## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | Case No. 1:18-CV-68 |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.* | § | |
| | § | |
| Defendant Intervenors. | § | |

## APPENDIX OF AUTHORITIES IN SUPPORT OF
## BRIEF OF *AMICI CURIAE* THE HOUSTON HISPANIC CHAMBER OF COMMERCE,
## THE TEXAS ASSOCIATION OF BUSINESS,  SEVEN OTHER TEXAS CHAMBERS OF
## COMMERCE, THE TEXAS BORDER COALITION, INTERNATIONAL
## BANCSHARES CORPORATION, MAREK BROTHERS CONSTRUCTION, INC.,
## SOUTHWEST AIRLINES AND UNITED AIRLINES, INC. IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Tab | Authority | Page(s) |
|---|---|---|
| A. | *American Dreamers*, The New York Times (2017) | App. 3-6 |
| B. | Anna Nunez, *Dreamers Are an Essential Part of our Nation's Health Care*, America's Voice (Feb. 15, 2018) | App. 7-13 |
| C. | Beatriz Alvarado, *Building the American Dream: Texas Woman Graduates, Owns Business*, CORPUS CHRISTI CALLER-TIMES, Dec. 13, 2017 | App. 14-22 |
| D. | Beatriz Alvarado, *South Texas Father, Laborer Works on Path to Citizenship*, CORPUS CHRISTI CALLER-TIMES, Dec. 13, 2017 | App. 23-30 |
| E. | Chloe Sikes and Angela Valenzuela, *Texas Dream Act [House Bill 1403]*, TEXAS STATE HISTORICAL ASSOCIATION (Aug. 23, 2016) | App. 31-34 |
| F. | CTR. FOR AM. PROGRESS, RESULTS OF TOM K. WONG, UNITED WE DREAM, NATIONAL IMMIGRATION CENTER, AND CENTER FOR AMERICAN PROGRESS NATIONAL SURVEY (2017) | App. 35-48 |
| G. | *DACA Stories*, FWD.us | App. 49-54 |
| H. | Declaration of Dr. Randy Capps | App. 55-58 |

| Tab | Authority | Page(s) |
|-----|-----------|---------|
| I. | Dianne Solis and James Barragan, *U.S. Could Lose An Estimated 20,000 Teachers, Many Bilingual, As DACA Is Phased Out*, Dallas Morning News (Oct. 5, 2017) | App. 59-71 |
| J. | Ileana Najarro and Monica Rhor, *Deeper Underground: Businesses Feel the Pinch As Undocumented Consumers Limit Shopping Expenses*, HOUSTON CHRONICLE, Oct. 20, 2017 | App. 72-81 |
| K. | INSTITUTE ON TAXATION AND ECONOMIC POLICY, STATE & LOCAL TAX CONTRIBUTIONS OF YOUNG UNDOCUMENTED IMMIGRANTS  (2018) | App. 82-100 |
| L. | JACQUELINE VARAS AND USAMA ZAFAR, AM. ACTION FORUM, ESTIMATING THE ECONOMIC CONTRIBUTIONS OF DACA RECIPIENTS (2017) | App. 101-109 |
| M. | Jasper Scherer, *Julián Castro Says Nearly All DACA Recipients Employed, In School Or Serving In Military*, POLITIFACT TEXAS (Jan. 10, 2018 2:01 PM) | App. 110-118 |
| N. | JIE ZONG ET AL., MIGRATION POLICY INSTITUTE, A PROFILE OF CURRENT DACA RECIPIENTS BY EDUCATION, INDUSTRY, AND OCCUPATION (2017) | App. 119-137 |
| O. | Karen Briscoe, *Diego Corzo – Secrets of a Top House Hacker Revealed: 5 Minute Success* (Apr. 24, 2018) | App. 138-143 |
| P. | Larry Collins, *DACA Decisions Could Affect Number of North Texas Teachers*, NBC-Dallas Fort Worth (Jan., 10, 2018 10:49 PM) | App. 144-147 |
| Q. | Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, CENTER FOR AMERICAN PROGRESS (July 21, 2017) | App. 148-153 |
| R. | P'SHIP FOR A NEW AM. ECON., AMS. SOC'Y AND COUNCIL OF THE AMS., IMMIGRATION AND THE REVIVAL OF AMERICAN CITIES: FROM PRESERVING MANUFACTURING JOBS TO STRENGTHENING THE HOUSING MARKET (2013) | App. 154-192 |
| S. | P'SHIP FOR A NEW AM. ECON., EXAMINING THE CONTRIBUTIONS OF THE DACA-ELIGIBLE POPULATION IN KEY STATES (2017) | App. 193-204 |
| T. | SZILVIA ALTORJAI & JEANNE BATALOVA, IMMIGRANT HEALTH-CARE WORKERS IN THE UNITED STATES, MIGRATION POLICY INSTITUTE (2017) | App. 205-215 |
| U. | Todd Ackerman, *Houston Dreamers In Health Care Despair About DACA Debate,* Houston Chronicle, (Jan. 18, 2018) | App. 216-221 |
| V. | *Total Affidavit Students, Overview: Eligibility For In-State Tuition And State Financial Programs*, TEXAS HIGHER EDUCATION COORDINATING BOARD (2018) | App. 222-227 |
| W. | U.S. CITIZENSHIP AND IMMIGRATION SERVS., NUMBER OF FORM I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, BY FISCAL YEAR, QUARTER, INTAKE AND CASE STATUS, FISCAL YEAR 2012-2018 (Mar. 31, 2018) | App. 228-233 |
| X. | Zoe Henry, *800,000 Workers, $460 Billion in Economic Output, Dozens of Entrepreneurs: What the U.S. Loses if DACA Goes Away*, Inc. (2018) | App. 234-238 |

# Tab A

# Julio Ramos

Teacher and Graduate Student in Biomedical Informatics from Brownsville, Tex.

  



At 23, I am simultaneously a high school biology teacher, and a graduate student enrolled in a Master of Science in Biomedical Informatics program. More importantly, I am working to become a physician in the US.

I was born in Tamaulipas, Mexico, but I am the product of my transnational, culturally-rich, and resourceful community on the border, by the sea. My life in the southernmost tip of Texas was never about me - it was always about an overarching sense of community. I have challenged myself to expand my bandwidth and realize the interconnectedness of individuals.

I plan to change the narrative of my community through medicine. I have been pursuing a medical degree since age 12, after my mother was diagnosed with stage 3 breast cancer. My parents had shared stories of a poverty-stricken life in our ranch in Mexico with little access to healthcare. Furthermore, our situation in Texas did not improve after immigrating, as we were continuously denied health insurance due to a lack of citizenship. Despite being aware of the growing lump in her breast, my mother purposely refrained from seeking medical help to spare us the medical costs. It is because of my mother's suffering that I have found my path in life.

Because of DACA, I have been accepted to medical schools in Texas in the 2014 and 2016 application cycles, but have been unable to matriculate due to my undocumented status. Being undocumented makes me no stranger to obstacles though, and has given me hope to persevere. Due to my experiences, I am empathetic to the obstacles people face in accessing healthcare, and this fuels my goal of providing care to those that are uninsured. I believe I can transform communities through medicine, but only if DACA continues.

Until November 2016, I was confident my goal of becoming a physician was in sight. However, all I feel now, along with many other people, is uncertainty. My ideology that anything is possible with hard work is now wavering in thoughts of insecurity. DACA recipients, along with many other undocumented immigrants, just want to have a positive

influence in our communities. It is you, it is me, it is us that make this country great.

# Tab B

 **(HTTPS://AMERICASVOICE.ORG)**

# Dreamers Are an Essential Part of our Nation's Health Care

*by Anna Núñez on February 15, 2018*

TAGS: **DREAMERS (HTTPS://AMERICASVOICE.ORG/TAG/DREAMERS/)**, **HEALTH CARE AND IMMIGRATION (HTTPS://AMERICASVOICE.ORG/TAG/HEALTH_CARE_AND_IMMIGRATION/)**

Since Donald Trump ended DACA last September, hundreds of Dreamers have been losing status every day, and thousands of Dreamers will start losing their ability to work (as well as their protection from deportation) when the program officially ends in March. Among many other things, this may compromise America's public health system, considering the number of DACA recipients who are doctors, health care workers, and researchers.

Immigrant health care workers are considered one of the solutions to address the nation's current labor shortage in health care **(HTTPS://DATAWAREHOUSE.HRSA.GOV/TOOLS/ANALYZERS/GEO/ShortageArea.aspx)**, which is most acute in disadvantaged areas, according to the Migration Policy Institute **(HTTPS://WWW.MIGRATIONPOLICY.ORG/ARTICLE/IMMIGRANT-HEALTH-CARE-WORKERS-UNITED-STATES)**. By 2026, 2.4 million

**(https://www.bls.gov/ooh/healthcare/home.htm)** new health care jobs will further increase our nationwide shortage of health care workers.

As President of Houston Methodist Hospital **(http://www.tmc.edu/members/houston-methodist-hospital/)**, Dr. Marc Boom, stated in a letter to Texas Congressional members and U.S. Sen. John Cornyn (R-Texas), Dreamers working in health care provide a vital service:

> *Patients do not care about the immigration status of their doctors. Instead, they ask that their doctor or nurse is well-trained, makes the right medical decisions and treats them with respect and care. Dreamers are an essential part of the nation's health workforce, and federal policies to terminate DACA without a workable solution will only diminish our nation's health.*

Following are examples of DACA recipients who provide vital health care services:

- Susana Rosas **(https://www.houstonchronicle.com/news/houston-texas/houston/article/Houston-Dreamers-in-healthcare-despair-about-DACA-12509021.php)**, Methodist nurse who work as a paramedic.

- Jesus Contreras **(https://www.houstonchronicle.com/about/houston-gives/article/EMT-who-worked-tirelessly-in-Harvey-a-dreamer-12372399.php)**, Emergency Medical Technician (EMT) who became a national hero for saving lives during Hurricane Harvey.

- Eli Oh **(https://www.wsj.com/articles/as-daca-deadline-looms-young-immigrants-plan-for-the-unknown-1518604200?mod=searchresults&page=1&pos=1)**, rapid response nurse at Stanford Medical Center.

- Josue De Luna Navarro
  **(https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html)**, health assistant in Albuquerque who plans to apply to medical school.

## Older Americans will suffer with end of DACA

America's home health care industry also relies heavily upon immigrant workers for positions such as home health care aides, nurses, and health assistants.

The end of DACA would compound an already "disastrous situation in terms of shortages of [health care worker] supply **(https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html)**," as the CEO of a home care company told The New York Times.

The economic impact of terminating DACA would be significant by depriving patients of the help they depend on and increasing the costs of care for families and taxpayers. The country will need more than 1.25 million home health aides by 2024 **(https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html)**, up from about 900,000 in 2014, according the the U.S. Department of Labor.

One-fifth of all DACA beneficiaries work in the health care **(https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html)** and educational sectors, suggesting a potential loss of hundreds of thousands of workers in those fields. According to MIT professor Paul Osterman **(https://muse.jhu.edu/book/52642)** more than one-quarter of home health aides in 2015 were immigrants. In California, immigrants were nearly one-half home health aides, and in New York, immigrants comprised two-thirds of all home health aides.

An overwhelming majority of Temporary Protected Status (TPS) recipients from El Salvador, Honduras and Haiti also work in health care professions, according to the National Immigration Forum **(http://immigrationforum.org/blog/fact-sheet-temporary-protected-status/)**.

## DACA impact on research and medical

**App. 10**

## students

The American Medical Association (AMA) **(https://www.ama-assn.org/ama-urges-congress-take-action-retain-daca-program-protections)** has urged Congress to retain DACA protections and said that ending the program "could have severe consequences for many in the health care workforce, impacting patients and our nation's health care system". They continued:

> *Estimates have shown that the DACA initiative could help introduce 5,400 previously ineligible physicians into the U.S. health care system in the coming decades...*

> *Removing those with DACA status will particularly create care shortages for rural and other underserved areas.  DACA physicians are more likely to work in high-need areas where communities face challenges in recruiting other physicians.  DACA students are also more likely to be bilingual, to come from diverse cultural backgrounds, and to understand challenges in certain ethnic communities.  Without these physicians, the AMA is concerned that the quality of care provided in these communities will be negatively impacted and that patient access to care will suffer.*

In addition to being medical students, health care workers, and doctors, a number of DACA recipients are researchers who are conducting groundbreaking work in health care and the biological sciences:

- Christian Uga **(https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/christian-ugaz)** participated in the

**App. 11**

research program at Princeton University's Chemistry Department, published in the Journal of the American Chemical Society, and is currently working at the Icahn School of Medicine in Mount Sinai.

- Nadia Rojas **(https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/nadia-rojas)** graduated with a Master of Public Health from UC Davis and works as a Research Assistant for the School of Public Health at UC Berkeley.

- Saba Nafees **(https://www.fwd.us/dacastories)** is a Dreamer and Ph.D. candidate utilizing mathematics to better understand cancer.

- Yuriana Aguilar **(https://www.pri.org/stories/2016-06-03/meet-one-few-undocumented-students-us-who-has-gotten-phd)** made history as the first DACA recipient to earn a Ph.D. in Quantitative and Systems Biology at UC Merced **(https://www.ucmerced.edu/news/2016/undocumented-student-makes-history-phd)**, and is a researcher in a biomedical lab at the University of California and instructor at Rush University **(https://www.rushu.rush.edu/faculty/yuriana-aguilar-phd)**.

As one **Dreamer-doctor told (https://www.theatlantic.com/health/archive/2017/09/daca-med-students-face-uncertain-futures/538695/)**the Atlantic:

> *If I didn't have DACA, I would not be able to continue practicing medicine. The patients are here, they're sick. The day DACA is revoked, I have to take off my white coat.*

Last September, over 200 Harvard Medical students (HMS) joined a rally **(https://hms.harvard.edu/news/white-coats-daca)** to support four Dreamers attending HMS and the DACA program that lets young doctors like them reach their dreams. The four are:

- Blanca Morales Temich (**https://hms.harvard.edu/news/american-dreamers#.Wn38iYlLPKt.twitter**), who graduated with a degree in neurology from the University of California and plans to become a primary care physician when she graduates from Harvard Medical School in 2020.

- Anthony Tucker-Bartley (**https://hms.harvard.edu/news/american-dreamers#.Wn38iYlLPKt.twitter**), who was able to intern at Cooper Medical School and study heart disease and diabetes at Johns Hopkins University. He won't be able to complete Harvard Medical School and residency if his permit expires.

- Dalia Larios Chavez (**https://hms.harvard.edu/news/american-dreamers#.Wn38iYlLPKt.twitter**), who earned a degree in genetic cell and molecular biology from Arizona State University and is currently conducting lung cancer research at Harvard Medical School. His DACA expires in October.

- Alma Oñate Muñoz (**https://hms.harvard.edu/news/american-dreamers#.Wn38iYlLPKt.twitter**), who graduated from Northern Kentucky University with a major in chemistry and worries she will not be able to finish Harvard Medical School when her DACA expires in October.

Unless Congress resolves the DACA crisis Trump created (**http://www.latimes.com/opinion/opinion-la/la-ol-trump-congress-daca-schumer-20180206-story.html**) when he terminated the program and allows DACA Dreamers to safely continue their medical studies and health care work, our nation's public health — especially in medically underserved areas — will suffer greatly, with America's most vulnerable communities paying the price via the loss of vital health care.

# Tab C

# Building the American dream: Texas woman graduates, owns business

THE DEFERRED ACTION PROGRAM GAVE A SOUTH TEXAS WOMAN THE CHANCE
TO PURSUE HER DREAM OF BECOMING A BUSINESS OWNER.

_Beatriz Alvarado (/staff/10054164/beatriz-alvarado)_, *Corpus Christi Caller-Times*

*Published 6:21 p.m. CT Dec. 13, 2017 | **Updated 4:27 p.m. CT Dec. 14, 2017***

Case 1:18-cv-00068 Document 221-2 Filed on 07/21/18 in TXSD Page 16 of 238

SHARE THIS STORY

(http://www.facebook.com/share.php?u=http%3A//www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/&image=https%3A//www.gannett-cdn.com/-mm-/76b8b206b53d80fdf9dd3cbc38b65435...%3D1120-0-5600-4480/local/-/media/2017/12/06/TXGroup/CorpusChristi/636481814057980949-DACA-Monica-Rocha-002.JPG%3Fwidth%3D60%26height%3D60%26fit%3Dcrop&title=Building%20the%20American%20dream%3A%20Texas%20woman%20graduates%2C%20owns%20business)

Tweet (https://twitter.com/intent/tweet?url=http%3A//...&text=Building%20the%20American%20dream%3A%20Texas%20woman%20graduates%2C%20owns%20business&via=...)

Share (...url=http%3A//www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

Share (https://www.linkedin.com/shareArticle?url=http%3A//www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

Pin (//www.pinterest.com/pin/create/button/?url=http%3A//www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/&media=https%3A%2F%2Fwww.gannett-cdn.com%2F-mm-%2F961df4192ed5b6c428d6f6503a577afbaa096bf5%2Fc%3D0-550-6711-4342%2Flocal%2F-%2Fmedia%2F2017%2F12%2F06%2FTXGroup%2FCorpusChristi%2F636481814057980949-DACA-Monica-Rocha-002.JPG%3Fwidth%3D1600%26height%3D800%26fit%3Dcrop&description=The deferred action program gave a South Texas woman a chance to pursue her dream of becoming a business owner.)

Email Comment

CORPUS CHRISTI, Texas - Monica Rocha Alcaraz grew accustomed to the idea that she was destined to wait tables.

“I used to think I was always going to be a waitress,” the 35-year-old said. “I used to always pray for something better.”

Her childhood as an undocumented girl from Guanajuato, Mexico was consumed by work. She was brought into the U.S. illegally by her sister when she was 4-years-old and started working when she was 11.

Texas woman owns business with help from deferred action                                           Page 3 of 10

Her older sister, who obtained legal immigration status through marriage at 17, raised her in Corpus Christi. She employed her at one of her restaurants. Rocha Alcaraz would buy candy and ice cream with the 50 cents or a $1 she'd get for washing dishes and lending a hand on her sister's housekeeping gigs.

As a teenager, she'd start her day waiting tables at 5 a.m. then head to school at 8 a.m., only to return after school to help close. Her English was limited so she didn't have many friends and extracurricular activities came second to work. She dropped out at 17.

Rocha Alcaraz, now a single mother of two U.S.-born sons, maintained a household of four on a waitress income for 16 years. She's since separated from the boys' father. Before that, the couple was getting by; She wished they had been saving for Ceasar and Hector's college funds.

So, she went back to school, juggled school assignments on limited English and worked to get a GED and a business degree. This despite not being able to obtain lawful employment because of her immigration status. She's been waiting in line for a visa since 2001.

When she learned about the Deferred Action for Childhood Arrivals program, or DACA, it seemed like an answer to her prayers.

"I had been a waitress for 16 years and I said 'Now is the opportunity to have a business.'"

## Dreams on Hold: Meet four South Texas DACA recipients



Monica Rocha Alcarez's oldest son Cesar Andres Palacios-Rocha laughs as his family surrounds him after having his face pushed in to his birthday cake on Nov. 22, 2017. Rocha Alcaraz is a DACA recipient and has earned a business degree. She owns a restaurant in Corpus Christi, Texas.

*(Photo: Courtney Sacco/Caller-Times)*



Monica Rocha Alcarez, clad in a Wonder Woman Halloween costume, looks over to the front door of Monica's Restaurant on Oct. 31, 2017. She was brought over from Mexico at the age of four. She's earned a business degree and since becoming a DACA recipient she's been able to become a business owner.

*(Photo: Courtney Sacco/Caller-Times)*

**Monica Rocha Alcaraz:** Texas woman graduates, owns business with help from deferred action (http://www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

**Claudia Jimenez:** Teen's future uncertain after DACA program ends (http://www.caller.com/story/news/local/2017/12/13/high-school-students-future-uncertain-after-daca-program-ends/945899001/)

**Ezequiel Rojas Martinez:** South Texas father, laborer works on path to citizenship (http://www.caller.com/story/news/local/2017/12/13/south-texas-father-laborer-works-path-citizenship/841604001/)

**Maria Hernandez:** End of DACA worries college grad who was detained (http://www.caller.com/story/news/local/2017/12/13/college-grad-worries-dacas-end-family-separation/847993001/)

Rocha Alcaraz is among the about 113,000 active DACA recipients who call Texas home. For a fraction of those undocumented immigrants who grew up in the U.S., the program — created in 2012 by the Obama administration — provides temporary relief from deportation, the ability to work lawfully in the U.S. and the ability to obtain a driver's license.

**More:** Dreams on Hold: What will the end of deferred action mean for recipients? (http://www.caller.com/story/news/local/2017/12/13/dreams-hold-what-end-deferred-action-mean-recipients/901217001/)

Texas is home to the second largest population of currently active DACA recipients in the nation, which was at about 689,800 as of September, according to data provided by Citizenship and Immigration Services.

DACA provided Rocha Alcaraz with the opportunity to pursue her dream of becoming a business owner. The Sept. 5 announcement to rescind DACA put shopping for a new home on hold. The family currently lives in the back of a shuttered Baptist church.

"Our next step was to buy a house but now like I told my kids, we need to stop and, you know, wait to see what's going to happen," Rocha Alcaraz said.

Cesar Andres Palacios-Rocha, Rocha Alcaraz's eldest, seemed perplexed and angry at the idea of moving to Mexico if his mother were to be deported. He doesn't fit in, he said.

"I don't like it," said the brawny, soft-spoken theater kid whose weekends are dedicated to speech and debate tournaments.

"I know we didn't work hard just to go back and start from the bottom when we're already getting to the top."



A truck is parked outside of Monica's Restaurant at 7:30am as the sun starts to rise along Leopard Street in Corpus Christi on Nov. 11, 2017. Monica's Restaurant is owned by Monica Rocha Alcarez, a DACA recipient. Monica who was an undocumented immigrant who was brought over from Mexico at the age of four.

*(Photo: Courtney Sacco/Caller-Times)*

## BUILDING A LIFE

In between yawns, Rocha Alcaraz cupped a makeshift horn against her mouth, stood up and shouted "Go Warriors!" at the top of her lungs.

It was a big day for Cesar, who had earned new spots on Tuloso-Midway High School's

football team as a kicker, left guard and left tackle, among other positions.

That day was exhausting, she said on a Thursday evening. She was particularly drained from an argument with her brother — her restaurant's cook. They had argued about switching to a cheaper meat distributor, she explained as her eyes stayed glued to her son's No. 77 jersey.

The six-day workweek for the waitress-turned-business owner rarely renders breaks between her roles as a single mother and head of Monica's Authentic Mexican Restaurant.

Running the business stretches her days past the 4 a.m. to 2 p.m. workday, during which she runs the register and drive-through.

She's in constant need of a nap. But taking a nap on a day like Thursday would contradict her convictions.

"There's always time," Rocha Alcaraz often says.

Especially for her two U.S.-born boys, 16-year-old Cesar and 10-year-old Hector Palacios. They're both athletes and into the arts, much like she would've liked to have been at their age.



Monica Rocha Alcaraz watches her son Hector Palacios' baseball game at Lyondell park on Sunday, Oct. 15, 2017 in Corpus Christi, Texas.

*(Photo: Courtney Sacco/Caller-Times)*

"I put them in sports because when I was young I didn't have the time," Rocha Alcaraz said. "I had to work and go to school at the same time. So now I tell my kids, 'you need to enjoy playing your sports … because I couldn't do it.'"

Rocha Alcaraz dropped out of school when she was a junior at King High School.

One of her five brothers, four of whom have obtained legal immigration status, petitioned for Rocha Alcaraz to apply for residency shortly after — when she was about 19.

She "got in line" for a visa in April 2001 and was told she would have to be patient.

"They said it was going to take like 10 years or probably more, so I'm still waiting," she said.

Rocha Alcaraz was with the father of her sons about 16 years. On a waitress' income, she was the main provider.

"My feet, they used to burn," Rocha Alcaraz said of working double shifts at her sister's restaurant – from 6 a.m. to 2 p.m. and 6 p.m. to midnight.

"I worked so much to prove to my family we were doing good," but the truth was she was growing tired of carrying most of the weight on such a limited income.



Monica Rocha Alcaraz's youngest son 10-year-old Hector Palacios stands in the dugout during a baseball game at Lyondell park on Sunday, Oct. 15, 2017, in Corpus Christi, Texas. Rocha Alcaraz, who was brought over to the U.S. from Mexico at the age of four, was an undocumented immigrant. With the help of the deferred action program, she's been able to open a restaurant in Corpus Christi, Texas.

*(Photo: Courtney Sacco/Caller-Times)*

As her children got older,  she developed a different outlook on life.

She began developing ambitions she once considered out of reach. At 30, she went back to school and obtained her GED, as well as a business degree from Del Mar College.

That's when her attorney's legal assistant recommended she apply for DACA.

She was tired of living in fear.

"I was scared being in the U.S. (illegally), that they were going to stop me without a driver's license, without a permit to be here in the US. So I said, you know what, it's worth it I'm going to try it.' I did try it and thank God."

Her first application was approved in 2014, two years after the program was created. She made the cutoff age of 31 by a year.

Rocha Alcaraz left her sister's restaurant and opened her own that same year. Family and friends helped her with the seed money. She's still paying some of those loans back, but business has been steady so she expects to be able to pay them all back in full, she said.

She separated from her sons' father about a year ago. That's when Cesar stepped up, he said.

"I wasn't going to let my mom struggle," the teen said.

That's why he learned how to file monthly sales taxes with his mom and wakes up early before school to help her at the restaurant.

"(My father) leaving changed me, too," he said. "(Rocha Alcaraz) became more independent. We did way better."

Monica's Restaurant is about to hit its four-year anniversary.



Monica Rocha Alcarez, owner of Monica's Restaurant, walks over to her restaurant to do prep work for the next day on Oct. 13, 2017. She was brought over from Mexico at the age of four. She's earned a business degree and since becoming a DACA recipient she's been able to become a business owner.

*(Photo: Courtney Sacco/Caller-Times)*

## THE 'LINE'

If Rocha Alcaraz loses the protections provided under DACA, she will continue to wait in line for a visa. Her DACA protections expire in February 2019.

Reaching the front of the line essentially means a slot has opened.

As time passes applicants get closer to the front of the line. Rocha Alcaraz has about 10 more years before it's her turn in line, said Santa Gonzalez, the legal assistant to Rocha Alcaraz's attorney who introduced her to the DACA program.

An applicant's petitioner and country of origin factor into how soon a visa will be available to them. Rocha Alcaraz's long wait is partly due to her country of origin: Mexico.

The federal government classifies Mexico as an "overprescribed" country, which means the demand for visas exceeds the per-country limit of seven percent of the total number of visas issued annually for family-sponsored and employment-based petitions.

Mexico is the country of origin of about 80 percent of

active DACA recipients.

Although it's a long wait, Rocha Alcaraz secured a place in line. But for some, there is no line.

"For a lot of our clients who are ineligible (for legal permanent residency) there is no line," Gonzalez said. "They have no family member (who has legal immigration status to petition for them), they're not married (to a U.S. citizen) and their (U.S.-born) children are not 21 yet. What do you do? There is no line."

About 40,000 DACA recipients — close to five percent of those who have participated in the program since its inception — have been granted green cards, according to federal data.

Separately, 59,778 DACA recipients had applied for green-card status as of September. Of the DACA recipients who received green cards, 1,056 have become U.S. citizens, according to data provided by USCIS.

Monica Rocha Alcarez goes through receipts as she prepares her taxes for her restaurant on Oct. 13, 2017. She was brought over from Mexico at the age of four. She's earned a business degree and since becoming a DACA recipient she's been able to become a business owner.

*(Photo: Courtney Sacco/Caller-Times)*

## A FORTUNATE FEW

For Rocha Alcaraz, there is a light at the end of the tunnel. But it's only because of chance, Gonzalez said.

When Cesar turns 21, which will happen before it's her turn in line for the visa she's been waiting for since 2001, he will be able to petition for his mother to adjust her status without having to leave the country.

Once a green card applicant reaches the front of the line, the process to obtain legal permanent residency requires they go back to their country of origin for the rest of the process to play out. This is knowns as "consular processing."

Rocha Alcaraz's brother petitioned for her to obtain a green card in April 2001. If she would have waited past April she would not have been eligible to apply for adjustment of status, which is a process for which only a select few are eligible.

She made a cutoff deadline by days and will be able to adjust her status under Section 245(i) of the Immigration and Nationality Act.

"She's blessed because of (when she applied)," Gonzalez said. "Everyone was trying to capture this section of the law … It makes a world of difference as far as processing goes."

Rocha Alcaraz and her older brother are the "only two left" of their 12 siblings who still lack permanent legal status.



Monica Rocha Alcarez holds sodas for her 10-year-old son Hector Palacios class as they wait at his bus stop on Spet. 29, 2017 in Corpus Christi, Texas. She's earned a business degree and since becoming a DACA recipient she's been able to become a business owner.

*(Photo: Courtney Sacco/Caller-Times)*

Her 40-year-old brother, who asked not to be named in this story because of fear of deportation, is among the more than 11 million undocumented immigrants in the U.S. He entered the U.S. illegally when he was 15 and now has a wife, kids and lives in a home he built in Corpus Christi.

He is among those who did not qualify for DACA because of his age. Those eligible for DACA need to have been under 31 years of age as of June 15, 2012. He was 35 in 2012.

"Not everyone qualified," he said of himself. "But I'm happy for (Rocha Alcaraz)."

## DREAMS ON HOLD

The Caller-Times spent several months investigating the impact of the decision to rescind DACA (Deferred Action for Childhood Arrivals program).

**The Dreams on Hold series** explores the potential effects on the economy, our schools, the workforce, our communities and those who relied on the program.

## Dreams on Hold: Meet four South Texas DACA recipients

**Monica Rocha Alcaraz:** Texas woman graduates, owns business with help from deferred action (http://www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

**Claudia Jimenez:** Teen's future uncertain after DACA program ends (http://www.caller.com/story/news/local/2017/12/13/high-school-students-future-uncertain-after-daca-program-ends/945899001/)

**Ezequiel Rojas Martinez:** South Texas father, laborer works on path to citizenship (http://www.caller.com/story/news/local/2017/12/13/south-texas-father-laborer-works-path-citizenship/841604001/)

**Maria Hernandez:** End of DACA worries college grad who was detained (http://www.caller.com/story/news/local/2017/12/13/college-grad-worries-dacas-end-family-separation/847993001/)

# Tab D

# South Texas father, laborer works on path to citizenship

EZEQUIEL ROJAS MARTINEZ DOESN'T REMEMBER A LIFE OUTSIDE THE U.S. INSTEAD OF RENEWING HIS DACA STATUS HE WANTS TO BE A LEGAL PERMANENT RESIDENT.

*Beatriz Alvarado (/staff/10054164/beatriz-alvarado)*, *Corpus Christi Caller-Times*

*Published 6:05 p.m. CT Dec. 13, 2017 | **Updated 6:25 p.m. CT Dec. 14, 2017***

South Texas father, laborer works on path to citizenship                                      Page 2 of 9

SHARE THIS STORY

Pin
(//www.pinterest.com/pin/create/button/?
url=http%
3A//www.caller.com/story/news/local/2017/12/13/south-
texas-
father-
laborer-
works-
path-
citizenship/841604001/&media=https%
3A%
2F%
2Fwww.gannett-
cdn.com%
2F-
mm-%
2Fb13a56187ce7f80da3b8f4dcd6e4413746766e52%
2Fc%
3D0-
119-
4600-
2718%
2Flocal%
2F-%
2Fmedia%
2F2017%
2F11%
2F03%
2FTXGroup%
2FCorpusChristi%
2F636453263466911246-
DACA-
Ezekiel01.JPG%
3Fwidth%
3D1600%
26height%
3D800%
26fit%
3Dcrop&description=Ezequiel
Martinez
doesn't
have
a life
outside
the
U.S.
Instead
of
renewing
his
status
wants
to be
a
legal
permanent

(http://www.facebook.com/share.php?
u=http%
3A//www.caller.com/story/news/local/2017/12/south-
texas-
father-
laborer-
works-
path-
citizenship/841604001/&Image=https%
3A//www.gannett-
cdn.com/-mm-/16744598ba35a2d783534fc38fc3159cd0429d99/c%
3D1041-
0-4113-
3072/local/-/media/2017/11/03/TXGroup/CorpusChristi/636453263466911246-
DACA-
Ezekiel01.JPG%
3Fwidth%
3D60%
26height%
3D60%
26fit%
3Dcrop&title=South                Tweet
20Texas%        (https://twitter.com/intent/tweet?
20father%       url=http%
2C%            3A//www.caller.com/
20laborer%      20works%
20works%         20on%
20on%            20path%
20path%          20to%
20to%            20citizenship)
20citizenship)20citizenship)&media=caller&hashtags   (https://plus.google.com/share?
url=http%
3A//www.caller.com/
texas-
father-
laborer-
works-
path-
citizenship/841604001/)   (https://www.caller.com/share/share/Article?
url=http%
3A//www.caller.com/story/news/local/2017/12/13/south-
texas-
father-
laborer-
works-
path-
citizenship/841604001/)        Email     Comment

ROCKPORT, Texas - Career days at Rockport High School inspired Ezequiel Rojas Martinez to want to be a cop.

"Catching the bad guys" for a living seemed fitting, he said. The limber and lanky 27-year-old's athletic physique spurred confidence in his ability to keep up. And the idea of protecting his community was exciting to him.

That's around the time his immigration status began shaping his aspirations; He's not a U.S. citizen and, therefore, cannot be a police officer.

"I've been here since I was nine months old," he said. "I feel like an American, but sadly I'm not."

**More:**  Dreams on Hold: What will the end of deferred action mean for recipients? (http://www.caller.com/story/news/local/2017/12/13/dreams-hold-what-end-deferred-action-mean-recipients/901217001/)

Rojas Martinez grew up in Rockport, a predominantly white coastal fishing town in South Texas. His mother, a housewife, overstayed her visitor's visa after her husband, a bricklayer, found stable work in the U.S. His father now runs a construction business in Rockport.

Although Rojas Martinez has worked since he was 14, he didn't get his first real paycheck until he was 23, when he obtained work authorization through the Deferred Action for Childhood Arrivals, or DACA program.

**More:**  What is DACA and who qualifies? (http://www.caller.com/story/news/2017/09/12/what-daca/657269001/)

Rojas Martinez was among the about 800,000 undocumented immigrants who grew up in the U.S. and have qualified for the program since its inception in 2012. His protections expired in April.

Rojas Martinez applied for residency about three months after President Donald Trump was inaugurated in January. Trump campaigned heavily on scrapping the federal program that's protected Rojas Martinez and thousands of others from deportation the past four years.

He got married and started a family in those four years. As Naomi Grace Hallax-Beckley's, 4-year-old Evalynn's and 1-year-old Nayeli's sole provider, he couldn't risk being deported, he said.

So Rojas Martinez and his wife of three years decided they would do something they had been holding back on: She petitioned for his legal permanent residency application.

"Our intentions were never to get married for that," Rojas Martinez said.

"But we felt like we had to make a decision … to make sure their life was not ruined just because of me," Rojas Martinez said.

## Dreams on Hold: Meet four South Texas DACA recipients

**Monica Rocha Alcaraz:** Texas woman graduates, owns business with help from deferred action (http://www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

**Claudia Jimenez:** Teen's future uncertain after DACA program ends (http://www.caller.com/story/news/local/2017/12/13/high-school-students-future-uncertain-after-daca-program-ends/945899001/)

**Ezequiel Rojas Martinez:** South Texas father, laborer works on path to citizenship (http://www.caller.com/story/news/local/2017/12/13/south-texas-father-laborer-works-path-citizenship/841604001/)

South Texas father, laborer works on path to citizenship                                  Page 4 of 9

**Maria Hernandez:** End of DACA worries college grad who was detained (http://www.caller.com/story/news/local/2017/12/13/college-grad-worries-dacas-end-family-separation/847993001/)

Instead of renewing DACA earlier this year, he spent his entire income tax return on the application for residency. It's about five times costlier than the biannual DACA renewal.

"We said, 'this is going to leave us broke but let's go for it,'" Rojas Martinez said.

About 113,000 active DACA recipients call Texas home. For a fraction of undocumented people who grew up in the U.S., the program — created in 2012 by the Obama administration — provides temporary relief from deportation, the ability to work lawfully in the U.S. and the ability to obtain a driver's license.



Former DACA recipient Rojas Martinez cleans up debris in Rockport on October 3, 2017. His citizenship status hasn't always made it easy to keep jobs. He's currently seeking legal permanent residency.
*(Photo: Rachel Denny Clow/Caller-Times)*

Texas is home to the second largest population of active DACA recipients in the nation, which was at about 689,800 as of September, according to data provided by Citizenship and Immigration Services.

Rojas Martinez is among the about 60,000 DACA recipients who had applied for legal permanent residency status as of September, according to federal data. About 40,000 of those applications have been approved and about 1,050 former DACA recipients are now U.S. citizens. Green-card recipients are eligible to apply for citizenship after three to five years.

Rojas Martinez, whose residency application was still pending as of December, said he may pursue his dream of becoming a police officer once he's eligible to apply for citizenship. He may even go to college, he said.

"I would really like to pursue being a cop once I become a citizen if I don't already have a great career going for me," he said.

## A TOUGH YEAR

Rojas Martinez was about 14 when he started working. He would take on several roles — from waiting tables to prepping food — at restaurants in Rockport during the school year and helped his father and uncle on construction gigs over the summer.

While in high school, he remembers his PE coach encouraging him to join the track team. He's a fast runner and was told he had the potential to earn a scholarship for college.

"But as soon as I heard 'scholarship,' I didn't get my hopes up," Rojas said. "I didn't think there would ever be a possibility for me to go to college. I thought you needed papers for all that."



Former DACA recipient Ezequiel Rojas Martinez and his girls, Evalynn Rojas (left), 4 (Dec 5), and Nayeli Rojas, 1 1/2, head to the soccer field on Oct. 8, 2017. He's seeking legal permanent residency in the U.S.
*(Photo: Rachel Denny Clow/Caller-Times)*

Nobody in Rojas' family went to college. All the men he looks up to in his family are laborers. A combination of his influences at home and not being able to pursue the same opportunities as his peers — going to college and pursuing his dream career — shaped his outlook on life.

When Rojas Martinez graduated high school, he went straight to work as a laborer and saved up to buy his brother's old car, a 1988 Buick LeSabre.

Rojas Martinez had to put the Buick up for sale to afford to apply for the DACA program. He put it up for sale the week DACA was announced in June 2012 and found a buyer within months.

He bought the clunker from his brother for $1,000 and that's exactly how much he sold it for — just enough for the filing and attorney fees. He was confident he'd be able to bounce back.

"I sold my car, which was the thing that I was most proud of because it's the only thing that I had," Rojas said. "But being able to have DACA would open so many opportunities for me - I knew eventually I would be able to upgrade ... into something bigger."

Rojas Martinez upgraded vehicles several times since getting DACA. He went from the Buick to a 2009 Chrysler PT Cruiser, then to a 2014 Chevrolet Cruze. This year he was planning on upgrading once again — this time to a spacious SUV — but 2017 proved to be a difficult year for that.

This year, his work authorization through DACA expired in April, about five months before Rojas Martinez received a temporary work permit via the residency application process.

Knowing his DACA would expire, the family moved back to Rockport in December 2016 from Corpus Christi, where Rojas Martinez had found a full-time job with Coca-Cola, thanks to the DACA program.

They moved out of their apartment in Corpus Christi and found a mobilehome in Rockport less than a year before Hurricane Harvey struck the Texas coast.

Besides some clothes, Barbies, and Legos Naomi packed up before they evacuated, the family lost everything in the Aug. 25 storm.

Despite undergoing difficult times this year to prepare for Trump's promise to end DACA, the Sept. 5 announcement of its official end — delivered less than



Ezequiel Rojas Martinez plays with Evalynn Rojas, 4 (turns 4 Dec 5) at the play area at La Palmera mall on October 10, 2017. When he isn't working, he spends all the time he can with his girls and wife.

*(Photo: Rachel Denny Clow/Caller-Times)*



Ezequiel Rojas Martinez's daughter, Nayeli Rojas, 1 1/2, holds onto his hand. He sold his 1988 Buick LeSabre for $1,000 in order to gain the funds to apply for DACA. His DACA expired in April and he applied for residency through his wife in March.

*(Photo: Rachel Denny Clow/Caller-Times)*



South Texas father, laborer works on path to citizenship                                    Page 6 of 9

two weeks after Harvey struck — sent Rojas Martinez into a deeper panic. His residency application is still pending, after all.



Ezequiel Rojas Martinez (center) visits with his mom, Rosaura Martinez (left), and sister Rocio Rojas and her kids, Rowen Ochoa, and Penelope Ochoa, 2, on Nov. 2, 2017. Ezequiel was brought to the United States when he was nine months old and had lived in Rockport since the second grade.

*(Photo: Rachel Denny Clow/Caller-Times)*

"It was the first time I had fear of losing everything I've been working for the past four years," Rojas Martinez said.

Rojas Martinez, his wife, Naomi, and their two girls moved into her parent's home in Corpus Christi after Harvey. It was unclear how long they'd have to stay there until the Federal Emergency Management Agency provided the family with a temporary home this month.

He's since found a full-time maintenance job at an apartment complex in Corpus Christi.

## A LIFE OF ASSIMILATING

Rojas Martinez was 9-months-old when he and his older brother were brought to the U.S.



Ezequiel Rojas Martinez plays soccer on Oct. 8, 2017. Sundays are busy days for the family. Following church service at Church Unlimited in Corpus Christi, Rojas typically has a soccer game and then the family goes to eat or goes to a park to play.

*(Photo: Rachel Denny Clow/Caller-Times)*

His mother gave birth to her first American-born child while the family was living in Houston, where they initially immigrated from Ciudad Mier, Mexico. Rojas Martinez and his brother are the only two of five children — two men and three women — who were born in Mexico.

Rojas Martinez feels like he passed his first American litmus test in second grade, he said.

He was in second grade when his parents enrolled him in the Aransas County Independent School District.

"In Houston, we were learning with Spanish-speaking teachers," he said. "Once we moved to Rockport, it was different."

Rojas Martinez and his brother, who were undocumented at the time, and their American-born sister were told they had to learn English before they'd be allowed to go to the next grade, he said.

"We were halfway done with the year," Rojas Martinez said. "I was the only one who didn't get held back."

He speaks fondly of the triumphant moment.

"Ever since I came to the U.S. I always tried learning the language, learning how to write, everything. Just like everybody else."

Only Rojas Martinez's closest circles know that he grew up undocumented. The couple got married in 2014.

Evalynn Rojas, 4, gets her hair done by her aunt, Alejandra Rojas, 12, while visiting with family on Nov. 2, 2017. Evalynn, who is a U.S. citizen, is the daughter of former DACA recipient Ezequiel Rojas Martinez, who is seeking legal permanent residency.

*(Photo: Rachel Denny Clow/Caller-Times)*

The no-frills courthouse ceremony in Rockport was attended by Rojas' mother and the couple's then 3-month old daughter, Evalynn.

Hallax-Beckley said she's never seen him as anything other than an American.

"I never thought he wasn't," she said the day Rojas Martinez let her in on his best-kept secret.

Rojas Martinez is simply afraid of being judged, he said. He takes pride in his ability to assimilate.

"The people who know, which many don't have never even noticed ... that I was from somewhere else," Rojas Martinez said. "I've tried my best to blend in."

## DREAMS ON HOLD

The Caller-Times spent several months investigating the impact of the decision to rescind DACA (Deferred Action for Childhood Arrivals program).



**Naomi and Ezequiel Rojas Martinez steal a moment together while visiting family on Nov. 2, 2017.**
*(Photo: Rachel Denny Clow/Caller-Times)*

**The Dreams on Hold series** explores the potential effects on the economy, our schools, the workforce, our communities and those who relied on the program.

## Dreams on Hold: Meet four South Texas DACA recipients

**Monica Rocha Alcaraz:** Texas woman graduates, owns business with help from deferred action (http://www.caller.com/story/news/local/2017/12/13/building-texas-woman-graduates-owns-business-help-deferred-action/841599001/)

**Claudia Jimenez:** Teen's future uncertain after DACA program ends (http://www.caller.com/story/news/local/2017/12/13/high-school-students-future-uncertain-after-daca-program-ends/945899001/)

**Ezequiel Rojas Martinez:** South Texas father, laborer works on path to citizenship (http://www.caller.com/story/news/local/2017/12/13/south-texas-father-laborer-works-path-citizenship/841604001/)

**Maria Hernandez:** End of DACA worries college grad who was detained (http://www.caller.com/story/news/local/2017/12/13/college-grad-worries-dacas-end-family-separation/847993001/)

**App. 30**

# Tab E



# TEXAS DREAM ACT [HOUSE BILL 1403]

*Chloe Sikes and Angela Valenzuela*

**TEXAS DREAM ACT [HOUSE BILL 1403]**. House Bill 1403, widely known as the Texas DREAM Act, provides in-state tuition for Texans without legal status. House Bill (HB) 1403, passed by the Texas Legislature in 2001, provides Texans, regardless of legal immigration status, eligibility to be classified as state residents for the purpose of being charged in-state tuition rates at public Texas colleges and universities. Without this eligibility, institutions of higher learning would charge the higher out-of-state or international tuition rates. Texas was the first state in the nation to pass this type of legislation, and approximately twenty states followed with similar bills.

The Seventy-seventh Texas Legislature passed HB 1403 with bipartisan support. Representative Rick Noriega (D–Houston) authored the measure, in collaboration with Domingo García (D¬–Dallas), Fred Hill (R–Richardson), Elvira Reyna (R –Mesquite), and Ismael Flores (D–Palmview). Leticia Van de Putte (D–San Antonio) sponsored the bill. An additional nineteen co-authors signed the bill. Sixty-three House Republicans voted in favor of it. With an amendment from the Senate, HB 1403 passed with 130 yeas, 2 nays, and 2 abstentions. Governor Rick Perry signed the bill into law on June 16, 2001, and the legislation became effective immediately for persons seeking college enrollment in the fall of 2001.

HB 1403 stipulates that Texas students without legal status must meet certain criteria to be eligible for in-state tuition rates. While in high school, they must be a dependent of a parent or guardian living in Texas; graduate from a Texas high school or obtain a GED certificate; reside in Texas for at least three years prior to graduating from high school; register with a Texas public college or university beginning in the fall of 2001; and file an application to seek permanent residency in the United States.

In the years since the passage of HB 1403, legislators have tried to repeal the law. The growing influence of conservative legislators, including the recent election of a like-minded governor and lieutenant governor, presented formidable challenges to the law in 2015. Lieutenant Governor Dan Patrick campaigned against the law, and Governor Greg Abbott said that he would not veto a repeal of the law if passed by the legislature. Groups such as Texans for Immigration Reduction and Enforcement and Tea Party adherents mobilized support for repeal legislation such as the proposed Senate Bill (SB) 1819. On the other hand, the **Texas Association of Business** (/handbook/online/articles/datwe) , religious groups, labor unions, and university groups that included students without legal status, and other allies united in support of HB 1403. Democratic legislators, particularly those associated with the **Mexican American Legislative Caucus** (/handbook/online/articles/wem04) , also voiced support for the original legislation.

Conservative members of the Eighty-fourth Texas Legislature introduced SB 1819 that stated that Texas residents "unauthorized to be present in the United States" could not be "considered a resident of this state for the purposes of receiving in-state tuition…." While the bill advanced from committee hearings, it failed to meet the deadline to be heard by the Senate for a vote. Public pressure and political maneuvering managed to defeat the repeal efforts, however, the strong opposition to HB 1403 indicated that the idea of providing in-state tuition to Texans without legal status would remain contentious in the state.

BIBLIOGRAPHY:

Stella M. Flores, "The First State Dream Act In-State Resident Tuition and Immigration in Texas," *Educational Evaluation and Policy Analysis* 32 (December 2010). *HOUSE JOURNAL, SEVENTY-SEVENTH LEGISLATURE, REGULAR SESSION*, May 24, 2001. "In-state tuition for undocumented immigrants debated," *Interim News*, December 15, 2010, House Research Organization, Texas House of Representatives. Texas Legislature Online: HB 1403 (http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=HB1403), accessed August 20, 2016. Texas Legislature Online: SB 1819 (http://www.capitol.state.tx.us/BillLookup/history.aspx?LegSess=84R&Bill=SB1819), accessed August 20, 2016. Alexa Ura, "For Abbott, a Balancing Act of Far Right and Hispanics," *Texas Tribune*, December 7, 2014 (https://www.texastribune.org/2014/12/07/abbott-balancing-act-far-right-and-hispanics/), accessed May 16, 2015.

What (#)

**The following, adapted from the *Chicago Manual of Style*, 15th edition, is the preferred citation for this article.**

*Handbook of Texas Online*, Chloe Sikes and Angela Valenzuela, "TEXAS DREAM ACT [HOUSE BILL 1403]," accessed July 20, 2018, **http://www.tshaonline.org/handbook/online/articles/mlt03**.

Uploaded on August 23, 2016. Published by the Texas State Historical Association.

report an error (http://www.tshaonline.org/handbook/feedback/revision-form?haid=33449&title=TEXAS+DREAM+ACT+%5BHOUSE+BILL+1403%5D&tid=mlt03)

# Tab F

# Results from Tom K. Wong[1] et al., 2017 National DACA Study

Updated 10/7 to include urban-rural cross-tabulations

Survey fielded 8/1/2017 to 8/20/2017
$n$ = 3,063

| | | |
|---|---|---|
| Methodology | …………………………… | 1 |
| Economic Integration | …………………………… | 2-5 |
| Education | …………………………… | 6-7 |
| Inclusion and Belonging | …………………………… | 8-9 |

---

[1] Tom K. Wong is associate professor of political science at the University of California, San Diego.
tomkwong@ucsd.edu

**Methodology**

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

## Economic Integration

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|
| Got my first job | 54.2% | 35.3% | 53.6% | 63.8% |
| Got a job with better pay | 68.5% | 77.7% | 68.6% | 66.1% |
| Got a job that better fits my education and training | 54.2% | 59.6% | 54.3% | 50.3% |
| Got a job that better fits my long-term career goals | 53.9% | 61.4% | 53.9% | 51.4% |
| Got a job with health insurance or other benefits | 57.3% | 66.9% | 56.9% | 61.0% |
| Got a job with improved work conditions | 56.2% | 64.4% | 56.2% | 55.9% |
| Started my own business | 5.4% | 7.9% | 5.3% | 5.1% |
| I have been able to earn more money, which has helped me become financially independent | 69.0% | 73.4% | 69.1% | 66.1% |
| I have been able to earn more money, which has helped my family financially | 70.8% | 73.7% | 71.0% | 69.5% |
| Opened a bank account | 61.0% | 47.3% | 60.5% | 68.9% |
| Got my first credit card | 65.7% | 67.9% | 66.4% | 57.6% |
| Bought my first car | 64.5% | 67.2% | 64.6% | 66.1% |
| Bought a home | 15.7% | 23.5% | 15.2% | 21.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

---

**Are you currently employed?**
(*n* = 3,063)

|  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|
| Yes | 91.4% | 93.3% | 91.4% | 90.9% |
| No | 8.6% | 6.7% | 8.6% | 9.0% |
| No response | 0.0% | 0.0% | 0.4% | 0.0% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

---

**App. 38**

····· **Please indicate your average hourly wage OR annual salary.**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|---|---|
| Average hourly wage | ........................................... | $17.46 | $20.05 | | $17.67 | $15.11 |
| Median hourly wage | ........................................... | $15.34 | $17.90 | | $15.50 | $14.00 |
| Average annual earnings | ........................................... | $36,231.91 | $41,621.48 | | $36,482.76 | $31,858.84 |
| Median annual earnings | ........................................... | $32,000.00 | $37,595.03 | | $32,000.00 | $29,000.00 |

Note: *n* = 1,551 for respondents 25 years and older and currently employed. *n* = 2,743 for respondents who are currently employed and for which urban-rural data are available. Figures exclude the bottom 1st and top 99th percentiles.

····· **On average, how many hours do you work per week?**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|---|---|
| Average hours worked per week | ........................................... | 37.9 | 39.9 | | 37.9 | 38.8 |
| Median hours worked per week | ........................................... | 40.0 | 40.0 | | 40.0 | 40.0 |

Note: *n* = 1,551 for respondents 25 years and older and currently employed. *n* = 2,743 for respondents who are currently employed and for which urban-rural data are available. Figures exclude the bottom 1st and top 99th percentiles.

····· **Were you employed before DACA?**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|---|---|
| Yes | ........................................... | 43.9% | 60.7% | | 44.4% | 39.1% |
| No | ........................................... | 55.9% | 38.9% | | 55.7% | 60.9% |
| No response | ........................................... | 0.3% | 0.4% | | 0.0% | 0.0% |

Note: *n* = 1,551 for respondents 25 years and older and currently employed. *n* = 2,743 for respondents who are currently employed and for which urban-rural data are available. Figures exclude the bottom 1st and top 99th percentiles.

·····   **Please indicate your average hourly wage OR annual salary before DACA.**
(*n* = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | ≥ 25 | \| | Urban | Rural |
|---|---|---|---|---|---|---|
| Average hourly wage | ......................................... | $10.29 | $10.87 | | $10.37 | $9.29 |
| Median hourly wage | ......................................... | $9.59 | $10.00 | | $9.59 | $9.00 |
| Average annual earnings | ......................................... | $20,068.49 | $21,950.47 | | $19,944.40 | $21,607.65 |
| Median annual earnings | ......................................... | $19,000.00 | $20,857.16 | | $18,990.01 | $19,586.18 |

Note: *n* = 942 for respondents 25 years and older, currently employed, and were employed before DACA. *n* = 1,205 for respondents who are currently employed, were employed before DACA, and for which urban-rural data are available. Figures exclude the bottom 1st and top 99th percentiles.

·····   **On average, how many hours did you work per week before DACA?**
(*n* = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  | ≥ 25 | \| | Urban | Rural |
|---|---|---|---|---|---|
| Average hours worked per week | ......................................... | 37.7 | 39.2 | | 37.3 | 42.9 |
| Median hours worked per week | ......................................... | 40.0 | 40.0 | | 40.0 | 40.0 |

Note: *n* = 942 for respondents 25 years and older, currently employed, and were employed before DACA. *n* = 1,205 for respondents who are currently employed, were employed before DACA, and for which urban-rural data are available. Figures exclude the bottom 1st and top 99th percentiles.

·····   **Does your employer know that you have DACA?**
(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  | \| | Urban | Rural |
|---|---|---|---|---|
| Yes | ......................................... | 50.0% | 50.3% | 45.9% |
| No | ......................................... | 11.4% | 11.5% | 8.1% |
| Not sure | ......................................... | 37.7% | 37.4% | 44.7% |
| No response | ......................................... | 0.9% | 1.2% | 0.8% |

Note: percentages may not sum to 100 due to rounding. *n* = 2,743 for respondents who are currently employed and for which urban-rural data are available.

**App. 40**

······ **Are you bilingual?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | | Urban | Rural |
|---|---|---|---|---|---|
| Yes | ......................................... | 98.1% | | 98.1% | 99.4% |
| No | ......................................... | 1.9% | | 1.9% | 0.0% |
| No response | ......................................... | 0.1% | | 0.0% | 0.6% |

Note: percentages may not sum to 100 due to rounding. $n$ = 2,743 for respondents who are currently employed and for which urban-rural data are available.

······ **Do you agree or disagree with the following statement: "My being bilingual has been an asset to my employer."**
($n$ = 2,746, which represents the 98.1% of respondents who are currently employed and are bilingual)

|  |  |  | | Urban | Rural |
|---|---|---|---|---|---|
| Strongly agree | ......................................... | 80.1% | | 79.9% | 81.3% |
| Agree | ......................................... | 12.5% | | 12.6% | 13.1% |
| Neither agree nor disagree | ......................................... | 6.1% | | 5.9% | 5.6% |
| Disagree | ......................................... | 0.8% | | 0.8% | 0.0% |
| Strongly disagree | ......................................... | 0.4% | | 0.4% | 0.0% |
| No response | ......................................... | 0.2% | | 0.2% | 0.0% |
|  |  |  | | | |
| Agree/strongly agree | ......................................... | 92.6% | | 92.6% | 94.4% |
| Neither agree nor disagree | ......................................... | 6.1% | | 5.9% | 5.6% |
| Disagree/strongly disagree | ......................................... | 1.2% | | 1.2% | 0.0% |
| No response | ......................................... | 0.2% | | 0.2% | 0.0% |

Note: percentages may not sum to 100 due to rounding. $n$ = 2,693 for respondents who are currently employed, are bilingual, and for which urban-rural data are available.

## Education

**Check all that apply. After my DACA application was approved, I...**
($n$ = 3,063)

|  | | $\geq 25$ | | Urban | Rural |
|---|---|---|---|---|---|
| Pursued educational opportunities that I previously could not | ...................................... | 65.3% | 54.2% | 65.3% | 63.3% |
| I haven't pursued more education yet, but I plan to | ...................................... | 33.3% | 42.7% | 33.4% | 36.2% |
| I don't plan to pursue more education | ...................................... | 3.3% | 5.1% | 3.4% | 2.3% |
| Paid off some/all of my student loans | ...................................... | 18.4% | 18.3% | 18.3% | 16.4% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n$ = 1,662 for all respondents 25 years and older. $n$ = 3,002 for which urban-rural data are available; $n$ = 2,825 for urban respondents; $n$ = 177 for rural respondents.

**Are you currently in school?**
($n$ = 3,063)

|  | | $\geq 25$ | | Urban | Rural |
|---|---|---|---|---|---|
| Yes | ...................................... | 44.9% | 30.6% | 45.0% | 40.7% |
| No | ...................................... | 55.0% | 69.3% | 54.9% | 58.8% |
| No response | ...................................... | 0.1% | 0.1% | 0.1% | 0.6% |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,662 for all respondents 25 years and older. $n$ = 3,002 for which urban-rural data are available: $n$ = 2,825 for urban respondents; $n$ = 177 for rural respondents.

**What degree are you currently pursuing?**
(*n* = 1,374, which represents 44.9% of all respondents who are currently in school)

|  |  |  | ≥ 25 | Urban | Rural |
|---|---|---|---|---|---|
| GED or equivalent | ........................... | 0.9% | 2.2% | 0.8% | 2.8% |
| High-school diploma | ........................... | 2.7% | 0.6% | 2.8% | 2.8% |
| Trade/technical/vocational degree or certificate | ........................... | 4.3% | 6.3% | 4.2% | 8.3% |
| Associate's degree | ........................... | 19.4% | 18.5% | 19.2% | 20.8% |
| Bachelor's degree | ........................... | 52.5% | 42.2% | 52.3% | 54.2% |
| Master's degree | ........................... | 13.1% | 21.0% | 13.5% | 8.3% |
| Professional degree above a master's degree | ........................... | 2.3% | 3.1% | 2.4% | 2.8% |
| Doctorate degree | ........................... | 3.6% | 4.9% | 3.8% | 0.0% |
| No response | ........................... | 1.2% | 1.2% | 1.2% | 0.0% |
| Bachelor's degree or higher | ........................... | 71.5% | 71.2% | 72.0% | 65.3% |

Note: percentages may not sum to 100 due to rounding. *n* = 509 for respondents 25 years and older who are currently in school. *n* = 1,344 for respondents who are currently in school and for which urban-rural data are available.

**What is the highest degree or level of school you have completed?** *If you are currently enrolled in school, what is the highest degree you have received thus far?*
(*n* = 3,063)

|  |  |  | ≥ 25 | Urban | Rural |
|---|---|---|---|---|---|
| GED or equivalent | ........................... | 3.4% | 5.4% | 3.4% | 3.9% |
| High-school diploma | ........................... | 24.0% | 18.1% | 23.4% | 33.9% |
| Trade/technical/vocational degree or certificate | ........................... | 3.6% | 4.3% | 3.7% | 2.3% |
| Associate's degree | ........................... | 15.7% | 15.0% | 15.4% | 19.8% |
| Some college | ........................... | 23.9% | 20.7% | 23.8% | 24.3% |
| Bachelor's degree | ........................... | 23.2% | 27.3% | 23.8% | 12.4% |
| Master's degree | ........................... | 4.4% | 7.3% | 4.5% | 1.7% |
| Professional degree above a master's degree | ........................... | 0.3% | 0.4% | 0.3% | 0.0% |
| Doctorate degree | ........................... | 0.3% | 0.5% | 0.3% | 0.0% |
| No response | ........................... | 1.3% | 0.9% | 1.3% | 1.7% |
| Bachelor's degree or higher | ........................... | 28.2% | 35.5% | 28.6% | 14.1% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

# Inclusion and Belonging

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | ≥ 25 | | Urban | Rural |
|---|---|---|---|---|---|---|
| Got my driver's license for the first time | ...................................... | 79.7% | 80.4% | | 79.6% | 81.4% |
| Got a state identification card for the first time | ...................................... | 55.1% | 51.1% | | 55.4% | 50.3% |
| Became an organ donor | ...................................... | 48.7% | 49.8% | | 48.8% | 50.3% |
| Donated blood for the first time | ...................................... | 17.8% | 13.7% | | 17.7% | 23.2% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

**Please indicate the immigration status of your immediate family members, meaning a parent, sibling, spouse, or child. (select all that apply)**
(*n* = 3,063)

|  |  |  | | Urban | Rural |
|---|---|---|---|---|---|
| American citizen spouse | ...................................... | 16.6% | | 16.4% | 20.9% |
| American citizen child | ...................................... | 25.7% | | 25.5% | 27.7% |
| American citizen sibling | ...................................... | 58.9% | | 58.9% | 64.9% |
| American citizen spouse, child, or sibling | ...................................... | 72.7% | | 72.7% | 77.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

**Do you have an immediate family member, meaning a parent, sibling, spouse, or child, who is a U.S. citizen and is 18 years or older?**
(*n* = 3,063)

|  |  |  | | Urban | Rural |
|---|---|---|---|---|---|
| Yes | ...................................... | 44.6% | | 44.5% | 48.0% |
| No | ...................................... | 55.0% | | 55.2% | 50.9% |
| No response | ...................................... | 0.4% | | 0.4% | 1.1% |

Note: percentages may not sum to 100 due to rounding. *n* = 3,002 for which urban-rural data are available: *n* = 2,825 for urban respondents; *n* = 177 for rural respondents.

**App. 44**

...... **Are any of your immediate family members who are U.S. citizens and are 18 years or older registered to vote?**
(*n* = 1,365, which represents 44.6% of all respondents who have immediate relatives who are U.S. citizens that are 18 years or older)

|  |  |  | Urban | Rural |
|---|---|---|---|---|
| Yes | ........................................ | 81.5% | 81.6% | 80.0% |
| No | ........................................ | 18.3% | 18.1% | 20.0% |
| No response | ........................................ | 0.2% | 0.2% | 0.0% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,342 for respondents who have immediate family members who are U.S. citizens 18 years and older and for which urban-rural data are available.

**App. 45**

**What state do you currently live in?**

(*n* = 3,063)

| | % Poll | % DACA |
|---|---|---|
| California | 24.3% | 28.3% |
| Texas | 17.4% | 15.8% |
| New York | 4.8% | 5.3% |
| Illinois | 4.4% | 5.4% |
| Arizona | 4.1% | 3.5% |
| Florida | 3.3% | 4.2% |
| North Carolina | 3.1% | 3.5% |
| Colorado | 2.8% | 2.2% |
| Washington | 2.7% | 2.3% |
| Georgia | 2.6% | 3.1% |
| New Jersey | 1.9% | 2.8% |
| Utah | 1.9% | 1.2% |
| Tennessee | 1.5% | 1.1% |
| Oregon | 1.3% | 1.4% |
| Maryland | 1.3% | 1.2% |
| Michigan | 1.3% | 0.8% |
| New Mexico | 1.2% | 0.9% |
| Massachusetts | 1.2% | 1.0% |
| Kansas | 1.1% | 0.9% |
| Pennsylvania | 1.1% | 0.7% |
| Virginia | 1.1% | 1.5% |
| Minnesota | 1.0% | 0.8% |
| Nevada | 1.0% | 1.7% |
| Oklahoma | 1.0% | 0.9% |
| South Carolina | 1.0% | 0.8% |
| Arkansas | 1.0% | 0.6% |
| Other | 10.6% | 8.1% |

Note: percentages may not sum to 100 due to rounding.

**App. 46**

**What is your race/ethnicity?**

($n = 3,063$)

| | | |
|---|---|---|
| White | ........................................ | 1.7% |
| Black | ........................................ | 1.1% |
| Hispanic/Latino | ........................................ | 92.6% |
| Asian or Pacific Islander | ........................................ | 3.5% |
| Other | ........................................ | 0.9% |
| No Response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

| | | % Poll | % DACA |
|---|---|---|---|
| Hispanic/Latino | ........................................ | 92.8% | 93.5% |
| Other | ........................................ | 7.2% | 6.5% |

**How old are you?**

($n = 3,063$)

| | | |
|---|---|---|
| Average | ........................................ | 25.2 |
| Median | ........................................ | 25 |
| 16 | ........................................ | 0.4% |
| 17 | ........................................ | 1.6% |
| 18 | ........................................ | 3.0% |
| 19 | ........................................ | 4.4% |
| 20 | ........................................ | 5.2% |
| 21 | ........................................ | 6.6% |
| 22 | ........................................ | 7.6% |
| 23 | ........................................ | 8.9% |
| 24 | ........................................ | 8.0% |
| 25 | ........................................ | 7.1% |
| 26 | ........................................ | 8.6% |
| 27 | ........................................ | 7.6% |
| 28 | ........................................ | 7.3% |
| 29 | ........................................ | 6.2% |
| 30 | ........................................ | 5.3% |
| 31 | ........................................ | 3.6% |
| 32 | ........................................ | 3.3% |
| 33 | ........................................ | 2.2% |
| 34 | ........................................ | 1.8% |
| 35 | ........................................ | 1.4% |

Note: percentages may not sum to 100 due to rounding.

**How old were you when you first came to the U.S.?**
($n$ = 3,063)

| | | |
|---|---|---|
| Average | ........................................ | 6.5 |
| Median | ........................................ | 6 |
| | | |
| 0 | ........................................ | 4.5% |
| 1 | ........................................ | 7.6% |
| 2 | ........................................ | 8.3% |
| 3 | ........................................ | 9.7% |
| 4 | ........................................ | 8.0% |
| 5 | ........................................ | 8.7% |
| 6 | ........................................ | 7.4% |
| 7 | ........................................ | 7.4% |
| 8 | ........................................ | 6.5% |
| 9 | ........................................ | 6.2% |
| 10 | ........................................ | 5.6% |
| 11 | ........................................ | 5.0% |
| 12 | ........................................ | 3.9% |
| 13 | ........................................ | 3.5% |
| 14 | ........................................ | 4.1% |
| 15 | ........................................ | 3.7% |

Note: percentages may not sum to 100 due to rounding.

# Tab G



IMMIGRATION      CRIMINAL JUSTICE      TAKE ACTION      OUR CHAPTERS      ABOUT US      **Join The Fight**



# DACA Stories

## SABA NAFEES

Saba Nafees is a Dreamer and Ph.D. candidate at
Texas Tech. She arrived in the U.S. from Pakistan at
age 11 and has known no other home outside of
Texas. Under DACA, she has been able to use
mathematics to better understand diseases like cancer
and teach undergraduate students.

Share On Facebook      Share On Twitter

WHAT IS DACA?
## DACA is...



### 750,000 DREAMERS

DACA has allowed hundreds of thousands of Dreamers to make our communities and economy stronger



### A WORK PERMIT FOR OUR EMPLOYEES

DACA allows 645,145 people, from every industry, to work and create jobs for native-born Americans



### PROTECTION FOR FAMILIES

2 in 5 DACA recipients have a U.S. citizen as a family member

## TIMELINE
## Fighting for Dreamers

### 2012
### EXECUTIVE ACTION ANNOUNCEMENT

On June 15, 2012, President Obama created a new policy calling for deferred action for certain undocumented young people who came to the U.S. as children. Applications under the program which is called Deferred Action for Childhood Arrivals ("DACA") began on August 15, 2012.

### 2014
### EXECUTIVE ACTION EXPANSION

President Obama announced his "immigration accountability executive action," which included a series of measures, including expansion of the current Deferred Action for Childhood Arrivals (DACA) program, as well as the creation of a new deferred action program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

### 2015 - 2016
### PRELIMINARY INJUNCTION AND SUPREME COURT CASE

Judge Andrew S. Hanen of the Federal District Court in Brownsville, Texas issued a preliminary injunction in 2015 effectively suspending implementation of the programs while he ruled on the programs' legality. In 2016, the United States v. Texas case made it all the way to the Supreme Court and tied in a 4-4 ruling. The decision halted the DACA expansion and creation of DAPA. DACA continues to exist as a program and its future is dependent on the next administration.

### 2017
### BRIDGE ACT RE-INTRODUCED

Senators Lindsey Graham (R-SC) and Dick Durbin (D-IL) re-introduced the BRIDGE Act – bipartisan legislation to allow those eligible for DACA to continue living in the U.S. with permission from the federal government and provides a congressional solution. A companion bill was introduced by Representative Mike Coffman (R-CO) in the House.

GLIMPSES OF DACA
# In Their Own Words



"We still don't know a lot about cancer. We still don't know about genetic diseases. My research at Texas Tech goes right into the heart of that. It uses pure mathematics to look into why all these genetic diseases exist and ...

Read More



"To me, Georgia is my home. I am proud to be from the South and I love to give back to my community. I tell everybody I'm a Latino that grew up eating tortillas and grits at the same time, and North Georgia is home. And fo...

Read More



"I invest in the next generation of biomedical tech solutions. When I was working at a convenience store, I always had big aspirations, even though I wasn't sure how they would ever come to fruition. But the moment DACA wa...

Read More



"I didn't let anything keep me from advancing academically. Unfortunately, when high school ended, I couldn't attend the university of my dreams. I was getting all these acceptance letters, but I couldn't go to any of thes...

Read More



"My dad was a fighter pilot in the Peruvian Air Force, so I grew up with a lot of military influence. When I was in high school I joined NJROTC which was the junior ROTC and I was there for three-and-a-half years. It gave me...

Read More



"My education was so that I could contribute to society. My last year at Southern Methodist University I began working on an engaged learning fellowship. Because of that I was selected to be the commencement

Read More

**App. 53**



https://www.fwd.us/dacastories

# Tab H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | Case No. 1:18-CV-68 |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.* | § | |
| | § | |
| Defendant Intervenors. | § | |

**DECLARATION OF DR. RANDY CAPPS IN SUPPORT OF**
**BRIEF OF *AMICI CURIAE* THE HOUSTON HISPANIC CHAMBER OF COMMERCE,**
**THE TEXAS ASSOCIATION OF BUSINESS,  SEVEN OTHER TEXAS CHAMBERS OF**
**COMMERCE, THE TEXAS BORDER COALITION, INTERNATIONAL**
**BANCSHARES CORPORATION, MAREK BROTHERS CONSTRUCTION, INC.,**
**SOUTHWEST AIRLINES AND UNITED AIRLINES, INC. IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Thomas S. Leatherbury
*Attorney-in-Charge*
Tex. Bar No. 12095275
SD of Tex. Bar No. 19358
VINSON & ELKINS L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
214.220.7700 telephone
214.999.7792 facsimile
tleatherbury@velaw.com

Harry M. Reasoner
Tex. Bar No. 16642000
Fed. ID. No. 538
Alberto P. Cardenas, Jr.
Tex. Bar No. 24012382
SD of Tex. Bar No. 3253266
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas 77002
713.758.2222 telephone
713.758.2346 facsimile
hreasoner@velaw.com
bcardenas@velaw.com

*Attorneys for Amici Curiae*

## <u>DECLARATION OF DR. RANDY CAPPS</u>

I, Dr. Randy Capps, declare:

1.      I am the Director of Research for U.S. Programs, at the Migration Policy Institute. As a demographer, my expertise focuses on immigration trends, the unauthorized population, immigrants in the United States labor force, the children of immigrants and their well-being, and immigrant health-care and public benefits access and use.  I received my Ph.D. in sociology from the University of Texas in 1999 and my master of public affairs, also from the University of Texas, in 1992.  I have personal knowledge of the following facts.  I make this Declaration in support of the Brief of *Amici Curiae* In Opposition to Plaintiffs' Motion For Preliminary Injunction.

2.      I have conducted research concerning recipients of deferred action pursuant to the Deferred Action for Childhood Arrivals ("DACA") initiative, including analyses of their characteristics (such as occupations, educational attainment, and incomes), and of the potential impact that the rescission of the DACA initiative would have on these individuals.

3.      Based on data from the U.S. Census Bureau's 2010-2014 American Community Survey and the 2008 Survey of Income and Program Participation, with assignments of legal status to noncitizens, I calculated that there are approximately 1,000 DACA recipients in Texas who are employed as public servants.

4.      I used the following Census Bureau classifications of "public servants" to inform my analysis: firefighters, police officers, and public school teachers, not including post-secondary teachers or teacher assistants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 18th day of July, 2018, in Washington, D.C.

_Dr. Randy Capps_

**App. 58**

# Tab I

Ad                                                          



☰ ALL SECTIONS                                                          SUBSCRIBE

IMMIGRATION      OCT 5

## U.S. could lose an estimated 20,000 teachers, many bilingual, as DACA is phased out


*Dianne Solis and James Barragán*

Don't miss a story. Like us on Facebook.     | Like 422K |

Stay strong. Luis Juarez, a Dallas fifth-grade teacher, knew that was his only choice.


Get a personal loan with low fixed rates — LendingClub

**App. 60**

"The moment parents see me break down and lose hope, they are going to lose hope. They know if Mr. Juarez still has hope, they are going to have hope, too."

And, yet here it was. For Juarez and many others, a dreaded announcement: On Sept. 5, President Donald Trump's administration said it would phase out DACA, the Obama-era initiative that gives the children of unauthorized immigrants, many who were brought here illegally, a reprieve from deportation and the right to work.

ADVERTISING



Replay

inRead invented by Teads

Trump's decision sent a chill through immigrant communities, even as he challenged Congress to pass a law to allow DACA recipients, also known as Dreamers, to legally remain in the country. If those legislative efforts fail, the end of DACA will affect more than just children, college students and their families.

It will mean teachers like Juarez could be deported, too.

Texas stands to lose about 2,000 teachers who are in the DACA program, and as many as 20,000 such teachers would be affected nationwide. The clock is ticking, and without a legislative reprieve, within a few years it will be illegal for these teachers to  work in the U.S. Their loss would hit bilingual education, where there's a constant dearth of educators, especially hard.

Juarez, a 26-year-old math and science teacher at Lipscomb Elementary, teaches in a school where many students are from immigrant families. He speaks English and Spanish.

**App. 61**



"My hope is that they see myself in their shoes," he said. "That they work to prove to their parents that they made the right decision to to come to this country."



Dallas teacher Luis Juarez (center) was one of nine young educators recognized at the White House for their leadership in the classroom and the community in 2015. All the immigrant teachers had DACA. (The White House)

If he goes, a symbol of their hope goes with him. So Juarez and other educators, despite their anxieties and worries about the future, are working hard to change the system.

# Plyler v. Doe

Education has played center stage in important immigration policy decisions for decades. In 1982, the Supreme Court ruled in a case originating in Texas that students can't be barred from a K-12 public education because of their immigration status.

When undocumented students entered college, they were often required to pay more expensive out-of-state tuition. That changed in 2001 when Texas became the first state in the nation to allow them to pay in-state tuition.

Another hurdle remained: Though undocumented students had a right to a public education and in-state tuition, they had no right to be hired for a job. They remained subject to detention and deportation.

For years, activists pushed for laws that would create a pathway to citizenship for children who were brought to the U.S. illegally by their parents or were brought with visas that later expired. Many of those children arrived as infants and had little knowledge of their places of birth.



Efforts to pass such a law repeatedly failed.

In 2012, President Barack Obama took matters into his own hands, issuing an executive action allowing children who'd arrived in the U.S. before the age of 16 to apply for Deferred Action for Childhood Arrivals status. Those who qualified could get renewable two-year employment authorization permits. And they were safe from deportation unless convicted of a crime.

The action was widely criticized as unconstitutional by some conservatives and legal experts, but over five years, it allowed many children to grow up without being challenged by immigration authorities. Thousands of DACA recipients who were raised in the U.S. graduated from college

and chose to teach; to go into public school systems full of poor children from minority and immigrant populations where their bilingual skills were highly sought.



**EDUCATION**

**Texas is desperate for bilingual teachers, so why aren't more answering the call?**

"We discovered that these DACA teachers grew up in this community," said Michael Hinojosa, Dallas ISD superintendent. His district employs 68 immigrants with DACA permits, including three dozen teachers.

Ironically, before DACA the school district had already been recruiting teachers from Mexico, Puerto Rico and Spain for their language skills, Hinojosa said. And DACA recruits came with a superior grasp of English, the superintendent said.

Trump's fulfillment of his campaign promise to end DACA pleases immigration hawks, including Texas Attorney General Ken Paxton, who led a 10-state consortium that threatened to sue unless the Trump administration shut down the program. The decision to phase it out leaves the future uncertain for the nearly 800,000 people who have DACA status.

Hinojosa said the end of DACA is something educators never really anticipated.

"We did not see this as a risk," Hinojosa said. "We saw this as a great win. These are local kids teaching our kids."

**TRUMP'S MOVE TO END DACA IGNITES DEBATE AND FEAR IN A NATION OF IMMIGRANTS**

**Where do those 'Dreamer' immigrants live? Dallas area third largest region**

**This 20-year-old DACA recipient with a disability will be released from detention after national pressure**

**U.S. could lose an estimated 20,000 teachers, many bilingual, as DACA is phased out**

*More in this Collection →*

**App. 64**

The Texas Education Agency, which oversees K-12 public education in Texas, does not keep tabs on how many of its teachers are in the DACA program. Neither does the Texas State Teachers Association. But an estimate by the Migration Policy Institute based on data from the federal government puts the national number at 20,000. The agency believes there are about 2,000 DACA teachers in Texas.

That may not seem like a huge proportion of Texas' more than 350,000 public school teachers. But as of two years ago, the latest year for which complete data was available, there were more than 20,500 bilingual or English-as-a-second-language teachers instructing almost 1 million Texas students who need Spanish-speaking teachers to help them with their English. The state has a chronic need for such bilingual teachers.

## What's next?

For some DACA teachers, the immediate reaction to the end of the program was fear.

Karen Reyes, a DACA recipient who teaches special education at an Austin school, said she worries daily about her future. She isn't eligible for another two-year DACA renewal, and her work permit expires next August. If she's out of a job after that, she's not sure what she'll do.

"It's been playing with our emotions," Reyes said, struggling to hold back tears. "This could potentially be my last year teaching."

SAS ERROR

Invalid Authorization Response

RELOAD YOUR SCREEN OR TRY SELECTING A DIFFERENT VIDEO

**App. 65**

Both DACA teachers and their school districts are confronted with questions about what might come next: If a teacher's work permit expires before the end of the school year, should they lose their job? How will schools replace those immigrant teachers?

A spokeswoman for the TEA said decisions on when to hire or fire a teacher are local district matters. The TEA hasn't set up any programs to assist teachers who are in limbo.

Some districts are supportive of their DACA teachers and have been sponsoring clinics to help them with what might be their final two-year permit renewals. Others have told employees that it is their responsibility to give notice when their permits expire, said Montserrat Garibay, vice president of Education Austin, an association for school district employees.

"That's very concerning," Garibay said. "I think there's going to be a very fine line in how they go about that."



Montserrat Garibay, vice president of Education Austin, speaks during a rally at the steps of the capitol on the first day of a legislative special session in July at the Texas state capitol. (Ashley Landis/Staff Photographer)

Garibay said her organization has least 12 members who've benefitted from DACA. In an effort to soothe their concerns, she held a meeting in early September. Only four showed up.

"They're scared," Garibay said.

But many DACA teachers are now fired up, too, said Viridiana Carrizales, who runs a national DACA  program for Teach for America, the nonprofit that requires a two-year commitment from its recruits. TFA teachers are often sent into the nation's poorest school populations.

TFA has helped nearly 200 DACA recipients become TFA teachers, including 60 in Texas and about 25 in the Dallas-Fort Worth area.

DACA teachers are asking for support, not pity, Carrizales says. "There is a lot of courage and strength that you need when everything is falling apart," she said.

DACA teachers are in overdrive fighting to preserve DACA or, more optimistically, seeking something even better, like a pathway to U.S. citizenship. More than a dozen court fights over DACA have sprung up across the nation.

"We are not in panic mode; We are in support mode," Hinojosa said. Like many others, the school superintendent feels the DACA issue personally. He's a Mexican immigrant who moved to Texas as a 3-year-old when his father legally entered the country.

Defense will be "very strategic," Hinojosa said. "I would really like Congress to handle this once and for all so that it is no longer in the hands of the president. If that doesn't work, the courts are always the backup plan...That is where civil rights has been handled."

Carrizales said she began devising a fight plan for DACA teachers after Trump's presidential victory last year. The TFA program provides legal support to assess each TFA teacher's case, advocates for DACA permit renewals, and will provide a financial plan if a DACA teacher loses her or his job and can't make payments on cars or other items. If a teacher decides they must move back with family, TFA will cover costs.

But Carrizales and others worry about what might happen if all else fails and the U.S. loses the DACA teachers altogether.

Many children in classrooms benefit from the life examples of DACA teachers, she said. To have a teacher suddenly end that relationship with students causes a ripple effect, especially for children

**App. 67**

who are undocumented as Carrizales herself once was, she said. The fear of deportation takes a toll, she said.

"Imagine a student who fears for their parents and now there is another layer that it could be their teacher," Carrizales said.

## "Out-innovate"

Juarez and his family came to the U.S. from a drug cartel-heavy region of Mexico near Monterrey on tourist visas when he was 13. When the visas expired, he became undocumented. DACA, he said, changed his life so that he can change others' for the best.

He swung into action after it was announced that the DACA program will end, making an appointment with the staff of Texas Republican Sen. John Cornyn. Juarez took a parent with him.

The meeting, he said, gave him some hope: Cornyn's staff indicated he is open to hearing about legislation to help DACA immigrants. Cornyn himself has said DACA recipients "continue to make positive contributions to Texas and the nation, and it's important for us to achieve a long-term resolution."

While waiting to see what happens, Juarez keeps teaching math and science in his elementary classroom. He's also  helping to coach soccer players and meets regularly with parents on work days that can stretch to 12 hours.

He said he looks with pride at a letter from Obama that's now framed and hanging in his classroom. In 2015, Juarez and other DACA teachers were invited to the White House and feted as "champions of change."

Each day when students walk into Mr. Juarez' classroom — with its math formulas on a dry erase board and its chemistry beakers — they can see the letter signed by Obama. "Together we will out-innovate, out-educate, out-build the rest of the world," it reads.

"It is a constant reminder of why I do what I do," Juarez said.

*Staff Writer Eva Marie-Ayala contributed to this report.*

## Timeline:

Texas has often led the nation in key immigration controversies involving education. Here are some of them:

1982: The U.S. Supreme Court ruled in the Texas case Plyler v. Doe that states cannot deny students in grades K through 12 a free public education because of their undocumented status.

2001: Texas becomes the first state in the nation to pass an in-state tuition law. The law creates a national movement and other states follow.

2012: President Barack Obama unveils an executive action called Deferred Action for Childhood Arrivals, or DACA, for certain young immigrants brought to the U.S. before the age of 16 by a parent. The 2012 DACA program was challenged in Dallas federal court by 10 federal immigration enforcement agents, but that suit fails in 2013.

2017: Texas Attorney General Ken Paxton leads a multi-state coalition that threatens to sue the federal government if the DACA program isn't ended.

2017: On Sept. 5, U.S. Attorney General Jeff Sessions announces the phase-out of DACA . President Donald Trump challenges Congress to pass a law that replaces it.

**

IN THIS COLLECTION...

## Trump's move to end DACA ignites debate and fear in a nation of immigrants

Where do those 'Dreamer' immigrants live? Dallas area third largest region

This 20-year-old DACA recipient with a disability will be released from detention after national pressure

Big business will test political muscle in defending DACA

*See all 17 Stories* →

## MORE FROM DALLAS NEWS

- Customer who didn't 'tip terrorist' on $100 check banned from Texas steakhouse

**App. 69**

- [Study says Asians in U.S. have widest income gap; How it shows up in DFW](#)

- [Garland 15-year-old's slime business brings in six figures a year](#)

- [Texas attorney who gave daughter $6 million quinceañera throws his son a $4 million 18th-birthday bash](#)

- [Where the cool kids aren't? Three North Texas cities get an 'F' in hipster cred](#)

Recommended by 

○ VIEW COMMENTS

IMMIGRATION     EDUCATION

SPONSORED STORIES                                                By            |



*Scribol*

**[Photos] After A Girl Left School Hungry, Her Mom Found A Teacher's Note In Her Lunchbox**



*maternityweek.com -*

**[Photos] After This 4-Year-Old Came Home Hungry, Her Mom Found A Note In Her Lunchbox**

**App. 70**

 *By* [David Tarrant](#)

**WEATHER** / 22 HRS AGO

## Why it's hotter than hell in Texas for the foreseeable future

**NBC 5 Forecast: Excessive heat warning**

**Texas sets four consecutive electricity usage records, and summer is only getting started**

*More in Weather →*

 *By* [Robert T. Garrett](#) *and* [Gromer Jeffers Jr.](#)

# Tab J

7/18/2018                          Deeper Underground: Businesses feel the pinch as undocumented consumers limit shopping expenses - Houston Chronicle

Emilia Alvarez alters a dress for a client from a corner of her business E-Mily's Boutique. She sells handmade designs and provides tailoring services.

# DEEPER UNDERGROUND

## Businesses feel the pinch as undocumented consumers limit shopping expenses

Story by Ileana Najarro (/author/ileana-najarro/) and Monica Rhor (/author/monica-rhor/)
Multimedia by Marie D. De Jesús (http://www.mariedejesus.com/) and Godofredo A. Vasquez (https://www.instagram.com/godovasquez/)

*Published: Oct. 20, 2017*

nside the PlazAmericas Mall in southwest Houston, where merchants sell baptism dresses, artisanal pottery and piñatas, the hallways are empty and bored employees pass the time on cellphones. The few shoppers remaining barely glance at vacant storefronts, omens of a new threat to business.

Toward the back of the complex, which has catered to immigrants customers since 2009, storeowner Emilia Alvarez snipped the sleeves off a button-up men's shirt she hasn't sold in months. Last year, Alvarez could easily rack up $1,000 at E-Mily's Boutique on any given Sunday. She had a loyal following among fellow undocumented immigrants.

Then Donald Trump was elected president, promising a border wall and mass deportations — and her sales plummeted.

Christmas sales in 2016 totaled $800, a $6,200 drop from the previous year. Sunday sales in January averaged $500. On the first Sunday of October, she made $160.

In one month alone, Alvarez lost 10 longtime customers — they left the country. (https://twitter.com/intent/tweet?text=In%20one%20month%20alone,%20Alvarez%20lost%2010%20longtime%20customers%20E2%80%94%20they%20left%20the%

The same is happening across the city — at mom-and-pop operations and big-box stores, shopping centers and discount boutiques that cater to Houston's huge immigrant population and its 575,000 undocumented immigrants. Business is sluggish, sales sporadic and shoppers sparse.

## ABOUT THE SERIES

**App. 73**

7/18/2018          Deeper Underground: Businesses feel the pinch as undocumented consumers limit shopping expenses - Houston Chronicle

"Deeper Underground (/newamerica/storylines/underground/)" is a series exploring how aggressive federal enforcement, controversial laws and heated political rhetoric are pushing Houston's immigrants – documented and undocumented – deeper into the shadows.

**Part 1:** Fear drives mistrust between police, immigrant communities (/deeperunderground/1/)

**Part 2:** Businesses feel the pinch as undocumented consumers limit shopping expenses (/deeperunderground/2/)

**Part 3:** Trump's immigrant crackdown brings 'blanket of fear' to Houston schools (/news/houston-texas/houston/article/Trump-s-immigrant-crackdown-brings-blanket-of-12442229.php)

**Part 4:** Fearing deportation, undocumented immigrants in Houston are avoiding hospitals and clinics (/news/houston-texas/houston/article/Fearing-deportation-undocumented-immigrants-are-12450772.php)

The slowdown is a response to a new reality for immigrants in Houston and across the country, one that began to unfurl after Trump's election ushered in a crackdown on so-called sanctuary cities, the stepped-up immigration enforcement and, most recently, the phasing out of the Deferred Action for Childhood Arrivals (DACA) program for young immigrants.

As undocumented immigrants grapple with greater fears of being deported or detained, they have cut back on spending, shuttered businesses and begun planning to move out of Texas.

In Houston, where foreign-born residents make up almost one-third of the workforce and nearly 30 percent of small business owners (https://twitter.com/intent/tweet?text=Foreign-born%20residents%20make%20up%20almost%20one-third%20of%20the%20workforce%20and%20nearly%2030%20percent%20of%20small%20business%20owners%20http://www.houst
🐦, that could mean a substantial loss to the greater economy and a crippling blow to the labor pool.

Alvarez spent a decade shoring up her shop, the lifelong dream of a designer growing up in El Salvador. Seeing her own handmade fashions fly off the shelves made the pain of leaving her mother behind somewhat bearable. Now, as her clients have all but disappeared, she's left to wonder: How much longer can the store stay open?

"It's slow again, isn't it?" asked Moises Kiche, Alvarez' only remaining employee after she let a girl go a few months ago. Alvarez cut Kiche's shift down to Sundays.

"Yes it is," Alvarez said with a sigh as she passed the now short-sleeved shirt over to Kiche for a finishing stitch.

She doesn't know how much longer she can afford to keep paying him $70 each Sunday. Losing him would serve as another stark reminder that business is going under.

With clothing sales becoming scarce and management unwilling to budge on the $1,500 rent, she's resorted to offering tailoring services on credit, selling knick-knacks in the store, even flipping used cars on the side.

"The idea is to make money," Alvarez said. "One way or another."

She adjusted a statue of La Virgen de Guadalupe at her store entrance. It's on sale for $99.99.*

**App. 74**



(http://ww2.hdnux.com/photos/62/50/17/13272005/3/rawImage.jpg)

(http://ww2.hdnux.com/photos/66/64/70/14372409/3/rawImage.jpg)

(http://ww4.hdnux.com/photos/62/50/21/13272163/3/rawImage.jpg)

Alvarez lost about $5,000 worth of merchandise after a portion of her store's ceiling caved in during Hurricane Harvey. With sales still sluggish since Donald Trump's election win, she's not sure how much longer she can sustain the business.

• • •

At a time when the national economy is holding strong, Houston now finds itself grappling with massive storm damage from Hurricane Harvey, stubbornly sluggish oil prices and a sectoral slump large enough to be felt across the entire region, with businesses that rely on immigrants as consumers and employees in danger of going under or laying off workers.

Remittances are down by 15 percent, and international shipping is down by 20 percent. (https://twitter.com/intent/tweet?text=Remittances%20are%20down%20by%2015%20percent,%20and%20international%20shipping%20is%20down%20by%2020%20p
🐦 Tourist bus companies that offer trips to and from Mexico report up to 30 percent ridership declines compared to last year. (https://twitter.com/intent/tweet?text=Bus%20companies%20that%20offer%20trips%20to%20and%20from%20Mexico%20report%20up%20to%2030%20percent%20r
🐦

Maria Rebollar, a real estate agent for the Gold Quest Group, has seen a 70 percent drop in mortgage and private investment loans among her undocumented clients, all of whom have designated IRS tax codes.

At PlazAmericas Mall, at least three shops have recently closed.

At the Farmer's Market Association in the Heights, where Latinos are normally the biggest spenders and most reliable customers, sales have dropped nearly 60 percent and buyers pick up only the bare necessities.

Along Airline Drive on Houston's north side, Mexican and Central American food trucks parked in gas stations and parking lots once drew scores of late-night customers — mostly undocumented immigrants pulling 12-plus hour shifts or working a second job. Now, they sit mostly idle, with less than two dozen customers straggling by, even on traditionally-busy Friday nights.

Since Trump's inauguration, his administration has contemplated limits on legal immigration, ordered increased enforcement by Immigration and Customs Enforcement, and made tougher border security and immigration enforcement a requirement for any deal to save DACA, an Obama-era program that gave deportation relief and work permits to about 800,000 immigrants brought to the country illegally as children. The number of arrests by ICE agents, who are reportedly targeting so-called "sanctuary cities," has jumped 43 percent.

State Sen. Charles Perry, R-Lubbock, said those predicting economic losses from the newly enacted state law he sponsored cracking down on sanctuary cities, known as Senate Bill 4, base their arguments on "unsupported 'what ifs'" and are "typically biased with a political agenda."

(http://ww3.hdnux.com/photos/66/65/20/14373922/3/rawImage.jpg)
 Freddy, owner of Smart Engine and Performance automotive repair, came to the U.S. at age 17. While his automotive business hasn't seen much of a downturn in the wake of SB4, the taco truck he operates on the side hasn't been fairing as well. Undocumented himself, Freddy is concerned over the greater economic slump the Houston region will face should everyone like him leave the state and/or the country in the wake of Trump's presidency and the passage of SB4.

The new state law requires local law enforcement agencies to honor federal immigration holds for people in the country illegally and authorizes police to ask about immigration status during traffic stops and other interactions. Other portions of the law, including a provision that would have penalized local police for refusing to cooperate with federal authorities, have been stayed by a federal judge in San Antonio, pending a hearing before the 5th Circuit Court of Appeals in New Orleans on Nov. 6.

"The only true measurable economic cost regarding SB4 is that of a lawless community," Perry said in a statement. "Example after example shows that when laws are not enforced and crime is left unchecked, communities suffer enormous financial costs."

But every piece of legislation and executive action aimed at restricting immigration and every rumored ICE raid has ratcheted up fears in immigrant communities — particularly among those here illegally — and forced families to map out what they describe as contingency plans.

Do we stay in Texas or head to a more immigrant-friendly state? Do we weather this political climate or return to homelands where poverty is grinding and violence rampant?

Do we buy this trinket or that toy or save our pennies, just in case? In case a father who supports the family is picked up by ICE agents. In case a single mother needs money to get her son out of immigration detention. In case children are left behind alone when parents are deported.

Such decisions are made countless times of day at kitchen tables and at cash registers across the city, whose 575,000 undocumented immigrants are the third largest concentration in the country.

About one in 10 private sector workers in Texas are undocumented, (https://twitter.com/intent/tweet?
text=About%20one%20in%2010%20private%20sector%20workers%20in%20Texas%20are%20undocumented.%20http://www.housto
🐦 according to a 2016 report by The Perryman Group, an economic research and analysis firm based in Waco. Undocumented
immigrants account for $77 billion in the state's retail sales every year. (https://twitter.com/intent/tweet?
text=Undocumented%20immigrants%20account%20for%20%2477%20billion%20in%20the%20state's%20retail%20sales%20every%2
🐦

When those workers and their families leave or stop spending money, it sends a ripple effect across the larger economy.

The jobs lost are not filled by native workers, explained Alex Nowrasteh, an immigration policy analyst with the Cato Institute. Instead, they disappear, along with consumers who had been pumping money into the local economy.

"Local restaurants, grocery stores and barbers shops also lose business," said Nowrasteh.

The Perryman Group report estimated that restrictive immigration policies could result in the loss of 417,815 jobs in the state and $14.6 billion in retail sales a year. (https://twitter.com/intent/tweet?
text=Restrictive%20immigration%20policies%20could%20result%20in%20the%20loss%20of%20417,815%20jobs%20in%20the%20sta
🐦 A mass exodus could also mean a big drop in revenue for Texas, which reaps about $1.5 billion a year in state and local taxes from undocumented immigrants, according to an analysis by the non-partisan Institute on Taxation and Economic Policy (ITEP).

**App. 76**

The Greater Houston region, which has an estimated 80,000 DACA recipients, could lose more than $2 billion in annual economic activity from just ending that program and losing those immigrants alone, according to studies by the Migration Policy Institute and the Center for American Progress.

"Houstonians may disagree when it comes to immigration, but we all seem to agree on keeping money in our wallets," said Laura Murillo, president and CEO of the Hispanic Chamber of Commerce. "Immigration absolutely has an impact on the greater economy. We need immigrants to continue to go out and spend money, to make purchases."

## Your stories: 'Living in fear'


Mark Mulligan / Houston Chronicle



Houston's undocumented immigrants, a community in living fear of increased immigration enforcement and the looming threat of a state law allowing police officers to question a person's immigration status, penned powerful thoughts on postcards. Click here to read them. (/newamerica/storylines/underground/postcards/)

· · ·

Leticia Alcocer was still a few minutes away from the quinceañera store she has owned for 12 years when she had to make the first bargain of the day.

Michelle Perry, her daughter and one of the employees at Lety's Quinceañeras, was calling on her cellphone.

A client planning a 15th birthday celebration for her daughter, Perry explained, wanted a more expensive dress, one that usually goes for $834, a couple hundred more than the one included in the package she had purchased. But the mother, a Mexican immigrant who works in retail, could not afford to pay more, even with help from padrinos, relatives who help shoulder the cost.

"No quiere pagar mas," Perry told her mother. The client did not want to pay extra.

Tears puddled in Alcocer's eyes.

Business had slacked off at her job, she explained. Everyone is afraid. Including her.

"Esta bien," she replied, without missing a beat. "Daselo de paquete."

It's OK. Give it to her as part of the package.

(http://ww3.hdnux.com/photos/66/64/70/14372414/3/rawImage.jpg)

(http://ww4.hdnux.com/photos/66/64/71/14372423/3/rawImage.jpg)

For 12 years, Lety's Quinceañeras in Gulfton has drawn a steady stream of customers planning 15th birthday celebrations, baptisms and weddings. Now, Leticia Alcocer is facing a 50 percent drop in business and considering selling her shop.

**App. 77**

Twelve months ago, Alcocer would not have given in so easily. She wouldn't have had "40 percent off" signs posted in front of her Gulfton store. Or intricately beaded gowns with voluminous chiffon skirts marked as specials going for more than $200 below regular price.

But 12 months ago, customers weren't coming in to cancel parties or slash guest lists in half. Like they are now. They weren't wary of going shopping or driving to stores for fear of being picked up by ICE agents. Like they are now.

Alcocer, a U.S. citizen who immigrated from Mexico 30 years ago, built the business from "two mannequins and two dresses" into a one-stop event-planning enterprise. Alongside a rainbow array of dresses with ruffled skirts and glittering bodices, Alcocer sells rhinestone tiaras, embroidered pillows, baptism gowns and silk bouquets. She rents out tables, folding chairs and children's inflatable bounce houses, offers catering and customized cakes, and owns a 6,000-square foot party hall.

For years, it was a lucrative operation with a loyal customer base, one rooted in traditions held dear in Latino families. Enough to help Alcocer support three daughters and fund their college educations. Two work in the store; another started a bridal shop of her own.

Then, in the first month after Trump's election, six customers — skittish of a coming backlash against undocumented immigrants — called off planned parties. Others postponed functions or just disappeared, leaving behind deposits. Some families passed up the elaborate quinceañera ritual for a picture of the birthday girl posing in a rented dress, a manageable cost of $200.

About half of Alcocer's normal revenue evaporated. She has started thinking about selling the store.

"I've never had problems like this with business before," said Alcocer, as she stood behind the counter. "This new president is going to devastate our lives." (https://twitter.com/intent/tweet?
text=%27This%20new%20president%20is%20going%20to%20devastate%20our%20lives.%27%20http://www.houstonchronicle.com
🐦

Just then, Guadalupe Andrade stepped out of a dressing room. A few weeks ago, she was not sure she would have a 15th birthday bash.

Her father, Crispin Andrade, who has lived in this country since he was 12, had applied for a green card last year and received an approval letter in April. But he still had to return to Mexico to finish the process, leaving the family's future and finances uncertain.

(http://ww3.hdnux.com/photos/66/64/71/14372422/3/rawImage.jpg)
   "I was worried that he wasn't going to come back," 14-year-old Guadalupe Andrade said of her father, Crispin, who had to return to Mexico to legalize his status, forcing her family to postpone her quinceañera for six months.

"We were terrified," said her mother, Angelina Andrade, a naturalized U.S. citizen. They didn't know if the current political climate would trip up the process. They didn't know if Crispin would be allowed to return from Mexico.

So the family cut back on expenses. The quinceañera — which her mother had dreamed of since her only daughter was born — was put on hold.

Earlier this month, the couple flew to Mexico and returned with Crispin Andrade's legal residency. They scheduled Guadalupe's party for July — six months late.

Inside Alcocer's store, Guadalupe posed in a pale pink gown, adorned with sparkling sequins and a flowing skirt resembling a cloud of cotton candy. The raven-hair teenager twirled around and smiled.

"Esta bonita," said her mother.

"It feels good," said Guadalupe.

"It's on sale," said Alcocer.

•  •  •

**App. 78**

7/18/2018                    Deeper Underground: Businesses feel the pinch as undocumented consumers limit shopping expenses - Houston Chronicle



(http://ww3.hdnux.com/photos/66/64/70/14372398/3/rawImage.jpg)

(http://ww1.hdnux.com/photos/66/64/70/14372404/3/rawImage.jpg)

(http://ww2.hdnux.com/photos/66/64/70/14372401/3/rawImage.jpg)

Pedro called Hurricane Harvey the second and shorter storm his family had to face living in Houston illegally. The bigger storm for him came in the form of SB4. The family is now saving up to move out of Texas should the law take full effect.

Rubi and Pedro barely had a chance to look at tangerines in the Walmart grocery store aisle when their 8-year-old, Alin Ashley, tugged on her father's shirt.

"Can we please? Can we please?" the girl pleaded. Her 11-year-old brother, Ian, rolled his eyes.

"Only to look," Pedro conceded.

Ashley sprinted away to the toy aisle. Pedro instructed Ian to keep an eye on her.

Rubi shook her head in disapproval while her 3-year-old, Ilem, fidgeted in the shopping cart's child seat.

The family, all undocumented except for the youngest, came to buy groceries that would need to last two weeks on a budget. With only $70 to spend, Walmart remains their best option for cheap prices.

Many major retailers are noticing dwindling sales in Latino communities, with as much as an 11 percent drop over a period of several months, said Target CEO, Brian Cornell at Fortune's Brainstorm Tech conference in July.

"If there's one thing that's concerning to me, and should be concerning to a lot of us, is a recognition that over the last few months the Hispanic consumer in the U.S. in shopping much less," he said. "There's almost a cocooning factor. They are staying at home. They're going out less often and particularly along border towns in the United States, you're seeing a change in behavior." (https://twitter.com/intent/tweet?text=%27There's%20almost%20a%20cocooning%20factor.%20They%20are%20staying%20at%20home.%27%20http://www.houstonc

🐦

**App. 79**

During the second quarter earnings call of O'Reilly Auto Parts, CEO Gregory L. Henslee noted less traffic in the company's predominately Hispanic markets, including South Texas.

For undocumented Latinos like Pedro and Rubi, who requested their last name not be published, the risk of being detained has convinced them to cut down on major expenses.

Pedro had saved up for over a year to buy a new car. As soon as Gov. Greg Abbott signed Senate Bill 4 into law in May, he and Rubi agreed to forgo the purchase, choosing instead to begin an emergency savings fund. If the law is fully enacted once the courts have finally ruled, they have decided, they would move to another state.

As Rubi got in line at the cash register, Alin Ashley arrived carrying a My School Girl doll half her height. Ian shook his head. Toys weren't on the grocery lists anymore like they used to be.

### Subscribe

The Houston Chronicle is dedicated to serving the public interest with fact-based journalism. That mission has never been more important.

Show your support for our journalism at HoustonChronicle.com/subscribe (http://www.houstonchronicle.com/subscribenow/)

Pedro scanned the box under a price checker. The screen read $27.95.

"One day's pay," Rubi scolded her daughter. "What is wrong with you?"

She ordered the girl to put the doll back.

Both Pedro and Rubi work in restaurants, as a waiter and cook. With fewer Latinos coming in to eat, their tips have suffered. Rubi lost a full hour of her shift after management realized the days of a packed lunch rush were gone.

The couple is among those who no longer eat out, choosing to save money by cooking all their meals. Even a McDonald's Happy Meal is now too much of a luxury. Alin Ashley rejoined her parents at the checkout line, carrying a magenta doll dress with a $9.57 price tag.

Pedro and Rubi began to bicker: We can afford it. No we can't. She really wants it. Who cares?

On and on the parents went, as Alin Ashley pouted.

Only the cashier noticed as Ian yanked the dress off the conveyer and slipped away to return it.

*Correction*: An earlier version of this article misstated how Emilia Alvarez obtained the statue of La Virgen de Guadalupe.

*Ileana Najarro (/author/ileana-najarro/) is a business reporter at the Houston Chronicle. She can be reached by email at Ileana.Najarro@chron.com (mailto:ileana.najarro@chron.com?Subject=Deeper%20Underground) or you can follow her on Twitter: @IleanaNajarro (https://twitter.com/IleanaNajarro).*

*Monica Rhor (/author/monica-rhor/) is a narrative reporter at the Houston Chronicle. She can be reached by email at Monica.Rhor@chron.com (mailto:Monica.Rhor@chron.com?Subject=Deeper%20Underground) or you can follow her on Twitter: @monicarhor (https://twitter.com/monicarhor).*

## A New America

**App. 80**

7/18/2018                    Deeper Underground: Businesses feel the pinch as undocumented consumers limit shopping expenses - Houston Chronicle



(http://www.houstonchronicle.com/newamerica/)

Aggressive federal enforcement, controversial laws and heated political rhetoric are pushing Houston's immigrants – documented and undocumented – deeper into the shadows. *Click here (http://www.houstonchronicle.com/newamerica/) to read more stories that show why immigration matters in Houston.*

---

*Credits*

STORY

Ileana Najarro
Monica Rhor

MULTIMEDIA

Marie D. De Jesús
Godofredo A. Vasquez

ENGAGEMENT

Rachael Gleason

DESIGN

Jordan Rubio

PHOTO EDITOR

Jasmine Goldband

**App. 81**

# Tab K

# State & Local Tax Contributions of Young Undocumented Immigrants

## Institute on Taxation & Economic Policy

*Updated April 2018*

Misha E. Hill
Meg Wiehe

**About The Institute on Taxation & Economic Policy**

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan 501 (c) 3 organization that produces timely, accessible, and sound analyses on federal, state, and local tax policy issues. ITEP's research helps inform policy makers, advocates, the media and general public about the fairness, adequacy, and sustainability of existing tax structures and how proposed tax changes would impact revenues and taxpayers across the income spectrum.

**Acknowledgments**

ITEP extends special thanks to David Dyssegaard Kallick at the Fiscal Policy Institute, Erica Williams at the Center on Budget and Policy Priorities, Jeanne Batalova at the Migration Policy Institute, and Wesley Tharpe at the Georgia Budget and Policy Institute for their guidance on this report.

# Introduction

The Trump administration's immigration policies have broken apart families and removed established members of communities. The administration's disregard for the contributions of immigrants, regardless of their legal status, is of real concern for young immigrants whose parents brought them to the United States as children. Many of those young immigrants qualify for deferred deportation action and legal work authorization under Deferred Action for Childhood Arrivals (DACA), a 2012 executive order under President Barack Obama.

In September 2017, President Trump used his executive powers to order the rescission of DACA on March 5, 2018 unless Congress enacted permanent protections. Trump's executive action was met by multiple lawsuits from state attorneys general and other parties that would be economically injured if DACA recipients lost their protections or were deported. Before the March 5 deadline, two federal rulings prevented the termination of the program but the administration did not have to accept new applications or renewals.

On April 24, 2018, a federal judge ordered that the administration must reinstate the program and begin accepting new applications and renewals—the administration has 90 days to respond. The legal status of the young people eligible for and currently enrolled in DACA is very much in flux.

## What is DACA?

Deferred Action for Childhood Arrivals provides temporary deferral from deportation and work authorization. Individuals must apply for DACA status through U.S. Citizenship and Immigration Services. Approved individuals maintain their status for two years and must apply to renew their eligibility.

To qualify for DACA an individual must:

✓ Be between the ages of 15 and 30

✓ Have arrived in the U.S. prior to the age of 16

✓ Have continuously resided in the U.S. for at least five years prior to their application for deferred action

✓ Be enrolled in an approved education course, have completed high school or its equivalency, or have been honorably discharged from military service

✓ Must **not** have been convicted of a felony, significant misdemeanor, three or more misdemeanors, or "otherwise pose a threat to public safety or national security"

*Note: See "DACA at Four" and "DACA at the Two-Year Mark" from the Migration Policy Institute for more detailed information.*

More than 1.3 million out of the 11 million undocumented immigrants living in the United States are eligible for DACA. As of January 2018, more than 682,000 individuals were enrolled in the program.[1] DACA offers eligible teenagers and young adults who were brought to the United States as children outside of their control temporary deferral from deportation and legal work authorization.[2] US

Customs and Immigration Services (USCIS) releases quarterly updates of DACA population estimates. These most recently available figures are smaller than previous estimates because they exclude former DACA enrollees who are now legal permanent residents, those who did not reapply, and those whose reapplication was denied. Additionally, the Trump administrations' rescission of DACA and the ongoing court cases have prevented and discouraged eligible DACA recipients from applying or reapplying. At this time, the most important population to consider is the total eligible population of 1.3 million Dreamers as this group will be most impacted by future decisions relating to DACA. This report will use the term Dreamers to refer to the combined population of young immigrants who are enrolled in DACA and those who are eligible for DACA but not enrolled.

DACA enrollment has helped young immigrants become more engaged in their communities. A national survey of DACA enrollees in 2017 found that more than 50 percent of respondents secured their first job after enrollment in DACA, and nearly 70 percent landed a job with better pay. DACA enrollment also allowed 65 percent of respondents to pursue educational opportunities that were previously unavailable to them, and more than 70 percent of respondents hold a bachelor's degree or higher.[3]

The 1.3 million Dreamers eligible for deferred action contribute tax dollars to communities that help pay for schools, public infrastructure, and other services. Their contributions could be increased by taking steps to ensure that all individuals eligible for deferred action are enrolled, or even by offering a path to citizenship. Conversely, stripping their temporary lawful status or deporting them would decrease their tax contributions and deprive our country of a dedicated and diverse generation.

An ITEP report from March 2017 found the 11 million undocumented immigrants living and working in the United States contribute more than $11.74 billion in state and local taxes.[4] This report specifically examines the state and local tax contributions of undocumented immigrants who are currently enrolled or immediately eligible for DACA and the fiscal implications of various policy changes. The report includes information on the national impact (Chart 1) and provides a state-by-state breakdown (Appendices 1 and 2).

# Key Findings

♦ The 1.3 million young undocumented immigrants enrolled or immediately eligible for DACA **contribute an estimated $1.7 billion a year** in state and local taxes.[5] This includes personal income, property, and sales and excise taxes.

♦ DACA-eligible individuals pay on average **8.3 percent of their income** in state and local taxes. Their effective tax rate is higher than the average rate paid by the top 1% of taxpayers in state and local taxes of just 7 percent and is on par with the average rate paid of 9.7 percent paid by the middle 20 percent of taxpayers.[6]

♦ Continuing DACA and ensuring all who are eligible for the program are enrolled would **increase estimated state and local revenue by $815 million**, bringing the total contribution to $2.5 billion, and increasing the effective tax rate for those enrolled to 9 percent.

♦ Repealing the temporary legal status and work authorizations permitted by DACA would **reduce estimated state and local revenues by nearly $700 million**, and drop the total contributions to just over $1 billion annually.

## How Dreamers Contribute to State and Local Revenue

Questions have frequently been raised about the taxes paid by undocumented immigrants. Everyone living and working in the U.S. contributes to state and local taxes, regardless of their immigration status. We all pay sales and excise taxes when we purchase goods and services, such as clothing or gasoline. We all pay property taxes either directly for our homes or indirectly as renters.

DACA provides young immigrants with work authorization and recipients are subject to the same state and local personal income tax laws as all lawfully present workers. Additionally, DACA recipients have (temporary) Social Security numbers. Thus, it is reasonable to assume that working DACA recipients file and pay state and local income taxes just like any other working American. As ITEP's 2017 report demonstrated, about half of undocumented immigrants of all ages file income tax returns. They do this using Individual Taxpayer Identification Numbers (ITINs) in the absence of having valid Social Security numbers. Therefore we assume that young immigrants who are eligible for but not enrolled in DACA comply with income tax law at a similar rate.

The tax revenues generated by DACA recipients are further boosted by the fact that DACA status boosts employment rates and wages. A national survey of DACA recipients found that employment rates increased by 127 percent after enrollment, from 44 percent of respondents employed to 91 percent.[7]  Evidence also shows that relief from deportation and temporary work permits through programs like DACA also boosts undocumented immigrants' wages by at least 8.5 percent. When given the opportunity to work legally and a reprieve from deportation DACA recipients are able to work more, earn more wages, and are less likely to be victims of wage theft from unscrupulous employers.



Chart 1: U.S. Total of State and Local Tax Contributions of Dreamers (in millions)

Based on this evidence, we assume that 91 percent of the 682,000 young immigrants currently enrolled in DACA are employed, and that they are earning, on average, 8.5 percent more than the estimated 643,000 young people eligible for but not receiving DACA. The higher earnings, higher employment rate, and higher tax compliance rate of individuals enrolled in DACA leads to their increased tax contributions and higher effective tax rate compared to those eligible for but not receiving DACA. The total contributions of all Dreamers who are currently receiving or eligible for DACA status is over $1.7 billion in state and local taxes annually. If all eligible individuals were enrolled in DACA, those state and local tax contributions would increase by more than $815 million due to higher earnings, higher employment rate, and 100 percent tax compliance for all DACA eligible immigrants (see Table 1).

In contrast, failing to maintain work authorizations and deportation relief of DACA would hurt state and local coffers. If the 682,000 young immigrants currently enrolled lost the protections of DACA, it would reduce their state and local tax contributions by nearly $700 million (see Table 1).

**App. 87**

## Table 1: U.S. Total of State and Local Tax Contributions of Dreamers

*Current and potential contributions of individuals currently receiving or eligible for DACA status*

| | Currently receiving DACA (682,000) | Currently eligible but not receiving (643,000) | Total DACA-eligible population (1.3 million) | Change from Current Contribution |
|---|---|---|---|---|
| Current Taxes of Dreamers | $1,244,854,000 | $516,541,000 | **$1,761,395,000** | -- |
| Taxes if All Dreamers Enrolled in DACA | $1,244,854,000 | $1,332,378,000 | **$2,577,232,000** | +$815,837,000 |
| Taxes If DACA protections lost | $551,160,000 | $516,541,000 | **$1,067,701,000** | ($693,694,000) |

## Conclusion

Every state benefits from the tax contributions of young undocumented immigrants, but every state has much more to lose if we remove the protections and work authorization granted to these young people. On average, DACA recipients were only 6 years old when they were brought to this country. DACA recipients are part of the American family and over 70 percent have a U.S. citizen spouse, child, or sibling.[8] Dreamers are our neighbors, classmates, and co-workers, and they have called this country home for most of their lives.  In its attempt to rescind DACA and increased detention and deportation enforcement, the Trump administration has broken a promise America made with these young people. If the Trump administration continues on this path, the nation risks forcing Dreamers back into the shadows and losing the economic and societal contributions these engaged young people are making in our communities.

# Methodology

ITEP estimates the state and local tax contributions of DACA-eligible immigrants under different policy options through the methodology detailed below.

### 1. Estimated DACA- eligible and enrolled population in each state

- ♦ The number of young immigrants in each state immediately eligible for DACA comes from the Migration Policy Institute.[9]  MPI estimated just over 1.3 million young immigrants nationwide are immediately eligible for DACA. MPI's estimates are limited to 41 states and the District of Columbia. To calculate the eligible population in the nine missing states, ITEP used the enrollee data (see below) for each state to estimate a total eligible population (see Appendix 3).

- ♦ The number of people currently enrolled in DACA nationally (682,600) and in each state comes from the United States Citizenship and Immigration Services[10]. (see Appendix 3).

### 2. Taxpaying units and employment status

- ♦ This analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

- ♦ The employment rate of immigrants depends on legal status. A 2017 nationally representative survey of 3,063 DACA recipients found that 91 percent of respondents were employed, compared to only 44 percent before gaining lawful status. The assumed employment rate of DACA-eligible immigrants with legal status, either those participating in the program or granted a pathway to citizenship, is 91 percent. The assumed employment rate of DACA-eligible immigrants who are not enrolled in the program is 44 percent.[11]  Additionally, to calculate the impact on tax contributions if DACA protections are removed, 44 percent was applied to the total DACA-eligible population.

- ♦ Here's how the national numbers break down (see Appendix 3 for state numbers):

| | Population | Workforce Participation % | Estimated Workers |
|---|---|---|---|
| Eligible DACA Population | 1,326,000 | | |
| Enrolled DACA Population | 682,600 | 91% | 623,900 |
| Eligible, but unenrolled DACA Population | 643,400 | 44% | 282,400 |
| Eligible, but no DACA protections | | 44% | 582,100 |

**App. 89**

### 3. Income

- Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting legal protections like DACA status increase wages by 8.5 percent, according to a 2014 report by the Center for American Progress[12]. The average wages applied to the estimated DACA working population in this analysis are:
    - o   $23,901 for the DACA-eligible population working and enrolled in the program.
    - o   $22,029 for the DACA-eligible population working, but not enrolled in the program.

This is a very conservative estimate. A 2017 nationally representative survey found the average annual income of working DACA recipients to be $36,231 while their average annual income prior to enrollment was $20,068. This represents an 81% increase in wages.[13]

### 4. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state[14]

ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population.

### The following assumptions were made to calculate the sales and excise, income, and property taxes of the undocumented immigration population:

- **Sales and excise taxes:** Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's Who Pays? for each state were applied to the various estimated DACA-eligible population incomes.

- **Income tax:** Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 623,900 DACA-enrolled workers are fully complying with state personal income taxes. 100 percent compliance is also assumed under the path to citizenship policy option.  Personal income tax effective rates in each state were applied accordingly.

**App. 90**

Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[15] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

♦ **Property tax:** The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state. The model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

[1] "Approximate Active DACA Recipients as of January 31, 2018." United States Citizenship and Immigration Services(USCIS), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf

[2] Batalova, Jeanne, et al. "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute, Aug. 2014, http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action

[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf

[4] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf

[5] See the methodology section for more information on the calculation of estimated undocumented immigrant state and local tax payments.

[6] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.
Note: the previous version of this report cited the effective tax rates paid after subtracting the federal deduction for state and local taxes, or federal offset. After the enactment of the Tax Cuts and Jobs Act of 2017 (TCJA), the federal offset is almost non-existent. Thus, the most appropriate effective tax rate to reference is without deducting the federal offset. For more information on the post-TCJA federal offset see: Essig, Alan "The Problems with State Workarounds to the Federal SALT Deduction," https://itep.org/the-problems-with-state-workarounds-to-the-federal-salt-deduction-limitations/. For more information on the pre-TCJA federal offset see: "How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset"," https://itep.org/how-state-tax-changes-affect-your-federal-taxes-a-primer-on-the-federal-offset-1/

[7] Center for American Progress (see endnote 3)

[8] Center for American Progress (see endnote 3)

[9] Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events

[10] USCIS (see endnote 1)

[11] Center for American Progress (see endnote 3)

[12] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014. https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/

[13] Center for American Progress (see endnote 3)

[14] Institute on Taxation and Economic Policy (see endnote 4)

[15] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." *Social Security Advisory Board*, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf;
Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." *Tax Analysts*, 20 Sept, 2004; and Cornelius, Wayne, and Jessica Lewis. *Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities*, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

**App. 92**

## Appendix 1: Loss of State and Local Tax Contributions if DACA Ends

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Taxes if DACA Protections Lost | Change if DACA status Lost |
|---|---|---|---|
| Alabama | $11,392,000 | $7,168,000 | -$4,224,000 |
| Alaska* | $73,000 | $39,000 | -$34,000 |
| Arizona | $50,714,000 | $29,288,000 | -$21,426,000 |
| Arkansas | $13,695,000 | $7,989,000 | -$5,706,000 |
| California | $497,607,000 | $290,138,000 | -$207,469,000 |
| Colorado | $31,476,000 | $14,958,000 | -$16,518,000 |
| Connecticut | $13,855,000 | $10,392,000 | -$3,463,000 |
| Delaware | $2,150,000 | $1,207,000 | -$943,000 |
| District of Columbia | $3,089,000 | $2,254,000 | -$835,000 |
| Florida | $77,552,000 | $59,504,000 | -$18,048,000 |
| Georgia | $61,358,000 | $37,730,000 | -$23,628,000 |
| Hawaii | $2,485,000 | $2,014,000 | -$471,000 |
| Idaho | $5,424,000 | $2,814,000 | -$2,610,000 |
| Illinois | $120,511,000 | $66,219,000 | -$54,292,000 |
| Indiana | $21,398,000 | $10,040,000 | -$11,358,000 |
| Iowa | $6,336,000 | $3,076,000 | -$3,260,000 |
| Kansas | $12,643,000 | $6,588,000 | -$6,055,000 |
| Kentucky | $8,081,000 | $4,435,000 | -$3,646,000 |
| Louisiana | $6,403,000 | $4,331,000 | -$2,072,000 |
| Maine* | $109,000 | $68,000 | -$41,000 |
| Maryland | $33,654,000 | $23,026,000 | -$10,628,000 |
| Massachusetts | $20,112,000 | $12,880,000 | -$7,232,000 |

## Appendix 1: Loss of State and Local Tax Contributions if DACA Ends

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Taxes if DACA Protections Lost | Change if DACA status Lost |
|---|---|---|---|
| Michigan | $13,429,000 | $7,416,000 | -$6,013,000 |
| Minnesota | $14,905,000 | $8,048,000 | -$6,857,000 |
| Mississippi | $3,820,000 | $2,219,000 | -$1,601,000 |
| Missouri | $7,447,000 | $4,207,000 | -$3,240,000 |
| Montana* | $140,000 | $86,000 | -$54,000 |
| Nebraska | $6,429,000 | $3,342,000 | -$3,087,000 |
| Nevada | $14,819,000 | $8,658,000 | -$6,161,000 |
| New Hampshire* | $457,000 | $365,000 | -$92,000 |
| New Jersey | $57,203,000 | $38,433,000 | -$18,770,000 |
| New Mexico | $16,482,000 | $9,660,000 | -$6,822,000 |
| New York | $113,432,000 | $72,001,000 | -$41,431,000 |
| North Carolina | $58,574,000 | $30,271,000 | -$28,303,000 |
| North Dakota | $243,000 | $163,000 | -$80,000 |
| Ohio | $11,942,000 | $7,348,000 | -$4,594,000 |
| Oklahoma | $15,320,000 | $8,515,000 | -$6,805,000 |
| Oregon | $18,446,000 | $7,697,000 | -$10,749,000 |
| Pennsylvania | $17,441,000 | $12,085,000 | -$5,356,000 |
| Rhode Island | $3,121,000 | $2,227,000 | -$894,000 |
| South Carolina | $11,097,000 | $5,821,000 | -$5,276,000 |
| South Dakota* | $510,000 | $313,000 | -$197,000 |
| Tennessee | $17,177,000 | $11,744,000 | -$5,433,000 |
| Texas | $244,686,000 | $166,426,000 | -$78,260,000 |

## Appendix 1: Loss of State and Local Tax Contributions if DACA Ends

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Taxes if DACA Protections Lost | Change if DACA status Lost |
|---|---|---|---|
| Utah | $17,815,000 | $8,384,000 | -$9,431,000 |
| Vermont* | $49,000 | $31,000 | -$18,000 |
| Virginia | $29,416,000 | $18,843,000 | -$10,573,000 |
| Washington | $49,774,000 | $28,523,000 | -$21,251,000 |
| West Virginia* | $270,000 | $138,000 | -$132,000 |
| Wisconsin | $15,915,000 | $8,014,000 | -$7,901,000 |
| Wyoming* | $923,000 | $566,000 | -$357,000 |
| All States | $1,761,395,000 | $1,067,701,000 | -$693,694,000 |

*DACA eligible population in these states was estimated using data on enrolled DACA participants as of January 2018.  Nationwide roughly 51 percent of immigrants immediately eligible DACA are enrolled thus the assumption was made that the actual participants in those states represent 51 percent of the eligible population (rounding was used).

## Appendix 2: Detailed Estimates of State and Local Tax Contributions of Dreamers

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Current Effective Tax Rate | Taxes if All Dreamers Enrolled in DACA | Change from Current | New Effective Tax Rate | Taxes if DACA Protections Lost | Change from Current | New Effective Tax Rate |
|---|---|---|---|---|---|---|---|---|
| Alabama | $11,392,000 | 8.4% | $18,516,000 | +$7,124,000 | 9.4% | $7,168,000 | -$4,224,000 | 8.2% |
| Alaska* | $73,000 | 4.0% | $87,000 | +$14,000 | 4.0% | $39,000 | -$34,000 | 4.0% |
| Arizona | $50,714,000 | 7.7% | $69,247,000 | +$18,533,000 | 9.1% | $29,288,000 | -$21,426,000 | 8.4% |
| Arkansas | $13,695,000 | 10.2% | $19,796,000 | +$6,101,000 | 11.3% | $7,989,000 | -$5,706,000 | 10.3% |
| California | $497,607,000 | 8.1% | $686,172,000 | +$188,565,000 | 8.3% | $290,138,000 | -$207,469,000 | 7.8% |
| Colorado | $31,476,000 | 7.7% | $39,579,000 | +$8,103,000 | 7.9% | $14,958,000 | -$16,518,000 | 6.7% |
| Connecticut | $13,855,000 | 9.0% | $24,474,000 | +$10,619,000 | 10.2% | $10,392,000 | -$3,463,000 | 9.8% |
| Delaware | $2,150,000 | 4.8% | $3,551,000 | +$1,401,000 | 5.4% | $1,207,000 | -$943,000 | 4.2% |
| District of Columbia | $3,089,000 | 8.4% | $4,112,000 | +$1,023,000 | 9.4% | $2,254,000 | -$835,000 | 7.8% |
| Florida | $77,552,000 | 7.6% | $134,417,000 | +$56,865,000 | 8.5% | $59,504,000 | -$18,048,000 | 8.5% |
| Georgia | $61,358,000 | 8.5% | $95,619,000 | +$34,261,000 | 9.3% | $37,730,000 | -$23,628,000 | 8.1% |
| Hawaii | $2,485,000 | 10.6% | $5,235,000 | +$2,750,000 | 12.0% | $2,014,000 | -$471,000 | 10.4% |
| Idaho | $5,424,000 | 7.5% | $6,919,000 | +$1,495,000 | 7.9% | $2,814,000 | -$2,610,000 | 7.3% |
| Illinois | $120,511,000 | 10.9% | $167,527,000 | +$47,016,000 | 11.3% | $66,219,000 | -$54,292,000 | 9.9% |
| Indiana | $21,398,000 | 9.4% | $25,016,000 | +$3,618,000 | 10.4% | $10,040,000 | -$11,358,000 | 8.7% |
| Iowa | $6,336,000 | 9.1% | $8,210,000 | +$1,874,000 | 9.4% | $3,076,000 | -$3,260,000 | 8.0% |
| Kansas | $12,643,000 | 8.4% | $16,156,000 | +$3,513,000 | 9.2% | $6,588,000 | -$6,055,000 | 8.5% |
| Kentucky | $8,081,000 | 8.8% | $12,744,000 | +$4,663,000 | 9.7% | $4,435,000 | -$3,646,000 | 7.6% |
| Louisiana | $6,403,000 | 9.0% | $10,751,000 | +$4,348,000 | 9.8% | $4,331,000 | -$2,072,000 | 9.0% |
| Maine* | $109,000 | 7.5% | $174,000 | +$65,000 | 8.0% | $68,000 | -$41,000 | 7.1% |
| Maryland | $33,654,000 | 10.1% | $59,874,000 | +$26,220,000 | 11.4% | $23,026,000 | -$10,628,000 | 9.9% |
| Massachusetts | $20,112,000 | 7.9% | $36,209,000 | +$16,097,000 | 8.7% | $12,880,000 | -$7,232,000 | 7.0% |
| Michigan | $13,429,000 | 8.2% | $19,933,000 | +$6,504,000 | 9.1% | $7,416,000 | -$6,013,000 | 7.7% |
| Minnesota | $14,905,000 | 8.6% | $19,738,000 | +$4,833,000 | 9.0% | $8,048,000 | -$6,857,000 | 7.6% |
| Mississippi | $3,820,000 | 8.4% | $5,724,000 | +$1,904,000 | 8.7% | $2,219,000 | -$1,601,000 | 7.6% |
| Missouri | $7,447,000 | 7.8% | $11,058,000 | +$3,611,000 | 8.4% | $4,207,000 | -$3,240,000 | 7.2% |
| Montana* | $140,000 | 4.8% | $118,000 | -$22,000 | 5.4% | $86,000 | -$54,000 | 4.4% |
| Nebraska | $6,429,000 | 8.5% | $8,428,000 | +$1,999,000 | 9.6% | $3,342,000 | -$3,087,000 | 8.6% |
| Nevada | $14,819,000 | 4.8% | $19,558,000 | +$4,739,000 | 5.6% | $8,658,000 | -$6,161,000 | 5.6% |
| New Hampshire* | $457,000 | 5.6% | $829,000 | +$372,000 | 7.6% | $365,000 | -$92,000 | 7.5% |
| New Jersey | $57,203,000 | 7.9% | $94,893,000 | +$37,690,000 | 8.2% | $38,433,000 | -$18,770,000 | 7.5% |
| New Mexico | $16,482,000 | 9.6% | $22,767,000 | +$6,285,000 | 10.4% | $9,660,000 | -$6,822,000 | 10.0% |
| New York | $113,432,000 | 10.1% | $183,220,000 | +$69,788,000 | 11.0% | $72,001,000 | -$41,431,000 | 9.8% |
| North Carolina | $58,574,000 | 8.2% | $79,195,000 | +$20,621,000 | 8.8% | $30,271,000 | -$28,303,000 | 7.5% |
| North Dakota* | $243,000 | 7.7% | $378,000 | +$135,000 | 8.7% | $163,000 | -$80,000 | 8.4% |
| Ohio | $11,942,000 | 8.9% | $19,350,000 | +$7,408,000 | 9.8% | $7,348,000 | -$4,594,000 | 8.4% |
| Oklahoma | $15,320,000 | 8.8% | $21,103,000 | +$5,783,000 | 9.7% | $8,515,000 | -$6,805,000 | 8.8% |
| Oregon | $18,446,000 | 6.9% | $24,084,000 | +$5,638,000 | 7.3% | $7,697,000 | -$10,749,000 | 5.3% |
| Pennsylvania | $17,441,000 | 8.2% | $31,643,000 | +$14,202,000 | 9.7% | $12,085,000 | -$5,356,000 | 7.8% |
| Rhode Island | $3,121,000 | 7.7% | $5,575,000 | +$2,454,000 | 8.5% | $2,227,000 | -$894,000 | 7.7% |
| South Carolina | $11,097,000 | 6.6% | $14,551,000 | +$3,454,000 | 6.7% | $5,821,000 | -$5,276,000 | 6.0% |
| South Dakota* | $510,000 | 8.1% | $706,000 | +$196,000 | 8.1% | $313,000 | -$197,000 | 8.1% |
| Tennessee | $17,177,000 | 7.4% | $26,534,000 | +$9,357,000 | 8.7% | $11,744,000 | -$5,433,000 | 8.7% |
| Texas | $244,686,000 | 7.8% | $365,624,000 | +$120,938,000 | 9.5% | $166,426,000 | -$78,260,000 | 9.5% |
| Utah | $17,815,000 | 7.9% | $20,375,000 | +$2,560,000 | 8.5% | $8,384,000 | -$9,431,000 | 7.2% |
| Vermont* | $49,000 | 8.0% | $37,000 | -$12,000 | 8.9% | $31,000 | -$18,000 | 8.2% |
| Virginia | $29,416,000 | 7.1% | $52,929,000 | +$23,513,000 | 8.1% | $18,843,000 | -$10,573,000 | 6.5% |
| Washington | $49,774,000 | 10.5% | $62,131,000 | +$12,357,000 | 10.5% | $28,523,000 | -$21,251,000 | 10.5% |
| West Virginia* | $270,000 | 7.9% | $360,000 | +$90,000 | 8.2% | $138,000 | -$132,000 | 7.1% |
| Wisconsin | $15,915,000 | 8.8% | $20,958,000 | +$5,043,000 | 9.6% | $8,014,000 | -$7,901,000 | 8.3% |
| Wyoming* | $923,000 | 5.3% | $1,047,000 | +$124,000 | 5.3% | $566,000 | -$357,000 | 5.3% |
| All States | $1,761,395,000 | 8.3% | $2,577,232,000 | +$815,837,000 | 9.0% | $1,067,701,000 | -$693,694,000 | 8.3% |

# Appendix 3: Dreamer Population Estimates

| State | Estimated Total Dreamer Population[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled |
|---|---|---|---|
| Alabama | 9,000 | 4,040 | 4,960 |
| Alaska* | 100 | 70 | 30 |
| Arizona | 36,000 | 25,620 | 10,380 |
| Arkansas | 8,000 | 4,680 | 3,320 |
| California | 384,000 | 196,670 | 187,330 |
| Colorado | 23,000 | 15,430 | 7,570 |
| Connecticut | 11,000 | 3,910 | 7,090 |
| Delaware | 3,000 | 1,310 | 1,690 |
| District of Columbia | 3,000 | 640 | 2,360 |
| Florida | 72,000 | 26,430 | 45,570 |
| Georgia | 48,000 | 21,410 | 26,590 |
| Hawaii | 2,000 | 340 | 1,660 |
| Idaho | 4,000 | 2,800 | 1,200 |
| Illinois | 69,000 | 36,100 | 32,900 |
| Indiana | 12,000 | 9,230 | 2,770 |

# Appendix 3: Dreamer Population Estimates

| State | Estimated Total Dreamer Population[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled |
|---|---|---|---|
| Iowa | 4,000 | 2,540 | 1,460 |
| Kansas | 8,000 | 5,950 | 2,050 |
| Kentucky | 6,000 | 2,780 | 3,220 |
| Louisiana | 5,000 | 1,840 | 3,160 |
| Maine* | 100 | 40 | 60 |
| Maryland | 24,000 | 8,320 | 15,680 |
| Massachusetts | 19,000 | 5,890 | 13,110 |
| Michigan | 10,000 | 5,450 | 4,550 |
| Minnesota | 11,000 | 5,520 | 5,480 |
| Mississippi | 3,000 | 1,370 | 1,630 |
| Missouri | 6,000 | 3,100 | 2,900 |
| Montana* | 200 | 80 | 120 |
| Nebraska | 4,000 | 3,040 | 960 |
| Nevada | 16,000 | 12,450 | 3,550 |
| New Hampshire* | 500 | 270 | 230 |

**App. 98**

# Appendix 3: Dreamer Population Estimates

| State | Estimated Total Dreamer Population[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled |
|---|---|---|---|
| New Jersey | 53,000 | 17,620 | 35,380 |
| New Mexico | 10,000 | 6,150 | 3,850 |
| New York | 76,000 | 31,510 | 44,490 |
| North Carolina | 42,000 | 25,000 | 17,000 |
| North Dakota* | 200 | 100 | 100 |
| Ohio | 9,000 | 3,920 | 5,080 |
| Oklahoma | 10,000 | 6,370 | 3,630 |
| Oregon | 15,000 | 10,170 | 4,830 |
| Pennsylvania | 16,000 | 4,690 | 11,310 |
| Rhode Island | 3,000 | 940 | 2,060 |
| South Carolina | 10,000 | 5,890 | 4,110 |
| South Dakota* | 400 | 200 | 200 |
| Tennessee | 14,000 | 7,890 | 6,110 |
| Texas | 182,000 | 111,670 | 70,330 |
| Utah | 12,000 | 8,880 | 3,120 |

# Appendix 3: Dreamer Population Estimates

| State | Estimated Total Dreamer Population[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled |
|---|---|---|---|
| **Vermont*** | 39 | 20 | 19 |
| **Virginia** | 30,000 | 10,200 | 19,800 |
| **Washington** | 28,000 | 16,570 | 11,430 |
| **West Virginia*** | 200 | 120 | 80 |
| **Wisconsin** | 10,000 | 6,850 | 3,150 |
| **Wyoming*** | 1,100 | 9,000 | 550 |
| **All States** | **1,326,000** | **682,630** | **643,370** |

*DACA eligible population in these states was estimated using data on enrolled DACA participants as of January 2018.  Nationwide roughly 51 percent of immigrants immediately eligible DACA are enrolled thus the assumption was made that the actual participants in those states represent 51 percent of the eligible population (rounding was used).

[1] "Estimates of DACA-Eligible Population at U.S., State, & County Levels." Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2014 American Community Survey (ACS), 2010-14 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP) by James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. Available at: https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles

[2] "Approximate Active DACA Recipients as of January 31, 2018"  United States Citizenship and Immigration Services(USCIS). https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf

# Tab L



**Research**

# Estimating the Economic Contributions of DACA Recipients

JACQUELINE VARAS, USAMA ZAFAR | DECEMBER 21, 2017

## EXECUTIVE SUMMARY

- The Trump Administration recently announced the end of DACA, a program that shields from deportation undocumented immigrants brought to the United States as children. This means that current DACA recipients can no longer renew their protections and others cannot submit new DACA applications.
- Congress was given six months to pass a legislative solution extending protections for these immigrants. If a bill is not passed, starting on March 5, 2018, 983 DACA recipients will lose protections
- AAF estimates that the average DACA worker contributes $109,000 to the economy each year. If all DACA recipients were removed, U.S. GDP would decrease by nearly $42 billion.

## INTRODUCTION

Strengthening U.S. immigration enforcement has been a central priority of the Trump Administration. After taking office, President Trump ordered the Department of Homeland Security to expand its removal priorities beyond criminal aliens, and the total number of arrests made by U.S. Immigration and Customs Enforcement (ICE) has increased by over 37 percent since 2016 as a result.[i],[ii] More recently, President Trump announced the end of Deferred Action for Childhood Arrivals (DACA), a federal program established by President Obama through executive order that shields young undocumented immigrants from deportation.[iii]

DACA applies to undocumented immigrants who were brought to the United States as children. It gives these individuals an opportunity to work lawfully, attend school, or serve in the U.S. military. On September 5, the Trump Administration announced its plan to end DACA. The administration is not accepting any new DACA applications and the program will officially expire on March 5, 2018. Additionally, as of October 5, current DACA recipients are no longer permitted to renew their two-year protected status.

American Action Forum (AAF) research previously estimated that physically removing over 11 million undocumented immigrants would cost the federal government up to $600 billion and reduce Gross Domestic Product (GDP) by over $1 trillion. It also found that removing 6.8 million undocumented workers from the U.S. labor force would create significant labor shortages and reduce economic output by up to $623 billion. Most recently, AAF estimated that it would cost up to $21 billion to remove all current DACA recipients and up to $52 billion to remove all DACA-eligible individuals from the United States. This paper expands on previous AAF research on the economic and fiscal impact of removing undocumented immigrants by estimating the contribution of DACA recipients to the U.S. economy.

## PREVIOUS AAF RESEARCH

In 2015, AAF research estimated that the federal government would need to spend between $400 billion and $600 billion to remove all undocumented immigrants from the United States and to prevent future unlawful entry.[iv] Specifically, it would cost between $100 and $300 billion to apprehend, detain, process, and remove 11.2 million undocumented immigrants. The research further estimated that this process would take 20 years based on U.S. Immigration and Customs Enforcement's current capacity. To maintain , the federal government would need to spend an additional $315 billion. Likewise, AAF estimated that removing over 11 million undocumented immigrants from the United States would reduce GDP by $1.6 trillion.

AAF also analyzed President Trump's campaign proposal to remove all undocumented immigrants in just two years and determined that this task would require an enormous expansion of the federal government. The number of federal immigration apprehension workers would have to increase from 4,844 to 90,582; immigration detention personnel from 5,203 to 53,381; immigration detention beds from 34,000 to 348,831; federal immigration attorneys from 1,430 to 32,445; and immigration courts from 58 to 1,316. In addition, to physically remove all undocumented immigrants, the government would need to charter a minimum of 17,296 flights and 30,701 bus trips each year.[v]

Beyond these direct costs to the federal government, removing all undocumented immigrants would also generate declines in the U.S. labor force, economic output, and overall GDP. In 2016, AAF research estimated that removing roughly 6.8 million undocumented workers from the private sector (about 5.6 percent of the workforce) would create substantial labor shortages.[vi] Assuming that native-born Americans and lawful immigrants would be able to fill the job openings left by undocumented immigrants, removing all undocumented workers would reduce private sector employment by at least 4 million. Consequently, the contribution from private industry to GDP would fall by $382 billion to $623 billion. Specifically, these deportations would significantly harm the agriculture, construction, and leisure and hospitality industries, where undocumented immigrants are disproportionately employed.

Earlier this year, AAF applied its previous cost estimates to DACA recipients and the DACA-eligible population.[vii] It found that the federal government would need to spend between $7 billion and $21 billion to remove all undocumented immigrants currently enrolled in DACA. These removals would reduce GDP by 0.4 percent and reduce the labor force by 0.5 percent. If all DACA-eligible undocumented immigrants were removed, it would cost between $18 billion and $52 billion and reduce GDP by $72 billion (1.0 percent). The labor force would also decline by 1.1 percent.

## BACKGROUND ON DACA

President Obama enacted DACA in 2012 to shield young undocumented immigrants from deportation. DACA applicants must fulfill a number of requirements to gain temporary legal status under the program.[viii] They must prove they were under the age of 16 when they came to the United States; have continuously resided in the country since 2007; are either enrolled in school, have graduated high school (or equivalent), or have served in the military; are less than 31 years old as of June 15, 2012; and have no conviction of any crime or felony. The strict eligibility requirements were put in place to ensure the program is applicable to only those individuals who came to the United States through no choice of their own.

Following the Trump Administration's announcement to end DACA, President Trump urged Congress to pass a

permanent legislative solution by giving lawmakers six months before DACA expires. However, he has argued that any bill providing protections for DACA-eligible individuals should also include provisions enhancing border security.

According to the United States Citizenship and Immigration Services (USCIS), nearly 690,000 young immigrants were benefitting from DACA as of September 4, 2017. While the number of individuals who were initially granted DACA was close to 800,000, nearly 40,000 recipients have adjusted to lawful permanent status. Another 70,000 individuals either failed to renew their status after their two-year validity period or were denied renewal by USCIS, leaving approximately 690,000 active DACA recipients.[ix] However, the Migration Policy Institute (MPI) estimates that the number of undocumented immigrants eligible for DACA is close to 1.9 million.[x]

Thousands of DACA recipients who failed to meet the October 5 renewal deadline have already lost their protected status, with approximately 122 individuals losing protection every day.[xi] Starting March 5, 2018, when the program is set to expire, as many as 983 DACA recipients will lose protection each day over the next two years. This is nearly 300,000 people per month.[xii] If no changes are made by March 2020, no undocumented immigrants will be left with DACA protections.

## CURRENT DACA BILLS IN CONGRESS

Seven different bills have been introduced that would extend protections for DACA recipients, most of which are similar to President Obama's original executive order establishing DACA. Almost all stipulate that DACA recipients must have been educated in the United States and have been continuously present in the country for a number of years. Furthermore, most of the bills give DACA recipients a path to legal permanent residence, and all are targeted to individuals who came to the United States as children (either under the age of 16 or 18).

The differences lie in the specifics. For instance, a DACA recipient is eligible to apply for permanent residence after 10 years under the SUCCEED Act, but is not eligible to sponsor any family members after becoming a legal permanent resident.[xiii] Alternatively, the Dream Act would allow undocumented immigrants to apply for lawful permanent residence upon completing at least two years of a bachelor's program or at least three years of employment in the United States.[xiv] A more conservative solution, introduced by Senator Jeff Flake, pairs DACA relief with funding for border fencing and requires DACA recipients that receive green cards to pay back taxes.[xv]

## ESTIMATING THE ECONOMIC CONTRIBUTIONS OF DACA RECIPIENTS

This study aims to gauge how the U.S. economy would be impacted if protections for almost 700,000 DACA recipients expire. Specifically, it analyzes available data on the industries in which DACA recipients are employed and the average economic contributions of workers in those industries to estimate how much employed DACA recipients contribute to GDP.

The employment trends of DACA recipients are similar to those of the rest of the country. According to MPI, over 380,000 current DACA recipients are employed in the United States.[xvi] This equates to a 55 percent overall employment rate in the total DACA population, compared to 57 percent of the U.S. population ages 15

to 32. Among individuals enrolled in school, 33 percent of DACA recipients are employed, compared to 37 percent of the U.S. population. And among those not enrolled in school, employment rates for DACA recipients and the entire U.S. population are 69 percent and 71 percent, respectively.

MPI also offers data on the employment of DACA recipients by industry.[xvii] Table 1 displays MPI's findings using industry classifications from the Bureau of Economic Analysis (BEA).

*Table 1: Employment of DACA Recipients by Industry*

| Industry | Number of DACA Workers |
|---|---|
| Arts, Entertainment, Recreation, Accommodation, and Food Services | 88,900 |
| Retail Trade | 54,000 |
| Construction | 41,300 |
| Educational Services, Health Care, and Social Assistance | 40,700 |
| Professional and Business Services | 39,000 |
| Manufacturing | 36,100 |
| Other Services (except government) | 23,900 |
| Agriculture, Forestry, Fishing, and Hunting | 14,400 |
| Finance, Insurance, Real Estate, Rental, and Leasing | 13,600 |
| Wholesale Trade | 11,300 |
| Transportation and Warehousing | 9,600 |
| Information | 4,100 |
| Mining & Utilities | 3,000 |
| Government | 2,300 |



| Total | 382,200 |
|-------|---------|

According to MPI, most DACA workers are employed in hospitality: Almost 90,000 DACA recipients—or 23 percent of all DACA workers—work in the arts, entertainment, recreation, accommodation, and food services industry. The next most common industries for DACA workers are retail trade and construction. Estimates for the number of DACA recipients employed in the Mining and Utilities industries were not available in the MPI report, but these numbers were obtained by contacting the MPI authors directly.[xviii] Furthermore, this analysis does not evaluate the contributions of DACA recipients employed by the U.S. military.

To determine the economic contributions of DACA recipients, the study utilizes data from BEA on the value added by each industry or government sector to overall GDP in 2016.[xix] It then calculates the average economic contribution of each worker by dividing the total industry value added by the total employment in each industry. The analysis assumes that the average economic contribution per worker in the industries listed above are the same for DACA workers and the rest of employed individuals in the United States.

BEA offers data on the total number of workers in each industry in 2016.[xx] However, it counts both full-time and part-time workers in its estimates. Part-time workers do not make the same economic contributions as full-time workers, but there is no way to account for this conflation in BEA's numbers. Since all workers are weighted equally in this analysis, we likely underestimate workers' contributions to GDP in each industry.

To complete the analysis, the average economic contribution per worker in each industry is multiplied by the number of DACA recipients employed in those industries, providing an estimate of the total economic contributions of DACA recipients by industry. The results are displayed in Table 2 below.

*Table 2: Employed DACA Recipients' Contributions to GDP by Industry*

| Industry | Average Value Added per Worker | Total Value Added by DACA Recipients |
|----------|-------------------------------|--------------------------------------|
| Arts, Entertainment, Recreation, Accommodation, and Food Services | $47,795 | $4,248,984,410 |
| Retail Trade | $68,608 | $3,704,816,112 |
| Construction | $114,855 | $4,743,514,493 |
| Educational Services, Health Care, and Social Assistance | $68,300 | $2,779,808,570 |
| Professional and Business Services | $106,822 | $4,166,056,265 |
| Manufacturing | $176,861 | $6,384,695,779 |

| | | |
|---|---|---|
| Other Services (except government) | $58,798 | $1,405,265,912 |
| Agriculture, Forestry, Fishing, and Hunting | $125,424 | $1,806,101,695 |
| Finance, Insurance, Real Estate, Rental, and Leasing | $465,851 | $6,335,573,947 |
| Wholesale Trade | $186,786 | $2,110,686,092 |
| Transportation and Warehousing | $111,651 | $1,071,853,910 |
| Information | $321,251 | $1,317,128,643 |
| Government | $97,628 | $224,544,974 |
| Mining & Utilities | $470,129 | $1,410,386,266 |
| **Total** | | **$41,709,417,068** |

In 2016, over 380,000 employed DACA recipients contributed $41.7 billion to U.S. GDP. The largest economic contributions were made in the manufacturing industry, followed by the finance, insurance, real estate, rental, and leasing industry. DACA recipients also made significant economic contributions in hospitality, construction, and professional and business services.

A average can be applied to the findings above to determine the economic contribution of an average DACA worker. By dividing the total value added by employed DACA recipients ($41.7 billion) by the total number of DACA workers (382,200), we estimate that each DACA worker contributes on average $109,130 to U.S. GDP per year. If DACA expires without a legislative solution, this economic output would be lost.

Conclusion

President Trump's decision to end DACA directly impacts 690,000 undocumented immigrants who were brought to the United States as children. These individuals have spent years living and studying in the United States, and granting them the right to work has resulted in sizeable economic benefits. We estimate that over 380,000 employed DACA recipients each contribute an average of $109,000 to GDP per year. Thousands of DACA recipients have already lost their legal status and, beginning next March, almost 1,000 will lose protections each day. Without a legislative solution to extend a lawful framework for these workers, and assuming that they return to their birth countries as a result, AAF projects that annual GDP would shrink by nearly $42 billion.

[i] Jacqueline Varas, "An Overview of President Trump's Executive Actions on Immigration," American Action Forum, March 13, 2017, https://www.americanactionforum.org/insight/overview-president-trumps-executive-actions-immigration/

[ii] Tal Kopan, "ICE: Arrests still up, deportations still down," CNN Politics, August 11, 2017, http://www.cnn.com/2017/08/11/politics/trump-administration-deportations/index.html

[iii] Office of the Press Secretary, "President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration," the White House, September 5, 2017, https://www.whitehouse.gov/the-press-office/2017/09/05/president-donald-j-trump-restores-responsibility-and-rule-law

[iv] Ben Gitis & Laura Collins, "The Budgetary and Economic Costs of Addressing Unauthorized Immigration: Alternative Strategies," American Action Forum, March 6, 2015, https://www.americanactionforum.org/research/budgetary-economic-costs-ending-daca/

[v] Ben Gitis & Laura Collins, "The Personnel and Infrastructure Needed to Remove All Undocumented Immigrants in Two Years," American Action Forum, February 28, 2016, http://americanactionforum.org/research/the-budgetary-and-economic-costs-of-addressing-unauthorized-immigration-alt/

[vi] Ben Gitis & Jacqueline Varas, "The Labor and Output Declines From Removing All Undocumented Immigrants," Americana Action Forum, May 5, 2016, https://www.americanactionforum.org/research/labor-output-declines-removing-undocumented-immigrants/

[vii] Ben Gitis, "The Budgetary And Economic Costs of Ending DACA," American Action Forum, September 7, 2017, https://www.americanactionforum.org/research/budgetary-economic-costs-ending-daca/

[viii] Memorandum from the U.S. Department of Homeland Security, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," June 15, 2012, https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf

[ix] U.S. Citizenship & Immigration Services, "Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)," https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data

[x] Randy Capps, Michael Fix, & Jie Zong, "The Education and Work Profiles of the DACA Population," Migration Policy Institute, August 2017, https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population

[xi] Tom Jawetz & Nicole Prchal Svajlenka, "Thousands of DACA Recipients Are Already Losing Their Protection From Deportation," Center for American Progress, November 9, 2017, https://www.americanprogress.org/issues/immigration/news/2017/11/09/442502/thousands-daca-recipients-already-losing-protection-deportation/

[xii] Ryan Struyk & Tal Kopan, "983 would lose protection per day: What a DACA phase-out would look like," CNN Politics, September 9, 2017, http://www.cnn.com/2017/09/09/politics/daca-phase-out-numbers/index.html

[xiii] S.1852 – SUCCEED Act, https://www.congress.gov/bill/115th-congress/senate-bill/1852/text

[xiv] S.1615 – Dream Act of 2017, https://www.congress.gov/bill/115th-congress/senate-bill/1615/text

[xv] S.1937 – Border Security and Deferred Action Recipient Relief Act, https://www.congress.gov/bill/115th-congress/senate-bill/1937/text

[xvi]Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, & Randy Capps, "A Profile of Current DACA Recipients by Education, Industry, and Occupation," Migration Policy Institute, November 2017, https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation

[xvii] Ibid.

[xviii] According the Migration Policy Institute (MPI), the sample sizes of DACA recipients employed in the Mining and Utilities industries were too small to provide a reliable estimate of DACA employment. However, by combining total employment in these two industries, MPI was able to provide an estimate.

[xix] Value added by Industry, Bureau of Economic Analysis, 2016, https://bea.gov/iTable/index_industry_gdpIndy.cfm

[xx] Full-Time and Part-Time Employees by Industry, Bureau of Economic Analysis, 2016, https://www.bea.gov/iTable/iTable.cfm?reqid=19&step=2#reqid=19&step=2&isuri=1&1921=survey

# Tab M



Says a "recent analysis" showed that 91 percent of Deferred Action for Childhood Arrival (DACA) recipients are employed, in school or serving in the military.

— *Julián Castro* on Sunday, October 29th, 2017 in a conference call reported in a PJ Media web

# Julián Castro says nearly all DACA recipients employed, in school or serving in military

*By Jasper Scherer on Wednesday, January 10th, 2018 at 2:01 p.m.*



*Julián Castro, shown here talking in August 2017 about joining the faculty of the LBJ School of Public Affairs, later made a Mostly True claim about DACA recipients mostly having jobs or going to school (Austin American-Statesman, RICARDO B. BRAZZIELL).*

Calling out Republicans, Julián Castro of Texas said research shows that nearly every young immigrant at risk of losing federal protection from deportation is employed, in school or serving in the military.

According to an October 2017 web post, the former Housing and Urban Development secretary was generally urging the Republican-led Congress to change federal law by offering a pathway to citizenship for undocumented immigrants brought to the U.S. illegally as children or those who overstayed their visas.

The post on the conservative blog PJ Media says that in a conference call organized by an advocacy group, Castro specified that a "recent analysis" showed that 91 percent of Deferred Action for Childhood Arrivals (DACA) recipients, sometimes called "Dreamers," are employed, in school or serving in the military. Critics, conversely, sometimes characterize the program as an illegal amnesty that harms the working class.

Castro, the former San Antonio mayor and 2020 Democratic presidential prospect, directed his call for DACA action at U.S. Rep. Will Hurd, R-San Antonio, as well as John Cornyn of Texas, the Senate majority whip, who, Castro said, "should make sure Congress passes a DREAM Act soon."

Castro, who joined the faculty of the University of Texas Lyndon B. Johnson School of Public Affairs in 2017, was otherwise quoted in the post criticizing President Donald Trump for declaring the month before that his administration would discontinue DACA, which President Barack Obama launched through a 2012 memo, unless Congress authorized a program by changing federal laws. In a September 2017 tweet, Trump said both that Congress should "legalize DACA" and that in the event of inaction, he'd "revisit this issue."

### Castro cites online survey results

So, was Castro right about DACA recipients nearly all being in school, employed or in the military?

Castro, asked the basis of his claim, told Josh Baugh of the *San Antonio Express-News* by text that he drew his data points from an August 2017 web post by the left-leaning Center for American Progress about a national DACA survey.

That survey, we found, asked if DACA recipients had jobs or were in school. It didn't ask if respondents were in the military.

The center's post summarizing the results said Tom Wong, a political scientist at the University of California, San Diego, led the August 2017 survey of 3,063 DACA recipients. All told, the post says, the survey reached DACA recipients in 46 states including Texas, where 17 percent of respondents said they were living, according to the center's separate post of the survey's 22 questions and tallied results.

Let's check on whether the results back up Castro's claim before turning to the survey methodology and other efforts to gauge how DACA recipients spend their lives.

**Survey results**

Asked if they were "currently employed," 91.4 percent answered affirmatively, according to the results, with 55.9 percent of those respondents saying they hadn't been employed "before DACA." Another question asked if the respondent was currently in school; 44.9 percent responded affirmatively with 55 percent saying not, according to the results.

Wong told us by email that an additional sort of the "in school" and "currently employed" responses showed 97 percent of all respondents reporting being employed or enrolled in school — with 71.5 percent of those

saying that they were in school reportedly pursuing a bachelor's degree or higher.

**Methodology**

The center said in its post that the results drew on the largest sampling of DACA recipients to date. Some perspective: the 3,000-plus respondents would have amounted to about 4/10ths of 1 percent of some 690,000 active DACA recipients reported at about that time by U.S. Citizenship and Immigration Services.

Wong conducted the survey in collaboration with the center and advocacy groups United We Dream and the National Immigration Law Center. At the survey's release, that teaming drew criticism on the right-leaning Breitbart blog, where writer Neil Munro underscored an acknowledgment in the survey's methodology section that "it is not possible to construct a valid margin of error" for the results because "there is no phone book of undocumented immigrants." Munro counted this as an admission that the data was unreliable.

In the same vein, we wondered how Wong's team confirmed that respondents were signed up for DACA; best we could tell, beneficiaries are not revealed by the government.

By phone, Wong reaffirmed the methodology described in the center's post about the survey including that the partnering entities recruited the recipients surveyed online. Specifically, Wong said, the partners sent a web link to the survey to individuals on their respective email lists, also employing Facebook ads to ensure that self-identified DACA recipients from all over the country could participate.

Recognizing that non-DACA recipients could potentially click through the survey, the researchers reported taking steps to eliminate bias and other factors that might skew the results.

In the write-up posted by the center, Wong and his co-authors said that to prevent people from submitting multiple responses, they used a survey platform that prevented an IP address from submitting multiple responses.

Wong said he used another tactic to stop people from gaming the study: Near the beginning of the survey, each respondent was asked to say at which age she or he came to the U.S. Close to the end, the survey requested the year the respondent came to the U.S. If the age provided toward the survey's start matched the year offered later, the results stayed in. If off by more than a year, Wong said, he threw out the response. In the end, he said, the responses of 3,063 people were tallied--with approximately 6,000 respondents' surveys getting set aside for one reason or another.

We asked Wong to provide more detail perhaps enabling us to confirm the percentages in the results. Wong told us by email that he hadn't talked to the study's outreach partners "about what data can and can't be released." Wong also said he plans to write a book analyzing the first four years of his survey results, at which point the data he analyzes for the book will be made publicly available. "I know talk isn't worth much, but I analyzed all of the data myself and stand by the results," Wong wrote.

**Solid research, expert says**

We separately asked Ernesto Castañeda, an American University expert on migration research, if he considers the Wong-led results to be valid.

Castañeda's answer: Yes. Wong and his colleagues "carried out a valid study on a hard-to-reach population," Castañeda said by email. "With more than three thousand respondents, this is an exceptionally large sample size." Castañeda further said that researchers cannot always calculate margins of error for "unknown populations" like homeless and undocumented people, adding that the authors "took a number of steps to avoid duplicates or dubious data."

Castañeda told us too that the study's results appeared to be consistent with ethnographic research on DACA recipients and survey and interview research through 2016 by Roberto Gonzales, a Harvard University expert on immigration and social inequality, suggesting that DACA recipients made gains after getting that designation.

Wong and Gonzales each found DACA beneficiaries finding educational and career opportunities that had been closed to them before they entered the program. According to Gonzales' study, posted by the center in June 2017, "DACA beneficiaries told the authors that they were able to match their education and training with work that was meaningful to them—'an occupation that they could be proud of and that did not carry the stigma of 'immigrant work.' " Wong told us a result from his 2017 study stood out to him: 54.2 percent of respondents reported getting a job "that better fits my education and training."

In the Breitbart post critical of Wong's work, Munro wrote that the study was "based on a skewed sample of relatively successful DACA illegals who were identified by advocacy groups."

To Munro's point, 35.5 percent of respondents 25 and older reported having bachelor's degrees or higher. Seemingly in contrast, Munro noted, an August 2017 Migration Policy Institute study found only 5 percent of the "immediately eligible DACA population" holding a bachelor's degree or higher. The institute, a think tank that says it believes in the benefits of well-managed immigration, reached its "5 percent" figure by drawing on responses to the U.S. Census Bureau's 2014 American Community Survey.

Wong, asked about the possibly too-high education levels suggested by his results, pointed out that the 35.5 percent of survey-indicated DACA recipients with bachelor's degrees came out only slightly greater than what's lately shown for naturalized American citizens. According to bureau data from 2016, 35.2 percent of naturalized citizens — those who obtained

citizenship after being born as non-citizens — reported having a bachelor's, graduate or professional degree.

DACA recipients' high education levels make sense, Wong said, because the program requires applicants to be currently in school, have graduated from high school, have obtained a General Education Development (GED) certificate, or be an honorably discharged Coast Guard or military veteran.

"We're actually requiring them to be more educated than the general population," Wong said, adding: "Now that the DACA population is getting older, we're talking about a pretty sizable number of college-educated individuals who are just beginning to hit their strides in their careers."

Castañeda suggested by email that Wong's survey provided more meaningful results than the MPI study, which was concerned with many more residents including individuals unlikely to seek DACA status. Castañeda wrote: "DACA recipients are by definition positively self-selected since they have to apply to the program, deal with the complex application process and requirements, and pay application fees."

**Another view**

We also asked Jessica Vaughan of the conservative-leaning Center for Immigration Studies to evaluate the survey cited by Castro.

By phone, Vaughan told us that she would not be surprised that DACA recipients participate in the labor force at high rates because for many, employment was likely "a motivating factor to apply for DACA." Vaughan speculated, though, that the survey overstated the employment and education rates of DACA recipients simply by being administered online and, she suggested, drawing from people with regular online access as well as individuals with the "time and inclination to fill out such a survey." It's reasonable, she said, to suppose that the same people would be more likely employed and well-educated.

## Our ruling

Castro said a "recent analysis" showed that 91 percent of DACA recipients are employed, in school or serving in the military.

Some 97 percent of respondents to an August 2017 online survey reported being employed or in school. However, the researchers asked no questions about military service.

We rate this claim Mostly True.

---

***MOSTLY TRUE*** – The statement is accurate but needs clarification or additional information. Click here for more on the six PolitiFact ratings and how we select facts to check.

Share The Facts

---

### Julián Castro

Former secretary, Housing and Urban Development

Says a "recent analysis" showed that 91 percent of Deferred Action for Childhood Arrivals (DACA) recipients are employed, in school or serving in the military.

Austin, Texas – Sunday, October 29, 2017





SHARE        READ MORE

# Tab N



# Fact Sheet

November 2017

# A Profile of Current DACA Recipients by Education, Industry, and Occupation

By Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps

## Executive Summary

Amid years of protracted congressional gridlock over immigration reform, the Obama administration in 2012 created the Deferred Action for Childhood Arrivals (DACA) program to offer work authorization and a temporary reprieve from deportation to certain unauthorized immigrants brought to the United States as children. Implemented through executive action, DACA was viewed by critics as an unconstitutional overreach of presidential authority, and the Trump administration announced in September 2017 that it would wind down the program.

While approximately 793,000 unauthorized immigrants have ever received DACA status since the program was launched on August 15, 2012, nearly 690,000 were current recipients as of September 4, 2017, according to U.S. Citizenship and Immigration Services (USCIS), which stopped accepting new applications the following day. Program participants will continue to retain their protections until their two-year DACA grant expires—a date that will vary by individual based on when status was initially received or renewed.

*Data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-participating population.*

Using a unique Migration Policy Institute (MPI) methodology that assigns legal status in U.S. Census Bureau data, thus permitting the modeling of the size and characteristics of certain foreign-born groups including unauthorized immigrants, this fact sheet provides new data on key characteristics of DACA holders. Among the indicators examined: recipients' educational attainment, school enrollment, labor force participation, industries, and occupations. MPI previously released analysis of some of these characteristics for the DACA-*eligible* population,[1] but data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-*participating* population.

With DACA holders set to begin losing their protection in growing numbers starting early next year—MPI estimates about 915 people on average will fall out of DACA status each day beginning March 6, 2018—there is growing momentum in Congress to find a legislative solution for the population of young unauthorized immigrants referred to as DREAMers.

Among the fact sheet's top findings:

- DACA recipients are almost as likely as U.S. adults in the same age group (15-32) to be enrolled in college (18 percent versus 20 percent), but less likely to have completed college (4 percent versus 18 percent). Forty-four percent of DACA holders

DACA FACTS



have completed secondary education, but not enrolled in college. Another 20 percent remain in secondary school.

- Among DACA participants, women are more likely than men to be enrolled in college (20 percent versus 15 percent), but less likely to be working (48 percent versus 64 percent).

- Fifty-five percent of DACA holders are employed, amounting to 382,000 workers. They account for 0.25 percent of all U.S. workers. Most DACA participants (62 percent) who are not in the labor force are enrolled in school.

- One out of three DACA recipients who are enrolled in school also work—a rate roughly equivalent to that of the U.S. young adult population.

- DACA holders are much less likely than young unauthorized immigrants who are not eligible for deferred action to work in construction jobs and are more likely to work in office support jobs, showing that DACA can be a means to occupational mobility.

- There are about 9,000 DACA recipients employed as teachers or similar education professionals, and another 14,000 in health-care practitioner and support jobs.

- While MPI estimates an average 915 individuals will fall out of DACA status daily beginning in March, the peak period will be in January – March 2019, when around 50,000 individuals a month will lose their DACA protections. MPI projects that all recipients will have lost status by early March 2020.

The estimates of DACA holders' characteristics offered here, as well as earlier MPI modeling of the populations that could be covered under several legalization scenarios introduced in Congress,[2] could help inform the ongoing debate over the future of these unauthorized immigrants who came to the United States as children.

# I.   Introduction and Methodology

For more than a decade, Migration Policy Institute (MPI) researchers have offered estimates and described characteristics of the population of unauthorized immigrants referred to as DREAMers: those brought to the United States as children, and who have been largely educated in this country, with many now in the workforce. Following creation of the Deferred Action for Childhood Arrivals (DACA) program in 2012,[3] MPI has described the population potentially eligible to apply, via a number of publications and data tools.[4]

In 2017, MPI researchers estimated that 1.3 million unauthorized immigrants met all the eligibility requirements to apply for DACA;[5] 897,605 ultimately did apply as of June 30, 2017, for an application rate of 68 percent.[6]

As with the earlier MPI research, the findings in this fact sheet draw upon a unique MPI methodology that permits estimation of the unauthorized population meeting the criteria to apply for the DACA program, as well as their demographic and other characteristics. The method combines data from two U.S. Census Bureau datasets: a pooled five-year file of the American Community Survey (ACS), which contains detailed characteristics of noncitizen populations at national and state levels, and the Survey of Income and Program Participation (SIPP), which includes data identifying which noncitizens are legal permanent residents and which are not.[7] MPI uses the legal status information in the SIPP to identify noncitizens who are likely to be unauthorized in the ACS—which does not collect legal status information—and in turn identifies unauthorized immigrants who are DACA-eligible based on their age, year of U.S. entry, and educational attainment.[8]

This fact sheet first examines the rate at which current DACA recipients are expected to lose their status under the program termination outlines announced by the Trump administra-

# Fact Sheet

tion on September 5, 2017. It then uses a revised dataset of DACA-eligible immigrants—reweighted to the participating population by age, gender, origin country, and state of residence in 2017—to provide national and state-level portraits of DACA holders on additional characteristics such as education, industry, and occupations, which are either not collected or not released by U.S. Citizenship and Immigration Services (USCIS).[9]

Understanding the characteristics of DACA recipients is important to assess the impact of the loss of work authorization—and potential deportation—of students and middle- and high-skilled workers in schools, universities, businesses, and immigrant communities.

## II. Losing DACA Protections: A Timeline

A total of 793,026 unauthorized immigrants were approved for DACA status between the program's launch on August 15, 2012 and June 30, 2017, according to the most recent data provided by USCIS.[10] Of these, nearly 689,800

(or 87 percent) still participated in the program as of September 4, 2017[11]—the day before the Trump administration announced a six-month wind-down of the program.[12] On September 5, USCIS stopped accepting applications from new applicants and restricted renewal to participants whose DACA eligibility would expire by March 5, 2018—six months later. October 5 was the last day renewal applications were accepted. According to the latest media accounts, USCIS estimated that 21,000 to 22,000 of the 154,000 individuals eligible to renew their status had failed to do so as of October 19, while 132,000 to 133,000 did apply for renewal.[13] Unless Congress, the administration, or federal courts take further action, DACA participants will begin to lose their status starting March 6, 2018.

MPI forecasts that on average approximately 915 DACA holders will lose their work authorization and protection from deportation each day between March 6, 2018 and March 5, 2020. When these immigrants fall back into unauthorized status and lose their work authorization, some employers may be forced to lay them off, and some may find themselves identified for deportation. Figure 1 shows the number of DACA holders expected to see their protections end by

**Figure 1. Predicted DACA Expirations from March 2018 through March 2020**



*Notes:* Expirations are based on U.S. Citizenship and Immigration Services (USCIS) reported data for March 2018 through August 2019 and Migration Policy Institute (MPI) estimates derived from USCIS data for September 2019 through March 2020. MPI's estimates assume that the distribution of expirations from September 2019 through March 2020 matches the distribution of renewal applications from September 2017 through March 2018, and that everyone who applied for renewal would be approved for benefits for a two-year period starting in the month when their prior eligibility period expired.
*Sources:* MPI calculations based on USCIS administrative data; USCIS, "Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)," accessed October 19, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_renewal_data.pdf.



month over this two-year period. The numbers are based on USCIS reporting that goes through August 2019 and MPI estimates of who is expected to lose protection from September 2019 onward through March 2020.

## III.  Education and Labor Force Profile of Current DACA Participants

This section discusses the education and labor force characteristics of unauthorized immigrants participating in the DACA program as of September 2017. To develop these estimates, the researchers employed USCIS administrative data released in September on DACA participants by age, gender, origin country, and state of residence, and used these data to reweight MPI's database on the DACA-eligible population to provide a more refined view of those holding the status as of September 2017.[14]

### A.  The Educational Profile of Current Recipients

DACA has an educational requirement: to qualify for the program, participants must either be in school[15] or hold a high school diploma or GED. Yet DACA holders are somewhat less educated than the overall U.S. population of similar ages (15 to 32). MPI estimates that 20 percent of DACA participants are still enrolled in secondary school (see Table 1). Forty-four percent have completed secondary education but have not pursued a college education at the time of the survey, compared to 19 percent among the broader U.S. population of similar age. Additionally, 18 percent of DACA recipients have enrolled in college, but have not yet graduated. Four percent have completed a bachelor's degree versus 17 percent of the broader U.S. population. The overall U.S. population, however, includes 9 percent who had dropped out of high school, while the DACA program excludes high-school dropouts unless they were enrolled in an adult education program.[16]

**Table 1. Educational Attainment and School Enrollment of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

| Education and Enrollment Status | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
| | | Total | Female | Male |
| **Total** | **78,108,000** | **689,800** | **362,700** | **326,900** |
| Not enrolled and have not completed high school (%) | 9 | N/A | N/A | N/A |
| Enrolled in secondary school (%) | 19 | 20 | 20 | 20 |
| Completed high school and not in higher education (%) | 19 | 44 | 41 | 47 |
| Enrolled in college (%) | 20 | 18 | 20 | 15 |
| Completed some college, not enrolled (%) | 16 | 15 | 15 | 15 |
| Completed at least a bachelor's degree (%) | 17 | 4 | 4 | 3 |

*Note:* "N/A" refers to the fact that virtually all current DACA participants have either completed high school or are currently enrolled—consistent with the program's education requirement. Secondary school includes middle school and high school. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

# Fact Sheet

For school enrollment rates for the 34 states with the most DACA holders, see Appendix 1.[17]

Women participating in DACA are more likely to be enrolled in college than men (20 percent versus 15 percent) but have similar college completion rates (see Table 1.)

## B.   The Workforce Status of Current Recipients

Most DACA participants work, but they represent a very small share of the U.S. labor force. The majority of DACA participants (64 percent) are in the labor force: 55 percent are working, and 8 percent are unemployed and looking for work (see Table 2). The 442,000 DACA recipients in the labor force amounted to 0.27 percent of the total U.S. labor force of 161 million people in September 2017.[18]

Many DACA participants are enrolled in school—either secondary school or college—and one out of three enrollees attends school and works at the same time, similar to the U.S. young adult population (see Table 2). Among those not enrolled in school, 69 percent are employed, and 22 percent are not in the labor force.

DACA-recipient men are more likely to be employed than women (64 percent versus 48 percent), reflecting a pattern similar to the overall unauthorized population.[19] Most of this gender gap in employment occurs among those who are not enrolled in school: 81 percent of men holding DACA status work, compared to 58 percent of women. Some female DACA holders, like other young women, are likely to be out of school and out of the labor force due to child-care responsibilities. Lack of English skills could also be a barrier to their employment, as women with DACA status who are not in school

**Table 2. School Enrollment and Employment Rates of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

| | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
| | | Total | Female | Male |
| **Total Number** | 78,108,400 | 689,800 | 362,700 | 326,900 |
| Employed (%) | 57 | 55 | 48 | 64 |
| Unemployed (%) | 9 | 8 | 8 | 8 |
| Not in labor force (%) | 35 | 36 | 44 | 27 |
| **Number Enrolled in School** | 33,303,500 | 261,200 | 145,100 | 116,100 |
| Employed (%) | 37 | 33 | 32 | 34 |
| Unemployed (%) | 7 | 8 | 8 | 8 |
| Not in labor force (%) | 56 | 59 | 60 | 58 |
| **Number Not Enrolled in School** | 44,804,900 | 428,600 | 217,600 | 210,800 |
| Employed (%) | 71 | 69 | 58 | 81 |
| Unemployed (%) | 10 | 9 | 9 | 9 |
| Not in labor force (%) | 19 | 22 | 33 | 11 |

*Notes:* School enrollment includes those in middle school, high school, or college. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients as of September 4, 2017. Percentages may not add up to 100 percent due to rounding.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.



and not in the labor force are more likely to have limited English proficiency than DACA men out of the labor force: 44 percent versus 32 percent.

See Appendix 2 for employment rates for the DACA population, both in and out of education, for the 34 states with the greatest numbers of participants.

## C.   *Major Industries and Occupations of Employment*

DACA participants work in a wide variety of industries and occupations, including many in professional jobs. They are less likely than unauthorized workers who do not have DACA to work in outdoor, manual labor occupations such as construction.

### I.   Top Industries of Employment

The most common industries of employment for DACA recipients are hospitality, retail trade, construction, education, health and social services, and professional services (see Table 3). Twenty-three percent of the estimated 382,000 employed DACA recipients (89,000 workers) are employed in the hospitality industry, i.e., arts, entertainment, recreation, accommodations, and food services. Fourteen

**Table 3. Employed Current DACA Recipients, by Major Industry Group**

| | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** | | |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Industry Group** | **382,400** | **100** |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 88,900 | 23 |
| Retail Trade | 54,000 | 14 |
| Construction | 41,300 | 11 |
| Educational, Health, and Social Services | 40,700 | 11 |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 39,000 | 10 |
| Manufacturing | 36,100 | 9 |
| Other Services (except public administration) | 23,900 | 6 |
| Agriculture | 14,400 | 4 |
| Finance, Insurance, Real Estate, and Rental and Leasing | 13,600 | 4 |
| Wholesale | 11,300 | 3 |
| Transportation and Warehousing | 9,600 | 3 |
| Information and Communications | 4,100 | 1 |
| Public Administration | 2,300 | <1 |
| Mining | <2,000 | <1 |
| Utilities | <1,000 | <1 |
| Armed Forces | <500 | <1 |

*Note:* Major industry groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bach-meier and Van Hook.

6

## Fact Sheet

percent (about 54,000) are employed in retail trade, while 11 percent (41,000) are employed in construction and a similar number in the education, health, and social services industry. One-tenth (39,000) are employed in profes-

sional scientific, management, administrative, and waste management services. Thus, DACA recipients are employed in a broad range of sectors, including many in industries with substantial numbers of professional jobs. Industry-level

**Table 4. Employed Current DACA Recipients, by Major Occupational Group**

|  | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** | | |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Occupational Group** | **382,400** | **100** |
| Food Preparation and Serving | 59,500 | 16 |
| Sales | 53,500 | 14 |
| Office and Administrative Support | 47,000 | 12 |
| Construction | 38,700 | 10 |
| Building and Grounds Cleaning and Maintenance | 32,300 | 8 |
| Production | 31,200 | 8 |
| Transportation and Material Moving | 26,400 | 7 |
| Management | 14,200 | 4 |
| Personal Care and Service | 14,000 | 4 |
| Farming, Fishing, and Forestry | 12,300 | 3 |
| Installation, Maintenance, and Repair | 10,800 | 3 |
| Education, Training, and Library | 8,800 | 2 |
| Health-Care Support | 8,600 | 2 |
| Health-Care Practitioners and Technical | 5,300 | 1 |
| Arts, Design, Entertainment, Sports, and Media | 3,500 | <1 |
| Business Operations Specialists | 2,800 | <1 |
| Computer and Mathematical | 2,600 | <1 |
| Protective Service | 2,300 | <1 |
| Financial Specialists | 2,200 | <1 |
| Architecture and Engineering | <2,000 | <1 |
| Community and Social Services | <2,000 | <1 |
| Life, Physical, and Social Science | <1,500 | <1 |
| Legal | <1,000 | <1 |
| Extraction | <1,000 | <1 |
| Military Specific | <500 | <1 |

*Note:* Major occupational groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.



data do not allow for analysis of the types of jobs that DACA recipients perform within each industry, however.

Appendix 3 provides data on the shares of employed DACA recipients working in the major industry groups for the 21 states with the most DACA workers.

### 2.     Top Occupations

Analysis of occupations allows for more precision in identifying the types of jobs in which DACA recipients work, though here also sample sizes limit MPI's analysis to the major groups provided by the Census Bureau. The occupations most commonly employing DACA holders are food preparation and serving (16 percent, or 60,000 workers), sales (14 percent, or 54,000 workers), and office and administrative support (12 percent, or 47,000 workers) (see Table 4). Among unauthorized immigrants in the same age range who are not eligible for DACA, a similar share is employed in food preparation, but the share of ineligible unauthorized immigrants working in sales and office jobs is lower.[20] DACA recipients are half as likely to work in construction as compared to their unauthorized counterparts not eligible for DACA (10 percent versus 20 percent), and the share working in production jobs is slightly lower: 8 percent versus 9 percent. These occupational distributions suggest that DACA recipients are substantially less likely to work in outdoor, manual-labor jobs than similarly aged unauthorized immigrants not eligible for DACA.

Significant numbers of DACA recipients are also employed in professional occupations. Approximately 14,000 are managers, while 9,000 are employed as teachers or related workers ("education, training, and library" occupations).[21] About 5,000 work as health-care practitioners and another 9,000 in health-care support occupations. Almost 3,000 each work in business operations and in computer or mathematical occupations.

See Appendix 4 for the shares of employed DACA recipients working in the major occupational

groups for the 21 states with the most DACA workers.

## IV.   Conclusions

Recent data from U.S. Citizenship and Immigration Services, offering more specifics on the population currently holding status under the Deferred Action for Childhood Arrivals program, have permitted the Migration Policy Institute to offer more detailed characteristics of those receiving DACA protections at the time the Trump administration placed the program on a six-month path to rescission in September 2017. These estimates should be useful for policymakers considering the potential impact at national and state levels of rescinding the program, as well as proposals to legalize DACA recipients and other DREAMers via legislation in Congress.

DACA has provided significant benefits to participants, which have been catalogued elsewhere.[22] The analysis in this fact sheet supports the notion that DACA recipients obtain better jobs than other unauthorized immigrants, with many employed in professional occupations.

The analysis presented here shows that DACA recipients are a largely middle-skilled population, either enrolled in school or working or both. DACA recipients are widely dispersed across industries and occupations, and so are integrated into many different parts of the nation's economy. While they represent a fraction of the U.S. millennial labor force, they have taken on prominence in the national immigration debate—by their own efforts as well as recognition in both parties that DREAMers here since childhood are a particularly sympathetic population.

As the DACA end date looms, with an average 915 young adults expected to begin losing their work authorization and protection from deportation daily beginning March 6, 2018 by MPI's count, resolving their futures undoubtedly will take on new urgency.

A Profile of Current DACA Recipients by Education, Industry, and Occupation

# Fact Sheet

## Appendices

**Appendix 1. School Enrollment Rates of Current DACA Recipients, Top States**

| | Current DACA Recipients | Enrolled in School | |
|---|---|---|---|
| | | In Secondary School (%) | In Postsecondary Institution (%) |
| **United States** | **689,800** | **20** | **18** |
| Alabama | 3,900 | 14 | 10 |
| Arizona | 25,500 | 19 | 14 |
| Arkansas | 4,700 | 31 | 9 |
| California | 197,900 | 18 | 20 |
| Colorado | 15,500 | 22 | 10 |
| Connecticut | 3,800 | 18 | 21 |
| Florida | 27,000 | 17 | 18 |
| Georgia | 21,600 | 22 | 13 |
| Illinois | 35,600 | 16 | 17 |
| Indiana | 9,000 | 22 | 15 |
| Kansas | 5,900 | 25 | 16 |
| Kentucky | 2,800 | 21 | 15 |
| Louisiana | 1,800 | 17 | 9 |
| Maryland | 8,100 | 23 | 23 |
| Massachusetts | 5,900 | 18 | 26 |
| Michigan | 5,400 | 19 | 21 |
| Minnesota | 5,500 | 28 | 21 |
| Missouri | 3,300 | 28 | 21 |
| Nevada | 12,400 | 25 | 12 |
| New Jersey | 17,400 | 20 | 16 |
| New Mexico | 6,000 | 24 | 20 |
| New York | 32,900 | 14 | 25 |
| North Carolina | 25,100 | 28 | 12 |
| Ohio | 4,000 | 22 | 16 |
| Oklahoma | 6,100 | 23 | 13 |
| Oregon | 10,200 | 18 | 17 |
| Pennsylvania | 4,900 | 21 | 24 |
| South Carolina | 6,000 | 25 | 11 |
| Tennessee | 7,900 | 27 | 7 |
| Texas | 113,000 | 22 | 17 |
| Utah | 8,900 | 22 | 18 |
| Virginia | 10,100 | 28 | 19 |
| Washington | 16,300 | 24 | 14 |
| Wisconsin | 6,700 | 24 | 16 |

*Notes*: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by U.S. Citizenship and Immigration Services (USCIS) as of September 4, 2017. Only states with sufficient sample sizes are shown. Secondary school includes both middle school and high school.
*Sources:* Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2010-14 American Community Surveys (ACS) and 2008 Survey of Income and Program Participation (SIPP), with legal status assignments by James Bachmeier of Temple University and Jennifer Van Hook of the Pennsylvania State University, Population Research Institute.



Fact Sheet

Appendix 2. Employment Rates of Current DACA Recipients In and Out of Education, Top States

| | Current DACA Recipients | Employed | | | Unemployed | | | Not in Labor Force | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) |
| **United States** | **689,800** | **55** | **12** | **43** | **8** | **3** | **5** | **36** | **22** | **14** |
| Alabama | 3,900 | 52 | 7 | 45 | 10 | 2 | 8 | 37 | 15 | 22 |
| Arizona | 25,500 | 47 | 9 | 38 | 8 | 2 | 6 | 45 | 23 | 22 |
| Arkansas | 4,700 | 52 | 7 | 44 | 9 | 2 | 6 | 40 | 30 | 10 |
| California | 197,900 | 55 | 12 | 43 | 9 | 3 | 6 | 36 | 22 | 13 |
| Colorado | 15,500 | 60 | 10 | 50 | 6 | 3 | 3 | 34 | 20 | 15 |
| Connecticut | 3,800 | 65 | 18 | 48 | 8 | 3 | 5 | 27 | 19 | 8 |
| Florida | 27,000 | 59 | 12 | 47 | 8 | 3 | 5 | 33 | 21 | 12 |
| Georgia | 21,600 | 55 | 10 | 45 | 7 | 2 | 5 | 38 | 23 | 15 |
| Illinois | 35,600 | 60 | 12 | 48 | 9 | 3 | 6 | 31 | 18 | 13 |
| Indiana | 9,000 | 56 | 13 | 43 | 6 | 2 | 4 | 38 | 22 | 16 |
| Kansas | 5,900 | 57 | 16 | 41 | 6 | 4 | 2 | 37 | 21 | 16 |
| Kentucky | 2,800 | 55 | 11 | 44 | 10 | 6 | 4 | 34 | 19 | 16 |
| Louisiana | 1,800 | 66 | 10 | 56 | 4 | 1 | 3 | 30 | 15 | 15 |
| Maryland | 8,100 | 58 | 17 | 41 | 9 | 5 | 4 | 33 | 24 | 9 |
| Massachusetts | 5,900 | 58 | 17 | 40 | 10 | 4 | 6 | 32 | 23 | 10 |
| Michigan | 5,400 | 59 | 18 | 41 | 9 | 4 | 5 | 33 | 18 | 14 |
| Minnesota | 5,500 | 56 | 19 | 36 | 10 | 5 | 5 | 34 | 24 | 10 |
| Missouri | 3,300 | 58 | 20 | 39 | 6 | 3 | 2 | 36 | 26 | 10 |
| Nevada | 12,400 | 58 | 12 | 46 | 8 | 3 | 6 | 34 | 22 | 12 |
| New Jersey | 17,400 | 60 | 12 | 48 | 8 | 3 | 5 | 32 | 20 | 12 |
| New Mexico | 6,000 | 48 | 11 | 36 | 7 | 2 | 4 | 46 | 31 | 15 |
| New York | 32,900 | 55 | 13 | 42 | 10 | 4 | 6 | 35 | 23 | 13 |
| North Carolina | 25,100 | 53 | 12 | 41 | 9 | 4 | 6 | 38 | 25 | 13 |
| Ohio | 4,000 | 49 | 12 | 37 | 14 | 2 | 12 | 37 | 24 | 12 |
| Oklahoma | 6,100 | 56 | 12 | 43 | 7 | 3 | 4 | 37 | 21 | 16 |
| Oregon | 10,200 | 57 | 12 | 46 | 10 | 4 | 7 | 32 | 20 | 12 |
| Pennsylvania | 4,900 | 51 | 12 | 39 | 11 | 4 | 6 | 38 | 29 | 10 |
| South Carolina | 6,000 | 47 | 9 | 38 | 11 | 2 | 9 | 42 | 25 | 18 |
| Tennessee | 7,900 | 57 | 9 | 48 | 6 | 3 | 3 | 37 | 23 | 14 |
| Texas | 113,000 | 53 | 12 | 41 | 7 | 2 | 5 | 40 | 24 | 16 |
| Utah | 8,900 | 59 | 14 | 44 | 10 | 3 | 7 | 31 | 22 | 9 |
| Virginia | 10,100 | 62 | 20 | 42 | 6 | 3 | 4 | 32 | 24 | 8 |
| Washington | 16,300 | 57 | 12 | 46 | 8 | 2 | 6 | 35 | 24 | 10 |
| Wisconsin | 6,700 | 51 | 12 | 39 | 12 | 5 | 6 | 37 | 22 | 15 |

Notes: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients, whether in or out of education, and regardless of age. Those under age 16 are categorized as not in the labor force. Those enrolled in school include those enrolled in middle school, high school, or college/university. Only states with sufficient sample sizes are shown. Percentages may not add up to 100 due to rounding.

Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

**App. 129**



Fact Sheet

**Appendix 3.  Employed Current DACA Recipients by Major Industry Group, Top States**

| | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current DACA Recipients** | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 59% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 47% | 44% | 43% | 49% | 43% | 47% | 41% | 38% | 43% |
| **Employed Current DACA Recipients** | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| *Share by Major Industry Group (%)* | | | | | | | | | | | | | | | | | | | | | | |
| Agriculture | 4% | 2% | 5% | 1% | 2% | 7% | 2% | <1% | <1% | <1% | 1% | <1% | 1% | 4% | 2% | 11% | 8% | 4% | 2% | 2% | 4% | 14% |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 23% | 19% | 22% | 29% | 28% | 21% | 21% | 27% | 19% | 27% | 32% | 25% | 24% | 26% | 29% | 21% | 23% | 20% | 21% | 30% | 28% | 19% |
| Construction | 11% | 14% | 7% | 13% | 13% | 12% | 21% | 5% | 14% | 5% | 11% | 7% | 10% | 17% | 18% | 8% | 15% | 25% | 15% | 9% | 15% | 9% |
| Educational, Health, and Social Services | 11% | 14% | 11% | 8% | 9% | 8% | 9% | 10% | 20% | 16% | 8% | 9% | 13% | 7% | 5% | 14% | 15% | 3% | 12% | 10% | 10% | 10% |
| Finance, Insurance, Real Estate, and Rental and Leasing | 4% | 6% | 3% | 5% | 3% | 4% | 6% | 4% | 3% | 2% | 6% | 3% | 4% | 1% | 3% | 4% | 1% | <1% | 4% | 6% | 2% | 3% |
| Information and Communications | 1% | 1% | 1% | <1% | <1% | <1% | <1% | 2% | <1% | 2% | 1% | <1% | 1% | <1% | <1% | 1% | 1% | 1% | <1% | <1% | <1% | 1% |
| Manufacturing | 9% | 3% | 9% | 4% | 5% | 3% | 12% | 16% | 4% | 11% | 5% | 7% | 5% | 17% | 11% | 6% | 6% | 8% | 8% | 17% | 4% | 7% |
| Mining | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 3% | <1% | <1% | 2% | 2% | <1% | <1% | <1% |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 10% | 13% | 10% | 13% | 16% | 13% | 10% | 12% | 16% | 9% | 9% | 13% | 10% | 8% | 5% | 10% | 8% | 18% | 8% | 5% | 9% | 11% |
| Public Administration | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% |
| Retail Trade | 14% | 15% | 16% | 12% | 17% | 19% | 9% | 14% | 12% | 18% | 15% | 15% | 16% | 8% | 9% | 17% | 11% | 6% | 15% | 11% | 15% | 12% |
| Transportation and Warehousing | 3% | 1% | 3% | 1% | <1% | 2% | 2% | 2% | 2% | 2% | 5% | 4% | 4% | 2% | 3% | <1% | 1% | 5% | 3% | 1% | 2% | 4% |
| Utilities | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Wholesale | 3% | 3% | 4% | 2% | 1% | 3% | 4% | 3% | 2% | 4% | 2% | 6% | <1% | 2% | 2% | 3% | 5% | 1% | 2% | 2% | 1% | 4% |
| Other Services (except public administration) | 6% | 8% | 7% | 8% | 4% | 7% | 3% | 5% | 6% | 3% | 4% | 9% | 9% | 6% | 9% | 3% | 4% | 4% | 7% | 5% | 7% | 5% |
| Armed Forces | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

*Notes:* The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 16 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major industry groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Industry group percentages are of employed recipients.

*Sources:* MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

**App. 130**



Fact Sheet

**Appendix 4.  Employed Current DACA Recipients by Major Occupational Group, Top States**

| | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current DACA Recipients** | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 59% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 47% | 44% | 43% | 49% | 43% | 47% | 41% | 38% | 43% |
| **Employed Current DACA Recipients** | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| *Share by Major Occupational Group (%)* | | | | | | | | | | | | | | | | | | | | | | |
| Architecture and Engineering | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | 4% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Arts, Design, Entertainment, Sports, and Media | <1% | <1% | <1% | <1% | <1% | 1% | 1% | 1% | 1% | 2% | <1% | 2% | 1% | 1% | 4% | <1% | 1% | <1% | <1% | <1% | <1% | <1% |
| Building and Grounds Cleaning and Maintenance | 8% | 11% | 8% | 11% | 19% | 13% | 8% | 7% | 10% | 8% | 8% | 11% | 8% | 10% | 6% | 9% | 6% | 17% | 6% | 6% | 11% | 9% |
| Business Operations Specialists | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | 2% | 2% | 2% | <1% | <1% | <1% | <1% | <1% | <1% |
| Community and Social Services | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% |
| Computer and Mathematical | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | 4% | 2% | <1% | 1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | 2% |
| Construction Trades | 10% | 11% | 6% | 14% | 13% | 11% | 18% | 6% | 10% | 4% | 10% | 7% | 9% | 15% | 17% | 7% | 11% | 23% | 14% | 10% | 15% | 10% |
| Education, Training, and Library | 2% | 3% | 2% | 1% | <1% | 1% | 1% | 2% | 5% | 3% | <1% | 1% | 4% | 2% | 2% | 3% | 4% | <1% | 3% | 4% | 2% | 2% |
| Extraction Workers | <1% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% |
| Farming, Fishing, and Forestry | 3% | 2% | 5% | 1% | <1% | 6% | 2% | <1% | <1% | <1% | 1% | <1% | 1% | 4% | 2% | 9% | 7% | 2% | 1% | 2% | 2% | 12% |
| Financial Specialists | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | 1% | 3% | <1% | 1% | 3% | <1% | <1% | <1% | <1% | <1% | 1% | 2% | <1% | <1% |
| Food Preparation and Serving | 16% | 13% | 13% | 18% | 21% | 14% | 15% | 18% | 14% | 21% | 18% | 19% | 19% | 20% | 16% | 16% | 14% | 18% | 13% | 17% | 17% | 15% |
| Health-Care Practitioners and Technical | 1% | 1% | 1% | <1% | <1% | 1% | <1% | 1% | 5% | <1% | 2% | 2% | 1% | <1% | <1% | <1% | 2% | <1% | 2% | 3% | 2% | 2% |
| Health-Care Support | 2% | 2% | 2% | 3% | 1% | <1% | 3% | 2% | 5% | 3% | 2% | 2% | 2% | <1% | 1% | 3% | 3% | <1% | 2% | 2% | 3% | 2% |
| Installation, Maintenance, and Repair Workers | 3% | 4% | 3% | 3% | <1% | 3% | 2% | 2% | 2% | 4% | 3% | 2% | 2% | 3% | 2% | 5% | 4% | <1% | 3% | 3% | 3% | 3% |
| Legal | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Life, Physical, and Social Science | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | 1% | <1% | <1% | 1% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% |
| Management | 4% | 3% | 4% | 4% | 1% | 3% | 4% | 4% | 3% | 2% | 7% | 4% | 3% | 2% | 5% | 3% | 4% | 2% | 4% | 5% | 3% | 4% |
| Office and Administrative Support | 12% | 13% | 14% | 9% | 8% | 12% | 10% | 16% | 11% | 16% | 15% | 12% | 13% | 11% | 12% | 9% | 8% | 6% | 12% | 12% | 7% | 7% |
| Personal Care and Service | 4% | 6% | 3% | 4% | 6% | 5% | <1% | 4% | 2% | 2% | 3% | 2% | 7% | 3% | 2% | 6% | 6% | <1% | 4% | 2% | 4% | 4% |
| Production | 8% | 5% | 7% | 4% | 4% | 4% | 14% | 13% | 5% | 5% | 5% | 7% | 5% | 12% | 9% | 6% | 7% | 10% | 8% | 13% | 3% | 8% |
| Protective Service | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | 2% | <1% | <1% | <1% | <1% | <1% |
| Sales | 14% | 16% | 16% | 16% | 16% | 16% | 11% | 14% | 13% | 13% | 13% | 12% | 14% | 8% | 10% | 12% | 6% | 15% | 10% | 6% | 20% | 12% |
| Transportation and Material Moving | 7% | 5% | 8% | 7% | 2% | 6% | 5% | 5% | 5% | 10% | 12% | 4% | 6% | 10% | 7% | 6% | 7% | 6% | 11% | 3% | 9% | 9% |
| Military Specific | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

*Notes:* The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 16 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major occupational groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Occupational group percentages are of employed recipients.

*Sources:* MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.



# Endnotes

1    See Randy Capps, Michael Fix, and Jie Zong, *The Education and Work Profiles of the DACA Population* (Washington, DC: Migration Policy Institute, 2017), www.migrationpolicy.org/research/education-and-work-profiles-daca-population.

2    For Migration Policy Institute (MPI) estimates of populations that could qualify for legal status under a range of legislative proposals, see Jeanne Batalova, Ariel G. Ruiz Soto, Sarah Pierce, and Randy Capps, *Differing DREAMs: Estimating the Unauthorized Populations that Could Benefit under Different Legalization Bills* (Washington, DC: MPI, 2017), www.migrationpolicy.org/research/differing-dreams-estimating-unauthorized-populations-could-benefit-under-different.

3    The specific eligibility requirements for the Deferred Action for Childhood Arrivals (DACA) program were: (1) minimum age of 15 to apply; (2) arrival in the United States before age 16; (3) maximum age of 30 as of June 15, 2012 (when the program was announced); (4) physical presence and lack of lawful status in the United States on June 15, 2012; (5) continuous presence in the United States since June 15, 2007, five years before DACA was announced; (6) current school enrollment, completion of high school or its equivalent, or honorable discharge from the U.S. armed forces or Coast Guard; and (7) absence of a felony, significant misdemeanor, three or more misdemeanor convictions; and does not pose a threat to public safety or national security. See U.S. Citizenship and Immigration Services (USCIS), "Consideration of Deferred Action for Childhood Arrivals (DACA)," updated October 6, 2017, www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca#guidelines.

4    For a complete listing of MPI's work in this area, see MPI, "DREAM ACT/Deferred Action," www.migrationpolicy.org/topics/dream-actdeferred-action.

5    MPI estimated that as of 2017, there were 1.9 million unauthorized immigrants who met the age at entry and years of U.S. residence requirements constituting the minimum threshold to potentially be considered for DACA. Of that number, an estimated 1.3 million immediately met all eligibility requirements, another 408,000 could have met eligibility by enrolling in an adult education program leading to a high school degree or equivalent, while 120,000 would have aged into eligibility once they reached the program's minimum application age of 15. Because USCIS stopped accepting applications in September 2017, these last two groups can no longer age into eligibility or enroll in adult education to qualify for the program. Eligibility due to adult education program enrollment and ineligibility due to criminal background or lack of continuous U.S. presence were not modeled due to lack of data. For methodological details, see the appendix section in Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population*.

6    USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (June 30)," accessed October 30, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf.

7    MPI used data from the Census Bureau's 2010-14 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP). While the ACS is issued annually, the SIPP is released only every several years. MPI is in the process of adapting the methodology to the 2014 SIPP, which was issued earlier in 2017. By using the SIPP's numbers on legal permanent residents and naturalized citizens, MPI is able to look at the characteristics of the remaining foreign-born population, removing those likely to be on long-term nonimmigrant visas, Temporary Protected Status, or similar programs, leaving a residual population of those believed to be unauthorized. The characteristics of that population can then be assigned to the much larger and more recent ACS file. For more on MPI's methodology, see Jeanne Batalova, Sarah Hooker, and Randy Capps, *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington,

A Profile of Current DACA Recipients by Education, Industry, and Occupation

DC: MPI, 2014), www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

8    The SIPP and ACS data do not permit modeling enrollment in adult education programs that lead to a high school degree or equivalent, or to model criminal convictions or security-related disqualifications.

9    USCIS publication in September 2017 of new data on DACA recipients' age, gender, origin-country, and residence-state distributions permits MPI to describe the educational and employment characteristics of the DACA-*recipient* population. Previously, MPI could only model characteristics for the DACA-*eligible* population, in particular those meeting all criteria to apply. The characteristics detailed here for DACA recipients vary somewhat from those previously offered for the DACA-eligible population (see Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population*) because the DACA-recipient profile looks somewhat different than that of the DACA-eligible cohort, as individuals did not apply in similar proportions. Younger immigrants, for instance, are more likely to be enrolled in school and less likely to be employed. Women are more likely than men to be enrolled in school, less likely to be employed overall and in construction, and more likely to be employed in service industries.

10    USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals."

11    USCIS, "Approximate Active DACA Recipients: Country of Birth As of September 4," accessed October 28, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

12    Justice Department, "Attorney General Sessions Delivers Remarks on DACA," September 5, 2017, www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca. See also Department of Homeland Security (DHS), "Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)," last updated September 5, 2017, www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

13    Jill Colvin, "22,000 Young Immigrants Eligible for DACA Renewals Failed to Apply in Time," Business Insider, October 19, 2017, www.businessinsider.com/22000-daca-recipients-missed-renewal-deadline-2017-10; Alan Neuhauser, "DHS: 1 in 7 DACA Recipients Did Not Apply to Renew Status," *U.S. News and World Report, October 19, 2017, www.usnews.com/news/national-news/articles/2017-10-19/dhs-1-in-7-daca-recipients-did-not-apply-to-renew-status*.

14    MPI used the 2010-14 American Community Survey (ACS) to develop the database of the population eligible for DACA: five years of data were used to improve the precision of the analysis, allowing for estimates for a broader range of industries, occupations, and states than would be possible using the single-year 2014 ACS. MPI has not yet finalized a dataset of the unauthorized population using more recent years of the ACS.

15    Three types of schools are considered according to USCIS guidelines: 1) a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements; 2) an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where the enrollee is working to achieve such placement; or 3) an education program assisting students either in obtaining a regular high school diploma or its equivalent, or in passing a GED exam or other state-authorized exam. See USCIS, "Frequently Asked Questions," updated October 6, 2017, www.uscis.gov/archive/frequently-asked-questions.



16      The ACS data employed here do not identify individuals enrolled in adult education or career train-ing programs, so unauthorized immigrants who meet other eligibility requirements but who have not completed high school and are not enrolled in school are excluded from the DACA-participating group. USCIS has not released data on participants' educational attainment or school enrollment.

17      This analysis was limited to 34 states because the other states did not have sufficiently large DACA populations to develop reliable estimates. In some cases, the data offered are limited to 21 states, for the same reason.

18      An estimated 382,000 DACA recipients are employed (see Table 2). This represents 0.25 percent of all U.S. workers (152 million) as of September See U.S. Department of Labor, Bureau of Labor Statis-tics, "The Employment Situation—September 2017" (news release USDL-17-1347, October 6, 2017), www.bls.gov/news.release/pdf/empsit.pdf.

19      MPI Data Hub, "Unauthorized Immigrant Population Profiles," accessed October 24, 2017, www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles.

20      Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population.* The population not eligible for DACA includes those who met all DACA eligibility criteria except for the educational requirement, those who arrived in the United States after 2012, those who arrived when they were over age 15, and those who were ages 31 or older in 2012.

21      Prior to publication of the more complete USCIS data on current DACA recipients in September 2017, MPI estimated that 20,000 unauthorized immigrants who were DACA-*eligible* were in the teaching occupation. This estimate included those who were eligible for DACA but not participating in the program as of September 2017, as well as those who reported a teaching occupation but were not employed at the time of the ACS survey in 2010-14. The lower estimate presented here is limited to those *participating* in the program and employed as teachers and similar education professionals at the time of the ACS survey.

22      See for instance, Tom K. Wong and Carolina Valdivia, *In Their Own Words: A Nationwide Survey of Undocumented Millennials* (United We Dream Network and Unbound Philanthropy, 2014), http://unitedwedream.org/wp-content/uploads/2014/05/Undocumented-Millennials-Survey-Summary.pdf; Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *New Study of DACA Beneficiaries Shows Positive Economic and Educa-tional Outcomes* (Washington, DC: Center for American Progress, 2016), www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-posi-tive-economic-and-educational-outcomes/; Roberto G. Gonzalez, *DACA at Year Three: Challenges and Opportunities in Accessing Higher Education and Employment* (Washington, DC: American Immigra-tion Council, 2016), www.americanimmigrationcouncil.org/research/daca-year-three-challenges-and-opportunities-accessing-higher-education-and-employment.

A Profile of Current DACA Recipients by Education, Industry, and Occupation

# Fact Sheet

## About the Authors



**Jie Zong** is an Associate Policy Analyst at the Migration Policy Institute, where she provides quantitative research support across MPI programs, particularly the National Center on Immigrant Integration Policy. Her research areas include structural and cultural integration of first- and second-generation immigrants, protective factors for children in refugee families, and workforce development in the United States.

Previously, Ms. Zong interned with the Center for Migration Studies of New York, where she provided research support on U.S. refugee and asylum issues, as well as the U.S. immigration detention system.

She holds a master's degree of public administration from New York University's Wagner Graduate School of Public Service with a specialization in policy analysis, and a bachelor of the arts degree in international finance from the Central University of Finance and Economics in China.



**Ariel G. Ruiz Soto** is an Associate Policy Analyst at MPI, where he provides quantitative research support across MPI programs. His research areas focus on the impact of U.S. immigration policies on immigrants' experiences of socio-economic integration across varying geographical and political contexts. More recently, Mr. Ruiz Soto has analyzed methodological approaches to estimate sociodemographic trends of the unauthorized immigrant population in the United States.

Mr. Ruiz Soto holds a master's degree from the University of Chicago's School of Social Service Administration with an emphasis on immigration policy and service provision, and a bachelor's degree in sociology from Whitman College.

**Jeanne Batalova** is a Senior Policy Analyst at MPI and Manager of the MPI Data Hub, a one-stop, online resource that provides instant access to the latest facts, stats, and maps covering U.S. and global data on immigration and immigrant integration. She is also a Nonresident Fellow with the Migration Policy Institute Europe.

Her areas of expertise include the impacts of immigrants on society and labor markets; social and economic mobility of first- and second-generation youth and young adults; and the policies and practices regulating immigration and integration of highly skilled workers and foreign students in the United States and other countries.

Dr. Batalova earned her PhD in sociology, with a specialization in demography, from the University of California-Irvine; an MBA from Roosevelt University; and bachelor of the arts in economics from the Academy of Economic Studies, Chisinau, Moldova.





**Julia Gelatt** is a Senior Policy Analyst at the MPI, working with the U.S. Immigration Policy Program. Her work focuses on the legal immigration system, demographic trends, and the implications of local, state, and federal U.S. immigration policy.

She previously worked as a Research Associate at the Urban Institute, where her mixed-methods research focused on state policies toward immigrants; barriers to and facilitators of immigrant families' access to public benefits and public prekindergarten programs; and identifying youth victims of human trafficking. She was a Research Assistant at MPI before graduate school.

Dr. Gelatt earned her PhD in sociology, with a specialization in demography, from Princeton University, where her work focused on the relationship between immigration status and children's health and well-being. She earned a bachelor of the arts in sociology/anthropology from Carleton College.



**Randy Capps** is Director of Research for U.S. Programs at MPI. His areas of expertise include immigration trends, the unauthorized population, immigrants in the U.S. labor force, the children of immigrants and their well-being, and immigrant health-care and public benefits access and use.

Dr. Capps, a demographer, has published widely on immigrant integration at the state and local level. He also has examined the impact of the detention and deportation of immigrant parents on children.

Prior to joining MPI, Dr. Capps was a researcher in the Immigration Studies Program at the Urban Institute (1993-96, and 2000-08).

He received his PhD in sociology from the University of Texas in 1999 and his Master of Public Affairs degree, also from the University of Texas, in 1992.

## Acknowledgments

This research was supported by the Ford Foundation, the Carnegie Corporation of New York, Unbound Philanthropy, and the Open Society Foundations.

© 2017 Migration Policy Institute.
All Rights Reserved.

Cover Design and Layout: Liz Heimann, MPI

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Zong, Jie, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps. 2017. *A Profile of Current DACA Recipients by Education, Industry, and Occupation.* Washington, DC: Migration Policy Institute.

A Profile of Current DACA Recipients by Education, Industry, and Occupation

**App. 136**

The Migration Policy Institute (MPI) is an independent, nonpartisan, nonprofit think tank dedicated to the study of the movement of people worldwide. The Institute provides analysis, development, and evaluation of migration and refugee policies at the local, national, and international levels. It aims to meet the rising demand for pragmatic responses to the challenges and opportunities that migration presents in an ever more integrated world.

WWW.MIGRATIONPOLICY.ORG



1400 16th Street, NW, Suite 300, Washington, DC 20036
202-266-1940 (t)  |  202-266-1900 (f)



**App. 137**

# Tab O


(http://www.5minutesuccess.com/)

# 5 MINUTE SUCCESS (HTTP://WWW.5MINUTESL

PODCAST (HTTP://WWW.5MINUTESUCCESS.COM/CATEGORY/PODCAST/)

Episode 48 – Diego Corzo

admin (http://www.5minutesuccess.com/author/admin/)  –  April 24, 2018
(http://www.5minutesuccess.com/48-diego-corzo/)





**Diego Corzo – Secrets of a Top House Hacker Revealed: 5 Minute Success – The Podcast, Episode 48**

Diego Corzo is a Forbes-featured millennial real estate entrepreneur, investor, mentor, and speaker. Diego was born in Lima, Peru and moved to the United States with his family when he was 9 years old. Diego graduated top 1% from Florida State University with 2 bachelor degrees in less than 4 years. He joined The Nino Real Estate Group in 2015, which sold 200+ units and sold over $50+ million in sales volume in just 3 years.

Diego is also a real estate investor, he is on a path to financial freedom and aspires to help others, especially Millennials, become financially free and reach their full potential. Diego's story has now been featured in Forbes, CNN Money, Inc.com, Entreprenuer.com, Fox News, Telemundo and Univision.

**In this episode, Karen and Diego discuss:**

- Success Story of Diego
- Commit to Get Leads
  - Diego doesn't do cold calls; he tries to meet as many people as possible through happy hours and lunches
- Consult to Sell
  - Diego tends to seal client relationships initially through house renting which translates to future buys
  - You can get an owner occupant loan where you can put down 5 percent! Many Millennial think 20% down is the minimum
- Connect to Build and Grow
  - You should only work for equity or knowledge
- Success Thinking, Activities and Vision
  - Give your time freely to surround yourself with people who are achieving at a higher level
- Sweet Spot of Success

> "The book 'Rich Dad, Poor Dad' changed my mindset because I found out that there are two ways to make money... you can either change your time for money or make your money work for you." — Diego Corzo

**\*5 Minute Success – Listener Giveaway\***

Go to HouseHackingClub.com/optin
(https://go.househackingclub.com/optin) to receive
your FREE Guide to begin YOUR House Hacking
journey!

**Connect with Diego Corzo:**

Website: Freeby26.com (http://freeby26.com/)

Twitter: @diegocorzo (https://twitter.com/diegocorzo?
lang=en)

LinkedIn: Diego Corzo
(https://www.linkedin.com/in/diegocorzo/)

**About the Podcast:**

Join host Karen Briscoe each week to learn how you
can achieve success at a higher level by investing just
5 minutes a day! Tune in to hear powerful, inspirational
success stories and expert insights from
entrepreneurs, business owners, industry leaders, and
real estate agents that will transform your business
and life. Karen shares a-ha moments that have
shaped her career and discusses key concepts from
her book Real Estate Success in 5 Minutes a Day:
Secrets of a Top Agent Revealed.

Here's to your success in business and in life!

**Connect with Karen Briscoe:**

Twitter: @5MinuteSuccess
(https://twitter.com/5MinuteSuccess)

Facebook: 5MinuteSuccess/
(https://www.facebook.com/groups/5minutesuccess/)

Website: 5MinuteSuccess.com

Email: Karen@5MinuteSuccess.com

(mailto:Karen@5MinuteSuccess.com)

**5 Minute Success Links**

Learn more about Karen's book, Real Estate Success
in 5 Minutes a Day
(http://www.5minutesuccess.com/the-books/)

Subscribe to 5 Minute Success Podcast on iTunes
(https://itunes.apple.com/us/podcast/5-minute-
success-podcast/id1291784244?mt=2)

Spread the love and share the secrets of 5 Minute
Success with your friends and colleagues!

Audio production by Turnkey Podcast Productions
(https://www.turnkeypodcast.com/). You're the expert.
Let us help you prove it.

Tagged April 2018
(http://www.5minutesuccess.com/tag/april-2018/),
Diego Corzo
(http://www.5minutesuccess.com/tag/diego-corzo/),
House Hacking
(http://www.5minutesuccess.com/tag/house-
hacking/), Karen Briscoe
(http://www.5minutesuccess.com/tag/karen-
briscoe/), Passive Income
(http://www.5minutesuccess.com/tag/passive-
income/), The Podcast
(http://www.5minutesuccess.com/tag/the-podcast/)

---

Episode 47 – Potomac              Episode 49 – Jeffrey Shaw
Concierge                         (http://www.5minutesucces

                                         jeffrey-shaw/)

(http://www.5minutesuccess.com/47-
potomac-concierge/)

---

**LEAVE A REPLY**

Your email address will not be published. Required
fields are marked *

| Comment |
| --- |
|  |

| Name* | Email* |
| --- | --- |

| Website |
| --- |

POST COMMENT

# Tab P

7/18/2018                    DACA Decisions Could Affect Number of North Texas Teachers - NBC 5 Dallas-Fort Worth

    Home    News    Weather    Sports    Entertainment                                   ☀ 105°   Connect


BULL DOG   SKINCARE FOR MEN        You should get your own.

# DACA Decisions Could Affect Number of North Texas Teachers

By Larry Collins

Published at 7:58 PM CST on Jan 10, 2018 | Updated at 10:49 PM CST on Jan 10, 2018



Employers around North Texas are keeping close watch on the courts, especially in school districts that would lose teachers who are in the United States under the Deferred Action for Childhood Arrivals Act. (Published Wednesday, Jan. 10, 2018)

      

Now Playing
DACA Decisions Could Affect Number of North Texas Teachers

Up Next
Texas Baby Thrives Despite Critical Birth Defect

Despite Heat, Drum Corps Members Play Away in Denton

Man Charged With Attacking Girl, 12, Near School Bus

### TRENDING STORIES

1    VIDEO New Record Set! High Temps Lead to Record Demands for Power

2    VIDEO Siberian Gun Lover's Path to Allegedly Gathering Info on NRA

3    VIDEO Man Charged With Attacking Girl, 12, Near School Bus

4    VIDEO Another Local Driver Comes Forward After Her Kia 'Exploded'

### WEATHER FORECAST


⚡ WEATHER ALERTS                          View all

DFW Airport, TX

 105° Scattered Clouds
Feels Like 107

    
Radar         Forecast        Maps

North Texans are bracing for a decision on the Deferred Action for Childhood Arrivals Act (DACA) and the impact it could have on families across the state.

A federal judge halted a plan from President Donald Trump's administration to end the program that allows immigrants who were brought to the United States illegally as youth to stay and work. The ruling says the administration must renew protections for so-called "dreamers" until the lawsuits can play out in court.

Employers around North Texas are keeping close watch on the courts, especially school districts that would lose teachers who are here under DACA.

WATCH LIVE        NBC 5 News at 6pm
                   The latest local news, weather and investigative

**App. 145**

Home    News    Weather    Sports    Entertainment                                     ☀ 105    Connect

Do you agree or disagree with CVS's decision to fire two employees for calling the police on a black woman who was using a coupon they deemed to be fraudulent?

○ Agree
○ Disagree
○ Not sure / No opinion

NEXT

Insights powered by CivicScience | Privacy Policy

Fisherman Reels in Prosthetic Leg

At the Little Red River in Heber Springs, Arkansas, Michael Nelson reeled in a prosthetic leg during his normal fishing time. Within hours, he tracked down the owner who said the leg had been missing since a boating accident in April. (Published Tuesday, July 17, 2018)

"You wake up with it. You go to sleep with it. It's very present in your mind," he said. "I have nothing to go back to. My life is here. My family is here. My career is here."

In the Dallas Independent School District, there are 68 DACA employees, including 36 teachers. The Fort Worth Independent School District has 76 DACA employees, including 27 teachers.

"The only preparation that we can have is to have substitute teachers, which would not be ideal," Dallas ISD Superintendent Michael Hinojosa said.

• **Judge Blocks Trump Decision to End Young Immigrant Program**

What teacher shortages around the nation, it could become a nightmare situation.

"It was even more catastrophic for us, because many of these are bilingual teachers and that's the biggest shortage area," Hinojosa said. "People don't realize that we have 44 percent of our students as English learners."

"If we would have lost them in the middle of the year, it would have had a traumatic impact on our school system," Hinojosa said.

NEWSLETTERS
Receive the latest local updates in your inbox
Email          Sign up
Privacy policy | More Newsletters

City Saves Boy's Hot Dog Stand

**App. 146**

 Home    News    Weather    Sports    Entertainment                         105    Connect

Hinojosa said the recent court ruling offers some help and "wiggle room."

"The actual ruling by the judge helps us, because it defers it until there is a resolution of that lawsuit. So we can at least get through the entire academic year and it won't create chaos in our classrooms," he said.

"The ruling, it's a spark of light," Juarez added. "You have to put on your brave face for your kids."

 **New Record Set! High Temps Lead to Record Demands for Power**

Dallas ISD is working provide resources for teachers and students' families affected by DACA.

*Get the latest from NBC DFW anywhere, anytime*

**Download the App**
Available for **IOS** and **Android**

**Follow NBC DFW**
  

### You May Like

Promoted Links by Taboola

Remember Hannah From 'Hollyoaks'? Where She Ended Up Is Incredible
NinjaJournalist

Melissa Sue Anderson Confirms What We Knew All Along
IcePop

This Famous Rock'n'roll Groupie Gave Birth to One of Today's Biggest Actresses
DirectExpose

Mass. Officer Dies After Being Hit With Rock, Shot With Own Gun

Texas Man Catches Massive Hammerhead Shark in Gulf of Mexico

Woman Fakes Cancer, Tricks Couple Into Taking Care of Her: Police

SPONSORED LINKS

- Ali MacGraw Turns 79 & Looks Totally Different Today (Healthy George)
- This Photo Is Not Edited, Look Closer (Travelfuntu)
- Code in Node.js, Java, Python, & Other Open Source Languages (Microsoft Azure)
- 17 Stars Who Gave Up Their Children For Adoption (Topix Stars)
- Gruesome Civil War Photos Released From Government Vault (BlitzLift)
- Lava Flies Through Roof of Hawaii Tour Boat, Injuring 23

MORE FROM NBC Dallas-Fort Worth

**App. 147**

# Tab Q

7/18/2018                    A New Threat to DACA Could Cost States Billions of Dollars - Center for American Progress



Center for American Progress

IMMIGRATION

# A New Threat to DACA Could Cost States Billions of Dollars

By Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez   |   Posted on July 21, 2017, 10:05 am



AP/Jacquelyn Martin

In this June 15, 2012 photo, undocumented immigrants who live in Maryland, hold signs saying "Thank You President Obama" in Washington, D.C.

Over the course of its five-year history, Deferred Action for Childhood Arrivals (DACA), has changed the lives of nearly 800,000 young people who have lived in the United States since their childhood.

App. 149

By providing the opportunity for individuals to come forward, pass rigorous background checks, and obtain permission to live and work in the United States lawfully, DACA has helped its recipients achieve milestones typically associated with the American dream, such as pursuing higher education, earning better wages to support their families, and buying homes. Nearly 8 in 10 voters support allowing DREAMers to remain permanently in the country, including almost three-quarters of Trump voters, and only 14 percent believe they should be forced to leave.

But despite the benefits of the popular program, DACA is now facing a dangerous new attack. In late June, officials from 10 states led by Texas Attorney General Ken Paxton issued an ultimatum to the Trump administration and Attorney General Jeff Sessions: End the DACA program by September 5 or face a lawsuit in front of the same federal judge who halted a separate initiative that would have provided similar temporary protections to the parents of U.S. citizens and lawful permanent residents. If DACA ends—whether because the administration accedes to the demands of DACA opponents or the initiative is enjoined by a federal court—hundreds of thousands of young people will be forced out of the workforce, upending their lives and the lives of their families, creating tremendous disruption for businesses, and sending shockwaves through the economies of most states.

According to the U.S. Citizenship and Immigration Services (USCIS), 787,580 people received DACA through March 2017. The data presented in this column update previous columns from November 2016 and January 2017, accounting for the additional DACA applicants that were approved since their publications.

Using data from two Center for American Progress publications—a report that estimates the gross domestic product (GDP) declines that would accompany removing all unauthorized workers from the country and a survey that estimates the share of DACA recipients who are employed—CAP estimates that ending DACA would result in a loss of $460.3 billion from the national GDP over the next decade. Ending DACA would remove an estimated 685,000 workers from the nation's economy.

Altogether, the 10 states demanding that the Trump administration end DACA—Alabama, Arkansas, Idaho, Kansas, Louisiana, Nebraska, Tennessee, Texas, South Carolina, and West Virginia—stand to lose more than $8 billion annually in state GDP if they get their wish.

TABLE 1
**State-by-state annual GDP loss from removing workers with DACA**

| State | Number of DACA recipients | Estimated number of DACA workers | Estimated annual GDP loss from removing DACA workers |
|-------|---------------------------|----------------------------------|------------------------------------------------------|
| Alabama | 4,270 | 3,715 | $182,030,100 |
| Alaska | 138 | 120 | $8,573,284 |

**App. 150**

7/18/2018                           A New Threat to DACA Could Cost States Billions of Dollars – Center for American Progress

| | | |
|---|---|---|
| Alaska | 130 | 120 | $0,372,204 |
| Arizona | 27,865 | 24,243 | $1,322,494,899 |
| Arkansas | 5,099 | 4,436 | $236,028,211 |
| California | 222,795 | 193,832 | $11,620,786,775 |
| Colorado | 17,258 | 15,014 | $856,946,796 |
| Connecticut | 4,929 | 4,288 | $315,289,496 |
| Delaware | 1,444 | 1,256 | $88,119,069 |
| District of Columbia | 764 | 665 | $48,219,513 |
| Florida | 32,795 | 28,532 | $1,524,721,538 |
| Georgia | 24,135 | 20,997 | $1,025,191,287 |
| Hawaii | 558 | 485 | $28,844,415 |
| Idaho | 3,132 | 2,725 | $159,526,996 |
| Illinois | 42,376 | 36,867 | $2,296,685,031 |
| Indiana | 9,840 | 8,561 | $516,409,548 |
| Iowa | 2,798 | 2,434 | $188,481,274 |
| Kansas | 6,803 | 5,919 | $335,913,999 |
| Kentucky | 3,062 | 2,664 | $155,574,096 |
| Louisiana | 2,049 | 1,783 | $91,007,953 |
| Maine | 95 | 83 | $3,967,200 |
| Maryland | 9,785 | 8,513 | $509,446,852 |
| Massachusetts | 7,934 | 6,903 | $606,598,730 |
| Michigan | 6,430 | 5,594 | $418,625,150 |
| Minnesota | 6,255 | 5,442 | $376,707,375 |
| Mississippi | 1,460 | 1,270 | $62,337,508 |
| Missouri | 3,524 | 3,066 | $209,005,419 |
| Montana | 72 | 63 | $3,507,840 |
| Nebraska | 3,371 | 2,933 | $150,222,997 |
| Nevada | 13,070 | 11,371 | $603,921,133 |
| New Hampshire | 367 | 319 | $26,873,575 |
| New Jersey | 22,024 | 19,161 | $1,587,108,546 |
| New Mexico | 6,815 | 5,929 | $384,647,119 |
| New York | 41,970 | 36,514 | $2,598,303,273 |
| North Carolina | 27,385 | 23,825 | $1,198,925,683 |
| North Dakota | 98 | 85 | $8,611,260 |
| Ohio | 4,442 | 3,865 | $251,609,158 |
| Oklahoma | 6,865 | 5,973 | $343,573,469 |
| Oregon | 11,281 | 9,814 | $605,603,130 |
| Pennsylvania | 5,889 | 5,123 | $357,080,795 |
| Rhode Island | 1,229 | 1,069 | $61,058,661 |
| South Carolina | 6,406 | 5,573 | $252,065,985 |
| South Dakota | 252 | 219 | $12,204,360 |
| Tennessee | 8,340 | 7,256 | $347,345,511 |
| Texas | 124,300 | 108,141 | $6,294,162,134 |
| Utah | 9,711 | 8,449 | $476,470,215 |
| Vermont | 42 | 37 | $2,429,910 |

**App. 151**

| Virginia | 12,134 | 10,557 | $711,429,519 |
| Washington | 17,843 | 15,523 | $1,098,330,382 |
| West Virginia | 117 | 102 | $5,445,765 |
| Wisconsin | 7,565 | 6,582 | $427,041,340 |
| Wyoming | 621 | 540 | $39,079,530 |

Source: See Methodology.

CAP

The present threat to those with DACA is real. Moreover, because DACA recipients are so well integrated into families, communities, schools, and workplaces throughout the country, the economic and social effects of ending DACA would be widespread and significant. In the short term, the fate of DACA rests entirely in the hands of President Donald Trump, who has at times expressed great support for DREAMers and has encouraged them to "rest easy." But ultimately, it is Congress that must act to provide a permanent solution so that these young people can contribute even more fully to the country they call home. Yesterday's introduction of the DREAM Act of 2017, which has bipartisan sponsorship from Sens. Dick Durbin (D-IL), Jeff Flake (R-AZ), Lindsey Graham (R-SC), and Chuck Schumer (D-NY), is an encouraging step.

## Methodology

This column uses the same methodology employed in CAP's November 2016 and January 2017 estimates of the cost of ending DACA.

The USCIS publishes quarterly data on DACA applicants and recipients since the program's beginning in 2012. In addition to national numbers, the USCIS also provides state-level data.

An October 2016 survey of DACA recipients—conducted by political scientist Tom K. Wong, United We Dream, the National Immigration Law Center, and CAP—estimated that nationally, 87 percent of DACA recipients were employed. The survey does not provide employment rates for individual states. Thus, this column uses the 87 percent benchmark for employment levels in each state.

The number of DACA recipients working in each state is a combination of the latest USCIS data and the survey findings.

A 2016 CAP report authored by Ryan Edwards and Francesc Ortega estimated the national and state-by-state GDP loss that would result from removing unauthorized workers from the workforce, both annually and over the next decade. This column uses the GDP loss and number of unauthorized workers by each state to identify the contributions of each unauthorized worker to the state GDP. By

**App. 152**

both assuming that the skill distribution of the workforce with DACA reflects that of the broader unauthorized workforce and expressing data in 2013 dollars, this analysis reflects a conservative estimate.

The GDP losses associated with ending DACA for each state are derived by multiplying the number of employed DACA recipients with the losses associated with each unauthorized worker.

*Nicole Prchal Svajlenka is a senior policy analyst for the Immigration Policy team at the Center for American Progress. Tom Jawetz is vice president for Immigration Policy at the Center. Angie Bautista-Chavez is an intern for the Immigration Policy team at the Center.*



© 2018 - Center for American Progress

# Tab R

# IMMIGRATION and the REVIVAL of AMERICAN CITIES:

## From Preserving Manufacturing Jobs to Strengthening the Housing Market





PARTNERSHIP FOR A
**NEW AMERICAN
ECONOMY**

AS / COA

**About Americas Society/Council of The Americas**

Americas Society and Council of the Americas (AS/COA) unite opinion leaders to exchange ideas and create solutions to the challenges of the Americas today.

The Americas Society (AS), the recipient of a grant from the Rockefeller Brothers Fund to produce part of this report, is the premier forum dedicated to education, debate and dialogue in the Americas.[1] The Council of the Americas (COA), affiliate organization to AS, is the premier international business organization with a membership that consists of leading international companies representing a broad spectrum of sectors including banking and finance, consulting services, consumer products, energy and mining, manufacturing, media, technology, and transportation.[2]

The positions and opinions expressed in this publication do not represent those of Americas Society and Council of the Americas members or the boards of directors of either organization.

This report was made possible with support from the Rockefeller Brothers Fund. The opinions and views of the authors do not necessarily state or reflect those of the Fund.

For further information about AS/COA, visit AS/COA Online at **www.as-coa.org**

**About Partnership for a New American Economy**

The Partnership for a New American Economy brings together more than 500 Republican, Democratic and Independent mayors and business leaders who support sensible immigration reforms that will help create jobs for Americans today. Visit **www.renewoureconomy.org** to learn more.[3]

*No part of this publication may be reproduced in any form without permission in writing from Americas Society/Council of the Americas and Partnership for a New American Economy.*

1   The Americas Society is a tax-exempt public charity described in 501(c)(3) and 509(a)(1) of the Internal Revenue Code of 1986.

2   The Council of the Americas is a tax-exempt business league under 501(c)(6) of the Internal Revenue Code of 1986, and as such, actively pursues lobbying activities to advance its purpose and the interests of its members.

3   The research efforts of the Partnership for a New American Economy are supported by the Partnership for a New American Economy Research Fund, a tax-exempt business under 501(c)(3) of the Internal Revenue Code of 1986.

# IMMIGRATION and the REVIVAL of AMERICAN CITIES:

## From Preserving Manufacturing Jobs to Strengthening the Housing Market

*—September 2013*

**Jacob L. Vigdor** of Vigdor Measurement & Evaluation LLC prepared this report and is grateful for the assistance of **Gretchen Calcagni** and **Mayuri Valvekhar**, whose data analysis efforts were instrumental in this study.

At Americas Society/Council of the Americas, **Jason Marczak**, director of policy, leads the AS/COA Immigration and Integration Initiative under which this report was produced. **Richard André**, senior policy associate, helps to oversee the organization's immigration work. **Susan Segal**, president and CEO, has led the organizations into the present-day immigration discussions.

At Partnership for a New American Economy, **John Feinblatt**, the chief advisor for policy and strategic planning to New York City Mayor Michael R. Bloomberg, oversees the organization's work. **Jeremy Robbins**, policy advisor and special counsel in the office of Mayor Bloomberg, serves as director of the Partnership. **Angie C. Marek**, a senior writer and researcher for PNAE, edits white papers and leads the organization's research efforts.

**Paula Daneze** designed this publication.

# TABLE of CONTENTS

2  **Executive Summary**

4  **Introduction**

5  **Immigration and Manufacturing Jobs**

11  **Immigrants and the U.S. Housing Market**

18  **Turning Communities into Magnets for U.S.-Born Residents**

20  **Civic Engagement**

23  **The Financial Costs of Turning Away Immigrants**

24  **Appendix**

33  **Endnotes**

# Executive Summary

**E**very day, across America, immigrants are choosing to make the United States their new home. In 2011, almost 1.1 million immigrants received green cards allowing them to remain in the country permanently—a rate of almost 3,000 people per day. At the same time, millions of students, agricultural laborers, high-tech employees, and others have arrived in the United States on a temporary basis. These new Americans leave an indelible mark on small towns and bustling urban communities alike, often dramatically changing them for the better. It is a story that has been told many times—from the struggling meatpacking towns in Iowa that

## For every 1,000 immigrants living in a county, 46 manufacturing jobs are created or preserved that would otherwise not exist or have moved elsewhere.

found new life when immigrant workers arrived, to Lewiston, Maine, which had a once-decaying downtown that now bustles with Somali-owned grocery stores and restaurants.

Regardless of their immigration status, immigrants settling in American towns and cities contribute to their communities in countless ways. They increase demand for housing, often in areas that would be in decline without them, raising the value of local homes and the wealth of

American homeowners and families. They become new customers at local businesses like restaurants and hair salons. These new Americans also create and preserve jobs in the U.S.: they start businesses at higher-than-average rates and fill critical labor needs in sectors like manufacturing, adding new skills to allow manufacturing to grow and remain here in America.

This report uses data from the U.S. Census Bureau and the American Community Survey to measure the impact of immigration on three leading indicators of community vitality: (1) the number of middle-class manufacturing jobs; (2) the health of the housing market; and (3) the size of the local U.S.-born population.

The report analyzes data for almost 3,100 counties—nearly every county in the United States—for the 40-year period from 1970 to 2010. The results are clear: Immigrants are a key part of the American success story at the community level, revitalizing local areas and creating economic growth and jobs for U.S.-born workers.

**Key Findings:**

- **Immigrants are creating and preserving U.S. manufacturing jobs–positions that are a lifeline for many middle-class American towns.** Immigration adds a talented workforce that helps bolster the manufacturing industry and protects U.S. manufacturing jobs. For every 1,000 immigrants living in a county, 46 manufacturing jobs are created or preserved that would otherwise not exist or have moved elsewhere.

- **Immigrants are increasing U.S. housing wealth.** Each of the 40 million immigrants in the U.S. adds, on average, 11.6 cents to the value of a home in their local county. This adds $3.7 trillion to U.S. housing wealth nationally.

- **Immigrants are making once-declining areas more attractive to the U.S.-born population.** For every 1,000 immigrants that arrive to

2 Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

App. 159

a county, 270 U.S.-born residents move there in response.[1] These residents are drawn by the increasing demand for service-oriented businesses ranging from restaurants to law firms and by the employment that is preserved in sectors like manufacturing.

Immigrants are also boosting civic engagement through participating in their communities and in the military while creating American jobs through entrepreneurship. The rate of immigrant self-employment is roughly three times the rate among the U.S.-born population.

Immigrants' impact on American communities is not limited to one geographic area or communities of a certain size. The data show that immigrants have stanched the decline of housing prices in Rust Belt cities and stabilized declining rural areas. Within major U.S. cities like New York and San Francisco, immigrants have helped revitalize once-declining neighborhoods on the outskirts of the urban core. The arrival of high-skilled immigrants as well as workers that are part of the essential economy has also greatly contributed to the growth of the manufacturing industry in places like Los Angeles, Houston, and in southern Arizona.

But the role that immigrants will play helping to create prosperity in American communities in the future is far from certain. Congressional action on immigration reform will have major implications on the number of new immigrants that arrive in American cities and towns in the coming decades. This

**Attracting 100,000 new immigrants per year would create or preserve 4,600 American manufacturing jobs and grow U.S. housing wealth by $80 billion annually.**

study shows that immigrants are more than just our neighbors; they're a key part of the way local areas grow and thrive. The data show that if the 11 million undocumented immigrants currently in the U.S. were deported, U.S. housing wealth would drop by $1 trillion and the manufacturing sector would shed an additional half-million U.S. jobs. The American military would also be deprived of a promising source of new recruits, and millions of potential taxpayers would be turned away. Attracting 100,000 new immigrants per year, on the other hand, would create or preserve 4,600 American manufacturing jobs and grow U.S. housing wealth by $80 billion annually.

Immigration and the Revival of American Cities: From Preserving
Manufacturing Jobs to Strengthening the Housing Market   **3**

**App. 160**

# Introduction

**B**etween 1970 and 2010—the period examined in this study—a dramatic number of immigrants settled in the United States. During that period, the U.S. foreign-born population quadrupled, from fewer than 10 million in 1970 to more than 40 million by 2010. Immigrants now account for one in eight U.S. residents.

This report aims to quantify how these new immigrants have affected communities across the United States with a focus on manufacturing jobs, the housing market, and civic engagement.

Urban economists have traditionally used housing prices to measure the vitality of local areas. Communities marked by economic opportunity and high quality of life generally attract new residents, who tend to bid up the price of housing. Housing prices also serve as an important barometer of the wealth of American families. About 65 percent of U.S. households own the homes they live in, and home equity is the most important store of wealth for the typical family. A large proportion of families have little in the way of financial assets aside from their homes.

Simply documenting that immigrants raise housing prices, however, does not demonstrate that immigrants have enhanced the vitality of American communities overall. To establish this, it is critical to consider whether immigrants have helped stabilize communities that would have been in decline without them.

Community decline most often begins with job loss. A major industry or business may close for a variety of reasons, such as foreign competition or a management decision to ship jobs to low-wage countries overseas. While some of the luckier unemployed workers might find new jobs locally, more often extensive community-wide job loss results in residents moving to areas with more vibrant economies and greater job prospects.[2] As the population shrinks, local businesses—including restaurants, shops and auto repair garages—face shrinking revenues because of their dwindling customer base, often times forcing them eventually to fold. As businesses close and families leave, local governments see their tax base shrink, making it harder to fund the essential public services such as high-quality policing and public education that make a community an attractive place to live.

At the same time, families that remain employed react to the effects of decreased local revenue—increasing crime and deteriorating schools—by moving to the suburbs or to other regions of the country altogether. Some of the families that stay behind may not do so by choice, but because poverty, old age or disability makes it difficult, if not impossible, to relocate. The end result of this vicious cycle is exemplified by the bankruptcy filing of Detroit, once the nation's fourth largest city. By 2012, Detroit, a city of roughly 700,000 people, had lost more than 1 million residents in the decades since its population peaked in 1950.

The cycle in which communities decline also points to how immigration can intervene at multiple points in the process to stem this downward spiral. For example, immigration may help convince employers to refrain from shipping jobs overseas. At the same time, once a decline has started, an influx of immigrants stabilizes the customer base for local businesses, cuts housing vacancy rates and helps local governments make payroll. The impact of immigration on declining areas may even be strong enough to reverse outward flows of the U.S.-born population.

Most American metropolitan areas feature some combination of expensive neighborhoods and areas in decline. Immigration may, in fact, ease affordability problems in the expensive neighborhoods by raising quality of life in the formerly declining areas to the point where they become a viable option for a wider array of middle-class families. In this sense, immigration produces a rare two-pronged effect on the local housing market—simultaneously boosting home prices and easing affordability issues all at once. By examining the impact of immigration at the county level, this report will explore whether immigration does indeed have such a powerful double-dividend impact.

**App. 161**

# Immigration and Manufacturing Jobs

Immigrants impact communities in a number of ways, from improving local real estate markets (see the following section on the housing market) to boosting civic engagement (discussed in a later report section) to filling gaps in the local labor force. But immigrants also play an outsize role in one very important measure of community vitality: the creation and preservation of American jobs. Here, it is particularly important to look at the impact of immigrants on the manufacturing sector—a segment of the economy on which millions of American middle-class jobs depend.

The U.S. manufacturing industry has undergone dramatic changes over the last half century with the rise of both global manufacturing operations and the increasing prominence of high-skilled manufacturing. The skills the manufacturing industry requires are more diverse and the wage pressures are more severe than they were a generation ago.

By adding more individuals with the requisite skills sets needed and by adding more workers to the labor pool, immigration changes the way corporations think about the costs and benefits of keeping operations on American soil.

The data in this report only reinforces this argument: communities with higher rates of immigration are able to retain more manufacturing jobs than those without as many immigrants. Foreign-born residents, in other words, are helping to grow the U.S. manufacturing sector and prevent much-needed U.S. manufacturing jobs from moving elsewhere.

## Immigration and Employment Opportunities

Labor economists have long debated the nature of immigration's impact on the job market.[3] A natural concern surrounding immigration will always be that immigrants may take jobs away from workers born in the U.S., particularly desirable jobs in manufacturing and other sectors that employ the middle class. The notion stems from the idea that the amount of work to be done in the United States is finite and immutable. This, however, is not the case.

Work can be divided into two categories: work that must be done in the United States and work that could be done anywhere in the world given modern transportation and communications technology. Jobs that must stay on U.S. soil (fixed-location work) are found in a broad array of service industries ranging from retail trade to legal representation, as well as construction and a small subset of manufacturing, like the production of U.S. military weapons. But jobs that depend on specific skills or competitive labor costs, and are not tied to a fixed location, are for obvious reasons more easily moved outside of the United States. These include much of the manufacturing industry, as well as a variety of traditional office or customer service tasks that can now be completed by workers globally.

The amount of fixed-location work to be done in the United States is fundamentally a function of the population. By increasing the number of people in a local area, immigrants increase the amount of demand for a variety of services, from clothing sales to automotive repair to hair care.

Their need for basic shelter leads to construction work as well. U.S. Bureau of Labor Statistics data indicate that approximately 79 percent of all American jobs are currently in the service industry, the vast majority of which is fixed-location work.[4]

For an American business that produces complex machinery for a global market, however, the amount of work to be done is not necessarily governed by the size of the U.S. population. These jobs depend on global demand, and are not intrinsically tied to U.S. soil. If the skill sets necessary to produce these goods are not available, or if the cost of labor is not competitive, these jobs can move elsewhere. Indeed, a major trend over the past half century or more has been for mobile employers to outsource work, primarily to take advantage of lower labor costs abroad. Domestic firms have also had to downsize as foreign-owned firms

Immigration and the Revival of American Cities: From Preserving
Manufacturing Jobs to Strengthening the Housing Market   **5**

**App. 162**



### Figure 1. How Immigrants are Preserving U.S. Manufacturing Jobs at the County and National Levels

WHEN **1,000** IMMIGRANTS MOVE TO A COUNTY

**46** MANUFACTURING JOBS ARE CREATED OR PRESERVED

THAT MEANS THE MORE THAN **40 million** IMMIGRANTS CURRENTLY IN THE U.S.

HAVE CREATED OR PRESERVED **1.8 million** MANUFACTURING JOBS NATIONALLY

THIS REPRESENTS MORE THAN **1** IN **7** MANUFACTURING JOBS REMAINING IN AMERICA

undercut them on price.

By introducing a new labor force into the United States—sometimes with skills in short supply in the broader U.S. population—immigration actually prevents some mobile employers from moving their operations elsewhere. This has a major impact on the U.S. economy. Manufacturers that remain on American soil employ workers at a variety of skill levels, from laborers on the factory floor to secretaries and executives.

Having manufacturing companies remain in America is also helpful to other U.S. companies—like part providers and human resources firms—that support the manufacturers' work locally. Such job preservation has an indirect effect on housing prices as well.

### The Data: Immigrants Bolster the Manufacturing Sector and Protect U.S. Manufacturing Jobs

The argument that immigration leads companies to keep jobs in the United States that would otherwise have been shipped abroad applies to a number of industries, but none more than manufacturing.

The manufacturing industry employed 18 million workers in 1970, more than a quarter of the nonagricultural workforce. Today, only 9 percent of American nonagricultural jobs are in the manufacturing industry. Six million manufacturing jobs were lost between 1970 and 2010—a period that saw the size of the American workforce double.[5] There are many reasons for this change, including the increasing mechanization of

**6**   Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 163**

manufacturing work, competitive pressures from abroad and the increasing prominence of the service industry, to name just three.

Leaders in the manufacturing industry have often said that having access to the best talent at all skill levels is critical to keeping their businesses running, making immigration reform a top priority for industry groups like the National Association of Manufacturers.[6]

Our findings reveal that immigrants are indeed playing a critical role in driving the U.S. manufacturing industry to create more jobs and to keep existing ones in America. In the last four decades, communities with more immigrants have maintained manufacturing jobs at a greater rate than would be expected, based on the nature of their local manufacturing industries in 1970. This impact is not a small one: for every 1,000 immigrants that arrive in a county, 46 manufacturing jobs are created or preserved [SEE FIGURE 1].

When viewed at the national level, it becomes clear that foreign-born residents are having a profound impact on the U.S. manufacturing industry. Our results indicate that the presence of 40 million immigrants in the United States is responsible for the retention of 1.8 million manufacturing jobs nationally, or about 15 percent of all employment remaining in the sector.

At the same time, while it makes intuitive sense that employers will want to locate their companies in communities with a strong supply of potential workers, it also makes sense that immigrants will gravitate toward areas where large numbers of jobs are available. This, of course, introduces a fundamental problem that could easily complicate this report's effort to measure the impact of immigration on manufacturing employment. While areas with more immigration also appear to have more manufacturing jobs, the question is whether this means that immigrants helped preserve or create jobs or whether immigrants went to where jobs were available.

To address this issue, this analysis makes use of a widely accepted statistical method—an instrumental variables regression—that is used to distinguish correlation from causality in immigration studies.

Calculations take advantage of the fact that immigrants tend to move to cities where a community of their compatriots are already living. Looking at the distribution of immigrants of different nationalities across counties in 1970, the report forecasts which counties would be expected to gain immigrants over the next 40 years, paying no attention to the local growth or decline of the manufacturing industry during the same period. The next step is to examine whether counties with higher forecast immigrant growth retain more manufacturing jobs than those with lower forecast growth, and if so, the overall strength of that relationship. (See the Appendix for a more detailed methodology description, as well as data on the impact of immigration on local manufacturing employment for the 200 largest counties by population.)

**The manufacturing analysis reveals three key findings:**

**1** **Immigration has kept America's top manufacturing hub on top.**

Over the last 40 years, the greatest concentration of manufacturing jobs has been nowhere near the Rust Belt; instead, it has been in Los Angeles County, California. In 1970, Chicago and surrounding Cook County, Illinois, came in a close second: both

Table 1:

| MANUFACTURING AND IMMIGRATION IN LOS ANGELES AND CHICAGO | | | | | | |
|---|---|---|---|---|---|---|
| | Manufacturing employment | | Percent change in employment | Foreign-born population | | Percent change in foreign-born population |
| | 1970 | 2010 | 1970-2010 | 1970 | 2010 | 1970-2010 |
| Los Angeles County | 824,507 | 406,878 | -51% | 793,209 | 3.5 million | +341% |
| Cook County (Chicago) | 802,763 | 202,540 | -75% | 500,742 | 1.1 million | +120% |

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market   **7**

**App. 164**

had more than 800,000 manufacturing jobs, twice as many as the next biggest counties, and more than 43 of the 50 states.

In the years since 1970, both counties have lost manufacturing jobs, as have more than 2,000 other counties in the United States. But Los Angeles has fared much better than Chicago. While the number of manufacturing jobs in Los Angeles County was only 3 percent larger than the number in Cook County in 1970, today Los Angeles has more than twice as many manufacturing jobs and remains the largest major manufacturing center in America [SEE TABLE 1].

Why has Los Angeles fared so much better than Chicago? One important factor: immigration.

A wave of new foreign-born residents moved to both areas between 1970 and 2010, but the growth was proportionately much larger in Los Angeles. There, the immigrant population nearly quintupled, compared to the doubling experienced in Cook County. Bearing in mind that when 1,000 immigrants move to an area 46 manufacturing jobs are created or preserved, the fact that Los Angeles added 2.7 million immigrants over this time period—rather than Cook County's 600,000—accounts for about half of the difference in total manufacturing jobs between the two areas in 2010. Immigrants now account for more than 35 percent of the population in Los Angeles County, a substantial share of the population.

While some critics might argue that the departure of immigrants from Los Angeles would free up jobs for U.S.-born workers, the reality is that virtually all of the jobs they now hold would disappear—along with many jobs held by U.S.-born Americans. From aerospace firms facing a shortage of qualified engineers to a garment industry fighting for market share against foreign competition, companies hiring both immigrants and U.S.-born workers would find it impossible to stay in business. It is nearly inconceivable to imagine Los Angeles County without 3.5 million of its inhabitants, but estimates indicate that about 40 percent of the county's manufacturing jobs would vanish without these immigrant residents.

More immigration could have also made a large difference in other counties hard hit by manufacturing job losses. Wayne County, Michigan, which includes the city of Detroit, bled 80 percent of its manufacturing

jobs from 1970 to 2010; the combined city and county of Philadelphia witnessed a 90 percent drop in manufacturing jobs. Neither Wayne County nor Philadelphia was a major magnet for immigrants in recent decades, especially compared to Chicago, which welcomed large waves of Mexican immigrants coming to work in the manufacturing industry.[7] For every immigrant in Philadelphia, there are more than 20 immigrants in Los Angeles County. The comparable ratio for Wayne County is even higher.

In such areas, a slack job market obviously contributes to the low levels of immigration experienced. But the absence of immigrants and their entrepreneurial and workforce contributions only compounds the employment problems in both areas. This is clearly illustrated with Wayne County. As of 2010, Wayne County's population was 7.6 percent foreign born. If the area had a foreign-born population comparable to Cook County, where 21 percent of residents were born abroad, calculations indicate that the area would have retained more than 14,000 additional jobs in the manufacturing sector.

## 2 The new manufacturing epicenters are also immigration epicenters.

Manufacturing employment has declined in roughly two-thirds of American counties. Not coincidentally, the counties that have experienced the largest expansion of the manufacturing sector are also areas that have become home to large numbers of immigrants.

The following table shows the five American counties with the largest raw increases in manufacturing employment between 1970 and 2010 [SEE TABLE 2]. In some cases, the source of the increase is fairly well-known: Santa Clara County is home to Silicon Valley, where semiconductors and computer equipment are produced. Harris County, including Houston and the surrounding suburbs, boasts a robust petrochemical industry. Other counties on the list have a diversified modern manufacturing base: pharmaceuticals and medical devices, plastics, semiconductors, and aerospace equipment figure prominently in San Diego County, Maricopa County and Orange County; San Diego is also home to a significant shipbuilding industry.

These counties are home to strong and

**8**  Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 165**

Table 2:

| THE TOP FIVE U.S. COUNTIES WITH THE MOST MANUFACTURING GROWTH, 1970–2010 | | | | |
|---|---|---|---|---|
| | Manufacturing employment | | Job increase | Number of manufacturing jobs attributable to immigration, 2010 |
| | 1970 | 2010 | | |
| Harris County, TX | 136,915 | 180,214 | 43,299 | 45,000 |
| Maricopa County, AZ | 73,273 | 114,091 | 40,818 | 27,000 |
| Orange County, CA | 124,056 | 162,207 | 38,151 | 42,000 |
| San Diego County, CA | 67,817 | 102,820 | 35,003 | 32,000 |
| Santa Clara County, CA | 124,982 | 157,457 | 32,475 | 7,200 |

growing industries, but, in reality, immigration accounts for the majority of the manufacturing employment increase in four of the five counties. In fact, in two cases—Harris and Orange Counties—the projected impact of immigration on manufacturing exceeds the increase between 1970 and 2010, indicating that the manufacturing sector would have shrunk rather than grown if not for immigration. Besides immigration, other factors helped to account for the growth in manufacturing employment, but the long-standing presence of immigrants played an important role.

The exception to this general pattern is Santa Clara County in California, where the manufacturing sector—focused on semiconductors, analytical laboratory instruments and wireless communication equipment—would have grown significantly with or without immigration. Nonetheless, although the majority of the increase in manufacturing jobs in Santa Clara County cannot be tied directly to immigration, the impact was still substantial. More than 7,000 manufacturing jobs in the area—at firms like Intel, Advanced Micro Devices, Cisco Systems, and Hewlett Packard—can be attributed to the presence of immigrants.

It also should be of no surprise that immigrants are a large part of the story in areas of the country like Harris and Orange Counties where sophisticated technology and research and development activity is at the heart of the manufacturing industry. In recent years, more than 42 percent of graduates receiving advanced-level degrees in science, technology, engineering, or math (or STEM fields) from the most research-intensive U.S. universities have been foreign-born residents on temporary visas.[8]

### 3 Immigration has kept manufacturers in small towns open for business.

Immigrants, as discussed in the next section, have helped reverse the trend of declining home values in many rural areas. But new Americans have also contributed to the vitality of small-town America in another critical way—by preserving valuable manufacturing jobs in areas where they could easily be vanishing.

In Buena Vista County, Iowa, for instance, the main source of employment is the meatpacking industry, a manufacturing category that has seen heavy foreign competition in recent years, from countries like Argentina and New Zealand. As of 1980, Buena Vista County had fewer than 1,200 manufacturing jobs and counted about 300 foreign-born residents among its 20,000-person population.

Over 20 years, however, more than 2,000 immigrants moved to Buena Vista County, and the area added nearly 1,700 manufacturing jobs. While meatpacking remains the mainstay of the local economy, the recent economic growth in Buena Vista has trickled down to other industries and sparked a wave of local entrepreneurship. Some of the new businesses exist to serve the manufacturers—such as Tasler Inc. a wooden pallet company that created a facility in Buena Vista County in the late 1990s. Others serve the expanded base of local consumers, including Tortillas El Lago, a wholesale bakery.

These same patterns are found in North

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market   **9**

**App. 166**

Carolina's coastal plain, an area sandwiched between booming beach communities and the prosperous cities of Charlotte and Raleigh. Traditionally an agricultural region, the coastal plain was also once home to food processing and textile manufacturing—businesses that have since largely shuttered. The result: today many counties in this region have patterns of manufacturing job loss that mirror the Rust Belt on a smaller scale. Washington County, for instance, lost more than half its manufacturing jobs between 1970 and 2010; Jones County lost more than three quarters over the same time period. Neither county has seen much immigration.

The story is very different, however, in the coastal plain counties that have attracted immigrants in the last several decades. While neighboring counties shed jobs, Duplin County added more than 2,000 positions concentrated in poultry processing between 1970 and 2010—growth that was possible due to the arrival of more than 7,000 immigrants. Pitt County, which also added 7,000 immigrants over the same time span, saw its manufacturing workforce swell by nearly 1,000 people, with the growth of the local pharmaceutical industry making up for losses in more traditional sectors like tobacco products and textiles.

• • •

All across the country, the manufacturing jobs that once provided families a sure route to the middle class are much less plentiful than in earlier decades. In those communities that have managed to buck the trend, immigration has played a critical role. Areas that have failed to attract immigrants tend to lack plentiful job opportunities for the U.S. born; on the contrary, the dominant trend in such communities has been the wholesale loss of jobs.

## About 40 percent of Los Angeles County's manufacturing jobs would vanish without immigrants.

At a national level, immigration reform—particularly reforms that increase the nation's ability to target shortages of workers at specific skill levels—could mean the difference between a renewal of the American manufacturing industry and its continued decline. High-skilled immigrants play an invaluable role in pharmaceutical and computer industries, two areas of manufacturing that continue to grow and add jobs. Lower-skilled, or essential-economy, immigrants address a second shortage area as well, replenishing a labor pool that has shrunk as increasing numbers of Americans pursue higher education or retire.

The importance of immigration should not be discounted. In the most recent recession alone, the manufacturing sector shed more than 2 million jobs. In nearly four years of postrecession recovery, only one-quarter of these jobs—a half-million—have returned. Our findings show that a loss of the 11 million undocumented workers in the United States today would wipe out these modest gains. Reform that permitted the legal entry of 100,000 additional immigrants per year, on the other hand, would retain 4,600 jobs in the manufacturing sector—or 46,000 every decade.

**10** Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 167**

# Immigration and the U.S. Housing Market

Immigration contributes to the vitality of American communities first and foremost by creating and preserving job opportunities. Immigrants help American businesses compete and expand, and often become employers themselves, spending a significant portion of their income at local businesses. This increased vitality is reflected in housing prices—a barometer of local economic vitality—in the very areas where immigrants have settled.

The American housing market is, in reality, a collection of thousands of local housing markets. In most of these markets, housing is reasonably priced and relatively available. Some communities, however, exhibit a more extreme pattern. In some areas marked by sustained declines in population over decades, vacant housing stock—and the issues that stem from it—can lead to a decline in housing prices over time. And in a select number of markets, particularly desirable neighborhoods in large coastal cities, the number of families seeking homes far outpaces available housing stock, which leads to significant affordability problems.

With so many different dynamics within individual housing markets then, the simple assessment that "immigrants buy houses, therefore the price of housing rises" is of little use in understanding the true role immigration has on the American housing market.

Instead, it is important to examine closely the individual communities where immigrants play a major role in the housing market. If immigrants moved to America's expensive neighborhoods, pushing high prices even higher, one might conclude that U.S.-born families would be better off without immigration. In fact, as will be shown below, immigrants tend to avoid these neighborhoods, gravitating instead to more affordable regions—Sun Belt cities with ample housing supply, and cities or neighborhoods that have fallen out of favor in recent decades. By lifting up declining areas and making them attractive to a wider group of families,

immigration actually lessens affordability problems in expensive areas nearby.

Immigration also has a powerful indirect impact on housing values. Vacant housing is closely tied to quality of life. Housing that is vacant or in disrepair fosters crime, and research has shown that then results in more population decline, creating a vicious cycle that also leads to falling property values.[9] Since local governments typically depend on property taxes more than any other revenue instrument, many must then either raise tax rates or cut valuable public services like education—moves that cause even more families to move elsewhere.

Immigration—and particularly the arrival of low-income immigrants who must find inexpensive housing—has the potential to turn around such vicious cycles. By keeping properties on the tax rolls, immigrants support local government. By moving into once-vacant homes, they help reduce crime. When the vicious cycles stop, potential residents—both immigrants and U.S.-born individuals—have an incentive to look at a neighborhood differently, moving in rather than out. This explains what at first might be seen as a contradiction in terms—that immigrants can simultaneously boost housing prices in some areas while easing housing affordability problems elsewhere.

## The Data: Immigration Boosts Housing Values in Communities Across the Country

Immigration yields a significant impact on home values across the country, occurring most notably in relatively affordable metropolitan areas and neighborhoods. Controlling for other factors, when an immigrant moves into a community, the price of the average home rises by 11.6 cents.[10] Since the typical immigrant lives in a county with 800,000 housing units, the average immigrant raises the total value of housing wealth in his or her local area by $92,800. The significance of this effect becomes clearer at the national level: the nation's more than

**App. 168**



## Figure 2. How Immigrants Build U.S. Housing Wealth at the Household, County and National Levels

WHEN **1** IMMIGRANT MOVES TO A COMMUNITY

THE PRICE OF THE AVERAGE HOME INCREASES BY **11.6** CENTS

BECAUSE THE AVERAGE IMMIGRANT LIVES IN A COMMUNITY WITH **800,000** HOUSING UNITS

THE TOTAL AMOUNT OF HOUSING WEALTH IN THE COUNTY INCREASES BY **$92,800**

THAT **$92,800** IN WEALTH

X

THE MORE THAN **40 million** IMMIGRANTS CURRENTLY IN THE UNITED STATES

=

**$3.7 trillion** IN HOUSING VALUE GAINS NATIONWIDE

40 million immigrants are responsible for an estimated $3.7 trillion boost to home equity nationwide [SEE FIGURE 2].[11]

But the true boost to the U.S. economy is likely much greater than $3.7 trillion. When immigrants move to a local area and demand more housing, work is often generated in the construction industry. Construction requires significant labor, which must be provided by workers residing in the United States, including U.S.-born workers. The failure to count the income generated by these jobs is one reason why this report likely underestimates the impact of immigration on the housing market.

Much like the manufacturing data, these figures are calculated to take into account other variables that could be attracting immigrants to move to a given area. One potential concern with an analysis of this sort, for instance, would be that immigrants could be attracted to places because of their affordability or the ample job opportunities already available. So it could be interpreted that instead of causing communities to improve, immigrants move to places that are already experiencing an upswing.

To avoid confusion of such causes and effects, this analysis used a widely-accepted statistical technique (instrumental variables regression)—also used in the manufacturing section—to analyze the data. This involved first looking at areas that already boasted immigrant communities of specific nationalities as of 1970. Because new immigrants often move where their compatriots are, the analysis then projected where immigration would be expected to occur in the decades

**12** Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 169**

after 1970—regardless of actual economic conditions on the ground. Rather than compare communities like Los Angeles to Detroit, the analysis then examined whether housing prices in Los Angeles alone (as well as Detroit alone) tended to increase more in decades when immigration was forecast to be more significant. (See the Appendix for a complete methodology discussion.)

**The housing analysis reveals four key findings:**

**1 The effects of immigration are strongest in booming Sun Belt cities.**

Twelve counties nationwide have seen the impact of immigration on housing raise the value of the average home by more than $10,000 over the last decade. For the most part, these communities are in the Sun Belt, an area spanning the South and Southwest that has attracted large numbers of immigrants and U.S.-born residents in recent years.

But the effect of immigration on these communities has not necessarily been to make them overly expensive. For example, Harris County, an area that includes Houston and its closest suburbs, experienced the largest increase in home values due to the direct and indirect effects of immigration, with the price of the average home increasing by more than $26,000 in the last decade [SEE TABLE 3] Even with that 20 percent rise in the value of the average home, how-

# The average immigrant raises the total value of housing wealth in his or her local area by $92,800.

ever, median home values in Harris County remain well below the national average of $186,200 revealed in the latest American Community Survey. The same is true in several other counties, which have experienced the largest percent increase in home values due to immigration but still maintain below-average housing prices. Examples include Hidalgo County, Texas, a border community that includes the city of McAllen, and Bexar County, Texas, which includes greater San Antonio [SEE TABLE 4].

**2 Immigrants tend to avoid places with the worst housing afford-ability problems, in many cases becoming part of the solution.**

Although immigrants have raised housing values, they have not contributed to U.S. housing shortages and affordability problems. Some of the most expensive places to live in the country—including Manhat-

Table 3:

| COUNTIES WHERE IMMIGRATION HAD THE LARGEST IMPACT ON HOUSING VALUES, 2000–2010 | |
| --- | --- |
| **County** | **Value added by immigration to the price of the average home** |
| Harris County, TX | $26,700 |
| Riverside County, CA | $20,600 |
| Clark County, NV | $19,700 |
| Maricopa County, AZ | $18,000 |
| Broward County, FL | $14,500 |
| San Bernardino County, CA | $13,200 |
| King County, WA | $12,100 |
| Miami-Dade County, FL | $11,700 |
| Gwinnett County, GA | $11,400 |
| Palm Beach County, FL | $10,700 |

Immigration and the Revival of American Cities: From Preserving
Manufacturing Jobs to Strengthening the Housing Market    **13**

**App. 170**

Table 4:

| COUNTIES WHERE IMMIGRATION HAD THE LARGEST PERCENT IMPACT ON HOUSING VALUES, 2000-2010 | | |
|---|---|---|
| County | Impact of immigration as a percent of 2010 median value | 2010 median value |
| Harris County, TX | 20% | $131,700 |
| Clark County, NV | 7.7% | $257,300 |
| Tarrant County, TX | 7.5% | $134,900 |
| Maricopa County, AZ | 7.5% | $238,600 |
| Hidalgo County, TX | 7.5% | $73,000 |
| Riverside County, CA | 6.3% | $325,300 |
| Dallas County, TX | 6.3% | $129,700 |
| Gwinnett County, GA | 5.9% | $194,200 |
| Broward County, FL | 5.9% | $247,500 |
| Bexar County, TX | 5.6% | $117,100 |

tan, San Francisco and resort communities such as Jackson, Wyoming—attracted few if any new immigrants over the past decade. The result is that immigration itself gives little insight into why these areas are expensive. Instead, immigrants have flocked to less expensive metro area and to the cheaper neighborhoods of expensive cities, often raising housing values in the process and making these communities more attractive to potential home buyers. This eases competition for housing within nearby expensive areas, making them more affordable in turn.

There is no overlap between America's 10 most-expensive counties and the 10 counties that have seen the most dramatic growth in housing values due to immigration. In most of the nation's 10 most-expensive counties—places where the cost of the average home is at least $650,000—the impact of immigration has been modest, or even negative [SEE TABLE 5]. Only three of the most expensive counties, all of which are in the San Francisco Bay Area, have experienced any sizable growth in home values on account of immigration, and these areas attracted large numbers of highly educated, highly skilled immigrants and U.S.-born workers alike.

If immigration does not explain the nation's worst affordability problems, what does?

Table 5:

| IMPACT OF IMMIGRATION ON THE 10 MOST-EXPENSIVE U.S. COUNTIES, 2000-2010 | |
|---|---|
| County | Value added by immigration to the price of the average home |
| Dukes County, MA | $93 |
| Marin County, CA | $660 |
| Nantucket County, MA | $84 |
| New York County (Manhattan), NY | -$39 |
| Pitkin County, CO | $51 |
| San Francisco City/County, CA | -$517 |
| San Mateo County, CA | $1,300 |
| Santa Clara County, CA | $8,100 |
| Santa Cruz County, CA | $87 |
| Teton County, WY | $93 |

Several places on this list, including New York (Manhattan) and counties in the San Francisco Bay Area, have housing affordability problems driven largely by a limited supply of developable land and local economies that rely on highly skilled, highly compensated workers. Some of these workers are foreign born, but with or without immigration these would be America's most expensive communities.

**3** **Immigrants revitalize less desirable neighborhoods in costly metropolitan areas, opening up new alternatives for middle- and working-class Americans to buy homes.**
With or without immigrants, Manhattan would be the most desirable residential address in the New York City metropolitan area. The less popular addresses are found in nearby areas—the so-called outer boroughs, along with nearby satellite cities like Newark and some inner-ring suburbs. In New York City and other major U.S. cities, the impact of immigration is most dramatic in these peripheral areas.

Since 2000, the strongest impact of immigration in New York City has been in the Bronx, where the average home value is estimated to be nearly $7,000 higher because of the arrival of new immigrants. The Bronx remains the city's least expensive borough, as measured by median home values. Immigration has raised the price of the average home in Queens by more than $3,000, on Staten Island by nearly as much, and in Newark and surrounding Essex County, New Jersey, by almost $2,000 [SEE FIGURE 3]. A generation ago, these areas were in the midst of a population and housing market decline.

Similar patterns are seen in other expensive metropolitan areas. In the Bay Area of Northern California, immigration has had essentially no impact on the high prices in the city of San Francisco, or in the wealthy enclave of Marin County across the Golden Gate Bridge. It has, however, had a more tangible impact on the peripheral areas. In Alameda and Contra Costa counties in the East Bay—the historically less affluent areas home to cities such as Oakland and Richmond—the price of the average home went up by more than $7,000 due to the inflow of over 60,000 new immigrants in each county from 2000 to 2010 [SEE FIGURE 4].

In the relatively expensive region around Washington DC, the largest effects of

immigration have been felt in suburban counties in Maryland and Virginia. Within the District of Columbia the impact of immigration was less than $300 per home, and it was similarly small in the nearby Virginia communities of Arlington and Alexandria. By contrast, the over 55,000 immigrants who settled from 2000 to 2010 in Prince George's County, Maryland—the least expensive of the suburban counties ringing DC—have raised the value of the average home by more than $6,000 [SEE FIGURE 5].

The role of immigration in supporting housing prices in once-declining areas is critical to local government agencies that depend on property tax revenue to fund public services. An expanded tax base provides municipal and county governments with the opportunity to deliver higher-quality services like education, police and fire protection, and park maintenance at a lower cost per family.

## The more than 40 million immigrants are responsible for an estimated $3.7 trillion boost to home equity.

The role of immigration in revitalizing urban areas can also be illustrated by taking a closer look at major cities that have not experienced major immigration increases in recent years. If the immigrant population of Wayne County, Michigan, had grown at the same rate as the national average between 2000 and 2010, the typical homeowner would have $4,000 more in home equity today—a meaningful boost to the wealth of the average family. The average homeowner in Cuyahoga County, Ohio—the area including Cleveland and its closest suburbs—would be $2,700 richer.

Immigrants have often avoided large swaths of the country, in some cases due to state legislation that aims to restrict immigration. In Montgomery County, Alabama, which includes the state capital of Montgomery, just under 4 percent of

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market **15**

**App. 172**



**A Tale of Three Cities:**
The Impact of Immigration on Housing Values in the
New York City, San Francisco and Washington DC Metropolitan Areas

Figure 3:
THE EFFECT OF IMMIGRATION ON MEDIAN
HOME VALUE IN COUNTIES IN THE NEW YORK
CITY METROPOLITAN AREA (2000-2010)

The value of the average house
increased by less than $1,000

The value increased by
$1,000-$2,000

Anywhere where the value
increased by more than $2,000

$494
PASSAIC, NJ

$2,650
WESTCHESTER, NY

$3,715
BERGEN, NJ

$6,716
BRONX, NY

$1,867
ESSEX, NJ

$5,666
SUFFOLK, NY

$2,087
HUDSON, NJ

$2,499
UNION, NJ

$4,237
NASSAU, NY

($39)
NEW YORK
(MANHATTAN), NY

$3,345
QUEENS, NY

($1,184)
KINGS
(BROOKLYN), NY

$2,726
RICHMOND
(STATEN ISLAND), NY

$6,096
MIDDLESEX, NJ

Figure 5:
THE EFFECT OF IMMIGRATION
ON MEDIAN HOME VALUE IN
COUNTIES IN THE WASHINGTON DC
METROPOLITAN AREA (2000-2010)

Figure 4:
THE EFFECT OF IMMIGRATION
ON MEDIAN HOME VALUE IN
COUNTIES IN THE SAN FRANCISCO
METROPOLITAN AREA (2000-2010)

$1,748
SOLANO

$657
MARIN

$6,940
MONTGOMERY, MD

$288
DISTRICT OF
COLOMBIA

$7,096
CONTRA COSTA

($813)
ARLINGTON, VA

$517
SAN FRANCISCO

$45
FALLS CHURCH
CITY, VA

$7,252
ALAMEDA

$6,395
PRINCE GEORGE'S, MD

$1,283
SAN MATEO

$7,383
FAIRFAX, VA

$8,121
SANTA CLARA

$17
FAIRFAX CITY, VA

($58)
ALEXANDRIA CITY, VA

**App. 173**

the population was born abroad, less than one-third of the national average. If Montgomery County were to attract enough foreign-born families to match the national immigrant average, local homeowners would see their home equity jump by more than $2,500 apiece.

# 4 Immigration has stabilized declining rural areas and stanched the decline of Rust Belt cities.

Many rural communities across America have experienced population declines over the last century. The trend is so well established now that over the last four years alone, more than 50 percent of rural counties have seen their populations fall.[12] That has led to declining property values and vacant storefronts in many once-vibrant small towns. Here, once again, immigrants have played a role in helping to reverse this cycle of decline. Although housing prices tend to be modest in rural areas—and the number of immigrants arriving tends to be modest as well—immigrants still make a notable impact on housing values in rural communities.

North Carolina's coastal plain region is a region that has seen broad economic decline, as noted in the earlier section on manufacturing jobs. Duplin County counted only 1 immigrant per 1,000 residents in 1970. After a notable population decline in the 1980s, 6,500 immigrants have settled in the county, helping to reverse falling population levels and provide a $200 boost in the value of the typical home, which costs, on average, $83,800. Today, Duplin mirrors the nation, with one in eight residents born abroad.

The rural impacts of immigration, however, can be seen well beyond North Carolina. Many areas that could have easily seen home prices decline in the last decade have actually seen increases. Skagit County, Washington, has witnessed a tripling of the foreign-born population since 1990, boosting the price of the typical home by about $350 since 2000. While this represents a small boost to the owners of the more expensive, ocean-view properties in the area—the average price of a house in Skagit is more than $278,000, in part because of such housing stock—a pricing increase is notable in the agricultural part of the county just a few miles inland, where more affordable housing is widely available. In Buena Vista County, Iowa, where the U.S.-born population has dropped by about

15 percent since 1980, an influx of more than 2,500 immigrants, drawn to opportunities in local meatpacking plants, has helped to maintain stability in the housing market.

Immigrants have also played a role slowing population decreases in America's Rust Belt region. The number of U.S.-born Americans residing in Chicago and surrounding Cook County, Illinois, has declined by 900,000 since 1970. The arrival of nearly 600,000 immigrants over the same time period offset most of that decline—and most likely kept additional people from leaving—blunting what could have been a catastrophic impact on the local housing market along the lines of what was seen in Detroit and the surrounding area of Wayne County, Michigan. Estimates indicate that if the share of immigrants in the population of Wayne County were to grow to match the level of Cook County—from 7.6 percent to 21 percent—average housing prices there would increase by more than $32,000. Immigration to greater Chicago, in fact, has even helped to stabilize the neighboring region around Gary, Indiana: some 13,000 immigrants have settled there since 1990, adding $1,500 to the value of the average home, which costs $135,400.

● ● ●

Immigration has provided a valuable boost to housing markets all over the country. From metropolitan New York City to rural North Carolina, the value of the average home has risen over the last decade because of the arrival of immigrants. In many cases, these new Americans have chosen the very communities that would be in decline without them, creating unexpected success stories and eroding affordability issues elsewhere.

By necessity, this report focuses on only a small fraction of the communities where immigrants are making a difference. Our analysis collected data from 3,091 counties in the lower 48 states. A more complete set of data, along with notes on the methodology used in the analysis, can be found in the Appendix to this report. A map with complete data for each of the counties studied can also be found online at: **www.renewoureconomy.org/housingmap** or **www.as-coa.org/interactive-impact-immigration-housing-market**.

**App. 174**

# Turning Communities into Magnets for U.S.-Born Residents

Immigrants are playing a critical role in adding to the vitality and success of American communities—largely by raising home values, becoming customers to local businesses, and preserving or creating American jobs. To understand fully how these factors interact, however, it's useful to look at the role immigrants play in making American communities more attractive to U.S.-born residents. This is a particularly important dynamic because immigrants often gravitate toward neighborhoods or cities that were formerly in decline.

This study finds that when 1,000 immigrants move to a given county,

## When 1,000 immigrants move to a given county, roughly 270 U.S.-born residents settle in the area as a direct result within the next decade.

roughly 270 U.S.-born residents settle in the area as a direct result within the next decade. But the number of U.S.-born individuals who settle in a community due to immigrants actually grows by more than that amount. Federal government statistics show that a group of 1,000 immigrants would be expected to then give birth to 150 U.S.-born children during that same period. These children—who aren't counted in the 270 figure above—become customers at

service-oriented businesses and potential entrepreneurs themselves. They are also some of America's most successful business executives and entrepreneurs including everyone from Henry Ford, the founder of Ford Motor Company, to the visionaries behind McDonald's, Home Depot and Apple.

Given findings from previous sections, it is not surprising that immigrants attract U.S.-born residents. The American population is highly mobile, and families—especially younger ones—have long tended to move away from areas lacking opportunity to those where opportunities are plentiful.

By helping businesses grow and starting their own firms, immigrants create the very opportunities that make communities attractive to others. This analysis, in fact, found that immigrants in communities all across America have played an outsize role as entrepreneurs and job creators in recent years. American Community Survey data indicate that there are more than 3.2 million self-employed immigrants in the United States. In a country where less than 13 percent of the population is foreign born, immigrants account for more than a third of all workers who have created their own jobs. The rate of immigrant self-employment is roughly three times the rate of the U.S.-born population.

Immigration has helped to stabilize and grow the U.S.-born population in some areas already highlighted in this report, including the Bronx in New York City and Lake County, Indiana. The effects of immigration, however, go well beyond these areas. Portland, Oregon, is today considered a city offering strong opportunities and a high quality of life. Yet as recently as the 1970s, Multnomah County, which includes Portland, had a U.S.-born population in decline. As U.S.-born residents left, immigrants moved in, stabilizing the population and eventually sparking an economic turnaround. Today, Multnomah has 70,000 more immigrants

**18** Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 175**

**By helping businesses grow and starting their own firms, immigrants create the very opportunities that make communities attractive to others.**

than it did in 1970, along with nearly 85,000 additional U.S.-born individuals.

Similar stories can be told about Providence, Rhode Island; Minneapolis, Minnesota; and Louisville, Kentucky— three cities with reputations for providing a high quality of life. These cities, along with others, share a recent history of population decline that stabilized right around the time immigrants began to arrive in significant numbers.

This pattern is repeated in both rural and urban parts of the country. Colusa County, California, a rural area in the state's Central Valley, witnessed a decline in the U.S.-born population in the 1970s, but then saw a doubling of its immigrant population between 1980 and 1990—drawing a new wave of U.S.-born residents. Bartholomew County, Indiana, lost U.S.-born residents in the 1980s, but an influx of more than 4,000 immigrants in the years since 1990 has helped stem the tide. Immigrants have also helped older suburban communities—from Cicero, Illinois, to Fairfax County, Virginia— maintain their vitality in the face of population movements to both gentrifying urban areas and far-flung exurbs.

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market   **19**

**App. 176**

# Civic Engagement

Today's immigrants are intrinsically linked to the future of the country. Children of immigrants, along a wide variety of dimensions, are nearly indistinguishable from those who can trace their heritage back generations. They occupy positions of great prominence in American civic life, up to and including the presidency. But first-generation immigrants are also an integral part of U.S. society, many becoming fully participating members of their communities and showing a strong devotion to America and its values.

## Citizenship

Of the over 40 million foreign-born residents now living in the United States, nearly 18 million—or more than 40 percent—are naturalized citizens. This is notable considering that an estimated 11 million immigrants are undocumented and thus are unable to naturalize under current law. For documented immigrants, the naturalization process also imposes long waiting periods for permanent residency and citizenship. Despite this, the clear majority of immigrants who are eligible to become citizens choose to do so.

Naturalization matters to communities for a number of reasons. By becoming citizens, immigrants make a long-term commitment to the United States—a decision that often leads them to contribute more to the communities they call home. Numerous studies have also documented that naturalized immigrants, who seek out higher education at greater rates than noncitizens, are more valuable contributors in the labor market.[13] They outearn migrants who are not citizens—by as much as 16 percent, according to some estimates—giving them more income to patronize local businesses.[14]

Naturalized citizens are also eligible to work in a number of occupations that require citizenship—most notably, government-service positions or scientific research posts requiring a security clearance. And due to the increased ease with which they can apply for licenses and insurance, naturalized citizens are also more likely to establish U.S.-based businesses, creating U.S. jobs in the process.[15]

The table below lists the counties that boasted the largest number of naturalized citizens from 2005 to 2010, according to the American Community Survey [SEE TABLE 6]. As the figures show, hundreds of thousands of naturalized citizens live in America's largest cities. These citizens share the burden of making American democracy work: they pay taxes, serve on juries, hold elected office, and work jobs that keep communities safe and secure. In

Table 6:

| COUNTIES WITH THE LARGEST ESTIMATED NUMBERS OF NATURALIZED CITIZENS | |
|---|---|
| Los Angeles County, CA | 1,580,000 |
| Miami-Dade County, FL | 630,000 |
| Queens County, NY | 563,000 |
| Kings County (Brooklyn), NY | 513,000 |
| Cook County (Chicago), IL | 491,000 |
| Orange County, CA | 438,000 |
| Santa Clara County, CA | 334,000 |
| San Diego County, CA | 331,000 |
| Harris County, TX | 316,000 |
| Broward County, FL | 275,000 |

**20**   Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

App. 177

Table 7:

| COUNTIES WITH THE HIGHEST ESTIMATED NATURALIZATION RATES (AT LEAST 100,000 FOREIGN BORN) | |
|---|---|
| San Francisco County, CA | 62% |
| Nassau County, NY | 62% |
| Bergen County, NJ | 57% |
| Honolulu County, HI | 57% |
| Kings County (Brooklyn), NY | 55% |
| San Mateo County, CA | 55% |
| Queens County, NY | 53% |
| DuPage County, IL | 52% |
| Wayne County, MI | 52% |
| Pinellas County, FL | 52% |

New York City, for example, the most recent class of new police officers included hundreds of immigrants who came to the United States from a total of 46 countries.[16] Like many cities, New York will hire only U.S. citizens to serve on its police force.

To understand fully the American communities most affected by naturalization trends, it is also useful to look at the rate of naturalization among immigrants [SEE TABLE 7]. In counties with a foreign-born population large enough to dispel concerns about sampling error, naturalization rates surpass 60 percent in two cases and exceed 50 percent in many others.[17] Again, bearing in mind that many immigrants have either no path to citizenship or a very long path under current

**Of the more than 40 million foreign-born residents now living in the United States, nearly 18 million—or more than 40 percent—are naturalized citizens.**

law, this is a clear indicator that immigrants in these areas are thriving and wish to see themselves as permanent members of the communities where they live. For those who rely on immigrants as employees, employers and neighbors, this commitment reassures them of immigrants' long-term investment in the area.

Naturalized immigrants and green card holders are also eligible to serve in the U.S. armed forces. Findings show that the rate of active-duty military service among immigrant citizens age 30 and younger—the largest group eligible to serve—is not very different from the rate of service for U.S.-born residents of the same age group.[18] In fact, estimates by the U.S. Census Bureau indicate that more than 800,000 foreign-born residents currently living in the United States have served in the American armed forces, including roughly 75,000 individuals who are now on active duty [SEE TABLE 8].

These figures are in many ways larger than would be expected. In many other countries, including France, foreign-born servicemen are recruited abroad, with military service used as a carrot to gain legal entry into the country. This is far different from the model used in the United States, where only naturalized citizens and permanent residents can enlist. Despite this, however, France—a country that has similar levels of military participation as America among the population as a whole—observes a lower rate of immigrant military enlistment.[19] Canada, which has a similar enlistment model to the United States, has

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market **21**

**App. 178**

# Naturalized immigrants are more valuable contributors in the labor market, and outearn migrants who are not citizens by as much as 16 percent.

an immigrant military participation rate that is less than half the rate in America.[20]

In recent years, the U.S. military has also often missed recruitment targets, making the foreign-born residents that do enlist a valuable part of the overall American recruitment effort. The immigrants that enlist also provide valuable skills to the U.S. military, filling its need for linguists and other specialists. Given the United States' relatively high immigrant military participation rate, any future legislation that allows a wider share of U.S. immigrants to become citizens would likely only boost American military enlistment numbers further. This is especially true of the Development, Relief, and Education for Alien Minors (or DREAM) Act, a bill that would allow some of the young undocumented immigrants brought to the United States as children to become permanent residents if they served two years in the U.S. military or earned a college degree.

•••

In the end, it is immigration reform that will in large part determine whether more immigrants become citizens. Making more foreign-born residents of the United States eligible for citizenship will encourage them to make even greater long-term investments in their communities. These investments range from simple acts such as improving their English-language skills or making charitable contributions, all the way up to large-scale commitments like building or expanding American businesses or committing to multiyear tours with the U.S. military.

Table 8:

## ELIGIBLE IMMIGRANTS ARE NEARLY AS LIKELY AS THE U.S. BORN TO SERVE IN THE MILITARY

| For every 10,000 citizens age 18–30, number who are: | U.S. born | Immigrants |
|---|---|---|
| Currently on active duty | 126 | 106 |
| Currently in reserves/National Guard | 59 | 46 |
| Veteran, active duty within the past year | 70 | 76 |
| Veteran, active duty more than a year ago | 158 | 135 |
| Total, all forms of past/present service | 413 | 363 |

Source: American Community Survey, 2010 and 2011.

**22** Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 179**

# The Financial Costs of Turning Away Immigrants

The U.S. Census Bureau estimates that more than half of the over 40 million immigrants in the United States today are not citizens of this country. Some of these new Americans lack legal status; some are green card holders with permanent residence; and others are temporary visa holders. Current debates about immigration policy could have a major impact on whether these noncitizens stay in the country and how many arrive in the future. This report shows that welcoming immigrants is critical to enhancing the vitality of American communities and making them more attractive places to live.

The estimates produced in this report show the real costs that the United States would incur if future policy caused the immigrants currently in the country to leave, or substantially decreased the number of immigrants arriving in the future. In the manufacturing sector alone, deporting the estimated 11 million immigrants without legal status would lead to the loss of more than half a million jobs. Such a move would also reduce American housing values—and by extension, the wealth of many American families—by more than $1 trillion. Drawing more immigrants to America, on the other hand, would dramatically impact U.S. housing wealth. Our research shows that if the United States welcomed an additional 100,000 immigrants each year, housing values would grow by $80 billion annually.

This impact on both job preservation and housing wealth translates into much more than just additional money and professional opportunities for American families. A strong job picture and growing housing market are key markers of community vitality. And living in a more successful and thriving local community can result in better educational and job opportunities for all Americans—foreign born or U.S. born, homeowner or renter.

By showing the contributions immigrants are making to the prosperity of local communities, this report also demonstrates why immigration reform is needed now. Today, an outdated immigration system makes it difficult for U.S. employers to recruit the talent needed to expand businesses and create more jobs. At the same time, 11 million undocumented immigrants exist in the shadows of society—not fully contributing to American life as workers or consumers. Because they are stuck in this limbo, their full potential to contribute to U.S. economic growth and community success remains untapped.

Immigration reform would deal with both of these issues, providing a sizable boost to the success and health of towns and cities across the United States. The increased flow of immigrants that would likely result from reform would do much more than just grow the local population—it would boost the housing market, keep more jobs at home, and result in greater levels of civic participation.

## Our research shows that if the United States welcomed 100,000 immigrants each year, housing values would grow by $80 billion annually.

**App. 180**

# Appendix
# Data and Methodology

**T**o assess the impact of immigration on local housing markets, this report utilizes data on housing and population characteristics for a set of more than 3,000 counties across the United States, covering the period between 1970 and 2010. The study examines data from five years: 1970, 1980, 1990, 2000, and 2010. The data for these years are derived from the Census enumerations conducted each decade. The data for 2010 is taken from the 5-year sample of the American Community Survey (ACS), which reflects data collected between 2006 and 2010.

The basic statistical strategy used in the report consists of examining whether counties with more immigrants tend to have higher housing prices. While there is sound economic logic behind the prediction that immigration will boost housing prices, a potential concern is that immigrants might gravitate toward growing communities where prices would have risen with or without them, for example, because the local economy is booming and jobs are widely available. Similarly, if immigrants tend to settle in low-cost areas, we might erroneously infer that immigration has a negative association with housing prices, actually causing prices to decline.

Both worries were addressed with a sophisticated statistical strategy, known as an instrumental variables (IV) regression. This technique, which is a widely adopted method for distinguishing correlation from causality in immigration studies, relies on the existence of a factor known to increase the immigrant population. This factor must have no other link to housing prices in a community—at least no link remaining after adding control variables to the regression model. Our model uses the well-established factor that immigrants tend to favor communities that already have an existing population of immigrants from the same country. This pattern has been verified in numerous studies using both historical and contemporary migration patterns.[21]

Because of this pattern, the number of immigrants residing in a community can be forecast on the basis of historical demographic data—which by definition do not reflect local economic characteristics. These predictions, rather than the actual number of immigrants observed in a county in a given year, form the basis of the analysis. For example, counties with large numbers of Asian or Latin American immigrants in 1970 would be predicted to witness a significant expansion of the foreign-born population after 1970, specifically among immigrants from those regions.

The forecasts generated by using this method are not completely accurate. This inaccuracy, however, is highly beneficial. The reasons for inaccuracy—situations where the foreign-born population grew more or less rapidly than one would predict on the basis of historical patterns—most likely reflect the heavy influence of the local economy in driving immigration. The table to the left [SEE TABLE A1] shows results of the statistical procedure that yields the synthetic measure of foreign-born population used in the analysis.[22]

The tendency for the forecasts to become less accurate over time is understandable: the greater the time interval, the greater the opportunity for unforeseen circumstances to introduce a deviation from the forecast.

The statistical procedure underlying these

Table A1:

| Year | When the foreign-born population is forecast to increase by 1,000, the average actual increase observed is: |
|------|-----------------------------------------------------------------------------------------------------|
| **ACCURACY OF FORECASTS BASED ON HISTORICAL DATA AND NATIONAL PATTERNS** | |
| 1980 | 372 |
| 1990 | 390 |
| 2000 | 311 |
| 2010 | 246 |

**App. 181**

forecasts of foreign-born populations in future years, a simple regression model, also controls for a number of housing market characteristics, and controls (known as fixed effects) for the year of observation and for each of the 3,091 counties used in the analysis. These controls are also employed in the housing price analysis. In terms generally applied to instrumental variables regressions, the foreign-born population forecasts serve as the first stage and housing price regressions the second stage.

The forecasts based on historical patterns and national trends are transformed into a "synthetic" foreign-born population measure using the information in Table A1, which accounts for the average degree of inaccuracy in the forecasts. The synthetic measure, by design, cannot incorporate any positive or negative local economic trend taking place after 1970.

The analysis of housing prices proceeds by evaluating whether housing prices tend to be higher in counties where the synthetic foreign-born population measure is higher. Housing prices, in this analysis, are median home values derived from the U.S. Census of Population and Housing, which are based on owners' self-reports of how much their homes would be worth on the market at the time they complete the decennial surveys. Housing prices are adjusted to account for inflation; the housing effects reported here are in terms of 2010 dollars.

To address concerns about the causal relationship between immigration and housing prices further, the regression also incorporates a set of controls that effectively forces the analysis to consider only variation in the immigrant population within a county over time. Thus, estimates of the impact of immigration on housing prices never rely on comparisons of Manhattan to rural areas in the Great Plains. In addition to these variables, the regressions control for a number of "lagged" housing market variables, capturing essential features of the housing stock 10 years before the observation of foreign-born population and median value. These indicators include lagged median value, vacancy rate, proportion of single-family detached homes in the housing stock, median age of housing units, and the total number of housing units. Similarly, the regression accounts for broad national changes in the housing market over time. This, and the timing of the data

collection, implies that the inflation of the housing "bubble" between 2002 and early 2006 does not affect the analysis.

The results of the data analysis reflect the estimated impact of immigration to a county on housing prices in that county. It should be noted that the results do not specify the impact of immigration on nearby counties. For example, the settlement of 600,000 immigrants in Chicago, Illinois, can be expected to influence the housing markets in neighboring counties even if no migrants move to those counties. For this reason, this analysis most likely understates the effect of immigration on housing prices in smaller counties at the periphery of large metropolitan areas.

To come up with the calculations showing the impact of 100,000 additional immigrants per year on total U.S. housing wealth, we assume that migrants will continue to settle in counties with an average of 800,000 housing units. Housing data for the 200 target counties is available in this Appendix [see table A2].

## Manufacturing Analysis

To evaluate whether immigration stems the outgoing tide of manufacturing jobs, we used data from the Social Security Administration—the County Business Patterns (CBP) dataset—to determine the number and type of jobs in the manufacturing sector for each county as of 1970. The CBP dataset reports the number of employed workers in each of roughly 20 manufacturing sectors.[23] Using a procedure similar to that used to forecast the foreign-born population, we then predicted the number of manufacturing jobs in each county as of 2010.

For example, counties with large numbers of primary metals manufacturers such as steel mills were forecast to lose a large number of jobs between 1970 and 2010. By contrast, counties with a large representation in the rubber and plastics industries were forecast to gain manufacturing jobs—since that is the only manufacturing sector where employment actually grew between 1970 and 2010. The forecast of manufacturing jobs in 2010 can be interpreted as follows: How many jobs would exist in this county if the various industries present in 1970 had each grown or declined at the national average rate?

We then considered how counties actually

Immigration and the Revival of American Cities: From Preserving
Manufacturing Jobs to Strengthening the Housing Market   25

App. 182

fared relative to the forecast. The forecast, based on 1970 employment totals and national trends, was subtracted from the actual number of 2010 manufacturing jobs, as reported in the CBP dataset. This yields a positive number in counties where the manufacturing industry did better than expected, and a negative number in counties where it did worse than expected.

The difference between actual manufacturing jobs in 2010 and the forecast was then used as a dependent variable in a regression analysis where the main independent variable of interest was growth in the foreign-born population in a county between 1970 and 2010. To address the concerns regarding the potential for migrants to gravitate toward successful counties, we once again use the IV strategy.

In this case, we begin with a forecast of foreign-born population growth in each county between 1970 and 2010 and look at whether individual groups present in the county in the first year grew at the national rate over the subsequent four decades. This forecast, which cannot incorporate any information on local economic conditions in the county after 1970, is used in place of the actual change in foreign-born population.

The basic result indicates that counties forecast to experience immigration growth between 1970 and 2010 retained a higher number of manufacturing jobs than expected on the basis of the 1970 industry mix and nationwide trends. (Once again, like the housing analysis, immigration growth forecasts were tied to immigrant settlement patterns that existed in 1970.) This strategy yielded a calculation showing the causal impact of immigration on manufacturing employment. This result is dependent upon the condition that the size of the immigrant population in 1970 has no bearing on whether manufacturing shrinks or grows more than expected over the next 40 years, except by determining how many immigrants will move to the area over that period.

The regression analysis also controls for the initial size of the manufacturing industry in the county. These two variables—initial size and the growth in foreign-born population forecast between 1970 and 2010—explain about 74 percent of the variation in the dependent variable.

The regression analysis makes use of data for 2,156 counties. Counties were excluded from the analysis when the specific number of manufacturing jobs in those counties in either 1970 or 2010 were not reported, which is generally done to protect the confidentiality of individual employers in those counties. This primarily affects counties with very little manufacturing employment.

The CBP data were also used to derive specific information about industries that have expanded or contracted in particular counties. Manufacturing data for the 200 largest counties is available in this Appendix [SEE TABLE A2].

## Additional Analyses

To assess the growth of the U.S.-born population in an individual county, or those pulled to an area by immigration, we used a variant of the IV strategy outlined above, subbing in the U.S.-born population instead of housing value as the variable to be explained. When analyzing the attractive impact of immigration on the U.S.-born population, we subtracted 150 people from our estimate. That figure represents the number of U.S.-born youth living with a foreign parent in the typical county, according to ACS statistics.

To determine the rate of immigrant entrepreneurship, we use ACS data to estimate the number of foreign-born individuals in a country who are self-employed.

Statistics presented regarding military service and citizenship are derived directly from the ACS. The ACS samples of 2010 and 2011 were used to compute the likelihood of past or present military service for citizens ages 18 through 30. The ACS five-year sample spanning 2007 to 2011 was used to estimate rates of citizenship for the foreign-born population in large counties. Because the ACS is subject to sampling error— the five-year ACS surveys the equivalent of five percent of the U.S. population— attention was restricted to the set of counties with a sufficiently large sample of immigrants surveyed. The threshold of 5,000 surveyed immigrants corresponds to an approximate threshold of 100,000 immigrants in the total population.

**26**  Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 183**

Table A2:

## DATA FOR THE 200 MOST POPULOUS COUNTIES IN THE UNITED STATES

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufac-turing jobs 2010 | Contribution of immigration to: | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFAC-TURING JOBS |
| Los Angeles, CA | 9,758,256 | 3,477,823 | 35.6% | 28,379 | $508,800 | 375,787 | $3,292 | 159,980 |
| Cook, IL | 5,172,848 | 1,086,881 | 21.0% | 22,178 | $265,800 | 179,271 | $2,573 | 49,997 |
| Harris, TX | 3,950,999 | 987,697 | 25.0% | 231,149 | $131,700 | 147,281 | $26,813 | 45,434 |
| Maricopa, AZ | 3,751,410 | 596,802 | 15.9% | 155,562 | $238,600 | 92,267 | $18,045 | 27,453 |
| San Diego, CA | 3,022,468 | 698,486 | 23.1% | 92,232 | $486,000 | 91,592 | $10,699 | 32,130 |
| Orange, CA | 2,965,525 | 903,037 | 30.5% | 53,138 | $607,900 | 142,424 | $6,164 | 41,540 |
| Kings, NY | 2,466,782 | 921,519 | 37.4% | -10,250 | $562,400 | 20,250 | $(1,189) | 20,250 |
| Miami-Dade, FL | 2,445,374 | 1,248,803 | 51.1% | 101,038 | $269,600 | 31,369 | $11,720 | 31,369 |
| Dallas, TX | 2,321,014 | 533,817 | 23.0% | 70,243 | $129,700 | 104,232 | $8,148 | 24,556 |
| Queens, NY | 2,199,169 | 1,057,296 | 48.1% | 28,957 | $479,300 | 22,910 | $3,359 | 22,910 |
| Riverside, CA | 2,109,464 | 471,927 | 22.4% | 178,215 | $325,300 | 40,317 | $20,673 | 21,709 |
| San Bernardino, CA | 2,005,287 | 432,631 | 21.6% | 113,984 | $319,000 | 47,691 | $13,222 | 19,901 |
| Clark, NV | 1,895,521 | 418,443 | 22.1% | 170,692 | $257,300 | 18,910 | $19,800 | 18,910 |
| King, WA | 1,879,189 | 372,845 | 19.8% | 104,560 | $407,700 | 69,406 | $12,129 | 17,151 |
| Wayne, MI | 1,870,362 | 142,564 | 7.6% | 4,795 | $121,100 | 63,944 | $556 | 6,558 |
| Tarrant, TX | 1,743,300 | 271,238 | 15.6% | 88,015 | $134,900 | 70,617 | $10,210 | 12,477 |
| Santa Clara, CA | 1,739,396 | 643,430 | 37.0% | 70,300 | $701,000 | 89,570 | $8,155 | 29,598 |
| Broward, FL | 1,734,139 | 535,828 | 30.9% | 125,441 | $247,500 | 21,028 | $14,551 | 21,028 |
| Bexar, TX | 1,650,052 | 208,511 | 12.6% | 57,171 | $117,100 | 31,996 | $6,632 | 9,592 |
| New York, NY | 1,583,345 | 452,102 | 28.6% | -338 | $825,200 | 20,200 | $(39) | 20,200 |
| Philadelphia, PA | 1,504,950 | 172,415 | 11.5% | 35,210 | $135,200 | 24,256 | $4,084 | 7,931 |
| Suffolk, NY | 1,482,548 | 207,577 | 14.0% | 49,052 | $424,200 | 53,099 | $5,690 | 9,549 |
| Middlesex, MA | 1,479,491 | 272,296 | 18.4% | 48,831 | $420,800 | 56,239 | $5,664 | 12,526 |
| Alameda, CA | 1,477,980 | 455,439 | 30.8% | 62,783 | $590,900 | 63,520 | $7,283 | 20,950 |
| Sacramento, CA | 1,395,144 | 273,770 | 19.6% | 76,575 | $324,200 | 19,487 | $8,883 | 12,593 |
| Bronx, NY | 1,365,725 | 443,968 | 32.5% | 58,141 | $386,200 | 6,677 | $6,744 | 6,677 |
| Nassau, NY | 1,329,083 | 275,091 | 20.7% | 36,677 | $487,900 | 17,772 | $4,255 | 12,654 |
| Palm Beach, FL | 1,299,356 | 289,118 | 22.3% | 92,266 | $261,900 | 11,031 | $10,703 | 11,031 |
| Cuyahoga, OH | 1,293,825 | 90,526 | 7.0% | 1,765 | $137,200 | 67,051 | $205 | 4,164 |
| Allegheny, PA | 1,223,066 | 56,870 | 4.6% | 8,604 | $115,200 | 37,704 | $998 | 2,616 |
| Oakland, MI | 1,201,113 | 134,834 | 11.2% | 15,616 | $204,300 | 39,576 | $1,811 | 6,202 |
| Hillsborough, FL | 1,200,236 | 181,108 | 15.1% | 65,957 | $198,900 | 18,062 | $7,651 | 8,331 |
| Franklin, OH | 1,141,117 | 101,511 | 8.9% | 37,024 | $155,300 | 29,381 | $4,295 | 4,670 |
| Hennepin, MN | 1,136,522 | 143,183 | 12.6% | 32,687 | $247,900 | 68,876 | $3,792 | 6,586 |
| Orange, FL | 1,116,094 | 213,644 | 19.1% | 84,740 | $228,600 | 25,308 | $9,830 | 9,828 |
| Fairfax, VA | 1,048,554 | 301,594 | 28.8% | 63,917 | $507,800 | 8,470 | $7,414 | 8,470 |

App. 184

Table A2:

## DATA FOR THE 200 MOST POPULOUS COUNTIES IN THE UNITED STATES

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufacturing jobs 2010 | Contribution of immigration to: | |
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFACTURING JOBS |
|---|---|---|---|---|---|---|---|---|
| Contra Costa, CA | 1,024,809 | 241,913 | 23.6% | 61,425 | $548,200 | 16,838 | $7,125 | 11,128 |
| Salt Lake, UT | 1,000,155 | 120,414 | 12.0% | 27,138 | $237,500 | 46,039 | $3,148 | 5,539 |
| St. Louis, MO | 999,454 | 62,114 | 6.2% | 19,412 | $179,300 | 35,608 | $2,252 | 2,857 |
| Travis, TX | 979,712 | 175,449 | 17.9% | 52,828 | $200,300 | 23,719 | $6,128 | 8,071 |
| Pima, AZ | 964,462 | 127,491 | 13.2% | 27,441 | $198,300 | 27,401 | $3,183 | 5,865 |
| Montgomery, MD | 947,230 | 293,071 | 30.9% | 60,075 | $482,900 | 8,613 | $6,969 | 8,613 |
| Westchester, NY | 939,406 | 228,371 | 24.3% | 22,942 | $556,900 | 11,952 | $2,661 | 10,505 |
| Milwaukee, WI | 937,616 | 80,336 | 8.6% | 16,688 | $165,700 | 49,551 | $1,936 | 3,695 |
| Honolulu, HI | 936,984 | 183,140 | 19.5% | 14,894 | $559,000 | 9,817 | $1,728 | 8,424 |
| Shelby, TN | 922,696 | 55,019 | 6.0% | 20,646 | $135,300 | 25,926 | $2,395 | 2,531 |
| Erie, NY | 921,202 | 56,368 | 6.1% | 13,482 | $117,700 | 41,933 | $1,564 | 2,593 |
| Pinellas, FL | 918,263 | 102,522 | 11.2% | 14,837 | $185,700 | 26,073 | $1,721 | 4,716 |
| DuPage, IL | 911,481 | 167,072 | 18.3% | 28,416 | $316,900 | 50,919 | $3,296 | 7,685 |
| Fresno, CA | 908,830 | 197,495 | 21.7% | 28,778 | $257,000 | 23,430 | $3,338 | 9,085 |
| Fairfield, CT | 905,342 | 182,327 | 20.1% | 33,289 | $477,700 | 35,737 | $3,862 | 8,387 |
| Bergen, NJ | 896,482 | 254,459 | 28.4% | 32,158 | $482,300 | 33,494 | $3,730 | 11,705 |
| Marion, IN | 890,976 | 70,722 | 7.9% | 31,336 | $122,200 | 44,702 | $3,635 | 3,253 |
| Hartford, CT | 887,976 | 126,216 | 14.2% | 25,523 | $247,400 | 47,270 | $2,961 | 5,806 |
| Fulton, GA | 886,982 | 114,966 | 13.0% | 36,347 | $253,100 | 17,333 | $4,216 | 5,288 |
| Mecklenburg, NC | 882,761 | 119,409 | 13.5% | 51,060 | $185,100 | 23,857 | $5,923 | 5,493 |
| New Haven, CT | 856,688 | 97,623 | 11.4% | 23,196 | $273,300 | 32,295 | $2,691 | 4,491 |
| Duval, FL | 854,848 | 76,905 | 9.0% | 31,254 | $175,900 | 20,480 | $3,625 | 3,538 |
| Prince George's, MD | 854,722 | 165,844 | 19.4% | 55,363 | $327,600 | 8,585 | $6,422 | 7,629 |
| Wake, NC | 850,546 | 107,693 | 12.7% | 47,091 | $222,300 | 13,895 | $5,463 | 4,954 |
| Macomb, MI | 837,490 | 81,095 | 9.7% | 12,088 | $157,000 | 46,791 | $1,402 | 3,730 |
| Kern, CA | 815,693 | 167,349 | 20.5% | 55,405 | $217,100 | 11,513 | $6,427 | 7,698 |
| Ventura, CA | 809,080 | 185,011 | 22.9% | 29,098 | $568,700 | 21,899 | $3,375 | 8,511 |
| Hamilton, OH | 802,194 | 37,145 | 4.6% | 8,566 | $148,200 | 44,236 | $994 | 1,709 |
| Baltimore, MD | 799,195 | 82,103 | 10.3% | 28,319 | $269,900 | 17,299 | $3,285 | 3,777 |
| Middlesex, NJ | 798,882 | 234,531 | 29.4% | 52,770 | $356,000 | 28,410 | $6,121 | 10,788 |
| Worcester, MA | 791,855 | 84,881 | 10.7% | 25,818 | $282,800 | 31,279 | $2,995 | 3,905 |
| Montgomery, PA | 790,497 | 73,171 | 9.3% | 21,019 | $297,200 | 39,666 | $2,438 | 3,366 |
| San Francisco, CA | 789,172 | 281,062 | 35.6% | -4,479 | $785,200 | 7,164 | $(520) | 7,164 |
| Pierce, WA | 782,681 | 73,334 | 9.4% | 16,809 | $269,300 | 15,040 | $1,950 | 3,373 |
| Essex, NJ | 780,872 | 184,327 | 23.6% | 16,162 | $395,700 | 18,605 | $1,875 | 8,479 |
| Gwinnett, GA | 778,022 | 198,622 | 25.5% | 99,104 | $194,200 | 18,208 | $11,496 | 9,137 |

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufac-turing jobs 2010 | Contribution of immigration to: | |
|---|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFAC-TURING JOBS |
| El Paso, TX | 772,280 | 207,746 | 26.9% | 21,578 | $101,800 | 13,053 | $2,503 | 9,556 |
| Monroe, NY | 741,274 | 61,941 | 8.4% | 8,198 | $130,400 | 36,222 | $951 | 2,849 |
| Collin, TX | 738,745 | 126,739 | 17.2% | 61,460 | $199,000 | * | $7,129 | * |
| Hidalgo, TX | 736,973 | 215,709 | 29.3% | 47,494 | $73,000 | 5,265 | $5,509 | 5,265 |
| Essex, MA | 735,642 | 106,918 | 14.5% | 24,879 | $372,400 | 37,346 | $2,886 | 4,918 |
| Jefferson, KY | 729,452 | 41,927 | 5.7% | 18,032 | $145,900 | 35,298 | $2,092 | 1,929 |
| Multnomah, OR | 712,036 | 97,800 | 13.7% | 13,835 | $281,600 | 30,074 | $1,605 | 4,499 |
| Suffolk, MA | 704,460 | 194,835 | 27.7% | 18,804 | $384,500 | 9,688 | $2,181 | 8,962 |
| San Mateo, CA | 704,327 | 239,225 | 34.0% | 11,107 | $784,800 | * | $1,288 | * |
| Oklahoma, OK | 704,023 | 68,862 | 9.8% | 21,033 | $117,500 | 19,264 | $2,440 | 3,168 |
| Lake, IL | 697,179 | 125,549 | 18.0% | 30,013 | $287,300 | 42,044 | $3,482 | 5,775 |
| Snohomish, WA | 694,219 | 94,702 | 13.6% | 35,688 | $338,600 | 48,713 | $4,140 | 4,356 |
| DeKalb, GA | 685,371 | 111,640 | 16.3% | 10,320 | $190,000 | 11,562 | $1,197 | 5,135 |
| Cobb, GA | 677,402 | 103,016 | 15.2% | 32,577 | $211,000 | * | $3,779 | * |
| San Joaquin, CA | 673,613 | 156,981 | 23.3% | 47,169 | $318,600 | 18,954 | $5,472 | 7,221 |
| Will, IL | 667,977 | 75,927 | 11.4% | 40,212 | $240,500 | 19,092 | $4,665 | 3,493 |
| Jackson, MO | 666,997 | 36,833 | 5.5% | 8,513 | $129,900 | 27,430 | $988 | 1,694 |
| Norfolk, MA | 662,077 | 99,554 | 15.0% | 22,822 | $408,100 | 19,658 | $2,647 | 4,579 |
| Jefferson, AL | 656,912 | 26,735 | 4.1% | 11,243 | $138,300 | 24,415 | $1,304 | 1,230 |
| Bernalillo, NM | 646,881 | 70,951 | 11.0% | 22,878 | $188,800 | 12,910 | $2,654 | 3,264 |
| Providence, RI | 628,413 | 110,248 | 17.5% | 13,572 | $258,000 | 22,695 | $1,574 | 5,071 |
| Monmouth, NJ | 628,112 | 81,482 | 13.0% | 17,675 | $424,800 | 8,737 | $2,050 | 3,748 |
| Denton, TX | 628,084 | 85,656 | 13.6% | 45,065 | $178,300 | 9,394 | $5,228 | 3,940 |
| Bucks, PA | 622,859 | 50,653 | 8.1% | 15,211 | $321,500 | 25,747 | $1,764 | 2,330 |
| Hudson, NJ | 622,123 | 252,667 | 40.6% | 18,070 | $383,900 | 7,928 | $2,096 | 7,928 |
| Baltimore city, MD | 620,538 | 43,571 | 7.0% | 13,933 | $160,400 | 13,000 | $1,616 | 2,004 |
| Davidson, TN | 612,884 | 70,318 | 11.5% | 30,722 | $164,700 | 16,495 | $3,564 | 3,235 |
| Lee, FL | 606,165 | 92,740 | 15.3% | 52,378 | $210,600 | 3,888 | $6,076 | 3,888 |
| El Paso, CO | 599,988 | 43,183 | 7.2% | 9,875 | $216,800 | 10,031 | $1,146 | 1,986 |
| Kent, MI | 599,432 | 43,879 | 7.3% | 5,725 | $147,600 | 47,135 | $664 | 2,018 |
| Polk, FL | 590,116 | 63,026 | 10.7% | 29,507 | $141,900 | 13,427 | $3,423 | 2,899 |
| Tulsa, OK | 589,757 | 44,112 | 7.5% | 13,882 | $126,200 | 32,455 | $1,610 | 2,029 |
| Washington, DC | 584,400 | 76,058 | 13.0% | 2,497 | $443,300 | * | $290 | * |
| Denver, CO | 578,087 | 96,230 | 16.6% | -371 | $240,900 | 15,842 | $(43) | 4,427 |
| Ocean, NJ | 569,374 | 44,157 | 7.8% | 11,005 | $294,100 | 4,817 | $1,277 | 2,031 |
| Delaware, PA | 556,468 | 47,358 | 8.5% | 10,723 | $232,300 | 13,847 | $1,244 | 2,178 |

Immigration and the Revival of American Cities: From Preserving
Manufacturing Jobs to Strengthening the Housing Market **29**

**App. 186**

Table A2:

## DATA FOR THE 200 MOST POPULOUS COUNTIES IN THE UNITED STATES

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufac-turing jobs 2010 | Contribution of immigration to: | |
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFAC-TURING JOBS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Arapahoe, CO | 552,860 | 82,414 | 14.9% | 28,972 | $232,300 | 8,117 | $3,361 | 3,791 |
| Bristol, MA | 546,433 | 65,725 | 12.0% | 2,912 | $306,600 | 27,739 | $338 | 3,023 |
| Summit, OH | 543,150 | 22,707 | 4.2% | 4,978 | $141,200 | 25,195 | $577 | 1,045 |
| Fort Bend, TX | 541,983 | 132,774 | 24.5% | 67,896 | $171,500 | 11,344 | $7,876 | 6,108 |
| Brevard, FL | 540,583 | 46,462 | 8.6% | 15,461 | $186,900 | 19,176 | $1,793 | 2,137 |
| Montgomery, OH | 538,461 | 17,769 | 3.3% | 3,962 | $119,100 | 24,279 | $460 | 817 |
| New Castle, DE | 533,514 | 51,419 | 9.6% | 18,578 | $252,800 | 14,420 | $2,155 | 2,365 |
| Johnson, KS | 531,228 | 41,834 | 7.9% | 16,303 | $209,900 | 20,380 | $1,891 | 1,924 |
| Union, NJ | 529,547 | 152,549 | 28.8% | 21,633 | $397,200 | 23,540 | $2,509 | 7,017 |
| Jefferson, CO | 528,614 | 33,700 | 6.4% | 5,300 | $259,300 | 17,114 | $615 | 1,550 |
| Anne Arundel, MD | 527,020 | 39,737 | 7.5% | 16,526 | $370,100 | 13,452 | $1,917 | 1,828 |
| WA, OR | 516,665 | 86,613 | 16.8% | 23,175 | $303,700 | 26,143 | $2,688 | 3,984 |
| Camden, NJ | 513,574 | 51,693 | 10.1% | 16,343 | $223,700 | 12,448 | $1,896 | 2,378 |
| Lancaster, PA | 511,250 | 22,242 | 4.4% | 7,205 | $184,400 | 33,981 | $836 | 1,023 |
| Stanislaus, CA | 509,682 | 103,821 | 20.4% | 22,206 | $285,200 | 18,229 | $2,576 | 4,776 |
| Douglas, NE | 505,545 | 41,701 | 8.2% | 14,283 | $141,400 | 20,733 | $1,657 | 1,918 |
| Ramsey, MN | 503,113 | 65,549 | 13.0% | 11,286 | $222,700 | 23,465 | $1,309 | 3,015 |
| Kane, IL | 502,628 | 89,802 | 17.9% | 26,286 | $245,000 | 27,062 | $3,049 | 4,131 |
| Passaic, NJ | 496,204 | 134,571 | 27.1% | 4,280 | $382,600 | 19,179 | $496 | 6,190 |
| Volusia, FL | 496,053 | 38,061 | 7.7% | 9,708 | $186,300 | 7,213 | $1,126 | 1,751 |
| Lake, IN | 494,417 | 33,083 | 6.7% | 7,235 | $135,400 | 22,782 | $839 | 1,522 |
| Plymouth, MA | 490,784 | 38,702 | 7.9% | 9,110 | $360,700 | 10,108 | $1,057 | 1,780 |
| Chester, PA | 490,571 | 40,791 | 8.3% | 17,021 | $334,300 | 14,971 | $1,974 | 1,876 |
| Morris, NJ | 489,811 | 91,447 | 18.7% | 18,809 | $474,700 | 14,478 | $2,182 | 4,207 |
| Sedgwick, KS | 486,123 | 37,184 | 7.6% | 7,113 | $117,300 | 46,253 | $825 | 1,710 |
| Utah, UT | 486,067 | 35,190 | 7.2% | 12,003 | $233,800 | 14,363 | $1,392 | 1,619 |
| Dane, WI | 477,748 | 35,228 | 7.4% | 8,442 | $230,800 | 22,126 | $979 | 1,620 |
| Guilford, NC | 475,786 | 43,534 | 9.1% | 16,217 | $153,800 | 30,888 | $1,881 | 2,003 |
| Sonoma, CA | 474,047 | 78,628 | 16.6% | 12,902 | $524,400 | 17,147 | $1,497 | 3,617 |
| Onondaga, NY | 463,704 | 31,374 | 6.8% | 5,445 | $124,400 | 20,480 | $632 | 1,443 |
| Richmond, NY | 463,450 | 96,258 | 20.8% | 23,601 | $461,700 | 1,050 | $2,738 | 1,050 |
| Hampden, MA | 462,270 | 40,109 | 8.7% | 7,076 | $200,500 | 20,243 | $821 | 1,845 |
| Spokane, WA | 461,262 | 23,228 | 5.0% | 4,517 | $187,900 | 13,473 | $524 | 1,068 |
| Pasco, FL | 456,514 | 41,989 | 9.2% | 17,860 | $157,400 | 2,437 | $2,072 | 1,931 |
| Burlington, NJ | 447,861 | 41,652 | 9.3% | 14,971 | $270,200 | 16,844 | $1,737 | 1,916 |
| Lucas, OH | 444,046 | 16,433 | 3.7% | 1,951 | $122,400 | 18,550 | $226 | 756 |

## App. 187

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufac-turing jobs 2010 | Contribution of immigration to: | |
|---|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFAC-TURING JOBS |
| Greenville, SC | 436,437 | 34,427 | 7.9% | 16,007 | $148,100 | 26,408 | $1,857 | 1,584 |
| VA Beach City, VA | 435,996 | 38,988 | 8.9% | 10,712 | $277,400 | 6,005 | $1,243 | 1,793 |
| East Baton Rouge, LA | 435,815 | 21,331 | 4.9% | 5,857 | $156,100 | 10,232 | $679 | 981 |
| Genesee, MI | 433,054 | 10,108 | 2.3% | 755 | $118,000 | 10,066 | $88 | 465 |
| Jefferson, LA | 431,019 | 45,950 | 10.7% | 11,888 | $175,100 | 10,984 | $1,379 | 2,114 |
| Tulare, CA | 429,404 | 99,273 | 23.1% | 16,149 | $211,200 | 12,040 | $1,873 | 4,567 |
| York, PA | 428,175 | 15,054 | 3.5% | 6,774 | $175,500 | 32,894 | $786 | 692 |
| Montgomery, TX | 427,717 | 51,900 | 12.1% | 26,624 | $157,100 | 8,254 | $3,088 | 2,387 |
| Adams, CO | 425,330 | 64,313 | 15.1% | 18,725 | $196,100 | 8,773 | $2,172 | 2,958 |
| Knox, TN | 423,748 | 17,158 | 4.0% | 7,590 | $152,300 | 10,830 | $880 | 789 |
| Polk, IA | 419,301 | 32,868 | 7.8% | 10,706 | $149,700 | 14,299 | $1,242 | 1,512 |
| Seminole, FL | 417,330 | 47,797 | 11.5% | 14,512 | $241,000 | 6,071 | $1,683 | 2,199 |
| Santa Barbara, CA | 416,051 | 98,785 | 23.7% | 13,959 | $576,500 | 11,955 | $1,619 | 4,544 |
| Clark, WA | 414,816 | 41,960 | 10.1% | 12,603 | $260,800 | 11,657 | $1,462 | 1,930 |
| Washoe, NV | 412,844 | 63,309 | 15.3% | 15,316 | $295,700 | 12,925 | $1,777 | 2,912 |
| Solano, CA | 410,042 | 81,629 | 19.9% | 15,133 | $389,800 | 9,715 | $1,755 | 3,755 |
| Mobile, AL | 408,620 | 13,024 | 3.2% | 3,891 | $120,700 | 15,051 | $451 | 599 |
| Monterey, CA | 407,435 | 122,788 | 30.1% | 6,229 | $566,300 | 5,504 | $723 | 5,504 |
| Berks, PA | 407,310 | 26,347 | 6.5% | 10,315 | $170,400 | 27,536 | $1,197 | 1,212 |
| Hillsborough, NH | 399,555 | 32,330 | 8.1% | 6,537 | $269,900 | 26,177 | $758 | 1,487 |
| Cameron, TX | 393,566 | 99,367 | 25.2% | 13,644 | $74,000 | 5,699 | $1,583 | 4,571 |
| Dakota, MN | 393,380 | 30,958 | 7.9% | 12,909 | $243,700 | 16,432 | $1,497 | 1,424 |
| Williamson, TX | 391,715 | 40,311 | 10.3% | 21,862 | $172,200 | 6,012 | $2,536 | 1,854 |
| Waukesha, WI | 386,130 | 16,919 | 4.4% | 3,902 | $262,200 | 39,494 | $453 | 778 |
| Ada, ID | 380,718 | 22,203 | 5.8% | 9,339 | $214,500 | 14,580 | $1,083 | 1,021 |
| Prince William, VA | 379,415 | 80,860 | 21.3% | 48,674 | $377,700 | 1,952 | $5,646 | 1,952 |
| Pulaski, AR | 377,060 | 19,925 | 5.3% | 9,089 | $134,300 | 13,253 | $1,054 | 917 |
| Stark, OH | 376,346 | 7,396 | 2.0% | 722 | $128,000 | 21,918 | $84 | 340 |
| Sarasota, FL | 376,200 | 43,482 | 11.6% | 13,066 | $235,100 | 4,521 | $1,516 | 2,000 |
| Richland, SC | 372,597 | 19,665 | 5.3% | 7,019 | $146,300 | 10,557 | $814 | 905 |
| Clackamas, OR | 370,479 | 31,382 | 8.5% | 7,282 | $331,100 | 15,109 | $845 | 1,444 |
| Orange, NY | 370,201 | 41,601 | 11.2% | 12,891 | $312,100 | 6,534 | $1,495 | 1,914 |
| Westmoreland, PA | 365,841 | 5,805 | 1.6% | 528 | $126,800 | 17,660 | $61 | 267 |
| Mercer, NJ | 364,445 | 71,936 | 19.7% | 23,277 | $309,300 | 6,757 | $2,700 | 3,309 |
| Butler, OH | 363,465 | 17,850 | 4.9% | 8,703 | $160,600 | 16,585 | $1,010 | 821 |
| Allen, IN | 351,332 | 19,063 | 5.4% | 5,669 | $113,200 | 25,062 | $658 | 877 |

Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market  **31**

**App. 188**

Table A2:

## DATA FOR THE 200 MOST POPULOUS COUNTIES IN THE UNITED STATES

| County, State | Population 2010 | Foreign-born population 2010 | | | Median home value 2010 | Manufac- turing jobs 2010 | Contribution of immigration to: | |
|---|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENT | CHANGE SINCE 2000 | | | HOME VALUES | MANUFAC- TURING JOBS |
| St. Charles, MO | 350,606 | 12,034 | 3.4% | 6,193 | $197,300 | 9,656 | $718 | 554 |
| Lane, OR | 347,156 | 19,492 | 5.6% | 3,531 | $230,000 | 12,622 | $410 | 897 |
| Washtenaw, MI | 343,947 | 38,122 | 11.1% | 4,958 | $216,200 | 12,324 | $575 | 1,754 |
| Lehigh, PA | 343,946 | 31,002 | 9.0% | 11,671 | $203,200 | 14,555 | $1,354 | 1,426 |
| Forsyth, NC | 342,989 | 30,523 | 8.9% | 10,687 | $149,000 | 14,566 | $1,240 | 1,404 |
| Charleston, SC | 342,434 | 19,227 | 5.6% | 8,103 | $242,100 | 9,257 | $940 | 884 |
| Placer, CA | 336,477 | 34,019 | 10.1% | 16,457 | $427,600 | 3,796 | $1,909 | 1,565 |
| Nueces, TX | 334,370 | 24,946 | 7.5% | 4,440 | $103,900 | 7,390 | $515 | 1,148 |
| Pinal, AZ | 329,297 | 34,601 | 10.5% | 18,358 | $164,000 | 2,827 | $2,130 | 1,592 |
| Hamilton, TN | 328,960 | 15,140 | 4.6% | 5,843 | $147,200 | 23,377 | $678 | 696 |
| Anoka, MN | 327,544 | 22,727 | 6.9% | 11,956 | $223,100 | 19,457 | $1,387 | 1,045 |
| Marion, FL | 326,833 | 25,403 | 7.8% | 12,051 | $150,700 | 5,362 | $1,398 | 1,169 |
| Madison, AL | 323,080 | 17,792 | 5.5% | 6,816 | $155,600 | 18,488 | $791 | 818 |
| Somerset, NJ | 319,347 | 70,244 | 22.0% | 16,307 | $431,200 | 10,458 | $1,892 | 3,231 |
| Luzerne, PA | 319,120 | 13,143 | 4.1% | 6,972 | $113,300 | 16,162 | $809 | 605 |
| St. Louis city, MO | 318,809 | 21,256 | 6.7% | 1,714 | $122,200 | 17,326 | $199 | 978 |
| Manatee, FL | 318,619 | 39,303 | 12.3% | 17,068 | $214,000 | 7,395 | $1,980 | 1,808 |
| Collier, FL | 316,931 | 74,872 | 23.6% | 28,801 | $357,400 | 2,457 | $3,341 | 2,457 |
| Cumberland, NC | 312,994 | 17,809 | 5.7% | 1,884 | $116,900 | 7,180 | $219 | 819 |
| Marion, OR | 309,894 | 43,832 | 14.1% | 7,863 | $205,100 | 8,869 | $912 | 2,016 |

**Note:** Contribution of immigration to home values evaluates the change in foreign-born population 2000–2010. Contribution of immigration to manufacturing considers the total magnitude of the immigrant population. See the appendix for methodological details.
∗ Manufacturing employment data redacted by the U.S. Census Bureau to protect the employer confidentiality.

**32**   Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 189**

# Endnotes

1   A pre-release of data from this report (June 20, 2013) estimated that for every 1,000 immigrants settling in a county, 250 U.S.-born individuals follow. Updated calculations show that in fact 270 U.S. born move to a county in response.

2   See Olivier J. Blanchard and Lawrence F. Katz (1992) "Regional Evolutions." *Brookings Papers on Economic Activity* v.23 n.1 pp. 1–76.

3   See, for example, George Borjas (2003) "The Labor Demand Curve Is Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *Quarterly Journal of Economics* v.118 n.4 pp. 1335–1374. See also David Card (2001) "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics* v.19 n.1. In studying the labor market impacts of immigration, both these studies restrict their attention to the effect of immigration of specific skill-level immigrants on natives of the same skill level. This is a more narrow examination than the one contemplated here; most labor economists would agree that the arrival of immigrants at one skill level is unambiguously positive for immigrants at other skill levels.

4   Current employment statistics are available through the U.S. Bureau of Labor Statistics at www.bls.gov/data.

5   Data on long-term trends in manufacturing employment can be found online at http://research.stlouisfed.org/fred2/series/MANEMP.

6   National Association of Manufacturers (2013). NAM chief calls for comprehensive immigration reform as a key building block for America's workforce [Press release]. Retrieved from http://www.nam.org/Communications/Articles/2013/02/NAM-Chief-Calls-for-Comprehensive-Immigration-Reform-as-Key-Building-Block-for-Americas-Workforce.aspx

7   "Mexicans" (2005). In *Encyclopedia of Chicago*, retrieved July 20, 2013, from http://www.encyclopedia.chicagohistory.org/pages/824.html.

8   U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System, 2009 data, compiled July 26, 2012.

9   See Julie B. Cullen and Steven D. Levitt (1999) "Crime, Urban Flight, and the Consequences for Cities." *Review of Economics and Statistics* v.81 n.2 pp. 159–169.

10  The report's methodology is explained at greater length in the appendix.

11   Compare Albert Saiz (2007) "Immigration and Housing Rents in American Cities," *Journal of Urban Economics* v.61 n.2 pp. 345–371; Gianmarco Ottaviano and Giovanni Peri (2011), "The Effects of Immigration on Wages and Rents: A General Equilibrium Approach" in *Migration Impact Assessment: New Horizons.* Nykamp, Poot, and Sahin, eds. London: Edward Elgar.

12  Christopher Doering. (2013, Jan. 13). "As More Move to the City, Does Rural America Matter?" *USA Today.* Retrieved from http://www.usatoday.com/story/news/nation/2013/01/12/rural-decline-congress/1827407/.

13  A discussion of naturalization appears in Jacob L. Vigdor (2009) *From Immigrants to Americans: The Rise and Fall of Fitting In.* Rowman & Littlefield. See also Bernt Bratsberg, James F. Ragan, and Zafar M. Nasir (2002) "The Effect of Naturalization on Wage Growth: A Panel Study of Young Male Immigrants," *Journal of Labor Economics* v.20 n.3.

14  Robert Lynch and Patrick Oakford, "The Economic Effects of Granting Legal Status and Citizenship to Undocumented Immigrants," Center for American Progress, March 20, 2013.

15  Pastor and Scoggins, "Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy," Center for the Study of Immigrant Integration, University of Southern California, December 2012. (Summary fact sheet: http://csii.usc.edu/documents/Citizen_gain_infographic_web.pdf)

16  New York City Police Department. (2012). "Mayor Bloomberg and Police Commissioner Kelly Preside Over Graduation Ceremony for 1159 New Police Officers" [Press release]. Retrieved from http://www.nyc.gov/html/nypd/html/pr/pr_2012_police_officer_graduation_2012_12_28.shtml

17  Specifically, the criterion is that at least 5,000 immigrants must be observed in the sample for the 5-year ACS; given that it is a 5 percent sample of the underlying population, this is equivalent to 100,000 in the county.

18  By necessity, our report examines only the enlistment rate among immigrants who have become naturalized citizens. The American Community Survey data used does not allow us to identify green card holders, the other group of immigrants who are eligible to enlist.

19  Université de Sherbrooke, "Personnel militaire (% de la main d'oeuvre totale)," Perspective Monde. Accessed on August 12, 2013 at http://perspective.usherbrooke.ca/bilan/servlet/BMTendanceStatPays?langue=fr&codePays=FRA&codeStat=MS.MIL.TOTL.TF.ZS&codeStat2=x and http://perspective.usherbrooke.ca/bilan/servlet/BMTendance StatPays?codeTheme=12&codeStat=MS.MIL.TOTL.TF.ZS&codePays=USA&codeTheme 2=12&codeStat2=x&langue=fr. Eva Baradji, Salah Idmachine, Amandine Schreiber, "Les descendants d'immigrés dans la function publique," Dossier: Immigrés et descendants d'immigrés en France, edition 2012, INSEE, 2012. http://www.insee.fr/fr/ffc/docs_ffc/ref/IMMFRA12_f_D4_fp.pdf.

20  Jungwee Park, "A profile of the Canadian Forces," Statistics Canada, July 2008. http://statcan.gc.ca/pub/75-001-x/2008107/pdf/10657-eng.pdf. Canadian Armed Forces, "About the Canadian Armed Forces: Who We Are," www.forces.gc.ca/en/about/canadian-armed-forces.page. Last modified on July 27, 2013. Accessed on August 14, 2013.

21  For an example of a prior peer-reviewed study employing this methodology, see Saiz, op cit. The use of initial immigrant population as an instrument for later flows can be attributed to Joseph Altonji and David Card (1991), "The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives," in Abowd and Freeman, eds., *Immigration, Trade and the Labor Market.* Chicago: University of Chicago Press. Altonji and Card in turn credit Ann Bartel (1989), "Where Do the New U.S. Immigrants Live?" *Journal of Labor Economics* v.7 pp. 371–391 for the initial insight. William J. Carrington, Enrica Detragiache, and Tara Vishwanath (1996), "Migration with Endogenous Moving Costs," *American Economic Review* v.86 n.4 pp. 909–930 further analyzed the tendency for migrants to choose destinations with a preexisting population of co-ethnics.

22  The two-stage least squares procedure operates best when the instrumental variables strongly predict the value of the endogenous regressor. In this exercise, this condition is satisfied: the set of instruments includes a control for a simulated foreign-born population, plus interactions of that simulated variable with three year effects (1980 being the omitted year effect). Each of the four variables is statistically significant individually, with the main simulation variable having a $t$-statistic of 17.6.

23  In some cases, actual employment figures are redacted in order to protect the confidentiality of individual employers. In such cases, we allocated manufacturing employment in equal numbers across redacted sectors. Counties where the manufacturing industry total was itself redacted in 1970 were excluded from the analysis.

**34**  Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market

**App. 191**

# Tab S



**Menu**

# Examining the Contributions of the DACA-Eligible Population in Key States

**Date:** November 6, 2017

As recent days have made clear, many Americans see plenty of reasons to provide legal status to those eligible for the Deferred Action for Childhood Arrivals, or DACA, program. The initiative, created in 2012, gave undocumented immigrants brought to the country as children a reprieve from deportation, allowing many to legally work, attend school, or join the military for the first time. In the days since the Trump administration announced its plan to phase out the program, more than 400 CEOs have come out in favor of protecting Dreamers, many of whom work at their firms. Prominent university presidents have extolled the character of their DACA students and their role in innovation-rich fields. And 15 states, as well as Washington, D.C., have sued to try to prevent the ending of the program.

Last week, NAE highlighted one of many reasons why Dreamers are an important community to accept and protect: The very real and meaningful economic contributions they make to the U.S. economy. Our analysis of the 1.3 million DACA-eligible individuals, age 16 and above, found that more than 90 percent were actively employed in 2015. That group earned $19.9 billion in income and contributed roughly $3.0 billion in taxes that year. They also formed businesses at higher rates than similarly aged U.S.-born workers, with almost 38,000 working as self-employed entrepreneurs in 2015 alone.

But DACA, of course, gains more resonance when we look beyond the national picture. Every state in the country is currently home to hundreds—or in many cases, thousands—of DACA recipients. Clawing back the protections afforded to this group upsets community networks and schools, and can hurt local employers and businesses dependent upon Dreamers to serve as workers and customers. To better understand how

**App. 194**

the DACA-eligible population contributes to individual states, this brief provides estimates on the economic activity of the Dreamer population in 26 states across the country—the areas where we estimate the DACA-eligible population exceeded 10,000 people in 2015. Our estimates are derived from the 2013–2015 American Community Survey, and rely on the same calculation techniques used in previous NAE studies on the subset of undocumented immigrants eligible for the DACA program. (A detailed methodology is available at the end of this report.)

Before diving into economic contributions, it helps to first consider how the DACA-eligible population is distributed geographically. Almost one of out every four DACA-eligible individuals was living in California in 2015, while another one out of every six was Texas-based. Other less expected states, however, had sizeable concentrations of undocumented immigrants eligible for the DACA program. This group includes Arizona and Georgia, two states that had roughly 40,000 or more DACA eligible residents. Another four states—including Maryland, Washington, Virginia, and North Carolina—had 25,000 or more. Colorado and Nevada hovered right below that in the low 20,000s.

**Figure 1: States with the Largest Number of DACA-Eligible Residents, 2015**

|  | Number of DACA Eligible Residents |
|---|---|
| California | 316,205 |
| Texas | 226,195 |
| Florida | 106,119 |
| New York | 85,699 |
| Illinois | 58,890 |
| New Jersey | 53,780 |
| Georgia | 46,105 |
| Arizona | 39,682 |
| North Carolina | 37,894 |
| Virginia | 30,580 |
| Washington | 28,054 |
| Maryland | 25,013 |
| Colorado | 24,917 |
| Nevada | 22,772 |
| Massachusetts | 16,483 |

**App. 195**

| | |
|---|---|
| Oregon | **16,062** |
| Pennsylvania | **15,355** |
| Utah | **13,627** |
| Tennessee | **13,290** |
| Connecticut | **13,195** |
| Michigan | **12,418** |
| Oklahoma | **11,672** |
| New Mexico | **10,896** |
| Indiana | **10,691** |
| Ohio | **10,663** |
| Wisconsin | **10,561** |
| South Carolina | **8,885** |

Much like the national picture, our work finds that the DACA-eligible population in each state is largely employed and working. Looking just at those aged 16 and older who are in the labor force and not in school or the military, we find that at least 86 percent of DACA-eligible individuals is employed in every state in our analysis. In some places, a particularly large share of DACA-eligible individuals is working. In Colorado, for instance, more than 95 percent of the state's sizeable DACA-eligible population was employed in 2015. Similarly, the employment rate of Massachusetts' DACA-eligible residents topped 95 percent that year. Meanwhile, in two smaller states—Oklahoma and Oregon—more than 93 percent of DACA-eligible individuals held jobs in 2015.

**Figure 2: Employment Rate of the DACA-Eligible Population in Top States, 2015**

| | Share of DACA Eligible Population in Labor Force that is Employed |
|---|---|
| Arizona | **87.9%** |
| California | **89.4%** |
| Colorado | **95.3%** |
| Connecticut | **87.9%** |
| Florida | **90.0%** |
| Georgia | **91.8%** |
| Illinois | **89.5%** |
| Indiana | **91.4%** |

**App. 196**

| | |
|---|---:|
| Maryland | **86.9%** |
| Massachusetts | **95.2%** |
| Michigan | **92.5%** |
| Nevada | **86.3%** |
| New Jersey | **89.6%** |
| New Mexico | **89.5%** |
| New York | **91.1%** |
| North Carolina | **90.7%** |
| Ohio | **91.3%** |
| Oklahoma | **93.2%** |
| Oregon | **93.6%** |
| Pennsylvania | **87.9%** |
| South Carolina | **90.3%** |
| Tennessee | **89.7%** |
| Texas | **91.2%** |
| Utah | **91.4%** |
| Virginia | **90.6%** |
| Washington | **91.5%** |
| Wisconsin | **92.2%** |

With their high rates of employment, it is little surprise that the DACA-eligible population is also contributing meaningfully to their states and localities as both earners and taxpayers. In 2015, the DACA-eligible population in the 26 states featured here earned a collective $18.6 billion. In each of the four states with the largest number of undocumented immigrants qualifying for the program—Florida, California, Texas, and New York—the DACA-eligible earned more than $1 billion in income that year. While the total in these four states amounts to over $11 billion, their earnings in California were particularly high, reaching almost $5 billion.

As would be the case with any other workers in our economy, some of the income earned by DACA-eligible groups went back to state and local governments in the form of tax revenue. State and local tax payments are essential to fund some of the basic functions of government such as staffing public schools, collecting trash, and maintaining police forces. At the federal level, the payments of DACA-eligible individuals go partially

**App. 197**

towards sustaining our fragile entitlement programs. In Figure 3 below, we show the amount of state and local taxes and taxes overall paid by DACA-eligible immigrants in each state. Looking beyond the largest states, we can see that even a relatively small DACA-eligible population contributes a significant amount to government tax coffers. In Florida, the subset of Dreamers eligible for the DACA program paid more than $214 million in taxes in 2015. In Illinois and New Jersey, they paid more than $130 million in overall taxes that year.

**Figure 3: Aggregate Earnings and Tax Payments of DACA-Eligible Individuals in Key States, 2015**

| | Aggregate Income (in millions $) | State and Local Taxes Paid (in millions $) | Taxes Paid Overall (in millions $) |
|---|---|---|---|
| Arizona | $438.2 | $40.0 | **$66.3** |
| California | $4,906.8 | $380.4 | **$748.1** |
| Colorado | $374.1 | $17.5 | **$33.0** |
| Connecticut | $208.2 | $17.5 | **$33.0** |
| Florida | $1,425.5 | $120.6 | **$214.2** |
| Georgia | $530.8 | $42.6 | **$75.6** |
| Illinois | $898.4 | $89.6 | **$146.5** |
| Indiana | $133.7 | $12.6 | **$19.9** |
| Maryland | $466.6 | $37.9 | **$85.0** |
| Massachusetts | $404.2 | $32.3 | **$67.7** |
| Michigan | $182.8 | $13.6 | **$27.0** |
| Nevada | $298.6 | $17.9 | **$36.8** |
| New Jersey | $811.9 | $64.9 | **$132.2** |
| New Mexico | $117.5 | $9.8 | **$16.8** |
| New York | $1,724.6 | $158.2 | **$311.7** |
| North Carolina | $479.4 | $35.7 | **$64.1** |
| Ohio | $168.0 | $14.7 | **$28.8** |
| Oklahoma | $146.3 | $12.1 | **$20.3** |
| Oregon | $208.1 | $13.0 | **$25.2** |
| Pennsylvania | $223.6 | $20.1 | **$35.8** |
| South Carolina | $101.8 | $6.8 | **$11.8** |

**App. 198**

| Tennessee | $167.1 | $12.9 | $24.8 |
|---|---|---|---|
| Texas | $3,040.0 | $258.6 | $473.3 |
| Utah | $176.4 | $13.1 | $22.2 |
| Virginia | $467.2 | $31.9 | $70.3 |
| Washington | $503.7 | $53.2 | $93.7 |
| Wisconsin | $128.3 | $10.1 | $17.6 |

One important measure of how a given group contributes to the country's economy is the amount they spend each year as consumers. More than three out of every five U.S. jobs were in the broader services sector in 2014, according to the U.S. Bureau of Labor Statistics.[1] Without a steady supply of paying customers, these positions—in fields like retail, hospitality, and medicine—would struggle or cease to exist. Looking at the spending power of the DACA-eligible population, we can see that in many states their power as consumers is notable. In nine states, their spending power was greater than $400 million in 2015. In two of them, it exceeded $2.5 billion. We show the spending power held by immigrants in each of our 26 states in Figure 4.

**Figure 4: Spending Power of DACA-Eligible Individuals in Key States, 2015**

| | Spending Power (in millions $) |
|---|---|
| Arizona | $371.9 |
| California | $4,158.7 |
| Colorado | $322.0 |
| Connecticut | $175.2 |
| Florida | $1,211.3 |
| Georgia | $455.2 |
| Illinois | $751.9 |
| Indiana | $113.7 |
| Maryland | $381.6 |
| Massachusetts | $336.5 |
| Michigan | $155.8 |
| Nevada | $261.8 |
| New Jersey | $679.7 |
| New Mexico | $100.7 |

**App. 199**

| | |
|---|---:|
| New York | $1,412.9 |
| North Carolina | $415.4 |
| Ohio | $139.2 |
| Oklahoma | $126.0 |
| Oregon | $182.8 |
| Pennsylvania | $187.8 |
| South Carolina | $87.3 |
| Tennessee | $142.3 |
| Texas | $2,566.7 |
| Utah | $154.2 |
| Virginia | $396.9 |
| Washington | $409.9 |
| Wisconsin | $110.7 |

DACA-eligible immigrants are not just contributing to our economy through their tax payments and spending, but by starting businesses and creating jobs for American workers as well. Because of limitations in the sample size available for analysis, we are only able to confidently estimate the size of the population of entrepreneurs eligible for DACA in the five largest states. Similar to the national pattern, we find that in four out of the five states the DACA-eligible population has higher rates of entrepreneurship than similarly aged U.S.-born workers, or those ages 16 to 34. In New York, for instance, 5.7 percent of the DACA-eligible population in the workforce is made up of self-employed entrepreneurs, compared to just 4.0 percent of the relevant group of U.S.-born workers. In Florida, the gap between the two entrepreneurship rates is 1.2 percent. Although the entrepreneurship rates of young people can sound small on their face, they do translate into large numbers on the ground. In 2015, California was home to roughly 8,900 DACA-eligible entrepreneurs, while Texas had 7,320.

**Figure 5: Share of DACA-Eligible Workers and U.S.-Born Workers Who Are Entrepreneurs in Selected States, 2015**

| | Share DACA-Eligible, Self-Employed | Share of U.S.-Born, ages 16-34, Self-Employed | Number of DACA-Eligible Entrepreneurs |
|---|---|---|---|
| California | 4.5% | 4.9% | 8,905 |
| Texas | 5.4% | 4.1% | 7,229 |

**App. 200**

| Florida | 5.6% | 4.4% | 3,676 |
|---------|------|------|-------|
| New York | 5.7% | 4.0% | 3,225 |
| Illinois | 3.8% | 3.5% | 1,507 |

The next few months will likely be decisive for the more than 1.3 million DACA-eligible individuals currently living in the United States. With the administration already winding down the DACA program, Congress has been given six months to find a legislative solution. But while a decent share of the press coverage in recent days has focused on the intense machinations on the issue in Washington, this brief shows just how important the DACA-eligible population is to the economies of a whole host of states—from longtime immigrant destinations like New York and California to states that have only in recent years been popular settlement destinations such as Georgia, North Carolina, and Nevada. Although there are many reasons to enshrine into law protections of the Dreamers, this brief demonstrates that economic contributions should be part of any discussion by policymakers on this issue going forward.

## Methodology

We use data from the 2013–2015 American Community Survey (ACS) to identify potential DACA-eligible persons. Due to the small sample size of DACA-eligible population in the one-year ACS sample, we pool the 2013, 2014, and 2015 data and use the average weight of three years to arrive at our final estimates.

To start, we use the same approach our previous work has employed to identify undocumented immigrants from the U.S. Census microdata. This method is similar to the method used by Harvard economist George Borjas to impute undocumented status using several variables in the U.S. Census. As DACA recipients are legally allowed to work in certain occupations that undocumented immigrants cannot work in, we adjust our methodology here to reflect such differences between undocumented immigrants and the DACA-eligible population.

To determine whether a person in the microdata has legal status in the United States, foreign-born individuals who reported naturalization are reclassified as non-citizens if the individual has resided in the United States for less than six years or, if married to a

**App. 201**

U.S. citizen, for less than three. In both of these cases, it would be virtually impossible to naturalize, making it likely such individuals misreported their status to Census officials. After reclassifying those individuals, we then consider the entire pool of non-naturalized immigrants as potentially undocumented. Using the following criteria, we then remove individuals from the pool who are highly likely to have legal status:

— Arrived in the United States before 1980;

— Citizens and children less than 18 years old reporting at least one U.S.-born parent;

— Spouses of natural born citizens, or naturalized citizens who have resided in the United States for six years or more;

— Recipients of Social Security benefits, Supplemental Security Income, Medicaid, Medicare, or public assistance;

— Households with at least one citizen that received SNAP benefits;

— Refugees; or

— Federal government employees or law enforcement officers.

The remainder of the foreign-born population that does not meet these criteria are reclassified as undocumented. Since DACA-eligible population is a subset of the total undocumented population, we then apply the guidelines for DACA from United States Citizenship and Immigration Services (USCIS) to ACS microdata to restrict our data further. We determine an undocumented person DACA-eligible if the individual:

— Was born after the second quarter of 1981;

— Came to the United States before reaching his or her 16th birthday; and

— Has moved to the United States by 2007.

While USCIS guidelines for DACA application also include restrictions on those who have criminal records, it is not possible to determine such information from the U.S. Census. Our final numbers of the DACA-eligible population are the most reliable

**App. 202**

estimates that one can extrapolate from the Census microdata.

Unlike past NAE papers on income and tax contributions, this brief treats each DACA-eligible individual as a single taxpaying unit. This follows the lead of other groups, such as the nonpartisan Institute on Taxation and Economic Policy (ITEP), that have also sought to quantify the economic and tax contributions of this population.

As in past NAE briefs, we use the term "spending power."[5] Here and elsewhere we define spending power as the disposable income leftover after subtracting federal, state, and local taxes from total household income.

Using the 2013–2015 ACS microdata sample, we then estimate the aggregate household income, tax contributions, and spending power of DACA-eligible households. We estimate state and local taxes using the tax incidence estimates produced by ITEP.[6] For federal tax rate estimates, we use data released by the Congressional Budget Office in 2014 and calculate the federal tax based on their estimates for household federal tax incidence rates by income quintile.[7]

Entrepreneurs in this brief are defined as any worker who reported being self-employed in the 2013–2015 ACS sample.

---

[1] U.S. Bureau of Labor Statistics, Bureau of Labor Statistics, "Employment by Major Industry Sector," accessed September 21, 2016, http://www.bls.gov/emp/ep_table_201.htm. ◢

---

**Issue:** International Students, Undocumented Immigrants

**Location:** National

**Type:** Feature, Research

**Share:**

---

**About Us**

**App. 203**

New American Economy brings together more than 500 mayors and business leaders who support immigration reforms that will help create jobs for Americans today. More...

---

**The Latest**

JULY 11, 2018

**Foreign-Born Residents Contributed $220 Million to Missoula Region GDP in 2016**

---

JUNE 27, 2018

**More Than 100 Leading Economists Oppose Department of Homeland Security Move to Rescind International Entrepreneur Rule**

---

JUNE 27, 2018

**New American Economy Statement on Failed Immigration Legislation in the House of Representatives**

**App. 204**

# Tab T

Immigrant Health-Care Workers in the United States | migrationpolicy.org                    Page 1 of 10



RESEARCH & INITIATIVES | PUBLICATIONS

Home » Migration Information Source



THE ONLINE JOURNAL of the MIGRATION POLICY INSTITUTE
MIGRATION INFORMATION SOURCE
FRESH. GLOBAL. AUTHORITATIVE.

ADJUST FONT | PRINT | RSS | COPYRIGHT & REUSE                    Like 75    Tweet    Share

# Immigrant Health-Care Workers in the United States

**JUNE 28, 2017**  SPOTLIGHT  | By Szilvia Altorjai and Jeanne Batalova



In 2015 there were 2.1 million foreign-born health care workers in the United States, comprising 17 percent of the health care labor force. (Photo: Shutterstock)

With health-care reform high on the legislative agenda the implications of immigration policy changes on part populations in the news, the role of the foreign born in medical occupations has become a topic of intense inter Immigrants represent a significant slice of this labor fo comprising almost 17 percent of the 12.4 million peopl United States working as doctors, nurses, dentists, and i other health-care occupations in 2015.

Although health care as a sector accounts for just 8 perc total U.S. employment, these occupations are among th fastest-growing, due in part to the aging of the U.S. population. Health care is projected to add 2.3 million j between 2014 and 2024, according to the U.S. Bureau of

**App. 206**

Statistics (BLS). The number of foreign-born health-care workers has risen significantly, from 1.5 million in to 2.1 million in 2015. The immigrant share is highest among highly skilled professionals such as physician surgeons (28 percent) and the least skilled direct-care workers such as nursing, psychiatric, and home health (24 percent).

Although the characteristics of health-care workers varied across seven occupational categories that make up this sector, as a group foreign-born health-care workers were more likely than their native-born counterparts to have obtained a university-level education. Immigrant women in the industry were more likely than natives to work in direct care, the occupations known for low wages and lower access to health insurance. In contrast, immigrant men were more likely than the U.S. born to be physician and surgeons, occupations that are well-compensated and come with near-universal health insurance access. Compared to all foreign-born workers, those employed in the health-care field were more likely to speak English fluently and had higher rates of naturalization and health insurance coverage.

This Spotlight provides a demographic and socioeconomic profile of foreign-born health-care workers residing in the United States. The data come primarily from the U.S. Census Bureau's 2015 American Community Survey (ACS) and the U.S. Bureau of Labor Statistics. All data refer to employed civilians ages 16 and older unless otherwise noted.

- Historical Trends and Projections
- Number and Share Nationally and by State
- Region and Country of Birth
- Education, Naturalization, and Language Proficiency
- Visa Pathways
- Health Insurance Coverage

## Historical Trends and Projections

### Definitions

The term "foreign born" refers to people res in the United States at the time of the Censu survey who were not U.S. citizens at birth. Th foreign-born population includes naturalized citizens, lawful permanent residents (LPRs), refugees and asylees, legal nonimmigrants (including those on student, work, or certain temporary visas), and persons residing in the country without authorization. The terms "immigrant" and "foreign born" are used her interchangeably.

The terms "U.S. born" and "native born" are u interchangeably and refer to persons with U. citizenship at birth, including persons born in Puerto Rico or abroad born to a U.S.-citizen p

Most analyses in this article divide health-ca occupations into the following seven occupatio groups:

*Health-Care Practitioners and Technical Occupations*

- **Physicians and surgeons**
- **Therapists** (i.e., occupational therapists, radiation therapists, physical therapists)
- **Registered nurses** (RNs)
- **Health-care technologists and technician** clinical laboratory technologists and technicians, dental hygienists, emergency medical technicians and paramedics, and licensed practical and vocational nurses)
- **Health practitioners and technical occupations, all others** (i.e., physician assi dentists, optometrists, podiatrists, nurse anesthetists, nurse practitioners, and nurs midwives).

*Health-Care Support Occupations*

- **Nursing, psychiatric, and home health aid**
- **Health-care support, all others** (i.e., mass therapists, dental assistants, and physical therapist assistants and aides).

Health-care occupations employed about 12.4 million workers in 2015, up from 12 million in 2010. These occupations are projected to account for 2.3 million of the 9.8 million newly created jobs in the United States between 2014 and 2024, or about one in four new jobs.

Jobs in this group fall into two broad categories: health-care practitioners and technical occupations (8.8 million workers in 2015), and health-care support occupations (3.6 million).Health-care support occupations are expected to grow the fastest among the 22 broad workforce-wide occupational groups analyzed by the Bureau of Labor Statistics (BLS), projected to increase by 23 percent between 2014 and 2024, followed by health-care practitioner and technical occupations (16 percent).

Occupations that grow fast tend to experience labor shortages, at least in the near term. An analysis earlier this year by the Committee for Economic Development estimated that health-care occupations will have the highest risk of labor shortages. Three occupations in particular—occupational and physical therapy assistants and aides; physicians and surgeons; and registered nurses—were projected to be hardest hit during the next decade.

A number of factors make it difficult to meet the rising demand in the health-care sector. One is changing demographics, such as aging of the U.S. population and retirement of those who provide services or train health-care workers. Other factors reflect the nature of health-care services: Most jobs require in-person services delivered in a particular location, which limits the potential for automation and telework. In addition, many health-care professionals must complete a lengthy training period and obtain licenses to practice, making it harder to switch between fields in response to new job openings. Recruitment of foreign-born health-care workers is often considered one of the solutions to address labor shortages in health care, particularly in disadvantaged regions.

- Click here for more information about BLS employment projections methodology.

### Number and Share Nationally and by State

Among the 12.4 million workers employed in health-care occupations in 2015, 2.1 million (17 percent, or about one in six) were foreign born. The immigrant share of health-care workers was roughly the same as that of all employed civilian workers ages 16 and over (see Table 1).

Relative to their share of the total workforce, immigrants were over-represented among both high- and low-skilled health-care workers. The foreign born accounted for 28 percent of the 910,000 physicians and surgeons practicing in the United States, and 24 percent of the 2.1 million nursing, psychiatric, and home health aides Table 1).

Immigrant Health-Care Workers in the United States | migrationpolicy.org                    Page 4 of 10

Table 1. All Civilian Employed Workers (ages 16 and older) and Health-Care Subset, by Occupational Group and Nativity, 2015

| Occupational Group | All Workers | Immigrant Workers | Immigrant Share (%) |
|---|---|---|---|
| Total employed workers (ages 16 and older) | 150,573,000 | 25,689,000 | 17.1 |
| Health-care workers (ages 16 and older) | 12,395,000 | 2,066,000 | 16.7 |
| Health-care practitioners and technical occupations | 8,794,000 | 1,364,000 | 15.5 |
| Physicians and surgeons | 910,000 | 254,000 | 27.9 |
| Registered nurses (RNs) | 3,081,000 | 486,000 | 15.8 |
| Therapists | 786,000 | 79,000 | 10.1 |
| Other health-diagnosing and -treating practitioners | 1,024,000 | 163,000 | 15.9 |
| Health-care technologists and technicians | 2,992,000 | 382,000 | 12.8 |
| Health-care support | 3,601,000 | 703,000 | 19.5 |
| Nursing, psychiatric, and home health aides | 2,060,000 | 489,000 | 23.8 |
| Health-care support, all others | 1,541,000 | 213,000 | 13.8 |

*Source:* Migration Policy Institute (MPI) tabulation of data from the U.S. Census Bureau 2015 American Community Survey (ACS).

The immigrant share of the health-care workforce was roughly twice the national level in three states: New York (37 percent), California (33 percent), and New Jersey (32 percent), as well as the District of Columbia (37 percent). Other states with high shares were Florida (28 percent), Maryland (24 percent), and Massachusetts (21 percent).

In a number of states, immigrants made up much higher shares of medical doctors and other health practitioners than of all health-care workers or all workers in general. In Michigan, for example, while immigrants accounted for just 8 percent of all workers and 9 percent of health-care workers, their share was twice as high (20 percent) among doctors. Other states that have a relatively low share of immigrant workers overall while relying heavily on foreign-born doctors include Maryland (29 percent of doctors), New Hampshire (17 percent), Indiana (16 percent), Missouri (15 percent), and West Virginia (13 percent).

In several states, immigrants accounted for large shares of low-skilled health-care workers such as nursing, psychiatric, and home health aides. New York had the highest share, with 59 percent, followed by the District of Columbia and New Jersey, where approximately half of home health aides were foreign born.

**State-Level Data on Immigrant Health-Care Workers**

Click here to access detailed information on the immigrant share among health-care workers overall and by occupation for all 50 states.



Notably, while the share of *all* foreign-born health workers in Alaska was below the national average (13 percent compared to 17 percent), more than one-third (38 percent) of nursing, psychiatric, and home health aides in the state were foreign born—the sixth highest of all states in the nation.

*Note: In this analysis the term "doctors and other health practitioners" includes physicians, surgeons, dentis*

*optometrists, podiatrists, veterinarians, physician assistants, nurse anesthetists, nurse practitioners, and n*

*midwives.*

In 2015, foreign-born women employed in health-care occupations were most likely to work as nursing,

psychiatric, or home health aides (28 percent) or as registered nurses (27 percent). In contrast, their male

counterparts were most likely to work as physicians and surgeons (30 percent), or as technologists and techn

(20 percent; see Table 2).

Table 2. Occupational Distribution of Civilian Employed Health-Care Workers (ages 16 and older), by Nativity and Sex, 2

| | Native-Born Workers | | | Foreign-Born Workers | | |
|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female |
| Health-care workers (ages 16 and older) | 10,329,000 | 2,114,000 | 8,215,000 | 2,066,000 | 544,000 | 1,522,000 |
| *Percent* | | | | | | |
| Physicians and surgeons | 6.4 | 20.2 | 2.8 | 12.3 | 29.5 | 6.1 |
| Registered nurses (RNs) | 25.1 | 11.6 | 28.6 | 23.5 | 15.2 | 26.5 |
| Therapists | 6.8 | 6.7 | 6.9 | 3.8 | 4.1 | 3.7 |
| Other health-diagnosing and -treating practitioners | 8.3 | 16.4 | 6.3 | 7.9 | 11.7 | 6.5 |
| Health-care technologists and technicians | 25.3 | 28.0 | 24.6 | 18.5 | 20.0 | 18.0 |
| Nursing, psychiatric, and home health aides | 15.2 | 9.1 | 16.8 | 23.7 | 12.4 | 27.7 |
| Health-care support, all others | 12.9 | 8.0 | 14.1 | 10.3 | 7.0 | 11.5 |

*Source:* MPI tabulation of data from the U.S. Census Bureau 2015 ACS.

Both immigrant men and women employed in health-care occupations in 2015 were more likely than the n

born to work as physicians and surgeons: Thirty percent and 6 percent of foreign-born men and women em

in health care, respectively, worked in these professions, compared to 20 percent and 3 percent of native-bo

men and women. Regardless of nativity, however, men were still considerably more likely than women to w

physicians and surgeons.

Foreign-born health-care workers overall were also more likely than their native-born peers to work as nurs

psychiatric, or home health aides: For the foreign born, 28 percent of women and 12 percent of men worked

this occupational group, compared to 17 percent and 9 percent of U.S.-born women and men respectively.

Regardless of nativity, most health-care occupations rely on female workers. Women accounted for 74 perc

the 2.1 million foreign-born health-care workers in 2015. Among the native born, this share was even highe

percent. Women represented the lion's share of both foreign- and native-born registered nurses (83 percent

91 percent, respectively). Similarly, both foreign- and native-born women accounted for approximately 86-

percent of low-skilled and low-paid nursing, psychiatric, and home health aides. In contrast, 37 percent of f

born physicians and surgeons were women, compared to 35 percent of those who were native born.

### Region and Country of Birth

Asia was the leading region of birth of foreign-born workers employed in health care in 2015, with 42 perce
followed by Latin America (18 percent); the Caribbean (16 percent); Northern America (Canada and Bermud
Europe, and Oceania (12 percent collectively); and Africa (12 percent).

Asian-born health-care workers and those from Northern America, Europe, and Oceania were more likely t
their counterparts from other regions to work as physicians and surgeons and, along with those born in Afr
registered nurses (see Figure 1). In contrast, those from the Caribbean were more likely to work as nursing,
psychiatric, or home health aides, with 48 percent in these jobs. One-third of African immigrants and 30 pe
of Latin American immigrants in the health-care industry also reported working as nursing, psychiatric, or
health aides.

Figure 1. Foreign-Born Civilian Employed Health-Care Workers (ages 16 and older), by Region of Birth and Occupationa
Group, 2015



*Note:* "Other Latin America" includes Mexico, Central America, and South America. "Northern America" includes Canada and Bermuda. Other a
unspecified countries and regions of birth were not included due to a small sample size. The term "Other Health-Diagnosing and -Treating
Practitioners" includes dentists and physician assistants, among other occupations.
*Source:* MPI tabulation of data from the U.S. Census Bureau 2015 ACS.

Immigrants from the Philippines accounted for nearly 30 percent of the 486,000 immigrants working as registered nurses, followed by those from India (6 percent) and Nigeria (5 percent). Among the 254,000 immigrant physicians and surgeons, Indians were the top group with 22 percent, followed by those from Ch percent) and the Philippines (4 percent). In contrast, Mexicans, Haitians, and Jamaicans together accounted percent of the 489,000 foreign-born nursing, psychiatric, and home health aides.

### Education, Naturalization, and Language Proficiency

Foreign-born workers ages 25 and older in health-care occupations were more likely than their native-born counterparts to have obtained a bachelor's degree or higher—53 percent, compared to 46 percent. This nativ in degree attainment was widest for health-care workers employed as registered nurses, health-care technolo and technicians, and "other" health-care support occupations (see Table 3).

Table 3. Educational Attainment for Overall Civilian Employed Population (ages 25 and older) and Health-Care Subset, I Occupational Group and Nativity, 2015

| | Employed Workers | | College Graduate Share (%) | |
|---|---|---|---|---|
| | Native Born | Immigrant | Native Born | Immigrant |
| All workers (ages 25 and older) | 106,855,000 | 23,988,000 | 37.4 | 33.2 |
| Health-care workers (ages 25 and older) | 9,330,000 | 1,992,000 | 45.5 | 53.1 |
| Physicians and surgeons | 657,000 | 253,000 | 99.7 | 99.4 |
| Registered nurses (RNs) | 2,481,000 | 477,000 | 57.6 | 72.2 |
| Therapists | 677,000 | 78,000 | 83.4 | 83.3 |
| Other health-diagnosing and -treating practitioners | 836,000 | 161,000 | 95.7 | 95.6 |
| Health-care technologists and technicians | 2,319,000 | 362,000 | 23.0 | 35.7 |
| Nursing, psychiatric, and home health aides | 1,261,000 | 466,000 | 8.4 | 14.9 |
| Health-care support, all others | 1,100,000 | 195,000 | 13.9 | 23.1 |

*Source:* MPI tabulation of data from the U.S. Census Bureau 2015 ACS.

Foreign-born health-care workers were also more likely to be naturalized citizens. About 70 percent were naturalized U.S. citizens, compared to 49 percent of all foreign-born civilians ages 16 and older employed in United States.

A majority of foreign-born workers in each of the seven health-care occupational groups were U.S. citizens. However, the share varied by occupation, ranging from 59 percent for those working as nursing, psychiatri home health aides, to 73 percent for physicians and surgeons and therapists, and about 80 percent for regist nurses and "other" health-care practitioners and technical occupations (see Table 4).

Table 4. Naturalization Rate and English Proficiency of Foreign-Born Health-Care Workers (ages 16 and older), by Occupational Group, 2015

| | Immigrant Workers | Share Naturalized (%) | English-Proficient Share (%) |
|---|---|---|---|
| All immigrant workers (ages 16 and older) | 25,689,000 | 48.8 | 53.7 |
| Health-care workers (ages 16 and older) | 2,066,000 | 70.3 | 74.7 |
| Physicians and surgeons | 254,000 | 73.0 | 92.8 |
| Registered nurses (RNs) | 486,000 | 79.1 | 83.5 |
| Therapists | 79,000 | 72.7 | 86.9 |
| Other health-diagnosing and -treating practitioners | 163,000 | 80.4 | 84.0 |
| Health-care technologists and technicians | 382,000 | 71.4 | 74.8 |
| Nursing, psychiatric, and home health aides | 489,000 | 59.0 | 56.1 |
| Health-care support, all others | 213,000 | 62.7 | 64.0 |

*Note*: English proficient refers to persons who reported speaking English exclusively or "very well."
*Source*: MPI tabulation of data from the U.S. Census Bureau 2015 ACS.

Approximately 75 percent of foreign-born health-care workers reported speaking English proficiently, me
exclusively or "very well." The proficiency rate for civilian employed foreign-born workers overall was abou
percent (see Table 4).

Majorities of immigrants in the seven occupational groups reported speaking English proficiently, with
proficiency rates ranging from 56 percent for nursing, psychiatric, and home health aides; to 93 percent for
physicians and surgeons.

### Visa Pathways

Foreign-born health-care workers are admitted to the United States under a variety of temporary and perm
visa categories. Temporary visa categories include H-1B (specialty occupations), H-2B (nonagricultural wor
H-3 (trainees), TN (Mexican and Canadian professionals under the North American Free Trade Agreement
[NAFTA]), J-1 (exchange visitors), and O-1 (persons with "extraordinary ability or achievement"). As is the ca
with other immigrants, those in the health-care sector can be admitted through permanent immigration ch
(i.e., getting a green card) based on family or employment connections, or through humanitarian protectio
routes.

It is hard to assess how many foreign health professionals arrive annually, whether via temporary or permal
visa channels, because for the most part visa data are not broken down by occupation. Since most occupatio
health care require a professional license, relatively few foreigners meet the requirement unless they obtain
degree and complete the necessary postgraduate training first. Some doctors with foreign degrees are able t
for a J-1 visa to complete a medical residency in the United States.

Despite the key role immigrants play in providing health-care services, the U.S. immigration system does n
prioritize attracting foreign-born health-care professionals. Just 4 percent (or 4,645) of the 113,603 H-1B

petitions approved for initial employment in fiscal year (FY) 2015 went to workers in health-care and medi-
occupations, according to Department of Homeland Security (DHS) data. The majority of annual H-1B peti-
(62 percent in FY 2015) go to workers in computer-related occupations.

## Health Insurance Coverage

Most workers employed in health-care occupations had health insurance in 2015, regardless of their occupa-
or nativity. A far greater share of immigrant workers in non-health-care occupations lacked coverage, comp-
to health-care workers: 24 percent versus 8 percent, respectively.

While the coverage rate was close to universal for physicians and surgeons regardless of nativity, about 13 p
of both foreign- and U.S.-born nursing, psychiatric, and home health aides lacked health insurance. Among
health-care support professionals, 9 percent of the native born and 12 percent of the foreign born lacked he
insurance.

## Sources

Committee for Economic Development (CED). 2017. *Immigration Policy That Works – Bringing Foreign-E*
*Workers into High-Shortage Occupations to Grow Our Economy*. Arlington, VA: CED. Available online.

Levanon, Gad and Ben Cheng. 2014. Occupations Most At Risk of Labor Shortages in the Next Decade. Blog
the Conference Board, April 7, 2014. Available online.

U.S. Census Bureau. 2015 American Community Survey. Accessed from Steven Ruggles, J. Trent Alexander
Genadek, Ronald Goeken, Matthew B. Schroeder, and Matthew Sobek. *Integrated Public Use Microdata Ser*
*Version 5.0* [Machine-readable database]. Minneapolis: University of Minnesota, 2010. Available online.

U.S. Citizenship and Immigration Services (USCIS). 2011. Temporary (Nonimmigrant) Workers. Updated
September 7, 2011. Available online.

---. 2016. *Characteristics of H-1B Specialty Occupation Workers*. Washington, DC: USCIS. Available online

U.S. Department of Labor Bureau of Labor Statistics. 2015. Economic and Employment Projections –
Employment Projections: 2014-24. News release, December 8, 2015. Available online.

IF YOU HAVE QUESTIONS OR COMMENTS ABOUT THIS ARTICLE, CONTACT US AT **Source@MigrationPol**



RESEARCH & INITIATIVES │ PUBLICATIONS │ EVENTS │ NEWS │ ABOUT US                          CONTA

1400 16th St NW, Suite 300, Washington, DC 20036 | ph. 202-266-1940 | fa



Copyright © 2001-2018 Migration Policy Institute. All rights reserv

# Tab U

**HOUSTON**

# Houston Dreamers in health care despair about DACA debate

**By Todd Ackerman** | January 18, 2018 | Updated: January 19, 2018 5:41pm

34

App. 217



Photo: Jon Shapley, Houston Chronicle

**IMAGE 1 OF 3**
Susana Rosas, a DACA recipient and nurse, checks on a patient at Methodist Sugar Land Hospital, Thursday, Jan. 18, 2018, in Sugar Land. "I feel like I make a difference every day, at least that's my goal," ... more

Hector Mejia recalls the depression he felt when he heard of the Trump administration's plan to dismantle a program that provides temporary work permits to young immigrants who came to the United States illegally as children.

Mejia was granted protection from deportation under the program in 2013, five years after he followed his mother from El Salvador and began an arduous path from English-as-a-second-language classes to honor student to lab assistant at Houston Methodist Hospital.

"There's suddenly a great feeling of despair," says Mejia, 26, who is responsible for quality control of blood processing at Methodist's hospital in The Woodlands. "Why did I work so hard for something that could go away in the blink of an eye? My life is at the mercy of the White House."

He now stands to lose both his permit and protection if Congress doesn't agree on what to do with some 800,000 so-called "Dreamers" by March, when President Donald Trump has said the Barack Obama-era program would end. Democrats and some Republican lawmakers had hoped to include protections for such young migrants in a stopgap spending bill that must be passed Friday.

But the prospect faded quickly after a meeting last week at which the president denounced the compromise proposal and used derogatory words to refer to Haiti and some African countries. On Thursday evening, it appeared the government was heading toward a shutdown and that a resolution on the future of the program, known as Deferred Action for Childhood Arrivals (DACA), was nowhere close.

At stake are more than 124,300 young immigrants in Texas, the state with the most Dreamers after California. Across the nation, such enrollees contribute a net $3.4 billion to the U.S. Treasury annually, according to a study this month by the American Action Forum, a Washington, D.C.-based nonprofit.

**RELATED**

 Immigrants, members of Houston clergy send 20,000 postcards to

 Grider: Dreamers don't need forgiveness

 DACA forced me to change my last name; I am worrying

 Family migration visas at risk in DACA debate

In Houston, some of their biggest contributions are at Methodist, which employs 57 Dreamers throughout the system in positions from lab technicians and nurses to pharmacists.

*Diminished health care*

DACA workers at healthcare institutions around the country would be at risk of deportation if the program is rescinded. MD Anderson Cancer Center has 46 such employees and Baylor College of Medicine 13, according to spokespersons at the institutions. A number of other major Texas Medical Center's institutions contacted by the Chronicle said they don't track their DACA numbers.

**App. 219**

The threat to Methodist's employees prompted Dr. Marc Boom, the system's usually politically reticent president, to write Texas congressional members and U.S. Sen. John Cornyn, R-Texas, last fall and again this week to find a solution to the problem.

"Patients do not care about the immigration status of their doctors," wrote Boom. "Instead, they ask that their doctor or nurse is well-trained, makes the right medical decisions and treats them with respect and care. Dreamers are an essential part of the nation's health workforce, and federal policies to terminate DACA without a workable solution will only diminish our nation's health."

**MORE INFORMATION**

**By the numbers**

*35,000*

**Number of Dreamers living in the Houston area.**

*124,300*

**Number of Dreamers living in Texas.**

Boom linked DACA's value to the nationwide shortage of health-care workers, which most prominently involves doctors and nurses but cuts across all manner of hospital technical and support positions. Methodist has a total of 1,071 job openings right now, for instance, 415 for registered nurses, 21 for pharmacy jobs and more than 250 for support jobs.

A number of Methodist's nurses currently have DACA status.

Among them is Susana Rosas, whose mother brought her from Mexico at age 6. They were visiting family on a travel visa, then her mother decided to stay. Rosas breezed through elementary, middle and high school, attaining good grades and engaged in many extracurricular activities before learning her college options were limited without a Social Security number, she said. She enrolled at Houston Community College as a foreign student at three times the tuition, first in general studies, then in an emergency medical technician program that enabled her to find work as a paramedic with small companies.

All the while, Rosas paid taxes.

She became approved for DACA in 2013, which she says opened all sorts of doors for her. Methodist's hospital in Sugar Land hired her as a paramedic, reimbursed tuition costs for a nursing program and ultimately hired her as a nurse. She has a house in Katy, two sons, a life here.

**App. 220**

"Trump's plan to terminate the program was shocking, sad," said Rosas. "He says he wants people like us - people who pay taxes and contribute to the community, who aren't a drain on society. I understand the need to fix immigration, but I wouldn't think we'd be the first whose status he'd terminate."

**'It seems wrong'**

Julia Gelatt, a senior policy analyst at the Migration Policy Institute in Washington, said the statistics bear Rosas out, that DACA enrollees are more likely to work in white-collar or indoor office jobs, such as administrative support or sales or professional jobs, whereas unauthorized immigrants are more likely to work in jobs like grounds keeping or construction.

Some 72 percent of the nation's Top 25 Fortune 500 companies count DACA recipients among their employees, according to a letter nearly 400 executives sent Trump and Congress last week. In U.S. medical schools, there are currently 99 Dreamers enrolled, according to the Association of American Medical Colleges, according to the Association of American Medical Colleges.

Rosas said she is hoping for the best, but preparing for the worst. She says Canada or Europe seem better options than returning to Mexico, given its safety issues and the little pay nurses make.

"The thing is, under the plan to dismantle DACA, the people who won't be deported are the undocumented still behind the curtain, not paying taxes, having lots of children, not taking care of themselves and ending up in the ER," said Rosas, who works in the ER.

"It seems wrong. But if it's my fate to have to leave, I'll come to terms with it. I've faced many challenges, I guess this is just one more."

Lomi Kriel contributed to this story.



**Todd Ackerman**
Medical Reporter,
Houston Chronicle

**App. 221**

# Tab V

# OVERVIEW: ELIGIBILITY FOR IN-STATE TUITION AND STATE FINANCIAL PROGRAMS



**June 2018**

## BACKGROUND

Texas law authorizes persons classified as Texas residents to pay in-state tuition, a rate of tuition that is generally three times lower than for those classified as nonresidents. In addition, Texas residents may receive state financial aid if they meet eligibility requirements of the program. Texas Education Code (TEC) Section 54.052 outlines specific ways of determining whether a student enrolling at a public institution of higher education is classified as a Texas resident. TEC Section 54.053 lists the information required to establish Texas resident status.

## FREQUENTLY ASKED QUESTIONS

### Can a non-U.S. Citizen/permanent resident who is not in the U.S. on a visa qualify for classification as a Texas resident?

Yes. Under certain conditions, a person who is not a U.S. Citizen, or permanent resident of the U.S., may be classified as a Texas resident for tuition purposes under TEC Section 54.052(a)(3).

Texas law specifies three paths to residency. Two paths require the student (or parent), including a non-U.S. Citizen/permanent resident with a visa that allows the student to establish a lawful presence in the United States, to establish domicile in Texas (see page 2 for more details). The third path (TEC Section 54.052(a)(3)) does not have citizenship requirements. Instead, eligibility through this path is based on several factors, including the period of time a student resides in the state prior to graduating from a Texas high school or acquiring a GED in Texas, and whether the student resided in Texas the year prior to enrolling in college. If a person who is not a U.S. Citizen or permanent resident meets these eligibility requirements, he/she must also complete an affidavit stating an intent to apply for permanent resident status in the United States as soon as he/she meets federal eligibility requirements for such status (herein referred to as "affidavit students").

> A person who is not a U.S. Citizen or permanent resident of the U.S. may be classified as a Texas resident for higher education purposes. Such students represented 1.5 percent of all students enrolled in Texas public institutions of higher education in Fiscal Year 2016. Such students represented less than one percent of all students who received state financial aid.

### Can a non-U.S. Citizen qualify for state financial aid?

Yes, depending on financial need and other program-specific requirements. All currently-funded state financial aid programs require recipients to be Texas residents and defer to residency provisions established in TEC Section 54.052.

**App. 223**

### How has Texas law regarding establishing residency for in-state tuition changed over time?

Prior to 2001, residency was established only through the establishment and maintenance of domicile in Texas:

1)      An underlined independent person could claim residency if he or she established a domicile in Texas and maintained it for one year prior to enrollment at a Texas institution of higher education; or

2)      A dependent person could claim residency if his or her parent established a domicile in Texas and maintained it for one year prior to enrollment.

The only non-U.S. Citizens who could establish a claim to residency were those who held visa classifications or other federal immigration status that allowed them to remain in the state long enough to establish domicile and maintain it for the year prior to enrollment.

In 2001, the 77th Texas Legislature passed House Bill (H.B.) 1403, which made several changes to the TEC, including creating a path for non-U.S. Citizens who are not lawfully present in the United States to pay in-state tuition rates at Texas public institutions of higher education. H.B. 1403 added a provision to TEC Section 54.052 allowing a student to be classified as a Texas resident if the student graduated from a Texas high school or received a diploma equivalent in this state and resided continuously in Texas for the 36-months leading up to high school graduation or receipt of a GED.  The statute required such a student to sign an affidavit indicating intent to apply for permanent resident status as soon as the student could do so.

Affidavit students are persons who are not U.S. Citizens or permanent residents, but meet the Texas residency requirements in TEC 54.052(a)(3). Those provisions require affidavit students to have resided in Texas 36 months prior to graduation from a public or private high school or have received the equivalent of a high school diploma in Texas, and for the 12 months prior to the census date of the term in which the person enrolls in an institution of higher education. The term "affidavit student" derives itself from the fact that TEC 54.053(3)(a)(B) requires such students to sign an affidavit stating that they will apply to become a permanent resident of the United States as soon as he/she becomes eligible to do so. Such persons would include, but are not limited to, undocumented persons. A person here on a visa that has allowed him/her to meet these provisions would fall into that category. H-4 visa holders, for instance, whose parents are here on an H-1B (specialty occupations) visa are included.

In 2005, the 79th Texas Legislature further amended the residency requirements through the passage of Senate Bill (S.B.) 1528.  The additional amendments maintained the 36-month pathway for non-U.S. Citizens, but extended it to all U.S. citizens. Prior to these amendments, many U.S. Citizens were inadvertently prevented from attaining Texas residency status because of unanticipated circumstances. For example, students born and raised in Texas but whose parents moved out of state before they had enrolled in college were previously classified as nonresidents unless they had enrolled in college prior to their parents' departure. Additionally, students raised by grandparents or other family members who had never gone to court to acquire legal custody were considered residents of the state in which their parents lived. Current statutes allow students in both cases, and other similar circumstances, to qualify for Texas resident status.

### Does Texas statute make provisions for U.S. Citizens who have lived outside of Texas to attain Texas resident status for in-state tuition?

U.S. Citizens may attain Texas resident status through any of the three pathways included in TEC Section 54.052. Although not conclusive or exhaustive, the following factors occurring throughout at least 12 consecutive months prior to the census date of the semester in which a person seeks to enroll may lend

support to a claim regarding his/her intent to establish and maintain domicile in Texas:

- Sole or joint marital ownership of residential real property in Texas by the person seeking to enroll or the dependent's parent, having established and maintained domicile at that residence;
- Ownership and customary management of a business, by the person seeking to enroll or the dependent's parent, in Texas which is regularly operated without the intention of liquidation for the foreseeable future;
- Gainful employment in Texas by the person seeking to enroll or the dependent's parent;
- Marriage, by the person seeking to enroll or the dependent's parent, to a person who has established and maintained domicile in Texas.

### Who maintains and monitors affidavits completed by non-U.S. Citizens seeking Texas resident status for higher education tuition purposes?

Each public institution of higher education is responsible for acquiring and maintaining, indefinitely or until the student becomes a permanent resident of the U.S., signed affidavits completed by non-U.S. citizens seeking Texas resident status for in-state tuition purposes.  In addition, Coordinating Board rules require institutions to remind affidavit students each year of their obligation to apply for permanent resident status as soon as they are eligible to do so. The same rules require the institutions to refer students to the appropriate federal agency for instructions on how to achieve rermanent resident status.

### How many students currently qualify for classification as Texas residents by meeting the TEC 54.052(a)(3) provisions and completing an affidavit?

The number of students who meet statutory requirements for establishing Texas resident status for in-state tuition under TEC 54.052(a)(3) totaled 25,151 in FY 2016, or 1.5 percent of the total enrollment at Texas public institutions of higher education. Each of these students qualified for in-state tuition and met the residency requirements for competing for state financial aid.  Below is a breakdown by sector of these students for both FY 2015 and FY 2016:

| Higher Education Sector | Total Affidavit Students (TEC 54.052(a)(3)) | |
|---|---|---|
| | FY 2015 | FY 2016 |
| Public Universities | 7,580 | 7,863 |
| Public Community, Technical and State Colleges | 17,384 | 17,261 |
| Public Health Related Institutions | 18 | 27 |
| Total All Public Institutions | 24,982 | 25,151 |

### How much state General Revenue (GR) is used to support affidavit students through institutional formula funding?

General revenue appropriations used to support affidavit students through institutional formula funding as estimated by the Coordinating Board are disaggregated by higher education sector below:

| Higher Education Sector | Formula Funding (General Revenue) to Affidavit Students[1] | |
|---|---|---|
| | FY 2015 | FY 2016 |
| Public Universities | $9.54M | $11.43M |
| Public Community, Technical and State Colleges | $13.51M | $13.41M |
| Public Health Related Institutions | $378,810 | $497,290 |
| Total All Public Institutions | $23.42M | $25.34M |

[1] Formula Funding (General Revenue (GR) is calculated for public universities using the average funding per semester credit hour (SCH) at each institution. For health-related institutions, community, technical and state colleges, it is calculated using statewide averages. The Coordinating Board does not have course-level data on each affidavit student to calculate an actual formula funding rate. The funding rates are different for each level (undergraduate/graduate) and course area (liberal arts or engineering for instance).

**App. 225**

**What types of financial aid may affidavit students receive?**

There are three categories of financial aid.

**Types of Financial Aid**

| | |
|---|---|
| **State-Supported Grant Aid** | Financial aid in the form of grants supported with general revenue via state appropriations. |
| **State-Authorized Loan Aid** | Financial aid in the form of loans (which require repayment) authorized by the state.  Funding for this aid is generated from the sale of bonds and loan repayments, <u>not</u> general revenue via state appropriations. |
| **Institutional/Other Financial Aid** | Financial aid which may be in the form of grants or loans provided from institutional or other resources, <u>not</u> general revenue via state appropriations. |

Each financial aid program has specific eligibility requirements for recipients.  For example, recipients of state-authorized loans must meet credit worthiness requirements to receive a loan, or secure a co-signer who meets these requirements and assumes ultimate financial responsibility for repayment.

**How many financial aid awards are provided to qualifying affidavit students?**

In Fiscal Year 2016, 10,716 financial aid awards were provided to 5,337 students who met statutory requirements for Texas resident status and in-state tuition under TEC 54.052(a)(3). This represents less than one percent of students who received financial aid. Of state-supported financial aid programs, 2,819 grant awards were provided to 2,674 students. The chart below details these awards by financial aid source for FY 2015 and FY 2016:

| Financial Aid Source | Total Financial Aid Awards to Affidavit Students | |
|---|---|---|
| | **FY 2015** | **FY 2016** |
| **State-Supported Grant Aid** | 2,958 | 2,819 |
| **State-Authorized Loan Aid** | 97 | 117 |
| **Institutional/Other Financial Aid (Non-state)** | 6,735 | 7,780 |
| **Total All State/Local Awards** | **9,790** | **10,716** |

**How much General Revenue (GR) is used to support qualifying affidavit students through state-supported grant aid programs?**

State-supported grant aid programs are funded by state GR appropriations. These programs are designed to assist qualifying Texas students by providing grants to help cover college costs. Recipients are not required to repay these funds to the state. GR appropriations for state-supported grant aid programs used by qualifying affidavit students, as estimated by the Coordinating Board, are listed in the table on the right.

| Estimated State-Supported Grant Aid to Affidavit Students | | |
|---|---|---|
| | **FY 2015** | **FY 2016** |
| **Total** | $10.98M | $11.99M |

**App. 226**

### What additional state-sponsored programs do affidavit students qualify for?

The Texas Higher Education Coordinating Board administers the College Access Loan (CAL) Program which offers low-interest loans to assist students with college costs. Students are required to repay all funds received, in addition to applicable interest. The CAL program is <u>not supported</u> by state GR. The program operates with student loan repayments. Affidavit students may qualify for the CAL program. However, they must meet the same credit and other requirements mandated for all borrowers and are subject to the same repayment responsibilities. CAL loan disbursements for qualifying affidavit students, as estimated by the Coordinating Board, are listed on the table on the right.

| Estimated College Access Loan Disbursements to Affidavit Students | | |
|---|---|---|
| | FY 2015 | FY 2016 |
| Total | $0.94M | $1.23M |

### What institutional or other financial aid do affidavit students qualify for?

In addition to state-supported or state-sponsored financial aid, institutions often provide access to various financial aid programs for students. These programs and available resources will vary by campus. Such financial aid resources may include merit-based grants, work study, or short-term loans. These resources are <u>not supported</u> by state GR. Total institutional or other financial aid provided to qualifying affidavit students as estimated by the Coordinating Board are included below:

| Estimated Institutional/Other Financial Aid to Affidavit Students | | |
|---|---|---|
| | FY 2015 | FY 2016 |
| Total Institutional or Other Financial Aid | $18.7M | $21.7M |

### What is the total tuition and fees paid by students who completed an affidavit as required by statute?

Institutions of higher education report students who completed an affidavit paid more than $58 million in tuition and fees in Fiscal Year 2015 and more than $63 million in tuition and fees in Fiscal Year 2016.

| Tuition & Fees Paid by Affidavit Students | | |
|---|---|---|
| | FY 2015 | FY 2016 |
| Total | $58.3M | $63.6M |

For more information:
Office of External Relations
512-427-6111
er@thecb.state.tx.us

**App. 227**

# Tab W

| | Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2018 (May 31, 2018) | | | | | | |
|---|---|---|---|---|---|---|---|
| **U.S. Citizenship and Immigration Services** | | | | | | | |
| Period | Requests by Intake and Case Status | | | | | | |
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| *Fiscal Year - Total*[6] | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,351 | 10,968 | 97,025 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,330 | 20,990 | 156,538 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,100 | 20,987 | 62,333 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,969 | 21,350 | 73,902 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,633 | 19,069 | 37,861 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,336 | 2,281 | 36,041 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,544 | 14,435 | 120,701 |
| 2016 Initial | 73,349 | 1,151 | 74,500 | 291 | 52,710 | 11,399 | 46,231 |
| 2016 Renewal | 187,352 | 11,166 | 198,518 | 744 | 145,834 | 3,036 | 74,470 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,884 | 462,343 | 13,310 | 117,502 |
| 2017 Initial | 45,602 | 44 | 45,646 | 182 | 47,290 | 9,242 | 35,193 |
| 2017 Renewal | 427,248 | 43,411 | 470,659 | 1,702 | 415,053 | 4,068 | 82,309 |
| 2018 | 137,993 | 23,231 | 161,224 | 826 | 205,659 | 8,128 | 41,556 |
| 2018 Initial | 1,495 | 2 | 1,497 | 9 | 20,573 | 4,904 | 11,198 |
| 2018 Renewal | 136,498 | 23,229 | 159,727 | 817 | 185,086 | 3,224 | 30,358 |
| Total Cumulative | 2,139,349 | 161,109 | 2,300,458 | 1,459 | 2,006,876 | 89,181 | 41,556 |
| Total Cumulative Initial | 908,258 | 49,156 | 957,414 | 619 | 819,337 | 76,569 | 11,198 |
| Total Cumulative Renewal | 1,231,091 | 111,953 | 1,343,044 | 840 | 1,187,539 | 12,612 | 30,358 |

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| ***Fiscal Year 2018 by Quarter [13]*** | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,639 | 2,545 | 45,820 |
| Q1. October - December Initial | 95 | 1 | 96 | 4 | 5,585 | 1,664 | 28,036 |
| Q1. October - December Renewal | 29,432 | 14,536 | 43,968 | 1,135 | 93,054 | 881 | 17,784 |
| Q2. January-March | 64,501 | 6,239 | 70,740 | 1,141 | 55,049 | 3,910 | 51,283 |
| Q2. January - March Initial | 977 | 0 | 977 | 17 | 9,637 | 2,162 | 17,208 |
| Q2. January - March Renewal | 63,524 | 6,239 | 69,763 | 1,123 | 45,412 | 1,748 | 34,075 |
| Q3. April - June | 43,965 | 2,455 | 46,420 | 1,022 | 51,971 | 1,673 | 41,556 |
| Q3. April - June Initial | 423 | 1 | 424 | 10 | 5,351 | 1,078 | 11,198 |
| Q3. April - June Renewal | 43,542 | 2,454 | 45,996 | 1,013 | 46,620 | 595 | 30,358 |

*D - Data withheld to protect requestors' privacy.*

*- Represents zero.*

[1] *Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.*

    *Each request is considered on a case-by-case basis.*

    *See http://www.uscis.gov/childhoodarrivals.*

[2] *The number of new requests accepted at a Lockbox during the reporting period.*

[3] *The number of requests rejected at a Lockbox during the reporting period.*

[4] *The number of requests that were received at a Lockbox during the reporting period.*

[5] *The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.*

[6] *The number of new requests received and entered into a case-tracking system during the reporting period.*

[7] *The number of requests approved during the reporting period.*

[8] *The number of requests that were denied, terminated, or withdrawn during the reporting period.*

[9] *The number of requests awaiting a decision as of the end of the reporting period.*

*NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.*

    *2. The report reflects the most up-to-date estimate available at the time the report is generated.*

    *3. USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn).  USCIS understands that it has corrected these query code issues and that this report provides a more accurate reflection of pending cases.  Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.*

    *4. The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018*

**App. 230**

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| Mexico | 707,370 | 966,230 | 1,673,600 | 645,311 | 932,709 | 1,578,020 |
| El Salvador | 34,497 | 46,917 | 81,414 | 29,540 | 45,094 | 74,634 |
| Guatemala | 24,907 | 30,862 | 55,769 | 20,786 | 29,645 | 50,431 |
| Honduras | 22,697 | 29,281 | 51,978 | 19,007 | 28,237 | 47,244 |
| Peru | 9,830 | 14,646 | 24,476 | 9,261 | 14,089 | 23,350 |
| South Korea | 7,901 | 14,700 | 22,601 | 7,409 | 13,940 | 21,349 |
| Brazil | 8,625 | 11,147 | 19,772 | 7,569 | 10,803 | 18,372 |
| Ecuador | 7,795 | 10,484 | 18,279 | 6,848 | 10,063 | 16,911 |
| Colombia | 7,296 | 10,182 | 17,478 | 6,717 | 9,848 | 16,565 |
| Philippines | 5,127 | 7,671 | 12,798 | 4,770 | 7,389 | 12,159 |
| Argentina | 5,263 | 7,088 | 12,351 | 4,925 | 6,873 | 11,798 |
| India | 3,788 | 5,477 | 9,265 | 3,242 | 5,242 | 8,484 |
| Jamaica | 4,448 | 4,950 | 9,398 | 3,507 | 4,767 | 8,274 |
| Venezuela | 3,489 | 4,743 | 8,232 | 3,174 | 4,604 | 7,778 |
| Dominican Republic | 3,840 | 4,196 | 8,036 | 3,247 | 4,070 | 7,317 |
| Uruguay | 2,643 | 3,357 | 6,000 | 2,468 | 3,251 | 5,719 |
| Bolivia | 2,238 | 3,303 | 5,541 | 2,113 | 3,199 | 5,312 |
| Costa Rica | 2,290 | 3,143 | 5,433 | 2,094 | 3,025 | 5,119 |
| Poland | 2,005 | 2,651 | 4,656 | 1,855 | 2,558 | 4,413 |
| Chile | 1,908 | 2,702 | 4,610 | 1,790 | 2,627 | 4,417 |
| Pakistan | 1,948 | 2,677 | 4,625 | 1,720 | 2,567 | 4,287 |
| Nicaragua | 1,908 | 2,395 | 4,303 | 1,648 | 2,313 | 3,961 |
| Tobago | 2,442 | 1,717 | 4,159 | 2,095 | 1,704 | 3,799 |
| Guyana | 1,486 | 1,954 | 3,440 | 1,297 | 1,905 | 3,202 |
| Not Reported | 1,607 | 1,770 | 3,377 | 1,255 | 1,647 | 2,902 |
| All Others | 30,910 | 36,848 | 67,758 | 25,689 | 35,370 | 61,059 |

*D  Data withheld to protect requestors' privacy.*

*- Represents zero.*

[1]  *The number of requests that were accepted to date of the reporting period.*

[2]  *The number of requests that were approved to date of the reporting period.*

[3]  *All fields with a blank in the country of birth field are included in the field "not reported."*

*NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.*

     *2) The report reflects the most up-to-date estimate data available at the time the report is generated.*

     *3) Ranked by total approvals.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018*

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| California | 246,429 | 279,313 | 525,742 | 228,478 | 274,170 | 502,648 |
| Texas | 142,773 | 149,297 | 292,070 | 127,144 | 146,710 | 273,854 |
| New York | 51,572 | 91,472 | 143,044 | 44,955 | 89,487 | 134,442 |
| Florida | 41,685 | 75,536 | 117,221 | 35,338 | 74,036 | 109,374 |
| Illinois | 46,330 | 49,676 | 96,006 | 43,313 | 48,639 | 91,952 |
| New Jersey | 26,542 | 41,524 | 68,066 | 23,323 | 40,709 | 64,032 |
| Arizona | 31,067 | 31,980 | 63,047 | 28,400 | 31,258 | 59,658 |
| North Carolina | 29,909 | 29,200 | 59,109 | 27,786 | 28,634 | 56,420 |
| Georgia | 29,091 | 30,820 | 59,911 | 24,809 | 30,170 | 54,979 |
| Washington | 20,007 | 23,464 | 43,471 | 18,392 | 23,018 | 41,410 |
| Colorado | 19,378 | 19,249 | 38,627 | 17,619 | 18,842 | 36,461 |
| Virginia | 14,378 | 21,515 | 35,893 | 12,746 | 21,041 | 33,787 |
| Nevada | 14,354 | 16,148 | 30,502 | 13,344 | 15,843 | 29,187 |
| Maryland | 11,868 | 17,921 | 29,789 | 10,295 | 17,551 | 27,846 |
| Massachusetts | 9,976 | 19,608 | 29,584 | 8,589 | 19,185 | 27,774 |
| Oregon | 12,224 | 12,715 | 24,939 | 11,506 | 12,477 | 23,983 |
| Pennsylvania | 7,491 | 14,848 | 22,339 | 6,436 | 14,548 | 20,984 |
| Indiana | 10,848 | 10,863 | 21,711 | 10,022 | 10,675 | 20,697 |
| Utah | 10,634 | 9,822 | 20,456 | 9,850 | 9,630 | 19,480 |
| Michigan | 7,587 | 12,189 | 19,776 | 6,783 | 11,904 | 18,687 |
| Tennessee | 9,447 | 9,649 | 19,096 | 8,515 | 9,457 | 17,972 |
| Minnesota | 7,127 | 9,861 | 16,988 | 6,502 | 9,632 | 16,134 |
| Wisconsin | 8,259 | 8,436 | 16,695 | 7,729 | 8,287 | 16,016 |
| Connecticut | 5,865 | 9,543 | 15,408 | 5,223 | 9,358 | 14,581 |
| Oklahoma | 7,573 | 7,763 | 15,336 | 7,002 | 7,638 | 14,640 |
| Kansas | 7,403 | 7,487 | 14,890 | 6,933 | 7,345 | 14,278 |
| New Mexico | 7,504 | 6,953 | 14,457 | 6,945 | 6,838 | 13,783 |
| South Carolina | 7,266 | 7,197 | 14,463 | 6,552 | 7,056 | 13,608 |
| Ohio | 5,485 | 8,882 | 14,367 | 4,729 | 8,679 | 13,408 |
| Arkansas | 5,680 | 5,520 | 11,200 | 5,198 | 5,410 | 10,608 |
| Alabama | 4,870 | 4,931 | 9,801 | 4,370 | 4,841 | 9,211 |
| Missouri | 3,995 | 5,281 | 9,276 | 3,678 | 5,185 | 8,863 |
| Nebraska | 3,852 | 4,285 | 8,137 | 3,476 | 4,198 | 7,674 |
| Kentucky | 3,522 | 4,162 | 7,684 | 3,147 | 4,081 | 7,228 |
| Iowa | 3,218 | 4,224 | 7,442 | 2,890 | 4,129 | 7,019 |
| Idaho | 3,429 | 3,592 | 7,021 | 3,199 | 3,523 | 6,722 |
| Louisiana | 2,496 | 3,730 | 6,226 | 2,153 | 3,661 | 5,814 |
| Rhode Island | 1,509 | 2,941 | 4,450 | 1,316 | 2,871 | 4,187 |
| Hawaii | 861 | 3,458 | 4,319 | 695 | 3,366 | 4,061 |
| Delaware | 1,645 | 2,098 | 3,743 | 1,496 | 2,070 | 3,566 |

**App. 232**

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | 1,724 | 1,896 | 3,620 | 1,501 | 1,874 | 3,375 |
| District of Columbia | 988 | 2,019 | 3,007 | 834 | 1,990 | 2,824 |
| Puerto Rico | 575 | 2,261 | 2,836 | 419 | 2,212 | 2,631 |
| New Hampshire | 480 | 1,197 | 1,677 | 415 | 1,168 | 1,583 |
| Wyoming | 699 | 703 | 1,402 | 627 | 686 | 1,313 |
| Alaska | 216 | 872 | 1,088 | 178 | 858 | 1,036 |
| South Dakota | 316 | 546 | 862 | 274 | 532 | 806 |
| Maine | 148 | 634 | 782 | 120 | 618 | 738 |
| Guam | 115 | 649 | 764 | 93 | 634 | 727 |
| North Dakota | 151 | 571 | 722 | 121 | 559 | 680 |
| Virgin Islands | 168 | 420 | 588 | 112 | 403 | 515 |
| West Virginia | 160 | 380 | 540 | 131 | 370 | 501 |
| Montana | 93 | 287 | 380 | 80 | 276 | 356 |
| Vermont | 66 | 307 | 373 | 50 | 302 | 352 |
| Armed Forces-Pacific | 33 | 146 | 179 | 29 | 142 | 171 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 129 | 157 | 21 | 123 | 144 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 84 | 98 |
| Northern Mariana Islands | 32 | 39 | 71 | 13 | 35 | 48 |
| Palau | | 20 | 20 | | 19 | 19 |
| Not Reported | 17,098 | 140,778 | 157,876 | 13,429 | 118,502 | 131,931 |

- Represents zero.

[1]  The number of requests that were accepted to date of the reporting period.

[2]  The number of requests that were approved to date of the reporting period.

[3]  All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

   2) The report reflects the most up-to-date estimate data available at the time the report is generated.

   3) Ranked by total approvals.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018

**App. 233**

# Tab X

7/18/2018          800,000 Workers, $460 Billion in Economic Output, Dozens of Entrepreneurs: What the U.S. Loses if DACA Goes Away | Inc.com

            **Inc.**

IMMIGRANT ENTREPRENEURS

# 800,000 Workers, $460 Billion in Economic Output, Dozens of Entrepreneurs: What the U.S. Loses if DACA Goes Away

Undocumented immigrants who came to the U.S. as children start businesses at twice the rate of the general population, research finds. Many are now concerned about the future of their startups.

**By Zoë Henry** *Staff writer, Inc.*  🐦 **@ZoeLaHenry**



**App. 235**

Dulce Garcia is an undocumented immigrant who was brought to the U.S. from Mexico at the age of 4. As a Dreamer, the name bestowed on people like Garcia, she was unable to apply for student loans, so she worked odd jobs selling flowers, waiting tables, and parking cars throughout high school, college, and eventually law school to pay off her debts. In 2016, Garcia fulfilled her life-long ambition of practicing immigration law when she opened her own firm in Chula Vista, California, where she has since hired six employees and two interns.

However, in the past six months, the uncertainty of whether she'd be allowed to remain in the U.S. has taken its toll. The Trump administration has vowed to dismantle Deferred Action for Childhood Arrivals (DACA), an Obama-era program that offers short-term protections for undocumented immigrants like Garcia. As a result, the entrepreneur has laid off half of her workforce. She also plans to close an additional office location in the southern part of the city, where she serves the primarily Spanish-speaking population. Garcia adds that her license to practice the law is in jeopardy as well. "I have worked so hard to get to this place, and now I don't know what will become of me," she says.

Monday marks the date that President Trump had planned to end the DACA program full-stop. His order was blocked by a federal judge–which the Supreme Court declined to reconsider last week, effectively keeping the program running. However, hundreds of thousands of Dreamers remain in limbo, as Congress attempts to negotiate a longer-term fix that may offer them a path to citizenship.

Along with Garcia, dozens of Dreamers have started their own companies since coming to the U.S., and the uncertainty surrounding the DACA program has them girding for losses and, in the worst-case scenario, deportation.

For many of these immigrant founders, returning to their country of birth is not feasible, and perhaps even dangerous. Garcia, who has long been out of touch with her family in Mexico, notes that DACA recipients can travel abroad only in very limited circumstances-- for instance, if they are able to obtain an advance parole document from U.S. Citizenship and Immigration Services. The entrepreneur has

**App. 236**

not returned home since she left originally--not even for her grandmother's funeral last year. "I still don't know where she is buried, and it breaks my heart," she adds. And given that she obtained her license to practice law in California exclusively, it would be difficult for Garcia pick up and move her business to Mexico.

Diego Corzo, the founder of the real estate firm Nino Group in Austin, Texas, is in a similar situation. His company, which sells around 80 homes each year and solicits business for related services such as appraisers and home stagers, grossed around $200,000 in sales last year. Corzo immigrated to the U.S. from Peru as a small child, and points out that his skills are not transferable to the business climate in Lima. In the meantime, "I have people [Americans] who rely on me to get paid every month," Corzo says. Should his documents expire--which would cause him to lose his driver's license--Corzo says he would plan to hire someone to drive him around to rental properties, until and unless he is forced to flee the country.

## A question of losses.

What often gets lost in the conversation surrounding DACA, analysts suggest, is the sheer productivity of these roughly 800,000 workers. Rescinding the program could mean the loss of as much as $460 billion in economic output over the next decade, according to a recently released report from the House Committee on Small Business, which was released by ranking member Nydia Velázquez (D.-N.Y.)

The report also points out that Dreamers start businesses at more than twice the rate of the general population, in large part because they are used to making ends meet without help from the government. "We are not only part of the workforce--we are also part of the entrepreneurial community," says Ivan Guzman, a Mexican immigrant and Dreamer who co-founded a restaurant, La Avenida, in the East Harlem section of Manhattan in 2016. His business, which employs eight people, generates around $240,000 in annual revenue selling authentic Mexican fare.

**App. 237**

Meanwhile, Dreamers contribute some $2 billion in local and state taxes annually–including to programs (e.g., Social Security) from which they are not eligible to receive any benefits.

Garcia, for her part, has paid a generous sum to the U.S. government: "If you told me five years ago that I would be paying $10,000 a year in employer taxes, I would think you were crazy," she says.

Then of course, there are the Dreamers who never officially signed up for DACA. Those who have not yet applied for the program are not currently eligible and remain unprotected–also making them basically untouchable to U.S. employers. La Avenida currently employs two undocumented immigrants–a dishwasher and a busboy–who failed to apply for DACA in time, and are therefore in danger of being deported. "There is a lot of uncertainty for the Dreamer population, and no one really knows what is going to happen," adds Guzman.

App. 238