**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

_____
)
**STATE OF TEXAS, et al.,**                                  )
)
              **Plaintiffs,**                          )
)
**v.**                                                              )     **CASE No. 1:18-CV-00068-ASH**
)
**UNITED STATES OF AMERICA, et al.,**                )
)
              **Defendants.**                       )
)
**and**                                                          )
)
**KARLA PEREZ, et al.,**                                     )
)
              **Defendant-Intervenors**    )
)
**and**                                                          )
)
**STATE OF NEW JERSEY,**                                )
)
              **Defendant-Intervenor.**         )
)
_____ )

**BRIEF OF AMICI CURIAE CURRENT AND FORMER PROSECUTORS AND LAW
ENFORCEMENT LEADERS IN SUPPORT OF DEFENDANTS-INTERVENORS**

## <u>TABLE OF CONTENTS</u>

INTEREST AND IDENTITY OF AMICI CURIAE ..................................................... 1

INTRODUCTION ................................................................................................... 2

ARGUMENT .......................................................................................................... 4

    I.    DACA Fosters Effective Law Enforcement. ............................................. 4

        A.    Trust and Respect Between Communities and Law Enforcement
               Officials Are Essential to Public Safety and Are Thwarted When
               Victims and Witnesses Fear Deportation Consequences of
               Cooperating. ................................................................................ 4

        B.    DACA Promotes Cooperation with Law Enforcement. ........................ 10

        C.    DACA Aids Law Enforcement by Facilitating Access to
               Identification. ............................................................................. 12

    II.    DACA Helps Law Enforcement Protect Vulnerable Individuals from Crime
        and Exploitation. ................................................................................. 14

CONCLUSION ..................................................................................................... 18

## TABLE OF AUTHORITIES

**Statutes**

8 U.S.C. § 1324a(h)(3)..................................................................................................13

8 C.F.R. § 274a.12(c)(14) ...........................................................................................13

Pub. L. No. 106-386, 114 Stat. 1491 (2000)...............................................................11


**Cases**

*City of Philadelphia v. Sessions*, No. CV17-3894, 2018 WL 2725503 (E.D. Pa. June 6,
    2018) ........................................................................................................................7


**Executive and Congressional Materials**

*Oversight of the Administration's Misdirected Immigration Enforcement Policies:
    Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the
    S. Comm. on the Judiciary*, 114th Cong. (July 21, 2015) (statement of Tom Manger,
    Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n)...........4

Soc. Security Admin., SSA Publ'n No. 05-10096, Social Security Numbers for
    Noncitizens (June 2015), *available at* http://www.ssa.gov/pubs/EN-05-10096.pdf ..............13

U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-
    0040, Instructions for I-765 Application for Employment Authorization (Nov. 2015),
    *available at* https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf ....................13

U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., *Victims of
    Criminal Activity:  U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/
    victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-
    status/victims-criminal-activity-u-nonimmigrant-status (last updated Aug. 25, 2017)...........11

U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *Enhancing Community
    Policing with Immigrant Populations* (Apr. 2010), *available at* https://ric-zai-
    inc.com/Publications/cops-w0747-pub.pdf..............................................................................14


**Other Authorities**

Angelica S. Reina, Brenda J. Lohman & Marta María Maldonado, *"He Said They'd
    Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among
    Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013)..................................................17

Anita Khashu, Police Found., *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (2009), https://www.policefoundation. org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf ...............4, 5, 6, 16

Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post, Apr. 4, 2017, https://www.washingtonpost.com/world/ national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html ....................8

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593 (2011) ..................................14, 15, 16, 17

Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, Gothamist, June 22, 2017, http://gothamist.com/2017/06/22/ice_immigrants_courts. php...............................................................................................................................10

Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR, Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver. ...................................................................9

Jacob Bucher, Michelle Manasse & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010) ................................................................................................14, 15, 16

James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News, Aug. 2, 2017, http://www.nydailynews. com/new-york/dad-2-testified-brooklyn-murder-cases-detained-ice-article-1.3378899...........9

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times, Oct. 9, 2017, http://www.latimes.com/ local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html...........................6

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015).........................................................................................................5, 6, 17

Katie Mettler, *"This is Really Unprecedented": ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post, Feb. 16, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/02/16/this-is-really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at-texas-courthouse/...............................................................................................................9

Leslye Orloff, Levi Wolberg & Benish Anver, Nat'l Ctr. on Domestic & Sexual Violence, *U-Visa Victims and Lawful Permanent Residency* (Sept. 6, 2012),

http://www.ncdsv.org/ images/NIWAP_U-
VisaVictimsAndLawfulPermanentResidency_9-6-12.pdf ....................................................11

Matthew Haag, *Texas Deputy Accused of Molesting 4-Year-Old and Threatening to
Deport Her Mother*, N.Y. Times, June 18, 2018, https://www.nytimes.com/2018/06/
18/us/cop-molests-girl-deport-mother.html. .........................................................................15

Nat'l Immigration Law Ctr., *Local Law Enforcement Leaders Oppose Mandates to
Engage in Immigration Enforcement* (Aug. 2013), https://www.nilc.org/wp-
content/uploads/2017/02/ Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf .........7

Nat'l Immigrant Women's Advocacy Project, *Promoting Access to Justice for Immigrant
and Limited English Proficient Crime Victims in an Age of Increased Immigration
Enforcement: Initial Report from a 2017 National Survey*, at 99 (May 3, 2018),
*available at* http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-
Justice-National-Report.pdf ....................................................................................................7

*Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends, Feb.
23, 2017, http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-
administration/ ........................................................................................................................5

Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving
'Unbanked' on Sidelines*, N.Y. Times, Dec. 23, 2015............................................................12

Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty.
Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017),
https://www.tdcaa.com/journal/new-ice-age ...........................................................................6

Natalia Lee et al., Nat'l Immigrant Women's Advocacy Project, *National Survey of
Service Providers on Police Response to Immigrant Crime Victims, U Visa
Certification and Language Access* (Apr. 16, 2013), http://www.niwap.org/reports/
Police-Response-U-Visas-Language-Access-Report-4.6.13.pdf.............................................12

Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina
Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230 (2005) ............................17

Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., *Insecure
Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*
(May 2013), www.policylink.org/sites/default/files/INSECURE_ COMMUNITIES_
REPORT_FINAL.PDF .......................................................................................................5, 15

Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case,
Travis DA Says*, The Statesman (Austin), Mar. 8, 2017, http://www.statesman.com/news/
local/deportation-fears-keep-victim-from-cooperating-domestic-violence-case-travis-says/
rdZAjFEAxjHWnxXV1LlpjM/. ...............................................................................................9

iv

Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* (2012), http://www.policeforum.org/assets/docs/Free_Online_Documents/Immigration/voices%20from%20across%20the%20country%20%20local%20law%20enforcement%20officials%20discuss%20the%20challenges%20of%20immigration%20enforcement%202012.pdf ....................................................................................................12

Robert C. Davis, Edna Erez & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183 (2001) ...........................................................................................................6, 8

Roberto G. Gonzales, *DACA's Beneficiaries Landed Good Jobs, Enrolled in College, and Contributed to Society*, Vox Media, Sept. 5, 2017, https://www.vox.com/ 2017/9/2/ 16244380/daca-benefits-trump-undocumented-immigrants-jobs............................................10

Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* (June 2014), http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca ..........................................................................................................10

S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* (Apr. 2009), http://www.splcenter.org/sites/default/files/downloads/ UnderSiege.pdf ..............................15

S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ, June 5, 2017, http://www.nj.com/politics/index.ssf/2017/06/advocates_say_ice_courthouse_arrests_are_hurting_i.html. ..................................................................10

Sarah Stillman, *When Deportation Is a Death Sentence*, New Yorker, Jan. 15, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence. ...9

Steve Coll, *When a Day in Court is a Trap for Immigrants*, New Yorker, Nov. 8, 2017, https://www.newyorker.com/news/daily-comment/when-a-day-in-court-is-a-trap-for-immigrants. .........................................................................................................................9

Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* (June 2015), http://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf ...............10

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici Current and Former Prosecutors and Law Enforcement Leaders file this brief as Amici Curiae in support of Defendants-Intervenors.[1]  Amici are criminal justice leaders who have extensive expertise in law enforcement, prosecution, and cooperative federal-state law enforcement activities.[2]  They are intimately familiar with the challenges of performing critical law enforcement and governance functions in communities where immigrants fear the police and are vulnerable to exploitation and crime.  Amici represent jurisdictions from across the country that understand the challenges of balancing local community needs and public safety.  A full list of amici is attached as Exhibit A.

Amici's experience in keeping their communities safe has underscored the critical importance of bringing immigrants and their families "out of the shadows."  Community trust and cooperation are essential to public safety, and sound police work as well as successful prosecutorial efforts are undermined by undocumented immigrants' fears of interacting with law enforcement and the justice system.  This dynamic, moreover, leaves undocumented immigrants more vulnerable to crime and exploitation, and undocumented immigrant victims less likely to come forward or cooperate with investigations and prosecutions, leading to more violence in the communities amici are charged with protecting.

Deferred Action for Childhood Arrivals ("DACA") protects from deportation nearly 800,000 individuals brought to this country as children.  Under DACA, these individuals, who have undergone background checks and lived continuously in the United States since 2007, have

---

[1] The parties have consented to the filing of this brief.
[2] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made a monetary contribution to this brief's preparation or submission.

been permitted to live, work, and study in this country without fear of deportation.  Amici are aware that DACA has helped law enforcement officers and prosecutors keep their communities safe by reducing the fear of removal from these nearly 800,000 individuals who are active members of their communities.

## INTRODUCTION

The lessons amici have learned in protecting their communities shed important light on the issues raised in this case.  When community residents live in constant fear that interactions with local law enforcement officials could result in deportation, there is a fundamental breakdown in trust that threatens public safety and impedes justice system leaders from doing their jobs.  Extensive evidence shows that undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences.  As a result, immigrant communities are less willing to report crimes and cooperate with criminal investigations and prosecutions.  This fundamental breakdown in trust poses a major challenge to the investigation and prosecution of individual crimes and to the proper allocation of public safety resources.

DACA ameliorates these problems by addressing an important reason that many individuals fear cooperating with law enforcement.  As experience with DACA has shown, when immigrants are permitted to step out of the shadows, they are much more willing to work cooperatively with police and prosecutors.  As explained below, nearly two-thirds of DACA recipients reported being less afraid of law enforcement, and 59 percent indicated that they were more likely to report crimes after having received the protections of DACA.  DACA further aids law enforcement by facilitating access to identification, such as federal employment authorization documents.  Lack of identification in immigrant communities often leads to undue burdens on police, potentially turning a simple traffic stop into an hours-long detour to

2

fingerprint someone at the police station.  When police are able to identify victims, witnesses, and potential suspects without those sorts of delays, valuable law enforcement resources are spared.  Knowing the identity of individuals with whom law enforcement officers come into contact aids in the safety of law enforcement officers as well.

DACA also benefits public safety by helping law enforcement protect a population uniquely vulnerable to exploitation and violent crime.  Numerous studies have shown that undocumented individuals' fear of interacting with law enforcement makes them attractive targets for many forms of crime and abuse.  Undocumented immigrants, for instance, face increased wage theft and other forms of exploitation in the workplace.  With limited access to bank accounts (in substantial part because of their lack of identification), they have been dubbed by some "walking ATMs" and are frequently targeted for robbery.  Undocumented individuals are also especially vulnerable to domestic abuse because they are often afraid to turn to law enforcement for help against abusive partners.

By eliminating an important reason to fear law enforcement, by providing work authorization and access to identification, and by building trust between law enforcement and immigrants with longstanding ties to the United States, DACA aids community policing and makes recipients less vulnerable to crime and exploitation.  In doing so, DACA provides vital support to police and prosecutors charged with protecting all members of their communities.

**ARGUMENT**

I.    **DACA Fosters Effective Law Enforcement.**

    A. **Trust and Respect Between Communities and Law Enforcement Officials Are Essential to Public Safety and Are Thwarted When Victims and Witnesses Fear Deportation Consequences of Cooperating.**

The experience of policing cities across the country has taught law enforcement officers that, "[t]o do our job, we must have the trust and respect of the communities we serve."[3]  In order to stop crime, police officers "need the full cooperation of victims and witnesses."[4]

This common-sense philosophy is sometimes called "community policing."  Community policing is an approach to policing whereby local law enforcement engages communities in a working partnership to reduce crime and promote public safety.[5]  It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation with the police department.[6]  When that relationship of trust is missing—as it is when people believe that contacting police or cooperating with prosecutors could lead to deportation for themselves or others—community policing breaks down and the entire community is harmed.

The reality of millions of undocumented immigrants living in the United States poses significant challenges to effective community policing.  According to a recent Pew survey, 67 percent of Hispanic immigrants and 47 percent of all Hispanic adults in the United States worry

---

[3] *See Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, at 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate. gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.
[4] *Id.*
[5] *See* Anita Khashu, *The Role Of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (Apr. 2009), *available at* https://www. policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.
[6] *Id.*

about deportation—of themselves, family members, or close friends.[7]  This fear necessarily affects cooperation and communication with police and prosecutors.  Immigrants—and their family members and neighbors who may be U.S. citizens or lawfully present—often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.

As a result, immigrant communities in general, and undocumented immigrants in particular, are less likely to trust and cooperate with local police and prosecutors.  One survey of Latinos in four major cities found that 70 percent of undocumented immigrants and 44 percent of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask them or people they know about their immigration status; and 67 percent of undocumented immigrants and 45 percent of all Latinos would be less likely to offer voluntarily information about, or report, crimes because of the same fear.[8]

These studies (among others) highlight that fears of immigration enforcement and the resulting damage to law enforcement cooperation affect not just undocumented community members but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[9]

_____

[7] *Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends, Feb. 23, 2017, http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/.
[8] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5–6 (May 2013), *available at* www.policylink.org/sites/default/files/ INSECURE_COMMUNITIES_REPORT_FINAL.PDF; *see also id.* at 1 ("Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").
[9] An estimated 85 percent of immigrants live in mixed-status families. *See* Khashu, *supra* note 5, at 24; *see also* Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) ("The results indicate that for each 1-point increase in fear of deportation [e.g., from 'not

This problematic atmosphere of mistrust is felt by police as well.  In one study, two-thirds of the law enforcement officers polled expressed the view that recent immigrants reported crimes less frequently than others.[10]  Those surveyed also indicated that the crimes underreported by immigrants are most often serious ones, with domestic violence and gang violence at the top.[11]  These trends have only worsened in recent months.  According to the Houston Police Department, rape reporting by members of the Hispanic community fell over 40 percent from the first quarter of 2016 to the same period in 2017, despite an overall *increase* in city-wide crime reports.[12]  Los Angeles, San Francisco, and San Diego also witnessed lagging sexual assault and domestic violence reporting by Hispanic persons—but not other ethnic groups—in the first half of 2017.[13]  According to Los Angeles County Sheriff's Deputy Marino Gonzalez, "[t]hey're afraid of us.  And the reason they're afraid of us is because they think we're going to deport

---

much' to 'some' worry, or from 'some' to 'a lot'], Latina participants were 15% less willing to report being victim of a violent crime to police.").

[10] Robert C. Davis, Edna Erez, & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 187 (2001).

[11] *Id.* at 188–89.

[12] Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), https://www.tdcaa.com/journal/new-ice-age.

[13] James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times, Oct. 9, 2017, http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

them."[14]  Philadelphia Police Commissioner Richard Ross recently echoed these concerns in

sworn testimony.[15]

      Immigrants' widely recognized fear of interacting with law enforcement and prosecutors

poses a fundamental challenge for community policing.  Police cannot prevent or solve crimes if

victims or witnesses are unwilling to talk to them or prosecutors because of concerns that they,

their loved ones, or their neighbors will face adverse immigration consequences.  According to a

recent national survey, law enforcement officers have seen an across-the-board decline in

immigrant communities' willingness to cooperate with law enforcement.[16]  As the president of

the Major Cities Chiefs Association has explained to Congress, "[c]ooperation is not

forthcoming from persons who see their police as immigration agents."[17]  And, as cautioned by

one official, "immigrants will never help their local police to fight crime once they fear we have

become immigration officers."[18]

---

[14] *Id.*; *see also* Nat'l Immigrant Women's Advocacy Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, at 99 (May 3, 2018), *available at* http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf [hereinafter *NIWAP Report*] (finding that, between 2016 and 2017, fear of deportation was the principal reason why immigrant victims did not call the police for help or file or follow through with a court case).

[15] *See City of Philadelphia v. Sessions*, No. CV17-3894, 2018 WL 2725503, at *42 (E.D. Pa. June 6, 2018) ("Police Commissioner Ross reiterated his earlier testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences.").

[16] *NIWAP Report*, *supra* note 144, at 101.

[17] Statement of Tom Manger, *supra* note 3, at 2.

[18] *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement*, Nat'l Immigration Law Ctr., at 2 (Aug. 2013) (statement of Chief Acevedo), *available at* https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf.

The underreporting of crimes by recent immigrants is a problem for the entire criminal justice system.[19]  The most immediate consequence, of course, is that serious crimes go unreported and unpunished.  In a recent national survey, a majority of participating law enforcement officers reported that such barriers to cooperation have "le[d] to greater numbers of perpetrators at large,"[20] thereby threatening officer safety and the safety of entire communities.[21]  As one official explained, when criminal behavior goes unreported, "[c]rime multiplies," and "[u]nresolved resentments grow in the community."[22]  Another added that the underreporting of crime "keeps fear at very high levels and diminishes quality of life."[23]  Even beyond the underreporting of crime, undocumented immigrant victims and witnesses may refuse to come to court to testify in important criminal cases because of their fear of being detained and deported.

These concerns are anything but hypothetical.  Over the past two years, the trends generating such concerns have escalated in ways that threaten long-term harm to criminal justice system operations.  A Department of Homeland Security official recently illustrated why many immigrants hesitate to cooperate with law enforcement.  In a briefing to reporters, he stated that "[j]ust because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien."[24]  An immigrant woman living in Texas learned that lesson all too perversely when she arrived at a courthouse seeking a protective order against her abusive boyfriend, only to leave under arrest—likely due to a tip from her

---

[19] Davis et al., *supra* note 100, at 188.
[20] *NIWAP Report*, *supra* note 144, at 103.
[21] *Id.* at 104.
[22] Davis et al., *supra* note 100, at 188.
[23] *Id.*
[24] Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post, Apr. 4, 2017, https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html.

abuser.[25]  In August 2017, federal agents detained an undocumented immigrant who had

provided key testimony in two homicide cases.[26]  And, weeks later, ICE agents arrested a victim

of domestic violence as he left a county courthouse.[27]  The Immigrant Defense Project reports

that the number of arrests or attempted arrests by ICE agents at courthouses throughout New

York rose by a staggering 1200 percent from 2016 to 2017.[28]

Precisely because victims and witnesses fear similar adverse treatment from immigration

authorities, some violent crimes have gone unreported, and pending prosecutions have

disappeared from courts' dockets.  A Texas district attorney confirmed that a victim of domestic

violence had become uncooperative because she feared deportation.[29]  Denver prosecutors were

forced to drop four domestic abuse cases when similar worries deterred the victims from

testifying;[30] in 2017, more than a dozen Latina women in Denver dropped their own civil cases

against domestic abusers, citing fear of deportation.[31]  An immigrant mother in New Jersey,

---

[25] Katie Mettler, *"This is Really Unprecedented": ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post, Feb. 16, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/02/16/this-is-really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at-texas-courthouse/.

[26] James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News, Aug. 2, 2017, http://www.nydailynews.com/new-york/dad-2-testified-brooklyn-murder-cases-detained-ice-article-1.3378899.

[27] Steve Coll, *When a Day in Court is a Trap for Immigrants*, New Yorker, Nov. 8, 2017, https://www.newyorker.com/news/daily-comment/when-a-day-in-court-is-a-trap-for-immigrants.

[28] Immigrant Defense Project, *ICE Out of Courts*, https://www.immigrantdefenseproject.org/ice-courts/ (last accessed July 19, 2018).

[29] Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, The Statesman (Austin), Mar. 8, 2017, http://www.statesman.com/news/local/deportation-fears-keep-victim-from-cooperating-domestic-violence-case-travis-says/rdZAjFEAxjHWnxXV1LlpjM/.

[30] Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR, Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver.

[31] Sarah Stillman, *When Deportation Is a Death Sentence*, New Yorker, Jan. 15, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

fearing that interaction with the court system could trigger removal, declined to report that her son had been assaulted on his way to school.[32]  And a victim of domestic violence in New York City "did not think it was in her best interest" to pursue a protective order.[33]  In addition to their particular deportation concerns, undocumented immigrant victims and witnesses may understandably recoil more generally from a system that allows participants to walk freely into a courthouse to fulfill a civic responsibility to testify, only to be detained by immigration authorities and prevented from returning to their lives.

### B.  DACA Promotes Cooperation with Law Enforcement.

DACA has helped to ameliorate the challenges faced by law enforcement in building trust with immigrant communities and has thus improved public safety.  Nearly eight in ten recipients of DACA relief reported that they are now less afraid of deportation,[34] two-thirds reported being less afraid of law enforcement, and 59 percent said that they would report a crime now in a situation in which they would not have reported it before.[35]  If DACA were to remain in place, those who qualify for DACA would not revert to old reasons to fear ordinary encounters with law enforcement.  Instead, they would retain greater freedom to cooperate for the protection

[32] S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ, June 5, 2017, http://www.nj.com/politics/index.ssf/2017/06/advocates_say_ice_courthouse_arrests_are_hurting_i.html.
[33] Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, GOTHAMIST, June 22, 2017, http://gothamist.com/2017/06/22/ice_immigrants_courts.php.
[34] Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 23 (June 2015), http://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf.
[35] Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 9 (June 2014), http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca; Roberto G. Gonzales, *DACA's Beneficiaries Landed Good Jobs, Enrolled in College, and Contributed to Society*, Vox Media, Sept. 5, 2017, https://www.vox.com/2017/9/2/16244380/daca-benefits-trump-undocumented-immigrants-jobs.

10

of their communities without worrying about how their good deed might be punished—for example, by causing them to be separated from their family members, siblings, or loved ones.

Lessons learned from implementation of the Violence Against Women Act of 2000[36] are instructive.  With that Act, Congress created the U visa to provide immigration relief to undocumented victims of certain crimes.[37]  Like DACA qualification, a U visa allows recipients to identify themselves, receive temporary relief from removal, and obtain verified government identification.[38]  The benefits for law enforcement have been striking.  A recent study indicated that U visa applicants and recipients, freed of the need to remain in the shadows, became far more likely to cooperate with law enforcement in the detection, investigation, and prosecution of crimes.[39]  Indeed, more than 99 percent stated that they were willing to cooperate with the police, and 70 percent were in fact asked to—and did—provide assistance related to crimes committed against them.[40]  That U visa holders who seek lawful permanent residency are expected to provide "reasonably requested information and assistance" to law enforcement in connection with the crimes that qualify them for immigration relief undoubtedly helps explain the especially high level of cooperation, but the protections offered by the U visa are what enable

---

[36] Pub. L. No. 106-386, 114 Stat. 1491 (2000).

[37] *See* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated Aug. 25, 2017).

[38] *See id.*

[39] *See* Leslye Orloff, Levi Wolberg & Benish Anver, Nat'l Ctr. on Domestic & Sexual Violence, *U-Visa Victims and Lawful Permanent Residency* 5-6 (Sept. 6, 2012), http://www.ncdsv.org/images/NIWAP_U-VisaVictimsAndLawfulPermanentResidency_9-6-12.pdf.

[40] *Id.*

that cooperation.[41]   Another study revealed that three-quarters of law enforcement officers view

U visas as beneficial in encouraging victims to come forward and report crimes.[42]

## C.  DACA Aids Law Enforcement by Facilitating Access to Identification.

A further benefit of DACA for effective policing follows from the greater availability of

identification.  Because most states do not issue driver's licenses or other identification to

undocumented immigrants, law enforcement often faces serious difficulties reliably identifying

undocumented community members.  Ready access to identification aids law enforcement in the

most basic of ways: if the police cannot verify who someone is, it becomes much harder to

identify witnesses and victims, investigate potential suspects, and perform critical tasks like

searching for a criminal history, investigating outstanding warrants, and determining whether

someone poses a threat.[43]

Even the simplest traffic stop can lead to an unnecessary waste of valuable law

enforcement resources if an individual cannot be identified.  If an officer stops a motorist who

---

[41] *See id.* at 5 (internal quotation marks omitted).  As set forth *supra*, note 35, the DACA program has yielded similar results, despite entailing no explicit expectation of law enforcement cooperation.

[42] Natalia Lee et al., Nat'l Immigrant Women's Advocacy Project, *National Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access* 21 (Apr. 16, 2013), *available at* http://www.niwap.org/reports/Police-Response-U-Visas-Language-Access-Report-4.6.13.pdf.

[43] *See, e.g.*, Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* 15 (2012), http://www.policeforum.org/assets/docs/Free_Online_Documents/Immigration/voices%20from %20across%20the%20country%20-%20local%20law%20enforcement%20officials%20discuss %20the%20challenges %20of%20immigration%20enforcement%202012.pdf15; *see also* Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving 'Unbanked' on Sidelines*, N.Y. Times, Dec. 23, 2015 (describing municipal identification and stating, "[t]he mayor emphasized that the cards were developed with input from the New York City Police Department and said the department had been one of the biggest backers of the program. 'They want every New Yorker on the street to have an ID card; it greatly improves the work of the NYPD,' Mr. de Blasio said.").

does not have a license or other verifiable identification, the officer may have no other option than to arrest the individual, bring him to the station, and obtain fingerprint information in order to identify the individual. As one police chief has explained, "[w]hen we stop cars and the driver doesn't have a driver's license, there are very few options for the officers and troopers."[44] The only way to reliably identify the individual may be through fingerprints, requiring a detour to "jail so we can find out who they are."[45] Another former police chief lamented the "manpower" required and time lost—"up to two to three hours to determine who an arrestee is"—which could be devoted to more pressing law enforcement concerns.[46]

Recipients of DACA are eligible to apply for a federal employment authorization document ("EAD"). The EAD comes in the form of a card issued by U.S. Citizenship and Immigration Services, and includes the recipient's photograph.[47] Individuals who receive employment authorization also are eligible to obtain a Social Security number and card.[48] Because DACA has expanded availability of identification, it has enhanced law enforcement officers' ability to identify those whom they encounter.[49] Instead of time-consuming, wasteful, and potentially antagonistic encounters with individuals who pose no public safety concern, police have more time to focus on higher priorities in keeping their communities safe.

---

[44] Police Exec. Research Forum, *supra* note 43, at 15–16.
[45] *Id.* at 16.
[46] *Id.* at 15.
[47] *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14); *see also* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-0040, Instructions for I-765 Application for Employment Authorization (Jul. 2017) (describing EAD as a "card" and requiring two passport-style photos), *available at* https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf.
[48] *See* Soc. Sec. Admin., SSA Publ'n No. 05-10096, Social Security Numbers for Noncitizens (Jul. 2017), *available at* http://www.ssa.gov/pubs/EN-05-10096.pdf.
[49] More than 90 percent of recipients of relief under DACA report that they have acquired a driver's license or other identification. Pérez, *supra* note 34, at 20.

13

II.     **DACA Helps Law Enforcement Protect Vulnerable Individuals from Crime and Exploitation.**

DACA has yielded another vital public safety benefit: protecting individuals who are particularly vulnerable to crime and thus attractive targets for criminals.

As discussed above, undocumented immigrants as well as their families fear interactions with police and are reluctant to report crimes when doing so is accompanied by the fear of removal.  No one knows this better than the predators who seek to take advantage of immigrant communities' vulnerabilities.  These communities face a range of misconduct, from abuse by unscrupulous employers to domestic and gang violence.[50]

"When immigrants come to view their local police and sheriffs with distrust because they fear deportation, it creates conditions that encourage criminals to prey upon victims and witnesses alike."[51]  This phenomenon has been termed the "deportation threat dynamic," whereby individuals who fear removal from the United States do not report the crimes they suffer.[52]  Nearly two-thirds of undocumented migrant workers participating in a study in Memphis, Tennessee, reported being the victim of at least one crime, with the most common being theft and robbery.[53]  Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[54]  And, in one especially horrific incident, a four-year-old girl in Texas suffered repeated sexual abuse at the hands of

---

[50] *See* U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *Enhancing Community Policing with Immigrant Populations* 16 (Apr. 2010), *available at* https://ric-zai-inc.com/ Publications/cops-w0747-pub.pdf.
[51] Statement of Tom Manger, *supra* note 3, at 2.
[52] Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 610 (2011).
[53] Jacob Bucher, Michelle Manasse, & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).
[54] *Id.* at 165.

someone who threatened to cause her mother to be deported if the mother reported her daughter's exploitation.[55]

This phenomenon is widespread in the workplace.  In a number of studies, between 40 and 80 percent of mostly undocumented immigrants reported being victims of wage theft.[56] Many immigrants also reported other types of worksite abuse.[57]  In one study, 32 percent of respondents said that they had suffered on-the-job injuries—and most of these individuals, after being injured, were fired, not paid lost wages, or denied medical care by their employers.[58]  The deportation threat dynamic fuels not only workplace exploitation but also outright violence.  An advocate reported that, when one worker attempted to collect wages his employer owed him, "[t]he contractor raised his shirt and showed he had a gun—and that was enough. . . . He didn't have to say any more.  The worker left."[59]  DACA recipients are currently eligible to receive work authorization, and many are currently working or pursuing higher educational opportunities.  Revocation of their work authorization would leave them more vulnerable to similar exploitation and even violent crime.

---

[55] Matthew Haag, *Texas Deputy Accused of Molesting 4-Year-Old and Threatening to Deport Her Mother*, N.Y. Times, June 18, 2018, https://www.nytimes.com/2018/06/18/us/cop-molests-girl-deport-mother.html.

[56] *See* Bucher et al., *supra note 53* (finding that 2 of 5 respondents reported wage theft since arriving in New Orleans, and citing Nik Theodore, Abel Valenzuela, Jr. & Edwin Meléndez, *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. Labor & Soc. 407 (Dec. 2006), finding a wage theft rate of approximately 50% in New York); S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* 6 (Apr. 2009) (finding that 41% of those surveyed across the South had experienced wage theft, and 80% had in New Orleans),
http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf.

[57] Fussell, *supra note 52*, at 604.

[58] S. Poverty Law Ctr., *supra note 56*, at 6.

[59] *Id.* at 7 (internal quotation marks omitted).

This same lawlessness plaguing undocumented communities extends well beyond the workplace.  Nearly two-thirds of undocumented migrant workers participating in a Memphis study reported being the victim of at least one crime, most commonly theft or robbery.[60] Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[61]

As this study suggests, robbery and similar crimes pose a particular threat to undocumented individuals, who typically do not have bank accounts, in part because of their inability to obtain government-issued identification.[62]  Moreover, many of these immigrants live in group apartments and are unable to store valuables in a safe place at home.[63]  As a result, undocumented immigrants are known to carry large amounts of cash, making robbing them an especially lucrative proposition.  The risk to the perpetrators, meanwhile, is minimal because the victims are often too afraid of adverse immigration consequences to report the crime to the police.

The targeting of undocumented immigrants for robbery has become so widespread that these individuals have been labeled "walking ATMs"—or the subjects of "amigo shopping."[64] In a study of largely undocumented immigrants helping to rebuild New Orleans in the wake of Hurricane Katrina, the immigrants reported robbery and physical assault at more than *ten times*

---

[60] Jacob Bucher, Michelle Manasse, & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).
[61] *Id.* at 165.
[62] Fussell, *supra* note 52, at 604; S. Poverty Law Ctr., *supra* note 56, at 6, 25.
[63] Khashu, *supra* note 5, at 25; *see also* Bucher, Manasse, & Tarasawa, *supra* note 44, at 164, 167–68 (finding that a large majority of surveyed undocumented migrants workers lived with at least three others, and identifying a strong relationship between the number of cohabitants and victimization by criminals).
[64] *See* Fussell, *supra* note 52, at 604–05; S. Poverty Law Ctr., *supra* note 56, at 25; Khashu, *supra* note 5, at 25.

the rate experienced by the general population.[65]  In another survey, 53 percent of law enforcement officers held the view that undocumented immigrants were especially likely to be victims of robbery and theft.[66]

Undocumented immigrants are particularly vulnerable to domestic violence, as well.  A number of studies have shown that abusive partners can and often do exploit the threat of deportation in order to maintain power and control.[67]  Financial dependence on an abusive partner with stable immigration status may facilitate violence in this way.[68]  Seventy percent of participants in one study of domestic abuse victims said that immigration status was a major factor keeping them from seeking help or reporting their abuse to the authorities—and thereby permitting the violence to continue.[69]  In another study, immigration status was identified as the single largest factor independently affecting the rate at which battered Latina immigrants called the police.[70]

In short, should DACA recipients lose their work authorizations and once again fear removal from the United States, their status would embolden exploitative employers and criminals alike and thus diminish the safety of entire communities.  By permitting these young

---

[65] *See* Fussell, *supra* note 52, at 604.

[66] *Id.*

[67] *See, e.g.*, Messing, *supra* note 9, at 330 (citing several studies); Angelica S. Reina, Brenda J. Lohman, & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).  The latter study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do . . . but he threatened me . . . . [H]e told me that if I called the police I was going to lose out . . . because [police officers] . . . would . . . take me, because I didn't have legal documents."  Reina, Lohman, & Maldonado at 601; *see also NIWAP Report*, *supra* note 4, at 103 (noting that 69 percent of law enforcement officers surveyed had observed a decrease in domestic violence reporting).

[68] *See, e.g.*, Messing, *supra* note 9, at 330.

[69] Reina, Lohman, & Maldonado, *supra* note 67, at 600.

[70] Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

individuals to live and work openly, DACA eliminates a significant barrier to the open and trusting relationship with law enforcement essential to public safety.  Continuing DACA will enable police and prosecutors to fight crime more effectively and to serve all of those whom they are charged with protecting.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

July 21, 2018                          Respectfully Submitted,

                                       /s/ Chirag G. Badlani

                                       Matthew J. Piers
                                       Chirag G. Badlani
                                       Caryn C. Lederer
                                       Hughes Socol Piers Resnick & Dym, Ltd.
                                       70 W. Madison St., Suite 4000
                                       Chicago, IL 60602
                                       Phone: (312) 580-0100

                                       Mary B. McCord
                                       Joshua A. Geltzer
                                       Daniel B. Rice
                                       Institute for Constitutional Advocacy and Protection
                                       Georgetown University Law Center
                                       600 New Jersey Avenue NW
                                       Washington, D.C. 20001
                                       Phone: (202) 662-9042

                                       *Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of BRIEF OF AMICI CURIAE CURRENT AND FORMER LAW ENFORCEMENT LEADERS was served on July 21, 2018 via this Court's ECF filing system, whereupon all counsel of record were served.

<u>/s/ Chirag G. Badlani</u>

## EXHIBIT A: LIST OF AMICI[*]

**Art Acevedo**
Police Chief, Houston, Texas

**Roy L. Austin**
Former Deputy Assistant to the President for Urban Affairs, Justice and Opportunity, White House Domestic Policy Council
Former Deputy Assistant Attorney General, Civil Rights Division, U.S. Department of Justice
Former Assistant U.S. Attorney, District of Columbia

**Aramis Ayala**
State Attorney, Ninth Judicial Circuit (Orlando), Florida

**Chiraag Bains**
Former Senior Counsel to the Assistant Attorney General, Civil Rights Division, U.S. Department of Justice
Former Trial Attorney, Criminal Section, Civil Rights Division, U.S. Department of Justice

**Diana Becton**
District Attorney, Contra Costa County, California

**Hillary Blout**
Former Assistant District Attorney, San Francisco, California

**Chris Burbank**
Former Police Chief, Salt Lake County, Utah
Director, Law Enforcement Engagement, Center for Policing Equity

**Jerry L. Clayton**
Sheriff, Washtenaw County, Michigan

**Brendan Cox**
Former Police Chief, Albany, New York

**Mark Curran**
Sheriff, Lake County, Illinois

**Stephen Downing**
Deputy Police Chief (Ret.), Los Angeles, California

**Mark A. Dupree, Sr.**
District Attorney, Wyandotte County (Kansas City), Kansas

---

[*] Individual affiliations are provided for identification purposes only.

**George C. Eskin**
Judge (Ret.), California Superior Court
Former Chief Assistant City Attorney, Los Angeles
Former Assistant District Attorney, Ventura and Santa Barbara Counties, California

**Tony Estrada**
Sheriff, Santa Cruz County, Arizona

**Shelley Fox-Loken**
Corrections and Parole/Probation Officer (Ret.), State of Oregon

**Neill Franklin**
Major (Ret.), Baltimore City and Maryland State Police Departments

**Brian Gaughan**
Officer (Ret.), Davenport, Iowa and Chicago, Illinois Police Departments

**Sarah F. George**
State's Attorney, Chittenden County, Vermont

**Michael Gilbert**
Former Corrections Officer, Alaska and Arizona Departments of Corrections

**Sim Gill**
District Attorney, Salt Lake County, Utah

**Diane Goldstein**
Lieutenant Commander (Ret.), Redondo Beach Police Department, California

**Eric Gonzalez**
District Attorney, Kings County (Brooklyn), New York

**Mark Gonzalez**
District Attorney, Nueces County (Corpus Christi), Texas

**Michael Haley**
Former Sheriff, Washoe County, Nevada

**Michael Hilliard**
Major (Ret.), Baltimore Police Department, Maryland

**Lawrence S. Krasner**
District Attorney, Philadelphia, Pennsylvania

**Miriam Aroni Krinsky**
Executive Director, Fair and Just Prosecution
Former Assistant U.S. Attorney, Central District of California
Former Criminal Appellate Chief and Chief, General Crimes, Central District of California
Former Chair, Solicitor General's Criminal Appellate Advisory Group

**Chief William Landsdowne**
Former Police Chief, San Diego County, California
Former Police Chief, San Jose County, California
Former Police Chief, Richmond, California

**Chris Magnus**
Police Chief, Tucson, Arizona

**John Matthews II**
Former Assistant U.S. Attorney, District of Puerto Rico

**Gordon D. McAllister, Jr.**
Judge (Ret.), District Court of Tulsa, Oklahoma

**Beth McCann**
District Attorney, 2nd Judicial Circuit (Denver), Colorado

**Bill McCarthy**
Sheriff, Polk County (Des Moines), Iowa

**Steve Miller**
Sergeant (Ret.), Canton Police Department, Michigan

**Teri Moore**
Patrol Officer (Ret.), Los Angeles Police Department, California

**Marilyn J. Mosby**
State's Attorney, Baltimore City, Maryland

**John Padgett**
Former Sergeant, City of Augusta Police, Richmond County Sheriff's Department, Georgia

**Corey Pegues**
Deputy Inspector (Ret.), New York City Police Department, New York

**Joe Pelle**
Sheriff, Boulder County, Colorado

**Titus Peterson**
Former Lead Felony Investigator, Fifth Judicial District, Colorado

**Channing Phillips**
Former Acting U.S. Attorney, District of Columbia
Former Senior Counselor to the Attorney General, U.S. Department of Justice
Former Deputy Associate Attorney General, U.S. Department of Justice

**Abdul Pridgen**
Police Chief, Seaside, California

**Charles Ramsey**
Former Commissioner, Philadelphia Police Department, Pennsylvania

**Ira Reiner**
Former District Attorney, Los Angeles County, California
Former City Attorney, Los Angeles, California

**Celestino Rivera**
Police Chief, Lorain, Ohio

**Dan Satterberg**
Prosecuting Attorney, King County (Seattle), Washington

**Ronal Serpas**
Co-Chairman, Law Enforcement Leaders to Reduce Crime & Incarceration
Former Superintendent, New Orleans Police Department, Louisiana
Former Chief, Metropolitan Nashville Police Department, Tennessee
Former Chief, Washington State Patrol

**Carol A. Siemon**
Prosecuting Attorney, Ingham County (Lansing), Michigan

**Norm Stamper**
Police Chief (Ret.), Seattle, Washington

**Ray Strack**
Special Agent (Ret.), Department of Homeland Security, Immigration and Customs Enforcement

**Carl Tennenbaum**
Sergeant (Ret.), San Francisco Police Department, California

**Raúl Torrez**
District Attorney, Bernalillo County (Albuquerque), New Mexico

**Cyrus R. Vance, Jr.**
District Attorney, New York County (Manhattan), New York

**Allison Watson**
Former Assistant District Attorney, 13th Judicial District, Tennessee

**Richard Wiles**
Sheriff, El Paso County, Texas