**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 1

# Exhibits 1 - 25

# DEF-INTERV.

# EX. 1

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000



**U.S. Citizenship and Immigration Services**

**APR 1 7 2015**

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your February 27 and March 20 letters.

From your February 27 letter, I understand that you are seeking information regarding a specific individual, including information regarding his involvement in Deferred Action for Childhood Arrivals (DACA). In addition, you are seeking the official policy and other information related to the adjudication of DACA requests from suspected or known gang members. This letter addresses your DACA-related questions regarding that individual and responds to your inquiries regarding DACA and gang membership. Per your request, U.S. Citizenship and Immigration Services (USCIS) is preparing the individual's A-file. Because the individual possesses a protected status unrelated to DACA, the Department is obligated to make certain redactions before transmitting the file to you.

Our review of the file indicates that on January 22, 2013, the individual requested deferred action pursuant to DACA. At the time of filing his request for deferred action, he was in removal proceedings as an alien present in the United States without being admitted or paroled. It appears he came to the attention of U.S. Immigration and Customs Enforcement (ICE) as a result of a 2012 arrest for possession of marijuana, for which charges were subsequently dismissed. Based on ICE records, there is no indication that ICE was aware at the time of the arrest that the individual was a gang member. His request for deferred action was approved on August 26, 2013, notwithstanding a TECS record indicating that he was a known gang member, and his application for employment authorization was approved. After the deferred action request was approved, immigration proceedings were administratively closed on December 18, 2013.

Based on standard procedures and protocols in place at the time, the DACA request and related employment authorization should not have been approved. On March 5, 2015, USCIS provided notice to the individual of the termination of his deferred action and employment authorization.

All DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU) within the USCIS Service Center considering the request. The BCU is responsible for reviewing and resolving TECS hits and other criminal, national security, and public safety concerns in accordance with USCIS

The Honorable Charles E. Grassley
Page 2

policy. The applicable USCIS internal guidance, which was in place at the time this individual's
deferred action request was approved, states, "For a known street gang member, … the DACA
BCU Team should deny the I-821D [Consideration of Deferred Action for Childhood Arrivals]
as a matter of discretion." The guidance also provides that if an adjudicator has evaluated the
totality of the circumstances in such a case and believes the request should be approved as a
matter of discretion, the request may be granted only after USCIS Headquarters approval. I have
enclosed a copy of this internal guidance.

While records indicate that, pursuant to standard protocols as stated above, the case was
appropriately sent to the BCU based upon the derogatory information in the background check,
the outcome of the resolution process and final decision did not comply with USCIS policy.
Given the fact that the individual was identified as a known gang member, his request should
have been denied by the adjudicator. Even if the adjudicator believed there were mitigating facts
sufficient to justify a positive exercise of discretion despite the TECS record, the case should
have been elevated to USCIS Service Center Operations Headquarters (HQSCOPS) for review
prior to a final decision being made.

USCIS is taking the following proactive steps and measures to be sure other errors did not occur
and to prevent such an error from occurring in the future:

- USCIS has provided refresher training in the following areas:
  - All Immigration Service Officers who adjudicate DACA requests received
    refresher training in interpreting and applying TECS records.
  - Officers received DACA refresher training regarding disqualifying public safety
    and criminality concerns, including but not limited to gang membership,
    significant misdemeanors, and three or more misdemeanor criminal offenses.
  - Additional refresher training was given to all officers who handle DACA requests
    on proper protocol and elevation of cases requiring USCIS HQSCOPS' review
    and concurrence prior to a final decision.
  - BCU Officers received refresher training in reviewing, applying and resolving
    TECS hits. USCIS will ensure that the BCU Officer who processes the resolution
    memo of the TECS hit obtains concurrence from a subject matter expert or
    supervisor prior to adjudicating a DACA request involving specified public safety
    or criminality issues such as criminal history or gang membership.

- The refresher training was provided by USCIS Headquarters personnel who are subject
  matter experts in TECS and the DACA adjudication process. This training was
  mandatory for all ISOs who adjudicate DACA requests, all Immigration Service Officers
  who process resolutions related to TECS hits, and all supervisors and managers who
  oversee these processes. All listed training was provided between March 30 and April
  10, 2015.

Furthermore, USCIS is in the process of completing a review of prior DACA approvals to
determine if requests from known gang members were processed in a manner consistent with
standard protocol. USCIS has identified certain cases that merit further review and is therefore
undertaking a thorough review of each of these individual case files. We anticipate conclusion

The Honorable Charles E. Grassley
Page 3

of that individualized review in the coming weeks, and, following conclusion of such review, we would be happy to provide a briefing to you and your staff on our findings.  Preliminary information concerning this review is included in the enclosure.

Detailed responses to the questions in your March 20 letter regarding DACA approvals are enclosed, which Senator Tillis, who co-signed that letter, will receive under separate cover. Should you require any additional assistance, please have your staff contact the USCIS Office of Legislative Affairs at (202) 272-1940.

Respectfully,

León Rodríguez
Director

Enclosures:
1) Responses to Questions
2) USCIS Internal Guidance

**U.S. Department of Homeland Security's Response to
Chairman Grassley and Senator Tillis's March 20, 2015 Letter**

1. **Since DACA's creation, how many applications have been approved?  Please provide the answer by fiscal year.**

   As of March 20, 2015, U.S. Citizenship and Immigration Services (USCIS) has approved 886,638 Deferred Action for Childhood Arrivals (DACA) requests, of which 223,826 were requests for renewal of DACA.  The number of DACA requests approved by fiscal year is as follows:

   |         |         |                                           |
   |---------|---------|-------------------------------------------|
   | FY 2012 | 1,685   |                                           |
   | FY 2013 | 471,293 |                                           |
   | FY 2014 | 158,278 | (Initial – 135,797; Renewal – 22,481)     |
   | FY 2015 | 255,382 | (Initial – 54,037; Renewal – 201,345)     |

2. **Of the DACA applications approved, please provide the number of applicants that:**

   USCIS does not track this information electronically and is working toward developing a tracking system to capture this information in the future.  However, USCIS recently conducted a batch TECS query of all approved DACA cases in order to identify records that contained information indicating known or suspected gang association.  Based on the information obtained from the query, out of all 886,638 cases approved for initial DACA or renewal of DACA, we found TECs records pertaining to 49 DACA recipients.  Of these 49, 13 individuals had TECS records entered after DACA adjudication.  The 13 cases are being reviewed for possible termination.  Twenty had TECS records at the time of filing, and one had a TECS record placed during the adjudication process.  These cases are being reviewed.  As noted below, any cases that were approved for known gang members were approved in error, as USCIS HQ has not cleared approval of any DACA requests by a known or suspected gang member.  Fifteen had TECS records that were vetted and were determined not to be gang members/gang affiliates.  These cases were adjudicated on their merits.

   a. **Had known gang affiliation.**

      In the analysis described above, we did not distinguish between known or suspected gang members.  Further manual review would be required to obtain this information.

   b. **Suspected gang affiliation.**

      In the analysis described above, we did not distinguish between known or suspected gang members.  Further manual review would be required to obtain this information.

**c. Had criminal affiliations.**

USCIS does not electronically track this information.  A manual review of files would be required to obtain this information.  Since not all crimes disqualify a requestor from being favorably considered for DACA, a requestor with one or two non-significant misdemeanors could have been approved.  USCIS is working toward developing a tracking system to capture this information in the future.

**3. Please explain why USCIS approved DACA applications for known or suspected gang members and others with criminal affiliations.**

Cases that were approved for known gang members were approved in error, as USCIS HQ has not cleared approval of any DACA requests by a known or suspected gang member. USCIS is not aware of any DACA grants where there was disqualifying criminal activity. DACA Refresher Training has been provided to prevent errors in the future.

**4. By fiscal year, how many DACA applications have been denied because of gang affiliation or other criminal affiliation?**

USCIS does not currently electronically track information regarding the basis for a denial of a DACA request.  A manual review of files would be required to obtain this information for each DACA denial.  USCIS is working toward developing a tracking system to capture this information in the future.

**5. By fiscal year, please provide the number of DACA terminations as a result of gang affiliation or other criminal affiliation.**

USCIS does not electronically capture the reasons for termination of a DACA request.  Ad hoc manual reports from each service center indicate that as of March 20, 2015, USCIS has terminated DACA for 282 requestors for having gang affiliation and/or criminal issues. Additionally, USCIS is in the process of manually reviewing another 13 DACA terminations to determine the reason for termination.

The following is a breakdown by fiscal year of the 282 DACA requests terminated due to criminal or gang issues:

| | |
|---|---|
| FY 2013 | 28 |
| FY 2014 | 131 |
| FY 2015 | 123 |

**6.  What steps is USCIS taking to ensure that known or suspected gang members or criminally affiliated applications are denied DACA or approved DACA is terminated once knowledge of gang affiliation or other criminal affiliation is known?**

When a suspicion of gang affiliation or other criminal affiliation comes to the attention of USCIS after the DACA request has been approved, the case is reviewed for possible termination.  This information is typically communicated by ICE as result of their engagement with local law enforcement or other encounters.

DACA refresher training was conducted by USCIS HQ subject matter experts who traveled to each of the Service Centers.  The training included interpreting and applying TECS records and a review of the disqualifying factors for DACA, including gang membership and significant misdemeanors.  Additional refresher training was given to all officers who handle DACA requests on proper protocol and elevation of cases requiring USCIS HQSCOPS' review and concurrence prior to a final decision.  The training was delivered to each ISO who adjudicates Form I-821D, *Consideration of Deferred Action for Childhood Arrivals*, the ISOs assigned to work DACA in the Background Check Unit, as well as management who oversees these ISOs.  This training was conducted between March 30, 2015 and April 10, 2015.

**U.S. Citizenship and Immigration Services**
**Internal DACA Adjudication Guidance**

| Title | Known or Suspected Gang Membership |
|---|---|
| Question | How should we handle DACA requests when there is a record that the requestor is a known or suspected criminal street gang member? |
| Answer | The BCU DACA Team should handle any DACA requests when the record indicates that the requestor was, is or may be a member of a criminal street gang.  Supervisors should only refer novel, complex, or sensitive cases to HQSCOPS, through the normal chain of command.  The Centers should not approve a DACA request filed by a known or suspected gang member without approval from HQSCOPS.

USCIS's Notice to Appear (NTA) guidance includes "known or suspected street gang members" in its definition of an Egregious Public Safety (EPS) case.  Therefore, if there is reason to believe the DACA requestor is a known or suspected gang member because the record indicates that the DACA requestor is under investigation for, or has been arrested for (without disposition), or has been convicted of a crime involving gang activities (e.g., a TECS record indicating the alien is a gang member or a suspected gang member as shown in the <u>images A and B</u>), the DACA BCU Team should follow the handling procedures for EPS cases described in Chapter 8, Section G, of the DACA SOP.

<u>ICE Priority</u>

If, in response to the referral to ICE (RTI), ICE issues an NTA or otherwise indicates that the DACA requestor is an enforcement priority, the DACA BCU Team should deny the I-821D using call up DACA 511 - DISCRETIONARY from the Appendix F.

<u>Known Gang Member</u>

For a known street gang member, if an RTI is not required, as stated in the National Background Identity and Security Checks Operating Procedures (NaBISCOP), or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action it has taken in the case within 60 days, the DACA BCU Team should deny the I-821D as a matter of discretion and notify ICE of the decision. |

<u>Suspected Gang Member</u>

For a suspected street gang member, if an RTI is not required, as stated in the NaBISCOP, or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action that it has taken in the case within 60 days, the DACA BCU Team must refer the case for an interview to determine whether or not the requestor is, in fact, a gang member.  Please contact the appropriate Field Office POC through established channels to facilitate the interview process.  If, after the interview, it is inconclusive whether the requestor is a gang member (e.g., based on the preponderance of the evidence the person is a street gang member), the DACA BCU Team should deny the I-821D as a matter of discretion because the person has not met the burden of showing he or she is 'more likely than not' not a street gang member and therefore does not pose a threat to public safety. The DACA BCU team must notify ICE of the decision.

# DEF-INTERV.

# EX. 2

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000



**U.S. Citizenship
and Immigration
Services**

JUN **2 9** 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC  20510

Dear Chairman Grassley:

Thank you for your March 2, 2016 letter.  Secretary Johnson asked that I respond on his behalf.

U.S. Citizenship and Immigration Services (USCIS) appreciates the opportunity to respond to your questions about immigration parole authority and advance parole as it may relate to individuals who have been granted Deferred Action for Childhood Arrivals (DACA).

As this Administration previously emphasized, neither deferred action nor advance parole creates "a path to citizenship."  Only individuals who qualify to be classified as an immigrant under the Immigration and Nationality Act (INA) are eligible for lawful permanent residence. The most common basis for such an immigrant classification is a specified family relationship or employment qualification.  Obtaining deferred action or advance parole does not alter the requirement that an alien must meet all existing requirements to be classifiable as an immigrant and all other requirements for admissibility.

In your letter, you requested information regarding the population of DACA recipients who have received advance parole.  According to USCIS electronic records, of the 713,300 individuals granted DACA through December 31, 2015, a total of 22,340 were subsequently approved for advance parole based on their submission of a separate advance parole request.  This calculation is based on our identification of a common A-number associated with both the DACA and advance parole records.  From among the 713,300 individuals who have been granted DACA, USCIS electronic records indicate that fewer than one percent were subsequently granted advance parole and also applied for adjustment of status—a total of 5,068.  As of December 31, 2015, of those 5,068, a total of 2,994 have been approved for adjustment of status.  The 2,994 constitutes less than one-half of one percent of the 713,300 DACA recipients.

It is important to note that some among the group of 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole.  For example, if a DACA recipient had been previously admitted (or paroled) into the United States and subsequently fell out of status, he or she would already meet the inspection and admission

The Honorable Charles E. Grassley
Page 2

(or parole) requirements of INA § 245(a) for adjustment of status. A subsequent parole into the United States would not affect that eligibility. It would be cost prohibitive and significantly burdensome to conduct a manual analysis of each of these files to identify such cases.

Without a manual review of each case, USCIS could not electronically determine which DACA recipients among the 2,994 who were approved for adjustment of status and who had applied for and received advance parole, actually traveled abroad, returned, and were paroled into the United States upon return. When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States based on the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.

Thank you again for your letter and interest in this important issue. Senator Lee, who co-signed your letter, will receive a separate, identical response. Should you wish to discuss this matter further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

# DEF-INTERV.

# EX. 3

## DACA Terminations Related to Criminal and Gang Activity by Fiscal Year[1]

USCIS does not electronically track in its systems the underlying reasons for termination of deferred action under DACA.  Compiling that data would require a manual review of individual files, and the categorization can be subjective.  Based on USCIS analysis of its currently available data, USCIS's best assessment is as follows:

| Fiscal Year (FY) | Total DACA Terminations Related to Criminal and Gang Activity | DACA Terminations Related to Criminal and Gang Activity | | | |
|---|---|---|---|---|---|
| | | Terminations Related to  Gang Membership or Affiliation | Terminations Related to Convictions or Arrests[2] | Terminations Related to Convictions or Arrests of Gang Members or Affiliates[3] | Terminations Related to Convictions that include Enhancements due to Gang Membership or Affiliation |
| FY 2013 | 30 | 0 | 30 | <10 | 0 |
| FY 2014 | 130 | <10 | 130 | <10 | <10 |
| FY 2015 | 330 | 30 | 290 | <10 | 0 |
| FY 2016 | 790 | <10 | 760 | 10 | <10 |
| FY 2017 | 850 | 20 | 820 | 20 | <10 |

[1] All numbers are rounded to the nearest ten, and totals may not add due to rounding.  Terminations related to gang membership or affiliation do not involve convictions or arrests and therefore are separated out from the three columns that list terminations related to convictions or arrests.  Terminations related to criminal activity are at various stages of the criminal process – from arrest to conviction – and involve a range of offenses from an accumulation of three nonsignificant misdemeanor convictions to very serious offenses such as murder, rape, and drug offenses.  Some of these terminations resulted automatically due to the issuance of a Notice to Appear.

[2] Terminations in this category are unrelated to gang activity.

[3] Terminations in this category involve gang members or affiliates.

# DEF-INTERV.

# EX. 4

The Washington Post

Fact Checker Analysis

Did Obama allow a 'back door' to citizenship through DACA?

by Glenn Kessler September 7, 2017 ✉Email the author

*"Now, let's be clear — this is not amnesty, this is not immunity. This is not a path to citizenship."*

**— President Barack Obama, announcing the Deferred Action for Childhood Arrivals (DACA) program, June 15, 2012**

*"Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship"*

**— headline of news release by Sen. Charles E. Grassley (R-Iowa), Sept. 1, 2017**

One criticism of DACA, which the Trump administration has said it will rescind unless Congress acts to make it permanent, is that it has allowed unauthorized immigrants to exploit the system and gain U.S. citizenship, despite former President Barack Obama's statement that it would not do so.

In a news release on Sept. 1, Sen. Charles E. Grassley (R-Iowa) asserted that "preliminary data … indicate that the Obama administration allowed thousands of DACA recipients to exploit an immigration law loophole to obtain green cards." More than a thousand DACA recipients had already obtained citizenship, the news release added. The announcement resulted in a flurry of news stories.

So, case closed, Obama told a fib? Actually, it is much more complicated than that. Let's take a look.

The Facts

DACA was intended to let "dreamers" — children of illegal immigrants who, in many cases, knew no other home than the United States — avoid deportation and get work permits that are renewed every two years. About 800,000 people have participated in the DACA program.

But that does not necessarily mean they are stuck in DACA forever. If a DACA participant marries a U.S. citizen, for instance, he or she could seek to obtain status as a lawful permanent resident, more popularly known as a green card. There are other routes to obtaining a green card, such as being a victim of a crime and helping police, being a battered spouse or a victim of human trafficking, and so forth. Green-card recipients are eligible to apply for U.S. citizenship after five years.

Marrying a U.S. citizen does have a procedural hurdle for a green card inside the United States — you have show you entered the country legally. (Alternatively, some individuals married to a U.S. citizen may receive a green card abroad by securing an "extreme hardship" waiver that allows them to re-enter the country after leaving.)

For perhaps 50 percent of DACA participants — precise numbers are not available — that is not a problem. That's because many undocumented immigrants overstay a visa, rather than illegally cross the border. In 2015 alone, more than 400,000 foreign visitors stayed in the United States beyond their visa, according to the Department of Homeland Security. Robert Warren, a demographer and senior visiting fellow at the Center for Migration Studies, estimates that about 50 percent of the 1.258 million people eligible for DACA are visa overstays.

A person who entered the country illegally, even as a child, would not have this option. But it turned out there was one possible way to get around this, in what Grassley labeled as a loophole. Under existing law, a person with a pending application for a change in immigration status could seek to travel abroad under what is known as "advance parole" to see a sick relative, attend a funeral or for another specific reason, such as education or employment (but not vacation travel).

Under the guidance issued by the Obama administration, a DACA participant could not travel overseas automatically but could apply for "advance parole" for humanitarian, educational or employment purposes.

The (Riverside, Calif.) Press-Enterprise in 2016 reported that Southern California universities were using the "advance parole" provision to allow DACA students to attend a study-abroad program in Mexico, Vietnam or other countries. Once a student returned, he or she then had evidence of a legal entry, which in theory could be used to apply for a change in immigration status if other conditions were met (such as marrying a U.S. citizen). The article did not identify anyone who had done this, only that some experts thought it might be possible.

The problem is that, despite the headline on Grassley's news release, no one knows how many people took advantage of this provision to successfully change their status.

The data released by Grassley, gathered from U.S. Citizenship and Immigration Services (USCIS), showed that through Aug. 21, 45,447 DACA recipients had been approved for travel overseas through advance parole. Separately, 59,778 DACA recipients had applied for green-card status — and 39,514 had been approved. Of the people who had received green cards, 1,056 had become U.S. citizens.

Note that more people applied for green-card status than had been approved for advance parole. That's because, as we noted, there are many ways that DACA recipients can obtain green cards, especially if they had simply overstayed their visa.

"Many DACA recipients, independent of advance parole, have been able to get green cards," said Jose Magaña-Salgado, managing policy attorney at the San Francisco-based Immigrant Legal Resource Center.

"We do not know what percentage of the 39,000 green-card holders are the recipients of advanced parole," acknowledged George Hartmann, a spokesman for the Senate Judiciary Committee. "We are still awaiting that answer."

But that did not stop some news organizations from erroneously reporting that Grassley's data showed that 45,000 DACA recipients were using a "DACA backdoor" to obtain green cards.

In June 2016, the Senate Judiciary Committee posted a letter from the USCIS that actually had more detail. That letter said that as of Dec. 31, 2015, 22,340 DACA recipients were approved for advance parole. Of that number, 2,994, or 13 percent, had subsequently applied for and been approved for a green card. Moreover, the letter noted that a certain number of these people (such as holders of lapsed visas) who were approved for a green card probably would have been eligible even without receiving advance parole. But USCIS said it was too time-consuming to review each case to determine a precise number.

If the 7-to-1 ratio had remained the same through 2016 and 2017, then the maximum number of DACA participants who had received advance parole and then been approved for a green card is about 6,000. That means the number of people who entered illegally, participated in DACA and then used advance parole to obtain a green card is going to be even smaller than that number — 3,000 or less. That's out of a universe of 800,000 DACA recipients.

"In my experience, few DACA recipients have taken advantage of that so-called 'loophole,' " said immigration attorney Amien Kacou, who said he believed a majority "of my DACA clients were overstays, not illegal entrants."

In any case, President Trump's announcement meant that no more advance paroles would be granted for DACA participants, including pending applications.

The Pinocchio Test

Grassley's news release was confusing, and some news organizations jumped to false conclusions in reporting on it. About 45,000 DACA recipients had been approved for advance parole, and 39,000 DACA recipients had received green cards. But those numbers represent a Venn diagram with very little overlap. It certainly fails to take into consideration that about half of DACA holders are visa overstays and thus did not need advance parole to begin to qualify for a green card.

At most, 3,000 DACA recipients, or 0.375 percent, may have used the advance-parole program to obtain a green card. Whether such a small percentage, given the uncertainty of the numbers, constitutes a violation of Obama's claim that DACA was not a path to citizenship gets us into the realm of opinion. Thus, we will not do a Pinocchio rating on Obama's statement.

As for the Grassley news release, it says that "thousands of DACA recipients [were able] to exploit an immigration law loophole to obtain green cards." Again, it's a matter of opinion as to whether this is a loophole. Given that we estimate about 3,000 may have used the advance parole provision to begin the green card process, "thousands" skates by as technically correct. But it's a much smaller number than the figures touted in the release — and Grassley's staff has a responsibility to set the record straight about the incorrect news reporting.

(About our rating scale)

**Send us facts to check by filling out this form**

**Keep tabs on Trump's promises with our Trump Promise Tracker**

**Sign up for The Fact Checker weekly newsletter**

💬 **189 Comments**

Glenn Kessler has reported on domestic and foreign policy for more than three decades. Send him statements to fact check by emailing him, tweeting at him, or sending him a message on Facebook. 🐦 Follow @GlennKesslerWP

The Washington Post

## The story must be told.

Your subscription supports journalism that matters.

**Try 1 month for $1**

### Inside 'Trump Revealed'

Read stories based on reporting for "Trump Revealed,"
a broad, comprehensive biography of the life of the
president.

- **Reporting archive: Trump's financial records,
  depositions and interview transcripts**



# DEF-INTERV.

# EX. 5

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland
Security**

November 20, 2014

MEMORANDUM FOR:   Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

Leon Rodriguez
Director
U.S. Citizenship and Immigration Services

Alan D. Bersin
Acting Assistant Secretary for Policy

FROM:   Jeh Charles Johnson
Secretary

SUBJECT:   **Policies for the Apprehension, Detention and
Removal of Undocumented Immigrants**

This memorandum reflects new policies for the apprehension, detention, and
removal of aliens in this country. This memorandum should be considered
Department-wide guidance, applicable to the activities of U.S. Immigration and Customs
Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship
and Immigration Services (USCIS). This memorandum should inform enforcement and
removal activity, detention decisions, budget requests and execution, and strategic
planning.

In general, our enforcement and removal policies should continue to prioritize
threats to national security, public safety, and border security. The intent of this new
policy is to provide clearer and more effective guidance in the pursuit of those priorities.
To promote public confidence in our enforcement activities, I am also directing herein
greater transparency in the annual reporting of our removal statistics, to include data that
tracks the priorities outlined below.

The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.

In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.

Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens,* March 2, 2011; John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens,* June 17, 2011; Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases,* November 17, 2011; *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems,* December 21, 2012; *National Fugitive Operations Program: Priorities, Goals, and Expectations,* December 8, 2009.

## A.      Civil Immigration Enforcement Priorities

The following shall constitute the Department's civil immigration enforcement priorities:

### Priority 1 (threats to national security, border security, and public safety)

Aliens described in this priority represent the highest priority to which enforcement resources should be directed:

(a)   aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

(b)   aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

(c)   aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 52l(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

(d)   aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

(e)   aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

### Priority 2 (misdemeanants and new immigration violators)

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

(a)   aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element

was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b)   aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c)   aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

(d)   aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority.

**Priority 3 (other immigration violations)**

Priority 3 aliens are those who have been issued a final order of removal[2] on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

---

[1] In evaluating whether the offense is a significant misdemeanor involving ..domestic violence," careful consideration should be given to whether the convicted alien was also the victim of domestic violence; if so, this should be a mitigating factor. *See generally,* John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs,* June 17, 2011.

[2] For present purposes, "final order" is defined as it is in 8 C.F.R. § 1241.1.

4

**B.     Apprehension, Detention, and Removal of Other Aliens Unlawfully in the   United States**

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein. However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified. Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest.

**C.     Detention**

As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law. Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest. To detain aliens in those categories who are not subject to mandatory detention, DHS officers or special agents must obtain approval from the ICE Field Office Director. If an alien falls within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

**D.     Exercising Prosecutorial Discretion**

Section A, above, requires DHS personnel to exercise discretion based on individual circumstances. As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the

integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

In making such judgments, DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality of the circumstances.

## E. Implementation

The revised guidance shall be effective on January 5, 2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.

## F. Data

By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers of those apprehended, removed, returned, or otherwise repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part of the package of data released by DHS to the public annually.

## G. No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# DEF-INTERV.

# EX. 6

Policy Number: 10072.1
FEA Number: 601-14

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

MAR 0 2 2011



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR: All ICE Employees

FROM: John Morton
Director

SUBJECT: Civil Immigration Enforcement: Priorities for the Apprehension,
Detention, and Removal of Aliens

Purpose

This memorandum outlines the civil immigration enforcement priorities of U.S. Immigration and
Customs Enforcement (ICE) as they relate to the apprehension, detention, and removal of aliens.
These priorities shall apply across all ICE programs and shall inform enforcement activity,
detention decisions, budget requests and execution, and strategic planning.

*A. Priorities for the apprehension, detention, and removal of aliens*

In addition to our important criminal investigative responsibilities, ICE is charged with enforcing
the nation's civil immigration laws. This is a critical mission and one with direct significance for
our national security, public safety, and the integrity of our border and immigration controls.
ICE, however, only has resources to remove approximately 400,000 aliens per year, less than 4
percent of the estimated illegal alien population in the United States. In light of the large number
of administrative violations the agency is charged with addressing and the limited enforcement
resources the agency has available, ICE must prioritize the use of its enforcement personnel,
detention space, and removal resources to ensure that the removals the agency does conduct
promote the agency's highest enforcement priorities, namely national security, public safety, and
border security.

To that end, the following shall constitute ICE's civil enforcement priorities, with the first being
the highest priority and the second and third constituting equal, but lower, priorities.

### Priority 1. Aliens who pose a danger to national security or a risk to public safety

The removal of aliens who pose a danger to national security or a risk to public safety shall be
ICE's highest immigration enforcement priority. These aliens include, but are not limited to:

- aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger
  to national security;

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens
Page 2

- aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders;
- aliens not younger than 16 years of age who participated in organized criminal gangs;
- aliens subject to outstanding criminal warrants; and
- aliens who otherwise pose a serious risk to public safety.[1]

For purposes of prioritizing the removal of aliens convicted of crimes, ICE personnel should refer to the following new offense levels defined by the Secure Communities Program, with Level 1 and Level 2 offenders receiving principal attention.  These new Secure Communities levels are given in rank order and shall replace the existing Secure Communities levels of offenses.[2]

- Level 1 offenders: aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act,[3] or two or more crimes each punishable by more than one year, commonly referred to as "felonies";
- Level 2 offenders: aliens convicted of any felony or three or more crimes each punishable by less than one year, commonly referred to as "misdemeanors"; and
- Level 3 offenders: aliens convicted of crimes punishable by less than one year.[4]

### Priority 2.  Recent illegal entrants

In order to maintain control at the border and at ports of entry, and to avoid a return to the prior practice commonly and historically referred to as "catch and release," the removal of aliens who have recently violated immigration controls at the border, at ports of entry, or through the knowing abuse of the visa and visa waiver programs shall be a priority.

### Priority 3.  Aliens who are fugitives or otherwise obstruct immigration controls

In order to ensure the integrity of the removal and immigration adjudication processes, the removal of aliens who are subject to a final order of removal and abscond, fail to depart, or intentionally obstruct immigration controls, shall be a priority.  These aliens include:

- fugitive aliens, in descending priority as follows:[5]

---

[1] This provision is not intended to be read broadly, and officers, agents, and attorneys should rely on this provision only when serious and articulable public safety issues exist.

[2] The new levels should be used immediately for purposes of enforcement operations.  DRO will work with Secure Communities and the Office of the Chief Information Officer to revise the related computer coding by October 1, 2010.

[3] As the definition of "aggravated felony" includes serious, violent offenses and less serious, non-violent offenses, agents, officers, and attorneys should focus particular attention on the most serious of the aggravated felonies when prioritizing among level one offenses.

[4] Some misdemeanors are relatively minor and do not warrant the same degree of focus as others.  ICE agents and officers should exercise particular discretion when dealing with minor traffic offenses such as driving without a license.

[5] Some fugitives may fall into both this priority and priority 1.

Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens
Page 3

- o fugitive aliens who pose a danger to national security;
- o fugitives aliens convicted of violent crimes or who otherwise pose a threat to the community;
- o fugitive aliens with criminal convictions other than a violent crime;
- o fugitive aliens who have not been convicted of a crime;
- aliens who reenter the country illegally after removal, in descending priority as follows:
    - o previously removed aliens who pose a danger to national security;
    - o previously removed aliens convicted of violent crimes or who otherwise pose a threat to the community;
    - o previously removed aliens with criminal convictions other than a violent crime;
    - o previously removed aliens who have not been convicted of a crime; and
- aliens who obtain admission or status by visa, identification, or immigration benefit fraud.[6]

The guidance to the National Fugitive Operations Program: Priorities, Goals and Expectations, issued on December 8, 2009, remains in effect and shall continue to apply for all purposes, including how Fugitive Operation Teams allocate resources among fugitive aliens, previously removed aliens, and criminal aliens.

## B. Apprehension, detention, and removal of other aliens unlawfully in the United States

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of other aliens unlawfully in the United States. ICE special agents, officers, and attorneys may pursue the removal of any alien unlawfully in the United States, although attention to these aliens should not displace or disrupt the resources needed to remove aliens who are a higher priority. Resources should be committed primarily to advancing the priorities set forth above in order to best protect national security and public safety and to secure the border.

## C. Detention

As a general rule, ICE detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law. Absent extraordinary circumstances or the requirements of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, or who are disabled, elderly, pregnant, or nursing, or demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest. To detain aliens in those categories who are not subject to mandatory detention, ICE officers or special agents must obtain approval from the field office director. If an alien falls

---

[6] ICE officers and special agents should proceed cautiously when encountering aliens who may have engaged in fraud in an attempt to enter but present themselves without delay to the authorities and indicate a fear of persecution or torture. *See* Convention relating to the Status of Refugees, art. 31, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137. In such instances, officers and agents should contact their local Office of the Chief Counsel.

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of
Aliens
Page 4

within the above categories and is subject to mandatory detention, field office directors are
encouraged to contact their local Office of Chief Counsel for guidance.

## D.  Prosecutorial discretion

The rapidly increasing number of criminal aliens who may come to ICE's attention heightens the
need for ICE employees to exercise sound judgment and discretion consistent with these
priorities when conducting enforcement operations, making detention decisions, making
decisions about release on supervision pursuant to the Alternatives to Detention Program, and
litigating cases.  Particular care should be given when dealing with lawful permanent residents,
juveniles, and the immediate family members of U.S. citizens.  Additional guidance on
prosecutorial discretion is forthcoming.  In the meantime, ICE officers and attorneys should
continue to be guided by the November 17, 2000 prosecutorial discretion memorandum from
then-INS Commissioner Doris Meissner; the October 24, 2005 Memorandum from Principal
Legal Advisor William Howard; and the November 7, 2007 Memorandum from then Assistant
Secretary Julie Myers.

## E.  Implementation

ICE personnel shall follow the priorities set forth in this memorandum immediately.  Further,
ICE programs shall develop appropriate measures and methods for recording and evaluating their
effectiveness in implementing the priorities.  As this may require updates to data tracking
systems and methods, ICE will ensure that reporting capabilities for these priorities allow for
such reporting as soon as practicable, but not later than October 1, 2010.

## F.  No Private Right Statement[7]

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right
or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or
criminal matter.

---

[7] This statement was added to ICE Policy 10072.1, "Civil Immigration Enforcement: Priorities for the
Apprehension, Detention, and Removal of Aliens" on February 7, 2011.  The policy contained in this memorandum
has not been altered or changed.

# DEF-INTERV.

# EX. 7

Policy Number: 10075.1
FEA Number: 306-112-0026

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

June 17, 2011

MEMORANDUM FOR:    All Field Office Directors
                   All Special Agents in Charge
                   All Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Exercising Prosecutorial Discretion Consistent with the Civil
                   Immigration Enforcement Priorities of the Agency for the
                   Apprehension, Detention, and Removal of Aliens

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) personnel
guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration
enforcement resources are focused on the agency's enforcement priorities. The memorandum
also serves to make clear which agency employees may exercise prosecutorial discretion and
what factors should be considered.

This memorandum builds on several existing memoranda related to prosecutorial discretion with
special emphasis on the following:

- Sam Bernsen, Immigration and Naturalization Service (INS) General Counsel, Legal
  Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976);
- Bo Cooper, INS General Counsel, INS Exercise of Prosecutorial Discretion (July 11,
  2000);
- Doris Meissner, INS Commissioner, Exercising Prosecutorial Discretion (November 17,
  2000);
- Bo Cooper, INS General Counsel, Motions to Reopen for Considerations of Adjustment
  of Status (May 17, 2001);
- William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (October 24,
  2005);
- Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (November 7,
  2007);
- John Morton, Director, Civil Immigration Enforcement Priorities for the Apprehension,
  Detention, and Removal of Aliens (March 2, 2011); and
- John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and
  Plaintiffs (June 17, 2011).

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the*
*Apprehension, Detention, and Removal of Aliens*

The following memoranda related to prosecutorial discretion are rescinded:

- Johnny N. Williams, Executive Associate Commissioner (EAC) for Field Operations, Supplemental Guidance Regarding Discretionary Referrals for Special Registration (October 31, 2002); and
- Johnny N. Williams, EAC for Field Operations, Supplemental NSEERS Guidance for Call-In Registrants (January 8, 2003).

Background

One of ICE's central responsibilities is to enforce the nation's civil immigration laws in coordination with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE, however, has limited resources to remove those illegally in the United States. ICE must prioritize the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system. These priorities are outlined in the ICE Civil Immigration Enforcement Priorities memorandum of March 2, 2011, which this memorandum is intended to support.

Because the agency is confronted with more administrative violations than its resources can address, the agency must regularly exercise "prosecutorial discretion" if it is to prioritize its efforts. In basic terms, prosecutorial discretion is the authority of an agency charged with enforcing a law to decide to what degree to enforce the law against a particular individual. ICE, like any other law enforcement agency, has prosecutorial discretion and may exercise it in the ordinary course of enforcement[1]. When ICE favorably exercises prosecutorial discretion, it essentially decides not to assert the full scope of the enforcement authority available to the agency in a given case.

In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:

- deciding to issue or cancel a notice of detainer;
- deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
- focusing enforcement resources on particular administrative violations or conduct;
- deciding whom to stop, question, or arrest for an administrative violation;
- deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
- seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;

---

[1] The Meissner memorandum's standard for prosecutorial discretion in a given case turned principally on whether a substantial federal interest was present. Under this memorandum, the standard is principally one of pursuing those cases that meet the agency's priorities for federal immigration enforcement generally.

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

- settling or dismissing a proceeding;
- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

## Authorized ICE Personnel

Prosecutorial discretion in civil immigration enforcement matters is held by the Director[2] and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities:

- officers, agents, and their respective supervisors within Enforcement and Removal Operations (ERO) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- officers, special agents, and their respective supervisors within Homeland Security Investigations (HSI) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- attorneys and their respective supervisors within the Office of the Principal Legal Advisor (OPLA) who have authority to represent ICE in immigration removal proceedings before the Executive Office for Immigration Review (EOIR); and

- the Director, the Deputy Director, and their senior staff.

ICE attorneys may exercise prosecutorial discretion in any immigration removal proceeding before EOIR, on referral of the case from EOIR to the Attorney General, or during the pendency of an appeal to the federal courts, including a proceeding proposed or initiated by CBP or USCIS. If an ICE attorney decides to exercise prosecutorial discretion to dismiss, suspend, or close a particular case or matter, the attorney should notify the relevant ERO, HSI, CBP, or USCIS charging official about the decision. In the event there is a dispute between the charging official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute with the local supervisors of the charging official. If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

---

[2] Delegation of Authority to the Assistant Secretary, Immigration and Customs Enforcement, Delegation No. 7030.2 (November 13, 2004), delegating among other authorities, the authority to exercise prosecutorial discretion in immigration enforcement matters (as defined in 8 U.S.C. § 1101(a)(17)).

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

Factors to Consider When Exercising Prosecutorial Discretion

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and conditions in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and
- whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

4

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

- veterans and members of the U.S. armed forces;
- long-time lawful permanent residents;
- minors and elderly individuals;
- individuals present in the United States since childhood;
- pregnant or nursing women;
- victims of domestic violence, trafficking, or other serious crimes;
- individuals who suffer from a serious mental or physical disability; and
- individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

- individuals who pose a clear risk to national security;
- serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
- known gang members or other individuals who pose a clear danger to public safety; and
- individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

Timing

While ICE may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing the enforcement proceeding. As was more extensively elaborated on in the Howard Memorandum on Prosecutorial Discretion, the universe of opportunities to exercise prosecutorial discretion is large. It may be exercised at any stage of the proceedings. It is also preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion. Although affirmative requests from an alien or his or her representative may prompt an evaluation of whether a favorable exercise of discretion is appropriate in a given case, ICE officers, agents, and attorneys should examine each such case independently to determine whether a favorable exercise of discretion may be appropriate.

In cases where, based upon an officer's, agent's, or attorney's initial examination, an exercise of prosecutorial discretion may be warranted but additional information would assist in reaching a final decision, additional information may be requested from the alien or his or her representative. Such requests should be made in conformity with ethics rules governing

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

communication with represented individuals[3] and should always emphasize that, while ICE may be considering whether to exercise discretion in the case, there is no guarantee that the agency will ultimately exercise discretion favorably. Responsive information from the alien or his or her representative need not take any particular form and can range from a simple letter or e-mail message to a memorandum with supporting attachments.

<u>Disclaimer</u>

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[3] For questions concerning such rules, officers or agents should consult their local Office of Chief Counsel.

# DEF-INTERV.

# EX. 8

Written Testimony of

**Stephen H. Legomsky**
**The John S. Lehmann University Professor**
**Washington University School of Law**
[ Legomsky@wulaw.wustl.edu ]

Before the

**United States Senate**
**Committee on the Judiciary**

**Confirmation Hearing on the Nomination of Loretta Lynch**
**As Attorney General of the United States**
**January 28-29, 2015**

Mr. Chairman and Honorable members of the committee, thank you for the opportunity to testify before you. My name is Stephen H. Legomsky. I am the John S. Lehmann University Professor at the Washington University School of Law. I have taught U.S. immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school textbook "Immigration and Refugee Law and Policy." This book is now in its sixth edition and has been the required text for immigration courses at 183 U.S. law schools since its inception. From 2011 to 2013 I had the honor of serving as the Chief Counsel of U.S. Citizenship and Immigration Services, in the Department of Homeland Security. I have had the privilege of advising both Democratic and Republican administrations and several foreign governments on immigration policy. I have held visiting academic appointments at universities in twelve countries.

Several members of this committee have publicly expressed concerns about the views of Attorney General nominee Loretta Lynch as to the legality of President Obama's recently-announced executive actions on immigration. I have studied these issues carefully. While I appreciate that reasonable minds can and do differ about the *policy* decisions, I take this opportunity to respectfully share my opinion that the President's actions are well within his *legal* authority. I note too that this conclusion is overwhelmingly shared by our country's immigration law professors and scholars. On November 25, 2014, some 135 scholars and teachers of immigration law joined in a letter expressing their view that the recent executive actions are "well within the legal authority of the executive branch of the government of the United States."[1]

---

[1] See https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/executive-action-law-prof-letter.pdf . The quoted conclusion appears on page 7 of the letter.

The principal executive actions at the heart of the debate are those announced by President Obama, and set forth in official memoranda from Secretary of Homeland Security Jeh Charles Johnson, on November 20, 2014.  One memorandum, which I'll refer to here as the "Prosecutorial Discretion Memo," lays out the Secretary's priorities for the apprehension, detention, and removal of aliens.[2]  Generally, this memorandum continues the Department's prioritization of removals that contribute to national security, public safety, and border security. The other memorandum at the center of the debate,[3] issued on the same date (and referred to here as the "DACA/DAPA Memo") does two things.  First, it expands the "DACA" program, which was originally announced on June 15, 2012.[4]  DACA allows deferred action for certain individuals who arrived in the United States as children.  Second, this latter memorandum establishes a program (informally known as "DAPA") that allows deferred action for certain parents of U.S. citizens or lawful permanent residents.

The critics of these actions have charged that they violate the President's duty, imposed by article II, section 3 of the Constitution, to "take Care that the Laws be faithfully executed" -- in this case, the immigration laws.  The various arguments seem to me to fall into two main categories.  Some of the arguments are meant to show that there is no affirmative legal authority for either the Prosecutorial Discretion Memo or the DACA/DAPA memo.  Other arguments are meant to show that these policies actually conflict with either the letter or the spirit of the Immigration and Nationality Act.  I consider each of those concerns in turn and then briefly discuss a few miscellaneous arguments that some critics have offered.

**A. There is ample legal authority for both the Prosecutorial Discretion Memo and the DACA/DAPA Memo.**

   *1. Prosecutorial Discretion*

Prosecutorial discretion is a long-established, and unavoidable, practice in every area of law enforcement today, both civil and criminal.  The basic idea is straightforward:  When a law enforcement agency has only enough resources to go after a fraction of the individuals whom it suspects of violating the relevant law, it has to make choices.  There is no alternative.

In the specific context of immigration, Congress has explicitly authorized – arguably, in fact, *required* – the Department of Homeland Security to exercise prosecutorial discretion.  In 6 U.S.C. § 202(5), Congress expressly makes the Secretary of Homeland Security "responsible" for "establishing national immigration enforcement policies and priorities."  Establishing

---

[2] Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014).

[3] Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014).
[4] Memorandum from Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

enforcement policies and priorities is the very definition of prosecutorial discretion.

If any further support were needed, the congressional intent can be conclusively inferred from the annual congressional appropriations Acts. Year after year, Congress gives the Administration only enough money to pursue a small fraction of the undocumented population. No one seriously disputes Congress's conscious awareness that its appropriations for immigration enforcement fall far short of what the Administration would need for 100% enforcement. Congress knows that there are about 11 million undocumented immigrants living in the U.S., and it knows that the resources it is appropriating enable the Administration to go after fewer than 400,000 of them per year, less than 4% of that population. In practice, DHS resources are stretched even thinner than that, because (a) a large portion of the resources must be allocated to border apprehensions; and (b) an increasingly higher percentage of unauthorized entries are by nationals of countries other than Mexico; removal of those individuals is far more resource-intensive. This means more than that prosecutorial discretion is unavoidable; it is also the clearest evidence possible that Congress *intends* for the Department of Homeland Security, like practically every other law enforcement agency in the country, to use its discretion to decide how those limited resources can be most effectively deployed.

The appropriations Acts, in fact, do more than simply evidence Congress's intent that the Administration formulate enforcement priorities. They actually mandate a specific priority on the removal of criminal offenders and, within that group of individuals, sub-priorities that depend on the severity of the crime. These mandates have been included in every annual DHS appropriations Act since the one for fiscal year 2009.[5] As discussed at the end of section B below, the President's recent executive actions adopt precisely these crime-related and other public safety priorities.

For still more support, one need only turn to the decision of the U.S. Supreme Court in *Arizona v. United States*, 132 S.Ct. 2492 (2012). There the Court struck down most of Arizona's immigration enforcement statute, precisely because it would interfere with the broad enforcement discretion of the federal government. On that point the Court was emphatic:

> A principal feature of the removal system is the broad discretion exercised by immigration officials. … *Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all*. …
>
> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has

---

[5] E.g., Consolidated Appropriations Act 2014, Pub. L. 113-76, Div. F, title II, 128 Stat. 5, 251 (2014); Consolidated Security, Disaster Assistance, and Continuing Appropriations Act 2009, Pub. L. 110-239, 122 Stat. 3574, 3659 (Sept. 30, 2008), http://www.gpo.gov/fdsys/pkg/PLAW-110publ329/pdf/PLAW-110publ329.pdf.

3

children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission. The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

*Id*. at 2499 [emphasis added].

These authoritative recognitions of broad prosecutorial discretion – 6 U.S.C. § 202(5), the annual congressional appropriations Acts, and the Supreme Court decision in A*rizona v. United States* – are all specific to immigration law. They are further reinforced by the longstanding judicial endorsements of prosecutorial discretion in law enforcement more generally. One of the leading cases is *Heckler v. Chaney*, 470 U.S. 821 (1985). State prisoners on death row sought to compel the Food and Drug Administration to ban the drug that was to be used for their executions. The Court held that the FDA's decision not to take any enforcement action with respect to that drug was unreviewable because the decision was "committed to agency discretion by law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2). The Court said: "This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, *whether through civil or criminal process*,[6] is a decision generally committed to an agency's absolute discretion" [citing several cases]. *Heckler*, 470 U.S. at 831.

The Court relied on the breadth of an enforcement agency's prosecutorial discretion in concluding that non-enforcement decisions were ordinarily unreviewable. It explained:

First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not

---

[6] Emphasis added. I highlight this phrase only because one of the witnesses at a Dec. 2, 2014 House Judiciary Committee hearing asserted that prosecutorial discretion is limited to criminal cases and thus does not apply at all to civil enforcement contexts such as immigration. Testimony of Ronald D. Rotunda, *The President's Power to Waive the Immigration Laws*, Comm. on the Judiciary, U.S. House of Reps. (Dec. 2, 2014), at 10-11. Professor Rotunda cites no authority for this novel position. To the contrary, the highlighted language in *Chaney*, together with its explicit recognition of prosecutorial discretion in the indisputably civil context of FDA enforcement, is alone enough to debunk it. The previously-discussed decision in *Arizona v. United States*, in the specific context of immigration, further illustrates that prosecutorial discretion extends to civil enforcement. And if it were otherwise, it would be impossible for civil enforcement agencies to comply with the law unless – as would be rare indeed – they were so flush with resources that they could literally afford to prosecute every actor whom they suspect of having violated the relevant law. Professor Rotunda seeks to distinguish *Chaney* by asserting that it was decided on standing grounds, not on prosecutorial discretion grounds. *Id*. at 16. That claim too is both novel and indefensible. First, the word "standing" never appears anywhere in the opinion. Second, it is unimaginable that a court would hold that a person about to be executed – and with a drug that he argued would cause excruciating pain – lacks enough of a personal interest to establish standing. Third, there is no need to speculate, because the Court made its reliance on the broad nature of the agency's enforcement discretion explicit, as the passages quoted above illustrate.

only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing.  The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities. …

*Id*. at 831-32.

One other statement in *Chaney* must be acknowledged.  In a footnote, the Court added a dictum on which critics of the President's recently-announced decision have sometimes relied:  "Nor do we have a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities" [quoting *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)].  Such policies, the Court said, "might indicate that such decisions were not 'committed to agency discretion'" (and thus might be judicially reviewable).  *Id*. at 833 n.4.

But such is not the case here, because the Administration's recent executive actions do not even approach "an abdication of its statutory responsibilities."  The discussion in section A.2.c below elaborates on the limits of prosecutorial discretion.  As explained there, even the combination of the Prosecutorial Discretion Memo and the DACA/DAPA Memo will still leave far more undocumented immigrants (and border arrivals) than DHS will have the resources to pursue.  Thus, the new policies will not prevent the Administration from continuing to enforce the immigration laws to the full extent the appropriated resources allow.  Under those circumstances, as long as the President continues to spend the immigration enforcement resources that Congress has appropriated, then absent some violation of an affirmative congressional mandate (which the next section of this testimony demonstrates does not exist), there is no basis for a claim of abdication.

As the Congressional Research Service has found, "no court appears to have invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care Clause."  Kate Manuel & Tom Garvey, Congressional Research Service, *Prosecutorial Discretion in Immigration Enforcement* (January 17, 2013), at 17.  In a unanimous opinion, the Court of Appeals for the Fifth Circuit concluded:  "We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty."  *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).  The important takeaway is the standard that the court carefully articulated for finding an abdication:  The State of Texas lost because "[t]he State does not contend that federal defendants are doing *nothing* to enforce the immigration laws or that they have *consciously* decided to abdicate their enforcement responsibilities. Real or perceived *inadequate* enforcement of immigration laws does not constitute a reviewable abdication of duty" [all emphases added].  *Id.*  No one can credibly claim that an Administration that is spending all the immigration enforcement resources Congress has given it is doing "nothing" to enforce the laws,

much less that the Administration has "consciously" decided to abdicate its responsibilities. And if an abdication claim could be "reject[ed] out of hand" even then, when the number of unauthorized entries was greater than today and the number of removals lower, there is even less room to intimate that the government's current policies somehow amount to abdication.

Even *Massachusetts v. EPA*, 549 U.S. 497 (2007), the case most frequently cited by those who seek to narrow the scope of prosecutorial discretion, is perfectly consistent with the recent executive actions.  In that case, the EPA had refused to regulate carbon dioxide emissions from motor vehicles.  The court found the EPA's explanations for its decision wanting.  Even then, the court did not require the EPA to begin regulating those emissions; it merely remanded the case with instructions for the EPA to provide a better-reasoned explanation for its decision.  In contrast, the Obama Administration has provided detailed, reasoned explanations for its prosecutorial discretion priorities (national security, public safety, and border security are rational enforcement priorities and in fact coincide with those that Congress itself has mandated; DACA and DAPA together bring people out of the shadows, keep families together, and recognize the moral innocence of those who were brought here as children).

### 2. Deferred Action

As the above discussion illustrates, there is clear legal authority for prosecutorial discretion in the enforcement of the immigration laws.  Still, some ask, what is the affirmative legal authority for employing deferred action as the specific vehicle for these recent exercises of prosecutorial discretion?  The answer is that there are multiple explicit sources of legal authority for deferred action.

By way of background, deferred action (originally called "non-priority status") – and similar programs operating under different names -- have been integral parts of immigration enforcement for more than 50 years.[7]  Congress, well aware of this administrative practice, has never enacted legislation to preclude it or even restrict it.

But the legal authority for deferred action does not rest solely, or even primarily, on congressional acquiescence in a well-known administrative practice.  In several statutory provisions, Congress has expressly recognized deferred action by name.  For example, 8 USC § 1227(d)(2) says that if a person is ordered removed, applies for a temporary stay of removal, and is denied, that denial does not preclude the person applying for deferred action. In addition, 8 USC § 1154(a)(1)(D)(i)(II,IV) specifically endorses deferred action (and work permits) for certain domestic violence victims and their children. Deferred action also

---

[7] See, e.g., Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014) [hereinafter OLC Opinion], at 13-20; Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4; Shoba Sivaprasad Wadhia, *In Defense of Deferred Action and the DREAM Act*, 91 Texas L. Rev. 59 (2013); Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 San Diego L. Rev. 42 (1976).

qualifies a person for a driver's license under the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, Div. B, § 202(c)(2)(B)(viii) (May 11, 2005).

In addition to the statute, the formal regulations of the Justice Department (and now the Department of Homeland Security) have also expressly recognized deferred action by name since at least 1982. See 8 C.F.R. § 109.1(b)(7) (1982) (allowing work permits for deferred action recipients). The regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14). These agency regulations have the force of law.

Finally, a long line of court decisions, including at least one Supreme Court decision, explicitly recognize deferred action by name. See, e.g., *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999); *Mada-Luna v Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987); *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985); *Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir. 1983); *Nicholas v. INS*, 590 F.2d 802 (9th Cir. 1979); *David v. INS*, 548 F.2d 219, 223 (8th Cir. 1977); *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976); Vergel v. INS, 536 F.2d 755 (8th Cir. 1976).

The Supreme Court was emphatic about the broad scope of the executive branch discretion to grant deferred action: "At each stage the Executive has discretion to abandon the endeavor [referring to the removal process], and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999). Other courts had expressed the same view: E.g., *Pasquini v. Morris*, 700 F.2d 658, 662 (11th Cir. 1983) (granting or withholding deferred action "is firmly within the discretion of the INS" and therefore can be granted or withheld "as [the relevant official] sees fit, in accord with the abuse of discretion rule when any of the [then] five determining conditions is present"); *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976) ("The decision to grant or withhold nonpriority status [the former name for deferred action] therefore lies within the particular discretion of the INS").

Deferred action, then, is well-established, explicitly authorized by multiple sources of legal authority, and extremely broad. Is there, nonetheless, a legal argument that the specific exercises of deferred action in DACA and DAPA are unauthorized? I am aware of three attempts to advance such an argument:

     a. Some have occasionally suggested that Congress's decision to mention deferred action in a few specific provisions (mainly for domestic violence victims and individuals who had unsuccessfully sought temporary stays of removal orders) indicates that Congress meant to prohibit deferred action in all other circumstances. That theory relies on the statutory interpretation maxim that (translated from Latin) the express mention of one thing excludes all others. But that principle does not apply here. When an administrative practice is as fundamental, as long entrenched, as integral to administrative practice, and as explicitly and frequently recognized as deferred action has been in statutes, regulations, and court decisions, it

is inconceivable that Congress would abolish virtually the entire practice by vague inference. Had Congress intended to do something that radical, there would surely have been some mention of the issue in the legislative history, there would have been heated debate, and there would have been some clear language in the statute.  There is none of these things.

b. A more frequent claim by critics of these executive actions is that deferred action is legal when granted on an individual, case-by-case basis but illegal when granted to an entire class.  A variant of this argument is that deferred action is legal if it is granted to a small number of people but illegal if granted to a large group.

The latter version of the argument is a non-starter.  As a policy matter, the number of individuals affected by a given set of deferred action criteria is clearly relevant.  But none of the legal authorities that recognize deferred action – not Congress, not the executive branch, and not the courts – have stated or even remotely implied that deferred action is legal for a small number of people but illegal for a large number.  (There are legal limits to the granting of deferred action, and they are discussed below, but there is no legal authority for the proposition that deferred action is per se illegal whenever it affects a large number of people.)

The distinction between individuals and groups requires slightly more discussion.  For the record, I note that nothing in either the statute or the regulations prohibits immigration officials from granting deferred action, or otherwise exercising its prosecutorial discretion, in favor of a class of individuals.  As discussed in section C below, previous Presidents have frequently granted either deferred action or some functionally equivalent discretionary relief (for example "deferred enforced departure," "extended voluntary departure," "family fairness") on a class-wide basis to large numbers of undocumented immigrants.

At any rate, both DACA and DAPA expressly require precisely the individualized, case-by-case, discretionary evaluations on which the critics insist – as explained below.  Surely, however, that doesn't mean, and to date none of the critics have identified any legal authority that suggests, that it is illegal for the agency to provide general criteria to guide the evaluation of individual cases.

To the contrary, the courts have consistently recognized the Administration's broad discretion to implement deferred action by announcing general categorical criteria. The courts were well aware of those categories; often they quoted them in their opinions. Indeed, there is no other way for an agency to guide its officers as to how to exercise that discretion.  For example, the Eleventh Circuit in *Pasquini*, above, 700 F.2d at 661, quoted the 1978 INS Operating Instructions' five criteria for officers to consider: "(1) advanced or tender age; (2) many years presence in the United States; (3) physical or mental condition requiring care or treatment in the United States; (4) family situation in the United States -- affect [sic] of expulsion; (5) criminal, immoral or subversive activities or affiliations." The court then noted the discretion of the INS district director. *Id*. at 662. The Ninth Circuit in *Nicholas*, above, 590 F.2d at 806-07, likewise quoted the then five general categorical criteria for deferred action. The Supreme Court in *Reno*, above, similarly quoted a treatise that listed the several general categorical criteria the INS was

then instructing officers to consider in deferred action cases. 525 U.S. at 483-84, quoting from 6
C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][h]. The
fact that the agency had laid out general categorical criteria did not prevent the court from
recognizing the agency's use of deferred action.

All of this is consistent with common sense.  When an agency sets its enforcement priorities –
whether via deferred action or any other vehicle – there are two ways it could proceed.  The
agency could leave it up to each individual police officer and each individual prosecutor to
decide what he or she thinks the agency's enforcement priorities ought to be.  Or, as the
Secretary of Homeland Security has done here, the agency can formulate those priorities at the
leadership level.  The latter approach is far preferable.  Enforcement priorities are important
policy decisions, and important policy decisions should be made by the leaders, who are
politically accountable.  In addition, only the leadership can disseminate guidance throughout the
agency so that the people on the ground know what they are supposed to do, so that these
important priorities will be transparent to the public, and so that there will be some reasonable
degree of uniformity.  Uniformity is essential to equal treatment.  To the extent avoidable, the
decision whether to arrest or detain or prosecute should not depend on which officer happens to
encounter the person or which prosecutor's desk the person's file happens to land on.

Perhaps most crucial of all, there is nothing inconsistent about adopting general threshold criteria
at the front end while still requiring individualized, case-by-case discretion at the back end.  On
this issue there has been a great deal of misinformation.  As the following discussion will show,
both the Prosecutorial Discretion Memo and the DACA/DAPA Memo embody precisely that
combination of steps.

The Prosecutorial Discretion Memo lays out three sets of high enforcement priorities but is
replete with language that authorizes officers to deviate from the stated priorities in
circumstances that either require them to weigh and balance various factors or are defined in
such broad terms as to amount to the exercise of discretion.  Some language goes further still,
explicitly instructing officers to use their "judgment" (often after consultation with a supervisor).
See, e.g., section A, priority 1, last paragraph; priority 2, last paragraph; priority 3, last sentence.
Conversely, the memo specifically instructs officers that it is not meant to "prohibit" or even
"discourage" enforcement actions against individuals who are *not* priorities; such decisions are
similarly assigned to ICE field office directors, who are to use their "judgment" to decide
whether removal "would serve an important federal interest" – again, language broad enough to
make the resulting decisions highly discretionary.  If this were not enough, the memo contains a
section D, entitled "Exercising Prosecutorial Discretion," which lists numerous factors that
officials "should consider."  It even adds "These factors are not intended to be dispositive nor is
this list intended to be exhaustive.  Decisions should be based on the totality of the
circumstances."

The DACA/DAPA Memo takes a similar approach.  It repeatedly mandates "case-by-case"
evaluation, for both DACA and DAPA (as the original 2012 DACA memo did).  At least one
critic has suggested that that language might mean that the adjudicator's case-by-case evaluation

is limited to determining whether the person meets the threshold criteria – as opposed to additionally deciding whether discretion should be favorably exercised.  Other language in the memo, however, removes any doubt.  Section B, after laying out certain threshold criteria for DAPA, expressly limits DAPA to cases that "present no other factors that, *in the exercise of discretion*, makes the grant of deferred action inappropriate" [emphasis added].  And on page 5, the next-to-last paragraph of the memo reinforces this point.  It explains that "immigration officers will be provided with specific eligibility criteria for deferred action [for both DACA and DAPA], *but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis*" [emphasis added].  Meeting the eligibility criteria, in other words, is not enough.

So both memoranda are filled with clear, careful, explicit, repeated commands to officers to make individualized, case-by-case discretionary judgments.  How can critics defend their persistent claims that DACA and DAPA lack individualized consideration when the Secretary's memoranda that tell officers how they are to decide these requests say precisely the opposite?

With the actual memoranda directly contradicting their claims, some critics have resorted to accusing the Administration of perpetrating a scam.  The charge appears to be that in practice no such individual evaluation – or at least no such discretionary determination – ever takes place.  Given the wording of the memoranda, this claim amounts to saying that DHS employees have been systematically disobeying the Secretary's clear and repeated instructions – but without offering any evidence to support that charge or any other reason to expect that result.

Attempts to establish that the practice does not follow the stated policy have been unsuccessful.  The states that have sued the Administration in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex., filed Dec. 3, 2014), alleged in their complaint that "according to the latest figures available," up to 99.8% of all DACA requests have been approved.  See allegation 25.  But they offered no support for that approval rate, and in fact their figure was wildly off.  USCIS has been posting detailed statistics on DACA from the outset, and at the time the complaint was filed the USCIS website showed it had already denied more than 32,000 DACA requests.  (These are in addition to the more than 40,000 rejections at the receiving point for errors such as incomplete applications, failure to enclose the application fee, etc; i.e., the 32,000 denials were on the merits).  See USCIS website, http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrati on%20Forms%20Data/All%20Form%20Types/DACA/DACA_fy2014_qtr4.pdf (through Sept. 30, 2014).[8]

      c. One last attack on the specific use of deferred action in DACA and DAPA is the claim

---

[8] Those data show an approval rate of 95%, not the nearly 100% claimed by the plaintiffs.  While some might assume at first blush that even 95% is a high approval rate, it is not high when one considers who actually files requests for DACA.  An undocumented individual with some additional misconduct in his or her background is unlikely to proactively approach the government, reveal his or her name, address, undocumented status, and additional negative information, and provide fingerprints – nor is that person likely to send the government $465 – if eligibility is unlikely.  For all these reasons, DACA requestors tend overwhelmingly to have strong cases.  The approval rate of just under 95%, therefore, is no evidence that DACA requests are being rubber-stamped.

that, if these policies are legal, then there are no limits to executive power. A future President, these critics say, could refuse to enforce the civil rights laws, or the labor laws, or the environmental laws, or the consumer safety laws.

But this line of argument is similarly misconceived. DACA and DAPA do not even approach the sort of hypothetical non-enforcement policies that this argument conjures up. If the President were truly to refuse to substantially spend the money Congress had specifically appropriated for enforcing the immigration laws or any of these other laws, then a serious legal issue would certainly arise. But that is not even close to what he has done. Since his first day of taking office, President Obama has spent every penny Congress has given him for immigration enforcement. More important still is this reality: Even after DACA and DAPA are fully operational, there will still remain in this country at least – and this is a conservative estimate – 6-7 million undocumented immigrants to whom these policies don't apply. And as noted earlier the President still will have only enough resources to go after fewer than 400,000 of them per year – i.e., less than 7% of even the non-DACA/DAPA population. Again, the resources are unlikely to permit even 400,000 removals of undocumented immigrants, because those same resources must also be used for border security and, further, because non-Mexican nationals comprise an increasingly large percentage of unauthorized entries and require significantly more resources per removal. Therefore, nothing in these new policies will prevent the President from continuing to enforce the immigration laws to the full extent that the resources Congress has given him will allow. As long as he does so, it is impossible to claim that his actions are tantamount to eliminating all limits.

### 3. Work Permits

In continuing to grant work permits to deferred action recipients who can demonstrate economic necessity, USCIS is exercising a discretionary power expressly granted by Congress, incorporated into the formal regulations, and in active use for more than three decades.

In 8 U.S.C. § 1103(a)(1), Congress charged the Secretary of Homeland Security with "the administration and enforcement" of all the immigration laws (except for any laws that Congress has assigned to other executive officers or departments). Section 1103(a)(3) then instructs the Secretary to "establish such regulations; … issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Act."

From the earliest days of the Reagan Administration, the former INS (where the analogous immigration responsibilities then resided) understood this authority to include the power to decide which aliens should receive permission to work. See OLC Opinion, note 7 above, at 21 n.11. Exercising this power, the INS regulations specifically authorized work permits for recipients of deferred action. 8 C.F.R. § 109.1(b)(7) (1982). When Congress later enacted the Immigration Reform and Control Act, Pub. L. 99-603, 100 Stat. 3359 (Nov. 5, 1986) [IRCA], it made this authority explicit. It did so in 8 U.S.C. § 1324A(h)(3), which defined the term "unauthorized alien" (meaning an alien who is not authorized to work) as excluding lawful permanent residents and aliens who are "authorized to be so employed by this Act *or by the*

11

*Attorney General*" [now the Secretary of Homeland Security] [emphasis added].  Congress thus expressly authorized the Attorney General (now the Secretary of Homeland Security) to grant work permits, and specifically to people whom the statute itself does not already authorize to work.  And at least since 1982, deferred action recipients have continued to be among the classes of aliens whom the immigration agency (now USCIS) specifically makes eligible for work permits, provided they demonstrate the economic necessity to work.  The relevant provision currently appears in 8 C.F.R. § 274a.12(c)(14 (2014).  See also *Perales v. Casillas*, 903 F.2d 1043, 1048-50 (5th Cir. 1990) (treating the executive power to decide which aliens may work as "unfettered" and therefore not only discretionary, but so "committed to agency discretion by law" that it is not even subject to judicial review).

Despite this broad and long-accepted authority, some critics of DACA and DAPA have disputed this power.  In effect, they argue that the statutory phrase "or by the Attorney General" should be interpreted to mean "or by the Attorney General in cases where this Act already authorizes employment."  See, e.g., Jan Ting, *President Obama's "Deferred Action" Program for Illegal Aliens is Plainly Unconstitutional* (Dec. 2014), at 18-19, citing John C. Eastman, *President Obama's "Flexible" View of the Law: The DREAM Act as Case Study*, Roll Call (Aug. 28, 2014).  They maintain that the only classes of aliens for whom Congress meant to allow the Attorney General to authorize employment were those whom Congress had already so authorized.  That, of course, would render the phrase "or by the Attorney General" superfluous, since the individuals whom Professors Ting and Eastman concede this phrase covers would already be covered by the phrase "by this Act."

Professors Eastman and Ting attempt to support this interpretation nonetheless.  They note that, before the 1986 enactment of IRCA, the Immigration and Nationality Act already (in Professor Ting's words) "separately authorizes or requires" the Attorney General to grant work permits.  They argue that these latter provisions are the ones that would be superfluous if the Attorney General possessed the broader discretion to grant work permits to any class of aliens.  But there are two flaws in this argument.  First, the argument ignores the *Perales* decision cited above (finding no statutory limits to the work permit authority).  Second, the specific provisions cited by Professor Ting are not, as he describes them, ones that "*authorize or* require" work permits [my emphasis].  The cited provisions are all mandatory.[9]  Their superfluousness argument thus falls apart.  There is nothing superfluous about *requiring* the Attorney General to grant work permits to certain classes of aliens and *permitting* the Attorney General to grant them to others.

The only other argument Professor Ting offers on this score is that post-IRCA legislation added some new classes of aliens for whom issuance of work permits was indeed discretionary.  Ting, above, at 26 n.80.  But that is a thin reed on which to rely.  All the cited post-IRCA provisions (relating to domestic violence victims and to nationals of Cuba, Haiti, and Nicaragua) singled out these particular groups for strong humanitarian reasons.  The provisions authorizing the grant of work permits to those groups were obviously intended to be ameliorative.  If Congress, through a simple charitable act of allowing work permits for those few groups, had thereby intended a

---

[9] They include 8 U.S.C. § 1101(i)(2) (requiring work permits for T-visa recipients) and refugees, asylees, and recipients of temporary protected status (all of whom similarly *must* be granted work permits).

change as momentous as the one Professors Ting and Eastman are hypothesizing – i.e. simultaneously prohibiting the grant of work permits to all those who had been eligible since the early 1980s unless specifically singled out elsewhere in the statute – the legislative history would surely have revealed at least a debate on the issue.  They assign unrealistic weight to the fact that parts of a humanitarian provision contained language that was unnecessary because of an otherwise more general, unrelated provision of a long statute.

**B. Nothing in the recent executive actions conflicts with the Immigration and Nationality Act or any other federal statute.**

Critics of DACA and DAPA continually assert that the President's actions violate, or disregard, or suspend, or ignore the immigration laws.  Rarely, however, do they ever attempt to identify any specific provisions of the law that they claim he has violated.

There is one exception.  Critics will occasionally cite section 235 of the Immigration and Nationality Act, codified as 8 U.S.C. § 1225.  Their argument is as follows:  Section 1225(a)(1) defines an "applicant for admission" as "an alien present in the United States who has not been admitted or who arrives in the United States …"  In turn, section 1225(a)(3) says that "[a]ll aliens … who are applicants for admission … *shall* be inspected by immigration officers" [emphasis added].  Finally, section 1225(b)(2)(A) provides that "in the case of an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a [removal] proceeding" [emphasis added].

The argument rests on the use of the highlighted word "shall."  The critics interpret this combination of provisions to mean that an immigration officer violates the law unless he or she detains, and initiates removal proceedings against, literally every alien who is believed to be unlawfully present in the United States – regardless of the priorities set by Departmental leadership for deploying its limited enforcement resources.

One federal judge relied on this provision.  While holding that the court had no jurisdiction to consider an action brought by ICE agents challenging DACA, the judge suggested in dictum that section 1225 does indeed literally mandate removal proceedings against every alien whom immigration officers believe is not "clearly and beyond a doubt entitled to be admitted."  *Crane v. Napolitano*, Civ. Action No. 3:12-cv-03247-O (N.D. Tex.) (Apr. 23, 2013 and July 31, 2013).  Under that interpretation, there is no room for any exercise of prosecutorial discretion.

That line of argument, however, has been thoroughly discredited.  A superb law review article by Professor David Martin identifies its many fatal flaws.  David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 Yale L.J. Online 167 (2012), http://yalelawjournal.org/forum/a-defense-of-immigration-enforcement-discretion-the-legal-and-policy-flaws-in-kris-kobachs-latest-crusade.  As Professor Martin points out, the argument first of all is immediately inapplicable to the approximately 40% of the undocumented population who were legally admitted on temporary

13

visas but overstayed.  Having already been admitted, they are not "applicants for admission" as expressly defined by section 1225(a)(1).  Therefore they do not fall within even the literal language of subsections a(3) and b(2)(A) on which the critics' argument depends.

But even as to the remaining undocumented immigrants – i.e., those who entered without inspection and whom the statute does classify as applicants for admission – the argument collapses for several reasons.  First, the word "shall" is routinely used in the law enforcement context.  Interpreting the word "shall" in an analogous subsection of section 1225, the Board of Immigration Appeals explained in *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011), that "[i]t is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of the Government on whether to charge an individual and on what charge or charges to bring."  *Id.* at 522, citing a long line of court cases that interpret "shall," in the enforcement context, as subject to prosecutorial discretion.  That result is a matter of common sense.  If it were otherwise, then practically every law enforcement agency and every law enforcement officer in the country would be violating the law every day by failing to do the impossible, because almost no agency has the resources to arrest and prosecute every possible offender.

Moreover, that interpretation would be hard to square with the many statutory provisions that expressly authorize officers to use their discretion in deciding whom to refer for removal proceedings.  These include not only the deferred action provisions discussed earlier, but also 8 U.S.C. §§ 1182(d)(5)(A) (parole), 1225(a)(4) (withdrawal of application for admission), and 1229c(a)(1) (voluntary departure "in lieu of" removal proceedings).  Together, those provisions provide a statutory structure that is incompatible with the notion of mandatory removal proceedings for everyone suspected of being unlawfully present – even if, contrary to reality, there were enough resources to do so.

Finally, even the district court in *Crane* acknowledged that, although in its view the officer was required to issue the Notice to Appear, the officer could then unilaterally cancel the Notice to Appear before the immigration judge acquires jurisdiction, or DHS could move to dismiss the case thereafter.  *Crane*, Apr. 23, 2013 Order, above, at 24, citing 8 CFR § 239.2(a,c).  The court did not attempt to explain why Congress would require such a wasteful and irrational procedure –i.e., why it would require the immigration officer to detain the person, issue a Notice to Appear, and then cancel the Notice, rather than simply not file the charge in the first place.

At any rate, a subsequent decision by the federal district court for the District of Columbia found that DACA and DAPA were valid exercises of the executive's well-established prosecutorial discretion.  *Arpaio v. Obama*, Civ. Action No. 14-01966 (BHH) (Dec. 23, 2014).[10]

Unable to convincingly identify any specific statutory provision with which DACA and DAPA conflict, the critics have often made vague suggestions that these policies violate the spirit, or the overall design, of the immigration laws.  Again, given the long history of both prosecutorial discretion generally and deferred action in particular, given the numerous applications of

---

[10] The court also held the plaintiff lacked standing to bring the suit.

deferred action or similar large-scale relief policies announced by previous Administrations (discussed below), given that until now these types of actions have rarely been questioned, and given the fact that Congress has been well aware of the practice and has never legislated to prevent it, this argument is hard to understand.

Still, some have tried to support the "spirit" argument by citing some of the statutory provisions that allow the government, in its discretion, to grant *lawful permanent resident* status to people who meet certain specific conditions.  Their argument is that this shows Congress intended not to allow benefits for those who don't meet those conditions.  But that argument is a nonsequitur. The fact that Congress is willing to give lawful permanent residence – a green card – to only *some* people doesn't tell us anything about whether the Administration, in setting enforcement priorities, may grant *temporary* reprieves from removal, and *temporary* permission to work, to others.  Deferred action, in fact, does not grant anyone an immigration status of any kind, let alone a permanent status; it is merely temporary relief from removal, revocable at any time for any reason.

Along similar lines, some critics have argued that DACA and DAPA are inconsistent with Congress's failure to pass the DREAM Act and its failure to enact comprehensive immigration reform.  Congressional inaction is cast as an indication that Congress objects to broad relief for undocumented immigrants.  First, congressional inaction tells us nothing about Congress's intentions.  If it did, then the failed attempt of the 113th Congress to block DACA and DAPA would be at least as indicative of Congress's intentions as Congress's failure to enact the DREAM Act or comprehensive immigration reform.  Second, again, a congressional decision not to provide a path to *lawful permanent residence* tells us even less about its views on temporary reprieves from removal and temporary permission to work.

Another form of "overall spirit" argument appears in Professor Ting's article, cited above.  He maintains that the recent executive actions (unlike other exercises of prosecutorial discretion) do more than "refrain from detaining and expelling millions of illegal aliens."  Ting, above, at 5. Quoting the OLC opinion, he says they "openly tolerate an undocumented alien's continued presence in the United States for a fixed period."  *Id.*  Professor Ting does not acknowledge how sweeping that argument would be if it led to the conclusion he wants to reach.  By his reasoning, deferred action could *never* be permissible (unless, presumably, the person already has a valid immigration status and therefore doesn't need deferred action).  *Any* time deferred action is granted to a person who is not already in lawful status, the person's continued presence is being "openly tolerated" for some period.  That is the tradeoff that the policy benefits of deferred action present and that the long and previously unquestioned administrative practice of deferred action has reflected.  At any rate, Professor Ting's observation – while a relevant, albeit unconvincing policy consideration – does not raise any identifiable legal barriers.

Finally (on the subject of the overall structure of the immigration laws), there is indeed a recurring theme in Congress's various enactments.  Far from supporting the critics of the President's recent executive actions, however, it affirmatively does the opposite.  As noted earlier, both the Prosecutorial Discretion Memo and the DACA/DAPA Memo expressly reflect

the Administration's prioritization of national security, public safety, and border security. These are precisely the priorities that Congress has directed the Administration to pursue. See, e.g., note 5 above (citing annual appropriations Acts prioritizing removal of criminal offenders); 8 U.S.C. §§ 1225(b)(1), 1225(c), 1226(c)(1)(D) (prioritizing national security and border security).

## C. Other miscellaneous objections similarly fail.

Some of the critics' legal arguments have been directed at straw persons. Some, for example, have seized on the President's frequent statements that he acted because Congress had failed to act. They have argued that Presidential action doesn't become legal simply because Congress has not acted. But no one claims otherwise. When the President explains that he is acting because Congress has not, he isn't asserting congressional inaction as his *legal* authority for acting. The legal authority comes from the multiple independent sources described in the first two sections of this testimony. The President's references to congressional inaction are simply to make the point that he would have had no policy reason to exercise his legal authority in this way if Congress had fixed the problem legislatively as he has encouraged it to do.

Another argument has been that the President's actions do not become legal simply because previous Presidents have adopted similar policies. (The critics have sought to distinguish the programs of previous Presidents in any event, as discussed below.) While those previous Presidential actions lend *additional* credence to the President's legal authority, the legal authority, again, is independently provided by the many sources of law already described in sections A and B of this testimony. And apart from their supplementary legal value, the analogous actions of his predecessors negate the oft-repeated, but unsupported claim that his actions are so extreme as to be outside the range of acceptable political norms. Undoubtedly, the Administration has also been eager to contrast the congressional and public acceptance of his predecessors' actions with the hyperbolic reactions of many to DACA and DAPA. But the legal authority, again, rests independently on the many sources already described.

Because the critics have also attempted to distinguish the actions of previous Presidents, a few observations about those comparisons might be helpful. In the past several decades, almost every President has used his executive powers to grant temporary reprieves from removal, and temporary permission to work, to large, definable classes of undocumented immigrants -- for humanitarian, foreign policy, or other legitimate reasons. See, e.g., *Arpaio v. Obama*, above, at 6 (summarizing some of the recent Presidents' actions); Bridge Project, *Executive Actions Speak Louder than Words*, http://www.bridgeproject.com/wp/assets/Executive-Action-8.8.14.pdf; American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), http://www.immigrationpolicy.org/sites/default/files/docs/executive_grants_of_temporary_immigration_relief_1956-present_final_5.pdf.

Despite the obvious parallels, critics of President Obama's recent executive actions have sought to distinguish his predecessors' programs. Professor Ting, for example, observes that Congress eventually passed legislation embracing, rejecting, or limiting some of those policies. Ting,

above, at 9.  That, of course, tells us nothing about either their legality or their compliance with political norms at the time the policies were adopted.  Ting argues in the paragraph on pages 9-10 that those policies are further distinguishable because they were based on foreign affairs considerations, an area in which the President enjoys special powers.  And indeed some of the prior Presidents' actions were based on foreign affairs.  But not all were.  The Reagan and Bush family fairness programs, which I turn to now, were not based on foreign affairs at all.  They were based on family unification, just like DACA and DAPA.

Congress in 1986 had granted legalization to certain undocumented immigrants but not to their spouses and children.  IRCA, above, title II.  President Reagan immediately granted relief from deportation to the children (provided both parents or a single parent were legalization beneficiaries), and President Bush Senior later extended those benefits to the spouses and granted them work permits as well.  These policies were called the "Family Fairness" program. The precise sequence of legislative, executive, and media developments is summarized in Immigration Policy Center, *Reagan-Bush Family Fairness: A Chronological History* (Dec. 9, 2014), http://www.immigrationpolicy.org/just-facts/reagan-bush-family-fairness-chronological-history [IPC Chronology].

Professor Ting argues these programs are meaningfully different from DACA and DAPA.  He says that "Presidents Reagan and Bush regarded these individuals as victims of an oversight in the drafting of IRCA and worked with Congress to fix it."  *Id.* at 10.  Ting offers no support for that claim, and the record conclusively shows it to be false.  Congress, in passing IRCA, made a conscious decision *not* to cover the family members of the legalization beneficiaries; Presidents Reagan and Bush provided executive relief nonetheless.  Among the hard evidence is the Senate Judiciary Committee report on the bill that became IRCA.  It specifically says: "It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization." Interpreter Releases (Oct. 26, 1987), at 1200, 1201, reproducing 1987 INS memo that cites S. Rep. No. 99-131 (99th Cong., 1st Sess. 343 (1985). See http://www.prwatch.org/files/ins_family_fairness_memo_oct_21_1987.pdf.  A Chicago Tribune article adds: "The law said nothing about legalizing children or spouses who came after the start of 1982. *Although Congress considered including them, conservative groups who opposed letting more immigrants into the country derailed the idea.* Moreover, Congress mistakenly assumed that the legalized immigrants would patiently petition the government to let their relatives into the United States" [emphasis added]. Chicago Tribune (Aug. 24, 1990), http://articles.chicagotribune.com/1990-08-24/news/9003110433_1_illegal-immigrants-immigrant-families-deport.  The fear was that including the family members could jeopardize passage in the House, where the vote was expected to be extremely close (and in fact was -- the legalization program ended up passing the House by only seven votes).  IPC Chronology, above. And on October 7, 1987, the Senate defeated an amendment that would have put the spouses and children on a path to legalization.  Two weeks later, the Reagan Administration announced its program for the spouses even as the INS was acknowledging the "clear" intent of Congress to exclude the family members from the IRCA legalization program.  *Id*.  Thus, even Professor Ting's representation that Presidents Reagan and Bush *thought* Congress's omission of the family members was an oversight in the drafting is not true.

17

Controversy has also emerged over the expected scale of the Bush Family Fairness program. The Bush program was announced on February 2, 1990. At the time, the predictions as to the number of eligible family members varied widely. In the previous year, the INS Statistical Yearbook said the agency had received 3.1 million applications for IRCA legalization and estimated that approximately 42% of those individuals (that would be about 1.3 million) were married. It reaffirmed that estimate one year later. (On the one hand, the Yearbook did not comment on how many of the spouses already qualified independently for IRCA; on the other hand, it did not have any estimates as to the number of children who would be eligible for Family Fairness.) Two newspapers quoted INS officials as estimating the number of beneficiaries at "more than 100,000 people," though that estimate appeared to be referring to the predicted number of applicants (expected to be much lower than the number of eligibles because many eligibles were expected not to apply). Another INS spokesperson said it "may run to a million." A few days later, an INS "Draft Processing Plan" estimated that "greater than one million" would apply. On the same day an INS internal Decision Memorandum to the Commissioner said the program "provides voluntary departure and employment authorization to potentially millions of individuals." About two weeks after that, INS Commissioner Gene McNary, testifying before the House Judiciary Committee, stated that Family Fairness would cover approximately 1.5 million already present in the United States and appeared to imply that yet another 1.5 million people outside the United States would also become eligible (though Mr. McNary, when contacted in late 2014, suggested he might have been misunderstood). As it turns out, far fewer than those numbers actually applied, largely because the Immigration Act of 1990 opened up alternative avenues for most of these individuals. See IPC Chronology.

Based on the congressional testimony of the then-INS Commissioner and the other data suggesting similar numbers of eligibles, the Obama Administration and numerous advocates have quoted the 1.5 million figure. They have pointed out that, like DACA and DAPA today, it amounted to roughly 40% of the then-existing undocumented population. The critics (including a controversial "fact-check" by Washington Post blogger Glen Kessler, since corrected for serious errors at least twice) have seized on the fact that the actual number of Family Fairness applicants turned out to be much smaller than the Commissioner's predictions. But the critics (including the "fact-checker") miss the point, in several respects. First, the key point is not how many actually applied, or even how many were actually eligible (as to which the 1.5 million figure was probably reasonably accurate). Rather, the point was that at the time of President Bush's announcement his Administration was *predicting* (notwithstanding his protest, 24 years later, that he was misunderstood) that 1.5 million would be eligible and still saw no legal barrier to going forward. Nor was there an outcry from either Congress or the general public.

Perhaps most important of all, while the parallels to Family Fairness make that program a natural point of comparison, one must remember that, even if it were distinguishable, it is still just one of the many examples of executive actions granting temporary reprieves from removal, and temporary permission to work, to large categories of undocumented immigrants. In addition, even the totality of the examples is not being cited as the sole, or even primary, legal authority for DACA and DAPA. As noted earlier, they rest on multiple other sound legal grounds. The

18

examples are offered mainly to show that DACA and DAPA have not exceeded acceptable political norms and to stress the need to judge President Obama's policies by the same standards that have been applied to previous Presidents.

Finally, the President's opponents like to use the President's own words to try to show that the President himself knows his actions are illegal. They like to cite some spontaneous answers the President has given to questions from the public. The vast majority of the answers they cite are perfectly consistent with DACA and DAPA. Some advocates have asked the President to suspend all deportations, and the President has indeed said he cannot legally do that. He has also said he cannot rewrite the law and that in our constitutional democracy he must follow the law that Congress enacts. All those statements are true. DACA and DAPA don't violate any of those principles unless the President exceeds his legal authority. For all the reasons given, DACA and DAPA do not do so.

Although the main purpose of this testimony is to assure the Committee that the recent executive actions are on solid *legal* footing, I note briefly that these programs serve several common-sense *policy* goals as well. To summarize a few: Most will agree that, with finite resources, it is sensible to prioritize national security, public safety, and border security over separating families and destroying the long-term ties of those who have lived peacefully and productively in their communities for many years. Positive grants of deferred action draw the recipients out of the shadows and into the open. These individuals provide their names, addresses, and histories, and the government performs background checks to assure public safety. Surely this is healthier for everyone than maintaining a permanent underground culture. Police chiefs and other law enforcement professionals know that communities are also safer when undocumented immigrants who are either victims of crimes or witnesses to crimes feel secure enough to report the crimes to the police rather than avoid contact for fear of being deported.[11]  Federal and state tax revenues from those who receive deferred action will increase.[12]  Unscrupulous employers

---

[11] Charlie Beck, Chief of the Los Angeles Police Department, Statement to the U.S. Senate Committee on the Judiciary, *Keeping Families Together: The President's Executive Action on Immigration and the Need to Pass Comprehensive Reform* (December 10, 2014); Richard Biehl, Chief of the Dayton Police Department, et al., Letter to U.S Senate Committee on the Judiciary (December 9, 2014); James R. Hawkins, Chief of the Garden City Police Department, Statement to the U.S. Senate Committee on the Judiciary, *Keeping Families Together: The President's Executive Action on Immigration and the Need to Pass Comprehensive Reform* (December 10, 2014); National Task Force to End Sexual and Domestic Violence (NTF), Letter to U.S. Senate Committee on the Judiciary (December 9, 2014), http://4vawa.org/4vawa/2014/12/11/ntf-supports-president-obamas-deferred-action-for-parents-and-expansion-of-the-deferred-action-for-childhood-arrivals-program.

[12] White House Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (2014), http://www.whitehouse.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf; Elizabeth H. Shuler, Secretary-Treasurer, AFL-CIO, Statement to the U.S. Senate Committee on the Judiciary, *Keeping Families Together: The President's Executive Action on Immigration and the Need to Pass Comprehensive Reform* (December 10, 2014),

19

who currently know they can hire unauthorized workers at low wages will no longer have any incentive to hire them over U.S. workers and will no longer be able to drive down overall market wages or working conditions in the process.[13]  And as many have shown, these executive actions can stimulate economic growth in additional ways.[14]

**Conclusion**

Reasonable people of good faith can certainly differ over the precise priorities the President should adopt when enforcing the nation's immigration laws with finite resources.  Like the overwhelming majority of other immigration law professors and scholars, however, I believe that the *legal* authority for both the Prosecutorial Discretion Memo and the DACA/DAPA Memo is clear.  There are Congress's express assignment of responsibility to the Secretary of Homeland Security for "establishing national immigration enforcement policies and priorities," in 6 U.S.C. § 202(5); the additional broad authority conferred by 8 U.S.C. § 1103(a); the long-settled recognition, by all three branches of our government, of broad prosecutorial discretion; the multiple provisions in which Congress has specifically recognized deferred action by name; the formal regulations that similarly recognize deferred action by name; the court decisions that do the same; the express grant by Congress of the power to decide who may be eligible for work permits; the formal regulations that have long made deferred action recipients specifically eligible for work permits; the absence of numerical limitations in any of these legal sources of authority; and the fact that the recent policy announcements will not prevent the President from continuing to spend all the immigration enforcement resources Congress gives him.  All these sources lead to the same conclusion: The President's actions are well within his legal authority.

Thank you once again for the privilege of testifying before this Committee.

---

http://www.judiciary.senate.gov/imo/media/doc/12-10-14ShulerTestimony.pdf., at 2-3.

[13] *Id*.
[14] *Id*.

# DEF-INTERV.

# EX. 9



# USCIS Advance Parole Documents

**January 6, 2017**
**Fiscal Year 2016 Report to Congress**



*U.S. Citizenship and Immigration Services*

# Message from U.S. Citizenship and Immigration Services

January 6, 2017

I am pleased to submit the following report, "USCIS Advance Parole Documents," which has been prepared by U.S. Citizenship and Immigration Services (USCIS).



This report was compiled pursuant to language set forth in Senate Report 114-68 accompanying the Fiscal Year (FY) 2016 Department of Homeland Security Appropriations Act (P.L. 114-113).

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

The Honorable John R. Carter
Chairman, House Appropriations Subcommittee on Homeland Security

The Honorable Lucille Roybal-Allard
Ranking Member, House Appropriations Subcommittee on Homeland Security

The Honorable John Hoeven
Chairman, Senate Appropriations Subcommittee on Homeland Security

The Honorable Jeanne Shaheen
Ranking Member, Senate Appropriations Subcommittee on Homeland Security

I am pleased to respond to any questions you may have.  Please do not hesitate to contact me at (202) 272-1000 or the Department's Deputy Under Secretary for Management and Chief Financial Officer, Chip Fulghum, at (202) 447-5751.

Sincerely,

León Rodríguez
Director
U.S. Citizenship and Immigration Services

# Executive Summary

This report responds to the Senate request to provide information on the use of advance parole documents.[1]

As requested, the report provides details on how many applications for advance parole documents were received by USCIS and, of those, how many applications were approved and denied.  From FYs 2012–2015, USCIS received approximately 300,000 applications for advance parole documents each year.  The majority of requests for advance parole documents comes from individuals seeking adjustment of status.

Without conducting a manual review of each case, USCIS is unable to provide data on all deferred action recipients who obtained advance parole documents, because USCIS does not track electronically advance parole applications from recipients of deferred action that is not associated with the Deferred Action for Childhood Arrivals (DACA) policy.  However, this report does include the number of DACA recipients who obtained advance parole documents and the number of applicants for adjustment of status (seeking lawful permanent resident status, commonly known as applying for a "green card") who obtained advance parole documents.

The report also provides data on the number of applications for which the filing fee was waived because of an inability to pay.  The majority of applicants for advance parole do not receive a waiver for the filing fee.

Without a manual review of each case, USCIS could not determine electronically which recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status.  When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped advance parole document, and/or the review of the Department's records of that applicant.  However, this report does provide information on the number of certain recipients, including DACA and non-DACA recipients, who obtained advance parole documents and subsequently filed adjustment of status applications.[2]

---

[1] With the exception of data on fee waiver requests for Form I-131, this report, based on USCIS's understanding of the legislative language, includes only information on requests for advance parole documents made for individuals currently in the United States.

[2] Some recipients of deferred action under DACA may be eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole.  However, as with the request for statistical data in requests (3) and (5) in Senate Report 114-68, providing data on this population is

Without a manual review of each case, USCIS also could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  However, this report does provide information on the types of supporting evidence accepted in support of applications for an advance parole document.

---

not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.



# USCIS Advance Parole Document

# Table of Contents

I.   Legislative Language ................................................................................................. 1

II.  Background ............................................................................................................... 2

III. Data Report ............................................................................................................. 5

IV.  Conclusion............................................................................................................... 9

# I.    Legislative Language

This document has been compiled in response to language included in Senate Report 114-68, which accompanies the Fiscal Year (FY) 2016 Department of Homeland Security Appropriations Act (P.L. 114-113).

Senate Report 114-68 states as follows:

> The Committee seeks more detail on the use of advance parole and directs USCIS to report on how many advance parole documents are being approved for entry into the United States.  The report should, for the past 4 years, detail:
>
> (1) how many applications for advance parole were made, how many granted, and how many denied;
>
> (2) the number of advance parole documents granted to deferred action recipients and applicants for adjustment of status;
>
> (3) the specific basis for the grant of advance parole under USCIS' criteria set forth in the instructions to the Form I–131 (i.e., educational, employment, or humanitarian);
>
> (4) the number of applications in each year for which the filing fee was waived;
>
> (5) the supporting documentation, by type, that was used to make advance parole determinations; and
>
> (6) the number of aliens, broken down by deferred action recipients and non-deferred action recipients, granted advance parole who left the country, were paroled back into the country using the advance parole document, and have filed an application for adjustment of status to lawful permanent residence.

# II.   Background

USCIS may issue an advance parole document for urgent humanitarian reasons or significant public benefit to a foreign national[3] inside the United States who is preparing to travel abroad and is planning to return.[4]   USCIS issues advance parole documents pursuant to the general statutory parole authority under sections 103(a) and 212(d)(5) of the Immigration and Nationality Act (INA), section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status.[5]   The use of advance parole documents also has been recognized by the Board of Immigration Appeals.[6]   The decision to grant an advance parole document, as with parole, is a matter of discretion and is decided case-by-case. USCIS weighs the circumstances of the specific request and any reasons in support of parole against any negative factors that may exist.

Issuance of an advance parole document is not, itself, a grant of parole, and receipt of an advance parole document does not guarantee the recipient's parole into the United States following travel abroad.[7]   A U.S. Customs and Border Protection officer makes a separate discretionary decision regarding the parole request itself upon the foreign national's arrival at the port of entry.

## Supporting Documentation

USCIS electronically does not track the supporting documentation that is considered when making a determination on the application for an advance parole document. However, to be considered for advance parole, all applicants must submit a Form I-131, *Application for Travel Document*, and the following required evidence:

---

[3] The term "foreign national" generally is used in lieu of the term "alien," which means a person who is not a citizen or national of the United States.  Notwithstanding, when quoting the title, subtitle, or text of a statute or regulation that includes the term "alien," the term "alien" is used.

[4] USCIS issues single-use and multiple-use advance parole documents.  USCIS also may issue a travel document that provides advance authorization for parole to a foreign national outside the United States with a need to visit the United States temporarily for urgent humanitarian reasons or significant public benefit.  Information on these travel documents is not included in this report.

[5] Congress specifically has stated that a TPS beneficiary may travel abroad with the prior consent of the Secretary. INA § 244(f)(3).

[6] *Matter of G-A-C-*, 22 I&N Dec. 83 (BIA 1998); *Matter of Arrabally*, 25 I&N Dec. 771 (BIA 2012).

[7] *Matter of G-A-C-*, 22 I&N Dec. at 88 n.3; *Matter of Arrabally*, 25 I&N Dec. at 778 n.6.

- Proper fee in accordance with the form instructions[8] or a fee waiver request. Generally, USCIS may not waive fees for applications for an advance parole document for individuals within the United States;[9]
- Copy of any document issued by the Department showing the person's current immigration status in the United States, if any;
- Copy of receipt notice for a pending adjustment or other immigration benefit application, if applicable;
- Copy of the order, notice, or document that granted deferred action, if applicable;
- Copy of a government-issued photo identity document;
- Two photographs as described in the form instructions; and
- Evidence supporting the facts that are the reason for the advance parole document request.

Individuals who have received deferred action under the DACA policy and who request an advance parole document additionally must provide documentation that the travel will be in furtherance of humanitarian, employment, or educational purposes. Travel for vacation is not a valid basis for issuance of a DACA-related advance parole document. USCIS determines whether the foreign national's purpose for international travel is justifiable on the basis of the circumstances described in the request and the supporting documentation provided.

Supporting documentation to demonstrate humanitarian purposes includes, but is not limited to:

- A letter from the applicant's physician explaining the nature of his or her medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the United States is medically necessary; or
- Documentation of a family member's serious illness or death.

Supporting documentation to demonstrate educational purposes includes, but is not limited to:

- A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or
- A document showing enrollment in an educational program requiring travel.

---

[8] 8 CFR 103.7.
[9] 8 CFR 103.7(c)(3) and (d).

Supporting documentation to demonstrate employment purposes includes, but is not limited to:

- A letter from the applicant's employer or conference host describing the need for travel; or
- A document showing a specific employment need, such as a conference program, that also shows the applicant's participation.

# III.  Data Report

Tables 1, 2A, 2B, and 3 provide the available requested USCIS data on advance parole documents for FYs 2012–2015, in response to requests (1), (2), and (4) in Senate Report 114-68, respectively.[10]  Without a manual review of each case, USCIS could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  Accordingly, this report does not include statistical data in response to requests (3) and (5) in the Senate Report.

Regarding request (6) in Senate Report 114-68, without a manual review of each case, USCIS also could not determine electronically which deferred action recipients and nondeferred action recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status.  Therefore, this report does not include full data in response to request (6) of the Senate Report.  When an individual applies for adjustment of status, however, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.  Thus, in Tables 4A and 4B, USCIS has provided data regarding individuals with an approved advance parole request and a later approved application for adjustment of status, broken down by DACA recipients and non-DACA recipients.  Some recipients of deferred action under DACA may be independently eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole.  However, as with the request for statistical data in response to requests (3) and (5) of the Senate Report, providing data on this population is not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.

---

[10] However, because USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents without conducting a manual review of each such case, Table 2A provides only data on deferred action under DACA.

**Table 1:  Receipts, Approvals, and Denials for Form I-131, Application for Travel Document for Individuals within the United States**

| U.S. Citizenship & Immigration Services (USCIS) Form I-131 - Advance Parole Receipts, Approvals, and Denials Fiscal Years 2012 – 2015 | | | |
|---|---|---|---|
| **Fiscal Year** | **Receipts*** | **Approvals** | **Denials** |
| 2012 Total | 284,064 | 283,470 | 9,322 |
| 2013 Total | 291,336 | 263,420 | 7,581 |
| 2014 Total | 291,553 | 253,119 | 18,326 |
| 2015 Total | 334,301 | 300,803 | 18,553 |
| **Grand Total** | **1,201,254** | **1,100,812** | **53,782** |

*Not all applications are adjudicated in the same fiscal year as received.  Thus, numbers of approvals and denials always may not equal receipt numbers.

**Table 2A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Filed after Form I-821D Approval "Valid From" Date* Fiscal Years 2012 – 2015 | |
|---|---|
| **Fiscal Year** | **I-131 Approvals** |
| 2012 Total | - |
| 2013 Total | 1,409 |
| 2014 Total | 5,687 |
| 2015 Total | 12,847 |
| **Grand Total** | **19,943** |

Without conducting a manual review of each case, USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents.

*Comparison used the earliest Form I-821D "valid from" date by A-Number.  The Form I-821D decision date was used where invalid data were returned for the Form I-821D "valid from" date.

**Table 2B:  Applicants Within the United States with a Pending Form I-485, Application to Register Permanent Residence or Adjust Status, who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Advance Parole Approvals Filed in Connection with a Form I-485 Fiscal Years 2012 – 2015 | |
|---|---|
| **Fiscal Year** | **I-131 Approvals** |
| 2012 Total | 252,616 |
| 2013 Total | 229,210 |
| 2014 Total | 210,062 |
| 2015 Total | 253,671 |
| **Grand Total** | **945,559** |

**Table 3:  Approvals of Fee Waiver Requests for Form I-131 for Individuals in the United States and Abroad**

| U.S. Citizenship and Immigration Services Form I-131, Application for Travel Document Approved Fee Waivers Fiscal Years 2012 - 2015 | |
|---|---|
| **Fiscal Year** | **Approvals** |
| 2012 | 1,189 |
| 2013 | 1,518 |
| 2014 | 2,733 |
| 2015 | 4,737 |
| **Grand Total** | **10,177** |

Fee waiver data exclusively on requests for an advance parole document for individuals within the United States can only be determined through a manual file review.  Domestic cases generally are ineligible for a fee waiver, but waivers may be authorized at the discretion of USCIS.  Therefore, the vast majority of these fee waiver approvals are likely for requests for advance parole documents for individuals who are abroad.

**Table 4A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents and Later Filed an Adjustment of Status Application**

| U.S. Citizenship & Immigration Services<br>I-131, Application for Travel Document<br>Advance Parole Approvals<br>with Receipt Date After I-821D Approval "Valid From" Date*<br>and I-485 Receipts Filed after I-131 "Valid From" Date*<br>Fiscal Years 2012 - 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | - |
| 2013 | 370 |
| 2014 | 1,652 |
| 2015 | 2,811 |
| **Grand Total** | **4,833** |

*Comparison used the earliest Form I-821D or Form I-131 "valid from" date by A-Number.  Decision date was used where invalid data were returned for Form I-821D or Form I-131 "valid from" date.

**Table 4B:  Individuals who Obtained Advance Parole Documents (excluding Deferred Action for Childhood Arrivals recipients) and Later Filed an Adjustment of Status Application**

| United States Citizenship and Immigration Services<br>I-131, Application for Travel Document<br>Non-DACA Recipients of Advance Parole Documents<br>with I-485 Filed on or after I-131 "Valid From" Date*<br>Fiscal Years 2012 – 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | 2,010 |
| 2013 | 2,517 |
| 2014 | 3,639 |
| 2015 | 3,833 |
| **Grand Total** | **11,999** |

*Comparison used the earliest Form I-131 "valid from" date by A-Number.  Status date was used where invalid data were returned for Form I-131 "valid from" date.

USCIS excluded individuals who had a pending adjustment of status application, or earlier filed an adjustment of status application at the time of the advance parole document request because USCIS understands the legislative language to request only those adjustment of status applications filed after an approved advance parole document request.

# IV.  Conclusion

USCIS issues advance parole documents pursuant to the Secretary's authority under sections 103(a) and 212(d)(5) of the INA, section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status.  USCIS adjudicates applications for advance parole documents case-by-case, applying the criteria set forth in law. The number of receipts and approvals of requests for advance parole documents have been fairly consistent from FYs 2012–2015.  FY 2014 and FY 2015 saw an increase in denials (noting not all approvals or denials occur in the same fiscal year in which an application was filed, as shown by the filing receipt).

Of the groups about which the legislative language inquires, the largest group of advance parole document recipients is individuals with pending applications to adjust status to lawful permanent residence.  As noted in the report, although USCIS is unable to provide volume data on non-DACA deferred action recipients who obtained advance parole documents because USCIS systems currently do not track this information electronically, USCIS is able to identify that individuals who obtained advance parole documents because DACA recipients were a small portion of the total group.  The number of DACA recipients who have applied for adjustment of status after receiving an advance parole document has been fairly consistent from FYs 2012–2015.

Finally, USCIS notes that the number of fee waiver requests granted for applications for an advance parole document has remained very small from FYs 2012–2015.  The majority of individuals applying for advance parole documents pays a fee.

# DEF-INTERV. EX. 10

# WITHDRAWN

# DEF-INTERV.

# EX. 11

535

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

————

No. 1:14-cv-254

STATE OF TEXAS, ET AL., PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, ET AL., DEFENDANTS

————

**DECLARATION OF DONALD W. NEUFELD**

————

I, Donald W. Neufeld, hereby make the following declaration with respect to the above captioned matter.

1.    I am the Associate Director for Service Center Operations (SCOPS) for U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security (DHS or Department).    I have held this position since January 2010.    In this position, I oversee all policy, planning, management and execution functions of SCOPS.    My current job duties include overseeing a workforce of more than 3,000 government employees and 1,500 contract employees at the four USCIS Service Centers located in California, Nebraska, Texas and Vermont. These four centers adjudicate about four million immigration-related applications and requests annually, including all requests for deferred action under the

536

Deferred Action for Childhood Arrivals (DACA) process.

2. I was previously the Deputy/Acting Associate Director for USCIS Domestic Operations from June 2007 to January 2010 where I oversaw all immigration adjudication activities at USCIS's four Service Centers and 87 field offices throughout the United States, as well as 130 Application Support Centers, four Regional Offices, two Call Centers, the Card Production Facility and the National Benefits Center. From January 2006 to June 2007, I was Chief of USCIS Field Operations managing and overseeing the 87 field offices delivering immigration benefit services directly to applicants and petitioners in communities across the United States and the National Benefits Center (NBC) which performs centralized front-end processing of certain applications and petitions. My career with USCIS and the legacy Immigration and Naturalization Service spans more than 30 years, where I have held several leadership positions including Deputy Assistant District Director for the Los Angeles District, Assistant District Director and later District Director of the Miami District, and Service Center Director for the California and Nebraska Service Centers. I began my career in 1983, initially hired as a clerk in the Los Angeles District, then serving as an Information Officer, then an Immigration Examiner, conducting interviews and adjudicating applications for immigration benefits. I also performed inspections of arriving passengers at Los Angeles International Airport.

537

3.    I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.

### USCIS's Role in Immigration Enforcement

4.    DHS has three components with responsibilities over the enforcement of the nation's immigration laws:    (1) Immigration and Customs Enforcement (ICE); (2) Customs and Border Protection (CBP); and (3) USCIS.    USCIS is the DHS component that administers a variety of immigration-related programs. Currently, USCIS adjudicates approximately seven million applications, petitions and requests per year, including applications for naturalization by lawful permanent residents (LPRs), immigrant visa petitions (including employment-based visa petitions filed by U.S. employers and family-based visa petitions filed by U.S. citizens and LPRs), a variety of non-immigrant petitions (including temporary worker categories such as the H-1B), asylum and refugee status, other humanitarian protections under the Violence Against Women Act (VAWA) and for victims of trafficking and crimes, humanitarian parole, and deferred action, among others.

5.    USCIS's current budget is approximately $3.2 billion.    This budget is funded overwhelmingly by user fees paid by individuals who file applications. Only approximately 5% of our budget is from Congressionally-appropriated taxpayer funds, and those appropriations are specifically designated for

538

operation and maintenance of the employment verification system, known as E-Verify, and for limited citizenship-related services (none of which are related to requests for deferred action).

6.   USCIS employs approximately 13,000 federal employees and an additional 5,000 contract employees housed in a range of facilities throughout the United States and overseas.   USCIS maintains 87 Field Offices under its Field Operations Directorate (FOD) and four major Service Centers under SCOPS. These Service Centers are located in Dallas, Texas; Laguna Niguel, California; Lincoln, Nebraska; and St. Albans, Vermont.   Altogether, the Service Centers employ approximately 3,000 federal workers.   USCIS also operates the NBC, which is similar in size to a Service Center.   The NBC performs some limited adjudications, although it was originally established to prepare cases for adjudication in other offices by conducting pre-interview case review.

7.   The Field Offices and Service Centers adjudicate a wide range of immigration-related applications and requests.   USCIS distributes the responsibility for processing and adjudicating various categories of applications and requests among the Field Offices and Service Centers based on multiple considerations in order to achieve maximum efficiency, reliability, consistency, and accuracy.

8.   The Service Centers are designed to adjudicate applications, petitions and requests of pro-

539

grams that have higher-volume caseloads, including non-immigrant visa petitions (such as H-1Bs), I-130 petitions establishing relationships between a U.S. citizen or LPR and a foreign national relative, employment-based applications for adjustment of status to lawful permanent residence, multiple forms of humanitarian protection (including temporary protected status, protection under the VAWA, non-immigrant status for victims of crimes and trafficking), and requests for deferred action under the DACA process.[1]

9. In addition to the Field Offices and Service Centers, USCIS also uses three centralized "lockboxes" for the initial receipt and processing of most applications, requests, and fee payments received by the

---

[1] DACA is not the only deferred action program handled by USCIS Service Centers. For example, the Vermont Service Center (VSC) currently administers two programs through which individuals may be placed in deferred action, one related to relief under VAWA and one related to U nonimmigrant status. VAWA allows certain spouses, children, and parents to self-petition for family-based immigration benefits if they have been battered or subjected to extreme cruelty by the U.S citizen or LPR spouse or parent, or U.S. citizen son or daughter. If the VAWA self-petition is approved by VSC, the self-petitioner can file an application for adjustment of status that is adjudicated by the appropriate field office. In addition, based on the approved self-petition, the self-petitioner is eligible for consideration for deferred action and for an employment authorization document. VSC adjudicates all VAWA self-petitions and also administers the deferred action and EAD component of the VAWA program.

540

agency each year. At the lockbox, every application and request is opened, reviewed for basic filing requirements, then fees are collected, and data is captured. In order to ensure reliability and proper processing, each application and request must be logged into one of the USCIS computer systems, the paper applications and requests must be scanned, the payment must be processed, a receipt must be issued, and the hardcopy applications and requests must be distributed to the appropriate Field Office, Service Center, or the NBC for further processing.

### The DACA Process

10. In 2012, then-Secretary of Homeland Security Napolitano "set[] forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws." In doing so, USCIS was tasked with implementing the DACA process and adjudicating these requests for deferred action. As explained by then-Secretary Napolitano, the DACA process supports DHS-wide efforts to efficiently prioritize overall enforcement resources through the removal of criminals, recent border crossers, and aliens who pose a threat to national security and public safety, while recognizing humanitarian principles embedded within our immigration laws. The individuals who could be considered for DACA "lacked the intent to violate the law" because they were "young people brought to this country as children[.]" She further explained such chil-

541

dren and young adults could be considered, on a case-by-case basis, for deferred action if they met the guidelines, passed a criminal background check, and lived in the U.S. continuously for five years. Secretary Napolitano explained that DACA was part of "additional measures to ensure that [DHS's] enforcement resources [were] not expended on these low priority cases but [were] instead appropriately focused on people who meet [DHS's] enforcement priorities." *See* Exhibit A (June 15, 2012 Memorandum, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," (hereinafter "the Napolitano Memo")).

11. Under DACA, aliens brought to the United States as children before the age of 16 and who are determined to meet other certain guidelines, including continuous residence in the United States since June 15, 2007, can be considered for deferred action on a case-by-case basis.[2] Requestors who meet the guide-

---

[2] The guidelines for DACA under the Napolitano Memo include: 1) being under the age of 31 as of June 15, 2012; 2) entering the U.S. before reaching the age of 16; 3) continuously residing in the U.S. since June 15, 2007 to the present time; 4) being physically present in the U.S. on June 15, 2012 and at the time of making the request for consideration for DACA; 5) having no lawful status on June 15, 2012; 6) being currently in school, having graduated or obtained a certificate of completion from high school, having obtained a General Educational Development (GED) certificate, or being an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and, 7) having not been con-

542

lines are not automatically granted deferred action under DACA. Rather, each initial DACA request is individually considered, wherein an adjudicator must determine whether a requestor meets the guidelines and whether there are other factors that might adversely impact the favorable exercise of discretion.

12. In addition to satisfying the DACA guidelines, requestors must submit to, and pay for, a background check. Information discovered in the background check process is also considered in the overall discretionary analysis. If granted, the period of deferred action under the existing DACA program is—depending on the date of the grant—two or three years.[3] Requestors simultaneously apply for employment authorization, although the application for employment authorization is not adjudicated until a decision is made on the underlying DACA request.

13. Procedurally, the review and adjudication of an initial request for deferred action under DACA is a multi-step, case-specific process described in greater detail below. The process begins with the request be-

_____

victed of a felony, a significant misdemeanor, three or more other misdemeanors, and not otherwise posing a threat to national security or public safety.

[3] The 2012 Napolitano Memo directed USCIS to issue two-year periods of deferred action under DACA. Pursuant to the November 20, 2014 memo issued by Secretary Johnson, as of November 24, 2014, all first-time DACA requests and requests for renewals now receive a three-year period of deferred action.

543

ing mailed to a USCIS lockbox, which then reviews requests for completeness. Following review at the lock-box stage, those requests that are not rejected (as briefly described below) are sent to one of the four USCIS Service Centers for further substantive processing. Once a case arrives at a Service Center, a specially trained USCIS adjudicator is assigned to determine whether the requestor satisfies the DACA guidelines and ultimately determine whether a request should be approved or denied.

14. Unlike a "denial," a DACA request is "rejected" when the lockbox determines upon intake that the request has a fatal flaw, such as failure to submit the required fee,[4] failure to sign the request, illegible or missing required fields on the form, or it is clear that the requestor does not satisfy the age guidelines.

15. A DACA request is "denied" when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met. Both scenarios necessarily involve the consideration of and exercise of USCIS's discretion.

16. Adjudicators evaluate the evidence each requestor submits in conjunction with the relevant

---

[4] Very limited fee exemptions are considered. *See* Exhibit B (FAQ 8).

544

DACA guidelines, assess the appropriate weight to accord such evidence, and ultimately determine whether the evidence is sufficient to satisfy the guidelines. Adjudicators must utilize judgment in determining weight accorded to the submitted evidence.

17. Where a guideline is not prescriptive, USCIS must also exercise significant discretion in determining whether that guideline, and the requestor's case in relation to that guideline, counsels for or against a grant of deferred action. For example, one of the DACA guidelines is that the requestor "has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety." *See* Exhibit A, at 1. While determining whether a requestor has been convicted of a felony is straightforward, determining whether a requestor "poses a threat to national security or public safety" necessarily involves the exercise of the agency's discretion.

18. Even if it is determined that a requestor has satisfied the threshold DACA guidelines, USCIS may exercise discretion to deny a request where other factors make the grant of deferred action inappropriate. For example, if the DACA requestor is believed to have submitted false statements or attempted to commit fraud in a prior application or petition, USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met. As another example, when USCIS learned that a

545

DACA requestor falsely claimed to be a U.S. citizen and had prior removals, as an exercise of discretion, USCIS denied the request even though those issues are not specifically part of the DACA guidelines.

19. Under current DACA procedures, denials issued solely on discretionary grounds, including for national security and public safety reasons, are generally required to undergo review by USCIS headquarters. There is an exception to that requirement for cases involving gang affiliation—where such affiliation is confirmed by interview—and those cases may be denied without further guidance from USCIS headquarters. After an adjudicator in a USCIS Service Center determines that, in his or her discretion, a request should be denied for purely discretionary reasons, the adjudicator may send to USCIS headquarters a "Request for Adjudicative Guidance," which summarizes the case, usually recommends a denial for discretionary reasons, and seeks concurrence or guidance before rendering a final decision. This process has been established to allow USCIS to ensure consistency and avoid arbitrary decisions regarding discretionary denials.

20. Adjudicators have the authority to verify documents, facts, and statements provided by the requestor by contacting educational institutions, other government agencies, employers, or other entities. *See* Exhibit B (USCIS Frequently Asked Questions for DACA Requestors (hereinafter DACA FAQs)), FAQ

546

21. In addition, adjudicators at the Service Centers may refer a case for interview at a Field Office. *See* Exhibit C (redacted DACA interview notices). Typically, an interview would be requested when the adjudicator determines, after careful review of the request and supporting documents, that a request is deniable, but potentially curable, with information that can best be received through an interview instead of requesting additional supporting documents. For example, where an adjudicator suspected a requestor was associated with a gang, an interview was conducted to question the requestor regarding this association.

21. An adjudicator may also issue a "Request for Evidence" (RFE) or a Notice of Intent to Deny (NOID) to require the requestor to submit additional evidence in support of the request for DACA. An RFE is issued when not all of the required initial evidence has been submitted or the adjudicator determines that the totality of the evidence submitted does not meet the DACA guidelines or other discretionary factors. A NOID is more appropriate than issuing an RFE when the officer intends to deny the request based on the evidence already submitted because the request does not appear to meet DACA guidelines or other discretionary factors, but the request is not necessarily incurable. Since August 15, 2012 through December 31, 2014, 188,767 RFEs and 6,496 NOIDs have been issued in the process of adjudicating DACA requests. Failure to respond may result in a denial. *See* Exhibit D (redacted DACA-related RFEs and

547

NOIDs); Exhibit E. In addition, all DACA requestors must submit to background checks, and requests are denied if these background checks show that deferred action would be inappropriate. Information discovered in this process may be provided to ICE, CBP, and other law enforcement authorities for further action if appropriate. *See* Exhibit B (DACA FAQs 19 and 20).

22. If USCIS denies a DACA request, USCIS applies its policy guidance governing the referral of cases to ICE. Normally, if the case does not involve a criminal offense, fraud, or a threat to national security or public safety, the case is not referred to ICE for purposes of removal proceedings. Many of the cases involving discretionary denials were referred to ICE due to public safety issues.

23. Since the inception of DACA through December 31, 2014, USCIS accepted as filed 727,164 initial requests for deferred action under DACA. An additional 43,174 requests were submitted to USCIS, but were rejected at the lockbox stage. Of the 727,164 initial requests that were accepted for filing, 638,897 were approved, 38,597 were ultimately denied, and the rest remain pending. All DACA requestors also submit applications for employment authorization. Of

548

the 970,735 employment authorization applications received, 825,640 were approved.[5]  *See* Exhibit E.

24. The reasons for these 38,597 denials vary. Most were based on a determination that the requestor failed to meet certain threshold criteria, such as continuous residence in the United States.  Other denials involved cases in which the deciding official exercised further judgment and discretion in applying the criteria set forth in the policy, including where individuals were determined to pose a public safety risk based on the individual circumstances of the case. For example, DACA requests have been denied for discretionary public safety reasons because the requestor was suspected of gang membership or gang-related activity, had a series of arrests without convictions, arrests resulting in pre-trial diversionary programs, or ongoing criminal investigations.  Requests have also been denied on the basis that deferred action was not appropriate for other reasons not expressly set forth in 2012 DACA Memorandum, such as evidence of immigration fraud.  See supra ¶ 18 (citing examples).  Until very recently, USCIS lacked any ability to automatically track and sort the reasons for

---

[5]  The total number of employment authorization document application receipts is higher than the number of DACA requests because USCIS systems do not distinguish between employment authorization document applications made by initial requestors, renewal requestors, or those seeking to replace an employment authorization document.

549

DACA denials, and it still lacks the ability to do so for all DACA denials except for very recent ones.

25.  DACA is funded exclusively through the fees requestors submit with their DACA request.  No Congressional appropriations are used to administer DACA.

### 2014 DACA Modifications and
### Deferred Action for Parents of U.S. Citizens and LPRs (DAPA)

26.  On November 20, 2014, Secretary Johnson issued a memorandum directing DHS to implement certain modifications to DACA and to create a process for certain parents of U.S. Citizens and LPRs to apply for deferred action (DAPA).  The DACA modifications include:  (1) allowing individuals over 31 to request deferred action; (2) increasing the period of deferred action and work authorization from two to three years; and (3) adjusting the date regarding the beginning of the continuous residence period from June 15, 2007 to January 1, 2010.  These modifications will not change the case-by-case process for reviewing DACA requests described above.  USCIS is in the process of determining the procedures for reviewing requests under DAP A, and thus USCIS has not yet determined whether the process to adjudicate DAPA requests will be similar to the DACA process.  However, as with DACA, DAPA will be funded through fees submitted by requestors, and USCIS will not use Congressional appropriations to administer DAPA.

550

27. The 2014 DACA modifications and DAPA do not restrict the longstanding authority of USCIS to grant deferred action in the exercise of its discretion. Accordingly, if a requestor is denied DACA or DAPA, USCIS may consider deferred action for the requestor if such action is considered appropriate in the agency's discretion. *See* Exhibit B (DACA FAQ 71).

28. USCIS has taken some steps to implement the expanded DACA and DAPA, such as securing adequate office space and beginning to develop a form, among others. In taking these steps, USCIS has counted on receiving the fees that will be generated by requestors when submissions commence in February for DACA and May 2015 for DAPA. USCIS has carefully calibrated expenses incurred in light of anticipated revenues to ensure the continuing fiscal integrity of our budget. USCIS's budget contemplates that we will begin receiving fees from requestors soon to cover some of the expenses we have already incurred and fund the process as it continues to go forward.

29. Based on our experience implementing DACA in 2012, we anticipate that fewer than the total number of estimated persons who might meet the guidelines for DAPA would submit requests. The total estimated population for DACA was projected to be approximately 1.2 million individuals in 2012. To date, approximately 720,000 initial DACA requests, or roughly 60% of the total estimated population, have been received by the agency. The projected total population

for DAPA is estimated at approximately 3.85 million. USCIS currently anticipates approximately 50% of this population will submit requests in the 18-month period after USCIS begins accepting requests.

30. As the foregoing paragraphs explain, the DACA program requires case-by-case consideration of each request and provides for individualized adjudicatory judgment and discretion. Each case is first reviewed by lockbox contractors who reject requests that are incomplete. All non-rejected cases are then forwarded to a USCIS Service Center for a case-by-case review. Upon careful review of the case, adjudicators regularly issue RFEs and NOIDs for additional evidence, where after initially reviewing the request, adjudicators determine the request is deniable, but also curable with additional evidence. In making a decision on each case, adjudicators must carefully evaluate the weight of the submitted evidence to ensure compliance with the discretionary guidelines broadly outlined by the Secretary when establishing DACA. They must also make determinations on individual requests based on non-prescriptive guidelines such as "public safety" and "national security." Finally, in DACA, USCIS exercises its discretion by otherwise denying a request where other factors not included in the guidelines would make the grant of deferred action inappropriate.

552

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of Jan. of 2015.

/s/  <u>DONALD W. NEUFELD</u>
Donald W. Neufeld

# DEF-INTERV.

# EX. 12

508

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

————

No. 1:14-cv-254

STATE OF TEXAS, ET AL., PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, ET AL., DEFENDANTS

————

## **DECLARATION OF MICHAEL HOEFER**

————

I, Michael Hoefer[1], hereby make the following declaration with respect to the above captioned matter.

## I.   QUALIFICATIONS

1.   I am a Senior Advisor for the Office of Policy & Strategy at U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security ("DHS" or "Department").   I have held this position since March 2013.   I was previously the Director of the DHS Office of Immigration Statistics (OIS) from 1997 to 2013.   The OIS is the lead office within DHS for the reporting and analysis of immigration data.   I began working in the Statis-

————

[1]   Curriculum Vitae provided at Exhibit 1.

509

tics Office at the Immigration and Naturalization Service (INS) in March 1982.

2.  I am a graduate of Cornell University with a B.S. (1976) in Industrial and Labor Relations with a concentration in applied statistics.

3.  As a technical expert at OIS I authored many reports on Department immigration data and population estimates, including annual estimates of the number of unauthorized aliens residing in the United States. I was staff statistician (on detail) at the Commission on Immigration Reform from 1994-95 and was a member of the DHS Immigration Reform Team in 2007. I co-chaired the Federal Interagency Workgroup on Immigration Statistics and Research for several years. As a leading expert on U.S. immigration data, I gave an invited address to the Annual Meeting of the Committee on National Statistics, National Academy of Sciences, titled "Measuring Immigration Flows and Immigrant Populations: What Do We Know? How Can we Learn More?" in October 2008. I also testified before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, of the House Judiciary Committee in June of 2007 on the subject, "Comprehensive Immigration Reform: Government Perspectives on Immigration Statistics." This past year I was the United States representative to the Organization for Economic Co-operation and Development Expert Meeting on Migration. I also was a member, and provided sta-

510

tistical guidance, to the DHS task force addressing the increase in apprehensions of unaccompanied minor children beginning in the spring of 2012.

4. Resulting from my role as Senior Advisor for the Office of Policy & Strategy at USCIS, I am familiar with the 2012 Deferred Action for Childhood Arrivals policy (DACA), as well as the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy and modification of DACA announced in 2014 and presently in the process of being implemented by DHS.

5. I have worked on various projects to estimate the size and characteristics of unauthorized populations, such as those who meet the guidelines for DACA. I was the lead author of DHS annual reports on the size and characteristics of unauthorized populations from 2005 to 2011. I also assisted in the development of the "Report on the Legalized Alien Population," which was sponsored by the former INS. Last year I served as an advisor on the development of a USCIS report on the "Characteristics of Individuals Requesting and Approved for DACA."

6. The purpose of this declaration is to respond to certain opinions and conclusions in the Declaration of Karl Eschbach, Ph.D., submitted as Exhibit 14 to the Plaintiffs' Reply Brief, filed in the case *State of Texas, et al., v. United States of America, et al.*, 14-cv-254, pending before the United States District Court for the Southern District of Texas.

511

7.   In addition to the documents and information available to me as Senior Advisor for the Office of Policy & Strategy at USCIS, I have reviewed the above-referenced Declaration of Karl Eschbach, Ph.D., including attachments.

8.   My views expressed in this declaration are based on my education, experience, knowledge of relevant scientific literature, knowledge of the generally accepted methodologies associated with review and analysis of statistical data regarding migrant populations, and my review of relevant documents and information.   I have personal knowledge of the matters stated herein.

## II.   SUMMARY OF DECLARATION

9.   Dr. Eschbach was retained by the Office of the Attorney General of Texas to analyze three issues: (1) whether the 2012 Deferred Action for Childhood Arrivals (DACA) policy caused an increase in the unauthorized immigrant population, and whether the 2014 Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy likely would cause concomitant increase in the unauthorized immigrant populations; (2) the method for counting the unauthorized immigrant population and the number of authorized immigrants that reside in Texas; and (3) whether unauthorized immigrants receive a disproportionate amount of uncompensated healthcare.   (Eschbach Dec. at ¶ 4, pg. 2)

512

10. This declaration addresses Dr. Eschbach's analysis of the first of these issues, i.e. whether 2012 DACA caused an increase in the unauthorized immigrant population, and whether the 2014 deferred action policies likely would cause concomitant increase in the unauthorized immigrant populations.

11. Dr. Eschbach opines, regarding issue (1), that "DAPA will discernibly and significantly increase unauthorized immigration to the United States in two ways": (1) by encouraging both eligible and ineligible unauthorized immigrants to stay in the United States, in the hopes of attaining adjustment of status in the future and relatedly, by reducing the emigration rate of immigrants who may be considered for DAPA; and (2) by "making it more attractive for unauthorized immigrants to migrate to the United States." (Eschbach Dec. at ¶ 5(a), pg. 3). He therefore concludes that DAPA implementation will result in an increase in unauthorized immigrants. (Eschbach Dec at ¶ 5(a), pg. 4.)

12. Having reviewed Dr. Eschbach's declaration, including the data and bases for his hypotheses and conclusions, it is my opinion that Dr. Eschbach's opinions are not supported by the available evidence. DACA and DAPA are very recent policies, and they have not been fully studied. Dr. Eschbach himself notes that with respect to DACA that "there is no peer-reviewed analytic study evaluating the influences on recent trends in child migration." (Eschbach Dec.

513

at ¶ 26.) Dr. Eschbach's opinions rest on speculation and unsupported inferences drawn largely from historical data reflecting generalized immigration statistics (e.g., Eschbach Dec. at ¶ 12, Table 2), and a program implemented in 1986 (the Immigration Reform and Control Act or "IRCA") (Eschbach Dec. at ¶¶ 20-23). There are not sufficient data to support his conclusions.

### III. DISCUSSION

13. In his analysis, Dr. Eschbach discusses unauthorized migration, including incentives that affect individuals considering whether or not to attempt an unauthorized entry into the United States, and the potential effects/incentives that policies such as DACA and DAPA may have on those individuals. He views the unauthorized immigrant population at issue as being comprised of three groups: (1) unauthorized immigrants in the United States who may apply for deferred action under DACA or DAPA; (2) "potential migrants", i.e., individuals outside the United States who do not meet the DACA/DAPA guidelines and who may be considering an illegal entry into the United States; and (3) unauthorized immigrants presently in the United States who do not meet the DACA/DAPA guidelines. (Eschbach Dec. at ¶ 16.)

14. Dr. Eschbach bases much of his speculation regarding the effect of DACA and DAPA on a rough extrapolation from pre-DACA/DAPA data, from which no relationship to DACA or DAPA can be inferred,

514

without considering other significant factors that may affect his conclusions. Dr. Eschbach concedes that the "flow of unauthorized entrants across the border was responsive to many influences, including primarily perceptions of relative employment opportunities and wage rates." (Eshbach Dec. at ¶ 23.) But Dr. Eschbach goes on to draw inferences regarding the causes of unauthorized migration without addressing environmental factors, such as crime, civil unrest and natural disasters. For example, he concludes that an increase in unauthorized migration can be attributed to IRCA, but the increase in the flow of unauthorized migrants since its passage was most notable between 1998 and 2002 (accounting for 42% of the total increase), which is significantly attenuated with respect to IRCA, and correlates with other events.[2]

### a. Dr. Eschbach's Opinions Regarding DACA/DAPA Causing an Increase in the Unauthorized Immigrant Population are Speculative and Unreliable

15. Regarding the first of Dr. Eschbach's groups— unauthorized immigrants in the United States who meet the guidelines for consideration under DACA or DAPA—Dr. Eschbach postulates that DACA and DAPA will increase the size of the unauthorized popu-

---

[2] In 1998 Hurricane Mitch devastated Central America, killing thousands and affecting more than 100,000 people. In 2001, El Salvador was struck by a series of earthquakes, killing more than a thousand people and damaging more than 100,000 homes and businesses.

515

lation, by: (1) deferring the removal of individuals whom he surmises would otherwise be "identified by" DHS and "subject to deportation within the time period specified in the programs"; and (2) "reducing the incentive to emigrate (i.e., return to [unauthorized immigrants'] home countr[ies])." (Eschbach Dec. at ¶ 17). The evidence he relies on to support this conclusion—data reflecting estimated removal and emigration rates for the resident unauthorized immigrant population within the United States during the period 1990-2010—predates the implementation of DACA, so this conclusion is based purely on conjecture. (Eschbach Dec. at ¶ 17, pg. 10, fn. 10.) Dr. Eschbach postulates a "crude estimate of an increase in the stock of resident unauthorized immigrants of 3 percent of the enrollees in the program for each year of their participation," before conceding that "[t]he actual number of reduced deportations/deferrals may vary" if certain factors are true. (Id.).[3] This "crude estimate" is

---

[3] No recent data are available on the rate that foreign-born residents (e.g., lawful permanent residents LPRs, unauthorized residents) emigrate. The U.S. government stopped collecting information on the emigration of LPRs in 1957. The "residual" methodology used by the DHS Office of Immigration Statistics and others to estimate the size of the unauthorized population does not require an estimate of the emigration rate of the unauthorized population, but does utilize an estimate of the foreign-born emigration based by Ahmed and Robinson, "Estimates of Emigration of the Foreign-Born Population: 1980-90," Census Bureau Technical Working Paper No. 9, December 1994. Ahmed and Robinson estimate that emigration rate of the foreign born population during the

516

just that—an unsupported guess based on several layers of inference—and it is particularly speculative because it does not rest on data or analysis drawn from DACA or DAPA. The incentives created by DACA and DAPA with regard to emigration now or in the future, and their relationship to existing disincentives to emigrate among the DACA and DAPA community, are affected by a complex set of factors which are not considered or discussed in any meaningful way by Dr. Eschbach.[4] He later postulates that those who meet

---

1980-89 period was 18.7 percent for those who entered during 1970-79, 9.1 percent for those who entered during 1960-69, and 7.1 percent for those who entered before 1960. Warren and Warren, in their estimate of 3 percent emigration, have extrapolated the emigration rates for the total foreign-born population who entered in 1970-79 and applied it to unauthorized residents who have entered the United States from 1980 to 2009.

[4] For example, lacking actual data and analysis concerning DACA and DAPA, any reasonable hypothesis regarding the effect of DACA and DAPA on incentives to emigrate, and the predicted consequence to the overall unauthorized immigrant population in the United States, would need to consider the pre-DACA and pre-DAPA incentives on the eligible population. Pursuant to the eligibility requirements of the program, the population of individuals in the United States who meet the DACA guidelines necessarily entered the United States at a young age. Their parents and immediate family are likely to be in the United States, and their primary community ties are likely to be in the United States. Conversely, this population may have diminished or non-existent family and community ties in their country of birth. The DAPA policy necessarily correlates with strong ties to the United States, including having at least one United States citizen or legal resident child and having at least 5 years of residence in the United States. Further,

517

the DACA/DAPA guidelines will serve as anchors for new unauthorized migration among non-DACA/DAPA populations, and by this connection he attributes that possible future growth to DACA/DAPA. (Eschbach Dec. at ¶ 28.) Dr. Eschbach provides no reliable data or analysis supporting his conclusions, which are more in the nature of conclusory assertions.

16. For example, Dr. Eschbach's declaration lacks any analysis or consideration of pre-DACA/DAPA incentives to emigrate, and present and future consequences of DACA/DAPA on that same community regarding incentives to emigrate.

17. In addition, Dr. Eschbach relies in part on data regarding the effects of the Immigration Reform and Control Act of 1986 (IRCA), a program implemented twenty-eight years ago. As I explain below, IRCA does not provide a basis on which to make predictions about DACA and DAPA.[5] Dr. Eschbach attempts to support his conclusion that DACA and DAPA will lead to an increased in the unauthorized population in the United States based on a tenuous comparison to the fact that unauthorized migration has increased in the

---

inasmuch as the DACA and DAPA policies are contingent upon individuals having not been convicted of serious crimes, this population is less likely to be placed in removal proceedings.

[5] DACA and DAPA, for example, result in a temporary and revocable grant of deferred action (which is not a lawful immigration status), while IRCA allowed persons to be granted the legal status of lawful permanent resident.

518

decades since IRCA was passed; but the fundamental assumption—that this increase is attributable to IRCA—is itself speculative, and fails to take into account other significant factors that may affect his conclusions, like environmental and economic factors. (supra at ¶ 14.)[6]  Available data, and reasonable inferences that can be drawn from them, do not support Dr. Eschbach's prediction that DAPA or DACA will increase unauthorized immigration.

18.  Dr. Eschbach's opinion regarding the effect of DACA and DAPA on incentives to voluntarily emigrate is not supported by the data or reasonable inferences drawn from it.   His conclusory statement that an "unambiguous effect" of DACA and DAPA is that they will "reduce the incentive to emigrate" suffers from a lack of analysis or consideration of pre-DACA/DAPA incentives to emigrate, and present and future consequences of DACA/DAPA on that same community regarding incentives to emigrate.  As such, Dr. Eschbach's hypothesized growth in the unauthorized population based upon the theory that individuals who meet the DACA/DAPA guidelines who are discouraged from emigrating by DACA/DAPA will attract new unauthorized migrants, is also unsupported by the data or

---

  [6]  If the net rate of removal remains constant, but immigration removal authorities are successful in focusing removal resources on higher priorities for removal, there would be a net qualitative benefit from DACA or DAPA, even if there is not a net quantitative increase in removals.

519

reasonable inferences that can be drawn from them. This is because a necessary premise of that hypothesis is that DACA or DAPA had a meaningful effect on the incentive to emigrate. Dr. Eschbach has not demonstrated DACA and DAPA have a meaningful effect on incentives to emigrate, and as such, he cannot tie any hypothesized future "anchor" growth to DACA/DAPA.

### b. Dr. Eschbach's Conclusions Regarding the Effect of DACA/DAPA on Individuals who do Not Meet those Policy Guidelines Are Not Supported by the Data or His Analysis.

19. Dr. Eschbach hypothesizes that DACA and DAPA may incentivize unauthorized migrants who do not meet the policy guidelines to seek illegal entry to the United States (group "2") (See supra, ¶ 13), or to stay in the United States if they are already here (group "3") (See supra, ¶ 13). Dr. Eschbach does not purport to base this hypothesis on any data regarding DACA. (Eschbach Dec. at ¶ 26). Instead, he begins by looking at IRCA and attempting to extrapolate the consequences of DACA/DAPA based his analysis of IRCA. (Eschbach Dec. at ¶ 20) His conclusions are not supported by available data or reasonable inferences that can be drawn from that data.

20. IRCA was implemented in 1986. Dr. Eschbach asserts that IRCA was intended to "reduce the impacts of unauthorized migration . . . [through] adjustment in status of a substantial portion of the resident unauthorized populations . . . [combined

520

with] enhanced enforcement [which would] reduce fu-
ture growth of the population." Dr. Eschbach assets
that IRCA "failed to accomplish its goals" (Eschbach
Dec. at ¶ 12, with citation at FN 13), and further as-
serts that "[i]n the 25 years after IRCA was imple-
mented, there has not been a significant decrease in
the number of unauthorized immigrants entering the
United States. Instead, the unauthorized population
has surged to 11.7 million individuals since its imple-
mentation." (Eschbach Dec. at ¶¶ 21-22.)[7]

21. This conclusion does not support Dr. Esch-
bach's hypothesis that DACA and DAPA will have "the
expected effect of increasing subsequent growth of the
unauthorized population." (Eschbach Dec. at ¶ 28).

22. First it is based on a flawed premise: Dr.
Eschbach implies a relationship between IRCA and
the growth of unauthorized populations within the
United States by citing data reflecting growth in un-
authorized population in the United States between
1990 and 2010 (Eschbach Dec. at ¶ 22), but this does
not demonstrate a causal connection. (Eschbach Dec.
¶ 22.) In fact, Dr. Eschbach goes on to point to other
primary causes for that increase, noting that "[t]he
most important factors influencing" decisions to en-
gage in unauthorized migration to the United States
"are likely to be based on relative wages and job op-

---

[7] I take no position on the success or failure of IRCA vis-à-vis its
intended goals.

521

portunities in the United States and the country of origin. (Eschbach Dec. at ¶ 23, pg. 13.; ¶ 11, pg. 7.) Given the primacy Dr. Eschbach and his authorities assign to perceptions of employment opportunities and wages in the United States as incentivizing unauthorized migration, his hypothesized connection between IRCA and unauthorized migration is not supported by his own findings.

23. The mere fact of an increase in the flow of unauthorized migrants reflected in the 21 years of accumulated data between 1990 and 2010 supports no clear connection to the 1986 passage of IRCA. Further, Dr. Eschbach fails to consider other factors affecting the flow of unauthorized migrants to the United States.

24. Dr. Eschbach references trend data, including data reflecting increased apprehensions of unauthorized immigrants, "changes in the effectiveness of border enforcement," and other "confounding influences on trend data" (Eschbach Dec. at ¶ 24, pg. 13), but this discussion fails to shed any light on IRCA, subsequent growth of unauthorized migration, and how, if at all, they are connected.

25. In support of his hypothesis that DACA and DAPA will increase the growth of unauthorized immigrant populations among individuals who do not meet the guidelines under those policies, Dr. Eschbach theorizes a connection between the unaccompanied minors ("UAC") surge and DACA. He does this by juxtaposing the 2012 implementation of DACA with statistical

522

data regarding UAC border apprehensions before and
after the implementation of DACA, and which reflect
the UAC surge. (Eschbach Dec. at ¶¶ 25-26). Dr.
Eschbach's hypothesis is premised upon the assump-
tion that DACA created a "climate of expectations
. . . that status adjustments might be available to
resident unauthorized children" rather than on data or
reasonable inferences derived therefrom, and that
DAPA and DACA expansion will create a similar
misimpression.

26. Notably, after conceding an absence of peer-
reviewed studies supporting his hypothesis, Dr. Esch-
bach concedes that another statute, the Trafficking
Victims Protection Reauthorization Act of 2008 (not
DACA), was "the recent policy most directly related to
the differential treatment of the Central American
child population that has contributed the largest num-
bers to the recent increase in unauthorized migration
by children." (Eschbach Dec. at ¶ 26.) Neverthe-
less, Dr. Eschbach asserts a meaningful connection
between DACA and the UAC surge, and bases that
connection largely on a hypothesized misinformation
effect, i.e., that individuals may have sent their chil-
dren to the U.S. border based on the mistaken belief
that they meet the DACA guidelines. (Eschbach Dec.
at, 26 (" . . . contributed to a climate of expecta-
tion . . . ")). But Dr. Eschbach's analysis of the
extent of the hypothesized misinformation effect is
flawed. And moreover, any misinformation effect has
abated, as shown below, and there is no support for Dr.

523

Eschbach's inference that DAPA or DACA would have a similar impact in the future.

27. The reasonable inference to be drawn from available data is that DACA did not create a "discernabl[e] and significan[t]" incentive for "increased unauthorized migration." (Eschbach Dec. at ¶ 5). The initial increase in apprehensions of Central American children began before the DHS Secretary announced DACA on June 15, 2012 (approximately 9 months into Fiscal Year 2012). In particular, apprehensions of Central American[8] children had been fairly steady in Fiscal Years 2009-11; however, child[9] apprehensions increased 147 percent between Fiscal Years 2011 and 2012 (Exhibit 2, Chart 1). The increase in Central American child apprehensions during the first 9 months of Fiscal Year 2012 (October 1, 2011 to June 30, 2012) was 112 percent above comparable months during Fiscal Year 2011. This increase is *prior* to the date of the DACA announcement. These differences contravene a reasonable inference that DACA was the primary factor affecting migration decisions during the relevant time period. Finally, and as further described below, while a misinformation effect may have

---

[8] This reference is to citizens of El Salvador, Guatemala, and Honduras, who account for nearly all of the apprehensions from Central America.

[9] Here, children are defined as persons under 18 years old, including Unaccompanied Minors (UAC) and those entering with others.

524

briefly existed and, as a result, motivated some individuals to attempt illegal migration, or send their children to the U.S. border, based on a misunderstanding of the DACA policy (infra at ¶¶ 30, 31), available data suggest that the effect was temporary and will not be a permanent feature of DACA, or a predictable consequence of DAPA (infra at ¶¶ 30-31). There is no data supporting the conclusion that a misinformation effect had a significant effect on migration rates.

28. An increase in apprehension of adults at the border also preceded the implementation of the 2012 DACA policy. Mirroring the patterns for children, Central American adult apprehensions had been fairly steady in Fiscal Years 2009-11 and then increased by 103 percent between Fiscal Years 2011 and 2012 (Exhibit 2, Chart 1).

29. Historically, Mexicans have represented the largest single nationality among persons apprehended by the U.S. Border Patrol. Recent apprehension trends for Mexicans are strikingly different from trends for Central Americans, suggesting that factors other than DACA have had the most influence on recent migration decisions. Mexican adult apprehensions have decreased annually from 442,000 in 2009 to 206,000 in 2014 (Exhibit 2, Chart 4). Mexican child apprehensions have also declined. Apprehensions of Mexican children have decreased from 61,000 in 2009 to 24,000 in 2014 (Exhibit 2, Chart 4). Conversely, there has been continued growth in the number of

525

Central American children apprehended by the U.S.
Border Patrol following the DACA announcement in
June 2012, peaking in June 2014 (Exhibit 2, Table 1).
The increasing trend in apprehensions of Central
American adults, who clearly do not meet DACA
guidelines, has also continued through 2014.   The pro-
portion of children among all Central American ap-
prehensions, however, has increased from about 16
percent in Fiscal Years 2009-11, to 19 percent in 2012,
23 percent in 2013, and then to 38 percent in 2014.
The concomitant increase in adult and child apprehen-
sions before and after the DACA announcement sug-
gests that macro factors such as economic or safety
concerns were pushing Central Americans to migrate
in 2012 rather than the DACA policy.[10]

30.   If DACA had in fact created incentives among
potential migrants who are ineligible for that program,
child or otherwise, it is reasonable to conclude that
those incentives would be constant as between Mexi-

---

[10] For example, Central American children interviewed in U.S.
detention facilities in 2012 reported that "dramatic increases in vio-
lence and poverty in their home countries" were the main reasons
they migrated to the United States.   See "Forced From Home:
The Lost Boys and Girls of Central America," Women's Refugee
Commission, October 2012, Page 1.   A UNHCR report also found
that "forty-eight percent of the displaced children interviewed for
this study shared experiences of how they had been personally af-
fected by the augmented violence in the region by organized armed
criminal actors, including drug cartels and gangs or by State
actors."   See "Children on the Run," UNHCR, July 2014, page 6.

526

can migrants and Central American migrants, yet the data reflects significantly different migration patterns. Dr. Eschbach does not address this discrepancy, which significantly undercuts his primary hypothesis regarding DACA's effect on UAC migration.

31. Dr. Eschbach hypothesizes that DACA may have initially had a misinformation effect among individuals considering illegal migration to the United States, such that individuals who do not meet the DACA guidelines may have attempted unauthorized migration, or sent their children to the U.S. border, based upon a mistaken understanding of DACA. This hypothesis does not provide a reasonable basis for extrapolating to future effects of DACA and DAPA. Dr. Eschbach does not identify data from which it can be determined the extent, if any, that a false expectation of non-removal based on a misinterpretation of DACA, or a misunderstanding about eligibility for other immigration programs, or other factors affected the UAC surge, and to what extent it has affected migration patterns generally. Moreover, the available data reflect a decrease of UAC migration in the latter half of 2014, a trend which corresponds to the redoubled efforts of DHS to inform the parents of children who were considering sending their children to the U.S. border that those apprehended would be a priority for deportation and that their children were not

527

eligible for DACA.[11]   DHS also initiated a series of responses focused on stepped up deterrence, enhanced enforcement, stronger regional cooperation, and greater capacity of affected Federal agencies to ensure that the U.S. border remained secure.   The monthly number of apprehensions of Central Americans dropped from 38,790 in June 2014, to 23,170 in July, and leveled off at approximately 9,500 during the months of September to December 2014 (Exhibit 2, Table 1).   This rapid and significant decrease in apprehensions following the DHS's increased education efforts supports a reasonable inference that even assuming there was a misinformation-effect on migration related to DACA, any such effect was mitigated through the information campaign and stepped up enforcement.   In sum, available data indicate that any hypothesized misinformation effect was likely temporary and has abated, and it would not be reasonable to infer from these data that DACA or DAPA will cause a significant misinformation effect in the future.

32.  Dr. Eschbach's hypothesized connection between the UAC surge, or indeed any migration effect,

---

[11]  See "An Open Letter to the Parents of Children Crossing Our Southwest Border," June 23, 2014; http://www.dhs.gov/news/2014/ 06/23/open-letter-parents-children-crossing-our-southwest-border; "Statement by Secretary Johnson About the Situation Along the Southwest Border," September 8, 2014, http://www.dhs.gov/news/ 2014/09/08/statement-secretary-johnson-about-situation-along-southwest-border for a description responses taken to address the increase in South West border apprehensions.

528

and DACA and DAPA do not rest on peer reviewed analysis, or on a complete analysis of the empirical data.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of Jan., 2015

/s/   <u>MICHAEL HOEFER</u>
      Michael Hoefer

# DEF-INTERV.

# EX. 13



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

---

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
      DISTRICT DIRECTORS
      CHIEF PATROL AGENTS
      REGIONAL AND DISTRICT COUNSEL

FROM:    Doris Meissner
      Commissioner
      Immigration and Naturalization Service

SUBJECT:  <u>Exercising Prosecutorial Discretion</u>

   Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion. This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions. <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position. In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

   More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 120 of 473
Case 1:14-cv-00254 Document 123-10 Filed 12/15/17 Page 8 of 149 PageID #:
2198

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day. In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others: Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law. Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 121 of 473
Case 1:17-cv-04700-NGG Document 12-36 Filed 12/15/17 Page 3 of 121 PageID #:
2199

Memorandum for Regional Directors, et al.                                   Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings.  INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

conduct, or one that while legal in other contexts, is not within the authority of the agency or officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive any legal requirements that apply to the action itself.  For example, an enforcement decision to focus on certain types of immigration violators for arrest and removal does not mean that the INS may arrest any person without probable cause to do so for an offense within its jurisdiction. Service officers who are in doubt whether a particular action complies with applicable constitutional, statutory, or case law requirements should consult with their supervisor and obtain advice from the district or sector counsel or representative of the Office of General Counsel to the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.  The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals.  These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals.  The INS has used this principle in the design and execution of its border enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution if "*no substantial Federal interest would be served by prosecution*."  This principle provides a useful frame of reference for the INS, although applying it presents challenges that differ from those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal responsibility, the option of an adequate alternative remedy under state law is not available.  In an immigration case, the interest at stake will always be Federal.  Therefore, we must place particular emphasis on the element of substantiality.  <u>How important is the Federal interest in the case, as compared to other cases and priorities</u>?  That is the overriding question, and answering it requires examining a number of factors that may differ according to the stage of the case.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 123 of 473
Case 1:18-cv-00068 Document 225 Filed on 07/21/18 in TXSD Page 129 Page ID #:
2201

Memorandum for Regional Directors, et al.                                    Page 5
Subject:  Exercising Prosecutorial Discretion

     <u>As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.</u>[3]  Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4] The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

### *Investigations*

     Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

     Managers should plan and design operations to maximize the likelihood that serious offenders will be identified.  Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention.  Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.

[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.

[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 124 of 473
Case 1:14-cv-04590-RGG Document 125 Filed on 11/18/17 TXSD Page 1 of 149 PageID #:
2202

Memorandum for Regional Directors, et al.                                         Page 6
Subject:  Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial
discretion.  Managers should consider not simply whether a particular effort is legally
supportable, but whether it best advances the INS' goals, compared with other possible
uses of those resources.  As a general matter, investigations that are specifically focused to
identify aliens who represent a high priority for removal should be favored over investigations
which, by their nature, will identify a broader variety of removable aliens.  Even an operation
that is designed based on high-priority criteria, however, may still identify individual aliens who
warrant a favorable exercise of prosecutorial discretion.[6]

   *Initiating and Pursuing Proceedings*

        Aliens who are subject to removal may come to the Service's attention in a variety of
ways.  For example, some aliens are identified as a result of INS investigations, while others are
identified when they apply for immigration benefits or seek admission at a port-of-entry.  While
the context in which the INS encounters an alien may, as a practical matter, affect the Service's
options, it does not change the underlying principle that the INS has discretion and should
exercise that discretion appropriately given the circumstances of the case.

        Even when an immigration officer has reason to believe that an alien is removable and
that there is sufficient evidence to obtain a final order of removal, it may be appropriate to
decline to proceed with that case.  This is true even when an alien is removable based on his or
her criminal history and when the alien–if served with an NTA–would be subject to mandatory
detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the
INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the
immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to
detain (for those aliens not subject to mandatory detention), whether to offer an alternative to
removal such as voluntary departure or withdrawal of an application for admission, and whether
to stay an order of deportation.

        The decision to exercise any of these options or other alternatives in a particular case
requires an individualized determination, based on the facts and the law.  As a general matter, it
is better to exercise favorable discretion as early in the process as possible, once the relevant
facts have been determined, in order to conserve the Service's resources and in recognition of the
alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the
Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether
the exercise of prosecutorial discretion would be appropriate in individual cases.

Memorandum for Regional Directors, et al.                                    Page 7
Subject:  Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration. However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation. It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 126 of 473
Case 1:18-cv-00068 Document 1-25 Filed on 11/18/17 in TXSD Page 149 Page ID #:
2204

- <u>Likelihood of ultimately removing the alien</u>:  Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- <u>Likelihood of achieving enforcement goal by other means</u>:  In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- <u>Whether the alien is eligible or is likely to become eligible for other relief</u>:  Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States.  The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- <u>Effect of action on future admissibility</u>:  The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- <u>Current or past cooperation with law enforcement authorities</u>:  Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- <u>Honorable U.S. military service</u>:  Military service with an honorable discharge should be considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- <u>Community attention</u>:  Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS.  Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds.  Public and professional responsibility will sometimes require the choice of an unpopular course.
- <u>Resources available to the INS</u>:  As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative.  For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.  There may be other factors, not on the list above, that are appropriate to consider.  The decision should be based on the totality of the circumstances, not on any one factor considered in isolation.  General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case.  In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 127 of 473
Case 1:60-cv-30-WGG Document 123 Filed on 11/18/17 XSD Page 149 of Page ID #:
2205

Memorandum for Regional Directors, et al.                                                    Page 9
Subject:  Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may not be considered.  Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 128 of 473
Case 1:18-cv-00068 Document 112-5 Filed on 11/18/17 in TXSD Page 108 of 449 PageID #:
2206

Memorandum for Regional Directors, et al.                                                    Page 10
Subject:  Exercising Prosecutorial Discretion

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if
appropriate, would be more useful to the INS if done sooner rather than later.  It would be
improper for an officer to assume that someone else at some later time will always be able to
make a more informed decision, and therefore never to consider exercising discretion.

       Factors relevant to exercising prosecutorial discretion may come to the Service's
attention in various ways.  For example, aliens may make requests to the INS to exercise
prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be
cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as
cancellation of removal that may only be available in that forum).  In either case, the INS may
consider the request, but the fact that it is made should not determine the outcome, and the
prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly,
the fact that an alien has _not_ requested prosecutorial discretion should not influence the analysis
of the case.  Whether, and to what extent, any request should be considered is also a matter of
discretion.  Although INS officers should be open to new facts and arguments, attempts to
exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have
been thoroughly considered and decided, or for other improper tactical reasons should be
rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the
close of this memorandum) this memorandum creates no right or obligation enforceable at law
by any alien or any other party.

**Process for Decisions**

       _Identification of Suitable Cases_

       No single process of exercising discretion will fit the multiple contexts in which the need
to exercise discretion may arise.  Although this guidance is designed to promote consistency in
the application of the immigration laws, it is not intended to produce rigid uniformity among INS
officers in all areas of the country at the expense of the fair administration of the law.  Different
offices face different conditions and have different requirements.  Service managers and
supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop
mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to
exercise discretion as early in process as possible once the factual record has been identified.[8]  In
particular, in cases where it is clear that no statutory relief will be available at the immigration
hearing and where detention will be mandatory, it best conserves the Service's resources to make
a decision early.

       Enforcement and benefits personnel at all levels should understand that prosecutorial
discretion exists and that it is appropriate and expected that the INS will exercise this authority in
appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either
for or against the exercise of discretion) based upon further development of the facts.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 129 of 473
Case 4:16-cv-00790-G Document 125 Filed 11/18/17 Page 1 of 149 PageID #:
2207

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the
favorable exercise of discretion to their attention for appropriate resolution.  To assist in
exercising their authority, DDs and CPAs may wish to convene a group to provide advice on
difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their
personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial
discretion.  These cases should then be reviewed at a supervisory level where a decision can be
made as to whether to proceed in the ordinary course of business, to develop additional facts, or
to recommend a favorable exercise of discretion.  Such triggers could include the following facts
(whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly
both within and between INS offices, this list of possible trigger factors for supervisory review is
intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to
suggest that the presence or absence of "trigger" facts should itself determine whether
prosecutorial discretion should be exercised, as compared to review of all the relevant factors as
discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended
solely as a suggested means of facilitating identification of potential cases that may be suitable
for prosecutorial review as early as possible in the process.

*Documenting Decisions*

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision
should be clearly documented in the alien file, including the specific decision taken and its
factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of
facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial
discretion favorably, such as not placing him or her in removal proceedings or not pursuing a
case.  This normally should be done by letter to the alien and/or his or her attorney of record,
briefly stating the decision made and its consequences.  It is not necessary to recite the facts of
the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

Memorandum for Regional Directors, et al.                                            Page 12
Subject:  Exercising Prosecutorial Discretion

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed.  For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing.  This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

*Future Impact*

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion.  An alien may come to the attention of the INS in the future through seeking admission or in other ways.  An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances.  However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account.  In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

**Legal Liability and Enforceability**

The question of liability may arise in the implementation of this memorandum.  Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision.  We cannot promise INS officers that they will never be sued.  However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Training and Implementation**

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level.  This training will include discussion of accountability and periodic feedback on implementation issues.  In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated.  The regions will report to the Office of Field Operations when this training has been completed.

# DEF-INTERV.

# EX. 14

CO 241.11-P

TO     : Commissioner

DATE: **1 5 JUL 1976**

FROM  : Sam Bernsen
        General Counsel

SUBJECT: Legal Opinion Regarding Service Exercise of Prosecutorial Discretion

You have asked for my opinion regarding the authority of the Service to exercise prosecutorial discretion in administrative proceedings arising under the Immigration and Nationality Act. You have also asked for my opinion regarding the appropriate time and manner for the exercise of such discretion.

Prosecutorial discretion refers to the power of a law enforcement official to decide whether or not to commence or proceed with action against a possible law violator. See generally, K. Davis, Administrative Law Treatise, 1970 Supp., §4.08, at 188. This power is not restricted to those termed prosecutors, but is also exercised by others with law enforcement functions such as police and officials of various administrative agencies. 1/ The power extends to both civil and criminal cases. 38 Op. Att'y Gen. 98, 102 (1934)

The reasons for the exercise of prosecutorial discretion are both practical and humanitarian. There simply are not enough resources to enforce all of the rules and regulations presently on the books. As a practical matter, therefore, law enforcement officials have to make policy choices as to the most effective and desirable way in which to deploy their limited resources. Thus, for example, police and prosecutors may choose to concentrate on apprehension and prosecution of perpetrators of violent crimes, while choosing not to proceed against those committing so-called "victimless crimes," such as certain consensual sex acts and possession of small amounts of marihuana. In addition, there are times when defects in the quality, quantity, or method of gathering evidence will make it difficult to prove the matter before a court.

Aside from purely practical considerations, it is also obvious that in enacting a statute the legislature cannot possibly contemplate all of the possible circumstances in which the statute may be applied. In some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose. For instance, a prosecutor may well decide not to proceed against a terminally ill individual, even in the presence of overwhelming evidence of guilt.

---

1/  See e.g., Ivan v. Siben, 356 U.S. 171, 182 (1957) (General Counsel of NLRB has unreviewable discretion to refuse to institute unfair labor practice complaint).

*Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan*

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 134 of 473
Case 1:16-cv-04756-NSG-JO Document 123-10 Filed 12/15/17 Page 22 of 149 PageID #:
2212

-2-

## General Authority of Executive Branch

The ultimate source for the exercise of prosecutorial discretion in the Federal
Government is the power of the President. Under Article II, Section 1 of the
Constitution, the executive power is vested in the President. Article II, Sec-
tion 3, states that the President "shall take care that the laws be faithfully
executed."

Most discussions of the exercise of prosecutorial discretion on the federal
level center on the Attorney General, since he is the chief legal officer of
the Federal Government. Nevertheless, prosecutorial discretion is also
exercised by a wide variety of other government officials with law-enforcement
responsibilities. 2/

The Attorney General has the authority "to determine when the United States
shall sue, to decide for what it shall sue, and to be responsible that such
suits shall be brought in appropriate cases." U.S. v. San Jacinto Tin Co.,
125 U.S. 273, 279 (1888). The power of the Attorney General to exercise his
prosecutorial discretion does not end with the entry of judgment, but also
embraces execution of the judgment. U.S. v. Morris, 23 U.S. (10 Wheat.) 246
(1825); 38 Op. Att'y Gen. 98, 102 (1934).

In a 1934 opinion, Attorney General Cummings pointed to three sources for the
Attorney General's exercise of prosecutorial discretion: (1) inherent au-
thority, (2) court decisions, and (3) various statutory enactments. 38 Op.
Att'y Gen. 98 (1934). 3/

The inherent authority can be traced to the common law, where a prosecuting
attorney had authority to terminate a suit at any time. See Confiscation
Cases, 74 U.S. (7 Wall.) 454 (1868). As Attorney General Taney stated in 2
Op. Att'y Gen. 482, 486 (1831):

> An attorney conducting a suit for a party has, in the absence of
> that party, a right to discontinue it whenever, in his judgment,
> the interest of his client requires it to be done. If he abuses
> this power, he is liable to the client whom he injures.... An
> attorney of the United States, except in so far as his power may
> be restrained by particular acts of Congress, has the same au-
> thority and control over the suits which he is conducting.

---

2/ Id.

3/ See also 2 Op. Att'y Gen. 482, 486 (1831); 22 Op. Att'y Gen. 491, 494
(1899); 23 Op. Att'y Gen. 507, 508-09 (1901). See generally Schwartz,
Federal Criminal Jurisdiction and Prosecutors Discretion, 13 Law &
Contemp. Prob. 64 (1948).

-3-

Numerous Supreme Court decisions have confirmed the power of the Attorney General to exercise his discretion in the institution, control, and settlement of suits in behalf of the United States. See e.g., Confiscation Cases, supra; U.S. v. San Jacinto Tin Co., supra; U.S. v. Throckmorton, 98 U.S. 61, 70 (1878); In re Neagle, 135 U.S. 1, 67 (1890); New York v. New Jersey, 256 U.S. 296, 308 (1921); Kern River Co. v. U.S., 257 U.S. 147, 155 (1921); Ponzi v. Fessendon, 258 U.S. 254, 262 (1922); Petite v. U.S., 361 U.S. 529 (1960). 4/

There is also a long line of lower court cases recognizing this authority. See e.g., U.S. v. Alessio, 528 F.2d 1079 (9 Cir. 1976); U.S. v. Cowley, 481 F.2d 702 (5 Cir. 1973); Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 379 (2 Cir. 1973); U.S. v. Kysar, 459 F.2d 422, 424 (10 Cir. 1972); Spillman v. U.S., 413 F.2d 527, 530 (9 Cir. 1969); Newman v. U.S., 382 F.2d 479 (D.C. Cir. 1967); U.S. v. Cox, 342 F.2d 167 (5 Cir. 1965), cert. denied, Cox v. Hauberg, 381 U.S. 935 (1965); Goldberg v. Hoffman, 225 F.2d 463 (7 Cir. 1955); District of Columbia v. Buckley, 128 F.2d 17, 20–21 (D.C. Cir. 1942); Pugach v. Klein, 193 F. Supp. 630, 635 (S.D.N.Y. 1961); U.S. v. Woody, 2 F.2d 263 (D. Mont. 1924).

A final source for the Attorney General's authority to exercise prosecutorial discretion can be found in the various statutes creating his office and conferring upon him the power to supervise and conduct the litigation and other legal affairs of the United States. 28 U.S.C. §§515-519, 547; Judiciary Act of 1789, Ch. 20, §35, 1 Stat. 92; Act of June 22, 1870, Ch. 150, 16 Stat. 162.

Most of the aforementioned federal cases dealing with prosecutorial discretion state that the power of the executive authorities is plenary and may not be reviewed by the judiciary. Nevertheless, dicta in several court decisions has indicated that selective prosecution based upon certain suspect classifications may violate the Constitution. 5/ Courts have also indicated that they will not tolerate an arbitrary exercise of prosecutorial discretion by an ad-

4/ See also Oyler v. Boles, 368 U.S. 448 (1962) (selective prosecution by state authorities not a violation of constitutional rights where not based upon unjustifiable standard); Linda R.S. v. Richard D., 410 U.S. 614 (1973) (private party has no standing to compel prosecution by state authorities).

5/ Oyler v. Boles, supra at note 4 (selection not based on unjustifiable standard such as race, religion, or other arbitrary classification); Nader v. Saxhe, 497 F.2d 676, 679 n. 19 (D.C. Cir. 1974) (exercise of prosecutorial discretion, like any other exercise of executive discretion, subject to statutory and constitutional limits enforceable through judicial review); U.S. v. Sacco, 428 F.2d 264, 271 (9 Cir. 1970), cert. denied, 400 U.S. 903 (1970) (selective prosecution not a constitutional violation where no allegation that it was based on constitutionally suspect classification).

-4-

ministrative agency. 6/

## Prosecutorial Discretion in Immigration Cases

It has been pointed out that prosecutorial discretion may be exercised in administrative, as well as criminal contexts. 7/   One of the earliest manifestations of prosecutorial discretion in an immigration-related field is Department of Justice Circular Letter Number 107, dated September 20, 1909, dealing with the institution of proceedings to cancel naturalization. That letter states:

> In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.

This policy still governs denaturalization cases. See Interp. 340.1(f).

The Attorney General has exercised prosecutorial discretion in the immigration area in the cases of aliens deportable under 241(a)(4) of the Immigration and Nationality Act who are eligible to receive state court expungements at a future date.  In a letter to the Commissioner of Immigration, dated January 17, 1961, Attorney General Rogers stated that the Service should "withhold or terminate proceedings under section 241(a)(4) of the Immigration and Nationality Act in the cases of youthful offenders who are eligible for an honorable discharge from the control of the California Youth Authority."

---

6/ Moog Industries, Inc. v. F.T.C., 355 U.S. 411 (1958) and F.T.C. v. Universal Rundle Corp., 387 U.S. 244, 251 (1967) (FTC does not have unbridled power to institute proceedings that will arbitrarily destroy one of many law violators in an industry); Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975) (dictum) (courts will not condone selective prosecution based upon secret political grounds); Lennon v. United States, 387 F. Supp. 651, 564 (S.D.N.Y. 1975) (Government cannot institute deportation proceedings solely as penalty for exercise of constitutional rights).  See also U.S. v. Berrios, 501 F.2d 1207, 1209 (2 Cir. 1974).  See generally K. Davis, Administrative Law Treatise §28.16, at 982 (1958); Note, Reviewability of Prosecutorial Discretion: Failure to Prosecute, 75 Colum. L. Rev. 130 (1975).

7/ See e.g., Vaca v. Sipes, supra note 1.  See also Bachowski v. Brennan, 502 F.2d 79, 87 (3 Cir. 1974), reversed on other grounds, Dunlop v. Bachowski, 421 U.S. 560 (1975), where the court stated that prosecutorial discretion could be exercised in administrative contexts, "which, like criminal prosecutions, involve the vindication of societal or governmental interest, rather than the protection of individual rights."

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 137 of 473
Case 1:16-cv-04756-NSG-JO Document 123-10 Filed 12/15/17 Page 239 of 149 PageID #:
2215

-5-

Numerous administrative decisions have affirmed the power of Service officers to exercise prosecutorial discretion. For instance, in Matter of Vizcarra-Delgadillo, 13 I&N Dec. 51, 53 (BIA 1968), the Board of Immigration Appeals upheld the authority of the District Director to move that proceedings be terminated as improvidently begun. The Board commented on the nature of the District Director's authority:

> Those charged with responsibility for enforcing the criminal laws have prosecutive discretion in determining whether to initiate criminal prosecution in a given case. A similar discretion not to proceed in a given case must be accorded to those responsible for immigration law enforcement. And where, following the formal start of deportation proceedings, additional facts or policy considerations arise which lead those responsible to conclude that this is not the sort of case in which such proceedings should have been started in the first place, 8 CFR 242.7 wisely provides the mechanics for termination on the ground that the proceeding was "improvidently begun." (Footnotes omitted)

Another case, Matter of Andrade, I.D. 2276 (BIA 1964), dealt with a minor who had been convicted of a marihuana violation which was expunged under a state law comparable to the Federal Youth Corrections Act. An order of deportation was initially entered. Thereafter, however, in connection with a petition for certiorari filed in the United States Supreme Court, the Solicitor General urged the Service to reconsider its policy with respect to such expungements and to administratively set aside the order of deportation. In response to this suggestion, the Service moved for termination of the deportation proceedings. The Board granted the Service's motion stating that, "the Service's determination not to initiate or press deportation proceedings in a given case or class of cases is a matter of prosecutorial judgment which we do not review."

Many other administrative decisions recognize and affirm the Service's power to exercise prosecutorial discretion. See e.g., Matter of Geronimo, 13 I&N Dec. 680 (BIA 1971); Matter of Wong, 13 I&N Dec. 701 (BIA 1971); Matter of Gallares, I.D. 2177 (BIA 1972); Matter of Merced, I.D. 2273 (BIA 1974), aff'd per curiam Merced v. INS, 514 F.2d 1070 (5 Cir. 1975); Matter of Lennon, I.D. 2304 (BIA 1974), rev'd on other grounds, Lennon v. INS, 527 F.2d 187 (2 Cir. 1975). See also Matter of Anaya, I.D. 2243 (BIA 1973), aff'd per curiam, Anaya v. INS, 500 F.2d 574 (5 Cir. 1974); Matter of Felix, I.D. 2149 (BIA 1972). See also Roberts, The Exercise of Administrative Discretion Under the Immigration Laws, 13 San Diego L. Rev. 144, 149-52 (1975).

The Service's power to exercise prosecutorial discretion is inherent in the nature of its enforcement function and does not depend upon any specific provision of the Immigration and Nationality Act. The Service has nevertheless promulgated regulations and operations instructions dealing with the exercise of prosecutorial discretion.

-6-

8 CFR 242.7(a) sets forth the authority of the District Director to cancel or move for cancellation of deportation proceedings if "he is satisfied that the respondent is actually a national of the United States, or is not deportable under the immigration laws, or is deceased, or is not in the United States, or that the proceeding was improvidently begun." (underscoring supplied).

It is obvious that the "improvidently begun" ground is in addition to the "not deportable" ground and includes individuals who are deportable, but whose departure the Service, for policy or humanitarian reasons, does not choose to enforce. Operations Instruction 103.1(c)(1)(ii) lists various factors to be considered in determining whether to place an alien in the "deferred action" (formerly "nonpriority") category, meaning that deportation proceedings will not be instituted or continued against the alien. 8/

In addition to the discretion not to institute deportation proceedings, prosecutorial discretion may be exercised in connection with various other discretionary remedies, such as voluntary departure, 9/ and stays of deportation. 10/

Courts have acknowledged that a determination whether or not to enforce a deportable alien's departure in a particular case is normally within the sound discretion of the Service officer having responsibility over the case. See e.g., Balanos v. Kiley, 509 F.2d 1023 (2 Cir. 1975); Vassiliou v. INS, 461 F.2d 1193 (10 Cir. 1972); Spata v. INS, 442 F.2d 1013 (2 Cir. 1971), cert. denied, 404 U.S. 857 (1971); Armstrong v. INS, 445 F.2d 1395 (9 Cir. 1971); Bowes v. District Director, 443 F.2d 30 (9 Cir. 1971); Manantan v. INS, 425 F.2d 693 (7 Cir. 1970); Discaya v. INS, 339 F. Supp. 1034 (N.D. Ill. 1972). See also Pignatello v. Attorney General, 350 F.2d 719, 725 (2 Cir. 1965). However, in Lennon v. U.S., 387 F. Supp. 561 (S.D.N.Y. 1975), the court indicated that a claim of selective deportation presents a proper issue for judicial review, and in Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975), the court indicated in dictum that selective deportation based on political motives will not be tolerated. See also Lennon v. Richardson, 378 F. Supp. 39 (S.D.N.Y. 1974).

In Vergel v. INS, _____ F.2d _____, Civ. No. 75-1526 (8 Cir. June 2, 1976), the court sustained an order of deportation, but noted that there was a substantial

---

8/ See also Wildes, The Nonpriority Program of the Immigration and Naturalization Service - A Measure of the Attorney General's Concern for Aliens, (two parts) 53 Interpreter Releases 25, 33 (1976).

9/ 8 CFR 244.1, 244.2. See Matter of Anaya, I.D. 2243 (BIA 1973), aff'd per curiam, 500 F.2d 574 (5 Cir. 1974); Matter of Felix, I.D. 2149 (BIA 1972)

10/ 8 CFR 243.4.

-7-

basis for allowing the alien to remain in the United States in the "deferred action category" under O.I. 103.1(a)(1)(ii). The court stated that it would be "appropriate for the District Director to make further inquiry to that end," and stayed its mandate for 90 days in order to allow the District Director to consider the alien's claim.

In several other cases, courts have upheld deportation orders while suggesting that the Service might appropriately exercise prosecutorial discretion to stay execution of the orders. See e.g., U.S. v. McAlister, 395 F.2d 852 (3 Cir. 1968); 11/ Lieggi v. INS, Civ. No. 75-1393 (7 Cir. January 27, 1976), reversing 389 F. Supp. 12 (N.D. Ill. 1975); 12/ Dunn v. INS, Civ. No. 72-2186 (9 Cir. February 20, 1974), cert. denied 419 U.S. 919 (1974). 13/

## Proper Time for Exercise

Normally the appropriate time for the exercise of prosecutorial discretion is prior to the institution of proceedings. The primary reason for this is the humanitarian factor; it makes little sense to put an alien through the ordeal and expense of a deportation proceeding when his actual removal will not be sought.

In addition, there are practical considerations. Deportation proceedings tie up Government manpower and resources that could be used in performing other important functions. Given the present illegal alien problem such a use of scarce resources on aliens whom the Service does not ultimately intend to deport is indefensible. Moreover, once a final administrative order of deportation is issued, the Service cannot prevent the alien from seeking judicial review. When a case with extremely appealing factors goes to court, it may place the Service in an unfavorable light, both before the court and in the forum of public opinion.

There are some situations, however, where prosecutorial discretion is properly exercised after the institution or completion of deportation proceedings. The sympathetic or humanitarian factors may not arise or become apparent until after the case has been started. In other cases involving aliens who may have committed serious offenses but are allowed to remain on the representation that

---

11/ "Therefore, we think it would be appropriate for the Department to make further inquiry to the end that, if justified, appellant's deportation at least be stayed during his good behavior."

12/ "We agree...that this is a hardship case. Therefore the Government should afford petitioner any administrative remedy that may still be available...."

13/ "While this is a case in which the administrative discretion of the INS might have been exercised with greater compassion the scope of our review in this area is extremely narrow."

-8-

they are the sole support of United States citizen families, it may be desirable to have a final order of deportation outstanding for immediate execution in the event of any further misconduct.

<u>Conclusion</u>

The power of various officers of the Executive Branch to exercise prosecutorial discretion is inherent and does not depend on express statutory authorization. Officers of the Service have been recognized as possessing such power, and provision for its exercise has been made in both the regulations and the operations instructions.

Although there is authority for the plenary nature of prosecutorial discretion, the trend, especially in administrative contexts, is towards judicial review of prosecutorial discretion to ascertain that it is not being exercised in a way that would be constitutionally suspect or grossly unfair. Consequently, the Service's attempts to set forth some standards for the exercise of prosecutorial discretion are particularly appropriate.

Finally, prosecutorial discretion may be exercised before, during, or after the completion of deportation proceedings. Normally, however, such discretion is best exercised prior to the institution of proceedings.

CC: W/F - Opinions of the General Counsel, 1976

CC: CO 840-P

FWS:anb

# DEF-INTERV.

# EX. 15

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>          v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 17-cv-5228<br><br><br>**DECLARATION OF SHOBA SIVAPRASAD WADHIA** |

I, Shoba Sivaprasad Wadhia, declare as follows:

1.       I am presently the Samuel Weiss Faculty Scholar, Clinical Professor of Law and founding director of the Center for Immigrants' Rights Clinic at Penn State Law in University Park. I have been employed by the Pennsylvania State University ("University") since 2008. This declaration was prepared in my individual capacity and does not reflect the views of the University.

2.       In 1999, I received my Juris Doctorate degree from the Georgetown University Law Center. Since that time, I have worked in the immigration field for nearly 20 years in the following settings: private practice, non-profit organizations, and institutions of higher education.

3.       As a practitioner, I have practiced immigration law on behalf of individuals seeking a benefit before the immigration agency as well as those challenging removal or seeking relief from removal before an immigration judge or the appellate agency. In the non-profit sector, I have drafted, reviewed, and analyzed legislative proposals on immigration and convened or participated in meetings with government officials, organizational leaders, and the public on immigration topics.

4.       As an academic researcher, my work focuses on the role of prosecutorial discretion in immigration law and the intersections of race, national security and immigration. In the area of prosecutorial discretion in immigration law, my scholarship has served as a foundation for scholars, advocates, and government officials seeking to understand or design a strong prosecutorial discretion policy. My book, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases*, was published by New York University Press and is the first book on the topic.

2

5.     I have published more than 30 articles, book chapters, and essays on immigration law, including a number discussing the use of prosecutorial discretion in immigration cases. My work has been published in seventeen law journals, including but not limited to *Emory Law Journal*; *Texas Law Review*; *Columbia Journal of Race and Law*; *Notice & Comment, Yale Journal on Regulation*; *Harvard Latino Law Review*; *Connecticut Public Interest Law Journal*; *Georgetown Immigration Law Journal*; and *Howard Law Journal*. Some of my scholarly works have been cited by federal judges in their opinions and decisions.

6.     I have delivered several academic lectures and papers over the past 15 years on a variety of topics, including the history of prosecutorial discretion in immigration cases.

7.     As an educator, I teach law students in the doctrinal survey course in immigration law and a specialized course in asylum and refugee law. I also supervise students in an in-house law school clinic known as the Center for Immigrants' Rights, which I founded.

8.     Since the Fall 2008 semester, I have supervised more than 75 students on the following types of cases and projects: policy products on behalf of institutional clients, outreach and education with the community and local municipality, and legal support in individual cases.

9.     I currently sit on the Board of Trustees of the American Immigration Council and previously served as a Commissioner on the American Bar Association's Commission on Immigration.

10.    I have received multiple awards and honors, including: Pro Bono Attorney of the Year by the American-Arab Anti-Discrimination Committee in 2003, leadership awards by the Department of Homeland Security's Office of Civil Rights and Civil Liberties and Office of the Inspector General in 2008, recognition as the 2017 Honoree by the National Immigration Project

and the award for Excellence in Legal Advocacy by the American-Arab Anti-Discrimination Committee in 2017.

11. I spent nearly a decade researching the history of prosecutorial discretion in immigration cases, especially its historical use, legal foundation, and litigation challenging the use of such authority, before and while writing my book. The opinions expressed in this declaration are based largely on the research for my book as well as related articles which have been published in law journals.

12. More information about my experience and qualifications as an expert, a complete list of my publications, and other relevant information is contained in my *curriculum vitae*, which is attached as Exhibit A to this declaration.

## Summary of Expert Opinions

13. I have been asked for my expert opinion concerning the history and use of prosecutorial discretion, including specifically deferred action, by federal immigration authorities in the United States. I have also been asked for my expert opinion as to how the formation and termination of the Deferred Action for Childhood Arrivals (DACA) compares to prior uses of deferred action. A summary of my conclusions are as follows:

- Prosecutorial discretion is a tool that has been part of the immigration system for as long as the system has operated.

- Deferred action is one form of prosecutorial discretion in immigration law and enjoys a long history.

- The Department of Homeland Security ("DHS") and its predecessor, Immigration and Naturalization Services ("INS"), have applied deferred action and other forms of prosecutorial discretion to groups (while still

4

requiring a case-by-case determination of each individual) based on

factors that are largely consistent with the eligibility criteria utilized for

DACA.

- The method by which DACA has been terminated is inconsistent with
  how deferred action has been used and applied historically.

### Prosecutorial Discretion in Immigration Law

14.     Prosecutorial discretion refers to the choice by the DHS and its predecessor

agencies, including INS, of whether and how to enforce the full scope of immigration law

against a person or group persons if at all.

15.     When an individual enters the country without inspection, overstays a visa, or

engages in conduct that makes her removable, she is subject to removal by DHS. This requires

enforcement action (*i.e.*, prosecution) by DHS to effectuate.

16.     To illustrate, when DHS chooses not to file legally valid immigration charges

against a person who is present in the United States without authorization discretion is being

exercised favorably. In other words, the question of whether to use discretion is raised only

where there is legally sufficient basis to bring immigration enforcement actions in the first place.

17.     There are more than one dozen forms of prosecutorial discretion in federal

immigration law. These forms have been outlined in several guidance documents issued by DHS

and INS, including a memorandum published in 1976 by then-INS General Counsel Sam

Bernsen (the "Bernsen Memo"),[1] a 2000 memorandum published by then-INS Commissioner

---

[1] Memorandum from Sam Bernsen, General Counsel, Immigration and Naturalization Service, Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976), https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-exercise-pd.pdf.

Doris Meissner (the "Meissner Memo"),[2] a 2011 memorandum by then-Immigrations and Customs Enforcement ("ICE") Commissioner John Morton (the "Morton Memo"),[3] and more recently by then-DHS Secretary Jeh Johnson (the "Johnson Memo").[4]

18.     The memoranda list at least 15 types of prosecutorial discretion. The most commonly utilized forms are:

- Deciding whether to issue, serve, file, or cancel a Notice to Appear;

- Deciding whom to stop, question, and arrest;

- Deciding whom to detain or release;

- Deciding whether to settle, dismiss, appeal, or join in a motion on a case; and

- Deciding whether to grant deferred action, parole, or a stay of removal.

19.     Other forms of prosecutorial discretion include the use of "extended voluntary departure"[5] and "deferred enforcement departure."[6] Formerly called extended voluntary departure, deferred enforcement departure can be utilized by the President to temporarily safeguard classes of individuals from removal.[7]

---

[2] Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion, (Nov. 17, 2000), http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf.

[3] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

[4] Memorandum from Jeh Charles Johnson, Secretary of U.S. Department of Homeland Security, on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[5] Ira Kurzban, *Kurzban's Immigration Law Sourcebook* 493 (11th ed. 2009).

[6] Shoba S. Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Connecticut Pub. Int. L. J. 243, n.124 (2009), citing U.S. Citizenship and Immigration Services, Affirmative Asylum Procedures Manual 57 (Nov. 2007).

[7] U.S. Citizenship and Immigration Services, Adjudicator's Field Manual 38.2(a) (2007),

20.     Prosecutorial discretion may be exercised at any stage of the immigration enforcement process including right before an arrest, prior to the filing of charges, and even after a removal order has been entered. As ICE's Principal Legal Advisor, William J. Howard, explained in a 2005 memo, there is a "universe of opportunities" to exercise prosecutorial discretion in federal immigration enforcement.[8]

21.     While there are multiple forms of prosecutorial discretion and stages at which it may be enforced, the outcome in any case is the same: a temporary reprieve from removal proceedings and/or deportation.

22.     The concept behind prosecutorial discretion is entrenched in the prioritization of limited government resources and compassion for individuals without a lawful immigration status who present strong qualities or equities in their cases. When DHS makes the choice to not take enforcement actions against a mother caring for an ill child, for a student affected by a natural disaster back home, or for a Dreamer working and/or finishing school, prosecutorial discretion is being exercised favorably with respect to that individual.

**Legal Basis for Use of Prosecutorial Discretion**

23.     Prosecutorial discretion in immigration law has been recognized repeatedly by federal courts and former agency heads.[9] The basis for this discretion is inherent to agency enforcement action as well as statutory authority.

---

https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-16606/0-0-0-16764.html.

[8] Memorandum from William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion (Oct. 24, 2005), http://www.asistahelp.org/documents/resources/DHS_NTA_discretion_7076BC4F57842.pdf; *see also* Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 27 (2015).

[9] *See, e.g.*, Bernsen Memo, *supra* note 1, at 1-2.

24.     Discretion in agency action dates back to the New Deal, with the birth of the modern administrative state.

25.     The Bernsen Memo published in 1976 is one of the first legal opinions issued on the use of prosecutorial discretion in immigration. The Bernsen Memo traces prosecutorial discretion back to common law and cites to the 1868 Confiscation Cases to describe the general authority of the Executive Branch to terminate a case. This same memo cites to a 1934 memo by the Attorney General to highlight the various sources for prosecutorial discretion and its extension to both civil and criminal contexts.

26.     The Bernsen Memo also identifies the Take Care Clause, Article II, Section 3 to the U.S. Constitution, as a source of authority for prosecutorial discretion in immigration matters.

27.     The Meissner Memo builds upon the Bernsen Memo and provides a broad overview regarding the use of prosecutorial discretion, including connections to criminal law. Standards guiding prosecutorial discretion in the criminal context historically have informed the use of such discretion in immigration.

28.     A review of the immigration statute, the Immigration and Nationality Act, also makes clear that Congress authorizes DHS to utilize its discretion. Section 103 delegates the administration and enforcement of immigration law to DHS, 8 U.S.C. § 1103(a)(1), and section 242 prohibits judicial review of three specific acts of prosecutorial discretion (commencement of proceedings, adjudication of cases, and execution of removal orders), *id.* § 1252(g).

29.     The Homeland Security Act delegates the establishment of national immigration enforcement policies and priorities to the DHS Secretary. 6 U.S.C. § 202(5).

30.     The Supreme Court also explicitly recognized the use of discretion in immigration law. In *Arizona v. United States* 567 U.S. 387 (2012), the Court concluded that several anti-immigration provisions in an Arizona statute overreached into federal domain over immigration matters and explained that "a principal feature of the removal system is the broad discretion exercised by immigration officials" in relation to how "federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Id.* at 396.

### History of Use of Prosecutorial Discretion

31.     Formal uses of prosecutorial discretion immigration law can be traced back to as early as September 20, 1909. On that date, the Department of Justice issued a letter concerning the initiation of proceedings to cancel naturalization.[10]

32.     In individual matters, prosecutorial discretion is exercised routinely, including whether to arrest, interrogate, file charging documents, or appeal a case. It is exercised at every stage, including after an order of removal has been obtained. Over time, INS and, then, DHS have taken greater care to ensure more uniformity in how prosecutorial discretion is exercised.

33.     The Meissner Memo provides a broad overview regarding the use of prosecutorial discretion, including a list of 13 factors to consider when evaluating the "totality of the circumstances" of a particular case. These factors include, but are not limited to: (i) immigration status; (ii) length of residence in the United States, (iii) criminal history, (iv) humanitarian concerns, and (v) immigration history, (vi) likelihood of ultimately removing the alien, (vii) likelihood of achieving enforcement goal by other means, (viii) whether the alien is eligible or is

---

[10] Bernsen Memo, *supra* note 1, at 4 (quoting Department of Justice Circular Letter Number 107 (Sep. 20, 1909). ("In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.").

likely to become eligible for other relief, (ix) effect of action on future admissibility, (x) current or past cooperation with law enforcement authorities, (xi) honorable U.S. military service, (xii) community attention, and (xiii) resources available to the INS.

34.     In addition to these factors for consideration, the Meissner Memo calls for even-handed application of discretion: "Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process."

35.     The Meissner Memo has been repeatedly reaffirmed in subsequent years, through both a 2003 memo from INS Associate Commissioner Johnny N. Williams,[11] shortly after DHS was formed, a 2007 memo from ICE Assistant Secretary Julie Myers,[12] and the 2011 Morton Memo, which details at least 16 factors for consideration and listing particular care for veterans, minors, and elderly individuals, among others.[13]

36.     Beyond the application of prosecutorial discretion in individual cases, there are many examples of the use of prosecutorial discretion on behalf of groups of people.

37.     **1956 (Eisenhower):** Thousands of Hungarian "Freedom Fighters" were permitted to enter the United States by way of "parole." Faced with the inaction of Congress to solidify an immigration statute for refugees, the administration moved to exercise prosecutorial discretion to admit refugees from Hungary.[14]

---

[11] Memorandum from Johnny N. Williams, Executive Associate Commissioner of the Office of Field Operations, U.S. Immigration and Naturalization Service, on Family Unity Benefits and Unlawful Presence (Jan. 27, 2003).

[12] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, on Prosecutorial and Custody Discretion (Nov. 7, 2007), https://www.ice.gov/doclib/foia/prosecutorial-discretion/custody-pd.pdf.

[13] Morton Memo at 5, *supra* note 3.

[14] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 29-30, (2015). ("Similar parole programs were applied in subsequent administrations to protect classes of individuals."). Kate M. Manuel & Michael J. Garcia, *Executive Discretion as to Immigration: Legal*

38.  **1956 (Eisenhower):** An extended voluntary departure program was implemented for certain beneficiaries of an approved third-preference petition for skilled or other workers.[15]

39.  **1981 (Reagan):** Extended voluntary departure was issued to thousands of Polish nationals as refugees residing in the United States when Poland declared martial law.[16]

40.  **1987 (Reagan):** After Congress passed the Immigration Reform and Control Act of 1986 (IRCA), the "Family Fairness" executive action was announced to defer deportations for children of a parent eligible for permanent residency.[17]

41.  **1990 (George H.W. Bush):** The "Family Fairness" policy was expanded to defer deportations to spouses and children of immigrants who qualified for permanent residency under IRCA.[18]

---

*Overview*, U.S. Congressional Research Service (Nov. 10, 2014), https://fas.org/sgp/crs/homesec/R43782.pdf.

[15] Immigration and Naturalization Service, Operations Instructions, O.I. § 242.10(a)(6)(i) (1956).

[16] Stephen H. Legomsky & Cristina M. Rodriguez, *Immigration and Refugee Law and Policy* 1115-17 (5th ed. 2009); David Reimers, *Still the Golden Door: The Third World Comes to America* 202 (1986).

[17] 64 Interpreter Releases 1191 (Oct. 26, 1987); *see also* American Immigration Council, *Reagan-Bush Family Fairness: A Chronological History* 1-2, (Dec. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/reagan_bush_family_fairness_final_0.pdf.

[18] Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. Times (Mar. 5, 1990), http://www.nytimes.com/1990/03/05/nyregion/new-policy-aids-families-of-aliens.html; 67 Interpreter Releases 204 (Feb. 26, 1990); 67 Interpreter Releases 153 (Feb. 5, 1990). ("President Bush's policy followed a narrower 1987 executive order by President Reagan's immigration commissioner that applied only to children."). Immigration and Nationality Act of 1990, Pub. L. 101-649, Sec. 301, 104 Stat. 4978, http://www.justice.gov/eoir/IMMACT1990.pdf.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 153 of 473
Case 1:17-cv-09220-NGC-JO Document 91 Filed 11/21/18 in TXSD Page 15 of 163 PageID #:
3958

42.     **2007 (George W. Bush):** Deferred enforcement departure was announced for certain Liberians in light of armed conflict in in Liberia.[19] The policy has since been extended for 18 months at a time, most recently by President Obama in September 2016.[20]

43.     **2011 (Obama):** ICE Commissioner John Morton published several memoranda concerning prosecutorial discretion. One memo discussed the specific enforcement priorities of the federal government with regard to deportable immigrants with criminal records, noting that "particular care should be given when dealing with lawful permanent residents, juveniles, and the immediate family members of U.S. citizens."[21] Another guidance memorandum dealt with the use of prosecutorial discretion for plaintiffs, victims, and witnesses in order to "avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights."[22]

44.     Several administrations have used prosecutorial discretion as an instrument for protecting victims of crime, domestic abuse, and sexual assault.

## Deferred Action

45.     Deferred action is one of the most common forms of prosecutorial discretion in immigration law and enjoys a long history. It is one of the few forms of prosecutorial discretion

---

[19] Deferred Enforcement Departure- Liberia, U.S. Citizenship and Immigration Services, http://www.uscis.gov/humanitarian/temporaryprotected-status-deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia (last updated Sep. 28, 2016).

[20] Memorandum from Barack Obama, President of the United States of America, on Deferred Enforced Departure for Liberians (Sep. 28, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/09/28/presidential-memorandum-deferred-enforced-departure-liberians.

[21] Morton Memo, *supra* note 3, at 2.

[22] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 154 of 473
Case 1:11-cv-05229-NGG-JO Document 97 Filed 12/14/11 Page 14 of 164 PageID #:
3959

to provide with it work authorization, the others being parole[23] and orders of supervision.[24] Historically, decisions to grant deferred action have also rested on identifiable humanitarian factors for consideration.

46.    For many years, deferred action was in operation through case-by-case determinations but not publicly understood. Previously described as "nonpriority," it operated essentially in secret for much of the 20th Century.

47.    In the early 1970s, as part of his effort to support his clients John Lennon and Yoko Ono, attorney Leon Wildes pursued Freedom of Information Act (FOIA) litigation to obtain deferred action records from INS.

48.    Through these records, Wildes conducted groundbreaking research and revealed multiple facets of deferred action. Among these revelations was the fact that deferred action cases labeled as "tender age" involved individuals who were teenagers or young adults when INS granted deferred action.[25]

49.    Following Wildes' litigation on behalf of Lennon and Ono, INS issued guidance on deferred action through "Operations Instructions." These instructions contained factors for INS agents and officers to determine whether a case should be referred for deferred action. They included: (i) young or old age; (ii) years present in the United States; (iii) health condition

---

[23] 8 U.S.C. § 1182(d)(5)(A) (2013) ("The Attorney General may…in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission.…").

[24] Shoba S. Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. of Race and L. 1, 7-8 (2016). ("Unlike deferred action, which can be granted or processed at any stage of immigration enforcement, an order of supervision may be processed after the government orders removal."); 8 U.S.C. § 1231(a)(3) (2006).

[25] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 64, (2015).

requiring care in the United States; (iv) impact of removal on family in United States; and (v) criminal or other problematic conduct.[26]

50.     The Operations Instructions required consideration for deferred action "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category…."[27]

51.     Since that time, INS and DHS have repeatedly issued guidance over the course of several administrations on the use of deferred action for both individuals and groups.  In the last 15 years, DHS has granted deferred action in thousands of cases for largely humanitarian reasons.

52.     Deferred action can have a significant impact on the individual and his or her family, as individuals granted deferred action are able to apply for employment authorization upon the showing of "economic necessity."[28]

53.     The United States Citizenship and Immigration Services ("USCIS") Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices details that a request for deferred action can be formally filed by the individual, a legal representative, or USCIS officers.[29] A request must have at least four components: an explanation supporting the

---

[26] *Id.* at 197, n.8(ii), citing (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975).

[27] *Id.*

[28] 8 C.F.R. § 274.12(c)(14) (2008); Shoba S. Wadhia, *The Aftermath of United States v. Texas: Rediscovering Deferred Action*, Notice & Comment: A Blog from the Yale Journal on Regulation and the ABA Section of Administrative Law & Regulatory Practice (Aug. 10, 2016), http://yalejreg.com/nc/the-aftermath-of-united-states-v-texas-rediscovering-deferred-action-by-shoba-sivaprasad-wadhia/.

[29] Shoba S. Wadhia, Standard Operating Procedure for Deferred Action (non-DACA), (Mar. 7, 2012), (Obtained under the Freedom of Information Act from U.S. Citizenship and Immigration Services; received Aug. 2015), http://works.bepress.com/shoba_wadhia/36/.

request with supplemental documentation, proof of identity and nationality, any documents utilized to enter the U.S., and biographical information. My understanding is that this policy still guides USCIS treatment of deferred action requests outside DACA. In addition, ICE has the authority to grant deferred action to individuals.

## Legal Basis for Deferred Action

54.     The legal foundation for the use of deferred action is clear from opinions of federal courts, federal statutes, regulations, and memoranda published by DHS and INS.

55.     Agency regulations that have been in place for nearly 30 years explicitly identify "deferred action" as one basis for the provision of work authorization. 8 C.F.R. § 274a.12(c)(14).

56.     Federal immigration law provides that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]" 8 U.S.C. § 237(d)(2).

57.     Shortly after the Operations Instructions were published in 1975, several Courts of Appeals recognized the ability of INS to offer deferred action to individuals who were facing removal or who were removable.[30]

58.     The Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), specifically mentioned "deferred action" when analyzing 8 U.S.C. § 1252(g), which precludes judicial review over certain acts of prosecutorial discretion decisions.

---

[30] *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1211 (5th Cir. 1976); *Vergel v. INS*, 536 F.2d 755, 755 (8th Cir. 1976); *David v. INS*, 548 F.2d 219, 223 (8th Cir. 1977).

Case 1:17-cv-05228-NGG-JO Document 97 Filed 07/14/17 Page 17 of 163 PageID #: 3962

59. Memoranda published by DHS provide guidance on the use of prosecutorial discretion in immigration law and in doing so identify the grant of deferred action as one such use of discretion.[31]

## Historical Use of Deferred Action

60. Long before DACA, thousands of individuals have been processed for and granted work authorization pursuant to deferred action.[32]

61. Historically, many deferred action cases have been driven by factors that are relevant to the DACA population. Two factors in particular have long driven outcomes in deferred action cases: age and long term presence in the United States.

62. DHS and its predecessor agencies have often set criteria, similar to those put forth in DACA, for how deferred action should be applied to particular groups, while still requiring a case-by-case determination for each individual.

63. **2003 (George W. Bush):** INS Associate Director of Operations Williams Yates published memoranda directing officers to use prosecutorial discretion forms like deferred action to protect victims who were eligible for eligible for certain statutory protections such as a U visa.[33]

---

[31] Letter from 130+ Law Professors (Sep. 3, 2014), https://pennstatelaw.psu.edu/_file/Law-Professor-Letter.pdf.

[32] Wadhia, *supra* note 25, at 2.

[33] Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2003/ucntrl100803.pdf; Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Assessment of Deferred Action Requests for Interim Relief from U Nonimmigrant Status Aliens in Removal Proceedings (May 6, 2004), http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/uprcd050604.pdf; *see also* Wadhia, *supra* note 25, at 61.

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 158 of 473
Case 1:11-cv-09220-NRB-JCD Document 91 Filed 12/13/17 Page 18 of 100 PageID #:
3963

64. **2005 (George W. Bush):** The President announced a "deferred action" program for foreign academic students affected by Hurricane Katrina.[34]

65. **2009 (Obama):** USCIS announced deferred action for the widows of U.S. citizens. In announcing the decision, DHS Secretary Janet Napolitano said: "Granting deferred action to the widows and widowers of U.S. citizens who otherwise would have been denied the right to remain in the United States allows these individuals and their children an opportunity to stay in the country that has become their home while their legal status is resolved."[35]

66. Deferred action has been used to protect individuals applying for relief under the Violence Against Women Act (VAWA). VAWA was enacted by Congress in 1994 and twice amended to include statutory remedies for abused spouses, parents, and children; victims of crimes and domestic abuse; and victims of human trafficking.

67. One protection under VAWA allows abused spouses and children of U.S. citizens and green card holders (lawful permanent residents) or the abused parents of U.S. citizens to file petitions for themselves with USCIS.

68. The self-petition process is critical to victims of domestic violence and abuse because it allows them to achieve a positive immigration status without having to rely on their abuser. If the self-petition is ultimately approved, the petitioner may receive deferred action.[36]

---

[34] Shoba S. Wadhia, *Response, In Defense of DACA, Deferred Action, and the DREAM Act*, 91 Tex. L. Rev. 59, n. 46 (2013), citing Press Release, U.S. Citizenship and Immigration Services, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005), http://www.uscis.gov/files/pressrelese/F1Student_11_25_05_PR.pdf.

[35] DHS Establishes Interim Relief for Widows of U.S. Citizens, https://www.dhs.gov/news/2009/06/09/dhs-establishes-interim-relief-widows-us-citizens.

[36] William A. Kandel, *Immigration Provisions of the Violence Against Women Act (VAWA)*, U.S. Congressional Research Service (May 15, 2012), https://fas.org/sgp/crs/misc/R42477.pdf

Case 1:18-cv-00068 Document 224-2 9 Filed on 07/21/18 in TXSD Page 159 of 473
Case 1:17-cv-05228-NGG-JO Document 91 Filed 7/24/18 Page 15 of 1009 PageID #:
3964

69. Deferred action also has been used as a mechanism to keep immigrants who are the spouses, parents, and children of military members together.

70. The examples identified above are not exhaustive but demonstrate how DHS (and INS before it) has long used the instrument of deferred action and its authority under the INA to protect certain classes of people.[37]

## DACA

71. DACA falls in line with the long history described above. By its terms, DACA requires the individual to document entry into the United States before the age of sixteen and presence in the United States since June 15, 2007.[38] Long-term residence and tender age are two central facets of deferred action.

72. Beyond those characteristics, the totality of circumstances weighs in favor of DACA grantees receiving deferred action based on past guidance documents. Among other things, DACA grantees are either in school, have graduated from high school (or obtained an equivalent degree), or have served honorably in the military.

73. The idea of protecting those who came to the United States at a young age, residing in the United States for a long period of time, and with other equities from removal through deferred action longstanding and in fact customary.

74. The implementation of DACA, even on a wide scale, is entirely consistent with previous acts of prosecutorial discretion by Democratic and Republic administrations.

---

[37] Wadhia, *supra* note 25, at 68.

[38] Memorandum from Janet Napolitano, Secretary of Homeland Security, on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

Case 1:18-cv-00068   Document 224-2   Filed on 07/21/18 in TXSD   Page 160 of 473
Case 1:17-cv-05228-NGC-JO   Document 97   Filed 12/15/17   Page 20 of 100 PageID #:
3965

75.     The decision to and method by which DACA has been terminated raises serious
legal questions and is wholly inconsistent with how deferred action has been used and applied
historically.

76.     Previous decisions to end deferred action programs or to change course on broad
exercises of prosecutorial discretion have been triggered by new statutory protections through an
Act of Congress that rendered the exercise of further prosecutorial discretion unnecessary,
changes in country conditions, or other significant changes in circumstances. DACA's
termination does not meet any of these criteria.

77.     Despite the great success of the DACA program and the contributions of its
grantees to our schools, businesses, communities, and economy, this Administration has turned
DACA grantees into among the most vulnerable immigrants. This switch from protecting those
with the most compelling cases for deferred action to the most vulnerable for such a large group
of immigrants is remarkable and also destabilizes the structure of prosecutorial discretion in the
immigration system.

## Conclusion

78.      Deferred action is a long-recognized form of prosecutorial discretion in
immigration law and with a strong legal foundation. The operation of DACA is a lawful exercise
of prosecutorial discretion. Categorically revoking deferred action from hundreds of thousands of
beneficiaries without reason is not only unprecedented but is in tension with the history of both
INS and DHS.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

SHOBA SIVAPRASAD WADHIA

Dated this 15th day of December 2017.

# EXHIBIT A

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 163 of 473
Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/13/17 Page 25 of 103 PageID #: 3968

Wadhia Resume Page 1

# CURRICULUM VITAE
## Shoba Sivaprasad Wadhia
## Samuel Weiss Faculty Scholar
## Penn State Law-University Park
## Phone: 814-865-3823 | Email: ssw11@psu.edu

## <u>EMPLOYMENT</u>

**Pennsylvania State University School of Law, University Park, PA**
**Samuel Weiss Faculty Scholar, Clinical Professor of Law**
**Director/Founder, Center for Immigrants' Rights, June 2008-present**

Direct an immigration clinic whose mission is to advance immigrants' rights through legal excellence, advocacy, education, and collaboration with key stakeholders on immigration law and policy. Supervise law students representing clients on policy projects, community education and individual cases pertaining to U.S. immigration law and policy.

Publications by the Center

Press releases and stories about the Center's work

**Teaching at Penn State Law:**

Center for Immigrants' Rights Clinic (5 credits)

Advanced Immigration Clinic (2 credits)

Asylum and Refugee Law (3 credits)

Immigration Law (3 credits)

**Scholarship at Penn State Law (see publication list below)**

**Service at Penn State Law:**

**Post-Election:** Penn State Law's Center for Immigrants' Rights has been at the forefront of responding to immigration issues Post-Election at local and national levels. See: https://pennstatelaw.psu.edu/immigration-after-election for more details.

**Minority Mentor Program:** Helped to develop and institutionalize the law school's first minority mentor program, aimed at improving the climate of law school and academic performance. Received initial and renewal matching grant from Penn State's Equal Opportunity Commission.

**Interdisciplinary Roundtable on Immigration:** Co-founder/chair of Interdisciplinary Working Group on Immigration, whose objective is to build connections among research

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 164 of 473
Case 1:17-cv-03222-NGG-JO Document 97 Filed 12/15/17 Page 24 of 103 PageID #: 3969

Wadhia Resume Page 2

and service organizations who work with or conduct research about immigrants and immigration, and to raise awareness of resources available among the local community of scholars and service providers.

**Academic Symposia Featuring Nationally Renowned Scholars and Legal Experts:** Organized and moderated academic symposia annually from 2009-12 on national immigration topics, with featuring speakers from around the nation.

- Symposium: Immigration in a New Administration (2009)
- Symposium: Immigration Adjudications: Court Reform and Beyond (2010)
- Colloquium: 30th Anniversary of the Refugee Act (2010)
- Symposium: 10th Anniversary of 9/11 (2011)
- Symposium: Immigration Remedies for Victims of Domestic Abuse (2012)

**Faculty Committees:** Serve(d) on the following academic committees:

- Diversity Committee (Chair) (2013-present)
- Strategic Planning Committee (2013-14)
- Academic Rules Committee (2012-13)
- Curriculum Committee (2009-12)
- Clinics Committee (2008-9)

**National Immigration Forum, Washington DC**
**Deputy Director for Legal Affairs, January 2007- June 2008**
**Senior Policy Associate/Counsel, July 2002-December 31, 2006**

- Worked for national immigration advocacy organization on the multiple legislative efforts, including the creation of the Department of Homeland Security, comprehensive immigration reform, immigration enforcement, and post 9-11 proposals affecting immigrants
- Provided legal and policy expertise on immigration issues to government officials, interested advocates, and the public
- Played a leadership role in working groups engaged in strategy and policy development on immigration law and policy reform with government officials
- Analyzed, prepared and/or drafted legislative and regulatory proposals on immigration law and policy for government officials and interested advocates

**Maggio Kattar, P.C., Washington DC**
**Attorney, 2000-2002/Law Clerk, 1998-2000**

- Represented clients in deportation (removal) proceedings before the VA and MD immigration courts
- Represented clients before Immigration and Naturalization Service (now Department of Homeland Security) during interviews for immigration benefits
- Interviewed clients and witnesses; prepared affidavits, evidentiary materials and legal briefs; conducted related legal research

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 165 of 473
Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/15/17 Page 25 of 103 PageID #: 3970

Wadhia Resume Page 3

<u>**EDUCATION**</u>

**Georgetown University Law Center, Washington, DC, J.D., May 1999**

*Related Coursework/Activities*
Georgetown Immigration Law Journal- Senior Notes & Comments Editor
Immigration and Refugee Law
Advanced Seminar on Immigration Research

**Indiana University, A.B. with Honors, Political Science, May 1996**

<u>**PUBLICATIONS**</u>

**Books**

Beyond Deportation*: The Role of Prosecutorial Discretion in Immigration Cases* (New York University Press 2015), new on paperback May 1, 2017
- Website: www.beyonddeportation.com
- Reviews published by NYU Press: https://nyupress.org/books/9781479870059/
- Review in Oxford University's Border Criminologies, April 22, 2016.
- Review in International Migration Review, Fall 2016.
- Featured in Guernica Magazine, July 1, 2016
- Review in Harvard Law Review, Recent Publications, June 2016
- Review in The Federal Lawyer, October/November 2016
- Review by Reader's Favorite, Book Review, August 2016
- Review by International Migration Review, Book Review, Fall 2016

**Law Journals**

Emory Law Journal, Is Immigration Law National Security Law? 66 Emory Law Journal 669 (2017).

"Beyond Deportation: Understanding Immigration Prosecutorial Discretion and U.S. v. Texas," 36 IMMGR. & NAT'LITY L. REV. 94 (2015).

"Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases" Colum. J. Race & L. 1 (2016).

"The Aftermath of United States v. Texas: Rediscovering Deferred Action," Notice and Comment, Yale Journal on Regulation (2016).

The President and Deportation: DACA, DAPA, and the Sources and Limits of Executive Authority - Response to Hiroshi Motomura Washburn Law Journal (2016).

"Executive Action and Immigration" Case W. Res. Journal of International Law 48 (2016).

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 166 of 473
Case 1:17-cv-03226-NCG-OU Document 97 Filed 07/24/18 in Page 26 of 100 PageID #:
3971

Wadhia Resume Page 4

"The History of Prosecutorial Discretion in Immigration Law" American University Law Review Vol 64.5 (2015).

"The Rise of Speed Deportation and the Role of Discretion," Vol. 5 No. 1 Colum. J of Race & L. (2014).

"Immigration Remarks for the 10th Annual Wiley A. Branton Symposium," Vol. 57 No. 3 HOW. L.J. (2014).

"My Great FOIA Adventure and Discoveries of Deferred Action Cases at ICE," 27 Geo. Immig. L.J. (2013).

"In Defense of DACA, Deferred Action, and the DREAM Act," 91 Texas L. Rev. SEE ALSO 59 (2013).

"The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions," 16 Harv. Latino L. Rev. 39 (2013).

"Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law," 10 U. N. H. L. Rev. 1 (2012).

"Business As Usual: Immigration and the National Security Exception," 114 Penn State L. Rev. 1485 (2010).

"The Role of Prosecutorial Discretion in Immigration Law," 9 Connecticut Pub. Int. L. J. 243 (2010).

"Under Arrest: Immigrants' Rights and the Rule of Law," 38 U. Memphis L. Rev. 853 (2008).

"The Policy and Politics of Immigrant Rights," 16 Temple Pol. & Civil Rts. L. Rev. 387 (2007).

"Immigration: Mind Over Matter," 5 U. Md. L. J. on Race, Religion, Gender & Class 201 (2006).

**Book Chapters and Essays**

American Immigration Lawyers Association, *Prosecutorial Discretion, Practice Advisory* (w. A. Gallagher and A. Nunez) (2017)

Carolina Academic Press, Book Chapter, Dreams Deferred: Deferred Action, Prosecutorial Discretion, and the Vexing Case(s) of DREAM Act Students in Law Professor and Accidental Historian (2017)

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 167 of 473
Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/15/17 Page 2 of 1003 PageID #: 3972

Wadhia Resume Page 5

American Immigration Lawyers Association, *The Long and Winding Road of Prosecutorial Discretion, Practice Advisory* (w. L. Wildes and P. Taurel) (2015)

Who are the Players in Immigration Law? <u>in What Every Lawyer Should Know About Immigration Law</u> (American Bar Association 2014)

Reflections on Prosecutorial Discretion One Year After the Morton Memo, in *Emerging Issues Analysis* (LexisNexis, June 2012)

Prosecutorial Discretion in Immigration Agencies: A Year in Review, in *Emerging Issues Analysis* (LexisNexis, January 2012)

The Term Illegal Alien, *in Debates on U.S. Immigration*, (Sage Publications, 2012)

The Morton Memo and Prosecutorial Discretion: An Overview, American Immigration Council (July 2011)

Reading the Morton Memo: Federal Priorities and Prosecutorial Discretion, American Immigration Council (December 2010)

"Letter to Lahore," The Subcontinental Vol. 1, Issue 3 (with Sin Yen Ling), (2004)

Obama-Biden Presidential Transition Team, Immigration Policy: Transition Blueprint for the Obama Administration, 2008 (contributor)

Immigration Law Weekly, *Concerns With The DOJ's Proposed Rule To Implement The St. Cyr. Ruling* (w. Rob Randhava and Nancy Morawetz), September 13, 2003

Florida Bar Association, *21st Annual Immigration Law Update, Extreme Hardship For Waivers of Inadmissibility*, (w. Michael Maggio), 2000

## APPOINTMENTS/HONORS

American-Arab Anti-Discrimination Committee, Excellence in Legal Advocacy Award, September 2017

National Immigration Project of the National Lawyers Guild, 2017 Honoree, June 2017

Penn State Law, Faculty Diversity Award, February 2017

Global Connections, Spirit of Internationalization Award, March 15, 2016

Named Samuel Weiss Faculty Scholar at Penn State Law, July 2013

Appointed to American Bar Association Commission on Immigration: 2010-2014

Department of Homeland Security, Office of Inspector General, Leadership Plaque, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, award for leadership as co-chair of NGO working group, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, Leadership Plaque, April 2006

American-Arab Anti-Discrimination Committee, Pro Bono Attorney of the Year, June 2003

Indiana University, Political Science Department, William Jennings Bryan Prize, 1996

Indiana University, Honors Division: Summer Research Grant, 1996

American University, Washington Semester Program, Dean's Scholarship, 1994

Congressional Award: Silver, 1991; Bronze, 1989

State/National Forensics League: over 25 trophies in related competitions, 1990-1993

## BAR ADMISSIONS

State of Maryland

State of New Jersey

Court of Appeals for the Third Circuit

Supreme Court of the United States

## MEMBERSHIPS

American Bar Association (since 2008) (Commissioner, 2010-2014)

American Civil Liberties Union, Pennsylvania Chapter, Board Member (2010-2011)

American Constitution Society (since 2015)

American Immigration Council, Board of Trustees (since 2016)

American Immigration Lawyers Association (since 2001)

National Immigration Project, National Lawyers Guild (since 2000)

Pennsylvania Immigration Resource Center, Board Member (2008-2011)

**PRESENTATIONS (HIGHLIGHTS)**

**2017**

Lecturer (Invited), Arlin Adams Center for Law and Society at Susquehanna University, Immigration in a New Administration, Selinsgrove, Pennsylvania, October 10, 2017

2017-2018 Cannon Lecturer (Invited), Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases in the Wake of the Trump Administration, University of Toledo School of Law, Toledo, Ohio, September 11, 2017

Faculty Speaker, Student Orientation, Diversity and Inclusion in the Legal Profession, Penn State Law at University Park, August 15, 2017

Panelist, International Student Orientation, Understanding International Student Visas and the U.S. Travel Ban, Office of Global Programs, Pennsylvania State University, August 12, 2017

Panelist, National Council for State Legislatures (Invited), National Summit, Immigration in 2017, Boston, MA, August 6, 2017

Discussant, Southeastern Association of Law Schools (SEALS), Workshop on National Security, Discussion Group: Trump's Executive Actions on Immigration: Travel Ban, Extreme Vetting, Border Surveillance, and Mass Deportation**,** Boca Raton, FL, August 4, 2017

Moderator (Invited), Annual Conference, American Immigration Lawyers Association, Prosecutorial Discretion, New Orleans, LA, June 21, 2017

Guest Speaker (Invited), Interfaith Initiative Centre County, Immigration in a New Administration, June 11, 2017

Speaker (Invited), Annual Conference, Community Diversity Group Conference, Immigration, June 6, 2017

Panelist (Invited), Career Professionals Conference, Pennsylvania State University, Immigration in a New Administration, May 9, 2017

Keynote (Invited), Immigrant Justice Week Keynote Speaker, University of Wisconsin School of Law, Beyond Deportation: The Role of Prosecutorial Discretion in the Wake of Trump's Executive Orders, April 2017

Moderator, "All In at Penn State Law: Addressing Diversity and Implicit Bias in the Legal Academy, Penn State Law, March 16, 2017

Case 1:18-cv-00068   Document 224-2   Filed on 07/21/18 in TXSD   Page 170 of 473
Case 1:17-cv-03222-NGG-JO   Document 97   Filed 7/21/18   Page 36 of 1009 PageID #:
3975

Wadhia Resume Page 8

Keynote (Invited), Sprit of Internationalization Awards Ceremony, Hosted by Global Connections, March 16, 2017

Speaker (Invited), National Press Conference on Executive Order on Immigration, Hosted by Americas Voice, March 6, 2017

Speaker (Invited), National Community Call on Executive Order on Immigration (Muslim Ban 2.0), Hosted by Muslim Advocates, March 6, 2017

Organizer, Executive Orders on Immigration: Where Have We Been and What Lies Ahead? at Penn State Law, February 24, 2017

Guest Speaker on Immigration for International Ministries at Penn State University, February 24, 2017

Speaker (Invited), Post-Executive Order Briefing for Academics, American Immigration Council February 15, 2017

Speaker, Information Session on Executive Orders on Immigration for Postdoctoral students, staff and faculty at Penn State, February 10, 2017

Speaker, Information Session on Executive Orders on Immigration for Engineering faculty, staff and students at Penn State, February 7, 2017

Organizer, Information Session, President Trump's Executive Orders on Immigration, February 3, 2017

**2016**

Speaker (Invited), Post-Election Research Briefing for Academics, Muslim Registry, American Immigration Council, December 20, 2016

Facilitator, Community Dialogue on Diversity, Immigration and Race Post-Election, State College, PA, November 18, 2016

Panelist (Invited), Fall Conference, DC Chapter of the American Immigration Lawyers Association, Notices to Appear/Prosecutorial Discretion, November 16, 2016

Panelist (Invited), Equal Justice Leadership and Training Conference, United States v. Texas and Prosecutorial Discretion, Washington D.C., October 26, 2016

Keynote and Book Discussion (Invited), Spartan Scholars Awards Ceremony, Ocean Township High School, Ocean, NJ, October 24, 2016

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 171 of 473
Case 1:17-cv-05228-NGG-VCC Document 9 Filed 11/21/18 in Page 3 of 603 PageID #: 3976

Wadhia Resume Page 9

Lecture and Book Discussion (Invited), Washington University School of Law (sponsored by the Immigration Law Society and American Constitution Society), St. Louis, MO, October 14, 2016

Book Talk, University Women's Club (Invited), Book and Play Review Group, Schlow Centre Regional Library, State College, PA, September 26, 2016

Immigration Issues after U.S. v. Texas, Center for Immigrants' Rights Clinic, September 1, 2016

Immigration Issues after U.S. v. Texas, State College Municipal Building, A Panel Discussion, August 31, 2016

Book Talk and Discussion of DAPA/DACA Case at Supreme Court, State College Sunrise Rotary, State College, PA, August 17, 2016

Book Talk and Discussion of DAPA/DACA Case at the Supreme Court and Beyond; Brown University Bookstore, Providence, RI, August 4, 2016

Panelist (Invited), American Immigration Lawyers Association's Annual Conference, Humanitarian Remedies in Immigration Law, June 2016

Guest Lecturer (Invited) United Nations Association of Centre County, May 2016

Cornell University School of Law, invited to present my research and FOIA strategies to social scientists working on empirical research related to deferred action, April 2016

Cornell University School of Law, present remarks on Beyond Deportation at a school sponsored public forum, April 2016

Pennsylvania Bar Association, Law Form on Mass Incarceration, Pittsburgh, PA (representing Penn State Law), March 31, 2016

Emory University School of Law, Discussion of Beyond Deportation (w. C. Kuck, sponsored by Immigration Law Society), February 2016

Emory University School of Law, annual Thrower Symposium on National Security, Invited panelist on domestic terrorism, immigration and national security, February 2016
Washington College of Law at American University, spoke about Beyond Deportation and Texas case (w. A. Frost, B. Johnson, P. Spiro) February 2016

New York School of Law/City Bar Association of New York City/NYU Press: panel on Beyond Deportation and United States v. Texas (w. L. Benson, A. Kalhan, F. Anello), January 2016

American Association for Law Schools, Annual Conference, (Invited) "Is Immigration Law Administrative Law," January 2016

## 2015

University of Cincinnati School of Law, Invited Speaker from Immigration and Nationality Law Review, Spoke about Beyond Deportation and United States v. Texas, November 2015

Case Western Reserve University School of Law, annual symposium, Invited panelist on executive action and immigration, October 2015

Chicago Bar Foundation/Mayor Brown/National Immigrant Justice Center: Panel Discussion on Beyond Deportation and United States v. Texas (w. G. Hereen, T. Magner, C. Valenzuela), October 2015

American Civil Liberties Union, Washington D.C., Book Talk on Beyond Deportation, September 2015

Department of Justice Office of Immigration Litigation, Washington D.C., Invited talk on Beyond Deportation to DOJ attorneys, September 2015

Temple University, Beasley School of Law, Philadelphia, PA, Panel Discussion on Beyond Deportation (w. Jaya Ramji-Nogales, J. Family), September 2015

Drexel School of Law, Philadelphia, PA, Panel Discussion on Beyond Deportation (w. B. Stock and A. Kalhan), September 2015

National Press Club, Book Launch of Beyond Deportation (with S. Legomsky, F. Sharry and E. Quinn), June 2015

Panelist, American Constitution Society, Going it Alone? Presidential Power and the DAPA Debate, June 2015

Moderator, American Immigration Lawyers Association's Annual Conference, The Long and Winding Road of Prosecutorial Discretion, June 2015

Keynote Speaker, Pennsylvania Immigration Resource Center, Light of Liberty Awards, March 2015

Keynote Speaker, Conference on Race, Class, Gender and Ethnicity: University of North Carolina School of Law-Chapel Hill, February 2015

Presenter, CLE on Immigration and Executive Action, Centre County Bar Association, February 2015

Opening Remarks and Panelist, American University Law Review, Symposium on Prosecutorial Discretion, January 2015

Panelist, American Association for Law School's Academic Symposium on Congressional Dysfunction and Executive Lawmaking, January 2015

**2014**

Moderator, Penn State Law, Symposium "Shining the Light on Gender-Based Violence at Home and Abroad", October 2014

Facilitator, National Immigration Project, Continuing Legal Education Program on Challenges to Immigration Detention, September 2014

Panelist, American Bar Association, Homeland Security Institute August 2014

Presenter of and Commentator on Works-in-Progress, Immigration Law Professors Workshop, University of California Irvine- School of Law May 2014

Presenter of and Commentator on Works-in-Progress, The Association of American Law Schools Annual Conference on Clinical Legal Education, April 2014

**2013**

Panelist, Tenth Annual Wiley A. Branton / Howard Law Journal Symposium, Howard University School of Law, October 2013

Workshop and Presenter, Clinical Law Review Writers' Workshop 2013, New York University School of Law, September 2013

Panelist, National Immigration Project, CLE Program on "Developments in Immigration Law & Removal Defense" (May 2013)

**2012**

Moderator, American Bar Association Section on Administrative Law and Regulatory Practice, Fall Conference, Understanding Prosecutorial Discretion in Immigration Law, (October 2012)

Luncheon Speaker, Pennsylvania State University, Migration Studies Project, Immigration Law and the Administration's Deferred Action for Childhood Arrivals Program, (September 2012)

Organizer and Moderator, Penn State Law's Symposium on Immigration Remedies for Victims of Domestic Abuse, (September 2012) (w. Centre County Women Resource Center's Civil Legal Representation Project)

Panelist, Immigration Law Teachers Workshop, Plenary on Prosecutorial Discretion

(June 2, 2012)

Panelist, Press Conference, "The NSEERS Effect: A Decade of Racial Profiling, Fear, and Secrecy" (June 4, 2012)

Speaker, Press Conference: "Law Professors Alongside DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," (June 1, 2012), http://act.americasvoiceonline.org/page/-/americasvoice/audio/DREAM%20060112.mp3

Panelist, Foreign Policy Association, *Immigration Policy: What Is It and What Should It Be?* (May 24, 2012)

Panelist, American Immigration Lawyers Association, CLE Audio Seminar on Cancellation of Removal Relief (April 26, 2012)

**2011**

Panelist, American Immigration Lawyers Association, CLE Webinar on Deferred Action (October 25, 2011)

Penn State Law, Center for Immigrants' Rights, The 9/11 Effect and its Legacy on U.S. Immigration Laws, Organizer and Moderator (September 2011)

Panelist, 23nd Annual Minority Attorney Conference, Immigration Panel, Philadelphia, PA (March 17 & 18, 2011)

Panelist, Maggio + Kattar Community Forum on Prosecutorial Discretion and Private Bills, Washington D.C. (January 26, 2011)

**2010**

Penn State Law, Center for Immigrants' Rights, Fall Colloquium on the 30th Anniversary of the Refugee Act, Organizer and Moderator (November 2010)

Presenter, Penn State University, Research Unplugged, Presentation on "Immigration Rights and Wrongs" (October 2010)

Penn State Law, World on Trial, Jury Member and Foreperson (September 2010)

Robert C. Byrd Center for Legislative Studies, Tom E. Moses Memorial Lecture on the U.S. Constitution (September 2010)

Seton Hall Law School, National People of Color Legal Scholarship Conference, Moderator and Panelist (September 2010)

Panelist, Penn State University Dickinson School of Law, <u>Symposium on Iqbal v. Ashcroft</u> (2010)

M.C. and Moderator, Penn State University Dickinson School of Law, <u>Symposium on Immigration Adjudications and Court Reform</u> (2010)

**2009**

Lecturer, Penn State University, Presidential Leadership Academy, Immigration (2009)

Lecturer, Penn State University, School for International Affairs, Asylum Law (2009)

University of Illinois School of Law, Big 10 Aspiring Scholars Conference, Abstract Presentation (2009)

M.C. and Moderator, Penn State Dickinson School of Law, Symposium on Immigration Reform (2009)

Panelist, Georgetown University Law Center, Panel on Counterterrorism and Immigration (2009)

**2008**

Panelist, University of Connecticut School of Law, Symposium on Immigration (2008)

Panelist, University of Memphis School of Law, Symposium on Immigration Issues (2008)

**Older**

New England People of Color Conference, Moving Forward or Moving Backward? Criminal Justice and Immigration in the 21st Century, Commentator (2007)

Panelist, Stanford Law School, Symposium on Immigration Reform and Policy (2007)

Panelist, Temple University School of Law, Symposium on Immigration Reform (2006)

Panelist, University of Texas School of Law, Symposium on Immigration and Civil Rights (2006)

Panelist, University of Maryland School of Law, Symposium on Immigration Reform (2004)

Instructor, District of Columbia Bar: Continuing Legal Education Series, Removal and Deportation (2002-03)

Panelist, Columbia University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Catholic University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Georgetown University Law Center, Alumni Panel on Public Interest Law (2004)

Arab Community Center for Economic and Social Services, Panel on Immigration Policy (2004)

University of Michigan-Dearborn, Teach-In on Immigration Policy (2005)

Illinois Coalition for Immigrant and Refugee Rights, Policy Summit, Panel on Immigration Policy and Due Process (2004)

Speaker, New York University School of Law/Breakthrough: Forum on Immigration Policy (2004)

Panelist, Japanese American Citizens League/Office of Chinese Americans Annual Leadership Conference: Panel on Immigration Policy and Due Process (2003-2005)

National Lawyers Guild Annual Convention, Panels on Immigration Policy (2001-05)

Panelist, Ethiopian Community Development Council: Panel on Department of Homeland Security and its Impact on the Asylum and Refugee Community (2003)

## **MEDIA**

MSNBC The Last Word with Lawrence O'Donnell, November 20, 2014.

USA Today, What's Next for Trump's travel ban? June, 2017

New York Times Magazine, Is It Possible to Resist Deportation in Trump's America? May 2017

Wisconsin Public Radio, Travel Ban Litigation, July 2017

WPSU, Travel Ban Blocked, But Its Aftermath Reverberates At Penn State, May 2017

The Hill, Immigrant detention centers marred by 'needless deaths' amid poor care – report, May 2017

ABC23 News, Immigration Concerns, May 2017

WPSU, Featured Guest on Immigration Panel, Conversations Live, March 2017

WPSU, Featured Guest, Digging Deeper on Immigration (w. Pennsylvania State University President Eric Barron), March 2017 (aired April 2017)

Town & Gown, Lunch with Mimi, March 2017

ABC23 New, Immigration Concerns, March 2017

WJAC, Trump's executive order could be stopped before going into effect, March 2017

Bloomberg BNA, Are Immigrants Protected Under Obama No Longer Safe?, February 2017

Law360, 3 Key Takeaways From The 9th Circ.'s Travel Ban Ruling, February 2017

The Washington Post, Draft executive order would begin 'extreme vetting' of immigrants and visitors to the U.S., January 2017

The Atlantic, Two Cases Could Limit or Enhance Trump's Ability to Engage in Mass Deportations, January 2017

NBC News, Obama Leaves Behind a Mixed Legacy on Immigration, January 2017

Centre Daily Times (Front Page), Teach-In Offers Overview of Immigrants' Rights, January 2017

WTAJ-TV, Statewide 'teach-in' held on immigrants' rights, January 2017

WJAC-TV, Penn State Law hosts 'Teach-In' on immigrants' rights, January 2017

Centre Daily Times (Front Page), Borough Council Expresses Support for Immigrant Community, January 2017

WTAJ-TV, Resolution approved to help immigrants, January 2017

Statecollege.com, Borough Council Passes Immigration Enforcement Resolution, January 2017

The Guardian, Registry used to track Arabs and Muslims dismantled by Obama administration, December 2016

Long Island Press, Obama Administration Dismantles Framework of Muslim-Focused Registry, December 2016

Huffington Post, Obama Administration Makes Last-Minute Bid To Stall Trump's Ability To Create Muslim Registry, December 2016

The Atlantic, America Already Had a Muslim Registry, December 2016

The Guardian, Muslims to march on White House in bid to dismantle discriminatory registry, December 2016

PBS Newshour, Could President Trump really create a tracking system for U.S. Muslims? , December 2016

Politifact, In context: "Dreamers" and background checks, December 2016

VICE, This Small Town Is Helping Undocumented Immigrants, but Don't Call It a 'Sanctuary City', December 2016

Centre Daily Times (Front Page): Penn State supports DACA students, hopes to ease fears, December 2016

Philadelphia Inquirer, Ebola scare over, Liberian immigrants lose right to stay in U.S., November 2016

Long Island Press, Trump Team Considering Resurrecting Ineffective & Discredited Bush-Era Muslim Registry, November 2016

ATTN, Why Muslim Registries Haven't Worked in America, November 2016

Medium, Musings on Dreamers, Mass Deportations and a "Muslim Registry" November 2016

New York Times, Trump Camp's Talk of Registry and Japanese Internment Raises Muslims' Fears, November 2016

Vox, Donald Trump's proposed "Muslim registry," explained, November 2016

The Christian Science Monitor, Will Trump's plan to register Muslims make it to The White House? , November 2016

Penn State Research Magazine Profile on Clinic and Research, Spring 2016

Penn State Probing Questions Video Project, February 2016

National Public Radio, Take Note: Unauthorized Immigrants and the Use of Prosecutorial Discretion, September 18, 2015 (full length book interview)

Minnesota Public Radio, Untangling Obama's Immigration Policy, March 2, 2016

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 179 of 473
Case 1:17-cv-03226-NGC-JO Document 97-1 Filed 7/24/18 in Page 38 of 103 PageID #: 3984

Wadhia Resume Page 17

San Francisco Chronicle, Paris attacks stoke fears at home about Syrian refugees, November 17, 2015

CNN National, States cannot refuse refugees, but they can make it difficult, November 16, 2015

Wall Street Journal Appeals Court to Again Consider Obama Immigrant Deportation Policy July 9, 2015

Buzzfeed No Clear Indications About Ruling On Immigration Actions Case At Arguments, April 17, 2015

Vox.com The government can't enforce every law. Who gets to decide which ones it does?, March 31, 2015

C-SPAN coverage, Association for American Law Schools, Academic Symposium on Executive Action, Jan. 5, 2015.

Rachel Maddow Blog Judge takes aim at Obama's immigration policy, Dec. 17, 2014.

MSNBC Bush appointee rules Obama's immigration action unconstitutional, Dec. 16, 2014.

Roll Call Obama's Immigration Actions Test Presidential Power, November 20, 2014.

The Roanoke Times Goodlatte signs legal brief fighting Obama immigration action Dec. 17, 2014.

C-SPAN coverage, American Bar Association, Homeland Security Institute, August 2014.

The Economist Blog Mini-DREAM and the rule of law, June 18, 2012.

Dallas Morning News U.S. Immigration Enforcements 'Prosecutorial Discretion' History Dates to John Lennon, October 6, 2013.

The Epoch Times Immigration's Legal Labyrinth: The Agony of Discretion, November 16, 2014.

United We Dream, Speaker, Press Conference UWD & Legal Experts Define Success: Presidential Executive Action Must Be Broad, Bold and Inclusive, Oct. 29, 2014.

National Immigration Law Center, Invited Speaker, Press Conference Law and Precedent Allow Broad Presidential Action on Immigration, August 14, 2014.

America's Voice, Invited Speaker, Press Conference: "Law Professors Alongside

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 180 of 473
Case 1:17-cv-03226-NGG-JO Document 97 Filed 12/13/17 Page 40 of 109 PageID #:
3985

Wadhia Resume Page 18

DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," June 1, 2012.

**Original Op-Eds/Opinion Pieces**

American Constitution Society, Muslim Ban Litigation: An Unfinished Symphony, July 20, 2017

American Constitution Society, Reflections on Bona Fide Relationships, July 14, 2017

American Immigration Council, ImmigrationImpact, Ending Deportation Priorities Breaks Away from Decades of History and Sound Policy, July 10, 2017.

SCOTUS Blog, Immigration symposium: Delays, detentions and due process – Why Jennings matters, June 27, 2017.

American Constitution Society, Musings on Today's Travel Ban Decision by the Supreme Court, June 26, 2017.

Medium, The Birth and Death of Deferred Action (and what the Future Holds), June 16, 2017.

American Immigration Council, ImmigrationImpact, The Dire State of Immigration Detention in Georgia, June 6, 2017.

Yale Law Journal on Regulation, Notice and Comment, Prosecutorial Discretion at ICE: My Latest FOIA Adventure, May 26, 2017.

Yale Law Journal on Regulation, Notice and Comment, Donald Trump's Enforcement Plan and the Future of Discretion, April 25, 2017.

Medium, Immigration Law and Policy After the Executive Orders: Five Key Points, March 25, 2017.

American Constitution Society, Musings on Muslim Ban 2.0, March 13, 2017.

The Conversation, Trump's immigration executive orders: The demise of due process and discretion, March 6, 2017. (reprinted in Associated Press, Newsweek, Salon, Houston Chronicle, and additional outlets)

Medium, Leaked DHS Memo Implementing the Executive Order on Border Enforcement, February 18, 2017.

Medium, Leaked DHS Memo Implementing the Executive Order on Interior Enforcement (or Is Prosecutorial Discretion Dead?), February 18, 2017.

Medium, On This Day: The End of NSEERS, December 2016.

Notice & Comment, Yale Journal on Regulation; Medium, Understanding the Final Rule Ending NSEERS, December 2016.

Medium, Shutting Down Special Registration, December 2016.

Medium, NSEERS or "Muslim" Registration Was a Failed Post 9–11 Program and Must Come to an End, November 2016.

American Constitution Society, Medium, Musings on Dreamers, Mass Deportations and a "Muslim Registry", November 2016.

Medium, Immigration Law and Policy After the Election: Six Key Points, November 2016

Supreme Court of the United States Blog (SCOTUS Blog), Symposium: A meditation on history, law and loss, June 23, 2016.

American Constitution Society. Beyond Deportation: Prosecutorial Discretion Requests After U.S. v. Texas, June 28, 2016.

American Constitution Society. Reflections on Judge Hanen's Reprimand. May 23, 2016.

American Immigration Council, ImmigrationImpact. Understanding Justice Kennedy's Upside Down Argument, April 20, 2016.

ImmigrationProf Blog. U.S. v. Texas – TRUE OR FALSE?, April 19, 2016.

American Constitution Society. Notice and Comment Rulemaking in U.S. v. Texas, April 15, 2016.

Yale Law Journal on Regulation, Notice and Comment, Employment Authorization and Prosecutorial Discretion: The Case for Immigration Unexceptionalism, February 10, 2016.

The Patriot-News, Trump's Muslim ban reeks of failed post-9/11 anti-Muslim policies, December 10, 2015.

The Hill, 9-11 Flashback and Future Immigration Policy, December 9, 2015.

The Hill, On the Anniversary of Obama's Immigration Announcement, November 21, 2015.

Centre Daily Times, Syrian Refugees and Moral Courage, November 21, 2015.

The Hill, Immigration Argument at the Fifth Circuit, July 14, 2015.

Centre Daily Times, State College Raid: Reflections One Year Later, June 9, 2015.

American Constitution Society. A President's Constitutional and Faithful Execution of Immigration Law, January 19, 2016.

American Constitution Society. Book Talk. Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases, January 27, 2016.

From the Square. NYU Press Blog. The Refugee Dilemma and the Broader Immigration Debate, December 11, 2015.

American Constitution Society. Seeking to Understand the Fifth Circuit Ruling on Deferred Action, November 11, 2015.

Crimmigration. Beyond Deportation: The Relationship Between Immigration Prosecutorial Discretion and Criminal Activity, August 4, 2015.

From the Square. NYU Press Blog, Book Notes: Beyond Deportation, July 28, 2015.

ImmigrationProf Blog. Law Professor Blogs, Work authorization for dreamers, a week of wonders and woes, July 17, 2015.

ImmigrationProf Blog. Law Professor Blogs, Beyond Deportation, July 10, 2015.

Centre Daily Times Raids, rights and the rule of law, June 24, 2014.

The Hill Relics of 'deferred action', November 20, 2014.

The Hill- Op-Ed To file or not to file Vargas's Notice to Appear, July 17, 2014.

Centre Daily Times State College Raid: Reflections One Year Later, June 9, 2015.

ImmigrationProf Blog. Law Professor Blogs, *Immigration Prosecutorial Discretion and Deportation,* April 30, 2014.

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Ninth Circuit Upholds the Rule of Law and Limits Chevron Deference for Children who "Age-Out" During the Green Card Process*, October 2012.

ImmigrationProf Blog. Law Professor Blogs, *Deferred Action in Immigration Law: The Next Generation,* June 28, 2012.

AILA Leadership Blog. American Immigration Lawyers Association, *DHS Releases Long-Awaited Memo on Controversial 9/11 Program* (w. Denyse Sabagh), May 2012.

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Musings on the Visa Waiver Program, No-Right Waivers and the Age of Youth*, March 2012.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Board Offers New Standard for Administrative Closure, and Highlights the Importance of Decisional Independence, February 2012.

ImmigrationProf Blog. Law Professor Blogs, *Prosecutorial Discretion and Post 9-11*, December 2011.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Third Circuit Reflects on Unlawful Presence, Chevron, and the Importance of Prosecutorial Discretion, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *White House's Review of Removal Cases*, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *9/11 Registration and the Morton Memo*, July 2011.

ImmigrationProf Blog. Law Professor Blogs, (w. Leon Wildes) *Prosecutorial Discretion and the Legacy of John Lennon,* July 2011.

Co-founder and contributor to "Race Matters" blog: http://endnseers.blogspot.com/

**Advocacy - Law Professor Letters**

Co-author of letter to the White House supporting the legal authority of executive action in immigration law, signed by 136 law professors and featured in national press, Sept. 3, 2014
- Washington Post Lawyer's agree:  Obama has broad authority to act on deportations, Sept. 3, 2014

Co-author of letter supporting President Obama's deferred action programs announced signed by 135 law professors and featured in national press and at congressional hearings, Nov. 25, 2014:
- Associated Press Bigstory Legal Scholars: Obama's immigration actions lawful, Nov. 25, 2014

Co-author of letter to the White House defending the legality of extending deferred action to the parents of DACA (Deferred action for Childhood Arrivals) recipients, Nov. 3, 2014
- NBC News Law Profs: Legal To Include More Immigrant Parents In Exec Action, Dec. 3, 2014

Co-author of law professor letter challenging *Texas v. U.S.* (March 2015), signed by 104 immigration law scholars and featured in national press

Case 1:18-cv-00068 Document 224-2 Filed on 07/21/18 in TXSD Page 184 of 473
Case 1:17-cv-03228-NGG-JO Document 9 Filed 07/21/18 Page 4 of 109 PageID #: 3989

Wadhia Resume Page 22

- NBC News Legal Experts: Ruling Blocking Immigration Action 'Deeply Flawed', March 13, 2015
- Law 360: Law Profs. Call Executive Action Injunction 'Deeply Flawed', March 13, 2015

## OTHER EXPERIENCE

**Howard University School of Law, Washington DC**
*Adjunct Faculty, January 2008-May 2008*
Taught 3 unit course on immigration law and policy

**American University, Washington College of Law, Washington DC**
*Adjunct Faculty, Spring 2005-August 2008*
Taught 3 unit course on asylum and refugee law

**Indiana University, Bloomington, Indiana**
*Teaching Assistant, Fall 1995*
Taught undergraduate course on American Political Science

**Georgetown University Law Center, Washington DC**
*Research Assistant for T. Alexander Aleinikoff, 1997-1998*

**District of Columbia Superior Court, Washington DC**
*Legal Intern, Fall 1997*

**Advice Desk for Abused Women, Durban, South Africa**
*Legal Intern/Trainer, Summer 1997*
Monitored women's collectives in rural regions of Zululand; Lived in a shelter for and counseled abused women and children; Wrote legal analysis of the Advice Desk for Abused Women's activities

**Indian Social Institute, New Delhi, India**
*Legal Researcher, Summer 1996*
Published legal analysis of girl-child prostitution in India; Conducted field work in village and slum areas of Delhi; wrote white paper on human rights education methods for women

**Department of Justice, Civil Rights Division, Washington DC**
*Washington Semester Intern, Fall 1994*
Read and absorbed Title II of the American with Disabilities Act (ADA); Reviewed and assessed complaints falling under Title II of ADA

## VOLUNTEER WORK AND COMMUNITY SERVICE

- Georgetown University Law Center Mentor, Public Interest Law Scholars Program, 2006-2009
- National Lawyers Guild, Washington DC Chapter, Immigration Comm. Chair, 2001-2004
- Florida Immigrant Advocacy Center, Legal Volunteer, Spring 1996 (one week intensive)
- Council for Community Accessibility, Bloomington, IN, Volunteer, 1995
- Monmouth Medical Center, Long Branch, NJ, Hospital Volunteer, 1988-1993- 500+ hours

# DEF-INTERV.

# EX. 16

# Consideration of Deferred Action for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 01/31/2019



| | | Receipt | Action Block |
|---|---|---|---|
| **For USCIS Use Only** | A- _____ | | |
| | **Case ID:** | | |
| | ☐ Requestor interviewed on | | |

| | | | | Remarks |
|---|---|---|---|---|
| Returned: ___/___/___ | | Received: ___/___/___ | | |
| Resubmitted: ___/___/___ | Relocated | Sent: ___/___/___ | | |

| **To Be Completed by an Attorney or Accredited Representative, if any.** | ☐ Select this box if Form G-28 is attached to represent the requestor. | Attorney State Bar Number *(if any)* |
|---|---|---|

▶ **START HERE - Type or print in black ink. Read Form I-821D Instructions for information on how to complete this form.**

## Part 1. Information About You *(For Initial and Renewal Requests)*

I am not in immigration detention **and** I have included Form I-765, Application for Employment Authorization, and Form I-765WS, Form I-765 Worksheet; and

I am requesting:

**1.** ☐ **Initial Request** - Consideration of Deferred Action for Childhood Arrivals

*OR*

**2.** ☐ **Renewal Request** - Consideration of Deferred Action for Childhood Arrivals

*AND*

For this Renewal request, my most recent period of Deferred Action for Childhood Arrivals expires on

*(mm/dd/yyyy)* ▶ _____

### Full Legal Name

**3.a.** Family Name *(Last Name)* _____

**3.b.** Given Name *(First Name)* _____

**3.c.** Middle Name _____

### U.S. Mailing Address *(Enter the same address on Form I-765)*

**4.a.** In Care Of Name *(if applicable)* _____

**4.b.** Street Number and Name _____

**4.c.** Apt. ☐ Ste. ☐ Flr. ☐ _____

**4.d.** City or Town _____

**4.e.** State _____ **4.f.** ZIP Code _____

## Removal Proceedings Information

**5.** Are you **NOW** or have you **EVER** been in removal proceedings, or do you have a removal order issued in any other context *(for example, at the border or within the United States by an immigration agent)*?

☐ Yes ☐ No

**NOTE:** The term "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997; an Immigration and Nationality Act (INA) section 240 removal proceeding; expedited removal; reinstatement of a final order of exclusion, deportation, or removal; an INA section 217 removal after admission under the Visa Waiver Program; or removal as a criminal alien under INA section 238.

If you answered "Yes" to **Item Number 5.**, you must select a box indicating your current status or outcome of your removal proceedings.

Status or outcome:

**5.a.** ☐ Currently in Proceedings *(Active)*

**5.b.** ☐ Currently in Proceedings *(Administratively Closed)*

**5.c.** ☐ Terminated

**5.d.** ☐ Subject to a Final Order

**5.e.** ☐ Other. Explain in **Part 8. Additional Information.**

**5.f.** Most Recent Date of Proceedings

*(mm/dd/yyyy)* ▶ _____

**5.g.** Location of Proceedings

_____

## Part 1. Information About You *(For Initial and Renewal Requests) (continued)*

### Other Information

**6.** Alien Registration Number (A-Number) *(if any)*

▶ A-

**7.** U.S. Social Security Number *(if any)*

▶

**8.** Date of Birth *(mm/dd/yyyy)* ▶

**9.** Gender ☐ Male ☐ Female

**10.a.** City/Town/Village of Birth

**10.b.** Country of Birth

**11.** Current Country of Residence

**12.** Country of Citizenship or Nationality

**13.** Marital Status
☐ Married ☐ Widowed ☐ Single ☐ Divorced

### Other Names Used *(If Applicable)*

If you need additional space, use **Part 8. Additional Information.**

**14.a.** Family Name *(Last Name)*

**14.b.** Given Name *(First Name)*

**14.c.** Middle Name

### Processing Information

**15.** Ethnicity *(Select only one box)*
☐ Hispanic or Latino
☐ Not Hispanic or Latino

**16.** Race *(Select all applicable boxes)*
☐ White
☐ Asian
☐ Black or African American
☐ American Indian or Alaska Native
☐ Native Hawaiian or Other Pacific Islander

**17.** Height    Feet ☐    Inches ☐

**18.** Weight    Pounds ☐ ☐ ☐

**19.** Eye Color *(Select only one box)*
☐ Black ☐ Blue ☐ Brown
☐ Gray ☐ Green ☐ Hazel
☐ Maroon ☐ Pink ☐ Unknown/Other

**20.** Hair Color *(Select only one box)*
☐ Bald (No hair) ☐ Black ☐ Blond
☐ Brown ☐ Gray ☐ Red
☐ Sandy ☐ White ☐ Unknown/Other

## Part 2. Residence and Travel Information *(For Initial and Renewal Requests)*

**1.** I have been continuously residing in the U.S. since at least June 15, 2007, up to the present time. ☐ Yes ☐ No

**NOTE:** If you departed the United States for some period of time before your 16th birthday and returned to the United States on or after your 16th birthday to begin your current period of continuous residence, and if this is an initial request, submit evidence that you established residence in the United States prior to 16 years of age as set forth in the instructions to this form.

**For Initial Requests:** List your current address and, to the best of your knowledge, the addresses where you resided since the date of your initial entry into the United States to present.

**For Renewal Requests:** List only the addresses where you resided since you submitted your last Form I-821D that was approved.

If you require additional space, use **Part 8. Additional Information.**

## Part 2. Residence and Travel Information *(For Initial and Renewal Requests) (continued)*

**Present Address**

**2.a.** Dates at this residence *(mm/dd/yyyy)*
From ▶ [ ]  To ▶ **Present**

**2.b.** Street Number and Name [ ]

**2.c.** Apt. [ ] Ste. [ ] Flr. [ ] [ ]

**2.d.** City or Town [ ]

**2.e.** State [ ] **2.f.** ZIP Code [ ]

**Address 1**

**3.a.** Dates at this residence *(mm/dd/yyyy)*
From ▶ [ ]  To ▶ [ ]

**3.b.** Street Number and Name [ ]

**3.c.** Apt. [ ] Ste. [ ] Flr. [ ] [ ]

**3.d.** City or Town [ ]

**3.e.** State [ ] **3.f.** ZIP Code [ ]

**Address 2**

**4.a.** Dates at this residence *(mm/dd/yyyy)*
From ▶ [ ]  To ▶ [ ]

**4.b.** Street Number and Name [ ]

**4.c.** Apt. [ ] Ste. [ ] Flr. [ ] [ ]

**4.d.** City or Town [ ]

**4.e.** State [ ] **4.f.** ZIP Code [ ]

**Address 3**

**5.a.** Dates at this residence *(mm/dd/yyyy)*
From ▶ [ ]  To ▶ [ ]

**5.b.** Street Number and Name [ ]

**5.c.** Apt. [ ] Ste. [ ] Flr. [ ] [ ]

**5.d.** City or Town [ ]

**5.e.** State [ ] **5.f.** ZIP Code [ ]

## *Travel Information*

**For Initial Requests:** List all of your absences from the United States since June 15, 2007.

**For Renewal Requests:** List only your absences from the United States since you submitted your last Form I-821D that was approved.

If you require additional space, use **Part 8. Additional Information.**

**Departure 1**

**6.a.** Departure Date *(mm/dd/yyyy)* ▶ [ ]

**6.b.** Return Date *(mm/dd/yyyy)* ▶ [ ]

**6.c.** Reason for Departure [ ]

**Departure 2**

**7.a.** Departure Date *(mm/dd/yyyy)* ▶ [ ]

**7.b.** Return Date *(mm/dd/yyyy)* ▶ [ ]

**7.c.** Reason for Departure [ ]

**8.** Have you left the United States without advance parole on or after August 15, 2012? [ ] Yes [ ] No

**9.a.** What country issued your last passport? [ ]

**9.b.** Passport Number [ ]

**9.c.** Passport Expiration Date
*(mm/dd/yyyy)* ▶ [ ]

**10.** Border Crossing Card Number *(if any)* [ ]

## Part 3. For Initial Requests Only

**1.** I initially arrived and established residence in the U.S. prior to 16 years of age. [ ] Yes [ ] No

**2.** Date of *Initial* Entry into the United States *(on or about)*
*(mm/dd/yyyy)* ▶ [ ]

**3.** Place of *Initial* Entry into the United States [ ]

## Part 3. For Initial Requests Only *(continued)*

**4.** Immigration Status on June 15, 2012 *(e.g., No Lawful Status, Status Expired, Parole Expired)*

[blank field]

**5.a.** Were you **EVER** issued an Arrival-Departure Record (Form I-94, I-94W, or I-95)? ☐ Yes ☐ No

**5.b.** If you answered "Yes" to **Item Number 5.a.**, provide your Form I-94, I-94W, or I-95 number *(if available)*.

▶ [blank field]

**5.c.** If you answered "Yes" to **Item Number 5.a.**, provide the date your authorized stay expired, as shown on Form I-94, I-94W, or I-95 *(if available)*.

*(mm/dd/yyyy)* ▶ [blank field]

### Education Information

**6.** Indicate how you meet the education guideline *(e.g., Graduated from high school, Received a general educational development (GED) certificate or equivalent state-authorized exam, Currently in school)*

[blank field]

**7.** Name, City, and State of School Currently Attending or Where Education Received

[blank field]

**8.** Date of Graduation *(e.g., Receipt of a Certificate of Completion, GED certificate, other equivalent state-authorized exam)* or, if currently in school, date of last attendance. *(mm/dd/yyyy)* ▶ [blank field]

### Military Service Information

**9.** Were you a member of the U.S. Armed Forces or U.S. Coast Guard? ☐ Yes ☐ No

If you answered "Yes" to **Item Number 9.**, you must provide responses to **Item Numbers 9.a. - 9.d.**

**9.a.** Military Branch

[blank field]

**9.b.** Service Start Date *(mm/dd/yyyy)* ▶ [blank field]

**9.c.** Discharge Date *(mm/dd/yyyy)* ▶ [blank field]

**9.d.** Type of Discharge

[blank field]

## Part 4. Criminal, National Security, and Public Safety Information *(For Initial and Renewal Requests)*

If any of the following questions apply to you, use **Part 8. Additional Information** to describe the circumstances and include a full explanation.

**1.** Have you **EVER** been arrested for, charged with, or convicted of a felony or misdemeanor, *including incidents handled in juvenile court,* in the United States? *Do not include minor traffic violations unless they were alcohol- or drug-related.* ☐ Yes ☐ No

**If you answered "Yes," you must include a certified court disposition, arrest record, charging document, sentencing record, etc., for each arrest, unless disclosure is prohibited under state law.**

**2.** Have you **EVER** been arrested for, charged with, or convicted of a crime in any country other than the United States? ☐ Yes ☐ No

**If you answered "Yes," you must include a certified court disposition, arrest record, charging document, sentencing record, etc., for each arrest.**

**3.** Have you **EVER** engaged in, do you continue to engage in, or plan to engage in terrorist activities? ☐ Yes ☐ No

**4.** Are you **NOW** or have you **EVER** been a member of a gang? ☐ Yes ☐ No

**5.** Have you **EVER** engaged in, ordered, incited, assisted, or otherwise participated in any of the following:

**5.a.** Acts involving torture, genocide, or human trafficking? ☐ Yes ☐ No

**5.b.** Killing any person? ☐ Yes ☐ No

**5.c.** Severely injuring any person? ☐ Yes ☐ No

**5.d.** Any kind of sexual contact or relations with any person who was being forced or threatened? ☐ Yes ☐ No

**6.** Have you EVER recruited, enlisted, conscripted, or used any person to serve in or help an armed force or group while such person was under age 15? ☐ Yes ☐ No

**7.** Have you EVER used any person under age 15 to take part in hostilities, or to help or provide services to people in combat? ☐ Yes ☐ No

## Part 5. Statement, Certification, Signature, and Contact Information of the Requestor *(For Initial and Renewal Requests)*

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.**

**1.a.** ☐ I can read and understand English, and have read and understand each and every question and instruction on this form, as well as my answer to each question.

**1.b.** ☐ The interpreter named in **Part 6.** has read to me each and every question and instruction on this form, as well as my answer to each question, in

[                    ],

a language in which I am fluent. I understand each and every question and instruction on this form as translated to me by my interpreter, and have provided true and correct responses in the language indicated above.

### Requestor's Certification

I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and that copies of documents submitted are exact photocopies of unaltered original documents. I understand that I may be required to submit original documents to U.S. Citizenship and Immigration Services (USCIS) at a later date. I also understand that knowingly and willfully providing materially false information on this form is a federal felony punishable by a fine, imprisonment up to 5 years, or both, under 18 U.S.C. section 1001. Furthermore, I authorize the release of any information from my records that USCIS may need to reach a determination on my deferred action request.

**2.a.** Requestor's Signature

➡ [                    ]

**2.b.** Date of Signature *(mm/dd/yyyy)* ▶ [          ]

### Requestor's Contact Information

**3.** Requestor's Daytime Telephone Number

[                    ]

**4.** Requestor's Mobile Telephone Number

[                    ]

**5.** Requestor's Email Address

[                    ]

## Part 6. Contact Information, Certification, and Signature of the Interpreter *(For Initial and Renewal Requests)*

### Interpreter's Full Name

Provide the following information concerning the interpreter:

**1.a.** Interpreter's Family Name *(Last Name)*

[                    ]

**1.b.** Interpreter's Given Name *(First Name)*

[                    ]

**2.** Interpreter's Business or Organization Name *(if any)*

[                    ]

### Interpreter's Mailing Address

**3.a.** Street Number and Name [                    ]

**3.b.** Apt. ☐ Ste. ☐ Flr. ☐ [                ]

**3.c.** City or Town [                    ]

**3.d.** State [        ] **3.e.** ZIP Code [            ]

**3.f.** Province [                    ]

**3.g.** Postal Code [                    ]

**3.h.** Country [                    ]

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

[                    ]

**5.** Interpreter's Email Address

[                    ]

## Part 6. Contact Information, Certification, and Signature of the Interpreter *(For Initial and Renewal Requests) (continued)*

### Interpreter's Certification

**I certify that:**

I am fluent in English and _____ which is the same language provided in **Part 5., Item Number 1.b.**;

I have read to this requestor each and every question and instruction on this form, as well as the answer to each question, in the language provided in **Part 5., Item Number 1.b.**; and

The requestor has informed me that he or she understands each and every instruction and question on the form, as well as the answer to each question.

**6.a.** Interpreter's Signature

**6.b.** Date of Signature *(mm/dd/yyyy)* ▶

## Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor *(For Initial and Renewal Requests)*

### Preparer's Full Name

Provide the following information concerning the preparer:

**1.a.** Preparer's Family Name *(Last Name)*

**1.b.** Preparer's Given Name *(First Name)*

**2.** Preparer's Business or Organization Name

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** Apt. ☐ Ste. ☐ Flr. ☐

**3.c.** City or Town

**3.d.** State          **3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Fax Number

**6.** Preparer's Email Address

### Preparer's Declaration

I declare that I prepared this Form I-821D at the requestor's behest, and it is based on all the information of which I have knowledge.

**7.a.** Preparer's Signature

**7.b.** Date of Signature *(mm/dd/yyyy)* ▶

**NOTE:** If you need extra space to complete any item within this request, see the next page for **Part 8. Additional Information.**

## Part 8. Additional Information *(For Initial and Renewal Requests)*

If you need extra space to complete any item within this request, use the space below. You may also make copies of this page to complete and file with this request. Include your name and A-Number *(if any)* at the top of each sheet of paper; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

### *Full Legal Name*

**1.a.** Family Name *(Last Name)*

**1.b.** Given Name *(First Name)*

**1.c.** Middle Name

**2.** A-Number *(if any)*

▶ A-

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**



# Instructions for Consideration of Deferred Action
# for Childhood Arrivals

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 01/31/2019

---

## What is the Purpose of this Form?

An individual may file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to request that U.S. Citizenship and Immigration Services (USCIS) exercise prosecutorial discretion in his or her favor under the Deferred Action for Childhood Arrivals (DACA) process, including consideration for Renewal of deferred action. USCIS considers deferring action (including Renewal of deferred action) on a case-by-case basis, based on the guidelines in the **What is a Childhood Arrival for Purposes of This Form** section of these instructions. Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral. See the Secretary of Homeland Security's memorandum issued on June 15, 2012 (Secretary's memorandum), upon which the DACA process is based, at **www.uscis.gov/childhoodarrivals**.

## When Should I Use Form I-821D?

Use this form to request consideration of Initial DACA or Renewal of DACA. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. All individuals filing Form I-821D, whether for an Initial or a Renewal of deferred action, must also file Form I-765, Application for Employment Authorization, and Form I-765 Worksheet, Form I-765WS. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more information.

**CAUTION:** If you file this request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. **USCIS encourages renewal requestors to file as early in the 150-day period as possible - ideally, at least 120 days prior to the DACA expiration date.**

**NOTE:** If you have received DACA and you are filing within one year after your last period of deferred action expired, please follow the instructions provided below for renewal requestors.

**NOTE:** If U.S. Immigration and Customs Enforcement (ICE) initially deferred action in your case and you are seeking a Renewal, you must file Form I-821D and select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to ALL subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

If you are currently in immigration detention, you may not request consideration of DACA or Renewal of DACA from USCIS. If you think you meet the guidelines of this process, you should identify yourself to your deportation officer.

## What is a Childhood Arrival for Purposes of This Form?

An individual may be considered for Initial DACA if he or she:

1. Was under 31 years of age as of June 15, 2012;

2. Came to the United States before reaching his or her 16th birthday;

3. Has continuously resided in the United States since June 15, 2007, up to the present time;

---

4. Was present in the United States on June 15, 2012 and at the time of making his or her request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

   **NOTE:** No lawful status on June 15, 2012 means that:

   **A.** You never had a lawful immigration status on or before June 15, 2012; or

   **B.** Any lawful immigration status or parole that you obtained prior to June 15, 2012 had expired as of June 15, 2012.

6. Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general educational development (GED) certificate, or is an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard; and

7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

An individual may be considered for **Renewal** of DACA if he or she met the guidelines for consideration of Initial DACA (see above) AND he or she:

1. Did not depart the United States on or after August 15, 2012 without advance parole;

2. Has continuously resided in the United States since he or she submitted his or her most recent request for DACA that was approved up to the present time; and

3. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

---

| **Who May File Form I-821D?** |
| --- |

1. **Childhood Arrivals Who Have Never Been in Removal Proceedings.** If you have never been in removal proceedings, submit this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

2. **Childhood Arrivals Whose Removal Proceedings Were Terminated.** If you were in removal proceedings which have been terminated by the immigration judge prior to this request, you may use this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

3. **Childhood Arrivals In Removal Proceedings, With a Final Removal Order, or With Voluntary Departure.** If you are in removal proceedings, have a final order of removal, exclusion, or deportation issued in any other context, have a voluntary departure order, or if your proceedings have been administratively closed, you may use this form to request that USCIS consider deferring action in your case, even if you are under 15 years of age at the time of filing. For the purpose of this form, "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997, an Immigration and Nationality Act (INA) section 240 removal proceeding, expedited removal, reinstatement of a final order of exclusion, deportation, or removal, an INA section 217 removal after admission under the Visa Waiver Program, removal as a criminal alien under INA section 238, or any other kind of removal proceeding under U.S. immigration law in any other context (e.g., at the border or within the United States by an immigration agent).

4. **Childhood Arrivals Whose Case Was Deferred and Who Are Seeking Renewal of DACA.** If USCIS or ICE deferred action in your case under DACA, you may use this form to request consideration of Renewal of DACA from USCIS.

---

## General Instructions

USCIS provides forms free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at **http://get.adobe.com/reader/**.

Each request must be properly signed and accompanied by Form I-765 with fees and Form I-765WS. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment. A photocopy of a signed request or typewritten name in place of a signature is not acceptable. This request is not considered properly filed until accepted by USCIS.

**Evidence.** You must submit all required evidence and supporting documentation with your request at the time of filing. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more details.

You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

**Biometric Services Appointment.** Individuals requesting DACA must provide fingerprints, photographs, and signatures (biometrics). You may receive a notice scheduling you to appear at an Application Support Center (ASC) for biometrics collection. Failure to comply with the notice may result in the denial of your deferred action request. USCIS may, in its discretion, waive the collection of certain biometrics.

**Copies.** You may submit a legible photocopy of any document, unless you are specifically required to file an original document with this request. Original documents submitted when not required may remain a part of the record, and USCIS will not automatically return them to you.

**Translations.** Any document you submit to USCIS that contains a foreign language must have a full English translation. The translator must certify that the English translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.

An example of a certification would read, "I [typed name], certify that I am fluent (conversant) in the English and [insert other language] languages, and that the above/attached document is an accurate translation of the document attached entitled [name of document]." The certification should also include the date, the translator's signature and typed name, and the translator's address.

**Advance Parole.** If you wish to file a request for Advance Parole, please follow the instructions for filing Form I-131, Application for Travel Document. You can get the most current information on how to apply for advance parole by visiting the USCIS website at **www.uscis.gov/i-131** or calling the National Customer Service Line at **1-800-375-5283** or **1-800-767-1833** (TTY for the hearing impaired). Customer service officers are available Monday - Friday from 8 a.m. - 6 p.m. in each U.S. time zone.

**Travel Warning.** On or after August 15, 2012, if you travel outside of the United States before USCIS has determined whether to defer action in your case, you will not be considered for deferred action. Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless you have been issued an Advance Parole Document by USCIS. Deferred action will terminate automatically if you travel outside the United States without obtaining an Advance Parole Document from USCIS. In addition, leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

## How To Fill Out Form I-821D

1.  This form consists of eight parts. Requestors for Initial DACA and those requestors seeking Renewal of DACA should fill out most parts. However, only requestors for Initial DACA should complete **Part 3.** See below for greater detail.

    **Part 1. Information About You.** All requestors must complete this part.

    **Part 2. Residence and Travel Information.** All requestors must complete this part. Please be aware that Initial requestors must provide more extensive information than Renewal requestors.

    **Part 3. For Initial Requests Only.** Renewal requestors should skip this part.

    **Part 4. Criminal, National Security, and Public Safety Information.** All requestors must complete this part.

    **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** All requestors must complete this part.

    **Part 6. Contact Information, Certification, and Signature of the Interpreter.** Any requestor using an interpreter must complete this part.

    **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor.** If you had someone else prepare your request, he or she must complete this part.

    **Part 8. Additional Information.** Any requestor may complete this part if additional space is needed.

2.  Further Information on filling out Form I-821D:

    **A.** Type or print legibly in black ink.

    **B.** If you need extra space to complete any item within this request, use **Part 8. Additional Information** and make additional copies of this sheet as needed. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

    **C.** Answer all questions fully and accurately. If an item is not applicable or the answer is "none," type or print "N/ A," unless otherwise directed.

    **D.** All dates must be entered as mm/dd/yyyy. You may provide approximate dates if you do not know the exact date. Do not leave a date response blank.

    **E.** **Processing Information.** You must provide the biometrics information requested in **Part 1.**, **Item Numbers 15. - 20.** Providing this information as part of your request may reduce the time you spend at your USCIS ASC appointment.

    **F.** **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** Select the box that indicates whether someone interpreted this form for you. If applicable, the attorney, accredited representative, or other individual who helped prepare this form for you must complete **Part 7.** and sign and date the form. Every request must contain the requestor's original signature. A photocopy of a signed request or a typewritten name in place of a signature is **not** acceptable. Sign and date the form and provide your daytime telephone number, mobile telephone number, and email address. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment.

    **G.** **Part 6. Contact Information, Certification, and Signature of the Interpreter.** If you used an interpreter to read the instructions and complete the questions on this form, the interpreter must fill out **Part 6.** The interpreter must provide his or her full name, the name of his or her business or organization, an address, a daytime telephone number, and an email address. He or she must also sign and date the form.

**H. Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other Than the Requestor.** If the person who completed this request, is someone other than the person named in **Part 1.**, he or she must complete this section of the request, provide his or her name, the address of his or her business or organization (if any), and his or her contact information. If the person completing this request is an attorney or accredited representative, he or she must submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with this request. Further, the attorney or accredited representative, and anyone who assisted in preparing your request, must sign and date the request. This section of the request **MUST** contain the original signature of the attorney or accredited representative, and anyone who assisted in preparing your request. A typewritten name in place of a signature is not acceptable.

## Evidence for Initial Requests Only

**NOTE:** If you are submitting an **Initial Request** for consideration of DACA to USCIS, you will need to submit documents showing how you believe you have satisfied each DACA guideline.

1. What documents should you submit with your Form I-821D?

    **A.** You do not need to submit original documents unless USCIS requests them.

    **B.** Evidence and supporting documents that you file with your Form I-821D should show that you are at least 15 years of age at the time of filing, if required (see the **Who May File Form I-821D** section of these instructions for more information), and that you meet all of the following:

    **(1)** Were born after June 15, 1981 (i.e., You were not age 31 or older on June 15, 2012);

    **(2)** Arrived in the United States before 16 years of age;

    **(3)** Have continuously resided in the United States since June 15, 2007, up to the present time;

    **(4)** Were present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

    **(5)** Had no lawful status on June 15, 2012; and

    **(6)** Are currently in school, graduated or received a certificate of completion from high school, obtained a GED certificate or other equivalent state-authorized exam in the United States, or that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard.

2. What documents do you need to provide to prove identity?

    Submit copies of any of the following:

    **A.** Passport;

    **B.** Birth certificate accompanied by photo identification;

    **C.** Any national identity document from your country of origin bearing your photo and/or fingerprint;

    **D.** Any U.S. government immigration or other document bearing your name and photograph (e.g., EADs, visas, driver's licenses, non-driver cards);

    **E.** Any school-issued form of identification with photo;

    **F.** Military identification document with photo;

    **G.** State-issued photo ID showing date of birth; or

    **H.** Any other document with photo that you believe is relevant.

    **NOTE:** Expired documents are acceptable.

3. **What documents may show that you came to the United States before your 16th birthday?**

Submit copies of any of the following documents:

A. Passport with an admission stamp indicating when you entered the United States;

B. Form I-94, I-94W, or I-95 Arrival-Departure Record;

C. Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

D. Travel records, such as transportation tickets showing your dates of travel to the United States;

E. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

F. Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

G. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding); or

H. Any other document that you believe is relevant.

4. **If you left the United States for some period of time before your 16th birthday and returned on or after your 16th birthday to begin your current period of continuous residence, what documents may show that you established residence before your 16th birthday?**

Submit copies of any of the following documents:

A. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

B. Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

C. Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

D. Any other relevant document.

5. **What documents may show that you continuously resided in the United States since June 15, 2007, up to the present date?**

Submit copies of any relevant documents such as:

A. Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

B. Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

C. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**6.  Do brief departures interrupt continuous residence?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States for any period of time, your absence will be considered brief, casual, and innocent, if it was on or after June 15, 2007, and before August 15, 2012, and:

**A.** The absence was short and reasonably calculated to accomplish the purpose for the absence;

**B.** The absence was not because of an order of exclusion, deportation, or removal;

**C.** The absence was not because of an order of voluntary departure or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

**D.** The purpose of the absence and/or your actions while outside of the United States were not contrary to law.

**In Part 3. Arrival/Residence Information,** list all your absences from the United States since June 15, 2007. Include information about all your departure and return dates, and the reason for your departures. Documents you can submit that may show your absence was brief, casual, and innocent include, but are not limited to:

**A.** Plane or other transportation tickets or itinerary showing the travel dates;

**B.** Passport entries;

**C.** Hotel receipts showing the dates you were abroad;

**D.** Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);

**E.** Copy of Advance Parole Document issued by USCIS; and

**F.** Any other evidence that could support a brief, casual, and innocent absence.

**7.  What documents may demonstrate that you were present in the United States on June 15, 2012?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**8. What documents may show you had no lawful status on June 15, 2012?** (Submit documents if you were admitted or paroled, or otherwise obtained a lawful immigration status, on or before June 15, 2012, or you were or are in removal proceedings.)

Submit copies of any of the following documents:

**A.** Form I-94, I-94W, or I-95 Arrival/Departure Record showing the date your authorized stay expired;

**B.** If you have a final order of exclusion, deportation, or removal issued as of June 15, 2012, submit a copy of that order and related charging documents, if available;

**C.** An INS or DHS charging document placing you into removal proceedings, if available; or

**D.** Any other document that you believe is relevant to show that on June 15, 2012, you had no lawful status.

**9. What documents may demonstrate that you: a) are currently in school in the United States at the time of filing; b) have graduated or received a certificate of completion or a certificate of attendance from a U.S. high school, a U.S. public or private college or university, including community college; or c) have obtained a GED certificate or other equivalent state-authorized exam in the United States?** (If applicable)

USCIS recognizes that schools, educational programs, school districts, and state education agencies around the country issue educational records in a variety of formats. USCIS does not require educational records to be presented in any particular format.

**A.** To be considered "currently in school," you are to demonstrate that you are currently enrolled in one of the following:

**(1)** A U.S. public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home school program meeting state requirements;

**(2)** An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in post-secondary education, job training, or employment, and where you are working toward such placement, and that the program:

**(a)** Is administered by a non-profit entity; or

**(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

**(c)** Is of demonstrated effectiveness;

(3) An education program in the U.S. assisting students in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent state-authorized exam, and that the program:

    (a) Is administered by a non-profit entity; or

    (b) Is funded in whole or in part by Federal, state, local, or municipal funds; or

    (c) Is of demonstrated effectiveness;

(4) A U.S. public or private college or university including community college.

Evidence of enrollment may include, but is not limited to: school registration cards, acceptance or other letters demonstrating enrollment or attendance, current transcripts, report cards, progress reports, or other documents issued by a school district, state education agency, school, or program. These documents should show your name; the name of the school district, or state educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your current educational or grade level.

If you have been accepted for enrollment and your classes have not yet begun, you may submit an acceptance letter with evidence that you have registered for classes or any other relevant evidence showing you have committed to starting classes on a certain date, including, for example, a copy of your tuition bill, your class schedule, or your Individualized Educational Program.

If you are enrolled in an educational, literacy, or career training program (including vocational training or an ESL course), evidence that the program is funded in whole or in part by Federal, state, local, or municipal funds includes a letter or other documentation from an authorized representative of the program that includes information such as: your name and date of enrollment, the duration of the program and expected completion date, the program's source of public funding, and the program's authorized representative's contact information.

If you are enrolled in an education, literacy, or career training program that is not publicly funded, evidence that the program is of demonstrated effectiveness may include information from an authorized school representative relating to: the duration of the program's existence; the program's track record in placing students in employment, job training, or post-secondary education; receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or any other information indicating the program's overall quality.

**B.** Evidence to show that you meet the educational guideline because you have "graduated from school" or "obtained a GED certificate" or other equivalent state-authorized exam in the United States includes, but is not limited to:

(1) A high school diploma from a U.S. public or private high school or secondary school;

(2) A recognized equivalent of a U.S. high school diploma under state law, including a GED certificate or other equivalent state-authorized exam, a certificate of completion, or a certificate of attendance;

(3) A transcript that identifies the date of graduation or program completion;

(4) An enrollment history that shows the date of graduation or program completion;

(5) A degree from a public or private college or university or a community college; or

(6) An alternate award from a U.S. public or private high school or secondary school.

These documents should show your name; the name of the U.S. school district, educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your date of graduation or completion.

**10. What documents may demonstrate that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?** (If applicable)

Submit copies of the following documents:

**A.** Form DD-214, Certificate of Release or Discharge from Active Duty;

**B.** NGB Form 22, National Guard Report of Separation and Record of Service;

**C.** Military personnel records;

**D.** Military health records; or

**E.** Any other relevant document.

**11. What additional documents should you submit if you are currently or have been in removal proceedings?**

Submit a copy of the removal order, any document issued by the immigration judge, or the final decision of the Board of Immigration Appeals (BIA), if available. If you have not been in removal proceedings, this question does not apply to you.

**12. What evidence should I submit to demonstrate my criminal history?**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you. If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

**A.** If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable court order confirming that no charges were filed for each arrest. If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**B.** If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order). If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

**(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

**(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**NOTE: You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol - or drug-related.**

---

### Evidence for Renewal Requests Only

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

If you are seeking a **Renewal** of DACA, respond to all questions, except where the section or question indicates "For Initial Requests Only."

If you are currently in exclusion, deportation, or removal proceedings, see **Item Number 11.** (above) for additional guidance.

If you have any criminal history, see **Item Number 12.** (above) for additional guidance.

---

With your Renewal request, you only need to submit any new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS. If USCIS needs more documentation from you, USCIS will send a Request for Evidence to you explaining the needed information. However, you should submit new documents if any of the following situations apply to you:

1. You are currently in exclusion, deportation, or removal proceedings (please note, you do not need to submit these documents if your case was administratively closed); or

2. You have been charged with, or convicted of, a felony or misdemeanor (please note, you do not need to submit these documents if you already submitted them with a previous DACA request).

**NOTE:** You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

If ICE initially deferred action in your case and you are seeking a Renewal, you must select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to **ALL** subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol-or drug- related.

---

## Additional Information Relevant to ALL Requests for DACA

1. **What other factors will USCIS consider when making a determination on deferred action?**

   USCIS will also conduct a background check. USCIS may consider deferring action in your case even if you have been arrested or detained by any law enforcement officer and charges were filed, or if charges were filed against you without an arrest. USCIS will evaluate the totality of the circumstances in reaching a decision on deferred action.

   In accordance with the Secretary's memorandum, if USCIS determines that you have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or that you otherwise pose a threat to national security or public safety, USCIS is unlikely to defer action in your case. See the Frequently Asked Questions at **www.uscis.gov/childhoodarrivals**.

   Even if you satisfy the threshold criteria for consideration of DACA, USCIS may deny your request if it determines, in its unreviewable discretion, that an exercise of prosecutorial discretion is not warranted in your case.

2. **What else should you submit with Form I-821D?**

   USCIS will not consider deferring action in your case unless your Form I-821D is accompanied by Form I-765, with fees, and Form I-765WS. If you do not include Form I-765 with all applicable fees with your Form I-821D, your entire submission will be rejected.

   **Optional E-Notification of Request Acceptance.** You may submit Form G-1145, Notification of Application/ Petition Acceptance, an optional form, which will notify you electronically when USCIS accepts your request for DACA.

---

## What is the Filing Fee?

There is no filing fee for Form I-821D. However, you must submit both filing and biometric services fees with Form I-765. Read Form I-765 filing instructions for complete information at **www.uscis.gov/I-765**.

---

## Where to File?

Please see our USCIS website at **www.uscis.gov/I-821D** or call the USCIS National Customer Service Center at **1-800-375-5283** for the most current information about where to file this form. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Changes

You must inform USCIS if you change your address. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to USCIS Lockbox facilities because these facilities do not process change of address requests.

## Processing Information

**Initial Processing.** Once your request has been received by USCIS, USCIS will check the request for completeness. If you do not completely fill out the form, USCIS may deny or reject your request.

**Requests for More Information, Including Biometrics or Interview.** We may request more information or evidence, or we may request that you appear at a USCIS office for an interview. We may also request that you provide the originals of any copies you submit. We will return these originals when they are no longer needed.

If the same documents are required for both Form I-821D and Form I-765 that are filed together, the documents only have to be submitted once.

At the time of any interview or other appearance at a USCIS office, USCIS may require that you provide biometric information (e.g., photograph, fingerprints, signature) to verify your identity and update your background information.

**Decision.** USCIS will review your request to determine whether the exercise of prosecutorial discretion is appropriate in your case. Each case will be considered on an individual, case-by-case basis. Even if you satisfy the threshold criteria for consideration of DACA, USCIS may determine, in its unreviewable discretion, that deferred action is not warranted in your case. You will be notified of the decision in writing. There is no motion to reopen/reconsider the decision and there is no right to appeal.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information. If you do not have Internet access, you may order USCIS forms by calling our toll-free number at **1-800-870-3676**. You may also obtain forms and information by calling the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

As an alternative to waiting in line for assistance at your local USCIS office, you can now schedule an appointment through our Internet-based system, **InfoPass**. To access the system, visit our website at **infopass.uscis.gov**. Use the **InfoPass** appointment scheduler and follow the screen prompts to set up your appointment. **InfoPass** generates an electronic appointment notice that appears on the screen.

## Penalties

If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## USCIS Privacy Act Statement

**AUTHORITIES:** The information requested on this form, and the associated evidence, is collected under the Immigration and Nationality Act, section 101, et seq.

**PURPOSE:** The primary purpose for providing the requested information on this form is to determine if you should be considered for deferred action as a childhood arrival. The information you provide will be used in making a decision whether to defer removal action in your case as an exercise of prosecutorial discretion.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your request.

**ROUTINE USES:** The information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records which can be found at **www.dhs.gov/privacy**].

## Other Disclosure Information

Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (**www.uscis.gov/NTA**). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. **The above information sharing clause covers family members and guardians, in addition to the requestor.**

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 3 hours per response, including the time for reviewing instructions and completing and submitting the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave NW, Washington, DC 20529-2140; OMB No. 1615-0124. **Do not mail your completed Form I-821D to this address.**

| Reminder |
| --- |

### *For Initial and Renewal Request*

Did you submit Form I-765 along with the filing and biometric services fees ($495) required for the application or employment authorization, and did you also submit a completed Form I-765WS?

Did you answer every relevant **Item Number**?

Did you provide an original, handwritten signature and date your request?

Did you submit the necessary documents? For Initial requests, did you submit documents to meet each guideline? For Renewal requests, see the section titled Evidence for Renewal Requests Only.

If you were issued a final order of exclusion, deportation, or removal, did you include a copy of that final order (if available and if you had not already submitted it to USCIS)?

If your exclusion, deportation, or removal proceedings were terminated by an immigration judge, did you include a copy of the immigration judge's termination order (if available and if you had not already submitted it to USCIS)?

If you have ever been arrested for, charged with, or convicted of any felony or misdemeanor in the United States or any crime in any country other than the United States, did you submit an original, official, or court-certified document that shows your complete arrest record and final disposition for each incident (if available and if you had not already submitted it to USCIS)?

### *For Initial Requests Only*

Did you submit evidence to show that you came to the United States while under 16 years of age?

Did you submit evidence to prove your identity, date of initial entry, and continuous residence from June 15, 2007 (or earlier) up to the present time?

Did you submit evidence that you are currently in school, have a GED certificate, have graduated or received a certificate of completion from high school, or are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?

Did you provide evidence showing that you had no lawful status as of June 15, 2012?

# DEF-INTERV.

# EX. 17



**U.S. Citizenship and Immigration Services**

# DEFERRED ACTION FOR CHILDHOOD ARRIVALS (DACA) TOOLKIT:

## Resources for Community Partners

App. 1865



In addition to the resources in this toolkit, USCIS has created a power point presentation on DACA to be used in stakeholder outreach events. To request a copy of the presentation, please contact the USCIS Public Engagement Division at **Public.Engagement@ uscis.dhs.gov**.

# TABLE OF CONTENTS

**4**  Program Overview

**6**  DACA "How Do I" Guide

**9**  Initial vs Renewal DACA Tip Sheet

**10**  Frequently Asked Questions by Topic

  10  *What is DACA?*
  11  *DACA Process*
  14  *Background Checks*
  15  *After USCIS Makes a Decision*
  16  *Initial Requests for DACA*
  22  *Renewal of DACA*
  23  *Travel*
  25  *Criminal Convictions*
  27  *Miscellaneous*

**29**  DACA Process Infographic Flyer

**30**  Avoid Immigration Scams Flyer

**31**  List of Federal Government resources pertaining to DACA

App. 1867

# PROGRAM OVERVIEW

## Background

- USCIS began accepting requests under the Deferred Action for Childhood Arrivals (DACA) program on August 15, 2012. The DACA process was created by the Secretary of Homeland Security to offer relief from removal (in 2-year increments) for undocumented immigrants who came to the United States as children and who met several key criteria. DACA is an exercise of prosecutorial discretion and does not provide lawful status.

- The first USCIS-approved DACA grants were issued in September 2012. The initial 2-year duration will begin to expire for certain individuals in September 2014. Those individuals will be able to request consideration for renewal of DACA for a 2-year period.

- Some individuals were granted DACA by U.S. Immigration and Customs Enforcement (ICE) between June 15, 2012, and August 15, 2012. In February 2014, USCIS provided guidance to these individuals on the process they should follow to request DACA renewals.

- USCIS has updated Form I-821D [dated 6/4/14] to allow individuals to request a 2-year renewal of DACA. Previous versions of the form will not be accepted after June 5, 2014. There will be no grace period for individuals to submit a previous version of Form I-821D to request a renewal of their deferred action.

- Individuals who have not yet requested consideration for DACA must also use the new Form I-821D.

- In addition to the new Form I-821D, all individuals must also submit a Form I-795, Application for Employment Authorization (along with the accompanying fees for that form), and a Form I-765WS, Worksheet, when requesting either initial DACA or renewal of DACA.

- Individuals who allow their initial 2-year period of DACA to expire and do not seek renewal will no longer be considered to be lawfully present for inadmissibility purposes and will no longer be authorized to work legally in the United States. To ensure that their deferred action does not lapse, USCIS recommends that current DACA recipients submit Forms I-821D, I-765, and I-765 Worksheet approximately 120 days (4 months) before their 2-year period of deferred action expires. However, USCIS may reject DACA requests received earlier than 150 days (5 months) before an individual's 2-year period of deferred action expires.

- For more information on requesting DACA, please visit our Web site at **www.uscis.gov/ childhoodarrivals** or call our National Customer Service Center at (800) 375-5283.

## Renewal DACA Requests

- An individual may be considered for renewal of DACA if he or she met the guidelines for initial DACA and he or she:
  - Did not depart the United States on or after June 15, 2007, without advance parole;
  - Has continuously resided in the United States since he or she submitted his or her most recent DACA request that was approved up until the present time; and
  - Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

- Requests for renewal should be submitted to USCIS no less than 120 days, and no more than 150 days prior to the expiration of the current period of deferred action.

## Initial DACA Requests

- USCIS will also continue to accept initial requests for DACA. An individual may be considered for initial DACA if he or she:
  - Was under the age of 31 as of June 15, 2012;
  - Came to the United States before reaching his or her 16th birthday;
  - Has continuously resided in the United States since June 15, 2007, up to the present time;
  - Was physically present in the United States on June 15, 2012, and at the time of making his or her request for consideration of deferred action with USCIS;
  - Had no lawful status on June 15, 2012.

  **NOTE:**

    No lawful status on June 15, 2012, means that:

    - ◆ You never had a lawful immigration status on or before June 15, 2012; or
    - ◆ Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.

  - Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a General Education Development (GED) certificate, or is an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and
  - Has not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and does not otherwise pose a threat to national security or public safety;

- Individuals who were younger than 15 when DACA was first announced and are not in removal proceedings or have a final order may request DACA from USCIS any time after they have reached their 15th birthday. Individuals who are in removal proceedings or who have a final order may request DACA from USCIS even if they are younger than 15 at the time of filing.

## Consideration of DACA

- USCIS has updated Form I-821D [dated 6/4/14] to allow individuals to request renewal of DACA for an additional 2-year period. Previous versions of the form will not be accepted after June 5, 2014.

- There will be no grace period for individuals to submit a previous version of Form I-821D to request a renewal of their deferred action.

- There is no fee for Form I-821D. The fee for Form I-765 and the required biometrics is $465.

## Avoiding Immigration Scams

- Please be aware of immigration scams. Unauthorized practitioners of immigration law may try to take advantage of individuals by charging them money to obtain or submit forms related to DACA or communicate with USCIS on their behalf. Visit **www.uscis.gov/avoidscams** or **www.uscis.gov/eviteestafas** for tips on how to find authorized legal assistance and how to recognize and avoid immigration services scams.

- Protect yourself from immigration scams. Official U.S. Government Web sites should be your main source of information on DACA and immigration services. Go to **www.uscis.gov** to learn more.

- If you need legal immigration advice, be sure to use an authorized professional. This means an attorney in good standing or a Board of Immigration Appeals (BIA) accredited representative. Check the BIA Web site for a list of attorneys who provide immigration services for low to no cost and for a list of disciplined attorneys. You can also check the American Bar Association or your State bar association for legal services in your State.

- If you are a victim of an immigration scam, report it to the Federal Trade Commission at **www.ftc.gov/complaint** or **www.ftc.gov/queja** or by calling (877) FTC-HELP ((877) 372-4357).

App. 1869



# General information — F5

## How do I request consideration of deferred action for childhood arrivals (DACA)?



**U.S. Citizenship and Immigration Services**

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of 2 years, subject to renewal. Those granted deferred action are also eligible for work authorization.

Only individuals who can prove through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the guidelines in the Secretary's memorandum.

### How do I know if I may request consideration of deferred action for childhood arrivals?

You may request consideration if you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request with USCIS;

5. Had no lawful status on June 15, 2012, which means that:
   - You never had a lawful immigration status on or before June 15, 2012; or
   - Any lawful status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Education Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and

7. Have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

### How do I request consideration of deferred action for childhood arrivals?

You must submit **Form I-821D**, Consideration of Deferred Action for Childhood Arrivals. This form must be completed, properly signed, and accompanied by a **Form I-765**, Application for Employment Authorization, and a **Form I-765WS**, Form I-765 Worksheet. Failure to submit a completed Form I-765, accompanied by the correct fees, will disqualify you from consideration for deferred action. While there is no filing fee for Form I-821D, you must submit the $380 filing fee and $85 biometric services fee for Form I-765, for a total fee of $465. Please read the form instructions to ensure that you submit all the required documentation to support your request. See **www.uscis.gov/I-821D** and **www.uscis.gov/I-765** for complete filing instructions. See **www.uscis.gov/childhoodarrivals** for additional information on the deferred action for childhood arrivals process.

**Please Note:** Once you receive a receipt confirming that your request is properly filed, you will be sent an appointment notice to visit an Application Support Center for biometric services (photograph and fingerprints). Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing or result in a denial of your request.

### Where do I file my request for consideration of deferred action for childhood arrivals?

Requests for consideration of deferred action for childhood arrivals will be filed by mail to the USCIS Lockbox. Please visit **www.uscis.gov/I-821D** or contact the USCIS National Customer Service Center at **(800) 375-5283** for the most current information and instructions on where to mail your request.

### What evidence should I submit with my initial request for consideration of deferred action for childhood arrivals?

For initial requests, the evidence should show that you meet the guidelines outlined above in "How do I know if I may request consideration of deferred action for childhood arrivals?" This includes evidence that you:

**App. 1870**

1. Were born after June 15, 1981;

2. Arrived in the United States before the age of 16;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were present in the United States on June 15, 2012;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or received a certificate of completion from high school, obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and

7. Are at least 15 years of age at the time of filing if you have never been in removal proceedings or if your case was terminated before you submit your request for consideration of deferred action for childhood arrivals.

For information about specific documents that may satisfy these guidelines, please read the instructions to Form I-821D at **www.uscis.gov/I-821D** and the frequently asked questions at **www.uscis.gov/childhoodarrivals**.

### Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?

Yes. This process is open to any individuals who can demonstrate that they meet the guidelines, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention). If you are not in immigration detention and want to affirmatively request consideration of deferred action, you must submit your request to USCIS. You do not need to be 15 years of age or older at the time of filing if you are in removal proceedings, have a final removal order, or have a voluntary departure order. All cases will be considered on an individual basis.

Submit a copy of the removal order or any document issued by the immigration judge or the final decision from the Board of Immigration Appeals, if available. This requirement applies only to people who have been in removal proceedings.

### Do brief departures affect my ability to satisfy the continuous residence in the United States since June 15, 2007, guideline?

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. Any absence will be considered brief, casual, and innocent if it occurred before August 15, 2012, and was:

1. Short and reasonably calculated to accomplish the purpose for the absence;

2. Not because of an order of exclusion, deportation, or removal;

3. Not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Any unauthorized travel outside of the United States on or after August 15, 2012, will interrupt your period of continuous residence and you will not be considered for deferred action under this process.

For information about specific documents that may show your absence was brief, casual, and innocent, please read the instructions at **www.uscis.gov/I-821D** and the frequently asked questions at **www.uscis.gov/childhoodarrivals**.

### Will USCIS conduct a background check when reviewing my request for consideration of deferred action for childhood arrivals?

Yes. You must undergo background checks before USCIS will exercise prosecutorial discretion. You will not be considered for deferred action for childhood arrivals, unless there are exceptional circumstances, if you have been convicted of:

- Any felony;
- A significant misdemeanor offense;
- Three or more misdemeanor offenses (not occurring on the same date and not arising out of the same act, omission or scheme of misconduct); or
- You otherwise pose a threat to national security or public safety.

### What happens after I submit my request for consideration of deferred action for childhood arrivals?

After receiving your Form I-821D, Form I-765, and Form I-765WS, USCIS will review them for completeness, including the required fees, initial evidence, and signatures. If the request is complete, USCIS will send you a receipt notice. USCIS will then send you a notice scheduling you to visit an Application Support Center for fingerprinting and photographing. You may choose to receive an email and/or text message notifying you that your form has been accepted by completing a **Form G-1145**, E-Notification of Application/Petition Acceptance. Please see **www.uscis.gov/G-1145** for instructions.

Each request for consideration of deferred action for childhood arrivals will be reviewed on an individual, case-by-case basis. You will be notified of USCIS' determination in writing. USCIS may request more information or evidence, or may request that you appear at a USCIS office. There is no appeal or motion to reopen/reconsider the denial of a request for consideration of deferred action for childhood arrivals.

### Can I renew the period for which removal action will be deferred in my case?

Yes. You may request consideration of renewal of your deferred action for childhood arrivals. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under deferred action for childhood arrivals for your case, you will receive deferred action for another 2 years, and if you demonstrate an economic necessity for employment you may receive employment authorization throughout that period.

### How do I know if I may request a renewal of my deferred action for childhood arrivals?

You may request consideration of renewal of deferred action for childhood arrivals if you meet the guidelines for initial deferred action for childhood arrivals (see above) and you:

1. Did not depart the United States on or after August 15, 2012, without advance parole;

2. Have continuously resided in the United States since you submitted your most recent deferred action for childhood arrivals request that was approved up to the present time;

F5—General information…How do I request consideration of deferred action for childhood arrivals?
M-1079B (June 2014) N

**App. 1871**

3. Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

Requests for renewal should be submitted to USCIS around 120 days (but no more than 150 days) before the expiration of the current period of deferred action. To request renewal of your deferred action for childhood arrivals, submit Form I-821D, Form I-765, and Form I-765WS along with the $380 filing fee for the Form I-765 and a $85 biometric services fee, for a total of $465.

You do not need to provide any additional documents at the time you request renewal of deferred action for childhood arrivals unless you have **new** documents related to removal proceedings or criminal history that you did not submit to USCIS in a previously approved deferred action for childhood arrivals request.

### If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?

If your request for consideration of deferred action for childhood arrivals is denied, USCIS will apply its policy guidance governing the referral of cases to U.S. Immigration and Customs Enforcement (ICE) and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for removal proceedings except in exceptional circumstances. For more detailed information, visit **www.uscis.gov/nta**.

### Does this process result in lawful status for people who receive deferred action for childhood arrivals?

No. Deferred action under this process is only a discretionary determination to defer removal action. It is an act of prosecutorial discretion and does not provide you with a lawful status.

### What protections are in place to protect the information I share in my request from being used for immigration enforcement purposes?

The information you provide in your request is protected from disclosure to U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria explained in USCIS' Notice to Appear guidance at **www.uscis.gov/nta**. Individuals whose cases are deferred under the consideration of deferred action for childhood arrivals process will not be referred to ICE.

The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal. These other purposes could include: for assistance in the consideration of deferred action for childhood arrivals, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. This information-sharing clause covers family members and guardians, in addition to the person requesting deferred action.

This policy may be modified, superseded, or rescinded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Key Information

| Key USCIS forms referenced in this guide | Form # |
|---|---|
| Consideration of Deferred Action for Childhood Arrivals | I-821D |
| Application for Employment Authorization | I-765 |
| I-765 Worksheet | I-765WS |
| E-Notification of Application/Petition Acceptance | G-1145 |

| Key USCIS Web sites referenced in this guide | Web site link |
|---|---|
| Information about Deferred Action for Childhood Arrivals process and frequently asked questions | **www.uscis.gov/ childhoodarrivals** |
| Consideration of Deferred Action for Childhood Arrivals Form | **www.uscis.gov/ I-821D** |
| Application for Employment Authorization | **www.uscis.gov/ I-765** |
| E-Notification of Application/ Petition Acceptance Form | **www.uscis.gov/ G-1145** |
| USCIS Notice to Appear Policy | **www.uscis.gov/ NTA** |

| Other U.S. Government Services-Click or Call | |
|---|---|
| General Information | **www.usa.gov** |
| New Immigrants | **www.welcometoUSA.gov** |
| U.S. Immigration & Customs Enforcement | **www.ice.gov** |

For more copies of this guide, or information about other customer guides, please visit **www.uscis.gov/howdoi**.

You can also visit **www.uscis.gov** to download forms, e-file some applications, check the status of an application, and more. It's a great place to start!

If you don't have Internet access at home or work, try your local library.

If you cannot find what you need, please call

**Customer Service at: (800) 375-5283**
*TDD for hearing-impaired: (800) 767-1833.*

*Disclaimer: This guide provides basic information to help you become generally familiar with our rules and procedures. For more information, or the law and regulations, please visit our Web site. Immigration law can be complex, and it is impossible to describe every aspect of every process. You may wish to be represented by a licensed attorney or by a nonprofit agency recognized by the Board of Immigration Appeals.*

**F5—General information…How do I request consideration of deferred action for childhood arrivals?**
**M-1079B (June 2014) N**

**App. 1872**

# Deferred Action for Childhood Arrivals (DACA) Tip Sheet
## At a Glance: Initial vs. Renewal DACA Process

| | **Initial DACA** | **Renewal DACA** |
|---|---|---|
| **Guidelines** | You may request consideration of initial DACA if you:<br><br>• Were under the age of 31 as of June 15, 2012;<br>• Came to the United States before reaching your 16th birthday;<br>• Have continuously resided in the United States since June 15, 2007, up to the present time;<br>• Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;<br>• Had no lawful immigration status on June 15, 2012;<br>• Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate (or other State-authorized exam in the United States), or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and<br>• Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety. | You may request consideration of renewal DACA if you met the guidelines for initial DACA and you:<br><br>• Did not depart the United States on or after August Aw15, 2012, without advance parole;<br>• Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and<br>• Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety. |
| **How to Request** | • Complete and sign:<br>  ❑ Form I-821D, Consideration of Deferred Action for Childhood Arrivals;<br>  ❑ Form I-765, Application for Employment Authorization; and<br>  ❑ Form I-765W, Worksheet.<br>• Submit all three forms, the $465 filing and biometrics fee and any required documentation to USCIS following the instructions on the forms. | • Complete and sign:<br>  ❑ Form I-821D, Consideration of Deferred Action for Childhood Arrivals;<br>  ❑ Form I-765, Application for Employment Authorization; and<br>  ❑ Form I-765W, Worksheet.<br>  ❑ Submit all three forms and the $465 filing and biometrics fee and any required documentation to USCIS following the instructions on the forms.<br>  ❑ Do not provide any additional documents at the time you request renewal of DACA unless you have new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. |
| **When to File** | You can file a request for initial DACA at any time. | USCIS encourages you to submit your request for renewal approximately 120 days (or four months) prior to the expiration of your current period of deferred action. However, if you file your renewal request more than 150 days (or 5 months) prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. |



**U.S. Citizenship and Immigration Services**

**M-555B (June 2014) N**
PED.DACA.0514_TipSheet

App. 1873

# FREQUENTLY ASKED QUESTIONS

**WHAT IS DEFERRED ACTION FOR CHILDHOOD ARRIVALS?**

Over the past several years, this Administration has undertaken an unprecedented effort to transform the immigration enforcement system into one that focuses on national security, public safety, border security, and the integrity of the immigration system. As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of 2 years, subject to renewal for a period of 2 years, and may be eligible for employment authorization.

**You may request consideration of DACA if you:**

1. Were under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching your 16th birthday;
3. Have continuously resided in the United States since June 15, 2007, up to the present time;
4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;
5. Had no lawful status on June 15, 2012, meaning that:
   – You never had a lawful immigration status on or before June 15, 2012, or
   – Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 1-800-375-5283 with questions or to request more information on DACA. Those with pending requests can also use a number of **online self-help tools** which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

## What is Deferred Action?

Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

**10   Deferred Action for Childhood Arrivals**

## What is DACA?

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of 2 years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

## Is there any difference between "deferred action" and DACA under this process?

DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

## If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?

**YES**. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

## If my case is deferred, am I in lawful status for the period of deferral?

**NO**. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by Federal law from establishing domicile in the United States.**

Apart from the immigration laws, "lawful presence," "lawful status," and similar terms are used in various other Federal and State laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate Federal, State, or local authorities.

## Can I renew my period of deferred action and employment authorization under DACA?

**YES**. You may request consideration for a renewal of your DACA. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another 2 years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

**DACA PROCESS**

## How do I request consideration of DACA?

To request consideration of DACA (either as an initial request or to request a renewal), you must submit **Form I-821D, Consideration of Deferred Action for Childhood Arrivals,** to USCIS. Please visit **www.uscis. gov/i-821d** before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed, and accompanied by a **Form I-765, Application for Employment Authorization**, and a **Form I-765WS, Worksheet**, establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, totaling $465), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at **www.uscis.gov/i-821d**. As of June 5, 2014, requestors must use the new version of the

form. After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a **Form G-1145, E-Notification of Application/Petition Acceptance**.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information visit ICE's Web site at **www.ice.gov/daca**.

### Can I obtain a fee waiver or fee exemption for this process?

There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his or her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty

level, and are in foster care or otherwise lacking any parental or other familial support; or

- You are under 18 years of age and homeless; or

- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or

- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our **Fee Exemption Guidance** Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support;

- Accept copies of tax returns, bank Statements, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level;

- Accept copies of medical records, insurance records, bank Statements, or other reliable evidence of unreimbursed medical expenses of at least **$10,000**;

- Address factual questions through Requests for Evidence (RFEs).

**If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**

DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**

This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**

**NO**. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**

**NO**. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information, visit ICE's Web site at **www.ice.gov/daca**.

**If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**

If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a State or local law enforcement officer?**

If you meet the guidelines and have been served a detainer, you should immediately contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA

even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

### Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g., F-1, E-2, H-4) or have Temporary Protected Status (TPS)?

**NO**. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

### Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?

Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (**www.uscis.gov/NTA**). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

### If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?

If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information

related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

### Will USCIS verify documents or Statements that I provide in support of a request for DACA?

USCIS has the authority to verify documents, facts, and Statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

### BACKGROUND CHECKS

### Will USCIS conduct a background check when reviewing my request for consideration of DACA?

**YES**. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

### What do background checks involve?

Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other Federal Government agencies.

### What steps will USCIS and ICE take if I engage in fraud through the new process?

If you knowingly make a misrepresentation or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will

be treated as an immigration enforcement priority to the fullest extent permitted by law and be subject to criminal prosecution and/or removal from the United States.

**AFTER USCIS MAKES A DECISION**

### Can I appeal USCIS' determination?

**NO**. You cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting USCIS' Call Centers at (800) 375-5283 to have a Service Request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied due to one of the following errors:

- Denied the request based on abandonment, when you actually responded to an RFE or NOID within the prescribed time;

- Mailed the RFE or NOID to the wrong address although you had submitted a Form AR-11, Change of Address, or changed your address online at www.uscis.gov before USCIS issued the RFE or NOID;

- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted **at the time of filing** shows that you did arrive before reaching that age;

- Denied the request on the grounds that you were under age 15 **at the time of filing** but not in removal proceedings, while the evidence submitted **at the time of filing** show that you indeed were in removal proceedings when the request was filed;

- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted **at the time of filing** shows that you were **not yet** 31 years old as of that date;

- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence

submitted **at the time of filing** shows that you indeed were in an unlawful immigration status on that date;

- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted **at the time of filing** shows that you were, in fact, present;

- Denied the request due to your failure to appear at a USCIS ASC to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or

- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees.

If you believe your request was denied due to any of these administrative errors, you may contact our National Customer Service Center at (800) 375-5283 or (800) 767-1833 (TDD for the hearing impaired). Customer service officers are available Monday – Friday, 8 a.m. – 6 p.m, in each U.S. time zone.

### If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?

If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its policy guidance governing the referral of cases to ICE and the issuance of a Notice to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit **www.uscis.gov/NTA**. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

**App. 1879**

## Can my deferred action under the DACA process be terminated before it expires?

**YES**. DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

### INITIAL REQUESTS FOR DACA

## What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?

Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. U.S. Citizenship and Immigration Services (USCIS) retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

## How old must I be in order to be considered for deferred action under this process?

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.

- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.

- In all instances, you cannot be the age of 31 or older as of June 15, 2012, to be considered for DACA.

## I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?

**YES**, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

## To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?

To meet the continuous residence guideline, you must submit documentation that shows you have been living

in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual, or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire 5-year continuous residence requirement.

### Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?

To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

### Who is considered to be "currently in school" under the guidelines?

To be considered "currently in school" under the guidelines, you must be enrolled in:

- A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home-school program meeting State requirements;

- An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- An education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other State-authorized exam (e.g., HiSet or TASC) in the United States.

These education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under State law, or in passing a GED exam or other State-authorized exam in the United States include but are not limited to programs funded, in whole or in part, by Federal, State, county or municipal grants or administered by nonprofit organizations. Programs funded by other sources may qualify if they are administered by providers of demonstrated effectiveness, such as institutions of higher education, including community colleges and certain community-based organizations.

In assessing whether such programs not funded in whole or in part by Federal, State, county, or municipal grants or administered by nonprofit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other State-authorized exam (e.g., HiSet or

TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

## How do I establish that I am currently in school?

Documentation sufficient for you to demonstrate that you are currently in school may include but is not limited to:

- Evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program meeting State requirements; or

- Evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:
  - Has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and
  - The program is funded in whole or in part by Federal or State grants or is of demonstrated effectiveness; or evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under State law (such as by passing a GED exam or other such State-authorized exam (for example, HiSet or TASC), and that the program is funded in whole or in part by Federal, State, county or municipal grants or are administered by nonprofit organizations or, if funded by other sources is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

## What documentation may be sufficient to demonstrate that I have graduated from high school?

Documentation sufficient for you to demonstrate that you have graduated from high school may include but is not limited to: a high school diploma from a public or private high school or secondary school, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under State law, or a GED certificate or certificate from passing another such State-authorized exam (e.g., HiSet or TASC) in the United States.

## What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such State-authorized exam (e.g., HiSet or TASC)?

Documentation may include but is not limited to, evidence that you have passed a GED exam or other State-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under State law.

## If I am enrolled in a literacy or career training program, can I meet the guidelines?

**YES**, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include but are not limited to programs funded, in whole or in part by Federal, State, county or municipal grants, or are administered by nonprofit organizations, or, if funded by other sources, programs of demonstrated effectiveness.

## If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?

**YES**, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by Federal, State, county or municipal grants, or administered by

App. 1882

nonprofit organizations, or, if funded by other sources, is a program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by Federal, State, county, or municipal grants, administered by a nonprofit organization, or of demonstrated effectiveness.

## Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?

**NO**. Evidence not listed in Chart #1 on the following page will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another State-authorized exam (e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

## Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?

Evidence other than those documents listed in Chart #1 may be used to establish the following guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You satisfy the continuous residence requirement, as long as you present direct evidence of

your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and

- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and

- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guidelines. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

**CHART #1:** on the next page, provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

App. 1883

| CHART #1: EXAMPLES OF DOCUMENTS TO SUBMIT TO DEMONSTRATE YOU MEET THE GUIDELINES | |
|---|---|
| **Proof of identity** | · Passport or national identity document from your country of origin<br>· Birth certificate with photo identification<br>· School or military ID with photo<br>· Any U.S. Government immigration or other document bearing your name and photo |
| **Proof you came to U.S. before your 16th birthday** | · Passport with admission stamp<br>· Form I-94/I-95/I-94W<br>· School records from the U.S. schools you have attended<br>· Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>· Travel records<br>· Hospital or medical records<br>· Rent receipts or utility bills<br>· Employment records (pay stubs, W-2 Forms, etc.)<br>· Official records from a religious entity confirming participation in a religious ceremony<br>· Copies of money order receipts for money sent in or out of the country<br>· Birth certificates of children born in the U.S.<br>· Dated bank transactions<br>· Automobile license receipts or registration<br>· Deeds, mortgages, rental agreement contracts<br>· Tax receipts, insurance policies |
| **Proof of immigration status** | · Form I-94/I-95/I-94W with authorized stay expiration date<br>· Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>· A charging document placing you into removal proceedings |
| **Proof of presence in U.S. on June 15, 2012** | · Rent receipts or utility bills<br>· Employment records (pay stubs, W-2 Forms, etc.)<br>· School records (letters, report cards, etc.)<br>· Military records (Form DD-214 or NGB Form 22) |
| **Proof you continuously resided in U.S. since June 15, 2007** | · Official records from a religious entity confirming participation in a religious ceremony<br>· Copies of money order receipts for money sent in or out of the country<br>· Passport entries<br>· Birth certificates of children born in the United States<br>· Dated bank transactions<br>· Automobile license receipts or registration<br>· Deeds, mortgages, rental agreement contracts<br>· Tax receipts, insurance policies |
| **Proof of your education status at the time of requesting consideration of DACA** | · School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current of requesting consideration of DACA educational or grade level<br>· U.S. high school diploma, certificate of completion, or other alternate award<br>· High school equivalency diploma or certificate recognized under State law<br>· Evidence that you passed a State-authorized exam, including the GED or other State-authorized exam (for example, HiSet or TASC) in the United States |
| **Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard** | · Form DD-214, Certificate of Release or Discharge from Active Duty<br>· NGB Form 22, National Guard Report of Separation and Record of Service<br>· Military personnel records<br>· Military health records |

**App. 1884**

## May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?

Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

- Demonstrating that you meet the 5-year continuous residence requirement; and

- Establishing that departures during the required period of continuous residence were brief, casual, and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

- You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other State-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You were under the age of 31 on June 15, 2012; and

- Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

## Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?

**YES**. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

## I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?

**NO**, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

## I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but "aged out" of my dependent nonimmigrant status as of June 15, 2012. May I be considered for deferred action under this process?

**YES**. For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012, but "aged out" of your dependent nonimmigrant status on or before June 15, 2012 (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

App. 1885

**I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?**

**YES.** For the purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

**I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of 6 months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider, for DACA purposes only, that the alien was lawfully admitted for a period of 6 months. Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be

for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**

You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

**RENEWAL OF DACA**

**When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?**

USCIS encourages you to submit your request for renewal approximately 120 days (or 4 months) before your current period of deferred action under the Deferred Action for Childhood Arrivals (DACA) process expires. If you have filed approximately 120 days before your deferred action and Employment Authorization Document (EAD) expire and USCIS is unexpectedly delayed in processing your renewal request, USCIS may provide deferred action and employment authorization for a short period of time until your renewal is adjudicated. However, if you file your renewal request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date.

## How will USCIS evaluate my request for renewal of DACA?

You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

1. Did not depart the United States on or after Aug. 15, 2012, without advance parole;

2. Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and

3. Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

## Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?

**YES**, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

However, if you have filed your renewal request with USCIS approximately 120 days before your deferred action and EAD expire and USCIS is unexpectedly delayed in processing your renewal request, USCIS may provide deferred action and employment authorization for a short period of time.

## Do I need to provide additional documents when I request renewal of deferred action under DACA?

**NO**, unless you have new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information, or Statements relating to a DACA renewal request determination.

**CAUTION:** If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to 5 years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## TRAVEL

## May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?

Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by U.S. Citizenship and Immigration Services (USCIS) to determine whether the travel qualifies as brief, casual, and innocent. (**See Chart #2 on the following page.**)

**CAUTION:** You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences.

## If my case is deferred under DACA, will I be able to travel outside of the United States?

Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a **Form I-131, Application for Travel Document** and paying the applicable fee ($360). USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| **On or after June 15, 2007, but before Aug. 15, 2012** | Brief, casual, and innocent | No |
| | For an extended time | |
| | Because of an order of exclusion, deportation, voluntary departure, or removal | Yes |
| | To participate in criminal activity | |
| | | |
| **On or after Aug. 15, 2012, and after you have requested deferred action** | Any | In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| | | |

if your travel abroad will be in furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;

- Educational purposes, such as semester-abroad programs and academic research; or

- Employment purposes such as overseas assignments, interviews, conferences, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

App. 1888

## Do brief departures from the United States interrupt the continuous residence requirement?

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual, and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;

2. The absence was not because of an order of exclusion, deportation, or removal;

3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file **Form I-131**, Application for Travel Document, to request advance parole to travel outside of the United States.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

## May I file a request for advance parole concurrently with my DACA package?

Concurrent filing of advance parole is not an option at this time. DHS is, however, reviewing its policy on concurrent filing of advance parole with a DACA request. In addition, DHS is also reviewing eligibility criteria for advance parole. If any changes to this policy are made, USCIS will update this FAQ and inform the public accordingly.

## CRIMINAL CONVICTIONS

## If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?

**NO**. If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

## What offenses qualify as a felony?

A felony is a Federal, State, or local criminal offense punishable by imprisonment for a term exceeding 1 year.

## What offenses constitute a significant misdemeanor?

For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; or

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a State or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking

**App. 1889**

into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

## What offenses constitute a non-significant misdemeanor?

For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

1. Is not an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a State or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

## If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?

A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

## What qualifies as a national security or public safety threat?

If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to: gang membership, participation in criminal activities, or participation in activities that threaten the United States.

## Will offenses criminalized as felonies or misdemeanors by State immigration laws be considered felonies or misdemeanors for purpose of this process?

**NO**. Immigration-related offenses characterized as felonies or misdemeanors by State immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

## Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?

Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

**MISCELLANEOUS**

### Does this Administration remain committed to comprehensive immigration reform?

**YES**. The Administration has consistently pressed for passage of comprehensive immigration reform, including the DREAM Act, because the President believes these steps are critical to building a 21st century immigration system that meets our Nation's economic and security needs.

### Is passage of the DREAM Act still necessary in light of the new process?

**YES**. The Secretary of Homeland Security's June 15, 2012, memorandum allowing certain people to request consideration for deferred action is one in a series of steps that DHS has taken to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety. Deferred Action for Childhood Arrivals (DACA) is an exercise of prosecutorial discretion and does not provide lawful status or a pathway to citizenship. As the President has Stated, individuals who would qualify for the DREAM Act deserve certainty about their status. Only the Congress, acting through its legislative authority, can confer the certainty that comes with a pathway to permanent lawful status.

### Does deferred action provide me with a path to permanent resident status or citizenship?

**NO**. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

### Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?

This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

### How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?

If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

### How should I fill out question 9 on Form I-765, Application for Employment Authorization?

When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

### Will there be supervisory review of decisions by USCIS under this process?

**YES**. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA.

### Will USCIS personnel responsible for reviewing requests for DACA receive special training?

**YES**. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

### Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?

Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file a Notice of Entry of Appearance as Attorney or Accredited Representative when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to

disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a Statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule at which time this matter will be reevaluated.

### When must an individual sign a Form I-821D as a preparer?

Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

### If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?

You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

### Can I request consideration for deferred action under this process if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?

**YES**, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program. You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of the DACA process.

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry and/or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment through INFOPASS with the USCIS ASC in Saipan to discuss your case with an immigration officer.

### Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?

**NO.** There is no expedited processing for deferred action. Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our **Avoid Scams** page to learn how you can protect yourself from immigration scams.

Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or the DHS. If you are seeking legal advice, visit our Find **Legal Services** page to learn how to choose a licensed attorney or accredited representative.

### Am I required to register with the Selective Service?

Most male persons residing in the United States, who are ages 18 through 25, are required to register with Selective Service. Please see link for more information. [**Selective Service, www.sss.gov**].



 **U.S. Citizenship and Immigration Services**

Learn how to protect yourself from immigration scams at
# www.uscis.gov/avoidscams

# THE WRONG HELP
# CAN HURT
## BEWARE OF IMMIGRATION SCAMS





**DOWNLOAD**
free forms and instructions



**LEARN**
about filing fees



**VERIFY**
only BIA-accredited representatives or eligible attorneys provide you legal services



**REPORT**
scams to the Federal Trade Commission (FTC) or your state attorney general

**www.ftc.gov/complaint**
1-877-FTC-HELP

## About Us
USCIS is your **official** source of information about immigration benefits and services. Contact us for more information on USCIS and its programs.

## Contact Us
**www.uscis.gov**
1-800-375-5283

App. 1894

# DACA RESOURCES

**DEPARTMENT OF HOMELAND SECURITY**

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS)

### DACA resource page

www.uscis.gov/childhoodarrivals
www.uscis.gov/acciondiferida

These English and Spanish Web pages contain important DACA information.

### Avoid Immigration Scams resource center

www.uscis.gov/avoidscams
www.uscis.gov/eviteestafas

These English and Spanish Web pages contain information related to immigration scams, including resources for applicants, community groups, and legal service providers.

### "How Do I" guides

www.uscis.gov/howdoi

This online repository for all USCIS "How Do I" guides includes "How Do I Request Consideration of Deferred Action for Childhood Arrivals (DACA)?"

### Public Engagement Division Outreach page

www.uscis.gov/outreach

This page lists upcoming national engagements, including multilingual engagements, and local outreach events.

### Multilingual resource center

www.uscis.gov/multilingual

This online resource has links to documents in 22 languages, including multilingual DACA resources.

### Online customer service tools

www.uscis.gov/tools

USCIS offers customers a variety of online customer service tools, including the ability to change address, check processing times and case status information, and submit inquiries.

### Systematic Alien Verification for Entitlements (SAVE)

www.uscis.gov/save

The SAVE program is an intergovernmental information service initiative which verifies the immigration status of benefit applicants.

### E-Verify

www.uscis.gov/e-verify

E-Verify is an electronic system that enables employers to verify employment eligibility. The E-Verify program has a variety of resources for employees on worker rights.

## OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES (CRCL)

### Overview of CRCL resources

www.dhs.gov/topic/civil-rights-and-civil-liberties

The mission of CRCL is to advance and safeguard the civil rights and civil liberties of individuals and communities with respect to the Department's immigration-related policies and activities.

## OFFICE OF THE CIS OMBUDSMAN

### Overview of Office of the CIS Ombudsman resources

www.dhs.gov/topic/cis-ombudsman

The Office of the CIS Ombudsman provides individual immigration case assistance and makes recommendations to improve the administration of immigration benefits.

**DEPARTMENT OF EDUCATION**

## DEPARTMENT OF EDUCATION

### Free Application for Federal Student Aid (FAFSA)

www.studentaid.ed.gov/fafsa

This Web page provides an overview of the FAFSA requirements and process.

App. 1895

**Resources for DACA and immigrant students**

www2.ed.gov/about/overview/focus/
immigration-resources.html

This resource page includes Q&As on Federal student aid and education records for DACA students and a financial aid guide.

**Migrant Education Program**

www2.ed.gov/programs/mep/index.html

The Migrant Education Program supports the development and funding of education and support services for migratory children.

## DEPARTMENT OF JUSTICE

### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (EOIR)

**List of Board of Immigration Appeals (BIA) recognized organizations and accredited representatives**

www.justice.gov/eoir/ra/raroster.htm

BIA accredited representatives working for BIA-recognized organizations are non-attorneys who are authorized to provide immigration legal services.

**List of low cost and free immigration legal service providers**

www.justice.gov/eoir/probono/states.htm

EOIR provides a list of free and low-cost immigration attorneys by State as a resource for applicants and petitioners.

### ACCESS TO JUSTICE

**Overview of Access to Justice resources**

www.justice.gov/atj

Access to Justice works with Federal agencies, State, and local governments and State Access to Justice commissions to increase access to counsel and legal assistance and to improve the justice delivery systems that serve people who are unable to afford lawyers.

**DACA resource guide**

www.justice.gov/atj/daca-resourceguide-atj-feb-27-3013.pdf

This resource guide provides information on the DACA process and links to DACA-related resources.

### OFFICE OF SPECIAL COUNSEL FOR IMMIGRATION-RELATED UNFAIR EMPLOYMENT PRACTICES

**DACA flyer**

www.justice.gov/crt/about/osc/pdf/
publications/DACA_English2.pdf

The Office of Special Counsel enforces the anti-discrimination provisions of the Immigration and Nationality Act. This flyer provides DACA recipients with information about their right to work in the United States

## DEPARTMENT OF LABOR

### WAGE AND HOUR DIVISION

**We Can Help website**

www.dol.gov/wecanhelp

This Web site provides useful information for workers to understand their rights in the workplace and how to file a complaint, regardless of their immigration status.

**YouthRules! Web site**

www.youthrules.dol.gov

This Web site provides critical information on the jobs and hours a minor is allowed to work.

# DEF-INTERV.

# EX. 18

# Memorandum



| Subject | Date |
|---|---|
| Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues | MAY - 6 1997 |

**To**

Regional Directors
District Directors
Officers-in-Charge
Service Center Directors

**From**

Office of Programs

This memorandum outlines changes in the handling of I-360 self-petitions for immigrant status filed by battered spouses and children of U.S. citizens and permanent residents aliens and addresses related issues. It should be read as a supplement to the guidance issued by the Office of Programs on April 16, 1996.

## Background

The issue of domestic violence and its potential impact on spouses and children who would normally be entitled to immigration benefits under the I-130 petitioning process was first addressed by Congress in the Violence Against Women Act ("VAWA") which was enacted as part of the Violent Crime Control Act of 1994 ("Crime Bill"). The VAWA contains provisions to limit the ability of an abusive U.S. citizen ("USC") or lawful permanent resident ("LPR") to utilize the spouse' or child's immigration status in order to perpetuate the abuse. The Service published an interim rule on March 26, 1996 (59 FR 13061-13079) establishing the procedures for qualified abused spouses and children to self-petition for immigrant classification using the Form I-360. This rule was accompanied by extensive field instructions in the Office of Programs' memorandum of April 16, 1996.

In the autumn of 1996, Congress enacted various new provisions relating to battered aliens, in both the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or "the welfare law") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "the immigration bill"). None of these new provisions directly affect the legal standards applicable to adjudication of I-360 applications. The new provisions do, however, provide additional benefits and protections for battered aliens, and have created the need for INS to restructure how we handle this category of very sensitive cases. This memorandum outlines those changes, and instructs field offices on the handling of pending cases and new cases received.

II-30

App. 2192

Guidance on Battered Alien Issues
Page 2

## Centralization at the Vermont Service Center

On April 7, 1997, the Service published a notice in the Federal Register at 16607-08 establishing the Vermont Service Center as the direct mail filing location for all Forms I-360 filed by self-petitioning battered spouses and children (Attachment A). This centralization was necessitated by the new welfare provisions which make certain battered aliens -- including self-petitioners and others -- eligible for public benefits. In addition to adjudicating I-360 self-petitions, the Vermont Service Center will serve as a central "clearinghouse" for inquiries from federal, state and local benefit-granting agencies regarding pending or recently-adjudicated cases, as discussed in more detail in the Verification section, below. Finally, as an alien may be eligible for public benefits not only upon the approval of the relevant immigrant status, but also upon having filed a petition which makes a prima facie case for such status, the Vermont Service Center will also begin making prima facie determinations pursuant to an interim rule expected to be published in the Federal Register prior to June 1, 1997.

While these are sensitive cases which require special handling, the move to centralized filing is expected to have only minimal impact on caseloads in the district offices. Since the beginning of the fiscal year, according to G-22 statistics, fewer than 500 cases have been filed Servicewide. Centralization allows the Service to have a small corps of officers well-versed in the complexity and sensitivity of VAWA adjudications, and will also allow for better monitoring of the caseload and any fraud trends.

Although the direct mail notice allows self-petitioners to continue to file locally until May 7, INS field offices and the other service centers are encouraged to forward to the Vermont Service Center those I-360s for which review/adjudication has not been initiated. All I-360 self-petitions received on or after May 7 shall be forwarded to the Vermont Service Center, but the 30 day transition period requires that no office refuse to receive an I-360 submitted before June 6, 1997. Immediate relatives, who were previously able to file concurrent I-360 self-petitions and I-485 adjustment applications, should be advised to retain their I-485s pending the Vermont Service Center's adjudication of the I-360 self-petition. The battered alien I-360s are to be mailed to:

> INS Vermont Service Center
> Attn: Family Services Product Line (VAWA)
> 75 Lower Weldon Street
> St. Albans, VT 05479-0001

As inquiries from benefit-granting agencies can be expected in many cases, offices are encouraged to expedite handling of all pending cases which they do not forward to the Vermont Service Center. Nothing in this move to centralize direct mail filing changes the ability of the Vermont Service Center to transfer I-360s to district offices when an interview or investigation of suspected fraud is merited.

II-31

App. 2193

Guidance on Battered Alien Issues
Page 3

## Deferred Action and Employment Authorization

In the April 16 memorandum, INS offices were encouraged to utilize voluntary departure and deferred action in order to provide approved VAWA self-petitioners with employment authorization pending the availability of a visa number. Since that time, in IIRIRA, Congress has limited grants of voluntary departure to no more than 120 days, and INS regulations no longer allow for work authorization during any period of voluntary departure.

Starting June 1, when the Vermont Service Center approves a VAWA self-petition, it will then also assess, on a case-by-case basis, whether to place the alien in deferred action status pursuant to new deferred action guidelines in the Interim Enforcement Procedures (a forthcoming document which will be available on the 96Act bulletin board, as well as in printed versions). By their nature, VAWA cases generally possess factors that warrant consideration for deferred action. In an unusual case, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny. Although the Vermont Service Center is not required to obtain Regional Director approval for deferred action, it will report all grants of deferred action to the Eastern Regional Office for statistical and tracking purposes. In addition, a process for periodic review of the deferred action decisions made by the Vermont Service Center is planned.

If the alien is placed in deferred action, the Vermont Service Center will notify the alien that he or she may submit an I-765, Application for Employment Authorization. After the initial deferred action decision and issuance of a one-year employment authorization document, the Vermont Service Center will hold these files and review the deferred action decision upon each application for extension of work authorization. When the Vermont Service Center is notified by the National Visa Center or by an INS district office that the alien is seeking a visa abroad or has filed an adjustment application, the Vermont Service Center will forward the file to the appropriate office.

In cases where the I-360 was approved prior to April 1, many aliens may have current grants of voluntary departure. Upon expiration of voluntary departure, and for other cases adjudicated before June 1, district offices are strongly encouraged to utilize deferred action to provide work authorization pending the availability of a visa. As described in more detail below, battered aliens are now eligible for certain public benefits, which are often necessary for the victim to be able to leave the abusive situation. To deny such aliens work authorization when they are able to obtain public assistance is counter to the spirit of welfare reform. Moreover, for many individuals, the ability to work is necessary in order to save the funds necessary to pay for the adjustment application and the penalty fee. As it has already been determined that these aliens face extreme hardship if returned to the home country and as removal of battered aliens is not an INS priority, the exercise of discretion to place these cases in deferred action status will almost always be appropriate.

JJ-32

Guidance on Battered Alien Issues
Page 4

## Non-Disclosure Provisions and Other Limitations in IIRIRA § 384

Section 384 of IIRIRA strictly prohibits the release of <u>any</u> information relating to a VAWA self-petitioner, and also precludes any INS officer from making an adverse determination of admissibility or deportability based solely on information furnished by an abusive relative. Any violation of this section can subject an INS officer to disciplinary action and a fine of up to $5,000. This provision is discussed in more detail in IIRIRA Implementation Memo #96act.036 (Attachment B).

## Verification of Status for Benefit-Granting Agencies

Section 501 of IIRIRA amends the welfare law to provide that certain battered aliens are "qualified aliens" for purposes of eligibility for some public benefits. This includes not only those aliens who can self-petition for immigrant status under the VAWA provisions, but also other aliens who have been abused by a member of their household. In cases other than VAWA self-petitioning cases, it is the benefit-granting agency, not the INS, which will assess the claims of abuse. Benefit providers, however, will request that INS verify the alien's status or the fact that a petition is pending on behalf of the alien. Detailed procedures for verification of these and other categories of qualified aliens under welfare law are being provided to benefit-granting agencies by the Department of Justice in a document entitled "Interim Guidance on Verification," which is expected to be published in the Federal Register later this month. An INS field directive designed for immigration status verifiers will be issued in conjunction with publication of the Interim Guidance on Verification.

Although some verification inquiries relating to battered aliens will be handled through the normal status verification channels, many of the inquiries will fall outside the type of inquiries which status verifiers typically handle. For example, because of the dynamics of abusive relationships, the abuse victim will not always have access to approval notices or other documentation relating to their cases. Moreover, because aliens can be eligible for public benefits upon filing a petition which makes a prima facie case for status, benefit providers will sometimes be seeking information on pending cases, including a determination as to whether the petition makes a prima facie case for eligibility for the status sought.

The Vermont Service Center will serve as the "clearinghouse" for these unusual types of inquiries, which will be submitted by fax using an inquiry format patterned on the sample at Attachment C. It is anticipated that the Vermont Service Center will be able to handle the vast majority of inquiries, which should pertain to cases pending there or in one of the other service centers. For those inquiries which pertain to cases pending in district offices or sub-offices, the Vermont Service Center will forward the inquiries by fax to the attention of a designated Service

II-33

App. 2195

Guidance on Battered Alien Issues
Page 5

Center liaison officer in each district or sub-office. Each district and sub-office should complete the liaison designation form at Attachment D and fax to Lisa Batey at 202/514-9262 prior to May 20 (the list of designees will be shared with INS regional offices and all four Service Centers). The designated liaison should ensure that a response is provided to the requesting agency, with a copy to the Vermont Service Center, within five working days. Information on pending or completed cases should not be given over the telephone, but rather should be sent via facsimile.

As you will note, the sample inquiry format includes a limited waiver of the non-disclosure provisions of IIRIRA § 384. At present, such a waiver is necessary before INS can provide any information relating to a VAWA self-petitioner, even to another governmental entity for purposes of determining eligibility for public benefits. Because of IIRIRA § 642, no waiver is necessary in other categories of cases, such as where the alien seeking benefits is the beneficiary of a spousal I-130 petition, but has suffered abuse at the hands of another household member. If there is any doubt as to whether a waiver is required, the officer should seek guidance from his or her district counsel. If there are waiver questions which cannot be resolved locally, please contact Lisa Batey of the Headquarters Office of Programs, at 202/514-9089.

## Providing Information on Filing of I-360 Self-Petitions

Some battered aliens who are eligible to self-petition have chosen not to do so, instead relying upon the I-130 petition filed by their abuser. This not only allows the abuser to continue to control the spouse's or child's immigration status by withdrawing the petition, but also places a battered spouse at risk should the abuser subsequently obtain a divorce before the spouse is able to adjust status. For these and other reasons, such as easier determinations as to welfare eligibility and employment authorization, an immigration officer who deals with a battered alien should inform that alien about the process for self-petitioning, despite the fact that an I-130 petition is still pending on his or her behalf. The Interim Guidance on Verification similarly urges benefit agency caseworkers to give such aliens the number for the INS Forms Line [1-800-870-3676] and for the National Domestic Violence Hotline [1-800-799-7233] for assistance in preparing self-petitions.

## Making Prima Facie Determinations

As noted above, Section 501 of IIRIRA includes in the definition of "qualified alien" for public benefit purposes those aliens who have filed a self-petition, or are the beneficiary of a spousal or parental petition, which sets forth a prima facie case for immigrant status under a variety of provisions. Specifically, those with approved petitions or pending petitions which make a prima facie case for status under any of the following Immigration and Nationality Act ("INA") provisions are included:

II-34

Guidance on Battered Alien Issues
Page 6

- ◆   spouse or child of a USC under 204(a)(1)(A)(i)

- ◆   spouse, child or unmarried son or daughter of an LPR under 204(a)(1)(B)(i)

- ◆   widow(er) of a USC under 204(a)(1)(A)(ii)

- ◆   self-petitioning battered spouse or child of a USC or LPR under 204(a)(1)(A)(iii)-(iv) or 204(a)(1)(B)(ii)-(iii)

In all but the latter category, battery or abuse will not be part of the INS adjudication, but rather will be assessed by the benefit-granting agency pursuant to the Interim Guidance on Verification.

In the case of self-petitioning battered spouses and children, the Vermont Service Center will begin making prima facie determinations no later than June 1, 1997, following publication of an interim rule in the Federal Register. If the self-petition and accompanying documentation are adequate, the self-petitioner will receive a decision or a Notice of Prima Facie Determination ("NPFD") within three weeks of filing. The approval notice or NPFD may be presented to benefit granting agencies as evidence of the applicant's status as a "qualified alien". The NPFD will be valid for 150 days, to allow time for the submission of any supplemental evidence and for adjudication of the self-petition.

In those cases which are not handled by the Vermont Service Center, benefit-granting agencies will be expecting decisions or prima facie determinations within a similar three-week time frame. As the non-VAWA cases are simpler adjudications based purely on family relationship, there are no plans to define what would constitute a prima facie case. Instead, when a benefit-granting agency inquires about a pending case, INS offices should expedite the adjudication of the case in order to minimize the time during which the alien is unable to receive public assistance for which he or she may be eligible.

### Aliens Seeking Issuance of Notices to Appear

An individual may also be eligible for public benefits if he or she makes a prima facie case for cancellation of removal as a battered spouse or child under INA § 240A(b)(2). INS district offices shall promptly issue a Notice to Appear to any alien who makes a credible request to be placed in proceedings in order to raise a claim for cancellation of removal under section 240A(b)(2). District offices may want to do a search of the CLAIMS system to determine if a self-petition was filed and denied. It is important to note, however, that some individuals who are ineligible for status pursuant to the self-petitioning provisions will be eligible for cancellation (e.g., where the marriage has been terminated). Once proceedings have been initiated, the alien can contact the immigration court to seek a determination that he or she has demonstrated a prima facie case for cancellation of removal.

II-35

Guidance on Battered Alien Issues
Page 7

## Other District Office Issues

While centralizing I-360 adjudications was motivated in part by the goal of having a small corps of officers well-trained in domestic violence issues, district adjudications officers will still interact with self-petitioners during the adjustment process. The nature of domestic violence and the sensitivity needed in dealing with victims are topics to which few INS officers will have had exposure. District offices are strongly encouraged to identify two or more officers (depending upon the size of the district) to handle all adjustments following from I-360 approvals. The designated officers should have the experience, discretion and communications skills to be able to balance sensitivity in dealing with true victims with vigilance against fraud, and would ideally also serve as the designated Service Center liaison officer described at pages 4-5, above.

Recognizing the need for more training on complex and subtle domestic violence issues, Headquarters is looking into opportunities to provide informational materials and perhaps training sessions. In addition, a number of reputable non-profit organizations throughout the country provide training for personnel who work with domestic violence victims, and are willing to share their expertise with INS offices. Last year, for example, training for San Francisco adjudicators was provided by representatives of the Family Violence Prevention Fund. The training was well-received by district personnel, and was given at no cost to the district. Managers interested in obtaining materials or in fostering contacts with local organizations which work with victims of domestic violence should contact either of the persons named below for information about organizations active in their area.

\*     \*     \*     \*     \*

The Office of Field Operations concurs with this memorandum. Addressees are strongly encouraged to distribute copies of this memorandum widely, particularly to adjudications and investigations officers. Questions about this policy or about the interim rule published in the Federal Register may be directed to Lisa Batey, Headquarters Office of Programs, 202/514-9089, or Karen FitzGerald, Headquarters Benefits Division, at 202/305-4904.

Paul W. Virtue
for Acting Executive Associate Commissioner

II-36

MAY-29-199?  15 21                    317 380 4319   P.13

[sample only – request to be submitted on letterhead of requesting agency]

Fax Request Form – from Benefit Agency to INS

To: INS Vermont Service Center, fax 802/527-3252
    Attn: Battered Alien Review Unit          This fax consists of ____ pages.

This request is being submitted by:
 Name (printed): _____          T_____

 Agency name and address: _____
 _____

 Fax number: _____            _____

 Agency case tracking number: _____          _____

Item 1:  An alien applicant is seeking _____ bene_____ from the agency _____ed above, pursuant
         to recent welfare reform legis____  This a_____ fal___ into one __ two categories:

         ____ a) believes an INS F_____ I-___, Peti____ for _____ation, was filed on the
             applicant's behalf ___ ___ _____ _____ or has self-petitioned as a
             widow(er) usi___ __ For__ I-___, P_____ for ___ ____lien, Widow or Special
             Immigrant (comp____ ___ ___ below);

         ____ b) has self-p_____ as a b_____ _____e or ____d using ___S Form I-360, Petition for
             Ame____ __, Widow, or ____l Im_____ (complete ___ B, below).

Item 2:  The ___ f_____ being requested ___m ___S:  (please check __ _____s)
□ Verify tha_ ___e attached doc_____ is a _____d ___y of the I-797 approv__ notice, prima facie
    dete___ ___ion or recei____ ___ ___ ___
□ Make a pri___ _____ ____ or _____ adjudication of the petition and notify the
    requesting_____
□ Update the stat___ ___ ___ __ency's _____ (insert date) request for a prima
    facie determin____ of ___ _____e adjudication.  (Requesting agency should allow three
    weeks from the request f__ ___ prima facie determination or filing of a petition before
    making this request.)
□ Determine whether the ___l____ has filed a petition or whether a petition has been filed on his
    or her behalf under (a) or (b), as indicated above.  If so, please make a prima facie
    determination or expedited adjudication of the applicant's petition and notify the
    requesting agency of the outcome.

Date: _____        Agency Signature: _____

II-37



**App. 2199**

MAY-29-1997 15:54                                              213 380 4319   P.14

**PART A:** For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)

**Step 1:** Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?   [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2.]

    Yes _____ → Attach a copy of the I-797 to this form (you need not complete Step 2)

    No _____ → If the applicant has documentation other than a Form I-797, proceed to Step

**Step 2:** If the applicant does not have a Form I-797, please fill out the following information. All blanks, except that noted "if available" must be complete.

.Benefit Applicant's full name: _____

Benefit Applicant's date of birth: _____

Benefit Applicant's best guess as to the date the I was filed: _____

Benefit Applicant's best guess as to the _____ (mo/yr) with which INS office the petition was filed:

Petitioner's full name: _____

Petitioner is Applicant's ____ spouse ____ parent ____ self [widow(er)]   (check one)

Petitioner is a ____ U.S. citizen or ____ lawful permanent resident ("green card holder")

Petitioner's date of _____

Petitioner's ALIEN Registration Number, if available:  A _____

Petitioner's address at the time the petition was filed:

    street address, _____

II-38

MAY-29-1997

**PART B:** For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS. If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name: _____

Applicant/self-petitioner's date of birth: _____

Date I-360 was filed: _____

Location (city) of INS office where filed: _____

**Step 2:** A waiver signed by the alien appears below.

This waiver authorizes release of information only if it is for a purpose determining eligibility for federal, state or local public benefits. It does not authorize the release of information to relatives of the applicant for any purpose other than those specified in paragraph (3), below.

**(1)** My name is (print full name) _____

**(2)** My date of birth is _____ 19___

**(3)** I hereby waive any restriction on the release of information relating to me under section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the "Immigration Act") to the extent necessary to permit the Immigration and Naturalization Service ("INS") and/or the Executive Office for Immigration Review ("EOIR") to provide, in writing, to any federal, state, or local public benefit-granting entity seeking to verify my immigration status, the information it is required to determine my eligibility for federal, state or local public benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Immigration Act: (a) whether an application for relief under section 204(a)(1)(A) (iii), (iv), 204(a)(1)(B) (ii) or (iii), section 216(c)(4)(C), section 244(a)(3) as in effect prior to April 1, 1997, or section 240A(b)(2) of the Immigration and Nationality Act, and (b) whether INS or EOIR has made a prima facie determination or final determination of eligibility for relief under any of the above provisions, and, if so, the outcome of those determinations.

I declare, under penalty of perjury, that the foregoing is true and correct, and that I have executed this waiver knowingly and voluntarily.

Executed on (date): _____

_____
Signature of Applicant

13

21.

II-39

# DEF-INTERV.

# EX. 19


**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

October 2014

### Executive Grants of Temporary Immigration Relief, 1956-Present

Much has been made of President Obama's Deferred Action for Childhood Arrivals (DACA) program, through which he deferred deportation for young adults brought to the U.S. as children. But as immigration legal scholar Hiroshi Motomura has noted, the president has broad executive authority to shape the enforcement and implementation of immigration laws, including exercising prosecutorial discretion to defer deportations and streamline certain adjudications.[1] In fact, a look at the history books reveals that President Obama's action follows a long line of presidents who relied on their executive branch authority to address immigration challenges.

A chart of these decisions [below] makes clear that presidents have ample legal authority—and abundant historical precedent—to exercise their discretion in immigration matters. Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance. This chart collects 39 examples, which span actions large and small, taken over many years, sometimes by multiple administrations.[2] Some presidents announced programs while legislation was pending. Other presidents responded to humanitarian crises. Still others made compelling choices to assist individuals in need when the law failed to address their needs or changes in circumstance.

Perhaps the most striking historical parallel to today's immigration challenges is the "Family Fairness" policy implemented by Presidents Ronald Reagan and George Bush, Sr. The story behind the fairness policy begins on November 6, 1986, when President Reagan signed the 1986 Immigration Reform and Control Act (IRCA), which gave up to 3 million unauthorized immigrants a path to legalization if they had been "continuously" present in the U.S. since January 1, 1982. But the new law excluded their spouses and children who didn't qualify and forced them to wait in line, creating "split-eligibility" families, as they were called. The U.S. Catholic bishops and immigration groups criticized President Reagan for separating families.

In 1987, Reagan's Immigration and Naturalization Service (INS) commissioner announced a blanket deferral of deportation (logistically similar to today's DACA program) for children under 18 who were living in a two-parent household with both parents legalizing, or with a single parent who was legalizing. Then, in July 1989, the Senate passed legislation to protect a bigger group—prohibiting deportation of all spouses and children of those who were legalizing under IRCA.

But the legislation stalled in the House, and in 1990 President Bush Sr. administratively implemented the Senate bill's provisions. His INS commissioner, saying "We can enforce the law humanely," expanded the blanket deferral to as many as 1.5 million spouses and children of immigrants who were legalizing, provided they met certain criteria. President Bush thus protected over 40 percent of the then-unauthorized population from deportation. The House then passed legislation, and President Bush signed it later that year.



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

The Family Fairness program is only one example of the common characteristics of presidential decisions to act on immigration. Several decisions were large-scale actions potentially affecting hundreds of thousands or millions of immigrants. Some presidents focused on the necessity of keeping families together. And other presidents acknowledged the absurdity of trying to deport people for whom major legislation in Congress was pending. Some of these examples include:

- **Large-scale actions**: In addition to Family Fairness, other large-scale actions include paroles of up to 600,000 Cubans in the 1960s and over 300,000 Southeast Asians in the 1970s, President Carter's suspension of deportations for over 250,000 visa-holders, and President Reagan's deferral of deportations for up to 200,000 Nicaraguans.

- **Family-based actions:** Other actions to protect families include the suspended deportations of families of visa-holders (Carter), parole of foreign-born orphans (Eisenhower, Obama), deferred action to widows of U.S. citizens and their children (Obama), and parole-in-place to families of military members (Obama).

- **Actions while legislation was pending**: Other actions taken while legislation was pending include parole of Cuban asylum seekers fleeing Castro (Nixon, Kennedy, Johnson), deferred action to battered immigrants whom the Violence Against Women Act (VAWA) would protect (Clinton), parole of orphans (Eisenhower), and DACA (Obama).

**Endnotes**

[1] Hiroshi Motomura, *The President's Discretion, Immigration Enforcement, and the Rule of Law* (Washington, DC: American Immigration Council, August 2014), http://immigrationpolicy.org/perspectives/president%E2%80%99s-discretion-immigration-enforcement-and-rule-law.

[2] This data is compiled from Marshall Fitz, *What the President Can Do on Immigration If Congress Fails to Act* (Washington, DC: Center for American Progress, July 2014), http://www.americanprogress.org/issues/immigration/report/2014/07/01/93042/what-the-president-can-do-on-immigration-if-congress-fails-to-act/; Andorra Bruno, Todd Garvey, Kate Manuel, and Ruth Ellen Wasem, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (Washington, DC: Congressional Research Service, July 13, 2012), http://edsource.org/wp-content/uploads/Deferred-Action-Congressional-Research-Service-Report.pdf; Arthur C. Helton, "Immigration Parole Power: Toward Flexible Responses to Migration Emergencies," *Interpreter Releases* 71, no. 1637 (December 12, 1994); John W. Guendelsberger, "Family Fairness: A Status Report," *In Defense of the Alien* 15 (1992):45-57, http://www.jstor.org/stable/23143114; and other media reports, press releases, and articles, linked to here where publicly available.



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

## Executive Grants of Temporary Immigration Relief, 1956-Present

| Year(s) | 1956 | 1956-58 | 1959-72 | 1962-65 | 1975-79 |
|---|---|---|---|---|---|
| **Relief Covered:** | 923 orphans were paroled into the custody of military families seeking to adopt them, pending Congressional legislation providing them permanent resident status | Parole of Hungarians who escaped after 1956 uprising against Soviets failed | Parole for Cuban asylum seekers fleeing Cuban revolution | Executive parole of Chinese who fled to Hong Kong in early 1962 | Executive parole of Indochinese from Vietnam, Cambodia, and Laos, in 10 authorizations or extensions from 1975-79 |
| **# Affected:** | 923 | 31,915 granted parole. | 621,403 received, vast majority granted parole | 15,100 paroled | 360,000 arrived in US, most under parole authorization |
| **President(s):** | Eisenhower | Eisenhower | Eisenhower, Kennedy, Johnson, Nixon | Kennedy, Johnson | Ford, Carter |
| **Other Notes:** | Press release, Oct. 26, 1956: "The Secretary of State and the Attorney General have just reported to me that this can be done." | | Legislation was pending during this time (i.e. the Cuban Adjustment Act of 1966). In FY 1972, a total of 17,109 Cuban asylum seekers were paroled into the U.S. via airlift | | Some also eligible under conditional entry, but since not enough entries statutorily available, most were paroled. Most of 130,000 refugees who were evacuated during 1975 U.S. withdrawal from Vietnam were paroled |

3



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1976 | 1977 | 1977-82 | 1977-1980 | 1978 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extended Voluntary Departure (EVD) for Lebanese | AG temporarily suspended expulsion of "*Silva* letterholders," who were suing because the State Department incorrectly calculated a visa cap, while their litigation and legislation moved forward | Extended Voluntary Departure (EVD) for Ethiopians | Parole for Soviet refugees | Extended Voluntary Departure (EVD) for Ugandans |
| **# Affected:** | Unknown (although 14,000 fled Lebanon to US) | Ultimately 250,000 (500,000 including dependents) | 15,000+ | 50,000 + (9,000 in Jan. and Dec. 1977; 12,000 in June 1978; 36,000 in 1979) | Unknown |
| **President(s):** | Ford | Carter | Carter, Reagan | Carter | Carter |
| **Other Notes:** | Extended Voluntary Departure (EVD) is an administrative process by which designated nationals of a country were protected from deportation and provided work authorization. *See* 563 F. Supp. 157 (D.D.C. 1983) | | Reagan extended this policy in 1982, after Reps. Dixon (D-CA) and Kemp (R-NY) cosponsored resolution | From 1972-on, parole was used frequently for Soviet refugees when not enough conditional entries were statutorily available | |

4



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1979 | 1979 | 1980 | 1980 | 1981-1987 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extend Voluntary Departure (EVD) for Nicaraguans | Extended Voluntary Departure (EVD) for Iranians | Extended Voluntary Departure (EVD) for Afghans | Parole of Cubans and Haitians during Mariel boatlift | Extended Voluntary Departure (EVD) for Poles |
| **# Affected:** | 3,600 | Unknown | Unknown | 123,000 paroled in US by 1981 | 7,000 (as of 1987) |
| **President(s):** | Carter | Carter | Carter | Carter | Reagan |
| **Other Notes:** | | In response to Iranian Revolution against Shah. | | | In response to Polish Communist government declaring martial law in 1981, after crackdown on Solidarity strikes. Initiated in 1981, extended in 1984 and 1987 |

5



# AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1987 | 1987 | 1989 | 1989 | 1990 |
|---|---|---|---|---|---|
| **Relief Covered:** | AG Meese directed INS not to deport Nicaraguans and to grant them work authorizations, if they demonstrated a "well-founded fear of persecution," even if denied asylum | Unauthorized children of some noncitizens who applied to legalize after 1986 immigration reform | Executive directive of deferred action for Chinese nationals following Tiananmen Square | Parole of Soviets and Indochinese, even though denied refugee status | Further executive order formalizing Deferred Enforced Departure (DED) for Chinese nationals following Tiananmen Square |
| **# Affected:** | Up to 200,000 | More than 100,000 families | 80,000 | 2,225 Indochinese in 1989; 5,000 Soviets as of 1989 | 80,000 |
| **President(s):** | Reagan | Reagan | Bush Sr. | Bush Sr. | Bush Sr. |
| **Other Notes:** | Legislation was pending. Ultimately, the Nicaraguan Adjustment and Central American Relief Act (NACARA) passed | Reagan's AG Meese also authorized INS to defer deportation proceedings for "compelling or humanitarian factors" | Visa overstays had to report to INS to benefit from deferred action and apply for work authorization. Bush: "I reemphasize my commitment… to never allow any action that would force the return of Chinese students if their lives or liberty are at risk." | | "Deferred Enforced Departure" is a stay of deportation, and often within the provision of work authorization, within the President's foreign relations power. Bush's executive order suspended deportations, provided work authorization for all Chinese nationals in the US as of 6/5/89, and waived a regulation to allow adjustment of status |

6



# AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1990 | 1991 | 1992 | 1994 | 1997 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred deportation of unauthorized spouses *and* children of individuals legalized under 1986 Immigration Reform and Control Act (IRCA) | President directed AG to grant deferred enforced departure (DED) to Persian Gulf evacuees who were airlifted to US after 1990 Kuwait invasion | Bush Administration granted DED to certain El Salvadorans, even though their statutory TPS grant expired | Parole of further Cubans into the US. | Deferred Enforced Departure (DED) for Haitians in the US since before 1995 |
| **# Affected:** | Up to 1.5 million | 2,227 | 190,000 | ~28,000 | 40,000 |
| **President(s):** | Bush Sr. | Bush Sr. | Bush Sr., Clinton | Clinton | Clinton |
| **Other Notes:** | Bush INS Commissioner issued blanket "Family Fairness" policy, and dropped "compelling or humanitarian factors" requirement in prior executive action. Legislation had passed the Senate, but not the House, providing similar relief | Criteria: Those who had US citizen relatives or harbored US citizens during the invasion. Allowed evacuees to apply for permanent residency. A Kuwaiti doctor said, "I feel the President has finally put a happy ending on this tragic story." | President Clinton subsequently extended the DED grant until Dec. 31, 1994 | Included Cubans on the immigrant visa waiting list, unmarried sons and daughters of Cubans issued immigrant visas or granted refugee status, and family members who reside in the same household. Also paroled Cubans detained at Guantanamo and Panama | Legislation was pending to help these Haitians (Haitian Refugee Immigration Fairness Act of 1998 allowed these Haitians to obtain green card) |

7



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1997 | 1998 | 1999 | 2002 | 2005 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred action to noncitizens who might gain relief through Violence Against Women Act (VAWA), if it passed | Attorney General temporarily suspended deportations to El Salvador, Guatemala, Honduras, and Nicaragua, in response to Hurricane Mitch | Deferred Enforced Departure (DED) for Liberians for 1 year | Executive order of expedited naturalization for green card holders who enlisted in military | Deferred action for foreign academic students who were affected by Hurricane Katrina |
| **# Affected:** | Unknown | 150,000 | 10,000 | Unknown | Unknown |
| **President(s):** | Clinton | Clinton | Clinton | Bush | Bush |
| **Other Notes:** | VAWA legislation was pending. Criteria: Battered noncitizens with approved LPR self-petitions, and their derivative children | | | Order eliminated a three-year wait, let the soldiers seek citizenship immediately and applied to anyone on active duty as of Sept. 11, 2001. Included Lance Cpl. José Gutiérrez, a Guatemalan who received U.S. status through SIJ and died in Iraq | Bush also suspended employer verification rules. Congress was considering legislation at the time |

8



AMERICAN
IMMIGRATION
COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 2006 | 2007 | 2009 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Relief Covered:** | Established Cuban Medical Parole Program, to allow Cuban doctors conscripted abroad to apply for parole at US embassies | Deferred Enforced Departure (DED) for Liberians in 2007, whose TPS had statutorily expired | Extended Deferred Enforced Departure (DED) for qualified Liberians | Extended deferred action to widows and widowers of U.S. citizens, and their unmarried children under 21 | Parole-in-place to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | 1,574, as of Dec. 2010 | 3,600 | Unknown | Unknown | Unknown |
| **President(s):** | Bush | Bush | Obama | Obama | Obama |
| **Other Notes:** | Program still in place | | | | Granted on case-by-case basis. First grant of parole-in-place was under Bush Administration |

9



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Relief Covered:** | Parole to Haitian orphans who were in the process of being adopted by U.S. citizens | Extended Liberian DED through March 2013 | Deferred action for childhood arrivals (DACA) | Revised parole-in-place policy to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | Unknown | 3,600 | Up to 1.8 million | Unknown |
| **President(s):** | Obama | Obama | Obama | Obama |
| **Other Notes:** | Actions followed Haitian earthquake on January 12, 2010 | | Legislation was pending (i.e. the DREAM Act). Provided for a two-year renewable reprieve from deportation, and work authorization, for those meeting certain criteria. USCIS took significant actions to process applications | Revised policy so that "ordinarily" granted |

10

# DEF-INTERV.

# EX. 20



No. 14-10049

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CHRISTOPHER L. CRANE; DAVID A. ENGLE; ANASTASIA MARIE
CARROLL; RICARDO DIAZ; LORENZO GARZA; FELIX LUCIANO; TRE
REBSTOCK; FERNANDO SILVA; SAMUEL MARTIN; JAMES D. DOEBLER;
STATE OF MISSISSIPPI, by and through Governor Phil Bryant,

Plaintiffs–Appellants/Cross-Appellees,

v.

JEH CHARLES JOHNSON, SECRETARY, DEPARTMENT OF HOMELAND
SECURITY; JOHN SANDWEG, in His Official Capacity as Director of
Immigration and Customs Enforcement; LORI SCIALABBA, in Her Official
Capacity as Acting Director of United States Citizenship and Immigration
Services,

Defendants–Appellees/Cross-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

BRIEF FOR THE FEDERAL APPELLEES/CROSS-APPELLANTS

STUART F. DELERY
  Assistant Attorney General
SARAH R. SALDAÑA
  United States Attorney
MICHAEL JAY SINGER
  (202) 514-5432
JEFFREY CLAIR
  (202) 514-4028
  jeffrey.clair@usdoj.gov

Attorneys, Civil Division
Room 7243, Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary of Homeland Security and other federal appellants/cross-appellees respectfully request oral argument. Oral argument will illuminate the position of the parties and aid the Court in reaching a decision.

i

# TABLE OF CONTENTS

Page

STATEMENT REGARDING  ORAL ARGUMENT................................ i

STATEMENT OF JURISDICTION .................................................. 2

STATEMENT OF THE ISSUES PRESENTED
    FOR REVIEW.................................................................... 4

STATEMENT OF THE CASE.......................................................... 5

    1.    Statutory Scheme:  Immigration Enforcement
        and Prosecutorial Discretion ........................................... 5

    2.    District Court Proceedings and Decision...................................... 17

        a.    Standing.......................................................... 18

        b.    Merits .......................................................... 21

        c.    Subject Matter Jurisdiction .................................... 23

SUMMARY OF THE ARGUMENT.................................................. 24

STANDARD OF REVIEW .......................................................... 29

ARGUMENT.......................................................................... 30

    I.    The State of Mississippi Lacks Standing To
        Challenge The Secretary's Exercise Of
        Prosecutorial Discretion In Removal
        Proceedings ................................................................ 30

ii

A.    Mississippi's Alleged Injuries Would Not Be Redressed By A Favorable Decision On Its Statutory Claims ........................................ 32

B.    Mississippi Has Not Alleged Or Established A Concrete Injury Traceable To The Secretary's Exercise Of Prosecutorial Discretion .............................................................. 34

    1.    *Massachusetts* v. *EPA* Does Not Relieve Mississippi Of The Obligation To Allege A Concrete Injury.............................................................. 35

    2.    Prudential Considerations Weigh Against Standing Because The Claimed Injury Is Not Within The Zone Of Interests Protected By The Statutes Underlying Mississippi's Claim.................................................... 37

    3.    The District Court Reasonably Determined That Mississippi Had Not Established An Injury Sufficient To Support Standing ................................................ 39

    4.    Mississippi's Allegations Of Injury Are Too Conclusory, Speculative, And Indefinite To Support Standing ...................... 47

iii

II.   The Plaintiff Immigration Officers' Employment-Related
      Claims Are Not Ripe for Adjudication ........................................ 50

III.  The Civil Service Reform Act Precludes District
      Court Jurisdiction Over The Plaintiff Immigration
      Officers' Claims Of Employment-Related Injury ....................... 55

      A.   The CSRA Establishes A Comprehensive
           Remedial Scheme For Resolving Federal
           Employment Disputes .......................................................... 55

      B.   CSRA Remedies Are Exclusive And Bar
           District Court Jurisdiction Over Claims
           Arising Out Of A Federal Employment
           Dispute ................................................................................. 59

      C.   The CSRA Precludes Plaintiffs' Claim
           For Prospective Injunctive Relief ...................................... 62

      D.   Statutory And Constitutional Claims Are
           Not Excepted From The CSRA's Exclusive
           Remedial Scheme ................................................................. 67

IV.   *Leedom* v. *Kyne* Does Not Authorize Plaintiffs To
      Circumvent The Jurisdictional Limitations Of The
      Civil Service Reform Act ................................................................ 70

V.    The Immigration Statutes Do Not Limit The
      Secretary's Prosecutorial Discretion To Defer
      Enforcement Action ........................................................................ 79

CONCLUSION ...................................................................................... 90

iv

FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE ......................................... 91

CERTIFICATE OF SERVICE ............................................................. 91

## Cases:

*Abbott Labs. v. Gardner*, 387 U.S. 136. (1967) ............................................. 50, 51

*AFGE Local I v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ...................................... 65

*Ali v. Rumsfeld*, 649 F.3d 742 (D.C. Cir. 2011) .................................................. 18

*Allen v. Wright*, 468 U.S. 737 (1984) .............................................................. 31, 78

*Am. States Ins. Co. v. Bailey*, 133 F.3d 363 (5th Cir. 1998) .............................. 29

*American Airlines, Inc. v. Herman*, 176 F.3d 283
(5th Cir. 1999) ...................................................................................... 72

*American Bottom Conservancy v. U.S. Army Corps of
Engineers*, 650 F.3d 652 (7th Cir. 2011) ...................................................... 79

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ...................................... 9, 36, 75

*Arvie v. Broussard*, 42 F.3d 249 (5th Cir. 1994) ................................................. 79

*Baker v. Carr*, 369 U.S. 186 (1962) ...................................................................... 30

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................ 37

*Board of Governors of the Federal Reserve System v.
MCorp Financial, Inc.*, 502 U.S. 32 (1991) ........................................... 27, 72

v

App. 2379

*Boire v. Greyhound Corp.*, 376 U.S. 473 (1964) ................................... 71

*Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982) ................................. 64

*Brotherhood of Ry. & S.S. Clerks v. Association for the
    Benefit of Non-Contract Employees*, 380 U.S. 650 (1965) .................... 64, 71

*Carducci v. Regan*, 714 F.2d 171 (D.C. Cir. 1983) ............................. 56

*Cent. & Sw. Servs. v. EPA*, 220 F.3d 683 (5th Cir. 2000) ................................ 51

*Chamber of Commerce of the United States v. Whiting,
    131 S. Ct. 1968 (2011)* ......................................................... 5

*Commonwealth of Pennsylvania v. Kleppe,
    533 F.2d 668 (D.C. Cir. 1976)* ............................................ 36, 49

*Compensation Dep't v. Marshall*, 667 F.2d 336 (3d Cir. 1981) ........................ 72

*Cornelius v. Nutt*, 472 U.S. 648 (1985) ......................................... 58

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) ........................ 72

*Donelon v. La. Div. of Adm. Law ex rel. Wise,
    522 F3d 564 (5th Cir. 2008)* ............................................... 20, 52

*Dubois v. Thomas*, 820 F.2d 943 (8th Cir. 1987) ................................ 84

*Dunlop v. Bachowski*, 421 U.S. 560 (1975) ...................................... 81

*Elgin v. Dept. of the Treasury*, 132 S. Ct. 2126
    (2012) ................................................. 3, 26, 55, 61, 65, 66, 67, 69

vi

*Finch v. Mississippi State Med. Ass'n,*
    585 F.2d 765 (5th Cir. 1978)..................................................................... 20, 52

*Galvin v. FDIC,* 48 F.3d 531, 1995 WL 84520
  (5th Cir. 1995) ......................................................................................... 64

*Gandy Nursery, Inc. v. United States,* 318 F.3d 631
    (5th Cir. 2003) ................................................................................... 30, 43

*Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907)....................................... 35

*Graham v. Ashcroft,* 358 F.3d 931 (D.C. Cir. 2004).............................. 61-62, 64

*Heckler v. Chaney,* 470 U.S. 821 (1985) .................................................. 79, 80, 88

*Hertz Corp. v. Friend,* 559 U.S. 77 (2010)...................................................... 41

*Heslabeck v. United States,* 821 F. Supp. 404
    (E.D. N.C. 1993) ....................................................................................... 65

*In re Deepwater Horizon,* 739 F.3d 790 (5th Cir. 2014) ............................ 30, 43

*In re G-N-C,* 22 I. & N. Dec. 281 (B.I.A. 1998) ................................................. 33

*Kirby Corp. v. Pena,* 109 F.3d 258 (5th Cir. 1997)................................. 27, 71, 72

*Leedom v. Kyne,* 358 U.S. 184
    (1958)......................................4, 24, 26, 27, 70, 71, 72, 73, 74, 75, 76, 77, 78

*Lexmark International, Inc. v. Static Control*
    *Components, Inc.,* 134 S. Ct. 1377 (2014)............................................ 37, 38

*Linn v. Chivatero,* 714 F.2d 1278 (5th Cir. 1983) ................................................. 3

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)................... 25, 31, 32, 38, 39

vii

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) ................................. 77

*Mangano v. United States*, 529 F.3d 1243 (9th Cir. 2008) ......................... 62, 64

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................... 34, 35, 47

*Mathews v. Diaz*, 425 U.S. 57 (1976) .................................................................. 36

*Matter of Vizcarra-Delgadillo*, 13 I & N Dec. 51
  (BIA 1968) ......................................................................................................... 10

*Martin* v. *DHS*, 2014 WL 1900939 (MSPB May 9, 2014) ........................... 74-75

*McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992) .............................. 61, 64, 66, 67

*McLendon v. Jackson Television, Inc.*, 603 F.3d 1174
  (5th Cir. 1979) .................................................................................................. 72

*Nor-Am Agricultural Products, Inc. v. Hardin*,
  435 F.2d 1151 (7th Cir. 1970) ........................................................................ 72

*NTEU v. Devine*, 577 F. Supp. 738 (D.D.C. 1983) ........................................... 66

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) .................................................................................... 51, 54

*Paladin Community Mental Health Center v. Sebelius*,
  684 F.3d 527 (5th Cir. 2012) .......................................................................... 72

*People of Colorado ex rel. Suthers v. Gonzales*,
  558 F. Supp. 2d 1158 (D. Colo. 2007) ........................................................... 35

*Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) ..................................................... 64

viii

App. 2382

*Quivira Mining Co. v. EPA*, 728 F.2d 477 (10th Cir. 1984) .............................. 72

*Reno v. American Arab Anti-Discrimination Committee*,
   525 U.S. 471 (1999) ................................................. 8, 28, 50, 75, 88

*Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43 ..................................................... 50

*Resolution Trust Corp. v. Miramon*, 22 F.3d 1357
   (5th Cir. 1994) ....................................................................................... 29

*Sampson v. Murray*, 415 U.S. 61 (1974) ......................................................... 54, 63

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ............................................................................. 47, 69

*Seabrook v. Costle*, 659 F.2d 1371 (5th Cir. 1981) ....................................... 28, 84

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) .............................. 77

*Simon v. Eastern Ky. Welfare Rights Organization*,
   426 U.S. 26 (1976) ................................................................................ 32

*Siwe v. Holder*, 742 F.3d 603 (5th Cir. 2014) ..................................................... 88

*Skelly Oil Co. v. Phillips Petroleum Co.*,
   339 U.S. 667 (1950) .............................................................................. 18

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..................................................... 88

*Smith v. Department of the Army*, 458 F.3d 1359
   (Fed. Cir. 2006) .................................................................................... 56

ix

*Telecommunications Research and Action Center v. FCC,*
 750 F.2d 70 (D.C. Cir. 1984) ............................................................. 72

*Texas v. United States,* 106 F.3d 661 (5th Cir. 1997) ........................................ 37

*Towers v. Horner,* 791 F.2d 1244 (5th Cir. 1986) ............................................... 64

*Town of Castle Rock v. Gonzales,* 545 U.S. 748 (2005)....................................... 84

*U.S. Dept. of the Treasury v. FLRA,*
 43 F.3d 682 (D.C. Cir. 1994) ....................................................................... 59

*United Food & Commercial Workers Int. Union v. IPB, Inc.,*
 857 F.2d 422 (8th Cir. 1988)...................................................................... 52

*United States v. Fausto,* 484 U.S. 439
 (1988).......................................................... 3, 26, 55, 59, 61, 63, 64, 65, 66, 69,

*United States v. Wallace & Tiernan Co.,*
 336 U.S. 793 (1949) ....................................................................................... 3

*Valley Forge Christian College v. Americans United for*
 *Separation of Church and State, Inc.,* 454 U.S. 464 (1982) ........................ 30

*Warth v. Seldin,* 422 U.S. 490 (1975)......................................................... 37, 40, 47

*Weaver v. Texas Capital Bank N.A.,*
 660 F.3d 900 (5th Cir. 2011)......................................................................... 79

*Whitman v. Dep't of Transportation,* 547 U.S. 512 (2006) ................................. 64

*Williamson v. Tucker,* 645 F.2d 404 (5th Cir. 1981)............................. 40, 42, 43

*Wood v. Herman,* 104 F. Supp. 2d 43 (D.D.C. 2000)......................................... 84

x

App. 2384

*Wyoming v. U.S. Dept. of Interior*, 674 F.3d 1220
  (10th Cir. 2012) ............................................................ 49

## United States Constitution:

  Article III .................................................... 20, 25, 37, 50, 52, 57, 65, 78

## Statutes:

Administrative Procedure Act:

  5 U.S.C. § 701(a)(1) .............................................................. 18
  5 U.S.C. § 701(a)(2) .............................................................. 18
  5 U.S.C. § 706(2) .................................................................. 18

Civil Service Reform Act:

  5 U.S.C. § 1101, et seq. ...................................................... 8, 55
  5 U.S.C. § 1214(a)(1) ............................................................ 62
  5 U.S.C. § 1214(a)(3) ............................................................ 57
  5 U.S.C. § 1214(b)(2) ............................................................ 62
  5 U.S.C. § 1214(c)(1) ............................................................ 57
  5 U.S.C. § 1221(a) ................................................................ 57
  5 U.S.C. § 1221(g)(1)(A) ........................................................ 74
  5 U.S.C. § 1221(h) ................................................................ 57
  5 U.S.C. § 2302(b)(9)(D) .................................................. 57, 73
  5 U.S.C. § 7103(a)(9)(A) ........................................................ 58
  5 U.S.C. § 7103(a)(9)(C)(ii) .................................................... 58
  5 U.S.C. § 7121 .................................................................... 58
  5 U.S.C. § 7121(b)(1)(C)(iii) .................................................. 64

5 U.S.C. § 7122 .................................................................................... 58
5 U.S.C. § 7122(a) ............................................................................... 58
5 U.S.C. § 7123 .................................................................................... 58
5 U.S.C. § 7123(a)(1) .......................................................................... 59
5 U.S.C. § 7703 .................................................................................... 57
5 U.S.C. § 7703(b) ............................................................................... 57
5 U.S.C. § 7703(b)(1) .......................................................................... 57
6 U.S.C. § 202(5) .......................................................................... 11, 89

Declaratory Judgment Act:

28 U.S.C. §§ 2201 & 2202 .................................................................. 18

Illegal Immigration Reform and Immigrant
Responsibility Act, Pub. L. No. 104–208,
Div. C. Title III, 301 & 302,
110 Stat. 3009-575-584 (1996) ....................................................... 87

Immigration and Nationality Act, 66 Stat. 163,
as amended, 8 U.S.C. § 1101 et seq. ............................................... 5

8 U.S.C. § 1103 ............................................................................. 6, 89
8 U.S.C. § 1103(g) ............................................................................... 7
8 U.S.C. § 1129a(c)(3) ....................................................................... 87
8 U.S.C. § 1182(a) ................................................................................ 6
8 U.S.C. § 1182(a)(2) & (3) ................................................................. 6
8 U.S.C. § 1182(a)(6) & (7) ................................................................. 6
8 U.S.C. § 1225 .................................................................................. 86
8 U.S.C. § 1225(a)(1) .......................................... 17, 22, 32, 38, 81, 82
8 U.S.C. § 1225(b)(2) ................................................................... 22, 38
8 U.S.C. § 1225(b)(1)(A)(i) ................................................................. 7
8 U.S.C. § 1225(b)(1)(A)(iii) ............................................................... 7
8 U.S.C. § 1225(b)(2)(A) ......................... 4, 17, 22, 27, 81, 82, 85
8 U.S.C. § 1227 .................................................................................... 6

App. 2386

8 U.S.C. § 1227(a)(1)(A) .............................................................. 6
8 U.S.C. § 1227(a)(1)(C) .............................................................. 6
8 U.S.C. § 1227(a)(2) .................................................................. 6
8 U.S.C. § 1227(a)(4) .................................................................. 6
8 U.S.C. § 1228(b) ...................................................................... 7
8 U.S.C. § 1229a ............................................................... 7, 22, 28
8 U.S.C. § 1229(a)(1) .................................................................. 8
8 U.S.C. § 1229a(a) ..................................................................... 7
8 U.S.C. § 1229a(a)(3) ................................................................. 7
8 U.S.C. § 1229a(b) ..................................................................... 8
8 U.S.C. § 1229a(c)(2) ................................................................ 87
8 U.S.C. § 1229(c) ...................................................................... 8
8 U.S.C. § 1252(a) ..................................................................... 13

28 U.S.C. § 1291 ........................................................................ 3
28 U.S.C. § 1331 ........................................................................ 7

**Rules:**

Fed. R. App. P. 43(c)(2) ............................................................... 6
Fed. R. Civ. P. 12(b)(1) .............................................................. 40
Fed. R. Civ. P. 59(e) ................................................................... 3

**Regulations:**

8 C.F.R. 239.1(a) ................................................................... 8, 11
8 C.F.R. 239.2(a) ................................................................. 32, 33
8 C.F.R. 239.2 (a)(6) & (7) ........................................................ 16
8 C.F.R. 239.2(c) ................................................................ 17, 39
8 C.F.R. 274a.12(c)(14) ............................................................ 16
8 C.F.R. 1003.10 ....................................................................... 7
8 C.F.R. 1003.12-1003.37 ........................................................... 8
8 C.F.R. 1003.14 ....................................................................... 7

xiii

8 C.F.R. 1003.38 ........................................................... 8
8 C.F.R. 1239.1(a) ......................................................... 8
8 C.F.R. 1239.2(c) .................................................. 11, 33

**Legislative Materials:**

H. Rep. No. 104-469, Pt. 1, 104th Cong.,
2d Sess. 225-26 (1996) ............................................ 87

H. Rep. No. 111-157, 111th Cong., 1st Sess. 8 (2009) .................................... 89

S. Rep. No. 969, 95th Cong., 2d Sess. 3 (1978) ............................... 59

**Miscellaneous:**

National Institute of Corrections,
State Statistics, http://nicic.gov/statestats/?st=MS ...................................... 45

*Webster's Third New International Dictionary*
at 2055 (1993) ................................................... 82

xiv

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 14-10049

———————————

CHRISTOPHER L. CRANE, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

JEH JOHNSON, SECRETARY OF
HOMELAND SECURITY, et al.,[1]

Defendants-Appellees/Cross-Appellants.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

———————————

**BRIEF FOR THE FEDERAL APPELLEES/CROSS-APPELLANTS**

———————————

Plaintiffs are federal immigration officers and the state of Mississippi.

They challenge a Department of Homeland Security policy to defer taking

———————————

[1] Pursuant to FRAP 43(c)(2), Secretary Johnson is automatically
substituted as defendant-appellee/cross-appellant.

enforcement action against aliens who, though unlawfully present in the United States, arrived in the United States as children and meet certain other criteria, such as having served in the United States armed forces. Plaintiffs allege that this prosecutorial discretion policy is inconsistent with statutory provisions assertedly compelling federal immigration officers to initiate removal proceedings against *all* inadmissible aliens, regardless of humanitarian considerations, resource constraints, or the alien's prior contributions to the interests of the United States. They accordingly seek a declaratory judgment that the policy is invalid and an injunction barring the government from exercising its prosecutorial discretion to refrain from initiating removal proceedings.

### STATEMENT OF JURISDICTION

1. Plaintiffs alleged district court jurisdiction under 28 U.S.C. § 1331. ROA.106. As explained more fully below, however, the district court correctly dismissed the case for lack of subject matter jurisdiction. Plaintiffs lack standing to assert a generalized grievance as to the government's exercise of prosecutorial discretion in the enforcement of

2

federal immigration law.  And insofar as the plaintiff immigration officers

challenge the potential imposition of employee discipline for failure to

follow agency enforcement policy, district court jurisdiction is barred by

principles of ripeness as well as the Civil Service Reform Act, 5 U.S.C. §

1101, *et seq. See Elgin* v. *Dept. of the Treasury,* 132 S. Ct. 2126  (2012); *United

States* v. *Fausto,* 484 U.S. 439, 455 (1988).

    2.  The district court entered a final judgment dismissing the case for

lack of jurisdiction on July 31, 2013.[2]  ROA.1360.  Plaintiffs filed a timely

FRCP 59(e) motion to alter or amend the judgment on August 28, 2013,

which the court denied by order entered December 9, 2013.  ROA.1418.

Plaintiffs filed a timely notice of appeal on January 8, 2014.  ROA.1430.  The

federal defendants filed a timely cross-appeal on January 17, 2014.

ROA.1433.  This Court has appellate jurisdiction under 28 U.S.C. §1291.

---

    [2] Although the court stated that its dismissal was "without
prejudice," the order disposes of all the claims of all the parties, terminates
the litigation, and does not contemplate any further proceedings in district
court.  It is therefore final and amenable to appellate review.  *See United
States* v. *Wallace & Tiernan Co.,* 336 U.S. 793, 794 n.1 (1949); *Linn* v. *Chivatero,*
714 F.2d 1278, 1280 (5th Cir. 1983).

3

App. 2391

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the state of Mississippi has standing to challenge the Department of Homeland Security's discretionary policy of declining to commence removal proceedings against certain inadmissible aliens who arrived in the United States as children.

2. Whether the plaintiff immigration officers' claim for equitable relief against potential future disciplinary action is ripe for adjudication.

3. Whether the Civil Service Reform Act precludes the district court from assuming subject matter jurisdiction over the plaintiff immigration officers' claims that they will be subject to unlawful employment discipline if they fail to comply with DHS policy.

4. Whether, notwithstanding the remedies afforded by the Civil Service Reform Act, district court jurisdiction is authorized under *Leedom* v. *Kyne*, 358 U.S. 184 (1958).

5. Whether 8 U.S.C. § 1225(b)(2)(A), which provides that all inadmissible applicants seeking admission to the United States "shall be

4

detained" for removal proceedings bars DHS from exercising its

prosecutorial discretion to refrain from initiating removal proceedings

against inadmissible aliens where the Department concludes that

humanitarian considerations, resource limitations, or other factors warrant

deferring enforcement action.

## STATEMENT OF THE CASE

1. <u>Statutory Scheme: Immigration Enforcement and Prosecutorial</u>

<u>Discretion</u>.

**a.** The Immigration and Nationality Act, 66 Stat. 163, as amended, 8

U.S.C. §§ 1101 *et seq.*, "established a comprehensive federal statutory

scheme for regulation of immigration and naturalization and set the terms

and conditions of admission to the country and the subsequent treatment

of aliens lawfully in the country." *Chamber of Commerce of the United States*

v. *Whiting,* 131 S. Ct. 1968, 1973 (2011) (internal quotations and citation

omitted). Much of the authority to enforce the immigration laws and to

5

establish enforcement priorities is now vested in the Secretary of Homeland Security. 8 U.S.C. § 1103; 6 U.S.C. § 202(5).

The statute sets forth a range of grounds on which an alien may be removed from the United States. *See generally* 8 U.S.C. §§ 1227(a), 1182(a). Aliens who have been convicted of certain crimes or who have engaged in criminal activity that endangers public safety or national security are removable. 8 U.S.C. §§ 1227(a)(2) & (4); 8 U.S.C. § 1182(a)(2) & (3). Aliens may also be removed for less serious infractions. For example, aliens are removable if they remain in the country beyond their authorized period of stay or violate conditions imposed on their admission. 8 U.S.C. § 1227(a)(1)(C). Similarly, aliens may be removed if they lacked an appropriate visa or were inadmissible on other, non-criminal grounds when they entered the United States. *See* 8 U.S.C. § 1227(a)(1)(A) & (C); 8 U.S.C. § 1182(a)(6) & (7).

An administrative determination to remove an alien from the United States is generally made through proceedings conducted in immigration

6

court – a specialized tribunal within the Department of Justice. 8 U.S.C. §
1229(a)(1), § 1103(g); 8 C.F.R. 1003.10.   With limited exceptions not relevant
here, these immigration court proceedings are the "sole and exclusive
procedure for determining whether an alien may be * * * removed from the
United States." 8 U.S.C. § 1229a(a)3).[3]

Removal proceedings conducted under 8 U.S.C. § 1229a are
commenced by filing a "notice to appear" with the immigration court.
8 U.S.C. § 1229(a); 8 C.F.R. 1003.14. The notice must be in writing and,
among other requirements, must describe the nature of the proceedings,
their legal basis, and the acts or conduct alleged to be in violation of the
law. 8 U.S.C. § 1229(a)(1). The notice must be served on the alien in
person unless personal service is impractical, in which case service may be

---

[3] Other, more expedited proceedings may, for example, be employed
to remove inadmissible aliens arriving in the United States  (8 U.S.C. §
1225(b)(1)(A)(i)), certain aliens who were not lawfully admitted or paroled
into the United States and who were not continuously present in the
United States for the two-year period immediately prior to their inspection
(8 U.S.C. § 1225(b)(1)(A)(iii)), and aliens convicted of aggravated felonies (8
U.S.C. § 1228(b)).

7

effected by mail.  8 U.S.C. § 1229(a)(1) & (c).  Authority to issue a "notice to

appear" and to thereby commence removal proceedings is generally vested

in supervisory immigration officials.  8 C.F.R. 239.1(a); 8 C.F.R. 1239.1(a).

Once proceedings are initiated, removability and the availability of

any relief or protection from removal are determined by an immigration

judge after an evidentiary hearing.  8 U.S.C. 1229a(b); 8 C.F.R. 1003.12-

1003.37.  The immigration judge's decision may be administratively

appealed to the Board of Immigration Appeals.  8 C.F.R. 1003.38.  The

Board's final order of removal may, in some instances, then be reviewed by

filing a petition in the appropriate court of appeals.  8 U.S.C. § 1252(a).

**b.**  Immigration officials have broad prosecutorial discretion to

refrain from proceeding against otherwise removable aliens.  In *Reno* v.

*American Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999),

the Supreme Court stated that "[a]t each stage [of the deportation process]

the Executive has discretion to abandon the endeavor" and noted that

immigration officials "had been engaging in a regular practice (which has

8

come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience." The Court recently confirmed that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona* v. *United States*, 132 S. Ct. 2492, 2499 (2012). It stated that the exercise of enforcement discretion may turn on the equities of an individual case, such as "whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service" or may instead involve policy choices that bear on the nation's international relations. *Ibid.* The Court concluded that "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Ibid.*

The exercise of prosecutorial discretion in determining whether to seek removal of an alien is a longstanding agency practice. In a 1976 legal opinion, the General Counsel of the Immigration and Naturalization Service concluded that there was an established administrative practice of exercising prosecutorial discretion in the enforcement of the immigration

9

laws, and that such discretion is inherent in the agency enforcement function and thus does not depend on any specific statutory authorization. *See* Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1975), ROA.440, citing, among other precedent, *Matter of Vizcarra-Delgadillo*, 13 I & N Dec. 51, 53 (BIA 1968). The legal opinion notes that courts had acknowledged that the decision whether to seek deportation normally lies within the sound discretion of the officer having responsibility for the case. ROA.441. It concludes that:

> Normally, the appropriate time for the exercise of prosecutorial discretion is prior to the institution of proceedings. The primary reason for this is the humanitarian factor; it makes little sense to put the alien through the ordeal and expense of a deportation proceeding when his actual removal will not be sought. In addition, there are practical considerations. Deportation proceedings tie up Government manpower and resources that could be used in performing other important functions. Given the present illegal alien problem[,] such a use of scarce resources on aliens whom the [INS] does not ultimately intend to deport is indefensible.

ROA.442.

Applicable regulations continue to expressly recognize this discretionary authority. They provide that appropriate officials may issue

10

a notice to appear but do not mandate commencement of proceedings

against every removable alien. 8 C.F.R. 239.1(a). Moreover, they provide

that any officer authorized to issue a notice to appear may cancel it at any

time prior to jurisdiction vesting in the immigration court if it appears that

the notice was "improvidently issued" or that "changed circumstances"

indicate that continuation of removal proceedings is "no longer in the best

interest of the government." 8 C.F.R. 239.2 (a)(6) & (7). After jurisdiction

vests in the immigration court, which, as noted, is a component of the

Executive Branch, government counsel or any official authorized to issue

the notice to appear may move to dismiss removal proceedings on the

same grounds. 8 C.F.R. 239.2(c); 8 C.F.R. 1239.2(c).

c. On June 17, 2011, the Director of the U.S. Immigration and

Customs and Enforcement ("ICE") issued an internal memorandum

clarifying the agency's general policies on the exercise of prosecutorial

discretion. ROA.425. The memorandum, noting that the agency has

limited resources to remove illegal aliens, states that ICE must "prioritize

the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system." ROA.426.

The memorandum makes several points relevant here. First, the memorandum reiterates that ICE may exercise its prosecutorial discretion at any stage of removal proceedings, ranging from the initial decision to commence removal proceedings through execution of a final removal order. ROA.426-427.

Second, the memorandum identifies the various agency officers who have authority to exercise prosecutorial discretion, noting that prosecutorial discretion extends to officers or agents who have authority to institute removal proceedings, and that all exercises of prosecutorial discretion are subject to appropriate supervisory oversight. ROA.427.

12

Third, the memorandum identifies a range of positive and negative factors that may be taken into account in determining whether to exercise the discretion to refrain from seeking removal of a removable alien. These include whether the alien arrived in the United States as a young child, service in the military, pursuit of education within the United States, the alien's age, with particular consideration given to minors and the elderly, length of presence in the United States, and ties -- or the lack of such ties -- to the country of origin. ROA.428-429.

Fourth, the memorandum stresses that although the exercise of prosecutorial discretion should always be considered on a case-by-case basis, "there are certain classes of aliens that warrant particular care." ROA.429. These classes include: minors and elderly individuals, individuals present in the United States since childhood, pregnant or nursing women, individuals with serious health conditions, and veterans or members of the U.S. armed forces. *Ibid.*

13

Finally, the memorandum states that an alien has no right to the exercise of prosecutorial discretion, that ICE retains legal authority to remove any alien unlawfully in the United States, and that the decision to refrain from prosecuting removal proceedings is an exercise of administrative discretion that does not create any legal right or confer any irrevocable benefit. ROA.430.

**d.** On June 15, 2012, the Secretary of Homeland Security issued a memorandum specifically addressing the exercise of prosecutorial discretion in the enforcement of immigration laws against "young people who were brought to this country as children and know only this country as a home." ROA.432. The Secretary stated that:

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

14

ROA.433.

The memorandum outlines a discretionary enforcement policy

referred to as Deferred Action for Childhood Arrivals or "DACA." It thus

provides that immigration officials may consider, on a case-by-case basis,

refraining from prosecuting removal actions against aliens who: (1) were

under the age of sixteen when they came to the United States, (2) were

present in the United States on the June 2012 effective date of the

memorandum and have continuously resided in the U.S. for at least five

years preceding the effective date of the memorandum, (3) are in school or

have completed high school level education or have been honorably

discharged from the Coast Guard or United States armed services, (4) have

not been convicted of significant criminal offenses and do not otherwise

pose a threat to public safety or national security, and (5) are not above the

age of 30. ROA.432.

Aliens who meet these criteria may receive several types of relief.

First, officials "should immediately exercise their discretion, on an

15

individual basis" to refrain from commencing removal proceedings in the first instance. ROA.433.

Second, if removal proceedings have already been commenced, immigration officials should consider deferring further enforcement action for two years, subject to renewal, "to prevent low priority individuals from being removed from the United States." *Ibid.*

Third, if such deferred action is granted, the alien may apply for work authorization during the period for which deferred action has been authorized. ROA.434; *see* 8 C.F.R. 274a.12(c)(14) (permitting aliens authorized for deferred action to apply for employment authorization).

Fourth, the memorandum provides for establishment of an administrative process through which aliens can request deferred action, even if they are not in removal proceedings or are otherwise subject to active scrutiny of their immigration status – a step that would then permit them to apply for work authorization. ROA.433-434.

16

Finally, the memorandum states that it "confers no substantive right, immigration status or pathway to citizenship" but is intended "to set forth policy for the exercise of discretion within the framework of existing law." ROA.434. The Secretary thus retains discretion to institute enforcement action at any time.

2. <u>District Court Proceedings and Decision</u>.

Plaintiffs are the state of Mississippi and immigration officers employed by DHS's Immigration and Customs Enforcement agency. ROA.100. They allege that DHS's prosecutorial discretion memoranda are contrary to statutory provisions assertedly mandating commencement of removal proceedings against *all* inadmissible aliens who are seeking admission to the United States at a port of entry, or who are deemed to be applicants for admission by operation of law. ROA.114-117; *see* 8 U.S.C. §§ 1225(a)(1); 1225(b)(2)(A). Plaintiffs seek a declaratory judgment that the Secretary's prosecutorial discretion policy is unlawful, as well injunctive relief barring the Secretary from implementing the policy or from taking

17

any adverse employment action against the plaintiff immigration officers for failing to follow it.[4] ROA.122-123.

a. Standing.

The court, ruling on the government's motion to dismiss, concluded that, while plaintiffs do not have standing to press a generalized grievance against the Secretary's enforcement policies, the plaintiff immigration officers do have standing to assert a narrower range of claims related to prospective, employment-related discipline.

The court thus held that Mississippi lacked standing and dismissed it from the case. ROA.884-888. Mississippi had alleged that the prosecutorial

---

[4] Plaintiffs' complaint implies that their cause of action to seek such relief is based on the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202, and the Administrative Procedure Act, 5 U.S.C. 706(2). ROA.122-123. The Declaratory Judgment Act, however, does not afford an independent cause of action or basis for subject matter jurisdiction. *Ali* v. *Rumsfeld*, 649 F.3d 742, 778 (D.C. Cir. 2011), citing *Skelly Oil Co.* v. *Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). And while the APA provides a cause of action to challenge unlawful agency action, it does not apply where statutes preclude judicial review (5 U.S.C. § 701(a)(1)) or where the challenged agency action is committed to agency discretion by law (5 U.S.C. § 701(a)(2)).

18

discretion policy would allow a significant number of otherwise removable
aliens to remain within the State, and that the State would consequently
incur additional health, education, and law enforcement costs. The court
concluded that "Mississippi's asserted fiscal injury is purely speculative
because there is no concrete evidence that the costs associated with the
presence of illegal aliens in the state of Mississippi have increased or will
increase as a result of" the DHS policy. ROA.888.

The court similarly concluded that the plaintiff immigration officers
do not have standing insofar as they assert a generalized interest in official
compliance with the immigration law. ROA.868-874. Plaintiffs argued that
they had taken an oath to uphold federal law, that DHS policy required
them to violate federal law by instructing them to refrain from
commencing removal proceedings in circumstances where, in plaintiffs'
view, federal law mandates commencement of removal proceedings, and
that the resulting, compelled violation of their oath of office is an injury
sufficient to support standing. The district court rejected these contentions,

19

concluding that, under this Court's precedents, a plaintiff lacks standing if

the only consequence that flows from adhering to a challenged policy

would be a perceived violation of the plaintiff's oath of office. ROA.869-

872, citing *Donelon* v. *La. Div. of Adm. Law ex rel. Wise,* 522 F3d 564 (5th Cir.

2008) and *Finch* v. *Mississippi State Med. Ass'n,* 585 F.2d 765 (5th Cir. 1978).

The court, however, concluded that the plaintiff immigration officers

do have standing insofar as they face potential employment-related

disciplinary action for failing to comply with the Secretary's prosecutorial

discretion policies. ROA.874-878. It reasoned that an adverse employment

action constitutes an injury-in-fact for purposes of Article III, and that

although plaintiffs had not been subject to employment discipline thus far,

the threat of adverse employment actions here is sufficiently concrete to

render employment-related claims justiciable. ROA.875-877; *see also*

ROA.954-955.

20

b. Merits

On April 23, 2013, the court issued a partial decision on plaintiffs' request for a preliminary injunction, concluding that plaintiffs had established a likelihood of success on the merits but postponing a final ruling on whether to issue a preliminary injunction pending further briefing on whether subject matter jurisdiction is precluded by the Civil Service Reform Act. ROA.928-965.

The court acknowledged that the immigration laws vest the United States with the discretion to suspend removal proceedings after they are initiated. It nonetheless concluded that applicable immigration statutes mandate the commencement of removal proceedings in all cases, even though the government has no obligation to prosecute the proceedings to conclusion and may terminate them at any time. ROA.937.

21

This determination turns on the court's construction of two, inter-related statutory provisions: 8 U.S.C. § 1225(a)(1) and 8 U.S.C. § 1225(b)(2).[5]  Section 1225(a)(1) provides that:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

Section 1225(b)(2)(A) provides, subject to exceptions not relevant here, that:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding under section 1229a of this title.

The court reasoned that the use of the term "shall" in these statutes indicates that Congress intended to circumscribe the government's discretion and to mandate commencement of removal proceedings against

---

[5] Pertinent statutes and regulations are reprinted in the addendum to this brief.

22

aliens who are physically present within the United States, who gained

entry without being lawfully admitted, and who are not "clearly and

beyond a doubt" entitled to be admitted. ROA.940-944.

c. Subject Matter Jurisdiction

The district court subsequently concluded that the Civil Service

Reform Act bars subject matter jurisdiction over plaintiffs' employment-

related claims and dismissed all remaining claims for lack of subject matter

jurisdiction. ROA.1353-1360. The court observed that the CSRA

establishes a comprehensive and exclusive system for reviewing personnel

action taken against federal employees, and that the statute therefore

precludes employees from seeking redress in federal district court for

work-related controversies. ROA.1356-1357. It reasoned that because the

plaintiff immigration officers' claims are based on the threat of allegedly

unlawful workplace disciplinary action, their claims fall within the

preclusive scope of the CSRA. ROA.1357-1358. It further reasoned that it

is unnecessary to determine whether the CSRA affords an adequate

23

remedy because whatever statutory remedies are available are the sole and
exclusive remedies intended by Congress.  ROA.1358.  The court
accordingly held that it lacked subject matter jurisdiction over plaintiffs'
employment-related claims and dismissed the case.

   Ruling on plaintiffs' subsequent motion to alter or amend the
judgment, the court further concluded that it could not assume jurisdiction
under the principles established by *Leedom* v. *Kyne*, 358 U.S. 184 (1958).
ROA.1418-1429.   It reasoned that *Leedom* is inapplicable where the
aggrieved party has a meaningful opportunity for judicial review, and that
the CSRA provides a remedy for the employment-related claims asserted
by the plaintiff immigration officers.  ROA.1424-1428.  It therefore denied
plaintiffs' motion to alter or amend the judgment and reaffirmed its prior
order dismissing the case for lack of subject matter jurisdiction.  ROA.1429.

## SUMMARY OF THE ARGUMENT

   1.  The district court correctly dismissed the state of Mississippi's
claims for lack of standing.  A State, like any other litigant, must

24

demonstrate a clear connection between the challenged action and a concrete and particularized injury, and also show that a favorable decision would be likely to afford redress. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575 (1992). Mississippi's allegations, however, merely frame a generalized grievance as to how the federal government has chosen to enforce immigration laws against other parties. Moreover, because the statutes at issue here do not, even under plaintiffs' interpretation, bar the Secretary from suspending or terminating removal proceedings at later stages of the case, Mississippi cannot show that a favorable decision would redress the putative harm caused by the presence of inadmissible aliens within its borders. Mississippi's allegations thus do not state a redressable, concrete, and particularized injury-in-fact sufficient to support Article III standing.

2. Subject matter jurisdiction over the plaintiff immigration officer's employment-related claims is barred by constitutional principles of ripeness as well as by the Civil Service Reform Act.

25

a. Plaintiffs' have not yet incurred a cognizable, employment-related injury arising out of a dispute over the Secretary's policies on prosecutorial discretion. Their concerns that such injuries might occur in the future do not present a specific controversy that is ripe for adjudication.

b. Moreover, even if these claims are deemed ripe, subject matter jurisdiction in the district court is barred by the Civil Service Reform Act. The CSRA establishes the exclusive remedy for *all* claims arising out of a federal personnel action, and it bars the district court from assuming jurisdiction over them. *Elgin* v. *Dept. of Treasury*, 132 S. Ct. 2126 (2012); *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). The district court therefore correctly dismissed plaintiffs' employment-related claims for lack of subject matter jurisdiction.

3. Plaintiffs err in asserting that, notwithstanding the Civil Service Reform Act, the district court may assume jurisdiction under principles established in *Leedom* v. *Kyne*. *Leedom* jurisdiction is exceedingly narrow, available only in the case of manifestly *ultra vires* action, and only if there is

26

App. 2414

no alternative avenue of judicial review. *Board of Governors of the Federal Reserve System* v. *MCorp Financial, Inc.*, 502 U.S. 32 (1991); *Kirby Corp.* v. *Pena*, 109 F.3d 258, 268-69 (5th Cir. 1997). The Civil Service Reform Act provides a meaningful avenue of judicial review for employment-related injuries. It therefore forecloses resort to *Leedom* jurisdiction here.

4. Finally, even assuming the district court had jurisdiction, it erred in indicating that it would have ruled on the merits that Congress has limited the Secretary's enforcement discretion by mandating commencement of removal proceedings in any and all cases. The court reasoned that 8 U.S.C. § 1225(b)(2)(A) requires all inadmissible aliens to be detained for removal proceedings. But the statutory duty to detain for removal proceedings applies, only to aliens who are "seeking admission" to the country. It does not apply to aliens who have already gained entry, are found within the United States, and are taking no action to "seek" admission.

27

In any event, section 1225(b)(2)(A) would not displace the Secretary's prosecutorial discretion, even if it applied. This Court has held that, "while 'shall' is normally interpreted to impose a mandatory duty[,] * * * when duties within the traditional realm of prosecutorial discretion are involved, the courts have not found this maxim controlling." *Seabrook* v. *Costle*, 659 F.2d 1371, 1374 n.3 (5th Cir. 1981). In this case, the statute directs only that an alien "shall be detained for a [removal] proceeding." That language makes detention mandatory if a removal proceeding is instituted, but it does not displace the Secretary's longstanding and well-recognized discretion to decline to institute removal proceedings in the first instance.

The government has for decades exercised the prosecutorial discretion to refrain from instituting removal proceedings where humanitarian factors or resource constraints indicate that deferring enforcement action is consistent with the larger interests of the United States. *See Reno* v. *American Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999). The statutes on which the district court relied do not

28

circumscribe this longstanding administrative practice. Nor do they
otherwise constrain the Secretary's discretion to refrain from removing
aliens who came to the United States as children, who now have significant
ties to this country, and who pose no threat to public safety or national
security. Thus, if the Court concludes that the district court had
jurisdiction, it should direct the entry of judgment for the Secretary on the
alternative ground that the pertinent immigration statutes do not limit the
Secretary's prosecutorial discretion.

## STANDARD OF REVIEW

This appeal presents issues of subject matter jurisdiction,
justiciability, and statutory construction. These are all questions of law
subject to the Court's *de novo* review. *See Gandy Nursery, Inc.* v. *United
States*, 318 F.3d 631, 636 (5th Cir. 2003); *Am. States Ins. Co.* v. *Bailey*, 133
F.3d 363, 368 (5th Cir. 1998); *Resolution Trust Corp.* v. *Miramon*, 22 F.3d 1357,
1359 (5th Cir. 1994).

29

The appeal also challenges the factual underpinnings of the district court's dismissal for lack of standing.  Those factual determinations must be sustained unless clearly erroneous.  *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir.  2014).

## ARGUMENT

I. The State of Mississippi Lacks Standing To Challenge The Secretary's Exercise Of Prosecutorial Discretion In Removal Proceedings.

To establish standing, a plaintiff must show that he has suffered "some actual or threatened injury" fairly traceable to the challenged conduct of the defendants that is likely to be redressed by a favorable decision.  *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).  The standing requirement is intended to ensure the parties have "such a stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends * * *." *Baker* v. *Carr*, 369 U.S. 186, 204 (1962).

30

An abstract, general disagreement with the manner in which the government is administering and interpreting immigration laws cannot satisfy these requirements. "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575 (1992). The Supreme Court thus has "repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen* v. *Wright*, 468 U.S. 737, 754 (1984).

Mississippi alleges that the Secretary's enforcement policies would result in the continued presence of unauthorized aliens within its borders, thereby burdening the state with additional health, education, and law enforcement costs. The claimed injury, however, is not redressable by a favorable decision and lacks sufficient specificity to support standing.

31

A. <u>Mississippi's Alleged Injuries Would Not Be Redressed By A Favorable Decision On Its Statutory Claims.</u>

The "irreducible constitutional minimum of standing" requires the plaintiff to establish two elements in addition to a concrete injury-in-fact: there must be a causal connection between the injury and the conduct complained of, and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976). Mississippi must thus show that, if it were to prevail on its claim that 8 U.S.C. §§ 1225(a)(1) and 1225(b)(2) require illegal aliens to be detained, they would ultimately be removed and no longer burden the State's health and welfare system.

These statutes, however, only apply to the *initial* decision as to whether to commence removal proceedings. They do not apply to any subsequent stage of removal proceedings and do not, *even under plaintiffs' interpretation*, constrain the Secretary's discretion to suspend or terminate

32

removal proceedings at a later stage of the case. As the district court found:

> DHS's ability to exercise its discretion at later stages in the removal process by, for example, cancelling the Notice to Appear or moving to dismiss the removal proceedings, is not at issue in the present case, and nothing in this [court] Order limits DHS's discretion at later stages of the removal process. See 8 C.F.R. § 239.2(a) (providing for cancellation of a Notice to Appear prior to jurisdiction vesting with an immigration judge); id. § 239.2(c) (providing for a motion to dismiss removal proceedings after jurisdiction vests with an immigration judge); *In re G-N-C*, 22 I. & N. Dec. 281, 283–84 (B.I.A. 1998) (noting that, pursuant to 8 C.F.R. § 239.2(a), an immigration officer "authorized to issue a Notice to Appear has complete power to cancel such notice prior to jurisdiction vesting with the Immigration Judge").

ROA.951.

The upshot is that Mississippi's statutory claims, even if successful, would only afford the basis for an order compelling *initiation* of removal proceedings. They do not afford any basis for a judicial order barring a discretionary termination of a removal proceeding at a later stage of the case. A favorable decision on plaintiffs' statutory claims would not compel the ultimate removal of any alien. And it consequently would not redress

33

App. 2421

the putative injury resulting from the presence of additional unlawful aliens within Mississippi's borders. As Mississippi cannot satisfy the essential constitutional requirement of redressability, the Court should affirm the judgment dismissing Mississippi's claims without further inquiry.

B. <u>Mississippi Has Not Alleged Or Established A Concrete Injury Traceable To The Secretary's Exercise Of Prosecutorial Discretion.</u>

Mississippi has also failed to adequately allege or otherwise establish the concrete injury-in-fact necessary to support standing. It argues here that, under *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), its claim of injury is entitled to "special solicitude." That contention, however, overstates the narrow scope of the *Massachusetts* holding and overlooks additional prudential limitations on a federal court's jurisdiction. It cannot overcome Mississippi's fundamental failure to allege a concrete and particularized injury-in-fact.

34

1. *Massachusetts* v. *EPA* Does Not Relieve Mississippi Of The Obligation To Allege A Concrete Injury.

In *Massachusetts* v. *EPA* , the state of Massachusetts challenged the EPA's determination not to conduct a rulemaking regulating greenhouse gases emitted by new motor vehicles. The Supreme Court majority held that the State's assertion of standing was entitled to "special solicitude." *Id.* at 520.

The Court, however, did not hold that constitutional standing requirements must be relaxed whenever a State is a plaintiff in federal court. Its holding is instead based on two, case-specific circumstances: the fact that Congress had accorded the States a procedural right to challenge the EPA's failure to conduct a rulemaking regulating greenhouse gas emissions, and Massachusetts' unique, sovereign interests in protecting lands within its dominion. *Id.* at 520; *see also Georgia* v. *Tennessee Copper Co.,* 206 U.S. 230, 237 (1907) (State's standing to sue supported by its "interest independent of and behind the titles of its citizens, in all the earth and air

35

within its domain"); *People of Colorado ex rel. Suthers* v. *Gonzales*, 558 F.

Supp. 2d 1158, 1162 (D. Colo. 2007).

None of those factors is present here. Indeed, prudential

considerations point in the opposite direction. Unlike the protection of

land within a State's borders, immigration policy is a matter of

overridingly federal concern. The federal government has broad,

constitutionally-based powers over the subject of immigration and the

status of aliens. *Arizona*, 132 S. Ct. at 2498. "Immigration policy may affect

trade, investment, tourism, and diplomatic relations for the entire Nation,

as well as the perceptions and expectations of aliens in this country who

seek the full protection of its laws." *Ibid.* And "[i]t is fundamental that

foreign countries concerned about the status, safety, and security of their

nationals in the United States must be able to confer and communicate

with one national sovereign, not the 50 separate States." *Ibid.* There are

indeed unique sovereign interests implicated by this case. But they belong

to the federal government, not Mississippi. *See Commonwealth of*

36

*Pennsylvania* v. *Kleppe,* 533 F.2d 668, 678 (D.C. Cir. 1976) ("[S]uits against

the Federal Government raise an important argument against standing

which is not relevant where other types of defendants are involved. That is

because wherever there is a federal defendant, a degree of disruption of

asserted federal powers at the hands of a plaintiff state is unavoidable"); *see*

*also Mathews* v. *Diaz,* 425 U.S. 57, 81-82 (1976)("For reasons long recognized

as valid, the responsibility for regulating the relationship between the

United States and our alien visitors has been committed to the political

branches of the Federal Government"); *Texas* v. *United States,* 106 F.3d 661,

665 (5th Cir. 1997) (same).

2. Prudential Considerations Weigh Against Standing Because
   The Claimed Injury Is Not Within The Zone Of Interests
   Protected By The Statutes Underlying Mississippi's Claim.

In addition to the immutable requirements of Article III, the federal

judiciary has adhered to a set of prudential principles "founded in concern

about the proper—and properly limited—role of the courts in a democratic

society." *Bennett* v. *Spear,* 520 U.S. 154, 162 (1997) (quoting *Warth* v. *Seldin,*

37

App. 2425

422 U.S. 490, 498 (1975)).   One of those prudential limitations is the
requirement that a plaintiff contesting an agency action on statutory
grounds show, not merely an injury-in-fact, but that his grievance falls
within the "zone of interests" protected or regulated by the statutory
provisions invoked in the suit.[6]  *Ibid.*

Mississippi cannot satisfy this prudential limitation on jurisdiction.
The statutes underlying its claim, 8 U.S.C. §§ 1225(a)(1) and 1225(b)(2),
regulate removal procedure.  They do not apply to the States and they are
not intended to confer any particular benefit on the States.  Moreover,
because Mississippi's claim of standing is based on the indirect

---

[6] In *Lexmark International, Inc.* v. *Static Control Components, Inc.*, 134 S.
Ct. 1377 (2014), the Supreme Court held that in some circumstances the
"zone of interests" test is better understood as an inquiry into whether
Congress intended to provide a particular type of plaintiff a cause of
action, rather than a prudential limitation on standing.  *Lexmark,* however,
addresses statutory causes of action rather than the general cause of action
established by the Administrative Procedure Act.  And, in any event, it
makes clear that the "zone of interests" test remains focused on whether
the statute is intended to protect the class of persons encompassing the
plaintiff from the harm that has occurred as a result of the alleged statutory
violation.  *Id.* at 1388-89 & n.5.

38

consequences of the way in which the federal government applies the immigration statutes to third parties, it has an especially heavy burden of establishing an injury sufficient to support standing. *See Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish");

These prudential considerations belie Mississippi's contention that its claim of injury must be assessed with "special solicitude." They instead indicate that Mississippi's claims must be carefully examined to ensure that the suit is based on a concrete and particularized injury, and not a desire to employ the courts as forum for airing generalized grievances about federal immigration policy.

3. The District Court Reasonably Determined That Mississippi Had Not Established An Injury Sufficient To Support Standing.

The district court held that (1) the plaintiff bears the burden of establishing standing (ROA.885, citing *Lujan*, 504 U.S. at 561) and, (2)

39

"there is no concrete evidence that the costs associated with the presence of illegal aliens in the state of Mississippi have increased or will increase as a result of" the DHS policy. ROA. 888.

Mississippi challenges this latter holding on appeal, but it advances contradictory assertions with respect to the analytical framework governing appropriate disposition of the Secretary's motion to dismiss. On the one hand, it argues that, at the pleading stage, the allegations of its complaint must be taken as true. It thus implies that the district court erred in looking beyond the face of the complaint and considering evidence of injury. *See* Appellant Br. at 11, 18, citing *Warth*, 422 U.S. at 501. On the other hand, it argues that it presented sufficient evidence to support a claim of injury, thus implying that the district court's factual determination that the State had not established injury is erroneous. *Id.* at 15-18. It then advances a novel combination of the two standards, concluding that, "[t]he State has presented more than enough evidence to support its standing,

40

particularly at the motion-to-dismiss stage, when a plaintiff's allegations must be accepted as true." *Id.* at 18.

These contentions misapprehend the appropriate framework for evaluating a motion to dismiss for lack of jurisdiction. In *Williamson* v. *Tucker*, 645 F.2d 404 (5th Cir. 1981), the Court explained that where a FRCP 12(b)(1) motion to dismiss is based solely on the face of the complaint, the allegations of the complaint must be taken as true. *Id.* at 412. But where the factual bases for jurisdiction are placed at issue and the parties rely on matters outside the complaint, the trial court is *not* bound to accept the complaint's allegations as true; it instead has the power to evaluate written and oral evidence and to resolve disputed questions of fact bearing on its jurisdiction. *Id.* at 412-13; *see also Hertz Corp.* v. *Friend,* 559 U.S. 77, 96-97 (2010) ("When challenged on allegations of jurisdictional facts, the parties must support their allegations with competent proof").

The district court stated that it was treating the Secretary's motion to dismiss as mounting a facial attack on the complaint, and that the

41

allegations of the complaint must therefore be taken as true. ROA.864. The court, however, also stated that it was basing its decision on the evidence presented. ROA.857; ROA. 884. Indeed, its analysis reflects a point-by-point assessment of the various reports, statistical studies, and affidavits cited by the State in response to the Secretary's motion. *See* ROA.884-888.

Ultimately, the district court's holding rests in substance on consideration of various evidentiary materials submitted by Mississippi and the court's resolution of disputed questions of jurisdictional fact. *Cf. Williamson*, 645 F.2d at 412 (appellate court "is not bound by label district court puts on its action where underlying facts indicate that a different action was in fact intended").

That approach was appropriate in light of the State's own litigation conduct. Mississippi did not respond to the Secretary's motion by resting on the allegations of its complaint. It instead cited the court to various evidentiary materials purporting to establish injury-in-fact, specifically: a state audit report appended to its complaint (ROA. 341), studies purporting

42

to document the fiscal impact of unlawful aliens on state resources
(ROA.342; ROA.348), and a set of affidavits appended to its memorandum
of law opposing the Secretary's motion (ROA.343-344; ROA. 352-373).   In
that posture, the district court did not err in looking beyond the face of the
complaint to consider evidence tendered by the State itself in support of
jurisdiction.

On appeal, Mississippi contests the factual bases for the district
court's holding.  Appellant Br. at 14-18.  But where, as in this case, the
district court makes findings resolving disputed questions of jurisdictional
fact, the reviewing court must accept those findings unless clearly
erroneous.  *Williamson*, 645 F.2d at 413; *In re Deepwater Horizon*, 739 F.3d
790, 798 (5th Cir.  2014).  Mississippi has not demonstrated clear error.

First, although Mississippi relies on a 2006 audit report purporting to
document the costs imposed by illegal aliens, that report falls well short of
demonstrating that the district court clearly erred in finding no evidence of
injury traceable to the challenged enforcement policies.  The report was

43

issued several years before the memoranda challenged here and thus affords no evidence whatsoever of a specific, additional burden attributable to implementation of the Secretary's prosecutorial discretion policies.

Second, there is no record evidence that the class of aliens for whom deferred action is potentially available are likely to impose a net, additional financial burden on the State.   Mississippi cites a national study purporting to show high rates of welfare utilization among all households headed by illegal aliens with children.  *See* Appellant Br. at 12.  But even accepting that study as valid, Mississippi points to no evidence that the study's general conclusions apply to the specific class of aliens falling within the guidelines for requesting deferred action under DACA.

To request deferred action, an alien must have come to the United States at a young age, continuously resided here for at least five years, had significant education or military service, and be under age 30.  ROA.432. DACA, moreover, facilitates an alien's ability to receive work

44

authorization, thereby increasing the likelihood that aliens covered by the policy will engage in lawful employment. There is no reasonable basis for concluding that welfare utilization rates for all households with children headed by illegal aliens apply to aliens who obtain deferred action under DACA. Rather, the more logical conclusion is that they are far more likely to be productively and lawfully employed and to have made positive contributions to the State through payment of taxes.

Third, Mississippi fails to account for the offsetting cost savings that may result from increased enforcement efforts against groups of illegal aliens who are far more likely to burden state resources. A key purpose of the prosecutorial discretion policy is to enable the Secretary to concentrate enforcement resources on illegal aliens who have committed crimes or pose other threats to the public safety or national security. Any increase in the number of such aliens removed will thus offset costs incurred in allowing DACA-eligible aliens to remain. Indeed, aliens who have committed a crime or pose some other threat to public safety are apt to impose on the

45

State far higher costs than the costs, if any, imposed by aliens who have completed high school or military service.[7]

Mississippi argues that recent removal statistics show a decline in the total number of removals. It concludes that implementation of DACA has not resulted in offsetting cost savings from increased enforcement efforts against higher priority illegal aliens. Appellant Br. at 17-18. The 2013 removal statistics on which Mississippi now relies, however, do not provide any information on the removal of aliens who have committed crimes or who pose other threats to public safety. The cited statistics thus do not shed any light on whether DACA has generated offsetting costs savings by facilitating increased enforcement efforts against aliens likely to impose the greatest costs on a state. Nor do they indicate whether trends in removal statistics are attributable to the DACA policy or to some other factor.

---

[7] The National Institute of Corrections, an agency within the United States Department of Justice, reports that in FY 2010, it cost Mississippi more than $15,200 per year to house an inmate in a state operated prison facility. *See* < http://nicic.gov/statestats/?st=MS>.

46

App. 2434

4. Mississippi's Allegations Of Injury Are Too Conclusory,
   Speculative, And Indefinite To Support Standing.

Finally, even assuming that Mississippi's standing must, at this

juncture of the case, be judged solely on the basis of the complaint, the

State has not alleged a concrete and particularized injury sufficient to

support standing:

> Central to the concept of "particularized" injury is the
> requirement that a plaintiff be affected in a "personal and
> individual way," *Defenders of Wildlife*, 504 U.S. at 560 n.1, and
> seek relief that "directly and tangibly benefits him" in a manner
> distinct from its impact on "the public at large," *id.* at 573-74.
> Without "particularized injury, there can be no confidence of 'a
> real need to exercise judicial review' or that relief can be framed
> 'no broader than required by the precise facts to which the
> court's ruling would be applied.'" *Warth* v. *Seldin*, 422 U.S. 490,
> 508 (1975) (quoting *Schlesinger* v. *Reservists Comm. to Stop the
> War*, 418 U.S. 208, 221-222 (1974)).

*Massachusetts*, 549 U.S. at 541 (Roberts, CJ., dissenting).

Mississippi's allegations fall well short of this standard. The State

alleges that it "will be compelled to bear the foreseeable fiscal costs of the

illegal aliens residing in Mississippi who are not placed in removal

proceedings," ROA.112, ¶ 60, and that these costs include "costs associated

47

with educating illegal aliens in the State's K-12 school system; costs related

to uncompensated healthcare provided by state agencies, hospitals, and

clinics; law enforcement costs associated with arresting, prosecuting, and

incarcerating illegal aliens in the, State's criminal justice system; and lost

tax revenues and economic losses related to illegal aliens who work "off

the books" and thereby avoid paying state taxes and/or who send

"remittances" to relatives in foreign countries, diverting dollars that

otherwise would remain in the State's economy and generate additional

state tax revenues." ROA.113-114, ¶ 66.

These allegations amount to no more than a broad and conclusory

assertion that the State is injured because it must expend resources on

serving unlawful aliens who reside with its borders. The allegations do not

identify these costs with any specificity. They do not identify the putative,

added costs of serving the specific population falling within the guidelines

for deferred action. And they do not offer an explanation of how the State

is injured by the particular exercise of enforcement discretion challenged in

48

this litigation. Indeed, the complaint expressly notes that its allegations of injury are based on a report issued in 2006, well before the 2011 and 2012 memoranda challenged here. *See* ROA.113, ¶¶ 61-63.

Conclusory allegations that the state's budget or tax revenues will be harmed in some general way are not sufficient to support standing. *See, e.g. Kleppe*, 533 F.2d at 672-73 ("[N]either the impairment of the state's ability to look after its citizens nor the diminution of its tax revenues constitutes sufficient injury to state proprietary interests to confer standing"); *Wyoming* v. *U.S. Dept. of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (same). Thus, even if review is confined to the allegations of the complaint, the district court was correct in dismissing Mississippi's claims for lack of standing.

49

II. The Plaintiff Immigration Officers' Employment-Related
Claims Are Not Ripe for Adjudication.

No plaintiff has been disciplined for failing to follow agency policy.[8]

The district court nonetheless reasoned that because plaintiffs intend to

violate the policy and face a clear threat of adverse employment

consequences if they do, their claims are justiciable. ROA.875-878. The

court further concluded that plaintiffs' challenge was ripe because the

issues turn on pure questions of law rather than fact, and because the

"direct and immediate" threat of disciplinary action renders the issues fit

for judicial review at this time. ROA.883; ROA.954-955.

---

[8] There are ten, individual immigration officers named as plaintiffs.
ROA.102-104. Only one of them, James Doebler, has thus far been subject
to any action for failure to follow DHS prosecutorial discretion policy.
Officer Doebler commenced removal proceedings against an alien covered
by the policy, contrary to his supervisor's instructions. In response, DHS
issued Doebler a non-disciplinary letter cautioning him to follow
supervisory instructions. ROA.471-472; ROA.628-629. The letter thus
states that "[t]his Final Decision will serve as a *non-disciplinary* counseling
to you and will not be placed in your Official Personnel Folder * * *."
ROA.629. (emphasis added).

50

App. 2438

The court's ripeness analysis is incorrect. Ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno* v. *Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n. 18, 1 (1993). Its "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148. (1967). Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Ohio Forestry Ass'n, Inc.* v. *Sierra Club*, 523 U.S. 726, 733 (1998). Thus, "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Cent. & Sw. Servs.* v. *EPA*, 220 F.3d 683, 690 (5th Cir. 2000).

Plaintiffs' employment-related claims are not ripe under these standards. First, plaintiffs will suffer no cognizable injury if they comply with the challenged policy. Many of the ripeness cases cited by the district

51

court are distinguishable for this reason alone. In *Abbott Labs*, for example,
the plaintiffs were required either to incur substantial and unrecoupable
compliance costs if they complied with the challenged regulation or to risk
substantial civil and criminal penalties if they violated the regulation in
order to test its validity in court. *Id.*, 387 U.S. at 152-53. This dilemma
imposed a direct and immediate hardship on the *Abbott* plaintiffs that
made the case appropriate for pre-enforcement review.

Similarly, in *United Food & Commercial Workers Int. Union v. IPB, Inc.*,
857 F.2d 422 (8th Cir. 1988), the plaintiffs – unions and union officials –
faced a similar dilemma of choosing between forgoing First Amendment
rights of expression in order to comply with an anti-picketing statute or
risking criminal prosecution for violating the statute. In these cases, the
coerced compliance with a law believed to be invalid resulted in actual,
concrete injury to the plaintiff.

Plaintiffs, in contrast, suffer no comparable, irremediable injury if
they comply with the DHS policy. Their only "harm" is being compelled to

52

carry out their official job duties in a way that they believe violates

applicable immigration statutes.  Such consequences, however, do not arise

to an injury-in-fact for purposes of Article III.  *See Donelon* v. *La. Div. of*

*Adm. Law ex rel. Wise*, 522 F3d 564 (5th Cir. 2008) (a plaintiff lacks standing

if the only consequence that flows from adhering to a challenged policy

would be a perceived violation of the plaintiff's oath to uphold law); *Finch*

v. *Mississippi State Med. Ass'n*, 585 F.2d 765 (5th Cir. 1978) (same).

Second, should plaintiffs violate the policy and be subject to an

unlawful adverse employment action, any resulting harm can be remedied

in a post-enforcement action for administrative and/or judicial review.  As

explained more fully below, the Civil Service Reform Act establishes a

comprehensive remedial scheme for redressing federal employment

sanctions that are contrary to law.  In the case of employment terminations

or other more serious sanctions, for example, the reviewing court has a

broad remedial power to set aside the sanction and, where appropriate, to

order back pay and attorney fees.  Thus, any concrete employment injury

53

plaintiffs are likely to incur as a result of failing to adhere to a policy they

believe to be unlawful is, if their legal contentions are correct, fully

remediable in a post-enforcement action for administrative or judicial

review. Postponing review until a final agency action would not impose a

significant hardship on the plaintiffs.

Finally, pre-enforcement review is a significant and inappropriate

intrusion into the government's management of its employees. Even

before enactment of the Civil Service Reform Act (which now affords the

exclusive remedy for claims like those pressed here), the Supreme Court

stressed that the government has traditionally been granted the widest

latitude in the dispatch of its own internal affairs, and that preliminary

injunctive relief in federal personnel disputes before exhaustion of

administrative remedies is disfavored absent a strong showing of

irreparable injury. *Sampson* v. *Murray*, 415 U.S. 61, 83-84 (1974); *see also*

*Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733 (1998) (in determining whether a

case is ripe for review, the court should evaluate, among other factors,

54

"whether judicial intervention would inappropriately interfere with further administrative action"). For all these reasons, plaintiffs' employment-related claims are not ripe for adjudication.

### III. The Civil Service Reform Act Precludes District Court Jurisdiction Over The Plaintiff Immigration Officers' Claims Of Employment-Related Injury.

Even assuming plaintiffs' claims could be deemed ripe, the Civil Service Reform Act bars district court jurisdiction over claims arising out of a federal employment dispute.

### A. The CSRA Establishes A Comprehensive Remedial Scheme For Resolving Federal Employment Disputes.

The CSRA, 5 U.S.C. 1101, *et seq.*, "established a comprehensive system for reviewing personnel actions taken against federal employees." *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). In particular, it created a three-tiered system providing graduated procedural protections based on the seriousness of the personnel action at issue.

First, for major personnel actions such as removal, suspension exceeding 14 days, or reduction in grade or pay, the employee has a right

55

to an administrative hearing before the Merit Systems Protection Board. If the employee prevails, the MSPB is authorized to order relief, including reinstatement, backpay, and attorney fees. *Elgin* v. *Dept. of Treasury*, 132 S. Ct. 2126, 2130 (2012). If the MSPB sustains the adverse personnel action, the employee has a right of appeal to the Federal Circuit, which has plenary authority to set the agency act aside and to order backpay or other appropriate relief. *Ibid*; *Smith* v. *Department of the Army*, 458 F.3d 1359, 1364 (Fed. Cir. 2006); 5 U.S.C. 7703(b).

Second, for specified "personnel actions infected by particularly heinous motivations or disregard of law ('prohibited personnel practices')," there are administrative proceedings followed by judicial review in the Federal Circuit under specified circumstances. *Carducci* v. *Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983). Employees who wish to challenge prohibited personnel practices may thus file a complaint with the Office of Special Counsel. 5 U.S.C. 1214(a)(1). If the Special Counsel finds reasonable grounds to believe an employee was or is to be subjected to a prohibited

56

personnel practice, he may seek remedial action from the agency and the
MSPB. 5 U.S.C. 1214(b)(2). The employee may thereafter seek judicial
review in the Federal Circuit of any adverse decision of the MSPB in any
case in which the Special Counsel has sought corrective action from the
MSPB. 5 U.S.C. 1214(c)(1), 7703(b)(1).

The statute provides additional remedies for employees who are
subjected to, or threatened with, disciplinary action, for "refusing to obey
an order that would require the individual to violate a law." 5 U.S.C.
§2302(b)(9)(D). Such disciplinary actions are defined as a "prohibited
personnel practice." *Ibid*. An employee adversely affected by such a
prohibited personnel practice may thus seek corrective action by first
seeking relief from the Office of Special Counsel. 5 U.S.C. § 1214(a)(3). If
the employee is dissatisfied with the decision of the Office of Special
Counsel, he may then appeal to the Merit Systems Protection Board. *Ibid*; 5
U.S.C. § 1221(a). If dissatisfied with the MSPB's decision, he may then seek
judicial review in the appropriate court of appeals. 5 U.S.C. § 1221(h); 5

57

U.S.C. § 7703. Thus, an employee who is disciplined for refusing to follow

an order that would compel him to violate the law ultimately has an appeal

of right to an Article III court upon exhaustion of administrative remedies,

regardless of whether the Special Counsel or MSPB conclude that

corrective action is necessary.

Third, for matters involving bargaining-unit employees, there is a

grievance procedure followed by binding arbitration and limited judicial

review in the courts of appeals, 5 U.S.C. §§ 7121, 7122, & 7123. *See*

*generally Cornelius* v. *Nutt*, 472 U.S. 648, 652 (1985). Covered grievances

include a complaint concerning "any matter relating to the employment of

the employee," 5 U.S.C. 7103(a)(9)(A) (which thus includes adverse actions

and prohibited personnel practices) as well as "any claimed violation,

misinterpretation, or misapplication of any law, rule, or regulation

affecting conditions of employment." 5 U.S.C. 7103(a)(9)(C)(ii). Any

covered grievance that is not settled by the negotiated grievance procedure

is subject to binding arbitration, which may be invoked by either the union

58

or the agency. 5 U.S.C. 7121(b)(1)(C)(iii). Arbitral awards are subject to

limited review by the Federal Labor Relations Authority. 5 U.S.C. 7122(a).

The FLRA's order, however, is not subject to judicial review unless it

involves a matter defined as an "unfair labor practice." 5 U.S.C. 7123(a)(1);

see *U.S. Dept. of the Treasury* v. *FLRA*, 43 F.3d 682 (D.C. Cir. 1994).

> B. <u>CSRA Remedies Are Exclusive And Bar District Court
> Jurisdiction Over Claims Arising Out Of A Federal
> Employment Dispute.</u>

In *Fausto*, the Supreme Court held that Congress enacted the CSRA to

establish a uniform set of remedial procedures for federal employment

disputes, and that these remedies were consequently intended to be the

sole and exclusive means of contesting an adverse employment action. The

Court explained that before 1978, federal employment law consisted of an

"outdated patchwork of statutes and rules built up over almost a century."

*Id.*, 448 U.S. at 444 (quoting S. Rep. No. 969, 95th Cong., 2d Sess. 3 (1978)).

There was no systematic scheme for review of federal personnel actions.

Some employees were afforded administrative review of adverse personnel

59

action by statute or executive order; others had no right to such review. Federal employees often sought judicial review of agency personnel decisions in "district courts in all Circuits and the Court of Claims," through "various forms of actions * * * including suits for mandamus, injunction, and declaratory judgment." *Id.* at 444-445 (citations omitted). "Criticism of this 'system' of administrative and judicial review was widespread." *Id.* at 445. There was "particular * * * dissatisfaction" with the lack of uniformity that stemmed from having cases adjudicated "under various bases of jurisdiction" in numerous district courts and the Court of Claims. *Ibid.*

Congress responded by enacting in the CSRA "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445. The CSRA accordingly provides a "comprehensive" scheme of protections and remedies for federal employment disputes, *id.* at 448, and "prescribes in

60

great detail the protections and remedies applicable * * * , including the availability of administrative and judicial review," *id.* at 443.

The Supreme Court has made clear that these CSRA remedies are the exclusive means of obtaining judicial review of claims arising out of federal employment disputes and, with one exception not relevant here, preclude district court jurisdiction.[9] *Fausto*, 484 U.S. at 448-51, 455; *Elgin*, 132 S. Ct. at 2133-34. Thus, where the statute provides a judicial remedy through Federal Circuit review of a Merit Systems Protection Board decision, district court review is precluded, even if the employee seeks equitable relief for an alleged constitutional violation. *Id.* at 2134-35. And if the CSRA does not afford any right to judicial review – as is the case for some minor personnel disputes and certain categories of employees – that means that judicial review is precluded entirely, not that the aggrieved employee

---

[9] Where an employee alleges that a challenged employment action was based on discrimination prohibited by the Civil Rights Act or other specified anti-discrimination laws, the employee may ultimately seek judicial review in district court. *Elgin*, 132 S. Ct. at 2134. No discrimination claims are at issue here, however.

61

may bring an extra-statutory review action in district court. *Fausto*, 484

U.S. 439 (1988); *McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992); *Graham* v.

*Ashcroft*, 358 F.3d 931, 933-35 (D.C. Cir. 2004) (Roberts, J.); *Mangano* v.

*United States*, 529 F.3d 1243, 1246 (9th Cir. 2008).

C. The CSRA Precludes Plaintiffs' Claim For Prospective
   Injunctive Relief.

Plaintiffs argue that, because the CSRA provides remedies only for an

employment action that has already occurred, it does not preclude suits

that seek relief against potential, *future* employment discipline based on

plaintiffs' prospective failure to comply with a policy that is assertedly

unlawful. Appellant Br. at 20-23. There are two errors in this argument.

First, it falsely equates the lack of a right to pre-enforcement relief

with the lack of *any* meaningful remedy for a disputed employment action.

Plaintiffs insist that they have no means of bringing a pre-enforcement

action for judicial review. But the lack of pre-enforcement remedy does not

mean that they lack any CSRA remedy for challenging an adverse

employment action. It means only that they must await a final agency

62

action before having access to the CSRA remedial scheme -- consistent

with the Supreme Court's longstanding, pre-CSRA view that preliminary

injunctive relief in federal personnel disputes is strongly disfavored.

*Sampson*, 415 U.S. at 83-84 (1974).

Second, it is well settled that the absence of CSRA remedy for an

adverse employment action means, not that such remedies may be sought

in district court, but that Congress intended to preclude them entirely.

This point is made explicit in *Fausto* and this Court's precedents.

*Fausto* involved employment-related claims by a group of "excepted

service" civil service employees who, at that time, did not have remedies

under the CSRA. The Court held that Congress's failure to provide a

particular CSRA remedy indicated, not that the plaintiff employees could

seek that remedy in district court, but rather that Congress intended that

no remedy be provided:

> It seems to us evident that the absence of provision for these
> employees to obtain judicial review is not an uninformative
> consequence of the limited scope of the statute, but rather

63

App. 2451

> manifestation of a considered congressional judgment that they
> should not have statutory entitlement to review * * *."

*Id*. at 448-49.

This Court followed *Fausto* in *McAuliffe* v. *Rice*, 966 F.2d 979 (5th Cir.

1992). There, a former civilian employee of a non-appropriated fund

instrumentality brought a district court action challenging her termination

from employment. Employees of such instrumentalities were not afforded

remedies under the CSRA. *Id*. at 979. The Court, citing *Fausto*, concluded

that the absence of CSRA remedies indicated an intent to foreclose

jurisdiction entirely and therefore precluded district court review of the

termination under the Administrative Procedure Act. *Id*. at 980. *Accord*

*Galvin* v. *FDIC*, 48 F.3d 531, 1995 WL 84520 (5th Cir. 1995) (unpublished);

*Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982); *Towers* v. *Horner*, 791 F.2d

1244, 1246 (5th Cir. 1986); *Graham* v. *Ashcroft*, 358 F.3d 931, 933-35 (D.C. Cir.

2004) (Roberts, CJ.); *Mangano* v. *United States*, 529 F.3d 1243, 1246 (9th Cir.

2008); *Pinar* v. *Dole*, 747 F.2d 899, 910-13 (4th Cir. 1984).

64

None of the cases cited by plaintiffs is to the contrary. *Whitman* v. *Dep't of Transportation*, 547 U.S. 512 (2006), did not reach a holding as to whether the CSRA barred federal question jurisdiction over the claims before the Court but rather vacated the lower court decision and remanded for further consideration of jurisdictional issues. *Id.* at 514-15. It does not hold that federal question jurisdiction is available whenever the CSRA fails to afford remedy – a result that would be inconsistent with the Court's prior decision in *Fausto* as well as its subsequent decision in *Elgin*.

*AFGE Local I* v. *Stone*, 502 F.3d 1027 (9th Cir. 2007), is also inapposite. It holds that where a federal employee lacks any CSRA remedy for challenging an allegedly unconstitutional federal personnel action, suit may be brought in district court. Unlike the plaintiff in *AFGE*, the plaintiff immigration officers do have a CSRA remedy for contesting a final adverse employment action and, after exhaustion of administrative remedies, can bring statutory or constitutional claims before an Article III court. Access

65

to these remedies must await a final agency action. But that means only that CSRA review is postponed, not foreclosed.

*Heslabeck* v. *United States*, 821 F. Supp. 404 (E.D. N.C. 1993), does not provide any further support for plaintiffs' position. It holds that where an employee of a "nonappropriated funds instrumentality" lacks a CSRA remedy for a challenging an adverse employment action, he may bring suit in district court. This Court, however, has rejected that conclusion and, citing *Fausto*, held that the CSRA precludes federal question jurisdiction over challenges to a personnel action brought by employees of a non-appropriated funds instrumentality. *McAuliffe*, 966 F.2d at 979-81. *Heslabeck* is thus contrary to Circuit precedent as well as *Fausto* and *Elgin*.

Finally, *NTEU* v. *Devine*, 577 F. Supp. 738 (D.D.C. 1983), involved claims brought by a union, not a federal employee, and in any event predates both *Fausto* and *Elgin*. It thus is not persuasive authority on whether the employee claims at issue here are precluded by the CSRA.

66

It would be particularly anomalous to permit claims challenging a yet-to-be-taken disciplinary action to be heard in district court while requiring claims challenging a completed disciplinary action taken on the basis of the very same, disputed agency policy to be channeled through the CSRA. Such bifurcated review procedures would invite a flood of new federal employment actions within this and other regional courts of appeals, frustrate Congress's intent to "supplant the hodgepodge of judicial remedies" that had existed before the CSRA, and "undermine the goals of unitary decisionmaking and consistency intended by the CSRA." *McAuliffe*, 966 F2d at 980. For all these reasons, plaintiffs err in asserting that claim for pre-enforcement relief against a prospective employment action is excepted from CSRA preclusion.

D. Statutory And Constitutional Claims Are Not Excepted From The CSRA's Exclusive Remedial Scheme.

Plaintiffs also err in asserting that their employment-related claims fall outside the CSRA exclusive remedial scheme because they rest on contentions that any adverse employment action would be based on

67

plaintiffs' failure to comply with policies that violate federal statutes and the Constitution. That contention is foreclosed by *Elgin*.

In *Elgin*, the plaintiffs were terminated because they had failed to comply with a federal statute barring from federal employment anyone who has knowingly and willfully failed to register for the Selective Service. Plaintiffs, who were male employees, alleged that this statute unlawfully discriminated against them on the basis of their gender because only men, and not women, were required to register for the draft. Plaintiffs concluded that their terminations were unlawful as well, because the terminations were based upon plaintiffs' failure to comply with an unconstitutional statute. But rather than challenge their terminations through the remedies established by the CSRA, plaintiffs sought equitable and declaratory relief in district court under general federal question jurisdiction.

The Supreme Court held that the CSRA precluded district court jurisdiction. The Court reasoned that "[j]ust as the CSRA's elaborate

68

App. 2456

framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extra-statutory review is not available to those employees to whom the CSRA *grants* review." *Id.*, 132 S. Ct. at 2133 (internal quotations and citation omitted). The Court specifically rejected attempts to carve out an exception to CSRA exclusivity for constitutional challenges to federal statutes underlying an adverse employment action, reasoning that the text and structure of the CSRA provide no support for such an exception (*id.* at 2134), and that allowing such suits to proceed outside the CSRA would "reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Id.* at 235.

Plaintiffs ignore *Elgin* and instead assert that numerous federal courts have exercised jurisdiction to adjudicate constitutional or statutory claims challenging their employers' policies. *See* Appellant Br. at 25-27. The cited cases, however, all predate *Elgin*, many predate *Fausto* as well, and none is

69

Circuit precedent. They are consequently of no precedential weight in determining whether plaintiffs' claims are foreclosed here. *Elgin* is controlling. And it makes plain that the employment-related claims are not excepted from CSRA's exclusive remedial scheme merely because they rest on contentions that an adverse employment action violates a statute or the Constitution.

IV. *Leedom* v. *Kyne* Does Not Authorize Plaintiffs To Circumvent The Jurisdictional Limitations Of The Civil Service Reform Act.

Plaintiffs also err in asserting that, notwithstanding the Civil Service Reform Act, the district court may assume jurisdiction under principles established in *Leedom v. Kyne,* 358 U.S. 184 (1958). In *Leedom,* union representatives challenged a National Labor Relations Board order including both professional and nonprofessional employees within the same collective bargaining unit without the professional employees' consent, even though such units were specifically prohibited by the governing statute. *Id.* at 186.

70

The Court held that although bargaining unit certifications were not
reviewable final orders under the National Labor Relations Act, the district
court nonetheless had jurisdiction to consider the union's challenge. *Id.* at
191. It explained that the lawsuit was not one to "review" a decision of the
Board made within its jurisdiction; rather the suit challenged an agency
order made in excess of the Board's delegated powers and contrary to a
specific prohibition in the Board's enabling legislation. *Id.* at 188. The
Court reasoned that it could not "lightly infer that Congress does not
intend judicial protection of rights it confers against agency action taken in
excess of delegated powers." *Id.* at 190. It thus concluded that, despite the
governing statute's failure to provide for judicial review, Congress
intended that the statutory rights violated by the NLRB remain judicially
enforceable through the general jurisdiction of the federal courts. *Id.* at
190-191.

Subsequent precedents have stressed the "narrow limits" and
"painstakingly delineated procedural boundaries" of *Leedom* jurisdiction.

71

*Boire* v. *Greyhound Corp.*, 376 U.S. 473, 481 (1964); *Brotherhood of Ry. & S.S.*

*Clerks* v. *Association for the Benefit of Non-Contract Employees*, 380 U.S. 650,

660 (1965); *Kirby Corp.* v. *Pena*, 109 F.3d 258, 269 (5th Cir. 1997). The case

law accordingly establishes that *Leedom* jurisdiction is unavailable if the

plaintiff has an alternative means of securing judicial enforcement of

statutory rights. *Board of Governors of the Federal Reserve System* v. *MCorp*,

502 U.S. 32, 465-66 (1991); *see Leedom*, 358 U.S. at 190-191; *id.* at 197

(Brennan, J., dissenting); *see also American Airlines, Inc.* v. *Herman*, 176 F.3d

283, 293-94 (5th Cir. 1999); *Telecommunications Research and Action Center* v.

*FCC*, 750 F.2d 70, 78 (D.C. Cir. 1984); *Quivira Mining Co.* v. *EPA* , 728 F.2d

477, 484 (10th Cir. 1984); *Compensation Dep't* v. *Marshall*, 667 F.2d 336, 343-

344 (3d Cir. 1981); *Nor-Am Agricultural Products, Inc. v. Hardin*, 435 F.2d

1151, 1159-1160 (7th Cir. 1970) (en banc). And it cautions that *Leedom*

jurisdiction is reserved for correction of patently *ultra vires* agency action

and thus is not available merely to resolve disputed questions of statutory

construction. *McLendon* v. *Jackson Television, Inc.*, 603 F.3d 1174, 1177 (5th

72

Cir. 1979); *Kirby*, 109 F.3d at 269, quoting *Dart* v. *United States*, 848 F.2d 217,

231 (D.C. Cir. 1988); *accord Paladin Community Mental Health Center* v.

*Sebelius*, 684 F.3d 527, 532-33 (5th Cir. 2012).

Both limitations preclude resort to *Leedom* jurisdiction here. First, the

CSRA provides a detailed and comprehensive set of remedies for disputing

an adverse employment action, including provisions that afford a right to

administrative and judicial review to employees who allege that they have

been subjected to or threatened with adverse disciplinary action for

"refusing to obey an order that would require the individual to violate a

law." 5 U.S.C. § 2302(b)(9)(D). *Leedom* jurisdiction is foreclosed for that

reason alone.

Plaintiffs insist that these CSRA remedies are inadequate, asserting

that they do not permit review unless the employee has been subjected to a

completed disciplinary action or concrete and specific threat of one, and

noting that the MSPB recently dismissed for lack of jurisdiction their

administrative complaints seeking to stay any adverse employment action

73

predicated on plaintiffs' failure to follow DACA policy. Appellants Br. at 37-41.

None of these contentions demonstrates that plaintiffs lack a meaningful remedy for a disputed adverse employment action. That plaintiffs must await an actual or more concrete and particularized threat of disciplinary action before invoking these remedies is fully consistent with settled principles requiring exhaustion of administrative remedies and final agency action. And because a plaintiff who succeeds in a CSRA action may obtain backpay, reinstatement, or other substantial relief (*see* 5 U.S.C. § 1221(g)(1)(A)), there is no basis for plaintiffs' contention that these remedies are inadequate and require supplementation with a right to pre-enforcement relief under *Leedom* jurisdiction.

Plaintiffs further err in asserting that the Merit Systems Protection Board's dismissal of their recent claims for pre-enforcement relief demonstrates that CSRA remedies are inadequate. The MSPB held only that plaintiffs must exhaust their administrative remedies before the Office

74

of Special Counsel, and that they could then file an appeal with the Board after having done so. *See Martin* v. *DHS,* 2014 WL 1900939 (MSPB May 9, 2014). Contrary to plaintiffs' contentions, the recent MSPB decisions confirm that CSRA remedies are available to an employee who alleges that he has been subjected to disciplinary action for refusing to obey an order that would require him to violate the law.

Second, a dispute as to the permissible scope of the Secretary's prosecutorial discretion does not implicate the kind of patent abuse of administrative power warranting extra-statutory review under *Leedom.* The Secretary's exercise of prosecutorial discretion in removal proceedings is consistent with longstanding administrative practice. Unlike the essentially lawless action at issue in *Leedom,* the Secretary's general authority to exercise prosecutorial discretion in removal proceedings has been acknowledged in two Supreme Court precedents. *Reno* v. *American Arab Anti-Discrimination Committee,* 525 U.S. 471, 483-84 (1999); *Arizona* v. *United States,* 132 S. Ct. 2492, 2499 (2012). Plaintiffs argue that this long-

75

recognized enforcement discretion has been partially limited by statute.
But even if that assertion were correct – and, as we show below, it is not – a
dispute as to the meaning of federal statutes allegedly limiting the
Secretary's prosecutorial discretion at one stage of a removal proceeding
does not warrant circumventing the remedies and jurisdictional limitations
established by the Civil Service Reform Act.

Plaintiffs' amicus, Eagle Forum, similarly errs in contending that
*Leedom* jurisdiction is available to determine whether the Secretary erred by
issuing the DACA policy without following the "notice and comment"
rulemaking procedures of the Administrative Procedure Act. *Leedom*
jurisdiction is reserved for errors that are of a "*summa* or *magna* quality"
*McLendon*, 603 F.3d at 1177 (5th Cir. 1979). We are aware of no case holding
that an alleged failure to comply with procedural rulemaking requirements
rises to that level. Moreover, the DACA policy explicitly states that it
"confers no substantive right, immigration status or pathway to
citizenship" but is intended "to set forth policy for the exercise of discretion

76

within the framework of existing law." ROA.434. Such statements of

agency policy are not subject to "notice and comment" rulemaking

requirements in the first instance. *See Shell Offshore Inc.* v. *Babbitt*, 238 F.3d

622, 627-29 (5th Cir. 2001); *Mada-Luna* v. *Fitzpatrick*, 813 F.2d 1006, 1012-17

(9th Cir. 1987) (INS operating instruction on deferred action not subject to

notice and comment rulemaking).

At bottom, plaintiffs seek to circumvent the CSRA and proceed

directly to district court under *Leedom* jurisdiction because "[t]he MSPB

was created to adjudicate garden-variety employment disputes * * * not to

review the constitutionality or legality of nationwide executive policies."

Appellant Br. at 41. Plaintiffs stress that they seek, not merely

individualized relief from employment actions directed against them

personally, but broad declaratory and injunctive relief against the entire,

nationwide application of the DACA policy. *Id.* at 42. They conclude that

the lack of such broad remedies under the CSRA supports district court

jurisdiction.

77

But is not just the CSRA that denies plaintiffs a district court remedy for such claims. It is also the "case and controversy" requirements of Article III. Subordinate officers of the Department of Homeland Security do not have standing merely because they disagree with the Secretary's interpretation of the statutes he is charged with administering. Like the state of Mississippi or members of the public in general, the plaintiff immigration officers cannot invoke the district court's jurisdiction merely because, in their view, the federal government is not acting in accordance with the law. *Allen*, 468 U.S. at 754. Such generalized grievances will not suffice. Plaintiffs must instead base their claim on some concrete and particularized injury-in-fact.

The only such claim here, the only claim that would support the plaintiff immigration officers' standing, is one premised on a potential employment-related sanction. The CSRA affords the exclusive avenue for obtaining judicial review in this context, and it precludes resort to federal question jurisdiction, *Leedom* jurisdiction, or any other basis for bringing

78

suit in district court. The district court therefore correctly dismissed the

plaintiff immigration officers' claims for lack of subject matter jurisdiction.

### V. The Immigration Statutes Do Not Limit The Secretary's Prosecutorial Discretion To Defer Enforcement Action.

If the Court finds that the district court erred in dismissing the case

for lack of jurisdiction it should nonetheless direct judgment for the

Secretary on the alternative grounds that the pertinent immigration

statutes do not limit the Secretary's discretion to decline to institute

removal proceedings.[10]

In *Heckler v. Chaney*, 470 U.S. 821, 833-24 (1985), the Court stated that

an agency's decision not to undertake enforcement action has traditionally

---

[10] We have raised this merits issue by means of a cross appeal, rather than merely asserting it as an alternative grounds for affirmance. An appellee may seek affirmance on any ground preserved in the record, provided he does not seek to enlarge rights under the judgment. *Weaver v. Texas Capital Bank N.A.*, 660 F.3d 900, 905-06 (5th Cir. 2011). A judgment on the merits rather than on jurisdiction, however, confers additional rights to foreclose subsequent litigation. It must thus be raised through an independent, cross-appeal. *See Arvie v. Broussard*, 42 F.3d 249, 250 (5th Cir. 1994) (per curiam); *American Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 660 (7th Cir. 2011).

79

been committed to agency discretion and is therefore presumptively unreviewable. It noted that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. But the presumption is that the agency itself is best situated to determine whether "agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831.

As explained above, the government has a longstanding policy of exercising prosecutorial or enforcement discretion in determining whether to remove aliens from the country, and it has historically stressed that a decision not to proceed should be made at the earliest feasible stage of the removal process. *Chaney* makes clear that Congress may circumscribe that discretionary power. But given the presumption that enforcement

80

decisions are committed to agency discretion and the very long history of

prosecutorial discretion in the enforcement of immigration laws, it should

not be deemed to have done so here absent a clear and unequivocal

statutory command.

The statutes cited by the plaintiffs do not reflect a clear intent to limit

DHS's enforcement discretion. As an initial matter, the provisions stating

that aliens "shall be detained" for removal proceedings apply only to an

"alien seeking admission." They thus do not apply to aliens who are

already present within the United States, and who are taking no action to

"seek" admission. *See* 8 U.S.C. § 1225(b)(2)(A).

In particular, the statute provides that an "applicant for admission"

includes two categories of aliens: those who are "present in the United

States" but who have not been lawfully admitted (§ 1225(a)(1), first clause),

and those who "arrive[] in the United States" (§ 1225(a)(1), second clause).

Aliens potentially eligible for prosecutorial discretion under the DACA

policy fall within the first category, pertaining to those who are already

81

physically present within the United States.[11] Such aliens are "deemed" to

be "applicants for admission" by operation of law.  *See* 8 U.S.C. §

1225(a)(1).  But unlike aliens arriving at the border, they are not engaged in

any affirmative behavior that could be characterized as "seeking

admission." *Cf. Webster's Third New International Dictionary* at 2055 (1993)

(defining "seek," in sense relevant here, as "to go in search of; to try to

acquire or gain; to make an attempt").  Indeed, if Congress intended the

"shall detain" provision of section 1225(b)(2)(A) to apply to both categories

of applicants for admission, it could easily have phrased the statute to

apply to any "applicant for admission."  It instead used different

phraseology that, in its ordinary sense, is not applicable to aliens who are

---

[11] *See* ROA.432 (to be considered, an alien must have been present in the United States on the June 2012 effective date of the memorandum and have continuously resided in the U.S. for at least five years preceding the effective date of the memorandum).

82

already present within the United States, and who are not taking action to

"seek" admission.[12]

Even assuming that section 1225(b)(2)(A) applies to inadmissible

aliens found within the United States, that statute does not constrain the

government's longstanding discretion to determine whether

commencement of removal proceedings is appropriate. Construing section

1225(b)(2)(A) as imposing a mandatory duty merely to *commence* removal

proceedings would yield nonsensical results. The statutory provisions on

which plaintiffs and the district court rely apply only to the initial stage of

a removal proceedings – the decision to file a "notice to appear"

commencing administrative proceedings. As the district court

---

[12] For similar reasons, the statutory directive to detain, for removal
proceedings, aliens seeking admission does not apply to aliens who were
previously admitted to the United States but overstay their authorization.
Although these aliens may be eligible for deferred action under the DACA
policy, they are not "applicants for admission" and are not taking action to
"seek" admission. Plaintiffs accordingly make no claim that the
government is statutorily compelled to commence removal proceedings
against them, nor do they contend that any order barring application of
DACA should apply to this group of aliens.

83

acknowledged, even under plaintiffs' interpretation, the government

would remain free to exercise the very same prosecutorial discretion by

terminating removal proceedings at any subsequent stage of the case.   *See*

ROA.951.   Plaintiffs' construction would thus compel the government to

commence removal cases that it has no intention of prosecuting further,

and no legal obligation to pursue to conclusion.   Construing the statute to

nonetheless mandate commencement of removal proceedings would waste

administrative resources, burden the alien and his or her family, and leave

the government's ultimate enforcement choices unaffected.

The plain language of the statute does not compel such absurd

results.   Contrary to the district court's reasoning, when words like "shall"

are used in the enforcement context, they are ordinarily *not* interpreted as

imposing an inflexible mandate that prohibits the agency from determining

that enforcement action is unwarranted.   Although "'shall' is normally

interpreted to impose a mandatory duty * * * when duties within the

traditional realm of prosecutorial discretion are involved, the courts have

84

not found this maxim controlling." *Seabrook* v. *Costle*, 659 F.2d 1371, 1374

n.3 (5th Cir. 1981). Numerous other cases are to the same effect. *See, e.g.,*

*Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (recognizing "[t]he

deep-rooted nature of law-enforcement discretion, even in the presence of

seemingly mandatory legislative commands"); *Dubois* v. *Thomas*, 820 F.2d

943, 946-47 (8th Cir. 1987) (finding, in context of Federal Water Pollution

Control Act, that the word "shall" did not impose a mandatory duty to

bring an enforcement action, and collecting cases reaching same result);

*Wood* v. *Herman*, 104 F. Supp. 2d 43, 47 (D.D.C. 2000) ("While it is a

recognized tenet of statutory construction that the word 'shall' is usually a

command, this principle has not been applied in cases involving

administrative enforcement decisions." (citation omitted)). [13]

---

[13] In *Dunlop* v. *Bachowski*, 421 U.S. 560 (1975), the Court held that the
Secretary of Labor's decision to refrain from commencing a civil action
under a statute providing that the Secretary "shall" bring a civil action if he
found probable cause to support a union member's complaint was subject
to judicial review. The Court, however, further held that the statute relied
on the Secretary's specialized knowledge and discretion in making this
enforcement determination, and that, notwithstanding the ostensibly

85

Here, the operative statutory language is directed, not at the decision as to whether to commence removal proceedings in the first instance, but at whether the government must *detain* an alien *after* it has determined to seek the alien's removal. The statute thus provides, not that the government "shall" commence removal proceedings against all inadmissible aliens, but rather that "the alien shall be detained for a [removal] proceeding." 8 U.S.C. § 1225(b)(2)(A). It thus does not displace the government's longstanding discretion to decide whether enforcement action is warranted in the first instance.

The legislative history, moreover, does not reflect any congressional intent to limit the government's discretion to refrain from initiating removal proceedings in light of humanitarian factors, resource constraints, or other matters of enforcement policy. As relevant here, the current statutory scheme is the result of amendments made by the Illegal

---

mandatory language of the statute, "the reviewing court is not authorized to substitute its judgment for the decision of the Secretary not to bring suit." *Id.* at 571.

86

Case 1:17-cv-02325-CRC Document 28-16 Filed 12/15/17 Page 388 of 505

Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, Div. C. Title III, " 301 & 302, 110 Stat. 3009-575-584 (1996).

These amendments were "intended to replace certain aspects of the 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H. Rep. No. 104-469, Pt. 1, 104th Cong., 2d Sess. 225-26 (1996). The change was effected by, among other provisions, amending 8 U.S.C. § 1225 [Immigration and Nationality Act § 235] so as to provide that aliens who had gained entry to the United States without inspection would nonetheless be deemed applicants for admission and thereby removable on the same grounds, and through the same procedures, applicable to aliens arriving at the border. *See* H. Conf. Rep. No. 104, 828, 104th Cong., 2d Sess. 208 (1996).

These procedures made it substantially more difficult for an alien who had gained entry without inspection to avoid removal. *Cf.* 8 U.S.C. §

87

1229a(c)(2) (providing that "applicants" for admission bear burden of establishing clear entitlement to admission) with 8 U.S.C. § 1129a(c)(3) (providing that, in the case of an alien lawfully admitted to the United States, government has burden of demonstrating by clear and convincing evidence that alien is deportable).   We have found nothing in the legislative history, however, that reflects Congress's intent to limit the enforcement discretion long exercised by immigration officials in determining whether to pursue an alien's removal in the first instance. Rather, "many provisions of IIRIRA are aimed at *protecting* the Executive's discretion from the courts-indeed, that can fairly be said to be the theme of the legislation." *Reno*, 525 U.S. at 485-86 (emphasis added).

Finally, insofar as there is any ambiguity in these statutory provisions, this Court should defer to the Secretary's reasonable interpretation of them.  *Chaney* holds that a reviewing court should generally defer to an agency's determination to refrain from enforcing a statute it is charged with administering.  *Chaney*, 470 U.S. at 832.   The

88

memoranda at issue here are consistent with decades of prior

administrative practice, fully explain the reasons for deferring enforcement

action, and, as *Chaney* indicates, concern prosecutorial decisions that are

presumptively within the agency's broad discretion. For all these reasons,

deference to the Secretary's interpretation is warranted. *See Siwe* v. *Holder*,

742 F.3d 603, 607 (5th Cir. 2014), citing *Skidmore* v. *Swift & Co.*, 323 U.S. 134

(1944).

Congress recently stated that "rather than simply rounding up as

many illegal immigrants as possible, which is sometimes achieved by

targeting the easiest and least threatening among the undocumented

population, DHS must ensure that the government's huge investments in

immigration enforcement are producing the maximum return in making

our country safer." H.R. Rep. No. 111-157, 111th Cong., 1st Sess. 8 (2009).

The DACA policy is fully consistent with that objective and well within the

government's broad discretion to "to "establish[ ] national immigration

enforcement policies and priorities." 6 U.S.C. § 202(5).

89

## CONCLUSION

The district court's judgment dismissing the case for lack of

jurisdiction should be affirmed. In the alternative, should the Court find

jurisdiction, it should remand the case with instructions to enter judgment

on the merits for the Secretary.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

SARAH R. SALDAÑA
United States Attorney

MICHAEL JAY SINGER
(202) 514-5432
/s/ JEFFREY CLAIR
(202) 514-4028
jeffrey.clair@usdoj.gov

Attorneys, Civil Division
Room 7243, Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

90

## FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared in Microsoft Word using a 14-point, proportionally spaced font, and that based on word processing software, the brief contains 15,200 words.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

## CERTIFICATE OF SERVICE

I certify that on July 9, 2014, I electronically filed the foregoing Brief for the Federal Appellees/Cross-Appellants using the Court's CM/ECF system, which constitutes service under the Court's rules.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

91

# STATUTORY AND REGULATORY ADDENDUM

1. 8 U.S.C. § 1225. . . . . . . . . . . . . . . . . . . . . . . . . . 1a

2. 8 U.S.C. § 1229a. . . . . . . . . . . . . . . . . . . . . . . . 4a

3. 8 C.F.R. Part 1239. . . . . . . . . . . . . . . . . . . . . . . 9a

4. 8 C.F.R. Part 239. . . . . . . . . . . . . . . . . . . . . . . 12a

8 U.S.C.A. § 1225

United States Code Annotated Currentness
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
 ˇ Subchapter II. Immigration
 ˇ Part IV. Inspection, Apprehension, Examination, Exclusion, and
Removal (Refs & Annos)

## ⇒§ 1225. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

(a) Inspection

(1) Aliens treated as applicants for admission

An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

(2) Stowaways

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B) of this section. A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B) of this section. In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.

(3) Inspection

1a

All aliens (including alien crewmen) who are applicants for admission
or otherwise seeking admission or readmission to or transit through
the United States shall be inspected by immigration officers.

(4) Withdrawal of application for admission

An alien applying for admission may, in the discretion of the Attorney
General and at any time, be permitted to withdraw the application for
admission and depart immediately from the United States.

(5) Statements

An applicant for admission may be required to state under oath any
information sought by an immigration officer regarding the purposes
and intentions of the applicant in seeking admission to the United
States, including the applicant's intended length of stay and whether
the applicant intends to remain permanently or become a United
States citizen, and whether the applicant is inadmissible.

(b) Inspection of applicants for admission

(1) Inspection of aliens arriving in the United States and certain other
aliens who have not been admitted or paroled

(A) Screening

(i) In general

If an immigration officer determines that an alien (other than an alien
described in subparagraph (F)) who is arriving in the United States or
is described in clause (iii) is inadmissible under section 1182(a)(6)(C)
or 1182(a)(7) of this title, the officer shall order the alien removed
from the United States without further hearing or review unless the
alien indicates either an intention to apply for asylum under section
1158 of this title or a fear of persecution.

\*   \*   \*

2a

(2) Inspection of other aliens

(A) In general

*Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under* section 1229a *of this title.*

(B) Exception

Subparagraph (A) shall not apply to an alien--

**(i)** who is a crewman,

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

(C) Treatment of aliens arriving from contiguous territory

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

(3) Challenge of decision

The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 1229a of this title.

* * *

3a

App. 2484

8 U.S.C.A. § 1229a

United States Code Annotated Currentness
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
°⊞Subchapter II. Immigration
°⊞Part IV. Inspection, Apprehension, Examination, Exclusion, and
Removal (Refs & Annos)

➡ **§ 1229a. Removal proceedings**

(a) Proceeding

(1) In general

An immigration judge shall conduct proceedings for deciding the
inadmissibility or deportability of an alien.

(2) Charges

An alien placed in proceedings under this section may be charged with
any applicable ground of inadmissibility under section 1182(a) of this
title or any applicable ground of deportability under section 1227(a) of
this title.

(3) Exclusive procedures

Unless otherwise specified in this chapter, a proceeding under this
section shall be the sole and exclusive procedure for determining
whether an alien may be admitted to the United States or, if the alien
has been so admitted, removed from the United States. Nothing in this
section shall affect proceedings conducted pursuant to section 1228 of
this title.

(b) Conduct of proceeding

(1) Authority of immigration judge

The immigration judge shall administer oaths, receive evidence, and
interrogate, examine, and cross-examine the alien and any witnesses.
The immigration judge may issue subpoenas for the attendance of
witnesses and presentation of evidence. The immigration judge shall

4a

App. 2485

have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this chapter.

(2) Form of proceeding

(A) In general

The proceeding may take place--

**(i)** in person,

**(ii)** where agreed to by the parties, in the absence of the alien,

**(iii)** through video conference, or

**(iv)** subject to subparagraph (B), through telephone conference.

(B) Consent required in certain cases

An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

(3) Presence of alien

If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

(4) Alien's rights in proceeding

In proceedings under this section, under regulations of the Attorney General--

**(A)** the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

**(B)** the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national

5a

security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, and

**(C)** a complete record shall be kept of all testimony and evidence produced at the proceeding.

(5) Consequences of failure to appear

(A) In general

Any alien who, after written notice required under paragraph (1) or (2) of section 1229(a) of this title has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2) of this section). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 1229(a)(1)(F) of this title.

(B) No notice if failure to provide address information

No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 1229(a)(1)(F) of this title.

(C) Rescission of order

Such an order may be rescinded only--

**(i)** upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1) of this section), or

**(ii)** upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

6a

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

(D) Effect on judicial review

Any petition for review under section 1252 of this title of an order entered in absentia under this paragraph shall (except in cases described in section 1252(b)(5) of this title) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

(E) Additional application to certain aliens in contiguous territory

The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 1225(b)(2)(C) of this title.

(6) Treatment of frivolous behavior

The Attorney General shall, by regulation--

**(A)** define in a proceeding before an immigration judge or before an appellate administrative body under this subchapter, frivolous behavior for which attorneys may be sanctioned,

**(B)** specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

**(C)** impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

(7) Limitation on discretionary relief for failure to appear

Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 1229(a) of this title, was provided oral

7a

notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1) of this section) to attend a proceeding under this section, shall not be eligible for relief under section 1229b, 1229c, 1255, 1258, or 1259 of this title for a period of 10 years after the date of the entry of the final order of removal.

(c) Decision and burden of proof

(1) Decision

(A) In general

At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

(B) Certain medical decisions

If a medical officer or civil surgeon or board of medical officers has certified under section 1222(b) of this title that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 1182(a) of this title, the decision of the immigration judge shall be based solely upon such certification.

(2) Burden on alien

In the proceeding the alien has the burden of establishing--

**(A)** if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182 of this title; or

**(B)** by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

8a

App. 2489

(3) Burden on service in cases of deportable aliens

(A) In general

In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

(B) Proof of convictions

In any proceeding under this chapter, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

**(i)** An official record of judgment and conviction.

**(ii)** An official record of plea, verdict, and sentence.

**(iii)** A docket entry from court records that indicates the existence of the conviction.

**(iv)** Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

**(v)** An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

**(vi)** Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

**(vii)** Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

9a

Code of Federal Regulations Currentness
Title 8. Aliens and Nationality
Chapter V. Executive Office for Immigration Review, Department of
Justice (Refs & Annos)
Subchapter B. Immigration Regulations (Refs & Annos)
➡Part 1239. Initiation of Removal Proceedings (Refs & Annos)

## § 1239.1 Notice to appear.

(a) Commencement. Every removal proceeding conducted under
section 240 of the Act (8 U.S.C. 1229a) to determine the deportability
or inadmissibility of an alien is commenced by the filing of a notice to
appear with the immigration court. For provisions relating to the
issuance of a notice to appear by an immigration officer, or supervisor
thereof, see 8 CFR 239.1(a).

(b) Service of notice to appear. Service of the notice to appear shall be
in accordance with section 239 of the Act.

## § 1239.2 Cancellation of notice to appear.

(a) Prior to commencement of proceedings. For provisions relating to
the authority of an immigration officer to cancel a notice to appear
prior to the vesting of jurisdiction with the immigration judge, see 8
CFR 239.2(a) and (b).

(b) [Reserved]

(c) Motion to dismiss. After commencement of proceedings pursuant to
8 CFR 1003.14, government counsel or an officer enumerated in 8 CFR
239.1(a) may move for dismissal of the matter on the grounds set out
under 8 CFR 239.2(a). Dismissal of the matter shall be without
prejudice to the alien or the Department of Homeland Security.

(d) Motion for remand. After commencement of the hearing,
government counsel or an officer enumerated in 8 CFR 239.1(a) may
move for remand of the matter to the Department of Homeland
Security on the ground that the foreign relations of the United States
are involved and require further consideration. Remand of the matter
shall be without prejudice to the alien or the Department of Homeland
Security.

10a

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) Termination of removal proceedings by immigration judge. An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

### § 1239.3 Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

11a

Code of Federal Regulations Currentness
Title 8. Aliens and Nationality
Chapter I. Department of Homeland Security (Refs & Annos)
Subchapter B. Immigration Regulations
➡Part 239. Initiation of Removal Proceedings (Refs & Annos)

## § 239.1 Notice to appear.

(a) Issuance of notice to appear. Any immigration officer, or supervisor thereof, performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);

(2) Deputy district directors (except foreign);

(3) Chief patrol agents;

(4) Deputy chief patrol agents;

(5) Assistant chief patrol agents;

(6) Patrol agents in charge;

(7) Assistant patrol agents in charge;

(8) Field operations supervisors;

(9) Special operations supervisors;

(10) Supervisory border patrol agents;

(11) Service center directors;

(12) Deputy service center directors;

(13) Assistant service center directors for examinations;

(14) Supervisory district adjudications officers;

12a

(15) Supervisory asylum officers;

(16) Officers in charge (except foreign);

(17) Assistant officers in charge (except foreign);

(18) Special agents in charge;

(19) Deputy special agents in charge;

(20) Associate special agents in charge;

(21) Assistant special agents in charge;

(22) Resident agents in charge;

(23) Supervisory special agents;

(24) Directors of investigations;

(25) District directors for interior enforcement;

(26) Deputy or assistant district directors for interior enforcement;

(27) Director of detention and removal;

(28) Field office directors;

(29) Deputy field office directors;

(30) Supervisory deportation officers;

(31) Supervisory detention and deportation officers;

(32) Directors or officers in charge of detention facilities;

(33) Directors of field operations;

(34) Deputy or assistant directors of field operations;

(35) District field officers;

(36) Port directors;

13a

(37) Deputy port directors;

(38) Supervisory service center adjudications officers;

(39) *Unit Chief, Law Enforcement Support Center;*

(40) *Section Chief, Law Enforcement Support Center;* or

(41) Other officers or employees of the Department or of the United States who are delegated the authority as provided by 8 CFR 2.1 to issue notices to appear.

(b) Service of notice to appear. Service of the notice to appear shall be in accordance with section 239 of the Act.

### § 239.2 Cancellation of notice to appear.

(a) Any officer authorized by § 239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to § 3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;

(2) The respondent is not deportable or inadmissible under immigration laws;

(3) The respondent is deceased;

(4) The respondent is not in the United States;

(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act;

(6) The notice to appear was improvidently issued, or

(7) Circumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.

14a

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) Motion to dismiss. After commencement of proceedings pursuant to 8 CFR 1003.14, ICE counsel, or any officer enumerated in paragraph (a) of this section, may move for dismissal of the matter on the grounds set out under paragraph (a) of this section.

(d) Motion for remand. After commencement of the hearing, ICE counsel, or any officer enumerated in paragraph (a) of this section may move for remand of the matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration.

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

### § 239.3 Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

# DEF-INTERV.

# EX. 21

No. 15-674

IN THE

# Supreme Court of the United States

UNITED STATES, ET AL.,

*Petitioners,*

v.

STATE OF TEXAS, ET AL.,

*Respondents.*

**On Writ of Certiorari
to the United States Court of Appeals
for the Fifth Circuit**

**BRIEF OF FORMER FEDERAL IMMIGRATION
AND HOMELAND SECURITY OFFICIALS
AS AMICI CURIAE IN SUPPORT OF
THE UNITED STATES**

MARTIN S. LEDERMAN
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Ave. NW
Washington, D.C. 20001
(202) 662-9937

MICHAEL J. GOTTLIEB
  *Counsel of Record*
ALEXANDER I. PLATT
JOSHUA RILEY
ALEXANDER TABLOFF
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., N.W.
Washington, D.C. 20015
(202) 237-2727
mgottlieb@bsfllp.com

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE .....................................1

SUMMARY OF ARGUMENT .........................................2

ARGUMENT ..................................................................5

    I.   DEFERRED ACTION POLICIES HAVE BEEN AN
         ESSENTIAL COMPONENT OF THE EXECUTIVE
         BRANCH'S ENFORCEMENT OF FEDERAL
         IMMIGRATION LAW FOR DECADES...........................5

        A.  Deferred Action Policies Have Been
            A Common Feature of Immigration
            Enforcement Since the 1950s .........................5

        B.  Deferred Action Programs Promote Sensible
            Immigration Policy Objectives .....................11

    II.  ALLOWING ALIENS WITH DEFERRED ACTION TO
         APPLY FOR WORK AUTHORIZATION IS AN
         IMPORTANT COMPONENT OF IMMIGRATION
         ENFORCEMENT THAT IS CONSISTENT WITH
         FEDERAL IMMIGRATION LAW ...............................20

        A.  The Executive's Longstanding Policy of
            Allowing Aliens with Deferred Action To
            Apply for Work Authorization Is the Product
            of Extensive Administrative, Legislative, and
            Public Deliberations .....................................21

        B.  Authorizing Certain Aliens With Deferred
            Action To Work Is Consistent With
            Established Immigration Policy Objectives .37

CONCLUSION...............................................................40

APPENDIX

ii

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*Barnhart v. Walton,*
   535 U.S. 212 (2002) ...................................................40

*Canas-Garcia v. McKinnon,*
   1984 U.S. Dist. LEXIS 14946,
   83-cv-2077 (D. Mass. Jul. 13, 1984).........................27

*Diaz v. INS,*
   648 F. Supp. 638 (E.D. Cal. 1986) ...........................27

*Gilana v. Smith,*
   1981 U.S. Dist. LEXIS 16824,
   81-cv-3829 (N.D. Ill. Dec. 24, 1981).........................27

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .....................................................3

*Hotel & Rest. Employees Union,*
   *Local 25 v. Smith,*
   846 F.2d 1499 (D.C. Cir. 1988) ..................................6

### STATUTES

8 U.S.C. § 1158(d)(2) ......................................................36

8 U.S.C. § 1226(a)(3) ......................................................36

8 U.S.C. § 1229c(a)(2)(A).................................................37

8 U.S.C. § 1324a(h)(3) ...................................26, 29, 33, 34

Immigration and Nationality Act,
   Pub. L. No. 82-414, 66 Stat. 163 (1952) ..................34

iii

# TABLE OF AUTHORITIES—Continued

Page(s)

Farm Labor Contractor Registration Act,
    Pub. L. No. 88-582, 78 Stat. 920 (1964) ..................23

Social Security Amendments of 1972, Pub. L.
    No. 92-603, 86 Stat. 1329..........................................22

Farm Labor Contractor Registration Act
    Amendments Act, Pub. L. No. 93-518,
    88 Stat. 1652 (1974) .................................................23

Immigration and Nationality Act Amendments
    of 1976, Pub. L. No. 94-571, 90 Stat. 2703...............23

Migrant and Seasonal Agricultural Worker
    Protection Act, Pub. L. No. 97-470, 96 Stat.
    2583 (1983) ...............................................................23

Immigration Reform and Control Act,
    Pub. L. No. 99-603, 100 Stat. 3359
    (1986) ...........................................................*passim*

Immigration Act of 1990, Pub. L. No. 101-
    649, 104 Stat. 4978...................................................10

Violent Crime Control and Law
    Enforcement Act, Pub. L. No. 103-322,
    108 Stat. 1796 (1994) ...............................................36

Illegal Immigration Reform and
    Immigrant Responsibility Act, Pub. L.
    No. 104-208, 110 Stat. 3009 (1996) ...................36, 37

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

## REGULATIONS

8 C.F.R. § 109.1 .................................................................24

8 C.F.R. § 274a.12 ..................................................*passim*

44 Fed. Reg. 43,480 (Jul. 25, 1979) ...................23, 24, 38

45 Fed. Reg. 19,563 (Mar. 26, 1980).............................24

46 Fed. Reg. 25,079 (May 5, 1981) .....................24, 25, 39

46 Fed. Reg. 55,920 (Nov. 13, 1981) ...............................39

51 Fed. Reg. 39,385 (Oct. 28, 1986)................................25

51 Fed. Reg. 45,338 (Dec. 18, 1986) ...............................33

52 Fed. Reg. 2115 (Jan. 20, 1987) ...................................32

52 Fed. Reg. 8762 (Mar. 19, 1987)...................................32

52 Fed. Reg. 16,216 (May 1, 1987) ...........................32, 39

52 Fed. Reg. 46,092 (Dec. 4, 1987) ...........................26, 34

56 Fed. Reg. 41,767 (Aug. 23, 1991)...............................21

60 Fed. Reg. 66,062 (Dec. 21, 1995) .................................9

61 Fed. Reg. 13,061 (Mar. 26, 1996)...............................35

62 Fed. Reg. 10,312 (Mar. 6, 1997)..................................37

75 Fed. Reg. 33,446 (Jun. 11, 2010) ...............................33

75 Fed. Reg. 58,962 (Sep. 24, 2010) .........................32, 33

**App. 2513**

v

**TABLE OF AUTHORITIES—Continued**

Page(s)

**LEGISLATIVE MATERIALS**

H.R. 2328 (1971) .............................................................. 27

H.R. 16188 (1972) ........................................................... 28

*Illegal Aliens: Hearings Before Subcomm.*
   *No. 1 of the H. Comm on the Judiciary,*
   92nd Cong. (1971 & 1972) ................................... 22, 28

H.R. Rep. 92-1366 (1972) ............................................. 28

H.R. Rep. 93-108 (1973) ............................................... 29

H.R. 982 (1973) ............................................................... 29

H.R. 8713 (1975) ............................................................ 29

H.R. Rep. 94-506 (1975) ............................................... 29

*S. 3074: Hearings Before the Subcomm.*
   *On Immigration and Naturalization of*
   *the S. Comm. on the Judiciary,* 94th
   Cong. (1976) ............................................................ 29

S. 2252 (1978) ................................................................. 29

*Alien Adjustment and Employment Act of*
   *1977: Hearings Before the S. Comm. on*
   *the Judiciary,* 95th Cong. (1978) ............................. 29

H.R. 6514 (1982) ............................................................ 29

H.R. Rep. 97-890 (1982) ............................................... 29

vi

## TABLE OF AUTHORITIES—Continued

Page(s)

*Immigration Control and Legalization Amendments (H.R. 3080): Hearing Before the Subcomm. On Immigration, Refugees and Int'l Law of the H. Comm. on the Judiciary*, 99th Cong. (1985).........................................................31

*Implementation of the Immigration Reform and Control Act of 1986: Hearing Before the Subcomm. on Immigration, Refuges, and Int'l Law of the H. Comm. on the Judiciary*, 99th Cong. (1986).............................................................31

*Immigration Reform and Control Act of 1986 Oversight: Hearings Before the Subcomm. On Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary,* 101st Cong. (1989)..............................35, 36

*Immigration Act of 1989: Hearing Before the Subcomm. On Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 101st Cong. (1990) ..........................................................9

Written Testimony of Stephen Legomsky before the H. Comm. on the Judiciary (Feb. 25, 2015) ...........................................10

vii

## TABLE OF AUTHORITIES—Continued

Page(s)

### BRIEFS

Brief for United States as Petitioner,
*Heckler v. Chaney*,
No. 83-1878, 1984 WL 565477
(U.S. Aug. 16, 1984). ................................................14

### PRESIDENTIAL MATERIALS

President Dwight Eisenhower, *Statement
Concerning the Entry into the United
States of Adopted Foreign-Born
Orphans* (Oct. 26, 1956). ............................................6

President Ronald Reagan, *Statement on
Signing the Immigration Reform and
Control Act of 1986*, 22 WEEKLY COMP.
PRES. DOCS. 1533 (Nov. 6, 1986) .......................17, 38

President George H.W. Bush, *Statement
on Signing the Immigration Act of
1990,* 26 WEEKLY COMP. PRES. DOC.
1947 (Nov. 29, 1990)................................................10

### OTHER AUTHORITIES

American Immigration Council, *Executive
Grants of Temporary Immigration
Relief, 1956-Present* (Oct. 2014)..................................6

Sam Bernsen, *Leave to Labor*, 52 No. 35
INTERPRETER RELEASES 291 (Sep. 2,
1975) ................................................................21, 22

viii

**TABLE OF AUTHORITIES—Continued**

Page(s)

Memorandum from Sam Bernsen, General
Counsel, INS, to Comm'r, *Legal
Opinion Regarding Service Exercise of
Prosecutorial Discretion* (Jul. 15, 1976) .............12, 14

Sam Bernsen, *Updating the Immigration
Law*, 9 IN DEFENSE OF THE ALIEN 203
(1986) ........................................................................22

Andorra Bruno et al., Congressional
Research Serv., *Analysis of June 15,
2012 DHS Memorandum, Exercising
Prosecutorial Discretion with Respect
to Individuals Who Came to the United
States as Children* (2012)...........................................6

Memorandum from Bo Cooper, General
Counsel, INS, to Comm'r, *INS Exercise
of Prosecutorial Discretion* (Jul. 11,
2000) ......................................................12, 13, 17, 18

U.S. Dep't of Justice, Circular Letter No.
107 (Sep. 20, 1909) ...................................................14

Executive Office of the President, Council
of Economic Advisers, *The Economic
Effects of Administrative Action on
Immigration* (2014). ................................................38

FAIR, *Supplemental Statement Regarding
the Permissible Scope of the Attorney
General's Authority to Grant Work
Authorization* (Jan. 29, 1987) ..................................33

ix

## TABLE OF AUTHORITIES—Continued

Page(s)

Memorandum from William Howard,
Principal Legal Advisor, ICE, to All
OPLA Chief Counsel, *Prosecutorial
Discretion* (Oct. 24, 2005) .............................. 15, 16, 18

INS, *Preliminary Working Draft of
Regulations on Powers and Duties of
Service Officers and Employment
Authorization* (Jan. 20, 1987) ................................... 32

*INS Reverses Family Fairness Policy,* 67
No. 6 INTERPRETER RELEASES 153
(Feb. 5, 1990) ............................................................. 7

Memorandum from Jeh Johnson, Sec'y of
Homeland Security, to Leon
Rodriguez, Dir., USCIS, *Exercising
Prosecutorial Discretion* (Nov. 20,
2014) ...................................................... 12, 17, 19, 38

Deborah Levy, *The Alien Rights Law
Project*, 27 HOWARD L.J. 1265 (1984) ............... 24, 25

Letter from Robert McConnell, Dep't of
Justice, to Hon. Romano Mazzoli (Apr.
4, 1983) ................................................................... 27

Memorandum from Gene McNary,
Comm'r, INS, to Reg'l Comm'rs,
*Family Fairness* (Feb. 2, 1990) ........................ *passim*

Memorandum from Doris Meissner,
Comm'r, INS, to Reg'l Dirs., *Exercising
Prosecutorial Discretion* (Nov. 17,
2000) ................................................................ 15, 18

x

## TABLE OF AUTHORITIES—Continued

Page(s)

Memorandum from Julie Myers, Assistant
  Sec'y of Homeland Security, to Field
  Office Dirs., *Prosecutorial and Custody
  Discretion* (Nov. 7, 2007)............................................19

Letter from Seema Nanda, Dep't of
  Justice, to David R. Burton, National
  Small Bus. Ass'n (Sep. 10, 2012) .............................31

Memorandum from Janet Napolitano,
  Sec'y of Homeland Security, to David
  V. Aguilar,, *Exercising Prosecutorial
  Discretion* (Jun. 15, 2012) ...................................14, 15

Letter from Alan Nelson, Comm'r, INS to
  Romano Mazzoli (May 14, 1984) .............................27

Alan Nelson, Comm'r, INS, *Legalization
  and Family Fairness: An Analysis*
  (Oct. 21, 1987)....................................................7, 8, 19

Jeffrey Passel et al., *As Growth Stalls,
  Unauthorized Immigrant Population
  Becomes More Settled*, Pew Research
  Center (2014) ..............................................................9

USCIS, *Interim Relief for Certain Foreign
  Academic Students Adversely Affected
  by Hurricane Katrina, Frequently
  Asked Questions* (Nov. 25, 2005). ...........................11

USCIS, Press Release*, USCIS Announces
  Interim Relief for Foreign Students
  Adversely Impacted by Hurricane
  Katrina* (Nov. 25, 2005)...........................................35

xi

## TABLE OF AUTHORITIES—Continued

Page(s)

Memorandum from Paul Virtue, INS, to
Reg'l Dirs., *Supplemental Guidance on
Battered Alien Self-Petitioning Process
and Related Issues* (May 6, 1997) ............................ 11

App. 2520

# INTEREST OF AMICI CURIAE[1]

Amici served in senior positions in the federal agencies charged with enforcement of U.S. immigration laws under both Democratic and Republican administrations.

Paul Virtue served as General Counsel of the United States Immigration and Naturalization Service ("INS" or "the Service") from 1998 to 1999. INS is the predecessor agency to the federal offices within the Department of Homeland Security ("DHS") that now have responsibility for enforcing the nation's immigration laws. He also served as Executive Associate Commissioner from 1997 until 1998 and Deputy General Counsel from 1988 until 1997.

Bo Cooper served as General Counsel of INS from 1999 until 2003.

Roxana Bacon served as Chief Counsel of U.S. Citizenship and Immigration Services ("USCIS") from 2009 to 2011.

Seth Grossman served as Chief of Staff to the General Counsel of DHS from 2010 to 2011, Deputy General Counsel of DHS from 2011 to 2013, and as Counselor to the Secretary at the same agency in 2013.

---

[1] Pursuant to Supreme Court Rule 37.3(a), all parties have consented to the filing of this brief. Pursuant to Rule 37.6, amici certify that no counsel for a party authored this brief in whole or in part, and no persons other than amici curiae or their counsel made a monetary contribution to its preparation or submission.

2

Stephen H. Legomsky served as Chief Counsel of USCIS from 2011 to 2013 and as Senior Counselor to the Secretary of DHS on immigration issues from July to October 2015.

John R. Sandweg served as Acting Director of Immigration and Customs Enforcement ("ICE") from 2013 to 2014, as Acting General Counsel of DHS from 2012 to 2013, as Senior Counselor to the Secretary of DHS from 2010 to 2012, and as Chief of Staff to the General Counsel of the same agency from 2009 to 2010.

As former leaders of the nation's primary immigration enforcement agencies, amici are familiar with the historical underpinnings of the deferred action and work authorization policies at issue in this litigation. Amici's experience demonstrates that prosecutorial discretion plays a vital role in the rational enforcement of federal immigration law, which has historically established laudable policy objectives backed by inadequate enforcement resources. Amici's experience is that the exercise of executive discretion in the immigration context is vital to advancing the national security interests, humanitarian values, and rule of law principles underlying federal immigration law.

## SUMMARY OF ARGUMENT

For more than half of a century, the Executive Branch has developed and implemented policies designed to delay—in many cases indefinitely—the enforcement of deportation and other aspects of federal immigration law. Administrations of both Republican and Democratic Presidents have relied on these policies to enforce federal immigration

3

laws in a manner that is efficient, rational, and humane. While these policies have at times generated political controversy, until recently their legal underpinnings did not. That is because, as a general rule, the ordering of enforcement priorities is a "special province of the Executive." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985).

Throughout this period, the Executive Branch has ordinarily allowed aliens with deferred action to apply for authorization to work while they remain in this country. This policy, which is codified at 8 C.F.R. § 274a.12(c)(14), was the subject of extensive deliberation in the 1970s and 1980s, including several rounds of notice and comment rulemaking by INS. These executive deliberations were recognized and ratified by Congress through a series of enactments during and after the same period.

The decision of the divided court of appeals panel threatens to upend the sensible enforcement policies on which federal immigration officials have relied for decades. The Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program is the same in its basic attributes as numerous deferred action policies that preceded it. As with DAPA, nearly all prior deferred action policies exercised prosecutorial discretion in order to focus enforcement efforts on the highest priority cases consistent with federal immigration policy, while allowing for work authorization for individuals who will likely remain in the country for at least some duration.

Executive discretion to establish enforcement policies is especially important in the immigration

4

context because scarce resources are available to implement myriad federal immigration policies and because the selection of enforcement priorities has potentially severe consequences for national security, the employment market, and the preservation of family unity. Prosecutorial discretion is just as important, and just as lawful, when it is used to establish priorities that may affect large numbers of persons as it is when it affects only individual cases. Reversal of the decision below is vital to ensure that immigration enforcement priorities are determined by the Executive Branch officials to whom Congress has committed such discretion, rather than by judicial fiat.

5

# ARGUMENT

## I. Deferred Action Policies Have Been An Essential Component Of The Executive Branch's Enforcement Of Federal Immigration Law For Decades

For more than half of a century, federal immigration officials have exercised enforcement discretion through policies that permit "deferred action," "extended voluntary departure," "parole," or "deferred enforced departure" for various classes of aliens. Notwithstanding the variation in terminology, these programs are fundamentally alike: each enables certain classes of otherwise removable aliens to remain temporarily in (or, in the case of parole, to enter) the United States and, in most cases, to support themselves while they are present by working lawfully. In amici's experience, the objectives Congress sought to achieve via the federal immigration laws would be thwarted if Executive Branch officials were suddenly deprived of the discretion to use such policies.

### A. Deferred Action Policies Have Been A Common Feature of Immigration Enforcement Since the 1950s

In 1956, President Eisenhower "paroled"—i.e., authorized the admission into the United States of—roughly one thousand foreign-born children who were adopted by American citizens overseas but who were precluded from entering the United States because of statutory quotas. The President explained that he had been "particularly concerned over the hardship" that these quotas imposed, especially on members of the U.S. armed forces who were "forced to leave their adopted children behind"

**App. 2525**

6

following tours of duty. On the advice of the Attorney General and Secretary of State, the President adopted the parole policy "pending action by Congress to amend the law." *See* President Dwight Eisenhower, *Statement Concerning the Entry into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956) *available at* http://www.presidency.ucsb.edu/ ws/?pid=10677.

As the Cold War entered its second decade, the Eisenhower Administration began to use the parole power as an instrument of foreign policy. For example, President Eisenhower ordered the parole of Cubans fleeing that country's oppressive communist regime—a program continued by the Kennedy, Johnson, and Nixon Administrations, and which ultimately permitted over six hundred thousand otherwise ineligible aliens to enter the United States. American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014).

The Ford and Carter Administrations each made grants of "extended voluntary departure," meaning that they "temporarily suspend[ed] enforcement" of deportation for "particular group[s] of aliens." *Hotel & Rest. Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc); Andorra Bruno et al., CRS, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (2012).

The Reagan and George H.W. Bush Administrations continued and broadened deferred action. In 1986, following passage of the Immigration Reform and Control Act (IRCA), Pub.

7

L. No. 99-603, 100 Stat. 3359 (1986), the Reagan
Administration also launched the "Family
Fairness" program. IRCA had established a
pathway to lawful status for certain aliens who
otherwise were present without authorization in
the United States, *see id.* at § 201, 100 Stat. at
3445*,* but the Act did not state whether INS should
continue to deport the relatives of aliens who might
qualify for lawful status under the new law—and
the legislative history makes clear that the
omission was a deliberate legislative decision. *See*
S. Rep. 99-132, at 16 (1986) ("It is the intent of the
Committee that the families of legalized aliens will
obtain no special petitioning rights by virtue of the
legalization."); *see also INS Reverses Family
Fairness Policy,* 67 No. 6 INTERPRETER RELEASES
153 (Feb. 5, 1990) ("What to do when some but not
all members of an alien family qualify for
legalization has been a controversial issue since the
beginning of the amnesty program."). Confronting
that question, INS Commissioner Alan Nelson
acknowledged that there was "nothing in [IRCA or
the legislative history] that would indicate
Congress wanted to provide immigration benefits to
others who didn't meet the basic criteria, including
the families of legalized aliens." Alan Nelson,
*Legalization and Family Fairness: An Analysis*
(Oct. 21, 1987), *reprinted as* 64 No. 41 INTERPRETER
RELEASES 1191, 1201 ("Nelson Statement"). INS
therefore lacked express statutory authority to
grant resident status to aliens who did not
otherwise qualify for it. *Id.*

The fact that IRCA did not provide express
statutory authority to INS to alter the status of
non-qualifying aliens, however, did not mean that

8

the Act required the Service to deport all such persons, or precluded such persons from working. The Reagan Administration recognized a distinction between granting permanent resident status, which the Attorney General could not do without statutory authorization, and merely deferring removal actions against certain unlawfully present aliens, which the law empowered the Attorney General to do. *Id*. As Commissioner Nelson explained:

> INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations.

*Id*.

President George H.W. Bush's Administration expanded the Family Fairness Program in 1990 by instructing that "[v]oluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien, who can establish" that they meet certain criteria, including residence in the United States for a specified period of time and the lack of a felony conviction. Memorandum from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, *Family Fairness* (Feb. 2, 1990)*, reprinted as* 67 No. 6 INTERPRETER RELEASES 153, 165 App. I ("McNary

9

Memo"); *see also* 60 Fed. Reg. 66,062, 66,063 (Dec. 21, 1995) ("The Service created the Family Fairness policy as a means of precluding the separation of family members by deferring their deportation."). The Service also made clear that aliens who qualified under the Family Fairness Program would be eligible to work. *See* McNary Memo.

Contemporaneous government estimates indicated that as many as 1.5 million aliens were expected to be eligible under the expanded Family Fairness program. *See Immigration Act of 1989: Hearing before the Subcomm. On Immigration, Refugees, and International Law of the H. Comm. On the Judiciary*, 101st Cong. 49 (1990) (Mr. McCollum: "Do you have any idea, any estimates of how many people we are talking about who are the immediate relatives legalized under the IRCA Act? . . . ." Mr. McNary: "Well, we are talking about 1.5 million under IRCA."); *see also id.* at 56 (Mr. Morrison: "Mr. McNary, you used the number 1.5 million IRCA relatives who are undocumented but who are covered by your family fairness policy. Do I have that number right?" Mr. McNary: "Yes."). Publicly available estimates indicate that this figure was approximately forty percent of undocumented aliens in the United States at the time. *See* Jeffrey Passel et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, Pew Research Center (2014) *available at* http://www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf (estimating that 3.5

10

million unauthorized immigrants lived in the United States in 1990).[2]

Shortly after implementing the expansion of Family Fairness, President Bush issued a signing statement accompanying his approval of the Immigration Act of 1990. That Act granted the Attorney General power to grant "temporary protected status" to allow otherwise deportable aliens to remain in the United States "because of their particular nationality or region of foreign state of nationality." Pub. L. No. 101-649 § 302, 104 Stat. 4978, 5030. President Bush objected to language purporting to make this the "exclusive" avenue for providing such relief, stating: "I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases." *See* President George H.W. Bush, *Statement on Signing the Immigration Act of 1990,* 26 WEEKLY COMP. PRES. DOC. 1947 (Nov. 29, 1990).

Recent Administrations have continued to employ deferred action. For instance, President Clinton's Administration authorized deferred action

---

[2] Although fewer people ultimately applied for Family Fairness than the Administration was predicting—in part because the subsequently-enacted Immigration Act of 1990 offered preferable remedies—the point is that the administration "saw no legal barrier to going forward . . . [n]or was there an outcry from either Congress or the general public." Written Testimony of Stephen Legomsky before the H. Comm. on the Judiciary 24-25 (Feb. 25, 2015), http://judiciary.house.gov/_cache/files/fc3022e2-6e8d-403f-a19c-25bb77ddfb09/legomsky-testimony.pdf ("Legomsky Testimony").

11

for aliens who might prove eligible for permanent relief through the Violence Against Women Act. *See* Memorandum from Paul Virtue, INS to Reg'l Dirs., *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997) ("Virtue Memo") (noting that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action"). President George W. Bush likewise provided deferred action for foreign students affected by Hurricane Katrina who were unable to fulfill their F-1 visa's full-time student requirement, and simultaneously suspended employer verification requirements for those students, as well. USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina, Frequently Asked Questions* (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/ files/ files/pressrelease/F1Student_11_25_05_FAQ.pdf.

These examples are by no means exhaustive. Amici have identified nearly forty examples of such policies, each of which is listed in the Appendix to this brief. The consistency and frequency with which the Executive has employed deferred action policies underscore the central role the practice has played in promoting sensible enforcement of the federal immigration laws.

**B. Deferred Action Programs Promote Sensible Immigration Policy Objectives**

Over the past several decades, Administrations of both political parties have repeatedly defended deferred action policies by invoking straightforward and consistent legal and policy arguments. As officials charged with enforcing U.S. immigration

12

laws have explained, deferred action policies are necessary to make the most efficient use of limited enforcement resources, to achieve consistent enforcement of federal immigration law, and to promote humanitarian and family values.

### 1. Deferred Action Is Necessary To Make The Most Efficient Use Of Limited Enforcement Resources

Like the numerous exercises of prosecutorial discretion in the immigration context that preceded it, DAPA responds to the reality that Congress has not allocated to DHS and DOJ sufficient resources to remove every person who is not authorized to be in the United States. *Compare* Memorandum from Jeh Johnson, Sec'y of Homeland Security, to Leon Rodriguez, Dir., USCIS, *Exercising Prosecutorial Discretion*, at 2 (Nov. 20, 2014), *available at* http://www.dhs.gov/sites/default/files/publications/ 14_1120_memo_deferred_action.pdf ("DAPA Memo") ("Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States.") *with* Memorandum from Sam Bernsen, General Counsel, INS, to Comm'r, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion*, at 1 (Jul. 15, 1976) ("Bernsen Memo") ("There simply are not enough resources to enforce all of the rules and regulations presently on the books. As a practical matter, therefore, law enforcement officials have to make policy choices as to the most effective and desirable way in which to deploy their limited resources."), *and* Memorandum from Bo Cooper, General Counsel, INS, to Comm'r, *INS Exercise of Prosecutorial Discretion*, at 2 (Jul. 11, 2000) ("Cooper Memo") ("[L]imitations in

13

available enforcement resources . . . make it impossible for a law enforcement agency to prosecute all offenses that come to its attention.").

Resource constraints require senior immigration officials to decide how funding and personnel can be allocated and deployed in the manner most likely to advance the multiple objectives of our federal immigration laws. As described *supra*, the Executive Branch for decades has been required to prioritize enforcement objectives, in a manner similar to DAPA, and it has consistently and successfully defended the legality of such actions. In 1984, the Reagan Administration's attorneys, arguing before this Court, set forth a compelling defense, equally applicable here, of the Executive's exercise of prosecutorial discretion:

> In deciding whether to undertake enforcement action, an agency must do far more than merely determine whether there is a sound factual and legal basis for proceeding. The agency must decide which enforcement strategy will best carry out its statutory mandate and must decide how to allocate its scarce resources. It must compare the importance and cost of various potential cases, as well as the likelihood of success in each of those endeavors. . . . After considering these and other factors, an agency may rationally decide to pursue highly visible cases. Or it may decide to undertake action in a much larger number of cases. Evaluating the relevant factors and developing a

14

> sound enforcement strategy are quintessentially the functions of a regulatory agency. They are not appropriate for judicial review.

Brief for United States as Petitioner, *Heckler v. Chaney*, No. 83-1878, 1984 WL 565477, at *17-18 (U.S. Aug. 16, 1984).

Like its predecessor deferred action policies, DAPA reflects the Executive's determination that enforcement of the immigration laws will be most effective if the government's limited resources are used to prosecute and remove individuals who pose the greatest threats to public safety and national security instead of those who do not pose such threats, who belong to families residing peacefully and productively in the United States for many years, and who have already developed strong ties to this country and to their communities.

DAPA employs the same type of enforcement strategy that Congress has authorized the Executive to make for decades. As early as 1909, a DOJ circular advised officers not to proceed in immigration cases unless "some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country." *See* U.S. Dep't of Justice, Circular Letter No. 107 (Sep. 20, 1909) (quoted in Bernsen Memo at 4). DAPA reflects a similar judgment that deferred action is necessary in order to best advance the ends of the immigration laws, national security, and public safety, in light of the limited resources available. *Compare* Memorandum from Janet Napolitano, Sec'y of Homeland Security, to David V. Aguilar, *Exercising Prosecutorial Discretion*, at 1 (Jun. 15,

15

2012) ("[A]dditional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.") *with* Memorandum from Doris Meissner, Comm'r, INS, to Reg'l Dirs., *Exercising Prosecutorial Discretion,* at 4 (Nov. 17, 2000), *reprinted as* 77 No. 46 INTERPRETER RELEASES 1661, App. I ("Meissner Memo") ("Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law. . . . An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.").

The need for prosecutorial discretion has grown more acute as increasingly sophisticated threats to the homeland have emerged and the number of potential targets for enforcement actions has surged. In the years after the September 11, 2001, terrorist attacks, the Principal Legal Advisor of ICE under President George W. Bush urged that "we must prioritize our cases to allow us to place greatest emphasis on our national security and criminal alien dockets." Memorandum from William Howard, Principal Legal Advisor, ICE, to All OPLA Chief Counsel, *Prosecutorial Discretion,*

16

at 8 (Oct. 24, 2005) ("Howard Memo"). He
elaborated:

> It is clearly DHS policy that national
> security violators, human rights
> abusers, spies, traffickers in both
> narcotics and people, sexual predators
> and other criminals are removal
> priorities. It is wise to remember that
> cases that do not fall within these
> categories sometimes require that we
> balance the cost of an action versus
> the value of the result. Our reasoned
> determination in making prosecutorial
> discretion decisions can be a
> significant benefit to the efficiency and
> fairness of the removal process.

*Id*.

DHS, of course, could have refrained from
removing these individuals without granting
deferred action. But deferred action policies
advance homeland security and public safety
objectives because they draw individuals from out
of the shadows and into the open. These individuals
provide their names, addresses, and histories, and
the government performs background checks to
assure public safety. Communities are safer when
undocumented immigrants who are either victims
of crimes or witnesses to crimes feel secure enough
to report the crimes to the police rather than avoid
contact for fear of being deported. *See* Legomsky
Testimony at 29. DAPA, which reflects this
Administration's decision "to prioritize threats to
national security, public safety, and border

17

security," is consistent with this approach. *See* DAPA Memo at 3.

### 2. Deferred Action Policies Are Necessary To Achieve Consistent Enforcement of Federal Immigration Law

The U.S. immigration system depends on the dedicated efforts of tens of thousands of federal employees—from border patrol agents and career prosecutors to the Attorney General and the Secretary of Homeland Security. These employees are frequently called upon to make important decisions that shape the implementation and enforcement of the law, the security of the nation, the safety of the public, and the future of families. *See* Cooper Memo at 3 ("[INS] exercises prosecutorial discretion thousands of times every day.").

Policy statements setting forth the Administration's enforcement priorities are necessary to coordinate these efforts in service of a common objective, namely, "to establish a reasonable, fair, orderly, and secure system of immigration into this country and not to discriminate in any way against particular nations or people." President Ronald Reagan, *Statement on Signing the Immigration Reform and Control Act of 1986*, 22 WEEKLY COMP. PRES. DOCS. 1533 (Nov. 6, 1986). Amici's experience is that policy statements like DAPA are necessary to avoid an immigration system in which similarly situated aliens are treated differently based solely on happenstance. They also provide public transparency on important policy decisions.

18

Policy statements that guide enforcement
discretion have played an important role in
promoting consistency in the treatment of
individuals in the immigration system. When the
Family Fairness Program was created, the INS
Commissioner explained that a policy statement
was necessary "to assure uniformity in the granting
of voluntary departure and work authorization for
the ineligible spouses and children of legalized
aliens." McNary Memo at 164. Senior officials in
subsequent Administrations have similarly noted
the importance of deferred action policy statements
as an effective tool to promote uniformity and
consistency in the enforcement of the law. *See, e.g.*,
Meissner Memo at 2 ("A statement of principles
concerning discretion . . . contribute[s] to more
effective management of the Government's limited
prosecutorial resources by promoting greater
consistency among the prosecutorial activities of
different offices[.]"); Howard Memo at 3 ("[I]t is
important that we all apply sound principles of
prosecutorial discretion uniformly throughout our
offices and in all of our cases, to ensure that the
cases we litigate on behalf of the United States,
whether at the administrative level or in the
federal courts, are truly worth litigating."); Cooper
Memo at 8 ("[A]ppropriate policy guidance,
reinforced by training, is necessary in order for a
law enforcement agency to carry out an
enforcement function properly. Such guidance
serves a variety of policy goals, including promoting
public confidence in the fairness and consistency of
the agency's enforcement action[.]").

App. 2538

19

### 3. Deferred Action Policies Promote Humanitarian Values

Sound enforcement of the immigration laws requires attention to the humanitarian policy objective of promoting family unity. As INS Commissioner McNary explained: "It is vital that we enforce the law against illegal entry. However, we can enforce the law humanely. To split families encourages further violations of the law as they reunite." McNary Memo.

Immigration officials at all levels have been called upon for decades to exercise prosecutorial discretion in a manner that is faithful to the rule of law without sacrificing the preservation of, and respect for, family units to the greatest extent practicable. *See, e.g.*, Memorandum from Julie Myers, Assistant Sec'y of Homeland Security, to Field Office Dirs., *Prosecutorial and Custody Discretion* (Nov. 7, 2007) ("Myers Memo") (discussing treatment of nursing mothers and stating that "[f]ield agents and officers are not only authorized by law to exercise discretion within the authority of the agency, but are expected to do so in a judicious manner at all stages of the enforcement process"); *see also* Nelson Statement at 1200. The Family Fairness Program, discussed *supra*, is one salient example of how federal immigration officials have attempted to avoid unnecessary harm to family unity.

DAPA's aim of preserving family unity in cases that do not threaten public safety is consistent with the policy objectives that have guided federal immigration enforcement efforts for decades. *E.g.*, DAPA Memo at 3 (explaining that aliens who

**App. 2539**

20

"commit serious crimes or otherwise become enforcement priorities" are ineligible). Amici's experience demonstrates that the best approach to achieving rational and effective enforcement of our immigration laws is to prioritize threats to public safety and national security, while simultaneously demonstrating compassion for families whose members pose no substantial risks and who have developed ties to the communities in which they live.

## II. ALLOWING ALIENS WITH DEFERRED ACTION TO APPLY FOR WORK AUTHORIZATION IS AN IMPORTANT COMPONENT OF IMMIGRATION ENFORCEMENT THAT IS CONSISTENT WITH FEDERAL IMMIGRATION LAW

Federal law provides that an "alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority," may apply for work authorization by showing "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14). This thirty-five-year-old regulation codifies a policy that has been in place for even longer, and it reflects extensive legislative, administrative, and public deliberations that warrant judicial deference. The policy was reexamined and reaffirmed following extensive public comment and congressional action in 1986 to outlaw the employment of "unauthorized" aliens; and Congress has subsequently ratified the practice.

21

## A. The Executive's Longstanding Policy of Allowing Aliens with Deferred Action To Apply for Work Authorization Is the Product of Extensive Administrative, Legislative, and Public Deliberations

The decision to allow aliens with deferred action policies to apply for work authorization was neither accidental nor anomalous. To the contrary, the availability of work authorization for such aliens was a deliberate choice that was first made in the 1970s, repeatedly affirmed over the following decades by administrations of both parties, and ratified by Congresses that were well aware of the policy.

### 1. INS Has Allowed Aliens With Deferred Action to Apply for Work Authorization Since at Least the 1970s

In 1975, INS's General Counsel explained that the Service authorized certain aliens to work in cases "when we do not intend or are unable to enforce the alien's departure," even though such work authorization "doesn't make his illegal stay here any less illegal." Sam Bernsen, *Leave to Labor*, 52 No. 35 INTERPRETER RELEASES 291, 294-95 (Sep. 2, 1975). Such authorizations were not given "automatically," but rather, "[t]he alien has to come to the Service and make a request." *Id.* at 295.[3]

---

[3] The same is true today for aliens with deferred action. *See* 8 C.F.R. §274a.12(c)(14) (requiring that aliens with deferred action establish "economic necessity" in order to receive employment authorization); *see also* 56 Fed. Reg. 41,767, 41,781 (Aug. 23, 1991) (rejecting a proposal to eliminate the

22

By the late 1970s, INS work authorizations were common, and served a host of important functions for both aliens and employers. Although in the 1970s there was not yet any blanket legal prohibition on the employment of undocumented aliens, permitting certain classes of undocumented aliens to obtain work authorization, including those with deferred action, served several objectives.

First, in 1972 Congress made work authorization a prerequisite for certain aliens to obtain a Social Security number. *See* Social Security Amendments of 1972, Pub. L. No. 92-603 § 137, 86 Stat. 1329, 1364 (codified as amended at 42 U.S.C. § 405(c)(2)(B)(i)(I)); 44 Fed. Reg. 10,369, 10,371 (Feb. 20, 1979) (adding 20 C.F.R. § 422.107(e)); *see also* Bernsen, *Leave to Labor*, at 294. Employers then, as now, were much less likely to hire aliens "off the books," and to avoid full remittance of Social Security payments and other taxes attributable to such aliens, if the aliens had Social Security numbers that allowed them to work "above board."[4]

Second, agricultural workers had a special reason to seek work authorization: as of 1974, federally registered farm labor contractors were

---

economic necessity requirement for aliens with deferred action).

[4] INS had even launched a "voluntary" pressure campaign to discourage employers from hiring aliens who lacked such authorization. *See* Sam Bernsen, *Updating the Immigration Law*, 9 IN DEFENSE OF THE ALIEN 203, 204-06 (1986); *Illegal Aliens: Hearings Before Subcomm. No. 1 of the H. Comm on the Judiciary,* 92nd Cong. 1020 (1971 & 1972).

23

prohibited from facilitating the hiring of any alien "not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment."[5] Farm Labor Contractor Registration Amendments Act, Pub. L. No. 93-518 § 11, 88 Stat. 1652, 1655 (1974).[6]

Finally, as of 1976, aliens who "continue[d] in or accept[ed] unauthorized employment" were barred from obtaining an adjustment of status. Immigration and Nationality Act Amendments of 1976, Pub. L. No. 94-571 § 6, 90 Stat. 2703, 2706 (codified as amended at 8 U.S.C. § 1255(c)); *see also* 44 Fed. Reg. 43,480 (Jul. 25, 1979) (describing this provision[7] as legislative recognition of the Attorney General's preexisting authority to grant work authorization).

---

[5] Prior to 1974, the statute prohibited these farm labor contractors from facilitating the hiring of any alien who was "violating the provisions of the immigration and nationality laws of the United States." Farm Labor Contractor Registration Act, Pub. L. No. 88-582 § 5(b), 78 Stat. 920, 922 (1964).

[6] IRCA subsequently repealed this language, which became mostly redundant in light of IRCA's broader employer sanctions provisions. IRCA, § 101(b)(1)(C), 100 Stat. at 3372; *see also* Migrant and Seasonal Agricultural Worker Protection Act, Pub. L. No. 97-470, §§ 106 & 523, 96 Stat. 2583, 2589-90, 2600 (1983).

[7] INS actually cited to Public Law 9*5*-571, but the context makes it clear that the reference is to 9*4*-571. *See* 44 Fed. Reg. at 43,480.

24

### 2. In the Early 1980s, INS Codified its Work Authorization Policy for Categories of Aliens Not Authorized To Be in the United States, Including Those with Deferred Action

In 1979, INS "for the first time codif[ied] existing employment authorization procedures," publishing a proposed rule in the Federal Register. 44 Fed. Reg. at 43,480. The proposal provided that "[a]n alien who, as an exercise of the Service's prosecutorial discretion, has been allowed to remain in the United States for an indefinite or extended period of time will . . . be eligible to apply" for work authorization. *Id.*; *see also id.* (proposing 8 C.F.R. § 109.1(b)) ("An alien who is not maintaining a lawful nonimmigrant status may apply for employment authorization if he . . . has been granted permission to remain in the United States for an indefinite or extended period of time by the Immigration and Naturalization Service.").

The next year, after giving "[c]areful consideration" to public comments, INS published a "significantly modified" proposal. 45 Fed. Reg. 19,563 (Mar. 26, 1980). This revised version made no mention of the Service's "prosecutorial discretion," or of INS's longstanding practice of making work authorization available to aliens whose removal had been deferred. The Federal Register contains no explanation for this omission.

Comments on the revised proposal expressed "concern" that it "did not adequately cover all categories [of] nonimmigrants who are permitted to work while in the United States." 46 Fed. Reg. 25,079, 25,080 (May 5, 1981); *see also* Deborah

25

Levy, *The Alien Rights Law Project*, 27 HOWARD
L.J. 1265, 1277 (1984). The final rule, published a
few months after President Reagan took office,
restored work authorization eligibility for the
category of aliens that had been omitted in the 1980
revised proposal, namely, "[a]ny alien in whose case
the district director recommends consideration of
deferred action, an act of administrative
convenience to the government which gives some
cases lower priority." 46 Fed. Reg. at 25,081.[8]

### 3. Congress Affirmed INS's Work Authorization Rule When it Enacted the Immigration Reform and Control Act of 1986

In 1986, the Federation for American
Immigration Reform ("FAIR") filed a petition for
rulemaking, seeking to rescind the 1981 rule that
allowed aliens subject to deferred action to apply
for work authorization. 51 Fed. Reg. 39,385 (Oct.
28, 1986). FAIR asserted that INS had "acted
beyond its statutory authority and contrary to the
purpose of the Immigration and Nationality Act" by
allowing "illegal or temporarily present aliens to
apply for and receive work authorization." *Id.* at
39,386; *see also id.* at 39,387 ("The granting of work
authorization to deportable aliens and
nonimmigrants not authorized by statute to work
allows such aliens to compete directly with

---

[8] The current regulations contain language that is virtually
identical to that added in 1981. *See* 8 C.F.R. § 274a.12(c)(14)
("An alien who has been granted deferred action, an act of
administrative convenience to the government which gives
some cases lower priority.").

26

American workers for jobs. This is in direct conflict with the purpose for which the [Immigration and Nationality Act] was enacted."). INS published FAIR's petition in the Federal Register and solicited public comments. *Id.*

Before the Service acted on FAIR's petition, Congress intervened and ratified INS's interpretation of its legal authorities. The 1986 Immigration Reform and Control Act ("IRCA") prohibited employers from employing aliens not "lawfully admitted for permanent residence" or "authorized to be . . . employed by [the Immigration and Nationality Act] *or by the Attorney General.*" IRCA, § 101(a)(1), 100 Stat. at 3368 (codified at 8 U.S.C. § 1324a(h)(3)) (emphasis added). This language reaffirmed the Attorney General's authority to grant work authorizations as well as the manner in which INS had been exercising that authority—a practice that Congress declined to limit in any way. *See* 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) ("[T]he only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute").

Congress had notice of the 1981 regulations when it passed IRCA. In addition to the publicly-noticed FAIR petition mentioned above, the Service's claim of work authorization authority was highlighted directly to Congress and included in the

27

Act's legislative history. *See* Letter from Robert McConnell, DOJ, to Romano Mazzoli (Apr. 4, 1983), *included in Immigration Reform and Control Act of 1983, Hearings before the Subcomm. On Immigration, Refugees and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1450 (1983) ("INS currently has authority to define classes of aliens who may be employed in the U.S."); Letter from Alan Nelson, Comm'r, INS, to Romano Mazzoli (May 14, 1984), *included in INS Oversight and Budget Authorization for Fiscal Year 1985: Hearings Before the Subcomm. On Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 357 (1984) (explaining that INS regulations "set forth eligibility and criteria for employment authorization"). Moreover, INS's work authorization regulations had also already been the subject of litigation when Congress deliberated upon and enacted IRCA. *E.g., Diaz v. INS*, 648 F. Supp. 638 (E.D. Cal. 1986); *Canas-Garcia v. McKinnon*, 1984 U.S. Dist. LEXIS 14946, 83-cv-2077 (D. Mass. Jul. 13, 1984); *Gilana v. Smith*, 1981 U.S. Dist. LEXIS 16824, 81-cv-3829 (N.D. Ill. Dec. 24, 1981).

IRCA marked the culmination of years of legislative deliberations about the Attorney General's power to issue work authorizations for aliens. In 1971, the Nixon Administration introduced legislation prohibiting the employment of "aliens who are illegally in the United States or are in an immigration status in which such employment is not authorized." H.R. 2328 § 26 (1971). But at a hearing before "Subcommittee Number 1" of the House Judiciary Committee, an organization representing "American Business"

28

warned that "[t]he phrasiology 'in violation of law or in an immigration status in which such employment is not authorized' is not sufficiently flexible to allow the Immigration and Naturalization Service to continue present treatment of aliens who work in certain categories." *Illegal Aliens: Hearings Before Subcomm. No. 1 of the H. Comm on the Judiciary,* 92nd Cong. 1243-45 (1971 & 1972) (statement of the American Council of Int'l Personnel, Inc.). When the INS General Counsel was later asked by the same Subcommittee about INS's "administrative permissiveness in allowing certain aliens to undertake employment," he insisted that the language in the Administration's proposed bill was intended to cover all cases where INS had authorized employment. *Id.* at 1344.

The Subcommittee decided to remove any possible ambiguity left by the Administration's "phrasiology." It reported a new version of the bill that prohibited employment of "any alien in the United States who has not been lawfully admitted to the United States for permanent residence, *unless the employment of such alien is authorized by the Attorney General.*" H.R. 16188 (1972) (emphasis added) (as reported in H.R. Rep. 92-1366, at 12 (1972)); *see also* H.R. Rep. 92-1366, at 1 (1972) ("The purpose of this bill is to make it unlawful to knowingly hire aliens who have not been lawfully admitted for permanent residence or are not authorized by the Attorney General to work while in the United States."). Subsequently proposed employer sanctions bills, up to and including the law that was ultimately enacted as IRCA in 1986, all recognized the Attorney General's

29

power to grant work authorizations. *See* IRCA, §
101(a)(1) (codified at 8 U.S.C. § 1324a(h)(3)); *see
also* H.R. 982 § 2 (1973) (reported in H.R. Rep. 93-
108, at 2 (1973)); H.R. 8713 § 2 (1975) (reported in
H.R. Rep. 94-506, at 26 (1975)); S. 2252 § 5 (1978)
(quoted in *Alien Adjustment and Employment Act of
1977: Hearings Before the S. Comm. on the
Judiciary*, 95th Cong. 3 (1978)).[9]

Armed with full knowledge of INS's assertion of
work authorization authority, as well as ample
opportunities to rescind or invalidate the same,
Congress ratified the Service's policy. Indeed, in a
separate provision in IRCA, Congress demonstrated
a clear understanding that the Attorney General
had authorized work for aliens whose removal had
been deferred—and that such authorization would
make an alien eligible for lawful employment under
IRCA.

Congress had earlier considered an amendment
to a draft of IRCA that would have made it
unlawful for an employer to discriminate against
*any* alien who had been authorized to work. *See* 130

---

[9] One further change in the proposed language before IRCA is
worth mentioning. In 1976, testimony noted that the new
wording used in the 1972 bill ignored the fact that the INA
was itself a source of work authorization. *S. 3074: Hearings
Before the Subcomm. On Immigration and Naturalization of
the S. Comm. on the Judiciary,* 94th Cong. 103 (1976)
(statement of Stanley Mailman, Ass'n of Immigration and
Nationality Lawyers). Thus, in 1982, the House Committee
reported a bill penalizing the employment of aliens not
authorized either "by this Act or by the Attorney General."
H.R. 6514 (1982) (reported in H.R. Rep. 97-890, at 41 (1982)).
That is the substance of the provision Congress eventually
included in IRCA.

30

CONG. REC. 15,935 (Jun. 12, 1984). Congress, however, ultimately enacted a narrower version of the amendment, which provided protection against discrimination to only lawful permanent residents, temporary residents, refugees, and asylees. *See* IRCA § 102 (codified as amended at 8 U.S.C. § 1324b(a)). A comparison between IRCA's non-discrimination provision, which covers a subset of aliens who are authorized to work, and the employer sanctions provision, which extends more broadly, highlights the relevant distinction:

| Employer Sanctions, § 101(a)(1) | Nondiscrimination, § 102 |
|---|---|
| "lawfully admitted for permanent residence, ***or . . .. authorized to be . . . employed by [the INA] or by the Attorney General***." | "lawfully admitted for permanent residence, ***is granted the status of an alien lawfully admitted for temporary residence under section 245A(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208***" |

Advocacy groups had complained that the narrowed version of the non-discrimination provision excluded from coverage "certain non-immigrant aliens, paroled aliens, aliens with extended voluntary departure status, and other classes of persons authorized to work but not

31

included in the specific categories delineated by the anti-discrimination provision." *See Immigration Control and Legalization Amendments: Hearing Before the Subcomm. On Immigration, Refugees and Int'l Law of the H. Comm. on the Judiciary*, 99th Cong. 127 (1985) (statement of Richard Fajardo, MALDEF). But Congress retained the narrower version and deliberately excluded from the anti-discrimination protection that subset of aliens who, although not lawful permanent or temporary residents, refugees, or asylees, were nonetheless authorized to work by the Attorney General, including those aliens with deferred action. *Cf.* Letter from Seema Nanda, DOJ, to David Burton (Sep. 10, 2012) *available at* http://www.justice.gov/sites/default/files/crt/legacy/2012/09/27/161.PDF (explaining that aliens who qualify for the DACA program are not protected from citizenship status discrimination under IRCA).

4. **INS Reaffirmed its Work Authorization Rule Immediately Following IRCA's Passage, After Extensive Notice and Comment**

Shortly after Congress enacted IRCA, INS began to solicit input on regulations to implement the law. *See Implementation of the Immigration Reform and Control Act of 1986, Hearing Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. On the Judiciary*, 99th Cong. 36-37, 60-61 (1986). The Service took an "unprecedented step to permit and encourage as much public input as possible," circulating an "internal draft [of] preliminary regulations prior to their formal publication in the federal register." 52

32

Fed. Reg. 2115 (Jan. 20, 1987). The draft regulations maintained work authorization eligibility for aliens with deferred action and also added a new group: "An alien who is a member of a nationality group granted extended voluntary departure." *See* INS, Preliminary Working Draft of Regulations (Jan. 20, 1987), *reprinted at* 32 IMMIGRATION AND NATIONALITY ACTS LEGISLATIVE AND RELATED DOCUMENTS, No. 127 (Supp. 1997).

While the Service's draft regulations were being circulated, INS officials made "[m]any public appearances . . . to inform and solicit comments from interested parties." 52 Fed. Reg. 8762 (Mar. 19, 1987). After reviewing and evaluating "numerous comments" from a "wide cross-section of society," INS published its proposed rules, which retained eligibility for work authorization in the deferred action and extended voluntary departure contexts. *Id.* Subsequently, after again considering comments on its proposed rules from "a very broad spectrum of American society [that] included private citizens; agricultural, business, industrial and labor organizations; Congressional sources and governmental entities at the federal, state, and local levels; educational institutions; voluntary agencies; interest groups and organizations; and law firms," INS promulgated final rules, which once again provided for work authorization for aliens with deferred action and extended voluntary departure. 52 Fed. Reg. at 16,216, 16,220, 16,227.[10]

---

[10] USCIS later substituted "deferred enforced departure" for "extended voluntary departure." *See* 75 Fed. Reg. 58,962, 58,990 (Sep. 24, 2010) (amending 8 C.F.R. § 274a.12(a)(11)); *see also* 75 Fed. Reg. 33,446, 33,457 (Jun. 11, 2010)

33

As INS was promulgating its final rules on IRCA, FAIR's petition to rescind the 1981 regulations remained pending. Shortly after Congress enacted IRCA, INS extended the comment period on the FAIR petition, noting that IRCA's recognition of the Attorney General's power to grant work authorization "appears to have a direct bearing on the issues to be resolved." 51 Fed. Reg. 45,338, 45,338 (Dec. 18, 1986). FAIR itself submitted a supplemental memorandum in which it argued that IRCA's enactment supported the petition to rescind the rule. *See* FAIR, *Supplemental Statement Regarding the Permissible Scope of the Attorney General's Authority to Grant Work Authorization* (Jan. 29, 1987), FAIR Records, 1867-2006, George Washington Univ. Gelman Library, Collection No. MS2195, Box 95, Folder 2.

INS thereafter denied FAIR's petition, having considered comments from a "wide spectrum of interested parties, ranging from local to national to international governmental entities, and from private individuals to business and educational institutions to public interest groups." 52 Fed. Reg. 46,092 (Dec. 4, 1987). INS pointed both to the Attorney General's general authority to enforce the immigration laws and establish regulations, as well as IRCA's more specific recognition of the Attorney General's power to grant work authorizations. *Id.* at 46,093 (discussing Immigration and Nationality Act, Pub. L. No. 82-414, § 103(a), 66 Stat. 163, 173-

---

(explaining that the reference to extended voluntary departure had become "obsolete" and proposing new regulation covering deferred enforced departure).

34

74 (1952); IRCA § 101(a)(1) (codified at 8 U.S.C. § 1324a(h)(3)). With respect to the latter, INS explained:

> [T]he only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

52 Fed. Reg. at 46,093.[11]

---

[11] The INS also noted that "most of the classes" permitted to apply for work authorization "are very small to begin with," and that "the total number of aliens authorized to accept employment is quite small and the impact on the labor market is minimal." 52 Fed. Reg. at 46,093. INS did not in any way suggest, however, that the number of eligible aliens was relevant to the question of its legal authority, nor did INS indicate that there would be grounds for rescinding the longstanding practice if and when the number of aliens eligible for deferred action were to increase, as it had in the past.

35

**5. Since 1987, INS Has Consistently Permitted Aliens With Deferred Action to Apply For Work Authorization, And Congress Has Left This Policy Undisturbed**

In the years following IRCA's passage, INS continued to grant work authorization to aliens not authorized to be in the United States, including aliens covered by many of the policies discussed above. *E.g.*, McNary Memo ("Work authorization will be granted to aliens who qualify for voluntary departure" under the expanded Family Fairness program); 61 Fed. Reg. 13,061 (Mar. 26, 1996) (inviting VAWA self-petitioners to apply for work authorization after obtaining direct action status, notwithstanding the fact that the original VAWA statute did "not direct the Service to provide employment authorization based solely on the filing or approval of a self-petition"); USCIS, Press Release, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* (Nov. 25, 2005) ("Katrina-impacted foreign academic students not covered by the Notice and their dependents (F-2 visa holders) may request deferred action and apply for employment authorization based on economic necessity."). In addition to aliens with deferred action, current regulations allow for work authorization for aliens with deferred enforced departure, applicants for adjustment of status, and even certain aliens already subject to removal proceedings. 8 C.F.R. §§ 274a.12(a)(11), (c)(9), (c)(10).

FAIR complained to Congress about this practice. *See Immigration Reform and Control Act of 1986 Oversight: Hearings Before the Subcomm.*

36

*On Immigration, Refugees, And International Law of the H. Comm. on the Judiciary,* 101st Cong. 597 (1989) (statement of Daniel Stein, FAIR) (criticizing the regulations providing for work authorization for aliens "given deferred action, applicants for political asylum, aliens granted extended voluntary departure, parolees, applicants for adjustment of status, asylees, and a whole host of classifications attributed to administrative and processing delay"). Yet Congress declined to rescind or even question the agency's authority.

To be sure, Congress has periodically limited the classes of aliens eligible for work authorization, but it has *never* altered the longstanding policy that aliens subject to deferred action may apply for work authorization, despite the legislature's knowledge of that longstanding and transparent policy. *E.g.*, Pub. L. No. 103-322 § 130005(b), 108 Stat. 1796, 2028 (1994) (codified as amended at 8 U.S.C. § 1158(d)(2)) (asylum applicants); Pub. L. No. 104-208, § 303(a), 110 Stat. 3009, 3009-585 (1996) (codified as amended at 8 U.S.C. § 1226(a)(3)) (detained aliens). Congress even enacted a provision in 1996 in which it recognized the agency's practice of authorizing some aliens *already subject to removal orders* to work. *Id.* § 305(a)(3), 110 Stat. at 3009-600 (codified as amended at 8 U.S.C. § 1231(a)(7)). Actions such as these—and Congress's failure to limit the agency's well-known asserted authorities and practices—belie Respondents' argument (Br. in Opp. at 32-33) that Congress has limited the Secretary's power to confer work authorization so as to encompass only

37

those classes of aliens that the INA itself specifies as eligible for such authorization.[12]

## B. Authorizing Certain Aliens With Deferred Action To Work Is Consistent With Established Immigration Policy Objectives

The longstanding regulations governing work authorization reflect sensible policy concerns, which became even more acute in 1986 when Congress prohibited employers from hiring aliens without work authorization. Absent work authorization, aliens, particularly those of modest means, would likely have no lawful way to support themselves or their families, and might therefore become a burden on those closest to them. Permitting aliens without means to remain in this country while

---

[12] Another example is also telling. In 1996, Congress for the first time established time-limits for grants of "voluntary departure"—another category of aliens not authorized to be in the United States who have long been eligible for work authorization under the regulations. *See* Pub. L. No. 104-208 § 304(a)(3), 110 Stat. 3009, 3009–596 (1996) (codified as amended at 8 U.S.C. § 1229c(a)(2)(A)). Since, under INS's regulations, aliens with voluntary departure could be granted work authorization for the period of the voluntary departure, this legislation effectively restricted the duration of work authorizations for those aliens. *See* 52 Fed. Reg. 16,216, 16,227 (May 1, 1987) (adding 8 C.F.R. § 274a.12(c)(12)). Because Congress did nothing to restrict the availability of work authorization in connection with deferred action, INS explained that deferred action might be available where voluntary departure no longer was, and that, if deferred action were granted, "employment authorization may be granted under the provisions of §274a.12(c)(14)." 62 Fed. Reg. 10,312, 10,325 (Mar. 6, 1997).

38

denying them permission to work would also cause economic distortions. Aliens in this position might turn to illegal work for lower wages in exploitative conditions, causing downstream effects on the labor market, including adverse effects on American workers. *See* Executive Office of the President, Council of Economic Advisers, *The Economic Effects of Administrative Action on Immigration* at 10 (2014).

Aliens with deferred action may obtain work authorization only if they can show "economic necessity" as defined by federal poverty guidelines. *See* 8 C.F.R. §§ 274a.12(c)(14), (e). This condition ensures that those aliens who remain in the country but who lack the means necessary to support themselves are able to earn a living through legitimate, above-board employment. The rule is consistent with the policy objective of ensuring that aliens who are not subject to deportation will live in the "sunlight" instead of "the shadows." *See* Reagan, *IRCA Signing Statement*; *see also* DAPA Memo at 3.

The economic necessity condition has been a part of the work authorization rule from the very beginning. INS's first proposed rules in 1979 would have granted authorization only "if the alien establishes to the satisfaction of the district director that he is financially unable to maintain himself during that period." 44 Fed. Reg. at 43,480. Though commenters expressed "opposition" to this requirement, arguing that it would "unduly burden the alien and Service," INS retained it, limiting authorization to that subset of aliens with deferred action who could establish "to the satisfaction of the district director that he/she is financially unable to

39

maintain himself/herself and family without employment." 46 Fed. Reg. at 25,080-081. INS chose to "alleviate" the complained-of "burden" by clarifying the standard, adopting the "Community Service Administration Income Poverty Guidelines" as "the basic criteria to establish economic necessity for employment authorization requests where the alien's need to work is a factor" (including aliens with deferred action). 46 Fed. Reg. at 25,080.[13]

Following IRCA, INS re-promulgated its rule and included both the "economic necessity" requirement and the reference to the poverty guidelines. 52 Fed. Reg. at 16,228. This language remains on the books today. 8 C.F.R. §§ 274a.12(c)(14) & (e).

Allowing aliens whose removal has been deferred to work upon a showing of economic necessity is a sensible tool employed for decades by both Republican and Democratic administrations to advance the humanitarian and economic objectives underlying the federal immigration laws. These policies were adopted carefully and thoughtfully over the course of decades, and they have been identified, studied, and ratified by Congress, including after the 1986 enactment of IRCA. At a minimum, the regulations reflect the Executive Branch's longstanding interpretation of the legal authorities granted to INS and DHS by federal

---

[13] INS later updated its regulation to acknowledge legislation requiring the Secretary of HHS to update these guidelines periodically. *See* 46 Fed. Reg. 55,920, 55,921 (Nov. 13, 1981) (citing Pub. L. No. 97-35 § 673, 95 Stat. 357, 512 (1981)).

40

immigration laws. As such, they are worthy of this Court's deference. *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002).

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted,

MARTIN S. LEDERMAN
GEORGETOWN
UNIVERSITY LAW CENTER
600 New Jersey Ave, N.W.
Washington, D.C. 20001
(202) 662-9937

MICHAEL J. GOTTLIEB
  *Counsel of Record*
ALEXANDER I. PLATT
JOSHUA RILEY
ALEXANDER TABLOFF
BOIES, SCHILLER &
  FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, D.C. 20015
(202) 237-2727
mgottlieb@bsfllp.com

March 8, 2016

# APPENDIX[14]

| Year | Type of Action | Class of Aliens | No. Affected | Comments |
|------|----------------|-----------------|--------------|----------|
| 1956 | Parole | Orphans adopted by U.S. citizens abroad | 923 | Legislation was pending |
| 1956 -72 | Extended Voluntary Departure (EVD) | Third preference visa petitioners | Unknown | *See U.S. ex rel. Parco v. Morris,* 426 F. Supp. 976, 979-80 (E.D. Pa. 1977) |
| 1956 -58 | Parole | Hungarians | 31,915 | |
| 1959 -72 | Parole | Cubans | 621,403 | |
| 1962 -65 | Parole | Chinese | 15,100 | |
| 1975 -79 | Parole | Vietnamese, Cambodians, and Laotians | Nearly 360,000 | |
| 1976 | EVD | Lebanese | Unknown | |
| 1977 | Suspended Deportation | "*Silva* letterholders" | 250,000 | |
| 1977 | EVD | Ethiopians | At least 15,000 | Extended in 1982 |

---

[14] Sources: CRS Report, *supra*; Karl R. Thompson, Principal Deputy Assistant Att'y General, OLC, Memorandum Op., for the Sec'y of Homeland Security and the Counsel to the President, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014); Am. Immigration Counsel, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014).

| 1977 -80 | Parole | Soviet Union nationals | Over 50,000 | Issued after statutory cap on conditional entries was met |
|---|---|---|---|---|
| 1978 | EVD | Ugandans | Unknown | |
| 1978 | EVD | Nurses | Unknown | 43 Fed. Reg. 2776 |
| 1979 | EVD | Nicaraguans | 3,600 | |
| 1979 | EVD | Iranians | Unknown | |
| 1980 | EVD | Afghans | Unknown | |
| 1981 - 1987 | EVD | Polish | 7,000 | Extended in 1984 and 1987 |
| 1987 | AG directed INS to refrain from deportation | Nicaraguans | 150,000-200,000 | Legislation was pending |
| 1987 | Indefinite Voluntary Departure | *Certain* children and spouses of aliens eligible for legalization under IRCA ("Family Fairness") | Over 100,000 families | Nelson Statement; *see also* discussion above |
| 1989 - 1990 | Deferred Action & Deferred Enforced Departure (DED) | Chinese | 80,000 | |
| 1990 | Voluntary departure | *All* spouses and children of aliens eligible for legalization under IRCA ("Family Fairness") | 1.5 million | McNary Memo; *see also* discussion above |
| 1991 | DED | Persian Gulf | 2,227 | |

| 1992 | DED | Salvadorians | 190,000 | Issued after expiration of legislative grant of temporary protected status. |
| 1997 | DED | Haitians | 40,000 | Legislation was pending |
| 1997 | Deferred action | VAWA beneficiaries | Unknown | Virtue Memo |
| 1998 | Temporary deportation suspension | Salvadorians, Guatemalans, Hondurans, and Nicaraguans | 150,000 | Hurricane Mitch |
| 1999 | DED | Liberians | 10,000 | Issued after expiration of legislative grant of temporary protected status |
| 2001-02 | Parole, deferred action, and stays of removal | "T" and "U" visa applicants | Unknown | |
| 2005 | Deferred Action | Students affected by Hurricane Katrina | Unknown | Legislation was pending |
| 2007 | DED | Liberians | 10,000 | Issued after expiration of legislative grant of temporary protected status |
| 2007 | Executive discretion | Nursing mothers | Unknown | Myers Memo |
| 2009 | DED | Liberians | Unknown | |

App. 2563

| 2009 | Extended deferred action | Foreign born spouses and children under the age of 21 of United States citizens who had died | Unknown | Memo from Donald Neufeld, USCIS, to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (Sep. 4, 2009) |
| 2010 | Parole | Haitian orphans in the process of being adopted | Unknown | Haitian earthquake |
| 2011 | Deferred action | Victims of human trafficking and sexual exploitation | Unknown | |
| 2011 | DED | Liberians | 3,600 | |
| 2012 | Deferred action | Foreign born individuals who entered the United States before their 16th birthday and were under the age of 31 as of June 2012 | Up to 1.8 million | Legislation was pending |

# DEF-INTERV.

# EX. 22



### State of California
### Office of the Attorney General

#### XAVIER BECERRA
ATTORNEY GENERAL

July 21, 2017

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500

RE:  June 29, 2017 letter from Ken Paxton re *Texas, et al., v. United States, et al.*,
Case No. 1:14-cv-00254 (S.D. Tex.)

Dear Mr. President:

We write to urge you to maintain and defend the Deferred Action for Childhood Arrivals program, or DACA, which represents a success story for the more than three-quarters of a million "Dreamers" who are currently registered for it. It has also been a boon to the communities, universities, and employers with which these Dreamers are connected, and for the American economy as a whole.

Since 2012, nearly 800,000 young immigrants who were brought to this country as children have been granted DACA after completing applications, submitting to and passing a background check, and applying for a work permit. In the case of young adults granted DACA, they are among our newest soldiers, college graduates, nurses and first responders. They are our neighbors, coworkers, students and community and church leaders. And they are boosting the economies and communities of our states every day. In fact, receiving DACA has increased recipients' hourly wages by an average of 42 percent[1] and given them the purchasing power to buy homes, cars and other goods and services, which drives economic growth for all.[2]

In addition to strengthening our states and country, DACA gives these bright, driven young people the peace of mind and stability to earn a college degree and to seek employment that matches their education and training. The protection afforded by

---

[1] Tom Wong, et al., Center for American Progress, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes* (Oct. 18, 2016), https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/ (last visited July 17, 2017).

[2] *See, e.g.*, United We Dream, *New National Survey of DACA Recipients: Proof That Executive Action Works* (Oct. 18, 2016), https://unitedwedream.org/press-releases/new-national-survey-of-daca-recipients-proof-that-executive-action-works/ (last visited July 10, 2017) (finding that 95 percent of DACA beneficiaries are working, and that 54 percent bought their first car and 12 percent bought their first home after receiving DACA).

President Donald J. Trump
July 21, 2017
Page 2

DACA gives them dignity and the ability to fully pursue the American dream. For many, the United States is the only country they have ever known.

The consequences of rescinding DACA would be severe, not just for the hundreds of thousands of young people who rely on the program—and for their employers, schools, universities, and families—but for the country's economy as a whole. For example, in addition to lost tax revenue, American businesses would face billions in turnover costs, as employers would lose qualified workers whom they have trained and in whom they have invested.[3] And as the chief law officers of our respective states, we strongly believe that DACA has made our communities safer, enabling these young people to report crimes to police without fear of deportation.

You have repeatedly expressed your support for Dreamers. Today, we join together to urge you not to capitulate to the demands Texas and nine other states set forth in their June 29, 2017, letter to Attorney General Jeff Sessions. That letter demands, under threat of litigation, that your Administration end the DACA initiative. The arguments set forth in that letter are wrong as a matter of law and policy.

There is broad consensus that the young people who qualify for DACA should not be prioritized for deportation. DACA is consistent with a long pattern of presidential exercises of prosecutorial discretion that targeted resources in a constitutional manner. Indeed, as Justice Antonin Scalia recognized in a 1999 opinion, the Executive has a long history of "engaging in a regular practice . . . of exercising [deferred action] for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999). DACA sensibly guides immigration officials' exercise of their enforcement discretion and reserves limited resources to address individuals who threaten our communities, not those who contribute greatly to them.

Challenges have been brought against the original DACA program, including in the Fifth Circuit, but none have succeeded. On the other hand, in a case relating to Arizona's efforts to deny drivers' licenses to DACA recipients, the Ninth Circuit stated that it is "well settled that the [DHS] Secretary can exercise deferred action." *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 967-968 (9th Cir. 2017). The court also observed that "several prior administrations have adopted programs, like DACA, to prioritize which noncitizens to remove." *Id.* at 976.[4]

As the Fifth Circuit was careful to point out in its ruling in the *Texas* case, the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")

---

[3] Jose Magaña-Salgado, Immigrant Legal Resource Center, *Money on the Table: The Economic Cost of Ending DACA* (Dec. 2016), https://www.ilrc.org/sites/default/files/resources/2016-12-13_ilrc_report_-_money_on_the_table_economic_costs_of_ending_daca.pdf (last visited July 17, 2017).

[4] In another opinion relating to the Arizona law, while deciding the appeal before it on other grounds, the Ninth Circuit stated that given the "broad discretion" that Congress gave to the executive branch "to determine when noncitizens may work in the United States," the President's decision to authorize (indeed, strongly encourage) DACA recipients to work was legally supported. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014).

**App. 2571**

President Donald J. Trump
July 21, 2017
Page 3

initiative that was struck down is "similar" but "not identical" to DACA. *Texas v. United States*, 809 F.3d 134, 174 (5th Cir. 2015). Indeed, as DHS Secretary Kelly pointed out in a press conference the day after his June 15 memorandum explaining that DACA would continue, DACA and DAPA are "two separate issues," appropriately noting the different populations addressed by each program. Notably, only a fraction of the 25 states which joined with Texas in the DAPA case before the Supreme Court chose to co-sign the letter threatening to challenge DACA.

Among other significant differences, DACA has been operative since 2012 while DAPA never went into effect. More than three-quarters of a million young people, and their employers, among others, have concretely benefitted from DACA, for up to five years. The interests of these young people in continuing to participate in DACA and retain the benefits that flow from DACA raise particular concerns not implicated in the pre-implementation challenge to DAPA. Further, the Fifth Circuit placed legal significance on the "economic and political magnitude" of the large number of immigrants who were affected by DAPA, *Texas*, 809 F.3d at 181; thus, it is notable that many fewer people have received DACA (about 800,000) than would have been eligible for DAPA (up to 4.3 million).

One additional, but related, issue concerns DHS's current practices regarding DACA recipients. A number of troubling incidents in recent months raise serious concerns over whether DHS agents are adhering to DACA guidelines and your repeated public assurances that DACA-eligible individuals are not targets for arrest and deportation. We urge you to ensure compliance with DACA and consistent enforcement practices towards Dreamers.

Mr. President, now is the time to affirm the commitment you made, both to the "incredible kids" who benefit from DACA and to their families and our communities, to handle this issue "with heart." You said Dreamers should "rest easy." We urge you to affirm America's values and tradition as a nation of immigrants and make clear that you will not only continue DACA, but that you will defend it. The cost of not doing so would be too high for America, the economy, and for these young people. For these reasons, we urge you to maintain and defend DACA, and we stand in support of the effort to defend DACA by all appropriate means.

Sincerely,

XAVIER BECERRA
California Attorney General

GEORGE JEPSEN
Connecticut Attorney General

MATTHEW DENN
Delaware Attorney General

KARL A. RACINE
District of Columbia Attorney General

**App. 2572**

President Donald J. Trump
July 21, 2017
Page 4

DOUGLAS S. CHIN
Hawaii Attorney General

LISA MADIGAN
Illinois Attorney General

TOM MILLER
Iowa Attorney General

JANET T. MILLS
Maine Attorney General

BRIAN FROSH
Maryland Attorney General

MAURA HEALEY
Massachusetts Attorney General

LORI SWANSON
Minnesota Attorney General

HECTOR BALDERAS
New Mexico Attorney General

ERIC T. SCHNEIDERMAN
New York Attorney General

JOSH STEIN
North Carolina Attorney General

ELLEN F. ROSENBLUM
Oregon Attorney General

JOSH SHAPIRO
Pennsylvania Attorney General

PETER KILMARTIN
Rhode Island Attorney General

TJ DONOVAN
Vermont Attorney General

MARK HERRING
Virginia Attorney General

BOB FERGUSON
Washington State Attorney General

cc:    The Honorable John F. Kelly, Secretary of Homeland Security
       The Honorable Jeff Sessions, Attorney General of the United States

# DEF-INTERV.

# EX. 23

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31)**

| Period | Requests by Intake, Biometrics and Case Status | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Biometrics[6] | | Case Review[8] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests | Average Accepted/Da | Biometrics Scheduled[7] | Requests Under | Approved[10] | Denied[11] | Pending[12] |
| *Fiscal Year - Total[6]* | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,684 | - | 150,747 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,524 | 470,521 | 11,025 | 96,817 |
| 2014 | 238,899 | 24,888 | 263,787 | 952 | 209,670 | 101,568 | 158,397 | 21,087 | 156,232 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | - | - | 136,161 | 21,084 | 61,996 |
| 2014 Renewal | 116,475 | 5,761 | 122,236 | 464 | - | - | 22,236 | D | 94,236 |
| 2015 | 448,850 | 35,479 | 484,329 | 1,781 | 525,499 | 48,355 | 510,289 | 21,452 | 73,341 |
| 2015 Initial | 85,300 | 7,481 | 92,781 | 338 | - | - | 90,746 | 19,158 | 37,392 |
| 2015 Renewal | 363,550 | 27,998 | 391,548 | 1,443 | - | - | 419,543 | 2,294 | 35,949 |
| 2016 | 260,700 | 12,325 | 273,025 | 1,035 | 68,140 | - | 198,916 | 14,503 | 120,622 |
| 2016 Initial | 73,387 | 1,205 | 74,592 | 291 | - | - | 52,882 | 11,445 | 46,452 |
| 2016 Renewal | 187,313 | 11,120 | 198,433 | 743 | - | - | 146,034 | 3,058 | 74,170 |
| 2017 | 242,979 | 23,398 | 266,377 | 1,960 | - | - | 246,850 | 6,930 | 109,821 |
| 2017 Initial | 25,656 | 21 | 25,677 | 207 | - | - | 35,586 | 5,155 | 31,367 |
| 2017 Renewal | 217,323 | 23,377 | 240,700 | 1,753 | - | - | 211,264 | 1,775 | 78,454 |
| Total Cumulative | 1,771,475 | 117,836 | 1,889,311 | 1,510 | 1,372,377 | - | 1,586,657 | 74,997 | 109,821 |
| Total Cumulative Initial | 886,814 | 49,580 | 936,394 | 756 | - | - | 787,580 | 67,867 | 31,367 |
| Total Cumulative Renewal | 884,661 | 68,256 | 952,917 | 754 | - | - | 799,077 | 7,130 | 78,454 |
| *Fiscal Year 2017 by Quarter[13]* | | | | | | | | | |
| Q1. October - December | 110,189 | 4,138 | 114,327 | 1,777 | - | - | 122,051 | 2,754 | 109,821 |
| Q1. October - December Initial | 15,294 | 15 | 15,309 | 247 | - | - | 18,311 | 2,106 | 31,367 |
| Q1. October - December Renewal | 94,895 | 4,123 | 99,018 | 1,531 | - | - | 103,740 | 648 | 78,454 |
| Q2. January - March | 132,790 | 19,260 | 152,050 | 2,142 | - | - | 124,799 | 4,176 | 124,437 |
| Q2. January - March Initial | 10,362 | D | 10,368 | 167 | - | - | 17,275 | 3,049 | 36,490 |
| Q2. January - March Renewal | 122,428 | 19,254 | 141,682 | 1,975 | - | - | 107,524 | 1,127 | 87,947 |
| Q3. April - June | | | | | | | | | |
| Q3. April - June Initial | | | | | | | | | |
| Q3. April - June Renewal | | | | | | | | | |
| Q4. July - September | | | | | | | | | |
| Q4. July - September Initial | | | | | | | | | |
| Q4. July - September Renewal | | | | | | | | | |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

Each request is considered on a case-by-case basis.

See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period.

Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.

2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), December 31, 2016

**Top Countries of Origin**

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Mexico | 689,029 | 689,235 | 1,378,264 | 618,342 | 622,170 | 1,240,512 |
| El Salvador | 33,661 | 33,787 | 67,448 | 28,371 | 30,262 | 58,633 |
| Guatemala | 24,247 | 21,837 | 46,084 | 19,792 | 19,466 | 39,258 |
| Honduras | 22,114 | 21,107 | 43,221 | 18,262 | 18,526 | 36,788 |
| Peru | 9,721 | 11,061 | 20,782 | 9,066 | 10,245 | 19,311 |
| South Korea | 7,813 | 11,038 | 18,851 | 7,250 | 10,375 | 17,625 |
| Brazil | 8,447 | 8,251 | 16,698 | 7,361 | 7,542 | 14,903 |
| Ecuador | 7,649 | 7,787 | 15,436 | 6,696 | 7,037 | 13,733 |
| Colombia | 7,217 | 7,776 | 14,993 | 6,591 | 7,100 | 13,691 |
| Philippines | 5,055 | 5,774 | 10,829 | 4,655 | 5,444 | 10,099 |
| Argentina | 5,180 | 5,112 | 10,292 | 4,774 | 4,723 | 9,497 |
| India | 3,741 | 4,140 | 7,881 | 3,182 | 3,846 | 7,028 |
| Jamaica | 4,375 | 3,581 | 7,956 | 3,435 | 3,192 | 6,627 |
| Venezuela | 3,441 | 3,523 | 6,964 | 3,099 | 3,240 | 6,339 |
| Dominican Republic | 3,744 | 3,050 | 6,794 | 3,115 | 2,722 | 5,837 |
| Uruguay | 2,556 | 2,419 | 4,975 | 2,361 | 2,201 | 4,562 |
| Unknown | 2,589 | 2,535 | 5,124 | 1,960 | 2,238 | 4,198 |
| Bolivia | 2,202 | 2,469 | 4,671 | 2,062 | 2,246 | 4,308 |
| Costa Rica | 2,262 | 2,387 | 4,649 | 2,047 | 2,169 | 4,216 |
| Tobago | 2,440 | 1,707 | 4,147 | 2,096 | 1,691 | 3,787 |
| Poland | 1,951 | 1,997 | 3,948 | 1,782 | 1,827 | 3,609 |
| Chile | 1,874 | 2,009 | 3,883 | 1,736 | 1,854 | 3,590 |
| Pakistan | 1,927 | 1,975 | 3,902 | 1,685 | 1,791 | 3,476 |
| Nicaragua | 1,860 | 1,730 | 3,590 | 1,576 | 1,565 | 3,141 |
| Guyana | 1,467 | 1,462 | 2,929 | 1,266 | 1,347 | 2,613 |

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| California | 242,339 | 217,023 | 459,362 | 222,795 | 202,200 | 424,995 |
| Texas | 140,688 | 117,309 | 257,997 | 124,300 | 110,050 | 234,350 |
| New York | 49,710 | 61,523 | 111,233 | 41,970 | 53,693 | 95,663 |
| Illinois | 45,663 | 39,602 | 85,265 | 42,376 | 37,039 | 79,415 |
| Florida | 39,843 | 48,460 | 88,303 | 32,795 | 41,526 | 74,321 |
| Missing | 13,691 | 70,681 | 84,372 | 7,140 | 53,276 | 60,416 |
| Arizona | 30,652 | 25,314 | 55,966 | 27,865 | 23,638 | 51,503 |
| North Carolina | 29,584 | 23,576 | 53,160 | 27,385 | 22,327 | 49,712 |
| New Jersey | 25,650 | 28,580 | 54,230 | 22,024 | 25,106 | 47,130 |
| Georgia | 28,589 | 23,521 | 52,110 | 24,135 | 21,804 | 45,939 |
| Colorado | 19,103 | 15,321 | 34,424 | 17,258 | 14,302 | 31,560 |
| Virginia | 13,967 | 14,995 | 28,962 | 12,134 | 13,272 | 25,406 |
| Nevada | 14,139 | 12,587 | 26,726 | 13,070 | 11,771 | 24,841 |
| Maryland | 11,513 | 12,357 | 23,870 | 9,785 | 10,917 | 20,702 |
| Oregon | 12,049 | 10,185 | 22,234 | 11,281 | 9,610 | 20,891 |
| Massachusetts | 9,517 | 12,449 | 21,966 | 7,934 | 10,854 | 18,788 |
| Indiana | 10,709 | 8,559 | 19,268 | 9,840 | 8,076 | 17,916 |
| Utah | 10,512 | 7,897 | 18,409 | 9,711 | 7,474 | 17,185 |
| Tennessee | 9,321 | 7,416 | 16,737 | 8,340 | 6,950 | 15,290 |
| Michigan | 7,339 | 8,450 | 15,789 | 6,430 | 7,443 | 13,873 |
| Pennsylvania | 7,144 | 9,625 | 16,769 | 5,889 | 8,178 | 14,067 |
| Wisconsin | 8,144 | 6,679 | 14,823 | 7,565 | 6,298 | 13,863 |
| Minnesota | 6,930 | 6,898 | 13,828 | 6,255 | 6,236 | 12,491 |
| Oklahoma | 7,488 | 6,157 | 13,645 | 6,865 | 5,771 | 12,636 |
| Kansas | 7,301 | 5,997 | 13,298 | 6,803 | 5,647 | 12,450 |
| New Mexico | 7,410 | 5,557 | 12,967 | 6,815 | 5,236 | 12,051 |
| South Carolina | 7,150 | 5,702 | 12,852 | 6,406 | 5,382 | 11,788 |

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Connecticut | 5,676 | 6,675 | 12,351 | 4,929 | 5,882 | 10,811 |
| Ohio | 5,249 | 5,895 | 11,144 | 4,442 | 5,124 | 9,566 |
| Arkansas | 5,606 | 4,475 | 10,081 | 5,099 | 4,255 | 9,354 |
| Alabama | 4,803 | 3,844 | 8,647 | 4,270 | 3,584 | 7,854 |
| Missouri | 3,883 | 3,747 | 7,630 | 3,524 | 3,407 | 6,931 |
| Nebraska | 3,759 | 3,223 | 6,982 | 3,371 | 2,970 | 6,341 |
| Kentucky | 3,448 | 3,056 | 6,504 | 3,062 | 2,786 | 5,848 |
| Idaho | 3,383 | 2,845 | 6,228 | 3,132 | 2,694 | 5,826 |
| Iowa | 3,131 | 3,074 | 6,205 | 2,798 | 2,780 | 5,578 |
| Louisiana | 2,421 | 2,499 | 4,920 | 2,049 | 2,219 | 4,268 |
| Rhode Island | 1,460 | 1,979 | 3,439 | 1,229 | 1,733 | 2,962 |
| Delaware | 1,603 | 1,561 | 3,164 | 1,444 | 1,417 | 2,861 |
| Mississippi | 1,693 | 1,421 | 3,114 | 1,460 | 1,326 | 2,786 |
| Hawaii | 774 | 2,096 | 2,870 | 558 | 1,740 | 2,298 |
| District of Columbia | 943 | 1,240 | 2,183 | 764 | 1,049 | 1,813 |
| Puerto Rico | 519 | 1,275 | 1,794 | 325 | 1,080 | 1,405 |
| Unknown | 185 | 1,197 | 1,382 | 104 | 952 | 1,056 |
| Wyoming | 694 | 563 | 1,257 | 621 | 520 | 1,141 |
| New Hampshire | 450 | 729 | 1,179 | 367 | 599 | 966 |
| Alaska | 195 | 508 | 703 | 138 | 419 | 557 |
| South Dakota | 305 | 377 | 682 | 252 | 311 | 563 |
| Maine | 134 | 410 | 544 | 95 | 334 | 429 |
| Guam | 96 | 413 | 509 | 59 | 352 | 411 |
| North Dakota | 130 | 322 | 452 | 98 | 260 | 358 |
| Virgin Islands | 159 | 252 | 411 | 94 | 204 | 298 |
| West Virginia | 144 | 232 | 376 | 117 | 200 | 317 |
| Montana | 89 | 186 | 275 | 72 | 164 | 236 |
| Vermont | 56 | 192 | 248 | 42 | 162 | 204 |

D  Data withheld to protect requestors' privacy.

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were accepted to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR),  March 2017

# DEF-INTERV.

# EX. 24

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## SUPPLEMENTAL DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration.  I have personal knowledge and expertise of the matters herein stated.

## Qualifications

1.      I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics.  Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2.      In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance.  I have since served as an Adjunct Associate Professor of Economics at Texas A&M University.  Formerly, I was Associate Director of the

1

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.      I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983.  I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.      Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.
- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

## Scope of Inquiry

5.      I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1], with particular focus on the interaction between the DHS Memorandum and the employer mandate provisions in the Affordable Care Act ("ACA").

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain immigrants who are not lawfully present.  The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

6.      My billing rate for this matter is \$525 per hour.

### Background on the Affordable Care Act
### and the DHS Memorandum

7.      It is my understanding that as a result of the DHS Memorandum the number of immigrants who are not lawfully present with an Employment Authorization Document ("EAD") has expanded nationwide.[2]  I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.      The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA*.  The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

---

[2] DACA_Population_Data_Mar_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.

[3]  HealthCare.gov, Immigration status and the Marketplace, available at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 – Definitions, Legal Information Institute.

[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

9.      The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

10.      To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.56% of the employee's income.[6]

11.      An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy*.  It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

---

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54.  See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013).  For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy.  This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals 2/3 − 20/# employees).

12.     Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

### Interaction of the DHS Memorandum and the ACA on the Labor Market

13.     As a threshold matter, the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.[10]   In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[11]

14.     Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15.     Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.56% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

---

[8] Morse, *supra*, at 223.
[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.
[10] See DACA_Population_Data_Mar_31_2018, *supra*.
[11] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker for 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

16.     In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

17.     An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.     Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

*Example 1*

19.     In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $90.10 or greater ($7.25 x 130 hours x 9.56%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[12]  There is no extra cost from hiring applicant B.

---

[12] At 40 hours per week, the monthly employee cost would have to be no more than $120.13 to be "affordable."

20.     As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

***Example 2***

21.     As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[13]  A monthly employee cost for employee and dependent coverage in excess of $239.00 (9.56% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.     Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

## Other Aspects of the Impact of the DHS Memorandum on the Labor Market

23.     Economic theory implies that the demand curve for a labor input slopes downward.[14] In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor

---

[13] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-10.2016.html.

[14] See, for example, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton & Company: New York, 1987, p. 327.

input will fall, other things equal.  Although the theoretical implication that, other things equal, immigration reduces the wages of native workers with the same skills is clear, there is no consensus in the economic literature on the magnitude of this effect.[15]

## Conclusion

24.    The DHS Memorandum and its interaction with the mandate provisions of the ACA gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled citizen in certain instances.

25.    Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of DHS Memorandum and its interaction with the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired.  The interplay between the DHS Memorandum and the ACA makes some U.S citizens more expensive to hire than equally productive immigrants who are not lawfully present.

26.    This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an immigrant

---

[15] See, for example, George J. Borjas, "The Labor Demand Curve *Is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *The Quarterly Journal of Economics*, Vol. 118, No. 4 (2003), pp. 1335-1374, and David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, Vol. 19, No. 1 (2001), pp. 22-64.

who is not lawfully present and who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

27.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of June, 2018.

DONALD DEERE

9

Appendix 1



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

Donald R. Deere is a Senior Economist in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).  Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch.  In Effects of the Minimum Wage, edited by M. Kosters.  AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.



# Donald R. Deere, Ph.D.

WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## PROFESSIONAL EXPERIENCE
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.



## WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

# Donald R. Deere, Ph.D.

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
> National Science Foundation Graduate Fellowship.
> Rotary Foundation Graduate Fellowship.
> Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
> Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.
>
> Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.
>
> Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.
>
> Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
> American Economic Review
> Journal of Political Economy
> Quarterly Journal of Economics
> Journal of Labor Economics
> Review of Economic Studies
> Rand Journal of Economics
> Review of Economics and Statistics
> Economic Journal
> Industrial Relations
> Economic Inquiry
> Industrial and Labor Relations Review
> Industrial Relations
> Journal of Labor Research

Grants Competition:
> National Science Foundation

### ABOUT WELCH CONSULTING

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

Appendix 2

**Testimony Given in Last 4 Years by Donald Deere**

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v.
McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3
Communications Vertex Aerospace, LLC, et al
Deposition:  06/17/16
In the United States District Court for the Northern District of Florida, Pensacola
Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party
Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

# DEF-INTERV.

# EX. 25



**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status**
**Fiscal Year 2012-2018 (March 31, 2018)**

| Period | Intake[1] | | | | Case Review[6] | | |
|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| *Fiscal Year - Total* [6] | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,348 | 10,968 | 97,028 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,331 | 20,990 | 156,540 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,101 | 20,987 | 62,335 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,962 | 21,352 | 73,909 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,629 | 19,070 | 37,866 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,333 | 2,282 | 36,043 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,541 | 14,434 | 120,712 |
| 2016 Initial | 73,350 | 1,151 | 74,501 | 291 | 52,708 | 11,396 | 46,242 |
| 2016 Renewal | 187,351 | 11,166 | 198,517 | 744 | 145,833 | 3,038 | 74,470 |
| 2017 | 472,852 | 43,453 | 516,305 | 1,884 | 462,357 | 13,318 | 117,493 |
| 2017 Initial | 45,645 | 42 | 45,687 | 182 | 47,298 | 9,250 | 35,231 |
| 2017 Renewal | 427,207 | 43,411 | 470,618 | 1,702 | 415,059 | 4,068 | 82,262 |
| 2018 | 94,021 | 20,773 | 114,794 | 758 | 153,764 | 6,480 | 51,118 |
| 2018 Initial | 164 | 1 | 165 | 1 | 15,294 | 3,839 | 16,252 |
| 2018 Renewal | 93,857 | 20,772 | 114,629 | 757 | 138,470 | 2,641 | 34,866 |
| Total Cumulative | 2,095,379 | 158,649 | 2,254,028 | 1,472 | 1,954,983 | 87,542 | 51,118 |
| Total Cumulative Initial | 906,971 | 49,153 | 956,124 | 637 | 814,058 | 75,510 | 16,252 |
| Total Cumulative Renewal | 1,188,408 | 109,496 | 1,297,904 | 835 | 1,140,925 | 12,032 | 34,866 |
| *Fiscal Year 2018 by Quarter* [13] | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,639 | 2,551 | 45,759 |
| Q1. October - December Initial | 97 | 1 | 98 | 4 | 5,585 | 1,669 | 28,071 |
| Q1. October - December Renewal | 29,430 | 14,536 | 43,966 | 1,135 | 93,054 | 882 | 17,688 |
| Q2. January-March | 64,494 | 6,236 | 70,730 | 1,140 | 55,125 | 3,929 | 51,118 |
| Q2. January - March Initial | 67 | - | 67 | 1 | 9,709 | 2,170 | 16,252 |
| Q2. January - March Renewal | 64,427 | 6,236 | 70,663 | 1,139 | 45,416 | 1,759 | 34,866 |

*- Represents zero.*

*[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.*

   *Each request is considered on a case-by-case basis.*

   *See http://www.uscis.gov/childhoodarrivals.*

*[2] The number of new requests accepted at a Lockbox during the reporting period.*

*[3] The number of requests rejected at a Lockbox during the reporting period.*

*[4] The number of requests that were received at a Lockbox during the reporting period.*

*[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.*

*[6] The number of new requests received and entered into a case-tracking system during the reporting period.*

*[7] The number of requests approved during the reporting period.*

*[8] The number of requests that were denied, terminated, or withdrawn during the reporting period.*

*[9] The number of requests awaiting a decision as of the end of the reporting period.*

*NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.*

   *2. The report reflects the most up-to-date estimate available at the time the report is generated.*

   *3. USCIS recently discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn).  USCIS understands that it has corrected these query code issues and that this report provides a more accurate reflection of pending cases. Note that if this report is compared to prior versions of this report that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018*

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 906,971 | 1,188,408 | 2,095,379 | 814,058 | 1,140,925 | 1,954,983 |
| Mexico | 706,368 | 932,933 | 1,639,301 | 640,890 | 896,244 | 1,537,134 |
| El Salvador | 34,468 | 45,207 | 79,675 | 29,355 | 43,204 | 72,559 |
| Guatemala | 24,878 | 29,776 | 54,654 | 20,642 | 28,410 | 49,052 |
| Honduras | 22,668 | 28,466 | 51,134 | 18,886 | 27,262 | 46,148 |
| Peru | 9,823 | 14,078 | 23,901 | 9,232 | 13,549 | 22,781 |
| South Korea | 7,895 | 13,791 | 21,686 | 7,378 | 13,129 | 20,507 |
| Brazil | 8,601 | 10,784 | 19,385 | 7,534 | 10,361 | 17,895 |
| Ecuador | 7,783 | 10,126 | 17,909 | 6,823 | 9,720 | 16,543 |
| Colombia | 7,288 | 9,845 | 17,133 | 6,700 | 9,510 | 16,210 |
| Philippines | 5,119 | 7,304 | 12,423 | 4,756 | 7,042 | 11,798 |
| Argentina | 5,260 | 6,846 | 12,106 | 4,901 | 6,634 | 11,535 |
| Jamaica | 4,433 | 4,793 | 9,226 | 3,498 | 4,583 | 8,081 |
| India | 3,786 | 5,238 | 9,024 | 3,230 | 4,974 | 8,204 |
| Venezuela | 3,483 | 4,573 | 8,056 | 3,159 | 4,423 | 7,582 |
| Dominican Republic | 3,826 | 4,093 | 7,919 | 3,229 | 3,934 | 7,163 |
| Uruguay | 2,640 | 3,241 | 5,881 | 2,456 | 3,134 | 5,590 |
| Bolivia | 2,237 | 3,212 | 5,449 | 2,102 | 3,089 | 5,191 |
| Costa Rica | 2,288 | 3,040 | 5,328 | 2,088 | 2,936 | 5,024 |
| Poland | 2,001 | 2,556 | 4,557 | 1,839 | 2,462 | 4,301 |
| Chile | 1,907 | 2,620 | 4,527 | 1,783 | 2,534 | 4,317 |
| Pakistan | 1,948 | 2,567 | 4,515 | 1,718 | 2,469 | 4,187 |
| Nicaragua | 1,905 | 2,332 | 4,237 | 1,637 | 2,235 | 3,872 |
| Tobago | 2,442 | 1,716 | 4,158 | 2,095 | 1,703 | 3,798 |
| Guyana | 1,485 | 1,904 | 3,389 | 1,292 | 1,821 | 3,113 |
| All Others | 30,837 | 35,549 | 66,386 | 25,581 | 33,920 | 59,501 |
| Not Reported | 1,602 | 1,818 | 3,420 | 1,254 | 1,643 | 2,897 |

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "Not Reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 906,971 | 1,188,408 | 2,095,379 | 814,058 | 1,140,925 | 1,954,983 |
| California | 246,191 | 274,825 | 521,016 | 227,432 | 264,915 | 492,347 |
| Texas | 142,657 | 147,049 | 289,706 | 126,645 | 142,211 | 268,856 |
| New York | 51,475 | 89,862 | 141,337 | 44,503 | 85,588 | 130,091 |
| Florida | 41,607 | 74,118 | 115,725 | 34,906 | 71,016 | 105,922 |
| Illinois | 46,284 | 48,931 | 95,215 | 43,149 | 47,081 | 90,230 |
| New Jersey | 26,496 | 40,855 | 67,351 | 23,102 | 39,132 | 62,234 |
| Arizona | 31,052 | 31,524 | 62,576 | 28,295 | 30,231 | 58,526 |
| North Carolina | 29,884 | 28,786 | 58,670 | 27,717 | 27,704 | 55,421 |
| Georgia | 29,062 | 30,329 | 59,391 | 24,692 | 29,130 | 53,822 |
| Washington | 19,983 | 23,081 | 43,064 | 18,288 | 22,202 | 40,490 |
| Colorado | 19,354 | 18,969 | 38,323 | 17,553 | 18,223 | 35,776 |
| Virginia | 14,352 | 21,100 | 35,452 | 12,643 | 20,168 | 32,811 |
| Nevada | 14,331 | 15,880 | 30,211 | 13,293 | 15,199 | 28,492 |
| Maryland | 11,851 | 17,637 | 29,488 | 10,192 | 16,852 | 27,044 |
| Massachusetts | 9,957 | 19,211 | 29,168 | 8,482 | 18,360 | 26,842 |
| Oregon | 12,221 | 12,538 | 24,759 | 11,457 | 12,132 | 23,589 |
| Pennsylvania | 7,482 | 14,551 | 22,033 | 6,337 | 13,932 | 20,269 |
| Indiana | 10,843 | 10,741 | 21,584 | 9,992 | 10,303 | 20,295 |
| Utah | 10,622 | 9,693 | 20,315 | 9,820 | 9,356 | 19,176 |
| Michigan | 7,573 | 11,990 | 19,563 | 6,706 | 11,499 | 18,205 |
| Tennessee | 9,431 | 9,508 | 18,939 | 8,479 | 9,100 | 17,579 |
| Minnesota | 7,121 | 9,714 | 16,835 | 6,442 | 9,303 | 15,745 |
| Wisconsin | 8,254 | 8,335 | 16,589 | 7,704 | 8,036 | 15,740 |
| Oklahoma | 7,567 | 7,658 | 15,225 | 6,982 | 7,396 | 14,378 |
| Connecticut | 5,857 | 9,374 | 15,231 | 5,182 | 8,968 | 14,150 |
| Kansas | 7,397 | 7,389 | 14,786 | 6,912 | 7,143 | 14,055 |
| New Mexico | 7,499 | 6,851 | 14,350 | 6,922 | 6,603 | 13,525 |
| South Carolina | 7,259 | 7,107 | 14,366 | 6,519 | 6,857 | 13,376 |
| Ohio | 5,476 | 8,753 | 14,229 | 4,672 | 8,347 | 13,019 |
| Arkansas | 5,668 | 5,466 | 11,134 | 5,178 | 5,250 | 10,428 |
| Alabama | 4,866 | 4,871 | 9,737 | 4,353 | 4,725 | 9,078 |
| Missouri | 3,984 | 5,202 | 9,186 | 3,645 | 5,003 | 8,648 |
| Nebraska | 3,848 | 4,221 | 8,069 | 3,451 | 4,084 | 7,535 |
| Kentucky | 3,521 | 4,086 | 7,607 | 3,131 | 3,926 | 7,057 |
| Iowa | 3,213 | 4,167 | 7,380 | 2,872 | 3,993 | 6,865 |
| Idaho | 3,428 | 3,554 | 6,982 | 3,187 | 3,418 | 6,605 |
| Louisiana | 2,493 | 3,670 | 6,163 | 2,130 | 3,518 | 5,648 |
| Rhode Island | 1,508 | 2,874 | 4,382 | 1,305 | 2,752 | 4,057 |
| Hawaii | 856 | 3,359 | 4,215 | 671 | 3,186 | 3,857 |
| Delaware | 1,645 | 2,070 | 3,715 | 1,484 | 1,996 | 3,480 |
| Mississippi | 1,723 | 1,876 | 3,599 | 1,496 | 1,808 | 3,304 |

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| District of Columbia | 988 | 1,980 | 2,968 | 822 | 1,898 | 2,720 |
| Puerto Rico | 572 | 2,210 | 2,782 | 401 | 2,107 | 2,508 |
| New Hampshire | 477 | 1,180 | 1,657 | 405 | 1,112 | 1,517 |
| Wyoming | 699 | 695 | 1,394 | 626 | 665 | 1,291 |
| Alaska | 216 | 852 | 1,068 | 171 | 812 | 983 |
| South Dakota | 316 | 534 | 850 | 270 | 513 | 783 |
| Maine | 146 | 619 | 765 | 116 | 592 | 708 |
| Guam | 115 | 633 | 748 | 86 | 597 | 683 |
| North Dakota | 151 | 560 | 711 | 117 | 536 | 653 |
| Virgin Islands | 168 | 406 | 574 | 109 | 380 | 489 |
| West Virginia | 158 | 372 | 530 | 126 | 353 | 479 |
| Montana | 93 | 283 | 376 | 80 | 265 | 345 |
| Vermont | 66 | 303 | 369 | 48 | 294 | 342 |
| Armed Forces-Pacific | 33 | 145 | 178 | 28 | 131 | 159 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 125 | 153 | 21 | 112 | 133 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 82 | 96 |
| Northern Mariana Islands | 32 | 37 | 69 | 12 | 32 | 44 |
| Palau | - | 19 | 19 | - | 18 | 18 |
| Not Reported | 16,803 | 115,596 | 132,399 | 12,685 | 109,780 | 122,465 |

*- Represents zero.*

[1]  *The number of requests that were accepted to date of the reporting period.*

[2]  *The number of requests that were approved to date of the reporting period.*

[3]  *All fields with less than 10 or a blank in the state field are included in the field "Not Reported."*

*NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.*

     *2) The report reflects the most up-to-date estimate data available at the time the report is generated.*

     *3) Ranked by total approvals.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018*