**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 2

# Exhibits 26 - 40

# DEF-INTERV.

# EX. 26

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JORGE A. AGUILAR** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF JORGE A. AGUILAR
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| 1 | COUNTY OF SANTA CLARA and      CASE NO. 17-CV-05813-WHA |

1    COUNTY OF SANTA CLARA and
     SERVICE EMPLOYEES INTERNATIONAL
2    UNION LOCAL 521,

3                Plaintiffs,

4          v.

5    DONALD J. TRUMP, in his official capacity
     as President of the United States, JEFFERSON
6    BEAUREGARD SESSIONS, in his official
     capacity as Attorney General of the United
7    States; ELAINE DUKE, in her official
     capacity as Acting Secretary of the Department
8    of Homeland Security; and U.S.
     DEPARTMENT OF HOMELAND
9    SECURITY,

10              Defendants.

CASE NO. 17-CV-05813-WHA

DECLARATION OF JORGE A. AGUILAR
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0010

I, JORGE A. AGUILAR, declare:

1. I am the Superintendent of the Sacramento City Unified School District ("District"), a school district of more than 43,000 students with many immigrant students from all parts of the world. Students come from families that speak at least 48 different languages, including Spanish, Hmong, Armenian, Korean, Tagalog, Cantonese, Arabic, Vietnamese and Russian.

2. Sixty four percent (64%) of District students qualify for free or reduced lunch. 17,104 students are of Latino descent. In 2015-16, nearly one-third of students were English language learners or non-native speakers.

3. The repeal of DACA has negatively impacted many students' abilities to focus on their studies. When it was announced that DACA would end, many of those students became fearful of what the decision meant for them, their undocumented relatives and friends.

4. Many teachers in the District have reported their students experiencing trauma in the classroom because of this decision. It has been a major distraction in the classroom. In fact, the District has had to create a guide for teachers to help them manage students dealing with this trauma. Teaching and learning cannot happen in our classrooms if students' basic needs are not met.

5. If the DACA program were eliminated, it would have a severe impact on the District's students. The elimination of work authorization for parents and guardians would likely result in many students withdrawing from the District. Students and/or their parents could be subject to deportation, which would undoubtedly impact their long term academic success.

6. The DACA program has increased the diversity of the District's workforce as well. We have a number of employees, both credentialed and classified, with DACA status.

7. These employees have made meaningful connections with our students, especially those students who have shared cultural and linguistic backgrounds.

8. The District desires to retain and continue to hire any such individuals who can benefit its students and the District as a whole by adding to its diversity and improving educational outcomes for all students.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017, at Sacramento, California

Jorge A. Aguilar,
Superintendent, Sacramento City Unified School District

1

0011

# DEF-INTERV.

# EX. 27

<table>
<tr><td>1</td><td>JEFFREY M. DAVIDSON (SBN 248620)<br>ALAN BERSIN (SBN 63874)</td><td>XAVIER BECERRA<br>Attorney General of California</td></tr>
</table>

1 JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
2 COVINGTON & BURLING LLP
One Front Street, 35th Floor
3 San Francisco, CA 94111-5356
Telephone: (415) 591-6000
4 Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
5 abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
6 *University of California and Janet Napolitano, in*
*her official capacity as President of the*
7 *University of California*

8 THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
9 JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DAVID R. ANDERSON** |

0012

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 | | |
| 18 | | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF DAVID R. ANDERSON
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

I, DAVID R. ANDERSON, declare:

1.    I am the President of St. Olaf College, a private liberal arts college in Northfield, Minnesota.  I have held this position since July 2006.  St. Olaf enrolls approximately 3,000 students from across the country and around the world.

2.    St. Olaf's mission statement, among other things, commits it to be "an inclusive, globally engaged community."  The phrase "inclusive, globally engaged community" dedicates St. Olaf to welcoming the people of the world and engaging with them.  St. Olaf emphasizes learning in global contexts and welcomes students and scholars from many parts of the world.  St. Olaf is also dedicated to being an inclusive college where people of diverse backgrounds and experiences can come together to share ideas and learn from one another.

3.    Approximately 10 students who attend St. Olaf participate in the Deferred Action for Childhood Arrivals (DACA) program.  These DACA students make valuable contributions to the St. Olaf community.

4.    The rescission of DACA will negatively affect St. Olaf's ability to fulfill its mission statement.  The rescission will impede St. Olaf's ability to foster relationships between people of different backgrounds because the DACA students, who bring diverse perspectives and experiences to the college, may be unable to afford tuition due to their loss of work authorization and may be subject to deportation.  The potential deportation of these students and the rescission of their legal status goes against St. Olaf's commitment to diversity and inclusivity.  Moreover, the rescission of DACA will adversely impact the diversity of the talent pool of potential St. Olaf students, which will make it more difficult for St. Olaf to fulfill its strategic plan of increasing the diversity of St. Olaf students.

5.    The rescission of DACA will also negatively affect St. Olaf's tuition revenue.  DACA students who are enrolled in St. Olaf may drop out because they are unable to work to meet their educational expenses, because they determine that the cost of a college education is not worth the

1    substantial investment of time and money if they are not able to work after graduation, or because they

2    are deported.    Additionally, the rescission of DACA will reduce the potential student population,

3    decreasing the future stream of tuition revenue for St. Olaf.

4

5

6            I declare under penalty of perjury under the laws of the United States that the foregoing is

7    true and correct.

8            Executed on 23 October         , 2017, in Northfield, Minnesota.

9

10                                                    DAVID R. ANDERSON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

0016

# DEF-INTERV.

# EX. 28

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF RON ANDERSON** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 | | |
| 18 | | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF RON ANDERSON
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0018

1 COUNTY OF SANTA CLARA and   CASE NO. 17-CV-05813-WHA
  SERVICE EMPLOYEES INTERNATIONAL
2 UNION LOCAL 521,

3      Plaintiffs,

4    v.

5 DONALD J. TRUMP, in his official capacity
  as President of the United States, JEFFERSON
6 BEAUREGARD SESSIONS, in his official
  capacity as Attorney General of the United
7 States; ELAINE DUKE, in her official
  capacity as Acting Secretary of the Department
8 of Homeland Security; and U.S.
  DEPARTMENT OF HOMELAND
9 SECURITY,

10     Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RON ANDERSON
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, RON ANDERSON, declare:

1.     I am the Senior Vice Chancellor of Minnesota State, a system of 37 colleges and universities with 54 campuses across the state of Minnesota. I have held this position since June 2015. Prior to my current position, I served as President of Century College, a large and diverse college within the Minnesota State system. The majority of my more than 25 year-long career in higher education has been spent serving within the Minnesota State system.

2.     As Minnesota State's chief academic and student affairs officer, I am in charge of leading the strategic planning, development, and administration of academic and student affairs, initiatives, programs, and policies in fulfillment of the system's commitments to Minnesota.

3.     Minnesota State is the fourth largest system of state colleges and universities in the country. Minnesota State does not include the University of Minnesota. Minnesota State offers higher education to more than 375,000 students every year. Minnesota State colleges and universities are dedicated to helping all Minnesotans improve their futures and to sustaining Minnesota's diverse and vibrant economy by supplying business and industry with a highly educated and skilled workforce. Minnesota State serves a diverse group of students, including 63,000 students of color, 48,500 first-generation college students, and 84,000 students with modest financial means.

4.     Minnesota State has an enduring commitment to enhancing Minnesota's quality of life by developing and fostering understanding and appreciation of a diverse society. It is Minnesota State's goal to recruit and retain diverse students, faculty, and staff and to ensure a welcoming and supportive environment on all of its campuses throughout the state. Minnesota State is committed to ensuring that its campuses are places of inclusion and opportunity for all students and employees. Minnesota State has long benefitted from the economic, scientific, and cultural contributions of students and scholars from diverse backgrounds.

0020

5.     The rescission of DACA will negatively affect Minnesota State's mission.  Rescinding DACA may cause any current Minnesota State students who are DACA recipients to drop out, either because they are unable to afford to meet their educational expenses due to their loss of work authorization or because they are deported.  The loss of these students will deprive the system's colleges and universities of the diverse backgrounds and perspectives of these students and will set back Minnesota State's efforts to recruit and retain diverse students.  The rescission of DACA will also adversely impact the diversity of potential applicants to Minnesota State's universities and colleges. Many DACA recipients will be unable to apply to Minnesota State institutions because they have been deported or will be deterred from applying because the investment of a college education may not seem worthwhile if unable to work after graduation.  As a result, Minnesota State institutions will be denied the diverse ideas and points of view that these potential DACA students would bring to enrich the college and university communities for all students, faculty, and staff.

6.     In addition, rescinding DACA will deprive the Minnesota workforce of these students and the contributions they can bring to Minnesota employers and communities.

7.     The loss of DACA students will produce a corresponding decrease in tuition revenue for Minnesota State institutions.  The rescission of DACA will similarly decrease the pool of potential students, reducing the future stream of tuition revenue for Minnesota State.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on  October 25 , 2017, in St. Paul, Minnesota.

RON ANDERSON

2

0021

# DEF-INTERV.

# EX. 29

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DR. CLARENCE BRADDOCK III** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

0063

| | |
|---|---|
| 1     COUNTY OF SANTA CLARA and<br>      SERVICE EMPLOYEES INTERNATIONAL<br>2     UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

1

    COUNTY OF SANTA CLARA and
    SERVICE EMPLOYEES INTERNATIONAL
2     UNION LOCAL 521,

3                   Plaintiffs,

4                 v.

5     DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6     BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7     States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8     of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9     SECURITY,

10                Defendants.

CASE NO. 17-CV-05813-WHA

0064

I, CLARENCE BRADDOCK III, DECLARE:

1.     I am Vice Dean of Education at the David Geffen School of Medicine at the University of California Los Angeles ("UCLA Medicine"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.     I have been Vice Dean of Education at UCLA Medicine for nearly four years. In my position, I oversee all aspects of medical education, including undergraduate, graduate, and postgraduate medical programs. I develop, manage, and implement strategies, initiatives and programs to promote and support education and training.

3.     We have several Deferred Action for Childhood Arrivals ("DACA") status medical students at UCLA Medicine, including 4th year medical students. The David Geffen School of Medicine, like the wider University of California system, is dedicated to providing a place for students who are the most qualified, meritorious and committed to their medical training and future patient care. The DACA students currently enrolled at the David Geffen School of Medicine exemplify these qualities. They are emblematic of our fundamental role as an institution of higher learning: to train the most talented, hard-working, passionate young scholars to become the doctors and biomedical researchers of tomorrow, regardless of gender, race, ethnicity or citizenship. These students are here not because of their DACA status, but because they are exceptionally qualified and share a genuine desire to care for, and heal, the sick.

4.     If these UCLA medical student and residents lose their DACA status, they become unemployable as physicians. They will not be able to practice medicine or even complete their residency in the United States as both require employment authorization. Without DACA, these students and residents would have no choice but to leave the United States in order to become practicing physicians. This would result in a loss of promising young doctors from our medical care system.

5.     The DACA policy rescission has also created the specific risk that our fourth year students will not be offered medical residency positions. Because they will lose their employment authorization without DACA status, they will be unable to complete or potentially even start their residency programs. Our faculty and UCLA residency program advisors have shared with me their significant concern about DACA students losing their status before or during residency, which means

1

0065

that our hard-working and bright DACA students might not be offered residency interviews and/or positions at all. This concern has become so acute that UCLA Medicine has offered to include language in the Dean's Letter for our fourth year students explaining DACA status and expressing our support for our DACA students. A Dean's Letter is provided to fourth year students applying for residency to describe each student's potential as a doctor and encourage their acceptance into a residency program. This language is being included in hopes it might help DACA students be considered for residency programs.

6.    Our DACA students have played an important role in enriching UCLA Medicine's educational environment and curriculum. At UCLA Medicine, we consider cultivating a diverse academic community as a way to drive excellence. A significant part of a medical student's training as a future physician is cultural sensitivity and a thoughtful, candid, respectful connection with patients, community members, and peers. Our DACA students come from incredibly diverse backgrounds and in my experience have helped their peers to build a more culturally sensitive and competent educational environment by sharing their perspectives and shaping our curriculum. For example, DACA students have provided unique insight on delivering care to immigrant populations, stemming from their understanding of both the American health system and the challenges immigrant families and communities often face. Our DACA students are often able to draw on their own and their family's experiences—in a way their peers cannot easily do—to provide context for the patient's choices and the right approach to delivering health care to that patient. As a medical educator, I believe that first-hand perspectives help all of our students to develop essential empathy and cross-cultural understanding that makes them better doctors for California's diverse population.

7.    Our DACA students' unique perspectives have also driven specific improvements in our curriculum. Among the foundational concepts of our medical curriculum are understanding concepts like implicit bias, stereotype threat, and micro-aggressions. Our DACA students brought to UCLA Medicine's attention that some of our own case studies contained stereotypical descriptions and bias in the terms used to describe a minority patient and, in another case, a migrant worker. This started conversations about the existence of stereotypes and bias in the healthcare environment led by DACA students, which sparked changes to these cases in our curriculum.

2

0066

8. Because of the DACA policy rescission, I believe we will see fewer diverse applicants to our programs from students who would otherwise have received DACA. This frustrates UCLA Medicine's concerted effort to recruit diverse students through programs like Programs in Medical Education ("PRIME"). UCLA PRIME is a five-year concurrent/dual degree program focusing on the development of leaders in medicine by addressing policy, care and research in healthcare for medically underserved communities. We look for candidates who have leadership experience and are experienced with and committed to working with underserved populations. DACA students often have all of these qualifications. About one third of our current UCLA Medical DACA students are also PRIME program students. The rescission of the DACA policy frustrates UCLA Medicine's efforts to select and train these talented future leaders of medical care for Californians.

9. Finally, I am concerned that the rescission of the DACA policy will have a broader negative impact on the UCLA community, particularly if any DACA recipients become the target of immigration enforcement. Recent news reports of immigration agents arresting undocumented individuals in courthouses and hospitals or near schools have already caused concern among our community. Our undocumented patients may choose to stay at home rather than seek the medical help they need in the face of this heightened immigration enforcement risk.

10. The decision to rescind the DACA policy harms our DACA recipient students, their peers, UCLA Medicine, their future patients and our broader community.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017 in Los Angeles.

CLARENCE BRADDOCK III

0067

# DEF-INTERV.

# EX. 30

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

    XAVIER BECERRA
    Attorney General of California
    MICHAEL L. NEWMAN
    Supervising Deputy Attorney General
    JAMES F. ZAHRADKA II (SBN 196822)
    1515 Clay Street, 20th Floor
    P.O. Box 70550
    Oakland, CA 94612-0550
    Telephone: (510) 879-1247
    Email: James.Zahradka@doj.ca.gov
    *Attorneys for Plaintiff State of California*

    JOSEPH W. COTCHETT (SBN 36324)
    NANCY L. FINEMAN (SBN 124870)
    COTCHETT, PITRE & McCARTHY, LLP
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
    Email: nfineman@cpmlegal.com
    *Attorneys for Plaintiff City of San Jose*

    JONATHAN WEISSGLASS (SBN 185008)
    STACEY M. LEYTON (SBN 203827)
    ERIC P. BROWN (SBN 284245)
    ALTSHULER BERZON LLP
    177 Post Street, Suite 300
    San Francisco, CA 94108
    Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
    Email: jweissglass@altber.com
    *Attorneys for Plaintiffs County of Santa Clara and*
    *Service Employees International Union Local 521*

16
17
18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

19
20

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | CASE NO. 17-CV-05211-WHA |
| Plaintiffs, | **DECLARATION OF SHAWN BRICK** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

21
22
23
24
25
26
27
28

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

0079

1  COUNTY OF SANTA CLARA and    CASE NO. 17-CV-05813-WHA
   SERVICE EMPLOYEES INTERNATIONAL
2  UNION LOCAL 521,

3                 Plaintiffs,

4           v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10                Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SHAWN BRICK
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, SHAWN BRICK, DECLARE:

1.     I am the Associate Director for Student Financial Support at the University of California Office of the President ("UCOP"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto. I have held various positions in student financial aid and admissions in the University of California ("UC") system for fifteen years and am currently the Associate Director for Student Financial Support at the UCOP. As Associate Director for Student Financial Support, my duties include policy analysis, development, and implementation. I am responsible for producing complex analyses, executive summaries, and talking points on UC enrollment and affordability of UC education.

2.     This declaration describes UC's population of undocumented students and students who have Deferred Action for Childhood Arrivals status ("DACA students"), and the financial investment UC has made in those students. It then explains the investment that UC expects undocumented and DACA students (and their families) to make in their own education. It then provides figures on UC's investment in graduate students. Finally, it provides the average debt of professional students upon graduation from UC. The rescission of the DACA program puts at risk the financial investment that UC and these students and families have made in their education.

3.     UC's mission includes provision of public undergraduate, graduate, and professional education. A key measure of our success is the percentage of entering students who complete their degrees. DACA students have earned their positions in programs at UC through their academic merit and accomplishments. UC invests in all its students, including DACA students, to enable them to continue their programs, complete their degree(s), graduate and become contributing members of society, including pursuing the careers for which UC trained them.

4.     As described below, the University has provided financial support to its DACA and undocumented students enrolled as of the 2016-2017 academic year in the cumulative amount of between approximately $87 million to $252 million since 2013. The same students and their parents would have to have invested approximately $73 million to $180 million over the same period.

**UC's Undocumented and DACA Students**

5.      As of the 2016-2017 academic year, UC had approximately 4,200 potentially undocumented students, of which approximately 1,700 students are likely to be DACA recipients.

6.      This assessment is based on an analysis of several criteria in our financial aid data that suggest students are undocumented, and additional criteria suggesting that they have DACA status. To approximate the 4,200 undocumented student population, I considered that undocumented students are not eligible for federal financial aid, but, if they are eligible for the California nonresident tuition exemption under California Assembly Bill 540 ("AB540") then undocumented students (and only undocumented students) may choose to file a California DREAM (Development, Relief, and Education for Alien Minors) financial aid application. For the 4,200 students who meet this criteria, I then applied additional criteria to approximate the subset of 1,700 students who appear to have DACA work authorization.

7.      This approach is likely to underestimate the number of undocumented students and, therefore, the number of students with DACA status at UC. For example, this figure would not include students who do not or cannot submit a California DREAM Act application for various reasons, or for whom we cannot identify likely work authorization for various reasons. It also excludes many graduate and professional students because the same criteria cannot be applied to accurately identify these students.

**UC and State Investment in DACA Students**

8.      Based on my assessments of undocumented and DACA student populations, I approximate UC's financial investment in these students cumulatively from 2013 to the 2016-2017 academic year, including state grants and other sources. UC awards financial aid to students on a non-discriminatory basis according to students' financial need, as they demonstrate that need by submitting a Free Application for Federal Student Aid ("FAFSA") (not applicable to undocumented students or DACA students, who are ineligible for federal aid) or a California DREAM Act application.

9.      UC has invested cumulatively between $87 million (based on the DACA only estimate of 1,700 students) and $252 million (based on the 4,200 undocumented estimate) in the DACA students

0082

1    who were pursuing degrees at UC as of the 2016-2017 academic year (based on dollar figures from

2    preliminary 2016-2017 data). This is the approximate, cumulative investment in the cohort of

3    undocumented and DACA students enrolled as of 2016-2017 at UC, over the course of their enrollment

4    at UC from 2013 to the 2016-2017 academic year. The estimates are from 2013 onward because this was

5    the earliest year that California DREAM Act data was received by UC, and it was this data that enabled

6    me to assess the populations of undocumented and DACA student populations as described above.

7

8    **UC Expectation of Student and Parent Investment in DACA Students' Education**

9    10.    All students and their parents are expected to invest in paying for the student's college

10    education. UC's financial aid policy for undergraduates approaches paying for the total cost of

11    attendance (tuition, fees, living expenses, books and supplies) as a partnership between parents, students,

12    state and federal governments, and UC. Parents and students are expected to contribute based on their

13    resources as reported on either the FAFSA (not applicable to undocumented students or DACA students,

14    who are ineligible for federal aid) or the California DREAM Act application. UC then uses the same

15    formula for all students to determine financial aid, based on demonstrated financial need. The average

16    expected parent contribution for the 4,200 undocumented students was roughly $700 per year, as

17    calculated using this same formula for all students, based on financial need.

18    11.    UC also expects all students that are financial aid recipients to contribute "self-help"

19    amounts to their education through work or loans in the amount of $10,000 per year. Many students

20    who have DACA work authorization hold jobs to satisfy this portion of their financial obligation.

21    Without DACA work authorization, it will be much more difficult for undocumented students to satisfy

22    the self-help contribution that UC expects of all students.

23    12.    The combined expected family investment is therefore $10,700 per year by students and

24    parents, or $42,800 for a completion of a four-year undergraduate degree. For our DACA and

25    undocumented students, this totals between approximately $73 million (based on the DACA-only

26    estimate of 1,700 students) and $180 million (based on the 4,200 potentially undocumented estimate).

27

28

0083

**Average Investment Graduate Academic and Professional Students**

13.     Because financial aid often works differently in UC graduate and professional programs, I am unable to accurately estimate our population of undocumented or DACA graduate and professional students based on financial aid records. However, UC believes that there are enrolled graduate and professional students who are DACA students.

14.     The University invests heavily in its graduate academic and professional students. In 2015-2016, UC paid $523 million in University-funded fellowships to all of its graduate and professional students.

15.     Graduate students are primarily supported through fellowships and employment as research and teaching assistants. In 2015-2016, UC's graduate academic students received an average combined fellowship and assistanceship award of more than $37,000 per student per year, including any graduate DACA students.

16.     By contrast, professional degree students primarily finance their degree by investing themselves through student loans. The UCOP tracks student loan borrowing patterns by professional students to estimate students' debt incurred for their own degrees. The average student loan debt for professional students is as follows, by program:

**Average Professional Student Debt Upon Graduation**

| Degree Type | Cumulative Borrowing, 2015-2016 Graduating Cohort |
|---|---|
| Law | $124,000 |
| MBA | $81,000 |
| Medicine | $154,000 |
| Education | $37,000 |
| Other Health Professions | $112,000 |
| Other Non-Health | $54,000 |

17.     Without DACA, it will be difficult if not impossible for many of these graduate and professional students to complete their degrees and then to repay their significant debt from those degrees. Some of these degrees require work experience as a condition of graduation, such as a researcher or graduate student instructor. Further, without DACA, these students will lose the

4

0084

employment authorization that enabled them to work in their chosen profession at a salary
commensurate with the debt incurred for their advanced degree.

### Conclusion

18.     As indicated above, this assessment of investments of UC and its students in their
education are conservative in many respects and the actual investment in undocumented and DACA
students is likely greater.

19.     The rescission of DACA puts in jeopardy the cumulative financial investments in the
education of these talented students by the UC, the State of California, their families and the students
themselves, as well as the ability of students to repay the debt incurred to pursue their education.

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct.

Executed on October 23, 2017 in Oakland, California.


SHAWN BRICK

# DEF-INTERV.

# EX. 31

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF SARA H. CODY, M.D.** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | Defendants. | |
| 15 | | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 | | |
| 18 | | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF SARA H. CODY, M.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

I, SARA H. CODY, M.D., DECLARE:

1. I am a resident of the State of California. I submit this declaration in support of the Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth herein.

2. This declaration provides an overview of the Santa Clara County Public Health Department's work and explains why these efforts are undermined by federal policies that increase immigrants' reluctance to interact with government institutions that play a critical role in protecting public health.

3. I am the Director of the County of Santa Clara's ("County") Public Health Department, as well as the Health Officer for the County and each of the 15 cities located within Santa Clara County. I have held the Health Officer position from 2013 to the present, and I have held the Public Health Department Director position from 2015 to the present. In these roles, I provide leadership on public health issues for all of Santa Clara County and oversee approximately 450 Public Health Department employees who provide a wide array of services to safeguard and promote the health of the community.

4. Prior to becoming the Health Officer for the County and each of its cities, I was employed for 15 years as a Deputy Health Officer/Communicable Disease Controller at the County's Public Health Department, where I oversaw surveillance and investigation of individual cases of communicable diseases, investigated disease outbreaks, participated in planning for public health emergencies, and responded to Severe Acute Respiratory Syndrome (also known as "SARS"), influenza A virus subtype H1N1 (also known as "swine flu" or H1N1), and other public health emergencies.

5. The mission of the Public Health Department is to promote and protect the health of Santa Clara County's 1.9 million residents. None of Santa Clara County's 15 cities have a health department. All 15 cities within the county, and all Santa Clara County residents, rely on the Public Health Department to perform essential public health functions. The Public Health Department's work is guided by core public health principles of equity, the value of every life, and harm prevention.

6. The work of the Public Health Department is focused on three main areas: (1) infectious disease and emergency response, (2) maternal, child, and family health, and (3) healthy communities.

1

7.     First, the Public Health Department is responsible for safeguarding the public health by preventing and controlling the spread of infectious diseases and planning for and responding to public health emergencies.  Programs in this branch of the Public Health Department receive reports on 85 different diseases and conditions; track overall trends in infectious diseases; investigate individual cases of concern; provide long term case management for certain categories of patients (e.g., active tuberculosis cases); provide immunizations and preventive therapy; identify, investigate and control outbreaks; and plan for and respond to public health emergencies.  They also ensure that all children attending school or child care facilities in Santa Clara County comply with State immunization requirements; conduct HIV and other STD testing and education for vulnerable communities; and distribute opioid overdose prevention kits for at-risk individuals.

8.     This branch of the Public Health Department also operates two pharmacies.  One of these pharmacies provides free, donated medicine to individuals who cannot afford the retail cost of such drugs.  The other pharmacy specializes in serving patients with HIV/AIDS, patients with tuberculosis, patients from the Public Health Department's STD clinic, and patients being discharged from the County jail.  Pharmacy staff also support communicable disease control by procuring, storing, maintaining, and distributing essential medications and vaccines during outbreaks; distributing approximately 20,000 state-funded influenza vaccines, annually, to health care providers in Santa Clara County to administer to low-income and elderly residents at no charge; and overseeing all enrollment workers in Santa Clara County for the State-sponsored AIDS Drug Assistance Program.

9.     Second, in the area of maternal, child, and family health, the Public Health Department provides services for Santa Clara County's most vulnerable children and families.  This includes, but is not limited to, (1) the Special Supplemental Nutrition Program for Women, Infants and Children (WIC) program, which provides low-income pregnant, postpartum, and breastfeeding women, infants, and children up to age 5 with nutritious foods to supplement their diets, information on healthy eating, and referrals to health care; (2) the Child Health and Disability Prevention (CHDP) Program, which ensures that low-income children and youth, including foster care youth, receive routine health assessments and treatment services; (3) the Childhood Lead Poisoning Prevention Program, which provides nursing and environmental case management and follow-up for lead-poisoned children,

0176

1   promotes screening for lead poisoning, and provides community education regarding lead poisoning

2   prevention; (4) the California Children's Services (CCS) program, which provides diagnostic and

3   treatment services, medical case management, and physical and occupational therapy to children under

4   21 years of age with CCS-eligible medical conditions, such as cystic fibrosis, hemophilia, cerebral palsy,

5   muscular dystrophy, spina bifida, cancer, and traumatic injuries; and (5) the Nurse Family Partnership,

6   which provides young, low-income first-time mothers with home visitation services from specially-

7   trained nurses to improve pregnancy outcomes and child health and development.

8           10.     Third, to create and maintain healthy communities, the Department conducts localized

9   health assessments and planning throughout Santa Clara County, and works with community partners

10  and County leadership to promote system wide and environmental changes to reduce the incidence of

11  chronic diseases and injuries in Santa Clara County.

12          11.     The Public Health Department's work is undermined by federal policies that increase

13  immigrant communities' reluctance to interact with government institutions. One of the Department's

14  major priorities is to advance health equity to eliminate health disparities, including health disparities

15  that exist between immigrant and non-immigrant communities and different racial and ethnic

16  communities. However, the Department is limited in its ability to develop partnerships with community

17  organizations, to engage communities of color and immigrant and refugee communities, and to improve

18  health equity when such communities and organizations fear or lose trust in the government and are

19  unwilling to access necessary health services.

20          12.     The rescission of DACA would likely lead to greater health inequity within Santa Clara

21  County. I have heard from community-based service providers in Santa Clara County that the current

22  political climate has already caused immigrants to miss medical appointments; to avoid going out in

23  public for fear of being detained by immigration agents; to avoid utilizing public safety services; and to

24  suffer from increased stress, anxiety and depression. Rescission of DACA would only cause more of the

25  same. Through the Department's work in serving vulnerable communities, I am acutely aware that the

26  loss of employment and employer-provided healthcare can mean greater economic instability and stress

27  on the affected individuals and the families they support; less access to food, medicine, other basic

28  necessities, and essential services; and increased need for safety net services.

13. Beyond health equity, the rescission of DACA could negatively impact the Department's core areas of work in controlling infectious disease and providing emergency response; promoting maternal, child, and family health; and ensuring healthy communities. Individuals unwilling to access necessary health services may miss necessary vaccinations. Immigrants—for whom their country of birth can provide important information for risk of diseases such as hepatitis B and tuberculosis—may be reluctant to share their national origin with their health care providers. Infectious individuals who wish to avoid detection by the government may be less likely to cooperate with public health efforts to monitor and control their diseases, thereby putting other community members at risk.

14. Healthy families and communities cannot be sustained when residents are suffering from illness, injury, or mental health issues but unwilling to access health services, when residents are too afraid to avail themselves of necessary public safety services, and when residents do not dare to leave their homes for fear of being deported.

1     I declare under penalty of perjury under the laws of the State of California that the foregoing is

2 true and correct and that this declaration was executed on _____*Oct 26*_____, 2017 in San

3 José, California.

4

5                                _____

6                           SARA H. CODY, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SARA H. CODY, M.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0179

# DEF-INTERV.

# EX. 32

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL** |

0218

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0219

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

We, Alan Essig, Meg Wiehe, and Misha Hill, declare:

1.    We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP).  ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies.  ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure, and public safety.  ITEP researchers use a microsimulation tax model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

2.    Alan Essig has been the Executive Director of ITEP since April 2017.  He holds a master's degree from the Nelson A. Rockefeller College of Public Affairs and Policy at the State University of New York at Albany and an undergraduate degree from the State University of New York at Buffalo.  Attached as Exhibit A is a true and correct copy of Alan Essig's curriculum vitae.

3.    Meg Wiehe is the Deputy Director of ITEP.  She has worked with ITEP since 2010.  Meg is nationally recognized expert on state and local taxation.  She studies, writes, and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy.  In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local governments' ability to fund basic public priorities, including education, infrastructure, and health care.  Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*  Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.  Attached as Exhibit B is a true and correct copy of Meg Wiehe's curriculum vitae.

4.    Misha Hill has been a State Policy Fellow at ITEP since 2016.  She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.  Attached as Exhibit C is a true and correct copy of Misha Hill's curriculum vitae.

1

0221

5.      According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of September 4, 2017, approximately 689,800 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1] This population estimate from USCIS takes into account the latest estimates of former DACA recipients who have become lawful permanent resident (about 40,000) and those who were granted DACA but failed to reapply or whose reapplication was denied (about 70,000). The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide, estimates an additional 617,000 individuals are eligible for DACA but not currently enrolled.[2]

6.      We used the above estimates of the current population receiving and eligible for, but not receiving DACA, in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.[3]

7.      Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes. We estimate that the population currently enrolled in DACA contributes more than $1.25 billion in state and local taxes. Further, the population eligible for DACA but not currently enrolled contributes an additional $497.6 million in state and local taxes. This brings the total contribution of the DACA-eligible population to just under $1.8 billion annually in state and local taxes. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

       a.   Taxpaying units and employment status:

---

[1] "Approximate Active DACA Recipients." Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[2] Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." Available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events.

[3] ITEP released a report in April 2017 that used USCIS data from September 2016. This analysis uses the same methodology with the most currently available population figures.

0222

i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

ii. The employment rate of immigrants depends on legal status.

iii. A 2017 national survey of 3,063 DACA recipients found that 91.4 percent of respondents were employed.[4] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks.

iv. The previously mentioned national survey also found that prior to obtaining DACA, only 44% of survey respondents were employed. Our analysis assumes that 44% of the population that is eligible for DACA but not currently enrolled are employed.

b. Income of DACA-eligible population

i. Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[5] The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.

---

[4] "Results of Tom K. Wong et al., 2017 National DACA Study." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

The April 2017 ITEP report used employment figures from the 2016 survey.

[5] Wong's 2017 survey found a higher average salary for the DACA-eligible population enrolled and working ($36,232) than the Center for American Progress report. Thus, by using an average salary of $23,901, this analysis provides a conservative tax contribution estimate.

0223

- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i. ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population with some modifications in states with major tax changes since *Who Pays?* was published.

d. The methodology used to calculate the contributions of the DACA-eligible population differs from the methodology used to calculate the contributions of all undocumented immigrants. The primary differences are that we assume a higher average income and employment rate for the DACA-eligible population. Thus the state and local tax contributions of the DACA-eligible population are not proportional to their share of the undocumented population.

8. We estimate that the population currently enrolled in DACA contribute $242.4 million in state and local income taxes annually. The population that is eligible for but not enrolled in DACA contributes an additional $44.5 million bringing the total contributions of the DACA-eligible population to $286.9 million in state and local income taxes annually.

a. Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 626,437 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated

4

0224

between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers. This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

    b. Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

9. We estimate the population currently enrolled in DACA contributes $281.1 million in state and local property taxes. The population eligible for not enrolled in DACA contributes an additional $131.9 million bringing the total $413 million annually in state and local property taxes. The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

    a. The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state. The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

10. We estimate the population currently enrolled in DACA contributes $726.1 million state and local sales and excise taxes. The population eligible but not enrolled in DACA contributes an additional $321.2 million bringing the total contributions of the DACA-eligible population to over $1 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0225

purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    a.  Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service.  It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes, thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

11.    A useful way to compare taxes paid across income levels is the effective tax rate.  This is the total of all taxes paid - income, property, and sales and excise - as a share of income.  The DACA-eligible population pays an average effective tax rate of 8.3%.  ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.4%, and the top 1% of taxpayers pays just 5.4% of their income in taxes.[6]  This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

12.    We also estimate that if DACA protections were lost, the population would continue to contribute to state and local revenues, but at much lower levels.  We estimate a total loss of $696 million in state and local tax revenues.

    a.  DACA protections increase state and local tax contributions because they increase employment rates, increase average salaries, and increase the share paying state personal income taxes from 50 to 100 percent.  Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages.  This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers.  Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

13.    There are residents of every state who are eligible for or enrolled in DACA, which means

---

[6] Carl Davis, et al., *Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.*, Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

0226

every state revenue stream could be harmed by the loss of DACA protections. Some examples relevant to this case are below:

a. In California, approximately 197,900 residents are currently enrolled in DACA. They contribute $358.3 million in state and local taxes. An additional 181,100 residents are eligible for but not enrolled in DACA. They contribute $136.8 million bringing the total contributions of the 379,000 DACA-eligible California residents to $495.1 million in state and local taxes annually. If DACA protections were lost, the contributions of California's total DACA-eligible population would decrease by $208.7 million to $286.4 million.

   i. Those currently enrolled in DACA in California contribute $222.9 million in sales and excise taxes. Those eligible for but not enrolled in DACA contribute an additional $90.3 million bringing the total sales and excise tax contributions of California's total DACA-eligible population to $313.2 million.

   ii. Those currently enrolled in DACA contribute $41 million in state personal income taxes. Those eligible for but not enrolled in DACA contribute an additional $8.3 million bringing the total personal income tax contribution of California's total DACA-eligible population to $49.3 million.

   iii. Those currently enrolled in DACA contribute $94.3 million in property taxes. Those eligible for but not enrolled in DACA contribute an additional $38.2 million bringing the total property tax contributions of California's total DACA-eligible population to $132.5 million.

   iv. Santa Clara County has the twelfth largest DACA-eligible population of counties nationwide. Approximately 15,000 Santa Clara residents are currently enrolled in DACA.[7] They contribute $14.8 million in state taxes (personal income tax and state sales tax) and $12.4 million to local taxes (property taxes and local sales taxes). An additional 13,700 are eligible but not enrolled bringing the total

---

[7] "State and County Estimates of DACA-Eligible Populations," Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

0227

DACA-eligible population to 28,700. The population that is eligible but not enrolled contributes $5.4 million in state and $5 million in local taxes. Altogether, the total DACA-eligible population in Santa Clara County contributes $20.2 million in state and $17.4 million in local taxes.

b. In Maine, approximately 40 residents are currently enrolled in DACA. They contribute over $67,600 in state and local taxes. An additional 60 residents are eligible for but not enrolled in DACA. They contribute over $41,100 bringing the total contributions of the 100 DACA-eligible Maine residents to over $108,700 in state and local taxes annually. If DACA protections were lost, their contributions would decrease by $40,300 to $68,400.

i. Those currently enrolled in DACA contribute $32,000 in sales and excise taxes. Those eligible but not enrolled contribute an additional $26,000 in sales and excise taxes bringing the total sales and excise tax contributions of Maine's DACA-eligible population to $58,000.

ii. Those currently enrolled in DACA contribute $23,000 in state personal income taxes. Those eligible but not enrolled contribute an additional $5,000 in personal income taxes bringing the total personal income tax contributions of Maine's DACA-eligible population to $28,000.

iii. Those currently enrolled in DACA contribute $11,000 in property taxes. Those eligible but not enrolled contribute an additional $9,000 in property taxes bringing the total property tax contributions of Maine's DACA-eligible population to $20,000.

c. In Maryland, approximately 8,100 residents are currently enrolled in DACA. They contribute $18.1 million in state and local taxes. An additional 15,900 residents are eligible for but not enrolled in DACA. They contribute $15.5 million bringing the total contributions of the 24,000 DACA-eligible Maryland residents to $33.6 million in state and local taxes annually. If DACA protections were lost, their contributions would

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0228

decrease by $10.3 million to $23.3 million.

   i.  Those currently enrolled in DACA contribute $7.5 million in sales and excise taxes. Those eligible but not enrolled contribute an additional $8.5 million in sales and excise taxes bringing the total sales and excise tax contributions of Maryland's DACA-eligible population to $16 million in sales and excise taxes.

   ii.  Those currently enrolled in DACA contribute $7.4 million in state income taxes. Those eligible but not enrolled contribute an additional $2.3 million in income taxes bringing the total state income tax contributions of Maryland's DACA-eligible population to $9.7 million.

   iii.  Those currently enrolled in DACA contribute $3.2 million in property taxes. Those eligible but not enrolled contribute an additional $4.4 million in property taxes bringing the total property tax contributions of Maryland's DACA-eligible population to $7.6 million.

d.  In Minnesota, approximately 5,550 residents are currently enrolled in DACA. They contribute $10.8 million in state and local taxes. An additional 4,500 residents are eligible for but not enrolled in DACA. They contribute $3.3 million bringing the total contributions of the 10,000 DACA-eligible residents to $14.1 million in state and local taxes annually. If DACA protections were lost, their contributions would decrease by $6.8 million to $7.3 million.

   i.  Those currently enrolled in DACA contribute $5.5 million in sales and excise taxes. Those eligible but not enrolled contribute an additional $2 million bringing the total sales and excise tax contributions of Minnesota's DACA-eligible population to $7.5 million.

   ii.  Those currently enrolled in DACA contribute $3.5 million in state income taxes. Those eligible but not enrolled contribute an additional $640,000 bringing the total state income tax contributions of Minnesota's DACA-eligible population to $4.1 million.

iii. Those currently enrolled in DACA contribute $1.8 million in property taxes. Those eligible but not enrolled contribute an additional $671,000 bringing the total property tax contributions of Minnesota's DACA-eligible population to just under $2.5 million.

14. For all the foregoing reasons, in our professional opinions, rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by at least half. This would hamper state and local revenues and hurt their economies.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Executed on October 26, 2017, at Washington, DC.

_____

Alan Essig

_____

Meg Wiehe

_____

Misha Hill

10

0230

# EXHIBIT A

**Alan Essig**
5914 Highgate Avenue
East Lansing, Michigan 48823
770-402-4630
aessig1959@gmail.com

## WORK EXPERIENCE

**Executive Director**                                                                 **2017-Present**
Institute on Taxation and Economic Policy

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan research organization that provides timely, in-depth analyses on the effects of federal, state, and local tax policies. Responsibilities include building and managing an annual budget of over $1.8 million and a staff of twelve, including analysts, communication staff, and administrative staff.

**Principal**                                                                                     **2016-2017**
Essig Gehl Consulting

Essig Gehl Consulting worked with non-profits to maximize their policy and advocacy impact through high-quality policy research and effective advocacy strategies. Responsibilities included the research and writing of policy reports as well as developing educational materials for a public education campaign.

**Executive Director**                                                                          **2015**
Michigan Consumers for Healthcare

Michigan Consumers for Healthcare (MCH) was a nonprofit organization with a statewide mission focused on making affordable, quality healthcare a reality for all in Michigan. Upon taking over leadership of MCH it became apparent that the organization was not financially viable. Working with the Board of Directors, and to save the underlying mission of MCH, it was decided to merge MCH with an organization (Michigan League for Public Policy (MLPP)) with a similar mission and a stronger financial base. Working with the Executive Director and board of MLPP and the board of MCH, the merger was successfully completed by January 1, 2016.

**Founding Executive Director**                                                        **2004-2015**
Georgia Budget and Policy Institute

The Georgia Budget and Policy Institute (GBPI) is an independent, nonprofit, nonpartisan organization that engages in research and education on the fiscal and economic health of the state of Georgia. GBPI studies tax and budget issues with an emphasis on the impact on low and moderate income Georgians. Areas of policy focus include healthcare (Medicaid, public health, implementation of Affordable Care Act), education (early childhood, K-12, higher education), anti-poverty and social safety net, economic development, and tax policy.
Responsibilities included building and managing an annual budget of over $1 million and a staff

of ten, including policy analysts, communication staff, development staff, and administrative staff.

Specific responsibilities included:

- Establishment of GBPI's research priorities and agenda.
- Researched and wrote policy reports and briefs concerning overall tax and budget policy.
- Oversaw organizational development and strategic planning, including capacity building.
- Worked with Development Director and appropriate Board committee to craft GBPI's long-term and annual development plan. Cultivated relationships with foundation representatives and other major donors, including foundations, corporations, and individuals.
- Write and delivered speeches and presentations in various venues, as well as represented GBPI at conferences and other relevant functions.
- In conjunction with Communications Director, implemented communications strategic plan by serving as main press spokesperson for organization and writing Op-Ed's and blogs.
- Built and maintained relationships with various politicians, policymakers, opinion leaders, and others involved in the legislative process. Wrote and presented legislative analysis, critique, and testimony.
- Built and maintained relationships with advocacy partner organizations, as well as coalitions.
- Ensured effective involvement of Board of Directors and brought appropriate matters before the Board for input, review, and/or approval.

**Senior Research Associate**                                                              **2000-2004**
Georgia State University
Andrew Young School of Policy Studies
Fiscal Research Center

Researched and prepared public policy research reports and briefs in regards to taxes, state budget policy and process, economic development, Medicaid and other social welfare issues.

**Committee Aide**                                                                              **2003**
Georgia House of Representatives Appropriations Committee

During 4-month legislative session was loaned as staff to Georgia House of Representatives. Responsibilities included advising Speaker and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with emphasis on the Department of Community Health and the Department of Human Resources.

**Deputy Policy Director**                                                              **2001-2002**
Office of the Governor
State of Georgia

As loaned senior staff to the Governor, helped formulate policy in the areas of health and human services,  including child welfare, public health, mental health, developmental disabilities, aging, Medicaid, economic development, taxes, and technology.  Provided oversight to the Departments of Human Resources, Community Health, Industry Trade and Tourism, Community Affairs, Labor, and the Georgia Technology Authority.

**Committee Aide**                                                    **2000 and 2001**
Georgia State Senate Appropriations Committee

During 4 month legislative session in 2000 and 2001 was loaned as staff to Georgia State Senate. Responsibilities included advising Lt. Governor and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with a specific emphasis on the Department of Community Health and the Department of Human Resources.

**Assistant Commissioner**                                           **1997-1999**
Office of Policy and Government Services
Georgia Department of Human Resources (DHR)

The Office of Policy and Government Services consists of the Office of Communications, Office of Fraud and Abuse, Office of Legal Services, and Office of Constituent Services and Intergovernmental Relations. Provided overall supervision to directors of the Offices and responsible for over 120 employees.

Legislative liaison to Georgia General Assembly and managed DHR legislation. Worked with the Commissioner and Division Directors to define the Department's position on legislation. Represented DHR with legislators and at legislative committee meetings. Liaison for DHR with Governor's Office on policy and legislative matters.

Assisted the Commissioner on policy related areas. Identified the issues involved for each policy area and worked on strategies to resolve the issues.

**Director, Deputy Director and Policy Analyst**                     **1993 -1997**
Georgia State Senate Research Office

Deputy Director (1996 - 1997) assisted the Director in the day to day operations of the office and staffed the Appropriations Committee.

Director during the 1996 legislative session, responsible for the day to day operations of office with staff of 10, and staffed the Appropriations Committee.

Policy Analyst (1993 - 1995) conducted research and analysis for the following committees: Appropriations, Finance and Public Utilities, and Retirement. Advised the Lieutenant Governor and the Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget.

**Deputy Director**                                                  **1995**
Budgetary Responsibility Oversight Committee (BROC)

Asked by Lieutenant Governor to serve in the newly created BROC office. BROC was created to assist the Governor's Office of Planning and Budget and the Department of Audits in the performance of legislatively required program and policy evaluations. Assisted the Director in hiring of initial staff and organizing initial evaluation projects.

**Operations Analyst**                                                   1989 - 1993
Georgia Department of Labor

Performed evaluations of the effectiveness of programs funded under the Job Training
Partnership Act including program design, program participation, coordination of services and
impact of program policy. Designed mechanism to analyze state's return on investment for job
training programs, created internal tracking system used to monitor job training programs, and
managed ongoing $2.5 million contract for survey research.

**Policy Consultant**                                                          1991
Governor's Commission on Effectiveness and Economy in Government

Selected by the Commissioner of the Department of Labor to comply with the Governor's
directive to serve on the Governor's Commission as Policy Consultant for the Economic
Development Task Force. Recommended organizational and policy changes to save over $2
million, provided implementation plan to reorganize the Governor's Economic Development
Council, and provided analytical and administrative support to task force.

**Legislative Budget Analyst**                                           1986 - 1989
New York State Senate Finance Committee (Minority Staff)

Analyzed budgetary and legislative issues for the New York State Departments of Labor, Civil
Service, Economic Development and the Public Employees' Pension System. Analyzed the New
York City budget and made recommendations to Senate Minority Leader regarding state aid and
tax issues affecting New York City. Assisted Senators and staff on agency appropriations, grants
in aid, and state and federal legislation.


## EDUCATION

**Masters of Public Administration**                                          1985
Rockefeller College of Public Affairs and Policy
State University of New York at Albany
Major: Public Management

**Bachelor of Arts**                                                          1981
State University of New York at Buffalo
Major: History

## AWARDS

Named one of the 100 Most Influential Georgians by *Georgia Trend Magazine* in 2011, 2012,
2013, and 2014.

# EXHIBIT B

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 ● megwiehe@gmail.com

## EDUCATION

Maxwell School of Syracuse University, *Masters of Public Administration, June 2006*

University of Virginia, *Bachelor of Arts, Anthropology, May 1998. Graduated with High Distinction*

## WORK EXPERIENCE

Institute on Taxation and Economic Policy (ITEP)                                      Durham, NC/Washington, DC
*Deputy Director (2016-present): State Tax Policy Director (2010-2016t)*

- Responsible for planning, managing, and **implementing ITEP's state** and federal tax policy programmatic work. This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- **Serve as a spokesperson for ITEP, elevating the organization's** profile through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform. Co-author **on ITEP's flagship report,** *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

North Carolina Justice Center                                                                            Raleigh, NC
*Senior Policy Analyst/Outreach Director: NC Budget and Tax Center (2006-2010)*
- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

Boston Museum Project                                                                                      Boston, MA
*Special Projects Coordinator/Project Coordinator (2002-2005)*
- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

MASSPIRG                                                                                      Amherst and Boston, MA
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*
- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives
*Mass Student PIRG Campus Organizer (1998-2000)*
- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

**0237**

# EXHIBIT C

# Misha E. Hill

| (C) 609.234.5931 | 804 Green St., Apt D-2, Durham, NC 27701 | hill.misha@gmail.com |

## EDUCATION

**Master of Public Policy Candidate,** concentration in Health Policy                                    May 2016
*The George Washington University* | Washington, DC
- ❖ Women's Leadership Fellow: A highly selective leadership program

**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts                  May 2010
*University of Pennsylvania* | Philadelphia, PA
- ❖ Academic Research: Critical analysis of Spanish literature

## POLICY RESEARCH EXPERIENCE

**State Policy Fellow**                                                                          Sept 2016—Present
*Institute on Taxation and Economic Policy* | Durham, NC
- ❖ Drafted blog posts on various state tax policy issues including taxes paid by undocumented immigrants, soda taxes, and state budgets
- ❖ Researched and drafted reports in collaboration with senior staff on various state policy issues including taxes paid by undocumented immigrants and soda taxes
- ❖ Analyzed existing and proposed state tax policies
- ❖ Tracked state legislative action related to tax policies

**Family Income Support Research Assistant**                                                    Nov 2015—Sept 2016
*Center on Budget and Policy Priorities* | Washington, DC
- ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related to TANF policies
- ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from HHS and state agencies to inform internal analyses and future work
- ❖ Tracked state and federal legislative action related to income support programs

**Women's Health Policy Internship**                                                            Jun 2015—Aug 2015
*The Henry J. Kaiser Family Foundation* | Washington, DC
- ❖ Peter G. Peterson Foundation Fiscal Policy Intern
- ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
- ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US

**Family Income Support Internship**                                                            Sep 2014—May 2015
*Center on Budget and Policy Priorities* | Washington, DC
- ❖ Co-authored a report on state General Assistance programs and updated background research
- ❖ Drafted briefs for an advocacy tool kit distributed to 80 participants at a conference on expanding TANF work programs
- ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
- ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for CBPP website used by advocates, experts, and civil society
- ❖ Monitored and summarized media on state and federal legislative and policy changes to income support programs
- ❖ Performed literature reviews of prior research related to various income support strategies

## LANGUAGES AND TECHNOLOGY SKILLS

**Language:** Spanish, Fluent in written and oral
**Technology:** SPSS and STATA (academic training), Adobe Illustrator, WordPress, MailChimp, and The Raiser's Edge

# DEF-INTERV.

# EX. 33

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

    XAVIER BECERRA
    Attorney General of California
    MICHAEL L. NEWMAN
    Supervising Deputy Attorney General
    JAMES F. ZAHRADKA II (SBN 196822)
    1515 Clay Street, 20th Floor
    P.O. Box 70550
    Oakland, CA 94612-0550
    Telephone: (510) 879-1247
    Email: James.Zahradka@doj.ca.gov
    *Attorneys for Plaintiff State of California*

    JOSEPH W. COTCHETT (SBN 36324)
    NANCY L. FINEMAN (SBN 124870)
    COTCHETT, PITRE & McCARTHY, LLP
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
    Email: nfineman@cpmlegal.com
    *Attorneys for Plaintiff City of San Jose*

    JONATHAN WEISSGLASS (SBN 185008)
    STACEY M. LEYTON (SBN 203827)
    ERIC P. BROWN (SBN 284245)
    ALTSHULER BERZON LLP
    177 Post Street, Suite 300
    San Francisco, CA 94108
    Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
    Email: jweissglass@altber.com
    *Attorneys for Plaintiffs County of Santa Clara and*
    *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF LISA M. GONZALES** |

0349

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

                Plaintiffs,

           v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

                Defendants.

CASE NO. 17-CV-05813-WHA

I, Lisa M. Gonzales, declare:

1.  I am the Assistant Superintendent of Educational Services at Dublin Unified School District, and my prior experience includes working as a superintendent, principal, and math/science teacher. I am also currently the President of the Association of California School Administrators (ACSA), and in that capacity I have had the opportunity to speak with educators around the State of California regarding the impact of the federal government's decision to terminate the Deferred Action for Childhood Arrivals (DACA) program. I am providing this declaration in my individual capacity based on my personal knowledge and experience, which includes conversations with students, parents and educators around the state.

2.  One of the responsibilities of my current job is to create the best possible teaching and learning environment for all the students and staff at Dublin USD. Although there are many factors involved in creating an optimal learning environment, without question schools must be considered safe places where students and parents feel welcome. In California, one of the ways we ensure that students feel safe and are ready to learn is that we promise them that the simple act of coming to school will not expose them or their families to federal immigration enforcement action. This is not a matter of taking a position on immigration policy, it is a basic necessity for a school environment where all students can learn and thrive.

3.  My understanding is that the point of the DACA program is to provide security and stability for the "Dreamers," young people who were brought to this country as children and who have demonstrated they will be productive contributors to our society by succeeding in school and in the workforce. Dreamers include college students and young working adults, but within the K-12 public school system they also include high school students, teachers and other school staff, and the parents of our students. As school officials we do not ask our students or parents about their federal immigration status, and do not always know which students and parents are in the DACA program. But we are keenly aware of the school environment in all of our schools, including those serving largely immigrant populations.

0352

4. Since the beginning of this year, I have noticed an increasing amount of uncertainty and fear among students, parents and staff due to statements and actions by federal officials related to immigration policy. From my perspective, there appears to be a cumulative impact of the threat that many members of our community may face deportation, followed by announcements that the federal government would retaliate against state and local entities that declare themselves "sanctuary" jurisdictions, and now the decision to terminate the DACA program.

5. I am aware of many examples of harm to students, parents and staff from the general actions of the federal government related to immigration enforcement, threatening statements of federal officials, and more specifically, from the decision to terminate the DACA program. Most of the information I have gathered is from fellow educators from different regions of the state who, like me, are constantly interacting with students, parents and staff in our schools. The common denominator in these stories is that many California students are effectively being denied an education because threats to their security, and the security of their peers and families, have stolen their hope for the future and left them unwilling or unable to continue to engage and thrive in school.

6. For example, a colleague and superintendent from Monterey County, has collected some heartbreaking stories about students, former students, parents and teachers who are in the DACA program. One Dreamer comes from a family in severe poverty and has worked to help support the family while attending high school. She was recently accepted to the University of California and wants to study medicine and, given her 4.1 GPA, tenacity and work ethic, she was poised to succeed. The announcement that DACA will be terminated has left her feeling abandoned and she has fallen into depression. Her grades are falling and she is afraid to commit to a future that may no longer be available for her.

7. Another student in high school in Salinas, California, dreams of joining the Air Force and studying electronics. A local teacher describes him as a passionate patriot who wants to serve this country, the only country he has ever known. She believes the DACA decision could make or break this young man, and potentially deprive our armed forces of an amazing and intelligent talent.

0353

8.     I was provided details of an interview with a parent who, for obvious reasons, wished to remain anonymous.  She came to the United States 13 years ago and has three children in the public school system; the eldest is a citizen and the other two are in the DACA program.  Although her youngest son has been a straight "A" student and hopes to go to college to study the sciences, his future is now uncertain, his grades are falling, and he has withdrawn from his family and friends.

9.     Finally, a principal of a middle school in Riverside County told me that she reviewed the parent sign-in sheets from parent-teacher conferences that were conducted just a couple weeks ago, and found she had 67% less parent participation compared to last year.  She also discussed a major drop in parents attending the school's English-Learner Advisory Council, with monthly meetings that used to average about 130 parents down to only 20 to 30 parents during the last two months.  She noted that many of the families that do still attend school events are no longer willing to sign-in, and have spoken to her about concerns regarding their safety going to and from school events.  I heard a similar account from an elementary school principal in Yolo County.

10.     These stories are just a few illustrations of the broad and harmful impact of the termination of DACA on students and parents.  Students are showing increased anxiety and fear, decreased engagement and attendance, increased behavioral issues, and a general disillusionment and lack of motivation to complete school and/or continue to progress toward their former goals of attending college or joining the workforce.  Parents are no longer participating in classroom and school activities, sometimes not even enrolling their children in free and reduced lunch programs.  Many of the students and parents are afraid that their families will be separated in the process of deportation.

11.     Many California students attend schools serving largely immigrant populations.  But it is important to note that the deteriorating school environment impacts all of our students, not just those threatened by the elimination of DACA.  An optimal teaching and learning environment requires a vibrant and diverse community of students, parents and staff.  Targeting some members of the community for exclusion harms the entire community.  As an educator, I know that we must restore a

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  healthy school environment for all our kids if we hope to ensure our social, economic and political

2  future.

3       I declare under penalty of perjury under the laws of the United States that the foregoing is true

4  and correct.

5       Executed on October 26, 2017, at Alameda County, California.

6

7

8                                         Lisa M. Gonzales

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0355

# DEF-INTERV.

# EX. 34

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF JENS HAINMUELLER AND DUNCAN LAWRENCE** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |

| | |
|---|---|
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF JENS HAINMUELLER AND DUNCAN LAWRENCE
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>       Defendants. | CASE NO. 17-CV-05813-WHA |

0463

1     We, Jens Hainmueller and Duncan Lawrence, declare and state as follows:

2     1.    Jens Hainmueller is a Professor of Political Science and Faculty Co-director of the

3 Immigration Policy Lab ("IPL") at Stanford University, Stanford, California. Duncan Lawrence is the

4 Executive Director of IPL. We write this declaration in our personal capacity as experts in support of

5 all Plaintiffs in the related lawsuits regarding the Deferred Action for Childhood Arrivals program,

6 commonly known as DACA.

7     a.  Jens Hainmueller is a Professor of Political Science at Stanford University and is

8     the Co-founder and Faculty Co-director of IPL. Mr. Hainmueller received his

9     PhD from Harvard University and also studied at the London School of

10     Economics, Brown University, and the University of Tübingen. Before joining

11     Stanford, he served on the faculty of the Massachusetts Institute of Technology.

12     He has published more than 40 articles in peer-reviewed journals. A copy of his

13     curriculum vitae is attached (Exhibit A).

14     b.  Duncan Lawrence is the Executive Director of IPL. Mr. Lawrence received his

15     PhD in political science from the University of Colorado Boulder, and has

16     published several peer-reviewed articles on immigration. A copy of his

17     curriculum vitae is attached (Exhibit B).

18     2.    In 2017, we (along with other colleagues) co-authored a peer-reviewed study about the

19 intergenerational effects of parental immigration status on children's health. This study was

20 published in *Science*, and a copy is attached to this declaration (Exhibit C).

21     3.    Our study focused on the Deferred Action Deferred Action for Childhood Arrivals

22 (DACA) program, which is one of the most extensive policies directed toward unauthorized

23 immigrants in recent decades. It builds on prior studies that have found that DACA is related to

24 higher rates of employment and improved health outcomes.

25     4.    Our study used data from Emergency Medicaid, a government program that provides

26 coverage for emergencies and labor and delivery services for low-income individuals who are not

27 eligible for Medicaid. The program serves unauthorized immigrants and lawful permanent residents

28 with less than 5 years of residency. Estimates from states such as California indicate that 90 to 99%

of Emergency Medicaid recipients are unauthorized immigrants. In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits (if meeting all requirements) and can be tracked with Medicaid claims data. We limited our sample to children whose mothers were under age 31 as of June 15, 2012—a date tied to the DACA eligibility criterion announced when DACA was adopted on June 15, 2012. Our data did not reflect whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children.

5. Using this sampling criteria, we used Medicaid claims data from Oregon to identify 5,653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8,610 children between 2003 and 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015.

6. Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well-being could have improved. Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs. Our main child outcome is a broad measure of any diagnoses of adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300:

a. Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in

DECLARATION OF JENS HAINMUELLER AND DUNCAN LAWRENCE
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
5

0465

1                 important areas of functioning, such as social activities, school performance, and

2                 sleep.

3         b.     Acute stress disorder can be a precursor to a diagnosis of a more lasting

4                 posttraumatic stress disorder (included in the ICD-9 category 309, adjustment

5                 disorder). It is characterized by symptoms or behaviors similar to those that arise

6                 from exposure to a traumatic or stressful event, but acute stress disorders cannot (by

7                 definition) last longer than 1 month.

8         c.     Anxiety disorders are characterized by excessive fear, anxiety, and related

9                 behavioral disturbances that can lead to substantial distress or impairment. An

10                external stressor might not be clearly identified, and anxiety disorders can be caused

11                by environmental, genetic, or physiological factors.

12 These mental health disorders in childhood are associated with considerable developmental,

13 psychosocial, and psycho-pathological complications for children and their families.

14      7.     We found that mothers' eligibility for DACA protection led to a significant improvement

15 in their children's mental health. Specifically, Mothers' DACA eligibility reduced adjustment and

16 anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate

17 of 7.9% among children of ineligible mothers at the threshold. This reduction represents more than a

18 50% drop in the rate of these disorders (albeit with a wide 95% confidence interval (CI) for the

19 magnitude of the estimated effect) and provides evidence that mothers' DACA eligibility sharply

20 improved their children's mental health.

21      8.     The causal link between parental DACA eligibility and positive child mental health

22 outcomes is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore,

23 children of ineligible mothers born just before the birthdate cutoff should be similar in all respects,

24 including in possible confounding characteristics, to children of DACA-eligible mothers born just

25 after the cutoff. We corroborated this continuity assumption by testing for differences in the

26 prevalence of disorder diagnoses in the children during a similar time period pre-DACA (2003 to

27 quarter 2, 2012) and at the cutoff date. We confirmed that there were no discernible difference in the

28 prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period. The difference in

1   diagnosis rates at the cutoff was a statistically insignificant 0.4 percentage points. All our tests

2   suggested that we can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

3       9.  We also confirmed that there were no discernible differences in diagnoses at the same

4   birthdate cutoff among children of mothers who were covered by standard Medicaid at the time they

5   gave birth. These mothers should not be affected by DACA eligibility, given that standard Medicaid

6   in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents. This

7   check again underscores that, in the absence of changes in DACA eligibility, there is no evidence of

8   confounders associated with having a mother who is born just before or after the cutoff date that

9   could explain the observed post-DACA difference in child mental health outcomes.

10      10.  Because health care utilization could be affected by immigration status, we also checked

11  for the possibility that the drop in diagnoses reflects a DACA-induced change in health care visits,

12  which could affect the probability of detection of mental health disorders. We found no support for

13  this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization

14  during the post-DACA period, as measured either by the total number of visits, the number of

15  emergency room (ER) and urgent care visits, or the number of outpatient visits. Consistent with this,

16  in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child

17  mental health were similar when we restricted the sample to children who had at least one health care

18  visit in the post-DACA period.

19      11.  Our results provide causal evidence supporting the theory that parental unauthorized

20  immigration status has important intergenerational effects on the well-being and development of

21  children in immigrant families. Protecting unauthorized immigrants from deportation led to

22  immediate and sizable improvements in the mental health of their U.S. citizen children. This

23  suggests that parents' unauthorized status is a substantial stressor that stymies normal child

24  development and perpetuates health inequalities by transferring parental disadvantages to children.

25      12.  Our findings have important implications for immigration and health care policy. Prior

26  research has suggested that early childhood exposure to stress and adversity does not only cause poor

27  health and impaired development in the short term; the issues can also persist into adulthood.

28  Anxiety and psychosocial stress have been identified as risk factors for depression, substance abuse,

cardiovascular diseases, and obesity. Treatment of mental disorders also carries considerable economic costs. Prior research indicates that they account for the highest total health care expenditures of all children's medical conditions and that they are associated with poor long-term outcomes for school performance and welfare reliance. By reducing mental health problems, deferred action can therefore have important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

13. Conversely, the termination of DACA is likely to erode the mental health gains we measured and lead to corresponding economic and public health costs in both the short-term and long term.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 23, 2017 in Stanford, California.

_____
JENS HAINMUELLER

_____
DUNCAN LAWRENCE

# EXHIBIT A

# Curriculum Vitae

## Jens Hainmueller

**Office**:

Department of Political Science, Stanford University, Encina Hall West, Room 440, 616 Serra Street, Stanford, CA 94305-6044
jhain@stanford.edu, http://www.stanford.edu/∼jhain

**Current Positions**
Full Professor, Department of Political Science, Stanford University, 2016-present.
Full Professor (by courtesy), Graduate School of Business, Stanford University, 2016-present

**Academic Affiliations**
Founder and Faculty Co-Director, Stanford Immigration Policy Lab, 2014-present
Faculty Associate, Institute for Quantitative Social Science, Harvard University, 2009-present
Faculty Fellow, WZB Berlin Social Research Center, 2013-15
Faculty Fellow, Centre for Research and Analysis of Migration, University College London, 2013-present
Faculty Affiliate, Stanford Europe Center, 2014-present
Faculty Affiliate, Stanford Center for Comparative Studies in Race and Ethnicity, 2015-present
Member, Experiments on Governance and Politics (EGAP)

**Previous Positions**
Associate Professor, Department of Political Science, Stanford University, 2014-2016.
Associate Professor (by courtesy), Graduate School of Business, Stanford University, 2014-2016.
Associate Professor, Department of Political Science, Massachusetts Institute of Technology, 2012-2013.
Assistant Professor, Department of Political Science, Massachusetts Institute of Technology, 2009–2012.

**Education**
Ph.D., Government, Harvard University, 2009.
M.P.A., Master of Public Administration, Harvard University, Kennedy School of Government, 2005.
M.Sc., International Political Economy (with Distinction), London School of Economics, 2003.
DAAD Research Fellow, Political Science Department, Brown University, 2001–2002.
B.A., *Zwischenprüfung* (Summa Cum Laude), Tübingen University, 2001.

**Impact Factor**
Google Scholar Citations: 6,248
Google Scholar h-index: 29
Google Scholar i10-index: 47

**Selected Awards and Honors**
*Andrew Carnegie Fellow* 2016-2017. Awarded by the Carnegie Corporation of New York to the country?s most creative thinkers to support research on challenges to democracy and international order.
*Halbert White Info-Metrics Prize* 2016. Awarded by the Info-Metrics Institute for scholars across disciplines who have creatively used info-metrics methods in their respective disciplines, with the potential for significant impact in those disciplines.
*Warren Miller Prize* 2015. Awarded by the Society of Political Methodology for the best work appearing in *Political Analysis* the preceding year.
*Emerging Scholar Award* 2014. Awarded by the Society for Political Methodology to honor a researcher, within ten years of their PhD, who is making notable contributions to the field of political methodology.
*Political Analysis Editors' Choice Award* 2014. Given to papers that the Editors see as providing an especially significant contribution to political methodology.
*Warren Miller Prize* 2013. Awarded by the Society of Political Methodology for the best work appearing in *Political Analysis* the preceding year.
*Best Paper on the study of elections, public opinion, and voting behavior* 2013. Awarded by the American Political Science Association.
*Best Paper on the study of labor in politics* 2012. Awarded by the American Political Science Association.

0470

*Robert H. Durr Award* 2012 awarded by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science.

*Senator Charles Sumner Prize* 2009. Awarded by Harvard faculty for the best dissertation from the legal, political, historical, economic, social, or ethnic approach.

*Robert H. Durr Award* 2008 awarded by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science.

*Gosnell Prize for Excellence in Political Methodology* 2007. Awarded by the Society of Political Methodology for the best work in political methodology presented at any political science conference during the preceding year.

## Publications

*Peer Reviewed Articles*

43. "Protecting Unauthorized Immigrant Mothers Improves their Children's Mental Health" (with D. Lawrence, L. Martén, B. Black, L. Figueroa, M. Hotard, T. Jiménez, F. Mendoza, M. Rodriguez, J. Swartz, D. Laitin. *Science*. doi.org/10.1126/science.aan5893

42. "The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments" (with K. Bansak, D. Hopkins, and T. Yamamoto). *Political Analysis*. (forthcoming).

41. "Expanding prenatal care to unauthorized immigrant women and the effects on infant health" (with J. Swartz, D. Lawrence, and M. Rodriguez). *Obstetrics & Gynecology*. (forthcoming).

40. "Europeans Would Support a Proportional Allocation of Asylum Seekers" (with K. Bansak and D. Hangartner). *Nature Human Behaviour*. doi:10.1038/s41562-017-0133.

39. "Providing driver's licenses to unauthorized immigrants in California improves traffic safety" (with D. Lawrence and H. Lueders). *Proceedings of the National Academy of Sciences*. doi: 10.1073/pnas.1618991114.

38. "Policy Design and Domestic Support for International Bailouts" (with M. Bechtel and Y. Margalit). *European Journal of Political Research*. 10.1111/1475-6765.12210.

37. "How Economic, Humanitarian, and Religious Concerns Shape European Attitudes toward Asylum-Seekers'" (with K. Bansak and D. Hangartner). *Science*. doi: 10.1126/science.aag2147.

36. "When lives are put on hold: Lengthy asylum processes decrease employment among refugees" (with D. Hangartner and D. Lawrence). *Science Advances*. 2(8), e1600432.

35. "Catalyst or Crown: Does Naturalization Promote the Long-Term Social Integration of Immigrants?" (with D. Hangartner and G. Pietrantuono). *American Political Science Review*. pp. 1-21. doi: 10.1017/S0003055416000745.

34. "krls: A Stata Package for Kernel-Based Regularized Least Squares" (with J. Ferwerda and C. Hazlett). *Journal of Statistical Software*. doi: 10.18637/jss.v079.i03.

33. "Naturalization fosters the long-term political integration of immigrants" (with D. Hangartner and G. Pietrantuono). *Proceedings of the National Academy of Sciences*. doi: 10.1073/pnas.1418794112.

32. "Does Lean Improve Labor Standards? Management and Social Performance in the Nike Supply Chain" (with Distelhorst, G. and R. Locke). *Management Science*. doi: http://dx.doi.org/10.1287/mnsc.2015.2369.

31. "Do Lower Caseloads Improve the Performance of Public Employment Services? New Evidence from German Employment Offices" (with B. Hofmann, G. Krug, and K. Wolf). *Scandinavian Journal of Economics*. doi: 10.1111/sjoe.12166

30. "'Does Direct Democracy Hurt Immigrant Minorities? Evidence from Naturalization Decisions in Switzerland" (with D. Hangartner). *American Journal of Political Science*. (Forthcoming 2015).

29. "'Validating vignette and conjoint survey experiments against real-world behavior" (with D. Hangartner and T. Yamamoto). *Proceedings of the National Academy of Sciences*. 112 (8): 2395-2400. 2015.

28. "'Assessing the External Validity of Election RD Estimates: An Investigation of the Incumbency Advantage" (with A. Hall and J. Snyder). *Journal of Politics*. 77(3): 707-720. 2015.

27. "'Do Concerns about Labour Market Competition Shape Attitudes Toward Immigration? New Evidence from U.S. Workers" (with M. Hiscox and Y. Margalit). *Journal of International Economics*. 97: 193-207. 2015.

26. "'The Hidden American Immigration Consensus: A Conjoint Analysis of Attitudes Toward Immigrants" (with D. Hopkins). *American Journal of Political Science*. 59(3): 529-548. 2015. Winner of the American Political Science Association's Best Paper Award for the study of Elections, Public Opinion, and Voting Behavior.

25. "'On the Validity of the Regression Discontinuity Design for Estimating Electoral Effects: New Evidence from Over 40,000 Close Races" (with A. Eggers, A. Fowler, A. Hall, and J. Snyder). *American Journal of Political Science*. 59 (1): 259-274. 2015.

24. "Consumer Demand for the Fair Trade Label: Evidence from a Field Experiment" (with M. Hiscox and S. Sequeira). *Review of Economics and Statistics*. 97(2): 242-256. 2015.

23. "'Reality Bites: The Limits of Framing Effects for Salient and Contested Policy Issues" (with M. Bechtel, D. Hangartner, and M. Helbling). *Political Science Research and Methods*. 3 (3): 683-695. 2015.

22. "'Comparative Politics and the Synthetic Control Method" (with A. Abadie and A. Diamond). *American Journal of Political Science*. 59 (2): 495-510. 2015.

21. "'Political Capital: Corporate Connections and Stock Investments in the U.S. Congress, 2004-2008" (with A. Eggers). *Quarterly Journal of Political Science*. 9 (2): 169-202. 2014.

20. "'Causal Inference in Conjoint Analysis: Understanding Multi-Dimensional Choices via Stated Preference Experiments" (with D. Hopkins and T. Yamamoto). *Political Analysis*. 22 (1): 1-30. 2014. Winner of the *Editors' Choice Award* given to papers that the Editors see as providing an especially significant contribution to political methodology. Winner of the 2015 Warren Miller Prize for the best work appearing in *Political Analysis* the preceding year.

19. "'Public Attitudes toward Immigration" (with D. Hopkins). *Annual Review of Political Science*. 17: 225-249. 2014

18. "'Kernel Regularized Least Squares: Reducing Misspecification Bias with a Flexible and Interpretable Machine Learning Approach" (with C. Hazlett). *Political Analysis*. 22 (2): 143-168. 2014.

17. "'Preferences for International Redistribution: The Divide Over the Eurozone Bailouts" (with M. Bechtel and Y. Margalit). *American Journal of Political Science*. 58 (4): 835-856. 2014.

16. "'Capitol Losses: The Mediocre Performance of Congressional Stock Portfolios, 2004-2008" (with A. Eggers). *Journal of Politics*. 75(2): 535-551. 2013.

15. "'Who Gets a Swiss Passport? A Natural Experiment in Immigrant Discrimination" (with D. Hangartner). *American Political Science Review*. 107(1): 159-187. 2013. Winner of the Robert H. Durr 2012 award for the best paper applying quantitative methods to a substantive problem in political science.

14. "ebalance: A Stata Package for Entropy Balancing" (with Y. Xu). *Journal of Statistical Software*. 54(7). 2013.

13. "'Entropy Balancing: A Multivariate Reweighting Method to Produce Balanced Samples in Observational Studies" *Political Analysis*. 20 (1): 25-46. 2012. Winner of the 2013 Warren Miller Prize for the best work appearing in *Political Analysis* the preceding year.

12. "'How Lasting is Voter Gratitude? An Analysis of the Short- and Long-term Electoral Returns to Beneficial Policy" (with M. Bechtel). *American Journal of Political Science*. 55 (4): 852-868. 2011.

11. "'Synth: An R Package for Synthetic Control Methods in Comparative Case Studies" (with A. Abadie and A. Diamond). *Journal of Statistical Software*. 42 (13): 1-13. 2011.

10. "'Attitudes toward Highly Skilled and Low Skilled Immigration: Evidence from a Survey Experiment" (with M. Hiscox). *American Political Science Review*. 104 (1): 61-84. 2010.

9. "'MPs for Sale: Estimating Returns to Office in Post-War British Politics" (with A. Eggers). *American Political Science Review.* 103 (4): 513-533. 2009. Winner of the Robert H. Durr 2008 award for the best paper applying quantitative methods to a substantive problem in political science.

8. "'Synthetic Control Methods for Comparative Case Studies of Aggregate Interventions: Estimating the Effect of California's Tobaco Control Program" (with A. Abadie and A. Diamond). *Journal of the American Statistical Association.* 105(490): 493-505. 2010. Winner of the Gosnell Prize for Excellence in Political Methodology. Among JASA's 10 most cited articles in 2009-11.

7. "Opium for the Masses: How Free Foreign Media can Stabilize Authoritarian Regimes" (with H. Kern). *Political Analysis.* 17: 377-399. 2009.

6. "Incumbency as a Source of Spillover Effects in Mixed Electoral Systems: Evidence from a Regression-Discontinuity Design" (with H. Kern). *Electoral Studies.* 27 (2): 213-227. 2008.

5. "Phylogenetic analysis and structural predictions of human adenovirus penton proteins as a basis for tissue-specific adenovirus vector design" (with I. Madisch, S. Hofmayer, C. Moritz, A. Grintzalis, P. Pring-Akerblom, and A. Heim) *Journal of Virology* 81(15): 8270-81. 2007.

4. "Educated Preferences: Explaining Individual Attitudes Toward Immigration in Europe" (with M. Hiscox). *International Organization.* 61(2): 399-442. 2007.

3. "Electoral Balancing, Divided Government, and Midterm Loss in German Elections" (with H. Kern). *Journal of Legislative Studies.* 12 (2): 127-149. 2006.

2. "Learning to Love Globalization: The Effects of Education on Individual Attitudes Toward International Trade" (with M. Hiscox). *International Organization.* 60 (2) 469-498. 2006.

1. "Why do Europeans fly safer? The politics of airport security in Europe and the US" (with M. Lemnitzer). *Terrorism and Political Violence.* 15 (4): 1-36. 2003.

## Book Chapters

B.2 "Voter Attitudes towards High- and Low-Skilled Immigrants: Evidence from Survey Experiments" (with M. Hiscox, reprinted APSR manuscript) in *Immigration and Public Opinion in Liberal Democracies.* G. P. Freeman, R. Hansen, D. L. Leal (eds.). Routledge Research in Comparative Politics. 2012.

B.1 "Wahlkreisarbeit zahlt sich doppelt aus - Zur Wirkung des Amtsinhaberstatus einer Partei auf ihren Zweitstimmenanteil bei den Bundestagswahlen 1949 bis 1998" (with H. Kern und M. Bechtel) in *Jahrbuch für Handlungs- und Entscheidungstheorie.* 11-47. 2006. T. Bräuninger and J. Behnke (eds.). Wiesbaden: Verlag für Sozialwissenschaft.

## Software

S.6 *interflex Package* (with Y. Xu and J. Mummolo). *interflex* is a statistical software that implements multiplicative interaction models with diagnostics and visualization. *interflex* is available as an R library and a Stata routine.

S.5 *Synth Package* (with A. Abadie and A. Diamond). *Synth* is a statistical software that implements synthetic control methods for causal inference in comparative case studies. *Synth* is available as an R library, MATLAB code, and a Stata routine.

S.4 *ebalance Package. ebalance* is a statistical software that implements entropy balancing. *ebalance* is available as an R library and as a Stata routine.

S.3 *KRLS Package* (with C. Hazlett). *KRLS* is a statistical software that implements Kernel Regularized Least Squares. *KRLS* is available as an R library, MATLAB code, and a Stata routine.

S.2 *Conjoint Survey Design Tool* (with A. Strezhnev, D. Hopkins, and T. Yamamoto). The Conjoint Survey Design Tool assists researchers in creating conjoint experiments that can be readily incorporated into pre-existing web survey software.

S.1 *cjoint* (with A. Strezhnev, E. Berwick, D. Hopkins, and T. Yamamoto). The *cjoint* R package implements the Average Marginal Component-specific Effects (AMCE) estimator for conjoint experiments.

**Work in Progress**

*Under Review*

"How Much Should We Trust Estimates from Multiplicative Interaction Models? Simple Tools to Improve Empirical Practice" (with J. Mummolo and Y. Xu)

"The Ideological Basis of the Grexit Debate" (with K. Bansak, M. Bechtel and Y. Margalit). 2015.

"The Socially Conscious Consumer? Field Experimental Tests of Consumer Support for Fair Labor Standards" (with M. Hiscox). 2014. Winner of the American Political Science Association's Labor Project Best Paper award for the best paper on the study of labor in politics.

"Buying Green? Field Experimental Tests of Consumer Support for Environmentalism" (with M. Hiscox). 2014.

**Selected Grants**

Robert Wood Johnson Foundation $70,150. Assessing the fiscal and health consequences of providing prenatal care to undocumented and recently arrived immigrants.

Russell Sage Foundation $109,065. Impact of Undocumented Status.

Ford Foundation $800,000. Core Support Immigration Policy Lab.

Andrew Carnegie Fellow $200,000.

Swiss National Science Foundation, Impact of Asylum Policies on Refugee Integration $280,000.

New York Community Trust $300,000.

Robin Hood Foundation $800,000.

UPS Endowment Fund $60,000.

FSI Policy Implementation Lab Seed Funding $35,000.

Time Sharing Experiments in the Social Sciences, Conjoint Voting Study.

Swiss National Science Foundation, Mass Support for Financial Bailouts $245,000.

Swiss National Science Foundation, Effects of Citizenship Project $200,000.

Russell Sage Foundation, Value of Citizenship Pilot Project $35,000.

WZB Research Grant, Wissenschaftszentrum Berlin EUR 35'000.

Swiss National Science Foundation, Local Xenophobia Project $220,000.

NBER Africa Project $65,000.

Humanity United Foundation, Fair Trade Project $235,000.

Humanity United Foundation, Consumer Demand for Ethical Products $20,000.

**Professional Experience**

Statistical consultant, International Finance Corporation, The World Bank Group.

Statistical consultant, German Federal Labor Market Agency.

Statistical consultant, German Research Institute for Labor Market Policy (IAB).

**Advising Ph.D. Students**

*Main Dissertation Advisor*

Yiqing Xu, Assistant Professor, University of California San Diego (graduated 2015)

Chad Hazlett, Assistant Professor, University of California Los Angeles (graduated 2013)

Mathilde Emeriau, ongoing

Kirk Bansak, ongoing

*Dissertation Committee Member*

Francisco Garfias, Assistant Professor, University of California San Diego (graduated 2016)

Jeremy Ferwerda, Assistant Professor, Dartmouth College (graduated 2015)

Greg Distelhorst, Assistant Professor, Oxford University Said Business School (graduated 2013)

Michael Sances, Assistant Professor, University of Memphis (graduated 2013)

Lucas Puente, Policy Analyst, Thumbtack, Inc (graduated 2015)

Tannis Thorlakson, ongoing

0474

**Teaching**

Political Methodology I: Regression, Stanford

- Autumn 2015-16 (Overall Rating: 4.8 out of 5)
- Autumn 2014-15 (Overall Rating: 4.5 out of 5)

Political Methodology II: Causal Inference, Stanford

- Winter 2015-16 (Overall Rating: 4.7 out of 5)
- Winter 2014-15 (Overall Rating: 4.4 out of 5)
- Spring 2013-14 (Overall Rating: 4.8 out of 5)

Empirical Methods in Political Economy, Fall 2013, MIT

Quantitative Research Methods II: Advanced Empirical Methods, MIT

- Spring 2012 (Overall Rating: 6.9 out of 7)
- Spring 2011 (Overall Rating: 4.7 out of 5)
- Spring 2010 (Overall Rating: 4.9 out of 5)

Quantitative Research Methods I: Regression, MIT

- Fall 2011 (Overall Rating: 6.4 out of 7)
- Fall 2010 (Overall Rating: 4.8 out of 5)
- Fall 2009 (Overall Rating: 4.0 out of 5)

Designing and Implementing Field Experiments, 2012, MIT. Overall rating: 4.8 out of 5.

August, 2017

0475

# EXHIBIT B

# Duncan Lawrence

*Curriculum Vitae*

## Education

2007–2013 **PhD/MA**, *University of Colorado*, Boulder, *CO*.
Political Science

2000–2004 **BA**, *Hamilton College*, Clinton, *NY*.
World Politics

## Professional Experience

2014–Present **Executive Director**, IMMIGRATION POLICY LAB, STANFORD UNIVERSITY, Stanford, CA.

2012–2017 **Co-Founder**, TELLURIDE RESEARCH GROUP, LLC, Denver, CO.

2013–2014 **Associate**, ROCKY MOUNTAIN INSTITUTE, Boulder, CO.

2011–2012 **Graduate Instructor**, UNIVERSITY OF COLORADO, Boulder, CO.

2011 **Research Methods Mentor/Field Survey Coordinator**, UNIVERSITY OF COLORADO, Arequipa, Peru.

2008–2011 **Research Assistant**, UNIVERSITY OF COLORADO, Boulder, CO.

2007–2011 **Teaching Assistant**, UNIVERSITY OF COLORADO, Boulder, CO.

2006–2007 **Medical Interpreter**, EL PUENTE, Jackson, WY.

## Publications

### Peer Reviewed Articles

8. "Expanding Prenatal Care to Unauthorized Immigrant Women and the Effects on Infant Health" (with J. Swartz, J. Hainmueller, and M. Rodriguez) *Obstetrics and Gynecology*. 2017.

7. "Protecting unauthorized immigrant mothers improves their children's mental health" (with J. Hainmueller et al.) *Science*. 2017.

6. "Providing driver's licenses to unauthorized immigrants in California improves traffic safety." (with H. Leuders and J. Hainmueller) *Proceedings of the National Academy of Sciences*. 114(16):4111-4116, 2017.

5. "When lives are put on hold: Lengthy asylum processes decrease employment among refugees." (with D. Hangartner and J. Hainmueller) *Science Advances*, 2(8):e1600432, 2016.

4. "More trees, more poverty? The socioeconomic effects of tree plantations in Chile, 2001–2011." (with K. Andersson, J. Zavaleta, and M. R. Guariguata) *Environmental Management*, 57(1):123–136, 2016.

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361* • ✉ *duncan.lawrence@stanford.edu*
⌂ *www.immigrationlab.org* 1/3

0477

3. "Crossing the cordillera: Immigrant attributes and Chilean attitudes." *Latin American Research Review*, 50(4):154–177, 2015.

2. "Local cohesion and radical right support: The case of the Swiss People's Party." (with J. Fitzgerald) *Electoral Studies*, 30(4):834–847, 2011.

1. "Immigration Attitudes in Latin America: Culture, Economics, and the Catholic Church." *The Latin Americanist*, 55(4), 143-170, 2011.

## Grants

### Co-Principal Investigator

| | |
|---|---|
| 2017 | STANFORD CHILD HEALTH RESEARCH INSTITUTE, $100,000. |
| 2017 | STANFORD CENTER FOR CLINICAL AND TRANSLATIONAL RESEARCH AND EDUCATION, $20,000. |
| 2016 | ROBERT WOOD JOHNSON FOUNDATION - EVIDENCE FOR ACTION, $70,150. |
| 2016 | RUSSELL SAGE FOUNDATION, $109,065. |

### Lab Research/Core Support

| | |
|---|---|
| 2016 | FORD FOUNDATION, $400,000. |
| 2016 | NATIONAL SCIENCE FOUNDATION, $149,978. |
| 2016 | ROBIN HOOD FOUNDATION, $800,000. |
| 2016 | NEW YORK COMMUNITY TRUST, $350,000. |
| 2015 | UPS ENDOWMENT FUND, $60,110. |

## Fellowships

| | |
|---|---|
| 2013 | Fulbright Scholar – Chile |
| 2011 | University of Colorado Department of Recreation Services Graduate Fellowship |
| 2008–2011 | University of Colorado Department of Political Science Summer Research Fellowship |
| 2009 | CARTSS Scholars Grant (co-investigator) |
| 2005 | Fulbright English Teaching Fellowship – Argentina |

## Awards and Honors

| | |
|---|---|
| 2012 | Best Graduate Instructor, Department of Political Science, University of Colorado Boulder |
| 2004 | Phi Beta Kappa Honor Society |
| 2004 | Pi Sigma Alpha Honor Society |
| 2004 | Constantine Karamanlis Award – Outstanding Senior Concentrator in World Politics |
| 200–2004 | Dean's List |

## Teaching Experience

| | |
|---|---|
| Instructor | International Political Economy (2011,2012); Global Development (2012) |

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361* • ✉ *duncan.lawrence@stanford.edu*
🖱 *www.immigrationlab.org* 2/3

0478

| | |
|---|---|
| Teaching Assistant | Comparative Politics (2007–2010); Topics in Political Data Analysis (2010) |
| Experiential Education Instructor | Hamilton College Outdoor Leadership Program (2001–2004); Hulbert Outdoor Center (2004); Wilderness Ventures (2004, 2006) |

## ▬▬▬▬ Skills

| | |
|---|---|
| Intermediate | LaTeX, R, Smartsheets, Asana |
| Advanced | Google Apps, Microsoft Office, Stata, Zotero |

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361* ● ✉ *duncan.lawrence@stanford.edu*
🖥 *www.immigrationlab.org* 3/3

0479

# EXHIBIT C

RESEARCH

Downloaded from http://science.sciencemag.org/ on October 23, 2017

## SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[2,6] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well-being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent-child separations can be harmful to children's health, economic security, and long-term development. Virtually all of these studies have been qualitative or correla-

tional because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference...has been lacking to date in studies of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreign-born, Hispanic, or Spanish-speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2-year (renewable) deferred action status, while also allow-

ing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action through this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low-income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized immigrants (25, 26). In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi-experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

RESEARCH | REPORT



**Fig. 1. Results from applying the regression discontinuity design.** (**Top**) In the post-DACA period (2013 to 2015). children of DACA-eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose mothers' birthdates were within ±150 days of the DACA eligibility cutoff (*n* = 2260). and circles are average diagnosis rates within each 15-day birthdate interval. (**Bottom left**) There was no such difference in children's diagnosis rates in the pre-DACA period (2003 to 2012). (**Bottom right**) There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well-being could have improved (*4*, *6*). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs (*32–34*).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except where otherwise noted, in a preregistered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of

adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300 (*35*).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (*36*, *37*). Acute stress disorder can be a precursor to a diagnosis of a more lasting posttraumatic stress disorder (included in the ICD-9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (*36*). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (*36*).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (*32*). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi-experimental nature of the RD design. The percent of children diagnosed with adjustment or anxiety disorders during the post-DACA period (2013 to 2015) dropped by about 4.5 percentage points (*P* = 0.037; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA-eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre-DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points (*P* = 0.817; local linear regression). Figure 1, bottom right, shows the distribution of *P* values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre-DACA health care utilization (tables S3 and S4). The distribution of *P* values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

0482

Downloaded from http://science.sciencemag.org/ on October 23, 2017

**RESEARCH** | REPORT

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention-to-treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined measure and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birthdates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff (38).

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit with a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked only at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, −0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post-DACA period (fig. S6 and table S8), redefining the post-DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A non-prespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non-prespecified subgroup analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of confounders associated with having a mother who is born just before or after the cutoff date that could explain the observed post-DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status (39), we also checked for the possibility that the drop in diagnoses reflects a DACA-induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post-DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post-DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well-being and development of children in immigrant families (4, 6). Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring parental disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision-makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of unauthorized immigrants' children, most of whom are U.S. citizens (2). Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity (32, 34, 39, 40). Treatment of mental disorders also carries considerable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions (41) and are associated with poor long-term outcomes for school performance and welfare reliance (33, 42). By reducing mental health problems, deferred action has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immigrant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health.** (**Left**) Mothers' DACA eligibility reduced child mental health disorders in the post-DACA period. (**Right**) There were no systematic, preexisting differences in the pre-DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post-DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre-DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

Downloaded from http://science.sciencemag.org/ on October 23, 2017

**RESEARCH** | REPORT

health and well-being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a pathway to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evaluating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an effective way to overcome some of the challenges in collecting systematic data from the unauthorized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that affect unauthorized immigrant parents and that may have health consequences for their children.

## REFERENCES AND NOTES

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez-Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470–477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291–297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348–385 (2011).
8. C. Suárez-Orozco, H. Yoshikawa, R. Teranishi, M. Suárez-Orozco, *Harv. Educ. Rev.* **81**, 438–473 (2011).
9. K. Yun, E. Fuentes-Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913–1921 (2013).
10. T. M. Caballero et al., *Clin. Pediatr.* **6**, 648–658 (2017).
11. F. L. Rivera-Batiz, *J. Popul. Econ.* **12**, 91–116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203–233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258–1268 (2007).
14. H. Yoshikawa, C. Suárez-Orozco, R. G. Gonzales, *J. Res. Adolesc.* **27**, 4–19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO-10-99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329–354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57–67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I-821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012–2016); www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852–1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98–114 (2016).
22. C. Amuedo-Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339–373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175–e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085–1092 (2007).
26. C. H. C. Foundation, *Medi-Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615–635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, C. Wong, *J. Policy Anal. Manage.* **27**, 724–750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 191–208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483–524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517–548 (2010).
34. J. P. Shonkoff et al., *Pediatrics* **129**, e232–e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD-9 categories
300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (posttraumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295–2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056–1067 (2012).
40. K. R. Merikangas et al., *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980–989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0–17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

## ACKNOWLEDGMENTS

This research was funded by a grant from the Russell Sage Foundation (grant no. 93-16-12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design-registrations). The analysis plan is also reprinted in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

## SUPPLEMENTARY MATERIALS

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (43, 44)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893

# DEF-INTERV.

# EX. 35

1    JEFFREY M. DAVIDSON (SBN 248620)
     ALAN BERSIN (SBN 63874)
2    COVINGTON & BURLING LLP
     One Front Street, 35th Floor
3    San Francisco, CA 94111-5356
     Telephone: (415) 591-6000
4    Facsimile: (415) 591-6091
     Email: jdavidson@cov.com,
5    abersin@cov.com
     *Attorneys for Plaintiffs The Regents of the*
6    *University of California and Janet Napolitano, in*
     *her official capacity as President of the*
7    *University of California*

8    THEODORE J. BOUTROUS, JR. (SBN 132099)
     ETHAN D. DETTMER (SBN 196046)
9    JESSE S. GABRIEL (SBN 263137)
     GIBSON, DUNN & CRUTCHER LLP
10   333 South Grand Avenue
     Los Angeles, CA 90071-3197
11   Telephone: (213) 229-7000
     Facsimile: (213) 229-7520
12   Email: tboutrous@gibsondunn.com,
     edettmer@gibsondunn.com,
13   jgabriel@gibsondunn.com
     *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14   *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
     *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15   *Latthivongsakorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF RALPH J. HEXTER** |

0496

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA |

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

             Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

             Defendants.

CASE NO. 17-CV-05813-WHA

0498

I, RALPH J. HEXTER, DECLARE:

1. I graduated *magna cum laude*, with a Bachelor of Arts degree in English and American Languages and Literatures from Harvard College in 1974. I hold a Master of Arts in Classics and Modern Languages from Corpus Christi College, Oxford University, and a Masters of Philosophy and a Ph.D in Comparative Literature from Yale University.

2. I have held various academic positions at Yale University (1981-1991) and the University of Colorado, Boulder (Professor of Classics and Comparative Literature, Director, Graduate Program in Comparative Literature, 1991-1995). At the University of California, Berkeley, I served as Professor of Classics and Comparative Literature (1995-2005), Chair of Comparative Literature (1996-1998), Dean of Humanities (1998-2005) and Executive Dean of the College of Letters and Sciences (2002-2005). I served as President of Hampshire College in Amherst, Massachusetts, from August 2005 through December 2010.

3. Currently, I serve as Provost and Executive Vice Chancellor at the University of California, Davis, a position I took up on January 1, 2011. (Between April 2015 and July 2017, I served as Acting and then Interim Chancellor of the University.) In my capacity as Provost and Executive Vice Chancellor, I have personal knowledge of the facts to which I attest in this declaration. In that role, I have primary responsibility for the academic functioning of the Davis Campus and have many responsibilities related to advancing and maintaining the University's multidimensional academic excellence.

4. The University as a whole, and UC Davis, in particular, are widely cited for excellence across a wide array of disciplines and measures. For example, according to the latest U.S. News & World Report rankings, UC Davis is recognized as a top-10 national university based on contributions to the "public good," defined as social mobility (recruiting and graduating low-income students), research (producing cutting-edge scholarship and Ph.Ds.), and service (encouraging students to give something

back to their country). Moreover, last year, UC Davis was ranked among the top 10 college campuses in the country for providing social and economic mobility to its students.[1]

5. The California Constitution gives the University's Board of Regents "full powers of organization and governance" of the University, subject to only narrow legislative control.[2] The Board of Regents has adopted Bylaws establishing responsibilities for governance of the University. Bylaw 40 recognizes that the University faculty participate in the shared governance of the University, through the agency of the Academic Senate, to ensure the quality of instruction, research and public service at the University and to protect academic freedom. The University Bylaws call for the Academic Senate to perform such duties and exercise such powers as the Board may direct, including, subject to the approval of the Board, the power to "determine the conditions for admission and for certificates and degrees." Consistent with the value the University places on academic freedom, the Board of Regents has empowered the Senate to "authorize and supervise all courses and curricula."[3] Finally, the Academic Senate is empowered to "determine the membership of the several faculties and councils."[4] In exercise of its responsibilities for shared governance of academic decision making, the Academic Senate sets the academic criteria for the high school courses that applicants must demonstrate that they have completed.

6. Among my many responsibilities as Provost at UC Davis and the primary academic administrator for the campus, I serve as the Chancellor's Principal Liaison to the System-Wide Provost in the Office of the University President. I also serve as the Chancellor's Principal Liaison to the Davis Division of the Academic Senate and the Deans and Department Heads of academic departments. Via established norms of shared governance at UC, the Academic Senate is responsible for setting overall

---

[1] *See* David Leonhardt, *California's Upward-Mobility Machine*, NY Times (Sept. 16, 2015), https://www.nytimes.com/2015/09/17/upshot/californias-university-system-an-upward-mobility-machine.html.

[2] Cal. Const., Article IX, Section 9.

[3] University of California Bylaw 40.1, *Duties and Powers of the Academic Senate*.

[4] University of California Standing Order 105.2(c): *Duties, Powers, and Privileges of the Academic Senate*.

0500

undergraduate admissions standards and approving the admissions process, the implementation of which is overseen by the administration. Admissions into graduate programs is more decentralized, but decisions by members of the Academic Senate in the various departments and programs are determinative. The Academic Senate has primary responsibility for setting degree requirements and approving and monitoring the quality of the curriculum and the courses that are taught. The administration, through the structure of college and school deans and department chairs oversees the delivery of the curriculum. The administration is the final authority on appointments, promotion and tenure, based on evaluations and recommendations of various panels of Academic Senate members. Maintaining and enhancing the University's quality and its reputation for academic excellence is a shared endeavor.

7.   Undocumented students enter the undergraduate student body at UC Davis by demonstrating that they have met the standards for academic preparation and excellence reflected in the University's admissions requirements and as a result of the University's non-discrimination policies.[5] UC Davis has high standards for selecting students, admitting only 42% of freshman applicants with a weighted GPA range of 3.92 to 4.23.  The University's admissions requirements and non-discrimination policies reflect the exercise of academic freedom jointly exercised by the Academic Senate and the University Administration. Undocumented students advance through the undergraduate curriculum in the subject matter of their choice by meeting, in the judgment of the University faculty, the same requirements for completion of coursework and requirements for their chosen major that apply to all other students. By University policy, we do not stand in the way of the academic progress of undocumented students; rather, we support them to progress successfully toward completion of their degree and development of their future career ambitions.

[5] *See UC Davis Freshman Admission Requirements*, https://www.ucdavis.edu/admissions/undergraduate/freshman/requirements (last visited Oct. 20, 2017); *UC Nondiscrimination Statement*, http://www.ucop.edu/operating-budget/fees-and-enrollments/policies-and-resources/nondiscrimination-statement.html (last visited Oct. 20, 2017).

8.     As with undergraduates, undocumented students enter the graduate and professional student body at UC Davis by meeting the standards for academic preparation and excellence that are required by the various programs, schools and departments of the University. Some graduate programs require applicants to identify general research interests or even specific research proposals before gaining admission to the program. Our faculty and academic departments evaluate the research interests and proposals of prospective graduate students during the admissions process to evaluate, among other things, how well those interests and proposals will serve and advance the needs and development of the department. As with our undergraduate programs, our graduate programs are very selective when it comes to the academic acumen of admitted students, admitting on average only 25% of applicants with an average undergraduate GPA of 3.55. UC Davis also receives graduate studies applications from all over the world, including all fifty states and ninety-seven different countries, for the 2017-2018 academic year.

9.     The University has long recognized that a diversity of backgrounds in its student population enriches the educational experiences of all. To that end, the University seeks to fill its academic communities with students who are academically and personally talented and representative of the diverse state of California.[6] The University believes that a diverse student body creates a fuller educational experience. When the University's students and faculty learn to interact effectively with individuals from different backgrounds who have perspectives different from their own, those individuals are better prepared to participate in our increasingly diverse workforce and society.[7]

10.     Students who cannot afford the total cost of attendance at UC Davis are nonetheless required to pay a portion of the costs of attendance according to uniform evaluation of financial need. I am informed and believe that many of the undocumented students at UC Davis have very substantial financial need and that many of these students rely on work authorization obtained through the DACA program in order to pay their share of the total cost of attendance. I am further informed and believe that

---

[6] *See* Regents Policy 2102, *Policy on Undergraduate Admissions*.

[7] *See* Regents Policy 4400, *Policy on University of California Diversity Statement*.

4

DECLARATION OF RALPH J. HEXTER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0502

many undocumented students who rely on DACA work authorization to pay their share of the total cost of attendance would be unable to continue with their studies without income from their work.

11.     The University relies on the skills and ability of our graduate students to carry out teaching and research responsibilities in collaboration with members of the faculty. To varying degrees in different graduate and professional programs, the academic work of the University simply cannot advance without the teaching and research work of our graduate student body. Graduate students play an integral role in the teaching and research missions of the University. Last year, the University received just over $780 million in research funding, a substantial portion of which supports the nearly 1,500 graduate students who are actively engaged in research. Additionally, the University employs over 1,700 teaching assistants who work closely with our faculty in teaching the University's large undergraduate population. In addition, the experience of working as a teaching assistant or research assistant is a strongly encouraged, if not essential, aspect to completing degree requirements in many UC Davis graduate programs. For example, the UC Davis Department of English requires doctoral candidates to have completed at least one year of teaching at the college level, and the Biochemistry, Molecular, Cellular and Developmental Biology Graduate Group requires doctoral candidates to work as a teaching assistant for at least one undergraduate biochemistry or molecular biology course. Additionally, many science graduate programs, including the Graduate Group in Immunology, will incorporate employment as a graduate student researcher as part of a Ph.D. student's academic plan.

12.     By interfering with the ability of students to pay their share of the total cost of attendance at UC Davis as undergraduate and graduate students, the rescission of DACA will likely cause some UC Davis students who have DACA authorization to leave the student body. It is possible that UC Davis will have classrooms that lose their teaching assistants and faculty who lose their research assistants as of March 6, 2018. The rescission may also deter undocumented students from competing to enter the UC Davis student body. These losses not only frustrate the personal ambition of the students; they also frustrate the University's exercise of its academic freedom, as reflected in the thousands of academic decisions the University has made to admit, advance, employ, and award degrees to our diverse student body according to our students' academic work meeting the University's academic standards.

0503

13. In some graduate and professional programs, travel abroad is important to a student's ability to complete their studies. For example, students in comparative studies benefit when they visit the countries they are analyzing. Students focused on languages or literature from specific regions benefit from immersive experiences that can only happen internationally. Students with research focused on or in other countries find travel to be an essential element of their work. Undocumented students depend on advance parole to benefit from and fulfill relevant degree requirements. Many UC Davis undergraduate students also take advantage of opportunities to travel abroad in order to fulfill their program and/or graduation requirements. This year alone, 1,271 students participated in the study abroad program. Without advance parole, undocumented students will be unable to take advantage of these opportunities, even where they would support or fulfill requirements of their desired major or degree.

14. Some of the University's DACA recipients serve as teaching assistants, helping educate their peers. Some work as research assistants, making discoveries and drawing connections that improve the learning outcomes of others. The rescission of the DACA program will result in the expiration of qualified educators' work authorization. The University will accordingly be unable to retain and hire qualified researchers and educators for positions that are critical to the University's teaching, research and service mission. Their loss undermines the thousands of academic decisions the University has made to admit, advance, employ, and award degrees to our diverse student body according to our students' academic work meeting the University's academic standards.

15. In conclusion, the rescission of the DACA program interferes with the University's academic decisions about who may be taught, what may be taught, how material is taught and who may do the teaching.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on **October 24, 2017** in **Davis, California**.

RALPH J. HEXTER

# DEF-INTERV.

# EX. 36

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DR. ROBIN HOLMES-SULLIVAN** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

1

2

3        Plaintiffs,

4        v.

5 DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON

6 BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United

7 States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department

8 of Homeland Security; and U.S. DEPARTMENT OF HOMELAND

9 SECURITY,

10        Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, ROBIN HOLMES-SULLIVAN, DECLARE:

1.      I am the Vice President for Student Affairs at the University of California ("UC"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      In my role as Vice President, I oversee the overall student experience across UC's campuses, and I work closely with the UC President and Provost in efforts to enhance the diversity, experiences, and successes of UC students, especially undergraduate students. This includes not only overseeing the UC undergraduate application process for admissions and financial support program, but also monitoring diversity and campus climate, overseeing student mental health and wellness, overseeing policies guiding student conduct, student activities, admissions and financial aid, and also serving as an intermediary between UC campuses, UC Office of the President, and student groups/leadership. In my role, I visit all UC campuses on a regular basis, where I meet and talk with faculty, staff and students. My office provides overall guidance and support to a plethora of Presidential Initiatives carried out on each of the campuses, including the President's Advisory Council on Undocumented Students, Student Veterans, LGBT Students, Faculty and Staff, the Global Climate Leadership Council, the California Community College Transfer Initiative, and the Global Food Initiative, to name a few. I enjoy a close working relationship with different individuals across our campuses, including student leaders and each Vice Chancellor of Student Affairs.

3.      In my role, I have observed and heard firsthand about the abilities and experiences of DACA students, as well as how the announced rescission of the DACA policy has affected them. UC data shows that with the implementation of DACA in 2012, the first-year persistence rate (i.e., percent of students continuing on to the second year) increased significantly for these students who could count on receiving financial aid, and no longer feared deportation.

4.      Our DACA students are very talented and make important contributions to the State of California and the United States as a whole. From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest

1

study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia. The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans (https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/).

5. Additionally, our undocumented and DACA graduate students make amazing contributions to medicine and technology, including through discoveries that have the potential to help communities throughout California. For instance, one of our former DACA PhD students researched the indicators for sudden cardiac death—the leading natural cause of death in Americans. This vital research has the potential to save countless lives.

6. Due to their talent and chosen fields of study, DACA students serve as academic role models to other students across UC's campuses. DACA students at all 10 of the campuses serve as teaching assistants ("TAs"). There are, for instance, four DACA-recipient PhD students at UC Merced who work as TAs. At UC Merced, 55 percent of the baccalaureate degrees awarded are in science, technology, and math, and several of the DACA PhD students' focuses lie in those fields. The industries that students and graduate students with science, technology, or math degrees enter are among the least diverse sectors of the economy (http://www.air.org/sites/default/files/downloads/report/AGEP_Lit_Review_10-26-09_0.pdf), and part of both the University and UC Merced's mission to diversify historically non-diverse industries. Our DACA-recipient TAs not only promise to diversify those fields upon entering the workforce, but they also serve as inspiration to the diverse undergraduate students in their classes that careers in those fields are attainable for them, too.

7. Our undocumented and DACA students' influence is not limited to the classroom. Many serve as role models in the broader community. Some of our campuses are located in regions of the state where a fair percentage of K-12 students are undocumented youth or members of the migrant farm community. We have DACA-recipients who volunteer at these K-12 schools, showing local children that a college education is attainable and worthwhile.

2

0509

8.      UC values diversity, and exposure to other perspectives is a critical part of a complete education. Developing robust cultural competency requires exposure to different cultures and viewpoints, and exposing others to the viewpoints of DACA recipients is an important component of that. Indeed, our undocumented and DACA students are vital members of our community. We have DACA students who serve as leaders of local chapters of national Greek Societies and in various student clubs, are influential student leaders and serve in student government, and are heavily involved in important events, such as performing the national anthem at school commencements. Through this engagement—both in the classroom and around campus—DACA students interact with many people and are able to share their unique perspectives with them. This enriches the social and educational environment for all. The valuable cultural exchange would be impoverished if undocumented students—including DACA recipients—were not on campus or were not as willing to share their stories and perspectives.

9.      DACA recipients are often model students on campus and are valuable to UC. Not only do undocumented students perform very well academically, but also they are highly involved in other aspects of student life and have few disciplinary issues.  For example, at UC Santa Barbara, University Service Awards are given each year to recognize the contributions and achievements of outstanding graduating seniors and graduate students who have performed above and beyond the call of duty in service to the University, the student body, and the community or have succeeded while facing extraordinary challenges.  For the 2016-17 year, several of the annual University Service Awards were given to DACA recipients.

10.      The announcement to rescind the DACA policy has created several harms. Our students report stressors ranging from a fear of deportation, increased discrimination, and the possibility of being unable to continue their studies. The most instantly recognizable impact for me—other than the various psychological and emotional strains our DACA recipients report—is our current inability to provide our students with the counseling resources they need.

11.      I have spoken with DACA students who are afraid that they or their family members will be detained or deported. One DACA student explained that she did not feel safe driving from campus to her parents' house because doing so required passing through an immigration checkpoint. She is afraid

3

0510

that immigration officers will learn her identity and follow her home or to campus. Not only is she scared, but her fear is preventing her from visiting her family, a valuable support network for her. This is not a unique story. This climate of fear has intensified since the announcement to rescind the DACA policy.

12.     We have observed an increase in anti-immigrant incidents on campus following the 2016 presidential election and the announcement to rescind DACA. On multiple occasions, racist posters targeted at immigrants have been put up on campuses overnight. There have also been several incidents where UC students are presumed to be immigrants and yelled at that they "do not belong" and that they should "go home." Our DACA students are afraid that they will be harassed or attacked because of their immigration status or the fact that they "look like immigrants."

13.     The uncertainty of being able to pay for school is also a significant source of stress for our students. Financial aid often covers part of the full tuition for DACA students, but students are expected to pay for some of the cost—approximately $10,000—out of their own pockets. Many DACA recipients thus rely on their ability to work, pursuant to work authorization, to pay for this cost of attendance. Beyond the need to support themselves, some DACA recipients work to provide for their families. When this is the case, some DACA students view school as a lower priority than working to earn as much as possible before their DACA status—and consequently their work authorization—ends.

14.     One consequence of all these stressors is that DACA students are presently unable to focus on their studies with the same intensity that they have in the past. I have heard from academic counselors who have observed a dip in the academic performance of DACA recipients since the rescission was announced. Professors are also concerned and report that many DACA students have reached out to them to report difficulty studying, completing assignments or focusing on their school work due to the stress they are experiencing. Our campus support staff have received a flood of emails from faculty who are concerned for their DACA students and are unsure how best to support them. We are working diligently to train our teachers about what resources exist and what they can do personally to help our DACA students.

15.     The stress caused by rescission of the DACA policy has resulted in a dramatic increase in the number of requests from DACA students for mental health services. For example, at UC Merced,

4

0511

over the weeks following the announcement to rescind DACA, demand for counseling services more than doubled from 11% of the total student population to 23% of the student population. At UC Berkeley, the number of appointments and walk-ins for mental health counseling increased by 90% following the announcement.

16.     I have also heard from my staff and from DACA students themselves that we need psychologists and other experts who are familiar with the challenges faced by undocumented individuals. Again, we are devoting time and rerouting resources to address this. Doing so undoubtedly places more demands on these services by the campus community as a whole. On some campuses we have increased the number of full-time staff members and hired more peer counselors to staff our mental health facilities. We have also reached out to our local contacts and brought in attorneys to run "know your rights" workshops. We have also invested time and money into our UndocuAlly training program, through which we teach our counselors and some of our faculty about what it means to be undocumented in this country. This better prepares our staff to provide our DACA students the services they need.

17.     Our staff is working tirelessly to address the acute demand for services following the announcement to rescind the DACA policy. I have observed the increased hours and emotional toll that this has had on our staff as they try to provide DACA students with information and support, and I am concerned that staff members will burn out and seek employment elsewhere.

18.     I and some of my colleagues are also concerned that the uncertainty surrounding the DACA policy will result in a loss of current and future students.  For example, I have heard that two undergraduate students at UCLA called to cancel their enrollment after DACA's rescission was announced. I have heard from several Vice Chancellors who are preparing for the possibility that DACA students will leave on an upcoming break from classes and will not return to school. Some of these students may decide not to return due to a desire to work and support their families while they can or to minimize the student debt they accrue before their DACA status expires. For others, though, the choice is out of their hands. Some families are deciding to leave the country and are taking their children with them. Still others depend on their DACA status for basic necessities. We have at least one DACA student who serves as a resident advisor, a position that comes with room and board but requires work

5

authorization. If this student loses their work authorization—which they will when their DACA status expires—they will lose their home.

19.    Our PhD students and others will not be able to continue as TAs without work authorization. Being a TA is a full-year commitment, and part of a TA's compensation is graduate school tuition reduction. When these students lose DACA status, they can no longer be employed as TAs, and their tuition will be higher, directly impacting their ability to pay for graduate school. UC will also have to scramble to find replacement TAs to take over teaching responsibilities mid-term. This, like our other efforts, will require time, energy, and money on UC's part. But beyond the administrative costs, losing our DACA TAs also deprives us of their impact as role models to diverse undergraduates who might be considering advanced degrees in historically non-diverse fields. Accordingly, if we lose these diverse PhD candidates, then our commitment to diversifying these fields is harmed.

20.    I, my staff, and the high school counselors we interact with are all concerned about a possible decrease in the number of undocumented applicants to UC as a result of the uncertainty created by the rescission of DACA. High school students are concerned about whether they will be accepted by their peers and the institution. They are also worried about the financial burden. As discussed, UC students need to cover some of the cost of attendance, and high school students are worried that, without work authorization, they will be unable to support themselves through school.

21.    We are trying to respond to the possible loss of both current and future students by creating focused communication campaigns. Currently, we are ramping up our efforts to convince our current students that they belong here and that we are doing all we can to provide them the institutional support they need. One of our staff members is spending time writing and sending out weekly updates discussing DACA-related news and campus resources. Vice Chancellors are spending time personally reaching out to donors, trying to raise money that we can provide to undocumented students and DACA-recipients as stipends or grants.

22.    In addition to diverting money, we are also spending time and energy making sure that qualified high school students who would normally apply to UC still do so this year. We have hosted outreach conferences around the state in order to provide information to address the current confusion and concern that exists among high school counselors and their students. Nevertheless, the fear and

0513

uncertainty looms large and, according to our outreach counselors, is having a negative impact on the recruitment of students who have DACA, despite our positive messages.

23. We are also trying to secure replacement housing for the DACA RA who faces the looming threat of losing their home. Thus, we are rapidly diverting resources to address these serious, imminent harms.

24. We are not the only institution that has recognized these pending harms, but we are quickly deploying our resources to address them. Other educational institutions like local community colleges and high schools are concerned about the same issues and have reached out to us for help and advice creating their own resources or borrowing from our approach.

25. UC recognizes that the institution and broader community are harmed if we lose current students and qualified future students. By losing our undergraduate and graduate DACA students and by missing out on qualified students who would otherwise attend, we are losing inspiring individuals who have served as role models to various kinds of students, brilliant minds, and a source of diversity that is important to building cultural competency and diversifying traditionally non-diverse professions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017 in Oakland, California.

DR. ROBIN HOLMES-SULLIVAN

DECLARATION OF DR. ROBIN HOLMES-SULLIVAN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0514

# DEF-INTERV.

# EX. 37

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DR. CATHERINE LUCEY** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

|  |  |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, |  |
| v. |  |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, |  |
| Defendants. |  |

I, CATHERINE LUCEY, DECLARE:

1.      I am the Vice Dean of the University of California San Francisco School of Medicine ("UCSF"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      I direct the UCSF graduate, undergraduate, and continuing medical education programs. This includes responsibility for medical student education and medical residency programs.

3.      UCSF is a leading institution dedicated to advancing health worldwide through advanced biomedical research, graduate-level education in the life sciences and health professions, and excellence in patient care. Our mission is to advance human health through education, research, patient care, and public service. To fulfill our mission, UCSF is committed to training physicians from all backgrounds and cultures, and to developing a diverse community in all training programs.

4.      I understand that there are approximately twelve DACA recipients who are currently health professional students (medical, dental, pharmacy or nursing) across the University of California Health system ("UC Health"), including students at UCSF. UCSF has one fourth year medical student and one first year medical student who are DACA recipients.

5.      Admission to our medical school is extraordinarily competitive. Less than 5% of applicants are admitted in an average year, and those admitted have exceptionally high grade point averages (both generally and in science courses specifically) and scores on standardized tests. For the 2017 class, for example, we received 8,078 applicants for a class of 145 students. Our DACA students gained admission to UCSF because of their individual records of high achievement. For example, our fourth year DACA recipient is among the top of his class academically and has emerged as a leader in catalyzing his peers and faculty to address the public health needs of immigrant and other vulnerable populations. He was awarded an Excellence in Public Health Service award in April of this year from the U.S. Public Health Service.

**Immediate Harm to Medical Students from the DACA Rescission**

6.      The announced rescission of the DACA policy threatens serious harm to DACA-recipient fourth-year medical students at UC Health who are trying to obtain residency positions. Medical residency positions require employment authorization. The rescission of the DACA policy is causing

uncertainty around their DACA employment authorization, and therefore jeopardizing the only chance these students have to obtain a residency position and to complete their residency.

7. Medical students must complete a residency program to become fully-licensed physicians. Medical residency is a three to eight year process. Upon graduation, approximately 98% of UCSF students go into residency programs.

8. Employment authorization is required at the outset and for the duration of all residency programs. This is because medical residents actively practice medicine in a clinical setting and care for patients. Residents serve as a critically important workforce for all academic hospitals. They care for patients as employees while they simultaneously learn as residents. Work authorization is thus essential for residents throughout their residency.

9. Physician graduates of American medical schools, including UCSF Medicine, are not eligible for a medical license until they have completed at least one year of residency training. Without a residency position, UC Health medical school graduates cannot practice medicine in the United States.

10. The matching to residency programs for all medical residency positions in the United States will occur in mid-February through to mid-March 2018. Residency matching therefore coincides with the March 5, 2018 end of the DACA program and the expiration of any DACA status for which renewal is not granted before then. Matching between residency positions and interested students is open exclusively to fourth-year medical students. These students are already beginning to collect materials in anticipation of the registration process for matching.

11. The process of matching students to residency position is highly controlled by the National Residency Matching Program (NRMP) for all 146 medical schools and every residency position in the United States. The NRMP matching process fills virtually every available residency spot in the country. It becomes almost impossible to obtain a desirable residency position after the matching process ends. The matching process therefore represents our students' only realistic chance to become medical residents, and consequently, their only realistic chance to become physicians.

12. The announced rescission of the DACA policy has created great hesitancy among residency programs as to whether to accept otherwise highly-qualified DACA students as matches. Students indicate their DACA status on their application to the NRMP for matching and each residency

2

0722

program has the discretion to accept or refuse to consider DACA candidates. I am not aware of any guidance from the NRMP on whether programs should accept DACA candidates.

13. Residency programs at UCSF and, as I understand it, in other locations across the United States are concerned that if they accept DACA recipients as matches, that resident will be unable to start or complete their residency because they will lose their work authorization. This is a very real worry; residencies are three to eight years and the rescission of DACA means DACA students' work authorizations will expire during this period. The hesitancy to accept DACA recipients as residents is understandable, as it would be difficult for a school to replace a trained resident with another qualified candidate partway through a residency program. Such programs are often specialized in particular areas of healthcare. This uncertainty over DACA student employment authorization is making it less likely that UCSF DACA students will obtain residency positions, which they would have otherwise obtained if the DACA policy continued.

14. This predicament also means our DACA students are considering self-selecting out of their one-time opportunity to participate in the residency match program. Our students understand that it is an exceptionally serious commitment to accept any matched residency position. It is an ethical and legal commitment to carry out the care of patients in the position for which they are matched. To break a match once it is made, the students would have to obtain a waiver from the NRMP. Students who obtain a waiver are then viewed as high-risk candidates for any future positions. Residency positions are already rarely available after the matching occurs; high-risk candidates with waivers are even less likely to obtain these rare positions.

15. The uncertainty of their employment status puts at risk our DACA students' ability to practice medicine in the United States, which in turn threatens their current and future investment in their medical education. UC Health medical students invest significantly in their education, graduating with median student loans totaling approximately $154,000. The students have taken on this debt with the expectation that they will be able to rely on DACA to become practicing physicians, with the ability to earn an income commensurate with that investment. The rescission of DACA puts in serious jeopardy the students' investment.

DECLARATION OF DR. CATHERINE LUCEY
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

16.     Finally, the rescission of DACA will leave our DACA students unable to train in Veterans Affairs hospitals (the "VA healthcare system"). The VA healthcare system is an extremely significant training resource for UCSF students. The VA has high-quality, integrated community care and training facilities that serve as an invaluable part of our mission to educate modern physicians. All UCSF students and one-third of UCSF's residents train in the VA healthcare system.

17.     The rescission of the DACA policy means our DACA students will no longer be able to train in the VA healthcare system, which requires authorization to work lawfully in the United States. This will be a significant loss of opportunity for our DACA students. It will be extremely difficult and costly for UCSF to replicate the training DACA students would have received if they can no longer work in the VA healthcare system.

**Harms to UCSF School of Medicine and California Communities from the DACA Rescission**

18.     The DACA rescission threatens significant harm to UCSF and UC Health. We estimate that UC Health invests approximately $70,000 per year in each students' medical education, which is 4-years.  If our students do not secure residency positions, our significant investment in their education and training is lost. This impacts UCSF's ability to achieve its mission of advancing human health through education and patient care, because the students will not go on to become practicing physicians in the United States.

19.     UCSF is preparing physician-leaders who are expected to make significant contributions to healthcare, medicine, and science in their careers. Accordingly, we invest significant financial resources in all of our students, including our DACA students. Student tuition provides less than 50% of the resources required to educate our medical students. UCSF absorbs the remaining cost of student education. The financial commitment to educate a single medical student represents a long-term investment in that student's success, since it can take 10 years or more for a medical doctor to complete all of his or her training. The attrition rate at UCSF is historically very low, and most of our students obtain residency positions, so our DACA students are otherwise likely to complete their education. If medical students leave UCSF before completing their program, or are unable to become physicians because of the rescission of the DACA policy, our investment in them is lost.

DECLARATION OF DR. CATHERINE LUCEY
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0724

20.     The rescission of the DACA policy threatens the diverse community of students, residents and fellows that is a key ingredient to the groundbreaking life sciences research and world-class healthcare UCSF strives to deliver. Increasing the diversity of the physician workforce increases the quality of care for diverse populations like those in California. Ample literature documents that language and culture concordance between doctors and their patients increases adherence to medical recommendations and improved health outcomes. Students from diverse and immigrant backgrounds are also more likely to practice in medically underserved areas. The UCSF students from minority and immigrant backgrounds, as our DACA students are, are approximately twice as likely to practice in underserved geographic areas and in underserved specialties, such as primary care, general surgery, general psychiatry, where the need for physicians is most dire. Diverse students like our DACA students are therefore essential to delivering the healthcare services California needs most.

21.     UCSF takes seriously our responsibility to heal and provide highly-skilled medical care to our communities and train the next generation of physicians. The DACA rescission deprives our DACA students of their well-earned opportunities to become residents and doctors. It is also impairing UCSF's ability to deliver the high-quality care our patients currently need and the next generation of California's physicians. The DACA rescission is harming and will continue to harm UCSF School of Medicine and our DACA students.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on October 27 , 2017 in San Francisco, California.

CATHERINE LUCEY

0725

DEF-INTERV.

EX. 38

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DR. JAMES L. MADARA, MD** |

0763

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA |

DECLARATION OF JAMES L. MADARA, MD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  COUNTY OF SANTA CLARA and                CASE NO. 17-CV-05813-WHA
   SERVICE EMPLOYEES INTERNATIONAL
2  UNION LOCAL 521,

3              Plaintiffs,

4      v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10             Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, JAMES L. MADARA, MD, HEREBY SUBMIT THE FOLLOWING DECLARATION IN
SUPPORT OF THE PLAINTIFFS IN THE ABOVE-CAPTIONED MATTERS:

1.      I am a Medical Doctor as well as the Chief Executive Officer and Executive Vice
President of the American Medical Association (the "AMA"), an Illinois not-for-profit corporation. I
am also an adjunct professor of pathology at Northwestern University in Chicago, Illinois.

2.      The AMA is the largest professional association of physicians, residents and medical
students in the United States. Additionally, through state and specialty medical societies and other
physician groups, seated in the AMA's House of Delegates, substantially all United States physicians,
residents and medical students are represented in the AMA's policy making process. The objectives of
the AMA are to promote the science and art of medicine and the betterment of public health. Its
members practice in every state and in every medical specialty.

3.      It is the position of the AMA that our nation's health care workforce depends on the care
provided by physicians and medical students with Deferred Action for Childhood Arrivals ("DACA")
program status. These physicians and students are trained at medical schools in the United States and
fill gaps in patient care, as well as offset the current deficit in the physician workforce. The Health
Resources and Services Administration reported that there is a current shortage of over 8,200 primary
care physicians. Likewise, an independent study by the Association of American Medical Colleges has
projected that the total physician deficit will grow to between 61,700 and 94,700 physicians by 2025.
American born physicians will, by themselves, be unlikely to fill these shortages. Estimates have shown
that the DACA initiative could help introduce 5,400 previously ineligible physicians into the U.S. health
care system in the coming decades to help address these shortages and ensure patient access to care.

4.      Removing medical professionals with DACA status will create care shortages,
particularly for rural and other underserved areas. DACA physicians are more likely to work in high-
need areas where communities face challenges in recruiting other physicians. DACA students are also

0766

more likely to be bilingual, to come from diverse cultural backgrounds, and to understand challenges in certain ethnic communities. The AMA is concerned that without these DACA physicians, the quality of care provided in these communities will decline and patient access to care will suffer.

5. Those protected by the DACA program also include medical students, residents, and fellows who are working to complete the lengthy and rigorous training and education needed to become a physician. In 2016, 108 students with DACA status applied to U.S. allopathic medical schools. Those who enrolled will now face uncertainty about completing their degrees, paying their student loans, and serving patients. Furthermore, if DACA residents are unable to complete their training, which typically spans three to six years after medical school, this could potentially waste graduate medical education funds, leave training slots unfilled, and generally exacerbate the physician shortage our country is facing, especially for our most vulnerable patients. The AMA believes that for the good of the DACA recipients and our nation's healthcare system as a whole, these DACA recipients should be able to continue to study, work, and improve patient access to care without the fear and uncertainty of being removed before their training is completed.

6. Those with DACA status help contribute to a diverse and culturally responsive physician workforce, which benefits all patients. These individuals have demonstrated their commitment to the United States in numerous ways by attending medical school, training to become doctors, caring for patients, conducting research, and improving our health care system.

7. Additionally, on behalf of the AMA, I previously submitted a letter to Senate Majority Leader Mitch McConnell, Senate Democratic Leader Chuck Schumer, Speak of the House Paul Ryan, and House Democratic Leader Nancy Pelosi on September 5, 2017, describing AMA's position regarding the cancellation of DACA as I have explained it here, and urging Congress to support DACA recipients and pass a legislative solution in the near future. A true and correct copy of that letter is attached to this declaration as Exhibit A.

1
2
3        I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true
4    and correct.
5        Executed on  10/25 , 2017, in Chicago, Illinois.
6
7
8                                                    James L. Madara, M.D.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF JAMES L. MADARA, MD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0768



**EXHIBIT A**



**JAMES L. MADARA, MD**
EXECUTIVE VICE PRESIDENT, CEO

ama-assn.org
t  (312) 464-5000

September 5, 2017

The Honorable Mitch McConnell
Senate Majority Leader
United States Senate
S-230 U.S. Capitol
Washington, DC  20510

The Honorable Chuck Schumer
Democratic Leader
United States Senate
S-221 U.S. Capitol
Washington, DC  20510

The Honorable Paul Ryan
Speaker of the House of Representatives
U.S. House of Representatives
H-232 U.S. Capitol
Washington, DC  20515

The Honorable Nancy Pelosi
Democratic Leader
U.S. House of Representatives
H-204 U.S. Capitol
Washington, DC  20515

Dear Majority Leader McConnell, Democratic Leader Schumer, Speaker Ryan, and Democratic Leader
Pelosi:

On behalf of the physician and medical student members of the American Medical Association (AMA), I
am writing to urge Congress to take prompt action to protect and provide stability for individuals with
Deferred Action for Childhood Arrivals (DACA) status.  President Trump's recent announcement to end
the DACA program in six months fails to recognize the enormous contributions of hundreds of thousands
of individuals who are living, working, and providing vital services in the United States, including health
care services.  We particularly are concerned that this reversal in policy could have severe consequences
for many in the health care workforce, impacting patients and our nation's health care system.
Accordingly, we urge Congress to act quickly to ensure that individuals with DACA status are able to
remain in the United States.

Our nation's health care workforce depends on the care provided by physicians and medical students with
DACA status, who are trained at medical schools in the United States and fill gaps in patient care, as well
as offset the deficit in the physician workforce.  The Health Resources and Services Administration
reported that there is a current shortage of over 8,200 primary care physicians.  Likewise, an independent
study by the Association of American Medical Colleges has projected that the total physician deficit will
grow to between 61,700 and 94,700 physicians by 2025.  Estimates have shown that the DACA initiative
could help introduce 5,400 previously ineligible physicians into the U.S. health care system in the coming
decades to help address these shortages and ensure patient access to care.

Removing those with DACA status will particularly create care shortages for rural and other underserved
areas.  DACA physicians are more likely to work in high-need areas where communities face challenges
in recruiting other physicians.  DACA students are also more likely to be bilingual, to come from diverse
cultural backgrounds, and to understand challenges in certain ethnic communities.  Without these

**AMA PLAZA** | 330 N. WABASH AVE. | SUITE 39300 | CHICAGO, IL 60611-5885

The Honorable Mitch McConnell
The Honorable Chuck Schumer
The Honorable Paul Ryan
The Honorable Nancy Pelosi
September 5, 2017
Page 2

physicians, the AMA is concerned that the quality of care provided in these communities will be negatively impacted and that patient access to care will suffer.

Those protected by the DACA program also include medical students, residents, and fellows who are working to pass the lengthy and rigorous training and education needed to become a physician. In 2016, 108 students with DACA status applied to U.S. allopathic medical schools. Those who enrolled will now face uncertainty about completing their degrees, paying their student loans, and serving patients. Furthermore, if DACA residents are unable to complete their training, which typically spans three to six years after medical school, this could potentially waste graduate medical education funds, leave training slots unfilled, and generally exacerbate the physician shortage our country is facing, especially for our most vulnerable patients. The AMA believes that these DACA recipients should be able to continue to study, work, and improve patient access to care without the fear and uncertainty of being deported before their training is completed.

The Administration has acknowledged that Congress could act to continue the DACA program and has provided a six-month timeframe for lawmakers to consider alternatives. The AMA urges Congress to pass legislation, such as the Dream Act of 2017 (S. 1615/H.R. 3440), that would provide a solution to ensure DACA recipients are protected and do not face continuous threats and potential legal challenges.

Those with DACA status help contribute to a diverse and culturally responsive physician workforce, which benefits all patients. These individuals have demonstrated their commitment to the United States in numerous ways by attending medical school, training to become doctors, caring for patients, conducting research, and improving our health care system. We therefore urge Congress to support these DACA recipients and pass a legislative solution in the near future.

Sincerely,

James L. Madara, MD

# DEF-INTERV.

# EX. 39

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

   XAVIER BECERRA
   Attorney General of California
   MICHAEL L. NEWMAN
   Supervising Deputy Attorney General
   JAMES F. ZAHRADKA II (SBN 196822)
   1515 Clay Street, 20th Floor
   P.O. Box 70550
   Oakland, CA 94612-0550
   Telephone: (510) 879-1247
   Email: James.Zahradka@doj.ca.gov
   *Attorneys for Plaintiff State of California*

   JOSEPH W. COTCHETT (SBN 36324)
   NANCY L. FINEMAN (SBN 124870)
   COTCHETT, PITRE & McCARTHY, LLP
   San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
   Burlingame, CA 94010
   Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
   Email: nfineman@cpmlegal.com
   *Attorneys for Plaintiff City of San Jose*

   JONATHAN WEISSGLASS (SBN 185008)
   STACEY M. LEYTON (SBN 203827)
   ERIC P. BROWN (SBN 284245)
   ALTSHULER BERZON LLP
   177 Post Street, Suite 300
   San Francisco, CA 94108
   Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
   Email: jweissglass@altber.com
   *Attorneys for Plaintiffs County of Santa Clara and*
   *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF KEVIN M. MAXWELL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

|   |   |   |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |

I, Kevin M. Maxwell, Ph.D., declare and state as follows:

      1.  I am the Chief Executive Officer of Prince George's County Public Schools (PGCPS) located within the State of Maryland.

      2.  I have served as the Chief Executive Officer of PGCPS since 2013.

      3.  PGCPS is invested in providing academic excellence within a safe and welcoming school environment for all its 131,000 students, 19,000 employees, and families.

      4.  As the second largest school system in Maryland and the 25th largest in the country, we take seriously our role as educational leaders. Our district represents a myriad of races/ethnicities, with over 93% of our students identifying as African American/Black and Latino/Hispanic, 64% receiving Free and Reduced Priced Meals, 22,000 English Learners, and 47,000 international students. Our students speak over 164 languages from over 129 countries. PGCPS is providing a world class education for the next wave of American leaders.

      5.  As we abide by federal regulations, PGCPS does not track students' immigration status. However, through requests for support received by staff, decreased attendance and decreased parental engagement when Immigration and Custom Enforcement (ICE) was feared, we are aware that our district has a significant number of undocumented youth and families, some of

which receive benefits currently in place under the Deferred Action for Childhood Arrivals (DACA) Program.

6. It stands to reason that our county then has a large number of DACA and DACA eligible recipients.

7. As a district we have emphasized an investment in our English Learners and new Americans, in the following ways: opening two international high schools to meet the needs of our new Americans; creation of the Office of Diversity Affairs, to provide systemic input to removing barriers for students to access educational opportunities; and increased funding for the Office of Interpreting and Translation to provide language access to families of English Learners.

8. We see these investments in our students and families as an integral piece in fulfilling our mission to educating thriving citizens. Education is the cornerstone of any federal or state plan to increase economic opportunities. Research overwhelming demonstrates that students with a high school diploma, associate's degree, and bachelor's degree earn more than students who drop out of school. When students stay in school and pursue post-secondary opportunities, juvenile delinquency and crime is reduced.

9. The potential impact of the termination of DACA on our students, families, staff, and community could be unprecedented. With over 47,000 international students in PGCPS we anticipate the following negative impacts: decreased attendance as students will no longer see post-secondary education as a possibility and will drop out sooner to pursue work in a shadow economy; diminished resources to serve the needs of this vulnerable population, as district funding is determined in large part by the total number of students enrolled; and increased need for social-emotional supports, such as trauma informed counselors, as students see families in their communities torn apart as a result of deportation.

10. In anticipation of the enactment of the termination of DACA, PGCPS has convened a Rapid Response Team comprised of the Diversity Officer, General Counsel, and senior staff from the offices of Pupil Accounting, Student Services, and Security Services. We are

---

developing training and protocols to provide support to school-based administrators and staff in the event that they have parents who are detained by Immigration and Customs Enforcement (ICE) and have left no provisions for the care of their children.

    11.    In addition, Prince George's County Public Schools continues to stand committed to safeguarding the personal information of our families to the fullest extent of the law. We cannot provide instruction under a cloak of fear and our schools cannot become the campus on which ICE decides to conduct their operations. We must abide by our federal civil rights laws and ensure the rights of *all* students to a free public school education.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___10/26/17___ in Upper Marlboro, Maryland.


                                    *Kevin M. Maxwell*
                                    KEVIN M. MAXWELL, PH.D

# DEF-INTERV.

# EX. 40

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF ANNE MCLEOD** |

0786

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05380-WHA |

0787

1  | COUNTY OF SANTA CLARA and          CASE NO. 17-CV-05813-WHA
   | SERVICE EMPLOYEES INTERNATIONAL
2  | UNION LOCAL 521,

3  |                Plaintiffs,

4  |         v.

5  | DONALD J. TRUMP, in his official capacity
   | as President of the United States, JEFFERSON
6  | BEAUREGARD SESSIONS, in his official
   | capacity as Attorney General of the United
7  | States; ELAINE DUKE, in her official
   | capacity as Acting Secretary of the Department
8  | of Homeland Security; and U.S.
   | DEPARTMENT OF HOMELAND
9  | SECURITY,

10 |                Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Anne McLeod, declare:

1.    I am the Senior Vice President, Health Policy and Innovation, with the California Hospital Association (CHA).  I have served at CHA in this, and similar positions, for more than 10 years.  CHA represents hospitals and health systems in California on state and federal legislative and regulatory issues.  In my role, I provide leadership for developing policy objectives that support the implementation of health care reforms and the transformation of health care in the future.  I have worked on health policy issues that include access to care, health care coverage and health care financing and delivery system improvement. In my work I have promoted initiatives aimed at enhancing the health care infrastructure, including developing strategic solutions to meet the demand for health care professionals and supporting education and training programs that promote expanding access to care in all communities in California including underserved areas.

2.    Access to medical insurance is an important component of public health.  By providing work authorization, DACA has significantly improved access to employer-based health insurance.  More than 90 percent of DACA grantees are employed, and 57 percent of DACA grantees credit the program with securing a job with health insurance or other benefits, according to a 2017 survey.[1]  These individuals are not eligible to purchase health insurance in a Marketplace, even at full cost, and they are not eligible for federal tax credits to make private health insurance in the Marketplace affordable.[2]  Maintaining access to employer-based heath insurance is, therefore, an important driver for both individual and the health of the communities where DACA grantees live and work.

3.    Having health care coverage helps individuals get the appropriate care when needed, including preventative services and primary care.  Further, when kids and families receive necessary preventative care they have better attendance in school and their parents are better able to work.  Without access to insurance, their health and the health of the community could be jeopardized.

---

[1] Tom K. Wong et al., *2017 National DACA Study* (last visited Oct. 10, 2017), https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

[2] Dinah Wiley, *For DACA Grantees, Health insurance Is (Only) a Dream*, Georgetown University Health Policy Institute (Apr. 11, 2014), https://ccf.georgetown.edu/2014/04/11/for-daca-youth-health-insurance-is-only-a-dream/.

0789

4. Getting the proper level of treatment in a timely manner helps reduce health costs for everyone. California hospitals have worked hard to reduce costs through delivery system reform, care coordination and clinical efficiencies. These innovations mean patients often recover quicker and can return to work and home sooner. Lower utilization results in lower costs. When individuals and families don't have health care coverage, they also lose access to care. Providers don't get paid to treat uninsured individuals. When patients can't be seen by a primary care doctor, they often turn to hospital emergency rooms—the most expensive place to be treated—as a last resort. Preserving emergency rooms for those truly needing emergency care ensures life-saving treatment is there when needed for everyone.

5. Caring for patients in the appropriate setting can lower costs and improve patient well-being. Sometimes the hospital is not the appropriate level of care for patients. But when a patient is uninsured, other providers such as nursing home, rehabilitative services or other post-acute care settings are not willing to accept hospital patients unless there is a form of payment guaranteed. This means the uninsured can stay in the hospital longer than what is needed, increasing costs for the entire health care system. Patients recover quicker when they receive timely and appropriate care in the appropriate setting. And, the proper level of treatment is often less costly.

6. Hospitals have not directly reported information to CHA as to whether or not they employ DACA recipients. However, it is estimated that at least 4 percent of DACA recipients are working in health care in some capacity.[3] Further, an estimated 222,000 of the 800,000 total DACA recipients are from California.[4] This means that approximately 8,880 DACA recipients in California are working in health care in some capacity. Many of those health care jobs could be in hospitals or health systems

---

[3] Randy Capps, et al., *The Education and Work Profiles of the DACA Population*, Migration Policy Institute, p. 6 (Aug. 2017), https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population.

[4] USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, quarter, Intake Biometrics and Case Status Fiscal Year 2012-2017* (Mar. 31, 2017), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

with hospitals.  This is no small number for an industry already facing significant labor shortages. These individuals are most likely serving diverse communities with health professional shortage designations, like the central valley. In addition, 65 DACA recipients were enrolled in medical school in the 2016-2017 school year, and an additional 113 DACA recipients had applied to medical school in 2016.[5] There are no specific estimates as to how many of the medical students are in California; however, given the high percentage of DACA individuals in California and the high percentage of medical students that are trained in the state, an estimate of one-third of those medical students are likely studying in California. These future physicians are more likely to work in high-need areas where communities face challenges in recruiting new physicians.  DACA students are also more likely to be bilingual, come from diverse cultural backgrounds, and understand the challenges of providing health care in diverse communities— attributes that are underrepresented by today's medical professionals. When communities are served by medical professionals that understand the language and cultural sensitivities that are unique to them, care is improved and better outcomes are achieved.

      7.   As the national debate continues over federal immigration policies, hospitals have reported to CHA that there is a growing level of wariness and fearfulness from individuals who might need medical care but do not seek care for fear of deportation or reporting. In response to this growing concern, CHA developed a comprehensive toolkit of materials on hospital practices related to federal immigration policies for member hospitals and health systems.  The toolkit includes resources to help hospitals communicate with their patients, employees and community stakeholders.  The resources help convey to patients that hospitals have always provided care to everyone in need, regardless of a person's ability to pay, the language they speak or their immigration status.  It is important to preserve the health of communities and protect the public's health. If immigrant groups start avoiding institutions like hospitals because they are fearful of the federal government learning of their status, the health of communities could be at risk.

---

[5] Sunny Nakae, et al., *Considerations for Residency Programs Regarding Accepting Undocumented Students Who Are DACA Recipients*, Association of American Medical Colleges (2017), https://undocu.ucsf.edu/sites/undocu.ucsf.edu/files/Considerations_for_Residency_ Programs _Regarding_DACA_Recipients_2017.pdf.

3

0791

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017, at Sacramento, California.

ANNE MCLEOD

DECLARATION OF ANNE MCLEOD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0792