**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 3

# Exhibits 41 - 60

# DEF-INTERV.

# EX. 41

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF NICK MELVOIN** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA |

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

I, NICK MELVOIN, DECLARE:

1.    I proudly serve on the Los Angeles Unified School District ("L.A. Unified") Board of Education ("Board") as the elected Board Member for the District 4 communities, which include portions of Hollywood, the San Fernando Valley and the Westside of Los Angeles.  I also serve as the Vice President of the L.A. Unified Board.

2.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

3.    I understand that Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is an undocumented person serving as a special education teacher within an L.A. Unified school, and was hired as an intern credentialed teacher with authorization to work through the Deferred Action for Childhood Arrivals ("DACA") program.

4.    L.A. Unified has been at the forefront of ensuring that our students, families, employees, and community—regardless of immigration status—are welcome and supported in our schools.  This includes L.A. Unified's commitment to affording students a free public education aligned with the United States Supreme Court case of *Plyler v. Doe*, which held that undocumented children have a constitutional right to receive a free public K-12 education to become "self-reliant and self-sufficient participant[s] in society" and to learn the "fundamental values necessary to the maintenance of a democratic political system."

5.    L.A. Unified's commitment is embodied in the numerous resolutions passed by the Board in support of immigration reform.

6.    For example, when DACA was implemented in 2013, the Board passed a resolution to establish the "DREAMers Program," a centralized process to assist students and graduates of L.A. Unified to obtain educational histories to support their DACA applications.  From 2013-2017, approximately 21,000 students and graduates availed themselves of the program.  This year, educational records for 719 students have been requested.  These figures alone show that L.A. Unified's students, graduates, and community will be significantly and irreparably impacted by the rescission of DACA.

1

DECLARATION OF NICK MELVOIN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

7.      Additionally, on February 9, 2016, the Board passed a resolution entitled *LAUSD Campuses as Safe Zones and Resource Centers*, which declared every L.A. Unified site a place of support and resource for all students and families, regardless of immigration status.

8.      The Board also adopted the *Reaffirmation of Los Angeles Unified School District as Safe Zones for Families* resolution, which further propelled efforts to provide services to immigrant students and their families, including, but not limited to, (1) a reference guide in the event ICE agents seek access to students or student records; (2) a district-wide campaign to build awareness around immigrant students' rights called *We Are One L.A. Unified: Standing with Immigrant Families*; (3) the Education & Immigration Resource Guide outlining academic, legal, health and wellness, and enrollment information for immigrant families and school communities; and, (4) opening a Center for Education & Immigration Resources in each local district, where families can access information on immigration, enrollment, healthcare services, and other supports.

9.      After the September 5, 2017 announcement on the rescission of DACA, L.A. Unified immediately distributed letters to schools, families, and employees about the termination of DACA and provided referrals to legal resources.  Superintendent Michelle King sent a letter to all employees denouncing the Presidential Administration's decision to end DACA and declaring L.A. Unified's unwavering support to all employees, including teachers in our classrooms and other employees, who may be affected by the rescission of the program.  We did this, in no small part, because we knew that even this announcement of the rescission would have immediate, devastating consequences for the students and families in our community.

10.      Prior to serving as an L.A. Unified Board Member, I served as an L.A. Unified middle school teacher for several years at Markham Middle School, initially serving through an intern credential program in partnership with Teach For America, whereby I provided instruction while simultaneously studying to obtain my teaching credential.  This internship program is similar to the one I understand Mr. Jimenez to be hired through.

11.      In general, L.A. Unified hires intern credentialed teachers for hard-to-fill positions that are experiencing teacher shortages, such as in the field of special education.  These hires are essential to

2

DECLARATION OF NICK MELVOIN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0797

the L.A. Unified given the shortage of qualified candidates in these fields, and we rely on these employees to continue within our teaching force for years to come.

12.     If employees like Mr. Jimenez do not have authorization to work, however, L.A. Unified will not be able to hire or continue to employ such individuals to serve our students.

13.     Without the availability of intern-credentialed teachers like Mr. Jimenez to work with special education students, L.A. Unified might be forced to resort to staffing special education classrooms with short or long-term substitute teachers, which I believe to be particularly detrimental to these students' academic achievement as well as to their social and emotional development.

14.     In addition to filling a high-need position, the shared experience between Mr. Jimenez and our significant population of undocumented students is valuable in helping to ensure that our schools create a safe and welcoming space for all in accordance with L.A. Unified's stated commitments.

15.     The impact of the rescission of DACA will be especially dramatic in places like California—and Los Angeles in particular—where there is an incredibly high number of DACA recipients working and serving in their respective communities.

16.     L.A. Unified does not have a record of how many of its employees, including teachers credentialed through internship programs or otherwise, are DACA recipients because employment authorization documents do not provide that information and the District does not inquire about an employee's immigration status.  However, based on the number of employees who have self-identified as DACA recipients and based on third-party studies of DACA recipients, we believe that a significant portion of our educator workforce may have DACA status.  For example, an August 2017 study by the Migration Policy Institute found that, in 2014, approximately 14,000 "immediately eligible DACA population" were in the Education, Training, and Library occupations, and I understand that a significant portion of DACA participants reside in the Los Angeles Region.

17.     Additionally, according to Teach for America, more than 190 corps members and alumni have DACA status and reach 10,000 students across 11 states, including California and the Los Angeles region specifically, where teachers largely are placed in L.A. Unified schools or charter schools that are authorized and overseen by L.A. Unified and by myself as an L.A. Unified Board Member.

0798

18.     I believe that the rescission of DACA discriminates against this class of young immigrants like Mr. Jimenez in violation of the Equal Protection guarantee of the Fifth Amendment by depriving them of their substantial interests in pursuing a livelihood, including opportunities in higher education.

19.     I believe that the rescission of DACA will have a significant and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.

20.     I believe that the announcement of the rescission of DACA has already had an immediate, significant, and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.  I have spoken with several teachers with DACA status and they are particularly frustrated, dismayed, and discouraged because they used their DACA opportunity to be able to give back to the community they felt had given them so much.  The teachers I have spoken with came to work at L.A. Unified after they were granted work authorization because they felt that L.A. Unified and the community it supports provided them with opportunities for success.  Those opportunities are now unfairly being pulled out from underneath them.  These teachers have offered themselves as sources of comfort and as role models for students who are undocumented or who have undocumented family—and now both our teachers and those students have extra anxiety, worry, and stress to cope with on account of the recent announcement that DACA would be discontinued.  The educators I have spoken with are paralyzed with fear and are afraid to pursue any professional opportunities outside of L.A. Unified, one of the increasingly few places they feel supported and understood.  Further, our students are now not only terrified that their family members may be swept away, detained, deported, and disappeared at any moment, but that their trusted educators may be as well.

21.     Every child deserves an opportunity to dream without boundaries and I will not watch from the sidelines as this White House ignores the catastrophic implications of rescinding DACA.

0799

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2017, in Los Angeles, California.

Nick Melvoin

DECLARATION OF NICK MELVOIN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0800

# DEF-INTERV.

# EX. 42

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF FERNANDO S. MENDOZA** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA |

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>        Defendants. | CASE NO. 17-CV-05813-WHA |

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, FERNANDO S. MENDOZA, declare and state as follows:

1. I am the Associate Dean of Minority Advising and Programs and Professor of Pediatrics (General Pediatrics) at the Lucile Salter Packard Children's Hospital. I write this declaration as a doctor and an expert in pediatric medicine in support of all Plaintiffs in the related-lawsuits regarding the Deferred Action for Childhood Arrivals program, commonly known as DACA. I have been an academic general pediatrician at Stanford University School of Medicine for 36 years, and have held the rank of Professor for the past 16 years. During that time, I also have held the position of Associate Dean of Minority Advising and Programs (1983 to present), and Chief of the Division of General Pediatrics at the Lucile Packard Children's Hospital (1996-2014). I received my MD in 1975 from Stanford University, School of Medicine, and my Masters of Public Health from Harvard University in 1979. My training in pediatrics was at Stanford University, School of Medicine as a resident from 1975 to 1978, and as a fellow in academic general pediatrics from 1979-1981. Relevant to this declaration is also my experience as a member of the Committee on the Health and Adjustment of Immigrant Children and Families, National Research Council, Institute of Medicine (1996-98).

2. Throughout my career of 36 years, I have focused in particular on the physical and mental well-being of immigrant and Mexican-American children. I have taught courses on delivering health care to diverse populations, and promoting well-being in immigrant children and youth. I have published numerous peer-reviewed publications on these issues. A copy of my curriculum vitae is attached (Exhibit A).

3. As a faculty member in the Pediatrics Department, I have spent my clinical time treating children and youth in the outpatient and inpatient settings at the Lucile Packard Children's Hospital. Most recently, my clinical time has been as an attending physician in the outpatient clinic of the Gardner-Packard Children's Health Center, a Federally Qualified Health Center run by the Gardner Family Care Corporation in partnership with Lucile Packard Children's Hospital. This clinic serves primarily children and youth from low-income families in our region; many of them come from immigrant families. Overall, my clinical experiences for the past 36 years has been with this population of children and youth, treating acute and chronic illness, providing well child care, and working with families on issues of child wellness.

0814

4.  In 2017, I co-authored a peer-reviewed study titled "Protecting unauthorized immigrant mothers improves their children's mental health," which was published in *Science*. A copy of that study is attached (Exhibit B). Using Medicaid claims data from the state of Oregon, we found that mothers' DACA eligibility decreased adjustment and anxiety disorder diagnoses by 50% among their U.S. born children. This study suggests that intergenerational benefits can occur when an immigration policy (DACA) positively impacts one generation (mother) in such a way that the impact on the parent's health and wellbeing is felt by the next generation (children), resulting in their improved development and well-being. More specifically, the results of this study indicated that parents' unauthorized status is a substantial stressor to children because of the daily uncertainty of deportation. When this stress is alleviated by a policy such as DACA, normal child development is more likely to occur leading to a lower prevalence of anxiety and adjustment disorders.  DACA can prevent a health disparity among U.S. children (a high level of chronic stress) by eliminating a parental disadvantage (fear of deportation) that can impact their U.S. children.

5.  As a pediatric practitioner, I am familiar with the short-term and long-term health effects of adjustment and anxiety disorder diagnoses for children. A child diagnosed with these disorders can be depressed and withdrawn, be unable to complete schoolwork, lash out at classmates and teachers, behave recklessly, and have trouble sleeping. These are conditions that significantly impair daily functioning and interfere with children's psychological and emotional development. If the cause of the anxiety is not addressed, the subsequent impairment can have long-term effects for school performance and general mental health, including an increased risk for substance abuse (The Effects of Childhood Stress on Health Across the Lifespan, Centers for Disease Control and Prevention, 2008).

6.  One of the greatest stressors to children is the loss of a parent by death, divorce, or in this case, deportation. However, in the case of deportation, the level of stress is heightened by the uncertainty of the event. Think about a young child going to school one day and returning home and not finding their mother. Or having the father leave in the morning, and always thinking, "will this be the last time I see him?" This is the current status of 4 million children who have one undocumented parent. This is the stress and uncertainty that DACA was able to relieve.

2

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

7. Childhood mental health problems are associated with serious challenges later in life. Struggles in school can lead to limited job prospects and long-term reliance on welfare, and adults who experienced trauma during these formative years have higher rates of substance abuse and chronic health problems (CDC: 2008). By curbing acute anxiety in young children, programs like DACA could have cascading effects in improving health and other outcomes across the lifespan. In addition, there are significant implications for cost savings given that it is estimated that at present, we spend $247 billion for U.S. youth in providing mental health and health services, and dealing with their lost productivity and crime (Preventing mental, emotional, and behavioral disorders among young people: Progress and possibilities. National Research Council and the Institute of Medicine of the National Academies, Washington, DC: National Academies Press; 2009).

8. Over the past 12 months, I have observed the effects that uncertainty about parental immigration status has on children. I have been asked to write letters for undocumented parents who have a U.S. child with chronic illness to be used for their request to stay with them in the U.S. I also had to discuss with parents the situation of being deported and not being able to return home to care for their U.S. children. In this situation, I have learned that parents are engaged in obtaining legal documents to entrust their children to other family members or friends, rather than have their children be placed in foster care. I cannot think of anything more stressful for parents and children than having to go through the process of dealing with the breakup of a family. As a pediatrician, my role is to care for all children, including those who have undocumented parents. This involves not only providing health care, but also advocating for children and their families. As such, I believe bringing to light the situation that children with undocumented parents face with regard to their health and wellbeing is important, and a vital first step toward addressing these public health concerns.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on [Date] in Stanford, California.

FERNANDO S. MENDOZA

3

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0816

# EXHIBIT A

CURRICULUM VITAE
October 2017

## FERNANDO S. MENDOZA, M.D., M.P.H.

Current Title:    Professor of Pediatrics at the Lucile Salter Packard
                  Children's Hospital, Division of General Pediatrics,
                  Department of Pediatrics,
                  and
                  Associate Dean of Minority Advising and Programs
                  Stanford University, School of Medicine

Business Address:    Division of General Pediatrics
                     Department of Pediatrics
                     School of Medicine
                     Stanford University
                     1265 Welch Road, MSOB 238
                     Stanford, CA, 94305-5459
                     (650) 725-8289

## EDUCATION AND TRAINING

| | |
|---|---|
| B.A., 1971 | San Jose State University San Jose, California |
| M.D., 1975 | Stanford University School of Medicine Stanford, California |
| Internship and Residency in Pediatrics (PL 1,2,3) 1975-1978 | Stanford University School of Medicine Stanford, California |
| M.P.H., 1979 | Harvard University School of Public Health Boston, Massachusetts |
| Robert Wood Johnson Academic General Pediatrics Fellowship, 1979-1981 | Stanford University School of Medicine Stanford, California |

## FACULTY APPOINTMENTS

| | |
|---|---|
| Assistant Professor of Pediatrics September 1981 to 1990 | Stanford University School of Medicine Stanford, California |

*Fernando S. Mendoza, MD, MPH*                                                          2

Assistant Dean of Student Affairs          Stanford University
September 1983 to August 1993              School of Medicine Stanford, California

Associate Professor of Pediatrics          Stanford University
July 1990 to May 2001                      School of Medicine Stanford, California

Associate Dean of Minority                 Stanford University
Advising and Programs                      School of Medicine Stanford, California
September 1993 to present

Division and Service Chief,                Stanford University
General Pediatrics                         School of Medicine Stanford, CA
(Acting 9/95-8/96)                         Lucile Packard Children's Hospital
September 1996-2014

Professor of Pediatrics                    Stanford University
June 2001-present                          School of Medicine Stanford, CA

**BOARD CERTIFICATION**

American Board of Pediatrics, December 7, 1980, Certificate# 25342

**HONORS**

Dean's Scholar, San Jose State University, 1968-1971

Recognition Award, Chicano Latino Medical Student Association, April 1986

Research Excellence Award, National Coalition of Hispanic Health and Human Services
Organizations (COSSMHO), September 1986

Henry J. Kaiser Award for Outstanding and Innovation Contribution
In Medical Education, Stanford University School of Medicine, June 1990

Honors Award, Latino Health Affairs Council, March 1992

Outstanding Research Advisor, The Stanford Society of Chicano/Latino Engineers and
Scientists, May 1993

Recognition Award, Stanford University Minority Medical Alliance, April 2000

Top Doctor in Silicon Valley in General Pediatrics.  San Jose Magazine, 1999-07
Best Doctors in America, 2007-2009

KGO Channel 7, (ABC Affiliate in San Francisco), Hispanic Profile of Excellence

0819

*Fernando S. Mendoza, MD, MPH* 3

October 2002

Selected as one of the 100 most influential Hispanics in the United States by Hispanic Business Magazine, November 2002

National Hispanic Medical Association, Leadership Award, March 20, 2004

Juan Villagomez Humanitarian Award, California Latino Medical Association, September 2004

Establishment of the Dr. Fernando S. Mendoza Award for exemplary leadership, service and commitment to minority community awarded by LSMA, SNMA, SAIMS; May 2005

Group on Student Affairs-Minority Affairs Section, Service Award, November 2005

100 Most Influential Latinos in Silicon Valley, Mexican American Community Services Agency, June 30, 2007

The Gardner Community Spirit Award, and resolutions of commendations from the City of San Jose, County of Santa Clara, California State Senate, and U.S. Congress, September 2008.

Best Doctors in America 2009-2014

Visiting Professor, Harvard Medical School, October 2009

Visiting Professor, University of Calfiornia, San Francisco, Philip R. Lee Instititue for Health Policy Studies, January 2010

Outstanding Leadership Award for Community Pediatric Services, Ravenswood Family Health Center, March 2012

JE Wallace Sterling "Muleshoe" Alumni Lifetime Achievement Award, May 2012

President's Award for Excellence through Diversity, Stanford University, June 2012

CDC's Health Equity Champion, Fall 2012

Visiting Professor, University of Puerto Rico Health Services Schools, February 2014

Leonard P. Rome CATCH Visiting Professor, Children's National Medical Center April 2014

Ravenswood Family Health Center, Community Service Award, August 2014.

Lucile Packard Children's Hospital Medical Staff Distinguish Service Award, April 2015

0820

Dr. Augustus A. White III and Family Faculty Professionalism Award, Stanford University School of Medicine, June 2015

Dr. Phil DeChavez Mentor of the Year Award, National Latino Medical Student Association April 2016

## ACADEMIC ACTIVITIES AND SERVICES

Member, Stanford Center for the Study of Families,
Children and Youth, 1983 to 1992

Child Health Advisory Committee
Youth Law Center National Center for Youth Law
1987 to 1992

Director, Stanford Center for Chicano Research
September, 1990 to April, 1993

Co-Director, Inter-University Program for Latino Research
September, 1990 to April, 1993

Co-Director, UCSF/Stanford Academic General Pediatric Fellowship
July 1997 - 2005

## PROFESSIONAL MEMBERSHIP

Academic Pediatric Association
American Academy of Pediatrics, Fellow
Association of American Medical Colleges
American Pediatric Society

## EDITORIAL MEMBERSHIP
Journal of Medical Education, January 1986 - September 1989

## REVIEWER
Pediatrics
Journal of Pediatrics
Archives of Pediatrics and Adolescent Medicine (JAMA Pediatrics)
Academic Pediatrics

## PAST AD HOC REVIEWER -
American Journal of Diseases of Children
American Journal of Human Biology
American Journal of Public Health
Child Development
Human Development

0821

*Fernando S. Mendoza, MD, MPH*                                              5

Hispanic Journal of Behavioral Sciences
Journal of Adolescent Health
The Journal of the American Medical Association
Public Health Reports

## MEDICAL SCHOOL AND HOSPITAL COMMITTEES

Co-Chairman, Minority Admissions Advisory Panel,
Admissions Office, Stanford Medical School, 1983-1990

Committee on Student Performance, Stanford University, School of Medicine, 1983 to
present

Co-Chairman, CPR Committee, Children's Hospital at Stanford,
1986-1989

Member, Utilization Review Committee, Children's Hospital at Stanford, 1986-1990

Member, Medical Executive Committee, Lucile Packard Children's Hospital, 1996- 2014

Co-Chair, Dean's Task Force on Diversity and Societal Citizenship, 2015-2017

Co-Chair, Diversity Cabinet, Stanford University, Medical School 2010-present

## NATIONAL and STATE COMMITTEES

**Research**
Member, National Institutes of Health, Human Development and
Aging Study Section (Subcommittee 1), Division of Research
Grants, 1988-1989; 1993-97

Member, Social Science Advisory Board for Poverty and Race
Research Action Council, 1991 to 1994

Member, Committee on Culture, Health and Society, Social Science
Research Council, 1991

Chairperson, Scientific Advisory Committee to the Interamerican College of Physician
and Surgeons project, "Vacune a Nuestros Niños", 1996

Member, The Committee on the Health and Adjustment of Immigrant Children and
Families, National Research Council, Institute of Medicine, and the Commission on
Behavioral and Social Science and Education.  March 26, 1996 through February 26,
1998.

0822

*Fernando S. Mendoza, MD, MPH* 6

Chair, California Health Interview Survey (CHIS), Child Technical Advisory Committee, UCLA Center for Health Policy Research 1999-2016.

National Advisory Council on Minority Health and Health Disparities, NIMHD, 2016-2020

**Medical Education and Public Service**

Chairperson, Group on Student Affairs - Minority Affairs Section, Association of American Medical Colleges, Western Region, 1986-1987.

Member, Association of American Medical Colleges, MCAT Evaluation Panel, 1989 to 1996.

Member, National Commission on Substance Abuse on College and University Campuses: Center on Addiction and Substance Abuse at Columbia University; Director, Joseph A. Califano, Jr. January 1993 to 2000.

Member, Health Resources and Services Administration, Bureau of Health Professions' Planning Committee on Minority Faculty Development.  September 1994.

Chairperson, 13 School Consortium Minority Affairs Section. 1995-2000.

Vice-President, Hispanic-Serving Health Professions Schools, Inc., 1996-2001

President, Hispanic Serving Health Professions School, Inc., 2001-03

Past President and Executive Board Member, Hispanic Serving Health Professions Schools, Inc. 2003-2013

Board Member, Stanford Medical Alumni Association 2004-10

Board Member and Secretary, Pan American Health and Education Foundation. 2006-2010; Chair, Research Committee 2008-2012

Co-Chair, Vision Council, KIDS IN COMMON, Santa Clara County 2008-present

Member, Diversity Taskforce of the American Pediatric Society, 2011-2016

Co-Chair, Diversity Taskforce, Federation of Pediatric Organizations, 2012- 2014

Member, AAP Task Force on Addressing Bias & Discrimination 2017- present

0823

*Fernando S. Mendoza, MD, MPH* 7

# BIBLIOGRAPHY

## JOURNAL ARTICLES

1. **Mendoza FS**, Castillo RO.  Growth abnormalities in Mexican-American children in the United States: The NHANES I Study.  *Nutrition Research,* 1986;6:1247-1257.

2. Malina RM, Martorell R, **Mendoza FS.**  Growth status of Mexican American Children and Youths: Historical trends and contemporary issues.  *Yearbook of Physical Anthropology,* 1986;29:45-79.

3. Martorell R, **Mendoza FS**, Castillo RO, Pawson IG, Budge CC.  Short and plump physique of Mexican-American Children.  *American Journal of Physical Anthropology,* 1987;73:475-487.

4. **Mendoza FS**, Atiba JO, Krensky AK, Scannell LM.  Rhabdomyolysis complicating doxylamine overdose.  *Clinical Pediatrics*, 1987;26(11):595-597.

5. **Mendoza FS**, Johnson F, Kerner JA, Tune BM, Shochat SJ.  Vitamin A intoxication presenting with ascites and a normal vitamin A level.  *The Western Journal of Medicine*, 1988;148(1):88-90.

6. Friedman IM, Kraemer HC, **Mendoza FS**, Hammer LD.  Elevated serum iron concentration in adolescent alcohol users.  *American Journal of Diseases of Children*, 1988;142(2):156-159.

7. Martorell R, Malina RM, Castillo RO, **Mendoza FS**, Pawson IG.  Body proportions in three ethnic groups: Children and youths 2-17 years in NHANES II and HHANES.  *Human Biology*, 1988;60(2):205-222.

8. Villarreal SF, Martorell R, **Mendoza FS**.  Sexual maturation in Mexican-American adolescents.  *American Journal of Human Biology*, 1989;1:87-95.

9. Martorell R, **Mendoza FS,** Castillo RO.  Genetic and environmental determinants of growth in Mexican-Americans.  *Pediatrics*, 1989;84(5):864-871.

10. Kaplowitz H, Martorell R, **Mendoza FS**.  Fatness and fat distribution in Mexican American children and youths from the Hispanic Health and Nutrition Examination Survey.  *American Journal of Human Biology*, 1989;1:631-648.

0824

11.    Murphy SP, Castillo RO, Martorell R, **Mendoza FS**.  An evaluation of four food group intakes by Mexican-American children.  *The Journal of the American Dietetic Association*, 1990;90(3):388-393.

12.    **Mendoza FS**, Ventura SJ, Valdez RB, Castillo RO, Saldivar LE, Baisden K, Martorell R.  Selected measures of health status for Mexican-American, Mainland Puerto Rican, and Cuban-American children.  *Journal of the American Medical Association*, 1991;265(2):227-232.

13.    Pollick HF, Pawson IG, Martorell R, **Mendoza FS**.  The estimated cost of treating unmet dental restorative needs of Mexican-American children from southwestern US HHANES, 1982-83.  *Journal of Public Health Dentistry*, Fall 1991;51(4):195-204.

14.    Pawson IG, Martorell R, **Mendoza FS**.  Prevalence of overweight and obesity in US Hispanic Populations.  *American Journal of Clinic Nutrition*, 1991;53:1522S-1528S.

15.    **Mendoza FS**. Latino child health policy issues.  *The Future of Children. Center for the Future of Children, The David and Lucile Packard Foundation,*  Volume 4, Number 3, Winter 1994, pages 43-72.

16.    **Mendoza FS**. The health of Latino children in the United States.  *Current Problems in Pediatrics*, November-December 1995 pg. 314-335.

17.    **Mendoza FS**. and Fuentes-Afflick, E.  Latino children's health and the family-community health promotion model. *Western Journal of Medicine*, 1999;170(2):85-92.

18.    Sanders LM, Gershon TD, Huffman LC, **Mendoza FS**.  Prescribing books for immigrant children:  A pilot study to promote emergent literacy among the children of Mexican-American immigrants.  *Archives of Pediatrics and Adolescent Medicine*, 2000;154(8):771-7.

19.    Romero AJ, Robinson TN, Kraemer HC, Erickson SJ, Haydel KF, **Mendoza FS**, Killen J,.  Are perceived neighborhood hazards a barrier to physical activity in children? *Archives of Pediatrics and Adolescent Medicine*, 2001;155:1143-1148.

20.    Flores G, Fuentes-Afflick E, Carter-Pokras O, et al.  Why ethnicity and race are so important in child health services research today.  *Archives of Pediatrics and Adolescent Medicine*, 2001;155:1178-79.

21.    Flores G, Fuentes-Afflick E, Barbot O, et al.  The health of Latino children:  Urgent priorities, unanswered questions, and a research agenda.  *Journal of the American Medical Association*, 2002;288:82-90.

0825

*Fernando S. Mendoza, MD, MPH*                                                    9

22.     Kelly NR, Huffman LC, **Mendoza FS,** Robinson TN.  Effects of a videotape to increase use of poison control centers by low-income and Spanish-speaking families: a randomized controlled trial.  *Pediatrics,* 2003;111(1):21-26.

23.     Jutte DP, Burgos A, **Mendoza FS**, Blasey C. and Huffman LC**.**  Use of the Pediatric Symptom Checklist in a low-income, Mexican American population. *Archives of Pediatric and Adolescent Medicine,* 2003;157:1169-76.

24.     Romero AJ, Robinson TN, Haydel KF, **Mendoza FS**, and Killen JD. Associations among familism, language preference, and education in Mexican-American mothers and their children.  *Developmental and Behavioral Pediatrics,* 2004;25(1):34-40.

25.     Burgos AE, Schetzina KE, Dixon LB, **Mendoza FS**. Importance of generational status in examining access to and utilization of health care services by Mexican American children.  *Pediatrics*. 2005 Mar;115(3):e322-30

26.     Javier, JR, Huffman, LC, **Mendoza, FS**. Filipino Child Health in the United States: Do Health and Health Care Disparities Exist? *Preventing Chronic Disease: Public Health Research, Practice, and Policy*, 2007;4 (2): 1-20.

27.     Javier, J., Wise, P., **Mendoza, FS**.  The Relationship of Immigrant Status With Access, Utilization, and Health Status for Children with Asthma. Ambulatory Pediatrics, Vol. 7, No. 6, 421-430, Nov-Dec 2007.

28.     **Mendoza, F**., Health Disparities and Children in Immigrant Families: A Research Agenda. Pediatrics November 2009, 124 Supplement 3 S187-95

29.     Javier, J., Huffman, L., **Mendoza, F**., Wise, P. Access, Utilization, and health Status of Children with Special Health Care Needs in Immigrant Families. Maternal and Child Health Journal 14 (4): 567-79: 2010

30.     Javier JR, Chamberlain LJ, Rivera KK, Gonzalez SE, **Mendoza FS**, Huffman LC. Lessons Learned from a Community-Academic Partnership Addressing Adolescent Pregnancy Prevention in Filipino-American Families. Progress in Community Health Partnerships: Research, Education, and Action. Prog. Community Health Partnership. 2010 Winter, 4(4): 305-13

31.     Frintner, M.P, **Mendoza, F.S**., Dreyer, B.P. Cull, W.L., Laraque, D. Resident Cross-Cultural Training, Satisfaction and Preparedness. Academic Pediatrics Jan-Feb 2013: 13 (1): 65-71

32.     **Mendoza, F.S**., Festa, N. New American Children: Supporting the Health and Well-being of Immigrant Populations. Archives of Pediatrics & Adolescent Medicine (JAMA Pediatrics) January 2013: 167 (1): 12-1.

0826

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 28 of 270
Case 3:17-cv-00821-DWM Document 119 Filed 11/01/17 Page 29 of 466

*Fernando S. Mendoza, MD, MPH*                                                                          10

33.  Bogetz J, Gabhart J, Rassbach C, Sanders L, **Mendoza F**, Bergman D, Blankenburg R. Special Care Optimization for Patients and Education (SCOPE): Training Pediatric Residents About Children With Special Health Care Needs. *MedEdPORTAL*; 2013. Available from:www.mededportal.org/publication/962

34.  Eneriz-Wiemer, M., Sanders, L. M., Barr, D.A., **Mendoza, F. S.**, Parental Limited English Proficiency and Health Outcomes for Children with Special Health Care Needs: A Systematic Review.  Academic Pediatrics, March/April 2014, Vol. 12, no. 2, pg.128-136.

35.  Horn, I.B. and **Mendoza, F. S**., Reframing the Disparities Agenda: A Time to Rethink, A Time to Focus.  Academic Pediatrics, March/April 2014, Vol. 12, no. 2, pg.115-116.

36.  Festa, N., Loftus-Gagli, P., Cullen, M., **Mendoza, F. S**., Disparities in Early Exposure to Book Sharing within Immigrant Families. Pediatrics, Vol. 134, No. 1. July 2014, e162-168.

37.  Dunlap, J.L., Jaramillo, J.D., Koppolu, R., Wright, R., **Mendoza, F.**, Bruzoni M., The Effects of Language Concordant Care on Patient Satisfaction and Clinical Understanding for Hispanic Pediatric Surgery Patients. Journal of American College of Surgeons, September 2014, Vol. 219, No. 3, S106

38.  Bogetz, Jori, Julia Gabhart, Caroline Rassbach, Lee Sanders, **Fernando Mendoza**, David Bergman and Rebecca Blankenburg. Outcomes of A Randomized Controlled Intervention to Train Pediatric Residents on Caring for Children With Special Health Care Needs. Clinical Pediatrics June 2015, Vol. 54 (7), 659-666).

39.  **Fernando S. Mendoza**, MD, MPH[1], Leslie R. Walker, MD[2], Barbara J. Stoll MD[3], Elena Fuentes-Afflick, MD, MPH[4], Joseph W. St. Geme III, MD[5], Tina L. Cheng, MD, MPH[6], Javier A. Gonzalez del Rey, MD, M.Ed [7], Christopher E. Harris, MD[8], Mary E. Rimsza, MD[9], Jie Li, Ph.D[1], and Theodore C. Sectish, MD[10]. Diversity and Inclusion Training in Departments of Pediatrics. Pediatrics, Vol. 135, No. 4, April 2015, pg. 707-713.

40.  Theodore C. Sectish[1], M.D., William W. Hay, Jr.[2], M.D., John D. Mahan[3], M.D., **Fernando S. Mendoza[4]**, M.D., M.P.H., Nancy D. Spector[5], M.D., Bonita Stanton[6], M.D., Peter G. Szilagyi[7], M.D., M.P.H., Teri L. Turner[8], M.D., M.P.H., M.Ed., Leslie R. Walker[9], M.D., Kenneth Slaw M.Ed., PhD[10], and the Federation of Pediatric Organizations' Visioning Summit Working Groups and Planning Committee[11]. Future of the Pediatric Workforce. June 2015 doi: 10.1542/peds.2008-153

0827

*Fernando S. Mendoza, MD, MPH*                                               *11*

41.  Jori Bogetz, Caroline Rassbach, Sylvia Bereknyei, **Fernando Mendoza**, Lee
     Sanders, Clarence Braddock. Training 21st Century Healthcare Professionals: A
     Systematic Review of Educational Interventions on Chronic Care. Academic
     Medicine July 15, 2015

42.  Joshua Jaramillo BA, Elizabeth Snyder MA, Jonathan L Dunlap MD, Rajashree
     Koppolu RN, MS, CPNP, Robert Wright MA, **Fernando Mendoza MD**, Matias
     Bruzoni MD-FACS, The impact of language concordant care for Hispanic
     pediatric surgery patients: Disparities in question asking and communication.
     Journal of Pediatric Surgery 50 (2015) 1586-89.

43.  Jaramillo, J., Snyder, E., Dunlap, J. L., Wright, R**., Mendoza, F**., Bruzoni, M.
     The Hispanic Clinic for Pediatric Surgery: A model to improve
     parent-provider communication for Hispanic pediatric surgery patients
     Journal of Pediatric Surgery, 2016; 51 (4): 670-674

44.  Glenn Flores, M.D.; **Fernando Mendoza**; Elena Fuentes-Afflick; Jayson
     Mendoza; Lee Pachter; Juan Espinoza; Christopher Russell; Cristina Fernandez;
     Danielle Arnold; Nicole Brown; Kymberly Gonzalez; Cynthia Lopez; Mikah
     Owen; Kenya Parks; Kimberly Reynolds. Hot Topics, Urgent Priorities, and
     Ensuring Success for Racial/Ethnic Minority Young Investigators in Academic
     Pediatrics.  International Journal for Equity in Health, (2016) 15:201. DOI
     10.1186/s12939-016-0494-6

45.  Khan, A., Coffey, M., Litterer, K. P., Baird, J. D., Furtak, S. L., Garcia, B. M.,
     Ashland, M. A., Calaman, S., Kuzma, N. C., O'Toole, J. K., Patel, A., Rosenbluth,
     G., Destino, L. A., Everhart, J. L., Good, B. P., Hepps, J. H., Dalal, A. K., Lipsitz,
     S. R., Yoon, C. S., Zigmont, K. R., Srivastava, R., Starmer, A. J., Sectish, T. C.,
     Spector, N. D., West, D. C., Landrigan, C. P., Allair, B. K., Alminde, C.,
     Alvarado-Little, W., Atsatt, M., Aylor, M. E., Bale, J. F., Balmer, D., Barton, K.
     T., Beck, C., Bismilla, Z., Blankenberg, R. L., Chandler, D., Choudhary, A.,
     Christensen, E., Coghlan-McDonald, S., Cole, F. S., Corless, E., Cray, S., Da
     Silva, R., Dahale, D., Dreyer, B., Growdon, A. S., Gubler, L., Guiot, A., Harris,
     R., Haskell, H., Kocolas, I., Kruvand, E., Lane, M. M., Langrish, K., Ledford, C.
     J., Lewis, K., Lopreiato, J. O., Maloney, C. G., Mangan, A., Markle, P.,
     **Mendoza, F**., Micalizzi, D. A., Mittal, V., Obermeyer, M., O'Donnell, K. A.,
     Ottolini, M., Patel, S. J., Pickler, R., Rogers, J. E., Sanders, L. M., Sauder, K.,
     Shah, S. S., Sharma, M., Simpkin, A., Subramony, A., Thompson, E. D.,
     Trueman, L., Trujillo, T., Turmelle, M. P., Warnick, C., Welch, C., White, A. J.,
     Wien, M. F., Winn, A. S., Winch, S., Wolf, M., Yin, H. S., Yu, C. E.Hide.
     Families as Partners in Hospital Error and Adverse Event Surveillance. JAMA
     Pediatrics 2017;171(4):372-381.

0828

*Fernando S. Mendoza, MD, MPH* 12

46. Jens Hainmueller, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás Jiménez, **Fernando Mendoza**, Maria Rodriguez, Jonas J. Swartz, and David Latin, "Protecting unauthorized immigrant mothers improves their children's mental health", Science, 357: September 8, 2017, 1041-1044, S

## BOOK CHAPTERS, EDITORIALS, and COMMENTARIES

1. **Mendoza FS**. Increasing minorities in academia: The faculty role model, Editorial. *Journal of Medical Education*, 1986;61(10):850-851.

2. Prieto DO, **Mendoza FS**. Minority admissions: Quo vadis?, Editorial. *Journal of Medical Education,* 1987;62:698-700.

3. Martorell R, **Mendoza FS**, Mueller WH, Pawson IG. Which Side to Measure: Right or Left? In TG Lohman, AF Roche, and R. Martorell (eds.), Anthropometry Standardization Reference Manual, 1988 (pp. 87-91). Champaign, Illinois: Human Kinetics Publishers, Inc.

4. Martorell R, **Mendoza FS**, Castillo R. Poverty and Stature in Children. In John C. Waterlow (ed.), Linear Growth Retardation in Less Developed Countries, Nestle Nutrition Workshop Series, Vol 14, 1988 (pp. 57-73). New York: Vavey/Raven Press.

5. **Mendoza FS**, Ventura S, Saldivar L, Baisden K, Martorell R. Health Status of U.S. Hispanic Children. In Antonio Furino (ed.), Health Policy and the Hispanic, 1992. Boulder, Colorado: Westview Press.

6. **Mendoza FA**, Takata G. Measures of Health Status and Health Care Access for Mainland Puerto Rican Children: Results from the Hispanic Health and Nutrition Examination Survey. In Cynthia Garcia Cole and Gontran Lamberty (eds.), Health and Development of Puerto Rican Mothers and Children in the Mainland, New York, New York: Plenum Publication Corporation, 1994.

7. Martorell R, **Mendoza F**, Baisden K, Pawson I. Physical Growth, Sexual Maturation, and Obesity in Puerto Rican Children. In Cynthia Garcia Cole and Gontran Lamberty (eds.), Health and Development of Puerto Rican Mothers and Children in the Mainland, New York, New York: Plenum Publication Corporation,1994.

8. **Mendoza FS**. Stanford Medical School's Minority Faculty Development and the Center of Excellence. In L. Bergeisen (ed) Minority Faculty in the Health

0829

Professions For the 21st Century. Selected Proceedings, Leesburg, Virginia, September 6-8, 1995.

9. **Mendoza FS**. Socioeconomic, Cultural, and Ethical Issues in Pediatrics. In Daniel Bernstein and Steven Shelov (eds), Pediatrics for Medical Students. Baltimore, MD: Williams and Wilkins pg. 99-105, 1996.

10. **Mendoza FS**. My Obligation to Others: A Tradition Carried Forward. In Ellen Bassuk (ed.), The Doctor Activist: Physician Fighting For Social Change. New York, New York: Plenum Publication Corporation. 1996

11. **Mendoza FS** and Villarreal S. Our Nation's Challenge, Vaccinating Latino Children; Can We Do It? *Medico InterAmericano*, 1996;15(1):7-8.

12. **Mendoza FS** and Rosales N., Health Issues of Immigrant Children of Color. In H. Fitzgerald, B. Lester, and B. Zuckerman (ed), Children of Color, Research, Health, and Policy Issues. Garland Publishing, Inc. New York and London, 1997 pg.141-158.

13. Committee member and Contributor, From Generation to Generation: The Health and Well-Being of Children in Immigrant Families. Board on Children, Youth, and Families, National Research Council, Institute of Medicine, National Academy Press, 1998.

14. **Mendoza FS** and Dixon LB. The Health and Nutritional Status of Immigrant Hispanic Children: Analyses of the Hispanic Health and Nutrition Examination Survey. In D Hernandez (ed) Children of Immigrants. Washington, D.C.: National Academy Press, 1999.

15. **Mendoza FS**, Nutritional Status of Immigrant Children, In Children in Immigrant Families: Issues for California's Future. California Policy Research Center, California Program on Access to Care and the UCLA Center for Health Policy Research, pages 11-12. 2000

16. **Mendoza FS**, Health Risk Profiles and Race, Culture, and Socioeconomic Status in the 31st Ross Roundtable, Child Health in the Multicultural Environment, September 2000, pages 5-26.

17. Orr JE, Baker S, Shirling E, Sanders L, Huffman LC, **Mendoza FS**. A book a day keeps the doctor away: A look at the implementation and effects of reach out and read, a pediatric clinic-based early literacy promotion program. Resources in Education, 2001. (electronic publication)

18. Flores G, **Mendoza FS**. ¿Dolor Aquí? ¿Fiebre? Editorial. *Arch Pediatr Adolesc Med,* 2002;(156):638-640.

0830

19.  **Mendoza, FS**, Socioeconomic and Cultural Issues in Pediatrics.  In Daniel Bernstein and Steven Shelov (eds), <u>Pediatrics for Medical Students, 2nd Edition</u>. Baltimore, MD: Williams and Wilkins pg. 112-120, 2003.

20.  Javier JR, Chamberlain L, Huffman L, **Mendoza F**.  Parent-adolescent communication about sex in Filipino American families: A demonstration of community-based participatory research.  Letter to the editor.  *Ambulatory Pediatrics*. 2006 Mar-Apr;6(2):120.

21.  Trowbridge, R. and **Mendoza, F**. Preventing Obesity in Mexican-American Children and Adolescents. In <u>Joint U.S.-Mexico Workshop on Preventing Obesity in Children and Youth of Mexican Origin</u>.  Institute of Medicine of the National Academies. The National Academies Press, Washington, D.C., pg 128-186, 2007

22.  **Mendoza, FS**, Javier, JR. and Burgos, AE.  Health of Children in Immigrant Families.  In Lansford, JE, Deater-Deckard, K, and Bornsten, MH, (eds) Immigrant Families in Contemporary Society. Guilford Press May 2007

23.  **Mendoza, FS,** Socioeconomic and Cultural Issues in Pediatrics.  In Daniel Bernstein and Steven Shelov (eds), <u>Pediatrics for Medical Students, 3nd Edition</u>. Baltimore, MD: Lippincott Williams and Wilkins pg. 120-130, 2012.

24.  Javier, J., Festa, N., Florendo, E., **Mendoza, F.S.**  Children in Immigrant Families: The Foundation of America's Future. Advances in Pediatrics 65 (2015) pg. 105-136.

25.  **Mendoza, FS**. Commnentary on New Century Scholars, Year Book of Pediatrics 2016, pg 467-469.

26.  Julie M. Linton M.D.[a]*; Ricky Choi M.D., M.P.H.[b]; **Fernando Mendoza M.D., M.P.H.**[c] Caring for Immigrant Families: Vulnerabilities, Resilience, and Opportunities. Pediatric Clinics of North America, February 2016, pg115-130.

27.  **Mendoza, FS.** Another reason to save DACA: Lessen childhood fears. Sacramento Bee Editorial, September 18, 2017


**TECHNICAL REPORTS**

1.  Litt IF, **Mendoza FS**.  Final Report -- Transactions of Pregnant Adolescents in Prenatal Care.  Bureau of Health Care Delivery and Assistance, Maternal and Child Health Research, Grant No. MCJ-060495, 1987.

0831

*Fernando S. Mendoza, MD, MPH*                                                15

2.  **Mendoza FS**, Villarreal S, Valdez R.  Health Issues for Hispanic Children, prepared for The National Coalition of Hispanic Health and Human Services Organizations (COSSMHO), 1987.

3.  **Mendoza FS**, Martorell R, Castillo RO.  Interim Report -- Health and Nutritional Status of Mexican-American Children.  The Maternal and Child Health Research Program, Bureau of Maternal and Child Health and Resources Development, Grant No. MCJ-060518, 1989.

## ABSTRACTS

1.  **Mendoza FS**, Martin J, Gross R, Litt IF, Lewiston N, Blessing-Moore J.  Social support and stress in mothers of asthmatic children: Relationship to morbidity.  *Pediatric Research*, 1981, 15:4:2(452).

2.  **Mendoza FS,** Martin J, Gross R, Litt IF, Lewiston N, Blessing-Moore J.  The effect of maternal social support and stress in the prospective morbidity of asthmatic children.  *Pediatric Research*, 1982, 16:4:2(90A).

3.  Willoughby A, **Mendoza FS**, Duke P, Williams J, Gross R.  Assessment of adolescent mother-child interactions.  *Pediatric Research*, 1983, 17:4:2.

4.  **Mendoza FS**, Castillo R.  Nutritional status of Mexican-American children: HANES I Survey.  International Inventory of Current Mexico Related Research, Volume 3, December, 1983.  Published by the Center of US-Mexican Studies, University of California, San Diego.

5.  **Mendoza FS,** Castillo RO.  Growth deficiencies in Mexican-American children in the United States.  *Pediatric Research*, April 1984.

6.  Willoughby A, **Mendoza FS**, Duke PM, Williams J, Gross RT.  Assessment of teenage parenting.  *Pediatric Research*, April 1984.

7.  Castillo RO, **Mendoza FS**.  Nutritional status of Mexican-American children in the United States.  International Inventory of Current Mexico-Related Research, Volume 4, December, 1984.

8.  Martorell R, **Mendoza FS**, Castillo R.  The short and plump syndrome of Mexican-American children.  American Association of Physical Anthropologists, 55th Annual Meeting, 1986.

9.  Valdez RB, **Mendoza FS**.  Health status of Mexican-American Children.  Vth International Congress of the World Federation of Public Health Associations, March 25, 1987.

0832

*Fernando S. Mendoza, MD, MPH* 16

10. Castillo RO, Pawson IG, **Mendoza FS**, Martorell R.  Iron status of Mexican-American children: The Hispanic HANES.  Federation of American Societies for Experimental Biology, March 31, 1987.

11. Martorell R, Figueroa Y, **Mendoza FS**, Castillo R, Pawson IG.  Overweight and fatness in Mexican American Children.  71st Annual Meeting of the Federation of American Societies for Experimental Biology (FASEB), Washington DC, April 1987.  Federation Proceedings 36(3):876 (abstract 3264).  Also, Translated and published in full as "Sobrepeso y Gordura en Ninos Mexico-Americanos," Monografia Sobre Crecimiento y Desarrollo del Nino.  Instituto de Nutricion de Centro America y Panama (INCAP).  Guatemala, 1988.

12. Martorell R, Pawson IG, **Mendoza FS**, Castillo R.  Explanations for the short stature of Mexican American Children.  56th Annual Meeting of the American Association of Physical Anthropologists, New York, April 1987.  Also, translated and published in full as "Explicacion de la Baja Estature de los Ninos Mexico-Americanos," Monografia Sobre Crecimiento y Desarrollo del Nino.  Instituto de Nutricion de Centro America y Panama (INCAP).  Guatemala, 1988.

13. **Mendoza FS**, Litt IF, Moss N, Brown E, Kraemer HC, DeAnda A.  Ethnic differences in Patient-Provider interactions in Prenatal Care.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):176A (abstract 21).

14. Villarreal SF, **Mendoza FS,** Martorell R.  Sexual maturation in Mexican-American adolescents: Hispanic Health and Nutrition Examination Survey.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):178A (abstract 32).

15. **Mendoza FS**, Saldivar LE, Valdez RO, Castillo RO, Martorell R, Baisden C.  Chronic medical conditions and perceived health status among Mexican-American children.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):259A (abstract 512).

16. Murphy SP, Castillo RO, Martorell R, **Mendoza FS**.  An evaluation of basic four food group intakes by Mexican American children in Hispanic HANES.  70th Annual Meeting, The American Dietetic Association, Atlanta, Georgia, October 19-23, 1987.

17. Pollick H, Pawson IG, Martorell R, **Mendoza FS.**  Dental restorative treatment needs in Mexican-American children.  115th Annual Meeting, American Public Health Association, New Orleans, Louisiana, October 18-22, 1987.

18. **Mendoza FS**, Helms B, Martorell R.  School absenteeism among Mexican-American children and its relationship to health status and health perception.

0833

*Fernando S. Mendoza, MD, MPH* 17

Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February 5, 1990.

19. Castillo RO, Garcia M, Pawson IG, Baisden K, Martorell R, **Mendoza FS**. Iron (FE) status of U.S. Hispanic children. Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):189A.

20. Saldivar LE, **Mendoza FS**, Martorell R, Pawson IG, Castillo RO. Blood pressure in Hispanic children. Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):214A.

21. Takata GS, **Mendoza FS**, Martorell R, Castillo RO. Health care access problems of Mexican-American children. Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):179A.

22. Pawson IG, **Mendoza FS**, Martorell R, Baisden K. Maternal perception of offspring size among Hispanics. AJDC, 1990, 144:437-38

23. **Mendoza FS**, Takata G, Baisden K, Herrera L, Martorell R. The relationship between maternal self-reported health status and maternal report of children's health status among Hispanics. Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February 4, 1991.

24. Takata GS, Baisden KL, **Mendoza FS** (introduced by Barbara Korsch). Regional disparities in Mexican-American children's health care access. Western Society for Pediatric Research, Carmel, California, February 5, 1992.

25. Duran-Guarino, M.R., Hlatky, M., and **Mendoza FS**. Access to Preventive Health Care Services for Hispanic Women. Presented at APHA national meeting October 1994

26. Garcia R., Carrillo, M., **Mendoza FS**. Ethnicity and Medicine: Teaching Cultural Competency. Presented at the Cultural Competency and Women's Health Conference sponsored by the Office of Minority Health in Washington D.C., Sept 1995.

27. **Mendoza FS**, Garcia R, Cross P, and Rhodes, C. The Stanford Early Matriculation Program: Creating Minority Faculty for the Future. Presented at the Annual National Meeting of the Association of American Medical Colleges. Washington D.C. Sept 1995.

28. **Mendoza FS** and Dixon LB. The Health and Nutritional Status of Immigrant Hispanic Children: Analyses of the Hispanic Health and Nutrition Examination Survey. Presented at the Western Regional Ambulatory Pediatric Association Meeting, Carmel Feb. 1998

0834

29.  Agredano YZ, Dixon LB, and **Mendoza FS**.  Comparison of Growth Patterns of First, Second, and Third Generation Mexican American Children to African American and Non-Hispanic White Children Ages 2-16. The medical student forum, WSPR 1999

30.  Burgos AE, Dixon LB, and **Mendoza FS**.  Health Care Access and Utilization for First, Second, Third and Later Generation Mexican American Children: Data from NHANES III.  Western Regional and National Ambulatory Pediatric 1999 Meeting.

31.  Sanders, L, Hard, K. , **Mendoza FS**.  Can a Videogame Improve Asthma Management?  A randomized, controlled trial.  Ambulatory Pediatric Association April 2001 annual meetings.

32.  Sanders, L., **Mendoza FS**.  Asthma Management Self Efficacy.  Ambulatory Pediatric Association April 2001 annual meetings.

33.  Chamberlain, L., Huffman, L., Sectish, T., **Mendoza FS**, Takayama J.  Impact of Child Advocacy Training on Pediatric Residents.  Ambulatory Pediatric Association April 2001 annual meetings.

34.  Chamberlain, L., Huffman, L., Sectish, T., **Mendoza FS**, Shochet, S., Takayama, J..  Pediatric Child Advocacy Training: Does It Make a Difference?  Ambulatory Pediatric Association, Region IX and X, February 2002 annual meeting in Carmel, CA.

35.  Klaudt Monte, Schetzina Karen, **Mendoza FS,** Robinson Thomas.  Racial/Ethnic Differences in Maternal Perception of Children's Weight.   Ambulatory Pediatric Association, Region IX and X,  February 2002 annual meeting in Carmel, CA

36.  Javier, JR, Wise, PH, **Mendoza, F**. Examining the Immigrant Paradox in Children with Asthma: Findings from the California Health Interview Survey. Annual American Public Health Association Meeting November 2006, Boston

37.  Javier, JR, Huffman, LC, Wise, PH, **Mendoza, FS**. Examining the Immigrant Paradox in Children with Special Health Care Needs.  2007 Pediatric Academic Societies' Annual Meeting, Toronto Canada.

38.  Festa, N., Loftus-Gagli, P., Cullen, M., **Mendoza, F. S**., Disparities in Early Exposure to Book Sharing within Immigrant Families. 2014 Pediatric Academic Societies' Annual Meeting, Vancouver, Canada.

0835

*Fernando S. Mendoza, MD, MPH* 19

## PRESENTATIONS

1. Social support of mothers of asthmatic children and its relationship to functional morbidity. Second Annual Robert Wood Johnson General Pediatrics Academic Development Conference, June, 1980, and Society of Pediatric Research, San Francisco, May, 1981.

2. Health status of Hispanic children. Bay Area Latino Health Conference. University of California, Berkeley, April, 1983.

3. Nutritional status of Mexican-American children - The HANES I Survey. Stanford HANES User Conference, August, 1983.

4. Hearings before the Select Committee on Hunger, House of Representatives, Ninety-Eighth Congress. San Francisco, July 23, 1984.

5. Health needs of Hispanics in the United Sates. National Coalition of Hispanic Mental Health and Human Services Organization's Fifth National Hispanic Conference on Health and Human Services and National Hispanic Youth Symposium, Los Angeles, September 1984.

6. Health status of minority children and its relationship to their behavior and development. National Institute of Child Health and Human Development Workshop, Minority Families and Children, Bethesda, Maryland, May 28-29, 1986.

7. Maternal and child health: Research issues and priorities for the nation's youngest population. Sixth Biennial National Hispanic Conference on Health and Human Services (COSSMHO), New York City, September 4-7, 1986.

8. Mendoza F, Saldivar L, Valdez R, Castillo R, Martorell R. Chronic conditions and perceived health status among Mexican-American children. Ambulatory Pediatric Association Day at Carmel, February 2, 1987.

9. Mendoza FS, Litt IF, Moss N, Brown E, Kraemer HC, DeAnda A. Ethnic differences in patient-provider interactions in prenatal care. The American Pediatric Society/The Society for Pediatric Research, April 30, 1987.

10. The health and nutritional status of Mexican-American children. Testimony to the House Select Committee on Hunger, Washington, D.C., March 30, 1988.

11. Mendoza FS, Litt IF, Moss N. Transactions of pregnant adolescents in prenatal care. 1988 Tri-Regional Conference on Completed Maternal and Child Health Research, Bureau of Maternal and Child Health and Resources Development, Washington, DC, October 3, 1988.

0836

12.    Hispanic health status - adolescent health.  Hispanic Health Leadership Program (COSSMHO), Harvard University, July 4-5, 1989.

13.    Health status of Mexican-American children.  National Action Forum on Health Policy and the Hispanic, San Antonio, Texas, October 6-7, 1989.

14.    Mendoza FS, Helms B, Martorell R.  School absenteeism among Mexican-American children and its relationship to health status and health perception. Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, 1990.

15.    Readiness in and out of school: A Hispanic perspective.  School Readiness: Scientific Perspectives, sponsored by the Bureau of Maternal and Child Health, Columbia, Maryland, January 24, 1992.

16.    Health Issues of Immigrant Children of Color.  Proceedings of the Second Round Table: Children of Color,  Society for Research on Child Development. March 29, 1994.

17.    Health Status of Minority School Age Children.  MacArthur Network on Successful Pathways Through Middle Childhood. Sponsored by the John D. and Catherine T. MacArthur Foundation.  Oakland, California, September 9, 1994.

18.    Minority Faculty in the Health Professions For the 21st Century.  Association of American Medical Colleges and Health Resources Services Administration. Leesburg, Virginia, September 6, 1995.

19.    Children Youth and Families: Building on Cultural Strengths of Hispanic and Latino Communities.  Center for Children with Chronic Illness and Disability, Phoenix, Arizona, June 28, 1996.

20.    Children in Immigrant Families: Issues for California's Future.  Board on Children, Youth, and Families of the National Research Council/Institute of Medicine and the UCLA Center for Health Policy Research.  Sacramento, California, December 10-11, 1998.

21.    Visiting Professor: Immigrant Children's Health Needs.  University of California, San Francisco School of Medicine, Office of Postgraduate Education.  Fresno, California, February 25, 1999

22.    Child Health in the Multicultural Environment, the 31st Ross Roundtable On Critical Approaches to Common Pediatric Problems.  Washington, DC, November 13-14, 1999.

23.    Grand Rounds Presentation at Children's Hospital Oakland, "Health Risk Profiles and Race, Culture, and Socioeconomic Status".  Oakland, CA, August 13, 2002.

0837

*Fernando S. Mendoza, MD, MPH* 21

24. Childhood Obesity Conference: A Public Health Crisis-A Common Sense Approach-Reshaping the Future for Overweight Kids. Watsonville Community Hospital, Februay 22, 2003.

25. Hispanic Serving Health Professions Schools Congressional Briefing on Hispanic Obesity and Diabetes, July 15, 2004

26. Children and Health Disparities: The Effects of Social, Race, Ethnic and Immigrant Status. COPR, American Academy of Pediatrics, Elk Grove Village, Ill, April 13, 2006

27. Preventing Obesity in Mexican American Children and Adolescents. Joint U.S.-Mexico Workshop on Preventing Obesity in Children and Youth of Mexican Origin sponsored by the Institute of Medicine, Kaiser Permanente, Instituto Nacional de la Salud Publica, Cuernavaca, Mexico, May 2006.

28. Health of Children in Immigrant Families. Conference on Immigrant Families in America. Duke University, North Carolina, May 2006

29. Overcoming Physicians and Latino/Hispanic Patients Communication Barriers. Keynote address for Conference on Physicians and Latino/Hispanic Patients Communication Barriers, America Medical Association, Chicago, Ill., August 2006

30. Comparison of the Magnitude of Obesity Among Mexican and Mexican American Children. 12th biannual congress for Research in Public Health, Instituto Nacional De Salud Publica, March 2007

31. Comparing the Problem of Obesity Among Mexican and Mexican American Children, NICHQ WebQ conference December 2007

32. Comparing the Problem of Childhood Obesity in Mexican American and Mexican Children. Binational Health Meeting, U.S. and Mexico, Santa Fe October 2009

33. Latino Children: Their Health and the Future of the United States. Visiting Diversity Professor, Harvard Medical School October 2009

34. Latino Children: Their Health and the Future of California. Visiting Professor UCSF, Child Health Policy. January 2010.

35. Immigration: Current Issues and the Effect on Children. Invited speaker for the American Academy of Pediatrics Districts V and VII Meeting, New Orleans, July 16, 2011

0838

36. Reducing Immigrant Child Health Disparities. Invite speaker for Pediatrics for the 21st Century Series at the Annual American Academy of Pediatric National Conference, New Orleans, October 2012

37. New American Children: Supporting the Health and Well-Being of Immigrant Children at the Annual American Academy of Pediatric National Conference, New Orleans, October 2012

38. Diversity: Past, Present, and Future. Visiting Professor Grand Rounds, Mount Sinai, Department of Pediatrics, New York, April 2013

39. Immigrant Children: Changing Pediatric Demographics and Practice. Visiting Professor, Texas Children's Hospital, Texas Southwestern Medical Center, May 2013

40. Meeting the Challenge of Diversity Through Organizational Change. Pediatric Academic Society Meeting, May 2013, Washington DC.

41. Training the future generation of minority scholars in the USA: The RAPID model: Building training capacity for addressing the obesity epidemic in the Americas. PACO III June 2013

42. Linking Data Sets and Career Advancement. Hispanic Serving Health Professions School- NIH Workshop on National Data Sets, July 2013

43. Diversity and Inclusion Working Group, Federation of Pediatric Organizations Pediatric Workforce Summit, September 2013.

44. Hispanic Child Health. Visiting Professor, University of Puerto Rico. February 26-28, 2014

45. American's New Children: Supporting the Health and Wellbeing of Children in Immigrant Families. Rome Visiting Professor, Children's National, April 22-24, 2014.

46. FOPO Symposium on the Future of the Pediatric Workforce, Diversity and Inclusion Working Group. Federation of Pediatric Organizations, PAS, May 3 2014 Vancouver, Canada

47. Disparities in early exposure to book sharing within immigrant families. AAP Presidential Plenary Session, May 4, 2014. Vancouver Canada

48. Hispanic Serving Health Professions Schools, Inc. Faculty Development Conference. NIH Bethesda, MD, July 2014

49. Immigrant Children's Health: Key Concepts and Treads. 2014 AAP National Conference and Exhibition, San Diego, CA October 2014

0839

50. Health and Health care Challenges Faced by US Immigrant Children and their Families. APS State of the Art Plenary: The Health and Healthcare of Immigrant Children: Innovative Approaches, Immigration Reform, and Humanitarian Crisis of Unaccompanied Minors Crossing the Border. PAS San Diego April 2015

51. Cultural Competency Training as a Tool to Lessen Unconscious Bias and Improve Health Disparities. Topic Symposium: Health Disparities and Unconscious Bias in the Clinical Setting: An Action-Oriented Approach. PAS San Diego April 2015

52. Unaccompanied Immigrant Children: A Primer for Pediatric Providers. Workshop PAS San Diego 2015.

53. Immigrant Health Update: From Border Crisis to Policy Challenges. AAP District II and VII joint meeting, Fort Worth, Texas June 2015

54. By Focusing on "Diversity" Do We Risk Abandoning Efforts to Increase Underrepresented Minorities in Medicine. AAMC/GDI Annual Meeting, Puerto Rico, San Juan, June 2015

55. "Diversity: Why is it important to Pediatrics." Keynote Academic Pediatric Association Western Region Meeting, Monterey California, January 16, 2016.

56. "Diversity: Why is it important to Pediatrics", Grand Rounds, Texas Children's Hospital, Baylor University School of Medicine. February 12, 2016.

57. "Diversity: Why is it important to Pediatrics", Grand Rounds, Duke University Department of Pediatrics, October 4, 2016.

58. "How Should Race and Ethnicity Be Used to Report Genetic Variation in Non-Research Setting" Panel Moderator, Workshop on the Use of Race and Ethnicity in Genomics and Biomedical Research, NIH October 24, 2016.

59. Diversity at Stanford Medical School: Past, Present, and Future. Department of Medicine Grand Rounds, Stanford University, School of Medicine. January 2017

## POSTERS

1. Mendoza FS, Castillo RO. Growth deficiencies in Mexican-American children in the United States. Society of Pediatric Research, April, 1984, San Francisco, California

2. Willoughby A, Mendoza FS, Duke PM, Williams J, Gross RT. Assessment of teenage parenting. American Pediatric Society, April, 1984, San Francisco, California.

0840

*Fernando S. Mendoza, MD, MPH*                                                  24

3. Mendoza FS, Saldivar LE, Valdez RO, Castillo RO, Martorell R, Baisden C. Chronic medical conditions and perceived health status among Mexican-American children. The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Anaheim, California.

4. Takata GS, Mendoza FS, Martorell R, Castillo RO. Health care access problems of Mexican-American children. Western Society for Pediatric Research, February 8, 1990.

5. Pawson IG, Mendoza FS, Martorell R, Baisden K. Maternal perception of offspring size among Hispanics. Ambulatory Pediatric Association, 30th Annual Meeting, May 7-11, 1990, Anaheim, California.

6. Mendoza F, Takata G, Baisden K, Herrera L, Martorell R. The relationship between maternal self-reported health status and maternal report of children's health status among Hispanics. ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February 4, 1991.

7. Takata GS, Baisden KL, Mendoza FS . Regional disparities in Mexican-American children's health care access. Western Society for Pediatric Research, Carmel, California, February 5, 1992

8. Lopez, QR, Schetzina, Haiman, A., Mendoza, F. Barriers to Obtaining Health Insurance Among Patients Served by a Mobile Community Health Van. Ambulatory Pediatric Association, May 2003, annual meeting.

9. Laraque D. **Mendoza F**, Dreyer B, Frintner MP, Cull W. Graduating pediatric residents: Who plans to work in underserved areas? Poster presentation at the Pediatric Academic Societies Meeting, Vancouver Canada, (abstract # 754414) May 1-4, 2010.

10. Laraque D. **Mendoza F**, Dreyer B, Frintner MP, Cull W. Cross cultural and linguistic appropriate care. Pediatric residents preparedness. Poster presentation at the Pediatric Academic Societies Meeting, Vancouver Canada, (abstract # 753038) May 1-4, 2010


## GRANTS AND AWARDS


Co-Investigator                     $5,000 award from the Stanford Center for the
                                    Study of Youth Development, for the Study of
                                    Teenage Parenting
                                    June 1982 - September 1982

0841

*Fernando S. Mendoza, MD, MPH* 25

Principal Investigator $1,000 award from the Stanford Center for the
Study of Youth Development, for the Study of
Nutritional Status of Hispanic Children
July 1983 - September 1983

Principal Investigator $6,000 award from Kaiser Hospital Foundation for
Development of Hispanic Health Database
March 1983 - February 1984

Co-Investigator $215,285. "The Transactions of Pregnant
Adolescents in Prenatal Care" IF Litt, FS Mendoza,
WL Heinrichs. Bureau of Health Care Delivery and
Assistance - Maternal and Child Health and
Crippled Children's Research Grants Program
February 1984 - April 1986

Co-Investigator $325,044. "Health and Nutritional Status of
Mexican-American Children"
R Martorell, F Mendoza
The Maternal and Child Health and Crippled
Children's Services Research Grants Program
April 1985 - March 1988

Principal Investigator $331,093. "Health Careers Opportunity Program
(HCOP)"
September 1985 - August 1988

Principal Investigator $5,000. "Hispanic Health Database"
Area Health Education Center
March 1986 - September 1986

Principal Investigator $50,000. "The Effects of Poverty on the Health and
School Performance of Mexican-American Children"
Inter-University Program for Latino Research
June 1, 1987 - May 31, 1988

Principal Investigator $494,000. "Health and Nutritional Status of U.S.
Hispanic Children"
FS Mendoza, R Martorell, R Castillo. Continuation
Grant of Bureau of Maternal and Child Health and
Resources Development
April 1, 1988 - March 31, 1993

Principal Investigator $20,000. "Chicano/Latino Maternal and Child
Health Project"
Inter-University Program for Latino Research

0842

*Fernando S. Mendoza, MD, MPH*                                                    26

January 1, 1992 - June 30, 1993

Principal Investigator            $140,358.  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1992 - August 31, 1993

Principal Investigator            $1,503,760  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1993- August 31, 1996

Principal Investigator            $162,000  "COE Bilingual and Bicultural Minority
                                  Pre-faculty Fellowship"
                                  Health Resources and Services Admin.
                                  Office of Minority Health
                                  July 1, 1995 to June 30, 1997

Principal Investigator            $1,500,000  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1996- August 31, 1999

Principal Investigator            $714,711 "Health Careers Opportunity Program."
                                  Health Resources and Services Admin., Division of
                                  Disadvantaged Assistance,
                                  September 1, 1996 - August 31, 1999.

Co-Principal Investigator         $563,651 "Faculty Development in General Internal
                                  Medicine and General Pediatrics." Bureau of Health
                                  Professions, Health Resources and Services
                                  Administration, Public Health Service.  7/1/97-
                                  8/31/00

Co-Principal Investigator         $2,326,352 "Cancer Risk Factor Prevention for
                                  High Risk Children." National Institute of Health,
                                  National Cancer Institute. 9/19/97-7/31/01.  (P.I.
                                  Joel D. Killen, Ph.D.).

Principal Investigator            $93,219 "Reach Out and Read Program." David and
                                  Lucile Packard Foundation. 1998-99.

Principal Investigator            $1,561,925 "Hispanic Center of Excellence." Health
                                  Resources and Services Admin.  Division of
                                  Disadvantaged Assistance.  September 1, 1999-
                                  August 31, 2002.

0843

*Fernando S. Mendoza, MD, MPH*                                                                 27

Principal Investigator                    $1,277,087 "Stanford Regional Comprehensive
                                          HCOP" Health Resources and Services Admin.
                                          Division of Disadvantaged Assistance.  September
                                          1, 1999-August 31, 2002.

Principal Investigator                    $98,000 "Reach Out and Read Program." Lucile S.
                                          Packard Foundation for Children. 1999.

Co-Principal Investigator                 $500,000 "Faculty Development in General Internal
                                          Medicine and General Pediatrics." Bureau of Health
                                          Professions, Health Resources and Services
                                          Administration, Public Health Service. (P.I. Robert
                                          Pantell, M.D., UCSF) 7/1/00-6/30/03.

Principal Investigator                    $ 135,000  "Reach Out and Read Program."
                                          Peninsula Community Foundation
                                          June 1, 2000 - May 31, 2001.

Principal Investigator                    $25,000 "Child Advocacy Fellowship."  David and
                                          Lucile Packard Foundation.  2000-2001.

Principal Investigator                    "Grant Writing Workshop for Hispanic
                                          Researchers" Health Care Financing
                                          Administration. 5/14/01

Principal Investigator                    $2,270,878 "Center of Excellence." Health
                                          Resources and Services Admin.  Division of
                                          Disadvantaged Assistance.  September 15, 2002-
                                          August 31, 2005.

Co-Principal Investigator                 $1,629,789 "Stanford Regional Comprehensive
                                          HCOP" Health Resources and Services Admin.
                                          Division of Disadvantaged Assistance.  September
                                          1, 2002-August 31, 2005.

Principal Investigator                    Hispanic Center of Excellence." Health Resources
                                          and Services Admin.  Division of Disadvantaged
                                          Assistance.  September 15, 2005-August 31, 2006.

Co-Principal Investigator                 "Stanford Regional Comprehensive HCOP" Health
                                          Resources and Services Admin.  Division of
                                          Disadvantaged Assistance.  September 1, 2005-
                                          August 31, 2006.

0844

*Fernando S. Mendoza, MD, MPH*                                                28

| | |
|---|---|
| Co-Principal Investigator | "Family-based Nutrition Intervention for Latino Children" National Heart Lung Blood Institute, NIH 2003-07. (P.I. Joel D. Killen, Ph.D.). |
| Co-Principal Investigator | "Home-based Nutrition Intervention and play Group Exercise for Low Income Latinas" NIH 2006-2010. (P.I. Donna Matheson, Ph.D.) |
| Co-Principal Investigator | "Ethnic Dance and Screen Time Reduction to Prevent Weight Gain in Latina Girls" NIH 2006-2011. (P.I. Thomas Robinson, M.D., M.P.H.) |
| Principal Investigator | D34 HP16047 Hispanic Center of Excellence, Health Services and Resources Administration, Bureau of Health Professions. July 2009 to June 2012 |
| Principal Investigator | D34HP16047A0 Hispanic Center of Excellence, Health Services and Resources Administration, Bureau of Health Professions. July 2012-June 2017 |
| Co-Principal Investigator | 1 R25 DK96944-01 Research in Academic Pediatrics Initiative on Diversity. NIDDK September 2012- August 2017. P.I. G. Flores, Texas Southwestern University |
| Co-Principal Investigator | "Undocumented Stauts and Immigrant Families: An Interdisciplinary Impact Evaluation of Deferred Action" Russell Sage Foundation, July 1, 2016- December 31, 2017. P.I. Jens Hainmueller, Ph.D., Stanford University, School of Business. |
| Principal Investigator | "An Educational Intervention Design to Decrease Implicit Bias in the Practice of Medicine." Teaching and Mentoring Academy Innovations Grant Program, Stanford University School of Medicine. September 2016- July2017. |
| Principal Investigator | "The Health and Well-Being of Children in Immigrant Families." Stanford Child Health Research Institute. May 1, 2017- April 30, 2019. |
| Principal Investigator | D34HP16047A0 Hispanic Center of Excellence, Health Services and Resources Administration, |

0845

Fernando S. Mendoza, MD, MPH                                          29

Bureau of Health Professions; July 2017 to June 2022

## Fellows Trained

1. Glenn Takata, M.D., M.S., Associate Professor of Clinical Pediatric, Children Hospital Los Angeles, USC
2. Noel Rosales, M.D., Associate Clinical Professor, UCSF
3. Anthony Burgos, M.D., M.P.H., Director of Newborn Services, Kaiser Permanente, Long Beach (Assistant Professor of Pediatrics, Division of General Pediatrics, Stanford University, School of Medicine 1997-2011)
4. Lee Sanders, M.D., M.P.H., Associate Professor of Pediatrics, Chief of the Division of General Pediatrics, Stanford University, School of Medicine
5. Elizabeth Stuart, M.D., M.S., Clinical Professor of Pediatrics, Division of General Pediatrics, and Director of Clerkship, Stanford University School of Medicine.
6. Lisa Chamberlain, M.D., M.P.H., Associate Professor of Pediatrics, Division of General Pediatrics, Stanford University, School of Medicine
7. Monte Klaudt, M.D. Kaiser Permanente, San Marcos, California
8. Dana Weintraub, M.D., Clinical Assistant Professor, Division of General Pediatrics, Stanford University, School of Medicine
9. Joyce Javier, M.D., M.P.H., Assistant Professor of Clinical Pediatrics, Division of General Pediatrics, Children's Hospital of Los Angeles, USC School of Medicine.
10. Leticia Pelayo, MD, Santa Clara Valley Medical Center
11. Monica Eneriz Weimer, MD. Palo Alto Medical Foundation
12. Jori Bogetz, MD.  Assistant Professor, UCSF
13. Victor Cueto, MD Clinical Instructor, Division of General Pediatrics, Stanford

0846

# EXHIBIT B

*RESEARCH*

SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[7] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well-being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent-child separations can be harmful to children's health, economic security, and long-term development. Virtually all of these studies have been qualitative or correla-

tional because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference...has been lacking to date in analyses of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreignborn, Hispanic, or Spanish-speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2-year (renewable) deferred action status, while also allow-

ing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action through this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low-income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized immigrants (25, 26). In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi-experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

**RESEARCH** | REPORT



**Fig. 1. Results from applying the regression discontinuity design.** (**Top**) In the post-DACA period (2013 to 2015). children of DACA-eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose mothers' birthdates were within ±150 days of the DACA eligibility cutoff (n = 2260). and circles are average diagnosis rates within each 15-day birthdate interval. (**Bottom left**) There was no such difference in children's diagnosis rates in the pre-DACA period (2003 to 2012). (**Bottom right**) There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well-being could have improved (4, 6). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs (32–34).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except where otherwise noted, in a preregistered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of

adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300 (35).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (36, 37). Acute stress disorder can be a precursor to a diagnosis of a more lasting posttraumatic stress disorder (included in the ICD-9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (36). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (36).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (32). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi-experimental nature of the RD design. The percent of children diagnosed with adjustment or anxiety disorders during the post-DACA period (2013 to 2015) dropped by about 4.5 percentage points (P = 0.037; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA-eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre-DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points (P = 0.817; local linear regression). Figure 1, bottom right, shows the distribution of P values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre-DACA health care utilization (tables S3 and S4). The distribution of P values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

Hainmueller *et al.*, *Science* **357**, 1041–1044 (2017)    8 September 2017

Downloaded from http://science.sciencemag.org/ on October 23, 2017

Downloaded from http://science.sciencemag.org/ on October 23, 2017

**RESEARCH** | REPORT

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention-to-treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined measure and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birthdates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff (*38*).

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked up at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, −0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several robustness checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post-DACA period (fig. S6 and table S8), redefining the post-DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A non-prespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non-prespecified subgroup analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These

mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of confounders associated with having a mother who is born just before or after the cutoff date that could explain the observed post-DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status (*9*), we also checked for the possibility that the drop in diagnoses reflects a DACA-induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post-DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post-DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well-being and development of children in immigrant families (*4*, *6*). Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the

mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring parental disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision-makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of unauthorized immigrants' children, most of whom are U.S. citizens (*2*). Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity (*32*, *34*, *39*, *40*). Treatment of mental disorders also carries considerable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions (*41*) and are associated with poor long-term outcomes for school performance and welfare reliance (*33*, *42*). By reducing mental health problems, deferred action has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immigrant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health.** (**Left**) Mothers' DACA eligibility reduced child mental health disorders in the post-DACA period. (**Right**) There were no systematic, preexisting differences in the pre-DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post-DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre-DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

health and well-being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a pathway to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evaluating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an effective way to overcome some of the challenges in collecting systematic data from the unauthorized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that affect unauthorized immigrant parents and that may have health consequences for their children.

## REFERENCES AND NOTES

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez-Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470–477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291–297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348–385 (2011).
8. C. Suárez-Orozco, H. Yoshikawa, R. Teranishi, M. Suárez-Orozco, *Harv. Educ. Rev.* **81**, 438–473 (2011).
9. K. Yun, E. Fuentes-Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913–1921 (2013).
10. T. M. Caballero *et al.*, *Clin. Pediatr.* **6**, 648–658 (2017).
11. F. L. Rivera-Batiz, *J. Popul. Econ.* **12**, 91–116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203–233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258–1268 (2007).
14. H. Yoshikawa, C. Suárez-Orozco, R. G. Gonzales, *J. Res. Adolesc.* **27**, 4–19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO-10-99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329–354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57–67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I-821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012–2016); www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852–1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98–114 (2016).
22. C. Amuedo-Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339–373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175–e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085–1092 (2007).
26. C. H. C. Foundation, *Medi-Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615–635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, V. C. Wong, *J. Policy Anal. Manage.* **27**, 724–750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 191–208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483–524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517–548 (2010).
34. J. P. Shonkoff *et al.*, *Pediatrics* **129**, e232–e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD-9 categories 300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (posttraumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295–2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056–1067 (2012).
40. K. R. Merikangas *et al.*, *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980–989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0–17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

## ACKNOWLEDGMENTS

This research was funded by a grant from the Russell Sage Foundation (grant no. 93-16-12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design-registrations). The analysis plan is also reprinted in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

## SUPPLEMENTARY MATERIALS

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (43, 44)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893

Downloaded from http://science.sciencemag.org/ on October 23, 2017

# DEF-INTERV.

# EX. 43

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

    XAVIER BECERRA
    Attorney General of California
    MICHAEL L. NEWMAN
    Supervising Deputy Attorney General
    JAMES F. ZAHRADKA II (SBN 196822)
    1515 Clay Street, 20th Floor
    P.O. Box 70550
    Oakland, CA 94612-0550
    Telephone: (510) 879-1247
    Email: James.Zahradka@doj.ca.gov
    *Attorneys for Plaintiff State of California*

    JOSEPH W. COTCHETT (SBN 36324)
    NANCY L. FINEMAN (SBN 124870)
    COTCHETT, PITRE & McCARTHY, LLP
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
    Email: nfineman@cpmlegal.com
    *Attorneys for Plaintiff City of San Jose*

    JONATHAN WEISSGLASS (SBN 185008)
    STACEY M. LEYTON (SBN 203827)
    ERIC P. BROWN (SBN 284245)
    ALTSHULER BERZON LLP
    177 Post Street, Suite 300
    San Francisco, CA 94108
    Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
    Email: jweissglass@altber.com
    *Attorneys for Plaintiffs County of Santa Clara and*
    *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | CASE NO. 17-CV-05211-WHA **DECLARATION OF ROBERT MENICOCCI** |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF ROBERT MENICOCCI
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF ROBERT MENICOCCI
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, ROBERT MENICOCCI, DECLARE:

1.      I am a resident of the State of California.  I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth herein.

2.      I am employed as the Director of the County of Santa Clara's ("County") Social Services Agency.  I have held the Social Services Agency Director position from 2015 to the present.  I am responsible for overseeing more than 2,800 Social Services Agency employees who provide a wide array of social services to residents throughout Santa Clara County, including in all 15 cities within the county and in the county's unincorporated areas.

3.      Prior to becoming the Social Services Agency Director, I served in financial management capacities at two California counties, Lake County and Santa Barbara County.  I was also employed for two years as a Deputy Commissioner for Management and Budget for the Commonwealth of Massachusetts's Department of Mental Health.  I also served for six years as the Chief Financial Officer and Vice President of AP Associates, a consulting firm in Massachusetts that specialized in public consultation on a variety of federal, state, and local rules, regulations, policies, and procedures to enable its public-agency clients to have maximum access to financial resources.

4.      The mission of the County's Social Services Agency is to provide resources and opportunities in order to enhance the quality of life in our community by protecting and delivering necessary services to individuals and families.

5.      In the most recently completed fiscal year, from July 1, 2016 through June 30, 2017, the Social Services Agency's total expenditures were approximately $781 million.  Although Fiscal Year 2017-2018 is still in progress, I expect the Social Service Agency's expenditures for this year to be consistent with, and likely somewhat larger than, the previous year.

6.      The Social Services Agency serves County residents through three different departments: (1) the Department of Aging and Adult Services; (2) the Department of Employment and Benefit Services; and (3) the Department of Family and Children's Services.

///

1

DECLARATION OF ROBERT MENICOCCI
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

7.     The Department of Aging and Adult Services serves seniors, dependent adults, and the disabled through the delivery of protective services, quality nutrition, and supportive in-home services. In addition, the Department of Aging and Adult Services evaluates community needs, develops programs and services, and advises on matters of policy that concern the welfare of seniors and persons with disabilities.  Department of Aging and Adult Services programs include In-Home Supportive Services, the Senior Nutrition Program, and Adult Protective Services.

8.     In-Home Supportive Services is a federally, state-, and locally funded program designed to provide assistance to eligible elderly, blind, and disabled county residents who, without this care, would be unable to remain safely in their own homes.  This program provides services according to the recipient's ability to perform daily activities, and can include feeding, bathing, dressing, housekeeping, laundry, shopping, meal preparation and clean up, respiration, bowel and bladder care, moving in and out of bed, accompaniment to medical appointments, paramedical services, and protective supervision. In Fiscal Year 2016-2017, the In-Home Supportive Services (IHSS) program served an average of over 21,000 county residents each month.

9.     With a loss of DACA status, DACA recipients would no longer qualify to be IHSS providers to eligible elderly, blind, and disabled county residents.  Their IHSS clients would no longer be safe in their homes.  If unable to remain in their homes, these county residents may require additional services from the County's Health and Hospital System.

10.     The Department of Employment and Benefit Services provides low-income county residents with access to programs that provide health insurance, employment services, foster care benefits, food assistance, and support for basic living costs.  In doing so, it promotes the transition of public assistance recipients to employment and self-sufficiency.

11.     The Department of Family and Children's Services provides child welfare services to protect, prevent, and remedy abuse and neglect of children while advancing child and family safety and well-being.  It promotes diversion, prevention, and in-home services to prevent the removal of children from their homes and to support less restrictive placement options for children that have been removed from their homes.  In doing so, the department partners with diverse community organizations to ensure

2

0856

that any child or youth who is at risk or has suffered abuse or neglect is safe, cared for and grows up in a stable, loving family, on a path to reaching their unique potential.

12.    Child welfare services include emergency response services, family maintenance services, family reunification services, and permanent placement services for children or youth at risk of abuse and neglect, children in out-of-home placements, and adopted children.

13.    The Department of Family and Children's Services provides numerous services to foster care youth, including the following:

- The Independent Living Program provides services designed to assist foster youth ages 16 to 21 in their transition to living independently and self-sufficiently.  The services include budgeting education, college enrollment support, driver's education, scholarship application and financial aid support, educational support, housing search assistance, job search assistance, and life skills training.

- The Transitional Housing Placement Program helps participants emancipate successfully by providing a safe environment for youth to practice the skills learned in the Independent Living Program (ILP).  Participants live with roommates in apartments and single-family dwellings with regular support and supervision provided by THPP provider staff, social workers, and ILP coordinators.  The supportive services include regular visits to participants' residences, educational guidance, employment counseling, and assistance reaching emancipation goals outlined in participants' Transitional Independent Living Plans.

- Foster youth are provided job search and employment support.  Participants in these services receive assistance with job leads, help with completing applications, preparing resumes, and interview practice.  The support continues once a participant receives a job offer in the form of mentorship and continued job training.

- Foster youth also receive financial literacy education, in which participants learn about banking, savings, and credit.  They learn to better manage and save money in order to build assets for financial stability

DECLARATION OF ROBERT MENICOCCI
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0857

- The HUB is a youth-led community resource center that offers a one-stop-shop for support and resources, including access to computers, internet, food, clothing closet, shower, and laundry services.

14. The rescission of DACA would likely lead to more children entering the County's child welfare services system. Researchers have found that about one quarter of DACA recipients have children who are U.S. citizens or otherwise documented. If DACA were to be rescinded and DACA recipients were subject to deportation, mixed-status families may see young U.S. citizen children separated from their DACA-recipient parents. The Department of Family and Children's Services would invest significantly in any such U.S. citizen child through its reunification efforts (including by coordinating with another country to reunify the child with their parents in that country as necessary), adoption services if reunification is impossible or not in the child's best interests, or placement and services in the absence of reunification or adoption. Under all three scenarios, the Department of Family and Children's Services would incur costs and expend resources to serve U.S. citizen children separated from DACA-recipient parents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on October 27, 2017 in San Jose, California.

ROBERT MENICOCCI

DECLARATION OF ROBERT MENICOCCI
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0858

DEF-INTERV.

EX. 44

**STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.**
**Dr. Leighton Ku on 06/27/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3                     + + + + +

 4      --------------------------
                                 :
 5   IN THE MATTER OF:           :
                                 :
 6   STATE OF TEXAS, et al.,     :
                                 :
 7              Plaintiffs,      :
                                 :
 8      v.                       : Case No.
                                 : 1:18-CV-68
 9   UNITED STATES OF AMERICA,   :
     et al.,                     :
10                               :
                Defendants,      :
11                               :
     and                         :
12                               :
     KARLA PEREZ, et al.,        :
13                               :
                Defendant-       :
14              Intervenors,     :
                                 :
15   and                         :
                                 :
16   STATE OF NEW JERSEY,        :
                                 :
17              Defendant-       :
                Intervenor.      :
18      --------------------------
19
                Wednesday,
20              June 27, 2018

21              Washington, D.C.

22
     DEPOSITION OF:
23
                     LEIGHTON KU
24

25
```

**For Depo Excerpts**

**Transcripts**

📄 Jun 27, 2018 Ku, Dr. Leighton

**Page:** 38
1          Q        How many American workers are there
2    total in the U.S.?
3                MS. AVILA:   Objection.   Vague.
4                THE WITNESS:   I -- I -- I don't know
5    the specific number of full-time workers in the
6    United States.   I -- I would venture that it is
7    more than 100 million.
8                BY MR. BIGGS:
9          Q        How are you able to determine that
10   three-quarters of them worked for these large
11   firms if you don't know the total number of
12   workers?
13         A        I took this based on statistics that
14   come from the Bureau of Labor Statistics.
15         Q        So virtually all, 97 percent of
16   businesses with 50 or more employees, offered
17   health insurance.   Okay?   How many of them offer
18   insurance -- actually withdrawn.   How many of
19   that 97 percent of businesses offer health
20   insurance that's deemed affordable under the ACA?
21         A        I do not know.   I'm not sure that
22   anyone knows the answer to that, but certainly I
23   don't know the answer to that.
24         Q        So none of them could offer affordable
25   policies, correct?

**Page:** 39
1          A        Well, that's false because I work for
2    a large employer and -- and -- and we do offer
3    affordable policies.
4          Q        Okay.
5          A        And as someone who is involved with
6    the Health Exchange in the District of Columbia
7    where we have some responsibilities in this area,
8    I am not aware of any sort of, you know,
9    particular violations.   I assume that there are
10   -- are -- are -- are employers who are falling
11   below this threshold.   It is -- it is possible.
12   I have not heard this brought as a -- a serious
13   issue.   In fact if the question is -- is have any
14   employers in the United States actually paid a
15   tax penalty under the employer mandate, I'm not
16   aware of any that have.
17         Q        Have you researched that topic?
18         A        I have asked various people and no one
19   has been able to give me an answer to that
20   question.
21         Q        How many people have you asked whether
22   or not employers throughout the entire United

23 **States have paid a penalty under the employer**
24 **mandate?**
25        A       I -- I didn't ask how many people --

Jun 27, 2018 Ku, Dr. Leighton

**Page:** 40
 1 in fact -- so what I asked people was have there
 2 been penalties that were assessed that people
 3 knew of.   I believe I inquired of three or four
 4 people, maybe three.
 5        Q        And who are those people?
 6        A        One is a gentleman named Jason Levitus
 7 who formerly was in charge of policies like this
 8 under the Treasury Department and remains a
 9 knowledgeable expert in this area.   Another was a
10 gentleman named Alex Alonzo who works for the
11 Health Care Exchange in D.C.   And another was a
12 woman, Debbie Curtis, who also works for the --
13 the D.C. Health Insurance Exchange and who was a
14 former congressional staffer knowledgeable about
15 the Affordable Care Act.
16        Q        As you sit here today can you say
17 conclusively that no business of 50 or more
18 employees in the United States has ever paid a
19 penalty for failure to provide affordable
20 policies?
21        A        If specifically the question is have
22 any paid the penalty described under the
23 Affordable Care Act, I was not able to -- to --
24 to find any evidence written or when I asked
25 various experts that suggest that there has --

**Page:** 41
 1 have -- there -- that anyone has paid these
 2 things yet.
 3        Q        So is your answer yes, no employer has
 4 ever paid that penalty?
 5        A        No, my answer is that I don't know of
 6 any that have when inquiring of people who have
 7 knowledge of this subject.
 8        Q        So you don't know after your
 9 discussions with three or four people?
10        A        That's correct, I --
11               MR. LEVINE:   Asked and answered.
12               BY MR. BIGGS:
13        Q        So the next sentence -- let's go with
14 -- actually, "More specifically, in Texas 97
15 percent of firms with 50 or more workers offered
16 health insurance in 2016 and 95 percent did so in
17 2010, thus the employer penalties are virtually
18 irrelevant to employers with more than 50 workers
19 and should not affect their hiring or wage
20 decisions."
21               Did I generally read that correctly?
22        A        Yes.

23      Q      How many employers with 50 or more
24   employees in Texas do not offer affordable
25   policies in accordance with the ACA?

Jun 27, 2018 Ku, Dr. Leighton

**Page:** 56
 1      Q      How many citizen workers in large
 2   businesses are eligible for premium tax credits?
 3      A      I -- I -- I don't know the specific
 4   number, but it would be very small based on the
 5   statistics that I provided in -- in the
 6   declaration.
 7      Q      Well, can you give me an estimate of
 8   what that percentage would be?
 9      A      Again, about three percent of firms
10   offer insurance to their workers.   That would
11   suggest that 90 percent of -- 97 percent of --
12   well, it says 97 percent of firms do provide
13   this.   Again, to the best of my knowledge based
14   on sort of the professional knowledge and the
15   responsibilities that I have, the great majority
16   of them; and I would say virtually all, offer
17   insurance that meets the standards under the
18   Affordable Care Act.   Therefore, it would be a
19   very small share of the workers in those firms.
20         Now what I don't necessarily know is
21   what percent of workers work in those -- those
22   firms that do or do not offer health insurance.
23   But it would be a -- a -- a very small
24   percentage.
25      Q      Well, you say the overwhelming

Jun 27, 2018 Ku, Dr. Leighton

**Page:** 70
 1   DACA recipients, how significant are these
 2   employment compliance barriers that you discussed
 3   in this section, in your opinion?
 4      A      I don't know.   I don't even know how
 5   to measure that.
 6      Q      So you just know that employment
 7   compliance barriers may exist, correct?
 8      A      Yes.   That's what the evidence
 9   suggests.   I mean, my reaction in general is, for
10   most employers the real question is, is this
11   person qualified to take this position, do they
12   seem like someone that would be a good hire.
13         They do need to be work authorized but
14   that generally, most other considerations, other
15   than perhaps salary, are not major factors.
16      Q      All right.   Well, let's do this.
17   Assume the following facts.
18         You have Employee A, who is qualified
19   and has asked for $100,000 and that person is a
20   U.S. citizen.

21          **You have Employee B, that person is**
22 **the exact same based on qualifications.   The same**
23 **race, the same age, everything, except they're a**
24 **DACA recipient.**
25          **Are you saying there is no incentive**

**Page:** 71
 1 **to hire a DACA recipient when considering**
 2 **Mechanism 2?**
 3      A      I think there is no such thing as
 4 having exactly the same qualifications.   And I'm
 5 not sure that a person who is a hiring official
 6 would even know what the citizenship status of
 7 that person is.
 8      **Q      Well, but they would have to, in order**
 9 **to get a job, a DACA recipient would have to**
10 **present work authorization, correct?**
11      A      My experience in larger firms is
12 typically they hand that to someone in the
13 personnel department.   The person who is the
14 hiring official doesn't necessarily know what
15 happened.
16      **Q      Okay.   Let me ask you some basic,**
17 **let's just ask a basic economics question then.**
18          **You have Toothbrush A and it is blue**
19 **and it costs $5.00 and you have Toothbrush B,**
20 **which is red, but it costs $3,480 more.   Which**
21 **one do you buy?**
22      A      It depends how much I like the color
23 red or blue.
24          (Laughter)
25      **Q      So you would buy the red one?**

📄 Jun 27, 2018 Ku, Dr. Leighton

**Page:** 72
 1      A      I personally would not.   There might
 2 be some people who would.
 3      **Q      So, that cost does factor into**
 4 **decision making at some point, correct?**
 5      A      Yes.
 6      **Q      So, if someone were aware of that**
 7 **cost, it could factor into their decision making,**
 8 **correct?**
 9      A      It is possible.   Can I go suggest
10 another alternative that is probably somewhat
11 more relevant?
12          If one employee has a family,
13 therefore might want to cover their family under
14 coverage, that will cost the employer more than
15 someone who does not have dependents.
16      **Q      Are you aware of DACA recipients**
17 **applying for jobs, not being hired and then suing**
18 **the employer for failure to hire?**
19      A      I am not aware of that.
20      **Q      Is that one of the compliance barriers**

21 **that you were considering when you wrote your**
22 **declaration?**
23        A        Again, I can't say necessarily.   The
24 issue is that there are additional factors that
25 go on in making decisions that employers may or

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Dr. Leighton Ku on 06/27/2018                                    Page 150

```
 1              C E R T I F I C A T E

 2   This is to certify that the foregoing transcript

 3   Deposition of: Dr. Leighton Ku

 4   In the matter of: State of Texas v USA

 5   Before: US District Court for Southern

 6        District of Texas

 7   Date: 06-27-18

 8   Place: Washington, DC

 9   were duly recorded and accurately transcribed

10   under my direction; further, that said transcript

11   is a true and accurate record of the proceedings;

12   and that I am neither counsel for, related to,

13   nor employed by any of the parties to this action

14   in which this deposition was taken; and further

15   that I am not a relative nor an employee of any

16   of the parties nor counsel employed by the

17   parties, and I am not financially or otherwise

18   interested in the outcome of the action.

19   [signature]

20   ----------------------

21   Neal Gross

22   Court Reporter

23

24

25
```

# DEF-INTERV.

# EX. 45

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF DEIRDRE O'BRIEN** |

**1067**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>          Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>         Defendants. | CASE NO. 17-CV-05813-WHA |

I, Deirdre O'Brien, declare and state as follows:

1.     I am the vice president of People at Apple Inc. ("Apple") and have worked at the company for nearly 30 years. The vice president of People is responsible for leading all human resource functions, including talent development and analytics, recruiting, benefits, compensation, business support, and employee training. I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would testify to these facts.

2.     Apple employs nearly 40,000 people in California and over 81,000 people across the United States. These figures do not include temporary employees or contractors.

3.     Apple and its customers have benefited and continue to benefit in many ways from the Deferred Action for Childhood Arrivals ("DACA") program. Apple currently employs over 250 DACA holders in 28 states. These talented and entrepreneurial people fill important and varied roles across the company, including in operations, research and development, administration, sales and marketing, and retail. Apple and its customers have benefitted greatly from their intelligence, ambition, creativity, resilience, and hard work. These employees are important contributors to Apple's unique culture. That unique culture enables employees throughout Apple to do the best work of their lives and excel at creating the most innovative products and providing the very best customer service.

4.     Many of Apple's DACA holder employees also possess language skills, insight, and cultural knowledge that are essential to allowing Apple to serve its diverse customer base in the best way possible. For example, AppleCare provides support to more than 100 million customers each year in more than 30 languages. AppleCare's U.S.-based employees support 11 languages with 160 skills related to Apple's products and services. AppleCare employees, including DACA recipients, are critical to ensuring Apple's customers get the most out of the products they have grown to love and depend upon. Aside from speaking to customers directly, AppleCare teams help to create and deliver training programs, pilot new and innovative approaches to customer support, provide important feedback on internal and customer-facing tools, and ensure that product feedback is provided to Apple's engineering teams.

---

DECLARATION OF DEIRDRE O'BRIEN__

5.      Apple currently employs 70 DACA recipients in California.  These employees work in a wide variety of roles, including as Hardware Development Engineers, Software Engineers, Software Technicians, Retail Store Geniuses, Technical Specialists, Technical Customer Service and Support Specialists, Operations Specialists, Quality Assurance/Quality Control Engineers, and iAd Account Managers.

6.      Apple has invested heavily in recruiting, training, and retaining employees with DACA status.

7.      Apple will be harmed significantly if it can no longer benefit from the hard work, creativity, and intelligence of its employees with DACA status.  From a practical standpoint, Apple will be forced to incur the cost, disruption, and delays associated with reallocating human resources; searching for, recruiting, interviewing, and hiring new employees; training new employees; and integrating new hires into Apple's unique culture.  Apple will also be deprived of the benefits of the considerable investments that it made in recruiting, hiring, and training these talented young people.

8.      But if Apple could no longer employ its people with DACA status, Apple would be hurt in ways that go far beyond these practical harms.  Inclusion and diversity are part of Apple's core values and fundamental to its ability to innovate.  By virtue of their personal experiences, employees with DACA status bring with them unique skills, knowledge, perspectives, and cultural understandings.  By excluding DACA holders and other immigrants, Apple and our nation as a whole will be harmed—in ways big and small—and deprived of these important benefits.

9.      Indeed, rescinding DACA attacks one of Apple's core values as a business—the belief that equal opportunities should be available for all, regardless of background.  As Apple's CEO Tim Cook recently explained, "More than any country in the world, this country is strong because of our immigrant background and our capacity and ability . . . to welcome people from all kinds of backgrounds." Apple believes that inclusivity and diversity are essential to recruiting and retaining a talented workforce, fostering innovation, and developing the highest-quality products for consumers around the world.  Rescinding DACA makes the United States and companies based here, including Apple, less attractive to the talented and ambitious people who come here to find success and build successful careers.  In the same way, rescinding DACA interferes with Apple's ability to accomplish

its important business goals and uphold its core values, harming both Apple and its hard-working and talented employees and partners.

10.     Because rescinding DACA causes such significant harms to Apple's values, its business, and its customers, Tim Cook joined hundreds of America's leading executives on August 31, 2017, and sent a letter to President Trump emphasizing the benefits of DACA and urging him to preserve the program. That letter explains, among other things, that "Dreamers are vital to the future of our companies and our economy" and part of America's "global competitive advantage." A copy of this letter is attached to this declaration as "Exhibit A."

11.     The "Dreamers" who work at Apple embody the American Dream and the best aspects of our American values. They were brought to this country as young children, and most cannot remember a time when they did not call our nation home. We have been told by the Dreamers that they deeply love our country. They grew up in our cities and towns, and earned degrees from colleges and universities across the country. They work hard and they pay taxes. They contribute tremendously to Apple and its success, to our customers and communities, and to the American economy. Their determination, resilience, and hard work inspire me and countless other Apple employees who are privileged to call them coworkers and friends. It is essential that we not only allow the Dreamers to stay in this country, but that we welcome them and tell them that we want them to be here. Their lives and their stories embody what is best about our country.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration was executed on September 21, 2017 in Cupertino, California.

_____
Deirdre O'Brien

3
DECLARATION OF DEIRDRE O'BRIEN

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

# OPEN LETTER FROM
## Leaders of American Industry

*August 31, 2017*
*To: President Donald J. Trump*
*To: Speaker Paul Ryan; Leader Nancy Pelosi; Leader Mitch McConnell; and Leader*
*Charles E. Schumer*

As entrepreneurs and business leaders, we are concerned about new developments in immigration policy that threaten the future of young undocumented immigrants brought to America as children.

The Deferred Action for Childhood Arrivals (DACA) program, which allows nearly 800,000 Dreamers the basic opportunity to work and study without the threat of deportation, is in jeopardy. All DACA recipients grew up in America, registered with our government, submitted to extensive background checks, and are diligently giving back to our communities and paying income taxes. More than 97 percent are in school or in the workforce, 5 percent started their own business, 65 percent have purchased a vehicle, and 16 percent have purchased their first home. At least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees.

Unless we act now to preserve the DACA program, all 780,000 hardworking young people will lose their ability to work legally in this country, and every one of them will be at immediate risk of deportation. Our economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions.

Dreamers are vital to the future of our companies and our economy. With them, we grow and create jobs. They are part of why we will continue to have a global competitive advantage.

We call on President Trump to preserve the DACA program. We call on Congress to pass the bipartisan DREAM Act or legislation that provides these young people raised in our country the permanent solution they deserve.

Business leaders wishing to add their name to this letter can do so by registering here.

## SIGNATORIES

| Name | Title | Company |
|------|-------|---------|
| Audley Logan Sr. | President | 3-C Technology, LLC |
| Paul Fox | Partner | 310 Architects & Interiors, Inc. |
| Joe Thomas | Owner | 4t Management and Maintenance |
| Angela Stergis | CEO | 92Seven |
| Jack Armstong | President | Acumen, LLC |
| Rob Dhoble | CEO | Adherent Health |
| Aaron Bell | CEO | AdRoll |
| Francisco Torres-Aranda, Jr. | Founder & President | Advanced-Tec Materials, LLC |
| Max Levchin | Chairman & CEO | Affirm |

| Name | Title | Company |
| --- | --- | --- |
| Jeffrey S. Collins | Vice President and General Counsel | After School App |
| Martin H. Richenhagen | President & CEO | AGCO Corporation |
| Shamilla Mansingh | President | AHM Contractors Corp |
| Brian Chesky | Co-Founder, CEO, Head of Community | Airbnb |
| Kevin P. Ryan | Chairman & CEO | Alleycorp and MongoDB |
| Jeff Bezos | CEO | Amazon |
| Tim Sullivan | President & CEO | Ancestry.com |
| Magdalena I. King | General Manager | Antlers at Vail |
| Myles Kleeger | President | Appboy |
| Tim Cook | | Apple |
| Alden Bruce Badger | Chairman and CEO | Aqueous Solutions Global |
| Nia Ogletree | CEO | Arielle Management Group, LLC |
| Gonzalo de la Melena Jr. | President & CEO | Arizona Hispanic Chamber of Commerce |
| Steven Zylstra | President & CEO | Arizona Technology Council |
| Jack Davis | Owner | Audit Resources, LLC |
| Andrew Anagnost | President and Chief Executive Officer | AutoDesk Inc. |

| Name | Title | Company |
|------|-------|---------|
| Zaheer Faruqi | Owner | Aventure Aviation |
| Andrea Guzman | Owner | Ayuda Hispana LLC |
| Robert Cheetham | CEO | Azavea |
| Jay Steinmetz | CEO | Barcoding Inc. |
| Ujjwal Gupta | Co-Founder/COO | BenchPrep |
| Jeremy Levine (Partner, Bessemer Ventures) | | |
| Tamara Drangstveit | DOJ Accredited Rep | Bethany Immigration Services |
| Rosalyn Ryan | CEO | Bicgen Foundation |
| RIchard Basile | CEO | BioPontis Alliance for Rare Diseases |
| Bernard Yoo | CEO | Bombfell Inc. |
| Elyse D. Cherry | CEO | Boston Community Capital, Inc |
| Henrik Johansson | CEO | Boundless Network |
| Aaron Levie | CEO | Box |
| Jim Breyer | Founder and CEO | Breyer Capital |
| Andy Feinberg | CEO | Brightcove Inc. |
| Brit Morin | Founder and CEO | Brit + Co |
| Charlie O'Donnell | Partner | Brooklyn Bridge Ventures |

| Name | Title | Company |
|---|---|---|
| Warren E. Buffett | | |
| Alex Torrenegra | CEO | Bunny, Inc |
| Gary Chahil | CEO | C.C.I Inc |
| Dr. Andrew P Mallon PhD GPharmC | CEO | Calista Therapeutics |
| Stas Gayshan | Managing Director | Cambridge Innovation Center |
| Timothy Rowe | CEO | Cambridge Innovation Center |
| Brian Dacey | President | Cambridge Innovation Center |
| Thomas Karwaki | President | Capital Dynamics LLC |
| Fred Schmidt | Director of International Affairs | Capital Factory |
| Kevin Jones | CEO | Cardinal Resources Inc |
| Jonathan Schwartz | CEO | CareZone Inc. |
| Carl Young | Owner | Carl Young Floral |
| Philip Krim | CEO | Casper |
| Bill Kunkler | Executive Vice President | CC Industries |
| Ira Combs | CEO | CCH Inc. |
| Ellen Shaffer | Co-Director | Center for Policy Analysis |
| Geoffrey Hueter | CTO | Certona Corporation |

| Name | Title | Company |
|------|-------|---------|
| Daniel Yanisse | CEO | Checkr |
| Dave Borders Jr. | GC | Chegg |
| Samuel C. Scott III | Chairman | Chicago Sister Cities International Program |
| Melanie Chischilly | CEO | Chischilly Designs |
| Chuck Robbins | CEO | Cisco Systems |
| Andrew Rasiej | Co-Founder | Civic Hall |
| Fritz Lanman | CEO | ClassPass Inc. |
| Joseph Bollin | President | Clean Energy Solutions |
| Gayle Gaines | President | Clean Energy Solutions |
| Dr Renee Entzminger | CEO | Clinical Alliance Partners |
| Mike Olson | Founder and Chief Strategy Officer | Cloudera |
| Hila Raz | CEO & Co-Founder | Coalition |
| Wendy Jameson | Co-Founder & CEO | Colnatec |
| Othman Laraki | President | Color Genomics |
| Jeff Wasden | President | Colorado Business Roundtable |
| Lindsay Baker | President | Comfy |
| Robert Bertrand | President/CEO | Concord Servicing Corporation |

| Name | Title | Company |
|------|-------|---------|
| Patty Johnson | President | Connections Marketing & Communications |
| Javier Cota | CEO | Cotax LLC DBA SuperTax Svc |
| Joyce Nelson | Owner | Coz |
| Carole and Gordon Segal | Co-Founders, Crate and Barrel | Crate and Barrel |
| Dr. Thomas Ross | CEO | Critical Medical Solutions Inc |
| Courtney Spence | Founder & CEO | CSpence Group |
| John Reing | Chief Human Resources Officer | CSRA |
| Robert Glaser | Principal | Cushman & Wakefield | PICOR |
| Brook Kohn | Co-Founder & CEO | DACA Time |
| Marie McGrath | CEO | Demand Lighting USA |
| Jeff Bleich | CEO | Dentons Diplomatic Solutions |
| A. Gabriel Esteban, PhD | President | DePaul University |
| Michael Guthrie | CEO | Detroit Chassis LLC |
| Diana Bello | Creative Director and Owner | Diana Bello Studio LLC |
| Dan Springer | CEO | DocuSign |
| Donna M. Carroll | President | Dominican University |
| Drew Houston | CEO & Co-Founder | Dropbox |

| Name | Title | Company |
|------|-------|---------|
| Michael Giles | Owner | Dynamic Capabilities LLC |
| Andy Wildenberg | President | E3 Power |
| David Wenig | President & CEO | eBay |
| Robert West | CEO | Echelon One |
| Vibhu Mittal | CEO | Edmodo |
| Jacob Schatz | SVP & General Counsel | Electronic Arts |
| Trini Garibay | President | ELITE |
| Anthony E. Hargrove | CEO | Ella Austin Community Center |
| Laurene Powell Jobs | | Emerson Collective |
| William Recker | Chair Emeritus | Energy Innovation Center |
| Nanxi Li | CEO/Founder | Enplug |
| Mahi Inampudi | Vice President of Product and Technology | ENVOY Global |
| Edward Doughty | Managing Director | Epic Capital Wealth Management |
| Kathleen Cook | Owner | Esso Skin Care |
| Jose Luis Prado | President and CEO | Evans Food Group |
| Seth Cassel | President and Partner | EveryMundo |
| Anton Diego | Founder | EveryMundo |

| Name | Title | Company |
|------|-------|---------|
| John Rowe | Chairman Emeritus | Excelon Corporation |
| Mark Zuckerberg | Founder & CEO | Facebook |
| Sheryl Sandberg | COO | Facebook |
| Christina Shatzen | Director of Marketing and Communications | Fast Forward |
| Craig Gaylord | CEO | Fiesta Foods |
| Kami Hinger | Partner | FireTest Company |
| James Park | CEO | Fitbit |
| Julio Fuentes | President & CEO | Florida State Hispanic Chamber of Commerce |
| John Dohm | President | Florida Transatlantic Holdings |
| Jeff Bussgang | Partner | Flybridge |
| Bruce Heyman | Ambassador | Former US Ambassador to Canada |
| Trevor Cornwell | President | Forum280, Inc. |
| Ivye Allen | President & CEO | Foundation for the Mid South |
| Jeff Glueck | CEO | Foursquare |
| Scott Osborn | President and Co-Owner | Fox Run Vineyards |
| Glen Popple | CEO | Fractured Imagination, LLC |
| Dilawar Syed | President | Freshworks |

| Name | Title | Company |
|---|---|---|
| Ryan Matzner | Co-Founder | Fueled Collective |
| Todd Schulte | President | FWD.us |
| Jake Schwartz | CEO | General Assembly |
| Steven A. Denning | Chairman | General Atlantic |
| Mary Barra | CEO | General Motors |
| Robert Hohman | CEO | Glassdoor |
| Arthur H. JacksonJr.MBA | CEO | Global AHJ Group |
| John Csaszar | CEO | Global Capital Funding Group, LLC |
| Patrice Iverson-Summer | President | Global Trading Resources, Inc. |
| Saeid Kamalpour | President | Globink |
| Rob Solomon | CEO | GoFundMe |
| Sundar Pichai | CEO | Google Inc. |
| Donald Graham | Chairman | Graham Holdings Company |
| Tim O'Shaughnessy | CEO | Graham Holdings Company |
| Cris Mercado | Founder | Grant Answers |
| Luis A. Rodriguez | President & CEO | Greater Austin Hispanic Chamber of Comme |
| Loren Kruger | CEO | Green Plastic Pallets |

| Name | Title | Company |
|------|-------|---------|
| Mark M. Greenough | President | Greenough Consulting Group |
| Reid Hoffman | Partner | Greylock Partners |
| Deborah Quazzo | President | GSV Acceleration Fund |
| Yenvy Truong | Co-Founder | HealthSnap Solutions |
| Keith Alperin | CEO | Helium Foot Software |
| Meg Whitman | CEO | Hewlett-Packard Enterprise |
| Mary C Howe | President | Howe Corporation |
| M. S. Hunter | President | Hunter Hawk Inc |
| Charles Blum | President | IAS Group Ltd. |
| Terrie Hellman | President | ICHC |
| Alan W. Cramb | President | Illinois Institute of Technology |
| Mark Harris | President & CEO | Illinois Science & Technology Coalition |
| Fred Hoch | CEO | Illinois Technology Association |
| Alan Schaaf | CEO | Imgur Inc |
| Geoff Mamlet | Executive Chairman | Impact Hub Boston |
| Ed Moore | President | Independent Colleges & Universities of Flor |
| David Mandelbrot | CEO | Indiegogo |

| Name | Title | Company |
|------|-------|---------|
| James Bost | CEO | Insight Research |
| Amy Rao | CEO | Integrated Archive Systems, Inc. |
| Mary Motsenbocker | President | International Tourism Marketing |
| Sinan Kanatsiz | Chairman | Internet Marketing Association (IMA) |
| Don Swift | President | iON Oklahoma Publishing |
| Ken Blow | President & CEO | ISG Illumination Systems, LLC |
| Trisha Degg | VP, Talent Programs & Executive Director | ITA and TechForward |
| Anurag Kumar | CEO | iTexico |
| Steve Jones | President | Jaap-Orr/Green Energy Enterprises |
| Jason Finkelman | Owner | Jason Finkelman Law |
| Harry Kargman | CEO | Kargo Global |
| Brook Byers | Partner | Kleiner Perkins |
| John Doerr | Partner | Kleiner Perkins |
| Amol Sarva | CEO | Knotel |
| Jeff Kurz | Principal | Kurz Group, Inc. |
| Martin B. Anstice | President and CEO | Lam Research Corporation |
| Louise noeth | President | LandSpeed Productions |

| Name | Title | Company |
|------|-------|---------|
| Raul Font | Executive Director | Latino Community Development Agency |
| Daniel Stewart | Managing Partner | Law Office of Daniel Stewart, PLLC |
| Michael R. Jarecki | Principal | Law Office of Michael R. Jarecki, LLC |
| Robert D. Ahlgren | Owner | Law Office of Robert D Ahlgren and Associ |
| Leah Duckett | Owner | Law Office of Robert D Ahlgren and Associ |
| Kathleen M. Vannucci | Owner | Law Office of Robert D Ahlgren and Associ |
| Kate Lincoln-Goldfinch | Owner | Lincoln-Goldfinch Law |
| Jed Smith | Chairman of the Board | Linden Lab |
| Jeff Weiner | CEO | LinkedIn |
| David Suarez | Vice President | Los Comales Restaurants |
| John Zimmer | Co-Founder | Lyft |
| Logan Green | Co-Founder | Lyft |
| Jason Rosenthal | CEO | Lytro, Inc. |
| Delano Wilson | CEO | M*A*C*S* LLC |
| Pompello D. Rivera | President & Owner | M&L Contractor LLC |
| Julian Martinez | COO | MaestroConference |
| Noramay | Co-Founder & General Partner | Make in LA |

| Name | Title | Company |
| --- | --- | --- |
| James Corrigan | CEO | Manage Operations |
| Eric Gundersen | CEO | Mapbox |
| Chris Lien | Chief Executive Officer | Marin Software Incorporated |
| Arne Sorenson | President and CEO | Marriott International |
| Mike Fernandez | Chairman | MBF Healthcare Partners |
| Fiona McEntee | Managing Attorney | McEntee Law Group |
| Scott Heiferman | Co-Founder & CEO | Meetup |
| Matthew Meltzer | Partner | Meltzer Hellrung LLC |
| Brad Smith | President & Chief Legal Officer | Microsoft Corporation |
| Satya Nadella | CEO | Microsoft Corporation |
| Sarah Miyazawa LaFleur | Founder & CEO | MMLaFleur |
| Mark O'Neill | CTO | MMLaFleur |
| Sameer Soleja | CEO | Molecule Software |
| Michael Townsend | President & Owner | MRT Management Group |
| Michael Kempner | CEO | MWWPR |
| Faquiry Diaz-Cala | Executive Chairman | mxHero Inc |
| Alex Nogales | President and CEO | National Hispanic Media Coalition |

| Name | Title | Company |
|------|-------|---------|
| Reed Hastings | CEO | Netflix |
| Patrick Lo | CEO/Chairman | NETGEAR |
| Shafqat Islam | CEO | NewsCred |
| Jared Kalmanson | General Counsel | NewsCred |
| Sergio Suarez | President and Co-Founder | North American Institute for Mexican Advan |
| Morton Schapiro | President | Northwestern University |
| Jacob Babcock | Founder & CEO | NuCurrent |
| Erik K. Grimmelmann | President | NY Tech Alliance |
| Boyede O. Sobitan | Co-Founder/CEO | Oja Express |
| David Castillo | President | Oklahoma City Hispanic Chamber of Comm |
| Tom Hurvis | Founder and Chairman | Old World Industries, LLC |
| Alex Kazerani | Chairman and CEO | OpenPath Security Inc |
| Mark Orlando | Owner | Orlando Network Services |
| Kay Ospital | Owner | Ospital Farms |
| Shradha Agarwal | President & Founder | Outcome Health |
| Rishi Shah | CEO & Founder | Outcome Health |
| Paul Metselaar | Chairman and CEO | Ovation Travel |

| Name | Title | Company |
|------|-------|---------|
| Elie Gordis | Executive Vice President and General Counsel | Ovation Travel |
| David Zalesne | President | Owen Steel Company |
| Elliott Ozment | Founder and Managing Attorney | Ozment Law |
| Kristen Sonday | COO | Paladin |
| Naveen Chopra | CFO and Interim CFO | Pandora Media |
| Amir Rubin | CEO | Paracosm |
| Frances Arazi | President & CEO | Pastourelle, LLC |
| Jack Conte | CEO | Patreon |
| Dan Schulman | CEO | PayPal Holdings, Inc. |
| W Mark Clark | President & CEO | Pima Council on Aging |
| Russ Yelton | CEO | Pinnacle Transplant Technologies |
| Katie Bethell | Founder and Executive Director | PL+US |
| Brian Sugar, Lisa Sugar | Lisa and Brian Sugar, Founders, President and CEO of POPSUGAR Inc. | POPSUGAR Inc. |
| Rosemarie Withee | President & CEO | Portal Integrators LLC |
| Bastian Lehmann | Co-Founder and CEO | Postmates |
| Penny Pritzker | Chairman | PSP Capital and Former US Secretary of Co |

| Name | Title | Company |
|------|-------|---------|
| Konrad Feldman | CEO & Co-Founder | Quantcast |
| John Palizzi | President & CEO | Quantum Renewable Energy, Inc. |
| Patti Smith | Co-Founder and Chief Marketing Officer | Querium |
| Kim Scott | Author and Co-Founder | Radical Candor |
| George Bousis | Founder & CEO | Raise |
| David Wilcox | CEO | ReachScale |
| Rob Glaser | Founder, Chairman and CEO | RealNetworks, Inc. |
| Ric Elias | Co-Founder/CEO | Red Ventures |
| Yamili Quezada | Owner | Rising Time Investments |
| John Paul Demirdjian | COO | Road to Status |
| John Bauschard | Founder | Road to Status |
| Javad Khazaeli | Co-Founder | Road to Status |
| Robert Acquaye | CEO | Robden Enterprises |
| David D. Hiller | President and CEO | Robert R. McCormick Foundation |
| Robert Roche | Founder & President | Roche Enterprises |
| Edi Demaj | Co-Founder, COO & Managing Partner | RocketFiber |

| Name | Title | Company |
|------|-------|---------|
| Cathy Rodriguez | CEO | Sacramento Hispanic Chamber of Commerce |
| Marc Benioff | Chairman & CEO | Salesforce |
| Amy Weaver | President, Legal & General Council | Salesforce |
| Alison Phillips | Communications Director | San Diego Regional Chamber of Commerce |
| Edgar Rincon | Owner | Servicios Latinos LLC |
| Blanca Rincon | Services Specialist/Manager | Servicios Latinos LLC |
| Jon Oringer | CEO | Shutterstock |
| Samir Mayekar | Co-Founder and CEO | SiNode Systems |
| Greg Siskind | Partner | Siskind Susser, PC |
| Lynn Susser | Partner | Siskind Susser, PC |
| Jamie Alford | Founder and CEO | Ski White Diamond |
| Jennifer Smith | Managing Partner | Smith Immigration |
| Greg Smith | President | Smith Sterling |
| Evan Spiegel | CEO | Snap |
| James Harrison | President | Soda Strippers International |
| Roy Lee | CEO & President | Solutions Learning, Inc. |
| Bijan Sabet | Co-Founder and General Partner | Spark Capital |

| Name | Title | Company |
| --- | --- | --- |
| Felicia Bruce | CEO | Spirit Enterprises |
| Harrison Tang | CEO | Spokeo |
| Rob Shepardson | Partner and Co-Founder | SS+K |
| Kevin Johnson | president & chief executive officer | Starbucks Coffee Company |
| Erika Lucas | Founder & CEO | StitchCrew |
| James Quarles | CEO | Strava |
| Patrick Collison | CEO | Stripe |
| John Nahm | Managing Partner | Strong Ventures |
| Nikolay Borisov | Founder & CEO | SuBB | Startup Business Box |
| Larry Augustin | CEO | SugarCRM |
| Winthrop H. Smith, Jr. | Chairman & CEO | Summit Ventures NE, LLC |
| Kiin Yang | CEO | Superior Carbontech and Solutions Sdn Bhd |
| Francisco Ibarra | CEO | Supermercados Morelos |
| Zander Lurie | CEO | SurveyMonkey Inc. |
| Susan Crown | Chairman & Founder | Susan Crown Exchange Inc. |
| Ron Conway | Founder | SV Angel |
| Christine Swanson | Attorney at Law | Swanson Law Offices |

| Name | Title | Company |
|------|-------|---------|
| Jatin Nahar | CEO | SynergyTop LLC |
| Daniel James Scott | Executive Director | Tampa Bay Tech Forum |
| Brenda Hernandez | VP of Operations | Tango Public Relations |
| Jorge Hernandez | President | Tango Public Relations |
| Stacy Bown-Philpot | CEO | TaskRabbit |
| Gregory Alfred Stevens | Managing Director | TechBridge Project |
| Linda Moore | President and CEO | TechNet |
| Terry Howerton | CEO | TechNexus |
| David Brown | Co-CEO | Techstars |
| Jill Salzman | Founder | The Founding Moms - IL |
| Laurie L. Bergner | Board Member | The Immigration Project |
| Millie Herrera | President | The Miami Group & Associates |
| Alex Nogales | CEO | The National Hispanic Media Coalition |
| JB Pritzker | Co-Founder and Managing Director | The Pritzker Group |
| Dr. Bryan Traubert | Chairman | The Pritzker Traubert Family Foundation (PT |
| Steve Townsend | President & CEO | The Record Xchange |
| Michelle Stevens | Founder | The Refill Shoppe, Inc. |

| Name | Title | Company |
| --- | --- | --- |
| | | Slack |
| Paola Mendoza | Co-Founder | The Soze Agency |
| Michael Skolnik | Co-Founder | The Soze Agency |
| John M. Lynn | Managing Partner | The Studio Project |
| Ann Marchant | CEO | The Walker Marchant Group (WMG) |
| Robert Mitchell | Partner | Three Rivers Energy Development |
| Marco Zappacosta | CEO | Thumbtack |
| David Cascino | CEO | Thunderclap, Inc. |
| Christie Hubley | Owner | Tinker Art Studio |
| Richard Barnard | President & CEO | Tio Chuy's Autosales |
| Lamine Zarrad | CEO | Tokken |
| Gregory E. Torrez | President | Torrez International |
| Tracy Dinunzio | Founder/CEO | Tradesy |
| Stephen Kaufer | President and Chief Executive Officer | TripAdvisor Inc. |
| Peter Reichard | Partner | Tryon Capital LLC |
| David Karp | CEO | Tumblr |
| Andre Haddad | CEO | Turo, Inc. |

| Name | Title | Company |
|---|---|---|
| Jeff Lawson | Co-Founder & CEO | Twilio Inc. |
| Jack Dorsey | CEO | Twitter |
| Thuan Pham | Chief Technology Officer | Uber |
| Glenn F. Tilton | Former Chairman | United Airlines |
| Stephane Kasriel | CEO | Upwork |
| | | Utah Hotel and Lodging Association |
| | | Utah Restaurant Association |
| Chris Romer | President & CEO | Vail Valley Partnership |
| Ronald Garcia | CEO | Vardex Laser Solutions LLC |
| Brian Frumberg | Founder | Venture Out |
| Erin Abrams | VP of Legal Affairs | Via |
| Daniel Ramot | CEO | Via |
| Sandy Hessler | CEO | Vibrancy Consulting |
| John Saylor | Chairman | Virginia-Washington, DC District Export Co |
| Alfred F. Kelly, Jr. | CEO | Visa Inc. |
| Barbara Steinfeld | President | Visit Tri-Valley |
| Diane von Furstenburg | | |

| Name | Title | Company |
|------|-------|---------|
| Barbara Grogan | Founder and former CEO | Western Industrial Contractors |
| Bettina Bennett | CEO | Whichbox Media |
| John Atkinson | Managing Partner | Willis Towers Watson |
| Lindsey McNeny | President | Window to the Wild |
| Robert Wist | President | Wist Office Products |
| Claudia Williams | CEO | WonderWorld |
| Mohan Ramaswamy | Partner, Strategy | Work & Co |
| Aneel Bhusri | CEO | Workday |
| James P. Shaughnessy | Senior Vice President, General Counsel & Secretary | Workday |
| Sam Altman | Co-Founder | Y Combinator |
| Zab Mendez | Owner | Z's Marketing Alliance |
| Sumithra Jagannath | President | ZED Digital |

# DEF-INTERV.

# EX. 46

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF BRIAN ROSENBERG** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF BRIAN ROSENBERG
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1292

1   COUNTY OF SANTA CLARA and         CASE NO. 17-CV-05813-WHA
    SERVICE EMPLOYEES INTERNATIONAL
2   UNION LOCAL 521,

3              Plaintiffs,

4           v.

5   DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6   BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7   States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8   of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9   SECURITY,

10            Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF BRIAN ROSENBERG
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, BRIAN ROSENBERG, declare:

1.     I am the President of Macalester College, a nationally ranked liberal arts college located in St. Paul, Minnesota. I have held this position since August 2003. Macalester's diverse student body, constituting approximately 2,100 students, includes students from all parts of the country and around the world. Macalester students come from 88 foreign countries, and approximately one-quarter of Macalester students are citizens of another country.

2.     As set forth in its mission statement, Macalester is committed to internationalism and multiculturalism. A unique feature of Macalester, the Institute for Global Citizenship fosters global citizenship by advancing scholarship and ethical action in Macalester's local, national, and international community. The Institute provides students, faculty, and staff with opportunities to learn about and serve the global community. Macalester is also committed to creating a culture of diversity and justice within its college community that will allow its students, faculty, and staff to respond to the complexities of the national and international community. Macalester strives to promote a welcoming and pluralistic environment on its campus.

3.     Approximately 7 to 9 students who attend Macalester are recipients of the Deferred Action for Childhood Arrivals (DACA) program. Since the program's inception in 2012, approximately 2 DACA recipients per year have graduated from Macalester. Macalester's DACA recipient students and graduates have made important contributions to the college community.

4.     The elimination of DACA will impair Macalester's ability to fulfill its mission statement. Macalester's efforts to create a college community that emphasizes internationalism and multiculturalism will be impaired if DACA is rescinded, as DACA students may be unable to afford tuition due to their loss of work authorization or may be subject to deportation. The rescission of DACA will cause Macalester to lose the unique perspectives and ideas of its DACA students. Moreover, the rescission of DACA will impede Macalester's strategic goal of increasing the diversity of its student body, faculty, and staff, including its goal of increasing the presence and retention of traditionally under-served populations. The potential deportation of the DACA students and the rescission of their legal status will not only deprive Macalester of the valuable contributions of its current students, but will also adversely impact the diversity of the talent pool of potential Macalester students. Potential students may

1

1294

1     be deterred from applying to Macalester because their substantial investment of time, effort, and money

2     may not seem worthwhile if they are unable to work after graduation. Other potential students may be

3     unable to apply to Macalester because they have been deported. The loss of its DACA students and the

4     adverse impact on the diversity of the pool of potential students will deprive Macalester of the valuable

5     contributions that these students would bring to the campus community.

6        5.     Additionally, the loss of DACA students due to the rescission of DACA will

7     result in a corresponding decrease in Macalester's tuition revenue and will adversely impact the future

8     stream of tuition revenue.

9

10        I declare under penalty of perjury under the laws of the United States that the foregoing is

11     true and correct.

12        Executed on    _10/23_   , 2017, in St. Paul, Minnesota.

13

14

15                       BRIAN ROSENBERG

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF BRIAN ROSENBERG
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# DEF-INTERV.

# EX. 47

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF THOMAS S. SAYLES OF THE UNIVERSITY OF SOUTHERN CALIFORNIA** |

DECLARATION OF THOMAS S. SAYLES OF
THE UNIVERSITY OF SOUTHERN CALIFORNIA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1326

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA |

DECLARATION OF THOMAS S. SAYLES OF
THE UNIVERSITY OF SOUTHERN CALIFORNIA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

        Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

        Defendants.

CASE NO. 17-CV-05813-WHA

---

DECLARATION OF THOMAS S. SAYLES OF
THE UNIVERSITY OF SOUTHERN CALIFORNIA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1328

1. This declaration is filed in support of the Complaint for Declaratory and Injunctive Relief in State of California, et al. vs. U.S. Department of Homeland Security, et al., Civil Case No. 3:17-CV-05235-WHA (US Dist. Court, Northern District of California).

2. The University of Southern California ("USC") is a private research university located in Los Angeles which employs over 6,000 faculty, over 14,000 staff members (50 percent time or more), and over 7,500 student workers (not including students working as teaching or research assistants).

3. USC's annual budget for the 2016-17 fiscal year was $4.4 billion. USC generates approximately $8 billion annually in economic impact in California.

4. USC has an undergraduate student body of approximately 19,000 students and a graduate and professional student body of approximately 25,000 students. In June 2016, USC granted over 15,000 bachelor's and advanced degrees to graduating students.

5. In addition to over 10,000 enrolled international students who are present in the United States primarily on F-1 and J-1 non-immigrant visas, USC has numerous immigrant students and employees, including students currently registered with the Department of Homeland Security under the Deferred Action for Childhood Arrivals (DACA) program.

6. While USC does not track DACA students, we are aware that many of USC's schools and administrative offices are in contact with DACA students who are enrolled as undergraduate, graduate, and professional students. We are also aware that that there are other individuals with DACA status who are affiliated with USC in different ways, including student family members with DACA status.

7. USC's central mission is the development of human beings and society, and our first priority is the education of our students. Given this role and mission, we are deeply concerned with the effect that the sudden termination of the DACA program will have on the university and on our students.

8. We are aware of the great concern and fear that the termination of the DACA program has created for our affected students and their colleagues, friends, professors, and advisors. USC has been providing various resources to support and counsel DACA students including through

2

Declaration of Thomas S. Sayles of
the University of Southern California
Case #17-5235

1329

1 chaplains in the Office of Religious Life, the Gould School of Law's Immigration Clinic, the

2 Cultural Centers, counseling services provided by the Student Health Center, and many individual

3 professors and staff members.

4      9.    If the DACA program is terminated some of our DACA students will likely see their

5 studies interrupted due to their inability to work on a part-time basis, to help pay for their tuition

6 and living costs, as a result of their loss of employment authorization. Others may decide to end

7 their studies because of their inability to enter the workforce upon graduation due to the lack of

8 employment authorization.

9      10.   Even if some of our DACA students were able to continue their education for some

10 period of time, it would be difficult for many of them to be full participants in academic, social,

11 and recreational activities due to the loss of DACA status. International travel would be

12 impossible due to the end of DACA-related advance parole, and domestic travel extremely

13 difficult if our students are unable to obtain or renew identity documents necessary for travel due

14 to their lack of legal or DACA status.

15      11.   USC would also be harmed by the termination of DACA. While all of our students

16 contribute in some fashion to the payment of tuition and living expenses, USC also invests in our

17 students, including our DACA students, by providing significant levels of financial support to

18 students who would otherwise be unable to afford tuition and living expenses. The loss of our

19 DACA students would also result in the future loss of the enormous economic and cultural

20 benefits that our DACA students would provide after graduation when they would go on to pay

21 taxes, create jobs and add to the rich fabric of American innovation.

22

23      I declare under penalty of perjury that the foregoing is true and correct to the best of my

24 knowledge.

25 September 21, 2017

26                         Thomas S. Sayles

                         Senior Vice President, University Relations

27                          UNIVERSITY OF SOUTHERN CALIFORNIA

28

Declaration of Thomas S. Sayles of
the University of Southern California
Case #17-5235

# DEF-INTERV.

# EX. 48

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JONATHAN SCHWARTZ** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF JONATHAN SCHWARTZ

| 1 | COUNTY OF SANTA CLARA and | CASE NO. 17-CV-05813-WHA |
| 2 | SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON | |
| 6 | BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United | |
| 7 | States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department | |
| 8 | of Homeland Security; and U.S. DEPARTMENT OF HOMELAND | |
| 9 | SECURITY, | |
| 10 | Defendants. | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF JONATHAN SCHWARTZ

I, Jonathan Schwartz, declare:

1.     I am over the age of eighteen and competent to testify.

2.     I am the Chief Legal & Corporate Affairs Officer at Univision Communications Inc. (Univision). I have been employed by Univision since 2012. In my role, I oversee the Legal & Corporate Affairs Department, which includes the following areas: Legal and Business Affairs, Corporate Compliance, Government Relations, Corporate Social Responsibility, Community Empowerment, Global Security, Media Rights Management & Content Protection, Standards & Practices, and Advertising Review.

3.     Univision is the leading media company serving Hispanic America and the rising multicultural mainstream of the United States. Univision's workforce reflects the audience it serves, including DACA beneficiaries, their families, and their communities. The government's decision to terminate DACA means that a segment of Univision's employees will eventually lose their work authorization. As a direct consequence of the government's decision, therefore, Univision will lose the benefit of these employees' immeasurable contributions to the Company. And because these employees uniquely contribute to Univision's operations, the Company cannot adequately replace them. Moreover, in hiring and training replacements, Univision will incur both business disruptions and financial losses. Additionally, the loss of DACA beneficiaries in our workforce will result in significant harm in the form of diminished connection with the communities we serve and reduced diversity of thought and point of view in the content we produce.

4.     Univision employs approximately 660 employees in the state of California, and a total of approximately 4,630 employees across the country in our corporate, network, local TV, radio, and digital operations. Univision's mission is to inform, empower, and entertain the Hispanic American population and rising multicultural mainstream.

5.     Univision began as a small Spanish-language TV station in San Antonio, Texas. Over its more than 50-year history, Univision's broadcast and cable TV, digital, and radio offerings have grown to become the foremost destination for Hispanic America and the rising multicultural mainstream, reaching an estimated 108 million average monthly-unduplicated media consumers. We engage audiences via our portfolio of 123 local TV and radio stations (in Arizona, California, Florida, Illinois,

1

New York, North Carolina and Texas, among other states), and 17 broadcast, cable and digital networks and partnerships. In recent years, we have expanded our efforts to reach English speaking Hispanics and young multicultural audiences through our investment in the El Rey network and the launch of the Fusion Media Group, which includes such properties as FusionTV, the Gizmodo Media Group (and its digital-first platforms Gizmodo, Jalopnik, Jezebel, Deadspin, Lifehacker, Kotaku, Splinter, and the Root), and a stake in The Onion.

6.    Univision has a unique relationship with its audience, whose members rely on us for news and information on critical matters such as immigration and DACA. Univision's news content has often been described as a "lifeline" for the Hispanic community. In addition, Univision provides a platform for—and gives a voice to—traditionally underrepresented communities in America. We do this through not only our media properties, but also through our Corporate Social Responsibility (CSR) and Social Impact initiatives. Among Univision's CSR priorities are several projects focused on education and youth development, informing and empowering Hispanic America through a multitude of health and wellness initiatives, increasing diversity in media, and providing training opportunities for young people to learn coding and other necessary skills to enter STEAM (science, technology, engineering, art, and math) careers.

7.    Univision may have up to 60 employees, ranging across our entire company, who are beneficiaries of the DACA program and affected by the government's decision. (Like many other companies, Univision has not yet been able to confirm the exact number of its employees who have DACA status.) From the talent in front of and behind the camera, to the sharp creative minds that make our business run, to energized interns who are the Company's future – hard-working DACA beneficiaries are essential to creating and disseminating the news, entertainment, and services that Univision provides to millions of Americans every day.

8.    Univision engages in expressive activity and depends on the unique perspectives and creative contributions of its content producers and the employees who support them. Some of Univision's DACA beneficiary employees are directly involved in producing content that helps shape Univision's expressive activity. These employees provide a distinct perspective both as individual voices and because their experiences as individuals who first came to the United States as children give

2

DECLARATION OF JONATHAN SCHWARTZ

them valuable insights into the culture and issues of interest to many of Univision's viewers. Their experiences as young immigrants help Univision better serve both the immigrant and non-immigrant communities that make up Univision's core audiences. The value of these employees to Univision thus goes well beyond their economic contributions.

9.     As a news operation, Univision will be harmed by the elimination of DACA. The ending of the program will make DACA beneficiaries, including DACA beneficiaries with family members who may be in the United States without status, less likely to come forward to appear on news programs, provide commentary on public affairs, and otherwise speak up on such issues as social justice and community affairs for fear that they or their families may be deported. This would not only hamper news coverage but, as seen in other countries, create a dearth of reliable information, lead to the dissemination of misinformation, and stifle the award-winning efforts of Univision's investigative journalism teams.

10.     Congress has recognized the unique importance of having the world's most talented journalists working in the United States, regardless of their country of birth, in providing for media and employment-based visas. Univision can avail itself of these visa processes if it seeks to hire a journalist from any other country in the world. But with the rescission of DACA, Univision will not be able to avail itself of these processes with respect to the skilled young persons who are already living in the United States with DACA status, even though they have unique talents and abilities and have been trained at our colleges and universities and have received U.S. journalism degrees. Without DACA, Univision would be unable to hire journalists from this talented set of individuals.

11.     For all these reasons, Univision stands by the hundreds of thousands of young people—including our own DACA beneficiary employees—who are impacted by the government's decision to terminate DACA. They have done everything asked of them by the government under DACA; they are active and contributing members of society who go to school, serve in the military, and work in thousands of civilian jobs—including at Univision—across our nation. Simply put, they should be able to stay in the United States—the only country most of them have ever known.

DECLARATION OF JONATHAN SCHWARTZ

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 3̶0̶, 2017, at New York, New York.

_____
Jonathan Schwartz, Esq.

DECLARATION OF JONATHAN SCHWARTZ

# DEF-INTERV.

# EX. 49

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

    XAVIER BECERRA
    Attorney General of California
    MICHAEL L. NEWMAN
    Supervising Deputy Attorney General
    JAMES F. ZAHRADKA II (SBN 196822)
    1515 Clay Street, 20th Floor
    P.O. Box 70550
    Oakland, CA 94612-0550
    Telephone: (510) 879-1247
    Email: James.Zahradka@doj.ca.gov
    *Attorneys for Plaintiff State of California*

    JOSEPH W. COTCHETT (SBN 36324)
    NANCY L. FINEMAN (SBN 124870)
    COTCHETT, PITRE & McCARTHY, LLP
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
    Email: nfineman@cpmlegal.com
    *Attorneys for Plaintiff City of San Jose*

    JONATHAN WEISSGLASS (SBN 185008)
    STACEY M. LEYTON (SBN 203827)
    ERIC P. BROWN (SBN 284245)
    ALTSHULER BERZON LLP
    177 Post Street, Suite 300
    San Francisco, CA 94108
    Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
    Email: jweissglass@altber.com
    *Attorneys for Plaintiffs County of Santa Clara and*
    *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.** |

|  |  |  |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 |  |  |
| 3 | Plaintiffs, |  |
| 4 | v. |  |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, |  |
| 6 |  |  |
| 7 |  |  |
| 8 | Defendants. |  |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, |  |
| 11 | v. |  |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, |  |
| 13 |  |  |
| 14 |  |  |
| 15 | Defendants. |  |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 |  |  |
| 18 |  |  |
| 19 | Plaintiffs, |  |
| 20 | v. |  |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, |  |
| 22 |  |  |
| 23 |  |  |
| 24 | Defendants. |  |
| 25 |  |  |
| 26 |  |  |
| 27 |  |  |
| 28 |  |  |

---

DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| 1 | COUNTY OF SANTA CLARA and<br>SERVICE EMPLOYEES INTERNATIONAL | CASE NO. 17-CV-05813-WHA |
| 2 | UNION LOCAL 521, | |
| 3 |           Plaintiffs, | |
| 4 |        v. | |
| 5 | DONALD J. TRUMP, in his official capacity | |
| 6 | as President of the United States, JEFFERSON<br>BEAUREGARD SESSIONS, in his official | |
| 7 | capacity as Attorney General of the United<br>States; ELAINE DUKE, in her official | |
| 8 | capacity as Acting Secretary of the Department<br>of Homeland Security; and U.S. | |
| 9 | DEPARTMENT OF HOMELAND<br>SECURITY, | |
| 10 |          Defendants. | |

DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1372

I, Marcelo M. Suárez-Orozco, declare:

1.  I am the Wasserman Dean of the Graduate School of Education and Information Studies at the University of California, Los Angeles ("UCLA"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.  In my role as the Wasserman Dean of UCLA's Graduate School of Education and Information Studies, I lead two academic departments, 16 nationally renowned research institutes, and two innovative demonstration schools. My research focuses on conceptual and empirical problems in cultural psychology and psychological anthropology with an emphasis on the study of migration, globalization, and education. I have authored, co-authored, or edited almost 40 books and over 150 articles and book chapters on these topics, including on the relationship between immigration, education, and achievement. My Curriculum Vitae is attached as Exhibit A.

3.  A substantial body of research documents the negative educational, developmental, physical, psychological, and other effects that growing up without authorized immigration status has on children, adolescents, and young adults. DACA provided a safe and reliable mechanism through which young immigrants who were brought to this country through no fault of their own—often at a young age—could integrate more fully into the American communities in which they were raised.

4.  DACA has enabled approximately 750,000 young immigrants to integrate into and contribute more to communities across the country; its rescission will snatch these youngsters from the stability they have come to expect and force them back into a life in the shadows as unauthorized immigrants. The research is clear: current DACA recipients who are forced to return to unauthorized immigration status will experience myriad negative educational, developmental, physical, psychological, and other effects because of DACA's rescission.[1]

---

[1] *See, e.g.*, Suárez-Orozco, Carola, *Conferring Disadvantage: Behavioral and Developmental Implications for Children Growing up in the Shadow of Undocumented Immigration Status*, 38 J. DEVELOPMENTAL & BEHAV. PEDIATRICS 424 (2017); Hirokazu Yoshikawa, Carola Suarez-Orozco, & Roberto G. Gonzales, *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. OF RES. ON ADOLESCENCE 4 (2017).

**The Benefits of DACA**

5.    Recipients of DACA status share a number of defining characteristics. First, they came to this country at a young age, through no volition of their own. Because of this, DACA recipients grew up in American society and have been socialized as Americans.

6.    Most DACA recipients received some or all of their K-12 education at American schools. Although their American education created opportunities, such as pursuing higher education, DACA recipients' undocumented status imposed burdens not faced by their citizen peers. For example, without their DACA status, youths cannot legally work in this country and face other hurdles such as the inability to open a bank account or travel freely.

7.    DACA enabled its recipients to engage fully with society and pursue opportunities to better their lives and the lives of those around them. With the promise that they could freely live, work, travel, and pursue an education, DACA recipients enrolled in universities like UCLA, got jobs to help support their families and pay for the educations, and pursued internships and other endeavors that enriched their lives and our communities.

8.    Studies of the impact of DACA reveal the measurable benefits that accrue to individuals gaining legal protections. Participation in DACA has been associated with greater experiences of incorporation and integration into U.S. society. These include greater sense of national belonging,[2] civic participation,[3] and involvement in college activities.[4] Rates of obtaining a driver's license, obtaining health care, opening bank accounts, and applying for credit cards are also higher.[5] There is also some

---

[2] *See, e.g.*, Robert T. Teranishi, Carola Suárez-Orozco, & Marcelo Suárez-Orozco, *In the Shadows of the Ivory Tower: Undocumented Undergraduates in the Uncertain Era of Immigration Reform.* INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION, UCLA (2015), *available at* http://www.undocuscholars.org/assets/undocuscholarsreport2015.pdf; Tom Wong & Carolina Valdivia, *In Their Own Words: A National Survey of Undocumented Millennials.* UNITED WE DREAM (2014), *available at* https://unitedwedream.org/words-nationwide-survey-undocumented-millennials/

[3] Tom Wong & Carolina Valdivia, *supra* note 2.

[4] Robert T. Teranishi, *et al.*, *supra* note 2.

[5] Roberto G. Gonzales, Veronica Terriquez, & Stephen P. Ruszczyk, *Becoming DACAmented: Assessing the Short-Term Benefits of DACA (Deferred Action for Childhood Arrivals).* 58 AMERICAN BEHAVIORAL SCIENTIST 1852-1872 (2014).

DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**1374**

1  evidence that those who apply for and are awarded DACA attain higher levels of education, although the
2  pathways of causality are not clear (those who apply for DACA may be positively selected).[6]

3      9.    Put simply, DACA has provided young immigrants with many important benefits. For
4  example, the UCLA study of childhood arrivals by the UndocuScholars Project found that 85.5 percent
5  of students with DACA reported a positive impact on their education. DACA recipients indicated
6  enjoying higher rates of working, greater housing & transportation stability, greater success in gaining
7  access to both scholarships and internships. Lastly, 94 percent of DACA recipients indicated a wish to
8  apply for U.S. citizenship if eligible.[7]

9      10.   Research points to the mechanisms by which protection against deportation can bring
10 improvement in an immigrant child's life trajectory. First, most simply, such protection eliminates the
11 fear and anxiety that flow from the constant concerns deportation and sudden forced family separations.
12 Like removing a hobble, this allows a child, youth and emerging adult to ascend developmentally, grow
13 psychologically more secure, and attain greater educational success. Second, protections serve to
14 remove tangible barriers to economic opportunity and social integration that arise from unauthorized
15 status. Third, protections foster social trust and civic engagement with the institutions of society. Basic
16 social science research has documented these outcomes in a variety of empirical, conceptual, and
17 methodological traditions.[8]

18     11.   Research further suggest that even a temporary work permit, such as those granted under
19 DACA, can set in motion a process that brings economic benefits first to the immigrants, in the form of
20 higher wages, and then to the public sector, in the form of higher tax revenue, and then to the nation as a
21 whole, in the form of a more productive labor force. Permission to work under DACA provides
22 unauthorized immigrants with better educational opportunities, a shield against workplace exploitation,
23 and grant freedom to move across the labor market to find work that best suits their skills.

---

[6] Robert T. Teranishi, *et al.*, *supra* note 2.

[7] *Id.*

[8] Robert Suro, Marcelo M. Suárez-Orozco, & Stephanie L. Canizales, *Removing Insecurity: How American Children Will Benefit From President Obama's Executive Action on Immigration.* TOMAS RIVERA POLICY INSTITUTE AT USC & THE INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION AT UCLA (2015).

**The Negative Effects of The Rescission of DACA**

12.     Rescinding DACA will thrust its young recipients back into turmoil and anxiety of living with unauthorized immigration status, thwarting the measurable gains in human and social capital that DACA has enabled.

13.     Research on the negative effects of undocumented status sheds light onto the consequences that DACA recipients will face when they lose the benefits that DACA promised. In particular, DACA recipients who lose their DACA status will likely face a slew of negative educational, developmental, physical, and psychological consequences.

*The Negative Educational and Developmental Consequences of DACA's Rescission*

14.     Multiple studies have shown that children who grow up undocumented exhibit lower levels of cognitive development and emotional well-being throughout early childhood and adolescence than comparable children whose parents have no immigration issues. The research that has produced this finding carefully isolated the impact of immigration status from other factors such as low incomes or low levels of education among the parents.

15.     As early as ages two and three, children growing up undocumented or with undocumented parents had lower cognitive skills as measured by standardized tests than comparable samples of children of parents who have no immigration issues. Research shows that the lack of a documented status is harmful to children's development—particularly their cognitive and language skills. These findings are based on a study of 380 newborns recruited hours after birth in public hospitals in New York City and then followed for three years with assessments of the children and in-depth interviews with the parents. Conducted by Hirokazu Yoshikawa, a developmental psychologist formerly at Harvard and now a professor at New York University's Steinhardt School of Culture, Education, and Human Development, the research offers a detailed assessment of how the everyday experiences of undocumented parents differ from legal immigrants in ways that can affect their children's development.

16.     Professor Yoshikawa's research shows that parents are reluctant to interact with any government agencies to the point that children may not receive any resources for which they are eligible, and fear of interacting with the authorities could leave them vulnerable to criminal exploitation whether by smugglers, loan sharks or unscrupulous landlords. Undocumented immigrants tend to have more

1376

restricted social connections of the sort that can help in childrearing as parents are cautious about interacting with neighbors, coworkers or even a playmate's parents out of fear their status will be discovered. Finally, undocumented parents are more likely to experience exploitative work conditions, including unsafe workplaces, longer hours and lower pay. Professor Yoshikawa's study found evidence of lower cognitive skills as early as twenty-four months and concluded that household-level "economic hardship and psychological distress—feelings of depression, anxiety, and worry—were responsible for this effect." At thirty-six months, additional effects on cognitive skills were associated with undocumented status in the household and "the disastrous work conditions of the undocumented parents in the sample, combined with lower access to center-based child care."[9]

17.    A more generalized study based on a large data set similarly concluded that the children growing up unauthorized are at greater risk of lower levels of development in the grade school years. That finding emerged from an analysis of data from the 2005 California Health Interview Survey, which has a sample of 43,020 households. The large sample enabled a team of researchers from the Institute for Social Science Research at the University of California Los Angeles to study developmental risks for children based on household level immigration status while controlling for other factors such as education, income and employment.[10]

18.    Many of the same impediments to full development observed in early childhood may apply to middle childhood, including less frequent use of service, such as afterschool enrichment programs, and greater social isolation of family networks.

19.    Moreover, by middle childhood, a child's cognitive skills and perspective-taking have developed to a point where he or she may have become aware of legal status—their own and that of their parents and siblings.[11] At this stage in a child's development, "concern over the family's legal

---

[9] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN (2011).

[10] Alexander N. Ortega et al., *Documentation Status and Parental Concerns about Development in Young U.S. Children of Mexican Origin.* 9 ACADEMIC PEDIATRICS 278-282.

[11] Carola Suárez-Orozco et al., *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 HARV. EDUC. REV. 438, 452 (2011).

DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1377

vulnerabilities begins to seep into consciousness. They become more cognizant of the culture of fear in which they live. Spanish-language television and radio frequently feature stories of deportations, and in some homes, it is a topic of family conversation that children begin to metabolize."[12]

20.     At this stage in a child's development, he or she is beginning to make social comparisons. A child's recognition that his or her family is different can "affect self-esteem, increase anxiety, and produce internalizing symptoms" associated with depression and acting out behaviors.[13]

21.     Development in adolescence implicates additional consequences of not having documented legal status. "[T]he key developmental task of adolescence is the formation of a stable sense of identity, along with finding one's place within the community beyond immediate family. Identity formation is, in part, achieved by mastering culturally marked rites of passage, such as obtaining a driver's license, getting a first job, and, for many, going off to college. Unauthorized youth are unable to fully partake in these normative coming of age rituals; moreover, their identity formation is complicated when they come to face a negative social mirror that portrays them as illegitimate and unwanted. For many adolescents who are unauthorized or are living in mixed-status homes, adolescence is a time when liminality first comes to fully destabilize their fragile world."[14]

22.     Although family and K-12 schooling often provide unauthorized adolescent immigrants with relative protections, moving into young adulthood and the public sphere is shocking and renders youth particularly vulnerable. These youth must "learn to be illegal. Although they might have been under the initial illusion that they would have similar access to the opportunity structure as their authorized peers, they are now confronted with limited life opportunities." These youth learn that they are vulnerable to deportation and have drastically limited educational and employment choices.[15]

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 453. *See also* CAROLA SUÁREZ-OROZCO & MARCELO M. SUÁREZ-OROZCO, CHILDREN OF IMMIGRATION (2001); CAROLA SUÁREZ-OROZCO, ET AL., LEARNING A NEW LAND: IMMIGRANT STUDENTS IN AMERICAN SOCIETY (2008).

[15] Carola Suárez-Orozco, *supra* note 11, at 454.

6

1378

23. The consequences of a young immigrant's undocumented status manifest in a variety of ways. For example, one survey of over 909 college students found statistically higher levels of anxiety in young college students who are unauthorized immigrants compared to standard measures of their peers in the general population.[16]

24. In sum, the negative consequences of unauthorized status, including limited access to services and opportunities, fear of deportation and forced family separations, have long-term and tangible developmental effects on the lives of their children and youth. Eliminating these negative consequences increases a child's cognitive development and well-being in childhood, middle-childhood, and adolescence.

*The Negative Physical and Health Consequences of DACA's Rescission*

25. Research suggests household-level undocumented status poses obstacles to access many means-tested benefits. An in-depth study of three communities by Randolph Capps and colleagues at the Urban Institute revealed that families go to great lengths to avoid contact with social service providers despite their children's program or service eligibility for fear of being identified as undocumented and deported.[17]

26. Researchers from the Center for Family and Demographic Research analyzed data collected by the Survey of Program Dynamics and found that food insecurity among the children of non-citizens has been higher and more persistent since the passing of the Personal Responsibility and Work Opportunity Reconciliation Act, which made non-citizens ineligible for federally funded food assistance programs.

---

[16] Robert T. Teranishi, *et al.*, *supra* note 2.

[17] Children and youth with unauthorized status are excluded from most means-tested federal and associated state programs. This includes sources of health or mental health care such as Medicaid, Medicare, or Children's Health Insurance Programs (CHIP) (aside from emergency care and care provided during the perinatal and immediate postnatal period); publicly funded job training; public housing; Supplemental Nutrition Assistance (SNAP, or Food Stamps); the Earned Income Tax Credit; Social Security; and cash welfare assistance (TANF or Temporary Assistance for Needy Families). Unauthorized immigrants are also ineligible for the expanded health insurance coverage through exchanges provided by the Affordable Care Act.

---

7

**1379**

27.     Using national data from the Early Childhood Longitudinal Study—Kindergarten (ECLS-K) cohort, public policy researchers Ariel Kalil and Jen-Hao Chen found that children with immigrant mothers who are not U.S. citizens are more than twice as likely to experience food insecurity than children of mothers with similar socioeconomic characteristics but who are native born. Limited or uncertain access to nutrition can contribute to a range of developmental problems, from lower cognitive skills in early childhood and higher anxiety among adolescents.[18]

*The Negative Psychological Consequences of DACA's Rescission*

28.     The negative impacts of unauthorized status extend to the psychological harm to young, undocumented immigrants. These psychological effects of "unauthorized status on development across the life span are uniformly negative, putting children and youth at risk of lower educational performance, economic stagnation, blocked mobility and ambiguous belonging. In all, the data suggest an alarming psychological formation."[19]

29.     Drawing on interviews with 91 parents and 110 children in 80 households, sociologist Joanna Dreby reports that children in Mexican immigrant families (even when the children are U.S. citizens) express fear and anxiety about potential forced family separations. Notable, she found that children and youth fearing familial separations and deportations come to distrust law enforcement officials.[20] Landale and colleagues found higher internalizing (depression, anxiety, withdrawal) and externalizing (aggressive and acting out) behavioral problems in a sample of Mexican-origin, primary-school-age children with unauthorized parents, relative to their counterparts with documented or citizen parents.[21]

---

[18] Ariel Kalil & Jen-Hao Chen, *Mother's Citizenship Status and Household Food Insecurity Among Low-Income Children of Immigrants.* In H. Yoshikawa and N. Way eds. *Beyond the Family: Contexts of Immigrant Children's Development.* 121 DIRECTIONS FOR CHILD AND ADOLESCENT DEVELOPMENT 43-62.

[19] Carola Suárez-Orozco, *supra* note 11.

[20] JOANNA DREBY, EVERYDAY ILLEGAL: WHEN POLICIES UNDERMINE IMMIGRANT FAMILIES (2015).

[21] Nancy S. Landale, Jessica Halliday Hardie, R.S. Oropesa, & Marianne M. Hillemeier, *Behavioral Functioning Among Mexican-Origin Children: Does Parental Legal Status Matter?* 56 J HEALTH SOC BEHAV. 2-18 (2015).

30. UCLA scholar Leisy J. Abrego's study based on 200 interviews conducted between 1998 and 2010 with Central American immigrants in Los Angeles and Phoenix and in sending communities, found that fear of detention and deportation generated "normalized but cumulative injurious effects" in work, family and school contexts. Some of those effects include restricted social integration and impeded upward mobility.[22]

31. A recent UCLA study of undocumented youth who were brought to the United States as children and are now in college found very high levels of anxiety due to fears of deportation. The UndocuScholars Project at UCLA conducted a survey of 909 undocumented undergraduates in 2014 and found that more than three-quarters expressed worries about being deported and more than half reported knowing someone who had been deported. These worries and other aspects of the insecurity that comes from being unauthorized translated into measurable consequences for the respondents' health. Among male subjects 28.5 percent produced scores on a standard anxiety screening that were above the cutoff for a clinical diagnosis; for females, it was 36.7 percent. In comparison, the shares in a population of college students with no reason to fear deportation would be 4 percent and 9 percent, respectively.[23]

32. In summary, rescinding DACA will return the youth who have benefited from the program back into the shadows of society, and to living in the state of fear and precariousness that triggers the negative consequences described above. Without DACA's promise that they can pursue their education and work and travel freely, these young people—who are Americans in every way except on paper—will likely lose the motivation to pursue their education, the means to work and support themselves and their families, and the psychological and social stability upon which they have come to rely.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 27, 2017, at Los Angeles, California.

Marcelo M. Suárez-Orozco

---

[22] Cecilia Menjívar, & Leisy J. Abrego, *Legal Violence: Immigration Law and the Lives of Central American Immigrants.* 117 AMERICAN JOURNAL OF SOCIOLOGY 1380-1421 (2012).

[23] Robert T. Teranishi, *et al.*, *supra* note 2.

DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1381

# DEF-INTERV.

# EX. 50

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF GEOFFREY H. YOUNG, PhD** |

|   |   |
|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, |
| 6 |
| 7 |
| 8 | Defendants. |

|   |   |
|---|---|
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, |
| 11 | v. |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, |
| 13 |
| 14 |
| 15 | Defendants. |

|   |   |
|---|---|
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 |
| 18 |
| 19 | Plaintiffs, |
| 20 | v. |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, |
| 22 |
| 23 |
| 24 | Defendants. |

DECLARATION OF GEOFFREY H. YOUNG, PhD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1561

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

I, GEOFFREY H. YOUNG, PhD, DECLARE:

1.    I am Senior Director, Student Affairs and Programs, at the Association of American Medical Colleges ("AAMC"). I have held this position since 2011. In this role, I am responsible for the program and services directed to the medical school student affairs community. I oversee AAMC's efforts to optimize the professional and educational development and informed decision making of medical school professionals and learners (from aspiring physicians to medical residents) through the development and delivery of programs, learning opportunities, resources, and other sources of support, as well as the collection, analysis, and sharing of data within the medical education continuum. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.    I earned my B.A. from Hampton University, Hampton VA, and my M.A. and PhD in clinical psychology at the Ohio State University. I began my clinical career in 1990 at the University of Medicine and Dentistry of New Jersey-University Behavioral Healthcare (now Rutgers University Behavioral Health Care) treating adults and children living in underserved communities. I joined the faculty at the UMDNJ-Robert Wood Johnson Medical School (now Rutgers University Robert Wood Johnson Medical School) in 1995 and was appointed Assistant Dean for Student and Multicultural Affairs in 1996. I served as Assistant Dean for Student Affairs at RWJMS between 1999 and 2004. I served as the Associate Dean for Student Affairs at the Medical College of Virginia Campus of Virginia Commonwealth University between 2004 and 2007 where I was the principal student affairs officer and primary spokesperson with students, parents, faculty, and administrators about student-related issues on the campus. I joined the AAMC after serving as the Associate Dean for Admissions at the Medical College of Georgia at Georgia Regents University (now Medical College of Georgia at August University). AAMC is a not-for-profit association dedicated to transforming health care through innovative medical education, cutting-edge patient care, and groundbreaking medical research.

3.    AAMC's members comprise all 147 accredited U.S. medical schools, nearly 400 major teaching hospitals and health systems, and more than 80 academic societies. Through these institutions and organizations, the AAMC serves the leaders of America's medical schools and teaching hospitals

1563

and their nearly 167,000 full-time faculty members, 88,000 medical students, and 124,000 resident physicians.

4.     Prior to the establishment of the DACA program, through my contacts with university and medical school officials, I learned of college students who wished to attend medical school and become physicians but who were unable to do so because of their undocumented status. Once the DACA program was established I was advised that students with DACA students were successful in gaining admission and matriculating at medical schools throughout the country.

5.     Currently there are approximately 100 medical students and medical resident physicians with Deferred Action for Childhood Arrivals ("DACA") status in AAMC member medical schools and teaching hospitals. These individuals, in qualifying for DACA status and pursuing a medical education, have demonstrated a commitment to acquiring the skills and professional attributes of a physician to improve the health of Americans throughout the country.

6.     With the nation's population growing and becoming more diverse, it is crucial that our physician workforce is prepared to mitigate racial, ethnic, and socioeconomic health disparities. Aspiring physicians with DACA status help our country produce a diverse and culturally responsive health care workforce to meet the needs of underserved populations, improve cultural awareness, and promote health equity. As an example, research demonstrates that concordance in race-ethnicity and language between physician and patient can overcome stigma associated with conditions like mental illness, with minority patients demonstrating a greater willingness to seek care from physicians of similar backgrounds.

7.     Research demonstrates that diversity in the health professions leads to improvements in access to care for the underserved and in quality care overall. We have found that diversity contributes to increased exposure to divergent perspectives, enhances cognitive complexity, promotes civic engagement and facilitates more inclusive teaching and educational content. Diverse medical school classes enhance the ability of the entire health professional workforce to provide culturally competent care to individuals regardless of their background. Diversity in health professional teams has contributed to greater productivity, creativity and innovation, with positive implications for advancing science and health care.

2

DECLARATION OF GEOFFREY H. YOUNG, PhD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

8.     To become a licensed physician, an individual must complete four years of medical school and between three and seven years in a medical residency program, pass national medical knowledge and clinical skills examinations, and thereafter meet the standards set by state licensing boards for eligibility to practice medicine. Revoking an aspiring or practicing physician's authorization to live and work in the United States will result in the loss of a multi-year investment by medical schools and teaching hospitals in these highly-qualified learners and leave significant gaps in our country's healthcare workforce, to the detriment of hospitals, health systems, patients, and communities throughout the United States.

9.     Because numerous medical schools require applicants to possess lawful immigration status, loss of status will prevent aspiring physicians from attending those schools.   This will keep high-achieving and highly-motivated individuals from entering the physician pipeline.

10.     Medical residency programs are required to complete I-9 Employment Eligibility Verification forms for all individuals who serve as physicians in their residency programs.  For medical school graduates who have been selected for residency, rescission of DACA status (and the corresponding loss of work permit) will in all likelihood disqualify them from residency positions, which will be highly detrimental to their careers and likely prevent them from serving as physicians in the American medical profession altogether.

11.     The DACA program also made it possible for medical students and residents to participate in training through rotations at Veteran Administration medical centers.  Rescission of DACA status will likely disqualify such trainees from VA rotations.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _10/26_____, 2017, in Washington, D.C.

Geoffrey H. Young, PhD

3

1565

# DEF-INTERV.

# EX. 51

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF BRAD WELLS** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

               Plaintiffs,

          v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

               Defendants.

CASE NO. 17-CV-05813-WHA

I, Brad Wells, declare:

1.     I am the current Associate Vice Chancellor, Business and Finance for the California State University ("CSU"). The CSU is the State of California acting in its higher education capacity. The CSU Board of Trustees is vested by statute with the authority to manage, administer and control the CSU's institutions of higher learning.

2.     The CSU joined the University of California, the California Community Colleges, the Association of Independent California Colleges and Universities, and the California Department of Education in communicating the message that ending the Federal Deferred Action for Childhood Arrivals ("DACA") program unnecessarily punishes hundreds of thousands of bright young people who are contributing members of American society. Our letter to the California Congressional Delegation can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Documents/daca-ca-ed-leaders-letter-9-5-17.pdf. As stated in that letter, it is the CSU's position that ending DACA would not only derail the futures of those participating in the program, but would also deprive the State of California of revenue and of the contributions of the program participates to the California workforce, now and in the future.

3.     Since the announcement of the DACA rescission, and in anticipation of the severe negative potential effect of that rescission on DACA participants who are students and employees, as well as the potential negative effect on the entire CSU community, the CSU has expended significant employee time. Evidence of the work involved in the CSU's response to DACA rescission can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Pages/rescission-of-daca.aspx.

4.     In my role as Associate Vice Chancellor, Business and Finance, I have determined that DACA rescission would likely cause the CSU to lose revenue, due to the loss of tuition and fees currently paid by students participating in the DACA program.

5.     Actual CSU student headcount enrollment for fiscal year 2016-17 was 472,427. Actual CSU annual tuition and fees collected for fiscal year 2016-17 totaled $2,838,185,912.00. Tuition and fees include state university tuition, as well as other mandatory fees required of resident students who enroll in or attend the university. Tuition and fees do not include fees such as student housing or parking, which

are optional, or non-resident tuition. The average annual tuition and fees per student headcount enrollment for fiscal year 2016-17 was calculated by dividing the annual tuition and fees by actual student headcount enrollment. The resulting figure is $6,008.00 per student.

6. For the fiscal year 2016-17, the CSU collected an average of $6,008.00 in annual tuition and fees per enrolled student. This figure, multiplied by the number of students affected by the rescission of DACA would yield a potential revenue loss to the CSU of $6,008.00 for each student or potential student participating in the DACA program who would be unable to enroll due to rescission of the DACA program.

7. Under Section 68130.5 of the California Education Code, certain non-resident students are exempt from paying non-resident tuition. This section of the statute became law after Assembly Bill 540 ("AB540") was signed. The CSU has a significant number of students who meet the AB540 guidelines, which include not holding a valid immigrant visa. Many of the AB540 students at CSU are undocumented.

8. CSU does not collect data according to DACA status. However, it is likely that a large number of current CSU students are participating in the DACA program. The CSU Director of Student Programs provided relevant fall 2016 enrollment data that I reviewed. The total number of AB540 students who earned a degree from CSU in 2016-17 was 2,016. Of those, 1,440 were undocumented.

9. Many of the AB540 and undocumented students at CSU are enrolled in academic programs that lead to a state license. These degree programs include the following: Nursing, Teacher Education, Counseling, Occupational Therapy, Physical Therapy, Social Work, Landscape Architecture, and Architecture. According to data provided by the CSU Director of Student Programs, as of Fall 2016, there were AB540 and undocumented students enrolled in these degree programs. In Fall 2016, 1,049 AB540 students were enrolled at CSU in academic programs that lead to a state license. Of those, 763 students were undocumented.

10. If the DACA program is eliminated, the State of California would likely lose trained and qualified students in license programs and would likely lose people who have already obtained licenses in important areas of need in California.

11. I have also reviewed data provided by the CSU Associate Vice Chancellor, Human Resources, which shows there are more than 700 current CSU employees who are potentially DACA

participants.  If DACA is eliminated, it is likely that the CSU would lose current employees who we have

invested in and trained.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed on October 31, 2017, at Long Beach, California.

_____
Brad Wells

DECLARATION OF BRAD WELLS
All DACA Cases (Nos. 17-5211. 17-5235. 17-5329. 17-5380. 17-5813)

# DEF-INTERV.

# EX. 52



PewResearchCenter

NUMBERS, FACTS AND TRENDS SHAPING THE WORLD

FOR RELEASE Wednesday, Sept. 3, 2014

# As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled

**FOR FURTHER INFORMATION
ON THIS REPORT:**

Jeffrey S. Passel, Senior Demographer
Mark Hugo Lopez, Director of Hispanic Research
D'Vera Cohn, Senior Writer
Molly Rohal, Communications Associate
202.419.4372

www.pewresearch.org

RECOMMENDED CITATION: Passel, Jeffrey S., D'Vera Cohn, Jens Manuel Krogstad and Ana Gonzalez-Barrera. "As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled" Washington, D.C.: Pew Research Center's Hispanic Trends Project, September.

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 149 of 270
Case 8:17-cv-09211-VMH Document 1211-1 Filed 13/01/11 Page 90 of 291

1
PEW RESEARCH CENTER

# About This Report

This report provides preliminary estimates of the size and duration of U.S. residence of the 2013 unauthorized immigrant population for the nation. It also includes 2012 and earlier estimates of the unauthorized immigrant population, its duration of U.S. residence, and number who live with U.S. citizen children. **The estimates use the "residual method," a widely accepted and well-**developed technique based on official government data. The data come mainly from the American Community Survey and March Supplement to the Current Population Survey, conducted by the U.S. Census Bureau. For more detail, see the Methodology appendix.

This report is a collaborative effort based on the input and analysis of the following people on the staff of the Pew Research Center. Editorial guidance was provided by Mark Hugo Lopez, director of Hispanic research. This report was written by **Jeffrey S. Passel, senior demographer; D'Vera Cohn,** senior writer; Jens Manuel Krogstad, writer/editor; and Ana Gonzalez-Barrera, research associate. Gonzalez-Barrera also created the charts; number-checking was done by Anna Brown, research assistant. Eileen Patten, research analyst, assisted with formatting and production. Molly Rohal was the copy editor. Find related reports online at pewresearch.org/hispanic.

# A Note on Terminology

"Foreign born" refers to an individual who is not a U.S. citizen at birth or who, in other words, is born outside the U.S., Puerto Rico or other U.S. territories and whose parents are not U.S. citizens. **The terms "foreign born" and "immigrant" are used interchangeably. "U.S. born" refers to an** individual who is a U.S. citizen at birth, including people born in the United States, Puerto Rico or other U.S. territories, as well as those born elsewhere to parents who are U.S. citizens. When **referring to children of unauthorized immigrants, the terms "U.S. born" and "U.S. citizen" are used** interchangeably; a small number of these children may be naturalized citizens.

The "legal immigrant" population is defined as people granted legal permanent residence; those granted asylum; people admitted as refugees; and people admitted under a set of specific authorized temporary statuses for longer-term residence and work. This group includes **"naturalized citizens," legal immigrants who have become U.S. citizens through naturalization;** **"legal permanent resident aliens" who have been granted permission to stay indefinitely in the** U.S. as permanent residents, asylees or refugees; and "legal temporary migrants" who are allowed to live and, in some cases, work in the U.S. for specific periods of time (usually longer than one year).

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 150 of 270
Case 8:17-cv-05211-WHA Document 121-1 Filed 11/01/17 Page 31 of 291

2

PEW RESEARCH CENTER

"Unauthorized immigrants" are all foreign-born non-citizens residing in the country who are not "legal immigrants." These definitions reflect standard and customary usage by the U.S. Department of Homeland Security and academic researchers. The vast majority of unauthorized immigrants entered the country without valid documents or arrived with valid visas but stayed past their visa expiration date or otherwise violated the terms of their admission. Some who entered as unauthorized immigrants or violated terms of admission have obtained work authorization by applying for adjustment to legal permanent status, obtaining Temporary Protected Status (TPS) or receiving Deferred Action for Childhood Arrivals (DACA) status. Data are very limited, but this "quasi-legal" group could account for as much as 10% of the unauthorized population. Many could also revert to unauthorized status.

## About Pew Research Center

Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes and trends shaping America and the world. It does not take policy positions. It conducts public opinion polling, demographic research, media content analysis and other empirical social science research. The center studies U.S. politics and policy views; media and journalism; internet and technology; religion and public life; Hispanic trends; global attitudes; and U.S. social and demographic trends. All of the center's reports are available at www.pewresearch.org. Pew Research Center is a subsidiary of The Pew Charitable Trusts.

James McMillan, *Acting President*
Michael Dimock, *Executive Vice President*
Elizabeth Mueller Gross, *Vice President*
Robyn Tomlin, *Chief Digital Officer*
Andrew Kohut, *Founding Director*

© Pew Research Center 2014

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 151 of 270
Case 3:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 92 of 291

3

PEW RESEARCH CENTER

# Table of Contents

About This Report                                                                            0

A Note on Terminology                                                                        1

About Pew Research Center                                                                     2

As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled                      4

   Total Population and Trend                                                  6

   Parents of U.S.-Born Children                                               7

   Adults Without Deportation Relief                                           8

   Unauthorized Relatives of Protected Immigrants                              8

   Policy and Public Opinion                                                   9

References                                                                                  11

Appendix A: Additional Tables                                                               14

Appendix B: Additional Charts                                                               18

Appendix C: Methodology                                                                     20

   Overview                                                                    20

   Data Sources and Survey Weights                                             21

   Status Assignments—Legal and Unauthorized Immigrants                        23

   Other Methodological Issues                                                 25

4

PEW RESEARCH CENTER

# As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled

**BY** *Jeffrey S. Passel, D'Vera Cohn, Jens Manuel Krogstad* **AND** *Ana Gonzalez-Barrera*

The number of unauthorized immigrants living in the United States has stabilized since the end of the Great Recession and shows no sign of rising, according to new Pew Research Center estimates. The marked slowdown in new arrivals means that those who remain are more likely to be long-term residents, and to live with their U.S.-born children.

There were 11.3 million unauthorized immigrants living in the U.S. in March 2013, according to a preliminary Pew Research Center estimate, about the same as the 11.2 million in 2012 and unchanged since 2009. The population had risen briskly for decades before plunging during the Great Recession of 2007 to 2009.

As growth of this group has stalled, there has been a recent sharp rise in the median length of time that unauthorized immigrants have lived in the U.S. In 2013, according to a preliminary estimate,

FIGURE 1

### Growth in Unauthorized Immigration Has Leveled Off

*In millions*



Note: Shading surrounding line indicates low and high points of the estimated 90% confidence interval. White data markers indicate that the change from the previous estimate shown is statistically significant (for example, for 1995 change is significant from 1990). Data labels are for 1990, odd years from 1995-2011, 2012, 2013.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2004 and 2013, and the American Community Survey for 2005-2012. Estimates for 1990 from Warren and Warren (2013). See Methodology.

**PEW RESEARCH CENTER**

unauthorized immigrant adults had been in the U.S. for a median time of nearly 13 years—meaning that half had been in the country at least that long. A decade earlier, in 2003, the median for adults was less than eight years.

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 153 of 270
Case 3:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 54 of 291

**5**

PEW RESEARCH CENTER

The new estimates are based mainly on data from the U.S. Census Bureau's American Community Survey and Current Population Survey, using the widely accepted "residual methodology"

employed by the center for many years.[1] The estimates of the total population, as well as regarding the share of unauthorized immigrants with U.S. citizen children and length of residence in the U.S., update previously published estimates.[2]

There is renewed interest in unauthorized immigrants who are long-time residents of the United States and have U.S.-born children because they are among those to whom President Obama reportedly is considering offering a temporary reprieve from deportation (Los Angeles Times, 2014). Obama reiterated in late August that he would prefer that Congress pass major legislation to overhaul the immigration system, but because Congress has not done so, he may take executive action on his own (White House, 2014).



FIGURE 2

## As Unauthorized Immigrant Population Growth Has Slowed, Median Length of Residence Has Grown

*Adult median duration of residence in U.S.*

Note: 2013 figure is preliminary. Data labels are for 1995, 2007 and 2013.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2003 and 2013, and the American Community Survey for 2005-2012. See Methodology.

**PEW RESEARCH CENTER**

Among the nation's 10.4 million unauthorized adults, a shrinking share have been in the country for less than five years—15% in 2012, compared with 38% in 2000. A rising share have lived in the U.S. for a decade or more—62% in 2012, compared with 35% in 2000. About a fifth (21%) had been in the U.S. for two decades or more as of 2012.

---

[1] For details about the methodology, see Methodology Appendix C.

[2] For previous estimates, see Passel, Cohn and Gonzalez-Barrera, 2013, and Taylor, Lopez, Passel and Motel, 2011.

Case 1:18-cv-00068   Document 225-2   Filed on 07/21/18 in TXSD   Page 154 of 270
Case 8:17-cv-09211-WHA   Document 121-1   Filed 11/01/17   Page 95 of 291

**6**

PEW RESEARCH CENTER

As the unauthorized population has tilted more toward long-term residents, these immigrants are more likely to have children who are U.S. citizens because they were born in the U.S. Among unauthorized immigrants, the Pew Research Center estimates that in 2012, 4 million, or 38% of adults, lived with their U.S.-born children, either minors or adults. In 2000, 2.1 million, or 30% of unauthorized adults, did.[3] About three-quarters of unauthorized parents residing with their U.S.-born children in 2012—3 million—had lived in the U.S. for 10 years or more.

## Total Population and Trend

The new Pew Research Center estimate of 11.2 million unauthorized immigrants in the U.S. for 2012 replaces a previously published preliminary estimate of 11.7 million as of March 2012 (Passel, Cohn and Gonzalez-Barrera, 2013). The two estimates are not statistically different. The new estimate is considered more accurate because it is based on the American Community Survey, a larger dataset than the Current Population Survey that was the basis for the earlier preliminary estimate.[4]

FIGURE 3

### Share of Long-Term Unauthorized Immigrants Surpasses Share of Short-Term Immigrants

*% of unauthorized adult immigrants, by duration of U.S. residence*



Note: 2013 estimates are preliminary. Data labels are for 1995, 2003 and 2013.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2003 and 2013, and the American Community Survey for 2005-2012.

**PEW RESEARCH CENTER**

---

[3] The total with U.S.-born minor or adult children may well be higher, because this estimate does not count those not living with their sons or daughters.

[4] For 2012, the public-use sample from the American Community Survey is a 1% sample of the U.S. population, or more than 3.1 million cases. The 2013 March Current Population Survey used for these estimates has a sample with 203,000 cases.

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 155 of 270
Case 3:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 96 of 291

**7**

PEW RESEARCH CENTER

The nation's estimated unauthorized immigrant population had risen steadily since at least 1990, when it numbered 3.5 million. By 2007, it had more than tripled, to 12.2 million.

As the U.S. economy faltered and border enforcement tightened, however, arrivals plummeted, and some unauthorized immigrants, especially Mexicans, have returned home (Passel, Cohn and Gonzalez-Barrera, 2012 & 2013). By 2009, the population fell to 11.3 million, and has changed little since.

## Parents of U.S.-Born Children

In 2012, there were 4 million unauthorized immigrant adults living with their U.S.-born children. Among those, 3.7 million do not have protection **from deportation under Obama's** Deferred Action for Childhood Arrivals (DACA) program or under the Temporary Protected Status (TPS) program. As the accompanying chart shows, an estimated 675,000 unauthorized immigrants without deportation protection have U.S.-born children ages 18 or older; some of those parents also have younger children.[5] The remainder, about 3 million, has only minor U.S.-born children.

As of 2012, all unauthorized immigrant parents of U.S.-born children had lived in the U.S. for a median 15 years, longer than the median 12 years for the entire unauthorized population. In 2000, the median was 11 years for these parents.

FIGURE 4

## Unauthorized Immigrants, by Selected Categories, 2012

*In thousands*



Notes: Among those under 18, an estimated 120,000 are protected by Deferred Action for Childhood Arrivals (DACA) and 5,000 have Temporary Protected Status. Among DACA or TPS protected adults, an estimated 475,000 have DACA status and 400,000 have TPS. These numbers are rounded, so may not add to total.

Source: Table A2, derived from Pew Research Center estimates based on residual methodology, applied to 2012 American Community Survey.

**PEW RESEARCH CENTER**

---

[5] An estimated 275,000 only have U.S.-born children ages 18 and older.

There were 775,000 unauthorized children younger than age 18 in 2012. In 2005, at its peak, this group numbered more than 1.6 million. By contrast, the number of U.S.-born children younger than 18 has risen. In 2012, there were 4.5 million U.S.-born children younger than 18 living with at least one unauthorized parent. In 2000, there were less than half as many, less than 2.2 million. [6]

The number of unauthorized immigrant children has declined in recent years, for two reasons. Some unauthorized immigrant children have turned 18 and become adults with unauthorized status. In addition, the recent slowdown in unauthorized immigration overall has resulted in fewer new unauthorized children arriving.

## Adults Without Deportation Relief

The overall 2012 figure for unauthorized immigrants includes about a million people who already have temporary relief from deportation through two separate administrative programs. About 575,000 unauthorized immigrants ages 16 to 30 who were brought to the country by their parents are shielded under Obama's Deferred Action for Childhood Arrivals (DACA) program (U.S. Department of Homeland Security, 2014). About 400,000 adults and 5,000 children, mainly Central Americans, have "Temporary Protected Status" based on conditions in their home countries that would make it difficult for them to return.

Among the 9.6 million unauthorized adults who do not have formal protection from deportation, 16% have lived in the U.S. for less than five years, 60% for at least 10 years, and 20% for 20 years or more, according to Pew Research Center's estimates. The figures are similar to those for all unauthorized adults.

## Unauthorized Relatives of Protected Immigrants

Some have suggested that Obama might expand the scope of the deferred action program that began in 2012, which gave a temporary reprieve and work permits to some unauthorized young adults who were brought to the U.S. by their parents before age 16. Among the possible beneficiaries would be parents or children of those who have received relief from deportation (Washington Post, 2014).

According to Pew Research Center estimates, about 450,000 unauthorized immigrants in the U.S. live with their unauthorized immigrant children who are protected from deportation under the deferred action program or who have Temporary Protected Status. Of these adults, more than half—about 230,000—also live with at least one of their U.S.-born children.

---

[6] These numbers do not reflect the recent surge in unaccompanied minors, which began in 2013.

**9**

PEW RESEARCH CENTER

A relatively small group of unauthorized immigrants, both children and adults, lives with parents who are protected from deportation under the deferred action program or who have Temporary Protected Status. According to the center's estimates, this group numbers about 50,000.

## Policy and Public Opinion

Obama signaled in March that he would consider changes in immigration policy via executive action, under renewed criticism by immigrant advocates for a record number of deportations during his administration (New York Times, 2014). From 2009 to 2012, a record 400,000 immigrants were deported per year, an annual average higher than under the administration of his predecessor, George W. Bush (Gonzalez-Barrera, 2014).



FIGURE 5

**Total Removals by U.S. Department of Homeland Security, 1997-2012**

*In thousands*

Note: Years are fiscal years. Data labels are for 1997, 2002 and 2012.

Source: U.S. Department of Homeland Security, Yearbook of Immigration Statistics: 2012

PEW RESEARCH CENTER

The president had said in June that he would pursue changes in immigration policy on his own by the end of summer after Congress failed to pass major legislation, but in late August he signaled that deadline might slip (White House, 2014).

The debate over immigration policy has been complicated by the recent arrival of thousands of unaccompanied children. During the first 11 months of the 2014 fiscal year (Oct. 1, 2013-Aug. 31, 2014), the number of unaccompanied children caught at the U.S.-Mexico border rose 88% compared with the same period in fiscal 2013 (U.S. Customs and Border Patrol, 2014).

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 158 of 270
Case 8:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 99 of 291

**10**

PEW RESEARCH CENTER

The Pew Research Center has not tested public opinion on the idea of broadened temporary relief from deportation for some categories of unauthorized immigrants. In a survey earlier this year, Americans were evenly divided over whether the growing number of deportations was a good thing or a bad thing, with 45% saying each (Pew Research Center, 2014a).

But in a new Pew Research Center survey, the share prioritizing tougher border security and law **enforcement has risen since early in Obama's second term** (Pew Research Center, 2014c). The national survey, conducted Aug, 20-24 among 1,501 adults, finds that 41% say that in dealing with unauthorized immigration, national policy should give equal priority to better border security and to creating a path to citizenship for unauthorized immigrants already in the U.S. A third (33%) say the priority should be on better border security and tougher law enforcement; 23% say that a path to citizenship should be the policy priority.

In a 2013 survey, the public was evenly split over whether national immigration policy should prioritize better border security or creating a path to citizenship (25% for each). Nearly half (47%) said both should have equal priority (Pew Research Center, 2013).

Most Americans still support a path to legal status for unauthorized immigrants. By 68% to 30%, the public in July backed offering unauthorized immigrants an opportunity to gain legal status (though not necessarily citizenship) if they meet certain requirements, though support has declined some since February, according to a recent Pew Research Center survey (Pew Research Center, 2014b).

Pew Research Center surveys have found that a strong majority of Hispanics and Asian Americans want to see immigration reform passed and support creating a pathway to citizenship for unauthorized immigrants. However, both Hispanics and Asian Americans believe it is more important for unauthorized immigrants to get relief from the threat of deportation (Lopez, Taylor, Funk and Gonzalez-Barrera, 2013).

1624

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 159 of 270
Case 3:17-cv-09211 WHA Document 121-1 Filed 11/01/17 Page 40 of 291

**11**

PEW RESEARCH CENTER

# References

Hoefer, Michael, **Nancy Rytina and Bryan Baker. 2012. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011." Washington,** D.C.: U.S. Department of Homeland Security, Office of Immigration Statistics, March. https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2011.pdf

Lopez, Mark Hugo, Paul Taylor, Cary Funk and Ana Gonzalez-**Barrera. 2013. "On Immigration Policy, Deportation Relief Seen as More Important Than Citizenship." Washington,** D.C.: Pew Research Center. December. http://www.pewhispanic.org/2013/12/19/on-immigration-policy-deportation-relief-seen-as-more-important-than-citizenship/

**Los Angeles Times. "**Immigration Activists Push Reform Despite Possible White House Del**ay." Aug. 29, 2014.** http://www.latimes.com/nation/nationnow/la-na-nn-obama-immigration-policy-20140829-story.html

New York Times. **"Deportation Policy Shift is Signaled by Obama." March 14, 2014.** http://www.nytimes.com/2014/03/15/us/politics/deportation-policy-shift-is-signaled-by-obama.html?_r=0

**Passel, Jeffrey S., Rebecca L. Clark, and Michael Fix. 1997. "Naturalization and Other Current Issues in U.S. Immigration: Intersections of Data and Policy." Proceedings of the Social** Statistics Section of the American Statistical Association: 1997. Alexandria, VA: American Statistical Association.

Passel, Jeffrey. 2007. **"**Unauthorized Migrants in the United States: Estimates, Methods, and Characteristics.**"** OECD Social, Employment and Migration Working Papers No. 57. Paris: OECD Working Party on Migration, September. http://www.oecd.org/dataoecd/41/25/39264671.pdf

Passel, Jeffrey S. **and D'Vera Cohn. 2010. "U.S. Unauthorized Immigration Flows Are Down** Sharply Since Mid-**Decade." Washington, D**.C.: Pew Research Center, September. http://pewhispanic.org/reports/report.php?ReportID=126

Passel, Jeffrey S. **and D'Vera Cohn. 2008. "Trends in Unauthorized Immigration:** Undocumented **Inflow Now Trails Legal Inflow." Washington, D.C.: Pew** Research Center, October. http://www.pewhispanic.org/2008/10/02/trends-in-unauthorized-immigration/

**1625**

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 160 of 270
Case 3:17-cv-05211-WHA Document 120-1 Filed 11/01/17 Page 41 of 291

**12**

PEW RESEARCH CENTER

Passel, Jeffrey S., D'Vera Cohn, and Ana Gonzalez-Barrera. 2013. "Population Decline of Unauthorized Immigrants Stalls, May Have Reversed." Washington, D.C.: Pew Research Center, September. http://www.pewhispanic.org/2013/09/23/population-decline-of-unauthorized-immigrants-stalls-may-have-reversed/

Passel, Jeffrey S., D'Vera Cohn, and Ana Gonzalez-Barrera. 2012. "Net Migration from Mexico Falls to Zero—and Perhaps Less." Washington, DC: Pew Research Center, April. http://www.pewhispanic.org/2012/04/23/net-migration-from-mexico-falls-to-zero-and-perhaps-less/

Pew Research Center. 2014a. "Public Divided Over Increased Deportation of Unauthorized Immigrants." Washington, D.C.: February. http://www.people-press.org/2014/02/27/public-divided-over-increased-deportation-of-unauthorized-immigrants/

Pew Research Center. 2014b. "Surge of Central American Children Roils U.S. Immigration Debate." Washington, D.C.: July. http://www.people-press.org/2014/07/16/surge-of-central-american-children-roils-u-s-immigration-debate/

Pew Research Center. 2014c. "More Prioritize Border Security in Immigration Debate." Washington, D.C.: September.

Ruggles, Steven, J. Trent Alexander, Katie Genadek, Ronald Goeken, Matthew B. Schroeder and Matthew Sobek. 2010. Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]. Minneapolis, MN: University of Minnesota. https://usa.ipums.org/usa/

Taylor, Paul, Mark Hugo Lopez, Jeffrey S. Passel and Seth Motel. 2011. "Unauthorized Immigrants: Length of Residency, Patterns of Parenthood." Washington, D.C.: Pew Research Center. December. http://www.pewhispanic.org/2011/12/01/unauthorized-immigrants-length-of-residency-patterns-of-parenthood/

U.S. Customs and Border Patrol. 2014. "Southwest Border Unaccompanied Alien Children." Washington, D.C., accessed Sept. 3, 2014. http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

**13**

U.S. Department of Homeland Security. 2014. "Deferred Action for Childhood Arrivals
Process (Through Fiscal Year 2014, 3rd Qtr). Washington, D.C.
http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_fy2014_qtr3.pdf

U.S. Department of Homeland Security. 2012. *Yearbook of Immigration Statistics: 2012*.
Washington, D.C. http://www.dhs.gov/yearbook-immigration-statistics-2012-enforcement-actions

Warren, Robert and John Robert Warren. 2013. "Unauthorized Immigration to the United
States: Annual Estimates and Components of Change, by State, 1990 to 2010."
International Migration Review 47 (2, June): 296-329.
http://onlinelibrary.wiley.com/doi/10.1111/imre.12022/full

Washington Post. "How Far Can Obama Go on Deportations?" Aug. 6, 2014.
http://www.washingtonpost.com/blogs/plum-line/wp/2014/08/06/how-far-can-obama-go-on-deportations/

White House. 2014. Statement by the President. Washington, D.C.: August.
http://www.whitehouse.gov/the-press-office/2014/08/28/statement-president

**1627**

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 162 of 270
Case 3:17-cv-00211-WHA Document 121-1 Filed 11/01/17 Page 93 of 291

14

PEW RESEARCH CENTER

# Appendix A: Additional Tables

TABLE A1

## Unauthorized Immigrant Population, by Age and Duration of Residence in the U.S., and Their U.S.-Born Children, 1995-2013

*Population figures in thousands, unless otherwise noted (see rounding notes below)*

| | Unauthorized Population | | | Unauthorized Population Ages 18 and Older | | | U.S.-Born Children of Unauthorized | |
| | *Total* | *Ages 18 and older* | *Younger than 18* | *Median duration in the U.S. (in years)* | *Less than 5 years in the U.S. (%)* | *10 years or more in the U.S. (%)* | *Ages 18 and older* | *Younger than 18* |
|---|---|---|---|---|---|---|---|---|
| 2013 | 11,300 | (x) | (x) | 12.7 | 16 | 61 | (x) | (x) |
| 2012 | 11,200 | 10,400 | 775 | 12.1 | 15 | 62 | 675 | 4,500 |
| 2011 | 11,500 | 10,700 | 825 | 11.5 | 17 | 60 | 675 | 4,450 |
| 2010 | 11,400 | 10,400 | 950 | 10.5 | 20 | 54 | 575 | 4,350 |
| | | | | | | | | |
| 2009 | 11,300 | 10,300 | 975 | 10.0 | 22 | 50 | 450 | 4,300 |
| 2008 | 11,700 | 10,600 | 1,100 | 9.5 | 24 | 47 | 375 | 4,150 |
| 2007 | 12,200 | 10,700 | 1,550 | 8.6 | 27 | 43 | 300 | 4,250 |
| 2006 | 11,600 | 10,100 | 1,500 | 8.0 | 29 | 41 | 220 | 3,800 |
| 2005 | 11,100 | 9,500 | 1,650 | 8.0 | 31 | 41 | 190 | 3,550 |
| | | | | | | | | |
| 2003 | 10,100 | 8,650 | 1,400 | 7.5 | 38 | 37 | 180 | 2,900 |
| 2000 | 8,600 | 7,150 | 1,450 | 7.5 | 38 | 35 | 85 | 2,150 |
| 1998 | 7,250 | 5,950 | 1,300 | 7.8 | 35 | 32 | 40 | 1,750 |
| 1995 | 5,700 | 4,600 | 1,100 | 7.4 | 36 | 33 | 35 | 1,200 |

Note: Estimates for 2013 are preliminary. All numbers rounded independently. Percentages and medians computed from unrounded numbers. See methodology for rounding rules. The symbol '(x)' means not available.

Source: Pew Research Center estimates based on residual methods (see Methodology). Estimates for 2005-2012 based on American Community Survey data from Integrated Public Use Microdata Series (IPUMS). Estimates for 1995-2003 and 2013 based on March supplements to the Current Population Survey.

**PEW RESEARCH CENTER**

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 163 of 270
Case 8:17-cv-00221-VWH Document 1210 Filed 11/01/17 Page 94 of 291

**15**

PEW RESEARCH CENTER

TABLE A2

## Unauthorized Immigrant Population, by Age, Status, Duration of Residence in the U.S. and Presence of Children, and Their U.S.-Born Children, 2012

*Population figures in thousands, unless otherwise noted (see rounding notes below)*

| | | DURATION OF RESIDENCE IN THE U.S. | | | | | |
| | TOTAL POPULATION | *Less than 5 years* | | *10 years or more* | | *20 years or more* | |
| | | Population | % | Population | % | Population | % |
| **Total unauthorized** | **11,200** | **1,850** | **17** | **6,650** | **59** | **2,200** | **20** |
| | | | | | | | |
| *Unauthorized Adults* | *10,400* | *1,600* | *15* | *6,450* | *62* | *2,200* | *21* |
| with DACA approval | 475 | 5 | 1 | 375 | 80 | 90 | 19 |
| with TPS | 400 | 15 | 4 | 375 | 94 | 170 | 43 |
| without DACA or TPS | 9,550 | 1,550 | 16 | 5,700 | 60 | 1,950 | 20 |
| | | | | | | | |
| *Adults, without DACA or TPS* | *9,550* | *1,550* | *16* | *5,700* | *60* | *1,950* | *20* |
| With U.S.-born children | 3,700 | 230 | 6 | 2,750 | 74 | 1,050 | 29 |
| 1+ child is 18 or older | 675 | 20 | 3 | 625 | 92 | 500 | 75 |
| Minor children only | 3,050 | 210 | 7 | 2,150 | 71 | 550 | 18 |
| No U.S.-born children | 5,900 | 1,350 | 23 | 2,950 | 50 | 900 | 15 |
| | | | | | | | |
| *Unauthorized Minors* | *775* | *(x)* | *(x)* | *(x)* | *(x)* | *(x)* | *(x)* |
| with DACA approval | 120 | (x) | (x) | (x) | (x) | (x) | (x) |
| with TPS | 5 | (x) | (x) | (x) | (x) | (x) | (x) |
| without DACA or TPS | 650 | (x) | (x) | (x) | (x) | (x) | (x) |
| | | | | | | | |
| *U.S.-born Children of Unauthorized* | | | | | | | |
| Younger than 18 | 4,500 | (x) | (x) | (x) | (x) | (x) | (x) |
| 18 and older | 675 | (x) | (x) | (x) | (x) | (x) | (x) |

Note: Adults are ages 18 and older. All references to children include only those living with their unauthorized parent(s). "Unauthorized Minors" are younger than 18 and include some who are not living with parent(s). All numbers rounded independently. Percentages computed from unrounded numbers. See methodology for rounding rules. The symbol '(x)' means not available. DACA refers to Deferred Action for Childhood Arrivals. TPS refers to Temporary Protected Status.

Source: Pew Research Center estimates based on residual methods (see Methodology) applied to 2012 American Community Survey data from Integrated Public Use Microdata Series (IPUMS)

**PEW RESEARCH CENTER**

TABLE A3

## Unauthorized Adults, by Status, Detailed Duration of Residence in the U.S. and Presence of Children, 2012

*Population figures in thousands, unless otherwise noted (see rounding notes below)*

| Duration of U.S. Residence | TOTAL POPULATION | ADULT POPULATION (18 and older) | ADULTS WITHOUT DACA OR TPS | | |
|---|---|---|---|---|---|
| | | | *Total* | With U.S.-born children | Without U.S.-born children |
| *Total population* | 11,200 | 10,400 | 9,550 | 3,700 | 5,900 |
| Less than 5 years | 1,850 | 1,600 | 1,550 | 230 | 1,350 |
| 5-9 years | 2,700 | 2,400 | 2,300 | 725 | 1,600 |
| 10-14 years | 2,850 | 2,650 | 2,400 | 1,000 | 1,350 |
| 15-19 years | 1,600 | 1,600 | 1,350 | 675 | 700 |
| 20 or more years | 2,200 | 2,200 | 1,950 | 1,050 | 900 |
| | | | | | |
| *Total percent* | 100 | 100 | 100 | 100 | 100 |
| Less than 5 years | 17 | 15 | 16 | 6 | 23 |
| 5-9 years | 24 | 23 | 24 | 19 | 27 |
| 10-14 years | 25 | 25 | 25 | 28 | 23 |
| 15-19 years | 14 | 15 | 14 | 18 | 12 |
| 20 or more years | 20 | 21 | 20 | 29 | 15 |

Note: Adults with U.S.-born children only includes those whose children are living with them. "U.S.-born children" include those younger than 18 and those 18 and older. All numbers rounded independently. Percentages computed from unrounded numbers. See methodology for rounding rules. DACA refers to Deferred Action for Childhood Arrivals. TPS refers to Temporary Protected Status.

Source: Pew Research Center estimates based on residual methods (see Methodology) applied to 2012 American Community Survey data from Integrated Public Use Microdata Series (IPUMS)

**PEW RESEARCH CENTER**

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 165 of 270
Case 3:17-cv-05211-WHA Document 121-1 Filed 11/01/17 Page 46 of 291

17

PEW RESEARCH CENTER

TABLE A4

# Unauthorized Adults, by Presence of U.S.-Born Children, 1995-2012

*Population figures in thousands (see rounding notes below)*

| | UNAUTHORIZED ADULT POPULATION | | | |
|---|---|---|---|---|
| | Total | With only U.S.-born children younger than 18 | With U.S.-born children ages 18 or older | Without U.S.-born children |
| 2012 | 10,400 | 3,250 | 700 | 6,450 |
| 2011 | 10,700 | 3,300 | 725 | 6,650 |
| 2010 | 10,400 | 3,250 | 625 | 6,600 |
| 2009 | 10,300 | 3,200 | 500 | 6,600 |
| 2008 | 10,600 | 3,200 | 425 | 6,950 |
| 2007 | 10,700 | 3,250 | 325 | 7,050 |
| 2006 | 10,100 | 3,050 | 250 | 6,750 |
| 2005 | 9,500 | 3,050 | 230 | 6,200 |
| 2003 | 8,650 | 2,700 | 210 | 5,750 |
| 2000 | 7,150 | 2,050 | 100 | 5,000 |
| 1998 | 5,950 | 1,850 | 40 | 4,100 |
| 1995 | 4,600 | 1,350 | 50 | 3,200 |

Note: Adults with U.S.-born children only include those whose children are living with them. Parents living with U.S.-born children ages 18 or older may also have U.S.-born children younger than 18 in their household. All numbers rounded independently. See methodology for rounding rules.

Source: Pew Research Center estimates based on residual methods (see Methodology). Estimates for 2005-2012 based on American Community Survey data from Integrated Public Use Microdata Series (IPUMS). Estimates for 1995-2003 based on March supplements to the Current Population Survey.

**PEW RESEARCH CENTER**

# Appendix B: Additional Charts

Figure B1

### A Rise in U.S.-born Children of Unauthorized Immigrants, and Decline in Unauthorized Children

*In millions*



Note: Chart does not include an unknown number of children of unauthorized immigrants who do not live with their parent(s). Data labels are for 1995, 2007 and 2012.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2003, and the American Community Survey for 2005-2012

**PEW RESEARCH CENTER**

Figure B2

## A Growing Number of Unauthorized Immigrants Live with Their U.S. Citizen Children

*In millions*



Note: Chart does not include unauthorized-immigrant parents who do not live with their children. Data labels are for 1995, 2007 and 2012.

Source: Table A4, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2003, and the American Community Survey for 2005-2012.

**PEW RESEARCH CENTER**

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 168 of 270
Case 8:17-cv-09212-WHA Document 121-1 Filed 11/01/17 Page 49 of 291

20
PEW RESEARCH CENTER

# Appendix C: Methodology

## Overview

The estimates presented in this report for the unauthorized immigrant population are based on a residual estimation methodology that compares a demographic estimate of the number of immigrants residing legally in the country with the total number of immigrants as measured by a survey—either the American Community Survey (ACS) or the March Supplement to the Current Population Survey (CPS): the difference is assumed to be the number of unauthorized immigrants in the survey, a number that is later adjusted for omissions from the survey (see below). The basic estimate is:

$$\text{Unauthorized Immigrants (U)} = \text{Survey, Total Foreign Born (F)} - \text{Estimated Legal Immigrant Population (L)}$$

The legal resident immigrant population is estimated by applying demographic methods to counts of legal admissions covering the period from 1980 to 2012 obtained from the Department of **Homeland Security's Office of Immigration Statistics and its predecessor at the Immigration and** Naturalization Service, with projections to 2013. The initial estimates are calculated separately for age-gender groups in six states (California, Florida, Illinois, New Jersey, New York and Texas) and the balance of the country: within these areas the estimates are further subdivided into immigrant populations from 35 countries or groups of countries by period of arrival in the United States. Variants of the residual method have been widely used and are generally accepted as the best current estimates (Baker and Rytina, 2014; Hoefer, Rytina and Baker, 2012: Warren and Warren, 2013). See also Passel, Cohn and Gonzalez-Barrera (2013), Passel and Cohn (2008) and Passel (2007) for more details. The overall population estimates presented in this report are the residual totals, adjusted for survey omissions for these six states and the balance of the country, subdivided for Mexican immigrants and other groups of immigrants (balance of Latin America, south and east Asia, rest of world) depending on sample size and state.

Once the residual estimates have been produced, individual foreign-born respondents in the survey are assigned a specific status (one option being unauthorized immigrant) based on the **individual's demograph**ic, social, economic, geographic and family characteristics. These status assignments are the basis for the characteristics reported here (including, for example, specific countries of birth, detailed state estimates, duration of residence and presence of children). A final step in the weighting-estimation process involves developing final state-level estimates that take into account trends over time in the estimates. For this report, additional status assignments

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 169 of 270
Case 8:17-cv-00242-WHA Document 121-1 Filed 11/01/17 Page 50 of 291

21
PEW RESEARCH CENTER

involving Temporary Protected Status (TPS) and Deferred Action for Childhood Arrivals (DACA) were done for the 2012 ACS only. Later reports will focus on more detailed information on the countries and regions of origin of the immigrants, estimates for all states and major metropolitan areas, and various demographic, social and economic characteristics of the unauthorized and legal immigrant populations.

## Data Sources and Survey Weights

The American Community Survey is an ongoing survey conducted by the U.S. Census Bureau. The survey collects detailed information on a broad range of topics, including country of birth, year of immigration and citizenship—the information required for the residual estimates. The ACS has a continuous collection design with monthly samples of about 250,000; the nominal annual sample size was about 2.9 million households for 2005-2009 with about 1.9 million included in the final sample. The initial sample was expanded to almost 3.3 million addresses for 2011 and over 3.5 million for 2012; the final sample included more than 2.1 million address in 2011 and almost 2.4 million in 2012. (http://www.census.gov/acs/www/methodology/sample_size_data/index.php).

For this report, public use samples of individual survey records from the ACS are tabulated to provide the data used in the estimation process. The public use file is a representative 1% sample of the entire U.S. (including about 3 million individual records for each year 2005-2012) obtained from the Integrated Public Use Microdata Series or IPUMS (Ruggles et al., 2010). The ACS began full-scale operation in 2005 covering only the household population; since 2006 it has covered the entire U.S. population. ACS data are released by the Census Bureau in September for the previous year.

The other survey data source used for residual estimates comes from March Supplements to the Current Population Survey. The CPS is a monthly survey currently of about 55,000 households conducted jointly by the U.S. Bureau of Labor Statistics and the Census Bureau. Since 2001, the March supplement sample has been expanded to about 80,000 households; before then, the expanded March Supplement sample included about 50,000 households. The CPS universe covers the civilian noninstitutional population. The CPS was redesigned in 1994 and, for the first time, included the information required for the residual estimates (i.e., country of birth, date of immigration and citizenship). Some limitations of the initial March Supplement redesign of the CPS as implemented in 1994 preclude its use in making these estimates, so the first CPS-based estimates are for March 1995. CPS data are released by the Census Bureau in September for the previous March. The most recent March CPS data were for 2013.

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 170 of 270
Case 3:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 91 of 291

**22**

PEW RESEARCH CENTER

**Population figures from both the ACS and CPS are based on the Census Bureau's official** population estimates for the nation, states and smaller areas through a weighting process that ensures the survey figures agree with pre-specified national population totals by age, sex, race and Hispanic origin. At the sub-national level, two surveys differ in their target populations. The March CPS data agree with state-level totals by age, sex and race and are based on a process that imposes other conditions on weights for couples (U.S. Census Bureau, 2006). The ACS weights use estimates for much smaller geographic areas that are summed to state totals (http://www.census.gov/acs/www/methodology/methodology_main/ – especially Chapter 11).

The population estimates for the surveys are based on the latest available figures at the time the survey weights are estimated. This process produces the best estimates available at the time of the survey, but it does not guarantee that a time series produced across multiple surveys is consistent or accurate. Significant discontinuities can be introduced when the Census Bureau changes its population estimation methods, as it did several times early in the 2000s and in 2007 and 2008 (Passel and Cohn, 2010), or when the entire estimates series is recalibrated to take into account the results of a new census.

The estimates shown for unauthorized immigrants and the underlying survey data are derived from ACS IPUMS 1% samples for 2005-2012 and March CPS public use files for 1995-2013, which have been reweighted to take into account population estimates consistent with the 1990 Census, the 2000 Census, the 2010 Census and the most recent population estimates. The population estimates **used to reweight the March 2011 CPS come from the Census Bureau's Vintage 2011** population estimates (http://www.census.gov/popest/data/index.html); they are consistent with the 2010 Census and the estimates used to weight the March 2012-2013 CPS. The population **estimates used to reweight the CPS for March 2001 through March 2010 are the Census Bureau's** intercensal population estimates for the 2000s (http://www.census.gov/popest/data/intercensal/index.html); these population estimates use demographic components of population change for 2000-2010 and are consistent with both the 2000 and 2010 censuses. Similarly, the population estimates used to reweight the CPS for March 1995 through March 2000 are the intercensal population estimates for the 1990s, which are consistent with the 1990 and 2000 censuses. The ACS data for 2010-2012 do not require reweighting as they are weighted to recent population estimates based on the 2010 Census. For the 2005-2009 ACS, the reweighting uses the same intercensal population estimates as used for the CPS.[7] The reweighting methodology for both the ACS and CPS follows, to the extent possible, the methods used by the Census Bureau in producing the sample weights that equal the population

---

[7] For the 2005, the ACS included only the household population; it did not cover the group quarters population. To make the data for the 2005 ACS comparable with 2006 and later, we augmented the ACS by adding records to represent the group quarter population by borrowing records from the 2006 ACS. (See Passel, Cohn and Gonzalez-Barrera 2013.)

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 171 of 270
Case 3:17-cv-09211-WHA Document 121-1 Filed 11/01/17 Page 62 of 291

23

PEW RESEARCH CENTER

totals. See Passel, Cohn and Gonzalez-Barrera 2013 for more details on weighting and adjustments for survey undercoverage.

Because of the much larger sample size in the ACS (3.1 million sample cases in 2012 including more than 350,000 foreign-born cases) than the March CPS (203,000 sample cases in 2013 with about 26,000 foreign-born), the ACS-based estimates should be considered more accurate than the CPS-based estimates. In this publication, we have replaced the previous CPS-based estimate for 2012 with the new ACS-based estimate. The CPS-based estimate for 2013 should be considered preliminary as it will be replaced with an ACS-based estimate when the 2013 ACS data become available.

## Status Assignments—Legal and Unauthorized Immigrants

Individual respondents are assigned a status as a legal or unauthorized immigrant based on the individual's demographic, social, economic and geographic characteristics so the resulting number of immigrants in various categories agrees with the totals from the residual estimates. The assignment procedure employs a variety of methods, assumptions and data sources.

First, all immigrants entering the U.S. before 1980 are assumed to be legal immigrants. Then, the data are corrected for known over-reporting of naturalized citizenship on the part of recently arrived immigrants (Passel et al. 1997) and all remaining naturalized citizens from countries other than Mexico and those in Central America are assigned as legal. Persons entering the U.S. as refugees are identified on the basis of country of birth and year of immigration to align with known admissions of refugees and asylees (persons granted asylum). Then, individuals holding certain kinds of temporary visas (including students, diplomats and "high-tech guest workers") are identified in the survey and each is assigned a specific legal temporary migration status using information on country of birth, date of entry, occupation, education and certain family characteristics. Finally, some individuals are assigned as legal immigrants because they are in certain occupations (e.g., police officer, lawyer, military occupation, federal job) that require legal status or because they are receiving public benefits (e.g., welfare or food stamps) that are limited to legal immigrants. As result of these steps, the foreign-born population is divided between individuals with "definitely legal" status (including long-term residents, naturalized citizens, refugees and asylees, legal temporary migrants, and some legal permanent residents) and a group of "potentially unauthorized" migrants.

The number of potentially unauthorized migrants typically exceeds the estimated number of unauthorized migrants (from the residual estimates) by 15-35%. So, to have a result consistent with the residual estimate of legal and unauthorized immigrants, probabilistic methods are

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 172 of 270
Case 8:17-cv-05211-WHA Document 121-1 Filed 11/01/17 Page 93 of 291

24

PEW RESEARCH CENTER

employed to assign legal or unauthorized status to these potentially unauthorized individuals. This last step also involves a check to ensure that the legal statuses of family members are consistent; for example, all family members entering the country at the same time are assumed to have the same legal status. The entire process requires several iterations to produce estimates that agree with the demographically derived population totals. At the end, the final estimates agree with the residual estimates for the six individual states noted earlier and for the balance of the country: for Mexican-born and other legal and unauthorized immigrants in each area; and for children, working-age men and working-age women within each category. Finally, the survey weights for the foreign-born are adjusted upward so the tabulated figures agree with the analytic, demographic estimates of the total number of legal and unauthorized migrants developed in the very first step.

For this report, two additional status groups have been assigned to persons initially assigned as unauthorized immigrants: (1) DACA approval or persons approved under the Deferred Action for Childhood Arrivals criteria; and (2) Temporary Protected Status. Under the DACA standards, an unauthorized immigrant must meet a number of specific criteria (U.S. Citizenship and Immigration Services, 2012 http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca):

1. Arrived in the U.S. before age 16 and were under age 31 as of June 15, 2012;
2. Continuously resided in the U.S. Since June 15, 2007;
3. Physically present in the U.S. on June 15, 2012;
4. Enrolled in school, have a high school diploma or a GED or have been honorably discharged from the military or the Coast Guard at the time of application;
5. Not been convicted of a felony, a significant misdemeanor offense. or three or more other misdemeanors, and do not present a threat to national security or public safety.

Using information from the 2012 ACS on year of arrival in the U.S., educational attainment, and veteran status, we determine whether persons assigned as unauthorized immigrants meet criteria (1)-(4). If they do so, they are identified as potential DACA applications. From this pool, we selected enough ACS respondents to represent the 580,000 DACA requests received by DHS as of September 2013 and approximate their characteristics (e.g., age by country of origin, age by gender, age by marital status and state of residence). See the tables at http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/USCIS-DACA-Characteristics-Data-2014-7-10.pdf.

Temporary Protected Status (TPS) is primarily a function of an individual's country of birth and date of arrival. As of calendar 2013, approximately 420,000 persons had been granted TPS.[8] We selected ACS respondents previously designated as unauthorized immigrants to represent the TPS

---

[8] Table entitled, "Existing Grants of Temporary Protected Status" supplied by DHS.

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 173 of 270
Case 8:17-cv-00211-AWA Document 121-1 Filed 11/01/17 Page 94 of 291

25

PEW RESEARCH CENTER

population based on country of birth and year of arrival:

| | | |
|---|---|---|
| El Salvador | 270,650 | Arrived before 2001 |
| Honduras | 83,349 | Arrived before 1999 |
| Haiti | 58,037 | Arrived before 2011 |
| Nicaragua | 4,275 | Arrived before 1999 |
| Syria | 2,475 | Arrived before 2013 |
| Sudan | 514 | Arrived before 2005 |
| Somalia | 378 | Arrived before 2012 |

## Other Methodological Issues

**Rounding of Estimates.** All state- and national-level estimates for unauthorized immigrant populations are presented as rounded numbers to avoid the appearance of unwarranted precision in the estimates. Estimates less than 100,000 are rounded to the nearest 5,000; estimates in the range of 100,000-250,000 to the nearest 10,000; estimates smaller than 1 million to the nearest 25,000; estimates of 1-10 million are rounded to the nearest 50,000; and estimates larger than that to the nearest 100,000. Unrounded numbers are used for statistical significance tests, in plotting charts and in computations of differences and percentages.

**Duration of Residence.** The reference date for the ACS is July 1 of the survey year (e.g., July 1, 2010 for the 2010 ACS). However, data are collected throughout the year and the date when individual information was collected is not available in the public use data. It is not possible to determine the exact duration of residence in the U.S. for each respondent, only the year of arrival in the U.S. In computing the distribution of duration of residence and the median duration of residence, we assumed that, on average, the ACS respondents arriving in a given year spent half of that year in the U.S. and, further, that respondents spent half of the survey year in the U.S. So, for example, in the 2012 ACS, the number of immigrants who had been in the U.S. for less than 10 years was estimated as those who reported arriving in 2003-2012 (which represents persons in the U.S. for less than 9.5 years) plus half of those arriving in 2002. The median duration of residence was computed from tabulations of immigrants by calendar year of arrival. For the CPS, period of immigration is reported in two-year intervals (e.g., immigrants arriving in 1998-1999); for computing distributions and medians, we assumed that the arrivals were evenly distributed across the period.

# DEF-INTERV.

# EX. 53

**U.S. Department of Justice**
Immigration and Naturalization Service

HQADN 70/6.2

_____

*Office of the Executive Associate Commissioner*                          *4257 Street NW*
                                                                          *Washington, DC 20536*

MAY  8  2002

MEMORANDUM FOR JOHNNY N. WILLIAMS                                          ~
              EXECUTIVE ASSOCIATE COMMISSIONER
              OFFICE OF FIELD OPERATIONS

FROM:        Stuart Anderson /S/
             Executive Associate Commissioner
             Office of Policy and Planning

SUBJECT:     Deferred Action for Aliens with bona fide Applications for
             <u>T Nonimmigrant Status</u>

   This memorandum outlines changes in Immigration and Naturalization Service (INS)
procedures for deferred action determinations on behalf of victims of severe forms of trafficking
whose applications for T nonimmigrant status have been determined to be bona fide but are still
awaiting final adjudication by the Vermont Service Center (VSC). It should be read as a
supplement to guidance by the Office of Programs on December 19, 2000, and
September 7, 2001, and to a memorandum dated August 30,2001, that instructed INS offices to
utilize deferred action as one means to provide possible victims the opportunity to avail
themselves of the provisions of the Victims of Trafficking and Violence Protection Act of 2000,
including applying for T or U nonimmigrant status.[1]

   Effective the date of this memorandum, the VSC is responsible for assessing deferred action
for all applicants whose applications have been determined to be bona fide. The duration of the
initial deferred action assessment shall be at the discretion of the Service Center Director but
shall not exceed 12 months. The initial assessment may be for less than 12 months if the director
determines an application would be adjudicated within that time. Deferred action <u>will not</u> be
considered or assessed for a T nonimmigrant status applicant if he or she is currently in

_____

1 This memorandum does not, however, after the guidance outlined in those memoranda regarding the interim
procedures to be followed while the regulations implementing the U nonimmigrant status are being promulgated.
Aliens who are identified as possibly eligible for U nonimmigrant status should not be removed from the United
States until they have had the opportunity to apply for such status. Existing authority and mechanisms such as
parole, deferred action, and stays of removal should be used to achieve this objective.

Memorandum for Johnny N. Williams
Subject: Deferred Action for Aliens with Bona Fide Applications
        for T Nonimmigrant Status

removal proceedings unless the case has been administratively closed by the Immigration Judge
or the Board of Immigration Appeals. For purposes of this memorandum, removal proceedings
are defined as the period between the filing of the Notice to Appear with the Immigration Judge
and the issuance of the final decision.

    If a deferred action determination is made, the VSC will notify the alien to submit Form I-765,
Application for Employment Authorization. Applications for employment authorization based on
an assessment of deferred action at the VSC must be filed with the VSC.  After the initial
deferred action decision and issuance of a one-year Employment Authorization Document, the
VSC will hold those files and review each subsequent request for employment authorization and
deferred action upon receipt of each application.  Requests for extensions of employment
authorization and deferred action will be reviewed and granted in increments of twelve months.

    Field Offices (and other Service Centers) may continue to receive inquiries from T applicants
regarding determination of deferred action.  These may be initial requests or requests for an
extension of deferred action. These requests should be mailed to: **USINS- Vermont Service
Center, ATTN: Keith Canney, Box 1000, 75 Lower Weldon St., St. Albans, VT 05479-0001.**

    If you have any questions regarding this memorandum or other T nonimmigrant status issues,
please contact Laura Dawkins, Office of Adjudications at (202) 514-4754.

# DEF-INTERV.

# EX. 54

**U.S. Department of Homeland Security**
Citizenship and Immigration Services

---

Office of Associate Director of Operations
*425 I Street NW*
*Washington, DC 20536*

**OCT  8 2003**

MEMORANDUM FOR  DIRECTOR, VERMONT SERVICE CENTER

FROM:                      William R. Yates
                                  Associate Director of Operations

SUBJECT:                Centralization of Interim Relief For
                                  <u>U Nonimmigrant Status Applicants</u>

**<u>Background</u>**

On October 28, 2000, Congress passed the Victims of Trafficking and Violence Protection
Act (VTVPA), Pub. L. 106-386.[1]  The VTVPA created the U nonimmigrant status, a new
nonimmigrant classification for victims of specific crimes. This nonimmigrant status was created
to strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of
domestic violence, sexual assault, trafficking of persons and other criminal activity of which
aliens are victims, while offering protection to victims of such offenses.  It provides an
immigration mechanism for cooperating victims to remain temporarily in the United States to
assist in investigations and/or prosecutions.  It is available to victims of certain criminal activity
and their families, and is limited to 10,000 principals per year.

Regulations implementing this new nonimmigrant status are currently in the clearance
process.  In an effort to provide interim relief for this vulnerable population, the Office of
Programs issued interim guidance in August 2001, which directed that no one who appeared to
be eligible to apply for U nonimmigrant status be removed from the United States until he/she
has had the opportunity to avail him/herself of the provisions of the VTVPA.  It further
instructed field offices to use existing mechanisms (parole, deferred action, and stays of removal)
to achieve this objective.

---

[1] The sections of the VTVPA pertaining to U nonimmigrant status are codified at sections 101(a)(15)(U), 214(o),
and 245(l) of the Immigration and Nationality Act (INA).

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 179 of 270

Memorandum for Director, Vermont Service Center                    Page 2
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

Since this guidance was issued, it has become apparent that until the regulations implementing the U nonimmigrant status are published, a more unified, centralized approach is needed in the interim relief process. Many field offices have been unsure how to proceed in granting interim relief, which has resulted in inconsistent treatment of potential U nonimmigrant status applicants. It is for these reasons that the U nonimmigrant status interim relief process will be centralized at the Vermont Service Center (VSC) effective immediately.

## Centralization of Interim Relief Process

The VSC will serve as the "clearinghouse" for early-filed applications and will have jurisdiction to assess deferred action in early-filed U nonimmigrant status cases. Upon receipt of a request for interim relief, the VSC will consider the facts of each case and determine if deferred action is appropriate. Each decision should be considered individually, based on all the facts present. Upon authorizing deferred action, the center director will advise the alien, by letter, of the action taken and advise him or her of eligibility to request employment authorization. The center director will include a copy of a G-312 in the alien's A file and maintain that file for docket control.

Deferred action shall not be assessed in those cases where the applicant is clearly ineligible for U nonimmigrant status or is an aggravated felon, and those cases should be referred to the Bureau of Immigration and Customs Enforcement (ICE) for possible issuance of a Notice to Appear. If the VSC determines that the case is not suitable for deferred action, the alien should be notified of that decision by letter.

By their nature, U nonimmigrant status cases generally possess factors that warrant consideration for deferred action. In some cases, however, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny. The VSC should maintain records of all assessments of deferred action for statistical and tracking purposes. In addition, a process for periodic review of the deferred action decisions made by the VSC is planned. Upon publication of the regulations implementing the U nonimmigrant status, the VSC will send a letter informing early filers to submit an application on the proper form, and monitor the early-filed list to determine whether those assessed deferred action have applied. The VSC will terminate deferred action and refer those who fail to apply within the timeframe established by the regulation to ICE for possible issuance of a Notice to Appear, or for removal.

## Eligibility to apply for U nonimmigrant status

Before determining whether to grant a form of interim relief, VSC personnel must first determine whether the alien adequately demonstrates that he/she may possibly be eligible to apply for U nonimmigrant status when regulations are issued. This would be demonstrated by the submission of *prima facie* evidence of each eligibility requirement. In other words, the alien must produce sufficient evidence to render reasonable a conclusion that the alien may be eligible for U nonimmigrant status when regulations are issued implementing that status. This is not a

determination that an alien is or is not eligible to apply, or an adjudication of the claim itself. It is a conclusion reached by examining the documents accompanying the request for interim relief based upon perceived eligibility.

The four basic eligibility requirements that an alien must satisfy in order to be classified as a principal U nonimmigrant are set out in the VTVPA. Therefore, in order to be eligible to apply for interim relief, an alien must present evidence demonstrating that:

1.  He/she has suffered substantial physical or mental abuse as a result of having been a victim of certain criminal activity;

2.  He/she (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning that criminal activity;

3.  He/she (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor; to a Federal or State judge; to the INS; or to other Federal, State, or local authorities investigating or prosecuting the criminal activity; and

4.  The criminal activity described violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States.

The criminal activity referred to above is listed at INA § 101(a)(15)(U)(iii). It is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes.

When considering whether an alien has presented sufficient evidence demonstrating he/she may be eligible to apply for U nonimmigrant status and thus eligible to request a form of interim relief, VSC personnel must examine each of the U nonimmigrant status eligibility requirements, taking into consideration the guidance below.

Law enforcement certification

The possible U nonimmigrant status applicant does not have to be identified to the VSC through a law enforcement official. However, any request for interim relief from a possible U

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 181 of 270

Memorandum for Director, Vermont Service Center                                    Page 4
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

nonimmigrant status applicant must be accompanied by some form of certification from a law enforcement official attesting to the fact that the alien has been, is likely to be, or is being helpful in the investigation or prosecution of criminal activity designated in the VTVPA. There currently is no official DHS-created law enforcement certification form. Therefore, the law enforcement official certification may be in the form of a letter, or a form created by a non-governmental organization or an applicant's attorney or representative, and should:

- State that the person was a victim of one or more of the crimes listed in the statute;
- Identify the crime(s); and
- Verify the victim is, has been, or is likely to be helpful to the prosecution or investigation of the criminal activity.

Whatever form the certification takes, it must in all cases be signed by the law enforcement official investigating or prosecuting the criminal activity. The certification submitted must have been signed within six months immediately preceding the submission of the request for interim relief. In addition, the VTVPA does not require the U nonimmigrant status applicant to assist in both the investigation and prosecution of the criminal activity; the assistance offered by the possible U nonimmigrant status applicant may be in either the investigation or the prosecution, or both.

It is important to note that the law enforcement certification does not have to come from a Federal law enforcement official. Section 214(o)(1) of the INA identifies from whom a certification may be accepted. The certification may come from a Federal, State or local law enforcement official, prosecutor, judge or other Federal, State, or local authority investigating the criminal activity. Further development of the range of criminal activity involved and the types of certifying government officials will occur in the rulemaking process. At this point, VSC personnel should keep in mind that circumstances will vary from case to case, and it is better to err on the side of caution than to remove a possible U nonimmigrant status applicant.

Time element

The fact that the criminal activity occurred a number of years prior to the current request or that the case in which the applicant is the victim is closed is not a determinative factor at this stage. The statute contemplates that a person may be eligible for U nonimmigrant status as a result of having been a victim of a crime that occurred at some point in the past. Until there are regulations interpreting this statutory requirement, VSC personnel should not deny interim relief based on the fact that the criminal activity at issue occurred prior to the enactment date of the VTVPA.

Level of harm

The VTVPA does not specifically reserve U nonimmigrant status solely for individuals who have suffered the most harm. As with any form of immigration benefit with a harm component, there are some applicants who present cases with more harm than others. Whether the level of harm meets the statutory requirement of substantial physical or mental abuse will be a question

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 182 of 270

Memorandum for Director, Vermont Service Center                                    Page 5
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

Bureau of Citizenship and Immigration Services (CIS) officers adjudicating the U nonimmigrant status application will decide in accordance with the regulations once they are promulgated. Therefore, for interim relief purposes, "substantial physical or mental abuse" should be broadly interpreted. Similarly, the fact that the criminal activity involved in the case was classified as a misdemeanor as opposed to a felony should not be a factor in determining eligibility for interim relief.

## Eligibility for Interim Relief

Once an individual is determined to have submitted *prima facie* evidence of his/her eligibility for U nonimmigrant status, VSC personnel must then decide whether to exercise discretion and assess deferred action. Absent adverse factors, deferred action will be assessed following established CIS guidelines. Officers should note that if the alien is in removal proceedings or has a final removal order, the VSC does not have jurisdiction to assess deferred action. The applicant shall be notified in writing if his/her submission does not establish a *prima facie* case or if deferred action cannot be assessed due to lack of jurisdiction.

It is important to note that deferred action does not confer any immigration status upon an alien. Since deferred action is not an immigration status, no alien has the right to deferred action. Deferred action does not preclude the CIS from commencing removal proceedings at any time against an alien.

## Employment Authorization

Although deferred action is not an immigration status, an alien may be granted work authorization based on deferred action in his or her case pursuant to 8 C.F.R. 274a.12(c)(14). If the alien is placed in deferred action, the VSC will notify the alien that he or she may submit an I-765, Application for Employment Authorization. After the initial deferred action decision and issuance of a one-year employment authorization document, the VSC will hold these files and review the deferred action decision upon each application for extension of work authorization.

## Derivative U Nonimmigrant Status Applicants

To avoid extreme hardship, the VTVPA authorizes CIS to provide U nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of U nonimmigrants. This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, child, or in the case of an alien child, the parent of the alien.

Family members who may be eligible to receive derivative U nonimmigrant status and who are present in the United States should not be removed, and shall be eligible for interim relief. The eligible family member(s) must demonstrate extreme hardship if removed from the United States and must also submit a certification of a government official that an investigation or prosecution would be harmed without the spouse, child, or parent of the principal. This certification must comply with the guidelines outlined in this memo.

Memorandum for Director, Vermont Service Center                    Page 6
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

**Reporting Requirements**

Deferred action is a resource utilization tool.  Therefore, the VSC should maintain statistics on deferred action cases to ensure that it is being used appropriately.  These statistics are to be maintained on a current basis so that data can be readily extracted upon request.

Statistics should be maintained in the following categories:

- number of requests in deferred action category at the beginning of the fiscal year;

- number of requests for which deferred action is assessed;

- number of requests for which deferred action is denied;

- number of requests removed from deferred action category;

- number of deferred action requests pending at the end of the fiscal year.

**Periodic Review**

The VSC adjudicators assigned to the early-filed U applications should conduct interim reviews to determine whether deferred action cases should be continued or the alien removed from the deferred action category.  Reviews must determine if there is any change in the circumstances of the case.  Results of the review and a recommendation to continue or terminate deferred action would be reported to the center director via memorandum.  The center director should endorse the memorandum with his or her decision and return it for inclusion in the alien's file.

**Termination of Deferred Action**

During the course of the periodic review, or at any other time if the VSC determines that circumstances of the case no longer warrant deferred action, the VSC should recommend termination.  Termination may occur for conduct that occurs after the issuance of interim relief (i.e. conviction of a violent crime), for conduct or a condition not disclosed prior to issuance of interim relief, or based on affirmative evidence that the alien unreasonably refused to provide assistance in a criminal investigation or prosecution.  The VSC should notify the alien of the decision to terminate by letter.  Such a determination is not appealable.  Upon termination of deferred action, any relating employment authorization will be revoked in accordance with the standard revocation procedures set out in 8 CFR § 274a.14(b).

**Record Keeping And Confidentiality**

It is imperative that documentation be maintained on all U nonimmigrant status applicants.  As such, information about the possible applicant, including all pertinent information surrounding the applicant's circumstances, must be maintained in the alien's A-file.  If

Memorandum for Director, Vermont Service Center                                  Page 7
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

no A-file exists for the individual, one should be created.

   Officers should keep in mind that section 384 of the Illegal Immigration Reform and
Immigrant Responsibility Act of 1996 (IIRIRA)[3] is applicable to all U nonimmigrant status
cases. Section 384 prohibits employees from making an adverse determination of admissibility
or deportability of an alien using information provided solely by:

1) a spouse or parent who has battered the alien or subjected the alien to extreme
   cruelty;
2) a member of the spouse's or parent's family residing in the same household as the
   alien who has battered the alien or subjected the alien to extreme cruelty when the
   spouse or parent consented to or acquiesced in such battery or cruelty;
3) a spouse or parent who has battered the alien's child or subjected the alien's child to
   extreme cruelty (without the active participation of the alien in the battery or
   extreme cruelty);
4) a member of the spouse's or parent's family residing in the same household as the
   alien who has battered the alien's child or subjected the alien's child to extreme
   cruelty when the spouse or parent consented to or acquiesced in such battery or
   cruelty and the alien did not actively participate in such battery or cruelty; or
5) **in the case of an alien applying for status under section 101(a)(15)(U) of the
   INA, the perpetrator of the substantial physical or mental abuse and the
   criminal activity.**[4]

   Section 384 of IIRIRA also prohibits employees from permitting the use by or disclosure to
anyone (other than a sworn officer or employee of the Department of Homeland Security (DHS),
or bureau or agency thereof, for legitimate DHS, bureau, or agency purposes) of any information
that relates to an alien who has applied for U nonimmigrant status.[5] Anyone who willfully uses,
publishes, or permits such information to be disclosed in violation of IIRIRA § 384 will face
disciplinary action and be subject to a civil money penalty of up to $5,000 for each such
violation.[6]

   When the VSC creates or encounters an A file of an applicant for interim relief based upon
eligibility for U nonimmigrant status, the contents of the A file should be placed behind a
colored cover sheet that sets out the disclosure parameters and penalties so that the materials are
handled with appropriate care.

   If you have questions regarding this memorandum or other U nonimmigrant status related
issues, please contact Laura Dawkins, Office of Program and Regulation Development, by
electronic mail.

---

[3] Codified at 8 U.S.C. § 1367.
[4] As amended by VTVPA § 1513(d). For limited exceptions to this prohibition *see* IIRIRA § 384(b).
[5] *See* IIRIRA § 384(a)(2) as amended by VTVPA § 1513 (d).
[6] *Id.*

# DEF-INTERV.

# EX. 55

*Press Office*
**U.S. Department of Homeland Security**



# Press Release

November 25, 2005

### USCIS ANNOUNCES INTERIM RELIEF FOR FOREIGN STUDENTS ADVERSELY IMPACTED BY HURRICANE KATRINA

Washington, D.C. – U.S. Citizenship and Immigration Services (USCIS) announced specific interim relief today for the approximately 5,500 foreign academic students adversely impacted by Hurricane Katrina. The Notice, which was published in the *Federal Register*, will allow Katrina-impacted foreign academic students (F-1 visa holders) to:

- Apply for immediate, short-term employment authorization;
- Work additional hours on-campus, or work off-campus if granted employment authorization; and
- Reduce normal course load requirements if granted employment authorization.

The interim relief will remain in effect until February 1, 2006. Foreign vocational students (M-1 visa holders) and foreign exchange students (J-1 visa holders) are not eligible for this interim relief. DHS will continue to monitor the adverse impact of Hurricane Katrina in the affected areas to determine if modification of the interim relief is warranted and will announce any modifications in the *Federal Register*.

Eligible foreign academic students wishing to work additional hours on-campus must obtain approval from their designated school official. Eligible foreign academic students wishing to work off-campus must file an Application for Employment Authorization (Form I-765) directly with the Texas Service Center at:

> *U.S. Citizenship and Immigration Services, Texas Service Center,*
> *P.O. Box 853062, Mesquite, TX 75815-3062.*

Applicants should mark the front of the envelope on the bottom right-hand side with the phrase, "HURRICANE KATRINA SPECIAL STUDENT RELIEF." Applicants who are unable to pay the Form I-756 filing fee may request a fee waiver. Read our Frequently Asked Questions.

Katrina-impacted foreign academic students not covered by the Notice and their dependents (F-2 visa holders) may request deferred action and apply for employment authorization based on economic necessity. A grant of deferred action in this context means that, during the period that the grant of deferred action remains in effect, DHS will not seek the removal of the foreign academic student or his or her qualified dependents based upon the fact that the failure to maintain status is directly due to Hurricane Katrina. Deferred action requests are decided on a case-by-case basis. USCIS cannot provide any assurance that all such requests will be granted. A grant of deferred action does not provide an individual any legal immigration status in the United States. Therefore, in order to resume their nonimmigrant status, foreign academic students who are granted deferred action must apply for reinstatement following the period of deferred action, which shall expire no later than February 1, 2006.

Eligible foreign academic students and their qualified dependents wishing to request deferred action and apply for employment authorization based on economic necessity must submit a letter, substantiating their need for deferred action, and file an Application for Employment Authorization (Form I-765) directly with the Texas Service Center at the address above. Applicants should mark the front of the envelope on the

bottom right-hand side with the phrase, "HURRICANE KATRINA SPECIAL STUDENT RELIEF." Applicants who are unable to pay the Form I-756 filing fee may request a fee waiver.

For additional information, please refer to the *Federal Register* Notice or visit the USCIS website at http://uscis.gov/.

– USCIS –

On March 1, 2003, U.S. Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.  USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services, while enhancing the integrity of our nation's security.

# DEF-INTERV.

# EX. 56

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC   20529-2110



**U.S. Citizenship
and Immigration
Services**

SEP   4  2009

# Memorandum

TO:          Field Leadership

FROM:       Donald Neufeld
            Acting Associate Director, Office of Domestic Operations

SUBJECT:     Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I. Purpose

This amended memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens and qualifying children of the surviving spouses.  It affords a new process by which they may apply for deferred action.  This policy guidance will be in effect until further notice and may be revised as needed.  This memorandum revises and replaces in its entirety the June 15, 2009 "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children".

## II. Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the approval of Form I-130, *Petition for Alien Relative,* be automatically revoked upon the death of the petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and admitted as an immigrant.  In such instances, the beneficiary may request a reinstatement of the approval and USCIS, in its discretion, may grant such a request for humanitarian reasons.  8 CFR 205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of Forms I-130 filed on their behalf.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

citizen before the citizen's death. This issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in the U.S. Congress (e.g., bills S. 815 and H.R. 1870).

## III. Policy Guidance

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated or divorced from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children. For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age and are residing in the United States (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned applicants without regard to their manner of entry into the United States. Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen. This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated). This guidance does not cover any beneficiary who was legally separated or divorced from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance. They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen, including cases in which the marriage was to a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F. If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein. Nothing in this memorandum, however, is intended to provide or imply eligibility for immigrant classification or adjustment of status of any person granted deferred action or humanitarian reinstatement, including widow(er) of U.S. citizens other than U.S. citizens who filed the Form I-129F who are subject to section 245(d) of the INA.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

It is not necessary for the widow(ers) of citizens to seek deferred action under the guidance in this memorandum, in a case governed by First, Sixth or Ninth Circuit law. Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative. *Taing v. Napolitano*, 567 F.3d 19 (1st Cir. 2009); *Lockhart v. Napolitano*, 561 F.3d 611 (6th Cir. 2009); *Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006). Litigation on this issue is currently pending in the Supreme Court. *Robinson v. Napolitano*, No. 09-94 (Cert petition filed July 23, 2009). Until such time as the Supreme Court decides the *Robinson* case on the merits, however, the *Taing, Lockhart* and *Freeman* cases remain the law in their respective circuits.

In the First, Sixth and Ninth Circuits, therefore, an officer should approve a Form I-130, and should also treat a pre-approval death as still valid, if the Form I-130 is approvable, apart from the issue of the petitioner's death. No request for reinstatement of a pre-death approval will be necessary. Should the beneficiary in a First, Sixth or Ninth Circuit case bring to the attention of USCIS a Form I-130 that was denied or revoked on or after August 30, 2001, solely because the petitioner had died officers should consider the *Taing, Lockhart* and *Freeman* decisions as a proper basis for reopening, *on USCIS motion,* the Form I-130, as well as any related Form I-485.[4] It is not necessary for the beneficiary to file a formal motion or pay any filing fee; any written request, such as a letter, will suffice. For purposes of this paragraph, a Form I-130 will be considered a First, Sixth or Ninth Circuit case if:

- the Form I-130 is pending in, or the original decision was made by, a USCIS office in the First, Sixth or Ninth Circuit; or
- either the petitioner or the beneficiary resided in First, Sixth or Ninth Circuit at the time of the petitioner's death.[5]

Whether an alien is actually admissible is not an issue in the adjudication of a Form I-130. *Matter of O-,* 8 I&N Dec. 295 (BIA 1959). In light of the judgment in *Hootkins v. Napolitano*, ___ F.Supp. 2d ___ , 2009 WL 2222839 (C.D.Cal. 2009), an officer will not consider the presence or absence of Form I-864 from a substitute sponsor in deciding whether to approve or deny a Form I-130 in a First, Sixth or Ninth Circuit case. The *Hootkins* court ruled, however, that the Class Plaintiffs had failed to prove their claim that an alien widow(er) whose Form I-130 is approved under Freeman does not need a Form I-864 from a substitute sponsor. 2009 WL 2222839 at *17, n. 23. The widow(er), therefore, must submit a new Form I-864 to obtain approval of the Form I-485, unless the Form I-485 applicant is exempt from this requirement under 8 CFR 213a.2(a)(2)(ii). Thus, the officer will treat the provision in AFM 21.5(a)(4)(B)(2) that requires submission of a new Form I-864 from a

---

[4] No action is necessary if the Form I-130 was denied or revoked before August 30, 2001. A civil action must generally be brought against the United States within 6 years after the cause of action accrues. 22 U.S.C. 2401(a). August 30, 2001, is selected as the cut-off date for reopening First, Sixth and Ninth Circuit cases since that is 6 years before the filing of *Hootkins v. Napolitano*, ___ F.Supp. 2d ___ (C.D.Cal. 2009), which began as a putative nation-wide class action.

[5] The First Circuit includes Maine, Massachusetts, New Hampshire, Rhode Island, and Puerto Rico; the Sixth Circuit includes Kentucky, Michigan, Ohio, and Tennessee; and the Ninth Circuit includes Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Washington, and Guam. 28 U.S.C. § 41.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

substitute sponsor as applying *only* to the adjudication of the Form I-485, and not to the adjudication of the Form I-130.

A widow(er) who is not able to submit a new Form I-864 from a substitute sponsor may seek deferred action, even if the Form I-130 itself is approved. In the case of a widow(er) whose Form I-485 cannot be approved because of the lack of a new Form I-864 from a substitute sponsor, a final decision on the Form I-485 will be held in abeyance during the period in which a grant of deferred action is in effect.

The *Taing, Lockhart* and *Freeman* cases apply only to First, Sixth and Ninth Circuit cases involving Forms I-130 filed for the spouses of citizens. These cases do not apply to a Form I-130 filed by a citizen for a step-child. Even if the citizen's widow(er) may have a Form I-130 and Form I-485 approved, therefore, any children of the widow(er) who are also beneficiaries of Forms I-130 filed by the deceased citizen may seek deferred action under this guidance.

## A. Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C). The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2). USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular case. If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement. If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing. Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request. Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly. If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

## B. Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location. Petitions may be transferred to

1667

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance is issued. The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III (E) below.

Note: In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the pending Form I-130 should be handled under existing procedures, including conversion of the Form I-130 to a Form I-360 for special immigrant classification as a widow/widower to the extent provided by 8 CFR 204.2(i)(1)(iv).

## C. Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

## D. Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist. The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

## E. Required Documentation for Requests for Deferred Action

Beneficiaries may request deferred action by submitting the following:

1) A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, non-waiveable filing fee (currently $375), completed in the format explained below; and
2) All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m. Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**Deferred Action -- Surviving spouse of a deceased U.S.**

218

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

**citizen, married less than 2 years**." The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration. Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT special immigrant self-petitions under current law. They should be adjudicated as requests for deferred action only. In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

## F. Decision on Requests for Deferred Action

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for: 1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

The following persons are ineligible for deferred action: 1) beneficiaries whose immigrant visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated or divorced from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons. A grant of deferred action is a discretionary action on the part of USCIS. It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries. However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter. If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*. If the request has been denied, the deferred action denial letter must cite the reasons for the denial. A decision on a request for deferred action falls within the discretion of the Secretary. A denial of a request for deferred action is not subject to administrative appeal or judicial review. See INA § 242(a)(2)(B), and (g).

## G. Validity Period for Deferred Action

For any deferred action request received on or before May 27, 2011, the validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

1669

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

## H. Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14). Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action. However, they must demonstrate an economic necessity. The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation. Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form. Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee. The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9). Evidence of an economic necessity is not required if using this classification. A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9). When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9) based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**. An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document. The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

## I. Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status. It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action. A grant of deferred action also does not eliminate any period of prior unlawful presence. However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA. Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

As noted earlier in this memorandum, in the case of a widow(er) whose Form I-485 cannot be approved because of the lack of a new Form I-864 from a substitute sponsor, a final decision on the Form I-485 will be held in abeyance during the period in which a grant of deferred action is in effect.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 8

**J.  Eligibility for Advance Parole**

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole. Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee.  Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

**K.  Implementation**

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

**L.  Contact Information**

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

**1671**

# DEF-INTERV.

# EX. 57



U.S. Department of Homeland Security
20 Massachusetts Ave., NW
Washington. DC 20529

**U.S. Citizenship
and Immigration
Services**

HQDOMO 70/6.1.1-P
70/6.1.3-P
*AFM* Update AD10-09

# Interoffice Memorandum

To:   Executive Leadership

From: Donald Neufeld
      Acting Associate Director
      Domestic Operations Directorate

      Lori Scialabba
      Associate Director
      Refugee, Asylum, and International Operations Directorate

      Pearl Chang
      Acting Chief
      Office of Policy and Strategy

Date: **DEC - 2 2009**

SUBJECT:   Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and
           their Children (REVISED)

           Effect of FY2010 DHS Appropriations Act on eligibility to immigrate after death
           of visa petitioner

           Revisions to Adjudicator's Field Manual (AFM) Chapter(s) 21.2(a)(4) and
           (h)(1)(C)
           (AFM Update AD10-09)

## I. Purpose

This memorandum supersedes an earlier memorandum on this subject, dated November 13,
2009, and provides updated guidance to U.S. Citizenship and Immigration Services (USCIS)
field offices and service centers regarding the processing of Forms I-130, petitions for alien
relative, and I-485, application to register permanent residence or adjust status, filed by surviving
spouses of deceased U.S. citizens and the qualifying children of the surviving spouses. This new
guidance is based on the enactment of section 568(c) of the Department of Homeland Security
Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009), which provides

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 2

relief for these aliens. Section 568(c) entered into force on October 28, 2009, the date of
enactment.

Sections 568(d) and (e) of the FY2010 DHS Appropriations Act, which provide relief for aliens
who are surviving beneficiaries of certain pending or approved petitions filed by certain
qualifying categories of noncitizens, will be addressed in a separate memorandum.

## II. Background

### A.  Prior Policy and Related Litigation

For many years, U.S. immigration policy has been that a Form I-130 could not be approved if the
petitioner died while the Form I-130 was pending. *See Matter of Sano,* 19 I&N Dec. 299 (BIA
1985); *Matter of Varela,* 13 I&N Dec. 453 (BIA 1970). As far back as 1938, our immigration
regulations have provided for the revocation of the approval of a visa petition upon the
petitioner's death. More recently, the regulations, while maintaining that general policy, have
provided for discretion, for "humanitarian reasons," to reinstate the approval. 8 C.F.R. §
205.1(a)(3)(i)(C)(2). Also, since 2006, 8 C.F.R. § 204.2(i)(1)(iv) and 205.1(a)(3)(i)(C)(1) have
provided that the automatic revocation provision does not apply to a spousal immediate relative
visa petition, if the deceased petitioner and the alien widow(er) had been married at least two
years when the petitioner died.

Over the past several years, widow(er)s of citizens who had died before the second anniversary
of the underlying marriages have challenged this long-standing policy as being inconsistent with
the statute. The federal courts of appeals have split on the legal issue. *Compare Robinson v.
Napolitano,* 554 F.3d 358 (3d Cir. 2009) (sustaining agency view that petitioner's death while a
Form I-130 is pending ends the beneficiary's eligibility; *petition for cert. filed,* No. 09- 94 (U.S.
filed July 23, 2009), *with Taing v. Napolitano,* 567 F.3d 19 (1st Cir. 2009) (holding agency
policy violative of statute); *Lockhart v. Napolitano,* 561 F.3d 611 (6th Cir. 2009) (same); *and
Freeman v. Gonzales,* 444 F.3d 1031 (9th Cir. 2006) (same). The issue has engendered much
litigation before the federal district courts in recent months, with most courts ruling against the
agency. Among the unfavorable decisions is the class action ruling in *Hootkins v. Napolitano,*
___ F. Supp. 2d ___, 2009 WL 2222839 (C.D. Cal. Apr. 28, 2009), which is on appeal to the
Ninth Circuit Court of Appeals. Other cases are pending in district courts throughout the United
States.

### B. Section 568(c) of FY2010 DHS Appropriations Act

Congress, however, recently acted to resolve the issue. On October 28, 2009, the President
signed into law the FY2010 DHS Appropriations Act. Section 568(c) of the new law amends the
second sentence in section 201(b)(2)(A)(i) of the INA so that, for a widow(er) of a citizen to
qualify as an immediate relative, it is no longer necessary for the couple to have been married at
least two years when the citizen died. The second sentence of section 201(b)(2)(A)(i) now reads,

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 3

> In the case of an alien who was the spouse of a citizen of the United States and
> was not legally separated from the citizen at the time of the citizen's death, the
> alien (and each child of the alien) shall be considered, for purposes of this
> subsection, to remain an immediate relative after the date of the citizen's death
> but only if the spouse files a petition under [section 204(a)(1)(A)(ii) of the INA]
> within 2 years after such date and only until the date the spouse remarries.

When a widow(er) qualifies as an immediate relative under the second sentence in section
201(b)(2)(A)(i) of the INA, his or her children, as defined in sections 101(b)(1) and 201(f) of the
INA, also qualify.  The amendment made by section 568(c) applies equally to aliens abroad who
are seeking immigrant visas and aliens in the United States who are seeking adjustment of status.
The amendment applies to any alien whose spouse died before October 28, 2009, and who had a
Form I-130 pending on October 28, 2009.  If no Form I-130 was pending, then an alien whose
U.S. citizen spouse died before October 28, 2009, and before the second anniversary of their
marriage, may file a visa petition under section 204(a)(1)(A)(ii) of the INA so long as (a) the
alien has not remarried, and (b) the petition is filed no later than October 28, 2011.

Section 568(c) relates only to the impact of the citizen's death on the alien's eligibility for
classification as an immediate relative.  All other requirements for approval of a visa petition
remain in force.  In particular, the alien must still establish that he or she was the citizen's legal
spouse, and that the marriage was a bona fide marriage and not an arrangement solely to confer
immigration benefits on the alien.  If the alien was in removal proceedings at the time of the
marriage, the "clear and convincing evidence" standard in section 245(e)(3) of the INA will still
apply to the adjudication of the visa petition.  If the necessary visa petition is approved, the alien
may then seek an immigrant visa or adjustment of status.  The alien must still establish that he or
she is admissible as an immigrant and, in an adjustment case, that he or she meets all other
adjustment eligibility requirements and merits a favorable exercise of discretion.

In light of this new legislation, the policy guidance stated in the November 8, 2007,
memorandum entitled "Effect of Form I-130 Petitioner's Death on Authority to Approve the
Form I-130" (*AFM* Update AD08-04) is obsolete.  This memorandum amends the Adjudicator's
Field Manual to remove the material added in that earlier memorandum.

### III. Policy Guidance and AFM Update

*AFM* **Update**

1. Chapter 21.2 of the *AFM* entitled "Factors Common to the Adjudication of All Relative Visa
   Petitions" is amended by

   a. Removing chapter 21.2(a)(4)
   b. Removing the **Note** at the end of chapter 21.2(h)(1)(C).

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 4

## A. **Widow(er)s with pending cases**

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act makes the amendment to the
second sentence in INA section 201(b)(2)(A)(i) applicable to any visa petition or adjustment
application "pending on or after the date of enactment." As noted, the date of enactment is
October 28, 2009.

### 1. *Reopening of pending Form I-130 cases*

For purposes of this amendment, a Form I-130 will be deemed "pending" on October 28 2009, if
the deceased citizen had filed a Form I-130 on or before that date but:

- USCIS has not adjudicated the Form I-130;

- USCIS denied the Form I-130, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-130 is, again, pending;

- USCIS denied the Form I-130, but has not yet ruled on a motion to reopen or reconsider;

- USCIS denied the Form I-130, but the alien's appeal from that decision is pending before
  the Board of Immigration Appeals (BIA) or the period for appeal of the adverse USCIS
  decision to the BIA had not yet expired; or

- The USCIS or BIA decision denying the Form I-130 is the subject of pending litigation
  before a federal court (including cases in which the district court issued a decision before
  October 28, 2009, but the appeals period established by law had not yet expired).

Under 8 C.F.R. § 204.2(i), a citizen's spousal Form I-130 is automatically converted to a
widow(er)'s Form I-360 if, on the date of the citizen's death, the beneficiary qualifies as a
widow(er) under the second sentence in section 201(b)(2)(A)(i). Under section 568(c) of the
FY2010 DHS Appropriations Act, these aliens now qualify under the second sentence. Thus,
any Form I-130 that is "pending" as described in the preceding paragraph will be deemed to be,
and adjudicated as, a widow(er)'s Form I-360.

In any Form I-130 case in which a motion to reopen or for reconsideration was filed, but not
acted on, USCIS will grant the motion and make a new decision in light of section 568(c) of the
FY2010 DHS Appropriations Act.

Any Form I-130 that is the subject of litigation in any federal court on the issue of the effect of
the petitioner's death is, as of the date of this memorandum, reopened for a new decision in light
of section 568(c) of the FY2010 DHS Appropriations Act. The beneficiary need not file a
separate motion. Nor does it matter, for purposes of reopening the Form I-130, whether the
beneficiary is currently in the United States or abroad. If the decision denying or terminating
action on the Form I-130 was pending in any court on October 28, 2009, the decision is now

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 5

reopened. USCIS will therefore make a new decision in light of section 568(c) of the FY2010
DHS Appropriations Act.

Cases challenging the denial of a spousal immediate relative Form I-130 based on the
petitioner's death have been filed in district courts throughout the United States. USCIS officers
must consult with the appropriate regional or service center counsel to identify those cases that
are the subject of litigation that was pending on October 28, 2009. Once a case is identified as
subject to reopening under this memorandum, the USCIS officer will notify the alien in writing
that the Form I-130 is reopened in light of section 568(c) of the FY2010 DHS Appropriations
Act, and will be readjudicated as a Form I-360.

If it is determined that a Form I-130 had been filed but was not "pending" on October 28, 2009,
because a USCIS decision denying the Form I-130 had become final before October 28, 2009
(and no administrative appeal or civil action challenging the denial was pending on October 28,
2009), please refer to part III(B) of this memorandum.

    2.    *Reopening of pending Form I-485 cases*

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act also makes the amendment
applicable to any Form I-485 that was pending on the date of enactment. A Form I-485 is
deemed "pending" on the date of enactment if it was filed before the deceased citizen's death
but:

- USCIS has not adjudicated the Form I-485

- USCIS denied the Form I-485, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-485 is, again, pending

- USCIS denied the Form I-485, but has not yet ruled on a motion to reopen or reconsider;

- The Form I-485 is the subject of litigation before a federal court (including cases in
  which the district court issued a decision before October 28, 2009, but the appeals period
  established by law had not yet expired).

With this guidance memo, USCIS also reopens, without the need for a formal motion, any Form
I-485 that is the subject of litigation on this issue in any federal court, if USCIS still has
jurisdiction to act on the Form I-485. As with the reopening of the related Form I-130, the
USCIS officer will notify the applicant in writing that the Form I-485 is reopened in light of
section 568(c) of the FY2010 DHS Appropriations Act.

In the case of a widow(er) who entered the United States as a K-1 nonimmigrant, and filed a
Form I-485 after marrying the deceased citizen who had filed the Form I-129F, ordinarily there
will not be a Form I-130. If the Form I-485 is still "pending" as described in this memo, and
USCIS still has jurisdiction to act on it, the Form I-485 will also be reopened for a new decision
in light of section 568(c) of the FY2010 DHS Appropriations Act, without the need for a formal

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 6

motion. Since no Form I-130 is required for a K-1 nonimmigrant to seek adjustment after
marrying the K petitioner within the period specified by statute, the K-1 nonimmigrant will also
be deemed the beneficiary of a Form I-360 if the K-1 nonimmigrant now qualifies as a
widow(er). The K-1 nonimmigrant still may not adjust on any basis other than the K-1
nonimmigrant's having married the citizen petitioner who filed the Form I-129F.

Some aliens may have been placed into removal proceeding after USCIS denied their Forms I-
485. Except for "arriving aliens," this factor would mean that USCIS no longer has jurisdiction
to adjudicate the Form I-485. 8 C.F.R. § 245.2(a)(1) and 1245.2(a)(1). USCIS would have
jurisdiction to adjudicate the Form I-485 only if the Executive Office for Immigration Review
(EOIR) terminated the removal proceeding. Whether to support or oppose terminating a removal
proceeding is a matter for U.S. Immigration and Customs Enforcement to decide, not USCIS. If
a USCIS office reopens a Form I-130 involving an alien in removal proceedings, the USCIS
office must, through the appropriate USCIS counsel, advise the local counsel for U.S.
Immigration and Customs Enforcement.

Some aliens whose citizen spouses had died may have left the United States voluntarily, without
obtaining a grant of advance parole. Others may have left after obtaining advance parole, but
may have remained abroad after expiration of the Form I-512. Under 8 C.F.R. §
245.2(a)(ii)(4)(B), these aliens have abandoned their adjustment applications. Also abandoned is
the adjustment application of an alien who left as the result of removal proceedings. 8 C.F.R. §
245.2(a)(4)(ii)(A). In these situations, a Form I-485 will not be deemed "pending" for purposes
of section 568(c)(2)(A). However, where section 568(c) applies to the approved Form I-130, and
the Form I-130 has been approved as a Form I-360, the alien approved on that I-360 who has left
the United States may apply for an immigrant visa abroad.

3.    *Petition already approved before death*

If a widow(er) is the beneficiary of a Form I-130 that was approved before the citizen
petitioner's death, it is not necessary for the widow(er) to request humanitarian reinstatement of
the approval. Under 8 C.F.R. § 204.2(i)(1)(iv), the approved Form I-130 is automatically
converted to an approved Form I-360. Any children of the widow(er) will also be eligible to
seek an immigrant visa or adjustment of status based on the converted petition.

There may be some cases in which a spousal immediate relative Form I-130 was approved, but
the approval was revoked automatically under 8 C.F.R. 205.1(a)(3)(i)(C) upon the citizen
petitioner's death. If the alien is now eligible for classification as the widow(er) of a citizen
under section 568(c)(2)(A) of the  FY2010 DHS Appropriations Act , the approval will be
deemed to have been reinstated, effective October 28, 2009. No separate request for
reinstatement is necessary. Under 8 C.F.R. § 204.2(i)(1)(iv), the Form I-130 will be deemed to
be an approved Form I-360.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 7

4.    *Admissibility issues*

Whether an alien is actually admissible is not germane in adjudicating a Form I-130. *Matter of O-*, 8 I&N Dec. 295 (BIA 1959). The only issue resolved by enactment of section 568(c) of the FY2010 DHS Appropriations Act is that the death of the citizen spouse, by itself, does not make the widow(er) ineligible for immediate relative classification. Thus, the alien must still be admissible as an immigrant to obtain adjustment of status or an immigrant visa.

For those aliens, however, who had pending Form I-130 cases, and who now can benefit from section 568(c) of the FY2010 DHS Appropriations Act, two inadmissibility grounds warrant special consideration. The first is section 212(a)(9)(B)(i) of the Act, under which an alien is inadmissible if the alien seeks admission within a specified period after the alien leaves the United States, if the alien has accrued a lengthy period of unlawful presence. The second is section 212(a)(9)(A), under which an alien who has been removed (or who left the United States while under a final administrative order of removal) must obtain consent to reapply, if the alien seeks admission within the period set in section 212(a)(9)(A).

It is important to note that the special provisions in this memorandum relating to INA section 212(a)(9)(A) and (B) apply only to an alien who was the beneficiary of a Form I-130 that was filed by a now-deceased spouse petitioner, and that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act. The purpose of these special provisions is simply to minimize the adverse effect on these aliens of the disputed, and now resolved, issue of the impact of the death of the petitioning spouse on the alien's eligibility.

a.  Unlawful presence

By specifying, in section 568(c)(2)(A) of the FY2010 DHS Appropriations Act, that the amendment should apply to pending cases, Congress indicated its desire to resolve these cases fully. For this reason, for purposes of INA section 212(a)(9)(B)(i), if an alien remained in the United States while awaiting the outcome of Form I-130 that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act, the alien will be deemed *not* to have accrued any unlawful presence. This protection applies even if the alien was not actually in a lawful status while the now-converted Form I-360 was pending.

An alien who had a Form I-130 pending on October 28, 2009, but who is present in the United States without a lawful admission or parole generally cannot obtain adjustment under INA section 245(a). Rather, the alien must generally seek adjustment under INA section 245(i). But this relief is not available to an alien who did not have a petition or labor certification filed before April 30, 2001. Thus, even if the Form I-130 can now be approved as a Form I-360, the alien may need to leave the United States to obtain an immigrant visa. But since, under this guidance memorandum, the alien will be deemed *not* to have accrued any unlawful presence, he or she will not be inadmissible under INA section 212(a)(9)(B)(i).

Again, these special provisions relating to the accrual of unlawful presence apply only to an alien who is the beneficiary of a spousal immediate relative Form I-130 that was pending on October

28, 2009, and that is now approved under section 568(c)(2)(A) of the FY2010 DHS
Appropriations Act and 8 C.F.R. § 204.2(i)(1)(iv) as a widow(er)'s Form I-360: the widow(er)
and his or her accompanying child(ren). Ordinarily, the pendency of a visa petition, itself, does
not prevent accrual of unlawful presence. A pending adjustment application, by contrast, does
prevent accrual of unlawful presence. *Adjudicator's Field Manual* chapter 40.9(b)(3)(A). Most
aliens who have been in litigation because the death of a spouse led to denial of the Form I-130
are probably already protected from unlawful presence under the ordinary provisions in the
AFM. This broader protection against unlawful presence, for this narrow class of cases, is
designed to maximize the ability of those aliens whose specific situations gave rise to the new
legislation to fully benefit from it.

### b. Consent to reapply for admission after removal

These protections against accrual of unlawful presence apply even if the alien was actually
removed from the United States under a removal order. Still, because the alien was removed
under a valid order, the alien is inadmissible under INA section 212(a)(9)(A)(i) or (ii). USCIS,
however, has discretion under section 212(a)(9)(A)(iii) to consent to the alien's re-application for
admission. USCIS should generally exercise discretion favorably and grant an application for
consent to reapply under section 212(a)(9)(A)(iii), if:

- The Form I-130 that had been filed by the alien's spouse has now been approved as a
  Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act;

- The alien is otherwise admissible, and

- The alien's case does not present significant adverse factors beyond the removal itself.

A USCIS adjudicator will not deny a Form I-212 filed by an alien whose case was in litigation
on October 28, 2009, and whose Form I-130 has been approved as a Form I-360 under section
568(c)(2)(A) of the FY2010 DHS Appropriations Act without consulting USCIS Headquarters
through appropriate channels.

### 5. *Remarriage*

Any immediate relative Form I-130 that was filed on behalf of the spouse of a U.S. citizen, and
that was pending on October 28, 2009, is no longer a spousal immediate relative Form I-130.
By operation of 8 C.F.R. § 204.2(i)(1)(iv), what was filed as a spousal immediate relative Form
I-130 is now a widow(er)'s Form I-360. The converted Form I-360 may be approved only if the
beneficiary, who is now also deemed to be the petitioner, qualifies as the widow(er) of a citizen,
as described in INA section 201(b)(2)(A)(i). Eligibility for classification as an immediate
relative continues "only until the date the spouse remarries."

### 6. Ninth Circuit cases

In acting on the guidance in this memorandum, USCIS adjudicators must keep in mind that the *Hootkins* case was certified as a class action. Thus, an individual need not be a *named* Plaintiff in *Hootkins* in order for his or her Form I-130 and Form I-485 to be reopened under this memorandum. If an individual has not already been identified as a member of the *Hootkins* class, that individual may make a written request to have his or her Form I-130 and Form I-485 reopened and readjudicated. The purpose of the written request is simply to *identify* the case as a *Hootkins* case. The individual is not required to pay the filing fee for a motion to reopen. The case will be considered a *Hootkins* class member case if the case was denied on or after August 30, 2001,[1] and:

- either the citizen spouse petitioner or the alien spouse beneficiary lived in the Ninth Circuit when the citizen spouse died; or

- a USCIS office in the Ninth Circuit made the prior decision on the Form I-130 or Form I-485.

### B. Widow(er)s without pending cases

The alien widow(er) of a citizen who died before October 28, 2009, but who did not have a Form I-130 pending on that date, may now file a Form I-360, provided that he or she does so no later than October 28, 2011, and has not remarried. FY2010 DHS Appropriations Act § 568(c)(2)(B). Section 568(c)(2)(B) applies if the citizen spouse did not file a Form I-130 on the alien spouse's behalf before dying. But it also applies if there was a Form I-130 filed, but the decision denying the Form I-130 had become administratively final before October 28, 2009, because the decision was not the subject of any type of administrative or judicial review that was pending on October 28, 2009. Note that section 568(c)(2)(B)(i) says the Form I-360 must be filed "not later than the date that is 2 years after the date of the enactment." Thus, a Form I-360 that is filed *on* October 28, 2011, will still be timely. A Form I-360 filed on or after October 29, 2011, will be untimely.

For any case in which a citizen dies on or after October 28, 2009, the alien widow(er) must file the Form I-360 within 2 years of the citizen's death.

### C. Children of widow(er)s

The child of a widow(er) whose Form I-360 is approved may, as specified in the second sentence of INA section 201(b)(2)(A)(i) and in INA section 204(a)(1)(A)(ii), be included in the widow(er)'s petition. Whether an individual qualifies as the widow(er)'s "child" is determined according to INA sections 101(b)(1) and 201(f).

---

[1] Any case denied before August 30, 2001, is time-barred under 28 U.S.C. § 2401(a). But even if a Ninth Circuit case is not considered "pending" because of *Hootkins*, the alien may still be eligible to immigrate as the widow(er) of a citizen, if the alien has not remarried and files the Form I-360 no later than October 28, 2011.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 10

In a case in which the deceased citizen had filed a Form I-130 for his or her spouse, and the
Form I-130 can now be adjudicated as a Form I-360 widow(er)'s petition, the child(ren) of the
widow(er) will be deemed to be included in the converted Form I-360. Thus, it will not be
necessary to act on any separate Form(s) I-130 that the deceased citizen may have filed for the
widow(er)'s children. And the child(ren) of the widow(er) will be deemed included in the
converted Form I-360 even if the deceased citizen had not filed any Form(s) I-130 for the
child(ren).

Note that, in light of INA section 201(f), whether an individual qualifies as the "child" of a
widow(er) depends on the individual's age when the visa petition was filed. For those cases that
were pending on October 28, 2009, the Form I-360 filing date is deemed to be the date on which
the deceased citizen filed the prior Form I-130. If a widow(er) has an unmarried son or daughter
who was under 21 when the deceased citizen filed the Form I-130, that individual will still be
deemed to be under 21 for purposes of the widow(er)'s now-converted Form I-360.

### D. Affidavits of support

Under section 212(a)(4)(C)(i)(I) of the INA, a Form I-864 (Affidavit of Support under Section
213A of the Act) is *not* required in the case of the widow(er) of a citizen and the widow(er)'s
accompanying children.[2]

### E. Conversion of deferred action applications filed under prior guidance

While remedial legislation was pending in Congress, the Secretary of Homeland Security
directed the use of deferred action relief to allow widow(er)s of citizen whose cases may have
been affected by the legislation to remain in the United States. In the September 4, 2009
Memorandum, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their
Children," USCIS designated the Form I-360 as the form an individual would use to request
deferred action under the Secretary's policy.

Now that Congress has enacted the legislation, any Form I-360 that had been filed to obtain
deferred action relief, and that has not yet been adjudicated as a deferred action request, will now
be considered to be, and adjudicated as, a widow(er)'s visa petition under 8 C.F.R. § 204.2(b). If
the Form I-360 has already been approved as a deferred action request, it will be reopened and
adjudicated as a visa petition under 8 C.F.R. § 204.2(b). It is not necessary for the alien to file a
formal motion, nor to pay a new Form I-360 filing fee. Additionally, any prior grant of deferred
action relief need not be rescinded and should remain undisturbed.

---

[2] There may be an individual case in which, regardless of the Form I-864 issue, the factors specified in INA section
212(a)(4)(B) and the standard public charge guidance, as published at 64 Fed. Reg. 28689 (1999), will support a
finding that a widow(er) is inadmissible as an alien likely to become a public charge. Even in this case, a Form I-
864 is not required. Rather, since the statute does not specifically require the Form I-864, the Form I-134 can be
used instead. 8 C.F.R. § 213a.5. It is important to note that, on a Form I-134, the sponsor does not have to meet the
requirements in INA section 213A(f), and so does *not* need to be someone who could have been a "substitute
sponsor" in a case in which a Form I-864 actually is required.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 11

Under the deferred action guidance, an alien could file a Form I-765, application for employment authorization, only if the deferred action request had been granted. Now that a Form I-360 that was filed to request deferred action is deemed to be a widow(er)'s visa petition, the alien can, if otherwise eligible, file a Form I-485 even before the approval of the Form I-360. 8 C.F.R § 245.2(a)(2)(i)(B). Filing the Form I-485 permits the alien to file a Form I-765. 8 C.F.R. § 274a.12(c)(9).

### F. Implementation

Section 568(c) of the FY2010 DHS Appropriations Act became effective on October 28, 2009, the date of enactment. USCIS offices and centers, therefore, are to begin implementing the instructions established in this memorandum immediately. USCIS adjudicators should note that Congress clearly intended to benefit the aliens affected by these provisions.

***AFM* Transmittal Memorandum Revisions. The *AFM* Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:**

| AD 10-09  [Date of Signature] | **Chapter 21.2** | This memorandum removes chapter 21.2(a)(4) and the **Note** at the end of chapter 21.2(h)(1)(C) to reflect enactment of section 568(c) of Public Law 111-83. |
|---|---|---|

### H. Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels. For cases adjudicated overseas, questions should be directed to the International Operations Division, Programs Branch.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

# DEF-INTERV.

# EX. 58

Leaders of American Industry – Stand With Dreamers

LL8

≡

(/)

OPEN LETTER FROM

# LEADERS OF AMERICAN INDUSTRY

*Entrepreneurs and business leaders from across the country and representing every major sector of the economy released an open letter calling on Congress to immediately pass the bipartisan Dream Act or legislation that provides Dreamers raised in our country the permanent solution they deserve. This is an update to the initial letter released prior to the administration's decision on DACA.*

New Dreamer Letter    Initial Letter

*August 31, 2017*
*To: President Donald J. Trump*
*To: Speaker Paul Ryan; Leader Nancy Pelosi; Leader Mitch McConnell; and Leader Charles E. Schumer*
As entrepreneurs and business leaders, we are concerned about new developments in immigration policy that threaten the future of young undocumented immigrants brought to America as children.
The Deferred Action for Childhood Arrivals (DACA) program, which allows nearly 800,000 Dreamers the basic opportunity to work and study without the threat of deportation, is in jeopardy. All DACA recipients grew up in America, registered with our government, submitted to extensive background checks, and are diligently giving back to our communities and paying income taxes. More than 97 percent are in school or in the workforce, 5 percent started their own business, 65 percent have purchased a vehicle, and 16 percent have purchased their first home. At least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees.

Unless we act now to preserve the DACA program, all 780,000 hardworking young people will lose their ability to work legally in this country, and every one of them will be at immediate risk of deportation. Our economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions.
Dreamers are vital to the future of our companies and our economy. With them, we grow and create jobs. They are part of why we will continue to have a global competitive advantage.

We call on President Trump to preserve the DACA program. We call on Congress to pass the bipartisan DREAM Act or legislation that provides these young people raised in our country the permanent solution they deserve.

Signed,

(f) (HTTPS://WWW.FACEBOOK.COM/SHARER.PHP?
U=HTTPS%3A%2F%2FDREAMERS.FWD.US%2FBUSINESS-
LETTER%3FUTM_SOURCE%3DFACEBOOK%26UTM_MEDII
(🐦) (HTTPS://TWITTER.COM/INTENT/TWEET?
TEXT=BUSINESS%20LEADERS%20ACROSS%20THE%20U.S
**Pledge to Stand With Dreamers**

**1861**

**Email:**

Email Address

**Zip:**

ZIP Code

SIGN UP

# Signers

Signatories who have signed both letters appear in **_bold and italic._** Those who have signed the initial letter appear in plain text and those who have signed the updated, new letter (Dreamer letter) appear in _italic._

Show 100 ▾ entries                                                Search:

| Name ⬍ | Title ⬍ | Organization ⬍ |
|---|---|---|
| Christopher "Chip" Paucek | Co-Founder & CEO | 2U |
| Audley Logan, Sr. | President | 3-C Technology, LLC |
| Paul Fox | Partner | 310 Architects & Interiors, Inc. |
| Joe Thomas | Owner | 4t Management and Maintenance |
| Luke Geiger | CEO | 6th Man Apps |
| Angela Stergis | CEO | 92Seven |
| William Barhydt | CEO | Abra |
| _Julie Sweet_ | _North American Chief Executive Officer_ | _Accenture_ |
| Jack Armstong | President | Acumen, LLC |
| Rob Dhoble | CEO | Adherent Health |
| David Beck | CEO | ADI American Distributors LLC |
| _Michael Dillon_ | _EVP and General Counsel_ | _Adobe Systems, Inc._ |
| _Aaron Bell_ | _CEO_ | _AdRoll_ |
| _Francisco Torres-Aranda, Jr._ | _Founder & President_ | _Advanced-Tec Materials, LLC_ |
| _Max Levchin_ | _Chairman & CEO_ | _Affirm_ |
| _Jeffrey S. Collins_ | _Vice President and General Counsel_ | _After School App_ |
| Mary Ellen Caron | CEO | After School Matters |
| Martin H. Richenhagen | President & CEO | AGCO Corporation |
| Dhawal Zatakia | President | AH Group |
| Shamilla Mansingh | President | AHM Contractors Corp |

1862

Case 1:18-cv-00068 Document 325-2 Filed on 07/21/18 in TXSD Page 212 of 270
Case 3:17-cv-05211-WHA Document 91-2 Filed 11/01/17 Page 97 of 110

10/30/2017                                    Leaders of American Industry - Stand With Dreamers

| | | |
|---|---|---|
| **Brian Chesky** | **Co-Founder, CEO, Head of Community** | **Airbnb** |
| Pedro A. Freyre | Chair, International Practice | Akerman LLP |
| Claudia Mirza | CEO | Akorbi |
| *Brad Tilden* | *Chairman and CEO* | *Alaska Airlines* |
| Nikki Pava | | Alegria Partners |
| Kevin P. Ryan | Founder & Chairman | Alleycorp and MongoDB |
| *Reza Chowdhury* | *Founder and CEO* | *AlleyWatch* |
| Hyoun Park | CEO | Amalgam Insights |
| **Jeff Bezos** | **CEO** | **Amazon** |
| **Jeffrey D. Epstein** | **Founder and CEO** | **Ambassador Software** |
| Matt Doll | CEO | American Fire Glass |
| *Tim Sullivan* | *President & CEO* | *Ancestry.com* |
| Brad Jefferson | CEO | Animoto |
| Anthem Hayek Blanchard | CEO and Co-Founder | Anthem Vault, Inc. |
| Magdalena I. King | General Manager | Antlers at Vail |
| Stephen Howard | President & CEO | Appanite, Inc. |
| Howard Hecht | Principal | Appanite, Inc. |
| *Myles Kleeger* | *President* | *Appboy* |
| Tim Cook | | Apple |
| JT Kostman, PhD | CEO | Applied AI |
| *Nithya Das* | *Chief Legal and People Officer* | *AppNexus* |
| *Brian O'Kelley* | *CEO* | *AppNexus* |
| Alden Bruce Badger | Chairman and CEO | Aqueous Solutions Global |
| Nia Ogletree | CEO | Arielle Management Group, LLC |
| *Gonzalo de la Melena Jr.* | *President & CEO* | *Arizona Hispanic Chamber of Commerc* |
| *Steven Zylstra* | *President & CEO* | *Arizona Technology Council* |
| *Shruti Gandhi* | *Founder and Managing Partner* | *Array Ventures* |
| Dustin Moskovitz | CEO | Asana |
| *Andrei Cherny* | *CEO* | *Aspiration* |
| *William C. Rudin* | *Chairman* | *Association for a Better New York* |
| *Gary S. Cox* | *President* | Association of Independent KY Colleges a Universities |
| Randall L. Stephenson | Chairman, CEO and President | AT&T |
| *Laura Gómez* | *CEO* | *Atipica* |

1863

Leaders of American Industry - Stand With Dreamers

| | | |
|---|---|---|
| *Mike Cannon-Brookes* | *Co-Founder & Co-CEO* | *Atlassian* |
| *Scott Farquhar* | *Co-Founder & Co-CEO* | *Atlassian* |
| Jack Davis | Owner | Audit Resources, LLC |
| *David M. Hornik* | *General Partner* | *August Capital* |
| *Barbary Brunner* | *CEO* | *Austin Technology Council* |
| Andrew Anagnost | President and Chief Executive Officer | AutoDesk Inc. |
| Zaheer Faruqi | Owner | Aventure Aviation |
| Brandon Canty | COO | Avidity Digital |
| Alberto Aguilar | CEO | Avidity Digital |
| Robert Olsen | President | Axcess Point LLC |
| Oscar Monroy | CEO | Axistem Co. |
| Andrea Guzman | Owner | Ayuda Hispana LLC |
| *Robert Cheetham* | *CEO* | *Azavea* |
| Craig Chico | President & CEO | Back of the Yards Neighborhood Counc |
| *Marjorie Baltazar* | *Principal* | *Baltazar Global LLC* |
| Jay Steinmetz | CEO | Barcoding Inc. |
| Andrew Robertson | President and CEO | BBDO Worldwide |
| Susan Lyne | Managing Partner | BBG Ventures |
| *Vincent A. Forlenza* | *Chairman and CEO* | *BD* |
| Chet Pipkin | CEO | Belkin International (belkin, Linksys, WeMo, Phyn) |
| Ujjwal Gupta | Co-Founder/COO | BenchPrep |
| *Jeremy Levine* | *Partner* | *Bessemer Ventures* |
| *Hubert Joly* | *Chairman & CEO* | *Best Buy* |
| Tamara Drangstveit | DOJ Accredited Rep | Bethany Immigration Services |
| Rosalyn Ryan | CEO | Bicgen Foundation |
| Cindi Bigelow | President & CEO | Bigelow Tea |
| RIchard Basile | CEO | BioPontis Alliance for Rare Diseases |
| Katia Beauchamp | Co-Founder and CEO | Birchbox |
| *Chloe McKenzie* | *CEO* | *BlackFem, Inc.* |
| *Karole Morgan-Prager* | *Chief Legal and Administrative Officer* | *BlackLine, Inc* |
| Jeremy Weinstein | Founder and CEO | Blinkk |
| *Matt Salzberg* | *CEO* | *Blue Apron* |
| *Ilia Papas* | *CTO* | *Blue Apron* |

Leaders of American Industry - Stand With Dreamers

| | | |
|---|---|---|
| *Abby Adlerman* | *CEO* | *Boardspan Inc.* |
| Bernard Yoo | CEO | Bombfell Inc. |
| Jim Bartel | Managing Director | Bonfire Labs |
| Michael Tucker | President | Books Inc. |
| *Elyse D. Cherry* | *CEO* | *Boston Community Capital, Inc* |
| *Henrik Johansson* | *CEO* | *Boundless Network* |
| *Aaron Levie* | *CEO* | *Box, Inc.* |
| *Seong-Hee Yoon* | *Founder* | *braillebot* |
| *Jim Breyer* | *President and CEO* | *Breyer Capital* |
| Romish Badani | CEO | Bridge US |
| Andy Feinberg | CEO | Brightcove Inc. |
| Brit Morin | Founder and CEO | Brit + Co |
| *Lloyd Carney* | *CEO* | *Brocade Communications Systems, Inc* |
| Charlie O'Donnell | Partner | Brooklyn Bridge Ventures |

Showing 1 to 100 of 807 entries

‹ Previous  Next ›



(https://www.fwd.us)

© 2013-2017 FWD.us
Privacy Policy (https://fwd.us/privacy_policy), Terms of Service (https://fwd.us/terms_of_use)



f    y
(http://p...
u=https%...

**1865**

# EXHIBIT CC

# DEF-INTERV.

# EX. 59

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
    THE REGENTS OF THE UNIVERSITY OF   ) Case No.
 5  CALIFORNIA and JANET NAPOLITANO,   ) 17-CV-05211-WHA
    in her official capacity as        )
 6  President of the University of     )
    California,                        )
 7                                     )
                 Plaintiffs,           )
 8                                     )
        v.                             )
 9                                     )
    U.S. DEPARTMENT OF HOMELAND        )
10  SECURITY and ELAINE DUKE, in her   )
    official capacity as Acting        )
11  Secretary of the Department of     )
    Homeland Security,                 )
12                                     )
                 Defendants.           )
13  -----------------------------------)
    AND RELATED CASES.                 )
14  -----------------------------------)
15                    - - -
16              Tuesday, October 17, 2017
17                    - - -
18
19       Videotaped deposition of JAMES McCAMENT,
20  taken at the offices of Gibson, Dunn & Crutcher,
21  1050 Connecticut Avenue NW, Washington, D.C.,
22  beginning at 9:14 a.m., before Nancy J. Martin, a
23  Registered Merit Reporter, Certified Shorthand
24  Reporter.
25
```

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 219 of 270
Case 8:17-cv-00921-JWH-7 Document 122-2 Filed 18/01/17 Page 29 of 910

Page 11

1        Q.   Okay.  Let me ask you what did you do to
2    prepare for that testimony, the Senate testimony we
3    just mentioned?
4        A.   For the Senate testimony?
5        Q.   Yes.
6        A.   I met with members of the USCIS team.  I
7    reviewed the -- there's a hearing book, which has
8    standard materials regarding the DACA program, as well
9    as possible questions to be asked by members of
10   Congress on other topics.
11       Q.   Okay.  The hearing -- I'm sorry.  I didn't
12   mean to cut you off.
13       A.   So the hearing book, and I'm sure just other
14   materials with respect to statistics on the DACA
15   program, the wind-down.
16       Q.   Okay.  The hearing book that you just
17   mentioned, was that assembled by members of your team?
18       A.   It was.
19       Q.   Okay.  Do you have an estimate of how much
20   time you spent preparing for that testimony?
21       A.   I was -- I would estimate it was several
22   hours.  Actually, quite a few hours, I suppose.
23   Probably about 8 to 12 hours, perhaps, over the
24   two-week period from the time I was invited to testify
25   to the hearing perhaps, approximately.

1       Q.   And the topic of that hearing was the

2   rescission of the DACA program; right?

3       A.   Right.

4       Q.   And just so we're all on the same page, you

5   know what I'm talking about when I talk about "DACA";

6   right?

7       A.   Yes.

8       Q.   Deferred Action for Childhood Arrivals

9   Program?

10      A.   Yes.

11      Q.   Let me ask you just a couple of questions

12  around that testimony.

13      A.   Uh-huh.

14      Q.   First, do you agree that DACA holders are a

15  benefit to our country?

16      A.   Yes.  I believe that the DACA holders, as I

17  stated in my testimony, as well, are folks who have

18  requested DACA over these last five years, are in

19  various sectors, educational, business, and so they

20  contribute to the economy and contribute to the

21  sectors in which they work.

22      Q.   Okay.  And you agree that they make a

23  valuable contribution to our society?

24      A.   I agree, and I think, you know, all those --

25  many in the immigrant system, those in the immigrant

1  system make contributions across all sectors of

2  society.

3      Q.  Do you also agree that it makes sense to

4  regularize their status through some legal means?

5      A.  I think that the regularization of status as

6  being discussed in Congress now, in the immigration

7  system any time there's a capacity within the right

8  bounds of laws and protections for regularization of

9  status, that's to the benefit of our immigration

10  system.

11      Q.  And, in your view, why is that?

12      A.  So our immigration history, our system back

13  to the founding of the nations, and our immigrants

14  have made many great contributions.  And therefore, I

15  think when immigrants are in a regularized status, it

16  certainly contributes to society.

17          Secondly, for law enforcement purposes as

18  well, it assists in the fact that the status is

19  regularized, and therefore, we know, as we do with

20  everyone in the immigrant system, we know who people

21  are, they're identified, they're contributing to

22  society.

23      Q.  Okay.  Any other reasons you can think of as

24  you sit here today?

25      A.  For the regularization of status?

1     Q.  Right.

2     A.  As I mentioned, the contribution to society,

3  the legalization benefits overall, and I think

4  generally, any time that we, as I said previously,

5  that we have folks in the legal system, it helps us in

6  USCIS, DHS, DOJ administer the immigration system more

7  effectively.

8     Q.  Let me switch gears a little bit.

9     A.  Sure.

10     Q.  Do you agree that rescinding DACA will create

11  disruptions for the DACA holders?

12     A.  To rescind DACA as we have, DHS, and USCIS

13  have, absent another solution, leaves those DACA

14  requesters and recipients without a future status as

15  their employment authorization documents begin to

16  expire.  But for that reason, the hope is that

17  Congress will provide a permanent solution for that

18  population.

19     Q.  Can you identify the disruptions that you see

20  for the DACA holders.  What are they, in your view?

21     A.  So DACA is an act of prosecutorial

22  discretion, deferring action on someone's case.  So

23  absent legislative action or permanent action to your

24  previous question regarding regularization of status,

25  as DACA holders begin to expire, or their EAD begins

1   to expire, they would not be able to work, or lawfully

2   work.

3           In addition, they are -- the status that they

4   held, if they held a status prior to the grant of

5   DACA, they revert to that. And therefore, if that

6   status begins to expire, then that's subject to law

7   enforcement within appropriate bounds for ICE and

8   other law enforcement agencies which are A, outside of

9   my purview, USCIS, and B, subject to guidelines.

10          Q.  And -- I'm sorry.

11          A.  No.  Sorry.  So then I would say the other

12   harm, to your question for DACA requesters and

13   recipients as the benefits begin to expire, is that

14   they are no longer -- they don't have that legal

15   status, but they never really did.  They had a

16   deferred action that allowed them to have employment

17   authorization.

18          If they don't, then that limits their options

19   here in the United States, ultimately, for work, for

20   employment and to really be in the legal immigration

21   system, which I think is not wise and why we hope that

22   there's a legislative solution, because that,

23   statutorily, provides the only permanent protection or

24   permanent status for them.

25          Q.  Have you finished your answer?

1    communications originated?

2        A.   As far as the E-mail type of conversation, we

3    can speak to the -- later.

4        Q.   Yes.

5        A.   Again, I don't recall a direct E-mail sort of

6    being forwarded on, but I don't want to misspeak that

7    there isn't one.  Just, there was a lot of discussion

8    with the Secretary, you know, through the Secretary's

9    office, et cetera.  So I just don't recall one coming,

10   like, forwarded on.  Might be.

11       Q.   I'm sorry.

12       A.   Sure.

13       Q.   What I was going to ask was whether or not

14   you actually got an E-mail forwarded, you know,

15   regardless of how the communication came.  Was that

16   ever tied to the identity of a White House staffer, so

17   and so "wants to know about 'X'"?

18       A.   Not that I recall.  Not worded that way.

19       Q.   Okay.  Worded any way that gave you a name?

20       A.   Not worded in a way that would give a name

21   either.

22       Q.   Okay.

23       A.   Then again, that compares to other requests

24   on other areas and issues.

25       Q.   Okay.  Just based on conversations that you

1    had or however you might have -- are you aware of

2    people in the White House who were engaged on this

3    issue on DACA?

4        A.   From those E-mail conversations or --

5        Q.   From any source.

6        A.   Largely, those two sitting in one of the

7    meetings or a meeting, and I remember those names.

8    But I don't recall sort of a reference to an "X"

9    person "wants this."  And generally what I recall is

10   if there was an ask, it was -- it may be "the White

11   House is asking" type of question.  Does that make

12   sense?

13       Q.   Yeah.  So it sounds like, with respect to

14   anything other than in-person -- it sounds like you

15   had one in-person meeting on this issue while you were

16   acting Secretary?

17       A.   That's what I recall.  Acting director.

18       Q.   Sorry.  Acting director.  Thank you.

19       A.   Please clarify.

20       Q.   I gave you a promotion.

21       A.   That's right.

22       Q.   So you remember one meeting while you were

23   acting director with White House people on the topic

24   of DACA?

25       A.   Yes.  I remember one meeting being held in

1  completion on discussion of DACA.

2      Q.  Okay.  That you attended?

3      A.  That I attended.

4      Q.  Okay.  Are you aware of other meetings that

5  you did not attend?

6      A.  I'm not aware of other meetings that I did

7  not attend, but there may well have been.

8      Q.  Okay.

9      A.  I mean that's not unusual.

10      Q.  Understood.  And obviously, I'm, you know,

11  just trying to get what you know.

12      A.  Sure.

13      Q.  Okay.  So let's talk, then, about that

14  meeting.  Do you remember when it happened?

15      A.  I believe it was August 24.

16      Q.  August 24.  Where did it happen?

17      A.  The Roosevelt Room.

18      Q.  Okay.  Which is where?

19      A.  In the White House, west wing.

20      Q.  Okay.  Who was there that you remember?

21      A.  That I recall, Acting Secretary Duke, General

22  Kelly, the chief of staff, the attorney general, Jeff

23  Sessions.  I'm reflecting around the table.  Rachel

24  Brand with Department of Justice.  OMB Director

25  Mulvaney.  Deputy Secretary of State Sullivan.

1  Stephen Miller.  I think Rob Porter.  I believe I have

2  that name right.

3      Q.  What's Mr. Porter's role?

4      A.  He is the staff -- I was going to say

5  executive secretary, but it's that staff secretary

6  or -- I probably have misapplied the title, but, in

7  essence, who handles correspondence, I believe, for

8  the White House, but I may have the title wrong.

9          Don McGhan.  Kierstjen Nielsen, the deputy

10  chief of staff to -- or currently the deputy chief of

11  staff.  I believe John Bash.

12      Q.  Who's John Bash?

13      A.  He's, I think, special counsel, and I believe

14  also -- I have to double-check the title.  I believe

15  special assistant to the President as well.  Marc

16  Short, who is -- I'm sorry.

17      Q.  Who is Mr. Short?

18      A.  The head of the legislative, White House

19  legislative affairs operation.  It may be a more

20  expanded title, but I think that he is the head of

21  legislative affairs.

22      Q.  Anybody else you can remember?

23      A.  Gene Hamilton, the senior counsel to the

24  Secretary.  I believe Chad Wolf.  There may have been

25  a couple of others as well.  I'm just trying to kind

1  of think through.  Danielle Cutrona.

2      Q.  How do you spell Cutrona?

3      A.  I believe C-u-t-r-o-n-a.

4      Q.  And who is she?

5      A.  She works for the attorney general directly.

6      Q.  Anyone else you remember?

7      A.  I believe Andrew Bremberg as well.

8      Q.  Who is that?

9      A.  He also, I believe, is a special assistant to

10  the President, but I might have the title adjusted

11  incorrectly.  I think there may have been one or two

12  others, but I'm just not recalling at the moment.

13      Q.  Okay.  Do you remember how long the meeting

14  lasted?

15      A.  Approximately.

16      Q.  How long, about, did it last?

17      A.  Approximately an hour to an hour and a half.

18      Q.  How did you come to be there?  Did you get an

19  E-mail invitation?  Did you get a phone call?

20      A.  I did receive --

21      Q.  Okay.  From whom?

22      A.  As I recall, from the chief of staff.  DHS

23  chief of staff.

24      Q.  Okay.  And do you remember what that said?

25  What did the E-mail say?

1      A.  I recall generally what it said.

2      Q.  What did it say?

3      A.  As I recall, that there would be a meeting in

4   the EEOB, or White House.  I'm not sure which was said

5   since they're adjacent.  And that I would be

6   attending.  That was how I knew that was the case.

7      Q.  Okay.  Anything else in that E-mail?  Did

8   you -- well, anything else on that E-mail?

9      A.  What I recall is that it was to discuss DACA.

10      Q.  Was there an agenda attached?

11      A.  No, not to that E-mail.

12      Q.  Did you ever receive an agenda for that

13   meeting?

14      A.  I don't recall receiving an agenda.  I

15   received an invite.

16      Q.  Okay.  Did you receive any E-mail, whatever

17   you were going to call it, anything like an agenda,

18   anything that set forth what was to be discussed?

19      A.  I don't recall receiving the agenda or a

20   read-ahead before the meeting.

21      Q.  You got a package of information at the

22   meeting of some kind?

23      A.  I recall receiving at the meeting what we

24   would say is the read-ahead, but the agenda.  I don't

25   recall receiving anything prior.  Could have been.  I

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 229 of 270
Case 8:17-cv-00692-GW-HW Document 112-10 Filed 11/01/17 Page 30 of 190

Page 123

1    know I'd say we'd finish, but --

2        A.   Sure.

3        Q.   -- and we'll obviously talk about this after

4    lunch, you also mentioned the AG's letter.  I think

5    you've covered the other points that you mentioned.

6        A.   Uh-huh.

7        Q.   So what about the AG's letter, the U.S. AG's

8    letter as a reason --

9        A.   Certainly.

10       Q.   -- in your mind for the rescission?

11       A.   Certainly.  It definitely was.

12       Q.   And why?  What about it?

13       A.   Because the AG was providing guidance to the

14   Department, that the Department of Justice did not

15   feel that they could defend DACA, as I read the

16   letter, against the Amended Complaint because it had

17   some of the same -- or had the same failings -- that's

18   not the word that was used in the AG's letter, and I

19   apologize, but the same structural lack or lack of

20   constitutionality that was applied to DAPA, the same

21   underpinnings applied to DACA.

22            So therefore, you know, stating to the

23   Secretary and recommending that she rescind the DACA

24   memo of 2012 and implement an orderly and efficient

25   wind-down.  It was also, I think -- I can't speak for

1883

1    the Secretary but with respect to her memo, indicates

2    that also was a factor, which certainly seems to tie

3    with those other points.

4           MR. DETTMER:  Okay.  All right.  I'm only two

5    minutes over.  Should we break now, have some food and

6    then we'll come back in an hour?

7           MR. GARDNER:  That's fine.

8           MR. DETTMER:  Want to say 1:30 or 45 minutes.

9           THE VIDEOGRAPHER:  We're going off the record

10   at 12:35 p.m.

11           (A recess was taken from 12:35 p.m.

12           to 1:38 p.m.)

13           THE VIDEOGRAPHER:  We are back on the record

14   at 1:38 p.m.

15   BY MR. DETTMER:

16       Q.  All right.  Good afternoon.

17       A.  Good afternoon.

18       Q.  You know you're still under oath; right?

19       A.  Yes.

20       Q.  And on the record?

21       A.  Yes.

22       Q.  Are you aware of a meeting on the topic of

23   DACA rescission that happened on August 21?

24       A.  Yes.  If I have the date correct.

25       Q.  Were you at that meeting?

1      A.  Can you specify as far as -- you mean as far

2  as a White House meeting or at DHS?

3      Q.  I'm not sure.  As far as I know, it was a DHS

4  only meeting.  Are you aware --

5      A.  Yes.

6      Q.  -- of that?

7      A.  Yes.

8      Q.  Okay.  And were you at that meeting?

9      A.  Yes.

10      Q.  Who else was at that meeting?

11      A.  As I recall, the acting secretary, the Chief

12  of Staff.  I believe the Deputy Chief of Staff as

13  well.  Gene Hamilton.  Joe Maher.  Nader Baroukh,

14  Dimple Shah, myself, of course.  I believe Kathy

15  Nuebel, Craig Symons, I believe our chief of counsel.

16  I think as well Tom Homan.  I'm trying to look around

17  the room.  I think one of his advisors was there, if I

18  recall correctly, John Feere.  I might be

19  mispronouncing the last name.  I think Kevin McAleenan

20  was there from customs and border protection.  But

21  certainly, it was someone from his team, or two

22  people, I think, from his team.  And, I believe, Kevin

23  was there.  If not, it would have been Ron Vitiello.

24  I'm not remembering exactly.

25          REPORTER MARTIN:  Ron Vitiello?

```
 1              THE WITNESS:  Sorry.  I apologize, Nancy.
 2      Ron Vitiello, who was the deputy -- acting Deputy
 3      Commissioner.  So if it weren't Kevin, it would be
 4      Ron.
 5              And also -- those are the names I recall.  I
 6      mean I don't recall the two names from CVP, but it
 7      might have been Julie Core, who's one of the executive
 8      commissioners.  Then probably a couple other people.
 9      It was a full room.
10      BY MR. DETTMER:
11          Q.   Okay.  How long did that meeting last?
12          A.   What I recall, it was probably an hour.
13      Somewhere between an hour and two hours.
14          Q.   And where was it?
15          A.   At the DHS headquarters.
16          Q.   Who called that meeting?  Who was the
17      motivator in making that meeting happen?
18          A.   I don't know the motivator, but I think the
19      scheduling invite would have come from the Secretary's
20      office.
21          Q.   Okay.  And did she lead the meeting?
22          A.   Yes.
23          Q.   And, you know, without getting into the
24      substance, the topic was DACA rescission?
25          A.   Yes.
```

1      Q.   Okay.  Were any decisions made at that

2    meeting?

3      A.   No, not that I recall.

4      Q.   Was it sort of a preparatory-type meeting for

5    the August 24 meeting?

6      A.   So I don't -- no.  As I recall, it was not

7    preparatory for that meeting.  It was to discuss the

8    topic, potential DACA rescission.

9      Q.   Who -- sorry.

10     A.   Sorry.  So as I recollect, it may have been

11   in preparation for a forthcoming meeting.  I don't

12   remember it being set as that date for a meeting on

13   the 24th, but it could have been.

14     Q.   Who were the people who sort of spoke the

15   most at that meeting?  Who were the primary

16   contributors?

17     A.   The Secretary.  I recall Joe Maher, Dimple.

18   I think Nader was there.  If he was, I think he spoke.

19   I'm pretty sure he was.  Myself.  I think Tom Homan

20   spoke.  Again, if I'm not misremembering.  We've had

21   several meetings with the three immigration agencies,

22   non DACA issues over the years, over the months, but I

23   think Kevin McAleenan or his team were there speaking,

24   and I believe Kathy and Craig spoke as well.

25     Q.   Was there anyone there who was not there sort

1    of under the DHS umbrella, from other agencies or --

2        A.   No.  And I think I also -- if I didn't

3    mention, Gene Hamilton was at the meeting, but I think

4    he spoke as well.

5        Q.   What was Gene's role again?

6        A.   He was the senior counsel to the Secretary.

7        Q.   Got you.  Okay.  Do you know Julie Kirchner?

8        A.   Yes.

9        Q.   To your knowledge, did Julie Kirchner have

10   any role in all these discussions that we've been

11   talking about today with respect to the rescission of

12   DACA?

13       A.   I don't recall her being at the meeting.  And

14   if I may ask and answer in a couple points.  So with

15   respect to the decisions we've discussed, she wasn't

16   present.

17       Q.   Okay.  Are you aware of her having any role

18   in the decision-making process on DACA rescission?

19       A.   Excepting her official title and role, I'm

20   not aware of that.

21       Q.   And what do you mean "excepting her official

22   title and role"?

23       A.   So she is a citizenship and immigration

24   services ombudsman.

25       Q.   And so you would expect somebody in that

1 position to have some role in the decision making?

2  A. Not necessarily, but I can explain.

3  Q. Please do.

4  A. So the ombudsman has by the definition the

5 title of ombudsman, oversees partners with our agency,

6 and so therefore, has opinions on our operations and

7 involves themselves appropriately with the work or

8 operations on decisions sometimes may, usually does

9 not from a guidance perspective.

10  Q. Okay.  Well, just to go through the

11 formalities, what was discussed at that August 21

12 meeting?

13   MR. GARDNER:  Objection.  Calls for

14 disclosure of information subject to deliberative

15 process privilege as well as the attorney-client

16 privilege.

17   I instruct the witness not to answer.

18   THE WITNESS:  And I follow my counsel's lead.

19   MR. DETTMER:  If I didn't say that I'm going

20 to observe the formalities, you think I could have

21 slipped that through?

22   MR. GARDNER:  I think so.  I'm still in a

23 lunch coma right now.

24   THE WITNESS:  Looking at these different

25 options to keep it going.

1  BY MR. DETTMER:

2      Q.  Was there any follow-up to that August 21

3  meeting that you were part of?

4      A.  Yes.

5      Q.  Can you describe that.

6          MR. GARDNER:  Objection.  Calls for

7  disclosure of information and subject to the

8  deliberative process privilege and potentially the

9  attorney-client privilege.

10         I instruct the witness not to answer.

11 BY MR. DETTMER:

12     Q.  So --

13     A.  I agree.  I concur, yes.

14     Q.  So let me just back off of that just a little

15 bit --

16     A.  Sure.

17     Q.  -- and ask you without divulging the

18 substance of the follow-up conversations, how many

19 were there, who were they with, when did they happen?

20         MR. GARDNER:  Objection.  Compound.  Can we

21 do it question by question?  I'm not trying to --

22         MR. DETTMER:  No.  Sure.

23     Q.  I'm trying to do it in a way that --

24     A.  Understood.

25     Q.  How many follow-up conversations do you

1    remember having?  Excuse me, follow-up communications

2    do you remember having to that August 21 meeting?

3          A.   A handful.  A few.

4          Q.   Okay.  Less than five?

5          A.   What is the time parameter when you say,

6    "follow-up"?

7          Q.   Well, you know, it's hard to say.  I mean it

8    depends on what you mean by "follow-up."  I mean --

9          A.   That's why I was asking.

10         Q.   -- if it's a communication that you

11   understood was sort of a follow-up on that meeting,

12   that's what I'm curious about.  And I don't --

13         A.   Right.

14         Q.   I can't see it in your mind.

15         A.   I can explain a bit of the parameters of why

16   I asked the question.

17         Q.   Sure.

18         A.   So following any conversation with the

19   Secretary or principal from that then role, or even

20   this one, usually, on whatever the topic is there may

21   be a variety of different types of communication or

22   follow-up.  So it could be E-mail or calls asking for

23   data.  Sometimes decisions are ultimately made.

24   Sometimes they aren't.  So sorry.  I was trying to set

25   the --

1      Q.  No.  No.  Understood.  And I'm sorry.  It is

2  a little vague just by nature.

3      A.  So I would say between the 21st and the 24th,

4  meaning that that meeting then occurred at the White

5  House.  There was, I think, a handful, maybe a

6  couple -- I don't recall exactly -- follow-up on what

7  was discussed.

8      Q.  And do you remember who those communications,

9  those follow-up communications were with?

10      A.  Some.

11      Q.  Tell me what you remember.

12      A.  So follow-up on the discussions at the

13  meeting for further information.

14      Q.  Do you remember with whom?

15      A.  So I recall Gene Hamilton would be one.  I

16  don't recall if it came through other channels or not.

17  It might have.

18      Q.  Were those requests for additional data?  Was

19  that sort of the nature of the --

20      A.  Additional data.  I think data would be

21  correct overall.

22      Q.  Okay.

23      A.  If I may amend an earlier answer.  At the

24  meeting as well, I believe on the 21st was Ambassador

25  Nealon.  James Nealon as well.  Assistant secretary in

1    the policy office.

2        Q.   Okay.  Do you remember whether Mr. Nealon

3    made -- was a participant in the conversation?

4        A.   I remember him speaking, but I don't remember

5    the specifics given a lot of folks were discussing.

6    So...

7        Q.   Okay.  I think I'm going to sort of switch

8    gears and take you back to earlier in your time at

9    USCIS and ask you a few questions about earlier in the

10   DACA program.  Sort of starting back in 2012-2013 time

11   period --

12       A.   Okay.

13       Q.   -- and moving forward from there.

14            We had talked a little bit this morning about

15   the roll-out of DACA --

16       A.   Uh-huh.

17       Q.   -- which you had some role in, it sounds,

18   like, based on your position.  I'm going to show you a

19   few of the documents that were put out by USCIS around

20   the DACA program and just ask you a few questions

21   about those if that makes sense.

22       A.   Sure.

23       Q.   Let me ask you one thing, though.  So for

24   sort of a general question.  For the sort of official,

25   you know, guidance documents that USCIS puts out, is

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 240 of 270
Case 8:17-cv-00921-WHP Document 125-12 Filed 11/01/17 Page 124 of 150

Page 189

1    skills?

2         A.   I went to law school.  So...

3         Q.   Do you have enough familiarity with the

4    adjudication process to just know whether that rings

5    true to you?  Does that ratio seem appropriate, in

6    your experience?

7         A.   Specifically with respect to DACA?

8         Q.   Yes.

9         A.   I believe so.  That's around the number I was

10   going to say.

11            MR. DETTMER:  Okay.

12            (Deposition Exhibit 16 was marked for

13            identification.)

14   BY MR. DETTMER:

15        Q.   All right.  Let me show you Exhibit 16.

16   While you're looking at that, Exhibit 16 is another

17   printout from the USCIS website.  It's a four-page

18   document.  Title is I-821D, "Consideration of Deferred

19   Action for Childhood Arrivals."  Actually, what I --

20   well, actually, one other thing.  On the last page it

21   indicates that this document was last reviewed or

22   updated on October 6, 2017, which is two weeks ago

23   more or less.  Not quite.

24            I want to ask you about the first page.  In

25   the box sort of right in the middle of that first page

Page 190

1    in red letters it says, "DACA is ending."

2            The first bullet point says, "We are no

3    longer accepting initial or renewal requests for

4    deferred action for childhood arrivals.  We will

5    consider DACA requests received from residents of the

6    U.S. Virgin Islands and Puerto Rico on a case-by-case

7    basis."  Do you see where I read that there?

8        A.  Yes.

9        Q.  When was the decision made to consider DACA

10   requests from residents of the U.S. Virgin Islands and

11   Puerto Rico on a case-by-case basis?

12       A.  As I recall, a few days prior to the

13   October 5 expiration.

14       Q.  And why was that decision made?

15           MR. GARDNER:  Objection.  Calls for

16   disclosure of privileged information.  Subject to the

17   deliberative process privilege.

18           Instruct the witness to not answer.

19           THE WITNESS:  And I will follow the advice of

20   my counsel.

21   BY MR. DETTMER

22       Q.  You know, unfortunately, the fact of the

23   matter is, as we all know in this room, that there

24   have been an awful lot of horrible, natural, and

25   manmade disasters recently.  Maybe you have the same

1    instruction, but what's the reason for these being

2    given additional consideration, and not Houston,

3    Napa Sonoma, Las Vegas?

4              MR. GARDNER:  You are correct.  Same

5    objection.  Same instruction.

6    BY MR. DETTMER:

7        Q.  Okay.  Let me ask you maybe a slightly

8    different question.  You can answer "yes" or "no."  Is

9    consideration being given to similar treatment for

10   residents of some of these other affected areas?

11             MR. GARDNER:  Same objection.  Same

12   instruction.

13             THE WITNESS:  I'll follow the advice of

14   counsel.

15             MR. DETTMER:  Really what I'm trying to get

16   in that last one is just whether there is

17   consideration going on or not.

18             MR. GARDNER:  I understand, and if we can try

19   to parse it a different way.  What I'm trying to do is

20   avoid disclosing the deliberative process while giving

21   you the ability to obtain factual information.  So I

22   think that last question, unfortunately, in my

23   judgement crosses the line.  I'm not trying to

24   speechify.  I'm trying to figure out a way we could

25   get you the information you need without intruding on

1    the privilege.

2          MR. DETTMER:  I guess I just -- I mean the

3    question goes to whether there is a deliberative

4    process on that issue.  If the answer is "no," then

5    there's no privilege to give.

6          MR. GARDNER:  That's correct.

7          MR. DETTMER:  If the answer is "yes," then,

8    you know, obviously, I can't get into the substance of

9    it.

10          MR. GARDNER:  I think as a high level topical

11   matter he can answer the question is there being

12   consideration.  I think when we get to the substance,

13   obviously then we're getting closer.  I think we can

14   proceed maybe that way if you understand.

15          So why don't you re-ask the question.  I

16   apologize.

17   BY MR. DETTMER:

18     Q.  Is USCIS considering whether or not to give

19   similar consideration to other geographic areas that

20   are also subject to natural disasters?

21     A.  Other than what is represented as U.S. VI and

22   Puerto Rico, no.

23     Q.  I'll just ask the question just to preserve

24   the record.  Why did USCIS decide to extend the

25   deadline, at least on a case-by-case basis, for people

1  from the U.S. Virgin Islands and Puerto Rico and not

2  other geographic areas also affected by natural

3  disasters?

4          MR. GARDNER:  Objection.  Calls for

5  disclosure of information subject to deliberative

6  process privilege.

7          I instruct the witness not to answer.

8          THE WITNESS:  I'll follow that advice, or

9  instruction.

10          MR. DETTMER:  All right.  Let's dive into

11  this.  This was marked as Exhibit 3 at a deposition

12  last week.

13          THE WITNESS:  Okay.

14          MR. DETTMER:  And it is the administrative

15  record that was produced in our case, and I think in

16  your cases as well.  And it is a 256-page document or,

17  I guess, compilation of documents.

18          (Previously marked Exhibit 3 was handed to

19          the witness.)

20          MR. DETTMER:  And it has Bates numbers on it

21  AR1 through AR256.

22          MR. GARDNER:  You might want to take the

23  binder clip off.  Just don't --

24          THE WITNESS:  Yep.

25  BY MR. DETTMER:

 1    the program?

 2         A.   My personal view was that it was quite high

 3    with respect -- my apologies.  With respect to

 4    continuing the program.  That for the reasons earlier

 5    described, there was a significant or high litigation

 6    risk.

 7         Q.   And to unpack that a little bit more, what

 8    factors went into your personal assessment of that

 9    litigation risk?  You mentioned the Texas litigation,

10    the letter from the attorney general.  Was there

11    anything else that went into that evaluation?

12         A.   My personal evaluation, my personal view?  I

13    mean in addition, the attorney general's letter

14    indicated DACA as we administered had some of the same

15    risks that DAPA had and the underlying foundation.

16         Q.   And was use of government resources a

17    consideration?  DHS resources?

18         MR. GARDNER:  Objection.  Vague.

19    Consideration by him?

20    BY MS. CROWLEY:

21         Q.   Yes, by you.  Was that part of the

22    consideration, the litigation risk?

23         A.   I'm sorry.  Just to be clear, so the use of

24    our USCIS resources as part of the litigation risk.

25         Q.   In assessing the litigation risk --

1        A.   Yeah.

2        Q.   -- was there consideration -- did you

3   consider the amount of -- the number of government

4   resources, DHS resources that would be used to either

5   continue the program or rescind the program?

6        A.   I mean to answer clearly, I saw if the

7   program -- so consideration of resources in the sense

8   if the program continued we would presumptively,

9   absent other challenges, use the same resources we've

10  been using to administer it.

11        So then I can answer the second part to your

12  question, if the program were rescinded, you know,

13  particularly actively by a court injunction, then

14  there would be, from my view at the time, thinking

15  through additional resources, depending upon how a

16  court action would play out, again, linking back to

17  DAPA or the injunction of DAPA.

18        Q.   In assessing the litigation risk of

19  continuing or rescinding -- continuing the program,

20  did you consider the likelihood of being sued for a

21  rescission of the program?  Was this lawsuit

22  contemplated?

23        A.   So again, just to reiterate, this was my

24  personal review -- personal view, looking at the

25  factors.  I wouldn't necessarily call it a formal

1    analysis nor documented as such.  But we've been sued

2    both directions.  If you're asking my opinion now, it

3    is if we were being sued requires an expenditure of

4    resources as well, but yet, the expenditure of

5    resources to perhaps unilaterally return approximately

6    100,000 requests or employment authorization documents

7    and rescind them to the tune of several hundred

8    thousand is also significant.

9         Q.  Were you involved in the decision to rescind

10    the deferred action for parents of Americans and

11    lawful permanent residents or DAPA in June 2017?

12         A.  You mean Secretary Kelly's memo?

13         Q.  Yes.

14         A.  I don't recall being involved on that.  If I

15    may add, there's a memo from the Secretary to several

16    of us; right?  But DAPA was never operational.  So

17    it's a different analysis or involvement point, from

18    my view.

19         Q.  Do you know whether litigation risk was a

20    factor that was considered in ending DAPA?

21         MR. GARDNER:  Objection.  Calls for the

22    disclosure of information subject to the deliberative

23    process privilege.  Instruct the witness not to

24    answer.

25         THE WITNESS:  I will follow counsel's advice.

```
 1   BY MS. CROWLEY:
 2        Q.  Were you in any meetings in which litigation
 3   risk associated with the rescission of DAPA was
 4   discussed?
 5             MR. GARDNER:  Same objection.  Same
 6   instruction.
 7             THE WITNESS:  And the same response.
 8   BY MS. CROWLEY:
 9        Q.  When did you first learn that litigation risk
10   was a relevant factor in rescinding DACA?
11        A.  Attorney General Paxton's letter laid out
12   litigation risk.
13        Q.  I understand that, in your opinion,
14   litigation risk is a proper consideration in
15   evaluating the rescission of a government program such
16   as DACA; is that correct?
17        A.  Based upon the unique parameters of DACA.
18        Q.  So do you think that litigation risk is a
19   factor that should be considered when evaluating the
20   continuation of all government programs?
21             MR. GARDNER:  Objection.  Calls for
22   speculation.  Hypothetical.  Vague.
23             THE WITNESS:  So could you repeat the
24   question, sorry, to make sure I have it clearly.
25   BY MS. CROWLEY:
```

1    implement or run.

2        Q.  Let me rephrase.

3        A.  Sure.

4        Q.  In determining -- are you part of helping

5    determine the department's policy goals?

6        A.  As part -- as deputy director, among many

7    others, I would say yes with respect to those that

8    touch USCIS.

9        Q.  And in determining the department's policy

10   goals, would it be fair to say that you weigh the

11   costs and benefits of various policy options as a

12   general matter?

13       A.  Whether implemented or not, or not yet

14   implemented, those are some -- I would say that's a

15   consideration.

16       Q.  You talked with Ethan about some of the

17   benefits that DACA recipients received from DACA.  You

18   remember that?

19       A.  Uh-huh.

20       Q.  You also talked about some of the benefits

21   that DACA may have had for USCIS.  Do you remember

22   that?

23       A.  With respect to some of the general goals and

24   policy principles --

25       Q.  Yes.

1     A.   -- that's to what you refer?

2     Q.   Yes.  Were those benefits considered in

3  evaluating whether DACA should be continued?

4          MR. GARDNER:  Objection.  Calls for the

5  disclosure of information such as deliberative process

6  privilege.

7          I instruct the witness not to answer.

8          THE WITNESS:  I'll follow counsel's advice.

9  BY MS. CROWLEY:

10    Q.   Let me break that down a little bit more,

11  then.  To your knowledge, were any of those benefits

12  considered in connection with the decision to rescind

13  DACA?

14         MR. GARDNER:  Objection.  Calls for the

15  disclosure of information subject to deliberative

16  process privilege.

17         I instruct the witness not to answer.

18         THE WITNESS:  I follow my counsel.

19  BY MS. CROWLEY:

20    Q.   Are you aware that DACA recipients are

21  employees of companies in this country?

22    A.   Yes.

23    Q.   To your knowledge, were any of their

24  employers consulted in connection with the decision to

25  rescind DACA?

1          A.   Not to my knowledge.

2          Q.   Are you aware that DACA recipients are

3     employers of other individualss in this country, that

4     they employ people?

5          A.   It's possible.  I mean probably.  I mean I

6     just don't know for sure.

7          Q.   But it stands to reason?

8          A.   Yes.  It's a possibility.

9          Q.   Are you aware of whether any of their

10    employees were consulted in connection with the

11    decision to rescind DACA?

12         A.   I'm not aware that they were.  They may have

13    been.

14         Q.   Are you aware that DACA recipients are

15    students in this country?

16         A.   Yes.

17         Q.   To your knowledge, were any of their schools

18    consulted in connection with the decision to rescind

19    DACA?

20         A.   I'm not aware that they were.  They may have

21    been.  I'm not aware.

22         Q.   Are you aware that DACA recipients are

23    teachers in this country?

24         A.   Yes.

25         Q.   And are you aware -- to your knowledge, were

Case 1:18-cv-00068 Document 225-2 Filed on 07/21/18 in TXSD Page 252 of 270
Case 3:17-cv-05211-WHA Document 212-2 Filed 11/01/17 Page 93 of 110

Page 242

1    any of the employees of those teachers consulted in

2    the connection with the decision to rescind DACA?

3         A.    The employees?

4         Q.    The employers.

5         A.    I'm not aware if they were.

6         Q.    Okay.  I want to shift a little bit and just

7    ask you one last set of questions.  Am I correct in

8    understanding that after March 5, 2018 DHS will no

9    longer adjudicate renewal applications from current

10   DACA recipients?

11        A.    No.  We'll still have it.  We will still have

12   renewals under adjudication.

13        Q.    But you will not be accepting new renewal

14   applications?

15        A.    Not accepting, that's correct, as of

16   October -- after October 5.

17        Q.    Are you aware of any discussions within DHS

18   regarding whether to extend that deadline, the March 5

19   deadline?

20        A.    I'm not aware of any.

21        Q.    To your knowledge, has anyone from the

22   Department of Justice provided input into whether the

23   March 5 deadline should be extended?

24        A.    Not to my knowledge.

25        Q.    To your knowledge, has anyone from the White

1   House provided input into whether the March 5 deadline
2   should be extended?
3       A.  Not to my knowledge.
4       Q.  And to your knowledge, has anyone from other
5   organizations within the executive branch weighed in
6   or provided input into whether the March 5 deadline
7   should be extended?
8       A.  Within the executive branch, not to my
9   knowledge.
10      Q.  In your opinion, does DHS have the authority
11  to extend the March 5 deadline?
12          MR. GARDNER:  Objection.  Calls for a legal
13  conclusion.
14          THE WITNESS:  Right.  I can't advise on that.
15  I'm not in a practicing attorney role.
16  BY MS. CROWLEY:
17      Q.  Do you personally see any benefits of
18  extending the March 5 deadline?
19      A.  My personal opinion, no, I don't.  We have --
20  I would like to explain, if I may.
21      Q.  Uh-huh.
22      A.  As in my testimony a couple of weeks ago and
23  the questions asked by members, I think congressional
24  action and statutory enactment is what will provide a
25  permanent status, or could, for this population.

1           C E R T I F I C A T E

2           I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15            _Nancy J. Martin_

                Nancy J. Martin, RMR, CSR

16

17   Dated:   October 18, 2017

18

19

20

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying shorthand reporter.)

25

# DEF-INTERV.

# EX. 60

Page 1

1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4

THE REGENTS OF THE UNIVERSITY OF    ) Case No.
5    CALIFORNIA and JANET NAPOLITANO,   ) 17-CV-05211-WHA
in her official capacity as         )
6    President of the University of     )
California,                         )
7                                        )
                  Plaintiffs,           )
8                                        )
     v.                                  )
9                                        )
U.S. DEPARTMENT OF HOMELAND         )
10   SECURITY and ELAINE DUKE, in her   )
official capacity as Acting         )
11   Secretary of the Department of     )
Homeland Security,                  )
12                                       )
                  Defendants.           )
13   -----------------------------------)
14
15                      - - -
16              Friday, October 13, 2017
17                      - - -
18
19       Videotaped deposition of JAMES D. NEALON,
20   taken at the offices of Covington & Burling,
21   850 Tenth Street NW, One City Center,
22   Washington, D.C., beginning at 7:32 a.m., before
23   Nancy J. Martin, a Registered Merit Reporter,
24   Certified Shorthand Reporter.
25

1933

1    would it be fair to say you weigh the costs and

2    benefits of policy options?

3        A.   Generally speaking, yes.

4        Q.   And the more the benefits of an option

5    outweigh the costs, the better a policy it is?

6        A.   Oftentimes, yes.

7        Q.   Are there any times when a policy option is

8    worse even though its benefits outweigh its costs more

9    than any other option?

10       A.   Well, there may be.  I don't know.  Political

11   science discussion.

12       Q.   In your career in government, have you ever

13   encountered such a situation?

14       A.   Generally speaking, you try to do the right

15   thing.

16       Q.   I appreciate that.  My question was about

17   whether you'd ever encountered a situation when in

18   weighing different policy options the best option was

19   one where its costs exceeded its benefits more than

20   any other option?

21       A.   Maybe.  I don't recall a specific incident

22   like that.  I'm sure you're going to take me there.

23       Q.   So in considering the rescission of DACA, one

24   policy option was to rescind DACA; is that correct?

25            MR. GARDNER:  Objection.  Calls for

1    disclosure of information subject to deliberative

2    process privilege.

3              Instruct the witness not to answer.

4    BY MR. BERENGAUT:

5         Q.   Prior to the rescission of DACA, DACA was a

6    policy of the DHS.  Is that fair to say?

7         A.   Yes.

8         Q.   Did that policy have policy benefits and

9    costs?

10             MR. GARDNER:  Objection.  Calls for

11   speculation.  Lack of foundation.

12             THE WITNESS:  Repeat the question, please.

13   BY MR. BERENGAUT:

14        Q.   Did DACA as a policy have costs and benefits?

15        A.   Those are matters of opinion.

16        Q.   Let me ask my question again.  Did DACA as a

17   policy have costs and benefits?

18             MR. GARDNER:  Same objections.

19             THE WITNESS:  I'm sure it did.

20   BY MS. CHUANG:

21        Q.   Do you have an understanding of what some of

22   the benefits of DACA as a policy are?

23        A.   So there were clear benefits of DACA to the

24   beneficiaries of DACA.

25        Q.   Right.  You already testified about the

1    specific benefits that were conveyed to the

2    beneficiaries of the program.  I'm asking about DACA

3    as a policy --

4         A.  Right.

5         Q.  -- in connection with this cost and benefit

6    analysis that we were talking about a minute ago.  My

7    question is do you have an understanding of whether

8    DACA has policy benefits?

9              MR. GARDNER:  Objection.  Lack of foundation.

10             THE WITNESS:  Yeah.  I don't have a clear

11   understanding of what those policy benefits might be.

12   I certainly understand the human benefits of DACA to

13   the beneficiaries of the program.

14   BY MR. BERENGAUT:

15        Q.  Well, let me give you an example.  Are you

16   aware that DACA beneficiaries are employed often?

17        A.  Yes.

18        Q.  And through their employment they contribute

19   economic activity to this country?

20        A.  Yes.

21        Q.  Would you say that that economic activity is

22   a benefit of the DACA program?

23        A.  Yes.

24        Q.  Can you think of any other policy benefits of

25   the DACA program?

1          MR. GARDNER:  Objection.  Lack of foundation.

2          THE WITNESS:  No, not at the moment.

3   BY MR. BERENGAUT:

4      Q.  Do you have an understanding of any policy

5   costs of the DACA program?

6      A.  Yes.

7      Q.  What is that understanding?

8      A.  Again, you have a large body of people who

9   are in legal limbo, and that's not a good policy.

10     Q.  Do you have an understanding of any other

11  policy costs of the DACA program?

12     A.  No.  I'd be happy to answer questions, but I

13  don't, off the top of my head, know.

14     Q.  Now, this policy cost that you described of

15  individuals being in legal limbo, have you seen any

16  documents relating to that policy cost?

17     A.  No.

18     Q.  Have you had any communications with anyone

19  else at DHS relating to that policy cost?

20     A.  No.

21     Q.  To your knowledge, was that policy cost

22  considered in connection with the decision to rescind

23  DACA?

24          MR. GARDNER:  Objection.  Calls for

25  disclosure of information subject to deliberative

1    process privilege.

2            I instruct the witness not to answer.

3            MR. BERENGAUT:  Sorry.  I was receiving a

4    note to adjust the microphone on my tie.

5            MR. GARDNER:  Everyone's a critic.

6            MR. BERENGAUT:  Is that better?

7            THE VIDEOGRAPHER:  Yes.  Thank you.

8            MR. BERENGAUT:  Thank you.

9        Q.  Let me ask you about some other policy

10   benefits of DACA.  Are you aware that DACA recipients

11   serve in this country's armed forces?

12       A.  Yes.

13       Q.  Would you say their service is a policy

14   benefit of DACA?

15       A.  We certainly thank them for their service,

16   and anyone who serves in our military deserves our

17   gratitude.

18   BY MR. BERENGAUT:

19       Q.  Can you think of any other -- now that we've

20   had a couple of other examples, any other policy

21   benefits of DACA?

22       A.  Not off the top of my head.

23       Q.  Do you have an understanding of what

24   "litigation risk" is?

25       A.  Some understanding.

1      Q.   What is your understanding?

2      A.   Simply that.  That policy may be at the risk

3   of litigation.

4      Q.   And when you earlier described what you

5   called the "threat to DACA," would that be an example

6   of litigation risk, in your understanding?

7      A.   That's what I was referring to.

8      Q.   Setting aside DACA, are you aware of any

9   other existing policy in your service in government

10   that was rescinded because of litigation risk?

11      A.   Nothing occurs to me.

12      Q.   Are you aware of administration policy goals

13   in the immigration context apart from the rescission

14   of DACA?

15      A.   Yes.

16      Q.   What understanding do you have of those

17   goals?

18      A.   I think the administration's general goals

19   related to administration emphasize the enforcement of

20   our laws.  That's the best way to describe the

21   administration's approach towards immigration.

22      Q.   Are you aware of an administrative --

23   administration policy goal of constructing a wall on

24   the border between the United States and Mexico?

25      A.   I am.

1        Q.   To your knowledge, were these other

2    administration goals in the immigration context

3    considered in connection with the decision to rescind

4    DACA?

5              MR. GARDNER:   Objection.   Calls for

6    disclosure of information subject to deliberative

7    process privilege.

8              Instruct the witness not to answer.

9    BY MR. BERENGAUT:

10       Q.   To your knowledge, was the administration

11   goal of constructing a wall on the border between the

12   United States and Mexico considered in connection with

13   the decision to rescind DACA?

14             MR. GARDNER:   Objection.   Calls for

15   disclosure of information subject to deliberative

16   process privilege.

17             I instruct the witness not to answer.

18   BY MR. BERENGAUT:

19       Q.   If we could go back to the administrative

20   record exhibit, which I believe is Exhibit 1.   It's

21   the document you have right in front of you.   And if

22   we could go back to what --

23             MR. GARDNER:   Exhibit 3?

24             MR. BERENGAUT:   I'm sorry.   Was the

25   administrative record Exhibit 3?   Yeah.   Exhibit 3.

1    BY MR. BERENGAUT:

2        Q.  Have you seen any documents relating to the

3    rescission of DACA that referenced political goals?

4        A.  No.  I don't recall any such document.

5        Q.  Are you aware -- this goes back to what I was

6    asking about the administration's policy objectives in

7    the immigration context.  As part of those policy

8    objectives, the administration has an agenda for

9    legislation with, like, Congress to enact; is that

10   correct?

11       A.  Yes.

12       Q.  To your knowledge, did the administration's

13   legislative agenda before Congress come up in any

14   discussions relating to the rescission of DACA?

15           MR. GARDNER:  Objection.  Calls for

16   disclosure of information subject to deliberative

17   process privilege.

18           Instruct the witness not to answer.

19   BY MR. BERENGAUT:

20       Q.  Have you seen any document relating to the

21   rescission of DACA that discusses the administration's

22   legislative agenda?

23       A.  No.

24       Q.  Earlier in your deposition you talked about

25   the voices within DHS that fed into the

1    decision-making process.  Do you remember that?

2        A.  I do.

3        Q.  Let me ask you about a few other voices.  Are

4    you aware that DACA recipients are employees of

5    companies in this country?

6        A.  I am.

7        Q.  To your knowledge, were any of their

8    employers consulted in connection with the decision to

9    rescind DACA?

10       A.  I'm not aware of that.

11       Q.  Are you aware that DACA recipients are

12   employers of other individuals in this country?

13       A.  Stand to reason.

14       Q.  Are you aware of any -- are you aware of

15   whether any of their employees were consulted in

16   connection with the decision to rescind DACA?

17       A.  I'm not aware of any such consultation.

18       Q.  Are you aware that DACA recipients are

19   students in this country?

20       A.  I am.

21       Q.  To your knowledge, were any of their schools

22   consulted in the decision to rescind DACA?

23       A.  Not to my knowledge.

24       Q.  Are you aware that DACA recipients are

25   teachers in this country?

1     A.   I'm not aware of specific cases, but again,

2   stand to reason.

3     Q.   To your knowledge, were any of their students

4   consulted in connection with the decision to rescind

5   DACA?

6     A.   Not to my knowledge.

7     Q.   Are you aware that DACA recipients are

8   members of faith communities in this country?

9     A.   Again, not specifically, but stands to

10   reason.

11     Q.   To your knowledge, were any of those other

12   faith communities consulted in connection with the

13   decision to rescind DACA?

14     A.   Not that I'm aware of.

15     Q.   Are you aware that DACA recipients are

16   doctors in this country?

17     A.   Again, not specifically, but may well be.

18     Q.   To your knowledge, were any of their patients

19   consulted in connection with their decision to rescind

20   DACA?

21     A.   Not to my knowledge.

22     Q.   You mentioned earlier that you're aware that

23   DACA recipients serve in this country's armed forces?

24     A.   Yes.

25     Q.   To your knowledge, were any of their military

1    commanders consulted in connection with the decision

2    to rescind DACA?

3        A.   Not to my knowledge.

4        Q.   Are you aware that DACA recipients are

5    members much families in this country?

6        A.   That would stand to reason.

7        Q.   To your knowledge, were any of their family

8    members consulted in connection with the decision to

9    rescind DACA?

10       A.   Not to my knowledge.

11       Q.   Do you have an understanding of whether DACA

12   recipients receive mental -- let me strike that.

13            Do you have an understanding of whether any

14   DACA recipients in this country receive mental health

15   counseling in connection with anxiety?

16       A.   I'm not aware of that, no.

17       Q.   What about other mental health conditions?

18       A.   I'm not aware of that.

19       Q.   Do you have any reason to doubt that some

20   DACA recipients in this country receive mental health

21   counseling for anxiety and other mental health

22   conditions?

23       A.   I would have no reason to doubt that.

24       Q.   To your knowledge, were any mental healthcare

25   providers consulted in connection with the decision to

1    rescind DACA?

2         A.   Not to my knowledge.

3         Q.   Do you have an understanding of whether the

4    rescission of DACA will have an effect on the U.S.

5    GDP?

6              MR. GARDNER:   Objection.   Calls for

7    speculation.   Lack of foundation.

8              THE WITNESS:   I don't have a deep

9    understanding of what the impact of a rescission of

10   DACA would be on the U.S. GDP.

11   BY MR. BERENGAUT:

12        Q.   That would be something an economist would

13   probably study; is that right?

14        A.   That would stand to reason.

15        Q.   To your knowledge, were any economists who

16   study the aggregate effect of DACA on the U.S. economy

17   consulted in connection with the rescission of DACA?

18        A.   Not to my knowledge.

19             MR. BERENGAUT:   Thanks.   I have no further

20   questions.   I appreciate your time.

21             THE VIDEOGRAPHER:   We're going off the record

22   at 11:28.

23             (A recess was taken from 11:28 a.m.

24             to 11:34 a.m.)

25             THE VIDEOGRAPHER:   We're now on the record at

1    11:34 a.m.

2

3                        EXAMINATION

4    BY MS. MORRISSON:

5        Q.  Hi.  Good morning.  My name is Haley

6    Morrisson, and I represent the Garcia plaintiffs.  Is

7    it your practice to use a calendar to keep track of

8    meetings and other appointments that you attend in a

9    professional capacity?

10       A.  Yes.

11       Q.  Do you personally maintain that calendar?

12       A.  No.

13       Q.  You said you have an office manager?

14       A.  Correct.

15       Q.  What is your office manager's name?

16       A.  Laquon Cuevas.

17       Q.  And does your office manager maintain your

18   calendar?

19       A.  She does.

20       Q.  Is there anyone else who maintains or has

21   access to your calendar?

22       A.  There's nobody else who maintains it.  There

23   are many people who have access to it.

24       Q.  Do you review your calendar on a daily basis?

25       A.  Absolutely.

1               C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15               _Nancy J. Martin_

              Nancy J. Martin, RMR, CSR

16

17   Dated:  October 14, 2017

18

19

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying shorthand reporter.)

24

25

Veritext Legal Solutions
www.veritext.com
212-279-9424             212-490-3430

1947