**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 4

# Exhibits 61 - 95

# DEF-INTERV.

# EX. 61

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

### DECLARATION OF NANCY ADOSSI

My name is Nancy Adossi.  I am over the age of 18 and fully competent to make this declaration.

1.  I live in Houston, Texas.

2.  I was born in Lomé, Togo and entered the United States when I was 9 years old.

3.  I graduated from George W. Carver High School in the top 10% of my class.

4.  I received a Bachelor's degree in Political Science and International Relations from the University of Houston, where I graduated as the valedictorian and was keynote speaker for my class.

5.  I also earned a Master's degree in Public Administration from the University of Houston, which awarded me the 2013 Master's in Public Administration Alumni Award.

1

6.     I hold a Doctorate of Education in Health Sciences Technology from the University of Houston. I was the youngest graduate of my doctoral program.

7.     I am 28 years old and currently work as a 6th grade teacher in the social studies program at Paul Revere Middle School.

8.     I am a small business owner. I own a consulting firm, Adossi Consulting, LLC. I also work as a research consultant with Lift a Village and the UndocuBlack Network. I have previously worked as a research consultant with the Black Alliance for Just Immigration.

9.     I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA). Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

10.    As a Texas resident, I pay various forms of taxes to the State of Texas, such as sales taxes, property taxes, and hotel occupancy taxes. I also pay federal income taxes. In addition, I pay all required state and federal taxes and fees through my consulting firm.

11.    I attended Texas public schools from my arrival to the United States at age 9 through 12th grade. In college, I received a public grant through the Texas Application for State Financial Aid (TAFSA) that helped me pay for most of my undergraduate tuition. I paid for the rest of my tuition out of pocket. The University of Houston provided me with a $2,000 merit-based alumni scholarship that helped me cover tuition for my Master's degree, and I paid the rest of the tuition and fees out of pocket. I paid for my doctorate degree out of pocket.

2

12. Since I obtained DACA, I have renewed my driver's license twice, in person. Both times, the wait time was very long, but the renewal process itself was relatively quick. It only took about 15 minutes to process the renewal with the clerk. In both instances, I paid the required fee, which I believe was approximately $25.

13. DACA has made me feel more comfortable about interacting with law enforcement. Now that I have deferred action, I am less afraid to call 9-1-1 to report a crime. Without DACA, I feared that if I interacted with law enforcement, I would risk deportation.

14. Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me. If I lose deferred action, I would lose my work authorization.

15. DACA provides me with a sense of security. It has helped alleviate the anxiety, stress, and fear of deportation that I endured as a child and as a young adult because of my immigration status.

16. I have lived in the United States for most of my life and I wish to remain in the United States. The United States is the only place I can call home. If I lost my DACA, I would consider all my options to stay in the United States and I would not want to return to Togo. My family, my friends, my career, and my business are all here. There is nothing for me back in Togo. I have not been there in twenty years. I do not see myself living anywhere other than the United States.

17. I have spoken to many other Texas DACA recipients who have expressed to me that they would not return to their countries of origin if they lost their DACA.

3

Many of the DACA recipients who I have spoken to are also teachers or small business owners, and they would not be willing to leave everything behind. From the conversations I have had with other DACA recipients, as well as my own experiences and observations, it is my understanding that the vast majority of DACA recipients would not return to their country of origin if they lost their DACA.

18.   I joined this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _18th_ day of June, 2018 in _____ Houston, TX _____.

_____
Signature

Dr. Nancy Adossi
Printed Name

4

# DEF-INTERV.

# EX. 62

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

**DECLARATION OF KARLA QUETZALLI PEREZ**

My name is Karla Quetzalli Perez.  I am over the age of 18 and fully competent to make this declaration.

1.      I live in Houston, Texas.

2.      I was born in Mexico and came to the United States with my parents in 1995 when I was two years old.

3.      I am 25 years old.

4.      I graduated from Pasadena Memorial High School in Pasadena, Texas, where I was a member of the National Honor Society and captain of the varsity soccer team.  I attended Texas public schools from pre-kindergarten through twelfth grade.

5.      I graduated magna cum laude from the University of Houston, where I received a Bachelor of Business Administration in Marketing and a minor in Mexican

1

American Studies.  I graduated from the University of Houston Law Center in May 2018 and I am currently studying for the Texas bar exam.

6.      As a law student, I worked with several non-profit organizations to provide legal services to crime victims, DACA recipients and immigrants who have survived gender-based violence.

7.      I am a recipient of the Equal Justice Works Fellowship.  I will begin my fellowship in September 2018 with the Tahirih Justice Center in Houston, Texas. Once licensed to practice law, as a Fellow I will provide direct legal representation to immigrant women and girls who are survivors of gender-based violence in underserved Texas communities.  My fellowship is a two-year fellowship sponsored by Greenberg Traurig, LLP and the Texas Access to Justice Foundation.

8.      I am a board member of United We Dream (UWD), the largest immigrant youth-led network in the United States.  I have served as the statewide coordinator of UWD legislative campaigns advocating for improved living conditions for immigrants in Texas.  In recognition for my community service, I earned the Texas Center for Public Policy Priorities' 2015 Future of Texas Award, and the Dallas Morning News named me a 2015 Texan of the Year Finalist.

9.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016 and 2018.

10.     DACA has significantly improved my quality of life.  DACA has decreased the stigma, anxiety, and fear of deportation that I experienced during my childhood and as a young adult because of my lack of immigration status.

11.     DACA allows me to work and live without fear of deportation and without fear of being separated from my family and my loved ones.  Losing deferred action would impose a great hardship on me.  If I lose deferred action from DACA, I will lose my temporary authorization to live in the United States.  I will also lose my work authorization and my ability to drive legally in Texas.

12.     DACA has also increased my trust in law enforcement.  I feel more comfortable interacting and approaching law enforcement officials to report crime now that I have been granted deferred action.

13.     As a Texas resident, I have paid taxes to the State of Texas in the form of sales and hotel occupancy taxes, for example.  I have never claimed the federal earned income tax credit.  Although Texas does not collect state income taxes, I have paid federal income taxes since I received DACA and work authorization.

14.     I paid for college out of pocket and received some merit-based scholarships, such as the Top Ten Percent Scholarship, the Moya Family Scholarship, and the Princeton Review Summer Bridge scholarship, to cover my college tuition.  Those scholarships were available to everyone who qualified regardless of immigration status and did not require a social security number.  I also received some state financial aid but not enough to cover the total cost of my education.  I paid for law school out of pocket and with the assistance of some merit-based scholarship funding, but I did not receive any state financial assistance.  The

Dean's Scholarship, which I received every year in law school, required applicants to provide a valid social security number.  The only other scholarship I received in law school was through a private foundation, and I was not required to provide proof of immigration status or a social security number.

15.     Since I obtained DACA, I have renewed my driver's license once, in person. Although the wait time was long, the renewal process itself was fairly quick.  It took no more than 5 to 10 minutes to speak to the clerk and take my photograph. I had to pay a $25 fee to renew my license.

16.     The United States is the only place I can call home.  I have lived in the United States for most of my life and I wish to remain in the United States. If I lost my DACA, I would not want to return to Mexico and I would look for every option to remain in the United States.  My family, friends, career, and life are here in Texas. I cannot see myself living anywhere else.

17.     I have spoken to many other Texas DACA recipients who have expressed that they would not return to their country of origin if they lost their DACA.  From these conversations and my own experiences and observations, I believe that the vast majority of DACA recipients would not return to their country of origin if they lost DACA.

18.     I joined this case in order to defend DACA for myself and others in my situation.

4

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___16th___ day of June, 2018 in _Houston, Harris County, Texas_.

_Karla Perez_
_____
Signature

_Karla Quetzalli Perez Ramirez_
_____
Printed Name

# DEF-INTERV.

# EX. 63

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF JOSE MAGAÑA-SALGADO

My name is Jose Magaña-Salgado.  I am over the age of 18 and fully competent to make this declaration.

1.    I live in Washington, D.C.

2.    I was born in Mexico and entered the United States when I was 2 years old.

3.    I graduated from St. Paul's Preparatory Academy in Phoenix, Arizona, where I was valedictorian of my high school class.

4.    I am 31 years old and earned a Bachelor's degree from Arizona State University and a law degree from Baylor School of Law.  During law school, I assisted attorneys and non-profit organizations in providing legal services to crime victims, trafficking survivors, Temporary Protected Status (TPS) recipients, and immigrants seeking asylum and fleeing persecution.

1

5.      I am a small business owner.  I provide consulting services to local, state, and national immigration non-profit organizations.  Previously, I worked as the Managing Policy Attorney at the Immigrant Legal Resource Center.  In that role, I developed education materials for attorneys and community members, advocated in Congress for comprehensive immigration reform, and appeared on national and local media to discuss immigration issues.

6.      I also co-founded the Dream Bar Association, a professional bar association led by and for undocumented immigrants.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016, and 2018.

8.      DACA offers me significant peace of mind.  It has helped alleviate the anxiety and fear of deportation that I endured throughout my childhood and as a young adult because of my immigration status.

9.      DACA has also increased my trust in law enforcement.  I feel more comfortable approaching law enforcement to report crime.  In fact, since I received DACA, I reported two crimes where I was the victim, an aggravated robbery and an assault. DACA made me more comfortable when reporting those crimes and I was not afraid of being deported for doing so.

10.     Since I obtained DACA, I have paid federal income taxes.  Although Texas does not collect state income taxes, during the three years that I lived in Texas while I was at Baylor School of Law, I paid taxes to the State of Texas in the form of sales taxes.

2

11.     I attended public schools in Arizona from kindergarten through 8th grade.  I attended a private high school, for which I received a scholarship to cover my tuition.  To my knowledge, that scholarship was funded by the private high school.  For college, I received merit-based scholarship money from the state of Arizona to cover the first two years of tuition.  Mid-way through my time in college, the law in Arizona changed and undocumented students could no longer receive in-state tuition or state scholarship funding.  I received scholarships from private entities to cover the last two years of tuition.  To my knowledge, none of the scholarships that I received required proof of immigration status or a social security number.

12.     I received institutional merit-based scholarships from Baylor School of Law, including the Dean's Scholarship, to cover my law school tuition.  I did not need to provide proof of immigration status or a social security number to apply to these scholarships.  I did not receive any state financial assistance during law school.

13.     Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.  If I lose DACA, I will lose my ability to drive legally, which is necessary to the work that I do for my business.

14.     I have lived in the United States for most of my life and I wish to remain in the United States.  The United States is the only place I can call home.  If I lost my DACA, I would consider all my options to stay in the United States.  I would not

want to return to Mexico.  My family, my friends, my business, and my life are here.  I do not see myself living anywhere else.

15.     I have spoken to many other DACA recipients who have expressed that they would not return to their country of origin if they lost their DACA.  From these conversations and my own experiences and observations, it is my understanding that, if they lost DACA, the overwhelming majority of DACA recipients would similarly pursue all avenues available to them to stay in the United States.

16.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in Washington, D.C.

_____
Signature

JOSE MAGANA-SALGADO
Printed Name

# DEF-INTERV.

# EX. 64

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF HYO-WON JEON</u>

My name is Hyo-Won Jeon.  I am over the age of 18 and fully competent to make this declaration.

1.  I currently live in Chicago, Illinois. I will be moving to Cambridge, Massachusetts in the fall.

1

2.      I was born in South Korea and came with my parents to the United States when I was 3 years old.

3.      I attended Texas public schools from fourth grade through twelfth grade. Before fourth grade, I lived in California and attended public schools there.   I graduated from high school in Houston, Texas, where I participated in the National Honor Society and graduated as valedictorian.

4.      While in Texas, I paid sales taxes.

5.      I have never been to the emergency room for any reason. Any medical care I received was paid by my parents out of pocket.  I am currently uninsured. I will be part of the Harvard health care plan when I return in the fall.

6.      My parents claim me as a dependent; therefore I do not file my own taxes.  I have never qualified for or claimed the Earned Income Tax Credit.

7.      I am 23 years old and pursuing a Bachelor of Arts in Social Studies from Harvard University.  I have paid for Harvard through financial aid awarded through the University itself.  I have not accepted any financial aid provided by the state of Texas. Harvard has, for many years, provided all its students full, need-based financial aid regardless of immigration status.  Therefore, whether or not I had DACA, I would have qualified for and received private aid from Harvard.

8.      I am currently taking a one-year leave of absence from Harvard to work at the National Korean American Service & Education Consortium as an Immigrant Rights Fellow in Chicago.  The funding for this employment is not tied to any government grants.  I will return to Harvard in the fall.

9.      At Harvard University, I volunteer as Senior Advisor to the Asian American Women's Association.  I am also a Leader at the First Year Urban Program, a mentorship program designed to orient freshmen students at Harvard who are interested in public interest careers.

10.     I received the Harvard Foundation Award for Race Relations my sophomore and junior years as a student at Harvard University.

11.     I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and October 2016.

12.     DACA has significantly changed my life for the better.  While the ability to work has been life-changing, more important has been the ability to live without fear of being deported.

13.     Further, I am able to have a reliable form of identification.  I have had my Texas driver's license since approximately 2012 and have renewed it twice since then. Each time, I was able to walk in and obtain the license with no problems or intervention and within several minutes.

14.     I never applied for Advanced Parole. I have not left the United States since I was 3 years old.

15.     I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.   If DACA were ended, I would do everything in my power to remain in the

3

United States.  If I were forced to leave the United States, I am not sure where I

go. The United States is my home.

16.     I want to participate in this case in order to defend DACA for myself and others in

my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in Chicago, IL _____.

_____
Signature

Hyo-won Jeon
_____
Printed Name

5

# DEF-INTERV.

# EX. 65

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | §   Case No. 1:18-CV-68 |
| | § |
| UNITED STATES OF AMERICA, *et al.*, | § |
| | § |
| Defendants, | § |
| | § |
| ~~~.¹ | § |
| | § |
| KARLA PEREZ, MARIA ROCHA, | § |
| JOSE MAGAÑA-SALGADO, | § |
| NANCI J. PALACIOS GODINEZ, | § |
| ELLY MARISOL ESTRADA, KARINA | § |
| RUIZ DE DIAZ, CARLOS AGUILAR | § |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § |
| RAFAEL, DARWIN VELASQUEZ, | § |
| JIN PARK, OSCAR ALVAREZ, | § |
| NANCY ADOSSI, DENISE ROMERO, | § |
| PRATISHTHA KHANNA, JUNG WOO | § |
| KIM, ANGEL SILVA, MOSES KAMAU | § |
| CHEGE, HYO-WON JEON, ELIZABETH | § |
| DIAZ, MARIA DIAZ, and BLANCA | § |
| GONZALEZ, | § |
| | § |
| Defendant- | § |
| Intervenors. | § |

## DECLARATION OF ART ACEVEDO

My name is Art Acevedo. I am over the age of 18 and fully competent to make this declaration.

1. I am currently the Chief of Police for the City of Houston, Texas. I was sworn in as Chief

   of Police for the City of Houston on November 30, 2016.

2. I have 32 years of law enforcement experience. Prior to my appointment as Houston's

   Chief of Police, I served as the Chief of Police for the City of Austin from July 2007 until

I joined the Houston Police Department ("HPD"). I began my law enforcement career in 1986 as a field patrol officer in East Los Angeles with the California Highway Patrol, a densely populated community and comprised of many immigrants, primarily of Hispanic/Latino origin. I rose through those ranks and was promoted to Chief, California Highway Patrol in 2005.

3.  I have held various leadership positions in and am currently a member of the Major Cities Chiefs Association (MCCA) and the International Association of Chiefs of Police (IACP). I am currently the First Vice President and Chair of the Homeland Security Committee of the MCCA and represent the organization on the Criminal Intelligence Coordinating Council. I am also a member of the IACP Research Advisory Committee and a member for United States Department of Homeland Security Secretary Advisory Council.

4.  I have a Bachelor of Science Degree in Public Administration from the University of La Verne in California.

5.  The views expressed in this declaration are based on my law enforcement training, decades of experience, and direct contact with undocumented residents in Houston, Austin, and in California.

6.  The City of Houston is the fourth most populous city in the nation with a population of about 2.3 million residents. Its population is comprised of citizens, non-citizens, legal residents, visitors and undocumented immigrants.

7.  As Chief of Police, I lead a department of 5,200 sworn law enforcement officers and 1,200 civil support personnel.[1] On average, HPD annually responds to roughly 1.2 million calls for service, makes 400,000 traffic stops and actively investigates 150,000

---

[1] *See* http://www.houstontx.gov/police/chief.

reported crimes. I am proud of the hard work that HPD does to keep the City of Houston safe. HPD officers work tirelessly to investigate crimes, arrest those responsible, and protect all Houstonians, regardless of their immigration status. Moreover, HPD recognizes the greatest force multiplier that enables us to keep everyone within our jurisdiction safe, is the public.

8. HPD works cooperatively with our partners at the Texas Department of Public Safety and federal law enforcement agencies, including Immigration and Customs Enforcement. For example, we collaborate to arrest perpetrators of human trafficking and to disrupt violent street gangs that threaten our communities.

9. To solve crimes, HPD works extremely hard to build and maintain trust, communication, and strong relationships with the communities it is sworn to serve and protect. The City of Houston is safer when everyone, regardless of immigration status, feels comfortable interacting with law enforcement. For that reason, I am a big proponent of "community policing" and "relational policing." I view every interaction with a resident as an opportunity to create a positive relationship between the police officer and the individual community member.

10. HPD officers rely on the information and community connections we have to solve crimes. Our jobs are made much more difficult if we do not have the trust of the community. For example, in circumstances in which only one person witnessed a crime and that person is unwilling to report what happened because of fear of deportation, I have to direct more resources toward solving that crime than would otherwise be necessary. Those are resources that could otherwise be spent investigating other crimes. Most troubling, are crimes that remain unsolved due to the loss of trust and cooperation

from victims and/witnesses in the immigrant communities, which results in the further victimization of the public at large. Thus, community trust is essential to our ability to do our jobs effectively to protect the Houston community.

11. Undocumented immigrants are among the most vulnerable members of the Houston community and are often afraid of reporting crime and providing needed assistance and cooperation. Many undocumented immigrants fear that interaction with law enforcement could lead to an investigation into their immigration status, deportation and separation from their family members, many whom are in this country legally.

12. In my experience, an all-too-familiar scenario that I encounter is one of an abuser threatening his undocumented partner that she will be deported if she reports his abuse to police. Many times, the abused partner believes these threats and does not report the crime to our Department or otherwise seek assistance for fear of deportation and separation from her children.

13. In April 2017, I announced that HPD found that, against the backdrop of increased fears of deportation among immigrants, the number of Latinos reporting violent crimes to HPD fell 13 percent and the number of Latinos reporting rape had fallen 42.8 percent from the previous year. That data was alarming. A person who rapes, robs or violently attacks an undocumented immigrant would likely do the same to a citizen or legal permanent resident.

14. Last year, Houston saw a decrease in domestic violence reports from the Latino community, while at the same time the City saw an increase in non-Hispanic victims reporting rape and an increase in non-Hispanics reporting other violent crimes.[2]

---

[2] See "HPD chief announces decrease in Hispanics reporting rape and violent crimes compared to last year", at https://www.chron.com/news/houston-texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-

15. The problem of undocumented immigrants underreporting crime is not unique to Houston. A 2013 survey of the Counties of Harris, Cook, Los Angeles and Maricopa seeking to assess the impact of police involvement in immigration enforcement among Latinos found that 70 percent of undocumented individuals and 44 percent of all Latinos said that they would "be less likely to contact law enforcement authorities if they were victims of a crime for fear that police would ask them or people they know about immigration status."[3] In that same study, over two thirds of undocumented immigrants and nearly half of all Latinos said that they "would be less likely to voluntarily offer information about, or report, crimes" because of a similar fear.

16. Houston's immigrant population is one of the fastest-growing in the United States and the City's Latino population constitutes approximately 44 percent of the population, so the problem of underreporting crime has serious consequences for the public safety of all Houstonians.

17. Aside from underreporting crime, Houston families that include at least some immigrant family members sought help after Hurricane Harvey at much lower rates than their U.S.-born counterparts. Mayor Sylvester Turner and I publicly urged all Houstonians, regardless of immigration status, to seek the help they needed after Hurricane Harvey. Nonetheless, according to a recent survey, "half of immigrants whose homes were damaged (46 percent) said they were worried that if they tried to get help in recovering from Hurricane Harvey, they would draw attention to their or a family member's immigration status."[4]

---

11053829.php
[3] See Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," at www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.
[4] See "Hurricane Harvey: The Experiences of Immigrants Living in the Texas Gulf Coast," at

18. An injunction of the DACA program would further exacerbate the abovementioned public safety concerns. In my experience, young people who felt protected from deportation came out of the shadows and were more likely to cooperate with law enforcement. I have personal experience with young DACA program recipients and knowledge of the fear the current uncertainty is creating.

19. However, DACA recipients who once again face the prospect of becoming undocumented (should the rescission of DACA stand) fear negative immigration consequences if they come forward to report crime. One 2013 nationwide survey of 2,700 DACA-eligible young adults found that "fifty-nine percent of our respondents say they would report a crime now in a situation when they wouldn't before [DACA]."[5] These findings are consistent with my views of the Houston undocumented population based on my experience as Chief of Police. The effect of DACA on public safety cannot be overstated. DACA makes our communities safer for all people.

20. Enjoining DACA would harm community policing efforts throughout our Nation and, therefore, public safety; it would significantly impair the progress that the law enforcement community has made over the last several decades.

21. Despite our greatest efforts to build bridges of trust to enhance our crime fighting and public safety mission, rescinding DACA will lead to less cooperation from members of the community, force HPD to spend more resources investigating crime, and lead to a degradation of our ability to fight and solve crime, making all communities less safe.

---

http://files.kff.org/attachment/Report-Hurricane-Harvey-The-Experiences-of-Immigrants-Living-in-the-Texas-Gulf-Coast.

[5] *See* "Here's how DACA changed the lives of young immigrants, according to research," at https://www.vox.com/2017/9/2/16244380/daca-benefits-trump-undocumented-immigrants-jobs.

Any measure that harms trust between law enforcement and immigrant groups perpetuates a class of silent victims and witnesses.

22. If DACA recipients in Houston lose their deferred action, they will be less likely to report crime and as witnesses, will be less likely to stand up for ALL victims of crime. The loss of their trust and cooperation will have a negative effect on HPD's ability to fulfill its mission.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __15TH__ day of June, 2018 in Houston, Harris County, Texas.

ART ACEVEDO

# DEF-INTERV.

# EX. 66

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF BRIAN MANLEY

My name is Brian Manley. I am over the age of 18 and fully competent to make this declaration.

1.      I am currently the Chief of Police for the City of Austin, Texas. I was sworn in as Chief of Police for the City of Austin in June 2018.

2.      Previously, I served as the City's Interim Chief of Police from December 2016 to June 2018.

3.  I have been a state-certified peace officer with the Austin Police Department ("APD" or "Department") and served in various capacities at APD for over 27 years. I joined APD in 1991 as a Patrol Officer and was later promoted to Detective, Sergeant, Lieutenant, and Commander. I have served in and led many APD units, including Patrol, Narcotics, Child Abuse, Homicide, Highway Enforcement, Internal Affairs, Special Operations & Homeland Security, and Recruiting and Training. From 2005 to 2012, I was a Commander overseeing multiple units including Internal Affairs, Special Operations, and Recruiting and Training. I then served as Assistant Chief and executive liaison to the Austin City Manager's office and Austin City Council from 2012 to 2015. I then served as Chief of Staff to the Chief of Police until I was appointed as the Interim Chief.

4.  I have also taught a course in criminal justice at St. Edward's University as an adjunct professor and served as an instructor at the APD Leadership Academy.

5.  I have a Bachelor's degree in Finance from the University of Texas at Austin and a Master of Science in Organizational Leadership and Ethics degree from St. Edward's University.

6.  The views expressed in this declaration are based on my police training, my 27 years at APD, and regular interaction with undocumented residents in Austin.

7.  The City of Austin is the eleventh largest city in the nation with a population of approximately 950,000 people.[1] Its' population is comprised of citizens, non-

---

[1] *See* https://www.census.gov/newsroom/press-releases/2018/estimates-cities.html; *see also* "Austin, Texas U.S. Census QuickFacts," at https://www.census.gov/quickfacts/fact/table/austincitytexas/LND110210.

citizens, legal residents, visitors and undocumented immigrants. The Austin area
has a growing number of undocumented people.[2]

8.     As Chief of Police, I manage APD's personnel, budget, and police operations.
       APD is one of the largest law enforcement agencies in Texas, with over 2,600
       employees (including approximately 1,900 sworn law enforcement officers) and an
       annual budget of approximately $422 million.

9.     I admire the dedication of APD officers to ensure Austin is safe and friendly for all.
       It is APD's mission to keep all Austin residents safe, whether they are citizens or
       not, documented or not.

10.    APD works collaboratively with the Texas Department of Public Safety ("DPS")
       and several federal law enforcement agencies, including Immigration and Customs
       Enforcement ("ICE"). For example, DPS, ICE and APD team up as members of
       the Central Texas Human Trafficking Task Force to identify victims and prosecute
       violators of human trafficking laws.

11.    For APD to fulfill its mission, it is imperative that everyone, regardless of
       immigration status, feels safe and comfortable interacting with and reporting crime
       to the police. I have heard from people at community forums that undocumented
       immigrants and their close family members are fearful that interacting with APD
       officers will result in deportation, either for themselves or a loved one. Based on
       conversations with my counterparts in other cities, I know that many law
       enforcement executives in Texas are concerned over the underreporting of crime.

---

[2] See "20 metro areas are home to six-in-ten unauthorized immigrants in the U.S." at,
http://www.pewresearch.org/fact-tank/2017/02/09/us-metro-areas-unauthorized-immigrants/

We know from first-hand experience that the communities we serve are safer when undocumented immigrants and their families cooperate with the police.

12.    As the Chief of Police, and in my previous roles at APD, I work hard to build trust between APD and the people of Austin.   A cooperative police-community relationship is essential for solving crime and making people feel safe.

13.    Consequently, I implement the "community policing" model of law enforcement in which APD officers strive to be more visible in the community and develop more meaningful relationships with the people we serve. APD devotes a significant amount of resources toward that end.  For example, APD officers attend important community meetings and events.  We have also expanded the number of patrol commanders to give them additional time to attend events and build stronger relationships with our community.

14.    Implementation of our community policing philosophy has also led to changes in recruitment and hiring processes.  For example, previously, our hiring videos emphasized action scenes of the APD Swat Team; now, we are intentional about including footage of our officers engaging with community members.

15.    In July of 2016, the Matrix Consulting Group released their report on APD's current community policing practices and recommended improvements to strengthen our relationship with Austin's residents. We have already implemented a significant number of those recommendations.

16.    I believe undocumented immigrants are at risk of being preyed upon by criminals who know that undocumented immigrants are among the least likely in our community to report crime.   Undocumented residents are particularly hesitant to

4

report crime because they believe that doing so, or assisting with an investigation, could mean deportation and separation from their families and support networks. When crimes go unreported, all Austin residents are less safe.

17. In the last several years, APD has devoted considerable time to ensure that Austin's undocumented immigrants feel safe. APD coordinates, participates in, and helps organize safety and outreach events in the Austin immigrant community.

18. APD created a position for a "Refugee and Immigrant Outreach Liaison." That person partners with neighborhood schools, churches and other organizations to provide civic education to recent immigrants and encourage their participation in school and police-related activities. Special emphasis is placed on organizing events that take place in the apartment complexes where large numbers of refugees and immigrants live. By going to the places where families and individuals live, APD is able to introduce these individuals to police officers in a non-threatening environment.

19. I do not profess to be an expert on the DACA program, or immigration law in general. Based on my experience and work with Austin's immigrant community, I believe that an end to the DACA program would make it less likely that DACA recipients would report crime and thus impair APD's ability to effectively investigate crimes in the Austin area. Moreover, if the DACA program ends, Austin could have a larger population of people who are at risk of being preyed on by criminals.

20. DACA applicants come forward to be registered, photographed and fingerprinted and that aids the law enforcement activities of APD. If a DACA recipient is

arrested and fingerprints are taken and run through the DHS system, the federal

government could quickly confirm the person's identity. The availability of that

person's information in the system allows APD and DHS officials to work more

effectively and cooperatively to promote public safety. If the DACA program ends,

I am concerned that APD would lose that advantage.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct.

Executed this __18__ day of June, 2018 in _Austin, Texas_ .

BRIAN MANLEY

PHILIP KEARNEY
NOTARY PUBLIC
ID# 13109650-7
State of Texas
Comm. Exp. 04-20-2021

Philip Kearney

6

# DEF-INTERV.

# EX. 67

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors | § | |

## DECLARATION OF SARAH R. SALDAÑA

My name is Sarah R. Saldaña.  I am over the age of 18 and fully competent to make this declaration.

1.  I am the former Director of U.S. Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security ("DHS" or "Department").  I held that position from December 23, 2014 to January 20, 2017.

1

2.  In my position as ICE Director, I led the largest investigative agency within DHS, overseeing nearly 20,000 employees in 400 offices across the country and 46 foreign countries.   I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.

3.  Before becoming ICE Director, I served as a United States Attorney for the Northern District of Texas for more than three years.  I was previously an Assistant United States Attorney in the same office and a partner in the trial department of a law firm in Dallas, Texas.

4.  I am a graduate of Texas A&I University, currently Texas A&M University, and hold a Bachelor of Science degree.  I also hold a Juris Doctorate from Southern Methodist University.

**DHS and ICE Mission of Immigration Enforcement**

5.  ICE is one of the three DHS components with responsibilities over the administration and enforcement of the nation's immigration laws.  The other two agencies are the U.S. Customs and Border Protection ("CBP") and U.S. Citizenship and Immigration Services ("USCIS").

6.  ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration.  In working to achieve its mission, ICE coordinates closely with CBP, which includes the Offices of Border Patrol, Field Operations, and Air and Marine Operations, and employs the uniformed corps of officers and agents charged with patrolling our nation's ports and borders.   ICE also partners with USCIS

2

immigration adjudicators who decide eligibility for immigration benefits and certain other forms of immigration relief.

7. Within ICE, the Office of Enforcement and Removal Operations (ERO) is responsible for identifying, apprehending, detaining, and removing inadmissible or deportable aliens from the United States, as appropriate.  ERO also removes aliens transferred to ICE by CBP officers and agents, and aliens against whom removal proceedings are initiated by USCIS.

**Limited Resources of DHS and ICE**

8. During my tenure as ICE director, ERO consistently removed hundreds of thousands of aliens annually from the United States.  ICE records reflect that there were 226,119 individuals removed in FY 2017; while I was ICE Director, ICE removed 240,255 individuals in FY 2016 and 235,413 in FY 2015.[1]

9. Based on limited resources, DHS does not have the capacity to investigate, detain, and remove all individuals who violate our immigration laws.  The most current estimate of the unauthorized immigration population residing in the United States is 12.1 million.[2]

10. Congress has chosen to provide limited funding for immigration enforcement, thus requiring DHS to make decisions about how it allocates its limited resources for the investigation, arrest and removal of undocumented immigrants. In light of DHS's limited resources and statutory mandates, ICE prioritized the apprehension and

---

[1] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 12, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf
[2] This estimate was released in July 2017 and is current to January 2014.  *See* DHS Office of Immigration Statistics, Office of Strategy, Policy & Plans, "Estimates of the Unauthorized Immigrant Population Residing in the United States:   January   2014,"   July   2017,   available   at https://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf.

removal of persons who pose a threat to national security, persons apprehended while attempting to cross the border illegally or who recently did so ("recent border crossers"), and persons convicted of serious crimes or who otherwise threaten public safety.   The vast majority of individuals removed by ICE fell into one of these categories.   For example, for FY 2015, ICE removed a total of 235,413 individuals.  Of those removals, 70% were in the border region, and 59% were of individuals with criminal convictions.  Only 2.5% (5,939) of removals were of noncriminals in the interior of the U.S.   For FY 2016, ICE removed a total of 240,255 individuals.  Of those removals, 73% were in the border region, and 58% were of individuals with criminal convictions.  Only 2.1% (5,014) of removals were of noncriminals in the interior of the U.S.  For FY 2017, ICE removed a total of 226,119 individuals.  Of those removals, 64% were in the border region, and 56% were of individuals with criminal convictions.  Only 6.1% (13,744) of removals were of noncriminals in the interior of the U.S.[3]

**ICE Enforcement Challenges**

11. Besides limited resources, ICE faces several challenges in accomplishing its enforcement mission.   One challenge requiring ICE to spend more resources conducting removals is the changing demographics of the immigrant population entering the country.   For example, from FY 2010 to FY 2014, the number of Mexican nationals apprehended by the Border Patrol fell by 43 percent, while the number of apprehensions of nationals from El Salvador, Guatemala, and Honduras increased by 423 percent in FY 2014.   In general, removing Central Americans is

---

[3] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 13, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf

4

more resource-intensive than removing Mexican nationals. While a Mexican national apprehended by CBP may, in many cases, be removed in a matter of hours, often without entering ICE custody, a national of a non-contiguous country apprehended at the border must generally be transferred to ICE and may need to remain in ICE custody for weeks or months until travel documents can be obtained from that country and removal arrangements via aircraft can be arranged.[4]

12. Another important demographic change impacting Department operations was the unprecedented surge of children and families from El Salvador, Guatemala, and Honduras intercepted at the border during FY 2014. Such cases present unique challenges for ICE given the special care needed and the legal obligations imposed by applicable laws and court orders with regard to providing housing for alien children in immigration proceedings,[5] as well as the stringent standards applicable to ICE family residential centers.[6]

13. To respond to these developments, ICE significantly expanded its family-appropriate housing, which must be designed and operated in a manner appropriate for the unique needs of this population and compliant with applicable legal requirements and residential standards, which are far more expensive to satisfy than those applicable to adult detention facilities.[7]

---

[4] Although inadmissible aliens apprehended at the border are often subject to the "expedited removal" process, those who demonstrate a "credible fear" of persecution or torture if returned to their countries are legally entitled to formal removal proceedings before an immigration judge, which can take many months, if not years, to complete. Because nationals of some Central American countries are more likely than Mexican nationals to claim a fear of return, the increased percentage of Central American apprehensions increases DHS's costs in managing and deterring border violations.

[5] *See* William Wilberforce Trafficking Victim Protection Reauthorization Act of 2008, Pub. L. No. 110-457 (Dec. 23, 2008); *Flores* settlement agreement, *Flores v. Reno*, Case No. CV 85-4544 (C.D. Cal. Jan. 17, 1997).

[6] *See* ICE Family Residential Standards, at http://www.ice.gov/detention-standards/family-residential.

[7] https://www.dhs.gov/sites/default/files/publications/CFO/17_0524_U.S._Immigration_and_Customs_Enforcement.pdf.

14. To address the demographic changes in illegal immigration (i.e., increases in Central American families requiring ICE involvement), and to do our part to ensure border integrity, ICE diverted resources from the interior of the country to the border.  This, in turn, resulted in fewer resources available to identify, detain, and remove individuals in the interior of the country.  For instance, over the course of FY 2014, ERO detailed over 800 of its officers and support personnel (over 10 percent of the ERO workforce) to support southwest border operations.  ICE also reallocated increased detention capacity, transportation resources, and other assets to support those operations.

15. Although during the Trump Administration, ICE has increased its arrests of individuals in the interior, removals of individuals apprehended in the interior still constituted only 36% of all removals in FY 2017, thus demonstrating the continued focus on enforcement in the border region.[8]

16. Another factor significantly impacting the ability of ICE to remove individuals from the United States is the backlog of the nation's immigration courts, which are under the jurisdiction of the Department of Justice.  There are currently 714,067 cases pending before the immigration courts, up from 629,051 in FY 2017.[9]   In particular, cases on the non-detained immigration court dockets routinely take years or more to complete.

**Impact of DACA and a Potential Injunction Blocking DACA**

---

[8] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 13, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf
[9]     TRAC     Immigration,     "Immigration     Court     Backlog     Tool,"     available     at http://trac.syr.edu/phptools/immigration/court_backlog/

17. DACA represents an effort by DHS, among others, to better prioritize its limited resources toward removing individuals who pose threats to national security, public safety, or the integrity of the border, as was required by Congress when it directed DHS in its Appropriations Act to prioritize "identification and removal of [immigrants] . . . by the severity of the crime."[10]  Among other things, DACA is intended to: incentivize certain non-priority aliens to present themselves to DHS, submit biographic and biometric information, and undergo background checks; and provide temporary relief from removal, which is expected to assist state and local law enforcement agencies with community-policing efforts.  DACA also complements and supports DHS's priority-based use of its resources.

18. Enjoining DACA would prevent ICE from benefitting from the efficiencies that such policy was intended to create.  For instance, when state and local law enforcement agencies encounter an alien who has received deferred action under DACA, ICE personnel would be able to quickly confirm the alien's identity through a biometric match.  This is because USCIS collects fingerprints and conducts background checks for DACA requestors.  The availability of such information allows ICE to more efficiently work with our law enforcement partners to promote public safety.

19. Similarly, when ICE officers are engaged in at-large enforcement operations, such as to locate criminal and fugitive alien targets, they often encounter non-target aliens who may also be removable from the United States.  If such aliens have received deferred action under DACA and have documentary proof of this on their persons, ICE officers would be able to ascertain more quickly whether enforcement resources

---

[10] DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 214, 2149 (2009).

should be expended to detain and initiate removal proceedings against the individuals. This would also allow ICE to further focus its resources on priority aliens.

20. DACA also assists with the efficient processing of high-priority cases in the immigration courts. While ICE attorneys who represent DHS in removal proceedings before the immigration courts can and do exercise prosecutorial discretion to promote efficient handling of dockets by immigration judges, DACA assists ICE attorneys and immigration judges in identifying non-priority cases. And, when an alien in removal proceedings receives deferred action from DHS under DACA, the agency may choose to drop the case, thereby making additional docket time available for high-priority cases. Once the cases of aliens with deferred action under DACA are taken off the immigration dockets, immigration judges should be able to focus more time and effort on the adjudication of cases involving recent border entrants and national security and public safety threats.

21. Enjoining DACA is likely to limit, in certain circumstances, the ability of law enforcement officials to protect public safety. Cooperation between police and community members is a cornerstone of modern law enforcement. While ICE has long taken steps to ensure that prosecutorial discretion is appropriately used when the agency encounters individuals who are crime victims and witnesses,[11] DACA further enhances the willingness of undocumented crime victims and witnesses to come forward and cooperate with their local law enforcement agencies, thereby bolstering efforts by police to address crimes that affect our communities, including domestic violence, human trafficking, and gang activity.

---

[11] *See, e.g.*, ICE Policy No. 10076.1, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf.

22. In sum, enjoining DACA would jeopardize the efficiencies that such policy can provide to ICE, making it more difficult to efficiently and effectively carry out its mission.  An injunction also undermines the effectiveness of community policing in various jurisdictions, impedes the identification of non-priority aliens, and leaves in place a barrier to more efficient proceedings to removal of threats from our country.

23. The DACA memo established guidelines for the exercise of prosecutorial discretion, specifically the grant of deferred action, with respect to individuals who were brought to the country before the age of 16.  ("DACA" memo")[12]  The DACA memo provided that DHS, through ICE personnel as well as that of USCIS, would exercise prosecutorial discretion through grants of deferred action.  The DACA memo instructed USCIS to "establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the above criteria and are at least 15 years old, for a period of two years, subject to renewal[.]"  DACA memo at 2-3.

24. By authorizing USCIS to establish a process for exercising prosecutorial discretion on a consistent and case by case basis, DHS conserves the resources of individual ICE officers and other ICE personnel who would not have to divert their time from investigating, apprehending and detaining priority individuals in order to verify documents, take biometrics and investigate the background of low-priority individuals.  In this way, DHS was able to continue to exercise prosecutorial discretion and focus its resources on its law enforcement priorities.

---

[12] DHS, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," June 15, 2012, available at https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct.

Executed this _27th_ day of June, 2018 in Dallas, Dallas County, Texas.

SARAH R. SALDAÑA

# DEF-INTERV.

# EX. 68

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF AMANDA BROWNSON

My name is Amanda Brownson. I am over the age of 18 and fully competent to make this declaration.

1. I am currently the Associate Executive Director of Governmental Relations for the Texas Association of School Business Officials. I previously worked as Director of Research

1

and Policy at Raise Your Hand Texas, a non-profit organization whose mission is to advance research-drive innovation in education policy and practice at the campus, district, and state levels.

2. From 2013 to 2016, I served as Director of State Funding at the Texas Education Agency ("TEA").  During my time at TEA, I directed the Division of State Funding, which was responsible for calculating and distributing state aid payments under the Foundation School Program (FSP) and collecting recapture payments under Chapter 41 of the Texas Education Code.

3. Prior to my time at TEA, I served as a consultant at Moak, Casey & Associates, where a significant portion of my time was spent assisting school districts with the state aid calculations under the Foundation School Program.

4. I have a doctorate in Education Policy and Planning from the University of Texas at Austin.  My CV is attached as Exhibit 1.

5. The opinions I provide in this declaration are based on my extensive training and experience in the field of Texas school finance.   I am being compensated for my time in preparing this report at the rate of $150 per hour.  There are no cases in the past four years in which I have testified as an expert in trial or by deposition.

6. As TEA's Director of State Funding, I became familiar with the types of data that TEA collected.  From my experience, TEA does not track the number of Texas public school students who are: undocumented; DACA recipients; or unaccompanied children (UAC).

7. Per the request of counsel for Defendant-Intervenors, I reviewed the declaration of Leo Lopez that the Plaintiffs submitted in this case, and I attended Mr. Lopez's deposition on June 14, 2018, in Austin, Texas.  I offer the following opinions:

8. Mr. Lopez, in paragraph 3 of his declaration, estimates that the average funding entitlement for fiscal year 2019 will be $9,826 per unaccompanied child in attendance for an entire school year, assuming that the student qualifies for bilingual education and compensatory education weighted funding.  To arrive at that figure, Mr. Lopez appears to have made several assumptions.  He presumes that a student is enrolled for the entire school year, attends school every day (*i.e.*, 100 percent average daily attendance), and is eligible for both a bilingual education and a compensatory education weight.  Those assumptions are inappropriate for a number of reasons.

9. First, the average child does not attend school every single day.  Based on my comparison of average daily attendance (ADA) to enrollment over the previous two school years (2015-2016 and 2016-2017), ADA is likely about 93 percent of enrollment, not 100 percent.  By overestimating ADA, Mr. Lopez also overstates the average funding entitlement per student.

10. Because TEA does not track UAC, it is unclear what percentage of those students would be eligible for compensatory education weighted funding, that is, which students in the prior school year participated in the federal free and reduced-priced lunch program.  Mr. Lopez provides no basis in his declaration for assuming that 100 percent of UACs fall into the "compensatory education" category.  In addition, because TEA does not track DACA recipients, it is unclear what percentage of those students would be eligible for a compensatory education weight.

11. At his deposition, Mr. Lopez stated that he believed UACs are a reasonable proxy for DACA. UACs do not seem to have a connection to DACA and it is inappropriate to use the cost of educating UACs as a proxy for the cost of educating DACA recipients.  After

3

reviewing the United States Citizenship and Immigration Services guidelines for DACA, it is my understanding that a child has to have resided continuously in the United States since June 15, 2007 in order to qualify for DACA.  However, Mr. Lopez testified in his deposition that the population of UACs he used to calculate the average funding entitlement per student were released to sponsors in October 2014 or later.  Thus, it seems as though there is little to no overlap between UACs and DACA recipients.

12. Furthermore, bilingual education funding seems to have little to no connection to DACA recipients. Students are not likely to receive bilingual education weighted funding as DACA recipients.  After reviewing the United States Citizenship and Immigration Services guidelines for DACA, I understand that a child would have to be at least 15 years old to request DACA.  From my experience at TEA, I understand that students can qualify for the bilingual weight if they are identified as limited English proficient and are participating in a bilingual education, English as a Second Language (ESL), or other special language program.  Based on my experience, students drawing the bilingual education weight are more likely to be in elementary or middle school. I know of no elementary school student who is 15 years old or older, and the majority of middle school students are under age 15.  While Texas high schools may offer language programs that would generate funding under the bilingual/ESL weight, those programs are generally for recent immigrant students who would have arrived after the June 15, 2007 date for DACA eligibility.  Therefore, it is very unlikely that current DACA recipients receive additional funding under the bilingual education weight.

13. For those reasons, Mr. Lopez's $9,826 estimate is an inflated estimate of the average funding entitlement for fiscal year 2019 for UACs and for DACA recipients.  Further,

4

Mr. Lopez makes the abovementioned assumptions for fiscal years 2016, 2017 and 2018 and, therefore, the cost estimates of \$9,573, \$9,639 and \$9,841 discussed in his paragraph 4 are also inflated.

14. In paragraph 5 of his declaration, Mr. Lopez says the entire cost of educating unaccompanied minors is borne by the State. That conclusion understates the role that local property taxes play in providing for the cost of education in Texas. Under the Foundation School Program, a total entitlement is calculated based on the number of students who attend school, the funding weights those students draw down, and the characteristics of the school district that may impact cost (*e.g.*, the district's cost-of-education index and school size). Once that total entitlement is calculated, a local share is subtracted based on the application of a tax rate to the prior-year property value of the school district in which the student attends school. Over time, as the economy and population changes, property values tend to increase. According to the TEA website, the State of Texas's share of education spending for public schools has dropped from 49 percent in 2008 to 40 percent in 2018.

15. Over the past three school years, it appears that local property values in Texas have, in fact, increased or are projected to increase at a rate fast enough to offset student enrollment increases such that the overall state aid has not increased as student enrollment increased, This demonstrates that in recent years increased local property taxes, rather than increased state aid, have paid for student enrollment growth in Texas public schools. *See Table 1.*

16. Table 1 likely over-estimates the true statewide cost of the Foundation School Program in fiscal years 2018 and 2019, as average daily attendance appears likely to decline once

5

final data reflecting actual attendance are incorporated into the state aid calculations. According to the 2017-2018 TEA Statewide Summary of Finance, payments were made this year based on estimated average daily attendance of 5,060,903 students.  However, the TEA district planning estimate (DPE) currently reflects projected ADA of only 5,008,020 (a drop of more than 52,000 students).  One consequence of that anticipated drop is that the TEA district planning estimate reflects an anticipated "settle-up" in the state's favor of almost $340 million for the 2017-2018 school year, which the state will recuperate by reducing payments to certain districts in the 2018-2019 school year.  TEA has been making payments to school districts based on the legislative payment estimate (LPE) data reflecting higher student counts.  Each September, TEA "settles up" with school districts by making payments to any districts who were under-paid during the prior year and recuperating any over-payments that were made during the prior year by reducing payments in the current year.

17. In paragraph 6 of his declaration, Mr. Lopez says the State plans for an increase of approximately 70,000 students in enrollment growth across Texas each year.  That increase is likely not due to DACA, as DACA eligibility to my understanding requires a person to have lived in the United States since 2007.  Additionally, the figure of 70,000 appears to overstate the actual enrollment growth experienced by the public education system in recent years. *See Table 2.*

18. The estimate of the deficit ($143.4 million) in the Foundation School Program in paragraph 7 does not appear to take into account the anticipated "settle-up" process.  If TEA's estimate of settle-up is accurate, it should be sufficient to more than compensate for the roughly $143.4 million deficit projected in February 2018.  Additionally, since

6

TEA's average daily attendance estimated for 2018 appears to have been high – and the 2019 count was estimated based on an increase from 2018 – it is likely that TEA also overestimated the count of ADA in 2019.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in ___Travis County_____.

_____
AMANDA BROWNSON

**Table 1.** State Aid and Local Revenue under the Foundation School Program, 2015-2016 through 2018-2019

|  | 2015-2016 (final) | 2016-2017 (final) | 2017-2018 (LPE) | 2018-2019 (LPE) |
|---|---|---|---|---|
| ADA | 4,924,906.14 | 4,971,924.26 | 5,060,903.35 | 5,168,918.312 |
| Local Property Taxes | $27,755,285,353 | $29,371,727,289 | $31,402,528,887 | $33,697,402,941 |
| Total FSP / Available School Fund State Aid | $21,526,864,980 | $20,996,934,591 | $21,014,663,863 | $20,828,813,651 |
| Estimated Recapture | ($1,579,109,696) | ($1,721,320,031) | ($2,081,434,387) | ($2,690,714,377) |
|  |  |  |  |  |
| State Aid Net of Recapture | $19,947,755,284 | $19,275,614,560 | $18,933,229,476 | $18,138,099,274 |

*Source: TEA Statewide Summary of Finance Reports.  Recapture figures in Table 1 were taken from the TEA website for the corresponding "run id."*

**Table 2.  Annual Texas Public School Enrollment Growth**



*Source: TEA PEIMS Standard Reports available online:*
https://tea.texas.gov/Reports_and_Data/Student_Data/Standard_Reports/PEIMS_Standard_Reports_Overview/

8

# DEF-INTERV.

# EX. 69

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF BARBARA HINES

I, Barbara Hines, hereby declare:

1.  I am over the age of 18 and make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows:

**Background and Experience**

2.  I have been a licensed attorney in Texas since 1975. I have practiced in the field of immigration law since that time. From 1982 until January, 1999, I handled all type of immigration cases, including visa applications, naturalizations, adjustment of status, requests for deferred action and other immigration benefits, as well as removal defense, in private practice. From October 1991 until June 1994, I also served as the Co-Director of the Lawyers Committee for Civil Rights of Texas, Immigrant and Refugee Rights Program. As Co-Director of the Texas Lawyers Committee, I litigated immigration

cases in Texas, wrote amicus briefs, provided back up technical support for immigration non-profits in the state, and participated in state-wide coalitions. From January, 1999 until December 2014, I founded and directed the immigration clinic at the University of Texas School of Law.  As a faculty member in the immigration clinic, I taught substantive immigration law and lawyering skills as well as supervised students in their casework.   The cases handled by the immigration clinic included removal defense, adjustment of status, applications under the Violence Against Women's Act, U visas, citizenship, DACA, deferred action, and asylum,  As an additional teaching activity, I taught a seminar at the University of Texas School of Law on the immigration consequences of crimes (for two semesters).

3.  From June 2015 to May 2017, I served in part time capacity as a Senior Fellow at the Emerson Collective, a non-profit organization based in Palo Alto, California, founded by Laurene Powell Jobs.  At the Emerson Collective, I was funded to conduct immigration advocacy and legal work in Texas and nationally, particularly relating to detention of families seeking asylum.

4.  Since retiring from my position at the immigration clinic, I have taught as an Adjunct Professor at the University of Texas School of Law.  In the fall of 2016, I taught a seminar entitled Immigration Law and Policy which included readings and a discussion of the DACA program.  In the spring of 2018, I taught a course entitled Advanced Topics in Immigration Law and Policy, where again DACA was included as a class topic.  For several years, I served as an update resource for Kurzban's Immigration Law Sourcebook, the leading immigration treatise.

5. From 1981 until 2016, I was Board Certified in Immigration and Nationality Law by the State Bar of Texas.  I did not renew my Board Certified because I am no longer working full time.

6. I was a Fulbright scholar in Argentina in 1996 and 2004 where I researched Argentine immigration law and a taught a course on U.S. immigration law at the University of Palermo in Buenos Aires, Argentina.

7. I have won numerous awards for my work in the field of immigration law. Later this month, June 2018, I will be awarded the Ohtli Award by the Mexican Government for service to Mexicans and Mexican Americans.  My other awards include: the 2014 University of Texas School of Law Massey Award for Teaching;  the 2010 National Lawyers Guild Carol King Award; the 2007 AILA Elmer Fried Excellence in Teaching Award; the 2002 Texas Law Fellowships Excellence in Public Interest Award; the 1993 AILA Texas Chapter Litigation Award; and the 1992 American Immigration Lawyers Association (AILA) Jack Wasserman Award for Excellence in Litigation.

8.  Attached to this declaration is my resume showing publications in the past 10 years. Within the past four years, I only testified by deposition or at trial in one case: *Grassroots Leadership, Inc. et al. v. Texas Department of Public Safety, et al.*, No. D-1-GN-15-004336 in Travis County District Court.  I am being compensated $250/hr. plus expenses for my work in this case.

9. The opinions I express in this declaration are based on my training, decades of experience practicing and teaching immigration law, and direct contact with undocumented youth and other attorneys who represent undocumented youth.

10. I have worked with undocumented youth, including the DACA population, for many years.  Before the passage of DACA, I represented young undocumented individuals in my private practice and law clinic, and I assisted in finding legal representation across the country for students facing removal proceedings.  In addition, during my tenure at the University of Texas Immigration Clinic, I advised college students about their immigration status and subsequently their eligibility for DACA.

11. When DACA became available, in collaboration with other organizations and volunteer lawyers, the University of Texas immigration clinic and the William Wayne Justice Center for Public Interest designed a system of free legal clinics to assist DACA-eligible individuals to file their applications.  Over the course of two years, we held thirteen pro bono clinics in Austin staffed by students and volunteers and assisted between 50-100 individuals at each clinic to file for deferred action under DACA. Our clinic model was replicated across the state and the country.   The immigration clinic also filed DACA applications for applicants who were already clients of the clinic.  I also spoke at schools and community organizations regarding DACA eligibility.

12. Through my experience working with the DACA population, I have become familiar with and have worked closely with many individuals who have received DACA, including law students whom I have taught.

**DACA ADJUDICATIONS**

13. The United States Citizenship and Immigration Services is the immigration benefits division of the Department of Homeland Security.  After September 11, 2001 (9/11), the U.S. Immigration and Nationality Service split into three agencies under the newly formed Department of Homeland Security:  Citizenship and Immigration Services

4

(USCIS), Immigration and Customs Enforcement (ICE) and Customs and Border Enforcement (CBP).[1]  USCIS is not the law enforcement arm of DHS and in fact, the separation of enforcement and immigration benefits was specifically contemplated when DHS was created. "The Services function –also called adjudications or benefits-involves the approval or denial of applications filed by would be migrants…".[2] The term "immigration benefits" means "any application or petition to confer, certify, change, adjust, or extend any status granted under the Immigration and Nationality Act."  8 U.S.C.A. § 1572.  In addition to the statutory definition, the term also refers to others actions of USCIS decisions, for example: naturalization, employment authorization, deferred action, renewal and replacement of lost documents.

14. The majority of applications for immigration benefits are adjudicated at a remote USCIS Service Center without an in-person interview.  Instead they are decided based on the information contained in the application, supporting documents, and a biometrics background check.  In fact, 44 different immigration benefits are adjudicated in this manner.[3] These immigration benefits range from non-immigrant visa petitions to applications for lawful permanent residence status.

15. Over the course of my career, the former INS and now USCIS has shifted most of its adjudication functions to the remote Service Centers.  The adjudication of DACA applications thus follows normal USCIS procedures for most immigration benefits.

16. Like other applicants, DACA applicants are required to submit documentation establishing their eligibility and respond to any requests for additional evidence.  For

---

[1] See Homeland Security Act of 2002, available at https://www.dhs.gov/homeland-security-act-2002.
[2] Aleinikoff, Thomas Alexander. Immigration and Citizenship: Process and Policy. 7th ed., West, 2012. p. 240
[3] "Service Center Forms Processing." United States Citizenship and Immigration Services, United States Department of Homeland Security, <www.uscis.gov/forms/service-center-forms-processing>

DACA that is proof of age, length of residency in the U.S, school records, relevant criminal records, and a biometrics background check of law enforcement and national security databases.  Furthermore, like many other applications adjudicated without an interview, if the USCIS officer has questions about the application, the agency will issue a Request for Further Evidence or require an in-person interview of a DACA applicant.[4]

17. From my experience supervising numerous DACA clinics, and from my work on the individual cases at the immigration clinic, I learned that applicants who would not qualify for DACA do not apply, either because they could not meet the DACA requirements (including age, education or length of presence in the U.S.), or because they had a disqualifying personal history. As an attorney, when I learned that a potential applicant would not meet the eligibility criteria for DACA, I counselled that individual not to apply.  I also saw some individuals who were not sure that they met the high bar of the DACA criteria decline to file an application out of fear that they would be placed in removal, or out of fear that they would spend $465.00, a sizable sum of money for the undocumented population we served, only to face likely rejection.

18. When DACA was announced, non-profit organizations, immigration clinics, immigrant advocacy organizations and private attorneys mobilized to provide free or low cost legal advice to DACA eligible individuals, using workshop and clinic models.  Others, such as United We Dream, developed an on-line screening tool.  These efforts screened out individuals whose applications were likely to be denied by USCIS if they had applied.

---

[4] "Frequently Asked Questions." United States Citizenship and Immigration Services, United States Department of Homeland Security, <www.uscis.gov/archive/frequently-asked-questions>

19. DHS statistics show that from January 2017 to the present, the rate of DACA initial application denials is 19.81%.[5]

20. Based on my experience as an immigration lawyer, and what I know from conversations with other immigration lawyers, the DACA denial rate is consistent with other discretionary applications such as adjustment of status. It is my opinion that the approval rate of DACA applications is not due to "rubber stamping" but due to the high caliber of the DACA applications submitted to USCIS.

**ADVANCED PAROLE AND ADJUSTMENT OF STATUS TO LAWFUL PERMANENT RESIDENCE**

21. Parole authority, including advanced parole, is provided for under INA §212(d)(5) and implementing regulations. Parole may be granted, for humanitarian reasons or in the public interest, to allow a person to enter the U.S or to be released from detention. 8 CFR §212.5. Cubans may be granted parole in place, making them eligible for the Cuban Adjustment Act, even if they entered without inspection.[6]

22. Advance parole allows a person who is present in the U.S. to travel abroad and upon return to the U.S. to present a parole document for re-entry. 8 C.F.R. § 212.5(f). Advance parole is available to a wide range of persons, other than DACA holders,

---

[5] "Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (September 30) " United States Citizenship and Immigration Services, United States Department of Homeland Security, September 30, 2017, available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20 Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr4.pdf and "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2018." United States Citizenship and Immigration Services, United States Department of Homeland Security, 31 Mar. 2018, available at www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms% 20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf
[6] Kurzban, Ira J. Kurzban's Immigration Law Sourcebook: A Comprehensive Outline and Reference Tool. 15th ed., American Immigration Lawyers Association, 2016. p. 888-890

7

including those with a pending application for adjustment of status, Temporary Protected Status, T and U non-immigrant visas, IMMACT 90 and LIFE Act Family Unity beneficiaries, and Temporary Resident Applicants under INA §245A.[7]

23. The presentation of an advance parole document upon arrival back into the U.S. does not guarantee readmission. The inspecting officer at a port of entry may still deny entry based on inadmissibility grounds.[8] An individual's re-entry into the U.S. with advance parole is a lawful entry under immigration law. For example, a person with Temporary Protected Status (TPS) can apply for advance parole to visit a sick relative in her home country. If the TPS-holder is permitted to re-enter the U.S., she had made a lawful entry. There are approximately 437,000 TPS holders in the United States.[9]

24. Advance parole has been recognized as an accepted practice by the Board of Immigration Appeals.[10] The decision to grant advance parole is made on a case by case basis.[11]

25. Contrary to the claims in the Palinkas affidavit, DHS reports that in 2015 it granted a total of 300,803 advance parole applications; 12,847 of those advance parole grants went to DACA recipients (4.27%). In 2014, DHS granted advance parole to 5,687 DACA recipients, while granting a total of 253,119 advance parole applications (2.25%). In

---

[7] "Instructions for Application for Travel Document." United States Citizenship and Immigration Services, United States Department of Homeland Security, 23 Dec. 2016, <www.uscis.gov/sites/default/files/files/form/i-131instr.pdf>
[8] Id.
[9] Redacted, Name. "Temporary Protected Status: Overview and Current Issues." Congressional Research Service, Congressional Research Service, 15 May 2018, <www.everycrsreport.com/files/20180515_RS20844_182e73595c174cfea704cbb57ad5e17f22abed40.pdf>
[10] *Matter of G-A-C-,* 22 I&N Dec. 83 (BIA 1998).; Matter of Arrabally and Yarabelly 25 I&N Dec.771 (BIA 2012).
[11] "USCIS Advance Parole Documents ." United States Citizenship and Immigration Services, United States Department of Homeland Security, 6 Jan. 2017, <www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Advance%20Parole%20Documents.pdf>

2013, DHS granted advance parole to 1,409 DACA recipients, while granting a total of 263,420 advance parole applications (.53%).[12]

26. The total number of DACA advance parole documents issued from 2012 to 2015, 19,943, represents only 2.9% of the 698,758 individuals granted DACA from 2012 to 2015.  In addition, this number is, in all likelihood actually lower because a single DACA recipient could have been granted advance parole more than one time. DHS data aggregates the number of advance parole documents issued, not the number of individuals granted advanced parole.

**Adjustment of Status**

27. Adjustment of status to lawful permanent residence is provided for under INA §245. Lawful permanent residence is not citizenship. Instead, a lawful permanent resident is eligible to apply for naturalization five years after obtaining status or after three years, if married to a U.S. citizen.

28. The requirements for adjustment of status, among others, include lawful admission or parole, maintenance of lawful status, an approved visa petition under the family or employment based categories and a current visa number.[13] INA § 245. Adjustment of status for immediate relatives, (spouse of a citizen, child under age 21 of a citizen parent, parent of  a citizen child over the age of 21) while requiring lawful admission or parole, does not require the maintenance of lawful status.  In addition, there is no limitation on the number of immediate relatives who may obtain status each year, and thus, a visa

---

[12] *Id.* p. 6
[13] The visa quota system limits the number of immigrant visas (other than immediate relatives) issued each year world-wide in each category as well as per-country limitations. INA §§201-203.

number is always currently available.  Immediate relatives represent the largest number of immigrants, almost one-half, admitted as lawful permanent residents each year.[14]

29.  In addition to adjustment of status under INA §245, INA §245(i) provides for adjustment of status without lawful admission or parole and without maintenance of lawful status. This section of the immigration laws requires that a visa petition or labor certification application[15] was filed before April 30, 2001 and that upon adjustment of status, the applicant pay an additional $1000 penalty as part of the filing fee.

30. Although §245(i) has been repealed, the statute provides a "grandfathering" mechanism. The principal beneficiary of the visa petition or labor certification application, his or her spouse, and children (who were under the age of 21 at the time of the filing of the petition or application) are "grandfathered." 8 CFR §245.10(a) (1)(i). They are able to adjust their status based on the original visa petition or labor certification application or any other future approved petition.

31. "Grandfathering" is person-specific, rather than petition-specific. This means that an applicant may use a different petition and different visa category than the one filed before April 30, 2001 to adjust status.  8 CFR §245.10.  Thus, some DACA holders are "grandfathered" under INA §245(i) and may use this mechanism to adjust status without advance parole or lawful admission.[16]

32. Furthermore, the number of DACA recipients who adjusted status after obtaining advance parole is very small.  According to DHS statistics, between 2013 and 2015,

---

[14] "Table 6. Persons Obtaining Lawful Permanent Resident Status By Type And Major Class Of Admission: Fiscal Years 2014 To 2016." *United States Department of Homeland Security*, United States Department of Homeland Security, 18 Dec. 2017, <www.dhs.gov/immigration-statistics/yearbook/2016/table6>

[15] The labor certification application filed with the Department of Labor is the first step for certain employment based categories.  20 CFR § 656 *et. seq.*

[16] Matter of Ilic, 25 I&N Dec. 717, 719 (BIA 2012) citing Memo, Yates, Assoc. Dir. Operations, USCIS, HQOPRD, 70/23.1 (March 2005).

4,833 DACA recipients adjusted their status to lawful permanent residence after obtaining advance parole.[17] A much larger group of non-DACA recipients, 11,999 individuals, adjusted status after receiving advance parole during the same periods of time.[18]

33. The overwhelming majority of DACA recipients who adjusted their status to lawful permanent residence did so without advance parole.  This becomes evident by comparing the 4,833 DACA recipients who adjusted their status to lawful permanent residence after obtaining advance parole to the 34,681 DACA recipients who adjusted their status without advance parole.[19]  This much larger group of DACA recipients were *already* eligible to adjust because they entered with a non-immigrant visa. because they were "grandfathered" or because they qualified under another law that does not require a lawful admission.[20] Thus, for them, DACA served as a temporary bridge as they transitioned from undocumented to an immigration status.

34. Although Mexicans make up the largest percentage of DACA recipients, those from countries other than Mexico and Central America generally arrived in the U.S. with non-immigrant visas and under the visa-waiver program.  Thus, this DACA population would be eligible for adjustment of status, notwithstanding advance parole.

35. DACA recipients' independent eligibility for adjustment of status, without the need for advance parole, is consistent with data regarding visa overstays.   Mexican citizens

---

[17] "USCIS Advance Parole Documents ." United States Citizenship and Immigration Services, United States Department of Homeland Security, 6 Jan. 2017, p. 8 <www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Advance%20Parole%20Documents.pdf>

[18] *Id.*  See also https://www.washingtonpost.com/news/fact-checker/wp/2017/09/07/did-obama-allow-a-backdoor-to-citizenship-through-daca/?utm_term=.db47214653fb

[19] Plaintiffs assert that 39,514 DACA recipients have been approved for lawful permanent resident status.  See Dkt. 5 at 3 and Dkt. 6 at App. 12.

[20] *Id.* p. 5

comprise the largest number of DACA holders.   Of the approximately 800,000 individuals who have had or currently have DACA, 548,000 come from Mexico.[21]

36. At the same time, after Canadians, Mexicans constitute the largest number of visa overstays in the country.[22]

37. In addition to adjustment of status under INA 245 and 245(i), DACA recipients have other means of adjustment of status that do not require legal admission or parole. Applicants under the Violence Against Women Act may adjust status, regardless of their means of entry into the country. INA §§ 204(a)(1)(A)(iii)-(vii) and (B)(ii)-(iii); 8 CFR §204.2(c)(4).   Likewise, victims of crime or trafficking may apply for U and T visas (*see* INA §§101(a)15 (U) and (T)) and subsequently adjust their status to lawful permanent residence, regardless of their manner of entry. INA §§245(l) and (m).   Others may qualify for Special Juvenile Immigrant Status because of abuse or abandonment by a parent, leading to lawful permanent residence without having to prove a lawful entry or parole. INA §101(a)(27)(j). Central Americans may qualify Special Rule Cancellation under the Nicaraguan and Cuban Adjustment Act. 8 CFR §1240.61(a)(4). A person granted asylum or whose parent was granted asylum is eligible to adjust status to lawful permanent residence after one year in asylee status.  Asylee adjustment does not require a lawful admission.  INA §209.

38. For example, a person could receive DACA, subsequently be granted asylum and adjust status one year later. I counselled a person who received DACA and did exactly this.

---

[21] López, Gustavo, and Jens Manuel Krogstad. "Key Facts about Unauthorized Immigrants Enrolled in DACA." Pew Research Center, Pew Research Center, 25 Sept. 2017, <www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/>
[22] "Entry/Exit Overstay Report Fiscal Year 2015." United States Department of Homeland Security, United States Department of Homeland Security, 19 Jan. 2016, p. 22 <www.dhs.gov/sites/default/files/publications/FY%2015%20DHS%20Entry%20and%20Exit%20Overstay%20Report.pdf>

12

When her parents received asylum, she adjusted her status as a derivative of their asylum grant.

39. During the DACA clinics held by the University of Texas Law School, we regularly screened for and counselled DACA applicants who qualified for other means of adjustment of status or permanent residence and referred them to non-profit agencies and private lawyers to pursue these avenue, in addition to pursuing DACA. We took several cases from the DACA clinics for full representation at the immigration clinic because they were eligible for other forms of status under the immigration laws.

40. For many of the DACA youth who attended workshops across the country, it was the first time they had spoken to any attorney and many were unaware of other legal options available to them.

41. None of these avenues of obtaining lawful permanent residence status under the Immigration and Nationality Act involve "jumping ahead of any line" as erroneously asserted by Mr. Palinkas.  Instead they represent lawful, historical and well-established means of obtaining permanent residence in the U.S. that are available to all non-citizens, including DACA recipients.

**UNLAWFUL PRESENCE AND DACA**

42. Unlawful presence has been defined by both statute and policy memos.  Periods of time in deferred action (and not any time before or after such periods) have never been considered unlawful presence for purposes of INA §212(a)(9).  The tolling of unlawful presence is not unique to DACA holders who receive deferred action. On the contrary, since the passage of the 1996 immigration law creating the concept of unlawful presence,

the period of time in deferred action has never been counted for the accrual unlawful presence.[23]

## LEAVING THE U.S. IF DACA IS CANCELLED

43. Based on my experience working with the DACA population, I do not believe that the rescission of the DACA initiative will cause recipients to leave the United States.  I worked with this population for many years before the DACA program.  Almost none of them considered or made the decision to leave the United States.  Instead, they advocated or hoped for federal legislation that would provide them with permanent status in the United States. I have only worked with one DACA eligible student who left the U.S. with his parents before the DACA program; this was because his family was granted residency in Canada.

44. Many DACA recipients come from mixed status families whom they would not abandon by leaving the US.  Other DACA recipients have other means of legalizing their status through other immigration provisions of the law, as previously explained herein.  Some are currently on the waiting lists for immigrant visas under the world-wide quota system.  Others plan to marry.  These applicants would not leave the U.S. either.  It is my opinion that without DACA, they will remain in the U.S. and be forced back into the uncertainty of unauthorized status.

---

[23] See, Adjudicator's Field Manual, (AFM) Chapter 40. 9(b)(3)(J), https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html#0-0-0-617; Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act, Revision to and Re-designation of Adjudicator's Field Manual (AFM) Chapter 30.l(d) as Chapter 40.9 (AFM Update AD 08-03),  May 6, 2009,  http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence;  Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act). June 17, 1997,  http://www.aila.org/infonet/ins-grounds-inadmissibility-unlawful-presence and 40.9 Section 212(a)(9) of the Act - Aliens Unlawfully Present after Previous Immigration Violations." United States Citizenship and Immigration Services, United States Department of Homeland Security, www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html

## UNACCOMPANIED MINORS AND DACA

45. An "unaccompanied child" (UAC) is a unique identifier under immigration law and has nothing to do with DACA.  A UAC is a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g) (2012).

46. Some UACs are further protected under the William Wilberforce Trafficking Victims Protection Act of 2005 and the Reauthorization Act of 2008 (TVPRA). Under the TVPRA,  "special immigrant juvenile status" is available to a child who has been declared dependent by a juvenile court in the U.S. or who has been placed by such court in custody of a state agency or other individual or agency; whose reunification with one or both of his or her parents is not viable due to abuse, neglect, abandonment or a similar basis under state law and for whom it has been determined that it would not be in his or her best interest to return to his or her country of nationality or country of last residence or that of his or her parents.  INA §§101(a)(27)(J)(i) and (ii).

47. UACs are typically identified shortly after crossing the border into the United States. UACs arriving during what has been described as a "surge" from Central America in 2012 and the years thereafter cannot qualify for DACA because they did not arrive in the U.S. before June 15, 2007 and remained in the U.S. since 2007. Thus, it is my opinion that the number of UACs in Texas is unrelated to the number of DACA recipients in Texas.  Furthermore, the number of UACs in Texas has no relationship to the costs, benefits, or impact of the DACA program on Texas.

15

48. Scholarly research demonstrates that the announcement of the DACA program did not lead to an increase in the number of UACs arriving at the southern border.  First, the numbers of UACs from Central America had been steadily rising well before DACA began.[24]

49. David Bier, a fellow at the CATO Institute, concluded that "the overwhelming weight of evidence reveals that DACA was not a factor in the recent influx of children."[25] Data shows that "the massive increase in unaccompanied alien children (UACs) began before DACA was even announced in June 2012. Without knowledge of the program, the children who came to the border in early 2012 could not have been motivated by DACA…. Fewer UACs entered illegally in the 3 months after DACA than the 3 months before it."[26] "In fact, fewer children entered the United States illegally in 2014 than in 2004, indicating that illegal child migration is not a recent phenomenon.[27]

50. Instead, the violent conditions in Central American, from where the majority of UACs come, represent the primary reason for the larger numbers, and secondarily the provisions of the TVPRA.[28] "Research based on qualitative survey evidence has generally concluded that violence is a leading cause of recent increases in emigration from the Northern Triangle, including unaccompanied child migration."[29]

---

[24] Bier, David. "*Examining* the UAC-DACA Link." Niskanen Center, Niskanen Center, 9 Feb. 2015, <niskanencenter.org/wp-content/uploads/2015/02/Examining-the-UAC-DACA-Link2.pdf>
[25] *Id.* p. 9
[26] *Id.* p. 1
[27] *Id.*
[28] Clemens, Michael A. "Violence, Development and Migration: Evidence from Central American Child Migrant Apprehensions." IZA Institute of Labor Economics, Deutsche Post Foundation, July 2017,< ftp.iza.org/dp10928.pdf>
[29] Clemens, Michael A. "Violence, Development and Migration: Evidence from Central American Child Migrant Apprehensions." IZA Institute of Labor Economics, Deutsche Post Foundation, July 2017, p. 5 < ftp.iza.org/dp10928.pdf>

51. "Violence is among of the main drivers causing the increase. Whereas Central American countries that are experiencing high levels of violence have seen thousands of children flee, others with lower levels of violence are not facing the same outflow."[30] "The TVPRA, along with the violence in the originating countries and economic conditions emerge as the some of the key determinants. The claim that DACA is responsible for the increase in the flow of unaccompanied alien children is not supported by the data".[31]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in Austin, TX

_____
Barbara Hines

[30] Wong, Tom K. "Statistical Analysis Shows That Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border." Center for American Progress, Center for American Progress, 18 Nov. 2015, <www.americanprogress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/ >
[31] Amuedo-Dorantes, Catalina, and Thitima Puttitanun. DACA and the Surge in Unaccompanied Alien Children. Princeton University, <paa2015.princeton.edu/papers/151149.>; Puttitanun, Thitima. "DACA and the Surge in Unaccompanied Minors at the US-Mexico Border." Freshwater Biology, Wiley/Blackwell (10.1111), 6 Apr. 2016, p. 19 <onlinelibrary.wiley.com/doi/pdf/10.1111/imig.12250.>

# DEF-INTERV.

# EX. 70

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## <u>DECLARATION OF ROBERTO G. GONZALES, PH.D.</u>

I, Roberto G. Gonzales, declare:

1.      I am a Professor of Education with tenure at Harvard University. I teach in the Harvard Graduate School of Education, which was ranked by the U.S. News & World Report as the number one school of education nationally. I write this declaration in support of Defendant Intervenors in Texas v. U.S., 1:18-CV-68 (SDTX), a challenge to the Deferred Action for Childhood Arrivals program, commonly known as DACA.

2.      This declaration is based on my knowledge, education, training and my extensive research on immigrant incorporation, as well as facts that I have personally observed or been made aware of. I have written two peer-reviewed books and have authored several peer-reviewed journal articles, book chapters, and reports on this subject. I have studied undocumented immigrant youth and young adults for more than fifteen years. In fact, my research, including a twelve-year longitudinal study in Los Angeles and a six-year national study on the effects of

DACA, includes the most comprehensive studies on this population.  I received a Ph.D. in sociology in 2008. I have held tenure track academic appointments at the University of Washington and the University of Chicago. I have attached a true and complete copy of my curriculum vitae to this Declaration.  The compensation I am paid for testimony in this case is $200 per hour.  In the past four years, I have not testified as an expert in trial or by deposition.

3. When DACA was created in 2012, I launched a national research project to study the program's effects on its recipients.  In 2013, sixteen months after the program's implementation, my team at Harvard surveyed 2,684 DACA eligible young adults; of those, 2,381 had obtained DACA by the time of the survey. We recruited respondents through a range of local and national organizations, consular offices, college and university campuses, GED programs, and community-based organizations. Because we were interested in understanding how a range of the DACA-eligible population was accessing this new status, we purposely drew our sample so as to include roughly one-third respondents with a high school diploma or less, one-third with some college experience, and one-third with a college degree (Associate's degree or higher). It is difficult to obtain survey data from undocumented populations because they comprise a fairly small proportion of the U.S. population, and because of their legal vulnerability and their low-income background (Bloch, 2006). Surveying them through random dialing methods, respondent driven sampling, or other types of probability sampling can be quite costly, and sometimes cost-prohibitive, especially on a national scale. We therefore relied on a sample drawn through a web survey and a multistage recruitment process—including "gateway" organizations (immigrant service agencies, law offices, churches, schools, universities, and local and national undocumented young adult organizations), snowball sampling, and targeted efforts to find harder-to-reach individuals to learn about the short-term benefits of DACA on the lives of some

recipients.

Following up on our survey, in 2015 and 2016, we carried out face-to-face interviews with 481 DACA recipients in Arizona, California, Georgia, New York, Illinois, and South Carolina. All respondents arrived to the United States before the age of 15 and had at least one undocumented parent. Most arrived from Mexico (78%), whereas others arrived from countries in Central and South America, Asia, Africa, the Caribbean, and Europe, and nearly two-thirds are women. We drew our sample based on the following characteristics: 1) We selected only respondents who met the DACA eligibility criteria; and 2) We drew our sample to reflect a diverse cross-section of educational experiences.

 Interviews with DACA beneficiaries covered a broad range of topics, including experiences growing up in the United States, K-12 education and beyond, work history, health and well-being, and the impact of DACA. In particular, DACA's impact on participants' lives constituted the major focus of our analyses. Interviews were coded by our research team at Harvard University.  Through in-person meetings, the research assistants generated a code book reflecting the topics covered in the interviews, such as "applying to DACA" and "academic support." From this initial coding, we examined the data coded under "Effects of DACA" for all of the interviews. We then conducted thematic analyses, first to organize our data and then to identify general patterns in our participants' experiences with DACA. This generated a new list of "DACA effects." Taken together, our analyses helped us identify central themes in how DACA beneficiaries reflected on the impact of their new status on their lives.

## Life Before DACA

4.     My research into undocumented immigrants long predates DACA—extending back 15 years.  From 2002 to 2015, I followed 150 undocumented young adults in Los Angeles, examining the ways they responded to adolescent and adult transitions and an accompanying shrinking of rights.[1]  Comparing the experiences of a group of college-goers with a group of

---

[1]  I highlight their stories in my book, Lives in Limbo: Undocumented and Coming of Age in America (2016). Lives

young people who discontinued their schooling at or before high school graduation, I found that over time even those who had attained advanced degrees shared similar work and life outcomes with their less-educated peers.  That is, once they finished their academic programs, their options for employment were similar to those of their  lesser achieving counterparts who had not finished high school—college graduates had little choice but  to enter into the informal, low-wage labor market.

5.      My research into the adolescent and adult transitions of undocumented immigrant young people shows how they undergo unique developmental trajectories during adolescence that compare negatively to their American born and citizen peers.[2]  I conceptualize this process as a *transition to illegality*.

6.      Undocumented young adults cannot legally work, vote, receive financial aid, or drive in most states, and deportation remains a constant threat.  Unauthorized residency status thus has little direct impact on most aspects of childhood but is a defining feature of late adolescence and adulthood.  As such, the life course trajectories of undocumented immigrant young people look markedly different than those of their American-born and citizen  peers.

7.      Due to their constitutional access to K-12 education, undocumented children grow up to a large extent protected from the limits of their immigration status, as they attend public schools and develop their identities alongside U.S.-born and citizen peers.  Childhood thus constitutes a period of integration for undocumented children, as their school experiences allow

---

in Limbo has won six major awards, including the Society for the Study of Social Problems C. Wright Mills Award, the Law and Society Association Herbert Jacob Book Award, the American Education Research Association Outstanding Book Award, and the Society for Social Work and Research Book Award.

[2] Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens through the Twenties*, 55 AMERICAN PSYCHOLOGIST 469 (2000).

them to develop feelings of belonging to the United States as well as expectations and life aspirations rooted in American culture.

8.      It is not until adolescence that undocumented youth begin to directly confront the social implications of their undocumented status, at which point they enter a critical developmental period of discovery.  Although some undocumented youth are cognizant of their immigration status before their teenage years, being undocumented only becomes salient when matched with experiences of exclusion.  At the time when they begin to require state identifications for driving, working, and travelling, undocumented youth come to realize how lacking legal status will thwart them from developing their desired adult lives.  Characterized by confusion, frustration, and vulnerability, this critical developmental period comprises a major "turning point" in the lives of undocumented youth, producing a jolting shift in their self-perceptions and pressing them to make their transitions into adulthood within same social confines as their undocumented  parents.

9.      For many undocumented youth, knowledge about their immigration status depresses their motivations and renders pursuing educational trajectories both financially unrealistic and meaningless.[3]  Unable to access federal financial aid makes it impossible for most undocumented youth to finance their higher education.

10.      Further, just as they experience a shrinking of access, their familial and financial responsibilities increase, pressing them to find work in the underground economy and help

---

[3]  Leisy J. Abrego, *Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California*, LAW & SOCIAL INQUIRY 33(3) (2009); Leisy J. Abrego,  *I Can't Go to College Because I Don't Have Papers: Incorporation Patterns of Undocumented Latino Youth*, 4  LATINO STUDIES 212-231 (2006); Roberto G. Gonzales, *On the Wrong Side of the Tracks:   The Consequences of School Stratification Systems for Unauthorized Mexican Students,* 85   PEABODY JOURNAL OF EDUCATION 469 (2010); Carola Suárez-Orozco, Marcelo M. Suárez-Orozco, and Irina Todarova, LEARNING  IN  A NEW LAND: IMMIGRANT STUDENTS  IN AMERICAN SOCIETY (2008).

support their families.  A small minority of undocumented youth are able to enroll in

postsecondary institutions due in large part to other external factors such as consistent support

from educators, counselors, parents, and other mentors—all of whom contribute to instilling in

youth optimistic outlooks and work ethics to pursue their dreams.  This, however, is not the

norm.

11.     Ultimately, the transition to "illegality" for undocumented youth involves a

gradual, adaptive process that wears them down and leaves them precarious in uncertain legal

conditions.  Without work authorization or financial aid to pursue their educational goals,

undocumented youth are pressed to relinquish their aspirations to accept poorly paid and often

physically demanding work with other undocumented workers in the underground  economy.

12.     Further, having to lead adult lives without work authorization or driver's licenses

not only increases their risk of police encounters and deportation, but undermines their moral

standing, diminishing their feelings of self-worth and belonging to mainstream society.[4]  In

response, undocumented youth learn to avoid immigration authorities, abide closely to traffic

laws, and constantly look over their shoulders for  police.

13.     Further, they grow vigilant toward strangers, avoid potentially threatening

situations, and learn to conceal their immigration status to strangers, authorities, employers, and

even friends and romantic partners.  Over time these conditions take their toll on young

immigrants' minds and bodies, leaving them physically fatigued, emotionally drained, and

feeling increasingly hopeless about their future possibilities.  The young people I met described

---

[4]  Hirokazu Yoshikawa, Carola Suárez-Orozco, and Roberto G. Gonzales, *Unauthorized status and youth development in the United States: Consensus statement of the society for research on adolescence*, 27 JOURNAL OF RESEARCH ON ADOLESCENCE 4-19 (2017); Carola Suárez-Orozco, Hirokazu Yoshikawa, Robert Teranishi, and Marcelo Suárez-Orozco, *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 HARVARD EDUC. REV. 438-473 (2011).

physical and emotional manifestations of stress: chronic headaches, toothaches, ulcers, difficulty

sleeping problems, eating disorders, and thoughts of suicide.

14.     Further, as they associate themselves with other low-skilled and undocumented

migrant laborers, they adopt similar lifestyles and perspectives, gradually assuming roles as

undocumented immigrants who must live in fear, with minimal prospects, and limited rights.  By

their late twenties, undocumented young people complete their transition to "illegality," finding

themselves in stagnated and uncertain situations.  Accordingly, the transition to "illegality"

involves a process that leaves them emotionally worn down and feeling hopeless about their

futures.

15.     Those who make it to postsecondary education are able to minimize and delay

some of these transformations by avoiding low-wage work and remaining in institutional

contexts that tend to support their aspirations and educational progress.  However, college goers

are not immune to immigration status-related threats, family responsibilities, financial concerns,

and fears of deportation.  Accordingly, few are able to avoid low-wage informal work to finance

their studies, and many leave school in order to save money for their education.

16.     Even college goers learn to accept that their immigration status—not their

dreams—will shape most of their future plans.  Without access to work authorization at the end

of their  studies, educated undocumented young persons face the same limited range of low-

wage job opportunities  as other undocumented immigrants, arriving even less prepared and

more vulnerable than their peers  who dropped out of school before them.

17.     Undocumented young people grow up in communities around the country and

attend school alongside American-born and citizen peers.  But as friends are obtaining driver's

licenses, taking after-school jobs, and thinking about college, their immigration status prohibits

them from accessing important rites of passage.  For many, these barriers are debilitating.  And,

over the years, their levels of stress and anxiety grow.  Excluded from financial aid for college

and unable to secure the kinds of  jobs their American born and citizen peers were taking, my

respondents had no choice but to exist as  second-class members of our society, living in fear in

a shadow  economy.

### The Benefits of DACA

18.      But things changed for many young people in 2012 when DACA was created.  In

five years, DACA has provided its recipients opportunities to access broader forms of adult life

and to benefit from their investments in education.  It has also allowed them important

opportunities to contribute to their families, communities, and the United States economy.

DACA recipients have made enormous gains.  They have experienced social mobility.  They

have increased their educational attainment.  They have experienced improved mental health.

And they have a greater sense of belonging.  None of these gains are trivial.  DACA has

provided its recipients access to the American Dream and new forms of social mobility.  They

now lead everyday lives with much more breathing room and without fear of  deportation.

19.      My team at Harvard surveyed 2,684 DACA eligible young adults in 2013, sixteen

months after DACA was created.  Of those, 2,381 had obtained DACA by the time of the survey.

20.   Just sixteen months into the program, 59 percent of respondents had obtained a new

job, and a significant portion (45 percent) had increased their job earnings.  Just over one fifth of

survey respondents had obtained a paid internship, which likely provided valuable career training

not typically available in jobs for young adults with limited employment histories.  In addition,

DACA recipients began building credit.[5]  Almost one-half of survey respondents opened up their

---

[5]  Although undocumented immigrants are not necessarily prohibited from possessing a bank account, the receipt of
a Social Security number through DACA allows young people to overcome bureaucratic hurdles and sometimes

first bank account after receiving DACA.  And roughly one-third of our respondents had

acquired their first credit card.   Close to 60 percent of our respondents had obtained a driver's

license.  And, twenty-one percent of those we surveyed had acquired health care after receiving

DACA, perhaps due to new education- or employment-based plans or to greater facility in

providing documentation to clinics and hospitals.

21.     Particularly impressive, our survey pointed to DACA's strong impact on

recipients finding new opportunities in education and employment.  Though having DACA

benefited all recipients, the effects were especially pronounced for DACA recipients attending

higher education and those with higher education degrees, who have been able to match their

educational attainment and degrees with high skilled jobs.  Respondents who attended

community and four-year colleges were more likely than their peers with no college experience

to obtain a new job and increase their earnings.

22.     Aiding in their success, DACA college graduates had multiple mentors in high

school, they were active in clubs and in leadership roles in school, they were involved in their

communities, and they were connected to organizations. As a result, these young people likely

possessed the social networks and information that allowed them to maximize DACA's benefits

to access job-related opportunities.

23.     We found that the improved earnings of DACA recipients were helping them to

access higher education.[6]  While DACA does not remove restrictions from federal financial aid,

DACA holders were better able to earn and save money for college tuition, related fees, and

---

awkward or uncomfortable situations when trying to open a bank account.  Similar hindrances apply to obtaining a credit card.

[6] Roberto G. Gonzales, Benjamin Roth, Kristina Brant, Jaein Lee, and Carolina Valdivia, *DACA at Year Three: Challenges and Opportunities in Assessing Education and Employment, New Evidence from the UnDACAmented Research Project*, AMERICAN IMMIGRATION COUNCIL (Feb. 2016) http://immigrationpolicy.org/sites/default/files/docs/daca_at_year_three.pdf.

books.  What's more, while DACA recipients continued to provide financial support to their

parents, their increased earnings through DACA allowed them greater flexibility to pay for

college.  We also found that more modestly educated DACA recipients were successful in

finding trade schools and occupational certificate programs.

24.    Following up on our survey, we were interested in how DACA recipients were

experiencing their status.  So, in 2015 and 2016, we carried out face-to-face interviews with 481

DACA recipients in Arizona, California, Georgia, New York, Illinois, and South Carolina.  This

carefully drawn sample provides a unique opportunity to understand how DACA is affecting the

educational trajectories of a wide range of young adult immigrants.[7]  The evidence we gained

from the survey provided a detailed picture of how DACA was working for a diverse cross-

section of young people.

25.    Take Miguel[8], from El Monte, California.  Miguel graduated from his high school

in 2011, and started taking classes at a local community college.  DACA was initiated during

Miguel's first year of college, and provided him a significant financial boost that allowed him to

persist in his schooling.  With a work permit, he started working at a print shop and was able to

enroll as a full-time student.  Having a driver's license also made life much easier for Miguel.  In

many parts of California, one could easily spend two or more hours a day on the bus.  After

---

[7]  We used purposive sampling methods to generate a sample of DACA recipients exhibiting a range of educational experiences. Based on the DACA requirements for eligibility, the participants screened by the authors were under the age of 31 as of June 15, 2012; had arrived in the United States before age  16; had accumulated at least five years of continuous residence in the United States; and had no felony convictions, significant misdemeanors, or more than two other misdemeanors.  Because we were interested in a range of experiences, our sample included those young people who had not yet graduated from or were enrolled in a U.S. high school or the equivalent.  While DACA eligibility is open to minors, this study focuses on young adult DACA recipients. We recruited respondents through national and local organizations and through referrals by those who had taken the survey.  The extensive interview covers several key areas: childhood and early years in the United States; migration history;  the impact of DACA; household and neighborhood characteristics; social networks; elementary and secondary education; post-secondary education; work history and finances; civic engagement;  health and emotional well-being; interactions with the justice system; and aspirations for the  future.

[8]  To protect our research subjects' confidentiality and to avoid deductive disclosure, we use pseudonyms to conceal real names.  This practice is customary in qualitative research with sensitive populations.

working for a year and establishing credit, Miguel pooled his money together with his father and

they opened up a cell phone store in nearby La Puente.  Just last year, Miguel started a business

as a web designer.  He credits DACA for providing opportunities to build a career.

26.     DACA recipients not only have increased access to the very resources that are

assisting them to make important educational transitions, they also have a renewed sense of

purpose that fueled educational pursuits.  Eighteen-year-old Carolina from Chicago told us, "My

freshman and sophomore year, I did really bad [in school], mostly because I was just not

motivated because all of this is going to be worthless in the end.  But then when DACA came

out, I started doing a lot better since I was like, 'OK, I actually have a chance.'"

27.     Max from New York put it this way, "I finally feel like I am a part of the U.S.,

like I'm no longer living in the shadows.  I can now work legally.  I can now be able to drive

legally. When I go to the doctor's, the clinic, it is being paid for through health insurance that

I'm eligible for."

28.     And Jenny from Phoenix told us, "I don't know where I would be right now,

without DACA.  I don't know if I would be going to school.  In some ways, I feel like it saved

my life."

29.     Perhaps the biggest success of DACA is its positive impact on young people with

modest levels of education, those who may have left school at or before their high school

graduation.[9]  In terms of distance traveled, DACA's biggest success stories come from moderate

achievers.  Statistically, most undocumented immigrant youth end their schooling before

---

[9]  Roberto G. Gonzales, Marco A. Murillo, Cristina Lacomba, Kristina Brant, Martha C. Franco,  Jaein Lee, and
Deepa S. Vasudevan, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year
Mark*, CENTER FOR AMERICAN PROGRESS (2017),
https://www.americanprogress.org/issues/immigration/reports/2017/06/22/434822/taking-giant-leaps-
forward/.

entering college.[10]  Due to a combination of scarce family resources, exclusion from financial aid at the state and federal levels, and depressed motivations stemming from legal limitations, accessing higher education is prohibitive for many undocumented young people.

30.     But, for the hundreds of thousands of DACA recipients without high school or college degrees, DACA has incentivized young people to return to GED or workforce development programs.  It has also provided important onramps to certificate programs in the trades and in health care.   These DACA recipients received training in industries such as medicine, dentistry, construction, cosmetology, teaching, law, nursing, and insurance.  As a result, DACA recipients have used these opportunities as stepping stones to build careers.

31.     Before DACA, choices were severely restricted to jobs in low-wage sectors. Despite length of time in the United States or level of education completed, they were limited to grueling jobs that did not offer opportunities for job security, safety, or benefits.  But through the work authorization provided by DACA, and the incentives to invest in education, DACA has enabled its recipients to obtain better employment.  In particular, DACA recipients who completed certificate or licensing programs experienced significant growth in salary.  For many (68 percent), hourly salaries increased from $5 to $8 to more than $14 an hour. Most (76 percent) at least doubled their previous salaries, earning between $25,000 and $30,000 per year.

32.     Equally impactful is DACA's positive role in improving the mental health of its recipients.  DACA has led to an overall decrease in stress.  More than two-thirds of recipients told us they were less afraid of law enforcement and of being deported.  Many report feeling less fear around government authorities, with new comfort to call on the police when in need.  In fact,

---

[10]  In fact, more than 40 percent of unauthorized adults ages 18 to 24 do not complete high school, and only 49 percent of unauthorized high school graduates go to college. *See* Jeffrey Passel, D'Vera Cohn, *A Portrait of Unauthorized Migrants in the United States* (2009), http://www.pewhispanic.org/files/reports/107.pdf.

59 percent of our respondents say they would report a crime now, but would not before. With work authorization documents, DACA recipients are also able to apply for driver's licenses in any state.  The ability travel freely and safely to school and work, without always looking over their shoulders, has decreased stressful situations.

### Ending DACA Would Have Disastrous Effects

33.     A repeal of DACA would have disastrous consequences for the young people who have enjoyed increased access over these last five years and who would experience a cruel transition back to a life of blocked access, daily struggles, and stigma.[11]  Over the last five years, they have grown into their new status.  Access to better employment and increased opportunities for education have allowed them to lead lives with more breathing room.  They have purchased cars, moved into better living situations, and have provided better opportunities for their children.  If DACA were to end, these benefits would be taken away, and their financial situation would decline significantly.  They would be hard pressed to keep up with their car payments, they would likely lose their homes, and they would have to make hard decisions, including whether or not to pull their children from daycare they can no longer afford.

34.     DACA recipients would also return to lives of stigma, fear, and worry.  Over time, these processes have grave consequences not only on individuals' mobility trajectories but also on their minds and bodies.[12]  They would return to lives on the outside, a fate they would share with many of their parents.  Their work options would be limited to unstable, dangerous jobs.  They would carry out their day-to-day lives always looking over their shoulders in fear of being apprehended, detained, and deported.  And they would likely experience health problems

---

[11]  Roberto G. Gonzales, *Learning to be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 AMERICAN SOCIOLOGICAL REV. 602-619 (2011).

[12]  Roberto G. Gonzales, LIVES IN LIMBO: UNDOCUMENTED AND COMING OF AGE   IN AMERICA (2016).

as a result.  Their everyday lives would be narrowly circumscribed by their undocumented status -- punctuated by anxiety, fear, limitation, and dreams not only deferred, but also snatched away from them.

35.     The loss of access to America's polity as well as to their feelings of belonging could have negative consequences on the health and well-being of these young people.  This abrupt transition from a protected status with important forms of access to an unprotected reality marked by exclusions from the very mechanisms to ensure their social mobility and well-being is a cruel revocation of their futures and a very difficult pill to swallow.

36.     Without DACA, hundreds of thousands of young people who have been leading productive lives will likely return to the shadows—uninsured, underemployed, and carrying high levels of stress and anxiety.  What's more, there is a good possibility that many of these young people will be compelled to leave school.  Many will no longer be able to afford postsecondary tuition.  And many more will no longer see incentives for investing in school with uncertain payoffs.  These realities, marked by feelings of loss, are certain to sow uncertainty and disillusionment.

37.     In addition, a large segment of the DACA eligible population will lack the tools and experience to navigate clandestine lives.  Because of its eligibility criteria, DACA has allowed tens of thousands of teenagers the opportunity to obtain DACA while in high school and, as a result, reduce the developmental barriers to adolescent and adult transitions, thus, at least partially, delaying the transition to illegality.  If DACA were to end, these youngsters could be the most vulnerable.  Because of their access to work authorization and driver's licenses, and reduced fears of deportation, these young people have experienced normal adolescent transitions. As such, DACA has positively shaped their sense of belonging and future outlooks.  To have

14

everything ripped away from them will likely have dire consequences.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 15, 2018, at Cambridge, Massachusetts.

Roberto G. Gonzales, Ph.D.

# DEF-INTERV.

# EX. 71

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

<u>**DECLARATION OF R. GIL KERLIKOWSKE**</u>

I, R. Gil Kerlikowske, declare:

1.      I was the Commissioner of U.S. Customs and Border Protection (CBP) from 2014-2017. I am currently a Professor of Practice at Northeastern University in the School of Criminal Justice and Criminology.  I am also a Distinguished Senior Fellow at the Global Resilience Institute at Northeastern University and a non-resident Fellow at Rice University.  I hold a B.A. and an M.A. in Criminal Justice from the University of South Florida.  My address is 4286 Massachusetts Ave NW, Washington, D.C. 20016.

2.      Prior to my tenure at CBP, I had approximately four decades of experience with law enforcement and drug policy.   From 2009 to 2014, I served as the Director of the Office of National Drug Control Policy.  From 2000 to 2009, I served as the Chief of Police for Seattle, Washington.  From 1998 to 2000, I served as the Deputy Director for the U.S. Department of

1

Justice, Office of Community Oriented Policing Services.   In addition, I served as the Police

Commissioner for Buffalo, New York, from 1994 to 1998.  I began my law enforcement career

as a police officer in St. Petersburg, Florida in 1972.  I enlisted in the U.S. Army in 1970 and

served as a Military Police officer.

3.        I have attached a true and complete copy of my curriculum vitae to this

Declaration which includes many of my publications over the past ten years.  The compensation

I am paid for testimony in this case is $250 per hour.  In the past four years, I have testified as an

expert in trial or by deposition in the *Texas v. United States* case.

4.        During my tenure at CBP I oversaw approximately 60,000 employees.  CBP

officers protect our nation's borders and safeguard national security by keeping criminal

organizations, terrorists and their weapons out of the United States while facilitating lawful

international travel and trade.

5.        This declaration addresses the relationship between DACA and CBP's

immigration enforcement mission.  I make this declaration on the basis of my personal

knowledge and knowledge gained during my tenure at CBP.

6.  **Use of Prosecutorial Discretion by CBP Works in Tandem With DACA**

7.        The Department of Homeland Security (DHS) had during my tenure, and to my

knowledge still has, three departments with responsibilities over the administration and

enforcement of the nation's immigration laws: CBP, U.S. Immigration and Customs

Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).  CBP secures the

borders at and between ports of entry, preventing the admission of inadmissible aliens and the

entry of illicit goods.  CBP works closely with ICE, which is responsible for identifying,

apprehending, detaining and removing inadmissible and deportable aliens from the United

States, including aliens apprehended by officers and agents of CBP.  CBP also, to my

knowledge, continues to work closely with USCIS, which among other duties, determines on a

case-by-case basis whether deferred action for individual undocumented immigrants is

appropriate under certain circumstances.

       8.     CBP officers and agents regularly encounter individuals who lack lawful status to

enter or remain in the United States.  The number of apprehensions on the southern border

regularly exceeds 400,000 individuals per year. Since 2009, there have been over 2.4 million

apprehensions.[1]  While the vast majority of these individuals are apprehended while attempting

to illegally cross the border into the United States, CBP also encounters individuals who are

unlawfully present in the country, often at internal checkpoints located at areas of strategic

importance.

    9.  CBP exercises discretion working closely with ICE, given finite resources that are under

        the control of ICE, when it decides to release someone on an order of supervision or

        release someone to NGO's.  CBP officers and agents also regularly exercise discretion

        with respect to the individuals they encounter.  This discretion takes the form of deciding

        whom to stop, question or arrest.  In addition, federal regulations authorize CBP officers

        to issue a Notice to Appear (NTA) to initiate removal proceedings before an immigration

        judge. See 8 CFR § 239.1.  For example, in 2016, the most recent year for which data is

        available, CBP, in communication and cooperation under the authority of ICE,  issued

---

[1] Southwest Border Migration FY2018, U.S. CUSTOMS AND BORDER PROTECTION,
https://www.cbp.gov/newsroom/stats/sw-border-migration#.

93,146 NTAs, about 45 percent more NTAs than in 2015.[2]  However, CBP chose many

times, as an act of discretion, to leave the decision of whether to issue an NTA to ICE.

10.     CPB issued guidance to its officers through roll call training during which it

provided direction on the priorities for enforcement based upon the policy directive of Secretary

Johnson.  I had no direct involvement in the roll call training, but I do know that those meetings

occurred.

**Benefits of Deferred Action for CBP Immigration Enforcement Efforts**

11.     In my experience, when a CBP agent at a checkpoint or other location encounters

an individual whose immigration status is not apparent after initial questioning, that alien is

taken to the nearest location where the agent can continue to question and process the alien.

During processing, an alien's biographical information and biometrics (i.e., fingerprints) are

collected.  Record checks are run through CBP and other law enforcement systems.  Agents

review all of the pertinent facts and circumstances to determine whether or not the alien is a

priority for removal.

12.     This process is detailed in DHS Secretary Johnson's November 20, 2014

memorandum, *Policies for the Apprehension, Detention and Removal of Undocumented

Immigrants.*[3] This memorandum discusses prioritizing the removal of aliens who pose a threat to

national security, border security or public safety.

13.     Processing aliens involves questioning the individual, collecting biographical and

biometric information, and conducting background checks.  This process takes a CBP agent time

that could otherwise be spent at the checkpoint or on other enforcement duties.

---

[2] *See* U.S. Department of Homeland Security, "Immigration Enforcement Actions: 2016" (Dec. 2017),
available at  https://www.dhs.gov/sites/default/files/publications/Enforcement_Actions_2016.pdf
[3] *See* Memorandum on Policies for the Apprehension, Detention and Removal of Undocumented
Immigrants, DEP'T OF HOMELAND SEC. (Nov. 20, 2014),
https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

14.     Individuals granted deferred action under the 2012 Deferred Action for Childhood Arrivals (DACA) guidelines are, at times, encountered by CBP agents at checkpoints or other locations.  When a DACA recipient is able to provide DACA documentation or a work authorization document, a CBP agent can more efficiently verify the identity of the individual, as well as the authenticity of the documentation provided.  Absent other factors and circumstances meriting further inquiry, and upon verifying the information provided, CBP agents normally take no further action with respect to that individual because that individual has already been registered, subjected to a background check and determined not to be an enforcement priority.

15.     The DACA initiative allows CBP to more efficiently identify individuals who are not a priority for removal and allows individual agents to better concentrate their limited enforcement efforts on those individuals who do pose a threat to national security, border security and public safety.  In this way, DACA improves the operations of CBP and of DHS by allowing the agencies to better carry out their law enforcement missions in the context of limited resources.

**Benefits of the DACA Initiative for Community Safety**

16.     Based on my years of experience in law enforcement, I believe DACA substantially benefits the overall safety of our communities.

17.     It is my understanding that the DACA initiative allows USCIS to process deferred action applications for undocumented individuals who meet the stated requirements.  The more deferred action grants made, the more individual non-citizens CBP agents can easily identify as not being enforcement priorities. This allows CBP to expend its finite resources to combat threats to national security, border security and public safety.

5

18.     Providing front line law enforcement personnel with documentation from vetted individuals who do not pose a threat to public safety or border security allows them to return more quickly to duties that have a higher priority.

19.     As a former police chief and former Commissioner of CBP, one of the nation's largest law enforcement organizations, I understand the critical need to prioritize law enforcement resources.  If law enforcement organizations do not ensure that their limited resources are directed to their highest priorities, overall public safety is compromised.  Focusing limited immigration enforcement resources on aliens who are eligible for DACA diverts resources from addressing recent border crossers and real national security and public safety threats, such as those who may be terrorists, smugglers, drug traffickers, or engaged in transnational organized crime.

20.     Another law enforcement benefit of DACA is that, by

temporarily eliminating the immediate fear of detention and deportation, recipients may be more inclined to cooperate with federal, state, and local law enforcement in reporting crimes or serving as witnesses in criminal cases.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 23 June , 2018, at

_____.

R. Gil

Kerlikowske
1

# DEF-INTERV.

# EX. 72

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF LEIGHTON KU, PhD, MPH

I, Leighton Ku, declare as follows:

1. My name is Leighton Ku and I am over eighteen years of age.  I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University in Washington, DC.  I have attached my Curriculum Vitae as Exhibit A to this declaration.

3. I am a nationally-known health policy researcher with over 25 years of experience.  I have conducted substantial research about immigrant health, health care, and costs.  I have authored or co-authored more than a dozen articles and reports about immigrant health issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and

1

American Journal of Public Health, as well as scholarly reports published by diverse non-profit organizations including the Migration Policy Institute, the Cato Institute and the Commonwealth Fund, as well as many more articles and reports on other subjects.  I have testified before the U.S. Senate Finance Committee about immigrant health issues and provided analyses and advice to state governments and non-governmental organizations in many states about immigrant health.

4. In November 2017, I provided an expert declaration about the effects of terminating DACA on health insurance coverage and states (*State of New York, et al. v Trump, et al.*).[1]  I have not provided testimony in any other court cases in the past four years.

5. In addition, I have conducted substantial research about health policy and employment. For example, in 2017, I authored studies about how repealing the Affordable Care Act (ACA) would affect employment levels and state economies, including "Repealing Federal Health Reform: The Economic and Employment Consequences for States" (2017).  This research is attached as Exhibit B.

6. I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace, formed under the federal ACA.  This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7. I have a PhD in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York. Nov. 22, 2017.

2

(1979).  Prior to becoming a faculty member at George Washington University, I was on

the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8.  I have been engaged by the Mexican American Legal Defense and Educational Fund and

the Office of the Attorney General of the State of New Jersey for this case. I am being

paid at a rate of $187.50 per hour.

### Overview

9.  This declaration discusses five topics: (1) a response to the declaration of Dr. Donald

Deere on joint effects of Deferred Action for Childhood Arrivals (DACA) and the ACA

on employment,[2] (2) the effects of terminating DACA on employment in the health sector

and on patient care, (3) a brief description of DACA recipients' eligibility for insurance

coverage under the ACA, (4) a review of the effects of DACA on mental health, and (5)

the effects of terminating DACA on health expenditures by states.  In that final section, I

also briefly discuss the declaration of Ms. Monica Smoot about medical expenditures in

Texas for undocumented immigrants.

### DACA and the ACA Do Not Create Incentives to Hire
### DACA Recipients Instead of U.S.-Born Citizens

10.  Dr. Donald Deere, a consultant paid by the Office of the Attorney General of Texas,

alleges that the combined effect of the ACA and DACA reduces the employment of

citizens in favor of DACA recipients (or as he calls them, "undocumented immigrants

who are authorized to work").

11. Dr. Deere's hypothesis that the ACA creates an incentive to hire DACA recipients

instead of citizens is misplaced.  I am not aware of any empirical evidence about the

---

[2] Declaration of Donald Deere, PhD, in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 27, 2018.

3

number of citizens who are unemployed because of such a possibility or aware of any empirical evidence that employers are hiring DACA recipients in lieu of citizens because of potential differences in ACA-related penalties. Nor does Dr. Deere show any such actual evidence. His hypothesis is built on a series of unsupported assumptions. His argument contradicts logic and well-established research.

12. To understand his claim, a brief review of applicable provisions of the ACA is necessary. Under §1513 of the ACA, a large employer with 50 or more full-time employees may be assessed federal tax penalties if it fails to offer affordable employer-based insurance and one or more of its employees instead obtains coverage in a health insurance exchange and receives federal premium tax credits. Specifically, large employers who do not offer any health insurance coverage may be penalized $2,320 per full-time employee (minus first 30) if at least one full-time employee receives a federal premium subsidy for marketplace coverage. Moreover, if the employer offers health insurance but does not cover at least 60% of total allowed costs or the insurance is not affordable because the employee's share of an individual premium (not the premium for the full family) exceeds 9.56% of income (in 2018), then the employer may be assessed fines of the lesser of $3,480 per full-time employee receiving a premium tax credit or $2,320 per full-time employee, minus the first 30 employees.[3] This provision is also known as the "employer shared responsibility" requirement or "employer mandate."

---

[3] Cigna. Employer Mandate Fact Sheet. 2018. https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/employer-mandate-fact-sheet.pdf

4

13. The employer shared responsibility does not apply to smaller firms with fewer than 50 employees.[4]

14. The employer shared responsibility was designed to ensure that large employers did not stop offering health insurance to their workers when the exchanges became available.

15. Large firms (50 or more workers) employ about three-quarters of all American workers,[5] and virtually all (97%) of businesses with 50 or more employees offer health insurance coverage to their employees and did so even before the ACA (for example, 96% in 2010). More specifically, in Texas, 97% of firms with 50 or more workers offered health insurance in 2016 and 95% did so in 2010.[6]  Thus, the employer penalties are virtually irrelevant to employers with more than 50 workers and should not affect their hiring or wage decisions.  The lack of employer-sponsored health insurance coverage is primarily a problem of smaller businesses, but the ACA penalty does not apply to them, so it ought not affect their hiring decisions either.

16. DACA recipients are not eligible for premium tax credits or for the health insurance exchanges (like other undocumented immigrants), in contrast to U.S. citizens or other immigrants like those who are lawful permanent residents.[7]

---

[4] Kaiser Family Foundation.  Employer Responsibility Under the Affordable Care Act.  Mar. 5, 2018.  https://www.kff.org/infographic/employer-responsibility-under-the-affordable-care-act/.
[5] Bureau of Labor Statistics.  Distribution of private sector employment by firm size class. ttps://www.bls.gov/web/cewbd/table_f.txt
[6] Agency for Healthcare Research and Quality.  Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016.  https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiia2.pdf; see also https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2010/tiia2.htm
[7] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

5

17. Dr. Deere makes it seem like large numbers of citizen workers could get premium tax credits and therefore could trigger penalties for their employers. This is misleading. In order to be eligible for the health insurance exchanges and premium tax credits, a person cannot be eligible for other insurance coverage, such as employer-sponsored coverage, Medicaid or Medicare. (In unusual cases where the employer coverage is too low, as described above, a person may be eligible for exchange coverage). That is, whether or not an employee takes insurance from his or her employer is irrelevant. The key issue is whether the employer offers insurance to full-time employees. In addition, to get the premium tax credits, people must generally have incomes between 100 and 400 percent of the poverty line. According to Census data for 2017, about 49% percent of adults 18 to 35 (roughly the DACA age range) have incomes in this range, and the other half would not be eligible for tax credits.[8] Therefore, only a small share of citizen workers could get the premium tax credits that might trigger federal tax penalties. The overwhelming majority of citizen workers in large businesses are not eligible for premium tax credits and their employment poses no risk to their employers.

18. Dr. Deere hypothesizes that ACA and DACA policies combined create an incentive for employers to hire DACA recipients instead of citizens, since employers are potentially subject to tax penalties under the employer shared responsibility provisions when they hire citizens but not when they hire DACA recipients, and since citizens are eligible for premium tax credits, but not DACA recipients. He suggests that these policies make it harder for U.S. citizens to find work and depresses their wages. Although he does not indicate how many citizens may be affected, he suggests the number is large by

---

[8] Based on analyses of the Census Bureau's Annual Social and Economic Survey, March 2018, as tabulated by https://www.census.gov/cps/data/cpstablecreator.html

mentioning that there are about 683,000 DACA recipients, of which 112,000 are in Texas.  This is a huge exaggeration of the potential scope.  Dr. Deere also exaggerates the number of people receiving premium tax credits by citing an outdated statistic that 64 million people are eligible for premium tax credits. The actual number receiving them was 8.7 million in 2017.[9]

19. Moreover, the extent to which an employer would hire a DACA recipient in lieu of a citizen worker because the DACA recipient is not eligible for premium tax credits relies on the dubious assumption that many employers are aware of this obscure nuance of health law.  To the extent that this minor incentive exists, it may be counteracted by other employment compliance barriers that firms may face in hiring DACA recipients.[10]  There are small conflicting conceptual incentives which may favor or disfavor hiring citizens vs. DACA recipients. It is plausible that they balance out and are, in reality, immaterial.

20. At the current time, unemployment rates are at record lows and many businesses have serious problems finding enough qualified workers.[11]  In fact, the cancellation of DACA and the resulting loss of work authorization for hundreds of thousands of workers who have DACA will compound this shortage of qualified workers and create a severe hardship for many businesses and their customers.  Hundreds of business leaders have

---

[9] Kaiser Family Foundation.  Estimated Total Premium Tax Credits Received by Marketplace Enrollees.  https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[10] Jones D, Ombok O.  DACA and the Challenges Faced by Employers in Workplace Compliance. Association of Corporate Counsel.  May 20, 2015. http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm
[11] Lynch D.  'This is super tight': Companies struggle to find, retain workers in a hot economy." Washington Post.  Jan. 12, 2018.  https://www.washingtonpost.com/business/economy/this-is-super-tight-companies-struggle-to-find-retain-workers-in-a-hot-economy/2018/01/12/0c1ce97e-f7cf-11e7-b34a-b85626af34ef_story.html?noredirect=on&utm_term=.94ad14c9418e

noted that DACA recipients are vital to their firms and to the economy and have opposed its termination.[12]

21. More fundamentally, Dr. Deere's hypothesis about DACA recipients displacing citizen workers is based on a belief that there is a fixed number of jobs available for which citizens and non-citizen immigrants compete and, if one gains, then the other must inherently lose.  If we believe that line of reasoning, then it also follows that hiring women inevitably harms men's employment, hiring African Americans inevitably harms white Americans, etc.  There is not a "fixed number" of jobs in the U.S. economy; the economy is dynamic and having more qualified workers, as well as more entrepreneurs, whether immigrants, women or African Americans, can contribute to economic growth, creating more employment opportunities for both citizens and immigrants alike. It is certainly plausible that, in specific cases, a qualified DACA immigrant may be hired for a job over a similarly qualified citizen worker, or vice versa, but economic growth leads to better employment for both qualified citizens and qualified immigrants.

22. Dr. Deere's belief that DACA and the ACA harm employment is not supported by rigorous research.

23. Evidence suggests that the overall effect of DACA and related policies is to stimulate the economy and thereby to increase employment of both citizens and non-citizens. Analyses conducted in 2014 by the White House Council of Economic Advisers examined the effect of administrative actions on immigration taken by President Obama,

---

[12] America's Voice.  Hundreds of Business Leaders Write Letter in Support of DACA, Dreamers. Sept. 1, 2017.  https://americasvoice.org/blog/business-leaders-support-daca/

particularly DACA, on employment and the economy.[13]  Its analyses indicated that these immigration policies lead to increased growth in the U.S. economy and more jobs and create no harm to employment or wages of U.S.-born workers.  (It is noteworthy that this analysis was conducted after the ACA was enacted and includes effects of the Act.)

24. More recently, analyses by the Cato Institute indicated that terminating DACA could reduce economic growth in the U.S. by $280 billion over the next decade.[14] These reductions in economic growth ultimately cause a loss of jobs.

25. In a parallel study that I conducted last year, we found that repealing key elements of the ACA (specifically the Medicaid expansion, health insurance exchanges (or marketplaces) and premium tax credits) would have caused 3 million jobs to be lost by 2021, almost a third of which would have been in the health care sector, and would have lowered states' economies by $1.5 trillion over five years.[15]

26. A recent review of several economic studies, conducted since the ACA was adopted, found that the Act did not reduce employment or lower wages.[16]

27. More broadly speaking, there is a strong scientific consensus that immigration benefits the U.S. economy.  A distinguished panel of researchers was convened by the National

---

[13] White House Council of Economic Advisers. *The Economic Effect of Administrative Action on Immigration*. Nov. 2014.
https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf
[14] Brannon I, Albright L.  *The Economic and Fiscal Impact of Repealing DACA*.  The Cato Institute.  Jan. 18,2017.
[15] Ku L Steinmetz E, Brantley E, Bruen B.  *Repealing Federal Health Reform: The Economic and Employment Consequences for States.*  Brief, Commonwealth Fund, Jan. 6, 2017.
http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform
[16] Abraham J, Royalty A. *How Has the Affordable Care Act Affected Work and Wages? Evidence Shows the Law Has Had Little Effect.*  Leonard Davis Institute of Health Economics, University of Pennsylvania.  Jan. 2017.  https://ldi.upenn.edu/brief/how-has-affordable-care-act-affected-work-and-wages

9

Academy of Sciences in 2016 to consider the economic and fiscal impact of immigration in the U.S.[17]  It concluded that, based on many years of rigorous research, that there is little evidence that immigration significantly reduces employment or wages of native-born workers in the U.S.  Even more recently, a letter signed by 1,470 economists, including Nobel Prize winners and former directors of the Office of Management and Budget, the Council of Economic Advisers and Congressional Budget Office from both parties, agreed that immigration strengthens the economy and policies that threaten immigrants would harm the economy.[18]

28. The skills of immigrant workers typically complement those of the U.S.-born workforce, enabling both to be more productive.  For example, the contributions of immigrant construction workers help build homes, office buildings, factories and roads that enable citizens to be employed in other sectors of the economy.  In addition, immigrant entrepreneurs have been important contributors to innovation and economic growth in the United States.[19]  Immigration helps lead to further economic growth and cancelling DACA would set back employment and the economy.

29. A simple and direct way to illustrate the flaw with Dr. Deere's arguments is to present Census data about changes over several years in unemployment levels, comparing U.S.-born citizens and non-citizens who are 18 to 30-year-old adults, the approximate age

[17] Blau F, Mackie , eds. *The Economic and Fiscal Consequences of Immigration*.  National Academy of Sciences.  Washington DC: National Academy Press.  2016.
[18] *An Open Letter from 1,470 Economists on Immigration* (written to President Trump and leaders of both houses of Congress).  April 12, 2017.
https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/
[19] Akcigit U, Grigsby J, Nicholas T.  *Research: Immigrants Played an Outsize Role in America's Age of Innovation.  Harvard Business Review.*  April 21, 2017.  https://hbr.org/2017/04/research-immigrants-played-an-outsize-role-in-americas-age-of-innovation?referral=03759&cm_vc=rr_item_page.bottom.

range for working DACA recipients.  The Census data do not provide the detailed

immigration status that would enable us to separate DACA recipients from other non-

citizen immigrants, including those who are lawful permanent residents, temporary legal

immigrants (e.g., those with work or student visas) and the undocumented.  For the sake

of simplicity, I exclude data about naturalized citizens, who tend to have high

employment levels.  The chart below illustrates trends from 2011 to 2016 for Texas and

the overall United States.[20]



30. Under Dr. Deere's hypothesis that DACA and the ACA increase unemployment by

citizens, we would expect rising unemployment by U.S.-born citizens, while non-citizen

unemployment falls.  In fact, the data reveal that both citizens and non-citizens have had

falling unemployment rates in recent years.  In Texas, a high immigrant state,

unemployment levels fell faster for U.S. born citizens than for non-citizens.  There has

---

[20] These data are tabulated from a web-based application of the U.S. Census Bureau, located at
https://www.census.gov/cps/data/cpstablecreator.html

not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA.  DACA, the ACA and the strong economy have combined to fuel employment for citizens and non-citizens alike.

**Effects of the Loss of DACA for Health Care Providers**

31. Termination of DACA will create very specific and substantial harm for those who have DACA and for the employers and customers of the DACA recipients.  One area that exemplifies the harm that will occur is the health care sector.  Many DACA recipients are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide additional manpower, but they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA would cause them to lose work authorization, which would create hardships both for their employers as well as for their potential patients.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

32. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support

staff (e.g., medical aides, home health staff, etc.).[21]  More are engaged in other positions in health care organizations, such as administration, computer services, food service, etc. It estimated that 40,700 DACA recipients work in education, health care or social services organizations.  In addition, a large number of DACA recipients are receiving training to be health care professionals in the future, including doctors, nurses, etc. and the loss of status would short-circuit their ability to provide those services in the future.

33. Health care executives representing a number of Catholic hospitals have written to President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[22]  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[23]  Similar problems are likely to occur for those in training for nursing and other health professions.

34. The loss of immigrant health workers would have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing nursing home and community-based care to senior citizens and those with disabilities.[24]  It is particularly worth noting that the Medicaid

---

[21] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.
[22] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf
[23] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.*  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06
[24] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported.  *New York Times.*  S*e*pt. 7, 2017.

program is the leading payer for long-term care services in the U.S.  The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

**How DACA Affects Heath Insurance Coverage and Access to Health Care**

35. Under DACA, recipients have a temporary deferral of removal proceedings, can receive authorization to work legally and can engage in other activities of civil society such as continue their education, obtain drivers' licenses, etc.  The survey and analysis conducted by Professor Tom Wong of the University of California at San Diego found that most DACA recipients are employed and most have private health insurance coverage.[25]

36. Federal law does not accord DACA recipients eligibility for federal health insurance benefits, including Medicaid, the health insurance program for low-income populations, nor are they permitted to enroll in the health insurance exchanges (marketplaces) formed under the ACA or to receive federal health insurance premium tax credits that are designed to make this insurance more affordable.  DACA recipients are barred from federal health insurance assistance, like other undocumented immigrants.  State or local governments may opt to offer public insurance coverage for certain undocumented immigrants, including DACA recipients, using state or local funds without federal funding support.[26]  For example, the District of Columbia supports a state-funded Health

---

[25] Declaration of Prof. Tom Wong, *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  May 16, 2018.

[26] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health

Care Alliance, which provides medical assistance to low-income adults not eligible for

Medicaid including undocumented immigrants and DACA recipients; no federal funding

is used.[27]  New York State provides Medicaid coverage to DACA recipients, but not

other undocumented immigrants, without federal funding support.[28]

37. The only federal health insurance benefit available to low-income undocumented

immigrants is very limited emergency Medicaid coverage (42 U.S.C. § 1396b(v)).[29]  The

costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be

covered under Medicaid.  However, this limited benefit does not provide broader

coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It

provides reimbursement to emergency providers for care rendered to low-income

undocumented immigrants, including labor and delivery costs for children born to

undocumented immigrant mothers.  Hospitals are separately required to provide

emergency care, to at least screen and stabilize their emergency medical conditions, to all

potential patients regardless of insurance coverage or citizenship status, under the

Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. § 1395dd).

The Medicaid emergency care benefit essentially provides a mechanism to reimburse

providers for the emergency care they are otherwise required to offer to low-income

undocumented immigrants.

Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.
[27] District of Columbia Department of Health Care Finance.  Health Care Alliance.
https://dhcf.dc.gov/service/health-care-alliance
[28] New York State Department of Health.  GIS 13 MA/011: Children's Health Insurance
Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and
PRUCOL Aliens.
https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.
[29] A previous limited federal grant program, called "Section 1011," provided federal funding for
emergency care for undocumented immigrants separate from Medicaid, but that program has
now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

15

38. In addition, many community-based health care providers provide free- or subsidized ambulatory health care services to needy or uninsured patients, including undocumented immigrants.  Perhaps most important, community health centers that receive federal grants under Section 330 of the Public Health Service Act, sometimes also called Federally Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that focus on care for migrant workers, are required to provide primary health care to all patients regardless of insurance or immigration status.  Many other "safety net providers – including non-profit, charitable and state or local public clinics – often provide free or subsidized care to uninsured persons, including undocumented immigrants, although the basis for that care varies.  In some cases, state or local laws or regulations require such service, in other cases it is a matter of clinical practice and a belief in charitable mission.

39. Because of the barriers they face in securing health insurance coverage, non-citizen immigrants, which include DACA recipients, undocumented immigrants and other immigrants who have been legally admitted but are not citizens, are much more likely to be uninsured than U.S.-born or naturalized citizens and to have less private insurance and less Medicaid coverage, even when one compares low-income (below 200% of the poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates financial barriers and as a result non-citizens have substantially less access to and use of medical services, including primary health care services, emergency medical care, hospital care and most other forms of health care, than citizens.[30]

---

[30] Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org

16

40. DACA enables recipients to work and many are thereby able to obtain employment-based private health insurance, which is the dominant form of insurance in the United States.  If DACA is lost, the former DACA recipients would lose their work authorization and, as a result, lose their jobs and their employer-based health insurance.  If they are not working they have few other options to obtain health insurance, other than emergency Medicaid.  Moreover, if the breadwinner in a family loses his or her job and private health insurance, his or her dependents may also lose their insurance coverage, even if they are U.S. born citizens.  In principle, a person without employer-based health insurance, Medicaid, or other publicly subsidized coverage, could purchase individual (non-group) health insurance on the private market.  The sad reality, however, is that individual health insurance is expensive and a person who is no longer employed or who has low income generally cannot afford individual health insurance premiums.  Thus, the health insurance prospects for undocumented immigrants without DACA and unemployed are bleak.

**Mental Health Consequences of the Loss of DACA**

41. Even though DACA does not generally provide health insurance coverage benefits, research indicates that DACA improves the mental health of recipients and their families by reducing stress related to their undocumented status and the fear of adverse actions, such as deportation, loss of work, loss of educational opportunities, separation from their families, etc.  Research, including studies published in peer-review journals by investigators at Harvard Medical School,[31] the University of California at Davis,[32] and

---

[31] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.*  2017; 2(4): e175-e181; Venkataramani AS, Tsai AC.  Dreams Deferred: The Public Health Consequences of Rescinding DACA.  *New England J Medicine*.  2017; 377(18):1707-9.

the Universities of California at Berkeley and at San Francisco,[33] show that the receipt of DACA has significantly reduced psychological stress and improves mental health status. The researchers warn that the loss of DACA will lead to higher stress and additional mental health problems for hundreds of thousands of people. Recent research by my colleagues at George Washington University also indicates that recent threats to legal immigration status have created major psychological stress on immigrant parents, who are worried about their own status as well as the future well-being of their children.[34]  In addition, a study by Stanford University researchers found that the DACA that protected mothers also led to better mental health status for their U.S.-born citizen children; children feel more secure when their parents do not fear deportation and can safely work. This shows the broader repercussions of changes in DACA policy which can even affect citizen children.[35]

42. The stress caused by loss of DACA could compound the harmful effects of employment and economic loss and could result in additional demands placed on our mental health and social welfare systems system and, in some cases, may lead to increased risk of disruptive behavior that could pose broader risks and further tax our social, educational

[32] Patler C, Laster Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Social Science and Medicine.* 2017 March 9 (Epub ahead of print).
33 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA).  *J Immigr Minor Health.* 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.
[34] Roche K, Vaquera E, White R, Rivera MI.  Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents.  *J Adolescent Health.*  2018 Mar; 62(5): 525–531.
35 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

and criminal justice systems. DACA has helped many youth and young adults "come out of the shadows."  Loss of DACA will push them back into the shadows and jeopardize the mental health of DACA recipients and their families, with broader societal effects within states.  States have an inherent interest in the well-being, public health and safety of their residents.  Terminating DACA undermines the interests of states.

### Estimates of Potential Health Costs at State Levels Due to the Loss of DACA

43. The loss of DACA would harm states because the loss of private health insurance coverage will increase public expenditures for emergency Medicaid and other uncompensated care for those who become uninsured, creating additional financial burdens on the states.  States would have to bear higher expenditures for medical care that would be rendered to former DACA recipients who become uninsured.  Without private health insurance, DACA recipients would become more reliant on emergency Medicaid and community-based uncompensated care.  In the analysis below, I describe paths by which undocumented immigrants can get emergency medical care reimbursed by Medicaid and some forms of community-based uncompensated care.  Nonetheless, these are not optimal forms of health care and would still leave many former DACA recipients with reduced access to medical care, which could endanger their health.

44. In this section, I estimate potential financial costs for states if DACA is lost.  DACA provides work authorization to young adults who would otherwise be without immigration status and thereby enables them to work legally.  A majority of working DACA recipients get private health insurance through their jobs.  Loss of work authorization would cause them to lose their jobs.  The loss of employment would also trigger the loss of employment benefits, like health insurance coverage for them and their

19

dependents.  In principle, some of those losing employment-based insurance might be able to purchase individual (non-group) health insurance on the private market, but without the income of a job, the cost of individual health insurance would be essentially unaffordable.  Undocumented immigrants, including DACA recipients, are ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax credits.  As a result, former DACA recipients must instead rely on emergency Medicaid coverage and/or community-based care for those without insurance, such as that provided by community health centers or state or local public health clinics.  I use recent national survey data to estimate the costs of emergency Medicaid and community-based care for individual states, as well as for the nation, if DACA recipients lose their status and, as a result, lose employment and private health insurance coverage.

45. I describe the basis and sources of data for my estimates below.  I note that these are estimates and that differences in methods or data sources could change the results somewhat, but the general magnitude and direction of results ought to be robust and valid.

46. For estimates of the number of people affected, I draw on data from the U.S. Citizenship and Immigration Services (USCIS) agency about persons approved for DACA as of June 30, 2017.[36]   I apply these data about the number of DACA recipients to Prof. Tom Wong's estimate that 91.4% of DACA recipients are employed and 57% have employer-based private insurance,[37] based on his survey of DACA recipients, to estimate the effects

---

[36] U.S. Citizenship and Immigration Services.  DACA Performance Data, 3rd Quarter, Fiscal Year 2017.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf
[37] Declaration of Prof. Tom Wong, *op cit.*

20

of potential loss of employment and private insurance coverage. (A Migration Policy
Institute report[38] estimates somewhat lower employment levels, but their data are for
DACA-eligible youth, not actual DACA recipients.  For example, they report that 83% of
DACA-eligible men 16-32 not in secondary school were employed vs. 79% of average
U.S. men that age.  It seems likely that actual DACA recipients work more than those
who are DACA-eligible, since they must apply for DACA and receive it in order to get
work authorization).

47. I conducted my own analyses of the 2016 National Health Interview Survey, conducted
    by the Centers for Disease Control and Prevention, and found that 55% of working
    DACA-eligible immigrants have private insurance (based on the criteria of being non-
    citizen immigrants between the ages of 18 and 36 residing in the U.S for more than 5
    years, excluding Medicaid recipients since DACA recipients are not eligible for
    Medicaid, except emergency Medicaid coverage).  This level is essentially the same as
    Prof. Wong's estimate and corroborates it.

48. For estimates of the implications and costs of alternative sources of medical care that
    former DACA recipients are likely to use I draw on my own analyses of the Center for
    Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the
    Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey
    (MEPS). I am an experienced analyst of these data and have published numerous studies
    using these nationally representative survey data.

49. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an
    estimate of DACA eligibility.  I use Prof. Wong's estimate that 57% of employed DACA

---

[38] Capps R, Fix M, Zong J.  The Education and Work Profiles of the DACA Population. August
2017.

recipients get insurance through work.  (My analysis of NHIS data show that 55% of the DACA-eligible immigrants, as described above, who are working have private insurance, about the same as Prof. Wong's estimate of employer-based insurance coverage among DACA recipients.  Two separate data sources yield almost the same estimate, corroborating each other). The loss of DACA and work authorization would trigger the loss of their jobs and therefore their private health insurance.

50. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care in the last 12 months.  Since the loss of DACA would result in the loss of work authorization, legal work and employment-based insurance, it is reasonable to assume that about 19% of former DACA recipients would need to rely on emergency Medicaid to pay their emergency medical bills.  Although they may have had incomes above Medicaid eligibility limits when they were employed, the loss of DACA and work authorization will cause them to lose income and often become impoverished, so more will fall within Medicaid income criteria.  To estimate the costs of emergency medical care, I relied on my analyses of MEPS data and estimated that the average annual cost of emergency room care received by an 18-36 year old immigrant who had been in the US for more than five years was $1,275 in 2015.  I used estimates of national health expenditure price increases per capita from 2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services,[39] to estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults who had previously been

---

[39] Centers for Medicare and Medicaid Services.  National Health Expenditures. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html

privately-insured working DACA recipients in each state, but who would now be uninsured.

51. I estimated the costs of community-based uncompensated care that would be received by the newly uninsured immigrant adults, due to the loss of DACA. For this, I drew on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[40] That study estimated that in 2013, the average uninsured person received uncompensated medical care costing $1,702 per person, of which 26% was provided as uncompensated care at publicly-supported state or local community-based ambulatory sites, such as community health centers or state or local clinics. This is equal to $449 in community-based ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for health care cost inflation between 2013 and 2018 to $559 per uninsured person. I multiplied this amount by the number of former DACA recipients who would lose their jobs and private health insurance in each state.

52. Based on the methods and sources, described above, the additional public costs that would be borne at state levels in 2018 are shown in Table 1 below. These are annual costs in 2018; the cumulative costs over several years would be substantially higher. These estimates are conservative, since they do not include the additional costs that might be borne by states if dependents of DACA recipients – their spouses or children – lose private health insurance if the DACA recipient loses his or her job.

53. Table 1 presents estimates for the United States (excluding the territories, such as Puerto Rico and the Virgin Islands), for the seven plaintiff states in this case (Texas, Alabama,

---

[40] Coughlin T, Holahan J, Caswell K, McGrath M. *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.* Kaiser Commission on Medicaid and the Uninsured. May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

Arkansas, Louisiana, Nebraska, South Carolina and West Virginia) and for all other states and the District of Columbia. These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

**Table 1.  Estimates of Additional Public Costs Due to the Loss of DACA Status**

| State | Number Currently Employed (1) | Number Who Could Lose Private Insurance If They Lose Their Jobs (2) | Number Who Might Require Emergency Room Use If Uninsured (3) | 2018 Costs of Emergency Room Care (4) | 2018 Cost of Community-Based Uncompensated Care (5) | Total Estimated 2018 Public Costs Due to Loss of DACA (6) |
|---|---|---|---|---|---|---|
| Total, U.S. | 716,618 | 408,472 | 77,610 | $112,508,841 | $228,521,352 | $341,030,194 |
| **Plaintiff States** | | | | | | |
| Alabama | 3,918 | 2,233 | 424 | $615,125 | $1,249,406 | $1,864,531 |
| Arkansas | 4,663 | 2,658 | 505 | $732,126 | $1,487,051 | $2,219,177 |
| Louisiana | 1,892 | 1,078 | 205 | $297,040 | $603,331 | $900,372 |
| Nebraska | 3,093 | 1,763 | 335 | $485,597 | $986,315 | $1,471,912 |
| South Carolina | 5,879 | 3,351 | 637 | $922,978 | $1,874,699 | $2,797,677 |
| Texas | 114,043 | 65,005 | 12,351 | $17,904,797 | $36,367,172 | $54,271,969 |
| West Virginia | 108 | 61 | 12 | $16,933 | $34,393 | $51,326 |
| **Other States** | | | | | | |
| Alaska | 133 | 76 | 14 | $20,951 | $42,554 | $63,504 |
| Arizona | 25,530 | 14,552 | 2,765 | $4,008,181 | $8,141,182 | $12,149,363 |
| California | 204,507 | 116,569 | 22,148 | $32,107,494 | $65,214,856 | $97,322,349 |
| Colorado | 15,821 | 9,018 | 1,713 | $2,483,947 | $5,045,248 | $7,529,195 |
| Connecticut | 4,560 | 2,599 | 494 | $715,911 | $1,454,116 | $2,170,026 |
| Delaware | 1,326 | 756 | 144 | $208,215 | $422,915 | $631,130 |
| Dist Columbia | 707 | 403 | 77 | $110,924 | $225,302 | $336,226 |
| Florida | 30,351 | 17,300 | 3,287 | $4,765,132 | $9,678,657 | $14,443,789 |
| Georgia | 22,150 | 12,625 | 2,399 | $3,477,526 | $7,063,347 | $10,540,873 |
| Hawaii | 532 | 303 | 58 | $83,516 | $169,632 | $253,148 |
| Idaho | 2,873 | 1,637 | 311 | $451,014 | $916,072 | $1,367,086 |
| Illinois | 38,879 | 22,161 | 4,211 | $6,103,967 | $12,398,019 | $18,501,986 |
| Indiana | 9,020 | 5,142 | 977 | $1,416,180 | $2,876,462 | $4,292,642 |
| Iowa | 2,570 | 1,465 | 278 | $403,516 | $819,598 | $1,223,114 |
| Kansas | 6,234 | 3,554 | 675 | $978,799 | $1,988,078 | $2,966,877 |
| Kentucky | 2,814 | 1,604 | 305 | $441,830 | $897,419 | $1,339,249 |
| Maine | 90 | 51 | 10 | $14,063 | $28,564 | $42,626 |
| Maryland | 9,023 | 5,143 | 977 | $1,416,610 | $2,877,336 | $4,293,946 |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,588 | $2,347,162 | $3,502,750 |
| Michigan | 5,946 | 3,389 | 644 | $933,597 | $1,896,267 | $2,829,864 |
| Minnesota | 5,743 | 3,273 | 622 | $901,597 | $1,831,270 | $2,732,867 |
| Mississippi | 1,344 | 766 | 146 | $211,085 | $428,744 | $639,829 |
| Missouri | 3,244 | 1,849 | 351 | $509,274 | $1,034,407 | $1,543,681 |
| Montana | 69 | 40 | 8 | $10,906 | $22,151 | $33,057 |
| Nevada | 11,988 | 6,833 | 1,298 | $1,882,117 | $3,822,846 | $5,704,964 |
| New Hampshire | 342 | 195 | 37 | $53,668 | $109,008 | $162,676 |
| New Jersey | 20,315 | 11,580 | 2,200 | $3,189,526 | $6,478,378 | $9,667,904 |
| New Mexico | 6,250 | 3,562 | 677 | $981,238 | $1,993,033 | $2,974,271 |
| New York | 38,848 | 22,143 | 4,207 | $6,099,088 | $12,388,109 | $18,487,197 |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,733 | $8,002,154 | $11,941,886 |
| North Dakota | 94 | 54 | 10 | $14,780 | $30,021 | $44,801 |
| Ohio | 4,101 | 2,338 | 444 | $643,875 | $1,307,801 | $1,951,675 |
| Oklahoma | 6,296 | 3,589 | 682 | $988,413 | $2,007,606 | $2,996,019 |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,539 | $3,299,668 | $4,924,207 |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,404 | $1,743,540 | $2,601,944 |
| Rhode Island | 1,141 | 650 | 124 | $179,085 | $363,748 | $542,833 |
| South Dakota | 233 | 133 | 25 | $36,592 | $74,323 | $110,915 |
| Tennessee | 7,653 | 4,362 | 829 | $1,201,507 | $2,440,431 | $3,641,938 |
| Utah | 8,895 | 5,070 | 963 | $1,396,521 | $2,836,531 | $4,233,052 |
| Vermont | 40 | 23 | 4 | $6,314 | $12,824 | $19,138 |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,561 | $3,569,855 | $5,327,417 |
| Washington | 16,394 | 9,345 | 1,776 | $2,573,920 | $5,227,996 | $7,801,916 |
| Wisconsin | 6,931 | 3,951 | 751 | $1,088,144 | $2,210,174 | $3,298,318 |
| Wyoming | 569 | 325 | 62 | $89,399 | $181,582 | $270,981 |

Notes:  See text for explanation of the source of estimates.
Analyses by Leighton Ku, June 11, 2018

54. For the overall United States (not including the territories), about 408,000 DACA recipients would lose their private health insurance and become uninsured if DACA is terminated.  Of them, about 78,000 would require emergency care in 2018, which would lead to about $113 million in additional Medicaid emergency care expenditures.  The 408,000 newly uninsured individuals would incur about $229 million in community-based uncompensated care at community health centers, public clinics and other safety net sites.  In total, the public costs of increased public health care would rise by about $341 million in 2018 due to the loss of DACA.  It is worth noting that, despite the emergency or charity care provided, DACA recipients would still have substantial unmet medical needs because they would lack insurance coverage for other medical costs, such as specialty ambulatory care, medications and inpatient hospital care.

55. I also illustrate the effects for two states: Texas, the largest of the plaintiff states, and for New Jersey.

56. In Texas, the loss of DACA could lead about 65,000 more people to become uninsured.  Of them, more than 12,000 would require emergency medical care in 2018, costing about $18 million.  And the 65,000 uninsured people would require about $36 million in additional community-based uncompensated care.  The total increase in one year in additional public medical expenditures in Texas would equal about $55 million in 2018 as a result of the termination of DACA.

57. For New Jersey, the loss of DACA could cause the number of uninsured people to rise by about 11,500.  This would increase public medical care costs by $7.6 million, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs.  New Jersey also has an innovative Charity Care – Hospital

26

Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients.[41] Increasing the number of uninsured patients, due to loss of DACA, would create additional financial burdens for this program and create hardships for hospitals across the state.

58. In her declaration, Ms. Monica Smoot of the Texas Health and Human Services Commission[42] notes that her agency incurs costs to provide emergency Medicaid services, family violence services and CHIP perinatal coverage for undocumented immigrants, as well as additional uncompensated medical care provided by state public hospitals.  She does not provide estimates of the costs of these services for DACA recipients.  While I cannot comment on the accuracy of her estimates, I note, as described above, that if DACA is lost, then a substantial number of those who currently have employer-sponsored health insurance will lose their work authorization and thereby lose their jobs and private health insurance and will become uninsured (and often become impoverished).  They will still have medical needs, however, and many will have to receive services such as emergency Medicaid or other charity care type facilities (including uncompensated care at state hospitals) that previously could have been financed by their private health insurance.  The loss of DACA will cause public expenditures for emergency Medicaid services and related services for uninsured people to rise even higher, creating additional costs for the state of Texas.

---

[41] New Jersey Department of Health.  Charity Care – New Jersey Hospital Care Payment Assistance Program.  http://www.nj.gov/health/charitycare/
[42] Declaration of Monica Smoot in in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 9, 2018.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

June 15, 2018

# DEF-INTERV.

# EX. 73

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF DOUGLAS S. MASSEY, PH.D

1.      My name is Douglas S. Massey and I am over the age of 18 and fully competent to make this declaration.

2.      I was asked by Defendant-Intervenor's counsel to serve as an expert witness in this case.  I am being compensated for my time in preparing this report at the rate of $250 per hour.

3.      A complete list of my qualifications, including a list of all publications authored in the previous 10 years, is included in my curriculum vitae, attached hereto as Exhibit A to this declaration.  I have not served as an expert witness in any litigation in the last 4 years.

4.      I have 38 years of experience on the faculties of the University of Pennsylvania, the University of Chicago, and Princeton University. In the course of my career, I have accumulated substantial expertise on documented and undocumented migration from Latin America to the United States, and on the status and behavior of Latin American migrants within

the United States.

5.      I am currently the Henry G. Bryant Professor of Sociology and Public Affairs at Princeton University where I direct the Office of Population Research, the nation's oldest Population Research Center. I also direct the New Immigrant Survey, the Latin American Migration Project, and the Mexican Migration Project, which together collect and disseminate data on documented and undocumented migration to data users throughout the world.  I have published more than 10 books and 100 refereed articles on the subject of international migration. I hold a 1978 Ph.D. from Princeton and am an elected member of the National Academy of Sciences, the American Academy of Arts and Sciences, and the American Philosophical Society. I am Past-President of the American Academy of Political and Social Science, the American Sociological Association, and the Population Association of America. In 2009 I won the Distinguished Career Award of the International Migration Section of the American Sociological Association, and the Mexican Migration Project has been recognized by a MERIT Award from the National Institutes of Health as well as the Malinowski Award from the Society for Applied Anthropology, bestowed to honor the project's "efforts to understand and serve the needs of the world through the use of social science."

6.      The Mexican Migration Project (MMP), which I have directed for 30 years, is the largest and most reliable source of data on documented and undocumented migration to the United States. Since 1987 it has annually collected detailed data on Mexico-U.S. migration through representative surveys of Mexican communities and targeted surveys of U.S. destination areas. The database currently includes surveys from 161 communities located throughout Mexico, which together contain data on 27,113 households and 169,945 individuals, 26,446 of whom reported U.S. migratory experience. All MMP data are publicly available from the project

website at http://mmp.opr.princeton.edu/, which currently has 4,757 registered data users worldwide.

7.      Since 1998 I have also directed the Latin American Migration Project (LAMP), which uses methods developed on the MMP to carry out surveys of migrant sending communities in other nations throughout Latin America, including Costa Rica, Colombia, the Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Puerto Rico. The LAMP database currently includes 10,388 households and 57,433 persons, 5,520 with international migratory experience and has 1,882 registered users. The references authored or coauthored by me and cited in this declaration rely on the MMP database for findings reported on Mexico and the LAMP database for findings on Central America.

8.      Migration from Mexico to the United States began in the early 20th as a result of direct recruitment by private employers and expanded rapidly during the First World War with U.S. government recruitment and accelerated further during the 1920s in response high labor demand in the United States (Massey et al. 1987; Massey, Durand, and Malone 2002). After a hiatus during the Great Depression in the 1930s, Mexico-U.S. migration was revived in 1942 by the Bracero Program, a binational agreement negotiated by federal authorities with Mexico to allow the annual importation of Mexican laborers for short-term work on temporary visas. By the late 1950s, around 450,000 Bracero migrants were entering the United States each year, along with around 50,000 permanent residents (Massey and Pren 2012).

9.      The Bracero Program was terminated by Congress at the end of 1964, by which time some 4.6 million Mexican Braceros had entered and worked the United States. In 1965 Congress amended U.S. immigration law to enact the first-ever numerical restrictions on legal immigration from the Americas. These restrictions were tightened by additional legislation in

3

1976, which imposed an annual quota of 20,000 permanent resident visas on all nations in the Western Hemisphere (Massey, Durand, and Malone 2002). As opportunities for legal entry constricted, Mexicans increasingly entered without authorization in response to ongoing U.S. labor demand and higher wages north of the border (Massey, Durand, and Pren 2014).

10.     Unauthorized migration grew from 1965 to 1979, then stabilized and thereafter fluctuated in response to economic conditions in Mexico and the United States. Before 1986 unauthorized migration was heavily circular, with 85% of undocumented entries offset by departures, yielding a slowly growing unauthorized population (Massey and Singer 1995). In 1986 the United States began a sustained militarization of the Mexico-U.S. border. By 2010 the number of Border Patrol agents had multiplied 5.6 times and the agency's budget had increased nearly 24 times (Massey 2015, 2016). The intensification of border enforcement dramatically increased the financial costs and physical risks of unauthorized border crossing and in response migrants minimized crossing, not by remaining in Mexico but by staying longer in the United States, steadily lowering the rate of return migration back to Mexico (Massey, Durand, and Pren 2015).

11.     Since net migration equals in-migration minus out-migration, the ultimate effect of border militarization was to increase the net volume of unauthorized migration and accelerate growth in the undocumented population, which rose from 2 million in 1988 to 12 million in 2008. As male workers stayed longer in the United States, they increasingly arranged for the entry of their spouses and children (Massey, Durand, and Pren 2016). These children are today's Dreamers and DACA recipients. Once families were reunited north of the border, husbands and wives began having U.S.-born citizen children, as did single male migrants who over time formed romantic partnerships in the United States. As of 2016, some 5.1 million children were

4

estimated to reside in the U.S. with an undocumented parent, 79% of whom were U.S. citizens and 2% were legal permanent residents (Capps, Fix, and Zong 2016).

12.     Mexico's fertility rate began a precipitous decline during the 1970s and approached replacement levels after the year 2000, leading to the aging of Mexican society and a steady rise in Mexico's average age. Migration is strongly age-dependent, with rates rising from the late teens through the early 20s and then declining to low levels by age 30. Owing to the fertility decline, the average age in Mexico rose from around 17 years in the 1970s to 29 years today. As a result, unauthorized migration began to decline around 2000 and according to the best estimates (Passel and Cohn 2017) in 2008 the net inflow turned negative (with departures exceeding arrivals). At this point, undocumented Mexican migration has been negative for a decade, the size of the undocumented is falling, and number of Mexicans being apprehended at the border is at its lowest point since the 1940s. Owing to its demographic transition to low fertility, undocumented migration from Mexico is over, and despite persistent employment demand and higher wages in the United States, it is unlikely to revive (Massey, Durand and Pren 2016).

13.     Migration from Central America to the United States began in the 1980s as a direct result of the U.S. political and military intervention in the region, which covertly supported death squads in El Salvador and Guatemala while training and equipping an army of "Contras" based in Honduras in an effort to topple the leftist Sandinista regime in Nicaragua and thereby prevent the spread of communism in Latin America (Lundquist and Massey 2005). From 1980 to 1986, civil violence spread, deaths multiplied, and as a result of ongoing violence the region's economy constricted. In response, Central Americans fled northward and crossed the border without authorization. While Nicaraguan refugees were allowed to adjust status and

become legal permanent residents (since they were fleeing a nation with a leftist government opposed by the United States), refugees fleeing El Salvador, Honduras, and Guatemala (governed by right-wing regimes allied with the United States) were not recognized and remained undocumented (Massey, Durand, and Pren 2014). The Central American minors seeking asylum at the border today are a legacy of this outflow, seeking to escape horrendous conditions caused by the U.S. intervention by reuniting with family members in the United States who had fled the region during the 1980s and 1990s.

14.     Although research indicates that unauthorized Mexican migrants to the United States originally came and went in response to economic circumstances on both sides of the border (Massey 1987; Massey and Espinosa 1997), the connection between return migration and economic conditions in Mexico was broken by the militarization of the border after 1986, causing rates of return to drop precipitously toward levels near zero, where they remain today (Massey, Durand, and Pren 2015). Studies show that, controlling for economic conditions on both sides of the border, rates of return migration fall steadily as migrants spend more time in the United States (Massey 1986; Massey and Espinosa 1997).

15.     Even during the era of circular migration before 1986, once established in the United States as settlers, the likelihood of returning to Mexico after five years in the United States was close to zero (Massey 1987). Similar findings hold for migrants from Central America, who are even less likely to return because of endemic violence in their regions of origin. As with Mexican migrants, the likelihood of returning home also falls sharply for Central Americans with time spent in the United States (Massey and Riosmena 2010) and has steadily fallen over time for Central American migrants generally, with one study finding a zero likelihood of return migration to the region as of 2005 (Massey, Durand, and Pren 2014).

16.     According to the latest statistics from U.S. Citizen and Immigrant Services (2018), there are 814,000 young people registered for DACA. Of these, 79% are Mexicans, 9% are Central Americans, and 6% are from elsewhere in Latin America. This population is not representative of undocumented U.S. residents generally, only 50% of whom are Mexican with 16% coming from Central America (Passel and Cohn 2017). Two-thirds of DACA recipients are under age 25 (compared to just 23% of all undocumented migrants), 54% are female (with a figure of 46% for all undocumented migrants), and 83% are single (compared with 40% for undocumented migrants generally) according to data reported by Lopez and Krogstad (2017) and the Migration Policy Institute (2018).

17.     These differences are not surprising given the criteria required to qualify for DACA. All recipients must have entered the United States before their 16th birthday, have been under the age of 31 as of June 15, 2012, physically residing in the country on that date, and also present at the time of their application. Moreover, all were high school graduates, GED holders, or persons honorably discharged from the U.S. Armed Forces who had lived continuously in the United States since June 15, 2007. None has ever been convicted of a felony or even a significant misdemeanor and all have been judged to pose no threat to national security or public safety by the U.S. Department of Homeland Security, a level of vetting far stricter than experienced by new legal permanent residents.

18.     Based the foregoing profile and the findings summarized above, I conclude it is very unlikely that DACA recipients from Mexico and Central America will voluntarily return to their countries of origin if they lose the legal right to remain in the United States. All available data indicate a strong attachment to the United States, and their many years of U.S. experience from a young age render them unrepresentative of subjects included in prior studies of return

7

migration. Earlier studies overwhelmingly focused on persons who began migrating as adult labor migrants, not children who were brought into the United States at young ages, who grew up speaking fluent English, attending U.S. schools, and consuming American culture. In addition, DACA recipients are unprepared for life and labor in their countries of birth. Most speak elementary household Spanish, cannot read or write very well in that language, and are unfamiliar with the culture and customs of nations they left long ago.

19.     Ultimately, by virtue of applying for DACA the recipients have signaled their ardent wish to remain in the United States and identify as Americans, despite the risks of coming out of the shadows and registering their presence with federal authorities. They had no real say about their being brought to the United States as minors, but by registering with DACA they are exercising their will to have a say about where they spend the rest of their lives, expressing a clear intent to remain where they grew up and in the only country they really know, whatever the challenges they face in achieving that end.  I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

        Executed this 13th day of June, 2018 in Jamaica, Vermont.

_____
Douglas S. Massey, Ph.D
Henry G. Bryant Professor of Sociology and Public Affairs
Princeton University

8

# REFERENCES

Capps, Randy, Michael Fix, and Jie Zong. 2016. *A Profile of Children with Unauthorized Immigrant Parents*. Washington, DC:  Migration Policy Institute.

López, Gustavo, and Jens Manuel Krogstad. 2017. *Key Facts about Unauthorized Immigrants Enrolled in DACA. Washington, DC: Pew Research Center*. http://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/

Lundquist, Jennifer H., and Douglas S. Massey. 2005. "Politics or Economics?  International Migration During the Nicaraguan Contra War." *Journal of Latin American Studies* 37:29-53.

Massey, Douglas S. 1986. "The Settlement Process Among Mexican Migrants to the United States." *American Sociological Review* 51:670-85.

Massey, Douglas S. 1987. "Understanding Mexican Migration to the United States." *American Journal of Sociology* 92:1372-1403.

Massey, Douglas S. 2015.  "Militarization of the Mexico-U.S. Border and its Effect on the Circularity of Migrants." Pp. 23-33  in Diego Acosta and Anja Wiesbrock, eds., *Global Migration: Old Assumptions and New Dynamics*, Volume 1.  NewYork: Praeger.

Massey, Douglas S. 2016. "The Mexico-U.S. Border in the American Imagination." *Proceedings of the American Philosophical Society* 160(2):160-177.

Massey, Douglas S., Rafael Alarcón, Jorge Durand, and Humberto González. 1987.  *Return to Aztlan:  The Social Process of International Migration from Western Mexico*.  Berkeley and Los Angeles:  University of California Press.

Massey, Douglas S. Jorge Durand, and Nolan Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration*.  New York:  Russell Sage Foundation.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2014. "Explaining Undocumented Migration." *International Migration Review* 48(4):1028-1061.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2015. "Border Enforcement and Return Migration by Documented and Undocumented Mexicans." *Journal of Ethnic and Migration Studies* 41(7): 1015-1040,

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2016. "Why Border Enforcement Backfired." *American Journal of Sociology* 121 (5): 1557– 1600.

Massey, Douglas S., and Kristen E. Espinosa. 1997. "What's Driving Mexico-U.S. Migration?  A Theoretical, Empirical and Policy Analysis." *American Journal of Sociology* 102:939-999.

Massey, Douglas S., and Karen A. Pren. 2012. "Unintended Consequences of US Immigration

Policy: Explaining the Post-1965 Surge from Latin America." *Population and Development Review* 38:1-29.

Massey, Douglas S., and Fernando Riosmena. 2010. "Undocumented Migration from Latin America in an Era of Rising U.S. Enforcement." *Annals of the American Academy of Political and Social Science* 630(1):137-161.

Massey, Douglas S., and Audrey Singer. 1995. "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension." *Demography* 32:203-13.

Migration Policy Institute. 2018. *Profile of the Unauthorized Population: United States*. Washington, DC: Migration Policy Institute. https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US#

Passel, Jeffrey S., and D'Vera Cohn. 2017. *As Mexican Share Declined, U.S. Unauthorized Iimmigrant Population Ffell in 2015 Below Recession Level*. Washington, DC: Pew Research Center. http://www.pewresearch.org/fact-tank/2017/04/25/as-mexican-share-declined-u-s-unauthorized-immigrant-population-fell-in-2015-below-recession-level/

U.S. Citizenship and Immigration Services. 2018. "Data Set: Form I-821D Deferred Action for Childhood Arrivals." Washington, DC: U.S. Citizenship and Immigration Services. https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals

# DEF-INTERV.

# EX. 74

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 1:18-cv-00068** |
| **UNITES STATES OF AMERICA, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| _____ | § | |

**Declaration of M. Ray Perryman, Ph D**

1.    My name is M. Ray Perryman. I am over the age of 18 years and am fully competent to make this affidavit. The statements contained herein are true and correct based upon the personal knowledge and information I have gained throughout my professional career as well as specific research related to this engagement.

2.    I have been retained by Mexican American Legal Defense and Education Fund (MALDEF) to review the declarations of Monica Smoot, Donald Deere, Lloyd Potter, and Leonard Lopez and offer relevant responses. My primary focus will be the declarations of Dr. Deere and Ms. Smoot. As background to my responses, I will also offer a perspective on economic issues related to this matter and Deferred Action for Childhood Arrivals (DACA).

3.    The Perryman Group is being compensated for work on this assignment based on billable hours plus expenses. My personal rate is $800 per hour. Other personnel have billing rates in the $250 to $450 per hour range. The level of compensation is not dependent in any way on the opinions I express in, or the outcome

1

of, this matter. Much of the work on this project has been performed by individuals working under my supervision at The Perryman Group.

4.   My complete Curriculum Vitae (CV) has been attached, which includes a list of all publications that I have authored and my professional qualifications. I am also attaching a list of my testimony over the past five years in litigation matters.

## I.   <u>Qualifications</u>

5.   I am President and Chief Executive Officer of The Perryman Group (TPG), an economic and financial analysis firm with its principal place of business in Waco, Texas. The Perryman Group has about 20 employees and maintains access to a large network of professionals in the United States and abroad.

6.   I have more than 40 years of academic and professional experience in economics and finance since completing my graduate education. My educational background includes a Bachelor of Science degree in Mathematics from Baylor University and a Ph.D. in Economics from Rice University. My academic career includes 17 years as a member of the faculty of Baylor University and five years as Business Economist-in-Residence at Southern Methodist University. During my tenure at Baylor, I served 10 years in an endowed research chair as the Herman Brown Professor of Economics and five years as University Professor and Economist-in-Residence. I have published five books and published or presented more than 400 academic papers on a wide range of topics. I have also served as an officer in several academic societies and as the editor of academic journals and monograph series. I have won numerous awards for my research endeavors.

7.   In the professional arena, I have authored more than 2,500 trade and professional articles. I also publish a monthly newsletter and a weekly syndicated column. My subscription forecasting services have provided data and projections regarding the economies of the US, Texas, regions and metropolitan areas in Texas, and Texas counties for more than three decades. I provide a daily syndicated radio program and deliver dozens of speeches each year on economic matters. I have also

2

served on numerous governmental task forces and am actively involved in the public policy process. I am frequently invited to provide testimony to legislative and regulatory bodies on various economic issues. I have received numerous awards for my work in these areas, including recent designations as the 2012 Texan of the Year by the Texas Legislative Conference, the 2012-13 Baylor University Meritorious Service Award, and the 2016 Cesar E. Chavez Legacy Award. I have more than 40 years of consulting experience, and my firm has served the needs of over 2,500 clients.

8.    I have decades of experience in assessing the alleged harms of various actions and policies. I have evaluated damages arising in litigation matters in hundreds of engagements. I have also assessed alleged harms in numerous regulatory proceedings and reports (including many involving a balancing of interests) on a wide variety of issues and have performed hundreds of policy studies dealing with similar issues. I have frequently testified on such issues before Congress and various legislative bodies. Topics have included, among others, energy policy, financial regulation, utility regulation, environmental issues, transportation, insurance, energy, water resources, and telecommunications.

9.    I am a Texas resident, my firm is based in Texas, and I have extensive experience in analyzing the economies of all areas of Texas. I developed the Texas Econometric Model beginning more than 40 years ago and have consistently maintained and updated it since that time. I have been providing forecasts of the state economy as well as its regions and metropolitan areas on a regular basis for more than 35 years. I am also the author of "Texas, Our Texas," the comprehensive plan that led to most of the major economic development incentive programs in the state. Many of our analyses have been specific to Texas; at least 500 studies or other reports have included measurement of economic and fiscal effects of economic patterns or changes on the state in addition to thousands of articles, columns, newsletters, interviews, and speeches.

10.  I also have extensive experience in the analysis of labor markets. Comprehensive workforce assessments have been conducted both from the perspective of communities and of potential locating firms. I have performed projects of

3

this nature for the US Department of Commerce, the US Department of Labor, the Texas Workforce Commission, the Texas Workforce Investment Council, the Bill and Melinda Gates Foundation, the Texas Higher Education Coordinating Board, and scores of councils of government, economic development organizations, local governments, educational institutions, trade associations, and chambers of commerce. I also developed and maintain a comprehensive occupational model which has been used in hundreds of studies of workforce issues. I have taught courses in labor economics at the undergraduate and graduate levels.

11.  I have performed numerous studies related to the effects of immigration on the economy and the cost and benefits of immigrants as well as undocumented workers in the United States and Texas. These studies have included assessments of the effects of such workers in each of the 50 US states. My work in this area has been supported by, among others, Americans for Immigration Reform, the Partnership for a New American Economy, and the Ford Foundation. I have also testified before the Texas House of Representatives and other governmental entities regarding the benefits of foreign workers on several occasions.

12.  In the area of health care, I have studied numerous aspects of health and wellness including economic analysis of issues (among others) related to obesity, diabetes, cancer, as well as public policy studies related to numerous health issues (including indigent health care, Medicaid and Children's Health Insurance Program (CHIP) funding, benefits of health insurance coverage for State employees, and scope of practice). I have also performed assessments for medical schools, hospital systems, and health-oriented research facilities. I have studied the economic and fiscal effects of education facilities as well as major hospital systems such as Parkland Memorial Hospital, University Health System, Texas Medical Center, Menninger Clinic, Baylor Scott & White, and Methodist Hospital. Assessments have also been performed for medical schools including UT Southwestern, The University of Texas Medical Branch, M.D. Anderson, the University of Kansas Medical School, The University of Texas Health Science Center at San Antonio, Baylor College of Medicine, Texas Tech University Health Sciences Center, The University of Texas Dell Medical School, the Temple Medical and Educational District, and multiple institutions and initiatives within

4

Texas A&M University's Research Valley Biocorridor. I have also analyzed numerous emerging technologies in the health care arena, including wound care treatment advances, genomic medicine, nanomedicine, and vaccine incubation. I have also examined the economic and effects of cancer, diabetes, mental health conditions obesity, and wellness. In addition, I serve on the board of directors of a large health insurance company with approximately $70 billion in annual revenue and 20,000+ employees (served as Chair of Finance, Governance, and Compensation Committees); am a Leadership Fellow of the National Association of Corporate Directors; serve as chair of a state advisory board for a large health-related group; and have served as chair and member of numerous trade association and related boards. A major study I performed using models I developed was recently published in *The Journal of Medical Economics*.

13.  My experience also includes other topic areas important to this matter. I have studied education and school finance on a number of occasions and am very familiar with the issues. I have assisted both the Texas House and Senate in analyzing various funding alternatives. In addition, my regular forecast series includes population projections and I have studied the various issues related to demographics including, among others, the effects of the aging of the population, domestic and international migration patterns, and workforce changes.

14.  I frequently prepare public policy studies and have been involved in shaping legislation. Representative topics include energy deregulation, communications (telephone, Internet, and cable), judicial reforms, insurance, transportation (water, air, rail, trucking, and highway funding), financial services, health care, economic development, education funding and policy, taxation, social services, oil and gas development, pipelines, mergers and acquisitions, competition, real estate, franchising, legal aid, and international trade). Analysis by my firm often plays a key role in policy formulation and implementation. I have served as advisor and/or consultant to several Presidents; numerous House and Senate Committees; the US Departments of State, Defense, Commerce, Labor, the Interior, Housing and Urban Development, Agriculture, Energy, Treasury, and Transportation; the Federal Reserve Board; The Federal Home Loan Bank Board; The Federal Energy Regulatory Commission; the International Trade

Commission; and more than 50 other state and federal agencies. I have provided testimony to Congress on numerous occasions and testified before various federal and state legislative committees and regulatory bodies on approximately 200 occasions; I have also provided testimony in several other countries. I have served on numerous federal and state task forces on economic issues and have received numerous awards for public policy work, including Congressional and legislative citations.

15.  My complete resume is attached to this declaration along with a list of my litigation testimony over the past several years. I will begin this discussion with some relevant background information and then comment on the declarations noted above within his framework.

## II.    Overview of DACA

16.  Implemented in August 2012, DACA allows individuals who entered the United States as children to remain here for school or work. Specifically, young undocumented immigrants can apply for a two-year reprieve from deportation that also grants the ability to work in the United States. As of March 31, 2018, there were 693,850 persons across the country enrolled in DACA, and approximately 113,960 of these individuals lived in Texas.[1] However, an estimated total of 1.3 million people nationwide are eligible to apply for DACA, including over 226,000 in Texas.[2]

17.  To be eligible for DACA, a non-citizen must be under the age of 31 as of June 15, 2012; have entered the US while under the age of 16; have resided in the US continuously since June 15, 2007; and have entered the US without inspection or have been lacking lawful visa status before June 15, 2012. Furthermore, applicants must currently be in school, have graduated from high school, have obtained a GED, or have been honorably discharged from the armed forces or Coast Guard. Additionally, an

---

[1] Approximate Active DACA Recipients: State or Territory of Residence As of March 31, 2018, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Mar_31_2018.pdf.
[2] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/.

applicant must not have been convicted of a felony, a significant misdemeanor, or have more than three misdemeanors of any kind.[3]

18.  A 2017 national survey of DACA recipients found that approximately 91% of DACA recipients are currently employed.[4] About 69% of respondents indicated that they were able to get a job with better pay after receiving DACA.[5] Similarly, 54% indicated they moved to a job that better fit their career goals, and 56% moved to a job with better working conditions.[6] On average, wages increased by 69% after receiving DACA, rising from $10.29 per hour to $17.46 per hour.[7] The increased earnings helped 69% of respondents "become financially independent" and 71% to better aid their family financially.[8]

19.  The survey also found that 45% of DACA recipients are currently in school.[9] Among that population, 72% are pursuing a bachelor's degree or higher.[10] Overall, 36%

---

[3] DACA (Deferred Action for Childhood Arrivals), Immigration Equality, (n.d.), https://www.immigrationequality.org/get-legal-help/our-legal-resources/path-to-status-in-the-u-s/daca-deferred-action-for-childhood-arrivals/#.WyAAFN%E2%80%A6.

[4] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[5] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[6] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[7] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[8] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[9] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[10] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

of respondents 25 years or older have at least a bachelor's degree and 94% of those currently in school indicated that DACA allowed them to pursue educational opportunities that would not have been available without the program.[11]

III.   **Current Labor Situation in the United States**

   A. **Unemployment and Job Openings**

20.  Any analysis of the effects of immigration on the economy must include an analysis of the domestic labor market. Essentially, the labor market refers to the availability of labor (workers) and employment (jobs).

21.  According to the US Bureau of Labor Statistics (BLS), the US seasonally adjusted unemployment rate in May 2018 was 3.8%, meaning the 3.8% of the labor force (which includes those employed and those available for work and seeking employment) is currently without a job.[12] The number of unemployed persons fell to 6.1 million in May of 2018.[13] It should also be noted that initial claims for unemployment are also at or near historically low levels.[14]Unemployment as traditionally measured counts only people who are actively looking for work, and changes in the rate are largely driven by cyclical factors such as the health of the economy and whether businesses are hiring, as well as longer-term demographic trends. It is assumed that a well-functioning economy will always have some natural unemployment. In fact, most economists consider an unemployment rate of 4.5-5% to signify that the economy is at or near full employment.

---

[11] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[12] The Employment Situation – May 2018, US Bureau of Labor Statistics, June 1, 2018,
https://www.bls.gov/news.release/pdf/empsit.pdf.
[13] The Employment Situation – May 2018, US Bureau of Labor Statistics, June 1, 2018,
https://www.bls.gov/news.release/pdf/empsit.pdf.
[14] Unemployment Insurance Weekly Claims, US Department of Labor, June 14, 2018,
https://www.dol.gov/sites/dolgov/files/OPA/newsreleases/ui-claims/20181010.pdf.

22.  The US is actually experiencing a labor shortage in many industries and in different parts of the country. With the economy at or near full employment, it is becoming increasingly difficult for employers to fill open positions. According to the most recent data, over half of the Metropolitan Statistical Areas (MSA) in the US had an unemployment rate below the national rate of 3.7% in April and 88 MSAs had an unemployment rate below 3%.[15] Some areas of the country are even experiencing unemployment levels as low as 2%, particularly in Hawaii, Iowa, South Dakota, Vermont, Virginia, and Wisconsin. The lowest unemployment rate is the 1.5% found in Ames, Iowa. While low unemployment levels seem like a good thing, insufficient numbers of workers available to fill new positions can actually slow overall economic growth as companies have difficulties expanding to meet demand.

23.  In April 2018, there were 6.7 million job openings, representing a job opening rate of 4.3% (percentage of job openings to the sum of the number of people in the labor force and the number of job openings). This number represents the highest level of job openings and the highest rate of job openings since the series began in December 2000, and likely the highest in US history. There is now less than one unemployed person per job opening, compared to over six in 2009. Close to 36% of firms report having a position that is unfilled as of February.[16]

24.  Within certain industries, the disparity between job openings and potential workers is even more marked. For example, according to New American Economy, online job listings in science, technology, engineering and math (STEM) fields outnumbered unemployed STEM workers 13 to 1 in 2016.[17] In addition, in 2014 there were 5.6 healthcare online job listings for every unemployed healthcare worker in Texas.[18] Overall, there are at least 15 occupations in the US health sector in which unfilled job listings outnumbered unemployed workers by more than 10 to 1.[19] Labor

---

[15] Unemployment at the MSA level is only calculated on a seasonally unedjusted basis, so those rates are compared here, *see* Metropolitan Area Employment and Unemployment – April 2018, Bureau of Labor Statistics, May 30, 2018, https://www.bls.gov/news.release/pdf/metro.pdf.
[16] The Labour Market is Hot… Too Hot: Deutsche Bank, ValueWalk, February 8, 2018, https://www.valuewalk.com/2018/02/us-labour-market-tightening/.
[17] Innovation & STEM Fields, New American Economy, (n.d.), https://www.newamericaneconomy.org/issues/innovation-stem-fields/.
[18] The Contributions of New Americans in Texas, New American Economy, August 2016, p. 15.
[19] Healthcare, New American Economy, (n.d.), https://www.newamericaneconomy.org/issues/healthcare/.

shortages in healthcare fields are even more alarming because the demand for those positions are expected to increase dramatically as more and more Baby Boomers age and require additional care.

### B.  Labor Force Participation

25.  One of the reasons for the current labor shortage is that the labor force participation rate has been declining in the past years. The labor force participation rate measures the number of people age 16 or older who are either working or have looked for work in the past year as a proportion of the total population age 16 or older. Labor force participation, in contrast to the unemployment rate, deals more with underlying patterns such as demographics and social norms and choices. Although the health of the job market affects labor force participation (people drop out during downturns and re-enter during recoveries), it is only one factor among many and is experiencing a notable downward trend.

26.  The Bureau of Labor Statistics tracks the labor force participation rate, which measures people who are either working or have looked for work in the past year. After increasing for more than 60 years, the participation rate peaked in the late 1990s at just over 67%. At the beginning of the Great Recession in 2007, it stood at 66%, and fell slightly by 2009 during the worst of the downturn in the business cycle. Even with job market improvement since the end of the recession, the labor force participation rate has continued to fall. The labor force participation rate in May 2018 was 62.7%.[20] The decline is projected to continue, and by the late 2020s, BLS predicts that only about 60% of Americans 16 and older will be part of the labor force, with the proportion dropping to only 57% by 2060.[21] While on the surface that percentage decline does not seem overly large, a one percentage point drop equates to around 2.6 million laborers leaving the workforce.

---

[20] The Employment Situation – May 2018, Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.
[21] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

27. There are multiple reasons for this decline. For one, the main source of the growth that has occurred since the 1950s was due to women entering the work force. The labor force participation rate of men peaked at the end of the 1940s and has long been declining, but the overall proportion of people working continued to rise as women joined the labor force in large numbers. In 1950, more than 86% of the US male population age 16 and over was part of the labor force, but the proportion has fallen steadily since that time to about 68% now. In 1950, less than 34% of women 16 or older were participating, but the proportion of women in the workforce grew rapidly in the following decades and peaked at roughly 60% in the late 1990s and early 2000s. However, the labor force participation rate of women peaked in 1999 at 60% and has now also begun to fall.[22]

28. Another major reason for the decline in labor force participation is the aging of the large generation of people born between 1946 and 1964 during the post-war "baby boom." The baby boomer generation has been a large share of the labor force but is now aging beyond prime working years (defined by BLS as ages 25 to 54). In fact, the oldest boomers began to reach retirement age several years ago. Participation rates among people aged 55 and older are much lower than in the prime working age ranges, and as more of the baby boomers retire there will be additional downward pressure on overall participation rates.[23]

29. The working patterns and choices of young people is also affecting the overall participation rate. BLS data indicate that the labor force participation rate of youths (ages 16 to 24) has fallen over the past several decades, especially since 2000. School is the most commonly cited reason among those choosing not to work.[24]

---

[22] *For larger discussion, see* Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[23] *For larger discussion, see* Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[24] Toossi, Mitra, Labor Force projections to 2024: the labor force is growing, but slowly, Bureau of Labor Statistics, December 2015, https://www.bls.gov/opub/mlr/2015/article/labor-force-projections-to-2024.htm#_edn1.

### C.  Market Responses to Smaller Workforce

30.  Most of these patterns have either been expected for many years (aging of the baby boomers), the result of the end of a major social transition (women entering the workforce in large numbers), or partly a desirable shift (young people choosing to further their education). The decline in the labor force participation rate will lead to a slower expansion in the workforce down the road. The civilian noninstitutional population was projected (by BLS) to grow from 251 million in 2015 to 326 million in 2060 (an increase of 75 million); however, the labor force is projected to increase from 157 million in 2015 to 186 million in 2060, an increase of only 29 million.[25]

31.  The labor shortage will become an increasing problem as the labor force participation rate continues to decline. Markets have responded to this phenomenon in multiple ways. Some companies have increased wages to attract more qualified applicants. In addition, there have been massive investments in technology that substitutes capital for labor or makes existing labor more productive. Accommodations to keep people in the workforce have also been developed. Options such as flex time, job sharing, and working at home are now more common, and many workplaces offer day care and even parent care on site. Retirees have also been rehired on a part-time or consulting basis. Immigration, both documented and undocumented, has also been a part of the solution.

### D.  Need for Immigrants

32.  These various market solutions have had some effect to date but will likely fall short in the future. Given that the United States is currently at full employment with record job openings and low levels of initial claims, it would clearly be difficult to maintain current growth patterns without immigrants. In the future, immigrants and their children are likely to be an increasingly crucial aspect of the workforce as the US population ages and baby boomers continue to retire. In fact, the share of immigration in

---

[25] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

population growth is projected to be larger than the share of growth from natural increase (the number of births and deaths in the native population) beginning in 2024 and is expected to account for around 80% of growth by the 2040s.[26]

33.  Immigrants are already a vital part of the US economy. The foreign-born population reached 43.7 million in 2016 and accounted for 13.5% of the US population.[27] That level is almost triple the share in 1970 and is only slightly below the all-time-high level of 14.8% immigrant which occurred back in 1890.[28] An estimated 11 million of these immigrants are unauthorized.[29]

34.  In 2016, about 26 million immigrants were working in the United States, which is about 16% of the total workforce.[30] Most of them are working legally, but about 8 million were undocumented.[31] Lawful immigrants are most likely to be employed in professional, management, business, or service jobs.[32] Undocumented workers are most likely to be working in service or construction jobs.[33]

35.  Immigration fluctuates with the economy, particularly within the undocumented segment. During the 1990s and early 2000s when the US economy was expanding, the unauthorized immigrant population was also rising. However, during the Great Recession, more people were leaving than entering, and the undocumented population decreased. Since that time, it has remained relatively stable. The number of

---

[26] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[27] Selected Characteristics of the Native and Foreign-Born Populations, 2016 American Community Survey 1-Year Estimates, US Census Bureau.

[28] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[29] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/; Zong, Jie, Jeanne Batalova, and Jeffrey Hallock, Frequently Requested Statistics on Immigrants and Immigration in the United States, February 8, 2018, https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Unauthorized.

[30] Selected Characteristics of the Native and Foreign-Born Populations, 2016 American Community Survey 1-Year Estimates, US Census Bureau; The Employment Situation – May 2018, Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.

[31] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[32] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[33] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

unauthorized immigrants in the US labor force has been in the range of eight million or
so for several years, which is about 5% of the total workforce (they comprise about
8.5% of the Texas workforce).[34]

36.  These observations clearly reveal that immigration should be viewed in a
broader social and economic context as one of several market responses to ongoing
demographic trends and business conditions. It is not an isolated issue, but rather one
that functions within the framework of the complex interactions of myriad factors that
drive the modern economy. The United States and Texas in particular need additional
workers to meet ongoing labor shortages. DACA recipients, who have lived in the
United States since childhood and have often completed higher levels of education and
have support networks in place, are well equipped to efficiently meet a portion of this
need.

## IV.    Benefits of DACA to the US Economy

37.  Many studies, including my own, have shown that undocumented immigrants
actually have a net positive effect on the Texas economy and state and local
governments, despite the costs they might present.[35] With the legal protection and
incentives for further education offered by DACA, recipients are likely to be particularly
important to the US economy, especially in light of labor shortages that must, to a
significant degree, be filled by immigrants.

38.  A non-partisan policy study has estimated that 1.3 million young
undocumented immigrants that are eligible for DACA are the source of $2 billion in
direct state and local tax revenues.[36] In Texas, DACA recipients currently are estimated

---

[34] Passel, Jeffrey S. and D'Vera Cohn, Size of U.S. Unauthorized Immigrant Workforce Stable After the
Great Recession, Pew Research Center, November 3, 2016, p. 4-5.
[35] Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented
Workers, The Perryman Group, February 2016; Anderson, Will, Undocumented immigrants provide Texas
with net benefit of more than $700 million annually, report says, Austin Business Journal, November 6,,
2017, https://www.bizjournals.com/austin/news/2017/11/06/undocumented-immigrants-provide-texas-
with-net.html.
[36] Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants,
Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.

to contribute between $259 and $313 million in direct state and local taxes annually.[37] One study found that DACA recipients will contribute $460.3 billion to the US gross domestic product over the next decade.[38] According to New American Economy, the DACA-eligible population in Texas has close to $2.6 billion in purchasing power.[39]

39.  In an analysis of DACA recipients performed by my firm, The Perryman Group, I estimated that, for the United States, direct benefits of DACA recipients include an estimated $84.3 billion in annual output (gross product), $52.8 billion in annual personal income, and almost 685,200 jobs. When multiplier effects are considered, the total benefits rise to $188.6 billion in annual output and $117.3 billion in income per year, as well as nearly 2.1 million jobs. For Texas, the direct gains in business activity associated with DACA recipients include an estimated $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs. When multiplier effects are included, the total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs.

40.  With the analysis provided above as a backdrop, I will now examine the declarations that I have been asked to review in this matter.


## V.  Response to the Declaration of Monica Smoot

41.  In her declaration, Monica Smoot, the Chief Data and Analytics Officer at the Texas Health and Human Services Commission (HHSC), provided estimates of the cost of providing services and benefits to undocumented immigrants.[40] Specifically, for fiscal

---

[37] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/; Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants, Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.
[38] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[39] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/.
[40] Declaration of Monica Smoot, May 2, 2018, Par. 7-10.

year 2015, the estimated costs were $73 million for the Texas Emergency Medicaid, $1.0 million for the Texas Family Violence Program (FVP), and $30 million for the Texas Children's Health Insurance Program (CHIP) Prenatal Coverage, totaling $104 million.[41] She also provides an estimate of the amount of uncompensated medical care from public hospitals from undocumented immigrants, which totaled $716.8 million in fiscal year 2008, the latest estimate.[42]

42.  It is important to note that none of these programs ask about or record residency or citizenship status and that these numbers are at best only estimates of the cost to the State of Texas. For the costs from HHSC services, aside from Texas Emergency Medicaid, the services described in the Rider 59 report (including uncompensated care) are available to citizens and non-citizens. However, HHSC assumed, without further analysis, that citizens and non-citizens receive these services at rates equal to their proportion of the population.

43.  Social science research suggests that undocumented immigrants are less likely to avail themselves of hospitals and other health care services available to them when compared to the rest of the population.[43]

44.  The HHSC report further assumed that in 2015 no less than 50% of non-citizens in Texas are undocumented immigrants (1.48 million).[44]  However that assumption is also not methodologically sound because it takes an estimate of the undocumented population in Texas by the US Department of Homeland Security and divides that number into the estimate of non-citizens in Texas provided by the US

---

[41] For a summary of costs in fiscal years 2007, 2009, 2011, 2013, and 2015, see Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 4).

[42] Declaration of Monica Smoot, May 2, 2018, Par. 11.

[43] Much of this literature is summarized in Hacker, Karen et al. "Barriers to Health Care for Undocumented Immigrants: A Literature Review." *Risk Management and Healthcare Policy* 8 (2015): 175–183. *PMC*. Web. 16 June 2018.

[44] This estimate was a conservative assumption based on the most recent estimate of undocumented immigrants from the Department of Homeland Security (2012) and the estimate of non-citizens from the 2015 American Community Survey; see Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 5-6).

Census American Community Survey to generate a proportion/percent of undocumented Texans.

45. The HHSC then applied its 50% undocumented rate to the Texas costs for Emergency Medicaid and the Texas Family Violence Programs.

46. More problematic is the HHSC estimate with respect to the CHIP Prenatal Coverage. Although HHSC admitted that recipients of CHIP Prenatal Coverage can be US citizens, documented non-citizens, or undocumented non-citizens, HHSC applied the 50% multiplier to its entire cost for CHIP Prenatal Coverage.

47. Therefore, the report estimated that about half of the costs for the Emergency Medicaid and CHIP prenatal coverage programs were due to undocumented immigrants, though it is unknown whether undocumented immigrants truly comprised half of the patients using Emergency Medicaid or CHIP prenatal coverage (or half of the expenses caused by these services).[45]

48. The estimate for FVP for fiscal year 2015 further used the organization's entire budget for funding 71 non-profit family violence shelters and 10 non-residential centers in addition to projects to provide services to victims of family violence, scaled down by the proportion of the estimated number of undocumented immigrants to the entire Texas population.[46] However, many of these costs are fixed for the fiscal year, and would not vary as the number of potential undocumented immigrants fluctuated, especially since this analysis assumes that only 5.4% of the potential recipients of these services would be undocumented immigrants.[47]

49. Even if they were not based on unreliable methodology, these estimates are actually quite low compared to what the state spends on health expenses each year. For perspective, the overall health care expenditures for Texas in fiscal year 2015

---

[45] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 7).
[46] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 8).
[47] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 8).

totaled nearly $43.0 billion, of which $18.0 billion was funded by Texas general revenue sources.[48] The HHSC by far had the largest share of those expenditures, with $25.4 billion total health care expenditures, $10.4 billion of which came from general revenue funding.[49] The HHSC administers the Medicaid and CHIP programs, along with others. The average Medicaid per-member monthly cost for acute and long-term care was $529, which would total $6,348 annually.[50] The amount estimated to have been spent on undocumented immigrants ($104 million in 2015) is actually quite small compared to the overall health care expenditures from HHSC health programs like Medicaid and CHIP across the state (less than 1%). Assuming 1.48 million undocumented immigrants as in the HHSC report, that would put the cost per-undocumented immigrant for the Emergency Medicaid and CHIP prenatal care at approximately $70 annually, while the FVP program would cost another $0.68 per undocumented immigrant.

50. Moreover, these estimates are for the entire undocumented population in Texas, rather than specifically related to DACA recipients. While there were approximately 1.65 million undocumented immigrants estimated to be in Texas as of 2014,[51] there have only been 112,336 approved DACA initial applications as of September 30, 2015.[52] The total number of DACA recipients in Texas was 111,670 as of January 2018, while there are an estimated 182,000 that are immediately eligible in the state as of 2017.[53] So at most, based on the latest estimates, 6.7% of the entire

[48] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 2.
[49] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 2.
[50] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 8.
[51] Estimated unauthorized immigrant population, by state, 2014, Pew Research Center, November 3, 2016, http://www.pewhispanic.org/interactives/unauthorized-immigrants/
[52] National and State Estimates of the Unauthorized Immigrant Population, 2010-14, Migration Policy Institute, https://www.migrationpolicy.org/sites/default/files/datahub/State-County-Unauthorized-Estimates.xlsx; Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2015 (September 30), U.S. Citizenship and Immigration Services (USCIS).
[53] Approximate Active DACA Recipients as of January 31, 2018, U.S. Citizenship and Immigration Services (USCIS), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf; National and State Estimates of the DACA-Eligible Population, 2017, Migration Policy Institute, https://www.migrationpolicy.org/sites/default/files/datahub/State%20and%20County%20Estimates%20of%20DACA-Eligible%20Population-2017-FINAL.xlsx.

undocumented persons in Texas are actually DACA recipients, and the share would only reach 11% if more of those eligible applied to the program. It is important to note that DACA recipients are not eligible for many normal Medicaid or CHIP programs beyond the ones listed in this report.[54] Moreover, the end of DACA would not necessarily affect the size of the undocumented population in Texas, as there will be an ongoing need for workers. Thus, the costs of these programs would not necessarily be reduced. In fact, to the extent that the replacement workers exhibited lower educational levels and less earning capacity, as would be expected, the demands on the social service system might be even greater (as discussed below).

51. DACA recipients are less likely to require these programs than other undocumented immigrants in that DACA recipients are more likely to get paid more and have better economic outcomes, so are ultimately less likely to need to rely on these services and benefits. As mentioned above, in a 2017 survey of DACA recipients, approximately 69% of respondents indicated that they were able to obtain a job with better pay after receiving DACA, 54% indicated they moved to a job that better fit their career goals, and 56% moved to a job with better working conditions.[55] On average, wages increased by 69% after DACA certification, rising from $10.29 per hour to $17.46 per hour.[56] The survey also indicated that the annual average salary for DACA recipients was $36,232 (median salary $32,000), while for those who were employed before receiving DACA benefits, the average annual salary was only $20,068.[57]

---

[54] North, Anna, DACA helped some immigrants finally get health care. Now they could lose it., Vox, September 28, 2017, https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants.
[55] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[56] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[57] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/; Results from Tom K. Wong et al., 2017 National DACA Study, Updated October 7, 2017,
https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.

Respondents aged 25 and older reported an average annual salary of $41,621 (median salary $37,595).[58] The increased earnings helped 69% of respondents "become financially independent" and 71% to better aid their family financially.[59]

52. Many of these financial benefits are likely due to the legality of respondents' employment as they received DACA. The DACA-recipients' ability to live and work legally in the US would also potentially place them outside the income guidelines for HHSC programs as well as allow them to sign up for health insurance, although they are not eligible for coverage under the Affordable Care Act and would need to pay the full price for health insurance outside the marketplace if not offered by employers.[60] Rather than trying to end DACA, achieving comprehensive protection for DACA recipients through legislation would be a better outcome for this population, as that could increase access to health care. Again, the removal of DACA would not necessarily impact the size of the undocumented population in Texas and therefore would not lower the costs reported by Ms. Smoot. However, an increase in the availability of health care to the DACA eligible population could also decrease the costs from these programs as well as the amount of uncompensated medical care in the state.

53. Furthermore, this entire analysis of the costs of DACA recipients disregards the benefits they offer the economy. It has been estimated that DACA recipients in Texas currently contribute between $259 and $313 million in direct state and local taxes annually.[61] There are also the large contributions to the economy as a whole which also

---

[58] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[59] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[60] North, Anna, DACA helped some immigrants finally get health care. Now they could lose it., Vox, September 28, 2017, https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants.

[61] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/; Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants, Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.

generate tax receipts. As noted, I estimate that the direct gains in business activity associated with DACA recipients in Texas include $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs. The total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs with multiplier effects. This economic activity generates further tax receipts to the state and local governments. My analysis of the overall undocumented population for the Ford Foundation revealed that, on balance, the State government in Texas as well as local governments across the state receive a substantial net benefit even when accounting for all incremental costs of the undocumented population (health care, education, public safety, and other services).[62] The relative gains for DACA recipients are even more pronounced, as they have higher average compensation and lower needs for public services.

54.  Stated more succinctly and putting aside the computational methodological issues noted above, Ms. Smoot provided a myopic static analysis of one cost factor without any consideration of the overall picture and without identifying the role of DACA in her identified costs. It is as if an automobile manufacturer determined that cars were not profitable to produce because it has to buy wiper blades. She failed to consider what was likely to happen if these individuals left the state, and she made no effort to incorporate the overall net effects of DACA on the state. A dynamic analysis of both the total costs and the benefits associated with DACA recipients clearly demonstrates that the benefits exceed the associated costs for governmental entities in Texas.

## VI.   Response to the Declaration of Donald Deere, PhD

55.  Dr. Deere presents a simple hypothetical situation in which a potential employer is deciding between a US citizen and an undocumented immigrant with an Employment Authorization Document ("EAD"). Dr. Deere indicates that an employer would expect the US citizen to be more expensive to employ than a DACA recipient with an EAD because of the employer mandate penalties described in the Affordable Care

---

[62] Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented Workers, The Perryman Group, February 2016.

21

Act (ACA).[63] Dr. Deere concludes that "mandate provisions of the ACA gives employers a financial incentive to hire an undocumented immigrant who is authorized to work instead of an identically skilled citizen in certain instances."[64] However, Dr. Deere's hypothetical is incomplete in that it ignores other decision criteria employers would use even when deciding between employees with similar skills. In particular, Dr. Deere's hypothetical ignores the potential for an employer to prefer to hire a citizen in light of current attitudes toward DACA and fears that the end of the program could lead to future deportation. As another example, investments in training for DACA recipients are riskier due to their uncertain future status. Employers consider a number of factors in any hiring decision, with the potential for ACA-related penalties only one criterion among many. Even in the stylized world of textbook hypotheticals, one would consider the total cost differential between two applicants in making a hiring decision.

56.  Dr. Deere further asserts that "there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired."[65] However, his hypothetical does not reflect the real world and the situations to which it relates is very limited at best and likely nonexistent.

57.  To analyze Dr. Deere's claim that an increase in the number of undocumented immigrants in the US and Texas will "put downward pressure on wages and make it more difficult for some U.S. citizens to find employment,"[66] I analyzed the potential number of instances where the penalty associated with the Affordable Care Act (ACA) could be relevant. The process used in this analysis is first to look at the employment totals at US firms with 50-99 employees and 100 or more employees from the US Bureau of Labor Statistics (BLS). As of the first quarter of 2017, according to BLS, there were 137,000 firms with 50 to 99 employees and 128,000 firms with 100 or more employees.[67] To those numbers, I applied data from the Kaiser Family Foundation

---

[63] Declaration of Donald Deere, PhD, April 27, 2018, p. 5.
[64] Declaration of Donald Deere, PhD, April 27, 2018, p. 7.
[65] Declaration of Donald Deere, PhD, April 27, 2018, p. 7.
[66] Declaration of Donald Deere PhD., May 2, 2018, page 5.
[67] United States Department of Labor, Bureau of Labor Statistics, Business Employment Dynamics, *National Business Employment Dynamics Data by Firm Size Class, Table F. Distribution of private sector employment by firm size class, not seasonally adjusted* and *Table G, Distribution of private sector firms by size class, not seasonally adjusted,* https://www.bls.gov/bdm/bdmfirmsize.htm.

on the percentage of firms offering health benefits for firms with 50 to 99 employees and firms with 100 or more employees to determine the total number of employees who would not receive health benefits at firms in which the ACA penalty would be relevant (firms with 50 or more employees). The Kaiser data indicated 10 percent of firms with 50 to 99 employees (with a total of 9.4 million employees) and 4 percent of firms with 100 or more employees (with a total of 77.3 million employees) did not offer health benefits to at least some of their employees.[68] This calculation resulted in 941,300 employees in firms of 50 to 99 employees and 3,090,320 employees in firms with 100 or more employees for a total of 4,031,620 employees potentially not being offered health benefits. I next calculated the portion of employees not receiving health benefits at firms with 50 or more employees of total employment at firms of all sizes which was 3.36%.

58.  The total number of Deferred Action for Childhood Arrivals (DACA) approved initial applications in Texas as of March 2017 was 124,300.[69] It is estimated that 91.4% of those DACA approved recipients were employed resulting in a likely maximum of 113,610 DACA approved recipients working in Texas.[70] Assuming a random distribution of DACA employees across firms of all sizes, it is reasonable to apply the same 3.36% ratio calculated above to the DACA approved recipients working in Texas to produce a number of DACA employees working in Texas at firms with 50 or more employees with no health benefits, or instances where the Deere hypothetical could come into play. That number is 3,813. Applying the maximum penalty per employee under the ACA of $3,480 to the 3,813 possible employees results in a total maximum penalty to Texas

---

[68] Employer Health Benefits 2017 Annual Survey, The Kaiser Family Foundation and Health Resources & Educational Trust, September 19, 2017, Section 2 Health Benefits Offer Rates, https://www.kff.org/report-section/ehbs-2017-section-2-health-benefits-offer-rates/.

[69] Actual DACA-approved population statistics are not available prior to as of September 4, 2017, so approved initial applications is used as a conservative approximation of actual DACA recipients in Texas as of first quarter 2017. *See* U.S. Citizenship and Immigration Services, Number of Form I-821D, Consideration of Deferred Action
for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017, March 31, 2017,
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

[70] Wong, Tom K.,et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

employers of $13,268,035. The affected employees, if any, would be distributed throughout the state.

59. The total maximum penalty amount of $13,268,035 is extremely small compared to total wages in Texas, representing only 0.00198% of total Texas wages.[71] The number of employees which could potentially be affected (3,813) represents only 0.032% of total employees in Texas.[72] The total maximum penalty amount is also miniscule (0.00072%) compared to Texas nominal gross product.[73] This amount is certainly not of sufficient magnitude to affect overall wage and employment levels of citizens in Texas.

60. Moreover, it is highly unlikely that this maximum level (or any level, for that matter) would ever be achieved. Dr. Deere's analysis assumes that there are not jobs available for both workers. As described previously, the US economy is characterized by full employment, record job openings, and record low unemployment. Moreover, demographic trends suggest that it is likely to remain so on average for decades to come. It is therefore unlikely that the citizen would be deprived of a job, have employment delayed, or wages depressed. In fact, his structure would require that a DACA individual and a citizen were applying for the same job with exactly the same qualifications, that there was only one job available, that the ACA provision is known and being enforced, and there were no other intervening factors such as the stigma or training risks that I outlined above. It is extremely unlikely that such a situation would ever occur, and certainly not with sufficient frequency to impact the labor market. It is far more likely that eliminating DACA would deprive Texas employers of needed workers and constrain the economy as described previously. There is no other obvious source of workers under current demographic conditions.

---

[71] The calculation is $13,268,035/$670,233,522,000. The total wage number is total wages for 2017 based on data from the US Bureau of Labor Statistics, Quarterly Census of Employment and Wages, available at https://www.bls.gov/data/.

[72] This calculation is 3,813/11,935,179 total employees in Texas as of March 2017 based on data from the US Bureau of Labor Statistics, Quarterly Census of Employment and Wages, available at https://www.bls.gov/data/.

[73] This calculation is $13,268,035/$1,838,115,540,000 Texas nominal gross product for 2017. My firm, The Perryman Group, is the source of the Texas nominal gross product number.

61. In summary, Dr. Deere's limited hypothetical analysis is incomplete even from a theoretical perspective and has no relevance in illustrating outcomes in a "real world" setting.

## VII.   Response to the Declarations of Leonardo Lopez and Lloyd Potter

62. It is my understanding that school finance and demographics experts will be responding to the declarations of Leonardo Lopez and Lloyd Potter. Thus, I will confine my comments to brief notes with regard to the economic aspects related to their declarations.

63. The declaration of Leonardo Lopez deals with the estimated cost to Texas of educating unaccompanied children in Texas public schools. Putting aside the fact that unaccompanied children and DACA recipients are not the same group of immigrants, a full examination of the issue must consider the benefits of having these children in the state as well as the costs. As noted, on balance, the benefits associated with immigrants, even undocumented immigrants, far outweigh the associated costs. Mr. Lopez's static analysis ignores important benefits associated with DACA recipients (previously described) and thus presents only a partial analysis of the implications for schools. The same issues that I addressed in my more detailed analysis of Ms. Smoot's declaration with regard to (1) making no effort to apportion his estimates to the DACA recipients, (2) not considering the likely market response to removing the DACA recipients, and (3) not accounting for the net benefits when all costs (including education) are considered in a dynamic context are equally relevant with respect to the isolated calculations of a single factor by Mr. Lopez.

64. The declaration of Lloyd Potter, PhD, the Texas State Demographer, discusses factors influencing migration and the likelihood that some DACA participants will return to their home country. While I agree with Dr. Potter that economic factors influence migration patterns, and that individual choices, situations, and preferences affect decisions to immigrate or emigrate, a comprehensive analysis would take into account the likely market response and the economic implications of any emigration. The assertion that some may leave, even if true, is not a positive development for

25

business activity or governmental resources. As described previously, the end result might well be that they were replaced by less qualified immigrants. Additionally, the presence of these immigrants is beneficial to the state economy even when associated all costs are considered in a dynamic manner. Therefore, if current DACA recipients leave the state, the implications for the state economy and employers would be negative, and net fiscal situation confronting the State and local governments would also likely be adversely affected.

## VIII.   <u>Conclusion</u>

65.  Immigrant workers are important to the Texas economy and the fiscal wellbeing of governmental entities given current and likely future labor market conditions. In addition, the benefits of undocumented workers far outweigh costs.

66.  Ms. Smoot presents a static snapshot of one element of current costs, but ignores the benefits associated with DACA recipients, the likely market response, and the dynamic picture when all costs and benefits are considered. Dr. Deere presents a limited and incomplete hypothetical which would not have any material effect on actual wages and employment (and likely no effect at all).

67.  From an economic and fiscal perspective, the benefits of DACA far outweigh the costs, and a permanent solution should be found that allows the state to make effective use of this much needed resource.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of June, 2018.

M. Ray Perryman

# DEF-INTERV.

# EX. 75

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF TOM WONG

1.  My name is Tom Wong. I am over the age of 18 and fully competent to make this declaration.

2.  I was asked by Defendant-Intervenor's counsel to serve as an expert witness in this case. I am being compensated for my time in preparing this report at the rate of $250 per hour.

3. I previously testified as an expert witness in the case, *City of El Cenizo, et. al. v. State of Texas, et. al.* and testified by deposition in the case *United States of America v. State of California*.

4. I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

5. I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

6. I am an expert on immigration politics and policy, including the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017. The 2017 DACA survey is in addition to three peer-reviewed journal articles on DACA (*International Migration Review*, *Journal on Migration and Human Security*, *Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

2

7. In July 2014, I examined the relationship between DACA and increases in the arrival of unaccompanied children at the Southwest border.[1] In my evaluation, I concluded that the main problem with the argument that DACA was causally related to increases in the arrival of unaccompanied children at the Southwest border was that the increases at that time were part of a longer trend that started before DACA. In other words, the data showed that the effect came before the asserted cause, undermining claims that DACA was causally related to increases in the arrival of unaccompanied children.

8. Since July 2014, more data have become available to examine the relationship between DACA and increases in the arrival of unaccompanied children at the Southwest border. My evaluation of the newer data confirms my previous conclusion.

9. In my first set of analyses, I evaluate changes over time in the arrival of unaccompanied children at the Southwest border. The data analyzed are the total number of apprehensions of unaccompanied children at the Southwest border by month from October 2009 to May 2018.[2] To the best of my knowledge, these data represent the full range of the publicly available data from U.S. Customs and Border Protection (CBP) on the total number of apprehensions of unaccompanied children at the Southwest border by month.

10. The method used to initially analyze these data is interrupted times series analysis (ITSA).[3] ITSA is a quasi-experimental research design that is used to evaluate trends before,

---

[1] Wong, Tom K. 2014. *Statistical Analysis Shows That Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border.* Washington, DC: Center for American Progress. Available at (last accessed June 14, 2018): https://www.americanprogress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/

[2] Data for FY 2010 to FY 2017 available at (last accessed June 14, 2018): https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10-FY17.pdf. Data for FY 2018 to date available at (last accessed June 14, 2018): https://www.cbp.gov/newsroom/stats/sw-border-migration

[3] Linden, Ariel. 2015. "Conducting interrupted time-series analysis for single- and multiple-group comparisons." *The Stata Journal* 15(2): 480-500.

immediately following, and during the period after an intervention, such as a policy change. ITSA estimates three main parameters: $\beta_1$ is the slope or trajectory of the outcome variable before the start of the intervention; $\beta_2$ is the change in the level of the outcome variable in the period immediately following the start of the intervention; and $\beta_3$ is the treatment effect of the intervention over time.

11. The ITSA results are reported in Table 1 below.[4]  If the monthly number of arrivals of $\beta_1$unaccompanied children was increasing before DACA, we would expect the $\beta_1$ coefficient to be positive and statistically significant. Moreover, if DACA was statistically significantly related to increases in the monthly number of arrivals of unaccompanied children at the Southwest border, we would expect the $\beta_3$ coefficient to be positive and statistically significant. The results support the former, but not the latter.[5]

12. Model 1 estimates the relationship between DACA, as measured by the first month that U.S. Citizenship and Immigration Services (USCIS) began accepting applications in August 2012 ($\beta_2$), and each subsequent month thereafter ($\beta_3$), and the monthly number of arrivals of unaccompanied children at the Southwest border over the entire period for which data are available.[6] In Model 1, the $\beta_1$ coefficient is positive and statistically significant, which suggests that the monthly number of arrivals was increasing before August 2012. We also see that the $\beta_3$ coefficient is negative and not statistically significant, which

---

[4] An autoregressive model with one lag, AR(1), is specified and Newey-West standard errors are used to address autocorrelation.
[5] Rerunning the model on the seasonally-adjusted monthly number of arrivals of unaccompanied children produces qualitatively similar results to Model 1.
[6] Two additional models were run focusing on the period from October 2009, the first month for which data are available on the monthly number of arrivals of unaccompanied minors, and September 2017, the month of the rescission of DACA. These two models, one run on the monthly number of arrivals of unaccompanied minors, and the other run on the seasonally-adjusted monthly number of arrivals of unaccompanied minors, produce qualitatively similar results to Model 1.

4

suggests that DACA is not statistically significantly related to increases in the monthly number of arrivals of unaccompanied children at the Southwest border.

13. I note here that the $\beta_2$ coefficient is positive and statistically significant, which is interpreted to mean that the pre-August 2012 and post-August 2012 trend lines are statistically significantly different from each other. This, however, is an artifact of model specification, as August 2012 is tucked into a longer trend in increases in the monthly number of arrivals of unaccompanied children at the Southwest border, which began in March 2011 and ran through April 2014 with major spikes in May 2014 and June 2014.[7]

14. Since my initial evaluation of the relationship between DACA and increases in the number of arrivals of unaccompanied children at the Southwest border in July 2014, data now exist for the entire lifespan of DACA, meaning the period during which new initial applications were being accepted by USCIS from August 2012 to September 2017. These newer data make clearer that there is no positive and statistically significant relationship between DACA and the number of arrivals of unaccompanied children at the Southwest border.

15. In my second set of analyses here, I evaluate the relationship between the quarterly number of arrivals of unaccompanied children at the Southwest border and the quarterly number of DACA applications received by USCIS over the entire lifespan of DACA, as well as the relationship between the quarterly number of arrivals of unaccompanied children at the Southwest border and the quarterly number of DACA applications approved by USCIS over the entire lifespan of DACA. Quarterly data are analyzed because, to the best of my

---

[7] Thirty-four additional models were run, each with a different specification for the interruption, i.e., for each month prior to August 2012 to the beginning of the time series in October 2009. This is an iterative process of estimating "pseudo-interruptions." These models show that both $\beta_2$ and $\beta_3$ are positive and statistically significant in March 2011.

knowledge, monthly DACA statistics have not been made publicly available by USCIS for the period under study.[8]

16. Figure 1 below plots the relationship between the quarterly number of arrivals of unaccompanied children and the quarterly number of DACA applications received by USCIS. As the figure shows, there is no positive and statistically significant relationship between the number of arrivals of unaccompanied children and the number of DACA applications received by USCIS.[9]

17. Figure 2 plots the relationship between the quarterly number of arrivals of unaccompanied children and the quarterly number of DACA applications approved by USCIS. As the figure shows, there is no positive and statistically significant relationship between the number of arrivals of unaccompanied children and the number of DACA applications approved by USCIS.[10]

18. In my third set of analyses, I evaluate the counterfactual to the claim that DACA was causally related to increases in the arrival of unaccompanied children at the Southwest border. More specifically, if DACA was causally related to increases in the arrival of unaccompanied children at the Southwest border, the counterfactual to this is that the absence of DACA (the absence of the asserted cause) would mean decreases in the arrival of unaccompanied children (the absence of the effect). If the counterfactual is true, this

---

[8] Monthly data were provided by USCIS up to September 2013 and quarterly data were provided thereafter. Available at (last accessed June 14, 2018): https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals

[9] The slope coefficient is negative and statistically significant ($p = .006$). However, when the fourth quarter of FY 2012 and the first quarter of FY 2013 are removed as outliers, the slope coefficient remains negative, but is not statistically significant ($p = .568$). Qualitatively similar results obtain when analyzing the lagged values of the quarterly number of DACA applications received by USCIS, which considers the possibility that the number of DACA applications received in one quarter may share a relationship with the number of arrivals of unaccompanied children in the subsequent quarter

[10] The slope coefficient is not statistically significant ($p = .211$). Qualitatively similar results obtain when analyzing the lagged values of the quarterly number of DACA applications approved by USCIS, which considers the possibility that the number of DACA applications approved in one quarter may share a relationship with the number of arrivals of unaccompanied children in the subsequent quarter.

strengthens the causal claim; however, if the counterfactual is not true, this weakens the causal claim. Data on the arrival of unaccompanied children after the September 2017 rescission of DACA do not support the counterfactual, further undermining claims of a causal relationship between DACA and increases in the number of arrivals of unaccompanied children at the Southwest border.

19. I use ITSA to analyze the relationship between the monthly number of arrivals of unaccompanied children at the Southwest border before and after the September 2017 rescission of DACA. The period analyzed here is August 2012, the first month that USCIS began accepting DACA applications, to May 2018, the most recent month for which data on the arrival of unaccompanied children at the Southwest border are available at the time of this writing. In Model 2, the $\beta_3$ coefficient is positive and statistically significant, which suggests that the monthly number of arrivals is increasing after the September 2017 rescission of DACA.

20. Table 3 below provides additional, and perhaps more intuitive, evidence that undermines claims of a causal relationship between DACA and increases in the number of arrivals of unaccompanied children at the Southwest border. Table 3 lists the three largest percentage increases in the monthly number of arrivals of unaccompanied children at the Southwest border (and these three represent the only percentage increases greater than forty percent for the entire time series). As the table shows, the second largest percentage increase occurred after the September 2017 rescission of DACA.

21. In my fourth set of analyses, I turn to the more rigorous Autoregressive Integrated Moving Average (ARIMA) interrupted time series method. ARIMA is the primary method of analyzing quasi-experimental time-series data. Thus far, the analyses have mostly

examined trends over time in the number of arrivals of unaccompanied children at the Southwest border before, immediately following, and during the period after an intervention. The more rigorous ARIMA interrupted time series method removes time trends (the "noise") in order to isolate the impact of an intervention (the "signal"). ARIMA modeling begins by identifying and removing noise, meaning the extent to which the data in a time series can be accurately predicted by time itself. After identifying and removing noise, this allows us to evaluate the extent to which an intervention has an effect on our outcome variable that is independent from the underlying time trends.  See Table 4.

22. Model 3[11] shows that after identifying and removing time trends, there is no statistically significant relationship between DACA and the monthly number of arrivals of unaccompanied children at the Southwest border across the entire time series. Model 4 reruns the analysis, but only for the period before and during DACA, in other words, for the period excluding the months after the September 2017 rescission of DACA. As the table shows, the results are qualitatively similar.

23. In my July 2014 report, I also examined the relationship between violence in El Salvador, Guatemala, Honduras, and Mexico and the number of arrivals of unaccompanied children from these countries. More specifically, I examined the relationship between homicide rates per 100,000 people in El Salvador, Guatemala, Honduras, and Mexico and the annual number of arrivals of unaccompanied children at the Southwest border from these four countries. The analysis focused on the annual number of arrivals of unaccompanied children because data on homicide rates, which come from the United Nations Office on

---

[11] The dependent variable in Model 3 is the first order difference in the monthly number of arrivals of unaccompanied children at the Southwest border. The first order difference is used to adjust for non-stationarity in the monthly number of arrivals of unaccompanied children. The dependent variable in Model 4 is also the first order difference.

Drugs and Crime (UNODC), are measured annually. In this analysis, I found evidence of a positive relationship between homicide rates and increases in the annual number of arrivals of unaccompanied children at the Southwest border. The relationship was weakly statistically significant ($p = .094$), but this was to be expected given the small sample size (i.e., annual data from 2009 to 2013 across four countries).

24. My updated analysis produced remarkably similar results. At the time of this writing, the most currently available data on homicide rates from the UNODC is through 2016.[12] This adds the years 2014 to 2016 for the four countries to the analysis. This analysis estimates the relationship between lagged homicide rates and the annual percentage change in the number of arrivals of unaccompanied children. Homicide rates are lagged so that the cause comes before the effect. Annual percentage change in the number of arrivals of unaccompanied children are used to provide a standard measure that is comparable across the four countries.

25. The updated analysis continues to show that there is a positive relationship between homicide rates in El Salvador, Guatemala, Honduras, and Mexico and increases in the annual number of arrivals of unaccompanied children from these countries. Because the sample size remains small, it is unsurprising that the relationship is weakly statistically significant ($p = .105$). The figure below illustrates the relationship.

**Conclusion**

26. Altogether, the data show that monthly increases in the number of unaccompanied children at the Southwest border was a trend that preceded DACA and, whether it be through analyzing time trends using ITSA, analyzing the relationship between the quarterly number

---

[12] Data on homicide rates per 100,000 people available at (last accessed June 15, 2018): https://dataunodc.un.org/

9

of arrivals of unaccompanied children and the quarterly number of DACA applications received or approved, or using ARIMA interrupted time series analysis to remove time trends (the noise) in order to isolate the impact of an intervention (the signal), the data show that there is no positive and statistically significant relationship between DACA and the number of arrivals of unaccompanied children at the Southwest border. Moreover, even after the September 2017 rescission of DACA, data from CBP suggest that the monthly number of arrivals of unaccompanied children at the Southwest border is once again increasing.

27. In other words, the data do not show that DACA was causally related to increases in the arrival of unaccompanied children at the Southwest border.

28. Also, the data that exists continue to show a positive relationship between homicide rates per 100,000 people in El Salvador, Guatemala, Honduras, and Mexico and the annual number of arrivals of unaccompanied children at the Southwest border from these four countries.

29. In other words, there is more evidence to suggest that people fleeing violence, not DACA, is driving the arrival of unaccompanied minors at the Southwest border.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in San Diego, California



TOM WONG

**Table 1.**

|  | Model 1 |
|---|---|
| $\beta_1$ PreAug2012 | 21.0* |
|  | (10.92) |
| $\beta_2$ Aug2012 | 1991.2** |
|  | (627.17) |
| $\beta_3$ PostAug2012 | -17.8 |
|  | (17.23) |
| $\beta_0$ Constant | 1253.6*** |
|  | (197.16) |
| Observations | 104 |

**Table 2.**

|  | Model 2 |
|---|---|
| $\beta_1$ PreSep2017 | 6.5 |
|  | (19.37) |
| $\beta_2$ Sep2017 | -1478.3 |
|  | (793.05) |
| $\beta_3$ PostSep2012 | 270.53** |
|  | (96.65) |
| $\beta_0$ Constant | 3899.6*** |
|  | (645.89) |
| Observations | 70 |

11

**Table 3.**

| % Change | Month | Period |
|---|---|---|
| +49.3% | Mar 2011 | Pre-DACA |
| +48.9% | May 2018 | Post-DACA Rescission |
| +47.7% | Mar 2014 | DACA |

**Table 4.**

|  | Model 3 | Model 4 |
|---|---|---|
|  | ARIMA(1,1,0) | ARIMA(1,1,0) |
| DACA | 202.7 (7525.27) $p = .979$ | 220.5 (8560.23) $p = .979$ |
| Observations | 103 | 94 |

**Figure 1.**



**Figure 2.**



**Figure 3.**



# DEF-INTERV.

# EX. 76

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DECLARATION OF STEPHEN H. LEGOMSKY**

My name is Stephen H. Legomsky.  I am over the age of 18 and fully competent to make this declaration.  I have personal knowledge of, and could testify in court concerning, the following statements of fact:


1. I am the John S. Lehmann University Professor Emeritus at the Washington University School of Law in Saint Louis, Missouri.  I have taught United States immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school coursebook "Immigration and Refugee Law and Policy," the seventh edition of which is now in process. This book is published by Foundation Press.  I am also the author of "Immigration and the Judiciary – Law and Policy in Britain and America," published by the Oxford University Press in 1987, as well as numerous articles on immigration law in scholarly journals.

1

2.  From October 2011 to October 2013, which includes the times when the program known as

Deferred Action for Childhood Arrivals ("DACA") was announced and initiated, I served as the

Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), in the United States

Department of Homeland Security (DHS).  USCIS is the agency charged with implementing

DACA.  From July 2015 to October 2015 I served as Senior Counselor to the Secretary of

Homeland Security, also on immigration matters.  I have advised both Democratic and

Republican Administrations on immigration policy. For example, I chaired the 5-member policy

advisory group convened by Immigration and Naturalization Service Commissioner Gene

McNary (during the administration of George H.W. Bush), which met with the Commissioner

for a half-day every month.  I also advised the transition teams for President Clinton and

President Obama.


3.  I have testified, as a private citizen, before both the U.S. House and U.S. Senate Judiciary

Committees concerning the legality of large-scale deferred action programs.  My written

statement submitted in conjunction with my House Judiciary Committee testimony of Feb. 25,

2015 (the latter of the two testimonies) analyzes the legal issues in detail and can be found at

https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.


4.  At present, I am an inactive member of the State Bar of California.


**I. DACA and Prosecutorial Discretion**

5. DHS routinely establishes priorities guiding its exercise of prosecutorial discretion in the enforcement of the immigration laws.  One of the methods by which DHS exercises its prosecutorial discretion is through deferred action.  DACA is one particular deferred action initiative.

6. USCIS and its predecessor agency have utilized prosecutorial discretion, and deferred action in particular, for several decades.  The history is described in Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 13-20; and in Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4.

7. Congress has explicitly recognized deferred action in several statutory provisions.  Examples include 8 USC § 1227(d)(2) (denial of temporary stay of removal after final removal order does not preclude application for deferred action); 8 USC § 1154(a)(1)(D)(i)(II,IV) (specifically endorsing deferred action, as well as work permits, for certain domestic violence victims and their children); and the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, Div. B, § 202(c)(2)(B)(viii) (May 11, 2005) (making deferred action recipients eligible for drivers licenses).

8. DHS formal administrative regulations also recognize deferred action by name.  See 8 CFR § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority[.]")

3

9. In addition to the above-cited statutory provisions and regulation, numerous court decisions also explicitly recognize deferred action by name.  Examples include *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999); *Mada-Luna v Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987); *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985); *Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir. 1983); *Nicholas v. INS*, 590 F.2d 802 (9th Cir. 1979); *David v. INS*, 548 F.2d 219, 223 (8th Cir. 1977); *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976); and *Vergel v. INS*, 536 F.2d 755 (8th Cir. 1976).

10. During my time as Chief Counsel of USCIS I had ample occasion to study a range of issues related to deferred action generally and DACA in particular.  I am not aware of any law, court decision, or other legal authority that forbids the use of deferred action, or limits its use to specific statutorily-enumerated contexts, or allows it when the number of affected individuals is small but not when that number is large.

11. Indeed, either deferred action or its functional equivalent has been used by several Administrations, of both political parties, to grant temporary reprieves from removal, and in some cases temporary employment authorization, to large, specifically-defined subclasses of undocumented immigrants. A list of some 39 examples is provided by Amer. Immigration Council, Executive Grants of Temporary Immigration Relief, 1956-Present (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

12. These past Administrations granted temporary reprieves from removal to large subclasses of undocumented immigrants for a variety of reasons.  In some instances the beneficiaries tended to be those with a bridge to some form of legal status.  DACA too serves as such a bridge because many current DACA recipients are eligible to adjust as they grow older and marry.  But a bridge to a formal legal status is merely one reason for creating such programs; many such programs were designed to serve other humanitarian purposes.  Here again, DACA is similar to those programs.  Examples of deferred action or similar programs for classes of individuals who otherwise lacked any bridge to legal immigration status include:

- President George H.W. Bush's 1989 parole of Soviet and Indochinese who had been denied refugee status;

- President George H.W. Bush's 1992 grant of "deferred enforced departure" to certain Salvadorans whose temporary protected status had expired;

- President Clinton's 1994 extension of that 1992 grant;

- President George W. Bush's 2005 grant of deferred action to foreign students who had been adversely affected by Hurricane Katrina;

- President George W. Bush's 2007 grant of deferred enforced departure to Liberians after their temporary protected status had expired;

- President Obama's 2009 and 2011 extensions of that 2007 grant; and

- President Obama's 2009 grant of deferred action to widows and widowers of U.S. citizens and their children under age 21.

*Id*.  These illustrate the broad range of humanitarian, foreign policy, and other reasons for executive action that spare large numbers of aliens from removal and in many cases grant temporary permission to work.

13. The number of individuals benefited by past deferred action or similar programs varies, but in some instances exceeds several hundred thousand.  For example, the discretionary program for Cuban asylum seekers from 1959 to 1972 allowed over 600,000 individuals to be paroled into the U.S.; the discretionary program for people from Vietnam, Cambodia, and Laos from 1975-1979 allowed over 350,000 individuals to be paroled into the U.S.; President Reagan's 1987 program of deferred action for undocumented children of some noncitizens who applied to legalize after 1986 immigration reform involved more than 100,000 families; and, according to the congressional testimony of President Bush's Immigration and Naturalization Service Commissioner, the President's 1990 "family fairness" program was expected to defer the deportation of, and authorize employment for, some 1.5 million undocumented spouses and children of the legalization beneficiaries under the 1986 Immigration Reform and Control Act (IRCA).  For detailed support, *see* Stephen H. Legomsky, U.S. House Judiciary Committee testimony of February 25, 2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

14.  Despite occasional imprecise language in various court filings, immigration law recognizes a crucial difference between lawful "presence" and lawful "status."  USCIS has interpreted deferred action as giving rise to temporary lawful "presence," but it cannot, and as the memo creating DACA explicitly provides, does not, create any legal immigration "status."  Because the individual continues to lack lawful immigration *status*, DACA, like any other grant of deferred action, may be revoked, and the individual placed in removal proceedings, at any time.  Once DACA is revoked, one who had entered without inspection will be removable under 8 USC §

6

1182(a)(6)(A)(i) (present in the United States without being admitted or paroled).  One who overstayed a nonimmigrant visa will be removable under 8 USC § 1227(a)(1)(C)(i) (failed to maintain nonimmigrant status or comply with the conditions of such status).  Consequently, DACA is never a barrier to the government commencing removal proceedings when it wishes to do so.  Moreover, since all DACA recipients had to have been already previously unlawfully present for much longer than the one-year period that triggers the ten-year inadmissibility bar (with some narrow exceptions, including those who were not unlawfully present for a year or more after age 18), and since DACA does not erase that previous period of unlawful presence, the person will ordinarily be inadmissible for ten years upon departure from the United States.  8 USC §§ 1182(a)(9)(B)(i)(II), 1182(a)(9)(B)(iii).

15. Even if a court were to hold that the executive branch lacks the authority to deem deferred action recipients temporarily lawfully present, that conclusion would be at most a reason to invalidate the determination of lawful presence, not a reason to invalidate DACA itself.  No law makes lawful presence a prerequisite for deferred action or for the grant of work authorization (the latter discussed separately in section II below).

16. A grant of DACA, like any other grant of deferred action, is simply a tentative, revocable signal to an alien that he or she is a low enforcement priority and that the government therefore does not intend to initiate removal proceedings for a specified period of time.  As the regulations explain, deferred action is simply "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14).

17.  In exchange, the DACA requestor must come forward, submit biographic and biometric data that will then be checked against various law enforcement and intelligence databases, provide his or her address, supply documentary proof of the DACA threshold criteria, and send payment of the processing fee ($465 at the inception of DACA).

18. Like any other workers with U.S. income, DACA recipients are required to pay federal and state income taxes, including Social Security and Medicare taxes.  One who receives deferred action and work authorization does become eligible for various federal benefits that flow from existing law – mainly various statutory provisions and in at least one instance a binding regulation.  Examples include 8 CFR § 274a.12(c)(14) (allowing deferred action recipients to apply for temporary work permits if they can demonstrate economic necessity); 8 USC §§ 1611(b)(2,3) (Social Security and certain Medicare benefits, although DACA recipients, having been under age 31 since 2012 at the earliest, will ordinarily be ineligible for both Social Security and Medicare for the next several decades); and 26 USC § 32 (earned income tax credit).

19. But the key point concerning these other benefits is that, in issuing DACA, the Obama Administration did not attempt to change any of the laws or policies that make deferred action recipients eligible for those benefits.  Nor am I aware of any legal problems with the laws that provide those benefits to DACA and other deferred action recipients.

20. Because DACA requires continuous residence in the United States since June 15, 2007, it is not available to anyone who arrives today or in the future.  Thus it creates no incentive for future illegal immigration.

21.  DHS grants deferred action precisely when the INA does not provide a lawful immigration status to an individual but where there are equities that are felt to warrant deferred action. Through its application of prosecutorial discretion, DHS routinely grants deferred action to undocumented individuals.  Examples include those who are seeking to adjust under the Violence Against Women Act (VAWA); who are applying for withholding of removal; who are applying for cancellation of removal; who are seeking to adjust status as beneficiaries of family preference petitions; who have applied for U-visas; or who have applied for T-visas.

## II. Employment Authorization

22. On the subject of the employment rights of aliens, perhaps the most important provision of the Immigration and Nationality Act (INA) is 8 USC § 1324a(h)(3).  That is the definitional provision that lays out which aliens may work and which ones may not.  To be ineligible for employment authorization, the alien must *not* be "either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act *or by the* [*Secretary of Homeland Security*]"[1] [my emphasis].  *Id*.  The plain language of this provision makes clear that employment authorization is not limited to those aliens whom other provisions of the Immigration and Nationality Act (INA) already authorize to work; it extends also to those whom the Secretary of Homeland Security so authorizes.

---

[1] The text refers to the Attorney General, but under the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), § 1517, that term is now to be read as referring to the Secretary of Homeland Security, to whom the relevant authority has been reassigned.

9

23. That plain language completes the statutory scheme in a way that comports with common sense and sound policy.  On the one hand, the INA identifies several specific categories of aliens who are eligible for employment authorization.  In addition to the LPRs explicitly mentioned in section 1324a(h)(3), a few examples are 8 USC §§ 1101(a)(15) (H,O, and P) (certain temporary workers), 1158(c)(1)(B) (asylees), and 1254a(a)(1)(B) (recipients of temporary protected status).  On the other hand, the INA also identifies several specific categories of aliens who are ineligible for employment authorization.  Examples include business visitors, 8 USC § 1101(a)(15)(B); visitors for pleasure, *id*; asylum applicants for the first 180 days after the filing of the application, 8 USC § 1158(d)(2); individuals in removal proceedings (unless already  authorized to work), 8 USC § 1226(a)(3); and (with exceptions) those who are awaiting execution of final removal orders, 8 USC § 1231(a)(7).  For all other aliens – i.e., those who (like the DACA recipients) typically do not fall within either of these two sets of provisions -- 8 USC § 1324a(h)(3) clarifies that the decision whether to authorize work is left to the Secretary of Homeland Security, who is the official to whom Congress has delegated principal responsibility for administering and enforcing the immigration laws, 8 USC § 1103(a); 6 USC § 202(5).

24. The formal regulations supplement this carefully-constructed statutory scheme.  They list numerous categories of aliens who are eligible for employment authorization.  Many of the listed categories cover classes of aliens who are typically present in the United States unlawfully.  These include individuals with pending *applications* for cancellation of removal, registry, temporary protected status, and (under 1986 legislation) legalization.  See, respectively, 8 CFR §§ 274a.12(c) (10, 16, 19, and 22).  In a similar vein, section 274a.12(c)(14), first adopted in 1982 during the Reagan Administration and in frequent and continuous use ever since, expressly

10

makes deferred action recipients eligible for employment authorization, provided they can show an "economic necessity" to work.

**III. Advance Parole**

25. 8 USC § 1182(d)(5) gives the Secretary of Homeland Security the discretion to "parole" an alien into the United States, on a case by case basis, "for urgent humanitarian reasons or significant public benefit."  The term "advance parole" refers to a decision by USCIS, upon request, to provide a reasonable assurance – though not a guarantee – that a person who is currently in the United States and who wishes to leave temporarily will "likely" be paroled back into the country upon his or her return.  *Matter of Arrabally and Yerrabelly*, 25 I. & N. Dec. 771, 778 n.6 (BIA 2012).  This enables the person to leave the country temporarily without undue fear of being unable to return.

26.  Parole can come into play in another context.  To be eligible for adjustment of status to lawful permanent residence under 8 USC § 1255, one has to have been "admitted or paroled" at one time.  Id. § 1255(a).  A person who was admitted on a nonimmigrant visa will meet this requirement even if he or she has now overstayed, but a person who entered without inspection (and has never been admitted or paroled) will not.

27. In general, adjustment of status under 8 USC § 1255 requires proof that the person meets all the substantive requirements for LPR status plus additional requirements for the adjustment of status procedure.  Although parole will satisfy the "admitted or paroled" requirement, it will not

11

result in adjustment of status unless the applicant meets all those other requirements as well. These include not only fitting within one of the categories of lawful permanent resident affirmatively authorized by Congress (for example family, employment skills, etc.), but also not falling within any of the more than 20 pages of inadmissibility grounds laid out in 8 USC § 1182(a) (subject to a few narrowly drawn statutory discretionary waivers). These alone are rigorous requirements.

28. But there are others, one of which is of critical importance here.   Under 8 USC § 1255(c)(2), almost all adjustment of status applicants who are not immediate relatives (a term defined narrowly in 8 USC § 1151(b)(2)(A)(i)  to encompass only certain very close family members of US citizens) must prove they have continuously maintained a lawful status in the U.S. since entry.  That requirement disqualifies the overwhelming majority of DACA recipients, regardless of advance parole, who lack an immediate relative to sponsor them.  The only numerically significant sub-group of DACA recipients for whom advance parole would remove that one remaining obstacle to adjustment of status consists of immediate relatives who entered without inspection.

29. Understanding the effects of advance parole on DACA recipients is crucial, because some have relied on the possibility of advance parole to claim that DACA effectively creates a path to LPR status and eventual U.S. citizenship.  For two reasons, that characterization is faulty.  First, neither DACA nor advance parole creates that path.  As explained above, the person still needs some independent statutory route to LPR status; if such a route exists, and the person otherwise meets all the prescribed requirements, then advance parole merely helps to eliminate one of the

12

many statutory obstacles.  Second, as of December 31, 2015, fewer than 1% of all DACA

recipients had received advance parole and then received or even applied for adjustment of

status.  Letter from Leon Rodríguez, Director, USCIS, to Charles E. Grassley, Chairman,

Committee on the Judiciary, United States Senate (June 29, 2016).  Those who do so are

applying for a benefit expressly conferred by the INA.

30. In his affidavit presented to this court, Mr. Palinkas states that DACA recipients who

received advance parole and then applied for adjustment of status "jumped the line and were able

to get permanent residence faster than the legal and eligible applicants who filed under current

USCIS rules and regulations."  That statement is incorrect.  The small percentage of DACA

recipients who receive advance parole and apply for adjustment of status are not permitted to

"jump the line."  As immediate relatives, they are statutorily exempt from numerical limitations

and thus need only await administrative processing, just like all other immediate relatives

seeking adjustment of status.

**IV. The "Rubber-Stamping" Assertion**

31. Mr. Palinkas's affidavit asserts that USCIS adjudicators are forced to "rubber-stamp" their

approvals of DACA requests.  His premises for this claim are that DACA adjudications normally

do not require personal interviews and that the approval rates are relatively high.

32.  As to the interview issue: the particular threshold criteria for DACA are ordinarily

ascertainable from a combination of written documents and required background checks.  For

example, whether the requestor "has continuously resided in the United States for at least five

years preceding [June 15, 2012] and is present in the United States on the date of this

memorandum" can be ascertained through a combination of employment or school records,

leases, or other documents.  Once that timeline is established, the person's age at time of arrival,

which must be under 16, can be determined from the birth certificate.  The same is true of the

requirement that the person not be above the age of 30 on the date of filing the request.  Whether

the person "is currently in school, has graduated from high school, has obtained a general

education development certificate, or is an honorably discharged veteran of the Coast Guard or

Armed Forces of the United States" is established through the official school or Armed Services

records.  And the facts that relate to criminal history or threats to public safety or national

security are gleaned from the required searches of the relevant law enforcement and intelligence

databases.  The National Standard Operating Procedures ("SOPs") for DACA adjudicators lay

out in detail the wide range of documents that the adjudicators are expected to consult.  See

USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred

Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 44-64.  For these determinations,

personal interviews are not necessary and would add very little.


33. To accept Mr. Palinkas's theory that the lack of a personal interview per se renders the results

unreliable, one would have to condemn not only the DACA process, but the entire body of work

performed by the USCIS Service Centers.  They receive applications in the mail or online and

decide the cases solely on the basis of the required documentation and the background checks.

See U.S. Citizenship and Immigration Services, USCIS Service Centers,

https://egov.uscis.gov/crisgwi/go?action=offices.type&OfficeLocator.office_type=SC.  They

handle more than 4 million cases per year.  See U.S. Citizenship and Immigration Services, "USCIS Service Center Operations," Fiscal Year 2016 Report to Congress (Jan. 18, 2017), https://www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Service%20Center%20Operations.pdf, at 2.  See also U.S. Citizenship and Immigration Services, Service Center Forms Processing (last updated Apr. 16, 2018), https://www.uscis.gov/forms/service-center-forms-processing, which lists all the different forms that the five Service Centers adjudicate.  By my count there are 45 different benefit adjudications assigned to the Service Centers.  They include a number of benefits that are either prerequisites to, or applications for, formal legal status as immigrants or nonimmigrants  -- i.e., cases in which the long-term consequences are far greater than for DACA requests.

34. The DACA SOPs for the adjudicators include instructions to carefully examine all cases for possible fraud, "based on the standard fraud protocols." See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 7 and chap. I.

35.  As to the approval/denial rates: the most recent available official compilation of DACA approval and denial rates displays those data as of March 31, 2018.  See https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf. The cumulative denial rate for initial DACA requests (i.e. as opposed to renewals), from the inception of the program through March 31, 2018, was approximately 8.5%.[2]

---

[2] Importantly, these are just the denials on the merits.  They are to be distinguished from, and do not include, "rejections," which entail returning the DACA file to the requestor upon arrival at the lockbox, for technical reasons

36. One would expect the denial rate to be lowest in the early years of the program and highest as time goes on, because the initial batch of requests would be likely to be the strongest; the more marginal requests might be expected to be filed later.  In fact, that is precisely what has happened; the compilation above shows the denial rate steadily increasing with time, reaching above 20% for the first two quarters of fiscal year 2018.  The annual denial rates for initial DACA requests for fiscal year 2013 through the first two quarters of 2018, calculated from the USCIS official report cited above (denials divided by the sum of approvals and denials), were as follows:

| Fiscal Year | Denial Rate |
| --- | --- |
| 2013 | 2.3% |
| 2014 | 13.4% |
| 2015 | 17.4% |
| 2016 | 17.7% |
| 2017 | 16.4% |
| 2018 | 20.1% |

37. In all, some 75,510 DACA requests have been denied as of March 31, 2018.  *Id*.

38. The roughly 80% current approval rate is not surprising when one considers the applicant pool.  A person who is undocumented, especially if there is some other negative information in

such as failure to sign the form, failure to enclose the required fee or the required documents, etc.

16

his or her background, is highly unlikely to initiate contact with the immigration authorities,
reveal his or her name and address, confess to being undocumented, confess to any other
negative history, and send a check for $465 – all for a benefit that is most likely going to be
denied.  It is thus hardly surprising that the approval rate is as high as it is.  Given the applicant
pool, the approval rate does not support any inference of rubber-stamping.

39. In any given case, an adjudicator who determines that he or she needs additional information
in order to reach a decision may issue a "Request for Evidence" (an "RFE").  I do not have
access to the precise number of DACA RFEs, but on information and belief my impression is
that they have numbered in the thousands.

40. In the end, despite his conclusory assertions that the DACA adjudication process is
insufficiently rigorous, Mr. Palinkas never identifies a single concrete piece of information that
he claims adjudicators are unable to obtain or consider.  I am similarly unable to identify any
such missing information.

**V. Discretion**

41. Previously cited examples of deferred action or equivalent exercises aimed at large,
specifically-defined classes of undocumented immigrants demonstrate that numerous Presidents
have assumed they had the power to create such programs.  While the fact that other
Administrations have done something does not prove that it is legal to do so, it is instructive that

17

Congress has long been fully aware of these actions and to date has never blocked the practice. There is no indication that Congress believed these past practices to be unlawful.

42. Even assuming *arguendo* that all deferred action must be issued on an individual basis, DACA satisfies that requirement.  The fact that the agency has announced the general criteria that should guide the exercise of that discretion does not mean that there is no discretion to exercise.  Agency guidance as to the exercise of discretion in individual cases is a common practice that serves several crucial purposes.  Important general policy decisions like DACA should be made at the leadership level, because political accountability rests solely with leadership, not with the career employees whose job is to carry out the policies.  Further, only the leadership can disseminate guidance throughout the agency so that the people on the ground know what they are supposed to do, so that important priorities will be transparent to the public, and so that there will be some reasonable degree of consistency.  Consistency in turn is essential to equal treatment.  To the extent avoidable, the decision whether to arrest, detain, prosecute, or grant or deny deferred action should not depend on which officer happens to encounter the person or which prosecutor's desk the person's file happens to land on.  For all these reasons, the DACA process wisely entails adopting general threshold criteria at the front end while still requiring individualized, case-by-case discretion at the back end.

43. The National Standard Operating Procedures issued by agency and departmental leadership to the USCIS adjudicators repeatedly and explicitly admonish them to approach each case individually and to exercise discretion. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012),

18

at 17 ("individual *may* be favorably *considered* for DACA if" the threshold criteria are met) (my emphasis); 44 (substantially similar instruction); 74 ("decision whether to defer action in a particular case is *individualized and discretionary*, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns") (my emphasis); 75 ("criminal history … is a factor to be considered in the unreviewable *exercise of discretion*") (my emphasis).

44. There is no evidence to support any counter-instinctive assumption that the USCIS adjudicators who decide DACA requests are systematically disobeying the Secretary's multiple clear instructions to exercise discretion on a case-by-case basis.  They are in fact exercising discretion at two different stages of the process:

45. First, some of the threshold criteria themselves require fundamentally discretionary judgments.  Whether someone endangers the public safety, for example, is more than simply a matter of finding facts.  The adjudicator has to decide not only how probable and how severe a danger the particular individual poses, but also how probable and how severe it *has to be* before finding the person to be a threat to public safety.  There is no scientific answer to that question; it is a matter of opinion, not fact. The same is true when the question is whether the person is a threat to national security. There are foundational facts to be ascertained, but once they are, the adjudicator must decide whether the threat is probable enough and severe enough to warrant denying DACA.  This is the classic definition of a discretionary determination – one for which there is no uniquely correct answer.  See, e.g., S.A. de Smith, "Constitutional and Administrative Law" (4th ed. 1981), at 278.  The fact that the discretion is exercised in applying the threshold

criteria rather than separately after the threshold criteria have been met does not make the determination any less discretionary.  The adjudicator is still choosing between two permissible courses of action.  See, e.g., *Gonzalez-Oropeza v. U.S. Attorney General*, 321 F.3d 1331, 1332-33 (11th Cir. 2003) (determinations of "exceptional and extremely unusual hardship," which is a statutory prerequisite for cancellation of removal, are discretionary and therefore unreviewable); *Romero-Torrez v. Ashcroft*, 327 F.3d 887, 889-92 (9th Cir. 2003) (same).  Nor is there any apparent legal or policy reason to value either exercise of discretion more than the other.

46. Second, the Neufeld affidavit submitted in the DAPA litigation in fact gave specific examples of cases in which DACA was denied in the exercise of discretion even though the threshold criteria had been met.  See *State of Texas v. United States*, Civ. No. B-14-254 (S.D. Tex. Feb. 16, 2015), Exh. 44, Declaration of [USCIS Associate Director for Service Operations] Donald W. Neufeld, at 510, para. 18.  In his sworn declaration, Mr. Neufeld stated that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met."  *Id*.  He furnished specific examples.  They included cases where a person had committed or had attempted to commit fraud in *prior* applications or petitions (not in connection with the DACA requests themselves), or where a person met all the threshold criteria but had previously made a false claim of U.S. citizenship and had had prior removals.  *Id*.

47. For all the foregoing reasons, and for additional reasons elaborated in my U.S. House Judiciary Committee testimony of February 25, 2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf, it is my firmly-held opinion that DACA is well within the legal authority of the United States Department of Homeland Security.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this  23rd  day of June, 2018 in  St. Louis, Missouri  .


_____

Stephen H. Legomsky

# DEF-INTERV.

# EX. 77

<u>**Curriculum Vitae**</u>

**STEPHEN H. LEGOMSKY**

John S. Lehmann University Professor Emeritus          Born: June 6, 1947
Washington University School of Law                    Phone:  (314) 935-6469
1 Brookings Drive                                      E-Mail: legomsky@wustl.edu
Campus Box 1120
St. Louis, Missouri 63130 USA

**EMPLOYMENT**

> Washington University School of Law
> > John S. Lehmann University Professor Emeritus, 2015 to present
> > John S. Lehmann University Professor, 2007-15
> > Charles F. Nagel Professor of International & Comparative Law, 1995-2006
> > Founding Director, Harris Institute for Global Legal Studies, 1999-2002
> > Walter D. Coles Professor of Law, 1993-95
> > Professor of Law, 1986 - 1993
> > Associate Professor of Law, 1984-86
> > Assistant Professor of Law, 1981-84

> Senior Counselor to the U.S. Secretary of Homeland Security, July to October 2015.

> Chief Counsel [on leave from Washington University], U.S. Citizenship and Immigration Services (USCIS), U.S. Dept. of Homeland Security, Oct. 2011 to Oct. 2013.  Job duties included management of 215 attorneys, legal and policy advice for Director of USCIS and General Counsel of DHS, collaboration with White House on proposed immigration legislation, and part of senior leadership teams for USCIS and DHS.

> Chief of Division II, Central Legal Staff of United States Court of Appeals for the Ninth Circuit, San Francisco, 1980-81

> Court Law Clerk, United States Court of Appeals for the Ninth Circuit, San Francisco, 1979-80

> Associate Actuary, Pacific Fidelity Life Insurance Company, Los Angeles, 1973-74

> Assistant Actuary, John Hancock Mutual Life Assurance Company, Boston, 1969-72

**VISITING APPOINTMENTS**

> Universidade Católica de Portugal, Visiting professor, April 2017 and April 2018

Catolica Global School of Law Research Professor, Universidade Católica de Portugal, January to December 2010

Visiting Professor of Law, Interdisciplinary Center, Herzliya, Israel, Fall 2010

Visiting Senior Research Fellow, Asia Research Institute, National University of Singapore, June to December 2007

Mason Ladd Distinguished Visiting Professor of Law, University of Iowa, fall 2005

Visiting Fellow, University of Cambridge, Center for Research in the Arts, Social Sciences and Humanities, Easter term 2004

Visiting Fulbright Scholar, Anton de Kom University, Paramaribo, Suriname, October to November, 2003

Visiting Senior Researcher, Headquarters Office of the United Nations High Commissioner for Refugees, Geneva, Switzerland, April to July, 2002

Visiting Fellow, Merton College, University of Oxford, and Visiting Senior Fellow, Refugee Studies Centre, Hilary term, January to March, 2002

Parsons Fellow, University of Sydney, Australia, January to July 1997

Katherine A. Ryan Distinguished Visiting Professor, St. Mary's University Institute on World Legal Problems, Innsbruck, Austria, July 1996

Summer Faculty, University of San Diego Institute of International and Comparative Law, Florence, Italy, June 1996

Visiting Professor, University of Konstanz, Germany, April-May 1996

Visiting Adjunct Professor, Webster University, Geneva, Switzerland, Summer 1991

Visiting Professor of Law, Victoria University of Wellington, New Zealand, Spring 1988

Summer Faculty, Institute on International & Comparative Law of University of San Diego, Mexico City, Summer 1987

**EDUCATION**

University of Oxford, Doctor of Philosophy, 1984

University of San Diego School of Law, J.D., 1977
>    Rank:  1st out of 237 (Day Division)
>    Notes and Comments Editor, San Diego Law Review

Student Director, Immigration Law Clinic

Worcester Polytechnic Institute, B.S., mathematics, 1969

## COURSES TAUGHT

Immigration and Refugee Law, International Human Rights, International Criminal Law, International Legal Process, Immigrants and Human Rights Seminar, Torts, Criminal Law, Administrative Law, Restitution, Poverty Law.

## BOOKS

The Picobe Dilemma (Booklocker.com, 2017)(paperback and digital), available at http://www.booklocker.com/books/9469.html or https://www.amazon.com/s/ref=nb_sb_noss?url=search-alias%3Dstripbooks&field-keywords=legomsky+picobe+dilemma or Left Bank Books.

Immigration and Refugee Law and Policy (Foundation Press, 1st edition 1992, Supplement 1994, 2nd edition 1997, Supplement 1999, 3rd edition 2002, Supplement 2003, 4th edition 2005, Supplement 2007, 5th edition (with Prof. Cristina M. Rodríguez, of Yale Law School) 2009, Supplement 2011), 6th edition (with Prof. Cristina M. Rodríguez), 2015.  1403 pages), 7th edition (with Prof. David Thronson, forthcoming Dec. 2018).  Adopted at 185 U.S. law schools from inception through fall 2017.

Teacher's Manual to Immigration and Refugee Law and Policy (Foundation Press, 1st edition 1992, 2d edition 1997, 3d edition 2002, 4th edition 2005, 5th edition 2009, 6th edition 2015) (626 pages).

Specialized Justice:  Courts – Administrative Tribunals, and a Cross-National Theory of Specialization  (Oxford University Press, Clarendon Division, 1990).

Immigration and the Judiciary –  Law and Politics in Britain and America (Oxford University Press, Clarendon Division, 1987).

## JOURNAL ARTICLES

Bold Executive Action and False Equivalence, Roger Williams University Law Review (forthcoming 2018).

Immigration Policy from Scratch: The Universal and the Unique, 21 William and Mary Bill of Rights Journal 339 (2013).

Rationing Family Values in Europe and America: An Immigration Tug of War Between States and their Supra-National Associations, 25 Georgetown Immigration L.J. 807 (2012).

Restructuring Immigration Adjudication, 59 Duke L.J. 1635 (2010).

Citizens' Rights and Human Rights, 43 Israel L. Rev. 67 (2010).

Portraits of the Undocumented Immigrant: A Dialogue, 44 Georgia L. Rev. 65 (2009).

Learning to Live with Unequal Justice: Asylum and the Limits to Consistency, 60 Stanford L. Rev. 413 (2007).

The New Path of Immigration Law: Asymmetric Incorporation of Criminal Justice Norms, 64 Washington & Lee L. Rev. 469 (2007).

Deportation and the War on Independence, 91 Cornell L. Rev. 369 (2006), reprinted in 26 J. Nat'l Assn. Admin. L. Judiciary 387 (2006).

The Ethnic and Religious Profiling of Noncitizens: National Security and International Human Rights, 25 Boston College Third World Law Journal 161 (2005).

Secondary Refugee Movements and the Return of Asylum-Seekers to Third Countries: The Meaning of Effective Protection, Consultant's Report to the United Nations High Commissioner for Refugees, 15 International Journal of Refugee Law 567-677 (Oxford Univ. Press. 2004).

Globalization and the Legal Educator: Building a Curriculum for the Brave New World, 43 South Texas L. Rev. 479 (2002).

Fear and Loathing in Congress and the Courts: Immigration and Judicial Review, 78 Texas Law Review 1615 (2000).

An Asylum-Seeker's Bill of Rights for a Non-Utopian World, 14 Georgetown Immigration Law Journal 619 (2000).

Immigration Exceptionalism: Commentary on "Is There a Plenary Power Doctrine?", 14 Georgetown Immigration Law Journal 307 (2000).

The Detention of Aliens: Theories, Rules, and Discretion, 30 Univ. of Miami Inter-Amer. L. Rev. 531 (1999).

Immigrants, Minorities, and Pluralism: What Kind of Society Do We Really Want?, 6 Willamette Journal of Internat'l Law & Dispute Resolution 153 (1998) (John C. Paulus lecture).

Refugees, Administrative Tribunals, and Real Independence: Dangers Ahead for Australia, 76 Washington Univ. L.Q. 243 (1998).

Noncitizens and the Rule of Law: The 1996 Immigration Reforms, Carnegie Endowment for International Peace, Research Perspectives (May/June 1997).

The New Techniques for Managing High-Volume Asylum Systems, 81 Iowa L. Rev. 671 (1996).  Reprinted in Peter McNab (ed.), Retreating from the Refugee Convention (Northern Territories Univ. Conference Proceedings, Darwin, Australia, 1997); reprinted in Kay Hailbronner, David A. Martin & Hiroshi Motomura (eds.), Immigration Controls: The Search for Workable Policies in Germany and the United States 117-57 (Berghahn Books, Germany, 1998).

E Pluribus Unum: Immigration, Race, and Other Deep Divides, 21 Southern Ill. U. L. Rev. 101 (1996) [Hiram Lesar Distinguished Lecture]

Undocumented Immigrants: Health, Education and Welfare, 19 In Defense of the Alien 79 (1996).

Immigration, Civil Rights, and American Ambivalence, 1 Civil Rights J. 16 (U.S. Commission on Civil Rights, 1995)(co-authored with Demetrios G. Papademetriou).

Immigration, Federalism, and the Welfare State, 43 UCLA L. Rev. 1453 (1995).

The Making of United States Refugee Policy:  Separation of Powers in the Post-Cold War Era, 70 Washington L. Rev. 675 (1995).

Why Citizenship?, 35 Virginia J. Internat'l L. 279 (1995).

Ten More Years of Plenary Power:  Immigration, Congress, and the Courts, 22 Hastings Const. L.Q. 925 (1995).

Diversity and the Immigration Act of 1990, 17 In Defense of the Alien 63 (1994).

Reforming the Asylum Process:  An Ambitious Proposal for Adequate Staffing, in Immigration Law:  United States and International Perspectives on Asylum and Refugee Status (Amer. Univ. J. Int'l L. & Policy & Loyola L.A. Int'l & Comp. L.J., eds.) (1994).

Immigration, Equality, and Diversity, 31 Columbia J. Transnat'l L. 319 (1993).

The Haitian Interdiction Program, Human Rights, and the Role of Judicial Protection, 2 International Journal of Refugee Law, Special Issue at 181 (Oxford Univ. Press, 1990).

Reforming the Criteria for the Exclusion and the Deportation of Alien Criminal Offenders, 12 In Defense of the Alien 64 (1990).

Political Asylum and the Theory of Judicial Review, 73 Minnesota L. Rev. 1205 (1989).

A Research Agenda for Immigration Law:  A Report to the Administrative Conference of the United States, 25 San Diego L. Rev. 227 (1988).

Aliens and the Supreme Court, 9 In Defense of the Alien 52 (1987).

Forum Choices for the Review of Agency Adjudication:  A Study of the Immigration Process, 71 Iowa L. Rev. 1297 (1986).

Immigration Law and the Principle of Plenary Congressional Power, 1984 Supreme Court Review 255 (Univ. of Chicago Press, 1985).


## BOOK CHAPTERS

The Removal of Irregular Migrants in Europe and America, in Vincent Chetail & Céline Bauloz (eds.), Research Handbook on International Law and Migration (Edward Elgar Press 2014), at 148-69.

Undocumented Students, College Education, and Life Beyond, in Jacqueline Bhabha (ed.), Children Without a State, chapter 9 (MIT Press, 2011).

Refugees, Asylum, and the Rule of Law in the USA, in Susan Kneebone (ed.), Refugees, Asylum Seekers and the Rule of law: Comparative Perspectives, chap. 3 (pp. 122-70) (Cambridge Univ. Press, 2009).

Learning to Live with Unequal Justice: Asylum and the Limits to Consistency, in Jaya Ramji-Nogales et al. (eds.), Refugee Roulette, chap. 12 (pp. 250-85) (NYU Press, 2009).

The Last Bastions of State Sovereignty: Immigration and Nationality Go Global, in Andrew C. Sobel (ed.), Challenges of Globalization, chap. 3 (pp. 43-57) (Routledge Press, 2009).

A Comparative Study of U.S. and Canadian Refugee Policy (with François Crépeau), in Susan Kneebone & Felicity Rawlings-Sanaei (eds.), New Regionalism and Asylum Seekers: Challenges Ahead (Berghahn Books, 2007).

Addressing Secondary Refugee Movements, in Ryszard Cholewinski, Richard Perruchoud & Euan MacDonald (eds.), International Migration Law: Developing Paradigms and Key Challenges, at 177 et seq. (Asser Press 2007).

La Regulación en los Países de Tradición Immigratoria – Estados Unidos de América (translated from English), in 2 Enric Argullol i Murgadas (ed.), Immigración y Transformación Social en Cataluña (Fundación BBVA 2007), at 33 et seq.

Expedited Removal Procedures, U.S., in 1 Matthew J. Gibney & Randall Hansen (eds.), Immigration and Asylum at 226 et seq. (2005).

Política Migratoria en Estados Unidos ["The Politics of Immigration in the United States," translated by Salvador Virgen & Mercedes Guhl], in Madeleine Andebeng Alingué (ed.), Migraciones Internacionales - Un Mundo en Movimiento (Universidad Externado de Colombia, 2004), at 63 et seq.

Dual Nationality and Military Service: Strategy Number Two, in David A. Martin & Kay Hailbronner (eds.), Rights and Duties of Dual Nationals: Evolution and Prospects, at 79-126 (Kluwer Law International, 2003).

Crimes and Deportation, in Ceza Hukuku Reformu [Criminal Law Reform], at 695 et seq. (Umut Vakfi Yayinlari, Istanbul 2001).

Migration Policy and Federalism in the USA, in Hans-Jürgen Vosgerau (ed.), Institutional Arrangements for Global Economic Integration at 117 et seq. (Macmillan Press, 2000).

The Expulsion of Criminal Aliens: Why and When?, in Kay Hailbronner & Eckart Klein (eds.), Einwanderungskontrolle und Menschenrechte -- Immigration Control and Human Rights, at 163 et seq. (C.F. Mueller Verlag, 1999).

Asylum: Experiences, Problems and Management Techniques in the United States, in Jorg Monar (ed.), The New Transatlantic Agenda and the Future of EU-US Relations, chapter 11 (Kluwer Law International, 1998).

Employer Sanctions: Past and Future, in Peter Duignan & Lewis H. Gann (eds.), The Debate in the United States Over Immigration, chapter 6 (Hoover Press, Stanford University, 1997).

Trends in United States Administrative Law and their Implications for Immigrants and Refugees, in J.R. Nethercote, Virginia Wilton & Elissa Keen (eds.), Administrative Law under the Coalition Government (Institute of Public Administration, Canberra, Australia, 1998).

## SELECTED OP-EDS, BOOK REVIEWS, AND OTHER SHORT WRITINGS

Op Ed, The Hill, Trump Lumps All Immigrants Together at America's Risk, http://thehill.com/opinion/immigration/367269-trumps-lumps-all-immigrants-together-at-americas-risk, Jan. 4, 2018.

Op Ed, Huffington Post, Pardoning Lawful Immigrants for Minor Offenses, http://www.huffingtonpost.com/stephen-legomsky/pardoning-lawful-immigran_b_14203040.html, Jan. 16, 2017.

Op Ed, Medium, <u>When a Judge is Out of Control</u>,
<u>https://medium.com/@legomsky/when-a-judge-is-out-of-control-</u>
<u>1e9ef0a15aa8#.t95tbwne0</u>, June 3, 2016.

Op Ed, Medium, <u>Yes, The Immigration Executive Actions are Perfectly Legal</u>,
<u>https://medium.com/@legomsky/yes-the-immigration-executive-actions-are-perfectly-</u>
<u>legal-b66d39ffa363#.67qoe89ib</u>, Apr. 20, 2016.

Op-Ed, Fortune.com, <u>How Immigration Debates are Disrupting Political Parties</u>,
<u>http://fortune.com/2016/04/01/immigration-debates-political-parties/</u>, Apr. 1, 2016.

Op-Ed, Huffington Post, <u>Supreme Court Immigration Case Will Have Profound Impact</u>,
**<u>http://www.huffingtonpost.com/stephen-legomsky/supreme-court-</u>**
**<u>immigration_b_9044870.html</u>**, Jan. 21, 2016.

Op-Ed, Balkinization, <u>Why Can't Deferred Action Be Given to Parents of the</u>
<u>Dreamers?</u>,  <u>http://balkin.blogspot.com/2014/11/why-cant-deferred-action-be-given-</u>
<u>to.html</u> , Nov. 25, 2014.

Op-Ed, Wall Street Journal, <u>The President is Right on Immigration</u>,
<u>http://www.wsj.com/articles/stephen-legomsky-the-president-is-right-on-immigration-</u>
<u>1416780170</u>, Nov. 24, 2014.

<u>Transporting Padilla to Deportation Proceedings: A Due Process Right to the Effective</u>
<u>Assistance of Counsel</u>, 31 St. Louis Univ. Public L. Rev. 43 (2011).

Essay, <u>Emigration, Obligation, and Evil: A Response to Michael Scaperlanda's Keynote</u>
<u>Address at Fordham University School of Law Delivered Feb. 25, 2005</u>, 83 Univ. Detroit
Mercy L. Rev. 849 (2006).

<u>The USA and the Caribbean Interdiction Program</u>, 18 Internat'l J. Refugee Law 677
(2006) (Oxford Univ. Press).

Introduction, <u>The United Nations and the Protection of Human Rights</u>, 5 Washington
Univ. Journal of Law and Policy 7 (2001).

<u>Commentary on Proposed Law of Ukraine on Refugees for the American Bar Association</u>
<u>CEELI Project</u> (unpublished 2001).

<u>Commentary on Part 9 of the Report of the Intersessional Meeting</u>, in Wexler & Bassioni
(eds.), Observations on the Consolidated International Criminal Court Text Before the
Final Session of the Preparatory Committee (L'Association Internationale de Droit Penal,
1998).

Consultant's Report, <u>Analysis and Commentary on the Law of the Republic of Azerbaijan</u>
<u>on Citizenship</u>, September 1998.

8

Consultant's Report, <u>Analysis and Commentary on the Law of the Republic of Belarus on Immigration</u>, September 1998.

Consultant's Report, <u>Analysis and Commentary on Amendments of the Law of Ukraine on the Legal Status of Foreigners</u>, May 1998.

Book review of <u>Threatened Peoples, Threatened Borders</u>, 90 American J. Int'l Law 344 (1996).

Op Ed, <u>Humanitarianism Provides Better Refuge</u>, Christian Science Monitor, Feb. 16, 1996, at 18, reprinted in 24 Migration World Magazine, issue # 3, at 3 (1996).

Survey Opinion, <u>Immigration: Where Do We Go from Here?</u>, Wall Street Journal, Nov. 27, 1995, at A20.

Op Ed, <u>Fuel for the Cruel</u>, Washington Post, Oct. 15, 1995, at C4 (co-authored with former INS Commissioner Gene McNary).


## PROFESSIONAL QUALIFICATIONS

Admitted to California State Bar, 1978.

Associate, Society of Actuaries, 1973 (now inactive).  Associateship required passing the first five of the then ten actuarial examinations; I had completed seven.


## AWARDS

2006 American Immigration Lawyers Association's Elmer Fried Excellence in Teaching Award (awarded annually to one immigration law professor in the United States).

2005 Arthur Holly Compton Faculty Achievement Award for Washington University (awarded annually to one member of the University faculty for lifetime achievement).

Washington University School of Law Alumni Association triennial teaching award (1998).

Washington University Founder's Day Distinguished Faculty Award (1992).

Elected to American Law Institute (1990).


## CONSULTANCIES AND ADVISORY POSITIONS

Member of the Advisory Committee to the Immigration Policy Group of President Obama's Transition Team, December 2008.

Consultant to Commissioner of the Korean Immigration Service, 2007.

Consultant to Hummingbird Project to Plan Model City in Belize, 2006.

Consultant to Office of the United Nations High Commissioner for Refugees, May to July 2002.

Consultant to Ukrainian Minister of Immigration on migration and refugee policy (Kiev, April 1995, under auspices of Open Society Institute).

Consultant to Russian Migration Service on development of immigration policy (Geneva and Moscow, Spring 1993, under auspices of International Organization for Migration).

Advisor to President Clinton's Transition Team, December 1992.

Consultant to the Commissioner of the Immigration and Naturalization Service and Chair of the Commissioner's Policy Advisory group (met monthly with the Commissioner), 1990-1993.

Consultant to Administrative Conference of the United States, 1985, 1987.


**OTHER PROFESSIONAL SERVICE**

Testimony before U.S. House of Representatives Committee on the Judiciary, Hearing on the constitutional issues raised by President Obama's executive actions on immigration (Feb. 25, 2015), available at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

Testimony before U.S. Senate Committee on the Judiciary, Confirmation Hearing on Nomination of Loretta Lynch for Attorney General, testified concerning the legality of President Obama's 2014 executive actions on immigration (Jan. 29, 2015), available at http://www.judiciary.senate.gov/imo/media/doc/01-29-15%20Legomsky%20Testimony.pdf.

Drafting of bill, at request of U.S. Senate Subcommittee on Immigration, Refugees, and Border Security, to restructure the immigration adjudication system.  Submitted Nov. 30, 2009.

Testimony before U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration, concerning the Executive Office for Immigration Review (Sept. 23, 2008).

10

Testimony before U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration, concerning family reunification (Apr. 19, 2007).

Washington University's Ambassador to the University of Hong Kong in the McDonnell International Scholars Academy, 2006 to 2011.

Testimony before Missouri House Special Committee on Immigration Reform, Aug. 14, 2006.

Fulbright Senior Specialist Grant, Suriname, Lectures on U.N. Human Rights System, Lectures on Public International Law, and meetings with various officials, Oct. 22 to Nov. 4, 2003.

Chair, Committee on Refugees, American Branch of International Law Association (1997-2001).

U.S. Representative to International Committee on Refugee Procedures, International Law Association (1997-2001).

Member, American Bar Association's Coordinating Committee on Immigration, 1995-98.

Member, International Law Association's American Branch Committee on a Permanent International Criminal Court, 1995-99.

Member, Working Group commissioned by American Academy of Arts & Sciences and German-American Academic Foundation, to recommend immigration policy reforms to U.S. and German governments (Cambridge, Mass. and Ladenburg, Germany, 1994-95).

Elected to Board of Education, School District of University City, Missouri, 1993-96.

Vice-Chair, Immigration, Naturalization and Aliens Committee of Administrative Law and Regulatory Practice Section of American Bar Association (1992-98).

Chair, Washington University Judicial Board, 1986-87, 1997-99.

Chair, Law Professors Section, American Immigration Lawyers Association (1992-93).

Testimony before Subcommittee on Immigration, Refugees, and International Law of Committee on the Judiciary, United States House of Representatives, on Rep. Mazzoli's Safe Haven Bill (1987).

Founded Section on Immigration Law of Association of American Law Schools, 1984; Chair of Section, January 1984 to January 1986.

Chair of various committees of Washington University School of Law at various times.

11

**SELECTED SPEAKING ENGAGEMENTS SINCE 1995**

Annual Harry H. Dow Lecture, on DACA, Suffolk University Law School, Nov. 15, 2018.

Panel presentation, Bold Executive Action and False Equivalence, Conference on executive action, Roger Williams University Law School, Oct. 13, 2018.

Introduction to US immigration for Judges of the District Court for the District of Puerto Rico and practicing Bar, San Juan, Puerto Rico, July 7, 2017.

Presentation of paper on state standing to sue, forum-shopping, and nationwide injunctions, Global Science and Technology Forum's annual International Conference on Law, Regulations, and Public Policy, Singapore, June 6, 2017.

Panel presentation, Immigration federalism, Conference on immigration law, Boston College, April 4, 2017.

Presentation on immigration law to New Members of 115th Congress, Conference of Congressional Research Service for New Members of Congress, Williamsburg, VA, Jan. 9, 2017.

Keynote Address, "World Migration Today: Universal Issues for Radically Different States," Conference on global immigration, Berlin, June 9, 2016.

Keynote Address, Naturalization Ceremony, U.S. Dist. Ct. for the Eastern District of Missouri, Nov. 20, 2015.

Panel presentation and closing comments, Conference on 50th anniversary of 1965 Immigration Act, University of Michigan Law School, spoke on legality of executive action in immigration, Feb. 7, 2015.

Keynote Address, Conference on Presidential actions on immigration, American University, Jan. 30, 2015.

Presenter, Press Conference for National Media on the legal basis for executive action on immigration, organized by America's Voice and Mark Zuckerberg's fwd.us, Dec. 5, 2014.

Presenter, Press Conference for National Media on the legal basis for executive action on immigration, organized by Center for American Progress, Dec. 1, 2014.

Presenter, Press Conference for National Media on the legal basis for executive action on immigration, organized by National Immigration Law Center, Aug. 26, 2014.

Speaker, 30th anniversary celebration of the Harvard Immigration and Refugee Clinic, Harvard Law School, June 17, 2014.

12

Panelist, biennial conference of immigration law professors, spoke on executive branch alternatives to comprehensive immigration reform, Univ. of California at Irvine, May 23, 2014.

Panelist, conference on proposed international Convention on Deported Migrants, Boston College Law School, May 2, 2014.

Roundtable presentation, Georgetown University, Institute for the Study of International Migration.  Spoke on enforcement strategies in immigration law, Nov. 20, 2013.

Roundtable discussion on comprehensive immigration reform, Yale Law School.  Spoke on administrative alternatives to legislative reform, Nov. 1, 2013.

Guest Lecture, George Washington University School of Law, Washington, DC.  Spoke on refugee and asylum law,  Oct. 29, 2013.

Presentation to Field Office Directorate of US Citizenship & Immigration Services, Dept. of Homeland Security, Washington, DC.  Spoke on comparative immigration law, Sept. 23, 2013.

Annual Tyrrell Williams Lecture, Washington University School of Law.  Spoke on immigration and the role of the government lawyer, Apr. 11, 2013.

Dinner speaker, Washington DC chapter of American Immigration Lawyers Association.  Spoke on work of Office of Chief Counsel of USCIS, Jan. 16, 2013.

Presentation to Academic Study Group on Comparative Immigration, Keio University, Tokyo, Nov. 18, 2012.  Spoke on general principles of U.S. immigration law.

Presentation at annual conference of International Human Rights Association, Tokyo, Nov. 18, 2012.  Spoke on principle of plenary congressional power in U.S. immigration law.

Presentation to Academic Study Group on Comparative Immigration, Waseda University, Tokyo, Nov. 17, 2012.  Spoke on comparative immigration policies (North America, Europe, and elsewhere).

Panelist on 2 panels at seminar of Federal Bar Association, on subject of Deferred Action for Childhood Arrivals (DACA), Oct. 31, 2012.

Guest lecture, Yale Law School, immigration law class, New Haven, Oct. 11, 2012.  Spoke on universal issues in immigration.

Panelist at plenary session of annual conference of the American Immigration Lawyers Association, Memphis, June 15, 2012.  Spoke on USCIS legal process issues.

Keynote Speech, USCIS and the Office of the Chief Counsel, Biennial Conference of U.S. Immigration Law Professors, Hofstra University, June 1, 2012.

13

Organized workshop on family immigration, and spoke about European family reunification policies on panel, at Washington University School of Law, March 7, 2012.

Informal lunch presentation, U.S. Dept. of Justice, Civil Division, Office of Immigration Litigation, guest lecture series, Washington, DC, Feb. 21, 2012.  Spoke on USCIS and the work of the Office of Chief Counsel (OCC).

Guest lecture at Georgetown Law Center, Feb. 7, 2012.  Spoke on "Universal Issues in Immigration Law."

Keynote Speech, Naturalization Ceremony, Miami, Jan. 25, 2012.

Moderator, Panel on Unauthorized Migration, annual conference of Metropolis, Azores Islands, Sept. 15, 2011.

Discussant, Panel on Intersection of Criminal Law and Immigration Law, annual conference of Metropolis, Azores Islands, Sept. 13, 2011.

Lectures, Universidade Católica Portuguesa, Lisbon, July 25 and 26, 2011. Spoke on U.S. immigration system and illegal immigration.

Dinner speech, Stetson University College of Law, annual dinner of Immigration Law Students Association, Mar. 11, 2011.  Spoke on policymakers' decisions in designing immigration programs.

Panel presentation, conference on Padilla v. Kentucky, St. Louis University, Feb. 25, 2011.  Spoke on implications of Padilla for deportation proceedings.

Main speech, conference on my article 'Portraits of the Undocumented Immigrant,' with commentators exploring Portuguese analogs, Universidade Católica and U.S. Embassy, Lisbon, Portugal, Dec. 13, 2010. Spoke on opposing conceptions of illegal immigration in the United States.

Opening speech, conference on human rights, University of Minho, Braga, Portugal, Dec. 10, 2010.  Spoke on universal and country-specific elements of a national immigration policy.

Guest lecture, Nova University, Lisbon, Portugal, Nov. 27, 2010.  Spoke on illegal immigration.

Series of three lectures at the Interdisciplinary Center, Faculty of Law, Herzliya, Israel, November 2, 7, and 9, 2010.  Lectured on U.S. immigration law.

Keynote speech, conference on formulating Israel's first comprehensive immigration law, in the Knesset, Jerusalem, Oct. 31, 2010.  Title was 'Designing an Immigration Policy from Scratch.' Was followed by the Director General of the Dept. of Justice and the Minister of the Interior (together unveiling government's proposal for comprehensive Israeli immigration law) and the Leader of the Opposition (unveiling opposition party's alternative proposal).

14

Lecture, University of Lund, Sweden, Oct. 11, 2010.  Spoke on U.S. immigration policy and contemporary debate.

Panel presentation, Swedish Institute of European Policy Studies, Stockholm, Oct. 7, 2010. Spoke on undocumented immigrants.

Presentation, workshop on illegal immigration, Swedish Institute of European Policy Studies, Stockholm, Oct. 7, 2010.  Spoke on future research agenda for illegal immigration studies.

Opening Presentation, one-day conference to discuss my article 'Portraits of the Undocumented Immigrant,' with commentators exploring the philosophical, sociological, legal, and political implications of my arguments, Center for Migration Law, University of Nijmegen, Netherlands, Oct. 5, 2010.

Series of five lectures, comparative migration course at Universidade Católica Portuguesa, Lisbon, Sept. 20-24, 2010.

Presentation, Hong Kong University, Sept. 6, 2010.  Spoke on Washington University and the McDonnell International Scholars Academy.

Lecture, Free University of Brussels, July 6, 2010. Spoke on U.S. and E.U. migration policy analogs.

Public Lecture, United Kingdom Migration and Law Network, London, June 10, 2010. Spoke on comprehensive immigration reform in the United States.

Commentator, biennial Immigration Law Professors conference, Chicago, May 25, 2010. Commented on paper proposing fundamental immigration reforms.

Panelist, Conference on migration and social rights, Berlin, Apr. 19, 2010.  Spoke on social rights of immigrants in the United States (flight cancelled, speech delivered in my absence).

Panel presentation, Universidade Nova de Lisboa, Lisbon, Feb. 28, 2010. Spoke on U.S.-E.U. migration analogs.

Panel presentation, Duke University, annual conference on administrative law, Feb. 12, 2010. Spoke on restructuring the U.S. immigration adjudication system.

Panel Presentation, American Bar Association Annual Administrative Law Conference, Washington, DC, Oct. 23, 2009.  Spoke on restructuring immigration adjudication system.

Presentation, Hong Kong University, Oct. 12, 2009.  Spoke on McDonnell International Scholars Academy.

15

Faculty Workshop, University of New Mexico, Oct. 7, 2009.  Presented paper on undocumented immigrants.

Panel Presentation, Conference on Family Reunification, University of Potsdam, Germany, June 13, 2009.  Spoke on trends in U.S. family reunification policy.

Panel Presentation, Conference on Human Rights and Justice in Immigration, Hebrew University of Jerusalem, Israel, May 27, 2009.  Spoke on citizens' rights and human rights.

Panel Presentation, Annual Conference on Portuguese and American Law sponsored by Catholic University of America and University of Lisbon, at Catholic University, Washington, DC, Mar. 23, 2009.  Spoke on refugees and asylum in the U.S.

Panel Presentation, Conference on "Immigration in a New Administration," Penn State Dickinson College of Law, Jan. 30, 2009.  Spoke on the current immigration debate.

Panel presentation, and Closing Address, to Conference of National Police Foundation, Washington, DC, Aug. 21-22, 2008.  Spoke on undocumented immigrants.

Address to plenary session, annual conference of Athens Institute for Education and Research, Athens, Greece, July 18, 2008.  Spoke on state sovereignty, migration, and nationality.

Presentation to TEAMS Project (German Marshall Fund-sponsored project to study comparative U.S.-European migration law), University of Virginia, May 23, 2008.  Spoke on labor migration.

Presentation to Conference on Children and Human Rights, Harvard University, May 5, 2008.  Spoke on higher education opportunities for undocumented students.

Panelist, Biennial Conference of Immigration Law Professors, Miami, May 2, 2008.  Spoke on use of simulation techniques in immigration law teaching.

Panelist, Biennial Conference of Immigration Law Professors, Miami, May 1, 2008.  Spoke on family unity implications of deportation.

Keynote address, annual Access to Equal Justice Conference, Washington University, April 17, 2008.  Spoke on the immigration debate in 21st century America.

Keynote address, conference on Immigration Reform, University of Connecticut School of Law, April 11, 2008.  Spoke on public reactions to immigration issues and solutions.

Dinner speech to annual meeting of Department of Surgery, Washington University School of Medicine, Feb. 22, 2008.  Spoke on public attitudes toward both legal and illegal immigration.

Faculty Workshop, Washington University School of Law, Feb. 20, 2008.  Presented paper on asylum and the theory of consistency.

16

Faculty Workshop, University of Florida College of Law, Feb. 15, 2008.  Presented paper on asylum and the theory of consistency.

Presentation to the Commissioner of the Korean Immigration Service and Senior Staff, Seoul, Korea, Nov. 22, 2007.  Spoke on the American immigration experience.

Speech to the Directors General of the Departments of Immigration for the various governments of Asia and Europe, at the annual Asia Europe Meeting (ASEM), Seoul, Korea, Nov. 21, 2007, on the subject of universal immigration issues.

Keynote Speech to plenary session of annual ASEM meeting, for Ministers and high officials of the Asian and European governments, Seoul, Korea, Nov. 20, 2007.  Spoke on worldwide migration trends.

Lecture, Korea University Faculty of Law, Seoul, Korea, Nov. 19, 2007.  Spoke on the American immigration experience.

Lecture, Soongsil University Faculty of Law, Seoul, Korea, Nov. 19, 2007.  Spoke on the American immigration experience.

Faculty seminar, National University of Singapore Faculty of Law, Oct. 24, 2007.  Spoke on the detention of asylum seekers and the constraints of international law.

Presentation to Asia Research Institute, National University of Singapore, Oct. 16, 2007.  Spoke on secondary refugee movements.

Conference, Monash University, Castan Centre for Human Rights Law, Melbourne, Australia, August 10, 2007.  Gave presentation on asylum and the rule of law.

Staff Seminar, National University of Singapore, Asia Research Institute, July 5, 2007.  Gave presentation introducing my proposed research at ARI.

Workshop on Transatlantic Immigration Issues, University of Konstanz, Germany, June 18, 2007.  Spoke on accommodating immigration and national security priorities.

Installation Speech for John S. Lehmann University Professorship, Washington University, Mar. 26, 2007.  Spoke on "Citizens, Nations, and Walls."

Faculty Workshop, University of Hong Kong Faculty of Law, Mar. 20, 2007.  Spoke on the merger of immigration law and criminal law.

Short presentation, Chulalongkorn University Faculty of Law, Bangkok, Mar. 12, 2007.  Spoke on current issues in U.S. immigration law.

Speech at the University of Missouri at Kansas City School of Law, Jan. 18, 2007.  Spoke on state and local anti-immigration initiatives.

Speech to annual conference of National Council of Jewish Women, St. Louis, Jan. 13, 2007. Spoke on U.S. immigration reform.

Presentation to working group planning model city in Belize, held at Washington University, St. Louis, Oct. 21, 2006.

Conference on Immigration Reform, Temple University School of Law, Philadelphia, Oct. 14, 2006.  Spoke on the selective importation of the criminal justice model into immigration law.

Debate with Phyllis Schlafly on subject of illegal immigration, organized by Focus St. Louis, Sept. 19, 2006.

Workshop on comparative asylum law and policy, University of Montreal, Sept. 4, 2006.  Spoke on principles underlying U.S. asylum policy.

Workshop on immigration and national security, co-sponsored by the German Marshall Fund and the Rockefeller Foundation, in Bellagio, Italy, June 28 to July 1, 2006.  Spoke on irregular immigration.

Presentation to the New South Wales Chapter of the Australian Institute of Administrative Law, Sydney, Australia, May 22, 2006.  Spoke on judicial independence.

Distinguished Visiting Mentor, Australian National University, Canberra, Australia, May 15-19, 2006.  Gave presentation to faculty on research strategy (May 15), faculty workshop on deportation and decisional independence (May 17), and presentation to graduate students on Ph.D dissertation strategies (May 19).

Presentation to Australian Defence Academy, Canberra, Australia, May 18, 2006.  Spoke on transnational movements of people and their security implications.

Biennial conference of immigration law professors, University of Nevada at Las Vegas, May 6, 2006.  Spoke on U.S. implementation of international refugee law.

Conference on Merging Immigration and Crime Control, State University of New York at Buffalo, Baldy Center, April 28, 2006.  Spoke on new convergence of immigration law and criminal law.

Conference on Cuban immigrants to the United States, University of Miami School of Law, April 7, 2006.  Spoke on fluctuations in public attitudes toward immigrants.

Roundtable sponsored by the Wiedenbaum Center, Washington University, St. Louis, March 28, 2006.  Spoke on current issues in U.S. immigration law.

Presentation to Migration Policy Forum (German Members of Parliament, staff, and others), Berlin, Jan. 30, 2006.

18

Awards Lecture, "Immigration and the American Psyche," delivered at Washington University upon receipt of the 2005 Arthur Holly Compton Faculty Achievement Award, Dec. 3, 2005.

Faculty workshop, University of Iowa College of Law, Nov. 10, 2005.  Spoke on deportation and the origins and theories of judicial independence.

Workshop on international migration law, organized by the International Organization for Migration, Geneva, Nov. 3-4 (2005).  Gave presentation on secondary refugee movements and commentary on presentation of Prof. Rosemary Byrne.

Keynote address, Symposium on U.S. Border Policy, University of Iowa College of Law, Oct. 7, 2005.

Workshop on interdiction of vessels on the high seas, organized by Monash University and the Office of the U.N. High Commissioner for Refugees, Prato, Italy, Sept. 27-28, 2005.  Gave presentation on interdiction in the Caribbean and commentary on presentation of Hon. Erika Feller.

Conference on Globalizing the Law School Curriculum, Lake Tahoe, organized by McGeorge School of Law, Aug. 2-4, 2005.  Group presentation on integrating international law into criminal law courses.

Conference on Habeas Corpus, Cornell Law School, April 1, 2005.  Spoke on decisional independence in the administrative and judicial phases of deportation proceedings.

Conference on Law and Religion, Fordham University School of Law, Feb. 25, 2005.  Response to Keynote Address (delivered in my absence because of flight cancellation), "Immigration and Evil: The Religious Challenge."

Faculty workshop, University of Iowa College of Law, Jan. 28, 2005.  Presented my consultant's report for the United Nations High Commissioner for Refugees entitled "Secondary Refugee Movements and the Return of Asylum-Seekers to Third Countries: The Meaning of Effective Protection."

Annual Conference of the Indian Society of International Law, New Delhi, India, Nov. 17, 2004.  Presented UNHCR consultant's report (above).

Guest Lecture, Faculty of Law, University of Konstanz, Germany, June 21, 2004. Spoke on the detention of refugees.

Workshop, University of Cambridge, Center for Research in the Arts, Social Sciences, and Humanities, United Kingdom, June 10, 2004.  Spoke on the detention of refugees.

Symposium on Comparative Migration Law, Universidad Pompeu Fabra, Barcelona, Spain, June 7, 2004.  Spoke on U.S.  refugee law.

19

Workshop on Immigration and Social Transformation in Catalonia, Universidad Pompeu Fabra, Barcelona, Spain, June 4, 2004.  Spoke on U.S. immigration policy.

Conference on Regionalism and Forced Migration, University of London, U.K., co-sponsored by Monash University Institute for the Study of Global Movements and Oxford University Refugee Studies Centre, May 27, 2004.  Gave two presentations: Refugee Policy in the United States; and commentary on cooperative Australia/Indonesia arrangements in Pacific regional refugee policies.

Roundtable on Globalization, University of Cambridge, May 26, 2004. Spoke on the links between globalization and migration.

Team Project on "Subjective Fear" Requirement for Refugee Determinations, University of Michigan Law School, March 26, 2004.

Conference on Immigration and National Security, Boston College Law School, March 19, 2004. Spoke on the applicability of the Race Convention to U.S. ethnic profiling practices.

Judges Conference, Duke Law School, March 11, 2004. Spoke on national security and the civil rights of noncitizens.

Conference on Globalization, Washington University School of Law, Nov. 14, 2003.  Spoke on the expanding influence of international law on nationality and migration.

Annual conference of the Administrative Law Section of the American Bar Association, Washington, D.C., Nov.7, 2003.  Spoke on national security and ethnic profiling in the context of immigration law.

Series of five two-hour lectures on the U.N. Human Rights System, Anton de Kom University, Paramaribo, Suriname, Oct. 26-31, 2003.

Presentations on the Role of the United States in International Law, Anton de Kom University, Paramaribo, Suriname, Oct. 28 and Oct. 29, 2003.

Conference on Immigration Policy and Ethics, Southern Methodist University, Dallas, Texas, April 22, 2003.  Spoke on Refugee Policy and Ethical Norms.

Annual Meeting of the U.S. Court of Appeals for the Sixth Circuit, co-sponsored by American Society of International Law, Memphis, Tennessee, April 11, 2003.  Spoke on international law issues in U.S. federal courts.

Roundtable for UN, government, and NGO representatives on my Consultant's Report to the United Nations High Commissioner for Refugees (UNHCR) on "Secondary Refugee Movements and the Return of Asylum-Seekers to Third Countries: The Meaning of Effective Protection," at Fundaçao Luso-Americana in Lisbon, Portugal.  Organized by UNHCR and the Migration Policy

20

Institute, December 9-10, 2002.  Gave opening address presenting my report and co-moderated discussion.

Guest seminar, Headquarters of the United Nations High Commissioner for Refugees, Geneva, Switzerland, July 17, 2002.  Spoke on the detention of asylum-seekers.

Conference on Human Rights, Pokhara, Nepal, June 21, 2002, sponsored by the Nepal Branch of the Statute Law Revision Society.  Gave the keynote address, entitled "An Asylum-Seeker's Bill of Rights."

Conference on Human Rights and the Rule of Law, Kathmandu, Nepal, sponsored by the Statute Law Revision Society, June 18, 2002.  Gave the keynote address, entitled "Citizens' Rights and Human Rights."

Conference on Human Rights of Refugees and a Single, Fair and Efficient Asylum Procedure, Potsdam, Germany, June 8-9, 2002, sponsored by European Union, University of Potsdam, and University of Konstanz.  Spoke on the status of integrated mechanisms for humanitarian relief in the United States.

Guest lecturer, University of Maastricht, Netherlands, Faculty of Law, on comparison of U.S. and European migration policies, June 3, 2002.

Conference on Women, Migration, and Human Rights, sponsored by UNESCO Chair of Migration and Human Rights, at Hassan II University of Casablanca, Morocco, spoke on teaching and researching women's migration issues, April 26-27, 2002.

Conference on Refugee Policy, Dublin, Ireland, sponsored by Irish Centre for European Law, Trinity College Dublin, Faculty of Law, spoke on Gaining Access to Asylum Determination Systems, March 2, 2002.

Seminar on Detention of Asylum-Seekers, Oxford University, Refugee Studies Centre, Feb. 19, 2002.

Seminar on Bill of Rights for Asylum-Seekers, Oxford University, Refugee Studies Centre, Jan. 30, 2002.

Conference on Comparative Criminal Procedure, Porto Alegre, Brazil, Nov. 28-30, 2001, sponsored by Brazilian Justice Ministry, speech on constitutional rights of criminal defendants in the United States.

Conference on U.S. Supreme Court's recent immigration decisions, Georgetown University Law Center, Nov. 16-17, 2001, moderated panel.

Faculty workshop, University of Wisconsin School of Law, Nov. 6, 2001, presented paper on dual nationality and military service.

21

Conference on comparative migration law, sponsored by Universidad Externado, Bogotá, Colombia, Oct. 29-30, 2001, spoke on United States immigration policy.

Faculty workshop, University of California at Davis School of Law, Oct. 17, 2001, presented paper on dual nationality and military service.

Workshop on International Legal Education, Heybeliada, Turkey (June 13-15, 2001), sponsored by the South Texas College of Law and the Law School Admission Council, paper on globalization and legal education.

Migration Policy Forum for German Members of Parliament and Government Officials, Berlin (May 14, 2001), presentation on European Commission proposal for Council directive on harmonization of asylum processes.

Annual conference of the Center for Migration Studies, Washington, D.C. (April 5, 2001), spoke on dual nationality and the notion of multiple allegiance.

Annual conference of the International Studies Association, Chicago (February 23, 2001), discussant on paper by R. Hansen & M. Gibney on deportation theory and its application to asylum claimants.

Workshop, University of Tel Aviv, Israel (December 15, 2000), spoke on dual nationality.

Presentation to the Victoria chapter of the Australian Institute of Administrative Law, Melbourne (Nov. 27, 2000), spoke on immigration and judicial review.

Conference on Migration, Labour, and the Law, in Sydney, Australia (Nov. 23-24, 2000), spoke on employer sanctions regimes.

German Marshall Fund Project on Dual Nationality, meetings in Mexico City (Feb. 18, 2000), Berlin (July 13, 2000), and Istanbul (Oct. 23, 2000), spoke on the military service obligations of dual nationals.

Workshop on Family Unification, University of Paris I (July 10, 2000).

International Workshop on Criminal Law Reform, Marmara University, spoke on "Crimes and Deportation", Istanbul, Turkey (Oct. 23, 1999).

Conference on United States Federal Courts, spoke on immigration and judicial review, University of Texas (Oct. 15, 1999).

Workshop on the Supreme Court and Immigration Law, spoke on constitutional immigration law, Georgetown University Law Center (Oct. 9, 1999).

Workshop on Transatlantic Visa Policy, Inspection, and Exit Controls, spoke on administrative review of visa denials, French Foreign Ministry, Paris (Sept. 27-28, 1999).

22

Annual Congress of International Association of Constitutional Law, spoke on "Constitutions and Noncitizens in a Changing World", Rotterdam, Netherlands (July 13, 1999).

Conference on Refugee and Asylum Practice in Europe and North America, spoke on U.S. asylum adjudication process, Oxford University (July 1, 1999).

Workshop on Family Reunification in the European Union and the USA, spoke on U.S. family unity policies, University of Konstanz, Germany (June 28, 1999).

Conference on Teaching Immigration Law, gave luncheon address on integration of immigrant perspectives into law school curricula, City University of New York (April 10, 1999).

Workshop on Visa Controls, spoke on administrative and judicial review of visa denials, Georgetown University (March 27, 1999).

Annual conference of Center for Migration Studies, spoke on the U.S. visa process, Washington, D.C. (March 26, 1999).

Delivered annual John C. Paulus Lecture, on pluralism and minorities, Willamette University (March 11, 1999).

Conference on magnet societies, spoke on migration patterns and immigrants' rights, Southern Methodist University (March 1, 1999).

Symposium on U.S. Immigration Reform, spoke on the theory of mandatory detention in deportation cases, University of Miami (Jan. 29, 1999).

Colloquium on Israeli and German migration policies, spoke on the role of ethnicity in formulating migration policies, University of Konstanz, Germany (July 15, 1998).

Series of three presentations under German Marshall Fund's "Eminent Visitors Grant":
      Guest lecture on immigration quotas, University of Tubingen (July 13, 1998);
      Guest lecture on refugees and asylum, University of Freiburg (July 8, 1998); and
      Seminar on immigration quotas, Max Planck Institute, Heidelberg (July 6, 1998).

Conference on Immigration Control and Human Rights, spoke on the expulsion of criminal aliens, University of Potsdam (June 30, 1998).

Conference on Nationality, Immigration and Integration in Europe and the USA, spoke on the impact of migration on nationality law, Fondation Nationale des Sciences Politiques, Paris (June 26, 1998).

Immigration Law Workshop, Opening Remarks plus presentation on the use of simulation in teaching immigration law, University of California at Berkeley (May 29-30, 1998).

23

Symposium on Institutional Arrangements for Global Economic Integration, spoke on the economic implications of federalism in migration policies, University of Konstanz, Germany (Feb. 27, 1998).

AALS annual meeting, section on immigration law, spoke on judicial and administrative review of Australian immigration and refugee decisions, San Francisco (Jan. 8, 1998).

Forum on migration, gave presentation to 40 German legislators, officials, and staff members on U.S.-style quota systems, Bonn, Germany (Nov. 10, 1997).

Faculty seminar, joint presentation to law faculties of Murdoch University and University of Western Australia, on immigrants and constitutions, Perth, Australia (June 20, 1997).

Conference on Immigrant Justice -- Courts, Tribunals and the Rule of Law, co-keynote speaker (with Australia's Minister of Immigration), spoke on the independence of administrative tribunals, Sydney, Australia (June 6, 1997).

Faculty seminar, University of Adelaide, on immigrants and constitutions, Adelaide, Australia (June 2, 1997).

Presentation to New South Wales State Chapter of Australian Institute of Administrative Law, on relationship between public opinion and judicial decisionmaking, Sydney, Australia (May 15, 1997).

Presentation to subsidiary office of Refugee Review Tribunal, on the independence of administrative tribunals, Melbourne, Australia (May 8, 1997).

Presentation to Victoria State Chapter of the Australian Institute of Administrative Law, on constitutional limitations on immigration regulation, Melbourne, Australia (May 6, 1997).

Faculty seminar, Centre for Comparative Constitutional Law, spoke on immigrants and constitutions, University of Melbourne, Australia (May 6, 1997).

Annual meeting of Australian Institute of Administrative Law, spoke to plenary session on recent developments in U.S. administrative law, Canberra, Australia (May 2, 1997).

Faculty seminar, University of Sydney, spoke on immigrants and constitutions, Sydney, Australia (April 24, 1997).

Faculty seminar, University of Tasmania, spoke on immigrants and constitutions, Hobart, Australia (April 3, 1997).

Luncheon speech to members of Refugee Review Tribunal, on refugee adjudication procedures in the United States, Sydney, Australia (March 3, 1997).

Conference on the Refugee Convention, spoke on U.S. asylum developments, and at end of conference delivered synthesis of speakers' comments, Darwin, Australia (February 7-10, 1997).

Conference on U.S. immigration policy, Hoover Institution of Stanford University, spoke on employer sanctions for the hiring of unauthorized workers, Stanford (October 26, 1996).

Conference on European Union - United States Relations, sponsored by European Commission and University of Leicester, spoke on political asylum, Brussels, Belgium (July 4, 1996).

Guest lecture, University of Vienna, spoke on immigration and criminality, Vienna, Austria (April 24, 1996).

Series of four guest lectures, University of Konstanz, on immigration and asylum policies of the United States and western Europe, Konstanz, Germany (April to May, 1996).

Annual conference of Center for Migration Studies, spoke on the use of government services by immigrants, Washington, D.C. (March 21, 1996).

Hiram H. Lesar Distinguished Lecture, Southern Illinois University, Carbondale (Feb. 27, 1996).

Guest lecture, St. Mary's University's Institute of World Legal Problems, spoke on designing an immigration policy, Innsbruck, Austria (July 19, 1995).

Workshop on German and American migration policies, presented revised version of paper on political asylum management techniques, American Academy of Arts and Sciences, Ladenburg, Germany (July 17-18, 1995).

Symposium on immigration, University of Washington, spoke on the overseas refugee selection process, Seattle (May 6, 1995).

Guest lecture, University of Naples, spoke on the universality of migration policy issues, Naples, Italy (May 2, 1995).

Seminar, Boltsmann Institute of Human Rights, on recent world developments in immigration and refugee law, Vienna, Austria (April 24, 1995).

Presentation to Ukrainian Minister of Immigration, other members of Parliament, and their staffs, on the drafting of immigration legislation, Kiev, Ukraine (April 18, 1995).

Symposium on immigration, Univ. of California at Hastings, spoke on the constitutional foundations of U.S. immigration law, San Francisco (April 1, 1995).

Workshop on German and American migration policies, presented first draft of paper on political asylum management techniques, American Academy of Arts and Sciences, Cambridge, Mass. (Mar. 23, 1995).

25

Debated against former INS Commissioner Gene McNary, Southern Illinois University, on subject of California Proposition 187, Carbondale, Illinois (Mar. 21, 1995).

Symposium on immigrants and public benefits, UCLA, spoke on the theories of welfare and their applicability to aliens, Los Angeles (Feb. 25, 1995).

Symposium on immigration and refugees, University of Virginia, spoke on the theory of citizenship, Charlottesville (Jan. 28, 1995).

**PERSONAL**

Married with two adult daughters and two grandchildren.

# DEF-INTERV.

# EX. 78

Amanda Bright Brownson
1507 W 40th Street
Austin, Texas 78756
(512)796-2455
abrownson@tasbo.org

## Education

**The University of Texas at Austin**

Ph.D., Educational Policy and Planning (Educational Administration)            December 2002
    Dissertation Title: *School finance reform in post-Edgewood Texas: An examination of revenue*
    *equity and implications for student performance.*
M.Ed., Educational Administration                                                                December 1997
B.A., Economics                                                                                           December 1992

## Professional Employment

**School Finance and Education Policy Experience**

Associate Executive Director of Governmental Relations, The Texas Association

of School Business Officials (TASBO)                                                          2018 – present

Provides direction over legislative agenda for TASBO members.  Keeps members informed of legislative changes at the state and federal level that will impact school business including analysis of legislation related to school finance, property tax administration, school district bonding authority, and school budgeting.  Provides research and policy analysis to TASBO members and legislators on issues of interest to school business officials.  Provides consulting assistance to school districts on state aid and revenue projection as well as compliance with state rule and law as it relates to school finance and school budgeting.  Serves as an instructor for TASBO's school finance certification course.

Director of Research and Policy, Raise Your Hand Texas                              2016 – 2018

Helped craft a research and legislative agenda.  Interacted with legislators and legislative staff to move the policy agenda forward. Analyzed legislation to help the organization take positions as necessary. Maintained a statewide school finance model to assist in analysis of legislative proposals. Helped design scholarship program for prospective Texas public school teachers (Raising Texas Teachers).  Conducted data analysis using Texas PEIMS database.  Managed the review of commissioned research on behalf of Raise Your Hand Texas. Wrote reports and other communications for various audiences to communicate Raise Your Hand's policy positions related to public education.

Director of State Funding, The Texas Education Agency                              2013 –2016

Directed the division of state funding at the Texas Education Agency. This division is responsible for the calculation and distribution of roughly $20 billion in annual state aid payments through the Foundation School Program as well as the calculation and collection of recapture payments from districts subject to the provisions of Chapter 41 of the Texas Education Code. Created a state aid template to assist school districts in projecting foundation school program revenue. The division helps legislators, superintendents, school business officials, and the general public understand the operation of the Texas school finance system. The division is also responsible for responding to public information requests and data inquiries using Texas school finance data.

Associate, Moak, Casey & Associates                                                2002 –2013

Analyzed education-related legislation, particularly with regard to its financial impact on Texas school districts. Conducted research in a number of areas including school finance and school accountability. Analyzed data and participated in drafting reports for two rounds of school finance litigation. Produced educational policy reports for school districts and legislators. Served as a consultant to Texas school business officials on projections of state aid and evaluations of the impact of alternative student and property tax assumptions. Explained the mechanics of the school funding formulas to a wide variety of audiences with differing levels of understanding. Analyzed school finance and student performance data to produce reports and presentations for a variety of audiences.

Research Scientist, The Charles A. Dana Center, The University of Texas at Austin      2000-2002

Worked on the research and policy team of the Charles A. Dana Center, an organized research unit of The University of Texas at Austin. Served on research teams for several studies related to education policy including a study of variations in the cost of Texas public education and a study of district level expenditure patterns and their relationship to student performance. Conducted program evaluations. Collected and analyzed both quantitative and qualitative data using software packages such as SPSS, SAS, Access, Excel, and Atlas. Managed the review process for research projects and served as a reviewer for other projects.

Graduate Research Assistant, The Educational Productivity Council                  1998-2000

Conducted statistical analyses of student performance data using SPSS, Microsoft Excel, and Microsoft Access software. Developed and facilitated professional development for teachers and administrators on the use of data in educational decision-making. Wrote evaluation reports for school districts integrating the analysis and interpretation of student achievement data.

**Teaching Experience**

Teaching Assistant, UT Austin, The Foundations of Education                        2002

Teaching Assistant, UT Austin, The Economics of Education                          1999-2000

Student Teacher Supervisor, The University of Texas at Austin                      1999

Teacher, Voigt Elementary School, Round Rock ISD                                   1997-1998

Teacher, Thrall Elementary School, Thrall ISD                                    1995-1997

Teacher, Laurel Elementary School, Compton USD, Los Angeles, California          1993-1995

## Publications

Texas Center for Educational Research and Moak, Casey & Associates, LLP., (2006). Texas Open-Enrollment Charter School Revenue: Supplement to the 2003-04 Evaluation.

Brownson, A.B., (2002). School finance reform in post-Edgewood Texas: An examination of revenue equity and implications for student performance. Dissertation report for the Department of Educational Administration at the University of Texas at Austin.

Callicut, A., Brownson, A., Kahlert, R., & Sobel, A. (2002). Driven to Succeed: High Performing, High Poverty Turn Around Middle Schools. [Online] http://www.utdanacenter.org/downloads/products/driven/ms_vol1.pdf.

Callicut, A., Brownson, A., Kahlert, R., & Sobel, A. (2002). Effective Leaders Shape Positive School Cultures. *Principal Leadership*, 3(4), 38-42.

Brownson, A. B. (2001). A Replication of Jay Greene's Voucher Effect Study Using Texas Performance Data. In M. Carnoy *Do school vouchers improve student performance?* Economic Policy Institute: Washington, D.C. [Online] http://www.economicpolicyinstitute.org.

Charles A. Dana Center (2000-01). Contributing researcher/analyst and author to the Texas Beginning Educator Support System Evaluation Report for Year Two.

Alexander, C., Boyer, H., Brownson, A., Clark, C., Jennings, J., and Patrick, E. (2000). Resource allocation practices and student achievement: An examination of district expenditures and student performance with interviews from twenty-one school districts. Charles A. Dana Center and the Southwest Educational Development Labs.

## Presentations

I have presented regularly at conferences and meetings on legislative issues related to public schools and school finance, including the following annual conferences:

      The Texas Association of School Business Officials Annual Conference

      The Texas Association of School Business Officials Summer Conference

      The Texas Association of School Business Officials Finance and Audit Conference

      The Texas Association of School Administrators Midwinter Conference

      The Texas Association of School Administrators Beginning Superintendents Conference

Education Service Centers Meetings of Superintendents and School Business Officials

## Certifications

Texas Mid-management Certification

Texas Supervisory Certification

Texas Elementary Self Contained: pre-kindergarten through sixth grade

Texas Special Education: pre-kindergarten through twelfth grade

## Professional Organizations and Service Work

Texas Association of School Business Officials                                    2003-present

Seedling Mentor                                                                                  2013 - 2017

Teach for America Corps Member                                                      1993-1995

# DEF-INTERV.

# EX. 79



# 2012-2013 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 646,182 |
| American Indian or Alaska Native | 21,795 |
| Asian | 183,789 |
| Hispanic | 2,606,126 |
| Native Hawaiian/Other or Pacific Islander | 6,644 |
| Two or More Races | 89,753 |
| White | 1,521,551 |
| Total All Ethnicities | 5,075,840 |

*This request took 0.15 seconds of real time (v9.4 build 1503).*



# 2013-2014 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 652,719 |
| American Indian or Alaska Native | 20,225 |
| Asian | 189,906 |
| Hispanic | 2,668,315 |
| Native Hawaiian/Other or Pacific Islander | 6,801 |
| Two or More Races | 96,666 |
| White | 1,517,293 |
| Total All Ethnicities | 5,151,925 |

*This request took 0.14 seconds of real time (v9.4 build 1503).*



# 2014-2015 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 660,952 |
| American Indian or Alaska Native | 21,480 |
| Asian | 202,229 |
| Hispanic | 2,722,272 |
| Native Hawaiian/Other or Pacific Islander | 7,112 |
| Two or More Races | 102,467 |
| White | 1,515,553 |
| Total All Ethnicities | 5,232,065 |

*This request took 0.14 seconds of real time (v9.4 build 1503).*



# 2015-2016 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 668,338 |
| American Indian or Alaska Native | 20,917 |
| Asian | 213,394 |
| Hispanic | 2,767,747 |
| Native Hawaiian/Other or Pacific Islander | 7,406 |
| Two or More Races | 108,899 |
| White | 1,513,027 |
| Total All Ethnicities | 5,299,728 |

*This request took 0.14 seconds of real time (v9.4 build 1503).*



# 2016-2017 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 674,718 |
| American Indian or Alaska Native | 20,767 |
| Asian | 225,294 |
| Hispanic | 2,809,386 |
| Native Hawaiian/Other or Pacific Islander | 7,700 |
| Two or More Races | 115,907 |
| White | 1,505,355 |
| Total All Ethnicities | 5,359,127 |

*This request took 0.11 seconds of real time (v9.4 build 1503).*



# 2017-2018 Student Enrollment

## Statewide Totals

[ TEA Home Page ] [ PEIMS Standard Reports Overview ]

| Ethnicity | Student Count |
|---|---|
| Black or African American | 680,777 |
| American Indian or Alaska Native | 20,586 |
| Asian | 235,491 |
| Hispanic | 2,827,847 |
| Native Hawaiian/Other or Pacific Islander | 8,026 |
| Two or More Races | 122,440 |
| White | 1,504,515 |
| Total All Ethnicities | 5,399,682 |

*This request took 0.10 seconds of real time (v9.4 build 1503).*

# DEF-INTERV.

# EX. 80



**U.S. Citizenship and Immigration Services**

---

> ### Archived Content
>
> **This page contains information that is no longer current but remains on our site for reference purposes.**

---

# Consideration of Deferred Action for Childhood Arrivals (DACA)

Versión en español

> **Important information about DACA requests:** Due to federal court orders, USCIS has resumed accepting requests to renew a grant of deferred action under DACA. USCIS is not accepting requests from individuals who have never before been granted deferred action under DACA. Until further notice, and unless otherwise provided in this guidance, the DACA policy will be operated on the terms in place before it was rescinded on Sept. 5, 2017. For more information, visit Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction.

This page provides information on requesting consideration of deferred action for childhood arrivals (DACA). You may request DACA for the first time or renew your existing period of DACA if it is expiring.

**Find on this Page:**

- Guidelines
- Filing Process
- Fee Exemptions
- Travel Information
- National Security and Public Safety Guidelines
- Don't Be a Victim of Immigration Scams
- Previous DACA Updates



## What Is DACA

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several guidelines may request consideration of deferred action for a period of two years, subject to renewal. They are also eligible for work authorization. Deferred action is a use of prosecutorial discretion to defer removal action against an individual for a certain period of time. Deferred action does not provide lawful status.

## Watch a Video on DACA



## Page not found

### The requested page was not found

Sorry! The page you are looking for may not exist, may have been removed or had its name changed, or is temporarily unavailable.

To help you find what you are looking for, try one or more of the following:

- Check the URL (Web address) for proper spelling and completeness.
- Use the **site map**.
- Type in what you are looking for in the search box in the upper right corner of this page.

## Request DACA for the First Time

The following information explains the guidelines for requesting DACA for the first time. If you need further information and cannot find it in our Frequently Asked Questions, you can call the USCIS Contact Center at 800-375-5283. For people who are deaf, hard of hearing, or have a speech disability:TTY 800-767-1833. Representatives are available Monday-Friday from 8 a.m. to 6 p.m. in each U.S. time zone.

## Guidelines

You may request DACA if you:

1. Were under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching your 16th birthday;
3. Have continuously resided in the United States since June 15, 2007, up to the present time;
4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;
5. Had no lawful status on June 15, 2012;
6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
7. Have not been convicted of a felony, significant misdemeanor,or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

**Age Guidelines**

Anyone requesting DACA must have been under the age of 31 as of June 15, 2012. You must also be at least 15 years or older to request DACA, unless you are currently in removal proceedings or have a final removal or voluntary departure order, as summarized in the table below:

| Your situation | Age |
|---|---|
| I have never been in removal proceedings, or my proceedings have been terminated before making my request. | At least 15 years old at the time of submitting your request and under the age of 31 as of June 15, 2012. |
| I am in removal proceedings, have a final removal order, or have a voluntary departure order, and I am not in immigration detention. | Under the age of 31 as of June 15, 2012, but you may be younger than 15 years old at the time you submit your request. |

**Timeframe for Meeting the Guidelines**

**You must demonstrate**

| That on June 15, 2012 you | As of the date you file your request you |
|---|---|
| <ul><li>Were under the age of 31 years</li><li>Were physically present in the United States</li><li>Had no lawful status</li></ul> | <ul><li>Have resided continuously in the U.S. since June 15, 2007;</li><li>Had come to the United States before your 16th birthday</li><li>Were physically present in the United States; and</li><li>Are in school, have graduated from high school in the United States, or have a GED; or</li><li>Are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States</li></ul> |

**Education and Military Service Guidelines**

| Your school or military status at the time of requesting DACA | Meet education or military service guidelines for DACA |
|---|---|
| I graduated from:<ul><li>Public or private high school; or</li><li>Secondary school.<br>Or</li><li>I have obtained a GED.</li></ul> | Yes |

| Your school or military status at the time of requesting DACA | Meet education or military service guidelines for DACA |
|---|---|
| I am currently enrolled in school.<br><br>See the Education section of the FAQs for a full explanation of who is considered currently in school. | Yes |
| I was in school but dropped out and did not graduate. I am not currently in school and am not an honorably discharged veteran of the Coast Guard or Armed Forces of the U.S. | No |
| I am an honorably discharged veteran of the Coast Guard or Armed Forces of the U.S. | Yes |

Please see our Frequently Asked Questions for more detail on school-related guidelines.

Return to top

## Filing Process for DACA

If you meet the guidelines for DACA, you will need to complete the following steps to make your request to USCIS.



 **Collect documents as evidence you meet the guidelines.**
You will need to submit supporting documents with your request for DACA. You can submit legible copies of these documents unless the instructions specify you must submit an original document.

---

**Examples of Documents to Submit to Demonstrate you Meet the Guidelines**
Please see the instructions (PDF, 262 KB) to Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for further details on acceptable documentation.

---

**Examples of Documents to Submit to Demonstrate you Meet the Guidelines**
Please see the **instructions (PDF, 262 KB)** to Form I-821D, **Consideration of Deferred Action for Childhood Arrivals**, for further details on acceptable documentation.

| | |
|---|---|
| Proof of identity | • Passport or national identity document from your country of origin<br>• Birth certificate with photo identification<br>• School or military ID with photo<br>• Any U.S. government immigration or other document bearing your name and photo |
| Proof you came to U.S. before your 16th birthday | • Passport with admission stamp<br>• Form I-94/I-95/I-94W<br>• School records from the U.S. schools you have attended<br>• Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>• Travel records<br>• Hospital or medical records<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date<br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>• A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc)<br>• School records (letters, report cards, etc)<br>• Military records (Form DD-214 or NGB Form 22)<br>• Official records from a religious entity confirming participation in a religious ceremony |

| Examples of Documents to Submit to Demonstrate you Meet the Guidelines<br>Please see the **instructions (PDF, 262 KB)** to Form I-821D, **Consideration of Deferred Action for Childhood Arrivals**, for further details on acceptable documentation. | |
|---|---|
| Proof you continuously resided in U.S. since June 15, 2007 | • Copies of money order receipts for money sent in or out of the country<br>• Passport entries<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of your student status at the time of requesting DACA | • Official records (transcripts, report cards, etc) from the school that you are currently attending in the United States.<br>• U.S. high school diploma or certificate of completion<br>• U.S. GED certificate |
| Proof you are an honorably discharged veteran of the Coast Guard or Armed Forces of the U.S. | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

See our **Frequently Asked Questions** for information on submitting affidavits or circumstantial evidence to support your request.

**Return to top**

 **Complete the required two forms and worksheet**

| Form name | Fee |
|---|---|
| I-821D, **Consideration of Deferred Action for Childhood Arrivals**<br><br>**Use the most recent version of the form linked on our website or USCIS will reject your form.** | Please review the Filing Fee section of the Forms I-821D and I-765 pages for detailed information. |

| Form name | Fee |
|---|---|
| I-765, Application for Employment Authorization | **These fees cannot be waived.** |
| I-765WS, Worksheet (PDF, 235 KB) | |

## Completing You Forms

- **You must file the most recent version of Form I-821D from our website. USCIS will reject older versions of the form if you submit them.**
- Write your name, date of birth, and mailing address exactly the same way on each form.
- We prefer that you download the forms from our website, fill them out electronically, and then print your completed forms to mail.
- Make sure you are using the most current version of the forms. The correct, most current edition of every USCIS form is always available for free download on our website.
- If you complete the forms by hand, use black ink only. Do NOT use highlighters or red ink on your forms. These could make your materials unreadable when scanned.
- If you must make changes on a form, we recommend that you begin with a new form, rather than trying to white out information. This can lead to scanning errors.
- Ensure that you provide all required supporting documentation and evidence.
- Be sure to sign all of your forms.

## Filing Your Forms

- USCIS will reject your request if you fail to submit Forms I-821D, I-765, I-765WS, and the correct fees.
- Organize and label your evidence by the DACA guideline that it meets.
- Be sure that you mail all pages of the forms.
- Mail the forms to correct USCIS Lockbox.
- You cannot e-file your DACA request.
- If you have questions, call the USCIS Contact Center at 1-800-375-5283; do NOT visit a USCIS field office.



**Mail your forms to the appropriate USCIS Lockbox.**
See the mailing instructions for Form I-821D. Include the required forms, fees and supporting documentation with your filing. Remember to carefully follow instructions and fully complete your forms. USCIS will not accept incomplete forms or forms without proper fee. USCIS will mail you a receipt after accepting your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a Form G-1145, E-Notification of Application/Petition Acceptance.

UPDATE: Create a USCIS online account for DACA requests.

Beginning February 1, 2016, anyone who submits a DACA request will be able to create a USCIS online account to track and manage his or her case online.  If you submit a DACA request, you will receive a USCIS Account Acceptance Notice in the mail with instructions on how to create a USCIS online account.

Case 1:18-cv-00068   Document 225-3   Filed on 07/21/18 in TXSD   Page 252 of 395

Having a USCIS online account allows you to:

- Check the status of your case;
- Receive notifications and case updates; and
- Manage your contact information, including updating your address.

If you are an attorney or accredited representative, creating a USCIS online account will allow you to manage all of your clients' DACA requests in one place. USCIS will continue processing your DACA request even if you choose not to access your USCIS online account. You will continue to receive notifications and updates about your case by mail through the U.S. Postal Service.

Note for Attorneys and Accredited Representatives: You should have only one USCIS online representative account. When you receive an Account Acceptance Notice for a paper form filed at a USCIS Lockbox on behalf of your client, please ensure that you enter the same personal information that you provided on the Form G-28 submitted with your client's original application, petition, or request. If the information you use to access your online representative account does not match the information you provided on the Form G-28, you may be unable to access your client's case.



**Visit an Application Support Center (ASC) for biometric services**.
After USCIS receives your complete request with fees, we will send you a notice scheduling you to visit an ASC to for biometric services. If you fail to attend your ASC appointment, USCIS may deny your request DACA. Children under 14 in removal proceedings, with a final removal order, or with a voluntary departure order, and who are not in immigration detention, will appear at the ASC for photographs only.



**Check the status of your request online.**
The 90-day period for reviewing Form I-765 filed together with Form I-821D begins if and when USCIS decides to defer action in your case.

You can check the status of your case on **Case Status Online** or by logging into your USCIS online account.

## Fee Exemptions

There are very limited fee exemptions available. Your request for a fee exemption must be filed and favorably adjudicated before you file your DACA request without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty level, and are in foster care or otherwise lacking any parental or other familial support; or,
- You are under 18 years of age and homeless; or,
- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or,
- You have, at the time of the request, accumulated $10,000 or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

Submit the following types of evidence:

- Affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support.
- Copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level.
- An affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level.
- Copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $10,000.

USCIS will send you a Request for Evidence (RFE) if it has questions on the evidence you submitted. You can find additional information on our Fee Exemption Guidance Web page.
Note: There are no fee waivers available for employment authorization applications connected to DACA.

**If USCIS Grants DACA in Your Case**

If USCIS grants DACA and employment authorization in your case, you will receive a written notice of that decision. An Employment Authorization Document will arrive separately in the mail.

**If USCIS Does Not Grant DACA in Your Case**

If USCIS decides not to grant DACA in your case, you cannot appeal the decision or file a motion to reopen or reconsider. USCIS will not review its discretionary determinations.
We will apply our policy guidance governing the referral of cases to U.S. Immigration and Customs Enforcement (ICE) and the issuance of notices to appear. If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, we will not refer your case to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more information on notices to appear, visit www.uscis.gov/NTA.

**Administrative Errors**

You may request a review using the Service Request Management Tool process if you met all of the DACA guidelines and you believe USCIS denied your request because of an administrative error.

Examples:

- USCIS believes you abandoned your case by not responding to a request for evidence (RFE), and you believe you did respond within the prescribed time; or
- USCIS mailed the RFE to the wrong address, even though you had submitted a Form AR-11, Change of Address, or changed your address online at www.uscis.gov before we issued the RFE.

You can find a full list of possible errors in our Frequently Asked Questions.

To make a service request, you must call the USCIS Contact Center at 800-375-5283. For people who are deaf, hard of hearing, or have a speech disability: TTY 800-767-1833. A USCIS representative will then forward your request to the proper USCIS office. Your service request will be reviewed for accuracy and USCIS will send you a letter informing you of its decision.

The USCIS Contact Center is now open Monday – Friday from 8 a.m. – 8 p.m. in each U.S. time zone.

Return to top

# Travel Information

Certain travel outside the United States may affect the continuous residence guideline. Traveling outside the U.S. before Aug. 15, 2012, will not interrupt your continuous residence if the travel was brief, casual, and innocent. If you travel outside the United States after Aug. 15, 2012, and before we decide your request for DACA, you will not be considered for DACA.

The following chart explains whether your travel will affect your continuous residence.

| Travel Dates | Type of Travel | Does it Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | • brief<br>• casual<br>• innocent | No |
| | • For an extended time<br>• Because of an order of exclusion, deportation, or removal<br>• To participate in criminal activity | Yes |
| After Aug. 15, 2012, and before you have requested DACA | • Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case and you cannot travel until you receive advance parole. |
| After Aug. 15, 2012, and after you have requested DACA | • Any | Yes. You cannot travel while your request is under review. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case.<br><br>In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and receiving DACA | • Any | It depends.  If you travel after receiving advance parole, the travel will not interrupt your continuous residence.  However, if you travel without receiving advance parole, the travel will interrupt your continuous residence. |

Case 1:18-cv-00068   Document 225-3   Filed on 07/21/18 in TXSD   Page 255 of 395

Once USCIS has approved your request for DACA, you may file Form I-131, Application for Travel Document, to request advance parole to travel outside of the United States. If you travel outside the United States without first receiving advance parole, USCIS will automatically terminate your DACA.

USCIS is currently updating its policy on granting advanced parole for DACA recipients. Please check the Frequently Asked Questions for the latest guidance.

For detailed information see the Travel section of the Frequently Asked Questions.

Return to top

## National Security and Public Safety Guidelines

You will not be considered for DACA if you have been convicted of:

- A felony offense;
- A significant misdemeanor offense; or
- Three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct.

Or

- You are otherwise deemed to pose a threat to national security or public safety.

### What is the difference between "significant misdemeanor", "non-significant misdemeanor", and "felony"?

| Felony | Significant Misdemeanor | Non-significant Misdemeanor |
|---|---|---|
| A felony is a federal, state or local criminal offense punishable by imprisonment for a term exceeding one year. | A significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and: <br><br>1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or, <br><br>2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence. | A crime is considered a non-significant misdemeanor (maximum term of imprisonment is one year or less but greater than five days) if it: <br><br>1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and <br><br>2. Is one for which the individual was sentenced to time in custody of 90 days or less. |

A minor traffic offense will not be considered a misdemeanor for purposes of DACA, However, driving under the influence is a significant misdemeanor regardless of the sentence. You can find detailed information in the National Security and Public Safety section of the Frequent Asked Questions.

## Don't Be a Victim of Immigration Scams

Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our Avoid Scams page to learn how you can protect yourself from immigration scams.

Make sure you seek information about DACA from official government sources such as USCIS or the Department of Homeland Security. If you are seeking legal advice, visit our Find Legal Services page to learn how to choose a licensed attorney or accredited representative.

Remember you can download all USCIS forms for free at www.uscis.gov/forms.

## Combatting Fraud

USCIS is committed to safeguarding the integrity of the immigration process. If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## Previous DACA Updates

**Sept. 13, 2016 Update:** We are aware that some DACA requestors may have experienced delays receiving their Application Support Center biometrics appointment notices. We recently mailed biometrics appointment notices to those whose notices were delayed. Most of these appointments will be scheduled during the week of October 24, 2016, and we encourage you to appear at your appointment as scheduled. If you need to reschedule an appointment, please follow the instructions on your appointment notice. We will only reschedule a biometrics appointment if you have a compelling reason For more information, please refer to our guidance on rescheduling appointments due to reasons such as illness. For further information about your DACA request, you may call the USCIS Contact Center or send us an email from your online account inbox.

**September 12, 2016 Update:** Due to a federal court order, USCIS will not begin accepting requests for the expansion of DACA on February 18 as originally planned. The court's temporary injunction, issued February 16, does not affect the existing DACA. Individuals may continue to come forward and request an initial grant of DACA or renewal of DACA under the guidelines established in 2012 and discussed below.

**August 10, 2016 Update:** If you submitted a request for DACA renewal between February 14 and May 14, 2016, your renewal request may have taken longer than expected. You should receive a decision on your case within the next few weeks. USCIS is dedicated to restoring normal processing times as quickly as possible.

**June 27, 2016, Update:** The Supreme Court's 4-4 decision on June 23, 2016, in United States v. Texas does not affect existing policy regarding 2012 Deferred Action for Childhood Arrivals (DACA). Individuals who meet the 2012 DACA guidelines may continue to come forward and file an initial or renewal request for DACA under the 2012 guidelines.
The Supreme Court decision does, however, mean that the injunction prohibiting implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded DACA remains in effect

**August 3, 2015, Update:** Quick Facts for DACA Recipients Who Received 3-Year Work Authorization Post-Injunction

**February, 15, 2015, Update:** Due to a federal court order, USCIS will not begin accepting requests for the expansion of DACA on February 18 as originally planned. The court's temporary injunction, issued February 16, does not affect the existing DACA. Individuals may continue to come forward and request an initial grant of DACA or renewal of DACA under the guidelines established in 2012 and discussed below. Please check back for updates.

[Return to top](#)



Last Reviewed/Updated: 02/14/2018

# DEF-INTERV.

# EX. 81

Facts and Data | Office of Refugee Resettlement | ACF

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

# Facts and Data

## General Statistics

Data provided by fiscal year (October 1 – September 30)

**Age | Country of Origin | Gender | Home Studies and Post-Release Services | Length of Stay | Referrals | Release to Sponsors**

## Age

Age breakdown of unaccompanied alien children by fiscal year (October 1 – September 30)

| AGE | FY2017 | FY2016 | FY2015 | FY2014 | FY2013 | FY2012 |
|---|---|---|---|---|---|---|
| 0-12 | 17% | 18% | 17% | 21% | 14% | 11% |
| 13-14 | 13% | 14% | 14% | 16% | 13% | 11% |
| 15-16 | 37% | 37% | 38% | 36% | 40% | 39% |
| 17 | 32% | 31% | 30% | 27% | 34% | 38% |

## Country of Origin

The top three countries of origin shifted slightly from FY2014, with the highest percentage of children in FY2015 coming from Guatemala, followed closely by El Salvador and Honduras.

| COUNTRY OF ORIGIN | FY2017 | FY2016 | FY2015 | FY2014 | FY2013 | FY2012 |
|---|---|---|---|---|---|---|
| HONDURAS | 23% | 21% | 17% | 34% | 30% | 27% |
| GUATEMALA | 45% | 40% | 45% | 32% | 37% | 34% |
| EL SALVADOR | 27% | 34% | 29% | 29% | 26% | 27% |
| MEXICO | <3% | 3% | 6% | <2% | 3% | 8% |
| ALL OTHER COUNTRIES | 3% | 2% | 3% | <3% | 5% | 4% |

## Gender

The demographic breakdown in FY15 changed slightly from FY14 to reflect an increase in male UAC arrivals and decrease in female UAC arrivals.

| YEAR | MALES | FEMALES |
|---|---|---|
| FY2017 | 68% | 32% |
| FY2016 | 67% | 33% |
| FY2015 | 68% | 32% |
| FY2014 | 66% | 34% |
| FY2013 | 73% | 27% |
| FY2012 | 77% | 23% |

## Home Studies and Post-Release Services

Number of home studies conducted by ORR and number of unaccompanied alien children served by post-release services (PRS).

| YEAR | HOME STUDIES | UAC SERVED BY PRS |
|---|---|---|
| FY2017 | 3,173 | 13,381 |
| FY2016 | 3,540 | 10,546 |

| YEAR | HOME STUDIES | UAC SERVED BY PRS |
|------|--------------|-------------------|
| FY2015 | 1,895 | 8,618 |

## Length of Stay

Average length of stay of a child in shelter care* in FY2017 was 41 days.

*Includes Shelter and Transitional Foster Care only

## Referrals

This reflects the number of referrals ORR receives from the Department of Homeland Security each fiscal year. Read more about **referrals to ORR and initial placement (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.3)**.

| YEAR | REFERRALS |
|------|-----------|
| FY2017 | 40,810 |
| FY2016 | 59,170 |
| FY2015 | 33,726 |
| FY2014 | 57,496 |
| FY2013 | 24,668 |
| FY2012 | 13,625 |

## Release to Sponsors

View the number of unaccompanied alien children released to sponsors by **state (https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state)** and by **county (https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-county)**

### View ORR Fact Sheet on Unaccompanied Alien Children's Services (https://www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf)

Last Reviewed: May 8, 2018

# DEF-INTERV.

# EX. 82



# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

## Unaccompanied Alien Children Released to Sponsors By State

Published: June 30, 2017

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR). Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied alien children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied alien children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied alien children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled. HHS cannot release information about individual children that could compromise the child's location or identity.

The data in the table below shows **state-by-state** data of unaccompanied alien children released to sponsors as of January 31, 2018. ACF will update this data each month. ACF will update this data each month. **View unaccompanied alien children released to sponsors by county (https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-county).**

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. Questions may be addressed to ORR directly, at (202) 401-9246.

### Unaccompanied Alien Children Release Data

| STATE | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2015 (OCTOBER 2014 – SEPTEMBER 2015)* | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2016 (OCTOBER 2015 – SEPTEMBER 2016) | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2017 (OCTOBER 2016 – SEPTEMBER 2017) | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2018 (OCTOBER 2017 - JANUARY 2018) |
|---|---|---|---|---|
| Alabama | 808 | 870 | 608 | 254 |
| Alaska | 2 | 5 | 3 | 0 |
| Arizona | 167 | 330 | 318 | 79 |
| Arkansas | 186 | 309 | 275 | 62 |
| California | 3,629 | 7,381 | 6,252 | 1,513 |
| Colorado | 248 | 427 | 375 | 97 |
| Connecticut | 206 | 454 | 410 | 83 |
| Delaware | 152 | 275 | 175 | 77 |
| District of Columbia | 201 | 432 | 292 | 41 |
| Florida | 2,908 | 5,281 | 4,054 | 1,190 |
| Georgia | 1,041 | 1,735 | 1,345 | 403 |
| Hawaii | 2 | 4 | 5 | 0 |
| Idaho | 11 | 39 | 11 | 11 |
| Illinois | 312 | 519 | 462 | 148 |

STATES000005

3/14/2018                Unaccompanied Alien Children Released to Sponsors By State | Office of Refugee Resettlement | ACF

| STATE | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2015 (OCTOBER 2014 – SEPTEMBER 2015)* | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2016 (OCTOBER 2015 – SEPTEMBER 2016) | TOTAL NUMBER OF UAC RELEASED  TO SPONSORS IN FY 2017 (OCTOBER 2016 – SEPTEMBER 2017) | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2018 (OCTOBER 2017 - JANUARY 2018) |
|---|---|---|---|---|
| Indiana | 240 | 354 | 365 | 108 |
| Iowa | 201 | 352 | 277 | 67 |
| Kansas | 245 | 326 | 289 | 103 |
| Kentucky | 274 | 503 | 363 | 105 |
| Louisiana | 480 | 973 | 1,043 | 253 |
| Maine | 4 | 9 | 11 | 9 |
| Maryland | 1,794 | 3,871 | 2,953 | 478 |
| Massachusetts | 738 | 1,541 | 1,071 | 232 |
| Michigan | 132 | 227 | 162 | 43 |
| Minnesota | 243 | 318 | 321 | 89 |
| Mississippi | 207 | 300 | 235 | 68 |
| Missouri | 170 | 261 | 232 | 53 |
| Montana | 2 | 0 | 2 | 0 |
| Nebraska | 293 | 486 | 353 | 119 |
| Nevada | 137 | 283 | 228 | 47 |
| New Hampshire | 14 | 25 | 27 | 8 |
| New Jersey | 1,462 | 2,637 | 2,269 | 549 |
| New Mexico | 19 | 65 | 46 | 8 |
| New York | 2,630 | 4,985 | 3,918 | 857 |
| North Carolina | 844 | 1,493 | 1,282 | 296 |
| North Dakota | 2 | 10 | 3 | 0 |
| Ohio | 483 | 693 | 587 | 163 |
| Oklahoma | 225 | 301 | 267 | 86 |
| Oregon | 122 | 188 | 169 | 77 |
| Pennsylvania | 333 | 604 | 502 | 153 |
| Rhode Island | 185 | 269 | 237 | 66 |
| South Carolina | 294 | 562 | 480 | 139 |
| South Dakota | 61 | 81 | 79 | 28 |
| Tennessee | 765 | 1,354 | 1,073 | 367 |
| Texas | 3,272 | 6,550 | 5,374 | 1,024 |
| Utah | 62 | 126 | 98 | 32 |
| Vermont | 1 | 1 | 0 | 1 |
| Virginia | 1,694 | 3,728 | 2,883 | 510 |
| Washington | 283 | 476 | 501 | 156 |
| West Virginia | 12 | 26 | 22 | 10 |
| Wisconsin | 38 | 85 | 92 | 26 |
| Wyoming | 6 | 23 | 14 | 3 |
| Virgin Islands | 0 | 0 | 3 | 0 |
| TOTAL | 27,840 | 52,147 | 42,416 | 10,291 |

*The FY2015 numbers have been reconciled.

For more information, please read ORR's reunification policy (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors).

Last Reviewed: February 28, 2018

STATES000006

DEF-INTERV.

EX. 83

**FSP** Foundation School Program
Funding Texas Schools

**2018-2019 Statewide Summary of Finances**

**Last Update:**   **JUN 08, 2018**

Payment Cycle: Preliminary

Run ID: 24061

| Funding Elements | | |
|---|---|---|
| **Students** | **LPE** | **DPE** |
| 1. | Refined Average Daily Attendance (ADA) | 5,168,918.312 | 5,168,988.312 |
| 2. | Regular Program ADA (Ref ADA - Spec Ed FTEs - CT FTEs) | 4,749,467.204 | 4,749,513.237 |
| 3. | Special Education FTEs | 124,163.857 | 124,184.724 |
| 4. | Career & Technology FTEs | 295,287.251 | 295,290.351 |
| 5. | Advanced Career & Technical Eduction FTEs | 0.000 | 0.000 |
| 6. | High School ADA | 1,453,555.742 | 1,453,655.742 |
| 7. | Weighted ADA (WADA) | 7,039,697.293 | 7,039,850.246 |
| 8. | Prior Year Refined ADA | 5,007,852.857 | 5,007,852.857 |
| 9. | Texas School for the Blind and Visually Impaired ADA | 143.851 | 143.851 |
| 10. | Texas School for the Deaf ADA | 530.714 | 530.714 |
| **Staff** | **LPE** | **DPE** |
| 11. | Full-Time Staff (not MSS) | 278,444.25 | 278,444.25 |
| 12. | Part-Time Staff (not MSS) | 21,971.48 | 21,971.48 |
| **Property Values** | **LPE** | **DPE** |
| 13. | 2018 (current tax year) Locally Certified Property Value | $2,562,634,577,550 | $2,562,634,577,550 |
| 14. | LPE = greater of 2017 (prior tax year) Adjusted State Certified Property Value (ASCPV) or 2016 ASCPV * 1.0704, DPE = 2017 ASCPV | $2,436,474,899,095 | $2,394,737,860,973 |
| **Tax Rates and Collections** | **LPE** | **DPE** |
| 15. | 2005 Adopted M&O Tax Rate | 1.4555 | 1.4555 |
| 16. | 2018 (current tax year) Compressed M&O Tax Rate | 0.9919 | 0.9919 |
| 17. | Average Tax Collection Rate | 98.0% | 98.0% |
| 18. | 2018 (current tax year) M&O Tax Rate | 1.0934 | 1.0934 |
| 19. | 2018-2019 (current school year) M&O Tax Collections (greater of 2018 school year LPE or DPE collections * 1.0677) | $27,254,887,091 | $27,255,074,360 |
| 20. | 2018 (current tax year) I&S Tax Rate | 0.2110 | 0.2110 |
| 21. | 2018-2019 (current school year) I&S Tax Collections | $6,442,515,850 | $6,442,515,850 |

**Foundation School Program**
**FSP**
**Funding Texas Schools**

**2018-2019 Statewide Summary of Finances**

**Last Update:**     **JUN 08, 2018**

Payment Cycle: Preliminary                                                                          Run ID: 24061

| | | | |
|---|---|---|---|
| 22. | 2018-2019 (current school year) Total Tax Collections | $33,697,402,941 | $33,697,590,210 |
| 23. | 2018-2019 (current school year) Total Tax Levy | $33,304,996,509 | $33,304,996,509 |
| **Funding Components** | | **LPE** | **DPE** |
| 24. | Adjusted Allotment | $6,594 | $6,594 |
| 25. | Revenue at Compressed Rate (RACR) per WADA | $5,600 | $5,682 |
| 26. | Cost of Education (CEI) Index | 1.079 | 1.079 |
| 27. | Adjusted CEI | 1.068 | 1.068 |
| 28. | Per Capita Rate | $447.180 | $447.180 |
| **Tier I Allotments** | | **LPE** | **DPE** |
| **Program Intent Codes - Allotments** | | | |
| 29. | 11-Regular Program Allotment | $27,371,321,729 | $27,371,626,131 |
| 30. | 23-Special Education Adjusted Allotment (spend 52% of amount) | $3,096,361,054 | $3,096,805,750 |
| 31. | 22-Career and Technology Allotment (spend 58% of amount) | $2,296,276,815 | $2,296,305,029 |
| 32. | 21-Gifted & Talented Adjusted Allotment (spend 55% of amount) | $164,775,795 | $164,775,728 |
| 33. | 24-Compensatory Education Allotment (spend 52% of amount) | $3,982,026,453 | $3,982,036,023 |
| 34. | 25-Bilingual Education Allotment (spend 52% of amount) | $535,424,831 | $535,423,867 |
| 35. | 11-Public Education Grant | $0 | $0 |
| 36. | 99-New Instructional Facility Allotment | $0 | $0 |
| 37. | 99-Transportation Allotment | $376,132,682 | $376,132,682 |
| 38. | 31-High School Allotment (spend 100% of amount) | $399,727,871 | $399,755,371 |
| 39. | Total Cost of Tier I | $38,221,525,322 | $38,222,338,673 |
| 40. | Less Local Fund Assignment | ($24,189,593,114) | ($23,779,000,312) |
| 41. | State Share of Tier I | $16,440,456,818 | $16,702,715,949 |
| 42. | Per Capita Distribution from Available School Fund (ASF) | $2,239,230,376 | $2,239,230,376 |



**2018-2019 Statewide Summary of Finances**

**Last Update:   JUN 08, 2018**

Payment Cycle: Preliminary                                                                          Run ID: 24061

| Foundation School Program (FSP) State Funding | | LPE | DPE |
|---|---|---|---|
| 43. | Greater of State Share of Tier I or (ASF+NIFA+HS) | $16,899,573,493 | $17,151,202,514 |
| 44. | Tier II | $3,187,513,329 | $3,293,861,150 |
| 45. | Other Programs | $271,917,692 | $271,895,872 |
| 46. | Less Total Available School Fund ($447.180 * Prior Yr ADA) | ($2,239,230,376) | ($2,239,230,376) |
| 47. | Total FSP Operations Funding | $18,120,296,046 | $18,478,251,068 |
| State Aid by Funding Source | | LPE | DPE |
| Fund Code / Object Code - Funding Source | | | |
| 48. | 199/5812 - Foundation School Fund | $18,120,296,046 | $18,478,251,068 |
| 49. | 199/5811 - Available School Fund | $2,239,230,376 | $2,239,230,376 |
| 50. | 599/5829 - EDA | $208,021,541 | $220,206,285 |
| 51. | 599/5829 - Instructional Facilities Allotment (Bond) | $175,382,205 | $181,544,884 |
| 52. | 199/5829 - Instructional Facilities Allotment (Lease Purchase) | $5,045,937 | $5,233,206 |
| 53. | Additional State Aid for Homestead Exemption (ASAHE) for Facilities | $80,837,546 | $78,982,120 |
| 54. | **TOTAL FSP/ASF STATE AID** | $20,828,813,651 | $21,203,447,939 |
| | | | |

Foundation School Program
FSP
Funding Texas Schools

**2017-2018 Statewide Summary of Finances**

**Last Update: JUN 11, 2018**

Payment Cycle: Preliminary

Run ID: 24085

## Funding Elements

| Students | | LPE | DPE |
|---|---|---|---|
| 1. | Refined Average Daily Attendance (ADA) | 5,060,903.346 | 5,008,020.506 |
| 2. | Regular Program ADA (Ref ADA - Spec Ed FTEs - CT FTEs) | 4,653,460.096 | 4,609,370.617 |
| 3. | Special Education FTEs | 121,744.195 | 122,778.353 |
| 4. | Career & Technology FTEs | 285,699.055 | 275,871.536 |
| 5. | Advanced Career & Technical Eduction FTEs | 4.000 | 0.000 |
| 6. | High School ADA | 1,433,620.779 | 1,426,358.002 |
| 7. | Weighted ADA (WADA) | 6,894,976.679 | 6,833,503.950 |
| 8. | Prior Year Refined ADA | 4,969,637.720 | 4,969,637.720 |
| 9. | Texas School for the Blind and Visually Impaired ADA | 143.851 | 143.851 |
| 10. | Texas School for the Deaf ADA | 530.714 | 530.714 |
| **Staff** | | **LPE** | **DPE** |
| 11. | Full-Time Staff (not MSS) | 278,457.66 | 279,683.50 |
| 12. | Part-Time Staff (not MSS) | 21,971.48 | 21,489.48 |
| **Property Values** | | **LPE** | **DPE** |
| 13. | 2017 (current tax year) Locally Certified Property Value | $2,394,137,979,134 | $2,394,137,979,134 |
| 14. | 2016 (prior tax year) Adjusted State Certified Property Value | $2,228,953,383,538 | $2,228,047,003,913 |
| **Tax Rates and Collections** | | **LPE** | **DPE** |
| 15. | 2005 Adopted M&O Tax Rate | 1.4555 | 1.4555 |
| 16. | 2017 (current tax year) Compressed M&O Tax Rate | 0.9919 | 0.9919 |
| 17. | Average Tax Collection Rate | 98.0% | 98.0% |
| 18. | 2017 (current tax year) M&O Tax Rate | 1.0934 | 1.0934 |
| 19. | 2017-2018 (current school year) M&O Tax Collections (2017 DPE collections * 1.0704) | $24,930,158,219 | $25,001,988,040 |
| 20. | 2017 (current tax year) I&S Tax Rate | 0.2110 | 0.2110 |
| 21. | 2017-2018 (current school year) I&S Tax Collections | $6,472,370,668 | $6,442,515,850 |



**2017-2018 Statewide Summary of Finances**

**Last Update:**   **JUN 11, 2018**

Payment Cycle: Preliminary                                                                                     Run ID: 24085

| | | | |
|---|---|---|---|
| 22. | 2017-2018 (current school year) Total Tax Collections | $31,402,528,887 | $31,444,503,890 |
| 23. | 2017-2018 (current school year) Total Tax Levy | $31,194,039,436 | $31,194,039,436 |
| **Funding Components** | | **LPE** | **DPE** |
| 24. | Adjusted Allotment | $6,540 | $6,543 |
| 25. | Revenue at Compressed Rate (RACR) per WADA | $5,587 | $5,577 |
| 26. | Cost of Education (CEI) Index | 1.079 | 1.079 |
| 27. | Adjusted CEI | 1.068 | 1.068 |
| 28. | Per Capita Rate | $206.566 | $206.566 |
| **Tier I Allotments** | | **LPE** | **DPE** |
| **Program Intent Codes - Allotments** | | | |
| 29. | 11-Regular Program Allotment | $26,755,200,912 | $26,509,169,838 |
| 30. | 23-Special Education Adjusted Allotment (spend 52% of amount) | $3,021,202,424 | $3,020,569,677 |
| 31. | 22-Career and Technology Allotment (spend 58% of amount) | $2,219,510,935 | $2,144,843,138 |
| 32. | 21-Gifted & Talented Adjusted Allotment (spend 55% of amount) | $162,131,342 | $164,912,402 |
| 33. | 24-Compensatory Education Allotment (spend 52% of amount) | $4,010,368,672 | $4,010,482,348 |
| 34. | 25-Bilingual Education Allotment (spend 52% of amount) | $516,601,643 | $506,031,698 |
| 35. | 11-Public Education Grant | $0 | $0 |
| 36. | 99-New Instructional Facility Allotment | $0 | $0 |
| 37. | 99-Transportation Allotment | $376,145,451 | $376,284,993 |
| 38. | 31-High School Allotment (spend 100% of amount) | $393,611,276 | $391,614,009 |
| 39. | Total Cost of Tier I | $37,454,250,747 | $37,123,386,195 |
| 40. | Less Local Fund Assignment | ($22,076,906,770) | ($22,068,685,472) |
| 41. | State Share of Tier I | $17,119,993,616 | $16,837,781,819 |
| 42. | Per Capita Distribution from Available School Fund (ASF) | $1,026,913,884 | $1,026,913,884 |



**2017-2018 Statewide Summary of Finances**

**Last Update:      JUN 11, 2018**

Payment Cycle: Preliminary                                                                Run ID: 24085

| | Foundation School Program (FSP) State Funding | LPE | DPE |
|---|---|---|---|
| 43. | Greater of State Share of Tier I or (ASF+NIFA+HS) | $17,302,312,560 | $17,016,580,669 |
| 44. | Tier II | $2,958,570,458 | $2,900,226,972 |
| 45. | Other Programs | $239,207,193 | $250,322,750 |
| 46. | Less Total Available School Fund ($206.566 * Prior Yr ADA) | ($1,026,913,884) | ($1,026,913,884) |
| 47. | Total FSP Operations Funding | $19,473,698,235 | $19,140,738,415 |
| | **State Aid by Funding Source** | **LPE** | **DPE** |
| | **Fund Code / Object Code - Funding Source** | | |
| 48. | 199/5812 - Foundation School Fund | $19,473,698,235 | $19,140,738,415 |
| 49. | 199/5811 - Available School Fund | $1,026,913,884 | $1,026,913,884 |
| 50. | 599/5829 - EDA | $223,305,463 | $212,667,952 |
| 51. | 599/5829 - Instructional Facilities Allotment (Bond) | $203,399,883 | $205,514,858 |
| 52. | 199/5829 - Instructional Facilities Allotment (Lease Purchase) | $5,327,995 | $5,371,421 |
| 53. | Additional State Aid for Homestead Exemption (ASAHE) for Facilities | $82,018,403 | $83,561,518 |
| 54. | **TOTAL FSP/ASF STATE AID** | $21,014,663,863 | $20,674,768,048 |



**2015-2016 Statewide Summary of Finances**

**Last Update:** **JUN 13, 2018**

Payment Cycle: Final                                                                 Run ID: 24101

| Funding Elements | | |
|---|---|---|
| **Students** | **LPE** | **Final** |
| 1. Refined Average Daily Attendance (ADA) | 4,945,112.789 | 4,924,906.137 |
| 2. Regular Program ADA (Ref ADA - Spec Ed FTEs - CT FTEs) | 4,580,674.826 | 4,544,721.045 |
| 3. Special Education FTEs | 117,375.010 | 118,964.479 |
| 4. Career & Technology FTEs | 247,062.953 | 261,220.613 |
| 5. Advanced Career & Technical Eduction FTEs | 0.000 | 46,452.685 |
| 6. High School ADA | 1,356,732.363 | 1,384,275.030 |
| 7. Weighted ADA (WADA) | 6,668,676.771 | 6,672,665.356 |
| 8. Prior Year Refined ADA | 4,841,017.623 | 4,841,017.623 |
| 9. Texas School for the Blind and Visually Impaired ADA | 142.700 | 149.558 |
| 10. Texas School for the Deaf ADA | 1,073.665 | 539.392 |
| **Staff** | **LPE** | **Final** |
| 11. Full-Time Staff (not MSS) | 254,600.42 | 276,054.57 |
| 12. Part-Time Staff (not MSS) | 20,296.82 | 21,301.33 |
| **Property Values** | **LPE** | **Final** |
| 13. 2015 (current tax year) Locally Certified Property Value | $2,129,035,039,762 | $2,129,035,039,762 |
| 14. 2014 (prior tax year) Adjusted State Certified Property Value | $1,988,798,246,155 | $1,975,036,213,241 |
| **Tax Rates and Collections** | **LPE** | **Final** |
| 15. 2005 Adopted M&O Tax Rate | 1.4555 | 1.4555 |
| 16. 2015 (current tax year) Compressed M&O Tax Rate | 0.9807 | 0.9819 |
| 17. Average Tax Collection Rate | 98.0% | 98.0% |
| 18. 2015 (current tax year) M&O Tax Rate | 1.0812 | 1.0812 |
| 19. 2015-2016 (current school year) M&O Tax Collections (2015 DPE collections * 1.0571) | $21,349,705,139 | $22,048,298,242 |
| 20. 2015-2016 (current school year) I&S Tax Collections | $5,347,393,054 | $5,706,987,111 |



**Foundation School Program**
# FSP
**Funding Texas Schools**

## 2015-2016 Statewide Summary of Finances

**Last Update:**   **JUN 13, 2018**

Payment Cycle: Final                                                                                     Run ID: 24101

| | | | |
|---|---|---|---|
| 21. | 2015-2016 (current school year) Total Tax Collections | $26,697,098,193 | $27,755,285,353 |
| 22. | 2015-2016 (current school year) Total Tax Levy | $27,446,236,147 | $28,038,532,616 |
| **Funding Components** | | **LPE** | **Final** |
| 23. | Adjusted Allotment | $6,461 | $6,471 |
| 24. | Revenue at Compressed Rate (RACR) per WADA | $5,491 | $5,549 |
| 25. | Cost of Education (CEI) Index | 1.079 | 1.079 |
| 26. | Adjusted CEI | 1.068 | 1.068 |
| 27. | Per Capita Rate | $180.320 | $180.320 |
| **Tier I Allotments** | | **LPE** | **Final** |
| **Program Intent Codes - Allotments** | | | |
| 28. | 11-Regular Program Allotment | $26,186,251,019 | $26,020,559,894 |
| 29. | 23-Special Education Adjusted Allotment (spend 52% of amount) | $2,819,006,026 | $2,914,940,728 |
| 30. | 22-Career and Technology Allotment (spend 58% of amount) | $1,910,338,808 | $2,024,815,365 |
| 31. | 21-Gifted & Talented Adjusted Allotment (spend 55% of amount) | $158,460,762 | $158,533,364 |
| 32. | 24-Compensatory Education Allotment (spend 52% of amount) | $3,767,851,315 | $3,771,767,827 |
| 33. | 25-Bilingual Education Allotment (spend 52% of amount) | $466,817,494 | $486,323,808 |
| 34. | 11-Public Education Grant | $0 | $2,320,394 |
| 35. | 99-New Instructional Facility Allotment | $9,728,755 | $9,884,111 |
| 36. | 99-Transportation Allotment | $371,787,971 | $371,639,740 |
| 37. | 31-High School Allotment (spend 100% of amount) | $372,938,394 | $380,390,905 |
| 38. | Total Cost of Tier I | $36,062,715,172 | $36,140,710,764 |
| 39. | Less Local Fund Assignment | ($19,565,939,392) | ($19,453,468,408) |
| 40. | State Share of Tier I | $18,016,404,986 | $18,186,074,828 |
| 41. | Per Capita Distribution from Available School Fund (ASF) | $873,163,821 | $873,163,821 |



**2015-2016 Statewide Summary of Finances**

**Last Update:**   **JUN 13, 2018**

Payment Cycle: Final

Run ID: 24101

| Foundation School Program (FSP) State Funding | | LPE | Final |
|---|---|---|---|
| 42. | Greater of State Share of Tier I or (ASF+NIFA+HS) | $18,115,422,865 | $18,285,129,081 |
| 43. | Tier II | $1,874,706,168 | $1,965,475,410 |
| 44. | Other Programs | $562,991,383 | $614,282,748 |
| 45. | Less Total Available School Fund ($180.320 * Prior Yr ADA) | ($873,163,821) | ($873,163,821) |
| 46. | Total FSP Operations Funding | $19,680,421,967 | $19,992,188,790 |
| **State Aid by Funding Source** | | **LPE** | **Final** |
| **Fund Code / Object Code - Funding Source** | | | |
| 47. | 199/5812 - Foundation School Fund | $19,680,421,967 | $19,992,188,790 |
| 48. | 199/5811 - Available School Fund | $873,163,821 | $873,163,821 |
| 49. | 599/5829 - EDA | $328,623,591 | $329,324,244 |
| 50. | 599/5829 - Instructional Facilities Allotment (Bond) | $232,911,084 | $237,193,716 |
| 51. | 199/5829 - Instructional Facilities Allotment (Lease Purchase) | $6,380,753 | $6,339,808 |
| 52. | Additional State Aid for Homestead Exemption (ASAHE) for Facilities | $80,642,164 | $88,539,062 |
| 53. | **TOTAL FSP/ASF STATE AID** | $21,202,143,380 | $21,526,864,980 |
| | | | |



**2016-2017 Statewide Summary of Finances**

**Last Update:** **JUN 14, 2018**

Payment Cycle: Final                                                                                          Run ID: 24124

| Funding Elements | | |
| --- | --- | --- |
| **Students** | **LPE** | **Final** |
| 1. Refined Average Daily Attendance (ADA) | 5,027,599.892 | 4,971,924.258 |
| 2. Regular Program ADA (Ref ADA - Spec Ed FTEs - CT FTEs) | 4,655,134.527 | 4,576,377.077 |
| 3. Special Education FTEs | 117,039.296 | 121,820.944 |
| 4. Career & Technology FTEs | 255,426.069 | 273,726.237 |
| 5. Advanced Career & Technical Eduction FTEs | 2.930 | 51,556.264 |
| 6. High School ADA | 1,378,343.021 | 1,413,844.241 |
| 7. Weighted ADA (WADA) | 6,774,976.231 | 6,756,147.774 |
| 8. Prior Year Refined ADA | 4,919,992.844 | 4,919,992.844 |
| 9. Texas School for the Blind and Visually Impaired ADA | 149.558 | 143.851 |
| 10. Texas School for the Deaf ADA | 538.392 | 530.714 |
| **Staff** | **LPE** | **Final** |
| 11. Full-Time Staff (not MSS) | 274,762.66 | 279,829.75 |
| 12. Part-Time Staff (not MSS) | 21,193.91 | 21,492.73 |
| **Property Values** | **LPE** | **Final** |
| 13. 2015 (prior tax year) Adjusted State Certified Property Value (ASCPV), Adjusted for decline under TEC 42.2521 | $2,076,186,680,300 | $2,076,186,680,300 |
| 14. 2015 (prior tax year) Adjusted State Certified Property Value | $2,175,156,850,841 | $2,113,553,342,567 |
| **Tax Rates and Collections** | **LPE** | **Final** |
| 15. 2005 Adopted M&O Tax Rate | 1.4555 | 1.4555 |
| 16. 2016 (current tax year) Compressed M&O Tax Rate | 0.9802 | 0.9817 |
| 17. Average Tax Collection Rate | 98.0% | 98.0% |
| 18. 2016 (current tax year) M&O Tax Rate | 1.0870 | 1.0869 |
| 19. 2016-2017 (current school year) M&O Tax Collections (2016 DPE collections * 1.0571) | $23,645,880,007 | $23,247,570,703 |
| 20. 2016-2017 (current school year) I&S Tax Collections | $5,686,800,618 | $6,124,156,586 |



**2016-2017 Statewide Summary of Finances**

**Last Update:** **JUN 14, 2018**

Payment Cycle: Final                                                                              Run ID: 24124

| | | | |
|---|---|---|---|
| 21. | 2016-2017 (current school year) Total Tax Collections | $29,332,680,625 | $29,371,727,289 |
| 22. | 2016-2017 (current school year) Total Tax Levy | $29,142,413,527 | $29,644,747,392 |
| **Funding Components** | | **LPE** | **Final** |
| 23. | Adjusted Allotment | $6,457 | $6,472 |
| 24. | Revenue at Compressed Rate (RACR) per WADA | $5,494 | $5,512 |
| 25. | Cost of Education (CEI) Index | 1.079 | 1.079 |
| 26. | Adjusted CEI | 1.068 | 1.068 |
| 27. | Per Capita Rate | $390.300 | $390.300 |
| **Tier I Allotments** | | **LPE** | **Final** |
| **Program Intent Codes - Allotments** | | | |
| 28. | 11-Regular Program Allotment | $26,617,737,416 | $26,227,364,389 |
| 29. | 23-Special Education Adjusted Allotment (spend 52% of amount) | $2,821,647,398 | $2,995,444,669 |
| 30. | 22-Career and Technology Allotment (spend 58% of amount) | $1,975,376,884 | $2,123,253,877 |
| 31. | 21-Gifted & Talented Adjusted Allotment (spend 55% of amount) | $160,747,574 | $160,024,868 |
| 32. | 24-Compensatory Education Allotment (spend 52% of amount) | $3,818,598,909 | $3,823,203,139 |
| 33. | 25-Bilingual Education Allotment (spend 52% of amount) | $479,649,206 | $502,028,842 |
| 34. | 11-Public Education Grant | $0 | $3,271,801 |
| 35. | 99-New Instructional Facility Allotment | $17,490,335 | $16,854,724 |
| 36. | 99-Transportation Allotment | $376,614,105 | $376,442,181 |
| 37. | 31-High School Allotment (spend 100% of amount) | $378,895,680 | $388,582,015 |
| 38. | Total Cost of Tier I | $36,646,235,599 | $36,615,948,597 |
| 39. | Less Local Fund Assignment | ($21,384,772,658) | ($20,830,757,580) |
| 40. | State Share of Tier I | $17,185,482,384 | $17,379,288,135 |
| 41. | Per Capita Distribution from Available School Fund (ASF) | $1,920,977,201 | $1,920,977,201 |



**2016-2017 Statewide Summary of Finances**

**Last Update:** **JUN 14, 2018**

Payment Cycle: Final                                                                    Run ID: 24124

| | Foundation School Program (FSP) State Funding | LPE | Final |
|---|---|---|---|
| 42. | Greater of State Share of Tier I or (ASF+NIFA+HS) | $17,486,379,789 | $17,663,054,393 |
| 43. | Tier II | $2,053,017,021 | $2,065,686,018 |
| 44. | Other Programs | $659,154,951 | $700,468,553 |
| 45. | Less Total Available School Fund ($390.300 * Prior Yr ADA) | ($1,920,977,201) | ($1,920,977,201) |
| 46. | Total FSP Operations Funding | $18,278,096,468 | $18,508,753,671 |
| | **State Aid by Funding Source** | **LPE** | **Final** |
| | **Fund Code / Object Code - Funding Source** | | |
| 47. | 199/5812 - Foundation School Fund | $18,278,096,468 | $18,508,753,671 |
| 48. | 199/5811 - Available School Fund | $1,920,977,201 | $1,920,977,201 |
| 49. | 599/5829 - EDA | $246,905,691 | $241,514,941 |
| 50. | 599/5829 - Instructional Facilities Allotment (Bond) | $223,221,684 | $236,239,897 |
| 51. | 199/5829 - Instructional Facilities Allotment (Lease Purchase) | $5,585,767 | $5,503,988 |
| 52. | Additional State Aid for Homestead Exemption (ASAHE) for Facilities | $82,949,571 | $83,944,893 |
| 53. | **TOTAL FSP/ASF STATE AID** | $20,757,736,382 | $20,996,934,591 |

# DEF-INTERV.

# EX. 84



# Sources of Education Funding

## Texas Commission on Public School Finance

TEXAS EDUCATION AGENCY

APRIL 5, 2018

# Texas Public Education Funds, 2016–2017 vs. 2018–2019 Biennium (in millions)

| Public Ed Funding | 2016–2017 Appropriated Biennium | 2018–2019 Appropriated Biennium | Dollar Change 2016–2017 vs. 2018–2019 | % Change 2016–2017 vs. 2018–2019 |
|---|---|---|---|---|
| State FSP (formula funding from state taxes, primarily sales taxes, other taxes and other revenues) | $42,388.6 | $42,972.0 | $583.4 | 1.4% |
| Local FSP* (local revenue from local property taxes) | $53,810.0 | $59,487.6 | $5,677.6 | 10.6% |
| Subtotal Formula Funding | $96,198.6 | $102,459.5 | $6,261.0 | 6.5% |
| State Non-Formula Funding / Interagency Contracts & Other | $1,941.4 | $1,708.9 | ($232.5) | (12.0%) |
| Federal Program Funds | $10,114.9 | $10,387.6 | $272.7 | 2.70% |
| TEA Administration | $275.9 | $290.1 | $14.1 | 5.1% |
| Total Public Education Spending | $108,530.8 | $114,846.1 | $6,315.4 | 5.8% |

* The local share of FSP (local revenue from local property taxes) are not appropriated.



# What are the main sources of local funding for school districts?

## TEXAS COMMISSION ON PUBLIC SCHOOL FINANCE



# Texas Education Code, Sec. 42.251

Sec. 42.251. FINANCING; GENERAL RULE.

*(a) The sum of the basic allotment under Subchapter B and the special allotments under Subchapter C, computed in accordance with this chapter, constitute the tier one allotments. The sum of the tier one allotments and the guaranteed yield allotments under Subchapter F, computed in accordance with this chapter, constitute the total cost of the Foundation School Program.*

*(b) The program shall be financed by*

*(1) ad valorem tax revenue generated by an equalized uniform school district effort;*

*(2) ad valorem tax revenue generated by local school district effort in excess of the equalized uniform school district effort;*

*(3) state available school funds distributed in accordance with law;  and*

**(4) state funds appropriated for the purposes of public school education and allocated to each district in an amount sufficient to finance the cost of each district's Foundation School Program <u>not covered by other funds specified in this subsection.</u>**

*(c) Repealed by Acts 1999, 76th Leg., ch. 396, Sec. 3.01(a), eff. Sept. 1, 1999.*



# Local Property Taxes for the 2018–2019 Biennium (in millions)

| Item | Amount | Notes |
|---|---:|---|
| Estimated Local Maintenance & Operations (M&O) Property Taxes | $51,204.5 | For the 2017 tax year, the average <u>locally adopted</u> district M&O tax rate is $1.0944 per $100 of taxable property valuation. |
| (Less Chapter 41 Recapture) | ($4,570.9) | These funds are appropriated for re-distribution through the FSP as "Appropriated Receipts". They are authorized by Chapter 41 of the Texas Education Code. |
| Estimated Local M&O Property Taxes *Net of Chapter 41 Recapture* | $46,633.6 | |
| Estimated Local Interest & Sinking (I&S) Property Taxes | $12,854.0 | For the 2017 tax year, the average <u>locally adopted</u> district I&S tax rate is $0.2106 per $100 of taxable property valuation. |
| **Total Estimated Local Property Taxes** | **$59,487.6** | |

*Charter schools do not levy property taxes so their FSP entitlements are 100% funded by other state taxes.



# What are the major revenue sources for state funding to school districts?

## TEXAS COMMISSION ON PUBLIC SCHOOL FINANCE



# State FSP Appropriation breakdown for the 2018–2019 Biennium (in millions)

| Item | Amount | Notes |
|---|---|---|
| Foundation School Fund (Fund 193) | $28,749.4 | The Foundation School Fund is an account within the General Revenue Fund used exclusively for the purpose of funding public education, largely funded by sales taxes, and occupation taxes and revenue. |
| Appropriated Receipts (Recapture) | $4,570.9 | Appropriated Receipts (Recapture) is authorized by Chapter 41 of the Texas Education Code. |
| Property Tax Relief Fund | $3,594.2 | Primarily funded through the franchise tax but also includes vehicle and tobacco sales taxes. |
| Available School Fund | $3,443.9 | Primarily, funded from returns on the Permanent School Fund, 25% of state's motor fuels tax revenue, and transfers from the General Land Office (GLO). |
| Lottery Proceeds | $2,613.5 | Approximately 60% of net lottery proceeds from the sale of Texas Lottery games is transferred to the FSP. |
| **Total Appropriated State FSP** | **$42,972.0** | **The FSP is a sum-certain appropriation and the mix of component revenue streams may fluctuate.** |



# Foundation School Fund (Fund 193) breakdown for the 2018–2019 Biennium

- Transfer from General Revenue (Primarily Sales Tax)
- Occupation Taxes
- Opening Balance

General Revenue (primarily through sales taxes) comprises 89% of the Foundation School Fund.

The remaining 11% is funded primarily through occupation taxes



8



# Available School Fund breakdown
# for the 2018–2019 Biennium (in millions)

| Available School Fund Calculation | FY2018 | FY2019 | Total for 2018-2019 Biennium |
|---|---|---|---|
| Transfer from Permanent School Fund for Per Capita Apportionment* | $141.7 | $1,220.5 | $1,362.2 |
| Interest | $0.8 | $0.9 | $1.7 |
| Motor Fuels Taxes | $884.6 | $895.5 | $1,780.1 |
| Direct Transfer from the General Land Office (Rider 77) | $0.0 | $300.0 | $300.0 |
| Total Available School Fund | $1,027.0 | $2,566.9 | $3,443.9 |

*Transfer from PSF to ASF in FY2018 is *net* of the $1.09 billion transfer to the Instructional Materials Fund
Source: Biennial Revenue Estimate



# State (non-FSP) and other funding breakdown for the 2018–2019 Biennium (in millions)

| Item | Amount | Notes |
|------|-------:|-------|
| Instructional Materials & Technology | $1,078.8 | Used for the purchase of instructional materials, technological equipment related services. (Rider 8) |
| Windham School District | $104.4 | Appropriations to Windham School District to assist students whose participation will help achieve goals of reduced recidivism and increased success in obtaining and maintaining employment. (Rider 6) |
| Assessment | $91.7 | Appropriations in support of the State's education testing services contract. |
| Regional Day Schools for the Deaf | $66.3 | Ensures that all eligible students who are deaf or hard of hearing are provided appropriate, ongoing, and fully accessible educational opportunities per Chapter 29 of the TEC, Subchapter I. (Rider 13) |
| Other, including grants, contracts and programs made by TEA to advance TEA strategic objectives. | $367.7 | TEA grants include grants for Reading and Math Academies, Lesson Study, Reading-to-Learn Academies, Reading Specialists, Communities in Schools. TEA can provide |
| Total State Funds for non-FSP related educational expenditures | $1,708.9 | |



# What are major sources of federal funding to school districts?

## TEXAS COMMISSION ON PUBLIC SCHOOL FINANCE



# Federal Funding – Major Federal Programs for the 2018–2019 Biennium (in millions)

| Federal Funds | Amount | Percent of Total |
|---|---|---|
| Child Nutrition (National School Lunch, School Breakfast Programs) | $4,343.6 | 41.8% |
| Title I (Provides supplemental financial assistance for schools with high numbers or percentages of children to help ensure all children meet challenging academic standards). | $2,938.9 | 28.3% |
| IDEA-B (Provides supplemental funding to ensure all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs) | $2,065.6 | 19.9% |
| Other (includes Title II, English Language Acquisition, Vocational Education Grants, etc.) | $1,039.6 | 10.0% |
| **Total Federal Funds** | **$10,387.6** | **100.0%** |

# DEF-INTERV.

# EX. 85

# Foundation School Program (FSP) Revenues by Year

## Local vs. State Funding Share Percentages

| Year | FSP Revenue (Billions) | | | Percent Shares | |
|------|---|---|---|---|---|
| | Local Revenue (M&O Collections + I&S Collections) | State Revenue (Total State Aid) | Total Local and State Revenue | Percent Local Revenue | Percent State Revenue |
| 1990 | 6.61 | 5.86 | 12.46 | 53% | 47% |
| 1991 | 7.57 | 6.43 | 14.00 | 54% | 46% |
| 1992 | 8.18 | 7.07 | 15.25 | 54% | 46% |
| 1993 | 8.68 | 7.06 | 15.74 | 55% | 45% |
| 1994 | 9.03 | 7.85 | 16.88 | 53% | 47% |
| 1995 | 9.34 | 8.11 | 17.45 | 54% | 46% |
| 1996 | 9.91 | 8.59 | 18.50 | 54% | 46% |
| 1997 | 10.37 | 9.08 | 19.46 | 53% | 47% |
| 1998 | 10.24 | 9.36 | 19.60 | 52% | 48% |
| 1999 | 11.16 | 10.31 | 21.47 | 52% | 48% |
| 2000 | 11.86 | 11.19 | 23.05 | 51% | 49% |
| 2001 | 13.17 | 12.18 | 25.35 | 52% | 48% |
| 2002 | 14.80 | 11.68 | 26.48 | 56% | 44% |
| 2003 | 15.20 | 11.36 | 26.56 | 57% | 43% |
| 2004 | 16.20 | 11.08 | 27.28 | 59% | 41% |
| 2005 | 18.40 | 10.87 | 29.27 | 63% | 37% |
| 2006 | 20.07 | 10.66 | 30.73 | 65% | 35% |
| 2007 | 20.20 | 14.60 | 34.80 | 58% | 42% |
| 2008 | 18.70 | 18.30 | 37.00 | 51% | 49% |
| 2009 | 20.87 | 17.86 | 38.73 | 54% | 46% |
| 2010 | 21.42 | 18.99 | 40.41 | 53% | 47% |
| 2011 | 21.36 | 19.86 | 41.22 | 52% | 48% |
| 2012 | 21.80 | 18.40 | 40.20 | 54% | 46% |
| 2013 | 22.91 | 18.44 | 41.35 | 55% | 45% |
| 2014 | 24.32 | 19.92 | 44.24 | 55% | 45% |
| 2015 | 26.50 | 20.59 | 47.09 | 56% | 44% |
| 2016 | 27.76 | 21.50 | 49.26 | 56% | 44% |
| 2017 | 29.37 | 20.96 | 50.33 | 58% | 42% |
| 2018 | 31.29 | 20.71 | 52.00 | 60% | 40% |

DEF-INTERV.

EX. 86

Wong: CV (9/2017)

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Google Voice: (619) 354-9913
Website: www.tomwongphd.com | bit.ly/tomkwong_citations

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2017 - | **ASSOCIATE PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |
| 2012 - 2017 | **ASSISTANT PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |

## OTHER POSITIONS

| | |
|---|---|
| 2013 - | **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**<br>University of California, San Diego |
| 2016 | **ADVISOR, IMMIGRATION PORTFOLIO**<br>**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS** |

## EDUCATION

| | |
|---|---|
| 2011 | **PH.D. IN POLITICAL SCIENCE**<br>University of California, Riverside<br>Focus in Comparative Politics, International Relations, and Research Methods<br>Dissertation: *Immigration Control in the Age of Migration* |
| 2005 | **B.A. IN POLITICAL SCIENCE**<br>University of California, Riverside<br>Focus in International Relations<br>*Magna Cum Laude* |

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity*. Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control*. Stanford University Press. Oxford Law blog

## JOURNAL ARTICLES

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. *2018*. "The Political Incorporation of Undocumented Youth," *Social Problems*.

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173.

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727.
C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304.
NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269.

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

## BOOK CHAPTERS

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

Tom K. Wong and Justin Gest. "Looks Skin Deep: Do Immigrant Legislators Better Represent Immigrant Interests?"

Tom K. Wong and Carolina Valdivia. "In Their Own Words: A Nationwide Survey of Undocumented Millennials," Working Paper 191, Center for Comparative Immigration Studies.
New York Times, Washington Post, The Hill, La Opinión, Univision, NBC News.com

Tom K. Wong. "President Obama's Executive Actions on Immigration and the 2016 Presidential Election." This project uses a nationally representative survey of Latinos ($n = 820$) and Asians ($n = 950$) fielded in late to analyze how knowing someone who is undocumented and potentially eligible for legal

status via programs like DAPA affects the civic engagement of Latino and Asian citizens. The survey was fielded by GfK and commissioned w/Dan Hopkins and Efren Perez.

Tom K. Wong. "Mobilizing Low-Propensity Voters of Color" and "Governing Diversity." These projects examine how demographic changes are reshaping the American electorate and how policymakers are responding. The former project includes multiple voter mobilization experiments utilizing direct voter contact run during the 2016 presidential cycle. These experiments analyze interventions designed to convey the urgency of voting to Latino, Asian, and immigrant-origin voters using political discourse around immigration policy and refugee admissions.

w/Justin Gest. "International Migrants Bill of Rights." This project aims to create cross-national indicators on government respect for and recognition of the human rights of migrants. Funding from the World Bank (obtained by Gest) will be used to pilot a 58 item index across 5 countries.

## REPORTS

Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA)*. Washington, D.C.: Center for American Progress.
C-Span, Associated Press

## OTHER PUBLICATIONS

Tom K. Wong. 2017. "The Effects of Sanctuary Policies on Crime and the Economy," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 5 no. 2.

James F. Hollifield and Tom K. Wong. 2012/2013. "International Migration: Cause or Consequence of Political Change," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 1 no. 1.

Tom K. Wong. 2012. "The Commission on Wartime Relocation and Internment of Civilians." In *The Encyclopedia of Transitional Justice*, edited by Lavina Stan and Nadya Nedelsky. Cambridge University Press.

Karthick Ramakrishnan, Dino Bozonelos, Louise Hendrickson, and Tom K. Wong. 2008. "Inland Gaps: Civic Inequalities in a High Growth Region," *Policy Matters* vol 2 no 1.

Karthick Ramakrishnan and Tom K. Wong. 2007. "Immigration Policies Go Local: The Varying Responses of Local Governments to Undocumented Immigration." Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity. Working Paper Series on Immigration.

## RESEARCH GRANTS (AS A FACULTY MEMBER)

- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016
- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, Department of Homeland Security, 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS (SELECTED)

2018 |   "Migrant Rights Database." Comparative Politics Workshop, University of Chicago, April 25, 2018.

Author Meets Critics. Center for the Study of International Migration, UCLA, March 2, 2018.

2017 |   "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**    "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**    "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

**2014** |      "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

**2013** |      "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

2012 | "Immigration Policy After the 2012 Elections." Center for the Study of International Migration, UCLA, November 16, 2012.

"PBS Need to Know 2012 Election Special: America by the Numbers." Presentation for KPBS at the Jo and Vi Jacobs Center, San Diego, CA, October 10, 2012.

"Immigrants in American Society." Presentation at the U.S. Citizenship and Immigration Services (USCIS) field office, Dallas, TX, March 6, 2012.

2011 | "The Radical Right and the Politics of Immigration Control in Europe." University of Neuchâtel, Switzerland, June 16-17, 2011.

"Conceptual Challenges and Contemporary Trends in Immigration Control." Presentation at the "Immigration Policy in an Era of Globalization" conference at the Federal Reserve Bank of Dallas, TX, May 18-20, 2011.

"Enforcing Like a State: A Mixed-Methods Study of the Politics of Immigration Control." Presentation at the University of California Center for New Racial Studies conference, UCLA, April 21, 2011.

"Immigration Enforcement in the Age of Obama." Center for Ideas and Society, University of California, Riverside, March 8, 2011.

2010 | "The Politics and Determinants of Immigration Control: Evidence from 25 Immigrant-Receiving Democracies." Department of Political Science and the Center for Research on Immigration, Population, and Public Policy, University of California, Irvine, December 1, 2010.

"States, Irregular Migrants, and a Theory of Selective Immigration Control: Evidence from European Gateway Cities." Presentation at the "Beyond Arizona: Laws Targeting Immigrants in the US and Europe" conference at the Warren Institute on Race, Ethnicity, and Diversity, University of California, Berkeley, October 25, 2010.

2009 | "Immigration Control in Industrialized Democracies: What Explains Their Variations." Presentation at Metropolis, an initiative of Citizenship and Immigration Canada, Ottawa, Canada, December 2, 2009.

## PROFESSIONAL ACTIVITIES

- Reviewer: *National Science Foundation, American Journal of Political Science, American Politics Research, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Political Research Quarterly, Russell Sage Foundation, Social Identities, Social Problems*
- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-present
- Advisory Board, Integrated Voter Engagement study, 2016-present
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Chair, 2018
- Editorial Board, Journal of Migration and Human Security (JMHS), 2014-present
- Editorial Board, Politics, Groups, and Identities (PGI), 2016-present
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-present
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016

# DEF-INTERV.

# EX. 87



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2010

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 4 | 2 | 4 | 2 | 3 | 4 | 6 | 7 | 11 | 4 | 6 | 4 | 57 |
| New Orleans | 3 | 1 | 2 | 3 | 1 | 4 | 1 | 4 | 3 | 0 | 3 | 3 | 28 |
| Ramey | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Blaine | 2 | 1 | 0 | 1 | 3 | 1 | 0 | 0 | 0 | 4 | 2 | 0 | 14 |
| Buffalo | 6 | 1 | 5 | 2 | 4 | 7 | 3 | 6 | 5 | 0 | 4 | 3 | 46 |
| Detroit | 2 | 3 | 3 | 2 | 4 | 1 | 6 | 3 | 3 | 1 | 2 | 3 | 33 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 4 | 0 | 1 | 2 | 3 | 14 |
| Havre | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| Swanton | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 4 | 2 | 1 | 10 |
| Big Bend *(formerly Marfa)* | 16 | 8 | 9 | 18 | 22 | 22 | 27 | 25 | 13 | 8 | 11 | 18 | 197 |
| Del Rio | 80 | 80 | 54 | 87 | 106 | 129 | 114 | 123 | 75 | 40 | 58 | 68 | 1,014 |
| El Centro | 28 | 46 | 27 | 36 | 52 | 64 | 43 | 29 | 28 | 35 | 29 | 31 | 448 |
| El Paso | 83 | 77 | 64 | 105 | 102 | 118 | 111 | 78 | 90 | 56 | 76 | 51 | 1,011 |
| Laredo | 103 | 76 | 88 | 103 | 103 | 205 | 209 | 184 | 148 | 101 | 148 | 102 | 1,570 |
| Rio Grande Valley *(formerly McAllen)* | 346 | 257 | 235 | 273 | 409 | 580 | 537 | 646 | 531 | 340 | 474 | 349 | 4,977 |
| San Diego | 88 | 61 | 64 | 87 | 118 | 155 | 101 | 88 | 79 | 54 | 40 | 45 | 980 |
| Tucson | 767 | 546 | 433 | 571 | 752 | 1,066 | 879 | 844 | 660 | 523 | 501 | 456 | 7,998 |
| Yuma | 22 | 20 | 24 | 25 | 31 | 25 | 18 | 11 | 11 | 10 | 13 | 6 | 216 |
| Coastal Border | 11 | 3 | 6 | 5 | 4 | 8 | 7 | 11 | 14 | 4 | 9 | 7 | 89 |
| Northern Border | 10 | 7 | 8 | 5 | 11 | 12 | 11 | 15 | 9 | 10 | 14 | 10 | 122 |
| Southwest Border | 1,533 | 1,171 | 998 | 1,305 | 1,695 | 2,364 | 2,039 | 2,028 | 1,635 | 1,167 | 1,350 | 1,126 | 18,411 |
| Monthly Total | 1,554 | 1,181 | 1,012 | 1,315 | 1,710 | 2,384 | 2,057 | 2,054 | 1,658 | 1,181 | 1,373 | 1,143 | 18,622 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2011

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 2 | 2 | 9 | 2 | 3 | 1 | 2 | 0 | 3 | 1 | 1 | 27 |
| New Orleans | 5 | 1 | 2 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 1 | 14 |
| Ramey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Blaine | 2 | 0 | 0 | 1 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 8 |
| Buffalo | 3 | 2 | 3 | 2 | 2 | 0 | 1 | 3 | 3 | 2 | 2 | 2 | 25 |
| Detroit | 4 | 1 | 0 | 3 | 4 | 0 | 1 | 1 | 0 | 1 | 1 | 5 | 21 |
| Grand Forks | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 3 | 0 | 1 | 0 | 0 | 7 |
| Havre | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 3 |
| Swanton | 0 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 0 | 9 |
| Big Bend *(formerly Marfa)* | 16 | 16 | 7 | 10 | 12 | 23 | 21 | 15 | 17 | 15 | 20 | 17 | 189 |
| Del Rio | 63 | 63 | 61 | 60 | 115 | 147 | 128 | 86 | 95 | 87 | 96 | 112 | 1,113 |
| El Centro | 31 | 24 | 25 | 38 | 28 | 58 | 59 | 31 | 36 | 35 | 39 | 53 | 457 |
| El Paso | 43 | 51 | 65 | 59 | 54 | 90 | 84 | 53 | 51 | 48 | 59 | 40 | 697 |
| Laredo | 91 | 91 | 76 | 95 | 113 | 179 | 175 | 162 | 161 | 132 | 156 | 177 | 1,608 |
| Rio Grande Valley *(formerly McAllen)* | 297 | 315 | 338 | 268 | 387 | 586 | 589 | 500 | 459 | 514 | 514 | 469 | 5,236 |
| San Diego | 48 | 33 | 33 | 32 | 54 | 58 | 64 | 48 | 51 | 45 | 47 | 36 | 549 |
| Tucson | 496 | 486 | 394 | 482 | 525 | 777 | 587 | 514 | 430 | 365 | 419 | 403 | 5,878 |
| Yuma | 12 | 13 | 12 | 29 | 22 | 38 | 11 | 26 | 13 | 12 | 10 | 24 | 222 |
| Coastal Border | 6 | 3 | 4 | 10 | 2 | 3 | 1 | 4 | 1 | 3 | 3 | 2 | 42 |
| Northern Border | 11 | 4 | 3 | 10 | 6 | 5 | 3 | 9 | 5 | 9 | 4 | 7 | 76 |
| Southwest Border | 1,097 | 1,092 | 1,011 | 1,073 | 1,310 | 1,956 | 1,718 | 1,435 | 1,313 | 1,253 | 1,360 | 1,331 | 15,949 |
| Monthly Total | 1,114 | 1,099 | 1,018 | 1,093 | 1,318 | 1,964 | 1,722 | 1,448 | 1,319 | 1,265 | 1,367 | 1,340 | 16,067 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2012

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 3 | 2 | 0 | 1 | 2 | 1 | 0 | 2 | 2 | 3 | 0 | 2 | 18 |
| New Orleans | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 5 |
| Ramey | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 5 |
| Blaine | 0 | 0 | 1 | 2 | 0 | 3 | 0 | 0 | 1 | 1 | 1 | 3 | 12 |
| Buffalo | 0 | 3 | 1 | 1 | 2 | 0 | 2 | 1 | 0 | 6 | 0 | 2 | 18 |
| Detroit | 2 | 2 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 10 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 |
| Swanton | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 |
| Big Bend (formerly Marfa) | 9 | 20 | 18 | 22 | 17 | 20 | 20 | 11 | 4 | 15 | 10 | 2 | 168 |
| Del Rio | 103 | 94 | 88 | 77 | 120 | 182 | 217 | 179 | 168 | 137 | 128 | 125 | 1,618 |
| El Centro | 43 | 39 | 12 | 31 | 48 | 62 | 50 | 58 | 64 | 35 | 34 | 22 | 498 |
| El Paso | 39 | 41 | 36 | 46 | 57 | 81 | 49 | 59 | 55 | 77 | 73 | 46 | 659 |
| Laredo | 147 | 179 | 135 | 195 | 223 | 286 | 241 | 241 | 221 | 243 | 308 | 239 | 2,658 |
| Rio Grande Valley (formerly McAllen) | 596 | 573 | 448 | 541 | 742 | 1,092 | 1,233 | 1,209 | 1,025 | 1,048 | 1,228 | 1,024 | 10,759 |
| San Diego | 33 | 36 | 29 | 34 | 29 | 68 | 47 | 57 | 41 | 54 | 24 | 72 | 524 |
| Tucson | 472 | 447 | 462 | 642 | 797 | 933 | 821 | 708 | 486 | 489 | 474 | 508 | 7,239 |
| Yuma | 23 | 17 | 31 | 47 | 44 | 31 | 25 | 19 | 7 | 20 | 10 | 6 | 280 |
| Coastal Border | 4 | 2 | 0 | 2 | 3 | 1 | 0 | 4 | 3 | 3 | 1 | 5 | 28 |
| Northern Border | 2 | 5 | 3 | 5 | 3 | 4 | 5 | 2 | 2 | 9 | 3 | 7 | 50 |
| Southwest Border | 1,465 | 1,446 | 1,259 | 1,635 | 2,077 | 2,755 | 2,703 | 2,541 | 2,071 | 2,118 | 2,289 | 2,044 | 24,403 |
| Monthly Total | 1,471 | 1,453 | 1,262 | 1,642 | 2,083 | 2,760 | 2,708 | 2,547 | 2,076 | 2,130 | 2,293 | 2,056 | 24,481 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2013

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 7 | 2 | 0 | 1 | 1 | 0 | 1 | 2 | 3 | 0 | 9 | 2 | 28 |
| New Orleans | 2 | 1 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 11 |
| Ramey | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 5 |
| Blaine | 1 | 1 | 1 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 8 |
| Buffalo | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 5 |
| Detroit | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 6 |
| Grand Forks | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 4 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 3 |
| Swanton | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 4 |
| Big Bend (formerly Marfa) | 15 | 5 | 9 | 17 | 8 | 13 | 17 | 15 | 6 | 11 | 6 | 3 | 125 |
| Del Rio | 189 | 142 | 103 | 143 | 201 | 208 | 231 | 180 | 136 | 220 | 190 | 192 | 2,135 |
| El Centro | 35 | 45 | 27 | 24 | 33 | 61 | 41 | 38 | 38 | 31 | 23 | 38 | 434 |
| El Paso | 84 | 62 | 56 | 56 | 56 | 59 | 89 | 72 | 50 | 52 | 57 | 51 | 744 |
| Laredo | 263 | 253 | 222 | 234 | 333 | 438 | 354 | 401 | 318 | 391 | 296 | 292 | 3,795 |
| Rio Grande Valley (formerly McAllen) | 1,067 | 1,106 | 978 | 945 | 1,385 | 2,206 | 2,420 | 2,378 | 2,080 | 2,255 | 2,427 | 2,306 | 21,553 |
| San Diego | 43 | 33 | 31 | 55 | 65 | 64 | 68 | 57 | 55 | 75 | 43 | 67 | 656 |
| Tucson | 620 | 733 | 764 | 758 | 887 | 1,041 | 949 | 818 | 684 | 559 | 667 | 590 | 9,070 |
| Yuma | 17 | 16 | 28 | 28 | 18 | 30 | 37 | 26 | 17 | 13 | 9 | 11 | 247 |
| Coastal Border | 9 | 4 | 0 | 4 | 2 | 2 | 2 | 2 | 5 | 0 | 11 | 3 | 44 |
| Northern Border | 2 | 3 | 2 | 6 | 1 | 2 | 1 | 2 | 2 | 6 | 3 | 0 | 30 |
| Southwest Border | 2,333 | 2,392 | 2,218 | 2,260 | 2,986 | 4,120 | 4,206 | 3,985 | 3,384 | 3,607 | 3,718 | 3,550 | 38,759 |
| Monthly Total | 2,344 | 2,399 | 2,220 | 2,270 | 2,989 | 4,124 | 4,209 | 3,989 | 3,391 | 3,613 | 3,732 | 3,553 | 38,833 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2014

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 3 | 2 | 0 | 3 | 0 | 0 | 3 | 2 | 4 | 3 | 7 | 1 | 28 |
| New Orleans | 1 | 3 | 4 | 1 | 3 | 1 | 2 | 1 | 0 | 4 | 0 | 1 | 21 |
| Ramey | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 4 | 4 | 0 | 1 | 16 |
| Blaine | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Buffalo | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 1 | 0 | 0 | 1 | 7 |
| Detroit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 4 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| Swanton | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 1 | 7 |
| Big Bend *(formerly Marfa)* | 18 | 10 | 15 | 22 | 24 | 16 | 18 | 25 | 30 | 43 | 23 | 12 | 256 |
| Del Rio | 172 | 221 | 220 | 156 | 267 | 378 | 370 | 544 | 453 | 239 | 127 | 121 | 3,268 |
| El Centro | 39 | 43 | 32 | 35 | 51 | 78 | 71 | 60 | 76 | 79 | 48 | 50 | 662 |
| El Paso | 64 | 94 | 54 | 71 | 100 | 86 | 100 | 111 | 114 | 81 | 70 | 84 | 1,029 |
| Laredo | 301 | 270 | 245 | 223 | 298 | 455 | 477 | 470 | 389 | 297 | 202 | 173 | 3,800 |
| Rio Grande Valley *(formerly McAllen)* | 2,652 | 2,809 | 2,833 | 2,419 | 3,330 | 5,215 | 5,725 | 8,433 | 8,730 | 4,149 | 2,173 | 1,491 | 49,959 |
| San Diego | 45 | 61 | 48 | 81 | 64 | 126 | 106 | 100 | 98 | 89 | 57 | 79 | 954 |
| Tucson | 874 | 816 | 860 | 658 | 672 | 780 | 796 | 788 | 698 | 505 | 422 | 393 | 8,262 |
| Yuma | 16 | 20 | 20 | 41 | 39 | 42 | 38 | 47 | 32 | 17 | 16 | 23 | 351 |
| Coastal Border | 7 | 5 | 4 | 4 | 3 | 3 | 5 | 5 | 8 | 11 | 7 | 3 | 65 |
| Northern Border | 1 | 1 | 2 | 1 | 0 | 3 | 3 | 2 | 3 | 5 | 1 | 3 | 25 |
| Southwest Border | 4,181 | 4,344 | 4,327 | 3,706 | 4,845 | 7,176 | 7,701 | 10,578 | 10,620 | 5,499 | 3,138 | 2,426 | 68,541 |
| Monthly Total | 4,189 | 4,350 | 4,333 | 3,711 | 4,848 | 7,182 | 7,709 | 10,585 | 10,631 | 5,515 | 3,146 | 2,432 | 68,631 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2015

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 0 | 0 | 0 | 1 | 2 | 4 | 0 | 0 | 8 | 0 | 4 | 20 |
| New Orleans | 1 | 1 | 3 | 5 | 3 | 1 | 1 | 4 | 4 | 3 | 0 | 0 | 26 |
| Ramey | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 |
| Blaine | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Buffalo | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Detroit | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 4 |
| Grand Forks | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Big Bend (formerly Marfa) | 13 | 24 | 21 | 25 | 59 | 52 | 50 | 100 | 66 | 110 | 136 | 183 | 839 |
| Del Rio | 120 | 94 | 101 | 99 | 129 | 163 | 248 | 254 | 270 | 236 | 309 | 262 | 2,285 |
| El Centro | 35 | 27 | 35 | 50 | 47 | 77 | 48 | 72 | 53 | 62 | 89 | 73 | 668 |
| El Paso | 80 | 83 | 101 | 86 | 83 | 103 | 187 | 155 | 174 | 206 | 196 | 208 | 1,662 |
| Laredo | 220 | 177 | 175 | 171 | 168 | 242 | 225 | 189 | 207 | 217 | 241 | 227 | 2,459 |
| Rio Grande Valley (formerly McAllen) | 1,547 | 1,672 | 1,701 | 1,123 | 1,289 | 1,744 | 1,864 | 2,299 | 2,368 | 2,629 | 2,895 | 2,733 | 23,864 |
| San Diego | 74 | 56 | 106 | 71 | 89 | 111 | 102 | 96 | 82 | 83 | 116 | 98 | 1,084 |
| Tucson | 401 | 454 | 555 | 439 | 478 | 549 | 483 | 655 | 501 | 480 | 505 | 519 | 6,019 |
| Yuma | 29 | 23 | 63 | 54 | 43 | 85 | 66 | 123 | 112 | 159 | 151 | 182 | 1,090 |
| Coastal Border | 2 | 5 | 3 | 5 | 4 | 3 | 5 | 4 | 4 | 11 | 0 | 5 | 51 |
| Northern Border | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 4 | 3 | 0 | 1 | 0 | 14 |
| Southwest Border | 2,519 | 2,610 | 2,858 | 2,118 | 2,385 | 3,126 | 3,273 | 3,943 | 3,833 | 4,182 | 4,638 | 4,485 | 39,970 |
| Monthly Total | 2,522 | 2,616 | 2,862 | 2,123 | 2,390 | 3,130 | 3,279 | 3,951 | 3,840 | 4,193 | 4,639 | 4,490 | 40,035 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2016

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 5 | 3 | 3 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 2 | 20 |
| New Orleans | 1 | 3 | 3 | 0 | 0 | 2 | 3 | 1 | 2 | 4 | 2 | 4 | 25 |
| Ramey | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Blaine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 3 |
| Buffalo | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Detroit | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Grand Forks | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 5 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| Big Bend (formerly Marfa) | 185 | 132 | 143 | 53 | 46 | 72 | 90 | 64 | 42 | 41 | 27 | 56 | 951 |
| Del Rio | 237 | 255 | 327 | 153 | 192 | 187 | 214 | 276 | 189 | 247 | 165 | 247 | 2,689 |
| El Centro | 76 | 99 | 97 | 58 | 76 | 90 | 142 | 121 | 97 | 146 | 192 | 185 | 1,379 |
| El Paso | 239 | 329 | 457 | 155 | 206 | 274 | 300 | 290 | 331 | 374 | 431 | 499 | 3,885 |
| Laredo | 242 | 278 | 284 | 191 | 219 | 250 | 263 | 298 | 203 | 195 | 266 | 264 | 2,953 |
| Rio Grande Valley (formerly McAllen) | 3,011 | 3,442 | 4,074 | 1,733 | 1,659 | 2,479 | 3,288 | 3,527 | 2,971 | 3,216 | 3,768 | 3,546 | 36,714 |
| San Diego | 105 | 97 | 147 | 142 | 110 | 135 | 152 | 144 | 116 | 97 | 147 | 161 | 1,553 |
| Tucson | 618 | 660 | 762 | 438 | 438 | 549 | 495 | 574 | 518 | 416 | 402 | 432 | 6,302 |
| Yuma | 230 | 312 | 466 | 166 | 146 | 173 | 218 | 300 | 283 | 294 | 369 | 309 | 3,266 |
| Coastal Border | 2 | 10 | 6 | 3 | 0 | 4 | 3 | 2 | 5 | 4 | 3 | 6 | 48 |
| Northern Border | 0 | 1 | 4 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 5 | 17 |
| Southwest Border | 4,943 | 5,604 | 6,757 | 3,089 | 3,092 | 4,209 | 5,162 | 5,594 | 4,750 | 5,026 | 5,767 | 5,699 | 59,692 |
| Monthly Total | 4,945 | 5,615 | 6,767 | 3,092 | 3,092 | 4,213 | 5,166 | 5,597 | 4,755 | 5,032 | 5,775 | 5,708 | 59,757 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2017

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 3 | 2 | 4 | 2 | 3 | 0 | 3 | 4 | 13 | 6 | 1 | 42 |
| New Orleans | 0 | 1 | 4 | 4 | 5 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 22 |
| Ramey | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Blaine | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 0 | 0 | 7 |
| Buffalo | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Detroit | 1 | 0 | 0 | 0 | 3 | 0 | 2 | 0 | 1 | 1 | 2 | 1 | 11 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| Havre | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 8 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 2 | 10 |
| Big Bend (formerly Marfa) | 86 | 74 | 63 | 63 | 23 | 29 | 51 | 80 | 73 | 87 | 83 | 99 | 811 |
| Del Rio | 222 | 208 | 243 | 147 | 88 | 60 | 47 | 67 | 66 | 52 | 75 | 74 | 1,349 |
| El Centro | 197 | 168 | 151 | 122 | 65 | 52 | 55 | 72 | 107 | 127 | 185 | 230 | 1,531 |
| El Paso | 620 | 665 | 676 | 433 | 178 | 90 | 100 | 120 | 146 | 268 | 369 | 261 | 3,926 |
| Laredo | 282 | 242 | 207 | 186 | 110 | 72 | 88 | 119 | 172 | 189 | 209 | 157 | 2,033 |
| Rio Grande Valley (formerly McAllen) | 4,082 | 4,777 | 4,718 | 2,692 | 1,081 | 508 | 447 | 669 | 957 | 1,192 | 1,294 | 1,291 | 23,708 |
| San Diego | 179 | 177 | 229 | 167 | 110 | 52 | 55 | 84 | 70 | 110 | 150 | 168 | 1,551 |
| Tucson | 580 | 528 | 453 | 327 | 196 | 149 | 119 | 171 | 237 | 234 | 317 | 348 | 3,659 |
| Yuma | 456 | 507 | 447 | 268 | 59 | 29 | 35 | 91 | 121 | 216 | 305 | 333 | 2,867 |
| Coastal Border | 1 | 4 | 6 | 8 | 7 | 3 | 5 | 7 | 4 | 13 | 6 | 1 | 65 |
| Northern Border | 2 | 1 | 1 | 2 | 5 | 3 | 2 | 4 | 2 | 12 | 5 | 7 | 46 |
| Southwest Border | 6,704 | 7,346 | 7,187 | 4,405 | 1,910 | 1,041 | 997 | 1,473 | 1,949 | 2,475 | 2,987 | 2,961 | 41,435 |
| Monthly Total | 6,707 | 7,351 | 7,194 | 4,415 | 1,922 | 1,047 | 1,004 | 1,484 | 1,955 | 2,500 | 2,998 | 2,969 | 41,456 |

# DEF-INTERV.

# EX. 88

🇺🇸 Official website of the Department of Homeland Security



**U.S. Customs and Border Protection** (/)

# Southwest Border Migration FY2018

During the month of May, CBP saw a slight 1.9 percent increase overall when compared to April, but a 160 percent increase compared to May 2017.

The number of Family Units increased by 435 percent and the number of unaccompanied children (UAC) increased by 329 percent compared to May 2017.



CBP Southwest Border Total Apprehensions / Inadmissibles

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY18 | 34,842 | 38,996 | 40,509 | 35,817 | 36,682 | 50,296 | 50,924 | 51,912 | | | | | 415,191 |
| FY17 | 66,708 | 63,361 | 58,412 | 42,463 | 23,555 | 16,588 | 15,766 | 19,940 | 21,657 | 25,019 | 30,567 | 31,155 | 415,191 |
| FY16 | 45,507 | 45,752 | 48,737 | 33,654 | 38,309 | 46,117 | 48,502 | 55,442 | 45,722 | 46,966 | 51,961 | 58,535 | 563,204 |
| FY15 | 35,895 | 33,023 | 34,238 | 30,178 | 32,550 | 39,159 | 38,296 | 40,681 | 38,616 | 38,610 | 42,414 | 41,165 | 444,825 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 | 569,237 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,761 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 | 489,498 |

**U.S. Border Patrol Apprehensions FY2018 YTD (October 1 - May 31)**

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | UAC | 3,153 | 3,975 | 4,063 | 3,207 | 3,122 | 4,145 | 4,302 | 6,405 | 32,372 |
| | Family Units | 4,837 | 7,016 | 8,120 | 5,654 | 5,475 | 8,873 | 9,653 | 9,485 | 59,113 |

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border Total Apprehensions** | | 25,483 | 29,086 | 28,998 | 25,978 | 26,665 | 37,385 | 38,278 | 40,344 | 252,187 |

*Tables are accurate as of 6/1/18, totals change as data is adjudicated.*

In May a total of 40,344 individuals were apprehended between ports of entry on our Southwest Border, compared with 38,278 in April and 37,385 in March. In Fiscal Year (FY) 2017, USBP apprehended 303,916 individuals along our Southwest Border, compared to 408,870 in FY16, 331,333 in FY15, and 479,371 in FY14.

## For breakdown by Sector, visit **USBP Southwest Border Apprehensions by Sector (/newsroom/stats/usbp-sw-border-apprehensions)**

## Office of Field Operations Inadmissibles FY2018 YTD (October 1 - May 31)

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | UAC | 629 | 672 | 905 | 686 | 587 | 1,057 | 1,015 | 830 | 6,319 |
| | Family Units | 3,230 | 3,680 | 4,906 | 3,562 | 3,941 | 5,162 | 5,445 | 4,718 | 34,65 |
| **Southwest Border Total Inadmissibles** | | 9,360 | 9,912 | 11,511 | 9,839 | 10,020 | 12,913 | 12,690 | 11,568 | 87,80 |

*Tables are accurate as of 6/5/18, totals change as data is adjudicated.*

In May, 11,568 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible compared to 12,690 in April, and 12,913 in March. In FY 2017 111,275 individuals were deemed inadmissible compared to 150,825 in FY16, 114,486 in FY15 and 90,601 in FY14.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws; and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

## For breakdown by Field Office, visit **Southwest Border Inadmissibles by Field Office (/newsroom/stats/ofo-sw-border-inadmissibles)**

Last modified: June 6, 2018

Tags: **Statistics, Unaccompanied Alien Children (UAC)**



# DEF-INTERV.

# EX. 89

**Indicator Nai Intentional homicide victims, counts and rates per 100,000 population**

**Indicator Def Definitions: "Intentional Homicide" means unlawful death inflicted upon a person with the intent to cause death or**

| Region | Subregion | UNODC Name | Source | 2000 | 2001 | 2002 | 2003 | 2004 |
|--------|-----------|------------|--------|------|------|------|------|------|
| Africa | Eastern Africa | Burundi | CTS/SDG | | | | | |
| Africa | Eastern Africa | Comoros | WHO Estimate | 56 | | | | |
| Africa | Eastern Africa | Djibouti | WHO Estimate | 64 | | | | |
| Africa | Eastern Africa | Eritrea | WHO Estimate | 335 | | | | |
| Africa | Eastern Africa | Ethiopia | WHO Estimate | 7,113 | | | | |
| Africa | Eastern Africa | Kenya | CTS | | | | | 1,200 |
| Africa | Eastern Africa | Madagascar | WHO Estimate | 1,793 | | | | |
| Africa | Eastern Africa | Malawi | NP | 700 | 900 | 567 | 300 | 411 |
| Africa | Eastern Africa | Mauritius | UNSDC/CTS/NSO | 26 | | | 39 | 35 |
| Africa | Eastern Africa | Mayotte | NP | | | | | |
| Africa | Eastern Africa | Mozambique | WHO/SDG | | 1,100 | 1,040 | 1,044 | 1,130 |
| Africa | Eastern Africa | Réunion | NP | | | | | 23 |
| Africa | Eastern Africa | Rwanda | NSO | | | | | |
| Africa | Eastern Africa | Seychelles | INTP/NSO | | | | | 10 |
| Africa | Eastern Africa | Somalia | WHO Estimate | 490 | | | | |
| Africa | Eastern Africa | South Sudan | NP | | | | | |
| Africa | Eastern Africa | Uganda | CTS/NP | | | | 2,136 | 2,049 |
| Africa | Eastern Africa | United Republic of Tanzan | INTP/CTS | | | | 2,778 | 2,926 |
| Africa | Eastern Africa | Zambia | UNSDC/WHO/NP | 797 | | | | |
| Africa | Eastern Africa | Zimbabwe | WHO | | 1,529 | 1,623 | 1,360 | 1,356 |
| Africa | Middle Africa | Angola | NSO | | | | | |
| Africa | Middle Africa | Cameroon | NSO/SDG | 459 | 755 | 1,031 | 1,002 | |
| Africa | Middle Africa | Central African Republic | CTS | | | | | |
| Africa | Middle Africa | Chad | WHO Estimate | 949 | | | | |
| Africa | Middle Africa | Congo | WHO Estimate | 366 | | | | |
| Africa | Middle Africa | Democratic Republic of th | WHO Estimate | 6,617 | | | | |
| Africa | Middle Africa | Equatorial Guinea | WHO Estimate | 20 | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Africa | Middle Africa | Gabon | WHO Estimate | 134 | | | | |
| Africa | Middle Africa | Sao Tome and Principe | CTS | | | | | |
| Africa | Northern Africa | Algeria | CTS | | | | 650 | 449 |
| Africa | Northern Africa | Egypt | CTS | | | | 471 | 322 |
| Africa | Northern Africa | Libya | WHO Estimate | 198 | | | | |
| Africa | Northern Africa | Morocco | UNSDC/CTS | 461 | 543 | 462 | 510 | 470 |
| Africa | Northern Africa | Sudan | CTS | | | | | |
| Africa | Northern Africa | Tunisia | WHO | | | | | 195 |
| Africa | Southern Africa | Botswana | WHO | | 213 | 255 | 312 | 259 |
| Africa | Southern Africa | Lesotho | CTS/NSO | | | | | |
| Africa | Southern Africa | Namibia | NP/INTP | 380 | 353 | 346 | | 352 |
| Africa | Southern Africa | South Africa | NP | 21,758 | 21,405 | 21,553 | 19,824 | 18,793 |
| Africa | Southern Africa | Swaziland | WHO | | 202 | 140 | 144 | 146 |
| Africa | Western Africa | Benin | WHO Estimate | 502 | | | | |
| Africa | Western Africa | Burkina Faso | NSO | | | 78 | 81 | 78 |
| Africa | Western Africa | Cabo Verde | NP/CTS | | | | 15 | 21 |
| Africa | Western Africa | Côte d'Ivoire | WHO Estimate | 2,681 | | | | |
| Africa | Western Africa | Gambia | WHO Estimate | 153 | | | | |
| Africa | Western Africa | Ghana | WHO | | 433 | 401 | 436 | 452 |
| Africa | Western Africa | Guinea | WHO Estimate | 956 | | | | |
| Africa | Western Africa | Guinea-Bissau | WHO Estimate | 162 | | | | |
| Africa | Western Africa | Liberia | UNMIL | | | | | |
| Africa | Western Africa | Mali | WHO Estimate | 1,413 | | | | |
| Africa | Western Africa | Mauritania | WHO Estimate | 371 | | | | |
| Africa | Western Africa | Niger | WHO | | | | | |
| Africa | Western Africa | Nigeria | WHO Estimate | 15,605 | | | | |
| Africa | Western Africa | Saint Helena | NSO | - | - | - | - | 1 |
| Africa | Western Africa | Senegal | WHO Estimate | 984 | | | | |
| Africa | Western Africa | Sierra Leone | UNSDC/NP/SDG | | | | | 112 |
| Africa | Western Africa | Togo | WHO Estimate | 522 | | | | |
| Americas | Caribbean | Anguilla | NSO/SDG/PAHO | 1 | - | 2 | 2 | 1 |
| Americas | Caribbean | Antigua and Barbuda | OAS | 5 | 7 | 5 | 5 | 4 |
| Americas | Caribbean | Aruba | MD | | 4 | 5 | 4 | 2 |
| Americas | Caribbean | Bahamas | OAS/CTS/NP | 74 | 43 | 52 | 50 | 44 |
| Americas | Caribbean | Barbados | OAS/CTS | 20 | 25 | 25 | 33 | 22 |

| Americas | Caribbean | British Virgin Islands | MD | | 1 | 1 | 2 | 4 |
|---|---|---|---|---|---|---|---|---|
| Americas | Caribbean | Cayman Islands | MD/WHO/NSO | 4 | 2 | - | 3 | 5 |
| Americas | Caribbean | Cuba | MD/MOH | 587 | 605 | 661 | 642 | 660 |
| Americas | Caribbean | Curaçao | PAHO | | 10 | 39 | 43 | 41 |
| Americas | Caribbean | Dominica | UNSDC/OAS | 2 | 1 | 9 | 8 | 8 |
| Americas | Caribbean | Dominican Republic | NGO/SES/CTS/RIC | 1,210 | 1,095 | 1,279 | 1,902 | 2,239 |
| Americas | Caribbean | Grenada | OAS/CTS | 15 | 6 | 14 | 9 | 6 |
| Americas | Caribbean | Guadeloupe | NP | | | | | 26 |
| Americas | Caribbean | Haiti | OAS | | | | | |
| Americas | Caribbean | Jamaica | OAS/CTS | 887 | 1,139 | 1,045 | 975 | 1,471 |
| Americas | Caribbean | Martinique | NP | | | | | 19 |
| Americas | Caribbean | Montserrat | PAHO/WHO/MD | - | - | - | - | - |
| Americas | Caribbean | Puerto Rico | NP/NSO | 695 | 747 | 781 | 787 | 797 |
| Americas | Caribbean | Saint Kitts and Nevis | OAS/CTS | 3 | 6 | 5 | 10 | 11 |
| Americas | Caribbean | Saint Lucia | OAS/MD | 23 | 34 | 42 | 36 | 37 |
| Americas | Caribbean | Saint Vincent and the Gre | OAS/CTS | 20 | 12 | 20 | 18 | 29 |
| Americas | Caribbean | Trinidad and Tobago | OAS/CTS | 120 | 151 | 171 | 229 | 260 |
| Americas | Caribbean | Turks and Caicos Islands | PAHO/MD | - | - | 2 | - | |
| Americas | Caribbean | United States Virgin Island | MD | 23 | 28 | 41 | 31 | 37 |
| Americas | Central America | Belize | OAS/CTS | 41 | 64 | 87 | 67 | 79 |
| Americas | Central America | Costa Rica | UNSDC/MOJ/CTS | 249 | 257 | 258 | 300 | 280 |
| Americas | Central America | El Salvador | OAS/CTS/RSC | 3,551 | 3,590 | 2,835 | 3,356 | 3,897 |
| Americas | Central America | Guatemala | UNSDC/NP/CTS | 2,904 | 3,230 | 3,631 | 4,237 | 4,507 |
| Americas | Central America | Honduras | OCAVI/NSO/CTS | 3,176 | 3,488 | 3,623 | 4,073 | 3,639 |
| Americas | Central America | Mexico | NSO | 10,737 | 10,285 | 10,088 | 10,087 | 9,329 |
| Americas | Central America | Nicaragua | NP | 476 | 537 | 554 | 635 | 646 |
| Americas | Central America | Panama | NSO/CTS | 299 | 306 | 376 | 337 | 308 |
| Americas | Northern America | Bermuda | NP/CTS | - | 3 | 1 | 2 | 1 |
| Americas | Northern America | Canada | OAS/CTS/SDG | 546 | 554 | 582 | 549 | 625 |
| Americas | Northern America | Greenland | NSO | 13 | 17 | 12 | 5 | 11 |
| Americas | Northern America | Saint Pierre and Miquelon | NP | | | | | |
| Americas | Northern America | United States of America | NP/UNSDC/CTS | 15,586 | 19,033 | 16,229 | 16,528 | 16,148 |
| Americas | South America | Argentina | CTS | | | | | |
| Americas | South America | Bolivia (Plurinational State | CTS | | | | | |
| Americas | South America | Brazil | MD Adjusted/NGO | 41,595 | 43,975 | 45,585 | 46,828 | 44,379 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Americas | South America | Chile | CTS/OAS | | | | 513 | |
| Americas | South America | Colombia | UNSDC/OAS/CTS | 26,539 | 27,840 | 28,387 | 23,523 | 20,210 |
| Americas | South America | Ecuador | OAS/CTS | 1,833 | 1,658 | 1,906 | 1,937 | 2,390 |
| Americas | South America | French Guiana | NP | | | | | 58 |
| Americas | South America | Guyana | OAS/CTS/NSO | 76 | 80 | 143 | 209 | 131 |
| Americas | South America | Paraguay | OAS/CTS | 995 | 1,314 | 1,372 | 1,285 | 1,209 |
| Americas | South America | Peru | CTS | | | | | |
| Americas | South America | Suriname | OAS | 68 | 79 | 57 | 60 | 46 |
| Americas | South America | Uruguay | MOI/CTS | 214 | 218 | 231 | 197 | 200 |
| Americas | South America | Venezuela (Bolivarian Rep | UNSDC/NGO/OAS/AG | 8,022 | 7,960 | 9,617 | 11,342 | 9,719 |
| Asia | Central Asia | Kazakhstan* | TSMNEE/CTS | 2,325 | 2,160 | 1,967 | 1,991 | 2,091 |
| Asia | Central Asia | Kyrgyzstan | UNECE/CTS | 430 | 386 | 411 | 421 | 420 |
| Asia | Central Asia | Tajikistan | TSMNEE/CTS | 283 | 233 | 180 | 164 | 142 |
| Asia | Central Asia | Turkmenistan | TSMNEE | 267 | 248 | 241 | 233 | 209 |
| Asia | Central Asia | Uzbekistan | TSMNEE/NSO | 1,068 | 1,081 | 1,058 | 963 | 962 |
| Asia | Eastern Asia | China | NSO Adjusted/NSO | 26,858 | 25,939 | 26,276 | 24,393 | 24,711 |
| Asia | Eastern Asia | China, Hong Kong Special | UNSDC/NP/CTS | 38 | 66 | 69 | 52 | 45 |
| Asia | Eastern Asia | China, Macao Special Adm | NP/CTS | 10 | 8 | 2 | 8 | 4 |
| Asia | Eastern Asia | China, Taiwan Province of | SDG | | 306 | | | |
| Asia | Eastern Asia | Democratic People's Repu | WHO Estimate | 1,521 | | | | |
| Asia | Eastern Asia | Japan | SDG/CTS | 678 | 697 | 662 | 697 | 699 |
| Asia | Eastern Asia | Mongolia | CTS | | | | 343 | 333 |
| Asia | Eastern Asia | Republic of Korea | UNSDC/NP/CTS | | | | | |
| Asia | South-Eastern Asia | Brunei Darussalam | WHO/MD | 4 | | | 3 | 2 |
| Asia | South-Eastern Asia | Cambodia | JP/WHO | 571 | 407 | 425 | 509 | 511 |
| Asia | South-Eastern Asia | Indonesia | UNSDC/INTP/CTS | 2,204 | | | 1,635 | 1,419 |
| Asia | South-Eastern Asia | Lao People's Democratic R | WHO Estimate | 572 | | | | |
| Asia | South-Eastern Asia | Malaysia | UNSDC/WHO/NP | 551 | 517 | 565 | 565 | 497 |
| Asia | South-Eastern Asia | Myanmar | NSO/CTS | 1,041 | 916 | 814 | 764 | 743 |
| Asia | South-Eastern Asia | Philippines* | UNSDC/CTS/NSO | 5,735 | 5,852 | 6,553 | 6,436 | 6,344 |
| Asia | South-Eastern Asia | Singapore | UNSDC/NP/CTS | 37 | 30 | 22 | 24 | 21 |
| Asia | South-Eastern Asia | Thailand | NP/CTS | 5,142 | 5,020 | 4,538 | 6,434 | 4,273 |
| Asia | South-Eastern Asia | Timor-Leste | UNMIT/NSO | | | | | 23 |
| Asia | South-Eastern Asia | Viet Nam | WHO | | 1,004 | 1,067 | 1,059 | 1,063 |
| Asia | Southern Asia | Afghanistan | NSO | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Asia | Southern Asia | Bangladesh | NP | 3,343 | 3,678 | 3,503 | 3,471 | 3,902 |
| Asia | Southern Asia | Bhutan | NSO/CTS | 18 | 19 | 19 | 5 | 15 |
| Asia | Southern Asia | India | MOI | 51,344 | 49,403 | 48,711 | 44,331 | 46,490 |
| Asia | Southern Asia | Iran (Islamic Republic of) | CTS/NSO/MD | | | | 1,803 | 2,015 |
| Asia | Southern Asia | Maldives | UNSDC/CTS | | 7 | 8 | 4 | |
| Asia | Southern Asia | Nepal | NSO/CTS | 635 | 848 | 858 | 757 | 936 |
| Asia | Southern Asia | Pakistan | NSO | 8,906 | 9,593 | 9,466 | 9,346 | 9,614 |
| Asia | Southern Asia | Sri Lanka* | CTS/NP | | | | 1,310 | 1,377 |
| Asia | Western Asia | Armenia | TSMNEE/CTS | 91 | 88 | 69 | 76 | 83 |
| Asia | Western Asia | Azerbaijan | UNSDC/CTS | 226 | 218 | 212 | 183 | 201 |
| Asia | Western Asia | Bahrain | UNSDC/CTS/NP/MD | | 9 | 8 | 3 | 7 |
| Asia | Western Asia | Cyprus | EUR/UNSDC/CTS | 8 | 7 | 2 | 14 | 16 |
| Asia | Western Asia | Georgia | UNSDC/TSMNEE/CTS | 239 | 263 | 292 | 302 | 298 |
| Asia | Western Asia | Iraq** | CTS | | | | | |
| Asia | Western Asia | Iraq (Central Iraq)** | CTS | | | | | |
| Asia | Western Asia | Iraq (Kurdistan Region)** | CTS | | | | | |
| Asia | Western Asia | Israel | NSO/CTS/SDG | 147 | 223 | 227 | 195 | 173 |
| Asia | Western Asia | Jordan | CTS/SDG/NP | | | | | |
| Asia | Western Asia | Kuwait | UNSDC/NP/CTS | | 39 | 23 | 29 | 43 |
| Asia | Western Asia | Lebanon | CTS | | | | | |
| Asia | Western Asia | Oman | NSO | | | 28 | 35 | 42 |
| Asia | Western Asia | Qatar | UNSDC/MD | 1 | 5 | | | 5 |
| Asia | Western Asia | Saudi Arabia | NSO/CTS | 173 | 229 | 285 | 250 | 301 |
| Asia | Western Asia | State of Palestine | CTS/SDG | | | | 94 | 96 |
| Asia | Western Asia | Syrian Arab Republic | NSO | 357 | 376 | 368 | 405 | 426 |
| Asia | Western Asia | Turkey | CTS | | | | 2,837 | 2,914 |
| Asia | Western Asia | United Arab Emirates | CTS | | | | 45 | 27 |
| Asia | Western Asia | Yemen | UNSDC/NSO/CTS | 697 | | | 704 | 646 |
| Europe | Eastern Europe | Belarus | UNSDC/CTS | 1,013 | 969 | 989 | 879 | 815 |
| Europe | Eastern Europe | Bulgaria | UNSDC/EUR/CTS | 332 | 308 | 255 | 247 | 244 |
| Europe | Eastern Europe | Czechia | UNSDC/CTS | 181 | 142 | 149 | 163 | 134 |
| Europe | Eastern Europe | Hungary | UNSDC/CTS | 205 | 254 | 203 | 228 | 209 |
| Europe | Eastern Europe | Poland# | EUR/UNSDC/CTS | 855 | 776 | 716 | 662 | 633 |
| Europe | Eastern Europe | Republic of Moldova | UNSDC/CTS | 433 | 411 | 401 | 319 | 277 |
| Europe | Eastern Europe | Romania# | SDG/UNSDC/CTS | 581 | 597 | 563 | 551 | 516 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Europe | Eastern Europe | Russian Federation## | NSO/CTS | 41,090 | 42,921 | 44,252 | 41,764 | 39,256 |
| Europe | Eastern Europe | Slovakia | SDG | 129 | 118 | 121 | 137 | 108 |
| Europe | Eastern Europe | Ukraine | UNSDC/TSMNEE/CTS/ | 4,418 | 4,854 | 4,296 | 4,041 | 3,487 |
| Europe | Northern Europe | Channel Islands | NP | | | | | |
| Europe | Northern Europe | Denmark | UNSDC/CTS | 58 | 52 | 56 | 65 | 43 |
| Europe | Northern Europe | Estonia | UNSDC/EUR/CTS | 143 | 137 | 142 | 147 | 91 |
| Europe | Northern Europe | Finland | UNSDC/CTS | 148 | 156 | 132 | 103 | 148 |
| Europe | Northern Europe | Iceland | UNSDC/CTS | 5 | 1 | 4 | - | 3 |
| Europe | Northern Europe | Ireland | NP/NSO/CTS | 37 | 52 | 52 | 37 | 30 |
| Europe | Northern Europe | Isle of Man | NP | | | | | |
| Europe | Northern Europe | Latvia | UNSDC/CTS | 238 | 219 | 214 | 202 | 181 |
| Europe | Northern Europe | Lithuania | UNSDC/CTS | 370 | 353 | 293 | 344 | 343 |
| Europe | Northern Europe | Norway | SDG/EUR/CTS | 48 | 37 | 46 | 51 | 36 |
| Europe | Northern Europe | Sweden | NCCP/CTS | 96 | 87 | 101 | 85 | 107 |
| Europe | Northern Europe | United Kingdom (England | UNSDC/SDG/CTS | 764 | 793 | 944 | 775 | 779 |
| Europe | Northern Europe | United Kingdom (Northern | SDG/CTS | 45 | 57 | 38 | 42 | 34 |
| Europe | Northern Europe | United Kingdom (Scotland | SDG/CTS | 106 | 116 | 125 | 109 | 137 |
| Europe | Northern Europe | United Kingdom of Great | CTS | 915 | 966 | 1,107 | 926 | 950 |
| Europe | Southern Europe | Albania | MD/CTS | 131 | 220 | 216 | 166 | 131 |
| Europe | Southern Europe | Andorra | INTP/CTS | | | | | 1 |
| Europe | Southern Europe | Bosnia and Herzegovina | UNECE/INTP/CTS | 99 | 82 | 90 | | 68 |
| Europe | Southern Europe | Croatia | MOI/CTS | 101 | 81 | 73 | 69 | 83 |
| Europe | Southern Europe | Gibraltar | NP | | | | | |
| Europe | Southern Europe | Greece | EUR/CTS | | 132 | 94 | 122 | 111 |
| Europe | Southern Europe | Holy See | CTS | | | | | |
| Europe | Southern Europe | Italy | UNSDC/CTS | 766 | 709 | 644 | 719 | 714 |
| Europe | Southern Europe | Kosovo under UNSCR 1244 | CTS | | | | | |
| Europe | Southern Europe | Malta | EUR/UNSDC/CTS | 4 | 6 | 6 | - | 7 |
| Europe | Southern Europe | Montenegro | EUR/CTS | | | 27 | 20 | 14 |
| Europe | Southern Europe | Portugal | EUR/CTS/SDG | 116 | 105 | 119 | 149 | 144 |
| Europe | Southern Europe | San Marino | WHO | - | - | 1 | - | - |
| Europe | Southern Europe | Serbia | EUR/CTS | 228 | 243 | 200 | 176 | 164 |
| Europe | Southern Europe | Slovenia | UNSDC/CTS/SDG | 36 | 28 | 36 | 21 | 27 |
| Europe | Southern Europe | Spain | EUR/CTS | 553 | 577 | 564 | 587 | 520 |
| Europe | Southern Europe | The former Yugoslav Repu | UNSDC/EUR/CTS | 47 | 55 | 60 | 70 | 49 |

| Europe | Western Europe | Austria | EUR/UNSDC/CTS | 82 | 70 | 65 | 50 | 59 |
|---|---|---|---|---|---|---|---|---|
| Europe | Western Europe | Belgium# | EUR/CTS | 212 | 282 | 319 | 230 | 268 |
| Europe | Western Europe | France | UNSDC/EUR/CTS | 1,051 | 1,047 | 1,119 | 987 | 990 |
| Europe | Western Europe | Germany | UNSDC/CTS | 1,015 | 925 | 955 | 859 | 868 |
| Europe | Western Europe | Liechtenstein | EUR/CTS | - | - | - | - | 1 |
| Europe | Western Europe | Luxembourg | EUR/UNECE/CTS | 4 | 9 | 6 | 3 | 2 |
| Europe | Western Europe | Monaco | UNSDC/CTS | | 1 | | | 1 |
| Europe | Western Europe | Netherlands | NSO/CTS | 180 | 202 | 195 | 202 | 191 |
| Europe | Western Europe | Switzerland | UNSDC/EUR/CTS | 69 | 86 | 86 | 73 | 78 |
| Oceania | Australia and New | Australia | EUR/CTS/UNSDC | 362 | 347 | 366 | 341 | 302 |
| Oceania | Australia and New | New Zealand# | NP/CTS | 52 | 51 | 60 | 44 | 45 |
| Oceania | Melanesia | Fiji | INTP/NSO | | | | 25 | 23 |
| Oceania | Melanesia | New Caledonia | NP | | | | | |
| Oceania | Melanesia | Papua New Guinea | UNSDC/NP | 465 | | | | |
| Oceania | Melanesia | Solomon Islands | CTS | | | | | 20 |
| Oceania | Melanesia | Vanuatu | WHO Estimate | 5 | | | | |
| Oceania | Micronesia | Guam | NP | 2 | 8 | 2 | 8 | 9 |
| Oceania | Micronesia | Kiribati | MD/WHO | 3 | 4 | | | |
| Oceania | Micronesia | Micronesia (Federated Sta | WHO Estimate | 4 | | | | |
| Oceania | Micronesia | Nauru | WHO Estimate | | | | | |
| Oceania | Micronesia | Palau | WHO Estimate | | | | | |
| Oceania | Polynesia | American Samoa | NSO/SDG | | 1 | 7 | 3 | 4 |
| Oceania | Polynesia | Cook Islands | SDG | | | | | |
| Oceania | Polynesia | French Polynesia | NP | | | | | |
| Oceania | Polynesia | Niue | WHO Estimate | | | | | |
| Oceania | Polynesia | Samoa | WHO | | | | | |
| Oceania | Polynesia | Tonga | NP | 1 | 6 | 6 | 6 | 2 |
| Oceania | Polynesia | Tuvalu | WHO | | | - | - | - |

Notes

* Kazakhstan, Philippines, Sri Lanka: Changes in definitions and/or counting rules are reported by the Member State to indicate a break in
** Iraq (Central Iraq) and Iraq (Kurdistan Region): excluding victims of terrorist attacks.
# Belgium, Romania: Data refer to offences, not victims, of intentional homicide; New Zealand: Data for 2000-2006 refer to offences, dat
## Russian Federation: Data for 2000-2009 are from WHO; break in series; data from 2013-2016 are from the Prosecutor-General of the

### Democratic People's Republic of Korea: In the absence of other data, the estimate provided by WHO is reproduced here. Please note

**serious injury.**

| | Total number of victims of intentional homicide | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** |
| | | | 341 | 376 | 347 | 349 | 500 | 520 | 564 | 461 |
| 58 | | | | | 59 | | | | | 60 |
| 63 | | | | | 63 | | | | | 60 |
| 382 | | | | | 389 | | | | | 390 |
| 7,214 | | | | | 7,419 | | | | | 7,552 |
| 1,084 | 1,106 | 1,102 | 1,215 | 1,907 | 1,926 | 2,271 | 2,374 | 2,450 | 2,305 | 2,261 |
| 1,842 | | | | | 1,941 | | | | | 1,863 |
| 200 | 821 | 690 | 780 | 320 | 520 | 343 | 279 | | | |
| 37 | 50 | 45 | 48 | 38 | 33 | 34 | 29 | 35 | 19 | 21 |
| | | 27 | 5 | 12 | | | | | | |
| 1,089 | 894 | 849 | 995 | 823 | 875 | 849 | | | | |
| 25 | 19 | 24 | 18 | 15 | | | | | | |
| | 319 | 268 | 144 | | 291 | | 256 | 359 | 428 | 293 |
| | 9 | 8 | 6 | 14 | 9 | 16 | 4 | 18 | 16 | 7 |
| 517 | | | | | 636 | | | | | 599 |
| | | | | | | | 1,504 | | | |
| 2,492 | 2,696 | 2,645 | 2,793 | 3,233 | 3,160 | 3,753 | 4,066 | 3,857 | 4,473 | |
| | | | | | 3,888 | 4,149 | 4,092 | 3,697 | 3,902 | 3,746 |
| | | | 694 | 812 | 814 | 863 | 885 | 867 | 825 | 853 |
| 1,350 | 1,072 | | | | 711 | | 981 | | | |
| | | | | | | 1,055 | 1,217 | | | |
| | | | 776 | 1,277 | 999 | 835 | 880 | | | |
| | | | | | | | | | | |
| 1,079 | | | | | 1,151 | | | | | 1,266 |
| 396 | | | | | 433 | | | | | 466 |
| 8,021 | | | | | 9,213 | | | | | 10,322 |
| 22 | | | | | 25 | | | | | 27 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 154 | | | | | 143 | | | | | 155 |
| | 4 | 4 | 14 | 5 | 6 | 6 | | | | |
| 204 | 312 | 271 | 328 | 277 | 254 | 280 | 523 | 480 | 577 | 542 |
| 522 | 549 | 680 | 967 | 912 | 1,839 | 2,703 | 2,207 | | | |
| 212 | | | | | 192 | | | | | 156 |
| 469 | 498 | 517 | 426 | 432 | 451 | 441 | 383 | 429 | 355 | 431 |
| | | 1,511 | 1,702 | | | | | | | |
| 260 | 249 | 273 | 280 | 255 | 286 | | 332 | | | |
| 291 | 261 | 280 | 281 | 289 | 303 | | | | | |
| | | 895 | 752 | 723 | 764 | 712 | 641 | 658 | | 897 |
| | | | 354 | 388 | 314 | 308 | 388 | | | |
| 18,528 | 19,106 | 18,400 | 18,084 | 16,767 | 15,893 | 15,554 | 16,213 | 17,023 | 17,805 | 18,673 |
| 152 | 121 | 170 | 217 | 187 | 208 | | | | | |
| 574 | | | | | 604 | | | | | 654 |
| 63 | 69 | 94 | 108 | 77 | 93 | 82 | 84 | 122 | 138 | 67 |
| 44 | 35 | 29 | 34 | 38 | 39 | 53 | 56 | 54 | 65 | 46 |
| 2,696 | | | | | 2,576 | | | | | 2,688 |
| 142 | | | | | 166 | | | | | 181 |
| 393 | 412 | 399 | 430 | 427 | 422 | 423 | | | | |
| 973 | | | | | 1,019 | | | | | 1,067 |
| 161 | | | | | 163 | | | | | 169 |
| | | 100 | 177 | 145 | 129 | 161 | 135 | | | |
| 1,623 | | | | | 1,836 | | | | | 1,905 |
| 388 | | | | | 392 | | | | | 416 |
| | | | | | | 831 | 788 | | | |
| 16,423 | | | | | 16,996 | | | | | 17,843 |
| - | - | - | - | - | | | | | | |
| 1,047 | | | | | 1,099 | | | | | 1,105 |
| 99 | 101 | 134 | 184 | 158 | 163 | 187 | 113 | | | 124 |
| 606 | | | | | 625 | | | | | 668 |
| - | 5 | 4 | 1 | 1 | - | - | 5 | 1 | 4 | |
| 3 | 11 | 17 | 16 | 16 | 6 | | 10 | | | |
| 6 | 5 | 3 | 5 | 4 | 4 | 2 | 4 | 6 | 2 | |
| 52 | 61 | 78 | 73 | 87 | 94 | 127 | 111 | 119 | 123 | 146 |
| 29 | 35 | 25 | 23 | 19 | 31 | 27 | 22 | 24 | 25 | 31 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | | | | | | | | | |
| 3 | 1 | 2 | 4 | 8 | 9 | | | 5 | 5 | |
| 684 | 576 | 568 | 515 | 565 | 505 | 534 | 621 | 674 | 600 | 619 |
| 26 | 18 | 26 | | | | | | | | |
| 8 | 5 | 7 | 7 | 13 | 15 | 6 | | | | |
| 2,394 | 2,144 | 2,111 | 2,394 | 2,375 | 2,474 | 2,513 | 2,268 | 1,978 | 1,810 | |
| 11 | 12 | 11 | 16 | 7 | 10 | 4 | 14 | 6 | 8 | 6 |
| 23 | 24 | 29 | 32 | 36 | | | | | | |
| | | 486 | 498 | 598 | 677 | 914 | 1,033 | | | |
| 1,674 | 1,340 | 1,584 | 1,619 | 1,683 | 1,447 | 1,133 | 1,099 | 1,201 | 1,005 | 1,208 |
| 19 | 23 | 23 | 17 | 11 | | | | | | |
| 1 | 1 | | 1 | | | | | 1 | | |
| 771 | 748 | 730 | 815 | 901 | 1,017 | 1,164 | 1,004 | 902 | 700 | 619 |
| 8 | 17 | 16 | 23 | 27 | 21 | 34 | 18 | | | |
| 41 | 43 | 29 | 39 | 39 | 44 | 46 | 39 | 33 | 34 | |
| 26 | 20 | 40 | 16 | 23 | 25 | 21 | 28 | | | |
| 386 | 371 | 391 | 547 | 507 | 473 | 352 | 380 | 408 | 405 | 420 |
| - | | 2 | 2 | 2 | | | | 4 | 2 | |
| 37 | 43 | 43 | 46 | 50 | 56 | 45 | 52 | | | |
| 81 | 92 | 97 | 103 | 97 | 129 | 124 | 145 | 99 | 123 | 119 |
| 335 | 351 | 369 | 512 | 525 | 527 | 474 | 407 | 411 | 477 | 557 |
| 3,882 | 3,927 | 3,497 | 3,179 | 4,382 | 3,987 | 4,371 | 2,594 | 2,513 | 3,921 | 6,656 |
| 5,338 | 5,885 | 5,781 | 6,292 | 6,498 | 5,960 | 5,681 | 5,155 | 5,253 | 4,998 | 4,778 |
| 3,212 | 3,118 | 3,588 | 4,455 | 5,280 | 6,236 | 7,104 | 7,172 | 6,431 | 5,891 | 5,148 |
| 9,921 | 10,452 | 8,867 | 14,006 | 19,803 | 25,757 | 27,213 | 25,967 | 23,063 | 20,010 | 20,762 |
| 729 | 722 | 714 | 736 | 802 | 785 | 738 | 673 | 594 | 525 | 524 |
| 364 | 221 | 279 | 493 | 562 | 460 | 549 | 637 | 663 | 568 | 447 |
| 2 | 3 | 3 | 5 | 6 | 7 | 8 | 6 | 5 | 4 | 4 |
| 664 | 608 | 597 | 614 | 610 | 556 | 606 | 548 | 509 | 521 | 604 |
| 10 | 8 | 8 | 8 | 10 | 11 | 1 | 8 | 7 | 4 | 4 |
| | - | - | 1 | 1 | | | | | | |
| 16,740 | 17,309 | 17,128 | 16,485 | 15,399 | 14,722 | 14,661 | 14,856 | 14,319 | 14,164 | 15,883 |
| | | | | | | | | | 3,227 | 2,837 |
| 478 | 482 | 770 | 828 | 819 | 1,273 | 1,236 | 1,221 | 932 | 942 | 671 |
| 43,645 | 45,086 | 44,625 | 45,885 | 44,518 | 43,272 | 48,084 | 53,054 | 54,163 | 57,091 | 58,459 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 576 | 590 | 616 | 588 | 630 | 541 | 636 | 434 | 556 | 638 | 534 |
| 18,111 | 17,479 | 17,198 | 16,140 | 15,817 | 15,459 | 16,127 | 16,440 | 15,419 | 13,343 | 12,782 |
| 2,121 | 2,385 | 2,273 | 2,607 | 2,625 | 2,623 | 2,344 | 1,923 | 1,725 | 1,311 | 1,055 |
| 45 | 42 | 28 | 32 | 30 | | | | | | |
| 142 | 153 | 115 | 158 | 117 | 140 | 130 | 139 | 155 | 149 | 149 |
| 887 | 742 | 783 | 833 | 821 | 741 | 657 | 649 | 604 | 578 | 617 |
| | | | | | | 1,617 | 1,968 | 2,013 | 2,076 | 2,247 |
| 69 | 62 | 45 | 43 | | | | | | | |
| 190 | 202 | 194 | 221 | 226 | 205 | 199 | 267 | 260 | 268 | 293 |
| 9,964 | 12,257 | 13,156 | 14,589 | 13,985 | 13,080 | 14,098 | 16,072 | | 19,030 | |
| | | | 1,807 | 1,771 | 1,387 | 1,420 | 1,266 | 1,120 | 904 | 853 |
| 419 | 422 | 426 | 429 | 419 | 1,072 | 494 | 301 | 206 | 216 | 304 |
| 157 | 194 | 132 | 100 | 97 | 181 | 126 | | | | |
| 206 | 203 | | | | | | | | | |
| 910 | 861 | 815 | 831 | | | | | | | |
| 20,770 | 17,973 | 16,119 | 14,811 | 14,667 | 13,410 | 12,015 | 11,286 | 10,640 | 10,083 | 9,200 |
| 34 | 35 | 18 | 36 | 47 | 35 | 17 | 27 | 62 | 27 | 22 |
| 4 | 10 | 6 | 4 | 6 | 2 | 4 | 4 | 1 | - | 1 |
| | 228 | 176 | 191 | 181 | 179 | | 179 | 168 | | 192 |
| 1,206 | | | | | 1,179 | | | | | 1,110 |
| 643 | 619 | 574 | 654 | 506 | 465 | 442 | 429 | 370 | 395 | 363 |
| 398 | 336 | 293 | 212 | 219 | 239 | 266 | 199 | 205 | 213 | 184 |
| | | | | | | 427 | 411 | 342 | 372 | 365 |
| 2 | 3 | 3 | 1 | 3 | 1 | 1 | 4 | 2 | | |
| 448 | 400 | 393 | 333 | 331 | 331 | 268 | | | | |
| | | | 1,372 | 1,311 | 1,058 | 1,467 | 1,456 | 1,386 | 1,277 | 1,491 |
| 553 | | | | | 502 | | | | | 467 |
| 604 | 588 | 652 | 597 | 561 | 540 | 530 | 602 | 627 | | |
| 676 | 777 | 749 | 791 | 879 | 801 | 1,055 | 1,436 | 1,238 | 1,230 | 1,152 |
| 6,434 | 6,200 | 5,962 | 5,820 | 9,088 | 8,897 | 8,674 | 8,484 | 9,153 | 9,756 | 9,643 |
| 21 | 17 | 18 | 27 | 20 | 19 | 16 | 11 | 17 | 14 | 14 |
| 4,806 | 4,687 | 4,435 | 3,974 | 3,703 | 3,654 | 3,307 | 3,323 | 2,894 | 2,649 | 2,387 |
| 46 | 49 | 62 | 35 | 32 | 39 | | | | | 49 |
| 1,053 | 1,048 | 1,168 | 1,092 | 1,233 | 1,336 | 1,358 | | | | |
| | | | | 1,115 | 983 | 1,231 | 1,948 | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,592 | 4,166 | 3,863 | 4,099 | 4,219 | 3,988 | 3,966 | 4,114 | 4,393 | 4,514 | 4,035 |
| 11 | 9 | 14 | 18 | 16 | 16 | 32 | 33 | 24 | | 12 |
| 45,095 | 45,099 | 45,362 | 45,999 | 45,824 | 46,460 | 47,640 | 47,478 | 45,878 | 47,356 | 44,385 |
| | | | | 2,215 | | | | 2,037 | 1,936 | |
| | | 3 | 5 | 6 | 6 | 3 | 10 | 3 | | |
| 878 | 610 | 841 | 892 | 806 | 813 | 679 | 642 | 606 | 558 | |
| 9,782 | 10,048 | 10,556 | 12,059 | 12,491 | 13,190 | 13,860 | 13,846 | 13,937 | 13,276 | 9,486 |
| 1,219 | 2,044 | | 2,002 | 1,099 | 763 | 732 | 676 | 619 | 553 | 487 |
| 58 | 79 | 77 | 97 | 97 | 56 | 71 | 65 | 63 | 72 | 75 |
| 192 | 190 | 189 | 192 | | 206 | | 202 | 221 | 236 | |
| 4 | 7 | 4 | 6 | 13 | 11 | 7 | 4 | 5 | 7 | |
| 20 | 15 | 13 | 9 | 19 | 8 | 9 | 22 | 12 | 11 | 15 |
| 403 | 323 | 330 | 263 | 210 | 187 | | | | 108 | |
| | | | 4,596 | 2,554 | 2,691 | 2,634 | 2,697 | 3,339 | | |
| | | | 4,452 | 2,458 | 2,553 | 2,518 | 2,594 | 3,228 | 3,029 | |
| | | | 144 | 96 | 138 | 116 | 103 | 111 | | |
| 166 | 182 | 125 | 136 | 128 | 145 | 151 | 134 | | 118 | 110 |
| 67 | 100 | 112 | 120 | 102 | 116 | 141 | 161 | 144 | 176 | 159 |
| 41 | 45 | 59 | 38 | 49 | 60 | 59 | 61 | | | |
| | | | 183 | 145 | 163 | 168 | 194 | 236 | 240 | 231 |
| 53 | 121 | 37 | 47 | 37 | 48 | 34 | 39 | 97 | 26 | |
| 6 | 5 | 9 | 12 | 8 | 4 | 4 | 7 | 9 | 9 | |
| 297 | 255 | 265 | | | | | | | | 472 |
| 86 | | | 48 | 44 | 32 | 24 | 26 | 24 | 35 | 45 |
| 430 | 446 | 533 | 529 | 476 | 463 | | | | | |
| 3,305 | 3,168 | 3,599 | 3,257 | 3,692 | 3,064 | 3,061 | 3,216 | | | |
| 56 | 39 | | | | 67 | 51 | 69 | 57 | 61 | 60 |
| 945 | 895 | 850 | 874 | 990 | 1,099 | 1,375 | 1,616 | 1,703 | | |
| 825 | 734 | 649 | 541 | 487 | 401 | 373 | 340 | 333 | 340 | |
| 199 | 186 | 177 | 172 | 150 | 148 | 128 | 141 | 109 | 116 | 129 |
| 108 | 130 | 126 | 114 | 94 | 103 | 86 | 105 | 90 | 81 | 88 |
| 164 | 174 | 154 | 181 | 139 | 138 | 145 | 124 | 154 | 146 | 221 |
| 555 | 490 | 525 | 460 | 493 | 436 | 449 | 377 | 296 | 282 | 287 |
| 296 | 262 | 217 | 236 | 246 | 267 | 304 | 229 | 169 | 130 | |
| 453 | 438 | 416 | 470 | 397 | 404 | 335 | 378 | 336 | 298 | 291 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 35,636 | 28,844 | 25,377 | 23,738 | 21,371 | | | | 15,763 | 16,260 | 16,519 |
| 93 | 82 | 82 | 86 | 78 | 82 | 88 | 63 | 71 | 69 | 44 |
| 3,030 | 2,958 | 2,646 | 2,466 | 2,240 | 1,988 | | 2,336 | | 2,845 | |
| 1 | 2 | | 1 | | - | | | | | |
| 53 | 29 | 39 | 54 | 47 | 42 | 46 | 47 | 48 | 73 | 56 |
| 113 | 91 | 96 | 86 | 70 | 70 | 65 | 63 | 52 | 41 | 42 |
| 119 | 119 | 129 | 133 | 120 | 119 | 110 | 88 | 89 | 88 | 82 |
| 3 | - | 2 | - | 1 | 2 | 3 | 1 | 1 | 2 | 3 |
| 52 | 62 | 78 | 50 | 56 | 53 | 42 | 53 | 52 | 52 | 29 |
| | | | | | | 1 | 2 | 2 | 3 | 1 |
| 126 | 128 | 94 | 99 | 108 | 70 | 69 | 70 | 50 | 64 | 67 |
| 372 | 288 | 277 | 298 | 252 | 219 | 211 | 202 | 198 | 159 | 172 |
| 33 | 33 | 30 | 34 | 29 | 29 | 111 | 27 | 46 | 29 | 24 |
| 83 | 91 | 111 | 82 | 93 | 91 | 81 | 68 | 87 | 87 | 112 |
| 708 | 710 | 729 | 639 | 595 | 633 | 526 | 543 | 521 | 511 | 568 |
| 31 | 30 | 29 | 24 | 29 | 23 | 22 | 21 | 20 | 17 | 23 |
| 95 | 120 | 115 | 99 | 82 | 100 | 93 | 63 | 62 | 62 | 58 |
| 834 | 860 | 873 | 762 | 706 | 756 | 641 | 627 | 603 | 590 | 649 |
| 154 | 95 | 105 | 93 | 85 | 127 | 142 | 157 | 124 | 117 | 66 |
| | | - | 1 | - | - | 1 | - | - | - | - |
| 70 | 73 | 66 | 66 | 71 | 56 | 51 | 63 | 46 | 50 | 57 |
| 68 | 74 | 62 | 71 | 49 | 62 | 49 | 51 | 46 | 36 | 37 |
| | | | | - | 1 | | | | | |
| 132 | 110 | 130 | 144 | 152 | 176 | 184 | 166 | 153 | 107 | 93 |
| | | | | - | - | - | - | - | - | - |
| 610 | 625 | 631 | 615 | 590 | 529 | 552 | 530 | 502 | 475 | 469 |
| | | | 113 | 73 | 106 | 62 | 90 | 41 | 41 | 30 |
| 4 | - | 4 | 6 | 4 | 4 | 3 | 12 | 7 | 6 | 4 |
| 22 | 25 | 12 | 24 | 21 | 15 | 21 | 17 | 10 | 20 | 17 |
| 135 | 155 | 185 | 124 | 130 | 124 | 114 | 122 | 144 | 92 | 100 |
| - | - | - | - | - | - | - | | | | |
| 147 | 156 | 171 | 140 | 154 | 130 | 135 | 111 | 142 | 120 | 104 |
| 20 | 12 | 24 | 10 | 13 | 15 | 16 | 14 | 12 | 17 | 20 |
| 518 | 476 | 482 | 407 | 412 | 401 | 385 | 364 | 302 | 323 | 302 |
| 44 | 46 | 42 | 35 | 35 | 43 | 30 | 29 | 22 | 33 | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 54 | 61 | 45 | 58 | 51 | 58 | 75 | 79 | 62 | 45 | 46 |
| 221 | 221 | 211 | 203 | 189 | 189 | 214 | 205 | 205 | 208 | 220 |
| 976 | 879 | 993 | 1,021 | 819 | 796 | 856 | 784 | 777 | 792 | 1,017 |
| 869 | 808 | 757 | 722 | 803 | 793 | 738 | 659 | 682 | 716 | 682 |
| - | - | - | 1 | - | 1 | - | - | - | 1 | - |
| 4 | 7 | 7 | 8 | 5 | 10 | 4 | - | 1 | 4 | |
| 1 | 1 | - | - | - | - | - | - | - | | - |
| 174 | 128 | 143 | 150 | 154 | 144 | 143 | 145 | 125 | 123 | 104 |
| 75 | 60 | 51 | 54 | 51 | 52 | 46 | 45 | 57 | 41 | 57 |
| 259 | 281 | 255 | 261 | 263 | 231 | 248 | 243 | 245 | 243 | 236 |
| 61 | 49 | 48 | 51 | 67 | 43 | 39 | 41 | 46 | 45 | |
| 23 | 22 | 21 | 17 | 29 | 20 | 20 | 20 | 19 | 20 | |
| | 8 | 12 | 11 | 8 | | | | | | |
| | 610 | 520 | | | | | | | | |
| 26 | 23 | 26 | 19 | | | | | | | |
| 5 | | | | | 5 | | | | | 6 |
| 7 | 11 | 1 | 1 | 5 | 3 | 4 | | | | |
| | | | 7 | 1 | 4 | 11 | 8 | | | |
| 5 | | | | | 5 | | | | | 5 |
| | | | | | | | - | | | |
| | | | | | | | 1 | | | |
| 6 | 4 | 1 | 3 | 2 | 5 | 5 | 2 | 3 | 3 | 4 |
| | | | | | | | 1 | | | |
| | 3 | 7 | 9 | 1 | | | | | | |
| | | | | | | | - | | | |
| | | | | 16 | 16 | | | 6 | | |
| 4 | 8 | 1 | 4 | 8 | 1 | 2 | 1 | | | |
| - | - | - | - | - | 1 | 1 | 2 | | | |

a the time series.

a for 2007 onwards refer to victims of intentional homicide; Poland: Data refer to offences of intentional homicide until 2015, then vict
Russian Federation and include victims of attempted homicide

that the Government of the Democratic People's Republic of Korea is not in agreement with the WHO estimate.

| 2016 | Victims of intentional homicide per 100,000 population | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| 635 | | | | | | | | | 4.2 | 4.4 | 4.0 | 3.9 |
| | 10.4 | | | | | 9.5 | | | | | 8.5 | |
| | 8.9 | | | | | 8.1 | | | | | 7.4 | |
| | 9.9 | | | | | 9.6 | | | | | 8.9 | |
| | 10.7 | | | | | 9.4 | | | | | 8.5 | |
| 2,363 | | | | | 3.4 | 3.0 | 3.0 | 2.9 | 3.1 | 4.7 | 4.7 | 5.3 |
| | 11.4 | | | | | 10.0 | | | | | 9.2 | |
| | 6.2 | 7.7 | 4.7 | 2.4 | 3.2 | 1.5 | 6.1 | 5.0 | 5.5 | 2.2 | 3.4 | 2.2 |
| 23 | 2.2 | | | 3.2 | 2.9 | 3.0 | 4.1 | 3.6 | 3.9 | 3.1 | 2.6 | 2.7 |
| | | | | | | | | 14.2 | 2.5 | 5.9 | | |
| | | 5.9 | 5.4 | 5.3 | 5.6 | 5.2 | 4.1 | 3.8 | 4.4 | 3.5 | 3.6 | 3.4 |
| | | | | | 2.9 | 3.2 | 2.4 | 3.0 | 2.2 | 1.8 | | |
| | | | | | | | 3.5 | 2.8 | 1.5 | | 2.8 | |
| 12 | | | | | 11.4 | | 10.0 | 8.9 | 6.6 | 15.4 | 9.8 | 17.4 |
| | 5.4 | | | | | 5.0 | | | | | 5.3 | |
| | | | | | | | | | | | | |
| | | | | 8.0 | 7.4 | 8.7 | 9.1 | 8.6 | 8.8 | 9.9 | 9.3 | 10.7 |
| | | | | 7.5 | 7.6 | | | | | | 8.4 | 8.7 |
| | 7.6 | | | | | | | | 5.3 | 6.0 | 5.9 | 6.0 |
| | | 12.4 | 13.0 | 10.8 | 10.6 | 10.4 | 8.2 | | | | 5.0 | |
| | | | | | | | | | | | | 4.4 |
| | 3.0 | 4.8 | 6.4 | 6.1 | | | | | 4.1 | 6.6 | 5.0 | 4.1 |
| 913 | | | | | | | | | | | | |
| | 11.4 | | | | | 10.7 | | | | | 9.7 | |
| | 11.3 | | | | | 10.6 | | | | | 9.9 | |
| | 14.1 | | | | | 14.6 | | | | | 14.3 | |
| | 3.3 | | | | | 2.9 | | | | | 2.6 | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10.8 | | | | | 11.0 | | | | | 8.7 | |
| | | | | | | | 2.5 | 2.5 | 8.4 | 2.9 | 3.4 | 3.4 |
| | | | | 2.0 | 1.4 | 0.6 | 0.9 | 0.8 | 0.9 | 0.8 | 0.7 | 0.8 |
| | | | | 0.6 | 0.4 | 0.7 | 0.7 | 0.9 | 1.2 | 1.1 | 2.2 | 3.1 |
| | 3.7 | | | | | 3.7 | | | | | 3.1 | |
| | 1.6 | 1.9 | 1.6 | 1.7 | 1.6 | 1.5 | 1.6 | 1.7 | 1.3 | 1.4 | 1.4 | 1.3 |
| | | | | | | | | | 4.7 | 5.2 | | |
| | | | | | 1.9 | 2.6 | 2.4 | 2.7 | 2.7 | 2.4 | 2.7 | |
| | | 12.1 | 14.3 | 17.3 | 14.2 | 15.7 | 13.9 | 14.6 | 14.4 | 14.6 | 15.0 | |
| | | | | | | | | 45.1 | 37.6 | 35.8 | 37.4 | 34.5 |
| | 20.0 | 18.3 | 17.6 | | 17.5 | | | | 16.8 | 18.2 | 14.4 | 13.9 |
| 19,016 | 47.6 | 46.1 | 45.8 | 41.6 | 39.0 | 38.0 | 38.7 | 36.9 | 35.9 | 32.9 | 30.8 | 29.8 |
| | | 18.8 | 13.0 | 13.2 | 13.3 | 13.7 | 10.8 | 14.9 | 18.7 | 15.8 | 17.3 | |
| | 7.3 | | | | | 7.2 | | | | | 6.6 | |
| | | | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.7 | 0.7 | 0.5 | 0.6 | 0.5 |
| 62 | | | | 3.3 | 4.5 | 9.3 | 7.3 | 6.0 | 6.9 | 7.6 | 7.8 | 10.4 |
| | 16.1 | | | | | 14.7 | | | | | 12.6 | |
| | 12.4 | | | | | 9.8 | | | | | 9.8 | |
| | | 2.2 | 2.0 | 2.1 | 2.2 | 1.8 | 1.9 | 1.8 | 1.8 | 1.8 | 1.7 | 1.7 |
| | 10.9 | | | | | 10.1 | | | | | 9.4 | |
| | 13.0 | | | | | 11.7 | | | | | 10.5 | |
| | | | | | | | | 2.8 | 4.8 | 3.8 | 3.3 | 4.0 |
| | 12.9 | | | | | 12.7 | | | | | 12.2 | |
| | 13.7 | | | | | 12.4 | | | | | 10.9 | |
| | | | | | | | | | | | | 4.9 |
| | 12.8 | | | | | 11.8 | | | | | 10.7 | |
| | - | - | - | - | 22.7 | - | - | - | - | - | | |
| | 10.0 | | | | | 9.3 | | | | | 8.5 | |
| | | | | | 2.1 | 1.7 | 1.7 | 2.2 | 3.0 | 2.5 | 2.5 | 2.8 |
| | 10.5 | | | | | 10.7 | | | | | 9.6 | |
| | 9.0 | - | 17.1 | 16.6 | 8.1 | - | 38.8 | 30.4 | 7.5 | 7.4 | - | - |
| | 6.0 | 8.2 | 5.8 | 5.7 | 4.5 | 3.4 | 12.2 | 18.6 | 17.3 | 17.1 | 6.3 | |
| | | 4.3 | 5.3 | 4.1 | 2.0 | 6.0 | 5.0 | 3.0 | 4.9 | 3.9 | 3.9 | 2.0 |
| 111 | 24.8 | 14.2 | 16.8 | 15.8 | 13.6 | 15.8 | 18.2 | 22.8 | 20.9 | 24.5 | 26.1 | 34.6 |
| | 7.4 | 9.2 | 9.2 | 12.1 | 8.1 | 10.6 | 12.7 | 9.1 | 8.3 | 6.8 | 11.1 | 9.6 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 4.7 | 4.6 | 9.1 | 17.7 | | 8.4 | | | | | |
| | 9.6 | 4.6 | - | 6.5 | 10.6 | 6.2 | 2.0 | 3.9 | 7.6 | 14.7 | 16.2 | |
| 572 | 5.3 | 5.4 | 5.9 | 5.7 | 5.9 | 6.1 | 5.1 | 5.0 | 4.6 | 5.0 | 4.5 | 4.7 |
| | | 7.7 | 30.3 | 33.6 | 32.0 | 20.1 | 13.6 | 19.2 | | | | |
| | 2.9 | 1.4 | 12.9 | 11.4 | 11.4 | 11.3 | 7.1 | 9.9 | 9.8 | 18.3 | 21.0 | 8.4 |
| 1,616 | 14.1 | 12.6 | 14.5 | 21.2 | 24.6 | 25.9 | 22.9 | 22.2 | 24.8 | 24.3 | 25.0 | 25.1 |
| 11 | 14.8 | 5.9 | 13.7 | 8.8 | 5.8 | 10.7 | 11.6 | 10.6 | 15.4 | 6.7 | 9.6 | 3.8 |
| | | | | | 6.0 | 5.2 | 5.4 | 6.5 | 7.2 | 8.0 | | |
| | | | | | | | | 5.1 | 5.1 | 6.1 | 6.8 | 9.0 |
| 1,354 | 33.4 | 42.5 | 38.8 | 35.9 | 53.9 | 61.0 | 48.5 | 57.1 | 58.0 | 60.0 | 51.4 | 40.0 |
| | | | | | 4.8 | 4.8 | 5.8 | 5.8 | 4.3 | 2.8 | | |
| | - | - | - | - | - | 20.9 | 20.6 | | 20.4 | | | |
| 679 | 18.3 | 19.7 | 20.6 | 20.8 | 21.1 | 20.5 | 19.9 | 19.5 | 21.8 | 24.2 | 27.4 | 31.4 |
| | 6.6 | 13.0 | 10.7 | 21.1 | 22.9 | 16.5 | 34.5 | 32.1 | 45.7 | 53.1 | 40.8 | 65.4 |
| | 14.7 | 21.5 | 26.3 | 22.4 | 22.8 | 25.0 | 26.0 | 17.3 | 23.0 | 22.8 | 25.5 | 26.5 |
| 40 | 18.5 | 11.1 | 18.5 | 16.6 | 26.7 | 23.9 | 18.4 | 36.7 | 14.7 | 21.1 | 22.9 | 19.2 |
| | 9.5 | 11.9 | 13.4 | 17.8 | 20.1 | 29.8 | 28.5 | 29.9 | 41.6 | 38.4 | 35.6 | 26.4 |
| | - | - | 9.2 | - | | - | | 7.0 | 6.8 | 6.6 | | |
| | 21.2 | 25.8 | 37.8 | 28.6 | 34.2 | 34.3 | 40.0 | 40.1 | 43.1 | 47.0 | 52.8 | 42.5 |
| 138 | 16.6 | 25.1 | 33.2 | 24.9 | 28.6 | 28.6 | 31.6 | 32.5 | 33.6 | 30.9 | 40.1 | 37.7 |
| 578 | 6.3 | 6.4 | 6.3 | 7.3 | 6.7 | 7.9 | 8.1 | 8.4 | 11.6 | 11.7 | 11.6 | 10.3 |
| 5,257 | 60.5 | 60.8 | 47.7 | 56.2 | 64.9 | 64.4 | 64.8 | 57.5 | 52.0 | 71.4 | 64.7 | 70.6 |
| 4,520 | 24.9 | 27.1 | 29.7 | 33.9 | 35.2 | 40.8 | 43.9 | 42.2 | 44.9 | 45.4 | 40.7 | 38.0 |
| 5,150 | 48.7 | 52.1 | 52.8 | 57.9 | 50.5 | 43.6 | 41.3 | 46.5 | 56.6 | 65.7 | 76.1 | 85.1 |
| 24,559 | 10.6 | 10.0 | 9.7 | 9.5 | 8.7 | 9.1 | 9.5 | 7.9 | 12.3 | 17.1 | 22.0 | 22.9 |
| 453 | 9.5 | 10.5 | 10.7 | 12.1 | 12.2 | 13.6 | 13.2 | 12.9 | 13.2 | 14.2 | 13.7 | 12.7 |
| 390 | 9.9 | 9.9 | 11.9 | 10.5 | 9.4 | 10.9 | 6.5 | 8.1 | 14.0 | 15.7 | 12.6 | 14.8 |
| 8 | - | 4.7 | 1.5 | 3.1 | 1.5 | 3.1 | 4.6 | 4.6 | 7.7 | 9.3 | 10.9 | 12.6 |
| 611 | 1.8 | 1.8 | 1.9 | 1.7 | 2.0 | 2.1 | 1.9 | 1.8 | 1.8 | 1.8 | 1.6 | 1.8 |
| 3 | 23.1 | 30.2 | 21.2 | 8.8 | 19.3 | 17.6 | 14.0 | 14.1 | 14.1 | 17.6 | 19.4 | 1.8 |
| | | | | | | | - | - | 16.0 | 15.9 | | |
| 17,250 | 5.5 | 6.7 | 5.6 | 5.7 | 5.5 | 5.7 | 5.8 | 5.7 | 5.4 | 5.0 | 4.8 | 4.7 |
| 2,605 | | | | | | | | | | | | |
| 686 | | | | | | 5.2 | 5.2 | 8.2 | 8.6 | 8.4 | 12.8 | 12.3 |
| 61,283 | 23.7 | 24.7 | 25.3 | 25.7 | 24.0 | 23.3 | 23.9 | 23.4 | 23.8 | 22.8 | 22.0 | 24.2 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 620 | | | | 3.2 | | 3.6 | 3.6 | 3.7 | 3.5 | 3.7 | 3.2 | 3.7 |
| 12,402 | 65.7 | 67.9 | 68.3 | 55.8 | 47.3 | 41.8 | 39.9 | 38.8 | 35.9 | 34.8 | 33.7 | 34.8 |
| 959 | 14.5 | 12.9 | 14.6 | 14.6 | 17.7 | 15.4 | 17.1 | 16.0 | 18.0 | 17.9 | 17.6 | 15.4 |
| | | | | | 29.6 | 22.1 | 19.9 | 12.9 | 14.4 | 13.2 | | |
| 142 | 10.1 | 10.6 | 19.0 | 27.8 | 17.4 | 18.9 | 20.4 | 15.4 | 21.2 | 15.7 | 18.8 | 17.4 |
| | 18.8 | 24.3 | 24.9 | 22.9 | 21.2 | 15.3 | 12.6 | 13.1 | 13.8 | 13.4 | 11.9 | 10.4 |
| 2,435 | | | | | | | | | | | | 5.4 |
| | 14.4 | 16.5 | 11.8 | 12.3 | 9.3 | 13.8 | 12.3 | 8.8 | 8.3 | | | |
| 265 | 6.4 | 6.6 | 6.9 | 5.9 | 6.0 | 5.7 | 6.1 | 5.8 | 6.6 | 6.7 | 6.1 | 5.9 |
| 17,778 | 32.8 | 31.9 | 37.8 | 43.8 | 36.9 | 37.2 | 45.0 | 47.5 | 51.8 | 48.9 | 45.1 | 47.8 |
| | 15.4 | 14.4 | 13.0 | 13.1 | 13.6 | | | | 11.3 | 10.9 | 8.5 | 8.5 |
| 267 | 8.7 | 7.8 | 8.2 | 8.4 | 8.3 | 8.3 | 8.2 | 8.2 | 8.2 | 7.8 | 19.8 | 9.0 |
| | 4.6 | 3.7 | 2.8 | 2.5 | 2.1 | 2.3 | 2.8 | 1.8 | 1.4 | 1.3 | 2.4 | 1.6 |
| | 5.9 | 5.4 | 5.2 | 5.0 | 4.4 | 4.3 | 4.2 | | | | | |
| | 4.3 | 4.3 | 4.1 | 3.7 | 3.7 | 3.4 | 3.2 | 3.0 | 3.0 | | | |
| 8,634 | 2.1 | 2.0 | 2.0 | 1.9 | 1.9 | 1.6 | 1.4 | 1.2 | 1.1 | 1.1 | 1.0 | 0.9 |
| 28 | 0.6 | 1.0 | 1.0 | 0.8 | 0.7 | 0.5 | 0.5 | 0.3 | 0.5 | 0.7 | 0.5 | 0.2 |
| 1 | 2.3 | 1.8 | 0.4 | 1.7 | 0.8 | 0.8 | 2.0 | 1.2 | 0.8 | 1.1 | 0.4 | 0.7 |
| | | 1.4 | | | | | 1.0 | 0.8 | 0.8 | 0.8 | 0.8 | |
| | 6.6 | | | | | 5.0 | | | | | 4.8 | |
| 362 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 | 0.5 | 0.4 | 0.4 | 0.3 |
| 171 | | | | 13.9 | 13.3 | 15.8 | 13.1 | 11.3 | 8.1 | 8.2 | 8.8 | 9.6 |
| 356 | | | | | | | | | | | | 0.9 |
| | 1.2 | | | 0.8 | 0.6 | 0.5 | 0.8 | 0.8 | 0.3 | 0.8 | 0.3 | 0.3 |
| | 4.7 | 3.3 | 3.4 | 4.0 | 3.9 | 3.4 | 3.0 | 2.9 | 2.4 | 2.3 | 2.3 | 1.8 |
| 1,292 | 1.0 | | | 0.7 | 0.6 | | | | 0.6 | 0.5 | 0.4 | 0.6 |
| | 10.7 | | | | | 9.6 | | | | | 8.0 | |
| | 2.4 | 2.2 | 2.3 | 2.3 | 2.0 | 2.4 | 2.2 | 2.4 | 2.2 | 2.0 | 1.9 | 1.9 |
| 1,198 | 2.3 | 2.0 | 1.7 | 1.6 | 1.5 | 1.4 | 1.6 | 1.5 | 1.6 | 1.8 | 1.6 | 2.1 |
| 11,385 | 7.4 | 7.3 | 8.1 | 7.8 | 7.5 | 7.5 | 7.1 | 6.7 | 6.4 | 9.9 | 9.5 | 9.1 |
| 18 | 0.9 | 0.7 | 0.5 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.6 | 0.4 | 0.4 | 0.3 |
| 2,229 | 8.2 | 7.9 | 7.1 | 10.0 | 6.6 | 7.3 | 7.1 | 6.7 | 6.0 | 5.5 | 5.4 | 4.9 |
| | | | | | | 2.3 | 4.5 | 4.7 | 5.8 | 3.2 | 2.9 | 3.5 |
| | | 1.2 | 1.3 | 1.3 | 1.3 | 1.2 | 1.2 | 1.4 | 1.3 | 1.4 | 1.5 | 1.5 |
| | | | | | | | | | | 4.0 | 3.4 | 4.1 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2.5 | 2.7 | 2.6 | 2.5 | 2.8 | 2.5 | 2.9 | 2.6 | 2.8 | 2.8 | 2.6 | 2.6 |
| 9 | 3.1 | 3.2 | 3.1 | 0.8 | 2.3 | 1.7 | 1.3 | 2.0 | 2.6 | 2.2 | 2.2 | 4.3 |
| 42,678 | 4.9 | 4.6 | 4.5 | 4.0 | 4.1 | 3.9 | 3.9 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 |
| | | | | 2.6 | 2.9 | | | | | 3.0 | | |
| | | 2.4 | 2.7 | 1.3 | | | | 0.9 | 1.4 | 1.7 | 1.6 | 0.8 |
| 627 | 2.7 | 3.5 | 3.5 | 3.0 | 3.7 | 3.4 | 2.4 | 3.2 | 3.4 | 3.0 | 3.0 | 2.5 |
| 8,516 | 6.4 | 6.8 | 6.5 | 6.3 | 6.4 | 6.4 | 6.4 | 6.6 | 7.4 | 7.5 | 7.7 | 8.0 |
| 530 | | | | 6.8 | 7.1 | 6.2 | 10.4 | | 10.0 | 5.5 | 3.8 | 3.6 |
| 87 | 3.0 | 2.9 | 2.3 | 2.5 | 2.8 | 1.9 | 2.7 | 2.6 | 3.3 | 3.4 | 1.9 | 2.5 |
| 208 | 2.8 | 2.7 | 2.6 | 2.2 | 2.4 | 2.2 | 2.2 | 2.2 | 2.2 | | 2.3 | |
| | | 1.3 | 1.1 | 0.4 | 0.8 | 0.4 | 0.7 | 0.4 | 0.5 | 1.1 | 0.9 | 0.5 |
| 13 | 0.8 | 0.7 | 0.2 | 1.4 | 1.6 | 1.9 | 1.4 | 1.2 | 0.8 | 1.7 | 0.7 | 0.8 |
| 39 | 5.1 | 5.6 | 6.3 | 6.6 | 6.6 | 9.0 | 7.3 | 7.5 | 6.1 | 4.9 | 4.4 | |
| | | | | | | | | | 15.8 | 8.5 | 8.7 | 8.3 |
| | | | | | | | | | 17.9 | 9.6 | 9.7 | 9.3 |
| | | | | | | | | | 3.3 | 2.2 | 3.0 | 2.5 |
| | 2.4 | 3.6 | 3.6 | 3.1 | 2.7 | 2.5 | 2.7 | 1.8 | 1.9 | 1.8 | 2.0 | 2.0 |
| 145 | | | | | | 1.2 | 1.7 | 1.8 | 1.8 | 1.5 | 1.6 | 1.9 |
| | | 1.8 | 1.1 | 1.3 | 1.9 | 1.8 | 1.9 | 2.4 | 1.4 | 1.7 | 2.0 | 1.8 |
| 235 | | | | | | | | | 4.5 | 3.5 | 3.8 | 3.7 |
| | | | 1.2 | 1.5 | 1.7 | 2.1 | 4.7 | 1.4 | 1.7 | 1.3 | 1.6 | 1.1 |
| | 0.2 | 0.8 | | | 0.7 | 0.7 | 0.5 | 0.8 | 0.9 | 0.5 | 0.2 | 0.2 |
| | 0.8 | 1.1 | 1.3 | 1.1 | 1.3 | 1.2 | 1.0 | 1.0 | | | | |
| 33 | | | | 2.7 | 2.7 | 2.4 | | | 1.2 | 1.1 | 0.8 | 0.6 |
| | 2.2 | 2.2 | 2.2 | 2.3 | 2.4 | 2.4 | 2.4 | 2.7 | 2.6 | 2.3 | 2.2 | |
| | | | | 4.3 | 4.3 | 4.9 | 4.6 | 5.2 | 4.6 | 5.2 | 4.2 | 4.2 |
| 83 | | | | 1.2 | 0.7 | 1.2 | 0.7 | | | | 0.8 | 0.6 |
| | 3.9 | | | 3.6 | 3.2 | 4.6 | 4.2 | 3.9 | 3.9 | 4.3 | 4.7 | 5.7 |
| | 10.2 | 9.8 | 10.1 | 9.0 | 8.4 | 8.6 | 7.7 | 6.8 | 5.7 | 5.1 | 4.2 | 3.9 |
| 81 | 4.2 | 3.9 | 3.2 | 3.2 | 3.2 | 2.6 | 2.4 | 2.3 | 2.3 | 2.0 | 2.0 | 1.7 |
| 65 | 1.8 | 1.4 | 1.5 | 1.6 | 1.3 | 1.1 | 1.3 | 1.2 | 1.1 | 0.9 | 1.0 | 0.8 |
| 202 | 2.0 | 2.5 | 2.0 | 2.2 | 2.1 | 1.6 | 1.7 | 1.5 | 1.8 | 1.4 | 1.4 | 1.5 |
| 256 | 2.2 | 2.0 | 1.9 | 1.7 | 1.6 | 1.4 | 1.3 | 1.4 | 1.2 | 1.3 | 1.1 | 1.2 |
| | 10.3 | 9.8 | 9.6 | 7.6 | 6.6 | 7.1 | 6.3 | 5.3 | 5.7 | 6.0 | 6.5 | 7.5 |
| 247 | 2.6 | 2.7 | 2.6 | 2.5 | 2.4 | 2.1 | 2.1 | 2.0 | 2.3 | 1.9 | 2.0 | 1.7 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15,561 | 28.1 | 29.4 | 30.5 | 28.9 | 27.3 | 24.8 | 20.1 | 17.7 | 16.6 | 14.9 | | |
| 57 | 2.4 | 2.2 | 2.2 | 2.5 | 2.0 | 1.7 | 1.5 | 1.5 | 1.6 | 1.4 | 1.5 | 1.6 |
| | 9.0 | 10.0 | 9.0 | 8.5 | 7.4 | 6.5 | 6.3 | 5.7 | 5.3 | 4.9 | 4.3 | |
| | | | | | | 0.6 | 1.3 | | 0.6 | | - | |
| 56 | 1.1 | 1.0 | 1.0 | 1.2 | 0.8 | 1.0 | 0.5 | 0.7 | 1.0 | 0.9 | 0.8 | 0.8 |
| | 10.2 | 9.8 | 10.3 | 10.7 | 6.7 | 8.3 | 6.7 | 7.1 | 6.4 | 5.2 | 5.3 | 4.9 |
| 78 | 2.9 | 3.0 | 2.5 | 2.0 | 2.8 | 2.3 | 2.3 | 2.4 | 2.5 | 2.2 | 2.2 | 2.0 |
| 1 | 1.8 | 0.4 | 1.4 | - | 1.0 | 1.0 | - | 0.7 | - | 0.3 | 0.6 | 0.9 |
| 38 | 1.0 | 1.3 | 1.3 | 0.9 | 0.7 | 1.2 | 1.4 | 1.8 | 1.1 | 1.2 | 1.1 | 0.9 |
| - | | | | | | | | | | | | 1.2 |
| | 10.0 | 9.3 | 9.2 | 8.8 | 7.9 | 5.6 | 5.8 | 4.3 | 4.6 | 5.0 | 3.3 | 3.3 |
| 153 | 10.6 | 10.2 | 8.5 | 10.1 | 10.1 | 11.1 | 8.7 | 8.5 | 9.3 | 8.0 | 7.0 | 6.9 |
| 27 | 1.1 | 0.8 | 1.0 | 1.1 | 0.8 | 0.7 | 0.7 | 0.6 | 0.7 | 0.6 | 0.6 | 2.2 |
| 106 | 1.1 | 1.0 | 1.1 | 0.9 | 1.2 | 0.9 | 1.0 | 1.2 | 0.9 | 1.0 | 1.0 | 0.9 |
| 709 | 1.5 | 1.5 | 1.8 | 1.5 | 1.5 | 1.3 | 1.3 | 1.3 | 1.2 | 1.1 | 1.1 | 0.9 |
| 18 | 2.7 | 3.4 | 2.2 | 2.5 | 2.0 | 1.8 | 1.7 | 1.6 | 1.3 | 1.6 | 1.3 | 1.2 |
| 64 | 2.1 | 2.3 | 2.5 | 2.2 | 2.7 | 1.9 | 2.3 | 2.2 | 1.9 | 1.6 | 1.9 | 1.8 |
| 791 | 1.6 | 1.6 | 1.9 | 1.6 | 1.6 | 1.4 | 1.4 | 1.4 | 1.2 | 1.1 | 1.2 | 1.0 |
| 79 | 4.2 | 7.0 | 6.9 | 5.3 | 4.2 | 5.0 | 3.1 | 3.5 | 3.1 | 2.9 | 4.3 | 4.9 |
| | | | | | 1.3 | | | - | | 1.2 | - | - | 1.2 |
| 45 | 2.6 | 2.2 | 2.4 | | 1.8 | 1.9 | 1.9 | 1.7 | 1.8 | 1.9 | 1.5 | 1.4 |
| 44 | 2.3 | 1.8 | 1.7 | 1.6 | 1.9 | 1.6 | 1.7 | 1.4 | 1.6 | 1.1 | 1.4 | 1.1 |
| | | | | | | | | | | | - | 3.0 |
| 84 | | 1.2 | 0.8 | 1.1 | 1.0 | 1.2 | 1.0 | 1.1 | 1.3 | 1.3 | 1.5 | 1.6 |
| | | | | | | | | | | - | - | - |
| 400 | 1.3 | 1.2 | 1.1 | 1.2 | 1.2 | 1.0 | 1.1 | 1.1 | 1.0 | 1.0 | 0.9 | 0.9 |
| 29 | | | | | | | | | 6.5 | 4.1 | 6.0 | 3.5 |
| | 1.0 | 1.5 | 1.5 | - | 1.7 | 1.0 | - | 1.0 | 1.5 | 1.0 | 1.0 | 0.7 |
| 28 | | | 4.4 | 3.3 | 2.3 | 3.6 | 4.0 | 1.9 | 3.9 | 3.4 | 2.4 | 3.4 |
| 66 | 1.1 | 1.0 | 1.1 | 1.4 | 1.4 | 1.3 | 1.5 | 1.7 | 1.2 | 1.2 | 1.2 | 1.1 |
| - | - | - | 3.6 | - | - | - | - | - | - | - | - | - |
| 123 | 2.4 | 2.6 | 2.1 | 1.9 | 1.8 | 1.6 | 1.7 | 1.9 | 1.5 | 1.7 | 1.4 | 1.5 |
| 10 | 1.8 | 1.4 | 1.8 | 1.1 | 1.4 | 1.0 | 0.6 | 1.2 | 0.5 | 0.6 | 0.7 | 0.8 |
| 294 | 1.4 | 1.4 | 1.3 | 1.4 | 1.2 | 1.2 | 1.1 | 1.1 | 0.9 | 0.9 | 0.9 | 0.8 |
| | 2.3 | 2.7 | 2.9 | 3.4 | 2.4 | 2.1 | 2.2 | 2.0 | 1.7 | 1.7 | 2.1 | 1.4 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57 | 1.0 | 0.9 | 0.8 | 0.6 | 0.7 | 0.7 | 0.7 | 0.5 | 0.7 | 0.6 | 0.7 | 0.9 |
| | 2.1 | 2.7 | 3.1 | 2.2 | 2.6 | 2.1 | 2.1 | 2.0 | 1.9 | 1.7 | 1.7 | 1.9 |
| 875 | 1.8 | 1.7 | 1.9 | 1.6 | 1.6 | 1.6 | 1.4 | 1.6 | 1.6 | 1.3 | 1.3 | 1.4 |
| 963 | 1.2 | 1.1 | 1.2 | 1.1 | 1.1 | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.0 | 0.9 |
| - | - | - | - | - | 2.9 | - | - | - | 2.8 | - | 2.8 | - |
| | 0.9 | 2.0 | 1.4 | 0.7 | 0.4 | 0.9 | 1.5 | 1.5 | 1.6 | 1.0 | 2.0 | 0.8 |
| | | 3.1 | | | 3.0 | 3.0 | 2.9 | - | - | - | - | - |
| 94 | 1.1 | 1.3 | 1.2 | 1.2 | 1.2 | 1.1 | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| 45 | 1.0 | 1.2 | 1.2 | 1.0 | 1.1 | 1.0 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 |
| 227 | 1.9 | 1.8 | 1.9 | 1.7 | 1.5 | 1.3 | 1.4 | 1.2 | 1.2 | 1.2 | 1.0 | 1.1 |
| | 1.3 | 1.3 | 1.5 | 1.1 | 1.1 | 1.5 | 1.2 | 1.1 | 1.2 | 1.5 | 1.0 | 0.9 |
| | | | | 3.1 | 2.8 | 2.8 | 2.7 | 2.5 | 2.0 | 3.4 | 2.3 | 2.3 |
| | | | | | | | 3.4 | 5.0 | 4.5 | 3.2 | | |
| | 8.3 | | | | | | 9.4 | 7.8 | | | | |
| | | | | | 4.4 | 5.5 | 4.8 | 5.3 | 3.8 | | | |
| | 2.9 | | | | | 2.5 | | | | | 2.3 | |
| | 1.3 | 5.1 | 1.3 | 5.1 | 5.7 | 4.4 | 6.9 | 0.6 | 0.6 | 3.1 | 1.9 | 2.5 |
| | 3.6 | 4.7 | | | | | | | 7.1 | 1.0 | 3.9 | 10.5 |
| | 4.0 | | | | | 4.6 | | | | | 4.5 | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 3 | | 1.7 | 11.9 | 5.1 | 6.7 | 10.1 | 6.8 | 1.7 | 5.3 | 3.6 | 9.0 | 9.0 |
| | | | | | | | | | | | | |
| | | | | | | | 1.2 | 2.7 | 3.4 | 0.4 | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | 8.7 | 8.6 |
| | 1.0 | 6.1 | 6.0 | 6.0 | 2.0 | 4.0 | 7.9 | 1.0 | 3.9 | 7.7 | 1.0 | 1.9 |
| | | | - | - | - | - | - | - | - | - | 9.5 | 9.4 |

:ims

| 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|
| 5.4 | 5.4 | 5.7 | 4.5 | 6.0 |
| | | | 7.7 | |
| | | | 6.5 | |
| | | | 8.0 | |
| | | | 7.6 | |
| 5.4 | 5.5 | 5.0 | 4.8 | 4.9 |
| | | | 7.7 | |
| 1.7 | | | | |
| 2.3 | 2.8 | 1.5 | 1.7 | 1.8 |
| | | | | |
| | | | | |
| | | | | |
| 2.4 | 3.2 | 3.8 | 2.5 | |
| 4.3 | 19.4 | 17.2 | 7.5 | 12.7 |
| | | | 4.3 | |
| 13.9 | | | | |
| 11.2 | 10.3 | 11.5 | | |
| 8.3 | 7.3 | 7.5 | 7.0 | |
| 6.0 | 5.7 | 5.3 | 5.3 | |
| 6.7 | | | | |
| 4.8 | | | | |
| 4.2 | | | | |
| | | | | 19.8 |
| | | | 9.0 | |
| | | | 9.3 | |
| | | | 13.5 | |
| | | | 2.3 | |

|      |      |      |      |      |
|------|------|------|------|------|
|      |      |      | 8.0  |      |
|      |      |      |      |      |
| 1.4  | 1.3  | 1.5  | 1.4  |      |
| 2.5  |      |      |      |      |
|      |      |      | 2.5  |      |
| 1.1  | 1.3  | 1.0  | 1.2  |      |
|      |      |      |      |      |
| 3.0  |      |      |      |      |
|      |      |      |      |      |
| 30.7 | 31.1 |      | 41.2 |      |
| 17.1 |      |      |      |      |
| 30.6 | 31.7 | 32.6 | 33.8 | 34.0 |
|      |      |      |      |      |
|      |      |      | 6.2  |      |
| 0.5  | 0.7  | 0.8  | 0.4  |      |
| 10.9 | 10.4 | 12.3 | 8.6  | 11.5 |
|      |      |      | 11.6 |      |
|      |      |      | 9.1  |      |
|      |      |      |      |      |
|      |      |      | 8.8  |      |
|      |      |      | 9.5  |      |
| 3.2  |      |      |      |      |
|      |      |      | 10.9 |      |
|      |      |      | 9.9  |      |
| 4.4  |      |      |      |      |
|      |      |      | 9.8  |      |
|      |      |      |      |      |
|      |      |      | 7.4  |      |
| 1.7  |      |      | 1.7  |      |
|      |      |      | 9.0  |      |
| 35.4 | 7.0  | 27.7 |      |      |
| 10.3 |      |      |      |      |
| 3.9  | 5.8  | 1.9  |      |      |
| 29.8 | 31.5 | 32.2 | 37.7 | 28.4 |
| 7.8  | 8.5  | 8.8  | 10.9 |      |

|       | 8.6  | 8.4  |       |      |
|-------|------|------|-------|------|
| 5.5   | 5.9  | 5.2  | 5.4   | 5.0  |
|       |      |      |       |      |
|       |      |      |       |      |
| 22.3  | 19.2 | 17.4 |       | 15.2 |
| 13.3  | 5.7  | 7.5  | 5.6   | 10.2 |
|       |      |      |       |      |
| 10.0  |      |      |       |      |
| 38.7  | 42.1 | 35.1 | 42.1  | 47.0 |
|       |      |      |       |      |
| 19.9  |      |      |       |      |
| 27.2  | 24.5 | 19.0 | 16.8  | 18.5 |
| 34.2  |      |      |       |      |
| 22.3  | 18.8 | 19.3 |       |      |
| 25.6  |      |      |       | 36.5 |
| 28.3  | 30.3 | 29.9 | 30.9  |      |
|       | 12.1 | 5.9  |       |      |
| 49.3  |      |      |       |      |
| 43.1  | 28.8 | 35.0 | 33.1  | 37.6 |
| 8.7   | 8.7  | 10.0 | 11.6  | 11.9 |
| 41.7  | 40.2 | 62.4 | 105.4 | 82.8 |
| 33.8  | 33.7 | 31.4 | 29.4  | 27.3 |
| 84.3  | 74.3 | 66.9 | 57.5  | 56.5 |
| 21.5  | 18.8 | 16.1 | 16.5  | 19.3 |
| 11.5  | 10.0 | 8.7  | 8.6   | 7.4  |
| 16.9  | 17.3 | 14.5 | 11.3  | 9.7  |
| 9.5   | 8.0  | 6.4  | 6.5   | 13.0 |
| 1.6   | 1.4  | 1.5  | 1.7   | 1.7  |
| 14.2  | 12.4 | 7.1  | 7.1   | 5.3  |
|       |      |      |       |      |
| 4.7   | 4.5  | 4.5  | 5.0   | 5.4  |
|       |      | 7.5  | 6.5   | 5.9  |
| 11.9  | 9.0  | 8.9  | 6.3   | 6.3  |
| 26.5  | 26.8 | 28.0 | 28.4  | 29.5 |

| | | | | |
|---:|---:|---:|---:|---:|
| 2.5 | 3.2 | 3.6 | 3.0 | 3.5 |
| 35.1 | 32.6 | 27.9 | 26.5 | 25.5 |
| 12.5 | 11.0 | 8.2 | 6.5 | 5.9 |
| | | | | |
| 18.5 | 20.4 | 19.5 | 19.4 | 18.4 |
| 10.2 | 9.3 | 8.8 | 9.3 | |
| 6.5 | 6.6 | 6.7 | 7.2 | 7.7 |
| | | | | |
| 7.9 | 7.6 | 7.8 | 8.5 | 7.7 |
| 53.8 | | 61.9 | | 56.3 |
| 7.5 | 6.5 | 5.2 | 4.8 | |
| 5.4 | 3.6 | 3.7 | 5.2 | 4.5 |
| | | | | |
| | | | | |
| | | | | |
| 0.8 | 0.8 | 0.7 | 0.7 | 0.6 |
| 0.4 | 0.9 | 0.4 | 0.3 | 0.4 |
| 0.7 | 0.2 | - | 0.2 | 0.2 |
| 0.8 | 0.7 | | 0.8 | |
| | | | 4.4 | |
| 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| 7.1 | 7.1 | 7.3 | 6.2 | 5.7 |
| 0.8 | 0.7 | 0.7 | 0.7 | 0.7 |
| 1.0 | 0.5 | | | |
| | | | | |
| 0.6 | 0.5 | 0.5 | 0.6 | 0.5 |
| | | | 7.0 | |
| 2.1 | 2.1 | | | |
| 2.8 | 2.4 | 2.4 | 2.2 | 2.3 |
| 8.8 | 9.3 | 9.7 | 9.5 | 11.0 |
| 0.2 | 0.3 | 0.3 | 0.3 | 0.3 |
| 4.9 | 4.2 | 3.9 | 3.5 | 3.2 |
| | | | 3.9 | |
| | | | | |
| 6.3 | | | | |

| | | | | |
|---|---|---|---|---|
| 2.6 | 2.8 | 2.8 | 2.5 | |
| 4.4 | 3.1 | | 1.5 | 1.1 |
| 3.8 | 3.6 | 3.7 | 3.4 | 3.2 |
| | 2.6 | 2.5 | | |
| 2.6 | 0.8 | | | |
| 2.3 | 2.2 | 2.0 | | 2.2 |
| 7.8 | 7.7 | 7.2 | 5.0 | 4.4 |
| 3.3 | 3.0 | 2.7 | 2.4 | 2.5 |
| 2.3 | 2.2 | 2.5 | 2.6 | 3.0 |
| 2.2 | 2.4 | 2.5 | | 2.1 |
| 0.3 | 0.4 | 0.5 | | |
| 1.9 | 1.0 | 1.0 | 1.3 | 1.1 |
| | | 2.7 | | 1.0 |
| 8.2 | 9.9 | | | |
| 9.2 | 11.1 | 10.1 | | |
| 2.1 | 2.2 | | | |
| 1.7 | | 1.5 | 1.4 | |
| 2.0 | 1.7 | 2.0 | 1.7 | 1.5 |
| 1.8 | | | | |
| 3.9 | 4.5 | 4.3 | 3.9 | 4.0 |
| 1.1 | 2.6 | 0.7 | | |
| 0.3 | 0.4 | 0.4 | | |
| | | | 1.5 | |
| 0.6 | 0.5 | 0.8 | 1.0 | 0.7 |
| | | | | |
| 4.3 | | | | |
| 0.8 | 0.6 | 0.7 | 0.7 | 0.9 |
| 6.5 | 6.7 | | | |
| 3.6 | 3.5 | 3.6 | | |
| 1.9 | 1.5 | 1.6 | 1.8 | 1.1 |
| 1.0 | 0.8 | 0.8 | 0.8 | 0.6 |
| 1.3 | 1.6 | 1.5 | 2.3 | 2.1 |
| 1.0 | 0.8 | 0.7 | 0.8 | 0.7 |
| 5.6 | 4.2 | 3.2 | | |
| 1.9 | 1.7 | 1.5 | 1.5 | 1.2 |

| | 11.0 | 11.3 | 11.5 | 10.8 |
|---|---|---|---|---|
| 1.2 | 1.3 | 1.3 | 0.8 | 1.0 |
| 5.2 | | 6.3 | | |
| | | | | |
| 0.8 | 0.9 | 1.3 | 1.0 | 1.0 |
| 4.8 | 3.9 | 3.1 | 3.2 | |
| 1.6 | 1.6 | 1.6 | 1.5 | 1.4 |
| 0.3 | 0.3 | 0.6 | 0.9 | 0.3 |
| 1.1 | 1.1 | 1.1 | 0.6 | 0.8 |
| 2.5 | 2.4 | 3.6 | 1.2 | - |
| 3.4 | 2.5 | 3.2 | 3.4 | |
| 6.7 | 6.6 | 5.4 | 5.9 | 5.2 |
| 0.5 | 0.9 | 0.6 | 0.5 | 0.5 |
| 0.7 | 0.9 | 0.9 | 1.1 | 1.1 |
| 1.0 | 0.9 | 0.9 | 1.0 | 1.2 |
| 1.2 | 1.1 | 0.9 | 1.2 | 1.0 |
| 1.2 | 1.2 | 1.2 | 1.1 | 1.2 |
| 1.0 | 0.9 | 0.9 | 1.0 | 1.2 |
| 5.4 | 4.2 | 4.0 | 2.3 | 2.7 |
| - | - | - | - | |
| 1.7 | 1.3 | 1.4 | 1.6 | 1.3 |
| 1.2 | 1.1 | 0.8 | 0.9 | 1.0 |
| | | | | |
| 1.5 | 1.4 | 0.9 | 0.8 | 0.8 |
| - | - | - | - | |
| 0.9 | 0.8 | 0.8 | 0.8 | 0.7 |
| 5.0 | 2.2 | 2.3 | 1.7 | 1.6 |
| 2.9 | 1.7 | 1.4 | 0.9 | |
| 2.7 | 1.6 | 3.2 | 2.7 | 4.5 |
| 1.2 | 1.4 | 0.9 | 1.0 | 0.6 |
| | | | | |
| 1.2 | 1.6 | 1.4 | 1.2 | 1.4 |
| 0.7 | 0.6 | 0.8 | 1.0 | 0.5 |
| 0.8 | 0.6 | 0.7 | 0.7 | 0.6 |
| 1.4 | 1.1 | 1.6 | | |

| | | | | |
|---|---|---|---|---|
| 0.9 | 0.7 | 0.5 | 0.5 | 0.7 |
| 1.8 | 1.8 | 1.9 | 1.9 | |
| 1.2 | 1.2 | 1.2 | 1.6 | 1.4 |
| 0.8 | 0.8 | 0.9 | 0.8 | 1.2 |
| - | - | 2.7 | - | - |
| - | 0.2 | 0.7 | | |
| - | - | | - | |
| 0.9 | 0.7 | 0.7 | 0.6 | 0.6 |
| 0.6 | 0.7 | 0.5 | 0.7 | 0.5 |
| 1.1 | 1.1 | 1.0 | 1.0 | 0.9 |
| 0.9 | 1.0 | 1.0 | | |
| 2.3 | 2.2 | 2.3 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | 2.1 | |
| | | | | |
| 7.5 | | | | |
| | | | 4.7 | |
| - | | | | |
| 3.1 | | | | |
| 3.6 | 5.4 | 5.4 | 7.2 | 5.4 |
| 3.5 | | | | |
| | | | | |
| - | | | | |
| | 3.1 | | | |
| 1.0 | | | | |
| 18.6 | | | | |

# DEF-INTERV.

# EX. 90

Center for American Progress 

≡

IMMIGRATION

# Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border

By Tom K. Wong | Posted on July 8, 2014, 9:04 am



AP/Ross D. Franklin

Two young girls sit in their holding area where hundreds of mostly Central American immigrant children are being processed and held at the U.S. Customs and Border Protection Nogales Placement Center on June 18, 2014, in Nogales, Arizona.

AP/Ross D. Franklin

Two young girls sit in their holding area where hundreds of mostly Central American immigrant children are being processed and held at the U.S. Customs and Border Protection Nogales Placement Center on June 18, 2014, in Nogales, Arizona.

A humanitarian refugee situation at the U.S. southern border has been unfolding over the past few years and dramatically intensifying over the past several months, as tens of thousands of unaccompanied children are fleeing their homes in Honduras, Guatemala, and El Salvador. In search of a safe haven, these children embark on dangerous journeys, arriving in the United States and neighboring countries throughout Central America. Indeed, according to the Office of the U.N. High Commissioner for Refugees, or UNHCR, asylum applications from children are up by 712 percent in the neighboring countries of Mexico, Panama, Nicaragua, Costa Rica, and Belize. Sen. Dianne Feinstein (D-CA) has argued that "many of the children apprehended at the border are fleeing unspeakable violence in their home countries."

Even as the Obama administration struggles to deal with the situation, including finding adequate shelter and protection for the kids, some in Congress have attempted to score political points by arguing that the increased numbers are the result of the administration's own immigration enforcement policies, such as the creation of the Deferred Action for Childhood Arrivals, or DACA, program in 2012, which grants eligible unauthorized youth a two-year reprieve from deportation and a work permit. Rep. Darrell Issa (R-CA), for example, called on President Barack Obama to end the DACA program and begin deporting those with the status to send a message to prospective child refugees that they should not come to the United States. However, a close statistical evaluation of the available data suggests a very different dynamic that is leading children to leave their Central American homes. It is not U.S. policy but rather violence and the desire to find safety that is the impetus for these children's journeys.

An analysis of the available data suggests that:

- Violence is among of the main drivers causing the increase. Whereas Central American countries that are experiencing high levels of violence have seen thousands of children flee, others with lower levels of violence are not facing the same outflow.

- By contrast, the evidence does not support the argument that DACA or lax border enforcement has caused the increase in children fleeing to the United States.

# Violence is causing children to flee Honduras, Guatemala, and El Salvador

How can it be determined that violence is a primary factor causing children to flee? One way is to use the U.N. Office on Drugs and Crime, or UNODC, data on homicides and homicide rates by country. Coupling this data with that of the number of children arriving each year allows us to examine the relationship between violence and children arrivals.

Figure 1 shows how violence affects the flow of children. The relationship is positive, meaning that higher rates of homicide in countries such as Honduras, El Salvador, and Guatemala are related to greater numbers of children fleeing to the United States.

Another way to examine the relationship between violence and unaccompanied children is to use the data on security levels in Latin America compiled by FTI Consulting, a global business advisory firm headquartered in Washington, D.C. The annual index ranges from 1 (safe) to 5 (very dangerous) for each country, and data are available from 2009 to 2014. Here again, the relationship is positive, meaning that more dangerous security conditions are related to greater numbers of unaccompanied children. Using the FTI Consulting index data provides an even more strongly statistically significant result, suggesting an even clearer link between violence and children fleeing.

Not only do countries with the highest rates of homicide have the largest numbers of unaccompanied children fleeing, but the data also make clear that countries in Latin America with lower rates of homicide are not sending large numbers of unaccompanied children.

In 2012, the countries of El Salvador, Guatemala, Honduras, and Mexico accounted for 41,828 homicides, at a rate of 28 per 100,000 people. Exclude Mexico and the murder rate jumps to 54 per 100,000 people. The president of Honduras has gone as far as calling the children refugees from "war" in his country. By contrast, other countries in the region, such as Belize, Costa Rica, Nicaragua, and Panama had a total of just 1,881 murders, at a rate of only 13 per 100,000. Nicaragua is particularly useful as an example: It is the second-poorest country in the region—behind only Haiti— and yet, with far lower rates of violence than the three main sending countries, it has not seen an uptick in unaccompanied children leaving.

These findings reinforce a report released by DHS that shows that many of the unaccompanied minors who have recently arrived come from some of the most dangerous cities in Central America.

# DACA or lax border enforcement is not to blame

# DACA

In fiscal year 2009, the U.S. Customs and Border Protection, or CBP, encountered slightly fewer than 20,000 unaccompanied children from Honduras, El Salvador, Guatemala, and Mexico. So far in FY 2014, more than 51,000 children have entered, with the increase almost entirely coming from Honduras, El Salvador, and Guatemala. (see Figure 2)

The sharp increase during FY 2012 has been used by senators such as Ted Cruz (R-TX) to argue that the creation of the DACA program in June 2012 is the reason "that we have seen the number of children taking the incredible risks entailed with coming across the border grow exponentially."

There are two problems with this line of thinking. For one, the increase in unaccompanied children began well before 2012. CBP estimates that between 2008 and 2009, for example, there was a 145 percent spike in unaccompanied children arrivals, jumping from 8,041 to 19,668.

But even more importantly, the U.S. fiscal year starts on October 1 and ends on September 30 of the following year. This means that FY 2012 actually started in October 2011 and ended in September 2012. Considering that applications for deferred action could only be submitted starting on August 15, 2012, it is highly unlikely that DACA caused an increase in children. Data on monthly border apprehensions—which admittedly do not distinguish between unaccompanied children and all others caught at the border—show that the number of people caught at the border actually slowed in the months after DACA was announced.

## Border enforcement

Arguments such as those of Sen. Cruz connecting DACA to the increase in unaccompanied children also cite lax border security by the Obama administration as an additional contributing factor. But these arguments, such as those about DACA, are equally unsupported by the data. To give just a few examples:

- Under the Obama administration, funding for the Border Patrol has reached record levels, increasing from $2.3 billion at the end of the Bush administration in 2008 to $3.5 billion in FY 2013—an increase of 52 percent.

- The number of Border Patrol agents in general, and at the southwest border, now stand at record levels. (see Figure 3)

If lax border security were contributing to the increase in children arriving, we would expect to see a negative relationship between border security metrics and the number of unaccompanied children entering the United States. To put it another way, we would expect more children to arrive as border security efforts decrease. Instead, the opposite has occurred: As the United States has ramped up its border enforcement, more children have come. (see Figure 4)

To be clear, this should not be interpreted to mean that more border security means more unaccompanied children—again, we only have a handful of observations to analyze. Rather, the data suggest that the recent increase in unaccompanied children is not the result of lax border security, but is occurring despite record levels of border security spending and staffing.

And from recent press reports, it is clear that our border security policies are working exactly as intended: Numerous stories note that the Border Patrol is apprehending these kids upon entry, or soon after. Here too, the evidence is clear that border enforcement policies are not driving the surge in unaccompanied children.

# Conclusion

Instead of attempting to repeal programs such as DACA, the United States should—as Sen. Robert Menendez (D-NJ) has suggested—ensure that these children are safe and secure, go after the smugglers and traffickers bringing them here in the first place, and seek solutions that help quell the violence in these children's home countries. The data show that this situation is a humanitarian and refugee issue, not an immigration issue, and all sides must not lose sight of the children themselves who are at the heart of the matter.

*Tom K. Wong is an assistant professor of political science at the University of California, San Diego.*



© 2018 - Center for American Progress

# DEF-INTERV.

# EX. 91

## R. GIL KERLIKOWSKE

Gilkerlikowske@hotmail.com

202-306-9587

4286 Massachusetts Ave NW

Washington, D.C.  20016

JUNE 2017–PRESENT
Professor of Practice, Northeastern University

JAN 2017–PRESENT
Nonresident Fellow, Rice University's Baker Institute for Public Policy

JAN 2017–MAY 2017
Resident Fellow at Harvard University's Institute of Politics at the Kennedy School

MAR 2014 – JAN 2017
Commissioner, United States Customs and Border Protection

I was nominated by President Barack Obama and unanimously confirmed by the U.S. Senate to head Customs and Border Protection (CBP).  CBP is the largest law enforcement organization in the country.  It has over 60,000 employees throughout the world and a budget of $13B.  Comprised of the Border Patrol, Air and Marine, and Field Operations, CBP has the dual responsibility of protecting our nation's borders and ensuring the efficient movement of both trade and travel.

MAY 2009 – MAR 2014
Director, White House Office of National Drug Control Policy (ONDCP)

I was nominated by President Barack Obama and confirmed by the U.S. Senate to lead the White House drug policy office.  ONDCP is responsible for establishing the policies priorities, and objectives for the Nation's drug control program.  I am charged with producing the President's National Drug Control Strategy.  The strategy directs the Nation's anti-drug efforts and establishes a program, a budget, and guidelines for cooperation among Federal, State, and local entities.  I have travelled the country extensively meeting with Governors, Mayors, Judges, law enforcement executives, community leaders, and those in treatment and recovery to rebalance our efforts and resources to focus on drug abuse as both a public health and a public safety problem.  I have met with leaders in over fifteen countries to collaborate on preventing drug abuse and to engage in law enforcement efforts to combat smuggling and transnational organized crime.

AUGUST 2000 – MAY 2009
Chief of Police, Seattle, Washington

In 2007 Seattle recorded the lowest crime rate in 40 years.  The department has over 1,900 employees to police a city of 680,000 residents.  I restructured a significant critical area that was partially responsible for the chief's position becoming available; Demonstration Management.  SPD is now requested for advice and consultation on managing crowds, from the G8 in Russia to the Presidential Inauguration.  SPD achieved National Accreditation in 2003 and 2006.  The Seattle Police Foundation was formed in 2001 and currently provides over $500,000 annually to the organization.  A Crime Scene Investigation unit was formed in 2004 and the Cold Case unit has solved a number of homicides, including one from 1969, at the time, the oldest cold case in the United States.  I implemented the first civilian oversight section for the department.  Responsibility for emergency preparedness for the entire city is a function of the department.  A state-of-the-art Emergency Operations Center was designed and opened in 2008.  New records management and computer aided dispatch systems were implemented in 2008.  The City agreed to the first comprehensive and sustainable growth in the size of the force since the 1980's.  The Seattle Police Department is regarded as one of the most professional and cutting edge big-city police departments in the United States.


JULY, 1998 – AUGUST, 2000
Deputy Director, U.S. Department of Justice, Office of Community Oriented Policing Services

This agency is responsible for providing grant funds for additional police officers and technology to local government.  As importantly, COPS supports community policing programs by providing training and educational materials to law enforcement and community groups.  I represented the Department at speaking engagements and media events throughout the country.  I was responsible for two divisions that comprise over 60 percent of the total personnel and $6 billion in federal investments.


JANUARY, 1994 – JULY, 1998
Police Commissioner, Buffalo, New York

As the first outside commissioner in 30 years, I was selected by the Mayor to restructure the organization.  The department was viewed as being isolated from the community and its culture did not support community policing.  Over the last two decades the department was not in the forefront in using modern crime prevention and control methods, training, and advanced technology.  During my tenure overall serious crime decreased by over 31%, violent crime by 46%, and homicides were reduced by 51%.  More police officers were put on the street by implementing technology and by hiring civilians.  A community policing implementation plan was developed and mini-precincts were opened.  I implemented a requirement of two years of college for new officers and an objective examination process for selecting detectives.

Two state-of-the-art district stations were opened and two more were planned and funded.  This completed realignment from 14 precincts to five districts.  I initiated a Citizen Advisory Committee, Citizen Police Academy, Youth Police Academy, and high school dialogues between officers and students that improved communication and provided closer cooperation with the community.  The Yale Child Development-Community Policing Program, an intervention for children exposed to violence, was implemented.
A random drug-testing program was negotiated with the PBA for all officers including the Commissioner and command staff.  A new process that provided easier access for citizens to make complaints was implemented.  I formed a police foundation to provide assistance to the department from the private sector.  An independent management study by the International Association of Chiefs of Police found the

department "far more contemporary, professional and effective" under my leadership.  Buffalo was honored as an All-American city.

JANUARY, 1990 – DECEMBER, 1993
Chief of Police, Fort Pierce, Florida

Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems.  Programs such as Neighborhood Oriented Patrol, Victim Assistance and Mall Watch contributed to a reduction in crime and an improved relationship between the community and the department.  A neighborhood police station was opened that provided a safe haven for a variety of programs such as scouting and after-school tutoring.  The department was selected by the Mott Foundation as one of four national sites for implementing neighborhood policing centers.  The department received the Attorney General's crime prevention award.  National accreditation was achieved.

APRIL, 1987 – JANUARY, 1990

Impact fees on new construction were implemented to pay for future police growth.  The process to achieve national accreditation was begun and a new police headquarters was designed.  The department received the Attorney General's crime prevention award.

JULY 1985, - APRIL, 1987
Commanding Officer, Lieutenant, Criminal Investigation Division, St. Petersburg, Florida

St. Petersburg is a city of a quarter million residents, and faces the same challenges as other large urban police agencies.  This division is responsible for the investigation of all major crimes. Responsibilities included management of all phases of criminal investigations, polygraph services, crime analysis, victim assistance, hostage negotiation, and a violent crimes unit.  New programs such as a weekly tactical crime meeting (a forerunner of COMPSTAT), statistical reporting format, interaction with community groups, and a management review and reallocation of personnel were implemented.

AUGUST, 1984 – JULY, 1985
Visiting Fellow, United States Department of Justice, Washington

I was the recipient of a one-year fellowship at the National Institute of Justice.  The Institute is the research arm of the Department of Justice and is on the leading edge of developments in the criminal justice field.  I was an advisor to the Director and also managed grants in excess of $3 million, including the Newport News Problem-Oriented Policing Project.  Other responsibilities included developing new programs and drafting long and short-range plans for the Law Enforcement Division.

MAY, 1980 – AUGUST, 1984
Lieutenant, Commanding, St. Petersburg Police

Over this period I commanded several key sections of the department, Field Training, Vice and Narcotics, and Internal Affairs.

FEBRUARY, 1972 – MAY, 1980
Police Officer, St. Petersburg Police

This period included patrol duty with an innovative inner-city team policing unit (a predecessor of community policing) and detective assignments in narcotics and later robbery-homicide.  I began my career in St. Petersburg as a police cadet in 1969.

FEBRUARY, 1970 – FEBRUARY, 1972
Security Team Leader, Army Military Police

Supervisor of one of the teams responsible for security of the presidential helicopter.

### *SELECTED AWARDS AND OFFICES*

Chair, National Law Enforcement Explorers Board, (2015)
Women in Federal Law Enforcement, Award for "elimination of systemic barriers" (2015)
Penrith Award, National Executive Institute Associates (2014)
John P. McGovern Award for work in preventing drug/drugged driving (2011)
Coordinating Council on Juvenile Justice and the Prevention of Delinquency (DOJ) (2011)
American Medical Association Nathan A. Davis Award (2011)
Honorary Doctorate, Human Letters, University of South Florida (2010)
President, Major Cities Chiefs Association, elected twice (2007-2009)
Community Service Award, Association of Hispanic Chambers of Commerce, (2008) (WA)
Seattle University Community Leader Award, (2008)
Police Executive Research Forum *Leadership Award*, (2006)
Brotherhood/Sisterhood Annual Award, The National Conference (Christians and Jews) (1998)
President, Police Executive Research Forum (1996-1998)
Progressive Leadership Award, Citizen Action of New York (1996)
Vice Chair, Governor's Crime Laboratory Council (FL 1991-1994)
Gary P. Hayes Award for innovation in policing, Police Executive Research Forum, (1991)
U.S. Army Presidential Service Medal (1972) Outstanding Military Police Honor Graduate (1970)

### *SELECTED PRESENTATIONS*

Naturalization Ceremony, Fanueil Hall, Boston (2016)
Australian National University symposium on policing (2007)
John Jay College of Criminal Justice, Patrick V. Murphy lecture (2007)
Community Policing, Police Service of Northern Ireland, Belfast (2005)
Presentation on anti-terrorist exercise, conference in Belfast (2003)
"The Use of Less Lethal Technology," Meeting of British Chief Constables, London (2002)
"The Use of Juvenile Curfew Laws", BBC Television, Glasgow (1997)
"Community Policing", F.B.I. International Law Enforcement Academy, Budapest (1996)
Secretary of Labor's Task Force on Labor/Management Cooperation (1995)

"Response to Urban Violence", U.S. Conference of Mayors, Houston (1992)
Testified before President's Commission on Missing Children (1986)
Speaker at annual meeting of Police Management Association, London (1985)

*SPECIAL ACTIVITIES*

Representative to International Association of Chiefs of Police Executive Board (2015)
Panel member, National Academy of Sciences National Research Council, <u>Protecting Individual Privacy in the Struggle Against Terrorists</u> (2008)
Member of the Executive Session on Policing, Harvard University (2008)
International City Management Association, editorial advisor, <u>Local Government Police Management</u>
Consultant to *Early Warning-Timely Response, A Guide to Safe Schools*, developed by the Department of Justice and the Department of Education (1998)
Adjunct faculty Seattle University (graduate program), Florida Atlantic University, Buffalo State College, St. Petersburg Community College, and Indian River Community College
International Association of Chiefs of Police Legislative Committee
U.S. Conference of Mayors Police Policy Board
Advisory board member/speaker/lecturer on numerous national criminal justice projects
Book jacket or preface; *Character and Cops (1994), Superpredators: The Demonization of Our Children by the Law (1999), Police Pursuits (2000)*

*SELECTED PUBLICATIONS/PAPERS*

President's Transnational Organized Crime Strategy (2010)
<u>Homeland Security Success through Law Enforcement Collaboration</u>, *The Police Chief (2014)*
Co-author, <u>A Comprehensive Approach to Internet Safety</u>, *The Police Chief* (2008)
Contributor, <u>Community Policing: A Contemporary Perspective</u>, 2nd edition (1998)
OP-ED, *Boston Globe*, with Elliott Richardson, on crime prevention through law enforcement partnerships to intervene in children's lives (1997)
Contributor, <u>Seeking Employment in Criminal Justice, 2nd edition</u> (1996)
Co-author of article on community surveys, *The Florida Police Chief* (1989)
Co-author of article on visiting fellowships at the Department of Justice, *The Police Chief* (1985)
Numerous OP-ED pieces

*MEDIA PRESENTATIONS*

Extensive print, digital, radio, and television interviews domestically and globally

*CIVIC INVOLVEMENT*

National Board Chair, Fight Crime: Invest in Kids (Washington, D.C. based)
Hearing, Speech and Deafness Center (Seattle)
United Way of King County, Seattle Advisory Board
Executive Board, National Conference (of Christians and Jews) (New York)
District Commissioner, Boy Scouts of America (New York and Florida)
Board of Trustees, St. Mary's School for the Deaf (New York)
Board of Directors, Fort Pierce-St. Lucie County Chamber of Commerce
Campaign Chair, United Way of St. Lucie County (Florida)
Board of Directors, Salvation Army (Seattle, New York and Florida)
Board of Directors, "Success by 6" (New York)
Teacher in adult literacy program (Florida)

Board of Trustees, Hospital Corporation of America (Port St. Lucie and Fort Pierce)
Chair, School Superintendent's Advisory Committee (Fort Pierce)
Chair, Advisory Committee of Rape Crisis Center (St. Petersburg)
Board of Directors, Center Against Spouse Abuse (St. Petersburg)


*PROFESSIONAL DEVELOPMENT*

National Executive Institute, FBI (1995)
Harvard University, John F. Kennedy School of Government
          National Executive Session on Policing (1988)
F.B.I. Law Enforcement Executive Development (1988)
F.B.I. National Academy (1984)
Florida Power Corporation, Total Quality Improvement (1988)
Senior Management Institute for Police (1983)

*EDUCATION*

Master of Arts, Criminal Justice from the University of South Florida, Tampa (1985).
          Emphasis in urban police administration.
Bachelor of Arts, Criminal Justice from the University of South Florida (1978).

# DEF-INTERV.

# EX. 92

 Official website of the Department of Homeland Security

 **U.S. Customs and Border Protection (/)**

(/)

# Southwest Border Migration FY2018

During the month of May, CBP saw a slight 1.9 percent increase overall when compared to April, but a 160 percent increase compared to May 2017.

The number of Family Units increased by 435 percent and the number of unaccompanied children (UAC) increased by 329 percent compared to May 2017.



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY18 | 34,842 | 38,996 | 40,509 | 35,817 | 36,682 | 50,296 | 50,924 | 51,912 | | | | |
| FY17 | 66,708 | 63,361 | 58,412 | 42,463 | 23,555 | 16,588 | 15,766 | 19,940 | 21,657 | 25,019 | 30,567 | 31,155 |
| FY16 | 45,507 | 45,752 | 48,737 | 33,654 | 38,309 | 46,117 | 48,502 | 55,442 | 45,722 | 46,966 | 51,961 | 56,535 |
| FY15 | 35,895 | 33,023 | 34,238 | 30,178 | 32,550 | 39,159 | 38,296 | 40,681 | 38,616 | 38,610 | 42,414 | 41,165 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,309 | 57,405 | 59,119 | 68,804 | 66,941 | 48,819 | 39,758 | 34,003 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,781 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 |

**U.S. Border Patrol Apprehensions FY2018 YTD (October 1 - May 31)**

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | UAC | 3,153 | 3,975 | 4,063 | 3,207 | 3,122 | 4,145 | 4,302 | 6,405 | 32,372 |

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Family Units | 4,837 | 7,016 | 8,120 | 5,654 | 5,475 | 8,873 | 9,653 | 9,485 | 59,113 |
| **Southwest Border Total Apprehensions** | | 25,483 | 29,086 | 28,998 | 25,978 | 26,665 | 37,385 | 38,278 | 40,344 | 252,187 |

*Tables are accurate as of 6/1/18, totals change as data is adjudicated.*

In May a total of 40,344 individuals were apprehended between ports of entry on our Southwest Border, compa
with 38,278 in April and 37,385 in March. In Fiscal Year (FY) 2017, USBP apprehended 303,916 individuals along
Southwest Border, compared to 408,870 in FY16, 331,333 in FY15, and 479,371 in FY14.

## For breakdown by Sector, visit USBP Southwest Border Apprehensions by Secto (/newsroom/stats/usbp-sw-border-apprehensions)

### Office of Field Operations Inadmissibles FY2018 YTD (October 1 - May 31)

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | UAC | 629 | 672 | 905 | 686 | 587 | 1,057 | 1,015 | 830 | 6,319 |
| | Family Units | 3,230 | 3,680 | 4,906 | 3,562 | 3,941 | 5,162 | 5,445 | 4,718 | 34,650 |
| **Southwest Border Total Inadmissibles** | | 9,360 | 9,912 | 11,511 | 9,839 | 10,020 | 12,913 | 12,690 | 11,568 | 87,800 |

*Tables are accurate as of 6/5/18, totals change as data is adjudicated.*

In May, 11,568 people presenting themselves at ports of entry on the Southwest Border were deemed inadmiss
compared to 12,690 in April, and 12,913 in March. In FY 2017 111,275 individuals were deemed inadmissible cor
to 150,825 in FY16, 114,486 in FY15 and 90,601 in FY14.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admissio
United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian
protection under our laws; and individuals who withdraw an application for admission and return to their cou
origin within a short timeframe.

## For breakdown by Field Office, visit Southwest Border Inadmissibles by Field Off (/newsroom/stats/ofo-sw-border-inadmissibles)

**Last modified:** June 20, 2018
**Tags:**  Statistics,  Unaccompanied Alien Children (UAC)


Share This Page.

# DEF-INTERV.

# EX. 93

**Annual Report**

DECEMBER 2017

# Immigration Enforcement Actions: 2016

**BRYAN BAKER**

The U.S. Department of Homeland Security (DHS) engages in immigration enforcement actions to prevent unlawful entry into the United States and to apprehend and repatriate aliens within the United States who have violated or failed to comply with U.S. immigration laws. Primary responsibility for the enforcement and administration of immigration law within DHS rests with U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). CBP primarily enforces immigration laws along the borders and at ports of entry (POEs), ICE is responsible for interior enforcement and detention and removal operations, and USCIS adjudicates applications, petitions, and requests for immigration and naturalization benefits.

## INTRODUCTION

The immigration enforcement actions covered in this report include initial enforcement actions (apprehensions by CBP U.S. Border Patrol (USBP) agents, administrative arrests by ICE officers, and determinations of inadmissibility by CBP Office of Field Operations (OFO) officers), initiation of removal proceedings, intakes into immigration detention, and repatriations (removals and returns).[1] This report provides details on the enforcement actions in Fiscal Year (FY) 2016 and changes from earlier years.[2,3]

Key findings:

• DHS apprehended 15 percent more aliens in 2016 than in 2015, driven by a 50 percent increase in apprehensions of aliens from the Northern Triangle of Central America (NTCA)[4] by USBP; apprehensions of Mexican nationals remained largely unchanged.

• Initial intakes into immigration detention increased by 15 percent; the increase was largely due to an increase in apprehensions of aliens from Northern Triangle countries, but also included large percentage increases for aliens from Haiti and Brazil.

• Removals increased slightly, including about 10,000 more Mexican nationals than in 2015 and a nearly 50 percent increase in removals of aliens from Brazil.

• Returns declined by nearly 20 percent between 2015 and 2016 and by nearly 80 percent from 2010—a long-term change largely driven by CBP's policy of removing most people apprehended at the border, rather than allowing them to voluntarily return. Returns of Mexican nationals declined by nearly 90 percent from 2010 to 2015, but only by eight percent from 2015 to 2016. The largest reductions in returns from 2015 to 2016 were for China, the Philippines, and Canada.

• The number of aliens determined to be inadmissible during inspection by OFO at the POEs increased eight percent from 2015 to 2016; notable changes included increases of more than 150 percent for the Northern Triangle and more than 600 percent for Haiti, but reductions for Canada, the Philippines, and China.

## ENFORCEMENT ACTIONS PROCESS

### Inspection Process

All aliens seeking admission at a POE are subject to inspection. CBP/OFO conducts these inspections at designated POEs and at pre-clearance locations at certain foreign ports. Applicants for admission who are determined to be inadmissible may be: permitted to voluntarily withdraw their application for admission and return to their home country; processed for expedited removal; referred to an immigration judge for

---

[1] Throughout this report, "repatriation" is used as a blanket term to include all removals and returns; it includes aliens removed to third countries, although such aliens technically were not "repatriated." This report does not include data on interdictions at sea or maritime repatriations completed by the United States Coast Guard.

[2] All years refer to fiscal years, which include all dates between October 1 of the prior calendar year and September 30 of the following year. For example, FY 2016 ran from October 1, 2015, through September 30, 2016.

[3] Statistics for FY 2010-2015 are provided for context. See the Yearbook of Immigration Statistics for additional information and longer-term trends.

[4] Northern Triangle countries include El Salvador, Guatemala, and Honduras.



**Homeland Security**

Office of Immigration Statistics

**OFFICE OF STRATEGY, POLICY & PLANS**

removal proceedings;[5] processed for a visa waiver refusal; or paroled into the United States. Aliens referred to an immigration judge for removal proceedings under section 240 of the Immigration and Nationality Act (INA) are issued a Form I-862 Notice to Appear (NTA) and may be transferred to ICE for a detention and custody determination or paroled from custody depending on the individual facts and circumstances. Aliens who apply for admission under the U.S. Visa Waiver Program (VWP) who are found to be inadmissible are refused admission without referral to an immigration judge under Section 217 of the INA, unless the alien requests asylum, withholding of removal, or protection under the U.N. Convention against Torture.

## Apprehension Process

DHS apprehensions of aliens for suspected immigration violations include "apprehensions" by USBP and "administrative arrests" by ICE. Aliens who are arrested and convicted for criminal activity, as opposed to immigration violations, might also be subject to administrative arrest by ICE at the conclusion of their criminal sentences; criminal arrests are not included in this report.[6]

Aliens who enter without inspection between POEs and are apprehended by USBP at or near the border are generally subject to removal. Adults from contiguous countries may be: permitted to return to their country of origin; removed administratively; or issued an NTA and either transferred to ICE for a detention and custody determination or released on their own recognizance. Adults from non-contiguous countries generally are transferred to ICE. Unaccompanied alien children (UAC) from contiguous countries may be permitted to return to their country of origin under certain circumstances, while other UAC are transferred through ICE to the custody of the U.S. Department of Health & Human Services (HHS).

Beginning in 2012, USBP implemented the Consequence Delivery System (CDS) across all sectors. The CDS guides USBP agents through a process designed to uniquely evaluate each subject and identify the most effective and efficient consequences to deliver in order to impede and deter further illegal activity. Examples of CDS consequences include expedited removal, lateral repatriation through the Alien Transfer Exit Program, and immigration-related criminal charges, among others.

Aliens unlawfully present in the United States and those lawfully present who are subject to removal may be identified and arrested by ICE within the interior of the United States. The agency's two primary operating components are Homeland Security Investigations (HSI) and Enforcement and Removal Operations (ERO). ICE usually identifies potentially removable aliens in the interior by working with federal, state, and local law enforcement agencies to check the immigration status of individuals who are arrested or incarcerated and also conducts targeted operations to detain certain at-large removable aliens. Aliens arrested by ICE are generally subject to the same legal framework as aliens who are apprehended by USBP.

## Benefit Denial

USCIS may issue an NTA upon determining that an alien applicant for an immigration or naturalization benefit is inadmissible or has violated immigration law under INA Sections 212 or 237. USCIS will also issue an NTA when required by statute or regulation (e.g., termination of conditional permanent resident status, referral of asylum application, termination of asylum or refugee status, or positive credible fear determination) or, in certain cases, upon the subject's request.[7]

## Detention Process

ICE/ERO makes detention and custody determinations for aliens who are arrested by ICE or who are apprehended by CBP and transferred to ICE. ICE officers base custody determinations on risk to public safety, promoting compliance with removal proceedings or removal orders (i.e., reducing flight risk), and the availability and prioritization of resources. Options available to ICE include immigration detention, supervised alternatives to detention, release on bond, or release on the alien's own recognizance, and may change at any point during the course of an alien's time in the immigration enforcement system.

## Repatriation Process

Inadmissible and removable aliens encountered by DHS may be subject to repatriation. Repatriations include removals, which carry penalties in addition to the repatriation itself, and returns, which generally do not. Removal cases can be further categorized as expedited removals, reinstatements of final orders, administrative removals, or removal orders issued during proceedings in immigration court. Penalties associated with removal may include fines and a bar of between five years and life from future lawful admission into the United States, depending upon the individual circumstances of the case. Aliens who illegally reenter following an order of removal may also be subject to criminal charges and imprisonment for up to 20 years.[8]

### Removal Proceedings

Aliens who are issued an NTA are provided an immigration removal hearing under the jurisdiction of the Executive Office for Immigration Review (EOIR) within the U.S. Department of Justice (DOJ). Removal hearings in EOIR immigration court are administrative proceedings during which aliens may present evidence before an immigration judge to establish that they are eligible to remain in the United States. Immigration judges may issue an order of removal, grant voluntary departure at the alien's expense (a form of "return"), terminate or suspend proceedings, or grant relief or protection from removal. Forms of relief from removal may include the award of an immigration benefit, such as asylum or lawful

---

[5] The immigration judge for the removal proceedings may also grant asylum or another form of relief from removal.

[6] USBP and OFO also initiate criminal charges against certain aliens who are apprehended or found inadmissible, as well as against certain people who are suspected of non-immigration-related offenses; these criminal arrests are also beyond the scope of this report.

[7] If USCIS finds an alien who has applied for an immigration benefit to be ineligible, the subject may request an appearance before an immigration judge for reconsideration.

[8] According to the United States Sentencing Commission in a 2015 report, the average sentence was 18 months (including sentences for aggravated felons who illegally reentered), offenders were deported 3.2 times on average prior to prosecution, and more than 60 percent of offenders were convicted of a criminal offense after having been previously deported (USSC, 2015).

permanent resident (LPR) status. Decisions by immigration judges can generally be appealed to the Board of Immigration Appeals, also within DOJ. Most decisions by the Board of Immigration Appeals can in turn be appealed by aliens to the appropriate federal appeals court.

### Expedited Removal

Expedited removal is a process wherein aliens are removed from the United States administratively by DHS (i.e., without appearing before an immigration judge). Expedited removal applies to three classes of aliens. First, under INA section 235(b)(1)(A)(i) DHS may expeditiously remove certain aliens who arrive at a POE without proper documentation and/or attempt to gain entry through fraud or misrepresentation. Second, under INA Section 235(b)(1)(A)(iii), DHS may use expedited removal against aliens apprehended between POEs. Although the INA permits DHS to use expedited removal for any alien who cannot prove to an immigration officer's satisfaction that the alien has been physically present in the United States continuously for the two-year period immediately prior, DHS limits this authority to aliens apprehended within 100 miles of the southwest border and within 14 days of unlawfully entering the United States.[9] Third, regulations also permit DHS to use expedited removal for aliens apprehended within two years after arriving by sea without being admitted or paroled.[10]

### Reinstatement of Final Removal Orders

Section 241(a)(5) of the INA permits DHS to reinstate final removal orders, without further hearing or review, for aliens who have been removed or departed voluntarily under an order of removal and who subsequently illegally reentered the United States. The prior order of removal is reinstated from its original date and the alien has limited ability to apply for relief under the INA.

### Administrative Removal

Section 238(b) of the INA permits DHS to administratively remove an alien if the alien has been convicted of an aggravated felony[11] and did not have LPR status at the time proceedings under this section commenced.

Aliens subject to expedited removal, reinstatement of removal, or administrative removal generally are not entitled to proceedings before an immigration judge or to consideration for administrative relief unless the alien expresses fear of being persecuted or tortured upon return to his or her home country or the alien makes a claim to certain forms of legal status in the United States. The specific procedures for establishing the right for review by an immigration judge differ for each of these three removal processes.

### Stipulated Removal

Section 240(d) of the INA permits DHS and an alien in removal proceedings to agree to forego a hearing before an immigration

judge and proceed with removal—a provision similar to a plea agreement in a criminal proceeding. An alien may stipulate to removal, thereby acknowledging being removable and agreeing to immediate departure pursuant to a removal order. The proposed stipulated removal order is then reviewed and signed by an immigration judge. The stipulated removal order carries the same penalties as other removal orders.

### Return

Returns are a form of prosecutorial discretion that may be offered as an alternative to formal removal or removal proceedings when an alien is denied entry or apprehended within the United States. For example, if a foreign vessel arrives at a POE and a crew member has an expired shore pass, that crew member would be found inadmissible, prohibited from departing the vessel, and considered to have been "returned" once the vessel departed. Other applicants for admission at a POE who are found to be inadmissible may be permitted to withdraw their applications and return to their home country in lieu of removal or removal proceedings.[12] Aliens apprehended by USBP near the border or who are otherwise potentially removable may be offered the opportunity to *voluntarily return* to their home country in lieu of removal or removal proceedings; generally such aliens waive their right to a hearing, remain in custody, and, if applicable, agree to depart the United States under supervision. Some aliens may also be permitted to voluntarily depart in lieu of removal proceedings pursuant to INA 240B; *voluntary departure* may be granted by certain ICE officials prior to the first removal proceedings hearing or by an immigration judge at or prior to the completion of proceedings. Aliens afforded voluntary departure generally depart unsupervised and at their own expense, must depart within a set period of time,[13] and may be required to post bond to ensure departure.

## DATA AND METHODS

The administrative record data used to compile this report were processed according to a set of defined rules and assumptions. To the extent possible, events were grouped into time periods according to when the event took place, rather than the date on which the case was completed, closed, or updated. Duplicate records were identified and excluded.[14] Whenever possible, statistics are presented for each year from 2010 to 2016.

The removal and return numbers included in this report are estimates. For removals, this is largely due to the absence of explicit records on removals performed by CBP Although CBP data systems indicate which aliens the agency initially intends to remove, they do not confirm the removal or provide a time and date (in contrast with ICE data systems). Returns are also estimates because a return cannot be confirmed for aliens who are returned without

---

[9] Department of Homeland Security Bureau of Customs and Border Protection, "Designating Aliens for Expedited Removal," *Federal Register*, Vol. 69, No. 154, p. 48877-48881, Aug. 11, 2004.

[10] Department of Justice, "Notice Designating Aliens Subject to Expedited Removal Under §235(b)(1)(A)(iii) of the Immigration and Nationality Act," Federal Register, Vol. 67, No. 219, p. 68924-68926, Nov. 13, 2002.

[11] The term, "aggravated felony" refers to a broad range of crimes and types of crimes which make an alien removable. See INA sections 101(a)(43) and 237(a)(2)(A)(iii) for additional details.

[12] Denial of entry for stowaways and refusals for travelers from U.S. Visa Waiver Program countries are also considered to be returns.

[13] 60 days if offered at the conclusion of proceedings, 120 days otherwise.

[14] In previous editions of this report, multiple administrative arrests or ICE removals of the same person in the same day were treated as duplicates and omitted. The impact of this data cleaning procedure was minimal (less than 0.1 percent of the total for ICE removals and one to two percent of the total for ICE/ERO administrative arrests), and the DHS Office of Immigration Statistics has discontinued this practice beginning with 2016 numbers in order to harmonize reporting with ICE.

supervision until the alien verifies his or her departure with a U.S. consulate. As a result of these limitations, previously reported estimates are routinely updated as new data become available.

Apprehension and inadmissibility data are collected in the Enforcement Integrated Database (EID) using Form I-213, Record of Removable-Inadmissible Alien, and EID Arrest Graphical User Interface for Law Enforcement (EAGLE). Data on individuals detained are collected through the ICE ENFORCE Alien Detention Module (EADM) and the ENFORCE Alien Removal Module (EARM). Data on USCIS NTAs are collected using the USCIS NTA Database. Data on individuals removed or returned are collected through both EARM and EID.

## TRENDS AND CHARACTERISTICS OF ENFORCEMENT ACTIONS

### Apprehensions

Total DHS apprehensions (i.e., including USBP apprehensions and ICE administrative arrests) increased by 15 percent from 2015 to 2016, driven by increasing apprehensions of aliens from Northern Triangle countries (see Table 1). The number of apprehensions and arrests of Mexican nationals was largely unchanged from 2015, and ICE arrests in the interior continued to decline. Altogether, DHS apprehended 530,000 aliens in 2016, compared to 460,000 in 2015.

### U.S. Border Patrol Apprehensions

USBP apprehended 415,000 aliens in 2016, nearly 80,000 and 25 percent more than the 335,000 apprehended in 2015. With apprehensions of Mexican nationals largely unchanged from 2015, the overall increase was largely the result of a surge in

apprehensions of aliens from Northern Triangle countries (see Table 2 and Figure 1). The Northern Triangle accounted for nearly 50 percent of all apprehensions in 2016, compared to only 10 percent in 2010.

Forty-five percent of the apprehensions occurred in the Rio Grande Valley sector and about 15 percent in the Tucson sector, a complete reversal from the relative shares in 2010. The turnabout was driven by a large decline in Mexican apprehensions in the Tucson sector from 2010 to 2016 and a comparable increase in apprehensions of aliens from the Northern Triangle in the Rio Grande Valley sector during the same period.



**Figure 1.**
**USBP Apprehensions for Selected Countries: Fiscal Years 2010–2016**

Source: U.S. Department of Homeland Security.

**Table 1.**

**DHS Apprehensions by Program and Country of Nationality: Fiscal Years 2010–2016**

(Countries ranked by 2016 apprehensions)

| Program and country of nationality | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016* |
|---|---|---|---|---|---|---|---|
| **PROGRAM** | | | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . . | 796,587 | 678,606 | 671,327 | 662,483 | 679,996 | 462,388 | 530,250 |
| USBP . . . . . . . . . . . . . . . . . . . . . . | 463,382 | 340,252 | 364,768 | 420,789 | 486,651 | 337,117 | 415,816 |
| Southwest sectors (sub-total) . . . . . | 447,731 | 327,577 | 356,873 | 414,397 | 479,371 | 331,333 | 408,870 |
| ICE ERO. . . . . . . . . . . . . . . . . . . . | 314,915 | 322,093 | 290,622 | 229,698 | 181,719 | 117,983 | 110,104 |
| ICE HSI . . . . . . . . . . . . . . . . . . . . | 18,290 | 16,261 | 15,937 | 11,996 | 11,626 | 7,288 | 4,330 |
| **COUNTRY OF NATIONALITY** | | | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . . | 796,587 | 678,606 | 671,327 | 662,483 | 679,996 | 462,388 | 530,250 |
| Mexico . . . . . . . . . . . . . . . . . . . . . | 632,034 | 517,472 | 468,766 | 424,978 | 350,177 | 267,885 | 265,747 |
| Guatemala. . . . . . . . . . . . . . . . . . . | 39,050 | 41,708 | 57,486 | 73,208 | 97,151 | 66,982 | 84,649 |
| El Salvador . . . . . . . . . . . . . . . . . . | 29,911 | 27,652 | 38,976 | 51,226 | 79,321 | 51,200 | 78,983 |
| Honduras. . . . . . . . . . . . . . . . . . . . | 32,501 | 31,189 | 50,771 | 64,157 | 106,928 | 42,433 | 61,222 |
| India . . . . . . . . . . . . . . . . . . . . . . . | 2,175 | 3,859 | 1,566 | 1,791 | 2,106 | 2,967 | 4,123 |
| Brazil. . . . . . . . . . . . . . . . . . . . . . . | 3,532 | 3,228 | 2,433 | 1,702 | 1,643 | 1,911 | 3,738 |
| Ecuador. . . . . . . . . . . . . . . . . . . . . | 3,890 | 3,298 | 4,374 | 5,680 | 6,276 | 3,438 | 3,472 |
| China, People's Republic. . . . . . . . . | 2,709 | 2,546 | 2,350 | 1,918 | 2,601 | 1,875 | 3,197 |
| Cuba. . . . . . . . . . . . . . . . . . . . . . . . | 4,030 | 4,801 | 4,121 | 2,809 | 2,872 | 2,281 | 3,061 |
| Dominican Republic . . . . . . . . . . . . | 5,274 | 4,433 | 4,506 | 3,893 | 3,455 | 2,797 | 2,770 |
| All others. . . . . . . . . . . . . . . . . . . . | 41,481 | 38,420 | 35,978 | 31,121 | 27,466 | 18,619 | 19,288 |

Note: "Other" includes unknown.

* The counting methodology was revised for ICE administrative arrests (apprehensions) conducted in 2016. See the Data and Methods section for details.

Source: U.S. Department of Homeland Security.

**Table 2.**
**USBP Apprehensions for Selected Countries of Nationality: FY 2010–2016**

| Country of Citizenship | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Total . . . . . . . . . . . . . . . . . . . . . | 463,382 | 340,252 | 364,768 | 420,789 | 486,651 | 337,117 | 415,816 |
| Mexico . . . . . . . . . . . . . . . . . . . . | 404,365 | 286,154 | 265,755 | 267,734 | 229,178 | 188,122 | 192,969 |
| Northern Triangle countries . . . . . . . . | 45,709 | 42,132 | 88,315 | 138,706 | 239,229 | 134,572 | 200,666 |
| All other countries . . . . . . . . . . . . | 13,308 | 11,966 | 10,698 | 14,349 | 18,244 | 14,423 | 22,181 |

Note: "Other" includes unknown.
Source: U.S. Department of Homeland Security.

Although the Rio Grande Valley has been by far the leading sector for Northern Triangle apprehensions for several years, trends in the lesser-trafficked sectors of Yuma and El Paso are also noteworthy; from 2014 to 2016, apprehensions in these two sectors increased collectively by nearly 600 percent, growing from one percent of the total in 2014 to 10 percent in 2016. Increases for unaccompanied children were even more pronounced in these sectors and could have logistical implications for USBP and ICE. Overall, about 20 to 25 percent of Northern Triangle apprehensions were unaccompanied children in 2014 to 2016, compared to only 10 to 15 percent in 2010 to 2013 (see Figure 2).

*ICE Administrative Arrests*

Administrative arrests conducted by ICE/ERO and ICE/HSI both decreased in 2016, continuing a five to six year downward trend (see Figure 3). ICE/ERO arrests fell seven percent to 110,000 from nearly 120,000 in 2015 and about 65 percent from the previous peak of 320,000 in 2011. Similarly, administrative arrests conducted by ICE/HSI declined by slightly more than 40 percent from 2015 to 2016 (from 7,000 to 4,000) and by about 75 percent from 2010 to 2016.

**Inadmissible Aliens**

During inspection of aliens seeking admission at the POEs in 2016, CBP/OFO officers found 275,000 to be inadmissible, an eight percent increase from 255,000 in 2015 (see Table 3). The increase reflects the continued upward trends for Cuba and Northern Triangle countries combined with a surge in inadmissibility determinations for Haiti. Inadmissibility determinations were largely unchanged from 2015 for Mexico and India and decreased for Canada, China, and the Philippines.

Most aliens who are found inadmissible by OFO officers at U.S. POEs fall into one of three main categories. First, a small fraction of persons who present themselves for inspection at a POE are denied for having missing, invalid, or expired documents, for having intentions prohibited by the visa (e.g., presenting a tourist visa but intending to seek employment), or for national security or public safety reasons. Thus, countries with relatively many admissions (e.g., Mexico, Canada, China, and India) also tend to have relatively many inadmissibility determinations. OFO officers may permit some of these aliens to



**Figure 2.**
**USBP Apprehensions of Aliens from Northern Triangle Countries by UAC Status: Fiscal Years 2010–2016**

Source: U.S. Department of Homeland Security.

**Figure 3.**
**ICE ERO and HSI Administrative Arrests: Fiscal Years 2010–2016\***

ICE ERO                ICE HSI

\* The counting methodology was revised for ICE administrative arrests (apprehensions) conducted in 2016. See the Data and Methods section for details.
Source: U.S. Department of Homeland Security.

**Table 3.**

**Aliens Determined Inadmissible by Mode of Travel, Country of Citizenship, and Field Office: Fiscal Years 2010–2016**

(Ranked by 2016 inadmissible aliens)

| Characteristic | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| **MODE OF TRAVEL** | | | | | | | |
| Total . . . . . . . . . . . . . | 229,575 | 213,345 | 195,804 | 205,623 | 225,016 | 254,714 | 274,617 |
| Land . . . . . . . . . . . . . . | 116,997 | 107,385 | 100,592 | 103,642 | 118,662 | 139,884 | 174,868 |
| Sea. . . . . . . . . . . . . . . | 68,254 | 66,538 | 53,774 | 52,326 | 52,695 | 49,672 | 35,327 |
| Air. . . . . . . . . . . . . . . | 44,324 | 39,422 | 41,438 | 49,655 | 53,659 | 65,158 | 64,422 |
| **COUNTRY** | | | | | | | |
| Total . . . . . . . . . . . . . | 229,575 | 213,345 | 195,804 | 205,623 | 225,016 | 254,714 | 274,617 |
| Mexico . . . . . . . . . . . . | 75,485 | 67,590 | 58,945 | 56,504 | 63,805 | 74,473 | 73,338 |
| Cuba. . . . . . . . . . . . . . | 7,456 | 7,794 | 12,290 | 17,717 | 24,301 | 43,146 | 54,226 |
| Canada . . . . . . . . . . . . | 33,155 | 32,182 | 30,786 | 29,403 | 28,100 | 26,347 | 22,120 |
| Philippines. . . . . . . . . . | 22,918 | 25,305 | 22,893 | 23,722 | 24,313 | 22,731 | 15,842 |
| Guatemala. . . . . . . . . . | 1,770 | 1,627 | 1,783 | 1,934 | 4,637 | 6,278 | 13,490 |
| China, People's Republic. . | 17,175 | 17,028 | 13,239 | 13,712 | 14,487 | 15,531 | 12,083 |
| El Salvador . . . . . . . . . | 1,100 | 862 | 1,040 | 2,198 | 3,160 | 2,828 | 9,738 |
| Honduras. . . . . . . . . . . | 1,301 | 1,084 | 1,457 | 2,197 | 5,922 | 3,235 | 7,996 |
| India . . . . . . . . . . . . . | 6,579 | 5,998 | 6,947 | 11,864 | 8,585 | 7,207 | 7,115 |
| Haiti . . . . . . . . . . . . . | 2,959 | 1,746 | 1,439 | 1,562 | 1,097 | 968 | 6,974 |
| All others . . . . . . . . . . | 59,677 | 52,129 | 44,985 | 44,810 | 46,609 | 51,970 | 51,695 |
| **FIELD OFFICE** | | | | | | | |
| Total . . . . . . . . . . . . . | 229,575 | 213,345 | 195,804 | 205,623 | 225,016 | 254,714 | 274,617 |
| Laredo, TX . . . . . . . . . | 24,443 | 25,847 | 28,212 | 32,149 | 39,699 | 52,795 | 68,014 |
| San Diego, CA . . . . . . . | 40,021 | 33,746 | 26,914 | 25,636 | 32,563 | 40,446 | 48,161 |
| El Paso, TX . . . . . . . . . | 7,898 | 6,942 | 6,981 | 7,870 | 10,185 | 12,063 | 23,552 |
| Miami, FL. . . . . . . . . . | 9,210 | 7,038 | 7,776 | 8,836 | 12,307 | 17,705 | 18,755 |
| San Francisco, CA . . . . . | 6,283 | 7,065 | 9,957 | 14,982 | 14,092 | 15,856 | 15,538 |
| New Orleans, LA. . . . . . . | 19,162 | 20,857 | 20,241 | 21,039 | 21,223 | 20,563 | 14,600 |
| Buffalo, NY . . . . . . . . . | 17,768 | 15,725 | 14,066 | 13,445 | 13,125 | 11,916 | 11,993 |
| Tucson, AZ. . . . . . . . . . | 8,744 | 7,986 | 7,674 | 10,041 | 9,014 | 9,423 | 11,835 |
| Houston, TX. . . . . . . . . | 18,966 | 19,573 | 12,786 | 10,958 | 10,492 | 11,224 | 9,820 |
| Pre-clearance[1] . . . . . . . | 9,543 | 8,604 | 8,582 | 9,707 | 10,710 | 10,763 | 8,065 |
| All others . . . . . . . . . . | 67,537 | 59,962 | 52,615 | 50,960 | 51,606 | 51,960 | 44,284 |

[1] Refers to field offices abroad.
Note: "Other" includes unknown.
Source: U.S. Department of Homeland Security.

counts increased by more than 600 percent between 2010 and 2016 (see Figure 4). For every 1,000 Cuban nationals admitted in 2016, another 1,000 were found inadmissible. Nearly 100 percent of these inadmissible Cubans were paroled into the United States.

Inadmissibility findings also increased by more than 600 percent for the Northern Triangle between 2010 and 2016. This trend roughly correlates with the border apprehension trend for Northern Triangle aliens, but with a slower start in 2011 to 2013 and a much larger percentage increase in 2016 (see Figure 5). Aliens traveling to the United States from Northern Triangle countries without official travel papers (e.g., valid passport and visa), may be found inadmissible, screened for credible fear of persecution or torture if repatriated, and paroled into the United States pending proceedings in immigration court. If an alien credibly asserts a fear of persecution or torture, an immigration judge may determine if the alien should be repatriated or granted protection under the INA and international law.

Inadmissibility determinations trended downward through 2015 for Haiti after the initial surge following the earthquake in 2010, but spiked more than 600 percent in 2016. Many of these Haitians migrated from Brazil,[15] entered the United States through San Ysidro, and claimed fear of return or requested asylum. From May through September, an average of 1,200 Haitians per month were determined to be inadmissible at the ports of entry, 1,000 per month at San Ysidro alone.[16] Most were issued an NTA with instructions to appear in immigration court and released into the United States.[17] Despite the surge, the number of inadmissible Haitians was small relative to the counts for Cuba and the Northern Triangle.

withdraw their applications for admission, but may place others in removal proceedings if, for example, the officer finds fraudulent intent or there are national security or public safety concerns. Although the numbers of inadmissibility determinations for top sending countries are large, the proportions of applicants for admission who are found inadmissible are small and comparable to the proportions for most other countries (about three per 1,000).

Second, nationals of certain countries can be paroled or released into the United States for humanitarian reasons or as a matter of foreign policy. These individuals may present themselves at a POE despite knowing that they are ineligible for lawful admission. For example, until the former U.S. "Wet Foot-Dry Foot" policy for Cuba was rescinded in January 2017, requesting asylum at a POE was a common method of economic or humanitarian migration for Cuban nationals, whether or not in possession of valid travel documents. The number of Cuban nationals found inadmissible has increased since 2009 and began to surge in 2012. In total, Cuban inadmissibility

[15] Unemployment in Brazil doubled between January 2015 and the summer Olympics in August 2016 (see https://www.pri.org/stories/2016-10-04/olympics-over-haitian-workers-are-leaving-brazil-us-big-numbers). Further, the first warnings about the Zika virus started around November 2015 and citizens began the impeachment process for then-President Dilma Rousseff in December 2015.

[16] The total number of inadmissible Haitians peaked at more than 3,500 in October 2016 before falling below 300 in February 2017.

[17] From October through August, more than 70 percent of the inadmissible Haitians were released directly into the United States and another 22 percent requested asylum or were found to have credible fear before being transferred to ICE/ERO for custody determination. In September, when DHS announced a policy shift for Haiti, 45 percent of the Haitians found to be inadmissible were slated for expedited removal and not found to have credible fear.



**Figure 4.**
**CBP OFO Inadmissibility Determinations for Selected Countries: Fiscal Years 2010–2016**

Source: U.S. Department of Homeland Security.



**Figure 5.**
**CBP OFO Inadmissibility Determinations and USBP Apprehensions of Nationals of Northern Triangle Countries: Fiscal Years 2010–2016**

Source: U.S. Department of Homeland Security.

**Table 4.**
**Notices to Appear Issued by DHS Component or Office: Fiscal Years 2010–2016**

(Ranked by 2016 notices to appear)

| DHS component or office | 2010 Number | 2010 Percent | 2011 Number | 2011 Percent | 2012 Number | 2012 Percent | 2013 Number | 2013 Percent | 2014 Number | 2014 Percent | 2015 Number | 2015 Percent | 2016 Number | 2016 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total . . . . . . . . | 260,143 | 100.0% | 250,127 | 100.0% | 235,687 | 100.0% | 224,178 | 100.0% | 273,727 | 100.0% | 191,978 | 100.0% | 270,494 | 100.0% |
| USBP . . . . . . . . | 34,986 | 13.4% | 31,739 | 12.7% | 31,506 | 13.4% | 42,078 | 18.8% | 118,753 | 43.4% | 64,775 | 33.8% | 93,146 | 35.6% |
| USCIS . . . . . . . . | 53,820 | 20.7% | 44,638 | 17.8% | 41,778 | 17.7% | 56,896 | 25.4% | 56,684 | 20.7% | 56,835 | 29.6% | 92,229 | 31.8% |
| ICE ERO. . . . . . . | 152,345 | 58.6% | 156,208 | 62.5% | 140,707 | 59.7% | 101,571 | 45.3% | 78,753 | 28.8% | 43,860 | 22.9% | 42,573 | 16.3% |
| CBP OFO . . . . . . | 18,992 | 7.3% | 17,542 | 7.0% | 21,696 | 9.2% | 23,633 | 10.5% | 19,537 | 7.1% | 26,508 | 13.7% | 42,546 | 16.3% |

Source: U.S. Department of Homeland Security.

The third major category of inadmissibility determinations is the crews of foreign vessels. Cargo operations can require visits to multiple ports, or multiple docks within a single port, and can take longer than the 29 days permitted by a D-1 crew visa. In such cases, crew members initially granted shore leave may be re-coded as inadmissible once the shore leave expires, regardless of whether or not the crew members intended or attempted to disembark the vessel. These aliens may be categorized as "detained onboard" and counted as returned (i.e., repatriated) once the vessel departs U.S. waters. Many of the inadmissibility determinations for the Philippines tend to be for crew members of foreign vessels.

In 2016, nearly 65 percent of the inadmissibility determinations occurred at land ports, compared to 55 percent in 2015. The larger share was due to a surge in inadmissibility determinations at land ports (35,000 more than in 2015, roughly the same as the increase in inadmissibility determinations for Cuba, the Northern Triangle, and Haiti) and a reduction in inadmissibility determinations at sea ports. The leading field offices were Laredo (70,000), San Diego (50,000), and El Paso (25,000). Among the 10 leading field offices,

the largest percentage increase from 2015 to 2016 occurred at El Paso (95 percent). Notably, USBP apprehensions of aliens from Northern Triangle countries in the surrounding El Paso sector tripled during the same time period.

## Notices to Appear

DHS issued 270,000 NTAs to initiate removal proceedings before an immigration judge in 2016, about 40 percent more than in 2015 (see Table 4). USBP issued about 45 percent more NTAs than in 2015, and USCIS and OFO issuances increased by more than 60 percent. ERO issuances declined only slightly, but due to the increases for USBP, OFO, and USCIS, the ERO share fell to 16 percent from 23 percent in 2015 and about 60 percent in 2010 through 2012. The increases for USBP and OFO correspond to increases in asylum seekers from the Northern Triangle and Haiti.[18,19]

---

[18] The number of asylum seekers from Cuba also increased substantially (nearly 600 percent since 2010), particularly at the ports of entry, but OFO officers transitioned from mostly issuing NTAs to these Cubans to paroling most them in without an OFO starting late in FY 2013.

[19] More than 40 percent of aliens from the Northern Triangle and 65 percent of Haitian nationals who were apprehended by USBP or were found inadmissible at a port of entry were issued an NTA.

**Table 5.**

**Initial Admissions to ICE Detention Facilities by Country of Nationality: Fiscal Years 2010–2016**

(Ranked by 2016 detention admissions)

| Country of Nationality | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Total | 358,390 | 421,312 | 464,190 | 440,540 | 425,728 | 307,342 | 352,882 |
| Mexico | 216,938 | 283,615 | 298,973 | 244,532 | 172,560 | 143,834 | 134,546 |
| Guatemala | 35,653 | 38,187 | 50,086 | 59,212 | 74,543 | 52,562 | 65,757 |
| El Salvador | 25,361 | 23,457 | 30,808 | 40,258 | 59,933 | 40,263 | 57,953 |
| Honduras | 27,742 | 26,106 | 39,859 | 50,622 | 76,708 | 34,899 | 46,753 |
| Haiti | 1,425 | 1,699 | 1,390 | 2,382 | 2,056 | 1,190 | 5,832 |
| India | 1,996 | 3,388 | 1,453 | 4,057 | 2,306 | 2,971 | 4,088 |
| Brazil | 2,889 | 2,467 | 1,920 | 1,423 | 1,376 | 1,802 | 4,056 |
| Ecuador | 3,627 | 2,929 | 3,811 | 4,717 | 5,351 | 3,097 | 3,196 |
| China, People's Republic | 2,370 | 2,289 | 1,966 | 1,729 | 2,444 | 1,880 | 3,023 |
| Dominican Republic | 4,870 | 3,987 | 3,954 | 3,538 | 3,379 | 2,757 | 2,788 |
| All others | 35,519 | 33,188 | 29,988 | 28,070 | 25,072 | 22,087 | 24,890 |

Notes: Excludes Office of Refugee Resettlement and Mexican Interior Repatriation Program facilities. "Other" includes unknown.
Source: U.S. Department of Homeland Security.

## Detentions

ICE/ERO, the agency responsible for immigration detention, booked about 350,000 aliens into detention during 2016, an increase of 15 percent from about 310,000 in 2015 (see Table 5). Detentions of Mexican nationals fell slightly to 135,000, continuing a decline from a peak of nearly 300,000 in 2012. Detentions of aliens from the Northern Triangle increased by more than 30 percent from 2015 and nearly 100 percent since 2011. Detentions of Haitians and Brazilians, typically 1,000 to 3,000 per year, increased by 390 percent and 125 percent, respectively. In 2016, Mexicans comprised about 40 percent of the total (compared to about 60 percent in 2010) and the Northern Triangle accounted for nearly 50 percent (compared to 25 percent in 2010).

## Removals and Returns

DHS repatriated about 445,000 aliens in 2016, a decline of about 10,000 from 2015. The modest drop in repatriations is notable in light of the increase in apprehensions during the same period. This disparity reflects a gap in recent years between apprehensions and repatriations in the case of aliens from Northern Triangle countries that stands in contrast to the relationship between apprehensions and repatriations in the case of Mexicans (see Figure 7). The gap for nationals of Northern Triangle countries is in part a result of the lengthy immigration court proceedings associated with asylum claims.

### Removals

DHS removed about 340,000 aliens in 2016, a small increase from about 325,000 in 2015 (see Table 6). The shares



**Figure 6.**
**ICE ERO Initial Detention Book-ins for Selected Countries: Fiscal Years 2010–2016**

Source: U.S. Department of Homeland Security.

**Table 6.**

**Aliens Removed by Component and Removal Type: Fiscal Years 2010–2016***

| Component or Removal Type | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| **APPREHENDING COMPONENT** | | | | | | | |
| Total | 381,593 | 385,778 | 415,900 | 433,034 | 405,589 | 326,962 | 340,056 |
| CBP OFO | 36,936 | 36,034 | 31,494 | 28,033 | 27,455 | 31,337 | 34,019 |
| ICE | 195,198 | 183,140 | 153,877 | 114,527 | 93,560 | 66,167 | 60,637 |
| USBP | 149,459 | 166,604 | 230,529 | 290,474 | 284,574 | 229,458 | 245,400 |
| **REMOVING COMPONENT** | | | | | | | |
| Total | 381,593 | 385,778 | 415,900 | 433,034 | 405,589 | 326,962 | 340,056 |
| CBP OFO | 31,732 | 29,655 | 21,688 | 21,384 | 20,726 | 22,862 | 26,070 |
| ICE | 302,169 | 314,453 | 345,628 | 332,213 | 301,089 | 227,698 | 228,174 |
| USBP | 47,692 | 41,670 | 48,584 | 79,437 | 83,774 | 76,402 | 85,812 |
| **REMOVAL TYPE** | | | | | | | |
| Total | 381,593 | 385,778 | 415,900 | 433,034 | 405,589 | 326,962 | 340,056 |
| Expedited Removals | 109,720 | 122,129 | 163,187 | 192,559 | 175,937 | 140,043 | 141,518 |
| Reinstatements | 122,198 | 123,535 | 143,669 | 164,508 | 159,867 | 130,671 | 143,003 |
| All other removals | 149,675 | 140,114 | 109,044 | 75,967 | 69,785 | 56,248 | 55,535 |

* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.
Note: the "all other removals" category includes removals pursuant to a standard judicial order of removal, removals pursuant to a stipulated judicial order of removal, and administrative removals.
Source: U.S. Department of Homeland Security Office of Immigration Statistics.



**Table 7.**

**Aliens Removed by Criminal Status and Country of Nationality: Fiscal Years 2010–2016**

(Ranked by 2016 aliens removed)

| Country of nationality | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent Criminal[1] | Number | Percent Criminal[1] | Number | Percent Criminal[1] | Number | Percent Criminal[1] | Number | Percent Criminal[1] | Number | Percent Criminal[1] | Number | Percent Criminal[1] |
| Total . . . . . | 381,593 | 44.5% | 385,778 | 49.0% | 415,900 | 48.1% | 433,034 | 46.0% | 405,589 | 42.6% | 326,962 | 42.7% | 340,056 | 39.9% |
| Mexico . . . . . | 272,486 | 47.1% | 286,731 | 50.6% | 301,255 | 50.3% | 308,828 | 47.5% | 266,165 | 47.5% | 235,087 | 44.9% | 245,306 | 41.7% |
| Guatemala . . | 29,709 | 31.7% | 30,343 | 38.6% | 38,899 | 34.7% | 46,948 | 32.7% | 54,247 | 25.3% | 33,398 | 31.6% | 33,729 | 31.3% |
| Honduras. . . | 25,121 | 41.5% | 22,027 | 49.1% | 31,738 | 43.5% | 36,591 | 45.4% | 40,633 | 34.5% | 20,334 | 42.2% | 21,891 | 39.0% |
| El Salvador . . | 20,346 | 41.1% | 17,379 | 48.9% | 18,992 | 45.5% | 20,921 | 45.2% | 26,895 | 33.5% | 21,610 | 33.1% | 20,127 | 33.2% |
| Colombia. . . . | 2,402 | 51.7% | 1,899 | 55.2% | 1,591 | 66.3% | 1,440 | 66.7% | 1,348 | 63.7% | 1,571 | 49.7% | 2,052 | 36.4% |
| Dominican Republic | 3,371 | 66.5% | 2,892 | 74.1% | 2,866 | 76.1% | 2,297 | 78.8% | 2,066 | 79.4% | 1,897 | 81.0% | 1,949 | 75.0% |
| Brazil. . . . . . | 3,533 | 13.8% | 3,350 | 16.4% | 2,397 | 17.7% | 1,449 | 25.4% | 952 | 29.8% | 1,008 | 28.9% | 1,485 | 21.6% |
| Ecuador. . . . | 2,385 | 29.0% | 1,716 | 41.0% | 1,763 | 40.0% | 1,510 | 38.7% | 1,528 | 37.0% | 1,441 | 33.9% | 1,399 | 32.8% |
| Jamaica. . . . . | 1,481 | 78.9% | 1,473 | 83.2% | 1,319 | 87.2% | 1,108 | 90.0% | 1,035 | 80.0% | 866 | 74.0% | 1,069 | 57.0% |
| Nicaragua . . . | 1,903 | 42.2% | 1,502 | 46.3% | 1,400 | 52.2% | 1,346 | 51.6% | 1,296 | 49.2% | 922 | 47.9% | 872 | 44.3% |
| All other countries . . . . | 18,856 | 34.0% | 16,466 | 39.0% | 13,680 | 47.3% | 10,596 | 50.5% | 9,424 | 49.4% | 8,828 | 41.2% | 10,177 | 34.2% |

* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.

[1] Refers to persons removed who have a prior criminal conviction.

Notes: Excludes criminals removed by Customs and Border Protection (CBP) because criminality data are not reliably collected. "Other" includes unknown.

Source: U.S. Department of Homeland Security.

of removals conducted by each component were largely unchanged from 2015; ICE removed more than 65 percent, USBP removed about 25 percent, and CBP/OFO removed the remainder. As in 2015, nearly 85 percent were expedited removals or reinstatement of prior removal orders. In most of the remaining 55,000 cases, the alien had a case in immigration court.[20] About 95 percent of all removals were of Mexican nationals or aliens from Northern Triangle countries.

The share of initial apprehensions among aliens removed in 2016 was largely unchanged from 2015, but changed substantially from 2010 to 2016 (*see* Figure 8). More than 70 percent of all aliens removed in 2016 were apprehended by USBP, compared to only about 40 percent in 2010. Conversely, fewer than 20 percent of aliens removed in 2016 were initially arrested by ICE, compared to about 50 percent in 2010. One factor contributing to this shift has been USBP's increased use of removal as a consequence for border apprehensions.

About 40 percent of all aliens removed in 2016 had a prior criminal conviction (*see* Table 7).[21] Slightly more than 40 percent of all Mexican nationals who were removed in 2016 had a prior criminal



**Figure 7.**

**DHS Apprehensions and Repatriations for Selected Countries: Fiscal Years 2010–2016***

* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.
Source: U.S. Department of Homeland Security.

conviction, compared to about 50 percent in 2010 through 2014. The proportion of aliens with prior criminal convictions also fell substantially for Colombia and Jamaica. As with removals overall, about 95 percent of criminal removals were of nationals of Mexico and Northern Triangle countries. The types of crime were unchanged from 2015; 35 percent were immigration offenses, 17 percent were related to dangerous drugs, 13 percent were traffic offenses, and 10 percent were assault (*see* Table 8).

[20] Persons convicted of an aggravated felony and administratively removed did not receive a hearing in immigration court; persons stipulating to removal had a hearing scheduled, but waived their rights to trial.

[21] The criminal percentage is much higher (90 to 95 percent in FY 2013 to 2016) among removals of subjects administratively arrested by ICE. The lower criminal percentage among all DHS removals results from a lower criminal percentage among border apprehensions than among arrests in the interior and less complete information on criminality for subjects removed by USBP.

## Returns

DHS returned about 25,000 fewer aliens to their home countries without an order of removal in 2016 than in 2015 (see Table 9). CBP/OFO returns fell by about 20 percent, due in part to a reduction in crew of foreign vessels determined to be inadmissible at sea ports. Despite the decrease, OFO continued to account for nearly 80 percent of all returns.[22] USBP returns did not change from 2015 to 2016, having already fallen nearly 95 percent from 2010 to 2015 as the Consequence Delivery System (CDS) guided the agency to focus on removal as a more effective means of discouraging illegal immigration (see Figure 9).[23] Slightly more than half of all aliens returned to their home countries were Mexican or Canadian.

---

[22] From 2010 through 2016, 90 to 95 percent of OFO returns each year were of inadmissible aliens who were allowed to withdraw their application for admission or crew of foreign vessels detained onboard.

[23] See Capps et al, 2017, for a recent review of the CDS.



**Figure 8.**
**Aliens Removed by Initial Apprehending Component: Fiscal Years 2010–2016\***

\* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.
Source: U.S. Department of Homeland Security.

**Table 8.**
**Criminal Aliens Removed by Crime Category: Fiscal Years 2010–2016**

(Ranked by 2016 criminal aliens removed)

| Crime Category | 2010 Number | 2010 Percent | 2011 Number | 2011 Percent | 2012 Number | 2012 Percent | 2013 Number | 2013 Percent | 2014 Number | 2014 Percent | 2015 Number | 2015 Percent | 2016* Number | 2016* Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total . . . . . | 169,656 | 100.0% | 188,964 | 100.0% | 200,143 | 100.0% | 198,981 | 100.0% | 172,739 | 100.0% | 139,633 | 100.0% | 135,570 | 100.0% |
| Immigration[1] . | 31,828 | 18.8% | 37,606 | 19.9% | 47,616 | 23.8% | 62,364 | 31.3% | 54,546 | 31.6% | 45,886 | 32.9% | 47,066 | 34.7% |
| Dangerous Drugs[2]. . . . . . | 42,890 | 25.3% | 43,378 | 23.0% | 42,679 | 21.3% | 30,688 | 15.4% | 28,452 | 16.5% | 24,129 | 17.3% | 23,217 | 17.1% |
| Traffic Offenses[3] . . . | 31,062 | 18.3% | 43,154 | 22.8% | 46,162 | 23.1% | 29,945 | 15.0% | 24,733 | 14.3% | 18,585 | 13.3% | 18,157 | 13.4% |
| Assault . . . . . | 12,175 | 7.2% | 12,783 | 6.8% | 13,045 | 6.5% | 20,244 | 10.2% | 17,809 | 10.3% | 14,536 | 10.4% | 13,239 | 9.8% |
| Weapon Offenses . . . . | 2,814 | 1.7% | 2,730 | 1.4% | 2,513 | 1.3% | 5,310 | 2.7% | 4,581 | 2.7% | 3,769 | 2.7% | 3,757 | 2.8% |
| Burglary. . . . . | 4,213 | 2.5% | 3,808 | 2.0% | 3,569 | 1.8% | 5,521 | 2.8% | 4,761 | 2.8% | 3,776 | 2.7% | 3,495 | 2.6% |
| Larceny . . . . . | 5,459 | 3.2% | 5,728 | 3.0% | 5,428 | 2.7% | 5,303 | 2.7% | 4,363 | 2.5% | 3,160 | 2.3% | 2,832 | 2.1% |
| Sexual Assault | 3,268 | 1.9% | 3,576 | 1.9% | 3,353 | 1.7% | 3,176 | 1.6% | 2,985 | 1.7% | 2,562 | 1.8% | 2,494 | 1.8% |
| Fraudulent Activities . . . . | 3,889 | 2.3% | 4,232 | 2.2% | 3,879 | 1.9% | 5,196 | 2.6% | 3,922 | 2.3% | 2,956 | 2.1% | 2,437 | 1.8% |
| Obstructing Police . . . . . | 1,896 | 1.1% | 2,294 | 1.2% | 2,508 | 1.3% | 2,934 | 1.5% | 2,436 | 1.4% | 1,911 | 1.4% | 2,054 | 1.5% |
| All others. . . . | 30,162 | 17.8% | 29,675 | 15.7% | 29,391 | 14.7% | 28,300 | 14.2% | 24,151 | 14.0% | 18,363 | 13.2% | 16,822 | 12.4% |

\* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.

[1] Including entry and reentry, false claims to citizenship, and alien smuggling.

[2] Including the manufacturing, distribution, sale, and possession of illegal drugs.

[3] Including hit and run and driving under the influence.

Notes: Excludes criminals removed by Customs and Border Protection (CBP) because criminality data are not reliably collected. "Other" includes unknown.

Source: U.S. Department of Homeland Security.

## FOR MORE INFORMATION

For more information about immigration and immigration statistics, visit the Office of Immigration Statistics website at www.dhs.gov/immigration-statistics.

## REFERENCES

Capps, Randy, Faye Hipsman, and Doris Meissner, 2017. "Advances in U.S.-Mexico Border Enforcement: A Review of the Consequence Delivery System," Migration Policy Institute.

U.S. Department of Homeland Security, forthcoming. "2016 Yearbook of Immigration Statistics," Office of Immigration Statistics, U.S. Department of Homeland Security.

U.S. Sentencing Commission, 2015. "Illegal Reentry Offenses," retrieved from https://www.ussc.gov/research/research-publications/illegal-reentry-offenses.



**Figure 9.**

**Ratio of Removals or Returns to DHS Apprehensions: Fiscal Years 2010–2016\***

* The counting methodology was revised for ICE removals conducted in 2016. See the Data and Methods section for details.
Note: The percentages represent ratios, not rates or proportions, because some persons removed or returned in the given year may not have been apprehended in the same year.
Source: U.S. Department of Homeland Security.

**Table 9.**

**Aliens Returned by Component and Country of Nationality: Fiscal Years 2010–2016**

| Characteristic | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **COMPONENT** | | | | | | | | | | | | | | |
| Total . . . . . | 474,166 | 100.0% | 322,073 | 100.0% | 230,333 | 100.0% | 178,663 | 100.0% | 163,223 | 100.0% | 129,429 | 100.0% | 106,167 | 100.0% |
| CBP OFO . . . . | 143,531 | 30.3% | 130,979 | 40.7% | 109,441 | 47.5% | 104,237 | 58.3% | 108,729 | 66.6% | 104,988 | 81.1% | 82,723 | 77.9% |
| USBP . . . . . . | 248,167 | 52.3% | 113,852 | 35.3% | 58,171 | 25.3% | 38,677 | 21.6% | 40,340 | 24.7% | 16,162 | 12.5% | 16,094 | 15.2% |
| ICE . . . . . . . | 82,468 | 17.4% | 77,242 | 24.0% | 62,721 | 27.2% | 35,749 | 20.0% | 14,154 | 8.7% | 8,279 | 6.4% | 7,350 | 6.9% |
| **COUNTRY** | | | | | | | | | | | | | | |
| Total . . . . . | 474,166 | 100.0% | 322,073 | 100.0% | 230,333 | 100.0% | 178,663 | 100.0% | 163,223 | 100.0% | 129,429 | 100.0% | 106,167 | 100.0% |
| Mexico . . . . . | 353,791 | 74.6% | 205,110 | 63.7% | 131,935 | 57.3% | 88,209 | 49.4% | 72,312 | 44.3% | 40,528 | 31.3% | 37,190 | 35.0% |
| Canada . . . . . | 29,142 | 6.1% | 28,273 | 8.8% | 27,038 | 11.7% | 23,965 | 13.4% | 23,256 | 14.2% | 22,541 | 17.4% | 18,410 | 17.3% |
| Philippines . . . | 21,413 | 4.5% | 23,150 | 7.2% | 20,903 | 9.1% | 21,526 | 12.0% | 22,161 | 13.6% | 20,426 | 15.8% | 13,601 | 12.8% |
| China . . . . . | 16,449 | 3.5% | 16,234 | 5.0% | 11,778 | 5.1% | 11,688 | 6.5% | 12,238 | 7.5% | 12,796 | 9.9% | 8,632 | 8.1% |
| India . . . . . . | 4,695 | 1.0% | 4,136 | 1.3% | 3,273 | 1.4% | 2,467 | 1.4% | 2,803 | 1.7% | 2,385 | 1.8% | 2,421 | 2.3% |
| Ukraine . . . . . | 4,415 | 0.9% | 4,111 | 1.3% | 2,589 | 1.1% | 2,609 | 1.5% | 3,046 | 1.9% | 2,662 | 2.1% | 2,059 | 1.9% |
| Burma . . . . . . | 3,951 | 0.8% | 2,582 | 0.8% | 2,337 | 1.0% | 1,920 | 1.1% | 1,888 | 1.2% | 2,012 | 1.6% | 1,444 | 1.4% |
| Turkey . . . . . | 1,802 | 0.4% | 1,879 | 0.6% | 1,226 | 0.5% | 1,033 | 0.6% | 1,095 | 0.7% | 1,094 | 0.8% | 982 | 0.9% |
| Korea, South . | 1,561 | 0.3% | 1,619 | 0.5% | 1,191 | 0.5% | 1,259 | 0.7% | 1,242 | 0.8% | 1,182 | 0.9% | 898 | 0.8% |
| Russia. . . . . . | 3,189 | 0.7% | 3,512 | 1.1% | 2,441 | 1.1% | 1,997 | 1.1% | 1,900 | 1.2% | 1,490 | 1.2% | 886 | 0.8% |
| All other countries . . . . | 33,758 | 7.1% | 31,467 | 0.5% | 25,622 | 11.1% | 21,990 | 12.3% | 21,282 | 13.0% | 22,313 | 17.2% | 19,644 | 18.5% |

* The counting methodology was revised for ICE returns conducted in 2016. See the Data and Methods section for details.
Note: "Other" includes unknown.
Source: U.S. Department of Homeland Security.

# DEF-INTERV.

# EX. 94



# Fiscal Year 2017 ICE Enforcement and Removal Operations Report

**Overview**

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities in Fiscal Year (FY) 2017. ERO identifies, arrests, and removes aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. ICE shares responsibility for administering and enforcing the nation's immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services.

On January 25, 2017, the President Donald J. Trump issued Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States* (EO), which set forth the Administration's immigration enforcement and removal priorities. The Department of Homeland Security's (DHS) February 20, 2017 memorandum, *Enforcement of the Immigration Laws to Serve the National Interest* (implementation memorandum) provided direction for the implementation of the policies set forth in the EO. The EO and implementation memorandum expanded ICE's enforcement focus to include removable aliens who (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Department has directed that classes or categories of removable aliens are no longer exempted from potential enforcement.

The EO and implementation memorandum highlight the critical importance of interior enforcement in protecting national security and public safety and upholding the rule of law. This report presents and analyzes ICE ERO's FY2017 year-end statistics and illustrates how ICE ERO successfully fulfilled its mission in furthering the policies set forth in the EO and implementation memorandum.

**FY2017 Enforcement and Removal Statistics**

As directed in the EO and implementation memorandum, ICE no longer exempts classes or categories of removable aliens from potential enforcement. This policy change is reflected in ERO's FY2017 enforcement statistics, which show increases in the following enforcement actions: (1) ICE ERO administrative arrests; (2) book-ins of aliens to ICE detention facilities resulting from ICE arrests; and (3) ICE ERO removals of aliens as a result of ICE's interior enforcement. The trend of increased enforcement actions began shortly after the change in administration on January 20, 2017, and this date is used throughout the report for the purposes of data reporting. In each of the aforementioned areas, there was a net increase over the prior fiscal year.

**ICE ERO Administrative Arrests**

An administrative arrest is the arrest of an alien for a civil violation of the immigration laws, which is subsequently adjudicated by an immigration judge or through other administrative processes. With 143,470 administrative arrests in FY2017, ICE ERO recorded its greatest number of administrative arrests as compared with the past three fiscal years.[1] There were 33,366 more administrative arrests in FY2017 than in FY2016, representing a 30 percent increase, as seen in Figure 1.

**Figure 1. FY2015 – FY2017 ERO Administrative Arrests**



Administrative arrests began to increase after January 25, 2017, when the EO was issued, as shown in Figure 2. The analysis of administrative arrests conducted per week shows an elevated level of enforcement as compared with FY2016, beginning just after the new Administration took office during FY2017. This illustrates ERO's prompt response to the direction set forth by the EO.

**Figure 2. FY2016 and FY2017 ERO Administrative Arrests per week Comparison**

The increase in ERO administrative arrests following the EO accounts for the increase in total ERO FY2017 arrests. Figure 3 shows the total ERO arrests from the start of the new Administration to the end of FY2017 compared to the same timeframe in FY2016; the number of administrative arrests rose from 77,806 to 110,568, a 42 percent increase. In fact, ERO arrested more aliens in FY2017 over this period than in all of FY2016. According to ICE's system of record, of the 110,568 ERO administrative arrests

---

[1] ERO administrative arrests include all ERO programs. All statistics are attributed to the current program of the processing officer of an enforcement action.

from January 20 to September 30, 2017, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive, or were processed with a reinstated final order.[2]

**Figure 3. FY2016 and FY2017 ERO Administrative Arrests from January 20 to End of FY**



*Administrative Arrests of Criminal vs. Non-Criminal Aliens*

An administrative arrest of a criminal alien is the arrest of an alien with a known criminal conviction. ICE remains committed to targeting such aliens for arrest and removal. ERO arrested 105,736 criminal aliens in FY2017, resulting in a 12 percent (10,985) increase over FY2016, as seen in Figure 4.

**Figure 4. FY2015 – FY2017 ERO Administrative Arrests of Criminal Aliens**

Table 1 provides a breakdown of total administrative arrests for FY2017, by those with known criminal convictions, those without a known conviction and with criminal charges pending final disposition, and those without a known criminal conviction or pending charges. An alien with both criminal convictions and pending criminal charges is only counted in the criminal conviction category. The vast majority of ERO's arrests were of convicted criminals or aliens with criminal charges. A relatively small percentage (11 percent) of the arrested alien population had no known criminal convictions or charges. These results clearly reflect ERO's success in expanding its efforts to address all illegal aliens encountered in the course

---

[2] ICE ERO defines "fugitive" as any alien who has failed to depart the United States following the issuance of a final order of removal, deportation or exclusion, or who has failed to report to ICE after receiving notice to do so.

3

of its operations, while still prioritizing its enforcement resources on those who pose a known threat to national security and public safety.

Table 2 shows the criminal background of arrested aliens and includes criminal charges and convictions in ICE's system of record for those administratively arrested in FY2017. Only criminal charge categories with at least 1,000 total convictions and charges are included in this table. Because this was a new area of focus and a new measure in FY2017, comparison to previous fiscal years is not possible at this time.

**Table 1. FY2017 ERO Administrative Arrests by Criminality**

| ERO Administrative Arrests by Criminality | | |
|---|---|---|
| Criminality | Arrests | % of Total |
| Criminal Convictions | 105,736 | 73.7% |
| Pending Criminal Charges | 22,256 | 15.5% |
| No Known Criminal Charges or Convictions | 15,478 | 10.8% |
| Total Arrests | 143,470 | 100.0% |

**Table 2. FY2017 Total ERO Administrative Arrests Criminal Charges and Convictions[3]**

| Criminal Charge Category | Criminal Charges | Criminal Convictions | Total |
|---|---|---|---|
| Traffic Offenses - DUI | 20,562 | 59,985 | **80,547** |
| Dangerous Drugs | 19,065 | 57,438 | **76,503** |
| Immigration | 10,389 | 52,128 | **62,517** |
| Traffic Offenses | 24,438 | 43,908 | **68,346** |
| Assault | 16,535 | 31,919 | **48,454** |
| Larceny | 4,438 | 15,918 | **20,356** |
| Obstructing Judiciary, Congress, Legislature, Etc. | 9,623 | 11,655 | **21,278** |
| General Crimes | 6,623 | 10,702 | **17,325** |
| Burglary | 2,574 | 10,262 | **12,836** |
| Obstructing the Police | 4,640 | 9,976 | **14,616** |
| Fraudulent Activities | 3,476 | 8,922 | **12,398** |
| Weapon Offenses | 2,913 | 8,260 | **11,173** |
| Public Peace | 3,592 | 7,336 | **10,928** |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,631 | 5,033 | **6,664** |
| Invasion of Privacy | 1,904 | 4,830 | **6,734** |
| Stolen Vehicle | 1,496 | 4,678 | **6,174** |
| Robbery | 1,020 | 4,595 | **5,615** |
| Family Offenses | 1,985 | 3,934 | **5,919** |
| Forgery | 1,442 | 3,768 | **5,210** |
| Sexual Assault | 1,413 | 3,705 | **5,118** |
| Stolen Property | 1,168 | 3,176 | **4,344** |
| Damage Property | 1,421 | 2,681 | **4,102** |
| Flight / Escape | 937 | 2,319 | **3,256** |
| Liquor | 1,675 | 2,313 | **3,988** |
| Health / Safety | 539 | 1,548 | **2,087** |
| Homicide | 355 | 1,531 | **1,886** |
| Kidnapping | 710 | 1,317 | **2,027** |
| Commercialized Sexual Offenses | 577 | 995 | **1,572** |
| Threat | 495 | 847 | **1,342** |

---

[3] The criminality displayed includes all criminal charges and convictions for FY2017 ERO administrative arrests entered into ICE's system of record at the time of the data run. An alien may have more than one criminal charge or criminal conviction in a fiscal year, and all relevant charges and convictions for each arrest are included. As such, the total number of criminal charges and convictions is greater than the total number of aliens administratively arrested.

4

*Notes:* Immigration crimes include "illegal entry," "illegal reentry," "false claim to U.S. citizenship," and "alien smuggling." "Obstructing Judiciary& Congress& Legislature& Etc." refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear.  "General Crimes" include the following National Crime Information Center (NCIC) charges: Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

Administrative arrests of non-criminals (i.e., those aliens without a criminal conviction on record at the time of arrest) comprised 26 percent of total ICE ERO administrative arrests in FY2017. Table 3 shows a breakdown of non-criminal arrests with and without criminal charges. A total of 59 percent of non-criminal arrests during FY2017 had unresolved criminal charges at the time of their arrest. Table 4 illustrates that the percentage of non-criminal arrests with unresolved charges was higher (62 percent) in the time period after the EO was issued. Of non-criminal aliens arrested in FY2017, 57 percent were processed with a notice to appear, and 23 percent were ICE fugitives or subjects who had been previously removed and served an order of reinstatement.

**Table 3. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type**

| ERO Administrative Arrest Type | FY2017 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **37,734** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **22,256** | **59.0%** |
| *Notice to Appear* | *13,860* | *36.7%* |
| *Fugitives* | *1,808* | *4.8%* |
| *Reinstatement* | *2,994* | *7.9%* |
| *Other* | *3,594* | *9.5%* |
| **No Criminal Arrests/Charges** | **15,478** | **41.0%** |
| *Notice to Appear* | *7,643* | *20.3%* |
| *Fugitives* | *2,350* | *6.2%* |
| *Reinstatement* | *1,695* | *4.5%* |
| *Other* | *3,790* | *10.0%* |

**Table 4. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type from January 20, 2017 to End of FY**

| ERO Administrative Arrest Type | FY2017 01/20/17 - 09/30/17 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **31,888** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **19,757** | **62.0%** |
| *Notice to Appear* | *12,622* | *39.6%* |
| *Fugitives* | *1,585* | *5.0%* |
| *Reinstatement* | *2,572* | *8.1%* |
| *Other* | *2,978* | *9.3%* |
| **No Criminal Arrests/Charges** | **12,131** | **38.0%** |
| *Notice to Appear* | *5,927* | *18.6%* |
| *Fugitives* | *2,072* | *6.5%* |
| *Reinstatement* | *1,440* | *4.5%* |
| *Other* | *2,692* | *8.4%* |

*At-Large Arrests*

5

An ERO at-large arrest is conducted in the community, as opposed to in a custodial setting such as a prison or jail.[4] The total number of at-large arrests increased after the EO was issued, particularly in those areas that do not honor ICE detainers or limit or restrict ICE's access to their jail population. Figure 5 shows that total at-large arrests in FY2017 increased to 40,066 from 30,348 in FY2016. Figure 6 shows the increase in at-large arrests in the time period after January 20 for both FY2016 and FY2017. In this time frame, ICE ERO conducted 31,663 at-large arrests in FY2017 as compared to 22,094 in FY2016.

**Figure 5. FY2015 – FY2017 ERO At-Large Administrative Arrests**



---

[4] ERO administrative arrests reported as "at-large" include records from all ERO Programs with Arrest Methods of Located, Non-Custodial Arrest, or Probation and Parole.

6

**Figure 6. FY2016 and FY2017 ERO Administrative At-Large Arrests, from January 20 to End of FY**



**Table 5. FY2016 and FY2017 ERO Administrative At-Large Arrests by Criminality**

| FY2016-2017 ERO At Large Administrative Arrests by Criminality | | |
|---|---|---|
| Criminality | FY2016 | FY2017 |
| Convicted Criminal | 24,850 | 26,466 |
| Non-Criminal Immigration Violators | 5,498 | 13,600 |
| Total | 30,348 | 40,066 |

**Detainers**

A detainer is a request that the receiving law enforcement agency both notify DHS as early as practicable, at least 48 hours, if possible, before a removable alien is released from criminal custody, and also maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise have been released to allow DHS to assume custody for removal purposes. ICE issues detainers to federal, state, and local law enforcement agencies only after establishing probable cause to believe that the subject is an alien who is removable from the United States and to provide notice of ICE's intent to assume custody of a subject detained in that law enforcement agency's custody. The detainer facilitates the custodial transfer of an alien to ICE from another law enforcement agency. This process helps avoid the potential risk of danger to ICE officers and to the general public by allowing arrests to be made in a controlled, custodial setting as opposed to at-large arrests in the community.

The cooperation ICE receives from other law enforcement agencies is critical to its ability to identify and arrest aliens who pose a risk to public safety or national security. While some jurisdictions do not cooperate with ICE as a matter of policy, others agree that increasing cooperation is beneficial, but decline to do so based upon litigation concerns. Although not legally required, as a matter of policy, all detainers issued by ICE must be accompanied by either:  (1) a properly completed Form I-200 (Warrant

7

for Arrest of Alien) signed by a legally authorized immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by a legally authorized immigration officer. These forms help to mitigate future litigation risk and will further ICE's efforts to ensure that our law enforcement partners can honor detainers.

*Issued Detainers*

The number of detainers issued by ERO officers substantially increased following the EO. Figure 8 shows that ERO issued 112,493 detainers in the time period beginning with the new Administration, as opposed to 62,192 during the same time period from the previous fiscal year, an 81 percent increase. Figure 7 shows the number of detainers issued over the past three fiscal years. In FY2017, ERO issued 142,356 detainers, up 65 percent from 86,026 in FY2016, which demonstrates ERO's commitment to taking enforcement action on all illegal aliens it encounters, as directed by the EO. The rise in detainers issued shows a more active approach to interior enforcement, particularly for those aliens involved in criminal activity, despite continued opposition from some state and local jurisdictions.

**Figure 7. FY2015 – FY2017 ERO Detainers Issued**



**Figure 8. FY2016 and FY2017 ERO Detainers Issued from January 20 to End of FY**



*Declined Detainers*

ICE records a detainer as declined when a law enforcement agency fails to maintain custody of an alien for up to 48 hours, as requested on Form I-247A (Immigration Detainer – Notice of Action), and instead releases the alien into the community. ERO is working to ensure that these aliens, many of whom may reoffend, are not released from custody. For example, in a new approach, DHS and ICE, in coordination with the Department of Justice, have taken actions to support our state and local partners when they face legal challenges for lawfully cooperating with ICE detainers, including by filing statements of interest and amicus briefs before the courts.

In FY2017, law enforcement agencies declined 8,170 ERO detainers, as compared with 3,623 in FY2016, as seen in Table 5. This is the greatest number of declined detainers over the last three fiscal years. Despite intensified efforts to locate and arrest these aliens—many of whom are convicted criminals— ERO was only able to arrest 6 percent of them in FY17.  While this is a 67 percent increase over FY2016, this further illustrates the public safety threat posed by those sanctuary jurisdictions that refuse to cooperate with ICE's enforcement efforts, as 7,710 illegal and criminal aliens remain at-large as a direct result of these policies.

**Table 5. FY2015 – FY2017 Declined Detainers and Subsequent ERO Administrative Arrests**

| Time Frame | Declined Detainers | Individuals with a Declined Detainer and a Later Arrest |
|---|---|---|
| FY 2015 | 7,369 | 1,045 |
| FY 2016 | 3,623 | 275 |
| FY 2017 | 8,170 | 460 |
| Between 1/20/2016 and 9/30/2016 | 2,267 | 181 |
| Between 1/20/2017 and 9/30/2017 | 7,232 | 376 |

9

**Initial Book-ins to ICE Custody**

An initial book-in is the first book-in to an ICE detention facility to begin a new detention stay. This population includes aliens initially arrested by CBP and transferred to ICE for removal. While *overall* ICE initial book-ins declined in FY2017, the proportion of those book-ins resulting from ICE's interior enforcement efforts increased in FY2017, as seen in Figure 9. ICE book-ins since the new Administration were 42 percent higher in FY2017 than during the same time period in FY2016, rising from 75,946 to 108,077, as seen in Figure 10.

**Figure 9. FY2015 - FY2017 Initial Book-ins from ICE Interior Programs**



**Figure 10. FY2016 and FY2017 Initial Book-ins from ICE Interior Programs for January 20 to End of FY**



Figure 11 shows the number of book-ins resulting from interior and border enforcement efforts across the past three fiscal years.[5] Border enforcement book-ins dropped 25 percent in FY2017 compared to FY2016, while book-ins from ICE arrests increased 29 percent over that time.

---

[5] Border enforcement efforts represent records that were processed by Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea.

**Figure 11. FY2015 – FY2017 Initial Book-ins to ICE Detention by Arresting Agency**



## Removals

A removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal.[6] Similar to the trends of ERO administrative arrests and book-ins, removals tied to ICE arrests increased during FY2017, especially from the start of the new Administration. Figure 12 shows a 37 percent increase in removals tied to interior ERO arrests when comparing January 20, 2016 through end of FY2016 with the same time period in FY2017.

**Figure 12. FY2016 and FY2017 ICE Interior Removals for January 20 to End of FY**



---

[6] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VR after June 1st, 2013 and not detained by ICE are primarily processed by the U.S. Border Patrol. CBP should be contacted for those statistics.

11

Figure 13 shows the removals over the past three fiscal years as a result of an ICE arrest. While total removals declined from 240,255 in FY2016 to 226,119 in FY2017, the proportion resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals in FY2017. Despite the 6 percent decline in overall removals as shown in Figure 14, ICE removed 25 percent more aliens arrested during interior enforcement activities in FY2017 compared to the previous year. This surge in interior removals nearly offset the 17 percent decline in border removals, which mirrored the trend of fewer book-ins of border apprehensions.

The decrease in ICE's overall removal numbers from FY2016 to FY2017 was primarily due to the decline in border apprehensions in 2017. Many fewer aliens were apprehended at the border in FY2017 than in FY2016—possibly reflecting an increased deterrent effect from ICE's stronger interior enforcement efforts. The drop in border apprehensions contributed to a decrease in total ICE-ERO removal numbers, as the majority of aliens arriving at the border are processed under the provisions of expedited removal and are removed quickly, while aliens arrested in the interior are more likely to have protracted immigration proceedings and appeals, which delays the issuance of an executable final order of removal. These cases also frequently require a more complex and lengthy process to obtain travel documents, further delaying the process.

**Figure 13. FY2015 – FY2017 ICE Interior Removals**



**Figure 14. FY2015 – FY2017 ICE Removals**



12

Figure 15 provides a summary of ICE-ERO removals for the past three fiscal years, broken down by interior versus border arrests, as well as criminals versus non-criminals. The drop in border apprehensions offers important public safety benefits, as there was a 24 percent (18,511) decrease in criminal border removals from FY2016 to FY2017. At the same time, the renewed commitment to interior enforcement resulted in a 10 percent increase in ICE criminal removals from FY2016 to FY2017, with 53 percent of criminal removals resulting from ICE interior arrests.

**Figure 15. FY2015 – FY2017 Interior vs. Border Program Removals by Criminality**



## Conclusion

The FY2017 statistics clearly demonstrate ICE's continued commitment to identifying, arresting, and removing aliens who are in violation of U.S. law, particularly those posing a public safety or national security threat, while restoring fidelity to the rule of law. In FY2017, ICE ERO conducted 143,470 overall administrative arrests, which is the highest number of administrative arrests over the past three fiscal years. Of these arrests, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive or were processed with a reinstated final order. In FY2017, ICE conducted 226,119 removals. While this is a slight overall decrease from the prior fiscal year, the proportion of removals resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals, in FY2017.  These results clearly demonstrate profound, positive impact of the EO. The 17 percent decrease in border removals shows the deterrent effect of strong interior enforcement, while the increase in interior removals restores the integrity of our nation's immigration system and enhances the safety and security of the United States.

*Appendix A: Methodology*

**Data Source:**
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

**Data Run Dates:**
FY2017: IIDSv1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017
FY2016: IIDSv1.22.1 run date 10/04/2016; ENFORCE Integrated Database (EID) as of 10/02/2016
FY2015: IIDSv1.19 run date 10/04/2015; ENFORCE Integrated Database (EID) as of 10/02/2015

**Removals**

ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ICE for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. FY2016 removals, excluding FY2015 "lag," were 235,524. The number of removals in FY2017, excluding the "lag" from FY2016, was 220,649.

ICE Removals include aliens processed for Expedited Removal (ER) and turned over to ERO for detention. Aliens processed for ER and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics.

**Criminality**

Criminality is determined by the existence of a criminal conviction in the ICE system of record.

14

*Appendix B: FY2016 and FY2017 Removals by Country of Citizenship*[7]

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Mexico | 149,821 | 128,765 |
| Guatemala | 33,940 | 33,570 |
| Honduras | 21,994 | 22,381 |
| El Salvador | 20,538 | 18,838 |
| Haiti | 310 | 5,578 |
| Dominican Republic | 1,981 | 1,986 |
| Brazil | 1,095 | 1,413 |
| Ecuador | 1,099 | 1,152 |
| Colombia | 1,156 | 1,082 |
| Nicaragua | 795 | 832 |
| Jamaica | 787 | 782 |
| China, People's Republic Of | 398 | 525 |
| Somalia | 198 | 521 |
| India | 353 | 460 |
| Peru | 406 | 458 |
| Canada | 417 | 353 |
| Nigeria | 242 | 312 |
| Ghana | 94 | 305 |
| Romania | 176 | 292 |
| Venezuela | 182 | 248 |
| Bangladesh | 128 | 203 |
| Senegal | 21 | 197 |
| Philippines | 183 | 182 |
| Pakistan | 79 | 177 |
| Spain | 101 | 172 |
| Cuba | 64 | 160 |
| Costa Rica | 157 | 151 |
| United Kingdom | 160 | 151 |
| Saudi Arabia | 106 | 139 |
| Guyana | 93 | 137 |
| Chile | 75 | 129 |
| Trinidad and Tobago | 128 | 128 |
| Russia | 94 | 127 |
| Poland | 115 | 120 |
| Italy | 55 | 117 |
| Hungary | 30 | 116 |
| South Korea | 77 | 113 |
| Micronesia, Federated States Of | 63 | 110 |
| Liberia | 27 | 107 |
| Kenya | 63 | 103 |
| Argentina | 76 | 102 |
| Jordan | 78 | 98 |
| Bahamas | 99 | 95 |
| Turkey | 50 | 93 |
| Guinea | 16 | 88 |
| Ukraine | 69 | 86 |
| Belize | 120 | 82 |
| France | 59 | 82 |
| Israel | 53 | 81 |
| Bolivia | 56 | 76 |
| Germany | 72 | 75 |

[7] Country of citizenship is reported as it appears in ICE's system of record at the time data is pulled, but may be updated as additional information is discovered or verified.

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Vietnam | 35 | 71 |
| Panama | 64 | 69 |
| Indonesia | 31 | 68 |
| Morocco | 22 | 67 |
| Portugal | 44 | 65 |
| Iraq | 48 | 61 |
| Cameroon | 29 | 58 |
| Egypt | 44 | 57 |
| Gambia | 2 | 56 |
| Albania | 32 | 55 |
| Afghanistan | 14 | 48 |
| Bosnia-Herzegovina | 49 | 47 |
| Ethiopia | 37 | 46 |
| Nepal | 25 | 45 |
| Korea | 46 | 44 |
| Sierra Leone | 18 | 44 |
| Eritrea | 13 | 41 |
| Sri Lanka | 35 | 41 |
| Netherlands | 25 | 40 |
| Uruguay | 22 | 38 |
| Lebanon | 36 | 35 |
| Democratic Republic of the Congo | 16 | 34 |
| Ireland | 26 | 34 |
| Mali | 7 | 34 |
| Moldova | 15 | 34 |
| Thailand | 22 | 33 |
| Burkina Faso | 8 | 31 |
| Czech Republic | 19 | 30 |
| Cambodia | 74 | 29 |
| Cape Verde | 11 | 29 |
| Algeria | 12 | 28 |
| Taiwan | 25 | 28 |
| Uzbekistan | 15 | 28 |
| Bulgaria | 17 | 26 |
| Lithuania | 17 | 26 |
| Unknown | 15 | 26 |
| Armenia | 21 | 24 |
| Mongolia | 6 | 23 |
| South Africa | 18 | 23 |
| St. Lucia | 15 | 23 |
| Australia | 24 | 22 |
| Georgia | 22 | 22 |
| Iran | 16 | 22 |
| Marshall Islands | 35 | 22 |
| Greece | 15 | 20 |
| Niger | 2 | 20 |
| Slovakia | 9 | 20 |
| Antigua-Barbuda | 14 | 19 |
| Barbados | 14 | 19 |
| Latvia | 8 | 19 |
| Sudan | 3 | 19 |
| Sweden | 18 | 19 |
| Togo | 4 | 19 |
| Serbia | 16 | 18 |
| Kyrgyzstan | 10 | 17 |
| New Zealand | 16 | 16 |
| St. Kitts-Nevis | 9 | 16 |
| Grenada | 10 | 15 |

16

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2016 | FY2017 |
| Palau | 10 | 15 |
| Kazakhstan | 19 | 14 |
| Fiji | 12 | 13 |
| Ivory Coast | 16 | 13 |
| Japan | 21 | 13 |
| Samoa | 3 | 13 |
| Tanzania | 16 | 13 |
| Tonga | 22 | 13 |
| Estonia | 9 | 12 |
| Kuwait | 13 | 12 |
| Zimbabwe | 6 | 12 |
| Uganda | 6 | 11 |
| Belarus | 8 | 10 |
| Burma | 3 | 10 |
| Dominica | 10 | 10 |
| Kosovo | 14 | 10 |
| Macedonia | 7 | 10 |
| Rwanda | 4 | 10 |
| St. Vincent-Grenadines | 13 | 10 |
| Yemen | 8 | 10 |
| Zambia | 8 | 10 |
| Belgium | 7 | 9 |
| Hong Kong | 5 | 9 |
| Libya | 3 | 9 |
| Montenegro | 5 | 9 |
| Tajikistan | 8 | 9 |
| Turkmenistan | 5 | 9 |
| Azerbaijan | 1 | 8 |
| Benin | 1 | 8 |
| Malaysia | 12 | 8 |
| Mauritania | 10 | 8 |
| Angola | 6 | 7 |
| Austria | 8 | 7 |
| Chad | 3 | 7 |
| Suriname | 2 | 7 |
| Tunisia | 9 | 7 |
| Burundi | 3 | 6 |
| Czechoslovakia | 3 | 6 |
| Congo | 2 | 5 |
| Croatia | 7 | 5 |
| Denmark | 4 | 5 |
| Laos | 0 | 5 |
| Paraguay | 8 | 5 |
| Switzerland | 11 | 5 |
| Guinea-Bissau | 2 | 4 |
| Malawi | 4 | 4 |
| Norway | 6 | 4 |
| Qatar | 2 | 4 |
| Singapore | 7 | 4 |
| Turks and Caicos Islands | 4 | 4 |
| Yugoslavia | 6 | 4 |
| Bermuda | 1 | 3 |
| Botswana | 1 | 3 |
| British Virgin Islands | 5 | 3 |
| Finland | 2 | 3 |
| Gabon | 2 | 3 |
| Oman | 2 | 3 |
| United Arab Emirates | 1 | 3 |

17

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Cayman Islands | 1 | 2 |
| Equatorial Guinea | 5 | 2 |
| Mozambique | 0 | 2 |
| Netherlands Antilles | 0 | 2 |
| Serbia and Montenegro | 1 | 2 |
| South Sudan | 1 | 2 |
| Syria | 9 | 2 |
| Andorra | 0 | 1 |
| Aruba | 0 | 1 |
| Bahrain | 0 | 1 |
| Central African Republic | 0 | 1 |
| Cyprus | 1 | 1 |
| Djibouti | 1 | 1 |
| French Guiana | 0 | 1 |
| Iceland | 2 | 1 |
| Luxembourg | 0 | 1 |
| Madagascar | 1 | 1 |
| Mauritius | 1 | 1 |
| Namibia | 2 | 1 |
| Papua New Guinea | 1 | 1 |
| San Marino | 0 | 1 |
| Slovenia | 1 | 1 |
| Swaziland | 1 | 1 |
| Anguilla | 1 | 0 |
| Guadeloupe | 1 | 0 |
| Lesotho | 1 | 0 |
| Macau | 1 | 0 |
| Montserrat | 2 | 0 |
| Seychelles | 1 | 0 |
| **Total** | **240,255** | **226,119** |

18

# DEF-INTERV.

# EX. 95


**TRAC Immigration**



# Immigration Court Backlog Tool
**Pending Cases and Length of Wait by Nationality, State, Court, and Hearing Location**

**About the Data**
through May 2018

**What to graph:**
- ● Pending Cases
- ○ Average Days

**What to tabulate:**
- ● Pending Cases
- ○ Average Days

**Charge Type:**
- ● All Charges
- ○ Immigration
- ○ Criminal/Nat. Sec./Terror

**Starting with:**
- ● States
- ○ Nationalities



- ● Time series
- ○ Top 10

**Fiscal Year 2018**
click on column headings to sort

| State | Pending Cases |
|---|---|
| Entire US | 714,067 |
| California | 136,203 |
| Texas | 107,196 |
| New York | 95,892 |
| Florida | 47,736 |
| Virginia | 40,458 |
| New Jersey | 38,726 |
| Maryland | 32,225 |
| Illinois | 26,430 |
| Massachusetts | 25,058 |
| Georgia | 21,873 |
| North Carolina | 13,478 |
| Pennsylvania | 12,369 |
| Colorado | 12,058 |
| Tennessee | 11,274 |

**Fiscal Year 2018**
click on column headings to sort

| Court Location | Pending Cases |
|---|---|
| All Courts | 714,067 |
| New York | 92,886 |
| Los Angeles | 70,378 |
| San Francisco | 55,197 |
| Houston | 48,569 |
| Arlington | 40,458 |
| Newark | 37,898 |
| Miami | 33,328 |
| Baltimore | 32,225 |
| San Antonio | 27,503 |
| Chicago | 26,430 |
| Boston | 25,058 |
| Atlanta | 21,193 |
| Dallas | 19,591 |
| Orlando | 13,663 |


Copyright 2018, TRAC Reports, Inc.