**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 5

# Exhibits 96 - 126

# DEF-INTERV.

# EX. 96

Policy Number: 10076.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

JUN 17 2011



**U.S. Immigration
and Customs
Enforcement**

| | |
|---|---|
| MEMORANDUM FOR: | All Field Office Directors |
| | All Special Agents in Charge |
| | All Chief Counsel |
| FROM: | John Morton |
| | Director |
| SUBJECT: | Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs |

Purpose:

This memorandum sets forth agency policy regarding the exercise of prosecutorial discretion in
removal cases involving the victims and witnesses of crime, including domestic violence, and
individuals involved in non-frivolous efforts related to the protection of their civil rights and
liberties. In these cases, ICE officers, special agents, and attorneys should exercise all
appropriate prosecutorial discretion to minimize any effect that immigration enforcement may
have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue
justice. This memorandum builds on prior guidance on the handling of cases involving T and U
visas and the exercise of prosecutorial discretion.[1]

Discussion:

Absent special circumstances or aggravating factors, it is against ICE policy to initiate removal
proceedings against an individual known to be the immediate victim or witness to a crime. In
practice, the vast majority of state and local law enforcement agencies do not generally arrest
victims or witnesses of crime as part of an investigation. However, ICE regularly hears concerns
that in some instances a state or local law enforcement officer may arrest and book multiple
people at the scene of alleged domestic violence. In these cases, an arrested victim or witness of
domestic violence may be booked and fingerprinted and, through the operation of the Secure

---

[1] For a thorough explanation of prosecutorial discretion, see the following: Memorandum from Peter S. Vincent,
Principal Legal Advisor, Guidance Regarding U Nonimmigrant Status (U visa) Applicants in Removal Proceedings
or with Final Orders of Deportation or Removal (Sept. 25, 2009); Memorandum from William J. Howard, Principal
Legal Advisor, VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367 (Feb. 1, 2007);
Memorandum from Julie L. Myers, Assistant Secretary of ICE, Prosecutorial and Custody Discretion (Nov. 7,
2007); Memorandum from William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (Oct. 24, 2005);
Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, Exercising
Prosecutorial Discretion (Nov. 17, 2000).

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 2

Communities program or another ICE enforcement program, may come to the attention of ICE. Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties.

To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints.  Particular attention should be paid to:

- victims of domestic violence, human trafficking, or other serious crimes;
- witnesses involved in pending criminal investigations or prosecutions;
- plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and
- individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

In deciding whether or not to exercise discretion, ICE officers, agents, and attorneys should consider all serious adverse factors.  Those factors include national security concerns or evidence the alien has a serious criminal history, is involved in a serious crime, or poses a threat to public safety.  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors, exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate.  Discretion may also take different forms and extend to decisions to place or withdraw a detainer, to issue a Notice to Appear, to detain or release an alien, to grant a stay or deferral of removal, to seek termination of proceedings, or to join a motion to administratively close a case.

In addition to exercising prosecutorial discretion on a case-by-case basis in these scenarios, ICE officers, agents, and attorneys are reminded of the existing provisions of the Trafficking Victims Protection Act (TVPA),[2] its subsequent reauthorization,[3] and the Violence Against Women Act (VAWA).[4]  These provide several protections for the victims of crime and include specific provisions for victims of domestic violence, victims of certain other crimes,[5] and victims of human trafficking.

Victims of domestic violence who are the child, parent, or current/former spouse of a U.S. citizen or permanent resident may be able to self-petition for permanent residency.[6]  A U nonimmigrant visa provides legal status for the victims of substantial mental or physical abuse as

---

[2] Pub. L. No. 106-386, §§101-113, 114 Stat. 1464, 1466 (codified as amended in scattered sections of the U.S.C.).
[3] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[4] Pub. L. No. 106-386, §§1001-1603, 114 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[5] For a list of the qualifying crimes, see INA §101(a)(15)(U)(iii).
[6] *See* INA §101(a)(51).

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 3

a result of domestic violence, sexual assault, trafficking, and other certain crimes.[7]  A T nonimmigrant visa provides legal status to victims of severe forms of trafficking who assist law enforcement in the investigation and/or prosecution of human trafficking cases.[8]  ICE has important existing guidance regarding the exercise of discretion in these cases that remains in effect.  Please review it and apply as appropriate.[9]

Please also be advised that a flag now exists in the Central Index System (CIS) to identify those victims of domestic violence, trafficking, or other crimes who already have filed for, or have been granted, victim-based immigration relief.  These cases are reflected with a Class of Admission Code "384."  When officers or agents see this flag, they are encouraged to contact the local ICE Office of Chief Counsel, especially in light of the confidentiality provisions set forth at 8 U.S.C. § 1367.

<u>No Private Right of Action</u>

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[7] *See* INA §101(a)(15)(U).

[8] *See* INA §101(a)(15)(T).

[9] *See* Memorandum from John P. Torres, Director, Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, Interim Guidance Relating to Officers Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007).

# DEF-INTERV.

# EX. 97

Policy Number: 10075.1
FEA Number:   306-112-0026

Office of the Director

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

June 17, 2011

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Exercising Prosecutorial Discretion Consistent with the Civil
                    Immigration Enforcement Priorities of the Agency for the
                    Apprehension, Detention, and Removal of Aliens

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) personnel
guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration
enforcement resources are focused on the agency's enforcement priorities. The memorandum
also serves to make clear which agency employees may exercise prosecutorial discretion and
what factors should be considered.

This memorandum builds on several existing memoranda related to prosecutorial discretion with
special emphasis on the following:

- Sam Bernsen, Immigration and Naturalization Service (INS) General Counsel, Legal
  Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976);
- Bo Cooper, INS General Counsel, INS Exercise of Prosecutorial Discretion (July 11,
  2000);
- Doris Meissner, INS Commissioner, Exercising Prosecutorial Discretion (November 17,
  2000);
- Bo Cooper, INS General Counsel, Motions to Reopen for Considerations of Adjustment
  of Status (May 17, 2001);
- William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (October 24,
  2005);
- Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (November 7,
  2007);
- John Morton, Director, Civil Immigration Enforcement Priorities for the Apprehension,
  Detention, and Removal of Aliens (March 2, 2011); and
- John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and
  Plaintiffs (June 17, 2011).

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the*
*Apprehension, Detention, and Removal of Aliens*

The following memoranda related to prosecutorial discretion are rescinded:

- Johnny N. Williams, Executive Associate Commissioner (EAC) for Field Operations, Supplemental Guidance Regarding Discretionary Referrals for Special Registration (October 31, 2002); and
- Johnny N. Williams, EAC for Field Operations, Supplemental NSEERS Guidance for Call-In Registrants (January 8, 2003).

Background

One of ICE's central responsibilities is to enforce the nation's civil immigration laws in coordination with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE, however, has limited resources to remove those illegally in the United States. ICE must prioritize the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system. These priorities are outlined in the ICE Civil Immigration Enforcement Priorities memorandum of March 2, 2011, which this memorandum is intended to support.

Because the agency is confronted with more administrative violations than its resources can address, the agency must regularly exercise "prosecutorial discretion" if it is to prioritize its efforts. In basic terms, prosecutorial discretion is the authority of an agency charged with enforcing a law to decide to what degree to enforce the law against a particular individual. ICE, like any other law enforcement agency, has prosecutorial discretion and may exercise it in the ordinary course of enforcement[1]. When ICE favorably exercises prosecutorial discretion, it essentially decides not to assert the full scope of the enforcement authority available to the agency in a given case.

In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:

- deciding to issue or cancel a notice of detainer;
- deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
- focusing enforcement resources on particular administrative violations or conduct;
- deciding whom to stop, question, or arrest for an administrative violation;
- deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
- seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;

---

[1] The Meissner memorandum's standard for prosecutorial discretion in a given case turned principally on whether a substantial federal interest was present. Under this memorandum, the standard is principally one of pursuing those cases that meet the agency's priorities for federal immigration enforcement generally.

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

- settling or dismissing a proceeding;
- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

## Authorized ICE Personnel

Prosecutorial discretion in civil immigration enforcement matters is held by the Director[2] and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities:

- officers, agents, and their respective supervisors within Enforcement and Removal Operations (ERO) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- officers, special agents, and their respective supervisors within Homeland Security Investigations (HSI) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- attorneys and their respective supervisors within the Office of the Principal Legal Advisor (OPLA) who have authority to represent ICE in immigration removal proceedings before the Executive Office for Immigration Review (EOIR); and

- the Director, the Deputy Director, and their senior staff.

ICE attorneys may exercise prosecutorial discretion in any immigration removal proceeding before EOIR, on referral of the case from EOIR to the Attorney General, or during the pendency of an appeal to the federal courts, including a proceeding proposed or initiated by CBP or USCIS. If an ICE attorney decides to exercise prosecutorial discretion to dismiss, suspend, or close a particular case or matter, the attorney should notify the relevant ERO, HSI, CBP, or USCIS charging official about the decision. In the event there is a dispute between the charging official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute with the local supervisors of the charging official. If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

---

[2] Delegation of Authority to the Assistant Secretary, Immigration and Customs Enforcement, Delegation No. 7030.2 (November 13, 2004), delegating among other authorities, the authority to exercise prosecutorial discretion in immigration enforcement matters (as defined in 8 U.S.C. § 1101(a)(17)).

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

Factors to Consider When Exercising Prosecutorial Discretion

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and conditions in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and
- whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the*
*Apprehension, Detention, and Removal of Aliens*

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

- veterans and members of the U.S. armed forces;
- long-time lawful permanent residents;
- minors and elderly individuals;
- individuals present in the United States since childhood;
- pregnant or nursing women;
- victims of domestic violence, trafficking, or other serious crimes;
- individuals who suffer from a serious mental or physical disability; and
- individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

- individuals who pose a clear risk to national security;
- serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
- known gang members or other individuals who pose a clear danger to public safety; and
- individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

Timing

While ICE may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing the enforcement proceeding. As was more extensively elaborated on in the Howard Memorandum on Prosecutorial Discretion, the universe of opportunities to exercise prosecutorial discretion is large. It may be exercised at any stage of the proceedings. It is also preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion. Although affirmative requests from an alien or his or her representative may prompt an evaluation of whether a favorable exercise of discretion is appropriate in a given case, ICE officers, agents, and attorneys should examine each such case independently to determine whether a favorable exercise of discretion may be appropriate.

In cases where, based upon an officer's, agent's, or attorney's initial examination, an exercise of prosecutorial discretion may be warranted but additional information would assist in reaching a final decision, additional information may be requested from the alien or his or her representative. Such requests should be made in conformity with ethics rules governing

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

communication with represented individuals[3] and should always emphasize that, while ICE may be considering whether to exercise discretion in the case, there is no guarantee that the agency will ultimately exercise discretion favorably. Responsive information from the alien or his or her representative need not take any particular form and can range from a simple letter or e-mail message to a memorandum with supporting attachments.

Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[3] For questions concerning such rules, officers or agents should consult their local Office of Chief Counsel.

# DEF-INTERV.

# EX. 98

# BARBARA HINES

*barbarahines@gmail.com • 512-699-3337*

## EDUCATION

- Northeastern University School of Law
  Boston, Massachusetts, J.D. 1975

- University of Texas School of Law
  Summer 1972, 1974-1975

- University of Texas at Austin
  B.A. with Honors, Latin American Studies, 1969
  Graduate School, Department of Spanish, Spring-Fall 1970

## LICENSED TO PRACTICE

- State Bar of Texas, May 1975

- Board Certified in Immigration and Nationality Law, Texas Board of Legal Specialization,
  December 1981-February 2016

- U.S. Supreme Court

- U.S. District Court, Western District of Texas

- Fifth Circuit Court of Appeals

## EMPLOYMENT

- **Adjunct Professor of Law, University of Texas at Austin School of Law,  January 2018 - March, 2018**
    - Taught seminar entitled "Advanced Topics in Immigation Law and Policy

- **Senior Fellow, Emerson Collective                    June, 2015 - May, 2017**

    - Independent Consultant on wide range of immigration matters
    - Family Detention and asylum

1

  o National and state immigration legal and advocacy issues

- **Adjunct Professor of Law, University of Texas at Austin School of Law,  September 2016 - December, 2016**
    o Taught seminar entitled "Current Topics in Immigration Law and Policy"

- **Clinical Professor, University of Texas at Austin School of Law      January 1999 – January 2015**

    Co-director of immigration clinic, including:
    o Teach classroom component of the course, including substantive and procedural immigration law and practical lawyering skills.
    o Supervise students handling asylum, removal defense, Violence Against Women Act, and other immigration cases before the Department of Homeland Security, immigration courts, the Board of Immigration Appeals and federal courts.
    o Participate in advocacy projects, seeking to improve human rights protections for immigrants in the United States.
    o Teach advanced immigration seminar bi-annually.

- **Hines and Leigh, P.C., Austin, Texas                          February 1982 – January 2000**
    o Practice limited to immigration and nationality law. Handled all types of immigration cases including removal defense, family and employment-based petitions, naturalization, non-immigrant visas, and federal and appellate cases.

- **Fulbright Scholar/Researcher, Buenos Aires, Argentina           July 2004 - December 2004**

    Taught course at the Universidad de Palermo Law School, entitled "Current U.S. Immigration Law and Policy."  Conducted research on Argentine immigration law. Collaborated with the University of Buenos Aires law school immigration clinic and other non-governmental organizations working on immigration issues.

- **Of counsel to Lawyers' Committee for Civil Rights Under           June 1994 - December 2000 Law of Texas, Immigrant and Refugee Rights Project, San Antonio, Texas**

    Participated as co-counsel in federal litigation on behalf of immigrants and refugees.

- **Fulbright Scholar/Researcher, Buenos Aires, Argentina           June 1996 - December 1996**

    Developed first immigrant rights project at the Centro de Estudios Legales y Sociales (CELS), researched Argentine immigration law, and lectured on U.S. immigration topics.

- **Co-Director, Lawyers' Committee for Civil Rights Under           October 1991 - June 1994 Law of Texas, Immigrant and Refugee Rights Project, San, Antonio, Texas**

    Served as first co-director of immigrants' rights project. Established statewide priorities for litigation, outreach and training. Responsible for litigation on behalf of immigrants and refugees

2

throughout Texas, including INS abuse, constitutional violations, human rights and rights of children in deportation proceedings. Supervised staff attorney, law clerks and paralegal. Developed back-up support and training for attorneys and non-profit immigrant/refugee groups in Texas.

- **Staff Attorney and Managing Attorney,**                             **September 1975 - February 1982**
  **Legal Aid Society of Central Texas**
  Handled federal litigation involving immigration, public benefits and child welfare issues. Represented low-income clients in immigration and asylum proceedings, family law and public benefits. Served as managing attorney and supervised five attorneys and two paralegals. Supervised students in University of Texas legal clinics.

## AWARDS

- National Women's Political Caucus Women of Courage Award, 2015

- Spirit of CHLSA award, Chicano/Hispanic Law Students Association (CHLSA), University of Texas School of Law, April, 2015.

- 2015-17 Massey Award for Teaching Excellence, University of Texas School of Law.

- Pathfinder Award, Travis County Women's Lawyers' Association,  January, 2014

- Outstanding Academic Service Learning Professor, Longhorn Center for Civic Engagement, Division of Diversity and Community Engagement, University of Texas at Austin, 2014

- Honoree of the named Professor Barbara Hines Public Interest Summer Student Fellowship, William Wayne Justice Center, May 2012.

- University Leadership Initiative Award, 10th Anniversary of H.B. 1403, Texas in-state tuition law, September 2012.

- Carol Weiss King Award For Pursuit of Justice for Immigrants, National Lawyers Guild, September 2010.

- Excellence in Legal Services Award, Mexican American Legal Defense and Education Fund, September 2009.

- Third Annual Ed Wendler Award for Outstanding Service to the Immigrant Community, Casa Marianella, March 2008.

- Elmer Fried Excellence in Teaching Award, American Immigration Lawyers Association, June 2007.

- Honored by Political Asylum Project of Austin on its 20th anniversary, May 2007.

- University of Texas Law Fellowships/Public Interest Law Association Faculty Award, 2002.

- Texas Lawyer, Legal Legends, A Century of Texas Lawyers and Lawyering, 2000.

- Jack Wasserman Memorial Award for Excellence in Litigation in the Field of Immigration Law, American Immigration Lawyers Association, June 1992.

- Litigation Award, Texas Chapter, American Immigration Lawyers Association, June 1993.

- Austin Chronicle, Best of Austin 1993, Best Immigration Lawyer, July 1993.


**PROFESSIONAL ORGANIZATIONS**

- **National Immigration Project, Board of Directors**             **1997 - Present**
  National membership organization that provides legal and technical support to immigrant communities, legal practitioners, and advocates seeking to advance the rights of noncitizens.

- **American Immigration Lawyers Association (AILA)**             **1984 - Present**
  National Bar Association comprised of attorneys who specialize in immigration and nationality law. Served on numerous national committees including the AILA INS Enforcement Liaison Committee, the Amicus Brief Committee, Publications Committee, the Asylum Committee and the EOIR liaison committee.

**OTHER IMMIGRATION RELATED ACTIVITIES**

- Member, Steering Committee,                                         2006 - 2015
  Bernard & Audrey Rapoport Center for Human Rights and Justice

- Board Member, Lawyers' Committee for Civil Rights             1994 - 2005
  Under Law of Texas, Immigrant and Refugee Rights Project

- Member of Legal Issues Subcommittee, City of Austin             1998 - 1999
  Task Force on Immigration Issues

- Advisory Board Member, Tibetan Resettlement Project of Austin   1995 - 1998
  Served as a legal resource for a refugee resettlement project. Continued to represent Tibetans refugees on pro bono basis.

- Human Rights Documentation Exchange
  Secretary, Board of Directors                                       1990 - 1998
  President, Board of Directors                                       1988 - 1990

Served as Board member and assisted in setting priorities for the national center, which provided documentation for asylum and refugee applications before the INS and the immigration courts.

- Advisory Board Member, Texas Immigrant and Refugee Coalition Advisory Board    1993 – 1997
  Statewide Ford Foundation funded coalition, which provided advocacy, training and networking for immigrants' rights groups in Texas. Participated in priority settings, coordination of statewide conferences, and state and national advocacy.

- Co-Founder and Board Member, Political Asylum Project of Austin (PAPA)          1990 - 1995
  (now American Gateways)
  Assisted PAPA in setting priorities and provided legal support for low-income asylum applicants. Participated in legal training for pro bono volunteer attorneys, developed informational videos for clients regarding asylum and deportation proceedings.

- Outside Advisor to Clinton Immigration                                    December 1992
  Transition Team, Washington, D.C.
  Assisted in development of policy and legislative recommendations on all aspects of immigration, and refugee and asylum issues for the incoming Clinton administration.


## COPYRIGHTED AND SELECTED PUBLISHED MATTERS

- 2015-16 SYMPOSIUM TRANSCRIPT: THE GLOBAL REFUGEE CRISIS
  Panel 2 - Sovereignty vs. Protection: State Efforts to Deflect and Deter Refugees, 31 Conn J. Int'l Law 281, 309 (Spring 2016).

- *Interpretation in the Immigration Courts of the United States*, Revista del Area de Traductología (Ex Centro de Investigación en Traducción), Facultad de Lenguas, Universidad Nacional de Córdoba, Año 2011- Número 2,

- *The Right to Migrate as a Human Right: The Current Argentine Immigration Law*, Cornell International Law Journal, Vol. 43, No.3 (Fall 2010).

- *An Overview of U.S. Immigration Law and Policy Since 9/11*, Texas Hispanic Journal of Law and Policy, Vol. 12 (Spring 2006).

- *Working Borders: Linking Debates about Insourcing and Outsourcing of Capital and Labor*, Roundtable I; Insourcing Presentations, Texas International Law Journal, Vol. 40, No. 4 (Summer 2005).

- *Fifth Circuit Survey: Immigration Law*, Texas Tech Law Review, Vol. 35, Issue 3 (Spring 2004).

- *Responses to Federal and State Enforcement*, American Immigration Lawyers Association, Immigration and Nationality Handbook, Vol. II (2003-2004).

- *Basics of Immigration Law for Texas Criminal Defense Attorneys*, Texas Criminal Defense Lawyers Association (2003).

- *So Near Yet So Far Away: The Effect of September 11th on Mexican Immigrants in the United States*, Texas Hispanic Journal of Law and Policy, Vol. 8, No.1 (Spring 2002).

- *Selected Issues Relating to Crimes of Moral Turpitude*, American Immigration Lawyers Association, Immigration and Nationality Handbook, Vol. II (2000-2001).

- *An Overview of Argentine Immigration*, Indiana International and Comparative Law Review, Vol. 9, No. 2 (1999).

- *New Affidavit of Support*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1998-1999).

- *Asylum and Withholding of Removal, Practice Under IIRAIRA: One Year Later*, American Immigration Lawyers Association (1998-1999).

- *Asylum and Withholding of Removal*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. II (1997-1998).

- *Selected Issues in Federal Litigation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. II (1995-1996).

- *Grounds of Deportations and Asylum and Withholding of Deportation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1994-1995); *Stays of Deportation for Aggravated Felons*, *id.* Vol. II

- *Grounds of Deportations and Asylum and Withholding of Deportation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1993-1994); *Changed Country Conditions*, *id.* Vol. I

- *Grounds of Deportation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1992-1993).

- *Asylum and Withholding of Deportation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1991-1992).

- *Asylum and Withholding of Deportation*, American Immigration Lawyers Association, Immigration and Nationality Law Handbook, Vol. I (1990)

**PRESENTATIONS**

- *Prosecutorial Discretion, What it Means, How to Use it and Promoting Effective Implementation* and *The Immigration Consequences of Criminal Convictions: Crimes of Moral Turpitude*, Standing

6

for Truth, Calling For Justice, 15th Annual Conference, Catholic Legal Immigration Network (CLINIC), Austin, Texas, May 2012.

- Moderator, *Ethical Issues in Removal Defense,* Impact of Criminal Convictions on Immigration Status seminar, National Immigration Project, Denver, Colorado, March 2012.

- *Interpretation and the Immigration Courts*, Universidad Pablo de Olavide, Sevilla, Spain, November 2011.

- *Ethical Issues in Removal Defense*, Impact of Criminal Convictions seminar, National Immigration Project, Philadelphia, Pennsylvania, October 2011.

- *Immigration Consequences of Crimes and Asylum Law*, Diocesan Migrant and Refugee Services Immigration seminar, El Paso, Texas, September 2011.

- Presenter and Workshop Participant, *Law, Social Movements, and the Criminalization of Race and Ethnicity*, Radcliffe Institute for Advanced Studies, Cambridge, Massachusetts, June 2011.

- *Immigration Detention Centers*, Civil Rights on the Border Symposium, Texas Journal on Civil Rights and Civil Liberties, Austin, Texas, March 2011.

- *Life Beyond the Border, Canada, U.S., and Mexico*, 40th Annual Frank Church Symposium, Idaho State University, Pocatello, Idaho, March 2011.

- *Dream Act*, Texas Association of Chicanos in Higher Education Annual Conference, Austin, Texas, January 2011.

- *Issues of Tolerance in the U.S./Party Politics/Immigration*, Transatlantic Intolerance Conference, European Studies Department, University of Texas at Austin, January 2011.

- *Current Immigration Issues in the U.S.*, Centro de Estudios Legales y Sociales, Buenos Aires, Argentina, December 2010.

- *How Pre-1996 Immigration Laws Affect Your Clients Today*, Achieving the Impossible, Advanced Topics in Deportation and Removal Defense seminar, National Immigration Project, New Orleans, Louisiana, September 2010.

- *Using Media to Teach*, AALS Immigration Professors Biannual Conference, Chicago, Illinois, May 2010.

- Moderator, *Advanced Topics in Removal and Deportation Defense* seminar, National Immigration Project, San Diego, California, March 2010.

- *Evidentiary Issues in Removal Proceedings*, Webinar, Immigration Advocates Network, March 2010.

7

- *Introduction to Criminal Immigration Issues*, Advanced Immigration and Nationality Law Conference, State Bar of Texas, Houston, Texas, February 2010.

- *U.S. Immigration in an Era of Enforcement and Restrictions: A View from the Field* and *Roundtable: Legal and Human Rights Advocacy*, Migration During an Era of Restriction Conference, University of Texas at Austin, November 2009.

- *U.S. Immigration Issues*, Universidad Pablo de Olavide, Sevilla, Spain, November 2009.

- *Immigration and Local Law Enforcement*, National Association for Civil Oversight of Law Enforcement, Austin, Texas, November 2009.

- *How to Work Collaboratively with Private Firms*, Public Interest Clinics in the Global North and South: Egalitarian Work and Subordination Conference, Red Latinoamericana de Clínicas, Bogotá, Colombia, November 2009.

- *Developments in U.S. Immigration Law*, Universidad del Norte Law School, Barranquilla, Colombia, August 2009.

- *Developments in U.S. Immigration Law*, Centro de Estudios Legales y Sociales, Buenos Aires, Argentina, July 2009.

- Presenter and Workshop Participant, *Undocumented and Unaccompanied Children: Building Bridges among Academics, Activists, and Practitioners*, Radcliffe Institute for Advanced Studies, Cambridge, Massachusetts, June 2009.

- *Ethical Issues in Immigration Cases*, Evidentiary Issues in Immigration Proceedings seminar, National Immigration Project, New York City, New York, April 2009.

- *Immigration Consequences of Crimes*, Diocesan Migrant and Refugee Services Immigration seminar, El Paso, Texas, April 2009.

- *Documentation in Discretionary Cases and Asylum*, Webinar, Immigration Advocates Network, April 2009.

- *Removal 101*; *Grounds of Inadmissibility and Removability*; and *Recent Developments at the BIA and 5th Circuit*, How to Successfully Defend Your Clients in Immigration Court: Removal Proceedings Today seminar, Pro Bar, Harlingen, Texas, February 2009.

- *The Phenomenon of Migration* and *The Case of Europe*, Fourth Convention on International Law and Politics, Institute of European and International Business Law, University of St. Gallen, St. Gallen, Switzerland, November 2008.

- *Public Interest Law in the U.S.*, International Clinical Conference on Public Interest Law, University de los Andes Law School, Bogota, Colombia, November 2008.

8

- *Open Wounds and Closures: Transnational Dynamics Today, Image, Memory and the Paradox of Peace*, Fifteen Years after the El Salvador Peace Accords Conference, Bernard and Audre Rapoport Center for Human Rights and Justice, Austin, Texas, April 2008.

- *Fundamentals of Immigration Law: Grounds of Inadmissibility and Deportability, Removal Proceedings and Relief*, University of Texas School of Law, Continuing Legal Education, Annual Conference on Immigration and Nationality Law, San Antonio, Texas, October 2007.

- *Introduction to Removal Defense*, University of Texas School of Law, Continuing Legal Education, Annual Conference on Immigration and Nationality Law, San Antonio, Texas, September 2006.

- *Relief from Removal: Does it Currently Exist?* American Immigration Lawyers Association Annual Conference, San Antonio, Texas, June 2006.

- *Cancellation of Removal, §212(c) and Waivers*, University of Texas School of Law, Continuing Legal Education, Annual Conference on Immigration and Nationality Law, San Antonio, Texas, September 2005.

- *Evidence* and Moderator: *Relief from Removal: §212(c) and LPR Cancellation*, Defenses to Removal seminar, National Immigration Project, San Diego, California, May 2005.

- *Insourcing,* Working Borders: Linking Debates about Insourcing and Outsourcing of Capital and Labor Conference, Bernard and Audre Rapoport Center for Human Rights and Justice, Austin, Texas, February 2005.

- *Responses to Federal and Local Enforcement*, American Immigration Lawyers Association Annual Conference, Philadelphia, Pennsylvania, June 2004.

- *Deportability and Inadmissibility Issues Related to Drugs and Firearms*, Immigration Law and Crimes Conference, American Immigration Lawyers Association Las Vegas, Nevada, December 2003.

- *Procedural Challenges in Removal Proceedings*, University of Texas School of Law, Continuing Legal Education, Annual Conference on Immigration and Nationality Law, San Antonio, Texas, October 2003.

- *Ethical Issues in Immigration Law*; *Priority Dates and Grandfathering*; and Moderator: *Fiancées and Conditional Residents*, Advanced Issues in Family Law seminar, National Immigration Project, Minneapolis, Minnesota, October 2003.

- *Immigration Fundamentals: Removal, Relief and Adjustment*, University of Texas School of Law, Continuing Legal Education,
     Houston, Texas and Plano, Texas, 5th Annual Conference, April 2007.
     Dallas, Texas and Houston, Texas, 4th Annual Conference, April 2006.
     Dallas, Texas and Houston, Texas, 3rd Annual Conference, April 2005.

9

Dallas, Texas and Houston, Texas, 2nd Annual Conference, April 2004.
El Paso, Texas, Dallas, Texas and Houston, Texas, 1st Annual Conference, April 2003.

## MAJOR LITIGATION

- *In Re Hutto Family Detention Center*, No. A07-CA-164-55 (W.D. Tx. 2007).
Co-counsel in lawsuit challenging detention of children and their families at the T. Don Hutto
Detention Center.  Settlement reached implementing significant changes in conditions and length of
detention.

- *Aparicio v. Blakeway*, 302 F.3d 437 (5th Cir. 2002).
Lead counsel, along with the Lawyers Committee for Civil Rights, Immigration and Refugee Rights
Project, in class action lawsuit against the San Antonio INS' naturalization procedures.

- *Murillo v. Mussegades*, 809 F. Supp. 487 (W.D. Tx. 1992).
Class action suit for declaratory/injunctive relief filed on behalf of students, faculty and staff of
Bowie High School, El Paso, Texas, against the U.S. Border Patrol.  Temporary injunction issued
and subsequent settlement to remove Border Patrol presence at high school campus and to enforce
monitoring, complaint procedure and training for Border Patrol.

- *Cedillo v. Adams*, No. H-94-2461 (S.D. Tex. Houston 1994).
Class action suit for declaratory/injunctive relief against local police/INS raid in Hispanic
neighborhood.  Settlement reached prohibiting further unconstitutional actions and providing for
community-based training of INS and police and community outreach.

- *Ricardo Aldape Guerra v. Collins*, No. H-93-290 (S.D. Tex. Houston 1992).
Amicus brief in support of habeas corpus challenge to death penalty sentence of undocumented
Mexican citizen.  Death penalty reversed.

- *Ruano v. Trominski*, No. M-92-087 (S.D. Tex. McAllen 1992).
Suit brought by non-profit refugee organization and children in deportation proceedings against INS
for constitutional and statutory violations.  Settlement reached that ensures children's access to
counsel.

- *In Re Perez-Hernandez*, A29 999 912 (BIA 1993).
Amicus brief filed challenging INS' taking of statements against interest from unaccompanied
children in deportation proceedings.

- *Gonzalez v. Gaines*, No. 90: 92-CV-12, (E.D. Tex. Lufkin 1992).
Suit challenging denial of Pell Grant federal financial aid for certain family unity immigrants.

- *Ignacio v. INS*, 955 F.2d 295 (5th Cir. 1992) (per curiam).
Challenge to government's retroactive interpretation of aggravated felon provisions of the IMMACT
90.

10

- *Martinez-Montoya v. INS*, 904 F.2d 1018 (5th Cir. 1990).
  Challenge to INS' interpretation of Texas deferred adjudication statute as a final conviction. Served as co-counsel.

- *Perales v. Casillas*, 903 F.2d 1043 (5th Cir. 1990); 950 F.2d. 1066 (5th Cir. 1992).
  Class action suit against INS regarding employment authorization for spouses awaiting immigrant visas.

- *Matter of Hernandez-Casillas v. INS*, Int. Dec. 3147 (A.G. 1991), 983 F.2d 231 (5th Cir. 1983).
  Challenge by long-term permanent resident to INS' narrow interpretation of eligibility for waiver of inadmissibility.

- *Mitchell v. Johnston*, F.2d 337 (5th Cir. 1983).
  Class action suit filed by AFDC/Medicaid recipients challenging cutbacks in Texas' preventive dental program.

- *Hernandez-Cordero v. INS*, 783 F.2d 1266 (5th Cir. 1986); 819 F.2d 558 (5th Cir. 1987) (en banc.)
  Appeal of denial of suspension of deportation.

- *Nunez v. Boldin*, 537 F. Supp 578.  (S.D. Tex. 1982).
  Class action challenge to detention conditions and rights to apply for asylum filed by Salvadoran and Guatemalan detainees. Assisted lead counsel.

- *Rebollar v. Texas Education Agency*, No. 265,783, 126th Judicial District Court of Travis County (1977); TEA No. 77-R87.
  Challenge to Texas law denying public education to certain immigrant children. TEC ruled that children awaiting immigrant visas were entitled to attend public school.


**COURSES TAUGHT**

- Immigration Clinic
- Immigration Consequences of Crimes

- Immigration Law and Policy Seminar
- Advanced Topics in Immigration Law and Policy.

**FOREIGN LANGUAGES**

Fluent in Spanish and conversational in Portuguese

# DEF-INTERV.

# EX. 99

# DACA and the Surge in Unaccompanied Alien Children

Catalina Amuedo-Dorantes[*] (San Diego State University)
Thitima Puttitanun (San Diego State University & Kasetsart University)

## Abstract

Apprehensions of unaccompanied minors from Central American countries have been on the rise since 2008, even if news reports caught up with the increase after 2012. As such, some politicians posited that the 2012 *Deferred Action for Childhood Arrivals* (DACA) contributed to the surge by creating the expectation that children would be allowed to stay in the country. Immigration advocates, however, believe that the two are not related. Given the new executive order granting a temporary reprieve from deportation and work permits to parents of permanent residents or U.S. born children (*Deferred Action for Parental Accountability* or DAPA), a careful analysis of the effect of these policy measures is much needed. Using data on apprehensions of unaccompanied children by border patrol sector, nationality and year, we examine the impact that DACA might have had on the surge of apprehensions of unaccompanied alien children. We find that DACA did not significantly impact those apprehensions. Rather, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act*, along with violence in the originating countries and economic conditions both in the origin countries and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest U.S.-Mexico border.

**JEL Codes:** F22, K37
**Keywords:** DACA, Unaccompanied Alien Children, Unaccompanied Minors, Central American immigrants.

We are grateful to Pia Orrenius, Susan Pozo and Madeline Zavodny for feedback on an earlier version, and to Nick Santos for assistance in acquiring the data.

([*]) Contact author: 5500 Campanile Drive, Nasatir Hall #310, San Diego, CA 92182. Phone: 619-594-1663. Fax: 619-594-5062. Email: camuedod@mail.sdsu.edu

## I.        Introduction

The number of unaccompanied alien children crossing the southern border of the United States has grown drastically since 2008, capturing congressional attention and leading to a number of hearings in the House (Rempdell 2015).   Figure 1 depicts the recent surge in apprehensions of unaccompanied alien children from Mexico, El Salvador, Guatemala, and Honduras.   Apprehensions of unaccompanied minors rose considerably after 2008, somewhat declined between 2009 and 2011, and surged again thereafter.   In addition to its growth, it has been noted that the composition of the flow of unaccompanied alien children changed over the time period under consideration.   While the vast majority of these children used to come from Mexico, the surge in unaccompanied minors observed in recent years has been dominated by children originating from three Central American countries: El Salvador, Guatemala, and Honduras (see Table 1).

A confluence of factors, including extreme violence, endemic poverty, increasingly sophisticated smuggling networks and the desire to reunite with family members in the United States, have fueled this growth.   Additionally, it has been argued that legislative changes, in particular, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act* (WWTVPRA) of President Bush era and the more recent *Deferred Action for Childhood Arrivals* (DACA) announced by President Obama on June 15, 2012, might have been used by smugglers to sway migrants with false promises that they will be able to stay in the United States once they get in the country (Hing 2014, Rempdell 2015).   The WWTVPRA legislated that unaccompanied minors from non-contiguous countries needed to be released into the custody of family or sponsors while they await a deportation hearing in front of a judge; thus enabling children coming from those countries to stay in the United States for what became, in most instances, years.   DACA, however, emanated from past variants of the *Development, Relief, and Education*

*for Alien Minors* (DREAM) *Act* that were never passed.  As immigration reform and DREAM Act legislation stalled at the national level, on June 15, 2012, President Barack Obama announced that his administration would practice prosecutorial discretion for individuals meeting a set of criteria very similar to those proposed in the most recent version of the DREAM Act (Preston and Cushman 2012).[1]  Under DACA, individuals approved for consideration of deferred action were granted a renewable two-year reprieve from deportation proceedings and become eligible for work authorization in the United States.  Because of the timing of DACA and the publicized surge in unaccompanied minors coming from Central America after 2012, Senator Sessions have called for a vote on DACA suspension.[2]  Yet, to this date, we still lack a good understanding of the role that DACA or, for that matter, the WWTVPRA might have played, if any, on such inflows.

In this paper, we explore the determinants behind the recent increase in inflows of unaccompanied alien children from Central America.  In particular, given President Obama's second executive order granting a reprieve from deportation to parents of U.S. born or legal permanent resident children –the so-called *Deferred Action for Parental Accountability* (DAPA), we pay especial attention to the effect that DACA –its predecessor focusing on childhood arrivals– might have played on the surge of unaccompanied minors originating from Mexico, El Salvador, Guatemala and Honduras in recent years.  Because one of the requirements of DACA involved being present in the United States, DACA might have encouraged undocumented immigration.  Additionally, DACA could have stimulated inflows of unauthorized children if it somehow fostered beliefs that other deferred deportation concessions or even permanent amnesties would occur in the future.

---

[1] These are detailed in the next section.
[2] See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/

Establishing the effect of DACA on the surge of unaccompanied minors is important for several reasons. *First*, the rapid increase has resulted in children often being held in overcrowded facilities with adult asylum seekers, thus increasing their difficulty in gaining access to proper legal and medical care (Binford 2013, Stinchcomb and Hershberg 2014, MPI 2012). This led President Obama to declare the wave of unaccompanied minors an "urgent humanitarian situation", asking federal agencies to coordinate an emergency response to the situation. Yet, an appropriate response requires a good understanding of the root causes for such flows, which we still lack.

*Second*, since President Obama's new executive order announced on November 20, 2014 extends the eligibility of DACA applicants and grants a *temporary* reprieve from deportation and work permits to parents of U.S. born or permanent resident children, an in-depth debate on the effect of the original reprieve from deportation offered by DACA will surely follow. As it has been previously argued in the past with regards to broad amnesty programs conceding a *permanent* reprieve from deportation through the granting of legal status –such as the 1986 Immigration Reform and Control Act (IRCA), some have alleged that these *temporary* reprieves form deportation increase illegal border crossings. However, what proof do we have? This analysis will provide some new evidence on the role of such policies in attracting recent flows of unaccompanied minors.

*Finally*, there is a substantial number of unauthorized immigrants in the United States. While the stock of undocumented immigrants decreased during the 2008-2009 recession, it is still estimated at approximately 11.2 million (Krogstad and Passel 2014). Aside from labor market displacement effects, concerns regarding the potential fiscal burdens they impose on state and local governments by increasing their expenditures on health and, in particular, education are

4

one of the main reasons for which natives tend to oppose undocumented immigration (Smith and Edmonston 1997, Hanson 2012).  Therefore, it is crucial to gain a better understanding of how current policies might be impacting the inflow of unaccompanied minors.

## II.    Background

Unaccompanied migrant children, legally referred to as "Unaccompanied Alien Children", are children under the age of 18 who enter the United States without lawful immigration status and do not have a parent or legal guardian with them to provide care and physical custody.  According to a portion of the *William Wilberforce Trafficking Victims Protection Reauthorization Act* (WWTVPRA) of 2008, with the exception of children coming from Mexico and Canada –countries with a border with the United States, unaccompanied minors have to be transferred to Office of Refugee Resettlement (ORR) custody by the Customs Border Patrol (CBP) within 72 hours.  ORR is responsible for holding them 'in the least restrictive setting that is in the best interest of the child' until the children can be released to a 'suitable family member' in the United States.[3,4]  Children then wait for a proper hearing.  Given the increase in deportation hearings from recent years, waiting periods have been known to last for years and, during that time, the children are allowed to stay in the country (Resnick, 2004).

In sum, the 2008 law significantly changed the way in which unaccompanied alien children were handled by the Department of Homeland Security (DHS), which had previously removed unaccompanied minors using expedited procedures.  The new legislation was accompanied by a surge in the flow of unaccompanied alien children from El Salvador,

---

[3] 8 U.S.C. § 1232
[4] Only recently, in July 2014, H.R. 5079 was introduced to amend the WWTVPRA and allow for any unaccompanied alien child who is not considered a victim of trafficking or does not have a credible fear of persecution to be: (1) placed in removal proceedings, (2) eligible for voluntary departure at no cost to the child, and (3) provided with access to counsel.  Currently, such expedited removal requirements apply only to unaccompanied children from countries that are contiguous to the United States.

Guatemala and Honduras, worsening the bottleneck in the handling of unaccompanied minors'
deportation.   The confluence of all these factors led some to the conclusion that the 2008
WWTVPRA might have played a role in the increase in inflows from those countries –a
deduction supported by Figure 1.

At the same time, others have pointed fingers to President Obama's 2012 executive order
offering a reprieve from deportation to unauthorized immigrant childhood arrivals that fulfilled a
series of requirements (the *Deferred Action for Childhood Arrivals* or DACA) as yet another
cause for the increased inflows.   As mentioned earlier, DACA's roots are closely tied to
DREAM Act proposals, which preceded DACA by over a decade.   However, the timing and
political context in which DACA was announced cannot be overlooked.   Its origins can be traced
back to the period leading to the presidential election in late 2012, which resulted in a battle for
Latino votes in the face of a potential alternative to the DREAM act presented by President
Obama's challengers (Wallsten 2012).   All this contributed to a political environment in which
DACA was announced suddenly and implemented swiftly.   For purposes of evaluating the
impact of DACA, this suggests that there were relatively little anticipation effects leading up to
the program's announcement.

DACA did not offer the more permanent immigration status embedded in DREAM Act
proposals; rather, it provided qualified individuals with a two-year reprieve from deportation
proceedings and the ability to obtain work authorization in the United States.   At the expiration
of the two-year period, program beneficiaries had to apply for a renewal of their DACA status,
with renewals being issued in two-year increments.   Although DACA did not offer a permanent
legal status to undocumented eligible undocumented youth, its eligibility rules closely mirrored
those in the DREAM Act legislation.   Namely, U.S. Citizenship and Immigration Services

(USCIS) stipulated that an individual eligible for DACA had to: (1) Be under the age of 31 as of June 15, 2012; (2) Have arrived in the United States before reaching his 16th birthday; (3) Have continuously resided in the United States since June 15, 2007, up until the time of application (4) Have been physically present in the United States on June 15, 2012, and at the time of making the request for deferred action with USCIS; (5) Have entered without inspection prior to June 15, 2012, or had his lawful immigration status expired by that date; (6) Be currently in school, have graduated from high school or obtained an equivalent degree, or have been honorably discharged from the Coast Guard or Armed Forces of the United States; and (7) Have no criminal records or pose a threat to national security or public safety.[5]

As noted above, since the surge in unaccompanied minors somewhat overlapped with the announcement of DACA, some politicians and critics have contended that DACA is primarily responsible for the surge in unaccompanied alien children (Hing 2014, Wolgin and Kelley 2014, Wong 2014).   They have noted that these young migrants are heading north not just to flee deteriorating economic and security conditions in Central America, but also lured by rumors that they will be granted permission to stay legally and that such rumors originated from DACA.[6]  In that vein, the Economist (2014) claimed that a memo from the U.S. Customs and Border Patrol based on interviews with 230 women and children apprehended in the Rio Grande Valley concluded that they crossed mainly because they expected to be allowed to stay.  However, many responses suggest that the surge started before DACA, as it appears to be the case in Figure 1. Furthermore, none of the children crossing in or after 2012 would be eligible for DACA.[7]  And, indeed, in an interview of over 400 children from Central America by the United Nations High

---

[5] For greater details, visit the section entitled: "Consideration of Deferred Action for Childhood Arrivals Process" at http://www.uscis.gov
[6] See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/
[7] Nowrasteh (2014) and *LA Times* (2014).

Commissioner for Refugees (UNHCR) regional office for the United States and the Caribbean, only a handful of the children mentioned the rumors of preferential treatment for children or potential immigration reform as a reason for coming to the United States.[8]

Without a real understanding of the factors driving the inflows of unaccompanied minors from Central America, we will not be able to address the root causes of the problem. Therefore, the aim of this paper is to explore in a more systematic manner the determinants of unaccompanied children migration from Central America, with a special focus on the role played by DACA, as opposed to other push and pull factors.

## III.    Brief Literature Review

A number of authors have examined how policies granting legal status via relatively broad amnesty programs, such as the 1986 Immigration Reform and Control Act (IRCA), have impacted immigration flows. In addition to focusing on amnesties, which grant a permanent legal status as opposed to a temporary reprieve from deportation as DACA, the results from these studies are somewhat mixed. For instance, Bean *et al.* (1990), White *et al.* (1990) and Linder (2011) find that border apprehensions –a proxy for illegal immigration inflows– were significantly lower after IRCA. In contrast, Donato *et al.* (1992) and Woodrow and Passel (1990) do not. Trying to reconcile these contradictory findings, Orrenius and Zavdony (2003) look at various points in time surrounding the enactment of IRCA and find that apprehensions declined immediately after IRCA, but returned to normal levels soon after.

Studies on how *temporary* reprieves from deportation, such as DACA, affect illegal immigration and, more specifically, the flow of unaccompanied minors are virtually inexistent. Most of the literature is circumscribed to commentary pieces and news reports that are

---

[8]http://themigrationist.net/2014/06/25/why-are-unaccompanied-children-fleeing-central-america-and-how-can-the-u-s-and-others-respond/

descriptive in nature.  For instance, Hulse (2014) discusses how the WWTVPRA, rather than DACA, is the root of the increased flow of unaccompanied minors across the southwest border; whereas Wong (2014) suggests that violence in the sending countries, as opposed to DACA, is mostly responsible for the surge in flows during 2013 and 2014.

In what follows, we address this gap in the literature with an analysis of the role that DACA, as opposed to the WWTVPRA and other determinants of immigration flows in the home and host countries considered in the literature (*e.g.* Borjas 1987, Yang 1995, Karemera *et al.* 2000, Orrenius and Zavodny 2003, Clark *et al.* 2007, Mayda 2010), might have played in explaining the recent surge in unaccompanied minors.

## IV.    Data and Descriptive Evidence

We make use of data on apprehensions of unaccompanied children by border patrol sector, nationality and year obtained via a Freedom of Information Act request.  Our dependent variable is the number of apprehended unaccompanied minors from Mexico, El Salvador, Guatemala and Honduras, per year and border patrol sector along the U.S.-Mexico border.  The four Central American countries account for the vast inflow of unaccompanied alien children.  Our data span from 2007 through 2013 –the time period made available for which the Customs Border Patrol (CBP) made these data available.  While it would be ideal to have quarterly or monthly data, yearly data was the highest frequency CBP was willing to release due to alleged confidentiality concerns.  Finally, because apprehensions varied widely across border patrol sector on account of their proximity to the railroad (nicknamed "The Beast"), pre-existing crossing networks and the difficulty on making it across the border,[9] we also requested having the data broken down by border patrol sector.  In that manner, we are able to account for

---

[9] As an example, while Rio Grande Valley, TX or Tucson, AZ experienced significant increases in unaccompanied minor flows, changes in the latter were negligible in border patrol sectors such as Yuma, AZ or El Centro, CA.

differences in border patrol sector enforcement levels, unobserved time-invariant characteristics captured by border patrol sector fixed-effects and time-varying factors embodied in border patrol sector specific time trends –all of which could be responsible for differences in the volume of unaccompanied minors.

At this point, it is also worth noting that the number of apprehended youth is not the ideal measure of the number of unaccompanied minors who have successfully crossed into the United States or even of the number who have attempted to do so.  However, given the generalized practice of turning themselves in to the border patrol agents upon crossing (Preston 2014), these numbers are likely to be correlated to the number of illegal crossings by unaccompanied minors –possibly even more so that in the case of overall apprehensions of undocumented immigrants (Bean *et al*. 1990, Espenshade 1995).  As such, while one might have to be careful in assessing the exact impact of any determinant on those flows, the data can be helpful in identifying the direction of the impact that DACA, versus other factors, might be having on the recent flows of unaccompanied alien children.

In addition to data on apprehensions of unaccompanied alien children, we gather information on a number of push and pull factors possibly responsible for the observed increase in unaccompanied minor apprehensions.  In particular, data on homicide counts and real GDP per capita from each Central American country is collected from the *United Nations Office on Drugs and Crime Database* and from the *World Development Indicators Database*, respectively. Data on real U.S. average weekly earnings and unemployment rates are gathered from the Bureau of Labor Statistics website.  Finally, figures on the total number of legal permanent residents admitted from each Central American country and on the number of border patrol agents by sector along the southwest border of the United States and Mexico are collected from

the *Yearbook of Immigration Statistics* at the Department of Homeland Security website and from the U.S. Customs and Border Protection website, correspondingly.

Table 2 displays the summary statistics for the variables used in the analysis before the 2008 WWTVPRA, after that law and before the 2012 DACA, and after DACA.  On average, apprehensions of unaccompanied alien children were the lowest prior to the implementation of the WWTVPRA and DACA –averaging 189 across the various southwest border patrol sectors in 2007.  Apprehensions doubled during the 2008-2011 period following the WWTVPRA law and prior to the announcement of DACA in 2012.  Then, they doubled again during 2012 and 2013, coinciding with the implementation of DACA.

Also worth noting are the ongoing changes in other potentially responsible push and pull factors.  For instance, homicide counts per 100,000 doubled from 2007 to 2008-2011 –a change that could be in part responsible for the large increase in unaccompanied minor apprehensions during that same period.  The increase took place despite the simultaneous increase in U.S. unemployment rates and the number of border patrol agents per sector along the southwest border –two factors that should have curtailed that surge in unaccompanied alien children.  But, perhaps more puzzling is the sharp rise in the unaccompanied minors during 2012 and 2013 notwithstanding the stability in most of the variables in Table 2 during that time period.  What sustained the continued growth in the flow of unaccompanied minors?

To better understand the dynamics of unaccompanied minor apprehensions, we step back to first assess the statistical significance of the increases in the number of unaccompanied alien children, as well as in some factors typically put forward as key determinants of such flows, in the different time periods displayed in Table 2.  According to the descriptive statistics in Panel A of Table 3, the doubling in the number of apprehensions of unaccompanied alien children from

before to after the WWTVPRA law and prior to the announcement of DACA, as well as thereafter following the enactment of DACA, was statistically significant at the 5 percent level. Because the increases observed surrounding the WWTVPRA and DACA might have originated form distinct countries, we subsequently differentiate between arrivals from El Salvador, Guatemala and Honduras, as opposed to arrivals from Mexico, in Panels B and Panel C, respectively. According to the statistics reported in Panel B, apprehensions of unaccompanied minors from El Salvador, Honduras and Guatemala significantly increased after both the WWTVPRA and, especially, DACA. In contrast, apprehensions of unaccompanied Mexican minors do not appear to have significantly risen following DACA, even though they did increase significantly following the enactment of the WWTVPRA. Could it be the case that conditions in the two sets of Central American countries significantly differed during those two time periods?

Tables 4 and 5 address that question by comparing two commonly cited determinants of unaccompanied minor flows –namely: homicide counts per 100,000 and real GDP per capita in home countries before and after the WWTVPRA and DACA, correspondingly. Overall, homicide rates doubled from before to after the WWTVPRA law and prior to the enactment of DACA. And, while all Central Americans endured a significantly more violent environment, the increase in homicide counts per 100,000 was particularly acute in Mexico, coinciding with the war on drugs. In fact, homicides kept on rising in Mexico during the time period surrounding the enactment of DACA, whereas they did not in El Salvador, Guatemala and Honduras.

Is it possible that, instead of violence, poor economic conditions in the home country contributed to the significant increase in unaccompanied minor apprehensions during the period when DACA was announced as shown in Panel B, Table 3? Table 5 looks into that question by examining changes in the real GDP per capita in unaccompanied minors' countries of origin –a

12

proxy for economic well-being– during the time period surrounding the WWTVPRA and DACA. According to the descriptive statistics in Table 5, economic conditions might have helped explain what went on with apprehensions of unaccompanied minors from Mexico during the time period surrounding the enactment of the WWTVPRA. However, real GDP per capita did not significantly change in the remaining Central American countries during the time span being examined.

In sum, while apprehensions of unaccompanied minors from El Salvador, Guatemala and Honduras seem to have surged during the time period surrounding the enactment of DACA, changes in homicides rates or economic condition, as captured by real GDP per capita, do not seem to have done the same. Yet, while informative, the statistics in Tables 3 through 5 are purely descriptive. In what follows, we thoroughly assess the role that these factors, along with traditional pull and push factors in the United States, might have played in explaining the observed changes in apprehensions of unaccompanied minors once we account for a wide range of unobserved fixed and time-varying country of origin and border patrol sector characteristics potentially responsible for the observed changes in flows.

## V.   Methodology

Our main aim is to gauge the role that DACA, relative to prior legislative measures and a range of home and host country characteristics, might have played in the increase in crossings of unaccompanied alien children. To that end, we regress the logarithm of unaccompanied minor apprehensions on two dummy variables indicative of the period during which DACA and the WWTVPRA laws were in place, along with a series of variables capturing push and pull factors. Among the former, we include homicide counts per 100,000 and real GDP per capita in the home country, as well as the number of border patrol agents per sector and year in the United States.

13

Among the pull factors, we include the average real U.S. weekly earnings and unemployment rates, in addition to the number of legal permanent residents admitted from each of the countries. Our benchmark specification is as follows:

(1) $\log(UACS)_{bct} = \alpha_0 + \alpha_1 DACA_t + \alpha_2 WWTVPRA_t + \alpha_3 X_{bt} + Y_t\beta + Z_{ct}\gamma + \delta_b + \theta_c +$

$trend + \delta_b * trend + \theta_c * trend + \varepsilon_{bct}$

where subscript $b$ denotes border patrol sector, $c$ denotes home country of the unaccompanied alien children, and $t$ denotes year of apprehension. Our dependent variable is the logarithm of unaccompanied minor apprehensions ($\log(UACS)_{bct}$) from each country per border patrol sector and year. Our key regressors are given by $DACA_t$ and $WWTVPRA_t$ –two dummy variables indicative of when DACA and the WWTVPRA were in effect. The vector $X_{bt}$ includes information on the number of border patrol agents per sector and year, whereas $Y_t$ accounts for average real weekly earnings and unemployment rates in the United States.[10] As noted above, we also control for home country characteristics possibly related to the observed increase in unaccompanied minor flows, such as violence and economic conditions as captured by homicide counts per 100,000 and real GDP per capita in the home country. Those two variables are included in the vector $Z_{ct}$, along with information on the number of legal permanent residents admitted to the United States from each of the four Central American countries. The latter could have influenced the migration of unaccompanied alien children if they came to the United States to reunite with other family members with a legal status. Alternatively, if children had migrated illegally prior to the enactment of any of the two laws, an increase in the number of new legal permanent residents should lower the apprehensions of unaccompanied minors.

---

[10] Average weekly earnings are in 1982-1984 constant dollars.

Equation (1) also includes a range of border patrol ($\delta_b$) and country of origin ($\theta_c$) fixed-effects to help explain flows of unaccompanied minors, such as proximity to railroad tracks crossing Mexico (*e.g.* the case of Rio Grande Valley sector) or a history of high emigration (*e.g.* Mexico due to the Bracero program or El Salvador owing to political turmoil in the 1980s). Importantly, because of the clear trend in apprehensions of unaccompanied alien children exhibited in Table 1, we include a time trend and also test for serial correlation.[11] One way to address first-order serial correlation is to perform the estimation in first differences. However, by doing so, we inevitably lose the 2007 data and the ability to assess the potential role of the WWTVPRA law on the flows of unaccompanied minors. Therefore, we instead use Baltagi-Wu's Generalized Least Square method to remove the AR(1) component.[12]

Finally, in addition to a time trend, equation (1) also incorporates border patrol- and country of origin-specific time trends (*i.e.* ($\delta_b * trend$) and ($\theta_c * trend$), respectively). These are included to address differences in the operability of border patrol sectors, sometimes related to the adoption of specific measures, as in the case of the progressive adoption of Operation Streamline by the various border patrol sectors from 2005 onwards.[13] Similarly, countries of origin-specific time trends allow us to account for other time-varying characteristics in the home country, such as fertility rates or policy interventions.

We estimate various model specifications that progressively add the discussed pull and push factors to better gauge their role in shaping flows of unaccompanied alien children. This is particularly important in the presence of potentially endogenous regressors –as would be the case

---

[11] Wooldridge (2002)'s test for autocorrelation in panel-data models suggest that we have first-order autocorrelation in all of our specifications in Table 6 at the 1% level of significance.

[12] See details in http://www.stata.com/manuals13/xtxtregar.pdf.

[13] We also experimented with including an indicator for Operation Streamline. The latter turned to be collinear with the border patrol specific time trends, which prove more relevant in explaining unaccompanied minor flows. Since our key findings were unaffected by the inclusion of that policy indicator, we opted for keeping the border patrol specific time trends instead. Results using the Operation Streamline indicator are available from the authors.

with the number of border patrol agents per sector and year (in hundreds). By including it in a stepped manner, we are able to gauge unexpected changes in the estimated impact of DACA potentially driven by its endogenous nature.

## VI.    Results

Was DACA responsible, at least in part, for the unprecedented increase in the inflow of unaccompanied alien children in 2012 and 2013? Table 6 explores that question.[14] In the most parsimonious model specification, DACA appears to have augmented apprehensions of unaccompanied minors by as much as 70 percent. A similar impact is also found for the 2008 WWTVPRA, which appears to have led to a 78 percent increase in apprehensions of unaccompanied alien children. These two estimates, however, significantly decrease in magnitude when we include a range of border patrol sector and country of origin fixed effects, along with a time trend and border patrol and country of origin specific time trends. Specifically, the effect of DACA on the apprehensions of unaccompanied minors goes down from 70 percent to 42 percent, whereas that of the WWTVPRA drops from 78 percent to 59 percent. In fact, as shown in specifications (3) through (7), the impact of DACA effectively becomes indistinguishable from zero when we control for the pull and push factors previously discussed in Table 2. Specifically, accounting for average weekly earnings and unemployment rates in the United States further reduces the estimated coefficient for DACA and eliminates its statistical significance. In contrast, the estimated impact of the WWTVPRA remains practically unchanged and only keeps on growing as we include the remaining controls –namely legal

---

[14] The Baltagi-Wu LBI-statistics in all specifications are around 2 indicating no autocorrelation. As a rough rule of thumb, values below 1 suggests positively autocorrelation, see Sarkisian (n.d.) and Engelhardt and Prskawetz (2009).

entries, border patrol agents by sector and information on economic conditions and violence in the home country.

Our most complete specification (specification (7)) adds an interaction term of the WWTVPRA with the Mexico country dummy. Because the WWTVPRA specifically targeted minors from countries other than Canada and Mexico, we would expect the 2008 law to have impacted the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, but not the flow from neighboring Mexico. As such, our expectation is that the estimated coefficients for the WWTVPRA and its interaction term with the Mexico country dummy would be jointly statistically different from zero and negative, revealing the comparatively larger impact of the 2008 law on the flow of unaccompanied minors from El Salvador, Guatemala and Honduras.

The estimates in specification (7) reveal that DACA has not been responsible for the observed increase in unaccompanied alien children in 2012 and 2013. Rather, apprehensions of unaccompanied minors from El Salvador, Guatemala and Honduras have been on the rise since 2008. They practically doubled since the passage of the aforementioned law by the U.S. Congress –likely due to the fact that children from non-neighboring countries were allowed to stay in the United States, often for years, while awaiting a hearing. In contrast, in relative terms, the WWTVPRA lowered apprehensions of unaccompanied minors originating from Mexico – who continued to be immediately returned to their home country following their apprehension via expedited removals, by approximately 26 percent.[15]

Other estimates in Table 6 have the expected signs. For instance, a 1 percent increase in average weekly earnings in the United States –a highly unusual event given the compression of household incomes since the 1980s, would be associated to a 29 percent increase in

---

[15] The impact of the WWTVPRA on apprehensions of unaccompanied alien children from Mexico is computed as the sum of the estimated coefficients of the WWTVPRA and the interaction term between WWTVPRA and Mexico dummy, which are jointly significant at the 1% level.

apprehensions of unaccompanied minors. [16]   In contrast, a similar 1 percent increase in unemployment rates would lower such apprehensions by 2.7 percent.  Additionally, conditions in the home countries also appear to play a significant role in shaping the flow of unaccompanied youth.  In particular, a 5 percent increase in the count of homicides per 100,000 –the equivalent to an additional 445 homicides per year, on average– seems to raise apprehensions of unaccompanied alien children by 4.51 percent.  In contrast, better living conditions back home as captured by a 1 percent higher real GDP per capita –a mere $37/year increase– would reduce the aforementioned apprehensions by 7.5 percent.

In sum, while DACA does not appear to have played a significant role in shaping the recent increases in apprehensions of unaccompanied alien children along the Mexico-U.S. border, the 2008 WWTVPRA does, along with economic conditions in the United States, plus economic conditions and violence in the originating countries.

## VII.    Summary and Conclusions

Apprehensions of unaccompanied minors from Central American countries had been on the rise since 2008, but news report particularly caught up with the increase after 2012 and, in particular, during the summer of 2014.  The surge in unaccompanied alien children crossing the southwest border brought new attention –most of it negative– to DACA.  Some politicians have posited that DACA created the expectation that children would be allowed to stay in the country and, as a result, contributed to the surge.  Immigration advocates, however, believe that the two are not related.  With the new executive order from November 20, 2014, granting a temporary reprieve from deportation and work permits to parents of permanent residents or U.S. born

---

[16] The marginal effect is computed as: $(0.01*\$337/week)*100*\beta$, where $337 is the average real weekly earnings in the U.S. as shown in Table 2.  Other marginal effects are computed similarly.

children (*Deferred Action for Parental Accountability* or DAPA), a careful analysis of the effect of these policy measures is much needed.

Using data on apprehensions of unaccompanied children by border patrol sector, nationality and year, we examine the impact that DACA might have had on the recent surge in the unaccompanied minors apprehended while crossing the southwest border of the United States.  We find that DACA does not appear to have a significant impact on those apprehensions once we account for traditional pull and push factors and a range of unobserved country of origin and border patrol sector time-varying and fixed effects.  Rather, the 2008 WWTVPRA, along with violence in the originating countries and economic conditions both in the origin countries and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest U.S.-Mexico border.  As such, the claim that DACA is responsible for the increase in the flow of unaccompanied alien children is not supported by the data.

# References

**Bean, F.D., T.J. Espenshade, M.J. White, and R.F. Dymowski.** 1990. "Post-IRCA Changes in the Volume and Composition of Undocumented Migration to the United States", Pp. 111-158 in *Undocumented Migration to the United States*, edited by F.D. Bean, B. Edmonston, and J.S. Passel. Santa Monica: RAND.

**Binford, W.** 2013. "Giving Voice to Unaccompanied Children in Removal Proceedings", *Willamette Journal of International Law and Dispute Resolution*, 34: 34-55

**Borjas, G.J.** 1987. "Self Selection and the Earnings of Immigrants", *American Economic Review* 77: 531-553.

**Clark, X., T.J. Hatton, and J.G. Williamson.** 2007. "Explaining U.S. Immigration, 1971-1998", *The Review of Economics and Statistics*, 89(2): 359-373.

**Donato, K.M., J. Durand, and D.S. Massey.** 1992. "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act", *Demography* 29:139-157.

**Engelhardt, H. and A. Prskawetz.** 2009. "A Pooled Time-Series Analysis on the Relation Between Fertility and Female Employment", *European Demographic Research Papers #0501*.

**Hanson, G.** 2012. "Immigration and Economic Growth", *Cato Journal*, 32(1): 25-34. Available online at: http://www.cato.org/pubs/journal/cj32n1/cj32n1.html

**Hanson, G. and A. Spilimbergo.** 2001. "Political Economy, Sectoral Shocks, and Border Enforcement", *Canadian Journal of Economics*, 34(3): 612-638.

**Hing, Julianne.** 2014. "Three Myths of the Unaccompanied Minors Crisis, Debunked" ColorLines News for Action, Tuesday, July 1. Online at: http://colorlines.com/archives/2014/07/three_myths_of_the_unaccompanied_minors_crisis.html [Last accessed on November 24, 2014].

**Hulse, Carl.** 2014. "Immigrant Surge Rooted in Law to Curb Child Trafficking", *The New York Times*. Published July 7, 2014. [Last accessed on December 8, 2014].

**Karemera, D., V.I. Oguledo, and B. Davis.** 2000. "A Gravity Model Analysis of International Migration to North America", *Applied Economics*, 32(13): 1745-1755.

**Krogstad, Jens M. and Jeffrey S. Passel.** 2014. "5 facts about illegal immigration in the U.S." Pew Research Center, Washington DC. Available at: http://www.pewresearch.org/fact-tank/2014/11/18/5-facts-about-illegal-immigration-in-the-u-s/ [Last accessed on December 6, 2014].

**Linder, J.** 2011. "The Amnesty Effect: Evidence from the 1986 Immigration Reform and Control Act", *The Public Purpose*, Spring 2011: 13-31.

**Los Angeles Times.** 2014. "Republicans blame Obama policies for immigration crisis on border" Available at: www.latimes.com/nation/la-na-immigration-border-20140620-story.html

**Mayda, A.M.** 2010. "International Migration: A Panel Data Analysis of the Determinants of Bilateral Flows", *Journal of Population Economics*, 23(4): 1249-1274.

**Migration Policy Institute.** 2012. "Top 10 of 12: Issue #10: As Migration of Unaccompanied Minors Endures, and in Some Cases Rises, Government Seeks to Respond", Migration Information Source, December 2012. Available at: http://www.migrationinformation.org [Last accessed on September 15, 2014].

**Nowrasteh, Alex.** 2014. "DACA Did Not Cause the Surge in Unaccompanied Children". Cato At Liberty, July 29, 2014. Available at: http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children [Last accessed on December 4, 2014].

**Orrenius, P.M., and M. Zavodny.** 2003. "Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA", *Demography* 40(3): 437-450.

**Preston, Julia.** "Migrants Flow in South Texas, as Do Rumors" *The New York Times*. Published June 16, 2014. [Last accessed on December 1, 2014].

**Preston, Julia and John H. Cushman Jr.** "Obama to Permit Young Migrants to Remain in U.S." *The New York Times*. Published June 15, 2012. [Last accessed on September 15, 2014].

**Rempdell, Scott.** 2015. "Credible Fears, Unaccompanied Minors, and the Causes of the Southwestern Border Surge", *Chapman Law Review, forthcoming 2015.*

**Resnick, Brian.** 2014. "Why We Don't Immediately Send the Border Kids Back", Available at: http://www.nationaljournal.com/domesticpolicy/why-we-don-t-immediately-send-the-border-kids-back-20140708. [Last accessed on December 12, 2014].

**Sarkisian, N.** n.d. "SC706: Longitudianal Data Analysis", Available at: http://sarkisian.net/sc706/fixed.doc [Last accessed on December 4, 2014].

**Smith, J. P. and B. Edmonston**, eds. 1997. *The New Americans*. Washington, DC: National Academy Press.

**Stinchcomb, D. and E. Hershberg.** 2014. "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses", *Center for Latin American & Latino Studies Working Paper Series No. 7.*

**The Economist.** 2014. "Migration to the United States. Under-age and on the move. A wave of unaccompanied children swamps the debate over immigration" Available at: http://www.economist.com/news/briefing/21605886-wave-unaccompanied-children-swamps-debate-over-immigration-under-age-and-move.

21

**Wallsten, Peter.**  2012.  "Marco Rubio's DREAM Act Alternative a Challenge for Obama on Illegal Immigration."  *The Washington Post*.  Published April 25, 2012.  Accessed September 26, 2013.

**Wolgin, Philip E. and Angela Maria Kelley.**  2014.  "5 Things You Need to Know About Unaccompanied Children", American Progress.  Online at: https://www.americanprogress.org/issues/immigration/news/2014/06/18/92056/5-things-you-need-to-know-about-the-unaccompanied-minors-crisis/ [Last accessed on November 24, 2014].

**Wong, Tom K.**  2014.  "Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border", American Progress.  Online at: https://www.americanprogress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/ [Last accessed on November 24, 2014].

**Woodrow, K.A., and J.S. Passel.** 1990. "Post-IRCA Undocumented Immigration to the United States: An Assessment Based on the June 1988 CPS. Pp. 33-75 in *Undocumented Migration to the United States: IRCA and the Experience of the 1980s*, edited by F.D. Bean, B. Edmonston, and J.S. Passel. Washington, DC: Urban Institute Press.

**Wooldridge, Jeffrey.** 2002. *Econometric Analysis of Cross Section and Panel Data.* Cambridge. MA: MIT Press.

**Yang, P.Q.** 1995. *Post-1965 Immigration to the United States*. Praeger, Westport, Connecticut.

**Figure 1: Apprehensions of Unaccompanied Minors over Time**



**Table 1: Apprehended Unaccompanied Alien Children by Fiscal Year and Country of Origin**

| Country | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| El Salvador | 629 | 1,388 | 1,221 | 1,910 | 1,394 | 3,314 | 5,990 |
| Guatemala | 494 | 1,371 | 1,115 | 1,517 | 1,565 | 3,835 | 8,068 |
| Honduras | 797 | 1,568 | 968 | 1,017 | 974 | 2,997 | 6,747 |
| Mexico | 4,839 | 3,288 | 16,114 | 13,724 | 11,768 | 13,974 | 17,240 |

**Source:** http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

23

**Table 2: Summary Statistics by Time Period**

| Variables | Overall (2007-2013) | Pre-WWTVPRA (2007) | Post-WWTVPRA & Pre-DACA (2008-2011) | Post-DACA (2012-2013) |
|---|---|---|---|---|
| UAC Apprehensions | 513.246 (1157.105) | 189.139 (486.518) | 419.833 (975.142) | 862.125 (1583.349) |
| Homicide Count per 100,000 at Origin | 0.09 (0.076) | 0.054 (0.022) | 0.094 (0.077) | 0.098 (0.086) |
| Real GDP per capita at Origin | 3773.414 (2645.779) | 3772.709 (2683.923) | 3725.95 (2596.191) | 3868.695 (2758.058) |
| Real U.S. Average Weekly Earnings | 337.286 (4.104) | 335 (0) | 339.5 (4.168) | 334 (1.007) |
| U.S. Unemployment Rate | 7.669 (1.74) | 4.617 (0) | 8.41 (1.532) | 7.713 (0.365) |
| LPRs Admitted per Country in 1,000s | 47.771 (61.4) | 48.83 (58.66) | 49.373 (64.7) | 44.037 (56.394) |
| BP Agents per Sector in 100s | 18.888 (9.446) | 14.774 (7.584) | 19.107 (8.998) | 20.507 (10.615) |
| No. of Observations | 252 | 36 | 144 | 72 |

**Note:** UAC apprehensions data is by border patrol sector and fiscal year.

24

**Table 3: Incidence of UAC Apprehensions Pre vs. Post WWTVPRA and DACA**

| Variable: | Count of Apprehensions of Unaccompanied Alien Children | | |
|---|---|---|---|
| Statistic: | Observations | Mean | t stat |
| **Panel A: From All Countries** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 36 | 189.139 (486.518) | **2.010\*\*** |
| After WWTVPRA | 144 | 419.833 (975.142) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 144 | 419.833 (975.142) | **2.173\*\*** |
| After DACA | 72 | 862.125 (1583.349) | |
| **Panel B: From El Salvador, Guatemala and Honduras** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 27 | 71.111 (132.494) | **2.198\*\*** |
| After WWTVPRA | 108 | 146.843 (240.791) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 108 | 146.843 (240.791) | **2.558\*\*** |
| After DACA | 54 | 572.426 (1210.797) | |
| **Panel C: From Mexico** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 9 | 543.222 (889.070) | **1.711\*** |
| After WWTVPRA | 36 | 1238.806 (1669.737) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 36 | 1238.806 (1669.737) | 0.837 |
| After DACA | 18 | 1731.222 (2198.518) | |

**Notes:** Standard deviations are in parentheses. The null hypothesis being tested is whether the mean of UACs after policies were implemented and the mean of UACs before policies were implemented are the same. \*\*\*, \*\*, \* denote 1%, 5%, and 10% levels of significance, respectively.

**Table 4: Homicide Incidence Pre vs. Post WWTVPRA and DACA**

| Variable: | Homicide Count per 100,000 | | |
|---|---|---|---|
| Statistic: | Observations | Mean | t stat |
| **Panel A: From All Countries** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 36 | 0.054 (0.022) | **5.361\*\*\*** |
| After WWTVPRA | 144 | 0.094 (0.077) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 144 | 0.094 (0.077) | 0.038 |
| After DACA | 72 | 0.098 (0.080) | |
| **Panel B: From El Salvador, Guatemala and Honduras** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 27 | 0.043 (0.011) | **4.244\*\*\*** |
| After WWTVPRA | 108 | 0.053 (0.012) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 108 | 0.053 (0.012) | -1.070 |
| After DACA | 54 | 0.050 (0.018) | |
| **Panel C: From Mexico** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 9 | 0.089 (0) | **14.495\*\*\*** |
| After WWTVPRA | 36 | 0.217 (0.009) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 36 | 0.217 (0.009) | **2.769\*\*\*** |
| After DACA | 18 | 0.244 (0.017) | |

**Notes:** Standard deviations are in parentheses.  The null hypothesis being tested is whether the mean of homicide count after policies were implemented and the mean of homicide count before policies were implemented are the same. \*\*\*, \*\*, \* denote 1%, 5%, and 10% levels of significance, respectively.

**Table 5: Gross Domestic Product per Capita Pre vs. Post WWTVPRA and DACA**

| Variable: | GDP per Capita in 2005 Constant Dollars | | |
|---|---|---|---|
| Statistic: | Observations | Mean | t stat |
| **Panel A: From All Countries** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 36 | 3772.709 (2683.923) | -0.094 |
| After WWTVPRA | 144 | 3725.95 (2596.191) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 144 | 3725.95 (2596.191) | 0.366 |
| After DACA | 72 | 3868.695 (2758.058) | |
| **Panel B: From El Salvador, Guatemala and Honduras** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 27 | 2275.307 (618.979) | -0.091 |
| After WWTVPRA | 108 | 2263.234 (596.196) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 108 | 2263.234 (596.196) | 0.528 |
| After DACA | 54 | 2316.369 (607.949) | |
| **Panel C: From Mexico** | | | |
| **Period prior to DACA** | | | |
| Before WWTVPRA | 9 | 8264.916 (0) | **-4.320\*\*\*** |
| After WWTVPRA | 36 | 8114.099 (209.484) | |
| **Period after WWTVPRA** | | | |
| Before DACA | 36 | 8114.099 (209.484) | **11.776\*\*\*** |
| After DACA | 18 | 8525.675 (6.866) | |

**Notes:** Standard deviations are in parentheses. The null hypothesis being tested is whether the mean of GDP per capita after policies were implemented and the mean of GDP per capita before policies were implemented are the same. \*\*\*, \*\*, \* denote 1%, 5%, and 10% levels of significance, respectively.

**Table 6: Determinants of UAC Apprehensions**

| Key Regressors | (1)<br>Baseline | (2)<br>Plus Fixed Effects and Time Trends | (3)<br>Plus Host Country Characteristics | (4)<br>Plus Legal Entries | (5)<br>Plus Enforcement | (6)<br>Plus Home Country Characteristics | (7)<br>Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| **DACA** | **0.695*** | **0.424*** | 0.177 | 0.195 | 0.192 | 0.290 | 0.249 |
| | (0.121) | (0.174) | (0.277) | (0.271) | (0.272) | (0.274) | (0.275) |
| **WWTVPRA** | **0.776*** | **0.592*** | **0.586*** | **0.792*** | **0.817*** | **0.872*** | **0.953*** |
| | (0.134) | (0.168) | (0.182) | (0.201) | (0.208) | (0.199) | (0.208) |
| Mexico*WWTVPRA | - | - | - | - | - | - | -1.213 |
| | | | | | | | (0.959) |
| Real U.S. Average Weekly Earnings | - | - | **0.098*** | **0.100*** | **0.100*** | **0.080*** | **0.086*** |
| | | | (0.039) | (0.039) | (0.039) | (0.045) | (0.045) |
| U.S. Unemployment Rate | - | - | **-0.233*** | **-0.266*** | **-0.254*** | **-0.323*** | **-0.357*** |
| | | | (0.136) | (0.135) | (0.137) | (0.152) | (0.154) |
| LPRs Admitted per Country in 1,000s | - | - | - | **-0.014*** | **-0.014*** | **-0.015*** | 0.002 |
| | | | | (0.006) | (0.006) | (0.006) | (0.015) |
| Border Patrol Agents per Sector in 100s | - | - | - | - | -0.022 | -0.026 | -0.032 |
| | | | | | (0.044) | (0.042) | (0.042) |
| Homicides per 100,000 at Origin | - | - | - | - | - | **5.856*** | **10.026*** |
| | | | | | | (3.297) | (4.661) |
| Real GDP per Capita at Origin | - | - | - | - | - | **-0.002*** | **-0.002*** |
| | | | | | | (0.001) | (0.001) |
| BP Sector Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Country of Origin Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Time Trend | N | Y | Y | Y | Y | Y | Y |
| BP Sector-Time Trends | N | Y | Y | Y | Y | Y | Y |
| Country of Origin-Time Trends | N | Y | Y | Y | Y | Y | Y |
| $R^2$ | 0.047 | 0.829 | 0.833 | 0.834 | 0.834 | 0.842 | 0.842 |
| Observations | 252 | 252 | 252 | 252 | 252 | 252 | 252 |

**Notes:** Standard errors are in parentheses and are clustered at the (country, border patrol sector) level.  The dependent variable is the logarithm of unaccompanied alien children. ***, **, * denote 1%, 5%, and 10% levels of significance, respectively.

# DEF-INTERV.

# EX. 100



doi: 10.1111/imig.12250

# DACA and the Surge in Unaccompanied Minors at the US-Mexico Border

Catalina Amuedo-Dorantes* and Thitima Puttitanun**

## ABSTRACT

Apprehensions of unaccompanied minors from Central American countries have been on the rise since 2008, but news reports particularly caught up with the increase after 2012. Some politicians posited that the 2012 *Deferred Action for Childhood Arrivals* (DACA) contributed to the surge by creating the expectation that children would be allowed to stay in the country. Immigration advocates, however, believe that the two are not related. Using data on apprehensions of unaccompanied minors by border patrol sector, nationality and year, we find that DACA did not significantly impact those apprehensions. Rather, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act*, along with violence in the originating countries and economic conditions in both the countries of origin and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border.

## INTRODUCTION

The number of unaccompanied alien children crossing the southern border of the United States has grown drastically since 2008, capturing congressional attention and leading to a number of hearings in the House (Rempdell, 2015). Figure 1 depicts the recent surge in apprehensions of unaccompanied alien children from Mexico, El Salvador, Guatemala, and Honduras. In addition to its growth, it has been noted that the composition of the flow of unaccompanied alien children changed over the time period under consideration. While the vast majority of these children used to come from Mexico, the surge in unaccompanied minors observed in recent years has been dominated by children originating from three other Central American countries: El Salvador, Guatemala, and Honduras.[1] A confluence of factors, including extreme violence, endemic poverty, increasingly sophisticated smuggling networks and the desire to reunite with family members in the United States, have fuelled this growth. Additionally, it has been argued that legislative changes, in particular, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act* (TVPRA) of President Bush era and the more recent *Deferred Action for Childhood Arrivals* (DACA) announced by President Obama on 15 June 2012, might have been used by smugglers to sway migrants with false promises that they will be able to stay in the United States once they get into the country (Hing, 2014; Rempdell, 2015). The TVPRA legislated that unaccompanied minors from non-contiguous countries needed to be released into the custody of family or sponsors while they await a deportation hearing in front of a judge, thus enabling children to stay in the United States for what became, in most instances, years. Under DACA, individuals approved for consideration of

* San Diego State University.
** Kasetsart University, Bangkok.

© 2016 The Authors
International Migration © 2016 IOM
*International Migration* Vol. 54 (4) 2016
ISSN 0020-7985

*The Surge in Unaccompanied Minors at the US-Mexico Border* 103

FIGURE 1
APPREHENSIONS OF UNACCOMPANIED MINORS OVER TIME



Source: U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request.

deferred action were granted a renewable two-year reprieve from deportation proceedings and become eligible for work authorization in the United States. Because of the timing of DACA and the publicized surge in unaccompanied minors coming from Central America after 2012, Senator Sessions have called for a vote on DACA suspension.[2]

Yet, so far, we still lack a good understanding of the role that DACA or, for that matter, the TVPRA might have played, if any, on such inflows.

In this article, we explore the determinants behind the recent increase in inflows of unaccompanied alien children from Central America. In particular, given President Obama's second executive order expanding DACA programme, we pay special attention to the effect that DACA might have played on the surge of unaccompanied minors originating from Mexico, El Salvador, Guatemala and Honduras in recent years. Because one of the requirements of DACA involved being present in the United States, DACA might have encouraged undocumented immigration. Additionally, DACA could have stimulated inflows of unauthorized children if it somehow fostered beliefs that other deferred deportation concessions or even permanent amnesties would occur in the future.

Establishing the effect of DACA on the surge of unaccompanied minors is important for several reasons. First, the rapid increase has resulted in children often being held in overcrowded facilities with adult asylum seekers, thus increasing their difficulty in gaining access to proper legal and medical care (Binford, 2013; Stinchcomb and Hershberg, 2014; MPI, 2012). This led President Obama to declare the wave of unaccompanied minors an "urgent humanitarian situation", asking federal agencies to coordinate an emergency response to the situation. Yet an appropriate response requires a good understanding of the root causes for such flows, which we still lack.

Second, since President Obama's new executive order announced on 20 November 2014 extends the eligibility of DACA applicants and grants a *temporary* reprieve from deportation and work permits to parents of US-born or permanent resident children – an initiative currently placed on hold after Judge Hanen's decision to temporarily enjoin its implementation, an in-depth debate on the effect of the original reprieve from deportation offered by DACA will surely follow. Some have alleged that these *temporary* reprieves form deportation increase illegal border crossings. What

© 2016 The Authors. International Migration © 2016 IOM

proof do we have? This analysis will provide some new evidence on the role of such policies in attracting the recent flows of unaccompanied minors.

Finally, there is a substantial number of unauthorized immigrants in the United States. While the stock of undocumented immigrants decreased during the 2008-2009 recession, it is still estimated at approximately 11.2 million (Krogstad and Passel, 2014). Aside from labour market displacement effects, concerns regarding the potential fiscal burdens they impose on state and local governments by increasing their expenditures on health and, in particular, education are one of the main reasons for which natives tend to oppose undocumented immigration (Smith and Edmonston, 1997; Hanson, 2012). Therefore, it is crucial to gain a better understanding of how current policies might be impacting the inflow of unaccompanied minors.

## BACKGROUND

Unaccompanied minors, legally referred to as "Unaccompanied Alien Children", are children under the age of 18 who enter the United States without lawful immigration status and do not have a parent or legal guardian with them to provide care and physical custody. According to a portion of the *William Wilberforce Trafficking Victims Protection Reauthorization Act* (henceforth: TVPRA) of 2008, with the exception of children coming from Mexico and Canada – countries with a border with the United States, unaccompanied minors have to be transferred to the custody of the Office of Refugee Resettlement (ORR) by the US Customs and Border Protection (CBP) within 72 hours. ORR is responsible for holding them "in the least restrictive setting that is in the best interest of the child" until the children can be released to a "suitable family member" in the United States.[3] Children then wait for a proper hearing. Given the increase in deportation hearings from recent years, waiting periods have been known to last for years and, during that time, the children are allowed to stay in the country (Resnick, 2014).

In sum, the 2008 law significantly changed the way in which unaccompanied minors were handled by the Department of Homeland Security (DHS), which had previously removed unaccompanied minors using expedited procedures. The new legislation was accompanied by a surge in the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, worsening the bottleneck in the handling of unaccompanied minors' deportation. The confluence of all these factors led some to conclude that the 2008 TVPRA might have led the increase in inflows from those countries – a deduction supported by Figure 1.

At the same time, others have pointed fingers to President Obama's 2012 executive order offering a reprieve from deportation to unauthorized immigrant childhood arrivals that fulfilled a series of requirements (the *Deferred Action for Childhood Arrivals* or DACA). DACA's roots are closely tied to DREAM Act proposals, which preceded DACA by over a decade. However, the timing and political context in which DACA was announced cannot be overlooked.

DACA did not offer the more permanent immigration status embedded in DREAM Act proposals; rather, it provided qualified individuals with a two-year reprieve from deportation proceedings and the ability to obtain work authorization in the United States. At the expiration of the two-year period, program beneficiaries had to apply for a renewal of their DACA status, with renewals being issued in two-year increments. An individual eligible for DACA had to: (1) be under the age of 31 as of 15 June 2012; (2) have arrived in the United States before reaching his/her 16th birthday; (3) have continuously resided in the United States since 15 June 2007, up until the time of application (4) have been physically present in the United States on 15 June 2012, and at the time of making the request for deferred action with USCIS; (5) have entered without inspection prior to 15 June 2012, or had his lawful immigration status expired by that date; (6) be currently in school, have graduated from high school or obtained an equivalent degree, or have been honourably discharged

© 2016 The Authors. International Migration © 2016 IOM

from the Coast Guard or Armed Forces of the United States; and (7) have no criminal records or pose a threat to national security or public safety.[4]

As noted above, since the surge in unaccompanied minors somewhat overlapped with the announcement of DACA, some politicians and critics have contended that DACA is primarily responsible for the surge in unaccompanied minors (Hing, 2014; Wolgin and Kelley, 2014; Wong, 2014). They have noted that these young migrants are heading north not just to flee deteriorating economic and security conditions in Central America, but also lured by rumours that they will be granted permission to stay legally and that such rumours originated from DACA.[5] In that vein, the Economist (2014) claimed that a memo from the US Customs and Border Patrol, based on interviews with 230 women and children apprehended in the Rio Grande Valley, concluded that they crossed mainly because they expected to be allowed to stay. Many responses, however, suggest that the surge started before DACA, as appears to be the case in Figure 1. Furthermore, none of the children crossing in or after 2012 would be eligible for DACA.[6] And, indeed, in an interview of over 400 children from Central America by the United Nations High Commissioner for Refugees (UNHCR) regional office for the United States and the Caribbean, only a handful of the children mentioned the rumours of preferential treatment for children or potential immigration reform as a reason for coming to the United States.[7]

Without a real understanding of the factors driving the inflows of unaccompanied minors from Central America, we will not be able to address the root causes of the problem. Therefore, the aim of this article is to explore in a more systematic manner the determinants of unaccompanied minors migration from Central America and Mexico, with a special focus on the role played by DACA, as opposed to other push-and-pull factors.

## BRIEF LITERATURE REVIEW

A number of authors have examined how policies granting permanent legal status via relatively broad amnesty programmes, such as the 1986 Immigration Reform and Control Act (IRCA), have impacted immigration flows.[8] The results from these studies are somewhat mixed. For instance, Bean et al. (1990), and Linder (2011) find that border apprehensions – a proxy for illegal immigration inflows – were significantly lower after IRCA. In contrast, Donato and Sisk (2015), Donato et al. (1992) and Woodrow and Passel (1990) do not. Trying to reconcile these contradictory findings, Orrenius and Zavodny (2003) look at various points in time surrounding the enactment of IRCA and find that apprehensions declined immediately after IRCA, but returned to normal levels soon after.

Studies on how *temporary* reprieves from deportation, such as DACA, affect illegal immigration inflows and, more specifically, child migration are virtually non-existent. Nonetheless, the literature has pointed out some factors they consider relevant in shaping child migration. For example, Bhabha (2008) suggests that, just as the migration of adults, child migration is motivated by traditional push and pull socio-economic factors, including poverty, employment and educational opportunities. Kandel et al. (2014) further add that, in addition to the aforementioned push and pull factors, actual and perceived US immigration policies play a role on child migration to the United States.

In addition, a number of commentary pieces and news reports that are descriptive in nature have zoomed in on unaccompanied minors in particular. For instance, Wong (2014) and Rosenblum and Ball (2016) suggest that violence in the sending countries is mostly responsible for the surge in flows during 2013 and 2014. Chishti and Hipsman (2014) and Hulse (2014) argue that, in addition to violence, child-friendly policies that date back to the TVPRA, have contributed to the upsurge in unaccompanied minors. By contrast, in a recent study Donato and Sisk (2015) argue that, while

© 2016 The Authors. International Migration © 2016 IOM

violence and poverty underlie migration decisions, they do not predict child migration. Rather, child migration is strongly linked to parents' US experience and period of entry, even though their analysis does not explore the more recent role played by the two policies being discussed here.

In what follows, we formally examine the role that DACA, as opposed to the potential role of the TVPRA and other well-known determinants of immigration flows, might have played in explaining the recent surge in unaccompanied minors. Specifically, as suggested by the aforementioned literature on child migration, we allow for the flow of unaccompanied minors to be impacted by economic conditions back at home and in the host country.[9] In addition, we take into account rampant violence, which often targets young people,[10] as well as the role played by border enforcement and the availability of alternative legal entry methods, as captured by the number of Border Patrol agents in the sector where minors are being apprehended and the number of legal permanent residents admitted yearly, respectively. Most importantly, we account for the role that the passage of the TVPRA, which might have fed rumours that the US government was offering legal status documentation to Central American children, as well as DACA, might have played on the observed increase in apprehensions of unaccompanied children once we condition for all the aforementioned push and pull factors.

## DATA AND DESCRIPTIVE EVIDENCE

We make use of data on apprehensions of unaccompanied minors from Mexico, El Salvador, Guatemala, and Honduras obtained via a Freedom of Information Act request. The dataset spans from 2007 through 2013, the time period for which the US Customs and Border Protection (CBP) made the data available. Unfortunately, CBP does not offer any data from before 2007, which would enhance our ability to evaluate the TVPRA policy more thoroughly. However, it does allow us to address our main purpose, namely to evaluate the role played by DACA in attracting unaccompanied minors. Finally, we use apprehension figures broken down by border patrol sector. In this manner, we are able to address: (a) the lack of higher frequency (monthly or quarterly) data, as well as (b) the large variation in apprehensions across border patrol sectors on account of a number of factors, including their proximity to the railroad (nicknamed "The Beast") on which the children ride throughout Mexico, the availability of crossing networks and coyotes, or the overall degree of difficulty associated with crossing through a particular border point due to its terrain (e.g. mountain or desert) or fencing, to name a few. Indeed, as made evident by the graphs in Figure 2, apprehensions in some border patrol sectors, such as Big Bend, TX and Yuma, AZ, were in the hundreds, whereas apprehensions in Rio Grande Valley, TX were in the thousands, exceeding 20,000 in 2013.[11] Moreover, while some sectors, such as Rio Grande Valley, TX, experienced the largest increases in unaccompanied minor flows, sectors like Yuma, AZ or El Centro, CA, witnessed negligible changes over that time period. In fact, in some sectors (e.g. El Paso, TX), the numbers were declining.

As noted above, a few factors help to explain these differences, but two key elements include geography and border security. Geographically, south Texas is closer to Central America than west Texas, New Mexico, Arizona or California, allowing migrants to minimize the risks of an already treacherous journey. Furthermore, until August 2014, when the Mexican government started to curtail migrants' ability to ride the cargo trains, they were able to get to the border on top of rail cars. In addition to geography, border security is also likely to have also played an important role in the observed differences in unaccompanied minors' flows across border patrol sectors. Border patrolling aside, the Rio Grande Valley sector has the least border fencing within proximity to densely populated areas. This is, in part, due to its terrain – a flood-prone area that makes the building of fencing along its banks extremely costly. Less fencing and proximity to a densely populated area

© 2016 The Authors. International Migration © 2016 IOM

FIGURE 2
APPREHENSIONS OF UNACCOMPANIED MINORS BY BORDER PATROL SECTOR



Source: US Customs and Border Protection (CBP) via a Freedom of Information Act request.

are factors that facilitate the crossing. In sum, for the aforementioned reasons it is essential to account for intrinsic border-patrol differences when modelling unaccompanied minors' apprehensions.

At this point, it is also worth noting that the number of apprehended youth is not the ideal measure of the number of unaccompanied minors who have successfully crossed into the United States or even of the number who have attempted to do so. However, given the generalized practice of turning themselves in to the border patrol agents upon crossing (e.g. American Immigration Council, 2014; Preston, 2014), these numbers are likely to be correlated to the number of illegal crossings by unaccompanied minors –possibly even more so that in the case of overall apprehensions of undocumented immigrants (Bean et al., 1990; Espenshade, 1995). As such, while one might have to be careful in assessing the exact impact of any determinant on those flows, the data can be helpful in identifying the direction of the impact that DACA, versus other factors, might be having on the recent flows of unaccompanied minors.

In addition, we gather information on a number of push and pull factors believed to be responsible for the observed increase in unaccompanied minor apprehensions – including economic and safety characteristics at home vs. in the host country. In particular, data on homicide counts and real GDP per capita of the sending countries is collected from the *United Nations Office on Drugs and Crime Database* and the *World Development Indicators Database*, respectively. Additionally, data on real US median weekly earnings and US unemployment rates are gathered from the Bureau of Labour Statistics website. Finally, as noted in section III, we also include figures on the total number of lawful permanent residents admitted from each country of origin and on the number of border patrol agents by sector along the southwest border of the United States and Mexico, which are collected from the *2007-2013 Yearbooks of Immigration Statistics* at the Department of Homeland Security website and from the US Customs and Border Protection website, correspondingly. A detailed description of the variables used in our analysis can be found in the data appendix.

Although our main purpose, owing to the availability of data, is on DACA, Table 1 displays the summary statistics for the variables used in the analysis before the 2008 TVPRA, after that law

© 2016 The Authors. International Migration © 2016 IOM

TABLE 1

SUMMARY STATISTICS BY TIME PERIOD

| Variables | Overall (2007-2013) | Pre-TVPRA (2007) | Post-TVPRA & Pre-DACA(2008-2011) | Post-DACA (2012-2013) |
|---|---|---|---|---|
| UAC Apprehensions | 513.246 | 189.139 | 419.833 | 862.125 |
| | (1157.105) | (486.518) | (975.142) | (1583.349) |
| Homicide Count per | 0.09 | 0.054 | 0.094 | 0.098 |
| 100,000 at Origin | (0.076) | (0.022) | (0.077) | (0.086) |
| Real GDP per capita at | 3773.414 | 3772.709 | 3725.95 | 3868.695 |
| Origin | (2645.779) | (2683.923) | (2596.191) | (2758.058) |
| Real U.S. Median | 337.286 | 335 | 339.5 | 334 |
| Weekly Earnings | (4.104) | (0) | (4.168) | (1.007) |
| U.S. Unemployment | 7.669 | 4.617 | 8.41 | 7.713 |
| Rate | (1.74) | (0) | (1.532) | (0.365) |
| LPRs Admitted per | 47.771 | 48.83 | 49.373 | 44.037 |
| Country in 1,000s | (61.4) | (58.66) | (64.7) | (56.394) |
| BP Agents per Sector in | 18.888 | 14.774 | 19.107 | 20.507 |
| 100s | (9.446) | (7.584) | (8.998) | (10.615) |
| No. of Observations | 252 | 36 | 144 | 72 |

Note: UAC Apprehensions Data is by Border Patrol Sector and Fiscal Year.

and before the 2012 DACA, and after DACA. On average, apprehensions of unaccompanied minors were the lowest prior to the implementation of the TVPRA and DACA –averaging 189 across the various southwest border patrol sectors in 2007. Apprehensions doubled during the 2008-2011 period following the TVPRA law and prior to the announcement of DACA in 2012. Then, they doubled again during 2012 and 2013, coinciding with the implementation of DACA.

Also worth noting are the ongoing changes in other potentially responsible push and pull factors. For instance, homicide counts per 100,000 doubled from 2007 to 2008-2011 – a change that could be in part responsible for the large increase in unaccompanied minor apprehensions during that same period. However, the increase took place despite the simultaneous increase in US unemployment rates and the number of border patrol agents per sector along the southwest border, two factors that should have curtailed that surge in unaccompanied minors. Even more puzzling is the sharp rise in the unaccompanied minors during 2012 and 2013 notwithstanding the stability in most of the variables in Table 1 during that time period. What sustained the continued growth in the flow of unaccompanied minors?

In what follows, we thoroughly assess the role that DACA and TVPRA, along with traditional pull and push factors, might have played in explaining the observed changes in apprehensions of unaccompanied minors once we account for a wide range of unobserved fixed and time-varying country of origin and border patrol sector characteristics potentially responsible for the observed changes in flows.

## METHODOLOGY

Our main aim is to gauge the role that DACA, relative to that of prior legislative measures or sending/receiving country characteristics, might have played in the increase in crossings of unaccompanied minors. To that end, we regress the logarithm of unaccompanied minor apprehensions on two dummy variables indicative of the period during which DACA and the TVPRA laws were in place, along with a series of variables capturing the push-and-pull factors discussed earlier. Among the

© 2016 The Authors. International Migration © 2016 IOM

former, we include homicide counts per 100,000 and real GDP per capita in the home country, as well as the number of border patrol agents per sector and year in the United States. Among the pull factors, we include the median real US weekly earnings and unemployment rates, in addition to the number of lawful permanent residents admitted from each of the countries. Our benchmark specification is as follows:

$$\log(UACS)_{bct} = \alpha_0 + \alpha_1 DACA_t + \alpha_2 TVPRA_t + \alpha_3 X_{bt} + Y_t\beta + Z_{ct}\gamma + \delta_b + \theta_c + trend + \delta_b*trend \\ + \theta_c*trend + \varepsilon_{bct}$$

(1)

where subscript $b$ denotes border patrol sector, $c$ denotes home country of the unaccompanied minors, and $t$ denotes year of apprehension. Our dependent variable is the logarithm of unaccompanied minor apprehensions ($\log(UACS)_{bct}$) from each country per border patrol sector and year, a monotonic transformation that proves convenient in dealing with heteroscedasticity and in transforming a highly skewed variable into one that is more approximately normal. Our key regressors are given by $DACA_t$ and $TVPRA_t$, two dummy variables indicative of when DACA and the TVPRA were in effect. The vector $X_{bt}$ includes information on the number of border patrol agents per sector and year, whereas $Y_t$ accounts for median real weekly earnings and unemployment rates in the United States. (Median weekly earnings are in 1982-1984 constant dollars.) Vector $Z_{ct}$ includes homicide counts per 100,000 and real GDP per capita in the home country, along with data on the number of lawful permanent residents admitted to the United States from each of the four countries of origin. The latter could have influenced the migration of unaccompanied minors if they came to the United States to reunite with other family members with a legal status. Alternatively, if children had migrated illegally prior to the enactment of any of the two laws, an increase in the number of new lawful permanent residents should lower the apprehensions of unaccompanied minors.

Equation (1) also includes a range of border patrol ($\delta_b$) and country of origin ($\theta_c$) fixed-effects to help explain flows of unaccompanied minors, such as proximity to railroad tracks crossing Mexico (e.g. the case of Rio Grande Valley sector), the difficulty associated with crossing through a mountainous or deserted terrain, or a history of high emigration to the United States (e.g. Mexico or El Salvador, owing to political turmoil in the 1980s). Importantly, because of the clear trend in apprehensions of unaccompanied minors exhibited in Figure 1, we include a time trend and also test for serial correlation.[12] One way to address first-order serial correlation is to perform the estimation in first differences. By doing so, however, we inevitably lose the 2007 data and the ability to assess the potential role of the TVPRA law on the flows of unaccompanied minors. Therefore, instead we use Baltagi-Wu's Generalized Least Square method to remove the AR(1) component.[13]

Finally, in addition to a time trend, equation (1) also incorporates border patrol- and country of origin-specific time trends (i.e. ($\delta_b * trend$) and ($\theta_c * trend$), respectively). These are included to address differences in the operability of border patrol sectors, sometimes related to the adoption of specific measures, as in the case of the progressive adoption of Operation Streamline by the various border patrol sectors from 2005 onwards.[14] At other times, differences in the flows of unaccompanied minors by border patrol sector are associated with the changing availability of crossing networks and coyotes through a particular border point. Similarly, countries of origin-specific time trends allow us to account for other time-varying characteristics in the home country, such as fertility rates or policy interventions.

We estimate various model specifications that progressively add the discussed pull and push factors to better gauge their role in shaping flows of unaccompanied minors. This is particularly important in the presence of potentially endogenous regressors, as would be the case with the number of border patrol agents per sector and year (in hundreds). By including it in a stepped manner,

TABLE 2

DETERMINANTS OF UAC APPREHENSIONS

| Key Regressors | (1) Baseline | (2) Plus Fixed Effects and Time Trends | (3) Plus Receiving Country Characteristics | (4) Plus Legal Entries | (5) Plus Enforcement | (6) Plus Sending Country Characteristics | (7) Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| **DACA** | **0.695*** | **0.424**** | 0.177 | 0.195 | 0.192 | 0.290 | 0.249 |
| | (0.121) | (0.174) | (0.277) | (0.271) | (0.272) | (0.274) | (0.275) |
| **TVPRA** | **0.776*** | **0.592*** | **0.586*** | **0.792*** | **0.817*** | **0.872*** | **0.953*** |
| | (0.134) | (0.168) | (0.182) | (0.201) | (0.208) | (0.199) | (0.208) |
| Mexico*TVPRA | – | – | – | – | – | – | –1.213 |
| | | | | | | | (0.959) |
| Real U.S. Median Weekly Earnings | – | – | **0.098**** | **0.100*** | **0.100**** | **0.080*** | **0.086*** |
| | | | (0.039) | (0.039) | (0.039) | (0.045) | (0.045) |
| U.S. Unemployment Rate | – | – | −0.233* | −0.266** | −0.254* | −0.323** | −0.357** |
| | | | (0.136) | (0.135) | (0.137) | (0.152) | (0.154) |
| LPRs Admitted per Country in 1,000s | – | – | – | −0.014** | −0.014** | −0.015** | 0.002 |
| | | | | (0.006) | (0.006) | (0.006) | (0.015) |
| Border Patrol Agents per Sector in 100s | – | – | – | – | −0.022 | −0.026 | −0.032 |
| | | | | | (0.044) | (0.042) | (0.042) |
| Homicides per 100,000 at Origin | – | – | – | – | – | **5.856*** | **10.026**** |
| | | | | | | (3.297) | (4.661) |
| Real GDP per Capita at Origin | – | – | – | – | – | **−0.002*** | **−0.002*** |
| | | | | | | (0.001) | (0.001) |
| BP Sector Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Country of Origin Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Time Trend | N | Y | Y | Y | Y | Y | Y |
| BP Sector-Time Trends | N | Y | Y | Y | Y | Y | Y |

© 2016 The Authors. International Migration © 2016 IOM

*The Surge in Unaccompanied Minors at the US-Mexico Border* 111

TABLE 2

(CONTINUED)

| Key Regressors | (1) Baseline | (2) Plus Fixed Effects and Time Trends | (3) Plus Receiving Country Characteristics | (4) Plus Legal Entries | (5) Plus Enforcement | (6) Plus Sending Country Characteristics | (7) Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| Country of Origin-Time Trends | N | Y | Y | Y | Y | Y | Y |
| $R^2$ | 0.047 | 0.829 | 0.833 | 0.834 | 0.834 | 0.842 | 0.842 |
| Observations | 252 | 252 | 252 | 252 | 252 | 252 | 252 |

Notes: Standard Errors are in Parentheses and are Clustered at the (Country, Border Patrol Sector) Level. The Dependent Variable is the Logarithm of Unaccompanied Alien Children. ***, **, * Denote 1%, 5%, and 10% Levels of Significance, Respectively. Country-of-origin Dummies, Including one for Mexico, are Added to Specifications (2) through (7).

© 2016 The Authors. International Migration © 2016 IOM

*Amuedo-Dorantes and Puttitanun*

we are able to gauge unexpected changes in the estimated impact of DACA potentially driven by its endogenous nature.

## RESULTS

Was DACA responsible, at least in part, for the unprecedented increase in the inflow of unaccompanied alien children in 2012 and 2013? Table 2 explores that question.[15] In the most parsimonious model specification, DACA appears to have augmented apprehensions of unaccompanied minors by as much as 70 per cent. A similar impact is also found for the 2008 TVPRA, which appears to have led to a 78 per cent increase in apprehensions of unaccompanied alien children. These two estimates, however, significantly decrease in magnitude when we include a range of border patrol sector and country of origin fixed effects, along with a time trend and border patrol and country of origin specific time trends. Specifically, the effect of DACA on the apprehensions of unaccompanied minors goes down from 70 percent to 42 percent, whereas that of the TVPRA drops from 78 per cent to 59 per cent. In fact, as shown in specifications (3) through (7), the impact of DACA effectively becomes indistinguishable from zero when we control for the pull and push factors previously discussed in Table 1. Accounting for median weekly earnings and unemployment rates in the United States further reduces the estimated coefficient for DACA and eliminates its statistical significance. In contrast, the estimated impact of the TVPRA remains practically unchanged and only keeps on growing as we include the remaining controls: lawful entries, border patrol agents by sector and information on economic conditions and violence in the home country.

Our most complete specification (specification 7) adds an interaction term of the TVPRA with the Mexico country dummy. Because the TVPRA specifically targeted minors from countries other than Canada and Mexico, we would expect the 2008 law to have impacted the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, but not the flow from neighbouring Mexico. As such, our expectation is that the estimated coefficients for the TVPRA and its interaction term with the Mexico country dummy would be jointly statistically different from zero and negative, revealing the comparatively larger impact of the 2008 law on the flow of unaccompanied minors from El Salvador, Guatemala and Honduras.

The estimates in specification 7 suggest that DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013. Rather, apprehensions of unaccompanied minors from El Salvador, Guatemala and Honduras have been on the rise since 2008.[16] They practically doubled since the passage of the aforementioned law by the US Congress, probably due to the fact that children from non-neighbouring countries were allowed to stay in the United States, often for years, while awaiting a hearing. In contrast, in relative terms, the TVPRA lowered by approximately 26 per cent apprehensions of unaccompanied minors originating from Mexico, who continued to be returned immediately to their home country following their apprehension via expedited removals.[17]

Other estimates in Table 2 have the expected signs. For instance, a one per cent increase in median weekly earnings in the United States, a highly unusual event given the compression of household incomes since the 1980s, would be associated with a 29 per cent increase in apprehensions of unaccompanied minors.[18] In contrast, a similar one per cent increase in unemployment rates would lower such apprehensions by 2.7 per cent. Additionally, conditions in the home countries also appear to play a significant role in shaping the flow of unaccompanied youth. In particular, a five per cent increase in the count of homicides per 100,000, the equivalent to an additional 445 homicides per year, on average, seems to raise apprehensions of unaccompanied alien children by 4.51 per cent. In contrast, better living conditions back home, as captured by a one per cent higher real

© 2016 The Authors. International Migration © 2016 IOM

GDP per capita, a mere $37 increase per year, would reduce the aforementioned apprehensions by 7.5 per cent.

In sum, while DACA does not appear to have played a significant role in shaping the recent increases in apprehensions of unaccompanied alien children along the Mexico-U.S. border, the 2008 TVPRA does, along with economic conditions in the United States, plus economic conditions and violence in the originating countries.

## SUMMARY AND CONCLUSIONS

Apprehensions of unaccompanied minors from Mexico and Central American countries had been on the rise since 2008, but news reports particularly caught up with the increase after 2012. The surge in unaccompanied alien children crossing the southwest border brought new attention, most of it negative, to DACA. Some politicians have posited that DACA created the expectation that children would be allowed to stay in the country and, as a result, contributed to the surge. Immigration advocates, however, believe that the two are not related. With the President's executive order from November 20, 2014 expanding DACA and granting a temporary reprieve from deportation and work permits to parents of permanent residents or US born children, currently placed on hold after Judge Hanen's decision to enjoin its implementation temporarily, a careful analysis of the effect of these policy measures is much needed.

Using data on apprehensions of unaccompanied children by border patrol sector, nationality and year, we find that DACA has not had a significant impact on those apprehensions once we account for traditional pull and push factors and a range of unobserved country of origin and border patrol sector time-varying and fixed effects. Rather, the 2008 TVPRA, along with violence in the originating countries and economic conditions both in the origin countries and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border. While our findings are bounded by the accessibility of CBP data, a limitation that warrants further analyses were such data made available, we can conclude that the empirical evidence does not support the claim that DACA is responsible for the increase in the flow of unaccompanied alien children.

## ACKNOWLEDGEMENTS

We are grateful to Pia Orrenius and Madeline Zavodny for feedback on an earlier version, and to Nick Santos for assistance in acquiring the data.

## NOTES

1. See http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children for details.
2. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/
3. 8 USC § 1232. Only recently, in July 2014, H.R. 5079 was introduced to amend the TVPRA and allow for any unaccompanied alien child who is not considered a victim of trafficking or does not have a credible fear of persecution to be: (1) placed in removal proceedings, (2) eligible for voluntary departure at no cost to the child, and (3) provided with access to counsel. Currently, such expedited removal requirements apply only to unaccompanied children from countries that are contiguous to the United States.
4. For greater details, visit the section entitled: "Consideration of Deferred Action for Childhood Arrivals Process" at http://www.uscis.gov

© 2016 The Authors. International Migration © 2016 IOM

5. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/

6. Nowrasteh (2014) and *LA Times* (2014).

7. http://themigrationist.net/2014/06/25/why-are-unaccompanied-children-fleeing-central-america-and-how-can-the-u-s-and-others-respond/

8. There is also a literature examining the role played by a much broader range of immigration policies, not just those granting legal status, on immigration flows from Latin America. For example, Massey and Pren (2012) suggest that the surge in illegal immigrants from Latin America since 1965 is an unintended conse-quence stemming from the Bracero Programme, the establishment of a cap on the number of permanent resident visas and stricter enforcement policies.

9. It is worth noting that, while young children may not be thinking about work and other economic aspects, such as wages, when they migrate, older youth – a group that encompasses most of the unaccompanied minors – might. Furthermore, even if they are not thinking about their immediate employment, young chil-dren might be swayed by better employment opportunities and overall economic conditions typically linked to better prospects for escaping poverty.

10. In a report for the Advocacy for Human Rights in the Americas, Meyer and Isacson (2015) note how, for example, homicides in El Salvador increased by 57 per cent in 2014 following the collapse of a 2012-2014 gang truce.

11. Because of the distinct magnitude of the flows, we use different scales for the y-axis in the figures in order to see the variation in the flows over time within each sector.

12. Wooldridge (2002)'s test for autocorrelation in panel-data models suggests that we have first-order auto-correlation in all of our specifications in Table 2 at the one per cent level of significance.

13. See details in http://www.stata.com/manuals13/xtxtregar.pdf.

14. We also experimented with including an indicator for Operation Streamline. The latter turned to be colli-near with the border patrol specific time trends, which prove more relevant in explaining unaccompanied minor flows. Since our key findings were unaffected by the inclusion of that policy indicator, we opted for keeping the border patrol specific time trends instead. Results using the Operation Streamline indicator are available from the authors.

15. The Baltagi-Wu LBI-statistics in all specifications are around 2 indicating no autocorrelation. As a rough rule of thumb, values below 1 suggests positively autocorrelation, see Sarkisian (n.d.) and Engelhardt and Prskawetz (2009).

16. Our findings are robust to the exclusion of Mexicans from our sample. Results are available from the authors upon request.

17. The impact of the TVPRA on apprehensions of unaccompanied alien children from Mexico is computed as the sum of the estimated coefficients of the TVPRA and the interaction term between TVPRA and Mexico dummy, which are jointly significant at the one per cent level.

18. The marginal effect is computed as: $(0.01*\$337/week)*100*\beta$, where $\$337$ is the average value of real median weekly earnings in the U.S. as shown in Table 1. Other marginal effects are computed similarly.


## REFERENCES

American Immigration Council
  2014    *Children in Danger: A Guide to the Humanitarian Crisis at the Border*. Special Report, July. Wash-ington DC. Available at: http://www.immigrationpolicy.org/sites/default/files/docs/children_in_dan-ger_a_guide_to_the_humanitarian_challenge_at_the_border_final.pdf (accessed 20 July 2015).

Bean, F.D., T.J. Espenshade, M.J. White, and R.F. Dymowski
  1990    "Post-IRCA Changes in the Volume and Composition of Undocumented Migration to the United States", in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the United States*, Santa Monica: RAND: 111–158

Bhabha, J.
  2008    "Independent Children, Inconsistent Adults: International Child Migration and the Legal Frame-work. *UNICEF Discussion Papers*. IDP No. 2008-02.

Binford, W.
  2013    "Giving Voice to Unaccompanied Children in Removal Proceedings", *Willamette Journal of Inter-national Law and Dispute Resolution*, 34: 34–55.

© 2016 The Authors. International Migration © 2016 IOM

Chishti, M., and F. Hipsman
  2014    "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solu-
        tions", *Migration Information Source*. Washington, DC: Migration Policy Institute. June 13. Online
        at: http://www.migrationpolicy.org/article/dramatic-surge-arrival-unaccompanied-children-has-deep-
        roots-and-no-simple-solutions
Donato, K.M., J. Durand, and D.S. Massey
  1992    "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act",
        *Demography*, 29: 139–157.
Donato, K.M., and B. Sisk
  2015    "Children's Migration to the United States from Mexico and Central America: Evidence from the
        Mexican and Latin American Migration Projects", *Journal on Migration and Human Security*, 3(1):
        58–79.
Engelhardt, H., and A. Prskawetz
  2009    "A Pooled Time-Series Analysis on the Relation Between Fertility and Female Employment",
        *European Demographic Research Papers #0501*.
Espenshade, M.J.
  1995    "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing
        the U.S.-Mexico Frontier", *International Migration Review*, 29(2): 545–465.
Hanson, G.
  2012    "Immigration and Economic Growth", *Cato Journal*, 32(1): 25–34. Available online at: http://
        www.cato.org/pubs/journal/cj32n1/cj32n1.html
Hanson, G., and A. Spilimbergo
  2001    "Political Economy, Sectoral Shocks, and Border Enforcement", *Canadian Journal of Economics*,
        34(3): 612–638.
Hing, J.
  2014    "Three Myths of the Unaccompanied Minors Crisis, Debunked" ColorLines News for Action, Tues-
        day, July 1. Online at: http://colorlines.com/archives/2014/07/three_myths_of_the_unaccompa-
        nied_minors_crisis.html (accessed 24 November 2014).
Hulse, C.
  2014    "Immigrant Surge Rooted in Law to Curb Child Trafficking", *The New York Times*. Published July
        7, 2014. (accessed 8 December 8 2014).
Kandel, W.A., A. Bruno, P.J. Meyer, C.R. Seelke, M. Taft-Morales, and R.E. Wasem
  2014    "Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration", Congres-
        sional Research Service, *CRS Report*, R43628.
Krogstad, Jens M., and Jeffrey S. Passel
  2014    "*5 facts about illegal immigration in the U.S.*" Pew Research Center, Washington DC.
        Available at: http://www.pewresearch.org/fact-tank/2014/11/18/5-facts-about-illegal-immigration-in-
        the-u-s/ (accessed 6 December 2014].
Linder, J.
  2011    "The Amnesty Effect: Evidence from the 1986 Immigration Reform and Control Act", *The Public
        Purpose*, Spring 2011: 13–31.
Los Angeles Times
  2014    "Republicans blame Obama policies for immigration crisis on border" Available at: www.latimes.-
        com/nation/la-na-immigration-border-20140620-story.html
Massey, D.S., and K.A. Pren
  2012    "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin
        America", *Population and Development Review*, 38(1): 1–29.
Meyer, Maureen, and Adam Isacson
  2015    "On the Front Lines: Border Security, Migration, and Humanitarian Concerns in South Texas",
        New WOLA Report on the South Texas Border. Available at: www.wola.org/publications/south_-
        texas_report (accessed 11 January 2016).
MPI/Migration Policy Institute
  2012    "Top 10 of 12: Issue #10: As Migration of Unaccompanied Minors Endures, and in Some Cases
        Rises, Government Seeks to Respond", Migration Information Source, December 2012. Available
        at: http://www.migrationinformation.org (accessed 15 September 2014).

© 2016 The Authors. International Migration © 2016 IOM

116                                    *Amuedo-Dorantes and Puttitanun*

Nowrasteh, Alex
    2014      "DACA Did Not Cause the Surge in Unaccompanied Children". Cato At Liberty, July 29, 2014.
              Available at: http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children (accessed
              4 December 2014).
Orrenius, P.M. and M. Zavodny
    2003      "Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA", *Demography*,
              40(3): 437–450.
Preston, J.
    2014      "Migrants Flow in South Texas, as Do Rumors" *The New York Times*. Published June 16, 2014.
              (accessed 1 December 2014).
Rempdell, S.
    2015      "Credible Fears, Unaccompanied Minors, and the Causes of the Southwestern Border Surge",
              *Chapman Law Review, forthcoming 2015*.
Resnick, B.
    2014      "Why We Don't Immediately Send the Border Kids Back", Available at: http://www.nationaljour-
              nal.com/domesticpolicy/why-we-don-t-immediately-send-the-border-kids-back-20140708. (accessed
              12 December 2014).
Rosenblum, M.R., and I. Ball
    2016      "Trends in Unaccompanied Child and Migration from Central America", *Migration Policy Institute*
              Fact Sheet, January 2016.
Sarkisian, N.
    n.d.      "SC706: Longitudinal Data Analysis", Available at: http://sarkisian.net/sc706/fixed.doc (accessed 4
              December 2014).
Smith, J. P., and B. Edmonston, eds.
    1997      *The New Americans*. Washington, DC: National Academy Press.
Stinchcomb, D., and E. Hershberg
    2014      "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses", *Cen-
              ter for Latin American & Latino Studies Working Paper Series No. 7.*
*The Economist*
    2014      "Migration to the United States. Under-age and on the move. A wave of unaccompanied children
              swamps the debate over immigration" Available at: http://www.economist.com/news/briefing/
              21605886-wave-unaccompanied-children-swamps-debate-over-immigration-under-age-and-move.
Wolgin, Philip E., and Angela Maria Kelley
    2014      "5 Things You Need to Know About Unaccompanied Children", *American Progress*. Online at:
              https://www.americanprogress.org/issues/immigration/news/2014/06/18/92056/5-things-you-need-to-
              know-about-the-unaccompanied-minors-crisis/ (accessed 24 November 2014).
Wong, T.K.
    2014      "Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccom-
              panied Children Crossing the Border", *American Progress*. Online at: https://www.american-
              progress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-
              deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/ (accessed 24
              November 2014).
Woodrow, K.A., and J.S. Passel
    1990      "Post-IRCA Undocumented Immigration to the United States: An Assessment Based on the June
              1988 CPS. in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the
              United States: IRCA and the Experience of the 1980s*, Washington, DC: Urban Institute Press: 33–
              75.
Wooldridge, Jeffrey
    2002      *Econometric Analysis of Cross Section and Panel Data*. Cambridge. MA: MIT Press.

© 2016 The Authors. International Migration © 2016 IOM

*The Surge in Unaccompanied Minors at the US-Mexico Border* 117

# DATA APPENDIX

## TABLE A

### VARIABLE NAMES, DEFINITIONS AND SOURCES

| Variable Name | Definition | Source |
|---|---|---|
| *Dependent Variable:*<br>Unaccompanied Alien Children | Number of apprehensions of unaccompanied children by border patrol sector, nationality and year. We work with 9 border patrol sectors: Big Bend, TX; Del Rio, TX; El Centro, CA; El Paso, TX; Laredo, TX; Rio Grande Valley, TX; San Diego, CA; Tucson, AZ; Yuma, AZ; 4 countries of origin: Mexico, El Salvador, Guatemala, Honduras; and 7 years of data spanning from 2007 through 2013. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| *Regressors:*<br>DACA | Dummy variable equal to 1 after DACA was in effect. | U.S. Citizenship and Immigration Services Website:http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca |
| TVPRA | Dummy variable equal to 1 after TVPRA was in effect. | U.S. Department of State Website: http://www.state.gov/j/tip/laws/113178.htm |
| Mexico | Dummy variable equal to 1 when the unaccompanied alien children apprehended were from Mexico. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| Real U.S. Median Weekly Earnings | U.S. median weekly earnings in 1982-1984 U.S. dollars. | Bureau of Labor Statistics Website: http://www.bls.gov/cps/cpswktabs.htm |
| U.S. Unemployment Rate | U.S. average unemployment rate. | Bureau of Labor Statistics Website: http://data.bls.gov/timeseries/LNS14000000 |
| LPRs Admitted per Country in 1000s | Total number of Lawful Permanent Residents (LPRs) admitted to the United States from each country in thousands. | 2007-2013 Yearbooks of Immigration Statistics at the Department of Homeland Security website: http://www.dhs.gov/yearbook-immigration-statistics |
| Border Patrol Agents per Sector in 100s | Total number of border patrol agents by border patrol sector in hundreds. | U.S. Customs and Border Protection website: http://www.cbp.gov/sites/default/files/documents/BP%20Staffing%20FY1992-FY2014_0.pdf |
| Homicide per 100,000 at Origin | Homicide rate per 100,000 in the country of origin. | United Nations Office on Drugs and Crime Database. |
| Real GDP per Capita at Origin | Real GDP per capita of the country of origin in 2005 U.S. dollars. | World Development Indicators Database. |

© 2016 The Authors. International Migration © 2016 IOM

# DEF-INTERV.

# EX. 101

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year 2012-2017 (September 30)**

Requests by Intake, Biometrics and Case Status

| Period | Intake[1] | | | | Biometrics[6] | Requests Under Review[9] | Case Review[8] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics Scheduled[7] | | Approved[10] | Denied[11] | Pending[12] |
| **Fiscal Year - Total[6]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,680 | | 150,751 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,747 | 470,352 | 10,975 | 97,040 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 209,670 | 101,568 | 158,336 | 20,992 | 156,612 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | - | - | 136,101 | 20,989 | 62,374 |
| 2014 Renewal | 116,476 | 5,760 | 122,236 | 1,370 | - | - | 22,235 | D | 94,238 |
| 2015 | 448,856 | 35,474 | 484,330 | 1,781 | 525,499 | 48,355 | 510,007 | 21,355 | 74,106 |
| 2015 Initial | 85,303 | 7,477 | 92,780 | 338 | - | - | 90,613 | 19,070 | 37,994 |
| 2015 Renewal | 363,553 | 27,997 | 391,550 | 1,443 | - | - | 419,394 | 2,285 | 36,112 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 68,140 | - | 198,702 | 14,427 | 121,678 |
| 2016 Initial | 73,362 | 1,204 | 74,566 | 291 | - | - | 52,789 | 11,398 | 47,169 |
| 2016 Renewal | 187,339 | 11,113 | 198,452 | 744 | - | - | 145,913 | 3,029 | 74,509 |
| 2017 | 472,873 | 43,429 | 516,302 | 1,884 | - | - | 462,713 | 13,193 | 118,645 |
| 2017 Initial | 45,557 | 42 | 45,599 | 194 | - | - | 47,445 | 9,248 | 36,033 |
| 2017 Renewal | 427,316 | 43,387 | 470,703 | 1,602 | - | - | 415,268 | 3,945 | 82,612 |
| Total Cumulative | 2,001,377 | 137,853 | 2,139,230 | 1,541 | 1,372,377 | - | 1,801,790 | 80,942 | 118,645 |
| Total Cumulative Initial | 906,693 | 49,596 | 956,289 | 698 | - | - | 798,980 | 71,680 | 36,033 |
| Total Cumulative Renewal | 1,094,684 | 88,257 | 1,182,941 | 1,305 | - | - | 1,002,810 | 9,262 | 82,612 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,186 | 4,141 | 114,327 | 1,777 | - | - | 121,919 | 2,720 | 107,225 |
| Q1. October - December Initial | 15,326 | 15 | 15,341 | 247 | - | - | 18,239 | 2,091 | 42,165 |
| Q1. October - December Renewal | 94,860 | 4,126 | 98,986 | 1,530 | - | - | 103,680 | 629 | 65,060 |
| Q2. January - March | 132,784 | 19,266 | 152,050 | 2,142 | - | - | 124,700 | 4,137 | 111,172 |
| Q2. January - March Initial | 10,419 | 8 | 10,427 | 168 | - | - | 17,220 | 3,024 | 32,340 |
| Q2. January - March Renewal | 122,365 | 19,258 | 141,623 | 1,974 | - | - | 107,480 | 1,113 | 78,832 |
| Q3. April - June | 94,562 | 8,590 | 103,152 | 1,525 | - | - | 102,509 | 3,705 | 99,520 |
| Q3. April - June Initial | 10,977 | 8 | 10,985 | 177 | - | - | 5,827 | 2,719 | 34,771 |
| Q3. April - June Renewal | 83,585 | 8,582 | 92,167 | 1,348 | - | - | 96,682 | 986 | 64,749 |
| Q4. July - September | 135,341 | 11,432 | 146,773 | 2,115 | - | - | 113,585 | 2,631 | 118,645 |
| Q4. July - September Initial | 8,835 | 11 | 8,846 | 138 | - | - | 6,159 | 1,414 | 36,033 |
| Q4. July - September Renewal | 126,506 | 11,421 | 137,927 | 1,977 | - | - | 107,426 | 1,217 | 82,612 |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.
Each request is considered on a case-by-case basis.
See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] Refers to the number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.
2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), September 30th, 2017

U.S. Citizenship and Immigration Services

**Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals,**
**by Fiscal Year, Quarter, Intake, Biometrics and Case Status**
**Fiscal Year 2012-2017 (September 30)**

| Period | Intake[1] | | | | Biometrics[6] | Case Review[8] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics Scheduled[7] | Requests Under Review[9] | Approved[10] | Denied[11] | Pending[12] |

Requests by Intake, Biometrics and Case Status

| Top Countries of Origin | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| Mexico | 705,125 | 857,475 | 1,562,600 | 627,666 | 785,675 | 1,413,341 |
| El Salvador | 34,430 | 41,531 | 75,961 | 28,754 | 37,843 | 66,597 |
| Guatemala | 24,852 | 27,219 | 52,071 | 20,187 | 24,706 | 44,893 |
| Honduras | 22,634 | 26,167 | 48,801 | 18,486 | 23,590 | 42,076 |
| Peru | 9,816 | 13,169 | 22,985 | 9,147 | 12,189 | 21,336 |
| South Korea | 7,893 | 12,832 | 20,725 | 7,309 | 11,964 | 19,273 |
| Brazil | 8,591 | 9,963 | 18,554 | 7,429 | 9,136 | 16,565 |
| Ecuador | 7,774 | 9,442 | 17,216 | 6,750 | 8,558 | 15,308 |
| Colombia | 7,285 | 9,221 | 16,506 | 6,631 | 8,537 | 15,168 |
| Philippines | 5,112 | 6,804 | 11,916 | 4,692 | 6,390 | 11,082 |
| Argentina | 5,249 | 6,357 | 11,606 | 4,833 | 5,876 | 10,709 |
| India | 3,782 | 4,869 | 8,651 | 3,205 | 4,496 | 7,701 |
| Jamaica | 4,430 | 4,387 | 8,817 | 3,464 | 4,025 | 7,489 |
| Venezuela | 3,481 | 4,283 | 7,764 | 3,119 | 3,954 | 7,073 |
| Dominican Republic | 3,812 | 3,752 | 7,564 | 3,169 | 3,428 | 6,597 |
| Uruguay | 2,636 | 2,980 | 5,616 | 2,395 | 2,709 | 5,104 |
| Bolivia | 2,232 | 3,005 | 5,237 | 2,080 | 2,768 | 4,848 |
| Unknown | 2,724 | 2,744 | 5,468 | 2,067 | 2,305 | 4,372 |
| Costa Rica | 2,287 | 2,834 | 5,121 | 2,065 | 2,623 | 4,688 |
| Poland | 1,998 | 2,407 | 4,405 | 1,808 | 2,226 | 4,034 |
| Chile | 1,907 | 2,446 | 4,353 | 1,763 | 2,251 | 4,014 |
| Pakistan | 1,947 | 2,415 | 4,362 | 1,697 | 2,222 | 3,919 |
| Tobago | 2,441 | 1,715 | 4,156 | 2,094 | 1,702 | 3,796 |
| Nicaragua | 1,900 | 2,114 | 4,014 | 1,601 | 1,948 | 3,549 |
| Guyana | 1,483 | 1,748 | 3,231 | 1,277 | 1,621 | 2,898 |

| Residence | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| California | 246,140 | 256,248 | 502,388 | 224,737 | 238,464 | 463,201 |
| Texas | 142,635 | 138,005 | 280,640 | 125,239 | 128,812 | 254,051 |
| New York | 51,462 | 80,850 | 132,312 | 43,138 | 72,637 | 115,775 |
| Missing | 16,517 | 100,782 | 117,299 | 9,768 | 89,320 | 99,088 |
| Florida | 41,582 | 67,495 | 109,077 | 33,631 | 59,249 | 92,880 |
| Illinois | 46,279 | 45,797 | 92,076 | 42,701 | 42,833 | 85,534 |
| New Jersey | 26,479 | 37,351 | 63,830 | 22,471 | 33,654 | 56,125 |
| Arizona | 31,040 | 29,458 | 60,498 | 28,028 | 27,350 | 55,378 |
| North Carolina | 29,881 | 26,798 | 56,679 | 27,515 | 25,169 | 52,684 |
| Georgia | 29,058 | 28,162 | 57,220 | 24,322 | 26,047 | 50,369 |
| Washington | 19,978 | 21,345 | 41,323 | 18,037 | 19,713 | 37,750 |
| Colorado | 19,351 | 17,677 | 37,028 | 17,369 | 16,497 | 33,866 |
| Virginia | 14,350 | 19,207 | 33,557 | 12,357 | 17,382 | 29,739 |
| Nevada | 14,326 | 14,690 | 29,016 | 13,160 | 13,741 | 26,901 |
| Maryland | 11,845 | 15,976 | 27,821 | 9,957 | 14,350 | 24,307 |
| Massachusetts | 9,955 | 17,248 | 27,203 | 8,172 | 15,174 | 23,346 |
| Oregon | 12,219 | 11,758 | 23,977 | 11,356 | 11,020 | 22,376 |
| Indiana | 10,841 | 9,946 | 20,787 | 9,894 | 9,293 | 19,187 |
| Pennsylvania | 7,476 | 13,151 | 20,627 | 6,084 | 11,711 | 17,795 |
| Utah | 10,617 | 9,124 | 19,741 | 9,749 | 8,533 | 18,282 |
| Michigan | 7,569 | 10,936 | 18,505 | 6,563 | 9,801 | 16,364 |
| Tennessee | 9,430 | 8,822 | 18,252 | 8,407 | 8,165 | 16,572 |
| Wisconsin | 8,252 | 7,786 | 16,038 | 7,610 | 7,278 | 14,888 |
| Minnesota | 7,116 | 8,914 | 16,030 | 6,324 | 8,004 | 14,328 |
| Oklahoma | 7,567 | 7,152 | 14,719 | 6,915 | 6,742 | 13,657 |
| Kansas | 7,397 | 6,926 | 14,323 | 6,849 | 6,497 | 13,346 |
| Connecticut | 5,854 | 8,558 | 14,412 | 5,038 | 7,752 | 12,790 |
| New Mexico | 7,498 | 6,422 | 13,920 | 6,858 | 6,063 | 12,921 |
| South Carolina | 7,257 | 6,650 | 13,907 | 6,454 | 6,171 | 12,625 |
| Ohio | 5,474 | 7,908 | 13,382 | 4,524 | 6,992 | 11,516 |

| . | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| Arkansas | 5,668 | 5,149 | 10,817 | 5,124 | 4,815 | 9,939 |
| Alabama | 4,861 | 4,600 | 9,461 | 4,304 | 4,270 | 8,574 |
| Missouri | 3,983 | 4,801 | 8,784 | 3,569 | 4,374 | 7,943 |
| Nebraska | 3,848 | 3,932 | 7,780 | 3,399 | 3,603 | 7,002 |
| Kentucky | 3,517 | 3,777 | 7,294 | 3,084 | 3,423 | 6,507 |
| Iowa | 3,211 | 3,841 | 7,052 | 2,826 | 3,483 | 6,309 |
| Idaho | 3,427 | 3,335 | 6,762 | 3,158 | 3,113 | 6,271 |
| Louisiana | 2,492 | 3,285 | 5,777 | 2,089 | 2,946 | 5,035 |
| Rhode Island | 1,508 | 2,616 | 4,124 | 1,264 | 2,338 | 3,602 |
| Hawaii | 856 | 2,974 | 3,830 | 617 | 2,623 | 3,240 |
| Delaware | 1,645 | 1,902 | 3,547 | 1,461 | 1,755 | 3,216 |
| Mississippi | 1,723 | 1,704 | 3,427 | 1,476 | 1,578 | 3,054 |
| District of Columbia | 987 | 1,783 | 2,770 | 787 | 1,558 | 2,345 |
| Puerto Rico | 571 | 1,966 | 2,537 | 357 | 1,610 | 1,967 |
| Unknown | 233 | 1,738 | 1,971 | 139 | 1,494 | 1,633 |
| New Hampshire | 476 | 1,038 | 1,514 | 381 | 904 | 1,285 |
| Wyoming | 699 | 653 | 1,352 | 624 | 608 | 1,232 |
| Alaska | 216 | 757 | 973 | 151 | 644 | 795 |
| South Dakota | 316 | 487 | 803 | 259 | 435 | 694 |
| Maine | 146 | 555 | 701 | 105 | 501 | 606 |
| Guam | 115 | 556 | 671 | 68 | 492 | 560 |
| North Dakota | 151 | 511 | 662 | 106 | 431 | 537 |
| Virgin Islands | 168 | 353 | 521 | 104 | 314 | 418 |
| West Virginia | 157 | 333 | 490 | 118 | 286 | 404 |
| Montana | 92 | 250 | 342 | 77 | 222 | 299 |
| Vermont | 66 | 278 | 344 | 45 | 245 | 290 |
| Armed Forces-Pacific | 33 | 118 | 151 | 19 | 109 | 128 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 105 | 133 | 17 | 91 | 108 |
| Armed Forces-Americas (except Canada) | 19 | 76 | 95 | 12 | 73 | 85 |
| Northern Mariana Islands | 32 | 32 | 64 | 11 | 25 | 36 |
| Not Reported | 4 | 37 | 41 | 2 | 33 | 35 |

D Data withheld to protect requestors' privacy.
- Represents zero.
[1] The number of requests that were accepted to date of the reporting period.
[2] The number of requests that were accepted to date of the reporting period.
[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."
NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.
2) The report reflects the most up-to-date estimate data available at the time the report is generated.
Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), September 2017

# DEF-INTERV.

# EX. 102



**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status**
**Fiscal Year 2012-2018 (March 31, 2018)**

| Period | Intake[1] | | | | Case Review[6] | | |
|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year - Total[6]** | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,348 | 10,986 | 97,028 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,331 | 20,990 | 156,540 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,101 | 20,987 | 62,335 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,962 | 21,352 | 73,909 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,629 | 19,070 | 37,866 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,333 | 2,282 | 36,043 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,541 | 14,434 | 120,712 |
| 2016 Initial | 73,350 | 1,151 | 74,501 | 291 | 52,708 | 11,396 | 46,242 |
| 2016 Renewal | 187,351 | 11,166 | 198,517 | 744 | 145,833 | 3,038 | 74,470 |
| 2017 | 472,852 | 43,453 | 516,305 | 1,884 | 462,357 | 13,318 | 117,493 |
| 2017 Initial | 45,645 | 42 | 45,687 | 182 | 47,298 | 9,250 | 35,231 |
| 2017 Renewal | 427,207 | 43,411 | 470,618 | 1,702 | 415,059 | 4,068 | 82,262 |
| 2018 | 94,021 | 20,773 | 114,794 | 758 | 153,764 | 6,480 | 51,118 |
| 2018 Initial | 164 | 1 | 165 | 1 | 15,294 | 3,839 | 16,252 |
| 2018 Renewal | 93,857 | 20,772 | 114,629 | 757 | 138,470 | 2,641 | 34,866 |
| Total Cumulative | 2,095,379 | 158,649 | 2,254,028 | 1,472 | 1,954,983 | 87,542 | 51,118 |
| Total Cumulative Initial | 906,971 | 49,153 | 956,124 | 637 | 814,058 | 75,510 | 16,252 |
| Total Cumulative Renewal | 1,188,408 | 109,496 | 1,297,904 | 835 | 1,140,925 | 12,032 | 34,866 |
| **Fiscal Year 2018 by Quarter[13]** | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,639 | 2,551 | 45,759 |
| Q1. October - December Initial | 97 | 1 | 98 | 4 | 5,585 | 1,669 | 28,071 |
| Q1. October - December Renewal | 29,430 | 14,536 | 43,966 | 1,135 | 93,054 | 882 | 17,688 |
| Q2. January-March | 64,494 | 6,236 | 70,730 | 1,140 | 55,125 | 3,929 | 51,118 |
| Q2. January - March Initial | 67 | - | 67 | 1 | 9,709 | 2,170 | 16,252 |
| Q2. January - March Renewal | 64,427 | 6,236 | 70,663 | 1,139 | 45,416 | 1,759 | 34,866 |

*- Represents zero.*

[1] *Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.*

    *Each request is considered on a case-by-case basis.*

    *See http://www.uscis.gov/childhoodarrivals.*

[2] *The number of new requests accepted at a Lockbox during the reporting period.*

[3] *The number of requests rejected at a Lockbox during the reporting period.*

[4] *The number of requests that were received at a Lockbox during the reporting period.*

[5] *The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.*

[6] *The number of new requests received and entered into a case-tracking system during the reporting period.*

[7] *The number of requests approved during the reporting period.*

[8] *The number of requests that were denied, terminated, or withdrawn during the reporting period.*

[9] *The number of requests awaiting a decision as of the end of the reporting period.*

*NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.*

    *2. The report reflects the most up-to-date estimate available at the time the report is generated.*

    *3. USCIS recently discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn). USCIS understands that it has corrected these query code issues and that this report provides a more accurate reflection of pending cases. Note that if this report is compared to prior versions of this report that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018*

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 906,971 | 1,188,408 | 2,095,379 | 814,058 | 1,140,925 | 1,954,983 |
| Mexico | 706,368 | 932,933 | 1,639,301 | 640,890 | 896,244 | 1,537,134 |
| El Salvador | 34,468 | 45,207 | 79,675 | 29,355 | 43,204 | 72,559 |
| Guatemala | 24,878 | 29,776 | 54,654 | 20,642 | 28,410 | 49,052 |
| Honduras | 22,668 | 28,466 | 51,134 | 18,886 | 27,262 | 46,148 |
| Peru | 9,823 | 14,078 | 23,901 | 9,232 | 13,549 | 22,781 |
| South Korea | 7,895 | 13,791 | 21,686 | 7,378 | 13,129 | 20,507 |
| Brazil | 8,601 | 10,784 | 19,385 | 7,534 | 10,361 | 17,895 |
| Ecuador | 7,783 | 10,126 | 17,909 | 6,823 | 9,720 | 16,543 |
| Colombia | 7,288 | 9,845 | 17,133 | 6,700 | 9,510 | 16,210 |
| Philippines | 5,119 | 7,304 | 12,423 | 4,756 | 7,042 | 11,798 |
| Argentina | 5,260 | 6,846 | 12,106 | 4,901 | 6,634 | 11,535 |
| Jamaica | 4,433 | 4,793 | 9,226 | 3,498 | 4,583 | 8,081 |
| India | 3,786 | 5,238 | 9,024 | 3,230 | 4,974 | 8,204 |
| Venezuela | 3,483 | 4,573 | 8,056 | 3,159 | 4,423 | 7,582 |
| Dominican Republic | 3,826 | 4,093 | 7,919 | 3,229 | 3,934 | 7,163 |
| Uruguay | 2,640 | 3,241 | 5,881 | 2,456 | 3,134 | 5,590 |
| Bolivia | 2,237 | 3,212 | 5,449 | 2,102 | 3,089 | 5,191 |
| Costa Rica | 2,288 | 3,040 | 5,328 | 2,088 | 2,936 | 5,024 |
| Poland | 2,001 | 2,556 | 4,557 | 1,839 | 2,462 | 4,301 |
| Chile | 1,907 | 2,620 | 4,527 | 1,783 | 2,534 | 4,317 |
| Pakistan | 1,948 | 2,567 | 4,515 | 1,718 | 2,469 | 4,187 |
| Nicaragua | 1,905 | 2,332 | 4,237 | 1,637 | 2,235 | 3,872 |
| Tobago | 2,442 | 1,716 | 4,158 | 2,095 | 1,703 | 3,798 |
| Guyana | 1,485 | 1,904 | 3,389 | 1,292 | 1,821 | 3,113 |
| All Others | 30,837 | 35,549 | 66,386 | 25,581 | 33,920 | 59,501 |
| Not Reported | 1,602 | 1,818 | 3,420 | 1,254 | 1,643 | 2,897 |

- Represents zero.

[1]  The number of requests that were accepted to date of the reporting period.

[2]  The number of requests that were approved to date of the reporting period.

[3]  All fields with less than 10 or a blank in the state field are included in the field "Not Reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

   2) The report reflects the most up-to-date estimate data available at the time the report is generated.

   3) Ranked by total approvals.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 906,971 | 1,188,408 | 2,095,379 | 814,058 | 1,140,925 | 1,954,983 |
| California | 246,191 | 274,825 | 521,016 | 227,432 | 264,915 | 492,347 |
| Texas | 142,657 | 147,049 | 289,706 | 126,645 | 142,211 | 268,856 |
| New York | 51,475 | 89,862 | 141,337 | 44,503 | 85,588 | 130,091 |
| Florida | 41,607 | 74,118 | 115,725 | 34,906 | 71,016 | 105,922 |
| Illinois | 46,284 | 48,931 | 95,215 | 43,149 | 47,081 | 90,230 |
| New Jersey | 26,496 | 40,855 | 67,351 | 23,102 | 39,132 | 62,234 |
| Arizona | 31,052 | 31,524 | 62,576 | 28,295 | 30,231 | 58,526 |
| North Carolina | 29,884 | 28,786 | 58,670 | 27,717 | 27,704 | 55,421 |
| Georgia | 29,062 | 30,329 | 59,391 | 24,692 | 29,130 | 53,822 |
| Washington | 19,983 | 23,081 | 43,064 | 18,288 | 22,202 | 40,490 |
| Colorado | 19,354 | 18,969 | 38,323 | 17,553 | 18,223 | 35,776 |
| Virginia | 14,352 | 21,100 | 35,452 | 12,643 | 20,168 | 32,811 |
| Nevada | 14,331 | 15,880 | 30,211 | 13,293 | 15,199 | 28,492 |
| Maryland | 11,851 | 17,637 | 29,488 | 10,192 | 16,852 | 27,044 |
| Massachusetts | 9,957 | 19,211 | 29,168 | 8,482 | 18,360 | 26,842 |
| Oregon | 12,221 | 12,538 | 24,759 | 11,457 | 12,132 | 23,589 |
| Pennsylvania | 7,482 | 14,551 | 22,033 | 6,337 | 13,932 | 20,269 |
| Indiana | 10,843 | 10,741 | 21,584 | 9,992 | 10,303 | 20,295 |
| Utah | 10,622 | 9,693 | 20,315 | 9,820 | 9,356 | 19,176 |
| Michigan | 7,573 | 11,990 | 19,563 | 6,706 | 11,499 | 18,205 |
| Tennessee | 9,431 | 9,508 | 18,939 | 8,479 | 9,100 | 17,579 |
| Minnesota | 7,121 | 9,714 | 16,835 | 6,442 | 9,303 | 15,745 |
| Wisconsin | 8,254 | 8,335 | 16,589 | 7,704 | 8,036 | 15,740 |
| Oklahoma | 7,567 | 7,658 | 15,225 | 6,982 | 7,396 | 14,378 |
| Connecticut | 5,857 | 9,374 | 15,231 | 5,182 | 8,968 | 14,150 |
| Kansas | 7,397 | 7,389 | 14,786 | 6,912 | 7,143 | 14,055 |
| New Mexico | 7,499 | 6,851 | 14,350 | 6,922 | 6,603 | 13,525 |
| South Carolina | 7,259 | 7,107 | 14,366 | 6,519 | 6,857 | 13,376 |
| Ohio | 5,476 | 8,753 | 14,229 | 4,672 | 8,347 | 13,019 |
| Arkansas | 5,668 | 5,466 | 11,134 | 5,178 | 5,250 | 10,428 |
| Alabama | 4,866 | 4,871 | 9,737 | 4,353 | 4,725 | 9,078 |
| Missouri | 3,984 | 5,202 | 9,186 | 3,645 | 5,003 | 8,648 |
| Nebraska | 3,848 | 4,221 | 8,069 | 3,451 | 4,084 | 7,535 |
| Kentucky | 3,521 | 4,086 | 7,607 | 3,131 | 3,926 | 7,057 |
| Iowa | 3,213 | 4,167 | 7,380 | 2,872 | 3,993 | 6,865 |
| Idaho | 3,428 | 3,554 | 6,982 | 3,187 | 3,418 | 6,605 |
| Louisiana | 2,493 | 3,670 | 6,163 | 2,130 | 3,518 | 5,648 |
| Rhode Island | 1,508 | 2,874 | 4,382 | 1,305 | 2,752 | 4,057 |
| Hawaii | 856 | 3,359 | 4,215 | 671 | 3,186 | 3,857 |
| Delaware | 1,645 | 2,070 | 3,715 | 1,484 | 1,996 | 3,480 |
| Mississippi | 1,723 | 1,876 | 3,599 | 1,496 | 1,808 | 3,304 |

| | | | | | | |
|---|---|---|---|---|---|---|
| District of Columbia | 988 | 1,980 | 2,968 | 822 | 1,898 | 2,720 |
| Puerto Rico | 572 | 2,210 | 2,782 | 401 | 2,107 | 2,508 |
| New Hampshire | 477 | 1,180 | 1,657 | 405 | 1,112 | 1,517 |
| Wyoming | 699 | 695 | 1,394 | 626 | 665 | 1,291 |
| Alaska | 216 | 852 | 1,068 | 171 | 812 | 983 |
| South Dakota | 316 | 534 | 850 | 270 | 513 | 783 |
| Maine | 146 | 619 | 765 | 116 | 592 | 708 |
| Guam | 115 | 633 | 748 | 86 | 597 | 683 |
| North Dakota | 151 | 560 | 711 | 117 | 536 | 653 |
| Virgin Islands | 168 | 406 | 574 | 109 | 380 | 489 |
| West Virginia | 158 | 372 | 530 | 126 | 353 | 479 |
| Montana | 93 | 283 | 376 | 80 | 265 | 345 |
| Vermont | 66 | 303 | 369 | 48 | 294 | 342 |
| Armed Forces-Pacific | 33 | 145 | 178 | 28 | 131 | 159 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 125 | 153 | 21 | 112 | 133 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 82 | 96 |
| Northern Mariana Islands | 32 | 37 | 69 | 12 | 32 | 44 |
| Palau | - | 19 | 19 | - | 18 | 18 |
| Not Reported | 16,803 | 115,596 | 132,399 | 12,685 | 109,780 | 122,465 |

*- Represents zero.*

[1]  *The number of requests that were accepted to date of the reporting period.*

[2]  *The number of requests that were approved to date of the reporting period.*

[3]  *All fields with less than 10 or a blank in the state field are included in the field "Not Reported."*

*NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.*

*2) The report reflects the most up-to-date estimate data available at the time the report is generated.*

*3) Ranked by total approvals.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigrations Services Centralized Operation Repository (eCISCOR), April 2, 2018*

# DEF-INTERV.

# EX. 103



# USCIS Advance Parole Documents

**January 6, 2017**
**Fiscal Year 2016 Report to Congress**



*U.S. Citizenship and Immigration Services*

# Message from U.S. Citizenship and Immigration Services

January 6, 2017

I am pleased to submit the following report, "USCIS
Advance Parole Documents," which has been prepared by
U.S. Citizenship and Immigration Services (USCIS).



This report was compiled pursuant to language set forth in
Senate Report 114-68 accompanying the Fiscal Year
(FY) 2016 Department of Homeland Security
Appropriations Act (P.L. 114-113).

Pursuant to congressional requirements, this report is being
provided to the following Members of Congress:

> The Honorable John R. Carter
> Chairman, House Appropriations Subcommittee on Homeland Security

> The Honorable Lucille Roybal-Allard
> Ranking Member, House Appropriations Subcommittee on Homeland Security

> The Honorable John Hoeven
> Chairman, Senate Appropriations Subcommittee on Homeland Security

> The Honorable Jeanne Shaheen
> Ranking Member, Senate Appropriations Subcommittee on Homeland Security

I am pleased to respond to any questions you may have.  Please do not hesitate to contact
me at (202) 272-1000 or the Department's Deputy Under Secretary for Management and
Chief Financial Officer, Chip Fulghum, at (202) 447-5751.

Sincerely,

León Rodríguez
Director
U.S. Citizenship and Immigration Services

# Executive Summary

This report responds to the Senate request to provide information on the use of advance parole documents.[1]

As requested, the report provides details on how many applications for advance parole documents were received by USCIS and, of those, how many applications were approved and denied.  From FYs 2012–2015, USCIS received approximately 300,000 applications for advance parole documents each year.  The majority of requests for advance parole documents comes from individuals seeking adjustment of status.

Without conducting a manual review of each case, USCIS is unable to provide data on all deferred action recipients who obtained advance parole documents, because USCIS does not track electronically advance parole applications from recipients of deferred action that is not associated with the Deferred Action for Childhood Arrivals (DACA) policy.  However, this report does include the number of DACA recipients who obtained advance parole documents and the number of applicants for adjustment of status (seeking lawful permanent resident status, commonly known as applying for a "green card") who obtained advance parole documents.

The report also provides data on the number of applications for which the filing fee was waived because of an inability to pay.  The majority of applicants for advance parole do not receive a waiver for the filing fee.

Without a manual review of each case, USCIS could not determine electronically which recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status.  When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped advance parole document, and/or the review of the Department's records of that applicant.  However, this report does provide information on the number of certain recipients, including DACA and non-DACA recipients, who obtained advance parole documents and subsequently filed adjustment of status applications.[2]

---

[1] With the exception of data on fee waiver requests for Form I-131, this report, based on USCIS's understanding of the legislative language, includes only information on requests for advance parole documents made for individuals currently in the United States.

[2] Some recipients of deferred action under DACA may be eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole.  However, as with the request for statistical data in requests (3) and (5) in Senate Report 114-68, providing data on this population is

Without a manual review of each case, USCIS also could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  However, this report does provide information on the types of supporting evidence accepted in support of applications for an advance parole document.

---

not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.



# USCIS Advance Parole Document

# Table of Contents

I.     Legislative Language ................................................................ 1

II.    Background .............................................................................. 2

III.   Data Report ............................................................................. 5

IV.   Conclusion ............................................................................... 9

# I.   Legislative Language

This document has been compiled in response to language included in Senate Report 114-68, which accompanies the Fiscal Year (FY) 2016 Department of Homeland Security Appropriations Act (P.L. 114-113).

Senate Report 114-68 states as follows:

> The Committee seeks more detail on the use of advance parole and directs USCIS to report on how many advance parole documents are being approved for entry into the United States.  The report should, for the past 4 years, detail:
>
> > (1) how many applications for advance parole were made, how many granted, and how many denied;
> >
> > (2) the number of advance parole documents granted to deferred action recipients and applicants for adjustment of status;
> >
> > (3) the specific basis for the grant of advance parole under USCIS' criteria set forth in the instructions to the Form I–131 (i.e., educational, employment, or humanitarian);
> >
> > (4) the number of applications in each year for which the filing fee was waived;
> >
> > (5) the supporting documentation, by type, that was used to make advance parole determinations; and
> >
> > (6) the number of aliens, broken down by deferred action recipients and non-deferred action recipients, granted advance parole who left the country, were paroled back into the country using the advance parole document, and have filed an application for adjustment of status to lawful permanent residence.

# II.   Background

USCIS may issue an advance parole document for urgent humanitarian reasons or significant public benefit to a foreign national[3] inside the United States who is preparing to travel abroad and is planning to return.[4]   USCIS issues advance parole documents pursuant to the general statutory parole authority under sections 103(a) and 212(d)(5) of the Immigration and Nationality Act (INA), section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status.[5]   The use of advance parole documents also has been recognized by the Board of Immigration Appeals.[6]   The decision to grant an advance parole document, as with parole, is a matter of discretion and is decided case-by-case. USCIS weighs the circumstances of the specific request and any reasons in support of parole against any negative factors that may exist.

Issuance of an advance parole document is not, itself, a grant of parole, and receipt of an advance parole document does not guarantee the recipient's parole into the United States following travel abroad.[7]   A U.S. Customs and Border Protection officer makes a separate discretionary decision regarding the parole request itself upon the foreign national's arrival at the port of entry.

## Supporting Documentation

USCIS electronically does not track the supporting documentation that is considered when making a determination on the application for an advance parole document. However, to be considered for advance parole, all applicants must submit a Form I-131, *Application for Travel Document*, and the following required evidence:

---

[3] The term "foreign national" generally is used in lieu of the term "alien," which means a person who is not a citizen or national of the United States.  Notwithstanding, when quoting the title, subtitle, or text of a statute or regulation that includes the term "alien," the term "alien" is used.

[4] USCIS issues single-use and multiple-use advance parole documents.  USCIS also may issue a travel document that provides advance authorization for parole to a foreign national outside the United States with a need to visit the United States temporarily for urgent humanitarian reasons or significant public benefit.  Information on these travel documents is not included in this report.

[5] Congress specifically has stated that a TPS beneficiary may travel abroad with the prior consent of the Secretary. INA § 244(f)(3).

[6] *Matter of G-A-C-*, 22 I&N Dec. 83 (BIA 1998); *Matter of Arrabally*, 25 I&N Dec. 771 (BIA 2012).

[7] *Matter of G-A-C-*, 22 I&N Dec. at 88 n.3; *Matter of Arrabally*, 25 I&N Dec. at 778 n.6.

- Proper fee in accordance with the form instructions[8] or a fee waiver request. Generally, USCIS may not waive fees for applications for an advance parole document for individuals within the United States;[9]
- Copy of any document issued by the Department showing the person's current immigration status in the United States, if any;
- Copy of receipt notice for a pending adjustment or other immigration benefit application, if applicable;
- Copy of the order, notice, or document that granted deferred action, if applicable;
- Copy of a government-issued photo identity document;
- Two photographs as described in the form instructions; and
- Evidence supporting the facts that are the reason for the advance parole document request.

Individuals who have received deferred action under the DACA policy and who request an advance parole document additionally must provide documentation that the travel will be in furtherance of humanitarian, employment, or educational purposes.  Travel for vacation is not a valid basis for issuance of a DACA-related advance parole document. USCIS determines whether the foreign national's purpose for international travel is justifiable on the basis of the circumstances described in the request and the supporting documentation provided.

Supporting documentation to demonstrate humanitarian purposes includes, but is not limited to:

- A letter from the applicant's physician explaining the nature of his or her medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the United States is medically necessary; or
- Documentation of a family member's serious illness or death.

Supporting documentation to demonstrate educational purposes includes, but is not limited to:

- A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or
- A document showing enrollment in an educational program requiring travel.

---

[8] 8 CFR 103.7.
[9] 8 CFR 103.7(c)(3) and (d).

3

Supporting documentation to demonstrate employment purposes includes, but is not limited to:

- A letter from the applicant's employer or conference host describing the need for travel; or
- A document showing a specific employment need, such as a conference program, that also shows the applicant's participation.

# III.  Data Report

Tables 1, 2A, 2B, and 3 provide the available requested USCIS data on advance parole documents for FYs 2012–2015, in response to requests (1), (2), and (4) in Senate Report 114-68, respectively.[10]  Without a manual review of each case, USCIS could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  Accordingly, this report does not include statistical data in response to requests (3) and (5) in the Senate Report.

Regarding request (6) in Senate Report 114-68, without a manual review of each case, USCIS also could not determine electronically which deferred action recipients and nondeferred action recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status.  Therefore, this report does not include full data in response to request (6) of the Senate Report.  When an individual applies for adjustment of status, however, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.  Thus, in Tables 4A and 4B, USCIS has provided data regarding individuals with an approved advance parole request and a later approved application for adjustment of status, broken down by DACA recipients and non-DACA recipients.  Some recipients of deferred action under DACA may be independently eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole.  However, as with the request for statistical data in response to requests (3) and (5) of the Senate Report, providing data on this population is not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.

---

[10] However, because USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents without conducting a manual review of each such case, Table 2A provides only data on deferred action under DACA.

**Table 1:  Receipts, Approvals, and Denials for Form I-131, Application for Travel Document for Individuals within the United States**

| U.S. Citizenship & Immigration Services (USCIS) Form I-131 - Advance Parole Receipts, Approvals, and Denials Fiscal Years 2012 – 2015 | | | |
|---|---|---|---|
| Fiscal Year | Receipts* | Approvals | Denials |
| 2012 Total | 284,064 | 283,470 | 9,322 |
| 2013 Total | 291,336 | 263,420 | 7,581 |
| 2014 Total | 291,553 | 253,119 | 18,326 |
| 2015 Total | 334,301 | 300,803 | 18,553 |
| **Grand Total** | **1,201,254** | **1,100,812** | **53,782** |

*Not all applications are adjudicated in the same fiscal year as received.  Thus, numbers of approvals and denials always may not equal receipt numbers.

**Table 2A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Filed after Form I-821D Approval "Valid From" Date* Fiscal Years 2012 – 2015 | |
|---|---|
| Fiscal Year | I-131 Approvals |
| 2012 Total | - |
| 2013 Total | 1,409 |
| 2014 Total | 5,687 |
| 2015 Total | 12,847 |
| **Grand Total** | **19,943** |

Without conducting a manual review of each case, USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents.

*Comparison used the earliest Form I-821D "valid from" date by A-Number.  The Form I-821D decision date was used where invalid data were returned for the Form I-821D "valid from" date.

**Table 2B:  Applicants Within the United States with a Pending Form I-485, Application to Register Permanent Residence or Adjust Status, who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Advance Parole Approvals Filed in Connection with a Form I-485 Fiscal Years 2012 – 2015 | |
|---|---|
| **Fiscal Year** | **I-131 Approvals** |
| 2012 Total | 252,616 |
| 2013 Total | 229,210 |
| 2014 Total | 210,062 |
| 2015 Total | 253,671 |
| **Grand Total** | **945,559** |

**Table 3:  Approvals of Fee Waiver Requests for Form I-131 for Individuals in the United States and Abroad**

| U.S. Citizenship and Immigration Services Form I-131, Application for Travel Document Approved Fee Waivers Fiscal Years 2012 - 2015 | |
|---|---|
| **Fiscal Year** | **Approvals** |
| 2012 | 1,189 |
| 2013 | 1,518 |
| 2014 | 2,733 |
| 2015 | 4,737 |
| **Grand Total** | **10,177** |

Fee waiver data exclusively on requests for an advance parole document for individuals within the United States can only be determined through a manual file review.  Domestic cases generally are ineligible for a fee waiver, but waivers may be authorized at the discretion of USCIS.  Therefore, the vast majority of these fee waiver approvals are likely for requests for advance parole documents for individuals who are abroad.

**Table 4A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents and Later Filed an Adjustment of Status Application**

| U.S. Citizenship & Immigration Services<br>I-131, Application for Travel Document<br>Advance Parole Approvals<br>with Receipt Date After I-821D Approval "Valid From" Date*<br>and I-485 Receipts Filed after I-131 "Valid From" Date*<br>Fiscal Years 2012 - 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | - |
| 2013 | 370 |
| 2014 | 1,652 |
| 2015 | 2,811 |
| **Grand Total** | **4,833** |

*Comparison used the earliest Form I-821D or Form I-131 "valid from" date by A-Number.  Decision date was used where invalid data were returned for Form I-821D or Form I-131 "valid from" date.

**Table 4B:  Individuals who Obtained Advance Parole Documents (excluding Deferred Action for Childhood Arrivals recipients) and Later Filed an Adjustment of Status Application**

| United States Citizenship and Immigration Services<br>I-131, Application for Travel Document<br>Non-DACA Recipients of Advance Parole Documents<br>with I-485 Filed on or after I-131 "Valid From" Date*<br>Fiscal Years 2012 – 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | 2,010 |
| 2013 | 2,517 |
| 2014 | 3,639 |
| 2015 | 3,833 |
| **Grand Total** | **11,999** |

*Comparison used the earliest Form I-131 "valid from" date by A-Number.  Status date was used where invalid data were returned for Form I-131 "valid from" date.

USCIS excluded individuals who had a pending adjustment of status application, or earlier filed an adjustment of status application at the time of the advance parole document request because USCIS understands the legislative language to request only those adjustment of status applications filed after an approved advance parole document request.

# IV.  Conclusion

USCIS issues advance parole documents pursuant to the Secretary's authority under sections 103(a) and 212(d)(5) of the INA, section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status.  USCIS adjudicates applications for advance parole documents case-by-case, applying the criteria set forth in law. The number of receipts and approvals of requests for advance parole documents have been fairly consistent from FYs 2012–2015.  FY 2014 and FY 2015 saw an increase in denials (noting not all approvals or denials occur in the same fiscal year in which an application was filed, as shown by the filing receipt).

Of the groups about which the legislative language inquires, the largest group of advance parole document recipients is individuals with pending applications to adjust status to lawful permanent residence.  As noted in the report, although USCIS is unable to provide volume data on non-DACA deferred action recipients who obtained advance parole documents because USCIS systems currently do not track this information electronically, USCIS is able to identify that individuals who obtained advance parole documents because DACA recipients were a small portion of the total group.  The number of DACA recipients who have applied for adjustment of status after receiving an advance parole document has been fairly consistent from FYs 2012–2015.

Finally, USCIS notes that the number of fee waiver requests granted for applications for an advance parole document has remained very small from FYs 2012–2015.  The majority of individuals applying for advance parole documents pays a fee.

# DEF-INTERV.

# EX. 104



Official website of the Department of Homeland Security

U.S. Department of
Homeland Security

☰ Menu

# Table 6. Persons Obtaining Lawful Permanent Resident Status By Type And Major Class Of Admission: Fiscal Years 2014 To 2016

The *2016 Yearbook of Immigration Statistics (/immigration-statistics/yearbook/2016)* is a compendium of tables that provide data on foreign nationals who are granted lawful permanent residence (i.e., immigrants who receive a "green card"), admitted as temporary nonimmigrants, granted asylum or refugee status, or are naturalized. The *Yearbook* also presents data on immigration enforcement actions, including apprehensions and arrests, removals, and returns.

*Table 6. Persons Obtaining Lawful Permanent Resident Status By Type And Major Class Of Admission: Fiscal Years 2014 To 2016*

| Type and Class of Admission | 2014 | 2015 | 2016 |
|---|---|---|---|
| Total | 1,016,518 | 1,051,031 | 1,183,505 |
| Family-sponsored preferences | 229,104 | 213,910 | 238,087 |
| First: Unmarried sons/daughters of U.S. citizens and their children | 25,686 | 24,533 | 22,072 |
| Second: Spouses, children, and unmarried sons/daughters of alien residents | 105,641 | 104,892 | 121,267 |

| | | | |
|---|---|---|---|
| Third: Married sons/daughters of U.S. citizens and their spouses and children | 25,830 | 24,271 | 27,392 |
| Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children | 71,947 | 60,214 | 67,356 |
| Immediate relatives of U.S. citizens | 416,456 | 465,068 | 566,706 |
| Spouses | 238,852 | 265,367 | 304,358 |
| Children [1] | 61,217 | 66,740 | 88,494 |
| Parents | 116,387 | 132,961 | 173,854 |
| Employment-based preferences | 151,596 | 144,047 | 137,893 |
| First: Priority workers | 40,554 | 41,688 | 42,862 |
| Second: Professionals with advanced degrees or aliens of exceptional ability | 48,801 | 44,344 | 38,858 |
| Third: Skilled workers, professionals, and unskilled workers | 43,156 | 37,243 | 35,933 |
| Fourth: Certain special immigrants | 8,362 | 10,584 | 10,377 |
| Fifth: Employment creation (investors) | 10,723 | 10,188 | 9,863 |
| Diversity | 53,490 | 47,934 | 49,865 |
| Refugees | 96,066 | 118,431 | 120,216 |
| Asylees | 38,176 | 33,564 | 37,209 |
| Parolees | 95 | 23 | 15 |
| Children born abroad to alien residents | 594 | 403 | 92 |

| Nicaraguan Adjustment and Central American Relief Act (NACARA) | 70 | 49 | 34 |
|---|---|---|---|
| Cancellation of removal | 5,248 | 4,713 | 3,453 |
| Haitian Refugee Immigration Fairness Act (HRIFA) | 22 | 9 | 15 |
| Other | 25,601 | 22,880 | 29,920 |

*Adjustments of Status*

| Type and Class of Admission | 2014 | 2015 | 2016 |
|---|---|---|---|
| Total | 535,126 | 542,315 | 565,427 |
| Family-sponsored preferences | 23,202 | 16,783 | 15,116 |
| First: Unmarried sons/daughters of U.S. citizens and their children | 2,296 | 2,503 | 1,952 |
| Second: Spouses, children, and unmarried sons/daughters of alien residents | 11,784 | 6,950 | 6,751 |
| Third: Married sons/daughters of U.S. citizens and their spouses and children | 1,851 | 2,510 | 2,073 |
| Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children | 7,271 | 4,820 | 4,340 |
| Immediate relatives of U.S. citizens | 228,128 | 230,194 | 257,302 |
| Spouses | 162,049 | 158,768 | 171,353 |
| Children [1] | 15,603 | 16,074 | 17,438 |
| Parents | 50,476 | 55,352 | 68,511 |
| Employment-based preferences | 129,645 | 121,978 | 113,640 |

| First: Priority workers | 38,813 | 39,924 | 40,445 |
|---|---|---|---|
| Second: Professionals with advanced degrees or aliens of exceptional ability | 46,872 | 42,531 | 36,448 |
| Third: Skilled workers, professionals, and unskilled workers | 35,588 | 29,648 | 26,878 |
| Fourth: Certain special immigrants | 6,933 | 8,890 | 8,478 |
| Fifth: Employment creation (investors) | 1,439 | 985 | 1,391 |
| Diversity | 1,331 | 1,268 | 1,048 |
| Refugees | 96,066 | 118,431 | 120,216 |
| Asylees | 38,176 | 33,564 | 37,209 |
| Parolees | 95 | 23 | 15 |
| Children born abroad to alien residents | - | - | - |
| Nicaraguan Adjustment and Central American Relief Act (NACARA) | 70 | 49 | 34 |
| Cancellation of removal | 5,248 | 4,713 | 3,453 |
| Haitian Refugee Immigration Fairness Act (HRIFA) | 22 | 9 | 15 |
| Other | 13,143 | 15,303 | 17,379 |

*New Arrivals*

| Type and class of admission | 2014 | 2015 | 2016 |
|---|---|---|---|
| Total | 481,392 | 508,716 | 618,078 |
| Family-sponsored preferences | 205,902 | 197,127 | 222,971 |
| First: Unmarried sons/daughters of U.S. citizens and their children | 23,390 | 22,030 | 20,120 |
| Second: Spouses, children, and unmarried sons/daughters of alien | 93,857 | 97,942 | 114,516 |

residents

| | | | |
|---|---|---|---|
| Third: Married sons/daughters of U.S. citizens and their spouses and children | 23,979 | 21,761 | 25,319 |
| Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children | 64,676 | 55,394 | 63,016 |
| Immediate relatives of U.S. citizens | 188,328 | 234,874 | 309,404 |
| Spouses | 76,803 | 106,599 | 133,005 |
| Children [1] | 45,614 | 50,666 | 71,056 |
| Parents | 65,911 | 77,609 | 105,343 |
| Employment-based preferences | 21,951 | 22,069 | 24,253 |
| First: Priority workers | 1,741 | 1,764 | 2,417 |
| Second: Professionals with advanced degrees or aliens of exceptional ability | 1,929 | 1,813 | 2,410 |
| Third: Skilled workers, professionals, and unskilled workers | 7,568 | 7,595 | 9,055 |
| Fourth: Certain special immigrants | 1,429 | 1,694 | 1,899 |
| Fifth: Employment creation (investors) | 9,284 | 9,203 | 8,472 |
| Diversity | 52,159 | 46,666 | 48,817 |
| Refugees | - | - | - |
| Asylees | - | - | - |
| Parolees | - | - | - |
| Children born abroad to alien residents | 594 | 403 | 92 |
| Nicaraguan Adjustment and Central American Relief Act (NACARA) | - | - | - |

| Cancellation of removal | | | |
|---|---|---|---|
| Haitian Refugee Immigration Fairness Act (HRIFA) | - | - | - |
| Other | 12,458 | 7,577 | 12,541 |

- Represents zero.

[1] Includes orphans.

Source: U.S. Department of Homeland Security.

Last Published Date: December 18, 2017

# DEF-INTERV.

# EX. 105



FEBRUARY 9, 2015

# *EXAMINING THE UAC-DACA LINK: NEW DATA SHOW CHILD MIGRANT CRISIS BEGAN BEFORE DACA*

BY DAVE BIER

**EXECUTIVE SUMMARY**

Since 2012, Deferred Action for Childhood Arrivals (DACA) has granted relief from deportation to illegal immigrants who, before June 2007, entered the United States as children. This month, the administration will begin to accept applications from anyone who arrived as a child before 2010. While this policy is understandably attacked as executive overreach, some critics further claim that it motivated a rush of migrant children to the Southwest border.

Newly available data—analyzed in this study for the first time—show that the massive increase in unaccompanied alien children (UACs) began before DACA was even announced in June 2012. Without knowledge of the program, the children who came to the border in early 2012 could not have been motivated by DACA. In fact, fewer UACs entered illegally in the 3 months after DACA than the 3 months before it.

The reality is that fewer children migrated illegally in 2014 than a decade earlier, indicating that illegal child migration is not a recent phenomenon. While the percentage of illegal entries by children has increased, this is mainly because entry for adults has become much more difficult due to greater

border security and the absence of legal avenues for admission. Congress should respond to the expansion of DACA by enacting its own reforms without fear that those reforms will launch a rush to the border.

Read the Full Study: **Examining the UAC-DACA Link**

# DEF-INTERV.

# EX. 106

# Violence, Development, and Migration Waves: Evidence from Central American Child Migrant Apprehensions

## Michael A. Clemens

### Abstract

A recent surge in child migration to the United States from Honduras, El Salvador, and Guatemala has occurred in the context of high rates of regional violence. But little quantitative evidence exists on the causal relationship between violence and international emigration in this or any other region. This paper studies the relationship between violence in the Northern Triangle and child migration to the United States using novel, individual-level, anonymized data on all 178,825 US apprehensions of unaccompanied child migrants from these countries between 2011 and 2016. It finds that one additional homicide per year in the region, sustained over the whole period—that is, a cumulative total of six additional homicides—caused a cumulative total of 3.7 additional unaccompanied child apprehensions in the United States. The explanatory power of short-term increases in violence is roughly equal to the explanatory power of long-term economic characteristics like average income and poverty. Due to diffusion of migration experience and assistance through social networks, violence can cause waves of migration that snowball over time, continuing to rise even when violence levels do not.

Keywords: violence, migration, refugee, UAC, unaccompanied children, Northern Triangle, Central America, Honduras, Guatemala, El Salvador, minors, survival migration, youths, Cartagena Declaration, Global Compact, war, drug trade, smugglers, traffickers, trafficking, cocaine, cartel, gang, mara, homicide, murder, mobility, asylum, asylee

JEL Codes: D74, F22, K42, O15, R23



Working Paper 459
July 2017

www.cgdev.org

**Violence, Development, and Migration Waves:**
**Evidence from Central American Child Migrant Apprehensions**

Michael A. Clemens
Center for Global Development
& IZA Institute of Labor Economics

Data were kindly provided by US Customs and Border Protection, Carlos Antonio Mendoza Alvarado, the EMIF project at El Colegio de la Frontera Norte, and the Instituto Universitario en Democracia, Paz y Seguridad (IUDPAS) at the Universidad Nacional Autónoma de Honduras (UNAH). Juan Bonilla, Gilbert Kiggundu, and Paul Sirma at the American Institutes for Research built the dataset on child migrants; Hannah Postel built the rest of the final dataset. Thanks to US Customs and Border Protection and the US Agency for International Development, and for helpful comments from Tanya Andrade, Laura Atuesta, Juan Bonilla, Patricia Campie, Thomas de Hoop, Steven Dudley, Alisha Holland, Gaurav Khanna, María Ana Lugo, Lorena Nieto, Peter Reuter, Mateo Salazar, Justin Sandefur, Liliana Sousa, and Amy West, but the author alone is responsible for any errors. USAID provided support. Marina Kaminsky provided research assistance.

The Center for Global Development is grateful for contributions from the Open Philanthropy Project in support of this work.

Michael A. Clemens. 2017. "Violence, Development, and Migration Waves: Evidence from Central American Child Migrant Apprehensions." CGD Working Paper 459. Washington, DC: Center for Global Development. https://www.cgdev.org/publication/violence-development-and-migration-waves-evidence-central-american-child-migrant

**Center for Global Development**
**2055 L Street NW**
**Washington, DC  20036**

202.416.4000
(f) 202.416.4050

**www.cgdev.org**

The Center for Global Development is an independent, nonprofit policy research organization dedicated to reducing global poverty and inequality and to making globalization work for the poor. Use and dissemination of this Working Paper is encouraged; however, reproduced copies may not be used for commercial purposes. Further usage is permitted under the terms of the Creative Commons License.

The views expressed in CGD Working Papers are those of the authors and should not be attributed to the board of directors, funders of the Center for Global Development, or the authors' respective organizations.

# Contents

1 Literature ...................................................................................................................... 2

2 Setting ............................................................................................................................ 5

3 Data ................................................................................................................................ 7

4 The effect of violence on UAC apprehension rates ................................................. 10

    4.1 The homicide-migration relationship ................................................................. 10

    4.2 Nonlinearities and influential observations ....................................................... 12

    4.3 Unobserved common trends ................................................................................ 13

    4.4 Flexible nationwide or department-wide unobserved shocks .......................... 14

5 Migration waves ........................................................................................................... 15

    5.1 A model of migration and network diffusion ..................................................... 16

    5.2 Estimates of the network diffusion channel ...................................................... 19

6 Security versus economic motives ............................................................................. 20

7 Discussion ..................................................................................................................... 23

References ......................................................................................................................... 26

Figures and tables ........................................................................................................... 33

Online Appendix A-1 ..................................................................................................... A-1

Over the last several years the 'Northern Triangle' countries of El Salvador, Honduras, and Guatemala have suffered high levels of violence associated with organized criminals. Violent crime perpetrated by *mara* street gangs, Central American drug transporters, and Mexican drug cartels has been linked to a wave of forced displacement in this region (Cantor 2014). During the same period the United States has apprehended a wave of Unaccompanied Alien Children (UACs) immigrating from the same countries without authorization. This wave has been very large; for example, the number of apprehensions of 17 year-old UACs from the Northern Triangle during 2011–2016 is 8% of the total number of 17 year-olds who were initially living in those countries. Efforts to manage those children's arrival in the United States, and to prevent future UAC migration, depend critically on understanding the links between violence in their origin countries and the decision to migrate. But little quantitative evidence exists, for these Central American children or for any other international migrants, that could empirically measure and causally identify the connection between origin-country violence and migration.

This paper uses novel, individual-level, anonymized data on all 178,825 UAC apprehensions between 2011 and 2016 to measure the causal relationship between municipal-level homicide rates and UAC migration across 893 municipalities of the Northern Triangle. It tests the robustness of the relationship to controlling for municipality and year fixed effects, flexible unobserved time trends with arbitrarily spatially-correlated effects, and higher levels of saturation including department (state)-by-year fixed effects, as well as assumptions on functional form and influential observations. It proceeds to decompose the effects of new violence and the snowballing effects of past migration by building and estimating a continuous-time discrete choice search model of innovation diffusion through social networks. This simple model explains most of the evolution of UAC apprehensions from different parts of the region over time. Finally, it decomposes the relative importance of security and economic determinants of UAC migration, both for the region as a whole and across space, municipality by municipality. The analysis focuses on the Northern Triangle because these three small countries account for approximately 80% of recent UAC apprehensions.

The analysis finds that a sustained increase of one homicide per year in the Northern Triangle over all six years 2011–2016 caused about 0.9 additional UAC apprehensions in the United

States *in any given year* between 2011 and 2016, or about 3.7 additional UAC apprehensions as a cumulative total over all years. The explanatory power of short-term increases in violence is roughly equal to the explanatory power of long-term economic characteristics like average income and poverty, and much greater than the explanatory power of short-term economic shocks like rises in overall unemployment. Across wide portions of Honduras, Guatemala, and El Salvador, rising violence does more to explain UAC rates than the local economic setting. These relationships are substantially unaffected by controlling for changes over time that affected all three countries, such as changes in U.S. immigration policy. Estimation of the diffusion model shows that inertia from past UAC movement explains about one third of the relationship between more recent violence and current UAC flows. This implies that homicides can produce waves of migration that snowball over time, continuing to rise even when violence levels do not.

The paper begins in Section 1 by reviewing the literature on violence and migration with a focus on Central America. Section 2 describes the Northern Triangle setting, and Section 3 describes the novel database of UAC apprehensions and regional violence built for the study. Section 4 presents the core empirical results and several robustness tests. Section 5 derives and estimates the network diffusion model, and Section 6 decomposes the security and economic determinants of UAC rates. Section 7 summarizes and explores policy lessons.

# 1   Literature

Although the effect of violence on domestic displacement has been well studied in Latin America (Engel and Ibáñez 2007; Ibáñez and Vélez 2008), there is little quantitative evidence on the effect of violent crime on international migration. An important reason for this evidence gap is that violence often varies greatly at the subnational level, but common sources of data on international migrants almost never identify their sub-national place of origin. An exception is Shrestha (2017), who uses a panel of towns in Nepal to find that an increase of 100 in the death rate (per 100,000 population) due to Maoist insurgency in urban areas raises by 0.8 percentage points the rate of emigration to India, Malaysia, and the Gulf. That response to

violence is conditional on relative economic opportunity abroad and access to social networks (Adhikari 2013).

Several studies therefore consider the relationship between national-level outbreaks of violence and international migration. Amuedo-Dorantes and Puttitanun (2016) find that arrivals of unaccompanied minors in the U.S. has been correlated with the national-level homicide rate in the countries of origin (the Northern Triangle and Mexico). Shellman and Stewart (2007) find a statistically significant relationship between outbreaks of civil conflict in Haiti and U.S. interdictions of unauthorized Haitian migrants. And there is some evidence that U.S. counties closer to more violent Mexican municipalities received more Mexican migrants during a large homicide wave in Mexico (Arceo-Gómez 2013), but Mexicans appear to respond to violence more through domestic migration than international migration (Martinez 2014; Atuesta and Paredes 2016). Causal attribution in this literature is complicated by the fact that confounding determinants of migration may be varying across time in correlation with national-level violence.

The economic causes and effects of migration are better understood, and complex. The real earnings gain to migration is very large—including gains between 220% and 260% for typical workers from Guatemala and Nicaragua who move to the United States (Clemens et al. 2016). Central American households use migration by younger members as a strategy to cushion themselves from negative income shocks with remittances (Molina 2015), tending to protect poor children in migrant households from negative shocks to physical growth (Carletto et al. 2011) and cognitive development (Macours and Vakis 2010). Households in the Northern Triangle that receive more remittances invest relatively more in education and housing (Cox Edwards and Ureta 2003; Adams and Cuecuecha 2010; Ambler et al. 2015) and in formal savings instruments at banks (Anzoategui et al. 2014). Emigration has been found to push wages up by reducing the labor supply in source communities in Mexico (Mishra 2007) and Honduras (Gagnon 2011).

But this does not necessarily mean that higher incomes in origin countries are associated with reduced migration. Capital constraints are binding for many low-income potential migrants, not only in the direct costs of migration but in the acquisition of tangible and intangible assets

that facilitate migration—such as education and access to international social networks. Thus migration to the United States is associated with relatively *greater* wealth among poor Salvadoran households (Halliday 2006), relative labor-market *success* in Nicaragua (Funkhouser 2009), and greater disposable income among Mexican households (Angelucci 2012, 2015). The literature finds similar patterns around the world (e.g. Bazzi 2017; surveyed in Clemens 2014).

Recent research has stressed the importance of social networks to migration decisions (Munshi 2003; Epstein and Gang 2006), particularly for first-time migrants (Massey and Aysa-Lastra 2011). The costs of informal migration are typically reduced by networks of family and friends who teach potential migrants how to access informal channels and help finance smuggling payments for Mexican migrants (Massey and Zenteno 1999; Winters et al. 2001; McKenzie and Rapoport 2010; Dolfin and Genicot 2010), as well as for Central American child migrants (e.g. Donato and Sisk 2015).

Violence, economic development, and networks are not only independent causes of migration but also deeply intertwined. Networks greatly affect the individual-level costs of migration and thus individuals' migratory responses to violence and economic conditions, and networks are in turn built by migration. Economic conditions are known to shape participation in violent crime in the United States (Ihlanfeldt 2007; Lin 2008) and Mexico (Piñeyro 2010, 159, 179; Escalante 2010), and certainly Central America as well (Seelke 2014, 5). And violence, beyond its large direct welfare cost through reduced life expectancy (Soares 2006), has been found to impede economic development (Bozzoli et al. 2010; Skaperdas 2011; Besley and Persson 2014; Jaitman et al. 2017).[1] These complex relationships imply that past violence can shape emigration not only through immediate threats to security but through enlarging migrant networks and through affecting local economic conditions.

---

[1]Violence harms local economies through channels that include reducing entrepreneurship (Brück et al. 2013), reducing propensity to invest for future returns (Voors et al. 2012), reducing trade (Blomberg and Hess 2006), reducing children's schooling (Chamarbagwala and Morán 2011; Brown and Velásquez 2017; Monteiro and Rocha 2017), harming children's physical and cognitive development (Duque 2017), reducing earnings especially among the self-employed (Dell 2015; Velásquez 2015), disproportionately reducing the value of assets held by the poor (Aizenman et al. 2015), and undermining democratic institutions (Trelles and Carreras 2012; Blanco 2013), as well as inducing hopelessness and pessimism for prospects of upward mobility (Moya and Carter 2014).

## 2   Setting

In 2012 there was a large and sudden increase in the number of child migrants arriving in the United States from the Northern Triangle of Central America—El Salvador, Guatemala, and Honduras—without any adult. These Unaccompanied Alien Children (UACs) from the Northern Triangle came to outnumber those from Mexico for the first time in 2013; they made up 75% of all UACs at the southwest border by 2014.[2] Detained unaccompanied children spend an average of 35 days in custody of the Department of Health and Human Services. Thereafter 95% are released to the custody of a parent, relative, or other sponsor and wait an average of a year and a half before appearing before an immigration judge (Goździak 2015; Manuel and Garcia 2016).

Violence related to drug trafficking rose sharply in the Northern Triangle after Mexico's 2007–2009 escalation in conflict with Transnational Criminal Organizations (TCOs) there pushed trafficking routes into the Northern Triangle (UNODC 2012; Selee et al. 2013; ICG 2014). The key drivers of violence are drug trafficking, gang activity, the widespread availability of firearms, and relatively weak institutions of criminal justice (van Bronkhorst and Demombynes 2010). Outbreaks of violent crime in the Northern Triangle are highly uneven across space, tending to focus on hot spots within portions of departments (Ingram and Curtis 2014). The homicide rate in subnational areas of Central America with high drug-trafficking activity have double the homicide rates of other areas on average, controlling for factors such as relative economic disadvantage and history of civil conflict (Demombynes 2011).

Research based on qualitative survey evidence has generally concluded that violence is a leading cause of recent increases in emigration from the Northern Triangle, including unaccompanied child migration (Carlson and Gallagher 2015; MSF 2017). Interviews with convenience-samples of child migrants from the Northern Triangle find that roughly half of those in transit and large numbers of those returned to their home countries were originally forcibly displaced

---

[2]United States Government Accountability Office, *Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody*, GAO-15-521, July 14, 2015, p. 90. UACs are defined by U.S. law as "children who lack lawful immigration status in the United States, who are under the age of 18, and who either are without a parent or legal guardian in the United States or without a parent or legal guardian in the United States who is available to provide care and physical custody" (Kandel 2017). The legal definition is set by P.L. 107–296, §462, 116 Stat. 2202–2205 (November 25, 2002) (codified, as amended, at 6 U.S.C. §279(g)(2)).

by violence (Khashu 2010; UNHCR 2014; Camargo 2014; IOM 2016; Casa Alianza 2017). Poll data across Central America find a strong individual-level association between stated future emigration intent among youths and recent experience or witness of crime victimization (Hiskey et al. 2014).

But the motives of child migrants and their families are complex and diverse. U.S. officials in Central America identify the drivers of UAC migration from the region as not just crime and violence, but also educational concerns, the desire for family reunification, and the extent of smuggling networks (Gootnick et al. 2015). Survey evidence likewise suggests that current UAC flows are determined by a complex mix of access to smuggling networks and the desire for family reunification, beyond current levels of violence (Chishti and Hipsman 2015), and by the level of generalized violence beyond direct threats to the individuals who move (Swanson and Torres 2016).[3] Measuring the extent to which violence does or does not determine children's migration is inherently difficult based only on interviews with them or their families: children fleeing side-effects of violence such as school closings might state that they are moving for a better education, when in fact violence is the root cause. Conversely, children migrating for economic opportunity might state that they are fleeing violence because they believe that this motive will be seen as more legitimate.

This complexity has given rise to legal controversy in the United States over whether unaccompanied child migrants qualify for formal legal status as refugees from violent persecution, or should be treated as economic migrants (e.g. Stinchcomb and Hershberg 2014; Weiss 2015; Rodríguez 2016; Reynolds 2016; Cantor 2016). Policymakers perceive a tension between measures to protect children with humanitarian protection claims and encouraging more children to make the journey, with or without claims for asylum or other forms of humanitarian relief that are likely to be legally sanctioned (Rosenblum 2015).

---

[3]Some U.S. politicians have characterized the increase in UAC arrivals as a consequence of changes to U.S. policy regarding the deportation of unauthorized immigrant children in 2013 (Kandel 2017, 1), but there is no sign that UAC arrivals discontinuously rose after the policy change (Amuedo-Dorantes and Puttitanun 2016).

## 3   Data

This study uses novel microdata on the universe of 178,825 U.S. apprehensions of UACs from El Salvador, Guatemala, and Honduras during calendar years 2011–2016. It matches these observations to data on violence, economic conditions, and demographic conditions in their municipalities of origin.[4] Data on UAC apprehensions come from U.S. Customs and Border Protection (CBP). They are anonymized to record only, for each individual: country and city of birth, calendar year of apprehension, age at apprehension, and in which of CBP's 20 geographic sectors the apprehension occurred. The city of birth provided by the child and recorded by CBP allowed matching 161,735 children (90.4%) to a municipality of birth.[5] Most of the children in the universe (53.7%) are age 16–17, but all ages are represented (Figure 1). About a third (31.9%) are female. These UACs represent a substantial fraction of all children in the region in some age ranges. For example, the number of 17 year-old UACs from the Northern Triangle apprehended during 2011–2016 is approximately 8.1% of the total number of 17 year-olds living in the Northern Triangle when the wave began.[6]

The nature of the data circumscribe the interpretation of the results to follow. The data on UACs contain only children who are unaccompanied and try to reach the United States, succeed in reaching the United States, and are apprehended there. They do not include any adult migrants, any child migrants who travel accompanied by any family member age 18 or over, any UACs who enter without being apprehended, or any UACs who depart their country of origin but either do not attempt to reach the U.S. or never succeed in reaching U.S. territory. A minority of unaccompanied child migrants try to reach other countries, primarily Mexico. Among overall unauthorized Northern Triangle migrants apprehended by and returned by Mexico, roughly three quarters of those from Honduras and El Salvador have the United States as their final destination, and roughly half of those from Guatemala (EMIF 2016, 15). About 40 percent of Central American child migrants headed to the United States or Mexico are apprehended by Mexico (Rodrigo and Rietig 2015; Rosenblum and Ball 2016).

---

[4]The three countries' collective territory is divided into administrative regions as 53 departments, and within those, 893 municipalities.

[5]The most common reason for a failure to match was a missing value for city of birth (2.5% of records). Thereafter the most common reason was because the child provided the name of a department (and that name was not also the name of a municipality in any department).

[6]Calculation in the Appendix.

Beyond this, the data on UACs' localities of origin report the city of birth, not city of last residence. This has the advantage that it captures effects of violence on children who are displaced within the country before they leave it, as is often the case. It has the disadvantage that it introduces measurement error in the case of children who first moved away from their city of birth for reasons other than violence, and were subsequently displaced by violence from their new home city.

The database on violence comprises municipality-by-year homicide counts 2009–2016 for all three countries. Because the panel for homicides extends two years further back in time than the panel for UAC apprehensions, this implies that one or two lags of homicides can be included in panel regressions without affecting the number of observations, whereas including three or more lags reduces the number of observations. Unemployment data are available in comparable form for all three countries for only two years in this period—2011 and 2014— and at the department level rather than the municipality level, as they are based on surveys only representative by department. Municipality-level data on income per capita, poverty fraction, adult illiteracy, school enrollment, overall population, and youth population change sufficiently slowly that, for a six-year study like this one, it is sufficient to use data from a single year: usually a year in the range 2009–2013, the same for all three countries for any given variable. Details of these data are in the Appendix.

The data on violence contain only data on homicides. Homicide statistics have two major advantages as an indicator of violent crime. First, homicides are much more likely to be recorded in official statistics than other types of crime. While crimes such as extortion or even kidnapping are often never reported to police, homicides are often recorded even if the crime itself is never reported by those affected—because data usually include information from coroners processing unidentified bodies. Second, homicide statistics are available at high levels of geographic disaggregation, whereas surveys on other types of crime victimization are only representative across broad regions. The important disadvantages of homicide data include their omission of other types of violent crime that could affect migration decisions, and their omission of people who disappear without any clear evidence of homicide.[7]

---

[7]In 2016 there were 5,280 homicides in El Salvador, and the National Civil Police of El Salvador reports 2,090 disappearances (Cidón 2017). Some disappearances are not homicides, and some disappearances that are homi-

For these reasons, in all results discussed here, the homicide rate should be considered as a proxy for overall levels of violent crime. There is evidence that it is an informative proxy for this purpose. Killings by violent gangs in Central America are closely associated with other crimes, particularly extortion (ICG 2017). Table 1 shows, using data from crime victimization surveys in the Northern Triangle, that reports of murders in respondents' neighborhoods are highly correlated with reports of other types of crime. For example, 47% of people reporting murders in their neighborhood also report extortion in the same neighborhood.

While recent increases in UAC apprehensions have occurred alongside intense violent crime in the countries of origin, there is no obvious relationship between the rate of increase of UAC apprehensions from a country and changes in the nationwide level of homicides in that country in the same year. Figure 2 shows recent trends in homicides and in UAC apprehensions for the countries of the Northern Triangle. Figure 2a shows that they have exhibited very high homicide rates, making the Northern Triangle one of the most violent regions on earth. While national homicide rates in the region range between roughly 40 and 100 (per 100,000 population per year), the corresponding rate for the United States is 4.9. But UAC rates have clearly not varied directly with contemporaneous homicide rates at the national level. UAC rates at the national level have steadily risen while homicide rates for the same years have fluctuated around high levels. Figure 2b shows the number of UAC apprehensions in the United States each calendar year. Figure 2c shows UAC apprehensions in the U.S. per 100,000 population in the origin country. To show the scale of UAC movement relative to the youth population, Figure 2d shows the UAC rate per 100,000 *youths* in the origin country (defined as age 8–17, measured in 2013).

Likewise, simple geographic correlation of UAC apprehensions and violence offers mixed indications about the drivers of UAC rates (Figure 3). Figure 3a shows the average homicide rate in 893 municipalities across the Northern Triangle during 2011–2016. Figure 3b shows the total number of UACs 2011–2016 (cumulative) originating in each municipality. There is evident overlap between some of the most violent municipalities of Honduras and the greatest numbers of UACs, but UACs also depart some of the least-violent areas of western Guatemala in large numbers. Figure 3c shows the average annual rate of UACs per 100,000 youths (age

---

cides are counted when unidentified bodies are discovered. Some disappearances that are homicides are either never reported at all, or are reported but never counted as homicides because no body is ever found.

8–17) in each municipality during 2011–2016, showing that some of the regions where any given youth is most likely to become a UAC (especially in the Sierra Madre de Chiapas mountains of northern El Salvador) do not exhibit the highest levels of violence.

## 4   The effect of violence on UAC apprehension rates

This study seeks better identification of the causal relationship between homicides and UAC apprehensions than is possible with national-level data by exploring the subnational relationship in a six-year panel. Figure 4 shows the simple, bivariate relationships in the pooled data between key variables and the rate of UAC apprehensions. UAC apprehensions rise with the homicide rate. UAC apprehensions first rise, and then fall, with average income per capita. UAC apprehensions markedly fall with increasing poverty. These last two patterns, corroborated by the survey literature discussed above, suggest that access to credit and smuggling networks are binding constraints on the poorest residents of the region. But all of these bivariate relationships could be misleading; UAC rates could be higher in places with less poverty because those places are more violent. This section and the next will seek to sort out these causal pathways and competing explanations.

### 4.1   The homicide-migration relationship

A first approach to the data is simply to ask whether municipalities with higher rates of violence (homicides per 100,000 population, per year) exhibit higher rates of UACs (also expressed per 100,000 population per year). Table 2, column 1 shows the simple regression of the UAC rate on the homicide rate, with all muncipalities and years pooled. The correlation between UACs and homicides is positive and statistically significant, but could arise for a number of reasons other than an effect of violence on emigration.

The most obvious potential confounder is any time-invariant traits of different municipalities that could determine UAC rates, such as the initial extent of migrant networks, urbanization, poverty, ethnic mix, and country (or even population itself, which can generate spurious correlation as a common divisor of both the homicide rate and the UAC rate). The rest of the

10

table introduces fixed effects, using the specification

$$\dot{c}_{i,t} = \alpha + \boldsymbol{\beta}' \boldsymbol{h_{i,t}} + \phi_i + \chi_t + \varepsilon_{i,t}. \tag{1}$$

where $c$ is the stock of child migrants apprehended in the U.S. as a fraction of the home-area population and a dot denotes the time derivative; thus $\dot{c}_{i,t}$ is the rate of apprehensions in the United States in year $t$ of unaccompanied children from municipality $i$ per 100,000 population of that municipality; $\boldsymbol{h_{i,t}}$ is a vector of the $K$ current and lagged homicide rates in municipality $i$ per 100,000 population; $\phi_i$ are municipality fixed effects; $\chi_t$ are year fixed effects; $\boldsymbol{\beta}'$ is a vector of $K$ coefficients and $\alpha$ a coefficient to be estimated, and $\varepsilon_{i,t}$ is an error term.[8]

Column 2 of the table introduces municipality fixed effects $\phi_i$ only. With this change, the coefficient rises from 0.45 to 0.61. This indicates that cross-municipality differences in observed or unobserved time-invariant traits are not driving the correlation in column 1. The rise of the coefficient when between-group effects are eliminated implies that UACs do not, on average, tend to depart in relatively greater numbers from places that are persistently violent, but rather from places that have experienced recent increases in violence. Columns 3, 4, and 5 progressively add lags of the homicide rate, and the last row of the table presents the sum of the coefficient estimates on current and all included lags of homicides, $\sum_{k=0}^{K} \hat{\beta}_k$ (and its standard error).

Another important potential confounder could be conditions that varied over time for all countries equally, such as policy changes in the United States, the expansion of smuggling routes in Mexico and from there into the United States, or the world price of cocaine. Columns 6 through 9 thus repeat the regressions with year fixed effects $\chi_t$ added alongside the municipality fixed effects. The coefficients shrink by roughly one tenth of their magnitude, indicating that changes over time common to the whole Northern Triangle are not driving the homicide-UAC relationship.

With three lags of the homicide rate included (Table 2, column 9), the sum of the coefficients on the homicide rates rises to 0.928 and is statistically significant at the 1% level. This repre-

---

[8]Here and below, tables show Liang-Zeger (1986) standard errors clustered by municipality, to allow for arbitrary structure and degree of serial correlation.

sents the number of UACs from the average municipality in a given year caused by a sustained increase of one in the number of homicides per year in that municipality—that is, an increase that is is sustained over the previous three years as well as during the current year. Put differently, the result implies that it takes an increase of 1.08 homicides per year on average (1/0.928), sustained across four years in child migrants' municipalities of origin, to cause one additional UAC apprehension in the United States. If that increase is sustained thereafter it continues to cause one additional UAC apprehension every year on average.

Figure 5 shows graphically the result in Table 2, column 9. It is a plot of predictive marginal effects from a sustained change in the homicide rate (that is, a change for all years from $t-3$ though $t$) on the contemporaneous UAC rate (at $t$). The horizontal and vertical dotted lines show the sample mean homicide rate and UAC rate, respectively.

## 4.2   Nonlinearities and influential observations

The estimates in Table 2 could be sensitive to influential observations—municipality-years with extraordinary numbers of UACs, homicides, or both—or to the imposition of a linear functional form. Figure 6 presents semiparametric fixed-effects regressions of the contemporaneous UAC rate on each current or lagged homicide rate in isolation (unconditional on other lags), using the Robinson (1988) double-residual method controlling for municipality fixed effects. The bandwidth is 50 homicide rate-points, but comparison of this figure to Figure 5 suggests that the overall slope of the semiparametric relationship does not greatly differ from the slope with a linear relationship imposed. This suggests that the estimates in Table 2 are not driven by outlying influential observations.

That said, there is notable nonlinearity in the relationship: the slope markedly rises at higher (conditional) homicide rates. The figures suggest that above a homicide rate of 100, the marginal relationship between homicide and UAC rates is roughly 3–4 times what it is below a homicide rate of 100. In other words, where the linear relationship suggests that a three-year sustained increase in the homicide rate of 1 causes ~0.9 additional UAC arrivals, the local coefficient may be closer to ~0.5 for municipalities below a homicide rate of 100 and closer to ~1.5–2.0 for municipalities above a homicide rate of 100.

## 4.3   Unobserved common trends

An important robustness check on the results above is to investigate whether the homicide-migration relationship arises spuriously from unobserved common shocks. It is possible in priciple that some unobserved trend, affecting different localities to different degrees, drives both homicides and UAC apprehensions independently. For example, areas experiencing economic decline could both experience increases in gang recruitment and thus violence, and experience rising child emigration—but due the economic decline rather than the violence.

Table 3 employs two stringent robustness tests for unobserved common shocks. The first four columns transform the fixed-effects model (1) into a multilevel model with random municipality-specific time trends,

$$\dot{c}_{i,t} = \alpha + \boldsymbol{\beta} \boldsymbol{h_{i,t}} + \phi_i + \omega_i t + \varepsilon_{i,t}, \tag{2}$$

where the coefficient on year $t$ is the municipality-specific $\left(\omega^0 + \omega_i^1\right)$, with $\omega_i^1$ assumed random and normally distributed. As before, the bottom row of the table sums the coefficients on lagged homicides, and shows the standard error of the sum. We should expect the homicide-migration relationship to fall in magnitude, since in this specification we are controlling away part of the relationship of interest: for example, a municipality-specific time trend in gang penetration that results in more UAC migration is controlled away. But it should be concerning if municipality-specific linear time trends absorb most or all of the homicide-migration relationship. They do not: in Table 3 the relationship diminishes by about a third of the coefficient magnitude relative to Table 2.

Municipality-specific linear time trends are a special case of the more flexible Interactive Fixed Effects (IFE) estimator (Totty 2015), developed by Bai (2009) and implemented by Gomez (2015). This specification allows any form of time-varying omitted factor with municipality-specific consequences:

$$\dot{c}_{i,t} = \alpha + \boldsymbol{\beta} \boldsymbol{h_{i,t}} + \phi_i + \boldsymbol{\lambda_i'} \boldsymbol{F_t} + \varepsilon_{i,t}, \tag{3}$$

13

where $\boldsymbol{\lambda}_i'$ are municipality-specific factor loadings and $\boldsymbol{F}_t$ are unobserved time-specific common factors in each period. Unlike (2), this specification allows the data to determine the form of the common shock $F_t$ and the spatial correlation in $\lambda_i$.

The remaining columns of Table 3 apply the IFE estimator for a single factor to the same regressions as above. The summed homicide effect at the bottom of the table loses about 40% of its magnitude relative to Table 2 (0.928 to 0.575), but remains statistically significant. Here again the robustness test is demanding: the time-varying unobserved factors that are being controlled away could well include much of the relationship of interest, such as the growing penetration of drug trade routes and gang presence into the country and its heterogeneous effects on violence in different municipalities. The fact that the homicide-migration relationship retains statistical significance and much of its magnitude in the presence of these controls implies that the relationship does not spuriously arise from common trends in both violence and migration arising from unobserved changes independently driving both over time.

## 4.4   Flexible nationwide or department-wide unobserved shocks

An even more stringent test is to control for all possible countrywide or department-wide time-variant confounding shocks, by adding country-by-year fixed effects or department-by-year fixed effects. Country-by-year fixed effects would account for a country-specific shock in any year, such as Guatemala's 2015 political crisis. Department-by-year fixed effects would account for any form of department-level economic shock by year, such as poor employment conditions in any department-year.

Here again we should expect the magnitude of the relationship between violence and migration to decline, because much of the relationship of interest is being controlled away. For example, some of the arbitrary department-specific shocks could include the violence produced by a sudden conflict between violent gangs and cartels in particular departments; violence in one municipality can have spilled over from violence in other municipalities of the same department; and the migration of children in one municipality could be affected by violence in the rest of that municipality's department. Because violence comes in both spatial and temporal clumps, we should not interpret the coefficients in these highly saturated models as estimat-

ing the true relationship between violence and migration, but as representing the relationship between violence that is exclusively local—occurring in that municipality but nowhere else in the department.

Table 4 accounts for any country-specific shocks that affect UAC migration in all municipalities equally (cols. 1–4) and any department-specific shocks that affect UAC migration in all municipalities equally (cols. 5–8). In these final columns the entire effect of homicides on UAC migration is being identified by intra-departmental, intra-year variance in homicide rates across municipalities. If these highly saturated models were to fully absorb the homicide-migration relationship this would be concerning. It would suggest that the violence-UAC relationship arises only due to correlations over broad geographic areas, possibly driven by unobserved confounders, since many outbreaks of violence are highly localized.

But the statistical significance and roughly one third of the magnitude of the homicide effect from Table 2 survives in the most saturated model of Table 4 (last column, bottom row), again suggesting the robustness of the core result. It suggests that the core result does not arise spuriously from changing economic conditions at the department level that are caused by or happen to coincide with violence, but from violence itself. It accords with the observation that outbreaks of violence are often much greater in some municipalities of a given department than others, whereas intradepartmental variance in employment conditions is rarely as large, given the ability of workers facing poor employment conditions in one municipality to work in a nearby municipality.

## 5   Migration waves

While the evidence above suggests a strong causal relationship between violence at the origin and UAC apprehension rates, it leaves unanswered a question of research and policy interest. If violence is an important cause of UAC apprehensions, why did UAC apprehensions rise greatly and steadily in the years after 2011 (Figure 2b), when national-level homicide rates did not (Figure 2a)? This section models and tests the role of network diffusion in producing 'snowballing' or waves of migrants.

15

## 5.1   A model of migration and network diffusion

The qualitative survey literature discussed above makes it clear that potential UACs rely heavily on the migration experience of those in their family and social networks in considering the decision to move. Holland and Peters (2017) build a political theory in which migrant waves can arise through diffusion of information through social networks, even without a large change in the conteporaneous fundamental drivers of migration, and offer evidence of such waves in the Middle East. This suggests that some portion of current UAC migration could arise because past homicides drove both the creation of migrant networks that facilitate current migration *and* current homicides through persistence of homicides, but not strictly because current homicides cause current UAC migration.

This section explores the role of networks by modeling the relationship between migration, overseas networks, and mortality risk with a continuous-time discrete choice model. The canonical search model of this type is due to McCall (1970) and Mortensen (1970) (surveyed by Rogerson et al. 2005; Abbring 2010). It has been applied to describe migration first by David (1974) and subsequently in a long literature surveyed early by Molho (1986) and recently by Faggian (2014).

Consider families deciding about the welfare of younger children, or older children deciding about their own welfare. Suppose that children, when they become workers, can earn wage $w > 0$ in the home country or earn $w^* > w$ abroad. In each period they have probability $0 \leqslant \theta < 1$ of receiving migration assistance from a relative abroad, as capital or information. Workers who receive assistance always migrate. If they do not receive assistance, they decide whether to remain in the home country and face mortality risk $0 \leqslant \mu < 1$, or emigrate and pay migration cost $\kappa > 0$. Migration is irreversible and the interest rate is $r$. In the stationary state, the discounted expected utility of a migrant ($V^*$) is related to that of a non-migrant ($V$) by the Bellman equation

$$V^* = \frac{1}{1+r}\Big(w^* + V^* - r\big(\kappa - \mu V\big)\Big). \tag{4}$$

The first two terms in the right-hand sum indicate that the following period, a migrant will retain the future flow of foreign benefits and will have earned one period of the foreign wage.

16

The last term reflects the per-period opportunity cost from paying the migration cost and the per-period benefit of saving oneself from the (capitalized) expected loss due to home-country mortality ($\mu V$).

Suppose that a non-migrant without family assistance chooses to migrate if the mortality risk $\mu$ exceeds some critical value $\widetilde{\mu}$. The non-migrant's Bellman equation is

$$V = \frac{1}{1+r}\left(w + \theta V^* + \left(1-\theta\right)\left[\int_0^{\widetilde{\mu}} V d\Psi(\mu) + \int_{\widetilde{\mu}}^1 V^* d\Psi(\mu)\right]\right), \qquad (5)$$

where $\mu \sim \psi(\mu)$ with cumulative distribution $\Psi(\mu)$. Define the expected mortality risk above the critical mortality level as $\overline{\mu} \equiv E[\mu \mid m > \widetilde{\mu}]$ and below the critical level as $\underline{\mu} \equiv E[\mu \mid \mu \leqslant \widetilde{\mu}]$. Finally, use $W^* \equiv \frac{w^*}{r} - \kappa$ as shorthand for the capitalized net economic gain from migration. Equations (4) and (5) give[9]

$$\widetilde{\mu} = \frac{w}{w + W^*(1+\theta)} + \frac{W^*\left(\theta\underline{\mu} + \overline{\mu} - r\right)}{w + W^*(1+\theta)}, \qquad (6)$$

which defines $\widetilde{\mu}$ only implicitly, since $\overline{\mu} = \overline{\mu}(\widetilde{\mu})$ and $\underline{\mu} = \underline{\mu}(\widetilde{\mu})$. The first term on the right side of equation (6) reflects the basic intuition that as the home wage $w$ rises relative to the benefits of migration ($W^*$), workers tolerate greater risk in the home country and the critical risk rises. The second term captures feedback effects: as the migration cutoff changes, so does the risk faced by the average non-migrant ($\underline{\mu}$) and the risk that would have been faced by the average unassisted migrant had they not migrated ($\overline{\mu}$)—both of which shape the net benefits of migration.

The net instantaneous static effects in equation (6) can be determined with the implicit function theorem, yielding $\frac{\partial\widetilde{\mu}}{\partial w} > 0$, $\frac{\partial\widetilde{\mu}}{\partial w^*} < 0$, and $\frac{\partial\widetilde{\mu}}{\partial \kappa} > 0$. As the home wage rises and migration gets more costly, workers tolerate more risk in the home country, while as the foreign wage rises they tolerate less risk. The sign of $\frac{\partial\widetilde{\mu}}{\partial \theta}$ is indeterminate.

The dynamics of migration behavior emerge from the two-part stopping rule specified above: workers migrate when assistance is offered by family abroad *or* when their mortality risk

---

[9]What follows is derived in the Appendix.

exceeds the critical value. The migration hazard rate is thus

$$\frac{f(t)}{\phi - F(t)} = \theta + \left(1 - \Psi(\mu)\right) - \theta\left(1 - \Psi(\mu)\right), \tag{7}$$

where $f(t)$ is the probability that a person migrates in period $t$ conditional on not having yet migrated, $F(t)$ is the corresponding cumulative distribution function, and $0 \leqslant \phi < 1$ is the maximum fraction of the population willing to migrate at any time.[10]

The problem becomes empirically tractable with three assumptions imposed on (7). First, the probability of migration assistance from a relative abroad is proportional to the fraction of possible migrants who have migrated: $\theta \equiv \alpha \frac{F(t)}{\phi}$, where $\alpha > 0$. Second, the probability that a representative migrant's expected risk of death exceeds the critical risk is proportional to the average homicide rate $h$: $(1 - \Psi(\mu)) \equiv \beta h$, where $\beta > 0$. Third, neither $\theta$ nor $(1 - \Psi(\mu))$ is large, thus $\theta\left(1 - \Psi(\mu)\right) \approx 0$. Equation (7) then reduces to

$$\frac{\dot{c}_t}{\phi - c_{t-1}} = \frac{\alpha}{\phi} c_{t-1} + \beta h_t, \tag{8}$$

where $c$ is the stock of child migrants as a fraction of the home-area population and a dot denotes the time derivative. This is the well-characterized model of innovation diffusion called the "mixed-influence" model by Mahajan and Peterson (1985).[11] As in the earlier logistic (Verhulst) and Gompertz models, the rate of diffusion is proportional to the number of potential adopters remaining; but unlike those other models, the "mixed-influence" model accounts separately for two different influences on diffusion.

The first term of equation (8) captures "internal influence", when previous adopters of an innovation cause new adoption—in the present case, prior migrants inspire, inform, and assist new migrants in a snowball effect. The second term captures "external influence" on diffusion—in the present case, an exogenous shock to mortality risk encourages migration independently of the snowball effect. Equation (8) implies that if network diffusion is a major determinant

---

[10]In general, the probability of event $A$ or event $B$ occurring is $\Pr(A \cup B) \equiv \Pr(A) + \Pr(B) - \Pr(A \cap B)$.

[11]Often called the Bass (1969) model in management science, but closely related to prior models in economics (Mansfield 1961), sociology (Coleman 1964), and communications (Taga and Isii 1959). The economic innovation of Bass was to give a theoretical account of the "external influence" parameter (Rossman et al. 2008). Moretto and Vergalli (2008) calibrate a mixed-influence diffusion model with migration data.

of UAC migration, the analysis can improve on the empirical model in (1) by controlling for *past* UAC migration at the local level, and its interaction with *current* violence.

## 5.2   Estimates of the network diffusion channel

Table 5 explores the role of network diffusion predicted by equation (8). Column 1 simply repeats Table 2, column 9 for comparison. The next column adds a control for the pre-existing stock of UAC apprehensions $c_{i,t-1}$.[12] Column 3 proceeds to include an interaction term between homicides and the prior UAC stock. Both the prior stock and the interaction term are statistically significant at the 1% level. The coefficient on the prior stock, 0.198, implies that an increase in the stock of prior UACs from a municipality of five children raises the per-year flow of new UACs by one. This, and the coefficient on the interaction term, imply that in an average municipality with a homicide rate of 100 (a little over double the average), the coefficient on the prior stock would be $0.198 + (100 \times 0.000642) = 0.262$. In other words, in a typical municipality with double the average homicide rate, it only takes an increase of four in the stock of previous UACs to raise the per-year flow of new UACs by one.

The results are similar when prior UAC migration is measured by the lagged flow rate ($\dot{c}_{t-1}$) rather than by the lagged stock ($c_{t-1}$), in columns 4 and 5. This suggests the important role of cumulative previous flows in shaping current flows. Because all of these regressions include municipality fixed effects, there is the potential for Nickell's (1981) dynamic panel bias. The last column of the table therefore uses the Arellano-Bond (1991) panel estimator to instrument for the lagged change in UAC flow with higher-order lagged levels of UAC flow. The results change little, suggesting that dynamic panel bias is not substantial in the rest of the table.

Table 5 also tests the relative importance of violence and network diffusion in shaping current UAC flows. In the last row of the table, which sums the coefficients on homicides, the effect of violence falls by one third (from 0.928 to 0.624) between columns 1 and 2. Thus implies that about one third of the apparent effect of current violence acts through the facilitation of current UAC flows by past UAC flows—that were in turn created by past violence. This offers

---

[12]Here, the prior stock $c_{i,t-1}$ is estimated as the sum of all UAC apprehensions from municipality $i$ in all years from the beginning of the panel up to and including year $t-1$.

a partial answer to the question of why UAC flows responding to violence could increase over time disproportionately to increases in current violence. It implies that UAC migration is a self-reinforcing 'snowball' phenomenon: It is affected by current violence, but once begun it can continue in part from the inertia created by network effects. This simple model of violence and network diffusion explains most of the variance in UAC flows across municipality-years: overall $R^2$ ranges from 0.53 to 0.59. Within-municipality $R^2$ ranges from 0.44 to 0.46.

## 6   Security versus economic motives

A further question of both research and policy interest is the relative importance of violence and economic conditions in determining movement by UACs. This section constructs various tests of this type. The interpretation of these tests should be delimited by the inability of any summary statistic to fully capture either the relevant forms of violence or the relevant economic conditions.

Table 6 tests how the relationship between violence and UAC migration at the municipality level is altered by controlling for unemployment at the departmental level.[13] Unemployment is measured in all three countries by national sample surveys that are representative at the departmental level only; and only in two years of the period of interest are such surveys available for all three countries: 2011 and 2014. Column 1 shows pooled Ordinary Least Squares for the 893 municipalities in two years, and column 2 adds a control for the departmental unemployment rate.[14] The coefficient on unemployment is positive, indicating that UACs have a greater tendency to leave municipalities in departments with high unemployment. But the coefficient estimate on homicides barely changes, suggesting that the link between UAC migration and violence does not arise spuriously from a spatial correlation between violence and poor labor market conditions. This accords with previous evidence in Table 4.

---

[13]Specifications in Table 2 with year fixed-effects control for changing economic conditions at the national level, such as increases in the nationwide unemployment rate. However nationwide economic shocks can affect different regions differently. The Appendix compares the nationwide unemployment rate to the departmental unemployment rates in Honduras, 2007–2014. There is high variance of the departmental rates around the nationwide rate, both in levels and changes. In 2014 the nationwide rate was 5.0% but departmental rates ranged from 1.2% to 7.0%. From 2013 to 2014 the nationwide change in the unemployment rate was +1.1% but the departmental changes ranged from –0.6% to +4.1%.

[14]In Honduras the official unemployment rate covers workers age 10+, whereas in Guatemala and El Salvador it covers age 12+.

Columns 3 and 4 of Table 6 repeat the same pair of regressions adding municipality fixed effects. The coefficient on homicides does not substantially change, but the coefficient on departmental unemployment becomes statistically insignificant. This suggests that the positive relationship between unemployment and UAC migration in column 2 arises because other time-invariant traits of municipalities cause them to have persistently high unemployment, not due to short-term (three-year) shocks to unemployment.

The preceding analysis suggests that the principal variance in important economic determinants of UAC migration may occur across space rather than over time. That is, UACs may primarily leave places where their concerns about the future are long-term rather than short-term. Table 7 tests the relative importance, in cross-section, of recent changes in homicide rates and other municipality traits related to economic development: average income per capita (2009 US\$ at Purchasing Power Parity); poverty rate (fraction, by national poverty line, 2007); adult illiteracy (%, 2009); and the child school enrollment rate.[15]  It reports cross-sectional regressions of the form $\tilde{c}_i = \alpha + \beta \Delta h_i + \gamma' X_i + \varepsilon_{i,t}$, where $\tilde{c}_i$ is cumulative total UAC apprehensions 2011–2016 from municipality $i$ per 100,000 population, $\Delta h_i$ is the mean across years of the change in the homicide rate of municipality $i$ during the preceding three years, and $X_i$ is a vector of development traits $x_i$.

Table 7, column 1 reports a coefficient on the homicide rate similar to the magnitude implied by the coefficient estimates in Table 2 (recall that here the outcome is *cumulative* UAC apprehensions per 100,000 population 2011–2016, not apprehensions in a single year). A sustained increase of one homicide per year causes 3.8 cumulative total UAC apprehensions from that municipality over the whole period under study. The partial correlation of the UAC rate and income per capita is negative but statistically insignificant. The partial correlation of UAC rates with the poverty rate is negative, as in the bivariate plot in Figure 4. The regressions control for the size of the overall population and the youth population (age 8–17) specifically.

[15]The school enrollment rate used here proxies for gross enrollment but is not identical to it. It is simply the ratio of the total number of people enrolled in grades 1–9 collectively in each municipality, to the total number of people in the municipality age 8–17. This is for reasons of census data availability; strictly speaking, gross enrollment for these grades should be calculated with the number of children age 6–15. That said, the measure calculated here is a close proxy for true gross enrollment. The regressions in Table 7 must be run in cross-section because all development indicators are available at municipal-level disaggregation for only a single year during the period of interest—innocuous in this setting because they change little over a six-year period. The reference year for development indicators is deliberately chosen to be in a year early in or prior to the period 2011–2016 so they are mostly or entirely predetermined, not affected by high UAC rates.

21

The table reports, in square brackets below each coefficient estimate, the Shapley value of each estimate (Huettner and Sunder 2012). This is the percentage of the total explanatory power of all included regressors that arises from each regressor. Thus for example the explanatory power of the change in the homicide rate (21.4%) is similar to the explanatory power of the relative size of the youth population (21.1%).

Column 2 of Table 7 adds interaction terms between the homicide rate and income per capita, and between the homicide rate and the poverty rate. The negative coefficient on the interaction with income implies that the effect of homicides on UAC apprehensions is relatively lower in areas with higher *average* incomes, all else equal. The negative coefficient on the interaction with poverty implies that the effect of homicides on UAC apprehensions is relatively lower in areas where poverty is greater—such as where large marginalized communities lack access to smuggling networks—all else equal. Column 3 shows that all of these findings are robust to controlling for further indicators of the overall level of development: the adult illiteracy rate and the child school enrollment rate.

The Shapley values of Table 7 are informative about the overall relative importance of homicides and economic conditions as drivers of UAC migration. In column 3, 12.2% of the explanatory power of the regressors comes from homicides alone, an additional 25.3% (11.1 + 14.2) comes from the interaction of homicides with basic economic conditions, and 35.3% (3.1 + 15.5 + 15.1 + 1.6) comes from conditions of economic development in isolation. This allows the broad conclusion that violence and the interaction of violence with economic conditions together explain roughly as much of UAC rates at the municipal level as do economic conditions by themselves.

We can decompose this relative importance not just for the dataset overall, but for each municipality. One of many ways to spatially decompose the relative contributions of security and economic determinants of UAC rates is to use the coefficient estimates in Table 7, column 1 to calculate for each municipality the difference

$$\delta_i \equiv \left| \hat{\beta} \left( \Delta h_i - \overline{\Delta h} \right) \right| - \left| \hat{\gamma}_{\mathrm{inc}} \left( x_{\mathrm{inc},i} - \overline{x}_{\mathrm{inc}} \right) + \hat{\gamma}_{\mathrm{pov}} \left( x_{\mathrm{pov},i} - \overline{x}_{\mathrm{pov}} \right) \right|, \tag{9}$$

22

where an overbar indicates the cross-section mean of the regressor. For a given municipality, the difference $\delta_i$ is greater than zero if recent changes in that municipality's homicide rate are predicted to have a larger effect on its UAC rate than its income per capita and poverty rate, given the coefficient estimates for the entire Northern Triangle. Figure 7 maps the values of $\delta_i$ across the region for the period 2011–2016. Bright red areas show $\delta_i \gg 0$, where recent changes in the homicide rate are predicted to determine much more of the UAC rate than economic factors. Light red areas show $\delta_i \approx 0$, where homicide shocks and economic traits are predicted to weigh roughly equally. Green areas show $\delta_i \ll 0$, where recent changes in the homicide rate are predicted to determine much less of the UAC rate than economic factors. In Honduras, homicides are predicted to be the dominant explanation in San Pedro Sula and large swathes of the coast and border regions with Guatemala and Nicaragua. In Guatemala, homicides are predicted to be the dominant explanation in many coastal and border municipalities as well as much of the north. In El Salvador, homicides are predicted to outweigh economic determinants in some of the most violent southern coastal areas.

An alternative spatial decomposition of interest is shown in Figure 8. This displays schematically the relative predicted change in UAC apprehension rate per unit change in the homicide rate, for each municipality. That is, this map shows

$$\frac{\partial \bar{c}_i}{\partial h_i} = \hat{\beta} + \left(\hat{\gamma}_{x_{\text{inc}} \times h}\right) x_{\text{inc},i} + \left(\hat{\gamma}_{x_{\text{pov}} \times h}\right) x_{\text{pov},i}, \tag{10}$$

where $\hat{\beta}$ is the coefficient on $\Delta h$ and $\hat{\gamma}_{x_{\text{inc}} \times h}$ and $\hat{\gamma}_{x_{\text{pov}} \times h}$ are the coefficient estimates on the interaction terms in Table 7, column 2. The decomposition model predicts that a given decline in the homicide rate will cause a relatively greater decline in the UAC rate in, for example, areas in and around Guatemala City and San Salvador, but relatively less in Tegucigalpa and many rural areas. This prediction arises because relatively high incomes and low poverty in and around Guatemala City and San Salvador give potential UACs better access to migration as a response to violence.

## 7   Discussion

This evidence implies that violence can be a major determinant of international migration from poor regions, interacting in complex ways with economic determinants of migration as well as prior migration flows. The analysis finds that an increase of one homicide per year in the Northern Triangle sustained over four years caused about 0.9 additional Unaccompanied Child migrant apprehensions in the United States in any given year between 2011 and 2016. Extensive robustness checks indicate that the relationship increases at higher levels of violence, and that the core finding is not driven by confounding with department-level economic shocks, influential outliers, or unobserved regionwide shocks. The relationship is substantially unchanged when time trends of arbitrary form are included; this implies that the violence-migration relationship was driven by events in the region and was unaffected by changes in U.S. immigration policy during the period.

The analysis finds that changes in homicide rates have persistent effects on UAC rates. Homicides in a given year have detectable effects on UAC apprehensions several years later. This occurs through three channels: a direct effect; an indirect effect because homicides in a given year also beget future homicides which then separately affect UAC rates; and a second indirect effect because homicides in a given year raise UAC rates in that year, and UAC rates snowball over time. About one third of the relationship between violence and UAC migration in a given year is driven by these snowball effects, in which past migration due to past violence facilitates current migration. This implies that sustained reduction in the pressure for child migration will require sustained reductions in homicide rates.

A further finding is that short-term economic shocks, such as a three-year rise in overall unemployment, did not affect UAC rates between 2011 and 2014. UAC rates are higher for places that have persistently higher unemployment rates, but not higher for places that— holding constant their long-term characteristics—experience short-term negative economic shocks. UAC rates are also not relatively higher on average in places with persistently high homicide rates, but in places that have experienced recent increases in the homicide rate. The principal drivers of UAC decisions therefore appear to be short-term shocks to violence

24

(not long-term geographic patterns of violence) together with long-term economic forces (not short-term economic shocks).

The findings on the economic determinants of UAC apprehensions suggest the complexity of development and migration. UAC migration is much higher in municipalities with *lower* poverty rates, all else equal, as well as modestly higher in municipalities with higher average incomes. These results might seem counterintuitive without the context of prior research findings that access to smuggling networks, family connections abroad, and the ability to finance the journey are major determinants of unauthorized migration by both children and adults. The patterns observed here are compatible with a model in which violence creates a strong impetus for child migration, an impetus to which relatively better-off families are able to be more responsive: those who have higher aspirations, more access to financial and practical assistance from abroad, and more domestic access to finance and smugglers. This suggests that further economic development without lasting reductions in violence is unlikely to reduce pressure for UAC migration.

These findings suggest that overseas policies by migrant-destination countries can shape migration, including economic migration, through their effect on violence (Keefer et al. 2010). The United States targets foreign assistance activities at parts of Central America that are the most violent and are the origins of intense emigration (GAO 2013). Aid policy interventions designed to reduce violence are a subject of active experimentation and research (Muggah and Aguirre 2013; Moestue et al. 2013; Berg and Carranza 2015; USAID 2016; Chioda 2017). There is rigorous evidence that aid interventions to improve local service provision reduced violent insurgency in Iraq (Berman et al. 2011)—though related measures in the Philippines may have sparked short-run violent countermeasures by organized criminals (Crost et al. 2014), and Nunn and Qian (2014) find that food aid can increase violence in some conflict settings. A randomized evaluation of one community-based crime and violence prevention project in the Northern Triangle supported by U.S. foreign assistance found that it reduced neighborhood-level reports of homicides by 50% (Berk-Seligson et al. 2014).[16] The causal links between such interventions and violence, together with the causal link between violence and child mi-

---

[16]The policy intervention by the Central America Regional Security Initiative, which was also carried out in Panama, is a complex mix that includes environmental redesign (such as street lighting), youth programs (such as workforce development and mentorships), and community policing.

25

gration, suggest that policies favoring the prevention of violence can have important effects on child migration in this region.

## References

**Abbring, Jaap H**, "Identification of dynamic discrete choice models," *Annual Review of Economics*, 2010, *2* (1), 367–394.

**Adams, Richard H and Alfredo Cuecuecha**, "Remittances, Household Expenditure and Investment in Guatemala," *World Development*, 2010, *38* (11), 1626–1641.

**Adhikari, Prakash**, "Conflict-Induced Displacement, Understanding the Causes of Flight," *American Journal of Political Science*, 2013, *57* (1), 82–89.

**Ajzenman, Nicolas, Sebastian Galiani, and Enrique Seira**, "On the distributive costs of drug-related homicides," *Journal of Law and Economics*, 2015, *58* (4), 779–803.

**Ambler, Kate, Diego Aycinena, and Dean Yang**, "Channeling remittances to education: A field experiment among migrants from El Salvador," *American Economic Journal: Applied Economics*, 2015, *7* (2), 207–232.

**Amuedo-Dorantes, Catalina and Thitima Puttitanun**, "DACA and the Surge in Unaccompanied Minors at the US-Mexico Border," *International Migration*, 2016, *54* (4), 102–117.

**Angelucci, Manuela**, "Conditional cash transfer programs, credit constraints, and migration," *Labour*, 2012, *26* (1), 124–136.

_ , "Migration and financial constraints: Evidence from Mexico," *Review of Economics and Statistics*, 2015, *97* (1), 224–228.

**Anzoategui, Diego, Aslı Demirgüç-Kunt, and María Soledad Martínez Pería**, "Remittances and financial inclusion: evidence from El Salvador," *World Development*, 2014, *54*, 338–349.

**Arceo-Gómez, Eva Olimpia**, "Drug-Related Violence and Forced Migration from Mexico to the United States," in Gaspare M Genna and David A Mayer-Foulkes, eds., *North American Integration: An Institutional Void in Migration, Security and Development*, New York: Routledge, 2013, pp. 211–230.

**Arellano, Manuel and Stephen Bond**, "Some tests of specification for panel data: Monte Carlo evidence and an application to employment equations," *Review of Economic Studies*, 1991, *58* (2), 277–297.

**Atuesta, Laura H and Dusan Paredes**, "Do Mexicans flee from violence? The effects of drug-related violence on migration decisions in Mexico," *Journal of Ethnic and Migration Studies*, 2016, *42* (3), 480–502.

**Bai, Jushan**, "Panel data models with interactive fixed effects," *Econometrica*, 2009, *77* (4), 1229–1279.

**Bass, Frank**, "A New Product Growth for Model Consumer Durables," *Management Science*, 1969, *15* (5), 215–227.

**Bazzi, Samuel**, "Wealth heterogeneity and the income elasticity of migration," *American Economic Journal: Applied Economics*, 2017, *9* (2), 219–255.

**Berg, Louis-Alexandre and Marlon Carranza**, *Crime, Violence, and Community-Based Prevention in Honduras*, Justice and Development Series Research Report. Washington, DC: World Bank, 2015.

**Berk-Seligson, Susan, Diana Orcés, Georgina Pizzolitto, Mitchell A Seligson, and Carole J Wilson**, *Impact Evaluation of USAID's Community-Based Crime and Violence Prevention Approach in Central America*, Latin America Public Opinion Project. Nashville: Vanderbilt University, 2014.

**Berman, Eli, Jacob N Shapiro, and Joseph H Felter**, "Can hearts and minds be bought? The economics of counterinsurgency in Iraq," *Journal of Political Economy*, 2011, *119* (4), 766–819.

**Besley, Timothy and Torsten Persson**, "The causes and consequences of development clusters: state capacity, peace, and income," *Annu. Rev. Econ.*, 2014, *6* (1), 927–949.

**Blanco, Luisa**, "The impact of crime and insecurity on trust in democracy and institutions," *The American Economic Review*, 2013, *103* (3), 284–288.

**Blomberg, S Brock and Gregory D Hess**, "How much does violence tax trade?," *The Review of Economics and Statistics*, 2006, *88* (4), 599–612.

**Bozzoli, Carlos, Tilman Brück, and Simon Sottsas**, "A survey of the global economic costs of conflict," *Defence and Peace Economics*, 2010, *21* (2), 165–176.

**Brown, Ryan and Andrea Velásquez**, "The effect of violent crime on the human capital accumulation of young adults," *Journal of Development Economics*, 2017, *127*, 1–12.

**Brück, Tilman, Wim Naudé, and Philip Verwimp**, "Business under fire: Entrepreneurship and violent conflict in developing countries," *Journal of Conflict Resolution*, 2013, *57* (1), 3–19.

**Camargo, Abbdel**, *Arrancados de raíz. Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y/o separados de Centroamérica y su necesidad de protección internacional*, México: Office of the United Nations High Commissioner for Refugees, 2014.

**Cantor, David**, "As deadly as armed conflict? Gang violence and forced displacement in the Northern Triangle of Central America," *Agenda Internacional*, 2016, *23* (34), 77–97.

**Cantor, David James**, "The New Wave: Forced Displacement Caused by Organized Crime in Central America and Mexico," *Refugee survey quarterly*, 2014, *33* (3), 34–68.

**Carletto, Calogero, Katia Covarrubias, and John A Maluccio**, "Migration and child growth in rural Guatemala," *Food Policy*, 2011, *36* (1), 16–27.

**Carlson, Elizabeth and Anna Marie Gallagher**, "Humanitarian Protection for Children Fleeing Gang-Based Violence in the Americas," *Journal on Migration and Human Security*, 2015, *3* (2), 129–158.

**Casa Alianza**, "Informe mensual de la situación de los derechos de los niños, niñas y jóvenes en Honduras," Observatorio de derechos de los niños, niñas y jóvenes en Honduras. Febrero. Tegucigalpa: Casa Alianza Honduras 2017.

**Chamarbagwala, Rubiana and Hilcías E Morán**, "The human capital consequences of civil war: Evidence from Guatemala," *Journal of Development Economics*, 2011, *94* (1), 41–61.

**Chioda, Laura**, *Stop the Violence in Latin America: A Look at Prevention from Cradle to Adulthood*, Washington, DC: World Bank, 2017.

**Chishti, Muzaffar and Faye Hipsman**, "The child and family migration surge of summer 2014: a short-lived crisis with a lasting impact," *Journal of International Affairs*, 2015, *68* (2), 95–114.

**Cidón, María**, "Michapa también vive con miedo," *Revista Factum*, March 30. 2017.

**Clemens, Michael A**, "Does development reduce migration?," in Robert E B Lucas, ed., *International Handbook on Migration and Economic Development*, Cheltenham: Edward Elgar Publishing, 2014, pp. 152–185.

— , Claudio Montenegro, and Lant Pritchett, "Bounding the Price Equivalent of Migration Barriers," Discussion Paper 9789. Bonn: IZA Institute for Labor Economics 2016.

**Coleman, James S.**, *Introduction to Mathematical Sociology*, New York: Free Press of Glencoe, 1964.

**Crost, Benjamin, Joseph Felter, and Patrick Johnston**, "Aid under fire: Development projects and civil conflict," *American Economic Review*, 2014, *104* (6), 1833–1856.

**David, Paul A**, "Fortune, risk, and the microeconomics of migration," in P A David and M W Reder, eds., *Nations and Households in Economic Growth: Essays in honor of Moses Abramovitz*, New York: Academic Press, 1974, pp. 21–88.

**Dell, Melissa**, "Trafficking networks and the Mexican drug war," *American Economic Review*, 2015, *105* (6), 1738–1779.

**Demombynes, Gabriel**, "Drug trafficking and violence in Central America and beyond," *World Development Report 2011* Background Case Study. Washington, DC: World Bank 2011.

**Dolfin, Sarah and Garance Genicot**, "What do networks do? The role of networks on migration and 'coyote' use," *Review of Development Economics*, 2010, *14* (2), 343–359.

**Donato, Katharine M and Blake Sisk**, "Children's Migration to the United States from Mexico and Central America: Evidence from the Mexican and Latin American Migration Projects," *Journal on Migration and Human Security*, 2015, *3* (1), 58–79.

**Duque, Valentina**, "Early-life conditions and child development: Evidence from a violent conflict," *SSM-Population Health*, 2017, *3*, 121–131.

**Edwards, Alejandra Cox and Manuelita Ureta**, "International migration, remittances, and schooling: Evidence from El Salvador," *Journal of Development Economics*, 2003, *72*, 429–461.

**EMIF**, "Encuesta sobre migración en la Frontera sur de México: Reporte Trimestral de Resultados, Enero–Marzo 2016," Tijuana: El Colegio de la Frontera Norte 2016.

**Engel, Stefanie and Ana María Ibáñez**, "Displacement Due to Violence in Colombia: A Household-Level Analysis," *Economic Development and Cultural Change*, 2007, *55* (2), 335–365.

**Epstein, Gil S and Ira N Gang**, "The influence of others on migration plans," *Review of Development Economics*, 2006, *10* (4), 652–665.

**Escalante, Fernando**, "Panorama del homicidio en México," in Arturo Alvarado and Mónica Serrano, eds., *Los Grandes Problemas de México XV: Seguridad nacional y seguridad interior*, Mexico City: El Colegio de México, 2010, pp. 301–330.

**Faggian, Alessandra**, "Job Search Theory," in Fischer M.M. and P. Nijkamp, eds., *Handbook of Regional Science*, Berlin: Springer-Verlag, 2014, pp. 59–73.

**Funkhouser, Edward**, "The Choice of Migration Destination: A Longitudinal Approach using Pre-Migration Outcomes," *Review of Development Economics*, 2009, *13* (4), 626–640.

**Gagnon, Jason**, "'Stay With Us?' The Impact of Emigration on Wages in Honduras," OECD Development Centre Working Papers. Paris: OECD 2011.

**GAO**, "Central America: U.S. Agencies Considered Various Factors in Funding Security Activities, but Need to Assess Progress in Achieving Interagency Objectives," Report GAO-13-771. Washington, DC: U.S. Government Accountability Office 2013.

**Gomez, Matthieu**, "REGIFE: Stata module to estimate linear models with interactive fixed effects," Statistical Software Components, Boston College Department of Economics July 2015.

**Gootnick, David et al.**, "Information on Migration of Unaccompanied Children from El Salvador, Guatemala, and Honduras," Report GAO-15-362. Washington, DC: U.S. Government Accountability Office 2015.

**Goździak, Elżbieta M**, "What Kind of Welcome? Integration of Central American Unaccompanied Children into Local Communities," Washington, DC: Institute for the Study of International Migration 2015.

**Halliday, Timothy**, "Migration, risk, and liquidity constraints in El Salvador," *Economic Development and Cultural Change*, 2006, *54* (4), 893–925.

**Hiskey, Jonathan, Mary Malone, and Diana Orces**, "Violence and Migration in Central America," *Americas Barometer Insights*, 2014, *101*, 1–8.

**Holland, Alisha and Margaret Peters**, "Explaining Migrant Waves," Working Paper, Dept. of Politics. Princeton: Princeton University 2017.

**Huettner, Frank and Marco Sunder**, "Axiomatic arguments for decomposing goodness of fit according to Shapley and Owen values," *Electronic Journal of Statistics*, 2012, *6*, 1239–1250.

**Ibáñez, Ana María and Carlos Eduardo Vélez**, "Civil Conflict and Forced Migration: The Micro Determinants and Welfare Losses of Displacement in Colombia," *World Development*, 2008, *36* (4), 659 – 676.

**ICG**, *Corridor of Violence: The Guatemala-Honduras Border*, Latin America Report No. 52. Brussels: International Crisis Group, 2014.

__ , "Mafia of the Poor: Gang Violence and Extortion in Central America," Latin America Report No. 62, April 6. Brussels: International Crisis Group 2017.

**Ihlanfeldt, Keith R**, "Neighborhood drug crime and young males' job accessibility," *Review of Economics and Statistics*, 2007, *89* (1), 151–164.

**Ingram, Matthew C and Karise M Curtis**, "Violence in Central America: A spatial view of homicide in the region, Northern Triangle, and El Salvador," in Eric L Olson, ed., *Crime and Violence in Central America's Northern Triangle*, Washington, DC: Woodrow Wilson Center, 2014, pp. 245–284.

**IOM**, *Niñez y Adolescencia Migrante No Acompañada Retornada en el Triángulo Norte de Centroamérica*, Northern Triangle Migration Management Information Initiative. San Salvador: International Organization for Migration, 2016.

**Jaitman, Laura, Dino Caprirolo, Rogelio Granguillhome Ochoa, Philip Keefer, Ted Leggett, James Andrew Lewis, José Antonio Mejía-Guerra, Marcela Mello, Heather Sutton, and Iván Torre**, *The Costs of Crime and Violence: New Evidence and Insights in Latin America and the Caribbean*, Washington, DC: Inter-American Development Bank, 2017.

**Kandel, William**, "Unaccompanied Alien Children: An Overview," CRS Report R43599. Washington, DC: Congressional Research Service 2017.

**Keefer, Philip, Norman Loayza, and Rodrigo R Soares**, "Drug prohibition and developing countries: Uncertain benefits, certain costs," in Philip Keefer and Norman Loayza, eds., *Innocent Bystanders: Developing Countries and the War on Drugs*, Washington, DC: World Bank, 2010, pp. 9–60.

**Khashu, Annita**, "Children in Transit: Results of Interviews with Central American Unaccompanied Minors Encountered in Mexico," Center for Interamerican Studies and Programs, Working Paper 21. Mexico City, Instituto Tecnológico Autónomo de Mé 2010.

**Liang, Kung-Yee and Scott L Zeger**, "Longitudinal data analysis using generalized linear models," *Biometrika*, 1986, *73* (1), 13–22.

**Lin, Ming-Jen**, "Does unemployment increase crime? Evidence from US data 1974–2000," *Journal of Human Resources*, 2008, *43* (2), 413–436.

**Macours, Karen and Renos Vakis**, "Seasonal Migration and Early Childhood Development," *World Development*, 2010, *36* (6), 857–869.

**Mahajan, Vijay and Robert A Peterson**, *Models for Innovation Diffusion*, Vol. 48 of *Quantitative applications in the social sciences, No. 07-048*, Beverly Hills: Sage, 1985.

**Mansfield, Edwin**, "Technical Change and the Rate of Imitation," *Econometrica*, 1961, *29* (4), 741–766.

**Manuel, Kate M and Michael John Garcia**, "Unaccompanied Alien Children—Legal Issues: Answers to Frequently Asked Questions," CRS Report R43623. Washington, DC: Congressional Research Service 2016.

**Martinez, Jose N**, "Beyond networks: health, crime, and migration in Mexico," *International Journal of Population Research*, 2014, *2014* (971739), 1–12.

**Massey, Douglas S and María Aysa-Lastra**, "Social Capital and International Migration from Latin America," *International Journal of Population Research*, 2011, *2011* (834145), 1–18.

__ **and Rene M Zenteno**, "The dynamics of mass migration," *Proceedings of the National Academy of Sciences*, 1999, *96* (9), 5328–5335.

**McCall, John J**, "Economics of Information and Job Search," *Quarterly Journal of Economics*, 1970, *84* (1), 113–26.

**McKenzie, David and Hillel Rapoport**, "Self-selection patterns in Mexico-US migration: the role of migration networks," *The Review of Economics and Statistics*, 2010, *92* (4), 811–821.

**Mishra, Prachi**, "Emigration and wages in source countries: Evidence from Mexico," *Journal of Development Economics*, 2007, *82* (1), 180–199.

**Moestue, Helen, Leif Moestue, and Robert Muggah**, "Youth violence prevention in Latin America and the Caribbean: a scoping review of the evidence," *NOREF Report, August*, 2013, *16*.

**Molho, Ian**, "Theories of migration: A review," *Scottish Journal of Political Economy*, 1986, *33* (4), 396–419.

**Molina, Teresa**, "Regional Migration, Co-Insurance and Economic Shocks: Evidence from Nicaragua," IZA Discussion Paper No. 9494. Bonn: IZA Institute of Labor Economics 2015.

**Monteiro, Joana and Rudi Rocha**, "Drug battles and school achievement: Evidence from Rio de Janeiro's favelas," *Review of Economics and Statistics*, 2017, *forthcoming*.

**Moretto, Michele and Sergio Vergalli**, "Migration Dynamics," *Journal of Economics*, 2008, *93* (3), 223–265.

**Mortensen, Dale T**, "Job Search, the Duration of Unemployment, and the Phillips Curve," *American Economic Review*, 1970, *60* (5), 847–62.

**Moya, Andrés and Michael Carter**, "Violence and the formation of hopelessness and pessimistic prospects of upward mobility in Colombia," NBER Working Paper No. 20463. Cambridge, MA: National Bureau of Economic Research 2014.

**MSF**, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, New York: Médecins Sans Frontières, 2017.

**Muggah, Robert and Katherine Aguirre**, "Mapping citizen security interventions in Latin America: reviewing the evidence," NOREF Norwegian Peacebuilding Resource Center 2013.

**Munshi, Kaivan**, "Networks in the modern economy: Mexican migrants in the US labor market," *Quarterly Journal of Economics*, 2003, *118* (2), 549–599.

**Nickell, Stephen**, "Biases in Dynamic Models with Fixed Effects," *Econometrica*, 1981, *49* (6), 1417–26.

**Nunn, Nathan and Nancy Qian**, "US food aid and civil conflict," *The American Economic Review*, 2014, *104* (6), 1630–1666.

**Piñeyro, José Luis**, "Las fuerzas armadas mexicanas en la seguridad pública y la seguridad social," in Arturo Alvarado and Mónica Serrano, eds., *Los Grandes Problemas de México XV: Seguridad nacional y seguridad interior*, Mexico City: El Colegio de México, 2010, pp. 155–189.

**Reynolds, Kayla Burkhiser**, "And the Melting Pot Bubbles Over: A Call for Compromise in Addressing the Child Migrant Crisis," *Drake Law Review*, 2016, *64*, 189–224.

**Robinson, Peter M**, "Root-$N$-Consistent Semiparametric Regression," *Econometrica*, 1988, *56* (4), 931–54.

**Rodrigo, Domínguez and Victoria Rietig**, *Migrants Deported from the United States and Mexico to the Northern Triangle: A Statistical and Socioeconomic Profile*, Washington, DC: Migration Policy Institute, 2015.

**Rodríguez, Nicolás**, "Fleeing Cartels and Maras: International Protection Considerations and Profiles from the Northern Triangle," *International Journal of Refugee Law*, 2016, *28* (1), 25–54.

**Rogerson, Richard, Robert Shimer, and Randall Wright**, "Search-theoretic models of the labor market: A survey," *Journal of Economic Literature*, 2005, *43* (4), 959–988.

**Rosenblum, Marc R**, "Unaccompanied child migration to the United States: The tension between protection and prevention," Washington, DC: Migration Policy Institute 2015.

\_ **and Isabel Ball**, "Trends in Unaccompanied Child and Family Migration from Central America," Washington, DC: Migration Policy Institute 2016.

**Rossman, Gabriel, Ming Ming Chiu, and Joeri M Mol**, "Modeling diffusion of multiple innovations via multilevel diffusion curves: Payola in pop music radio," *Sociological Methodology*, 2008, *38* (1), 201–230.

**Seelke, Clare Ribando**, "Gangs in central America," Report RL34112. Washington, DC: Congressional Research Service 2014.

**Selee, Andrew D, Cynthia Arnson, and Eric L Olson**, *Crime and Violence in Mexico and Central America: An Evolving but Incomplete US Policy Response*, Washington, DC: Migration Policy Institute, 2013.

**Shellman, Stephen M and Brandon M Stewart**, "Predicting risk factors associated with forced migration: An early warning model of Haitian flight," *Civil Wars*, 2007, *9* (2), 174–199.

**Shrestha, Maheshwor**, "Push and pull: A study of international migration from Nepal," Policy Research Working Paper 7965. Washington, DC: World Bank 2017.

**Skaperdas, Stergios**, "The costs of organized violence: a review of the evidence," *Economics of Governance*, 2011, *12* (1), 1–23.

**Soares, Rodrigo R**, "The welfare cost of violence across countries," *Journal of Health Economics*, 2006, *25* (5), 821–846.

**Stinchcomb, Dennis and Eric Hershberg**, "Unaccompanied migrant children from Central America: Context, causes, and responses," CLALS Working Paper 7. Washington, DC: American University 2014.

**Swanson, Kate and Rebecca Maria Torres**, "Child Migration and Transnationalized Violence in Central and North America," *Journal of Latin American Geography*, 2016, *15* (3), 23–48.

**Taga, Yasushi and Keiiti Isii**, "On a stochastic model concerning the pattern of communication," *Annals of the Institute of Statistical Mathematics*, 1959, *11* (1), 25–43.

**Totty, Evan**, "The Effect of Minimum Wages on Employment: A Factor Model Approach," IRLE Working Paper 110-15. Institute for Research on Labor and Employment. Berkeley: University of California Berkeley 2015.

**Trelles, Alejandro and Miguel Carreras**, "Bullets and votes: Violence and electoral participation in Mexico," *Journal of Politics in Latin America*, 2012, *4* (2), 89–123.

**UNHCR**, *Children on the Run: Unaccompanied children leaving Central America and Mexico and the need for international protection*, New York: Office of the United Nations High Commissioner for Refugees, 2014.

**UNODC**, *Transnational Organized Crime in Central America and the Caribbean: A Threat Assessment*, Vienna: United Nations Office on Drugs and Crime, 2012.

**USAID**, *What Works in Reducing Community Violence: A Meta-Review and Field Study for the Northern Triangle*, Washington, DC: U.S. Agency for International Development, 2016.

**van Bronkhorst, Bernice and Gabriel Demombynes**, "Crime and Violence in Central America, Vol. II," Report No. 56781-LAC, Central America Unit, Latin America and Caribbean Region 2010.

**Velásquez, Andrea**, "The economic burden of crime: Evidence from Mexico," Working Paper, Dept. of Economics. University of Colorado Denver 2015.

**Voors, Maarten J, Eleonora EM Nillesen, Philip Verwimp, Erwin H Bulte, Robert Lensink, and Daan P Van Soest**, "Violent conflict and behavior: a field experiment in Burundi," *American Economic Review*, 2012, *102* (2), 941–964.

**Weiss, Melissa**, "Protection for the Vulnerable: How Unaccompanied Minors From El Salvador, Guatemala, and Honduras Can Qualify for Asylum in the United States," *Washington University Law Review*, 2015, *93* (1), 205–234.

**Winters, Paul, Alain de Janvry, Elisabeth Sadoulet et al.**, "Family and Community Networks in Mexico-US Migration," *Journal of Human Resources*, 2001, *36* (1), 159–184.

**Figure 1:** AGE DISTRIBUTION OF UNACCOMPANIED CHILDREN FROM THE NORTHERN TRIANGLE



Bars labeled with percent of total. Numbers of UACs are cumulative total for the universe of United States apprehensions of UACs from Guatemala, Honduras, and El Salvador in calendar years 2011–2016.



**Figure 2:** Homicides and Unaccompanied Child Migrants in the Northern Triangle

UAC data show the full universe, not only the children who could be matched to a municipality of origin. National population size in denominator of each rate is measured at 2013.

34

**Figure 3:** SPATIAL DISTRIBUTION OF HOMICIDES AND UNACCOMPANIED CHILD ORIGINS

(a) *Homicide rate, per 100,000 population, average 2011–2016*



(b) *UAC total, cumulative 2011–2016*



(c) *UAC rate, annual per 100,000 youths, average 2011–2016*



'Youths' defined as population age 8–17.

35

**Figure 4:** Bivariate relationships with UAC rate in pooled data



(a) *Homicides*

(b) *Income per capita*

(c) *Poverty rate*

Local linear regressions with 95% confidence interval, Epanechnikov kernel. Bandwidths: homicides 50; inc./cap. 1.2 natural log points; poverty fraction 0.1. Data pooled across municipality-years. Average income per capita is estimated in 2009 (in 2009 PPP US$). Poverty fraction estimated in 2007, at national poverty line.

36

**Table 1:** CORRELATION OF CRIME VICTIMIZATION WITHIN FAMILIES AND NEIGHBORHOODS

(a) *Family-level crime experience*

|  | Murder | Extortion | Burglary | Kidnapping |
|---|---|---|---|---|
| Murder | 1.000 | | | |
| Extortion | 0.077 | 1.000 | | |
| Burglary | 0.074 | 0.084 | 1.000 | |
| Kidnapping | 0.174 | 0.064 | 0.102 | 1.000 |

(b) *Neighborhood-level crime experience*

|  | Murder | Extortion | Burglary | Drug sales |
|---|---|---|---|---|
| Murder | 1.000 | | | |
| Extortion | 0.471 | 1.000 | | |
| Burglary | 0.512 | 0.468 | 1.000 | |
| Drug sales | 0.477 | 0.482 | 0.486 | 1.000 |

All correlations shown are significant at the 1% level. Pooled data from Latinobarómetro surveys 2008, 2010, 2012, and 2014 in Guatemala, Honduras, and El Salvador. 18,562 observations, correlations weighted by sampling weight. Variables are 0 if the respondent reports no incidence of each crime in their family or neighborhood, 1 otherwise. Family-level questions: Murder: "¿Algún pariente o persona que vivía en la casa con usted fue asesinada en los últimos doce meses? in the past 12 months?" Extortion: "¿En los últimos doce meses, ha sido usted víctima de un chantaje, extorsión o renta?" Burglary: "¿Se metieron a robar en su casa en los últimos doce meses?" Kidnapping: "¿Fue usted o algún pariente que vive en su hogar víctima de un secuestro en los últimos doce meses?" Neighborhood-level questions: Murder: "¿Han ocurrido asesinatos en los últimos 12 meses en su barrio/colonia?" Extortion: "¿Han ocurrido extorsiones o cobro de impuesto de guerra en los últimos 12 meses en su barrio/colonia?" Burglary: "¿Han ocurrido robos en los últimos 12 meses en su barrio/colonia?" Drug sales: "¿Han ocurrido ventas de drogas ilegales en los últimos 12 meses en su barrio/colonia?"

**Table 2:** CORE RESULTS: HOMICIDE RATES AND UAC APPREHENSION RATES

| Dep. var.: UAC rate $\dot{c}$ | (1) OLS | (2) | (3) | (4) Municipality fixed effects | (5) | (6) | (7) | (8) Municipality and year fixed effects | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Homicide rate $h_t$ | 0.451*** (0.178) | 0.609** (0.289) | 0.375*** (0.113) | 0.386*** (0.113) | 0.600*** (0.0828) | 0.543** (0.261) | 0.317*** (0.0865) | 0.352*** (0.0906) | 0.523*** (0.0702) |
| $h_{t-1}$ | | | 0.348** (0.145) | 0.198*** (0.0510) | 0.146*** (0.0531) | | 0.244** (0.119) | 0.115* (0.0609) | 0.133*** (0.0395) |
| $h_{t-2}$ | | | | 0.471 (0.341) | 0.115*** (0.0417) | | | 0.440 (0.331) | 0.113*** (0.0358) |
| $h_{t-3}$ | | | | | 0.187*** (0.0492) | | | | 0.158*** (0.0447) |
| Constant | 91.07*** (7.630) | 84.07*** (12.81) | 74.86*** (9.877) | 56.66*** (17.38) | 70.10*** (7.425) | −9.988 (18.87) | −11.84 (12.25) | −26.58 (19.99) | −0.890 (7.861) |
| $N$ | 5276 | 5276 | 5212 | 5147 | 4222 | 5276 | 5212 | 5147 | 4222 |
| adj. $R^2$ | 0.004 | 0.012 | 0.011 | 0.016 | 0.035 | 0.130 | 0.156 | 0.162 | 0.290 |
| Clusters | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 |
| $\sum \hat{\beta}$ | 0.451*** (0.178) | 0.609*** (0.289) | 0.723*** (0.225) | 1.055** (0.412) | 1.048*** (0.172) | 0.543*** (0.261) | 0.561*** (0.165) | 0.907*** (0.361) | 0.928*** (0.143) |

Liang-Zeger (1986) standard errors in parentheses clustered by municipality. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$. Unit of observation is municipality-year. $\sum \hat{\beta}$ is the sum of the coefficients on the homicide rate and its lags in each regression.

38

**Figure 5:** PREDICTIVE MARGINS FOR UAC RATE BY HOMICIDE RATE (4-YEAR SUSTAINED CHANGE)



Uses the coefficient estimates from Table 2, col. 9, which are conditional on municipality and year fixed effects. Dashed lines show 95% confidence interval. Shows the predicted UAC rate per 100,000 population in year $t$ given a constant homicide rate from year $t-3$ to $t$ inclusive. Vertical dotted line shows sample mean homicide rate; horizontal dotted line shows sample mean UAC rate.

39

**Figure 6:** SEMIPARAMETRIC FIXED-EFFECTS REGRESSIONS

(a) *Homicide rate at t*



(b) *Homicide rate at t − 1*



(c) *Homicide rate at t − 2*



Robinson (1988) double-residual method for each lag in isolation, controlling for municipal fixed effects. Local linear with 95% confidence interval, Bandwidth 50, Epanechnikov kernel, standard errors clustered by municipality.

Table 3: UNOBSERVED COMMON SHOCKS

| Dep. var.: UAC rate $\dot{c}$ | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | Multilevel (municipality-specific time trend) | | | | Interactive Fixed Effects | | | |
| Homicide rate $h_t$ | 0.487** | 0.248*** | 0.262*** | 0.436*** | 0.233*** | 0.183*** | 0.227*** | 0.301*** |
| | (0.238) | (0.0833) | (0.0748) | (0.0716) | (0.0869) | (0.0646) | (0.0553) | (0.0689) |
| $h_{t-1}$ | | 0.203* | 0.0247 | 0.0607 | | 0.0939*** | 0.112*** | 0.111** |
| | | (0.120) | (0.0873) | (0.0371) | | (0.0350) | (0.0323) | (0.0467) |
| $h_{t-2}$ | | | 0.404 | 0.0772** | | | 0.111*** | 0.0941** |
| | | | (0.328) | (0.0344) | | | (0.0294) | (0.0386) |
| $h_{t-3}$ | | | | 0.115*** | | | | 0.0688** |
| | | | | (0.0351) | | | | (0.0289) |
| Year | 36.61*** | 36.33*** | 34.60*** | 30.21*** | | | | |
| | (2.846) | (2.788) | (2.559) | (1.498) | | | | |
| $N$ | 5276 | 5212 | 5147 | 4222 | 5276 | 5212 | 5147 | 4172 |
| Clusters | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 |
| $\sum \hat{\beta}$ | 0.487*** | 0.450*** | 0.690*** | 0.688*** | 0.233*** | 0.277*** | 0.450*** | 0.575*** |
| | (0.238) | (0.138) | (0.279) | (0.128) | (0.087) | (0.094) | (0.092) | (0.128) |

Standard errors clustered by municipality in parentheses. Multilevel model includes municipality fixed-effects and municipality-specific time-trends. Interactive Fixed Effects estimator (Bai 2009) assumes one factor and includes municipality fixed effects. All regressions include constant term (not reported). $^*$ $p < 0.10$, $^{**}$ $p < 0.05$, $^{***}$ $p < 0.01$. $\sum \hat{\beta}$ is the sum of the coefficients on the homicide rate and its lags in each regression. Constant term included but not reported.

41

**Table 4:** COUNTRY-BY-YEAR AND DEPARTMENT-BY-YEAR FE

| *Dep. var.:* UAC rate $\dot{c}$ | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | | Country-by-year FE | | | | Department-by-year FE | | |
| Homicide rate $h_t$ | 0.294 (0.208) | 0.0528 (0.0865) | 0.114* (0.0600) | 0.272*** (0.0761) | 0.288 (0.221) | 0.0669 (0.0664) | 0.108* (0.0650) | 0.262*** (0.0721) |
| $h_{t-1}$ | | 0.0195 (0.0824) | −0.0839 (0.110) | 0.00124 (0.0531) | | 0.0357 (0.103) | −0.0679 (0.0722) | −0.0245 (0.0440) |
| $h_{t-2}$ | | | 0.396 (0.329) | 0.0564 (0.0389) | | | 0.316 (0.312) | −0.00604 (0.0424) |
| $h_{t-3}$ | | | | 0.162*** (0.0614) | | | | 0.103** (0.0450) |
| $N$ | 5276 | 5212 | 5147 | 4222 | 5276 | 5212 | 5147 | 4222 |
| adj. $R^2$ | 0.163 | 0.199 | 0.203 | 0.353 | 0.201 | 0.245 | 0.260 | 0.457 |
| Clusters | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 |
| $\sum \hat{\beta}$ | 0.294 (0.208) | 0.072 (0.094) | 0.426* (0.258) | 0.492*** (0.153) | 0.288 (0.221) | 0.103 (0.116) | 0.357 (0.322) | 0.334** (0.142) |

Standard errors clustered by municipality in parentheses. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$. $\sum \hat{\beta}$ is the sum of the coefficients on the homicide rate and its lags in each regression. Constant term included but not reported.

42

**Table 5:** EXTERNAL VIOLENCE VERSUS INTERNAL NETWORK DIFFUSION

| Dep. var.: UAC rate $\dot{c}$ | (1) | (2) | (3) | (4) | (5) | (6) Arellano Bond |
|---|---|---|---|---|---|---|
| | | Municipality and year fixed effects | | | | |
| Stock $c_{t-1}$ | 0.192*** (0.0146) | | 0.198*** (0.0205) | | | |
| $c_{t-1} \cdot h_t$ | | | 0.000642*** (0.000151) | | | |
| Flow $\dot{c}_{t-1}$ | | | | 0.452*** (0.0366) | 0.476*** (0.0426) | 0.492*** (0.0544) |
| $\dot{c}_{t-1} \cdot h_t$ | | | | | 0.000724** (0.000357) | |
| $h_t$ | 0.523*** (0.0702) | 0.408*** (0.0546) | 0.205*** (0.0513) | 0.385*** (0.0568) | 0.287*** (0.0597) | 0.340*** (0.0782) |
| $h_{t-1}$ | 0.133*** (0.0395) | 0.0542* (0.0296) | 0.0717*** (0.0264) | 0.0412 (0.0312) | 0.0715* (0.0304) | 0.0742** (0.0376) |
| $h_{t-2}$ | 0.113*** (0.0358) | 0.0586* (0.0310) | 0.0996*** (0.0287) | 0.0561* (0.0311) | 0.118*** (0.0421) | 0.0596 (0.0370) |
| $h_{t-3}$ | 0.158*** (0.0447) | 0.103*** (0.0359) | 0.128*** (0.0411) | 0.0963*** (0.0365) | 0.127* (0.0656) | 0.110** (0.0487) |
| $N$ | 4222 | 4222 | 4222 | 4222 | 4222 | 3329 |
| Clusters | 893 | 893 | 893 | 893 | 893 | 893 |
| $R^2$ within groups | 0.291 | 0.456 | 0.464 | 0.440 | 0.444 | — |
| $R^2$ overall | 0.0642 | 0.528 | 0.546 | 0.585 | 0.590 | — |
| $\sum \hat{\beta}$ | 0.928*** (0.143) | 0.624*** (0.086) | 0.504*** (0.084) | 0.579*** (0.086) | 0.603*** (0.092) | 0.584*** (0.117) |

Standard errors clustered by municipality in parentheses. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$. $\sum \hat{\beta}$ is the sum of the coefficients on the homicide rate and its lags in each regression. Arellano-Bond (1991) regression in column 6 uses all lags from $t-2$ backward, and robust standard errors. All columns include a constant term (not reported). Columns 3 and 5 also include interactions with the three lagged homicide rates (not reported), that is, in column 3: $(c_{t-1} \cdot h_{t-1})$, $(c_{t-1} \cdot h_{t-2})$, and $(c_{t-1} \cdot h_{t-3})$, and in column 5: $(\dot{c}_{t-1} \cdot h_{t-1})$, $(\dot{c}_{t-1} \cdot h_{t-2})$, and $(\dot{c}_{t-1} \cdot h_{t-3})$.

43

**Table 6:** UNEMPLOYMENT, 2011 AND 2014 ONLY

| Dep. var.: UAC rate $\dot{c}$ | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Pooled OLS | | Municipality fixed effects | |
| Homicide rate, $h_t$ | 0.679*** | 0.628*** | 0.754*** | 0.743*** |
| | (0.164) | (0.167) | (0.252) | (0.254) |
| Unemployment rate, $u_t$ | | 8.004** | | −9.336 |
| | | (4.021) | | (10.28) |
| ln Population | 21.47 | 0.408 | | |
| | (51.03) | (52.29) | | |
| ln Youth pop. | −50.60 | −28.08 | | |
| | (51.08) | (52.54) | | |
| Constant | 278.0*** | 266.6** | 62.49*** | 101.9** |
| | (107.2) | (108.5) | (14.06) | (44.99) |
| $N$ | 1754 | 1734 | 1754 | 1734 |
| Clusters | 893 | 893 | 893 | 893 |

Standard errors clustered by municipality in parentheses.  Department-level unemployment estimates only available for all three countries in 2011 and 2014. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$. Youth population defined as number of people age 8–17.

44

**Table 7:** DECOMPOSITION IN CROSS-SECTION

| *Dep. var.:* UAC rate $\dot{c}$ | (1) | (2) | (3) |
|---|---|---|---|
| | | Cross-section OLS | |
| 3-year chg. in homicides: $\Delta h$ | 3.748** (1.606) [21.4] | 117.2** (50.75) [16.1] | 122.9** (50.74) [12.2] |
| Income per capita: $\ln y$ | −147.9 (177.2) [5.0] | −12.62 (178.5) [2.7] | 57.01 (183.6) [3.1] |
| $\Delta h \times \ln y$ | | −10.32* (5.384) [14.7] | −10.91** (5.396) [11.1] |
| Poverty rate (frac.): $p$ | −1514.7*** (519.3) [27.4] | −966.8* (538.6) [14.1] | −1567.2*** (554.3) [15.5] |
| $\Delta h \times p$ | | −61.99*** (16.49) [17.5] | −66.76*** (16.37) [14.2] |
| ln Population | −806.8** (362.8) [25.2] | −1098.6*** (394.1) [19.3] | −1537.3*** (493.4) [14.9] |
| ln Youth pop. | 609.6* (363.6) [21.1] | 886.7** (393.5) [15.7] | 1336.1*** (494.3) [12.4] |
| Adult illiteracy (%) | | | 26.84*** (7.275) [15.1] |
| Child school enrollment (%) | | | 330.4* (177.0) [1.6] |
| Constant | 5510.5*** (1666.7) | 4580.1*** (1694.8) | 4013.5** (1846.4) |
| $N$ | 886 | 886 | 886 |

Standard errors in parentheses. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$. Owen value in square brackets shows percent of regression's explanatory power arising from each variable (Huettner and Sunder 2012). $\Delta h_i$ is the average over all years, for each municipality, of $h_t - h_{t-3}$.

**Figure 7:** Spatial decomposition of UAC determinants



Shows $\delta_i$ for each municipality calculated from equation (10) using the coefficient estimates from Table 7, col. 1. Bright red areas show $\delta_i \gg 0$, where recent changes in the homicide rate are predicted to determine much more of the UAC rate than economic factors. Light red areas show $\delta_i \approx 0$, where homicide shocks and economic traits are predicted to weigh roughly equally. Green areas show $\delta_i \ll 0$, where recent changes in the homicide rate are predicted to determine much less of the UAC rate than economic factors.



**Figure 8:** SPATIAL DECOMPOSITION OF CHANGE IN UACS PER CHANGE IN HOMICIDES

Shows predicted $\partial\tilde{c}/\partial\Delta h$ for each municipality using the coefficient estimates from Table 7, col. 2. Green areas show low values of predicted $\partial\tilde{c}/\partial\Delta h$ conditional on income per capita and poverty fraction; progressively intense red areas show higher values of predicted $\partial\tilde{c}/\partial\Delta h$ conditional on income per capita and poverty fraction.

47

# Online Appendix

### "Violence, Development, and Migration Waves: Evidence from Central American child migrant apprehensions "

## A1    Model derivation

Equation (4) gives the difference in discounted expected utility between migrating and not migrating,

$$V^* - V = \frac{w^*}{r} - (1-\mu)V - C. \qquad (A.1)$$

Workers migrate if $V^* - V > 0$, that is if

$$\mu > 1 - \frac{W^*}{r}V \equiv \widetilde{\mu} \implies V = \frac{W^*}{1-\widetilde{\mu}} \xrightarrow{\text{into (A.1)}} V^* - V = W^*\left(\frac{\mu - \widetilde{\mu}}{1-\widetilde{\mu}}\right), \qquad (A.2)$$

a result used below. Equation (5) gives

$$(1+r)V = w + \underbrace{\theta\int_0^{\widetilde{\mu}} V^* d\Psi(\mu) + \theta\int_{\widetilde{\mu}}^1 V^* d\Psi(\mu)}_{\equiv \theta V^*} + (1-\theta)\int_0^{\widetilde{\mu}} V d\Psi(\mu) + (1-\theta)\int_{\widetilde{\mu}}^1 V^* d\Psi(\mu)$$

$$= w + \theta\int_0^{\widetilde{\mu}}\left(V^* - V\right)d\Psi(\mu) + \int_0^1 V d\Psi(\mu) + \theta\int_{\widetilde{\mu}}^1\left(V^* - V\right)d\Psi(\mu)$$

Plugging in equation (A.2) and dividing both sides by $V = \frac{W^*}{1-\widetilde{\mu}}$,

$$-\frac{w}{W^*}(1-\widetilde{\mu}) = -r + \theta\left(\int_0^{\widetilde{\mu}}\mu d\Psi(\mu) - \widetilde{\mu}\int_0^{\widetilde{\mu}} d\Psi(\mu)\right) + \int_{\widetilde{\mu}}^1 \mu d\Psi(\mu) - \widetilde{\mu}\int_{\widetilde{\mu}}^1 d\Psi(\mu)$$

$$= -r + \theta\underline{\mu} - \theta\widetilde{\mu} + \overline{\mu} - \widetilde{\mu} \qquad (A.3)$$

Solving equation (A.3) for $\widetilde{\mu}$ gives equation (6).

## A2    Estimation of UAC flows relative to child population at origin

*Honduras*: Honduras's Instituto Nacional de Estadística estimates that the number of 17 year-olds in 2013 was 180,681 in Honduras. [*Data downloaded from www.ine.gob.hn on March 10, 2017*]

*El Salvador*: El Salvador's Dirección General de Estadística y Censos has not published estimates by age of the 2013 population at the time of this writing. In El Salvador the number of 17 year-olds in 2007 was 122,879 (2.139% of the total 2007 population of 5,744,113) and the number of 11 year-olds in 2007 was 141,243, while the total population in 2013 was

6,344,069. This allows two different rough estimates of the 2013 population of 17 year-olds in El Salvador: 1) simply 'aging forward' the 11 year-olds of 2007, assuming minimal mortality gives 141,243, and 2) applying the 17 year-old fraction of the population in 2007 (2.139%) to the total population in 2013 (6,344,069) gives an estimate of 135,700. Here an estimate of 136,000 is used. [*Data downloaded from www.digestyc.gob.sv on March 12, 2017*]

*Guatemala*: Guatemalas' Instituto Nacional de Estadística has produced demographic estimates of population by age for 2015, and only for five-year age rages. But it is possible to estimate the number of 17 year-olds as a fraction of all children age 13–17 by noting this fraction for the two other countries: In El Salvador 2007, of children aged 13–17, 18.965% were age 17; and in Honduras 2013, of children aged 13–17, 19.443% were age 17. The Guatemalan government estimates that in 2015, there were 1,779,267 children age 15–19, implying that there were roughly 1,780,000 childen age 13–17 in 2013. Using the above estimates from El Salvador and Honduras, approximately 19% of these or 338,200 would be age 17 in 2013. [*Data downloaded from epidemiologia.mspas.gob.gt on March 10, 2017*]

Adding up these estimates for the three countries gives 180,681 + 136,000 + 338,200 = 654,881 people age 17 in all three countries combined in 2013. The cumulative total number of apprehensions of 17 year-old UACs from these three countries during 2011–2016 was 53,287, or 8.1% of all 17 year-olds in the Northern Triangle.

A check on these figures is provided by United Nations estimates from the *World Population Prospects, 2015 revision*. It estimates the total population of 15–19 year-olds in all three countries combined as 3.14 million in 2010, and 3.34 million in 2015. Since 17 year-olds sit in the middle of this age range, their population is well-approximated by simply dividing by 5: 628,000 in the year 2010, and 667,600 in the year 2015. Interpolating these for 2013 gives an estimate of 647,800, slightly lower than the estimates of the national governments. Using this figure would imply that the number of 17 year-old UAC apprehensions 2011–2016 was 8.2% of the number of all 17 year-olds in the Northern Triangle.

## A3   Data sources

### A3.1   UACs from the Northern Triangle

Anonymized microdata provided by U.S. Customs and Border Protection. The city of birth reported to CBP by each child was matched using a Jaro-Winkler distance (JWD) algorithm against a list of all municipality names in the Northern Triangle. This successfully matched abouth two thirds of the children to a municipality of origin. Unsuccessful matches were then matched by JWD against concordances of geographic areas published by the Encuesta sobre Migración en la Frontera Sur de México ('Emif Sur'), a research consortium based at El Colegio de la Frontera Norte. These files, built from data originally provided by the census bureaus of the countries of the Northern Triangle, contain lists of every cantón in El Salvador matched to a municipality; every pueblo, colonia, condominio, caserío, aldea, finca, granja, and hacienda in Guatemala matched to a municipality; and every aldea, caserío, barrio, and colonia in Honduras matched to a municipality. This brought the overall rate of matching a

child to a municipality of birth to 90.4% (161,735 matched out of the universe of 178,825). The rate of successful matches was similar across the three countries.

## A3.2   Homicides

*El Salvador*:  Municipal level homicide data 2009–2016.  2009–2012 from Fundacion Dr. Guillermo Manual Ungo (FUNDAUNGO) Atlas de la violencia en El Salvador (2009-2012). 2013-2016 from Organo Judicial de la Republica de El Salvador, Portal de Transparencia.  Individual year PDFs follow:  2013;  2014;  2015;  2016.

*Guatemala*:  Municipal level homicide data 2009–2016.  All years kindly provided by Carlos Mendoza.

*Honduras*:  Municipal level homicide data 2009–2016.  2009–2012 from Fundación Dr.  Guillermo Manual Ungo (FUNDAUNGO) Atlas de la violencia en Honduras (2009-2012).  2013–2015 from Instituto Universitario en Democracia, Paz, y Seguridad (IUDPAS) yearly homicide maps available online.  The data were accessed by viewing the page sources for the maps and searching for the underlying Google 'fusion' table.  Individual tables for each year are linked as follows:  2013;  2014;  2015.  2016 data manually retrieved from Secretaria de Seguridad Policia Nacional (SEPOL), Incidencia por Municipio, on April 26, 2017.

## A3.3   Other variables

*Income per capita*:

El Salvador:  Municipal level income per capita for 2009 from United Nations Development Programme (UNDP) and Fundacion Dr.  Guillermo Manual Ungo (FUNDAUNGO), Almanaque 262: Estado del desarrollo humano en los municipios de El Salvador 2009, p. 13.

Guatemala: Municipal level income per capita for 2009 was calculated as follows.  Municipal level consumption figures in Romero and Zapil (2009) "Dinámica Territorial del consumo, la pobreza y la desigualdad en Guatemala", Annex IV.2 p.  83 were averaged by department, weighted by municipal population, to yield the corresponding department-level consumption per capita.  The ratio of municipal consumption per capita to department consumption per capita for each municipality was then applied to department level income per capita listed on p. 22 here to yield the 2009 municipal level income per capita.  These figures were then inflated according to Guatemala's CPI and converted from quetzales to 2009 PPP dollars.

Honduras:  Municipal level income per capita for 2009 from United Nations Development Programme, Informe Nacional de Desarrollo Humano 2011, Statistical Annex. Indicator 1, p. 307.

*Poverty*

El Salvador: Municipal level poverty rates for 2007 from Melgar and Amaya (2013), Informe de Pobreza Rural en El Salvador Annex 3.  The poverty line is recalculated with each year's

household survey factoring in both the cost of a basic food basic and the household's income level. The Melgar and Amaya study is based on the 1998 and 2009 surveys; more details here.

Guatemala: Municipal level poverty rates for 2006 from Romero and Zapil (2009), "Dinámica Territorial del consumo, la pobreza y la desigualdad en Guatemala", Annex IV.2 p. 83. The source does not include a firm definition of poverty, but likely follows the household survey methodology linked here, based on the ability to afford a minimum consumption basket and other basic goods and services.

Honduras: Municipal level poverty rates for 2006 imputed through averaging 2013 and 2001 values.

*Unemployment*

El Salvador: Department level unemployment figures for 2011 and 2014 from Direccion General de Estadistica y Censos (DIGESTYC) El Salvador, Encuesta de Hogares de Propositos Multiples (EHPM). Data for 2011 are on p. 13 and data for 2014 on p. 27 of the corresponding year PDFs. These data refer to the economically active population 16 years and older.

Guatemala: Department level unemployment figures for 2011 and 2014 from Instituto Nacional de Estadistica (INE) Guatemala, Encuesta Nacional de Condiciones de Vida (ENCOVI), kindly shared with the author via email. These data refer to the economically active population 15 years and older.

Honduras: Department level unemployment figures for 2014 downloaded here; 2011 data calculated from Encuesta Permanente de Hogares de Propositos Multiples (EPHPM) microdata according to published methodology. These data refer to the economically active population 10 years and older.

*Adult illiteracy*

El Salvador: Municipal level adult literacy rates for 2009, ages 15 and over from United Nations Development Programme (UNDP) and Fundacion Dr. Guillermo Manual Ungo (FUNDAUNGO), Almanaque 262: Estado del desarrollo humano en los municipios de El Salvador 2009, p. 13.

Guatemala: Municipal level adult literacy rates for 2010, ages 15 and over from the United Nations Development Programme, Informe Nacional de Desarrollo Humano - department level publications including full municipality breakdowns.

Honduras: Municipal level adult literacy rates for 2009, ages 15 and over from the United Nations Development Programme, Informe Nacional de Desarrollo Humano 2011, Statistical Annex. Indicator 1, p. 307

*School Enrollment*

A-4

**Figure A1:** HONDURAS UNEMPLOYMENT: DEPARTMENTAL VS. NATIONAL



Black line shows nationwide unemployment rate, gray lines show rate in each department implied by EHPHM survey data. No data for Islas de la Bahía and Gracias a Dios departments.

El Salvador: Municipal counts of students enrolled in grades 1–9 for 2013, downloaded from the Ministry of Education.

Guatemala: Municipal counts of students enrolled in grades 1–9 for 2013, downloaded from the National Education Statistics System.

Honduras: Municipal counts of students enrolled in grades 1–9, downloaded from an archived Honduran government website.

## A4   Departmental vs. national unemployment

Figure A1 compares departmental unemployment rates to the national-level unemployment rate in the data of the Encuesta Permanente de Hogares de Propósitos Múltiples (EPHPM), various years.

# DEF-INTERV.

# EX. 107

## CURRICULUM VITAE

## LEIGHTON KU

Professor of Health Policy and Management                    Telephone:   (202) 994-4143
Director, Center for Health Policy Research
Department of Health Policy and Management
Milken Institute School of Public Health
The George Washington University                             E-mail:  lku@gwu.edu
950 New Hampshire Ave, NW, 6th Floor
Washington, DC 20052

## Summary

Leighton Ku, PhD, MPH, is a professor of health policy and management at the George Washington University (GW).  He is a nationally known health policy and health services researcher and expert with more than 25 years of experience.  He has expertise in diverse areas, including health reform, access to care for low-income populations, Medicaid, preventive services, the health care safety net, cost and benefits of health services, and immigrant health.  He directs the Center for Health Policy Research, a multidisciplinary research center, which includes physicians, attorneys, economists, health management and policy experts and others, with more than 20 faculty and dozens of staff; it has a research portfolio in excess of $25 million.   He has been principal investigator for a large number of studies with support from the National Institutes of Health, Centers for Disease Control and Prevention, Centers for Medicare and Medicaid Services, the Commonwealth Fund and Robert Wood Johnson Foundation, and other sources. In the course of his career at GW, the Center on Budget and Policy Priorities and the Urban Institute, he has worked with federal and state executive and legislative agencies, health care organizations, advocates and others in research, technical assistance, strategic advice and advocacy.   As a faculty, he has taught research methods and policy analysis at the graduate level for more than 20 years and guided a large number of students through dissertations and other research.  As a member of his community, he helped establish and guide the District of Columbia's Health Benefits Exchange Authority as a founding member of its Executive Board.

## Education

1990      Ph.D., Health Policy, Boston University (Pew Health Policy Fellow in a joint program of
           Boston University and Brandeis University)
1979      M.P.H., Public Health, University of California, Berkeley
1979      M.S., Nutritional Sciences, University of California, Berkeley
1975      A.B. (honors), Biochemistry, Harvard College

## Professional Background

| | |
|---|---|
| 2012 - present | Executive Board, District of Columbia Health Benefit Exchange Authority (voluntary position). |
| 2008 - present | Director, Center for Health Policy Research, The George Washington University |
| 2008  - present | Professor of Health Policy and Management (with tenure), Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University. |

| | |
|---|---|
| 2015- Feb. 2016 | Interim Chair, Department of Health Policy and Management |
| 2000 - 2008 | Senior Fellow, Center on Budget and Policy Priorities, Washington, DC |
| 1992 - present | Adjunct Professor in Public Policy and Public Administration, Trachtenberg School of Public Policy and Administration, The George Washington University. Began as Associate Professorial Lecturer. |
| 1990 - 2000 | Principal Research Associate. The Urban Institute, Washington, DC.  Began as Research Associate I. |
| 1989 - 1990 | Research Manager, SysteMetrics/McGraw-Hill, Cambridge, MA. |
| 1987 - 1989 | Pew Health Policy Fellow, Health Policy Institute, Boston University and the Heller School, Brandeis University |
| 1980 - 1987 | Program Analyst, Office of Analysis and Evaluation and Supplemental Food Programs Division, Food and Nutrition Service, U.S. Dept. of Agriculture, Alexandria, VA and Washington, DC. |
| 1975 - 1976 | Registered Emergency Medical Technician, Dept. of Health and Hospitals, Boston, MA |

## Publications Authored or Co-authored in Peer-Reviewed Journals

[Aggregate measures of scholarly productivity: H-index = 42, I10-index = 98 (according to Google Scholar as of March 31, 2017)]

Lantz P, Miller G, Ryhan C, Rosenbaum S, Ku L, Iovan S.  "Pay for Success" Financing and Home-Based Multicomponent Childhood Asthma Interventions: Modeling Results from the Detroit Medicaid Population.  *Milbank Quarterly*.  2018; 96(2): 272-99.

Brantley E, Greene J, Bruen B, Steinmetz E, Ku L.  Policies Affecting Medicaid Beneficiaries' Smoking Cessation Behaviors. *Nicotine & Tobacco Research,* forthcoming, 2018.

Holla N, Brantley E, Ku L.  Physicians' Recommendations to Medicaid Patients about Tobacco Cessation.  Submitted for publication.

Ku L, Steinmetz E, Bysshe T, Bruen B. Crossing Boundaries: Medicaid and Public Health Collaborations to Help Smokers Quit, Public Health Reports, 2017 Feb, Vol. 132(2) 164-170.

Han X, Luo Q, Ku L.  Medicaid Expansions and Increases in Grant Funding Increased the Capacity of Community Health Centers, Health Affairs, 2017 Jan.; 36 (1):49-56.

Lantz P, Rosenbaum S, Ku L, Iovan S. Pay for Success Initiatives in the U.S.:  Potential and Challenges as a Strategy for Population Health Improvement, Health Affairs, 2016 Nov; 35:2053-2061

Pittman P, Masselink L, Bade L, Frogner B, Ku L. Determining Medical Staff Configurations in Community Health Centers: CEO Perspectives.  Journal of Healthcare Management, 61(5): 364-77, Sept./Oct 2016.

2

Frogner B, Pittman P, Masselink Ku L L, Do Years of Experience with EHRs Matter for Productivity in Community Health Centers?  Journal of Ambulatory Care Management. 2017 Jan/Mar;  40(1): 36-47.

Ku L, Brantley E, Bysshe T, Steinmetz E, Bruen B.  How Medicaid and Other Public Policies Affect Utilization of Tobacco Cessation. Preventing Chronic Diseases, 2016 Oct;13:160234. DOI: http://dx.doi.org/10.5888/pcd13.160234.2016.

Labarthe D. Goldstein L, Antman E, Arnett D, Fonarow G, Alberts M, Hayman L, Khera A,  Sallis J, Daniels S, Sacco R, Li S, Ku L, Lantz P,  Robinson J, Creager M, Van Horn L, Kris-Etherton P, Bhatnagar A, Whitsel L. Evidence-Based Policy Making: Assessment of the American Heart Association's Strategic Policy Portfolio.  Circulation, 2016 May 3; 133(18):e615-53.

Ku L.  Letter: Treating Unhealthy Behaviors: The Author Replies.  Health Affairs, 35(3):551, March 2016.

Bruen B, Steinmetz E, Bysshe T,  Glassman P, Ku L.  Care for Potentially Preventable Dental Conditions in Operating Rooms by Medicaid Children, Journal of the American Dental Association, 2016 Sept. :147(9):702-708 (cover story)

Steinmetz E, Berger S, Cabanas J, Horton K, Ranou J, Sasson C, Seiler N, Ku L.  Cardiopulmonary Resuscitation Training for High School Students: A Cost-Effectiveness Analysis.  under review, 2016.

Ku L, Bysshe T, Steinmetz E, Bruen B.  Health Reform, Medicaid Expansions and Women's Cancer Screening, Women's Health Issues, Feb. 2016.  http://dx.doi.org/10.1016/j.whi.2016.01.0

August E, Steinmetz E, Gavin L, Rivera M, Pazol K, Moskosky S, Weik T, Ku L.  Projecting the Unmet Need and Costs for Contraception Services after Health Care Reform, American Journal of Public Health. 106(2): 334–341, Feb. 2016.  doi:10.2105/AJPH.2015.302928

Ku L Bruen B, Steinmetz E, Bysshe T.  Medicaid Tobacco Cessation: Big Gaps Remain In Efforts To Get Smokers To Quit, Health Affairs,  35:62-70, Jan. 2016; doi:10.1377/hlthaff.2015.0756

Ku L. Capsule Commentary: Unauthorized Immigrants: Contributing to Medicare, But Left Out, Journal of General Internal Medicine, 31(1):100, Jan. 2016.

Ku L.  Immigrants Face Barriers Both as Health Care Patients and Providers,  Harvard Health Policy Review, 15(1):22-24, Fall 2015.

Jones E, Ku L. Sharing a Playbook: Integrated Care in Community Health Centers, American Journal of Public Health. 105(1). 2028-2034, October 2015,  doi: 10.2105/AJPH.2015.302710

Zur J, Ku L.  Factors Associated with Geographic Variation in Psychiatric Prescription Drug Expenditures among Medicaid Beneficiaries, Journal of Behavioral Health Services & Research, epub ahead of print July 24, 2015, doi: 10.1007/s11414-015-9471-x.

Ku L, Frogner B, Steinmetz E, Pittman P.  Community Health Centers Use Diverse Staffing and Can Provide Lessons for Other Medical Practices, Health Affairs  34(1):95-103, Jan. 2015.

Jones E, Ku L, Smith S, Lardiere  M. County Workforce, Reimbursement, and Organizational Factors Associated with Behavioral Health Capacity in Health Centers, Journal of Behavior and Health Services Research, 2014 Apr;41(2):125-39.

3

Bruen B, Ku L, Lu X, Shin P.   No Evidence That Primary Care Physicians Offer Less Care To Medicaid, Community Health Center Or Uninsured Patients, Health Affairs, 32(9): 1624-30, Sept. 2013.

Ku L, Steinmetz E, Bruen, B. Continuous Eligibility Policies Stabilize Medicaid Coverage for Children and Could Be Extended to Adults with Similar Results, Health Affairs, 32(9): 1576-82, Sept. 2013.

Ku L, Sharac J, Bruen B, Thomas M, Norris L.  Increased Use of Dental Services by Children Covered by Medicaid: 2000-2010 Medicare and Medicaid Research Review 3(3): E1-E12.  July 2013. doi: http://dx.doi.org/10.5600/mmrr.003.03.b01

Levy A, Bruen B, Ku L. Health Care Reform and Women's Insurance Coverage for Breast and Cervical Cancer Screening.  Preventing Chronic Disease.  9: 120069.  Oct. 25, 2012.  DOI: http//dx.doi.org/10.5888/pcd9.120069.

Levy A, Bruen B, Ku L.  The Potential Employment Impact of Health Reform on Working-Age Adults With Disabilities, Journal of Disability Studies.  30 May 2012. DOI: 10.1177/1044207312446225

Willard R, Shah G, Leep C, Ku L.  Impact of the 2008-2010 Economic Recession on Local Health Departments, Journal of Public Health Management and Practice, 18(2):106-114, Mar/Apr. 2012.

Richard P, West K, Ku L. The Return on Investment of a Medicaid Tobacco Cessation Program in Massachusetts PLoS ONE, 7(1): e29665, January 2012.  doi: 10.1371/journal.pone.0029665. Available at http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0029665

Rosenbaum S,  Ku L, Lantz P, et al. Examining the Evidentiary Basis of Congress's Commerce Clause Power to Address Individuals' Health Insurance Status, BNA's Health Care Policy Report, Feb. 6, 2012, p 1-9.

Richard P, Ku L, Dor A, Tan E, Shin P, Rosenbaum S.  Cost Savings Associated with the Use of Community Health Centers. Journal of Ambulatory Care Management, 35(1): 50-59. Jan-Mar. 2012.

Ku L, Jones E, Shin P, Burke FR, Long S. Safety-net providers after health care reform: lessons from Massachusetts Archives of Internal Medicine, 171(15): 1379-84, Aug. 8, 2011.

Bruen B, Ku L, Burke M, Buntin M. More Than Four in Five Office-Based Physicians Could Quality for Federal Electronic Health Record Incentives. Health Affairs, 30(3): 472-80, Mar. 2011.

Ku L, Jones K, Shin P, Bruen B, Hayes K.  The States' Next Challenge — Securing Enough Primary Care for an Expanded Medicaid Population. New England Journal of Medicine 364(6):493-95, Feb. 10, 2011. Also supplementary appendix available at http://www.nejm.org/doi/suppl/10.1056/NEJMp1011623/suppl_file/nejmp1011623_appendix.pdf

Ku L  Ready, Set, Plan, Implement.  Executing Medicaid's Expansion. Health Affairs, 29(6): 1173-77, June 2010.

Ku L, Pervez F. Documenting Citizenship in Medicaid: The Struggle Between Ideology and Evidence, Journal of Health Politics, Policy and Law, 35(1): 5-28, February 2010.

Ku L. Medical and Dental Care Utilization and Expenditures Under Medicaid and Private Health Insurance, Medical Care Research and Review, 66(4):456-71, August 2009.

Ku L Health Insurance Coverage and Medical Expenditures for Immigrants and Native-Born Citizens in the United States, American Journal of Public Health, 99(7): 1322-28, July 2009.

Ku L, Broaddus M. Public and Private Health Insurance: Stacking Up the Costs, Health Affairs, 27(4):w318-327, June 2008.  Also, Technical Appendix: Public and Private Health Insurance: Stacking Up the Costs, at http://content.healthaffairs.org/cgi/content/full/hlthaff.27.4.w318/DC2.

[Note between 2000 and 2008, I was working at the Center on Budget and Policy Priorities and was not principally working on refereed publications.]

Ku L Improving Health Insurance and Access to Care for Children in Immigrant Families, Ambulatory Pediatrics, 7(6):412-20, November 2007.

Ponce, N.,  Ku L, Cunningham W, Brown ER. Language Barriers to Health Care Access Among Medicare Beneficiaries, Inquiry, 43(1):66–76, Spring 2006.

Ku L, Flores G. Pay Now or Pay Later: Providing Interpreter Services In Health Care, Health Affairs, 24(2) 435-44, March/April 2005.

Park E, Ku L, Broaddus M, More Than 900,000 Children Will Lose Health Insurance Due to Reductions in Federal SCHIP Funding, International Journal of Health Services, 33(2), 2003.

Ku L. The Number of Americans Without Health Insurance Rose in 2001 and Appears to Be Continuing to Rise in 2002, International Journal of Health Services, 33(2), 2003.

Lessard G, Ku L. Gaps in Coverage for Children in Immigrant Families, The Future of Children, 13(1):101-115, Spring 2003.

Ku L, St. Louis M, Black C, Aral S, Turner C, Lindberg L, Sonenstein F. Risk Behaviors, Medical Care and Chlamydial Infection Among Young Men in the United States, American Journal of Public Health, 92(7): 1140-42, July 2002.

Ku L, Matani S. Left Out: Immigrants' Access to Health Care and Insurance, Health Affairs, 20(1):247-56, Jan./Feb. 2001.

Ku L, Ellwood M, Hoag S, Ormond B, Wooldridge J. The Evolution of Medicaid Managed Care Systems and Eligibility Expansions, Health Care Financing Review, 22(2):7-29, Winter 2000.

Coughlin T, Ku L, Kim J., Reforming the Medicaid Disproportionate Share Program in the 1990s,  Health Care Financing Review, 22(2):137-58, Winter 2000.

Ku L, Coughlin T, Sliding Scale Premium Health Insurance Programs: Four States' Experience, Inquiry, 36(4):471-80, Winter 2000.

Lindberg L, Ku L, Sonenstein F, Adolescents' reports of reproductive health education, 1988 and 1995. Family Planning Perspectives, 32(5):220-6, Sept./Oct. 2000.

Porter L, Ku L.  Use of Reproductive Health Services Among Young Men, 1995 Journal of Adolescent Health, 27(3):186-94, September 2000.

Bradner C, Ku L, Lindberg L. Older, but Not Wiser: How Do Men Get AIDS and Sexually Transmitted Disease Information after High School?, Family Planning Perspectives, 32(1):33-39, January/February 2000.

Lindberg L, Ku L, Sonenstein F.  Adolescent Males' Combined Use of Condoms with Partners' Use of Female Contraceptive Methods, Maternal and Child Health Journal, 2(4): 201-9, Spring 1999.

Ku L, Sonenstein F, Lindberg L, Bradner C, Boggess S, Pleck J. Understanding Changes in Sexual Activity Among Young Metropolitan Men: 1979 to 1995, Family Planning Perspectives, 30(6): 256-62, November/ December 1998.

Ku L, Hoag S. Medicaid Managed Care and the Marketplace, Inquiry, 35(3):332-45, Fall 1998.

Ellwood MR, Ku L. Welfare and Immigration Reforms: Unintended Side Effects for Medicaid, Health Affairs, 17(3):137-51, May/June 1998.

Sonenstein F, Pleck J, Ku L, Lindberg L, Turner C.  Changes in Sexual Behavior and Condom Use Among Teenaged Males: 1988 to 1995, American Journal of Public Health, 88(6):956-959, June 1998.

Turner C, Ku L, Rogers S, Lindberg L Pleck J, Sonenstein F. Adolescent Sexual Behavior, Drug Use and Violence: New Survey Technology Detects Elevated Prevalence Among U.S. Males, Science, 280:867-73, May 8, 1998.

Ku L, Sonenstein F, Turner C, Aral S, Black C, The Potential of Integrated Representative Surveys about STDs and Risk Behaviors, Sexually Transmitted Diseases, 24(5):299-309, May 1997.

Lindberg L, Sonenstein F, Ku L , Levine G, Young Men's Experience with Condom Breakage, Family Planning Perspectives, 29(3): 132-36, May/June 1997.

Pleck JH, Sonenstein F, Ku L.  Black-white Differences in Adolescent Males' Substance Use: Are They Explained by Underreporting in Blacks?, Journal of Gender, Culture, and Health, 2, 247-265, 1997

Lindberg L, Sonenstein F, Ku L, Martinez G.  Age Differences Between Minors Who Give Birth and Their Adult Partners, Family Planning Perspectives, 29(2):52-60, March/April 1997.

Sonenstein F, Ku L, Schulte M, Reproductive Health Care -- Patterns in a Changing Health Care Market, Western Journal of Medicine, 163(3 Suppl):7-14, September 1995.

Ku L, Coughlin T. Medicaid Disproportionate Share and Other Special Financing Programs, Health Care Financing Review, 16(3): 27-54, Spring 1995.

Holahan J, Coughlin T, Ku L, Lipson D, Rajan S. Insuring the Poor through Medicaid 1115 Waivers, Health Affairs, 14(1): 200-17, Spring 1995.

Coughlin T, Ku L, Holahan J, Heslam D, Winterbottom C. State Responses to the Medicaid Spending Crisis: 1988 to 1992, Journal of Health Politics, Policy and Law, 19(4):837-64, Winter 1994.

Ku L, Sonenstein F, Pleck J. The Dynamics of Young Men's Condom Use During and Between Relationships, Family Planning Perspectives, 26(6): 246-251, November/ December 1994.

Pleck J, Sonenstein F, Ku L. Attitudes Toward Male Roles: A Discriminant Validity Analysis, Sex Roles, 30(7/8):481-501, 1994.

Ku L, Sonenstein F, Pleck J. Factors Affecting First Intercourse Among Young Men, <u>Public Health Reports</u>, 108(6):680-94, November/December 1993.

Ku L, Sonenstein F, Pleck J. Neighborhood, Work and Family: Influences on the Premarital Behaviors of Adolescent Men, <u>Social Forces</u>, 72(2):479-503, December 1993.

Ku L, Sonenstein F, Pleck J. Young Men's Risk Behaviors for HIV Infection and Sexually Transmitted Diseases, 1988 through 1991, <u>American Journal of Public Health</u>, 83(11):1609-15, November 1993.

Pleck J, Sonenstein F, Ku L. Changes in Adolescent Males' Use of and Attitudes Towards Condoms: 1988-91, <u>Family Planning Perspectives</u>, 25(3):100-105, 117, May/June 1993.

Pleck J, Sonenstein F, Ku L. Masculine Ideology: Its Impact on Adolescent Males' Heterosexual Relationships, <u>Journal of Social Issues</u>, 49(3):11-30, 1993.

Ku L, Sonenstein F, Pleck J. The Association of AIDS Education and Sex Education with Sexual Behavior and Condom Use Among Teenage Men, <u>Family Planning Perspectives</u>, 24(3):100-106, May/June 1992 (erratum, <u>Family Planning Perspectives</u>, 25(1):36, January/February 1993).

Ku L, Sonenstein F, Pleck J, Patterns of HIV Risk and Preventive Behaviors Among Teenage Men, <u>Public Health Reports</u>, 107(2):131-38, March/April 1992.

Sonenstein F, Pleck J, Ku L, Levels of Sexual Activity Among Adolescent Males in the United States, <u>Family Planning Perspectives</u>, 23(4):162-67, July /August 1991.

Pleck J, Sonenstein F, Ku L, Adolescent Males' Condom Use: The Influence of Perceived Costs-Benefits on Consistency, <u>Journal of Marriage and the Family,</u> 53:733-45, August 1991.

Pleck J, Sonenstein F, Ku L, Contraceptive Attitudes and Intention to Use Condoms in Sexually Experienced and Inexperienced Adolescent Males, <u>Journal of Family Issues,</u> 11(3):294-312, Sept. 1990.

Ku L, Ellwood MR, Klemm J. Deciphering Medicaid Data: Issues and Needs, <u>Health Care Financing Review,</u> 1990 Annual Supplement, p. 35-45.

Ku L, Fisher D, Attitudes of Physicians Toward Health Care Cost Containment Policies, <u>HSR: Health Services Research</u>, 25(1):25-42, April 1990 (Part I).

Sonenstein F, Pleck J, Ku L. Sexual Activity, Condom Use and AIDS Awareness Among Adolescent Males, <u>Family Planning Perspectives</u>, 21(4):152-58, July/August 1989.

Branch L, Ku L. Transition Probabilities to Disability, Institutionalization and Death for the Elderly Over a Decade, <u>Journal of Aging and Health</u>, 1(3):370-408, August 1989.

Ku L. Early Prenatal Enrollment in the WIC Program, <u>Public Health Reports</u>, 104(3): 301-06, May/June 1989.

Ku L, Shapiro L, Crawford P, Huenemann R. Body Composition and Physical Activity in Eight Year Old Children, <u>American Journal of Clinical Nutrition</u>, 34(12):2770-75, 1981.

Persellin R, Ku L. Effects of Steroid Hormones on Human Polymorphonuclear Leukocyte Lysosomes, <u>Journal of Clinical Investigation</u>, 54(4):919-25, 1974.

## Books Authored or Co-authored

Ku L, Lin M, Broaddus M, Improving Children's Health: A Chartbook about the Roles of Medicaid and SCHIP: 2007 Edition, Center on Budget and Policy Priorities, Jan. 2007.

Ku L, Nimalendran S. Improving Children's Health: A Chartbook About the Roles of Medicaid and SCHIP, Center on Budget and Policy Priorities, Jan. 15. 2004

Coughlin T, Ku L, Holahan J, Medicaid Since 1980: Costs, Coverage and the Shifting Alliance Between the Federal Government and the States, Washington, DC: Urban Institute Press, 1994. (Selected by *Choice* as one of ten outstanding academic books for 1994.)

Sorensen, E, Bean F, Ku L, Zimmerman W, Immigrant Categories and the U.S. Job Market: Do They Make a Difference?, Urban Institute Report 92-1, Washington, DC: Urban Institute Press, 1992.

## Articles or Chapters in Books (Refereed)

Ku L (contributor), CCH;s Law, Explanation and Analysis of the Patient Protection and Affordable Care Act, Vol.1, Commerce Clearinghouse, Wolters Kluwer, 2010.

Ku L. Changes In Immigrants' Use of Medicaid and Food Stamps: the Role of Eligibility and Other Factors, in Immigrants and Welfare, edited by Michael Fix, Russell Sage Foundation and Migration Policy Institute, 2009, p, 153-92.

Ku L, Papademetrios DG. Access to Health Care and Health Insurance: Immigrants and Immigration, in Securing America's Future: U.S. Immigrant Integration Policy Reader, M. Fix, editor, Migration Policy Institute, Feb. 2007.

Sonenstein FL., Ellen J, Pleck J, Ku L. Taking Risks: Understanding Adolescents' Behavior, in STDs in Adolescents: Challenges for the 21st Century, edited by P. Hitchcock, et al. New York: Oxford University Press Inc.1999.

Ku L, Wooldridge J, Rajan S, Ellwood MR, Dubay L, Coughlin T, Hoag S, Wall S. The New Generation of Statewide Medicaid Managed Care Programs: State Health Reform Projects in Hawaii, Oklahoma, Rhode Island and Tennessee in Remaking Medicaid: Managed Care for the Public Good, edited by Steve Davidson and Steve Somers, San Francisco: Jossey-Bass, Inc., 1998, p. 147-78.

Wooldridge J, Ku L, Coughlin T, Dubay L., Ellwood MR, Rajan S, Hoag S, Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, in Contemporary Managed Care, edited by Marsha Gold, Health Administration Press, pp. 211-26, 1998.

Sonenstein F, Ku L, Pleck J. Measuring Sexual Behavior Among Teenage Males in the U.S., in Researching Sexual Behavior: Methodological Issues, Bancroft, J., ed., Bloomington, IN: Indiana University Press, p. 87-105, 1997.

Turner, CF, Ku L, Sonenstein FL, Pleck JH, Impact of Audio-CASI on Reporting of Male-male Sexual Contacts: Preliminary Findings from the National Survey of Adolescent Males, in Health Survey Research Methods: Conference Proceedings, Warnecke, R.B., ed., Hyattsville, MD: National Center for Health Statistics, p. 171-76, 1995.

8

Pleck J, Sonenstein F, Ku L, Problem Behaviors and Masculinity Ideology in Adolescent Males, in Adolescent Problem Behaviors: Issues and Research, R. Ketterlinus and M. Lamb, eds., Hillsdale, NJ: Erlbaum, 1994, p. 165-186.

Holahan J, Coughlin T, Ku L, Heslam D, Winterbottom C, Understanding the Recent Growth in Medicaid Spending, in Medicaid Financing Crisis: Balancing Responsibilities, Priorities and Dollars, D. Rowland, J. Feder and A. Salganicoff, eds., Washington, DC: AAAS Press, 1993, p. 23-44.

Sonenstein F, Pleck J, Ku L. Paternity Risk Among Adolescent Males in Young Unwed Fathers: Changing Roles and Emerging Policies, R. Lerman and T. Ooms, eds., Philadelphia, PA: Temple Univ. Press, p. 99-116, 1993.

Pleck J, Sonenstein F, Ku L. Masculine Ideology and Its Correlates in Gender Issues in Contemporary Society, S. Oskamp and M. Constanzo, eds., Claremont Symposium on Applied Social Psychology, Newbury Park: Sage Publications, p. 85-110, 1993.

## Translational and Other Reports, Briefs and Publications

### Health Policy

[Note: Reports marked with [PR] went through an external peer-review process prior to release.]

Brantley E, Ku L. Work Requirements: SNAP Data Show Medicaid Losses Could Be Much Faster and Deeper Than Projected. Health Affairs Blog. April 12, 2018. https://www.healthaffairs.org/do/10.1377/hblog20180412.310199/full/

Ku L. What is the Evidence of the Effects of the ACA's Individual Mandate and of Its Repeal? DC Health Benefits Exchange Authority. Revised Feb. 12, 2018.

Ku L. It Makes More Sense to Strengthen SHOP Than to Expand Association Health Plans. Jan. 4, 2018. http://gwhealthpolicymatters.com/blog-it-makes-more-sense-strengthen-shop-expand-association-health-plans

Ku L, Steinmetz E. State Economic and Employment Losses If Community Health Center Funding Is Not Restored. Geiger Gibson/RCHN Community Health Foundation Research Collaborative Policy Research Brief # 51. Dec. 4, 2017. [PR] https://publichealth.gwu.edu/sites/default/files/downloads/GGRCHN/State%20Economic%20and%20Employment%20Losses%20if%20CHC%20Funding%20is%20Not%20Restored%2051.pdf

Ku, L. Declaration about Public Health Effects of Terminating the Deferred Action for Childhood Arrivals (DACA) program. Filed in support of New York, et al. v. Trump in suit in Federal District Court of Eastern New York, Nov. 22,. 2017.

Ku L. May You Live in Interesting Times: The Challenges of Health Policy Analysis in a Turbulent Period. GW Health Policy Matters. Oct. 2, 2017. http://gwhealthpolicymatters.com/may-you-live-interesting-times-challenges-health-policy-analysis-turbulent-period-0

Ku L, Steinmetz E, Brantley E, Pillai D. The Graham-Cassidy Proposal Would Eliminate a Third of a Million Jobs, *To the Point*, The Commonwealth Fund, Sept. 26, 2017, [PR] available at: http://www.commonwealthfund.org/publications/blog/2017/sep/graham-cassidy-job-loss. Methods

appendix at http://www.commonwealthfund.org/~/media/files/publications/blog/2017/gc-methods-appendix_final.pdf

Ku L, Seiler N.  Medicaid Expansions Help States Cope with the Opioid Epidemic.  GW Dept of Health Policy and Management.  July 25, 2017.
https://publichealth.gwu.edu/sites/default/files/images/Medicaid%20Expansions%20Help%20States%20Cope%20with%20the%20Opioid%20Epidemic%207-25-17%20report.pdf

Ku L.  Cutting immigrants' access to health insurance would drive up costs for many Americans. *Washington Post*, Letter to the Editor.  July 18, 2017.

Ku L, Steinmetz E, Brantley E, Holla N, Bruen B.  The Better Care Reconciliation Act: Economic and Employment Consequences for States.  Commonwealth Fund, July 6, 2017.[PR]
http://www.commonwealthfund.org/publications/issue-briefs/2017/jul/bcra-economic-employment-consequences-states

Ku L, Steinmetz E, Brantley E, Holla N, Bruen B.  The American Health Care Act: Economic and Employment Consequences for States.  Commonwealth Fund, June 14, 2017.  [PR]
http://www.commonwealthfund.org/publications/issue-briefs/2017/jun/ahca-economic-and-employment-consequences
[Like the January 6th report, the June 14 and July 6 reports gained considerable interest and was widely cited by the media and by federal and state policy officials. This series of reports were among the most often downloaded reports for the Commonwealth Fund.]

Ku L, Paradise J, Thompson V.  Data Note: Medicaid's Role in Providing Access to Preventive Care for Adults. Kaiser Commission for Medicaid and the Uninsured.  May 17, 2017.
[PR]http://kff.org/medicaid/issue-brief/data-note-medicaids-role-in-providing-access-to-preventive-care-for-adults/

Ku L  In podcast:  ACA Repeal Waves Goodbye to 3 Million Jobs and $1.5 Trillion.  The Working Life. May 10, 2017.  http://www.workinglife.org/politics/episode-29-aca-repeal-waves-goodbye-to-3-million-jobs-1-5-trillion/

Ku L, Brantley E.  Medicaid Work Requirements: Who's at Risk?  *Health Affairs Blog*, April 12, 2017.
http://healthaffairs.org/blog/2017/04/12/medicaid-work-requirements-whos-at-risk/

Ku L, Brantley E.  Myths about the Medicaid Expansion and the "Able-Bodied." *Health Affairs Blog*, March 6, 2017.  http://healthaffairs.org/blog/2017/03/06/myths-about-the-medicaid-expansion-and-the-able-bodied/

Ku L  In podcast: The Financial Consequences of ACA Repeal.  The Commonwealth Fund.  Feb. 15, 2017. http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Bennett J, Brown C, Ku L, Bruen B.  The Economic, Fiscal and Employment Effects of Health Care Modernization in Oklahoma.  State Chamber (of Commerce) Research Foundation.  Feb. 1, 2017. [PR]
http://www.okstatechamber.com/sites/www.okstatechamber.com/files/OK%20Study%20-%20REMI%20FINAL.pdf

10

Mitchell K.  Interview with Leighton Ku.  GW Expert: Repealing Obamacare Would Hurt Patients, Economy.  GW Today.  Jan. 17, 2017.   https://gwtoday.gwu.edu/gw-expert-repealing-obamacare-would-hurt-patients-economy

Ku L Steinmetz E, Brantley E, Bruen B.  Repealing Federal Health Reform: The Economic and Employment Consequences for States.  Brief, Commonwealth Fund, Jan. 6, 2017. http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform [PR]

Ku L Steinmetz E, Brantley E, Bruen B.  The Economic and Employment Consequences of Repealing Federal Health Reform: A 50 State Analysis.  Milken Institute School of Public Health, George Washington University.  Jan. 6, 2017. https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Repealing_Federal_Health_Reform.pdf [PR]

[Note: The Jan. 6 reports were reported widely in numerous media including CBS, NBC, NPR, *Forbes, Fortune, the Atlantic*, etc.  Findings were frequently cited by Congressmen and Senators in Congressional floor debates about repeal of the Affordable Care Act.  One of the most popular Commonwealth Fund reports in 2017]

Ku L, Steinmetz E, Bruen B. Changes in Insurance Coverage and Cardiovascular Risk for U.S. Adults in States Expanding and Not Expanding Medicaid. Dec. 2016  George Washington University and American Heart Association.  [PR] https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Americans%20Cardiovascular%20Risk%20and%20Changes%20in%20Health%20Insurance%20Coverage%20Dec%2016.pdf

Ku L.   DC Health Link Has Expanded Health Insurance Coverage In The District.  DC Health Benefits Exchange Authority, Sept. 29, 2016 [no author listed] http://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/SurveyReportGainedCoverage%20final.pdf

Ku L. Up in smoke: We'll spend billions tomorrow for not helping poor people quit smoking today, *The Conversation*.  July 12, 2016.  https://theconversation.com/up-in-smoke-well-spend-billions-tomorrow-for-not-helping-poor-people-quit-smoking-today-60686

Ku L.  The Role Of Medicaid In Pay For Success Models For Supportive Housing For Chronically Homeless Individuals: Opportunities And Challenges, Report to Office of the Assistant Secretary for Planing and Evaluation, HHS, under review. [PR]

Regenstein M, Jewers M, Nocella K, Goldberg D, Strasser J, Ku L, Mullan F.  Cost Estimates for Training a Resident in a Teaching Health Center.  Report to HRSA.  GW Dept. of Health Policy and Management, Feb. 2016. [PR]

Lantz,P, Rosenbaum S., Ku L et al.  Opportunities for Pay for Success Demonstrations in HHS Programs, Office of the Assistant Secretary for Planning and Evaluation, HHS, forthcoming. [PR]

Ku L, Steinmetz E, Bruen B., Bysshe T.  Effects of the Affordable Care Act on Health Insurance Coverage of Americans at Risk of Cardiovascular Disease, Washington, DC: American Heart Association.  Jan. 2016.

Ku L, Steinmetz, E, Bysshe T.  Continuity of Medicaid Coverage in an Era of Transition, Washington, DC: Association of Community Affiliated Plans, Nov. 1, 2015. [PR]

11

Ku L, Bysshe T, Steinmetz E, Bruen B.  Health Reform and the Implications for Cancer Screening. Report to American Cancer Society, Sept. 2015

Ku L, Bysshe T, Wu. X.  The Changing Community Health Center Workforce: 2007-13, GW Health Workforce Research Center, Sept. 22, 2015. [PR]

Ku L, Mullan F, Serrano C, Barber Z, Shin P.  Teaching Health Centers: A Promising Approach for Building Primary Care Workforce for the 21st Century.  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 40, March 10, 2015. http://www.rchnfoundation.org/?p=4651

Rosenbaum S, Ku l, et al. (unnamed authors).  *Amici Curiae* Brief Of Public Health Deans, Chairs, And Faculty And The American Public Health Association In Support Of Respondents to the Supreme Court of the United States re: *King v Burwell.*  Jan. 28, 2015. [PR]

Ku L.  Covering the Uninsured Through DC Health Link: Report on the First Year.  DC Health Benefits Exchange Authority, Dec. 26, 2014.  http://hbx.dc.gov/node/978322  [PR]

Ku L, Bruen B, Steinmetz E, Bysshe T.  The Economic and Employment Costs of Not Expanding Medicaid in North Carolina: A County-Level Analysis. Dec. 2014.  Cone Health Foundation and Kate B. Reynolds Charitable Trust. At  www.ncmedicaidexpansion.com {PR]

Ku L, Bruen B, Steinmetz E, Brown C., Motamedi R, Stottlemyer C.  Economic and Employment Effects of Expanding KanCare.  Kansas Hospital Association, Nov. 2014  at http://www.kha-net.org/.

Steinmetz E, Bruen, B, Ku L.  Children's Use of Dental Care in Medicaid:  Federal Fiscal Years 2000 – 2012.  Report to CMS, Oct. 2014.  Posted at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/dental-trends-2000-to-2012.pdf. [PR]

Stewart A, Cox M, Ku L.  Health Insurance Benefits Advisors: Understanding Responsibilities, Regulations, Restrictions and Relevance in Implementing the Affordable Care Act.  GW Dept of Health Policy, Sept. 2014.  [PR]

Ku L Zur, J. Jones E, Shin P, Rosenbaum S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs: A 2014 Update Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 37, June 18, 2014.  [PR]

Miller V, Ku L. The Impact of Government Transfer Programs on State and Regional Personal Incomes, Department of Health Policy Issue Brief, April 30, 2014.

Ku L. Strengthening Immigrants' Health Access: Current Opportunities GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29/

Ku L Zur, J. Jones E, Shin P, Rosenbaum S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 34, Nov. 18. 2013

Paradise J, Rosenbaum S, Shin P, Sharac J, Alvarez C, Zur J, Ku L. Providing outreach and enrollment assistance: lessons learned from community health centers in Massachusetts. The Henry J. Kaiser Family

Foundation. September 24, 2013. Available at: http://kff.org/health-reform/issue-brief/providing-outreach-and-enrollment-assistance-lessons-learned-from-community-health-centers-in-massachusetts/

Ku L, Steinmetz E.  Bridging the Gap: Continuity and Quality of Coverage in Medicaid, Washington DC: Association of Community Affiated Plans. Sept. 2013.  [PR]

Ku L.  The Bipartisan Senate Immigration Bill: Implications for Health Coverage and Health Access, GW Department of Health Policy, Aug. 8, 2013

Ku L. The Senate Immigration Bill's Impact on Health Care, blog posted at www.cmwf.org, Aug. 8, 2013. [PR]

Ku L. Comprehensive Immigration Reform and Health Care: CBO's Analysis of S. 744, Dept of Health Policy report, June 20, 2013.  Also posted on *HealthReformGPS.org*.

Ku L. Explaining Recent Changes in CBO Projections of Health Insurance Coverage and Costs under the Affordable Care Act, Implementation Brief posted on www.*HealthReformGPS.org*, June 5, 2013.

Ku L.  Medicaid Expansions Using Private Plans: The Role of Premium Assistance and Cost-Sharing, commentary in www.*HealthReformGPS*.org April 2013. http://www.healthreformgps.org/resources/medicaid-expansions-using-private-plans-the-role-of-premium-assistance-and-cost-sharing-2/

Ku L, Bruen B.  Poor Immigrants Use Public Benefits At a Lower Rate than Poor Native-Born Citizens, *Economic Development Bulletin* No. 17, Washington, DC: Cato Institute.  March 4, 2013 http://www.cato.org/sites/cato/files/pubs/pdf/edb17.pdf  [PR]

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Iowa, Regional Economic Models, Inc. and George Washington University. Prepared for Iowa Hospital Association. Mar. 2013. http://blog.iowahospital.org/wp-content/uploads/2013/03/IA-Medicaid-Expansion-Econ-Full-Report.pdf

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Arizona, Regional Economic Models, Inc. and George Washington University. Prepared for Arizona Hospital and Healthcare Association. Feb. 2013. http://www.azhha.org/member_and_media_resources/documents/ArizonaMedicaidExpansionReportREMI2-28-13_000.pdf

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Arkansas, Regional Economic Models, Inc. and George Washington University. Prepared for Arkansas Hospital Association. Feb. 2013. http://www.arkhospitals.org/Misc.%20Files/ReportBriefAppendix.pdf

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen B and Ku L.  Economic and Employment Effects of Expanding Medicaid in Kansas, Regional Economic Models, Inc. and George Washington University. Prepared for Kansas Hospital Association. Feb. 2013. http://m.kha-net.org/communications/mediareleases/102615.aspx

Ku L, Bruen B.  The Use of Public Assistance Benefits by Citizens and Non-citizen Immigrants in the United States.  Working Paper, Cato Institute, Feb. 2013. [PR]

Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute,

June 2013.  www.migrationpolicy.org [PR]

Ku L, Bruen B, and Steinmetz E. Task 9: Medicaid DSH Simulation: Final Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Jan. 2013.  [PR]

Ku L, Bruen B, Steinmetz E Beeson T.  Task 7: Medicaid DSH Analytic Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Oct. 2012. [PR]

Ku L Cartwright-Smith L, Sharac J,  Steinmetz E, Lewis J, Shin P. Deteriorating Access to Women's Health Services in Texas: Potential Effects of the Women's Health Program Affiliate Rule, Geiger Gibson/RCHN CHF Research Collaborative Brief, Issue No. 31. October 11, 2012

Ku L, Regenstein M, Shin P, Mead H, Levy A, Buchanan K, Byrne, F.. Coordinating and Integrating Care for Safety Net Patients: Lessons from Six Communities. George Washington University Dept. of Health Policy, May 21, 2012.

Ku L, Levy A, Bruen B.  The Potential Primary Care Crisis in Texas: A County-Based Analysis Report for Methodist Healthcare Ministries, April 2012.

Ku L, Cunningham M, Goetz-Goldberg D., Darnell J, Hiller M.. Quality Incentives for Federally Qualified Health Centers, Rural Health Clinics and Free Clinics: A Report To Congress, report prepared for U.S. Department of Health and Human Services for submission to Congress, January 23, 2012. [PR]

Ku L.  Saving Money: The Massachusetts Medicaid Tobacco Cessation Benefit: A Policy Paper. Partnership for Prevention.  Jan. 2012.
http://www.prevent.org//data/images/roi%20policy%20paper_a.pdf

Ku L, Levy A, Lantz P, Pierre-Matthieu R.  Options for CDC's Cancer Screening Programs: Implications of the Affordable Care Act.  Report to the American Cancer Society and Centers for Disease Control and Prevention, Nov. 15, 2011.  [PR]

Ku L, Regenstein M., Shin P, Mead H, Levy A, Buchanan K, Byrne F. Coordinating and Integrating Care for Safety Net Patients:  Lessons from Six Communities, Draft Report to the Commonwealth Fund, Sept. 2011.  [PR]

Ku L, Regenstein M., Shin P, Bruen B, Byrne FR. Improving the Integration and Coordination of Safety Net Health Providers Under Health Reform: Key Issues, Commonwealth Fund Pub 1552, Oct. 2011.  Posted at http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2011/Oct/ 1552_Ku_promoting_integration_safetynet_providers_under_reform_ib.pdf  [PR]

Ku L, Shin P, Jones E, Bruen B.  Transforming Community Health Centers into Patient-Centered Medical Homes: The Role of Payment Reform, Report to the Commonwealth Fund, Sept. 28, 2011.  Posted at http://www.commonwealthfund.org/Publications/Fund-Reports/2011/Sep/Transforming-Community-Health-Centers.aspx. [PR]

Ku L, Ferguson C.  Medicaid Works: A Review of How Public Insurance Protects the Health and Finances of Low-Income Families and Individuals. First Focus and George Washington Univ. Dept. of Health Policy, June 2011.

Ku L. Medicaid in the Bull's Eye.:  Blog posted at *Health Affairs* blog website.  April 15, 2011. http://healthaffairs.org/blog/2011/04/15/medicaid-in-the-bulls-eye.

Rosenbaum S, Shin P, Ku L. Who Are the Health Center Patients Who Risk Losing Care Under the House of Representatives Proposed FY 2011 Spending Reductions?. Issue No. 20.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative Feb 24, 2011.

Ku L, Richard P, Dor A, Tan E, Shin P, Rosenbaum S.  Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Brief No. 19.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, June 30, 2010.

Ku L, Shin P, Bruen B.  Can Health Care Investments Stimulate the Economy?.  Blog posted at *Health Affairs* blog website, March 16, 2010.
http://healthaffairs.org/blog/2010/03/16/can-health-care-investments-stimulate-the-economy/

Shin P, Bruen B, Jones E, Ku L, Rosenbaum S.  The Economic Stimulus: Gauging the Early Effects of ARRA Funding on Health Centers and Medically Underserved Populations and Communities, Brief No. 17.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Feb. 2010.

Shin P, Bruen B, Ku L, Mead KH, Regenstein M, Rosenbaum S, Buchanan K, Smith K. The Early Impact of ARRA on Community Health Centers: Analysis of HCQR2. Report to Health Resources and Services Administration, Rockville, MD. February 2010.

Ku L, Rosenbaum S, Shin P.  Using Primary Care to Bend the Cost Curve: The Potential Impact of Health Center Expansion in Senate Reforms. Brief No. 16. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 14, 2009.

Shin P, Ku L, Mauery R, Finnegan B, Rosenbaum S. Estimating the Economic Gains for States as a Result of Medicaid Coverage Expansions for Adults, Brief No. 15. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 7, 2009.

Ku L, Richard P, Dor A, Tan E, Shin P, Rosenbaum S. Using Primary Care to Bend the Curve: Estimating the Impact of a Health Center Expansion on Health Care Costs. Brief No. 14. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Sep 1, 2009.

Ku L. Do Medicaid and CHIP Measure Errors Correctly?. Dept. of Health Policy, George Washington Univ. Aug. 4, 2009.

Ku L, Shin P, Rosenbaum S. Estimating the Effects of Health Reform on Health Centers' Capacity to Expand to New Medically Underserved Communities and Populations. Issue No. 11. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Washington, DC. Jul 23, 2009. Rosenbaum S, Jones E, Shin P and Ku L National Health Reform: How Will Medically Underserved Communities Fare? Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 9, 2009.

Ku L, MacTaggart P, Pervez F, Rosenbaum S.  Improving Medicaid's Continuity and Quality of Care, Association for Community Affiliated Plans, July 2009.  [PR]

Finnegan B, Ku L, Shin P, Rosenbaum S.  Boosting Health Information Technology in Medicaid: The Potential Effect of the American Recovery and Reinvestment Act. Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 7, 2009.

Ku L. Expanding Coverage for Low-income Americans: Medicaid or Health Insurance Exchanges? Blog posted at *Health Affairs* blog website, June 23, 2009.  http://healthaffairs.org/blog/2009/06/23/expanding-coverage-for-low-income-americans-medicaid-of-health-insurance-exchanges/

Shin P Ku L, Jones E, Finnegan B, Rosenbaum S.  Financing Community Health Centers As Patient- And Community-Centered Medical Homes:  A Primer, George Washington Univ., May 27, 2009. [PR]

Ku L, Jones E, Finnegan B, Shin P, Rosenbaum S. Community Health Centers in the Midst of Massachusetts' Health Reform:  How Is the Primary Care Safety Net Faring? Kaiser Commission on Medicaid and the Uninsured and Geiger Gibson Community Health Program.  March 2009. [PR]

Ku L. Restoring Medicaid and SCHIP Coverage to Legal Immigrant Children and Pregnant Women: Implications for Community Health and Health Care for Tomorrow's Citizens, Geiger Gibson/RCHN Community Health Foundation Research Brief, Jan. 13, 2009.

Ku L, Feiden K.  Examining the Health Consequences of the 2008-09 Recession, Rapid Public Health Policy Response Project, GW School of Public Health and Health Services, January 2009.

Ku L. The Dial and the Dashboard: The Child Well-Being Index and Public Policy, prepared for the Foundation for Child Development, Jan. 2009.

Jones E, Ku L, Lippi J, Whittington R, Rosenbaum S. Designation of Medically Underserved and Health Professional Shortage Areas: Analysis of the Public Comments on the Withdrawn Proposed Regulation. Geiger Gibson/RCHN Community Health Foundation Research Brief #5. September 2008.

Shin P, Ku L, Jones E, Rosenbaum S. Grantee-Level Estimates Show that 31 Percent of All Health Centers would Fail to Meet Tier Two Status under HRSA's Proposed MUA/MUP/HPSA Designation Regulations. Geiger Gibson/RCHN Community Health Foundation Research Brief #3. May 2008.

Shin P, Ku L, Jones E, Rosenbaum S.  Analysis of the Proposed Rule on Designation of Medically Underserved Populations and Health Professional Shortage Areas, (report and highlights) Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Department of Health Policy, The George Washington University, revised May 1, 2008.

Ku L, Lindblom E. (authors not named) Expanding Children's Health Insurance And Raising Federal Tobacco Taxes Helps Low-Income Families, Joint Paper of the Center on Budget and Policy Priorities and the Campaign for Tobacco-Free Kids, Oct. 16, 2007.
Ku L. 'Crowd-Out' Is Not the Same as Voluntarily Dropping Private Health Insurance for Public Program Coverage, Center on Budget and Policy Priorities, Sept. 27, 2007

Greenstein R, Ku L (authors not named) Charge That Bipartisan SCHIP Compromise Bill Aids Undocumented Immigrants Is False, Center on Budget and Policy Priorities, Sept. 25, 2007.

Ku L. Collateral Damage: Children Can Lose Coverage When Their Parents Lose Health Insurance, Center on Budget and Policy Priorities, Sept. 17, 2007.

Ku L (author not named), More Americans, Including More Children, Now Lack Health Insurance, Center on Budget and Policy Priorities, Aug. 31, 2007.

Ku L, New Research Shows Simplifying Medicaid Can Reduce Children's Hospitalizations, Center on Budget and Policy Priorities, June 11, 2007.

Ku L, Comparing Public and Private Health Insurance for Children, Center on Budget and Policy Priorities, May 11, 2007.

16

Ku L, Reducing Disparities in Health Coverage for Legal Immigrant Children and Pregnant Women, Center on Budget and Policy Priorities, April 20, 2007.

Ku L, Census Revises Estimates of the Number of Uninsured People, Center on Budget and Policy Priorities, April 5, 2007.

Ku L, Schneider A, Solomon J,  The Administration Again Proposes to Shift Federal Medicaid Costs to States, Center on Budget and Policy Priorities, Feb.14, 2007.

Ku L. Medicaid Costs Are Growing More Slowly Than Costs For Medicare or Private Insurance, Center on Budget and Policy Priorities, Nov. 13, 2006.

Ku L, Broaddus M. Coverage of Parents Helps Children, Too, Center on Budget and Policy Priorities, Oct. 20, 2006.

Ku L Paying for Language Services in Medicare: Preliminary Options & Recommendations, National Health Law Program and Center on Budget and Policy Priorities, Oct. 2006. (www.healthlaw.org/library.cfm?fa=detail&id=118637&appView=folder)

Ku L, Broaddus M. Is Medicaid Responsible for the Erosion of Employer-Based Health Coverage?, Center on Budget and Policy Priorities, Sept. 22, 2006.

Greenstein, R., Ku L and Dean, S. Survey Indicates House Bill Could Deny Voting Rights To Millions Of U.S. Citizens, Center on Budget and Policy Priorities, Sept. 22, 2006.

Ku L, Cohen Ross D, Broaddus M.  Documenting Citizenship and Identity Using Data Matches: A Promising Strategy for State Medicaid Programs, Center on Budget and Policy Priorities, Sept. 1, 2006.

Ku L. Why Immigrants Lack Adequate Access to Health Care and Health Insurance, Migration Information Source, Migration Policy Institute, Sept. 2006. [PR](www.migrationinformation.org/Feature/display.cfm?id=417)

Kogan R, KuL, et al. Budget Process Bill Would Result in Deep Cuts in Medicare and Medicaid, Center on Budget and Policy Priorities, Aug. 9, 2006.

Ku L. Revised Medicaid Documentation Requirement Jeopardizes Coverage for 1 To 2 Million Citizens, Center on Budget and Policy Priorities, July 13, 2006.

Ku L. Using Information Technology to Document Citizenship in Medicaid, Center on Budget and Policy Priorities, June 20, 2006.

Ku L. The Slowdown in Medicaid Expenditure Growth, Center on Budget and Policy Priorities, March 13, 2006.

Ku L, Broaddus M.  New Requirement For Birth Certificates or Passports Could Threaten Medicaid Coverage For Vulnerable Beneficiaries: A State-By-State Analysis, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

Ku L Cohen Ross D. Broaddus M. Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

Schneider A, Ku L, et al. Administration's Medicaid Proposals Would Shift Federal Costs to States, Center on Budget and Policy Priorities, Feb. 14, 2006.

Ku L, Cohen Ross D. New Medicaid Requirement Is Unnecessary and Could Impede Citizens' Coverage, Center on Budget and Policy Priorities, Revised Jan. 4, 2006.

Wachino V, Ku L, et al. Medicaid Provisions of House Reconciliation Bill Both Harmful and Unnecessary Senate Bill Achieves Larger Savings Without Reducing Access to Care, Center on Budget and Policy Priorities, Dec. 9, 2005

Ku L, Wachino V. Greenstein R. The House Reconciliation Bill's Provisions On Medicaid Co-Payments and Premiums: Are They Mild or Harsh? Center on Budget and Policy Priorities, Nov. 22, 2005.

Wachino V, Ku L , et al. An Analysis of The National Governors Association's Proposals For Short-Run Medicaid Reform Center on Budget and Policy Priorities, Oct. 14, 2005.

Ku L and Wachino V. Don't Shift Medicaid's Costs onto Those Who Can Least Afford Them The Hill, July 20, 2005.

Ku L. Medicaid: Improving Health, Saving Lives, Center on Budget and Policy Priorities, July 19, 2005.

Ku L. New Research Sheds Light on Risks from Increasing Medicaid Cost-Sharing and Reducing Medicaid Benefits, Center on Budget and Policy Priorities, July 18, 2005.

Ku L, Wachino V. Medicaid Commission Named By Secretary Leavitt Lacks Balance, Center on Budget and Policy Priorities, July 10, 2005

Ku L, Wachino V. Assessing The National Governors Association's Proposals To Allow Increases In Cost-Sharing Charges To Medicaid Beneficiaries, Center on Budget and Policy Priorities, July 7, 2005.

Ku L, Wachino.V.  The Effect Of Increased Cost-Sharing In Medicaid: A Summary Of Research Findings, Center on Budget and Policy Priorities, Revised, July 7, 2005.

Ku L, Broaddus M. Out-Of-Pocket Medical Expenses For Medicaid Beneficiaries Are Substantial And Growing, Center on Budget and Policy Priorities, May 31, 2005.

Ku L, Solomon, J. Is Missouri's Medicaid Program Out-of-Step and Inefficient?, Center on Budget and Policy Priorities, April 4, 2005.

Wachino V, Schneider A, Ku L. Medicaid Budget Proposals Would Shift Costs To States And Be Likely To Cause Reductions In Health Coverage: Administration's Proposal Also Implies Cap On Federal Funding, Center on Budget and Policy Priorities, Feb. 18, 2005

Ku L, Broaddus M, Wachino, V.. Medicaid and SCHIP Protected Insurance Coverage for Millions of Low-Income Americans, Jan. 31, 2005

Ku L and Wachino V. The Potential Impact of Eliminating TennCare and Reverting to Medicaid: A Preliminary Analysis, Center on Budget and Policy Priorities, Nov. 15, 2004.

Ku L, Deschamps E, Hilman J. The Effects of Copayments on the Use of Medical Services and Prescription Drugs in Utah's Medicaid Program, Center on Budget and Policy Priorities, Nov. 2, 2004.

Ku L. Will the New TennCare Cutbacks Help Tennessee's Economy? Center on Budget and Policy Priorities, July 8, 2004.

Ku L, Nimalendran S. Losing Out: States Are Cutting 1.2 to 1.6 Million Low-Income People from Medicaid, SCHIP and Other State Health Insurance Programs, Center on Budget and Policy Priorities, Dec. 22, 2003.

Ku L, Broaddus M. Funding Health Coverage For Low-Income Children In Washington, Center on Budget and Policy Priorities, Nov. 10, 2003.

Ku L, Report Documents Growing Disparities in Health Care Coverage Between Immigrant and Citizen Children as Congress Debates Immigrant Care Legislation, Center on Budget and Policy Priorities, Oct. 14, 2003

Ku L. CDC Data Show Medicaid and SCHIP Played a Critical Counter-Cyclical Role in Strengthening Health Insurance Coverage during the Economic Downturn, Center on Budget and Policy Priorities, Rev. Oct. 8, 2003.

Ku L. How Many Low-Income Medicare Beneficiaries In Each State Would Be Denied The Medicare Prescription Drug Benefit Under The Senate Drug Bill? Center on Budget and Policy Priorities, July 31, 2003.

Ku L. State Fiscal Relief Provides An Opportunity To Safeguard Medicaid Budgets, Center on Budget and Policy Priorities, June 4, 2003

Ku L, Charging the Poor More For Health Care: Cost-Sharing In Medicaid, Center on Budget and Policy Priorities, May 7, 2003.

Ku L, Fremstad S, Broaddus M. Noncitizens' Use Of Public Benefits Has Declined Since 1996, Center on Budget and Policy Priorities, April 14, 2003.

Nathanson M,d Ku L. Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage For 1.7 Million People: An Update, Center on Budget and Policy Priorities, Mar. 21, 2003.

Ku L, Shift In Costs From Medicare To Medicaid Is A Principal Reason For Rising State Medicaid Expenditures, Center on Budget and Policy Priorities, March 3, 2003.

Ku L, The Medicaid-Medicare Link: State Medicaid Programs Are Shouldering A Greater Share of The Costs Of Care For Seniors And People With Disabilities, Center on Budget and Policy Priorities, Feb. 25, 2003.

Ku L, Broaddus M. Why Are States' Medicaid Expenditures Rising? Jan. 13, 2003.

Cohen-Ross D, Ku L. Quarterly Status Reporting Could Jeopardize The Health Coverage Of Hundreds Of Thousands Of Eligible Low-Income Californians, Center on Budget and Policy Priorities, Revised Dec. 23, 2002

Ku L, et al., Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage for One Million People, Center on Budget and Policy Priorities, Dec. 23, 2002.

Ku L, Cohen-Ross D. <u>Staying Covered: The Importance of Retaining Health Insurance Coverage for Low-income Families,</u> Commonwealth Fund, Dec. 2002.  (One of the most frequently downloaded Commonwealth Fund reports in 2006.) [PR]

Ku L, New CDC Data Show the Importance of Sustaining Medicaid and SCHIP Coverage as Private Health Insurance Erodes in 2002, Center on Budget and Policy Priorities, Revised Oct. 8, 2002.

Ku L, Cohen-Ross D, Nathanson M. State Medicaid Cutbacks and the Federal Role In Providing Fiscal Relief to States, Center on Budget and Policy Priorities,  Revised. Aug. 8, 2002

Ku L, Park E., Improving Transitional Medicaid to Promote Work and Strengthen Health Insurance Coverage, Center on Budget and Policy Priorities, April 29, 2002.

Capps R, Ku L, et al. How Are Immigrants Faring After Welfare Reform?  Preliminary Evidence from Los Angeles County and New York City, Report to the Office of the Assistant Secretary for Planning and Evaluation, Dept. of Health and Human Services, March 2002.  Available at http://aspe.hhs.gov/hsp/immigrants-faring02/index.htm.  [PR]

Broaddus M, et al. Expanding Family Coverage: States' Medicaid Eligibility Policies for Working Families in the Year 2000, Center on Budget and Policy Priorities, Revised Feb. 2002.

Ku L, Park E, Administration's Regulation to Reduce Medicaid Upper Payment Limit Would Further Worsen State Budget Crises, Center on Budget and Policy Priorities, Dec. 11, 2001.

Ku L, Park E. Federal Aid to State Medicaid Programs Is Falling While the Economy Weakens, Center on Budget and Policy Priorities, Oct. 6, 2001.

Ku L, Rothbaum E. Many States Are Considering Medicaid Cutbacks in the Midst of the Economic Downturn, Center on Budget and Policy Priorities, October 26, 2001.

Park E, Ku L, Health Care Provisions of House Ways And Means Committee Stimulus Package Offer Little Help for the Health Insurance Needs of Unemployed Workers, Center on Budget and Policy Priorities, Oct. 19, 2001.

Park E, Ku L, Temporary Medicaid Improvements As Part of a Stimulus Package, Center on Budget and Policy Priorities, Oct. 9, 2001.

Ku L, Counting the Uninsured: A Guide for the Perplexed, Center on Budget and Policy Priorities, Sept. 21, 2001

Park E, Ku L. Administration Medicaid and SCHIP Waiver Policy Encourages States to Scale Back Benefits Significantly and Increase Cost-Sharing for Low-Income Beneficiaries, Center on Budget and Policy Priorities, August 15, 2001.

Ku L, Guyer J. Medicaid Spending: Rising Again But Not to Crisis Levels,  Center on Budget and Policy Priorities, April 20, 2001.

Broaddus M, Ku L. Nearly 95 Percent of Low-Income Uninsured Children Now Are Eligible for Medicaid or SCHIP, Center on Budget and Policy Priorities, Dec. 6, 2000.
12/6/00

Ku L, Freilich A., Caring for Immigrants: Health Care Safety Nets in Los Angeles, New York, Miami and Houston,  Kaiser Commission on Medicaid and the Uninsured, Feb. 2001.

Holahan J, Ku L, Pohl M.. Is Immigration Responsible for the Growth in the Number of Uninsured People?  Kaiser Commission on Medicaid and the Uninsured, March 2001.

Ku L, Blaney S.  Health Coverage for Legal Immigrant Children: New Census Data Highlight Importance of Restoring Medicaid and SCHIP Coverage, Center on Budget and Policy Priorities, Revised. Oct. 10, 2000.

Ormond B, Ku L and Bruen B. Engine of Change or One Force among Many? Section 1115 Demonstration Projects and Trends in Medicaid Expenditures (Baltimore, MD: Health Care Financing Administration, February 2001).

Ku L, Limiting Abuses of Medicaid Financing: HCFA's Plan to Regulate the Medicaid Upper Payment Limit, Center on Budget and Policy Priorities, Sept. 27, 2000.

Ku L, Broaddus M. The Importance of Family-Based Insurance Expansions: New Research on the Effects of State Health Reforms, Center on Budget and Policy Priorities, September 5, 2000.

Ku L, Matani S. Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, Assessing the New Federalism Discussion Paper 00-03, Washington, DC: The Urban Institute, June 2000.

Ku L, Garrett B. How Welfare Reform and Economic Factors Affected Medicaid Participation: 1984-96, Assessing the New Federalism Discussion Paper 00-01, Washington, DC: The Urban Institute,  February 2000.

Ku L, Ellwood MR, Hoag S, Ormond B, Wooldridge J. The Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects.  Final report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., May 2000. [PR]

Coughlin T, Ku L, Kim, J., Reforming the Medicaid Disproportionate Share Program in the 1990s, Assessing the New Federalism, The Urban Institute, Discussion Paper 99-14, (joint release with Commonwealth Fund), 1999. [PR]

Ku L, Bruen B. The Continuing Decline in Medicaid Coverage, Assessing the New Federalism Brief A-37, The Urban Institute, December 1999.

Ku L, Ullman F, Almeida R, What Counts? Determining Medicaid and CHIP Eligibility for Children, Assessing the New Federalism Discussion Paper 99-05, Washington, DC: The Urban Institute, 1999.

Ku L, Hoag S. Medicaid Managed Care and the Marketplace: State Health Reforms in Hawaii, Oklahoma, Rhode Island and Tennessee, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, February 1998.

Ku L, Kessler B.  The Number and Cost of Immigrants on Medicaid: National and State Estimates, Report to the Office of the Assistant Secretary for Planning and Evaluation from the Urban Institute, December 1997. [PR]

Ku L, Berkowitz, A., Ullman F, Regenstein M. Health Policy for Low-Income People in Mississippi, Assessing the New Federalism, Washington, DC: The Urban Institute, December 1997. [PR]

Nichols L, Ku L, Norton S, Wall S. Health Policy for Low-Income People in Washington Assessing the New Federalism, Washington, DC: The Urban Institute, November 1997. [PR]

Ku L, Wall S. The Implementation of Oklahoma's Medicaid Reform Program: SoonerCare, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, October 1997. [PR]

Ku L, Coughlin T, The Use of Sliding Scale Premiums in Subsidized Insurance Programs, Urban Institute Working Paper, March 1997. [PR]

Ku L, Coughlin T, How the New Welfare Reform Law Affects Medicaid, Assessing New Federalism Policy Brief No. A-7, the Urban Institute, February 1997. [PR]

Wooldridge J., Ku L, Coughlin T, Dubay L, Ellwood MR, Rajan S, Hoag S., Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, Mathematica Policy Research, January 1997. [PR]

Wooldridge J, Ku L, Coughlin T, Dubay L, Ellwood MR, Rajan S, Hoag S.  Implementing State Health Care Reform: What Have We Learned from the First Year?  The First Annual Report of the Evaluation of Health Reform in Five States.  Report to the Health Care Financing Administration, from  Mathematica Policy Research Inc. and the Urban Institute, December 1996.  [PR]

Ku L, Wade M, Dodds S. How Cost-Reimbursement Affected Patients, Health Centers and Medicaid: The Federally Qualified Health Center Program, Report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., August 1996.

Long S, Ciemnecki A, Coughlin T, Kenney G, Ku L, Mitchell J, Rajan S, Rosenbach M, Thornton C, Wade M, Zuckerman S. Designing an Evaluation of the Medicaid Health Reform Demonstrations, Report to the Health Care Financing Administration, from the Urban Institute, Center for Health Economics Research and Mathematica Policy Research, Inc., Feb. 1996.

Holahan J, Coughlin T, Liu K, Ku L, Kuntz C, Wade M, Wall S.  Cutting Medicaid Spending in Response to Budget Caps, Report to the Kaiser Commission on the Future of Medicaid, Sept. 1995. [PR]

Wade M, Ku L, Dodds S. (1995).  The Impact of the Medicaid FQHC Program on Center Users, FQHCs and the Medicaid Program, Urban Institute Working Paper 06428-03, May 1995.

Ku L, Coughlin T.  Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the States and the Federal Government, Report to the Kaiser Commission on the Future of Medicaid from the Urban Institute, December 1994.

Holahan J, Coughlin T, Ku L, Lipson D, Rajan S. Increasing Insurance Coverage through Medicaid Waiver Programs, Urban Institute Working Paper 06433-005-01, November 1994.

Rajan S, Coughlin T, Ku L, Holahan J, Lipson, D. Increasing Insurance Coverage through Medicaid Waiver Programs: Case Studies, Urban Institute Working Paper 06433-005-02, November 1994.

Ku L, Publicly Supported Family Planning in the United States: Financing of Family Planning Services. Report to the Kaiser Family Foundation, The Urban Institute, June 1993.

Holahan J, Coughlin T, Ku L, Heslam D, Winterbottom C,  The States' Response to Medicaid Financing Crisis: Case Studies Report, Health Policy Center Report 6272-02, The Urban Institute, December 1992 (revised).

Sonenstein F, Ku L, Juffras J, Cohen B. Promising Prevention Programs for Children,  Report to the United Way of America, The Urban Institute, March 1991.

Ellwood MR, Ku L. Summary and Policy Recommendations: Studies on Health Care Services to Severely Disabled Children, Report Submitted to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/ McGraw-Hill, August 1990.

Ku L, Who's Paying the Big Bills?: Very High Cost Pediatric Hospitalizations in California in 1987, Report to Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, August 1990.

Sonenstein F, Ku L, Adams EK, Orloff T.  Potential Research Strategies to Evaluate the Effect of Transitional Medicaid and Child Care Benefits, Report to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, May 1990.

### *HIV/AIDS and Reproductive Health*

Lindberg L, Ku L, Sonenstein F.  Minor Mothers and Adult Fathers: Age Differences Between Teen Mothers and Their Partners,  Urban Institute Working Paper, 1996.

Sonenstein FL., Pleck JH, Ku L. Why Young Men Don't Use Condoms: Factors Related to Consistency of Utilization, Sexuality and American Policy Seminar Series, Kaiser Family Foundation and American Enterprise Institute for Public Policy Research, Washington, D.C., May 1995.

Ku L and the NSAM Study Team, Preliminary Results of the Pretest for the National Survey of Adolescent Males, Report to the Centers for Disease Control and Prevention and the National Institute for Child Health and Human Development, November 1994.

Ku L, Levine G, Sonenstein F, State STD Reporting Rules and Research Surveys, Report to the Centers for Disease Control and Prevention, September 1994.

Sonenstein F, Pleck J, Ku L, The Male Side of the Equation, TEC Networks, 33:3-4, June 1992.

Sonenstein F, Pleck J, Ku L,  Influences on Adolescent Male Premarital Sexual Behavior, Final Report to the Office of Population Affairs, DHHS from Urban Institute, May 1992.

Sonenstein F, Pleck J, Ku L, Sex and Contraception Among Adolescent Males,  TEC Networks, 29:1-3, June 1991.

Sonenstein F, Pleck J, Calhoun C, Ku L, 1988 National Survey of Adolescent Males: A User's Guide to the Machine Readable Files and Documentation, Data Set G6, Data Archives on Adolescent Pregnancy and Pregnancy Prevention, Los Altos, CA: Sociometrics Corp, 1991.

Sonenstein F, Pleck J, Calhoun C, Ku L, Determinants of Contraceptive Use by Adolescent Males, Final Report to the National Institute for Child Health and Human Development, Urban Institute, February 1991.

### *Food and Nutrition Policy*

Ku L, Debating WIC, The Public Interest, 135: 108-12, Spring 1999. [PR]

Ku L, Cohen B, Pindus N. Full Funding for WIC: A Policy Review, Washington, DC: Urban Institute Press, 1994.

Ku L, Long S, Brayfield A. and others, Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs.  Final Report to the Food and Nutrition Service, USDA from the Urban Institute, September 1993.

Ku L, Institutional Participation in the National School Lunch and Breakfast Programs, Final Report to the Food and Nutrition Service, USDA from the Urban Institute, March 1993.

Ku L, Reported Meal Production Costs and Reimbursement Rates in the National School Lunch Program, Draft Report to the Food and Nutrition Service, USDA from the Urban Institute, April 1992.

Ku L, Brayfield A, and others, Evaluation of Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs: Conceptual Assessment.  Report to Food and Nutrition Service, USDA from the Urban Institute, February 1992.

Ku L, McKearn M. Effects of the Temporary Emergency Food Assistance Program (TEFAP) on Displacement of Commercial Sales, (with the Economic Research Service and Mathematica Policy Research), Report to Congress, U.S. Dept. of Agriculture, August 1987.*  [PR]

Ku L, Dalrymple R., Differences Between SIPP and Food and Nutrition Service Program Data on Child Nutrition and WIC Program Participation, Survey of Income and Program Participation (SIPP) Working Papers, No. 8707, Bureau of the Census, May 1987.

Ku L, Nutritional Research Relating to Infant Feeding in the WIC Program, Report to the Assistant Secretary for Food and Consumer Services, June 1986.*

Richman L, Hidelbaugh T, McMahon-Cox N, Ku L, Dayton CM, Goodrich N.  Study of WIC Participant and Program Characteristics, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture (with Ebon Research Systems and Abt Associates Inc.), April 1986. [PR]

Ku L, Abbot J, Forchheimer M. The Feasibility, Costs and Impacts of a Universal School Lunch Program, Draft Report to Congress, U.S. Dept. of Agriculture, June 1985.

Puma M, Ku L, Economic Analysis of the Temporary Emergency Food Assistance Program, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, May 1985.* [PR]

Ku L, Nichols A. Report on the Food Bank Demonstration Project, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, April 1984.* [PR]

*        These reports were issued as official Agency or Department reports with no listed authors.  In addition, Leighton Ku wrote numerous proposed and final regulations and legislative and budget reports while on the staff of the Food and Nutrition Service.  In many cases, these were published in the Federal Register, Congressional Record and related Federal series.

## Presentations and Testimony

Seiler N, Ku L.  Medicaid's Role in Addressing the Opioid Crisis.  GW seminar, Nov. 16, 2017.

Ku L. Medicaid: Addressing Tobacco & Opioid Addictions.  Presentation at Addressing Addiction: Policy Prescriptions to Preventing Opiate Abuse and Tobacco Use.  Health Policy Institute of Ohio, Columbus, OH, Sept. 26, 2017.

Ku L.  Economic and Employment Effects of the Better Care Reconciliation Act.  Testimony to the Maryland Legislative Health Insurance Coverage Protection Commission, Maryland House of Delegates, Annapolis, MD.  Aug. 1, 2017.  Similar presentation at REMI webinar, Aug. 2, 2017.

Ku L.  Economic and Employment Effects of the American Health Care Act.  Presentation at AcademyHealth Annual Research Conference, New Orleans, June 25, 2017.  Similar presentations at Policy in the Trump Era: National, State, and Regional Economic Impacts Conference, Hall of States, Washington, D.C. June 19, 2017 and at Medicaid Policy Conference, Council of State Governments, Washington, DC, June 29, 2017.

Ku L.  Repealing Obamacare: Effects on the Health Workforce.  Presentation at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Brantley E, Ku L.  Promoting Tobacco Cessation: The Role of Medicaid and Other Policies.  Poster at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Ku L.  The Future of Medicaid.  Conference on Obamacare After Obama.  Southern Illinois Healthcare/Southern Illinois University School of Law.  Springfield, IL, May 19, 2017.

Brantley E, Ku L.  Linking Data to Uncover Medicaid's Role in Cessation.  National Conference on Tobacco or Health, Austin TX, March 23, 2107.

Ku L.  The Future of Medicaid and the Safety Net.  Health Policy Expert Series.  Milken Insitute School of Public Health.  March 21, 2017.

Ku L.  Financial Consequences of ACA Repeal. Podcast, Feb. 15, 2017 http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Ku L.  Repealing Health Reform: Economic and Employment Consequences for States.  REMI Seminar, Washington, DC.  Jan. 27, 2016.  Similar national webinar Feb. 1, 2017.

Ku L.  Pay for Success Demonstrations of Supportive Housing for Chronically Homeless Individuals: The Role of Medicaid.  Association for Public Policy and Management Research Conference, Washington, DC.  Nov. 4, 2016.

Ku L.  Immigrants and Community Health Centers.  Pennsylvania Association of Community Health Centers, Lancaster PA.  Oct. 12, 2016.

Ku L. Moving Medicaid Data Forward (discussant).  Mathematica Policy Research, Washington, DC Oct. 11, 2016.

Ku L.  Medicaid Can Do More to Help Smokers Quit, Michael Davis Lecture, University of Chicago, Oct. 4, 2016.  Similar seminar at Univ. of Maryland, Sept. 15, 2016.

Ku L, Borkowski L.  Publish or Perish: Advice for Publishing for Peer-Reviewed Journals in Health Policy. GW Department of Health Policy & Management seminar, Sept. 20, 2016.

Ku L . Family Planning, Health Reform and Potential Restrictions on Coverage or Access,  presented at Contraception Challenged: Putting *Zubik v. Burwell* in Context, sponsored by National Family Planning and Reproductive Health Association meeting at Capitol Visitors Center, Washington, DC, June 7, 2016.

Ku L Russell T. et al.  Debate on the Role of Public Programs in Care for the Poor.  Benjamin Rush Institute, Washington, DC, April 1, 2016.

Brantley E, Ku L. Improved Access and Coverage Under The ACA: Are Immigrants at the Table?, presented at GW Research Day, March 30, 2016.  (Won prize for best policy and practice research.)

Ku L. The Role of the Health Care Safety Net, Virginia Commonwealth University, Richmond, March 17, 2016.

Ku L, Steinmetz E, Bysshe T.  Medicaid Continuity of Coverage in an Era of Transition.  Webinar for Association of Community-Affiliated Plans, Nov. 2, 2015.

Ku L Bruen B, Steinmetz E, Bysshe T.  Trends in Tobacco Cessation Among Medicaid Enrollees, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 15, 2015.

Ku L. Using Economic Impact Analysis in Medicaid Advocacy, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 13, 2015.

Ku L. The Translation of Health Services Research into Policy Related to the Affordable Care Act, Presented at American Association of Medical Colleges, March 20, 2015.

Ku L.  Policy and Market Pressures on Safety Net Providers, National Health Policy Conference, Feb. 10, 2015.

Ku L. 'Economic and Employment Costs of Not Expanding Medicaid in North Carolina, Cone Health Foundation, Greensboro, NC, Jan. 9, 2015.

Ku L . Health Reform: How Did We Get Here, What the Heck Is Going On and What Next? Keynote Address: Medical Librarians Association, Alexandria VA, Oct. 20, 2014.

Ku L. Health Reform and the Safety Net.  Testimony before Maryland Community Health Resources Commission.  Annapolis, MD, Oct. 2, 2014.

Ku L. Some Key Issues in Health Reform. Presented at American Association for the Advancment of Science Health Policy Affinity Group Meeting, Washington, DC July 24, 2014.

Ku L, Curtis D. Barlow P.  District of Columbia's Health Benefits Exchange at the Launch of a State-Based Exchange: Challenges and Lessons Learned Georgetown Law School Summer Session on Health Reform,  July 23, 2014.

Ku L.  The Big Picture on Medicaid for State Legislators  Presented at Council of State Governments. Medicaid Workshop for Health Leaders, Washington, DC June 20, 2014.

Ku L, Frogner B, Steinmetz E, Pittman P.  Many Paths to Primary Care: Flexible Staffing and Productivity in Community Health Centers, Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 10, 2014.

Ku L, Zur J., Jones E, Shin, P, Rosenbaum S.  How Medicaid Expansions and Post-ACA Funding Will Affect Community Health Centers' Capacity.  Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 9, 2014.

Ku L. Critical Issues for Community Health Centers, Alliance for Health Reform briefing, Commonwealth Fund, Washington, DC.  May 16, 2014.

Ku L.  Immigrants' Health Access: At the Nexus of Welfare, Health and Immigration Reform, Keynote talk at Leadership Conference on Health Disparities, Harvard Medical School, Boston, MA May 6, 2014.

Ku L.  Wellness and the District of Columbia. District of Columbia Chamber of Commerce forum, Washington, DC, March 11, 2014.

Ku L.  Health Care for Immigrant Families: A National Overview. Congressional Health Justice Summit, Univ. of New Mexico - Robert Wood Johnson Center for Health Policy, Albuquerque, NM, Sept. 7, 2013.

Ku L.  Health Reform: Promoting Cancer Prevention and Care.  Talk to DC Citywide Navigators Network, Washington, DC, July 15, 2013.

Ku L. Analyzing Policies to Promote Prevention and Health Reform.  Seminar at the Centers for Disease Prevention and Promotion, Atlanta, GA.  July 10, 2013.

Ku L. Medicaid: Key Issues for State Legislators.  Council on State Governments, Medicaid Workshop for Health Leaders, Washington, DC, June 22, 2013.

Ku. L.Steinmetz E.  Improving Medicaid's Continuity of Care: An Update.  Association of Community Plans Congressional Briefing, May 10, 2013.

Ku L (with Brown C, Motamedi R, Stottlemeyer C, Bruen B) Economic and Employment Impacts of Medicaid Expansions.  REMI Monthly Policy Seminar, Washington, DC, April 24, 2013.

Ku L. Building Texas' Primary Care Workforce, Legislative Briefing: Health Care Coverage Expansion & Primary Care Access in Texas, Center on Public Priorties and Methodist Healthcare Ministries, Texas Capitol, Austin, TX, Mar. 8, 2013

Ku L, Jewers M.  Health Care for Immigrants: Policies and Issues in a New Year. Presentation to Conference on  After the Election: Policies Affecting Young Children of Immigrants, Migration Policy Institute, Washington, DC, Jan. 17, 2013.

Ku L. Health Reform and the New Health Insurance Exchanges: Issues for Indiana Families, Indiana Family Impact Seminar at Indiana State Legislature, Nov. 19, 2012.

Ku L.  Pediatric Preventive Medical and Dental Care: The Role of Insurance and Poverty, AcademyHealth Annual Research Meeting, Orlando, FL, June 24, 2012.

Ku L. A Medicaid Tobacco Cessation Benefit: Return on Investment, Webinar for Partnership for Prevention and Action to Quit, Feb. 8, 2012.

Ku L. Safety Net Financing Issues, Webinar for National Workgroup on Integrating a Safety Net, National Academy for State Health Policy, Feb. 6, 2012

Ku L.  How Medicaid Helps Children: An Introduction.  Briefing to Congressional Children's Health Caucus, Jan. 25, 2012

Ku L. Market Access Webinar: Provider Access: Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Webinar for Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Dec. 15, 2011.

Ku L. The Safety Net: An Evolving Landscape, Presented to Grantmakers in Health, Washington, DC. Nov. 3, 2011.  [Similar talks in Orlando, FL to Blue Cross Blue Shield of Florida Foundation, Feb. 17, 2012 and in Williamsburg, VA to Williamsburg Community Health Foundation Apr. 3, 2012 and to Virginia Health Foundation, Nov. 13, 2012]

Ku L. Open Access Publishing.  Presented at forum for GW Medical Center faculty and staff, Oct. 24, 2011.

Ku L, Levy A.  Implications of Health Reform for CDC's Cancer Screening Programs: Preliminary Results, Presentation to National Breast and Cervical Cancer Early Detection Program and Colorectal Cancer Control Program Directors Meeting, Atlanta, GA, Oct. 21, 2011.

Ku L. Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Presented to America's Health Insurance Plans, Washington, DC. Sept. 16, 2011.

Ku L. The Potential Impact of Health Reform on CDC's Cancer Screening Programs: Preliminary Results, Presented to NBCCEDP Federal Advisory Committee Meeting, Atlanta, GA, Jun. 17, 2011.  (Similar presentations to the American Cancer Society, Sept. 2011.)

Ku L. Crystal Balls and Safety Nets: What Happens After Health Reform?  Presented at AcademyHealth, Seattle, WA, June 2011.

Ku L. Strengthening Primary Care to Bend the Cost Curve: Using Research to Inform U.S. Policy, International Community Health Center Conference, Toronto, Canada, June 2011

Ku L. Integrating/Coordinating Care for Safety Net Providers: Issues and Local Examples, International Community Health Center Conference, Toronto, Canada, June 2011.

Ku L. Health Reform: Federal Implementation and More Unanswered Questions Presented at American Society of Public Administration, Baltimore, MD, Mar. 14, 2011.

Ku L.  Key Issues in the Confusing World of Health Reform, Presented to Industrial College of the Armed Forces, National Defense University, Washington, DC, Feb. 25, 2011.

Ku L. Reducing Disparities and Public Policy Conflicts, Institute of Medicine Workshop on Reducing Disparities in Life Expectancy, Washington, DC, Feb. 24, 2011.

Ku L. Primary Care, Hospitalizations and Health Reform, American Enterprise Institute Workshop, Washington, DC, Feb. 17, 2011.

Ku L. The Promise and Perils of Health Policy for Asians in the United States, Invited keynote talk at 4th International Asian Health and Wellbeing Conference, Univ. of Auckland, New Zealand, NZ, July 6, 2010.  Similar talk at symposium sponsored by the New Zealand Office of Ethnic Affairs, Wellington, NZ, July 8, 2010.

Ku L, Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Briefing for Senate and House staff and media, convened by Sen. Bernie Sanders (VT), Russell Senate Office Building, June 30, 2010.

Ku L. Ready, Set, Plan, Implement.  Executing Medicaid's Expansion, *Health Affairs* Conference on Health Reform, Washington, DC, June 8, 2010.

Ku L. Coordinating Care Among Safety Net Providers, Primary Care Forum, National Academy of State Health Policy, Alexandria, VA, June 2, 2010.

Ku L.Title VI: The Role of Culturally Competent Communication in Reducing Ethnic and Racial Health Care Disparities, National Minority AIDS Education and Training Center Spring Symposium, Howard Univ.  May 29, 2010.

Ku L. American Health Reform as Massive Incrementalism, American Association for Budget and Program Analysis, Nov. 24, 2009.

Ku L. The Health Care Safety Net and Health Reform, National Academy of Public Administration, Conference on Health Care for the Future, Nov. 22, 2009.

Ku L. The Health of Latino Children, National Council of La Raza Symposium on Latino Children and Youth, Oct. 22, 2009.

Ku L. What the Obama Administration Will Mean for Child Health, AcademyHealth preconference session on Child Health, Chicago, IL June 2009.

Ku L. Immigrants and health reform,  6th Annual Immigration and Law Conference, Georgetown Univ. Law School, Migration Policy Institute and Catholic Legal Immigration Network, Washington, DC, June 24, 2009.

Ku L. From the Politics of No! to the Potential for Progress, invited keynote talk about immigrant policy and research to Society for Research in Child Development, Denver, CO, April 1, 2009.

Ku L. Strengthening the Primary Care Safety Net, National Association of Community Health Centers, Policy and Issues Conference, March 26, 2009.

Ku L. The Dial and the Dashboard: Assessing the Child Well-Being Index, Presentation to the Board of the Foundation for Child Development, March 3, 2009.

Ku L. Key Data Concerning Health Coverage for Legal Immigrant Children and Pregnant Women, invited presentation to Senate staff, Jan. 13, 2009.

Ku L. Comparing the Obama and McCain Health Plans, George Washington Univ. Medical School Alumni Conference, Sept. 27, 2008.

Ku L. The Future of Medicaid, Medicaid Congress, sponsored by Avalere Health and Health Affairs, Washington, DC, June 5, 2008.

Ku L. A Brief Appreciation of Health Advocates: Progress Made, Some Setbacks, Challenges Ahead, Public Interest Law Center of Philadelphia Conference, Philadelphia, PA, May 14, 2008.

Ku L. Financing Health Care Reform in New Jersey: Making Down Payments on Reform, Rutgers-AARP Conference, New Brunswick, NJ. Mar. 18, 2008

Ku L, Perez T, Lillie-Blanton M.  Immigration and Health Care-What Are the Issues, Kaiser Family Foundation HealthCast, webcast interview March 12, 2008.

Ku L. How Research Might Affect SCHIP Reauthorization, Child Health Services Research Meeting at AcademyHealth, Orlando, FL, June 2, 2007.

Ku L. Immigrant Children and SCHIP Reauthorization, Capital Hill Briefing conducted by the Population Resource Center, April 20, 2007.

Ku L. Health Policy and Think Tanks, Robert Wood Johnson Health Policy Fellows, Institute of Medicine, June 2006.  Similar talk in other years.

Ku L. Medicaid Reform and Mental Health, National Alliance for the Mentally Ill, Annual Conference, Austin, TX, June 20, 2005.

Ku L. Cost-sharing in Medicaid and SCHIP: Research and Issues, National Association of State Medicaid Directors, Washington, DC, Nov. 18, 2004.  Similar talk given to National Academy of State Health Policy, St. Louis, MO, Aug. 2, 2004.

Ku L. Coverage of Poverty-Level Aged and Disabled in Mississippi's Medicaid Program, Testimony to Mississippi Senate Public Health and Welfare Committee, Aug. 24, 2004

Ku L. Medicaid Managed Care Issues, Testimony to Georgia House of Representatives Appropriations Committee, March 2, 2004.

Ku L. Medi-Cal Budget Issues, Testimony to Joint Hearing of California Senate Budget and Health and Human Services Committees, Feb. 26, 2003.

Ku L .New Opportunities to Improve Health Care Access and Coverage, American College of Emergency Physicians, May 1, 2001.

Ku L,. Medicaid DSH and UPL: Perplexing Issues, National Association of Public Hospitals Health Policy Fellows Conference, Washington, DC, Mar. 20, 2001.

Ku L, Insurance Coverage and Health Care Access for Immigrant Families, Testimony Before the U.S. Senate Finance Committee, Washington, DC, March 13, 2001.

Ku L. Increasing Health Insurance Coverage for Low-Income Families and Children, Insuring the Uninsured Project Conference, Sacramento, CA, Feb. 13, 2001.

Ku L, Concerning the Healthy Families Program Parent Expansion Proposal, Testimony
Before a Joint Hearing of the California Senate Health and Human Services and Insurance Committees and Budget and Fiscal Review Subcommittee # 3, Sacramento, CA, January 30, 2001.

Ku L, Insurance Trends and Strategies for Covering the Uninsured, National Health Law Program Conference, Washington, DC, Dec. 3, 2000.

Ku L, Improving Health Care Access and Coverage: New Opportunities for States in 2001, Midwest Leadership Conference, Council of State Governments, Minneapolis, MN, August 6, 2000.

Ku L, Health Care for Immigrants: Recent Trends and Policy Issues,  Alliance for Health Reform, Washington, DC, August 2, 2000.  Similar talks in Miami at Florida Governor's Health Care Summit and in San Diego at California Program on Access to Care conference.

Ku L, Matani S, Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, presented at Association for Health Services Research Conference, Los Angeles, CA, June 25, 2000.

Ku L, Matani S. Immigrants and Health Care: Recent Trends and Issues, presented to the Association of Maternal and Child Health Programs meeting, Washington, DC, March 7, 2000.

Ku L, Ellwood MR., Hoag S, Ormond B, Wooldridge J. Building a Newer Mousetrap: the Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects, presented at American Public Health Association meeting, Chicago, IL, Nov. 10, 1999.

Ku L. Young Men's Reproductive Health: Risk Behaviors and Medical Care@, presented at D.C. Campaign to Prevent Teen Pregnancy Meeting, Washington, DC, Oct. 19, 1999.

Ku L, Medicaid and Welfare Reform: Recent Data, presented at Getting Kids Covered Conference, sponsored by National Institute for Health Care Management and Health Resources and Services Administration, Washington, DC, Oct. 6, 1999.

Ku L, Garrett B. How Welfare Reform and Economic Factors Affected Medicaid Participation, presented at Association for Health Services Research meeting, Chicago, IL, June 29, 1999.

Ku L. Recent Factors Affecting Young Men's Condom Use, presented to conference sponsored by National Campaign to Prevent Teen Pregnancy and Advocates for Youth, Washington, DC, February 1999.

Medicaid, Welfare Reform and CHIP: The Growing Gulf of Eligibility Between Children and Adults, presented to National Association of Public Hospitals and Health Systems, Washington, DC, and to Generations United, Washington, DC, September 1998.

Ku L. Sliding Scale Premiums and Cost-Sharing: What the Research Shows presented at workshop on CHIP: Implementing Effective Programs and Understanding Their Impacts, Agency for Health Care Policy and Research User Liaison Program, Sanibel Island, FL, June 30, 1998.

Ku L. Sonenstein F, Boggess S, Pleck J. Understanding Changes in Teenage Men's Sexual Activity: 1979 to 1995, presented at 1998 Population Association of America Meetings, Chicago, IL, April 4, 1998.

Ku L. Welfare Reform, Immigrants and Medicaid presented at Annual Meeting of the Association of Maternal and Child Health Programs, Washington, DC, March 9, 1998.  Similar talk presented at Association for Health Services Research Meeting, Washington, DC, June 23, 1998.

Ku L. Medicaid Policy and Data Issues: An Overview presented to National Committee on Vital and Health Statistics, DHHS, September 29, 1997.

Ku L. How Welfare Reform Will Affect Medicaid Coverage presented to National Ryan White Title IV Program Conference, Washington, DC, November 8, 1996.

Ku L, Rajan S, Wooldridge J, Ellwood MR, Coughlin T, Dubay L. Using Section 1115 Demonstration Projects to Expand Medicaid Managed Care in Tennessee, Hawaii and Rhode Island, presented at Association of Public Policy and Management, Pittsburgh, Nov. 1, 1996.

Ku L. The Federal-State Partnership in Medicaid: Is Divorce Inevitable or Would Therapy Be Enough? presented to Council of State Governments Conference on Managing the New Fiscal Federalism, Lexington, KY, May 10, 1996.

Ku L. The Male Role in the Prevention of Teen Pregnancy, presented to the Human Services Committee, National Council of State Legislatures, Washington, DC, May 9, 1996

Ku L. Implications of Converting Medicaid to a Block Grant with Budget Caps, presented to American Medical Association State Legislation Meeting, Aventura, FL, Jan. 1996 and to the American Psychiatric Association Public Policy Institute, Ft. Lauderdale, FL, March 1996.

Ku L. Medicaid: Program Under Reconstruction, presented at Speaker's Forum at New York City Council, September 12, 1995.

Ku L. State Health Reform Through Medicaid Section 1115 Waivers, presented at Pew Health Policy Conference, Chicago, IL, June 3, 1995.

Ku L. Setting Premiums for Participants in Subsidized Insurance Programs, presented at Conference on the Federal-State Partnership for State Health Reform, sponsored by HCFA, the National Academy of State Health Policy and RTI, March 15, 1995.

Ku L. Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the Federal Government and the States, with Teresa Coughlin, presented to the Kaiser Commission on the Future of Medicaid, November 13, 1994.

Ku L. Full Funding for WIC: A Policy Review, with Barbara Cohen and Nancy Pindus, presented at Dirksen Senate Office Building, Washington, DC, in a panel hosted by the Center on Budget and Policy Priorities, Bread for the World, the Food Research and Action Center and the National Association of WIC Directors, May 5, 1994.

Ku L. The Financing of Family Planning Services in the U.S., presented at the Institute of Medicine, National Academy of Sciences on February 15, 1994 and at the American Public Health Association meeting, San Francisco, CA, October 25, 1993.

Ku L. Using SUDAAN to Adjust for Complex Survey Design in the National Survey of Adolescent Males, with John Marcotte and Karol Krotki, briefing at National Institute of Child Health and Human Development, Rockville, MD, April 2, 1992.

Ku L. The Association of HIV/AIDS Education with Sexual Behavior and Condom Use Among Teenage Men in the United States with Freya Sonenstein and Joseph Pleck, presented at the Seventh International Conference on AIDS, Florence, Italy, June 1991.

Ku L. Patterns of HIV-Related Risk and Preventive Behaviors Among Teenage Men in the United States, with Freya Sonenstein and Joseph Pleck, paper presented at the Sixth International Conference on AIDS, San Francisco, CA, June 23, 1990.

Ku L. Trends in Teenage Childbearing, Pregnancy and Sexual Behavior, paper presented at the American Sociological Association Meeting, Washington, D.C., August 15, 1990.

Ku L.  Research Designs to Assess the Effect of WIC Participation by Pregnant Women on Reducing Neonatal Medicaid Costs, briefing to Congressional staff, February 1987.

Ku L.  Testimony about the Special Supplemental Food Program for Women, Infants and Children (WIC), with Frank Sasinowski, presented to House Education and Labor Committee on behalf of the American Public Health Association, March 1983.

## Media

Leighton Ku has extensive experience with electronic and print media.  He has been interviewed by ABC, NBC, CBS, Fox, PBS, National Public Radio, CNN, Bloomberg TV, BBC and other television or radio news broadcasts and webcasts.  He has been quoted or his research has been cited in the *New York Times, Los Angeles Times, Washington Post, Wall Street Journal, USA Today, Christian Science Monitor, Forbes, Fortune, US News and World Report, Politico, The Hill, Buzzfeed,* and trade publications, such as *Modern Health Care, Nation's Health* or *CQ HealthBeat, Kaiser Health News*, etc.  He has been an online contributor to the *Washington Post.*  He was a regular panelist on a radio talk show about health policy, broadcast on WMAL in the Washington DC region.  He has been cited as an expert by *PolitiFact* and related fact-checking sources.

## Service and Honors

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-now) (The board  governs the new health insurance exchange for the District of Columbia, based on the Patient Protection and Affordable Care Act.  This is a voluntary, unpaid position, appointed by the Mayor and approved by the City Council.  I was reappointed in 2018.) Chair of the Research Committee and Information Technology Committee.  Led working groups that developed the financial sustainability plan for the Exchange, dental plans, standardized benefit plans and changes required in light of threats to the Affordable Care Act.

Commonwealth Fund, two of the top ten most frequently downloaded reports (2017).

Commonwealth Fund, one of top ten most frequently downloaded reports (2006).

Award for promoting racial and economic justice, Mississippi Center for Justice, 2005

Service award from the National WIC Directors Association (2002).

*Choice* (the magazine of the American Library Association for academic publications), top ten academic books of the year (1994)

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Other Service

Helped develop *amicus* briefs on behalf of public health scholars in key federal lawsuits, including *King v Burwell* (health insurance exchanges) and *Stewart v Azar* (approval of Kentucky work requirement waiver), with Sara Rosenbaum and others.

Faculty Advisor, GW Health Policy Student Association, 2016-now

Member, AcademyHealth/NCHS Health Policy Fellowship Program board.  2016-17.

Affiliated faculty, Jacobs Institute of Women's Health, 2015-now.

Advisory Board, Remaining Uninsured Access to Community Health Centers (REACH) Project, Univ. of California Los Angeles, 2015-present

Member, DC Metro Tobacco Research and Instruction Consortium (MeTRIC). 2014- present

Member, Health Workforce Research Institute, GW, 2013-present.

Member, National Advisory Board, Public Policy Center of University of Iowa, 2014-present

Chair/Vice Chair, Advocacy Interest Group, AcademyHealth, 2014-present.

Member, Advisory Committee on Non-Health Effects of the Affordable Care Act, Russell Sage Foundation, Dec. 2013.

Member, Technical Expert Group on the Affordable Care Act and the National Survey of Family Growth, National Center for Health Statistics, Centers for Disease Control and Prevention, Nov. 2013

Member, Steering Committee, GW Institute of Public Policy, 2013-now

Member, External Review Committee for Department of Family Science for the University of Maryland School of Public Health, 2012.

GW Faculty Senator, representing School of Public Health and Health Services, 2010-12.

Member of numerous University, School and Departmental committees.  2008-present.

Member or chair, numerous faculty and dean search committees, Milken Institute School of Public Health and School of Nursing, George Washington University. 2008-present.

National Institutes of Health, member of various grant review study sections (1996-now).

Invited reviewer.  Committee on National Statistics.  National Academy of Sciences.  Databases for Estimating Health Insurance Coverage for Children.  2010-11.

Grant reviewer.  Robert Wood Johnson Public Health and Law program.  2010.

Invited reviewer, Institute of Medicine report on family planning services in the U.S., 2009.

External reviewer for faculty promotion and tenure for Harvard Medical School, Univ. of California at Los Angeles and at San Diego, Boston University, Baruch College, George Mason University, University of Maryland, University of Iowa, Kansas University, Portland State University, etc., 2008-present.

Submitted expert witness affidavits/declarations in federal, state and local lawsuits including: *New York, et al. v. Trump* (Deferred Action for Childhood Arrivals), *Wood, et al. v. Betlach,* (Medicaid cost sharing), *Lozano v. City of Hazleton* (immigrant rights), *Spry, et al., v. Thompson* (Medicaid cost-sharing), *Dahl v. Goodno* (Medicaid cost-sharing), *Newton-Nations, et al., v. Rogers* (Medicaid cost-sharing) and *Alford v. County of San Diego* (cost-sharing for a local health program).

Board Member and Treasurer, Alliance for Fairness in Reforms to Medicaid (2002-2008)

34

Urban Institute, founding member, Institutional Review Board (1997-2000)

National Health Research Institute (Taiwan's NIH) grant reviewer (1999).

Urban Institute, member, Diversity Task Force (1995)

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Consultant Services

New York State Attorney General, 2017
First Hospital Foundation, Philadelphia PA, 2017
Wilmer Hale/Planned Parenthood Federation, 2017
Centers for Disease Control and Prevention 2016

## Professional Society Memberships and Service

AcademyHealth (formerly Association for Health Services Research), Program Selection Committees (multiple years), chair Advocacy Interest Group (2014-16).
American Public Health Association
Association of Public Policy and Management, Program Selection Committees (many years)

## Editorial Peer Review Service

Associate editor, *BMC Health Services Research,* 2009 – 2013.

Reviewer for numerous journals, including *Health Affairs, New England Journal of Medicine, Journal of the American Medical Association, Pediatrics, American Journal of Public Health, Inquiry, Medical Care, HSR, Medicare and Medicaid Research Review, American Journal of Preventive Medicine, Family Planning Perspectives, Journal of Association of Public Policy and Management,* etc. (1990 to now).  In 2017, I reviewed 16 manuscripts for journals.

## Public Health Practice Portfolio

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-now).   The board governs the new health insurance exchange for the District.  (Nominated by the Mayor and appointed by the City Council; reappointed in 2017).  Chair of the IT and Eligibility Committee, Research Committee and various working groups.

Expert Advisor, Russell Sage Foundation.  Non-health effects of the Affordable Care Act.  (2013).

Expert Advisor, Revisions to the National Survey of Family Growth, National Center for Health Statistics, CDC (2013)

Member, Technical Advisory Committee for Monitoring the Impact of the Market Reform and Coverage Expansions of the Affordable Care Act, sponsored by ASPE. (2013)

Member, Technical Advisory Group for the Design of the Evaluation of the Medicaid Expansion Under the ACA, sponsored by ASPE (2012)

Member, National Workgroup on Integrating the Safety Net, National Academy of State Health Policy,

July 2011 – 2013.

Member, National Advisory group for Iowa Safety Net Integration project, 2011-2013.

Foundation for Child Development, Selection Committee, Young Scholars Program, 2008-2015.

Foundation for Child Development, Advisory Committee, Child Well-Being Index, 2008-present

Member, National Advisory Board, Center on Social Disparities on Health, University of California at San Francisco, 2005-2008.

National Campaign to Prevent Teen Pregnancy, Member, Effective Programs and Research Task Force (2000)

## Doctoral Students Mentored/Advised

**Dissertations Completed**
Prof. Peter Shin (chair)
Prof. Megan McHugh
Dr. Sarah Benatar
Dr. Emily Jones (chair)
Dr. Saqi Cho (chair)
Dr. DaShawn Groves (chair)
Dr. Heitor Werneck
Dr. Brad Finnegan (chair)
Dr. Maliha Ali
Dr. Christal Ramos

**In Progress**
Evelyn Lucas-Perry (chair)
Brian Bruen
Nina Brown
Darla Bishop
Kyle Peplinski (chair)
Shin Nozaki
Kristal Vardaman (chair)
Ollie Ganz
Jessica Sharac (chair)
Serena Phillips
Mariellen Jewers (chair)
Erin Brantley
Xinxin Han (chair)
Leo Quigley (chair)
Drishti Pillai

## Other Student Advising

Faculty advisor, MPH, health policy.  Provide guidance to about a dozen MPH students per cohort.

# DEF-INTERV.

# EX. 108

**Table II.A.2(2010) Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2010**

| Division and State | Total | Less than 10 employees | 10-24 employees | 25-99 employees | 100-999 employees | 1000 or more employees | Less than 50 employees | 50 or more employees |
|---|---|---|---|---|---|---|---|---|
| United States | 53.8% | 31.8% | 60.9% | 80.6% | 94.9% | 99.5% | 39.2% | 96.4% |
| | | | | | | | | |
| New England: | | | | | | | | |
| Connecticut | 59.0% | 37.3% | 73.0% | 91.9% | 98.7% | 99.8% | 46.5% | 98.9% |
| Maine | 51.8% | 30.2% | 67.4% | 87.5% | 98.7% | 100.0% | 38.1% | 98.6% |
| Massachusetts | 65.7% | 44.8% | 79.8% | 96.0% | 97.9% | 100.0% | 54.0% | 99.4% |
| New Hampshire | 53.6% | 29.7% | 65.1% | 86.8% | 95.2% | 98.8% | 39.4% | 96.6% |
| Rhode Island | 60.0% | 42.2% | 68.7% | 94.6% | 97.5% | 100.0% | 49.8% | 99.1% |
| Vermont | 55.6% | 37.0% | 68.8% | 91.1% | 97.3% | 100.0% | 45.2% | 98.2% |
| | | | | | | | | |
| Middle Atlantic: | | | | | | | | |
| New Jersey | 62.1% | 46.7% | 68.4% | 90.6% | 97.3% | 98.8% | 52.7% | 97.6% |
| New York | 59.8% | 43.3% | 79.9% | 87.4% | 96.1% | 99.9% | 50.6% | 97.3% |
| Pennsylvania | 57.9% | 36.0% | 71.6% | 84.9% | 94.8% | 99.0% | 44.7% | 97.1% |
| | | | | | | | | |
| East North Central: | | | | | | | | |
| Illinois | 50.6% | 26.9% | 54.8% | 85.8% | 91.6% | 98.5% | 34.8% | 95.7% |
| Indiana | 49.9% | 22.3% | 52.8% | 73.9% | 96.0% | 100.0% | 31.2% | 96.6% |
| Michigan | 52.3% | 31.0% | 62.0% | 78.5% | 93.8% | 99.0% | 38.8% | 93.9% |
| Ohio | 61.4% | 37.8% | 69.3% | 83.0% | 95.9% | 97.6% | 46.4% | 96.1% |
| Wisconsin | 49.2% | 24.3% | 56.6% | 78.6% | 95.7% | 99.3% | 34.5% | 95.7% |
| | | | | | | | | |
| West North Central: | | | | | | | | |
| Iowa | 51.3% | 29.2% | 58.9% | 81.3% | 94.8% | 100.0% | 36.5% | 97.1% |
| Kansas | 53.4% | 33.4% | 53.1% | 78.6% | 97.5% | 100.0% | 39.0% | 96.5% |
| Minnesota | 47.6% | 26.6% | 56.2% | 78.9% | 91.2% | 98.0% | 34.3% | 92.0% |
| Missouri | 54.1% | 29.0% | 73.0% | 80.0% | 90.7% | 98.3% | 38.8% | 94.9% |
| Nebraska | 46.2% | 23.0% | 57.6% | 80.2% | 93.7% | 99.7% | 31.5% | 94.9% |
| North Dakota | 52.0% | 32.2% | 60.3% | 89.6% | 93.6% | 100.0% | 40.5% | 95.8% |
| South Dakota | 47.7% | 28.6% | 56.8% | 73.8% | 98.5% | 100.0% | 35.7% | 96.9% |
| | | | | | | | | |
| South Atlantic: | | | | | | | | |
| Delaware | 56.7% | 30.5% | 72.6% | 89.0% | 91.4% | 96.1% | 41.0% | 94.2% |
| District of Columbia | 73.4% | 48.7% | 79.7% | 90.5% | 100.0% | 100.0% | 58.6% | 99.6% |
| Florida | 46.2% | 24.2% | 63.0% | 79.3% | 97.9% | 100.0% | 31.2% | 97.6% |
| Georgia | 48.2% | 21.3% | 56.0% | 74.1% | 95.0% | 100.0% | 29.1% | 97.3% |
| Maryland | 61.0% | 41.7% | 60.3% | 81.4% | 96.6% | 100.0% | 47.2% | 97.9% |
| North Carolina | 51.6% | 29.5% | 54.0% | 65.3% | 90.9% | 100.0% | 35.5% | 94.2% |
| South Carolina | 50.1% | 24.9% | 49.8% | 73.8% | 97.8% | 99.7% | 31.9% | 96.2% |
| Virginia | 56.7% | 31.4% | 66.4% | 82.8% | 93.0% | 99.9% | 40.0% | 97.2% |
| West Virginia | 52.2% | 24.6% | 49.9% | 80.4% | 92.3% | 100.0% | 32.4% | 96.4% |
| | | | | | | | | |
| East South Central: | | | | | | | | |

| Division and State | Total | Less than 10 employees | 10-24 employees | 25-99 employees | 100-999 employees | 1000 or more employees | Less than 50 employees | 50 or more employees |
|---|---|---|---|---|---|---|---|---|
| Alabama | 60.5% | 34.0% | 69.7% | 88.2% | 94.6% | 100.0% | 44.0% | 98.1% |
| Kentucky | 53.2% | 26.6% | 66.2% | 73.9% | 94.7% | 98.3% | 35.0% | 95.8% |
| Mississippi | 50.8% | 23.9% | 47.5% | 69.2% | 98.7% | 100.0% | 30.9% | 96.3% |
| Tennessee | 55.9% | 26.6% | 53.9% | 84.4% | 91.7% | 100.0% | 36.1% | 96.6% |
| West South Central: | | | | | | | | |
| Arkansas | 50.2% | 26.3% | 48.2% | 78.8% | 93.7% | 98.9% | 32.9% | 95.3% |
| Louisiana | 54.4% | 27.7% | 62.4% | 79.6% | 94.7% | 99.6% | 38.0% | 93.9% |
| Oklahoma | 49.0% | 25.9% | 47.6% | 75.1% | 95.6% | 98.8% | 32.2% | 95.8% |
| Texas | 51.0% | 25.6% | 44.1% | 72.6% | 90.6% | 100.0% | 31.4% | 95.3% |
| Mountain: | | | | | | | | |
| Arizona | 50.7% | 25.8% | 41.2% | 76.3% | 94.9% | 100.0% | 30.9% | 96.4% |
| Colorado | 52.5% | 34.9% | 49.6% | 81.2% | 100.0% | 100.0% | 39.1% | 97.4% |
| Idaho | 45.3% | 24.5% | 42.2% | 73.5% | 97.7% | 100.0% | 30.1% | 97.7% |
| Montana | 42.8% | 28.8% | 46.7% | 77.5% | 94.7% | 99.4% | 33.0% | 95.1% |
| Nevada | 55.5% | 31.1% | 57.1% | 79.6% | 95.5% | 96.6% | 39.0% | 94.9% |
| New Mexico | 46.8% | 21.6% | 43.0% | 77.9% | 93.6% | 99.2% | 28.2% | 96.1% |
| Utah | 47.2% | 24.5% | 53.4% | 77.1% | 98.0% | 98.8% | 31.4% | 96.9% |
| Wyoming | 42.4% | 21.0% | 47.5% | 85.7% | 100.0% | 100.0% | 28.6% | 97.3% |
| Pacific: | | | | | | | | |
| Alaska | 44.4% | 20.5% | 55.2% | 65.7% | 95.7% | 100.0% | 29.6% | 93.4% |
| California | 54.2% | 34.6% | 60.9% | 77.4% | 96.7% | 99.5% | 41.5% | 96.6% |
| Hawaii | 84.7% | 73.2% | 94.4% | 100.0% | 100.0% | 100.0% | 78.8% | 100.0% |
| Oregon | 52.1% | 34.2% | 56.5% | 81.7% | 89.2% | 100.0% | 39.7% | 94.7% |
| Washington | 55.2% | 32.5% | 72.5% | 87.6% | 97.3% | 100.0% | 42.1% | 98.3% |

Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2010 Medical Expenditure Panel Survey-Insurance Component.

Note: Definitions and descriptions of the methods used for this survey can be found in the Technical Appendix.

**Table II.A.2(2010) Standard error for percent of private-sector establishments that offer health insurance by firm size and State: United States, 2010**

| Division and State | Total | Less than 10 employees | 10-24 employees | 25-99 employees | 100-999 employees | 1000 or more employees | Less than 50 employees | 50 or more employees |
|---|---|---|---|---|---|---|---|---|
| United States | 0.18% | 0.42% | 1.00% | 0.67% | 0.44% | 0.13% | 0.28% | 0.24% |
| New England: | | | | | | | | |
| Connecticut | 1.94% | 2.90% | 4.13% | 2.91% | 0.71% | 0.32% | 2.38% | 0.62% |
| Maine | 1.89% | 2.95% | 5.13% | 3.75% | 1.38% | 0.00% | 2.19% | 0.70% |
| Massachusetts | 2.82% | 4.46% | 6.97% | 2.76% | 2.17% | 0.00% | 3.61% | 0.47% |
| New Hampshire | 2.36% | 3.01% | 6.57% | 4.36% | 2.58% | 0.80% | 2.84% | 1.09% |
| Rhode Island | 3.09% | 3.76% | 5.37% | 4.36% | 1.91% | 0.00% | 3.64% | 0.63% |
| Vermont | 1.66% | 2.47% | 3.80% | 2.93% | 2.34% | 0.00% | 2.10% | 1.20% |
| Middle Atlantic: | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| New Jersey | 2.39% | 3.09% | 6.57% | 4.36% | 3.14% | 0.87% | 3.06% | 0.94% |
| New York | 2.07% | 2.27% | 2.02% | 3.50% | 1.91% | 0.10% | 2.36% | 0.57% |
| Pennsylvania | 2.10% | 3.19% | 5.39% | 4.36% | 2.66% | 0.72% | 2.86% | 0.86% |
| **East North Central:** | | | | | | | | |
| Illinois | 1.82% | 3.44% | 5.39% | 4.36% | 3.74% | 1.56% | 2.35% | 1.20% |
| Indiana | 1.73% | 2.88% | 6.36% | 5.15% | 2.48% | 0.00% | 2.52% | 1.20% |
| Michigan | 1.96% | 3.26% | 3.52% | 4.28% | 4.25% | 0.94% | 2.56% | 1.28% |
| Ohio | 2.35% | 3.58% | 4.51% | 4.41% | 2.47% | 3.66% | 2.66% | 1.90% |
| Wisconsin | 2.13% | 3.18% | 3.25% | 5.32% | 2.66% | 0.59% | 2.79% | 1.27% |
| **West North Central:** | | | | | | | | |
| Iowa | 1.97% | 2.97% | 6.97% | 3.96% | 2.52% | 0.00% | 2.21% | 1.16% |
| Kansas | 2.75% | 3.64% | 6.81% | 5.16% | 1.70% | 0.00% | 3.46% | 1.17% |
| Minnesota | 2.22% | 2.62% | 7.76% | 4.44% | 2.77% | 1.61% | 2.58% | 2.14% |
| Missouri | 1.85% | 2.96% | 4.21% | 3.39% | 3.50% | 2.37% | 2.54% | 1.81% |
| Nebraska | 1.98% | 3.07% | 8.14% | 4.86% | 2.52% | 0.41% | 2.40% | 1.62% |
| North Dakota | 1.80% | 1.96% | 6.47% | 3.50% | 2.44% | 0.00% | 1.79% | 1.19% |
| South Dakota | 1.86% | 2.98% | 5.48% | 4.74% | 1.08% | 0.00% | 2.47% | 0.88% |
| **South Atlantic:** | | | | | | | | |
| Delaware | 3.04% | 3.25% | 4.87% | 4.24% | 3.76% | 2.32% | 2.90% | 1.67% |
| District of Columbia | 2.54% | 4.89% | 4.51% | 2.92% | 0.00% | 0.00% | 4.14% | 0.33% |
| Florida | 1.28% | 1.62% | 5.48% | 5.04% | 1.81% | 0.00% | 1.31% | 0.74% |
| Georgia | 2.04% | 2.86% | 5.31% | 6.42% | 2.83% | 0.00% | 2.34% | 1.31% |
| Maryland | 2.00% | 2.52% | 7.37% | 4.60% | 2.02% | 0.00% | 2.25% | 0.96% |
| North Carolina | 1.96% | 2.61% | 5.20% | 7.56% | 3.36% | 0.00% | 2.41% | 1.41% |
| South Carolina | 1.94% | 2.78% | 6.75% | 2.50% | 1.83% | 0.23% | 2.45% | 1.00% |
| Virginia | 1.89% | 3.28% | 5.65% | 6.83% | 4.38% | 0.17% | 2.75% | 1.15% |
| West Virginia | 0.75% | 1.40% | 7.60% | 4.49% | 3.50% | 0.00% | 1.17% | 1.69% |
| **East South Central:** | | | | | | | | |
| Alabama | 1.70% | 3.43% | 6.83% | 3.92% | 3.58% | 0.00% | 2.37% | 0.91% |
| Kentucky | 2.26% | 3.67% | 6.01% | 7.27% | 2.13% | 2.99% | 2.19% | 1.90% |
| Mississippi | 2.32% | 2.84% | 5.74% | 5.70% | 0.78% | 0.00% | 2.36% | 0.73% |
| Tennessee | 1.97% | 2.67% | 8.68% | 4.82% | 5.36% | 0.00% | 3.40% | 1.72% |
| **West South Central:** | | | | | | | | |
| Arkansas | 1.04% | 2.73% | 10.11% | 4.07% | 3.02% | 0.81% | 2.01% | 0.72% |
| Louisiana | 1.98% | 4.07% | 5.49% | 4.63% | 2.53% | 0.37% | 2.45% | 1.51% |
| Oklahoma | 2.27% | 3.43% | 6.17% | 6.66% | 2.02% | 1.17% | 2.67% | 1.39% |
| Texas | 0.96% | 1.64% | 2.51% | 2.56% | 2.46% | 0.00% | 1.07% | 1.00% |
| **Mountain:** | | | | | | | | |
| Arizona | 2.42% | 4.08% | 6.11% | 4.07% | 2.74% | 0.00% | 3.39% | 0.84% |
| Colorado | 2.53% | 2.72% | 6.07% | 7.08% | 0.00% | 0.00% | 2.90% | 1.13% |
| Idaho | 2.27% | 3.08% | 6.10% | 7.77% | 2.31% | 0.00% | 2.97% | 1.48% |
| Montana | 3.10% | 4.28% | 5.02% | 6.43% | 2.24% | 0.86% | 3.87% | 2.23% |

| Nevada | 2.94% | 3.59% | 9.41% | 7.98% | 3.08% | 1.49% | 3.21% | 1.18% |
| New Mexico | 1.88% | 2.61% | 9.96% | 4.84% | 2.51% | 0.97% | 2.76% | 1.02% |
| Utah | 2.80% | 2.45% | 6.89% | 5.03% | 1.83% | 1.37% | 2.92% | 0.81% |
| Wyoming | 1.99% | 2.31% | 5.75% | 3.96% | 0.00% | 0.00% | 2.05% | 1.38% |
| | | | | | | | | |
| Pacific: | | | | | | | | |
| Alaska | 1.47% | 2.02% | 5.29% | 8.38% | 2.17% | 0.00% | 1.63% | 1.98% |
| California | 1.24% | 1.89% | 4.06% | 2.53% | 1.30% | 0.25% | 1.51% | 0.77% |
| Hawaii | 1.85% | 2.79% | 2.31% | 0.00% | 0.00% | 0.00% | 2.36% | 0.00% |
| Oregon | 2.07% | 1.75% | 6.94% | 4.32% | 5.43% | 0.00% | 2.02% | 1.39% |
| Washington | 2.76% | 4.05% | 4.92% | 5.01% | 1.07% | 0.00% | 3.22% | 0.72% |

Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2010 Medical Expenditure Panel Survey-Insurance Component.

Note: Definitions and descriptions of the methods used for this survey can be found in the Technical Appendix.

# DEF-INTERV.

# EX. 109

Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States 2016

| Division and State | Total | Less than 10 employees | 10-24 employees | 25-99 employees | 100-999 employees | 1000 or more employees | Less than 50 employees | 50 or more employees |
|---|---|---|---|---|---|---|---|---|
| United States | 45.3% | 21.7% | 49.4% | 74.6% | 96.3% | 99.8% | 28.6% | 97.0% |
| New England: | | | | | | | | |
| Connecticut | 52.6% | 25.2% | 59.6% | 88.6% | 99.5% | 99.9% | 35.3% | 98.8% |
| Maine | 43.2% | 19.4% | 53.1% | 73.4% | 96.8% | 100.0% | 27.1% | 97.4% |
| Massachusetts | 56.9% | 36.7% | 55.6% | 86.6% | 100.0% | 99.9% | 41.8% | 99.9% |
| New Hampshire | 51.6% | 27.9% | 54.9% | 81.5% | 100.0% | 97.1% | 34.9% | 96.8% |
| Rhode Island | 52.8% | 34.4% | 64.5% | 82.3% | 98.3% | 99.4% | 41.6% | 98.1% |
| Vermont | 42.2% | 20.8% | 47.9% | 81.6% | 98.1% | 100.0% | 28.6% | 97.2% |
| Middle Atlantic: | | | | | | | | |
| New Jersey | 51.2% | 32.7% | 59.0% | 77.5% | 96.7% | 100.0% | 38.9% | 98.5% |
| New York | 44.3% | 25.5% | 55.4% | 82.9% | 94.2% | 100.0% | 32.4% | 97.3% |
| Pennsylvania | 48.5% | 22.9% | 57.5% | 74.7% | 94.2% | 100.0% | 32.2% | 95.3% |
| East North Central: | | | | | | | | |
| Illinois | 44.9% | 20.3% | 50.4% | 66.9% | 95.1% | 100.0% | 27.2% | 96.6% |
| Indiana | 41.3% | 13.5% | 32.7% | 67.6% | 98.0% | 100.0% | 20.3% | 94.3% |
| Michigan | 42.8% | 16.7% | 49.5% | 73.6% | 92.5% | 100.0% | 25.3% | 94.9% |
| Ohio | 54.8% | 30.4% | 61.6% | 74.2% | 96.9% | 99.4% | 38.2% | 96.4% |
| Wisconsin | 45.6% | 19.3% | 47.4% | 81.4% | 97.9% | 100.0% | 28.8% | 96.9% |
| West North Central: | | | | | | | | |
| Iowa | 45.8% | 21.7% | 51.8% | 76.3% | 99.6% | 98.8% | 29.3% | 97.4% |
| Kansas | 47.9% | 28.5% | 43.2% | 76.4% | 95.6% | 100.0% | 33.3% | 95.8% |
| Minnesota | 42.0% | 15.6% | 50.6% | 81.7% | 88.9% | 100.0% | 24.4% | 95.3% |
| Missouri | 42.5% | 18.3% | 44.5% | 76.4% | 98.4% | 100.0% | 24.4% | 97.5% |
| Nebraska | 36.1% | 9.5% | 36.1% | 77.2% | 96.0% | 99.8% | 16.8% | 97.0% |
| North Dakota | 51.4% | 34.5% | 49.2% | 83.9% | 93.1% | 100.0% | 39.4% | 96.7% |
| South Dakota | 39.1% | 19.0% | 50.9% | 80.1% | 97.1% | 99.8% | 26.3% | 97.5% |
| South Atlantic: | | | | | | | | |
| Delaware | 42.0% | 13.8% | 46.1% | 70.6% | 96.8% | 97.7% | 23.4% | 93.8% |
| District of Columbia | 64.4% | 35.8% | 63.0% | 86.6% | 99.5% | 98.7% | 45.2% | 98.4% |
| Florida | 37.2% | 16.0% | 44.9% | 68.2% | 100.0% | 100.0% | 20.5% | 98.0% |
| Georgia | 39.1% | 12.0% | 49.0% | 77.1% | 99.1% | 100.0% | 19.4% | 99.8% |
| Maryland | 49.7% | 27.7% | 49.6% | 71.8% | 98.6% | 99.8% | 32.9% | 98.0% |
| North Carolina | 39.9% | 11.9% | 32.0% | 71.9% | 96.8% | 100.0% | 18.7% | 96.7% |
| South Carolina | 41.7% | 15.8% | 38.3% | 64.5% | 97.7% | 98.3% | 21.8% | 96.1% |
| Virginia | 49.1% | 23.1% | 62.8% | 80.4% | 88.8% | 100.0% | 31.8% | 96.9% |
| West Virginia | 44.0% | 13.5% | 56.9% | 58.7% | 95.1% | 100.0% | 22.1% | 95.0% |
| East South Central: | | | | | | | | |
| Alabama | 50.7% | 23.9% | 53.3% | 71.3% | 97.0% | 99.8% | 31.5% | 97.2% |
| Kentucky | 48.2% | 19.1% | 45.5% | 78.5% | 100.0% | 100.0% | 27.7% | 97.4% |
| Mississippi | 50.8% | 28.6% | 41.4% | 75.3% | 96.7% | 99.5% | 33.9% | 97.9% |
| Tennessee | 46.8% | 12.9% | 37.5% | 81.9% | 97.0% | 100.0% | 20.8% | 98.1% |
| West South Central: | | | | | | | | |
| Arkansas | 39.4% | 12.3% | 43.4% | 70.8% | 96.6% | 100.0% | 20.1% | 97.3% |
| Louisiana | 48.4% | 22.1% | 49.7% | 74.8% | 91.5% | 100.0% | 29.6% | 97.1% |
| Oklahoma | 51.6% | 28.4% | 56.6% | 73.9% | 96.4% | 99.1% | 35.4% | 94.5% |
| Texas | 47.6% | 22.4% | 41.6% | 73.0% | 94.8% | 99.8% | 28.5% | 97.1% |
| Mountain: | | | | | | | | |
| Arizona | 38.4% | 10.4% | 36.5% | 63.2% | 96.2% | 100.0% | 17.0% | 97.3% |
| Colorado | 44.8% | 25.9% | 39.9% | 75.2% | 97.6% | 100.0% | 30.3% | 99.0% |
| Idaho | 37.7% | 15.2% | 42.1% | 64.4% | 100.0% | 99.9% | 21.7% | 97.4% |
| Montana | 28.3% | 8.1% | 42.6% | 71.2% | 91.8% | 95.9% | 16.1% | 91.5% |
| Nevada | 54.6% | 33.2% | 60.3% | 60.0% | 95.8% | 100.0% | 39.1% | 96.0% |
| New Mexico | 42.4% | 15.4% | 53.7% | 60.9% | 96.2% | 100.0% | 23.2% | 96.6% |
| Utah | 42.3% | 22.1% | 35.2% | 71.2% | 97.7% | 100.0% | 26.1% | 97.0% |
| Wyoming | 38.0% | 18.9% | 42.8% | 76.6% | 98.0% | 99.8% | 24.6% | 97.1% |
| Pacific: | | | | | | | | |
| Alaska | 37.8% | 16.3% | 28.9% | 64.7% | 99.1% | 99.7% | 19.9% | 96.2% |
| California | 44.4% | 23.8% | 54.3% | 70.9% | 96.2% | 99.4% | 30.6% | 96.0% |
| Hawaii | 78.1% | 62.2% | 97.2% | 98.1% | 100.0% | 100.0% | 70.5% | 99.7% |
| Oregon | 45.7% | 27.7% | 37.3% | 71.7% | 95.9% | 100.0% | 30.8% | 96.4% |
| Washington | 43.7% | 18.4% | 53.2% | 83.5% | 98.3% | 99.4% | 27.5% | 98.1% |

Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2016 Medical Expenditure Panel Survey-Insurance Component.
Note: Definitions and descriptions of the methods used for this survey can be found in the Technical Appendix.

Table II.A.2 Standard errors for percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016

| Division and State | Total | Less than 10 employees | 10-24 employees | 25-99 employees | 100-999 employees | 1000 or more employees | Less than 50 employees | 50 or more employees |
|---|---|---|---|---|---|---|---|---|
| United States | 0.41% | 0.64% | 1.14% | 0.86% | 0.49% | 0.06% | 0.54% | 0.20% |
| New England: | | | | | | | | |
| Connecticut | 2.60% | 4.21% | 7.28% | 3.85% | 0.46% | 0.12% | 3.50% | 0.56% |
| Maine | 2.31% | 3.30% | 6.89% | 5.73% | 2.69% | 0.00% | 2.91% | 1.35% |
| Massachusetts | 3.21% | 5.36% | 7.08% | 3.76% | 0.00% | 0.11% | 4.36% | 0.06% |
| New Hampshire | 2.55% | 4.17% | 7.06% | 5.08% | 0.00% | 2.83% | 3.44% | 1.98% |
| Rhode Island | 3.40% | 5.23% | 7.50% | 5.53% | 1.24% | 0.59% | 4.27% | 0.77% |
| Vermont | 2.42% | 3.42% | 6.28% | 4.68% | 1.38% | 0.00% | 2.90% | 1.14% |
| Middle Atlantic: | | | | | | | | |
| New Jersey | 2.61% | 4.07% | 5.54% | 4.48% | 1.45% | 0.00% | 3.32% | 0.53% |
| New York | 2.16% | 3.08% | 5.50% | 3.71% | 3.36% | 0.00% | 2.61% | 1.16% |
| Pennsylvania | 2.02% | 3.18% | 5.72% | 4.35% | 2.50% | 0.00% | 2.65% | 1.11% |
| East North Central: | | | | | | | | |
| Illinois | 2.65% | 4.36% | 7.50% | 5.93% | 3.51% | 0.00% | 3.58% | 1.41% |
| Indiana | 2.14% | 3.05% | 6.18% | 5.83% | 1.46% | 0.00% | 2.64% | 1.77% |
| Michigan | 2.09% | 3.05% | 6.84% | 5.40% | 5.29% | 0.00% | 2.66% | 1.78% |
| Ohio | 2.38% | 3.85% | 6.70% | 4.87% | 2.47% | 0.63% | 3.21% | 1.35% |
| Wisconsin | 2.50% | 3.93% | 6.69% | 4.34% | 1.07% | 0.00% | 3.20% | 1.12% |
| West North Central: | | | | | | | | |
| Iowa | 2.48% | 3.84% | 6.46% | 5.74% | 0.41% | 1.17% | 3.20% | 1.14% |
| Kansas | 2.75% | 4.20% | 7.12% | 4.91% | 2.66% | 0.00% | 3.54% | 1.45% |
| Minnesota | 2.23% | 3.36% | 6.85% | 4.51% | 4.66% | 0.00% | 2.85% | 1.74% |
| Missouri | 2.61% | 4.01% | 7.48% | 5.57% | 0.84% | 0.00% | 3.46% | 0.96% |
| Nebraska | 2.03% | 2.70% | 7.03% | 5.02% | 2.27% | 0.21% | 2.45% | 1.08% |
| North Dakota | 3.07% | 4.76% | 6.69% | 4.23% | 4.12% | 0.00% | 3.89% | 1.54% |
| South Dakota | 2.48% | 3.32% | 7.16% | 4.60% | 2.42% | 0.20% | 2.93% | 1.21% |
| South Atlantic: | | | | | | | | |
| Delaware | 2.49% | 3.74% | 7.40% | 6.26% | 2.58% | 1.45% | 3.20% | 2.08% |
| District of Columbia | 2.90% | 6.03% | 7.83% | 3.84% | 0.46% | 0.82% | 4.54% | 0.70% |
| Florida | 2.10% | 3.01% | 6.49% | 5.50% | 0.00% | 0.02% | 2.68% | 0.58% |
| Georgia | 2.09% | 2.95% | 7.38% | 5.42% | 0.94% | 0.00% | 2.64% | 0.19% |
| Maryland | 2.95% | 4.69% | 7.63% | 5.80% | 1.02% | 0.17% | 3.92% | 0.66% |
| North Carolina | 1.75% | 2.41% | 5.45% | 4.96% | 2.42% | 0.03% | 2.13% | 1.07% |
| South Carolina | 2.25% | 3.50% | 5.89% | 5.60% | 1.24% | 0.88% | 2.94% | 1.11% |
| Virginia | 2.66% | 4.08% | 7.87% | 4.67% | 5.22% | 0.00% | 3.46% | 1.29% |
| West Virginia | 2.18% | 3.07% | 7.01% | 6.65% | 3.08% | 0.00% | 2.77% | 1.68% |
| East South Central: | | | | | | | | |
| Alabama | 2.62% | 4.40% | 6.81% | 5.48% | 2.50% | 0.16% | 3.60% | 1.03% |
| Kentucky | 2.32% | 3.70% | 7.40% | 5.27% | 0.00% | 0.04% | 3.13% | 1.07% |
| Mississippi | 2.98% | 4.92% | 7.78% | 5.74% | 2.75% | 0.45% | 4.04% | 0.95% |
| Tennessee | 1.80% | 2.64% | 7.53% | 4.63% | 2.80% | 0.00% | 2.45% | 1.00% |
| West South Central: | | | | | | | | |
| Arkansas | 2.12% | 2.97% | 6.86% | 6.30% | 3.33% | 0.00% | 2.63% | 1.30% |
| Louisiana | 2.78% | 4.75% | 6.83% | 5.48% | 4.44% | 0.00% | 3.80% | 1.28% |
| Oklahoma | 2.76% | 4.42% | 7.04% | 5.07% | 2.20% | 0.88% | 3.69% | 1.49% |
| Texas | 1.69% | 2.79% | 4.73% | 3.71% | 2.78% | 0.17% | 2.29% | 0.87% |
| Mountain: | | | | | | | | |
| Arizona | 1.90% | 2.70% | 6.40% | 7.04% | 2.65% | 0.00% | 2.41% | 1.13% |
| Colorado | 2.88% | 4.30% | 6.50% | 5.31% | 1.90% | 0.00% | 3.54% | 0.67% |
| Idaho | 2.25% | 3.19% | 6.49% | 5.71% | 0.00% | 0.06% | 2.72% | 1.29% |
| Montana | 2.07% | 2.41% | 6.81% | 5.71% | 4.94% | 3.90% | 2.36% | 2.98% |
| Nevada | 3.14% | 5.25% | 7.50% | 6.64% | 2.37% | 0.00% | 4.26% | 1.10% |
| New Mexico | 2.19% | 3.14% | 7.18% | 5.82% | 2.20% | 0.00% | 2.74% | 1.15% |
| Utah | 2.71% | 4.23% | 6.77% | 5.72% | 1.59% | 0.00% | 3.54% | 1.15% |
| Wyoming | 2.43% | 3.40% | 6.16% | 5.07% | 1.48% | 0.17% | 2.91% | 1.21% |
| Pacific: | | | | | | | | |
| Alaska | 2.13% | 3.11% | 5.96% | 6.52% | 0.90% | 0.30% | 2.69% | 1.35% |
| California | 1.46% | 2.14% | 3.93% | 3.07% | 1.59% | 0.47% | 1.82% | 0.76% |
| Hawaii | 2.87% | 4.99% | 2.77% | 1.31% | 0.00% | 0.00% | 3.90% | 0.34% |
| Oregon | 2.71% | 4.14% | 5.71% | 5.28% | 3.55% | 0.00% | 3.41% | 1.52% |
| Washington | 2.46% | 3.74% | 6.76% | 4.53% | 1.74% | 0.63% | 3.13% | 1.01% |

Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2016 Medical Expenditure Panel Survey-Insurance Component.
Note: Definitions and descriptions of the methods used for this survey can be found in the Technical Appendix.

# DEF-INTERV.

# EX. 110



## DACA and the Challenges Faced By Employers in Workplace Compliance

🕐 May 20, 2015        QuickCounsel

👤 By David S. Jones and Otieno B. Ombok

This resource is sponsored by:



### Overview

On November 20, 2014, President Barack Obama issued an Executive Order expanding the number of individuals who qualify under the Deferred Action for Childhood Arrivals ("DACA") program; since 2012, DACA has allowed thousands of previously ineligible individuals to obtain employment authorization.  The President's Executive Order also sought to provide relief from deportation, as well as employment authorization, to undocumented immigrants who are parents of U.S. citizens or of permanent legal residents through Deferred Action for Parents of Americans and [of] Lawful Permanent Residents ("DAPA").  This January, the U.S. Citizenship and Immigration Service ("USCIS") announced that it would start accepting applications for expanded DACA, although that initiative has since been suspended in response to an injunction  issued by a federal judge in Texas.  Adding further to the mix, the Department of Homeland Security ("DHS") has announced that certain H-4 dependent spouses of H-1B workers will be able to apply for employment authorization starting May 26, 2015.  (In April 2015, a group representing U.S. computer workers filed a lawsuit in the U.S. District Court for the District of Columbia challenging this initiative as robbing them of their domestic labor protections.  Save Jobs USA v. U.S. Department of Homeland Security, case number 1:15-cv-00615.)

The increased number of "Employment Authorization Documents" or "EADs" in the labor pool, particularly in the cases of workers who were previously not authorized to be employed, may prove problematic for some employers.  First, employers must be diligent in updating their I-9 records to ensure that there are no gaps in employment authorization. Second, despite employers' best efforts, there are likely to be instances of gaps in employment authorization, which raise a number of issues regarding how to handle those gaps.  Third, and likely the most difficult challenge, is how to address workers who now disclose that when they were hired, they were not authorized to work. This QuickCounsel will address each of these challenges.

### I-9 Reverification

The Immigration Reform and Control Act of 1986 (P.L. 99-603), 100 Stat. 3359 (Nov. 6, 1986), 1986 S. 1200) ("IRCA"), Immigration and Nationality Act §274A-274C, requires all U.S. employers to verify the identity and employment authorization status of all employees hired after November 6, 1986. This verification is performed by requiring all new hires to complete Section 1 of Form I-9 no later than the first date of hire and present documentation confirming their identity and authorization to work no later than three days after the date of hire which the employer must record in Section 2 of Form I-9.

INA § 274A(a)(2) provides that it is unlawful for an employer, after hiring an alien for employment, to continue to employ the alien, knowing the alien is or has become unauthorized to work.  Employers are required to reverify the employment authorization of an employee whose List A or List C employment authorization document expires (except in the case of I-551 Permanent Resident Cards). An EAD (Form I-688A, Form I-688B, or Form I-766) is a List A document, which requires reverification upon expiration. The USCIS Employer's Handbook provides that when an employee's work authorization expires, the employer may either complete Section 3 of the original Form I-9 or prepare a new Form I-9, including Section 1.  The employer should keep a tickler list to remind the employee to file an application to renew his/her work authorization well in advance (180 to 120 days) of the expiration date of the current document because of the time taken by the USCIS to issue new documents.  The employer should ask the employee, no later than the last day of the term of the current employment authorization document, to present documents of his or her choice, evidencing continued employment authorization.  Depending upon the changes that may have occurred in the employee's situation, the employee may also need to modify the response to the Section 1 attestation regarding United States citizenship, lawful permanent residence, or employment authorized status.  If a change to Section 1 is needed, the employee should initial and date the change in the margin.

---

## Gaps in Employment Authorization

EAD applications frequently take up to 120 days for processing.  As such, failure to make a new application at least 120 days before expiration of the current EAD is likely to lead to gaps in employment authorization. The Form I-9 receipt rules for EAD also can be confusing for employers, further complicating this issue. For the vast majority of expiring EADs, a receipt for an extension is not acceptable evidence for Form I-9. The exceptions to this rule are Temporary Protected Status ("TPS") and STEM OPT. TPS is available to individuals from countries that have been designated unsafe for their nationals to return.  Individuals granted TPS may remain in the US and work as long as TPS remains in effect for their country, the person remains eligible, and the person timely files for extensions. When extending TPS, DHS may issue a blanket extension of all EADs for those individuals. In such cases, documentation regarding the extension is adequate for I-9 reverification.  Likewise, the regulations for STEM OPT allow for continued employment while the EAD extension is in process. For all other EADs, including DACA and DAPA EADs, the EAD must be valid during all periods of employment.

The potential gaps in employment authorization caused by EAD renewals raise the question of how employers should handle employees with such gaps.  Essentially, the two options available are Leave of Absence and Termination/Rehire. IRCA defines employment as providing services or labor for an employer for wages or other remuneration; this definition permits an unpaid leave of absence since the employee is not providing services or labor during this period.  In fact, the U.S. Court of Appeals for the 9th Circuit has held that a leave of absence should be granted for a reasonable period of time for such gaps in employment authorization. *Incalza v. Fendi North America, Inc., 479 F.3d 1005 (9th Cir. 2007)*. The decision stemmed from a California state law that requires good cause for termination.  The 9th Circuit held that a gap in employment authorization did not constitute good cause for termination because a leave of absence was a viable alternative and is consistent with IRCA.  While this decision only controls in the 9th Circuit, it may inform other jurisdictions.

As the obligation to complete Form I-9 is triggered by the provision for services in exchange for compensation or expectation for such compensation, we believe that the prohibition on further employment when a work authorization document expires should be interpreted as a prohibition on continuing to (i) provide services, and (ii) receiving remuneration for such services. An employee who is suspended, and therefore providing neither services nor receiving remuneration for such services, should be deemed not to be "employed" for those purposes.

By contrast, there are arguments as to why Termination and Rehire are more appropriate. First, there is a clear separation from the employee at the time employment authorization ends. This makes for a cleaner record and puts the burden on the employee to request rehire once the issue is resolved.  Otherwise, an employer could have an employee on leave indefinitely waiting or the employment authorization issue to be resolved. Leaves of absence also raise benefits questions, such as medical insurance and COBRA. In the context of indefinite leave, for example, there may be some

question as to when a COBRA qualifying event takes place. Specifically, it may be difficult to ascertain at what point the individual is no longer employed.  If such an employee is in a car accident while on leave of absence, the insurance company may determine that the employee was not covered based on his employment status and deny coverage. In this case, the employer may be liable for not having provided COBRA notice.

## Previously Unauthorized Workers

One increasingly common issue for employers is how to handle employees who disclose unlawful status to the employer. If an employee admits to providing false I-9 identification, should the employer terminate the employee or merely accept the new documentation? The USCIS I-9 Employer's Handbook provides as follows: "In cases where an employee has worked for you using a false identity but is currently work authorized, the I-9 rules do not require termination of employment. However, there may be other laws, contractual obligations, or company policies that you should consider prior to taking action." Such employee may be terminated only if doing so is in compliance with an existing written honesty policy implemented indiscriminately and consistently throughout the entire organization. Please bear in mind that an employer who terminates an employee pursuant to an existing honesty policy, which is consistently administered may still be sued by a terminated employee alleging national origin discrimination.

In the absence of an honesty policy, the employee should be given an opportunity to present other acceptable I-9 documentation. The I-9 Handbook states as follows: "You may encounter situations other than a legal change of name where an employee informs you or you have reason to believe that his or her identity is different from that previously used to complete the Form I-9 For example, an employee may have been working under a false identity, has subsequently obtained a work authorized immigration status in his or her true identity, and wishes to regularize his or her employment records.  In that circumstance, you should complete a new Form I-9, write the original hire date in Section 2, and attach the new Form I-9 to the previously completed Form I-9 and include a written explanation."  If the employee provides alternate Form I-9 documentation, the employer may accept the documentation and have the employee complete a new Form I-9. The new Form I-9 should be attached to the old one.  If the employee fails to present new documentation, the employer may terminate. Before taking any adverse personnel action, the employer should consult legal counsel.

## Conclusion

While DHS new regulations and guidelines providing EADs to DACA recipients and certain H-4 spouses is a welcome development to employers as they have the effect of potentially expanding the labor market pool, they present myriad challenges for employers. Employers can better avoid these pitfalls and challenges by establishing and maintaining effective policies and procedures and administering them in a uniform manner.

## Additional Resources

Employment Authorization for Certain H-4 Dependent Spouses, U.S. Citizenship and Immigration Service

Completing Section 3, Reverification and Rehires, U.S. Citizenship and Immigration Service

An Employer's Guide to Group Health Continuation Coverage Under COBRA, U.S. Department of Labor

President to Expand, Create Programs for Undocumented Workers, Jackson Lewis P.C.

USCIS to Accept Expanded Deferred Action for Childhood Arrivals Applications Starting February 18, 2015, Jackson Lewis P.C.

About the Authors

David S. Jones and Otieno B. Ombok

http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm

# DEF-INTERV.

# EX. 111

 **(https://americasvoice.org)**

# Hundreds of Business Leaders Write Letter In Support of DACA, Dreamers

*by Americas's Voice on September 1, 2017*

TAGS: **AVEF (HTTPS://AMERICASVOICE.ORG/TAG/AVEF/)**, **DACA THREATENED (HTTPS://AMERICASVOICE.ORG/TAG/DACA-THREATENED/)**, **GRASSROOTS ACTION (HTTPS://AMERICASVOICE.ORG/TAG/GRASSROOTS_ACTION/)**

Thousands of American leaders **(http://americasvoice.org/press_releases/preserve-daca-pass-dream-act/)** from faith and advocacy groups, all levels of elected government, judges, police chiefs, and sheriffs earlier this week signed a letter in support of DACA and Dreamers.

Last night, they were joined by hundreds of major business leaders **(https://www.washingtonpost.com/news/wonk/wp/2017/09/01/hundreds-of-business-leaders-call-on-trump-to-protect-dreamers/)** who asked Donald Trump to preserve DACA and Congress to pass the Dream Act.

Signers included Facebook's Mark Zuckerberg and Sheryl Sandberg, Apple's Tim Cook, Amazon's Jeff Bezos, Google's Sundar Pichai, HP's Meg Whitman, and many more. The full letter and list of signatories can be found here **(https://dreamers.fwd.us/business-leaders?utm_source=twitter&utm_medium=social&utm_campaign=protect-dreamers&utm_term=&utm_content=)**, and the signers pointed out that Dreamers are vital to the economy and contribute to America's competitive advantage.

As the letter reads:

*As entrepreneurs and business leaders, we are concerned about new developments in immigration policy that threaten the future of young undocumented immigrants brought to America as children.*

A recent report from the Center of American Progress **(https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/)** revealed that rescinding DACA would cost the US economy $460 billion over the next ten years, and that least 72% of the top 25 Fortune 500 companies count DACA recipients among their employees. Furthermore, a Cato Institute report **(https://www.cato.org/blog/ending-daca-will-impose-billions-employer-compliance-costs)** found that DACA's elimination — which would lead to Dreamers losing the ability to legally work — would cost employers $6.3 billion in employee turnover as they scrambled to recruit, hire, and train hundreds of thousands of new employees. If DACA is rescinded, around 1,000 Dreamers would lose DACA status every day, costing employers $61 million weekly — the estimated equivalent of 31 "major" regulations.

Some of the signers of last night's letter posted more personal notes on their social media profiles. Facebook's Mark Zuckerberg wrote:

*I stand with the Dreamers — the young people brought to our country by their parents. Many have lived here as long as they can remember.*

*We need a government that protects Dreamers. These young people represent the future of our country and our economy. They are our friends and family, students and young leaders in our communities.*

And from Microsoft's Satya Nadella:

*As a CEO, I see each day the direct contributions that talented employees from around the world bring to our company, our customers and to the broader economy. We care deeply about the DREAMers who work at Microsoft and fully support them. We will always stand for diversity and economic opportunity for everyone. It is core to who we are at Microsoft and I believe it is core to what America is.*

# DEF-INTERV.

# EX. 112



# THE ECONOMIC EFFECTS OF ADMINISTRATIVE ACTION ON IMMIGRATION

November 2014



## Contents

Executive Summary ................................................................................................................... 2

I. The Economic Effects of Administrative Action on Immigration ............................................ 3

    Effects on Population and the Labor Force ......................................................................... 4

    Effects on Output per Worker ........................................................................................... 5

    Effects on Total Output ...................................................................................................... 6

II. Effects on U.S.-Born Worker Employment and Wages ......................................................... 9

    Employment Effects .......................................................................................................... 9

    Wage Effects ...................................................................................................................... 9

III. Effects of Higher Growth on the Federal Budget ............................................................... 12

Appendix: Detailed Methodology for GDP and Wage Estimates ............................................ 13

    Population .......................................................................................................................... 13

    Labor Force ....................................................................................................................... 16

    Output per Worker ........................................................................................................... 17

    U.S.-Born Worker Wages .................................................................................................. 20

References ............................................................................................................................... 23

1

# Executive Summary

This analysis examines the economic impact of the administrative actions on immigration announced by President Obama on November 20th, 2014. The analysis is based on the economic literature, including, wherever possible, the methods and studies that the Congressional Budget Office (CBO) employed in its analysis of the Border Security, Economic Opportunity, and Immigration Modernization Act (S. 744) passed by the Senate in June 2013.

CEA's analysis includes a range of estimates. The conservative lower bound of these estimates indicates that these administrative actions will:

- Raise the level of U.S. GDP by 0.4 percent after ten years, equivalent to an additional $90 billion in real GDP in 2024 (in today's dollars). This would be the result of:

  o An expansion in the size of the American labor force by nearly 150,000 workers over the next ten years, largely as a result of higher labor force participation; and

  o An increase in the productivity of American workers, both because of increased labor market flexibility and reduced uncertainty for workers currently in the United States and because of increased innovation from high-skilled workers.

- Have no impact on the likelihood of employment for U.S.-born workers.

- Raise average wages for U.S.-born workers by 0.3 percent in 2024, or $170 (in today's dollars).

- Cut Federal deficits by $25 billion in 2024 due to the addition to real GDP growth over the next ten years—although the actual budgetary effects of the actions could vary.

CEA's plausible upper-bound projection, based on the more optimistic estimates in the economic literature, is that the actions would raise the level of U.S. GDP by 0.9 percent after ten years, equivalent to $210 billion in GDP in 2024 resulting in a $60 billion reduction in the deficit after a decade.

These estimated effects are significant but are a fraction of the economic benefits that would occur if these actions were superseded by Congressional action on commonsense immigration reform. CBO estimated that S. 744 would increase real GDP by 3.3 percent, or roughly $700 billion, in ten years and 5.4 percent, or about $1.4 trillion, in twenty years (CBO 2013b).

Note that all estimates of immigration policy changes on the economy are complex and difficult, especially in the long run (see, for example, the discussion in CBO 2013b). CEA's estimates rely on a number of assumptions that are spelled out in detail in the Appendix and reflect a range of more conservative to less conservative scenarios.

# I.  The Economic Effects of Administrative Action on Immigration

CEA's estimates of the economic impact of administrative action on immigration are based on the following set of actions included in the President's announcement:

- **Providing deferred action to low-priority individuals with significant family ties.** The Department of Homeland Security (DHS) will expand the existing Deferred Action for Childhood Arrivals program (DACA) which allows young people who came to the country before turning 16 years old who meet certain education guidelines, such as graduating from high school or attending college, to request temporary relief from removal ("deferred action") and be eligible to obtain work authorization. DHS will also establish a similar process for parents of U.S. citizens or Lawful Permanent Residents (LPRs) who have been in the country for five years or more to request deferred action;

- **Expanding immigration options for foreign entrepreneurs who have created American jobs or attracted significant investments.** DHS will expand immigration options for foreign entrepreneurs who meet certain criteria to obtain either temporary status or LPR status if they are able to meet certain requirements such as creating jobs, attracting investment, and generating revenue in the United States;

- **Extending on-the-job training for science, technology, engineering, and mathematics (STEM) graduates of U.S. universities through reforms to the existing Optional Practical Training (OPT) program.** DHS will propose changes to expand and extend the OPT program and require stronger ties between OPT students and their colleges and universities following graduation;

- **Providing work authorization to spouses of individuals with H-1B status who are on the path to LPR status.** DHS is finalizing new rules to give H-4 dependent spouses of H-1B workers access to work authorization as long as their H-1B spouse has an approved green card application; and

- **Providing portable work authorization for high-skilled workers awaiting processing of LPR applications.** Under the current system, employees with approved LPR applications often wait many years for an immigrant visa to become available. DHS will make regulatory changes to allow these workers to move or change jobs more easily.

Our calculations of the economic effects of these actions are based on estimates of the size of the eligible population for each action provided by DHS and by the Office of Management and Budget (OMB).

To estimate the effects of these policies, we begin with the following identity, which breaks up output (GDP) into several components:

$$GDP = Population * \frac{Labor\ Force}{Population} * \frac{Employment}{Labor\ Force} * \frac{GDP}{Employment}$$

It is important to note that this identity reflects long-run aggregate *supply*, while the level of total output in both the short and long run is determined by the interaction of aggregate supply and aggregate demand. However, because CEA's estimates focus on the long-run impact of these administrative actions, we assume, as is standard, that in the long run aggregate demand will match aggregate supply; in other words, we assume that, in the long run, the economy is not constrained by aggregate demand.

Alternatively, to calculate long-run *changes* in GDP, the above identity can be rewritten as:

$$\%\Delta GDP = \%\Delta POP + \%\Delta LFPR + \%\Delta EMPR + \%\Delta \frac{Output}{Worker}$$

where *POP* is the working-age population, *LFPR* is the labor force participation rate, and *EMPR* is the employment rate. Changes in immigration policy, generally speaking, are likely to have the strongest impacts on population, the labor force participation rate, and output per worker. We assume that immigration policy does not impact the employment (or unemployment) rate in the long run.

To assess long-run changes in GDP associated with administrative action on immigration, CEA thus estimated the sum of changes, relative to current policy, in each of the following components: (a) the size of the working-age population; (b) the labor force participation rate; and (c) output per worker. For each component, CEA calculated both an upper- and lower-bound estimate based on ranges of parameters found in the academic literature. CEA's estimates rely on a number of assumptions that may be only approximately valid. Consequently, the true economic impact of administrative action may ultimately be greater or less than CEA's estimates. In this analysis, to be conservative we highlight the lower-bound estimate. For detailed explanations on the methodology behind and assumptions underlying each component of our GDP calculations, see the Appendix.

### Effects on Population and the Labor Force

Compared to current administrative policy, relatively few new immigrants (with some small exceptions) will be allowed into the United States under the administrative actions considered in CEA's estimates. Thus, these actions' effects on the size of the U.S. labor force will not be due to large expansions in the working-age population.[1] Instead, CEA estimates that these actions will affect the size of the labor force by increasing the labor force participation of people who would

---

[1] This contrasts with S. 744, which according to CBO would increase the size of the U.S. working-age population by 10.4 million in 2023, or 3.0 percent, relative to current law (CBO 2013a).

have been U.S. residents even in the absence of administrative action, primarily through providing work authorization for dependent spouses of H-1B nonimmigrant visa holders, also known as H-4 dependents (see Table 1). Based on academic studies of previous policy reforms that reduced uncertainty for undocumented immigrants, such as the 1986 Immigration Reform and Control Act (IRCA), CEA estimates that deferred action will not cause significant changes to the labor force participation of undocumented immigrants. Nevertheless, our upper-bound estimate incorporates the finding in Pan (2012) of a small increase in female labor force participation following the implementation of IRCA.

**Table 1: Estimated Changes to the U.S. Labor Force in 2024[2]**

| Administrative action | Lower-Bound Estimate | Upper-Bound Estimate |
|---|---|---|
| Expanding options for foreign entrepreneurs | +33,000 | +53,000 |
| Extending OPT for STEM graduates | +10,000 | +36,000 |
| Work authorization for dependent spouses of H-1B visa holders with approved LPR applications | +104,000 | +167,000 |
| Portable work authorization for certain high-skilled workers | 0 | 0 |
| Deferred action for low-priority individuals | 0 | +42,000 |
| **Total** | +147,000 | +297,000 |

Taken together, CEA conservatively estimates that administrative action on immigration will increase the size of the U.S. labor force in 2024 by approximately 147,000 workers, or 0.1 percent, relative to current administrative policy.

## Effects on Output per Worker

CEA estimates that the largest impact of administrative action on output will come in the form of increases in output per worker—or, in other words, increases in productivity. Output per worker is a combination of several factors: (a) total factor productivity (the amount of output for a given capital and labor input); (b) hours supplied per worker; (c) the skill composition of the workforce; and (d) capital intensity.[3]

The administrative actions considered by CEA for this analysis are likely to lead to increases in productivity for several reasons. First, a large body of academic work has found that increases in high-skilled immigration lead to increases in productivity, both directly through increased innovation and indirectly through positive spillovers on nonimmigrant workers (Hunt and Gauthier-Loiselle 2010; Peri, Shih, and Sparber 2014). Such increases in total factor productivity would allow the U.S. economy to produce more for any given combination of capital and labor stock.

---

[2] In this table, as throughout this analysis, components may not sum to totals due to rounding.
[3] Productivity is generally reported as output per hour and thus is not affected by additional hours of work. For presentational simplicity, we aggregate additional output per hour and additional hours into a concept that we refer to as "productivity," defined as output per worker.

Second, the provision of work authorization to undocumented workers receiving deferred action is likely to increase the total productivity of the U.S. labor force by allowing for greater occupational mobility. As undocumented workers move to the legal economy, they will be able to work in occupations that better fit their particular level of skills, instead of working in occupations or industries where the likelihood of detection is lowest. Barcellos (2011), for example, finds that the 1986 IRCA, which provided work authorization for certain undocumented immigrants, led to increased occupational mobility, particularly for better-educated immigrants. In the wider academic literature, occupational reallocation and task specialization among both immigrant and native populations have been shown to be leading causes for increases in productivity associated with increases in low-skilled immigration (Peri and Sparber 2009). Because specialization allows for greater productivity among both immigrant and nonimmigrant workers, this pathway for increased output would also be likely to lead, in the long run, to increases in wages for all workers—immigrants and natives.

Finally, low-priority individuals eligible for deferred action, faced with less uncertainty about a future in the United States, may be more likely to make key investments in themselves and in their communities (Bratsberg et al. 2002). Once provided with certainty about their status, these individuals may be more likely to start a new business or to pursue additional education or vocational training, investments which they may not have made if they were unsure if they could remain in the United States and which may have spillovers even to nonimmigrants.[4]

CEA conservatively estimates that administrative action on immigration will increase output per worker by 0.3 percent in the long run. Of this increase, 0.2 percent is due to increases in productivity associated with actions focused on high-skilled immigrants, while 0.1 percent can be attributed to reduced uncertainty and increased occupational mobility associated with the expansion of deferred action for low-priority individuals. This is slightly less than half of the productivity effect that CBO estimated for S. 744.

## Effects on Total Output

The combination of these estimated effects on the size of the labor force and on output per worker imply that, relative to current administrative policy, the announced administrative actions considered by CEA will increase output by a total of 0.4 percent in ten years. Using CBO's baseline projections for real GDP over the next ten years (CBO 2014c), this implies an increase of about $90 billion in GDP in 2024. These estimates represent CEA's conservative lower-bound estimates of the impact of the announced actions on GDP. The upper- and lower-bound estimates are summarized in Table 2.

---

[4] In addition to the potential that this increased certainty has on human capital investment, immigrants may be more likely to increase large-scale durables purchases, such as a new home. Furthermore, increases in income associated with increased productivity are expected to increase aggregate demand. Our estimates assume that any such short-run increase in aggregate demand due to reductions in uncertainty will ultimately be matched by aggregate supply in the long run.

## Lower-Bound Estimate

CEA's lower-bound estimate for the impact of administrative action on immigration on long-run output is an increase of 0.4 percent relative to current administrative policy. Of this, 0.3 percent is attributable to administrative actions focused on encouraging high-skilled immigration, and 0.1 percent is attributable to deferred action for low-priority individuals.

The 0.3 percent increase in GDP associated with actions focused on high-skilled immigration can be decomposed as follows: 0.1 percent due to changes in the labor force and 0.2 percent due to changes in productivity. The 0.1 percent increase in GDP associated with deferred action is due entirely to changes in productivity.

**Table 2: Summary of Estimated Changes in Real Output in Ten Years (Percent)**

|  | Lower-Bound Estimate | Upper-Bound Estimate | CBO estimate of S. 744 |
|---|---|---|---|
| Population: High-skilled immigration | +0.02 | +0.05 | +3.0 |
| Population: Deferred action | 0 | 0 | |
| Labor Force: High-skilled immigration | +0.09 | +0.16 | +0.5 |
| Labor Force: Deferred action | 0 | +0.03 | |
| Output per Worker: High-skilled immigration | +0.15 | +0.47 | +0.7 |
| Output per Worker: Deferred action | +0.14 | +0.23 | |
| Other (including changes in capital intensity) | | | -0.9 |
| **Total** | **+0.4** | **+0.9** | **+3.3** |
| **Change in Real GDP ($billion)** | **+90** | **+210** | **+700** |

*Note: In CEA's estimates, changes in capital intensity and other factors are incorporated into estimates of effects on output per worker.*

## Upper-Bound Estimate

CEA's upper-bound estimate for the impact of administrative action on immigration on long-run output is an increase of 0.9 percent relative to current administrative policy. Of this, 0.7 percent is attributable to administrative actions focused on encouraging high-skilled immigration, and 0.3 percent is attributable to deferred action for low-priority individuals (note that the components do not sum to the total because of rounding).

The 0.7 percent increase in GDP associated with actions focused on high-skilled immigration can be decomposed as follows: 0.1 percent due to changes in population, 0.2 percent due to changes in the labor force, and 0.5 percent due to changes in productivity. The 0.3 percent increase in GDP associated with deferred action is mostly due to changes in productivity (0.23 percent), but we also allow for increases in female labor force participation in this estimate (0.03 percent).

## Comparison with S. 744

CBO's estimate for S. 744, which totaled 3.3 percent additional GDP after a decade (CBO 2013b), is substantially higher than our estimates for the announced administrative actions. The largest difference between the estimates of S. 744 and the administrative actions we analyze is that CBO

estimated that S. 744 would result in an additional 10.4 million people in the U.S. working-age population after ten years, equivalent to a 3.0 percent increase in population relative to current law. By contrast, our estimates imply at most a 0.1 percent increase in the population. In addition, CBO's estimated increase in the size of the labor force in ten years (0.5 percent) primarily reflects the increases in population resulting from S. 744, whereas CEA calculates that the announced administrative actions affect the size of the labor force mostly by increasing the labor force participation of people who would have been U.S. residents even in the absence of the actions. CBO also calculates larger increases in productivity as a result of S. 744 than CEA does in its lower-bound estimate for administrative action, principally due to their larger forecasts for population change.

## II.    Effects on U.S.-Born Worker Employment and Wages

In this section, we examine the effects of administrative action on immigration on the employment and wages of U.S.-born workers.

### Employment Effects

Theory suggests that these policy changes would not have an effect on the long-run employment (or unemployment) rate, the focus of CEA's analysis, as the additional demand associated with the expanded economy would offset the additional supply of workers.

Consistent with the theory, much of the academic literature suggests that changes in immigration policy have no effect on the likelihood of employment for native workers. Card (1990), for example, examines the effect of a large influx of lower-skilled immigrants—the arrival of 125,000 Cuban immigrants in the 1980 Mariel boatlift, which increased the labor force in Miami by 7 percent—on the labor market opportunities of native workers nationwide. The author finds no effect on the likelihood of employment of lower-skilled, non-Cuban workers. Ottaviano and Peri (2012) and Peri and Sparber (2009) also report no evidence of crowding out of native employment by immigration. In a more recent paper, Peri, Shih, and Sparber (2014) find that increases in high-skilled immigration have no effect on the likelihood of unemployment for either college-educated or non-college-educated natives.

Consequently, we estimate that these actions will have no effect on the likelihood of employment of native workers in the long run.

### Wage Effects

Although we hypothesize, based on theory and consistent with the academic evidence, that administrative action will have no long-run effect on the *quantity* of jobs held by native workers, our analysis of changes in output per worker implies that these actions will increase the *quality* of native-worker jobs and thus these workers' wages. As we discuss in Section I, academic research has found that increases in high-skilled immigration lead to both increases in innovation and positive spillovers on the productivity of native workers due to complementarities between their skills and those of immigrants (Hunt and Gauthier-Loiselle 2010; Peri, Shih, and Sparber 2014). Meanwhile, better task specialization and occupational reallocation as a result of work authorization for undocumented workers granted deferred action would allow for greater productivity—and thus higher wages—for native workers as well (Peri and Sparber 2009).

Empirical research has generally confirmed these effects.[5] Card (1990) finds that within the Miami labor market, average wages for natives rose by 0.6 percent on the whole following the

---

[5] Research by Borjas, Freeman, and Katz (1997) reports negative implications of immigration on the wages of the least-skilled U.S. workers. We note that their findings, based on a model calibration, do not match the empirical evidence from actual changes in immigration policy. Moreover, their model ignores considerations such as the

Mariel boatlift. Even the least-educated workers in Miami experienced small, positive wage gains post-Mariel. Peri, Shih, and Sparber (2014) find that increases in high-skilled immigration are associated with significant increases in wages for both college-educated native workers and non-college-educated (high school graduate) native workers.[6]

Parameters from the literature allow us to estimate wage gains for native workers separately for actions focused on encouraging high-skilled immigration and for deferred action for low-priority individuals. As with our GDP estimates, these wage estimates rely on a number of assumptions (see the Appendix for a full discussion of the methodology), so that the true increase in native workers' wages associated with administrative actions may ultimately be larger or smaller than our estimates.

### High-Skilled Immigration

Based on parameters from Peri, Shih, and Sparber (2014), CEA calculates that administrative actions focused on encouraging high-skilled immigration would raise the real annual earnings of native college graduates by 0.4 percent by 2024, or about $300 (in 2014 dollars). Native high-school graduates would see smaller, though still positive, wage gains from the administrative actions encouraging high-skilled immigration of 0.3 percent, or approximately $110. Following Peri, Shih, and Sparber (2014), CEA estimates that administrative actions focused on encouraging high-skilled immigration will have essentially no impact on the wages of native workers who have not completed high school. Combining the impacts on college-educated workers, high-school graduate workers, and those workers with less than a high school degree, based on their shares in the population, we estimate that the administrative actions encouraging high-skilled immigration will increase native workers' wages by 0.3 percent, or approximately $130 (in today's dollars).

### Deferred Action

Using estimates from Chassamboulli and Peri (2014), CEA estimates that deferred action for low-priority individuals would increase the wages of all native workers by 0.1 percent on average by 2024. In today's dollars, this translates into an additional average wage gain for U.S.-born workers of $40. The estimates in Chassamboulli and Peri (2014) do not permit a breakdown of the average wages effects by educational attainment.

### Total Impact on U.S.-Born Worker Wages

Table 3 reports CEA's estimates for the increases in native worker wages based on the combination of the effects of the administrative actions on high-skilled immigration and on deferred action.

---

positive spillovers from the potential complementarity between immigrants and natives and the changes in capital and technology that more recent research have found to be important.

[6] Friedberg (2001) and Hunt (1992) find broadly similar results in studies examining the effects of immigration on native-worker wages in other countries.

**Table 3: Summary of Estimated Changes for Native Worker Wages (Percent)**

| Group and educational attainment | High-skilled immigration | Deferred action | Total |
|---|---|---|---|
| Native workers, less than high school | 0 | - | - |
| Native workers, high school | +0.27 | - | - |
| Native workers, bachelor's or higher | +0.37 | - | - |
| **Total** | **+0.3** | **+0.1** | **+0.3** |
| **Change in 2024 annual earnings (2014 dollars)** | **$130** | **$40** | **$170** |

## Comparison with S. 744

CBO (2013b) projected that S. 744 would raise average wages for everyone, U.S.-born workers and immigrant workers, starting in 2025. Specifically, CBO estimated that when wage changes for native-born workers were averaged together with the new immigrants' wages, which are on average lower than native wages, the result would be a decrease in average wages in the United States by 0.1 percent after 10 years and an increase of 0.5 percent after 20 years. CBO emphasized that this did not imply that wages declined for native-born workers: "[These] figures represent differences between the averages for *all* U.S. residents under [S. 744]…and the averages under current law for people who would be residents in the absence of [S. 744]… [T]he additional people who would become residents under the law would earn lower wages, on average, than other residents, which would pull down the average wage." As a result, CBO's results are not directly comparable to CEA's estimates of the wage increases for native workers.

## III.    Effects of Higher Growth on the Federal Budget

In general, stronger economic growth reduces the deficit by both increasing revenues and reducing outlays (largely due to the interest savings from a lower path for the Federal debt). CEA uses standard analysis to estimate the impact that the *higher growth associated with the immigration administrative actions* would have on the budget. It is important to emphasize that this is not the same as a full budget scoring of the administrative actions.

For the purposes of this analysis, we assume that the growth effects of administrative action will be spread out evenly between 2015 and 2024 and use CBO's estimates of how economic growth will affect the Federal budget in 2024 (CBO 2014a). Using our conservative lower-bound estimate for the impact of administrative action on immigration on GDP, or 0.4 percent, CEA estimates that the additional growth in GDP caused by administrative action on immigration would reduce the Federal deficit in 2024 by $25 billion. Our upper-bound estimate of 0.9 percent additional growth in GDP would yield a net deficit reduction of $60 billion in 2024.

The actual budget effect would depend on other features of the administrative actions as well. For example, to the degree that the administrative actions increase tax compliance for undocumented workers, they would raise additional revenue above and beyond the impact they would have on measured GDP, since undocumented workers are already contributing to GDP. CEA's analysis focused solely on the economic impacts of immigration actions and the impact of the higher growth on the budget and did not systematically estimate these other factors that would feed into a full budget scoring of the immigration actions.

While the economic growth resulting from administrative action on immigration is estimated to reduce deficits, comprehensive immigration reform would have a larger impact on the U.S. fiscal outlook. CBO noted that estimated changes in productivity, wages, and investment from the Senate bill would likely reduce the deficit by an additional $300 billion between 2024 and 2033 (CBO 2013b). This reduction due to economic growth would be in addition to the approximately $850 billion in deficit reduction from 2014 to 2033 that CBO estimated in their full budget scoring of the bill's provisions (CBO 2013a).

# Appendix: Detailed Methodology for GDP and Wage Estimates

In this Appendix, we offer further details on the methodology and assumptions underlying the GDP calculations summarized in Section I and the wage calculations summarized in Section II.

Recall our main framework for the changes in output associated with administrative action on immigration:

$$\%\Delta GDP = \%\Delta POP + \%\Delta LFPR + \%\Delta EMPR + \%\Delta \frac{Output}{Worker}$$

We characterize the changes in output associated with the announced administrative actions as changes in the working-age population, plus changes in the labor force participation rate, plus changes in the productivity of existing labor.[7] Within this section, we analyze each of these components separately for administrative actions centered on high-skilled immigration and for deferred action for low-priority individuals, offering a lower-bound estimate and an upper-bound estimate of the effects for each set of actions. Table 4 provides a detailed list of the assumptions used by CEA in constructing each of these estimates.

## Population

As noted above, compared to current administrative policy, relatively few additional immigrants will be allowed into the United States under the administrative actions considered in CEA's estimates, with some small exceptions. CEA thus estimates that the population changes associated with administrative actions will be very small. We estimate that the increase in the U.S. working-age population in 2024 due to immigration actions is between 0.02 percent and 0.05 percent, and these changes are entirely the result of actions focused on high-skilled immigration (expanded options for entrepreneurs and extended OPT for STEM graduates). Table 5 summarizes our estimates for changes in the working-age population in ten years.

### High-Skilled Immigration

DHS estimates that approximately 10,000 individuals will obtain new entrepreneurial temporary status or an immigrant visa each year, for a total of 100,000 until 2024. Not all of these will be allocated to individuals outside of the United States, and over a ten-year period there is also likely to be some immigrant outflow. To account for these two factors, we consider typical emigration rates from the Census Bureau (2012) and mortality rates from the Centers for Disease Control (CDC 2010). We further assume a conservative range of displacement rates, that is, the share of visas issued that do not add to the population because they displace visas held by workers already in the United States. Together, CEA assumes combined outflow and displacement rates ranging between 20 and 50 percent. Our lower- and upper-bound calculations, therefore, suggest that the 100,000 individuals who obtain either a new entrepreneurial temporary status or immigrant visa over ten years will increase the U.S. population by between 50,000 and 80,000 in ten years.

---

[7] Recall that we assume that the long-run employment rate will not change as a result of these immigration actions.

**Table 4: Summary of Key Assumptions Used in CEA's GDP Estimates**

| | Lower-Bound Estimate | Upper-Bound Estimate | Source |
|---|---|---|---|
| *GDP* | | | |
| 2014 GDP (in billions) | 17,336 | 17,336 | CBO (2014c) |
| 2024 projected real GDP (in billions of 2014 dollars) | 22,208 | 22,208 | CBO (2014c) |
| | | | |
| *Population* | | | |
| 2014 working-age population (in millions) | 248 | 248 | CBO (2014c) |
| 2024 estimated working-age population (in millions) | 274 | 274 | CBO (2014c) |
| Immigrant outflow and displacement rate | 0.50 | 0.20 | Based on CDC (2010)/Census (2012) |
| Share working-age population in total population | 0.78 | 0.78 | CBO (2014c)/Census |
| Share of H-1B holders who are married* | 0.73 | 0.73 | DHS |
| Trend increase in STEM enrollment due to policy change | 0 | 0.11 | Based on Kato and Sparber (2013) |
| Share of STEM PhDs who would remain in United States | 0.78 | 0.88 | Based on NSCG |
| Share of STEM MAs who would remain in United States | 0.46 | 0.52 | Based on NSCG |
| | | | |
| *Labor Force* | | | |
| 2014 labor force (in millions) | 156 | 156 | CBO (2014c) |
| 2024 estimated labor force (in millions) | 167 | 167 | CBO (2014c) |
| 2014 employment (in millions) | 146 | 146 | CBO (2014c) |
| 2024 projected employment (in millions) | 158 | 158 | CBO (2014c) |
| Labor force participation rate, all foreign-born residents | 0.66 | 0.66 | BLS (2014) |
| Labor force participation rate, foreign-born females | 0.55 | 0.55 | BLS (2014) |
| Labor force participation rate, foreign-born males | 0.79 | 0.79 | BLS (2014) |
| Foreign-born population (in millions) | 41 | 41 | 2013 ACS |
| Net annual immigration rate per 1,000 U.S. population | 3.8 | 3.8 | CBO (2014b) |
| Share of H-1B spouses with own H-1B work authorization* | 0.23 | 0.23 | DHS |
| Share of H-1B visa holders who are male* | 0.76 | 0.76 | DHS |
| | | | |
| *Output per Worker* | | | |
| Average annual wage, all U.S. workers (in dollars) | 44,321 | 44,321 | SSA (2013) |
| Average annual wage, undocumented workers (in dollars) | 22,029 | 22,029 | Oakford (2014) |
| Average annual wage, high-skilled immigrants (in dollars) | 99,800 | 99,800 | Based on NSCG |
| Share of undocumented immigrants who are female | - | 0.44 | Passel (2005) |
| Labor force participation rate, undocumented females | - | 0.56 | Passel (2005) |
| Labor force participation rate, advanced-degree holders | >0.95 | >0.95 | Based on NSCG |

*Share for H-1B visa holders adjusting to LPR status. In its analysis, CEA assumes that these rates are the same for the population of all H-1B visa holders.*

**Table 5: Estimated Changes to the Working-Age Population in 2024**

| Administrative action | Lower-Bound Estimate | Upper-Bound Estimate |
|---|---|---|
| Expanding options for foreign entrepreneurs | +39,000 | +62,000 |
| Extending OPT for STEM graduates | +17,000 | +62,000 |
| Work authorization for dependent spouses of H-1B visa holders with approved LPR applications | 0 | 0 |
| Portable work authorization for certain high-skilled workers | 0 | 0 |
| Deferred action for low-priority individuals | 0 | 0 |
| **Total** | +56,000 | +124,000 |

However, this number represents an increase in the total U.S. population, while our GDP identity requires information on the working-age population. We, therefore, scale the total population numbers by the 2014 working-age population share of total population of approximately 78 percent (calculated using data from CBO and Census), leaving a working-age population increase due to the 100,000 entrepreneurial visas of around 39,000 to 62,000.

The number of temporary students who graduate with U.S. master's and doctoral degrees who remain in the country to continue training in their course of study and who are likely to remain in the United States in 2024 under current policy is computed based on the staying rates in Tables 3 and 5 of Finn (2012) and linearly-projected degrees earned based on National Science Foundation (NSF) data. Some assumptions are made concerning the effect of the change in policy. Based on the National Survey of College Graduates (NSCG), the stay rates of master's graduates are computed to be 59 percent of those of doctoral graduates. Simulation of successive cohorts graduating provides an estimate of the additional number of STEM graduates in the U.S. in 2024 for our lower-bound estimate. Our upper-bound estimate also allows for increases in foreign enrollment in U.S. advanced-degree programs, as well as an increase in the likelihood that any given graduate will stay in the United States following graduation, in response to the change in policy. We use this information, in combination with typical marriage rates for high-skilled immigrants (73 percent) to reach our final estimates for increases in working-age population resulting from administrative action on STEM OPT extension of between 17,000 and 62,000.

The total estimated increase in working-age population due to new entrepreneurial visas and extension of STEM OPT is between 56,000 and 124,000 over ten years. CBO currently projects 2024 working-age population at 274 million, a 10.5 percent increase over the current 2014 working-age population of 248 million. CEA therefore estimates that this additional immigration would increase the working-age population of the United States in 2024 by between 0.02 percent and 0.05 percent relative to current administrative policy.

### Deferred Action

Deferred action would change the status of individuals already in the United States. For this reason, we do not estimate changes in the U.S. working-age population associated with these actions.

## Labor Force

Most of the administrative actions considered by CEA in its estimates will change the status of individuals already present and/or working in the United States. Therefore, we estimate changes in the size of the labor force to be relatively small, particularly in comparison to the effects of S. 744, the bipartisan Senate immigration reform bill (CBO 2013a). Our analysis estimates that increases in the U.S. labor force associated with administrative action on immigration are between 0.09 percent and 0.19 percent. Table 1 summarizes CEA's estimates of long-run changes in the size of the labor force.

### High-Skilled Immigration

Though the changes in the labor force may be small, they are still positive, as new entrepreneurs obtaining a temporary or permanent status, extended stays for STEM graduates, and work authorization for H-4 dependents all have implications for the size of the labor force. We rely on several key assumptions in calculating the labor force implications of actions designed to encourage high-skilled immigration (see Table 4).

Of the 39,000 to 62,000 increase in working-age population resulting from the 100,000 new entrepreneurial temporary status or permanent visas over ten years, we calculate that approximately 86 percent will contribute to increases in the labor force. Under the new policy, spouses of these individuals will also be eligible for work authorization. Based on DHS estimates of the share of married high-skilled visa holders (73 percent), we decompose the increase in working-age population into entrepreneurs and their spouses. Although entrepreneurs will all be incorporated into the labor force, spouses may opt not to participate. We thus discount the increase in working-age spousal population by the BLS (2014) estimate for the foreign-born population's labor force participation rate of 66 percent. In total, our estimates imply an increase in the U.S. labor force due to the 100,000 new entrepreneurial visas of between 33,000 and 53,000 in ten years.

Following directly from the estimated increases in working-age population (excluding spouses), we note that labor force participation rates of STEM graduates are very high (above 95 percent), as calculated from the NSCG. Increases in the U.S. labor force due to STEM OPT extension are thus calculated to be between 10,000 and 36,000 in ten years.

DHS estimates that 124,600 H-4 dependent spouses are eligible for new work authorization under the new policy in the first year. An additional 35,900 are estimated to be eligible on an annual basis thereafter. The total increase in H-4 dependent visa work authorization over ten years is thus 447,700. Once again, applying our attrition and displacement rates suggests take-up between 224,000 and 358,000 in ten years. Not all of these H-4 dependents require work

authorization from their principal visa holder spouses. In fact, DHS estimates that roughly 23 percent of H-1B spouses have their own visa work authorization, leaving between 172,000 and 276,000 spouses newly eligible for work authorization. Seventy-six percent of H-1B primary visa holders are male, according to DHS. Based on estimates from BLS (2014), their wives enter the labor force approximately 55 percent of the time. The male spouses of the remaining 24 percent of female primary visa holders enter the labor force at a rate of 79 percent (BLS 2014). Altogether, we estimate that over ten years offering work authorization to H-4 dependent visa holders will increase the labor force by between 104,000 and 167,000.

The total estimated increase in the U.S. labor force due to new entrepreneurial temporary status or permanent visas, extension of STEM OPT, and work authorization for H-4 dependents is between 147,000 and 255,000 over ten years. CBO currently projects that the U.S. labor force will be 167 million in 2024, a 7.1 percent increase over the current 2014 labor force of 156 million. The administrative actions encouraging high-skilled immigration would therefore increase the U.S. labor force in 2024 by between 0.09 percent and 0.16 percent relative to current administrative policy.

### Deferred Action

Parallel to our discussion about population changes, deferred action for certain low-priority undocumented immigrants would provide temporary relief for millions of individuals. Based on the academic literature, CEA does not estimate large changes in the labor force as a result of this component of the new actions on immigration. In fact, research on the 1986 IRCA, which, among other measures, provided work authorization for many undocumented workers, found little evidence of significant changes in labor force participation or employment status. Therefore, in our lower-bound estimate, we assume no impact of deferred action on labor force participation. However, recent research by Pan (2012) suggests that the labor force participation of female undocumented immigrants covered by the 1986 IRCA increased by 4 percentage points following the law's implementation. We rely on this statistic for our upper-bound calculation of the impact of deferred action on the labor force participation of undocumented immigrants.

To calculate the increase in female labor force participation associated with deferred action, we assume application and approval rates consistent with DACA.[8] A Pew Hispanic Center Report estimates that roughly 44 percent of the undocumented population are female (Passel 2005). Similarly, about 56 percent of female undocumented workers participate in the labor force. Relying on Pan's (2012) estimate, a 60 percent labor force participation rate increases the U.S. labor force by approximately 42,000 workers, or 0.03 percent.

# Output per Worker

In contrast with the relatively small estimated effects of administrative action on immigration on changes in population and changes in the labor force, we estimate the announced actions to have the largest impacts on output per worker. For our analysis, we decompose output per worker

---

[8] Importantly, though, this assumption may only be approximately valid, as the population of individuals potentially eligible for deferred action under these actions is different from those eligible under DACA.

into four components: (1) total factor productivity; (2) hours supplied per worker; (3) the skill composition of the labor force; and (4) capital intensity. CEA estimates that increases in output per worker associated with immigration actions are between 0.29 percent and 0.70 percent, or around 70 percent of the total estimated effect.

### High-Skilled Immigration

A body of academic research conducted over the past ten years has found that high-skilled immigration has positive effects on innovation (as measured by patenting) and on total factor productivity. Due to increased flexibility in the overall labor market, wages may increase, which in turn may increase labor supply (or hours per worker). Finally, because the main changes in the labor force that we document are due to high-skilled labor, our estimates reflect increases in the skill intensity of work. If capital does not fully adjust to meet the larger labor force, we may see decreases in capital intensity.

We rely on estimates from Peri (2012) to consider the impact of immigration on output per worker. Across 10 regression specifications, Peri (2012) finds that immigration is positively associated with total factor productivity. We use the minimum (0.61) and the maximum (1.37) of these estimated elasticities in our lower and upper bounds (see Table 6 for details on the elasticities used). In other words, a one percent increase in the foreign-born employment share increases total factor productivity by between 0.61 percent and 1.37 percent. Our estimated increase in the foreign-born share of total employment in ten years due to administrative action encouraging high-skilled immigration ranges from 0.08 percent (in our lower-bound estimate) to 0.13 percent (in our upper-bound estimate).[9] Therefore, increases in the foreign-born employment share resulting from administrative action on immigration translate into approximately a 0.05 percent to 0.18 percent increase in total factor productivity.[10]

---

[9] We calculate the foreign-born employment share as follows: CBO (2014c) reports total employment of 146 million in 2014 and a forecasted 158 million in 2024. The 2013 American Community Survey reports that the foreign-born population was about 41 million. We estimate the foreign-born population in 2024 using CBO's net immigration rate of 3.8 per 1,000 in the U.S. population (see CBO 2014b). This corresponds to a net inflow of approximately 12 million foreign-born individuals by 2024, for a total of 54 million. As elsewhere in this analysis, we scale these total population numbers down to working-age population (78 percent) and then by the BLS (2014) estimate of the foreign-born labor force participation rate (66 percent). Taken together, the foreign-born employment share in 2014 is 14.6 percent and estimated to be 17.5 percent in 2024 in the absence of administrative action on immigration. The increase in the foreign-born labor force, as presented in Table 1, therefore increases the foreign-born employment share by between 0.08 percent and 0.13 percent, relative to current administrative policy.

[10] To examine the robustness of this estimate, CEA also used an alternative methodology, based on research by Hunt and Gauthier-Loiselle (2010), to calculate the total factor productivity gains from high-skilled immigration. Both methods yield roughly similar results.

**Table 6: Summary of Key Elasticities Used in CEA's Estimates**

| | Lower-Bound Estimate | Upper-Bound Estimate | Source |
|---|---|---|---|
| *Output per Worker* | | | |
| Total factor productivity | 0.61 | 1.37 | Peri (2012) |
| Hours per worker | 0.09 | 0.61 | Peri (2012) |
| Capital intensity | -0.22 | 0.27 | Peri (2012) |
| Wage effects of 1986 IRCA | 6.00 | 10.00 | Kossoudji and Cobb-Clark (2002) |

We follow the same logic to calculate increases in hours per worker associated with high-skilled immigration. Peri's (2012) estimates range from 0.09 to 0.61, suggesting that a one percent increase in the foreign-born employment share increases average hours worked by between 0.09 percent and 0.61 percent. Given the estimated increases in the foreign-born employment share due to administrative action, hours per worker are estimated to increase by between 0.01 percent and 0.08 percent.

As immigration is typically unskilled-labor intensive (i.e., most immigrants to the United States are lower-skilled than the average native worker), Peri (2012) finds that immigration is negatively associated with the skill intensity of the labor force. This is not the case with the current set of administrative actions, since, as Table 1 notes, the bulk of labor force increases are due to the administrative actions encouraging high-skilled immigration. For this reason, we take a different approach to understanding the impact of high-skilled immigration on the skill composition of the labor force. Our approach utilizes information on the average wage in the United States from the Social Security Administration ($44,321 in 2012) and the average wage calculated from the NSCG for workers in STEM occupations who hold a visa ($99,800 in 2010) to calculate the skill intensity of work based on wages.[11] We find a gain of between 0.11 percent and 0.17 percent, relative to current administrative policy.

Finally, though the effects are typically statistically insignificant, we also rely on Peri's (2012) work to consider that the capital stock may not fully adjust in response to the increase in labor. If this is the case, we may see a decrease in capital intensity with immigration. The estimated elasticities in Peri (2012) range from -0.22 to 0.27, suggesting that a one percent increase in the foreign-born employment share may decrease capital intensity by 0.22 percent or increase capital intensity by 0.27 percent. Again, these estimates are not statistically significant. Nevertheless, given the computed increase in the foreign-born employment share, we estimate changes in capital intensity ranging from -0.02 percent to 0.04 percent.

Summing these calculated effects offers an estimate of the total impact of high-skilled immigration on output per worker. Our lower estimate, which incorporates slowly adjusting capital, indicates that administrative action on immigration would increase output per worker by at least 0.15 percent, while our upper-bound estimate reaches 0.47 percent.

---

[11] In our upper-bound estimate, we also use average annual wage information calculated by Oakford (2014) for undocumented workers ($22,029).

### Deferred Action

Unlike the actions encouraging high-skilled immigration, there is no new immigration proposed as part of deferred action for low-priority undocumented immigrants. For this reason, we cannot use the estimated elasticities in Peri (2012) to calculate the impact of deferred action on output per worker. However, we know that alongside the productivity-enhancing benefits of high-skilled immigration, lower-skilled immigration allows workers to reallocate to better-matched and higher-paying positions. We also know that this job reallocation and task specialization has additional benefits for native workers in terms of increased productivity and wages (Peri and Sparber 2009).

We rely on work by Kossoudji and Cobb-Clark (2002) that documents an increase in wages for undocumented workers who were covered by the provisions of the 1986 IRCA. The authors report that workers gaining legal permanent status saw wage increases of 6 percent relative to a comparison group from the National Longitudinal Survey of Youth (NLSY). We use this estimate in our lower bound. It captures all of the components of output per worker in the worker's wage. For instance, research by Peri and Sparber (2009) finds increases in total factor productivity due to task specialization with low-skilled immigration. Barcellos (2011) documents significant occupational mobility for workers changing status under IRCA, which offers evidence that the task reallocation impact is not strictly from new immigration. Kossoudji and Cobb-Clark (2002) also report an additional 4 percent increase in wages due to observable characteristics of immigrants covered by the law. They note that this is consistent with increases in investment in human capital associated with reductions in uncertainty about legal status. We therefore consider a 10 percent increase in wages for the workers granted temporary relief through deferred action in our upper-bound estimates.

We calculate the total increase in output per worker associated with these wage gains based on a calculation in Oakford (2014) for the average wage for undocumented workers ($22,029). When combined with the estimated wage gains from Kossoudji and Cobb-Clark (2002), this translates into a total increase in labor income for undocumented workers of between $3.1 billion and $5.2 billion. Over ten years, these labor income increases amount to between 0.14 percent and 0.23 percent of GDP.

## U.S.-Born Worker Wages

The increase in productivity of the American workforce that we estimate in response to the announced actions on immigration has positive implications for wages for immigrants and native workers alike. In this section, we focus on the wage implications of administrative action on immigration for native workers alone. Given average annual earnings for all workers of $44,321 and average annual earnings for foreign-born workers (both undocumented and legal immigrants) of $43,864, this suggests that the average native worker earns higher wages than the average immigrant worker. In fact, we calculate an average annual wage of $46,185 for native workers. Therefore, increases in native wages may in fact be greater, in dollar terms, than increases for all workers. As with our GDP calculations, we consider the impact on native wages

of the administrative actions encouraging high-skilled immigration and of deferred action separately.

### Table 7: Summary of Estimates Used in Wage Calculations

| Group | Mean annual earnings (2014) |
| --- | --- |
| Foreign-born workers | $43,864 |
| Native workers | $46,185 |
| Native college-educated workers | $70,242 |
| Native non-college-educated workers | $33,689 |
| Native high school graduates | $35,209 |

Note: All estimates from 2014 Current Population Survey March supplement.

## High-Skilled Immigration

Peri, Shih, and Sparber (2014) document an increase in native workers' wages in response to high-skilled immigration. Specifically, a one percentage point increase in the foreign-born STEM employment share increases the growth rate of college-educated native workers' wages by a lower-bound estimate of 5.6 percentage points. The authors also report increases in the growth of wages for native-born high school graduates of around 4.1 percentage points in response to foreign-born STEM immigration of one percentage point. Though the point estimates are positive, there is no statistically significant impact of high-skilled immigration on the wages of native high school dropouts.

Using our estimated actual increase in the foreign-born employment share (see footnote 9), we calculate an increase in native-born college-educated workers' wage growth over ten years of 0.43 percentage point and an increase in high school graduate workers' wage growth over ten years of 0.31 percentage points. Average wages for native-born college graduates and native-born high school graduates from the 2014 Current Population Survey (CPS) March supplement are $70,242 and $35,209, respectively. In combination with real wage growth projections for 2024 from CBO (2014c),[12] we calculate wage increases for native-born college graduates of around $300 and wage increases for high school graduates of around $110, relative to current administrative policy. This amounts to a 0.37 percent increase in wages for native college-graduates and a 0.27 percent increase in wages for high school graduates over the ten-year period.

## Deferred Action

As we have previously mentioned, the increased flexibility in the labor market resulting from the President's actions on immigration will allow all workers to specialize in the jobs best suited for their abilities, increasing productivity and wages. In fact, Chassamboulli and Peri (2014) consider a model with legal migration, unauthorized migration, and a native population and simulate reductions in the unauthorized population as a result of changing status to understand the implications for the wages of native workers. Combining their estimate for native wage growth

---

[12] Because CBO does not forecast wage growth for native workers and foreign-born workers separately, we assume that the rate of wage growth for native workers will be identical to that of all workers.

with CEA's estimate of the number of individuals affected by deferred action, we calculate an additional 0.08 percent, or $40, increase in native workers' annual earnings by 2024.

# References

Barcellos, Silvia Helena. 2011. "Legalization and the Economic Status of Immigrants." RAND Corporation Working Paper.

Borjas, George J. 2003. "The Labor Demand Curve *is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market." *Quarterly Journal of Economics* 118(4): 1335-1374.

Borjas, George, Richard B. Freeman, Lawrence F. Katz, John DiNardo, and John M. Abowd. 1997. "How Much Do Immigration and Trade Affect Labor Market Outcomes?" *Brookings Papers on Economic Activity* 1997(1): 1-90.

Bratsberg, Bernt, James F. Ragan, and Zafar M. Nasir. 2002. "The Effect of Naturalization on Wage Growth: A Panel Study of Young Male Immigrants." *Journal of Labor Economics* 20(3): 568-597.

Bureau of Labor Statistics (BLS). 2014. "Foreign-Born Workers: Labor Force Characteristics – 2013." BLS News Release, May 22, 2014.
http://www.bls.gov/news.release/archives/forbrn_05222014.pdf.

Card, David. 1990. "The Impact of the Mariel Boatlift on the Miami Labor Market." *Industrial and Labor Relations Review* 43(2): 245-257.

Census Bureau. 2012. "Methodology and Assumptions for the 2012 National Predictions." http://www.census.gov/population/projections/files/methodology/methodstatement12.pdf.

Centers for Disease Control and Prevention (CDC). 2010. "Death Rate by 10-Year Age Groups: United States and Each State, 2007."
http://www.cdc.gov/nchs/data/dvs/MortFinal2007_Worktable23r.pdf

Chassamboulli, Andri and Giovanni Peri. 2014. "The Labor Market Effects of Reducing Undocumented Immigrants." NBER working paper. http://www.nber.org/papers/w19932.

Congressional Budget Office (CBO). 2013a. "Cost Estimate: S. 744, Border Security, Economic Opportunity, and Immigration Modernization Act." June 18, 2013.
https://www.cbo.gov/publication/44225.

Congressional Budget Office (CBO). 2013b. "The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act." June 18, 2013.
https://www.cbo.gov/publication/44346.

Congressional Budget Office (CBO). 2014a. "The Budget and Economic Outlook: 2014 to 2024." February 4, 2014. http://www.cbo.gov/publication/45010.

Congressional Budget Office (CBO). 2014b. "The 2014 Long-Term Budget Outlook." July 15, 2014. http://www.cbo.gov/publication/45471.

Congressional Budget Office (CBO). 2014c. "An Update to the Budget and Economic Outlook: 2014 to 2024." August 27, 2014. http://www.cbo.gov/publication/4563.

Finn, Michael G. 2012. "Stay Rates of Foreign Doctorate Recipients from U.S. Universities, 2009." Oak Ridge Institute for Science and Education.

Friedberg, Rachel M. 2001. "The Impact of Mass Migration on the Israeli Labor Market." *Quarterly Journal of Economics* 116(4): 1373-1408.

Hunt, Jennifer. 1992. "The Impact of the 1962 Repatriates from Algeria on the French Labor Market." *Industrial and Labor Relations Review* 45(3): 556-572.

Hunt, Jennifer and Marjolaine Gauthier-Loiselle. 2010. "How Much Does Immigration Boost Innovation?" *American Economic Journal: Macroeconomics* 2: 31-56.

Kato, Takao and Chad Sparber. 2013. "Quotas and Quality: The Effect of H-1B Visa Restrictions on the Pool of Prospective Undergraduate Students from Abroad." *Review of Economics and Statistics* 95(1): 109-126.

Kossoudji, Sherrie A. and Deborah A. Cobb-Clark. 2002. "Coming Out of the Shadows: Learning about legal Status and Wages from the Legalized Populaiton." *Journal of Labor Economics* 20(3): 598-628.

Oakford, Patrick. 2014. "Administrative Action on Immigration Reform: The Fiscal Benefits of Temporary Work Permits." Center for American Progress, September 2014. http://cdn.americanprogress.org/wp-content/uploads/2014/09/OakfordAdminRelief.pdf.

Ottaviano, Gianmarco and Giovanni Peri. 2012. "Rethinking the Effects of Immigration on Wages." *Journal of the European Economic Associate* 10(1): 152-197.

Pan, Ying. 2012. "The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986." *Journal of Labor Research* 33: 119-142.

Peri, Giovanni, Kevin Shih, and Chad Sparber. 2014. "Foreign STEM Workers and Native Wages and Employment in U.S. Cities." NBER Working Paper 20093. http://www.nber.org/papers/w20093.

Peri, Giovanni and Chad Sparber. 2009. "Task Specialization, Immigration, and Wages." *American Economic Journal: Applied* 1(3): 135-169.

Passel, Jeffrey. 2005. "Unauthorized Migrants: Numbers and Characteristics." Pew Hispanic Center, June 14, 2005. http://www.pewhispanic.org/files/reports/46.pdf.

Social Security Administration (SSA). 2013. "National Average Wage Index." Retrieved November 14, 2014. http://www.ssa.gov/OACT/COLA/AWI.html.

# DEF-INTERV.

# EX. 113



# CATO AT LIBERTY

**JANUARY 18, 2017 3:00PM**

# The Economic and Fiscal Impact of Repealing DACA

*By* IKE BRANNON *and Logan Albright*

**Executive Summary**

Donald Trump has proposed eliminating or severely modifying the Deferred Action for Childhood Arrivals (DACA) program. Many Americans believe that the presence of unauthorized immigrants is harmful to the economy and would like to see steps taken to reduce their presence. However, a repeal or roll-back of DACA would harm the economy and cost the U.S. government a significant amount of lost tax revenue. We estimate that the fiscal cost of immediately deporting the approximately 750,000 people currently in the DACA program would be over $60 billion to the federal government along with a $280 billion reduction in economic growth over the next decade.

We arrived at our estimates by comparing and adjusting the characteristics of DACA recipients to similarly well-educated immigrants admitted through the H-1B visa program, a cohort that not only resembles the population of DACA recipients but whose own economic impact has been well-studied. We use the estimated budgetary and economic impact of H-1B visa workers and adjust it to reflect the age and earnings differences between the two groups to calculate our figures.

**Background**

President Obama created the DACA program in 2012 via executive action. DACA's objective was to allow American residents who entered the country illegally as children to receive temporary protection from deportation, work permits, and an incentive to invest in their own human capital. The program only applies to those who have lived in the United States for five years or longer and do not have a criminal record. Essentially, these are people who never knowingly broke any law and have been productive and peaceful members of society since their arrival. The logic of the Obama Administration in creating DACA is that it makes little sense to expend time and resources trying to track down, arrest, and deport these people when they have not committed any crime save for being unwittingly brought across the border by others.

There is much legitimate debate in the United States over the role that immigration—both legal and illegal—plays in the economy, and what should be done about border security. Inseparable from this problem is the question of what to do with the undocumented immigrants already in the country, a sizeable population that is estimated to number 11 to 12 million.[1]

President-Elect Donald Trump has taken an absolutist position on the issue, vowing not only to build a wall with the intent of greatly reducing illegal entry from the Mexican border, but also to unilaterally nullify President Obama's executive actions dealing with immigration, including the action which spawned DACA.

As with any sudden and dramatic shift in any policy, there are bound to be costs associated with implementation, as well as after-effects of the policy, not all of which are immediately intuitive. It is the goal of this paper to examine the costs that the wholesale repeal of DACA would impose on the American economy, both in terms of enforcement as well as the sudden loss of a large number of residents and their contributions to the domestic economy.

**Who Are the DACA Recipients?**

Although there have been many previous studies on the costs and benefits of immigration as a whole (we recently authored a <u>review</u> of such studies), it is important to note that we cannot simply assume that DACA recipients constitute a representative sample of the immigrant population. In addition to the aforementioned screening for criminal activity, workers in the DACA program tend to be younger, better educated, and more highly paid than the typical immigrant. To extrapolate from the studies on immigration in general, therefore, would significantly underestimate the opportunity cost to the economy of deporting the approximately 750,000 program participants, due to their higher level of productivity.

We instead looked for another group that might more closely resemble the demographic characteristics of those in the DACA program whose economic and budgetary impacts on the economy is well established: the recipients of H-1B visas, which are issued to skilled workers who are invited into the country to fulfill specific economic needs. This coincidence is useful.

The average DACA recipient is 22 years old, employed, and earns about $17 an hour. The majority are still students and 17 percent are pursuing an advanced degree.[2] By contrast, most recipients of H-1B visas are between 25 and 34 and hold either a Bachelor's Degree or a Master's Degree. In short, they appear to be a close reflection of what DACA recipients will look like a few years from now as they complete their educations.[3]

While the comparison is not perfect, as no such comparison can be, calculating costs under the assumption that DACA recipients are more like H-1B Visa holders than the general population of unauthorized immigrants will, we believe, yield a more accurate result. And given that we know the demographic and educational differences between the two groups we take those differences into account when estimating the fiscal and economic costs of repealing DACA.

**Economic Costs**

As of June 2016, U.S. Citizenship and Immigration Services has received 844,931 applications for the DACA program. Of these, 741,546 were accepted, with the rest either denied or pending approval.[4] It should be noted that the applicants to DACA are asked to pay the administrative fees for background checks and

processing, so the administrative costs of implementing the program itself are minimal. While the Obama Administration had announced its intention to expand the program last year, this is unlikely to occur under the Trump Administration, so we will accept these numbers as representative of the affected population.

Little research has been done on the effects of DACA itself, which is why we have chosen to extrapolate the program's economic impact from the research done on holders of H-1B visas, who are demographically similar to workers in the DACA program, as well as from the numerous studies on the economic effects of undocumented immigration generally.

One study on DACA itself was conducted by Nolan G. Pope and published in the *Journal of Public Economics* in 2016. Nolan found that DACA moved between 50,000 and 75,000 immigrants into employment from either outside the formal labor force or unemployment, and increased the average income of immigrants in the bottom of the income distribution.[5] This is a positive labor market outcome for a number of reasons: working and earning a higher level of income in the formal sector means that the DACA workers pay more taxes, both through payroll, income, and sales as a result of greater consumption associated with higher incomes. The Organization of Economic Co-operation and Development (OECD) cited employment as "the most important factor that weighs on migrants' net fiscal contributions," so it is clear that any increase in immigrant employment will tend to result in a positive fiscal impact.[6]

A 2014 survey found that 59 percent of DACA recipients reported getting their first job, 45 percent received a pay increase, 49 percent opened their first bank account, and 33 percent got their first credit card due to their participating in DACA.[7] All of these factors contribute positively to the economy. But while the survey also noted that recipients would be eligible for higher levels of education, Pope's research completed two years later found no correlation between DACA participation and education, although it is possible that simply not enough time has passed to observe an effect.

Turning more generally to the cost-benefit analysis of unauthorized immigration as a whole, the evidence suggests that the mere presence of undocumented workers, especially non-criminals like those covered under DACA, is not nearly as detrimental to the economy as most people suppose, and may actually be a net benefit. Legalizing unauthorized immigrants and allowing them to participate in society as legal workers dramatically reduces government enforcement costs and generates broader economic benefits. [8]

## Quantifying the Net Costs

Quantifying the costs of any action on immigration presents enormous difficulties, due to the complexity and number of variables involved.

Alex Nowrasteh, a scholar at the Cato Institute, points out that while the economic impact of immigration is large and positive, the fiscal impact tends to be minimal. Nowrasteh also stresses the need to take into account the long-term effects of immigration, meaning the contributions of immigrants' children and grandchildren, which tend to be more positive than those of first generation immigrants. [9]

There are unquantifiable benefits from DACA as well, such as providing increased access to private health insurance, driver's licenses, and auto insurance, all of which generate spillover benefits to the rest of society. This analysis also leaves out the effects of simply having more productive minds in the country capable of producing innovations and increasing labor productivity. The data show that immigrants start their own businesses and file patents at greater rates than native-born Americans. [10]

The fiscal costs of DACA recipients are also minimal and comparable to the fiscal costs of H-1B workers.[11] Under current law, DACA recipients are ineligible for means-tested welfare benefits provided by the federal government or funded through federal matching grants to the states.[12]  Although states can extend welfare benefits to DACA recipients if they choose to, few have done so. DACA recipients, like everybody else in the United States, are eligible for emergency Medicaid. Thus, DACA does not boost government welfare expenditures above the level consumed by unauthorized immigrants.

To reiterate, we need to isolate DACA recipients—who tend to be more educated, younger, and less prone to criminal activity—from the general population of unauthorized immigrants to derive an accurate estimate of DACA's impact. To do this, we begin by comparing them to the holders of H-1B visas, the work permits issued for high-skilled labor. The main difference between the two groups is age, with H-1B visa holders being on average 3 to 12 years older. With this age gap also comes the concomitant difference in education and earnings, which we can adjust for in our calculations.

Thomas Church, a senior fellow at the Hoover Institution, estimates that expanding the H-1B visa program over a ten year period would increase GDP by $456 billion and tax revenues by $113 billion, assuming that 660,000 new H-1B immigrants would arrive over the decade.[13] Church obtains his results by taking the mean wages for H-1B immigrants, assuming an average wage growth of 3 percent per year, and applying the appropriate tax rates.

Church also incorporates income accrued to capital from these workers, using the relatively stable historical averages calculated by the Congressional Budget Office. Multiple studies have been conducted on the impact of immigration on native wages, and the results have been both positive and negative, albeit small in either direction. There is also some evidence that the presence of immigrant workers can increase purchasing power by reducing consumer prices. Given these conflicting and minor findings, Church has not included wage or purchasing power effects in his calculations, and we have done the same.

We take Church's estimate as our baseline and begin by adjusting it to reflect the 741,546 participants in the DACA program—which is a bit more than his H-1B expansion called for—producing an estimated GDP gain of $512 billion and a budgetary impact of $127 billion.

However, since the average wages of DACA participants are lower than H-1B immigrants, we corrected these values to reflect the relative youth and inexperience of DACA immigrants. DACA participants earn an average of $34,000 annually and H-1B participants an average of $72,000 annually, a ratio of 47 percent. Applying this ratio to the economic and fiscal costs above yields an economic impact of $215 billion and a fiscal impact of $60 billion.

We feel this is a conservative estimate due to the fact that many DACA immigrants are young and still acquiring education credentials that will boost wages later.  DACA immigrants are less like H-1B immigrants at half the salary, and more like younger H-1B workers. Additionally, the higher tax brackets associated with higher incomes would increase DACA immigrants' fiscal contributions at a greater rate than the increase in salary. In other words, doubling the wages of DACA participants would more than double their contributions to state and federal budgets. Thus, a life-cycle comparison of the wages of the two groups would produce a narrower difference.

For comparison, an influential study by the National Research Council[14] examined the present value fiscal impact of immigration in the United States, with an emphasis on long-term impact. The study points out that immigrants become more productive over time as they learn new skills and become more fluent in English. The authors concluded that the average immigrant will have a net long-term impact on state, local and federal budgets of $80,000, which includes tax payments as well as the impact of the children of immigrants, who tend to be less costly—and higher-earning—than their parents. Multiplying this estimate by the number of DACA recipients produces an estimated fiscal impact of $59.3 billion, nearly identical to the $60 billion fiscal impact we derived from the Hoover study.

We also need to add the actual cost of deportation for current DACA recipients to the fiscal and economic estimates. For this we borrow from a study from the Center for American Progress that estimates the marginal deportation costs at just over $10,000 per removal.[15] The total deportation cost would then be $7.5 billion.

Summing these numbers produces a total cost estimate of immediately eliminating the DACA program and deporting its participants of $283 billion over 10 years. In other words, the United States economy would be poorer by more than a quarter of a trillion dollars if President Trump were to make good on his threat to repeal it.

There are other variables that potentially impact both the costs and benefits of immigrant workers, and the further into the future we attempt to project such costs and benefits the more difficult accurate estimates become. For example, our calculation used only the current number of DACA recipients, but it is estimated that there could be another one million eligible residents who have not yet applied for, or received, membership in the program.[16] We do not make any forecast regarding whether this cohort would eventually take advantage of the program and instead assume none of them would do so.

Likewise, assuming immediate deportation instead of a temporary reversion to undocumented status changes the calculus as well, considering the costs that result from people trying to live outside the law. This would need to be taken into account.

Alex Nowrasteh of Cato suggested that it is probably more realistic to assume that upon a repeal of DACA the newly unauthorized immigrants would predominantly remain in the United States and pursue employment illegally, at wages 10 percent to 20 percent less than they earned legally. If we combined that with a similar reduction in employment levels then the resulting economic impact would be a bit less—in the range of $60-$100 billion—but still significant.[17]

Regardless of the response, it is clear that there is a significant fiscal and economic cost to the immediate repeal of DACA, one borne by all of the nation's residents and not just by those whose lives would be upended by such a move. This suggests that it would make more sense to focus immigration enforcement efforts elsewhere—if indeed the aim is to protect American national sovereignty, as well as the life, liberty, and private property of Americans.

**Small Gains, Big Costs**

There are valid reasons to be concerned about unauthorized immigration in the United States. The DACA program, however, screens out anyone with a criminal past as part of its core eligibility requirements. DACA participants are not eligible for means-tested welfare benefits or Obamacare subsidies.

Since DACA applicants pay their own processing fees, the program itself does not have an administrative cost, and so the only costs we need to evaluate are those that stem from having these people in the country in the first place. We submit that any such costs are far outweighed by the benefits that come from immigrants who are able to work openly and legally, pay taxes, support entitlement programs, create jobs, innovate, and sire children who will one day do the same.

The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants.

---

[1] Jeffrey S. Passel and D'Vera Cohn, "Unauthorized Immigrant Population Stable for Half a Decade," (Washington: Pew Research Center, September 21, 2016), http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/.

[2] Tom K. Wong, "Results of Tom K. Wong, National Immigration Law Center, and Center for American Progress National Survey," (Washington: National Immigration Law Center and Center for American Progress, June 2015), https://cdn.americanprogress.org/wp-content/uploads/2015/07/DACA-Wong_NILC_CAP-Codebook-PDF.pdf.

[3] "Characteristics of H-1B Specialty Occupation Workers," Fiscal Year 2014 Annual Report to Congress (Washington: U.S. Citizenship and Immigration Services, February 26, 2015), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/H-1B/h-1B-characteristics-report-14.pdf.

[4] "Number of I-821D, Consideration of Arrivals by Fiscal Year, Quarter, Intake, Biometrics, and Case Status: 2012-2016," (Washington: U.S. Citizenship and Immigration Services, June 30, 2016), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%....

[5] Nolan G. Pope, "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143 (2016): 98-114.

Organization for Economic Cooperation and Development, "International Migration Outlook," (Paris: OECD, 2013), p. 161.

[7] Robert G. Gonzales and Angie M. Bautista-Chavez, "Two Years and Counting: Assessing the Growing Power of DACA," American Immigration Council Special Report (Washington: American Immigration Council, June 14, 2014), https://www.americanimmigrationcouncil.org/research/two-years-and-counting-assessing-growing-power-daca.

[8] Ike Brannon and Logan Albright, "Immigration's Impact on the Texas Economy," Texas Public Policy Foundation (Austin: TPPF, March 2016), http://www.texaspolicy.com/library/doclib/Immigration-s-Impact-on-the-Texas-Economy.pdf.

[9] Alex Nowrasteh, "The Fiscal Impact of Immigration," Cato Institute Working Paper (Washington: Cato Institute, July 23, 2014), https://object.cato.org/sites/cato.org/files/pubs/pdf/working-paper-21-fix.pdf.

[10] American Immigration Council, "Value Added: Immigrants Create Jobs and Businesses, Boost Wages of Native-Born Workers," American Immigration Council Factsheet (Washington: AIC, January 2, 2012), https://www.americanimmigrationcouncil.org/research/value-added-immigrants-create-jobs-and-businesses-boost-wages-native-born-workers.

[11] Ruth Ellen Wasem, "Noncitizen Eligibility for Federal Public Assistance: Policy Overview and Trends," Congressional Research Service (Washington: CRS, September 27, 2012).

[12] "Frequently Asked Questions: The Obama Administration's DAPA and Expanded DACA Programs," National Immigration Law Center (Washington: NILC, March 2, 2015), https://www.nilc.org/issues/immigration-reform-and-executive-actions/dapa-and-expanded-daca-programs/.

[13] Thomas V. Church, "Estimating the Economic and Budgetary Effects of New H-1B Visas in the Senate Gang of Eight's Proposed Immigration Bill," Hoover Institution (Stanford: Hoover, May 7, 2013), http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf.

James P. Smith and Barry Edmonston, editors, "The New Americans: Economics, Demographic, and Fiscal Effects of Immigration," National Academies Press (Washington: NAP, 1997), p. 346.

[15] https://www.americanprogress.org/issues/immigration/news/2015/02/23/1069.

[16] Philip E. Wolgin, "What Would it Cost to Deport All 5 Million Beneficiaries of Executive Action on Immigration?" Center for American Progress (Washington: CAP, February 23, 2015),

https://www.americanprogress.org/issues/immigration/news/2015/02/23/106983/would-it-cost-to-deport-all-5-million-beneficiaries-of-executive-action-on-immigration/.

[17] Alex Nowrasteh, "Heritage Immigration Study Fatally Flawed," Cato at Liberty, April 4, 2013, https://www.cato.org/blog/heritage-immigration-study-fatally-flawed.

---

**Topics:**  International Economics,  Development & Immigration

**Tags:**  immigration, DACA, Trump

---

This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License.

# DEF-INTERV.

# EX. 114

# HEALTH CARE FOR IMMIGRANT FAMILIES

## CURRENT POLICIES AND ISSUES



YOUNG CHILDREN OF IMMIGRANTS: RESEARCH FINDINGS AND POLICY CHOICES

LEIGHTON KU
MARIELLEN JEWERS



NATIONAL CENTER ON IMMIGRANT INTEGRATION POLICY

# HEALTH CARE FOR IMMIGRANT FAMILIES
## Current Policies and Issues

Leighton Ku and Mariellen Jewers

George Washington University

June 2013



# Acknowledgments

The authors appreciate helpful suggestions and editing from colleagues at the Migration Policy Institute (MPI) and analytic help from Brian Bruen of George Washington University.

A version of this report was produced for a public symposium convened by MPI's National Center on Immigrant Integration Policy in January 2013. The goal of this and other reports in the series is to frame the major policy and practice issues affecting children (birth through age 10) with immigrant parents. By drawing on scholarly research, the papers collectively address public policy in the areas of early education, health, and immigration. Both the symposium and the research flowing from it were supported by the Foundation for Child Development.

To access other papers produced for the symposium, please visit: www.migrationpolicy.org/integration.

© 2013 Migration Policy Institute.
All Rights Reserved.

Cover Photo: "Nurse with a patient in the hospital" (103311101) — Shutterstock.com
Cover Design: April Siruno and Rebecca Kilberg, MPI
Typesetting: Rebecca Kilberg, MPI

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from: www.migrationpolicy.org.

Information for reproducing excerpts from this report can be found at www.migrationpolicy.org/about/copy.php. Inquiries can also be directed to: Permissions Department, Migration Policy Institute, 1400 16th Street, NW, Suite 300, Washington, DC 20036, or by contacting communications@migrationpolicy.org.

Suggested citation: Ku, Leighton and Mariellen Jewers. 2013. *Health Care for Immigrant Families: Current Policies and Issues.* Washington, DC: Migration Policy Institute.



# Table of Contents

Executive Summary .................................................................................4

I.    Introduction ...................................................................................5

II.   Health Insurance Coverage in the United States ..........................6

III.  Access to Health Care ...................................................................11

IV.   Language Barriers ..........................................................................17

V.    Immigration Reform and Health Care ...........................................18

    A.   Health Insurance .........................................................................19
    B.   Health Care Access .....................................................................19
    C.   Reducing Language Barriers .......................................................20

VI.   Issues for Future Consideration ....................................................20

Works Cited ............................................................................................22

About the Authors .................................................................................24



# Executive Summary

The prospect that Congress may act on a comprehensive immigration reform bill provides an important opportunity to assess how the current American system addresses the health needs of immigrants in the United States.

Low-income immigrants are much more likely to lack health insurance than similarly poor native-born citizens, because of shortfalls in their access to both public insurance, such as Medicaid and the Children's Health Insurance Program, as well as private job-based health insurance. The 1996 welfare reform law restricted access for recent lawful permanent residents (LPRs) for public insurance; meanwhile, unauthorized immigrants remain ineligible. Immigrants are also less likely to be offered job-based insurance, at least in part because they often work in sectors — such as agriculture, food service, and construction — that have low insurance coverage.

As a result, immigrants also have less access to health care services and are less likely to see a doctor or even visit an emergency room. In addition to problems affording care among the many who are uninsured, immigrants often encounter problems finding health care providers who can communicate in their language. Safety-net clinics, such as nonprofit community health centers, help provide access even to the poor and uninsured, but have their limits. There have been a number of efforts to help assure that those who lack English proficiency can get language assistance, such as interpreters, but there is little information about whether these efforts are making gains.

Prospects are improving, however. A 2009 law allows states to eliminate the five-year waiting period for LPR children and pregnant women, and a large number of states have expanded coverage for these groups. The *Affordable Care Act* will also help many legal immigrants by expanding Medicaid coverage and offering better opportunities to buy private health insurance in new health insurance exchanges, with income-related tax subsidies to help make them more affordable.

*Low-income immigrants are much more likely to lack health insurance than similarly poor native-born citizens.*

It is too early to assess how comprehensive immigration reform bills may affect health care access for immigrants, including those who may be on a path toward citizenship. The federal health reform law has been — and remains — polarizing, and immigration reform is likely to be controversial, so the combination of issues could be vexing. Initial legislative proposals have shown reluctance to provide access to health insurance coverage to unauthorized immigrants who gain provisional status on the path toward citizenship. Even so, there are a variety of ways to help improve health access for needy immigrants, particularly those who have been legally admitted. These include encouraging states to take up the option to expand Medicaid and to adopt options to eliminate waiting periods for legal immigrant children and pregnant women. Supporting the health care safety net by, for example, expanding community health centers will help assure access, even for those who remain uninsured. Efforts to continue to increase language access — and to measure the extent to which these services are being provided — will both help improve access to care as well as improve the quality of health care received.

 MIGRATION POLICY INSTITUTE

# I.    Introduction

*Of all the forms of inequality, injustice in health care is the most shocking and inhumane.*

Rev. Martin Luther King, Jr., 1966

Many believe that quality health care is a fundamental human right and an antidote to the health care disparities that afflict our nation. Even though health care reform is arguably one of the most important social policies in the United States since the 1960s, it has become a polarizing topic. As those who are following the current immigration reform debate realize, immigration policy and the rights of immigrants in the United States are also contentious. Put together, these two topics can be explosive. Many people remember the outburst by US Representative Joe Wilson of South Carolina when he cried out "You lie!" after President Obama told a joint session of Congress that his health reform proposal would not apply to unauthorized immigrants.[1]

The *Patient Protection and Affordable Care Act* (ACA) was narrowly enacted and has continued to be one of the most hotly argued government policies in recent years. Since the 2012 elections, the nation has begun another national dialogue — on immigration reform. In May 2013, the Senate Judiciary Committee approved an immigration reform bill crafted by a bipartisan group of senators, the *Border Security, Economic Opportunity, and Immigration Modernization Act of 2013*, and sent it on to the full Senate for its consideration in June. Also during May, the House of Representatives voted yet again to repeal the *Affordable Care Act*, knowing that repeal would not be accepted by the Senate or president. How Congress and the nation ultimately will address both concerns remains to be seen.

Regardless of the controversies surrounding health care policy and immigration, the United States has made important progress in improving immigrants' health care, particularly for children in immigrant families. Though much remains to be done, three areas of progress stand out:

1. Health insurance coverage for members of immigrant families, especially those who are noncitizens, has been improved.

2. Access to health care services has been increased.

3. Language and cultural barriers to quality care have been reduced.

*Regardless of the controversies surrounding health care policy and immigration, the United States has made important progress in improving immigrants' health care.*

Health insurance, health care access, and language and cultural barriers are distinct but intrinsically linked. Being insured is one of the strongest determinants of getting timely health care. Yet health insurance coverage is not synonymous with health care access. Likewise, health care access does not guarantee that people will use services. For example, if patients know they will have difficulty explaining their medical needs or problems to a doctor or nurse, they are less willing to seek care.

---

[1]   Carl Hulse, "In Lawmaker's Outburst, a Rare Breach of Protocol," *New York Times*, September 9, 2009, www.nytimes. com/2009/09/10/us/politics/10wilson.html.

MIGRATION POLICY INSTITUTE 

# II.    Health Insurance Coverage in the United States

Perhaps the most visible and frequently debated issue in health policy is health insurance coverage. For the majority of Americans, health insurance coverage is associated with their jobs (i.e., it is sponsored by employers or unions). Private, primarily job-based insurance covers 55 percent of the US population.[2] Next in importance is public health insurance, such as Medicare for the elderly or Medicaid or the Children's Health Insurance Program (CHIP) for low-income families and children. However, citizenship and immigration status affect the extent to which immigrants and their families can obtain health insurance and whether they remain uninsured. Overall, almost half (44 percent) of noncitizen immigrants in the United States are uninsured, compared to 13 percent of native-born citizens, according to Census data for 2011.[3]

**Figure 1. Health Insurance Coverage for Low-Income Children (Ages 18 and Under), United States, 2011**



*Note*: Low-income children are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due to overlaps in public and private coverage and rounding.
*Source*: George Washington University Department of Health Policy analysis of data from the US Current Population Survey (CPS), March Annual Social and Economic Supplement, 2012.

The following analyses focus on low-income people — those with incomes below 200 percent of the federal poverty level (FPL), who are more likely to be uninsured and to lack access to health care than those of higher income. Low-income children and adults who are noncitizen immigrants are much more likely to be uninsured than low-income citizens.[4] As seen in Figure 1, low-income children with noncitizen

---

2    Carmen DeNevas-Walt, Bernadette D. Proctor, and Jessica C. Smith, "Income, Poverty, and Health Insurance Coverage in the United States: 2011" (Current Population Reports, P60-243, US Census Bureau, US Government Printing Office, Washington, DC, 2012), www.census.gov/prod/2012pubs/p60-243.pdf.

3    Analysis of data from the US Current Population Survey (CPS), March Annual Social and Economic Supplement, 2012, by the Department of Health Policy, George Washington University, Washington, DC.

4    Data in Figures 1 and 2 are based on the authors' analyses of the Census Bureau's March 2012 CPS, Annual Social and Economic Supplement. This CPS supplement is a nationally representative survey of noninstitutionalized persons, and records individuals' health insurance status in 2011. It is the most commonly used data source for information about health insurance coverage in the United States. The survey identifies foreign-born status and citizenship, but does not identify legal status of immigrants. Brian Bruen of George Washington University's Department of Health Policy helped develop the analytic files that we analyzed.

parents are more likely to be uninsured than those with citizen parents. The risks are particularly high for children who are themselves noncitizens:[5] among low-income children with noncitizen parents, the risk of not having any insurance (public or private) is more than twice as high for noncitizen children (38 percent) than for citizen children (17 percent). The patterns for low-income adults ages 19 to 64 are similar (see Figure 2).[6] Almost twice as many (62 percent) low-income noncitizen adults are uninsured as low-income citizen adults (35 percent).

**Figure 2. Health Insurance Coverage for Low-Income Adults (Ages 19 to 64), United States, 2011**



*Notes*: Low-income adults are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due to overlaps in public and private coverage and rounding. Adults ages 65 and over are excluded because the vast majority is eligible for public health insurance coverage through Medicare.
*Source*: George Washington University Department of Health Policy analysis of data from the US Current Population Survey (CPS), March Annual Social and Economic Supplement, 2012.

Low coverage of noncitizen adults is due in part to low coverage through their employers. To be sure, noncitizens are just as willing as citizens to pay for job-based insurance, but most simply do not have the opportunity to do so. Noncitizen workers are less likely than naturalized and US-born citizens to be offered job-based health insurance.[7] About 40 percent of noncitizen workers are employed in service and construction industries, which have low rates of insurance offerings.

---

5   A citizen child with noncitizen parents is defined as a child (US born or naturalized) with one or more noncitizen parents. Most children in immigrant families are US born and therefore citizens, regardless of their parents' citizenship. Noncitizen children are classified based on their own citizenship, but over 90 percent have noncitizen parents. Children with citizen parents include children with naturalized citizen parents and children with US-born citizen parents.
6   Adults ages 65 and over are excluded from this analysis because the vast majority is eligible for public health insurance coverage through Medicare.
7   Enrico Marcelli, "Comparisons of Insurance among Latinos in California 1999-2011," *Migraciones Internacionales* 2 (2004): 5-36; Richard E. Brown, Roberta Wyn, and Victoria Ojeda, *Access to Health Insurance and Health Care for Children in Immigrant Families* (Los Angeles, CA: University of California, Los Angeles Center for Health Policy Research, 1999).



Many others work in agriculture or small businesses, which often do not offer health insurance to their employees.[8] Thus, a large number of immigrant workers find that job-based health insurance is unavailable to them. If noncitizen parents are unable to get job-based insurance, as often occurs, their children are also likely to be uninsured. Among low-income families, only 18 percent of children with noncitizen parents (regardless of whether the children are citizens or noncitizens themselves) have private insurance, a level about half that of children with citizen parents (32 percent).

Both because of the lack of available job-based health insurance and because immigrant families tend to have lower incomes than the average American family, public health insurance — particularly Medicaid and CHIP — assumes greater importance for children with immigrant parents. Yet, immigrants are constrained from gaining access to these programs, because of eligibility restrictions placed on noncitizens. Since 1996, adults who are lawful permanent residents (LPRs) or "green card" holders have been generally ineligible for Medicaid and CHIP during their first five years in permanent resident status, no matter how poor they are.[9, 10] One of the first laws signed by President Obama in 2009 was the *CHIP Reauthorization Act*, which included a provision — known as the *Immigrant Children's Health Improvement Act* (ICHIA) — that gave states the option to restore coverage to LPR children and pregnant women without a five-year waiting period. Although ICHIA had bipartisan support, it took more than a decade of advocacy and repeated efforts to secure its enactment into law.

## *If noncitizen parents are unable to get job-based insurance, as often occurs, their children are also likely to be uninsured.*

ICHIA is optional for states; they are not required to cover LPR children or pregnant women during the five-year waiting period. However, states' responses to ICHIA's option to cover these LPR children and pregnant women have been encouraging. As of early 2012, 24 states (including the District of Columbia) had adopted the option to extend Medicaid coverage to LPR children during the five-year waiting period, and 16 states (including the District of Columbia) had opted to extend coverage to LPR pregnant women during this period.[11] Many of these states previously covered LPR children or pregnant women before 2009 during the waiting period, but had used only state funds to support their coverage. In these states, the adoption of ICHIA restored federal matching funds for Medicaid coverage of these LPR children and pregnant women, but did not increase the number with Medicaid coverage. What is noteworthy is that nine very different and diverse states (Illinois, Iowa, Montana, New Mexico, North Carolina, Oregon, Texas, Vermont, and Washington) opted to expand Medicaid coverage to LPR children during the five-year waiting period, even though they had not previously done so using their own funding. Despite the recession and a desperate budget environment for states, these states were willing to pay the state

---

8   Alison Siskin, *Noncitizen Health Insurance Coverage Use of Select Safety-Net Providers* (Washington, DC: Congressional Research Service, 2009), www.ilw.com/immigrationdaily/news/2011,0316-crs.pdf.

9   Lawful permanent residents (LPRs) are those admitted permanently through legal immigration channels, and do not include those with temporary visas such as students and temporary workers.

10  All people who meet income and categorical requirements for Medicaid (e.g., poor children, parents, the elderly, disabled, etc.) are eligible for Medicaid coverage of emergency medical care, including childbirth, regardless of citizenship status. In large measure, this policy is intended to help support hospital emergency departments that are required to screen and stabilize all individuals who come with emergency conditions, regardless of insurance status, under the *Emergency Medical Treatment and Active Labor Act* (EMTALA). EMTALA ensures that uninsured people, including immigrants, can get emergency care, while emergency Medicaid provides reimbursement.

11  Georgetown University Health Policy Institute Center for Children and Families, "Coverage of Lawfully-Residing Immigrant Children and Pregnant Women without a 5-Year Waiting Period, as of February 2012," http://ccf.georgetown.edu/wp-content/uploads/2012/04/ICHIA.pdf.

 MIGRATION POLICY INSTITUTE

Medicaid match to extend coverage to these immigrant children.[12] The nine states demonstrate that incremental progress can be made on a bipartisan basis even during very tough fiscal times. In other states, discussions to extend Medicaid coverage to these groups of LPRs are currently under way.

Because Medicaid and CHIP do not restrict eligibility for citizens, about two-thirds of low-income citizen children in both citizen families (64 percent) and noncitizen families (69 percent) have public insurance, while slightly less than half (48 percent) of noncitizen children are publicly covered. The level of public coverage for noncitizen children is bolstered because so many states have been willing to cover LPR children using ICHIA (or state funds before that). Unfortunately, the same progress has not been made in increasing public insurance coverage for low-income noncitizen adults. Medicaid eligibility is much more restrictive for adults than for children today, and there is no equivalent to the ICHIA option for adult LPRs with fewer than five years of permanent residency.

***The Affordable Care Act.*** The ACA includes a number of changes that will improve the affordability of health insurance for millions of Americans, including those living in immigrant families, beginning in 2014. Unlike Medicaid and CHIP, ACA subsidies for private health insurance are available to all noncitizens who are "lawfully present" — including LPRs as well as those who have a temporary or provisional legal status. Under current law, ACA subsidies only exclude unauthorized immigrants.

The ACA's subsidies would allow lawfully present immigrants, like citizens, to purchase health insurance in newly developed health insurance exchanges for individuals and small businesses, if they cannot otherwise obtain job-based or public insurance. Lawfully present immigrants and citizens with incomes between 100 and 400 percent of FPL will be eligible for federal tax credits to offset the cost of private insurance purchased through the exchanges. In addition, lawfully present immigrants with incomes below 100 percent of FPL will be eligible for the exchange and tax credits if they are ineligible for Medicaid, either because they are not LPRs (i.e., they have a temporary or provisional but not a permanent legal status), or if they are LPRs with fewer than five years of permanent residency. Since a principal barrier to health insurance coverage for immigrants is that they are not offered job-based health insurance, these new policies open much broader access to health coverage to lawfully present immigrants and their families, who will in theory be able to buy private coverage similar to what most privately insured Americans have already.

*Medicaid eligibility is much more restrictive for adults*
*than for children today.*

The current debate over immigration reform, however, suggests that the ACA subsidies may not be extended to those unauthorized immigrants who legalize but have only a provisional, and not a permanent, resident status. As currently outlined, the Senate and Obama administration proposals would grant unauthorized immigrants provisional status for a period of several years; during this time they would not be eligible for means-tested public benefits such as Medicaid and CHIP, nor would they be eligible for ACA subsidies. Whether a final immigration reform law extends eligibility for ACA subsidies to immigrants during the provisional period remains to be seen.

---

12   Commonwealth Institute for Fiscal Analysis, *Lessons from the Field: Expanding Access to Health Care for Immigrants in Virginia* (Richmond, VA: Commonwealth Institute for Fiscal Analysis, 2012).



The ACA will also extend Medicaid eligibility for nonelderly adults with incomes up to 133 percent of FPL in 2014. Currently, low-income parents' eligibility varies by state, but the median eligibility threshold is 70 percent of FPL, and the threshold is as low as 24 percent of FPL in some states.[13] Low-income adults without dependent children are not eligible for Medicaid in most states. However, the Supreme Court's ruling in the landmark *NFIB v. Sebelius* case grants states the right to refuse to expand Medicaid to all adults with incomes below 133 percent of FPL. In states that expand coverage, large numbers of LPR adults with more than five years of permanent residency will gain coverage. Since low-income immigrant adults have such low rates of insurance coverage, this change constitutes a major expansion of coverage. However, we do not know which states will or will not expand Medicaid at this time. It seems likely that some major immigrant destinations (such as Texas, Florida, and Georgia) will not expand Medicaid, while others (such as California, New York, and Massachusetts) will.

> *Overall, immigrants have poorer access to medical care than the native born, even when they are insured.*

Unauthorized immigrants will likely remain ineligible for public insurance coverage or even private insurance offered in the health insurance exchanges. In June 2012 the Obama administration announced a new Deferred Action for Childhood Arrivals (DACA) policy, which grants deferred action, or temporary permission to remain in the United States legally, for certain unauthorized young people who arrived in the country before the age of 16 and who have graduated from high school, are still in school, or have served in the military and do not have a criminal record. DACA youth will remain ineligible for insurance coverage under Medicaid, CHIP, and the ACA's subsidies and health insurance exchanges.[14] As we note above, whether immigration reform will similarly exclude legalizing immigrants with provisional status from health coverage remains to be seen.

## III.   Access to Health Care

Having health insurance makes medical care more affordable and accessible. But many are able to access at least some health care, even if they are uninsured. There is a system of safety-net health care providers, such as nonprofit community health centers, charity hospitals, and public clinics and hospitals that deliver free- or sliding-scale care to those who lack insurance. Despite their limited resources, these facilities also serve insured patients, particularly Medicaid and Medicare patients, so they may have waiting lists, making it harder to get services at times.

Overall, immigrants have poorer access to medical care than the native born, even when they are insured. One way to measure health care access is to estimate the share of the population who has made at least one office-based medical visit — that is, a regular doctor's office visit — per year.[15] Overall, 47 percent of

---

13   Kaiser Commission on Medicaid and the Uninsured, "Where are States Today? Medicaid and CHIP Eligibility Levels for Children and Non-Disabled Adults," March 28, 2013, http://kff.org/medicaid/fact-sheet/where-are-states-today-medicaid-and-chip/.

14   National Immigration Law Center (NILC), "Frequently Asked Questions: Exclusion of People Granted 'Deferred Action for Childhood Arrivals' from Affordable Health Care," November 26, 2012, www.nilc.org/acadacafaq.html.

15   Data presented in Figures 3 through 6 are based on the full-year consolidated file for the 2010 Medical Expenditure Panel Survey (MEPS), conducted by the Agency for Healthcare Research and Quality. MEPS is a nationally representative survey of health insurance coverage, utilization, and expenditures for noninstitutionalized persons. The MEPS data identify foreign-born persons, but do not identify their citizenship or legal status. Children of immigrants are classified based on their own nativity, as native-born or foreign-born children.

MIGRATION POLICY INSTITUTE

immigrant (i.e., foreign-born) children made a medical visit in 2010, compared to 69 percent of native-born children (see Figure 3). Native-born children with insurance were more than twice as likely to see a doctor as uninsured native-born children. Immigrant children with insurance were also more likely to see a doctor than uninsured immigrants, but insurance coverage did not yield as large an increase in access. Figure 4 shows comparable statistics for low-income adults. Immigrants have poorer access to office-based medical care than the native-born, and the disparities persist regardless of whether people have insurance or not.

**Figure 3. Share of Low-Income Children (Ages 17 and Younger) with Any Office-Based Medical Visits in the Prior Year, 2010**



*Note*: Low-income children are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due overlaps in public and private coverage and rounding.
*Source*: George Washington University Department of Health Policy analysis of data from the 2010 Medical Expenditure Panel Survey (MEPS).

MIGRATION POLICY INSTITUTE 

**Figure 4. Share of Low-Income Adults (Ages 18 to 64) Who Made an Office-Based Medical Visit in the Previous Year, 2010**



Note: Low-income adults are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due to overlaps in public and private coverage and rounding. Adults ages 65 and over are excluded from the analysis because the vast majority is eligible for public health insurance coverage through Medicare.
Source: George Washington University Department of Health Policy analysis of 2010 MEPS data.

It is commonly believed that uninsured immigrants overwhelm emergency rooms, perhaps in part because so many are uninsured and have problems securing care in doctors' offices. Data indicate that this is a myth, however, and that immigrants use emergency rooms more sparingly than the native born.16 Immigrant children were slightly less likely to use emergency rooms than native-born children overall, although they were slightly more likely to use them when publicly insured and less likely to use them when privately insured (see Figure 5). (It is worth remembering that Medicaid covers emergency-room services for noncitizen immigrant children in all states.) For adults, we see that immigrants were consistently less likely to use emergency rooms, regardless of whether they were uninsured or had private or public coverage (see Figure 6).

---

16  Comparable results have been found using other data sources. See Leighton Ku and Sheetal Matani, "Left Out: Immigrants' Access to Health Care and Insurance," *Health Affairs* 20, No. 1 (2001): 247–56.

MIGRATION POLICY INSTITUTE

**Figure 5. Share of Low-Income Children (Ages 17 and Under) with Any Emergency-Room Visits in the Prior Year, 2010**



*Notes:* Low-income children are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due to overlaps in public and private coverage and rounding.
*Source:* George Washington University Department of Health Policy analysis of 2010 MEPS data.

**Figure 6. Share of Low-Income Adults (Ages 18 to 64) with Any Emergency-Room Visits in the Prior Year, 2010**



*Notes:* Low-income adults are those with family incomes below 200 percent of the federal poverty level. Percentages may not add up to 100 due to overlaps in public and private coverage and rounding. Adults ages 65 and over are excluded because the vast majority is eligible for public health insurance coverage through Medicare.
*Source:* George Washington University Department of Health Policy analysis of 2010 MEPS data.



Some may question these results because they are based on household surveys, and respondents may not be completely reliable. But administrative data, too, indicate that public beliefs about unauthorized, uninsured immigrants' use of emergency rooms are exaggerated. Several years ago the federal government established a special $1 billion fund — called Section 1011 — to reimburse hospitals for uncompensated costs incurred by unauthorized immigrants for emergency care. Each year from 2005 to 2008, $250 million was allotted for this purpose. To give a sense of perspective, total annual US emergency-room expenditures are about $50 billion annually,[17] and so Section 1011 funding represented about one-half of 1 percent of emergency-room expenses — hardly an overwhelming share. Many believed that the uncompensated care costs due to unauthorized immigrants were far larger and that Section 1011 funds would be rapidly depleted. In fact, as of the third quarter of fiscal year (FY) 2012 — four years after the $1 billion appropriation was supposed to expire — $54.6 million remained unused in the Section 1011 account, and hospitals in 22 states and the District of Columbia had still not fully spent their allotted funds.[18]

---

*Insurance coverage does not, in and of itself, ensure access to care.*

---

Why do immigrants have such limited health care access? Much of the reason is related to insurance coverage and financial access: when people — native-born or immigrant — have health insurance, out-of-pocket health care costs fall, and access becomes more affordable. But immigrants face other barriers, too.

- *Language barriers* limit access. If patients know they will have difficulty explaining their medical needs or problems to a doctor or nurse, they are less willing to seek care. About 30 percent of the foreign-born do not speak English or do not speak it well.[19]

- *Cultural differences* also play a role. The medical care system is organized differently in the United States than in immigrants' home countries, and managed care can be particularly difficult to navigate. Immigrants are less likely to have a primary physician or other, usual source of care than the native-born who have grown up in the United States' complicated system.

- Immigrants may have *different perceptions* of the need and appropriateness of medical care. The need for preventive care may be less familiar. In many countries, seeking help for mental health problems is stigmatized.

- Finally, *legal status* can be a concern. Unauthorized immigrants often worry that seeking care, particularly at a public facility, may lead to exposure of their unauthorized status and increase the risk of sanctions such as deportation. Even legal immigrants may worry that using benefits could jeopardize their legal status and perhaps make it harder to gain citizenship or permanent residency.

As mentioned before, insurance coverage does not, in and of itself, ensure access to care. There must also be health care providers who are willing to serve needy patients, whether they are insured or not. One particularly important federal initiative is the community health center program. Community

17  David Kashihara and Kelly Carper, "National Health Care Expenses in the U.S. Civilian Noninstitutionalized Population, 2009" (Medical Expenditure Panel Survey Brief #355, Agency for Healthcare Research and Quality, 2012), http://meps.ahrq.gov/data_files/publications/st355/stat355.pdf.

18  The Section 1011 payment history is available at www.novitas-solutions.com/section1011/program/paymenthistory.html.

19  Elizabeth M. Grieco, Yesenia D. Acosta, G. Patricia de la Cruz, Christine Gambino, Thomas Gryn, Luke J. Larsen, Edward N. Trevelyan, and Nathan P. Walters, "The Foreign-Born Population in the United States: 2010" (American Community Survey Reports ACS-19, Census Bureau, Washington, DC, 2012), www.census.gov/prod/2012pubs/acs-19.pdf.

 MIGRATION POLICY INSTITUTE

health centers are nonprofit primary care clinics, designed to help medically underserved populations, including the poor, the uninsured, migrant workers, and the homeless. Health centers provide affordable primary health care — using sliding-scale fees — to help low-income uninsured patients, many of whom are immigrants. With support from both the Bush and Obama administrations and from state and local governments, the number of patients who get care at health centers has more than doubled over the past decade. Although health center data do not indicate how many patients are immigrants, they do report how many require language assistance because of limited English proficiency. About one-quarter of health center patients need language assistance, and that number rose from 4.3 million in 2007 to 4.7 million in 2011. Health centers take pride in serving multicultural communities and make special efforts to provide language assistance and to make their care culturally appropriate; the average health center employs two interpreters and uses language lines and other multilingual staff to help meet language needs.[20]

The ACA set aside funds to help further expand community health centers and safety-net health care, particularly in communities where access is poor. While health centers have continued to grow since 2009, federal and state budget difficulties have meant that actual funding levels have not increased as rapidly as planned.

## IV.   Language Barriers

In health care, as in many other service areas, limited English proficiency can be a serious barrier for immigrants. It is self-evident that decent health care requires patients and clinicians to discuss health problems and how to address them. Studies confirm that communications problems lead to mutual misunderstandings and errors in diagnosis, treatment, and patient adherence.[21] Moreover, immigrants are deterred from seeking care for themselves or their children if they are not sure their doctor will speak their language. Hispanic parents have cited language problems as the leading barrier to their children's health care.[22] Language barriers affect immigrants regardless of legal or citizenship status; many immigrants who have lived in the United States for decades still have limited English skills and may face problems explaining and understanding complex and sensitive health issues.

*In health care, as in many other service areas,*

*limited English proficiency can be a serious barrier for immigrants.*

The Clinton administration established a federal policy that health care providers had to assure language assistance for patients with limited English proficiency as an extension of civil-rights laws prohibiting discrimination on the basis of national origin.[23] But the reality is that many patients with limited English are still unable to get sufficient language assistance from, e.g., bilingual clinicians or trained interpreters.

---

20  US Department of Health and Human Services, Health Resources and Services Administration, "National Data," http://bphc. hrsa.gov/healthcenterdatastatistics/nationaldata/index.html.

21  Glenn Flores, "The Impact of Medical Interpreter Services on the Quality of Health Care: A Systematic Review," *Medical Care Research and Review* 62 (2005): 255-99.

22  Glenn Flores, Milagros Abreu, Mary Anne Olivar, and Beth Kastner, "Access Barriers to Health Care for Latino Children," *Archives of Pediatrics and Adolescent Medicine* 152 (1998): 1119-25.

23  White House, Executive Office of the President, "Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency," August 11, 2000, www.lep.gov/13166/eo13166.html.


In part, this is because health insurance typically does not pay for interpretation services — so clinics, hospitals, pharmacies, nursing homes, and other facilities have little incentive to hire interpreters or to pay for other forms of assistance, such as language lines.[24] Equally problematic are the logistical challenges of arranging for interpreters, language lines, or other translation methods. Even among well-intentioned health care providers, making special arrangements for an interpreter or language line can delay or disrupt the normal flow of medical care, creating problems and barriers.

But these problems can be addressed over time and with concerted effort. It has been challenging for hospitals and clinics to address infection-control methods like ensuring adequate hand washing and immunization of health care workers, but careful attention to quality improvement is improving the situation. Effectively erasing language barriers to health care utilization will not only entail making language assistance a legal right, but also ensuring that there is funding to support related services. It will also require a broader educational campaign, raising awareness that language barriers pose a major health quality problem.

Gradual progress is being made. Organizations that establish health quality standards for accreditation, such as the Joint Commission and the National Committee for Quality Assurance, have established standards aimed at improving the availability of language assistance in hospitals, standards that may eventually spread to ambulatory care settings.[25] The ACA requires that health care records include information about patients' primary language, along with more commonly reported items such as gender and race/ethnicity, which should make it easier to plan for adequate language services and to monitor disparities in health care delivery that could be related to language barriers.

The ACA also requires the collection of data on primary language in Department of Health and Human Services (HHS)-funded surveys and initiatives. The law also supports efforts to help enroll persons with limited English proficiency in Medicaid and health insurance exchanges through simplified and translated enrollment materials and through the development of new programs to assist those applying for coverage in the new health insurance exchanges.

# V.    Immigration Reform and Health Care

As a result of the 2012 elections, there is renewed policy interest in immigration reform at the federal level. The last major effort at reform, which occurred during the Bush administration, failed to reach consensus despite strong support from leading politicians in both the Republican and Democratic parties. President Obama has voiced support for reform, but it remains unclear what can be done while Congress remains divided and sometimes bitterly partisan. Although the Supreme Court affirmed the constitutionality of most of the ACA, and most believe that it will remain the law of the land, it remains a policy that many Republicans at the national level would still like to repeal and that many still oppose at state levels. Initiatives that combine immigration and health reform could prove particularly controversial.

It is difficult to offer meaningful recommendations about immigration reform and health issues without knowing more about the general direction of plans for immigration reform and the framework for

---

24  Leighton Ku and Glenn Flores, "Pay Now or Pay Later: Providing Interpreter Services in Health Care," *Health Affairs* 24, No. 2 (2005): 435-44.

25  For example, the National Committee for Quality Assurance (NCQA), *Implementing Multicultural Health Care Standards: Ideas and Examples* (Washington, DC: NCQA, 2010), www.ncqa.org/portals/0/Publications/Implementing%20MHC%20 Standards%20Ideas%20and%20Examples%2004%2029%2010.pdf; and the Joint Commission, *Patient-Centered Communication Standards for Hospitals* (Oakbrook Terrace, IL: Joint Commission, 2011), www.jointcommission.org/assets/1/18/ r3%20report%20issue%201%2020111.pdf.



congressional deliberation. That said, the outlines currently made public by the Obama administration and the US Senate suggest that unauthorized immigrants who gain a provisional status on the path to citizenship will not be eligible for ACA subsidies, and that eligibility will only be conferred after they obtain LPR status. But at the time of writing, final legislation has yet to emerge.

Regardless of the important issue of the exclusion of legalizing immigrants from health benefits and subsidies, there are areas where incremental progress can be continued:

## A.    Health Insurance

- If states decide to expand Medicaid, this will significantly improve insurance coverage for low-income adults, including many legal immigrants with more than five years of permanent residency. Some large immigrant destinations — e.g., California, New York, and Massachusetts — are expanding Medicaid to cover all LPRs regardless of their length of US residency. California and New York have the two largest immigrant populations in the country, so their decisions to expand Medicaid are certain to have broader implications for the country as a whole.

- Additionally, more states could adopt the ICHIA option to provide Medicaid to immigrant children and pregnant women with fewer than five years of permanent residency. ICHIA is a relatively inexpensive initiative, since most children in immigrant families are already native-born, and state adoption would be a positive signal to immigrants in states looking to demonstrate bipartisan support for immigrant communities.

- Strong and effective outreach and education to immigrant communities regarding health insurance exchanges to workers and the firms that employ them could improve understanding and increase health insurance coverage for legal immigrants and help allay concerns about verification requirements for citizen children with unauthorized parents.

## B.    Health Care Access

- It will remain important to assure that there is adequate funding to support safety-net providers, such as community health centers. Research in Massachusetts found that, after that state's health reform, safety-net providers became even more important because the newly insured turned to these facilities to get care.[26] Without an adequate supply of primary care providers, expansion of health insurance coverage will not be able to improve access to care.

- Some mistakenly believe that after health reform is implemented, the only remaining uninsured people will be unauthorized immigrants, which might erode political support for safety-net providers. In fact, about three-quarters of those who remain uninsured (and who need access to community health centers and other safety-net providers) will continue to be citizens and legal residents, and only a small minority will be unauthorized immigrants.[27]

---

26  Leighton Ku, Emily Jones, Peter Shin, Fraser Rothenberg Byrne, and Sharon K. Long, "Safety-Net Providers after Health Care Reform: Lessons from Massachusetts," *Archives of Internal Medicine* 171, No. 15 (2011): 1379-84.

27  Congressional Budget Office (CBO), "Estimates for the Insurance Coverage Provisions of the Affordable Care Act Updated for the Recent Supreme Court Decision," July 24, 2012. www.cbo.gov/publication/43472.



## C.   *Reducing Language Barriers*

■ Establishing policies to reimburse health care providers that provide language services would be extremely helpful. Medicare does not currently provide reimbursement for language services. If Medicare paid for language services, it seems likely that many private health insurance plans would follow suit. A number of state Medicaid programs pay for language services, and the 2009 *CHIP Reauthorization Act* offers matching funds for administrative costs for interpretation and translation services. However, the norm is that Medicaid does not cover these services. Thus, health care providers must pay for these services out of their own pockets, reducing their willingness to provide adequate language services.

■ Further development of language-related quality standards and monitoring would also help. There are no routine surveys of the extent to which health care providers offer language assistance to patients with limited English proficiency. This makes it hard to know where gaps exist — and where they are being narrowed.

■ While there are numerous efforts to improve quality in health care, there are also strong efforts to reduce health care costs; it is critical to ensure that an appropriate balance is being struck. Taking advantage of technological advances could play a role. As anyone with a smart phone knows, there have been amazing advances in communications technology in recent years. Major advances in mobile health and e-health are helping care providers reach vulnerable communities worldwide, many of whom speak indigenous languages. Automated translation and interpretation services could help reduce the costs of language services and improve their accessibility. However, it will be important to test automated translations of medical information for accuracy and comprehension before widespread use to avoid medical errors and misunderstanding.

*The nation has a mixed record and remains divided regarding the extent to which certain groups of immigrants and their children should have access to health insurance and health care.*

# VI.   Issues for Future Consideration

Overall, the nation has a mixed record and remains divided regarding the extent to which certain groups of immigrants and their children should have access to health insurance and health care. Regardless of medical needs or poverty, our laws and policies separate care by immigration status.

As the data show, noncitizen immigrants are far less likely to be insured than citizens, because of disparities in access to both private job-based coverage and public coverage. Low-income children who are citizens, but whose parents are not, are slightly more likely to be to be uninsured than children in citizen families; children who are themselves noncitizens, meanwhile, are far more likely to be uninsured. Immigrant children and adults are also less likely to use regular office-based medical care or emergency-room care than the low-income native-born.

Nonetheless, the United States has made limited progress in some areas, including the enactment of the ICHIA option in 2009 and the implementation of standards for language access. Beginning in 2014, the ACA will permit further expansions of health insurance coverage, both through health insurance exchanges and federal tax credits — which will be implemented in all states — and Medicaid expansion,

 MIGRATION POLICY INSTITUTE

which will be implemented in many, but not all, states. The net effect is that there will be a major expansion of LPRs' eligibility for insurance, although it appears likely that unauthorized immigrants and those who are in provisional status will remain uncovered by Medicaid or the health insurance exchanges. In sum, policies that bar coverage because of legal immigration status persist. Unauthorized immigrants may be unable to purchase private health insurance through the new health insurance exchanges, even if they are willing to pay the full cost of coverage. And some LPRs who have been residents for fewer than five years will continue to be ineligible for Medicaid and, although they may be eligible for the exchanges and tax subsidies, may still find insurance unaffordable.

The prospect of a new federal immigration reform law offers the possibility of further changes and improvements for both current and future immigrants to the United States and their families. But, as mentioned before, it is too early to know the final outcome of what is likely to be a contentious struggle in Congress. In the meantime, there are other, less contentious steps that could be taken to improve access to health insurance and health care and to reduce language barriers for immigrants and their children at federal and state levels.

For more on MPI's National Center on Immigrant Integration Policy, visit:
**www.migrationpolicy.org/integration**



# Works Cited

Brown, Richard E., Roberta Wyn, and Victoria Ojeda. 1999. *Access to Health Insurance and Health Care for Children in Immigrant Families*. California: University of California, Los Angeles Center for Health Policy Research.

Commonwealth Institute for Fiscal Analysis. 2012. *Lessons from the Field: Expanding Access to Health Care for Immigrants in Virginia*. Richmond, VA: Commonwealth Institute for Fiscal Analysis.

Congressional Budget Office (CBO). 2012. Estimates for the Insurance Coverage Provisions of the Affordable Care Act Updated for the Recent Supreme Court Decision. www.cbo.gov/publication/43472.

DeNevas-Walt, Carmen, Bernadette D. Proctor, and Jessica C. Smith. 2012. Income, Poverty, and Health Insurance Coverage in the United States: 2011. Current Population Reports, P60-243, US Census Bureau, Washington, DC. www.census.gov/prod/2012pubs/p60-243.pdf.

Flores, Glenn. 2005. The Impact of Medical Interpreter Services on the Quality of Health Care: A Systematic Review. *Medical Care Research and Review* 62: 255-99.

Flores, Glenn, Milagros Abreu, Mary Anne Olivar, and Beth Kastner. 1998. Access Barriers to Health Care for Latino Children. *Archives of Pediatrics and Adolescent Medicine* 152: 1119-25.

Georgetown University Health Policy Institute Center for Children and Families. Coverage of Lawfully-Residing Immigrant Children and Pregnant Women without a 5-Year Waiting Period, as of February 2012. http://ccf.georgetown.edu/wp-content/uploads/2012/04/ICHIA.pdf.

Grieco, Elizabeth M., Yesenia D. Acosta, G. Patricia de la Cruz, Christine Gambino, Thomas Gryn, Luke J. Larsen, Edward N. Trevelyan, and Nathan P. Walters. 2012. The Foreign-Born Population in the United States: 2010. American Community Survey Reports ACS-19, Census Bureau, Washington, DC. www.census.gov/prod/2012pubs/acs-19.pdf.

Hulse, Carl. 2009. In Lawmaker's Outburst, a Rare Breach of Protocol. *New York Times*, September 9, 2009. www.nytimes.com/2009/09/10/us/politics/10wilson.html.

Joint Commission. 2011. *Patient-Centered Communication Standards for Hospitals*. Oakbrook Terrace, IL: Joint Commission. www.jointcommission.org/assets/1/18/r3%20report%20issue%201%2020111.pdf.

Kaiser Commission on Medicaid and the Uninsured. 2013. Where are States Today? Medicaid and CHIP Eligibility Levels for Children and Non-Disabled Adults. http://kff.org/medicaid/fact-sheet/where-are-states-today-medicaid-and-chip/.

Kashihara, David and Kelly Carper. 2012. National Health Care Expenses in the U.S. Civilian Noninstitutionalized Population, 2009. Medical Expenditure Panel Survey Brief #355, Agency for Healthcare Research and Quality. http://meps.ahrq.gov/data_files/publications/st355/stat355.pdf.

Ku, Leighton and Glenn Flores. 2005. Pay Now or Pay Later: Providing Interpreter Services In Health Care. *Health Affairs* 24 (2): 435-44.

Ku, Leighton and Sheetal Matani. 2001. Left Out: Immigrants' Access to Health Care and Insurance. *Health Affairs* 20 (1): 247-56.

Ku, Leighton, Emily Jones, Peter Shin, Fraser Rothenberg Byrne, and Sharon K. Long. 2011. Safety-Net Providers after Health Care Reform: Lessons from Massachusetts. *Archives of Internal Medicine* 171 (15): 1379-84.

Marcelli, Enrico. 2004. Comparisons of Insurance among Latinos in California 1999-2011. *Migraciones Internacionales* 2: 5-36.

 MIGRATION POLICY INSTITUTE

National Committee for Quality Assurance (NCQA). 2010. *Implementing Multicultural Health Care Standards: Ideas and Examples*. Washington, DC: NCQA. www.ncqa.org/portals/0/Publications/Implementing%20MHC%20 Standards%20Ideas%20and%20Examples%2004%2029%2010.pdf.

National Immigration Law Center. 2012. Frequently Asked Questions Exclusion of People Granted 'Deferred Action For Childhood Arrivals' from Affordable Health Care. Revised November 26, 2012. www.nilc.org/acadaca-faq.html.

Siskin, Alison. 2009. *Noncitizen Health Insurance Coverage Use of Select Safety-Net Providers*. Washington, DC: Congressional Research Service. www.ilw.com/immigrationdaily/news/2011.0316-crs.pdf.

US Census Bureau and the US Bureau of Labor Statistics (BLS). 2012. US Current Population Survey (CPS). US Census Bureau and BLS, Washington, DC.

US Department of Health and Human Services, Health Resources and Services Administration. National Data. http://bphc.hrsa.gov/healthcenterdatastatistics/nationaldata/index.html.

White House, Executive Office of the President. 2000. Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency. August 11, 2000. www.lep.gov/13166/eo13166.html.



MIGRATION POLICY INSTITUTE

# About the Authors



Leighton Ku, Ph.D., M.P.H., is a Professor and Director of the Center for Health Policy Research in the Department of Health Policy in the School of Public Health and Health Services at the George Washington University.

For more than 20 years, he has conducted research and analysis regarding health care for disadvantaged populations, including studies of health care reform at national and state levels, Medicaid, safety-net health care, and immigrants. Prior to coming to George Washington, Dr. Ku was a Senior Fellow at the Center on Budget and Policy Priorities and a principal researcher at the Urban Institute.

He has a Ph.D. in health policy from Boston University and an M.P.H. from the University of California, Berkeley.



Mariellen Malloy Jewers is a Senior Research Associate for the Aligning Forces for Quality program at the George Washington University. She is also a doctoral student at the Trachtenberg School of Public Policy and Public Administration, focusing on health policy. Previously, she was Associate for Social Policy at the Inter-American Dialogue and a social performance research fellow for FINCA International, where she conducted field research in Peru and El Salvador.

Ms. Jewers served as a Peace Corps volunteer in the Dominican Republic and an Americorps*VISTA volunteer in Massachusetts.

She received her BA in economics, Phi Beta Kappa, from the University of Massachusetts Amherst and holds an MA in international affairs from Columbia University's School for International and Public Affairs.



The Migration Policy Institute is a nonprofit, nonpartisan think tank dedicated to the study of the movement of people worldwide. MPI provides analysis, development, and evaluation of migration and refugee policies at the local, national, and international levels. It aims to meet the rising demand for pragmatic and thoughtful responses to the challenges and opportunities that large-scale migration, whether voluntary or forced, presents to communities and institutions in an increasingly integrated world.

# www.migrationpolicy.org

1400 16th Street NW
Suite 300
Washington, DC 20036

Tel: 001 202-266-1940
Fax: 001 202-266-1900

# DEF-INTERV.

# EX. 115

# UC Berkeley
## UC Berkeley Previously Published Works

**Title**

Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant
Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA)

**Permalink**

https://escholarship.org/uc/item/2hv0m7qh

**Journal**

Journal of Immigrant and Minority Health, 19(3)

**ISSN**

1557-1912

**Authors**

Siemons, R
Raymond-Flesh, M
Auerswald, CL
et al.

**Publication Date**

2017-06-01

**DOI**

10.1007/s10903-016-0354-x

Peer reviewed

eScholarship.org                                   Powered by the California Digital Library
University of California

# *Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA)*

## Rachel Siemons, Marissa Raymond-Flesh, Colette L. Auerswald & Claire D. Brindis

**Journal of Immigrant and Minority Health**

ISSN 1557-1912
Volume 19
Number 3

J Immigrant Minority Health (2017)
19:543-551
DOI 10.1007/s10903-016-0354-x



Volume 19
Number 3
June
2017

Journal of
Immigrant
and Minority
Health

Center for
Minority
Public Health

Springer
ISSN 1557-1912
19(3) 499–778 (2017)



Author's personal copy

J Immigrant Minority Health (2017) 19:543–551
DOI 10.1007/s10903-016-0354-x



ORIGINAL PAPER

# Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA)

Rachel Siemons[1,2,3] · Marissa Raymond-Flesh[4] · Colette L. Auerswald[1,2,3] ·
Claire D. Brindis[4]

Published online: 6 February 2016
© Springer Science+Business Media New York 2016

**Abstract**  Undocumented immigrant young adults growing up in the United States face significant challenges. For those qualified, the Deferred Action for Childhood Arrivals (DACA) program's protections may alleviate stressors, with implications for their mental health and wellbeing (MHWB). We conducted nine focus groups with 61 DACA-eligible Latinos (ages 18–31) in California to investigate their health needs. Participants reported MHWB as their greatest health concern and viewed DACA as beneficial through increasing access to opportunities and promoting belonging and peer support. Participants found that DACA also introduced unanticipated challenges, including greater adult responsibilities and a new precarious identity. Thus, immigration policies such as DACA may influence undocumented young adults' MHWB in expected and unexpected ways. Research into the impacts of policy changes on young immigrants' MHWB can guide stakeholders to better address this population's health needs. MHWB implications include the need to reduce fear of deportation and increase access to services.

**Keywords**  Deferred Action for Childhood Arrivals (DACA) · Undocumented · Mental health · Well-being Latino · Immigrants · Young adults · Qualitative research

## Introduction

The United States is home to approximately 11.4 million undocumented immigrants, half of whom are of Latino origin [1, 2]. Immigrants, regardless of legal status, face significant stress both during and following migration [3–5]. The immigration experience itself has been shown to threaten individual and family well-being due to separation from family, exposure to traumatic events, discrimination, and loss of social status [6]. While Latinos living in the US, whether native born, documented or undocumented immigrants face marginalization, socioeconomic challenges, and reduced social integration, the undocumented experience an even greater degree of stigma associated with their "illegal" status [3, 7–15]. Stressors are further magnified for undocumented immigrants who struggle even more for basic necessities, experience perpetual fear of deportation, and are often confined to the lowest-wage jobs [3, 7–12, 14, 16, 17].

Risks to mental health and wellbeing (MHWB) are magnified for undocumented young adults who must navigate these challenges, while simultaneously moving through the critical developmental period between adolescence and adulthood, normally a time marked by the development of self-reliance and increased legal and social responsibilities [18–22]. In contrast to their US citizen and legal resident peers, undocumented young adults' "illegal" status restricts access to structures of opportunity, obstructs societal integration, limits social support, and challenges their self-identity [23–25]. Limited research indicates that these destabilizing experiences can jeopardize these young

✉ Claire D. Brindis
   Claire.Brindis@ucsf.edu

1  University of California, Berkeley, Berkeley, CA, USA

2  University of California, San Francisco, San Francisco, CA, USA

3  Joint Medical Program, UC Berkeley School of Public Health, Berkeley, CA, USA

4  Philip R. Lee Institute for Health Policy Studies, Division of Adolescent & Young Adult Medicine, Department of Pediatrics, University of California, San Francisco, 3333 California Street, Suite 265, San Francisco, CA 94118, USA



Author's personal copy

**Table 1** Original DACA eligibility criteria (June 2012)[a]

At least 15 years old at time of application

Under age 31 as of June 15, 2012

Arrived in the United States prior to age 16

Physically present in the United States since at least June 15, 2012

Lived continuously in the United States for at least 5 years as of June 15, 2007

Currently attend school, earned a high school diploma or GED, or have been honorably discharged veteran of the United States military

No convictions for a felony, significant misdemeanor or three or more misdemeanors, and do not pose a threat to public safety or national security

[a] President Obama issued a second executive order in November 2014 that expanded DACA eligibility by removing the upper age limit and broadening the dates of US presence. For the purposes of this study, the original DACA eligibility criteria from 2012 were used

adults' MHWB, leading to depression and suicidal thoughts [14–16, 18, 25].

A transformative federal Executive Order, issued in June 2012, established the Deferred Action for Childhood Arrivals (DACA) [26], which allows an estimated 2.1 million undocumented children and young adults (see Table 1) to apply for legal work authorization and a 2-year deportation reprieve [27–29]. Given the previously-reported impacts of undocumented status on immigrants' MHWB, DACA provides new opportunities that may influence the MHWB of eligible young adults.

Few studies have investigated the MHWB of eligible undocumented young people, and none have done so within the context of the DACA program. Some prior research on DACA's short-term impacts indicates that it has increased young people's access to new opportunities and removed the fear of deportation [27–29]. However, these young adults remain constrained in their upward mobility and continue to lack sufficient access to health care [18, 28, 29]. As more undocumented young adults gain DACA status, additional information is needed regarding the potential influence of DACA on their MHWB.

The data presented here were obtained during the course of a parent study of the health needs of DACA-eligible Latino young adults [18]. During focus groups, MHWB emerged overwhelmingly as participants' primary health concern. Thus, this analysis further examines how participants perceive their MHWB needs and view the impact of the DACA program thereon. Our analysis is informed by the broader World Health Organization definition of mental health as not simply the absence of mental illness, but "a state of wellbeing in which every individual realizes his or her own potential" [30]. We further recognize that certain social support and resilience factors may be protective for this population's MHWB. Several studies documented that young undocumented immigrants demonstrate substantial resilience when facing obstacles, benefiting their MHWB [18, 24, 31, 32].

To organize our findings, we utilized the ecological framework, which proposes that the wellbeing of the



**Fig. 1** Ecological framework

individual is determined by interconnections of systems at multiple levels (Fig. 1) [33, 34]. Through this framework, we analyzed participant perceptions regarding the influence of DACA on community, interpersonal, and individual-level determinants of MHWB [33, 34].

## Methods

### Participants

In partnership with community-based organizations (CBOs), research staff, including two DACA-eligible interns, recruited DACA-eligible Latinos (age 18–31) residing in Los Angeles or the San Francisco Bay Area (Table 2) [18]. Recruitment at sites such as legal clinics, colleges, markets and churches, was supplemented by social media-based (Facebook) recruitment and phone and email outreach. While all participants reported meeting DACA-eligibility criteria,



Author's personal copy

J Immigrant Minority Health (2017) 19:543–551

**Table 2** Characteristics of focus group participants

| | |
|---|---|
| Total participants | 61 |
| Age, years ± SD | 22.4 ± 3 |
| Female | 36 (59 %) |
| Latino | 61 (100 %) |
| Country of origin | |
| Mexico | 53 (87 %) |
| Other | 8 (13 %) |
| Employment status | |
| Full-time or part-time | 46 (75 %) |
| Self-employed | 3 (5 %) |
| Unemployed | 15 (25 %) |
| Income < 139 % federal poverty level | 21 (43 %) |
| Student status | |
| Full-time | 31 (51 %) |
| Part-time | 12 (20 %) |
| Not a student | 17 (28 %) |
| High school graduate | 58 (95 %) |
| Military veteran | 0 (0 %) |
| Activist for immigration reform | 44 (72 %) |
| Insurance status | |
| Uninsured | 32 (52 %) |
| Privately insured | 24 (39 %) |
| Publically insured | 5 (8 %) |
| Depressed in the past month | 14 (23 %) |

*Source*: This demographic data was drawn from the parent study: Raymond-Flesch et al. [18]

for participants' protection, researchers did not verify legal status. Study protocol, approved by the Institutional Review Board at the University of California, San Francisco, allowed for verbal informed consent to minimize risk.

**Data Collection**

Nine focus groups, conducted in English, with 61 participants (Group size: 4–12 participants, 7 on average), were held at CBOs in summer 2013. The decision to conduct groups in English was made in consultation with study advisors familiar with participants' language preference. Three experienced, bilingual, qualitative researchers, two of whom are Latina, facilitated the groups. Audio-recorded sessions lasted 60–90 min. Participants received a $20 gift card, a meal, and a resource guide to immigrant-accessible services.

**Measures and Analysis**

Focus group questions included the impact of DACA on identity, health, and health care access (Appendix). Two primary coders developed a codebook of 22 codes (Table 3), incorporating the ecological framework and following

multiple rounds of transcript review. Coding involved content analyses guided by grounded theory, with codes drawn directly from participants' comments and from literature on immigrants' health experiences and human development [35]. Consistent with a consensual coding process [36], coding was iterative with frequent review of code use among the primary coders. Shared memos summarized ongoing findings and emerging sub-codes. Coders discussed disparities in coding until achieving consensus. A third team member and the study's senior author, acted as an "auditor" of the data and codebook, reviewing final codes. Coding was assisted by Dedoose, a web-based analysis program [37].

**Results**

We employed the levels of the ecological framework to organize key findings regarding participants' perceptions of the impacts of DACA on their MHWB (Fig. 1). At each level, we highlight participants' most salient views of DACA's influence, including societal integration (community-level), social support (interpersonal-level), and sense of self (individual-level).

**Community-Level**

*Increased Societal Integration with DACA*

Participants reported that DACA smoothed their integration into US society. Without DACA, participants explained how their lack of legal status restricted their full societal engagement, limiting their ability to apply to college, seek employment or obtain a driver's license. When comparing their situation to their peers, participants described feeling isolated, stressed, and some, suicidal. A female participant shared:

> [I]t didn't hit me what it really meant to be undocumented until I got to College…that set me into a depression… there's still a lot of things I can't do, whereas I see a lot of my friends who take it for granted. It's hard to deal with sometimes.

In contrast, participants discussed how DACA status enabled their societal integration by providing them with increased access to resources, greater autonomy, and an improved sense of belonging. Access to a Social Security number, driver's license, and work permit allowed them to engage in normal travel and employment activities, which was beneficial for their MHWB: "I've been able to do more …it helps your self-esteem and your confidence, and your mental health does get better."

Without DACA, participants reported significant stress, often living in survival mode, struggling to meet basic



Author's personal copy

                                               J Immigrant Minority Health (2017) 19:543–551

**Table 3** Selected illustrative codes and example quotes

| Code with brief definition | Example quote |
|---|---|
| *Isolation*<br>This code captures participants' real or perceived feelings and experiences of not belonging or being separated from others | "How am I supposed to exist in the world with this experience that's so much different than the majority of the US population?…I just feel like anxiety. I feel like I don't belong. I feel like I'm different." (SF1, M) |
| *Belonging*<br>This code captures participants' feelings and experiences of being integrated into mainstream society related to DACA eligibility or status | "It helps you feel normal…It does help you feel like 'Oh, I'm now capable of doing the things that my peers have been doing.' Or I take advantage, like being able to get a job, being able to work, and being able [to]…drive and apply for the things that you couldn't before without something like a social security number. That's really a great help. It's like being able to have…that sense of normal, or at least for the time being." (LA5, M) |
| *Transition to adulthood*<br>This code captures participants' experiences of moving from childhood to adulthood. This can include achievement of normal adolescent or young adult developmental milestones and experiences of impediments to achievement of those milestones | "[W]hen I wanted to apply to college, I had to apply to so many scholarships and I saw all these restrictions…So it was kind of like a mental instability for me during my senior year, with college…I was just really depressed, really unstable during my senior year all because I was undocumented and because I didn't have money." (LA4, F) |
| *Survival mode*<br>This code captures participants' experiences of having to devote great amount of time, energy, or resources to meeting basic needs | "[Y]ou're trying to think about how to pay for school, how to pay rent. There's so many other stressors going through your mind …You're just in survival mode." (OAK3, F) |
| *Resilience*<br>This code captures participants' reports of personal skills, abilities, and experiences that promote success and allow effective coping | "I think one of the things though that's come out of this is, in general, we're all very self-sufficient people because we've had to navigate…I was pushed into the situation. So it's like I needed to find a way to progress pretty much on my own…in a sense, I feel more empowered, like I did it by myself." (LA3, F) |
| *External supports*<br>This code captures sources of help outside of one's self that participants report drawing on, including supports at the family, community, and structural levels | "[T]hey were trying to organize a undocumented support group, and that's when I started to meet other students who were in the same situation. And we started talking about our experiences, being undocumented, and trying to access higher education, and so forth. And so, that was the first time that I actually felt like I could be myself and I could express myself and talk about what is it like to live here in the U.S., as an undocumented person." (SF1, M) |

needs while juggling school, work and family responsibilities. Speaking of these challenges, a male participant shared: "[Y]ou're not only dealing with regular teenage problems, you're also being undocumented, having to work sometimes two jobs, going to school…It really affects mental health." With DACA, participants described feeling increased autonomy and hope for the future. One female participant explained: "[I]t has really helped my mental health, and I'm not stuck in a rut anymore. I just know what to do with my life."

Participants reported having gone to great lengths to hide their undocumented status due to constant fear of discovery and deportation. With DACA, they expressed an improved sense of comfort in disclosing their status. A male participant described how before DACA: "I built mechanisms to lie because that's what I thought I had to do. But now that I've come out, I can be more myself, who I really am." Without the need to hide their status, participants expressed feelings of belonging and normalcy; one reported:

I was like a fish out of the water, gasping for stuff. And then, DACA was announced. It was like someone threw me back in the river. I've been able to help my family financially…get back into school, and feel more normal.

### Remaining Challenges to Societal Integration with DACA

Even with DACA, participants described ongoing limitations, with ramifications for their MHWB. While DACA increased access to employment-based health benefits for a few participants, the majority reported not being offered coverage. As they are also disqualified for coverage through the Affordable Care Act (ACA), many remained uninsured. Similarly, DACA did not expand access to federal financial aid, thus diminishing educational opportunities. A female participant described how ongoing restrictions impacted her: "I still can't really go to grad school because it's going to be really expensive and I can't get loans…It reminds you that you're not fully there."



J Immigrant Minority Health (2017) 19:543–551

Though participants credited DACA with providing relief, many felt that the trauma of growing up undocumented remained stressful. A male participant described how emotional challenges became engrained: "Your experiences with pre-DACA, of full-on undocumented life, that fear or paranoia…that's still there. You're still going to feel the residual of what that felt like."

## Interpersonal-Level

### Greater Peer Support with DACA

Participants viewed DACA as altering their previously-available sources of support. Many reported limited social support and fractured family networks related to their undocumented status and inability to travel freely to visit family in their native countries. In contrast, they described how DACA expanded their support networks by providing the impetus to freely connect with peers with similar experiences for the first time. A female participant explained: "It's always good for me to see that I'm not alone…I might have all of these anxieties and [be] depressed, but I'm not the only one." The opportunity to process shared experiences with other young adults provided validation and much-needed support.

### Increased Family Responsibilities with DACA

Participants described how DACA also influenced the nature of their relationships with their families, resulting in shouldering additional responsibilities. Many welcomed their increased ability to contribute resources to their families. A male participant expressed the relief brought by his options: "It impacts my life—being able to apply for a job and contribute money for rent or for bills, and not just having to see my dad work." However, others felt overwhelmed by their added responsibilities, which added to their stress. A female participant described: "Everything's more dependent on you just because you have this…Too much pressure, like what if I just crash? It's like I'm ruined."

Many participants also took on increased emotional responsibility for their undocumented parents and siblings who remained ineligible for the protections bestowed by DACA. This transfer of worry from their own survival to their families had mental health consequences. A male participant explained the shift in his anxiety:

I'm worried about my parents now…I've kind of become the parenting figure. It's no longer about yourself…it's more of a fear for what's going to happen to my parents.

## Individual-Level

### Improved Sense of Self with DACA

At the individual level, participants noted that DACA influenced their self-image. Participants reported that before DACA, their undocumented status imposed a burden on their self-confidence. One male participant, speaking of his parents, expressed how "they instilled shame regarding [my] identity as an undocumented person…." In contrast, participants described how DACA status gave them a new sense of belonging that improved their self-esteem, impacting their MHWB. A female participant stated, "You don't have to feel like, 'I'm undocumented, I'm not supposed to be here'….You're worth something, so now you can show it."

### DACA as a New Precarious Status

Participants reported that DACA, as a temporary status, also imposed a new precarious identity that proved stressful. One male participant described his feelings of uncertainty: "Yeah, we got DACA. But, it's two years only…I only have one year [of protection from DACA] left and that's it. I have to worry again." Furthermore, a female participant explained how the uncertainty of DACA status left her with little confidence: "When I think about DACA, I also have these feelings that I'm kind of just passing, that I'm not really a citizen…you're not really there yet." Participants also spoke of their fear of having DACA taken away: "It also limits you…You have DACA, then you're like 'Crap, I can't do anything to risk that. If I make one mistake…I'm screwed completely!" Thus, despite DACA's benefits, concern about its temporary nature provoked anxiety.

## Discussion

While previous research has examined the mental health implications of undocumented status, this analysis is the first to shed light on the perceived influences of DACA on the MHWB of eligible Latino Immigrant young adults from their own perspective. Consistent with previous studies, our participants experienced substantial mental health challenges related to reduced societal integration and lower self-esteem while growing up undocumented [3, 24–26, 32, 38].

Our research is also consistent with findings of the limited studies to date regarding the impacts of DACA. These studies similarly found that increased access to societal structures is a major benefit of DACA status [15, 28, 29, 39]. Our findings further expand on this research by



Case 1:18-cv-00068  Document 225-4  Filed on 07/21/18 in TXSD  Page 286 of 558

Author's personal copy

showing how DACA-eligible young adults perceive increased societal integration as having protective effects on their MHWB by decreasing stress and encouraging greater autonomy. Thus, these results show that eligible young adults view DACA as having both beneficial and detrimental impacts on their MHWB.

A novel finding from our analysis was that participants perceived DACA as enabling them to connect with and experience social support from peers with similar life experiences, resulting in an improved sense of MHWB. The benefits of strong social support are aligned with existing literature which points to the positive effects of peer support for identity formation and wellbeing [6, 40].

Another unique finding related to the importance of social policy for individuals' MHWB was participants' recognition that beyond the tangible benefits provided, DACA status also helped reduce their shame about being undocumented. This finding suggests that DACA status provides a new, less-stigmatized way of defining themselves, providing a greater sense of legitimacy. This finding is similar to those of Abrego, who studied the impacts of AB540, a law allowing in-state tuition for undocumented students in California. The law allowed these youth to use a more socially-acceptable label as "AB540 students," replacing the more stigmatizing label of "undocumented" [41].

Despite the substantial benefits reported, DACA also has unintended negative mental health consequences, including the stress associated with increasing family responsibilities, shifting concerns about deportation risk from oneself to ineligible family members, and a new sense of precariousness as they move from the tenuous existence of being undocumented to their temporary DACA status. The precarious nature of undocumented status was described by Gonzales [24, 25]; our study suggests that while there are stabilizing benefits of DACA, recipients still perceive DACA as a precarious temporary status.

Important to investigate further is the resilience of undocumented Latino young adults [24, 31, 32]. While we have documented their profound capacity to overcome adversity in our prior work [18], this analysis further contributes to the resilience literature by showing how DACA facilitated supportive and meaningful connections to peers with shared experiences.

This study has several limitations. First, focus groups were held with Latino participants and results cannot be generalized to immigrants of different ethnic backgrounds. Second, we conducted focus groups primarily in English. Although this decision was informed by knowledgeable key informants and participants were free to use Spanish given the study's bilingual facilitators, this may have excluded recent immigrants, for whom groups held in Spanish would have been preferable. Third, we conducted our study in two relatively immigrant-friendly California

cities. DACA-eligible young adults living in less-welcoming communities may have different, perhaps more isolated experiences. Fourth, our approach to recruiting this hidden population was biased towards recruitment of students, college-educated young adults, and those connected to CBOs. This limits our study's generalizability to broader undocumented immigrant populations, and future studies should target harder-to-reach and less-privileged individuals who may experience substantial mental health needs, but have fewer resources to address them. Despite these limitations, the depth of MHWB issues that participants relayed is noteworthy.

Both the substantial MHWB needs described by participants and the limited research on DACA's impacts call for continued evaluation of the program's health implications and greater consideration of the multi-layered ways in which immigration policies may influence health. Specifically, our findings point to the unintended negative consequences of policy changes for target populations. One step towards averting such unintended impacts could involve encouraging governments to adopt a "health in all policies" approach to policy development that "emphasizes the consequences of public policies on health determinants, and aims to improve the accountability of policymakers for health impacts at all levels of policy-making" [42]. Inherent in this approach is the need to better understand the population for which policies are being designed.

Our findings also highlight the need for increased availability of and access to mental health services for DACA-eligible young adults. Our results suggest that such improved services should incorporate peer-led counseling resources, given the positive mental health effects of peer support described by participants. Similarly our findings suggest that, given their profound mental health needs, DACA recipients could benefit from better access to health insurance.

In conclusion, while DACA is a positive first step, it provides only a short-term policy solution to the challenges of our country's piecemeal immigration system. Immigration policy changes that are longer-lasting, for example, expanding the length of time that DACA eligible youth may reside lawfully in this country, or immigration policy reform, such as DAPA, announced by President Obama in November, 2014, but blocked by a number of states and currently under review by the Supreme Court [43], would likely provide more sustained benefits for the MHWB of young adults and their families. The policy implications of this research is that removing the residual fear, stigma, and uncertainty that the undocumented live with on a daily basis could play a substantial role in improving the mental health of nearly half of the country's 11.4 million undocumented immigrants. Further efforts by policymakers, providers and advocates to understand and address the MHWB needs of DACA-eligible youth immigrants and

Author's personal copy

J Immigrant Minority Health (2017) 19:543–551   549

their families can help assure that this young, ambitious population successfully pursues their goal to more fully participate in US society.

**Acknowledgments**  This research was made possible by funding from the Blue Shield of California Foundation. Rachel Siemons' time was also supported by the UCSF Dean's Office Medical Student Research Program, the Philip R. Lee Institute for Health Policy Studies, the UC Berkeley-UCSF Joint Medical Program Thesis Grant, and the Schoeneman Grant. Dr. Marissa Raymond-Flesch's time was supported by the Leadership Education in Adolescent Health Program from the Maternal and Child Health Department (T71MC00003) and the Philip R. Lee Institute for Health Policy Studies. Dr. Colette Auerswald's time was supported by the UC Berkeley-UCSF Joint Medical Program. Dr. Claire Brindis' time was supported by grants from the Maternal and Child Health Bureau, Health Resources and Services Administration, U.S. Department of Health and Human Services (U45MC 00002 and U45MC 00023). We are grateful to the following people for their valuable contributions to this project: Irene Bloemraad, PhD (UC Berkeley, Department of Sociology), Ken Jacobs, BA (UC Berkeley Center for Labor Research and Education), as well as Laurel Lucia, MPP (UC Berkeley Center for Labor Research and Education), Nadereh Pourat, PhD, Efrain Talamantes, MD, MBA, and Max Handler, MPH, MA (UCLA Center for Health Policy Research), our interns Arlette Lozano and Kathy Latthivongskorn, our advisory board members, and our community-based organization partners. Most of all we thank the participants who shared their personal experiences with us.

**Compliance with Ethical Standards**

**Conflict of interest**   None of the authors have conflicts of interest to disclose regarding this research. The study sponsor, Blue Shield Foundation of California, had one representative on the study's advisory board, but was not directly involved in data collection or analysis, nor required review of this manuscript.

**Human and Animal Rights and Informed Consent**  All procedures performed in studies involving human participants were in accordance with the ethical standards of the institutional and/or national research committee and with the 1964 Helsinki declaration and its later amendments or comparable ethical standards. Informed consent was obtained from all individual participants included in the study. This article does not contain any studies with animals performed by any of the authors.

## Appendix: Focus Group Questions

1. What health problems do you think DACA-eligible young people face?

   - Probes: What health conditions do you think are particularly challenging for this group? How are health problems for young people like yourselves different from other young adults? Are stress or mental health issues something that DACA-eligible young people struggle with?

2. What decisions or actions affect the health of young adults like yourselves, who are eligible for DACA?

   - Probes: In your experience, how easy is it for young adults like yourselves to maintain a healthy diet and lifestyle? Can you tell me about experiences with tobacco use among young adults like you? What about alcohol or other substances?

3. What do young adults like yourselves do when you need health care?

   - Probes: Where do you think that DACA-eligible young adults get health care? Do you, or other DACA-eligible young adults that you know, have a regular doctor? Are there particular programs in your area that give health care to immigrants without documentation? What is it like to get care in those places? What about mental health care access?

4. What is it like for young people like yourselves to get health care?

   - Probes: What factors do young people like you consider when deciding whether to go the doctor? What barriers make it challenging for you to get medical care? Mental health care? Do you feel like your doctor understands you? Have you ever gone without seeing a doctor for a long time? If so, why?

5. Have you heard of young adults who might be eligible for DACA not getting the health care that they need because it is too expensive? Can you tell me about that?

   - Probes: Have you heard of someone who might be DACA-eligible ever deciding to skip a doctor's appointment or not to have a test done because of cost? How much is "too expensive" for a doctor's visit? Is cost a barrier for mental health care as well?

6. Do you think that having insurance is important to DACA-eligible young adults? Do you know what type of insurance they might have or how they find out about insurance and where they get it?

   - Probes: What might be some reasons that DACA-eligible young adults may not have health insurance? Have you or someone you know had a period of time in which they lost their insurance in the last few years? Why? How did that change the ways you or that person got health care? If you could design an insurance program for DACA-eligible young people what would you want it to look like? What services would you include in your health insurance?

Author's personal copy

J Immigrant Minority Health (2017) 19:543–551

Who would you trust to tell you about an insurance program like this?

7. If you were able to get health insurance under a public program, what would be the best way to reach out to you to enroll you in a health insurance program?

   - Probes: What types of information would you want to know about the program before you decided to enroll? Would you enroll? If so why or why not?

8. What specific types of health services do you think are most needed or most in-demand by DACA-eligible young adults?

   - Probes: How about general primary care services? Reproductive health care services? Dental care services? Stress can be a very challenging thing for young adults to manage. Do you know young adults like yourselves who have used mental health services like therapists to manage stress? Where do DACA-eligible young adults get these different types of care?

9. Are there any medical services that are hard for young adults like yourselves to find or access?

   - Probes: What are these services? What makes them hard to access? Are there things that have made it particularly difficult for young adults like yourselves to get mental health care?

10. What other barriers exist that might prevent DACA-eligible young adults from seeking care? For example, concerns about their citizenship status? Stigma?

    - Probes: Since the DACA program went into effect last year, has this concern changed among your friends or family members who are your age?

11. What do you think DACA has done for you? Have you had any increased stress or responsibility because of DACA?

12. Do you have any other thoughts that you would like to share with us about health or health care needs of young adults like yourselves?

## References

1. Krogstad JM, Passel JS. 5 facts about illegal immigration in the U.S. Pew Research Center. 2015. http://www.pewresearch.org/fact-tank/2015/07/24/5-facts-about-illegal-immigration-in-the-u-s/.

2. Hill L, Hayes J. Undocumented Immigrants. Public Policy Institute of California. 2013. http://www.ppic.org/main/publication_show.asp?i=818.

3. Sullivan MM, Rehm R. Mental health of undocumented Mexican immigrants: a review of the literature. Adv Nurs Sci. 2005;28(3):240–51.

4. Hovey JD, King CA. Acculturative stress, depression, and suicidal ideation among immigrant and second-generation Latino adolescents. J Am Acad Child Adolesc Psychiatry. 1996;35(9):1183–92.

5. Crocker R. Emotional testimonies: an ethnographic study of emotional suffering related to migration from Mexico to Arizona. Front Public Health. 2015;3:177.

6. Potochnick SR, Perreira KM. Depression and anxiety among first-generation immigrant Latino youth. J Nerv Ment Dis. 2010;198(7):470–7.

7. Hacker K, et al. The impact of immigration and customs enforcement on immigrant health: perceptions of immigrants in Everett, Massachusetts, USA. Soc Sci Med. 2011;73(4):586–94.

8. Abrego LJ, Gonzales RG. Blocked paths, uncertain futures: the postsecondary education and labor market prospects of undocumented Latino youth. J Educ Stud Placed Risk. 2010;15(1–2):144–57.

9. Terriquez V. Dreams delayed: barriers to degree completion among undocumented latino community college students. J Ethnic Migr Stud. 2014. doi:10.1080/1369183X.2014.968534.

10. Gleeson S, Gonzales RG. When do papers matter? An institutional analysis of undocumented life in the United States. Int Migr. 2012;50(4):1–19.

11. Organista KC. Solving Latino psychosocial and health problems: theory, practice, and populations. Hoboken: Wiley; 2007.

12. Standish K, et al. Household density among undocumented Mexican immigrants in New York City. J Immigr Minor Health. 2010;12(3):310–8.

13. Chavez LR. Undocumented immigrants and their use of medical services in Orange County, California. Soc Sci Med. 2012;74(6):887–93.

14. Perez C, Fortuna L. Psychological stressors, psychiatric diagnoses and utilization of mental health services among undocumented immigrant Latinos. J Immigr Refugee Serv. 2005;3(1):107–23.

15. Menjívar C. Liminal legality: Salvadoran and Guatemalan immigrants' lives in the United States. Am J Sociol. 2006;111(4):999–1037.

16. Stacciarini JM, et al. *I didn't ask to come to this country…I was a child*: the mental health implications of growing up undocumented. J Immigr Minor Health. 2014;. doi:10.1007/s10903-014-0063-2.

17. Brindis CD, et al. Realizing the dream for californians eligible for Deferred Action for Childhood Arrivals (DACA): demographics and health coverage. UC Berkeley Center for Labor Research and Education. 2014. http://laborcenter.berkeley.edu/realizing-the-dream-for-californians-eligible-for-deferred-action-for-childhood-arrivals-daca-demographics-and-health-coverage/.

18. Raymond-Flesch M, et al. "There is no help out there and if there is, it's really hard to find": a qualitative study of the health concerns and health care access of latino "DREAMers". J Adolesc Health. 2014;55(3):323–8.

19. Park MJ, et al. Adolescent and young adult health in the United States in the past decade: little improvement and young adults remain worse off than adolescents. J Adolesc Health. 2014;55(1):3–16.

20. Setterson RA, Furstenburg FJ, Rumbaut R, editors. On the frontier of adulthood: theory, research, and public policy. Chicago: University of Chicago Press; 2005.

21. Arnett JJ, Tanner JT. Emerging adults in America: coming of age in the 21st century. Washington: American Psychological Association; 2006.

22. Abrego LJ. I can't go to college because I don't have papers: incorporation patterns of Latino undocumented youth. Latino Stud. 2006;4(3):212–31.



Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 289 of 558

Author's personal copy

23. Abrego LJ. Legal consciousness of undocumented Latinos: fear and stigma as barriers to claims-making for first- and 1.5-generation immigrants. Law Soc Rev. 2011;45(2):337–70.

24. Gonzales RG. Learning to be illegal: undocumented youth and shifting legal contexts in the transition to adulthood. Am Sociol Rev. 2011;76(4):602–19.

25. Gonzales RG, et al. No place to belong: contextualizing concepts of mental health among undocumented immigrant youth in the United States. Am Behav Sci. 2013;57(8):1174–99.

26. U.S. Citizenship and Immigration Services (USCIS). Consideration of Deferred Action for Childhood Arrivals (DACA). 2015. http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca.

27. Batalova J, et al. DACA at the two year mark: a national and state profile of youth eligible and applying for deferred action. Migration Policy Institute. 2014. http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

28. Gonzales RG, Bautista-Chavez AM. Two Years and Counting: Assessing the Growing Power of DACA. American Immigration Council. 2014. http://www.immigrationpolicy.org/sites/default/files/docs/two_years_and_counting_assessing_the_growing_power_of_daca_final.pdf.

29. Gonzales RG, et al. Becoming DACAmented: assessing the short-term benefits of deferred action for childhood arrivals (DACA). Am Behav Sci. 2014;58(14):1852–72.

30. World Health Organization. *Strengthening mental health promotion*. Geneva, World Health Organization (Fact sheet no. 220), 2001.

31. Perez Huber L, Malagon MC. Silenced struggles: the experiences of Latina and Latino undocumented college students in California. Nev Law J. 2007;7:841–61.

32. Perez W, et al. Academic resilience among undocumented Latino students. Hispanic J Behav Sci. 2009;31(2):149–81.

33. Bronfrenbrenner U. The ecology of human development. Cambridge: Harvard Press; 1979.

34. McLeroy KR, Steckler A, Bibeau D. The social ecology of health promotion interventions. Health Educ Q. 1998;15(4):351–77.

35. Strauss A, Corbin J. Basics of qualitative research: techniques and procedures for developing grounded theory. 2nd ed. Thousand Oaks: Sage; 1998.

36. Hill CE, Knox S, Thompson BJ, Williams EN, Hess SA, Ladany N. Consensual qualitative research: an update. J Couns Psychol. 2005;52(2):196–205. doi:10.1037/0022-0167.52.2.196.

37. Dedoose Version 5.0.11, web application for managing, analyzing, and presenting qualitative and mixed method research data. Los Angeles, CA: SocioCultural Research Consultants, LLC. 2014. www.dedoose.com.

38. Suárez-Orozco C, et al. Growing up in the shadows: the developmental implications of unauthorized status. Harvard Educ Rev. 2011;81(3):438–72.

39. Martinez LM. Dreams deferred: the impact of legal reforms on undocumented Latino youth. Am Behav Sci. 2014;58(14):1873–90.

40. Ellis LM, Chen EC. Negotiating identity development among undocumented immigrant college students: a grounded theory study. J Couns Psychol. 2013;60(2):251–64.

41. Abrego LJ. Legitimacy, social identity, and the mobilization of law: the effects of Assembly Bill 540 on undocumented students in California. Law Soc Inq. 2008;33(3):709–34.

42. World Health Organization. Framework and statement: consultation on the drafts of the "Health in All Policies Framework for Country Action" for the Conference Statement of 8th Global Conference on Health Promotion. 2013. http://www.healthpromotion2013.org/conference-programme/framework-and-statement.

43. US Citizenship and Immigration Services, Department of Homeland Security: Executive Actions on Immigration: President Obama's Executive Actions on Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), November 20, 2014. http://www.uscis.gov/immigrationaction.



# DEF-INTERV.

# EX. 116



U.S. Department of Commerce (//www.commerce.gov/) | Blogs (//www.census.gov/about/contact-us/social_media.html) | Index A-Z (//www.census.gov/about/index.html) | Glossa (//www.census.gov/glossary/) | FAQs (//ask.census.gov)

Search

/www.census.gov/en.html)

# Current Population Survey (CPS)

## CPS Table Creator

| CPS Data Collected in Year: 2011 |
| --- |
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

| Age 18 to 30 |
| --- |

| | Totals | | Employment Status (EMP) Recode | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| **Totals** | 54,874 | 100.0% | 16,093 | 29.3% | 33,522 | 61.1% | 5,259 | 9.6% |
| **Nativity - Detailed** | | | | | | | | |
| Native | 47,110 | 100.0% | 13,640 | 29.0% | 28,816 | 61.2% | 4,654 | 9.9% |
| Naturalized Citizen | 2,030 | 100.0% | 589 | 29.0% | 1,271 | 62.6% | 171 | 8.4% |
| Not a Citizen | 5,734 | 100.0% | 1,865 | 32.5% | 3,435 | 59.9% | 435 | 7.6% |

| |
| --- |
| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2011 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2012 |
|---|
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

**Age 18 to 30**

| | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 55,141 | 100.0% | 16,233 | 29.4% | 34,020 | 61.7% | 4,888 | 8.9% |
| Nativity - Detailed | | | | | | | | |
| Native | 47,570 | 100.0% | 13,778 | 29.0% | 29,445 | 61.9% | 4,346 | 9.1% |
| Naturalized Citizen | 2,056 | 100.0% | 641 | 31.2% | 1,272 | 61.8% | 144 | 7.0% |
| Not a Citizen | 5,516 | 100.0% | 1,815 | 32.9% | 3,303 | 59.9% | 398 | 7.2% |

| |
|---|
| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2012 |
| Source: U.S. Census Bureau |

**CPS Data Collected in Year: 2013**

**Persons - All**

**Percentages by Employment Status (EMP) Recode**

**(Sums in Thousands)**

**Age 18 to 30**

| | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| **Totals** | 55,452 | 100.0% | 16,460 | 29.7% | 34,398 | 62.0% | 4,595 | 8.3% |
| **Nativity - Detailed** | | | | | | | | |
| **Native** | 47,825 | 100.0% | 13,910 | 29.1% | 29,808 | 62.3% | 4,106 | 8.6% |
| **Naturalized Citizen** | 2,087 | 100.0% | 656 | 31.4% | 1,311 | 62.8% | 121 | 5.8% |
| **Not a Citizen** | 5,540 | 100.0% | 1,894 | 34.2% | 3,279 | 59.2% | 367 | 6.6% |

| |
|---|
| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2013 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2014 |
| --- |
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |
| The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. The redesigned income questions were implemented to a subsample using a probability split panel design. |
| The source of data for this table is the portion of the CPS ASEC sample which received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses. |

**Age 18 to 30**

| | Totals | | Employment Status (EMP) Recode | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 55,668 | 100.0% | 16,362 | 29.4% | 35,099 | 63.1% | 4,206 | 7.6% |
| Nativity - Detailed | | | | | | | | |
| Native | 48,478 | 100.0% | 13,928 | 28.7% | 30,803 | 63.5% | 3,748 | 7.7% |
| Naturalized Citizen | 1,894 | 100.0% | 593 | 31.3% | 1,188 | 62.7% | 113 | 6.0% |
| Not a Citizen | 5,295 | 100.0% | 1,841 | 34.8% | 3,109 | 58.7% | 345 | 6.5% |

| |
| --- |
| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2014 |
| Source: U.S. Census Bureau |

**CPS Data Collected in Year: 2015**

**Persons - All**

**Percentages by Employment Status (EMP) Recode**

**(Sums in Thousands)**

**Age 18 to 30**

| | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| **Totals** | 56,323 | 100.0% | 16,559 | 29.4% | 36,226 | 64.3% | 3,538 | 6.3% |
| **Nativity - Detailed** | | | | | | | | |
| **Native** | 48,832 | 100.0% | 13,949 | 28.6% | 31,714 | 64.9% | 3,169 | 6.5% |
| **Naturalized Citizen** | 2,035 | 100.0% | 595 | 29.2% | 1,342 | 65.9% | 98 | 4.8% |
| **Not a Citizen** | 5,456 | 100.0% | 2,014 | 36.9% | 3,170 | 58.1% | 271 | 5.0% |

Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option.

Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year.

Current Population Survey, Annual Social and Economic Supplement, 2015

Source: U.S. Census Bureau

| CPS Data Collected in Year: 2016 |
|---|
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

**Age 18 to 30**

| | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 56,661 | 100.0% | 16,294 | 28.8% | 37,109 | 65.5% | 3,258 | 5.7% |
| Nativity - Detailed | | | | | | | | |
| Native | 49,135 | 100.0% | 13,734 | 28.0% | 32,456 | 66.1% | 2,946 | 6.0% |
| Naturalized Citizen | 2,174 | 100.0% | 715 | 32.9% | 1,374 | 63.2% | 85 | 3.9% |
| Not a Citizen | 5,351 | 100.0% | 1,845 | 34.5% | 3,280 | 61.3% | 227 | 4.2% |

Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option.

Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year.

Current Population Survey, Annual Social and Economic Supplement, 2016

Source: U.S. Census Bureau

# DEF-INTERV.

# EX. 117

U.S. Department of Commerce (//www.commerce.gov/) | Blogs (//www.census.gov/about/contact-us/social_media.html) | Index A-Z (//www.census.gov/about/index.html) | Glossa
(//www.census.gov/glossary/) | FAQs (//ask.census.gov

United States™
Census
Bureau

/www.census.gov/en.html)

Search

# Current Population Survey (CPS)

## CPS Table Creator

| CPS Data Collected in Year: 2011 |
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

### Age 18 to 30

| State: TX | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 4,773 | 100.0% | 1,399 | 29.3% | 2,924 | 61.2% | 451 | 9.5% |
| Nativity - Detailed | | | | | | | | |
| Native | 3,829 | 100.0% | 1,108 | 28.9% | 2,331 | 60.9% | 390 | 10.2% |
| Naturalized Citizen | 179 | 100.0% | 48 | 26.9% | 124 | 69.5% | 6 | 3.6% |
| Not a Citizen | 765 | 100.0% | 242 | 31.7% | 468 | 61.2% | 54 | 7.1% |

| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2011 |
| Source: U.S. Census Bureau |

**CPS Data Collected in Year: 2012**

**Persons - All**

**Percentages by Employment Status (EMP) Recode**

**(Sums in Thousands)**

**Age 18 to 30**

| State: TX | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| **Totals** | 4,694 | 100.0% | 1,394 | 29.7% | 2,956 | 63.0% | 345 | 7.3% |
| **Nativity - Detailed** | | | | | | | | |
| **Native** | 3,853 | 100.0% | 1,107 | 28.7% | 2,434 | 63.2% | 312 | 8.1% |
| **Naturalized Citizen** | 187 | 100.0% | 62 | 33.0% | 125 | 67.0% | . | . |
| **Not a Citizen** | 654 | 100.0% | 225 | 34.4% | 396 | 60.5% | 33 | 5.1% |

| |
|---|
| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2012 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2013 |
|---|
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

| Age 18 to 30 |
|---|

| State: TX | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 5,028 | 100.0% | 1,510 | 30.0% | 3,133 | 62.3% | 385 | 7.7% |
| Nativity - Detailed | | | | | | | | |
| Native | 4,141 | 100.0% | 1,214 | 29.3% | 2,600 | 62.8% | 327 | 7.9% |
| Naturalized Citizen | 154 | 100.0% | 62 | 40.1% | 83 | 53.7% | 9 | 6.2% |
| Not a Citizen | 734 | 100.0% | 235 | 32.0% | 450 | 61.4% | 49 | 6.6% |

| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
|---|
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2013 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2014 |
| --- |
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |
| The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. The redesigned income questions were implemented to a subsample using a probability split panel design. |
| The source of data for this table is the portion of the CPS ASEC sample which received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses. |

| Age 18 to 30 |
| --- |

| | Totals | | Employment Status (EMP) Recode | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| State: TX | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 4,848 | 100.0% | 1,349 | 27.8% | 3,256 | 67.2% | 242 | 5.0% |
| Nativity - Detailed | | | | | | | | |
| Native | 4,023 | 100.0% | 1,108 | 27.5% | 2,703 | 67.2% | 212 | 5.3% |
| Naturalized Citizen | 143 | 100.0% | 42 | 29.3% | 98 | 68.4% | 3 | 2.3% |
| Not a Citizen | 682 | 100.0% | 200 | 29.3% | 455 | 66.8% | 27 | 3.9% |

| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| --- |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2014 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2015 |
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

| Age 18 to 30 |

| State: TX | Totals | | Employment Status (EMP) Recode | | | | | |
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 4,977 | 100.0% | 1,498 | 30.1% | 3,239 | 65.1% | 240 | 4.8% |
| Nativity - Detailed | | | | | | | | |
| Native | 4,111 | 100.0% | 1,205 | 29.3% | 2,695 | 65.6% | 211 | 5.1% |
| Naturalized Citizen | 151 | 100.0% | 65 | 42.9% | 85 | 55.9% | 2 | 1.2% |
| Not a Citizen | 714 | 100.0% | 227 | 31.8% | 459 | 64.3% | 28 | 3.9% |

| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2015 |
| Source: U.S. Census Bureau |

| CPS Data Collected in Year: 2016 |
|---|
| Persons - All |
| Percentages by Employment Status (EMP) Recode |
| (Sums in Thousands) |

| Age 18 to 30 |
|---|

| State: TX | Totals | | Employment Status (EMP) Recode | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Children, Armed Forces, or Not In Labor Force | | Employed | | Unemployed | |
| | Persons | | Persons | | Persons | | Persons | |
| | Sum | PCT | Sum | PCT | Sum | PCT | Sum | PCT |
| Totals | 5,234 | 100.0% | 1,592 | 30.4% | 3,386 | 64.7% | 256 | 4.9% |
| Nativity - Detailed | | | | | | | | |
| Native | 4,331 | 100.0% | 1,315 | 30.4% | 2,804 | 64.7% | 212 | 4.9% |
| Naturalized Citizen | 170 | 100.0% | 57 | 33.5% | 109 | 64.3% | 4 | 2.2% |
| Not a Citizen | 733 | 100.0% | 220 | 30.0% | 473 | 64.5% | 40 | 5.5% |

| Inferences should be made with extreme caution when the cell sizes are small. To examine cell sizes, select "Display Unweighted Record Counts" under the Statistics Option. |
|---|
| Some CPS questions, such as income, ask about the previous year. Others, such as age, refer to the time of the survey. The column labels indicate any subject with a reference year which differs from the survey year. |
| Current Population Survey, Annual Social and Economic Supplement, 2016 |
| Source: U.S. Census Bureau |

**ABOUT US (//www.census.gov/about.html)**

Are You in a Survey? (//www.census.gov/programs-surveys/are-you-in-a-survey.html)
FAQs (//ask.census.gov/)
Director's Corner (//www.census.gov/about/leadership.html)
Regional Offices (//www.census.gov/about/regions.html)
History (//www.census.gov/about/history.html)
Research (//www.census.gov/about/our-research.html)
Scientific Integrity (//www.census.gov/about/policies/quality/scientific-integrity.html)
Census Careers (//www.census.gov/about/census-careers.html)
Diversity @ Census (//www.census.gov/about/diversity-networks.html)
Business Opportunities (//www.census.gov/about/business-opportunities.html)
Congressional and Intergovernmental (//www.census.gov/about/cong-gov-affairs.html)
Contact Us (//www.census.gov/about/contact-us.html)

**FIND DATA (//www.census.gov/data.html)**

QuickFacts (//www.census.gov/quickfacts.html)
American FactFinder (//www.census.gov/data-tools/american-factfinder.html)
Population Finder (//www.census.gov/data-tools/interactive-population-map.html)
2010 Census (//www.census.gov/programs-surveys/decennial-census/2010-census.html)
Economic Census (//www.census.gov/programs-surveys/economic-census.html)
Interactive Maps (//www.census.gov/geography/interactive-maps.html)
Training & Workshops (//www.census.gov/data/training-workshops.html)
Data Tools (//www.census.gov/data/data-tools.html)
Developers (//www.census.gov/developers/)
Catalogs (//www.census.gov/data/product-catalog.html)
Publications (//www.census.gov/library/publications.html)

**BUSINESS & INDUSTRY**

Help With Your Forms (//www.census.gov/programs-surveys/help.html)
Economic Indicators (//www.census.gov/topics/economy/economic-indicators.html)
Economic Census (//www.census.gov/programs-surveys/economic-census.html)
E-Stats (//www.census.gov/programs-surveys/e-stats.html)
International Trade (//www.census.gov/topics/international-trade.html)
Export Codes (//www.census.gov/topics/international-trade/code-b.html)
NAICS (//www.census.gov/eos/www/naics/)
Governments (//www.census.gov/topics/public-sector.html)
Local Employment Dynamics (//www.census.gov/topics/employment/lehd.html)
Survey of Business Owners (//www.census.gov/programs-surveys/sbo.html)

**PEOPLE & HOUSEHOLDS**

2020 Census (//www.census.gov/2020census/)
2010 Census (//www.census.gov/programs-surveys/decennial-census/2010-census.html)
American Community Survey (//www.census.gov/programs-surveys/acs/)
Income (//www.census.gov/topics/income-poverty/income.html)
Poverty (//www.census.gov/topics/income-poverty/poverty.html)
Population Estimates (//www.census.gov/topics/population/population-estimates.html)
Population Projections (//www.census.gov/topics/population/population-projections.html)
Health Insurance (//www.census.gov/topics/health/health-insurance.html)
Housing (//www.census.gov/topics/housing.html)
International (//www.census.gov/topics/population/international.html)
Genealogy (//www.census.gov/topics/population/genealogy.html)

**SPECIAL TOPICS**

Advisors, Centers and Research Programs (//www.census.gov/about/partners.html)
Statistics in Schools (//www.census.gov/schools/)
Tribal Resources (AIAN) (//www.census.gov/about/cong-gov-affairs/intergovernmental-affairs/tribal-affairs/tribal-resources.html)
Emergency Preparedness (//www.census.gov/topics/preparedness.html)
Statistical Abstract (//www.census.gov/library/publications/time-series/statistical_abstracts.html)
Special Census Program (//www.census.gov/programs-surveys/specialcensus.html)
Data Linkage Infrastructure (//www.census.gov/about/adrm/linkage.html)
Fraudulent Activity & Scams (//www.census.gov/about/policies/privacy/data_stewardship/fraudulent-activity-and-scams.html)
USA.gov (//www.usa.gov/)
Business USA (//business.usa.gov/)

**NEWSROOM (//www.census.gov/newsroom.html)**

News Releases (//www.census.gov/newsroom/press-releases.html)
Release Schedule (//www.calendarwiz.com/calendars/calendar.php?crd=cens1sample&cid[]=31793)
Facts for Features (//www.census.gov/newsroom/facts-for-features.html)
Stats for Stories (//www.census.gov/newsroom/stories.html)
Blogs (//www.census.gov/about/contact-us/social_media.html)

**CONNECT WITH US (//www.census.gov/about/contact-us/social_media.html)**

(//www.facebook.com/uscensusbureau)
(//twitter.com/uscensusbureau) (//www.linkedin.com/company/us-census-bureau) (//www.youtube.com/user/uscensusbureau)
(//www.pinterest.com/uscensusbureau) (//www.instagram.com/uscensusbureau)
(//public.govdelivery.com/accounts/USCENSUS/subscriber/new)

Accessibility (//www.census.gov/about/policies/privacy/privacy-policy.html#par_textimage_1) | Information Quality (//www.census.gov/quality/) | FOIA (//www.census.gov/foia/) | Data Protection and Privacy Policy (//www.census.gov/privacy/) | U.S. Department of Commerce (//www.commerce.gov/)

Source: U.S. Census Bureau | Current Population Survey (CPS) |??? Last Revised:

# DEF-INTERV.

# EX. 118

RESEARCH

## SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[7] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well-being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent-child separations can be harmful to children's health, economic security, and long-term development. Virtually all of these studies have been qualitative or correla-

tional because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference…has been lacking to date in studies of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreign-born, Hispanic, or Spanish-speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2-year (renewable) deferred action status, while also allow-

ing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action through this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low-income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized (25, 26). In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi-experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

Downloaded from http://science.sciencemag.org/ on July 5, 2018

RESEARCH | REPORT



Downloaded from http://science.sciencemag.org/ on July 5, 2018

**Fig. 1. Results from applying the regression discontinuity design.** (**Top**) In the post-DACA period (2013 to 2015), children of DACA-eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose mothers' birthdates were within ±150 days of the DACA eligibility cutoff ($n = 2260$), and circles are average diagnosis rates within each 15-day birthdate interval. (**Bottom left**) There was no such difference in children's diagnosis rates in the pre-DACA period (2003 to 2012). (**Bottom right**) There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well-being could have improved (4, 6). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs (32–34).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except when otherwise noted, in a preregistered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of

adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300 (35).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (36, 37). Acute stress disorder can be a precursor to a diagnosis of a more lasting posttraumatic stress disorder (included in the ICD-9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (36). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (36).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (32). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi-experimental nature of the RD design. The percent of children diagnosed with adjustment or anxiety disorders during the post-DACA period (2013 to 2015) dropped by about 4.5 percentage points ($P = 0.037$; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA-eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre-DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points ($P = 0.817$; local linear regression). Figure 1, bottom right, shows the distribution of $P$ values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre-DACA health care utilization (tables S3 and S4). The distribution of $P$ values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

Hainmueller *et al.*, *Science* **357**, 1041–1044 (2017)   8 September 2017

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention-to-treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined model and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birthdates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff (38).

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit with a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked only at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, –0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post-DACA period (fig. S6 and table S8), redefining the post-DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A nonprespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non-prespecified subgroup analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These

mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of confounders associated with having a mother who is born just before or after the cutoff date that could explain the observed post-DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status (9), we also checked for the possibility that the drop in mental health visits reflects a DACA-induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post-DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post-DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well-being and development of children in immigrant families (4, 6). Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the

mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring parental disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision-makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of unauthorized immigrants' children, most of whom are U.S. citizens (2). Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity (32, 34, 39, 40). Treatment of mental disorders also carries considerable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions (41) and are associated with poor long-term outcomes for school performance and welfare reliance (33, 42). By reducing mental health problems, deferred action has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immigrant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health.** (**Left**) Mothers' DACA eligibility reduced child mental health disorders in the post-DACA period. (**Right**) There were no systematic, preexisting differences in the pre-DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post-DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre-DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

Downloaded from http://science.sciencemag.org/ on July 5, 2018

Downloaded from http://science.sciencemag.org/ on July 5, 2018

health and well-being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a pathway to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evaluating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an effective way to overcome some of the challenges in collecting systematic data from the unauthorized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that affect unauthorized immigrant parents and that may have health consequences for their children.

## REFERENCES AND NOTES

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez-Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470–477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291–297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348–385 (2011).
8. C. Suárez-Orozco, H. Yoshikawa, R. Teranishi, M. Suárez-Orozco, *Harv. Educ. Rev.* **81**, 438–473 (2011).
9. K. Yun, E. Fuentes-Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913–1921 (2013).
10. T. M. Caballero et al., *Clin. Pediatr.* **6**, 648–658 (2017).
11. F. L. Rivera-Batiz, *J. Popul. Econ.* **12**, 91–116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203–233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258–1268 (2007).
14. H. Yoshikawa, C. Suárez-Orozco, R. G. Gonzales, *J. Res. Adolesc.* **27**, 4–19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO-10-99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329–354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57–67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I-821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012–2016); www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852–1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98–114 (2016).
22. C. Amuedo-Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339–373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175–e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085–1092 (2007).
26. C. H. C. Foundation, *Medi-Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615–635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, V. C. Wong, *J. Policy Anal. Manage.* **27**, 724–750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 191–208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483–524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517–548 (2010).
34. J. P. Shonkoff et al., *Pediatrics* **129**, e232–e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD-9 categories 300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (posttraumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295–2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056–1067 (2012).
40. K. R. Merikangas et al., *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980–989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0–17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

## ACKNOWLEDGMENTS

This research was funded by a grant from the Russell Sage Foundation (grant no. 93-16-12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design-registrations). The analysis plan is also registered in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

## SUPPLEMENTARY MATERIALS

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (43, 44)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893



## Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás R. Jiménez, Fernando Mendoza, Maria I. Rodriguez, Jonas J. Swartz and David D. Laitin

*Science* **357** (6355), 1041-1044.
DOI: 10.1126/science.aan5893originally published online August 31, 2017

**Life under threat of deportation**

What is the effect on a child of having parents who are at risk of deportation as unauthorized immigrants? Hainmueller *et al.* developed a quasi-experimental protocol to address this complicated question. They selected mothers who had birthdates either just before or just after the cutoff for the United States' Deferred Action for Childhood Arrivals (DACA) program. Children whose mothers were protected from deportation by DACA had 50% fewer diagnoses of adjustment and anxiety disorder than children with mothers whose birthdates, by coincidence, preceded the cutoff and who thus were not protected.

*Science*, this issue p. 1041

| | |
|---|---|
| **ARTICLE TOOLS** | http://science.sciencemag.org/content/357/6355/1041 |
| **SUPPLEMENTARY MATERIALS** | http://science.sciencemag.org/content/suppl/2017/08/30/science.aan5893.DC1 |
| **REFERENCES** | This article cites 30 articles, 3 of which you can access for free http://science.sciencemag.org/content/357/6355/1041#BIBL |
| **PERMISSIONS** | http://www.sciencemag.org/help/reprints-and-permissions |

Downloaded from http://science.sciencemag.org/ on July 5, 2018

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. 2017 © The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. The title *Science* is a registered trademark of AAAS.

# DEF-INTERV.

# EX. 119

**Douglas S. Massey**
Curriculum Vitae
May 1, 2016

| | |
|---|---|
| **Address:** | Office of Population Research<br>Princeton University<br>Wallace Hall<br>Princeton, NJ 08544<br>dmassey@princeton.edu |
| **Birth:** | Born October 5, 1952 in Olympia, Washington, USA |
| **Citizenship:** | Citizen and Resident of the United States |
| **Education**: | Ph.D., Sociology, Princeton University, 1978<br>M.A.,  Sociology, Princeton University, 1977<br>B.A.,  Magna Cum Laude in Sociology-Anthropology, Psychology,<br>    and Spanish, Western Washington University, 1974 |
| **Honorary Degrees:** | Master in Arts and Sciences, Honoris Causa, University of Pennsylvania, 1985.<br>Doctor of Social Science Honoris Causa, Ohio State University, 2012 |
| **Languages:** | Fluent in Spanish |
| **Employment:** | (9/05-present) Henry G. Bryant Professor of Sociology and Public Affairs,<br>    Princeton University<br>(7/03- 8/05)  Professor of Sociology and Public Policy, Princeton University<br>(7/94-6/03)  Dorothy Swaine Thomas Professor, Department of Sociology,<br>    Graduate Group in Demography, and Lauder Program in International<br>    Studies, University of Pennsylvania<br>(7/90-6/94)  Professor, Irving B. Harris School of Public Policy Studies,<br>    University of Chicago<br>(7/87-6/94)  Professor, Department of Sociology, University of Chicago<br>(7/85-7/87)  Associate Professor, Department of Sociology and Graduate<br>    Group in Demography, University of Pennsylvania<br>(9/80-7/85)  Assistant Professor, Department of Sociology and Graduate Group<br>    in Demography, University of Pennsylvania<br>(9/79-9/80)  NSF Postdoctoral Fellow, Graduate Group in Demography,<br>    University of California at Berkeley<br>(1/79-6/79)  Lecturer, Woodrow Wilson School of Public and International<br>    Affairs, Princeton University<br>(9/78-9/79)  Research Associate, Office of Population Research, Princeton<br>    University |
| **Major Fields**: | Demography, Urban Sociology, Stratification, Social Research Methods, Latin<br>American Studies, Race/Ethnic Relations, Biosociology, Immigration |

| | |
|---|---|
| **Honors and Awards**: | John Hope Franklin Award 2016, for exceptional scholarship in the field of Race, Racism and the Law, from the Law and Society Association |

President, American Academy of Political and Social Science, 2006-2015

Robert and Helen Lynd Career Award 2014, Community and Urban Studies Section, American Sociological Association

Robert E. Park Award for Best Book 2014. Community and Urban Studies Section, American Sociological Association

Paul Davidoff Award, 2013. From the Association of Collegiate Schools of Planning for *Climbing Mount Laurel: The Struggle for Affordable Housing and Social Mobility in an American Suburb* (Princeton U. Press)

Irene B. Taeuber Award, Given by the Population Association of America in recognition of an unusually original or important contribution to the scientific study of population or for an accumulated record of exceptionally sound and innovative research, 2013.

Award for the Public Understanding of Sociology, American Sociological Association, 2012

Lifetime National Associate of the National Research Council, 2011

Julian Simon Lecture, 8th Annual Migration Meeting, Deutsches Institut für Wirtschaftsforschung--DC, May 13, 2011

External Fellow, Center for Research and Analysis of Migration, University College London, 2011-present

Visiting Scholar, Russell Sage Foundation, 2009-2010

Distinguished Career Award, International Migration Section, American Sociological Association, 2009

Award for Distinguished Contribution to Scholarship in Population, for "From Illegal to Legal: Estimating Previous Illegal Experience Among New Legal Immigrants to the United States" published in Demography and coauthored with Guillermina Jasso, Mark Rosenzweig, and James Smith, from the Population Section of the American Sociological Association

Premio de Reconocimiento de Destacado Mérito, El Consejo Cultural Mundial, México, D.F., 2008

Fellow, American Association for the Advancement of Science, 2006

Senior Prize, 2005, Vereinigung der Freunde des Deutschen Instituts für Wirtschaftsforschung (Association of Friends of the German Institute for Social Research–Berlin) for the paper "Return Migration by German Guestworkers: Neoclassical versus New Economic Theories" published in International Migration 40(4):5-38.

Otis Dudley Duncan Award, Population Section of the American Sociological Association (for Beyond Smoke and Mirrors), 2004.

W.E.B. DuBois Fellow, American Academy of Political and Social Science, 2003-present

Antonio García Cubas Prize, Best Book on Mexican Art, National Institute of Anthropology and History, Mexico City, 2001 (for Milagros en la Frontera)

2

President, American Sociological Association, 2000-2001
Member, American Philosophical Society, Elected 2004
Member, National Academy of Sciences, Elected 1998
Member, American Academy of Arts and Sciences, Elected 1995
Member, Sociological Research Association, Elected 1989
Exemplary Alumnus Award, Western Washington University, 2000
Clifford C. Clogg Award (outstanding early career), Population Association of
    America, 1998
President, Population Association of America, 1996
Member, Council of the American Sociological Association, 1996-99
Southwest Book Award, Border Regional Library Association
    (for Miracles on the Border), 1996
Distinguished Publication Award, American Sociological Association
    (for American Apartheid), 1995
Otis Dudley Duncan Award, Population Section of the American
    Sociological Association (for American Apartheid), 1994
Critics' Choice Award, American Educational Studies Association
    (for American Apartheid), 1993
First Vice President, Population Association of America, 1994
John Simon Guggenheim Memorial Fellow, 1990-91
MERIT Award, National Institute of Child Health and Human Development,
    1987-97
Board of Directors, Population Association of America, 1986-1989
NSF Postdoctoral Fellow, University of California, Berkeley, 1979-1980
Charlotte Elizabeth Proctor Fellowship, Princeton University, 1977-78
NIH Trainee in Demography, Princeton University, 1975-77
Outstanding Graduate in Sociology-Anthropology, Western Washington
    University, 1975

**Administrative Experience**:

(7/11- present) Director, Office of Population Research, Woodrow Wilson
    School of Public and International Affairs, Princeton University
(1/09-6/09) Chair, Dean Search Committee, Woodrow Wilson School of
    Public and International Affairs, Princeton University
(7/04-6/09)   Director of Ph.D. Program in Policy Studies, Woodrow Wilson
(7/06-6/07) Interim Director, Program in Latin American Studies, Princeton
    University
(7/96-6/03)  Chair, Department of Sociology, University of Pennsylvania
(1/97-12/97) Chair, Dean Search Committee, School of Arts & Sciences,
    University of Pennsylvania
(9/95-7/96)  Director, Population Studies Center, University of Pennsylvania
(10/90-6/94) Director, Center for Latin American Studies, University of
    Chicago
(7/87-9/90)  Director, Population Research Center, University of Chicago

(10/87-9/90) Chair, Committee on Demographic Training, University of
    Chicago
(7/85-6/87)  Chair, Graduate Group in Demography, University of
    Pennsylvania

**Professional**
**Affiliations:**
Population Association of America
American Sociological Association
International Union for the Scientific Study of Population
Southwestern Social Science Association
Latin American Studies Association
International Sociological Association
Mexican Demographic Society
American Association for the Advancement of Science

**Funded Grants:**  (9/1/97-5/31/20)  "Public Use Data on Mexican Immigration."
 National Institute of Child Health and Human Development, Principal
Investigator, $1,125,000 1 R01 HD35643

(1/1/09-11/30/15)  The Latin American Migration Project and the Center for
Migration and Development, John D. and Catherine T. MacArthur Foundation,
$750,000,

(6/1/11-12/31/11)  "Segregation, Securitized Lending and Foreclosure
Outcomes in New York City."  Center for New York City Neighborhoods,
$10,000

(1/1/09-12/31/11)  "Monitoring Mt. Laurel."  John D. and Catherine T.
MacArthur Foundation, $450,000.

(2/1/08-12/31/08) "Proposal for a Pilot Survey of New Immigrant
Destinations."  Russell Sage Foundation, $150,000.  Co-PI with Marta Tienda

(6/1/07 - 5/31/12) "Social Influences on Early Adult Stress Biomarkers,"
 National Institute of Child Health and Human Development, $323,969.

(7/01/02-6/30/04)  "Transnational Identities and Behavior."  Russell Sage
Foundation. $65,000.

(6/1/01-5/31/04) "Theoretical and Methodological Analysis of Mexico-U.S.
Migration."  NICHD, R3TW01223A, $120,582

(8/1/01-7/31/08) "Religion and Religious Practice among New Immigrants to
the United States."   Pew Charitable Trusts, $500,000.  Co-PI with Guillermina
Jasso.

4

3/1/98-11/1/2014) "New Immigrant Survey."  NICHD, R01HD33834, $4,239,124, Subcontract, Co-PI with Guillermina Jasso, Mark Rosenzweig, and James Smith.

(9/1/98-8/31/2010)  "National Longitudinal Survey of Freshmen at Selective Colleges and Universities."  Andrew W. Mellon Foundation, $6.5 million (with Camille Charles).

(3/1/98-2/28/05) "The Latin American Migration Project," Principal Investigator, National Institute of Child Health and Human Development, $738,769, 1 R01 HD3584-01.

(12/1/95-11/30/98) "The New Immigrant Survey: A Pilot Study."  NICHD, $1,218,550.  Co-PI with Guillermina Jasso, Mark Rosenzweig, and James Smith.

(7/1/95-6/30/96) "The Hourglass Economy."   Russell Sage Foundation, Principal Investigator, $24,500.

(11/1/94-12/31/05) "The Socioeconomic and Demographic Consequences of Mexico-U.S. Migration." Hewlett Foundation, Principal Investigator, $400,000, 94-7795.

(9/1/91-8/31/92) "Neighborhood Effects on Family Formation, Education, and Employment among the Poor." Hewlett Foundation, Principal Investigator, $26,000.

(1//1/90-7/1/92) "The Effects of the Immigration Reform and Control Act of 1986:  Mexican Immigration to the United States." Sloan Foundation, Co-Principal Investigator (with Katharine Donato), $105,000.

(9/87-8/97) "Public Use Data on Mexican Immigration," National Institute of Child Health and Human Development, Principal Investigator, $391,027, HD-23415, MERIT Award

(6/87-5/90) "The Consequences of Residential Segregation," National Institute of Child Health and Human Development, Principal Investigator, $342,532, HD-22992.

(6/84-5/87) "Spatial Segregation of Hispanics, Blacks, and Asians," National Institute of Child Health and Human Development, Principal Investigator, $278,719, HD-18594.

5

(9/81-8/84) "Mexican Migration: The Settlement Process," National Institute of Child Health and Human Development, Principal Investigator, $200,800, HD-15166.

(8/81-1/82) "Problems of Hispanics in the Labor Market," National Commission for Employment Policy, Principal Investigator, $18,343, 99-1-3050-50-52.

(9/79-9/80) "Processes of Residential Segregation Among Hispanic Americans," National Science Foundation, Postdoctoral Research Grant, $13,980, SPI-7914866.

| | |
|---|---|
| **Surveys Designed:** | New Jersey Housing and Community Survey (2009-2010)<br>New Immigrant Survey 2003-20014<br>National Longitudinal Survey of Freshmen (1998-2004)<br>Survey of African American Home Buyers in Suburban Baltimore (1998)<br>National Longitudinal Survey of Freshmen Pilot (1997-1999)<br>Survey of Latin American Immigrants to the United States (1997-present)<br>Survey of Mexican Immigrants to the United States (1987-present)<br>New Immigrant Survey Pilot (1995-2000) |
| **Editorial Boards:** | Annual Review of Sociology, Board, 2002-2004; Co-Editor 2004-present<br>Cityscape, 2008-present<br>Social Science Research, 1999-present<br>Social Science Quarterly, 1991-present<br>Race and Social Problems, 2008-present<br>International Migration Review, 2010-present<br>World Politics, 2007-2013<br>Migraciones Internacionales, 2001-2011<br>Ethnicities, 1998-2012<br>International Journal of Conflict and Violence, 2006-2014<br>Race and Society, 1996-2002<br>Latino Review of Books, 1995-2002<br>Encyclopedia of Sociology, 1997-2001<br>American Journal of Sociology, 1987-1994<br>Demography, 1984-1987 |

**Professional Service**:

Member, Advisory Board, Koshland Science Museum, Washington, DC, 2012-present

Member, Census Scientific Advisory Board, U.S. Bureau of the Census 2012-present

Associate Member, Amsterdam Centre for Inequality Studies, 2013-present.

Member, Council of the National Academy of Sciences 2011-2014

Member, Governing Board, National Research Council, 2012-2015

Member, National Academies Committee on the Integration of Immigrants in U.S. Society, 2012-2015

Member, Scientific Advisory Board, Max Planck Institute for the Study of Religious and Ethnic Diversity, 2011-2015

Chair, Class V–Social and Behavioral Sciences, National Academy of Sciences, 2010-2012

Member, Committee on Estimating Costs to the Department of Justice of Increased Border Security Enforcement by the Department of Homeland Security, 2009-2011

Member, Committee on National Statistics, National Research Council, 2004-2010

Secretary, Class V--Social and Behavioral Sciences, National Academy of Sciences, 2008-2010

Member, International Advisory Board, Institute for Interdisciplinary Research on Conflict and Violence, University of Bielefeld, Germany, 2006-present

Member, Advisory Board, Opportunity New Jersey, 2008-present

Member, Panel Evaluating HUD Office of Research and Policy Development, National Research Council, 2005-2008

Chair, Section 53--Social and Political Sciences, National Academy of Science, 2005-2008

Chair, Membership Committee for Class III,--Social and Behavioral Sciences, American Philosophical Society 2005-2008

Member, Class III Social Sciences Membership Committee--American Academy of Arts and Sciences, 2006-2008

Member, Advisory Board, Program on Intercultural Conflict and Societal Integration, Wissenschaftszentrum Berlin für Sozialforschung, 2003-2007.

Consultant, Center for Strategic and International Studies, Global Aging Initiative, 2005-2006

Member, Panel on the Measurement of Discrimination, Committee on Population, National Research Council, 2001-2003

Member, Committee on Population, National Research Council, 2002-2005

Member, National Advisory Board, Leadership Council for Metropolitan Open Communities, 1995-2003

Member, Immigration Advisory Board, Russell Sage Foundation, 1993-2006

Member, Advisory Board, Mexican Cultural Center of Philadelphia, 1998-

Visiting Professor, Mannheim University, Germany, Summer 2002

Member, Council of the American Sociological Association, 1997-2002

Member, Committee of Executive Office and Budget, American Sociological Association, 2000-2002

Member, Panel on Population Projections, Committee on Population, National
Research Council, 1998-2000

Keynote Speaker, Meeting of the Advisory Board of the President's Initiative
on Race, Georgetown University Law Center, Washington, D.C., July 13,
1998

Panelist, Meeting of the Advisory Board of the President's Initiative on Race,
San Jose, California, February 11, 1998

Chair, Committee on South-North Migration, International Union for the
Scientific  Study of Population 1991-1996

Member, Nominating Committee, Latin American Studies Association, 1994-
1995.

Member, Research and Planning Advisory Board, Chicago Urban League,
1990-1994

Member, Board of Trustees, Leadership Council for Metropolitan  Open
Communities, Chicago, 1993-1994

Member, Board of Trustees, Mexican Cultural and Education Institute,
Chicago, 1993-1994

Member, NICHD Population Research Committee, NICHD, 1989-93

Member, Committee for Public Policy Research on Contemporary Hispanic
 Issues, Social Science Research Council, 1988-1993

Member, International Organizing Committee, Conference on the Peopling of
the Americas, 1989-1992

Chair, Committee on Population Statistics, Population Association of
America, 1984-1989

Member, Social Sciences and Population Study Section, NICHD, 1984-1988

Member, Subcommittee on Migration Statistics, Committee on Population
Statistics, Population Association of America, 1987-88

Member, Subcommittee on the 1990 Census, PAA, 1985-86

Member, Ad Hoc Advisory Committee, Demographic and Behavioral Sciences
Branch, Center for Population Research, NICHD, 1986

Visiting Lecturer, El Colegio de Michoacán, Zamora, Michoacán, México,
1985

Consultant, National Academy of Sciences, Committee on National Statistics,
Panel on Immigration Statistics, 1980-85

Consultant, National Commission for Employment Policy, 1982

Consultant, Commission on International Migration and Cooperative
Economic Development 1987-1988

8

**Books:**

2016    <u>Undocumented Migration in a Global Economy</u>.  Thousand Oaks, CA: Sage Publications. Special issue of the *Annals of the American Academy of Political and Social Science* (Co-edited with Katharine Donato and includes three coauthored chapters)

2014    <u>Spheres of Influence: The Social Ecology of Racial and Class Inequality</u>. New York: Russell Sage Foundation.(Coauthored with Stefanie Brodmann)

2013    <u>Immigration and the Future of America</u>.  Cambridge, MA: MIT Press.  Special issue of *Daedalus*.  (Edited with an introductory chapter).

2013    <u>Climbing Mount Laurel: The Struggle for Affordable Housing and Social Mobility in an American Suburb</u>.  Princeton, NJ: Princeton University Press.  (Coauthored with Len Albright, Rebecca Casciano, Elizabeth Derickson, and David Kinsey).

   *Paul Davidoff Award* 2014, Best Book Promoting Participatory Planning and Positive Social Change, Association of Collegiate Schools of Planning

   *Robert E. Park Award* 2014, Best Book, Community and Urban Studies Section, American Sociological Association

2013    <u>The Non-Response Challenge to Surveys and Statistics</u>.  Thousand Oaks, CA: Sage Publications. Special issue of the *Annals of the American Academy of Political and Social Science* (Co-edited with Roger Tourangeau)

2010    <u>Brokered Boundaries: Creating Immigrant Identity in Anti-Immigrant Times</u>.  New York: Russell Sage Foundation.  (Coauthored with Magaly Sánchez R.)

2010    <u>Continental Divides: International Migration in the Americas.</u>  Thousand Oaks, CA: Sage Publications.  Special issue of the *Annals of the American Academy of Political and Social Science*.  (Co-edited with Katharine Donato, John Hiskey, and Jorge Durand)

   Spanish Edition: <u>Salvando Fronteras: Migración Internacional en Amérca Latina y el Caribe</u>.  México, D.F.: Porrúa.

2009    <u>The Moynihan Report Revisited: Lessons and Reflections after Four Decades</u>. Thousand Oaks, CA: Sage Publications.  Special issue of the *Annals of the American Academy of Political and Social Science*.  (Co-edited with Robert J. Sampson and co-author of introductory chapter).

2009    <u>Taming the River:  Negotiating the Academic, Financial, and Social Currents in America's Selective Colleges and Universities</u>.  Princeton, NJ: Princeton University Press. (Coauthored with Camille Z. Charles, Mary J. Fischer, and Margarita Mooney)

2008    New Faces in New Places: The Changing Geography of American Immigration.  New York: Russell Sage Foundation..  (Edited with an introduction, conclusion, and contributed chapter).

2007    Categorically Unequal: The American Stratification System.  New York: Russell Sage Foundation.  (Commissioned for the Centennial of the Russell Sage Foundation)

2006    Chronicle of a Myth Foretold: The Washington Consensus in Latin America.  Thousand Oaks, CA: Sage Publications.  Special issue of the *Annals of the American Academy of Political and Social Science*.  (Co-edited with and introduction by Jere R. Behrman and Magaly Sanchez R.)

2005    Return of the L-Word: A Liberal Vision for the New Century.   Princeton: Princeton University Press.

2005    Strangers in a Strange Land: Humans in an Urbanizing World.  New York: Norton Publishers.

2004    Crossing the Border:  Research from the Mexican Migration Project.  New York: Russell Sage Foundation.  (Co-edited with Jorge Durand)

2004    International Migration: Prospects and Policies in a Global Market.  Oxford:  Oxford University Press.  (Co-edited with J. Edward Taylor) 388  pp.

2003    Clandestinos: Migración México-Estados Unidos en los Albores del Siglo XXI.  México, D.F.: Editorial Porrua.   (Coauthored with Jorge Durand)   210 pp.

        Chapter 2 reprinted in Diálogos—Foro Universal de la Cultura:  Identidad y Diversidad.  Monterrey: Foro Editorial de Nuevo León.

2003    Source of the River:  The Social Origins of Freshmen at America's Selective Colleges and Universities. Princeton:  Princeton University Press. (Coauthored with Camille Charles, Garvey Lundy, and Mary J. Fischer), 281 pp.

2002    Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration.  New York:  Russell Sage Foundation. (with Jorge Durand and Nolan Malone) 197 pp.

        *Otis Dudley Duncan Award* 2004, Best Book, Population Section of the American Sociological Association.

        Honorable Mention, *Thomas and Znaniecki Award* of the International Migration Section of the American Sociological Association

Spanish Edition.  2009.  Detrás de la Trama: Políticas Migratorias entre México y Estados Unidos.  México, D.F.: City: Editorial Porrua.

2001   Problem of the Century:  Racial Stratification in the United States.  New York: Russell Sage Foundation. (Co-edited with Elijah Anderson) 470 pp.

1998   Worlds in Motion:  International Migration at the End of the Millennium.  Oxford: Oxford University Press.  (Coauthored with Joaquín Arango, Graeme Hugo, Ali Kouaouci, Adela Pellegrino, and J. Edward Taylor) 362 pp.

1995   Miracles on the Border:  Retablos of Mexican Migrants to the United States.  Tucson: University of Arizona Press.  (Coauthored with Jorge Durand).  250 pp.

Spanish Edition.  Milagros en la Frontera: Retablos de Migrantes Mexicanos a Estados Unidos.  Editorial El Colegio de San Luis y el Centro de Investigación y Estudios Superiores en Antropología Social, San Luis Potosí y Guadalajara, 2001.

*Antonio García Cubas Prize*, Best Book on Mexican Art, National Institute of Anthropology and History, Mexico City, 2001.

*Southwest Book Award*, Border Regional Library Association, El Paso, TX, 1996

*Design Award*, Bookbuilders West (Now Publishing Professionals Network, 1995

1993   American Apartheid:  Segregation and the Making of the Underclass.  Cambridge: Harvard University Press.  (Coauthored with Nancy A. Denton) 292 pp.

*Distinguished Publication Award* of the American Sociological Association, 1995

*Otis Dudley Duncan Award* of the ASA Population Section., 1994

*Critics′ Choice Award*, American Educational Studies Association, 1993

French Edition.  American Apartheid.  Collection "Les Urbanités," Dirigée par Jean-Marc Rennes, Francis Godard, Sophie Body-Gendrot, et Thierry Paquot.  Paris:  Descartes & Cie, 1995.

Chapter 1, "The Missing Link" reprinted as "American Apartheid" in Margaret L. Anderson, Kim A. Logio, and Howard F. Taylor, eds., Understanding Society: An Introductory Reader.  Stamford, CT:  Wadsworth Publishing. Pp. 476-83.

Chapter 1, "The Missing Link" reprinted as "American Apartheid: Segregation and the Making of the Underclass" reprinted in David B. Grusky, ed., Social Stratification in Sociological Perspective: Race, Class, and Gender, Boulder: Westview, pp. 660-70.

Chapter 4, "The Continuing Causes of Segregation," reprinted in Amanda Konradi and Martha Schmidt, eds., <u>Social Problems: Perspectives and Approaches</u> (Mayfield Publishing Company, 1997)

Chapter 4, "The Continuing Causes of Segregation," reprinted in Thomas M. Shapiro, ed., <u>Great Divides: Readings in Social Inequality in the United States</u>.  Moutainview, Ca: Mayfield Publishing, 2000, pp. 249-64.

Chapter 6, "The Perpetuation of the Underclass," reprinted in Charles A. Gallagher, ed., <u>Rethinking the Color Line: Readings in Race and Ethnicity</u>.  Mountain View, Ca.: Mayfield Publishing.

Chapter 8 , "The Future of the Ghetto," reprinted in Stephen Steinberg, ed., <u>Race and Ethnicity in the United States: Issues and Debates</u> (Blackwell Publishers, Oxford, 2000), pp. 114-26.

1990    <u>Doy Gracias:  Iconografía de la Emigración México-Estados Unidos</u>.  Guadalajara: Programa de Estudios Jaliscienses, Secretraría de Educación y Cultura, Universidad de Guadalajara;  Published in cooperation with the Instituto Nacional de Antropología e Historia.  (Coauthored with Jorge Durand) 40 pp.

1990    <u>Milagros en la Frontera</u>.  Museum Catalogue to Exhibit "Milagros en la Frontera" at the Diego Rivera Studio Museum, Mexico City, December-February, 1990-1991; the Centenario Museum, Monterrey, Mexico; and Pape Library Museum, Monclova, Coahuila, Mexico. 30 pp.  (Coauthored with Jorge Durand)

1987    <u>Return to Aztlan:  The Social Process of International Migration from Western Mexico</u>.  Berkeley and Los Angeles:  University of California Press.  (Coauthored with Rafael Alarcón, Jorge Durand, and Humberto González).  332 pp.

Spanish Edition.  1991.  <u>Los Ausentes:  El Proceso Social de Migración Internacional en México Occidental</u>.  México, D.F.:  Alianza Editorial Mexicana and Consejo Nacional para la Cultura y las Artes. (with Rafael Alarcón, Jorge Durand, y Humberto González)

**Scholarly Articles and Book Chapters** (* indicates refereed publication):

2016    ""El MMP ( Mexican Migration Project).  Monitoreo y análisis del proceso migratorio entre México y Estados Unidos." <u>Coyuntura Demográfica</u>, forthcoming (with Jorge Durand, Karen Pren, Silvia Giorguli, and David Lindstrom)

2016    "Segregation, Stigma, and Stratification: A Biosocial Model." Forthcoming in <u>The Oxford Handbook of Stigma, Discrimination, and Health</u>, edited by Brenda Major, John Dovidio, and Bruce Link. (with BrandonWagner)

2016    La migración mexicana en la era de los indocumentados" Forthcoming in Alanís Enciso, Fernando Saúl and Rafael Alarcón Acosta, (Eds.). <u>El Ir y Venir de los Norteños. La Historia de la Migración Mexicana a Estados Unidos (S. XIX-S. XXI)</u>. Mexico: El Colegio de la Frontera Norte, El Colegio de San Luis A.C. y El Colegio de Michoacán..

2016*   "'Riding the Stagecoach to Hell:' A Qualitative Analysis of Racial Discrimination in Mortgage Lending." <u>City and Community</u>, forthcoming, (with Len Albright, Justin Steil, and Jacob S. Rugh)

2016    "The Mexico-U.S. Border in the American Imagination." Forthcoming in the <u>Proceedings of the American Philosophical Society</u>.

2016    "The Origins and Future of Global Latinos." Forthcoming in Mark Overmyer-Velázquez and Enrique Sepúlveda, eds., <u>Global Latin(o) Americanos: Transoceanic Diasporas and Regional Migrations</u>.  New York: Oxford University Press.

2016    "Migracion de talento y profesionales cualificados:  El caso reciente de inmigrantes Venezolanos a EEUU."  Forthcoming in Rubén Darío Peralta, Cristina Lares Vollmer, Francisco Kerdel Vargas, eds., <u>Diáspora de Talento, Migración, y Educación en Venezuela</u>.  Caracas: Fundación de Talento Venezolano en el Exterior. (with Magaly Sánchez).

2016    "Globalización, Inmigración y Migración Ilegal: La construcción de un Problema Social Estadonidense."  Forthcoming as Chapter 15 in Trinidad Requena, A. & Sanchez Martínez, M., eds., <u>Problemas Sociales: Una Mirada desde la Sociología</u>. Madrid: Los Libros de la Catarata.

2016    "Twenty-First Century Globalization and Illegal Migration."  <u>Annals of the American Academy of Political and Social Science</u> 666:7-26. (with Katharine M. Donato)

2016    "Double Disadvantage: Unauthorized Mexicans in the U.S. Labor Market." <u>Annals of the American Academy of Political and Social Science</u> 666:78-90. (with Jorge Durand and Karen A. Pren)

2016    "The Precarious Position of Latino Immigrants in the United States: A Comparative Analysis of Ethnosurvey Data."<u>Annals of the American Academy of Political and Social Science</u> 666:91-109. (with Jorge Durand and Karen A. Pren)

2016*   "Residential Segregation is the Linchpin of Racial Stratification." <u>City and Community</u> 15(1):4-7.

2016*   "International Migration Under the Microscope." <u>Science</u> 352(6288) 897-899. (with Frans Willekens, James Raymer, and Cris Beauchemin)

2016*   "Why Border Enforcement Backfired." <u>American Journal of Sociology</u> 121 (5): 1557–1600.  (with Jorge Durand and Karen A. Pren)

2016   "Segregation, Race, and the Social Worlds of Rich and Poor."Pp. 13-33 in Henry Braun and Irwin Kirsch, eds., <u>The Dynamics of Opportunity in America: Evidence and Perspectives</u>.  New York: Springer. (with Jonathan Tannen)

2016   "Segregation and the Perpetuation of Disadvantage." Pp. 369-393 in Linda Burton and David Brady, eds., <u>The Oxford Handbook of the Social Science of Poverty</u>.  Oxford: Oxford University Press.

2016   "Confronting the Legacy of American Apartheid."Pp. 91-101 in Susan Wachter and Lei Ding , eds., <u>Building Shared Prosperity in America's Communities</u>. Philadelphia: University of Pennsylvania Press.

2015*   "A Missing Element in Migration Theories." <u>Migration Letters</u> 12(3:263-274 .

2015   "Threat Evasion as a Motivation for Migration." <u>World on the Move</u> 22(1):1, 3-5).

2015   "Militarization of the Mexico-U.S. Border and its Effect on the Circularity of Migrants." Pp. 23-33  in Diego Acosta and Anja Wiesbrock, eds., <u>Global Migration: Old Assumptions and New Dynamics, Volume 1</u>.  NewYork: Praeger.

2015*   "Race, Space, and Cumulative Disadvantage: A Case Study of the Subprime Lending Collapse." <u>Social Problems</u> 62:186–218. (with Jacob Rugh and Len Albright)

        Winner of the 2016 John Hope Franklin Award for exceptional scholarship in the field of Race, Racism and the Law, from the Law and Society Association.

2015*   "A Research Note on Trends in Black Hypersegregation."  <u>Demography</u> 52:1025-1034. (with Jonathan Tannen)

2015*   "Border Enforcement and Return Migration by Documented and Undocumented Mexicans." <u>Journal of Ethnic and Migration Studies</u> 41(7): 1015-1040, DOI: 10.1080/1369183X.2014.986079.  (with Jorge Durand and Karen A. Pren)

2015*   "The Legacy of the 1968 Fair Housing Act." <u>Sociological Forum</u> 30(S1):91-108

14

2015    "Threat Evasion as Motivation for Migration: New Results on the Effect of Violence in Latin America."  Pp. 40-44 in Robert Stojanov, Zdenek Žalud, Pavel Cudlín, Aleš Farda, Otmar Urban, and Miroslav Trnka, eds.,  Global Change and Resilience: From Impacts to Responses.  Brno:  Global Change Research Centre, Academy of Sciences of the Czech Republic. http://www.czechglobe.cz/wp-content/uploads/conference-proceedings.pdf

2015*   "The Brave New World of Biosocial Science."  Criminology 53(1):127-131.

2015    "Uninformed Policies and Reactionary Politics:  A Cautionary Tale from the United States."  Pp. 118-137 in Christian Dustmann, ed., Migration: Economic Change, Social Challenge. Oxford, UK: Oxford University Press.

2015*   "Geographic Effects on Intergenerational Income Mobility."  Economic Geography 91(1): 83-106. (with Jonathan Rothwell)

2014*   "Violence, Networks, and International Migration from Colombia." International Migration 54(5):162-178. (with Carolina Silva)

2014*   "Explaining Undocumented Migration."  International Migration Review 48(4):1028-1061. (with Jorge Durand and Karen A. Pren)

2014*   "Intermarriage among New Immigrants to the United States."  Ethnic and Racial Studies 38(5): 734-758.  (with Pratikshya Bohra-Mishra)

2014*   "Filling the Meso-Level Gap in Stratification Theory." Socio-Economic Review 12(3): 610-614

2014*   "Segregation in Post-Civil Rights America:  Stalled Integration or End of the Segregated Century?"  The DuBois Review: Social Science Research on Race 11(2):202-232. Published online 3/1/13 at DOI:10.10170S1742058X13000180 (with Jacob S. Rugh)

2014*   "Beyond English Proficiency: Rethinking Immigrant Integration."  Social Science Research 45:200-210.  (with Ilana Redstone Akresh and Reanne Frank)

2014    "Migradollars and Development in Eight Latin American Nations."  Pp.43-68 in Enrique Contreras Suárez, ed., Los Que Se Quedan: Una Imagen de la Mitración Internacional desde el Ámbito Local y del Hogar.  México, DF: Universidad Nacional Autónomo de México.   (With Jorge Durand and Karen Pren)

2014    "Contrasting Patterns of Migration and Settlement." Pp.30-54  in Andreu Domingo i Valls, Albert Sabater Coll, Richard Ruiz Verdugo, eds., Demographic Analysis of Latin American Immigrants in Spain: From Boom to Bust?  London: Springer. (with Albert Sabater)

15

2014    "Moroccan Immigrants in Spain and the United States: A Comparative Analysis."  Pp.
        15-130 in Emigración, Identidad y Países Receptores.  Sevilla, Spain: Tirant
        Humanidades. (with Monica Espinoza)

2014    "Why Migrate?  Theorizing Undocumented Migration."  Pp. 53-70 in Lois A. Lorentzen,
        ed., Hidden Lives and Human Rights in the United States: Understanding the
        Controversies and the Tragedies of Undocumented Immigration, Volume 1—History,
        Theories, and Legislation.  New York: Praeger.

2014*   "Undocumented Migration and the Wages of Mexican Immigrants in the United States."
        International Migration Review 48(2): 482–499. (with Kirsten Gentsch)

2014    "How Arizona Became Ground Zero in the War on Immigrants." Pp 40-62 in G. Carissa
        B. Hesdick and Gabriel J. Chin, eds., Strange Neighbors: The Role of States in
        Immigration Policy.  New York: New York University Press.

2014    "The Racialization of Latinos in the United States."  Pp. 21-40 in Michael Tonry and
        Sandra Bucerius, eds., The Oxford Handbook on Ethnicity, Crime, and Immigration.
        New York: Oxford University Press.

2013    "Inheritance of Poverty or Inheritance of Place?  The Emerging Consensus on
        Neighborhoods and Stratification." Contemporary Sociology 42: 690-97.

2013*   "Do Affordable Housing Projects Harm Suburban Communities? Crime, Property Values
        and Taxes in Mount Laurel, New Jersey" City and Community 12(2):89-112. (with Len
        Albright and Elizabeth Derickson)

2013*   "Mediators of Stereotype Threat among Black College Students."  Ethnic and Racial
        Studies 37(3):557-575. (with Jayanti Owens)

2013    "Immigration Enforcement as a Race-Making Institution."  Pp. 357-81 in David Card and
        Steven Raphael, eds., Immigration, Poverty, and Socioeconomic Inequality.  New York:
        Russell Sage Foundation.

2013    "Challenges to Surveying Immigrants."  Pp. 270-293 in Roger Tourangeau, Brad
        Edwards, Timothy P. Johnson, Kirk M. Wolter, and Nancy Bates, eds., Interviewing
        Hard-to-Survey Populations.  Cambridge: Cambridge University Press.

2013*   "Building a Comprehensive Model of International Migration."  Eastern Journal of
        European Studies 3(2):9-35

2013    "America's Immigration Policy Fiasco:  Learning from Past Mistakes."  Daedalus
        142(3):5-15.

16

2013   "Immigration and Language Diversity in the United States." Daedalus 142(3)141-154. (with Rubén Rumbaut)

2013*   "La Guerra de los Estados Unidos Contra la Inmigración: Efectos Paradójicos." Documents d'Anàlisi Geogràfica 59(2):209-237. (with Karen A. Pren)

2013   "New Challenges to Social Measurement." Annals of the American Academy of Political and Social Science 645: 6-22. (with Roger Tourangeau)

2013   "Where Do We Go from Here? Nonresponse and Social Measurement." Annals of the American Academy of Political and Social Science 645: 222-236. (with Roger Tourangeau.

2012*   "Fitting In: Segregation, Social Class and Life on Campus for Black College Students." Race and Social Problems 4:171-192 (with Kimberly Torres) PMC3614416

2012*   "Reflections on the Dimensions of Segregation." Social Forces 91(1): 39-43.

2012   "Hispanics in 21st Century America: A Review Essay." Contemporary Sociology: A Journal of Reviews 2012 41: 602-605.

2012*   "Neighborhood Disorder and Anxiety Symptoms:  New Evidence from a Quasi-Experimental Study." Health and Place 18(2):180-190.  (with Rebecca Casciano)

2012*   "Origins of the New Latino Underclass." Race and Social Problems 4(1):5-17. (with Karen A. Pren)

2012   "Neighborhood Disorder and Individual Economic Self-sufficiency: New Evidence from a Quasi-Experimental Study." Social Science Research 41(4):801-819 (with Rebecca Casciano)

2012   "Location Matters."  Review Essay on Robert J. Sampson's Great American City. Science 336 (April 6):35-36.

2012*   "Pathways to El Norte:  Origins, Destinations, and Characteristics of Mexican Migrants to the United States." International Migration Review 46(1):3–36.  (with Fernando Riosmena)

2012*   "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America." Population and Development Review 38:1-29.  (with Karen Pren)

2012*   "School Context and Educational Outcomes: Results from a Quasi-Experimental Study." Urban Affairs Review 48:180-204.  (with Rebecca Casciano)

2012    "Migradollars in Latin America: A Comparative Analysis."  Pp. 243-64 in Alfredo Cuecuecha and Carla Pederzini, eds., Migration and Remittances: Trends, Impacts, and New Challenges.  Lanham, MD:  Rowman and Littlefield. (with J. Durand and K.A. Pren)

2011*   "The New Immigrant Survey and Research on American Stratification."  Social Science Research 40(5): 1287-91.

2011*   "The Effect of Immigration on Religious Belief and Practice: A Theologizing or Alienating Experience?"  Social Science Research 40(5):1371-89.  (with Monica Espinoza Higgins)  PMC3629734

        Reprinted in James Beckford, ed., *Migration and Religion*. Cheltenham, UK: Edward Elgar Publishing.

2011*   "Labor Market Outcomes for Legal Mexican Immigrants under the New Regime of Immigration Enforcement."  Social Science Quarterly 92(3):875-93. (with Kerstin Gentsch)

2011*   "Emigration from Two Labor Frontier Nations:  A Comparison of Moroccans in Spain and Mexicans in United States."  Papers: Revista de Sociología 96(3):781-803.  (with Phillip Connor and Jorge Durand)

2011    "The Past and Future of American Civil Rights."  Daedalus 140(2): 37-54.

2011    "Environmental Degradation and Out-Migration: New Evidence from Nepal." Pp. 74-101 in Etienne Piguet, Antoine Pécoud, and and Paul de Guchteneire, eds., Migration and Climate Change.  Cambridge: Cambridge University Press. (with Pratikshya Bohra-Mishra)

2011*   "Healthier Before They Migrate, Less Healthy When They Return?  The Health of Returned Migrants in Mexico."  Social Science and Medicine 73: 421-428.  (with Heidi Norbis Ullmann and Noreen Goldman)

2011*   "Stereotype Threat and College Academic Performance:  A Latent Variables Approach."  Social Science Research 40(1):150-166.  (with Jayanti Owens)

2011*   "Social Capital and International Migration from Latin America.."  International Journal of Population Research Volume 2011, Article ID 834145, 18 pages. http://www.hindawi.com/journals/ijpr/2011/834145/  (with María Aysa-Lastra)

2011*   "Individual Decisions to Migrate During Civil Conflict."  Demography 48(2):401-424. with Pratikshya Bohra-Mishra.

2011*   La Inserción en el Mercado de Trabajo de los Inmigrantes Latinos en España y en los Estados Unidos: Diferencias por País de Origen y Estatus Legal.  <u>Revista Internacional de Sociología</u> 79(M1):189-217. (with Philip Connor)

2011*   "New Migration Streams between Mexico and Canada."  <u>Migraciones Internactionales</u> 6(1);119-144.  (with Amelia E. Brown)

2011    "Epilogue:  The Past and Future of Mexico-U.S. Migration."  Pp. 241-265 in <u>Beyond la Frontera: The History of Mexico-U.S. Migration</u>, edited by Mark Overmyer-Velázquez. New York: Oxford University Press.

2011*   La inserción en el Mercado Laboral de los Inmigrantes Latinos en España y en los Estados Unidos: Diferencias por País de Origen y Estatus Legal.   <u>Revista Internacional de Sociología</u>, Monográfico nº 1, 189-217. (with Phillip Connor)

2010*   "Environmental Change and Out-Migration: Evidence from Nepal."   <u>Population and Environment</u> 32(2-3):109-136..  (with William G. Axinn and Dirgha J. Ghimire)

2010*   "What Happened to the Wages of Mexican Immigrants? Trends and Interpretations." <u>Latino Studies</u> 8:328-54.  (with Julia Gelatt)

2010*   "Economic Outcomes Among Latino Migrants to Spain and the United States: Differences by Source Region and Legal Status." <u>International Migration Review</u>, 44:802-29. (with Phillip Connor)

2010*   "Density Zoning and Class Segregation in U.S. Metropolitan Areas." <u>Social Science Quarterly</u> 91(5):1123-43.  (with Jonathan Rothwell)  PMC3632084

2010*   "Racial Segregation and the American Foreclosure Crisis." <u>American Sociological Review</u> 75(5):629-51. (with Jacob S. Rugh)

2010    "Miracles on the Border: The Votive Art of Mexican Migrants to the United States." Pp. 214-228 in Paul DiMaggio and Patricia Fernandez Kelly, eds., <u>Art in the Lives of Immigrant Communities in the United States</u>.  New Brunswick, NJ: Rutgers University Press.

2010    "Immigration Statistics for the 21ˢᵗ Century."  <u>Annals of the American Academy of Political and Social Science</u> 631:124-40..

2010*   "Divergent Streams: Race-Gender Achievement Gaps at Selective colleges and Universities."  <u>The DuBois Review: Social Science Research on Race</u> 7(1): 219-246. (with LiErin Probasco)  PMC3640568

2010    "Migration in the Americas:  Mexico and Latin America in Comparative Context"

Annals of the American Academy of Political and Social Science 630(1):6-17.  (with Katharine M. Donato, Jonathan Hiskey, and Jorge Durand)

2010   "New World Orders:  Continuities and Changes in Latin American Migration"  Annals of the American Academy of Political and Social Science 630(1):20-52.  (with Jorge Durand)

2010   "Undocumented Migration from Latin America in an Era of Rising U.S. Enforcement."  Annals of the American Academy of Political and Social Science 630(1):137-161.  (with Fernando Riosmena)

2010   "In Search of Peace:  Structural Adjustment, Violence, and International Migration."  Annals of the American Academy of Political and Social Science 630(1): 294-321. (with Steven E. Alvarado)

2010*  "Community Services and Out-Migration."  International Migration 48:1-41.  (with William G. Axinn, Nathalie Williams, and Dirgha J. Ghimire).

2010*  "The Geography of Undocumented Mexican Migration."  Mexican Studies/Estudios Mexicanos 26:120-52.  (with Jacob Rugh and Karen A. Pren)

2009   Muros o Puentes?  Visiones Alternativas de la Integración Regional en Norteamérica y Europa."  Revista de Ciencias y Humanidades de la Fundación Ramón Areces 10(1):75-89.  (Madrid, Spain)

2009*  "Nuevos Escenarios de la Migración México-Estados Unidos:  Las Consecuencias de la Guerra Antiinmigrante."  Papeles de Población 61:101-28. (with Jorge Durand and Karen A. Pren)

2009   "The Political Economy of Migration in an Era of Globalization."  Pp. 25-43 in Samuel Martinez, ed., International Migration and Human Rights: The Global Repercussions of US Policy.  Berkeley: University of California Press.

2009   "Changing Bases of Segregation in the United States."  Annals of the American Academy of Political and Social Science 626:74-90. (with Thurston Domina and Jonathan Rothwell)

2009   "Restrictive Immigration Policies and Latino Immigrant Identity in the United States."  UNDP Human Development Research Papers 43.  New York: United Nations Development Program.  (with Magaly Sanchez)

2009*  "Processes of Internal and International Migration from Chitwan, Nepal"  International Migration Review 43:621-51.  (with Pratikshya Bohra)

20

2009*   "Racial Formation in Theory and Practice: The Case of Mexicans in the United States." Race and Social Problems 1:12-26.

2009*   "The Effect of Density Zoning on Racial Segregation in U.S. Urban Areas." Urban Affairs Review 44:799-806.  (with Jonathan Rothwell)

2009    "Moynihan Redux: Legacies and Lessons." Annals of the American Academy of Political and Social Science 621:6-27.  (with Robert J. Sampson).

2009*   "Globalization and Inequality: Explaining American Exceptionalism." European Sociological Review 25:9-24.

2008    "Immigration and Democratization in Latin America: Crossing the Mexico-U.S. Border." Pp. 259-280 in Jose V. Ciprut, ed., Democratizations: Comparisons, Confrontations, Contrasts.  Cambridge: The MIT Press. (with S. Mara Pérez)

2008*   "La Racialización de Mexicanos en Los Estados Unidos: Estratificación Social en la Teoría y la Práctica." Migración y Desarrollo 10:65-95.

2008*   "From Illegal to Legal: Estimating Previous Illegal Experience among New Legal Immigrants to the United States." International Migration Review 42:803-843.  (With G. Jasso, M. Rosenzweig, and J. Smith).

2008*   "Structural Economic Change and International Migration from Mexico and Poland" Kölner Zeitschrift für Soziologie und Sozialpsychologie 60:134-62.  (with Frank Kalter and Karen Pren)

2008*   "Neighborhood Effects on Economic Self-Sufficiency:  A Reconsideration of the Moving to Opportunity Experiment." American Journal of Sociology 114:107-43. (with Susan Clampet-Lundquist)

2008    "Origins of Economic Disparities:  Historical Role of Housing Segregation" in Segregation:  The Rising Costs for America."  Pp. 37-78 in James H. Carr, Nandinee K. Kutty, and Shanna Smith, eds., Segregation:  The Rising Costs for America.  New York: Routledge.

2008    "Migración, Cooperación, y Desarrollo en Norte América: Lecciones desde Europa."  Pp. 423-46 in Alfonso Guerra and José Félex Tezanos, eds., La Inmigración y Sus Causas. Madrid: Editorial Sistema.

2008*   "Neighborhoods, Employment, and Welfare Use: Assessing the Influence of Socioeconomic Composition."  Social Science Research 37:544-58. (with Rebecca Casciano)

21

2008    "Immigration and Equal Opportunity."  Pp. 112-45 in Elijah Anderson, ed., <u>Against the Wall: Poor, Young, Black, and Male</u>.  Philadelphia: University of Pennsylvania Press.

2008*   "How Neighborhood Disadvantage Reduces Birth Weight:  The Mediating Effects of Neighborhood Danger and Negative Coping Behaviors."  <u>International Journal of Conflict and Violence</u> 2(1).  Online journal: http://www.ijcv.org/.  (with Emily Moiduddin)

2008    "The Legacy of Robin Williams in the Short 21st Century."  <u>Sociological Forum</u> 23:328-332.

2008    "People and Places: The New American Mosaic."  Pp. 1-22 in Douglas S. Massey, ed., <u>New Faces in New Places: The Changing Geography of American Immigration</u>.  New York: Russell Sage. (with Charles Hirschman)

2008    "The Geographic Diversification of U.S. Immigration."  Pp. 25-50 in Douglas S. Massey, ed., <u>New Faces in New Places: The Changing Geography of American Immigration</u>.  New York: Russell Sage. (with Chiara Capoferro)

2008    "Assimilation in a New Geography."  Pp. 343-54 in Douglas S. Massey, ed., <u>New Faces in New Places: The Changing Geography of American Immigration</u>.  New York: Russell Sage.

2008*   "Gender-Specific Effects of Ecological Segregation on College Achievement."  <u>Social Science Research</u> 37: 220–38.  (with Nicholas Ehrmann)

2007    "Las Peculiaridades de un Modelo: La Migración México-Estados Unidos."  Pp. 109-26 in Víctor Zúñiga, ed., <u>Identidad y Diversidad</u>.  Monterrey: Fondo Editorial de Nuevo León.  (with Jorge Durand)

2007     "Capital Social y Migracion Internacional de America Latina."  Pp. 469-518 in Paula Leite, Susana Zamora, and Luis Acevedo, eds. <u>Migracion Internacional y Desarrollo en America Latina y el Caribe</u>.  México, DF:  Consejo Nacional de Poblacion (with María Aysa).

2007    "Understanding America's Immigration Crisis."  <u>Proceedings of the American Philosophical Society</u> 151(3):309-27.

2007*   "Toward a Comprehensive Model of International Migration."  Pp. 126-148 in <u>Migration and Development:  International Migration of Population–Russia and Contemporary World</u>.  Moscow: MAX Press.

2007*   "The Effects of Affirmative Action in Higher Education."  <u>Social Science Research</u> 36: 531-49.  (with Mary J. Fischer)

2007    "Borderline Madness: America's Counterproductive Immigration Policy."  Pp. 129-38 in

22

Carol M. Swain, ed., <u>Debating Immigration</u>.  New York: Cambridge University Press.

2007*   "Latino and American Identities as Perceived by Immigrants."  <u>Qualitative Sociology</u> 30:81-108. (with Magaly Sanchez R.)

Spanish language version.  2008.  "La Percepción de la Identidad Latina y Americana por Parte de los Inmigrantes Latinos en Estados Unidos."  Pp. 391-422 in Marina Ariza and Alejandro Portes, eds., <u>El País Transnacional: Migración Mexicana y Cambio Social a Través de la Frontera</u>.  Mexico City: Universidad Nacional Autónomo de México, Instituto de Investigaciones Sociales.

2007*   "Black Immigrants and Black Natives Attending Selective Colleges and Universities in the United States."  <u>American Journal of Education</u> 113:243-71.  (with Margarita Mooney, Camille Charles, and Kimberly Torres)

2007*   "The Effects of America's Three Affirmative Action Programs on Academic Performance."  <u>Social Problems</u> 54:99-117. (with Margarita Mooney)

2007    "Borders for Whom?  The Role of NAFTA in Mexico-U.S. Migration."  <u>Annals of the American Academy of Political and Social Science</u> 610:98-119.  (with Patricia Fernández Kelly)

2006*   "Capital Social, Política Social y Migración Desde Comunidades Tracionales y Nuevas Comunidades de Orgien en México."  (Social Capital, Social Policy, and Migration from Traditional and New Sending Communities in Mexico.)  <u>Revista</u> <u>Española de Estudios</u> <u>Sociológicos</u> 116:97-122.  (with Jorge Durand and Fernando Riosmena)

2006*   "Doing Social Science in Anti-Scientific Times."  <u>American Sociologist</u> 37:87-95.  Special Issued edited by Bruce Keith on Perspectives on Sociological Knowledge.

2006*   "Linguistic Life Expectancies: Immigrant Language Retention in Southern California."  <u>Population and Development Review</u> 32:447-60.  (with Ruben Rumbaut and Frank D. Bean)

2006    "Sálvese Quien Pueda:  Structural Adjustment and Emigration from Lima."  Pp. 116-27 in Douglas S. Massey, Magaly Sánchez R., and Jere R. Behrman, eds., <u>Chronicle of a Myth Foretold: The Washington Consensus in Latin America</u>, *Annals of the American Academy of Political and Social Science* 606:116-27.  (with Chiara Capoferro)

2006    "Assessing Racial Discrimination: Methods and Measures."  Pp. 61-80 in John Goering, ed.,  <u>Fairness in the Housing Market</u>.  Lanham, MD:  Rowman and Littlefield.  (with Rebecca M. Blank)

2006*   "International Migration and Gender in Latin America: A Comparative Analysis."

23

International Migration 44:1-29.  (with Mary Fischer and Chiara Capoferro)

2006   "Patterns and Processes of International Migration in the 21st Century: Lessons for South Africa."  Pp. 38-70 in Marta Tienda, Sally Findley, Steve Tollman, and Eleanor Preston-Whyte, eds, African Migration and Urbanization in Comparative Perspective. Johannesburg: Witts University Press.

2006*  "Immigrant Intentions and Mobility in a Global Economy: The Attitudes and Behavior of Recently Arrived U.S. Immigrants."  Social Science Quarterly 87:30-47.  (with Ilana Redstone Akresh)

2006*  "Social Background and Academic Performance Differentials:  White and Minority Students at Selective Colleges."  American Law and Economics Review 8(2):1-20.

2006  "Why Housing Segregation Still Matters."  Journal of Catholic Social Thought 3:97-114.

2006*  "The Effect of Childhood Segregation on Minority Academic Performance  at Selective Colleges."  Ethnic and Racial Studies 29:1-26.  (with Mary J. Fischer)

2005   "The Continuing Reality of Racial Segregation."  The Next American City 9:1-5.

2005*  "Labor Market Segmentation and the Earnings of German Guestworkers."  Population Research and Policy Review 24:489-512.  (with Amelie Constant)

2005   "Immigration, Health, and New York City: Early Results Based on the U.S. New Immigrant Cohort of 2003.  Federal Reserve Bank of New York Economic Policy Review 11(2):127-52.  (with Guillermina Jasso, Mark R. Rosenzweig, and James P. Smith)

2005*  "The Changing Legal Status Distribution of Immigrants:  A Caution."  International Migration Review 34:469-84.  (with Katherine Bartley)

2005*  "Stereotype Threat and Academic Performance: New Data from the National Longitudinal Survey of Freshmen."  The DuBois Review: Social Science Research on Race 2:45-68..  (with Mary J. Fischer).

2005   "Race, Class, and Markets: Social Policy in the 21st Century."  Pp. 117-32 in David B. Grusky and Ravi Kanbur, eds., Conceptual Challenges in Understanding Poverty and Inequality.  Stanford: Stanford University Press.

2005*  "Household Composition, Family Migration, and Community Context.  Migrant Remittances in Four Countries."  Social Science Quarterly 86:509–28  (with Mariano Sana)

2005*  "Racial Discrimination in Housing: A Moving Target."  Social Problems 52:148-51.

24

2005    "Social and Economic Aspects of Immigration."  Pp. 206-212 Stephen G. Kaler and Owen M. Rennert, eds., in Understanding and Optimizing Human Development: From Cells to Patients to Populations, Annals of the New York Academy of Sciences, Volume 1038.  New York: New York Academy of Sciences.

2005    "The New Geography of Mexican Immigration."  Pp. 1-20 in Rubén Hernández León and Victor Zúñiga, eds  New Destinations of Mexican Migration in the United States: Community Formation, Local Responses and Inter-Group Relations.  New York: Russell Sage Foundation.  (with Jorge Durand and Chiara Capoferro)

2005*   "Politics or Economics?  International Migration During the Nicaraguan Contra War.."  Journal of Latin American Studies 37:29-53.  (with Jennifer H. Lundquist)

2004*   "The Continuing Consequences of Segregation."  Social Science Quarterly 85:1353-74.  (with Camille Charles and Gniesha Dinwiddie)

2004*   "Measuring Undocumented Migration."  International Migration Review 38:1075-1102.  (with Chiara Capoferro)

        Reprinted in Joshua DeWind and Alejandro Portes, eds.  2007.  Rethinking Migration: New Theoretical and Empirical Perspectives.  New York:  Berghahn Press

        Spanish Translation.  "La Medida de Migración Indocumentada."  In Alejandro Portes, ed., Repensando las Migraciones.  México, D.F.: Editorial Porrúa, 2006.

2004*   "Coming to Stay: An Analysis of the Census Question on Year of Arrival."  Demography 41:721-38.  (With Ilana Redstone)

2004    ""The New Geography of Inequality in Urban America."  Pp. 173-87 in C. Michael Henry, ed., Race, Poverty and Domestic Policy.  New Haven: Yale University Press.

2004*   "The Ecology of Racial Discrimination."  City and Community 3:221-43.  (with Mary J. Fischer)

2004*   "Patterns of U.S. Migration from Mexico, the Caribbean, and Central America."  Migraciones Internacionales 2(2):1-39.  (with Mariano Sana)

2004*   "Segregation and Stratification: A Biosocial Perspective."  The DuBois Review: Social Science Research on Race 1:1-19.

        Reprinted in Kevin M. Beaver and Anthony Walsh, eds., Library of Essays in Theoretical Criminology:  Biosocial Theories of Crime. Famham, UK: Ashgate, 2010.

2004*   "The Limits to Cumulative Causation: International Migration from Mexican Urban Areas." Demography 41:151-71.   (with Elizabeth Fussell)

2004*   "Social Capital and the Wages of Mexican Migrants:  New Hypotheses and Tests." Social Forces 82:671-702.  (with Michael B. Aguilera)

2004    "Immigrant Health - Selectivity and Acculturation."  In Norman B. Anderson, Randy A. Bulatao, and Barney Cohen (eds.), Critical Perspectives on Racial and Ethnic Differences in Health in Late Life. Washington, DC:  National Academy Press.  (with Guillermina Jasso, Mark R. Rosenzweig, and James P. Smith).

2004    "Trends in Mexican Migration to the United States, 1965-1995."  Pp. 17-44 in Jorge Durand and Douglas S. Massey, eds., Crossing the Border: Research from the Mexican Migration Project.  New York: Russell Sage. (with Marcela Cerrutti)

2004    "Wives Left Behind: The Labor Market Behavior of Women in Migrant Communities." Pp. 131-46 in  Jorge Durand and Douglas S. Massey, eds., Crossing the Border: Research from the Mexican Migration Project.  New York: Russell Sage. (with María Aysa)

2004    "Social Capital and Emigration from Rural and Urban Communities."  Pp. 184-200 in Jorge Durand and Douglas S. Massey, eds., Crossing the Border: Research from the Mexican Migration Project.  New York: Russell Sage.  (with Nadia Flores and Rubén Hernández León)

2003    "Exploring the Religious Preference of Recent Immigrants to the United States: Evidence from the New Immigrant Survey Pilot." Pp. 217-253 in Yvonne Haddad, ed. et al., eds., Religion and Immigration: Christian, Jewish, and Muslim Experiences in the United States. Walnut Creek, CA: AltaMira Press.  (with Guillermina Jasso, Mark R. Rosenzweig, and James P. Smith).

2003*   "Self-Selection, Earnings, and Out-Migration:  A Longitudinal Study of Immigrants to Germany."  Journal of Population Economics 16: 630-533 (with Amelie Constant)

        Reprinted in Klaus F. Zimmermann and Amelie Constant, eds.,  How Labor Migrants Fare.  Berlin: Springer-Verlag, 2004, pp. 73-96.

2003    "The Geography of Inequality in the United States 1950-2000."  Pp. 1-40 in William G. Gale and Janet Rothenberg Pack, eds., Brookings-Wharton Papers on Urban Affairs 2003. Washington, D.C.: Brookings Institution.  (with Mary Fischer)

2003*   "The Costs of Contradiction: U.S. Immigration Policy 1986-1996."  Latino Studies 1:233-52.  (with Jorge Durand)

2003    "A Synthetic Theory of International Migration."   Pp. 142-52  in World in the Mirror of

26

International Migration: International Migration of Population—Russia and Contemporary World.  Moscow: MAX Press.

2003*   "Pathways to Legalization."  Population Research and Policy Review 21:473-504. (with Nolan J. Malone)

2003   "The U.S. in the World Community: The Limits of National Sovereignty."  Pp. 143-54 in Jonathan Rieder and Stephen Steinlight, eds., The Fractious Nation?  Unity and Division in American Life.  Berkeley: University of California Press.

2002*   "Return Migration by German Guestworkers:  Neoclassical versus New Economic Theories." International Migration 40(4):5-38. (with Amelie Constant)
Winner, Senior Prize, Vereinigung der Freunde des Deutschen Institut für Wirtschaftsforschung (Association of Friends of the German Institute for Social Research–Berlin)

2002*   "A Brief History of Human Society: The Origin and Role of Emotions in Social Life." American Sociological Review 67:1-29  (2001 Presidential Address to the American Sociological Association).

   Reprinted in in Carolyn Neel, ed., World History Encyclopedia: An Introduction to World History.  Santa Barbara, CA: ABC-CLIO, pp. 77-110.

2002   "La Ricerca sulle Migrazioni nel XXI Secolo." Pp. 5-24 in Colombo di Asher and Giuseppe Sciortino, eds., Stranieri in Italia:  Assimilati ed Esclusi.  Bologna: Instituto Cattaneo.

2002*   "The Culture of Mexican Migration: A Theoretical and Empirical Analysis."  Social Forces 80:981-1004.  (with William Kandel)

   Reprinted in Robin Cohen and Gunvor Jonsson, eds., Migration and Culture. London: Edward Elgar, 2011.

2001*   "Segregation of Asians in U.S. Metropolitan Areas: 1980-1990."  EurAmerica 31:1-30. (With Mary J. Fischer)

2001*   "On the Auspices of Female Migration between Mexico and the United States." Demography 38:187-200. (with Marcella Cerrutti)

2001   "Segregation and Violent Crime in Urban America."  Pp. 317-346 in Elijah Anderson and Douglas S. Massey, eds., Problem of the Century: Racial Stratification in the United States.  New York: Russell Sage Foundation.

27

2001*   "Social Capital and International Migration: A Test Using Information on Family Networks."  American Journal of Sociology 106:1262-99. (with Miguel Ceballos, Kristin Espinosa, Alberto Palloni, and Mike Spittel)

Reprinted in Lawrence W. Wu, ed., Event History Analysis.  Thousand Oaks, CA: Sage Publications.

2001*   "Use of Black English and Racial Discrimination in Urban Housing Markets: New Methods and Findings."  Urban Affairs Review 36:470-96. (with Garvey Lundy)

2001     "Migrantes agradecidos."  Artes de México 53:74-80..  (with Jorge Durand)

2001*   "Mexican Immigration to the United States:  Continuities and Changes."  Latin American Research Review 36:107-27. (with Jorge Durand and René Zenteno)

2001     "The Prodigal Paradigm Returns:  Ecology Comes Back to Sociology."  Pp. 41-48 in Alan Booth and Ann C. Crouter, eds., Does it Take a Village?  Community Effects on Children, Adolescents, and Families.  Mahwah, N.J.: Lawrence Erlbaum Associates.

2000     "Residential Segregation and Neighborhood Conditions in U.S. Metropolitan Areas."  Pp. 389-482 in Neil Smelser, William Julius Wilson, and Faith Mitchell, eds., America Becoming: Racial Trends and Their Consequences.Washington, D.C.:  National Academy Press.

Reprinted in Elizabeth Higginbotham and Margaret L. Andersen, eds., Race and Ethnicity in Society: The Changing Landscape.  Belmont, CA: Thomson Wadsorth.

2000*   "Seeking Social Security: An Alternative Motivation for Mexico-U.S. Migration."  International Migration 38: 3-24.(with Mariano Sana)

2000*   "Residential Segregation and Ethnic Enterprise in U.S. Metropolitan Areas."  Social Problems 47:407-24.  (with Mary J. Fischer)

2000     "Higher Education and Social Mobility in the United States, 1940-1998" Pp. 45-55 in Ann Leigh Speicher, Editor, America's Research Universities: Quality, Innovation, Partnership.  Washington, D.C.: Association of American Universities.

2000     "The Ecology of Violence in Urban America."  Urbana 4(26):37-46.  (Journal published by the Instituto de Urbanismo, Facultad de Arquitectura y Urbanismo, Universidad Central de Venezuela).

2000*   "How Segregation Concentrates Poverty."  Ethnic and Racial Studies 23:670-91. (with Mary J. Fischer)

28

2000    "International Migration."  Pp. 156-87 in John Bongaarts and Rodolfo A. Bulatao, Eds., Beyond Six Billion: Forecasting the Worlds Population.  Washington, D.C.: National Academy Press.  (with Sharon Russell and Michael Teitelbaum)

2000*   "A Validation of the Ethnosurvey: The Case of Mexico-U.S. Migration."  International Migration Review 34:765-92.  (with René Zenteno)

2000    "Family, Schooling, Religiosity, and Mobility among New Legal Immigrants to the United States: Evidence from the New Immigrant Pilot Survey."  (with G. Jasso, M. Rosenzweig, and J. Smith).  Pp. 52-81 in Lydio F. Tomasi and Mary G. Powers, eds., Immigration Today: Pastoral and Research Challenges.  New York: Center for Migration Studies.

2000*   "Assortative Mating among married New Legal Immigrants from the United States: Evidence from the New Immigrant Pilot Survey."  International Migration Review 34:443-59.  (with Guillermina Jasso, Mark Rosenzweig and James P. Smith)

2000    "The Residential Segregation of Blacks, Hispanics, and Asians:  1970 to 1990." Pp 44-73 in Gerald D. Jaynes, ed., Immigration and Race: New Challenges for American Democracy.  New Haven: Yale University Press.

2000*   "The Changing Geography of Mexican Immigration to the United States: 1910-1996" Social Science Quarterly 81:1-15. (with Jorge Durand and Fernando Charvet)

2000*   "The New Immigrant Survey Pilot Study: Overview and New Findings About U.S. Legal Immigrants at Admission."  Demography 37:127-38  (with Guillermina Jasso, Mark Rosenzweig, and James P. Smith)

1999*   "Does Rising Income Bring Integration? New Results for Blacks, Hispanics, and Asians in 1990."  Social Science Research 28:316-26.  (with Mary J. Fischer)

1999*   "International Migration at the Dawn of the Twenty-First Century: The Role of the State." Population and Development Review 25:303-23.

1999*   "Engines of Immigration: Stocks of Human and Social Capital in Mexico."  Social Science Quarterly 81:33-48. (with Julie Phillips)

1999    "American Apartheid."  Perspectives, Primus Online Publishing, McGraw-Hill.  Web address:   www.mhhe.com/primis/online.

1999    "Why Does Immigration Occur?  A Theoretical Synthesis."  Pp. 34-52 in Charles Hirschman, Josh DeWind, and Philip Kasnitz, eds., Handbook of International Migration: the American Experience.  New York: Russell Sage.

29

1999*   "The New Era of Mexican Migration to the United States."  <u>Journal of American History</u> 86:518-36.  (with Jorge Durand and Emilio Parrado).

1999   "Miracles on the Border: Retablos of Mexican Migrants to the United States."  Pp. 203-28 in Edna Acosta and Liliana Golden, ed.,  <u>Identities on the Move: Transnational Processes in North American and the Caribbean Basin</u>.  Austin:   University of Texas Press. (with Jorge Durand)

1999*   "The New Labor Market:  Immigrants and Wages After IRCA."  <u>Demography</u> 36:233-46. (with Julie Phillips)

1999*   "The Dynamics of Mass Migration."  <u>Proceedings of the National Academy of Sciences</u> 96(8):5328-335.  (with René Zenteno)

1999   "When Surveys Fail:  An Alternative Approach to Studying Illegal Migration."  Pp. 145-60 in Arthur A. Stone et al., eds., <u>The Science of the Self-Report: Implications for Research and Practice</u>.  New York: Erlbaum Press.

1999*   Especifidad versus Representatividad: Enfoques Metodológicos para el Estudio de la Migración Internacional."  <u>Estudios Demográficos y Urbanos</u> 40:75-116. (with René Zenteno)

1998   "Dinámica Migratoria entre México y Estados Unidos."  Pp. 49-68 in René Zenteno, editor, <u>Población, Desarrolo, y Globalización: V Reunión de Investigación Sociodemográfica en México, Volumen 2</u>.  México, D.F.: Sociedad Mexicana de Demografía y El Colegio de la Frontera Norte. (with Jorge Durand and Kristin Espinosa)

1998   "Back to the Future: Rediscovering Neighborhood Context."  Review Essay on <u>Neighborhood Poverty, Volumes I and II</u>, edited by Jeanne Brooks-Gunn, Greg J. Duncan, and Lawrence Aber.  <u>Contemporary Sociology</u> 27:570-73.

1998*   "The Social Process of Undocumented Border Crossing."   <u>International Migration Review</u> 32:561-92.  (with Audrey Singer)

1998*   "From Escalator to Hourglass: Changes in the U.S. Occupational Wage Structure: 1949-1989."  <u>Social Science Research</u> 27:51-71.  (with Deborah Hirst)

1998*   "International Migration and Business Formation in Mexico."  <u>Social Science Quarterly</u> 79:1-20.  (with Emilio Parrado)

1997*   "Undocumented Migration and the Quantity and Quality of Social Capital."  <u>Soziale Welt</u> 12:141-62. (with Kristin Espinosa)

30

Reprinted in Ludger Pries, ed., <u>Migration and Transnational Social Spaces</u> (Aldershot, U.K.: Ashgate, 1999), pp. 106-37.

1997*   "Migración y Pequeña Empresa ." <u>Ciudades</u> 35:34-40.  (with Emilio A. Parrado)

1997    Review Essay on <u>When Work Disappears: The World of the New Urban Poor</u> by William Julius Wilson.  <u>Contemporary Sociology</u> 26:416-18.

1997    "The Retablo Art of Mexican Migrants to the United States." <u>Latino Review of Books</u> 3(1-2):22-24.  (with Jorge Durand)

1997*   "What's Driving Mexico-U.S. Migration?  A Theoretical, Empirical and Policy Analysis." <u>American Journal of Sociology</u> 102:939-999. (with Kristin Espinosa)

1997*   "Determinants of English Proficiency Among Mexican Migrants to the United States." <u>International Migration Review</u> 31:28-50.  (with Kristin E. Espinosa)

1996*   "The Age of Extremes:  Concentrated Affluence and Poverty in the 21st Century." <u>Demography</u> 33:395-412 (1996 Presidential Address, Population Association of America)

Reprinted in Otis Scott, ed, <u>Readings in Ethnic Studies</u>.  Dubuque: Kendall/Hunt Publishing.

Reprinted in <u>Crime and Criminals: Opposing Viewpoints</u>.  San Diego, Ca.:  Greenhaven Press, 1999.

Reprinted in <u>The Political Economy: Frontiers of Economic Thought, Volume 5</u>. Medford, Mass.: Global Development and Environmental Institute, Tufts University.

Reprinted in <u>Inequality and Society</u>, W.W. Norton, 2009.

1996*   International Migration and National Development." <u>Population Index</u> 62-181-212. (with J. Arango, G. Hugo, A. Kouaouci, A. Pellegrino, and J.E. Taylor)

Reprinted in <u>Migration and Development,</u> edited by Oliver Bakewell.  Cheltenham, UK: Edward Elgar Publishing, Ltd.

1996*   "The Dimensions of Segregation Revisited." <u>Sociological Methods and Research</u> 25:172-206 (with Michael White and Voon-Chin Phua)

Reprinted in <u>Migration and Development,</u> edited by Oliver Bakewell.  Cheltenham, UK: Edward Elgar Publishing, Ltd.

1996*   "International Migration and Community Development." <u>Population Index</u> 63:397-418. (with Joaquin Arango, Graeme Hugo, Ali Kouaouci, Adela Pellegrino, and J.Edward Taylor)

1996*   "International Migration and Development in Mexican Sending Communities."
        Demography 33:249-64.  (with Jorge Durand, Emilio Parrado, and William Kandel)

        Reprinted in Migration and Development, edited by Oliver Bakewell.  Cheltenham, UK:
        Edward Elgar Publishing, Ltd.

1996*   "Migradollars and Development:  A Reconsideration of the Mexican Case."  International
        Migration Review 30:423-44 (with Jorge Durand and Emilio Parrado)

1995*   "Unraveling the Tangle of Pathology:  The Effect of Spatially Concentrated Joblessness
        on the Well-Being of African Americans."  Social Science Research 24:352-66. (with
        Kumiko Shibuya).

1995    Review Essay on The Bell Curve:  Intelligence and Class Structure in American Life, by
        Richard J. Herrnstein and Charles Murray."  American Journal of Sociology 101:747-53.

1995*   "The New Immigration and Ethnicity in the United States."  Population and Development
        Review 21:631-52.

        Reprinted Chapter 3 in American Diversity:  A Demographic Challenge for the Twenty-
        First Century, edited by Stewart E. Tolnay and Nancy A. Denton.  Albany:  State
        University of New York Press, 2002, pp. 75-98.

1995*   "New Estimates of Undocumented Mexican Migration and the Probability of
        Apprehension."  Demography 32:203-13. (with Audrey Singer)

1995*   "The Changing Geographic Structure of Black-White Segregation in the United States."
        Social Science Quarterly 76:527-42.  (with Zoltan Hajnal)

1995    "Getting Away with Murder:  Segregation and Violent Crime in Urban America."
        University of Pennsylvania Law Review 143(5):1203-1232.

1995    "The New Geography of Inequality in Urban America."  Pp. 27-37 in Suburbs and Cities:
        Changing Patterns in Metropolitan Living.  Washington, D.C.:  The Aspen Institute.

1995    "Contemporary Issues in Latino Families: Future Directions for Research, Policy, and
        Practice"  Chapter 10 in Ruth E. Zambrana, ed., Understanding Latino Families:
        Scholarship, Policy, and Practice.  (with Ruth E. Zambrana and Sally Alonzo Bell).
        Newbury Park, Ca.:  Sage.

1994*   "An Evaluation of International Migration Theory: The North American Case."
        Population and Development Review 20:699-752.  (with J. Arango, A. Koucouci, A.
        Pelligrino, and J.E. Taylor)

1994*   "Selective Emigration, Cohort Quality, and Models of Immigrant Assimilation."  Social
        Science Research 23:315-49. (with David Lindstrom)

Reprinted in M Suarez-Orozco and D.B. Qin-Hilliard (eds.), <u>The New Immigration: Interdisciplinary Perspectives</u> Vol. 2. Hamden, CT: Garland Publishing.

1994   "America's Apartheid and the Urban Underclass" <u>Social Service Review</u> 68:471-87.

Reprinted in <u>Civil Rights and Social Wrongs:  Black-White Relations Since World War II</u>, edited by John Higham.  State College, PA:  Penn State University Press, pp. 102-118.

Reprinted in Fred Pincus and Howard Ehrlich, eds.,  <u>Race and Ethnic Conflict: Conflicting Views on Prejudice, Discrimination, and Ethnoviolence</u>.  Boulder: Westview.

Reprinted in <u>The Making and Unmaking of Urban Communities</u>, edited by Scott Chazdon.  Boston:  Allyn and Bacon, 1999.

1994*   "Disentangling the Causes of Concentrated Urban Poverty." <u>International Journal of Group Tensions</u> 24:267-316. (with Nancy Denton and Mitchell Eggers)

1994*   "Migradollars:  The Remittances and Savings of Mexican Migrants to the United States." <u>Population Research and Policy Review</u> 13:3-30. (with Emilio Parrado)

1994*   "Continuities in Transnational Migration:  An Analysis of 19 Mexican Communities." <u>American Journal of Sociology</u> 99:1492-1533 (with Luin Goldring and Jorge Durand)

1994   "The Methodology of an Ethnosurvey."  Chapter 24 in Donald J. Bogue, ed.,  <u>Readings in the Methodology of Population Research</u>.  New York:  United Nations Fund for Population Activities.

1994*   "Migration, Segregation, and the Spatial Concentration of Poverty." <u>American Sociological Review</u> 59:425-45.  (with Andrew Gross and Kumiko Shibuya)

1993*   "Theories of International Migration:  A Review and Appraisal." <u>Population and Development Review</u> 19:431-66.  (with J. Arango, G. Hugo, A. Kouaouci, A. Pellegrino, and J.E. Taylor)

Reprinted in Turkish as "Uluslararasý göç kuramlarýnýn bir deðerlendirmesi." *Göç Dergisi, Makale tarihçesi: 1 Temmuz 2014'de Tercüme Edildi*

Reprinted as Chapter 23 in Frank Trovato, ed., <u>Population and Society: Essential Readings</u>.  Oxford: Oxford University Press (2001).

Reprinted in Spanish as "Teorías sobe la Migración Internacional: Una Reseña y una Evaluación." <u>Trabajo: Migraciones y Mercados de Trabajo</u> 2(3):5-50.

Reprinted in <u>International Migration</u>, edited by Andrew Geddes.  Los Angeles: Sage Publications (2011).

1993*   "The Spatial Concentration of Affluence and Poverty During the 1970s."  Urban Affairs Quarterly 29:299-315. (with Mitchell Eggers)

1993*   "Latinos, Poverty, and the Underclass:  A New Agenda for Research."  Hispanic Journal of Behavioral Sciences 15:449-75.

1993*   "Effect of the Immigration Reform and Control Act on the Wages of Mexican Migrants." Social Science Quarterly 74:523-41. (with Katharine Donato)

1993*   "Public Housing and the Concentration of Poverty."  Social Science Quarterly 74:109-23. (with Shawn M. Kanaiaupuni)

1992*   "Racial Identity and the Segregation of Mexicans in the United States."  Social Science Research 21:235-60 (with Nancy A. Denton)

1992*   "The Residential Segregation of Asian Origin Groups in U.S. Metropolitan Areas." Sociology and Social Research 76:170-77. (with Nancy A. Denton)

1992*   "Changing Conditions in the U.S. Labor Market:  Effects of the Immigration Reform and Control Act of 1986." Population Research and Policy Review 11:93-116.  (with Katharine Donato and Jorge Durand)

1992*   "A Longitudinal Analysis of Urban Poverty:  Blacks in U.S. Metropolitan Areas Between 1970 and 1980."  Social Science Research 21:175-203.  (with Mitchell Eggers)

1992*   "Mexican Migration to the United States:  A Critical Review."  Latin American Research Review 27:3-43.  (with Jorge Durand)

1992*   "Stemming the Tide?  Assessing the Deterrent Effects of the Immigration Reform and Control Act."  Demography 29:139-57. (with K. Donato and J. Durand)

1992*   "Determinants of Savings, Remittances, and Spending Patterns among Mexican Migrants to the United States."  Sociological Inquiry 62:186-207. (with Lawrence Basem)

1991*   "Segregation, the Concentration of Poverty, and the Life Chances of Individuals."  Social Science Research 20:397-420. (with Andrew Gross and Mitchell Eggers)

1991*   "The Structural Determinants of Urban Poverty:  A Comparison of Whites, Blacks, and Hispanics."  Social Science Research 20:217-55. (with Mitchell Eggers)

1991*   "Explaining Trends in Residential Segregation 1970-1980."  Urban Affairs Quarterly 27:13-35.  (with Andrew B. Gross)

1991*   "Segregation in the Second Ghetto:  Racial and Ethnic Segregation in American Public Housing, 1977."  Social Forces 69:1011-1038. (with Adam Bickford)

34

1991*   "Spatial Assimilation Models:  A Micro-Macro Comparison."  Social Science Quarterly 72:347-61. (with Andrew B. Gross)

1990*   "Patterns of Neighborhood Transition in a Multiethnic World."  Demography 28:41-64. (with Nancy A. Denton)

1990   "Effects of the Immigration Reform and Control Act of 1986:  Preliminary Data from Mexico."  Pp. 183-210 in Frank D. Bean, Barry Edmonston, and Jeffrey S. Passel, eds., Illegal Immigration to the United States:  The Experience of the 1980s.  Washington, D.C.:  Urban Institute Press. (with Zai Liang)

1990*   "Segregation and Neighborhood Quality:  Blacks, Hispanics, and Asians in the San Francisco Metropolitan Area."  Social Forces 69:15-32. (with Eric Fong)

1990*   "American Apartheid:  Segregation and the Making of the Underclass."  American Journal of Sociology 95:1153-88.

        Reprinted in David B. Grusky and Szonja Szelényi, eds., The Inequality Reader: Contemporary and Foundational Readings in Race, Class, and Gender.  Boulder, CO: Westview Press, 2006.

        Reprinted in David Inglis and John Bone, ed., Social Stratification: Critical Concepts in the Social Sciences.  London:  Routledge, 2006

        Reprinted in Jessie P.H. Poon, Kenneth Button, and Peter Nijkamp, eds., Social Planning. Cheltenham, UK: Edward Elgar Publishing, 2005.

        Reprinted in Double Exposure: Poverty and Race in America, New York and London: M.E. Sharpe, pp. 135-40.

        Reprinted in The Sociology of Race and Ethnicity, edited by Malcom Cross. Cheltenham, UK:  Edward Elgar Publishing, Ltd.

1990*   "Social Structure, Household Strategies, and the Cumulative Causation of Migration." Population Index 56:3-26.

        Reprinted in Victor Piché, ed., Les Théories de la Migration.  Paris: INED Editions.

1990   "The Social and Economic Origins of Immigration."  Annals of the American Academy of Political and Social Science 510:60-72.

        Reprinted in Spanish as: "Los Orígenes Sociales y Econonómicos de la Inmigración," Bolotín:   Grupo Parlamentario Inter-Americano Sobre Población y Desarrollo, Vol. 8(2).

1990*   "The Ecology of Inequality:  Minorities and the Concentration of Poverty 1970-1980." American Journal of Sociology 95:1153-1188.  (with Mitchell L. Eggers)

1989*    "The Long-Term Consequences of a Temporary Worker Program: The U.S. Bracero Experience." Population Research and Policy Review 8:199-226. (with Zai Liang)

1989*    "Racial Identity among Caribbean Hispanics:  The Effect of Double Minority Status on Residential Segregation." American Sociological Review 54:790-808. (with N.A. Denton)

         Reprinted in Thomas Shapiro, ed., Great Divides: Readings in Social Inequality in the United States.  New York: McGraw Hill, 2004.

1989*    "Hypersegregation in U.S. Metropolitan Areas:  Black and Hispanic Segregation along Five Dimensions." Demography 26:373-93. (with N.A. Denton)

1989*    "Residential Segregation of Mexicans, Puerto Ricans, and Cubans in U.S. Metropolitan Areas." Sociology and Social Research 73:73-83. (with N.A. Denton)

1988*    "Residential Segregation of Blacks, Hispanics, and Asians by Socioeconomic Status and Generation." Social Science Quarterly 69:797-817. (with N.A. Denton)

1988*    "International Migration and Economic Development in Comparative Perspective." Population and Development Review 14:383-414.  Prepared for the U.S. Commission for the Study of International Migration and Cooperative Economic Development.

         Reprinted in Sergio Díaz-Briquets and Sidney Weintraub, eds., Determinants of Emigration from Mexico, Central America, and the Caribbean, pp. 14-47.  Boulder, Co.: Westview Press.

         Reprinted in The Sociology of Development, edited by Bryan Roberts, Charles Wood, and Robert Cushing.  London:  Edward Elgar Publishing.

1988*    "The Dimensions of Residential Segregation." Social Forces 67:281-315. (with N.A. Denton)

         Reprinted in Donald J. Bogue, ed.  1994.  Readings in Population Demography.  New York: United Nations.

1988*    "Suburbanization and Segregation in U.S. Metropolitan Areas." American Journal of Sociology 94:592-626. (with N.A. Denton)

1987*    "The Ethnosurvey in Theory and Practice." International Migration Review 21:1498-1522.

1987*    "The Effect of Residential Segregation on Black Social and Economic Well-Being." Social Forces 66:29-56.  (with G.A. Condran and N.A. Denton)

1987*  "The Social Process of International Migration." Science 237:733-8. (with Felipe García España)

1987*  "Trends in the Residential Segregation of Blacks, Hispanics, and Asians." American Sociological Review 52:802-25. (with N.A. Denton)

Reprinted in Norman R. Yetman, ed., Minority and Majority: The Dynamics of Race and Ethnicity in American Life, pp. 352-78. Boston: Allyn and Bacon, 1991 (Fifth Edition).

Reprinted in Kenneth L. Kusmer, ed., Black Communities and Urban Development in America, 1720-1990, Volume 8, Progress versus Poverty: 1970 to Present, pp. 344-68.

1987*  "Do Undocumented Migrants Earn Lower Wages than Legal Immigrants? New Evidence from Mexico." International Migration Review 21:236-74.

1987*  "Understanding Mexican Migration to the United States." American Journal of Sociology 92:1372-1403.

1987  "Geographic Distribution, Internal Migration, and Residential Segregation of Hispanics." Chapter 5 in The Hispanic Population of the United States. New York: Russell Sage. (with Frank D. Bean and Marta Tienda)

1986*  "The Settlement Process Among Mexican Migrants to the United States." American Sociological Review 51:670-85.

1986*  "The Social Organization of Mexican Migration to the United States." Annals, American Academy of Political and Social Science 487:102-13.

Reprinted in Norman R. Yetman, ed., Minority and Majority: The Dynamics of Race and Ethnicity in American Life, pp. 469-76. Boston: Allyn and Bacon, 1991 (Fifth Edition).

Reprinted in David Jacobson, ed., Immigration to the United States: A Reader, pp 200-16. Cambridge: Blackwell, 1998.

1985*  "Ethnic Residential Segregation: A Theoretical Synthesis and Empirical Review." Sociology and Social Research 69:315-350.

1985*  "Explaining the Paradox of Puerto Rican Segregation." Social Forces 64:306-331. (with Brooks Bitterman)

1985*  "A Comparison of Patterns of U.S. Migration in Two Mexican Sending Communities." Latin American Research Review 20: 104-123. (with Richard Mines)

1985*  "Spatial Assimilation as a Socioeconomic Outcome." American Sociological Review 50:94-105. (with Nancy A. Denton)

37

1985    "The Settlement Process Among Mexican Migrants to the United States: New Methods and Findings."  Pp. 255-292 in Daniel B. Levine, Kenneth Hill, and Robert Warren, eds. Immigration Statistics: A Story of Neglect.  Washington, D.C.: National Academy Press.

1984*   "Processes of Hispanic and Black Spatial Assimilation."  American Journal of Sociology 89:836-73. (with Brendan P. Mullan)

        Reprinted in Norman R. Yetman, ed., Minority and Majority: The Dynamics of Race and Ethnic Relations, Fourth Edition, pp. 352-369.  Boston: Allyn and Bacon.

1984*   "A Demonstration of the Effect of Seasonal Migration on Fertility."  Demography 21:501-18.  (with Brendan P. Mullan)

1983*   "Recent Trends in Hispanic Immigration to the United States."  International Migration Review 17:212-244.  (with Kathleen M. Schnabel)

1983    "Background and Characteristics of Undocumented Hispanic Migrants to the United States."  Migration Today 11(1):6-13.  (with Kathleen M. Schnabel)

1982    "The Undergraduate Curriculum in Sociology: An Immodest Proposal."  Teaching Sociology 9:423-434.  (with G. Edward Stephan)

1982*   "Guestworker Programs: Some Evidence from Europe and the United States and Some Implications for U.S. Policy."  Population Research and Policy Review 1:1-17. (with Joshua S. Reichert)

1981*   "Social Class and Ethnic Segregation: A Reconsideration of Methods and Conclusions." American Sociological Review 46:641-650.

1981    "Dimensions of the New Immigration to the United States and the Prospects for Assimilation."  Annual Review of Sociology 7:57-85.

        Edited version reprinted in David Martin and T. Alexander Aleinikoff, eds., Immigration: Process and Policy.  San Francisco: West Publishing, 1985.

1981*   "Hispanic Residential Segregation: A Comparison of Mexicans, Cubans, and Puerto Ricans."  Sociology and Social Research 65:311-322.

1980*   "History and Trends in U.S.-Bound Migration from a Mexican Town."  International Migration Review 14:475-491.  (with Joshua S. Reichert)

1980*   "Residential Segregation and Spatial Distribution of a Non-Labor Force Population: The Needy Elderly and Disabled."  Economic Geography 56:190-200.

1979*   "Effects of Socioeconomic Factors on the Residential Segregation of Blacks and Spanish Americans."  American Sociological Review 45:1015-1022.

1979*   "Patterns of Migration from a Central Mexican Town to the United States: A Comparison of Legal and Illegal Migrants." <u>International Migration Review</u> 13:599-623.  (with Joshua S. Reichert)

   Reprinted in R.C. Jones, ed., <u>Patterns of Undocumented Migration: Mexico and the United States</u>, Pp.  93-109.  Totawa, N.J.: Rowman and Allanheld.

1979*   "Residential Segregation of Spanish Americans in U.S. Urbanized Areas."  <u>Demography</u> 16:553-563.

1977*   "The Size-Density Hypothesis in Great Britain:  Analysis of a Deviant Case." <u>Demography</u> 14:351-361.  (with G. Edward Stephan)

1976*   "Economic Development and Fertility: A Methodological Reevaluation." <u>Population Studies</u> 30:429-437. (with Lucky M. Tedrow)

**Opinion Pieces:**

2016    "U.S. Border Patrol Policy."  <u>Academic Minute</u>, Tuesday, June 21, 2016.
        https://www.insidehighered.com/audio/2016/06/21/us-border-patrol-policy

2016    "Donald Trump will build a Mexican wall to solve a problem that doesn't actually exist,"
        <u>Market Watch</u>, April 20, 2016
        http://www.marketwatch.com/story/donald-trump-will-build-a-mexican-wall-to-solve-a-p
        roblem-that-doesnt-actually-exist-2016-04-20

2015    "Does a US-Mexico Border Wall Make Sense?" <u>Parallax World News</u>, October 20.
        http://pxw.news/does-a-us-mexico-border-wall-make-sense/#2

2015    "Ending the Cycle of Racial Isolation." *New York Times* Editorial, October 17. Featuring
        work published in Massey et al.  <u>Climbing Mount Laurel</u>.

2015    Interview on Racial Segregation and Predatory Lending with Glenn Ellis Program
        "Information is the Best Medicine, WURD Philadelphia, September 26.

2015    "America's Immigration Policy Needs Less Emotion and More Reason." <u>Zocalo Public
        Square</u>, September 25.  http://time.com/4048840/us-immigration-policy/

2015    "How a 1965 Immigration Reform Created Illegal Immigration." <u>Washington Post</u>,
        September 25, 2015.  https://www.washingtonpost.com/posteverything/wp/2015/09/25/
        how-a-1965-immigration-reform-created-illegal-immigration/

2015    "How Segregation Destroys Black Wealth." <u>New York Times</u> Editorial, September 15.
        Featuring work forthcoming by Massey and Tannen in Braun and Kirsch, eds., <u>The
        Dynamics of Opportunity in America</u>.  http://www.nytimes.com/2015/09/15/opinion/
        how-segregation-destroys-black- wealth.html?_r=0

2015    "The Truth About Illegal Migration." <u>Harris Online</u>, September 9.
        http://paulharrisonline.blogspot.com/2015/09/the-truth-about-illegal-immigration.html

2015    "Donald Trump's Mexican Border Wall Is a Moronic Idea."  <u>Foreign Policy</u>, August 18.
        http://foreignpolicy.com/2015/08/18/donald-trump-immigration-border/

2015    "The Real Hispanic Challenge." <u>Pathways</u>, Winter 2015, pp. 3-7. http://web.stanford.edu/
        group/scspi/_media/pdf/pathways/spring_2015/Pathways_Spring_2015_Massey.pdf

2015    "Border Enforcement as Political Theater."  Blogpost on <u>Border Criminologies</u>, April 8.
        http://bordercriminologies.law.ox.ac.uk/border-enforcement-as-political-theater/

2015    "The Social Science of Affordable Housing."  <u>Housing Policy Debate</u> 25(3):634-639.
        http://dx.doi.org/10.1080/10511482.2015.1039860

2014   "Children of Central American Turmoil and the U.S. Reform Impasse."  Scholars'
       Strategy Network Forum on the Immigration Impasse.
       http://www.scholarsstrategynetwork.org/page/children-central-american-turmoil-and-us-r
       eform-impasse

2014   "How to Create a More Integrated Society."  MetroTrends Blog, Urban Institute.
        http://blog.metrotrends.org/2014/05/create-integrated-society/

2014   "Lessons from Mount Laurel: The Benefits of Affordable Housing for All Concerned."
        Pp. 351-54 in Chester Hartman, ed., America's Growing Inequality: The Impact of
        Poverty and Race.  Lanham, MD: Lexington Books.

2013   "From Immigration Restriction to Immigration Management."  UN Chronicle
       Vol. 50(3):16-17.
       http://unchronicle.un.org/article/migration-restriction-migration-management/

2013   Who're you going to believe on immigration? Mark Krikorian or your lying eyes?"
       Washington Post Wonkblog.
       http://www.washingtonpost.com/blogs/wonkblog/wp/2013/08/14/whore-you-going-to-bel
       ieve-on-immigration-mark-krikorian-or-your-lying-eyes/

2013   "The Third Wave of Immigration." Bulletin of the American Academy of Arts &
       Sciences, Summer 2013, pp. 30-33.

2013   "Lessons from Suburbia." Pathways, Spring 2013, pp. 19-23.

2012   "Climbing Mount Laurel." New Jersey Law Journal, November 13, 2012.
       http://www.law.com/jsp/nj/PubArticleNJ.jsp?id=1202578252308&slreturn=2013023011
       5938

2012   "The Great Decline in American Immigration?"  Pathways, Fall 2012, pp. 9-13.

2012   "Adiós a la Migra."  Nexos, September 1, 2012.  Nexos en Línea.
       http://www.nexos.com.mx/?P=leerarticulo&Article=2102905

2012   "Do-it-yourself Immigration Reform.  New York Times, June 2.  (with Jorge Castañeda)

2012   "Lessons from Mount Laurel: The Benefits of Affordable Housing for All Concerned"
       Poverty and Race 21(3):7-8.

2102   "Learning from Mount Laurel." Shelterforce:  The Journal of Affordable Housing and
       Community Building, Summer 2012, pp. 34-35.

2012   "America is Losing as Many Illegal Immigrants as It's Gaining."  Reuters Blog: The

Great Debate, April 12, 2012.  http://blogs.reuters.com/great-debate/2012/04/12/america-is-losing-as-many-illegal-immigrants-as-its-gaining/

2011   "The Truth About Undocumented Migration.  Scholars Strategy Network Blog, December.
http://www.scholarsstrategynetwork.org/sites/default/files/ssn_basic_facts_massey_on_undocumented_migration.pdf

2011   "Immigration Turn Over the Page."  Interview with Giuseppe Terranova for West: Welfare, Society, Territory, August 31, 2011. http://www.west-info.eu/douglas-massey-mexican-immigration-turn-over-the-pag/

2011   Isolated, Vulnerable, and Broke."  New York Times, August 5, 2011

2011   "It's Time for Immigration Reform." CNN Global Public Square, July 7, 2011.
 http://globalpublicsquare.blogs.cnn.com/tag/douglas-s-massey/

2011   "Race and the Stunted Growth and Rapid Decline of American Liberalism."
Logos:  A Journal of Modern Society and Culture 10(2).
http://logosjournal.com/2011/race-and-the-stunted-growth-and-rapid-decline-of-american-liberalism/

2011   "Surcharge Doesn't Erode Tax Base."  Newsday, March 10, 2011  (with Howard Chernick)

2010   "Segregation: The Invisible Elephant in the Foreclosure Debate."  Huffington Post, November 1, 2010.  (with Gregory D. Squires)  http://www.huffingtonpost.com/douglas-s-massey/segregation-the-invisible_b_777323.html

2010   "What Was He Thinking?  Obama and Immigration Reform."  World on the Move 17(1):8.

2010   "Immigration Today."  The Wilson Quarterly 34(4):11-12.

2010   Massey, Douglas S.  2010.  "Anchor Babies Aweigh!"  The Nation 291(16):1,26.

2009   "Criminalizing Immigrants in the Post 9/11 Era."  Points of Migration, September 1. Center for Migration and Development, Princeton University.

2009   "The Realities of North American Economic Integration."  Boston Review 34(3):16, May/June.

       Reprinted in Joseph Carens, ed., Immigrants and the Right to Stay.  Cambridge, MA: MIT Press, 2010, pp. 73-81.

2009    "Battlefield: El Paso."  The National Interest, July/August 2009, pp. 44-51.

2009.   "Unsolicited Advice for the New President: Pay More Attention to Our Own Backyard."
        Miller-McCune Magazine 2(1): 39.

2008    "The Fence: Deconstructing America's 'Immigration Crisis.'" Pp. 259-73 in David Elliot
        Cohen, ed., What Matters: The World's Preeminent Photojournalists and Thinkers Depict
        Essential Issues of Our Time.  New York: Sterling Publishers.

2008    "La Inmigración y las Elecciones."  Vanguardia Dossier 20:56-59, Octubre/Diciembre
        (Barcelona, España).

2008    "Caution: NAFTA at Work."  Miller-McCune Magazine 1(1):2-9.

2008    "Deconstructing America's Immigration Crisis.'" Pp. 258-73 in David Cohen, ed., What
        Matters.  New York: Sterling Publications.

2008    "At Issue:  Would Tighter Border Security Curb Undocumented Migration?  No."  CQ
        Researcher:  A Publication of Congressional Quarterly 18(5): 113.

2008    "America's Unfolding Human Rights Crisis."  Pp. 6-7 in Many Voices, One Dream: A
        Collection of Insights and Recommendations for Achieving Immigration Reform.
        Washington, DC: The Reform Institute.
        http://www.reforminstitute.org/DetailPublications.aspx?pid=130&cid=7&tid=2&sid=0

2007    "International Migration in a Globalizing Economy."  Great Decisions 2007: Journal of
        the Foreign Policy Association, pp. 41-52

2007    "The Strength of Weak Politics."  PP. 145-57 in Dan Clawson, Robert Zussman, Joya
        Misra, Naomi Gerstel, Randall Stokes, Douglas L. Anderton, and Michael Buruwoy, eds.,
        Public Sociology:  Fifteeen Eminent Sociologists Debate Politics and the Profession in
        the Twenty-First Century.  Berkeley: University of California Press.

2006    "Getting Emotional About Mexicans."  Cato Unbound, Online Magazine of the Cato
        Institute, http://www.cato-unbound.org/

2006    "Seeing Mexican Immigration Clearly."  Cato Unbound, Online Magazine of the Cato
        Institute, http://www.cato-unbound.org/

2006    "Borderline Madness." Must Read Column, Chronicle of Higher Education Review,  June
        30, B11.

2006    "Illegal Immigrants: Are they Freebies or Freeloaders?"  Op-Ed, San Diego Union-
        Tribune, June 2.

2006   "The Wall That Keeps Illegal Workers In."  Op-Ed, New York Times, April 4, 2006.

2005   "Foolish Fences."  Washington Post, Op-Ed, November 30, 2005.

2005  "A 'Free Market' Includes Labor."  Los Angeles Times Op-Ed, July 31, 2005.

2005   "Five Myths About Immigration:   Common Misconceptions Underlying U.S.
       Border-Enforcement Policy." Immigration Policy IN FOCUS 4(6). Washington, DC:
       Immigration Policy Center, American Immigration Law Foundation, August 2005.

2005    "Beyond the Border Buildup:  A New Approach to Mexico-U.S. Migration."
       Immigration Policy IN FOCUS 4(7). Washington, DC: Immigration Policy Center,
       American Immigration Law Foundation, September 2005.

2005   "Backfire at the Border: Why Enforcement without Legalization Cannot Stop Illegal
       Immigration." Cato Institute Trade Policy Analyses, No. 29.  Washington, DC: Center
       for Trade Policy Studies, Cato Institute.

2004   "Migrants Need a Way to Go Home."  Los Angeles Times Op-Ed, January 15.

2004   "An Exercise in Self-Deception."  Newsweek International Edition, January 19.

2003   "The Race Case."  The American Prospect 14(2):22.

2003   "Mondialisation et Migrations: L'Exemple des Etat-Unis."  Futuribles 284:1-9.

2003   "Una Política de Inmigración Disfuncional."  Letras Libres 53:16-21.

2003   "How Stereotypes Sabotage Minority Students."  Chronicle of Higher Education Review,
       January 10, pp. B10-11.

2003   "Closed-Door Policy:  Mexico Vividly Illustrates How U.S. Treatment of Immigrant
       Workers Backfires."  American Prospect 14(7):26-29.

2003   "The American Side of the Bargain."  Pp. 81-91 in Tamar Jacoby, ed., Reinventing the
       Melting Pot: The New Immigrants and What it Means to be American.  New York: Basic
       Books.

2001   "Borderline Sanity."  American Prospect, September 15, 2001. (with Jorge Durand)

2001   "Etats-Unis: La Peur du Mexicain."  Le Monde des Debats, Numéro 21, Janvier.

2000   Free Trade and the Economic Underpinnings of Mexico-U.S. Migration."  Borderlines

44

Vol. 8, No. 5:1-4.  Inter-Hemispheric Resource Center, Albuquerque, NM.

2000    "Einwanderungspolitick für ein neues Jahrhundert" ("Immigration Policies for a New Century").  Pp 53-76 in Karl Husa, Christof Parnreiter, and Irene Stacher, eds., Internationale Migration: Die Globale Herausforderung des 21 Jahrhunderts?  Frankfurt: Brandes & Apsel Südwind.

2000    "To Study Migration Today, Look to a Parallel Era."  Chronicle of Higher Education Review, August 18, pp. B4-B5.

1999    "Un Nuevo Espacio para la Migración Mexicana en Chicago."  Tropel, Num. 0, p. 6 (Chicago).

1999    "Where We Live in Black and White."  In The Nation, October 26, 1998. (with Mary J. Fischer)

1998    "March of Folly: U.S. Immigration Policy Under NAFTA."  The American Prospect, 37:22-33.

1996    "Roots of Urban Underclass Linked to High-Density Projects."  Dallas Morning News, Sunday, September 15, 1996, J1-J2.

1995    "Regards sur L'Apartheid Américain"  Le Monde Diplomatique, Février 1995, p. 3.

1995    "Sguardi sull'Apartheid Americano."  Il Manifesto, Febrero 1995, p. 3.

1992    "Shrugging Off Racism."  The Washington Post, Sunday, May 17.

1989    "Racial Segregation Itself Remains a Corrosive Force:  Blacks Held Back by Isolation within Cities."  Los Angeles Times, August 13.

1988    "Immigration Adjustments Ignore Chain Effect of Family Eligibility."  Los Angeles Times, April 6.

1979    "Hordes of Illegals? No."  New York Times Op-Ed, May 31.

**Book Reviews, Research Notes, and Comments**:

2015    "The Social Science of Affordable Housing." Housing Policy Debate 25:3, 634-638

2014    "Manufacturing Marginality among Women and Latinos in Neoliberal America." Ethnic and Racial Studies 37(10): 1747-52.

2013    "Comment: Building a Better Underclass." Demography 50(3):1093-1095.

2007    "Family and Migration in Comparative Perspective: Reply to King." Social Science Quarterly 89: 908-911.  (with Mariano Sana)

2006    "Diversity's Blind Spot or the Data's Blind Spot?"  Review Essay on Richard Alba's article "Diversity's Blind Spot: Catholic Ethnics on the Faculties of Elite American Universities." Ethnicities, forthcoming.

2006    "America's Never Ending Debate."  Review Essay on *A Nation by Design: Immigration Policy in the Fashioning of America* by Aristide R. Zolberg (Harvard University Press and Russell Sage Foundation 2006). Population and Development Review 32, pp. 573-84.

 2006    "The Power of Comparison."  Review Essay on In a New Land: A Comparative View of Immigration by Nancy Foner. Contexts 5(3):57-59..

2005    "Long Day's Journey into Night: One Person's Experience of International Migration." Review Essay on The Suffering of the Immigrant by Abdelmalek Sayad. Qualitative Sociology 29:111-16.

2005    "Commentary on Trajectories for the Immigrant Second Generation by John Mollenkopf" Federal Reserve Bank of New York Economic Policy Review 11(2):121-123.

2004    Review of Who Are We? by Samuel P. Huntington. Population and Development Review 30:543-48.

2004    "Revenge of the Chicago School."  Review Essay on Remaking the American Mainstream: Assimilation and Contemporary Immigration by Richard D. Alba and Victor Nee. Contemporary Sociology 33:408-10.

2002    Comments on Jacob L. Vigdor's "Does Gentrification Harm the Poor?".  Pp. 174-76 in William G. Gale and Janet R. Pack, eds., Brookings-Wharton Papers on Urban Affairs 2002.  Washington, D.C.: Brookings Institution Press.

2002    Review of Thinking the Unthinkable: The Immigration Myth Exposed by Nigel Harris. Population and Development Review 28:358-59.

46

2002    Review of <u>At the Dawn of Modernity: Biology, Culture, and Material Life in Europe after the Year 1000</u> by David Levine.  <u>American Journal of Sociology</u> 107:847-48.

2001    Review of <u>Heaven's Door: Immigration Policy and the American Economy</u> by George J. Borjas, <u>Contemporary Sociology</u> 30:66-67.

2000    Review of <u>The Age of Mass Migration: Causes and Economic Impact</u> by Timothy J. Hatton and Jeffrey G. Williamson, <u>The Journal of Modern History</u> 72:497-98.

1997    The Elusive Quest for the Perfect Index of Concentration:  Reply to Egan, Anderton, and Weber.  <u>Social Forces</u> 76:1123-32. (with Nancy A. Denton)

1995    "Beyond the Technical Details:  Reply to St. John."  <u>American Journal of Sociology</u> 100:1333-35.  (with Mitchell L. Eggers)

1994    Review of <u>Immigrants and the American City</u> by Thomas Muller.  <u>American Journal of Sociology</u> 99:1346-48.

1991    Review of <u>Regional and Sectoral Development in Mexico as Alternatives to Migration</u>, edited by Sergio Díaz-Briquets and Sidney Weintraub.  <u>Journal of American Ethnic History</u>.

1991    Review of <u>The New Chosen People</u> by Guillermina Jasso and Mark R. Rosenzweig.  <u>American Journal of Sociology</u> 97:865-6.

1991    Review of <u>Immigrant America:  A Portrait</u> by Alejandro Portes and Rubén G. Rumbaut.  <u>Population and Development Review</u> 16:783-4.

1990    Review of <u>Land of Hope:  Chicago, Black Southerners, and the Great Migration</u> by James R. Grossman.  <u>Ethnic and Racial Studies</u> 13:304-5.

1989    Review of <u>International Migration Today, Volume 1:  Trends and Prospects; Volume 2: Emerging Issues</u> edited by Reginald Appleyard and Charles Stahl.  <u>Population and Development Review</u> 15:568

1990    Review of <u>Searching for Rural Development:  Labor Migration and Employment in Mexico</u> by Merilee S. Grindle.  <u>American Journal of Sociology</u> 95:515-16.

1989    Review of <u>The New American Immigration: Selected Patterns of Legal and Illegal Emigration</u>, By Francisco Cordasco.  <u>Journal of American Ethnic History</u> 9:133-4.

1987    Review of <u>Migration Surveys in Low-Income Countries</u>, by R.E. Bilsborrow, A.S. Oberai, and G. Standing.  <u>Journal of Development Economics</u>.

1986    Review of <u>Clamor at the Gates: The New American Immigration</u>.  Edited by Nathan

Glazer.  <u>Population and Development Review</u> 12:350-51.

1984    "Reply to Goldstein and White."  <u>American Journal of Sociology</u> 89:396-99.

1983*   "A Research Note on Residential Succession: The Hispanic Case."  <u>Social Forces</u>
        61:825-833.

1980*   "Regional Population Density and County Size: A Note on the Problem of Tautology in
        Size-Density Relationships." <u>Geographical Analysis</u> 12:184-188.  (with G.E. Stephan and
        L.M. Tedrow)

1978*   "On the Measurement of Segregation as a Random Variable." <u>American Sociological
        Review</u> 43:587-590.

**Other Publications:**

2015 "Who will the Common Core Standards Serve and How do they Reflect 21st Century Demographic Realities?"  Pp. 9-10 in Guadalupe Valdés, Kate Menken, and Mariana Castro, eds., Common Core Bilingual and English Language Learners: A Resource for Learners.  Philadelphia, PA: Caslon Publishing.

2015 "Retablos."  Oxford Bibliographies in Latino Studies.  Oxford, UK: Oxford University Press. DOI: 10.1093/obo/9780199913701-0093 (with Jorge Durand)

2015 Preface:  The Great Divide between Spain and the United States.  Pp. i-iv María Aysa-Lastra and Lorenzo Cachón, eds., *Immigrant Vulnerability and Resilience: Comparative Perspectives on Latin American Immigrants During the Great Recession*. New York: Springer.

2015 "Segregation Indices." Pp. 411-413 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition. London: Elsevier

2015 "Urban Violence." Pp. 949-952 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition. London: Elsevier.

2015 "Migration to and From Latin America."  Pp. 462-465 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition.   London: Elsevier.

2015 "Theory of Migration." Pp. 466-471 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition.   London: Elsevier.

2015 "Social Inequality." Pp. 908-913 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition. London: Elsivier.

2015 "Migration Motivations." Pp. 452-456 in James Wright, ed., The International Encyclopedia of Social and Behavioral Sciences, Second Edition.   London: Elsevier.

2014 "The Spatial Foundations of Social Stratification." Community and Urban Sociology Newsletter 27(1):1.

2013 "Preface: Undoing the Bitter Legacy of Segregation and Discrimination."  Pp. ix-xii in Chester Hartman and Gregory D. Squires, eds., From Foreclosure to Fair Lending: Advocacy, Organizing, Occupy, and the Pursuit of Equitable Access to Credit.  New York: New Village Press.

2012 "Preface."  Handbook of Neurosociology, edited by David Franks and Jonathan Turner. Berlin:  Springer, pp. i-iv..

49

2012   "Capitalism and Immigration."  <u>Oxford Encyclopedia of Business, Labor, and Economic History</u>.

2011   "A Brief History of Human Society."  Pp. 77-110 in Carolyn Neel, Ed., <u>World History Encyclopedia, Volume 1: An Introduction to World History</u>.   Santa Barbara, CA: ABC-CLIO.

2010   "Teologia Delle Migrazioni."  Pp. 1016-1037 in Graziano Battistella, ed., <u>Migrazioni: Dizionario Socio-Pastorale</u>.  Milano: Edizioni San Paolo.

2009   "Mexico on the Move: How the Mexican Migration Project Came About."  <u>International Innovation</u> 20-23.

2009   "Securing America's Borders"  Testimony of Douglas S. Massey Before the Senate Judiciary Committee, May 20, <u>Congressional Record</u>.

2008   "Migration Theories."  <u>Social-Pastoral Dictionary of Migration</u>.  Rome: Scalabrini International Migration Institute..

2007   "Affordable Housing Reform in New Jersey."  Testimony before the Housing and Local Government Committee of the New Jersey General Assembly, December 10, 2007.

2007   "When Less is More: Border Enforcement and Undocumented Migration."  Testimony before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law of the Committee on the Judiciary, U.S. House of Representatives, April 20, 2007, <u>Congressional Record</u>, Serial 110-25.

2007   "Forward."  Pp. xi-xii in  <u>Latinas/os in the United States: Changing the Face of América</u>, edited by Havidán Rodríguez, Rogelio Sáenz, and Cecilia Menjívar.  New York: Springer.

2007   "American Apartheid."  Forthcoming in Richard T. Schaefer, ed., <u>Encyclopedia of Race, Ethnicity, and Society</u>.  Thousand Oaks, CA: Sage Publications.

2006   "Education, Skills, and U.S. Immigration Policy"  Testimony before the U.S. Senate Committee on Health, Education, Labor, and Pensions, <u>Congressional Record</u>, September 14, 2006.

2006   "On the Origins of Stratification."  <u>Evolution and Sociology</u> 3(1):1-5.

2006   "Blackballed."  <u>Contexts</u> 5(1):40-43.

2006   "Building a Comprehensive Model of International Migration."  Pp. 4-28 in *Annex* of Neil Howe and Richard Jackson, eds., <u>Long-Term Immigration Projection Methods: Current Practice and How to Improve It.</u>.  Boston: Center for Retirement Research,

Boston College

2005   "Immigration and North American Economic Integration."  Testimony before the Senate Judiciary Committee,  Congressional Record, October 18, 2005.

2005   "The Consequences of Affirmative Action at Selective Institutions."  Pp. 59-69 in Refocusing on the Common Good: Advancing Equity and Access in Higher Education. New York: The College Board.

2005   "From Social Sameness, a Fascination With Differences."  Chronicle of Higher Education Review, April 12, 2005, B11-B12.

2005   "The Case for Immigration Reform."  Testimony Before Immigration Subcommittee, enate Committee on the Judiciary, Congressional Record, May 26, 2005.

2003   "The American Dilemma Revisited: Remarks from a Social Scientist." Black Renaissance 5(1):51-55.

2003   "The Two Social Psychologies."  American Psychological Society Observer16(3):1-2.

2003   "Doing Race with a White Face."  Contexts 2(1):70.

2003   "Preface."  The Methods and Materials of Demography edited by David Swanson and Jacob Siegel.  San Diego:  Academic Press.  (With Linda Gage)

2003   "The New Immigrant Survey in the US:  The Experience over Time."  Migration Information Source (http://www.migrationinformation.org/USfocus/display.cfm?id=81), Migration Policy Institute, Washington, D.C.  (with Guillermina Jasso, Mark R. Rosenzweig, and James P. Smith).

2002   "Migration: International Migration."  In Paul Demeny and Geoffrey McNichol, eds., The Encyclopedia of Population .  New York: Macmillan

2002   "Theory of Migration."  Pp. 9828-34 in Neil J. Smelser and Paul B. Baltes, eds., International Encyclopedia of the Social and Beahvioral Sciences.  London: Elsevier Science.

2002   "Residential Segregation."  Pp. 348-55 in John Solomos and David Theo Goldberg, eds., The Blackwell Companion to Racial and Ethnic Studies.  London: Blackwell.

2001   "El Norte: Vida y Milagros de la Migración Hispana." Generación Chicago: La Cultura Hispana No. 33 (March):5-6.

2000   "Residential Segregation."  In Neil J. Smelser and Paul B. Baltes, eds., International Encyclopedia of the Social and Beahvioral Sciences.  London: Elsevier Science.

2000    "What I Don't Know About My Field But Wish I Did." <u>Annual Review of Sociology</u> 26:699-701.

2000    "Housing Discrimination 101." <u>Population Today</u> 28(6):1,4.

2000    "Forward" to <u>Human Snakes: Smuggled Chinese Immigrants in America</u> by Ko-lin Chin. Philadelphia: Temple University Press, pp. ix-xvii.

1999    "The Immigration Experience for Families and Children." <u>Issue Series in Social Research and Social Policy</u>. Washington, D,C,: American Sociological Association (with Richard Alba and Rubén Rumbaut).

1998    "Undocumented Migration in the Context of NAFTA." <u>LASA Forum</u> 39(2):17-18. Pittsburgh: Latin American Studies Association.

1994    "American Apartheid:  Housing Segregation and Persistent Urban Poverty." <u>Distinguished Lecture Series</u>, Northern Illinois University, DeKalb, Illinois.

1993    "The 1986 Immigration Reform and Control Act and its Aftermath." <u>Mexico Policy News</u> 9:45-46.

1993    "Latino Poverty Research:  An Agenda for the 1990s." <u>Items</u> 47(1):7-12.  New York: Social Science Research Council

1992    "American Apartheid." <u>Poverty and Race Research Action Council</u>, Vol. 1, No. 4. Washington, D.C.:  Poverty and Race Action Council.

1992    "Overview."  Pp. 92-96 in Studs Terkel, <u>Race: How Blacks and Whites Think and Feel About the American Obsession</u>.  New York: The New Press.

1991    "Census Data Needs for the 21st Century."  Testimony before the U.S. House of Representatives, Subcommittee on Census and Population of the Committee on Post Office and Civil Service, March 20, 1991, <u>Congressional Record</u>.

1991    "Segregation Indices." <u>The Encyclopedia of Sociology</u>. New York: Macmillan, 1738-43.

1988    "Residential Segregation of Blacks in American Cities."  Testimony before the U.S. House of Representatives Subcommittee on Housing and Community Development, <u>Congressional Record</u>, January 27, 1988.

1987    "Los Angeles as an Immigrant City."  Pp. 192-99 in M. Mark Stolarik, ed.,  <u>The Other Ports of Entry</u>.  Philadelphia:  Balch Institute of Ethnic Studies Press.

1984    "Comments on Statistical Data and Public Policy."  Pp. 133-38 in V.M.  Briggs and M. Tienda, eds., <u>Immigration: Issues and Policies</u>.  Washington, D.C.: National Council on Employment Policy.

1983    "A Summary and Evaluation of Local Area Statistics on Hispanics." <u>Report of the Ford Foundation Task Force on Statistical Policy and Data Needs for Hispanics</u>.  New York: Ford Foundation.

1979    "Migration from a Rural Mexican Town to the United States:  Research Report." <u>Intercom</u> 7:6-7. (with Joshua S. Reichert)

**Postdoctoral Fellows Supervised:**

Nancy A. Denton (1984-90)
Professor
Department of Sociology
SUNY at Albany
1400 Washington Avenue
Albany, NY 12222

Katharine M. Donato (1988-90)
Professor
Department of Sociology
Vanderbilt University
VU Station B351811
Nashville, TN  37235-1811

Margaret E. Greene (1990-93)
Program Associate
Center for Health and Gender Equity
6930 Carroll Ave., Suite 910
Takoma Park, MD 20912

Luin Goldring (1989-91)
Associate Professor
Department of Sociology
York University
Toronto, Ontario
CANADA

Mitchell L. Eggers (1991-92)
Chief Operations Officer, GMI, Inc.
E-Business Solutions for Global Market Research
+1-(206) 315-9300 main
+1-(206) 315-9301 fax
Seattle, WA 98052

Audrey Singer (1993-94)
Senior Fellow, The Brookings Institution
Center on Urban and Metropolitan Policy
1775 Massachusetts Ave NW
Washington, DC 20036
(202) 797-6241

René Zenteno (1996-98)
Vice Provost for International Initiatives
Professor of Demography
University of Texas at San Antonio
501 W. César E. Chavéz
San Antonio TX 78207- 4415

Emilio A. Parrado (1997-99)
Professor and Chair
Department of Sociology
University of Pennsylvania
3718 Locust Walk
Phildelphia, PA 19104-6298

Marcella Cerrutti (1997-2001)
Director, Centro de Estudios de Población
Av. Corrientes 2817 - 7º Piso
Buenos Aires, Argentina
Casilla 4397 - Correo Central
1000 - Buenos Aires, Argentina
mcerrutti@cenep.org.ar

Elizabeth Fussell (1998-2001)
Associate Professor
Population Studies and Training Center
Brown University Box 1836
68 Waterman St.
Providence, RI 02912

Ayumi Takenaka (2001)
Research Officer
COMPAS
School of Anthropology
University of Oxford
58 Banbury Road,
Oxford, OX2 6QS

Rubén Hernández-León (2000-2003)
Associate Professor
Department of Sociology
296 Haines Hall
University of California, Los Angeles
Los Angeles, CA 90095-1551

Amelie Constant (2000-2003)
Executive Director, Washington Office

55

German Institute for the Study of Labor (IZA)
Visiting Professor, Elliot School of International Affairs
Georgetown University
constant@iza.org

Krystyna Iglicka (1997-98)
Professor of Economics and Demography
Institute of Social Studies
University of Warsaw
00-183 Warsaw

Garvey Lundy (1998-2003)
Instructor of Sociology
Social Science Division
Montgomery County Community College
340 DeKalb Pike
Blue Bell, PA 19422

Mary J. Fischer (2003-2004)
Associate Professor
Department of Sociology
344 Mansfield Road
University of Connecticut
Storrs, CN 06269

Cris Beauchemin (2004-2005)
Centre Population & Développement
Institut National Etudes Démographiques
221 Boulevard Davout
75020 Paris, FRANCE
cris.beauchemin@ined.fr
(33)01.56.06.21.28

Susan Clampet-Lundquist (2005-2006)
Associate Professor
Department of Sociology
St. Joseph's University
130 Post Hall
5600 City Avenue
Philadelphia, PA 19131-1395

Margarita Mooney (2005-2007)
Associate Research Scientist
Department of Sociology
Yale University
P.O. Box 208265

New Haven CT 06520-8265

Kimberly Torres (2006-2008, 2011-2012)
Parent Liaison
Expert Admissions
1270 Avenue of the Americas, Suite 1700
Rockefeller Center
New York, NY 10020

Stefanie Brodmann (2008-2009)
Senior Economist
The World Bank
1818 H St NW
Washington, DC 20006
(202) 473-1000
stefanie.brodmann@gmail.com

Pablo Mateos (2008)
Profesor-Investigador
Centro de Investigaciones y Estudios Superiores en Antropología Social-Unidad Occidente  Av. España 1359
Col. Moderna, C.P. 44190
Guadalajara, Jalisco, México.

Albert Sabater (2010-2011)
 Research Fellow in the Centre for Population Change
School of Geography & Geosciences
Sustainable Development
Irvine Building
University of St Andrews
Fife, Scotland, KY16 9AL
United Kingdom

Sofya Aptekar (2010-2011)
Assistant Professor
Department of Sociology
University of Massachusetts Boston
Wheatley Hall, Floor: 04, Room 00012
Boston, MA 02125

**Doctoral Students Supervised**:
A.W.A.D.G Abayasekara (1984)
Board of Agricultural Economics
Postgraduate Institute of Agriculture
University of Peradeniya
Peradeniya 20400
Sri Lanka

Brendan P. Mullan (1985)
Associate Professor
Department of Sociology
Michigan State University
East Lansing, MI 48824

Francis Dodoo (1987)
Professor of Sociology and Demography
Department of Sociology
412 Oswald Tower
Pennsylvania State University
University Park, PA 16802

Mitchell E. Eggers (1990)
Chief Scientist
GMI, Inc.
Integrated Solutions for Market Research
1100 12th Ave NE - Suite 200
Bellevue, WA 98004 USA
meggers@gmi-mr.com

Emily Rosenbaum (1990)
Professor of Sociology
Department of Sociology
Fordham University
Bronx, NY 10458

Felipe García España (1991)
Senior Research Associate
Department of Psychopharmacology
3600 Market Street, Suite 875
University of Pennsylvania
Philadelphia, PA 19104-2649

Eric Fong (1992)
Professor of Sociology
Department of Sociology
725 Spadina Avenue
University of Toronto
Toronto, Ontario M5S 2J4

Zai Liang (1992)
Professor of Sociology
Department of Sociology
University at Albany
1400 Washington Avenue
Albany, NY 12222

Shawn Kanaiaupuni (1995)
Division Director, Public Education Support
Kamehameha Schools
567 South King Street, Ste 300
Honolulu, Hawai'i  96813
shkanaia@ksbe.edu

David Lindstrom (1995)
Professor of Sociology
Department of Sociology
Brown University
Box 1916
Providence, RI 02912

Héctor Cordero Guzmán (1995)
Professor of Sociology
Department of Black and Hispanic Studies
Baruch College, Box B4-280
17 Lexington Ave.
New York, N.Y. 10010

Kumiko Shibuya (1996)
Senior Policy Advisor
Developmental Services Branch
Social Policy Development Division
Ontario Ministry of Community and Social Services
Toronto, Ontario M7A 1Z1

Kristin E. Espinosa (1997)
Associate Director of Institutional Research
Loyola University Chicago
25 E. Pearson, Suite 800
Chicago, IL 60611-9810
espinosa@alumni.uchicago.edu

William Kandel (1998)
Immigration Specialist
Congressional Research Service
Domestic Social Policy Division
101 Independence Avenue, SE
Washington, DC 20540
wkandel@crs.loc.gov
202-577-4593 (cell)


S. Mara Pérez (1998)
President
Development and Planning Services
Web site: www.svn.net/mperez
Larkspur, CA 94977
mperez@maraperez.com

Randall S. Kuhn (1999)
Associate Professor
Director, Global Health Affairs Program
Graduate School of International Studies
University of Denver
2201 S. Gaylord St.
Denver, CO 80208

Nicholas M. Young (2000)
Postdoctoral Associate
Program in African and African American Studies
Stanford University
Main Quad, Bldg. 240
Stanford, California 94305

Payal Gupta Kondisetty (2001)
Senior Consultant
Blueberry
Chalfont, PA 18914
pkondisetty@blue-berry.com

Mariano Sana (2003)
Associate Professor
Department of Sociology
Vanderbilt University
VU Station B #351811
Nashville, TN  37235-1811
615-322-4004
mariano.sana@vanderbilt.edu

Rebecca Joyce Kissane (2003)
Associate Professor
Department of Anthropology and Sociology
Lafayette College
Easton, PA 18042

Mary J. Fischer (2003)
Associate Professor
Department of Sociology
344 Mansfield Road
University of Connecticut
Storrs, CN 06269

Gretchen Livingston (2003)
Research Associate
Pew Hispanic Center
1615 L Street NW
Washington DC 20036
glivingston@pewhispanic.org
202-419-3645

Sara Goldrick-Rab (2004)
Professor of Educational Policy Studies and Sociology
Department of Educational Policy Studies
University of Wisconsin-Madison
210 Education Building
1000 Bascom Mall
Madison, WI 53706
608/262-6564

Nolane J. Malone (2004)
Vice President for Pacific Operations
Director of REL Pacific
McREL International
1003 Bishop Street, Suite 2200
Honolulu, HI 96813

Nadia Flores-Yeffal (2005)
Assistant Professor
Department of Sociology, Anthropology, and Social Work
Texas Tech University
MS 1012, Holden Hall,
Lubbock, TX 79409-1012
nadia.flores@ttu.edu

Ilana Redstone Akresh (2005)
Associate Professor
University of Illinois at Urbana-Champaign
326 Lincoln Hall
702 South Wright Street
Urbana, IL 61801

María Aysa-Lastra (2005)
Assistant Professor of Sociology
Winthrop University
329 Kinard
Rock Hill, SC 29733

Fernando Riosmena (2005)
Associate Professor
Population Program, Institute of Behavioral Science
University of Colorado Boulder
1416 Broadway St. 484 UCB.
Boulder, CO. 80302.
O1: (303) 492-1476
fernando.riosmena@gmail.com

Kimberly C. Torres (2006)
Parent Liaison
Expert Admissions
1270 Avenue of the Americas, Suite 1700
Rockefeller Center
New York, NY 10020

Katherine Bartley (2007)
Demographic Analyst
Bureau of Epidemiology Services
NYC Dept of Health and Mental Hygiene
Tel: 212-788-9302
kbartley@health.nyc.gov

David Potere (2008)
Consultant, Boston Consulting Group
Exchange Place
31st Floor
Boston, Massachusetts 02109
http://www.bcg.com/

Rebecca Casciano (2009)
President and CEO
Glass Frog Research
172 Orchard Rd
Skillman, NJ 08558
201-341-3291
 rebecca@glassfrog.us

Elisha Smith Arrillaga (2009)
Program Fellow
The William and Flora Hewlett Foundation
2121 Sand Hill Road
Menlo Park, CA 94025

Jonathan Rothwell (2009)
Senior Research Analyst
Metropolitan Policy Program
The Brookings Institution
1775 Massachusetts Ave NW
Washington DC 20036
202.797.63140
jrothwell@brookings.edu

Gregory Elacqua (2009)
Director , Instituto de Políticas Públicas Expansivas-UDP
Facultad de Ecnomía y Empresa
Universidad Diego Portales
Avda. Santa Clara 797,
Huechuraba, Santiago, Chile
gregory.elacqua@udp.cl

Nicholas Ehrmann (2010)
CEO and Founder
Blue Engine Educational Program
150 Court Street
Brooklyn, NY 11201
nick@blueengine.org

Sofya Aptekar (2010)
Assistant Professor
Department of Sociology
University of Massachusetts Boston
Wheatley Hall, Floor: 04, Room 00012
Boston, MA 02125

Pratikshya Bohra-Mishra (2011)
Postdoctoral Research Associate
Program in Science, Technology and Environmental Policy (STEP)
Woodrow Wilson School of Public and International Affairs
410A Robertson Hall
Princeton University
Princeton, NJ 08544

Shahana Chattaraj (2011)
Postdoctoral Fellow
Blavatnik School of Government
Oxford University
10 Merton St
Oxford OX1 4JJ, United Kingdom

Michael Moynihan (2011)
Chief Economist
NYC Economic Development Corporation
110 William St
New York, NY 10038
mmoynihan@nycedc.com

Jacob Rugh  (2012)
Assistant Professor
Department of Sociology
Brigham Young University
2008 Joseph F. Smith Building
Provo, UT 84602

Julia Gelatt (2013)
Research Associate
Urban Institute
2100 M St NW
Washington, DC 20037

Joel Thibert (2013)
Consultant, McKinsey & Co.
1250 René-Lévesque Ouest
Montreal, QC H3B 4W8, Canada

Jayanti Owens (2013)
Assistant Professor
Department of Sociology
Brown University
Box 1916
Providence, RI 02912

Erik Vickstrom (2013)
Demographic Statistician
Education and Social Stratification Branch
Population Division, U.S. Census Bureau
U.S. Department of Commerce
4600 Silver Hill Road
Washington, DC 20233

Laura Nolan (2015)
Postdoctoral Research Scientist
Columbia Population Research Center
School of Social Work
1255 Amsterdam Avenue, Room 718
 New York, New York 10027

Mahesh Somashekar (2015)
Postdoctoral Fellow
Department of Sociology
University of Washington
211 Savery Hall
Box 353340
Seattle, WA 98195-3340

Takudzwa Sayi (2015)
Postdoctoral Fellow
Department of Community and Family Health
USF College of Public Health
13201 Bruce B. Downs Blvd., MDC 56
Tampa Florida 33612

Charles Varner (2016)
Associate Director,
Center on Poverty and Inequality
Institute for Research in the Social Sciences
30 Alta Road
Stanford, CA 94305
cvarner@stanford.edu

Kerstin Gentsch (2016)
Senior Policy Analyst
Office of Policy Research
City University Of New York
555 West 57th St., Suite 1240
New York, NY 10019
(646) 664-8110
Kerstin.Gentsch@cuny.edu

**Other Doctoral Students** (Research Assistants and Coauthors):
Kathleen Mullan Harris (1988)
James Haar Distinguished Professor
Department of Sociology
University of North Carolina
Chapel Hill, NC 27599-3210

Emilio A. Parrado (1996)
Professor and Chair
Department of Sociology
University of Pennsylvania
3718 Locust Walk
Philadelphia, PA 19104-6299

Zoltan Hajnal (1998)
Associate Professor
Department of Political Science
University of California at San Diego
9500 Gilman Drive
 La Jolla, CA  92093-0521

Julie A. Phillips (1998)
Associate Professor of Sociology
Rutgers University
54 Joyce Kilmer Avenue
Piscataway NJ 08854-8045

Michael B. Aguilera (1999)
Associate Professor
Department of Sociology
University of Oregon
Eugene, OR 97403-1291

Jennifer H. Lundquist (2004)
Associate Professor and Associate Dean of Faculty Development
Department of Sociology
Thompson Hall

University of Massachusetts
Amherst, MA 01003-7525

Susan Clampett Lundquist (2003)
Assistant Professor
Department of Sociology
St. Joseph's University
130 Post Hall, 5600 City Avenue
Philadelphia, PA 19131-1395

Gniesha Dinwiddie (2005)
Assistant Professor
African American Studies Department
University of Maryland
2169 LeFrak Hall
College Park, MD 20742

Phillip Connor (2010)
Research Associate
Pew Research Center's Forum on Religion & Public Life
615 L Street NW, Suite 700
Washington, DC 20046
pconnor@pewforum.org
Steven E. Alvarado (2011)
Assistant Professor
Department of Sociology
Cornell University
336 Uris Hall
Ithaca, New York, 14853-7601

S. Heidi Norbis Ullman (2011)
Associate Social Affairs Officer
United Nations Economic Commission for Latin America and the Caribbean
Av. Dag Hammarskjöld 3477
Casilla 179-D
Santiago, Chile 7630412
(56-2) 210-2000; (56-2) 471-2000

Len Albright (2011)
Assistant Professor of Sociology and Public Policy
Northeastern University
360 Huntington Ave.
Boston, Massachusetts 02115
l.albright@neu.edu

Liz Derickson
Assistant Dean for Academic Affairs
Swarthmore College
500 College Ave.
Swarthmore, PA 19081
(610)328-8475
ederick1@swarthmore.edu

**Current Doctoral Students:**
Amanda Cheong, Chair
Etienne Breton, Chair
Liz Derickson, Committee Member
Angela Dixon, Committee Member
Janeria Easley, Chair
Lindsey Edwards, Chair
Kerstin Gentsch, Chair
Aaron Gottlieb, Committee Member
Yosi Harpaz, Committee Member
Sarah James, Committee Member
Zitzi Mirakhur, Chair
Emilce Santana, Chair
Jonathan Tannen, Chair
Sali Thorkelson, Chair

**Master's Theses Supervised at University of Chicago**
Virginia Ruiz, M.A., Latin American Studies, 1991
Amy Wendt, M.A., International Relations,  1992
Jeffrey Bass, M.A., Social Sciences, 1992
Jessica Fleischmann, M.A., Latin American Studies, 1992
Carla Burnett, M.A., Latin American Studies, 1992
Debra Westlake, M.A., Latin American Studies, 1992
S. Mara Perez, M.A., Latin American Studies, 1992
Mary C. Simon, M.A., Latin American Studies, 1993
Andrew Geer, M.A., Public Policy Studies, 1994
Jorge Buendia, Latin  American Studies, 1994
Caryn Howell, Latin American Studies,, 1994
Ana Salas, M.A., International Relations, 1995

**Master's Theses Supervised at University of Pennsylvania**
Michael Jeram, Lauder Program, Wharton School, 1996
Jonathan Hoopes, Lauder Program,  Wharton School, 1996
William Krolicki, Lauder Program, Wharton School, 1996
Lisa Sharon, Lauder Program,  Wharton School, 1996
Deborah Hirst, Sociology, 1996
Michael McGrann, Lauder Program, Wharton School, 1997
R. Kenneth Bryant, Lauder Program,  Wharton School, 1997
Bret Caldwell, Lauder Program,  Wharton School, 1997

Laura Purcell, Lauder Program, Wharton School,  1997
Juan L. Betancourt, Lauder Program,  Wharton School, 1998
Luis Gonzalez, Lauder Program,  Wharton School, 1998
Agustin Lara, Lauder Program,  Wharton School, 1998
Buxton Midyette, Lauder Program,  Wharton School, 1998
Jill Scriba, Lauder Program,  Wharton School, 1998
Ernesto Garza, Lauder Program,  Wharton School, 1998
Matthew Laessig, Lauder Program, Wharton School,  1998
Roberto Junguito, Lauder Program,  Wharton School, 1998
David Buenfil, Lauder Program,  Wharton School, 1998
Elizabeth Menke, Lauder Program  Wharton School, 1998
Dan Feldman, Lauder Program. Wharton School, Spring 1999
Sean Ludwick, Lauder Program, Wharton School, Spring 1999
Jeffrey Smith, Lauder Program, Wharton School, Spring 1999
Sarene Riley, Lauder Program, Wharton School, Spring 1999
Richard Caballero, Lauder Program, Wharton School, Spring 1999
Nora Ruedi, Demography Program, Spring 1999
Douglas Asiello, Lauder Program, Wharton School, Spring 2000
Erica Blewer, Lauder Program, Wharton School, Spring 2000
Stewart Hobbs, Lauder Program, Wharton School, Spring 2000
Stephen Schafer, Lauder Program, Wharton School, Spring 2000
Andrew Bond, Lauder Program, Wharton School,  Spring 2000
William Belleville, Lauder Program, Wharton School, Spring 2000
Anthony Diggle, Lauder Program, Wharton School, Spring 2001
Jason Nelson, Lauder Program, Wharton School, Spring 2001
Shimon Shkury, Lauder Program, Wharton School, Spring 2001
Tal Lev, Lauder Program, Wharton School, , Spring 20001
Cassandra Santos, Lauder Program, Wharton School, Spring 2001
Jonathan Masland, Lauder Program, Wharton School, Spring 2002
Maria Aysa, Demography Program, Spring 2002
Ilana Redstone, Demography Program, Spring 2002
Kevin Johnson, Lauder Program, Wharton School, Spring 2003
Erik Sandorff, Lauder Program, Wharton School, Spring 2003
William McClain, Lauder Program, Wharton School, Spring 2003

**Undergraduate Theses Supervised at University of Chicago**
Andrew Gross, Sociology, 1991
Aracely Muñoz, Sociology, 1994

**Undergraduate Theses Supervised at University of Pennsylvania**
Andrew Borinstein, Sociology, 1981
Leonardo Simpser, Development Studies, 1995
Azucena Rangel, Sociology, 1996
Bryan Hirsch, Political Economy, 2003

**Senior Theses Supervised at Princeton University**
**2004**
Alison Epting, Woodrow Wilson School
Kathryn Parolin, Sociology

**2005**
Mark C. Parrett, Politics
Joseph Robinson III, Sociology
Rebecca Stewart, Sociology
Camille Coates, Woodrow Wilson School

**2006**
Lindsay F. Tintenfass, Woodrow Wilson School
Karen Barajas, Woodrow Wilson School
Rishard P.O. Cooper, Woodrow Wilson School
Cherice Landers, Sociology (Winner of Lisa Bryant Thesis Award)
Cynthia Loomis, Politics
Venkatram N. Rao, Sociology

**2007**
Laura Boyce, Woodrow Wilson School
Robert Braun, Sociology (Winner of Ruth Simmons Thesis Prize in African American Studies, *Summa Cum Laude, Phi Beta Kappa*)
Timothy Callahan, Sociology
Kristin Clarke, Woodrow Wilson School
Ana Cordovil, Sociology
Joseph Falit, Woodrow Wilson School
Alexander Maugeri, Woodrow Wilson School
Meghan McCormick, Woodrow Wilson School
Samara Penn, Woodrow Wilson School
Amelia Rawls, Woodrow Wilson School
Stephanie Steel, Politics

**2008**
Luke Cohler, Woodrow Wilson School and Program (Winner of Stanley Stein Thesis Prize in Latin American Studies)
Kathryn Lankester, Woodrow Wilson School, High Honors
Regina Lee, Politics (Winner of Center for Migration and Development Thesis Prize)
Sian O'Faolain, Woodrow Wilson School (Winner of Frederick Douglass Service Award and the Henry Richardson Labouisse '28 Prize)

**2009**
Chanté Coleman, Sociology
Amirah Mercer, Sociology

70

Barry Newell, Sociology
Colleen Poynton, Politics

**2010**
On sabbatical leave

**2011**
Margaret Boberg, Politics
Katherine Gaudyn, Woodrow Wilson School
Megan Kelly, Sociology
Caaminee Pandit, Sociology, High Honors
Emily Persons, Sociology

**2012**
Katherine Alvarez, Sociology, Honors
Bianca Cabrera, Sociology
Omar Carrillo, Woodrow Wilson School
Raven Keith, Woodrow Wilson School
Destiny Ortega, Woodrow Wilson School
Nicole Phan, Woodrow Wilson School, Honors
Maya Reid, Sociology,
Alicia Zeng, Woodrow Wilson School, Highest Honors

**2013**
Rana Campbell, Sociology, Honors
Charles Du, Sociology, Isadore Brown Prize, Highest Honors
Merik Mulcahey, Politics

**2014**
Brittany Serafino, WWS, Honors
Jacob Jackson, WWS
Luc Cohen, WWS
Taylor Platt, WWS, Honors
Rukiya Ross, Sociology, Honorable Mention, Ruth J. Simmons Thesis Prize in African
American Studies

**2015**
Jacob Intrator, WWS, High Honors
Diane Hu, WWS, Honors
Ali Pankowski, WWS
Nshira Turkson, WWS, Bain-Swigget Poetry Prize
Jiayan Yu, WWS, Center for Migration and Development Thesis Prize, Highest Honors

**2016**
On sabbatical leave.

# DEF-INTERV.

# EX. 120



The Settlement Process Among Mexican Migrants to the United States
Author(s): Douglas S. Massey
Source: *American Sociological Review*, Vol. 51, No. 5 (Oct., 1986), pp. 670-684
Published by: American Sociological Association
Stable URL: http://www.jstor.org/stable/2095492
Accessed: 18-06-2018 16:12 UTC

**REFERENCES**
Linked references are available on JSTOR for this article:
http://www.jstor.org/stable/2095492?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://about.jstor.org/terms



*American Sociological Association* is collaborating with JSTOR to digitize, preserve and extend access to *American Sociological Review*

# THE SETTLEMENT PROCESS AMONG
# MEXICAN MIGRANTS TO THE UNITED STATES*

DOUGLAS S. MASSEY

*University of Pennsylvania*

*This report examines the process of integration and settlement among Mexican migrants to the United States using data specially collected from four Mexican sending communities. These data indicate that as migrants accumulate experience in the United States, social and economic ties are formed which progressively increase the likelihood of U.S. settlement. Over time, migrants bring family members abroad, make new friends, establish institutional connections, and obtain more stable, better paying jobs. As a result, less money is remitted home to Mexico, and more is spent in the United States. These trends give rise to a steady, cumulative increase in the probability of U.S. settlement.*

Americans have traditionally been ambivalent about immigration. During periods of labor scarcity, immigration is tolerated by the public and encouraged by the government, but during periods of unemployment means are sought to make immigrants return home. Between 1942 and 1964, for example, the United States government sponsored the importation of some 4-million Mexican workers under the "temporary" auspices of the Bracero Program; and until 1968 the legal entry of Mexican immigrants was virtually unrestricted (Galarza, 1964; Keely, 1979). With the economic reversals of the 1970s, however, public opinion turned sharply against immigration. Restrictive laws were passed to limit the entry of new Mexican migrants, and growing attention was focused on border enforcement.

In the years since 1970, federal policy makers have been surprised to discover that it is more difficult to stop immigration than to start it. The "temporary" migration initiated by the Bracero Program has become a permanent feature of American life. The United States now faces a growing Mexican population and mounting undocumented migration. Surprise at the persistence of immigration stems from a basic misunderstanding of the nature of international migration. It is not something than can be turned on and off. Rather, it is a developmental social process that unfolds according to its own internal logic, with its own momentum. This paper draws upon recent theory

to explicate a developmental model of migrant integration and settlement. The model is tested using data specially collected in four Mexican communities. Results show how temporary Mexican migrants are transformed, over time, into permanent settlers.

## THE PROCESS OF INTEGRATION
## AND SETTLEMENT

The view that Mexican migrants are temporary workers rather than permanent immigrants stems from the notion of migrants as economic beings, people divorced from a social setting and working exclusively for money. In deciding whether or not to migrate, Mexicans are hypothesized to make a rational calculation about the expected gains and losses from migration (Greenwood, 1978; Conroy et al., 1980; Chiswick, 1980). The obvious benefits are the high wages prevailing in the United States, while costs are not only monetary, but also stem from the very strong sentimental and personal ties that migrants retain in their home communities (Cornelius, 1978; Reichert, 1980). Balancing these costs and benefits, Mexican migrants are thought to opt for a strategy of temporary migration, maximizing short-term income and minimizing time away from family, friends, and culture.

Thus, Cornelius (1978:24–28) argues that Mexican migrants are "sojourners" rather than "settlers," and their long-term impact on the United States will be less pronounced than their large numbers would suggest. He states that "while it is quite likely that the number of *temporary* Mexican migrants to the U.S. has increased substantially in recent years, . . . there is no evidence indicating that the number of new *permanent* additions to the illegal migrant population has risen dramatically" (Cornelius, 1978:13). Overall, the evidence seems to support Cornelius's view. In his own sample, temporary migrants outnumber permanent migrants by eight to one. Other surveys indicate that Mexican migrants generally remain in the U.S. a year or less (North and Houstoun, 1976; Bustamante,

---

*Address all correspondence to Douglas S. Massey, Population Studies Center, Graduate Group in Demography, 3718 Locust Walk, University of Pennsylvania, Philadelphia, PA 19104–6298.

This paper is a revised version of a report prepared for the National Academy of Sciences Panel on Immigration Statistics, and was supported by NICHD grant number HD15166. It also forms the basis for a chapter in the forthcoming book, *Return to Aztlán: The Social Process of International Migration From Western Mexico*, by Douglas S. Massey, Rafael Alarcón, Jorge Durand, and Humberto González, to be published by the University of California Press.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 386 of 558

1978; Ranney and Kossoudji, 1983); and several field studies have described entire communities of temporary migrants who regularly shuttle back and forth between Mexico and the United States (Wiest, 1973; Reichert and Massey, 1979, 1980; Reichert, 1981; 1982).

However, the logic upon which the "sojourner" theses is based contains a basic flaw. The utilitarian conception of migrants as economic beings divorced from a social setting ignores the social context of migration. Migrants do not enter the United States and begin work within an asocial setting. Rather, they obtain jobs, housing, and support through a close network of social ties. As migrants seasonally commute back and forth for work, and build up time abroad, these social ties inevitably expand and ramify, binding them more closely to people and institutions in the United States and progressively drawing them into settled life abroad.

These considerations imply that the propensity to be a sojourner or a settler is not a fixed trait, but a variable that changes over the course of the migrant career. While Mexican migrants may begin as sojourners, they are increasingly likely to become settlers the more trips they make to the United States and the more U.S. experience they accumulate. Although migrants' interests initially are utilitarian—to achieve a target income and return home as soon as possible—they inevitably acquire social and economic ties binding them to U.S. society, ties that make permanent settlement progressively more likely. If recent surveys show short trip durations and a preponderance of temporary migrants, it is because none has controlled for migrants' total U.S. experience. Given the recent upswing in migration, most Mexican migrants have only been migrating a short time, and have not had time to accumulate the social ties that draw them into longer residences abroad.

Although several scholars have made the above case (cf. Bohning, 1972; Mines, 1981) the most complete theoretical treatment of the integration process has been by Piore (1979:52–65). For expository purposes, I divide the integration process into three basic phases, although in real life the process is a continuous, ongoing development. In the initial "sojourner phase," male migrants enter the host country to work without dependents. During this stage they correspond most closely to the ideal of economic men. They are target earners seeking to maximize short-term income before returning home. The jobs they hold are unstable, and often seasonal. Most earnings are repatriated in the form of savings or remittances. They live a spartan existence, often sharing living quarters with other men and sleeping in shifts to save money. They work long hours and have little interest in social activities. They see themselves as members of their home communities and not as

participants in the receiving society. Most of their contacts are restricted to other townspeople living and working nearby, and their lives are spent largely within the confines of an immigrant enclave, with no real ties—personal, institutional, or economic—to the host society. At this stage, the vast majority of Mexican migrants are undocumented.

In the short run, there is no particular problem with this life. The migrant knows it will end, and he does not define himself with respect to the foreign context. The labor may be menial and life unpleasant, but he will return home with a good deal of money, and with it he will be able to buy status and prestige in his community. However, migration has a way perpetuating itself. Satisfaction of the wants that originally led to migration tends to create new wants, and poverty is not erased by a single trip. Once migration has been experienced, it becomes a familiar resource that can be employed again as needs arise. Migration alters tastes and expectations in ways that lead to more trips and longer stays.

As migrants spend more time abroad, either through continuous residence or repeated trips, they enter a "transition phase" during which the sojourner–settler distinction becomes increasingly problematic. An anomic social life becomes increasingly difficult to maintain, and inevitably the migrant becomes more strongly emeshed in a web of social ties based in the United States. Social contacts with other townspeople become more frequent, and interactions with people and institutions outside the immigrant enclave multiply. As stays lengthen and trips become more frequent, enforced separation from family members becomes more difficult, and pressure to bring along wives and children grows. Many acquire legal residence documents, and as their experience grows, they get more stable, better paying jobs. With these changes, earnings increasingly are spent in the country rather than remitted home.

In the final "settlement phase," migrants come to see themselves as residents of the host society. They have been joined by wives and children, and they have developed widespread contacts with people and institutions in and out of the immigrant enclave. They have established links with formal institutions in the host society, such as banks, branches of government, and schools; and most have obtained legal residence documents. Earnings are spent primarily in the receiving country rather than in the home community.

This theoretical scenario of integration and settlement, derived from the work of Piore (1979), is examined using data specially collected from migrants in four Mexican communities. Integration is considered with respect to four specific dimensions: personal ties, institutional connections, economic links, and spending patterns. Following the predictions of Piore, we postulate that growing

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

experience in the United States will be accompanied by: (1) an increase in the number and range of interpersonal ties based in the United States, (2) more connections to U.S. institutions, (3) higher earnings and greater stability of employment, and (4) a shift from investment in the home community to spending in the United States. These developments bring a progressive increase in the likelihood of U.S. settlement, which is modelled directly using life table methods.

## DATA

Data were gathered from representative samples of four communities—two rural and two urban—located in western Mexico, the most important source region for Mexican migrants to the United States (Samora, 1971; Dagodag, 1975; North and Houstoun, 1976; Cornelius, 1978; Jones, 1982; Ranney and Kossoudji, 1983). Of the two rural communities, one was a traditional agricultural town of about 6,100 inhabitants located in the state of Jalisco, and the other was a larger, more commercialized farm center of 9,900 situated in the state of Michoacán. Both displayed workforces that were overwhelmingly agrarian. In contrast, neither of the two urban communities had significant agricultural employment. One was an industrial town of 9,400 just south of Guadalajara, Mexico's second largest city, and the other was a working-class neighborhood of 4,800 in Guadalajara itself. All four communities lie more than 500 miles from the nearest border crossing, and over 1,200 miles from California, where most migrants work.

Data were gathered using a combination of ethnographic and survey methods. Within each community, a simple random sample of 200 households was drawn—large enough to provide cases for analysis, yet small enough so that intricate, ethnographically informed interviews could be conducted. The questionnaire design was semi-structured and was applied in two phases. In the first phase, basic social and demographic data were collected on all household members. The second phase compiled a complete life history from household heads with migrant experience in the United States, and asked a detailed series of questions about their latest U.S. trip. If the household head had never been a migrant, but another member (typically a son) had, an abbreviated history was taken. Interviews were conducted by three Mexican anthropologists and by assistants they specially trained for the project.

Interviewing took place from November 1982 through February 1983, but was concentrated in the months of December and January, when most seasonal migrants are back from the United States. However, since samples of returned migrants inevitably underrepresent those who have settled abroad, the four community samples were supplemented by an additional survey of 60 households residing in California during August and September of 1983. Twenty households from the two rural towns and the industrial community were located using the chain-referral method (Goodman, 1961). A household was eligible for inclusion in the California sample if its head had been in the U.S. for three continuous years and was born in one of the towns. Out-migrants from the Guadalajara neighborhood were not interviewed because most household heads were born somewhere else.

This report is based on data gathered from 440 migrants interviewed during the second phase of the survey about experiences on their most recent trip to the United States. Of these, 66 percent were from the rural towns, and 34 percent were from the urban communities; 19 percent were documented, 65 percent were undocumented, and 17 percent were Braceros. The median date of their last trip was 1975. A more detailed account of sampling methods and interviewing procedures, together with a justification of the research design, is presented in Massey (1985) and Massey et al. (forthcoming).

## RESULTS

### Interpersonal Integration

The first aspect of integration to be considered concerns the acquisition of personal ties in the host country, and Table 1 shows the percentage of migrants reporting selected family and friendship connections within the United States by years of migrant experience. The classic view of the Mexican migrant is of a young male travelling to the United States without family dependents (Cornelius, 1978:30); and consistent with the results of other studies (Massey and Schnabel, 1983; Passel and Warren, 1983), this is exactly what the marginals of Table 1 show: 84 percent of rural migrants and 77 percent of urban migrants have neither wife nor children with them in the United States.

However, considering the marginal distributions alone does not give a true picture of what is going on, since the tendency for family members to migrate increases with time spent in the United States. Consistent with expectations, the percentage with spouses, sons, and daughters rises smoothly, almost monotonically, with U.S. migrant experience, as does the average number of relatives reported to be living in the United States. Among both rural and urban migrants with at least 15 years of U.S. experience, around 43 percent report their spouses to be in the U.S.; and among rural migrants, a majority (54 percent) report having their sons along (among urban migrants the figure is 36 percent). The average number of relatives living in the United States doubles from 10 or 11 among beginning migrants to 23 or 24

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 388 of 558

Table 1. Interpersonal Ties Within the United States by Years of Migrant Experience and Rural/Urban Origin: Migrants from Four Mexican Communities.

| Origin and Tie | Years of Migrant Experience | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Under 1 | 1–4 | 5–9 | 10–14 | 15+ | Total |
| *Rural Origin* | | | | | | |
| Family & Home Ties | | | | | | |
| % with Spouse in U.S. | 3.6 | 10.4 | 18.6 | 26.0 | 44.0* | 16.3 |
| % with Son in U.S. | 1.7 | 6.3 | 11.6 | 40.0 | 54.2* | 14.3 |
| % with Daughter in U.S. | 1.7 | 5.3 | 7.0 | 36.0 | 45.8* | 11.8 |
| # Relatives in U.S. | 9.6 | 9.6 | 17.2 | 25.4 | 30.5* | 14.7 |
| Ties with U.S. Groups | | | | | | |
| % with Chicano Friend | 14.8 | 28.9 | 45.2 | 58.3 | 58.3* | 34.6 |
| % with Black Friend | 7.4 | 11.1 | 23.8 | 8.3 | 25.0* | 13.7 |
| % with Anglo Friend | 11.1 | 20.0 | 38.1 | 33.3 | 62.5* | 26.9 |
| % with Latino Friend | 7.4 | 27.8 | 31.0 | 20.8 | 54.2* | 25.6 |
| Number of Migrants | 66 | 121 | 49 | 27 | 26 | 289 |
| *Urban Origin* | | | | | | |
| Family & Home Ties | | | | | | |
| % with Spouse in U.S. | 12.2 | 21.1 | 25.0 | 44.4 | 42.9* | 23.1 |
| % with Son in U.S. | 7.5 | 21.1 | 14.3 | 33.3 | 35.7* | 17.8 |
| % with Daughter in U.S. | 5.0 | 7.9 | 17.9 | 33.3 | 35.7* | 13.9 |
| # Relatives in U.S. | 11.2 | 8.9 | 16.0 | 14.8 | 24.9* | 13.3 |
| Ties with U.S. Groups | | | | | | |
| % with Chicano Friends | 39.0 | 52.6 | 64.3 | 75.0 | 85.7* | 55.8 |
| % with Black Friends | 4.9 | 18.4 | 10.7 | 12.5 | 35.7* | 13.9 |
| % with Anglo Friends | 17.1 | 31.6 | 35.7 | 25.0 | 71.5* | 31.8 |
| % with Latino Friends | 29.3 | 36.8 | 39.3 | 25.0 | 78.6* | 38.8 |
| Number of Migrants | 45 | 47 | 32 | 12 | 15 | 151 |

* Figure is significantly different from that in lowest experience interval ($p < .05$, one-tailed test).

among the most experienced. In all cases, these increases are statistically significant.

Another thing that naturally happens with the passage of time abroad is the formation of friendship ties with members of the host society. Table 1 also documents the gradual development of friendly relations between Mexican migrants and members of various U.S. ethnic groups. It is not surprising that, in general, the most prevalent social relations are with Chicanos (native Americans of Mexican descent) and other Latinos (who may themselves be Spanish-speaking immigrants—see the marginal distributions). However, as the amount of time spent in the United States grows, the percentage knowing Anglos (non-Hispanic whites) increases quite dramatically, from 11 to 63 percent among rural migrants and from 17 percent to 72 percent among urban migrants. Indeed, by the time rural origin migrants have accumulated 15 years in the United States, they are more likely to be friendly with Anglos than *either* Chicanos or Latinos. There is also a mild increase in the tendency for migrants to be friends with American blacks, in spite of the high degree of residential segregation between the two groups (Massey, 1979) and the apparent disinclination of Mexicans to live near blacks (Lieberson and Carter, 1982; Massey and Mullan, 1984).

Thus, the data in Table 1 confirm the findings of prior research in showing that Mexican migrants are generally not well connected to U.S. society, but at the same they support Piore's model of steady personal integration over time. The key factor reconciling the apparent paradox is total migrant experience. While new migrants have few social relations with U.S. groups, experienced migrants report extensive connections to people both inside and outside the Hispanic enclave.

Institutional Integration

A second dimension of integration concerns the relative involvement of migrants with organizations in the United States. As discussed above, an important part of institutional integration in the United States involves movement from transitory seasonal employment to a steady, more sedentary job. Among rural origin migrants, this transformation typically involves movement from agricultural to non-agricultural employment. Table 2 shows a very marked shift in rural migrants' sector of employment as U.S. experience increases. Among those with less than a year's migrant experience, 91 percent were farmworkers; but after 15 years this percentage fell to 38 percent, showing a clear transition from overwhelming agricultural to predominantly non-farm employment.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

674                                                                                              AMERICAN SOCIOLOGICAL REVIEW

Table 2. Indicators of Institutional Integration Within the United States by Years of Migrant Experience and Rural/Urban Origin: Migrants from Four Mexican Communities.

| Origin & Indicator | Years of Migrant Experience | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Under 1 | 1–4 | 5–9 | 10–14 | 15+ | Total |
| *Rural Origin* | | | | | | |
| % Nonagricultural Workers | 9.1 | 30.6 | 46.9 | 44.4 | 61.5* | 32.5 |
| % with Legal Papers | 1.5 | 5.0 | 10.2 | 44.4 | 69.2* | 14.6 |
| % with Child in U.S. Schools | 7.6 | 9.1 | 16.4 | 37.0 | 69.2* | 18.0 |
| % Member of Athletic Club | 6.6 | 9.5 | 20.8 | 23.1 | 16.0 | 12.7 |
| % Member of Social Club | 1.6 | 3.4 | 8.3 | 7.7 | 16.0* | 5.4 |
| % Ever Receiving: | | | | | | |
| Unemployment | 12.7 | 8.6 | 24.4 | 40.0 | 56.0* | 20.5 |
| Foodstamps | 0.0 | 2.2 | 0.0 | 12.0 | 16.0* | 3.8 |
| Welfare | 0.0 | 2.2 | 0.0 | 4.0 | 12.0* | 2.5 |
| Social Security | 0.0 | 3.2 | 0.0 | 4.0 | 28.0* | 4.6 |
| Medical Services | 22.2 | 35.5 | 69.0 | 64.0 | 80.0* | 46.0 |
| Number of Migrants | 66 | 121 | 49 | 277 | 26 | 289 |
| *Urban Origin* | | | | | | |
| % Nonagricultural Workers | 60.0 | 80.9 | 65.6 | 100.0 | 80.0 | 72.9 |
| % with Legal Papers | 13.6 | 25.5 | 25.0 | 41.7 | 73.3* | 28.0 |
| % with Child in U.S. Schools | 13.3 | 10.6 | 21.9 | 33.3 | 53.3* | 19.9 |
| % Member of Athletic Club | 15.9 | 25.5 | 40.6 | 33.3 | 64.3* | 30.2 |
| % Member of Social Club | 2.3 | 4.3 | 3.1 | 0.0 | 7.1 | 3.4 |
| % Ever Receiving | | | | | | |
| Unemployment | 4.9 | 15.8 | 25.0 | 50.0 | 50.0* | 20.2 |
| Foodstamps | 7.3 | 2.4 | 7.1 | 0.0 | 14.3 | 6.2 |
| Welfare | 2.4 | 0.0 | 3.6 | 0.0 | 28.6* | 4.7 |
| Social Security | 0.0 | 5.3 | 7.1 | 0.0 | 7.1* | 3.9 |
| Medical Services | 24.4 | 34.2 | 60.7 | 66.7 | 85.7* | 44.6 |
| Number of Migrants | 45 | 47 | 32 | 12 | 15 | 151 |

* Figure is significantly different from that in lowest experience interval (p<.05, one-tailed test).

In contrast, urban origin migrant workers are predominantly non-agricultural no matter what their experience category, although a sizeable plurality of those in the lowest experience class, 40 percent, do engage in farmwork. This pattern occurs even though nearly all held non-agricultural jobs in Mexico, demonstrating the strong tendency for Mexicans to be channeled into agriculture, regardless of background (Mullan, 1984). In the next experience interval, however, there is a shift back to non-agricultural employment.

Another crucial step in the integration process, particularly from the migrant's point of view, is the acquisition of legal papers, which implies direct contact with the U.S. government. Most Mexican migrants begin going north without residence documents. As the migrant experience lengthens and ties to the United States solidify, a regularization of status becomes increasingly valuable. Whether or not a migrant plans to stay permanently, the "green card" provides security and ready access to U.S. employment.

It is not surprising, therefore, to find a steady, sharp, virtually monotonic increase in the proportion of migrants having legal papers as the years of U.S. experience accumulate. Only about 2 percent

of rural origin migrants and 14 percent of urban origin migrants with less than a year of U.S. experience have green cards, and most of these acquired their papers through a documented parent or sibling, using the family reunification provisions of U.S. immigration law. However, after 15 years of migrating to the United States, the vast majority of migrants have regularized their status—69 percent of those from rural areas and 73 percent of those from urban areas.

We saw earlier that increasing U.S. experience was accompanied by a growing presence of wives and children. This fact also has important ramifications for institutional integration. Many children of migrants will be minors, and will therefore enroll in U.S. schools. Indeed, the percentage of migrants reporting a child in U.S. schools grows steadily as U.S. experience increases. Among rural migrants it rises from 8 percent in the lowest experience interval to 69 percent in the highest, and from 13 percent to 53 percent among urban migrants.

As migrants spend more time in the United States, they also move farther away from the ideal of economic men by developing recreational interests. As the migrant experience lengthens,

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 390 of 558

people become less concerned with earning money alone and take more time for socializing. Membership in voluntary organizations therefore increases. Among migrants from the rural communities, the percentage reporting an affiliation with a U.S. social club rises from 2 percent in the lowest experience category to 16 percent in the highest, and from 2 percent to 7 percent among urban migrants, although the latter increase is not statistically significant.

However, the most important integrative mechanism is participation in U.S.-based soccer clubs (see Massey et al., forthcoming), especially among urban migrants, where membership in athletic clubs rises from 16 percent among those with the least experience to 64 percent among those with the most. In the industrial town, for example, participation takes the form of playing in a local soccer league. Every week migrants meet in a Los Angeles area park, where townspeople field up to four teams. This institution provides a ready means of keeping in touch with friends and relatives and introduces new settlers to the out-migrant community. It is an important mechanism of social cohesion and community integration (see Massey et al., 1985).

A topic of widespread interest to many in the United States is the use of social services by Mexican migrants. Without controlling for duration of U.S. experience, studies generally show low rates of service utilization among immigrants (Avante Systems, 1978; Bustamante, 1977, 1978; Cornelius, 1978; North and Houstoun, 1976; Orange County Task Force, 1978; Van Arsdol et al., 1979; North, 1983). Among those services that are used by migrants, unemployment compensation and medical facilities seem to be the most common. But when studies have controlled for the length of time an immigrant has been in the United States, a pattern of increasing use over time has been discovered (Blau, 1984; Simon, 1984).

The service usage data of Table 2 are consistent with this prior research. Looking at the marginals, migrants generally appear quite unlikely to draw upon U.S. social services (only 2 percent to 6 percent have ever received foodstamps, welfare, or social security); but consonant with earlier studies, some 20 percent have used U.S. unemployment compensation, and roughly 45 percent have used U.S. medical facilities. And as in prior studies, usage displays a pattern of increase over the years. Foodstamps, welfare, and social security show an erratic trend in service usage between 0 and 15 years of migrant experience, followed by a sharp jump thereafter (in most cases these jumps are statistically significant). Nonetheless, even in the highest experience intervals, the percentage of service users never exceeds 29 percent. The percentages of migrants who have ever received unemployment compensation and medical treatment display more regular, crescive increases over

the course of their migrant careers. After 15 years of migrant experience, the vast majority have made use of U.S. medical facilities (80 percent of those from rural areas and 86 percent of those from urban areas); and around half have received U.S. unemployment compensation (56 percent of rural origin migrants and 50 percent of urban origin migrants).

In recognition of the intense interest that has been displayed in the use of public services by undocumented migrants, Table 3 is presented as a short digression from the main theme of the report. This table cross-classifies use of U.S. social services by legal status and years of migrant experience. In general, with the exception of medical services, undocumented migrants are very *unlikely* to use public services. Only around 2 percent or 3 percent have *ever* used foodstamps, welfare, or social security, only 12 percent have had a child in U.S. schools, and only 14 percent have received unemployment compensation. In contrast, 83 percent report taxes being withheld on their latest U.S. job.

Taking account of migrant experience, however, some interesting patterns emerge. Basic findings concerning undocumented use of foodstamps, welfare, and social security do not really change. No matter how much time undocumented migrants have accumulated in the United States, they are still unlikely to use these services. Therefore the significant increases reported for migrants in Table 2 mainly reflect the ongoing process of legalization. On the other hand, the use of unemployment compensation triples from 10 percent to 33 percent as one moves from less than a year of migrant experience to more than 15. Over the same length of time, the proportion of migrants with children in U.S. schools quadruples, from 12 to 50 percent. Both increases are highly significant. But at the same time, the proportion with taxes withheld also increases steadily. Among undocumented migrants with less than a year of experience, only 68 percent have taxes withheld, but this percentage increases steadily to 100 percent in the highest experience category.

Medical services are different from others in that they may be provided either publicly or privately. It is not surprising to find a marked increase, over time, in the percentage of migrants who received medical care in the United States. Sooner or later nearly everyone has need of a doctor. The figures range from 19 percent among those with less than a year in the U.S. to 78 percent among those with more than 15 years. Overall, the percentage ever using medical facilities is 40 percent.

However, use does not necessarily imply service at public expense. The questionnaire also asked undocumented migrants how their U.S. medical bills were paid. Thirty-nine percent reported they paid the bills themselves, 34 percent said the service was covered by health insurance, 20

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

676                                                                    AMERICAN SOCIOLOGICAL REVIEW

Table 3.  Use of U.S. Social Services by Years of Migrant Experience and Legal Status: Migrants from Four Mexican Communities.

| Legal Status and Service Usage | Years of Migrant Experience | | | | | |
|---|---|---|---|---|---|---|
| | Under 1 | 1–4 | 5–9 | 10–14 | 15 + | Total |
| *Documented Migrants* | | | | | | |
| % with Taxes Withheld | 83.3 | 93.3 | 92.3 | 88.2 | 96.4 | 92.4 |
| % with Child in U.S. Schools | 28.6 | 38.9 | 38.5 | 64.7 | 72.4* | 54.8 |
| % Ever Receiving: | | | | | | |
| Unemployment | 50.0 | 31.3 | 40.0 | 75.0 | 64.3 | 55.3 |
| Foodstamps | 16.7 | 6.3 | 0.0 | 18.8 | 17.9 | 13.1 |
| Welfare | 0.0 | 6.3 | 0.0 | 6.3 | 21.4 | 10.5 |
| Social Security | 0.0 | 6.3 | 10.0 | 6.3 | 28.6* | 14.5 |
| Medical Services | 66.7 | 50.0 | 70.0 | 93.8 | 82.1 | 75.0 |
| Number of Migrants | 7 | 18 | 13 | 17 | 29 | 84 |
| *Undocumented Migrants* | | | | | | |
| % with Taxes Withheld | 68.2 | 85.0 | 91.8 | 94.4 | 100.0* | 83.5 |
| % with Child in U.S. Schools | 12.2 | 6.8 | 15.9 | 15.0 | 50.0* | 12.3 |
| % Ever Receiving: | | | | | | |
| Unemployment | 9.5 | 9.5 | 24.1 | 13.3 | 33.3* | 14.2 |
| Foodstamps | 3.2 | 2.4 | 3.7 | 0.0 | 11.1 | 3.1 |
| Welfare | 1.6 | 1.2 | 1.9 | 0.0 | 11.1 | 1.8 |
| Social Security | 0.0 | 3.6 | 1.9 | 0.0 | 0.0 | 1.8 |
| Medical Services | 19.4 | 35.7 | 65.4 | 37.5 | 77.8* | 40.3 |
| Number of Migrants | 74 | 118 | 63 | 20 | 10 | 285 |

* Figure significantly different from that in lowest experience interval ($p<.05$, one-tailed test).

percent said their employer paid, 4 percent said a relative picked up the tab, and 3 percent reported some other arrangement. Of the 105 undocumented migrants who reported receiving medical attention in the United States, *not one* admitted to receiving treatment at public expense.

Thus, these data do not suggest widespread abuse of publicly provided social services by undocumented migrants. The service most likely to be used by migrants is, understandably, education, which increases monotonically as migrants become more integrated into U.S. society and accumulate family dependents here. The one public transfer that is illegitimately used to any degree at all is unemployment compensation, where the usage level varies from 10 to 33 percent, depending on experience. But in each experience category, the percentage of undocumented migrants having taxes withheld far exceeds the percentage using services, a pattern that holds for documented migrants as well.

To summarize the main theme of this section, then, indicators reveal an ongoing pattern of institutional integration among Mexican migrants to the United States, consonant with the predictions of Piore and others. As migrants make repeated trips and accumulate U.S. experience, they acquire a range of organizational ties within the United States. Over time there is a steady shift to non-agricultural employment, and a progressive acquisition of legal documents. As family ties expand, migrants are also more likely to have children in U.S. schools, and as social interests

grow, they are increasingly likely to become members of a social or athletic club. As the integration process proceeds, migrants make greater use of social services, notably medical services and unemployment compensation. However, this increase does not signal an increase in abuse by undocumented migrants, but an increase in the relative number of legal migrants, who are entitled to use public services.

Economic Integration

The prior section demonstrated how migrants shift from agricultural to non-agricultural employment the more time they spend in the United States. However, urban jobs do not necessarily imply stability. In the urban sector, migrants tend to be employed within the secondary labor market, made up of a class of unstable jobs located in labor-intensive enterprises (Piore, 1979; Portes and Bach, 1985). Employers in these firms are subject to intense competitive pressures and attempt to maintain profits through a variety of tactics: keeping employees off official books, dealing strictly in cash, not paying taxes, and not conforming to minimum wage legislation. However, over time migrants should experience a formalization of their economic status in the U.S., moving into more regularly taxed, better-paid jobs that comply with government regulations.

The data of Table 3 generally support the notion of a gradual regularization of migrants' employment status over time. While those with little U.S.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

SETTLEMENT OF MEXICAN MIGRANTS IN THE U.S.                                    677

experience are less likely to be paid by check or to have taxes withheld from their pay, and are more likely to earn less than minimum wage, after 15 years of experience, all are paid by check, and nearly all have taxes withheld. Moreover, even among those with the least experience the vast majority are in reasonably legitimate job situations: three-quarters report being paid by check and having taxes withheld; although a sizeable plurality, about one-third in each sector, did report earning less than the minimum wage.

Trends in compliance with minimum wage law at first appear partially to contradict the picture of growing economic integration. While among non-agricultural workers, the percentage earning less than the minimum wage falls sharply after one year of experience, among agricultural workers, this percentage falls up to 15 years of experience but then increases. However, closer inspection of the data revealed that this increase stemmed from the continued labor-force participation of several elderly migrants with many years of U.S. experience. All members of the 15+ experience category are above age 65 (indeed, one is 77), and they continue to do light agricultural work for minimal pay in order to accompany their families northward.

The last two indicators of economic integration in Table 4 measure connections between migrants and U.S. economic institutions—namely, banks. The more experience a migrant builds up in the United States, the more likely he is to have opened a U.S. bank account of one kind or another. The percentage of farmworkers with a savings or a checking account rises from 0 percent initially to 15 percent after 15 years. Among non-agricultural workers, the percentage with a checking account

rises from 11 percent to 15 percent, and the percentage with a savings account rises from 11 percent to 29 percent. All these increases are statistically significant.

The information in Table 4 is thus consistent in depicting an ongoing process of economic integration among Mexican migrants to the United States. With growing U.S. experience, migrants move increasingly into jobs that conform to minimum wage law, that are paid by check, and that withhold income taxes. They are also more likely to establish formal connections to U.S. economic institutions.

Spending Patterns

In the early phases of migration to the United States, the migrant's main social frame of reference is the sending community, and most earnings are sent home in the form of remittances or savings. There they enhance the social and economic status of the migrant's family through the purchase of land, housing, businesses, or consumer goods (Reichert, 1981, 1982; Mines, 1981; Pressar, 1982; Massey et al., forthcoming: Chapter 8). A sure sign that the settlement process is underway occurs when a migrant sends fewer of his earnings back to the home community and begins spending more in the United States. In order to get at this dimension of the settlement process, migrants were asked a detailed series of questions about income, expenses, and work in the United States, and the resulting information is summarized in Table 5.

Each economic sector has two panels of information. The top panel shows the components

Table 4. Indicators of Economic Integration Within the United States by Sector of U.S. Employment: Migrants from Four Mexican Communities.

| Sector & Indicator | Years of Migrant Experience | | | | | |
| | Under 1 | 1–4 | 5–9 | 10–14 | 15+ | Total |
|---|---|---|---|---|---|---|
| *Agricultural Workers* | | | | | | |
| % Below Minimum Wage** | 30.0 | 17.0 | 17.2 | 0.0 | 33.3 | 19.5 |
| % Paid by Check | 77.0 | 93.2 | 94.3 | 93.3 | 100.0* | 88.4 |
| % with Taxes Withheld | 74.3 | 91.0 | 88.9 | 93.3 | 84.6 | 85.0 |
| % with Checking Account | 0.0 | 11.6 | 0.0 | 0.0 | 15.4* | 5.1 |
| % with Savings Account | 0.0 | 14.3 | 11.8 | 20.0 | 15.4* | 9.5 |
| Number of Migrants | 78 | 93 | 37 | 15 | 13 | 236 |
| *Nonagricultural Workers* | | | | | | |
| % Below Minimum Wage** | 33.3 | 18.2 | 5.9 | 8.3 | 14.3 | 16.0 |
| % Paid by Check | 75.9 | 88.4 | 95.3 | 86.9 | 100.0* | 89.5 |
| % with Taxes Withheld | 78.6 | 82.9 | 90.7 | 86.4 | 100.0* | 86.8 |
| % with Checking Account | 10.7 | 6.8 | 11.8 | 22.2 | 37.5* | 14.7 |
| % with Savings Account | 10.7 | 8.5 | 21.2 | 17.6 | 29.2* | 15.5 |
| Number of Migrants | 33 | 75 | 44 | 24 | 28 | 204 |

* Figure significantly different from that in lowest experience interval (p<.05, one-tailed test).
** Includes only jobs held since 1965, reducing the n's for the experience categories as follows. For agricultural workers from left to right the n's are 36, 56, 31, 13, 8, and 144. For non-agricultural workers the respective numbers are 27, 54, 39, 18, 16, and 154.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

AMERICAN SOCIOLOGICAL REVIEW

Table 5. Components of Annual U.S. Income by Years of U.S. Migrant Experience and Sector of U.S. Employment: Migrants from Four Mexican Communities.

| Sector and Component of Income | Years of U.S. Migrant Experience | | | | | |
|---|---|---|---|---|---|---|
|  | Under 1 | 1–4 | 5–9 | 10–14 | 15–19 | Total |
| *Agricultural Workers* | | | | | | |
| Annual U.S. Income | $935 | $1,609 | $3,309 | $3,185 | $4,647* | $1,821 |
| Hourly Wage | $1.39 | $1.63 | $2.06 | $2.97 | $4.17* | $1.87 |
| Hours Worked/Week | 41.0 | 43.3 | 47.8 | 38.3 | 39.8 | 42.7 |
| Months Worked/Year | 4.1 | 5.7 | 8.4 | 7.0 | 7.0* | 5.7 |
| Annual U.S. Expenses | $211 | $356 | $716 | $1,194 | $1,720* | $461 |
| Food | $147 | $241 | $518 | $740 | $1,389* | $325 |
| Rent | $64 | $115 | $198 | $454 | $331* | $136 |
| Disposable Income | $724 | $1,253 | $2,593 | $1,991 | $2,927* | $1,360 |
| As % of Total | 77.4 | 77.9 | 78.4 | 62.5 | 63.0 | 74.7 |
| Number of Migrants | 78 | 93 | 37 | 15 | 13 | 236 |
| *Nonagricultural Workers* | | | | | | |
| Annual U.S. Income | $2,425 | $3,375 | $5,296 | $7,260 | $11,256* | $5,101 |
| Hourly Wage | $2.10 | $2.24 | $3.38 | $4.00 | $6.95* | $3.34 |
| Hours Worked/Week | 45.1 | 42.8 | 40.8 | 46.3 | 40.9 | 42.9 |
| Months Worked/Year | 6.4 | 8.8 | 9.6 | 9.8 | 9.9* | 8.9 |
| Annual U.S. Expenses | $579 | $1,053 | $1,965 | $3,635 | $4,672* | $1,835 |
| Food | $381 | $612 | $1,181 | $2,581 | $3,216* | $1,186 |
| Rent | $198 | $441 | $784 | $1,054 | $1,456* | $649 |
| Disposable Income | $1,846 | $2,322 | $3,331 | $3,625 | $6,584* | $3,266 |
| As % of Total | 76.1 | 68.8 | 62.9 | 49.9 | 58.5 | 64.0 |
| Number of Migrants | 33 | 75 | 44 | 24 | 28 | 204 |

 * Figure significantly different from that in lowest experience interval ($p<.05$, one-tailed test).
NOTE: All amounts in 1967 U.S. dollars.

of gross annual income during the respondent's most recent U.S. trip: hourly wage, hours worked per week, and months worked per year. The second panel shows the average yearly expenses for food and rent in the United States. These were ascertained from migrants' estimates of the amount spent each month, on average, for food and lodging in the United States. These estimates were then multiplied by the average months worked per year from the top panel to give the yearly totals. Disposable income is computed as gross annual income minus annual expenses and is shown underneath the two panels in each employment sector. Since the data refer to the most recent U.S. job, which could have been held in a variety of years, all figures are expressed in 1967 U.S. dollars.

Considering first the components of gross annual income, there is a rather steep rise in wages over the years of U.S. migrant experience. In both agricultural and non-agricultural jobs, wages roughly triple as one moves from those with under one year of experience to those with more than 15 years, although wages are consistently higher in the non-agricultural sector.

Among farmworkers, hours worked per week increase up to a point, and then fall abruptly, peaking at about 48 hours among those with 5–9

years of experience before falling to a more conventional 40-hour week thereafter. Months worked per year display exactly the same pattern, rising from 4.1 to 8.4 months between 0–1 and 5–9 years of experience, and falling to 7 months thereafter. Thus, up to nine years of experience, economic motives apparently predominate, as migrants work on maximizing income by working long hours and more months. After this time, they ease up, working fewer hours and months for higher wages. The higher wages are more than enough to offset the shorter work time, so that gross income is maintained or rises steadily as years of U.S. experience accumulate.

In the non-agricultural sector, hours worked per week behave somewhat erratically. Starting high at 45.1, they fall to 40.8 in the experience interval from 5 to 9 years, rise to 46.2 years in the interval from 10 to 14, and then fall back again in the 15+ experience class. Months worked per year, however, are more regular, displaying a steady increase from 6.4 to 9.9 over the range of U.S. experience intervals considered. The increase in months worked combines with a rising wage rate to almost quintuple the annual gross income of non-agricultural workers from the first to the last experience interval.

In every experience interval the gross income of

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

SETTLEMENT OF MEXICAN MIGRANTS IN THE U.S. 679

non-agricultural workers is considerably larger than that of farmworkers. Overall the former exceeds the latter by a factor of 2.8. However, the expenses of non-agricultural workers are also considerably higher, by a factor of four on average. Food and lodging for migrant farmworkers are often provided or subsidized by growers, while in cities, non-agricultural workers must make their own arrangements. However, even though the latter's expenses are higher, the income differential is not significantly reduced. Instead of exceeding the income of farmworkers by a factor of 2.8, taking account of expenses reduces it to 2.4.

In both groups, expenses rise steadily with years of accumulated migrant experience. As wives and children join the migrants in the United States, household expenses naturally rise. Among farmworkers, these added expenses produce a decline in disposable income between the experience intervals 5–9 and 10–14, before recovering to a peak of about $3,000 in the highest interval. Among non-agricultural workers, disposable income does not decline, but it clearly stalls at the same point before peaking at $6,600 in the interval 15 plus years.

The most important rows in the table, from the viewpoint of our model of integration and settlement, give disposable income as a proportion of gross income. Among those just beginning a migrant career, over three-quarters of gross income is disposable in both agricultural and non-agricultural sectors. That is, the quantity of money that migrants potentially have available to remit back to their home communities amounts to 77 percent of their gross earnings. Farmworkers maintain this level up through nine years of migrant experience. Beyond this point, it falls to roughly 63 percent of gross pay as more and more of their earnings are spent on the upkeep of families in the United States. The share of

non-agricultural workers' income potentially available for remittance home falls immediately and rapidly from 76 percent in the experience interval 0–1 to 50 percent in the experience interval 10–14, as the cost of maintaining families is much higher in urban areas and its growth over time exceeds the growth in migrants' wages. In the highest experience interval, the share of non-agricultural income that is disposable recovers somewhat to 59 percent.

A more telling indicator of the settlement process is what happens to migrants' disposable incomes. The questionnaire asked migrants to estimate the average amounts they saved and remitted home each month. The residual of these two quantities from disposable income provides an estimate of the amount spent in the United States on things other than food and rent. The percentages of disposable income devoted to each these three categories—savings, remittances, and spending—are presented in Table 6.

Farmworkers begin their careers remitting or saving all of the disposable income they earn in the United States. As the years of U.S. experience add up, however, they save and remit less, and spend more in the United States. After 15 years of being migrants, they are spending 65 percent of their disposable income in the United States. Non-agricultural workers begin by spending 59 percent of their disposable income. Apparently much more spending is required to establish oneself in a city job, and of course there are many more inducements to spending for recreation and pleasure. However, after one is established in the city, the relative amount spent falls by almost half. In the experience interval 1–4, non-agricultural workers spend only 34 percent of their disposable incomes. However, as with farmworkers this quantity rises rapidly and steadily thereafter, to 76 percent in the highest experience interval.

Thus, spending patterns are also consistent with

Table 6. Disposition of U.S. Disposable Income by Years of Migrant Experience and Sector of U.S. Employment: Migrants from Four Mexican Communities.

| | Years of U.S. Migrant Experience | | | | | |
|---|---|---|---|---|---|---|
| Sector and Disposition | Under 1 | 1–4 | 5–9 | 10–14 | 15+ | Total |
| *Agricultural Workers* | | | | | | |
| % Remitted | 59.3 | 38.8 | 29.6 | 18.4 | 25.8* | 39.4 |
| % Saved | 40.7 | 31.4 | 24.3 | 10.9 | 8.9* | 28.8 |
| % Spent | 0.0 | 29.8 | 46.1 | 70.6 | 65.3* | 31.7 |
| Disposable Income | $724 | $1,253 | $2,593 | $1,991 | $2,927 | $1,360 |
| *Nonagricultural Workers* | | | | | | |
| % Remitted | 21.4 | 41.6 | 17.6 | 17.8 | 6.0** | 20.9 |
| % Saved | 19.8 | 25.0 | 25.8 | 13.8 | 17.8 | 20.4 |
| % Spent | 58.8 | 33.5 | 56.6 | 68.4 | 76.3** | 58.7 |
| Disposable Income | $1,846 | $2,322 | $3,331 | $3,625 | $6,584 | $3,266 |

\* Figure significantly different from that in lowest experience interval ($p<.05$, one-tailed test).
\*\* Figure significantly different from that in interval 1–4 ($p<.05$, one-tailed test).

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

the scenario of integration and settlement postulated by Piore. While income rises steadily as migrant experience accumulates, less of it is disposable and available for remittance home, and more is spent on support in the United States. Moreover, of the income that is disposable, increasingly small shares are saved or remitted to the community of origin, while the percentage spent in the United States steadily grows. In short, the migrant's orientation steadily shifts from Mexico to the United States.

### The Settlement Process

The above data on personal, institutional, and economic ties provide tangible evidence of a crescive settlement process operating over the course of the migrant career. However, while this evidence is tangible, it is indirect. This section endeavors to produce a more direct measure of the settlement process using life table procedures on event history data gathered from migrants during the second phase of the survey. For each spell that a migrant spent in the United States, basic information was collected on the length of stay and the total amount of time he had accumulated in the United States, providing the raw information for a life table analysis of settlement by total years of experience. These data are arrayed in Table 7. The experience intervals are labelled in column (1), the number of migrants reaching the beginning of each interval are in column (2), and the number "settling" within each interval are shown in column (3).

Table 7. Life Table Analysis of Settlement Probabilities by Rural/Urban Origin: Migrants from Four Mexican Communities.

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| | | Double Decrement Life Table | | | | Association Single Decrement Table for Settlement | | |
| Origin and Years of U.S. Experience | Number of Migrants | Settled Migrants | | Censored Migrants* | | | | |
| | | N | $Q_x$ | N | $Q_x$ | $l_x$ | $d_x$ | $q_x$ |
| *Rural Origin* | | | | | | | | |
| 0 | 271 | 0 | .000 | 123 | .454 | 1.00 | .000 | .000 |
| 2 | 148 | 13 | .088 | 36 | .243 | 1.00 | .100 | .100 |
| 4 | 99 | 13 | .131 | 9 | .091 | .900 | .124 | .138 |
| 6 | 77 | 12 | .156 | 8 | .104 | .776 | .128 | .164 |
| 8 | 57 | 6 | .105 | 1 | .018 | .649 | .069 | .106 |
| 10 | 50 | 11 | .220 | 0 | .000 | .580 | .128 | .220 |
| 12 | 39 | 6 | .154 | 1 | .026 | .452 | .070 | .156 |
| 14 | 32 | 5 | .156 | 0 | .000 | .382 | .060 | .156 |
| 16 | 27 | 7 | .259 | 0 | .000 | .322 | .083 | .259 |
| 18 | 20 | 2 | .100 | 0 | .000 | .239 | .024 | .100 |
| 20 | 18 | 3 | .167 | 0 | .000 | .215 | .036 | .167 |
| 22 | 15 | 3 | .200 | 0 | .000 | .179 | .036 | .200 |
| 24 | 12 | 1 | .083 | 0 | .000 | .143 | .012 | .083 |
| 26 | 11 | 3 | .273 | 0 | .000 | .131 | .036 | .273 |
| 28 | 8 | 2 | .250 | 0 | .000 | .095 | .024 | .250 |
| 30 | 6 | | | | | .071 | | |
| *Urban Origin* | | | | | | | | |
| 0 | 150 | 0 | .000 | 71 | .473 | 1.00 | .000 | .000 |
| 2 | 79 | 14 | .177 | 4 | .051 | 1.00 | .182 | .182 |
| 4 | 61 | 10 | .164 | 3 | .049 | .818 | .138 | .168 |
| 6 | 48 | 8 | .167 | 2 | .042 | .681 | .116 | .170 |
| 8 | 38 | 6 | .158 | 1 | .026 | .565 | .090 | .160 |
| 10 | 31 | 3 | .097 | 0 | .000 | .474 | .036 | .097 |
| 12 | 28 | 5 | .179 | 0 | .000 | .429 | .077 | .179 |
| 14 | 23 | 3 | .130 | 0 | .000 | .352 | .046 | .130 |
| 16 | 20 | 2 | .100 | 0 | .000 | .306 | .031 | .100 |
| 18 | 18 | 2 | .111 | 0 | .000 | .275 | .031 | .111 |
| 20 | 16 | 5 | .313 | 0 | .000 | .245 | .077 | .313 |
| 22 | 11 | 1 | .091 | 0 | .000 | .168 | .015 | .091 |
| 24 | 10 | 6 | .600 | 0 | .000 | .153 | .092 | .600 |
| 26 | 4 | 2 | .500 | 0 | .000 | .061 | .031 | .500 |
| 28 | 2 | 1 | .500 | 0 | .000 | .031 | .015 | .500 |
| 30 | 1 | | | | | .016 | | |

* Observation occurred before migrant accumulated additional migrant experience.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

There are several technical problems underlying this table. The first and most obvious is the definition of "settlement." It is a notoriously slippery concept to define with respect to Mexican migrants. Even after many years of residence in the United States—complete with a house and car in California—families often make annual trips back to their home communities in Mexico. They may even own land and a house there and play a role in community affairs; and if asked, they will swear to their intention to return permanently some day. Many do, others don't.

Table 7 adopts an arbitrary, yet reasonable criterion for defining settlement. A settler is a migrant who has lived for three *continuous* years in the United States. This definition excludes seasonal migrants who work six or nine months in the U.S. in successive years. It is a far more stringent criterion than most censuses use to define when someone has moved and settled. At the end of three continuous years, a person is considered "settled," and the number of migrants settling by this definition generates the figures in column (3).

A second problem concerns right-hand censoring of data. In the top line of column (5), 123 migrants are listed as having been censored between the first and second experience interval. That is, 123 people began migrating, but did not accumulate more than 2 years of experience before the survey date. Of these people, some are retired migrants who made one or two trips many years ago and will probably never go again. Others are young men who began migrating fairly recently, but who had not yet returned for additional trips at the survey date. Since retired migrants are not of interest in the present instance, we lump the two together as censored cases and consider them as a second decrement in a dougle decrement table.

The two $Q_x$ functions for the double decrement table defined by settlement and censoring are presented in columns (4) and (6) of Table 7. These give dependent probabilities of settlement and censoring within each experience interval. Most censoring occurs in the first few experience intervals. The unadjusted probability of not going on to accumulate at least two years of U.S. experience is quite high, about .45, reflecting the combination of censoring and retiring among migrants.

The results of greatest interest are presented in the last three columns of the table, which give the $l_x$, $_n d_x$, and $_n q_x$ functions for the associated single decrement life table of migrant settlement (Pollard et al., 1974). These functions are independent of the censoring process. The $_n q_x$ column gives the independent probability of settlement within the interval between x and $x + 2$ years of experience, and the $l_x$ column gives the cumulative independent probability of *not settling* after x years of migrant experience. Thus, $1 - l_x$ gives the cumulative probability of *settling* after x years, the value

of greatest interest here, which is plotted in Figure 1.

The cumulative probability of settling is roughly linear between 2 and 18 years of experience, during which time it rises from .10 to .75, after which it decelerates and begins to approach 1.0 asymptotically. While there are some differences between rural and urban probabilities, the settlement process is essentially the same. Settlement occurs at a somewhat more rapid pace among urban origin migrants. After 10 years of experience the cumulative probability of U.S. settlement is .53 for urban migrants, compared to .42 for rural migrants. However, from 10 to 24 years, the cumulative probabilities of settlement are quite close, and do not depart again until the last experience intervals, when the few urban migrants that still have not settled experience a high probability of doing so. After 30 years of U.S. experience, the chances are 98 percent an urban migrant will have settled and 93 percent that a rural migrant will have done so.

These results provide direct evidence of a settlement process among Mexican migrants to the United States. As migrants accumulate U.S. experience and acquire an increasing number of social and economic ties in this country, the probability of settling becomes ever more likely. Settlement appears to be an incremental process that occurs at a steady pace throughout the migrant career. Thus, if a migrant shuttles back and forth repeatedly over a period of years, behavior reported as common in several Mexican migrant communities (Cornelius, 1978; Mines, 1981; Reichert and Massey, 1979) the probability of settlement eventually becomes quite large.

## CONCLUSION

This study is based on small samples from four non-randomly chosen communities, and the statistical estimates derived here can in no way be extrapolated to represent quantities for Mexico as a whole. The data cannot help one estimate the number of undocumented migrants in the United States, the number using public services, or the number with children in public schools. What the data do provide, however, is a way of understanding and interpreting the social processes which generate these aggregate statistics.

The foregoing results clearly confirm the model of migrant integration and settlement postulated by Piore (1979) and others. As Mexican migrants build up time in the United States, they become progressively enmeshed in a web of social connections rooted north of the border. Over time, they form friendship ties with Chicanos and Latinos inside the Hispanic enclave, and with Anglos and blacks outside of it. Family members begin travelling with migrants to the United States. They become more involved with public institu-

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 397 of 558

Figure 1. Cumulative probability of settlement in the United States by years of U.S. migrant experience.



tions, and with informal organizations such as social and athletic clubs. At the same time, they acquire more stable, urban-based jobs that pay higher wages and conform more closely to federal employment standards. As incomes rise, the share of earnings sent home steadily falls as migrants shift their focus from Mexico to the United States. Over time, these changes give rise to a steady increase in the probability of long-term settlement among former seasonal migrants.

This model of integration and settlement suggests that migration is an ongoing, emergent process that cannot be understood in ahistorical, synchronic terms. Rather, it is a developmental process with a strong internal momentum that, once set in motion, tends to develop in a characteristic way over time. Couching an analysis of migration's potential impacts in terms of a sojourner–settler debate is therefore inappropriate. The tendency for migrants to be sojourners or settlers is a socially determined variable that changes in a predictable way over the course of the migrant career. While it may be true that recent Mexican migrants are sojourners who do not seek permanent residence in the United States, over time this pattern will change.

The future of Mexican migration rests partially on the propensity for new migrants to make repeated trips. If the large number of people who became migrants during the 1970s and the early 1980s display a tendency to return for successive trips, eventually many can be expected to accumulate migrant experience and the social ties that accompany it. In fact, data from the four communities suggest that the probability of repeat migration is quite high, and that it rises with each successive trip. Among rural migrants the probability of making an additional trip rises from .77 after one trip to .93 after nine, and from .59 to 1.0 among urban migrants (Massey, 1985).

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

SETTLEMENT OF MEXICAN MIGRANTS IN THE U.S. 683

Extrapolating from these findings, then, recent Mexican migrants seem quite likely to make repeated trips and to accumulate significant U.S. experience. As they do so, increasing numbers will be drawn into settlement in the United States. Through the ties of kinship and friendship these new settlers will, in turn, be linked to other potential migrants still in Mexico, providing them with direct access to jobs, lodging, and support. Each new settler creates a host of potential migrants with network connections in the United States, substantially reducing the costs for subsequent entrants. As the costs drop, and new aspirants take up migration, social networks expand geometrically. Migration takes on a self-perpetuating character as each new migrant creates a class of people with contacts in the United States, and each new settler becomes a central node in an extensive social network leading to U.S. employment.

Thus, the build-in momentum inherent in the social process of Mexican migration suggests that it will continue into the foreseeable future. Given the long history of movement between the two countries, the large numbers of people involved, and the extent to which institutions in both nations have come to depend on migrant labor, there is probably little that either government can do to alter this fact. Stopping the flow would entail huge costs, human and financial, that neither country seems willing to pay. In spite of much political agitation in the United States, a significant change in immigration policy has not been forthcoming.

It is important to recall that the present mass movement has its origins in the Bracero Program of the 1940s and 1950s. Before 1942, Mexicans had not entered the United States in significant numbers for more than 12 years. Now, some 45 years after the United States began importing "temporary" Mexican workers, migration has become deeply ingrained into the economic and social fabric of both countries, and the developmental momentum of the migration process insures that it will continue for years to come. If there is a moral to this research, it is that in the long run, there is no such thing as temporary migration.

REFERENCES

Avante Systems. 1978. A Survey of the Undocumented Population in Two Texas Border Areas. San Antonio, TX: U.S. Commission on Civil Rights.
Blau, Francine D. 1984. "The Use of Transfer Payments by Immigrants." Industrial and Labor Relations Review 37:222–39.
Bohning, Wolf R. 1972. The Migration of Workers in the United Kingdom and the European Community. London: Oxford University Press.
Bustamante, Jorge A. 1977. "Undocumented Migration from Mexico: Research Report." International Migration Review 11:149–77.
———. 1978. Proceedings of the Brookings-El Colegio de Mexico Symposium on Structural Factors in

Mexican and Caribbean Migration. Washington, DC: Brookings Institution.
Chiswick, Barry R. 1980. "The Impact of Immigration on the Level and Distribution of Economic Well-Being." Paper presented at the Conference on U.S. Immigration Issues and Policies, Chicago.
Conroy, Michael E., Mario C. Salas, and Felipe V. Gonzalez. 1980. Socio-Economic Incentives for Migration from Mexico to the U.S.: Magnitude, Recent Changes, and Policy Implications. Mexico-U.S. Migration Research Reports. Austin, TX: Institute of Latin American Studies, University of Texas.
Cornelius, Wayne A. 1978. Mexican Migration to the United States: Causes, Consequences, and U.S. Responses. Migration and Development Monograph C/78–9. Cambridge, MA: Center for International Studies, Massachusetts Institute of Technology.
Dagodag, W. Tim. 1975. "Source Regions and Composition of Illegal Mexican Immigration to California." International Migration Review 12:485–501.
Galarza, Ernest. 1964. Merchants of Labor: The Mexican Bracero Story. Santa Barbara, CA: McNally and Loftin.
Goodman, Leo A. 1861. "Snowball Sampling." Annals of Mathematical Statistics 32:148–70.
Greenwood, Michael J. 1978. "The Economic Consequences of Immigration for the United States: A Survey of the Findings." Pp. 1–109 in Report of the Interagency Task Force on Immigration. Washington, D.C.: Departments of Justice, Labor, and State.
Jones, Richard C. 1982. "Undocumented Migration from Mexico: Some Geographical Questions." Annals of the Association of American Geographers 72:77–87.
Keely, Charles B. 1970. Immigration: A Policy Analysis. New York: The Population Council.
Lieberson, Stanely, and Donna K. Carter. 1982. "A Model for Inferring the Voluntary and Involuntary Causes of Residential Segregation." Demography 19:511–26.
Massey, Douglas S. 1979. "Residential Segregation of Spanish Americans in U.S. Urbanized Areas." Demography 16:553–63.
———. 1985. "The Settlement Process Among Mexican Migrants to the United States: New Methods and Findings." Pp. 255–92 in Immigration Statistics: A Story of Neglect, edited by Daniel B. Levine, Kenneth Hill, and Robert Warren, Washington, DC: National Academy Press.
Massey, Douglas S., Jorge Durand, Humberto González, and Rafael Alarcón. 1985. "The Social Organization of Mexican Migration to the United States." Paper presented at the Annual Meetings of the Population Association of America, Boston.
Massey, Douglas S., Rafael Alarcón, Jorge Durand, and Humberto González. In Press. Return to Aztlán: The Social Process of International Migration from Western Mexico. Berkeley and Los Angeles: University of California Press.
Massey, Douglas S., and Brendan P. Mullan. 1984. "Processes of Hispanic and Black Spatial Assimilation." American Journal of Sociology 89:836–73.
Massey, Douglas S., and Kathleen M. Schnabel. 1983. "Background and Characteristics of Undocumented Hispanic Migrants to the United States." Migration Today 11:6–13.
Mines, Richard. 1981. Developing a Community Tradition of Migration: A Field Study in Rural Zacatecas

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

*Mexico and California Settlement Areas*. Monographs in U.S.-Mexican Studies No. 3. La Jolla, CA: Program in United States-Mexican Studies, University of California at San Diego.

Mullan, Brendan P. 1984. "Occupational Mobility of Mexican Migrants to the United States." Paper presented at the Annual Meetings of the Population Association of America, Minneapolis.

North, David S. 1983. "Impact of Legal, Illegal, and Refugee Migrants on U.S. Social Service Programs." Pp. 269–86 in *Immigration and Refugee Policy: Global and Domestic Issues*, edited by Mary M. Kritz. Lexington, MA: Heath.

North, David S., and Marion F. Houstoun. 1976. *The Characteristics and Role of Illegal Aliens in the U.S. Labor Market: An Exploratory Study*. Washington, DC: Linton.

Orange County Task Force. 1978. *The Economic Impact of Undocumented Immigrants on Medical Costs, Tax Contributions, and Health Needs of Undocumented Migrants*. Santa Ana, CA: Orange County Board of Supervisors.

Passel, Jeffery S., and Robert Warren. 1983. "Estimates of Illegal Aliens from Mexico Counted in the 1980 United States Census." Paper presented at the Annual Meetings of the Population Association of America, Pittsburgh.

Piore, Michael J. 1979. *Birds of Passage: Migrant Labor and Industrial Societies*. New York: Cambridge University Press.

Pollard, A.H., F. Yusuf, and G.N. Pollard. 1974. *Demographic Techniques*. New York: Pergamon.

Pressar, Patricia R. 1982. "The Role of Households in International Migration and the Case of U.S.-Bound Migration from the Dominican Republic." *International Migration Review* 16:342–64.

Ranney, Susan, and Sherry Kossoudji. 1983. "Profiles of Temporary Mexican Labor Migrants in the United States." *Population and Development Review* 9:475–93.

Reichert, Joshua S. 1981. "The Migrant Syndrome: Seasonal U.S. Wage Labor and Rural Development in Central Mexico." *Human Organization* 40:422–33.

_____. 1982. "Social Stratification in a Mexican Sending Community: The Effect of Migration to the United States." *Social Problems* 29:422–33.

Reichert, Joshua S., and Douglas S. Massey. 1979. "Patterns of Migration from a Mexican Sending Community: A Comparison of Legal and Illegal Migrants." *International Migration Review* 13:599–623.

_____. 1980. "History and Trends in U.S.-Bound Migration from a Mexican Town." *International Migration Review* 14:475–91.

Samora, Julian. 1971. *Los Mojados: The Wetback Story*. Notre Dame, IN: University of Notre Dame Press.

Simon, Julian L. 1984. "Immigrants, Taxes, and Welfare in the United States." *Population and Development Review* 10:55–70.

Van Arsdol, Maurice D., Jr., Joan W. Moore, David M. Heer, and Susan V. Haynie. 1979. *Non-Apprehended and Apprehended Undocumented Residents in the Los Angeles Labor Market: An Exploratory Study*. Washington, DC: U.S. Department of Labor.

Wiest, Raymond E. 1973. "Wage-Labor Migration and the Household in a Mexican Town." *Journal of Anthropological Research* 29:180–209.

This content downloaded from 206.253.207.235 on Mon, 18 Jun 2018 16:12:50 UTC
All use subject to http://about.jstor.org/terms

# DEF-INTERV.

# EX. 121

# Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America

Douglas S. Massey

Karen A. Pren

The year 1965 is often cited as a turning point in the history of US immigration, but what happened in the ensuing years is not well understood. Amendments to the Immigration and Nationality Act passed in that year repealed the national origins quotas, which had been enacted during the 1920s in a deliberate attempt to limit the entry of Southern and Eastern European immigrants—or more specifically Jews from the Russian Pale and Catholics from Poland and Italy, groups at the time deemed "unassimilable." The quotas supplemented prohibitions already in place that effectively banned the entry of Asians and Africans. The 1965 amendments were intended to purge immigration law of its racist legacy by replacing the old quotas with a new system that allocated residence visas according to a neutral preference system based on family reunification and labor force needs. The new system is widely credited with having sparked a shift in the composition of immigration away from Europe toward Asia and Latin America, along with a substantial increase in the number of immigrants.

Indeed, after 1965 the number of immigrants entering the country did increase, and the flows did come to be dominated by Asians and Latin Americans. Although the amendments may have opened the door to greater immigration from Asia, however, the surge in immigration from Latin America occurred in spite of rather than because of the new system. Countries in the Western Hemisphere had never been included in the national origins quotas, nor was the entry of their residents prohibited as that of Africans and Asians had been. Indeed, before 1965 there were no numerical limits at all on immigration from Latin America or the Caribbean, only qualitative restrictions. The 1965 amendments changed all that, imposing an annual cap of 120,000 on entries from the Western Hemisphere. Subsequent amendments further limited immigration from the region by limiting the number of residence visas

for any single country to just 20,000 per year (in 1976), folding the separate hemispheric caps into a worldwide ceiling of 290,000 visas (in 1978), and then reducing the ceiling to 270,000 visas (in 1980). These restrictions did not apply to spouses, parents, and children of US citizens, however.

Thus the 1965 legislation in no way can be invoked to account for the rise in immigration from Latin America. Nonetheless, Latin American migration *did* grow. Legal immigration from the region grew from a total of around 459,000 during the decade of the 1950s to peak at 4.2 million during the 1990s, by which time it made up 44 percent of the entire flow, compared with 29 percent for Asia, 14 percent for Europe, 6 percent for Africa, and 7 percent for the rest of the world (US Department of Homeland Security 2012). The population of unauthorized immigrants from Latin America also rose from near zero in 1965 to peak at around 9.6 million in 2008, accounting for around 80 percent of the total present without authorization (Hoefer, Rytina, and Baker 2011; Wasem 2011). How this happened is a complicated tale of unintended consequences, political opportunism, bureaucratic entrepreneurship, media guile, and most likely a healthy dose of racial and ethnic prejudice. In this article, we lay out the sequence of events that culminated in record levels of immigration from Latin America during the 1990s. We focus particularly on the case of Mexico, which accounted for two-thirds of legal immigration during the decade and for three-quarters of all illegal migration from the region.

## The unintended legacy of immigration reform

Paradoxical as it may seem, US immigration policy often has very little to do with trends and patterns of immigration. Even when policies respond explicitly to shifts in immigration, rarely are they grounded in any real understanding of the forces that govern international migration. Instead, over time the relative openness or restrictiveness of US policies is more strongly shaped by prevailing economic circumstances and political ideologies (Timmer and Williamson 1998; Massey 1999; Meyers 2004). In the United States, especially, immigrants carry significant symbolic weight in the narrative of American peoplehood (Smith 1997, 2003), and how they are depicted in the media, portrayed by politicians, and treated by legislators probably reveals more about America's aspirations and hopes—and its fears and insecurities—than anything to do with immigration itself (Tichenor 2002; Ngai 2003).

Americans' fears and apprehensions prevailed in the 1920s and led to the passage of the discriminatory quotas. In response to rising economic inequality along with new currents of scientific racism, xenophobia, and conservative ideology, the Quota Acts of 1921 and 1924 sought to reduce the number of immigrants entering the United States and shift their origins away from Southern and Eastern Europe and toward Northern and Western

Europe, while maintaining outright prohibitions on all immigration from Asia and Africa (Zolberg 2006). In contrast, hopes and aspirations were the dominant force of the 1960s, and legislators sought to enact liberalizing reforms and introduce greater openness into the immigration system. As the civil rights movement gathered force, discriminatory quotas against certain Europeans and prohibitions on African and Asian immigration came to be seen as intolerably racist and were duly repealed by Congress in 1965.

At that time, the United States was nearing the end of a "long hiatus" with respect to immigration (Massey 1995). Indeed, with so few immigrants settling in the United States, the foreign-born percentage in 1970 dipped below 5 percent for the first and only time in US history (compared with 12.4 percent in 2010). As a result, immigration was not a very salient issue in 1965, except to a few conservative senators who actually favored the restrictive quotas. To the extent that legislators were concerned at all, their attention focused mainly on the consequences of opening the door to Asian and African immigration, not immigration from Latin America. Newly elected Senator Ted Kennedy, who served as floor leader for the bill, assured his colleagues that "our cities will not be flooded with a million immigrants annually...[and] the ethnic mix of this country will not be upset. . . . Contrary to the charges in some quarters, [the bill] will not inundate America with immigrants from any one country or area, or the most populated and economically deprived nations of Africa and Asia" (*Congressional Digest*, May 1965, p. 152).

The second order of business for immigration reformers with a civil rights agenda was ending a scheme admitting short-term foreign workers known as the Bracero Program. Originally established in 1942 as a temporary wartime measure, the program was extended by Congress and massively expanded in the latter half of the 1950s. By the 1960s, however, the Bracero Program had come to be seen as an exploitive labor regime on a par with Southern sharecropping, and in 1964, over vociferous objections from Mexico, Congress voted to terminate it (Calavita 1992; Massey, Durand, and Malone 2002). The program was phased out between 1965 and 1967 and the flow went to zero in 1968, the same year the new cap on immigration from the Western Hemisphere took effect.

Immigration was a back burner issue for most Americans in the 1960s. They concerned themselves instead with civil rights, the war in Vietnam, the sexual revolution, and urban riots. Nonetheless, out of view of both citizens and politicians, immigration from Latin America had been quietly but steadily growing, especially from Mexico. Owing to the Bracero Program, however, the lion's share of the migration was temporary and circular and, hence, invisible to citizens. During the period 1955–59, around half a million Mexicans were entering the country each year, the number fluctuating around 450,000 temporary Bracero migrants and 50,000 permanent residents (Massey 2011). Given this large annual inflow, the sudden elimination of the Bracero Program clearly would have dramatic consequences on migration between

4                             Unintended Consequences of US Immigration Policy

Mexico and the United States; and with the imposition of a hemispheric cap, and eventually country quotas, the displaced temporary migrants were not going to be accommodated within the system for legal immigration.

In short, as a result of shifts in US immigration policy between the late 1950s and the late 1970s, Mexico went from annual access to around 450,000 guestworker visas and a theoretically unlimited number of resident visas in the United States (in practice averaging around 50,000 per year) to a new situation in which there were no guestworker visas and just 20,000 resident visas annually. The effect of these new limits on the system of Mexican migration that had evolved during the Bracero era was predictable and is il-lustrated in Figure 1, which shows Mexican entries into the United States in three categories by legal status for the period 1955–1995: temporary migrants (Braceros before 1965 and H-visa holders thereafter), legal immigrants (those entering with permanent resident visas), and illegal immigrants (proxied here by a series based on the annual number of apprehensions per thousand Border Patrol agents—see Table A1). Former illegal migrants adjusting under the 1986 Immigration Reform and Control Act (IRCA) have been removed from the series on legal immigrants as they are already accounted for in the series on illegal immigrants.

The number of apprehensions recorded in any year is a joint function of the number of migrants attempting unauthorized entry and the effort made to apprehend them. Raw apprehension counts in themselves are seriously flawed as indicators of the volume of illegal migration. However, once the enforcement effort is accounted for, here by dividing the number of migrants arrested by the number of Border Patrol agents looking for them, the adjusted

**FIGURE 1   Mexican immigration to the United States in three categories, 1955–95**



SOURCE: US Department of Homeland Security (2012). See text and Table A1.

apprehension counts offer serviceable indicators of *trends* in illegal migration. We do not claim that the estimates yielded by this procedure capture the *true* number of undocumented entries, only that fluctuations in them over time reflect trends in the volume of undocumented migration.

As already noted, by the late 1950s a massive circular flow of Mexican migrants had become deeply embedded in employer practices and migrant expectations and had come to be sustained by well-developed and widely accessible migrant networks (Massey, Durand, and Malone 2002). As a result, when avenues for legal entry were suddenly curtailed after 1965, the migratory flows did not disappear but simply continued without authorization or documents. As shown in the figure, the end of the Bracero Program corresponded exactly in time with the rise of illegal migration. From a figure of around 40,000 in 1965, the number of apprehensions per thousand agents rose to peak at around 460,000 in 1977. It then fluctuated between 330,000 and 460,000 from 1978 to 1986 whereupon it fell into the range of 240,000–320,000 per year after passage of IRCA. This act offered legal status to millions of undocumented migrants who before 1965 had moved back and forth across the border and contributed to the annual count of apprehensions.

In sum, illegal migration rose after 1965 not because there was a sudden surge in Mexican migration, but because the temporary labor program had been terminated and the number of permanent resident visas had been capped, leaving no legal way to accommodate the long-established flows. With permanent resident visas capped, moreover, the inflow of legal immigrants could not rise and remained below 50,000 through the early 1970s and thereafter fluctuated between 50,000 and 100,000 per year. The number of legal immigrants was able to exceed the annual statutory cap of 20,000 because parents, spouses, and minor children of US citizens were exempted from numerical limitation (we return to this point later).

## Rise of the Latino threat narrative

In the absence of access to any avenue of legal entry, the post-1965 increase in illegal migration was attributable almost entirely to the termination of the Bracero Program. Once the status quo ante of circular migration had been reestablished under undocumented auspices in the late 1970s, growth in illegal migration ceased and ultimately declined in the wake of IRCA's legalization. The increase in illegal migration from 1965 through the late 1970s is critically important to understanding the dynamics of policy responses in the years that followed, however, for it was this development that enabled political activists and bureaucratic entrepreneurs to frame Latino immigration as a grave threat to the nation.

Chavez (2001, 2008) has documented the rise of what he calls the "Latino threat" narrative in American media after the 1960s. When he coded national magazine covers on immigration as positive, negative, or neutral

he found a steady rise of negative portrayals through the 1970s, 1980s, and 1990s. The rise in the threat narrative occurred during a time of increasing income inequality, and as social psychologist Susan Fiske (2011: 89) has shown, "feeling individually deprived... may alert a person to feeling collectively deprived...[and] this collective feeling leads to blaming out-groups (immigrants, rich elites, the party in power)."

The most common negative framing depicted immigration as a "crisis" for the nation. Initially marine metaphors were used to dramatize the crisis, with Latino immigration being labeled a "rising tide" or a "tidal wave" that was poised to "inundate" the United States and "drown" its culture while "flooding" American society with unwanted foreigners (Santa Ana 2002). Over time, marine metaphors increasingly gave way to martial imagery, with illegal immigration being depicted as an "invasion" in which "outgunned" Border Patrol agents sought to "hold the line" in a vain attempt to "defend" the border against "attacks" from "alien invaders" who launched "banzai charges" to overwhelm American defenses (Nevins 2001; Chavez 2008).

To document the rising use of such metaphors in the American media, we used the Proquest Historical Newspaper Files to search for instances in which the words "undocumented," "illegal," or "unauthorized" were paired with "Mexico" or "Mexican immigrants" and the words "crisis," "flood," or "invasion." We focused our analysis on the country's four leading papers: the *New York Times, Washington Post, Wall Street Journal,* and *Los Angeles Times*. To control for random noise and isolate the underlying trends, we computed three-year moving averages. The results are plotted in Figure 2. As can be seen, the use of the negative metaphors to describe Mexican immigration was virtually nonexistent in 1965, at least in major newspapers, but thereafter rose steadily, slowly at first and then rapidly during the 1970s to reach a peak in the late 1970s, roughly at the same time illegal migration itself peaked. From 1965 through 1977 the correlation between the illegal migration series shown in Figure 1 and the negative metaphor series shown in Figure 2 is 0.911.

The framing of immigration as a "crisis" and the increasing use of martial imagery were actively promulgated by immigration officials. In 1976, for example, the Commissioner of the Immigration and Naturalization Service (INS) published an article in *Reader's Digest* entitled "Illegal Aliens: Time to Call a Halt!" in which he told readers that "when I became commissioner [of the INS] in 1973, we were out-manned, under-budgeted, and confronted by a growing, silent invasion of illegal aliens. Despite our best efforts, the problem—critical then—now threatens to become a national disaster" (Chapman 1976: 188). Similarly, in 1992 the Chief of the San Diego Sector of the Border Patrol, Gustavo de la Viña, filmed and released a video entitled "Border Under Siege," which in one vivid scene showed migrants scrambling over cars and dodging traffic on Interstate 5 to enter the United States without inspection

**FIGURE 2   Frequency of pairing of the terms "flood," "crisis," or "invasion" with "Mexico" or "Mexican immigrants," in four leading US newspapers (three-year moving average), 1965–1995**



SOURCE: Proquest Historical Newspaper Files.

in and around the San Ysidro Port of Entry, then the country's busiest border crossing (Rotella 1998).

Politicians quickly discovered the political advantages to be gained by demonizing Latino immigrants and illegal migration. Ronald Reagan, for example, asserted that illegal immigration was a question of "national security," and in a 1986 speech he told Americans that "terrorists and subversives are just two days' driving time from [the border crossing at] Harlingen, Texas" (Kamen 1990). In his 1992 reelection campaign, California Governor Pete Wilson called on Congress to "stop the invasion" and borrowed footage from "Border Under Siege" for a series of attack ads. As images of migrants dashing through traffic rolled, a narrator intoned, "they keep coming. Two million illegal immigrants in California. The federal government won't stop them at the border yet requires us to pay billions to take care of them" (Massey, Durand, and Malone 2002: 89).

The media discovered that the trope of a border under siege made for dramatic copy and good visuals and happily played handmaiden to aspiring politicians and bureaucrats. Later, a host of pundits joined the anti-immigrant chorus to attract attention and sell books. Lou Dobbs (2006) framed the "invasion of illegal aliens" as part of a broader "war on the middle class." Patrick Buchanan (2006) charged it was part of an "Aztlan Plot" hatched by Mexicans to recapture lands lost in 1848, stating that "if we do not get control of our borders and stop this greatest invasion in history, I see the dissolution of the U.S. and the loss of the American southwest" (*Time*, 28 August, p. 6). From his lofty Harvard position, Samuel Huntington (2004) warned Americans that

"the persistent inflow of Hispanic immigrants threatens to divide the United States into two peoples, two cultures, and two languages.... The United States ignores this challenge at its peril." All these views received extensive coverage in print and broadcast media throughout the country.

## Effects on public opinion

The shift in the legal auspices of Mexican migration thus transformed what had been a largely invisible circulation of innocuous workers into a yearly and highly visible violation of American sovereignty by hostile aliens who were increasingly framed as invaders and criminals. The relentless propagandizing that accompanied the shift had a pervasive effect on public opinion, turning it decidedly more conservative on issues of immigration even as it was turning more conservative with respect to social issues more generally. Indeed, the rise of illegal migration remains inadequately acknowledged as a factor in the rightward shift of American public opinion.

To support this argument, we extracted data from the General Social Survey (GSS) from its inception in 1972 to the present and estimated the effect that the annual number of border apprehensions had on the likelihood that a respondent self-identified as conservative (Massey and Pren 2012). We controlled for individual demographic, social, and economic characteristics as well as the country's overall economic climate. Holding these factors constant, we found that border apprehensions were strongly associated with the likelihood of self-identifying as conservative. An increase in the number of apprehensions from its minimum to its maximum doubled the likelihood that a respondent self-identified as conservative.

Admittedly, self-identification as conservative does not necessarily predict anti-immigrant sentiment; but annual data on attitudes toward immigration are not available. To establish this link, we drew on GSS data for 1996 and 2004, two years in which the survey questionnaires had asked about attitudes toward immigration, enabling us to create a reliable scale of support for exclusionist policies (ibid.). We regressed this measure on respondents' self-identification as slightly conservative or as extremely conservative (compared to not conservative at all), controlling for age, education, income, occupation, race, region, city size, and national economic climate. We found that conservative self-identification strongly predicted support for exclusionist policies. Both effects were highly significant. Other things equal, conservative self-identification and exclusionist sentiments are strongly interrelated.

## Policy feedbacks

Not surprisingly, the rise of the Latino threat narrative and the concomitant increase in conservatism were associated over time with the passage of

increasingly restrictionist immigration legislation and the implementation of ever more stringent enforcement policies. Table 1 presents a cumulative list of 15 restrictive immigration bills passed from 1965 to 2010. As can be seen, over time restrictionist bills were passed at an increasingly rapid pace. In the 30 years from 1965 to 1995, for example, only six major immigration bills were enacted, whereas in the decade from 1996 to 2006, eight pieces of legislation were signed into law. Table 2 lists 16 named enforcement operations launched between 1993 and 2010. They typically were announced with great fanfare, including official releases, press conferences, and saturated media coverage. The pace at which such operations were launched also increased over time. Moreover, they became more sweeping in scope, covering locations within the United States as well as along the Mexico–US border.

This sustained, accelerating accumulation of anti-immigrant legislation and enforcement operations produced a massive increase in border apprehensions after the late 1970s, when the underlying flow of migrants had actually leveled off. For any given number of undocumented entry attempts, more restrictive legislation and more stringent enforcement operations generate more apprehensions, which politicians and bureaucrats can then use to inflame public opinion, which leads to more conservatism and voter demands for even stricter laws and more enforcement operations, which generates more apprehensions, thus bringing the process full circle. In short, the rise of illegal migration, its framing as a threat to the nation, and the resulting conservative reaction set off a self-feeding chain reaction of enforcement that generated more apprehensions even though the flow of undocumented migrants had stabilized in the late 1970s and actually dropped during the late 1980s and early 1990s.

The dimensions of the paradox are illustrated in Figure 3, which contrasts estimated illegal entries (from Figure 1) with total apprehensions (which reflect both the enforcement effort and underlying traffic). Controlling for the enforcement effort, we see that illegal migration rose from 1965 to 1977, as the circulation of the Bracero Era was reestablished, but thereafter leveled off and fluctuated before ultimately falling. In contrast, the total number of apprehensions grew at a faster pace after 1977, peaking at 1.7 million in 1986 before declining to around 900,000 and then rising again to 1.3 million by 1995. As one would expect, temporal variation in the total number of apprehensions is closely related to the use of threatening immigration metaphors. From 1965 through 1995, the temporal correlation between the frequency of newspaper allusions to crises, floods, and invasions and the total number of apprehensions is 0.956.

After the late 1970s, in other words, anti-immigrant sentiment increasingly fed off itself to drive the bureaucratic machinery of enforcement forward to new heights, despite the lack of any real increase in illegal migration. In

Case 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 410 of 558

**TABLE 1   Restrictive immigration legislation enacted by Congress affecting Latin Americans, 1965–2010**

| | |
|---|---|
| **1965** | **Hart–Cellar Act**<br>Imposed first-ever annual cap of 120,000 visas for immigrants from Western Hemisphere |
| **1976** | **Amendments to Immigration and Nationality Act**<br>Put Western Hemisphere under preference system and country quotas |
| **1978** | **Amendments to Immigration and Nationality Act**<br>Combined separate hemispheric caps into single worldwide ceiling of 290,000 |
| **1980** | **Refugee Act**<br>Abolished refugee preference and reduced worldwide ceiling to 270,000 |
| **1986** | **Immigration Reform and Control Act**<br>Criminalized undocumented hiring and authorized expansion of Border Patrol |
| **1990** | **Amendments to the Immigration and Nationality Act**<br>Sought to cap visas going to spouse and children of resident aliens |
| **1996** | **Anti-Terrorism and Effective Death Penalty Act**<br>Authorized expedited removal of noncitizens and deportation of aggravated felons |
| **1996** | **Illegal Immigration Reform and Immigrant Responsibility Act**<br>Increased resources for border enforcement, narrowed criteria for asylum, and increased income threshold required to sponsor immigrants |
| **1996** | **Personal Responsibility and Work Opportunity Act**<br>Declared documented and undocumented migrants ineligible for certain entitlements |
| **1997** | **Nicaraguan and Central American Relief Act**<br>Allowed registered asylum seekers from Central America (mostly Nicaraguans) in the US for at least 5 years since December 1, 1995 to obtain legal status; but prohibited legalization and ordered deportation for those who lacked a valid visa or who previously violated US immigration laws (mostly Guatemalans, Hondurans, and Salvadorans) |
| **2001** | **USA PATRIOT Act**<br>Created Department of Homeland Security, increased funding for surveillance and deportation of foreigners, and authorized deportation of noncitizens without due process |
| **2004** | **National Intelligence Reform and Terrorism Protection Act**<br>Funded new equipment, aircraft, Border Patrol agents, immigration investigators, and detention centers for border enforcement |
| **2005** | **Real ID Act**<br>Sharply increased the data requirements, documentation, and verification procedures for state issuance of drivers licenses |
| **2006** | **Secure Fence Act**<br>Authorized construction of additional fencing, vehicle barriers, checkpoints, lighting and funding for new cameras, satellites, and unmanned drones for border enforcement |
| **2010** | **Border Security Act**<br>Funded hiring 3,000 more Border Patrol agents and increased BP budget by $244 million |

Figure 4 we model these hypothesized causal paths using a two-stage least squares estimation strategy on time-series data for the 30-year period from 1965 to 1995 (see Table A1). Data on apprehensions, the number of Border

**TABLE 2   Restrictive enforcement operations launched by the Immigration and Naturalization Service or the Department of Homeland Security 1993–2010**

| | |
|---|---|
| 1993 | **Operation Blockade**<br>Border Patrol's (BP) militarization of the El Paso Sector |
| 1994 | **Operation Gatekeeper**<br>BP's militarization of the San Diego Sector |
| 1998 | **Operation Rio Grande**<br>BP program to restrict the movement of migrants across the Texas and New Mexico border with Mexico |
| 1999 | **Operation Safeguard**<br>BP's militarization of the Tucson Sector |
| 2003 | **Operation Endgame**<br>Plan launched by Immigration and Customs Enforcement (ICE) to detain and deport all removable noncitizens and "suspected terrorists" living in the United States |
| 2004 | **Operation Frontline**<br>Program launched by ICE to address "vulnerabilities in immigration and trade" by focusing on immigration violators who pose an "enhanced public safety or national security threat" |
| 2004 | **Arizona Border Control Initiative**<br>Multi-agency effort supporting Homeland Security's anti-terrorism mission through the detection, arrest, and deterrence of all persons engaged in cross-border illicit activity |
| 2004 | **Operation Stonegarden**<br>Federal grant program administered through the State Homeland Security Grant Program to provide funding to state and local agencies to improve immigration enforcement |
| 2005 | **Secure Borders Initiative**<br>Comprehensive multi-year plan launched by ICE to secure America's borders and reduce illegal migration |
| 2005 | **Operation Streamline**<br>Program mandating criminal charges for illegal migrants, including first-time offenders |
| 2006 | **Operation Return to Sender**<br>Sweep of illegal immigrants by ICE to detain those deemed most dangerous, including convicted felons, gang members, and repeat illegal immigrants |
| 2006 | **Operation Jump Start**<br>Program authorizing the deployment of National Guard troops along the US–Mexico border |
| 2007 | **Secure Communities Program**<br>ICE program to identify and deport criminal noncitizens arrested by state and local authorities |
| 2007 | **Operation Rapid REPAT**<br>Program to Remove Eligible Parolees Accepted for Transfer by allowing selected criminal noncitizens incarcerated in US prisons and jails to accept early release in exchange for voluntary deportation |
| 2008 | **Operation Scheduled Departure**<br>ICE operation to facilitate the voluntary deportation of 457,000 eligible illegal migrants from selected cities |
| 2010 | **Operation Copper Cactus**<br>Deployment of Arizona National Guard troops to assist BP in apprehension of illegal migrants |

**FIGURE 3    Annual number of apprehensions and estimated illegal entries, 1955–1995**



SOURCE: US Department of Homeland Security (2012). See text and Table A1.

Patrol agents, the size of the Border Patrol budget, and the number of line-watch hours spent patrolling the border were obtained from the Office of Immigration Statistics of the US Department of Homeland Security. Proportions conservative from 1972 onward come from the General Social Survey. From 1965 through 1971, we used various national surveys conducted by Gallup, *Newsweek*, and other polling organizations to provide figures for individual years before the launching of the GSS. The cumulative numbers of pieces of restrictive legislation passed and restrictive operations launched were coded from Tables 1 and 2.

The exogenous variable, number of undocumented entries, was independently estimated using life-history data obtained from household heads interviewed by the Mexican Migration Project (MMP), a binational study that each year surveys Mexicans on both sides of the border and draws on the information they provide to create a cumulative database on patterns and processes of documented and undocumented migration («http://mmp. opr.princeton.edu/»). At this writing, the database contains life histories of 21,475 household heads. Each history includes a complete history of migration that can be used to compute annual probabilities of illegal migration (see Massey and Singer 1995; Massey, Durand, and Pren 2009). We applied these estimated probabilities to annual population counts derived from Mexico's National Institute for Statistics and Geographic Information (the Mexican census bureau) to estimate the gross annual inflow of illegal migrants.

Because this number is exogenous to the paths that define the policy feedback loop, it offers a means of estimating that feedback. The hypoth-

**FIGURE 4   Feedback loop between apprehensions and border enforcement, 1965–1995**



esized causal chain begins with rising undocumented entries, which generate more apprehensions, which are then transformed into a conservative anti-immigrant reaction through the activities of entrepreneurial politicians, ambitious bureaucrats, and elements of the media, and this reaction, in turn, generates more restrictive immigration laws and border operations, which increase the number of Border Patrol agents and the size of the Border Patrol budget, which ultimately produce more linewatch hours, which generates more apprehensions. The effect of the feedback—what might be termed the "enforcement loop"—is to increase the conservative reaction independently of the actual number of illegal entries.

Figure 4 also shows estimated path coefficients for each relationship in the model, allowing judgments of the relative strength of the various pathways. The total effect of any pathway is computed as the product of coefficients along the pathway. Thus the effect of illegal entries on the percent conservative is 0.905 * 0.937, or 0.848. To put it in words, as illegal entries rise so do apprehensions, thus transforming clandestine crossings into threatening events, which prompts more Americans to identify as conservative. This effect is quite strong, as one would expect; but an increasing percent conservative also sets in motion a number of feedback effects that are quite powerful. The total indirect effect through enforcement feedbacks is 0.692 (0.820 * 0.873 * 0.935 * 0.936 + 0.820 * 0.377 * 0.029 * 0.936 + 0.336 * 0.402 * 0.029 * 0.936 + 0.336 * 0.181 * 0.935 * 0.936). Of the two principal pathways in the enforcement loop—the upper one through restrictive legislation (0.820 * 0.873 * 0.935 * 0.936 = 0.626) and the lower one through restrictive border operations (0.336 * 0.402 * 0.029 * 0.936 = 0.004)—the former is obviously by far the stronger,

**FIGURE 5   Intensity of border enforcement, 1955–1995**



SOURCE: US Department of Homeland Security (2012). See text and Table A1.

accounting for 90 percent of the total feedback effect (0.626/0.691=0.906). Although not proving causality, this model nonetheless suggests that between 1965 and 1995 rising apprehensions produced a conservative reaction that led to strengthened enforcement and hence more apprehensions, further exacerbating the conservative reaction.

The end result of this feedback loop is depicted in Figure 5, which shows three indicators of the intensity of border enforcement relative to the number of standardized apprehensions, our indicator of the underlying traffic in illegal migrants. Each series is divided by its value in 1977, the year in which undocumented migration reached its peak. The relative number of apprehensions per thousand agents rose from the late 1950s to 1977 and thereafter fluctuated around 1.0 before dropping in the late 1980s. In contrast, from 1977 to 1995 the number of linewatch hours doubled, the number of Border Patrol agents increased 2.5 times, and the Border Patrol budget rose by a factor of 6.5. During and after the 1970s, in other words, the border build-up was increasingly disconnected from the actual traffic in illegal migrants.

## Enter the war on terrorism

The feedback loop connecting apprehensions, public attitudes, legislation, and enforcement was fully established by the 1990s when a series of exogenous terrorist events drove the enforcement cycle to new heights. Major attacks unleashed in the United States and against US installations abroad in the 1990s and early 2000s helped transform the first decade of the twenty-first century

into another era of fear and insecurity. Although anti-immigrant sentiments based on material and ideological considerations were in ample evidence before the 1990s, a string of visible and politically charged terrorist attacks that began in 1993 brought such concerns to new levels. In response to the 1993 attack on the World Trade Center and the 1995 bombing of the Murrah Federal Building in Oklahoma City, Congress in 1996 passed the Anti-Terrorism and Effective Death Penalty Act as well as the Illegal Immigration Reform and Immigrant Responsibility Act. Then upon the heels of the 1998 bombing of the USS *Cole* in Yemen, the 2000 bombings of the US Embassies in Kenya and Tanzania, and the catastrophic attacks on the World Trade Center and the Pentagon in 2001, Congress enacted the USA PATRIOT Act.

These measures not only further strengthened border enforcement, which had been rising for some time, but more dramatically increased the number of arrests, detentions, and deportations within the United States. Before 1996, internal enforcement activities had not played a very significant role in immigration enforcement; afterward these activities rose to levels not seen since the deportation campaigns of the Great Depression (Hoffman 1974; Balderrama 1995). The conflation of the war on terrorism with the deportation of immigrants is suggested by Figure 6, which plots deportations by year from 1955 through 2009 (US Department of Homeland Security 2012). Prior to the mid-1990s the annual number of deportations had not exceeded 50,000 for decades, but with the passage of the 1996 legislation this threshold was breached and by the turn of the century deportations were running at just under 200,000 annually. With the passage of the Patriot Act in late 2001,

**FIGURE 6   Annual deportations from the United States, 1955–2009**



SOURCE: US Department of Homeland Security (2012). See text and Table A1.

the number of deportations increased again and reached nearly 400,000 in 2009. None of the terrorist attacks involved Mexicans, and none of the terrorists entered through Mexico. Indeed, all came to the United States on legal visas. Yet, as Figure 6 clearly indicates, Mexicans nonetheless bore the brunt of the deportation campaign launched in the name of the war on terrorism, comprising 72 percent of those removed in 2009.

The likely dynamic by which this outcome unfolded is summarized by the path diagram shown in Figure 7, which uses time-series data from 1965 through 2009 to estimate the effects of the two principal Islamic terrorist attacks on the number of deportations and through them on the conservative reaction, in addition to the ongoing effect through border apprehensions. (See Table A1.) The 1993 terrorist attack indicator was given a value of 1 from 1993 onward and zero otherwise, whereas the 2001 terrorist attack indicator was coded 1 during 2001–09 and zero at earlier dates.

In this model, the effect of apprehensions continues, but its influence on the conservative reaction is now much more direct (0.806) than indirect through the feedback loop, which is essentially zero ([0.806 * 0.304 * −0.187 * 0.886 * 0.269] + [0.806 * 0.006 * 1.143 * 0.886 * 0.269] = −0.010). In addition, the rising number of apprehensions is no longer significantly connected to the rise in deportations (0.806 * 0.304 * −0.187 * 0.886 + 0.806 * 0.006 * 1.143 * 0.886 = −0.036). The upsurge in deportations arises mainly from the two principal terrorist attacks and the resulting increase in anti-immigrant legislation and enforcement operations. In general, the 1993 attack was more powerful in generating deportations (0.513 * −0.187 * 0.886 + 0.317 * 1.143 * 0.886 = 0.236) than the 2001 attack (0.323 * −0.187 * 0.866 + 0.674 * 1.143 * 0.866 = 0.615), with most of the effect occurring through the rise in enforcement operations in the wake of the Anti-Terrorism and Effective Death Penalty Act.

**FIGURE 7   Feedback loop between deportations and internal enforcement, 1965–2009**



Effect of 1993 terrorist attack
   On deportations:              0.236
   On conservative reaction:   0.063

Effect of 2001 terrorist attack
   On deportations:              0.615
   On conservative reaction:   0.159

The feedback effects of the terrorist attacks in provoking a conservative reaction through deportations are also relatively modest for both the 1993 attack ($0.513 * -0.187 * 0.886 * 0.269 + 0.317 * 1.143 * 0.886 * 0.269 = 0.063$) and the 2001 attack ($[0.323 * -0.187 * 0.866 * 0.269] + [0.674 * 1.143 * 0.866 * 0.26] = 0.159$). Though fairly large by usual social science standards, these effect sizes pale in comparison to the feedback effect of 0.692 observed in the earlier model. Most of the increase in deportations occurred as a response to the two rounds of terrorist attacks.

## Explaining the Latino immigration boom

It is evident that the massive increase in border enforcement (Figure 5) and the exponential increase in deportations (Figure 6) were not successful in preventing the entry of millions of unauthorized Mexicans after 1965 (Redburn, Reuter, and Majmundar 2011: 34). From 1980, when Warren and Passel (1987) first estimated the number of undocumented Mexicans living in the United States to be 1.13 million, the population grew to 2.04 million in 1990, reached 4.68 million in 2000, and then peaked at 7.03 million in 2008 (Wasem 2011). Most of the remaining growth in the undocumented population came from Central America. When the United States intervened in the region by launching the Contra War and funding paramilitary groups, the level of violence increased; and as the region's economy deteriorated, the resulting wave of emigrants met with the same restrictions on legal entry that had earlier blocked the entry of former Braceros from Mexico. The sole exception was Nicaragua, whose emigrants were fleeing a leftist regime and were thus allowed to overstay tourist visas and ultimately adjust their status to become legal permanent residents (Lundquist and Massey 2005). In contrast, the flows of undocumented Salvadorans, Guatemalans, and Hondurans remained predominantly illegal, accumulating total undocumented populations of 570,000, 430,000, and 300,000, respectively, by 2008 (Hoefer, Rytina, and Baker 2009). Central Americans and Mexicans together accounted for nearly three-quarters of the increase in the undocumented population.

Not only did the massive enforcement effort fail to prevent the entry of unauthorized Latin Americans, in an unanticipated way it actually accelerated the net inflow. Although the inflow of undocumented Mexicans was largely unaffected by the build-up of enforcement resources along the border, the outflow was drastically curtailed (Redburn, Reuter, and Majmundar 2011). As the costs and risks of unauthorized border crossing mounted, migrants minimized them by shifting from a circular to a settled pattern of migration, essentially hunkering down and staying once they had successfully run the gauntlet at the border (Massey, Durand, and Malone 2002). It was thus a sharp decline in the outflow of undocumented migrants, not an increase in the inflow of undocumented migrants, that was responsible for the acceleration of undocumented population growth during the 1990s and early 2000s,

and this decline in return migration was to a great extent a product of US enforcement efforts (Redburn, Reuter, and Majmundar 2011).

It was not just undocumented migration that grew after 1965. As we have seen, legal immigration from Latin America also grew despite the imposition of caps and quotas. With a country quota of 20,000 visas per year beginning in 1976, the expected number of entries for any country over a decade is 200,000, yet the decadal number of legal Mexican immigrants, which amounted to 442,000 in the 1960s, rose to 621,000 in the 1970s, reached 1 million in the 1980s, and peaked at 2.8 million in the 1990s before dropping back to 1.7 million in the first decade of the new century. Over the same period, legal immigration from the rest of Latin America rose from 544,000 in the 1960s to 734,000 in the 1970s, 935,000 in the 1980s, 1.5 million in the 1990s, and 1.6 million in the 2000s (US Department of Homeland Security 2012).

The key to understanding the dynamic of this growth again lies with decisions taken by Congress that had unintended consequences: the decision in 1965 to exempt close relatives of US citizens from the country quotas and a series of decisions from 1986 onward that systematically privileged US citizens, limited the rights and liberties of legally resident noncitizens ("green card" holders), and increased the vulnerability of noncitizens to deportation. The quota exemptions by themselves probably would not have led to a sharp increase in legal immigration from Latin America, but when combined with the rising burden placed on noncitizens by US immigration legislation, they produced a dynamic interplay between naturalization and family reunification that drove legal immigration to new heights.

When the citizenship exemption was enacted in 1965, Congress was not really thinking about naturalized citizens. In that year the typical naturalized citizen was an elderly European who had arrived before 1929 and whose children had been born in the United States. Instead, the prototypical citizen seeking to sponsor an immigrant spouse and children in 1965 was a US serviceman returning from duty in Southeast Asia, or coming home from a deployment in Germany, South Korea, the Philippines, Panama, or other countries containing large US military bases. In the context of the Vietnam War, Congress certainly did not want to block entry by wives and children of American soldiers. In addition, the Catholic Church, immigrant organizations, and humanitarian groups rallied around the principle of "family reunification" as the moral cornerstone of US policy and succeeded in including the parents of US citizens under the quota exemption.

For many years, the quota exemption for citizen relatives had little effect on levels and patterns of immigration. For Latin Americans, there was no special advantage to assuming US citizenship once legal permanent residence had been achieved. The entry of spouses and minor children was numerically limited, but they were given a high position in the "preference system" of visa allocation; and with the exception of eligibility for federal employment and the right to vote, there was no particular advantage to naturalization.

This calculus began to change in 1986, and in subsequent years the benefits of citizenship increased as the costs of noncitizenship proliferated.

When Congress passed the Immigration Reform and Control Act in 1986, it authorized two legalization programs, one for farm workers and another for long-time residents, and the terms of these programs for the first time made prerequisites to citizenship a requirement for legalization. Prior to adjusting status to a legal one, immigrants were required to provide evidence of facility or instruction in English and a knowledge or evidence of instruction in American history. In this way, 2.7 million former undocumented migrants were induced to satisfy the requirements previously asked only of people wishing to become US citizens (Massey, Durand, and Malone 2002). Five years after regularization, millions of people would suddenly become eligible for naturalization. Having satisfied the language and civics requirements, all they would have to do is pay an application fee and wait.

The first cohort of persons legalized under IRCA became eligible for citizenship in 1992, with the bulk following in 1993 and 1994. In 1990, Congress undertook the first of a series of actions that began to ratchet up the costs of noncitizenship. In an effort to slow immigration from Latin America and other major immigrant-sending countries, amendments passed in that year sought to limit visas issued for purposes of family reunification by setting an annual cap, but one that could be "pierced" by taking family reunification visas that formerly went to relatives of legal residents and giving them to relatives of citizens. The net effect was to permanently reduce access to legal visas by relatives of legal resident aliens, which greatly increased their waiting time (Zolberg 2006).

Congress followed up in 1996 with three pieces of legislation, all of which bore down heavily on legal immigrants. The Illegal Immigration Reform and Immigrant Responsibility Act authorized the deportation of noncitizens from ports of entry without judicial hearing and, in an effort to restrict family migration still further, required sponsors of legal immigrants to provide affidavits of support that demonstrated a household income at least 125 percent of the federal poverty line. Not only would resident noncitizens have to wait in a long line to sponsor the entry of a spouse or child, when their turn finally came, they would need more money as well. Meanwhile, the Personal Responsibility and Work Opportunity Reconciliation Act placed new restrictions on legal permanent residents' access to public services, barring them from receiving food stamps, Supplemental Security Income, and other means-tested benefits for five years after admission (Newton 2008).

The legislative troika was completed with passage of the Anti-Terrorism and Effective Death Penalty Act, which declared that any noncitizen who had ever committed a crime, no matter how long ago, was subject to immediate deportation. It also gave the federal government broad new powers for the "expedited exclusion" of any noncitizen who had ever crossed the border without documents, no matter what his or her current legal status. In addi-

tion, the bill granted the executive branch new authority to designate any organization as "terrorist," thereby making all members immediately excludable. At the same time, the bill severely circumscribed the possibilities for judicial review of deportation orders (Legomsky 2000).

Finally, in response to the terrorist attacks of September 11, on October 26, 2001 Congress passed, without significant debate, the USA PATRIOT Act, which granted executive authorities even greater powers to deport, without hearings or any presentation of evidence, all noncitizens—legal or illegal, temporary or permanent—who the Attorney General had "reason to believe" might commit, further, or facilitate acts of terrorism. For the first time since the Alien and Sedition Act of 1798, Congress authorized the arrest, imprisonment, and deportation of noncitizens upon the orders of the Attorney General without judicial review (Zolberg 2006). These repressive federal laws have been accompanied in recent years by a surge in anti-immigrant measures enacted at the state and local level (Hopkins 2010).

The net effect of these legislative acts was to dramatically increase the pressure on noncitizens, regardless of legal status. In response to the rising pressure, more immigrants adopted a strategy of "defensive naturalization" in order to protect themselves and their families from detention and deportation and to guarantee their continued access to public benefits. The trend is most clearly seen among Mexicans, who historically exhibited one of the lowest rates of naturalization of any major immigrant group. From 1965 through 1985, the number of Mexicans who naturalized averaged just 8,200 per year. During the immediate post-IRCA period (1986–95), it grew to 29,400 and in the period just after the 1996 Acts (1996–2001) it mushroomed to 168,500, before finally falling back to 99,000 per year in the years after the 2001 terrorist attack (2002–10). If we take the average number of naturalizations per year from 1965 to 1985 as the pre-IRCA norm, then an additional 2 million Mexicans naturalized after 1986 compared to what would have been the case under the previous circumstances.

As the number of newly minted citizens grew, so did the number of Mexicans admitted to the United States outside the quotas as relatives of US citizens, rising from an annual average of 24,000 before 1986 to 34,000 during 1986–95 and 80,000 during 1996–01 before peaking at 98,000 during 2002–10 (US Department of Homeland Security 2012). Whereas a legal permanent resident may petition for the entry of a spouse and minor children, such dependents must wait in an increasingly long line for an increasingly scarce allocation of visas. If the same person naturalizes, however, his or her spouse, children, and parents can enter immediately without limitation. Each new citizen thus generates more potential immigrants over time. By pushing immigrants toward defensive naturalization, Congress in effect increased future legal immigration.

As a result of this dynamic, the proportion of Mexicans admitted to the United States as relatives of US citizens has steadily increased since 1991,

**FIGURE 8   Percentage of Mexicans admitted outside the country quota as relatives of US citizens, 1990–2010**



SOURCE: US Department of Homeland Security (2012).

when the costs of noncitizenship began seriously to accumulate. As shown in Figure 8, the percentage admitted outside the country quotas rose from just 5 percent in 1990 to peak at 69 percent in 2002 before falling to 45 percent in 2005 and then rebounding to 64 percent in 2010. The more young naturalized citizens there are in the population, the larger the share of entries by citizen relatives. Indeed, from 1990 to 2010 the correlation between the cumulative total of naturalizations and the percentage entering as citizen relatives is 0.854. In other words, the larger the number of naturalized citizens in the population, the higher the percentage of immigrants able to enter outside the national quota.

## The new American demography

We have argued that the post-1965 surge in Mexican, Central American, and to a lesser extent South American immigration was not a direct result of immigration reforms that occurred in the mid-1960s, but instead arose indirectly through an accumulation of unintended consequences that unfolded afterward. Before 1965 a circular flow of migrants between Mexico and the United States had been established under the aegis of the Bracero Program and institutionalized informally through the spread and elaboration of migrant networks, which connected sending communities in Mexico to work sites in the United States. By the late 1950s a circulatory cross-border migration system was entrenched and the annual inflow averaged roughly 500,000 persons per year, with around 90 percent entering on temporary work visas.

A host of immigration reforms enacted beginning in the mid-1960s eliminated the temporary work program while simultaneously imposing new quantitative limits on immigration from the Western Hemisphere. With opportunities for legal entry constrained, the well-established migratory flow simply continued informally without authorization. Illegal migration rose steadily after 1965 to peak in the late 1970s. Thereafter it fluctuated in tandem with economic trends north and south of the border. In essence, in 1965 the United States shifted from a de jure guestworker program based on the circulation of bracero migrants to a de facto program based on the circulation of undocumented migrants.

The substitution of a de facto for a de jure system of labor migration might have been the end of it, if not for the fact that the associated rise in apprehensions offered aspiring politicians an opportunity to mobilize voters and entrepreneurial bureaucrats a chance to obtain status and resources by framing illegal migration as a grave threat to the United States. These actors portrayed the undocumented inflow as a crisis, framing it as a "tidal wave" threatening to "flood" the country and "drown" its society, or as an "alien invasion" that threatened national security, defined with reference first to the Cold War and then to the war on terrorism. The media disseminated the "Latino threat" narrative and depicted a "border under siege" and increasingly deployed threatening marine and martial imagery in newspapers, magazines, and on the air.

The rising number of border apprehensions and the intensifying threat narrative, in turn, had profound political consequences, galvanizing a shift toward conservatism among voters and increasing support for more stringent immigration and enforcement policies, setting off a chain reaction in the public sphere. Rising apprehensions led to greater conservatism, which produced more restrictionist legislation and enforcement policies, which translated into a larger Border Patrol with bigger budgets, which produced more linewatch hours, which boosted apprehensions, which then fed back on conservatism. After 1979 rising apprehensions were driven increasingly by this feedback effect, bringing about a growing divergence between apprehensions and the actual volume of undocumented migration.

The massive increase in border enforcement that arose from this feedback loop had the unintended and unexpected result not of deterring departures from Mexico but of reducing returns (Redburn, Reuter, and Majmundar 2011). The volume of US out-migration plummeted as the volume of in-migration continued, and the net rate of undocumented population growth rose sharply to bring about a large increase in the size of this population during the 1990s and early 2000s. On top of this growth in undocumented migration from Mexico, US intervention in Central America during the Cold War contributed to a further destabilization of the region, leading to large-scale migration northward. Although Nicaraguan emigrés were for the most part welcomed as refugees from communist tyranny, those from Salvador,

Guatemala, and Honduras encountered the same restricted opportunities for legal entry as Mexicans. As a result, most entered without authorization or grudgingly received temporary protected status only to have it revoked after the Cold War ended. As a result, nearly three-quarters of the roughly 11 million undocumented migrants in the United States today are from Mexico or Central America.

In the 1990s the Cold War was replaced by the threat of terrorism. The Anti-Terrorism and Effective Death Penalty Act of 1996 and the 2001 Patriot Act intensified border enforcement and, more importantly, brought about a sharp rise in deportations from the United States. Deportations replaced border apprehensions as the visible manifestation of the Latino threat. Although the resulting feedback loop was not as powerful as the apprehensions-based loop that prevailed from 1965 to 1995, it was potent nonetheless and deportations expanded even as apprehensions fell in the decade after 2000.

Led by Mexico, legal immigration from Latin America also rose steadily over the period, especially after 1986 when it came to be powered by a dynamic interplay between rising naturalization rates and the increasing use of quota exemptions by recently naturalized immigrants. Spouses, minor children, and parents of US citizens had long been exempted from the country quotas, but, in response to the continuing increase in legal immigration, rising concerns about terrorism, and growing xenophobia, Congress began to strip civil, social, and economic rights from legal as well as illegal immigrants, prompting more permanent residents to petition for citizenship as part of a strategy of "defensive naturalization." This dynamic unfolded just as millions of former undocumented migrants became eligible to naturalize after receiving permanent residence under IRCA, and each new citizen simply created more legal migration over time. As the number of naturalized migrants grew into the millions, a rising share of immigrants from Mexico and other countries were admitted as relatives of citizens, thus evading the country quotas.

The end result of these processes has been a massive transformation of the demography of the United States in the past 40 years. In 1970 the Hispanic population of the United States stood at around 9.6 million and comprised just 4.7 percent of the US population. More than 70 percent were native born, 60 percent were Mexican, and just 6 percent were Central or South American, compared with nearly a quarter from the Caribbean. In 2010, after four decades of mass migration, the number of Hispanics had risen to 50.5 million and constituted more than 16 percent of the US population. The percentage US-born among Hispanics had fallen to a little over 60 percent and the distribution by national origin had shifted, with Caribbeans dropping to around 15 percent while Mexicans rose to 63 percent and Central and South Americans to 13 percent, with the remaining 9 percent falling into the "other" category (Ennis, Ríos-Vargas, and Albert 2011).

Over the past four decades, the legal status distribution was likewise markedly transformed. According to estimates from the Census Bureau (Acos-

ta and de la Cruz 2011) and the Department of Homeland Security (Hoefer, Rytina, and Baker 2011), a majority of immigrants from Mexico and Central America are present without authorization, including 58 percent of Mexicans, 57 percent of Salvadorans, 71 percent of Guatemalans, and 77 percent of Hondurans. Even when one considers all Hispanic generations together, the undocumented members constitute large fractions of these origin groups: 21 percent of all persons of Mexican origin, 38 percent of Salvadoran origin, 50 percent of Guatemalan origin, and 52 percent of Honduran origin. In other words, undocumented migrants are no longer a small share of Latinos in the United States. Never before have so many people been outside the law and never before have the undocumented been so concentrated within such a small number of national origins.

## A counterfactual scenario

To say that US immigration policies have failed is an understatement. From 1970 to 2010 the population born in Latin America increased more than 11 times. Owing to mass immigration, the total Hispanic population grew by a factor of five, and the percentage of the population born in Latin America residing in the US more than tripled. All these trends unfolded in spite of—and, as we have shown, paradoxically also because of—the progressive limitation of opportunities for legal entry, the massive build-up of enforcement resources at the border, the large rise in deportations, and the systematic restriction of the civil liberties and social rights of noncitizens. If the goal of such actions was to limit immigration from Latin America and prevent the demographic transformation of the United States, they achieved the opposite.

Might events have worked out differently? Possibly. The crux of the problem is that Congress routinely makes consequential policy decisions with scant consideration of the underlying dynamics of the social processes involved. That was certainly the case here, for in orchestrating immigration reforms during the 1960s and 1970s Congress took little notice of the long history of recruitment in the hemisphere; the high degree of circularity that historically had prevailed; the strong connection of flows to the dynamics of labor supply and demand; the key role of networks in sustaining and expanding migration over time; the motivations of migrants and how they change in the course of a migratory career; the structural transformations that occur in sending and receiving areas as a result of mass migration; the likelihood of a migratory response to economic, political, and military intervention; the large size and well-established nature of flows into the United States on the eve of restriction; and most importantly the strong momentum that accrues to migratory flows once underway.

As we have demonstrated, intervening forcefully in complex social and economic systems without understanding their dynamics can lead to

unintended consequences and unanticipated policy feedbacks. To be fair, immigration was not a salient issue in the 1960s and 1970s when many of the fateful decisions were taken, and fundamental features of migration processes—network effects, migratory momentum, migrant motivations—are much better understood now than they were four decades ago. Nonetheless, it is possible to imagine a different scenario occurring, particularly if Congress had thought about immigration reform as potentially having wide-ranging effects on a well-established binational migratory system rather than simply as a domestic political issue.

Suppose, for example, that in choosing to reform the Bracero Program, Congress had enacted safeguards to improve the wages, working conditions, and treatment of workers instead of shutting down the program entirely. Suppose that in implementing the new system of ethnically neutral country quotas, Congress had granted special, more generous visa allocations to Canada and Mexico as America's closest neighbors. Finally, suppose that instead of funding the Contras and other paramilitary operations, generating a cycle of violence and economic disruption, the Reagan Administration had let events in Nicaragua take their course without interference.

Under those circumstances mass migration from Latin America might indeed have been avoided. With the continuation of a reformed temporary labor migration program, the flow from Mexico would have remained predominantly circular. With a generous country quota for permanent resident visas, Mexican workers who established legitimate ties and wished to settle in the United States would have had a legal pathway. Hispanic population growth would thus have been slow and illegal migration would likely not have risen to the high levels that have made it into a major political issue. The Latino threat narrative would not have gained traction, fears of an alien flood or invasion would not have pushed Americans toward greater conservatism, and there would have been little support for restrictionist policies.

At the same time, absent a US intervention in Central America, the collapse of Soviet support would likely have brought down the Sandinista government in Nicaragua and ended insurgencies elsewhere without displacing millions of Central Americans northward. Central Americans would not have contributed so greatly to Hispanic population growth. The illegal population of the United States would consequently have remained rather small, Latinos would still be the country's second minority after African Americans, and, when the terrorists attacked, the United States would have been a less divided and fractious nation. A softer line on restriction, less punitive enforcement, and greater military restraint could have yielded fewer permanent immigrants, less undocumented migration, and slower population growth.

The era of mass Mexican migration appears to be over, at least for the moment. According to the best estimates, the undocumented population peaked at around 12 million in 2008, fell to 11 million in 2009, and has held

26          Unintended Consequences of US Immigration Policy

steady since then (Wasem 2011). The annual number of legal entries has likewise fallen, dropping from 219,000 in 2002 to 139,000 in 2010. The number of entries by temporary workers, in contrast, has increased to record levels, reaching 517,000 in 2010, the largest number in history (US Department of Homeland Security 2012). With the number of temporary worker entries exceeding those recorded during the Bracero Program, illegal migration at zero, and demand for permanent resident visas apparently falling, the key remaining item on the immigration reform agenda is how to deal with the legacy of past failed policies—the large population of undocumented residents. Despite record deportations and rising anti-immigrant sentiment, the rate of return migration among this population is also near zero.

Of the 11 million persons currently present without authorization, some 3 million entered as children. Absent a criminal record, there is a compelling case that they should be granted amnesty as proposed in pending legislation, such as the Dream Act. After all, it was not their decision to be undocumented. For those who entered the United States illegally as adults, arguably the only sensible and humane solution is an earned legalization program. For example, migrants could accumulate points for learning English, taking civics courses, paying taxes, and having US citizen children. When a specified threshold number of points is reached, they would pay a fine and adjust their status to legal permanent resident. Abundant research has documented that harsher enforcement and rising deportation have not increased the rate of "self-deportation," but instead have lowered the rate of return migration among the undocumented to record lows. A permanent undocumented population of 11 million can only bring a host of social and economic problems, ones that will worsen the longer an appropriate policy response is deferred.

TABLE A1   Legal and illegal US migration from Mexico and political and policy indicators, 1955–2009

| Year | Legal migrants (1) | Temporary migrants (2) | Estimated illegal migrants (3) | Apprehensions (4) | Deportations (5) | Border Patrol agents (6) | Border Patrol budget ($1,000) (7) | Linewatch hours (8) | Percent conservative (9) |
|------|------|------|------|------|------|------|------|------|------|
| 1955 | 50772 | 398650 | 164035 | 242608 | 17695 | 1479 | NA | 919000 | NA |
| 1956 | 65047 | 445197 | 45475 | 72442 | 9006 | 1593 | NA | 990000 | NA |
| 1957 | 49154 | 436049 | 29813 | 44451 | 5989 | 1491 | NA | 927000 | NA |
| 1958 | 26712 | 432857 | 24437 | 37242 | 7875 | 1524 | NA | 947000 | NA |
| 1959 | 23061 | 437643 | 20131 | 30196 | 8468 | 1500 | NA | 932000 | NA |
| 1960 | 32084 | 315846 | 19847 | 29651 | 7240 | 1494 | NA | 929000 | NA |
| 1961 | 41632 | 291420 | 18093 | 29817 | 8181 | 1648 | NA | 1024000 | NA |
| 1962 | 55291 | 194978 | 18756 | 30272 | 8025 | 1614 | NA | 1003000 | NA |
| 1963 | 55253 | 186865 | 26205 | 39124 | 7763 | 1493 | NA | 928000 | NA |
| 1964 | 32967 | 177736 | 29366 | 43844 | 9167 | 1493 | NA | 928000 | NA |

/…

Douglas S. Massey / Karen A. Pren                                          27

**TABLE A1 (continued)**

| Year | Legal migrants (1) | Temporary migrants (2) | Estimated illegal migrants (3) | Apprehensions (4) | Deportations (5) | Border Patrol agents (6) | Border Patrol budget ($1,000) (7) | Linewatch hours (8) | Percent conservative (9) |
|---|---|---|---|---|---|---|---|---|---|
| 1965 | 37969 | 20286 | 37116 | 55340 | 10572 | 1491 | 41.7 | 920000 | 18.2 |
| 1966 | 45163 | 8647 | 60195 | 89751 | 9680 | 1491 | 49.2 | 930000 | 19.3 |
| 1967 | 42371 | 7703 | 72508 | 108327 | 9728 | 1494 | 52.3 | 937566 | 20.5 |
| 1968 | 43563 | 0 | 101543 | 151705 | 9590 | 1494 | 47.8 | 941860 | 21.6 |
| 1969 | 44623 | 0 | 134964 | 201636 | 11030 | 1494 | 46.3 | 909623 | 22.7 |
| 1970 | 44469 | 0 | 177125 | 277377 | 17469 | 1566 | 47.0 | 1148854 | 23.8 |
| 1971 | 50103 | 0 | 224053 | 348178 | 18294 | 1554 | 55.9 | 1118710 | 24.9 |
| 1972 | 64040 | 0 | 263288 | 430213 | 16883 | 1634 | 60.5 | 1259430 | 26.0 |
| 1973 | 70141 | 0 | 338511 | 576823 | 17346 | 1704 | 64.7 | 1279198 | 27.8 |
| 1974 | 71586 | 0 | 408257 | 709959 | 19413 | 1739 | 62.6 | 1253191 | 29.5 |
| 1975 | 62205 | 0 | 377367 | 680392 | 24432 | 1803 | 63.1 | 1465423 | 30.1 |
| 1976 | 74449 | 0 | 394883 | 781474 | 38471 | 1979 | 67.3 | 1775890 | 31.7 |
| 1977 | 44646 | 2011 | 464160 | 954778 | 31263 | 2057 | 67.9 | 1740446 | 31.8 |
| 1978 | 92681 | 2271 | 446170 | 976667 | 29277 | 2189 | 78.1 | 1762616 | 33.8 |
| 1979 | 52479 | 1725 | 427033 | 998830 | 26825 | 2339 | 65.5 | 1935926 | 33.9 |
| 1980 | 56680 | 3323 | 329098 | 817479 | 18013 | 2484 | 82.6 | 1815797 | 34.0 |
| 1981 | 101268 | 4719 | 357788 | 874433 | 17379 | 2444 | 85.6 | 1929448 | 33.4 |
| 1982 | 56106 | 4966 | 356705 | 887481 | 15216 | 2488 | 98.7 | 1871173 | 32.7 |
| 1983 | 59079 | 5014 | 473850 | 1172306 | 19211 | 2474 | 110.1 | 1976162 | 34.5 |
| 1984 | 57820 | 5336 | 473229 | 1170769 | 18696 | 2474 | 114.1 | 1843179 | 36.5 |
| 1985 | 61290 | 9622 | 392017 | 1266999 | 23105 | 3232 | 141.9 | 1912895 | 36.5 |
| 1986 | 66753 | 12029 | 452602 | 1671458 | 24592 | 3693 | 150.9 | 2401575 | 35.8 |
| 1987 | 72511 | 13393 | 307752 | 1139606 | 24336 | 3703 | 194.6 | 2546397 | 32.5 |
| 1988 | 95170 | 16802 | 255783 | 949722 | 25829 | 3713 | 205.3 | 2069498 | 36.7 |
| 1989 | 66933 | 27168 | 232418 | 865292 | 34427 | 3723 | 246.4 | 2570311 | 32.3 |
| 1990 | 57667 | 16891 | 292606 | 1092298 | 30039 | 3733 | 262.6 | 2781317 | 36.9 |
| 1991 | 54622 | 19148 | 309918 | 1131510 | 33189 | 3651 | 298.7 | 2638720 | 32.2 |
| 1992 | 91658 | 19813 | 294298 | 1199560 | 43671 | 4076 | 399.3 | 2642227 | 34.4 |
| 1993 | 109108 | 23169 | 318661 | 1263490 | 42542 | 3965 | 361.7 | 2713937 | 36.3 |
| 1994 | 107012 | 24896 | 244124 | 1031668 | 45674 | 4226 | 400.0 | 3073758 | 37.0 |
| 1995 | 87073 | 26512 | 271297 | 1324202 | 50924 | 4881 | 451.5 | 3397049 | 37.1 |
| 1996 | 160138 | 35949 | 263674 | 1549876 | 69680 | 5878 | 568.0 | 4073542 | 37.2 |
| 1997 | 144641 | 35949 | 205371 | 1412953 | 114432 | 6880 | 717.4 | 4807669 | 36.1 |
| 1998 | 129970 | 66197 | 194911 | 1555776 | 174813 | 7982 | 877.1 | 6660692 | 35.0 |
| 1999 | 146432 | 86424 | 189080 | 1579010 | 183114 | 8351 | 916.8 | 8740258 | 34.5 |
| 2000 | 173161 | 104155 | 181984 | 1676438 | 188467 | 9212 | 1055.4 | 8999552 | 34.0 |
| 2001 | 205560 | 116157 | 131200 | 1266214 | 189026 | 9651 | 1146.5 | 9802081 | 34.5 |
| 2002 | 218822 | 118835 | 96476 | 955310 | 165168 | 9902 | 1416.3 | 9183667 | 35.1 |
| 2003 | 115585 | 114673 | 88375 | 931557 | 211098 | 10541 | 1420.3 | 9457060 | 36.8 |
| 2004 | 175411 | 117999 | 108175 | 1160395 | 240665 | 10727 | 1212.9 | 9830697 | 38.4 |
| 2005 | 161445 | 169786 | 107069 | 1189108 | 246431 | 11106 | 1525.3 | 10474078 | 36.7 |
| 2006 | 173749 | 225680 | 86419 | 1089136 | 280974 | 12603 | 1561.8 | 11562715 | 34.7 |
| 2007 | 148640 | 300346 | 62179 | 876787 | 319382 | 14101 | 2277.5 | 14055363 | 35.2 |
| 2008 | 189989 | 360903 | 41365 | 723840 | 358886 | 17499 | 3002.2 | 17852594 | 35.7 |
| 2009 | 164920 | 301558 | 27637 | 556032 | 392862 | 20119 | 3501.3 | 20657122 | 40.0 |

SOURCES: Columns 1–8: US Dept. of Homeland Security; Column 9: General Social Survey.

# References

Acosta, Yesenia D. and G. Patricia de la Cruz. 2011. "The foreign born from Latin America and the Caribbean: 2010," *American Community Survey Briefs*, US Bureau of the Census, Washington, DC.

Balderrama, Francisco E. 1995. *Decade of Betrayal: Mexican Repatriation in the 1930s*. Albuquerque: University of New Mexico Press.

Buchanan, Patrick J. 2006. *State of Emergency: The Third World Invasion and Conquest of America*. New York: Thomas Dunne Books.

Calavita, Kitty. 1992. *Inside the State: The Bracero Program, Immigration, and the INS*. New York: Routledge.

Chapman, Leonard F. 1976. "Illegal aliens: Time to call a halt!," *Reader's Digest*, October, pp. 188–192.

Chavez, Leo R. 2001. *Covering Immigration: Population Images and the Politics of the Nation*. Berkeley: University of California Press.

———. 2008. *The Latino Threat: Constructing Immigrants, Citizens, and the Nation*. Stanford, CA: Stanford University Press.

Dobbs, Lou. 2006. *War on the Middle Class: How the Government, Big Business, and Special Interest Groups Are Waging War on the American Dream and How to Fight Back*. New York: Viking.

Ennis, Sharon R., Merarys Ríos-Vargas, and Nora G. Albert. 2011. "The Hispanic population: 2010," *2010 Census Briefs*, US Bureau of the Census, Washington, DC.

Fiske, Susan T. 2011. *Envy Up, Scorn Down: How Status Divides Us*. New York: Russell Sage Foundation.

Hoefer, Michael, Nancy Rytina, and Bryan C. Baker. 2009. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2008*. Washington, DC: Office of Immigration Statistics, US Department of Homeland Security.

———. 2011. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010*. Washington, DC: Office of Immigration Statistics, US Department of Homeland Security.

Hoffman, Abraham. 1974. *Unwanted Mexican Americans in the Great Depression: Repatriation Pressures, 1929–1939*. Tucson: University of Arizona Press.

Hopkins, Daniel J. 2010. "Politicized places: Explaining where and when immigrants provoke local opposition," *American Political Science Review* 104: 40–60.

Huntington, Samuel P. 2004. "The Hispanic challenge," *Foreign Policy*, March/April, pp. 1–12. Accessed 6/15/2011 at «http://www.foreignpolicy.com/story/cms.php?story_id=2495».

Kamen, Al. 1990. "Central America is no longer the central issue for Americans," *Austin American Statesman*, 21 October.

Legomsky, Stephen H. 2000. "Fear and loathing in Congress and the courts: Immigration and judicial review," *Texas Law Review* 78: 1612–1620.

Lundquist, Jennifer H. and Douglas S. Massey. 2005. "Politics or economics? International migration during the Nicaraguan Contra war," *Journal of Latin American Studies* 37: 29–53.

Massey, Douglas S. 1995. "The new immigration and ethnicity in the United States," *Population and Development Review* 21: 631–652.

———. 1999. "International migration at the dawn of the twenty-first century: The role of the state, *"Population and Development Review* 25: 303–322.

———. 2011. "Epilogue: The past and future of Mexico–U.S. migration," in Mark Overmyer-Velázquez (ed.), *Beyond la Frontera: The History of Mexico–U.S. Migration*. New York: Oxford University Press, pp. 241–265.

Massey, Douglas S., Jorge Durand, and Nolan J. Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration*. New York: Russell Sage Foundation.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2009. "Nuevos escenarios de la migración México–Estados Unidos: Las consecuencias de la guerra antiinmigrante," *Papeles de Población* 61: 101–128.

Massey, Douglas S. and Karen A. Pren. 2012. "Origins of the new Latino underclass," *Race and Social Problems*, forthcoming.

Massey, Douglas S. and Audrey Singer. 1995. "New estimates of undocumented Mexican migration and the probability of apprehension," *Demography* 32: 203–213.

Meyers, Eytan. 2004. *International Immigration Policy: A Theoretical and Comparative Analysis*. London: Palgrave Macmillan.

Nevins, Joseph. 2001. *Operation Gatekeeper: The Rise of the "Illegal Alien" and the Remaking of the U.S.–Mexico Boundary*. New York: Routledge.

Newton, Lina. 2008. *Illegal, Alien, or Immigrant: The Politics of Immigration Reform*. New York: New York University Press.

Ngai, Mae M. 2003. *Impossible Subjects: Illegal Aliens and the Making of Modern America*. Princeton, NJ: Princeton University Press.

Redburn, Steve, Peter Reuter, and Malay Majmundar. 2011. *Budgeting for Immigration Enforcement: A Path to Better Performance*. Washington, DC: National Academies Press.

Rotella, Sebastian. 1998. *Twilight on the Line: Underworlds and Politics at the U.S.–Mexico Border*. New York: W.W. Norton.

Santa Ana, Otto. 2002. *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse*. Austin: University of Texas Press.

Smith, Rogers M. 1997. *Civic Ideals: Conflicting Visions of Citizenship in U.S. History.* New Haven, CT: Yale University Press.

———. 2003. *Stories of Peoplehood: The Politics and Morals of Political Membership.* New York: Cambridge University Press.

Tichenor, Daniel J. 2002. *Dividing Lines: The Politics of Immigration Control in America*. Princeton, NJ: Princeton University Press.

Timmer, Ashley S. and Jeffrey G. Williamson. 1998. "Immigration policy prior to the 1930s: Labor markets, policy interactions, and globalization backlash," *Population and Development Review* 24: 739–771.

US Department of Homeland Security. 2012. Website of the Office of Immigration Statistics, Accessed 1/5/12 at «http://www.dhs.gov/files/statistics/immigration.shtm».

Warren, Robert and Jeffrey S. Passel. 1987. "A count of the uncountable: Estimates of undocumented aliens counted in the 1980 Census," *Demography* 24: 375–393.

Wasem, Ruth E. 2011. *Unauthorized Aliens Residing in the United States: Estimates Since 1986*. Washington, DC: Congressional Research Service.

Zolberg, Aristide R. 2006. A *Nation by Design: Immigration Policy in the Fashioning of America*. New York: Russell Sage Foundation.

# DEF-INTERV.

# EX. 122

 INTERNATIONAL MIGRATION REVIEW

# Explaining Undocumented Migration to the U.S.[1]

Douglas S. Massey
*Princeton University*

Jorge Durand
*University of Guadalajara*
*Centro de Investigación y Docencia Económicas*

Karen A. Pren
*Princeton University*

Using data from the Mexican Migration Project and the Latin American Migration Project, we find that undocumented migration from Mexico reflects U.S. labor demand and access to migrant networks and is little affected by border enforcement, which instead sharply reduces the odds of return movement. Undocumented migration from Central America follows primarily from political violence associated with the U.S. intervention of the 1980s, and return migration has always been unlikely. Mass undocumented migration from Mexico appears to have ended because of demographic changes there, but undocumented migration from Central America can be expected to grow slowly through processes of family reunification.

Although net unauthorized migration from Mexico to the U.S. has been zero or negative since 2008 (Wasem, 2011; Baker and Rytina, 2013; Warren and Warren, 2013) and border apprehensions are at their lowest level since 1970 (Massey, 2013), unauthorized migration by Central Americans continues to grow and apprehensions are rising (Passel, Cohn, and Gonzalez-Barrera, 2013). Whereas border apprehensions of Mexicans fell from 1.7 million in 2000 to 449,000 in 2012, apprehensions of Central Americans rose from 33,000 to 145,000 over the same period. Here, we draw upon data from the Mexican Migration Project (MMP) and the Latin

[1]The authors acknowledge support from NIH Grants R24 HD047879 and R01 HD035643.

© 2014 by the Center for Migration Studies of New York. All rights reserved.
DOI: 10.1111/imre.12151

ase 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 432 of 5!

EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.          1029

American Migration Project (LAMP) to study and explain these contrasting trends in undocumented migration. The paper constitutes the first comparative analysis of undocumented migration from Mexico and Central America based on comparable data.

We begin our analysis by reviewing the history of undocumented migration from both regions. After describing our methods and data, we specify and estimate equations to model decisions made by actors at four key junctures in the migration process: taking a first undocumented trip to the U.S., returning from that first trip, taking an additional undocumented trip to the U.S., and returning from that additional trip. We then draw on the estimated models to interpret recent trends in undocumented migration from Mexico and Central America. In the conclusion, we summarize our findings and draw on the final models to predict the future of undocumented migration to the U.S. We offer our findings as evidence of the benefits of a multisite, multimethod research design for studying the dynamics of migration, especially in cases where much of the movement is unauthorized. The MMP originated this approach, and the LAMP was the first spin-off project.

## THE EVOLUTION OF UNDOCUMENTED MIGRATION

The origins of U.S. undocumented migration date back to 1965 when changes in U.S. immigration policy blocked avenues for legal entry from Mexico (Massey and Pren, 2012). Prior to that year, Mexicans had enjoyed access to a large temporary worker program and legal permanent immigration was not restricted numerically. In the late 1950s, around half a million Mexicans entered the country each year, roughly 90 percent as temporary workers known as Braceros and the rest as legal permanent residents (Massey and Pren, 2012). Despite the label, many permanent residents actually circulated back and forth using their "green cards" as de facto work permits (Massey *et al.*, 1987). Indeed, Warren and Kraly (1985) estimate that during the 1970s, annual out-migration by Mexican legal residents averaged about 20 percent of annual in-migration, and Jasso and Rosenzweig (1982) estimate that 56 percent of legal immigrants from Mexico who arrived in 1970 had returned by 1979.

At the end of 1964, the U.S. Congress abruptly terminated the Bracero Program, and in 1965, it imposed the first-ever numerical limitations on legal immigration from the Western Hemisphere. Mexican migration, however, did not cease. Although the deportation campaigns of the 1930s

and the lack of significant immigration from Mexico between 1929 and 1942 had ruptured the migrant networks that formed during the migration boom of the 1920s (Hoffman, 1974; Cardoso, 1980; Baldarrama, 1995), over 22 years, the Bracero Program reestablished mass migration from Mexico and regenerated networks linking residents of communities throughout Mexico to jobs and destinations in the U.S. (Massey *et al.*, 1987; Massey, Durand, and Malone, 2002). These networks provided non-migrants with access to information and assistance in crossing the border to lower the costs and risks of cross-border movement (Palloni *et al.*, 2001). Given continuing labor demand in the U.S., well-developed migrant networks, and economic needs in Mexico, the annual inflow of migrants did not cease when opportunities for legal entry were curtailed after 1965; instead, migrants simply drew on network ties to continue migrating without authorization to jobs waiting for them north of the border (Massey and Pren, 2012).

As during the Bracero years, the undocumented flows that arose after 1965 were overwhelmingly circular, with 85 percent of undocumented entries being offset by departures (Massey and Singer, 1995). As a result, the undocumented population grew slowly and had increased to just 3.2 million by 1986 (Wasem, 2011), when Congress passed the Immigration Reform and Control Act (IRCA). This legislation contained two legalization programs that temporarily reduced the undocumented population to 1.9 million persons in 1988 (Woodrow and Passel, 1990). By 1990, however, the undocumented inflow had resumed its former pace (Orrenius and Zavodny, 2003), and two years later, the population was back up to 3.4 million (Warren, 2000). In addition to legalizing former undocumented migrants, IRCA simultaneously stepped up enforcement by criminalizing the hiring of undocumented migrants and increasing the size and budget of the Border Patrol, thus beginning a two-decade process of border militarization (Massey, Durand, and Malone, 2002; Massey, 2011).

Between 1986 and 2000, the number of Border Patrol Officers nearly tripled and the agency's budget grew by a factor of seven (Massey, Durand, and Malone, 2002). As border enforcement accelerated, the rate of cross-border circulation steadily fell, especially after the launching of Operation Blockade in El Paso in 1993 and Operation Gatekeeper in San Diego in 1994 (Massey, Durand, and Malone, 2002). As the costs and risks of unauthorized border crossing multiplied, migrants quite logically minimized border crossing – not by remaining home in Mexico as U.S.

authorities had hoped but by staying longer in the U.S. once they had run the gauntlet at the border (Reyes, 2004; Riosmena, 2004; Cornelius and Lewis, 2007; Massey, Durand, and Pren, 2009; Rendall, Brownell, and Kups, 2011; Angelucci, 2012). The resulting drop in return migration has been called a "caging effect," in which a hardened border functioned to "cage in" migrants north of the border (Rosenblum, 2012).

The combination of continued in-migration and declining out-migration sharply increased the net rate of the undocumented population growth, which surged to reach 9.4 million persons in 2001. Thereafter, the rate of growth slowed and ultimately came to a halt in 2008 when the undocumented population peaked at around 12 million persons (Wasem, 2011; Warren and Warren, 2013). Between 2008 and 2009, the number of undocumented residents fell by more than million persons, and since then, the population has hovered around 11 million. At present, around 60 percent of all undocumented residents are from Mexico and 15 percent are from Central America, with another 5 percent coming from elsewhere in Latin America and the Caribbean (Passel and Cohn, 2011). Thus, undocumented migration is mostly a regional problem of the Western Hemisphere, with Mexico and Central America constituting by far the two most important sources.

Undocumented migration from Central America began after 1979 following the U.S. government's intervention in the Nicaraguan Contra War and its support of right-wing regimes in Guatemala, El Salvador, and Honduras. As the intervention intensified and violence grew and spread through the 1980s, undocumented migration to the U.S. rose accordingly, as unauthorized Nicaraguans, Salvadorans, Guatemalans, and Hondurans increasingly joined Mexicans north of the border (Lundquist and Massey, 2005). Although Nicaraguans, like other Central Americans, originally entered the country without authorization or overstayed tourist visas, as emigrants from a leftist regime, they were given preferential access to permanent residence.

The 1997 Nicaraguan Adjustment and Central American Relief Act (NACARA), for example, contained two sections. Section 202 applied to Nicaraguans and authorized them to apply for legal permanent residence if they had been in the U.S. since December 1, 1995, while forgiving any legal infractions related to their unauthorized entry and presence in the U.S. (Marín Abaunza, 1998). Section 203 applied to Salvadorans and Guatemalans and only authorized them to apply for a suspension of

deportation or cancelation of removal, not legal permanent residence, and Hondurans were not covered at all.

Not only were Guatemalans and Salvadorans unable to apply for legal permanent residence, even the pathway to obtain relief from removal was torturous and eligibility was limited. Guatemalans, for example, were authorized to apply for relief only if they had first entered the U.S. on or before October 1, 1990, registered for benefits with the American Baptist Churches by December 31, 1991, and not been apprehended trying to enter the country after December 19, 1990. Salvadorans could apply if they had entered the U.S. on or before September 19, 1990, registered for Baptist benefits or applied for temporary protected status by October 31, 1991, and not been apprehended trying to enter the country after December 19, 1990.

Moreover, the foregoing conditions only authorized Salvadorans and Guatemalans to *apply* for relief from threat of deportation or removal. To receive actual relief, they also had to document seven years of continuous presence in the U.S. and good moral character and in addition show that their deportation or removal would result in extreme hardship to the applicant or to a spouse, child, or parent who was a U.S. citizen or legal permanent resident. Finally to receive relief, they had to demonstrate that they deserved "a favorable exercise of discretion." Given the stark contrast between Sections 202 and 203, Nicaraguans were easily able to transition into legal status and disappear from the undocumented population, but such a transition was out of reach for most Salvadorans and Guatemalans and, of course, all Hondurans, and migrants from these nations languished either in undocumented status or the legal limbo of temporary protected status.

It is no surprise, then, that after Mexico, the next most important source countries for unauthorized migrants are El Salvador, Guatemala, and Honduras. While the Mexican undocumented population fell from 7 million in 2008 to 6.7 million in 2012, the number of undocumented Central Americans grew from 1.3 to 1.6 million (Baker and Rytina, 2012). Government estimates suggest that as of 2010, around 55 percent of Salvadorans, 63 percent of Guatemalans, and 73 percent of Hondurans living in the U.S. in 2010 were present without authorization (Acosta and Patricia de la Cruz, 2011; Baker and Rytina, 2012). In this study, we seek to explicate the recent contrast in trends of undocumented migration from Mexico and Central America.

## DATA AND METHODS

Our data come from the Mexican Migration Project (MMP) and the
Latin American Migration Project (LAMP). Since 1987, the MMP has
annually conducted representative surveys in communities throughout
Mexico. At the time of this research, 134 communities in 20 Mexican
states had been surveyed, yielding information on 22,479 households.
Communities were selected to build socioeconomic, geographic, and
demographic diversity into the sample over time and to include a range of
urbanism, from small rural villages to neighborhoods in large urban areas.
The LAMP was launched in 1998 to replicate the success of the MMP in
other countries of Latin America. To date, it has undertaken surveys in
eleven nations, including seven communities in Costa Rica (2000–2002),
four in El Salvador (2007), three in Guatemala (2004), and nine in Nica-
ragua (2000–2002), together yielding information on 3,986 households
from Central America.

   In both projects, during their time in the field, interviewers gathered
contact information on friends and family members settled in the U.S.
and then used these as starting points to build network samples of
migrants in U.S. destination communities, thus capturing the experience
of settled households whose members no longer return home with any
regularity. Interviews were guided by a semi-structured instrument that
blended ethnographic and survey methods to compile comprehensive
information about the household head, the spouse, all children of the
head, and any additional household members. Interviews were conducted
with the household head and the spouse, who provided information on
other members of the family, including all children of the household head
and any other person present in the household at the time of the inter-
view. Grown children of the head who had left the household were
flagged with a dummy variable to indicate that they were no longer mem-
bers. Migrants in the U.S. were considered to be household members if
they were expected to rejoin the family upon returning home.

   The interviewers compiled basic social, economic, and demographic
information about the household and its members, including data on first
and most recent trips to the U.S. and legal status during the year in which
the trip was made. Undocumented migrants include those who reported
crossing the border without authorization and those who entered with a
tourist visa but then violated its terms by working or over-staying. In

addition, each household head and spouse provided a complete history of
migration, and household heads additionally answered a detailed series of
questions about their history of border crossing and experiences on the
most recent U.S. trip.

Here, we draw upon the life histories provided by household heads
to compute probabilities of first undocumented migration. Specifically, we
follow each household head year-by-year from the point of entry into the
labor force to the date of the first trip or the survey. An undocumented
trip is defined as a journey to the border in which entry to the U.S. was
attempted or achieved. The probability of taking a first undocumented
trip is computed as the number of observed first trips in year t divided by
the number of people at risk of taking a first trip in that year. To com-
pute the probability of taking an additional trip, we follow each migrant
from the point of their return form one trip up to the time of their next
trip or the survey date and divide the number of additional trips observed
in year t by the number of migrants at risk of making an additional trip
in that year. We measure the probability of return migration from all trips
simply by dividing the number of migrants who returned within
12 months of entry by the total number of successful entries 12 months
earlier.

We model undocumented migration as both a social and an eco-
nomic process. Economically, people choose to migrate to the U.S. for
diverse motives: some to maximize earnings; others to finance purchases
in the absence of well-functioning markets for credit, capital, and mort-
gages; others to diversify sources of household income in the absence of
insurance markets or government substitutes; and still others to finance
retirement in the absence of access to an old-age pension system (Massey
et al., 1998; Sana and Massey, 2000). Socially, people also migrate to
achieve family reunification, but they also draw upon and manipulate
social ties to mobilize social capital, seeking access to information about
U.S. markets for labor, housing, and other resources as well as assistance
with the process of undocumented entry (Massey and Phillips, 1999; Pal-
loni et al., 2001). Naturally, motives for migration may change over the
course of a migratory career (Piore, 1979) and different motives may
dominate among migrants leaving at different points in historical time
(Garip, 2012).

The independent variables we use to predict decisions about migra-
tion and return are listed in and defined in Table 1. To the extent that
migration is an economic enterprise, the likelihood of departure is

EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.            1035

**TABLE 1**
**DEFINITION OF INDEPENDENT VARIABLES (YEAR T)**

| Variable | Operational Definition |
|---|---|
| Demographic Background | |
| Age | Age at last birthday |
| Female | Female dummy |
| Married | Respondent in formal or informal union |
| No. of minors in household | No. of own children under age 18 |
| Human Capital | |
| Labor force experience | No. of years since first job |
| Education | No. of years of school completed |
| Cumulative U.S. experience | Total months of U.S. experience on prior trips |
| Number of prior U.S. trips | Number of prior U.S. trips |
| Documented on last trip | Migrated with documents on last U.S. trip |
| Origin Occupation | |
| Agricultural job | Agricultural occupation in home country |
| Unskilled job | Unskilled non-agricultural occupation in home country |
| Skilled job | Skilled non-agricultural occupation in home country |
| Social Capital | |
| Parent a U.S. migrant | Subject's parents was a U.S. migrant |
| No. of U.S. migrant siblings | No. of siblings with U.S. experience |
| Prop. U.S. migrants in community | Proportion over age 15 with U.S. migration experience |
| Spouse a U.S. migrant | Spouse has begun migrating to the United States |
| No. of U.S. migrant children | No. of children who have begun migrating |
| No. of U.S. born children | No. of children born in United States |
| Physical Capital | |
| Land | Household owns farmland |
| Home | Household owns home |
| Business | Household owns a business |
| U.S. Social Context | |
| Enforcement Index | Factor Scale |
| Rate of Employment Growth | Rate of U.S. Employment Growth |
| Legal Entries per Capita | Number of Legal Entries for Work or Residence Divided by National Populaton |
| Mexican Context | |
| Rate of Population Growth | Yearly rate of population growth |
| Rate of GDP Growth | Yearly rate of GDP growth |
| Homicide Rate | Yearly homicide rate |
| Central American Context | |
| Level of Civil Violence | Index from Proquest Historical Newspaper Series |
| Rate of GDP Growth | Yearly rate of GDP growth |
| Rate of Population Growth | Yearly rate of population growth |

expected to vary in conjunction with personal characteristics that affect earning capacity. Models of migration thus typically include demographic indicators such as age, gender, marital status, and household composition as well as human capital indicators such as labor force experience, education, and occupational skill. Ownership of physical capital such as land, a home, or a business is also relevant in migrant decision-making, for these

se 1:18-cv-00068   Document 225-4   Filed on 07/21/18 in TXSD   Page 439 of 55

assets may serve either as a source of money to finance a trip or as a
motivation for capital accumulation and investment. Indicators of social
capital generally assess ties to people with prior U.S. migratory experience,
such as parents, spouses, siblings, and children, but we also include more
general indicators such as the prevalence of U.S. migrants in the commu-
nity.

Whatever individual and household characteristics a person displays,
the likelihood of undocumented migration also depends crucially on con-
textual circumstances at both origin and destination. Among the most
salient is labor demand in the U.S., which we measure as the annual per-
centage change in the number of people gainfully employed in the civilian
labor force (obtained from the U.S. Bureau of Labor Statistics at <http://
www.bls.gov/>). Whatever the demand for migrant labor might be, how-
ever, the supply is filtered by U.S. immigration and border policies. For
instance, the probability of undocumented migration is likely to be deter-
mined, at least partially, by access to legal visas, which we measure as the
annual number of legal entries for work or residence from a particular
country (obtained from the U.S. Office of Immigration Statistics at
<http://www.dhs.gov/immigration-statistics>) divided by that country's
population (from the U.S. at <http://data.un.org/>).

As noted earlier, since 1986, the U.S. has mounted a concerted
effort to apprehend unauthorized migrants at the border, and to mea-
sure this enforcement effort, we undertook a principal components
analysis of annual deportations, the number of Border Patrol agents,
the Border Patrol budget, and the number of linewatch hours spent by
agents looking for unauthorized border crosses (compiled from various
sources at the U.S. Department of Homeland Security and the archives
of the Immigration and Naturalization Service). We then used the fac-
tor loadings to create a weighted average of the four separate compo-
nents.

On the sending side, we focus on three conditions in each origin
nation. Population pressure is measured by the annual rate of population
growth (from the United Nations Population Division at <http://data.
un.org/Default.aspx>), and economic opportunity is assessed using the
annual percentage change in GDP expressed in constant 2005 dollars
(from the U.S. Department of Agriculture's Economic Research Service
(<http://www.ers.usda.gov/data-products/international-macroeco-
nomic-data-set.aspx>). Finally, we consider civil violence as a potential
driver of migration from both Mexico and Central America, although

owing to data constraints we use different measures to capture trends in the two regions.

In Mexico, we measure shifting levels of violence by simply including the homicide rate per 100,000 persons (*see* <http://www.mexicomaxi co.org/Voto/Homicidios100M.htm>).

When President Felipe Calderón came into office in December of 2006 in a disputed election, he sought to assert his authority by launching a direct assault on Mexico's well-armed drug cartels, mobilizing the military to carry out operations against drug kingpins, raid their hideouts, and occupy their staging areas. Rather than slowing down the trafficking of drugs, however, the assault spurred an upsurge in civil violence as the cartels fought back against the police and the military. With bystanders increasingly caught in the cross fire, the end result was a rapid increase in the murder rate.

As already noted, Central America has its own history of civil violence tied to politics and ideology, with a rising tide of genocidal massacres, guerilla insurgencies, paramilitary executions, and open warfare observed during the U.S. intervention of the 1980s. Although homicide records are incomplete and exact statistics on the number of deaths do not exist, the United Nations Office on Drugs and Crime (2007) estimates that total deaths from political violence during the 1980s exceeded 335,000. Lacking access to reliable death statistics, we followed the example of Lundquist and Massey (2005) to capture trends in violence using the Proquest Historical Newspaper Database to conduct a search for newspaper articles that contained the words "war," "killing," or "death" plus the name of the country in question. This operation generated an annual frequency count for each country that we use to indicate the rise and fall of political violence in the region.

Figure I shows the Mexican homicide rate and the Central American frequency counts, with each series divided by its maximum value to put them on a comparable scale. As can be seen, civil violence in Mexico was quite high historically but then fell steadily through the 1990s and early 2000s before surging upward after President Calderón launched his attack on the drug cartels in 2006. In contrast, our indicator of political violence in Central America was quite low through the 1970s but surged upward between 1979 and 1989 before dropping again to the low levels observed before the Contra Wars of the 1980s. Thus, both series correspond to a priori notions about trends in violence within the regions.

1038                          INTERNATIONAL MIGRATION REVIEW

Figure I.            Probability of Taking a First Undocumented Trip to the U.S.



## TRENDS IN UNAUTHORIZED DEPARTURE AND RETURN

Figure II shows the annual probability of initiating undocumented migration from Mexico and Central America from 1970 through 2007. As can be seen, the likelihood of taking a first undocumented trip was rising rapidly when we pick up the trend in 1970, but as discussed earlier, the increase peaked in 1979 by which time the historical legal inflow of the 1950s had been reestablished under undocumented auspices (Massey and Pren, 2012). Thereafter, the likelihood of taking a first undocumented trip fell during Mexico's oil boom of 1980–1982 but rose again during Mexico's economic crisis in the 1980s before declining a bit during the early 1990s U.S. recession. It then climbed upward once again during the U.S. boom of the "roaring nineties" to reach another localized peak in 1999, after which the likelihood fell steadily to reach the lowest level seen in decades by the end of the 2000s. These trends are consistent with trends derived from official statistics by Massey and Pren (2012) and aggregate estimates of undocumented population growth done by the Pew Hispanic Center (Passel and Cohn, 2011), the U.S. Department of Homeland Security (Baker and Rytina, 2012), and Warren and Warren (2013).

EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.          1039

**Figure II.**          **Probability of Returning from a First Undocumented U.S. Trip within 12 months**



The initiation of undocumented migration from Central America follows a very different trajectory, with the probability of taking a first undocumented trip being quite low for most of the 1970s before rising rapidly in the late 1970s when the Sandinista's came to power in Nicaragua and then accelerating again with the U.S. Contra intervention of the 1980s. The probability peaks in 1989, shortly after the signing of the Central American Peace Accords and falls during the subsequent winding down of political violence in the region. Although the probability dropped through the 1990s and early 2000s, however, it never returned to the status quo ante.

This absence of a return to baseline is what we would expect given that mass emigration during the 1980s inevitably generated social networks connecting migrants in the U.S. to friends and relatives who remained at home. It is difficult to interpret the meaning of fluctuations at the end of the time series given the small number of cases and the fact that all these cases come from El Salvador. In general, we conclude that the odds of initiating undocumented migration to the U.S. rose during the period of violence in the 1980s and then fell as the region calmed down in the 1990s but never returned to the low levels observed in the early 1970s.

1040                               INTERNATIONAL MIGRATION REVIEW

Figure III.          Probability of Taking an Additional Undocumented Trip to the U.S.



Undocumented population growth depends not only on the propensity of migrants to enter the U.S. but also on their tendency to return. As noted earlier, Mexican migration to the U.S. historically was highly circular, and we see clear evidence of this fact in Figure III, which shows the probability of returning home within 12 months of entering on a first undocumented trip. In the early 1970s, the likelihood of returning within a year was about 0.50, and it remained above 0.40 through 1985 when it began to decline very rapidly to reach a figure of just 0.10 in 2007. As already noted, it was the rapid decline in return migration rather than any surge in new undocumented migration that produced the explosion in the number of undocumented migrants living north of the border.

Once again, the time trend for Central American migration is entirely different. During the 1970s, when the likelihood of taking a first undocumented trip was low, the probability of returning quickly from a first trip was high, suggesting the beginnings of a circulatory migration system. After peaking in 1976, however, the likelihood of return migration fell sharply and remained low from 1979 through 1989, the years of greatest political violence. Although the probability of return increased somewhat in the wake of the Peace Accords, after 2000, it declined rapidly to reach zero by 2007, when gang violence rose to replace the



EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.          1041

Figure IV.          Probability of Returning from an Additional Undocumented U.S. Trip
                    within 12 months



political violence of earlier times. Undocumented migration from Central America never really had a chance to develop into a circulatory system, and during the peak years of departure in the 1980s, the likelihood of returning within 12 months was quite low, as one would expect for a war-torn and violent region.

Figure IV draws on life histories provided by household heads to compute the probability of taking an additional undocumented trip given at least one prior trip to the U.S. In general, the probability of taking an additional trip is much higher than the probability of taking a first trip. This outcome is expected because social connections and personal experiences accumulated by migrants on prior trips greatly facilitate the taking subsequent trips, and with each trip taken, the probability of taking another one steadily rises (Massey 1986). In Mexico, for example, the annual probability of taking a first trip never exceeded 0.012, but the annual probability of taking an additional trip ranges from 0.03 to 0.06.

Whereas the likelihood of first undocumented migration was much higher among Mexicans than Central Americans, this order was reversed for the probability of migrating again. Although the sample size is much smaller and the time series more variable than in Mexico, we see that

Figure V.          Trends in Civil Violence within Mexico and Central America



within Central America, a relatively high likelihood of taking an additional undocumented trip prevailed during the 1970s, followed by a reduction during the violent years of 1980s, and thereafter a steady increase to reach a peak of around 0.18 during 2004–2006. Thus, despite the massive increase in border enforcement during the 1990s and early 2000s, the likelihood of taking an additional undocumented steadily rose in both Mexico and Central America.

Figure V completes our analysis by showing the probability of returning from an additional undocumented trip within 12 months of entry. The number of additional trips taken by Central Americans was too small to sustain reliable analysis across years (averaging just 3.8 trips per year), so we focused exclusively on Mexico. As with the first undocumented trip, the likelihood of returning from an additional trip remains high through the mid-1980s and then experiences a sustained decline. As repeat migrants are people who have established a pattern of circulation, the probability of returning home was extremely high historically, fluctuating around 0.80 through the 1980s. In the face of massive border enforcement, however, even experienced border crossers progressively gave up return trips, and in 2003, the probability of return dipped below 0.50

for the first time. With repeat migrants displaying a probability of return below 50 percent and new migrants around 10 percent, the circularity of undocumented migration between Mexico and the U.S. was substantially curtailed.

## MODELING MIGRANT DECISION-MAKING

To estimate the model predicting first undocumented trips, we selected all person-years lived in 1970 or later and followed each household head from the age of labor force entry up to the date of the survey or the first unauthorized trip. All independent variables are time varying except gender, education, and community size. Gender is fixed, of course, and in practical terms, education does not change after people enter the labor force. Community size is measured in the survey year, and although populations do change over time, there is little movement between broad categories of urbanism. Table 2 shows means and standard deviations across person-years to reveal that, compared to migrants from Mexico, those from Central America are older (aged 31.5 versus 25.5 in the average person-year), more likely to be female (17% versus 5%), and more often married (75% versus 52%). Central American migrants also have more labor force experience (17.6 versus 11.9 years), display higher levels of education (10.4 versus 6.1 years), are much less likely to hold agricultural occupations (6% versus 40%), and much more likely to be skilled workers (40% versus 9%). Consistent with this contrast, Central Americans are also more likely to be business owners (24% versus 6%) and home owners (46% versus 28%) than Mexicans.

These contrasts are consistent with the hypothesis that Mexicans generally begin migrating as workers seeking low-wage jobs in the U.S., whereas Central Americans initially depart as refugees seeking to escape the political violence and economic turmoil that followed the American intervention of the 1980s. Unsurprisingly, stocks of migration-related human and social capital are larger in Mexico than in Central America given its longer history of migration to the U.S. Whereas the average Mexican migrant evinced 45 months of U.S. experience accumulated across an average of 4.7 trips, the average Central American migrant had accumulated just 26 months over 1.2 trips. Likewise, whereas 19 percent of Mexicans reported having a migrant parent, the figure was just 10 percent for Central Americans, and while the average prevalence of U.S. migrants in the sending community was 19 percent for Mexicans, it was

**TABLE 2**
**MEANS AND STANDARD DEVIATIONS OF INDEPENDENT VARIABLES**

|  | Mexico | | Central America | |
|---|---|---|---|---|
|  | Mean | SD | Mean | SD |
| Demographic Background |  |  |  |  |
| Age | 25.5 | 9.6 | 31.5 | 9.8 |
| Female | 0.0466 | 0.2110 | 0.1743 | 0.3811 |
| Married | 0.5182 | 0.4997 | 0.7522 | 0.4336 |
| No. of minors in household | 1.4 | 2.0 | 1.6 | 1.8 |
| Human Capital |  |  |  |  |
| Labor force experience | 11.9 | 9.8 | 17.6 | 9.7 |
| Education | 6.1 | 3.7 | 10.4 | 4.2 |
| Cumulative U.S. experience | 44.84 | 46.84 | 26.40 | 26.1 |
| Number of prior U.S. trips | 4.7 | 5.5 | 1.2 | 0.51 |
| Documented on last trip | 0.5138 | 0.4998 | 0.8696 | 0.3443 |
| Origin Occupation |  |  |  |  |
| Agricultural job | 0.3971 | 0.4893 | 0.0642 | 0.2462 |
| Unskilled job | 0.3916 | 0.4881 | 0.3577 | 0.4815 |
| Skilled job | 0.0874 | 0.2825 | 0.4036 | 0.4928 |
| Social Capital |  |  |  |  |
| Parent a U.S. migrant | 0.1859 | 0.3890 | 0.1009 | 0.3026 |
| No. of U.S. migrant siblings | 0.6 | 1.2 | 0.8 | 1.3 |
| Prop. U.S. migrants in community | 18.9 | 12.9 | 7.2 | 5.5 |
| Spouse a U.S. migrant | 0.0384 | 0.1923 | 0.0813 | 0.275 |
| No. of U.S. migrant children | 0.06 | 0.40 | 0.02 | 0.13 |
| No. of U.S. born children | 0.00 | 0.06 | 0.00 | 0.00 |
| Physical Capital |  |  |  |  |
| Land | 0.0792 | 0.2700 | 0.0550 | 0.2291 |
| Home | 0.2775 | 0.4478 | 0.4587 | 0.5005 |
| Business | 0.0602 | 0.2379 | 0.2385 | 0.4281 |
| U.S. Context |  |  |  |  |
| Enforcement Index | 1125.58 | 1036.44 | 1273.48 | 971.26 |
| Rate of Employment Growth | 1.97 | 1.42 | 1.99 | 1.02 |
| Residence/Work Visas per Capita | 1.92 | 2.10 | 1.51 | 1.12 |
| Origin Nation Context |  |  |  |  |
| Rate of Population Growth | 2.43 | 1.22 | 3.36 | 0.55 |
| Rate of GDP Growth | 1.91 | 3.59 | −3.23 | 6.05 |
| Violence Indicator | 17.28 | 2.58 | 418.33 | 321.09 |
| Total number of person-years | 102,563 | | 35,062 | |

just 7 percent for Central Americans. Central Americans, however, were more likely to have a migrant spouse, suggesting that they more often depart as couples; in contrast to Mexican migrants were are more typically solo males leaving spouses and children behind as they commute for work in the U.S. (Cerrutti and Massey, 2001).

*First Undocumented Departure*

Table 3 presents models estimated to predict the likelihood of leaving on a first undocumented trip from Mexico and Central America to the U.S.

EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.          1045

**TABLE 3**
DISCRETE TIME EVENT HISTORY ANALYSIS PREDICTING LIKELIHOOD OF TAKING A FIRST U.S. TRIP

| Independent Variables (year=t) | Mexico: Took First Undocumented Trip (year=t 1) | | Central America: Took First Undocumented Trip (year=t 1) | |
|---|---|---|---|---|
| | β | SE | β | SE |
| Demographic Background | | | | |
| Age | 0.1078*** | 0.0143 | 0.1340 | 0.0901 |
| Age-squared | −0.0023*** | 0.0002 | −0.0016* | 0.0009 |
| Female | −0.4889*** | 0.1370 | 0.4425 | 0.6076 |
| Married | −0.2353** | 0.0839 | 0.4529 | 0.3415 |
| No. of minors in household | −0.0570** | 0.0187 | −0.1684* | 0.8970 |
| Human Capital | | | | |
| Labor force experience | −0.0057 | 0.0058 | −0.0406 | 0.0715 |
| Education | −0.0269** | 0.0088 | 0.0626** | 0.0268 |
| Origin Occupation | | | | |
| Agricultural | — | | — | |
| Unskilled | 0.5417*** | 0.0689 | 0.5886* | 0.3481 |
| Skilled | 0.1053 | 0.1247 | 0.7798** | 0.3531 |
| Social Capital | | | | |
| Parent a U.S. migrant | 0.3377*** | 0.0709 | 0.8374* | 0.4456 |
| No. of U.S. migrant siblings | 0.0846*** | 0.0248 | 0.4370*** | 0.0803 |
| Prop. U.S. migrants in community | 0.0188*** | 0.0028 | 0.0251 | 0.0226 |
| Spouse a U.S. migrant | −0.4511** | 0.1673 | 0.9805* | 0.5254 |
| No. of U.S. migrant children | 0.1477** | 0.0562 | −0.9192 | 0.6234 |
| No. of U.S. born children | −1.4572*** | 0.3523 | — | |
| Physical Capital | | | | |
| Land | 0.1534 | 0.1269 | −0.2084 | 0.4731 |
| Home | −0.3589*** | 0.0812 | 0.3060 | 0.2529 |
| Business | −0.2980** | 0.1095 | 0.4688* | 0.2687 |
| U.S. Context | | | | |
| Enforcement Index | 0.0000 | 0.0004 | −0.0004 | 0.0001 |
| Rate of Employment Growth | 0.1148*** | 0.0234 | 0.1559 | 0.1184 |
| Residence/Work Visas per Capita | −0.0240 | 0.0330 | 0.0804 | 0.1434 |
| Origin Country Context | | | | |
| Rate of Population Growth | 0.0130 | 0.0699 | −0.1882 | 0.3086 |
| Rate of GDP Growth | 0.0107 | 0.0097 | 0.0071 | 0.0210 |
| Civil Violence | 0.0081 | 0.0352 | 0.0027*** | 0.0005 |
| Country of Origin | | | | |
| Nicaragua | — | | — | |
| Costa Rica | — | | 0.5759* | 0.3223 |
| El Salvador | — | | 0.0477 | 0.4286 |
| Guatemala | — | | 0.0276 | 0.3946 |
| Intercept | −5.7142*** | 0.8435 | −10.4526*** | 1.7502 |
| Likelihood Ratio | 1103.9308*** | | 161.4564*** | |
| Wald | 672.5451*** | | 156.3301*** | |
| Total number of person-years | 102,563 | | 35,062 | |

$^{+}p = 0.10$; $^{*}p < 0.10$; $^{**}p < 0.05$; $^{***}p < 0.001$.

In these models, we follow household heads from the point of entry into the labor force up to the date of the first trip or year of survey and use logistic regression to predict migration in year $t + 1$ from independent

variables defined in year t, thus yielding a lagged discrete time event history model. We prefer discrete time models to hazard models because they do not require assumptions about functional form and instead let the data define the shape of the likelihood functions over time and in response to independent variables. It has long been the preferred strategy for modeling life history data from the MMP (*see* Massey *et al.*, 1987; Massey and Espinosa, 1997; Massey and Riosmena, 2010).

In Mexico, the likelihood of initiating undocumented migration displays the expected curvilinear relationship with age, rising through the young adult years before declining with advancing age. The odds of undocumented migration are lower for women and married respondents and fall as the number of minors in the household increases. In terms of human capital, Mexican undocumented migrants to the U.S. are negatively selected with respect to education and come disproportionately from the ranks of unskilled manual workers, which is expected given that the returns to human capital are low for persons without documents (*see* Taylor, 1987). Home and business owners are generally less likely to initiate migration, and as other studies have found, the initiation of undocumented migration is strongly predicted by access to social capital, being greater for those having a parent with U.S. experience and rising as the number of migrant siblings, migrant children, and the share of migrants in the community grow (Massey *et al.*, 1987; Massey and Espinosa, 1997; Palloni *et al.*, 2001). Undocumented out-migration is negatively predicted by having a migrant spouse, however, and falls as the number of U.S.-born children increases.

Turning to the contextual indicators, only one indicator is significant: the rate of U.S. employment growth. The very strong and highly significant coefficient suggests that the initiation of undocumented migration from Mexico is driven primarily by the pull of U.S. labor demand. Consistent with our opening narrative, the enforcement index has no effect at all on the likelihood of taking a first undocumented trip, indicating the absence of a significant deterrent effect. Although our indicator of access to legal visas carries the expected negative sign, the effect is not significant statistically. On the Mexican side, the initiation of undocumented migration does not appear to be significantly connected to demographic pressure, national economic performance, or variations in the rate of homicide. Thus, the rising tide of violence since 2006 has not played a meaningful role in *initiating* new undocumented migration to the U.S., which is instead driven primarily by U.S. labor demand.

Within Central America, in contrast, the indicator of civil violence has a very strong effect in promoting initial undocumented trips to the U.S., whereas U.S. labor demand has no effect at all. The process by which migration to the U.S. was initiated in Central America also displays other salient differences compared with Mexico. For example, the probability of initiating undocumented migration is not selective with respect to gender, marital status, or age. In addition, fewer social capital indicators are significant in predicting out-migration, and the levels of significance are generally lower. Moreover, whereas having a migrant spouse deterred the initiation of undocumented migration from Mexico, it promoted it in Central America. Finally, the likelihood of taking a first undocumented trip from Central America is *positively* related to education, occupational skill, and business ownership, not negatively related as in Mexico.

In sum, as one would expect from people fleeing political violence and economic disorder, initial departures from Central America were much less selective with respect to demographic characteristics and social capital compared with Mexican labor migrants, but more selective with respect to human and physical capital. Faced with imminent danger, everyone who can leave does so and those with access to human and physical capital draw on these assets to escape. Among contextual factors, only violence had a detectable effect on the odds of taking a first undocumented trip, suggesting that it is the push of disorder and violence in the region that promoted migration from the region not faltering economic growth or demographic pressure or the pull of jobs in the U.S. Once again, the effect of the enforcement index is virtually nil.

## First Undocumented Return

Table 4 presents logistic regression models estimated to predict the likelihood of returning from the first undocumented trip within 12 months of entry. In this case, both independent and dependent variables are measured in year t. Recall from Figure III that circular migration between Mexico and the U.S. was the norm before the militarization of the border during the late 1980s and 1990s, but that return migration was *never* very common in Central America, especially during the period of greatest instability and violence. Thus, the likelihood of returning home to Central America is only weakly related to individual and contextual factors compared with Mexico. The very large negative intercept indicates that

TABLE 4
LOGISTIC REGRESSION MODELS PREDICTING THE LIKELIHOOD OF RETURNING FROM FIRST TRIP

| Independent Variables (year=t) | Mexico: Return Home from first trip within 12 months (year = t 1) | | Central America: Return Home from first trip within 12 months (year = t 1) | |
|---|---|---|---|---|
| | β | SE | β | SE |
| Demographic Background | | | | |
| Age | 0.0567** | 0.0222 | 0.5802** | 0.1022 |
| Age-squared | −0.0015*** | 0.0003 | −0.0053* | 0.0009 |
| Female | −0.2402 | 0.2065 | −0.5684 | 0.5561 |
| Married | 0.4712*** | 0.1261 | −0.3228 | 0.4609 |
| No. of minors in household | −0.0310 | 0.0257 | −0.1230 | 0.1041 |
| Human Capital | | | | |
| Labor force experience | −0.0085 | 0.0076 | −0.2212** | 0.0737 |
| Education | −0.0650*** | 0.0142 | 0.0381 | 0.0340 |
| Origin Occupation | | | | |
| Agricultural job | — | | — | |
| Unskilled job | 2.9202*** | 0.1030 | — | |
| Skilled job | 2.3772*** | 0.3336 | — | |
| Social Capital | | | | |
| Parent a U.S. migrant | 0.1045 | 0.1090 | 1.1218 | 0.5057 |
| No. of U.S. migrant siblings | −0.1643*** | 0.0383 | −0.1022 | 0.1136 |
| Prop. U.S. migrants in community | 0.0205*** | 0.0043 | 0.0560 | 0.0243 |
| Spouse a U.S. migrant | −2.1752*** | 0.2416 | — | |
| No. of U.S. migrant children | 0.1211* | 0.0708 | — | |
| No. of U.S. born children | — | | — | |
| Physical Capital | | | | |
| Land | −0.2608 | 0.1995 | 0.7703 | 0.7504 |
| Home | −0.2608** | 0.1119 | 1.2789* | 0.3163 |
| Business | 0.2712* | 0.1449 | 0.1873 | 0.3209 |
| U.S. Social Context | | | | |
| Enforcement Index | −0.0015** | 0.0007 | 0.0001 | 0.0015 |
| Rate of Employment Growth | 0.0200 | 0.0352 | 0.0737 | 0.1408 |
| Residence/Work Visas per Capita | −0.0304 | 0.0519 | 0.0046 | 0.1449 |
| Mexican Context | | | | |
| Rate of Population Growth | −0.2452** | 0.1163 | −0.0001 | 0.0006 |
| Rate of GDP Growth | 0.0603*** | 0.0144 | −0.0208 | 0.0242 |
| Homicide Rate | 0.0341 | 0.0566 | 0.3799 | 0.3532 |
| Country of Origin | | | | |
| Nicaragua | — | | — | |
| Costa Rica | — | | 1.4899 | 0.3879 |
| El Salvador | — | | −2.0598* | 0.4941 |
| Guatemala | — | | 0.9329 | 0.3975 |
| Intercept | −4.9530*** | 1.3691 | −20.5262*** | 4.6138 |
| Likelihood Ratio | 1062.8990*** | | 34.2562* | |
| Wald | 1141.3442*** | | 27.7807 | |
| Total number of person-years | 102,514 | | 56,695 | |

$^+p$ = 0.10; $^*p$ < 0.10; $^{**}p$ < 0.05; $^{***}p$ < 0.001.

the underlying probability of returning to Central America is much, much
lower than the likelihood of returning to Mexico, especially in El Salvador
where gang violence has risen to replace the political violence of the

1980s. The odds of returning to Central America are boosted by home ownership and rising age and they fall with rising labor force experience, but they are totally unconnected to contextual circumstances at either origin or destination.

In contrast, return migration from Mexico is strongly predicted by contextual circumstances on both sides of the border. Although border enforcement had no significant effect in deterring the initiation of undocumented migration, it strongly and significantly reduces the likelihood that migrants on their first undocumented trip will go back to Mexico. Return migration is strongly promoted by GDP growth in Mexico but discouraged by rapid population growth. In other words, Mexicans tend to return home when the economy is growing rapidly but the labor force is not. The likelihood of return migration is curvilinear with respect to age and is greater for those who are married, hold non-agrarian jobs, have migrant children, originate in communities with a high prevalence of migrants, and own businesses. Return migration is less likely for well-educated people who have migrant siblings and spouses, and somewhat surprisingly, homeowners. The plethora of significant effects nonetheless suggests the existence of a systematic process of return migration in Mexico that has never really existed for Central America, although the rapid rise in the U.S. enforcement effort has significantly diminished the odds of returning to Mexico in recent years.

## Additional Undocumented Departures

Table 5 shows event history models estimated to predict the likelihood of taking an additional trip to the U.S. without documents. Although homicide had no apparent effect on the initiation of undocumented migration from Mexico, it does have a strong effect in *perpetuating* migration once it has begun. Each point increase in the homicide rate increases the odds of taking an additional undocumented trip by around 14 percent, a highly significant effect. Within Mexico, the likelihood of taking an additional trip also rises significantly as population growth increases but declines as the rate of GDP growth increases. Although initial departure was not tied to economic or demographic conditions in Mexico, repeat migration is significantly connected to these factors. As one would expect, experienced migrants decide to leave again during periods when demographic growth is rapid and economic expansion is slow.

Despite the greater role of contextual circumstances in Mexico, the likelihood of additional migration continues to be connected to labor

**TABLE 5**
**DISCRETE TIME EVENT HISTORY ANALYSIS PREDICTING LIKELIHOOD OF ADDITIONAL UNDCOCUMENTED MIGRATION**

|  | Mexico: Additional Undocumented Trip (year=t 1) | | Central America: Additional Undocumented Trip (year=t 1) | |
|---|---|---|---|---|
|  | β | SE | β | SE |
| Demographic Background |  |  |  |  |
| Age | 0.1747*** | 0.0137 | 0.3418 | 0.3326 |
| Age-squared | −0.0028*** | 0.0001 | −0.0055 | 0.0035 |
| Female | −1.1394*** | 0.1507 | 1.2712 | 1.1077 |
| Married | 0.0506 | 0.0730 | 1.4467 | 1.1652 |
| No. of minors in household | −0.0169 | 0.0122 | −0.1099 | 0.2062 |
| Human Capital |  |  |  |  |
| Labor force experience | 0.0042 | 0.0052 | 0.0807 | 0.2095 |
| Education | −0.0068 | 0.0076 | 0.0927 | 0.0664 |
| Cumulative U.S. experience (months) | 0.0005 | 0.0007 | −0.0308** | 0.0123 |
| No of previous U.S. trips | 0.0937*** | 0.0073 | 2.7408*** | 0.4686 |
| Documented on last trip | −3.2323*** | 0.0501 | 0.8487 | 1.0097 |
| Origin Occupation |  |  |  |  |
| Agricultural | — |  | — |  |
| Unskilled | −0.9665 | 0.0656 | 0.0050 | 0.7690 |
| Skilled | −1.1848*** | 0.1320 | −0.1480 | 0.7322 |
| Social Capital |  |  |  |  |
| Parent a U.S. migrant | 0.1597** | 0.0556 | 2.9817*** | 0.8373 |
| No. of U.S. migrant siblings | 0.0668*** | 0.0166 | −0.1332 | 0.2314 |
| Prop. U.S. migrants in community | 0.0201*** | 0.0021 | 0.0925** | 0.0421 |
| Spouse a U.S. migrant | −0.4796*** | 0.0904 | −1.9394** | 1.0267 |
| No. of U.S. migrant children | −0.0227 | 0.0284 | 0.2380 | 0.5298 |
| No. of U.S. born children | −0.5505*** | 0.0983 | — |  |
| Physical Capital |  |  |  |  |
| Land | −0.3168*** | 0.0890 | 0.2250 | 0.8596 |
| Home | −0.0163 | 0.0558 | −1.5051** | 0.6341 |
| Business | −0.1059 | 0.0779 | 0.5627 | 0.5994 |
| U.S. Social Contex |  |  |  |  |
| Enforcement Index | −0.0008** | 0.0003 | −0.0003 | 0.0004 |
| Rate of Employment Growth | 0.0818*** | 0.0186 | 0.3585 | 0.3384 |
| Residence/Work Visas per Capita | −0.0113 | 0.0270 | 0.3482 | 0.2486 |
| Mexican Context |  |  |  |  |
| Rate of Population Growth | 0.1793*** | 0.0566 | −0.0013 | 0.0015 |
| Rate of GDP Growth | −0.0149** | 0.0072 | 0.0735 | 0.0799 |
| Homicide Rate | 0.1329*** | 0.0284 | 0.3388 | 0.7025 |
| Country of Origin |  |  |  |  |
| Nicaragua | — |  | — |  |
| Costa Rica | — |  | 0.7089 | 0.8129 |
| El Salvador | — |  | — |  |
| Guatemala | — |  | — |  |
| Intercept | −9.2806*** | 0.6913 | −19.2098*** | 5.8258 |
| Likelihood Ratio | 9092.0706*** |  | 133.4553*** |  |
| Wald | 7363.8751*** |  | 121.0645*** |  |
| Total number of person-years | 99,260 |  | 35,062 |  |

$^+p$ = 0.10; $^*p$ < 0.10; $^{**}p$ < 0.05; $^{***}p$ < 0.001.

demand, and border enforcement comes to have significant negative effect, although it is relatively small in substantive terms. The probability of taking an additional trip continues to be lower for women and displays a curvilinear relationship with respect to age. The likelihood of migrating again also rises steadily with the number of prior trips and is greater for those having migrant parents and migrant siblings but lower for those with migrant spouses and U.S.-born children. The odds of additional migration rise as the share of migrants in the community grows but they are lower for skilled and unskilled workers compared with those employed in agriculture, except those who are land owners.

The right-hand columns repeat the analysis for Central Americans substituting in the proxy measure of political violence for the homicide rate used in Mexico. Despite its predominant role in initiating undocumented migration, violence in the region plays no role in its perpetuation over time. As with first trips, once undocumented migration from Central America has been initiated, the likelihood of taking an additional trip is relatively unsystematic, with the exception of social capital. Once again, repeat migrants are not selected demographically, but unlike new undocumented migrants, they are also not selected with respect to education, skill, or business ownership. The main predictors are having a migrant parent, having a large number of prior trips, and coming from a community with a high percentage of migrants. The main deterrents are home ownership and having a U.S. migrant spouse. As on the first trip, there is no evidence that Central Americans responded in any significant way either to rising U.S. border enforcement or fluctuating U.S. labor demand in deciding whether to migrate again. This decision is determined mainly by the presence or absence of family connections to other U.S. migrants.

*Additional Undocumented Returns*

Finally, Table 6 shows the results of a logistic regression model estimated to predict the likelihood of returning to Mexico from an additional undocumented trip. The numbers of additional migrants and returns were too small to sustain reliable estimation in the case of Central America. Once again, the enforcement index has a negative effect on the likelihood of return migration to Mexico, underscoring again the perverse effect of U.S. immigration and border policies in discouraging return migration rather than deterring undocumented entry. Unlike returns from first trips, however, those from additional trips are not connected to economic or

**TABLE 6**
**LOGISTIC REGRESSION PREDICTING LIKELIHOOD OF RETURN FROM ADDITIONAL U.S. TRIP**

| Independent Variables (year=t) | Mexico: Additional Return Home within 12 months of a trip (year=t 1) | |
|---|---|---|
| | β | SE |
| Demographic Background | | |
| Age | 0.1208*** | 0.0245 |
| Age-squared | −0.0022*** | 0.0003 |
| Female | −1.5209*** | 0.3272 |
| Married | 0.4851*** | 0.1370 |
| No. of minors in household | −0.0139 | 0.0193 |
| Human Capital | | |
| Labor force experience | 0.0256** | 0.0103 |
| Education | −0.0819*** | 0.0141 |
| Cumulative U.S. experience (months) | −0.0177*** | 0.0018 |
| No. of previous U.S. trips | 0.1787*** | 0.0141 |
| Origin Occupation | | |
| Agricultural job | — | |
| Unskilled job | 2.9988*** | 0.0979 |
| Skilled job | 2.1963*** | 0.4291 |
| Social Capital | | |
| Parent a U.S. migrant | 0.1780* | 0.0956 |
| No. of U.S. migrant siblings | 0.0347 | 0.0289 |
| Prop. U.S. migrants in community | 0.0334*** | 0.0036 |
| Spouse a U.S. migrant | −1.0715*** | 0.1874 |
| No. of U.S. migrant children | 0.0690 | 0.0450 |
| No. of U.S. born children | −1.5061*** | 0.3719 |
| Physical Capital | | |
| Land | 0.1325 | 0.1302 |
| Home | 0.1035 | 0.0922 |
| Business | −0.0686 | 0.1246 |
| U.S. Social Context | | |
| Enforcement Index | −0.0019** | 0.0007 |
| Rate of Employment Growth | 0.0388 | 0.0325 |
| Residence/Work Visas per Capita | −0.0261 | 0.0474 |
| Mexican Context | | |
| Rate of Population Growth | −0.0533 | 0.1013 |
| Rate of GDP Growth | 0.0134 | 0.0124 |
| Homicide Rate | 0.1501** | 0.0503 |
| Intercept | −9.2598*** | 1.2221 |
| Likelihood Ratio | 1673.9221*** | |
| Wald | 1774.1944*** | |
| Total number of person-years | 98,616 | |

$^+p = 0.10$; $^*p < 0.10$; $^{**}p < 0.05$; $^{***}p < 0.001$.

demographic conditions in Mexico, although they are positively predicted by the homicide rate. Perhaps, those migrants who have established a pattern of circular migration are more likely to return home to look after family members and protect property during periods of greater political violence.

Rather than contextual factors, the decision to return to Mexico from additional U.S. trips seems to be governed primarily by individual and family circumstances. Returning home from an additional undocumented trip is once again curvilinear with respect to age and greater for married individuals, but in contrast to first trips, females are significantly less likely than males to return from additional trips. The likelihood of return falls with rising education and experience in the U.S., but is positively predicted by labor force experience and the number of prior trips. Those with non-agricultural backgrounds in Mexico are also more likely to return, as are those with a migrant parent and coming from a community with a high prevalence of U.S. migrants. As one would expect, having a migrant spouse and U.S.-born children sharply reduces the likelihood of returning from an additional trip. Once family reunification has been achieved and births begin to occur north of the border, a return to Mexico becomes quite unlikely, despite a lack of legal status in the U.S.

## CONCLUSION

The foregoing analysis suggests that the initiation of undocumented migration to the U.S. from Mexico was driven largely by U.S. labor demand and by the existence of well-developed migrant networks that provided migrants with access to U.S. labor markets despite a rising enforcement effort. The taking of additional trips is likewise tied to U.S. labor demand and access to migrant networks, as well as the number of U.S. trips a migrant has accumulated over his or her career. Unlike first undocumented trips, however, additional trips are also tied strongly to circumstances in Mexico, declining in response to Mexican economic growth and increasing during periods of rising population pressure and increasing violence.

Perhaps most importantly, we found that the exponential increase in U.S. enforcement had no effect at all the odds of taking a first undocumented trip and only a modest effect in deterring additional undocumented departures, but that enforcement has strong and significant effects in deterring migrants from returning to Mexico once entry has been achieved, thereby accounting for the rapid growth of the undocumented Mexican population during the 1990s and early 2000s. Nonetheless, aggregate estimates suggest that undocumented Mexican migration has, in fact, declined since 2008 and now fluctuates around a net of zero. In keep with these aggregate estimates, first departure probabilities computed from

the MMP's individual life history data indicate a steady decline in undocumented migration since 2000 and a drop toward zero after 2008. If border enforcement did not cause the decline in undocumented departures from Mexico, what did?

To answer that question, we turn to our model and use it to generate predicted probabilities of migration from three variables, in turn, while holding all other variables' constant at their mean values. The three variables are annual employment growth in the U.S. (indicating labor demand north of the border), annual GDP growth in Mexico (indicating economic opportunity south of the border), and the average age of household heads in our sample who are at risk of taking a first undocumented trip – that is, those that in the labor force but have not yet been to the U.S. (indicating the demographic potential for emigration). The results of the exercise are shown in Figure VI.

As can be seen, economic conditions on both sides of the border predict continued migration through 2010 and likely into the future. Even though a drop in the probability of first undocumented migration after 2008 is clearly predicted by the drop in U.S. labor demand during

Figure VI.        **Probability of Taking a First Undocumented Trip Predicted by Trends in U.S. Labor Demand, Mexican GDP Growth, and Average Age of Never-Migrants**



the Great Recession, after 2009, the likelihood of undocumented migration was predicted to go back up, which did not happen. Moreover, although fluctuations in the Mexican economy push the predicted probability of undocumented migration up and down over time, there is no clear trend in either direction. In general, then, economic conditions on both sides of the border have consistently fluctuated to increase or decrease the odds of initiating undocumented migration over the past four decades, but at no point did the economic incentives for unauthorized departure disappear.

Instead, the marked decline in the probability of first undocumented migration appears to be attributable entirely to the rising average age among household heads at risk of taking a first undocumented trip. According to MMP data, the average age of persons who had entered the labor force but who had not yet migrated to the U.S. rose from 22.5 in 1970 to 45.9 in 2010. This dramatic increase in average age stems from two complementary demographic dynamics: the sharp drop in Mexican childbearing from a total fertility rate of 7.3 children per woman in 1960 to a value of 2.3 today and the steady selection of young men out of the population at risk of taking a first trip by migration itself. As Hanson and McIntosh (2009) note, the seeds for diminished rates of undocumented migration were sown by changes in fertility that began four decades ago. As cohorts entering the labor force ages shrank after the mid-1990s and younger persons entering the labor force were steadily siphoned off into the U.S., the average age of the pool remaining behind steadily and rapidly rose.

In the end, our results suggest that recent declines in the likelihood of undocumented migration had little or nothing to do with border enforcement, but were mainly attributable to Mexico's changing demography. The U.S. thus spent $35 billion in constant dollars on border enforcement between 1970 and 2010 in a vain effort to bring about a decline in undocumented migration that was already built into Mexico's demography. A simple waste of taxpayers' money would have been bad enough, but our analysis also implies that the billions spent on border enforcement actually served to *increase*, not decrease, the size of the undocumented population by driving down rates of return migration. Thus, money spent on border enforcement was not only wasted, it was counterproductive.

Given demographic trends in Mexico, the boom in Mexican undocumented migration is likely over. Mexico has turned the corner and

become an aging population (Wong, Espinoza, and Palloni, 2007; Zúñiga and García, 2008). Although undocumented Mexicans may have stopped arriving, however, Mexico still accounts for the large majority of undocumented migrants present in the U.S., and coming to terms with the six million undocumented Mexicans who currently live north of the border is among the most pressing policy issues facing the nation today. As we have noted, however, the next most important source region for undocumented migrants is Central America, and its unauthorized population continues to grow.

Our analysis of undocumented migration from that region suggests that it was driven almost entirely by the upsurge in violence that followed U.S. political and military interventions in Central America during the 1980s, yielding outflows that were unselected demographically but positively selected on the basis of human capital, occupational skill, business ownership, and social capital. Return migration to Central America is and has always been relatively low because conditions in the region have remained unstable, both politically and economically. Although the political violence that originally drove Central Americans northward wound down during the 1990s, it has been replaced by gang violence, which ironically is yet another side effect of U.S. policies, for the Central American gangs now terrorizing El Salvador and Honduras originated as exports from the U.S. Lacking legal status and seeing no way forward in the U.S., many undocumented Central Americans found solace and support in gangs. The most infamous, Mara Salvatrucha, was founded by Salvadorans in the Pico-Union neighborhood of Los Angeles in the mid-1980s. When undocumented gang members were later apprehended and deported, gang violence was exported back to El Salvador and transnational gang networks were created.

Given ongoing gang violence, continued economic turmoil, and the existence manifold ties linking Central Americans in the U.S. to relatives at home, undocumented migration from the region continued to rise at a slow but steady rate. To the extent that undocumented migration occurs today, it is largely determined by the social capital created earlier during prior periods of mass emigration. Under these circumstances, we can expect migration from Central America not only to continue but to continue to be dominated by the sons, daughters, spouses, and other relatives of those left during the violence of the 1980s.

To underscore this reality, we turn once again to our estimated model of first undocumented migration to the U.S. Figure VII shows

EXPLAINING UNDOCUMENTED MIGRATION TO THE U.S.          1057



Figure VII.          Probability of Taking a First Undocumented Trip Predicted from Trends
in Violence and Violence Plus Rise in Access to Social Capital



what happens when we generate predicted probabilities of first undocu-
mented departure from Central America under two scenarios: first by
inserting our estimate of political violence into the equation and holding
other variables constant at the mean, and second by adding in observed
values for three social capital indicators (having a migrant parent, having
a migrant spouse, and the percentage of people in the community with
migrant experience) and generating new predicted probabilities while
holding other variables' constant at the mean.

As can be seen, first undocumented departure probabilities predicted
from violence alone trace out the rise in unauthorized migration during
the late 1970s, its growth and peak in the 1980s, and its subsequent
moderation in the 1990s. If political violence were the only factor driving
people to initiate undocumented migration, then the probability of first
departure would have fallen back to pre-Sandinista levels observed in the
1970s. Unfortunately, one cannot return to the status quo ante after a
period of mass out-migration because the people who depart during the
period of mass departure are inevitably connected to relatives left
back home. As a result, in addition to whatever economic motivations
they might have, those left behind acquire a new motivation for
migration—family reunification—and the ties they have to migrants in

the U.S. simultaneously provide a source of social capital for them to undertake the trip.

When we add in the effects of the three social capital indicators to the prediction model, we see that the probability of taking a first undocumented trip does not, in fact, return to the baseline probability observed before 1980. Looking at the Violence plus Social Capital curve, we see that in 1977, the probability of first undocumented out-migration stood at 0.0012, but that after the political violence ended in 1992, it only fell back to 0.002, and from there, it continued to rise in subsequent years, approaching 0.003 by 2005. Even though the political violence had ended, undocumented migration continued to rise as people capitalized on ties to U.S. family members and began to take undocumented trips themselves, contributing to a self-sustaining process of social capital accumulation that has steadily increased the number of Central American migrants ever since. This increase is only obvious now because Mexican undocumented migration has all but ceased.

Our analysis thus sheds considerable light on the current historical moment and what we can expect for the future. Mexican border apprehensions are plummeting because Mexico's fertility transition has produced an aging society with ever smaller cohorts of people at risk of leaving for the U.S., but Central American apprehensions are rising as the sons and daughters, nieces, and nephews of undocumented migrants who left during the 1980s seek either to reunite with family members in the U.S. or to escape gang violence and economic turmoil at home. As fertility transitions, once completed, historically do not reverse, we predict the continued decline of undocumented migration from Mexico. However, because motivations for family reunification only increase with time spent apart and social capital itself accumulates over time to make additional departures more likely, we predict continued unauthorized migration by young Central Americans and no easy resolution of the current border crisis as long as the family members with whom they seek to reunite themselves remain undocumented.

In the end, our results once again underscore the importance of multisite, multimethod studies that use qualitative data collection methods to compile reliable quantitative information about hard-to-study behaviors such as undocumented migration. We know of no standard source of census or survey data that would have supported the analyses we conducted here. Our results also suggest the importance of diachronic measurement, which we achieved by compiling repeated cross-sectional samples over

time, and at each point in time gathering detailed retrospective life histories to support the estimation of dynamic, longitudinal models of migratory behavior. As these sorts of data sets accumulate for different countries at different times, investigators will acquire a new ability to understand how context affects migration decisions and outcomes around the world.

## REFERENCES

Acosta, Y. D., and G. Patricia de la Cruz
2011   "The Foreign Born From Latin America and the Caribbean: 2010." *American Community Survey Brief* 10–15, U.S. Bureau of the Census, Washington, DC.
Angelucci, M.
2012   "U.S. Border Enforcement and the Net Flow of Mexican Illegal Migration." *Economic Development and Cultural Change* 60(2):311–357.
Baker, B. C., and N. Rytina
2012   *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012.* Washington DC: Office of Immigration Statistics.
Balderrama, F. E.
1995   *Decade of Betrayal: Mexican Repatriation in the 1930s.* Albuquerque: University of New Mexico Press.
Cardoso, L.
1980   *Mexican Emigration to the United States 1897–1931.* Tucson: University of Arizona Press.
Cerrutti, M., and D. S. Massey
2001   "On the Auspices of Female Migration Between Mexico and the United States." *Demography* 38:187–200.
Cornelius, W. A., and J. M. Lewis Ed.
2007   *Impacts of Border Enforcement on Mexican Migration: The View From Sending Communities.* Boulder CO: Lynne Rienner Publishers.
Garip, F.
2012   "Discovering Diverse Mechanisms of Migration: The Mexico–US Stream 1970–2000." *Population and Development Review* 38(3):393–433.
Hoffman, A.
1974   *Unwanted Mexican Americans in the Great Depression: Repatriation Pressures*, 1929-1939 Yucson.
Jasso, G., and M. R. Rosenzweig
1982   "Estimating the Emigration Rates of Legal Immigrants Using Administrative and Survey Data: The 1971 Cohort of Immigrants to the United States." *Demography* 19(3):279–290.
Lundquist, J. H., and D. S. Massey
2005   "Politics or Economics? International Migration During the Nicaraguan Contra War." *Journal of Latin American Studies* 37:29–53.
Marín Abaunza, L.
1998   *La Ley Díaz-Balart Nacara.* Miami FL: Astran Massey.
Massey, D. S.
1986   "The Social Organization of Mexican Migration to the United States." *Annals of the American Academy of Political and Social Science* 487:102–113.

Case 1:18-cv-00068 Document 225-4 Filed on 07/21/18 in TXSD Page 463 of 558

Massey, D. S. and K. E. Espinosa
1997 "What's Driving Mexico-U.S. Migration? A Theoretical, Empirical and Policy Analysis." *American Journal of Sociology* 102:393–999.
———
2011 "Epilogue: The Past and Future of Mexico-U.S. Migration." In *Beyond la Frontera: The History of Mexico-U.S. Migration*. Ed. M. Overmyer-Velázquez. New York NY: Oxford University Press. Pp. 241–265.
———
2013 "America's Immigration Policy Fiasco: Learning From Past Mistakes." *Daedalus* 142 (3):1–11.
———, J. Durand, and N. J. Malone
2002 *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration*. New York: Russell Sage Foundation.
———, ———, and K. A. Pren
2009 "Nuevos Escenarios de la Migración México-Estados Unidos: Las Consecuencias de la Guerra Antiinmigrante." *Papeles de Población* 61:101–128.
———, and J. A. Phillips
1999 "Engines of Immigration: Stocks of Human and Social Capital in Mexico." *Social Science Quarterly* 81(1):33–48.
———, and K. A. Pren
2012 "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge From Latin America." *Population and Development Review* 38(1):1–29.
———, and F. Riosmena
2010 "Undocumented Migration From Latin America in an Era of Rising U.S. Enforcement." *Annals of the American Academy of Political and Social Science* 630:137–161.
———, and A. Singer
1995 "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension." *Demography* 32(3):203–213.
———, R. Alarcón, J. Durand and H. González
1987 *Return to Aztlan: The Social Process of International Migration From Western Mexico*. Berkeley and Los Angeles: University of California Press.
——— *et al.*
1998 *Worlds in Motion: International Migration at the End of the Millennium*. Oxford: Oxford University Press.
Orrenius, P. M., and M. Zavodny
2003 "Do Amnesty Programs Reduce Undocumented Immigration? Evidence From IRCA." *Demography* 40(3):437–450.
Palloni, A., D. S. Massey, M. Ceballos, K. Espinosa and M. Spittel
2001 "Socail Capital and International Migration: A test Using Information on Family Networks." *American Journal of Sociology* 106:1262–1299.
Passel, J. V., and D. V. Cohn
2011 *Unauthorized Immigrant Population: National and State Trends, 2010*. Washington DC: Pew Hispanic Center.
Passel, J. S., D'Vera Cohen and A. Gonzalez-Baker
2012 *Net Maigration Falls to Zero and Perhaps Less*. Washington, DC: Pew Research Hispanic Trends Project.
Piore, M. J.
1979 *Birds of Passage: Migrant Labor in Industrial Societies*. New York NY: Cambridge University Press.

Rendall, M., P. Brownell, and S. Kups
2011 "Declining Return Migration From the United States to Mexico in the Late-2000s Recession: A Research Note." *Demography* 48(3):1040–1068.

Reyes, B.
2004 "U.S. Immigration Policy and the Duration of Undocumented Trips." In *Crossing the Border Research From the Mexican Migration Project*. Ed. J. Durand, and D. S. Massey. New York NY: Russell Sage Foundation, Pp. 299–321.

Riosmena, F.
2004 "Return Versus Settlement Among Undocumented Mexican Migrants, 1980 to 1996." In *Crossing the Border: Research From the Mexican Migration Project*. Ed. J. Durand, and D. S. Massey. New York NY: Russell Sage Foundation, Pp. 265–280.

Rosenblum, M. R.
2012 *Border Security: Immigration Enforcement Between Ports of Entry*. Washington DC: Congressional Research Service.

Sana, M., and D. S. Massey
2000 "Seeking Social Security: An Alternative Motivation for Mexico-U.S. Migration." *International Migration* 38(1):3–24.

Taylor, J. E.
1987 "Undocumented Mexico-U.S. Migration and the Returns to Households in Rural Mexico." *American Journal of Agricultural Economics* 69:626–638.

United Nations Office on Drugs and Crime
2007 *Crime and Development in Central America: Caught in the Crossfire*. New York NY: United Nations.

Warren, R.
2000 *Annual Estimates of the Unauthorized Immigrant Population Residing in the United States and Components of Change: 1987 to 1997"*. Washington DC: Office of Policy and Planning, U.S. Immigration and Naturalization Service.
———, and E. P. Kraly
1985 "The Elusive Exodus: Emigration From the United States." Population Trends and Public Policy Occasional Paper No. 8. Washington DC: Population Reference Bureau.
———, and J. R. Warren
2013 "Unauthorized Immigration to the United States: Annual Estimates and Components of Change, 1990–2010." *International Migration Review* 47(3):296–329.

Wasem, R. E.
2011 *Unauthorized Aliens Residing in the United States: Estimates Since 1986*. Washington DC: Congressional Research Service.

Wong, R., M. Espinoza, and A. Palloni
2007 "Adultos Mayores Mexicanos en Contexto Socioeconómico Amplio: Salud y Envejecimiento." *Salud Pública de México* 49(S4):S436–S447.

Woodrow, K., and J. S. Passel
1990 "Post-IRCA Undocumented Immigration to the United States: An Analysis Based on the June 1988 CPS." In *Undocumented Migration to the United States: IRCA and the Experience of the 1980s*. Ed. F. D. Bean, B. Edmonston, and J. S. Passel. Washington DC: Urban Institute Press, Pp. 33–76.

Zúñiga, E., and J. E. García
2008 "El Envejecimiento Demográfico en México. Principales Tendencias y Características." In *Situación Demográfica de México*. Ed. México, DF: Consejo Nacional de Población. Pp. 93–100.

# DEF-INTERV.

# EX. 123

Gonzales 1

# ROBERTO G. GONZALES

Harvard Graduate School of Education
6 Appian Way, Gutman 429
Cambridge, MA 02138
roberto_gonzales@gse.harvard.edu
Google Scholar Profile

## EDUCATION

Ph.D.  University of California Irvine, Sociology (2008).

*Dissertation*: *Born in the Shadows: The Uncertain Futures of the Children of Unauthorized Mexican Migrants.*

*Fields of Specialization*: Immigration, Unauthorized Migration, Race/Ethnicity, Latino Studies

M.A.  University of California, Irvine, Sociology (2004).
*Thesis*: *Can't Get There from Here: Capital, Context and Unauthorized Status among the 1.5 and 2nd Generations.*

A.M.  University of Chicago, School of Social Service Administration (1999)

B.A.  The Colorado College, Sociology (1992)
Awarded the Abbot Prize for outstanding student in Sociology Department

## ACADEMIC APPOINTMENTS

Professor of Education, Harvard Graduate School of Education (2017-)

Assistant Professor, Harvard Graduate School of Education (2013 to 2017)

Assistant Professor, University of Chicago School of Social Service Administration (2011-2013)

Adjunct Assistant Professor, University of Washington, Department of Sociology (2011-2016)

Assistant Professor, University of Washington, School of Social Work (2009 to 201)

Acting Assistant Professor, University of Washington School of Social Work (2008-2009)

## ACADEMIC AFFILIATIONS

Faculty Research Affiliate, Institute for Research on Poverty, University of Wisconsin-Madison (2016-Present)

Faculty Research Affiliate, University of Oxford, Department of Social Policy and Intervention (2015)

Faculty Research Affiliate, Chapin Hall Center for Children, University of Chicago (2011-2014)
Faculty Research Affiliate, Center for the Study of Race, Politics & Culture, University of Chicago (2011-2013)

Faculty Research Affiliate, Center for Human Potential and Public Policy, University of Chicago (2011-2013)

Faculty Research Affiliate, West Coast Poverty Center, University of Washington (2009-2011)

## HONORS AND AWARDS

Winner (2017), Society for the Study of Social Problems C. Wright Mills Book Award.

Winner (2017), American Sociological Association Sociology of Education Section, Pierre Bourdieu Book Award.

Winner (2017), American Sociological Association Sociology of Education Section, Pierre Bourdieu Book Award.

Winner (2017), Law and Society Association Herbert Jacob Book Award.

Winner (2017), American Education Research Association Outstanding Book Award.

Honorable Mention (2017), American Sociological Association International Migration Section, Thomas and Znaniecki Distinguished Book Award.

Honorable Mention (2017), American Sociological Association Aging and the Life Course Section, Outstanding Publication Award.

Honorary Degree Recipient (2017), Colorado College.

Ranked #1 among Junior Faculty in Rick Hess's 2017 Edu-Scholar Public Influence Rankings.

Winner (20016), American Anthropological Association ALLA Book Award.

Early Career Award (2016), American Educational Research Association Committee on Scholars of Color in Education. Given annually by the Association to a scholar who is within the first decade of his or her career after receipt of a doctoral degree.

Early Career Award (2016), American Educational Research Association Hispanic Research Issues Special Interest Group.

Public Sociology Award (2014), American Sociological Association, International Migration Section.

2

Distinguished Contribution to Research, Best Article Award (2013), American Sociological Association, Latino/a Sociology Section.

Distinguished Contribution to Research, Honorable Mention, Best Article (2013), American Sociological Association, International Migration Section.

Lauds and Laurels Outstanding Graduate Student (2008), University of California Irvine. Each year the UC Irvine Alumni Association presents this award to recognize a graduate student who has excelled academically and has impacted the campus or community at-large through significant service or program creation.

Order of Merit (2008), UC Irvine School of Social Sciences.

Fellow (2007-2008), Public Policy Institute of California.

Ford Dissertation Fellow (2006-2007), National Academy of Sciences.

Outstanding Graduate Student Instructor (2006), UC Irvine Department of Sociology.

Faculty Mentor Fellowship (2003-2004), UC Irvine.

Abbot Scholar (1996-1999), University of Chicago.


## RESEARCH GRANTS

William T. Grant Foundation Research Grant (2017-2018), "Putting Immigration and Education in Conversation Everyday." Co-PI with Rebecca Lowenhaupt, Dafney Blanca Dabach, and Ariana Figueroa, $50,000.

Spencer Foundation Research Grant (2017-2018), "Putting Immigration and Education in Conversation Everyday." Co-PI with Rebecca Lowenhaupt, Dafney Blanca Dabach, and Ariana Figueroa, $35,000.

John D. and Catherine T. MacArthur Foundation Research Grant (2016-2017), "From Undocumented to DACAmented and Potentially DAPAmented: Understanding Mixed-Status Families in a New Policy Context," $100,000.

Heising-Simons Foundation Research Grant (2016-2018), "Putting Immigration and Education in Conversation Every day," $270,000.

Russell Sage Foundation Research Grant (2015-2016), "Undocumented Immigration: Effects of Policy on the Experience of Illegality," $35,000.

Bill and Melinda Gates Foundation Research Grant (2014-2016), "Going Back to School? Understanding the Effects of Widened Access for Undocumented Young Adults," $250,000.

John D. and Catherine T. MacArthur Foundation Research Grant (2013-2016), "Learning to be Legal: A Proposal to Track the Impact of Deferred Action on DREAM Act Eligible Youth and Young Adults," $600,000.

James B. Irvine Foundation Research Grant (2013-2014), "Assessing DACA Implementation in California," $125,000.

Heising-Simons Foundation Research Grant (2013-2014), "Understanding the Effects of Widened Access Among Undocumented Young Adults," with Veronica Terriquez, Co-PI, $40,000.

U.S. Department of Health and Human Services Grant, administered under the Stanford Center for the Study of Poverty and Inequality (2012-2013), 'Hispanic Poverty: Social Mobility.' (Douglass S. Massey and David Grusky, Co-PI's).

William T. Grant Scholars Program (Finalist, 2013) "Assessing Critical Supports for the Educational Persistence of the Children of Suburban Latino Immigrants."

University of California, Davis Poverty Center Small Grant (2012), "Suburban Poverty and Immigrant Integration," $19,800.

University of Washington Institute for Ethnic Studies in the United States Small Grant (2010), "The Undocumented 1.5 Generation in Seattle," $10,205.

University of Washington West Coast Poverty Center Small Grant for Early Scholars (2009), "The Uncertain Futures of the Children of Undocumented Immigrants," $9,000.

University of Michigan National Poverty Center Small Grant (2009), Young Lives on Hold: Undocumented 1.5 Generation Young Adults Learning to be "Illegal," $8,228.

UC Irvine Center for Latinos in a Global Society Research Grant (2004-2007), $30,000.

UC MEXUS Dissertation Research Grant, (2006), "The Children of Post-Industrial America: How the Sons and Daughters of Unauthorized Migrants Make Ends Meet," $12,000.

## PUBLICATIONS (*Names in italics indicate graduate students*)

### Books

**Gonzales, Roberto G.** 2016. *Lives in Limbo: Undocumented and Coming of Age in America.* Oakland: University of California Press.
- Winner (2017), Society for the Study of Social Problems C. Wright Mills Book Award.
- Winner (2017) Law and Society Association Herbert Jacob Book Award.
- Winner (2017) American Education Research Association Outstanding Book Award.

- Winner (2017), American Sociological Association Sociology of Education Section, Pierre Bourdieu Book Award.
- Honorable Mention (2017), American Sociological Association International Migration Section, Thomas and Znaniecki Distinguished Book Award.
- Honorable Mention (2017), American Sociological Association Aging and the Life Course Section, Outstanding Publication Award.
- Winner (2016) American Anthropological Association ALLA Book Award.
- Chosen for Author Meets Critic Session, Eastern Sociological Society, Boston, 2016.
- Reviewed in *The New York Review of Books*, *International Migration Review*, *Sociological Forum*, *City and Society*, *Migration Studies*, *NACLA Report on the Americas*, *Journal of Children and Poverty*; *Chiricú Journal: Latina/o Literatures, Arts, and Cultures*
- Selected by Tufts University as its Freshman Class's Common Book for AY 2017-2018

**Gonzales, Roberto G**., and Nando Sigona (Spring, 2017). *Within and Beyond Citizenship: Borders, Membership and Belonging*. New York: Routledge.

**Gonzales, Roberto G**., and Nando Sigona (Spring, 2018). *Undocumented Migration*. Under Contract. Cambridge: Polity Press.

**Gonzales, Roberto G.,** Benjamin Roth, and Kristina Brant (Spring 2019) *The Growing Significance of Place: Assessing the Diverging Trajectories of DACA-eligible Young Adults*. Under Contract, Oakland: University of California Press.

## Special Issues

**Gonzales, Roberto G**., and Steven Raphael. 2017. *Russell Sage Foundation Journal*, Special Issue on "Undocumented Immigrants and their Experiences of Illegality, Volume 3 No. 4.

**Gonzales, Roberto G**., Nando Sigona, and Edelina Burciaga. 2016. *American Behavioral Scientist,* Special issue on "Citizenship, Rights, and Deservingness, Volume 60 No. 13.

Aranda, Elizabeth, Elizabeth Vaquera, and **Roberto G. Gonzales**. 2014. *American Behavioral Scientist* Special Issue on "Latino Incorporation in Old and New Immigrant Destinations," 2014, Volume 58 No. 14.

## Peer-Reviewed Journal Articles

Zhou, Min, and **Roberto G. Gonzales**. Forthcoming. "Divergent Destinies: Children of Immigrants Growing Up in America. American Review of Sociology, Issue 45.

**Gonzales, Roberto G**. and Edelina Burciaga. Forthcoming. "Segmented Pathways of Illegality: Reconciling the Co-existence of Master and Auxiliary Statuses in the Experiences of 1.5 Generation Undocumented Young Adults." *Ethnicities*.

Yoshikawa, Hirokazu, Carola S. Suarez-Orozco, and **Roberto G. Gonzales**. 2017. "Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research in Adolescence." *Journal of Research on Adolescence*. Volume 27, Issue 1, 4-19.

**Gonzales, Roberto G.,** and Steven Raphael. 2017. "Illegality: A Contemporary Portrait." Russell Sage Foundation Journal, Volume 3 No 4.

Trieu, Monica, *Nicholas Vargas*, and **Roberto G. Gonzales**. 2016. "Transnational Patterns among Asian American and Latina/o American Children of Immigrants from Southern California." *Journal of Ethnic and Migration Studies*, Volume 42, Issue 7, 1177-1198.

**Gonzales, Roberto G**., Luisa L. Heredia, and Genevieve Negron-Gonzales. 2015. "Untangling Plyler's Legacy: Undocumented Students, Schools, and Citizenship." *Harvard Educational Review*, Volume 85 No. 3, 318-341.

**Gonzales, Roberto G.** 2015. "Imagined Futures: Thoughts on the State of Policy and Research Concerning Undocumented Immigrant Youth and Young Adults." *Harvard Educational Review*, Volume 85 No. 3, 518-524.

*Roth, Benjamin J.*, **Roberto G. Gonzales**, and *Jacob Lesniewski*. 2015. "Building a Stronger Safety Net: Local Organizations and the Challenges of Serving Immigrants in the Suburbs." *Human Service Organizations: Management, Leadership, & Governance*, Volume 39, No. 4 348-361.

*Patler*, *Caitlin* and **Roberto G. Gonzales**. 2015. "Framing Citizenship: Media Coverage of Anti-Deportation Cases Led by Undocumented Immigrant Youth Organizations." *Journal of Ethnic and Migration Studies,* Volume 41, No. 9, 1453-1474.

**Gonzales, Roberto G**., Veronica Terriquez, and *Stephen. Ruszczyk*. 2014. "Becoming DACAmented: Assessing the Short-term Benefits of Deferred Action for Childhood Arrivals (DACA)." *American Behavioral Scientist*, Volume 58, No. 14, 1852-1872.

Vaquera, Elizabeth, Elizabeth Aranda, and **Roberto G. Gonzales**. 2014. Patterns of Incorporation of Latinos in Old and New Destinations: From Invisible to Hypervisible." American Behavioral Scientist, Volume 58, No. 14, 1823-1833.

**Gonzales, Roberto G.,** and *Ariel Ruiz*. 2014. "Dreaming Beyond the Fields: Undocumented Youth, Rural Realities, and a Constellation of Disadvantage." *Latino Studies*, Volume 12 Issue 2, 194-216.

**Gonzales, Roberto G**., Carola Suárez-Orozco, and *Maria Cecilia Dedios*. 2013. "No Place to Belong: Contextualizing Concepts of Mental Health among Undocumented Immigrant Youth in the United States." *American Behavioral Scientist*, Volume 57 Issue 8, 1173 - 1198.

Gleeson, Shannon, and **Roberto G. Gonzales**. 2012. "When Do Papers Matter? An Institutional Analysis of Undocumented Life in the United States." *International Migration*, Vol. 50, Issue 4, 1-19.
- Lead Article

- Reprinted in The New Latino Studies Reader: A Twenty-First-Century Perspective, Gutierrez and Almaguer, Eds. 2016. University of California Press.

**Gonzales Roberto G**., and Leo R. Chavez. 2012. "Awakening to a Nightmare": Abjectivity and Illegality in the Lives of Undocumented 1.5 Generation Latino Immigrants in the United States." *Current Anthropology* 53(3).
- Lead Article

**Gonzales, Roberto G.** 2011. "Learning to be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood." *American Sociological Review,* Volume 76, Number 4, 602-619.
- Featured Article
- Distinguished Contribution to Research, Best Article Award, American Sociological Association, Latino/a Sociology Section, 2013.
- Distinguished Contribution to Research, Honorable Mention, Best Article, American Sociological Association, International Migration Section, 2013.
- Reprinted in *The Structure of Schooling: Readings in the Sociology of Education*, 2015, Arum, Beattie, and Ford, Eds.

**Gonzales, Roberto G.** 2010. "On the Wrong Side of the Tracks: Understanding the Effects of School Structure and Social Capital in the Educational Pursuits of Undocumented Immigrant Students." *Peabody Journal of Education*, Volume 85 Issue 4, 469-485.

Abrego, Leisy J. and **Roberto G. Gonzales.** 2010. "Blocked Paths, Uncertain Futures: The Postsecondary Education and Labor Market Prospects of Undocumented Youth." *Journal of Education for Students Placed at Risk*, 15: 1, 144 — 157.

**Gonzales, Roberto G**. 2010. "More Than Just Access: Undocumented Students Navigating the Post-Secondary Terrain." *Journal of College Admissions*, Number 206.

**Gonzales, Roberto G.** 2009. "On the Rights of Undocumented Children." *Society*. Volume 46 Number 5, 419 – 422.

**Gonzales, Roberto G.** 2008. "Left Out but not Shut Down: Political Activism and the Undocumented Latino Student Movement." *Northwestern Journal of Law and Social Policy*. Volume 3:2, 219-239.
- Reprinted in *Governing Immigration through Crime: A Reader*, Dowling and Inda, Eds. 2013. Stanford University Press.

## Peer Reviewed Book Chapters

**Gonzales, Roberto G.** and *Edelina M. Burciaga*. Forthcoming. "Undocumented Youth and Local Contours of Inequality." In *Handbook of the Sociology of Education in the 21ˢᵗ Century,* Barbara Schneider and Guan Saw, Editors. New York: Springer International Publishing.

**Gonzales, Roberto G.** In Press. "Sergio Rodriguez's Dream Deferred: Illegality, Deportation, and the Long Term Impacts of Lives in Limbo. F*orced Out and Fenced In: Immigration Tales From the Field*, Tanya Golash-Boza, Editor. New York: Oxford University Press.

**Gonzales, Roberto G.,** *Joanna Perez,* and *Ariel Ruiz*. 2016. "Ni de aqui, ni de alla": Undocumented Immigrant Youth and the Challenges of Identity Formation amid Conflicting Contexts." In *Bilateral Perspectives on Mexican Migration: Demographic, Economic and Incorporation Trends*, Harriett Romo and Olivia Lopez, Editors. Austin: University of Texas Press.

Stein, Gabriela, **Roberto G. Gonzales**, Cynthia Garcia Coll, and Juan I. Prandoni. 2015. "Latinos in Rural, New Immigrant Destinations: A Modification of the Integrative Model of Child Development." In Rural Ethnic Minority Youth and Families in the United States, Crockett and Carlo, Eds. Springer International Publishing.

**Gonzales, Roberto G.,** and Benjamin Roth. 2015. "Immigrant Children and the Transition to Adulthood." In Scott, R. & Kosslyn, S. Eds. *Emerging Trends in the Social and Behavioral Sciences*. SAGE Publications.

**Gonzales, Roberto G**., and Cynthia N. Carvajal. 2015. "Difficult Transitions: Undocumented Immigrant Students Navigating Vulnerability and School Structures." In Inequality, Power and School Success: Case Studies on Racial Disparity and Opportunity in Education, Gilberto Conchas and Michael Gottfried, Editors. New York: Routledge.

**Gonzales, Roberto G.,** Luisa Heridia, and *Genevieve Negrón –Gonzales* 2013.. "Challenging the Transition to New 'Illegalities': Undocumented Young Adults and the Shifting Boundaries of Inclusion." In *Immigrant Illegality: Constructions, Critiques and Resistance*, Cecilia Menjivar and Daniel Kanstroom, Editors. Cambridge: Cambridge University Press.

**Gonzales, Roberto G.** 2013 "Reassessing Human Capital and Intergenerational Mobility." In *Poverty, Inequality, and Immigration*, David Card and Steven Raphael, Editors. New York: Russell Sage.

**Gonzales, Roberto G.,** and *Rennie Lee*. 2013."Second generation, identity formation." *The Encyclopedia of Global Migration*. Malden, MA: Wiley.

**Gonzales, Roberto G.** 2011. "In Spite of the Odds: Undocumented Immigrant Youth, School Networks, and College Success." In *Is Becoming an American a Developmental Risk?*, Cynthia García Coll and Amy Marks, Editors. Washington DC: APA Books.

**Gonzales, Roberto G.** 2009. "*Dirty Pretty Things:* The State, Global Migration and Survival in Contemporary Cities," in *Cinematic Sociology: Social Life in Film,* Feltey, K. and J. Sutherland eds. London, U.K.: Sage Press.

Rumbaut, Rubén G., **Roberto G. Gonzales**, Golnaz Komaie, and Charlie V. Morgan. 2008."Inmigración, encarcelamiento y delincuencia en los Estados Unidos de América: La percepción pública frente a la evidencia empírica," in *Procesos de infracción de normas y de reacción a la*

*infracción de normas: dos tradiciones criminológicas. Nuevos estudios en homenaje al profesor Alfonso Serrano Gómez.* Alfonso Serrano Maíllo y José Luis Guzmán Dálbora, editores. Madrid: Editorial Dykinson.

Rumbaut, Rubén G., **Roberto G. Gonzales,** Golnaz Komaie, and Charlie V. Morgan and Rosaura Tafoya-Estrada.  2006.  "Immigration and Incarceration: Patterns and Predictors of Imprisonment among First – and Second-Generation Young Adults," in *Immigration and Crime: Ethnicity, Race, and Violence*, Martinez, R. and A. Valenzuela eds.  New York University Press.

## Policy Reports

**Gonzales, Roberto G.**, Marco A. Murillo, Cristina Lacomba, Kristina Brant, Martha C. Franco, Jaein Lee, and Deepa S. Vasudevan. 2017. "Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark." Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/reports/2017/06/22/434822/taking-giant-leaps-forward/

**Gonzales, Roberto G.,** Maria E. Luna-Duarte, Daysi X. Diaz-Strong, M. Ireva Rivas, and Kristina Brant. 2016 "How Will I Pay for It? Undocumented Students and the Barriers to College Affordability." Latino Policy Forum. Available at: http://www.latinopolicyforum.org/blog/nurp-financial-accessbility#

**Gonzales, Roberto G.**, Benjamin Roth, Kristina Brant, Jaein Lee, and Carolina Valdivia. 2016. "DACA at Year Three: Challenges and Opportunities in Assessing Education and Employment, New Evidence from the UnDACAmented Research Project." American Immigration Council: February, 2016. Available at: http://immigrationpolicy.org/sites/default/files/docs/daca_at_year_three.pdf

**Gonzales, Roberto G.**, and Angie Bautista-Chavez. 2014. "Two Years and Counting: Assessing the Growing Power of DACA." Immigration Policy Center, June 2014. Available at: http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca

Cervantes, Wendy, and **Roberto G. Gonzales**. 2013. "The Cost of Inaction: Why Children Can't Wait for Immigration Reform." First Focus: Center for the Children of Immigrants, October 2013.

**Gonzales, Roberto G.**, and Veronica Terriquez. 2013. "How DACA is Impacting the Lives of Those Now DACAmented: Preliminary Findings from the National UnDACAmented Research Project." Immigration Policy Center and the Center for the Study of Immigrant Integration, August, 2013. Available at: http://www.immigrationpoliPreliminary Findings from the National UnDACAmented Research Projectcy.org/just-facts/how-daca-impacting-lives-those-who-are-now-dacamented

**Gonzales, Roberto G.** 2011. "Where Do We Go From Here? Undocumented Youth and an Effort Requiring the Entire Village." UC Berkeley Center for Latino Policy Research. Available at: http://escholarship.org/uc/item/1k51m25n;jsessionid=BDBD64FF6A2F9C48D5A4B8DDE41B391C

**Gonzales, Roberto G**.  2009. "Young Lives on Hold: The College Dreams of Undocumented Students**" (**with a foreword by Marcelo Suárez-Orozco).   *The College Board*. Available at: http://professionals.collegeboard.com/profdownload/young-lives-on-hold-college-board.pdf

- Reprinted in Spanish. 2009. "Vidas Jóvenes en Espera: Los Sueños Universitarios de Estudiantes Indocumentados " (Prólogo de Marcelo M. Suárez-Orozco). *The College Board*. Available at:
http://professionals.collegeboard.com/profdownload/young-lives-on-hold-college-board-spanish.pdf

**Gonzales, Roberto G. 2009**. "Why Integration Matters: Undocumented Immigrant Youth and Making a Case for Moving Beyond Enforcement." *The Role of Local Police: Striking A Balance Between Immigration Enforcement and Civil Liberties*, The Police Foundation.

**Gonzales, Roberto G.** 2007. **"**Wasted Talent and Broken Dreams: the Lost Potential of Undocumented Students."  *Immigration Policy: In Focus*. Volume 5, Issue 13. Immigration Policy Center, of the American Immigration Law Foundation. Washington, D.C. Fall 2007. Available at:
http://www.immigrationpolicy.org/sites/default/files/docs/Wasted%20Talent%20and%20Broken%20Dreams.pdf
- Reprinted in *Current Controversies: Illegal Immigration*, 2012. Noel Merino, Editor. Greenhaven Press.

 Rubén G. Rumbaut, **Roberto G. Gonzales**, Golnaz Komaie, and Charlie V. Morgan. 2006."Debunking the Myth of Immigrant Criminality: Imprisonment Among First- and Second-Generation Young Men," in *Migration Information Source*, June 1, 2006 (with Rubén G. Rumbaut, Golnaz Komai, and Charlie V. Morgan).  Available at:
http://www.migrationinformation.org/usfocus/display.cfm?ID=403

## Book Reviews

**Gonzales, Roberto G.** Forthcoming. Review of *Dreams and Nightmares: Immigration Policy, Youth, and Families*, Marjorie Zatz and Nancy Rodriguez. *Contemporary Sociology*.

**Gonzales, Roberto G.** 2016. Review of *Skills of the Unskilled: Work and Mobility Among Mexican Migrants*, Jacqueline M. Hagan, Ruben Hernandez-Leon, and Jen-Luc Demonsant. *American Journal of Sociology*, 121 (6): 1947-1949.

**Gonzales, Roberto G.** 2013. Review of *Rallying for Immigrant Rights: The Fight for Inclusion in 21st Century America*, Kim Voss and Irene Bloemraad, Eds. *Contemporary Sociology* 42 (5): 755-756.

**Gonzales, Roberto G.** 2012. Review of *Immigrants Raising Citizens: Undocumented Parents and Their Young Children*, by Hirokazu Yoshikawa. *Social Service Review*, 86 (3): 547-548.

**Gonzales, Roberto G.** 2010. Review of *Manifest Destinies: The Making of the Mexican American Race*, by Laura E. Gomez.  *Contemporary Sociology*, 39 (1): 38.

**Gonzales, Roberto G.** 2006. Review of *Chicanas and Chicanos in School: Racial Profiling, Identity Battles, and Empowerment*, by Marcos Pizarro. *Latino Studies* 2006, Volume 4 Issue 3 Autumn 2006.

## Op-Eds

**Gonzales, Roberto G.** "I study young immigrants. Here's how DACA changed their lives" *Vox: The Big Idea*, September 2, 2017. https://www.vox.com/2017/9/2/16244380/daca-benefits-trump-undocumented-immigrants-jobs

**Gonzales, Roberto G.**, and Kristina Brant. "DACA Boosts Young Immigrants' Well-Being, Mental Health," *NBC News*, June 15, 2017. https://www.nbcnews.com/news/latino/analysis-daca-boosts-young-immigrants-well-being-mental-health-n772431

**Gonzales, Roberto G.** "Community Support Can Help Integrate Immigrants," *The New York Times, Room for Debate*, September 12, 2016.

**Gonzales, Roberto G.** "How the Supreme Court's immigration decision hurts all of us," T*he Washington Post*, June 23, 2016.

**Gonzales, Roberto G.** "Supreme Court ruling could put immigrants deeper into shadows," *The Boston Globe*, June 23, 2016.

**Gonzales, Roberto G.** 2012. "Five Myths about the Dream Generation," *Washington Post*, June 22, 2012.

**Gonzales, Roberto G.** 2010. "We Cannot Afford to Not Pass the DREAM Act: A Plea from Immigration Scholars." *Huffington Post*, December 8, 2010. Lead author accompanied by 381 of the nation's top scholars. Available at:
http://www.huffingtonpost.com/roberto-g-gonzales/we-can-not-afford-not-to-_1_b_793702.html

**Gonzales, Roberto G.** 2010. "Investing in the American Dream: The DREAM Act Would Allow Undocumented Youth to Give Back to America." The Immigration Policy Center. Available at:
http://immigrationpolicy.org/sites/default/files/docs/Gonzales__Investing_in_the_American_DREAM_120210.pdf

**Gonzales, Roberto G.** 2009. Perspectives Piece on the DREAM Act and Comprehensive Reform for the Illinois Coalition for Immigrant and Refugee Rights. Available at:
http://icirr.org/ko/node/4206

## Selected Works in Progress

"Immigration Policy and Mental Health Outcomes among Undocumented Latino Young Adults: An Elaboration of the Stress Process Model," with Veronica Terriquez and Juanita Garcia. Preparing for *Journal of Health and Social Behavior*.

Gonzales 12

"The Impact of DACA on the Life Course," with Basia Ellis and *Sarah Rendon-Garcia*. Preparing for submission to *Child Development*.

"Imagined Futures: The Effects of Uncertainty on DACAmented Youth in the United States," with Cristina Fernandez-Gutierrez and *Carolina Valdivia*. Preparing for submission to the *American Journal of Sociology*.

"On the Path to College: Undocumented Students Disclosing their Immigration Status to School Personnel," with *Carolina Valdivia*. Preparing for submission to the *Sociology of Education*.

"Power and Political Opportunity in the Lives of Young Undocumented Immigrants: Complicating Established Frameworks, Constructing New Theory," with *David Knight*. Preparing for submission to *Perspectives on Politics*."

"The Contours of Concealment and Disclosure: An Analysis of Undocumented Youth's Disclosures in School Settings," with Dafney Blanca Dabach and *Deepa Vasudevan*. In Progress.

"Undocumented Youth's Disclosure Patterns across Contrasting State Contexts: Implications for Policy and Practice, with Dafney Blanca Dabach and *Deepa Vasudevan*. In Progress.

"The Power of Inclusion: How DACA Transforms the Psychological Lives of Undocumented Youth," with Basia Ellis and *Sarah Rendon-Garcia*. In Progress.

"What Counts as Well-being for Undocumented Youth?" with Basia Ellis and *Sarah Rendon-Garcia*. In Progress.

"Because My Dad Helped Me": Assessment of Family Engagement in the DACA Application Process," with *Jaein Lee*. In Progress

"Documenting the Undocumented: Methodological and Ethical Strategies," with *Thomas Swerts*. Preparing for submission to *Qualitative Methods*.

## PRESENTATIONS

### Keynote Addresses and Select Invited Presentations

Future of Latinos in the United States: Law Opportunity, and Mobility, Northeast Roundtable, Yale Law School, April 8-9, 2017.

Children of Immigrants in New Places of Settlement, The American Academy of Arts and Sciences, April 19-21, 2017.

Keynote Speaker, Global Politics of Migration and Refuge Symposium, Grinnell College, September 8, 2016.

Keynote Speaker, Undocumented and Coming of Age: What lessons can Europe draw from the USA? European Parliament, Sponsored by MEP Brando Benifei and the European Parliament Youth Intergroup, March 16, 2016.

Carl A. Grant Lecture, University of Wisconsin-Madison Center for Educational Research, May 6, 2016.

Keynote Speaker, Illinois African American and Latino Higher Education Alliance Research Forum, University of Illinois at Chicago, April 6, 2016.

George I. Sanchez, Lecture, University of Houston Institute for Higher Education Law and Governance, March 29, 2016.

Keynote Speaker, University of Chicago Latino Student Association Annual Conference, April 17, 2015.

National Academy of Sciences, Committee on Population, Panel on Integrating Immigrants into America, July 17, 2014.

Keynote Speaker, Serving Mexican Population's Educational Needs: Lessons from Coast to Coast, City University New York, December 5, 2014.

Annual Daniel Patrick O'Connor Memorial Lecture, Colorado College, December 11, 2013.

Keynote Speaker, César E. Chávez Undergraduate Research Symposium, Indiana University, March 21, 2013.

Keynote Speaker, 50 Years Later: (R)Evolution of the Dream, University of Michigan, February 5, 2013.

Keynote Speaker, Latino Heritage Month, Illinois State University, October 4, 2012.

Keynote Speaker, Social Services in the Latino/a Community Conference, UCLA Luskin School of Public Affairs, May 7, 2011.

## Presentations at Professional Associations and Meetings

"Between Peril and Possibility: DACAmented Youth Views of American Democracy." Society for the Study of Social Problems Annual Meeting, Seattle, WA, August, 2016.

"From Undocumented to DACAmented: Understanding Legal Status in a New Policy Context." American Education Research Association Annual Meeting, Washington, D.C., March, 2016.

"Between Peril and Possibility: DACAmented Youth Views of American Democracy." Eastern Sociological Society, Boston, MA, February, 2016.

"Taking Small Steps Forward: Assessing Short-term Benefits of DACA from the National Undocumented Research Project." American Sociological Association Annual Meeting, San Francisco, CA, August, 2014.

"Are Small Steps Forward Enough? Assessing the Benefits of Deferred Action for Childhood Arrivals from the National Undocumented Research Project." Presidential Panel, American Educational Research Association Annual Meeting, Philadelphia, PA, 2014.

"Invisible Work and the Undocumented, A Conversation with Roberto Gonzales and Robert Smith." Eastern Sociological Society Annual Meeting, Baltimore, MD, February, 2014.

"Immigration, Schooling, and the Transition to Illegality." Eastern Sociological Society Annual Meeting, Boston, MA, March, 2013.

"Education Not Deportation! Undocumented Students & the Reframing of the Debate about Immigrant Rights." Law and Society Annual Meeting, Honolulu, HI, May, 2012.

"Dreams in a Time of Confusion: Undocumented Youth and the Four Shocks of Discovery." American Anthropological Association Annual Meeting, Montreal, November 21, 2011.

"Waking up to a Nightmare." Law and Society Annual Meeting, San Francisco, June 2011.

"Making Connections, Building a Movement: Undocumented Students Organizing Online." Thematic Session, American Sociological Association Annual Meeting, Atlanta, GA, Aug. 2010.

"Wasted Talent and Hard Work: An Evaluation of Framing in the Immigrant Rights Movement" Law and Society Association Annual Meeting, Chicago, May 2010, with Shannon Gleeson (UC Santa Cruz)

"Citizenship, Abjectivity, and Illegality: The end(s) of Identity." 2009 Presidential Panel on "Dilemmas of Citizenship," the annual meetings of the AAA, December 2009, Philadelphia, Pennsylvania, with Leo Chavez (UC Irvine).

(Presider and Discussant) "Emerging Issues in Social Work Research and Practice with Immigrant Communities." Council on Social Work Education, San Antonio, TX, November 2009.

"Transitioning to Work and Uncertainty." American Sociological Association Annual Meeting, San Francisco, CA, Aug. 2009.

"Membership, Opportunity, and Claims Making: Undocumented Immigrants Negotiating Bureaucracies." Law and Society Association Annual Meeting,  Denver, CO, May 2009, with Shannon Gleeson (UCSC)

"Learning to be Illegal: Undocumented Mexican Youth Coming of Age at a Crossroads" Presidential Session: *Mexican Immigration: Current Issues & Controversies*, Pacific Sociological Association Annual Meeting, San Diego, CA April 2009.

"Dreams Deferred: Immigration and the Construction of Liminal Americans."  University of Texas at Austin, American Studies Conference.  Austin, TX. September 2007.

(Presider) Immigrant Networks Roundtables, American Sociological Association Annual Meeting, New York, New York, August 2007.

(Presider and Discussant) "The Future of Ethnic Identity: Case Studies of 1.5- & Second-Generation Young Adults in Southern California," panel at the Pacific Sociological Association's Annual Conference, Oakland, CA. March 2007.

(Organizer) "Waking the Sleeping Giant? Organizing & the Immigrants Rights Movement," panel at the Pacific Sociological Association's Annual Conference, Oakland, CA. March 2007.

"Growing up on the margins: The children of Mexican unauthorized migrants."  Pacific Sociological Association Annual Meeting, Hollywood, CA, April 2006.


## Policy Briefings

Center for American Progress, Harnessing the Talent of Unauthorized and DACA Students: What's Working in K-12 Policy and Practice, with Frances Esparza, Assistant Superintendent, Boston Public Schools; Richard Loeschner, Principal, Brentwood High School, Brentwood, New York; and Yehemi Cambron, Georgia Public School Teachers, March, 2016.

Center for American Progress, DACA Turns 1: Lessons and Challenges on the Anniversary of the Deferred Action for Childhood Arrivals Directive, with Tom Wong (UC San Diego), Audrey Singer (Brookings Institute), and Erika Andiola (Rep. Krysten Simema D-AZ), August, 2013.

The Immigration Policy Center, A Roadmap to Citizenship for the 11 million Undocumented Immigrants in the U.S., with Rob Paral (Rob Paral and Associates) and Sherri Kassoudji (University of Michigan), January, 2013.

Center for American Progress, Legal Violence: How Immigration Enforcement Affects Families, Schools, and Workplaces, with Leisy Abrego (UCLA), Cecilia Menjívar (ASU), Lisa Moore (National Domestic Workers Alliance), and Chris Newman (National Day Laborer Organizing Network), December, 2012.

Reform Immigration for America, National Education Leaders Discuss the DREAM Act, with Becky Pringle (Secretary Treasurer, National Education Association); Antonia Cortese (Secretay-Treasurer, American Federation of Teachers); Gary Rhoades (Secretary General, American Association of University Professors); and Junot Diaz (Pulitzer Prize winning writer and Professor, Massachusetts Institute of Technology), December, 2010.

The Immigration Policy Center, Noted American Scholars Discuss the DREAM Act, with Douglas S. Massey (Princeton University), Carola Suarez-Orozco (New York University), Rubén G. Rumbaut (UC Irvine), and Jacqueline Hagan (University of North Carolina at Chapel Hill), December, 2010.

The University of Washington, Pursuing the Dream: Beyond Achieving Education, with Hon. Maria Cantwell (U.S. Senator, D-WA); Rep. Phyllis Gutierrez-Kenney (46th District, Washington), August, 2009.

The College Board, Young Lives on Hold: The College DREAMS of Undocumented Students. Washington DC: Capitol Briefing, with Hon. Robert Menendez (U.S. Senator, D-New Jersey); Joseph Zogby (Chief Counsel to Senator Richard Durbin, D-IL); James M. Montoya (Vice President, The College Board); Hemi Kim (D.C. Director, National Korean American Service & Education Consortium); Gumecindo Salas (Vice President, Government Relations, Hispanic Association for Colleges and Universities, April, 2009.

"Why Integration Matters: Making a Case for Moving Beyond Enforcement." The Police Foundation, Conference on the Role of Local Police: Striking a Balance between Immigration Enforcement and Civil Liberties.  Washington DC, August 2008.

American Immigration Law Council. Policy and Politics: Senator Durban and Education Experts Discuss the DREAM Act. Washington DC. Presented research on panel with Hon. Richard Durbin (U.S. Senator, D-IL); Robert J. Birgeneau, (Chancellor, University of California at Berkeley); Reg Weaver (President, National Education Association); Gov. Bob Wise (President, Alliance for Excellent Education and former governor of West Virginia), October, 2007.

The Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity, UC Berkeley, Boalt Hall School of Law. *The Education of Our Children: The 25th Anniversary of Plyler V. Doe*, May, 2007.

## TEACHING

Harvard Graduate School of Education (2013 to Present)

>    Contemporary Immigration Policy and Educational Practice

>    Ethnographic Methods

University of Chicago School of Social Service Administration (2011 to 2013)

>    Contemporary Immigration Policy and Practice

>    Cultural and Political Understandings of Youth

University of Washington (2008-2011)

>    Critical Youth Empowerment

>    Maco-Practice I: Organizational, Community and Policy Practice

University of California, Irvine (Graduate Teaching, 2004-2007)

>    Summer Academic Enrichment Program

>    Sociology of Los Angeles
>    Contemporary Minority Politics

Latino Metropolis

University of Illinois, Chicago (2002)

Intro to the Barrio

Associated College of the Midwest Urban Studies Program (1998-2002)

Immigration and Labor: Becoming an American in the Global City
Economics, Community, and Urban Change in the Global City
Immigration and Ethnicity: The Journey to Becoming an America
Youth and the System: Making Sense of the Institutions in a Kid's Life
The Immigrant Dilemma: Changing Demographics and a City's Response.
Chicago Communities: Race and Ethnicity/Art and Culture.
Communities, Institutions, and Families in Chicago.

## STUDENT ADVISING

### Dissertation Committees

Matthew Shaw, HGSE, (**Assistant Professor, Vanderbilt**).
Eve Ewing, HGSE, (**Assistant Professor, University of Chicago**).
Benjamin Roth, University of Chicago (**Assistant Professor, U. South Carolina**).
Kevin Escudero, University of California, Berkeley 2014. (**Assistant Professor, Brown University**)
Joanna Perez, University of Illinois, (**Assistant Professor, Cal State Dominguez Hills**)
Thomas Swerts, University of Chicago (**Postoctoral Fellow, University of Antwerp**)
Marcelle Medford-Lee, University of Chicago, (**Postdoctoral Fellow, University of Connecticut**)
Michele Statz, University of Washington, (**Postdoctoral Fellow, University of Minnesota**)
Daysi Diaz-Strong, University of Chicago (current student).
Matt Maronic, University of Chicago (current student)
Maria Luna-Duarte, University of Illinois Chicago (current student)
Alessandra Bazo Vienrich, University of Massachusetts, Boston (current student)
Deepa Vasudevan, HGSE (current student)
Abena Subira Mackall, HGSE (current student)
Stephany Cuevas, HGSE (current student).
Carolina Valdivia, HGSE (current student).
Jain Lee, HGSE (current student)
Sarah Rendon-Garcia, HGSE (current student).
Jonathan Hampton, HGSE (current student)
Daphne Penn, HGSE (current student)
Clint Smith, HGSE (current student)
Martha Franco, HGSE (current student)
Carlos Aguilar (current student)

### Undergraduate Thesis Advising
Lisette Candia Diaz, Harvard College, 2016
Juan Guevara, The College, University of Chicago, 2013

Michele Suarez, University of Washington, 2010

**Other Advising** (Ph.D. Proposal Committees)

Miriam Valdovinos, University of Washington (**Assistant Professor, University of Connecticut**)
JoAnn Lee, University of Washington (**Assistant Professor, George Mason University**)
Marcela García-Castañon, University of Washington (**Assistant Professor, San Francisco State University**)
Natasha Merchant, University of Washington (**Assistant Professor, University of North Georgia**)
Eric Waithaka, University of Washington
Sabrina C. Bonaparte, University of Washington

## SELECTED PROFESSIONAL SERVICE

| | |
|---|---|
| Editorial Board, *Sociology of Education* | 2016 |
| Associate Editor, *Social Problems* | 2014-Present |
| Editorial Board, *Research in the Sociology of Education* | 2014-Present |
| Chair, American Sociological Association Latino/a Section, Distinguished Contribution to Research Best Paper Award | 2014 |
| Committee Member, American Sociological Association International Migration Section, Distinguished Contribution to Research Best Paper Award | 2014 |
| Advisory Board, Dream.US Scholarship Fund | 2013-Present |
| Council Member (elected), American Sociological Association Latino/a Section | 2012-Present |
| Advisory Board Member (Chosen by Mayor Rahm Emanuel), City of Chicago Office of New Americans | 2102-Present |
| Editorial Board, *Social Problems* | 2011-2014 |
| Editorial Board, *Social Service Review* | 2011-2013 |
| Scholarship Committee, Seattle Central Community College Foundation | 2011 |
| Panel Organizer, Pacific Sociological Association Annual Meeting, Oakland | 2007 |
| Organizer, Graduate Student Mini-Conference, Center for Research on Latinos in a Global Society, UC Irvine | 2006 |
| Co-Director, UC Irvine Labor Studies Group | 2005 – 2007 |
| Organizer, Graduate Student Mini-Conference, Center for Research on Latinos in a Global Society | 2005 |
| Co-Organizer, UCI Labor Studies Conference | 2002 |

## UNIVERSITY SERVICE

| | |
|---|---|
| Member, Committee on Ethnicity, Migration, Rights, Harvard University | 2015-Present |
| Member, Committee on Rights & Responsibilities, HGSE | 2015-Present |
| Member, Ph.D. Steering Committee, Harvard Graduate School of Education | 2015-Present |
| Member, Ph.D. Admissions Committee, Harvard Graduate School of Education | 2013-Present |
| Member, Committee on Degrees, Harvard Graduate School of Education | 2013-Present |
| MSW Admissions Committee – UW School of Social Work | 2009-2011 |
| Social Justice Sub-Committee – UW School of Social Work | 2009-2010 |
| Qualitative Methods Committee – UW School of Social Work | 2009-2010 |
| Founder, Purple Group (support group of UW undocumented students) | 2008 |

| | |
|---|---|
| Dissertation Fellowship Committee, Public Policy Institute of California | 2008 |
| Co-Founder, Student Group, DREAMS (Dedication for the Realization of an Education and Always Motivated for Success) UC Irvine | 2006 |
| Search and Hire Committee, UC Irvine Department of Sociology | 2004 |
| Graduate Student Representative, UCI Sociology | 2002-2005 |
| Director Search Committee, Associated Colleges of the Midwest Urban Studies | 2000 |
| Co-Organizer Associated Colleges of the Midwest Faculty Spring Conference | 2000 |
| Faculty Search Committees, Associated Colleges of the Midwest Urban Studies | 1999-2000 |
| Policies and Procedures Committee, Associated Colleges of the Midwest | 1999 |

## PROFESSIONAL MEMBERSHIPS

American Educational Research Association, member
American Sociological Association, member
Eastern Sociological Society, member
Pacific Sociological Association, member
Law and Society Association, member

## REVIEWER

### Journal Manuscript Reviewer

*American Sociological Review, American Journal of Sociology, Demography, Ethnicities, Social Forces, Social Problems, Journal of Ethnic and Migration Studies, Sociological Forum, Sociological Perspectives, International Migration Review, Ethnos, Mexican Studies, Sociology of Education, Review of Higher Education, Latino Studies, Analyses of Social Issues and Public Policy, Journal of Latino-Latin American Studies, British Journal of Social Work, Childhood, Sociology Quarterly, Education Policy.*

### Book Manuscript Reviewer
Stanford University Press
New York University Press
Cambridge University Press
University of California Press
Palgrave Press

### Grant Reviewer
National Science Foundation
Russell Sage Foundation

### International Dissertation, Outside Reviewer
Elizabeth Benedict Christensen, Copenhagen Business School

# DEF-INTERV.

# EX. 124

*Law & Social Inquiry*
Volume 33, Issue 3, 709–734, Summer 2008

# Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California

Leisy Abrego

*This article examines the instrumental and constitutive effects of California Assembly Bill 540. The law grants undocumented immigrant students an exemption from out-of-state tuition, thereby making some forms of higher education more accessible. Despite the narrow actionable aspects of the law, it unintentionally legitimizes this disenfranchised group. This longitudinal study of undocumented immigrant youth consists of in-depth interviews before, shortly after, and four years after the passage of the law. The findings demonstrate that AB 540 immediately relieved stigma and later provided a socially acceptable identity that, within a legal consciousness informed by meritocracy, empowered these students to mobilize the law in a number of unforeseen ways. The case strongly suggests that it is possible for unintended constitutive functions to have more transformative effects on the daily lives of targeted beneficiaries than the intended instrumental objectives of law.*

**Leisy Abrego** is a doctoral candidate in the Department of Sociology at the University of California, Los Angeles. The research for this article was approved by the UCLA IRB, #G01-09-069-01. Please direct all correspondence to abrego@ucla.edu.

I am grateful to Rebecca Emigh, Susan Coutin, Roger Waldinger, and Sandy Levitsky for their thoughtful comments on previous drafts of this article. Special thanks to Carlos Colorado for his support. I also wish to thank *Law & Social Inquiry*'s anonymous referees for their tremendously helpful recommendations. An earlier draft of this article won the 2007 Best Graduate Student Paper Award from the American Sociological Association's Section on Sociology of Law. The research was supported in part by a grant from the Institute of American Cultures through the Chicano Studies Research Center at UCLA.

© 2008 American Bar Foundation. 709

## INTRODUCTION

On October 12, 2001, undocumented students in California were legally granted greater access to institutions of higher education.[1] Then Governor of California, Gray Davis, signed Assembly Bill 540 (AB 540) into law. Currently still known under its bill number, this law qualifies all long-term California residents, regardless of immigration status, for an exemption from nonresident tuition in California public colleges and universities. Although still barred from federal or state financial aid, undocumented students no longer pay three to seven times more for tuition than their documented peers. Since 2001, comparable bills were also passed in nine other states.[2] Students who had organized for months around this piece of legislation rejoiced, and politicians who authored and supported the measure have since publicly touted their success, claiming to have improved the lives of young immigrant students.[3] To date, however, little is known about the effects of this law in the daily lives of undocumented youth. Were students able to benefit as expected? Did the change in law also bring forth any unforeseen consequences?

The relationship between law and social life is extraordinarily complex. Lawmakers and law enforcers tend to emphasize the instrumental purposes of law—those facets that aim directly to control behavior. However, in practice, various social forces can also weigh heavily on people's actions and influence their interpretation and application of laws. Consequently, unintended outcomes of laws are not uncommon. Civil rights laws, for example, often lead to results that contradict stated instrumental goals. Despite attempts to enhance and protect the interests of marginalized groups, targeted beneficiaries rarely invoke civil rights laws (Bumiller 1988; Engel and Munger 1996; Nielsen 2000). Moreover, when change is detected, it is gradual and not necessarily observable in formal legal claims (Engel and Munger 2003).

This article examines one group that is effectively and expeditiously invoking a new rights-granting law to access mainstream institutions. Few studies have traced the interconnections between a new rights-granting law, legal subjects' interpretation of that law, and their everyday application of the law. In this study, I analyze the legal consciousness of undocumented immigrant students who directly stand to gain from the passage of California Assembly Bill 540. I explore participants' belief in meritocracy and how it

---

1. For the purposes of this study, undocumented immigrant youth refers to youth who are born outside of the United States, have spent a significant portion of their lives in the United States, and reside here without legal permission from the federal government.

2. The following states have passed similar laws: Texas, Utah, Washington, New York, Oklahoma, Illinois, Kansas, Nebraska, and New Mexico; other states have considered following suit (National Immigration Law Center 2006). But in most cases, these bills do not qualify undocumented students for federal or state financial aid.

3. The signing of the bill was largely publicized through the Spanish-language media but received scarce coverage in the more mainstream English-language media.

powerfully interacts with the law to help construct subjects' identities in support of their claims to higher education and upward mobility. This case study demonstrates that neutral labeling effects of laws have the potential to transform social identities, thereby encouraging greater mobilization of the law. Furthermore, it reveals that in some instances, unintended constitutive consequences can be more beneficial and far reaching than instrumental outcomes of law.[4]

## DISENFRANCHISED GROUPS AND THE (IM)MOBILIZATION OF THE LAW: THE ROLE OF MERITOCRACY

Despite being a "rights" thinking society, people in the United States are, simultaneously, passive law-avoiders when it comes to making legal claims (Engel and Munger 1996, 2003). This is especially true of civil rights and antidiscrimination laws (Bumiller 1988; Engel and Munger 1996; Nielsen 2000). Although these laws intend to improve conditions for marginalized groups—to grant them greater inclusion into mainstream society—they can have precisely the opposite effect. Along with rights, these laws also unintentionally produce negative labels that categorize subjects as victims and associate them with weakness (Bumiller 1988). This backlash, in turn, further undermines subjects' social status (Nielsen 2000). Even when they have a legal claim to rights, people shy away from invoking the law to claim those rights.

I argue that the principle of meritocracy, so deeply rooted in U.S. society (Hochschild 1995; Kaiser and Major 2006; McNamee and Miller Jr. 2004), centrally informs the backlash against those who may potentially make civil rights claims.[5] A meritocratic worldview endorses the belief that anyone, regardless of their social location, is free to be successful through their own merits (Kaiser and Major 2006). Under this logic, individual outcomes are fair and deserved because they are the result of (in some cases, a lack of) individual talent and effort (ibid.). It follows, then, that in a context that values individual merit—while it simultaneously overlooks institutionalized forms of inequality—legally mandated rights are thought to be incompatible with the central principles of society. Opponents of rights-granting laws are able to draw on the myth of meritocracy to frame legal rights as unfair advantages in what is, otherwise, premised to be a level field of opportunities.

---

4. I recognize that law informs and is informed by society, culture, and legal consciousness in ways that are simultaneously "instrumental" and "constitutive" (Sarat and Kearns 1993). However, in this article it is useful, for heuristic purposes, to distinguish between the two types of effects of law.

5. Meritocracy is also powerfully entrenched in the U.S. legal system, where it informs legal decisions that block the progress of some rights-granting laws (Beiner 2002; Haney and Hurtado 1994).

712   LAW & SOCIAL INQUIRY

Simultaneously, they brand potential beneficiaries as weak or undeserving and opportunistic.[6] In this way, the logic of meritocracy deems new rights as socially *illegitimate* (cf. Bumiller 1988; Nielsen 2000).

However, because law and legal consciousness are socially constructed, there is room for shifting interpretations and uses of law. Even rights-granting laws can eventually assist targeted beneficiaries. In an impressive analysis of the relationship between law and identity, Engel and Munger (2003) highlight the intricate ways in which the Americans with Disabilities Act (ADA) of 1990 produced gradual social change. Without ever filing a legal claim, targeted beneficiaries enjoy new rights in the form of improved self-esteem, higher aspirations, and greater expectations from social institutions. Although the authors do not emphasize it in their analysis, meritocracy is also one of the forces influencing the largely positive changes. After years of internal debates that encompass conflicting experiences of social exclusion and legal inclusion, subjects in their study justify accommodations by drawing on the principle of meritocracy when they note their individual efforts and abilities.[7] Moreover, people with disabilities underscore society's failure to properly accommodate them (Heyer 2007). In this context, the ADA merely remedies the previously unequal playing field for people with disabilities, and their new rights allow them to properly take part in the meritocracy where their contributions are now legitimized (ibid.).[8]

**Legal Consciousness and the Mobilization of Law**

It matters, then, how individuals interpret laws. Legal consciousness—the way people come to understand the law as a result of continual lived experiences (Merry 1990)—is a dialectical process in which the meanings people give to everything in their world, including law, come to be perceived as natural and objective (Ewick and Silbey 1998, 39). Ewick and Silbey identify three predominant types of legal consciousness, each associated with a set of actions. Individuals who are "before the law" are in passive acceptance of a law that is experienced as impartial and grandiose (47). Those who are "with the law" utilize it as a resource and perceive it as a game (48). And

---

6. Beneficiaries are perceived to be weak because they presumably can only compete against others when granted "unfair advantages." Or they are seen as undeserving subjects who opportunistically take advantage of a system that otherwise equally distributes rewards to those who "earn" them without external aid (cf. Bumiller 1988; Nielsen 2000).

7. See, for example, the nurse who justifies testing accommodations for her dyslexia by emphasizing her abilities on the job (Engel and Munger 2003, 1).

8. Meritocracy is also evident in the narratives of people who Ewick and Silbey (1998) categorize as being with the law; people who utilize the law as a resource suggest that individuals can be "effective legal player[s]" (121) while those who do not benefit from law are merely incompetent. See especially the narratives of Charles Reed and Nikos Stavros for examples of how the tenets of meritocracy are embedded in their accounts (1998, 108–28).

subjects who are "against the law" are trapped by its pervasive authority (48–49). Although these categories are shifting and contingent, orientations toward law will loosely correlate with social status.

Analytically, the concept of legal consciousness is useful in this study because it lends itself to an exploration of the ways that knowledge about the law affects individuals' mobilization of the law (Bumiller 1988; Ewick and Silbey 1998; Nielsen 2000). Ewick and Silbey's (1998) framework predicts that members of disenfranchised groups will be "against the law"—distrusting and suspicious of the law and its implementation. This corresponds closely with many of the outcomes of civil rights and other antidiscrimination laws (Nielsen 2000).

Previous studies on the mobilization of law have focused on racial minorities, women, the disabled, and other disadvantaged groups (Bumiller 1988; Engel and Munger 1996; Nielsen 2000). This study extends this line of inquiry to examine the experiences of undocumented immigrants, another disenfranchised group in the United States (Chavez 1998; Menjívar 2006). California's Assembly Bill 540 is a rights-granting law intended to benefit undocumented students. Unlike the aforementioned cases, however, I note the powerful influence of meritocracy to provide an account that demonstrates greater variation in the current understanding of legal consciousness approaches by detailing *how* and *why*, contrary to other disenfranchised groups, undocumented youth do mobilize the law and claim new rights.

## Undocumented Immigrants: A Disenfranchised Group

The very concept of rights for persons with undocumented migratory status may seem counterintuitive. Commonly referred to, both socially and legally, as "illegal aliens," undocumented immigrants are a legally banned category because they lack the required documentation to reside lawfully in the United States (De Genova 2004). The general public may not associate undocumented immigrants with any form of legal rights. And yet immigration law and other laws can be contradictory (Calavita 1998, 1996; Coutin 2002; Heyer 2007; Macías 2006). This is particularly true because immigration "law on the books" is inconsistently enforced, allowing for the settlement of millions of undocumented immigrants (Castles 2004; Macías 2006).[9]

Although immigration law is commonly portrayed as necessary to curtail undocumented immigration, undocumented immigrants are actually produced through the laws that criminalize their presence in the United States (Coutin 1998, 2000, 2002; De Genova 2004; Ngai 2004). In a study of immigration law in Spain, Calavita (1998) underscores the strong parallel

---

9. With over eleven million undocumented immigrants estimated to reside in the United States, undocumented immigration is currently at an all-time high (Passel 2005).

between the Spanish and U.S. cases to suggest that "despite the rhetoric of control and integration, immigration laws and policies have one conspicuous effect: Instead of controlling immigration, they control the immigrant" (560). The exclusivist nature of many immigration policies often lead to intense fear of deportation and a life of permanent anxiety for undocumented migrants.

Undocumented migratory status has important legal and social implications in people's lives. Barred from most legal resources, undocumented immigrants often live in the shadows of society (Chavez 1998). With limited access to jobs, education, and social services, undocumented immigrants are also restricted in their efforts for socioeconomic mobility and community development (Abrego 2006; Chavez 1998; Hagan 1994; Mahler 1995; Menjívar 2000, 2006). However, while the law renders undocumented immigrants "criminals, fugitives, and illicit" (Coutin 2000, 167–68), migrants inhabit legitimate spaces through practices that include work, paying for legal services, and sending remittances (Coutin 2002, 20). In these ways, undocumented migrants are agents in the creation of legitimate actions and spaces.

## The Liminal Status of Undocumented Students

The case of undocumented students is arguably even more contradictory than that of adult undocumented immigrants. Because many arrived in the United States as young children, they were able to learn the language, absorb the customs, and make the culture their own in ways that are not available to those who migrate as adults (Abrego 2006; Fernández-Kelly and Curran 2001). For example, whereas working-class adults signal to others through their clothing and language practices that they are outsiders, undocumented students dress and speak English in ways that make them largely indistinguishable from their U.S.-born peers (Olivas 1995).[10] Thus, undocumented students can manipulate social assumptions to avoid questions about their legal status (Abrego 2006; Gonzales 2006). In this sense, undocumented students are simultaneously included and excluded from U.S. society.[11]

---

10. In fact, there is little difference between undocumented youth and their documented peers. Because they share the same neighborhoods and schools, their socialization processes are almost identical. The most significant difference between the two groups is only evident in their post-high school options, when legal protections for undocumented youth end. Unlike their documented peers, who can access financial aid for college, undocumented youth face prohibitively expensive fees, thereby greatly limiting their chances for upward mobility through education (Abrego 2006).

11. To date, little social science research has examined the specific experiences of undocumented youth (Abrego 2006; Gonzales 2006). This population, however, is included in an undifferentiated manner in current studies of children of immigrants. For example, although the Children of Immigrants Longitudinal Study (CILS)—a notable recent survey that informs several studies (Rumbaut and Portes 2001)—did not measure immigrant status, undocumented students are included in the sample and their experiences are generally not distinguished from those of their documented peers (Portes and Rumbaut 2001).

Undocumented youth also have legal access to public education through high school (Carrera 1989).[12] The educational system is central to the development of identity and understanding of social norms (Lopez 2003)—forces that, along with the law, powerfully determine legal consciousness. Undocumented immigration, therefore, is a compelling context in which to explore legal consciousness. Straddling between legal and illegal categories (Gonzales 2006), and between inclusion and exclusion, gives these informants a unique perspective when interpreting and mobilizing the law. I argue that these students' liminal status (criminalized for being undocumented, yet legitimated for their successful student status) magnifies the role of law in their lives, making them a strategic group from which to reevaluate legal consciousness and the mobilization of rights-granting laws.

## Enactment of AB 540 in California

California Assembly Bill 540 aimed to improve undocumented youth's prospects for higher education. The potential effects are noteworthy because California is the most popular U.S. destination for undocumented immigrants (Passel 2005). It is estimated that between 5,800 and 7,450 undocumented students per year are eligible to benefit from AB 540 (Bartindale 2001).[13] To qualify, a student must have attended and graduated from a California high school (or obtained a GED), she must enroll in an accredited institution of higher education in California, and must declare, through an affidavit, that she is in the process of legalizing her immigration status or will seek to do so as soon as she becomes eligible.[14] Students who meet each of the bill's requirements are exempt from nonresident tuition. This is important because the cost difference between resident and nonresident tuition is considerable.[15] Moreover, in the original language of the bill, the law intended to grant these students access to state financial aid. However, after amendments, its final language no longer included financial aid.[16]

---

12. Since 1982, a Supreme Court ruling, *Plyler v. Doe*, has barred public schools from excluding undocumented children.

13. These figures only include those students who match all of the criteria set forth in AB 540. Presumably, many more drop out or do poorly in school. Nationwide, 65,000 undocumented students graduate from high school every year and roughly 5 to 10 percent of them go on to college (National Immigration Law Center 2006).

14. The exemption is also available for U.S. citizens who graduated high school in California and moved out of state but are now returning. It also benefits current college students who attend college out of state throughout the academic year but want to enroll in a California institution for summer courses.

15. In 2006–2007, for example, the cost difference between nonresident and resident tuition at the University of California was $25,827 per year versus $7,143.

16. As will be highlighted in the students' narratives, the lack of access to financial aid plays a crucial role in limiting the effects of AB 540. Specifically, without financial aid, four-year colleges continue to be prohibitively expensive for most undocumented students.

The language of the bill expresses the instrumental intent of the law but also hints at the constitutive effects by emphasizing academic merit and implicitly legitimizing a space in the state's future for undocumented youth.[17] The lawmakers supporting the bill concur. Then governor Gray Davis, for example, justified his signing of the bill by stating that "kids who grew up and graduated from high school here should not be priced out of a future" (Sanchez 2001, A1). Moreover, according to the bill's author, Marco Firebaugh, AB 540 intends to give "hard-working California immigrant students an opportunity to achieve their dreams and contribute meaningfully to our society" (A1).[18]

What effects, then, did AB 540 have? Although undocumented immigrants share a disenfranchised social status with other intended beneficiaries of rights-granting laws, undocumented youth do not stand against the law as predicted in current frameworks (Ewick and Silbey 1998; Nielsen 2000). Instead, this article demonstrates that a belief in meritocracy helped inform their legal consciousness to empower undocumented youth to mobilize the law.

## METHODS AND DATA

While there is great value in exploring legal consciousness in common places, away from legal institutions and separate from specific laws (Ewick and Silbey 1998; Hoffmann 2003), this study examines the outcomes, both intended and unintended, of one particular law. Because even the very presence of undocumented youth in the United States is legally unsanctioned, laws have the potential to be especially salient for this population. Based on this assumption and on a five-year participant observation project with undocumented youth, I employ a longitudinal study that consists of interviews with students before, shortly after, and three to four years after the implementation of Assembly Bill 540.

In total, I draw on forty-three interviews with twenty-seven respondents.[19] From July to November 2001, prior to the passage of the law, I conducted

---

17. The bill's language is also informed by the tenets of meritocracy. It states: "These pupils have already proven their academic eligibility and *merit* by being accepted into our state's colleges and universities" (AB 540, sec. 1, para. 2, added emphasis) (http://www.maldef. org/ab540/pdf/AB_540.pdf, accessed Feb. 5, 2008).

18. Interestingly, the words of AB 540 supporters implicate meritocratic ideals. As one *Law & Social Inquiry* anonymous referee pertinently notes, AB 540 further reifies meritocracy by "legitimating the idea that hard work and educational diligence" result in upward mobility, when, in fact, lack of financial aid continues to block access to college for most undocumented students.

19. Twelve participants form the basis of the longitudinal part of the study. The remaining fifteen participants were recruited only for the interviews that took place three to four years after the passage of AB 540.

twelve interviews with undocumented youth. I located all of the respondents while volunteering at community-based organizations. About half of the respondents participated in an immigrant-rights youth organization. The rest were enrolled in an art class for school credit. From November 2002 to January 2003, just over a year after the passage of AB 540, I reinterviewed eight of the original respondents—all of whom were still undocumented.[20] The third round of interviews took place between December 2005 and June 2006. To control for the effects of the law on the targeted population, in rounds two and three, I only reinterviewed the eight participants from the original sample who remained undocumented. For the purposes of corroborating some of my observations with the smaller original sample, in the third round I also conducted interviews with fifteen more undocumented students who attend various colleges and universities throughout California. All interviews were conducted in English. They were tape recorded and transcribed (all transcripts are in possession of the author).

The interview data is heavily supplemented with participant-observation conducted on a weekly or biweekly basis over the course of several years at community organizations and in numerous meetings and events. From 2001–2006, I gained access to strikingly similar stories of many more students in these interactions. Teachers and school administrators were also often present at meetings, and their accounts serve to further verify the students' accounts.

With the exception of one student who came when she was fourteen, most of the youth arrived in the United States between their very early childhood and the age of eight. Their ages at the time of the interviews range from seventeen to twenty-four. All students are Guatemalan, Mexican, or Salvadoran—representing the three largest national origin groups among the undocumented population of the United States. Of the original twelve respondents, seven were politically active around the passage of the bill; the remaining five were unfamiliar with the bill prior to its passage. Among the additional fifteen respondents, none were politically active around the passage of the bill. All fifteen had only learned about the law through the college application process or upon enrolling in college.

## HOW UNDOCUMENTED STUDENTS EXPERIENCE THE LAW—INSTRUMENTAL EFFECTS OF AB 540

Instrumentally, Assembly Bill 540 aims to "[ensure] access to our state's colleges and universities" by establishing a "fair tuition policy" for all those

---

20. I was able to reinterview all but one of the original respondents. He and his family had relocated. Another three had obtained legal residency through family reunification policies. I did not include the three newly legalized students in the second or third rounds of the interviews because their experiences were no longer relevant for this project.

718   LAW & SOCIAL INQUIRY

California-educated students who "have already proven their . . . merit."[21] Undocumented students who were formerly "precluded from obtaining an affordable college education because they [were] required to pay nonresident tuition fees" should now have access to higher education institutions throughout the state.[22] Effectively, higher education was now within reach for students who previously could not afford even community college. Before the passage of AB 540, for example, some of the students who were academically eligible to attend college decided not to apply because it was beyond their means. Prior to AB 540, Patty describes how she felt when she had to make the decision not to apply to college:[23]

> I felt *so* bad! Because my friends knew my grades and they would ask me, "What school did you apply to?" And I was like, "No, I didn't." "How come you haven't applied?!" . . . And one friend, she knew about my situation and she said, "You know what? I feel so bad because your grades are much better than mine and I'm able to go to a university and you're not." I felt like crying. . . . All they do senior year is talk about college. "I applied here and I applied there" and I didn't even bother applying because I knew the answer—I couldn't pay for it.

This excerpt highlights the painful consequences of illegal status prior to the passage of AB 540 for academically oriented students. Especially because during her protected status under the law, this student's academic experiences were in no way distinct from her peers'. In fact, she excelled in comparison to other students. Despite her achievements, college was so unaffordable that she chose to avoid the application process altogether. Shortly after the passage of AB 540, however, Patty's response is very different. In the second interview, she discusses the law's effect in her life:

> It helped me a lot because before there was no way I could afford community college. They would have charged me around $1,700 for just one semester and that's a lot of money! . . . So after the law passed, I was really, really happy. . . . The good thing is that you can take advantage of it right now by going to a community college. And that's better than not attending school at all.

By the second interview, Patty was already enrolled in community college and more hopeful about her ultimate goal of completing a bachelor's degree. Although a BA was still economically out of reach, she clearly benefited

---

21. AB 540, sec. 1, paras. 2 and 3.
22. AB 540, sec. 1, para. 1.
23. The names of individual respondents, schools, and organizations have been disguised to preserve anonymity.

from the change in law. With greater access to higher education, her experience suggests that AB 540 met its intended instrumental purpose.

Several other participants affirm that AB 540 has reached its instrumental intent, at least at the community college level. Nonetheless, expensive tuition continues to limit undocumented students' access to four-year institutions. Given that most undocumented students live in precarious economic conditions, even when admitted, attendance at a four-year college is rarely an option. Indeed, according to the University of California (UC) Office of the President, in 2002–2003 (the last time they compiled statistics),[24] within a system-wide undergraduate student population of almost 160,000, the exemption was granted to 719 students (University of California 2003). Of these, however, only 93 (13 percent) were potentially undocumented students.[25]

Several students in the original sample gained admission into the University of California straight out of high school, but only one was attending by the subsequent rounds of interviews, after the passage of AB 540.[26] For all admitted students, tuition was still beyond their means. The majority were forced to settle for the more affordable community college. In the following excerpt, Sara, one of the students who earned admission to several UCs, discusses the effects of the bill in her life. Her "first plan" refers to attending a UC; her second plan is attendance at a less expensive community college:

> After it passed, I was very happy, excited about going to college, getting my education, you know, actually going to a UC. . . . I told my dad, "You know, this is less money, dad. It's less for us to pay". . . . I was going to get to do my first plan rather than my second plan. But then I realized that it was still a lot of money, no financial aid, no one to give you a hand.

Sara, like several other undocumented students, certainly benefited from the bill, but only in a limited way. Access to education is increased because the costs are reduced. However, without financial aid, only community college is accessible. Even after the passage of AB 540, attendance at any California State University or University of California is prohibitively expensive for these socioeconomically disadvantaged students and their families.

24. Similar statistics are not available for the California State University system or for California Community Colleges, all of which must also comply with AB 540.
25. The remaining 626 exemptions were granted to U.S. citizens, legal residents, or otherwise documented students (University of California 2003).
26. Two more were enrolled in California State University campuses by the third round of interviews.

720   LAW & SOCIAL INQUIRY

Moreover, most scholarships require legal residency or U.S. citizenship for eligibility. After the passage of AB 540, community organizations and a few private institutions began to offer small scholarships to undocumented students.[27] Several students in the study qualify for scholarships, but funding is so minimal that it rarely covers four years of college. Molly is a case in point. Ranked in the top 4 percent of her class, she was guaranteed admission to at least one UC campus. In fact, she was accepted to three and chose, with her scholarship money, to attend one. During the second interview and after her first quarter in college, Molly talked about what it means in her life that AB 540 was passed:

> Fortunately AB 540 was ratified, but unfortunately it was just for tuition purposes. I have my money for my first year, but now I'm facing the problem that my scholarship money is running out and as of right now I don't really have money for next year. . . . So that's something that's haunting me . . . it's a major problem. Although AB 540 did help with tuition, it just leaves a lot of room for you just falling back down.

Despite the formal access, it is possible that students like Molly will only be able to partially cover the costs of a college education. Without financial aid, her situation becomes almost as precarious as it was before she started college. By the third interview, Molly was close to graduating from a UC. With great effort and creativity, she found employment and was able to raise just enough funds to pay for tuition each quarter. Not all undocumented students fare as well.

Instrumentally, AB 540 achieved only limited success in granting greater access to higher education. Despite having demonstrated their "merit," not all undocumented students who earn admission to four-year universities are able to attend. And even when they do attend, lack of funds puts them at constant risk of not graduating. Beyond the instrumental effects of the law, however, undocumented students express that they have benefited in other ways from AB 540.

## How Undocumented Students Experience the Law: Constitutive Effects of AB 540

Law plays a powerful role in the lives of undocumented students. As Tatiana attests, "Law has been so influential in my life. It dictates my life

---

27. The Salvadoran-American Leadership and Educational Fund (SALEF) and the Mexican American Legal Defense and Education Fund (MALDEF), for example, provide scholarships and information for "AB 540-Eligible Students."

and I'd like to know more about how it works." However, according to the constitutive approach, law cannot be separated from other social forces including culture, identity, and everyday experiences—all of which mutually shape one another. Indeed, the undocumented youth who participated in this study commonly referred to social values, along with law, as important forces in their lives and in their quests for greater legitimacy and belonging in this society. Specifically, they shared their beliefs in the notion of objective meritocracy and education as a guaranteed path to upward mobility—both important tenets of meritocracy (Hochschild 1995; Kaiser and Major 2006). In a country that celebrates past immigrants who purportedly "pulled themselves up by their bootstraps," undocumented youth proudly highlight their own merits and are quick to associate themselves with these social ideals.

Among the respondents, Claudia states the common position with regards to education most clearly: "I will not give up. Education is the only way out of all of these problems. Going to school is not just another thing that I have to do. It's the main way to change my life." Like the rest of the participants, she invests heavily in the belief that educational success guarantees upward mobility.

Meritocracy is the other social myth that academically successful undocumented students actively invest in. In the following excerpt, Wilfredo draws on ideals of meritocracy to frame his description of the predicament of undocumented students:

> Students who are born in the U.S. are completely different from me. They don't know the struggles. None of them have experienced rejection from a program even when they have completed all the requirements needed to participate just because of their legal status. None of them know what it means to work hard and have all the doors close in their face.

Wilfredo suggests that within the logic of meritocracy, undocumented students work harder and are therefore more worthy than their documented peers. Moreover, in his interpretation, formal immigration law is unjust when it impedes the rewards of meritocracy "just because of their legal status."

By submitting to the myth of meritocracy, students are able to establish a sense of legitimacy despite their status as immigration outlaws. Their legal consciousness, powerfully informed by meritocratic principles, allows them to reinterpret their lives and their social standing in U.S. society.

## In Search of Legitimacy, Inside and Outside of the Law

The legal consciousness of undocumented students is informed not only by immigration and other laws, but also by various social norms and ideals.

722   LAW & SOCIAL INQUIRY

However, because they are legally always at risk of being deported, it is not surprising that the law plays an explicit and palpable role in their lives. It makes sense that they seek other forms of legitimacy. Armando, for example, makes claims about his legitimacy by drawing upon a law-based rationale: "I've never committed any crimes and I've been a productive member. Not just for my own benefit, but I've helped a lot of other people too." He declares himself as law-abiding, thereby overriding the immigration laws that he is breaking. But more importantly, like the rest of the respondents, he appeals to a greater sense of common good through which he has *earned* his belonging. Karla, another undocumented college student, is more direct in her appeal to circumvent immigration law and focus instead on her merits:

> I can understand the point of view of natives who are against immigration. But when it comes to education, that's different. All students want is an opportunity to have a career, to have a better life. . . . The fact that we are in high school and college, that says a lot about a person, that we are going to contribute to this country when we get a degree. We are going to contribute to the economy, to the society. And there is nothing wrong about that. We have worked three times as hard as any other students.

Once again, legal consciousness draws on a sense of justice that is informed by meritocracy. By underscoring their actual and potential positive contributions to society, undocumented students are able to claim legitimate spaces through legal and legitimate actions. In their interpretation, although their presence in this country is outside of the law, their actions redeem them because "there is nothing wrong" with their day-to-day behavior and their outstanding efforts to improve their lives through education.

It is not surprising that undocumented students emphasize their role as successful students to counterbalance their unlawful status. In the following excerpt, Benjamin explicitly connects his educational efforts to his pursuit of legalization:

> My parents always told me, "If you do well in school, somehow the government is going to know that you're a good student and a good person and they're going to grant you residency." So I always strived for that. Because I thought, if I do well, someday I'll have the opportunity to become a resident.

Benjamin's experience, like that of his peers, leads to a form of legality that connects educational attainment and good behavior to legal residency. Although not a single student was able to recount a specific example of someone who acquired legal residency through educational achievement, several students made reference to this perceived connection. Given the power of

meritocratic ideals, in their construction of legality, education and effort are on the same plane as law, making the students hopeful that an exceptional report card will ultimately earn them legal residency. Interestingly, in their narratives, students do not make technical legal arguments establishing the legitimacy of their claims. Instead, they focus on providing narrative descriptions of their personal hardships, sacrifices, and, above all, achievements in hopes that their stories will appeal to society's sense of justice. Several students express hope that the difficulty, urgency, sadness, or unfairness of their situation will attract attention from authorities who will feel compelled to grant them legal residency.

Given their construction of legality, it is understandable why undocumented students readily welcomed AB 540. Not only did the bill recognize their merit but it granted them another legitimate space—in colleges and universities—where, as students, they are valued and "legitimate" members of society. Considering the fundamental role of law in their lives, AB 540 has also led to other, less directly visible effects in them. Specifically, the law provided undocumented students with a new, neutral, and more socially acceptable label that subsequently changes their social identity and their potential for collective organization and further claims-making.

## The Stigma of Undocumented Status

To appreciate the various unintended constitutive effects of the law, it is necessary first to understand how the students felt about their status before the law's enactment. Prior to the passage of AB 540, aside from the worries of not having access to college, several youth expressed a sense of stigma and embarrassment that derived from being undocumented. In the first round of interviews, for example, Elizabeth notes, "I hate how they call us 'illegal *aliens*.' I feel like telling them that I don't have antennae, I'm not a weirdo like they think." In the same conversation, Emily adds, "Or they call us 'illegals' and they think we're committing crimes all the time and we're not." Having gone through the educational system in the United States, protected by the law up until high school graduation, their experiences are similar to those of their school peers (Abrego 2006). However, for undocumented youth, their status was a constant reminder that they were different, vulnerable, and considered suspect.

Undocumented status, because it is tantamount to illegality, is stigmatizing and renders migrants suspect in the eyes of the rest of society. Mateo claimed that he was always fearful and embarrassed about being undocumented. Before the passage of AB 540, he described the stress of having to hide his illicit status from friends and strangers alike. Rather than revealing the truth, he provided people with a different version of his background each time he was asked. This was difficult and led to more pressure:

Psychologically, you get damaged, because you know, any time they ask you where you're from, it's such a pain. I mean, your mind goes like, [quickly] "Whoa, whoa, what do I say? What do I say? What do I say?" I mean, so it's a lot, I mean a lot. You torture yourself, you get depressed. Anything starts going down.

Aside from the instrumental effects of marginalizing immigrants and denying them basic rights and protections, Mateo demonstrates that undocumented status—created by immigration laws—can also be internalized to affect a subject's sense of self and social identity. Based on his initial articulation of stigma, it was fascinating to reinterview Mateo shortly after the passage of AB 540. In the second interview, he had a markedly different perspective. He was very frank with the college representative who helped him fill out the forms for community college matriculation:

Question: Did you tell him that you weren't a citizen?

Mateo: Yeah, I said I had been here for many years, but I'm not a citizen or a legal resident.

Question: And you felt comfortable telling him?

Mateo: Yeah.

Question: How come?

Mateo: I don't know, the atmosphere was more welcoming or something. Since AB 540 had passed and I had worked with a lot of students around this issue and I think that atmosphere made me more comfortable. So back in that scenario, I was comfortable saying, "The truth is, I'm not a citizen, I'm not a legal resident."

The constitutive power of law is evident in this drastic shift in attitude. As a result of the change in law, this student has a newfound confidence when disclosing his undocumented status. Revealingly, he directly links his new sense of comfort regarding the college application process to the "atmosphere" created through his work and the passage of the law.

It is possible that Mateo's participation in organizing around and lobbying for AB 540 greatly informed his new relaxed approach when disclosing his undocumented status. Indeed, in the second round of interviews, shortly after the passage of the law, only students who had been politically active in support of the bill were familiar enough with it to invoke it or benefit from it. However, by the third round of interviews, four years after the passage of the bill, more students were familiar with AB 540, whether or not they had heard of it prior to its passage. Among them, even students

who described themselves as "politically apathetic" shared similar accounts of greater willingness to divulge their status.[28]

Prior to the passage of AB 540, a few students in the interview sample and many whom I met at community meetings had abandoned their dreams of pursuing a college education simply because they were too ashamed of their undocumented status to ask for help. However, AB 540 unintentionally led to changes in many of the students' outlooks. Molly, who started out with an acute sense of stigma stemming from undocumented status, went through a striking transformation. She knew few other undocumented students her age, was very popular in high school, and recognized for being a high achiever. Like other informants in the study, she had difficulty or simply avoided seeking information and resources from her peers, teachers, and counselors out of fear of denigration and possible deportation. The normally poised student held her stomach and became very fidgety when describing, prior to the passage of AB 540, how she felt about being undocumented:

> Well, I feel ashamed. I debated so many times whether to tell my counselor. Because you're just scared to tell somebody because you don't know what they're going to think. And you're just so scared of that reaction. Because you do feel inferior to somebody because you don't have the same rights as they do. . . . You feel inferior because you know they have more rights than you. And even though I know I've worked as hard as my friends, they're the ones who are going to get to go to [four-year colleges].

This subject specifically links her sense of inferiority to having fewer rights than her peers. Implicitly, she notes that even her merit and academic excellence fail to grant her equal rights. More importantly, and related back to the literature on the mobilization of law, having a group of disenfranchised people who are also ashamed of themselves makes for an additional demobilizing force.

During the second interview and after the passage of AB 540, however, Molly expressed a greater degree of assurance with her unchanged status. She no longer refrains from seeking assistance with legal issues and has even shared her story with many of her new friends. She described how AB 540 helped change her feelings about being undocumented:

> I guess I always felt confident that I belonged here, but they always just have that advantage where they can use that "undocumented" word

---

28. In fact, among the fifteen additional students recruited in the third round of interviews, none of them had been politically active around the passage of AB 540. Despite only learning about AB 540 in college, their social identity changed in the same ways as the participants in the longitudinal part of the study. Given the strong association between higher education and political engagement (Hillygus 2005), it is likely that the college experience also affects these students' increasingly political social identities.

> to address me and that would be my scar. . . . But it did reinforce the idea that the state was becoming a little bit more open-minded, more aware of immigrant issues. And in that sense it just gave me a reassuring feeling that we were a step closer.

Interestingly, this subject conceives of the "undocumented" label as a "scar" that needs to be hidden and causes shame. Her response also suggests that aside from the instrumental effects, the constitutive function of the law is communicating to her that "the state" is becoming more "open-minded." The pro-immigrant nature of AB 540 has unintentionally relieved some of the stigma and improved the way undocumented youth feel about their place in this society. By the third round of interviews, this theme was prevalent in all of the college students' narratives.

## A New Label to Disguise Their Undocumented Status

Participants' narratives reveal that the label as "undocumented" or "illegal" is a source of profound shame. Consequently, the most intriguing effect of Assembly Bill 540 in undocumented students' day-to-day lives is the employment of a new, neutral, and, therefore, more socially acceptable label and identity. As noted in the previous section, the labels "illegal" and "undocumented" conflict with the students' perceptions of themselves as upstanding and productive members of society. It is understandable, then, that students now prefer to adopt the label "AB 540 student" when referring to themselves and to their peers who share undocumented and student status. In the second round of interviews, shortly after the passage of the law, all students who were familiar with AB 540 recounted stories of interactions with high school and college staff in which they identified themselves as AB 540 students. By the third round of interviews, the usage of this label is prominent not only in all of the participants' narratives but also appeared in college, university, and scholarship agency publications.

Douglas explains how he introduced the topic of the AB 540-mandated affidavit with school officials: "I just came out and said, 'I'm an AB 540 student so I need an affidavit.'" During the second round of interviews, several students also mentioned requesting the affidavit because they are AB 540 students. In response to further inquiry about the term, Molly explains, "I used [the term] because it's cool that it fills in the blank for 'undocumented.'" According to all the students who employed it, "AB 540" is more acceptable than "undocumented" because it helps conceal their illegal migratory status. Furthermore, as Marily fittingly notes, "the fact that we're students gives us credibility and, in their eyes, that's better." Indeed, in a society that values education and individual effort, an emphasis on the student status will give subjects legitimacy and social acceptance. In this way, students unintentionally

gain greater legitimacy while claiming their new legally granted right. In the following excerpt, Patty, who also identified herself as an AB 540 student when requesting the affidavit, responds to questions about fears in the process.

> No, no, I wasn't really scared because everything that we did made me feel confident. . . . like there's nothing to fear. This is not illegal, this is legal. You know you can go ahead and do it, and they know about it, so they shouldn't be surprised about me being undocumented. So I felt really comfortable and really confident about it.

This subject's response powerfully draws out the point that beyond the instrumental effects of AB 540, the law has also granted undocumented students a new sense of legitimacy. As students, they can "legally" and, therefore, legitimately request rights formally granted by the law. The legitimacy attached to their status and actions as students allows them to confidently claim their new rights. Such confidence stands in stark contrast to the stigma they all felt prior to the law.

The unintended effect of AB 540 to procure a more disguising and socially acceptable label lends itself to greater success for the intended instrumental effects of the law. The neutral label disguises subjects' marginal status, thereby promoting a more accepting environment in which to claim their rights. Unlike the potential beneficiaries of civil rights and other rights-granting laws who are perceived as victims when they invoke the law (Bumiller 1988; Engel and Munger 1996; Nielsen 2000), undocumented students are able to further hide their marginalized status with a label that is neutral and socially unrecognizable. When invoking the ADA, or calling for protection against sexual harassment or other legally defined discriminatory actions, subjects are directly identifying as members of marginalized groups. On the other hand, undocumented students can disassociate themselves with negative labels and instead identify themselves as AB 540 students, thereby not only concealing their stigmatized status but also reinforcing their merits as students.

## Mobilization of the Law: Invoking AB 540 and Claiming Rights

By claiming their right to an exemption from out-of-state tuition, undocumented students are mobilizing the law. However, unintentionally, the constitutive effects of AB 540 have produced more far-reaching outcomes. Specifically, the increased confidence, coupled with a more socially acceptable label, has allowed undocumented students to identify themselves publicly in an effort to find others who share their status. Collectively, they have been able to organize, inform greater numbers of undocumented students about their rights, and further mobilize to request rights not directly granted by the law.

Although in the second round of interviews, shortly after the passage of the law, students were still relatively timid about claiming their rights, by the third round of interviews four years later, students were organizing to pursue their interests collectively. Students from four different colleges and universities described the work of student organizations that mobilized exclusively around AB 540 student rights. The same students, who initially dreaded disclosing their status to school staff, are now approaching them to claim their rights and expressing a greater sense of entitlement.

This post-AB 540 atmosphere has allowed students to further disseminate information about the law and attract greater numbers of undocumented students into four-year universities. Maria, a third-year university student, describes an annual event that her student organization coordinates:

> Maria: We came up with the idea to have a workshop for incoming students who were AB 540, to tell them about our group, the work that we do, and to share resources about scholarships . . . and the affidavit.
>
> Question: What did you call the workshop?
>
> Maria: I think it was just something like "Orientation for AB 540 Students."
>
> Question: Did many students come?
>
> Maria: Well, we had like ten students and they all thanked us. They were so happy because it's always good to find others like you.
>
> Question: Do you think you would have organized the workshop and called it "Orientation for Undocumented Students"?
>
> Maria: (Laughs.) I think that would have been kind of problematic. Maybe we could have, but we probably would have gotten complaints or questioning from other students.

This example once again demonstrates the power of the legally produced neutral label to disguise undocumented status. Under this new label, identifiable only by their undocumented peers, students can organize, recruit others, share resources, and work to pursue more common goals. Unintentionally, Assembly Bill 540 granted more than just an exemption from out-of-state tuition—it gave undocumented students an opportunity to claim a legitimate space in institutions of higher education.

Once legitimated in those institutions, both as individuals who demonstrated their merit by earning admission and as legally sanctioned subjects, undocumented students are more willing to demand other rights that are

consistent with their merit-based student status. In the following excerpt, Mirna illustrates this point.

> I applied for a scholarship that was only for legal residents and citizens. Because my resume is very strong, they gave it to me. Then they wanted to go back and tell me that I didn't qualify for it. I felt very strongly that it should be for AB 540 students too because we work as hard, if not harder. So [the director] helped me write letters and all this bureaucracy and then they opened the scholarship for AB 540 students. So now I'm motivated to speak up for change whenever I feel strongly about it.

Interestingly, despite her unchanged immigration status, this subject is empowered as a deserving student to use her neutral legally produced label to demand privileges for herself and for others in her situation. The change in law that granted her a single right unintentionally led to greater legitimacy and more possibilities of mobilization.

## IMPLICATIONS AND CONCLUSION

Current frameworks predict that although forms of legal consciousness are contingent, marginalized groups typically stand against the law (Ewick and Silbey 1998; Nielsen 2000). That is, they feel trapped and powerless in a system that they try to resist in various futile ways. Because many undocumented students have no legal or legitimate paths to secure residency or citizenship under current U.S. immigration law, they are arguably a disenfranchised group. As such, their legal consciousness should place them against the law. And, in fact, they participate in legality regarding migratory status from this perspective. However, as *students*, they are able to reposition themselves through AB 540 because it crucially provides a neutral, socially acceptable label that, in turn, hides their stigmatized social identity while also underscoring their merits. The neutral label is the means to claiming their rights. In their new social identity as AB 540 students, they shift legal consciousness from being against the law to being with the law—able to mobilize the law by using it as a resource in their favor.

It is also noteworthy that the legal claims-making of undocumented students stands in contradiction to previous sociolegal scholarship that repeatedly demonstrates that rights-granting laws rarely have the widespread transformative effect they set out to achieve (Bumiller 1988; Engel and Munger 1996; Nielsen 2000). Instead of furthering and protecting the interests of intended beneficiaries, many rights-granting laws unintentionally lead to backlash and greater stigmatization before advancing to gradual positive changes. This is not to say that rights-granting laws have had no effect, but

rather that the effects are complex and often slow to take place. AB 540, on the other hand, has had an empowering effect in a relatively short time.

Some may argue that the findings are unsurprising. Intuitively, it makes sense that undocumented immigrants would take any opportunity to claim rights in this country. However, in actuality, undocumented immigrants risk deportation any time their unauthorized status is made public (De Genova 2002). Moreover, there is a history of immigrant fear and mistrust of immigration agencies due to harassment and deportations, and this fear extends to other officials, including law enforcement, which undocumented immigrants are known to avoid (cf. Hagan 1994; Hamilton and Chinchilla 2001; Menjívar 2000). Within this context, then, the outcomes of AB 540 are particularly intriguing.

This case study indicates that legal consciousness is central in explaining AB 540's complex constitutive outcomes. Unlike their adult counterparts who were socialized in their home countries, undocumented youth's legal consciousness is informed by U.S. social values that venerate education and individual merit (Hochschild 1995; Kaiser and Major 2006; McNamee and Miller Jr. 2004). Undocumented students believe in objective meritocracy and in the notion that dedication alone will be enough to achieve upward mobility (Abrego 2006; Olivas 1995).[29] Strongly shaped by these beliefs, academically high-achieving undocumented students use the language of "justice" to claim legitimate spaces for themselves in higher education. This allows them to declare themselves worthy and legitimate members of society, even though legally they are immigration outlaws. This is also *why* they claim this new right. When a law like AB 540 underscores their merits and grants them rights, it gives them legitimacy, and they willingly invoke the law despite risking deportation. Moreover, the disguising label—also generated directly by the law—lends itself to greater mobilization of the law. The disguising label explains *how* they are able to claim their new right.

The case of AB 540 in California strongly suggests that unintended constitutive functions of law may sometimes have more transformative effects on the daily lives of targeted subjects than the intended instrumental objectives of law. Instrumentally, AB 540 has been partially successful; the exemption from out-of-state tuition makes community college more accessible, but fails to make a university education affordable for most undocumented students. In comparison, however, the constitutive effects of the law are considerably more far reaching. Despite the narrow actionable aspects of AB 540, the law is powerfully symbolic for the students who benefit from it. To

---

29. Clearly, not all undocumented youth are successful students. The alarmingly low educational attainment levels of Latino students, many of whom are likely undocumented, is manifested in their high school graduation rate of only about 60 percent in California (Swanson 2005). This study, however, focuses on the experiences of those who are college-bound or currently attending college.

them, the law represents a statement about their earned belonging in this society; it signals support for their endeavors and affirmation of their legitimacy.

While courts and other state actors play important roles in the production of law, the constitutive approach underscores that ordinary citizens and subjects also contribute greatly to the meaning and outcomes of law. Law's constitutive power is relational and leaves room for contestation. Although marginalized groups have been known to stand against the law (Ewick and Silbey 1998; Nielsen 2000), the relational nature of law's constitutive power opens up the potential for innovative actions to exploit law's possibilities and invoke its power and protection. In this way, law may be invoked and utilized in ways never intended by legislators.

For undocumented students, the contradictions between social values and immigration laws cause pain and frustration when they are blocked from full inclusion in U.S. society (Abrego 2006). Social values exalting meritocracy and education as the path to upward mobility live strongly in the minds and actions of these students. However, immigration laws, particularly as they determine these students' lives, stand squarely in contradiction. These contradictions open up spaces for undocumented students to make claims and stake their sense of belonging in the United States.

But how does an empirical study of undocumented students and the passage of a single state law aid our understanding of legal consciousness and mobilization of law? My cautious assertion is that these means are available to other intended beneficiaries of rights-granting laws. Using the neutral labeling based on bill numbers—or any other neutral label—can provide similar protective identities for other marginalized groups trying to claim rights. For participants in this study, their status as *students* works strongly in their favor. Similarly, other groups can accomplish the same effect by emphasizing such social roles as workers, citizens, community members, and taxpayers. For example, potential beneficiaries could call themselves "AB 00 workers" or "AB 00 citizens" to capitalize on this strategy. Utilizing language in this way can empower disenfranchised groups to exploit the constitutive powers of law and help promote changes in legal consciousness from being against the law to being with the law. With a more empowering legal consciousness, subjects are more likely to mobilize the law in their favor, thereby making more effective use of rights-granting laws.

## REFERENCES

Abrego, Leisy J. 2006. "I Can't Go to College Because I Don't Have Papers": Incorporation Patterns of Latino Undocumented Youth. *Latino Studies* 4 (3): 212–31.

Bartindale, Becky. 2001. Bill Seeks Tuition Break for Illegal Immigrants. (San Jose) *Mercury News*, August 21, 1A.

Beiner, Theresa M. 2002. Let the Jury Decide: The Gap Between what Judges and Reasonable People Believe is Sexually Harassing. *Southern California Law Review* 75:791–846.

Bumiller, Kristin. 1988. *The Civil Rights Society: The Social Construction of Victims*. Baltimore: Johns Hopkins University Press.

Calavita, Kitty. 1998. Immigration, Law, and Marginalization in a Global Economy: Notes from Spain. *Law & Society Review* 32 (3): 529–66.

Carrera, John Willshire. 1989. *Educating Undocumented Children: A Review of Practices and Policies. A Trends and Issues Paper*. Charleston, WV: ERIC Clearinghouse on Rural Education and Small Schools.

Castles, Stephen. 2004. The Factors that Make and Unmake Migration Policies. *International Migration Review* 38 (3): 852–84.

Chavez, Leo R. 1998. *Shadowed Lives: Undocumented Immigrants in American Society*. Fort Worth, TX: Harcourt Brace.

Coutin, Susan B. 1996. Differences within Accounts of U.S. Immigration Law. *PoLAR: Political and Legal Anthropology Review* 19 (1): 11–19.

——. 1998. From Refugees to Immigrants: The Legalization Strategies of Salvadoran Immigrants and Activists. *International Migration Review* 32 (4): 901–25.

——. 2000. *Legalizing Moves: Salvadoran Immigrants' Struggle for U.S. Residency*. Ann Arbor: University of Michigan Press.

——. 2002. Questionable Transactions as Grounds for Legalization: Immigration, Illegality, and Law. *Crime Law and Social Change* 37 (1): 19–36.

De Genova, Nicholas P. 2002. Migrant "Illegality" and Deportability in Everyday Life. *Annual Review of Anthropology* 31:419–47.

——. 2004. The Legal Production of Mexican/Migrant "Illegality." *Latino Studies* 2 (2): 160–85.

Engel, David M., and Frank W. Munger. 1996. Rights, Remembrance, and the Reconciliation of Difference. *Law & Society Review* 30 (1): 7–54.

——. 2003. *Rights of Inclusion: Law and Identity in the Life Stories of Americans with Disabilities*. Chicago: University of Chicago Press.

Ewick, Patricia, and Susan S. Silbey. 1998. *The Common Place of Law: Stories from Everyday Life*. Chicago: University of Chicago Press.

Fernández-Kelly, Patricia, and Sara Curran. 2001. Nicaraguans: Voices Lost, Voices Found. In *Ethnicities: Children of Immigrants in America*, ed. Rubén G. Rumbaut and Alejandro Portes, 127–55. Berkeley: University of California Press and Russell Sage Foundation.

Gonzales, Roberto. 2006. Born in the Shadows: How the Sons and Daughters of Unauthorized Migrants Make Ends Meet. Paper presented at the Conference of Ford Fellows, October 20, in Washington, DC.

Hagan, Jacqueline Maria. 1994. *Deciding to Be Legal: A Maya Community in Houston*. Philadelphia: Temple University Press.

Haney, Craig, and Aida Hurtado. 1994. The Jurisprudence of Race and Meritocracy: Standardized Testing and "Race-Neutral" Racism in the Workplace. *Law and Human Behavior* 18 (3): 223–48.

Heyer, Katharina. 2007. A Disability Lens on Sociolegal Research: Reading *Rights of Inclusion* from a Disability Studies Perspective. *Law & Social Inquiry* 32 (1): 261–93.

Hillygus, D. Sunshine. 2005. The Missing Link: Exploring the Relationship Between Higher Education and Political Engagement. *Political Behavior* 27 (1): 25–47.

Hochschild, Jennifer. 1995. *Facing up to the American Dream: Race, Class, and the Soul of the Nation*. Princeton, NJ: Princeton University Press.

Hoffmann, Elizabeth A. 2003. Legal Consciousness and Dispute Resolution: Different Disputing Behavior at Two Similar Taxicab Companies. *Law & Social Inquiry* 28 (3): 629–57.

Legitimacy, Social Identity, and the Mobilization of Law   733

Kaiser, Cheryl R., and Brenda Major. 2006. A Social Psychological Perspective on Perceiving and Reporting Discrimination. *Law & Social Inquiry* 31 (4): 801–30.

Lopez, Nancy. 2003. *Hopeful Girls, Troubled Boys: Race and Gender Disparity in Urban Education*. New York: Routledge.

Macías, Patrisia. 2006. Criminalizing Migration in an Era of Rights: Ethnographic Observations from the U.S.-Mexico Border. Paper presented at the American Sociological Association Annual Meetings, August 11, in Montreal, Quebec, Canada.

Mahler, Sarah J. 1995. *Salvadorans in Suburbia: Symbiosis and Conflict*. Needham Heights, MA: Allyn and Bacon.

McNamee, Stephen J., and Robert K. Miller Jr. 2004. *The Meritocracy Myth*. Lanham, MD: Rowman & Littlefield.

Menjívar, Cecilia. 2000. *Fragmented Ties: Salvadoran Immigrant Networks in America*. Berkeley: University of California Press.

——. 2006. Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States. *American Journal of Sociology* 111 (4): 999–1037.

Merry, Sally Engle. 1990. *Getting Justice and Getting Even: Legal Consciousness among Working-Class Americans*. Chicago: University of Chicago Press.

National Immigration Law Center. 2006. *Basic Facts about In-State Tuition for Undocumented Immigrant Students*. http://www.nilc.org/immlawpolicy/DREAM/in-state_tuition_basicfacts_041706.pdf (accessed April 1, 2008).

Ngai, Mae M. 2004. *Impossible Subjects: Illegal Aliens and the Making of Modern America*. Princeton, NJ: Princeton University Press.

Nielsen, Laura Beth. 2000. Situating Legal Consciousness: Experiences and Attitudes of Ordinary Citizens about Law and Street Harassment. *Law & Society Review* 34 (4): 1055–90.

Olivas, Michael. 1995. Storytelling Out of School: Undocumented College Residency, Race, and Reaction. *Hastings Constitutional Law Quarterly* 22:1019–86.

Passel, Jeffrey. 2005. *Estimates of the Size and Characteristics of the Undocumented Population*. Report published by Pew Hispanic Center. http://pewhispanic.org/files/reports/44.pdf (accessed April 1, 2008).

Portes, Alejandro, and Rubén G. Rumbaut. 2001. *Legacies: The Story of the Immigrant Second Generation*. Berkeley: University of California Press and Russell Sage Foundation.

Rumbaut, Rubén G., and Alejandro Portes, eds. 2001. *Ethnicities: Children of Immigrants in America*. Berkeley: University of California Press.

Sanchez, Leonel. 2001. Law Grants in-State Tuition to Undocumented Immigrants. *San Diego Union-Tribune*, October 12, News.

Sarat, Austin, and Thomas R. Kearns, eds. 1993. Beyond the Great Divide: Forms of Legal Scholarship and Everyday Life. In *Law in Everyday Life*, 21–62. Ann Arbor: University of Michigan Press.

Swanson, Christopher B. 2005. *Who Graduates in California?* Report published by the Urban Institute. http://www.urban.org/url.cfm?ID=900794, (accessed April 1, 2008).

University of California, Office of the President. 2003. *Statistical Summary of Students and Staff, University of California, Fall 2003*. http://www.ucop.edu/ucophome/uwnews/stat/statsum/fall2003/statsumm2003.pdf (accessed April 1, 2008).

# CASES CITED

*Plyler v. Doe*, 457 U.S. 202 (1982)

734   LAW & SOCIAL INQUIRY

## STATUTES CITED

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (Supp. IV 1992).
Assembly Bill 540. 2001–2002 Leg., Reg. Sess. (Cal. 2001) (codified at Cal. Educ. Code
§ 68130.5).

Copyright of Law & Social Inquiry is the property of Blackwell Publishing Limited and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# DEF-INTERV.

# EX. 125





# Taking Giant Leaps Forward

## Experiences of a Range of DACA Beneficiaries at the 5-Year Mark

By Roberto G. Gonzales, Marco A. Murillo, Cristina Lacomba, Kristina Brant, Martha C. Franco, Jaein Lee, and Deepa S. Vasudevan        June 22, 2017

## Introduction

Over the past several years, hundreds of thousands of unauthorized immigrant children in the United States have experienced difficult transitions into young adulthood—going without driver's licenses, college financial aid, or stable employment opportunities. These young people—who have attended U.S. K-12 schools for most, if not all, of their lives—aspire to attend college and enter well-paying, meaningful careers like their classmates. Yet with a tenuous immigration status, unauthorized youth and their families have faced undue hardships in their everyday lives and pursuit of advanced education and work opportunities.[1] On June 15, 2012, this troubling situation changed for many of these young people when then-President Barack Obama introduced Deferred Action for Childhood Arrivals (DACA)—a policy that temporarily defers deportations and provides renewable two-year work permits for up to an estimated 1.9 million eligible unauthorized young adults.[2] Now, five years later, nearly 790,000 eligible youth have been approved for DACA.[3]

Shortly after DACA's implementation in 2012, a team led by Roberto G. Gonzales, an assistant professor at the Harvard Graduate School of Education, launched the National UnDACAmented Research Project (NURP), a five-year study aimed at understanding how a diverse cross section of the DACA-eligible population accessed the program and experienced their new status. NURP, arguably the most comprehensive study on DACA to date, consists of a national survey of 2,684 DACA-eligible young adults carried out in 2013 and two waves of in-depth interviews with 481 DACA-eligible young adults in Arizona, California, Georgia, Illinois, New York, and South Carolina in 2015 and 2016.[4] This carefully drawn sample provides a unique opportunity to understand how DACA is shaping the life trajectories of a wide range of young adult immigrants.

In the past five years, DACA beneficiaries have experienced immediate benefits and improved their outlooks.[5] Across state and local contexts, a diverse group of DACA beneficiaries has moved up the socio-economic ladder by completing their degrees and securing higher-paying jobs. For many of these young people, DACA has significantly boosted incorporation into mainstream American society. From obtaining legal employment and driver's licenses to feeling less fear of deportation, DACA beneficiaries have transitioned into lives filled with a greater sense of belonging and future possibility. These individual successes also contribute to the United States' economic growth: As DACA beneficiaries begin to save for larger purchases such as cars and houses, states see increased revenue from title fees and sales tax.

This issue brief focuses on a group of beneficiaries in the NURP study that most research and media coverage about DACA has overlooked but that is no less important: the hundreds of thousands of DACA beneficiaries without high school or college degrees whom DACA has provided with on-ramps back into education and training programs that have increased their job mobility. There are also broader implications to the significant leaps in social and economic mobility for these particular beneficiaries. Increased incomes and financial stability lead to greater spending, which percolates directly into household spending, lifting hopes for longer-term goals such as purchasing a home.[6] Indirectly, these DACA beneficiaries are boosting the country's economy through paying taxes that flow into the national coffers.

Specifically drawing on interviews with 319 NURP respondents who, prior to receiving DACA, dropped out of high school, finished their education with a high school degree, or did not complete college due to financial, legal, or motivational barriers, this brief illuminates the ways in which DACA has positively affected their educational and work trajectories.[7]

## Finding on-ramps back to education

DACA has been instrumental in helping eligible youth find their way back to various education pathways. These pathways have led them to obtain better employment and contribute more to their families and local communities.

### DACA is encouraging eligible youth to re-enroll in school

Statistically, most unauthorized immigrant youth end their schooling before entering college.[8] Due to a combination of scarce family resources, exclusion from financial aid at the state and federal levels, and depressed motivations, the majority of unauthorized students pursuing higher education attend community colleges and struggle to persist and graduate.[9] With access to legal employment and diminished fear of possible deportation, many of the study's respondents described their newfound motivation and interest in school. Jin, a student from New York, recalled:

*I kind of went into depression during that whole college application part. I started thinking I'm never going to go anywhere and it's all because of some paper I don't have. It was really rough. I felt kind of—I was angry all the time. When the DACA program was announced it instilled a new hope in me and I think it's what's driving me forward to do the best I can again and to focus and be responsible.*[10]

DACA has been the impetus for many young people like Jin to return to school. In order to qualify for DACA, beneficiaries must have either graduated with a high school diploma or be enrolled in a high school, a General Educational Development (GED), a literacy, or a career training program. At the program's onset, almost 20 percent of individuals who were potentially eligible did not meet the education requirement.[11] Dozens of the respondents who had previously not finished high school told the authors that DACA was an important impetus to re-enroll in school and training programs.

Take Sandra, for example. Sandra began working at the age of 13, cleaning houses with her mother to help support her family. Family needs, growing frustrations due to her unauthorized status, and her inability to envision a promising future compelled her to drop out of high school. When DACA was announced in 2012, Sandra was 26 years old and had two children. She enrolled in a GED program to gain eligibility and to receive DACA's benefits. But she didn't stop there. After she passed her GED exam, she pursued a medical assistant program through a local nonprofit in Arizona. Her life has dramatically improved, and she said she feels as though she can provide her children with a better life. With her new job, she is working to save money, and her next goal is to pursue a bachelor's degree in nursing.

## DACA beneficiaries are investing in education and training

Gaining work authorization as a result of DACA also improves the likelihood that an investment in education can lead to a job commensurate with training and credentials. This benefit has given DACA beneficiaries an incentive to invest in education in order to enter higher-paying jobs. It has also opened up options for education and training in critical growth sectors.[12] Many of the study's respondents found job training programs by enrolling at a community college or through local community-based organizations. The respondents received training in industries such as medicine, dentistry, construction, cosmetology, teaching, law, nursing, and insurance. In addition to offering lower tuition costs, certificate programs offer flexible class schedules that allow students to work while pursuing their degrees. These programs tend to be much shorter in duration than four-year degree programs, as well as significantly less expensive. Many DACA beneficiaries view these programs as stepping stones to a four-year degree and a foot in the door to gain relevant job experience. Work authorization provides the assurance that beneficiaries will be competitive for employment in their chosen industries after completing their programs.

Before DACA, Eric said he felt that his opportunities for postsecondary education in South Carolina were limited. Moreover, his inability to acquire a driver's license under state law left him frustrated and many jobs inaccessible. When DACA was announced, Eric had just graduated from high school. His world changed almost overnight. Once he received his DACA status, he obtained his driver's license, enrolled in an insurance certification program and, soon after, landed a job selling insurance at an agency just a 15-minute drive from home. Eric does not know whether he wants to pursue a career in insurance, but the opportunity has given him some experience and a steady income that has allowed him to enroll in community college to continue exploring his options. As Eric explains, DACA has given him the self-confidence and motivation to pursue his goals:

> *DACA was a big turning point … because it's a transition from when I was turning from childhood into adulthood, going to college, being able to study, having more responsibilities, having more decisions to make, having more paths to choose and directions to take. It opened a lot [of opportunities] and I saw what I had to do and how to get it and how far [DACA's] going to take me.*

## DACA helps break down financial barriers to education and career-building opportunities

A large proportion of the DACA-eligible population experiences postsecondary education as a revolving door.[13] Many of the respondents had entered college before DACA, only to leave due to growing debt and an inability to afford tuition and fees. However, access to legal employment improves DACA holders' ability to save money and pay for college. In addition, several scholarship funds have expanded eligibility to allow DACA holders to apply, while internship and fellowship programs are providing the necessary job training that these young people need to be competitive when they enter the job market.[14] For instance, Franco was working in the fields of California for low wages. With DACA, he will be starting a union-affiliated apprenticeship in the state's construction sector. At the time of the interview, he was completing some prerequisite classes for the apprenticeship. Once he joins the union, he will earn $18 an hour and enjoy salary increases based on merit and experience. "Without DACA," Franco said, "I'd have not been able to do any of this."

## Increased job mobility

Prior to DACA, the career goals of many unauthorized youth were often derailed because of restricted access to educational and work opportunities. Despite length of time in the United States or level of education completed, they could not legally work and were confined to the unregulated, low-wage labor market. These jobs were often grueling and did not provide opportunities for job security, safety, or benefits. Today, with the ability to legally work and the incentives to invest in education, DACA has boosted beneficiaries' mobility prospects and trajectories.

Of the 2,381 DACA recipients who responded to the survey, approximately 61 percent took on new jobs and 45 percent increased their earnings within 16 months of DACA's launch.[15] As a result, respondents experienced significant financial gains, which, in turn, allowed them to save money for additional education, support family members financially, and contribute to the economy. In addition, work authorization enabled those stuck in low-wage jobs without opportunities for raises and promotions to leave and pursue employment commensurate with the education they received prior to or after receiving DACA.

## Work authorization and driver's licenses are improving access to opportunities

In addition to the positive impact of secure legal employment, DACA beneficiaries who obtain an employment authorization document can apply for a driver's license in any state.[16] Of the study's survey participants, 57 percent obtained a driver's license within the first 16 months after receiving DACA. This benefit provides DACA holders with the ability to travel freely and safely to school or work, a significant form of relief for both beneficiaries and their families.

Laura grew up in California's Central Valley with parents who are farmworkers. With little counseling information regarding postsecondary options and limited access to transportation, Laura labored in the fields for several years after graduating from high school. She said she felt discouraged and wondered if there was any hope for the future. After DACA was announced, she saved money to pay for the application fees, applied to the program, and received approval by the end of 2013. Her prospects quickly changed. She left her work in the fields when she was hired as a receptionist, more than doubling her earnings from $11,500 a year to $23,400. What's more, Laura obtained a driver's license and was able to enroll in classes at a nearby community college. With the money earned from her new job, Laura bought a car and is saving money to rent an apartment close to her college that will give her increased access to the internet, libraries, and the college itself.

## DACA allows beneficiaries to get jobs that match their skills

DACA beneficiaries told the authors that they were able to match their education and training with work that was meaningful to them—an occupation that they could be proud of and that did not carry the stigma of "immigrant work." Moreover, being DACA recipients allowed them to seek employment that matched their training and credentials. Respondents found jobs in a wide range of employment sectors, including retail and sales, manufacturing, accounting, banking, the beauty industry, real estate, the medical field, teaching, and interpreting. In many cases, they made great gains in prestige and job satisfaction.

Before DACA, Tariq was working in the kitchen of a New York restaurant for $5 an hour, far below the city's minimum wage. Because of his immigration status, Tariq said he feared demanding a fair wage from his employer and could not ensure that he would be paid for the full hours he worked. After being approved for DACA at age 25, he left his low-wage job and found employment as a bank teller:

> I had always been doing labor work. Now I'm doing teller work, which is much more a brain thing. Honestly, I am the youngest guy in my branch, so that's something to say. [It] makes me feel good that, okay, my mom can tell people that "My son's working in a bank." Even though I'm a teller, and that's the beginning position, it's something. Like, "Oh, he's a waiter," I don't think that she's gonna be with her chest out with that.

DACA beneficiaries also dramatically increased their earnings. In particular, DACA beneficiaries who completed certificate or licensing programs experienced significant growth in salary. For many, hourly salaries increased from $5 to $8 to more than $14 an hour. Most at least doubled their previous salaries, earning between $25,000 and $30,000 per year. With increased purchasing power, the respondents could then, in turn, help their families while fueling their local economies and contributing to state revenue.

## Conclusion

While DACA does not address the full set of challenges that DACA beneficiaries and their families face, it has provided opportunities for hundreds of thousands of unauthorized young people to take giant leaps in their education and careers. To date, the success of DACA has been illustrated in the trajectories of politically and socially active beneficiaries with advanced levels of education. However, the true magnitude of its impact is most felt by those young people who, because of barriers related to their immigration status, were forced into early exits from the school system. Because of DACA, these young people have returned to GED programs, workforce development, certificate programs, and college campuses. DACA's work authorization has enabled them to take jobs commensurate with their education, incentivizing investments in such programs.

As such, DACA beneficiaries have experienced immediate and continued job mobility. Many DACA beneficiaries are using these new opportunities for training and work as building blocks to start careers. The personal success of these DACA beneficiaries translates to more purchasing power that allows them to invest in the United States at the local and state levels. DACA is a temporary fix—the program is not permanent, and recipients must renew their status every two years. Nonetheless, it has positively affected most of those who have received it. All of these things underscore the need for a permanent solution that provides a path to citizenship for the ongoing success of these young people and their families.

*Roberto G. Gonzales is an assistant professor at the Harvard University Graduate School of Education and the principal investigator of the National UnDACAmented Research Project. Marco Murillo is a postdoctoral fellow at the University of California, Berkeley Graduate School of Education. Cristina Lacomba is a postdoctoral scholar at the Harvard University Graduate School of Education. Kristina Brant, Martha C. Franco, Jaein Lee, and Deepa Vasudevan are doctoral students at Harvard University. This issue brief has been produced with the generous support of the Bill & Melinda Gates Foundation and the John D. and Catherine T. MacArthur Foundation.*

*The authors thank the entire NURP research team, their community partners, and, especially, all who participated in their survey and interviews.*

## Endnotes

1  Roberto G. Gonzales, *Lives in Limbo: Undocumented and Coming of Age in America* (Oakland: University of California Press, 2015).

2  Jeanne Batalova, Sarah Hooker, and Randy Capps, "Deferred Action for Childhood Arrivals at the One-Year Mark: A Profile of Currently Eligible Youth and Applicants" (Washington: Migration Policy Institute, 2013), available at http://www.migrationpolicy.org/research/deferred-action-childhood-arrivals-one-year-mark-profile-currently-eligible-youth-and.

3  U.S. Citizenship and Immigration Services, "Number of I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31)," available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performance-data_fy2017_qtr2.pdf (last accessed June 2017).

4  The authors developed their measures in consultation with an advisory board consisting of academics, policy experts, and practitioners. They also partnered with Veronica Terriquez, an associate professor at the University of California Santa Cruz who led the development of the survey and provided infrastructure to support it, and Ben Roth, an assistant professor at the University of South Carolina who fielded a team of researchers in South Carolina. Based on the DACA requirements for eligibility, the participants screened by the authors were under the age of 31 as of June 15, 2012; had arrived in the United States before age 16; had accumulated at least five years of continuous residence in the United States; and had no felony convictions, significant misdemeanors, or more than two other misdemeanors. Because the authors were interested in a range of experiences, their sample included those young people who had not yet graduated from or were enrolled in a U.S. high school or the equivalent. While DACA eligibility is open to minors, this study focuses on young adult DACA beneficiaries. The authors recruited respondents through national and local organizations and through referrals by those who had taken the survey.

5  Tom K. Wong and others, "New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes," Center for American Progress, October 18, 2016, available at https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/; Roberto G. Gonzales and Angie M. Bautista-Chavez, "Two Years and Counting: Assessing the Growing Power of DACA" (Washington: American Immigration Council, 2014), available at https://www.americanimmigrationcouncil.org/sites/default/files/research/two_years_and_counting_assessing_the_growing_power_of_daca_final.pdf.

6  See National Academies of Sciences, Engineering, Medicine, *The Economic and Fiscal Consequences of Immigration* (Washington: The National Academies Press, 2017); National Academies of Sciences, Engineering, Medicine, *The Integration of Immigrants into American Society* (Washington: The National Academies Press, 2015).

7  The authors draw this subsample from their larger sample of 481 interviews.

8  In fact, more than 40 percent of unauthorized adults ages 18 to 24 do not complete high school, and only 49 percent of unauthorized high school graduates go to college. See Jeffrey Passel and D'Vera Cohn, "A Portrait of Unauthorized Migrants in the United States" (Washington: Pew Hispanic Center, 2009), available at http://www.pewhispanic.org/files/reports/107.pdf.

9  See Leisy Janet Abrego, "'I Can't Go to College Because I Don't Have Papers': Incorporation Patterns of Latino Undocumented Youth," *Latino Studies* 4 (3) (2006): 212–231, available at https://link.springer.com/article/10.1057/palgrave.lst.8600200; Roberto G. Gonzales, "Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood," *American Sociological Review* 76 (4) (2011): 602–619, available at http://www.asanet.org/sites/default/files/savvy/images/journals/docs/pdf/asr/Aug11ASRFeature.pdf.

10  In order to protect the respondents' anonymity and confidentiality, the authors have replaced all names with pseudonyms. Interviews were carried out between March 2015 and November 2015.

11  Margie McHugh, "Diploma, Please: Promoting Educational Attainment for DACA- and Potential DREAM Act-Eligible Youth" (Washington: Migration Policy Institute, 2014), available at http://www.migrationpolicy.org/research/diploma-please-promoting-educational-attainment-daca-and-potential-dream-act-eligible-youth.

12  Bureau of Labor Statistics, "Employment Projections—2012–2022," Press release, December 19, 2013, available at http://www.bls.gov/news.release/archives/ecopro_12192013.pdf; Audrey Singer, "Immigrant Workers in the U.S. Labor Force" (Washington: Brookings Institution, 2012), available at https://www.brookings.edu/wp-content/uploads/2016/06/0315_immigrant_workers_singer.pdf.

13  Stopping out, or leaving college for a certain period of time with the intention of returning, is a growing and concerning trend among college students nationwide. See Jeff E. Hoyt and Bradley A. Winn, "Understanding Retention and College Student Bodies: Differences Between Drop-Outs, Stop-Outs, Opt-Outs, and Transfer-Outs," *NASPA Journal* 41 (3) (2004): 395-417. Unauthorized immigrant youth are three times more likely than similar youth—controlling for GPA, ethnicity, and socioeconomic status—to stop out. See Veronica Terriquez, "Dreams Delayed: Barriers to Degree Completion among Undocumented Community College Students," *Journal of Ethnic and Migration Studies* 41 (8) (2015): 1302-1323.

14  See, in particular, efforts by TheDream.US scholarship fund, available at http://www.thedream.us, and the Hispanic Scholarship Fund, available at https://www.hsf.net.

15  Gonzales and Bautista-Chavez, "Two years and Counting."

16  At present, only 12 states plus the District of Columbia offer unauthorized immigrants eligibility for driver's licenses.

# DEF-INTERV.

# EX. 126

# Growing Up in the Shadows: The Developmental Implications of Unauthorized Status

CAROLA SUÁREZ-OROZCO
*New York University*

HIROKAZU YOSHIKAWA
*Harvard Graduate School of Education*

ROBERT T. TERANISHI
*New York University*

MARCELO M. SUÁREZ-OROZCO
*New York University*

*Unauthorized immigrants account for approximately one-fourth of all immigrants in the United States, yet they dominate public perceptions and are at the heart of a policy impasse. Caught in the middle are the children of these immigrants—youth who are coming of age and living in the shadows. An estimated 5.5 million children and adolescents are growing up with unauthorized parents and are experiencing multiple and yet unrecognized developmental consequences as a result of their family's existence in the shadow of the law. Although these youth are American in spirit and voice, they are nonetheless members of families that are "illegal" in the eyes of the law. In this article, the authors develop a conceptual framework to systematically examine the ways in which unauthorized status affects the millions of children, adolescents, and emerging adults caught in its wake. The authors elucidate the various dimensions of documentation status—going beyond the binary of the "authorized" and "unauthorized." An ecological framework brings to the foreground a variety of systemic levels shaping the daily experiences of children and youth as they move through the developmental spectrum. The article moves on to examine a host of critical developmental outcomes that have implications for child and youth well-being as well as for our nation's future.*

*Harvard Educational Review*   Vol. 81   No. 3   Fall 2011
Copyright © by the President and Fellows of Harvard College

As the United States contends with a bevy of woes at home and abroad—the deepest economic crisis since the Great Depression, wars, and terrorism on a global scale—it also needs to come to terms with the aftermath of the largest wave of immigration in recent history. A dizzying demographic change is taking place in an era of economic decline, downsized expectations, and anxiety. Complicating matters, we have entered a pervasive political ethos of divisiveness that immobilizes civil and constructive discourse across multiple policy issues. As a result, we find ourselves at a national immigration impasse with every attempt at comprehensive immigration reform having failed over the course of the last decade. In the second decade of the new century, all immigration lines are broken—the line at the border, the queues in U.S. consulates and U.S. Citizenship and Immigration Services offices all over the homeland (Anderson, 2009, 2010; Jimenez, 2009).

The population of unauthorized migrants is larger now than at any time since the United States began trying to regulate immigration in the early twentieth century: while the United States represents 5 percent of the world's population, it has approximately 20 percent of all unauthorized migrants in the world (United Nations Development Programme [UNDP], 2009). Although "illegal immigrants" account for about a fourth of the overall U.S. immigrant population, they dominate the immigration debate and are at the heart of the policy paralysis. Engulfed by the angry rhetoric and policy dystopia are the roughly one million unauthorized children and youth who are coming of age, some of whom are beginning to "come out illegal" (Jones, 2010, p. 36), while many others stay in the closet regarding this aspect of their lives. These youth who are American in spirit, schooling, and life experiences are nonetheless illegal in the eyes of the law. Just as forgotten are the more than four million citizen-children growing up with unauthorized parents who are experiencing unrecognized developmental threats as a result of their families' experiences.

In this article, we develop a conceptual model to examine the ways in which unauthorized status affects the millions of children, adolescents, and emerging adults caught in its wake. It is difficult to gather reliable data on unauthorized populations, and there are also ethical and legal concerns about doing research in this field, particularly involving children and youth. There are significant lacunae in what is known beyond brute numbers. This article represents a systematic and uncommon interdisciplinary effort to draw on our own research as well as that of others, including the perspectives of psychology, sociology, anthropology, education, and public policy.

As an organizing framework, we present a conceptual diagram depicting several critical dimensions that have been neglected in the specialized literatures. First, we present the various dimensions of documentation status beyond the facile binary of documented versus undocumented. Second, using an ecological approach, we consider a variety of systemic factors shaping the day-to-day experiences of children and youth as they move through the developmental spectrum from birth to adulthood. Last, we examine several different types

439

*Harvard Educational Review*

of developmental outcomes that are of significance to well-being and engagement. We present a conceptual model that depicts particularly challenging contexts of development for children and youth growing up in the shadows of unauthorized homes and considers developmental outcomes beyond the usual education variables. The major components of our conceptual model are developed in an interdisciplinary synthesis of the research literature offering short case vignettes of unauthorized children, youth, and families. We conclude with a discussion of the policy and research implications of our conceptual framework.

## Documentation Status

The terms *alien, illegal,* and the semantically related *criminal* are often uttered interchangeably, conjuring up many unsavory associations. For children and minors, *illegal status* does not usually come about through their own volition; rather, it comes about as a result of a decision made and actions taken by their parents or other adults. Further, even for adults, there are gray zones. Many exist in a state of "liminal legality" (Menjívar, 2006) with ambiguous documentation as they patiently wait in broken queues (Anderson, 2009, 2010). In this article, we use the more neutral, descriptive term *unauthorized* as opposed to *undocumented,* as many immigrants have some form of documentation but may find themselves in limbo pending a formal legal outcome.

### Unauthorized Status

Unauthorized immigrants are defined as those who live within the country without legal authorization to do so (Motomura, 2008). These individuals are not U.S. citizens, do not hold current permanent resident visas, and have not been permitted admission under the most current and specific set of rules for longer-term residence and work permits (Passel & Cohn, 2010). During the boom economic years in the last decade of the twentieth century, the unauthorized population grew dramatically from under 1 million in 1980 to a peak of nearly 12 million in 1996 (Hoefer, Rytina, & Baker, 2009). The current estimate of the unauthorized population has declined to 11.2 million (Passel & Cohn, 2010). While the majority arrived through the borders "uninspected," a substantial number are visa over-stayers (Hoefer et al., 2009).[1] All told, unauthorized adult immigrants comprise approximately 4 percent of the total U.S. population (Passel & Taylor, 2010).

The focus of the immigration debate typically concerns adults without consideration of children in families with undocumented parents (Yoshikawa, 2011). Because unauthorized immigrants are disproportionally young and in prime childbearing years, their children make up a large share of both the American newborn (8%) and school-age (7%) populations (Passel & Taylor, 2010). Among the estimated 5.5 million children growing up with unauthorized parents, approximately 1 million are themselves unauthorized. The

remainder, 4.5 million, are citizens, having been born in the United States (Passel & Cohn, 2010).

In media discourse, blog discussions, and our public presentations, frustrated American citizens often pose a version of the question, "Why won't 'illegals' get in line?" While on the surface this is a reasonable question, in reality there is no line to join. The terrorist attacks of September 11, 2001, threw sand in already rusty immigration machinery. In U.S. consulates and embassies overseas, and in U.S. Citizenship and Immigration Services offices all over the country, millions of would-be migrants wait in interminable queues. There are nearly 3.5 million immediate family members of U.S. citizens and permanent lawful immigrants waiting overseas for their visas (Anderson, 2010; U.S. Department of State, 2009). The average wait for Mexico and the Philippines, for example, is four to six years for spouses and children (Anderson, 2010). The visa allocation system for work permits is no more functional (Anderson, 2009). The current wait for business-sponsored green card requests is six to twenty years, an unrealistic time frame for hiring new employees (Anderson, 2010). The annual cap for visas for highly skilled foreign nationals is filled each year in a matter of days, leaving both businesses and exceptionally qualified would-be immigrants equally frustrated. For highly skilled immigrants who manage to obtain visas, there are no guarantees. Their families may pay a steep price down the road.  Hyo[2] is a young man who was raised and educated in the United States but, by a twist of fate, finds himself trapped in a place not of his making and without good choices.

> Hyo arrived with his parents in Silicon Valley, California, in the early 1990s, when he was just a toddler. His father was an engineer who found a lucrative job in the booming electronics industry, qualifying for an H-1 visa, which was renewed year after year for nearly two decades. With the economic downturn, Hyo's father lost his job, and with that the entire family lost their visas and the right to stay in the United States. Hyo speaks, but does not read or write, in his native Korean. He has been entirely educated in the United States and has adopted a laid-back Californian identity. He has been a good student in high school and is now enrolled as a foreign student at UCLA where he is studying Asian Pacific studies. He recognizes that he has little chance to remain in the United States once he graduates and is worried about how he will adapt to the country he has visited only for brief periods a half a dozen times.

### Citizen Children in "Mixed-Status" Families

An estimated 14.6 million people are living in some sort of mixed-status home (Passel, 2006) where at least one member of the family is not authorized (Fix & Zimmerman, 2001). Currently, *one in ten children* living in the United States is growing up in such a household (Passel, 2006). There are multiple patterns of mixed authorization: 41 percent have one documented parent with the other parent undocumented; 39 percent have two undocumented parents; and 20 percent live in households headed by a single undocumented parent

(Fix & Zimmerman, 2001). Within these mixed-status households are also a range of documentation patterns involving siblings: some born in the States with birthright citizenship, some in the process of attempting to obtain documentation, and some fully undocumented (Fix & Zimmerman, 2001). Thus, becoming a mixed-status family can arise out of a variety of circumstances. As an example:

> Li's parents arrived without papers from Fujian province, China, three years before he was born in the United States. Deeply indebted to a snakehead (smuggler) to whom they owed a staggering sum of $90,000, they found themselves working eighty-hour weeks—Li's mother as a seamstress in a factory and his father delivering food for a restaurant. In this context of unbearable stress, they made the decision to send back their infant son to be taken care of by his grandparents in China. Their plan was to send for him when he turned five and was ready for kindergarten. They rationalized that the grandparents would provide much better care than any child-care center and that they would be able to use the money they saved on child care to pay down their smuggler's debt. Because Li is a citizen, they knew they would be able to bring him back, though they were also aware that they would not be able to go and visit him for his entire infancy and early childhood.

In other cases, parents make the conscious choice to leave their children behind and go through the long regularizing process, an ordeal that is much more circuitous and lengthy than anticipated (Fix & Zimmerman, 2001; Suárez-Orozco, Bang, & Kim, 2011). Longer and longer backlogs, a byzantine bureaucracy, and higher rates of denials are cementing growing numbers of transnationally separated families (Suárez-Orozco, Suárez-Orozco, & Todorova, 2008). Facing long delays and the realization that they are missing their children's childhood, some parents make the always-difficult decision to bring their children to the United States without papers. Gabriela embodies this unhappy choice.

> Gabriela's father was shot and killed in Guatemala during the civil war when she was four years old. Her mother, with no other means of supporting her four children, made the difficult trek *al Norte*, leaving the children in their grandmother's care. Gabriela's mother worked many jobs, sent back regular remittances, and applied for asylum. Seven years later, she was finally given full refugee status. She then applied for the admittance of her children; she was told the process would take several more years. In the meantime, Gabriela's grandmother died, and she learned that the caretaker she had hired was abusive. Desperate and feeling there were no good options left, she sent for her children to make the dangerous illegal crossing with a coyote (smuggler).

In some families, older siblings accompanied their unauthorized parents, while younger siblings were born as U.S. citizens.

> Anna, a fourteen-year-old girl with a bleached streak in her otherwise dark hair, is often dressed in artsy clothes. She confides that she wants to be a creative

442

writer but that her parents expect her to go to medical school. She feels the burden of being the only documented member of the family. With tears streaming down her face, she talks about how unfair it is that her older sister, Clara, born in Puebla but living in the States since she was eighteen months old, is the "good student" in the family but cannot go to college. Instead, her parents are pushing Clara to drop out of school to help the family pay the bills, since she is not eligible for financial aid, and they cannot afford to pay for her college.

*Citizen Children of Unauthorized Parents*

Approximately four million (79%) of the children of unauthorized immigrants are citizen-children (Passel & Taylor, 2010). Data from the Pew Hispanic Center show that over 80 percent of these children are born after the parents have been settled in the United States for at least two years, and over 50 percent are born after parents have been settled for at least five years (Preston, 2010), belying perceptions that these families come to the United States only to have children. Further, despite widespread misconceptions, having U.S.-born children does not provide an "anchor" to unauthorized parents by affording automatic pathways to citizenship, or even any protections from deportation. At best, these parents will have to wait decades until their citizen-children reach adulthood, and they will then be placed at the back of the now-decades-long line to undergo the regularizing process (Anderson, 2010). In the meantime, these parents remain at high risk of being deported during the course of their children's childhood. Indeed, well over one hundred thousand citizen-children have experienced their parents' deportation in the last decade (U.S. Department of Homeland Security, 2009). And those who have not had this experience nonetheless live the daily nightmare of knowing their parents may be swept away at any time:

> Heidi's immigrant dream turned into a nightmare: "At only 10 years of age I had a sad awakening . . . When I woke up, I found out that my mother had been arrested . . . My biggest preoccupation was my two little brothers and sister. What was going to happen to them? And what about my little brother that my mother was breast feeding?" She went onto [sic] explain how, as the eldest sister, she took on the responsibility of caring for her younger siblings, and how, a year and a half later, she had not seen her mother again. (U.S. Congress, 2010)

*Interrupted Rites of Passage and Interminable Liminality*

The family's unauthorized status entraps youth in a labyrinth of liminality that complicates the normative stages of development in multiple ways. Typically, the life course is punctuated from birth to death by religious, social, and institutional ritual practices—baptisms, bar/bat mitzvahs, quinceañeras, graduations, marriages, retirements—marking entries into new domains of life. Van Gennep (1960) termed these life-demarking rituals as "rites of passage" (p. 1), which confer new roles, rights, and obligations. Prior to undergoing these offi-

443

*Harvard Educational Review*

cial rites of entry into new roles, Van Gennep argued, individuals reside in a space of temporary liminality.

Liminality has been theorized as the transitional moment between spheres of belonging when social actors no longer belong to the group they are leaving behind and do not yet fully belong in their new social sphere. The liminal condition "eludes the network of classifications that normally locate states and positions in cultural space. Liminal entities are betwixt and between the positions assigned and arrayed by law, custom, convention and ceremony" (Turner, 2002, p. 4). The liminal moment is a period of heightened danger and ambiguity for the social orphan. The state of ambiguous belonging leaves him or her without the shared bundles of rights and obligations that structure social behavior and make it predictable.

The condition of illegality (one's own status or the status of one's parent[s]) places children, adolescents, and young adults in the untenable position of *interminable* liminality. These "betwixt and between" residents of the United States attempt to perform symbolic and ritual claims of belonging without the corresponding reciprocal condition of acknowledgment. Their claim, "I am an American by virtue of a shared fate because I speak the language, share values, ideals, and worldview," is met with a symbolic slap in the face: "You are an illegal and cannot belong." Ironically, these are individuals likely to reside in stable, two-parent, working families who put deep roots down in the United States despite their legal status (Mather, 2009). The ambiguity of belonging experienced by unauthorized youth becomes increasingly intolerable as they move into the public sphere to engage in normative coming-of-age rituals. In early childhood, the immediate family and kinship group shape a relatively protected microcosm of belonging. Typically, the family's secret taboo of unauthorized status is hidden from the child's conscious experience (Gonzales, in press), although the condition of illegality nevertheless has harmful consequences for early development (Yoshikawa, 2011). As adolescents make their way into the public domain, the intermediate worlds of neighborhood, school, and eventually work begin to mold their experiences in new ways (Gonzales, in press). As unauthorized youth pass into older adolescence and emerging adulthood, their awareness is awakened and they begin to experience increasing blocked access to expected normative rites of passage, identities, and ways of being.

Developmentally specific experiences are shaped by various ecological contexts, systems, and processes, which in turn will have implications for the developmental outcomes of children and youth growing up under the shadow of unauthorized status.

## Ecological Contexts, Systems, and Processes

The social-ecological environments in which children growing up in unauthorized homes develop include varying levels of risk and protective factors—

variables that detract from or enhance healthy adaptation and outcomes (Bronfenbrenner & Morris, 2006; Serdarevic & Chronister, 2005). The social-ecological perspective considers human development as unfolding in reciprocal interactions between individuals and their environments, varying as a function of the individual, his or her context and culture, and time. The interactions between the individual and her immediate environment (the *microsystem*, including family, school or care, and peers) take place within nested systems including the *mesosystem* (interrelations among microsystems), the *exosystem* (community, neighborhood, or parent work factors), and the *macrosystem* (societal, policy, and cultural belief systems) (Bronfenbrenner & Morris, 2006). Lastly, the *chronosystem* represents change over time. For immigrants, this can mean many things across systems, including developmental changes (at the individual level), obtaining documentation (at the individual or family level), acculturation (at the individual and family level) (Serdarevic & Chronister, 2005), a decision to pass an immigration reform act (at the exosystemic level), or forced migration due to wars, and changes in the economic cycle (at the macrosystemic level) (see figure 1). A social-ecological framework, then, considers the multiple factors that affect potential responses and outcomes of children and youth growing up in unauthorized homes. From our conceptual viewpoint, the mesosytemic interactions for unauthorized youth are characterized by the increasingly felt undertow of liminality shaping developmental trajectories and outcomes.

We are largely concerned with locating the vulnerabilities and risks associated with unauthorized status while recognizing that unauthorized families strive to support and enhance developmental outcomes for their children. However, because our conceptual work is animated by the hope of motivating research and informing policy in the direction of ameliorating a system that discounts and underserves so many vulnerable children, we focus on specific risks (Wagmiller, Lennon, Kuang, Alberti, & Aber, 2006) and constraints of unauthorized status. Drawing on ecological systems theories, we next explore how contextual factors constrain options and negatively influence the experiences of children and youth growing up in unauthorized families.

*The Macrosystem*

Macrosystemic factors in economy and society shape developmental trajectories. There are public policies, societal norms, and shared attitudes that affect unauthorized parents, children, and youth. Such factors have profound influence, beginning prior to the family's transition to unauthorized status. The global economy, conditions, and emigration policies in countries of origin, and immigration policies in the United States, influence decisions on whether to migrate or overstay visas (Ngai, 2004; Yoshikawa & Kalil, in press). Since the end of 1988, when the amnesty provisions of the Immigration Reform and Control Act largely ended, U.S. immigration policy has increasingly restricted access and pathways to citizenship to the unauthorized (Motomura, 2008).

*Harvard Educational Review*

FIGURE 1   *The Implications of Unauthorized Status: An Ecological Developmental Perspective*



Today, there is no avenue to provide a pathway to citizenship for the unauthorized, even for the restricted population targeted by the DREAM Act.

Attitudes toward unauthorized immigrants have become increasingly harsh in recent years, as reflected in the flurry of state and local laws aimed at unauthorized immigration. In the first three months of the year 2011, 1,538 bills related to immigration, with 141 measures in twenty-six states, passed into law. While some of those laws extended new opportunities to illegal immigrants (such as permitting them to pay lower in-state tuition rates at public colleges), most of the laws imposed restrictions on them (Preston, 2011b). In 2010, the governor of Arizona proposed—and the state legislature passed—a law (SB 1070) allowing local law enforcement officers to detain individuals based solely on suspicion that they might be without papers. Despite some public outcry about this law, and efforts by the Obama administration to stop its implementation, other states, including Georgia, Alabama, and South Carolina, have passed similar laws as of this writing. Alabama's (HB 56) draconian legislation mandates parents to report the immigration status of their foreign-born children to public schools, requires children to report their undocumented parents to authorities, and makes it a crime to knowingly provide rides to undocumented persons (including to a hospital or church) (Preston, 2011a; Southern Poverty Law Center, 2011). Bias crimes against Latinos have risen in recent years, even in the midst of overall decreases in violent crime. In 2008, for example, a group of high school students in Patchogue, New York, set out one morning to "kill a Mexican" (Barnard, 2008); by the end of the day, Marcelo Lucero, an Ecuadorian immigrant living in that community, was dead. According to the Southern Poverty Law Center, the number of anti-Latino hate crimes has grown steadily since 2003 (Keller, 2010).

*The Exosystem*

Beyond the social and cultural belief systems embodied in the flurry of legislation and new patterns of discrimination, multiple variables at the neighborhood and community levels also have relevance for children and youth in unauthorized families. Above and beyond the relative disadvantage of unauthorized parents due to lower levels of education, there is evidence that a range of everyday experiences—from interactions with authorities to characteristics of their social networks and work conditions—exclude them from obtaining resources to help their children's development. The threat of deportation results in lower levels of enrollment of citizen-children in programs they are eligible for, including child-care subsidies, public preschool, and food stamps, and lowered interactions and engagement with public institutions, such as schools. Fear and vigilance shape life in the labyrinth of liminality. The fear of authorities in public institutions can extend to timidity in reporting crimes to the police, housing problems and violations to landlords, and lower use of resources like public libraries. Further, parents are often in debt to illegal enti-

*Harvard Educational Review*

ties, such as smugglers. The current "fare" for one adult to come from mainland China to the United States, for example, ranges from $60,000 to $80,000, with debts taking years to repay (Yoshikawa, 2011).

The poor work conditions of the unauthorized contribute substantially to the lower cognitive skills of children in their families, whether these children are citizens or not. As two recent studies show (Bernhardt et al., 2009; Yoshikawa, 2011), 30 to 40 percent of unauthorized parents work at illegally low wages, a rate much higher than that among their authorized, low-wage counterparts. The combustive combination of exploitation and indebtedness forces many unauthorized parents to work twelve-hour days, six days a week, for years in jobs with the lowest levels of autonomy or the very basic protections afforded by a democracy. Unauthorized status means these workers typically cannot dare ask for a raise or report unacceptable working conditions; for them there is a permanent fear of being fired. Without recourse to unions or to public safeguards, the work conditions are not only poor but chronic, with harmful influences on children's development through increased economic hardship and psychological distress as well as less access to resources that require proof of employment, such as child-care subsidies.

— Neighborhoods and Social Ties

While immigrants reside in virtually every type of social and geographical setting, from the inner city and suburbs to rural outskirts, the majority of individuals who migrated to the United States after 1965 are concentrated in cities with large ethnic populations (Bartel, 1989). These neighborhoods are typically segregated across multiple dimensions, including class, race and ethnicity, and language (Orfield & Lee, 2006). Immigrants are disproportionately likely to live in poverty (U.S. Census, 2007), and while some are able to extract valuable social capital from their ethnic enclaves (e.g., Louie, 2004), others suffer from minimal institutional engagement in their communities (Stanton-Salazar & Dornbusch, 1995). For very recent unauthorized immigrants, the economic and social capital benefits of ethnic enclaves are often elusive. In such families, the majority in the social network may be unauthorized themselves, sharing lower quantity and quality of information about community and public resources.

*The Microsystem*

— Schools

New arrivals most often find themselves in underresourced schools. These schools are typically highly segregated (Orfield & Lee, 2006) and provide limited engaging opportunities for students (Noguera, 2003; Suárez-Orozco et al., 2008). Racially and linguistically isolated schools put students at academic risk (Orfield & Lee, 2006) and are associated with a variety of negative characteristics, including crowding, inadequate resources, low teacher expecta-

tions, poor achievement test outcomes, high dropout rates, and limited social capital to provide information about access to college (Gándara & Contreras, 2009; Orfield & Lee, 2006; Weinstein, 2002). Such contexts are also associated with negative school climates (Noguera, 2003) and increased school violence (Goldstein & Conoley, 1997). Further, because unauthorized families are often in tenuous financial circumstances, their children frequently move and must change schools; school mobility, not surprisingly, has been linked to negative school performance (Rumberger & Larsen, 1998; Suárez-Orozco et al., 2010). The children of the unauthorized, in sum, find themselves in the most liminal spaces of America's dystopic schools.

— Family Processes

Unauthorized parents are as dedicated to their children's learning as parents with authorized or citizenship status, as one recent study showed (Yoshikawa, 2011). Parents of different statuses did not differ, for example, in rates of reading books, telling stories, or engaging in other cognitively stimulating interactions with their young children. Unauthorized fathers, despite working substantially more hours than the authorized, showed high levels of social engagement and care-giving activities. Despite these family strengths, children growing up in unauthorized homes face a number of uniquely complicated family dynamics (Yoshikawa & Kalil, in press). Many face long family separations and complicated reunifications following protracted times apart related to their unauthorized status (Suárez-Orozco et al., 2008). Parents in liminal authorized status will often wait for years attempting to regularize themselves before bringing over their children. In many cases, children spend half or more of their childhood raised apart from their biological parents (Abrego, 2006; Suárez-Orozco et al., 2011). Children and youth in households with unauthorized members live in fear of being separated from parents or other family members should anyone be apprehended or deported (Capps, Castañeda, Chaudry, & Santos, 2007; Chaudry et al., 2010). To prepare them, some parents may talk to them about a contingency plan in case of detention or deportation; a survey of Latino parents found that among the unauthorized, 58 percent had a plan for the care of their children in case they were detained, and 40 percent reported that they had discussed that plan with their children (Brabeck & Xu, 2010). This is a unique parental ethnic-racial socialization (Hughes et al., 2006) to the realities of a shadowed existence. Perhaps because they believe their children are less likely to be detained, or because they wish to protect them from harsh realities as long as possible, other parents do not tell their children about their own status until their mid-to-late adolescence. This only postpones a difficult and alienating conversation.

In addition to these family dynamics, a host of factors appears to contribute to uneven family investments in children who live in unauthorized homes (Yoshikawa & Kalil, in press). While there is no evidence that there are differences in educational goals or psychological investments between groups with

449

*Harvard Educational Review*

high, moderate, and low proportions of unauthorized populations, there is some evidence that there are differences in economic investments, including the purchase of books, toys, and learning materials (Ng et al., 2009). This can relate both to lower rates of parental educational as well as the economic precariousness in which many subsist. When a parent owes a coyote or snakehead, has unpredictable low-wage work, is sending home remittances, and has many dependents, the purchase of books and learning toys may be an unaffordable luxury. Space for children to study is often extremely limited, as unauthorized families often pool resources, sharing space with other families or taking in boarders in already-tight quarters. While parents work long hours, older siblings often take on the responsibilities of child care, elder care, cooking, and translation (Faulstich-Orellana, 2009; Fuligni, 2010). These circumstances have been linked to high levels of stress (Yoshikawa & Kahlil, in press); though well-intentioned, unauthorized parents may have difficulty being fully physically or psychologically available to their children (Suárez-Orozco & Suárez-Orozco, 2001).

*The Individual Experience*

The labyrinth of liminality thwarts individual autonomy and agency, the very foundation of a democratic society. At the individual level, children growing up in the shadow of unauthorized status take the body blows of both distal and proximal contexts. In addition to the lived experiences within neighborhoods, schools, and families, their daily lives may reflect food and housing insecurities (Chaudry et al., 2010) and, above all, the ever-present threat in the air of the deportation of a loved one, or potentially their own. A dawning awareness of their own legal status; concerns about their future, including access to education and work (Gonzales, 2009); negative experiences with the authorities; and the "social mirror" (Suárez-Orozco, 2001), the barrage of derogatory portraits of immigrants, particularly of unauthorized immigrants, in the media, school, and community settings, will shape at the individual level a number of critical developmental outcomes for these children and youth.

   This array of social-ecological environments has distinct experiential and developmental implications at each specific developmental period. The bulk of the research on the unauthorized has been done on young adults or adolescents. Only very recently has consideration been given to the implications for children in early and middle childhood (e.g., Yoshikawa, 2011). Below, we systematically examine the evidence, calling attention to what is known, what is likely (based on theory and available evidence), and where further research is needed.

— Early Childhood

The overwhelming majority of children under the age of five born to unauthorized parents are *citizen-children* born in the United States (Passel & Cohn,

2010). For these young Americans, having an unauthorized parent will shape their developmental contexts in the early years—at home, child care, and preschool—as well as more distally through the work, social networks, and policy contexts their parents experience (Yoshikawa, 2011; Yoshikawa & Kalil, in press).

Early childhood is the foundational period for later cognitive and social skills (Knudsen, Heckman, Cameron, & Shonkoff, 2006). The existence of disparities due to parental unauthorized status in early skill development is cause for societal concern, as recent research suggests that citizen-children of unauthorized parents are at a disadvantage as far as school readiness when compared to children of the authorized. For example, among second-generation Latino children, those from groups with higher proportions of unauthorized immigrants fare worse on emergent reading and math skills assessments at school entry than those from groups with lower proportions of unauthorized immigrants, controlling for a range of indicators of socioeconomic status (Crosnoe, 2006; Han, 2006). Moreover, such disparities are evident earlier than age five—as early as twenty-four and thirty-six months (Fuller et al., 2009; Yoshikawa, 2011).

In one New York–based birth cohort study, two sets of mechanisms were found to be responsible for the harmful influence of parent unauthorized (relative to authorized or citizen) status on children's cognitive skills at twenty-four months of age: higher parental economic hardship and psychological distress combined with lower availability of social support for help with infant child care and lower levels of information about community and public resources that could help children's development (Yoshikawa, 2011). At thirty-six months of age, the poor work conditions of unauthorized parents—characterized by wages below the legal minimum, flat wage growth, and low levels of autonomy at work—were associated with lower enrollment of children in center-based care. Additionally, parents did not access child-care subsidies, the chief support for center-based care among families in poverty in the United States. The nexus of terrible employment conditions and lack of access to learning environments proved harmful to children's early cognitive development. Victor and Luz's experience illustrates many of these issues.

> Emiliana and Victor Sr. were parents from the Mixteca region of Mexico living in New York City and raising their twelve-month-old son Victor Jr. and four-year-old daughter Luz. Their working lives and schedules were grueling. Victor Sr. worked in a restaurant as a line cook, putting in six twelve-hour days a week. Unauthorized himself, he had been dutifully paying taxes for eleven years and waiting for a work visa; none was forthcoming. Emiliana woke up every day around 6:00, prepared her children for preschool and child care, went to work cleaning houses, came home, prepared dinner, put her children to bed, did housework, and then waited up for Victor Sr. to return home, often after 1:00 a.m. She then gave him his dinner, went to bed, and woke up only a few hours later. Emiliana seemed

*Harvard Educational Review*

listless and sad, though when asked always said that things were "fine." Emiliana found out about Head Start only accidentally and then hesitantly enrolled her daughter, Luz, always worrying about exposure.

— Middle Childhood

To our knowledge, no studies have examined how a parent's or a child's own unauthorized status might affect development in middle childhood. Many of the same mechanisms from early childhood might apply: lower levels of take-up of programs for which children are eligible, such as afterschool enrichment programs, and greater social isolation of parent networks. Research also shows that poor work conditions experienced by unauthorized parents—low wages, meager benefits, minimal autonomy, and few opportunities for advancement—are associated with lower academic achievement in middle childhood (Yoshikawa, Weisner, & Lowe, 2006). In addition, by middle childhood, cognitive skills and perspective taking have developed to a point where some children may now have become aware of the legal status of their parents.

For youth in middle childhood, concern over the family's legal vulnerabilities begins to seep into consciousness. They become more cognizant of the culture of fear in which they live. Spanish-language television and radio frequently feature stories of deportations, and in some homes, it is a topic of family conversation that children begin to metabolize. In May 2010, when the First Ladies of the United States and Mexico visited a second-grade classroom in Maryland, a Latina girl spontaneously revealed to Michelle Obama, "My mom said . . . I think she says that Barack Obama's taking everybody away that doesn't have papers." The first lady replied, "That's something we have to work on, right? To make sure that people can be here with the right kind of papers?" Innocently, the girl blurted out, "But my mom doesn't have [papers]" (Suárez-Orozco & Suárez-Orozco, 2010a; Mackey, 2010). As an example, eleven-year-old Mateo begins to (re)cognize and name the culture of fear in which too many are growing up.

> Mateo was poised and collected as he spoke in the august chamber of the U.S. Congress speaking on behalf of thousands of children of immigrant families with unauthorized family members. His steady voice was riveting: "I am here to tell you about my fears growing up in Arizona. Children want to be with their parents because we know that our parents love us. The laws in Arizona are unjust and make me fear for my family. I am always worried when my family leaves the house that something might happen to them. I think about it when my dad goes to work that he might not come back or when I go to school that there might not be someone to pick me up when I get out." (U.S. Congress, 2010)

The dawning realization—stemming from the social comparisons that children in this developmental period learn to make (Huston & Ripke, 2006)—that one's family is different can also affect self-esteem, increase anxiety, and produce internalizing symptoms.

*Growing Up in the Shadows*
SUÁREZ-OROZCO ET AL.

— Adolescence and (Sub)merging Adulthood

Classically, the key developmental task of adolescence is the formation of a stable sense of identity (Erickson, 1968; Marcia, 1966), along with finding one's place within the community beyond immediate family. Identity formation is, in part, achieved by mastering culturally marked rites of passage, like obtaining a driver's license, getting a first job, and, for many, going off to college. Unauthorized youth are unable to fully partake in these normative rituals; moreover, their identity formation is complicated when they come to face a negative social mirror that portrays them (Suárez-Orozco, 2001) as illegitimate and unwanted. For many adolescents who are unauthorized or are living in mixed-status homes, adolescence is a time when liminality first comes to fully destabilize their fragile world.

Ensconced in the family and provided with public education from kindergarten through twelfth grade (as per *Plyer v. Doe*), the 1.1 million unauthorized youth in the United States find themselves in a "suspended illegality" through late adolescence (Gonzales, in press), when they do not have to face full on the consequences of their condition. The social parenthesis the moratorium affords them gives way in late adolescence to a time of deep disorientation, of shock, of not knowing who they are or where they belong, and of anger at their parents for putting them into this situation (Gonzales, in press; Suárez-Orozco et al., 2011). These circumstances can place adolescents at risk of developing internalizing and externalizing symptoms.

> Estella has been in the States since she was four. She has two younger siblings, both U.S. citizens born in Seattle. Her family never discussed citizenship, and she has always assumed she, like her siblings, was a citizen. When she wanted to get her driver's license, her parents told her that they were concerned about safety and did not want her to drive until she was older. It was when she applied for college that she discovered her lack of documentation. Her parents shamefacedly admitted that they had brought her north to provide her a better life, thinking an amnesty eventually would come along. Twelve years later, she finds herself unable to apply for a driver's license or qualify for financial aid to go to college or apply for work. Though on some level she appreciates their sacrifices, on another she is angry with her parents and feels like she belongs "neither here nor there."

In the United States, the adolescent passage into adulthood has typically been marked by achieving independence and autonomy by, inter alia, moving out of the parental home, attending college, working full time, getting married, and having children (Arnett, 2000; Setterson, Furstenburg, & Rumbaut, 2005). These markers have been shifting since the 1950s as norms and economic realities have changed, including the increasingly greater training required for entrance into the labor force and postponement of marriage until the mid-to-late twenties. Arnett (2000) has proposed a new phase of development between adolescence and adulthood, which he terms "emerging adulthood." For young adults in the Western middle-class world, this is often an age

453

marked by development of individual character, self-reliance, independence, intense self-focus, and identity exploration in the areas of love and work, as well as being a time of possibilities, optimism, and transformation accompanied by instability (Arnett & Tanner, 2006).

But in many nonaffluent, non-Western contexts, where many immigrants originate, adulthood is associated with greater interdependence, reliance on extended kin and kith, and a relational obligation and responsibility to the family (Fuligni & Pedersen, 2002; Russell, Coughlin, El Walily, & Al Amri, 2005). Further, the process of immigration may add additional complications to the Western conception of emerging adulthood (Walsh, Shulman, Feldman, & Maurer, 2005). Using data from the 2008 Current Population Survey, Rumbaut and Komaie (2010) found that the traditional markers of adulthood did not hold in quite the same way when comparisons are made across immigrant and nonimmigrant generations. The first generation—the group that initiated the migration—is most likely to have already achieved the classic adult milestones of living away from the parental home (as their parents often remained back in the homeland). This first generation is most likely to be working, be married, and have children, though they are least likely to be going to college. However, the 1.5 generation—born abroad but arriving as children—is more likely to still live with their immigrant parents, to study and work part time, and to postpone marriage and children (Rumbaut & Komaie, 2010). They also often juggle other responsibilities of working in a family business, contributing to family expenses and remittance pools, providing child care and elder care, and translating for and aiding parents and extended kin in navigating medical and legal bureaucracies (Fuligni & Pederson, 2002; Rumbaut & Komaie, 2010).

The young people who are unauthorized—nearly half of the first generation in adolescence and a high proportion of the 1.5 generation (Rumbaut & Komaie, 2010)—face a particularly difficult set of circumstances and a complicated emergence into adulthood. Liminality theory becomes a particularly useful frame for understanding how their formal entry into adulthood is complicated—while, on the one hand, they are inevitably propelled into adulthood, on the other, they are denied participation in state-sanctioned rites of passage, like getting a driver's license or passport and facile entry into college or legally sanctioned passage into the work force (Chavez, 1992; Menjívar, 2006; Yoshikawa, 2011). For the young adult immigrants who are exiting the relative protections of family and K–12 schooling and moving into the public sphere, the new stage is one of shock and vulnerability; they must "learn to be illegal" (Gonzales, in press). Although they might have been under the initial illusion that they would have similar access to the opportunity structure as their authorized peers, they are now confronted with limited life opportunities. They come to recognize that they, like their parents, are vulnerable to deportations, have drastically limited choices in the world of work, and will need to move ever deeper into the shadows in adulthood (Gonzalez, in press). Thus, for unauthorized young adults, this phase can be characterized as a time

of not emerging but, rather, of *(sub)merging* adulthood. They must now adapt to living below the surface of legality.

If they have managed to get good enough grades and are relatively well-connected socially—able to get the necessary information, supports, and financial resources (scholarships or financial supports) to find a way to go to college—some unauthorized young adults can temporarily put off having to function in the more vulnerable sphere of work (Abrego, 2006; Gonzales, in press). For some, like Renato, a tall, well-spoken young man from Ecuador, college can become another space of liminality. "I completed engineering and now I am doing a degree in political science hoping for the DREAM Act to pass," he said, his voice trailing softly. "Until then, I can't legally look for a job." Those who must work, as most do, will squarely face what it means to not have an authorized identity. Rodolfo recounts how he had never really thought before about his illegal identity.

> I never actually felt like I wasn't born here. Because when I came I was like ten and a half. I went to school. I learned the language. I first felt like I was really out of place when I tried to get a job. I didn't have a Social Security number. Well, I didn't even know what it meant. You know Social Security, legal, illegal. I didn't even know what that was. (Gonzalez, in press, p. 16)

Unauthorized young adults often find themselves unable to find jobs different from the ones their parents hold (Gonzales, in press). Margarita, a young woman who pursued an education, found her efforts to enter the labor force frustrated.

> I graduated from high school and have taken some college credits. Neither of my parents made it past fourth grade, and they don't speak any English. But I'm right where they are. I mean, I work with my mom. I have the same job. I can't find anything else. It's kinda ridiculous, you know. Why did I even go to school? It should mean something. I mean that should count right? You would think. I thought. Well here I am cleaning houses. (Gonzales, in press, p. 26)

Unauthorized young adults may find themselves tempted to secure false Social Security cards or driver's licenses in order to find work. Step by step, many begin to cross a threshold: while in earlier years their illegal status was passive and innocent, they may now start to actively pursue the milestones of adulthood to which their authorized peers have access. Once they dip their toes in the underground waters of false driver's licenses and Social Security numbers, they are at risk of getting caught in the undertow of a vast and unforgiving ocean of complex legal currents. Obtaining a fake Social Security number can constitute identity theft, a federal offense, making unauthorized youth not just deportable but also eligible for time in the penal system (Solis, 2011). In addition, in the federal sweep to get rid of "illegal aliens," many young adults become more vulnerable to deportations for old transgressions committed during adolescence, even if they were holders of green cards.

455

Jasmina, born in the Philippines, arrived at eleven years old in Forest Hills, New York, after a long separation from her mother, who had taken years to establish residency for herself and then her daughter. After receiving a green card for Jasmina, her mother sent for her, though the reunification was complicated, and her mother and stepfather had trouble establishing a bond and authority over her. When she was fifteen, Jasmina was stopped by the police in a car with four other kids, one of whom had large quantities of marijuana, enough to sell—and not just for the recreation of the five youngsters in the car. Jasmina was high but not judged to be selling, and after a lengthy and scary court process, she was placed on probation on a marijuana possession charge. She was terrified by the experience; she eventually came to terms with her mother and became a good student. She graduated from high school and got a scholarship to a Jesuit college. When she was twenty-one, she was stopped on an unrelated infraction. A few days later she was suddenly picked up at her mother's home by Immigration and Customs Enforcement (ICE) officials and placed in a detention facility. Because of her prior record, it is very likely she will be deported.

Dating, partnering, and marriage are also complicated for this age group (Taxin, 2011). Unauthorized young adults may be unable to legally drive and often are ashamed to reveal their unauthorized status to new friends. Even if they marry a citizen, doing so does not automatically correct their status; unauthorized youth simply get a slot in the broken queue. Further, for lesbian, gay, bisexual, and transgender (LGBT) youth, applications for residency for same-sex partnerships under current immigration regulations are consistently denied, even in the few states that allow marriage for LGBT partners (Human Rights Watch/Immigration Equality, 2006).

Thus, across multiple developmental stages—from early childhood through young adulthood—policy, neighborhood, family, and individual factors constituting the liminality and social exclusion of the unauthorized place these children and youth at risk.

## Developmental Implications

Having considered the ecology of systemic factors shaping the experiences of unauthorized children and youth as they move through the developmental spectrum, we now turn to examine a range of developmental outcomes shaped by unauthorized status.

### Health

Unauthorized parents are currently ineligible for all health care except perinatal and emergency-room care. Although citizen-children of the unauthorized are eligible for all government health benefits, unauthorized children are not. The outcomes of these factors for health of adults and children in unauthorized families have not been well established. On the one hand, research on the "immigrant health paradox" shows that groups with high rates of unauthorized immigrants, such as lower-income Mexicans in the United States,

have better perinatal and postnatal outcomes than their U.S.-born counterparts with roughly equal economic conditions (Hu-DeHart & Garcia Coll, 2010). On the other hand, the consequences of disparate health-care access on lifelong health outcomes are largely unknown, as the large increases in unauthorized migration (starting in the early 1990s) have been among adults and children during the relatively more protected developmental periods of childhood and young adulthood. The cumulative consequences of social disadvantage for lifelong health and mental health problems, such as heart disease, diabetes, and depression, are well established (Center on the Developing Child, 2010); they suggest that the costliest consequences of unauthorized status will emerge later in the life course, as current generations of unauthorized parents, children, and youth move into midlife and older age.

*Cognitive Development and Educational Trajectories*

The development of early cognitive skills of children of the unauthorized is at risk relative to their peers in authorized families. This consensus emerges from the findings of a few studies that have directly examined the issue and is bolstered by patterns in national data (Crosnoe, 2006; Han, 2006; Ortega et al., 2009; Yoshikawa, 2011). The size, growth, and heterogeneity of the population of children growing up in unauthorized households warrant particular attention in the context of education, as these youngsters enter formal schooling. There are more than five million children of immigrants in unauthorized households in the United States that need to be accommodated by the K–12 system of education. Along with seven million more students living in immigrant households with at least one foreign-born parent with legal status, it is projected that by 2015, as much as 30 percent of the public school population will be children of immigrants (Johnson & Janosik, 2008; Mather, 2009).

These millions of children and youth in unauthorized households face varying degrees of academic challenges. While some enter the U.S. educational system as young children and quite acculturated and speaking English as a primary language, more arrive sometime during the midway point of their education trajectory and with many language and academic hurdles to overcome. Moreover, poor work conditions, such as low wages, lack of access to benefits, and limited opportunities for employment, which are more prevalent among unauthorized adults, are associated with low academic achievement among their middle school and high school children. Many immigrant parents have not had schooling in their home countries and lack familiarity with the U.S. educational system, which hinders not only their access to information, knowledge, and resources that can help them navigate the system but also their ability to facilitate their child's educational mobility (Teranishi, 2010). While immigrant parents have high educational aspirations and expectations for their children, many arrive in the United States with few resources and opportunities that can help them realize these educational goals (Ruiz-de-Velasco & Fix, 2000).

457

Parental engagement with their child's school—a positive predictor of academic achievement, higher self-esteem, greater academic achievement, and higher rates of high school completion and college enrollment (Hill & Taylor, 2004)—is often a challenge for immigrant families (Hill & Torres, 2010). In some cases, language is a significant barrier that prevents contact between immigrant families and schools. Correspondence between families and schools by way of interpreters often challenges communication, and students themselves are often called on to play this role. Aside from language barriers, immigrant parents have also reported feeling intimidated by schools, particularly if parents are unauthorized and are fearful of being deported if their status is recorded in any way by the school (Advocates for Children of New York, 2009).

Barriers to parental involvement are particularly problematic for immigrant families living in racially and ethnically isolated communities (Suárez-Orozco et al., 2008). Their children attend schools that lack adequate resources (Ruiz-de-Velasco & Fix, 2000) and that hold low expectations for its immigrant students (Suárez-Orozco et al., 2008). These schools are often characterized by higher dropout rates, inadequate postsecondary educational preparation, and lower rates of matriculation into college (Teranishi, Allen, & Solorzano, 2004). In fact, many immigrant youth who pursue postsecondary education may not have the academic background to adequately prepare them for college course work. Too many are relegated to remediation courses before being allowed to enroll in credit-bearing courses. Moreover, more than half (53%) of immigrant college students are over the age of twenty-four, and a sizable proportion (60%) are considered independent for financial aid purposes. They are also more likely to attend college as part-time students while working either a part-time or full-time job (Teranishi, Suárez-Orozco, & Suárez-Orozco, 2011), which is correlated with lower persistence and degree attainment.

In addition, affordability is a significant factor in the decision to attend college. Research has found that immigrant students lack information about financing college, are less likely to apply for and access student loans, borrow less than other students, and cover more of their college cost with their own financial contribution (NCES, 2006). While naturalized citizens and legal permanent residents are typically eligible for in-state tuition, nonpermanent residents and undocumented students are treated differently from one state to the next. Additionally, undocumented students and nonpermanent residents are ineligible for federal aid and most forms of state aid (González, 2009). In combination, these factors relegate unauthorized youth to community colleges, because of their lower tuition cost, or discourage college attendance altogether (Dougherty, Nienhusser, & Vega, 2010; Flores & Chapa, 2009; Teranishi et al., 2011). And in at least one state (Alabama), legislation was passed barring unauthorized students from attending any public college (Preston, 2011a).

*Socio-Emotional Development*

There is limited research on the psychosocial implications of growing up unauthorized or in unauthorized homes. There only recently has been a dawning awareness of this issue within the field of psychology, and more research is needed to better inform service providers working with these children and youth (APA Presidential Task Force Report on Immigration, forthcoming). There are several areas in which there are some emerging data or about which we can make educated guesses regarding the socio-emotional implications of this condition.

The duress of liminality takes a heavy toll on the socio-emotional development of unauthorized children and youth. Previous research has demonstrated that stressed and depressed parents have compromised parenting abilities (Ashman, Dawson, Panagiotides, Yamada, & Wilkens, 2002; Athey & Ahearn, 1991); obviously a larger than average percentage of unauthorized parents may be at risk of stress or depression. The negative consequences of having a parent detained have been well documented in an Urban Institute study of children across a range of ages and include a high incidence of reported depressive, anxiety, and post–traumatic stress disorder (PTSD) symptoms (Chaudry et al., 2010). It is likely that living in a community where family members or friends' parents have been detained or deported heightens insecurity and may undermine a sense of belonging and trust. If the child is a citizen, her sense of belonging to the nation could be undermined as its authorities actively seek to expel his or her parents, siblings, and other loved ones. And, if the child is him- or herself unauthorized, belonging is elusive, because he or she will be encircled by the hard boundaries of liminality and unable to participate in the rituals that define personhood in early adulthood. Although he or she may deeply long for belonging, it will remain a frustrated ambition. Identity formation, already a complicated task for immigrant youth (Suárez-Orozco, 2001; Fuligni, 2010), will be particularly frustrated under the siege of liminality and in the face of hostile and disparaging social, political, and media representations (Suárez-Orozco, 2004), creating a perfect storm of what we may call "perpetual outsider-hood."

*Civic Engagement*

To date, research on the civic engagement of immigrant-origin youth has been conspicuously sparse. Historically, civic engagement has been defined by the gold standard of voting, though more recently it has been conceptualized more broadly by including commitment to society, activities that help those who are in need, and collective action to fight for social justice (Flanagan, Gallay, Gill, Gallay, & Nti, 2005; Morsillo & Prilleltensky, 2007). As voting is a blocked pathway for both permanent lawful residents and the unauthorized, broader definitions of civic engagement should be considered for immigrants and their children to make possible the promise of their integration

into the life of the country (Jensen & Flanagan, 2008). Some, such as Huntington (2004), have claimed that immigrants represent a threat to American civil society because of their alleged divided loyalties. Yet, the few studies that do exist on the topic of civic engagement suggest that such fears may be misplaced. In fact, when considering a broader definition of civic participation, immigrant-origin youth were found to be more active civically, especially in immigrant-specific activities like interpreting, translating, advocating, filling out official documents, and other forms of civic engagement often overlooked in traditional measures in the field (Jensen & Flanagan, 2008).

When studying immigrants, it is wise to separate civic incorporation from political incorporation (Waters, 2008). While greater civic *and* political participation come with citizenship and second-generation status, non-naturalized immigrants can be involved in an array of civic projects even though they cannot vote (Lopez & Marcelo, 2008; Stoll & Wong, 2007). Additionally, although not speaking English can block participation in some activities for the first generation, bilingual competencies can serve as tools for civic engagement among the children of immigrants (Ramakrishhnan & Baldasarre, 2004). For the 1.5 and second generations, bilingualism acts as a vector of engagement (Arnett Jenson, 2008; Stepick, Stepick, & Labissiere, 2008). Further, immigrants tend to be highly religious (Levitt, 2008; Stepick, 2005), and religious involvement and religious organizations tend to generate multiple pathways to civic involvement (Levitt, 2008; Stoll & Wong, 2007). Religious institutions socialize youth into participating in collective efforts and are traditionally places where members, especially African Americans, have been found to exchange political information and discuss public issues (Smetana & Metzger, 2005). For many immigrants, religious institutions and spiritual communities provide ready-made social ties for fostering civic participation. Finally, immigration-related controversies can serve as a catalyst for civic engagement. These controversies can mobilize some to participate in a variety of political activities, a phenomenon named "reactive ethnicity" (Rumbaut, 2008, p. 108). Young people on campus who are "coming out illegal" (Jones, 2010, p. 36), those who march, sign petitions, participate in sit-ins, organize letter-writing campaigns in support of the DREAM Act, are recent examples of reactive ethnicity mobilized in the service of civic engagement.

*Labor Market Access*

Nationally, almost 30 percent of young adults (those between the ages of eighteen and thirty-four) are of immigrant origin (Rumbaut & Komaie, 2010). Strikingly, nearly half of the foreign-born in this age group are unauthorized, having "entered without inspection" or overstayed their visas as young adults or aged into early adulthood after having been brought over as children (Hoefer et al., 2009; Rumbaut & Komaie, 2010). Unauthorized status has distinct implications for their participation in the labor market as well as for the developmental opportunities in the next generation as they begin to have children

of their own. As immigrants and their children constitute a growing share of the U.S. population, it is important to examine their access to the labor market, particularly as it pertains to occupations, wages, and opportunities for mobility. Adult immigrants tend to have higher rates of labor force participation, lower rates of unemployment, and lower wages (Bureau of Labor Statistics, 2008). However, it is important to consider the trajectory of children of immigrants into the labor force and the factors that shape their opportunities for work. Research on the intergenerational mobility of immigrant youth yields important insight on the success of children of immigrants. Among U.S.-born youth of immigrant parents and immigrant youth who arrived at a young age, there is evidence of significant gains in upward mobility: they have more education, higher wages, and work in occupations with more job security than their parents (Haskins, 2010). By the second generation, children of immigrants are experiencing labor force outcomes that are equal to or greater than the national average.

For unauthorized youth, however, there is a very different trajectory into the labor force. As unauthorized young adults are in the midst of their high school education, perhaps contemplating their future college or career aspirations, many begin to discover that they do not have a Social Security card and will not be able to apply for jobs (Gonzales, in press). In a study of unauthorized youth, Gonzales found that it is during the filling out of job applications or the college admissions process that many came to learn of their illegal status. As a consequence, a sizable proportion of unauthorized youth ultimately drop out of school and end up in low-skilled jobs with low wages, little or no job security, no benefits, and reduced promise of mobility. A generation later, they find themselves where their parents started. This is a deformation of the American Dream where children expect to do better than their parents. In some cases, unauthorized youth will pursue college and earn a degree but nevertheless face barriers to employment without a means to change their immigration status, despite their skills and credentials. Ultimately, many unauthorized youth are forced deeper and deeper into an underground work force where they will be vulnerable to depressed wages, lack of benefits, and other forms of exploitation (Bernhardt et al., 2009; Yoshikawa, 2011). By then, they are members of our nation's own caste of untouchables; American in all but the law, these youth find themselves in a labyrinth of liminality not of their own making and with virtually all exits blocked.

Discussion

The evidence reveals a consistent pattern: the effects of unauthorized status on development across the lifespan are uniformly negative, with millions of U.S. children and youth at risk of lower educational performance, economic stagnation, blocked mobility, and ambiguous belonging. In all, the data suggest an alarming psychosocial formation. Though the relationships among

461

documentation status, ecological settings, and developmental outcomes are articulated in our conceptual model, the significance of these relationships goes beyond the conceptual framing of a new social problem.

The sheer numbers—currently more than 4.5 million citizen-children of unauthorized immigrant parents *plus* more than 1 million unauthorized children and youth—indicate a large-scale national concern that touches every state in the nation and reaches well into the future. The 5.5 million children and youth growing up in the shadows equals more than the combined populations of Montana, Delaware, South Dakota, Alaska, North Dakota, Vermont, and Wyoming. Put another way: on average, one or two students per American classroom is a child who is touched directly by unauthorized status. Unauthorized status cannot be reduced to concerns about redundant workers whose labors and brainpower are sometimes needed but at times of economic contraction become superfluous and easily dismissed. Immigration is above all a family process: love (family reunification) and work (to provide for the family) have always driven migration. These families are growing deep roots in American soil. The experience of being unauthorized touches broad swatches of the American fabric. It is not restricted to a few states or a few ethnicities. It is not a California issue or a Latino issue. Relatively large proportions of certain Asian immigrant groups are also represented among the unauthorized, and these groups are particularly vulnerable to long periods of parent-child separation with the consequent social-emotional problems examined above (Suárez-Orozco et al., 2011; Yoshikawa, 2011). Finally, the impact of unauthorized status is not just about effects on educational outcomes or access to college and the military, the foci of the proposed DREAM Act. The implications of growing up in an unauthorized family span a variety of developmental contexts shaping multiple outcomes, including psychological well-being, mental health, physical health, education, and employment.

Our review shows that unauthorized status harms development, from the beginning of life through adolescence and young adulthood, by restricting access to some of the most important pathways to adult well-being and productivity: early learning opportunities such as quality child care, preschool, and school as well as higher education and formal entry into the world of work. For millions of children and youth growing up in unauthorized families, the American Dream and the promise of a better tomorrow have become an elusive mirage. In facing the perfect storm, unauthorized families exhibit strength and resilience and undoubtedly deploy many assets. Unauthorized parents, for example, report levels of dedication and commitment to their children's learning that are no different than those of more privileged authorized parents (Ng et al., 2009). In highlighting the fact that unauthorized status represents a measurable risk threatening the well-being of children and youth, we hope to motivate future research, novel policy interventions, and responsive practice as well as public opinion.

*Research Implications*

Our article focuses on a consistent, though still nascent, evidentiary base. There is still a lot we do not know about how unauthorized status affects developmental outcomes across domains, life stages, and contexts. Forthcoming large-scale and longitudinal studies with direct information on unauthorized status will help fill in the picture (e.g., the L.A. Family and Neighborhood Study and work by K. Perreira and by R. Smith). However, the vast majority of developmental and policy studies of children and youth do not collect any information on unauthorized status. With the appropriate protections for anonymity and confidentiality, such data can be collected. A variety of methods, from ethnography and in-depth interviews to survey and observational methods, can inform the study of this phenomenon (Yoshikawa et al., 2008). Studies on the domains of health and socio-emotional development are particularly needed, as are studies during the middle childhood period and studies of young and older adults in higher education, adult education, employment, and other settings.

We also need more work on the effects of high levels of protracted unauthorized immigration on democratic practices at the local, state, and federal levels. If by one measure citizens are bound by a shared fate, how does the liminality of millions among us shape our common future when the evidence suggests that neither the forced deportation of eleven million people nor massive self-deportations are likely to occur? We need further work on the ethics of systems—health, education, justice—that de facto punish children and youth for embodying a condition not of their own making. We need legal work on the millions of U.S. citizen-children who, day in and day out, lose the right to have rights simply by growing up in the shadows of their parents' unauthorized status. The societal importance of these issues is unquestionable.

*Policy and Practice Implications*

There are more concrete considerations as well. With a rapidly aging population, the United States cannot afford to relegate millions of its children and youth to a liminal, excluded status that harms their development and restricts their ability to become productive and civically engaged members of society. In the upcoming decades, when every working-age American will be needed to support a burgeoning elderly population, writing off millions of productive, potential citizens is economically self-destructive and civically reckless. Restricting access to high-quality child care, enriching preschool environments, and, later, higher education and employment opportunities represents an extraordinary disrespect for humanity and human potential and a tremendous waste of resources.

The most fundamental policy implication of this article is the need to create a pathway to citizenship for the long-settled unauthorized who pass a strict "belonging threshold" (Suárez-Orozco & Suárez-Orozco, 2010b). Bringing

*Harvard Educational Review*

them out of the shadows would free unauthorized parents to enroll their children—our future police officers, nurses, firefighters, teachers, and doctors—in programs that benefit their development. They would also experience higher wages and be able pursue their own education as adults.

Second, labor law enforcement to correct wage violations would help address the disastrous work conditions of the unauthorized, which affect unauthorized parents, citizen-children, and unauthorized youth and young adults alike. The pernicious combination of permanent marginality, exploitation at work, and blocked mobility will shape the democratic vigor of the entire society for years to come. Quarantining millions in interminable liminality threatens to infect the larger body politic:

> The formalistic exclusion of deportable noncitizens from our rich traditions of constitutional discourse also risks the creation of a caste from a "discrete and insular minority." It facilitates irrational discrimination against the noncitizens who live, work, pay taxes, raise children and participate in communities alongside citizens every day. And practices that take root against noncitizens may provide models for actions against citizens. (Kanstroom, 2007, p. 18)

Third, as the United States becomes more diverse, and as the foreign-stock population grows numerically and proportionally, it is smart policy to increase the rate at which immigrants can access education and succeed in schooling. The need to create a more accessible and responsive education system for immigrants is important because educational attainment is now the most significant prerequisite for maintaining and gaining social status in America and is fundamental to the replenishment and development of a labor force that needs to be globally competitive. While some thrive in the educational system, the potential of unauthorized youth is often unrealized, and their dreams are thwarted. The barriers and discrimination they face stand in painful conflict with American ideals and have detrimental long-term personal, economic, and societal consequences.

Fourth, policy and procedures need to increase efficacious parental involvement for the unauthorized population. Although the Supreme Court decision in *Plyer v. Doe* provides unauthorized youth access to K–12 education, there are still many barriers for unauthorized parents of students that limit their involvement in their child's schooling. Greater attention to language needs and communication strategies can improve the relationship between schools and the families they serve. Policy implications extend into the arena of higher education. One of the most significant factors determining college participation and persistence is knowledge of, access to, and use of financial aid; this access should be extended to the unauthorized population. In addition, because unauthorized students have a disproportionately greater presence in community colleges, there is a need for state policy reform so that community colleges receive an equitable share of state funding in comparison to their four-year counterparts. For unauthorized students specifically, there

are significant barriers related to college cost and access to aid. Therefore, we need to support efforts to gain and retain access to in-state tuition for all U.S. high school graduates, regardless of documentation status, as research has shown that extending in-state tuition for undocumented students is associated with increased participation in college (Dougherty et al., 2010; Flores & Chapa, 2009).

Our last policy recommendation concerns the practices of community-based organizations serving immigrant populations. These organizations can connect unauthorized families with resources and information, which the unauthorized are either excluded from or are reluctant to access. Child development services that unauthorized parents take up must come from trusted organizations perceived as directly helpful to children, with enrollment conducted in the appropriate language (Yoshikawa, 2011). Trusted organizations, both formal and informal, can also facilitate community organizing and advocacy among this group (Smith, 2006). Even families with few connections to formal service providers or agencies report high levels of engagement with churches, local organizations with trusted reputations for working with immigrant groups, and transnational organizations with links to their countries of origin (Galvez, 2009; Smith, 2006; Yoshikawa, 2011). Among the unauthorized, networks of trust matter greatly and are imminently possible to build and sustain.

In conclusion, the conditions of exclusion we have described in this article are reinforced through public policies and structural, systemic inequities. Immigrants, due to their rapid growth and relative youth, are burgeoning in proportional representation. With a rapidly aging native population dependent on the youthful population's economic contributions, our nation can ill afford to foster a new underclass of socially disaffected youth and young adults.

If we cannot muster the political will to fix current immigration malaise, we should at least face with eyes wide open what the status quo means for millions of children and youth caught in a situation not of their own making. We need to answer Bernstein's (2011) unsettling question—"Are we, in effect, creating an American caste system here, one that challenges the nation's concepts of civil rights?" (p. 37). Permanently encircling millions of children and youth behind a barbed wire of liminality is counter to fundamental democratic ideals, the values we share as Americans, and the core tenets of our civilization. It is, above all, the atavistic punishing of children for the "sins" of others.

The category of "illegal immigrant" did not exist in the United States until 1888, when the Chinese Exclusion Act was passed; much of the growth of this nation of immigrants occurred with open doors (Ngai, 2004). The ways in which immigrant-origin youth are integrated into U.S. society, and the ways in which they are invited to participate civically, will in no small measure determine the kind of country we will become (Stepick et al., 2008). The future holds either a more equitable and democratic America or a divided society

*Harvard Educational Review*

with a new caste of untouchables, permanent outsiders at the threshold of belonging. The children of the unauthorized urgently need to be brought out of the shadows and into the sunshine of true democratic promise, fair play, and equal opportunity. Only then can we begin the work of promoting the healthy development of millions of children in our nation.

## Notes

1. Over 8.5 million of the unauthorized are from the North American region (Mexico, Canada, Central America, and the Caribbean), followed by 980,000 from Asia (China, India, South Korea, and the Philippines are the top four sending countries), 740,000 from South America, and the rest from other regions (Hoefer et al., 2009).
2. Case vignettes are used for illustrative purposes and come from a range of sources, including our own field and clinical work, others' research, and news stories. Attributions are made when the cases come from sources other than the authors' own research. All names and some details may have been changed to protect the identities of the individuals.

## References

Abrego, L. J. (2006). I can't go to college because I don't have papers: Incorporation patterns of Latino undocumented youth. *Latino Studies, 4*, 212–231.

Advocates for Children of New York. (2009). Our children, our schools: A blueprint for creating partnerships between immigrant families and New York City public schools. New York: Author.

Anderson, S. (2009). *Employment-based green card projections point to decade-long waits.* Arlington, VA: National Foundation for American Policy. Retrieved from http://www.nfap.com/

Anderson, S. (2010). *Family immigration: The long wait to immigrate.* Arlington, VA; National Foundation for American Policy. Retrieved from http://www.nfap.com/

APA Presidential Task Force on Immigration. (forthcoming). Humanizing the dehumanized: Psychological implications of the immigration experience. Washington, DC: American Psychological Association.

Arnett, J. J. (2000). Emerging adulthood: A theory of development from the late teens through the twenties. *American Psychologist, 55*(5), 469–480. doi:10.1037/0003-066X.55.5.469

Arnett, J. J., & Tanner, J. T. (2006). *Emerging adults in America: Coming of age in the 21st century.* Washington, DC: APA Press.

Ashman, S. B., Dawson, G., Panagiotides, H., Yamada, E., & Wilkins, C. W. (2002). Stress hormone levels of children of depressed mothers. *Development and Psychopathology, 14*(2), 333–349.

Athey, J. L., & Ahearn, F. L. (1991). Refugee children: Theory, research, and services. Baltimore: John Hopkins University Press.

Barnard, A. (2008, November 28). Admired by many, but to police a killer. *New York Times,* p. A25.

Bartel, A. P. (1989). Where do the new U.S. immigrants live? *Journal of Labor Economics, 7*(4), 371–391.

Bernhardt, A., Milkman, R., Theodore, N., Heckathorn, D., Auer, M., DeFilippis, J., Gonzales, A., Narro, V., Perelshteyn, J., Polson, D., & Spiller, M. (2009). *Broken laws,*

*unprotected workers: Violations of employment and labor laws in America's cities.* New York: National Employment Law Project.

Bernstein, N. (2011). The making of an outlaw generation. In M. M. Suárez-Orozco, V. Louie, & R. Suro (Eds.), *Writing immigration: Scholars and journalists in dialogue* (pp. 23–43). Berkeley: University of California Press.

Brabeck, K., & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioral Sciences, 32*(3), 341–361.

Bronfenbrenner, U., & Morris, P. A. (2006). The bioecological model of human development. In R. M. Lerner & W. Damon (Eds.), *Handbook of child psychology:* Vol. 1, *Theoretical models of human development* (6th ed., pp. 793–828). Hoboken, NJ: Wiley.

Bureau of Labor Statistics. (2008). Labor force statistics from the current population survey: Unemployment rates by education for those 25 and over. Retrieved from www .bls.gov/cps/

Capps, R., Castañeda, R. M., Chaudry, A., & Santos, R. (2007). *Paying the price: The impact of immigration raids on America's children.* Retrieved from http://www.urban.org/ publications/411566.html

Center on the Developing Child. (2010). *The foundations of lifelong health are built in early childhood.* Cambridge, MA: Author.

Chaudry, A., Capps, R., Pedroza, J., Castañeda, R. M., Santos, R., & Scott, M. M. (2010). *Facing our future: Children in the aftermath of immigration enforcement.* Washington, DC: Urban Institute. Retrieved from http://www.urban.org/publications/412020.html

Chavez, L. R. (1992). *Shadowed lives: Undocumented immigrants in American society.* Fort Worth, TX: Harcourt Brace.

Crosnoe, R. (2006). *Mexican roots, American schools: Helping Mexican immigrant children succeed.* Palo Alto, CA: Stanford University Press.

Dougherty, K. J., Nienhusser, H. K., & Vega, B. E. (2010). Undocumented immigrants and state higher education policy: The politics of in-state tuition eligibility in Texas and Arizona. *Review of Higher Education, 34*(1), 123–173.

Erickson, E. (1968). *Identity: Youth and crisis.* New York: W. W. Norton.

Faulstich-Orellana, M. (2009). *Translating childhoods: Immigrant youth, language, and culture* (Series in Childhood Studies). Piscataway, NJ: Rutgers University Press.

Fix, M., & Zimmermann, W. (2001). All under one roof: Mixed-status families in an era of reform. *International Migration Review, 35*(2), 397–419.

Flanagan, C. A., Gallay, L. S., Gill, S., Gallay, E. E., & Nti, N. (2005). What does democracy mean? Correlates of adolescents' views. *Journal of Adolescent Research, 20*(2), 193–218.

Flores, S. M., & Chapa, J. (2009). Latino immigrant access to higher education in a bipolar context of reception. *Journal of Hispanic Higher Education, 8*(1), 90–109.

Fuligni, A. J. (2010). Social identity, motivation, and well-being among adolescents from Asian and Latin American backgrounds. In G. Carlo, N. J. Crockett, & M. A. Carranza (Eds.), *Health disparities in youth and families: Research and applications.* Nebraska Symposium on Motivation, Vol. 57, pp. 97–120. New York: Springer Science.

Fuligni, A. J., & Pederson, S. (2002). Family obligations and the transition to young adulthood. *Developmental Psychology, 38*(5), 856–868.

Fuller, B., Bridges, M., Bein, E., Jang, H., Jung, S., Rabe-Hesketh, S., Halfon, N., & Kuo, A. (2009). The health and cognitive growth of Latino toddlers: At risk or immigrant paradox? *Maternal and Child Health Journal, 13*(6), 755–768.

Galvez, A. (2009). *Guadalupe in New York: Devotion and the struggle for citizenship rights among Mexican immigrants.* New York: New York University Press.

Gándara, P., & Contreras, F. (2009). *The Latino educational crisis: The consequences of failed policies.* Cambridge, MA: Harvard University Press.

*Harvard Educational Review*

Goldstein, A. P., & Conoley, J. C. (Eds.). (1997). *School violence intervention: A practical handbook*. New York: Guilford Press.

Gonzales, R. G. (2009). *Young lives on hold: The college dream of undocumented students*. Washington, DC: College Board. Retrieved from http://professionals.collegeboard.com/profdownload/young-lives-on-hold-college-board.pdf

Gonzales, R. G. (in press). Learning to be illegal: Undocumented youth and shifting legal context in the transition to adulthood. *American Sociological Review*.

Han, W. (2006). Academic achievements of children in immigrant families. *Educational Research and Reviews, 1*(8), 286–318.

Haskins, R. (2010). *Economic mobility of immigrants in the United States*. Washington, DC: Pew Charitable Trust.

Hill, N. E., & Taylor, L. C. (2004). Parental school involvement and children's academic achievement. *Current Directions in Psychological Science, 13*(4), 61–164.

Hill, N. E., & Torres, K. (2010). Negotiating the American dream: The paradox of aspirations and achievement among Latino students and engagement between their families and schools. *Journal of Social Issues, 66*(1), 5–112.

Hoefer, M., Rytina, N., & Baker, B. C. (2009). Estimates of the unauthorized immigrant population residing in the United States: January 2008. Population Estimates. Washington, DC: U.S. Department of Health and Human Services.

Hu-DeHart, E., & Garcia Coll, C. (2010). *The immigrant paradox in children's education and behavior: Evidence from new research*. Providence, RI: Brown University.

Hughes, D., Rodriguez, J., Smith, E. P., Johnson, D. J., Stevenson, H. C., & Spicer, P. (2006). Parents' ethnic-racial socialization practices: A review of research and directions for future study. *Developmental Psychology, 42*(5), 747–770.

Human Rights Watch/Immigration Equality. (2006). *Family, unvalued discrimination, denial, and the fate of binational same-sex couples under U.S. law*. New York: Human Rights Watch. Retrieved from http://www.immigrationequality.org/uploadedfiles/Family-Unvalued.pdf

Huntington, S. P. (2004). *Who are we? The challenges of America's national identity*. New York: Simon & Schuster.

Huston, A. C., & Ripke, M. (2006). (Eds.). *Developmental contexts in middle childhood: Bridges to adolescence and adulthood*. New York: Cambridge University Press.

Jensen, L. A. (2008). Immigrants' cultural identities as sources of civic engagement. *Applied Developmental Science, 12*(2), 74–83.

Jensen, L. A., & Flanagan, C. A. (2008). Immigrant civic engagement: New translations. *Applied Developmental Science, 12*(2), 55–56.

Jimenez, M. (2009). Humanitarian crisis: Migrant deaths at the U.S.-Mexican border. ACLU & Mexico's Commission of Civil Rights. Retrieved from http://www.aclu.org/files/pdfs/immigrants/humanitariancrisisreport.pdf

Johnson, A., & Janosik, S. M. (2008). Undocumented students and public higher education: A public policy morass. *College and University Journal, 84*(1), 32–41.

Jones, M. (2010, October 24). Coming out illegal. *New York Times Magazine*, pp. 36–39.

Kanstroom, D. (2007). Deportation nation: Outsiders in American history. Cambridge, MA: Harvard University Press.

Keller, L. (2010). Anti-Latino hate crimes seen from Baltimore to Arizona. Southern Poverty Law Center Hate Watch. Retrieved from http://www.splcenter.org/blog/2010/08/23/anti-latino-hate-crimes-seen-from-baltimore-to-arizona/

Knudsen, E. I., Heckman, J. J., Cameron, J. L., & Shonkoff, J. P. (2006). Economic, neuro-biological, and behavioral perspectives on building America's future workforce. *Proceedings of the National Academy of Sciences, 103*(27), 10155–10162.

Levitt, P. (2008). Religion as a path to civic engagement. *Ethnic and Racial Studies, 31*(4), 766–791.

Lopez, M. H., & Marcelo, K. B. (2008). The civic engagement of immigrant youth: New evidence from the 2006 Civic and Political Health of the Nation Survey. *Applied Developmental Science, 12*(2), 66–73.

Louie, V. S. (2004). *Compelled to excel: Immigration, education, and opportunity among Chinese Americans.* Palo Alto, CA: Stanford University Press.

Mackey, R. (2010, May 19). Worried girl asks Michelle Obama if her mother will be deported. *New York Times.*

Marcia, J. E. (1966). Development and validation of ego-identity status. *Journal of Personality and Social Psychology, 3*(5), 551–558.

Mather, M. (2009). Children in immigrant families chart new path. Washington, DC: Population Reference Bureau. Retrieved from http://www.prb.org/pdf09/immigrantchildren.pdf

Menjívar, C. (2006). Liminal legality: Salvadorian and Guatamalan immigrants' lives in the United States. *American Journal of Sociology, 111*(4), 999–1037.

Morsillo, J., & Prilleltensky, I. (2007). Social action with youth: Interventions, evaluation, and psychopolitical validity. *Journal of Community Psychology, 35*(6), 725–740.

Motomura, H. (2008). Immigration outside the law. *Columbia Law Review, 108*(8). 2008 UCLA School of Law Research Paper No. 09-01. Retrieved from http://ssrn.com/abstract=1323914

National Center for Education Statistics [NCES]. (2006). *Profile of undergraduates in U.S. postsecondary education institutions 2003–04 with a special analysis of community college students.* Washington DC: U.S. Department of Education.

Ng, F. F., Godfrey, E. B., Hunter, C. J., Tamis-LeMonda, C. S., Yoshikawa, H., & Kahnana-Kalman, R. (2009). Mothers' socializing goals for children in the first years of life: Developmental, ethnic, and economic differences. *Parental goals for children: The role of cultural and social context* (Paper symposium). Paper presented at the biennial meeting of the Society for Research in Child Development, Denver, CO.

Ngai, M. (2004). *Impossible subjects: Illegal aliens and the making of America.* Princeton, NJ: Princeton University Press.

Noguera, P. (2003). City schools and the American dream: Reclaiming the promise of public education. New York: Teacher's College Press.

Orfield, G., & Lee, C. (2006). *Racial transformation and the changing nature of segregation.* Cambridge. MA: The Civil Rights Project at Harvard University.

Ortega, A. N., Horwitz, S. M., Fang, H., Kuo, A. A., Wallace, S. P., & Inkelas, M. (2009). Documentation status and parental concerns about development in young US children of Mexican origin. *Academic Pediatrics, 9*(4), 278–282.

Passel, J. S. (2006). *The size and characteristics of the unauthorized migrant population in the U.S: Estimates based on the March 2005 current population survey.* Washington, DC: Pew Hispanic Center. Retrieved from http://pewhispanic.org/files/reports/61.pdf

Passel, J. S., & Cohn, D. (2010). *Unauthorized immigrant population: National and state trends.* Washington, DC: Pew Hispanic Center. Retrieved from http://pewhispanic.org/reports/report.php?ReportID=133

Passel, J. S., & Taylor, P. (2010). *Unauthorized immigrants and their U.S.-born children.* Washington, DC: Pew Research Center. Retrieved from http://pewhispanic.org/reports/report.php?ReportID=125

Preston, J. (2010, August 11). Births to illegal immigrants are studied. *New York Times*, p. A19.

Preston, J. (2011a, June 4). Immigrants are focus of harsh bill in Alabama. *New York Times,* p. A10.

Preston, J. (2011b, May 28). Justice's Arizona ruling on illegal immigration may embolden states. *New York Times,* p. A14.

Ramakrishhnan, S. K., & Baldasarre, M. (2004). *The ties that bind: Changing demographics and civic engagement in California.* San Francisco: Public Policy of California.

Ruiz-de-Velasco, J., & Fix, M. (2000). *Overlooked and underserved: Immigrant students in U.S. secondary schools.* Washington, DC: The Urban Institute.

Rumbaut , R. G. (2008). Reaping what you sow: Immigration, youth, and reactive ethnicity. *Applied Developmental Science, 12*(2), 108–111.

Rumbaut, R., & Komaie, G. (2010). Immigration and adult transitions. *The Future of Children, 20*(1), 43–66.

Rumberger, R. W., & Larsen, K. A. (1998). Student mobility and the increased risk of high school dropout. *American Journal of Education, 107*(1), 1–35.

Russell, A., Coughlin, C., El Walily, M., & Al Amri, M., 2005. Youth in the United Arab Emirates: Perceptions of problems and needs for a successful transition to adulthood. *International Journal of Adolescence and Youth, 12*(3), 189–212.

Serdarevic, M., & Chronister, K. M. (2005).Research with immigrant populations: The application of an ecological framework to mental health research with immigrant populations. *International Journal of Mental Health Promotion, 7*(2), 24–34.

Setterson, R. A., Furstenburg, F. J., & Rumbaut, R. (Eds). (2005). *On the frontier of adulthood: Theory, research, and public policy.* Chicago: University of Chicago Press.

Smetana, J. G., & Metzger, A. (2005). Family and religious antecedents of civic involvement in middle class African American late adolescents. *Journal of Adolescent Research, 15*(3), 325–352.

Smith, R. C. (2006). *Mexican New York: Transnational lives of new immigrants.* Berkeley: University of California Press.

Solis, D. (2011). What part of illegal you don't understand? In M. M. Suárez-Orozco, V. Louie, and R. Suro (Eds.), *Writing immigration: Scholars and journalists in dialogue* (pp. 62-72). Berkeley: University of California Press.

Southern Poverty Law Center (2011). SPLC launches federal court challenge to Alabama's discriminatory anti-immigrant law. Retrieved from http://www.splcenter.org/get-informed/news/splc-launches-federal-court-challenge-to-alabama-s-discriminatory-anti-immigration

Stanton-Salazar, R. D., & Dornbusch, S. M. (1995). Social capital and the reproduction of inequality: Information networks among Mexican-Origin high school students. *Sociology of Education, 68*(2), 116–135.

Stepick, A. (2005). God is apparently not dead: The obvious, the emergent, and the still unknown in immigration and religion. In K. Leonard, A. Stepick, M. A. Vasquez, & J. Holdaway (Eds.), *Immigrant faiths: Transforming religious life in America* (pp. 11–38). Lanham, MD: Alta Mira Press.

Stepick, A., Stepick, C. D., & Labissiere, Y. (2008). South Florida's immigrant youth and civic engagement: Major engagement minor differences. *Applied Developmental Science, 12*(2), 57–65.

Stoll, M. A. & Wong, J. S. (2007). Immigration and civic participation in a multiracial and multiethnic context. *International Migration Review, 41*(4), 880–908.

Suárez-Orozco, C. (2001). Identities under siege: Immigration stress and social mirroring among the children of immigrants. In A. Robben & M. Suárez-Orozco (Eds.), *Cultures under siege: Social violence and trauma* (pp. 194–206). Cambridge: Cambridge University Press.

Suárez-Orozco, C. (2004). Formulating identity in a globalized world. In M. Suárez-Orozco & D. B. Qin-Hilliard (Eds.), Globalization: Culture and education in the new millennium (pp. 173–202). Berkeley: University of California Press.

Suárez-Orozco, C., Suárez-Orozco, M., & Todorova, I. (2008). *Learning a new land: Immigrant students in American Society.* Cambridge, MA: Harvard University Press.

Suárez-Orozco, C., Gaytan, F. X., Bang, H. J., Pakes, J., O'Connor, E., & Rhodes, J. (2010). Academic trajectories of newcomer youth. *Developmental Psychology, 43*(3), 602–618.

Suárez-Orozco, C., Bang, H. J., & Kim, H. Y. (2011). "I felt like my heart was staying behind": Psychological implications of immigrant family separations and reunifications. *Journal of Adolescent Research, 26*(1), 22–257.

Suárez-Orozco, M., & Suárez-Orozco, C. (2001). *Children of immigration.* Cambridge, MA: Harvard University Press.

Suárez-Orozco, M., & Suárez-Orozco, C. (2010a). Anti–anti immigration: Principles to make migration work. *Huffington Post.* Retrieved from http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/antianti-immigration-prin_b_706609.html

Suárez-Orozco, M., & Suárez-Orozco, C. (2010b). The education of Michelle Obama. *Huffington Post.* Retrieved from http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/the-education-of-michelle_b_585733.html

Taxin, A. (2011, January 17). Illegal students grapple with U.S. dating. Associated Press. Retrieved from http://www.bakersfieldnow.com/news/local/113957514.html

Teranishi, R. T. (2010). *Asians in the ivory tower: Dilemmas of racial inequality in American higher education.* New York: Teachers College Press.

Teranishi, R. T., Allen, W. R., & Solorzano, D. G. (2004). Opportunities at the crossroads: Racial inequality, school segregation, and higher education in California. *Teachers College Record, 106*(11), 2224–2245.

Teranishi, R. T., Suárez-Orozco, C., & Suárez-Orozco, M. (2011). Immigrants in community college: Toward greater knowledge and awareness. *The Future of Children, 21*(1), 153–169.

Turner, V. (2002). Betwixt and between: The liminal period in rites of passage. In L. C. Mahadi, S. Foster, & M. Little (Eds.), Betwixt and between: Patterns of masculine and feminine initiation (pp. 3–22). Chicago: Open Court Publishing.

United Nations Development Programme [UNDP]. (2009). Human development report—Overcoming barriers: Human mobility and development. New York: Author. Retrieved from http://hdr.undp.org/en/reports/global/hdr2009/

U.S. Census. (2007). Selected characteristics of the native and foreign-born populations. American Community Survey. Retrieved from http://factfinder.census.gov/servlet/STTable?_bm=y&-geo_id=01000US&-qr_name=ACS_2007_1YR_G00_S0501&-ds_name=ACS_2007_1YR_G00_&-_lang=en&-redoLog=false

U.S. Congress. (2010, July 15). In the best interest of our children: Examining our immigration enforcement policy *(*Ad-hoc hearing). U.S. House of Representatives, Washington, DC. Retrieved from http://www.apa.org/about/gr/issues/cyf/immigration-enforcement.aspx

U.S. Department of Homeland Security. (2009). *Removals involving illegal alien parents of United States Citizen Children.* Washington, DC: Author. Retrieved from http://serrano.house.gov/media/PDFs/dhs_study_parent_removals.pdf

U.S. Department of State. (2009). *Annual report on immigrant visa applicants in the family sponsored and employment based preferences registered at the national visa center as of November 1.* Annual Report on Immigrant Visas. Washington, DC: Author.

Van Gennep, A. (1960). *Rites of passage.* London: Routledge.

Wagmiller, R. L., Lennon, M. C., Kuang, L., Alberti, P. M., & Aber, L. (2006). The dynamics of disadvantage and children's life chances. *American Sociological Review, 49*(1), 37–55.

Walsh, S., Shulman, S., Feldman, B., & Maurer, O. (2005). The impact of immigration on the internal processes and developmental tasks of emerging adulthood. *Journal of Youth and Adolescence, 34*(5), 413–426.

*Harvard Educational Review*

Waters, M. C. (2008). The challenges of studying political and civic incorporation. *Applied Developmental Science, 12*(2), 105–107.

Weinstein, R. S. (2002). *Reaching higher: The power of expectations in schooling*. Cambridge, MA: Harvard University Press.

Yoshikawa, H. (2011). *Immigrants raising citizens: Undocumented parents and their young children*. New York: Russell Sage.

Yoshikawa, H., & Kalil, A. (in press). The effects of parental undocumented status on the developmental contexts of young children in immigrant families. *Child Development Perspectives*.

Yoshikawa, H., Weisner, T. S., Kalil, A., & Way, N. (2008). Mixing qualitative and quantitative methods in developmental science: Uses and methodological choices. *Developmental Psychology, 44*, 344–354.

Yoshikawa, H., Weisner, T. S., & Lowe, E. (2006). (Eds.). *Making it work: Low-wage employment, family life and child development*. New York: Russell Sage Foundation.

We would like to thank Ha Yeon Kim for patiently accommodating multiple requests for iterative changes to figure 1 as the authors strove to incorporate complex ideas into an all-encompassing theoretical model.

This article has been reprinted with permission of the *Harvard Educational Review* (ISSN 0017-8055) for personal use only. Posting on a public website or on a listserv is not allowed. Any other use, print or electronic, will require written permission from the *Review*. You may subscribe to *HER* at www.harvardeducationalreview.org. *HER* is published quarterly by the Harvard Education Publishing Group, 8 Story Street, Cambridge, MA 02138, tel. 617-495-3432. Copyright © by the President and Fellows of Harvard College. All rights reserved.