**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 6

# Exhibits 127 - 143

# DEF-INTERV.

# EX. 127

Westlaw.

46 CRLR 207                                                             Page 1
46 Creighton L. Rev. 207

c

Creighton Law Review
March, 2013

Article

**\*207** LIFTING THE FOG: NAVIGATING PENALTIES IN THE AFFORDABLE CARE ACT

Edward A. Morse [FNd1]

Copyright (c) 2013 Creighton University; Edward A. Morse

"[W]e have to pass the bill so that you can find out what is in it, away from the fog of the controversy."

-Speaker Nancy Pelosi, March 9, 2010. [FN1]

| I. | INTRODUCTION | 208 |
|---|---|---|
| II. | AN OVERVIEW OF THE AFFORDABLE CARE ACT | 212 |
| | A. Diagnosing Infirmity in the U.S. Healthcare System | 212 |
| | B. Formulating a Prescription | 217 |
| | C. Implementing the Treatment Plan | 220 |
| | 1. The Employer Mandate | 220 |

DEPOSITION
EXHIBIT
3
DEERE
PENGAD 800-631-6989

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000076

46 CRLR 207
46 Creighton L. Rev. 207

| | a. Employers Not Offering "Minimum Essential Coverage" | 220 |
| | b. Employers Offering "Minimum Essential Coverage" | 221 |
| | 2. The Individual Mandate | 225 |
| | 3. "Minimum Essential Coverage" | 231 |
| III. | LEGAL CHALLENGES TO MINIMUM COVERAGE FOR "PREVENTATIVE CARE" | 237 |
| IV. | EXCHANGES AND TAX SUBSIDIES: ANOTHER FLY IN THE OINTMENT? | 247 |
| | A. Section 36B: Did Congress Mean What It Wrote? | 248 |
| | B. Implications for Employers and Other Exchange-Based Concerns | 252 |
| V. | CONCLUDING OBSERVATIONS | 253 |

**\*208** I. INTRODUCTION

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000077

46 CRLR 207
46 Creighton L. Rev. 207

Page 3

On March 23, 2010, President Obama signed the Patient Protection and Affordable Care Act, [FN2] followed one week later by amendments and related provisions in the Health Care and Education Reconciliation Act of 2010. [FN3] Together, these laws (hereinafter jointly referred to as the "Affordable Care Act" or "the Act") introduced significant changes into the delivery of health insurance coverage. Through a complex thaumaturgy involving mandates on employers and individuals (coupled with forced exactions for the noncompliant), restrictions and mandates on insurers, federally-directed cooperation from the states, and subsidies from the federal government, the Affordable Care Act attempts laudable goals that include expanding access to health insurance coverage and the reduction of health care costs. [FN4]

Much political wrangling preceded passage of the Affordable Care Act, which was highly controversial and narrowly enacted by partisan majorities in both houses of Congress. [FN5] Following its passage, the primary locus of controversy moved to the courts and to administrative *209 agencies, where the government and others affected by the Act have sought to shape its implementation and enforcement.

In National Federation of Independent Business v. Sebelius, [FN6] the United States Supreme Court resolved the first wave of constitutional challenges to the Act by upholding the individual mandate to maintain insurance coverage and its related penalties under the federal taxing power. [FN7] However, it also struck down a provision requiring states to expand Medicaid coverage to reach 133% of the federal poverty guidelines at the pain of losing all their federal Medicaid funding, severing this provision from the rest of the Act. [FN8] The Court's affirmation of state autonomy likely presents some problems that were unintended by Congress, [FN9] but the Court's decision to uphold the rest of the Act removed a significant threat to its implementation.

On the administrative front, regulations spawned by the Act are generating new legal challenges that are currently working their way through the courts. In particular, the Obama Administration has promulgated regulations mandating coverage for contraception and sterilization services, which have generated public outcry from individuals and employers with religious and/or conscientious objections purchasing this coverage. [FN10] Litigation challenging these regulations *210 is being pursued at the district court level in many different jurisdictions, providing another source of uncertainty for insurers, employers, and others seeking to navigate through this new health care regime. [FN11] If unabated, this contraception mandate raises a significant barrier to compliance with the Act for many scrupulous Americans, resulting in financial penalties that put affordable insurance coverage further out of reach for many Americans solely because of their beliefs about contraception, abortion, and sterilization.

One of the primary mechanisms for enhancing affordability under the Act includes the advance payment of premium tax credits for lower income citizens, which are paid directly to insurers to reduce the cost of insurance coverage. These credits require a bureaucratic apparatus known as an Exchange in order to provide access to government-approved insurance coverage, as well as to determine eligibility for the tax credit subsidy. [FN12] Exchanges do not appear organically, but instead require human effort to develop and implement the necessary bureaucratic structures. In drafting key provisions of the Act, Congress apparently presupposed that states would cooperate in creating these Exchanges. States that do not cooperate as planned may add further barriers to implementing the Act's intention to expand insurance. [FN13]

Thus, although the "fog of the controversy" associated with passing the Act may have lifted, it is fair to say that visibility is still limited. Learning what is in the Act is itself a substantial undertaking; *211 the Act spans nearly one thousand pages in the official statutes and now includes hundreds of additional pages of administrative guidance. [FN14] But determining how even

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000078

46 CRLR 207
46 Creighton L. Rev. 207

a limited number of important new rules will apply in various situations, along with their behavioral effects, also presents an ongoing challenge for citizens and institutions affected by the Act, as well as the lawyers who advise them.

This Article examines the tax penalties affecting employers and individuals, which are a critical part of the scheme for regulating coverage under the Act. As discussed below, those penalties inflict potentially significant fiscal consequences for employers and individuals (including those of limited means). In some cases, the likely behavioral consequences for these penalties may undermine, rather than support, the purposes of the Act. Further, by combining these penalties with regulations requiring insurance coverage for contraception and sterilization services, the Obama Administration adds a new barrier to achieving expanded coverage. Not only does the contraception and sterilization mandate conflict with legal and social traditions of religious freedom and toleration, but it also singles out citizens with religious and/or conscience objections and effectively makes their health insurance coverage less affordable.

Part II of this Article provides an overview of significant provisions in the Act and their intended effects on employers, individuals, and insurers. These provisions include the employer mandate, the individual mandate, and requirements for minimum essential coverage. Part III briefly explores the Obama Administration's approach to implementing the so-called "preventive care" provisions of the Act involving women's health, including the conflict with religious and/or conscientious beliefs on contraception and sterilization practices and the implications for insurance coverage. Part IV addresses the implications of State decisions to create Exchanges on the effectiveness of *212 the Act, including the availability of tax credits to finance insurance coverage. Part V provides some concluding observations about using taxing powers to regulate behavior and implications for personal liberty in this context.

## II. AN OVERVIEW OF THE AFFORDABLE CARE ACT

The Affordable Care Act has many moving parts that are supposed to work together to make health care in the United States more accessible and affordable. [FN15] Although a comprehensive treatment of all these parts is beyond the limited scope of this Article, a general understanding of health care delivery issues provides a helpful backdrop to contextualize the respective role of tax penalties and credits discussed below. Accordingly, Parts II.A and II.B provide a brief overview of the U.S. healthcare system and some of the significant problems that the Affordable Care Act attempts to address. Those who are thoroughly familiar with this environment can skip directly to Part II.C, which focuses in greater detail on the employer and individual penalties and the minimum coverage provisions necessary to create an exemption from the penalty regime.

A. Diagnosing Infirmity in the U.S. Healthcare System

Most Americans depend on private sector resources for health care coverage. The federal government currently extends health insurance benefits to the aged through Medicare, to the poor through Medicaid, and to children through the Children's Health Insurance Program ("CHIP"). [FN16] However, as of 2010, approximately 55.3% of the U.S. population obtained health insurance coverage through their employers and 9.8% through other private sources. [FN17]

Approximately 16.3% of the U.S. population--about 49.9 million people--remained uninsured in 2010. [FN18] Nearly 40% of the uninsured *213 are between the ages of eighteen and thirty-four, [FN19] and more than one-fourth of persons in this age group are not insured; a higher rate than among any other age group. [FN20] Nearly two-thirds of the uninsured have incomes of less than $50,000, [FN21] but 17.7% have incomes of $50,000-$74,999 and 19% have incomes of $75,000 or more. [FN22]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000079

46 CRLR 207
46 Creighton L. Rev. 207

Federal income tax laws have become important policy tools for shaping the delivery of health benefits, and employer-provided benefits have become the chosen tool for delivery. Employees are allowed to exclude from their gross income the value of employer-provided coverage under accident and health plans, [FN23] as well as the benefits received under those plans, which are used to cover the medical costs. [FN24] This tax benefit is a "tax expenditure" because it varies from the norm of taxation otherwise applied to compensation for services rendered by the employee. [FN25] The size of this particular tax expenditure has also been growing, reflecting the increasing role of health insurance costs in American society: the latest estimates for the 2010-2014 period indicate that employer-provided health care benefits now constitutes the largest form of tax expenditure for individuals. [FN26]

Generally speaking, employer-provided coverage is a good deal for both parties: employers get to deduct the cost of health insurance premiums from their gross income in the same manner as other reasonable compensation paid to employees, [FN27] but unlike other forms of compensation, employees get to exclude these employer payments from their taxable income. [FN28] To the extent that employees share in *214 the cost of those premiums through an employer-provided cafeteria plan, they are also allowed to deduct their share of premium costs from their gross income. [FN29] In contrast, employees without employer-provided coverage must generally pay for their insurance with after-tax dollars. [FN30] Federal Insurance Contributions Act [FN31] ("FICA") taxes are also lower for an employer-provided plan, as the FICA tax provisions do not include the value of these health care fringe benefits in the employment tax base. [FN32] As a result, if an employee wants to obtain health insurance coverage, current law makes it much more tax efficient to obtain the insurance through an employer. [FN33]

The employer-provided delivery approach does not work for everyone. First, not all employers offer coverage. As of 2010, about 15% of those employed full time were uninsured, and that percentage increases for those employed only on a part-time basis. [FN34] Cost considerations, the particular preferences of their employees for salary over an additional benefit, or both are among the potential explanations for this behavior. [FN35] Second, employees may leave their jobs or be terminated, creating a potential gap in coverage. Continued coverage may *215 be available under the Consolidated Omnibus Budget Reconciliation Act [FN36] ("COBRA"), but the former employee may be required to pay up to 102% of the premium cost, which can be problematic if the person is unemployed. [FN37] Some former employees may have preexisting medical conditions that require medical treatment at the time they are seeking new insurance coverage, thus presenting difficulty in acquiring that coverage at an affordable rate under traditional underwriting standards.

Affordability is a significant issue for many citizens, particularly in times of economic hardship. Unlike other human consumption needs, such as food, clothing, and shelter, a failure to pay health insurance premiums does not necessarily produce an immediate adverse consequence, particularly if the consumer stays healthy. Federal law requires emergency care regardless of citizenship or the ability to pay for medical facilities that receive Medicare funding. [FN38] For those with resources, however, the option to pay for services when needed--essentially to self-insure--may be a valid economic choice. [FN39] Younger, healthier citizens with no significant medical conditions may be especially attracted to this option. However, some medical conditions cannot be anticipated, such as accidents and other emergency conditions. If these unanticipated medical treatments exceed their ability to pay, it is possible that health care providers who care for them may be uncompensated. [FN40]

*216 Research indicates that the uninsured pay only about 35-38% of total medical costs they incur, thereby shifting the remaining costs to others. [FN41] The ultimate incidence of that cost shifting is difficult to unravel, as charitable contributions, insured patients, and the government each may bear a portion of those costs, while providers bear the balance. [FN42] While

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000080

some characterize this shifting as a "free rider" problem that justifies government intervention, others have argued that the magnitude of truly voluntary shifting of costs is likely to be quite small, and that the biggest problem remains affordability. [FN43]

Affordability is a significant consideration for any purchase, which affects employers as well as the prospective insureds. In 2010, when the Affordable Care Act was passed, the average annual health insurance premium for an individual employee was $4,940, with $1,021 paid by the employee and $3,918 paid by the employer. [FN44] However, family coverage cost $13,871, with $3,721 paid by the employee and $10,150 by the employer. [FN45] A private study by the Kaiser Family Foundation indicated that the cost of family coverage in 2011 topped $15,000, increasing by more than 9%. [FN46] These costs only include insurance, and do not take into account the total medical costs incurred by patients, which likely includes co-payments, deductibles, and other medical items. Insurance costs of this magnitude are out of reach for many people, particularly families, who earn more than the income level that qualifies them for Medicaid coverage. [FN47]

*217 The premium figures discussed above reflect national averages. Variations exist among the states due to factors including demographic differences among the insured populations, regional variations in the cost of delivery, and varying coverage requirements under state insurance laws. [FN48] Traditional underwriting standards also take into account some other individual characteristics to address the likely costs for the insured. Generally speaking, older people will face higher medical costs than their younger (and generally healthier) counterparts. [FN49] And of course, those within each age demographic who are in poor health will face higher costs than those who are healthier. Unfortunately, such persons in poor health may also face greater challenges in maintaining their employment, thereby also adversely affecting their ability to procure insurance either through an employer or their ability to fund those payments privately.

B. Formulating a Prescription

The "diagnosis" above provides only a simplified and generalized understanding, which fails to address all of the structures within the anatomy of the health care system. Nevertheless, it permits us to identify some presuppositions underlying the Affordable Care Act, which help us to contextualize its provisions and their effect on various constituencies, including employers, individuals (whether covered by their employer or not), and insurers.

First, it is quite clear that the current system of tax incentives associated with employer-provided health insurance does not induce every employer to provide voluntary coverage. Because employers obtain equally valuable income tax deductions for providing salary or health insurance benefits in kind, the only significant federal tax difference in providing an in-kind benefit is the reduction in employment tax costs on these premiums. [FN50] This tax benefit is apparently insufficiently large to induce all employers to cover their employees based solely on their own economic interests. [FN51]

*218 Absent some penalty for choosing not to offer insurance benefits, incentives to do so will likely come primarily from their employees, who may have different preferences depending on their own personal situations. Some employees may prefer higher cash compensation in lieu of insurance coverage, thus reinforcing an employer's decision not to offer insurance benefits. [FN52] For many employees, the income tax benefits from excluding employer-provided health benefits from gross income are simply insufficient to prefer an employer-provided delivery plan. [FN53] Even though employment tax benefits from excluding those benefits may apply to a broader range of employees, the sheer complexity and uncertainty of the computations, including the amount of employer benefits, may effectively constrain employees from sufficient knowledge to seek employer coverage.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000081

[FN54] Imposing employer penalties might thus increase employer incentives to provide insurance for their employees, assuming such penalties are properly designed. Moreover, requiring employers to provide information to their employees about the value of insurance coverage may become an important step toward increasing employee awareness. [FN55]

 **\*219** Second, traditional underwriting standards affect access to affordable insurance, particularly for those with preexisting health problems. Limiting an insurer's ability to discriminate in pricing policies for those with preexisting conditions could enhance the affordability for them. However, in order to pay for that expansion in coverage, insurers would likely charge more for others in the insurance pool, thus reducing affordability for others. [FN56] Imposing a penalty on the uninsured would potentially help solve this problem by expanding the premium-paying members of the insurance pool, thereby reducing the impact of this cost-shifting effect from those with preexisting conditions. Of course, this would also expand coverage among those without employer-provided benefits.

 Third, no amount of fines or penalties can provide a comprehensive solution to the matter of affordability. Penalties may enhance incentives to purchase insurance, but they do not ensure that all people who want insurance will earn enough to purchase it, or will choose to purchase it after satisfying other necessities, such as food, clothing, and shelter. Government subsidies thus provide a necessary accompaniment to the program of penalties if meaningful inroads are to be made to enhance coverage. Expanding Medicaid (i.e., the existing vehicle used to provide for the poor) to include a greater portion of the population could help this coverage problem, although it comes at a significant cost to taxpayers. [FN57] If additional subsidies are needed to address affordability for those with incomes above the level for Medicaid eligibility, those subsidies would ideally taper off as income levels grow, so that they do not create disincentives for earning more income.

 Finally, it is apparent that dealing with these problems through government will be a big undertaking that requires an enormous bureaucracy. The states already have a stake in delivering healthcare benefits through Medicaid and Medicare and in regulating insurers offering coverage in their jurisdictions. [FN58] Their assistance can be helpful in delivering these prescriptions that are designed to improve the health of their citizens.

**\*220** C. Implementing the Treatment Plan

 The Act attempts to follow up on the diagnosis and prescriptions outlined above by implementing a treatment plan. The discussion in this Part II.C focuses on some of the most significant and impactful provisions, including the employer mandate, the individual mandate, and the requirements for minimum essential coverage.

 1. The Employer Mandate

 Section 1513 of the Act, codified at section 4980H of the Internal Revenue Code [FN59] ("Code"), provides for "shared responsibility for employers regarding health coverage" through imposing penalty taxes on employers that either fail to offer "minimum essential coverage" to their employees, or who offer such coverage that is deemed not to be "affordable" for their employees. These penalty tax payments present new complexities for employers and potentially raise the costs of those not offering insurance coverage. However, as discussed below, the penalties also may be ineffective to keep employers that provide insurance coverage to their employees from dropping that coverage because it is economically attractive to do so.

 a. Employers Not Offering "Minimum Essential Coverage"

STATES000082

Section 4980H(a) imposes an "assessable payment" on an "applicable large employer" that "fails to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan." [FN60] This "assessable payment," or penalty tax, is imposed if "at least one full-time employee . . . has been certified to the employer . . . as having enrolled . . . in a qualified health plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee." [FN61]

Several terms require unpacking. First, an "applicable large employer" is defined as one who "employed an average of at least 50 full-time employees on business days during the preceding calendar year." [FN62] Aggregation rules apply to preclude the use of separate but related entities to avoid the fifty-employee limit. [FN63] Full-time employees are defined to include those employed on an average of at least **221** thirty hours per week, but the full-time equivalent of part-time employees is also counted to determine whether the fifty-employee threshold has been met. [FN64] Those employing more than fifty full-time employees for only 120 or fewer days (i.e., due to seasonal workers) are exempt from the payment. [FN65]

Thus, many small businesses are exempt from the employer penalty because they do not reach the minimum employee threshold. Moreover, it is theoretically possible that some larger employers could also be exempt, but this would require that none of their employees be certified as eligible for premium subsidies through an Exchange. [FN66] Even if only one employee were eligible, the penalties would be imposed based on the total number of full-time equivalent employees.

The amount of this penalty--the "applicable payment amount"--is determined on a monthly basis by multiplying $166.67 per employee per month [FN67] times the total number of full-time employees in excess of thirty. [FN68] Thus, with the overall limitation in place, the maximum penalty for an employer with fifty employees is approximately $3,333 per month or $40,000 per year assuming at least one employee is certified as enrolled in a subsidized plan. [FN69] This translates to an annual penalty of approximately $800 per employee for an employer with fifty employees. [FN70] As the number of employees increases beyond fifty, the penalty per employee also increases, approaching the statutory limit of $2,000 per employee as found in the overall limitation. [FN71]

b. Employers Offering "Minimum Essential Coverage"

The Act also imposes a penalty on large employers that offer their employees an opportunity to enroll in minimum essential coverage under an employer-sponsored plan, but which has employees who qualify for premium tax credits or subsidies reducing the cost of coverage**222** as certified by an applicable Exchange. [FN72] This penalty does not apply unless the employee obtains coverage through an Exchange and receives a subsidy, whether through a premium tax credit under section 36B of the Code, [FN73] or an insurer subsidy. [FN74] Such employees will be eligible for subsidized coverage only if their cost of coverage exceeds an amount determined to be affordable--approximately 9.5% of the employee's household income, [FN75] or if the insurance benefits provided by the employer fail to deliver "minimum value" to the employee. [FN76]

This penalty is computed by multiplying $250 per month times the number of employees certified as enrolled in a subsidized plan. [FN77] Although this suggests an annual payment of $3,000 per employee, this penalty computation is subject to the overall limitation described above, which is computed as $166.67 per employee per month [FN78] times the total number of full-time employees in excess of thirty. [FN79] As a result of this penalty structure, if few employees are certified as enrolled in a subsidized plan, the penalty could be much smaller than if the employer failed to offer coverage at all. For example, an em-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 CRLR 207                                                                                                    Page 9
46 Creighton L. Rev. 207

ployer with fifty employees who failed to offer minimum essential coverage might face a penalty of $40,000 per year, [FN80] but if that employer offered coverage and only one employee sought coverage through an Exchange and was certified as eligible for a subsidy, the total penalty would be only $3,000.

Employee demographics thus can particularly affect this penalty for those employers who offer insurance. Certain kinds of employees will not trigger the penalty, including:

> (1) highly compensated employees (i.e., those earning at least 400% of the applicable federal poverty level), who are not eligible for subsidies in any event; [FN81]
> *223 (2) employees covered by a policy owned by a parent or a spouse;
> (3) employees eligible for Medicaid coverage, which are not eligible for the subsidized policies;
> (4) employees eligible for Medicare coverage; and
> (5) those who choose to be uninsured.

As noted above, the penalty for failing to offer insurance could conceivably be triggered if even one employee is certified by an Exchange as enrolled in a subsidized plan. [FN82] The consequences to those large employers who fail to offer minimum coverage is therefore disproportionately severe as compared with those who offer coverage that is deemed unaffordable because required employee contributions are relatively high in relation to employee income.

The penalty tax imposed in this case is not connected to the government's cost of funding insurance benefits for employees or the employer's required contribution for coverage. In this sense, the penalty structure makes it particularly costly if the employer chooses not to insure because of religious or conscience-based objections about the type of coverage required. Alternatively, an employer who offers eligible coverage that is deemed unaffordable for some employees will face comparatively modest penalties based on the number of affected employees.

The employer penalty--whether based on failure to offer coverage or offering unaffordable coverage--is nondeductible and thus must be paid with after-tax dollars. [FN83] This treatment is disadvantageous when compared with the cost of paying for insurance, which is a deductible amount paid with pre-tax dollars. Nevertheless, an employer who may be subject to this penalty tax may find that it is economically advantageous to terminate employee coverage altogether and pay the penalty tax. It is possible that employees who go to the Exchanges to receive subsidized coverage will find that they can pay less for coverage than the comparable total cost of the employer-provided coverage, particularly when lower-income employees are the predominate members of the employer's workforce. [FN84] Thus, after taking into account *224 government subsidies, both employer and employees may be better off even after the employer penalty is imposed. [FN85] In this sense, the penalties are flawed if the Affordable Care Act's goal was to incentivize employer-based coverage. The penalties may not be large enough to offset the financial advantage from allowing employees to seek comparable insurance benefits from Exchanges at government expense. [FN86]

The Congressional Budget Office ("CBO") has recognized that "there is clearly a tremendous amount of uncertainty about how employers and employees will respond to the set of opportunities and incentives under [the Act]." [FN87] The CBO has estimated that "a sharp decline in employment-based health insurance as a result of the [Act] is unlikely and, if it occurred, would not dramatically increase the cost of the [Act]." [FN88] However, employers are considering this option and a significant percentage may choose to drop coverage. [FN89] One survey conducted in 2011 indicates thirty percent of employers will choose to drop coverage and send their employees to an Exchange (or to other government programs, such as Medicaid) to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000084

procure coverage independently. [FN90] Such behavior could result in significant fiscal consequences for the federal treasury, notwithstanding the assurances of the CBO. Furthermore, this practice may actually contribute to insurance coverage experiences that contradict the intention to expand coverage. To the extent that employers drop their plans and send their employees to the individual insurance markets, those employees who are younger and healthier may choose simply to take the money and run--receiving a higher cash salary benefit while not purchasing insurance through the Exchanges. This would have two consequences: increasing insurance costs through adverse selection of insurance by those who are least healthy, and decreasing the total coverage results.

*225 As noted above, the outcome presents an empirical uncertainty based on the future behavior of employers and their employees. However, given the current penalty tax structure for employers, the incentives for behavior with adverse fiscal effects are present in the current regime. As discussed below, the penalty tax structure for individuals may also facilitate a behavioral outcome that is inconsistent with the stated intentions of the Act.

2. The Individual Mandate

Section 1501 of the Act, codified at section 5000A of the Code, [FN91] requires individuals to maintain "minimum essential coverage" in order to avoid a penalty tax known as a "shared responsibility payment." [FN92] The Act consistently refers to this payment as a "penalty." [FN93] It is due with the individual's annual federal income tax return, [FN94] and it is assessed and collected in the same manner as other tax penalties. [FN95] However, unlike other tax penalties, where failing to pay them can result in criminal sanctions, no criminal prosecution or penalty is imposed with respect to the failure to pay this penalty. [FN96] This kinder and gentler treatment does not make the penalty a nullity, however, to the extent that the Internal Revenue Service ("IRS") may collect it by offsetting the liability against refunds that may otherwise be due to the taxpayer from an overpayment of other taxes. [FN97] However, the Treasury Department may not file a notice of lien or levy on the property of the individual who owes this penalty, as it could with other unpaid taxes. [FN98]

The penalty determination is complex, and there are numerous limitations. First, the penalty applies only to an "applicable individual." This term excludes incarcerated individuals (other than those *226 incarcerated pending the disposition of charges) [FN99] and persons not lawfully present in the United States. [FN100]

Members of recognized religious sects conscientiously opposed to accepting the benefits of public or private insurance are also exempt from the individual mandate. [FN101] This exemption is consistent with religious conscience accommodations that have previously been made for purposes of Social Security. [FN102]

A comparatively novel exemption was also crafted for individual members of a "health care sharing ministry," [FN103] which is a tax-exempt organization that facilitates the sharing of medical expenses among persons with common religious or ethical beliefs, provided that the organization has continuously operated since December 31, 1999. [FN104] Old Order Amish originally formed one of these groups, although others have since emerged, which include those having evangelical Christian beliefs, which may also be qualified under this exemption. [FN105] Cost sharing within health-sharing organizations is not the same as insurance, as it does not contractually obligate a third party for the payment of medical expenses in exchange for a premium payment. Moreover, many health care conditions are not covered by these arrangements, such as those involving conduct that is outside the expected religious or ethical behavioral parameters set up for the organization. [FN106] Thus, it is likely these arrangements will not substantially conform to any "minimum essential coverage" requirements, including the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

preventive services requirements for women. At a minimum, this raises a serious question about the importance of government interests to secure coverage despite conscientious objections, religious objections, or both in other contexts. [FN107]

Although all other individuals [FN108] are "applicable individuals," section 5000A also provides several other exemptions for the penalty. **227** First, those who cannot afford coverage are exempt. [FN109] For this purpose, affordability is defined as a required contribution for self-only coverage that exceeds eight percent of annual household income. [FN110] A required contribution is essentially either the employee's share under an eligible employer-sponsored plan or that individual's net contribution required for the lowest cost plan available through the Exchange where the individual resides, if the individual did not have access to an employer-provided plan. [FN111] This affordability provision is curious, as one would expect affordability to be addressed through the subsidy and tax credit provisions of the Act, rather than making it a basis for exempting some citizens from the penalty regime.

As an alternative to the "affordability" exemption, an individual with household income below the level required to file a federal income tax return is also exempt. [FN112] Those amounts depend on the filing status and number of dependents for an individual, and the amount is subject to change annually. [FN113] While this makes some sense to the extent that the tax system is used to collect the penalty, it should be noted that other tax benefits, such as the Earned Income Tax Credit, are available to those with earned income that does not otherwise meet filing requirements. If subsidies and refundable credits (as discussed below) are included to make these policies affordable, imposing penalties even on those with modest incomes who do not acquire insurance (and who are not otherwise covered by Medicaid) would arguably provide greater incentives for that coverage.

Members of Indian tribes are also exempt. [FN114] Entire tribes are eligible to purchase federal insurance for their employees under the Indian Health Care Improvement Act, [FN115] and individual members **228** may also be eligible for other health benefits through the same. [FN116] However, the extent to which all tribal members are otherwise insured or eligible for medical care under this or other federal programs is not clear. Thus, another possibility arises for gaps in the effectiveness of the penalty provisions, particularly among those Native Americans having substantial incomes and who are otherwise subject to obligations under federal income tax laws. For example, the Department of Health and Human Services has advised the IRS and the Treasury Department that it does not intend to designate access to services from the Indian Health Services as providing "minimum essential coverage." [FN117] Thus, it appears that tribal members are exempt from penalties, but potentially eligible for tax credits to subsidize the acquisition of coverage through an Exchange. [FN118]

Finally, those who have "short gaps" in coverage [FN119] and those determined by the Secretary of Health and Human Services "to have suffered a hardship with respect to the capability to obtain coverage under a qualified health plan" are also exempt. [FN120] Given the restrictions on insurers, including community rating and guaranteed issue, it is unclear what a hardship exemption will entail or whether it will be significant.

As can be seen, a large swath of the population will be exempt from the individual mandate to maintain private insurance coverage. To the extent that the individual mandate is intended to raise revenue, it potentially leaves considerable revenue uncollected. Likewise, to the extent this provision is intended to channel behavior toward acquiring insurance, it leaves considerable behavior unchanneled.

The amount of the penalty links to formulas that take into account the income of the taxpayer and the cost of an insurance

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000086

premium for average minimum coverage under an Exchange. The statute provides for a basic two-tiered computation, in which the taxpayer will owe the lesser of an income-linked amount or the average premium amount for covering the applicable taxpayer and his or her family. [FN121] Thus, the premium amount ultimately provides a cap on *229 the amount of any penalty due for higher-earning taxpayers. The worst-case scenario for upper-income taxpayers who choose not to acquire health insurance would thus be a penalty to the government in the full amount of the insurance that the taxpayer did not want to buy. [FN122]

The income-linked penalty will apply to most taxpayers. This penalty is the greater of two figures: a "flat dollar amount" or a "percentage of income." [FN123] On an annual basis, the "flat dollar amount" is no more than $95 in 2014, $325 in 2015, or $695 in 2016 for each individual not covered by insurance. [FN124] For a family, the total penalty is capped at 300% of the annual "flat dollar amount." [FN125] Thus, a family of four subject to only the flat dollar penalties would pay no more than $2,085 (i.e., $695 x 3) if that family was uninsured.

The "percentage of income" amount increases from 1% in 2014, 2% in 2015, up to 2.5% after 2015 times the modified adjusted gross income of the taxpayer's household that exceeds the applicable threshold amount for filing a federal income tax return. [FN126] Single taxpayers must earn an income greater than $27,800 above the filing threshold for 2016 in order to incur a penalty greater than the flat dollar figure of $695. [FN127] A family of four otherwise facing a flat dollar penalty of the maximum $2,085 must therefore earn $83,400 (i.e., $27,800 x 3) *230 above the applicable filing threshold before it would owe more under the percentage of income penalty. [FN128]

In order to reach the highest premium-based penalty, a taxpayer would need to earn more than approximately $600,000 for a family or $200,000 for an individual. [FN129] At that level, the penalty is effectively capped at the premium-based amount, which means that the penalty effectively falls as a percentage of income as income grows beyond these levels.

As currently designed, one can see the penalty shows regressive traits when measured against income, as it punishes lower income earners much more (as a percentage of their income) than higher-earning counterparts. For example, a single taxpayer who earns above 133% of the federal poverty guideline (i.e., $14,856 in 2012) [FN130] who pays the flat $695 penalty in 2016 is paying over 13% of the penalty base income (i.e., household income minus threshold amount) for failing to acquire minimum health insurance coverage. [FN131] This is far above the 2.5% penalty for a single taxpayer earning approximately $200,000. [FN132] At this level, the penalty may also create a disincentive for additional earnings, as the lower income taxpayer will face the full $695 penalty for being uninsured. Moreover, many taxpayers who are eligible for the refundable earned income credit will effectively forfeit a portion of that credit if this penalty applies to them. Thus, it would appear that the penalty and the earned income credit will work against each other in this context. [FN133]

*231 Capping the individual penalty at the equivalent premium cost suggests that the penalty is not designed purely for revenue-raising purposes. Those with higher incomes presumably have greater capacity to pay this penalty than their lower-earning counterparts. Nevertheless, higher-income taxpayers pay a lower percentage of their income as a penalty in this regime.

Neither is the penalty designed to incentivize insurance at all income levels. High-earning taxpayers could face a penalty amount reaching the cost of insurance, which leaves no economic incentive to remain uninsured. However, healthy taxpayers with lower incomes retain a viable economic option to remain uninsured and pay the penalty, which still leaves resources

STATES000087

available for other preferred forms of consumption. For example, consider a single taxpayer earning approximately $27,000 in 2016, which would incur the minimum penalty of $695 if she failed to buy insurance. [FN134] Her expected contribution for insurance through an Exchange would likely exceed $2,200. [FN135] The penalty in this case is far below her cost for insurance even after subsidies from advance credits under section 36B of the Code are applied. [FN136] By linking the penalty to an amount that would meet or exceed the taxpayer's required payment into the health care system if she had acquired insurance, determined after all relevant credits and subsidies, the penalty could more effectively induce taxpayers to purchase insurance. But Congress did not choose that design. [FN137]

3. "Minimum Essential Coverage"

The "minimum essential coverage" necessary to satisfy the individual mandate is defined to include a variety of federal programs, including Medicare, Medicaid, and the Children's Health Insurance Program ("CHIP"). [FN138] Eligible employer-sponsored plans may also **232 meet this definition, as well as individual health plans acquired through Exchanges and such other plans as approved by the Secretary of Health and Human Services. [FN139]

In order to satisfy the requirements for minimum essential coverage, employer plans and individual policies of insurance must meet certain other requirements. The Act includes a number of provisions that are designed to affect the content of insurance coverage, and an exhaustive discussion of those is beyond the purpose of this Article. However, some significant constraints are worth mentioning. First, section 1201 of the Act amends the Public Health Service Act [FN140] to impose several significant constraints on insurers. [FN141] These include prohibiting exclusions from health coverage based on preexisting conditions, [FN142] requiring insurers to take all individuals or employers, [FN143] prohibiting discrimination based on health or claims experience, [FN144] and requiring guaranteed renewability. [FN145] Such provisions ensure that even those patients with serious health conditions can have access to insurance if, for example, they change employers or withdraw from the work force.

Insurers also face restrictions on premium adjustments. The Act constrains premium differentials to the following categories: individual vs. family coverage, certain geographical rating areas, age (but not by more than 3:1 for adults), and tobacco use (but not by more than 1.5:1). [FN146] These constraints ensure that the sickest patients do not pay substantially more for the privilege of guaranteed access, but they also accomplish other redistributive goals. For example, by restricting insurers from charging market rates for age and tobacco use, it is likely that the younger insureds will be subsidizing the older ones, and that the nonsmoking insureds will be subsidizing the smokers. [FN147] Curiously, there are no permitted categories that allow discrimination based on obesity, exercise or eating habits, or other similar health predictors. [FN148]

**233 The categories selected here (i.e., age, tobacco use, and region of the country), apparently reflect political choices. One might ask why relatively younger and generally less well-off people should be subsidizing their older counterparts, or why nonsmokers should subsidize their smoking counterparts, as is currently reflected in the Act. One might also ask why other categories are not reflected in these underwriting standards, as the current approach requires those who maintain a healthy weight and exercise regularly to subsidize the obese and sedentary. [FN149] Additionally, one might wonder why the Act requires those mothers who breastfeed their children to subsidize those who use infant formula. [FN150] But the proper locus for those questions is apparently the Congress, which according to the Court in National Federation of Independent Businesses v. Sebelius [FN151] has broad authority to exercise its taxing powers without breaching applicable limits on regulatory powers under the Commerce Clause. [FN152]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 1001 of Act also amends the Public Health Service Act to include various other insurance reforms. [FN153] These include preventing the imposition of lifetime limits on the dollar value of benefits or unreasonably annual limits on healthcare costs, [FN154] and extending dependent coverage to include unmarried adult children until age twenty-six. [FN155] Significantly, section 1001 also adds minimum coverage provisions for group or individual health insurance plans, which include:

> (1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force; [and] . . .
> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph. [FN156]

*234 Thus, Congress delegated authority to the Health Resources and Services Administration ("HRSA") to determine the coverage required for "additional preventive care and screenings" affecting women's health. That coverage could go beyond the current recommendations of the United States Preventive Services Task Force ("USPSTF"), which focuses on treatment recommendations for primary care physicians. [FN157] The HRSA is an agency of the U.S. Department of Health and Human Services that is devoted to "improving access to health care services for people who are uninsured, isolated or medically vulnerable." [FN158] HRSA, in turn, commissioned a study by the Institute of Medicine ("IOM") in order to "review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women." [FN159]

The IOM report essentially defined these preventive health services as "measures--including medications, procedures, devices, tests, education and counseling--shown to improve well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition." [FN160] Pregnancy is not commonly understood to be a disease, [FN161] but it is a condition that some women wish to avoid and others willingly embrace. [FN162] Accordingly, the USPSTF did not contain recommendations*235 for contraception or sterilization. [FN163] However, the IOM report included these items in its final recommendation: "The committee recommends for consideration as a preventive service for women: the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." [FN164] The HRSA issued guidelines embracing this recommendation on August 1, 2012. [FN165]

The Obama Administration issued interim rules on July 19, 2010, [FN166] which directed these new recommendations or guidelines for preventatives services to become effective beginning one year after the date of a recommendation's or guideline's issuance. [FN167] Thus, for most plans, the effective date one year following the HRSA guidelines would include plan years beginning on or after August 1, 2012. [FN168] This would effectively require conforming coverage to be in place before the 2014 effective date for the employer and individual penalties under the Act.

However, not all plans would be immediately affected. First, in response to public comments, the Departments of Health and Human Services, Labor, and Treasury issued interim final regulations that granted discretion to the HRSA to establish an exemption for certain religious employers with regard to contraceptive coverage. [FN169] As discussed below, this exemption was very narrowly drafted, so that many religiously affiliated nonprofit organizations were not covered. [FN170] A temporary safe harbor for enforcement was announced for such organizations until August 1, 2013. [FN171]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000089

46 CRLR 207                                                                                   Page 15
46 Creighton L. Rev. 207

**\*236** Second, so-called "grandfathered health plans," defined as those "in which an individual was enrolled on March 23, 2010," and which meet certain regulatory requirements, including no significant changes in coverage, would not be affected by such recommendations. [FN172] A "grandfathered health plan" is deemed to provide minimum essential coverage without regard to its compliance with many, but not all, of the current restrictions on the content of coverage. [FN173] The statute does not define a grandfathered health plan, but regulations define these plans to include coverage with at least one individual enrolled on March 23, 2010, and continuously thereafter, without entering into a new policy, certificate, or contract of insurance. [FN174] Significant changes in coverage, including elimination of benefits for treating certain medical conditions, increases in the percentage of cost sharing, and increases in copayments, or significant decreases in the contribution rate that increases the employee cost of coverage can all terminate grandfather status. [FN175] Whether a plan is grandfathered is a legal issue, which depends on determinations of the Secretary of Health and Human Services under the applicable regulations. [FN176]

Maintaining grandfathered health plan status is an important issue for both employers and employees, as coverage under grandfathered plans need not conform to requirements that some employers and employees find objectionable, including required coverage for so-called "preventive care" services including contraception and sterilization. [FN177] However, marketplace demands may well cause many plans to lose their grandfathered status by 2013, when these additional requirements must be implemented. [FN178] Accordingly, for many insureds, maintaining a grandfathered plan status does not provide a suitable long-term form of protection from these additional requirements.

### \*237 III. LEGAL CHALLENGES TO MINIMUM COVERAGE FOR "PREVENTATIVE CARE"

The adoption of Health Resources and Services Administration ("HRSA") guidelines on preventive care for women, and particularly its requirement that insurance coverage must include contraception and sterilization services, generated a significant response from the public. The Departments of Health and Human Services, Labor, and Treasury ("Departments") received over 200,000 responses to a request for comments on their interim final regulations addressing preventive services. [FN179] These interim regulations granted discretion to HRSA to establish exemptions from its guidelines for health plans maintained by "religious employers." [FN180] However, for this purpose, the regulations defined a "religious employer" to include only organizations meeting all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.
(2) The organization primarily employs persons who share the religious tenets of the organization.
(3) The organization serves primarily persons who share the religious tenets of the organization.
(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended. [FN181]

The fact that any exemption based on religious affiliation is included in the regulations obviously recognizes that these rules potentially impact the free exercise of religion. Nevertheless, some commentators urged the Departments to rescind the exemption in its entirety, so that all women employees would have access to contraceptive coverage recommended by the HRSA guidelines. [FN182] The regulations continued to embrace a narrow exemption, perhaps in recognition of the fact that the United States Supreme Court recently dealt the Equal Employment Opportunity Commission ("EEOC") a serious defeat in its attempt to apply employment discrimination laws to a church. [FN183] The Departments' accommodation demonstrates they **\*238** understand significant religious objections exist in opposition to the contraceptive and sterilization services provisions.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000090

46 CRLR 207
46 Creighton L. Rev. 207

Catholic moral teachings on contraception, abortion, and sterilization are quite clear. Pope John Paul II's book, Man and Woman He Created Them: A Theology of the Body, summarized the teachings of the Catholic Church as follows:

> In the first place, the following are morally illicit: "the direct interruption of the generative process already begun" ("abortion," HV 14), "direct sterilization," and "every action which, either in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible" (HV 14), and thus all contraceptive means. [FN184]

The prospect of a government-imposed requirement to purchase coverage for contraception and sterilization in violation of these teachings was thus an important concern for Catholic leaders. On August 10, 2011, the United States Conference of Catholic Bishops ("USCCB") issued a memorandum explaining its concerns about mandated coverage for contraception and sterilization. The memo stated in part: "This poses an unprecedented threat to the religious freedom of Catholic individuals and institutions." [FN185] The memo also outlined a history of objections from the USCCB over the absence of conscience protections in the Affordable Care Act, as well as in the related regulations, and the USCCB's efforts to obtain relief from those requirements. [FN186]

Other religious leaders who shared a commitment to these aspects of Catholic teachings on contraception and sterilization also recognized the potential threat to religious freedom and human conscience protections that would result if this mandate were sustained. Testimony before the House Oversight Committee in February 2012 included representatives from Protestant and Jewish *239 traditions who expressed concerns about the free exercise of religion and the protection of conscience rights from government-imposed coercion. [FN187]

Among other things, these religious leaders expressed concerns about making abortifacient drugs a part of mandated healthcare. [FN188] Moreover, they also objected to the narrow definition of religious activity embraced in the exemption for religious organization. In particular, the exemption requires that the "organization serves primarily persons who share the religious tenets of the organization," which excludes many nonprofit organizations engaged in works of education, mercy, or charity that extend to persons in need regardless of their religious beliefs. [FN189]

*240 The Obama Administration essentially rejected these religious freedom and conscience concerns by adopting final regulations without change on February 15, 2012. [FN190] Comments issued with the regulations noted that "[a] broader exemption, as urged by some commenters, would lead to more employees having to pay out of pocket for contraceptive services, thus making it less likely that they would use contraceptives, which would undermine the benefits [of contraceptive coverage]." [FN191] Justifying the policy based on out-of-pocket costs that would be incurred for contraceptive and sterilization services is curious indeed.

Like any other healthcare expenditure, the significance of an out-of-pocket cost will vary to each individual depending on his or her income and healthcare preferences. If the magnitude of out-of-pocket cost is the real concern, then it is unclear why insurance must finance this particular benefit for all those who are insured. The Act allows insureds to choose to bear significant costs for other healthcare services, including those that may save the insured's life (including treatment for sickness or other injury). The varying levels of coverage approved by the government--i.e., bronze, silver, gold, and platinum-- are based on increasing levels of the total actuarial value of the expected benefits to the insured through the plan. [FN192] Allowing this *241 choice presumably allows individuals to match the amount of insurance coverage they purchase with their expected needs, based on all of their needs and wants.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 CRLR 207                                                                              Page 17
46 Creighton L. Rev. 207

If an insured chooses a bronze level of coverage, then he or she must bear up to forty percent of the expected actuarial value of health care costs incurred, which could require significant expenditures. Allowing individuals to avoid tax penalties through insurance that permits significant other out-of-pocket liabilities undermines any justification for requiring first-dollar coverage associated with these particular contraception and sterilization services in order to avoid tax penalties. Allowing choice, on the other hand, respects not only individual autonomy, as many citizens would otherwise reject such coverage for prudential reasons, [FN193] as well as the freedom for all to follow their religious or conscientious beliefs. [FN194]

As for religious freedom and conscience implications, comments issued with the regulations boldly stated:

> This approach is consistent with the First Amendment and Religious Freedom Restoration Act. The Supreme Court has held that the First Amendment right to free exercise of religion is not violated by a law that is not specifically targeted at religiously motivated conduct and that applies equally to conduct without regard to whether it is religiously motivated--a so-called neutral law of general applicability. The contraceptive coverage requirement is generally applicable and designed to serve the compelling public health and gender equity goals described above, and is in no way specially*242 targeted at religion or religious practices. Likewise, this approach complies with the Religious Freedom Restoration Act, which generally requires a federal law to not substantially burden religious exercise, or, if it does substantially burden religious exercise, to be the least restrictive means to further a compelling government interest. [FN195]

However, in recognition of the serious moral dilemma for nonprofit organizations with religious objections to providing contraceptive services, comments to these regulations announced a "one-year safe harbor from enforcement" for these organizations. [FN196] During that period, the Departments would "work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage." [FN197] The principal option announced was to initiate rulemaking to require insurers to cover these costs without charge to the employers, thus avoiding an employer obligation to pay directly for these services. [FN198]

Comments to the regulations also note that "[a]ctuaries, economists and experts have found that coverage of contraceptives is at least cost neutral when taking into account all costs and benefits in the health plan." [FN199] This assertion may suggest it will be feasible to require insurers to cover these items when cost savings enhance their economic interests in doing so; however, this approach to cost savings *243 is both factually dubious and ultimately irrelevant to the moral problem that coverage presents.

If cost savings to insurers could truly be achieved by providing contraceptive and sterilization coverage, then it is reasonable to ask why the federal government must engage in controversial rulemaking to require insurers to offer this coverage. If it would be in the insurers' self-interest to offer it freely, then query why they are not already doing so. [FN200] Moreover, even if cost savings for insurers were achievable, the moral problems created by shifting the locus of the direct payment to another are not necessarily resolved. Catholic bishops promptly stated their objection to this proposed form of compromise, [FN201] and other Catholic commentators noted the inadequacy of such an approach to resolve the serious moral issues presented by the mandate. [FN202]

The temporary enforcement safe harbor defers enforcement of the Health and Human Services mandate until August 2013, but only for nonprofit organizations with religious objections to coverage. [FN203] It *244 does not protect for-profit em-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000092

46 CRLR 207
46 Creighton L. Rev. 207

ployers that may also have significant religious objections to providing coverage for contraception and sterilization. The consequences to both kinds of employers are significant and potentially harmful.

First, if the employer has at least fifty employees, the employer penalties outlined above are likely applicable. For a nonprofit organization the size of Creighton University, which has about 3,000 full time employees, [FN204] the employer penalty associated with dropping health insurance coverage would approach $6 million. [FN205] Such an amount is likely to have a serious impact on the tax-exempt mission of the organization. [FN206] Using financial information from 2010, the most recent year for which audited financial statements are publicly available, the net difference between operating revenues and expenses at Creighton University was $6.026 million. [FN207] A $6 million penalty would thus essentially wipe out the annual operating margin for the university, potentially placing programs in jeopardy. Stated differently, it would essentially redirect $6 million of the $10.8 million in unrestricted charitable contributions received by the university to the federal treasury, instead of the charitable and educational purposes anticipated by the donors. [FN208]

Second, other market effects would likely accompany a decision to discontinue offering employee insurance benefits. In order to remain competitive, the employer would face market pressure to raise its compensation levels on account of the reduced insurance benefit. [FN209] Although*245 an employer without religious or conscience constraints may achieve advantages by dropping coverage and sending employees to Exchanges to acquire private insurance, [FN210] employers with religious objections face special challenges to the extent their employees share common beliefs and commitments with their employers concerning the purchase of contraceptive and sterilization coverage.

The prospect of purchasing insurance through an Exchange with the benefit of subsidies may not be a palatable moral alternative for those employees, thus resulting in some of those employees incurring individual penalties. [FN211] Further, without Exchange participation, those employees are not eligible for tax credits to subsidize the purchase of equivalent coverage dropped by the employer. [FN212] To restore their wellbeing, those employees must be able to privately purchase some form of morally-acceptable insurance coverage without contraception and sterilization components but also must finance the penalty tax for the failure to purchase the government-approved product. If Exchanges restrict their output to the government-approved policies, these individuals will face the additional challenge of finding that coverage through other means, without the benefit of the Exchange that is available to other individuals. [FN213]

Consequences such as these have triggered approximately two-dozen lawsuits challenging the validity of the mandate on various grounds, including statutory claims under the Religious Freedom Restoration Act [FN214] as well as constitutional claims under the First *246 Amendment. [FN215] Plaintiffs have included not only nonprofit organizations, but also corporate employers owned by Catholics that objected to the requirement to purchase insurance coverage that included contraception and sterilization services. [FN216] At the time this Article was written, only four of those cases had produced rulings. In Nebraska v. Department of Health & Human Services, [FN217] the district court dismissed claims brought by the State and various nonprofit organizations on standing and ripeness grounds, never reaching the substance of the religious freedom claims raised therein. [FN218] Likewise, in Belmont Abbey College v. Sebelius [FN219] and in Wheaton College v. Sebelius, [FN220] claims by a Catholic and Protestant college, respectively, were also dismissed without prejudice based on ripeness and standing grounds. However, in Newland v. Sebelius, [FN221] the district court granted a preliminary injunction against enforcement in favor of a for-profit employer, which was an S corporation owned by individuals who adhered to Catholic teachings. This ruling required a determination that plaintiffs demonstrated a likelihood of success on the merits of their claims, as well as a threat of irreparable harm that outweighed harms to the government, and that an injunction would not adversely affect the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

public interest. [FN222] However, that ruling was binding only for the benefit of those plaintiffs, and it was temporary. A full trial will be needed to definitively adjudicate those claims, leaving an uncertain future in place for other similarly situated employers.

The Health and Human Services mandate has clearly added compliance burdens. Although it is beyond the scope of this Article to analyze the statutory, constitutional, moral, and ethical arguments presented in this recent spate of cases, these lawsuits create new legal uncertainty about the Act's effectiveness in incentivizing insurance coverage. Instead of focusing on the wellbeing of all insureds, the mandate arguably adopts a position that prefers the particular interests of a subset of the public--women who want contraceptive and sterilization coverage--over the interests of others--men and women *247 who have religious and conscientious objections to all or part of such coverage. Catholic institutions and Catholic faithful who adhere to these teachings are particularly disadvantaged by these policies, given the clarity of Catholic teaching on these issues and the extent to which the mandate squarely contradicts them.

The Obama Administration's policy decision necessarily impedes the broader policy goal of increasing access to insurance coverage for all. Further, by effectively elevating cost-saving justifications for preventing human life to a predominant policy goal, the Administration enters into dangerous moral and political territory. This approach ignores other human, economic, and social goods that come from bringing new persons into the world. [FN223] If cost savings can provide a basis for preventing or killing unborn life, then future implications for other lives must be considered, too. Some states permit physicians to assist their patients in committing suicide, which is highly controversial. [FN224] If those practices deliver cost savings (and who could doubt that a narcotic overdose might be cheaper than following a chemotherapy regimen), then should insurers be required to cover it where it is legal? And should all insureds be required to pay for that which is morally odious to them or face the pain of new taxes? These lawsuits will help clarify and confirm the scope of our legal traditions respecting moral autonomy and the freedom from government coercion.

## IV. EXCHANGES AND TAX SUBSIDIES: ANOTHER FLY IN THE OINTMENT?

Government subsidies are an important component of the Affordable Care Act's scheme for delivering health insurance coverage to those with limited incomes. As health insurance costs rise in relation *248 to personal income, affordability presents a serious problem. The Act thus embraces a refundable tax credit to assist lower-income households in acquiring insurance coverage at an affordable rate. Unlike other refundable tax credits, which are paid directly to the taxpayer, the credit provisions embraced by the Act generally allow for the credit to be paid directly to the taxpayer's insurer, providing an immediate benefit in making insurance coverage more affordable. [FN225] The taxpayer is thus responsible for paying only the difference between the premium cost and the credit amount in order to receive health care coverage. [FN226] Unfortunately for these citizens, the Act as written raises serious questions about the availability of credits. [FN227] In particular, if states do not cooperate in designing and implementing insurance Exchanges, will citizens living in those states be eligible for tax credits?

A. Section 36B: Did Congress Mean What It Wrote?

Section 36B of the Internal Revenue Code ("Code") offers a "premium assistance credit" to eligible taxpayers who purchase health insurance through an Exchange. [FN228] The amount of the credit is generally based on the relationship of health insurance premium costs and household income, but the computation requires detailed information for each taxpayer including household income, [FN229] the applicable federal poverty line based on the size of the household, [FN230] and an applicable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000094

46 CRLR 207
46 Creighton L. Rev. 207

premium percentage which requires the individual to interpolate an amount based on a table provided in the statute. [FN231] Treasury *249 regulations have recently been issued to clarify some of these computational issues. [FN232] Eligible taxpayers include those with household incomes that equal or exceed 100%, but which do not exceed 400%, of the applicable poverty line for a family of that size. [FN233]

The statute provides that the applicable premium assistance will be the lesser of the following amounts:

(A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under [[section] 1311 of the Patient Protection and Affordable Care Act, or
(B) the excess (if any) of--
(i) the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over

(ii) an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year. [FN234]

The figure in paragraph (A) thus limits the maximum premium assistance in any event to the amount actually paid by the taxpayer for healthcare coverage. However, the emphasized language also requires that that coverage be acquired "through an Exchange established by the State"--which presupposes that such an Exchange is in existence and functioning by 2014, when this provision becomes operable.

The alternative in paragraph (B) requires two figures to be computed. First, one must determine the monthly premium cost for the "applicable second lowest cost silver plan with respect to the taxpayer." [FN235] Recall that the Act allows insurers to vary their premium rates according to the particular market in which the taxpayer acquires*250 the insurance. [FN236] Accordingly, the "applicable second lowest cost silver plan" is specifically defined to take into account "the individual market in the rating area in which the taxpayer resides which . . . is offered through the same Exchange through which the qualified health plans taken into account under paragraph (2)(A) were offered." [FN237] Significantly, the Code once again specifically refers to the "Exchange established by the State" as the relevant source for this premium information.

Second, paragraph (B) requires the taxpayer to determine "an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income." The "applicable percentage" is based on a sliding scale ranging from 2% for those with household income up to 133% of the federal poverty line to 9.5% for those up to 400% of the federal poverty line. [FN238] Because the amount computed here will grow according to household income, the amount of the allowable credit will presumably phase out.

Thus, in many cases when a taxpayer acquires insurance through a State Exchange, the alternative figure in paragraph (B) will be the amount of the assistance credit, as it will be the lowest amount. Consider the following example, in which taxpayer A has two dependents. She earns $4,500 per month, which is assumed to be 275% of the federal poverty line for her family size during the taxable year. [FN239] Her "applicable percentage" at that income level is 8.78%. [FN240] Assume the monthly premium for coverage she selects is $1,200 and the monthly premium for the second-lowest cost silver plan is $1,100. The

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

monthly figure in paragraph (A) is $1,200 (her actual insurance cost). The amount in paragraph (B) is the difference between the monthly cost of the silver plan in her area ($1,100 per month) and the product of her applicable percentage times her monthly income (8.78% x $4,500 per month = $395.10 per month), or in this case $704.90. Because $704.90 is less than the premium she actually pays, she would hypothetically receive a credit of only $704.90 in this example. As a result, she would be expected to pay approximately $395.10 each month toward her family's insurance costs.

However, the example above assumes that the taxpayer lives in a state that operates an Exchange. If the state does not establish an **251** Exchange, then it would arguably be impossible to purchase through such an Exchange and the premium amounts necessary for these computations will not exist. There will be no such premium actually paid in paragraph A because the taxpayer did not purchase the insurance through an "Exchange established by the State"--thus making the amount zero if the statute is followed. [FN241]

Final regulations published on May 23, 2012 [FN242] reject this statutory constraint based on state sponsorship. Although comments accompanying the regulations acknowledge disagreement on whether section 36B(b)(2)(A) of the Code required a State Exchange, the regulations take the position that no such constraint applies:

> The statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a State Exchange, regional Exchange, subsidiary Exchange, and the Federally-facilitated Exchange. Moreover, the relevant legislative history does not demonstrate that Congress intended to limit the premium tax credit to State Exchanges. Accordingly, the final regulations maintain the rule in the proposed regulations because it is consistent with the language, purpose, and structure of section 36B and the Affordable Care Act as a whole. [FN243]

Adler and Cannon have raised substantial challenges to these assertions about both statutory language and legislative history. [FN244] As noted above, the Code's restriction to State Exchanges appears not just once, but twice in section 36B(b). Congress may well have assumed that the states would dutifully follow its direction, but the combination of the United States Supreme Court's affirmation of state autonomy in National Federation of Independent Business v. Sebelius, [FN245] and the political resistance to implementing the Act in some states has produced a different result. [FN246] According to data accumulated by the Kaiser Family Foundation, only eighteen states have declared support for forming a State Exchange; five states plan for a **252** Partnership Exchange; while twenty states will default to the Federal Exchange, thus refusing to create a state-run version. [FN247] Eight states remain undecided. [FN248] Controversial implications of the Health and Human Services mandate for states that refused to implement exchanges have pointed to cost considerations [FN249] and the disordered state of the federal administration concerning the implementation of the Affordable Care Act. [FN250]

B. Implications for Employers and Other Exchange-Based Concerns

The uncertainty about the credits under section 36B of the Code presents several challenges for employers and individuals seeking to navigate the provisions of the Act. Exchanges are critical not only for the credits, under section 36B, but also for other aspects of the Act. For example, the employer penalty tax requires that "at least one full-time employee . . . has been certified to the employer . . . as having enrolled . . . in a qualified health plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee." [FN251] If a premium tax credit is not available because of the absence of a State Exchange, then an employer may have a defense to the imposition of an employer penalty under this provision. [FN252]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000096

46 CRLR 207
46 Creighton L. Rev. 207

Employers considering whether to drop coverage may thus be quite interested in how this dispute is resolved, particularly if they have employees who live in a state where an Exchange has not been *253 created. [FN253] Multistate operations may present some unusual problems, in that dropping coverage may permit some employees to pursue subsidized coverage while those in others states may not be able to do so. Thus, State decisions about Exchange formation may present yet another factor to access in locating business operations among competing jurisdictions.

## V. CONCLUDING OBSERVATIONS

Speaker Pelosi's comment--"we have to pass the bill so that you can find out what is in it" [FN254] has turned out to be remarkably prescient. Both supporters and opponents of the Affordable Care Act have discovered surprises that were not clearly understood during the congressional debates in early 2010. Tax laws are essential to the framework of incentives contemplated by the Affordable Care Act, and they are currently at the core of disputes that are rooted in disparate impacts on those with a religious world view.

Congress could presumably have chosen a scheme that would impose new taxes to fund welfare benefits for all citizens that would include contraception and sterilization services. Such a scheme would still raise moral concerns from citizens, but the locus for airing and resolving them would be found within the politically accountable branches of government. Even though the government engages in behavior that we find morally objectionable, it does not legally excuse our obligation to pay taxes to fund those activities, no matter how much those activities may offend our religious beliefs. [FN255]

But in this context, Congress did not explicitly embrace either taxation or an obvious government takeover of the healthcare industry, both of which were politically untenable. Instead, it chose another system that was more subtle, in which taxing private behavior became a policy tool to incentivize favored choices and disfavor others. Although the United States Supreme Court agreed that such an approach *254 may generally be consistent with constitutional limits on the federal taxing power, the Court was not presented with the religious and moral implications of differential tax impacts based on religious convictions, which flow from mandating contraception and sterilization coverage.

A government decision to tax on a differential basis confiscates property from some citizens for the benefit of others, just as a differential exemption can provide a bonus to some citizens. [FN256] Economic coercion through taxation can have significant effects on liberty, which when shared by all citizens is subject to powerful political constraints. But as the taxing power moves from objects that are general and broadly shared in society into particular segments of society, exercising this power raises concerns that are not so easily resolved in the politically accountable branches on account of minority status. In effect, the power to tax can be transformed into the dreaded power to confiscate, without the associated right to just compensation. [FN257] The Affordable Care Act presents this kind of threat, and particularly so to the extent it requires citizens to embrace particular services instead of leaving those decisions to the marketplace and maintaining the freedom to choose--or not to choose--coverages that many citizens believe to be objectionable.

## *255 APPENDIX: ILLUSTRATION OF ECONOMIC CONSEQUENCES OF DROPPING EMPLOYEE COVERAGE UNDER THE AFFORDABLE CARE ACT PENALTY REGIME

The computations below illustrate effects on employers, employees, and the federal treasury on a per employee basis in the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

event the employer drops insurance coverage and substitutes additional cash compensation. The examples include an employer with fifty full-time employees subject to a penalty that averages $800 per employee as well as an employer with a large employer base, where the penalty approaches the statutory limit of $2,000 per employee. [FN258] Two scenarios are modeled: one has all employees as singles with no dependents earning 300% of the federal poverty guidelines for 2012; the other has all employees consisting of families with two dependent children above age seventeen, and those employees also earn 300% of the 2012 federal poverty level. The premium cost will be for a silver-level plan equivalent coverage, and it is assumed the exchange policy cost will be equivalent. The total premiums and employer/employee shares for premiums are as follows: Single ($5,000: $4,000 employer, $1,000 employee); Family ($15,000: $10,000 employer, $5,000 employee). Taxes are computed using simplified assumptions, which include: (1) taxpayer takes a standard deduction plus personal exemptions based on 2012 figures (i.e., standard deduction is $5,950 single, $11,900 married filing jointly; personal exemption are $3,800 per person); (2) the insurance premium, whether paid to the Exchange or to the employer, is deductible in computing the applicable tax base; (3) all taxable income of employees is taxed at a 15% marginal rate; and (4) there are no effects on special deductions or credits (e.g., child credits, earned income credits, etc.) based on changing income levels within the model.

The incremental salary paid by an employer who drops coverage is assumed to be the maximum level at which the employer could pay additional cash compensation without that employer being worse off, when taking into account not only the additional Federal Insurance Contributions Act [FN259] ("FICA") taxes and employer penalties but also the lost tax benefits from the nondeductible employer penalty. These tax benefits are computed based on a 25% marginal tax rate applied to the deductible expenses (including salary and FICA taxes) but not the employer penalty. As you will note, the "net cost" to the employer for the employee's salary and health benefits is the same with our without the insurance coverage in this model.

**\*256** As can be seen below, the single employee in a smaller firm is slightly better off (in terms of the cash available after all relevant taxes and costs) if he or she chooses Exchange coverage. However, this employee is not better off losing employer coverage if he or she happens to be employed by a larger firm that bears the full brunt of the employer-level tax. However, the employee with family coverage (and thus a higher total premium cost) is better off with Exchange coverage as compared with employer-provided coverage regardless of whether he or she is employed in a large firm. Some of that difference could be retained by the employer, rather than sharing it with the employee.

Finally, the employees in all categories will have more cash available if they drop coverage, assuming they are healthy, despite having to pay significantly more in taxes and penalties. The Treasury's tax collections appear to be greatest when employers and employees choose to pay penalty taxes rather than purchase insurance, given the penalty-reduction and income tax-saving features of health insurance coverage. However, Exchange-based insurance can generate less than employer-provided coverage in terms of tax receipts (net of subsidies paid through section 36B credits) in some cases (i.e., small employer, single coverage; large and small employers, family coverage), though not in all cases (large employer, single coverage). The demographic makeup of employees as well as the size of the employer could potentially impact whether a decision to drop coverage will be beneficial to the employer and/or employees. These examples do not take into account any administrative cost savings in dropping employee coverage, which could also benefit the employer.

!C$C2-3!C$Emplo          !C$C4-5!C$Emplo
yee (Single):            yee (Family of 4):

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000098

46 CRLR 207  
46 Creighton L. Rev. 207

| Employer: With Insurance | 50 Employees | Very Large Employer | 50 Employees | Very Large Employer |
|---|---|---|---|---|
| Salary | $33,510 | $33,510 | $69,150 | $69,150 |
| Insurance | $4,000 | $4,000 | $10,000 | $10,000 |
| FICA Tax | $2,564 | $2,564 | $5,290 | $5,290 |
| Total Costs | $40,074 | $40,074 | $84,440 | $84,440 |
| Less: Tax Benefit (at 25%) | $10,018 | $10,018 | $21,110 | $21,110 |
| Net Cost | $30,055 | $30,055 | $63,330 | $63,330 |
| Employer: Drop Insurance, Raise Salary | | | | |
| Salary | $33,510 | $33,510 | $69,150 | $69,150 |
| Incremental Salary | $2,725 | $1,239 | $8,298 | $6,812 |
| Total Salary | $36,235 | $34,749 | $77,448 | $75,962 |
| Insurance | $0 | $0 | $0 | $0 |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000099

46 CRLR 207
46 Creighton L. Rev. 207

Page 25

| | | | | |
|---|---|---|---|---|
| FICA Tax | $2,772 | $2,658 | $5,925 | $5,811 |
| Penalty Tax | $800 | $2,000 | $800 | $2,000 |
| Total Costs | $39,807 | $39,407 | $84,173 | $83,773 |
| Less: Tax Benefit (at 25%) | $9,752 | $9,352 | $20,843 | $20,443 |
| Net Cost | $30,055 | $30,055 | $63,330 | $63,330 |
| Employee: With Employer Insurance | | | | |
| Salary | $33,510 | $33,510 | $69,150 | $69,150 |
| Income Tax* | $3,414 | $3,414 | $5,558 | $5,558 |
| FICA Tax | $2,564 | $2,564 | $5,290 | $5,290 |
| Insurance premium | $1,000 | $1,000 | $5,000 | $5,000 |
| Net Cash | $26,532 | $26,532 | $53,303 | $53,303 |
| Employee: With Exchange Insurance | | | | |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000100

46 CRLR 207
46 Creighton L. Rev. 207

| | | | | |
|---|---|---|---|---|
| Salary | $33,510 | $33,510 | $69,150 | $69,150 |
| Incremental Salary | $2,725 | $1,239 | $8,298 | $6,812 |
| Total Salary | $36,235 | $34,749 | $77,448 | $75,962 |
| Income Tax* | $3,456 | $3,825 | $6,449 | $6,226 |
| FICA Tax | $2,772 | $2,658 | $5,925 | $5,811 |
| Insurance premium | $3,442 | $3,301 | $7,358 | $7,358 |
| Net Cash | $26,564 | $24,965 | $57,717 | $56,568 |

Employee: Without Insurance

| | | | | |
|---|---|---|---|---|
| Salary | $33,510 | $33,510 | $69,150 | $69,150 |
| Incremental Salary | $2,725 | $1,239 | $8,298 | $6,812 |
| Total Salary | $36,235 | $34,749 | $77,448 | $75,962 |
| Income Tax* | $3,973 | $3,750 | $7,552 | $7,329 |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000101

46 CRLR 207
46 Creighton L. Rev. 207

| | | | | |
|---|---|---|---|---|
| FICA Tax | $2,772 | $2,658 | $5,925 | $5,811 |
| Insurance premium | $0 | $0 | $0 | $0 |
| Penalty Tax | $695 | $695 | $695 | $695 |
| Net Cash | $28,795 | $27,646 | $63,276 | $62,127 |
| Treasury Revenue from Employer & Employee: | | | | |
| Employer-Provided Insurance | $8,541 | $8,541 | $16,137 | $16,137 |
| Exchange Insurance | $7,443 | $9,141 | $10,656 | $10,064 |
| No Insurance | $11,012 | $11,761 | $20,897 | $21,646 |

[FNd1]. Professor of Law, McGrath North Mullin & Kratz Endowed Chair in Business Law, Creighton University School of Law.

[FN1]. House Speaker Nancy Pelosi (D.-Cal.), Address at the 2010 Legislative Conference for the National Association of Counties (Mar. 9, 2010), available at http://pelosi.house.gov/news/press-releases/2010/03/releases-March10-conf.shtml.

[FN2]. Pub. L. No. 111-148, 124 Stat. 119 (2010).

[FN3]. Pub. L. No. 111-152, 124 Stat. 1029 (2010).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000102

[FN4]. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. __, __, 132 S. Ct. 2566, 2580 (2012) ("The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care.").

[FN5]. The Patient Protection and Affordable Care Act passed the Senate by a vote of 60-39 on Christmas Eve, December 24, 2009. Only Democrat senators voted in the affirmative. Legislation and Records: U.S. Senate Roll Call Votes 111th Congress--1st Session, U.S. Senate, http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=111&session=1&vote=00396 (last visited Sept. 6, 2012). On March 21, 2010, the House voted 219-212 to approve the bill, with the entire affirmative vote once again coming solely from Democrats. Final Vote Results for Roll Call 165, Off. Clerk U.S. House Representatives, http://clerk.house.gov/evs/2010/roll165.xml (last visited Sept. 6, 2012). Abortion politics was an important part of the House victory, as assurances to pro-life Democrats, including Rep. Bart Stupack, ultimately delivered the majority needed to pass the bill, which became Pub. L. No. 111-148. See Clea Benson, A New Kind of Abortion Politics, 68 CQ Weekly 740, 740-46 (2010). The Health Care and Education Reconciliation Act of 2010 passed the House on March 21, 2010, by a vote of 220-211, also with all affirmative votes coming solely from Democrats. Final Vote Results for Roll Call 167, Off. Clerk U.S. House Representatives, http://clerk.house.gov/evs/2010/roll167.xml (last visited Sept. 6, 2012). The Senate voted 56-43 to approve this bill, with amendments, on March 25, 2010, using the reconciliation process. See Legislation and Records: U.S. Senate Roll Call Votes 111th Congress--2nd Session, U.S. Senate, http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=111&session=2&vote=00105 (last visited Oct. 18, 2012). The special election of Scott Brown (R.-Mass.) to fill the seat of Senator Ted Kennedy (D.-Mass.), who died in office, changed the makeup of the Senate so that there were no longer 60 Democratic votes in favor of the bill necessary to overcome a filibuster under ordinary Senate rules. See Alex Wayne & Edward Epstein, Obama Seals Legislative Legacy with Health Insurance Overhaul, 68 CQ Weekly 748, 753 (2010). Finally, the House voted on March 25, 2010, by a vote of 220-207, with only Democrats in favor of the bill. See Final Vote Results for Roll Call 194, Off. Clerk U.S. House Representatives, http:// clerk.house.gov/evs/2010/roll194.xml (last visited Oct. 18, 2012). This bill became Pub. L. No. 111-152.

[FN6]. 567 U.S. __, 132 S. Ct. 2566 (2012).

[FN7]. See Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2600.

[FN8]. See id. at 2606-08.

[FN9]. See id. at 2608 ("It is fair to say that Congress assumed that every State would participate in the Medicaid expansion, given that States had no real choice but to do so."). The states argued that Congress' failure to enact any alternative approach to coverage for low-income individuals should cause the entire Act to fail. Id. However, the Court rejected this argument, ruling that Congress would not want the rest of the Act to fail even though states maintain the power to choose to participate. Id. Medicaid programs in most states currently restrict coverage, particularly for adults, to less than the federal poverty rate, and 17 states limit eligibility to less than half the poverty rate. See Henry J. Kaiser Family Found., Where are the States Today? Medicaid and CHIP Eligibility Levels for Children and Non-Disabled Adults (2012), available at http://www.kff.org/medicaid/upload/7993-02.pdf. Several states have signaled that they will not participate in the expansion due to state fiscal concerns. This nonparticipation also creates fiscal concerns for the federal government, to the extent that more individuals may be required to seek subsidized coverage under the Act. See generally Tevi Troy, The ObamaCare Debacle Deepens, Commentary, Sept. 2012, at 30, 32-33.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000103

[FN10]. Section 1001 of the Affordable Care Act amends the Public Health Service Act by adding section 2713, codified at 42 U.S.C. § 300gg-13, which provides in part that:

A group health plan or health insurance issuer ... shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for ... (4) with respect to women, such additional preventive care and screenings ... provided for in comprehensive guidelines supported by the Health Resources and Services Administration.

See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1001, 124 Stat. 119, 131 (2010). The Health Resources and Services Administration ("HRSA") issued guidelines on August 1, 2011, which included "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." See Health Res. & Servs. Admin., Women's Preventive Services: Required Health Plan Coverage Guidelines, U.S. Dep't Health & Hum. Services, http:// www.hrsa.gov/womensguidelines/ (last visited Aug. 1, 2012). Those guidelines became generally effective on August 1, 2012, with a narrow religious organization exemption and a temporary enforcement safe harbor for other nonprofit organizations with objections to this coverage. See generally Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725 (Feb. 15, 2012) (to be codified at 45 C.F.R. pt. 147).

[FN11].      See      HHS      Mandate      Information      Central,      Becket      Fund      for      Religious      Liberty, http://www.becketfund.org/hhsinformationcentral/ (last visited Sept. 4, 2012) (compiling 26 cases filed by 86 plaintiffs).

[FN12]. See, e.g., Health Insurance Premium Tax Credit, 76 Fed. Reg. 50,931 (proposed Aug. 17, 2011) (to be codified at 26 C.F.R. pt. 1). Comments to these proposed regulations explain in part:

Beginning in 2014 ... individuals and small businesses will be able to purchase private health insurance through State-based competitive marketplaces called Affordable Insurance Exchanges (Exchanges). Exchanges will offer Americans competition and choice. Insurance companies will compete for business on a level playing field, driving down costs. Consumers will have a choice of health plans to fit their needs and Exchanges will give individuals and small businesses the same purchasing power as big businesses.

Id. at 50,932. Exchanges also make advance determinations as to the eligibility of individuals for coverage, including the amount of advance payment available to assist the individual in covering premium costs. See id.

[FN13]. See infra Part IV.

[FN14]. During oral argument, Solicitor General Edwin Kneedler argued that the Justices would need to look at the structure and text of the law in making their ruling, which provoked Justice Scalia to ask, "Mr. Kneedler, what happened to the Eighth Amendment? You really want us to go through these 2,700 pages?" See Byron Tau, Scalia: Reading Entire Health Care Law Would      Be      Cruel      and      Unusual      Punishment,      Politico      (Mar.      28,      2012),      http:// www.politico.com/politico44/2012/03/scalia-reading-entire-health-care-bill-would-be-cruel-118964.html. The version available to the Court was apparently spaced differently than the official statutory page count, as Pub. L. No. 111-152 spans 55 pages (124 Stat. 1029-83) and Pub. L. No. 111-148 spans 906 pages (124 Stat. 119-1024) in the official statutes. Of course, there are other examples of large and complex bills being passed without members of Congress becoming fully aware of all that is in them. See Ittai Bar-Siman-Tov, Lawmakers as Lawbreakers, 52 Wm. & Mary L. Rev. 805, 821 (2010) (noting that "the length, scope, and complexity of omnibus bills (and the highly accelerated pace of their enactment) often make it impossible for legislators, or even legislative leaders, to be aware of all the provisions in the bill," resulting in "statutory mischief").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN15]. See Henry J. Kaiser Family Found., Health Care Costs: A Primer 2 (2012), available at http://www.kff.org/insurance/upload/7670-03.pdf ("The ACA also has a number of provisions that address the costs and efficiency of the health care system, including provisions to demonstrate and implement new payment systems for Medicare (e.g., accountable care organizations, or ACOs), provisions to better coordinate care for people dually eligible for Medicare and Medicaid, reductions in Medicare payments, and new rules (e.g., disclosure and transparency) and new institutions (i.e., exchanges) to improve the efficiency of private health insurance.").

[FN16]. See Office of the Assistant Sec'y for Planning & Evaluation, Dep't of Health & Human Servs., ASPE Issue Brief: Overview of the Uninsured in the United States 1-2 (2011), available at http://aspe.hhs.gov/health/reports/2011/CPSHealthIns2011/ib.pdf. Other programs are available to assist veterans and other members of the military, which are not mentioned here. See id.

[FN17]. See id. at 2 fig.1.

[FN18]. See id.

[FN19]. See id. at 5 tbl.1 (providing that 27.2% of those age 18 to 24 and 28.4% of those age 25 to 34 are uninsured, representing a total of 39.9% of the uninsured population).

[FN20]. See id. (providing that ages 18 to 24 have an "uninsured rate" of 27.2%, while ages 25 to 34 have 28.4%).

[FN21]. See id. (providing that 32.4% of uninsured earn less than $25,000, while 30.9% earn from $25,000-$49,999).

[FN22]. See id.

[FN23]. See I.R.C. § 106 (2012).

[FN24]. See id. § 105(b).

[FN25]. See Staff of J. Comm. on Taxation, 112th Cong., Background Information on Tax Expenditure Analysis and Historical Survey of Tax Expenditure Estimates (Comm. Print 2011), available at https://www.jct.gov/publications.html?func=select&id=50.

[FN26]. See id. at 25 tbl.8. It should be noted that when comparing "Individual Tax Expenditure" categories from Table 3 (1985-1989) through Table 8 (2010-2014), the health benefit category moved to the top of the list beginning in 2010, eclipsing the exclusion for pension and retirement benefits. The pension and retirement category is divided into two separate components, one for defined benefit plans and one for defined contribution plans, which partially explains the decline in the rank for this expenditure. See id. at 20 tbl.3 to 25 tbl.8. However, even when the defined benefit and defined contribution categories are combined, the total is still lower than the total for health care benefits. See id. at 25 tbl.8.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000105

[FN27]. See I.R.C. § 162(a).

[FN28]. See id. § 106. As noted above, benefits are also excludable from an employer-provided policy to the extent they are used to pay medical costs. See id. § 105.

[FN29]. See id. § 125 (covering cafeteria plans).

[FN30]. Such employees without employer-provided coverage may be able to deduct health insurance premiums as an itemized deduction, although those deductions are limited to amounts in excess of 7.5% of adjusted gross income at the time of this writing and 10% of adjusted gross income beginning in 2013. See id. § 213; Patient Protection & Affordable Care Act, Pub. L. No. 111-148, § 9013(a), (d), 124 Stat. 119, 868 (2010). Self-employed persons (including 2% shareholder-employees of S corporations) are allowed to deduct insurance premiums from their gross income independently of the itemized deduction limitations if they meet the requirements of I.R.C. § 162(l), which gives their insurance coverage tax parity with employees receiving employer-provided coverage.

[FN31]. I.R.C. §§ 3101-3128.

[FN32]. See id. § 3121(a)(2) (exempting health insurance from taxable wage base); id. § 3121(a)(5) (exempting cafeteria plan benefits from taxable wage base); id. § 3101 (imposing employment taxes on wage base of employee); id. § 3111 (imposing employment taxes on employer based on wages paid to employees).

[FN33]. For illustrations showing the tax effects at various income levels, see generally Henry J. Kaiser Family Found., Tax Subsidies for Health Insurance: An Issue Brief (2008), available at http:// www.kff.org/insurance/upload/7779.pdf. It should also be noted that other efficiencies may also be available through an employer model, which can reduce transaction costs associated with a model of individual insurance. For example, the purchasing power of a large group can make the insurance easier to manage and thus less costly than an individualized policy offering. See, e.g., Health Insurance Premium Tax Credit, 76 Fed. Reg. 50,931, 50,932 (proposed Aug. 17, 2011) (to be codified at 26 C.F.R. pt. 1) (discussing cost reduction benefits of Affordable Insurance Exchanges).

[FN34]. See Office of the Assistant Sec'y for Planning & Evaluation, supra note 16, at 3.

[FN35]. For example, a small employer having a majority of employees who are already covered by a working spouse might choose to pay a higher salary to all employees instead of paying for insurance coverage, as this would maximize the utility for their workers. Once a salary structure is in place without employer-provided health care, adding a health-care benefit represents a significant cost that the employer may not be willing to bear without adjusting cash compensation downward, which could upset employees. See supra notes 32-33 and accompanying text (providing estimated costs for single and family coverage, as well as the employer and employee shares).

[FN36]. Pub. L. No. 99-272, 100 Stat. 82 (1986).

[FN37]. See generally Health Plans and Benefits: Continuation of Health Coverage--COBRA, U.S. Dep't Lab.,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000106

http://www.dol.gov/dol/topic/health-plans/cobra.htm (last visited July 20, 2012). Government subsidies were provided during the recent economic downturn, beginning with the American Recovery and Reinvestment Act of 2009 and subsequently extended through May 31, 2010. See COBRA Health Insurance Continuation Premium Subsidy, IRS, http://www.irs.gov/uac/COBRA-Health-Insurance-Continuation-Premium-Subsidy (last updated Aug. 3, 2012).

[FN38]. See 42 U.S.C. § 1395dd (2012). Medical ethics and other social norms, including the charitable missions of some hospitals and health care organizations, would likely also result in care apart from a federal legal obligation. However, some have criticized the scope of coverage required under this provision, suggesting that this safety net has holes in it. See Catherine Hoffman & Susan Starr Sered, Kaiser Comm'n on Medicaid & the Uninsured, Threadbare: Holes in America's Health Care Safety        Net        11-14        (2005),        available        at http://www.kff.org/uninsured/upload/Threadbare-Holes-in-America-s-Health-Care-Safety-Net-report.pdf.

[FN39]. Such a decision by a healthy consumer may be similar to that of purchasing an extended warranty on a consumer product. The warranty may cover repairs, but some consumers may prefer to run the risk of paying for those out-of-pocket if they occur, rather than paying the cost of the policy, particularly if they believe the product will be used gently and well taken care of.

[FN40]. Hospitals do indeed collect unpaid medical bills from those who have resources to pay. See, e.g., Additional Requirements for Charitable Hospitals, 77 Fed. Reg. 38,148 (proposed June 26, 2012) (constraining debt collection practices by charitable hospitals affected patients eligible for financial assistance policies).

[FN41]. See Brief Amici Curiae of Economic Scholars in Support of Defendants-Appellees at 13, Liberty Univ., Inc. v. Geithner, 671 F.3d 391 (4th Cir. 2011) (No. 10-2347), 2011 WL 670809, at *13 [hereinafter "Economic Scholars Brief" ].

[FN42]. See id. at 13-14.

[FN43]. See Douglas A. Kahn & Jeffrey H. Kahn, Free Rider: A Justification for Mandatory Medical Insurance Under Health Care Reform?, 109 Mich. L. Rev. First Impressions 78 (2011).

[FN44].        See        Health        Insurance:        Premiums        and        Increases,        Nat'l        Conf.        St.        Legislatures, http://www.ncsl.org/issues-research/health/health-insurance-premiums.aspx (last updated Aug. 2011). The one dollar difference is likely attributed to rounding.

[FN45]. See id.

[FN46]. See Kaiser Family Found. & Health Research & Educ. Trust, Employer Health Benefits: 2011 Summary of Findings (2011), available at http:// ehbs.kff.org/pdf/8226.pdf.

[FN47]. See Henry J. Kaiser Family Found., supra note 9. Although Medicaid and CHIP program coverage may be available for low-income children and pregnant women at income levels that are up to 200% of poverty guidelines, coverage for parents and other adults may be very limited, with 33 states limiting Medicaid eligibility to those parents with less than 100% of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000107

federal poverty guidelines or ($18,530 for a family of three in 2011). See id. at 2. Thus, assuming a family of three (two parents and an adult dependent child beyond the age of CHIP coverage) earning just over the poverty guidelines, the average insurance cost of $13,871 would nearly exhaust their entire income.

[FN48]. See Health Insurance: Premiums and Increases, supra note 44 (showing 50 state insurance cost breakdowns).

[FN49]. Census data available for 2009, the latest year available, shows an "average annual expenditure per consumer unit for health care" of $3,126, of which $1,785 was for insurance, $736 for medical services, and $605 for drugs and medical supplies. See U.S. Census Bureau, Statistical Abstract of the United States: 2012, at 101 tbl.134 (2012), available at http://www.census.gov/prod/2011pubs/12statab/health.pdf. However, this total expenditure ranged from a low of $676 for those under the age 25 to a high of $4,906 for those aged between 65 and 74. See id. Notably, those 75 years old and over had only $4,779 in expenditures, less than the next younger demographic. See id.

[FN50]. See supra note 32 and accompanying text.

[FN51]. Employer self-interest may also include concern about the health and productivity of employees, but this is not necessarily linked to insurance coverage in all cases. For example, employers may offer exercise facilities on a tax-favored basis without requiring employees to be covered by insurance. See I.R.C. § 132(j)(4) (2012) (providing employee benefit exclusion for certain on-premises gyms and athletic facilities).

[FN52]. See, e.g., Kaiser Family Found. & Health Research & Educ. Trust, supra note 46, at 4 ("[Some] workers do not enroll in coverage offered to them because, for example, of the cost of coverage or because they have access to coverage through a spouse.").

[FN53]. A family of four could earn up to $46,233 and pay no federal income taxes using only basic deductions and child credits, ignoring the earned income tax credit. This figure is based on a combination of the standard deduction ($11,900) and personal exemptions (4 x $3,800 = $27,100), along with $2,000 in child credits under I.R.C. § 24 ($1,000 x 2 children ages 16 and under), which would offset an additional $19,133 under 2012 tax brackets for married filing joint returns. See Rev. Proc. 2011-52, 2011-45 I.R.B. 701 (showing adjusted amounts for 2012). However, it should be noted that the earned income tax credit ("EITC") does not completely phase out for a family with two children until $47,162, so that a clever taxpayer who avails himself or herself of this credit may indeed have an incentive to receive insurance on a tax-favored basis from their employer, instead of purchasing it with after-tax dollars, as that taxpayer would have more after-tax dollars if the EITC refundable credit were not reduced by additional income. Query whether taxpayers are sufficiently savvy to act upon those incentives.

[FN54]. See Henry J. Kaiser Family Found., supra note 33, at 1 ("Despite the important role that the tax system plays in subsidizing private coverage, the amount of the benefit received by individuals and families in different circumstances is often not well understood because the tax code is complex, and the value that families receive from tax exclusions and other tax subsidies can vary substantially with income and individual circumstances.").

[FN55]. The Affordable Care Act includes enhanced information reporting requirements for large employers. See I.R.C. § 6056; I.R.S. Notice 2012-32, 2012-20 I.R.B. 910 (discussing implementation of these requirements after 2013). However, this information alone would not allow the employee to quantify the tax benefits received without substantial additional computa-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 CRLR 207
46 Creighton L. Rev. 207

tions that are likely beyond the ken of most Americans.

[FN56]. If uninsured persons end up paying only 35-38% of their costs, see supra note 41 and accompanying text, others necessarily bear the remainder.

[FN57]. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. __, __, 132 S. Ct. 2566, 2604 (2012) (explaining state and federal funding of Medicaid which, even before expansion by the Affordable Care Act, would consume $3.3 trillion of federal resources between 2010-2019, with additional costs to states).

[FN58]. See Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2606-08 (noting that "the States have developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid").

[FN59]. I.R.C. § 4980H (2012).

[FN60]. I.R.C. § 4980H(a) (2012). As discussed below, "minimum essential coverage" presents a problem for employers with conscientious or religious objections to mandated preventive care services. See discussion infra Part II.C.3.

[FN61]. I.R.C. § 4980H(a).

[FN62]. Id. § 4980H(c)(2)(A).

[FN63]. See id. § 4980H(c)(2)(C)(i).

[FN64]. See id. § 4980H(c)(2)(E). The determination is made on a monthly basis, and for this purpose the IRS has suggested that 130 hours per month might be used, though this is not official guidance. See I.R.S. Notice 2011-36, 2011-21 I.R.B. 792.

[FN65]. I.R.C. § 4980H(c)(2)(B).

[FN66]. See id. § 4980H(a).

[FN67]. This is the "applicable payment amount," defined as one-twelfth of $2,000. See id. § 4980H(c)(1).

[FN68]. See id. § 4980H(a), (c)(1), (2)(D).

[FN69]. [$166.67/(employee x month)] x (50-30 employees) = $3,333.40/month; $3,333.40/month x 12 months/year = $40,000.80/year.

[FN70]. [$40,000/(year x 50 employees)] = $800/(employee x year).

[FN71]. The statutory limit of $2,000 per employee is an asymptotic limit, which can be approached as the number of em-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000109

46 CRLR 207                                                                                                  Page 35
46 Creighton L. Rev. 207

ployees grows, but it is never actually reached due to the statutory reduction for the first 30 employees. Stated differently, the significance of the reduction for the first 30 employees on a per-employee basis is reduced from $1,200/employee for an employer with 50 employees (i.e., $2,000 x 30 employees = $60,000 reduction, which spread over 50 employees is worth $1,200 each) and it approaches $0 as the number of employees grows.

[FN72]. See I.R.C. § 4980H(b)(1) (2012). Various aspects of minimum essential coverage are addressed below. See discussion infra Part II.C.3.

[FN73]. I.R.C. § 36B.

[FN74]. See id. § 4980H(c)(3). See discussion infra Part IV.

[FN75]. See I.R.C. § 36B(c)(2)(C)(i)(II).

[FN76]. See id. § 36B(c)(2)(C)(ii). Minimum value requires that the plan provide coverage for at least 60% of the total cost of benefits. Actuarial computations may be required to make this determination. See I.R.S. Notice 2012-31, 2012-20 I.R.B. 906 (requesting comments on approaches for minimum value determinations).

[FN77]. See I.R.C. § 4980H(b). The statute refers to "1/12 of $3000," which is $250.

[FN78]. This is the "applicable payment amount," defined as 1/12 of $2,000. See id. § 4980H(c)(1).

[FN79]. See id. § 4980H(a), (c)(1), (2)(D).

[FN80]. See supra note 69 and accompanying text.

[FN81]. See I.R.C. § 36B(a) (allowing refundable premium assistance credit to an "applicable taxpayer"); § 36B(c)(1) (limiting those with household income greater than 400% of the federal poverty line from eligibility as an "applicable taxpayer"). It should be noted that this information may not be readily apparent to the employer, as the federal poverty guidelines depend on the household size of the individual and may also depend on the earnings level of a spouse who is not an employee of the employer making this determination. See I.R.S. Notice 2011-73, 2011-40 I.R.B. 474 ("Because affordability is determined by reference to household income and because household income is determined by reference to variables that are generally unknown to an employer ... employers may encounter practical difficulties in assessing [affordability]."). As discussed below, Exchanges will be collecting information and thus will potentially be useful for the implementation of this provision. Whether monthly changes will be reported, as required for the penalty, also remains to be seen.

[FN82]. See I.R.C. § 4980H(a)(2).

[FN83]. See id. § 275(a)(6).

[FN84]. See Cong. Budget Office, CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000110

46 CRLR 207
46 Creighton L. Rev. 207

Obtaining    Employment-Based    Health    Insurance    3    (2012),    available    at    http://
cbo.gov/sites/default/files/cbofiles/attachments/03-15-ACA_and_Insurance_2.pdf ("If [a firm] with a large share of
low-income workers chose not to offer insurance coverage, the net effect would tend to be an increase in the federal budgetary
cost of the [Affordable Care Act's ("ACA")] coverage provisions; if an additional firm with a small share of low-income
workers chose not to offer insurance coverage, the net effect would tend to be a decrease in the federal budgetary cost of the
ACA's coverage provisions.").

[FN85]. See id. The Appendix includes examples showing the net advantage. See infra Appendix.

[FN86]. The Congressional Budget Office has released estimates showing that, from 2019-2022, from three million to five
million fewer people will obtain employer-based insurance under the Affordable Care Act as compared with prior law. See
Cong. Budget Office, supra note 84, at 4.

[FN87]. Id. at 2.

[FN88]. Id. at 4.

[FN89]. See Shubham Singhal et al., How US Health Care Reform Will Affect Employee Benefits, McKinsey Q. (June 2011),
https://          www.mckinseyquarterly.com/Health_Care/Strategy_Analysis/How_US_health_care_          re-
form_will_affect_employee_benefits_2813.

[FN90]. See id.

[FN91]. I.R.C. § 5000A (2012).

[FN92]. See I.R.C. § 5000A(a), (b).

[FN93]. See id. § 5000A(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (e), (e)(4), (g)(1), (g)(2).

[FN94]. See id. § 5000A(b)(2).

[FN95]. See id. § 5000A(g)(1).

[FN96]. See id. § 5000A(g)(2)(A). It should be noted that the employer penalty is treated consistently with other penalties,
except that the Secretary of the Treasury is allowed to provide for payment on a periodic basis. See id. § 4980H(d)(1) (employer
penalty assessed and collected in the same manner as other penalties); id. § 4980H(d)(2) (granting discretion to prescribe time
for payment).

[FN97]. See id. § 6331(h) (providing authorization to collect payments due to individuals including the State Income Tax Levy
Program and payment due from the Financial Management Service).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000111

46 CRLR 207                                                                                          Page 37
46 Creighton L. Rev. 207

[FN98]. See id. § 5000A(g)(2)(B). It is currently unclear whether this penalty will be taken into account in computations for employee withholding purposes.

[FN99]. See id. § 5000A(d)(4).

[FN100]. See id. § 5000A(d)(3).

[FN101]. See id. § 5000A(d)(2)(A).

[FN102]. See id. § 1402(g)(1).

[FN103]. See id. § 5000A(d)(2)(B).

[FN104]. See id.

[FN105]. See What Is a Health Care Sharing Ministry?, Alliance Health Care Sharing Ministries, http://www.healthcaresharing.org/hcsm/ (last visited Aug. 28, 2012).

[FN106]. For example, Medi-Share, a health sharing ministry that claims to qualify under the Affordable Care Act exemption, states in part that members must "[b]elieve the biblical doctrine that their bodies are temples of the Holy Spirit and therefore are to be kept pure," "[m]ust not engage in sex outside of traditional Christian marriage," and "[c]annot use tobacco or illegal drugs in any form, or abuse legal drugs or alcohol." Medishare: Medical Bill Sharing for the Christian Community, Christian Care Ministries, http:// mychristiancare.org/eligibility.aspx (last visited Aug. 28, 2012).

[FN107]. See discussion infra Part III.

[FN108]. That is, individuals apart from those unlawfully present, those incarcerated after conviction, and those not religiously exempt.

[FN109]. See I.R.C. § 5000A(e)(1).

[FN110]. See id. After 2014, the eight percent figure is indexed for the differential between the rate of premium growth over the rate of income growth since 2013, as determined by the Secretary for Health and Human Services. See id. § 5000A(e)(1)(D). The income measure stated here is unclear. Presumably, if overall income increases relative to health insurance costs, the eight percent figure would decline. However, overall income could have no actual impact on the affordability of an individual whose income does not grow in a given year because he or she worked in an industry that did not share in this growth.

[FN111]. See id. § 5000A(e)(1)(B).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000112

[FN112]. See id. § 5000A(e)(2).

[FN113]. For 2012 figures, see IRS, Publication 501: Exemptions, Standard Deduction, and Filing Information tbl.1 (2011), available at http:// www.irs.gov/pub/irs-pdf/p501.pdf. For a single taxpayer under age 65, that figure is currently $9,750; married filing jointly (and both under 65) $19,500. Many individuals in this category will likely be eligible for other exemptions, including coverage by Medicaid.

[FN114]. See I.R.C. § 5000A(e)(3).

[FN115]. See 25 U.S.C. § 1647b (2012).

[FN116]. See Health Reform for American Indians and Alaska Natives, Nat'l Indian Health Board, http://www.nihb.org/docs/05142010/Consultation%20Fact_ Sheet.pdf (last visited July 21, 2012).

[FN117]. See Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,380 (May 23, 2012) (to be codified at 26 C.F.R. pts. 1, 602).

[FN118]. See id.

[FN119]. See I.R.C. § 5000A(e)(4). This generally involves a continuous period of less than three months. Administration of that exception may be difficult, particularly because the penalty is imposed on a monthly basis and months of coverage could extend to more than one year. See § 5000A(e)(4)(iii) (directing the Secretary to prescribe rules for collection when continuous periods span more than one taxable year).

[FN120]. Id. § 5000A(e)(5).

[FN121]. See id. § 5000A(c)(1).

[FN122]. See discussion infra Part III. That taxpayer may be paying for his/her own health care, but refusing to purchase an insurance policy with contraception or sterilization coverage the taxpayer did not want. Thus, the taxpayer may effectively pay double for healthcare if, for conscientious reasons, the taxpayer rejects a policy covering these so-called preventive services.

[FN123]. See I.R.C. § 5000A(c)(2)(A), (B).

[FN124]. See id. § 5000A(c)(3). Special rules apply to individuals under 18, which effectively halve the penalty amount in most cases. See id. § 5000A(c)(3)(C). The $695 figure for 2016 is subject to annual indexing thereafter. See § 5000A(c)(3)(D). The flat amount could be less if the individual maintained insurance for a portion of the taxable year, in which case the statute imposes a minimum penalty of 300% of the stated amount. See § 5000A(c)(2)(A)(ii).

[FN125]. See id. § 5000A(c)(2)(A)(ii).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000113

[FN126]. See id. § 5000A(c)(2)(B). The threshold amount is defined in I.R.C. § 6012(a)(1)(A). It generally includes the personal exemption amount plus the basic standard deduction for the eligible taxpayer. As these amounts are adjusted each year for inflation, the precise amount in 2016 cannot be determined. However, using 2012 figures, the standard deduction is $5,950 (single) and $11,900 (married filing jointly) and the personal exemption is $3,800. See Rev. Proc. 2011-52, 2011-45 I.R.B. 701. Thus, the 2012 filing threshold for a single taxpayer would be $9,750 (i.e., $5,950 + $3,800), and for a married couple with two children would be $27,100 (i.e., $11,900 + (4 x $3,800)).

[FN127]. The figure $27,800 is calculated by dividing $695 by 2.5%. Using the 2012 filing threshold ($9,750) as an estimate of the 2016 threshold, a single taxpayer would have to earn at least $37,550 before the income-based penalty would be applicable. It should be noted that for purposes of computing the penalty, household income applies. Thus, income earned by dependents may also be included. See I.R.C. § 5000A(c)(2)(B), (c)(4)(B).

[FN128]. The figure $83,400 is calculated by dividing $2,085 by 2.5%. Using the 2012 filing threshold for a family of four ($19,500), this translates into total household income of at least $102,900.

[FN129]. For simplicity, these figures assume an average premium cost of $15,000 per family ($15,000/.025 = $600,000) or $5,000 per individual ($5,000/.025 = $200,000).

[FN130]. See Annual Update of the HHS Poverty Guidelines, 77 Fed. Reg. 4,034, 4,035 (Jan. 26, 2012) (showing figure for 48 contiguous states and the District of Columbia at $11,170 for one person in household; 1.33 x $11,170 = $14,856). The 2016 guideline levels are not available, but even assuming normal inflation rates, the flat penalty will impose a penalty greater than 2.5%. The figure of 133% of poverty guidelines is used here, as this is the baseline for expanded Medicaid coverage under the Affordable Care Act. However, not all states are following this guideline.

[FN131]. The $695 penalty is close to 5% of gross income (i.e., $695/ $14,856 = .04678); however, the $695 is more than 13% of penalty base income (i.e., $695/($14,856-$9750) = .13611).

[FN132]. Because the United States Supreme Court determined this mandate was a "tax," this may raise a political problem for President Obama who pledged in 2008 that he would not raise taxes on middle class families, defined as those with incomes under $200,000 (single) or $250,000 (married filing jointly). See generally Paul Howard, Making Health Care Worse, Nat'l Rev. Online (Aug. 1, 2012, 4:00 AM), www.nationalreview.com/blogs/print/312678.

[FN133]. The income levels at which the earned income credit will be available for 2016 are not yet determined. However, the amounts for 2012 are projected to include credits for those earning less than $50,270, married filing jointly with three or more qualifying children. See Preview of EITC Income Limits, Maximum Credit Amounts and Tax Law Updates, IRS, http://www.irs.gov/Individuals/Preview-of-2012-EITC-Income-Limits,-Maximum-Credit--  Amounts-and-Tax-Law-Updates (last updated Aug. 4, 2012).

[FN134]. See supra note 124 and accompanying text.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000114

[FN135]. See Treas. Reg. § 1.36B-4(a)(4) ex. 1 (2012) (showing I.R.C. § 36B premium credit and expected contribution for single taxpayer in 2014).

[FN136]. The estimated credit here would contribute over $2,900 of the estimated $5,200 policy cost. See discussion infra Part IV (discussing I.R.C. § 36B credits).

[FN137]. Perhaps if it had done so, the "tax" designation embraced by a majority of the Supreme Court, which ultimately saved the constitutionality of the individual mandate, would not have been quite so plausible. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. __, 132 S. Ct. 2566 (2012).

[FN138]. See I.R.C. § 5000A(f)(1)(A) (2012). For background on Medicaid and CHIP, see Ctrs. for Medicare & Medicaid Servs.,                    Eligibility,                    U.S.                    Dep't                    Health                    &                    Hum.                    Services, http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Eligibility/Eligibility.html (last visited Aug. 6, 2012). For Medicare and a comparison with the Medicaid program, see Medicare, U.S. Soc. Security Admin. (July 2012), http:// www.socialsecurity.gov/pubs/10043.htmla0=1.

[FN139]. See I.R.C. § 5000A(f)(1)(B), (f)(1)(C), (f)(1)(E), (f)(2).

[FN140]. 42 U.S.C. §§ 201 to 300mm-61 (2012).

[FN141]. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1201, 124 Stat. 119, 154.

[FN142]. Id. (amending § 2704 of the Public Health Service Act).

[FN143]. Id. (amending § 2702 of the Public Health Service Act).

[FN144]. Id. (amending § 2705 of the Public Health Service Act).

[FN145]. Id. (amending § 2703 of the Public Health Service Act).

[FN146]. See id. (amending § 2701 of the Public Health Service Act).

[FN147]. This assumes that the ratios as applied will restrict at least some premium rates that might be charged based on age or smoking practices.

[FN148]. Cf. Patient Protection and Affordable Care Act § 1201, 124 Stat. at 154 (amending § 2705(j) of the Public Health Service Act) (providing that wellness programs can become a basis for discounts if the programs address "health promotion or disease prevention").

[FN149]. See, e.g., Inst. of Med. of the Nat'l Acads., Clinical Preventive Services for Women: Closing the Gaps 198 (2011)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000115

("An unhealthy diet and physical inactivity are associated with the leading causes of morbidity and mortality among women in the United States.").

[FN150]. See id. at 110 ("Breastfeeding benefits the mother, the child, and society.").

[FN151]. 567 U.S. __, 132 S. Ct. 2566 (2012).

[FN152]. Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. __, __, 132 S. Ct. 2566, 2585 (2012).

[FN153]. See Patient Protection and Affordable Care Act § 1001, 124 Stat. at 130.

[FN154]. See id. § 1001, 124 Stat. at 131 (codified at 42 U.S.C. § 300gg-11).

[FN155]. See id. § 1001, 124 Stat. at 132 (codified at 42 U.S.C. § 300gg-14).

[FN156]. See id. § 1001, 124 Stat. at 131 (codified at 42 U.S.C. § 300gg-13(a)(1), (4)). A list of recommendations and guidelines that are required to be covered by the United States Preventive Services Task Force, as referenced in section (1), can be found at Preventative Care, U.S. Dep't Health & Hum. Services, http://www.HealthCare.gov/center/regulations/prevention.html (last visited Oct. 22, 2012). See Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,728 (July 19, 2010) (to be codified at 45 C.F.R. pt. 147).

[FN157]. See Inst. of Med. of the Nat'l Acads., supra note 149, at 4 ("The USPSTF process for developing recommendations is a disease-focused one. The intent of its recommendations has been to provide guidance to primary care providers. The IOM committee's approach to identifying gaps in existing services accounts for contextual issues beyond traditional research evidence used by the USPSTF.").

[FN158]. See Health Res. & Servs. Admin., About HRSA, U.S. Department Health & Hum. Services, http://www.hrsa.gov/about/index.html (last visited Aug. 16, 2012).

[FN159]. See Health Res. & Servs. Admin., Women's Preventive Service: Required Health Plan Coverage Guidelines, U.S. Dep't Health & Hum. Services, http://www.hrsa.gov/womensguidelines/ (last visited Aug. 16, 2012).

[FN160]. See Clinical Preventive Services for Women: Closing the Gaps, Inst. Med. Nat'l Acads., http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Aug. 16, 2012) (summarizing the IOM's study).

[FN161]. See In re Union Pac. R.R. Emp't Practices Litig., 479 F.3d 936, 944 (9th Cir. 2007) ("We decline to address whether pregnancy is a 'disease.'"). In Union Pacific, the court held that failure to offer prescription contraception coverage did not violate the Pregnancy Discrimination Act or Title VII provisions involving gender discrimination. In re Union Pac., 479 F.3d at 944-45. In other cases predating the Pregnancy Discrimination Act, the Supreme Court rejected the view that pregnancy was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 CRLR 207                                                                 Page 42
46 Creighton L. Rev. 207

similar to a disease or disability. See, e.g., Nashville Gas Co. v. Satty, 434 U.S. 136, 140 (1977) (citing Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 136 (1976)). The district court in Gilbert heard expert testimony on the question of whether pregnancy was a disease, concluding in part: "The great mass of expert testimony presented here on the subject merely confirms what appears obvious to any layman: pregnancy is not a disease, as that term is commonly understood ...." Gilbert v. Gen. Elec. Co., 375 F. Supp. 367, 375 (D. Va. 1974).

[FN162]. IOM's report cited a Health and Human Services study, Healthy People 2020, for the proposition that 51% of pregnancies in the United States are intended. See Inst. of Med. of the Nat'l Acads., supra note 149, at 104. Health and Human Services wishes to raise that proportion to 56% by 2020. See id.

[FN163]. See id. at 10.

[FN164]. Id.

[FN165]. See Certain Preventive Services under the Affordable Care Act, 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012) (to be codified at 45 C.F.R. pt. 147) (discussing history of regulations). Oddly enough, although IOM recommended contraception and sterilization, nothing in the recommendation includes fertility services for women who want to be pregnant. Apparently, the IOM does not recognize pregnancy as a source of well-being for women.

[FN166]. See Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 75 Fed. Reg. at 41,726.

[FN167]. Id. at 41,729.

[FN168]. See Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. at 16,502.

[FN169]. Id. (citing Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011) (to be codified at 45 C.F.R. pt. 147)).

[FN170]. See discussion infra Part III.

[FN171]. Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. at 16,502-03 (citing Memorandum from Ctr. for Consumer Info. & Ins. Oversight and Ctrs. for Medicare & Medicaid Servs. (Feb. 12, 2012) (on file with author), available at http:// cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf).

[FN172]. See id. at 16,502.

[FN173]. I.R.C. § 5000A(f)(1)(D). For example, lifetime coverage limits restrictions in the Affordable Care Act nevertheless apply to grandfathered plans. See Temp. Treas. Reg. § 54.9815-1251T (2010).

[FN174]. See Temp. Treas. Reg. § 54.9815-1251T(a); see also Preservation of Right to Maintain Existing Coverage, 29 C.F.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000117

46 CRLR 207
46 Creighton L. Rev. 207

§ 2590.715-1251 (2012); Preservation of Right to Maintain Existing Coverage, 45 C.F.R. § 147.140 (2012).

[FN175]. See Temp. Treas. Reg. § 54.9815-1251T(g)(1) (listing "[c]hanges causing cessation of grandfather status").

[FN176]. See Nebraska ex rel. Bruning v. U.S. Dep't of Health & Human Servs., 877 F. Supp. 2d 777, 791 (D. Neb. 2012).

[FN177]. See Nebraska ex rel. Bruning, 877 F. Supp. 2d at 791 n.5 (noting that the "[Health and Human Services] Rule--[does] not apply to grandfathered plans").

[FN178]. See id. at 792 (noting allegations by the plaintiffs "that 'only 55% of large employer and 34% of small employer plans would remain grandfathered by 2013'").

[FN179]. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011) (to be codified at 45 C.F.R. pt. 147).

[FN180]. See id. at 46,626 (amending "Part 147--Health Insurance Reform Requirements for the Group and Individual Health Insurance Markets").

[FN181]. Id. at 46,623.

[FN182]. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012) (to be codified at 45 C.F.R. pt. 147).

[FN183]. See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n, 567 U.S.__, 132 S. Ct. 694 (2012). In Hosanna-Tabor, the Court recognized that the First Amendment required that a ministerial exception to the Americans with Disabilities Act would be applied to a church decision to dismiss a teacher in the church's school who the church had held out to be a minister. Interfering with the employment relationship between a church and those ministering on its behalf presents special concerns that the First Amendment resolves in favor of the church, regardless of whether the law causing that interference is otherwise considered a neutral law of general application. See Hosanna-Tabor, 132 S. Ct. at 706-07, 710.

[FN184]. John Paul II, Man and Woman He Created Them: A Theology of the Body 628 (Michael Waldstein trans., 2006). It should be noted that "HV" refers to the papal encyclical letter, Paul VI, Humanae Vitae (1968), available at http://www.vatican.va/holy_father/paul_vi/encyclicals/documents/hf_p-vi_enc_ 25071968_humanae-vitae_en.html. See also Catholic Church, Catechism of the Catholic Church PP 2368-2370 (2006) (addressing moral teachings on contraception, sterilization, and abortion).

[FN185]. Memorandum from Richard Doerflinger to the Diocesan Pro-Life/Respect Life Dirs. and State Catholic Conference Dirs. & Staff (Aug. 10, 2011) (on file with author), available at http:// archphila.org/evangelization/resplife/prolife/forms/USCCBalert.pdf.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000118

46 CRLR 207
46 Creighton L. Rev. 207

[FN186]. See id.

[FN187]. See Lines Crossed: Separation of Church and State. Has the Obama Administration Trampled on Freedom of Religion and Freedom of Conscience?: Hearing Before the H. Comm. on Oversight & Gov't Reform, 112th Cong. (2012) [[hereinafter                     Lines                  Crossed],                available                  at http://oversight.house.gov/wp-content/uploads/2012/06/02-16-12-Full-Committee-Hearing-Transcript.pdf.

[FN188]. See, e.g., id. at 46 (statement of Reverend Dr. Matthew C. Harrison, President, Lutheran Church, Missouri Synod) ("Specifically, we object to the use of drugs and procedures used to take the lives of unborn children. We oppose this mandate since it requires religious organizations to pay for and otherwise facilitate the use of such drugs by their employees--a requirement that violates our stand on the biblical teaching of the sanctity of life, which is a matter of faith and conscience."); id. at 144 (statement of Dr. Samuel W. Oliver, President, East Texas Baptist University) ("As a Baptist, I would be standing here even if this mandate only affected my Catholics neighbors. But I must point out that this is not just a Catholic issue. While many Christians do not share the Catholic beliefs against contraception, there is wide agreement that abortion is wrong. And we believe, based on the Bible, that life begins at conception. The [Obama] Administration's mandate covers emergency contraceptives such as Plan B (the morning after pill) and ella (the week after pill), which even the Administration admits interfere with a human embryo. Our faith and the most recent science tells us that these drugs cause abortions. But under the Administration's mandate, East Texas Baptist University will be required to buy insurance so that our employees can get abortion causing drugs for free, as if they are no different than penicillin. We believe that is wrong."); id. at 156 (statement of Laura Champion, M.D., Medical Director and Physician, Calvin College) ("Contraception is not controversial at our school. Clinicians write prescriptions that include contraception for a variety of reasons, including the prevention of pregnancy. However, abortifacient agents are not prescribed, nor are they covered in our health care plan. The advocacy of these agents is profoundly inconsistent with the belief system of our college and our religion. To force the access of such agents upon our students would violate our religious liberty.").

[FN189]. See id. at 46 (statement of Reverend Dr. Matthew C. Harrison) ("Furthermore, we believe and teach that freedom of religion extends beyond mere houses of worship. We must be able to exercise our faith in the public square and, in response to Christ's call, demonstrate His mercy through our love and compassion for all people according to the clear teachings of Holy Scripture."); id. at 56-57 (statement of Rabbi Meir Soloveichik, Director of the Straus Center for Torah and Western Thought, Yeshiva University) ("[T]he [[Obama] administration implicitly assumes that those who employ or help others of a different religion are no longer acting in a religious capacity, and as such are not entitled to the protection of the First Amendment. This betrays a complete misunderstanding of the nature of religion. For Orthodox Jews, religion and tradition govern not only praying in a synagogue, or studying Torah in a Beit Midrash, or wrapping oneself in the blatant trappings of religious observance such as phylacteries. Religion and tradition also inform our conduct in the less obvious manifestations of religious belief, from feeding the hungry, to assessing medical ethics, to a million and one things in between. Maimonides, one of Judaism's greatest Talmudic scholars and philosophers, and also a physician of considerable repute, stresses in his Code of Jewish Law that the commandment to 'Love the Lord your God with all your heart' is achieved not through cerebral contemplation only but also requires study of the sciences, and engagement in the natural world, as this inspires true appreciation of the wisdom of the Almighty. In refusing to extend religious liberty beyond the parameters of what the administration chooses to deem religious conduct, the administration denies people of faith the ability to define their religious activity. Therefore, not only does the new regulation threaten religious liberty in the narrow sense, in requiring Catholic communities to violate their religious tenets, but also the administration impedes religious liberty by unilaterally redefining what it means to be religious.").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000119

[FN190]. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725 (Feb. 15, 2012) (to be codified at 45 C.F.R. pt.147).

[FN191]. Id. at 8,728. The regulations also raise a concern that including religious employers who do not employ those who share their religious beliefs against contraception "would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care." Id. While this also repeats the utilitarian justification of inhibiting conception as a desirable good (from the Administration's perspective), it does not address the religious freedom or conscience concerns of the employer. Moreover, it elevates a form of compensation provided through employment into an entitlement for coercing employer support for whatever the employee believes--an effectively limitless potential.

[FN192]. By way of background, the Act requires some standardization based on four levels of coverage: bronze, silver, gold, and platinum. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1302(d), 124 Stat. 119, 167 (2010). These metallic coverage levels indicate the scope of benefits provided, although all such plans are subject to the minimum essential coverage requirements, including preventive services as discussed above. A bronze plan generally results in an actuarial value of coverage at 60%, with increasing values for silver (70%), gold (80%), and platinum (90%). The balance generally must be paid by the insured. See Henry J. Kaiser Family Found., What the Actuarial Values in the Affordable Care Act Mean 1 (2011), available at http://www.kff.org/healthreform/upload/8177.pdf.

[FN193]. Sterilization coverage presents special concerns, particularly because of the permanent implications for reproductive potential. In some states, minors are legally required to have access to birth control, and they may also give consent to medical or surgical treatment without consent from their parents or guardians. See, e.g., Or. Rev. Stat. § 109.640 (2012) (allowing access to "birth control information and services to any person without regard to the age of the person," and allowing minors 15 years of age or older to consent to "[h]ospital care, medical or surgical diagnosis or treatment"). Coupling a minor's independent access to birth control services with first-dollar insurance coverage could lead to an irreparable and regretted decision, and some parents might choose to avoid creating this option for their minor child.

[FN194]. It should also be noted that the Act effectively exempts others from the requirements of minimum coverage, including those who for religious reasons choose to participate in health care sharing organizations. See supra note 104 and accompanying text. Those participants will not be subject to minimum coverage requirements, including the contraceptive and sterilization mandate. If coverage for all is such a compelling interest, it is unclear why this exception is permitted.

[FN195]. Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed. Reg. at 8,729. However, as discussed below, lawsuits filed on behalf of religious plaintiffs contest these positions. Secretary Sebelius, in testimony before the House Energy and Commerce Committee on March 1, 2012, stated in response to a question by Rep. Blackburn that the Department of Health and Human Services did not consult the Department of Justice on the matter of the constitutionality of the rule. See The Fiscal Year 2013: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Commerce, 112th Cong. (2012) (statement of Kathleen Sebelius, Secretary,         of         Health         and         Human         Services),         available         at http://energycommerce.house.gov/hearing/fy-2013-hhs-budgetvideo (comments at 1:37 in the video testimony). It is not clear whether the Secretary of the Treasury or Secretary of Labor made any similar inquiry.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN196]. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed. Reg. at 8,728.

[FN197]. Id.

[FN198]. See id. The regulations also note that self-insured group health plans sponsored by organizations with religious objections will also need to be addressed under this policy initiative, but they do not specify how the shift in payment obligation would be accomplished without an intermediary. See id. The Obama Administration also formally sought additional comments on methods of accommodation through an Advance Notice of Proposed Rulemaking. See Certain Preventive Services under the Affordable Care Act, 77 Fed. Reg. 16,501, 16,501 (Mar. 21, 2012) (to be codified at 45 C.F.R. pt. 147).

[FN199]. Student Health Insurance Coverage, 77 Fed. Reg. 16,453, 16,457 (Mar. 21,2012) (to be codified at 45 C.F.R. pt. 147).

[FN200]. An assumption that self-interest rather than altruistic behavior has also been applied in other economic questions where proof is complex and costly. See, e.g., Phillip E. Areeda, Introduction to Antitrust Economics, 52 Antitrust L.J. 523, 536 (1983) ("Given that certain proof of anything is both difficult and socially costly, it is both convenient and sensible to assume that business people are acting in their own self-interest and to assume that an unambiguously exclusionary purpose tends to indicate an anticompetitive effect.").

[FN201]. See, e.g., Executive Overreach: The HHS Mandate Versus Religious Liberty: Hearing Before the H. Comm. on the Judiciary, 112th Cong. 14 (2012) (statement of Most Reverend William E. Lori, Bishop of Bridgeport), available at http://judiciary.house.gov/hearings/printers/112th/112-101_ 73101.pdf ("This is no accommodation at all, since the 'services' will still be paid for by virtue of enrollment in an insurance policy provided by and paid for by the objecting employer.").

[FN202]. See, e.g., Lines Crossed, supra note 187, at 124 (statement of John Garvey, President of the Catholic University of America) ("From a moral point of view, the administration's cost savings don't matter even if they are real. When a student who is enrolled in our plan purchases contraceptives at the local CVS pharmacy, CVS will seek payment from the insurance company. The payment for that service will be charged to our account, funded by our contributions. The [Obama Administration's theory] assumes that charges for other drugs and services will go down as a result of contraceptive use. But it is still true that the University and its subscribers are being forced to pay for sterilizations, contraceptives, and abortions, and those are activities we view as immoral."). President Garvey also posed this question: "Suppose the administration believed that we could reduce our overall health care costs by covering infanticide for young mothers who found their children a burden. And suppose that HHS devised a plan under which the necessary drugs would be charged to Catholic University's account. Would we have no moral objection to that plan if the government could show that it saved us money?" Id. at 124 n.10.

[FN203]. The category for exemption was clarified by a notice issued August 15, 2012. Among other things, the notice confirms that a nonprofit with religious objections to some but not all contraceptive coverage is eligible for the safe harbor, and a nonprofit organization may be eligible for the safe harbor if action was taken prior to February 10, 2012, to try to limit or exclude contraceptive coverage, even if such action was not successful. Memorandum from Ctr. for Consumer Info. & Ins. Oversight and Ctrs. for Medicare & Medicaid Servs. (Aug. 15, 2012) (on file with author), available at http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 CRLR 207                                                                                           Page 47
46 Creighton L. Rev. 207

[FN204]. See Welcome to Careers at Creighton, Creighton U., http:// www.creighton.edu/hr/careers/index.php (last visited Aug. 21, 2012) ("Creighton is proud to employ over 3000 employees making us one of the top employers in the Omaha area.").

[FN205]. Estimated based on $2,000/employee x 3000 employees. See supra note 71 and accompanying text (discussing penalty computations).

[FN206]. This assumes the employer would continue providing nonconforming insurance benefits (i.e., without contraception and sterilization coverage), so that it continued to incur significant costs. Alternatively, it might choose to discontinue coverage altogether, although as discussed below, market pressures will not necessarily allow the employer to use cost savings from not paying insurance benefits to offset the employer penalty.

[FN207]. See Creighton Univ., Financial Report for the Year Ended June 30, 2010, at 5 (2010), available at http:// www.creighton.edu/fileadmin/user/AdminFinance/Controller/docs/Forms/FY_10_Final_FS.pdf.

[FN208]. See id. (showing "Contributions" for fiscal 2010 of $10.811 million).

[FN209]. See, e.g., Cong. Budget Office, supra note 84, at 8 ("Employers who drop coverage, leaving their employees to purchase insurance on their own, will generally have to raise the cash compensation of their employees to compete with employers who continue to offer health insurance."). Alternatively, the employer might choose to provide health benefits that did not comply with the mandate, thus continuing to incur similar benefit costs. However, the employer would still incur the impact of the employer penalty, which could result in cuts to programs or to employee compensation. Employees would also face the prospect of incurring the individual penalty, despite having coverage for the vast majority of their health care needs.

[FN210]. See Singhal et al., supra note 89 ("At least 30 percent of employers would gain economically from dropping coverage even if they completely compensated employees for the change through other benefit offerings or higher salaries."). For a discussion of this potential benefit, see infra Appendix.

[FN211]. See supra notes 123-29 and accompanying text. Some exchanges may include policies that cover elective surgical abortions. These policies require a separate premium on all insured members due to funding restrictions in the Act, which prohibit the use of federal funds, including section 36B advance payment credits, for this purpose. See Segregation of Funds of Abortion Services, 45 C.F.R. § 156.280 (2012). The fact that federal funds could not be spent on such procedures illustrates similar moral concerns that individuals would face if required to fund abortion coverage in order to access affordable health insurance through the exchange. These regulations are the result of an Executive Order issued at the time the Act was passed, which among other things reaffirms the "longstanding Federal statutory restriction that is commonly known as the Hyde Amendment." See Exec. Order No. 13,535, 3 C.F.R. 201-03 (2011).

[FN212]. See infra Part IV. Recall that only one employee receiving a subsidy is sufficient to trigger a penalty for a large employer who fails to offer insurance.

[FN213]. See supra note 12 (regarding the purported benefits of Exchanges in connection with competitive effects benefitting

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000122

46 CRLR 207
46 Creighton L. Rev. 207

consumers).

[FN214]. 42 U.S.C §§ 2000bb to 2000bb-4 (2012).

[FN215]. See HHS Mandate Information Central, supra note 11 (compiling 26 cases filed by 86 plaintiffs).

[FN216]. See, e.g., Newland v. Sebelius, No. 1:12-cv-1123-JLK, 2012 WL 3069154, at *1-2 (D. Colo. July 27, 2012) (including Hercules Industries, a private, for-profit corporation); Complaint at 13, Legatus v. Sebelius, No. 2:12-cv-12061-RHC-MJH (E.D. Mich. filed May 7, 2012), 2012 WL 1601702 (including Weingartz Supply Company, a for-profit corporation).

[FN217]. 877 F. Supp. 2d 777 (D. Neb. 2012).

[FN218]. Nebraska ex rel. Bruning v. U.S. Dep't of Health & Human Servs., 877 F. Supp. 2d 777, 804 (D. Neb. 2012).

[FN219]. No. 11-1989 (JEB), 2012 WL 3861255 (D.D.C. Sept. 5, 2012).

[FN220]. No. 12-1169 (ESH), 2012 WL 3637162 (D.D.C. Aug. 24, 2012).

[FN221]. No. 1:12-cv-1123-JLK, 2012 WL 3069154 (D. Colo. July 27, 2012).

[FN222]. Newland, 2012 WL 3069154, at *2.

[FN223]. The graying population and accompanying low birthrates in developed countries is raising concerns in many different areas, including the funding of retirement and health care benefits for the aged and the likely impact of slower GDP growth. See, e.g., Jamie Hall & Andrew Stone, Demography and Growth, Bull. (Reserve Bank of Austl., Sydney, N.S.W., Austl.), June 2010, at 15, available at http://www.rba.gov.au/publications/bulletin/2010/jun/pdf/bu-0610-3.pdf; see also Ted C. Fishman, Shock of Gray (2010); George Magnus, The Age of Aging: How Demographics are Changing the Global Economy and Our World (2009).

[FN224]. See, e.g., Or. Rev. Stat. §§ 127.800-127.995 (2012); Wash. Rev. Code §§ 70.245.010-70.245.904 (2011). In Baxter v. Montana, the Montana Supreme Court ruled that a physician who assisted a terminally ill patient to die was free from criminal liability, finding "no indication in Montana law that physician aid in dying provided to terminally ill, mentally competent adult patients is against public policy." Baxter v. Montana, 224 P.3d 1211, 1215 (Mont. 2009). The United States Supreme Court has rejected individual autonomy in end-of-life matters as a constitutional basis to challenge state laws banning assisted suicide. See Washington v. Glucksberg, 521 U.S. 702 (1997). However, it has also rejected a federal attempt to constrain physicians from assisted suicide in states that permit it. See Gonzales v. Oregon, 546 U.S. 243 (2012).

[FN225]. See Staff of J. Comm. on Taxation, 111th Cong., Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act" 12 (Comm. Print 2010), available at https://www.jct.gov/publications.html? func=select&id=48.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000123

[FN226]. See id.

[FN227]. Professor Jonathan Adler of Case Western Reserve University and Michael F. Cannon of the Cato Institute are credited for raising these concerns. See, e.g., Brett Ferguson, IRS Rule Related to Employer Mandate May Be Next Challenge in Courts, 130 Daily Tax Report (BNA) G-1 (July 9, 2012). Their working paper explores these issues in greater detail. Jonathan H. Adler & Michael F. Cannon, Taxation Without Representation: The Illegal IRS Rule to Expand Tax Credits under the PPACA, Health Matrix (forthcoming 2013) (Case Legal Studies, Research Paper No. 2012-27), available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=2106789. The discussion below provides only a brief overview of this controversy to illustrate the uncertainties that it presents for those seeking to navigate the current healthcare regime.

[FN228]. See I.R.C. § 36B(a) (2012); see also Staff of J. Comm. on Taxation, supra note 225, at 12.

[FN229]. See I.R.C. § 36B(d)(2). This includes household members and adjustments to add back certain exclusions from gross income, including Social Security benefits and tax-exempt interest. See id.

[FN230]. See id. § 36B(d)(3).

[FN231]. See id. § 36B(b)(3)(A)(i). That table is also adjusted for inflation after 2014. See id. § 36B(b)(3)(A)(ii)(I). After 2018, an additional constraint applies to limit available assistance based on a specified level of spending in relation to the gross domestic product. See id. § 36B(b)(3)(A)(ii)(II).

[FN232]. See Treas. Reg. § 1.36B-3 (2012).

[FN233]. See I.R.C. § 36B(c)(1)(A).

[FN234]. Id. § 36B(b)(2)(A)-(B) (emphasis added).

[FN235]. See id. § 36B(b)(2)(B), (3)(B). By way of background, the Act requires some standardization based on four levels of coverage: bronze, silver, gold, and platinum. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1302(d), 124 Stat. 119, 163 (2010). These metallic coverage levels indicate the scope of benefits provided, although all such plans are subject to the minimum essential coverage requirements, including preventive services as discussed above. A silver level plan generally results in an actuarial value of coverage where the plan covers 70% of the health care expenses of a standard population, while the insureds pay for the balance of those costs. See Henry J. Kaiser Family Found., supra note 192.

[FN236]. See supra note 146 and accompanying text.

[FN237]. I.R.C. § 36B(b)(3)(B) (emphasis added).

[FN238]. See id. § 36B(b)(3)(A).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000124

[FN239]. This is a rough estimate based on the 2012 figures provided by the Department of Health and Human Services. See Annual Update of the HHS Poverty Guidelines, 77 Fed. Reg. 4,034, 4,035 (Jan. 26, 2012) (showing 2012 annual poverty guideline of $19,030 for a family of 3, or a monthly income of $1,590.83; $1,590.83 x 2.75 = $4,375, which adjusted for future inflation approximates to $4,500).

[FN240]. See Treas. Reg. § 1.36B-3(g)(3) ex. 1.

[FN241]. There is also no comparable silver-level premium from such an Exchange necessary for computations in I.R.C. § 36B(b)(2)(B), but it is unnecessary to reach that part of the computation if the first point-- purchasing through a State Exchange--is not met.

[FN242]. Health Insurance Premium Tax Credit, 77 Fed Reg. 30,377 (May 23, 2012) (to be codified at 26 C.F.R. pts. 1, 602).

[FN243]. See Health Insurance Premium Tax Credit, 77 Fed. Reg. at 30,378.

[FN244]. See Adler and Cannon, supra note 227.

[FN245]. 567 U.S.__, 132 S. Ct. 2566 (2012).

[FN246]. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. __, __, 132 S. Ct. 2566, 2603-04 (2012). It should also be noted that this ruling created other problems that Congress must likely address. For instance, by allowing the states to reject the federal directive to expand Medicaid coverage to 133% of the federal poverty guidelines, some states will choose not to expand.

[FN247]. See Henry J. Kaiser Family Found., Kaiser's Health Reform Source, StateHealthFacts.org, http://statehealthfacts.org/healthreformsource.jsp (last visited Dec. 11, 2012).

[FN248]. Id.

[FN249]. See, e.g., Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,377 (May 23, 2012) (to be codified at 26 C.F.R. pts. 1, 602) (indicating that the total compliance burden associated with the collection of information by Exchanges and the coordination of the section 36B credits by Exchanges would alone take an estimated 250,000 hours). In Nebraska, Governor Dave Heineman ultimately decided not to form a state Exchange based in part on state budgetary considerations. According to Governor Heineman, a state Exchange would cost Nebraska $470 million more than a federal Exchange over fiscal years 2013-2020. See Governor Dave Heineman, Remarks on Health Insurance Exchanges (Nov. 15, 2012), available at http://www.governor.nebraska.gov/news/2012/11/pdf/Federal_Health_Insurance_ Exchange.pdf.

[FN250]. See Letter from Bruce D. Greenstein, Sec'y, La. Dep't of Health & Hosps. to Kathleen Sebelius, Sec'y, Dep't of Health & Human Servs. (Nov. 16, 2012) (on file with author), available at http://new.dhh.louisiana.gov/assets/media/LA_Declaration_HealthInsuranceExchanges.pdf (characterizing the Affordable Care Act as "an unworkable piece of legislation," and noting the absence of federally promised guidance on implementation).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000125

46 CRLR 207                                                                                        Page 51
46 Creighton L. Rev. 207

[FN251]. I.R.C. § 4980H(a)(2) (2012).

[FN252]. However, this presupposes that no other subsidy deemed to be a "cost-sharing reduction" is provided through a Federal Exchange.

[FN253]. Note that I.R.C. § 45R also provides a tax credit for a "qualified small business employer" for the purpose of incentivizing insurance coverage. After 2013, this credit only applies to those that purchase health insurance coverage through a State Exchange and then only for two years. Again, without a State Exchange, is no benefit available?

[FN254]. See supra note 1 and accompanying text.

[FN255]. See, e.g., Autenrieth v. Cullen, 418 F.2d 586, 588 (9th Cir. 1969) ("[W]e hold that nothing in the Constitution prohibits the Congress from levying a tax upon all persons, regardless of religion, for support of the general government. The fact that some persons may object, on religious grounds, to some of the things that the government does is not a basis upon which they can claim a constitutional right not to pay a part of the tax."); Tingle v. Comm'r, 73 T.C. 816, 820-21 (1980) (rejecting conscience-based exemption regarding expenditures as inconsistent with constitutional scope of taxing power).

[FN256]. See, e.g., Sir Josiah Stamp, The Fundamental Principles of Taxation in the Light of Modern Developments 133 (1921) ("Just as a differential tax tends to be a confiscation of values for present owners, so a differential exemption or privilege tends to be a bonus to present owners.").

[FN257]. See Richard Epstein, Taxation, Regulation, and Confiscation, 20 Osgoode Hall L.J. 433, 434 (1982) ("Regulation and taxation both may be used as instruments of confiscation, because both are equivalent of the (partial) taking of private property.").

[FN258]. See supra notes 60-71 and accompanying text for further explanation of these penalties.

[FN259]. I.R.C. §§ 3101-3128 (2012).

46 Creighton L. Rev. 207

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATES000126

# DEF-INTERV.

# EX. 128

NBER WORKING PAPER SERIES

THE LABOR DEMAND CURVE IS DOWNWARD SLOPING:
REEXAMINING THE IMPACT OF IMMIGRATION
ON THE LABOR MARKET

George J. Borjas

Working Paper 9755
http://www.nber.org/papers/w9755

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
June 2003

The views expressed herein are those of the authors and not necessarily those of the National Bureau of Economic Research.

©2003 by George J. Borjas.  All rights reserved. Short sections of text not to exceed two paragraphs, may be quoted without explicit permission provided that full credit including © notice, is given to the source.



DEPOSITION
EXHIBIT
5
DEERE
PENGAD 800-631-6989

The Labor Demand Curve is Downward Sloping: Reexamining the Impact of Immigration on the
Labor Market
George J. Borjas
NBER Working Paper No. 9755
June 2003
JEL No. J1, J6

## ABSTRACT

Immigration is not evenly balanced across groups of workers that have the same education but differ in their work experience, and the nature of the supply imbalance changes over time. This paper develops a new approach for estimating the labor market impact of immigration by exploiting this variation in supply shifts across education-experience groups. I assume that similarly educated workers with different levels of experience participate in a national labor market and are not perfect substitutes. The analysis indicates that immigration lowers the wage of competing workers: a 10 percent increase in supply reduces wages by 3 to 4 percent.

George J. Borjas
Kennedy School of Government
Harvard University
79 JFK Street
Cambridge, MA 02138
and NBER
gborjas@harvard.edu

# THE LABOR DEMAND CURVE *IS* DOWNWARD SLOPING: REEXAMINING THE IMPACT OF IMMIGRATION ON THE LABOR MARKET[*]

## George J. Borjas

"After World War I, laws were passed severely limiting immigration. Only a trickle of immigrants has been admitted since then. . .By keeping labor supply down, immigration policy tends to keep wages high"

Paul Samuelson, *Economics* [1964]

## I. Introduction

Do immigrants harm or improve the employment opportunities of native workers? As Paul Samuelson's assertion suggests, the textbook model of a competitive labor market predicts that an immigrant influx should lower the wage of competing factors.[1]

Despite the intuitive appeal of this theoretical implication and despite the large number of careful studies in the literature, the existing evidence provides a mixed and confusing set of results. The measured impact of immigration on the wage of native workers fluctuates widely from study to study (and sometimes even within the same study), but seems to cluster around zero. A widely cited survey by Friedberg and Hunt [1995, p. 42] concludes that "the effect of immigration on the labor market outcomes of natives is small." Similarly, the 1997 National Academy of Sciences report on the economic impact of immigration argues that "the weight of the empirical evidence suggests that the impact of immigration on the wages of competing native workers is small" [Smith and Edmonston 1997, p. 220]. These conclusions are potentially inconsistent with the textbook model because the immigrant supply shock in recent decades has

[*] I am grateful to Daron Acemoglu, Joshua Angrist, David Autor, Richard Freeman, Daniel Hamermesh, Lawrence Katz, Michael Kremer, Casey Mulligan, Stephen Trejo, and a referee for helpful comments and suggestions, and to the Smith-Richardson Foundation for financial support.

[1] The historical context of Samuelson's [1964, p. 552] assertion is interesting. He was writing just before the enactment of the 1965 Amendments to the Immigration and Nationality Act, the major policy shift that initiated the resurgence of large-scale immigration.

3

been very large, and most studies of labor demand (outside the immigration context) conclude that the labor demand curve is not perfectly elastic [Hamermesh 1993].

This paper presents a new approach for thinking about and estimating the labor market impact of immigration. Most existing studies exploit the geographic clustering of immigrants and use differences across local labor markets to identify the impact of immigration. This framework has been troublesome because it ignores the strong currents that tend to equalize economic conditions across cities and regions. In this paper, I argue that by paying closer attention to the characteristics that define a skill group—and, in particular, by using the insight that both schooling *and* work experience play a role in defining a skill group—one can make substantial progress in determining whether immigration influences the employment opportunities of native workers.

My analysis uses data drawn from the 1960-1990 U.S. Decennial Censuses, as well as the 1998-2001 Current Population Surveys, and assumes that workers with the same education but different levels of work experience participate in a national labor market and are not perfect substitutes. It turns out that immigration—even within a particular schooling group—is not balanced evenly across all experience cells in that group, and the nature of the supply imbalance changes over time. This fact generates a great deal of variation—across schooling groups, experience cells, and over time—that helps to identify the impact of immigration on the labor market. Most importantly, the size of the native workforce in each of the skill groups is relatively fixed, so that there is less potential for native flows to contaminate the comparison of outcomes across skill groups. In contrast to the confusing array of results that now permeate the literature, the evidence consistently suggests that immigration has indeed harmed the employment opportunities of competing native workers.

4

## II. Measuring the Labor Market Impact of Immigration

The laws of supply and demand have unambiguous implications for how immigration should affect labor market conditions in the short run. The shift in supply lowers the real wage of competing native workers. Further, as long as the native supply curve is upward sloping, immigration should also reduce the amount of labor supplied by the native workforce.

If one could observe a number of closed labor markets that immigrants penetrate randomly, one could then relate the change in the wage of workers in a particular skill group to the immigrant share in the relevant population. A negative correlation (i.e., native wages are lower in those markets penetrated by immigrants) would indicate that immigrants worsen the employment opportunities of competing native workers.

In the United States, immigrants cluster in a small number of geographic areas. In 1990, for example, 32.5 percent of the immigrant population lived in only three metropolitan areas (Los Angeles, New York, and Miami). In contrast, only 11.6 percent of the native population clustered in the three largest metropolitan areas housing natives (New York, Los Angeles, and Chicago). Practically all empirical studies in the literature, beginning with Grossman [1982], exploit this demographic feature to identify the labor market impact of immigration. The typical study defines a metropolitan area as the labor market that is being penetrated by immigrants. The study then goes on to calculate a "spatial correlation" measuring the relation between the native wage in a locality and the relative number of immigrants in that locality. These correlations are usually negative, but very weak.[2] The best known spatial correlations are reported in Card's

---

[2] Representative studies include Altonji and Card [1991], Borjas [1987], LaLonde and Topel [1991], Pischke and Velling [1997], and Schoeni [1997]. Friedberg [2001] presents a rare study that uses the supply shock in an occupation to identify the labor market impact of immigration in the Israeli labor market. Although the raw Israeli data suggest a substantial negative impact, correcting for the endogeneity of occupational choice leads to the usual result that immigration has little impact on the wage structure. Card [2001] uses data on occupation and metropolitan area to define skill groups and finds that immigration has a slight negative effect.

[1990] influential study of the Mariel flow. Card compared labor market conditions in Miami and in other cities before and after the *Marielitos* increased Miami's workforce by 7 percent. Card's difference-in-differences estimate of the spatial correlation indicated that this sudden and unexpected immigrant influx did not have a discernable effect on employment and wages in Miami's labor market.[3]

Recent studies have raised two questions about the validity of interpreting weak spatial correlations as evidence that immigration has no labor market impact. First, immigrants may not be randomly distributed across labor markets. If immigrants endogenously cluster in cities with thriving economies, there would be a spurious positive correlation between immigration and wages.[4] Second, natives may respond to the wage impact of immigration on a local labor market by moving their labor or capital to other cities. These factor flows would re-equilibrate the market. As a result, a comparison of the economic opportunities facing native workers in different cities would show little or no difference because, in the end, immigration affected *every* city, not just the ones that actually received immigrants.[5]

Because the local labor market may adjust to immigration, Borjas, Freeman, and Katz [1997] suggested changing the unit of analysis to the national level. If the aggregate technology can be described by a CES production function with two skill groups, the relative wage of the two

---

[3] Angrist and Krueger [1999] replicate Card's study using an alternative time period, and find that a "phantom" influx of immigrants (in the sense that had it not been for a policy intervention, many immigrants would likely have arrived) had a sizable adverse effect on Miami's labor market. This result suggests that many other factors influence labor market conditions in Miami and comparison cities. At the least, one should be cautious when interpreting the spatial correlations estimated from comparisons of specific localities.

[4] Borjas [2001] presents evidence indicating that new immigrants belonging to a particular schooling group tend to settle in those regions that offer the highest return for their skills.

[5] Borjas, Freeman, and Katz [1997] and Card [2001] provide the first attempts to jointly analyze labor market outcomes and native migration decisions. The two studies reach different conclusions. Card reports a slight positive correlation between the 1985-90 rate of growth in the native population and the immigrant supply shock by

groups depends linearly on their relative quantities. By restricting the analysis to two skill groups, the "factor proportions approach" precludes the estimation of the impact of immigration—there is only one observation at any point in time (usually a Census year), giving relative wages and relative employment. As a result, the typical application of this approach compares the actual supplies of workers in particular skill groups to those that would have been observed in the absence of immigration, and then uses outside information on labor demand elasticities to simulate the consequences of immigration. The immigrant flow to the United States in the 1980s and 1990s was relatively low-skill. Not surprisingly, the Borjas-Freeman-Katz [1997] simulation finds that immigration worsened the relative economic status of low-skill workers.

Despite all of the confusion in the literature, the available evidence teaches two important lessons. First, the study of the geographic dispersion in native employment opportunities is not an effective way for measuring the economic impact of immigration; the local labor market can adjust in far too many ways to provide a reasonable analogue to the "closed market" economy that underlies the textbook supply-and-demand framework. Second, the factor proportions approach is ultimately unsatisfactory. It departs from the valuable tradition of empirical research in labor economics that attempts to estimate the impact of labor market shocks by directly observing how those shocks affect some workers and not others. For a given elasticity of substitution, the approach mechanically predicts the relative wage consequences of supply shifts.

Ideally, one would want to estimate directly how immigration alters the employment opportunities of a particular skill group. As noted above, by aggregating workers into groups based on educational attainment, there is just too little variation to examine how supply shocks affect relative wages. However, the human capital literature emphasizes that schooling is not the

---

metropolitan area, while Borjas, Freeman, and Katz report a negative correlation between native net migration in 1970-90 and immigration by state—once one standardizes for the pre-existing migration trends.

7

only—and perhaps not even the most important—determinant of a worker's skills. The seminal work of Becker [1975] and Mincer [1974] stressed that skills are acquired both before and after a person enters the labor market. I will assume that workers who have the same schooling, but who have different levels of experience, are imperfect substitutes in production. As a result, a skill group should be defined in terms of both schooling and labor market experience.

To see how this insight can provide a fruitful approach to the empirical analysis of the labor market impact of immigration, consider the following example. Recent immigration has increased the relative supply of high school dropouts substantially. The labor market implications of this supply shock clearly depend on how the distribution of work experience in the immigrant population contrasts with that of natives. After all, one particular set of native high school dropouts would likely be affected if all of the new low-skill immigrants were very young, and a very different set would be affected if the immigrants were near retirement age.

It is unlikely that similarly educated workers with very different levels of work experience are perfect substitutes [Welch 1979; Card and Lemieux 2001]. The definition of a skill group in terms of both education and experience provides a great deal more independent variation in the immigrant supply shock that can be used to identify how immigration alters the economic opportunities facing particular groups of native workers.

### III. Data

The empirical analysis uses data drawn from the 1960, 1970, 1980, and 1990 Public Use Microdata Samples (PUMS) of the Decennial Census, and the 1999, 2000, and 2001 Annual Demographic Supplement of the Current Population Surveys (CPS). I pool all three of the CPS surveys and refer to these pooled data as the "2000" cross-section. The analysis is restricted to

men aged 18-64 who participate in the civilian labor force. A person is defined to be an immigrant if he was born abroad and is either a non-citizen or a naturalized citizen; all other persons are classified as natives. Appendix 1 provides a detailed description of the construction of the data extracts and of the variables used in the analysis.

As noted above, I use both educational attainment and work experience to sort workers into particular skill groups. In particular, I classify the men into four distinct education groups: persons who are high school dropouts (i.e., they have less than twelve years of completed schooling), high school graduates (they have exactly twelve years of schooling), persons who have some college (they have between thirteen and fifteen years of schooling), and college graduates (they have at least sixteen years of schooling).

The classification of workers into experience groups is bound to be imprecise because the Census does not provide any measure of labor market experience or of the age at which a worker first enters the labor market. I initially define work experience as the number of years that have elapsed since the person completed school. This approximation is reasonably accurate for most native men, but would surely contain serious measurement errors if the calculations were also conducted for women, particularly in the earlier cross-sections when the female labor force participation rate was much lower.

Equally important, this measure of experience is also likely to mis-measure "effective" experience in the sample of immigrants—i.e., the number of years of work experience that are valued by an American employer. After all, a variable that roughly approximates "Age – Education – 6" does not differentiate between experience acquired in the source country and experience acquired in the United States. I address this problem in Section VI below.

I assume that the age of entry into the labor market is 17 for the typical high school dropout, 19 for the typical high school graduate, 21 for the typical person with some college, and

9

23 for the typical college graduate. Let $A_T$ be the assumed entry age for workers in a particular schooling group. The measure of work experience is then given by $(\text{Age} - A_T)$. I restrict the analysis to persons who have between 1 and 40 years of experience.

As noted in Welch's [1979] study of the impact of cohort size on the earnings of baby boomers, workers in adjacent experience cells are more likely to influence each other's labor market opportunities than workers in cells that are further apart. Throughout much of the analysis, I will capture the similarity across workers with roughly similar years of experience by aggregating the data into five-year experience intervals, indicating if the worker has 1 to 5 years of experience, 6 to 10 years, and so on.

Consider a group of workers who have educational attainment $i$, experience level $j$, and are observed in calendar year $t$. The $(i, j, t)$ cell defines a skill group at a point in time. The measure of the immigrant supply shock for this skill group is defined by

$$(1) \qquad p_{ijt} = \frac{M_{ijt}}{(M_{ijt} + N_{ijt})},$$

where $M_{ijt}$ gives the number of immigrants in cell $(i, j, t)$, and $N_{ijt}$ gives the corresponding number of natives. The variable $p_{ijt}$ measures the foreign-born share of the labor force in a particular skill group.

The various panels of Figure I illustrate the supply shocks experienced by the different skill groups between 1960 and 2000 (Appendix 2 reports the underlying data). There is a great deal of dispersion in these shocks even within schooling categories. It is well known, for instance, that immigration greatly increased the supply of high school dropouts in recent decades. What is less well known, however, is that this supply shift did not affect equally all

experience groups within the population of high school dropouts. Moreover, the imbalance in the supply shock changes over time. As Panel A of the figure shows, immigrants made up half of all high school dropouts with 10 to 20 years of experience in 2000, but only 20 percent of those with less than 5 years. In 1960, however, the immigration of high school dropouts increased the supply of the most experienced workers the most. Similarly, Panel D shows that the immigrant supply shock for college graduates in 1990 was reasonably balanced across all experience groups, generally increasing supply by around 10 percent. But the supply shock for college graduates in 1960 was larger for the most experienced groups, while in 2000 it was largest for the groups with 5 to 20 years of experience.

The earnings data used in the paper are drawn from the sample of persons who worked in the year prior to the survey and reported positive annual earnings, are not enrolled in school, and are employed in the wage and salary sector. Earnings are deflated to 1999 dollars by using the CPI-U series. Table I summarizes the trends in log weekly wages for the various native groups. Not surprisingly, there is a great deal of dispersion in the rate of decadal wage growth by education and experience. Consider, for instance, the sample of college graduates. In the 1970s, wage growth was steepest for college graduates with 31-35 years of experience. In the 1990s, however, the wage of college graduates grew fastest for workers with 11-20 years of experience. In sum, the data reveal substantial variation in both the immigrant supply shock and native labor market outcomes across skill groups.

Before proceeding to a formal analysis, it is instructive to document the strong link that exists between log weekly wages and the immigrant share within schooling-experience cells. In particular, I use the data reported in Table I to calculate the decadal change in log weekly wages for each skill group, and the data summarized in the various panels of Figure I (and reported in Appendix 2) to calculate the decadal change in the group's immigrant share. Figure II presents

11

the scatter diagram relating these decadal changes after removing decade effects from the differenced data. The plot clearly illustrates a negative relation between wage growth and immigrant penetration into particular skill groups, and suggests that the regression line is not being driven by any particular outliers. Put simply, the raw data show that weekly wages grew fastest for workers in those education-experience groups that were least affected by immigration.

Finally, the validity of the empirical exercise reported below hinges on the assumption that similarly educated workers who have different levels of experience are not perfect substitutes. Studies that examine this question, including Welch [1979] and Card and Lemieux [2001], find less than perfect substitutability across experience groups. Nevertheless, it is of interest to document that (for given education) immigrants and natives with similar levels of experience are closer substitutes than immigrants and natives who differ in their experience.

I use Welch's [1999] index of congruence to measure the degree of similarity in the occupation distributions of immigrants and natives. The index for any two skill groups $k$ and $\ell$ is defined by

$$(2) \qquad G_{k\ell} = \frac{\sum_c (q_{kc} - \overline{q}_c)(q_{\ell c} - \overline{q}_c) / \overline{q}_c}{\sqrt{\left(\sum_c (q_{kc} - \overline{q}_c)^2 / \overline{q}_c\right)\left(\sum_c (q_{\ell c} - \overline{q}_c)^2 / \overline{q}_c\right)}},$$

where $q_{hc}$ gives the fraction of group $h$ ($h = k,\ \ell$) employed in occupation $c$, and $\overline{q}_c$ gives the fraction of the entire workforce employed in that occupation. The index $G_{k\ell}$, which is similar to a correlation coefficient, equals one when the two groups have identical occupation distributions and minus one when the two groups are clustered in completely different occupations.

12

I calculate the index of congruence in the 1990 Census. I use the three-digit Census Occupation Codes to classify male workers into the various occupations, and restrict the analysis to workers in non-military occupations. To minimize the problem of having many occupation-experience cells with few observations, I aggregate workers into 10-year experience bands. Table II reports the calculated indices for each of the education groups. The occupation distributions of immigrants and natives with the same experience are generally more similar than the distributions of immigrants and natives with different levels of experience. Moreover, the congruence index falls the larger the disparity in work experience between the two groups.

Consider the group of native workers who are high school dropouts and have 11 to 20 years of experience. The index of congruence with immigrants who have the same experience is 0.63. This index falls to 0.53 for immigrants who have 1 to 10 years of experience, and to 0.59 for immigrants with 31 to 40 years. Similarly, consider the native workers who are college graduates and have fewer than 10 years of experience. The index of congruence with immigrants who have the same experience is 0.76, but this index falls to 0.71 for immigrants who have 11 to 20 years of experience, to 0.64 for immigrants who have 21 to 30 years, and to 0.53 for immigrants who have more than 30 years. In sum, the occupation distributions of immigrants and natives (for a given level of education) are most similar when one compares workers who have roughly the same level of work experience.

## IV. Basic Results

Let $y_{ijt}$ denote the mean value of a particular labor market outcome for *native* men who have education $i$ ($i = 1, \ldots, 4$), experience $j$ ($j = 1, \ldots, 8$), and are observed at time $t$ ($t$=1960,

13

1970, 1980, 1990, 2000). Much of the empirical analysis reported in this paper stacks these data across skill groups and calendar years and estimates the model:[6]

$$(3) \qquad y_{ijt} = \theta \, p_{ijt} + s_i + x_j + \pi_t + (s_i \times x_j) + (s_i \times \pi_t) + (x_j \times \pi_t) + \varphi_{ijt},$$

where $s_i$ is a vector of fixed effects indicating the group's educational attainment; $x_j$ is a vector of fixed effects indicating the group's work experience; and $\pi_t$ is a vector of fixed effects indicating the time period. The linear fixed effects in equation (3) control for differences in labor market outcomes across schooling groups, experience groups, and over time. The interactions $(s_i \times \pi_t)$ and $(x_j \times \pi_t)$ control for the possibility that the impact of education and experience changed over time, and the interaction $(s_i \times x_j)$ controls for the fact that the experience profile for a particular labor market outcome differs across schooling groups.

The dependent variables are the mean of log annual earnings, the mean of log weekly earnings, and the mean of fraction of time worked (defined as weeks worked divided by 52 in the sample of all persons, including non-workers). Unless otherwise specified, the regressions are weighted by the sample size used to calculate $y_{ijt}$. The presence of the education-experience

---

[6] The generic regression of wages on some measure of immigrant penetration is used frequently in the literature. Suppose the labor demand function in the pre-immigration period is $\log w_{kt} = D_{kt} + \varepsilon \log N_{kt} + \varphi$, where $k$ is a skill group. The wage change resulting from an exogenous influx of immigrants is

$$\Delta \log w_{kt} = \Delta D_{kt} + \varepsilon \log \left[ (N_{kt}(1 + n_{kt}) + M_{kt})/N_{kt} \right] + \xi \approx \Delta D_{kt} + \varepsilon \, (n_{kt} + m_{kt}) + \xi,$$

where $n_{kt}$ gives the percent change in the number of natives, and $m_{kt} = M_{kt}/N_{kt}$. The rate of change $n_{kt}$ is determined by the labor supply function, $n_{kt} = S_{kt} + \sigma \, \Delta \log w_{kt} + \mu$. The reduced-form wage equation is

$$\Delta \log w_{kt} = X_{kt} + \varepsilon^* \, m_{kt} + \xi^*,$$

where $X_{kt} = (\Delta D_{kt} + \varepsilon S_{kt})/(1 - \varepsilon\sigma)$ and $\varepsilon^* = \varepsilon/(1 - \varepsilon\sigma)$. Equation (3) is a transformation of this reduced-form equation that approximately uses $\log m_{kt}$, rather than $m_{kt}$, as the measure of immigrant penetration. In particular, $\log m \approx (M - N)/(0.5(M + N)) = 2 \, (2p - 1)$. I opted for the immigrant share specification because the relation between wages and $m$ is nonlinear and $m$ has a large variance both over time and across groups.

interactions in (3) implies that the impact of immigration on labor market outcomes is identified from changes that occur within education-experience cells over time. The standard errors are clustered by education-experience cells to adjust for possible serial correlation.

The first row of Table III presents the basic estimates of the adjustment coefficient $\theta$. Consider initially the results when the dependent variable is the log of weekly earnings of native workers. The coefficient is -0.572, with a standard error of 0.162. It is easier to interpret this coefficient by converting it to an elasticity that gives the percent change in wages associated with a percent change in labor supply. Let $m_{ijt} = M_{ijt}/N_{ijt}$, or the percentage increase in the labor supply of group $(i, j, t)$ attributable to immigration. Define the "wage elasticity" as[7]

$$(4) \qquad \frac{\partial \log w_{ijt}}{\partial m_{ijt}} = \frac{\theta}{(1 + m_{ijt})^2}.$$

By 2000, immigration had increased the number of men in the labor force by 16.8 percent. Equation (4) implies that the wage elasticity—evaluated at the mean value of the immigrant supply increase—can be obtained by multiplying $\theta$ by approximately 0.7. The wage elasticity for weekly earnings is then -0.40 (or -0.572 × 0.7). Put differently, a 10 percent supply shock (i.e., an immigrant flow that increases the number of workers in the skill group by 10 percent) reduces weekly earnings by about 4 percent.

Table III indicates that immigration has an even stronger effect on annual earnings, suggesting that immigration reduces the labor supply of native male workers. A 10 percent

---

[7] As noted above, the immigrant share approximates log $m$. Because there are no cells with zero immigrants in the data used in Table III, the results are virtually identical (once properly interpreted) if log $m$ is used as the regressor. In the next section, however, where I categorize workers by state of residence, education, and experience, 15.7 percent of the cells have no immigrants, and using log $m$ would create a serious selection problem.

supply shock reduces annual earnings by 6.4 percent and the fraction of time worked by 3.7 percentage points. Note that the difference in the coefficients from the log annual earnings and the log weekly earnings regressions gives the coefficient from a log weeks worked specification. A simple supply-demand framework implies that the labor supply elasticity for workers can be estimated from the ratio of the immigration effect on log weeks worked and log weekly earnings. The point estimate for this ratio is 0.6. This estimate lies above the range reported by Juhn, Murphy, and Topel [1991], who report labor supply elasticities between 0.1 and 0.4.[8]

The remaining rows of Table III conduct a variety of specification tests to determine the sensitivity of the results. The coefficients reported in the second row, for example, indicate that the results are similar when the regressions are not weighted by the sample size of the skill group. In the third row, the regression redefines the measure of the immigrant share $p_{ijt}$ to include both male and female labor force participants. Despite the misclassification of many women into the various experience groups, the adjustment coefficients remain negative and significant, and have similar values to those reported in the first row. The last row of the table addresses the interpretation problem that arises because a rise in $p_{ijt}$ can represent either an increase in the number of immigrants or a decline in the number of native workers in that skill group (e.g., the secular decline in the number of natives who are high school dropouts). Row 4 of the table reports the adjustment coefficient when the regression adds the log of the size of the native workforce in cell $(i, j, t)$ as a regressor. The wage elasticity for log weekly earnings is -0.39 and

---

[8] The variable $p_{ijt}$ gives the immigrant share among labor force participants. The labor force participation decision may introduce some endogeneity in this variable. The problem can be addressed by using an instrument given by the immigrant share in the population of all men in cell $(i, j, t)$. The IV estimates of $\theta$ (and standard errors) are -0.803 (0.586) for log annual earnings, -0.541 (0.153) for log weekly earnings, and -0.493 (0.125) for the fraction of time worked. These coefficients are similar to those reported in the first row of Table III. The immigrant share may also be endogenous in a different sense. Suppose the labor market attracts foreign workers mainly in those skill cells where wages are relatively high. There would be a spurious positive correlation between $p_{ijt}$ and the wage. The results in Table III should then be interpreted as lower bounds of the true impact of immigration.

significant. In short, the parameter θ in equation (3) is indeed capturing the impact of an increase in the size of the immigrant population on native labor market outcomes.[9]

I also estimated the regression model within schooling groups to determine if the results are being driven by particular groups, such as the large influx of foreign-born high school dropouts. With only one exception, Table IV shows that the impact of immigration on the weekly earnings of particular schooling groups is negative and significant. The exception is the group of college graduates, where the adjustment coefficient is positive and has a large standard error. Note, however, that the regression estimated within a schooling group cannot include experience-period interactions to control for secular changes in the shape of the experience-earnings profile. As a result, the coefficient of the immigrant share variable may be measuring a spurious correlation between immigration and factors that changed the wage structure differentially within schooling groups. It is probably not coincidental that the adjustment coefficient is positive for college graduates, the group that experienced perhaps the most striking change in the wage structure in recent decades.[10]

Finally, the last column of Table IV estimates the regressions using only the groups of natives with at least a high school education. The coefficients generally suggest that the sample of high school dropouts is not the group that is driving much of the analysis. Although the

---

[9] The results would be roughly similar if the regressions were estimated separately using each set of two adjacent cross-sections, so that the regression models would be differencing the data over a decade. The adjustment coefficients (and standard errors) for log weekly earnings are: -1.042 (0.484) in 1960-1970, -0.427 (0.561) in 1970-1980, -0.277 (0.480) in 1980-1990, and -0.285 (0.270) in 1990-2000. This rough similarity contrasts with the inability of the spatial correlation approach to generate parameter estimates that even have the same sign over time; see Borjas, Freeman, and Katz [1997] and Schoeni [1997].

[10] I also estimated the regression model within experience groups. The adjustment coefficients (and standard errors) for log weekly earnings were: 1-5 years of experience, -0.403 (0.470); 6-10 years, -0.358 (0.286); 11-15 years; -0.475 (0.285); 16-20 years, -0.555 (0.244); 21-25 years, -0.568 (0.244); 26-30 years, -0.634 (0.193); 31-35 years, -0.495 (0.288); and 36-40 years, -0.147 (0.228). Although these regressions only have 20 observations, the point estimate of θ is negative and significant for many groups.

17

adjustment coefficients remain negative for all the dependent variables, it is insignificant for log weekly earnings. In the case of log annual earnings, however, the wage elasticity is around -0.8, suggesting that immigration had an adverse impact on native workers even when the regression ignores the information provided by the workers who experienced the largest supply shock in the past few decades.[11]

## V. A Comparison with the Spatial Correlation Approach

In contrast to the studies that calculate spatial correlations between wages in local labor markets and measures of immigrant penetration, the evidence presented in the previous section indicates that immigrants have a sizable adverse effect on the wage of competing workers. This discrepancy suggests that it might be instructive to examine how the results of the generic spatial correlation regression would change if that analysis defined skill groups in terms of both education and experience.

Suppose that the relevant labor market for a typical worker is determined by his state of residence ($r$), education, and experience.[12] I use the 1960-2000 Census and CPS files to calculate both the immigrant share and the mean labor market outcomes for cell ($r, i, j, t$). I then use these

---

[11] It is of interest to use the labor market outcomes of immigrants as the dependent variable. I used the sample of immigrants with fewer than 30 years of experience because there are relatively few observations in the cells for older workers in 1970 and 2000; and did not use data from the 1960 Census because that survey does not provide information on the immigrant's year of entry into the United States. The estimates are imprecise, but the results resemble those found for native workers once I control for cohort and assimilation effects. If the regression is estimated on the sample of immigrants who have been in the United States for fewer than 10 years, the adjustment coefficients (and standard errors) are -0.506 (0.398) for log annual earnings, -0.290 (0.350) for log weekly earnings, and -0.192 (0.105) for the fraction of time worked.

[12] I use states to define the geographic boundary of the labor market because a worker's state of residence is the only geographic variable that is consistently coded across the entire 1960-2000 span. The 1960 Census does not report the person's metropolitan area of residence, and the metropolitan area identifiers for the 1970 Census differ substantially from those reported in later surveys.

18

aggregate data to estimate regressions similar to those presented above, but the unit of analysis is now a state-education-experience group at a particular point in time.

Table V reports the estimated coefficient of the immigrant share variable from this regression framework. The first column of the table presents the coefficient from the simplest specification, which includes the state, education, experience, and period fixed effects, as well as interactions between the state, education, and experience fixed effects with the vector of period fixed effects, and interactions between the state and education fixed effects. This regression, in effect, estimates the impact of immigration on the *change* in labor market outcomes experienced by a particular education group in a particular state. The adjustment coefficients for the various dependent variables are negative and mostly significant. The adjustment coefficient in the log weekly earnings regression is -0.124, with a standard error of 0.042. Note that the implied adverse impact of immigration resulting from this specification is far smaller than the effects reported in the previous section.

The second column of Table V adds a three-way interaction between the state, education, and experience fixed effects. This specification, therefore, examines the impact of immigration on the wage growth experienced by a particular education-experience group living in a particular state. The adjustment coefficients are more negative (-0.217 in the log weekly wage specification) and statistically significant. In short, defining a skill group in terms of both education and experience implies that immigration has a more adverse impact than a specification that ignores the experience component.

The third column of the table further expands the model by allowing for period effects to vary across education-experience cells, while the fourth column presents the full specification of the regression that allows for all possible three-way interactions between the state, education, experience, and period fixed effects. This regression specification effectively identifies the wage

19

impact by using only variation in immigration at the (state × education × experience × period) level. The coefficient is negative and significant (-0.183 in the log weekly wage specification), and it is numerically much smaller than the coefficients reported in the previous section.

In fact, it is instructive to contrast the difference in the results reported in the last column of Table V with the evidence reported in Table III. The key difference between the two sets of estimates is the assumption made about the geographic boundary of the labor market. The estimated wage elasticity for log weekly earnings is -0.13 when a state's geographic boundary limits the size of the market, and -0.40 when the worker participates in a national market. One interesting interpretation of this discrepancy is that there is sufficient spatial arbitrage—perhaps due to interstate flows of labor and capital—that tends to equalize opportunities for workers of given skills across regions. The spatial arbitrage effectively cuts the national estimate of the impact of immigration by two-thirds.[13] Put differently, even though immigration has a sizable adverse effect on the wage of competing workers at the national level, the analysis of wage differentials across regional labor markets conceals much of the impact.

## VI. Refining the Definition of Skills

*A. Measuring Effective Experience*

---

[13] The smaller wage effects estimated at the state level could also be due to attenuation bias from the measurement error that arises when I calculate the immigrant supply shock at such a detailed level of disaggregation. I reestimated the model using the nine Census regions (rather than states) as the geographic unit. The region-level regression coefficients corresponding to the last column of Table V are -.346 (.096) in the log annual earnings regression; -.289 (.070) in the log weekly earnings regression; and -.057 (.023) in the fraction of time worked regression. Even though the coefficients in the annual and weekly earnings regressions are numerically larger than those obtained in the state-level analysis, the coefficient in the log weekly earnings regression is still only half the size of the one reported in Table III. Moreover, it is unclear if the relatively larger effects estimated at the region level result from the partial elimination of attenuation bias or from the possibility that some of the native flows induced by immigration are intra-regional, and hence the region is a slightly better conceptual representation of the "closed market" required for measuring the local impact of immigration; see Borjas, Freeman, and Katz [1996] for related evidence.

20

Up to this point, labor market experience has been defined as the time elapsed since entry into the labor market for both immigrants and natives. The evidence indicates that U.S. firms attach different values to experience acquired abroad and experience acquired in the United States [Chiswick 1978]. These findings suggest that one should use the "effective experience" of an immigrant worker before assigning that worker to a particular schooling-experience group, where effective experience measures the years of work exposure that are valued in the U.S. labor market. Let $A$ denote age, $A_m$ the age of entry into the United States, and $A_T$ the age of entry into the labor market. The years of effective experience for an immigrant worker are given by

(5)
$$X = \begin{cases} \alpha(A_M - A_T) + \beta(A - A_m), & \text{if } A_m > A_T \\ \gamma(A - A_T), & \text{if } A_m \leq A_T, \end{cases}$$

where $\alpha$ translates a year of source country experience acquired by immigrants who migrated as adults (i.e., $A_m > A_T$) into the equivalent value of experience acquired by a native worker; $\beta$ rescales the value of a year of U.S. experience acquired by these adult immigrants; and $\gamma$ rescales the experience acquired by immigrants who migrated as children (i.e., $A_m \leq A_T$).

The parameters $\alpha$, $\beta$, and $\gamma$ can be estimated by using the standard model of immigrant assimilation, a model that also accounts for differences in immigrant "quality" across cohorts [Borjas 1985]. Suppose we pool data for native and immigrant workers in two separate cross-sections (such as the 1980 and 1990 Censuses). A generic regression model that can identify all of the relevant parameters is

(6)
$$\begin{aligned} \log w = s_i &+ \phi_C I^C + \phi_D I^D + \lambda_N N(A - A_T) + \lambda_C I^C (A - A_T) \\ &+ \lambda_{D0} I^D (A_m - A_T) + \lambda_{D1} I^D (A - A_m) + \kappa Y + \rho\pi + \varphi, \end{aligned}$$

where $w$ gives the weekly wage of a worker observed in a particular cross-section; $s_i$ gives a vector of education fixed effects; $I^C$ indicates if the immigrant entered the country as a child; $I^D$ indicates if the immigrant entered as an adult; $N$ indicates if the worker is native-born ($N = 1 - I^C - I^D$); $Y$ gives the calendar year of entry into the United States (set to zero for natives); and $\pi$ indicates if the observation is drawn from the 1990 Census.

The coefficient $\lambda_N$ gives the market value of a year of experience acquired by a native worker; $\lambda_C$ gives the value of a year of experience acquired in the United States by a "child immigrant"; and $\lambda_{D0}$ and $\lambda_{D1}$ give the value of a year of source country experience and of U.S. experience acquired by an adult immigrant, respectively. The weights that define an immigrant's effective experience are

$$(7) \qquad \alpha = \frac{\lambda_{D0}}{\lambda_N}, \quad \beta = \frac{\lambda_{D1}}{\lambda_N}, \quad \gamma = \frac{\lambda_C}{\lambda_N}.$$

Although the generic regression model in (6) is pedagogically useful, it ignores the curvature of the experience-earnings profile, and also ignores the possibility that the returns to education differ among the various groups. Further, it is preferable to define the calendar year of an immigrant's arrival as a vector of dummy variables indicating the year of arrival, rather than as a linear time trend. I estimated this more general model using the pooled 1980 and 1990 data. Table VI reports the relevant coefficients from this regression.

The experience coefficients for natives and for immigrants who migrated as children have almost identical numerical values, so that a marginal year of experience is valued at the same rate by employers (although the tiny numerical difference is statistically significant). This

implies that the weight γ is estimated to be 1.0. In contrast, the value of an additional year of source country experience for adult immigrants (evaluated at the mean years of source country experience) is 0.006, while the value of an additional year of U.S. experience for these immigrants is 0.024. The value of a year of experience for a comparable native worker is 0.015. The implied weights are $\alpha = 0.4$ and $\beta = 1.6$.

I used these weights to calculate the effective experience of each immigrant, and then reclassified them into the schooling-experience cells using the predicted measure of effective experience.[14] The top row of Table VII reports the estimated adjustment coefficients. The effects are roughly similar to those reported in the previous section. For example, the weekly earnings regression implies that the wage elasticity is -.30, and the effect is statistically significant.

*B. Measuring Effective Skills*

The notion of effective experience raises a more general question about the overall comparability of the skills of immigrants and natives. The U.S. labor market differentiates the value of human capital embodied in immigrants and natives along many dimensions. For example, the value that firms attach to schooling will probably differ between the two groups, as well as among immigrants originating in different countries. It is of interest, therefore, to devise a simple way of summarizing the differences in "effective skills" that exist between immigrants and natives within a schooling category. It seems sensible to assume that similarly educated workers who fall in the same general location of the wage distribution have roughly the same

---

[14] Neither the Census nor the CPS report the exact year in which immigrants entered the United States, but instead report the year of entry within particular intervals (e.g., 1980-84). I used a uniform distribution to randomly assign workers in each interval to each year in the interval. Because the immigrant's year of arrival is not reported in the 1960 Census, the analysis is restricted to data drawn from the 1970 through 2000 cross-sections.

number of efficiency units because employers attach the same value to the *entire* package of skills embodied in these workers.

To conduct this classification of workers into skill groups, I restrict the analysis to workers who have valid wage data. In each cross-section and for each of the four schooling groups, I sliced the weekly wage distribution of *native* workers into 20 quantiles. By construction, five percent of natives in each schooling group fall into each of the quantiles. I then calculated how many of the immigrant workers in each schooling group fall into each of the 20 quantiles. The immigrant supply shock is defined by

$$(8) \qquad \hat{p}_{ikt} = \frac{M_{ikt}}{(M_{ikt} + N_{ikt})},$$

where $M_{ikt}$ and $N_{ikt}$ give the number of foreign-born and native-born workers in schooling group $i$, quantile $k$ ($k = 1, \ldots, 20$), at time $t$.

Consider the regression model:

$$(9) \qquad y_{ikt} = \theta \, \hat{p}_{ikt} + s_i + q_k + \pi_t + (q_k \times s_i) + (s_i \times \pi_t) + (q_k \times \pi_t) + \varphi_{ikt},$$

where $q_k$ is a vector of fixed effects indicating the quantile of the cell. The second row of Table VII reports the adjustment coefficients estimated from this specification of the model. Despite the very different methodological approach employed to define the skill groups, the estimated coefficient in the log weekly earnings regression is similar to those reported above. The estimate of $\theta$ is -0.606 (with a standard error of 0.158), implying a wage elasticity of -0.42. In sum, the evidence suggests that the clustering of immigrants into particular segments of the wage

24

distribution worsened the wage outcomes of native workers who happened to reside in those regions of the wage distribution.[15]

## VII. A Structural Approach to Immigration and Factor Demand

*A. Theory and Evidence*

Up to this point, I have not imposed any economic structure in the estimation of the wage effects of immigration. As in most of the studies in the spatial correlation literature, I have instead attempted to calculate the correlation that indicates if an increase in the number of immigrants lowers the wage of competing native workers.

An alternative approach would impose more structure by specifying the technology of the aggregate production function.[16] This structural approach would make it possible to estimate not only the effect of a particular immigrant influx on the wage of competing native workers, but also the cross-effects on the wage of other natives. An empirically useful approach assumes that the aggregate production function can be represented in terms of a three-level CES technology: Similarly educated workers with different levels of work experience are aggregated to form the

---

[15] The fraction of time worked variable used in the regression reported in the second row of Table VII has a different definition than elsewhere in this paper. To simplify the sorting of persons into the quantiles of the wage distribution, I restricted the analysis to working men. One could classify non-workers into the various quantiles by using a first-stage regression that predicts earnings based on a person's educational attainment, experience, and other variables. For native men, this approach leads to results that are similar to those reported in the text.

[16] Early empirical studies of the labor market impact of immigration [Grossman 1982; Borjas 1987] actually imposed a structure on the technology of the local labor market, such as the translog or the Generalized Leontief, and used the resulting estimates to calculate the various substitution elasticities. Although this approach fell out of favor in the early 1990s, the evidence reported by Card [2001] and the results presented in this section suggest that the structural approach may be due for a timely comeback.

effective supply of an education group; and workers across education groups are then aggregated to form the national workforce.[17]

Suppose the aggregate production function for the national economy at time $t$ is

$$(10) \qquad Q_t = \left[ \lambda_{Kt} K_t^{\,v} + \lambda_{Lt} L_t^{\,v} \right]^{1/v},$$

where $Q$ is output, $K$ is capital, $L$ denotes the aggregate labor input; and $v = 1 - 1/\sigma_{KL}$, with $\sigma_{KL}$ being the elasticity of substitution between capital and labor ($-\infty < v \le 1$). The vector $\lambda$ gives time-variant technology parameters that shift the production frontier, with $\lambda_{Kt} + \lambda_{Lt} = 1$. The aggregate $L_t$ incorporates the contributions of workers who differ in both education and experience. Let

$$(11) \qquad L_t = \left[ \sum_i \theta_{it} L_{it}^{\,\rho} \right]^{1/\rho},$$

where $L_{it}$ gives the number of workers with education $i$ at time $t$, and $\rho = 1 - 1/\sigma_E$, with $\sigma_E$ being the elasticity of substitution across these education aggregates ($-\infty < \rho \le 1$). The $\theta_{it}$ give time-variant technology parameters that shift the relative productivity of education groups, with $\Sigma_i \, \theta_{it} = 1$. Finally, the supply of workers in each education group is itself given by an aggregation of the contribution of similarly educated workers with different experience. In particular,

---

[17] The three-level CES technology slightly generalizes the two-level approach used in the labor demand context by Bowles [1970] and Card and Lemieux [2001].

26

$$(12) \qquad L_{it} = \left[ \sum_j \alpha_{ij} \, L_{ijt}^{\eta} \right]^{1/\eta},$$

where $L_{ijt}$ gives the number of workers in education group $i$ and experience group $j$ at time $t$; and $\eta = 1 - 1/\sigma_X$, with $\sigma_X$ being the elasticity of substitution across experience classes within an education group ($-\infty < \eta \leq 1$). Equation (12) incorporates an important identifying assumption: the technology coefficients $\alpha_{ij}$ are constant over time, with $\Sigma_j \, \alpha_{ij} = 1$.

The marginal productivity condition implies that the wage for skill group $(i, j, t)$ is

$$(13) \qquad \log w_{ijt} = \log \lambda_{Lt} + (1 - v) \log Q_t + (v - \rho) \log L_t + \log \theta_{it} + (\rho - \eta) \log L_{it}$$
$$+ \log \alpha_{ij} + (\eta - 1) \log L_{ijt}.$$

As Card and Lemieux [2001] show in their recent study of the link between the wage structure and cohort size, it is straightforward to implement this approach empirically. In particular, note that the marginal productivity condition in (13) can be rewritten as

$$(14) \qquad \log w_{ijt} = \delta_t + \delta_{it} + \delta_{ij} - \frac{1}{\sigma_X} \log L_{ijt},$$

where $\delta_t = \log \lambda_{Lt} + (1 - v) \log Q_t + (v - \rho) \log L_t$, and is absorbed by period fixed effects; $\delta_{it} = \log \theta_{it} + (\rho - \eta) \log L_{it}$, and is absorbed by interactions between the education fixed effects and the period fixed effects; and $\delta_{ij} = \log \alpha_{ij}$, and is absorbed by interactions between education fixed

effects and experience fixed effects. The regression model in (14), therefore, identifies the elasticity of substitution across experience groups.

Moreover, the coefficients of the education-experience interactions in (14) identify the parameters $\log \alpha_{ij}$. I impose the restriction that $\Sigma_j \alpha_{ij} = 1$ when I estimate the $\alpha_{ij}$ from the fixed effect coefficients.[18] As indicated by equation (12), the estimates of $\alpha_{ij}$ and $\sigma_X$ permit the calculation of $L_{it}$, the CES-weighted labor aggregate for education group $i$. I can then move up one level in the CES technology, and recover an additional unknown parameter. Let $\log w_{it}$ be the mean log wage paid to the average worker in education group $i$ at time $t$. The marginal productivity condition determining the wage for this group is

$$(15) \qquad \log w_{it} = \delta_t + \log \theta_{it} - \frac{1}{\sigma_E} \log L_{it} .$$

This equation is closely related to the model estimated by Katz and Murphy [1992, p. 69] that examines how the wage differential between college and high school graduates varies with relative supplies. Note that $\sigma_E$ cannot be identified if the regression included interactions of education-period fixed effects to capture the term $\log \theta_{it}$. There would be 20 such interaction terms, but there are only 20 observations in the regression (four education groups observed at five different points in time). To identify $\sigma_E$, I adopt the Katz-Murphy assumption that the technology shifters can be approximated by a linear trend that varies across education groups.

It is important to note that ordinary least squares regressions of equations (14) and (15) may lead to biased estimates of $\sigma_X$ and $\sigma_E$ because the supply of workers to the various education

---

[18] If $\log \hat{\alpha}_{ij}$ is an estimated fixed effect coefficient, then $\hat{\alpha}_{ij} = \exp(\log \hat{\alpha}_{ij}) / \sum_j \exp(\log \hat{\alpha}_{ij})$.

groups is likely to be endogenous over the 40-year period spanned by the data. The economic question at the core of this paper, however, suggests an instrument for the size of the workforce in each skill group: the number of immigrants in that group. In other words, the immigrant influx into particular skill groups provides the supply shifter required to identify the labor demand function. This instrument would be valid if the immigrant influx into particular skill groups were independent of the relative wages offered to the various skill categories. It is likely, however, that the number of immigrants in a skill group responds to shifts in the wage structure. Income-maximizing behavior on the part of potential immigrants would generate larger flows into those skill cells that had relatively high wages. This behavioral response would tend to build in a positive correlation between the size of the labor force and wages in a skill group. The regression coefficients, therefore, understate the negative wage impact of a relative supply increase.[19]

The three-level CES technology offers a crucial advantage for estimating the impact of immigration within a structural system of factor demand. My analysis defines 33 factors of production: 32 education-experience skill groups plus capital. A general specification of the technology, such as the translog, would require the estimation of 561 different parameters (or $n(n+1)/2$). The three-level CES approach drastically reduces the size of the parameter space; the technology can be summarized in terms of three elasticities of substitution. Obviously, this simplification comes at a cost: the CES specification restricts the types of substitution that can

---

[19] Consider the regression model given by $\log w = \beta \log L + u$. The IV estimate of $\beta$ has the property:

$$\text{plim } \hat{\beta} = \beta + \frac{\text{cov}(\log M, u)}{\text{cov}(\log M, \log L)},$$

where $\log M$ is the instrument. The total number of workers in a skill group is, in fact, positively correlated with the number of immigrants in that group, so that $\text{cov}(\log M, \log L) > 0$. Further, $\text{cov}(\log M, u) > 0$ because skill cells with

exist among the various factors. The elasticity of substitution across experience groups takes on the same value for workers in adjacent experience categories as for workers who differ greatly in their experience; the elasticity of substitution between high school dropouts and high school graduates is the same as that between high school dropouts and college graduates; and the elasticity of substitution between capital and labor is the same for all the different types of workers.

Finally, note that the empirical implementation of the three-level CES technology described above does not use any data on the aggregate capital stock, making it difficult to separately identify the value of $\sigma_{KL}$.[20] I will discuss below a plausible assumption that can be made about this parameter to simulate the impact of immigration on the labor market.

The first step in the empirical application of the model is to estimate equation (14) using the sample of 160 $(i, j, t)$ cells. The IV estimate of this regression equation is[21]

$$(16) \qquad \log w_{ijt} = \delta_t + \delta_{it} + \delta_{ij} - 0.288 \log L_{ijt}.$$
$$(0.115)$$

---

favorable demand shocks will probably attract larger numbers of income-maximizing immigrants. The IV regression coefficient then provides a lower bound for the wage reduction resulting from a supply increase.

[20] In principle, the elasticity $\sigma_{KL}$ could be estimated even without direct information on the aggregate capital stock by going up an additional level in the CES hierarchy. This exercise yields the marginal productivity condition for the average worker at time $t$. This marginal productivity condition depends on a time fixed effect and on $L_t$, the CES-weighted aggregate of the workforce. The coefficient of $L_t$ identifies $-1/\sigma_{KL}$. However, this regression would only have five observations in my data, and I would need to find a variable that could proxy for the movements in the period fixed effects.

[21] The instrument is $\log M_{ijt}$ and the standard errors are clustered by education-experience group. To avoid introducing errors due to composition effects, the regressions reported in this section use the mean log weekly wage of native workers as the dependent variable. The results would be very similar if the mean log wage was calculated in the pooled sample of natives and immigrants. The relevant coefficients (and standard errors) in equations (16), (17), and (17′) would be -0.281 (0.059), -0.676 (0.518), and -0.680 (0.462), respectively. The regressions estimated in this section are weighted by the size of the sample used to calculate the cell mean on the left-hand-side.

The implied elasticity of substitution across experience groups is 3.5. This estimate of $\sigma_X$ is similar to the Card-Lemieux [2001] estimate of the elasticity of substitution across age groups. The Card-Lemieux estimates for U.S. data range from 3.8 to 4.9.

I use the implied estimate of the elasticity of substitution and the (transformed) coefficients of the education-experience fixed effects to calculate the size of the CES-weighted labor aggregate for each education group. I then estimate the marginal productivity condition for the education group given by (15). The IV regression estimate is[22]

$$(17) \qquad \log w_{it} = \delta_t + \text{linear trend interacted with education fixed effects} - 0.741 \log L_{it}.$$
$$(0.646)$$

Alternatively, I can bypass the calculation of the CES-weighted labor aggregate for each education group, and simply use the actual number of workers in the group ($L_{it}^*$). The IV regression estimate is

$$(17') \qquad \log w_{it} = \delta_t + \text{linear trend interacted with education fixed effects} - 0.759 \log L_{it}^*.$$
$$(0.582)$$

Both specifications imply that $\sigma_E$ is around 1.3. The regressions reported in (17) and (17') have only 20 observations (four education groups observed at five different points in time), so that the elasticity of substitution is not measured precisely. Nevertheless, the implied elasticity is similar

---

[22] The "linear trend interacted with education fixed effects" vector includes the linear trend and education fixed effects, as well as the interactions. The instrument in (17) is $\log M_{it}$, where $M_{it} = [\sum_j \alpha_{ij} M_{ijt}^\eta]^{1/\eta}$. The alternative specification in (17') uses the instrument $\log M_{it}^*$, where $M_{it}^* = \sum_j M_{ijt}$.

to the Katz-Murphy [1992] estimate of 1.4, despite the different data and methodology.[23] In sum, the evidence indicates that workers within an experience group are not perfect substitutes, but there is clearly more substitution among similarly educated workers who differ in their experience than among workers with different levels of education.

*B. Simulating the Wage Effects of Immigration*

Hamermesh [1993, p. 37] shows that the factor price elasticity giving the impact on the wage of factor $y$ of an increase in the supply of factor $z$ is[24]

(18)
$$\varepsilon_{yz} = \frac{d \log w_y}{d \log L_z} = s_z \frac{Q_{yz}}{Q_y} \frac{Q}{Q_z}.$$

where $s_z$ is the share of income accruing to factor $z$; and $Q_y = \partial Q / \partial L_y$, $Q_z = \partial Q / \partial L_z$, and $Q_{yz} = \partial^2 Q / \partial L_y \partial L_z$.

The three-level CES technology implies that the own factor price elasticity giving the wage impact of an increase in the supply of workers with education $i$ and experience $j$ is

(19)
$$\varepsilon_{ij,ij} = -\frac{1}{\sigma_X} + \left( \frac{1}{\sigma_X} - \frac{1}{\sigma_E} \right) \frac{s_{ij}}{s_i} + \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{ij}}{s_i} + \frac{1}{\sigma_{KL}} s_{ij},$$

---

[23] Card and Lemieux [2001] estimate the elasticity of substitution between high school and college equivalents to be between 1.1 and 3.1, depending on the sample composition.

[24] The factor price elasticity holds marginal cost and the quantities of other factors constant.

32

where $s_{ij}$ gives the share of income accruing to group $(i, j)$; $s_i$ gives the share of income accruing to education group $i$; and $s_L$ gives labor's share of income. Similarly, the (within-branch) cross factor price elasticity giving the impact on the wage of group $(i, j)$ of an increase in the supply of group $(i, j')$, with $j \neq j'$, is

(20)     $$\varepsilon_{ij,ij'} = \left( \frac{1}{\sigma_X} - \frac{1}{\sigma_E} \right) \frac{s_{ij'}}{s_i} + \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{ij'}}{s_L} + \frac{1}{\sigma_{KL}} s_{ij'} .$$

Finally, the (across-branch) cross factor price elasticity giving the impact on the wage of group $(i, j)$ of an increase in the supply of group $(i', j')$, with $i \neq i'$ and $j' = (1, \ldots, j, \ldots 8)$, is

(21)     $$\varepsilon_{ij,i'j'} = \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{i'j'}}{s_L} + \frac{1}{\sigma_{KL}} s_{i'j'} .$$

The calculations of the factor price elasticities in (19)-(21) require information on the factor shares. I assume that labor's share of income is 0.7, and use the 1990 Census to calculate the share of total annual earnings accruing to each education-experience cell. I use these total annual earnings to apportion the labor shares accruing to the various groups.[25] Based on the coefficients estimated above, I set $\sigma_X = 3.5$ and $\sigma_E = 1.3$. Finally, the calculations require an

---

[25] My calculation of the cell's income share uses all men and women who reported annual earnings in 1989. The estimated shares for the 8 experience groups within each education group are: high school dropouts (0.003, 0.004, 0.006, 0.005, 0.005, 0.007, 0.007, 0.007); high school graduates (0.018, 0.030, 0.034, 0.030, 0.028, 0.026, 0.022, 0.017); some college (0.018, 0.030, 0.036, 0.036, 0.030, 0.022, 0.016, 0.011); and college graduates (0.025, 0.039, 0.044, 0.049, 0.037, 0.025, 0.019, 0.013). These income shares, when aggregated to the level of the education group, are similar to the shares reported by Autor, Katz, and Krueger [1998, p. 1209]. The share of income accruing to high school dropouts is 4.5 percent; high school graduates, 20.5 percent; workers with some college, 19.9 percent; and college graduates, 25.1 percent.

33

assumption about $\sigma_{KL}$. Hamermesh [1993, p. 92] concludes that the aggregate U.S. economy can be reasonably described by a Cobb-Douglas production function, suggesting that $\sigma_{KL}$ equals one. I impose this restriction in the analysis.

Table VIII reports the estimated elasticities. The own elasticity varies from -0.30 to -0.36, with a weighted mean of -0.33 (where the weight is the size of the native labor force as of 2000).[26] The table also reports the cross-elasticities within an education branch. Without exception, these cross-elasticities are negative and their weighted mean is -0.05. Finally, the table reports the cross-elasticities across education branches. These cross-elasticities are positive and small, with a weighted mean of 0.02. It is worth noting that the cross-branch elasticities reported for high school dropouts are very close to zero. This result follows from the definition of the elasticity in equation (21). Because the share of income accruing to high school dropouts is small, an influx of low-skill immigrants is bound to have only a tiny impact on the wage of workers in other education groups.[27] As an example, consider the wage effects of a 10 percent increase in the number of college graduates who have 16-20 years of experience. The elasticities calculated for this group indicate that their own wage would drop by 3.5 percent; that the wage of other college graduates (with different levels of experience) would fall by -0.6 percent, and that the wage of all workers without a college degree would rise by 0.3 percent.

---

[26] The own elasticities reported in Table VIII are not directly comparable to the "wage elasticities" reported earlier. As noted in footnote 6, the regression model estimated in previous sections identifies the reduced-form effect of immigration on wages. This reduced form effect is $\varepsilon/(1-\varepsilon\sigma)$, where $\varepsilon$ is the factor price elasticity and $\sigma$ is the labor supply elasticity. If $\varepsilon = -0.33$ and $\sigma = 0.4$, for example, the implied reduced-form effect estimated in this section is -0.29, which is somewhat smaller than the estimates that do not use a structural approach.

[27] Murphy and Welch [1992] report elasticities of complementarity (defined as $Q_{yz}Q/Q_yQ_z$) for a number of education-experience groups. In the Murphy-Welch exercise, the cross-elasticities between high school graduates and college graduates tend to be positive, but the within-branch elasticities for a given education group are not always negative.

I use the elasticity estimates reported in Table VIII to calculate the wage impact of the immigrant influx that entered the United States between 1980 and 2000. The marginal productivity condition for the typical worker in education group $s$ and experience group $x$ can be written as $w_{sx} = D(K, L_{11}, \ldots, L_{18}, \ldots, L_{41}, \ldots, L_{48})$. Assuming that the capital stock is constant, the net impact of immigration on the log wage of group $(s, x)$ is[28]

$$(22) \qquad \Delta \log w_{sx} = \varepsilon_{sx,sx}\, m_{sx} + \sum_{j \neq x} \varepsilon_{sx,sj}\, m_{sj} + \sum_{i \neq s} \sum_{j} \varepsilon_{sx,ij}\, m_{ij},$$

where $m_{ij}$ gives the percentage change in labor supply due to immigration in cell $(i, j)$. Because the size of the native labor force in each skill group is shifting over time, I define $m_{ij}$ as

$$(23) \qquad m_{ij} = \frac{M_{ij,2000} - M_{ij,1980}}{0.5(N_{ij,1980} + N_{ij,2000}) + M_{ij,1980}},$$

so that the baseline population used to calculate the percent increase in labor supply averages out the size of the native workforce in the skill cell and treats the pre-existing immigrant population as part of the "native" stock.

Table IX summarizes the results of the simulation. The large immigrant influx of the 1980s and 1990s adversely affected the wage of most native workers, particularly those workers at the bottom and top of the education distribution. The wage fell by 8.9 percent for high school dropouts and by 4.9 percent for college graduates. In contrast, the wage of high school graduates

---

[28] The assumption of a constant capital stock implies that the resulting wage consequences should be interpreted as short-run impacts. Over time, the changes in factor prices will fuel adjustments in the capital stock that attenuate the wage effects.

35

fell by only 2.6 percent, while the wage of workers with some college was barely affected. Overall, the immigrant influx reduced the wage of the average native worker by 3.2 percent.

These predictions assume that the elasticity of substitution between capital and labor equals one. Equations (19)-(21) imply that the adverse wage effects of immigration are larger if there is less substitution between capital and labor than implied by the aggregate Cobb-Douglas specification. For example, the predicted wage effect for each skill group is about one percentage point lower (i.e., more negative) when $\sigma_{KL} = 0.75$, so that the wage of the average native worker would then fall by 4.2 percent.

## VIII. Conclusion

The concern over the adverse labor market impact of immigration has always played a central role in the immigration debate. The resurgence of large-scale immigration in recent decades stimulated a great deal of research that attempts to measure these labor market effects. This research effort, based mainly on comparing native employment opportunities across regions, has not been entirely successful. The weak spatial correlations typically estimated in these studies, although often construed as showing that immigrants do not lower native wages, are difficult to interpret. In fact, economic theory implies that the more that firms and workers adjust to the immigrant supply shock, the smaller these cross-region correlations will be— regardless of the true impact of immigration on the national economy.

This paper introduces a new approach for estimating the labor market impact of immigration. The analysis builds on the assumption that similarly educated workers who have different levels of experience are not perfect substitutes. Defining skill groups in terms of educational attainment and work experience introduces a great deal of variation in the data. In

36

some years, the influx of immigrant with a particular level of schooling mainly affects younger workers, in other years it mainly affects older workers. In contrast to the existing literature, the evidence reported in this paper consistently indicates that immigration reduces the wage and labor supply of competing native workers, as suggested by the simplest textbook model of a competitive labor market. Moreover, the evidence indicates that spatial correlations conceal around two-thirds of the national impact of immigration on wages.

My estimates of the own factor price elasticity cluster between -0.3 and -0.4. These estimates, combined with the very large immigrant influx in recent decades, imply that immigration has substantially worsened the labor market opportunities faced by many native workers. Between 1980 and 2000, immigration increased the labor supply of working men by 11.0 percent. Even after accounting for the beneficial cross-effects of low-skill (high-skill) immigration on the earnings of high-skill (low-skill) workers, my analysis implies that this immigrant influx reduced the wage of the average native worker by 3.2 percent. The wage impact differed dramatically across education groups, with the wage falling by 8.9 percent for high school dropouts, 4.9 percent for college graduates, 2.6 percent for high school graduates, and barely changing for workers with some college.

Although the comparison of workers across narrowly defined skill classifications reveals a sizable adverse effect of immigration on native employment opportunities, it is worth noting that we still do not fully understand *why* the spatial correlation approach fails to find these effects. I suspect that we can learn a great deal more about the labor market impact of immigration by documenting the many adjustments that take place, by workers and firms, both inside and outside the labor market, as immigration alters economic opportunities in many sectors of the economy. For instance, my analysis ignored the long-run capital adjustments induced by immigration, the role played by capital-skill complementarities, and the possibility

37

that high-skill immigration (e.g., scientists and high-tech workers) is an important engine for endogenous technological change.

The adverse wage effects documented in this paper tell only part of the story of how the U.S. economy responded to the resurgence of large-scale immigration. The interpretation and policy implications of these findings require a more complete documentation and assessment of the many other consequences, including the potential benefits that immigrants impart on a host country.

## APPENDIX 1: VARIABLE DEFINITIONS

The data are drawn from the 1960, 1970, 1980, 1990 Public Use Microdata Samples of the U.S. Census, and the pooled 1999, 2000, 2001 Annual Demographic Supplement of the Current Population Surveys. In the 1960 and 1970 Censuses, the data extracts form a 1 percent random sample of the population. In 1980 and 1990, the immigrant extracts form a 5 percent random sample, and the native extracts form a 1 percent random sample. The analysis is restricted to men aged 18-64. A person is classified as an immigrant if he was born abroad and is either a non-citizen or a naturalized citizen; all other persons are classified as natives. Sampling weights are used in all calculations involving the 1990 Census and the CPS.

*Definition of education and experience:* I categorize workers into four education groups: high school dropouts, high school graduates, persons with some college, and college graduates, and use Jaeger's [1997, p. 304] algorithm for reconciling differences in the coding of the completed education variable across surveys. I assume that high school dropouts enter the labor market at age 17, high school graduates at age 19, persons with some college at age 21, and college graduates at age 23, and define work experience as the worker's age at the time of the survey minus the assumed age of entry into the labor market. I restrict the analysis to persons who have between 1 and 40 years of experience. Throughout much of the paper, workers are classified into one of 8 experience groups. The experience groups are defined in terms of five-year intervals (1-5 years of experience, 6-10, 11-15, 16-20, 21-25, 26-30, 31-35, and 36-40).

*Counts of persons in education-experience groups:* The counts are calculated in the sample of men who do not reside in group quarters and participate in the civilian labor force (according to the information provided by the labor force status variable for the reference week).

*Annual and weekly earnings:* These variables are calculated in the sample of men who do not reside in group quarters, are employed in the civilian labor force, are not enrolled in school,

report positive annual earnings, weeks worked, and weekly hours, and are not self-employed (as determined by the class of worker variable). In the 1960, 1970, and 1980 Censuses, the top coded annual salary is multiplied by 1.5. In the 1960 and 1970 Censuses, weeks worked in the calendar year prior to the survey are reported as a categorical variable. I impute weeks worked for each worker as follows: 6.5 weeks for 13 weeks or less, 20 for 14-26 weeks, 33 for 27-39 weeks, 43.5 for 40-47 weeks, 48.5 for 48-49 weeks, and 51 for 50-52 weeks. The average log annual earnings or average log weekly earnings for a particular education-experience cell is defined as the mean of log annual earnings or log weekly earnings over all workers in the relevant population.

*Fraction of time worked:* This variable is calculated in the sample of men who do not reside in group quarters, are not enrolled in school, and are not in the military (as indicated by the labor force status variable for the reference week). The fraction of time worked for each person is defined as the ratio of weeks worked (including zeros) to 52. The group mean used in the analysis is the mean of this variable over the relevant population, which includes persons with zero hours worked.

40

## APPENDIX 2. PERCENT OF MALE LABOR FORCE THAT IS FOREIGN-BORN, BY EDUCATION AND EXPERIENCE, 1960-2000

| Education | Years of experience | 1960 | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|---|---|
| High school dropouts | 1-5 | 2.6 | 3.9 | 8.5 | 18.4 | 20.8 |
| | 6-10 | 3.6 | 5.4 | 13.9 | 29.7 | 44.9 |
| | 11-15 | 3.6 | 6.2 | 15.8 | 28.1 | 49.8 |
| | 16-20 | 4.3 | 6.7 | 13.5 | 28.9 | 50.0 |
| | 21-25 | 4.4 | 6.0 | 12.5 | 28.5 | 40.5 |
| | 26-30 | 5.2 | 5.5 | 11.2 | 21.4 | 40.0 |
| | 31-35 | 8.0 | 5.4 | 8.8 | 17.7 | 37.1 |
| | 36-40 | 12.3 | 5.8 | 7.9 | 15.3 | 28.4 |
| High school graduates | 1-5 | 1.2 | 2.1 | 3.2 | 8.0 | 12.3 |
| | 6-10 | 1.6 | 2.4 | 3.8 | 7.8 | 14.0 |
| | 11-15 | 2.0 | 3.1 | 4.6 | 6.9 | 14.5 |
| | 16-20 | 3.1 | 3.0 | 4.3 | 7.3 | 11.5 |
| | 21-25 | 3.0 | 3.2 | 4.8 | 7.6 | 9.4 |
| | 26-30 | 4.8 | 4.0 | 4.8 | 6.8 | 9.5 |
| | 31-35 | 7.3 | 3.4 | 4.7 | 6.5 | 10.8 |
| | 36-40 | 13.0 | 5.3 | 5.2 | 6.6 | 9.7 |
| Some college | 1-5 | 2.3 | 3.5 | 5.2 | 7.9 | 9.1 |
| | 6-10 | 3.3 | 4.2 | 5.1 | 8.3 | 10.8 |
| | 11-15 | 3.7 | 4.9 | 5.6 | 7.4 | 11.6 |
| | 16-20 | 4.6 | 4.8 | 6.1 | 6.4 | 9.3 |
| | 21-25 | 4.9 | 4.5 | 6.3 | 6.6 | 7.6 |
| | 26-30 | 5.5 | 4.7 | 5.8 | 7.0 | 5.7 |
| | 31-35 | 9.6 | 4.7 | 6.1 | 7.2 | 6.3 |
| | 36-40 | 10.7 | 6.5 | 6.3 | 6.9 | 6.0 |
| College graduates | 1-5 | 3.4 | 4.1 | 5.0 | 9.0 | 12.4 |
| | 6-10 | 4.3 | 7.2 | 6.9 | 10.8 | 15.4 |
| | 11-15 | 4.8 | 6.5 | 8.5 | 10.3 | 17.5 |
| | 16-20 | 5.0 | 5.8 | 10.5 | 9.5 | 14.6 |
| | 21-25 | 6.4 | 5.6 | 8.5 | 10.2 | 11.5 |
| | 26-30 | 7.8 | 5.7 | 7.6 | 11.6 | 10.8 |
| | 31-35 | 10.0 | 6.9 | 7.2 | 9.6 | 12.4 |
| | 36-40 | 12.5 | 9.0 | 7.2 | 9.1 | 14.5 |

*Harvard University and National Bureau of Economic Research*

41

## References

Altonji, Joseph G., and David Card, "The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives," in John M. Abowd and Richard B. Freeman, eds., *Immigration, Trade, and the Labor Market* (Chicago: University of Chicago Press, 1991).

Angrist, Joshua D., and Alan B. Krueger, "Empirical Strategies in Labor Economics," in Orley C. Ashenfelter and David Card, eds., *Handbook of Labor Economics*, Vol. 3A (Amsterdam: Elsevier, 1999).

Autor, David H., Lawrence F. Katz, and Alan B. Krueger, "Computing Inequality: Have Computers Changed the Labor Market?" *Quarterly Journal of Economics*, CXVII (1998), 1169-1213.

Becker, Gary S., *Human Capital*, 2nd edition (New York: Columbia University Press, 1975).

Borjas, George J., "Assimilation, Changes in Cohort Quality, and the Earnings of Immigrants," *Journal of Labor Economics*, III (1985), 463-489.

Borjas, George J., "Immigrants, Minorities, and Labor Market Competition," *Industrial and Labor Relations Review*, XL (1987), 382-392.

Borjas, George J., "Does Immigration Grease the Wheels of the Labor Market?" *Brookings Papers on Economic Activity*, 1 (2001), 69-119.

Borjas, George J., Richard B. Freeman, and Lawrence F. Katz, "Searching for the Effect of Immigration on the Labor Market," *American Economic Review Papers and Proceedings*, LXXXVI (1996), 246-251.

Borjas, George J., Richard B. Freeman, and Lawrence F. Katz, "How Much Do Immigration and Trade Affect Labor Market Outcomes?" *Brookings Papers on Economic Activity*, 1 (1997), 1-67.

Bowles, Samuel, "Aggregation of Labor Inputs in the Economics of Growth and Planning: Experiments with a Two-Level CES Function," *Journal of Political Economy*, LXXVIII (1970), 68-81.

Card, David, "The Impact of the Mariel Boatlift on the Miami Labor Market," *Industrial and Labor Relations Review*, XLIII (1990), 245-257.

Card, David, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, XIX (2001), 22-64.

Card, David, and Thomas Lemieux, "Can Falling Supply Explain the Rising Return to College for Younger Men? A Cohort-Based Analysis," *Quarterly Journal of Economics*, CXVI (2001), 705-746.

42

Chiswick, Barry R., "The Effect of Americanization on the Earnings of Foreign-Born Men," *Journal of Political Economy*, LXXXVI (1978), 897-921.

Friedberg, Rachel M., "The Impact of Mass Migration on the Israeli Labor Market," *Quarterly Journal of Economics*, CXVI (2001), 1373-1408.

Friedberg, Rachel M., and Jennifer Hunt, "The Impact of Immigration on Host Country Wages, Employment and Growth," *Journal of Economic Perspectives*, IX (1995), 23-44.

Grossman, Jean Baldwin, "The Substitutability of Natives and Immigrants in Production," *Review of Economics and Statistics*, LIV (1982), 596-603.

Hamermesh, Daniel, *Labor Demand* (Princeton, N.J.: Princeton University Press, 1993).

Jaeger, David A., "Reconciling the Old and New Census Bureau Education Questions: Recommendations for Researchers," *Journal of Business and Economic Statistics*, XV (1997), 300-309.

Juhn, Chinhui, Kevin M. Murphy, and Robert H. Topel, "Why Has the Natural Rate of Unemployment Increased Over Time?" *Brookings Papers on Economic Activity*, 2 (1991), 75-126.

Katz, Lawrence F., and Kevin M. Murphy, "Changes in the Wage Structure, 1963-87: Supply and Demand Factors," *Quarterly Journal of Economics*, CVII (1992), 35-78.

LaLonde, Robert J., and Robert H. Topel, "Labor Market Adjustments to Increased Immigration," in John M. Abowd and Richard B. Freeman, eds., *Immigration, Trade, and the Labor Market* (Chicago: University of Chicago Press, 1991).

Mincer, Jacob, *Schooling, Experience, and Earnings* (New York: Columbia University Press, 1974).

Murphy, Kevin M., and Finis Welch, "The Structure of Wages," *Quarterly Journal of Economics*, CVII (1992), 285-326.

Pischke, Jörn-Steffen, and Johannes Velling, "Employment Effects of Immigration to Germany: An Analysis Based on Local Labor Markets," *Review of Economics and Statistics*, LXXIX (1997), 594-604.

Samuelson, Paul A., *Economics, 6*[th] Edition (New York: McGraw-Hill, 1964).

Schoeni, Robert F., "The Effect of Immigrants on the Employment and Wages of Native Workers: Evidence from the 1970s and 1980s," The RAND Corporation, March 1997.

Smith, James P., and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academy Press, 1997).

Welch, Finis, "Effects of Cohort Size on Earnings: The Baby Boom Babies' Financial Bust," *Journal of Political Economy*, LXXXVII (1979), S65-S97.

Welch, Finis, "In Defense of Inequality," *American Economic Review*, LXXXIX (1990), 1-17.

44

**TABLE I**
**Log Weekly Wage of Male Native Workers, 1960-2000**

| Education | Years of experience | 1960 | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|---|---|
| High school dropouts | 1-5 | 5.535 | 5.758 | 5.722 | 5.494 | 5.418 |
| | 6-10 | 5.920 | 6.157 | 6.021 | 5.839 | 5.751 |
| | 11-15 | 6.111 | 6.305 | 6.166 | 6.006 | 5.932 |
| | 16-20 | 6.188 | 6.360 | 6.286 | 6.087 | 5.989 |
| | 21-25 | 6.201 | 6.413 | 6.364 | 6.180 | 6.034 |
| | 26-30 | 6.212 | 6.439 | 6.368 | 6.268 | 6.036 |
| | 31-35 | 6.187 | 6.407 | 6.419 | 6.295 | 6.086 |
| | 36-40 | 6.175 | 6.377 | 6.418 | 6.295 | 6.168 |
| High school graduates | 1-5 | 5.940 | 6.132 | 6.090 | 5.837 | 5.773 |
| | 6-10 | 6.257 | 6.476 | 6.343 | 6.159 | 6.140 |
| | 11-15 | 6.392 | 6.587 | 6.497 | 6.309 | 6.273 |
| | 16-20 | 6.459 | 6.639 | 6.609 | 6.415 | 6.323 |
| | 21-25 | 6.487 | 6.664 | 6.638 | 6.495 | 6.406 |
| | 26-30 | 6.478 | 6.677 | 6.662 | 6.576 | 6.414 |
| | 31-35 | 6.450 | 6.674 | 6.667 | 6.572 | 6.493 |
| | 36-40 | 6.435 | 6.622 | 6.657 | 6.548 | 6.460 |
| Some college | 1-5 | 6.133 | 6.322 | 6.237 | 6.085 | 6.013 |
| | 6-10 | 6.412 | 6.633 | 6.472 | 6.387 | 6.366 |
| | 11-15 | 6.535 | 6.752 | 6.641 | 6.534 | 6.489 |
| | 16-20 | 6.604 | 6.805 | 6.762 | 6.613 | 6.591 |
| | 21-25 | 6.634 | 6.832 | 6.764 | 6.711 | 6.626 |
| | 26-30 | 6.620 | 6.841 | 6.789 | 6.771 | 6.648 |
| | 31-35 | 6.615 | 6.825 | 6.781 | 6.740 | 6.662 |
| | 36-40 | 6.575 | 6.728 | 6.718 | 6.658 | 6.623 |
| College graduates | 1-5 | 6.354 | 6.612 | 6.432 | 6.459 | 6.458 |
| | 6-10 | 6.625 | 6.891 | 6.702 | 6.766 | 6.747 |
| | 11-15 | 6.760 | 7.032 | 6.923 | 6.908 | 6.943 |
| | 16-20 | 6.852 | 7.109 | 7.043 | 7.005 | 7.046 |
| | 21-25 | 6.876 | 7.158 | 7.087 | 7.112 | 7.051 |
| | 26-30 | 6.881 | 7.146 | 7.085 | 7.122 | 7.084 |
| | 31-35 | 6.867 | 7.095 | 7.079 | 7.095 | 7.074 |
| | 36-40 | 6.821 | 7.070 | 6.985 | 6.950 | 6.944 |

The table reports the mean of the log weekly wage of workers in each education-experience group. All wages are deflated to 1999 dollars using the CPI-U series.

45

**TABLE II**
**Index of Congruence in Occupation Distributions within Education Groups, 1990**

| Education-experience of native groups: | Experience of corresponding immigrant group | | | |
|---|---|---|---|---|
| | 1-10 years | 11-20 years | 21-30 years | 31-40 years |
| High school dropouts | | | | |
| 1-10 years | 0.709 | 0.714 | 0.671 | 0.619 |
| 11-20 years | 0.525 | 0.631 | 0.628 | 0.585 |
| 21-30 years | 0.410 | 0.527 | 0.567 | 0.566 |
| 31-40 years | 0.311 | 0.435 | 0.496 | 0.518 |
| High school graduates | | | | |
| 1-10 years | 0.682 | 0.611 | 0.498 | 0.405 |
| 11-20 years | 0.279 | 0.379 | 0.387 | 0.338 |
| 21-30 years | 0.030 | 0.184 | 0.297 | 0.272 |
| 31-40 years | -0.035 | 0.126 | 0.276 | 0.311 |
| Some college | | | | |
| 1-10 years | 0.649 | 0.571 | 0.474 | 0.291 |
| 11-20 years | 0.147 | 0.401 | 0.492 | 0.336 |
| 21-30 years | -0.052 | 0.230 | 0.432 | 0.407 |
| 31-40 years | -0.066 | 0.217 | 0.458 | 0.489 |
| College graduates | | | | |
| 1-10 years | 0.756 | 0.710 | 0.639 | 0.531 |
| 11-20 years | 0.561 | 0.673 | 0.674 | 0.593 |
| 21-30 years | 0.430 | 0.597 | 0.661 | 0.619 |
| 31-40 years | 0.422 | 0.599 | 0.688 | 0.691 |

Equation (2) defines the index of congruence. The index is calculated separately for each pair of native and immigrant groups.

46

## TABLE III
## Impact of Immigrant Share on Labor Market Outcomes
## of Native Education-Experience Groups

| Specification: | Dependent variable | | |
|---|---|---|---|
| | Log annual earnings | Log weekly earnings | Fraction of time worked |
| 1. Basic estimates | -0.919 | -0.572 | -0.529 |
| | (0.582) | (0.162) | (0.132) |
| 2. Unweighted regression | -0.725 | -0.546 | -0.382 |
| | (0.463) | (0.141) | (0.103) |
| 3. Includes women in labor force counts | -0.919 | -0.637 | -0.511 |
| | (0.661) | (0.159) | (0.148) |
| 4. Includes log native labor force as regressor | -1.231 | -0.552 | -0.567 |
| | (0.384) | (0.204) | (0.116) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within education-experience cells. All regressions have 160 observations and, except for those reported in row 2, are weighted by the sample size of the education-experience-period cell. All regression models include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects.

47

**TABLE IV**
**Impact of Immigrant Share on Native Labor Market Outcomes,**
**by Education Group**

| Dependent variable: | High school dropouts | High school graduates | Some college | College graduates | At least high school graduates |
|---|---|---|---|---|---|
| 1. Log annual earnings | -1.416 | -2.225 | -0.567 | 1.134 | -1.184 |
| | (0.313) | (0.622) | (0.421) | (0.436) | (0.668) |
| 2. Log weekly earnings | -0.947 | -2.074 | -1.096 | 0.610 | -0.335 |
| | (0.164) | (0.510) | (0.461) | (0.440) | (0.612) |
| 3. Fraction of time worked | -0.086 | 0.393 | 0.567 | 0.300 | -1.040 |
| | (0.073) | (0.251) | (0.385) | (0.499) | (0.211) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within experience cell (in the first four columns) and within education-experience cells (in the last column). All regression are weighted by the sample size of the education-experience-period cell. The regressions reported in the first four columns have 40 observations and include experience and period fixed effects. The regressions reported in the last column have 120 observations and include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects.

48

**TABLE V**
**Impact of Immigrant Share on Labor Market Outcomes**
**of Native State-Education-Experience Groups**

| Dependent Variable: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| 1. Log annual earnings | -0.115 | -0.276 | -.253 | -.217 |
| | (0.079) | (0.053) | (.046) | (.068) |
| 2. Log weekly earnings | -0.124 | -0.217 | -.203 | -.183 |
| | (0.042) | (0.039) | (.038) | (.050) |
| 3. Fraction of time worked | -0.038 | -0.100 | -.078 | -.119 |
| | (0.030) | (0.015) | (.015) | (.021) |
| Controls for: | | | | |
| (State × period), (education × period), (experience × period), (state × education) fixed effects | Yes | Yes | Yes | Yes |
| (State × education × experience) fixed effects | No | Yes | Yes | Yes |
| (Education × experience × period) fixed effects | No | No | Yes | Yes |
| (State × education × period), (state × experience × period) fixed effects | No | No | No | Yes |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native state-education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within state-education-experience cells. All regressions are weighted by the sample size of the state-education-experience-period cell and include state, education, experience, and period fixed effects. The regressions on log annual earnings or log weekly earnings have 8,153 observations; the regressions on the fraction of time worked have 8,159 observations.

49

### TABLE VI
**Impact of Different Types of Labor Market Experience on
the Log Weekly Earnings of Natives and Immigrants**

| Coefficient of: | Group | | |
|---|---|---|---|
| | Natives | Child immigrants | Adult immigrants |
| Source country experience | --- | --- | 0.012 |
| | | | (0.001) |
| Source country experience squared ÷ 10 | --- | --- | -0.003 |
| | | | (0.000) |
| U.S. experience | 0.056 | 0.058 | 0.032 |
| | (0.000) | (0.001) | (0.002) |
| U.S. experience squared ÷ 10 | -0.010 | -0.010 | -0.004 |
| | (0.001) | (0.000) | (0.001) |
| Mean value of: | | | |
| Source country experience | --- | --- | 10.6 |
| U.S. experience | 16.7 | 13.0 | 10.8 |
| Marginal value of an additional year of experience for immigrants: | | | |
| Source country experience | --- | --- | 0.006 |
| | | | (0.001) |
| U.S. experience | --- | 0.033 | 0.024 |
| | | (0.001) | (0.001) |
| Marginal value of an additional year of experience for natives, evaluated at mean value of relevant sample of immigrants | --- | 0.031 | 0.015 |
| | | (0.000) | (0.000) |

Standard errors are reported in parentheses. The regression pools data from the 1980 and 1990 Census and has 1,141,609 observations. The dependent variable is the log of weekly earnings. The regressors include: dummy variables indicating if the worker is an adult immigrant or a child immigrant; a vector of variables indicating the worker's educational attainment, interacted with variables indicating if the worker is an adult or a child immigrant; experience (and its squared) for native workers; experience (and its square) for immigrants who arrived as children; source country experience (and its squared) for immigrants who arrived as adults; experience in the U.S. (and its squared) for immigrants who arrived as adults; dummy variables indicating the calendar year in which the immigrant arrived (1985-1989, 1980-1984, 1975-1979, 1970-1974, 1965-1969, 1960-1964, 1950-1959, and before 1950), and the interaction of this vector with a dummy variable indicating if the immigrant arrived as an adult; and a dummy variable indicating if the observation was drawn from the 1990 Census.

50

**TABLE VII**

**Impact of Immigrant Share on Labor Market Outcomes of Native Skill Groups, Using Effective Experience and Effective Skills**

| Specification: | Dependent variable | | |
| --- | --- | --- | --- |
| | Log annual earnings | Log weekly earnings | Fraction of time worked |
| 1. Effective experience | -1.025 | -0.422 | -0.611 |
| | (0.506) | (0.210) | (0.118) |
| 2. Using quantiles of wage distribution | -0.562 | -0.606 | -0.048 |
| | (0.329) | (0.158) | (0.167) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native skill group (defined in terms of education-experience in row 1 or education-quantile in row 2) at a particular point in time. The quantile definition of skill groups is based on the worker's placement in each of 20 quantiles of the (within-education) native weekly wage distribution. Standard errors are reported in parentheses and are adjusted for clustering within education-experience cells (row 1) or within education-quantile cells (row 2). All regressions are weighted by the sample size of the education-experience-period cell (row 1) or the education-quantile-period cell (row 2). The regressions reported in row 1 have 128 observations; those reported in row 2 have 400 observations. The models in row 1 include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects. The models in row 2 include education, quantile, and period fixed effects, as well as interactions between education and quantile fixed effects, education and period fixed effects, and quantile and period fixed effects

51

**TABLE VIII**
**Estimated Factor Price Elasticities, By Skill Group**

| Education | Years of experience | Own elasticity | Cross elasticity (within education branch) | Cross elasticity (across education branches) |
|---|---|---|---|---|
| High school dropouts | 1-5 | -0.313 | -0.028 | 0.002 |
| | 6-10 | -0.330 | -0.044 | 0.003 |
| | 11-15 | -0.344 | -0.059 | 0.004 |
| | 16-20 | -0.341 | -0.056 | 0.004 |
| | 21-25 | -0.339 | -0.053 | 0.004 |
| | 26-30 | -0.352 | -0.066 | 0.004 |
| | 31-35 | -0.358 | -0.072 | 0.005 |
| | 36-40 | -0.361 | -0.076 | 0.005 |
| High school graduates | 1-5 | -0.316 | -0.030 | 0.012 |
| | 6-10 | -0.335 | -0.050 | 0.020 |
| | 11-15 | -0.343 | -0.057 | 0.023 |
| | 16-20 | -0.337 | -0.051 | 0.020 |
| | 21-25 | -0.333 | -0.047 | 0.019 |
| | 26-30 | -0.330 | -0.044 | 0.017 |
| | 31-35 | -0.323 | -0.037 | 0.015 |
| | 36-40 | -0.315 | -0.029 | 0.012 |
| Some college | 1-5 | -0.318 | -0.032 | 0.012 |
| | 6-10 | -0.339 | -0.054 | 0.020 |
| | 11-15 | -0.349 | -0.063 | 0.024 |
| | 16-20 | -0.348 | -0.063 | 0.024 |
| | 21-25 | -0.339 | -0.054 | 0.020 |
| | 26-30 | -0.324 | -0.038 | 0.015 |
| | 31-35 | -0.313 | -0.028 | 0.010 |
| | 36-40 | -0.305 | -0.019 | 0.007 |
| College graduates | 1-5 | -0.317 | -0.031 | 0.017 |
| | 6-10 | -0.335 | -0.049 | 0.026 |
| | 11-15 | -0.341 | -0.056 | 0.030 |
| | 16-20 | -0.348 | -0.062 | 0.033 |
| | 21-25 | -0.332 | -0.046 | 0.025 |
| | 26-30 | -0.318 | -0.032 | 0.017 |
| | 31-35 | -0.309 | -0.023 | 0.013 |
| | 36-40 | -0.302 | -0.016 | 0.009 |

Equations (19)-(21) define the factor price elasticities in the three-level CES framework. For a given percent change in the numbers of workers of any specific group: The own factor price elasticity gives the percent change in that group's wage; the cross-elasticity within an education branch gives the percent change in the wage of a group with the same education but with different experience; the cross-elasticity across education branches gives the percent change in the wage of groups that have different educational attainment.

52

**TABLE IX**
**Wage Consequences of Immigrant Influx of the 1980s and 1990s**
**(Predicted change in log weekly wage)**

| Years of experience | Education | | | | |
|---|---|---|---|---|---|
| | High school dropouts | High school graduates | Some college | College graduates | All workers |
| 1-5 | -0.065 | -0.021 | 0.004 | -0.035 | -0.024 |
| 6-10 | -0.101 | -0.027 | 0.001 | -0.042 | -0.029 |
| 11-15 | -0.128 | -0.036 | -0.009 | -0.059 | -0.041 |
| 16-20 | -0.136 | -0.033 | -0.011 | -0.055 | -0.039 |
| 21-25 | -0.108 | -0.025 | -0.008 | -0.049 | -0.033 |
| 26-30 | -0.087 | -0.023 | 0.000 | -0.049 | -0.029 |
| 31-35 | -0.066 | -0.022 | 0.001 | -0.050 | -0.027 |
| 36-40 | -0.044 | -0.013 | 0.008 | -0.056 | -0.022 |
| All workers | -0.089 | -0.026 | -0.003 | -0.049 | -0.032 |

The simulation uses the factor price elasticities reported in Table VIII to predict the wage effects of the immigrant influx that arrived between 1980 and 2000. The calculations assume that the capital stock is constant. The variable measuring the group-specific immigrant supply shock is defined as the number of immigrants arriving between 1980 and 2000 divided by a baseline population equal to the average size of the native workforce (over 1980-2000) plus the number of immigrants in 1980.

53



**Figure I**
**The Immigrant Supply Shock, 1960-2000**

Note: Within each education group, workers are aggregated into experience groups defined in five-year intervals. The figures use the midpoint of each experience interval to illustrate the trends.

54



**Figure II**
**Scatter Diagram Relating Wages and Immigration, 1960-2000**

Note: Each point in the scatter represents the decadal change in the log weekly wage and the immigrant share for a native education-experience group. The data have been adjusted to remove decade effects. The regression line in the figure weighs the data by $(n_0 n_1)/(n_0 + n_1)$, where $n_0$ is the sample size of the cell at the beginning of the decade, and $n_1$ the sample size at the end. The coefficient of the regression line is -.450, with a standard error of .172.

# DEF-INTERV.

# EX. 129

# APPENDIX 1

# Curriculum Vitae

# M. Ray Perryman, Ph.D.
# Vita



**510 N. Valley Mills Drive, Suite 300**
**Waco, TX  76710-6076**
**Phone: 254.751.9595**
**Fax: 254.751.7855**
**E-mail: *info@perrymangroup.com***
**Internet: *perrymangroup.com***

# M. Ray Perryman, Ph.D.
# Vita

## Table of Contents

**Background** ....................................................................... 1

M. RAY PERRYMAN, PH.D. .................................................................. 2
AREAS OF PROFESSIONAL RESEARCH, CONSULTING, AND
SPECIALIZATION ................................................................................ 3
PROFESSIONAL BACKGROUND ........................................................ 4
   Primary Positions (Current) ............................................................... 4
   Other Positions (Current and Former) ............................................... 6
PROFESSIONAL AFFILIATIONS ...................................................... 17
   (Current and Former) ........................................................................ 17
HONORS AND AWARDS .................................................................... 18
   Professional ...................................................................................... 18
   Undergraduate and Graduate ............................................................ 21
   Honorary Affiliations ....................................................................... 21

**Consulting Activity** ...................................................... 22

IMPACT STUDIES, REAL ESTATE PROJECTS, AND RELATED ANALYSES .. 23
ECONOMIC DEVELOPMENT, SITE SELECTION, AND RELATED PROJECTS 42
REGULATORY AND PUBLIC POLICY ANALYSES ............................... 49
LITIGATION AND DISPUTE RESOLUTION .......................................... 79
   Antitrust, Competition, and Related Matters .................................... 79
   Intellectual Property and Related Matters ......................................... 82
   Securities and Related Matters .......................................................... 89
   Real Estate, Bankruptcy, Financial, Commercial, and Other Matters .......... 93
FORECASTS, CUSTOMIZED MODELS, DATA BASES, AND RELATED
PROJECTS ......................................................................................... 112
SURVEYS, INDUSTRY STUDIES, VALUATIONS, AND OTHER PROJECTS .. 133

**Regulatory, Congressional, and Legislative Testimony** ......... 136

REGULATORY, CONGRESSIONAL, AND LEGISLATIVE TESTIMONY ......... 137

**Trade & Professional Writing** ....................................... 161

SELECTED TRADE ARTICLES AND RELATED PROFESSIONAL WRITING . 162
TEXAS ECONOMIC FORECAST .......................................................... 214
   Lead Articles .................................................................................... 214
PERRYMAN ECONOMIC FORECAST .................................................. 220

THE PERRYMAN REPORT .................................................................. 223
  Lead Articles ......................................................................................223
THE PERRYMAN REPORT & TEXAS LETTER ................................ 234
  Lead Articles ......................................................................................234
THE PERRYMAN REPORT ................................................................. 239
  "Perryman's Commentary" ...............................................................240
THE PERRYMAN REPORT & TEXAS LETTER ................................ 248
  "Perryman's Perspective" ..................................................................248
THE ECONOMIST ............................................................................... 249

**Speeches & Presentations ......................................... 300**

  SELECTED SPEECHES, PUBLIC PRESENTATIONS, AND RELATED ACTIVITY
  .................................................................................................................. 301

**Academic Research ...................................................... 418**

  ACADEMIC RESEARCH AND RELATED ACTIVITY ......................... 419
    Books Authored and Edited................................................................419
    Selected Major Independent Research Reports ..................................419
    Academic Publications and Presentations .........................................421
    Other Academic Conference Activity ................................................455

# Background

# M. RAY PERRYMAN, PH.D.

## PERSONAL INFORMATION

Married:        Lorraine

Children:       Skye Lynn, Bethany Rae,

                Bryan Ray, Matthew Blake, and Meredith Grace

Date of Birth:  December 25, 1952

## EDUCATIONAL BACKGROUND

| Degree | University | Years | Subject |
|--------|-----------|-------|---------|
| B.S. | Baylor | 1971-74 | Mathematics |
| Ph.D. | Rice | 1974-77 | Economics |

## HEADQUARTERS

The Perryman Group

510 N. Valley Mills Dr., Suite 300

Waco, Texas 76710

254.751.9595

254.751.7855 (fax)

1.800.749-8705

E-Mail Address: *ray@perrymangroup.com*

Web Site: *www.perrymangroup.com*

## AREAS OF PROFESSIONAL RESEARCH, CONSULTING, AND SPECIALIZATION

Econometrics

Economic Modeling

Economic Forecasting

Macroeconomics

Microeconomics

Time Series Analysis

History of Economic Thought and Analysis

Bargaining Theory

Quantitative Economic Theory

Financial Market Behavior, Analysis and Models

Scientific Philosophy

Public Utility Economics

Economic Development

Regional Economics

Urban and Regional Planning

Input-Output Analysis

Automated Systems

Intellectual Property

Real Estate Economics, Valuation, and Modeling

Economics of Taxation

Antitrust

Economic History

National Income Accounting and
    Social Statistics

Environmental Economics

Financial Institutions Analysis

Public Policy

Industrial Economics

Feasibility Analysis

Economics of Tourism

Telecommunications Economics

Economics of Discrimination

Energy Economics

Cultural Economics

Risk Analysis

Intellectual Property

Health Economics

Monetary Theory and Policy

Urban Economics

Dynamic Systems and Uncertainty

Labor Economics and Labor Relations

Social Modeling

Energy Forecasting

Survey Research Methods and Applications

Economic Fluctuations

Statistical Theory and Methods

International Economics and Trade

Data Base Development

Industrial Location and Development
    Strategy

Demographic Modeling and Forecasting

Impact Assessment

Occupational Modeling and Forecasting

Corporate Forecasting and Planning

Game Theory

Security Market Analysis,
    Modeling, and Valuation

Fiscal Modeling and Policy

Natural Resource Policy

Regulatory Economics

Transportation Economics

Economics of Education

Valuation Analysis

Economics of Information

Strategic Planning

Simulation

Economics of Technology

Financial Economics

Socioeconomic Analysis

General Equilibrium Models

Transactions and Financial Engineering

Mergers and Acquisitions

Rural Development

3

## PROFESSIONAL BACKGROUND
### Primary Positions (Current)

Chairman of the Board, President, and Chief Executive Officer, The Perryman Group (including Perryman Consultants, Inc., and Texas Economic Publishers, Inc., subsidiaries)

Institute Distinguished Professor of Economic Theory and Method, International Institute for Advanced Studies

Chairman of the Board, President, and Chief Executive Officer, Perryman Center for Economic Studies

Chairman of the Board, President, and Chief Executive Officer, Y'all Street, Inc.

Chairman of the Board and Chief Executive Officer, The Perryman Group/Great Eastern International, Inc.

Co-Chair, Strategic Advisory Committee, Texas Team: The Future of Nursing, Robert Wood Johnson Foundation

Chairman of the Board, President and Chief Executive Officer, Texas Business, Inc.

Chairman, Blue Cross and Blue Shield of Texas Affiliate Board

Global Senior Research Fellow, $IC^2$ Institute, The University of Texas at Austin

Distinguished Fellow, International Institute for Advanced Studies

Member, Board of Directors, Health Care Service Corporation

Editor and Author, The Perryman Economic Forecast (detailed subscription forecast published by Texas Economic Publishers, Inc.)

Editor and Author, The Perryman Report & Texas Letter (monthly newsletter addressing various topics related to the economy published by Texas Economic Publishers, Inc.)

Author, "Perryman's Perspective" (column in The Perryman Report & Texas Letter)

Author, The Economist (weekly syndicated column discussing various national and international issues)

Host, The Perryman Report (syndicated daily radio commentary discussing current economic and financial topics on the domestic and international levels)

Director, Annual Texas Economic Outlook Conference Series, 1984-2012

Director, Texas Economic Model Project (development and maintenance of an extensive modeling system including economic, input-output, real estate, impact assessment, industry-occupation, demographic, fiscal impact, industrial, and trade models for Texas, its metropolitan areas, regions, counties, and small areas)

4

Director, US Impact Assessment Modeling Project (development and maintenance of a comprehensive set of impact assessment systems, consumer impact models, regulatory impact models, and industrial impact models for every county and multi-county region of the United States)

Member, Advisory Board, The Real Estate Council of Dallas

Member, Board of Visitors, Scott & White Hospital

Member, Board of Directors, Texas Manufacturing Assistance Center

Economics Principle, Linked International Causeway Project

Member, Advisory Board, Texas Legislative Conference

Member, Advisory Board, Texas Travel and Tourism Association

Chairperson, Compensation Committee, Health Care Service Corporation

Member, Community Issues Council Advisory Committee, The Real Estate Council

Board of Editors, Journal of Pharmacoeconomics and Health Economics

Contributing Editor and Columnist, Journal of Business Forecasting Methods and Systems

Contributing Editor and Columnist, WVIA Investment Letter

Contributing Columnist, Quarterly Domestic and Global Forecasts (International Institute of Forecasting)

Contributing Economist, Marketplace Radio, National Public Radio

Contributing Economist, Bloomberg News

Contributing Economist, Yahoo Finance

## Other Positions (Current and Former)

Member, Governor's Task Force on Economic Growth, State of Texas

University Professor and Economist-in-Residence, Baylor University

Herman Brown Professor of Economics, Baylor University

Founder and Director, Center for the Advancement of Economic Analysis, Baylor University

Founder and Director, Baylor University Forecasting Service

Graduate Faculty (Full Professor), Baylor University

Business Economist-in-Residence, Southern Methodist University

Invited Speaker and Panelist, The President's Economic Forum

Chairman of the Board and President, Texas Manufacturing Technology Center

Director, Women's Financial Services, Southern Methodist University

Member, Board of Directors, Blue Cross and Blue Shield of Texas (Member, Finance Committee)

Member, Texas Coalition for Excellence in Higher Education

Advisory Director, Chase Bank (San Antonio)

Chairperson, Advisory Council on School Finance, Texas Senate

Member, Board of Directors, Group Life and Health Insurance

Co-Principal, American Business Valuation

Member, Board of Directors, Trailblazer Insurance Company

Chairman, Advisory Committee, Texas Legislative Conference

Member, Strategic Economic Policy Commission Task Force, State of Texas

Member, Treasury Task Force on Economic Development, State of Texas

Director, Texas, Our Texas Project, Texas Economic Development Initiative for the Texas House of Representatives, the Texas Senate, and the Office of the Governor

Economic Advisor, Select Committee on Public Education, Texas House of Representatives

Economic Advisor, Interim Committee on NAFTA and GATT, Texas House of Representatives

Member, National Advisory Council on Financial Planning, International Board of Standards and Practices for Certified Financial Planners, Inc.

Economic Consultant, Federal Communications Commission

Director, American Conference of the International Time Series Association, 1980-1981

Chairman, Selection Committee, "Texan of the Year" Award

Chairman, China-US-Mexico Trade and Technology Expo

Associate Editor, The Journal of Economics

Member, Board of Directors, The Real Estate Council of Dallas

Advisory Director, Texas State Chamber of Commerce

Author, "The Texas Economy" (monthly column in Texas Banking)

Member, Academic Advisory Committee on the North American Free Trade Agreement, United States Senate

Editor and Author, The Perryman Report (monthly subscription newsletter addressing various topics related to the economy published by Texas Economic Publishers, Inc.)

Author, "Perryman's Commentary" (monthly column in The Perryman Report)

Editorial Advisor, The Perryman Texas Letter (monthly subscription newsletter discussing political, economic, and social issues affecting Texas and its regions published by Texas Economic Publishers, Inc.)

Author, "Economic Outlook" (quarterly column in Business Review)

Author, "International Economic Perspectives" (monthly column in International Prospects)

Author, "The Regions of Texas" (bi-monthly column in MPACT Source)

Co-Host, Money Facts (monthly economic information seminar)

Author and Narrator, Economic Commentary (weekly radio show discussing various national and international issues)

Contributing Editor, MPACT Source newsletter

Co-Author and Editor, Money Facts (monthly bank newsletter)

Contributing Editor, Pinnacle Magazine

Contributing Editor, Texas Banking

President, Southwestern Economics Association, 1987

President, Southwestern Society of Economists, 1988

Author, <u>The Texas Update</u> (quarterly report prepared for distribution by Dain Rauscher)

Member, Board of Directors, Texas Perspectives, Inc.

Chairman of the Board, President, and Chief Executive Officer, Perryman Data Services, Inc. (subsequently merged into The Perryman Group)

Editor, <u>DallasStats</u> (quarterly survey of the Dallas/Fort Worth Area)

Contributing Editor and Columnist, <u>Dallas Chamber Report</u>

Director, State of Texas Economic and Trade Mission to the Republic of China

Host and Writer, <u>Texas Economic Outlook</u> (weekly radio broadcast sponsored by Citicorp, Inc.)

Economic Consultant, Office of Management and Budget, Office of the Governor, State of Texas

Advisory Board, North American Economics and Finance Association

Member, Intergovernmental Fiscal Relations Committee, National Tax Association—Tax Institute of America

Economic Advisor, Texas Department of Commerce

Member, State Income and Business Taxation Committee, National Tax Association—Tax Institute of America

Economic Advisor, Texas Natural Research Laboratory Commission

Member, Speaker's Special Advisory Commission on Diversification of the Texas Economy, Texas House of Representatives

Economic Consultant, Economic Development Administration, United States Department of Commerce

Member, Federal Task Force on the Savings and Loan Crisis, Congress of the United States

Economic Advisor, United States Department of Agriculture

Member, Board of Directors, BancWorks, Inc.

Adjunct Faculty and Economist, Texas Tech School of Banking

Economic Consultant, Minerals Management Service, United States Department of the Interior

Adjunct Faculty, Southwestern Graduate School of Banking, Southern Methodist University

Economic Advisor, Joint Economic Committee, Congress of the United States

Member, Workforce 2000 Task Force, Texas Department of Labor and Standards

Economic Advisor, Texas Financial Institutions Research League

Economic Consultant, United States Department of Labor

Member, Select Committee on the Recovery of Texas Real Estate and Finance, Texas House of Representatives

Economic Consultant, Public Utility Commission of Texas

Developmental Consultant and Advisor, Lincoln Center for Economic Awareness, Houston Independent School District

Member, Economic Advisory Board, M/PF Research, Inc.

Program Committee, Annual Conference of the North American Economics and Finance Association

Economic Consultant, Committee on Science and Technology, Texas House of Representatives

Senior Faculty Member, Governor's Executive Development Program, State of Texas

Vice-President, Southwestern Society of Economists, 1985

Member, Economic Outlook Group, The Kiplinger Texas Letter

Executive Council, Southwestern Social Science Association

Advisor, Committee on Higher Education, Texas House of Representatives

Member, Economic Forecasting Panel, Inside Texas (newsletter)

Executive Board, Southwestern Federation of Administrative Disciplines

Program Committee, Annual Conference of the Allied Social Science Associations

Chairperson, Nominating Committee, Southwestern Economics Association

Honorary Chairman, Five Outstanding Young Texans Program

Consultant, Merrill Lynch Economics, Inc.

Contributing Editor, WOAI Business Weekly

Program Chairman, Southwestern Economics Association, 1986

Program Chairman, Southwestern Society of Economists, 1987

Program Committee, 1985 Conference of the Southwestern Economics Association

General Program Committee, 1986 Conference of the Southwestern Social Science Association

Program Committee, International Symposium on North American Economies in the 1990s (Mexico)

Member, Governmental Affairs Committee, Texas Chamber of Commerce

Member, Heart of Texas Economic Growth Task Force

Member, Central Texas High Technology Development Committee

Member, Advisory Board, Downtown Waco, Inc.

Economic Advisor, Texas Employment Commission

Editor, Southwestern Journal of Economic Abstracts

Editor and Author, Trends in the Texas Economy (detailed subscription forecast)

Editor and Author, The Texas Economic Update (subscription newsletter)

Economic Advisor, Committee on Banking and Financial Institutions, Texas House of Representatives

Author, The Perryman Permian Basin Oil Report (quarterly newsletter)

Chairperson, Finance Committee, Health Care Service Corporation

Chairperson, Compensation Committee, Health Care Service Corporation

Director and Committee Chairman, Baylor University Honors Program (Colloquium Subcommittee, Curriculum Subcommittee, Awards Subcommittee, Research Subcommittee)

Chairman, Special Projects Committee for Baylor University's Centennial in Waco

Associate Director, Baylor University Accreditation Self-Study

Member, Self-Study Accreditation Advisory Committee, Baylor University (Liaison for Administrative Systems and Denominational Relations)

Director of Economics Division, Inter-University Consortium for Political and Social Research, Baylor University

Urban and Regional Policy Planning Board, Heart of Texas Council of Governments

Director of North American Programs, Time Series Analysis and Forecasting European Interest Group

Program Committee, International Symposium on Forecasting

Program Committee, World Conference on Modeling and Simulation

Author, "The Perryman Comment" (monthly column in Austin Perspectives, Dallas Perspectives, and San Antonio Perspectives)

Member, Publication Committee, Baylor Business Studies, Baylor University

Member, Baylor University Faculty Senate Committee to Assess Graduate Programs

Member, Baylor University Faculty/Trustee Committee on Enrollment Management

Program Committee, International Symposium on Modeling and Simulation, 1996-2003

Board of Directors, Central Texas Venture Capital Group

Senior Consultant, Center for Community Research and Development, Baylor University

Senior Fellow, Hobby Center for the Study of Texas, Rice University

Editor, International Series in Economic Modeling (book series)

Member, Board of Directors, Texas Academic Decathlon Foundation

Chairperson, Investment Committee, Permian Basin Rehabilitative Center

Member, Task Force on the Texas Water Plan, State of Texas

Member, Water and Wildlife Advisory Group, State of Texas

Liaison, Governor's Council on Science and Biotechnology, State of Texas

Economic Advisor, Asia and World Institute

Economic Advisor, Committee on Business and Industry, Texas House of Representatives

Member, Advisory Panel on Innovative Education, Educational Economic Policy Center, The University of Texas

Member, Health Care Programs Committee, Health Care Service Corporation

Member, Emerging Issues Committee, Health Care Service Corporation

Member, Finance Committee, Health Care Service Corporation

Member, Audit Committee, Health Care Service Corporation

Member, Governance and Nominating Committee, Health Care Service Corporation

Member, Legislative and Governmental Affairs Committee, Health Care Service Corporation

Member, Compensation Committee, Health Care Service Corporation

Member, Executive Committee, Health Care Service Corporation

Member, Public Policy Committee, Health Care Service Corporation

Member, International Trade Committee, Texas Association of Business

Member, Board of Directors, Texas Leadership Institute

Economic Consultant and Advisor, City of Dallas

Member, Executive Advisory Counsel, Texas Association of Minority Business
    Enterprises

Member, Investment Committee, Ector County

Member, Economic Advisory Board, Texas Department of Economic Development

Honorary Board of Advisors, Texas Lyceum

Member, Advisory Task Force, National Center for Advanced Manufacturing

Member, Texas State Chamber of Commerce

Member, Selection Committee, "Texan of the Year" Award

Advisory Panel, Five Outstanding Young Texans Program

Economic Advisor, Committee on Ways and Means, Texas House of Representatives

Economic Advisor, Texas Technology Initiative

Member, Texas Business Council

Economic Advisor, Committee on Appropriations, Texas House of Representatives

Member, Texas Marketing Team

Economic Advisor, United States House of Representatives

Economic Advisor, United States Senate

Member, Central Texas Technology Working Group, Office of the Governor, State of
    Texas

Economic Advisor, Comptroller of Public Accounts, State of Texas

Economic Advisor, Office of the Speaker, Texas House of Representatives

Economic Advisor, Occupational Training Advisory Group, Texas Education Agency

Economic Advisor, MOTRAN (Midland Odessa Transportation Alliance)

Economic Advisor, Committee on Transportation, Texas House of Representatives

Economic Consultant, United States Chamber of Commerce

12

Adjunct Fellow, Citizens for a Sound Economy

Economic Advisor, Committee on Economic Development, Texas Senate

Member, Brazos River Basin Historical Commission

Economic Consultant, Texas Water Development Board

Economic Advisor, Committee on Healthcare, Texas House of Representatives

Economic Advisor, United States Department of the Treasury

Senior Consultant, Resource Economics and Management Associates

Economic Advisor, East Texas Economic Development Commission

Economic Advisor, Committee on Economic Development, Texas House of Representatives

Publication Review Board, North American Economics and Finance Association

Secretary and Executive Committee Member, Time Series Interaction Committee of the United States

Contributing Editor and Columnist, Texas Industrial Development Council Newsletter

Editorial Advisor, The Handbook of Texas

Contributing Columnist, Arlington Morning News

Contributing Columnist, Dallas Business Journal

Contributing Editor and Columnist, Texas Association of Broadcasters Newsletter

Contributing Editor and Columnist, Texas Independent Banker

Economic Advisor, Office of the Governor, State of Texas

Economic Advisor, Office of Rural and Community Affairs, State of Texas

Economic Advisor, Committee on State Affairs, Texas Senate

Member, CEO Council, Texas Chamber of Commerce

Member, Economic Outlook Panel, DRI-WEFA

Member, Quarterly Economic Survey Panel, National Association of Business Economists

Member, Dallas Morning News Board of Economists

Member, Economic Development Task Force, Texas Water Development Board

Member, Technology Task Force, Frisco Economic Development Corporation

Economic Advisor, State Taxation Reform Task Force, Texas Legislature

Economic Advisor, Joint Select Committee on School Finance, Texas Legislature

Economic Advisor, Committee on Finance, Texas Senate

Economic Advisor, Ministry of Economic Affairs, Republic of China

Member, Economic Forecasting Panel, <u>Western Blue Chip Economic Indicators</u>

Member, International Public Finance Committee, National Tax Association

Member, Central Texas Transportation Task Force

Honorary Board of Advisors, American Biographical Institute

Member, United States Congressional Advisory Board

Economic Advisor, National Institutes of Health

Economic Advisor, Texas Medical Association

Economic Advisor, Texas Public Power Association

Economic Advisor, Texas State Technical College System

Economic Advisor, Texas Department of Agriculture

Economic Advisor, Public Construction Supervisory Board, People's Republic of China

Texas Representative to the Regional Information Exchange Program, Bureau of
   Economic Analysis, United States Department of Commerce

Economic Advisor, The Milken Institute

Contributing Author, <u>Legalmedia</u>

Economic Consultant, Financial Services Roundtable

Board of Reviewers, National Science Foundation (Economics and Statistics)

Economic Advisor, Texas Railroad Commission

Board of Reviewers, National Academy of Sciences

Economic Advisor, Texas Workforce Commission

Board of Reviewers, National Research Council

Member, Task Force on Economic Impact of Diabetes, American Diabetes Association

Economic Advisor, National Economic Policy Council, Office of the President

Economic Advisor, State Science and Technology Commission, People's Republic of China

Economic Advisor, United States Department of Transportation

Editorial Consultant, International Journal of Econometric Modeling

Economic Advisor, United States Environmental Protection Agency

Economic Advisor, Texas Industrial Development Council

Advisory Director, Texas Association of Business and Chambers of Commerce

Economic Consultant, United States Department of Housing and Urban Development

Economic Advisor, Texas Higher Education Task Force

Economic Advisor, Texas Association of Urban Counties

Economic Advisor, Texas Technology Legislative Task Force

Economic Advisor, Texas Legislative Task Force on Rural Economic Development

Economic Advisor, Texas Department of Transportation

Economic Advisor, Texas Council on Environmental Quality

Economic Advisor, Texas Economic Development Program, Office of the Governor

Economic Advisor, Texas Hospital Association

Economic Advisor, TransTexas Corridor

Economic Advisor, United States Department of Energy

Program Committee, 2001-2004 International Symposium on Systems Research

Economic Advisor, Texas Education Agency

Board of Advisors, Texas Advisory Council on Intergovernmental Relations

Consultant, The Center for Political Research, University of California

Member, Legislative Affairs Committee, Odessa Chamber of Commerce

President, Board of Directors, Texas Leadership Institute

Honorary Guest Editor, <u>Nursing Administration Quarterly</u>

Member, Foundation Advisory Council, National League of Nursing

Reviewer/Editorial Consultant, <u>Southern Economic Journal</u>, <u>Journal of Economic Issues</u>, <u>Journal of Economics</u>, <u>Journal of Macroeconomics</u>, <u>Journal of Time Series Analysis</u>, <u>Growth and Change</u>, <u>Journal of Economic History</u>, <u>Review of Business and Economic Research</u>, <u>Social Science Quarterly</u>, <u>Modeling and Simulation</u>, <u>Southwestern Economic Journal</u>, <u>Issues in North American and Caribbean Economics and Finance</u>, <u>Applied Economics</u>, <u>Business Economics</u>, <u>Review of North American Economics and Business</u>, <u>Journal of Official Statistics</u>, Prentice-Hall, Irwin, CBS Publishing, Duxbury, Wadsworth, Harper and Row, North-Holland, McGraw-Hill, Kluwer-Nijhoff, Goodyear, Scott-Foresman, Mosby, Macmillan, Dryden, Houghton-Mifflin, Instrument Society of America.

## PROFESSIONAL AFFILIATIONS
### (Current and Former)

American Academy of Arts and Sciences
American Academy of Political and Social Science
American Association for the Advancement of Science
American Economic Association
American Finance Association
American Statistical Association
Asia and World Institute
Association for Christian Economists (Founding Member)
Association for Evolutionary Economics
Association for Social Economics
Atlantic Economic Society
Baker Street Irregulars
Econometric Society
Economic History Association
Hastings Center: Institute for Society, Ethics, and the Life Sciences
History of Economics Society
Institute for Socioeconomic Studies
Institute of Mathematical Statistics
International Association for Modeling and Simulation (France-Charter Member)
International Association of Business Forecasters (Charter Member)
International Association of Mathematical Modeling (Charter Member)
International Institute for Advanced Studies
International Institute of Forecasters (Charter Member)
International Platform Association
International Time Series Association (Charter Member)
Mathematical Association of America
Midsouth Academy of Economics and Finance
Midwest Economic Association
Missouri Valley Economic Association
National Association of Business Economists
National Association of Corporate Directors
National Collegiate Honors Council
National High Speed Rail Association
National Tax Association—Tax Institute of America
North American Economics and Finance Association
Post-Keynesian Economic Association (Charter Member)
Royal Economic Society (England)
Sherlock Holmes Society of London
Society for Economic Analysis (England)
Society for General Systems Research
Southern Economic Association
Southwestern Economics Association
Southwestern Federation of Administrative Disciplines
Southwestern Social Science Association
Southwestern Society of Economists
Systems Research Foundation
Texas Economic and Demographic Association
Time Series Interaction Committee of the United States (Founding Member)
Western Economic Association International

## HONORS AND AWARDS
### Professional

2012 Texan of the Year, Texas Legislative Conference
Distinguished Alumni Award, Baylor University
Distinguished Fellow, International Institute for Advanced Studies
Outstanding Young Graduate of the Decade Award, Baylor University
*Doctoris Honoris Causa* degree, International Institute for Advanced Studies
Global Senior Research Fellow, IC$^2$ Institute
Honorary Fellow, Academy of Nursing Education
First Recipient, Meritorious Service Medal in Business and Commerce, Baylor
      University (2013)
Distinguished Service Award, Baylor University Board of Regents
First Recipient, Outstanding Alumnus in Economic Research, Rice University
Citation for Long-Term Contributions to the State of Texas ("shaping the economic
      future of the state; extensive contributions to economic growth in the Lone Star
      State"), Texas House of Representatives
Distinguished Alumni Award, Lindale Independent School District (2013)
Texas Leadership Hall of Fame (John Ben Shepperd Leadership Institute), Inducted in
      2014
Citation for Outstanding Initiative in Promoting World Trade, China External
      Development and Trade Administration
First Recipient, "Ray Perryman Leadership Award," Texas Association of Nurse
      Practitioners
Special Commendation for Excellence in Academic Research, Baylor University Board
      of Trustees
2016 Cesar E. Chavez Conscience Builders Award, Cesar E. Chavez Legacy and
      Education Foundation
Honorary President, Republic of the Rio Grande
Selected to the "Dallas 500" (the 500 most powerful people in Dallas) by D CEO
      Magazine, 2016 and 2017
Youngest Endowed Research Chairholder at a Major University in the United States
Youngest Full Professor at a Major University in the United States
Youngest University Professor at a Major University in the United States
Outstanding Young Alumnus, Baylor University
Leadership Fellow, National Association of Corporate Directors
Recognized as one of the Five Outstanding Baylor University Honors Program Graduates
      at 50th Anniversary of Program
Outstanding Young Wacoan
World Hall of Fame
Hall of Fame of Notable Americans
Outstanding Advocacy Award, National Association of Nurse Practitioners
Distinguished Professor Award, Hankamer School of Business, Baylor University
Honorary "Prince of the City of New Braunfels"
Citation for Promoting International Academic Exchange, Asia and World Institute
Citation for Outstanding Advisory Contributions, Congress of the United States
Citation for Economic Development Efforts ("tireless efforts in helping to build a better
      Texas"), Texas House of Representatives
Citation as Outstanding University Scholar and Teacher, Baylor University
Award for Outstanding Research Achievement in Economic Modeling, Systems Research
      Foundation
Distinguished World Leadership Award

Lifetime Achievement Award, International Institute for Advanced Studies
Presidential Medal of Merit
Citation for Promotion of Trade and Technology Exchange, State Science and
    Technology Commission, People's Republic of China
<u>Texas Business</u> Rising Star
Five Outstanding Young Texans
Citation for Leadership, Texas House of Representatives
Honorary Marshall, City of Fort Worth
Honorary Judge, Webb County
Citation for Outstanding Advisory Contributions, Texas Legislature
Most Popular Professor, Hankamer School of Business, Baylor University
Honorary Citizen, City of Lubbock
Citation for Distinguished Service, Texas Leadership Institute
Ten Outstanding Young Americans
Ten Outstanding Young Persons in the World
Outstanding Young Person in the World in the Field of Economics and Business
    Innovation
Rotary Centennial Distinguished Professional Service Award
Baylor University Research Sabbatical (15)
President's Award, Texas Nursing Association
Award for Bringing Positive National Recognition to the Waco Area, Waco Chamber of
    Commerce
Who's Who in America
Who's Who Among Distinguished Americans
Citation for Outstanding Contribution to Global Trade and Development, China
    Productivity Center
Who's Who in the South and Southwest
Citation for Outstanding Contributions to the Social Sciences, Southwestern Social
    Science Association
Who's Who Among Writers
Texas State Network "Lone Star Hero" Award
Presidents' Award, Greater Odessa Chamber of Commerce
Silver Special Award, Permian Basin Regional Planning Commission
Recognition as One of the Five Outstanding Graduates in the First 50 Years of the Baylor
    University Honor Program
Citation for Teaching Excellence, Baylor University
Citation for Research Excellence, Baylor University
Citation for Outstanding Contributions to Texas Economic Development, Texas
    Department of Economic Development
Honorary Citizen, City of Big Spring
Personalities of the South
Mile Marker Award for Contributions to Transportation Development, Midland-Odessa
    Transportation Alliance
Community Leaders of America
Personalities of America
Citation for Outstanding Contributions to the Success of the Six-Year Redevelopment
    Plan, Executive Yuan, People's Republic of China
Citation for Outstanding Contributions as Economist-in-Residence at Baylor University
Who's Who in American Education
Citation for Outstanding Contributions to the Field of Technical Education, Texas State
    Technical Institute Development Foundation
Men of Achievement (Cambridge)
World Who's Who of Men
International Who's Who in Education

Citation for Meritorious Efforts in Promoting World Capitalism (including the People's
        Republic of China), The Democracy Foundation
International Authors and Writers Who's Who
2000 Notable Americans
Directory of Distinguished Americans
Directory of International Biography
Outstanding Young Men of America
World Who's Who of Intellectuals
Citation for Outstanding Service to Economics, Southwestern Society of Economists
Citation for Outstanding Contributions to US-Mexico Relations, Texas Philosophical
        Society
International Who's Who of Contemporary Achievement
Award for Outstanding Scholarly Achievement and Seminal Contributions to the Field of
        Economic Modeling, Systems Research Foundation
Biographical Role of Honor
International Registry of Profiles
Strathmore's Who's Who
International Directory of Distinguished Leadership
International Book of Honor
Who's Who in Technology
American Bar Association's Best Experts in America
Outstanding People of the Century
5000 Personalities of the World
Who's Who Among Leading American Executives
Outstanding Texas Leader (John Ben Shepperd Memorial Award)
Texas Monthly "Bum Steer" Award
Heritage of Odessa Foundation Community Statesman Award
City of Odessa Outstanding Citizen Award and "Dr. M. Ray Perryman Day"
Who's Who Among Business Executives

**Undergraduate and Graduate**

National Merit Scholar
Summa Cum Laude Graduate of the Baylor University Honors Program with Distinction, 1974
Outstanding Student, Baylor University, 1974
Outstanding Mathematics Major, Baylor University, 1974
Outstanding Economics Major, Baylor University, 1974
First Southwest Bancorporation Scholarship
Alpha Chi Scholarship Award
Dean's Distinguished Honor List, 1971-1974
Omicron Delta Epsilon Outstanding Paper in Economics Award, 1974
Rice University Graduate Fellowship, 1974-1977
National Science Foundation Fellowship

**Honorary Affiliations**

Alpha Chi, National Academic Honor Society
National Academy of Nurses
Society of Jack Ben Rabbit
Omicron Delta Epsilon, International Honor Society in Economics
Omicron Delta Kappa, National Leadership Fraternity
Phi Eta Sigma, National Academic Honor Society
Beta Gamma Sigma, National Business Honor Fraternity

# Consulting Activity

## IMPACT STUDIES, REAL ESTATE PROJECTS, AND RELATED ANALYSES

"The Impact of Oil Prices on the Texas Economy."  Study prepared for Republic Bancorporation, 1985.

"The Economic Impact of the University of Texas Healthcare Science Center at San Antonio on San Antonio and Texas."  Study prepared for the San Antonio Economic Development Foundation, Inc., 1987 (partial basis for legislative testimony by University officials).

"The Impact of the University of Texas at San Antonio on Economic Activity in San Antonio and Texas."  Study prepared for the San Antonio Economic Development Foundation, Inc., 1987 (partial basis for legislative testimony by University officials).

"The Impact of Savings and Loan Activity on Economic Performance in Texas and the Dallas/Fort Worth Metropolitan Area."  Study prepared for the Dallas Morning News, 1987.

"Expenditure Losses from External Spending in the Abilene Market Area."  Study prepared for the 'Buy the Big Country First' Campaign, Abilene, Texas, 1987.

"The Economic Impact of Proposed Truck Mall Facilities on the East Texas Economy."  Study prepared for Triton Energy Corporation, 1987.

"The Impact of the Oil Industry on the Economy of Texas: A Geographically and Sectorally Disaggregated Analysis."  Project prepared for Pennzoil Corporation, 1987.

"An Estimation of the Leakage of Retail Sales from the San Angelo Market Area."  Study prepared for the 'Buy San Angelo First' Media Campaign, 1987.

"The Expenditure Leakage Associated with Retail Sales in the Brown County Area."  Study prepared for StarTel Communications, 1987.

"The Impact of the Healthcare Delivery and Educational Systems in the Temple/Belton Area on Economic Activity in Bell County and Texas."  Study prepared for the Temple Economic Development Commission and the Central Texas Private Industry Council, 1988.

"The Impact of Retail Sales Leakage on the Amarillo Market Region."  Study prepared for the "Buy the Panhandle First" Campaign of KFDA-TV, 1988.

"An Impact Assessment System for the Heart of Texas Region."  Computerized software system designed for the Heart of Texas Council of Governments, 1988.

"The Leakage of Expenditures from the Corpus Christi Market Area."  Study prepared for the "Buy Corpus Christi First" Campaign, 1988.

"An Economic Impact Assessment Model of Three Regions of North Texas."  Software systems designed for Dallas Area Rapid Transit, 1988.

"The Economic Impact of the New Fujitsu North American Facilities on Business Conditions in the North Texas Area."  Study prepared for The Perot Group, 1988.

"The Economic Impact of New Telecommunications Facilities on Texas."  Study prepared for the Office of the Governor, State of Texas, 1988.

"Retail Sales and Business Spending Leakages in the East Texas Economy."  Study prepared for the "Buy the Panhandle First" Campaign of KFDA-TV, 1988.

"The Impact of Baylor College of Medicine on Economic Activity in Harris County and Texas."  Study prepared for Baylor College of Medicine, 1988 (partial basis for legislative testimony by University officials).

"The Economic Impact of the Proposed Dallas Area Rapid Transit Rail System on Business Activity in the North Texas Region."  Study prepared for Dallas Area Rapid Transit, 1988.

"Estimated Retail Sales Leakage in the Lawton/Wichita Falls Area and its Impact on Business Activity."  Study prepared for KSWO-TV, 1988.

"An Impact Assessment System for the Abilene-Taylor County Area."  Computerized software system prepared for Abilene Christian University, 1988.

"The Economic Impact of the Proposed Texas Enterprise Zone in the Brownsville/Cameron County Area."  Study prepared for the City of Brownsville, 1988 (partial basis for a successful Enterprise Zone application).

"The Impact of New Industrial Development on the Economy of Denton County and Texas."  Study prepared for the Denton Chamber of Commerce, 1988.

"The Impact of Retail Sales Leakages in the Lubbock Metropolitan Area."  Study prepared for the Lubbock Board of City Development, 1988.

"Retail Sales Losses and the Multiplier Effects in the Midland/Odessa Area."  Study prepared for KMID-TV, 1988.

"An Overview of the Direct and Indirect Economic Impact and the Economic Development Implications of Adding Four Graduate Programs to the University of Texas at San Antonio."  Study prepared for the University of Texas at San Antonio, 1989 (partial basis for legislative testimony by University officials).

"The Economic Impact of the Educational, Research, and Healthcare Delivery Programs of the University of Texas Health Science Center at San Antonio on Business Activity in San Antonio, Texas."  Study prepared for the San Antonio Economic Development Foundation, 1989 (partial basis for legislative testimony by University officials).

"The Impact of Formosa Plastics on Business Activity in Victoria, Jackson, and Calhoun Counties."  Study prepared for First Victoria National Bank, 1989.

"The Economic Impact of the Proposed ALAMODOME Facility on Bexar County and Texas."  Study prepared for the Greater San Antonio Chamber of Commerce, 1989.

"The Economic Impact of the Educational, Research, and Cultural Programs of the University of Texas at San Antonio on Business Activity in San Antonio and Texas."  Study prepared for the San Antonio Economic Development Foundation, 1989 (partial basis for legislative testimony by University officials).

"The Economic Impact of an Expanded Convention Complex on the Economy of the Austin Area."  Study prepared for the Austin Chamber of Commerce, 1989.

"The Economic Effects of the New North American Telecommunications Research Center of Fujitsu, Inc., on the Economy of the Dallas Area and Texas."  Study prepared for Fujitsu, Inc., 1989.

"The Economic Impact of Maquiladoras on the McAllen-Hidalgo County Area."  Study prepared for the McAllen Economic Development Corporation, 1989.

"A Briefing Paper Regarding the Relative Attractiveness of Dallas/Fort Worth and New York City (Manhattan) for New Manufacturing and Service Operations and Corporate Headquarters."  Study prepared for The Perot Group, 1989.

"Preliminary Evaluation of the Economic and Fiscal Impact of the Proposed Food Lion Distribution Facility on Denton County, the City of Roanoke, and the Northwest Independent School District (NISD)."  Study prepared for The Perot Group, 1990.

"The Economic Impact of Selected Corporate Enterprises on Business Activity in Texas."  Study prepared for ClayDesta Communications, 1990.

"A Preliminary Assessment of the Economic Impact of the Proposed Matsushita Electronics Manufacturing Facility on the City of Denton."  Study prepared for The Perot Group, 1990.

"The Comprehensive Effects of a Potential New Distribution and Warehousing Complex on Revenue Patterns in the Northwest Independent School District (NISD)."  Study prepared for The Perot Group, 1990.

"A Preliminary Assessment of the Economic Impact of the Proposed United Airlines Maintenance Facility on the City of Fort Worth."  Study prepared for The Perot Group, 1990.

"The Impact of the IntelliCall, Inc., Manufacturing Facility on Economic Activity in the Rio Grande Valley."  Study prepared for IntelliCall, Inc., 1990.

"The Economic Impact of the Construction and Operation of a Proposed Electronic Manufacturing Facility (Matsushita) on Business Activity and Tax Revenues in the Fort Worth/Denton County Area."  Study prepared for The Perot Group, 1990.

"The Impact of the Proposed Elsinore Aerospace Service Expansion on Business Activity in the Waco Area."  Study prepared for Elsinore Aerospace Services, 1990.

"An Evaluation of the Economic Impact of the Santa Fe Automobile Distribution Facility on Business Activity and Fiscal Revenues in the North Texas Area."  Study prepared for The Perot Group, 1991.

"The Economic and Fiscal Impact of the Proposed Hillwood Mall on the Fort Worth Area."  Study prepared for The Perot Group, 1991.

"The Economic and Fiscal Impact of the Proposed McDonnell Douglas Aircraft Manufacturing Facility on the Fort Worth Area."  Study prepared for The Perot Group, 1991.

"An Analysis of Retail Sales Leakage for the Eugene, Oregon Economy."  Analysis prepared for KSLR-TV, 1991.

"The Economic Impact of the Activities of the Tyler Economic Development Council."  Study prepared for the Tyler Economic Development Council, 1991.

"A Comprehensive Sensitivity Analysis of the Hillwood Mall Project on Fiscal Patterns in the City of Fort Worth."  Study prepared for The Perot Group, 1991.

"The Impact of the Pace Foods Expansion on Business Activity and Fiscal Revenues in the San Antonio Area."  Study prepared for the San Antonio Economic Development Foundation, 1991.

"The Economic Impact of a New Super Speedway and Transportation Technology Center on the Dallas/Fort Worth Area."  Study prepared for The Perot Group and Ishin Speed Sport, Inc., 1991.

"A Reevaluation of the Effects of the Santa Fe Distribution Center on the Economy of the Fort Worth Area."  Study prepared for The Perot Group, 1991.

"A Comprehensive Sensitivity Evaluation of the Fiscal Effects of the Proposed McDonnell Douglas MDX-12 Facility on the City of Fort Worth."  Study prepared for The Perot Group, 1991.

"The Fiscal Effects of the Ishin Project (Super Speedway and Transportation Technology Center) on the City of Fort Worth, Denton County, and the Northwest Independent School District."  Study prepared for The Perot Group and Ishin Speed Sport, Inc., 1991.

"The Impact of the Proposed CenterPort International Development on Denver County: Preliminary Assessment."  Report prepared for CenterPort International, 1991.

"The Economic Impact of the Proposed Class 1 Race Track on the Dallas/Fort Worth Area and the City of Grand Prairie."  Study prepared for the City of Grand Prairie, 1991.

"The Economic Impact of the Arts on the San Antonio Metropolitan Area."  Project prepared for the City of San Antonio, 1992.

"The Economic Impact of Fort Worth Alliance Airport: A Comprehensive Analysis With Emphasis on the Fiscal Consequences of Federal Outlays for the Project."  Study prepared for Hillwood Development Corporation, 1992.

"The Economic Impact of the Texas Residential Care Industry on Business Activity in Texas: A Disaggregated Analysis."  Analysis prepared for the Texas Healthcare Association, 1992.

"The Economic Impact of the Irving Healthcare System on Local Business Activity."  Study prepared for the Irving Healthcare System, 1992.

"The Economic Benefits of Sea World to the San Antonio Area."  Study prepared for
    USAA Real Estate Company, 1992.

"The Impact of the Arts and Related Activity on the Economy of the San Antonio Area."
    Study prepared for KJN Consultants and the City of San Antonio, 1992.

"The Impact of a Proposed Biotech Plant on Round Rock and the Surrounding Area."
    Study prepared for the Round Rock Chamber of Commerce, 1993.

"The Impact of the Dell Computer Relocation in Round Rock and the Surrounding
    Areas."  Study prepared for the Round Rock Chamber of Commerce, 1993.

"The Economic Impact of the Proposed Runway Extension at Fort Worth Alliance
    Airport."  Study prepared for the City of Fort Worth, 1993.

"The Impact of a Large Food Processing Facility on Round Rock and the Surrounding
    Area."  Study prepared for the Round Rock Chamber of Commerce, 1993.

"The Impact of a Large Aircraft Manufacturing Facility on the Fort Worth Area, the
    Dallas/Fort Worth Metroplex, and the State of Texas."  Study prepared for The
    Perot Group, 1993.

"An Analysis of the Economic Benefits Associated with the City of College Station's
    Proposal for a Cogeneration Facility for Texas A&M University."  Study prepared
    for the City of College Station, 1993.

"The Economic Impact of the Pantex Facility on the Amarillo Area."  Study prepared for
    the Amarillo Economic Development Corporation, 1993.

"The Impact of the Proposed South Dallas Cargo Airport on Business Activity in the
    Dallas/Fort Worth Area."  Study prepared for the I-45 Corridor Airport Alliance,
    1993.

"The Economic Impact of the Proposed Apple Computer Facilities on the Williamson
    County Area."  Study prepared for Williamson County, 1993.

"The Economic Impact of a Proposed Plastics Facility on the Bryan-College Station
    Metropolitan Area."  Study prepared for the Bryan Economic Development
    Corporation, 1994.

"The Economic Impact of a Proposed Poultry Processing Facility on Business Activity in
    the Longview-Marshall Metropolitan Area."  Study prepared for the Longview
    Economic Development Corporation, 1994.

"The Impact of the Texas Eastman Facility on Business Activity in the East Texas Area."
    Study prepared for Eastman Chemical Corporation, 1994.

"The Sensitivity of Lot Prices and Demand to Various Market Factors."  Study prepared
    for The Woodlands Corporation, 1994.

"The Economic and Fiscal Impact of the Cemex-Sunbelt Facility on the City of New
    Braunfels."  Analysis prepared for Fulbright & Jaworski and Cemex, 1995.

"The Impact of a Proposed NASCAR Speedway on Business Activity and Fiscal Revenues in the Fort Worth Area."  Study prepared for The Perot Group, 1995.

"The Economic Impact of the Proposed Samsung Facility on Business Activity in the Austin Area."  Study prepared for the City of Round Rock, 1995.

"An Analysis of the Contributions of Cemex to US Business Activity."  Study prepared for Cemex, 1995.

"The Impact of the Proposed LSI Facility on the Economy of Round Rock and Williamson County."  Study prepared for the City of Round Rock, 1995.

"The Economic Impact of the Sitel Location on Business Activity in the Amarillo Area."  Study prepared for the Amarillo Economic Development Corporation, 1995.

"The Impact of Mobil Oil Corporation on the Economy of the Beaumont Area."  Study prepared for Mobil Oil Corporation, 1995.

"The Economic Impact of the Various Cemex Operations on the State of Texas."  Study prepared for Cemex, 1995.

"The Economic Impact of the Houston Advanced Research Center on Local, State, and National Business Activity."  Study prepared for the Houston Advanced Research Center, 1996.

"The Economic Impact of the Proposed Frisco Jetport on Local Business Activity."  Analysis prepared for Frisco Economic Development Corporation, 1996.

"The Economic Impact of Cemex Operations on the Economy of Arizona."  Analysis prepared for Sunbelt Management, 1996.

"The Economic Impact of the Proposed Rail Port Industrial Facility on Business Activity in the Ellis County Area."  Study prepared for Brookhollow Development, 1996.

"The Economic Impact of Selected Brewery Facilities on the Economy of Texas."  Study prepared for Stroh's, Inc., 1996.

"The Economic Impact of the Solar Turbine Facility on Business Activity in the DeSoto Area."  Study prepared for the DeSoto Economic Development Corporation, 1996.

"The Economic Impact of Maquiladora Facilities on the Economy of the McAllen-Edinburgh-Mission MSA."  Study prepared for the McAllen Economic Development Corporation, 1997.

"A Review of the Economic Effects of a Proposed Sports Arena Complex in the Dallas Area."  Analysis prepared for the City of Dallas, 1998.

"The Economic Impact of the Availability of Gulf Cost Refined Petroleum on the Economy of New Mexico and Selected Metropolitan Areas."  Study prepared for Longhorn Partners Pipeline and Jenkens & Gilchrist, 1998.

"The Economic Impact of Lower Cost Refined Petroleum Products on the Economy of Arizona and the Phoenix and Tucson MSAs."  Study prepared for Longhorn Partners Pipeline and Jenkens & Gilchrist, 1998.

"The Economic Impact of the Quarrying and Manufacturing Facilities of Cemex USA on the Texas Economy and Selected Regions."  Analysis prepared for Cemex USA, 1998.

"An Assessment of the Potential Economic Significance and Investment Returns Associated with a Proposed Western Heritage Development."  Analysis prepared for Silver Screen Junction, 1998-1999.

"The Economic Impact of a Proposed New Refined Petroleum Pipeline on Salt Lake City and the State of Utah."  Analysis prepared for The Williams Company, 1999.

"The Economic Impact of the Proposed Texas Motorplex on the Grand Prairie Economy."  Study prepared for the City of Grand Prairie, 1999.

"The Economic Impact of Access Limitations on Selected Mineral Properties."  Study prepared for Fargo Mining, Inc., 1999.

"The Economic Impact and Development Consequences of a Joint Use Airport on the City of Killeen and the Surrounding Area."  Study prepared for the City of Killeen, 1999-2000.

"The Economic Impact of a Major New Retail and Distribution Facility on the New Braunfels-Comal County Economy."  Study prepared for The Scooter Store, 2000.

"Potential Cost Savings from Smart Vehicle Systems Installation in Texas."  Study prepared for Intelligent Vehicle Systems, 2000.

"The Impact of Private Technical Education on the Texas Economy: An Analysis of Workforce Characteristics and Competitive Advantages."  Study prepared for Career College Schools of Texas, 2001.

"The Competitive Market for Electric Power in Texas: An Analysis in Light of Recent Developments."  Study prepared for the Association of Electric Companies of Texas, 2001.

"The Current Impact of Horse and Greyhound Racing on Business Activity in Texas."  Study prepared for the Texas Racing and Agribusiness Coalition, 2001.

"The Impact of Competitive Threats to the Racing Industry on Business Activity in Texas."  Study prepared for the Texas Racing and Agribusiness Coalition, 2001.

"The Impact of Navarro College on the Economy of Navarro County."  Study prepared for Navarro College, 2001.

"The Economic Impact of Expanded Gaming Activity at Texas Horse and Greyhound Racing Venues."  Study prepared for the Texas Racing and Agribusiness Coalition, 2001.

"The Impact of Horse and Greyhound Racing on Business Activity in Texas—An Assessment of Current Effects, Competitive Threats, and Potential Market Responses."  Study prepared for the Texas Racing and Agribusiness Coalition, 2001.

"The Economic Viability of Tax Abatements for the Expansion of a Major Retail Distribution Company."  Analysis prepared for The Scooter Store, 2001.

"The Economic Impact of Expanded Gaming Activity at Texas Race Tracks on Major Urban Markets."  Analysis prepared for Texas Racing and Agribusiness Coalition, 2001.

"The Economic Impact of the Nucor Steel Facility on Jewett and Leon Counties."  Analysis prepared for Nucor Steel, 2002.

"The Economic Benefits of the Victory Project to the Downtown Segment of Dallas."  Study prepared for The LeMasters Group, 2002.

"The Economic Impact of Wind Farm Investments Under House Bill 1200 (HB1200) on the Rankin Independent School District and the Surrounding Area."  Study prepared for the Rankin Independent School District, 2002.

"The Economic Impact of Wind Farm Investments Under House Bill 1200 (HB1200) on the Iraan-Sheffield Independent School District and the Surrounding Area."  Study prepared for the Iraan-Sheffield Independent School District, 2002.

"The Economic Impact of Wind Farm Investments Under House Bill 1200 (HB1200) on the Borden County Independent School District and the Surrounding Area."  Study prepared for the Borden County Independent School District, 2002.

"The Economic Benefits of the Grass Valley Water Project to the San Antonio Area."  Analysis prepared for Grass Valley Water, 2002.

"The Economic Impact of Wind Farm Investments Under House Bill 1200 (HB1200) on the Crockett County Consolidated Common School District and the Surrounding Area."  Study prepared for the Crockett County Consolidated Common School District, 2002.

"An Assessment of the Economic Impacts Associated with Nichols Reservoir."  Study prepared for Freese and Nichols, 2002.

"The Economic and Fiscal Impact of the Texas Instruments 300mm Semiconductor Manufacturing Facility and a Collateral Educational Initiative at the University of Texas at Dallas (UTD) on Texas and the Dallas-Fort Worth Area: A Perspective Analysis of a Key Investment in Future Prosperity."  Study prepared for the Dallas Chamber of Commerce, 2003.

"The Economic Impact of Six Flags Over Texas on the Economy of the Dallas-Fort Worth Area."  Study prepared for Six Flags Theme Parks, 2003.

"The Economic Benefits Associated with the Proposed Purchase of the Ameripol Synpol Styrene-Butadiene Rubber Plant in Port Neches by International Specialty Products."  Study prepared for International Specialty Products, 2003.

"The Impact of Locating a Large Tank Car Facility on the Economy of Texas."  Analysis prepared for Union Tank Car, 2003.

"The Impact of the Nucor Steel Facility on Business Activity on Kankakee County and Illinois."  Study prepared for Nucor Steel, 2003.

"The Impact of Developing a Major Applied Materials Research Center on the Competitiveness of the US Economy for Next Generation Technology."  Analysis prepared for Sematech International and Fulbright & Jaworski, 2003.

"The Impact of Locating a Large-Scale Financial Services Operation on Business Activity in Texas."  Study prepared for Countrywide Mortgage, 2003.

"Providing Essential Healthcare in an Increasingly Complex Environment: The Impact of VHA Southwest Medical Facilities on Their Local Communities and Texas." Study prepared for VHA Southwest, 2004.

"The Impact of Private Career Education on the Performance of the Texas Economy." Study prepared for the Career Colleges and Schools of Texas, 2004.

"The Impact of the National Biocontainment Laboratory and Related Initiatives at The University of Texas Medical Branch (UTMB) on Business Activity in Texas." Study prepared for The University of Texas Medical Branch, 2004.

"The Current and Potential Impact of The University of Texas at Tyler on Local and State Business Activity."  Study prepared for The University of Texas at Tyler, 2004.

"The Impact of Proposed Expansions of Lockheed Martin at the Kelly Aviation Center on Business Activity in Texas."  Study prepared for Lockheed Martin, 2004.

"An Assessment of the Economic Impact of the Vought Aircraft Expansion on Texas and the Dallas/Fort Worth Metroplex."  Study prepared for Vought Aircraft and the Dallas Chamber of Commerce, 2004.

"The Impact of the Potential Location of the Freescale Corporate Headquarters and Other Future Expansions on the Austin and Texas Economies."  Study prepared for Freescale and Fulbright & Jaworski, 2004.

"The Economic Impact of American National Insurance Company on the City of Galveston and Galveston County."  Analysis prepared for American National Insurance, 2004.

"The Impact of Parkland Hospital and the Healthcare Complex on Economic Activity in the Dallas Area: A Comprehensive Assessment Including an Evaluation of Indigent Care Contributions."  Study prepared for Texas Health Resources, 2004.

"The Economic Impact of Coal Mining and Coal-Fired Electric Generation Activity on Texas and the East Texas Region."  Study prepared for TXU, 2004.

"The Impact of a Major Chemical Manufacturing Expansion on the Economy of East Texas."  Study prepared for the Longview Economic Development Cooperation, 2004.

"The Economic and Fiscal Impacts of New Investments in Petrochemical Facilities on the Houston Economy."  Study prepared for Valero Energy Corporation, 2004.

"The Impact of Expanded Microelectronics and Nanotechnology Investments on the Economies of Austin and Texas."  Study prepared for Advanced Micro Devices, 2004.

"The Impact of an Advanced Processing and Prototyping Center for Energy Technology on the Texas Economy."  Study prepared for Sematech International, 2004.

"The Potential Impact of Valley Baptist Health System's Treasure Hills Development on Business Activity in Cameron County."  Study prepared for Valley Baptist Health System, 2004.

"The Economic Impact of the Proposed Premcor Expansion on Port Arthur."  Study prepared for the Port Arthur Independent School District and Wells Payton Greenberg & Hunt, 2004.

"The Potential Impact of the Texas Institute for Genomic Medicine on Business Activity in Texas."  Study prepared for Lexicon Genetics and Texas A&M University, 2004.

"Fueling Prosperity: The Impact of the Refining and Petrochemicals Cluster on Business Activity in Texas and Areas of Significant Concentration."  Study prepared for the Economic Alliance of the Houston Port Region, 2005.

"The Potential Impact of the Cartega Automobile Remanufacturing Facility on Business Activity in Texas."  Study prepared for the Economic Alliance of the Houston Port Region, 2005.

"The Impact of the Nucor Steel Berkeley Facility on Business Activity in Berkeley County and South Carolina."  Study prepared for Nucor Steel and Moore & Van Allen, 2005.

"The Impact of the Methodist Hospital System on Business Activity in Houston and Texas."  Study prepared for The Methodist Hospital System, 2005.

"The Impact of a Cheese Manufacturing Facility and Associated Development on Business Activity in the Panhandle Region and Texas."  Study prepared for the High Plains Dairy Council, 2005.

"The Impact of Current and Expanded Operations of Samsung Austin Semiconductor on Business Activity in Texas and the Austin Area."  Study prepared for Samsung and Fulbright & Jaworski, 2005.

"The Potential Impact of an Expansion of Windsor Foods on Business Activity in Lampasas County and Texas."  Study prepared for Windsor Foods and Fulbright & Jaworski, 2005.

"The Impact of a Substantial Investment in Coal-Fired Generating Capacity and Related Mining Operations on Business Activity in the Brazos Valley Region and Texas."  Study prepared for TXU, 2005.

"The 'Safety Net' of Sustainable Prosperity: An Assessment of the Economic Impact of Parkland Health & Hospital System on Dallas County and the Surrounding Area." Study prepared for the Parkland Foundation, 2005.

"The Impact of the Nucor Steel-Nebraska Facility and Vulcraft-Nebraska and Nucor Cold Finish-Nebraska Facilities on Business Activity in Madison County and Nebraska." Study prepared for Nucor Steel and Moore & Van Allen, 2005.

"The Potential Impact of the Texas Institute for Preclinical Studies on Business Activity in Texas and the College Station-Bryan Area." Study prepared for Research Valley Partnership, 2006.

"The Overall Impact of TXU's Capital Investments in Generating Facilities, Enhanced Electricity Delivery Mechanisms, and Other Significant Capital Expenditures on Business Activity in Texas." Study prepared for TXU, 2006.

"The Potential Impact of an Enhanced Emphasis on Cancer Research (including designation as a Comprehensive Cancer Center) at the University of Kansas Medical Center on Business Activity in Kansas and the Kansas City Metropolitan Area." Study prepared for Kansas Technology Enterprise Corporation, 2006.

"The Potential Impact of the Proposed Texas Institute of Nanomedicine on the Economy of Texas." Study prepared for Introgen Therapeutics, Inc., and Fulbright & Jaworski, 2006.

"The Impact of a Substantial Investment in the Big Brown Generation Facility on Business Activity in Freestone County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Lake Creek Generation Facility on Business Activity in McLennan County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Martin Lake Generation Facility on Business Activity in Rusk County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Monticello Generation Facility on Business Activity in Titus County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Morgan Creek Generation Facility on Business Activity in Mitchell County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Oak Grove Generation Facility on Business Activity in Robertson County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Sandow 5 Generation Facility on Business Activity in Milam County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Tradinghouse Generation Facility on Business Activity in McLennan County and Texas." Study prepared for TXU, 2006.

"The Impact of a Substantial Investment in the Valley Generation Facility on Business Activity in Fannin County and Texas."  Study prepared for TXU, 2006.

"The Impact of TXU's Power Division Investment in New Generation Facilities on Business Activity in Texas."  Study prepared by TXU, 2006.

"The Annual Impact of Baseball Tournaments at River Bend Park on Business Activity in the Waco Area."  Study prepared for the City of Waco, 2006.

"The Impact of NRG's Proposed Nuclear Generation Facility on Business Activity in Texas and the Matagorda County Area."  Study prepared for NRG, 2006.

"The Current and Potential Expanded Impact of Valero's Refinery Operations on Business Activity in Aruba."  Study prepared for Valero Aruba, 2006.

"The Economic Impact of Recent and Planned Investments by TXU on Business Activity in Texas and Affected Counties and Legislative Districts."  Study prepared for TXU, 2006.

"The Impact of a Significant Investment by TXU in Electric Generation Capacity on Business Activity in Pennsylvania and Selected Regions."  Study prepared for TXU, 2006.

"Proposed Nucor Steel Investment Would Bring Notable Stimulus to Leon County and Texas."  Study prepared for Nucor Steel and Moore & Van Allen, 2006.

"The Impact of Current and Proposed Expanded Sartori Foods Blackfoot Operations on Business Activity in Idaho."  Study prepared for Sartori Foods, 2006.

"The Impact of a Proposed Coal-Fired Generation Plant to be Developed by NRG on Business Activity in Texas and the Central Texas Area."  Study prepared for NRG, 2006.

"The Economic Impact of the Health Care Sector on the Waco Economy."  Study prepared for the Waco Chamber of Commerce, 2006.

"Bounty from Below: The Impact of Developing Natural Gas Resources Associated with the Barnett Shale on Business Activity in Fort Worth and the Surrounding 14-County Area."  Study prepared for the Fort Worth Chamber of Commerce, 2007.

"Enhancing Prosperity for Texas and Texans: The Impact of Graduates from Career Colleges and Schools on Business Activity in Texas."  Study prepared for the Career Colleges and Schools of Texas, 2007.

"The Potential Impact of the Proposed National Bio- and Agro-Defense Facility on Business Activity in Texas and the Research Valley (College Station-Bryan) Area."  Study prepared for the Research Valley Partnership and Texas A&M University, 2007.

"Catching the Next Big Wave.  The Potential Impact of the International Institute of BioPharmaceutical Manufacturing and Testing (BioPharMaT) on Business activity in Texas and the Greater Austin Area: An Analysis with Emphasis on the Opportunities Associated with the Emergence of Nanomedicine and the Anticipated Convergence of Numerous Sectors Relating to Advances in Nanotechnology."  Study prepared for Introgen Therapeutics, Inc., and Fulbright & Jaworski, 2007.

"The Impact of Developing a Major Medical School at The University of Texas at Austin on Regional and State Business Activity."  Study prepared for the Austin Chamber of Commerce, 2007.

"Meeting Critical Needs in a Dynamic Environment: The Current and Projected Impact of Parkland Health and Hospital System on Business Activity and Economic Progress in the Dallas Area."  Study prepared for the Parkland Foundation, 2007.

"The Impact of the Proposed 'Summit at Rivery Park' Mixed-Use Real Estate Development on Business Activity and Fiscal Revenues in the Georgetown/Williamson County Area."  Study prepared for the Ledgestone Group, 2007.

"Impact Multipliers for Major Meat Processing Operations."  Analysis prepared for Sam Kane Beef Processors, 2007.

"The Economic Impact of Frac Tech Services, Cisco High-Lift of Texas, and the Other Wilks Group Companies on Business Activity in the Cisco-Eastland County Area: An Analysis in Light of Recent and Proposed Expansions."  Study prepared for Frac Tech, 2007.

"The Impact of Destination Shopping and Tourism on Business Activity in The Woodlands: An Assessment of Current Patterns and the Potential Benefits of a Major Promotional Effort."  Study prepared for The Woodlands Town Center, 2007.

"The Impact of a Proposed Investment by Gunsight Mountain Wind Energy on Business Activity and Tax Revenues in the Big Spring Independent School District."  Study prepared for the Underwood Law Firm, 2007.

"Drilling for Dollars: An Assessment of the Ongoing and Expanding Economic Impact of Activity in the Barnett Shale on Fort Worth and the Surrounding Area."  Study prepared for the Fort Worth Chamber of Commerce, 2008 (partial basis for keynote presentation at the 2008 Barnett Shale Expo).

"The Impact of Exelon's Proposed Construction and Operation of a Nuclear Power Facility on Business Activity in Victoria County and Texas."  Report prepared for Exelon, 2008.

"The Potential Impact of the Proposed Baylor Research and Technology Commercialization Park on Business Activity in the Waco-McLennan County Area and Texas."  Study prepared for the Waco Chamber of Commerce, 2008.

"The Potential for Commercial Real Estate Activity Associated with the EarthQuest Development: An Analysis Within the Context of Demand Conditions in the Local Area."  Analysis prepared for Global EarthQuest Venture, LP, 2008.

35

"Evaluation and Extension of the Initial CLC Market Penetration Study for the EarthQuest Adventures Theme Park and Resort: An Analysis with Emphasis on the Unique Aspects of Texas Tourism Patterns."  Analysis prepared for Global EarthQuest Venture, LP, 2008.

"Economic Impact Analysis of a Proposed Expansion of Meat Packing Operations in Texas."  Analysis prepared for Sam Kane Beef Processors, 2008.

"An Assessment of the Economic Benefits of Developing the Oak Grove Electric Generation Facility."  Analysis prepared for Energy Future Holdings, 2008.

"The Impact of Investments in Electric Power Generation and Transmission Infrastructure in the Electric Reliability Council of Texas (ERCOT) Region on State Business Activity: An Assessment of Recent Patterns and Future Prospects."  Analysis prepared for Energy Future Holdings, 2008.

"The Impact of the Implementation and Operation of the Proposed EarthQuest Entertainment Complex and Associated Commercial and Residential Real Estate Development on Business Activity in Montgomery County, the Greater Houston Area, and Texas."  Analysis prepared for Global EarthQuest Venture, LP, 2008.

"An Analysis of Economic Aspects of a Potential Hotel Expansion at Harrah's Horseshoe Casino and Hotel in Shreveport, Louisiana: Factors Affecting Visitors from Texas and the Impact of the Expansion on Business Activity in the Shreveport-Bossier City Area and Louisiana."  Analysis prepared for Slack/Alost Development, LLC, 2008.

"Lights! Camera! Action! An Assessment of the Impact of Villa Muse Studios and Collateral Development on Business Activity in Bastrop County, the Greater Austin Area, and Texas."  Analysis prepared for Villa Muse, Inc., 2008.

"The Outlook for the US, Texas, and the Greater Houston Economy in Light of Recent Events with Emphasis on Implications for the Local Real Estate Market and the Proposed EarthQuest Resort Development."  Analysis prepared for Global EarthQuest Venture, LP, 2009.

"An Enduring Resource: A Perspective on the Past, Present, and Future Contribution of the Barnett Shale to the Economy of Fort Worth and the Surrounding Area."  Analysis prepared for the Fort Worth Chamber of Commerce, 2009 (partial basis for keynote presentation at the Barnett Shale Expo).

"The Economic Impact of Vought Aircraft on Business Activity in the Dallas-Fort Worth Area and Texas.  Analysis prepared for Vought Aircraft, 2009.

"'The Sky's the Limit!'  The Economic Impact of the Proposed Central Texas Airport and Associated Development on Business Activity in Texas, the Austin Area, and Bastrop County."  Analysis prepared for Carpenter and Associates, 2009.

"Citizens Medical Center: An Economic Assessment of Issues Surrounding the Potential Expansion of the Victoria Citizens Medical Center."  Analysis prepared for Citizens Medical Center, 2009.

"An Engine of Efficiency: A Preliminary Assessment of the Net Economic Impact of Independent Contractors and Potential Adverse Effects of Reducing Their Availability"  Analysis prepared for the Independent Contractor Association of America, 2009.

"'Caring!  Curing!  Conquering!'  A Comprehensive Assessment of the Impact of The University of Texas M. D. Anderson Cancer Center on Business Activity in the Houston Area and Texas."  Analysis prepared for The University of Texas M. D. Anderson Cancer Center, 2009.

"Potential Impact of the Round Rock Convergent Technologies Center (RRCTC) on Business Activity in the Round Rock-Williamson County Area and Texas."  Analysis prepared for the City of Round Rock, 2009.

"The Impact of the Proposed ALSTOM Wind Power Manufacturing and Service Facility on Business Activity in Amarillo and Texas."  Analysis prepared for the Amarillo Economic Development Corporation, 2009.

"The Potential Impact of a Large-Scale, Good Manufacturing Practices (GMP)-Compliant, Tobacco-Based Vaccine Manufacturing Facility Located on the Campus of the Texas A&M Health Science Center and Related Initiatives (Including Clean Room Pod Production and Therapeutic/Pharmaceutical Development) on Business Activity in the Local Area and Texas."  Analysis prepared for G-Con and Sante Ventures, 2009.

"The Economic Impact of Proposed Enhancements to Charleston Port Facilities: Findings from an Analysis of Potential Expanded Intermodal Capabilities, Expansion, Alternative Plans, and Economic Development Implications."  Analysis prepared for The Loeffler Group, LLP, 2009-2010.

"The Anticipated Impact of Construction and Operations Associated with the Proposed Development of Units 3 and 4 of the South Texas Project (STP) Nuclear Generation Facility on Business Activity in Texas and the Matagorda County Area."  Analysis prepared for NRG, 2010.

"The Impact of Implementing Proposed Strategic Plan Initiatives at the Cockrell School of Engineering of The University of Texas at Austin on Business Activity in Austin and Texas."  Analysis prepared for The University of Texas Cockrell School of Engineering, 2010.

"Phoenix Rising from the Ashes!  The Impact of the Programs, Health Care, Operations, and Construction Projects of The University of Texas Medical Branch on Business Activity in the City of Galveston (Galveston Island), Galveston County, the Greater Houston Area, and Texas."  Analysis prepared for The University of Texas Medical Branch (UTMB) (prepared jointly with Southwest Business Research), 2010.

"'Shop 'Til You Drop!!'  The Economic Impact of First Monday Trade Days on Business Activity in the Canton/Van Zandt County Area and Texas."  Analysis prepared for the City of Canton, 2010.

"The Impact of Texas State Technical College (TSTC) on Business Activity in the Waco Metropolitan Statistical Area, the City of Waco, and the City of Bellmead."  Analysis prepared for Texas State Technical College, 2010.

"The Impact of Locating a High Temperature Teaching and Test Reactor (HT3R) Research Facility in Andrews County on Business Activity in Affected Areas." Analysis prepared for The University of Texas of the Permian Basin, 2010.

"The Importance of the "Texas Four": Economic Losses Stemming from Separating Baylor from the Other Texas Big 12 Schools." *Pro Bono* analysis prepared as a public service, 2010.

"The Impact of Lamar University on Business Activity in Beaumont, the Surrounding Region, and Texas." Analysis prepared for the Beaumont Chamber of Commerce, 2010.

"The Potential Effect of the Proposed Renner Road/Highway 75 Development on Business Activity in the Richardson/Collin County Area: An Analysis of Anticipated Economic and Fiscal Impacts." Analysis prepared for K&L Gates, LLP, US Trust, and the Caruth Foundation, 2010.

"The Impact of the Proposed Springwoods Village Mixed-Use Development on Business Activity in Harris County, Montgomery County, the City of Houston, the Houston-Sugar Land-Baytown Metropolitan Statistical Area, and Texas." Analysis prepared for Allen Boone Humphries Robinson, LLP, Springwoods Realty Company, and Harris County Improvement District #18, 2010.

"The Menninger Clinic: Economic Benefits of Current Operations, Proposed Construction Projects, and the Expanded Initiatives Associated with the Potential Mental Health Epicenter Project on Business Activity in the Houston Area and Texas." Study prepared for The Menninger Clinic, 2010.

"The Potential Economic Benefits of a New Hybrid Technology Retrofitting Heavy-Duty Vehicles for Emission Compliance and Fuel Efficiency: An Analysis of the Impact of the Manufacturing Process on Eastland County and Texas and the Benefits to the State of Fuel Cost Savings and Emissions Reductions in Multiple Contexts." Study prepared for the Eastland Economic Development Corporation and Clean Emissions Technology, Inc., 2010.

"The Next Gusher!!! The Current and Potential Future Impact of the Texas Tech University Health Sciences Center at the Permian Basin on the Odessa-Midland Area Economy: An Analysis with Emphasis on Long-Term Economic Development Potential." Analysis prepared for Texas Tech University, 2011.

"The Economic Impact of Graduates of Career Colleges and Schools on Business Activity in Texas and Its Major Urban Regions: An Analysis with Emphasis on Cost Savings and Productivity Benefits." Analysis prepared for Career Colleges and Schools of Texas, 2011.

"The Economic Benefits of EOG Oil and Gas Exploration and Related Activity in Cooke and Montague Counties." Analysis prepared for EOG Resources, Inc., 2011.

"A Decade of Drilling: The Impact of the Barnett Shale on Business Activity in the Surrounding Region and Texas: An Assessment of the First Decade of Extensive Development." Analysis prepared for the Fort Worth Chamber of Commerce, 2011.

"The Effect of the New Children's Hospital at Scott & White on Business Activity in Temple and Texas."  Analysis prepared for Scott & White Health System, 2011.

"The Potential Impact of a New Football Stadium for Baylor University and Related Development on Business Activity in the Waco/McLennan County Area."  Study prepared for Baylor University, 2012.

"The Impact of The University of Texas at Arlington on Business Activity in the Surrounding Region and Texas."  Analysis prepared for The University of Texas at Arlington, 2012.

"The Potential Impact of a Costco Location in Corpus Christi on Business Activity and Tax Receipts in the Local Area."  Study prepared for Joe Adame & Associates and Costco, Inc., 2012.

"The Economic and Fiscal Benefits of Restoration of the Hotel Settles in Big Spring, Texas."  Analysis prepared for Ryan and Company, 2012.

"Building Economic Benefits: The Impact of Proposed Expansion Initiatives at Texas State University."  Study prepared for Texas State University, 2013.

"The Proposed New Engineering and Science Building Located on the San Marcos Campus of Texas State University Would Provide Additional Research Space and Classrooms."  Study prepared for Texas State University, 2013.

"The Proposed New Health Professions Building 1 Located on the Round Rock Campus of Texas State University Would Provide Additional Research Space and Classrooms."  Study prepared for Texas State University, 2013.

"The Potential Economic Benefits of Operations of a Full Service Unit for Blue Cross Blue Shield of Montana in Great Falls."  Study prepared for Blue Cross Blue Shield of Montana, 2013.

"The Potential Impact of Implementation of the Texas A&M Center for Innovation in Advanced Development and Manufacturing (CIADM) on Business Activity and Tax Receipts in the Research Valley Area and Texas."  Analysis prepared for Texas A&M University, 2013.

"The Impact of the University of Rhode Island College of Engineering on Business Activity in Rhode Island and the Surrounding Region."  Analysis prepared for Ballinger and the University of Rhode Island College of Engineering, 2014.

"The Economic Benefits of the Precision Dance Industry Inspired by the Kilgore College Rangerettes."  Analysis prepared for the Kilgore Rangerettes, 2014.

"The Economic Benefits of Adding Football at The University of Texas of the Permian Basin (UTPB)."  Analysis prepared for The University of Texas of the Permian Basin (UTPB), 2014.

"The Current and Potential Future Economic Benefits of the West Texas Food Bank for the Odessa Area."  *Pro bono* study prepared for the West Texas Food Bank, 2014.

"The Economic Benefits of Oil and Natural Gas Production: An Analysis of Effects on the United States and Major Energy-Producing States." *Pro bono* study prepared as a public service, 2014.

"The Potential Economic Benefits of Reducing South Texas Region Health Disparities through an Expansion of Texas A&M University System Programs." Analysis prepared for Texas A&M Health Science Center, 2014.

"The Impact of Redevelopment of the Statler Hotel and Related Facilities on Business Activity and Tax Receipts in Dallas County and the City of Dallas." Analysis prepared for Fiamma Partners, LLC, 2014.

"The Potential Economic and Fiscal Benefits of Restoration of the Former Statler Hilton and Rejuvenation of the 'Statler Strip' in Dallas, Texas." Analysis prepared for Fiamma Partners, LLC, 2014.

"The Economic and Fiscal Contribution of the Barnett Shale: Impact of Oil and Gas Exploration and Production on Business Activity and Tax Receipts in the Region and State." Analysis prepared for the Fort Worth Chamber of Commerce, 2014.

"Greenport International Airport: Market Assessment and Potential Economic Benefits." Analysis prepared for Carpenter & Associates, Inc., 2015.

"The Potential Economic Value of The University of Texas at Arlington: A Comparison of a Recent Study of Economic Modeling Specialists International to Prior Work by The Perryman Group." Analysis prepared for The University of Texas at Arlington, 2015.

"The Economic Benefits of Enhancing the Nursing, Science, and Engineering Facilities at The University of Texas at Arlington." Analysis prepared for The University of Texas at Arlington, 2015.

"The Potential Effect of Changes in Oil Prices on State Funding for Health Care Programs." Analysis prepared for DW Healthcare Partners, 2015.

"The Current and Potential Future Expanded Economic and Fiscal Benefits of ExxonMobil's Beaumont Refinery and Associated Facilities: Effects on the Local Area, Surrounding Region, and Texas." Analysis prepared for ExxonMobil, 2015.

"The Economic Impact of American National Insurance Company (ANICO) on the City of Galveston and Galveston County." Analysis prepared for ANICO, 2015

"The Potential Economic and Fiscal Benefits of Fairway Energy Partners' Proposed Pierce Junction Crude Oil Storage Project for the City of Houston and the Surrounding Area." Analysis prepared for Fairway Energy Partners, LLC, 2015.

"Catalyst!!  The Role of Dallas/Fort Worth International Airport in the North Central Texas Regional Economy." Analysis prepared for the Dallas/Fort Worth International Airport, 2015.

"The Impact of Medical Center Health System on Business Activity and Tax Receipts in the Odessa-Ector County Area." Analysis prepared for the Medical Center Health System, 2016.

"Economic and Fiscal Benefits of a Performing Arts Center and Black Box Theatre in Round Rock."  Analysis prepared for the Round Rock Area Arts Council, 2017.

"The Civic Center: The Economic Benefits of a Proposed Mixed-Use Development in Waco, Texas."  Analysis prepared for CMc Strategic, 2017.

"Growing the Gulf: Economic and Fiscal Benefits of ExxonMobil's Current and Proposed Gulf Coast Operations and Investments."  Analysis prepared for ExxonMobil Corporation, 2017.

"An Economic Analysis of Factors Related to the Formation of a Community College District in Brazos County."  Analysis prepared for Research Valley Partnership, 2017.

"Medicine, Mission, and Miracles: Economic and Fiscal Benefits of The University of Texas Southwestern Medical Center."  Analysis prepared for The University of Texas Southwestern Medical Center, 2017.

"The Impact of Deepening the Sabine-Neches Waterway on Business Activity in Jefferson County, the Surrounding Region, Texas, and the United States."  Analysis prepared for the Sabine Neches Navigation District, 2017.

"The Economic Impact of Saulsbury Industries: 50 Years of Growth, Diversification, and Contribution to Business Activity in the Odessa Area."  Analysis prepared for Saulsbury Industries, 2017.

"The Economic Benefits of a Significant Reduction in Recovery Time from Major Surgery."  Analysis prepared for US Wound, Inc., 2017.

## ECONOMIC DEVELOPMENT, SITE SELECTION, AND RELATED PROJECTS

"An Industrial Location Analysis of the Fort Worth Economy."  Study prepared for the Fort Worth Chamber of Commerce, 1985.

"A Comprehensive Data Base and Economic Forecast for the Heart of Texas Region (Bosque, Falls, Freestone, Hill, Limestone, and McLennan Counties)."  Study prepared for the Job Training Partnership Program of the Heart of Texas Private Industry Council and the US Department of Labor, 1985 .

"A Comprehensive Historical and Projected Data Base for the Temple/Killeen Area."  Study prepared for the Job Training Partnership Program of the Central Texas Private Industry Council, 1985 (funded by the US Department of Labor).

"An Economic Development Program for the Central I-35 Corridor."  Study prepared for the Economic Development Administration of the US Department of Commerce, 1985-1986.

"An On-Line Economic/Demographic/Quality-of-Life Data Base for the Central Texas Area."  Project prepared for the Heart of Texas Council of Governments, 1986.

"A Plan for the Diversification and Revitalization of the Longview-Gregg County Economy."  Study prepared for the City of Longview, 1986.

"A Detailed Industrial Data Base for the Central Texas Area."  Study prepared for the Heart of Texas Council of Governments, 1986.

"A Plan for the Promotion of Economic Growth and Development in the Tyler-Smith County Area."  Study prepared for the Tyler Area Chamber of Commerce, 1987.

"A Plan for the Promotion of Economic Growth and Development in the Palestine-Anderson County Area."  Study prepared for the Palestine Industrial Foundation, Inc., 1987.

"A Plan for the Promotion of Economic Growth and Development in the Alice-Jim Wells County Area."  Study prepared for the Alice Industrial Foundation, Inc., 1987.

"An Evaluation of the Potential for Selected Real Estate Projects in the Austin Metropolitan Area."  Study prepared for the Circle-C Development Corporation, 1987.

"A Comprehensive Assessment of the Economic Development Potential of the South Texas Economy."  Study and extensive database prepared for Central Power & Light Company, 1987-1988.

"A Comprehensive Strategy for the Economic Development and Diversification of the East Texas Area."  Study and extensive database prepared for the East Texas Private Industry Council and the US Department of Labor, 1987-1988.

"A Target Industry Analysis of the Bryan-Brazos County Area with Emphasis on Opportunities for Downtown Revitalization in the City of Bryan."  Study prepared for the City of Bryan in association with The Williams Company, 1988.

"The East Texas Economic Development System: A Comprehensive Computerized Data Base and Retrieval System."  Computerized Information System prepared for the East Texas Private Industry Council, 1988.

"A Quality of Life and Demographic Data Base for the Heart of Texas Region." Computerized data base and retrieval system designed for the Heart of Texas Council of Governments, 1988.

"A Strategic Economic Development Plan for the Lufkin-Angelina County Area."  Study prepared for the Economic Development Administration of the US Department of Commerce, 1988.

"The McKinney Economic Development System: A Comprehensive Computerized Data Base and Retrieval System."  Computerized Information System prepared for the City of McKinney, 1988.

"A Target Industry Analysis and Marketing Strategy for the City of Farmers Branch." Study prepared for the City of Farmers Branch, 1988.

"A Briefing Paper Regarding Several Factors Affecting the Competitive Position of the Dallas/Fort Worth Area as a Potential Site for Aircraft-Related Manufacturing and Servicing."  Study prepared for The Perot Group, 1988.

"The Lufkin-Angelina County Economic Development System: A Comprehensive Computerized Data Base and Retrieval System."  Computerized information system prepared for the Angelina County Chamber of Commerce, 1988.

"An Occupational Profile of the Heart of Texas Council of Governments Region."  Study prepared for the Heart of Texas Council of Governments, 1988.

"A Briefing Paper for Star Micronics Regarding Several Factors Affecting the Competitive Position of the Fort Worth Economy as a Potential Site for Manufacturing Operations."  Study prepared for The Perot Group, 1988.

"A Briefing Paper for British Aerospace, Inc., Regarding Several Factors Affecting the Competitive Position of the Fort Worth Economy Relative to that of Washington, D.C. - Northern Virginia (NOVA) as a Potential Site for Corporate Headquarters."  Study prepared for The Perot Group, 1988.

"A Target Industry Analysis for the Heart of Texas Council of Governments Region." Study prepared for the Heart of Texas Council of Governments, 1988.

"A Historical Economic Data Base for Texas and Selected Metropolitan Areas."  Study prepared for Aldrich, Eastmann, and Waltch, 1988.

"A Briefing Paper Regarding the Relative Attractiveness of Dallas/Fort Worth, Atlanta, and Chicago for New Manufacturing and Service Operations and Corporate Headquarters."  Study prepared for The Perot Group, 1988.

"The South Texas Economic Development System: A Comprehensive Computerized Data Base and Retrieval System."  Computerized Information System prepared for Central Power & Light Company, 1989.

"A Briefing Paper for Federal Express Regarding the Attractiveness of the Dallas/Fort Worth Area and Alliance Airport as a Site for Future Expansion of Maintenance Operations."  Report prepared for The Perot Group, 1989.

"Wage and Benefit Levels for Positions Associated with Aircraft Maintenance in the Dallas/Fort Worth and Oklahoma City Metropolitan Areas."  Study prepared for American Airlines, 1989.

"A Strategic Economic Development Plan for the Southwest Bexar County Area."  Study prepared for the Bexar County Local Development Corporation, 1990.

"A Comprehensive Economic and Quality of Life Data Base for the Southeast Bexar County Area."  Detailed computerized data base completed for the Bexar County Local Development Corporation, 1990.

"An Economic Development Profile of the Central Power & Light Company Service Area."  Study prepared for Central Power & Light Company, 1990.

"Selected Demographic and Economic Data Comparing Fort Worth to San Antonio, Oklahoma City, and Jacksonville with Reference to Aircraft Maintenance Facilities."  Study prepared for The Perot Group, 1990.

"A Comprehensive Computerized Data Base and Modeling System for the Central Power & Light Company Service Area."  Computerized software system developed for Central Power & Light Company, 1990.

"A Comprehensive Economic and Real Estate Data Base for the Midland Metropolitan Area."  Computerized data base compiled for the Midland Chamber of Commerce, 1990.

"Comparative Business Costs in Fort Worth, Miami, Oklahoma City, and Tulsa with Particular Reference to Warehousing and Transportation."  Study prepared for The Perot Group, 1990.

"An Updated Analysis of the Competitiveness of the Dallas/Fort Worth Metroplex as a Site for Aircraft and Avionics Facilities."  Study prepared for The Perot Group, 1990.

"An Overall Competitive Assessment of the Dallas/Fort Worth Area Within the Global Economy."  Analysis prepared for The Perot Group, 1991.

"A Briefing Paper Regarding the Relative Attractiveness of Fort Worth, Shreveport, Salt Lake City, Kansas City, and Tulsa as Potential Sites for Aircraft Manufacturing Operations."  Study prepared for The Perot Group, 1991.

"A Briefing Paper Regarding the Relative Attractiveness of Fort Worth, Shreveport, Kansas City, Tulsa, Salt Lake City, St. Clair County, Mesa, and Houston as Potential Sites for Aircraft Manufacturing Facilities."  Study prepared for The Perot Group, 1991.

"CenterPort International Development—An Analysis of Potential Absorption and Benefits for Manufacturing and Distribution Industries in the Denver Market Area."  Study prepared for CenterPort International, Denver, Colorado, 1991.

"The Potential for Various Manufacturing and Distribution Industries to Benefit from the CenterPort International Development."  Study prepared for CenterPort International, 1991.

"A Plan for the Strategic Promotion of Economic Growth, Development, and Diversification in the City of Longview and the Gregg County Area: Update and Comprehensive Analysis."  Study prepared for the City of Longview and the Longview Economic Development Corporation, 1992.

"A Briefing Paper Regarding the Attractiveness of Fort Worth for Automobile Manufacturing Facilities."  Study prepared for The Perot Group, 1992.

"A Comprehensive Economic Data Base for the Longview-Marshall Area."  Computerized Information System prepared for the City of Longview and the Longview Economic Development Corporation, 1992.

"A Comprehensive Analysis to Support a Strategic Plan for Promotion of Economic Growth, Development, and Diversification in the City of Odessa and the Ector County Area."  Study prepared for the City of Odessa, 1992.

"An Economic Data Base and Impact System for Ector County."  Computerized Information System prepared for the City of Odessa and Ector County, 1992.

"A Comprehensive Demographic and Economic Assessment of Somervell County, Texas."  Study prepared for Somervell County and Somervell County Development Commission, 1993 (in cooperation with The Cornerstone Group).

"A Computerized Data Base for Economic Development in the Somervell County Area."  Data base prepared for Somervell County and the Somervell County Development Commission, 1993.

"An Assessment and Marketing Plan for the Gregg County Airport."  Study prepared for Gregg County, 1994.

"An Assessment of the Technical Training Needs and Evolving Labor Force Patterns in the High Plains Region of Texas, Oklahoma, and New Mexico."  Study prepared for the Texas State Technical College System, 1994.

"The Aggregate Impact of the Sales Tax Program Administered by the Amarillo Economic Development Corporation on Local Economic Conditions."  Study prepared for the Amarillo Economic Development Corporation, 1995.

"An Analysis of the Economic Development Potential and Strategies for the East Austin Area."  Study prepared for the Austin Revitalization Administration and The Center for Urban Studies, 1996.

"An Economic Development Profile and Strategic Plan for the Southwest Texas Area."  Study prepared for the Partnership for Southeast Texas, 1997.

"A Comprehensive Economic Assessment and Strategic Economic Plan for the City of Frisco."  Analysis prepared for Frisco Economic Development Corporation, 1997-1998.

"A Comparison of Selected Costs and Resource Availability Factors for the Location of a Tiltrotor Aircraft Manufacturing Facility."  Analysis prepared for Hillwood Development Corporation, 1998.

"An Analysis of Projected Water Resource Needs and Economic Development Prospects in the Bell County Area."  Study prepared for Bell County, 1998.

"An Economic Development Profile and Strategic Action Plan for the Capital Area Council of Governments (CAPCO)."  Study prepared for the Capital Area Council of Governments, 2000.

"An Economic Development Profile and Strategic Plan for the Sulphur Springs-Hopkins County Area."  Study prepared for the Sulphur Springs Economic Development Corporation, 2000-2001.

"The Viability of Selected Sites for the Headquarters of a Major Aircraft Manufacturing Firm."  Analysis prepared for the Frisco Economic Development Corporation, 2001.

"An Economic Development Profile of the Granbury/Hood County Area: A Comprehensive Evaluation with Recommendations for Sustainable Long-Term Growth."  Study prepared for the Lake Granbury/Hood County Economic Development Foundation, 2003.

"The Potential Impact of the Temple Health & Bioscience District Facility on Business Activity in Temple and Texas."  Study prepared for the Temple Health & Bioscience District, 2005.

"Advantage Amarillo: An Assessment of the Competitive Benefits of Locating in Amarillo, Texas."  Study prepared for the Amarillo Economic Development Corporation, 2005.

"The Impact of the Spillover Effects of a Proposed Cheese Production Facility and Associated Dairy Development on Business Activity in Amarillo, Texas."  Study prepared for the Amarillo Economic Development Corporation, 2005.

"An Assessment of the Potential Impact of Developing a Business Park on Economic Activity in Lampasas."  Study prepared for the City of Lampasas, 2005-2007.

"Paths to Prosperity: Strategic Job Growth Parameters for 'Opportunity Houston' Through 2015."  Study prepared for the Greater Houston Partnership, 2006.

"The Effects of the Housing Industry on the Copperas Cove Economy."  Study prepared for the Copperas Cove Economic Development Corporation, 2006.

"The Impact of 100 'Primary' Jobs in Selected Targeted Sectors on Business Activity in the Panhandle Region and Texas."  Study prepared for the Amarillo Economic Development Corporation, 2007.

"The Impact of the Cancer Research Institute and Related Entities within the Temple Health and Bioscience Economic Development District on Business Activity in Texas and the Temple Area."  Study prepared for the Temple Health and Bioscience Economic Development District, 2007.

"Intelligent Growth in a Dynamic Context: An Economic Development Plan for Limestone County in Light of Recent and Anticipated New Activity."  Analysis prepared for Mexia Economic Development Corporation and the Groesbeck Economic Development Corporation, 2007-2008.

"Amarillo Always!"  An Assessment of the Forces Impacting Local Competitiveness and the Role of the Amarillo Economic Development Corporation in Promoting Growth and Prosperity."  Analysis prepared for Amarillo Economic Development Corporation, 2009.

"An Assessment of the Labor Market Characteristics of San Marcos and Competing Areas as Potential Locations for "Project Lucy" (a Major Multifunctional Shared Services Center)."  Analysis prepared for the San Marcos Chamber of Commerce, 2009.

"An Assessment of the Current and Potential Economic Impact of the Temple Medical and Education District (TMED) on Local and State Business Activity."  Analysis prepared for the City of Temple, 2011.

"The Impact of 100 'Primary' Jobs in Selected Targeted Sectors."  Analysis prepared for the Amarillo Economic Development Corporation, 2011.

"Workforce Needs in Fort Bend County and the Surrounding Service Area: An Assessment to Inform Program Choices by the Texas State Technical College System."  Analysis prepared for the Texas State Technical College System, 2014.

"Amarillo Advantages and the Contribution of the Amarillo Economic Development Corporation: Current Conditions and a Look Back Over 25 Years of Investing in the Local and Regional Economies."  Analysis prepared for the Amarillo Economic Development Corporation, 2014

"Catalyst for Growth: The Importance of 25 Years of Projects Facilitated by the Texas Sales Tax for Economic Development."  Analysis prepared for the Texas Economic Development Council, 2014.

"An Assessment of Workforce Conditions and Needs in Brownwood and the Surrounding Area: An Assessment Focusing on Implications for Texas State Technical College in Brownwood."  Analysis prepared for Texas State Technical College, 2015.

"An Assessment of Workforce Conditions and Needs in Abilene and the Surrounding Area: An Assessment Focusing on Implications for Texas State Technical College in Abilene."  Analysis prepared for Texas State Technical College, 2015.

"Texas Workforce Preparedness: A Multifaceted Challenge."  Analysis prepared for Texas Travel Industry Association (TTIA), 2016.

"An Assessment of Current and Future Workforce and Training Needs in the Research Valley Education Analysis Area."  Analysis prepared for Research Valley Partnership, 2016.

"The Impact of Travel and Tourism on Texas Property Tax Revenues."  Analysis prepared for the Texas Travel Industry Association, 2016.

"Energy and Beyond!!  An Analysis of Economic Development Strategy and
   Opportunities for Long-Term Prosperity in the Odessa-Ector County Area."
   Analysis prepared for the Odessa Economic Development Corporation, 2017.

"A Greater Waco: Preparing for Future Growth in Waco Through Infrastructure
   Investments."  Analysis prepared for the City of Waco, 2017.

## REGULATORY AND PUBLIC POLICY ANALYSES

"An Economic and Demographic Profile of Central Texas."  Study prepared for the
    Federal Communications Commission, 1983 (partial basis for testimony on
    licensing procedure).

"An Analysis of Indicators for Socioeconomic Impacts Due to Outer Continental Shelf
    Oil and Gas Activities in the Gulf of Mexico."  Representative of the State of
    Texas and Louisiana in a comprehensive interstate research program of the US
    Department of the Interior, 1985-1986.

"Tax Reform and the US Oil and Gas Industry."  Analysis prepared for the Office of the
    Governor, State of Texas, 1985.

"The Impact of Varying Unemployment Benefit Funding Patterns on the Texas Economy
    and Its Various Regions."  Study prepared for the Texas Employment
    Commission, 1986.

"An Economic and Impact Analysis of the Construction and Operation of Little Cypress
    Reservoir."  Study prepared for the Little Cypress Utility District, 1987 (partial
    basis for testimony before the Texas Water Commission supporting a reservoir
    permit application).

"Looking Beyond the Numbers and Reading Beyond the Headlines: A Perspective on the
    Economic Recovery in Texas."  Report prepared for the Joint Economic
    Committee, Congress of the United States, 1987 (partial basis for Congressional
    testimony).

"Economic Impacts and Competitive Factors Supporting the Foreign Trade Zone Status
    of Fort Worth Alliance Airport."  Study prepared for The Perot Group, 1988
    (partial basis for a successful Foreign Trade Zone Application to the US
    Department of Commerce).

"The Economic Impact of the Proposed Texas Enterprise Zone in Raymondville and
    Willacy County."  Study prepared for the City of Raymondville, 1988 (partial
    basis for a successful Enterprise Zone application).

"The Economic Structure of the Texas Triangle."  Technical memorandum prepared for
    Lichliter/Jameson Associates and the Texas Turnpike Authority as part of the
    Texas High Speed Rail Feasibility Study, 1988 (partial basis for testimony before
    the Texas Turnpike Authority).

"The Potential Impact of the Texas High Speed Rail Project on Business Activity in
    Texas and its Major Metropolitan Areas."  Technical memorandum prepared for
    Lichliter/Jameson Associates and the Texas Turnpike Authority as part of the
    Texas High Speed Rail Feasibility Study, 1988 (partial basis for testimony before
    the Texas Turnpike Authority and the Committee on Transportation of the Texas
    Senate).

"The Economic Impact of the Prepared Texas Enterprise Zone in Mercedes, Texas."
    Study prepared for the City of Mercedes, 1988 (partial basis for a successful
    Enterprise Zone application).

49

"An Analysis of Regulatory Forbearance Issues Related to the Current Financial Crisis in Texas." Study prepared for Arthur Young & Company, 1988 (partial basis for legislative testimony).

"The Impact of the Potential Natural Gas Price Reduction Associated with the Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Household Expenditures in the Central Power & Light Company Service Area." Study prepared for Central Power & Light Company in conjunction with the South Texas Nuclear Project, 1988 (partial basis for testimony before the Public Utility Commission of Texas).

"The Economic Impact of Changing the Definition of a Producer-Handler in Federal Order 126 on Gore's, Inc., the Milk Industry Within the Order, and Overall Business Activity." Study prepared for Gore's, Inc., 1988 (partial basis for testimony before the US Department of Agriculture).

"The Potential Economic Impact of the V-22 Tiltrotor Aircraft on Economic Activity in Dallas/Fort Worth and Texas." Study prepared for The Perot Group, 1988 (partial basis for Congressional testimony).

"The Economic Impact of the Proposed Texas Enterprise Zone in the City of Beaumont." Study prepared for the City of Beaumont, 1988 (partial basis for a successful Enterprise Zone application).

"The Impact of Electricity Rate Structures Associated with the Cost Recovery and Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Household Expenditures in the Central Power & Light Company Service Area: A Comprehensive Analysis with Additional Illustrations Related to the Significance of Fuel Diversity." Study prepared for Central Power & Light Company in conjunction with the South Texas Nuclear Project, 1988 (partial basis for testimony before the Public Utility Commission of Texas).

"The Impact of Electricity Rate Structures Associated with the Cost Recovery and Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Industrial Expenditures in the Central Power & Light Company Service Area: A Comprehensive Analysis with Fully Disaggregated Results and an Illustration Related to the Significance of Fuel Diversity." Study prepared for Central Power & Light Company in conjunction with the South Texas Nuclear Project, 1988 (partial basis for testimony before the Public Utility Commission of Texas).

"The Economic Impact of the Proposed Texas Enterprise Zone in the Donna/Hildago County Area." Study prepared for the City of Donna/Hildago County, 1988 (partial basis for a successful Enterprise Zone application).

"Estimates of the Economic Impact of the Proposed Bridge Closure on Business Activity in the Granbury-Hood County Area." Study prepared for the Lake Granbury Chamber of Commerce, 1988 (partial basis for testimony before the Texas Highway Commission).

"The Viability of State Purchases for Office Space Expansion in the Austin Market Area." Study prepared for the Texas Savings and Loan League, 1988 (partial basis for testimony before the Legislature Budget Board of the Texas Legislature).

"Materials Related to the Banking and Real Estate Situation in Texas."  Analysis prepared for the Task Force on the Recovery of Real Estate Finance, Texas House of Representatives, 1988 (partial basis for testimony before the Texas Legislature).

"A Survey of Industrial Recruiters Regarding the Effects of the Current Civil Justice System on Business Location Decisions in Texas."  Study prepared for the Texas Civil Justice League, 1989 (partial basis for testimony before the Texas Legislature).

"The Impact of Central Office Upgrades and Outside Plant Construction Associated with the 'Texas First' Proposal of Southwestern Bell Telephone Company on the Economy of Texas."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Economic Impact of the Proposed Texas and Federal Enterprise Zone in the City of Beaumont."  Study prepared for the City of Beaumont, 1989 (partial basis for a successful Enterprise Zone application).

"An Evaluation of the Potential Demand for Extended Metropolitan Service (EMS) in Texas as a Result of Implementing the 'Texas First' Proposal: Evidence from a Survey of Rockwall County and Related Data from Southwestern Bell Telephone Company for Other Areas."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Economic Impact of the Current Civil Justice System on Expenditures, Earnings, and Employment in Texas."  Study prepared for the Texas Civil Justice League, 1989 (partial basis for testimony before the Texas Legislature).

"A Comprehensive Analysis of the Economic Effects Associated with the Displacement of Natural Gas Associated with Units 1 and 2 of the South Texas Nuclear Project (STP): An Impact Analysis Including Losses in Expenditures, Earnings, and Employment with the South Texas Economy and Offsetting Savings in the Commercial and Industrial Sectors."  Study prepared for Central Power & Light Company in conjunction with the South Texas Nuclear Project, March 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Civil Justice System: A Synopsis of Its Impact on the Texas Business Climate."  Study prepared for the Texas Civil Justice League, 1989 (partial basis for testimony before the Texas Legislature).

"The Impact of the Overall Rate Structure Associated with the 'Texas First' Proposal of Southwestern Bell Telephone Company on Industrial Expenditures in Texas and Selected Sub-Regions."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Impact of Natural Gas Price Reductions of the Household Sector on the Central Power & Light Company Service Area: An Extended Analysis Incorporating New Capacity Factors of the South Texas Nuclear Plant."  A study prepared for Central Power & Light Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Economic Development Potential of an Enhanced Telecommunications System for Texas and Various Regions: Selected Hypothetical Impacts of the Proposed 'Texas First' Proposal of Southwestern Bell Telephone Company."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"An Analysis of State Revenue and Expenditure Patterns in Webb County Compared to Other Regions of Texas."  Study prepared for the International Bank of Commerce and the Laredo Chamber of Commerce, 1989.

"The Impact of Proposed Rate Increases Associated with the Implementation of the South Texas Nuclear Project on Industrial Activity in the Central Power & Light Company Service Area: A Detailed Analysis Incorporating a Revised Nine-Year Phase-In Plan and Projected Natural Gas Market Responses."  Study prepared for Central Power & Light Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Impact of the American Airlines Facility and Related Activity on Tarrant County, Denton County, the City of Fort Worth, and the Northwest Independent School District."  Series of studies performed for The Perot Group, 1989 (partial basis for testimony before the Fort Worth City Council, the Denton County Commissioners Court, and the Northwest Independent School District Board of Trustees).

"The Impact of the Overall Rate Structure Associated with the 'Texas First' Proposal of Southwestern Bell Telephone Company on Household Expenditures in Texas and Selected Sub-Regions."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"A Synopsis of the Current Economic and Demographic Status of the Houston Economy."  Materials prepared for the Harris County Flood Control District, 1989 (partial basis for testimony before Moody's and Standard & Poor's regarding bond issues).

"A Survey of Market Penetration and Customer Satisfaction with Optional Telephone Services in the Dallas/Fort Worth Area."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"The Overall Economic Impact of the Ongoing Operations of the South Texas Project on Business Activity in the Central Power & Light Company Service Area: A Comprehensive Assessment Accounting for Household and Industrial Rate Increases, Natural Gas Price Decreases, and the Economic Stimulus Associated with Plant Operations."  Study prepared for Central Power & Light Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"An Empirical Examination of the 'Rate Shock' Hypothesis Regarding Utility Rates and Economic Activity: Evidence from an Extensive Socioeconomic Model and a Comprehensive National Data Base."  Study prepared for Central Power & Light Company in conjunction with the South Texas Nuclear Project, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"A Comparative Analysis of the Impact on the Economy of Texas of the 'Texas First' Proposal of Southwestern Bell Telephone Company and the Rate Structure Prepared by the Staff of the Public Utility Commission of Texas."  Study prepared for Southwestern Bell Telephone Company, 1989 (partial basis for testimony before the Public Utility Commission of Texas).

"Projections of Population and Employment in the Harris County Toll Road Authority Service Area: A Methodological Synopsis and Detailed Results by Census Tract."  Analysis and testimony prepared for the Harris County Toll Road Authority, 1989 (partial basis for testimony before Moody's and Standard & Poor's regarding bond issues).

"Indices of Real Estate Values in Selected Market Areas of Texas."  Project prepared for Olney Savings as part of The Southwest Plan, 1989.

"An Analysis of Future Water Resource Demand in McLennan County in Light of Recent Developments and Area-Specific Information."  Study prepared for the City of Waco, 1990 (partial basis for testimony before the Texas Water Commission).

"The Economic Impact of Texas State Technical Institute on Business Activity in Waco, the Lower Rio Grande Valley, Amarillo, Sweetwater, and the State of Texas."  Study prepared for Texas State Technical Institute, 1990 (partial basis for testimony before the Texas Legislature).

"The Impact of Fiesta Texas on Business Activity and Fiscal Revenues in the San Antonio Metropolitan Area."  Study prepared for La Cantera Development Corporation (USAA), 1990 (partial basis for testimony before the San Antonio City Council).

"A Comprehensive Demographic and Economic Profile of Ellis County and an Economic Development Plan to be Implemented as a Component of the Land Use and Infrastructure Plan in Association with the Superconducting Super Collider in Ellis County, Texas."  Study prepared for Johnson Johnson & Roy and the Texas National Research Laboratory Commission, 1990 (partial basis for testimony before the Texas National Research Laboratory Commission).

"Alternative Scenarios Related to Water Resource Requirements in the Brazos River Basin."  Analysis prepared for the Brazos River Authority, 1990 (partial basis for testimony before the Texas Water Commission regarding a proposed reservoir permit).

"A Comprehensive Interactive Modeling System for Evaluating the Real Estate Holdings of Lomas Realty USA Under Alternative Scenarios."  Computerized software system prepared for Lomas Realty USA, 1990.

"A Preliminary Assessment of the Impact of the MECA Facility on Revenue Streams to City, County, and School Taxing Authorities."  Study prepared for The Perot Group, 1991.

"The Impact of Texas State Technical Institute on Business Activity in the State of Texas: An Analysis of the Value of a Well-Trained Technical Workforce."  Study prepared for Texas State Technical Institute, 1991 (partial basis for testimony before the Texas Legislature).

"Survey Sampling Approaches for Contract Analysis in the City of Philadelphia."  Study prepared for the City of Philadelphia, 1991 (in association with A.D. Jackson Consultants, Inc.)

"The Impact of Expanded Oil Production in the East Texas Field on Business Activity in the Local Economy (Gregg, Rusk, Smith, and Upshur Counties)."  Study and testimony prepared for Oxy USA and Mobil Oil, 1991 (partial basis for testimony before the Railroad Commission of Texas regarding the proper production allowable in a large oil field).

"The Economic Consequences of Social Investing."  Study prepared for Philip Morris, 1991.

"Projections of the Future Availability of Disadvantaged Business Enterprises in the Service Area of the Dallas Area Rapid Transit Authority (DART)."  Study prepared for the Dallas Area Rapid Transit Authority, 1991 (in association with A.D. Jackson Consultants, Inc.).

"Some Effects of a Free Trade Agreement with Mexico on the Domestic Economy."  Analysis prepared for the Joint Economic Committee, Congress of the United States, 1991 (partial basis for Congressional testimony).

"A Comprehensive Analysis of the Economic Impact of the Proposed Texas High Speed Rail Project on Business Activity."  Study prepared for the Texas High Speed Rail Joint Venture, 1991 (partial basis for testimony before the Texas High Speed Rail Authority).

"An Assessment of Tort Reform and Economic Activity."  Analysis prepared for the Texas Civil Justice League, 1991 (partial basis for legislative testimony).

"The Economic Impact of the Proposed Camino Columbia Toll Road on Business Activity in the Laredo-Webb County Area."  Study prepared for Camino Columbia, Inc., 1991 (partial basis for testimony before the Texas Highway Commission).

"A Comprehensive Analysis of Various Factors Affecting the Future Economic Development in the Austin Area in Light of Environmental and Regulatory Trends."  Analysis prepared for the Austin Chamber of Commerce and other sponsoring entities, 1991 (partial basis for testimony before the Austin City Council).

"An Analysis of the Economic Effects of Flexible Automobile Insurance Rate Bands."  Analysis and materials compiled for the Texas Automobile Insurance Service Organization, 1991.

"Williams Chrysler-Plymouth, Inc., d/b/a Williams Jeep-Eagle, Applicant French Jeep/Eagle, Inc., Protestant Chrysler Motors Corporation, Intervenor." (**Williams Chrysler-Plymouth, Inc., Chrysler Motors Corporation**) Docket No. 91-171, Texas Motor Vehicle Commission, 1992 (deposition and hearing testimony).

"The Costs of Social Investment by State Governments."  Materials compiled for Philip Morris, 1992 (partial basis for testimony before the Nebraska State Legislature).

"The Impact of the University of Texas at San Antonio on Economic Activity in San Antonio and Texas." Study prepared for the San Antonio Economic Development Foundation, 1992 (partial basis for legislative testimony by University officials).

"Perspectives on Product Liability and Economic Development." Materials prepared for General Motors, 1992 (analytical support for post-trial document filings in a matter related to product liability).

"The Impact of Programs and Activities of the University of Texas Health Science Center at San Antonio on Business Activity in Texas and the San Antonio Metropolitan Statistical Area." Study prepared for the San Antonio Economic Development Foundation, 1992 (partial basis for legislative testimony by University officials).

"The Economic Effects of Four-Year Status for the University of Texas at Tyler on State and Local Business Activity." Study prepared for the UT-Tyler Educational Foundation, 1992 (partial basis for legislative testimony by University officials).

"The Economic Impact of the North American Free Trade Agreement on Traffic Patterns and Real Estate Development in the Laredo Metropolitan Statistical Area." Study prepared for URS Consultants, 1992 (partial basis for testimony before the Texas Department of Transportation).

"The Privatization of Mass Transit Systems." Special report prepared for the Public Construction Supervisory Board, Executive Yuan, Republic of China, 1992.

"Future Patterns in Global Trade, Newly Industrialized Countries, and the Domestic Economy of the United States, with Emphasis on the Southwestern Region: An Analysis and Structure Recommendations for Capitalizing on Emerging Opportunities." Special report prepared for the China Productivity Center, Republic of China, 1992.

"Discrimination Study on Minority Business Enterprises: Examination of the Market Area." Study prepared for the District of Colombia 1992-1993 (in conjunction with A.D. Jackson Consultants, Inc.).

"The Impact of the Proposed Camino Colombia Toll Road on Economic Activity in Webb County and the City of Laredo: An Analysis with Emphasis on the Distribution of Effects Within the County and the Consequences Related to the North American Free Trade Agreement." Study prepared for Camino Colombia, Inc., 1992-1993 (partial basis for testimony before the Texas Department of Transportation).

"Small Area Forecast for the Laredo MSA." Study prepared for URS Consultants, 1993 (partial basis for testimony before the Texas Department of Transportation).

"Analysis of the Effects of a Landfill on Economic Development in Denton County." Analysis prepared for Sanders, Mumm, O'Hanlon & Motley, 1993 (partial basis for testimony in a landfill permit hearing before the Texas Water Commission).

"The Economic Impact of Elimination of the Air Logistics Center at Kelly Air Force Base on the San Antonio Economy: An Analysis with Emphasis on Selected Occupations and Demographic Segments." Study prepared for the San Antonio Economic Development Foundation, 1993 (partial basis for testimony before the Federal Base Realignment and Closure Commission).

"The Impact of Intrastate Trucking Regulation on Business Activity and Economic Development in Texas and Its Metropolitan Areas—An Analysis in Light of Recent Legislative Initiatives."  Study prepared for the Texas Reform Initiative, 1993 (partial basis for testimony before the Committees on Transportation of the Texas House of Representatives and the Texas Senate).

"The Impact of Franchising on the Economy of Texas: An Analysis Comparing Potential Effects of Legislative Restrictions on Future Expansion."  Study prepared for the Texas Coalition for Responsible Franchising and the International Franchise Association, 1993 (partial basis for testimony before the Committee on Business and Industry of the Texas House of Representatives).

"A Comparative Analysis of Agricultural and Industrial Losses Associated with Pumping Limitations in the Edwards Aquifer."  Analysis prepared for Haynes & Boone and a consortium of large water users in the San Antonio area, 1993 (partial basis for testimony before the Texas Legislature).

"The Economic Impact of the Superconducting Super Collider on the United States and Each of the States."  Series of studies prepared for the Foundation for American Scientific Progress, 1993 (partial basis for testimony before the Congress of the United States).

"Sentry Environmental, LP, Application for Permit No. 2171" (**Sanders Mumm O'Hanlon & Motley**) Texas Water Commission, 1993 (deposition testimony).

"A Reassessment of the Benefits Derived from Full Allowable Production Activity in the East Texas Oil Fields."  Study prepared for Oxy, Mobil, and Atlantic Richfield, 1994 (partial basis for testimony before the Railroad Commission of Texas).

"The Economic Effects of Restrictive Water Ordinances in Outlying Development Potential."  Analysis and materials prepared for Circle-C Development, 1994.

"Retail Wheeling of Electricity: An Analysis of Its Economic Impacts and Development Consequences on the State of New Mexico."  Study prepared for the Public Policy Research Group, 1994.

"The Economic Impact of Proposed Hotel Construction on Activity in the Kansas City Area."  Study prepared for Hospitality Valuation Services, 1994 (partial basis for testimony before the Kansas City Civic Commission).

"The Economic Impact of Three Alternative Casino Projects on the Baton Rouge Metropolitan Area and the State of Louisiana."  Study prepared for the Riverboat Gaming Division, State of Louisiana, 1994 (partial basis for testimony before the Riverboat Gaming Commission of the State of Louisiana).

"The Impact of Burning Hazardous Waste in Cement Kilns on Business Activity in Texas and Selected Senatorial Districts."  Study prepared for Texas Industries, Inc. (TXI), 1994.

"The Deceptive Trade Practices Act: An Analysis of Its Consequences for Economic Activity."  Study prepared for the Texans Against Lawsuit Abuse, 1994 (partial basis for testimony before the Texas Senate).

"The Relative Economic Consequences of Alternative Routes for the Proposed Interstate-27 Extension: An Analysis in Light of the North American Free Trade Agreement."  Study prepared for MOTRAN, 1994-1995.

"Economic Forecast of Relevant Factors Related to Traffic in the Counties Along the Proposed Interstate Highway 69 Corridor."  Report prepared for the Texas Department of Transportation and the US Department of Transportation as part of the feasibility study for the proposed corridor, 1994-1996 (in association with RUST/Lichliter-Jameson).

"The Effects of Restrictions on Production in Natural Gas Fields on Business Activity in Texas."  Analysis compiled for Union Pacific Resources, 1995.

"The Economic Impact of Brooks Air Force Base on the San Antonio Economy and the Local Housing and Unemployment Situation."  Study prepared for the San Antonio Economic Development Foundation, 1995 (partial basis for testimony before the Federal Base Realignment and Closure Commission).

"An Analysis of the Domestic and International Trade Potential Along Three Proposed Western Highway Corridors—An Analysis with Emphasis on La Entrada Al Pacifico."  Study prepared for MOTRAN, 1995 (partial basis for testimony before the Texas Transportation Commission).

"The Impact of Kelly Air Force Base on San Antonio and the Hispanic Workforce."  Study prepared for the San Antonio Economic Development Foundation, 1995 (partial basis for testimony before the Federal Base Realignment and Closure Commission).

"An Economic and Demographic Profile of the Minority Business Patterns in Montgomery County, Maryland, and the Baltimore-Washington, D.C. Consolidated Metropolitan Statistical Area."  Study prepared for Montgomery County, 1995 (in association with A.D. Jackson Consultants, Inc.).

"An Assessment of the Appropriateness of a Dividends-Based Method for Assessing Exemplary Damages."  Review and analysis conducted for Gardere & Wynne, 1996.

"An Assessment of the Potential Siting of Various Missions Resulting from the Downsizing of the Nuclear Weapons Complex."  Study prepared for the US Department of Energy, 1996.

"The Potential Effects of Retail Wheeling of Electricity on Business Activity in Texas."  Analysis prepared for TU Electric, 1996.

"The Potential Economic Development Consequences of a Proposed Targeted Sales Tax Initiative."  Report prepared for the Odessa Chamber of Commerce, 1996.

"The Economic Impact of Proposed Transactions Tax on Business Activity in Texas."  Study prepared for the Texas Association of Public Employee Retirement Systems, 1997.

"The Potential Economic Impacts of the Proposed Union Pacific-Southern Pacific Merger."  Study prepared for the Texas Farm Bureau, the Texas Cattle Raisers Association, and Conrail, 1997 (partial basis for testimony before the Railroad Commission of Texas).

"Criteria and Methods for Performing Economic Impact Studies of Changes in Housing Policy."  Study prepared for the United States Department of Housing and Urban Development, 1997.

"Application of Community Credit Union" (**Community Credit Union**) Case No. 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, 1997 (resolved prior to testimony).

"John Henderson, Jr., Former Officer, Director, and Controlling Stockholder of Home Savings and Loan Association, Lufkin, Texas and Southland Savings Association, Longview, Texas" (**Home Savings and Loan Association**), OTS Order No. AP-95-22, United States of America Office of Thrift Supervision, 1998 (resolved prior to testimony).

"The Economic Impact of Potential Water Shortages on the Corpus Christi Region."  Study prepared for Brown & Potts and the City of Corpus Christi, 1998 (partial basis for testimony before the Select Committee on the State Water Plan of the Texas Senate).

"The Impact of the Proposed Longhorn Partners Pipeline on Business Activity in Texas, the Houston Metropolitan Area, the Odessa-Midland Metropolitan Area, and the El Paso Metropolitan Area."  Series and studies prepared for Longhorn Partners Pipeline, 1998 (partial basis for Congressional testimony).

"The Economic Impacts of Extending Environmental Impact Statement Requests to Routine Permitting Cases."  Analysis prepared for Jenkens & Gilchrist and Longhorn Partners Pipeline, 1999 (partial basis for Congressional testimony).

"The Impact of Alternative Business Tax Measures on Economic Activity in Texas."  Study prepared for the Office of the Speaker and the Committee on Appropriations of the Texas House of Representatives and the Office of the Lieutenant Governor, State of Texas, 1999 (partial basis for testimony before the Texas Legislature).

"Economic and Competitive Considerations in the Provision of Internet Service Via Cable Access."  Study prepared for America OnLine, GTE, SBC, Internet America, and FlashNet, 1999 (partial basis for testimony before the Committee on Public Utilities of the Texas Legislature).

"The Impact of a Proposed Investment Tax Credit for Large-Scale Projects on Business Activity in Texas: A Dynamic Estimate."  Analysis prepared for InvesTexas, Intel, Texas Chemical Council, the Texas Association of Business and Chambers of Commerce, and related spending entities, 1999 (partial basis for testimony before the Committee on Ways and Means of the Texas House of Representatives).

"The Economic Consequences of Electric Power Deregulation on the Texas Economy Under Alternative Structural Programs."  Study prepared for Texas Utilities, 1999 (partial basis for testimony before the Committee on Economic Development of the Texas Senate).

"The Potential Impact of a Comprehensive Economic Development Fund on Business Locations in Texas."  Analysis prepared for Texas Utilities, Inc., 1999.

"The Economic Implications of Alternative Cost Allocation Systems in the Rate Base of a Regulated Utility System."  Analysis prepared for Texas Utilities, Inc., 1999.

"Best Practices and Analytical Methods for Evaluating the Adequacy of Hiring Counseling Programs."  Study prepared for the United States Department of Housing and Urban Development, 1999-2000.

"The Impact of Judicial Reforms on the Texas Economy."  Study prepared for Citizens for a Sound Economy, 2000.

"The Consequences of the Inventory Tax on Business Activity in Texas."  Study prepared for the Texas Warehouse Association, 2000.

"The Impact of Coal-Fired Power Generation on Business Activity in Texas."  Study prepared for the Center for Energy and Economic Development, 2000.

"The Implications of the Clean Air Act Amendments for Business Activity in Attainment and Non-Attainment Areas."  Study prepared for the Texas Association of Urban Counties, 2000 (partial basis for testimony in a Special Briefing Session of the Texas Legislature).

"The Fallacy of Falsity: An Analysis of 'Negative' Stranded Costs and Their Implications for Competitive Electric Generation in Texas."  Study prepared for TXU Electric, 2001.

"An Analysis of the Effects of Severance Tax Reform in Light of Recent Fluctuations in Global and Domestic Energy Markets."  Analysis prepared for the Texas Oil and Gas Association, 2000-2001.

"The Economic Development Consequences of Developing a Cooperative Tax Mechanism for Large Industrial Locations in Texas."  Study prepared for the Texas Association of Business and Chambers of Commerce, 2001 (partial basis for testimony before the Texas Legislature).

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on Rural Growth and Development."  Analysis prepared for AT&T, 2001 (partial basis for testimony before the Texas Legislature).

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on the Situation Confronting the Texas-Mexico Border Region."  Study prepared for AT&T, 2001 (partial basis for testimony before the Texas Legislature).

"An Analysis of the Economic Consequences of Inadequate Bank Credit in Texas."  Study prepared for the Committee on Business and Commerce of the Texas Senate, 2001 (partial basis for testimony before the Texas Legislature).

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on the Implications for Urban Areas in Texas."  Study prepared for AT&T, 2001 (partial basis for testimony before the Texas Legislature).

"The Impact of the Joint Strike Fighter (JSF) Contract on Business Activity in Texas." Study prepared for the Fort Worth Chamber of Commerce and Lockheed Martin, 2001 (partial basis for Congressional testimony).

"The Impact of the Proposed Texas Mobility Fund on Business Activity—A Comprehensive Assessment." Analysis prepared for Associated General Contractors of Texas, 2001.

"Sutherlin Nissan of Grapevine, LLC vs. Grubbs Nissan Mid-Cities, Ltd. vs. Nissan North America" (**Grubbs Nissan Mid-Cities, Ltd.**) Docket No. 01-0013 LIC, Texas Department of Transportation, Motor Vehicle Board, 2001-2002 (affidavit, deposition, and hearing testimony).

"The Current and Projected Impact of Recent Judicial Reforms on Economic Activity in Alabama." Analysis prepared for the US Chamber of Commerce, 2002.

"The Impact of the Three-Tiered Licensed Beverage Distribution System on Business Activity in Texas." Study prepared for the Licensed Beverage Distributors of Texas, 2002 (partial basis for testimony before the Texas Legislature).

"Financing the Public Schools of Texas: Some Issues of Growth, Equity, and Efficiency." Study prepared for the Texas School Finance Coalition, 2002 (partial basis for testimony before the Texas Legislature).

"The Potential Impact of Proposed Judicial Reforms on Economic Activity in Mississippi." Study prepared for Mississippians for Economic Progress, 2002 (partial basis for testimony before the Mississippi Legislature).

"Electric Competition: A Year in Review." Study prepared for the Association of Electric Companies of Texas, 2002.

"Landmark Chevrolet Corporation vs. General Motors Corporation, et al." (**Landmark Chevrolet Corporation**) Docket No. 02-0002 LIC, Texas Department of Transportation, 2002 (deposition testimony).

"The Economic Impact of Inequitable and Inadequate Transportation Funding on Business Activity in the Houston Area." Study prepared for The Wedge Group, 2002.

"The Negative Impact of the Current Civil Justice System on Economic Activity in West Virginia." Study prepared for the West Virginia Chamber of Commerce, 2002 (partial basis for testimony before the West Virginia Legislature).

"The Effects of Access Management Policies on Business Activity." Analysis prepared for Texas Roads United Coalition, 2002 (partial basis for testimony before the Texas Department of Transportation and the Texas Legislature).

"A Review of Population and Water Use Projections for Bell County Resulting from the State Water Plan." Analysis prepared for Bell County, 2002.

"The Importance of Maintaining a Proper State Implementation Plan (SIP) to Address Air Quality Issues in Texas: An Economic and Fiscal Impact Assessment." Study prepared for the Texas Clean Air Working Group, 2002 (partial basis for testimony before the Texas Legislature).

"Application of Cap Rock Electric Cooperative, Inc. to Transfer its Certificates of Convenience and Necessity to the Cap Rock Energy Corporation" (**Texas Farm Bureau**) SOAH Docket No. 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, Public Utility Commission Docket No. 24577, 2002 (affidavit, deposition, and hearing testimony).

"The Potential Economic and Fiscal Benefits of Adopting an E-Procurement System for the State of Texas." Analysis prepared for American Management Systems, 2003.

"The Potential Impact of Intrastate Long-Distance Access Charge Reform on Business Activity in Texas." Study prepared for AT&T, 2003.

"The Effect of Inventory Taxes on Business Activity in Texas." Study prepared for the Texas Warehouse Association, 2003 (partial basis for testimony before the Texas Legislature).

"The Negative Impact of the Current Civil Justice System on Economic Activity in Arkansas." Study prepared for the Arkansas State Chamber of Commerce, 2003.

"An Economic Evaluation of the Proposed Gas Reliability Infrastructure Program (GRIP) to Encourage the Enhancement of the Natural Gas Distribution System in Texas." Study prepared for TXU, 2003 (partial basis for testimony before the Texas Legislature).

"Medicaid and the Children's Health Insurance Program (CHIP): An Assessment of Their Impacts on Business Activity and the Consequences of Potential Funding Reductions." Study prepared for the Texas Hospital Association and the Texas Medical Association, 2003 (partial basis for testimony before the Texas Legislature).

"The Impact of the Proposed Judicial Reforms on Business Activity in Texas: An Initial Assessment." Study prepared for Texans for Lawsuit Reform, 2003 (partial basis for testimony before the Texas Legislature).

"The Impact of an Overly Restrictive Annexation Policy on Economic Activity in Texas and Its Metropolitan Regions." Study prepared for the Texas Municipal League, 2003.

"The Potential Economic Impact of the Proposed Texas Technology Initiative: An Initial Assessment." Study prepared for Sematech and the Governor's Working Group on Technology, 2003.

"The Impact of Permitting Limited Gaming at Tribal Facilities on Business Activity in Texas: A Prospective Analysis Including Regional and Fiscal Consequences." Study prepared for the Alabama-Coushatta Tribe of Texas, 2003.

"The Economic Consequences of Failing to Renew Current Provisions of the Fair Credit Reporting Act (FCRA) Which Promote Uniform National Standards." Study prepared for the Financial Services Roundtable, 2003 (partial basis for testimony before the US Congress).

"The Impact of Horse and Greyhound Racing on Business Activity in Texas: An Analysis Encompassing the Effects of Permitting Video Lottery Terminals (VLTs) at Licensed Track Facilities with Emphasis on the Contributions to Agriculture and Rural Development."  Study prepared for the Texas Thoroughbred Association, 2003 (partial basis for testimony before the Texas Legislature).

"The Potential Impact of the Texas Fair Defense Act on Business Activity."  Study prepared for The Appleseed Group, 2003.

"The Optimal Approach to Taxation of a Low Level Radioactive Waste Disposal Site."  Study prepared for Waste Control Specialists, 2003.

"Economic Evolution of Specific Investment Initiatives on the Trans Texas Corridor."  Analysis prepared for HNTB, HDR, and the Texas Department of Transportation, 2003.

"The Impact of the Aggregates and Concrete Industry on the Economy of Texas."  Analysis prepared for the Texas Aggregates and Concrete Association, 2003-2004 (partial basis for testimony before the Texas Legislature.)

"The Potential Economic and Fiscal Impact of Casino Gaming on Texas."  Study prepared for the Texas Enhancement Group, 2003-2004.

"Don Davis Nissan Grapevine, Inc. vs. Grubbs Nissan Mid-Cities, Ltd., et al." (**Grubbs Nissan Mid-Cities, Ltd.**) Docket No. 03-0028-LIC, Texas Department of Transportation, Motor Vehicle Board, 2003-2004 (deposition and hearing testimony).

"Peltier Chevrolet Pontiac, Inc. d/b/a Peltier Chevrolet vs. King Chevrolet Motor Company" (**Peltier Chevrolet Pontiac, Inc.**) Docket No. 04-021 LIC, Texas Department of Transportation, Motor Vehicle Board, 2004 (deposition testimony).

"An Analysis of Certain Economic Aspects of Implementing a Business Activity Tax (BAT) as Part of a Revised System of Public School Finance in Texas."  Study prepared for the Lone Star Foundation, 2004.

"An Evaluation of Key Economic Aspects of the Pricing and Use of Telecommunications Infrastructure on a Competitive Environment."  Analysis prepared for Verizon, 2004.

"Stalling the Engine of Economic Growth: An Analysis of the Potential Impacts of Implementing the US VISIT Program at the US-Mexico Border on the National and Texas Economies."  Study prepared for the Association for Security and Trade, 2004 (partial basis for testimony before the US Congress).

"The Impact of Implementing the Point of Collection Changes in the Streamlined Sales Tax on Selected Cities."  Study prepared for the City of Round Rock and CASTLE, 2004.

"Allen Samuels Austin Dodge, Inc., et al. vs. Prestige Chrysler Northwest, Ltd., et al." (**Allen Samuels Austin Dodge, Inc.**) Docket No. 04-0011 LIC, Texas Department of Transportation, Division of Motor Vehicles, Austin, Texas, 2004 (deposition and hearing testimony).

"An Assessment of the Economic Consequences of Electric Competition in Texas After Two Years."  Study prepared for the Associated Electric Companies of Texas, 2004.

"The Impact of Limiting Owner-Provided Insurance on Highway Construction on the Economy of Texas."  Study prepared for Associated General Contractors of Texas, 2004.

"The Potential Impact of Additional Judicial Reforms on Economic Activity in Mississippi."  Study prepared for Mississippians for Economic Progress, 2004.

"The Impact of Video Lottery Terminals (VLTs) on Business Activity in Dallas County."  Study prepared for Lone Star Park, 2004.

"'Critical Condition!'  An Assessment of the Impact of the Health Care Sector on the Texas Economy, with Emphasis on the Situation Confronting Hospitals and the Effects of Medicaid and Children's Health Insurance Program (CHIP) Funding Reductions."  Study prepared for the Texas Hospital Association, 2004 (partial basis for testimony before the Texas Legislature).

"The Economic and Fiscal Impact of the Proposed Pecan Creek Village Center on the City of Colleyville."  Study prepared for ServiceStar Development Company, 2004 (partial basis for testimony before the Colleyville City Council).

"The Impact of Implementing an Owner-Controlled Insurance Program (OCIP) for State Highway Construction on Business Activity in Texas."  Study prepared for the Associated General Contractors of Texas, 2004 (partial basis for testimony before the Texas Legislature).

"The Consequences of Selected Potential Tax Reforms for Real Estate Performance and Business Activity in Texas."  Study prepared for the Texas Association of Realtors, 2005 (partial basis for testimony before the Committee on Ways and Means of the Texas House of Representatives).

"The Consequences of a Proposed Measure for the Reform of Public School Finance for Business Activity in Texas."  Study prepared for the Dallas Citizens Council, 2005 (partial basis for testimony before the Committee on Ways and Means of the Texas House of Representatives).

"The Impact of Potential Restraints on Local Government Activity (Appraisal Caps, Expenditure Limits, and Revenue Limits) on the Economy of Texas."  Study prepared for the Texas Municipal League, the Texas Association of Counties, and the Texas Council of Urban Counties, 2005 (partial basis for testimony before the Committee on Ways and Means of the Texas House of Representatives).

"The Benefits of Electric Competition to the Texas Economy: A Perspective on the First Three Years."  Study prepared for the Association of Electric Companies of Texas, 2005.

"Talmadge Heflin vs. Hubert Vo" (**Hubert Vo**) House of Representatives of the State of Texas, 2005 (hearing testimony).

"Power and Prosperity: An Assessment of the Current Economic Benefits of Competition in the Electric Power Industry and the Economic Harms of Potential Future Market Restrictions." Study prepared for TXU, 2005.

"The Impact of Requiring Contractors to Provide Long-Term Warranties for Highway Construction on Business Activity in Texas." Study prepared for the Associated General Contractors of Texas, 2005 (partial basis for testimony before the Texas Legislature).

"The Impact of Horse and Greyhound Racing on Business Activity in Texas: An Updated Analysis Encompassing the Effects of Permitting Video Lottery Terminals (VLTs) at Licensed Track Facilities with Emphasis on the Contributions to Agriculture and Rural Development and Selected House Districts." Study prepared for the Texas Thoroughbred Association, 2005 (partial basis for testimony before the Committee on Ways and Means of the Texas House of Representatives).

"Texas Power: The Impact of a Substantial Expansion in Renewable Power Capacity and Electric Transmission Infrastructure on Business Activity in Texas." Study prepared for The Energy Foundation, 2005.

"An Assessment of the Impact of Competition in the Delivery of Wireline Video Services on Business Activity in Texas." Study prepared for Southwestern Bell Corporation, 2005 (partial basis for testimony before the Regulated Industries Committee of the Texas House of Representatives).

"Power: An Assessment of the Future Demand for Electric Power in the Region Served by The Electric Reliability Council of Texas (ERCOT) and the Potential Advantages Associated with Greater Diversity in the Fuel Mix for Power Generation." Study prepared for Sempra, 2005.

"Texas Justice: An Evaluation of the Economic Development, Productivity, and Other Benefits to the Texas Economy Associated with Increased Investment in the State Court System." Study prepared for the Supreme Court of Texas and the Texas state court system, 2005 (partial basis for testimony before the Texas Legislature).

"The Impact of Pharmacy Benefit Managers (PBMs) on the Texas Economy: An Assessment of Current and Projected Benefits and the Consequences of Various Potential Regulations." Study prepared for the Pharmaceutical Benefit Management Association, 2006 (partial basis for testimony before a Joint Hearing of the Committee on State Affairs and the Committee on Health and Human Services of the Texas Senate).

"Beyond the Classroom: The Impact of Pension Benefits Paid by the Teacher Retirement System of Texas (TRS) on Business Activity in Texas, Its Regions, Metropolitan Areas, and Counties." Study prepared for the Teacher Retirement System of Texas, 2006 (partial basis for testimony before the Board of Directors of the Texas Retirement System of Texas).

"Risk, Return, Investment, and the Global Economy: Potential Obstacles to Sustainable Prosperity." Study prepared for Thompson & Knight, 2006 (partial basis for testimony before the US Congress).

"Growth in the Need for Power: Demand Will Exceed Capacity Without Substantial Investment." Study prepared for TXU, 2006.

"Sunshine, Soccer, and Success: An Assessment of the Impact of Municipal Parks and Recreation Facilities and Programs on Business Activity in Texas." Study prepared for the Texas Recreation and Parks Foundation, 2006.

"Healthy Minds and Bodies: The Impact of Health Care Benefits Paid by the Teacher Retirement System of Texas (TRS) on Business Activity in Texas, Its Regions, Metropolitan Areas, and Counties." Study prepared for the Teacher Retirement System of Texas, 2006 (partial basis for testimony before the Board of Directors of the Texas Retirement System of Texas).

"Destination Casino Gaming in Texas: The Impact of Proposed Legislation on Business Activity in the State." Study prepared for the Texas Gaming Association, 2006.

"Electricity Price Changes in Perspective: Looking Back Over the Past Decade." Study prepared for TXU, 2006.

"The Tie that Binds: An Assessment of the Cement Industry, Its Role in the Texas Economy, and the Potential Consequences of Environmental Regulations Presently Under Consideration." Study prepared for TXI, 2006.

"The Potential Impact of More Efficient Regulation of the Property/Casualty and Life Insurance Sectors on US Business Activity." Study prepared for the Financial Services Roundtable, 2006 (partial basis for testimony to the US Congress).

"Effective, Efficient, and Essential: The Economic Impact of the NorthSTAR Model for Providing Mental Health and Substance Abuse Services and the Potential Benefits of Program Expansion and Increased Funding." Study prepared for Value Options, Inc., 2006.

"Four Years of Electric Competition: An Analysis of the Benefits to Consumers and Business Activity in Texas." Study prepared for the Association of Electric Companies of Texas, 2006.

"Texas Electric Power at a Crossroads: Needs, Responses, Challenges, and Consequences." Study prepared for TXU, 2006.

"The Consequences of Specific Proposals to Limit Local Tax Revenues or Appraised Values from Business Activity and Fiscal Responsiveness in Texas." Analysis prepared for the Texas Association of Counties, 2006 (partial basis for testimony before the Task Force on Appraisal Reform).

"Complaint by Southern Union Gas Energy, Ltd. Against Louis Dreyfus Pipeline, L.P." (**Louis Dreyfus Pipeline, L.P.**) GUD No. 9686, Railroad Commission of Texas, 2006 (deposition testimony).

"The Net Impact of Alternative Pumping Policies Affecting the Water Level in Lake Fort Phantom Hill on Business Activity in Abilene."  Study prepared for the City of Abilene, 2006-2007.

"An Assessment of the Economy of the Tier 1 Windstorm Insurance Coverage Area (Texas Gulf Coast), Its Linkage to Other Parts of the State, and the Consequences of Substantial Insurance Rate Increases and Reduced Coverage Availability."  Study prepared for the Independent Insurance Association of Texas, 2006-2007 (partial basis for testimony before the Texas Legislature).

"The Economic Impact of Eliminating the Texas Universal Service Fund on Business Activity in Texas and Various Regions."  Analysis prepared for AT&T, 2007 (partial basis for testimony before the Regulated Industries Committee of the Texas House of Representatives).

"The Economic Consequences of a Substantial Shortage in Electric Power Availability on Business Activity in Texas."  Study prepared for TXU, 2007.

"An Assessment of the Impact of a Representative Scholarship Program Funded by Direct Fiscal Revenues from a Proposed Destination Casino Initiative on Business Activity in Texas."  Study prepared for the Texas Gaming Association, 2007 (partial basis for testimony before the Texas Legislature).

"A Tale of Two States—And One Million Jobs!!  An Analysis of the Economic Benefits of Achieving the Future Goals of the 'Closing the Gaps' Initiative of the Texas Higher Education Coordinating Board."  Study prepared for the Bill and Melinda Gates Foundation, 2007.

"Beyond Public Service: An Assessment of the Economic Impact of Benefits Provided Through the Texas Municipal Retirement System on Business Activity in Texas and its Various Regions, Metropolitan Areas, and Counties."  Study prepared for the Texas Municipal Retirement System, 2007 (partial basis for testimony before the Board of Directors of the Texas Municipal Retirement System).

"The Prognosis for Retail Sales Tax Revenue in the Service Area of Dallas Area Rapid Transit Over the 2007-2009 Time Period and the Implications for Bond Debt Coverage."  Study prepared for First Southwest Securities and Dallas Area Rapid Transit, 2007.

"The Impact of the Undocumented Workforce on Business Activity in Texas."  Study prepared for the Association of General Contractors of Texas, 2007 (partial basis for testimony before the Committee on State Affairs of the Texas House of Representatives).

"The Potential Impact of an Initiative to Increase the Pool of Engineering and Computer Science Graduates on Business Activity in Texas."  Study prepared for the Association of Engineering Advisory Boards, 2007 (partial basis for testimony before the Committee on Higher Education of the Texas Senate).

"It Ain't Broke!!  Don't Fix It!!  An Analysis of Electric Competition in Texas and the Potential Effects of Proposed 'Reform' Legislation."  Study prepared for TXU, 2007 (partial basis for testimony before the Committee on Regulated Industries of the Texas House of Representatives).

"'An Ounce of Prevention!' The Potential Impact of Investments in Prevention, Wellness, and Smoking Cessation Programs on Business Activity in Texas." Study prepared for the Texas Wellness Coalition, 2007 (partial basis for testimony before the Texas Legislature).

"An Economic Assessment of Alternative Approaches to Developing the State Highway 121 (SH121) Toll Road Project."  Study prepared for Cintra, 2007 (partial basis for testimony before the North Central Texas Regional Transportation Authority).

"Increasing Momentum and Sustaining Progress: The Impact of the Proposed 'Frisco City' Mixed-Use Real Estate Development on Local Business Activity and Fiscal Revenues."  Study prepared for TPMC Realty, 2007 (partial basis for testimony before the Frisco City Council).

"An Analysis of the Potential Economic Impact of Alternative Retail Development Strategies and Their Implications for Incentive Policy in the Corpus Christi Area." Study prepared for Trademark Property Company, 2007 (partial basis for testimony before the Corpus Christi City Council).

"Potential Regional Economic Boundaries in Texas: An Analysis in Light of Current Patterns and Linkages in Business Activity."  Study prepared for the Texas Workforce Investment Council, 2007 (partial basis for testimony before the Texas Workforce Investment Council).

"An Assessment of the Economic Competitiveness of Texas with Emphasis on Future Patterns in Electric Power Costs and Availability."  Study prepared for Oncor, 2007.

"Lights!  Cameras!  Action!  An Assessment of the Impact of the Villa Muse Studios and Collateral Development on Business Activity in Texas and the Austin Area." Study prepared for Villa Muse and Fulbright and Jaworski, 2007 (partial basis for testimony before the Austin City Council).

"'Thinking About Tomorrow!'  The Texas Guaranteed Tuition Plan: An Economic Assessment of Recent Evidence and Options for the Future."  Study prepared for the Coalition for the Texas Guaranteed Tuition Plan, 2007 (partial basis for testimony before the Texas House of Representatives).

"An Analysis of the Economic Consequences of Proposed Annexation Plans in the City of Midlothian."  Analysis prepared for the City of Midlothian, 2007 (partial basis for hearing testimony before the American Arbitration Association).

"A Texas Turnaround: The Impact of Lawsuit Reform on Business Activity in the Lone Star State."  Study prepared for Texans for Lawsuit Reform, 2008 (partial basis for testimony before the Judiciary Committee of the Texas Senate).

"The Economic and Fiscal Effects of the Proposed Investment in Padre Staples Mall on the City of Corpus Christi."  Study prepared for Trademark Property, 2008 (partial basis for testimony before the Corpus Christi City Council).

"The Economic Consequences of Isolated Development and Infrastructure Outlays on Ellis County."  Analysis prepared for Ellis County, 2008 (partial basis for testimony before the Texas Commission of Environmental Quality).

"The Impact of Luminant's Proposed Investment in Nuclear Power Facilities in Somervell County on Business Activity in Somervell County, Water Planning Region G, and Texas."  Study prepared for Luminant, 2008 (partial basis for testimony before the Texas Water Development Board and the US Nuclear Regulatory Commission).

"The Economic Impact and Fiscal Consequences of a Substantial Relocation of State Employees and Associated Commercial Development."  Study prepared for the Texas Facilities Commission, 2008.

"An Essential Resource: An Analysis of the Economic Impact of Undocumented Workers on Business Activity in the US with Estimated Effects by State and by Industry."  Study prepared for Americans for Immigration Reform, 2008.

"Lower Neches Valley Authority's Application for Amendment to Certificate of Adjudication No. 06-4411" (**Lower Neches Valley Authority**) SOAH Docket No. 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, TCEQ Docket No. 2009-0168-WR, State Office of Administrative Hearings, 2008 (hearing testimony).

"City of Lufkin's Application for Amendment to Certificate of Adjudication No. 06-4411" (**City of Lufkin**) SOAH Docket No. 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, TCEQ Docket No. 2009-0506-WR, State Office of Administrative Hearings, 2008 (hearing testimony).

"The Economic Consequences of Proposed Changes in the Texas Universal Service Fund: A Comprehensive Analysis of Multiple Provisions."  Analysis prepared for AT&T, 2008 (partial basis for testimony before the Public Utility Commission of Texas).

"An Analysis of Alternative Regulatory Mechanisms for Natural Gas Utilities in Oklahoma."  Analysis prepared for Oklahoma Natural Gas, 2008.

"An Analysis of Bond Funding Requirements Relative to Sales Tax Revenues for Dallas Area Rapid Transit."  Analysis prepared for Southwest Securities and Dallas Area Rapid Transit, 2008.

"The Impact of the Oak Grove Electric Generating Facility and Related Mining Operations on Business Activity in the Brazos Valley Region and the State of Texas: An Analysis with Emphasis on the Economic Consequences of Potential Delays in Implementation."  Analysis prepared for Energy Future Holdings, 2008.

"An Evaluation of Debt Service Coverage and Related Financial Matters Associated with the Long-Term Securities of Dallas Area Rapid Transit."  Study prepared for First Southwest Securities and Dallas Area Rapid Transit, 2008.

"The Economic and Fiscal Impact of Alcoholic Beverage Sales in Texas: An Analysis with Emphasis on Various Representative Communities."  Study prepared for the Distilled Spirits Council of the US, 2008.

"The Impact of the Texas State Technical College (TSTC) System on Business Activity in Texas: A Current Assessment and a Perspective on the Potential Effect of a More 'Outcomes-Oriented' Funding Mechanism."  Analysis prepared for Texas State Technical College, 2008.

"The Economic Benefits of a More Competitive Framework for Workers' Compensation Insurance in Texas: An Analysis with Emphasis on the Role of Texas Mutual Insurance Company."  Analysis prepared for Texas Mutual Insurance Company, 2008.

"The Impact of Legal Aid Services on Economic Activity in Texas: An Analysis of Current Efforts and Expansion Potential."  Analysis prepared for Texas Access to Justice Foundation, 2009.

"The Net Economic Impact of Providing Laparoscopic Adjustable Gastric Banding Procedure Benefits to Texas Employees Retirement System Members and Adult Dependents."  Analysis prepared for Allergan, 2009.

"An Evaluation of the Net Economic Benefits Associated with Local Contracting of Public Construction of Projects in the City of Waco."  Analysis prepared for John Erwin General Contractors, 2009.

"The Impact of a Substantial Decrease in Population Resulting from a Force Reduction at Fort Hood on Economic Activity and Fiscal Resources in the City of Killeen."  Analysis prepared for the City of Killeen, 2009.

"Power to the People!!! A Retrospective on Ten Years of Electric Competition in Texas and Considerations for Future Success."  Analysis prepared for Energy Future Holdings, 2009.

"The Impact of Restrictions on the Use of Cement from the Ash Grove Plant on Business Activity in the Dallas-Fort Worth Area and Texas."  Analysis prepared for Ash Grove Cement, 2009 (partial analysis for testimony before the Natural Resources Committees of the Texas House of Representatives and the Texas Senate).

"The Economic and Fiscal Impact of Allowing Alcoholic Beverage Sales in Lubbock."  Analysis prepared for the Texas Hospitality Association, 2009.

"An Analysis of Sales Tax Revenues in Light of the Bond Financing Requirements of Dallas Area Rapid Transit."  Analysis prepared for Estrada Hinojosa & Co., Inc. Southwest Securities, and Dallas Area Rapid Transit, 2009.

"The Impact of Later School Start Dates on Tourism and Business Activity in Texas."  Analysis prepared for Texas Travel Industry Association, 2009.

"An Assessment of the Potential Consequences of Substantial Insurance Rate Increases and Reduced Coverage Availability in the Tier 1 Windstorm Insurance Coverage Area (Texas Gulf Coast)."  Analysis prepared for Independent Insurance Agents of Texas, 2009.

"Costs, Consequences, and Cures!!!  An Assessment of the Impact of Severe Mental Health and Substance Abuse Disorders on Business Activity in Texas and the Anticipated Economic and Fiscal Return on Investment in Expanded Mental Health Services."  Analysis prepared for ValueOptions and the Texas Council of Community Mental Health and Mental Retardation Centers, 2009.

"The Impact of Allowing Gaming Operations at the Alabama-Coushatta Reservation on Local and State Business Activity."  Analysis prepared for the Alabama-Coushatta Indian Tribe, 2009.

"The Economic Impact of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: A Brief Assessment in a Series of Reports Regarding the Economics of Cancer and Cancer Research, Treatment, and Related Activity." Analysis prepared for the Cancer Prevention and Research Institute of Texas, 2009.

"Powering the Future of San Antonio: The Economic Impact of Past and Current Cost Savings to CPS Energy Customers and the Potential Future Effects of Generation Investment Options." Analysis prepared for CPS Energy, 2009.

"Texas as a "State of Minds": An Assessment of the Potential Impact of Increasing  the Number of Tier One Universities on State and National Business Activity." Analysis prepared for Texans for Tier One, 2009.

"Stability and Sustainable Progress: The Impact of Annuity Payments by the Teacher Retirement System of Texas on the State and its Regions, Metro Areas, Counties, and Zip Codes." Analysis prepared for Teacher Retirement System of Texas, 2009.

"Some Illustrations of the Potential Economic Development and Social Benefits Associated with the Cancer Prevention and Research Institute of Texas: A Brief Assessment in a Series of Reports Regarding the Economics of Cancer and Cancer Research, Treatment, and Related Activity." Analysis prepared for the Cancer Prevention and Research Institute of Texas, 2009.

"The Economic Cost of Cancer in Texas: A Brief Assessment in a Series of Reports Regarding the Economics of Cancer and Cancer Research, Treatment, and Related Activity." Analysis prepared for the Cancer Prevention and Research Institute of Texas, 2009.

"An Assessment of the Impact of Billboards and Other Outdoor Advertising on Business Activity in Texas." Analysis prepared for the Texas Travel & Tourism Association, 2010.

"The Impact of Developing the Keystone XL Pipeline Project on Business Activity in the US: An Analysis Including State-by-State Construction Effects and an Assessment of the Potential Benefits of a More Stable Source of Domestic Supply." Analysis prepared for TransCanada Pipeline, 2010 (partial basis for testimony before the US Department of State).

"Gains in Kansas Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits." Analysis prepared for TransCanada Pipeline, 2010.

"Gains in Montana Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits." Analysis prepared for TransCanada Pipeline, 2010.

"Gains in Nebraska Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits." Analysis prepared for TransCanada Pipeline, 2010.

"Gains in Oklahoma Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits."  Analysis prepared for TransCanada Pipeline, 2010.

"Gains in Texas Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits."  Analysis prepared for TransCanada Pipeline, 2010.

"Gains in South Dakota Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits."  Analysis prepared for TransCanada Pipeline, 2010.

"The Economic Benefits Associated with Increasing the Efficiency and Productivity of the Texas Judicial System Through Expanded Investment in Educational Programs for Judges."  Analysis prepared for the Texas Judicial Foundation, 2010.

"The Cost of Cancer: A Corporate Perspective."  Analysis prepared for the Cancer Prevention and Research Institute of Texas, 2010.

"The Economic and Fiscal Effects of Expanding Alcoholic Beverage Sales in the City of Dallas."  Analysis prepared for Progress Dallas, 2010.

"Comments of M. Ray Perryman, PhD Regarding the Draft Study 'Projecting the Need for Engineering Education' by the Texas Higher Education Coordinating Board."  Analysis prepared for the Association of Engineering Advisory Boards, 2010.

"Winds of Prosperity: The Impact of the Competitive Renewable Energy Zone (CREZ) Investment in Transmission Infrastructure and the Potential Effects on Renewable Generation, Electricity Cost Savings, and Economic Development."  Analysis prepared for Oncor, The Wind Coalition, and more than 50 sponsoring organizations, 2010.

"An Assessment of the Potential Economic and Fiscal Impact of Investment in Expanding Various Aspects of a Public-Private Risk Sharing Model for Funding Mental Health and Substance Abuse Services in Texas."  Analysis prepared for ValueOptions, 2010.

"The Impact of Expanded Liquor Sales in the City of Dallas."  Study prepared for Progress Dallas, 2010.

"The Impact of Deepening the Sabine-Neches Waterway on Business Activity in Jefferson County, the Surrounding Region, and Texas."  Analysis prepared for the Sabine-Neches Navigation District (SNND), 2010.

"The Potential Impact of the Proposed Plains & Eastern Clean Line Transmission Project on Business Activity in the US and Affected States."  Analysis prepared for Clean Line Energy Partners, 2010 (partial basis for testimony before the Corporation Commission of Oklahoma).

"The Impact of Allowing Gaming Operations at the Alabama-Coushatta Reservation on Local and State Business Activity."  Analysis prepared for the Alabama-Coushatta Tribe of Texas, 2010.

"The Economic Impact of Streamlining the Rate-Setting Process for Entergy Texas: Lower Costs and Better Outcomes for Customers."  Analysis prepared for Entergy, 2010.

"Review of 'Secondhand Smoke Policies in Bexar County, 2010.'"  Analysis prepared for the San Antonio Mixed Beverage Association, 2010.

"An Assessment of the Economic Impact of Proposed National Initiatives to Reduce Greenhouse Gas Emissions in Contrast to Market-Based Mechanisms Such as Those Recently Implemented in Texas."  Study prepared for Energy Future Holdings Corporation, 2010.

"The Impact of Developing the Keystone XL Pipeline Project on the Hispanic Population of the US: A State-by-State Analysis."  Study prepared for TransCanada Pipeline, 2010 (partial basis for testimony before the US Department of State).

"Enhancing the Economic Benefits of Competitive Wholesale Energy to All Texans: An Economic Assessment of Some Issues Surrounding the Responsiveness of Current Regulation to Purchased Power Initiatives in Areas Outside the Boundaries of the Electric Reliability Council of Texas (ERCOT) Region."  Study prepared for Entergy, 2010.

"A War Worth Waging: An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs."  Study prepared for the Cancer Prevention and Research Institute of Texas, 2010.

"An Evaluation of Expected Sales Tax Coverage Ratios for the Bond Refinancing Program of Dallas Area Rapid Transit."  Analysis prepared for Estrada Hinojosa & Co., Inc., Southwest Securities, and Dallas Area Rapid Transit, 2010.

"Keeping the Record Straight!!  An Assessment of the Economic Benefits of Court Reporters in Texas."  Study prepared for the Texas Court Reporter Association, 2011.

"The Potential Impact of Data Centers on Business Activity in Texas: An Analysis in Light of Competitive Incentives in Other States."  Study prepared for Capstar Real Estate Advisors, 2011.

"The Potential Impact of the Proposed Comprehensive Tort Reform Legislation on Business Activity in Tennessee."  Analysis prepared for Tennesseans for Economic Progress, 2011.

"The Economic Impact of Changing the Texas Medicaid Pharmacy Benefit Structure: An Analysis of the Potential Effects of Switching from a "Carve-Out" to a "Carve-In" System or Limiting Network Access."  Analysis prepared for Pharmacy Care and Access Now (PCAN), 2011.

"An Assessment of the Potential Impact of the Lockheed Martin Taiwan F-16 Program on Business Activity in Affected States and Congressional Districts."  Analysis prepared for Lockheed Martin Aeronautics, 2011.

"An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: 2011 Annual Update."  Analysis prepared for the Cancer Prevention and Research Institute of Texas, 2011.

"An Assessment of Revenue Adequacy for the Bond Funding Requirements of Dallas Area Rapid Transit."  Analysis prepared for Estrada Hinojosa & Co., Inc., Southwest Securities, and Dallas Area Rapid Transit, 2011.

"The Cost to Date of Delays in Permits for Development of the Keystone XL Pipeline Project on Business Activity in the US."  Analysis prepared for TransCanada Pipeline, 2011 (partial basis for testimony before the US Department of State).

"The Economic Benefits of Retirement Annuity and Other Payments by Major Public Employee Retirement Systems on Business Activity in Texas."  Analysis prepared for Texas Public Employee Retirement Systems (TEXPERS), 2011.

"Gains in Texas Business Activity Stemming from the Gulf Coast Project and Houston Lateral Project: A County-Level Analysis of Economic and Tax Benefits."  Analysis prepared for TransCanada Pipeline, 2012.

"Gains in Oklahoma Business Activity Stemming from the Gulf Coast Project: A County-Level Analysis of Economic and Tax Benefits."  Analysis prepared for TransCanada Pipeline, 2012.

"An Assessment of the Impact of Investment Diversions, Business Interruptions, and Related Power Outages Associated with Potential Storm Damage in Jefferson and Orange Counties on State and Local Business Activity."  Analysis prepared for Entergy, 2012.

"The Economic Benefits of More Fully Utilizing Advanced Practice Registered Nurses in the Provision of Health Care in Texas: An Analysis of Local and Statewide Effects on Business Activity."  Analysis prepared for the Texas Nursing Association, 2012 (partial basis for testimony before the Committee on Public Health of the Texas House of Representatives).

"A Detailed Forecast of Future Economic Activity in Victoria, Texas and the Surrounding Area: An Analysis with Considerations of the Implications for Future Fiscal Policy."  Analysis prepared for the City of Victoria, 2012.

"Gains in South Dakota Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits."  Study prepared for TransCanada Pipeline, 2012.

"Gains in Montana Business Activity Stemming from Keystone Pipeline Investments: A County-Level Analysis of Economic and Tax Benefits."  Study prepared for TransCanada Pipeline, 2012.

"The Potential Impact of Allowing Expanded Alcoholic Beverage Sales in the City of Tyler and Smith County Justice of the Peace Precinct 2 on Business Activity and Tax Receipts in the Local Area."  Analysis prepared for the Tyler Economic Development Council, 2012.

"Projected Sales Tax Resources for the Debt Service Payments of Dallas Area Rapid Transit."  Analysis prepared for Estrada Hinojosa & Co., Inc., Southwest Securities, and Dallas Area Rapid Transit, 2012.

"The Socioeconomic Impact of Authorizing Exports of Liquefied Natural Gas (LNG) from the Golden Pass Products Facility in Jefferson County, Texas on Business Activity in Jefferson County, the Surrounding Region, and the United States."  Analysis prepared for Golden Pass LNG, 2012.

"Only One Rational Choice: Texas Should Participate in Medicaid Expansion Under the Affordable Care Act."  *Pro bono* study prepared as a public service, 2012.

"Only One Rational Choice: Texas Should Participate in Medicaid Expansion Under the Affordable Care Act: Effects on Regions, Local Areas, and Legislative Districts. *Pro bono* study prepared as a public service, 2012.

"Toward a "Texas Solution" Texas Should Provide Insurance Coverage for the Expanded Medicaid Population Under the Affordable Care Act: Effects of Implementing a Representative Market-Based, Private Exchange Option for Newly Eligible Recipients."  *Pro bono* study prepared as a public service, 2012.

"The Anticipated Impact of Cheniere's Proposed Corpus Christi Liquefaction Facility on Business Activity in Corpus Christi, Texas, and the US."  Analysis prepared for Cheniere Energy, Inc., 2012.

"The Potential Impact of Increasing Natural Gas Severance Tax Rates on Business Activity in Arkansas."  Analysis prepared for the Conway Chamber of Commerce, 2012.

"The Impact of Construction and Operation of Pangea's South Texas LNG Export Project on Business Activity in the Corpus Christi Area."  Analysis prepared for Pangea LNG, 2012.

"2012 Update: An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs."  Analysis prepared for Cancer Prevention and Research Institute of Texas (CPRIT), 2012.

"Sowing the Seeds: The Impact of Annuity Payments by the Teacher Retirement System on Texas and Local Areas Within the State."  Study prepared for the Teacher Retirement System of Texas, 2013.

"Current and Potential Economic Benefits of Legal Aid Services in Texas: 2013 Update."  Study prepared for Elizabeth Christian & Associates, 2013.

"The Potential Economic Benefits for Texas of a Free Trade Agreement between the United States and the European Union."  Study prepared for the British Government, 2013.

"The Potential Economic Losses Stemming From Required Work Force Reductions in the Absence of the Proposed Merger between Blue Cross Blue Shield of Montana and Health Care Service Corporation."  Study prepared for Blue Cross Blue Shield of Montana, 2013.

"The Impact of Earlier Public School Start Dates on Business Activity in Texas and Local Areas within the State."  Study prepared for the Texas Travel Industry Association (TTIA), 2013.

"The Impact of Deepening the Sabine-Neches Waterway on Business Activity in Jefferson County, the Surrounding Region, Texas, and the United States."  Study prepared for the Sabine-Neches Navigation District, 2013.

"The Impact of Benefit Payments to Veterans on Business Activity in Texas."  Study prepared for the Texas Veterans Commission, 2013.

"The Impact of Using State Strike Force Teams to Enhance the Approval Process for Benefit Payments to Veterans on Business Activity in Texas."  Study prepared for the Texas Veterans Commission, 2013.

"The Impact of Federal Education Outlays for Veterans and Educational Services to Veterans and Their Families through the Hazlewood Exemption on Business Activity in Texas."  Study prepared for the Texas Veterans Commission, 2013.

"The Impact of the Proposed Stage 3 Expansion of Cheniere Energy's Sabine Pass LNG Facility and Creole Trail Pipeline on Business Activity in the Surrounding Region, Louisiana, and the United States."  Study prepared for Cheniere Energy, Inc., 2013.

"Factors Affecting Future Tuition Rates Within the Texas A&M University System: An Analysis Relating to Appropriate Fixed-Rate Tuition Levels Beginning in Fall 2014."  Study prepared for Texas A&M University, 2013.

"An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: 2013 Update."  Analysis prepared for the Cancer Prevention and Research Institute of Texas (CPRIT), 2013.

"The Potential Impact of Allowing Alcoholic Beverage Sales in Canadian (Hemphill County) on Business Activity and Tax Receipts in the Local Area."  Study prepared for Canadian-Hemphill County Chamber of Commerce, 2013.

"The Impact of Construction and Operation of Pangea's South Texas LNG Export Project on Business Activity in the Brownsville Area."  Analysis prepared for Pangea LNG, 2014.

"The Economic Cost of Deployment: An Analysis of the Effects of National Guard Troop Deployment on the Lower Rio Grande Valley and Texas."  *Pro bono* study prepared as a public service, 2014.

"The Adverse Impact of Banning Hydraulic Fracturing in the City of Denton on Business Activity and Tax Receipts in the City and State."  Analysis prepared for the Barnett Shale Energy Education Council, 2014.

"Revenue Projections in Light of the Bond Refinancing Initiative of Dallas Area Rapid Transit." Analysis prepared for Estrada Hinojosa & Co., Inc., Southwest Securities, and Dallas Area Rapid Transit, 2014.

"The Impact of Annuity Payments by the Teacher Retirement System on Texas and Local Areas Within the State: 2014 Update."  Study prepared for the Teacher Retirement System of Texas, 2014.

"An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: 2014 Update."  Analysis prepared for the Cancer Prevention and Research Institute of Texas (CPRIT), 2014.

"Hunger: Economic Perspectives – Sustainable Solutions."  *Pro bono* study prepared as a public service, 2014.

"Suffer the Little Children: Assessment of the Economic Cost of Child Maltreatment."  *Pro bono* study prepared as a public service, 2014.

"The Impact of Veterans Benefit Payments on Business Activity in Texas and Local Areas within the State."  Analysis prepared for the Texas Veterans Commission, 2014.

"Economic and Fiscal Benefits of the Proposed Bear Head LNG Project in Nova Scotia: An Analysis with Emphasis on the Effects on the United States."  Analysis prepared for Bear Head LNG, 2015.

"Economic and Fiscal Benefits of the Proposed Bear Head LNG Project in Nova Scotia: An Analysis with Emphasis on the Effects on the United States, *Supplemental Report: Potential Effects for Maine and North Carolina*."  Analysis prepared for Bear Head LNG, 2015.

"The Economic Impact of a More Effective Collection Process for Texas' Business Personal Property Tax."  Analysis prepared for Ryan LLC, 2015.

"The Economic Importance of Texas' Coastal Counties: An Analysis of the Dependence of Texas and its Regions on Business Operations in the Tier 1 Windstorm Insurance Coverage Area."  Analysis prepared for the Beaumont Chamber of Commerce, 2015.

"The Potential Economic and Fiscal Impacts of a Jail Diversion Program and Restoration Center for Mental Health and Related Disorders in Baton Rouge."  Analysis prepared for the Baton Rouge Area Foundation, 2015.

"Sales Tax Forecast Evaluation with Respect to the Debt Financing Schedule of Dallas Area Rapid Transit."  Analysis prepared for Estrada Hinojosa & Co., Inc., Southwest Securities, and Dallas Area Rapid Transit, 2015.

"The Anticipated Impact of Cheniere's Proposed Corpus Christi Liquefaction Facility on Business Activity in Corpus Christi, Texas, and the US: 2015 Update."  Analysis prepared for the Cheniere Energy, Inc., 2015.

"The Potential Impact of the Proposed Rio Grande Liquefied Natural Gas (LNG) and Rio Bravo Pipeline Facilities on Business Activity in Cameron County, Texas, and the United States."  Analysis prepared for NextDecade, 2015.

"The Electronic Payment System: An Assessment of Benefits for the US and State Economies."  Analysis prepared for MasterCard Inc., 2015.

76

"An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: 2015 Update."  Analysis prepared for the Cancer Prevention and Research Institute of Texas (CPRIT), 2015.

"The Economic Benefits of the Activity Associated with Contracts and Expenditures Arising from Business Diversity Programs at Dallas/Fort Worth International Airport."  Analysis prepared for the Dallas/Fort Worth International Airport, 2016.

"Texas Needs the Workers!!  An Analysis of the Economic and Fiscal Impact of Undocumented Workers."  Analysis prepared for the American Jewish Congress, Ford Foundation, 2016.

"An Assessment of the Economic Implications of Redesigning the Foster Care Systems in Selected Counties and the State of Texas."  Analysis prepared for ACH Child and Family Services aka Our Community Our Kids, 2016.

"The Potential Effect of Exempting Downhole Processing Equipment from Taxation on State of Texas Tax Receipts."  Analysis prepared for the Texas Association of Business, 2016.

"An Economic Assessment of the Cost of Cancer in Texas and the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT) and its Programs: 2016 Update."  Analysis prepared for the Cancer Prevention and Research Institute of Texas (CPRIT), 2016.

"The Impact of Annuity Payments by the Texas Retirement System on Texas and Local Areas Within the State: 2016 Update."  Analysis prepared for the Teacher Retirement System of Texas, 2016.

"The Economic and Fiscal Benefits to Texas of the Proposed "Feeding with Impact" Initiative."  Analysis prepared for Feeding Texas, 2016.

"'Expensive Insufficiency': The Economic Cost of Judicial Vacancies in US District Courts."  Analysis prepared for the Eastern District of Texas Bar Association, 2016.

"An Assessment of Current and Future Needs for Attorneys in the Dallas-Fort Worth Area and Texas."  Analysis prepared for the University of North Texas System, 2016.

"Messing with Texas: Potential Adverse Economic and Fiscal Impacts of Disruptions to Texas Travel."  Analysis prepared for the Texas Travel Industry Association, 2016.

"… and Fountains of Unstinted Wealth Will Gush Forth": An Assessment of the Economic Benefits of University Lands."  Analysis prepared for the University of Texas System, 2016.

"Potential Economic Effects of Converting Portions of US 380 in Collin County to a Limited Access Roadway."  Analysis prepared for Collin County, 2017.

"SYNERGY: Defining Economic Opportunities, Potential, and Challenges Confronting the US-Mexico Border Regions and Strategies for Enhanced Prosperity." Analysis prepared for MATT: Mexicans and Americans Thinking Together, 2017-2018.

"The Potential Impact of Social Legislation on Business Activity: A Case Study of Actions Which Could Adversely Affect Tourism in the San Antonio Area and Texas." Analysis prepared for the San Antonio Area Tourism Council, 2017.

"A Texas Case Study: The Effect of Retail Competition on the Electric Utility Industry." Analysis prepared for Direct Energy, 2017.

"The Long-Term Economic Benefits of an Expanded Program of Kinship Care in Texas." Analysis prepared for TexProtects, 2017.

"Potential Economic and Fiscal Impacts of Alternative Appropriations Levels for Texas Tourism Promotion Activities." Analysis prepared for Texas Tourism Industry Association (TTIA), 2017.

# LITIGATION AND DISPUTE RESOLUTION
## Antitrust, Competition, and Related Matters

"The Times Herald Printing Company vs. A.H. Belo Corporation, Universal Press Syndicate, Inc., and Dallas Morning News Company" (**A.H. Belo Corporation**) No. 89-032407, District Court of Harris County, Texas, 280th Judicial District, 1989-1990 (deposition and trial testimony).

"Syntek Finance Corp. vs. Metropolitan Life Insurance Co., et al." (**Metropolitan Life Insurance Co.; MetHotels, Inc.; and Doubletree, Inc.**) No. CA3-89-1204-D, United States District Court for the Northern District of Texas, Dallas Division, 1991 (deposition testimony).

"Express Convenience Center Inc. vs. Federal Express Corporation" (**Federal Express Corporation**) No. 4-89-821-A, United States District Court for the Northern District of Texas, Fort Worth Division, 1991 (resolved prior to testimony).

"Xerox Antitrust Matter" (**Xerox Corporation**) 1992 (citation not available—resolved prior to testimony).

"NTS Communications, Inc. Antitrust Matter" (**NTS Communications, Inc.**) 1992 (citation not available—resolved prior to testimony).

"The Seven-Up Company vs. The Coca-Cola Company" (**Seven-Up Company**) Cause No. 92-2754-F, District Court of Dallas County, Texas, 116th Judicial District, 1993-1994 (deposition and trial testimony).

"DSC Communications Corporation and DSC Technologies Corporation vs. Alan E. Negrin, Henri Sulzer, Advanced Fibre Communications and Quadrium Corporation" (**DSC Communications Corporation and DSC Technologies Corporation**) Civil Action No. 2-93CV126, United States District Court for the Eastern District of Texas, Marshall Division, 1994-1995 (deposition testimony).

"Doskocil Antitrust Matter" (**Doskocil**) 1995-1996 (citation not available—resolved prior to testimony).

"Entech Sales and Service, Inc. vs. American Standard, Inc. d/b/a The Trane Company" (**The Trane Company**) Civil Action No. 3:93-CV-0330-D, United States District Court for the Northern District of Texas, Dallas Division, 1995-1996 (affidavit testimony).

"Texas Piggly Wiggly of Clarksville, Inc., et al. vs. Mrs. Baird's Bakeries, Inc., et al." (**Flowers Industries, Inc.**) Civil Action No. 3:95CV48, United States District Court for the Eastern District of Texas, Tyler Division, 1996 (affidavit testimony).

"Few Ready Mix Concrete Co. vs. Transit Mix Concrete & Material Co., et al." (**Few Ready Mix Concrete Co.**) Civil No. 96-CV-86, United States District Court for the Eastern District of Texas, Lufkin Division, 1996 (resolved prior to testimony).

"Bell Atlantic Corporation and DSC Communications Corporation vs. AT&T Corporation and Lucent Technologies, Inc." (**AT&T Corporation**) Civil Action No. 5-96CV45, United States District Court for the Eastern District of Texas, Texarkana Division, 1996-1997 (affidavit and deposition testimony).

"Kinetic Concepts, Inc. and Medical Retro Design, Inc. vs. Hillenbrand Industries, Inc. and Hill-Rom Company, Inc." (**Kinetic Concepts, Inc., KCI USA, Inc.; Medical Retro Design, Inc.**) Civil Action No. SA-95-CA-0755, United States District Court for the Western District of Texas, San Antonio Division, 1996-2003 (affidavit, deposition, and trial testimony).

"Kimberly-Clark Corporation vs. Paragon Trade Brands, Inc." (**Paragon Trade Brands, Inc.**) Civil Action No. 3:95-CV-2574T, United States District Court for the Northern District of Texas, Dallas Division, 1997 (affidavit testimony).

"Waste Control Specialists, LLC vs. Envirocare of Texas, Inc., Envirocare of Utah, Inc., Khosrow B. Semnani, Charles A. Judd, and Frank C. Thorley" (**Envirocare**) Cause No. 14,580, District Court of Andrews County, Texas, 109th Judicial District, 1998 (resolved prior to testimony).

"Amway Corporation vs. Procter & Gamble Internet Advertising Antitrust Matter" (**Amway Corporation**) 1999 (citation not available—resolved prior to testimony).

"Nuclear Fuel Services vs. Envirocare of Utah, Inc., et al." (**Envirocare**) Case No. 970901677CV, 3rd District Court in and for Salt Lake County, State of Utah, 1998-1999 (deposition testimony).

"Longhorn Partners Pipeline, L.P. vs. Holly Corporation, et al." (**Longhorn Partners Pipeline, L.P.**) Civil Action No. 98-2991, District Court of El Paso County, Texas, 120th Judicial District, 2000 (affidavit testimony).

"P.V. Patel, M.D., et al. vs Midland Memorial Hospital, et al." (**Midland Memorial Hospital**) Civil Action No. M099CV159, United States District Court for the Western District of Texas, Midland-Odessa Division, 2000 (resolved prior to testimony).

"Progress Materials, Inc. vs. Dominion Ash CCP Limited, et al." (**Dominion Ash CCP Limited**) Civil Action No. SA01CA0264, United States District Court for the Western District of Texas, San Antonio Division, 2001 (resolved prior to testimony).

"Raymond Verdin vs. Pride Offshore, Inc., et al." (**Pride Offshore, Inc. and Pride International**) Civil Action No. G-00-488, United States District Court for the Southern District of Texas, Galveston Division, 2001 (resolved prior to testimony).

"Retractable Technologies, Inc. vs. Becton Dickinson & Co., et al." (**Becton Dickinson & Co.**) Civil Action No. 5:01-CV-036, United States District Court for the Eastern District of Texas, Texarkana Division, 2001-2004 (deposition testimony).

"Prepaid Wireless Services, Inc. vs. Southwestern Bell Wireless, Inc. and Southwestern Bell Mobile Systems d/b/a The Partnership." (**Southwestern Bell Wireless, Inc. and Southwestern Bell Mobile Systems (Cingular)**) Civil Action No. M-00-302, United States District Court for the Southern District of Texas, McAllen Division, 2002 (deposition testimony).

"Dr Pepper/Seven-Up, Inc. vs. Pepsico, Inc., et al." (**Dr Pepper/Seven-Up, Inc.**) Cause No. 01-0863, District Court Harrison County, Texas, 71st Judicial District, 2002 (resolved prior to testimony).

"Pride International, Inc. vs. Royal Insurance Co. of America." (**Pride International, Inc. and Pride Offshore, Inc.**) Civil Action No. H-03-2568, United States District Court for the Southern District of Texas, Houston Division, 2003 (resolved prior to testimony).

"Dr Pepper/Seven Up, Inc. vs. The Coca-Cola Company" (**Dr Pepper/Seven-Up, Inc.**) Cause No. 04-04820, District Court of Dallas County, Texas, 298th Judicial District, 2004 (resolved prior to testimony).

"Flying J Inc., et al. vs. TA Operating Corporation d/b/a TravelCenters of America, et al." (**TravelCenters of America**) Civil Action No. 1:06-CV-00030DS, United States District Court District of Utah, Central Division, 2006 (resolved prior to testimony).

"American Airlines, Inc. vs. Travelport Limited, et al." (**American Airlines, Inc.**), Civil Action No. 4:11-CV-00244-Y, United States District Court for the Northern District of Texas, Fort Worth Division, 2012 (resolved prior to testimony).

"American Airlines, Inc. vs. Sabre, Inc., Sabre Holdings, Inc., and Sabre Travel International Ltd." (**American Airlines, Inc.**), No. 067-249214-10, District Court of Tarrant County, Texas, 67th Judicial District, 2012 (deposition testimony).

"Tristar Investors, Inc. vs. American Tower Corporation, et al." (**Tristar Investors, Inc.**) Civil Action No. 3:12-CV-499-M, United States District Court for the Northern District of Texas, Dallas Division, 2013 (deposition testimony).

"Sanger Insurance Agency vs. HUB International, LTD; HUB Internationsl Midwest, LTD." (**Sanger Insurance Agency**) Civil Action No. 4:14-CV-00171-RAS, United States District Court for the Eastern District of Texas, Sherman Division, 2016.

## Intellectual Property and Related Matters

"Texas Instruments Inc. vs. Dell Computer Corporation" (**Dell Computer Corporation**) Civil Action No. 3:90-2086-P, United States District Court for the Northern District of Texas, Dallas Division, 1992 (deposition and affidavit testimony).

"Electronic Data Systems Corporation vs. Computer Associates International, Inc." (**Computer Associates International, Inc.**) Civil Action No. 3:92-CV-0055-X, United States District Court for the Northern District of Texas, Dallas Division, 1994 (resolved prior to testimony).

"Tidel Engineering, Inc. vs. Emerson Electric Company, Inc." (**Tidel Engineering**) Civil Action No. 95-435-A, United States District Court for the Eastern District of Virginia, Alexandria Division, 1994-1995 (deposition testimony).

"Transamerican Natural Gas Corporation vs. Enron Corporation, Enron Oil and Gas Company" (**Transamerican Natural Gas Corporation**) Cause No. C-5203-92-B, District Court of Hidalgo County, Texas, 93rd Judicial District, 1995 (resolved prior to testimony).

"Aladdin Company Trademark Arbitration Matter" (**Aladdin Company**) 1996 (citation not available—resolved prior to testimony)."

"BPA Fabrication, Inc. vs. Jamak Fabrication, Inc." (**Jamak Fabrication, Inc.**) Case No. 70-181-0237-95-K, American Arbitration Association, 1996 (deposition and hearing testimony).

"Kimberly-Clark Corporation vs. Paragon Trade Brands, Inc." (**Paragon Trade Brands, Inc.**) Civil Action No. 3:95-CV-2574T, United States District Court for the Northern District of Texas, Dallas Division, 1997 (affidavit testimony).

"Industrial Molding Corporation vs. Santa's Best" (**Industrial Molding Corporation**) Civil Action No. 97-CV-0109-C, United States District Court for the Northern District of Texas, Lubbock Division, 1997-1998 (resolved prior to testimony).

"Community Technology Fund, BUNP, et al. vs. BCM Technologies, Inc. and Baylor College of Medicine" (**Baylor College of Medicine**) No. 96-64698, District Court of Harris County, Texas, 280th Judicial District, 1998 (resolved prior to testimony).

"Genlyte Thomas Group LLC vs. Lutron Electronics Co., Inc." (**Lutron Electronics Co., Inc.**) Civil Action No. 3:02-CV-0602-K, United States District Court for the Northern District of Texas, Dallas Division, 2003 (deposition testimony).

"Intergraph Hardware Technologies Company vs. Hewlett-Packard Company, et al." (**Hewlett-Packard Company**) Civil Action No. 2:02CV312 (TJW), United States District Court for the Eastern District of Texas, Marshall Division, 2004 (resolved prior to testimony).

"The Board of Regents of The University of Texas System on Behalf of The University of Texas Southwestern Medical Center and Mission Pharmacal Company, Inc. vs. Corepharma LLC and Rising Pharmaceuticals, Inc." (**The Board of Regents of The University of Texas System on Behalf of The University of Texas Southwestern Medical Center and Mission Pharmacal Company, Inc.**) Civil Action No. W-06-CA-301, United States District Court for the Western District of Texas, Waco Division, 2006 (resolved prior to testimony).

"Rembrandt Technologies, LP vs. Comcast Corporation, et al." (**Comcast Corporation**) Case No. 2:05-CV-443, United States District Court for the Eastern District of Texas, Marshall Division, 2006 (resolved prior to testimony).

"Caritas Technologies, Inc. vs. Comcast Corporation" (**Comcast Corporation**) Civil Action No. 2:05-CV-339DF, United States District Court for the Eastern District of Texas, Marshall Division, 2006-2007 (resolved prior to testimony).

"Pressure Products Medical Supplies, Inc. vs. Quan Emerteq Corp. d/b/a/ Enpath Medical, Inc." (**Enpath Medical, Inc.**) Case No. 9:06-CV-121, United States District Court for the Eastern District of Texas, Lufkin Division, 2008 (deposition and trial testimony).

"Intel Corporation et al. vs. Commonwealth Scientific and Industrial Research Organisation" (**Intel Corporation; Microsoft Corporation; Hewlett-Packard Company; Netgear, Inc.; Toshiba America Information Systems, Inc.; Nintendo of America Inc.; Fujitsu Computer Systems Corporation; Asus Computer International; D-Link Systems, Inc.; Belkin Corporation; Accton Technology Corporation USA; SMC Networks, Inc.; 3COM Corporation; Marvell Semiconductor, Inc.; Marvell Asia PTE., Ltd.; Marvell Intl., Ltd.**) Case Nos. 6:06-CV-551, 6:06-CV-549, 6:06-CV-550 (LED), 6:07-CV-204 (LED), United States District Court for the Eastern District of Texas, Tyler Division, 2008 (resolved prior to testimony).

"Saxon Innovations, LLC vs. Apple, Inc.; Gateway, Inc.; Acer America Corp.; Acer, Inc.; Hewlett-Packard Company; Dell, Inc.; Asus Computer International, Inc. and Intel Corporation, Intervener/Defendant" (**Apple, Inc.; Gateway, Inc.; Acer America Corp.; Acer, Inc.; Hewlett-Packard Company; Dell, Inc.; Asus Computer International, Inc. and Intel Corporation**) Civil Action No. 6:08-CV-265-JDL, United States District Court for the Eastern District of Texas, Tyler Division, 2009-2010 (resolved prior to testimony).

"Wi-Lan Inc. vs. Acer, Inc., et al." (**Acer, Inc., Acer America Corporation; Apple, Inc.; Dell, Inc.; Gateway, Inc.; Hewlett-Packard Company; Lenovo Group Ltd.; Lenovo (United States) Inc.; Sony Corporation; Sony Corporation of America; Sony Electronics, Inc.; Sony Computer Entertainment America, Inc.; Toshiba Corporation; Toshiba America, Inc.; Toshiba America Information Systems, Inc.; Broadcom Corporation; Intel Corporation; Atheros Communications, Inc.; Marvell Semiconductor, Inc.**) Civil Action No. 2:07-CV-00473 TJW, United States District Court for the Eastern District of Texas, Marshall Division, 2010 (resolved prior to testimony).

"The PACID Group, LLC vs. Apple, et al." (**Apple, Inc.; Dell, Inc.; Gateway, Inc.; Hewlett-Packard Company; Lenovo Group Limited; Lenovo (United States) Inc.; Toshiba Corporation; Toshiba America, Inc.; Toshiba America Information Systems, Inc.; Broadcom Corporation; Intel Corporation; Marvell Technology Group Ltd.; Marvell Semiconductor, Inc.; Marvell Technology, Inc.; and Marvell Semiconductor, Ltd.**) Case No. 6:09-CV-143, United States District Court for the Eastern District of Texas, Tyler Division, 2010 (resolved prior to testimony).

"Clear with Computers, LLC vs. Hyundai Motor America, Inc." (**Hyundai Motor America, Inc.**) Civil Action No. 6:09-CV-00479, United States District Court for the Eastern District of Texas, Tyler Division, 2010-2011 (deposition and trial testimony).

"Dogleg Right Partners, LP and Dogleg Right Corporation vs. Taylor Made Golf Company, Inc." (**Taylor Made Golf Company, Inc.**) Civil Action No. 2:07-CV-533-TJW/CE, United States District Court for the Eastern District of Texas, Marshall Division, 2010-2011 (deposition testimony).

"Canrig Drilling Technology, Ltd. vs. Omron Oilfield and Marine, Inc. and Helmerich & Payne, Inc." (**Helmerich & Payne, Inc.**) Civil Action No. 6:09-CV-00414, United States District Court for the Eastern District of Texas, Tyler Division, 2011 (resolved prior to testimony).

"Wi-Lan, Inc. vs. Acer, Inc., et al." (**Acer, Inc.; Acer America Corporation; Apple, Inc.; Dell, Inc.; Gateway, Inc.; Hewlett-Packard Company; Lenovo Group Ltd.; Lenovo (United States) Inc.; Sony Corporation; Sony Corporation of America; Sony Electronics, Inc.; Sony Computer Entertainment America, Inc.; Toshiba Corporation; Toshiba America, Inc.; Toshiba America Information Systems, Inc.; Broadcom Corporation; Intel Corporation; Atheros Communications, Inc.; Marvell Semiconductor, Inc.**) Civil Action No. 2:07-CV-473 (TJW) Consolidated with Civil Action No. 2:07-CV-474 (TJW), United States District Court for the Eastern District of Texas, Marshall Division, 2011 (resolved prior to testimony).

"Wi-Lan, Inc. vs. Research in Motion Corporation, Research in Motion Ltd., Motorola, Inc., and UTSTARCOM, Inc., LG Electronics MobileComm U.S.A. and LG Electronics, Inc." (**Motorola, Inc.**) Civil Action No. 2:08-CV-247-TJW, United States District Court for the Eastern District of Texas, Marshall Division, 2011 (resolved prior to testimony).

"Novartis Vaccines & Diagnostics, Inc. vs. Wyeth and Wyeth Pharmaceuticals, Inc." (**Wyeth and Wyeth Pharmaceuticals, Inc.**) Case No. 2:08-CV-067, United States District Court for the Eastern District of Texas, Marshall Division, 2011 (deposition testimony).

"Alcatel-Lucent USA Inc. vs. Amazon.com, Inc., et al." (**Alcatel-Lucent USA Inc.**) Civil Action No. 6:09-CV-422-LED, United States District Court for the Eastern District of Texas, Tyler Division, 2011 (deposition and trial testimony).

"SFA Systems, LLC vs. 1. BigMachines, Inc.; 2. Beckman Coulter, Inc.; 3. Entrasys Networks, Inc.; 4. Ricoh Americas Corporation; 5. Hyundai Motor America, Inc.; and 6. Carestream Health, Inc." (**Hyundai Motor America, Inc.**) Case No. 6:10-CV-00300, United States District Court for the Eastern District of Texas, Tyler Division, 2011 (resolved prior to testimony).

"Avago Technologies ECBU IP (Singapore) PTE. Ltd. and Avago Technologies General IP (Singapore) PTE. Ltd., vs. STMicroelectronics, Inc. and STMicroelectronics, N.V." (**Avago Technologies ECBU IP (Singapore) PTE Ltd. and Avago Technologies General IP (Singapore) PTE. Ltd.**) Case No. 6:10-CV-92-LED, United States District Court for the Eastern District of Texas, Tyler Division, 2011 (resolved prior to testimony).

"Secure Axcess, LLC vs. Bank of America Corp, et al." (**Bank of America Corp.; Bank of America, N.A.; A.N.B. Holding Company, Ltd.; American National Bank of Texas; Arvest Bank Group, Inc.; Arvest Bank; Austin Bancorp, Inc.; Austin Bank, Texas NA; Bank of the Ozarks, Inc.; Bank of the Ozarks; Citizens 1st Bank; Compass Bancshares, Inc.; Compass Bank a/k/a BBVA Compass; Cullen/Frost Bankers, Inc.; The Frost National Bank; Diboll State Bancshares, Inc.; First Bank & Trust East Texas; First Community Bancshares, Inc.; First National Bank Texas; First National of Nebraska, Inc.; First National Bank of Omaha; First National Bank Southwest; Sterling Bancshares, Inc.; Sterling Bank; Harris Bankcorp, Inc.; Harris N.A.; Intouch Credit Union f/k/a EDS Credit Union; ING Direct Bancorp; ING Bank, FSB d/b/a/ ING Direct USA; North Dallas Bank & Trust Co.; Zions Bancorporation; Zions First National Bank; and Amegy Bank N.A. d/b/a Amegy Bank of Texas**) Case No. 6:10-CV-00670-LED, United States District Court for the Eastern District of Texas, Tyler Division, 2011 (resolved prior to testimony).

"Simpleair, Inc., vs. AWS Convergence Technologies, Inc., et al." (**Apple, Inc.**) Case No. 2:09-CV-289, United States District Court for the Eastern District of Texas, Marshall Division, 2011-2012 (deposition testimony).

"Eolas Technologies Incorporated vs. Adobe Systems Inc., et al." (**Google Inc. and YouTube, LLC**), Civil Action No. 6:09-CV-00446-LED, United States District Court for the Eastern District of Texas, Tyler Division, 2011-2012 (deposition testimony).

"Commonwealth Scientific and Industrial Research Organisation vs. Lenovo (United States) Inc., et al." (**Broadcom Corporation; Lenovo (United States) Inc.; Lenovo Group Limited; Lenovo Holding Company, Inc.; T-Mobile USA, Inc.; Sony Corporation, Sony Corporation of America; Sony Electronics Inc.; Acer Inc.; Acer America Corporation; Gateway Inc.; Cellco Partnership d/b/a Verizon Wireless; AT&T Inc.; AT&T Mobility LLC, f/k/a Cingular Wireless LLC; AT&T Wi-Fi Services, f/k/a Wayport, Inc.**) Case No. 6:09-CV-399 (LED) consolidated case including: Case Nos. 6:09-CV-399; 6:09-CV-400; 6:09-CV-401; 6:09-CV-513; 6:10-CV-65; 6:10-CV-66; 6:10-CV-67, United States District Court for the Eastern District of Texas, Tyler Division, 2012 (deposition testimony).

"Smartphone Technologies LLC vs. HTC Corporation, HTC B.V.I., HTC America, Inc., et al." (**HTC Corporation; HTC B.V.I.; HTC America, Inc.**) Civil Action No. 6:10-CV-580, United States District Court for the Eastern District of Texas, Tyler Division, 2012 (resolved prior to testimony).

"Data Treasury Corporation vs. Austin Bancorp, Inc., et al." (**Austin Bancorp, Inc.; Austin Bank Texas, N.A.; Bok Financial Corp.**) Case 6:11-CV-00470, United States District Court for the Eastern District of Texas, Tyler Division, 2012 (resolved prior to testimony).

"TiVo Inc. vs. Cisco Systems, Inc." (**Cisco Systems, Inc. and Time Warner Cable Inc.**) Case No. 2:11-CV-311, United States District Court for the Eastern District of Texas, Marshall Division, 2013 (resolved prior to testimony).

"Ericsson, Inc., et al. vs. D-Link Systems, Inc., Intel Corporation (Plaintiff in intervention and counterclaim Defendant)" (**Dell, Inc.; Belkin International, Inc.; Toshiba America Information Systems, Inc.; D-Link Systems, Inc.; Netgear, Inc.; Acer, Inc., Acer America Corporation; Gateway, Inc.; Intel Corporation**) Civil Action No. 6:10-CV-473, United States District Court for the Eastern District of Texas, Tyler Division, 2013 (deposition and trial testimony).

"Mosaid Technologies Inc., vs. Dell, Inc., et al." (**Intel Corporation and Dell Inc.**) Civil Action No. 2:11-CV-179, United States District Court for the Eastern District of Texas, Marshall Division, 2013 (resolved prior to testimony).

"TQP Development, LLC vs. 1-800-Flowers.com, Inc., et al." (**Intel Corporation/McAfee, Inc.**) No. 2:11-CV-248-MHS-CMC, United States District Court for the Eastern District of Texas, Marshall Division, 2013 (resolved prior to testimony).

"Innovative Sonic Limited, vs. Research in Motion, Ltd. and Research in Motion Corporation" (**Research in Motion, Ltd. and Research in Motion Corporation**) Civil Action No. 3:11-CV-706-K, United States District Court for the Northern District of Texas, Dallas Division, 2013 (deposition and trial testimony).

"Variant Holdings, LLC and Variant, Inc. vs. Travelclick, Inc." (**Travelclick, Inc.; 1859 Historic Hotels, Ltd.; Gal-Tex Hotel Corp.; Benchmark Hospitality International; Ashton Hotel Partners LP d/b/a The Ashton Hotel; Hale Blackwell, Ltd. d/b/a/ Hotel Allandale; Live Oak Lodging, LLC; Heritage Hotels Rockport, LLC d/b/a The Lighthouse Inn at Aransas Bay; Heritage Hotels Fredericksburg, LLC d/b/a/ Inn on Barons Creek; and Moody Gardens, Inc. d/b/a Moody Gardens Hotel, Spa and Convention Center**) Case 2:12-CV-00623-JRG (Lead Case), United States District Court for the Eastern District of Texas, Marshall Division, 2013 (resolved prior to testimony).

"LBS Innovations LLC vs. Sally Beauty Supply LLC, et al." (**American Express Company; Barnes & Noble, Inc.; Bed Bath & Beyond, Inc.; Home Depot U.S.A., Inc.; Regions Financial Corporation; SunTrust Banks, Inc.**) Civil Action No. 2:11-CV-409, United States District Court for the Eastern District of Texas, Marshall Division, 2014 (resolved prior to testimony).

"Uniloc USA, Inc. and Uniloc Luxembourg SA vs. McAfee, Inc." (**McAfee, Inc.**) Civil Action No. 6:13-CV-260, United States District Court for the Eastern District of Texas, Tyler Division, 2014 (resolved prior to testimony).

"Affinity Labs of Texas, LLC vs. Samsung Electronics Co., Ltd. et al." (**Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Telecommunications America, LLC f/k/a Samsung Telecommunications America, LP**) Case 6:13-CV-00364-WSS, 2014 (resolved prior to testimony).

"Scott Wonders vs. William E. Johnson, Individually, Jacob S. Mattis, Individually, and the Matthews Law Firm, PLLC d/b/a Matthews, Lawson & Johnson PLLC." (**Matthews Law Firm, PLLC d/b/a Matthews, Lawson & Johnson PLLC**) Cause No. 2011-69475, District Court 152nd Judicial District, Harris County, Texas, 2014 (resolved prior to testimony).

"SimpleAir, Inc. vs. Amazon.com." (**Amazon.com, Inc.**) Case No. 2:14-CV-00679, United States District Court for the Eastern District of Texas, Marshall Division, 2015 (resolved prior to testimony).

"TracBeam, LLC, vs. Apple, Inc."  (**Apple, Inc.**) Case No. 6:14-CV-680-RWS, United States District Court for the Eastern District of Texas, Tyler Division, 2016 (resolved prior to testimony).

"Imperium IP Holdings (Cayman), Ltd. vs. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, Samsung Semiconductor, Inc."  (**Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc.**) Case No. 4:14-CV-371, United States District Court for the Eastern District of Texas, Sherman Division, 2016 (deposition and trial testimony).

"Super Interconnect Technologies, LLC vs. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc." (**Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.**) Case No. 2:15-CV-00773, United States District Court for the Eastern District of Texas, Sherman Division, 2016 (resolved prior to testimony).

"Auto-Dril, Inc. vs. Integrated Drive Systems, LLC, Pason Systems, Inc., National Oilwell Varco, Helmerich & Payne, Integrated Drive Systems, LLC, Omron Oilfield and Marine, Canrig Drilling Technology Ltd., Accudrill, Inc." (**Auto-Dril, Inc.**) CA No. 6:15-CV-00095, United States District Court for the Eastern District of Texas, Sherman Division, 2016 (resolved prior to testimony).

"Tinnus Enterprises, LLC and Zuru LTD vs. Telebrands Corporation"  (**Tinnus Enterprises, LLC and Zuru LTD**) Civil Action No. 6:16-CV-33, United States District Court for the Eastern District of Texas, Tyler Division, 2016 (deposition and hearing testimony).

"Telefonaktiebolaget LM Ericsson (Publ) vs. Lava International Limited"  (**Lava International Limited**) C.S. (O.S.) No. 674 of 2015, High Court of Delhi at New Delhi (Original Civil Commercial Jurisdiction), 2016 (resolved prior to testimony).

"Uniloc USA, Inc. and Uniloc Luxembourg, S.A. vs. Autodesk, Inc."  (**Autodesk, Inc.**) Case No. 2:15-CV-01187-JRG-RSP, United States District Court for the Eastern District of Texas, Sherman Division, 2016 (resolved prior to testimony).

"Rockwell Automation, Inc. vs. 3S-Smart Software Solutions, GMBH" (**3S-Smart Software Solutions, GMBH**) Civil Action No. 2:15-CV-01543, United States District Court for the Eastern District of Texas, Marshall Division, 2016 (resolved prior to testimony).

"Intel Corporation vs. Future Link Systems, LLC." (**Intel Corporation**) Civil Action No. 14-377-LPS, United States District Court for the District of Delaware, 2017 (deposition testimony).

"B/E Aerospace, Inc. vs. Zodiac Aerospace, et al.." (**Zodiac Aerospace**) Case No. 2:16-CV-1417, United States District Court for the Eastern District of Texas, Marshall Division, 2017 (deposition and hearing testimony).

"Biscotti Inc. vs. Microsoft Corporation" (**Biscotti Inc.**) Case No. 2:13-CV-01015-JRG, United States District Court for the Eastern District of Texas, Marshall Division, 2017 (deposition and trial testimony).

"Mobile Telecommunications Technologies, LLC vs. Google Inc." (**Google Inc.**) Case No. 2:16-CV-0002-JRG-RSP, United States District Court for the Eastern District of Texas, Marshall Division, 2017 (resolved prior to testimony).

"Network-1 Security Solutions, Inc. vs. Alcatel-Lucent USA Inc., et al." (**Hewlett-Packard Company**) Case No. 6:11-CV-492-LED-JDL, United States District Court for the Eastern District of Texas, Tyler Division, 2017 (deposition testimony).

## Securities and Related Matters

"LTV Securities Litigation" (**LTV**) MDL No. 371, United States District Court for the Northern District of Texas, Dallas Division, 1981-1982 (deposition testimony).

"Edward J. Whalen vs. Miller & Laventhol & Horwath, Miller & Schroeder Financial, Inc., et al." (**Miller & Schroeder Financial, Inc.; Miller & Schroeder, Inc.**) Civil Action No. 87-7280, United States District Court Eastern District of Pennsylvania, 1984-1989 (deposition testimony).

"Rosalind Wells vs. Southmark Corporation, et al." (**Southmark Corporation**) Civil Action No. 3-85-1518G, United States District Court for the Northern District of Texas, Dallas Division, 1989-1992 (affidavit testimony).

"Joseph B. Moorman, et al. vs. Southmark Corporation and Liquidity Fund, et al. vs. Southmark Corporation" (**National Realty**) Nos. 322135 and 332435, Superior Court of the State of California in and for the County of San Mateo, 1990 (deposition testimony).

"Jennie Farber vs. Public Service Company of New Mexico, et al." (**Public Service Company of New Mexico**) No. CIV-89-0456-JB-WWD, United States District Court for the District of New Mexico, 1991 (deposition testimony).

"Joel A. Gerber, et al. vs. International Telecharge, Inc., et al." (**International Telecharge, Inc.**) Civil Action No. CA3-89-1702-C, United States District Court for the Northern District of Texas, Dallas Division, 1991 (deposition testimony).

"First RepublicBank Securities Litigation" (**Salomon Brothers Inc.; Goldman, Sachs & Co.; Morgan Stanley & Co. Inc.; Ernst & Young**) Civil Action No. CA3-88-0641-H, United States District Court for the Northern District of Texas, Dallas Division, 1990-1992 (deposition testimony).

"Estate of Marvin H. Grove, Marvin M. Grove, Executor vs. Commissioner of Internal Revenue" (**Marvin H. Grove and Marvin M. Grove**) Docket No. 25765-90, United States Tax Court, 1992 (written testimony).

"The National Bank of Andrews vs. SouthTrust Securities, Inc. and Frank Petrusnea" (**SouthTrust Securities, Inc.**) No. 12,390, District Court Andrews County, Texas, 109th Judicial District, 1992, (deposition and trial testimony).

"City National Bank of Carrollton vs. SouthTrust Securities, Inc. and Frank Petrusnea" (**SouthTrust Securities, Inc.**) CA No. CA3-90-0980-T, United States District Court for the Northern District of Texas, Dallas Division, 1992 (deposition testimony).

"Eduardo Franco, et al. Complainant vs. Painewebber Incorporated and Rotan Mosle, Inc. Respondents and Ken Frost Third-Party Respondent" (**Grupo Infra**) Case No. 91-01176, Arbitration before the National Association of Securities Dealers, Inc., 1993 (resolved prior to testimony).

"Texas Hospital Insurance Exchange and Texas Hospital Insurance Network, Inc. vs. APS Facilities Management, Inc., et al." (**APS Facilities Management, Inc.**) No. 92-00089, District Court of Travis County, Texas, 261st Judicial District, 1993 (deposition and affidavit testimony).

"Bank One, Texas, N.A. vs. John B. Rogers, et al." (**John B. Rogers**) Cause No. 90-8482-CIV-MOORE, 1993-1996 (resolved prior to testimony).

"Apex Municipal Fund, Inc., et al. vs. N-Group Securities, Inc.; Patrick Graham; Keck, Mahin & Cate, et al." (**Keck, Mahin & Cate**) Civil Action No. H-92-546, United States District Court for the Southern District of Texas, Houston Division, 1994 (deposition and trial testimony).

"Texas Life, Health, Accident & Hospital Service Insurance Guaranty Association vs. Gaylord Entertainment Company, Individually and as Plan Sponsor for Retirement Savings Plan and Trust for Employees of the Gaylord Entertainment Company & Affiliated Corporations, et al." (**Gaylord Entertainment Company, Nations Bank of Texas, N.A., British Gas Exploration & Production, Inc., Cool Temp Awning & Siding Co., Baylor College of Medicine, Sperry Marine, Inc., First City, Texas-Houston, N.A., Tuboscope, Inc., Club Corporation of America, Club Corporation International, Ameritrust Texas N.A., CSC Credit Services Inc., Edinburg Hospital, Fissons Scientific Equipment, Curtis Mathison Scientific, Inc., Oklahoma Publishing Company, IDS Trust, Honeywell, Inc., National City Bank, Marathon Oil Company, Wachovia Bank of North Carolina, RJR Nabisco, Inc., Mellon Bank, N.A., Bally Manufacturing Corporation, State Street Bank & Trust Co., Asarco, Miles Inc., Pep Boys, Chase Manhattan Bank, N.A., Reynolds Metals Co., Ames Department Stores, Inc., Cabot Corporation, Crystal Brands, Inc., National Bank of Detroit, Exide, State Street Bank, Haynes, Harris Trust, IPC (Freudenberg), INB National Bank, Inland Container Corporation, Holiday Inns, Inc., Continental Trust Company, Underwriters Laboratories, Inc., Bank of Oklahoma, N.A., Hilti, Inc., Booz-Allen & Hamilton, Inc., Northern Trust Company, BW/IP International Inc., International Paper Company, Nations Bank of Virginia, James River Corporation, Vanguard Fiduciary Trust Company, Electronic Data Systems, Texas Commerce Bank, American Nukem Corporation, Xerox Corporation, Unisys Corporation, ICL, Inc., Putnam Fiduciary Trust Co., Putnam Companies**) Civil Action No. 94-CA-246-JN, United States District Court for the Western District of Texas, Austin Division, 1994 (affidavit testimony).

"Reuben Riskind, et al. vs. Prudential Securities, Inc. f/k/a Prudential-Bache Securities, Inc., Polaris Aircraft Income Fund I, Polaris Investment Management Corporation and Jerry Cohn, Individually and as Agent and/or Employee of Prudential Securities, Inc." (**GECC, Polaris Aircraft Income Fund I, Polaris Investment Management Corporation**) Case No. 94-02-12341-CV, District Court of Maverick County, Texas, 365th Judicial District, 1994-1995 (deposition and trial testimony).

"Larry Schwartz & Maxine Schwartz Against Kidder, Peabody & Co., Inc. and Polaris Securities Corp." (**GECC and Polaris Securities Corp.**) NASD No. 93-05299, National Association of Securities Dealers, 1995 (resolved prior to testimony).

"Thompson, et al. vs. Glenmede Trust Co., et al." (**Glenmede Trust Co.**) Civil Action No. 92-5233, United States District Court for the Eastern District of Pennsylvania, 1995 (resolved prior to testimony).

"Southwest Securities, Inc., f/k/a Barre & Company, Incorporated vs. Sungard Data Systems, Inc. and Sungard Financial Systems, Inc." (**Southwest Securities, Inc., f/k/a Barre & Company, Incorporated**) Cause No. 95-04987, District Court for Dallas County, Texas, 193rd Judicial District, 1997 (deposition testimony).

"Sledge W. Killion vs. Metropolitan Life Insurance Company, et al." (**Sledge W. Killion**) No. 95-05997, NASD Arbitration, 1996 (resolved prior to testimony).

"Murphy, et al. vs. Blockbuster Entertainment Corp., et al." (**Blockbuster Entertainment Corp.**) No. 94-10051-M, District Court Dallas County, Texas, 298th Judicial District, 1997 (deposition testimony).

"David Croucher, Steven J. Reins, and Thomas L. Thomas, Jr. vs. Midcon Corp. Employee Stock Ownership Plan Administrative Committee; US Trust Company of California, N.A.; Occidental Petroleum Corp.; L. Allyson Wolfe; John Doe 1; John Doe 2; John Doe 3; John Doe 4; John Doe 5; John Doe 6; John Doe 7; John Doe 8; John Doe 9; and John Doe 10" (**Employee Stock Option Plan (ESOP) of Mid-Continental Oil and Gas**) Civil Action No. H-98-4159, United States District Court for the Southern District of Texas, Houston Division, 1999 (resolved prior to testimony).

"Alexander P. Remenchik, MD vs. Lighthouse Capital Mgmt., Inc., Paul G. Horton, Kevin P. Duffy, and Chris Cobb" (**Lighthouse Capital Mgmt., Inc.**) No. 1999-32573, District Court Harris County, Texas, 280th Judicial District, 2000 (resolved prior to testimony).

"Cantwell Security Matter" (**Dr. Thomas Cantwell**) 2003 (no citation available—resolved prior to testimony).

"Rawls Family, LP, Rawls Management Corporation, Tax Matters Partner vs. The Commissioner of Internal Revenue" (**Rawls Family, LP, Rawls Management Corporation**) Docket No. 12938-07, United States Tax Office, 2006-2008 (resolved prior to testimony).

"J&J Fernandez, LP, JMJV Management Corporation vs. United States of America" (**J&J Fernandez, LP, JMJV Management Corporation**) Case No. 05-26T, United States Court of Federal Claims, 2007-2008 (deposition testimony).

"Southgate Master Fund, LLC by and through Montgomery Capital Advisors, LLC vs. United States of America" (**Southgate Master Fund, LLC**) Case No. 3-06-CV-2335-K, United States District Court for the Northern District of Texas, Dallas Division, 2008 (deposition and trial testimony).

"Ashford Hospitality Finance LP vs. Wachovia Bank, N.A. (**Ashford Hospitality Finance LP**) No. 09-06958, District Court of Dallas County, Texas 298th Judicial District, 2011 (resolved prior to testimony).

"Timothy Aden, et al. vs. Greenhunter Energy, Inc., et al." (**Greenhunter Energy, Inc.**) Case No. 70-198-Y-1024-10, American Arbitration Association, 2011 (resolved prior to testimony).

"In Re BP Securities Litigation." (**British Petroleum**) MDL No. 2185 Civil Action No. 4:10-MD-2185, United States District Court for the Southern District of Texas, Houston Division, 2014 (deposition testimony).

### Real Estate, Bankruptcy, Financial, Commercial, and Other Matters

"Roy J. Fuller, Jr., et al. vs. Ray Ellison Homes, Inc." (**Ray Ellison Homes, Inc.**) Case No. 85-CI-17918, District Court of Bexar County, Texas, 166th Judicial District, 1987 (deposition testimony).

"K.P. Properties, Inc., d/b/a Fondren Glen Apartments" No. 86-06714-H2-11; "Bammelwood 226 d/b/a Bammelwood Apartments" No. 87-00151-H2-11; "Beechnut Place Apartments II" No. 86-07793-H2-11; "Camino South Apartments" No. 87-00153-H2-11; "Chancellors Atrium Offices" No. 87-00154-H2-11; "El Dorado Place Apartments" No. 87-00155-H2-11; "Edgebrook Apartments" No. 87-01209-H2-11 (**United of Omaha Life Insurance Company and Connecticut Mutual Life Insurance Company**) United States Bankruptcy Court Southern District of Texas, Houston Division, 1987 (deposition and trial testimony).

"Eduardo Flores, et al. vs. Pioneer Concrete of Texas, Inc." (**Pioneer Concrete of Texas, Inc.**) Case No. 85-CI-02235, District Court of Bexar County, Texas, 73rd Judicial District, 1987 (deposition testimony).

"Boerne Stage Road Joint Venture, Debtor" (**Selected Creditors of Boerne Stage Road Ventures**) No. 88-52034-A, United States Bankruptcy Court, Western District of Texas, San Antonio Division, 1988 (resolved prior to testimony).

"Denton A. Cooley, M.D., d/b/a Cardiovascular Associates, et al." (**First City Bancorporation**) Case No. 88-00154-H5-11, United States Bankruptcy Court for the Southern District of Texas, Houston Division, 1988 (deposition testimony).

"Jon H. Wilson vs. Allied Bank Austin (now known as First Interstate Bank-Austin), et al." (**First Interstate Bank**) Cause No. 430,050, District Court of Travis County, Texas, 345th Judicial District, 1988 (resolved prior to testimony).

"Trammel Crow Co., et al. vs. Southwest Regional Consolidated Enterprises and Joe Brand, Inc." (**Trammel Crow Company**) No. 435,012, 1989 (resolved prior to testimony).

"Southwestern Bell Media, Inc. vs. Pleasure Pools, Inc." (**Southwestern Bell Media, Inc.**) Case No. W-88-CA-320, United States District Court for the Western District of Texas, Waco Division, 1989 (resolved prior to testimony).

"The Equity Group Underwriting Matter" (**The Equity Group**) 1989 (citation not available—resolved prior to testimony).

"Barker Ltd., Inc. vs. Linen Supermarket, Inc., d/b/a The Home Front and Tan Shires" (**Barker Ltd., Inc.**) Cause No. 89-533-3, District Court of McLennan County, Texas, 74th Judicial District, 1990 (resolved prior to testimony).

"Centex Communications Demand Forecasting Arbitration Matter" (**Centex Communications**) 1990 (citation not available— hearing testimony).

"Flagstone Petroleum Corporation vs. John S. Bullard, Jr., et al." (**Flagstone Petroleum Corporation**) No. 89-01-19019-CV, District Court of Erath County, Texas, 266th Judicial District, 1990 (deposition testimony).

"Tarrant County Water Control and Improvement District #1 vs. T.A. Bounds, et al." (**T.A. Bounds, et al.**) No. 245-88, District Court of Navarro County, Texas, 3rd Judicial District, 1990 (resolved prior to testimony).

"James C. Morgan and Donald H. Ray vs. J. Livingston Kosberg" (**First Gibraltar Savings & Loan**) No. 89-03566-A, District Court Dallas County, Texas, 14th Judicial District, 1990 (deposition testimony).

"Lomas Realty USA Bankruptcy Matter" (**Lomas Realty USA**) 1990 (citation not available—resolved prior to testimony).

"T.L. Delcambre, et al. vs. US Homes Corporation" (**US Homes Corporation**) Cause No. 87-01328, District Court of Harris County, Texas, 189th Judicial District, 1990 (resolved prior to testimony).

"Michael D. Lee d/b/a Mid-South Investments vs. Wal-Mart Stores, Inc." (**Wal-Mart, Inc.**) Civil Action No. M-88-126-CA, United States District Court for the Eastern District of Texas, Marshall Division, 1990 (deposition and trial testimony).

"James Slaughter, et al. vs. Farm & Home Savings Assoc., et al. and Mike Fenimore, et al. vs. Farm & Home Savings Assoc., et al." (**Monsanto Company**) Civil Action No. 89-1498, United States District Court for the Southern District of Texas, Houston Division, 1990 (deposition and trial testimony).

"Monsanto Company vs. Crum & Forster, Inc., Farm & Home Savings Association, et al." (**Monsanto Company**) No. 89-1063, District Court of Harrison County, Texas, 71st Judicial District, 1990 (resolved prior to testimony).

"Keep Hood Alive and Kicking, Inc., et al. vs. Department of the Army, et al." (**Keep Hood Alive and Kicking, Inc.--KHAKI**) No. 90-166, United States District Court for the Western District of Texas, Waco Division, 1990 (trial and affidavit testimony).

"Agricultural Services, Inc. vs. Motorola Communications & Electronics, Inc." (**Motorola Communications & Electronics, Inc.**) No. 1-89-0082-W, United States District Court for the Northern District of Texas, Abilene Division, 1990 (deposition testimony).

"NCNB Texas National Bank vs. Sterling Projects, Inc., et al." (**NCNB Texas National Bank**) Cause No. 89-10414-M, District Court of Dallas County, Texas, 298th Judicial District, 1990 (deposition testimony).

"Southmark Corporation, Debtor" (**Southmark Corporation**) Case No. 389363247AF-11, Chapter 11, United States Bankruptcy Court Northern District of Texas, Dallas Division, 1990 (affidavit testimony).

"North Dallas Residential Real Estate Matter" (**Gardere & Wynne**) 1991 (citation not available—resolved prior to testimony).

"Dennis E. Murphree vs. James R. Treptow, et al." (**Treptow Development**) Civil Action No. H-89-1319, United States District Court for the Southern District of Texas, Houston Division, 1991 (deposition testimony).

"One American Center Associates LP, d/b/a One American Center Metropolitan Club and Congress Executive Suites, Debtor" (**Teacher Retirement System of Texas**) Bankruptcy No. 90-12675 LEK Chapter 11, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, 1991 (deposition testimony).

"Oxy USA, Inc. vs. Railroad Commission of Texas" (**Oxy USA and Mobil Oil**) Cause No. 495,373, District Court of Travis County, Texas, 345 Judicial District, 1991 (trial testimony).

"John Deere Retail Equipment Matter" (**John Deere**) 1991 (citation not available—resolved prior to testimony).

"San Antonio Multi-Family Market Underwriting Litigation Matter" (**Fulbright & Jaworski**) 1991 (citation not available—resolved prior to testimony).

"Southwestern Bell Yellow Pages Advertising for Construction Services Matter" (**Southwestern Bell Yellow Pages**) 1991 (citation not available—resolved prior to testimony).

"Pedro Alfredo Anzaldua Jr., et ux. vs. Polly Ryon Memorial Hospital, et al." (**Polly Ryon Memorial Hospital**) No. 90-053379, District Court of Harris County, Texas, 215th Judicial District, 1991 (deposition and trial testimony).

"First National Bank of Abilene Lender Liability Matter" (**McMahon, Surovik, Suttle, Buhrmann, PC**) 1991 (citation not available—resolved prior to testimony).

"Houston Real Estate Working Capital Matter" (**Urquhart & Hassell**) 1991 (citation not available—resolved prior to testimony).

"Federal Savings and Loan Insurance Corporation, Receiver of Sun Belt Federal Bank, F.S.B. vs. Wendell P. Shelton, et al." (**Officers and Directors of Sun Belt Federal Bank. F. S. B**) Civil Action No. 86-393, United States District Court Middle District of Louisiana, 1991 (deposition testimony).

"Larry Gentry, Trustee vs. Texaco Inc., et al." (**Larry Gentry**) Cause No. 48-113402-88, District Court of Tarrant County, Texas, 48th Judicial District, 1991 (deposition testimony).

"Gateway Three Health Assoc., et al. vs. Ernst & Whinney" (**Ernest & Young**) Civil Action No. CA-4-87-281-A, United States District Court for the Northern District of Texas, Fort Worth Division, 1991 (deposition and trial testimony).

"FDIC vs. Anders, et al." (**Officers and Directors of Farmers Savings & Loan**) 1991 (resolved prior to testimony).

"Federal Deposit Insurance Corporation vs. Gus S. Mijalis, et al." (**Officers and Directors of the Bank of Commerce**) Civil Action No. 89-1316, United States District Court Western District of Louisiana, Shreveport Division, 1991 (deposition and trial testimony).

"Federal Deposit Insurance Corporation vs. Jones Day Reavis & Pogue, et al." (**Jones Day Reavis & Pogue**) Civil Action No. A-90-CA-925, United States District Court for the Western District of Texas, Austin Division, 1991 (resolved prior to testimony).

"Bright Management Bankruptcy Matter" (**Bright Management**) 1991 (citation not available—resolved prior to testimony).

"Michael E. Adkins, et al. vs. Chicago Title Insurance Company, et al." (**Chicago Title Insurance Company**) No. 90-CI-10820, District Court of Bexar County, Texas, 37th Judicial District, 1992 (deposition testimony).

"Ronald Louis Hedderich, M.D., et al. vs. Adolph H. Giesecke, M.D., et al." (**Ronald Louis Hedderich, M.D. and Rhonda Alicia Hedderich**) Civil Action No. CA-4-91-038E, United States District Court, 1992 (resolved prior to testimony).

"FDIC vs. Edward Israel, et al." (**Offers and Directors of Westwood Savings & Loan**) Case No. CV-87-4124-WDK, United States District Court, C.D., California, 1992 (resolved prior to testimony).

"Compaq Computer Corporation vs. Dell Computer Corporation and Goldberg Moser O'Neill" (**Dell Computer Corporation**) Civil Action No. H-91-0970, United States District Court for the Southern District of Texas, Houston Division, 1992 (resolved prior to testimony).

"Will Alexander Hadden III and Cindy Wilkerson vs. Wynne Moore Brown" (**Wynne Moore Brown**) No. 90-1953-A, County Court at Law of Smith County, Texas, 1992 (resolved prior to testimony).

"Dallas Retail Sales Matter" (**Middleton, Burns & Davis**) 1992 (citation not available—resolved prior to testimony).

"LaFarge Corporation vs. William R. Campbell, Executive Director of the Texas Air Control Board, and Jesus Garza, Executive Director of the Texas Water Commission" (**LaFarge Corporation**) Case No. 92-CA-079, United States District Court for the Western District of Texas, Austin Division, 1992 (affidavit testimony).

"FDIC vs. Grant Thornton, et al." (**Federal Deposit Insurance Corporation**) Civil Action No. 3-89-2295-X, United States District Court for the Northern District of Texas, Dallas Division, 1992 (resolved prior to testimony).

"American Casualty Company of Reading, Pennsylvania vs. National Bancshares Corporation of Texas, et al." (**American Casualty Company**) Civil Action No. SA-92-CA-0027, United States District Court for the Western District of Texas, San Antonio Division, 1992 (resolved prior to testimony).

"Larry Wallace, et al. vs. Duncan Aircraft Sales of Florida, Inc., and Prestige Touring, Inc." (**Duncan Aircraft Sales of Florida, Inc.**) No. 91-4808-H, District Court of Dallas County, Texas, 160th Judicial District, 1992 (deposition testimony).

"Sierra Club, Plaintiff, Guadalupe-Blanco River Authority, et al., Intervenors vs. Manuel Lujan, Jr. and the United States Fish and Wildlife Service, Defendants, Danny McFadin, et al., Intervenors" (**City of San Antonio**) Civil Action No. MO-91-CA069, United States District Court for the Western District of Texas, Midland/Odessa Division, 1992 (affidavit and trial testimony).

"First Republic Bancorporation Officers' and Directors' Liability Matter" (**First Republic Bancorporation Officers and Directors**) 1992 (citation not available—resolved prior to testimony).

"Federal Deposit Insurance Corporation vs. John A. Wright, et al." (**Directors of First State Bank, Abilene, Texas**) Civil Action No. 192-CV-0021, United States District Court for the Northern District of Texas, Abilene Division, 1992 (resolved prior to testimony).

"Marriott Information Systems, Inc. and Marriott Corporation vs. AMR Information Systems, Inc. and AMR Corporation" (**AMR Information Systems, Inc. and AMR Corporation**) Case No. 96336, Circuit Court for Montgomery County, Maryland, 1992 (resolved prior to testimony).

"Laurie Rae Dietrich, et al. vs. E.I. Dupont de Nemours and Company, Inc., et al." (**E.I. Dupont de Nemours and Company, Inc.**) No. 92-13007, District Court of Harris County, Texas, 127th Judicial District, 1992-1994 (deposition testimony).

"Irving I. Rubin, et al. vs. Southern Greyhound Lines, Inc. and Greyhound Lines, Inc." (**Southern Greyhound Lines, Inc.**) Cause No. 91-13156, District Court of El Paso County, Texas, 171st Judicial District, 1993 (resolved prior to testimony).

"Cheryl L. Thompson and Mary C. Thompson, et al. vs. Deloitte & Touche, et al." (**Warren Electric Company**) No. 232,239-401, Probate Court Number One (1) of Harris County, Texas, 1993 (deposition and trial testimony).

"Michael H. Gulley, et al. vs. Sunbelt Savings Association, et al." (**Officers and Directors of Sunbelt Savings**) Case No. CA3-88-1417-D, United States District Court for the Northern District of Texas, Dallas Division, 1993 (resolved prior to testimony).

"American Bank & Trust of Coushatta, Louisiana, et al. vs. Federal Deposit Insurance Corporation" (**Federal Deposit Insurance Corporation**) Case No. CV91-2268, 1993 (deposition testimony).

"Carter Wind Systems, Inc. vs. Johnson & Higgins of Texas, Inc." (**Johnson & Higgins of Texas, Inc.**) No. 133,591-A, District Court of Wichita County, Texas, 30th Judicial District, 1993 (resolved prior to testimony).

"Creighton University vs. American Medical International Inc. and AMISUB (St. Joseph Hospital), Inc." (**American Medical International Inc. and AMISUB (St. Joseph Hospital), Inc.**) Docket 886, Pg. 631, District Court of Douglas County, Nebraska, 1993 (resolved prior to testimony).

"American Medical International Inc. and AMISUB (St. Joseph Hospital), Inc. vs. Creighton University" (**American Medical International Inc. and AMISUB (St. Joseph Hospital), Inc.**) No. 92-10315-L, District Court of Dallas County, Texas, 193rd Judicial District, 1993 (resolved prior to testimony).

"Pan American Electronics Inc. vs. Tandy Corporation, Radio Shack Division" (**Tandy Corporation**) Cause No. C-2059-85-A, District Court Hidalgo County, Texas, 92nd Judicial District, 1993 (resolved prior to testimony).

"Mary Lynn Aldrich vs. MCI Telecommunications Corp. and Mark Smith/Marilyn Scamardo vs. MCI Telecommunications Corp. and Mark Smith" (**MCI Telecommunications Corp.**) No. 67-137217-91, District Court Tarrant County, Texas, 67th Judicial District, 1993 (resolved prior to testimony).

"Mary Ann Warlick vs. John L. White, M.D., et al." (**John L. White, M.D.**) No. 91-1445-A, District Court of Gregg County, Texas, 188th Judicial District, 1993 (resolved prior to testimony).

"Thomas Marshall McKamy vs. Gardere & Wynne, et al." (**Gardere & Wynne**) Consolidated No. 85-2293-P (A&B), Probate Court of Dallas County, Texas, 1993 (resolved prior to testimony).

"Phyllis Davenport vs. Barbara Burns and Barbara Burns, et al. vs. Phyllis Davenport, et al." (**Schuparra Financial Companies, Inc., Schuparra Securities Corporation, Kenton Place Limited Partnership, and SWT/Kenton, Inc.**) Cause No. 89-2229-3, District Court of McLennan County, Texas, 74th Judicial District, 1993 (resolved prior to testimony).

"Diana L. Jackson vs. MCI Telecommunications Corporation" (**MCI Telecommunications Corporation**) Case No. 92-2503, United States District Court for the District of Kansas at Kansas City, 1993 (resolved prior to testimony).

"Hackberry Land Partners I, et al. vs. Teachers Insurance & Annuity Association of America, et al." (**JMB Realty Corporation**) No. 3:92-CV-1142-D, United States District Court for the Northern District of Texas, Dallas Division, 1993-1996 (resolved prior to testimony).

"Hassan Ainetchian vs. MCI Telecommunications Corporation" (**MCI Telecommunications Corporation**) Civil Action No. 3:92-CV-2249-X, 1994 (resolved prior to testimony).

"Resolution Trust Corp. as Receiver for Alamo Federal Savings Association of Texas vs. Wilber L. Fite, et al." (**Alamo Federal Savings Association of Texas**) Civil Action No. SA-92-CA-0196, United States District Court for the Western District of Texas, San Antonio Division, 1994 (resolved prior to testimony).

"Danny Joe Dickens and Carolyn Raye Dickens vs. First American Bank Sulphur Springs, N.A., Barry Orr, and the United States Small Business Administration" (**First American Bank Sulphur Springs**) Cause No. 3:94-CV-9, United States District Court for the Eastern District of Texas, Paris Division, 1994 (resolved prior to testimony).

"Southwest Savings Officers' and Directors' Liability Matter" (**Officers and Directors of Southwest Savings**) 1994 (citation not available—resolved prior to testimony).

"Albert W. Dugan, et al. vs Standard Gypsum Corp. & Caraustar Industries, Inc." (**Minority Shareholders of Standard Gypsum Corp.**) No. 92-12007-C, District Court of Dallas County, Texas, 68th Judicial District, 1994 (resolved prior to testimony)

"Russell Harris vs. Houstonian, Inc., et al." (**Russell Harris**) No. 89-004517, District Court of Harris County, Texas, 165th Judicial District, 1994 (resolved prior to testimony).

"Jerry J. Quick, et al. vs. City of Austin" (**Circle C Land Corporation**) No. 92-0637, District Court of Hays County, Texas, 22nd Judicial District, 1994 (resolved prior to testimony).

"The Federal Deposit Insurance Corporation, in its Separate Corporate Capacity and As Receiver of Ingram State Bank vs. Charles Schreiner, III, et al." (**Officers and Directors of Schreiner Bank**) Civil Action No. SA-93-CA-0674, United States District Court for the Western District of Texas, San Antonio Division, 1994-1995 (deposition testimony).

"Thomas J. Blankenship vs. Texas State Technical Institute, et al." (**Texas State Technical Institute**) Cause No. 94-3686-3, District Court of McLennan County, Texas, 19th Judicial District, 1995 (deposition testimony).

"F. Buddie Contracting Company vs. City of Cleveland, Ohio, et al." (**City of Cleveland**) Case No. 1:93CV-2010, United States District Court for the Northern District of Ohio Eastern Division, 1995 (resolved prior to testimony).

"Sierra Club, Plaintiff, Guadalupe-Blanco River Authority, et al., Plaintiff-Intervenors vs. Bruce Babbitt and the United States Fish and Wildlife Services, Defendants, Danny McFaddin, et al., Defendant-Intervenors" (**City of San Antonio-Defendant-Intervenor**) Civil Action No. MO-91-CA069, United States District Court for the Western District of Texas, Midland/Odessa Division, 1995 (hearing testimony).

"Carolyn Jean Thomas, et al. vs. Christopher William Brosky, et al." (**Chevron USA, Inc.**) Cause No. 348-147989-93, District Court of Tarrant County, Texas, 348th Judicial District, 1995 (resolved prior to testimony).

"Tejas Testing Technology One, L.C., Tejas Testing Technology Two, L.C., and Snap-On Incorporated vs. Texas Natural Resource Conservation Commission, et al." (**Snap-On Incorporated**) Cause No. 95-05307, District Court of Travis County, Texas, 353rd Judicial District, 1995 (resolved prior to testimony).

"Curb, Inc. vs. City of Bryan, Texas, et al." (**City of Bryan**) No. 9504263, District Court of Travis County, Texas, 353rd Judicial District, 1995 (deposition and trial testimony).

"Global Octanes Corporation and Global Octanes Texas L.P. vs. Kubota Corporation, et al." (**Kubota Corporation and M.W. Kellogg Company**) Cause No. 94-21977, District Court of Harris County, Texas, 11th Judicial District, 1995 (resolved prior to testimony).

"DeMarini Sports, Inc. vs. Amateur Softball Association of America, et al." (**DeMarini Sports, Inc.**) CIV-94-1280R, United States District Court for the Western District of Oklahoma, Oklahoma City Division, 1995 (resolved prior to testimony).

"Martha C. Martinez, et al. vs. Calmac Suites Ltd., et al." (**Calmac Suites Ltd.**) Cause No. C-5042-93-B, District Court of Hidalgo County, Texas, 93rd Judicial District, 1995 (resolved prior to testimony).

"James Howard, Special Deputy Receiver for Texas Employers' Insurance Association vs. KPMG Peat Marwick" (**KPMG Peat Marwick**) Cause No. 93-05461, District Court of Travis County, Texas, 53rd Judicial District, 1995-1996 (deposition testimony).

"Jack Webb, Special Deputy Receiver for Employers' Casualty Company vs. KPMG Peat Marwick" (**KPMG Peat Marwick**) Cause No. 94-02564, District Court of Travis County, Texas, 53rd Judicial District, 1995-1996 (resolved prior to testimony).

"David's Supermarkets, Inc. vs. Fleming Companies, Inc., Fleming Foods of Texas, Inc. and James E. Stuard" (**David's Supermarkets, Inc.**) No. 246-93, District Court of Johnson County, Texas, 18th Judicial District, 1995-1996 (deposition and trial testimony).

"John B. McClane, et al. vs. Ogden Corporation, et al." (**Ogden Corporation**) Cause No. 48-151833-94, District Court of Tarrant County, Texas, 48th Judicial District, 1995-1996 (resolved prior to testimony).

"Jerry L. Perry vs. Videojet Systems International, Inc." (**Peritech, Inc.**) Civil Action No. 4:86-CV-538-Y, United States District Court for the Northern District of Texas, Fort Worth Division, 1995-1996 (deposition and trial testimony).

"American Nurses for Nurses, Inc., d/b/a Stat Medical Services vs. National Union Fire Insurance Company of Pittsburgh, PA, et al." (**National Union Fire Insurance Company of Pittsburgh, PA; AI Management and Professional Liability Claim Adjusters, a Division of American International Adjustment Company, Inc.; AIG Claims Services, f/k/a American International Adjustment Company, Inc., a/k/a AI Adjustment Company, Inc.; Smith Bell & Thompson, Inc.**) Civil Action No. H-94-4392, United States District Court for the Southern District of Texas, Houston Division, 1995-1996 (resolved prior to testimony).

"Shanks, et al. vs. Caliber System, Inc." (**Cherry Davis Harrison Montez Williams & Baird PC**) 1996 (full citation not available—resolved prior to testimony).

"Amelia Garza, et al. vs. Amerada Hess Corporation, et al. (Consolidated)" (**Amerada Hess Corp.; Citgo Petroleum Corp.; Oxy Chemical Corp.; Oxy CH Corp.; Occidental Chemical Corp.; Koch Refining Co.; The Coastal Corp.; Coastal Refining and Marketing, Inc.; American Chrome & Chemicals, Inc.; Javelina Co.; Southwestern Refining Co., Inc.**) 93-3348-A, District Court of Nueces County, Texas, 28th Judicial District, 1996-2000 (deposition testimony).

"Accelerated Christian Education Valuation Matter" (**Accelerated Christian Education (A.C.E.), Inc.**) American Arbitration Association, 1996 (citation not available—hearing testimony).

"Debra Wolf vs. Nationwide Mutual Insurance Company" (**Nationwide Mutual Insurance Company**) Cause No. 154,103-C, District Court of Bell County, Texas 169th Judicial District, 1996 (trial testimony).

"Friemark-Blair & Co., Inc., et al. vs. Nipsco Industries, Inc., et al." (**Triumph Natural Gas, Inc.**) Cause No. 95-036553, District Court of Harris County, 129th Judicial District, 1996 (deposition testimony).

"Tenneco Power Generation Company vs. The City of College Station, The City of Bryan, and Enserch Development Corporation" (**Enserch Development Corporation**) Cause No. 96-30013, District Court of Harris County, Texas, 1996 (resolved prior to testimony).

"Andres Torres vs. Lockheed Support Systems, Inc." (**Lockheed Corporation**) No. 154,945-B, District Court of Bell County, Texas, 146th Judicial District, 1996 (resolved prior to testimony).

"Dale Jackson vs. Lockheed Support Systems, Inc." (**Lockheed Corporation**) No. W-95-CA-342, United States District Court for the Western District of Texas, Waco Division, 1996, (resolved prior to testimony).

"Linn-Faysville Aquifer Preservation Association, et al. vs. Republic Waste Industries, Inc., et al." (**Republic Waste Industries, Inc.**) Cause No. C-4430-95-F, District Court of Hidalgo County, Texas, 1996 (resolved prior to testimony).

"Arbitration Between Alpha Products, Inc. and Omega Plastics, Inc." (**Alpha Products, Inc.**) Case No. 30-J-1999-00226-95, American Arbitration Association, 1996 (resolved prior to testimony).

"TransTexas Gas Corporation and ICA Energy, Inc. vs. Tennessee Gas Pipeline Company and CXY Energy, Inc." (**TransTexas Gas Corporation**) No. C-94-240-B, District Court of Ector County, Texas, 244th Judicial District, 1996-1997 (deposition testimony).

"Janie Navarro, et al. vs. Colonial Pipeline Company, Texaco, Inc., et al." (**Colonial Pipeline Company and Texaco, Inc.**) No. 094-52872, District Court of Harris County, Texas, 281st Judicial District, 1996-1998 (resolved prior to testimony).

"Transamerican Natural Gas Corporation vs. El Paso Natural Gas Company, et al." (**Transamerican Natural Gas Corporation**) No. 96-06635-E, District Court of Dallas County, Texas, 101st Judicial District, 1996-2000 (deposition and affidavit testimony).

"Transamerican Natural Gas Corporation vs. Liberty Mutual Insurance Company" (**Transamerican Natural Gas Corporation**) Civil Action No. H-94-3822, United States District Court for the Southern District of Texas, Houston Division, 1996-1997 (resolved prior to testimony).

"West vs. Investment Corporation of America Matter" (**Investment Corporation of America**) 1997 (citation not available—deposition testimony).

"The State of Texas vs. Meadows Foundation Incorporated, et al." (**Texas National Research Laboratory Commission**) Cause No. 92-C-3048, 1997 (resolved prior to testimony).

"Jewell Hoffman vs. Dr. George W. Carlson, Dr. R.E. Engles, M.D., and the Medical Center of Southeastern Oklahoma." (**Medical Center of Southeastern Oklahoma**) Case No. CIV-97-140-2, United States District Court Eastern District of Oklahoma, 1997 (resolved prior to testimony).

"Rexair, Inc. vs. George James, Wool Sanity S.P.A. a/k/a W.S. S.P.A." (**Wool Sanity S.P.A. a/k/a W.S. S.P.A.**) Civil Action No. 3-96-CV1283-G, United States District Court for the Northern District of Texas, Dallas Division, 1997 (resolved prior to testimony).

"Carey Hobbs vs. Coopers & Lybrand, LLP, et al." (**Coopers & Lybrand, LLP**) Case No. 96-19334, 170th Judicial District Court, 1997 (resolved prior to testimony).

"Maxine and D.G. McBee vs. William Kevin Luick and CST Drilling Fluids, Inc." (**CST Drilling Fluids, Inc.**) Cause No. 44,110-272, District Court of Brazos County, Texas, 272nd Judicial District, 1997 (resolved prior to testimony).

"Furr's Supermarkets, Inc. vs. Fleming Companies, Inc., William M. Lawson, and Thomas L. Zaricki" (**Furr's Supermarkets, Inc.**) No. CIV-97-0410 JC/RLP, United States District Court for the District of New Mexico, 1997 (resolved prior to testimony).

"Fort Worth Turf Farm Matter" (**Chicago Title Insurance**) 1997 (citation not available—resolved prior to testimony).

"Kenneth Coats vs. A&K Railroad Materials, Inc." (**A&K Railroad Materials, Inc.**) Cause No. H-96-4320, United States District Court for the Southern District of Texas, Houston Division, 1997 (resolved prior to testimony).

"Carver Dan Peavy and Sally Peavy vs. WFAA-TV, Inc., et al." (**WFAA-TV, Inc. and A.H. Belo Corporation**) Civil Action No. 3:96-CV-2945-R, United States District Court for the Northern District of Texas, Dallas Division, 1997 (resolved prior to testimony).

"Eugene M. Oliver, et al. vs. WFAA-TV, Inc., et al." (**WFAA-TV, Inc. and A.H. Belo Corporation**) Civil Action No. 3:96-CV-3436-G, United States District Court for the Northern District of Texas, Dallas Division, 1997 (resolved prior to testimony).

"Healthsouth Orthopedic Services, Inc., et al. vs. David A. Valcik" (**Healthsouth Orthopedic Services, Inc.**) Cause No. 96-13061-B, District Court of Dallas County, Texas, 44th Judicial District,1997 (resolved prior to testimony).

"Union Pacific Resources Company vs. Chesapeake Energy Corporation and Chesapeake Operating, Inc." (**Union Pacific Resources Company**) Civil Action No. 4-96-CV-726-Y, United States District Court for the Northern District of Texas, Fort Worth Division, 1997 (resolved prior to testimony).

"Manufacturing Facility Value Litigation Matter" (**Keith & Weber**) 1998 (citation not available—resolved prior to testimony).

"Sun Communications, Inc. vs. SunTech Processing Systems, LLC, Cash Delivery Systems, LLC, UICI f/k/a United Insurance Companies, Inc. and Ronald L. Jensen" (**SunTech Processing Systems, LLC**) No. 98-01051-A, District Court of Dallas County, Texas, 14th Judicial District, 1998 (deposition testimony).

"Robert Ted Enloe, III and Bradley S. Buttermore vs. Colony Capital, Inc., et al." (**Colony Capital, Inc.**) Cause No. 96-11810-A, District Court of Dallas County, Texas, 14th Judicial District, 1998 (resolved prior to testimony).

"Ethel Spiller, et al. vs. Longhorn Partners Pipeline, L.P., et al." (**Longhorn Partners Pipeline, L.P.**) Civil Action No. A-98-CA-255-SS, United States District Court for the Western District of Texas, Austin Division, 1998 (affidavit testimony).

"Refining Facility Valuation Litigation Matter" (**Keith & Weber**) 1998 (citation not available—resolved prior to testimony).

"National Lube Oil Service, Inc. vs. Halliburton Industrial Services, et al." (**Halliburton Industrial Services; Halliburton Company; Halliburton Services; Brown & Root, Inc.; Brown & Root Industrial Services, Inc.; HydroChem Industrial Services, Inc.**) Case Number CV-970901677CV, Circuit Court, 13th Judicial Circuit of Alabama, Mobile County, 1998 (deposition testimony).

"Lyondell Petrochemical Company vs. Colonial Pipeline Company, et al." (**Colonial Pipeline Company and Texaco Pipeline, Inc.**) No. 94-52872-H, District Court of Harris County, Texas, 295th Judicial District, 1998-1999 (resolved prior to testimony).

"Progressive Concepts, Inc. vs. Southwestern Bell Mobile Systems, Inc., et al." (**Southwestern Bell Mobile Systems, Inc.**) Cause No. 153-166909-66, District Court of Tarrant County, Texas, 153rd Judicial District, 1998-1999 (resolved prior to testimony).

"RAS Holdings Corp., Presby Corp., and Dr. Ronald A. Schachar vs. Vorys, Sater, Seymour & Pease, LLP and Thomas R. Boland" (**RAS Holdings Corp.**) Civil Action No. 3-98CV2337-P, United States District Court for the Northern District of Texas, Dallas Division, 1998-1999 (resolved prior to testimony).

"The Procter & Gamble Company and the Procter & Gamble Distributing Company vs. Amway Corporation, et al." (**Amway Corporation**) Civil Action No. H-97-2384, United States District Court for the Southern District of Texas, Houston Division, 1998-1999 (deposition and trial testimony).

"Northwest Independent School District vs. Denton Central Appraisal District, FW Sports Authority, Inc., Texas Motor Speedway, Inc., City of Fort Worth, Texas, and Denton County, Texas" (**Texas Motor Speedway, Inc.**) Cause No. 97-20568-158, District Court of Denton County, Texas, 158th Judicial District, 1999 (resolved prior to testimony).

"Joe Carrabba, Jr., et al. vs. Tom Thumb Food & Drugs, Inc., Randalls Food Markets, Inc., and The Management Security Plan for Cullum Companies." (**Employee Retirement System of Tom Thumb, Inc.**) Civil Action No. 4:96-CV-651-A, United States District Court for the Northern District of Texas, Fort Worth Division, 1999 (deposition and trial testimony).

"Payless Housing, Inc. d/b/a American Spirit Homes vs. Clayton Homes, Inc., CMH Manufacturing, Inc., and CMH Homes, Inc." (**Payless Housing, Inc. d/b/a American Spirit Homes**) Civil Action No. 598CV365, United States District Court for the Eastern District of Texas, Texarkana Division, 1999 (deposition testimony).

"Amway Corporation vs. Procter & Gamble Arbitration Matter" (**Amway Corporation**) 1999 (citation not available—resolved prior to testimony).

"Estate of Albert Strangi, Deceased vs. Commissioner" (**Stranco, Inc.**) Internal Revenue Service, 1999 (citation not available—resolved prior to testimony).

"Harold M. Griffin vs. The Mutual Life Insurance Company of New York, Mony Life Insurance Company and Ed McGrew" (**The Mutual Life Insurance Company of New York**) No. DV98-530, District Court of Dallas County, Texas, 162nd Judicial District, 1999 (resolved prior to testimony).

"Edgar Lee Jones and Francis Jones vs. Allis Chalmers Product Liability Trust, et al." (**Allis Chalmers**) Cause No. 96-09038-D, District Court of Dallas County, Texas, 95th Judicial District, 1999 (resolved prior to testimony).

"Arbitration between Blanchard and Company, Inc. and Heritage Capital Corporation" (**Heritage Capital Corporation**) Case No. 71-148-00517-98, American Arbitration Association, 1999 (resolved prior to testimony).

"FMC Corporation and Frigoscandia Inc. vs. Michael Townsend" (**FMC Corporation and Frigoscandia Inc.**) Civil Action No. A99CA628JN, United States District Court for the Western District of Texas, Austin Division, 1999 (resolved prior to testimony).

"Crown Central Petroleum Corp. vs. Local 4-227, Oil Chemical & Atomic Workers International Union, AFL-CIO, et al." (**Crown Central Petroleum Corp.**) No. 98,119, United States District Court for the Southern District of Texas, Houston Division 1999 (deposition testimony).

"Dawson County Gin, Inc. vs. Chickasha Cotton Oil Company, d/b/a Lamesa Cotton Oil Mill" (**Dawson County Gin, Inc.**) Arbitration Proceedings Pursuant to the Federal Arbitration Act and the Texas State Arbitration Statutes, 1999-2000 (deposition, hearing, and trial testimony).

"Hunter Schuehle vs. Bruce Babbitt, et al." (**Edwards Aquifer Authority and the Foundation for Social Justice**) MO-99-CA-40, United States District Court for the Western District of Texas, Midland-Odessa Division, 1999-2000 (affidavit testimony).

"Friends for American Free Enterprise Association vs. Wal-Mart Stores, Inc., d/b/a Sam's Club" (**Wal-Mart Stores, Inc.**) Civil No. 2-00CV160 TJW, United States District Court for the Eastern District of Texas, Marshall Division, 2000 (affidavit testimony).

"American Realty Trust (ART) Midwest, Inc. and American Realty Trust, Inc. vs. David M. Clapper, Atlantic Midwest LLC, Atlantic XIII, LLC and Art Midwest, LP" (**ART Midwest, Inc. and American Realty Trust, Inc.**) Cause No. DV99:4535, District Court of Dallas County, Texas, 2000 (resolved prior to testimony).

"American Realty Trust (ART) 57 Properties, Inc. vs. Milewood International, Inc., et al." (**ART 57 Properties, Inc.**) Index No. 98/606137, Supreme Court of the State of New York County, New York, 2000 (resolved prior to testimony).

"United States of America Ex Rel. James M. Churchill vs. The State of Texas, Texas Department of Human Services, et al." (**James M. Churchill**) Civil Action No. P-97-CA-57, United States District Court for the Western District of Texas, Pecos Division, 2000 (resolved prior to testimony).

"Avatex Corporation vs. McKesson Corporation, et al." (**Zeneca**) No. 97-00311-D, District Court of Dallas County, Texas, 95th Judicial District, 2000 (resolved prior to testimony).

"Edward T. Haines, Jr., et al. vs. Briar Ridge Investments, Inc., et al." (**Edward T. Haines, Jr. and Colliers Baldwin-Texas LLC**) No. 219-378-99, District Court of Collin County, Texas, 219th Judicial District, 2000 (resolved prior to testimony).

"Michael Valentine vs. Warren Electric Company and Cheryl L. Thompson" (**Michael Valentine**) Civil Action No. H-99-3712, United States District Court for the Southern District of Texas, Houston Division, 2000 (resolved prior to testimony).

"Basic Capital Management, Inc., et al. vs. Dynex Commercial, Inc." (**Basic Capital Management, Inc.**) Civil Action No. 3:99-CV-1010-T, United States District Court for the Northern District of Texas, Dallas Division, 2000-2004 (deposition, affidavit, and trial testimony).

"Amway Corporation vs. Procter & Gamble Company, et al." (**Amway Corporation**) Case No. 1:98-CV-726, United States District Court for the Western District of Texas, Southern Division, 2001 (affidavit and deposition testimony).

"Reata Restaurants, Inc., and Reata Restaurants Management Co., Ltd. vs. Loutex Fort Worth LP; Loutex Fort Worth LLC; CW Dalcan Management Services, LLC; Trammell Crow Company; and Ron Cherry" (**Reata Restaurants, Inc. and Reata Restaurants Management Co., Ltd.**) Cause No. 348-183899-00, District Court of Tarrant County, Texas, 348th Judicial District, 2001 (deposition testimony).

"Coburn Supply Company, Inc. vs. Kohler Co." (**Coburn Supply Company, Inc.**) No. 1:00-CV-00306, United States District Court for the Eastern District of Texas, Beaumont Division, 2001 (deposition and trial testimony).

"Hillwood Enterprises, LP d/b/a Hillwood Investments vs. Los Nietos de Turner Limited Partnership, et al." (**TETCO**) Cause No. 00-0239, District Court of Houston County, Texas, 3rd Judicial District, 2001 (resolved prior to testimony).

"International Truck and Engine Corporation vs. Brett Bray" (**International Truck and Engine Corporation**) No. A-00CA-688JN, United States District Court for the Western District of Texas, Austin Division, 2001 (resolved prior to testimony).

"Sunshine Mining and Refining Company vs. Ernst & Young, LLP" (**Ernst & Young, LLP**) Cause No. CC-00-6081-A, County Court at Law No. 1, Dallas, Texas, 2001 (resolved prior to testimony).

"Gary Albertson, D.O., et al. vs. American Home Products Corp., et al." (**American Home Products Corp.**) Cause No. 00-02-19671-CVW, District Court of Ward County, Texas, 143rd Judicial District, 2001 (resolved prior to testimony).

"Brazos Electric Power Cooperative, Inc. vs. Mirant Americas Energy Marketing, LP" (**Brazos Electric Power Cooperative, Inc.**) American Arbitration Association, 2002 (resolved prior to testimony).

"Southside Dodge Sales, Inc. d/b/a Allen Samuels Dodge vs. Mid-Continent Casualty Company of Tulsa, OK" (**Allen Samuels Dodge**) Cause No. 67-179145-99, District Court of Tarrant County, Texas, 67th Judicial District, 2002-2006 (deposition testimony).

"Raytheon E-Systems, Inc. vs. Bombardier Inc." (**Raytheon E-Systems, Inc.**) Cause No. 63562, District Court of Hunt County, Texas, 196th Judicial District, 2002 (resolved prior to testimony).

"Rental Car Franchise Matter" (**Avis Budget Group**) 2002 (citation not available—resolved prior to testimony).

"The City of Shoreacres, et al. vs. Colonel Leonard D. Waterworth, et al., The Port of Houston Authority, Intervenor" (**The Port of Houston Authority**) Civil Action No. H-03-2443, United States District Court for the Southern District of Texas, Houston Division, 2003-2004 (affidavit testimony).

"Corporacion Durango, S.A., DE C.V. vs. Grant Thornton LLP and Durango Paper Company vs. Grant Thornton LLP" (**Corporacion Durango, S.A., DE C.V.**) Docket Nos. MID-L-6468, MID-L-6893-05, Superior Court of New Jersey Law Division, Middlesex County, 2003-2007 (deposition testimony).

"Barsness Service Group, Inc. vs. Bug Master Exterminating Service, Ltd." (**Barsness Service Group, Inc.**) Civil Action No. SA-03-CA-0514-OG, United States District Court for the Western District of Texas, San Antonio Division, 2004 (resolved prior to testimony).

"Beverly Gollan vs. Ronald Disney, Michael Bingham, Disney Bingham Investments, Inc., and GAI Lewisville, Inc." (**Disney Bingham Investments, Inc. and GAI Lewisville, Inc.**) Cause No. 03-10788, District Court Dallas County, Texas, 14th Judicial District, 2004 (resolved prior to testimony).

"Rose Plair vs. Wyeth (f/k/a American Home Products Corporation), et al." (**Wyeth f/k/a American Home Products Corporation**) No. 2001-32833, District Court of Harris County, Texas, 189th Judicial District, 2004-2005 (resolved prior to testimony).

"Silber/I-10 Venture, Ltd., f/k/a Rocksprings, Ltd. vs. Falcon Interests Realty Corp. a/k/a, d/b/a Falcon Group Development, a/k/a, d/b/a Falcon Group Construction; Cooper Cameron Corporation and Cooper Industries, Inc." (**Cooper Cameron Corporation and Cooper Industries, Inc.**) Cause No. 02-CV-0991, District Court of Galveston County, Texas, 212th Judicial District, 2004-2005 (deposition testimony).

"Mark C. Mecum and Lori L. Mecum, Individually and on Behalf of Mitchell C. Mecum vs. Host Marriott Corporation, et al." (**Host Marriott Corporation; HMC Charlotte LP; HMC Charlotte (Calgary) Company; Calgary Charlotte Holdings Company; Calgary Charlotte Partnership; HMC Grace (Calgary) Company; Marriott International, Inc.; Marriott International Hotels, Inc.; Marriott Hotels of Canada, Ltd; Host Marriott International**) Civil Action No. 4:04-CV-260, United States District Court for the Eastern District of Texas, Sherman Division, 2005 (deposition testimony).

"Cooper Cameron Corporation Environmental Matter" (**Cooper Cameron Corporation**) 2005 (citation not available—resolved prior to testimony).

"Paul Kelley, et al. vs. Bayer Corporation" (**Wyeth**) Case No. 1:01-CV-872, United States District Court for the Eastern District of Texas, Beaumont Division, 2005 (resolved prior to testimony).

"Pamala Janca, et al. vs. Magna International, Inc., et al." (**Magna International, Inc.**) Civil Action No. 2:04-CV-95-TJW, United States District Court for the Eastern District of Texas, Marshall Division, 2005 (resolved prior to testimony).

"Milton Ray Doss and Wife, Charlene Doss vs. George P. Bane, Inc." (**George P. Bane, Inc.**) Cause No. 51 354-A, County Court at Law No. 2, Smith County, Texas, 2006 (deposition testimony).

"Periodical Services, Inc. vs. EKS Ventures, LLC" (**Periodical Services, Inc.**) Case No. 70-180-00431-06, American Arbitration Association, 2006 (resolved prior to testimony).

"Siesta Village Market, LLC, et al., Plaintiffs vs. Rick Perry, Governor of Texas, Greg Abbott, Attorney General of Texas, and John T. Steen, Jr., Gail Madden, and Jose Cuveas, Jr. Commissioners of the Texas Alcoholic Beverage Commission, Defendants. Glazer's Wholesale Drug Company, Inc., Samco, Inc., and Republic Beverage Company, Intervenors" (**Glazer's Wholesale Drug Company, Inc. and Republic Beverage Company**) Civil Action No. 3-06CV-0585D Consolidated with Civil Action No. 4:06-CV-232-A, United States District Court for the Northern District of Texas, Dallas Division, 2006-2007 (resolved prior to testimony).

"In the Matter of the Marriage of Lisa J. Bennett and Montgomery Jack Bennett, et al." (**Lisa J. Bennett**) No. DF-06-2006-U, District Court of Dallas County, Texas, 302nd Judicial District, 2006-2007 (resolved prior to testimony).

"Bopco, LP vs. KCP Energy Investors, Inc."  (**KCP Energy Investors, Inc.**) Case No. 71-198-Y-00749-06, American Arbitration Association, 2006-2007, (resolved prior to testimony).

"Global Enterprises a/k/a EGlobal, et al. vs. Incell, Inc., Teksa Innovations Corp., and Satai Network Foundation d/b/a Satai, et al. (**Global Enterprises a/k/a EGlobal**) Case No. 2006-CI-13868, District Court of Bexar County, Texas, 166th Judicial District, 2007 (deposition testimony).

"Ross Riley vs. Axis Media, LLC" (**Ross Riley**) No. 06-11-843, District Court of Wise County, Texas, 271st Judicial District, 2007 (resolved prior to testimony).

"Corilant Financial, LP and Corilant Financial Management, LLC vs. Fiduciary Financial Services of the Southwest, Inc., et al." (**Corilant Financial, LP and Corilant Financial Management, LLC**) Case No. 07-07361, District Court of Dallas County, Texas, 116th Judicial District, 2008 (deposition and affidavit testimony).

"Texas Health Resources vs. Triad-Denton Hospital, GP, LLC, Triad-Denton Hospital, LP, and CHS/Community Health Systems, Inc." (**Texas Health Resources**) Civil Action No. 4:07-CV-450, United States District Court for the Eastern District of Texas, Sherman Division, 2008 (deposition and affidavit testimony).

"Rajan Bhakta and Raj, Ltd. vs. Harper-Kennedy and Associates, Inc., Underwriters of Lloyds, London and Totura & Company, Inc." (**Lloyds of London**) No. 18,669, District Court of Nolan County, Texas, 32nd Judicial District, 2008 (resolved prior to testimony).

"Villas at Parkside Partners d/b/a/ Villas at Parkside, Lakeview at Parkside Partners, Ltd. d/b/a Lakeview at Parkside, Chateau Ritz Partners d/b/a Chateau de Ville, and Mary Miller Smith vs. The City of Farmers Branch, Texas" (**Villas at Parkside Partners d/b/a/ Villas at Parkside, Lakeview at Parkside Partners, Ltd. d/b/a Lakeview at Parkside, Chateau Ritz Partners d/b/a Chateau de Ville**) Civil Action No. 3-08-CV-1551-B, United States District Court for the Northern District of Texas, Dallas Division, 2008 (resolved prior to testimony).

"Crossmark, Inc. and Markatec, LLC, Individual and Derivatively on Behalf of Local Marketing Corporation d/b/a J. Brown vs. Grey Global Group, Inc., WPP Group Plc, G2, a Business Unit of Grey Global Group, Inc., et al." (**Crossmark, Inc.; Markatec, LLC; Local Marketing Corporation d/b/a J. Brown**) Case No. 06-10978-G, District Court of Dallas County, Texas, 134th Judicial District, 2008 (deposition and affidavit testimony).

"D&D Power, LLC vs. Walker Centrifuge Services, LLC; Premier Solids Control, LLC; Charles W. Walker; Brett Williamson; Charles Birchell; Tracy Taylor; Jeffrey Garner; and Blue Beacon International, Inc." (**Walker Centrifuge Services, LLC**) Cause No. 07-07-541, District Court of Wise County, Texas, 271st Judicial District, 2008 (resolved prior to testimony).

"Glazer's Wholesale Drug Company, Inc. and Glazer's Distributors of Louisiana, Inc. vs. Klein Foods, Inc. d/b/a Rodney Strong Vineyards" (**Glazer's Wholesale Drug Company, Inc.**) No. 3:08-CV-0774-L, United States District Court for the Northern District of Texas, Dallas Division, 2009 (deposition testimony).

"Quicksilver Resources Inc. vs. Eagle Drilling, LLC and Eagle Domestic Drilling Operations, LLC" (**Quicksilver Resources Inc.**) Case No. H-08-868, United States District Court for the Southern District of Texas, Houston Division, 2009 (resolved prior to testimony).

"Jim Caplinger and Judy Caplinger vs. Atmos Energy Corporation, et al." (**Atmos Energy Corporation; Energy Transfer Fuel, LP; Energy Transfer Fuel GP, LLC; Enbridge Gathering, LP; Enbridge Pipelines, LP; Enbridge Holdings, LLC; Chesapeake Energy Marketing, Inc.; Crosstex Energy Services, LP; Crosstex Operating GP, LLC; Crosstex in Texas Gathering, LP; Crosstex North Texas Pipeline, LP; Crosstex Energy Services GP, LLC**) Cause No. 2007-60195-393, District Court of Denton County, Texas, 393rd Judicial District, 2009 (resolved prior to testimony).

"Glazer's Wholesale Drug Company, Inc. and Glazer's Distributors of Louisiana, Inc. vs. The Wine Group, Inc." (**Glazer's Wholesale Drug Company, Inc. and Glazer's Distributors of Louisiana, Inc.**) No. 3:08-CV-1787-G, United States District Court for the Northern District of Texas, Dallas Division, 2009 (deposition testimony).

"Sonic Petroleum Services, Ltd. and Lonnie's Well Service Co. vs. Brian Shoemaker, Blowout Tools, Inc. and Superior Energy Services, LLC" (**Sonic Petroleum Services, Ltd. and Lonnie's Well Service Co.**) Cause No. D-125,961, District Court of Ector County, Texas, 358th Judicial District, 2010 (deposition testimony).

"General Parts, Inc. vs. Internet Autoparts, Inc. vs. O. Temple Sloan, Jr., Third-Party Defendant" (**Internet Autoparts, Inc.**) Civil Action No. 1:08-CV-00313-SS, United States District Court for the Western District of Texas, Austin Division, 2010 (deposition testimony).

"Dallas City Limits Property Co., L.P. vs. Austin Jockey Club, Ltd. And Texas Racing Commission" (**Dallas City Limits Property Co., L.P.**) Cause No. 09-15046, District Court of Dallas County, Texas, 160th Judicial District, 2010 (trial testimony).

"Trisun Healthcare, LLC vs. HC Hill Country Associates, Ltd., et al." (**Trisun Healthcare, LLC**) Cause No. 239,385-B, District Court of Bell County, Texas, 146th Judicial District, 2010 (resolved prior to testimony).

"Louis Burkhart and Stephen Earnhart vs. Texas Windstorm Insurance Association" (**Texas Windstorm Insurance Association**) Cause No. 09-CV-0998, District Court of Galveston County, Texas, 212th Judicial District, 2010 (resolved prior to testimony).

"Ash Grove Texas, L.P. vs. City of Dallas, City of Fort Worth, City of Arlington, Dallas County Schools, and Tarrant County" (**Ash Grove Texas, L.P.**) Civil Action No. 3:08-CV-02114-O, United States District Court for the Northern District of Texas, Dallas Division, 2010 (deposition testimony).

"Elizabeth D'Angelo, Toni D'Angelo Lott, Robert Paul D'Angelo, John D'Angelo, Karen D'Angelo, Joe Dangelo, and Christopher Barker vs. Frederick Deluca, Franchise Brands, LLC, and John Hayes (**Franchise Brands, LLC**) Cause No. DC-10-06661, District Court of Dallas County, Texas, 193rd Judicial District, 2011, (resolved prior to testimony).

"Luminant Generation Company LLC, et al. vs. Environmental Protection Agency"
(**Luminant Generation Company LLC**) Case No. 11-1315, United States Court
of Appeals for the District of Columbia Circuit, 2011 (resolved prior to
testimony).

"Timothy Nelson, et al. vs. ATI Enterprises, Inc., et al." (**ATI Enterprises, Inc., d/b/a/
ATI Technical Training Center, d/b/a ATI Career Training Center, d/b/a
ATI Schools & Colleges, d/b/a American Trades Institute, and d/b/a ATI
Career Training; ATI Enterprises of Florida, Inc. d/b/a ATI Career
Training; ATI Acquisition Company**), Private Arbitration, 2011-2012
(deposition and trial testimony).

"U.S. Bank National Association, Litigation Trustee of the Idearc Inc., et al. vs. Verizon
Communications Inc., et al." (**U.S. Bank National Association**) Civil Action No.
3:10-CV-1842-G, United States District Court for the Northern District of Texas,
Dallas Division, 2012 (resolved prior to testimony).

"Panda Energy International, Inc. vs. Kurt Torster and Gea Group, Ag" (**Panda Energy
International, Inc.**) Cause No. CI-085-085, District Court Deaf Smith County,
Texas, 222nd Judicial District, 2013 (deposition testimony).

"Trinity Industries, Inc. and Texas A&M University System vs. Joshua Harman" (**Trinity
Industries, Inc. and Texas A&M University System**) Civil Action No. 2:12-
CV-0046, United States District Court for the Eastern District of Texas, Marshall
Division, 2013 (resolved prior to testimony).

"Varian Medical Systems, Inc. vs. Janice Kenoyer and Elekta, Inc." (**Elekta, Inc.**) Cause
No. 85321, District Court of Ellis County, Texas, 40th Judicial District, 2013
(hearing and deposition testimony).

"United States of America and the State of West Virginia vs. RG Steel Wheeling, LLC, et
al." (**Mountain State Carbon, LLC**) Civil Action No. 5:12-CV-19, United States
District Court for the Northern District of West Virginia, Wheeling Division,
2013 (resolved prior to testimony).

"Peteski Productions, Inc. vs. Gawker Media, LLC" (**Peteski Productions, Inc.**) Case
No. 5:13-CV-00046-MHS-CMC, United States District Court for the Eastern
District of Texas, Texarkana Division, 2013 (resolved prior to testimony).

"Jack H. Ikenaga, Jr. vs. William D. Bailey, Temporary Administrator of the Estate of
Jack H. Ikenaga, Sr. and Sandra Ikenaga." (**Jack Hiromi Ikenaga, Jr.**) Cause No.
2012-CI-19491, Judicial District of Bexar County, Texas, 2014 (resolved prior to
testimony).

"Clarence Johnson vs. Scroll Compressors, LLC; Emerson Electric Co. d/b/a Fusite; and
Sensata Technologies, Inc." (**Clarence Johnson**) Case No. 048-268665-13,
District Court 48th Judicial District, Tarrant County, Texas, 2014 (resolved prior
to testimony).

"Dallas County, Texas; Harris County, Texas; and Brazoria County, Texas, on Behalf of Themselves and All Other Similarly Situated Counties in Texas vs. Merscorp, Inc.; Mortgage Electronic Registration Systems, Inc.; and Bank of America, National Association." (**Dallas, Harris, and Brazoria counties**) Civil Action No. 3:11-CV-02733-0, United States District Court for the Northern District of Texas, Dallas Division, 2013 (resolved prior to testimony).

"Nueces County, Texas v. Merscorp, Inc.; Mortgage Electronic Registration Systems, Inc.; and Bank of America, N.A." (**Nueces County**) Civil Action No. 2:12-CV-00131, United States District Court for the Southern District of Texas, Corpus Christi Division, 2013 (resolved prior to testimony).

"Duplitrans, Inc. f/k/a Duplitrans, LLC vs. Bobby N. Underwood, Suzonne Underwood, and PGFX Patent Holdings, LLC." (**Duplitrans, Inc. f/k/a Duplitrans, LLC**) Civil Action No. 6:15-CV-00075-WSS, United States District Court for the Western District of Texas, Waco Division, 2015 (resolved prior to testimony).

"Christianson Air Conditioning and Plumbing, LLC vs. NIBCO, Inc., MRK Manufacture's Sales, Inc., Westway Sales, Inc., and Morrison Supply Company, LLC." (**NIBCO, Inc.**) Case No. D-1-GN-14-000962, District Court of Travis County, Texas, 261st Judicial District, 2015 (resolved prior to testimony).

"Ralph S. Janvey, et al. vs. James R. Alguire, et al." (**Ralph S. Janvey, et al**.) Case No. 03:09-CV-0724-N, United States District Court for the Northern District of Texas, Dallas Division, 2015 (deposition).

"Edgar L. Smith vs. Orix USA Corporation and Orix Capital Markets, LLC." (**Orix USA Corporation and Orix Capital Markets, LLC**) Cause No. DC-14-02267, District Court of Dallas County, Texas, 160th Judicial District, 2015 (resolved prior to testimony).

"Sun Electric Services, Inc. vs. Shanon Davis, et al." (**Sun Electric Services, Inc.**) Cause No. B-16-08-0721-CV, District Court of Ector County, Texas, 358th Judicial District, 2017 (deposition).

## FORECASTS, CUSTOMIZED MODELS, DATA BASES, AND RELATED PROJECTS

"The Projection of Daily Funds Positions from Incomplete Information."  Study prepared for the Funds Control Division of Allied Bank of Texas, 1978.

"An Analysis of the National, State, and Regional Economic Outlooks for 1980."  Study prepared for the affiliates of Pan National Bank Holding Company, 1979.

"A Disaggregated Econometric Model of System Energy Usage and Customers."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative and Affiliated Distribution Systems, 1983.

"An Energy Demand Model for the Southwest Texas Electric Cooperative Service Area."  Study prepared for Somerville-Gonzales & Associates, 1985.

"An Energy Demand Model and an Economic/Demographic Profile of the City of Sanger."  Study prepared for RMI-Texas, Inc., 1985.

"An Economic/Demographic Profile of the Little Rock Metropolitan Area."  Study prepared for RMI-Texas, Inc., 1985.

"An Expanded Model of System Energy Demand."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative and Affiliated Distribution Systems, 1985.

"The Outlook for Technology and Electronics in the Current Business Environment."  Study prepared for Texas Instruments, Inc., 1985.

"The Future Prospects of the Oil and Gas Industry."  Study prepared for the Interstate Oil Compact Commission, 1985.

"An Energy Demand Model and Economic/Demographic Profile of the Kerrville Electric Service District."  Study prepared for RMI-Texas, Inc., 1986.

"Anticipated Wage Patterns in the Engineering Services Sector of the Houston Economy Under Varying National, State, and Local Economic Conditions."  Study prepared jointly for Northrop Industries and McDonnell-Douglas, 1986.

"The Long-Term Economic Outlook for Texas and the Major Energy-Sensitive Industries."  Study prepared for the Public Utility Commission of Texas, 1986.

"An Update on Energy Demand Conditions in the Expanded Service Area of The Brazos System."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative and Affiliated Distributional Cooperatives, 1986.

"The Impact of Oil Price Movements on Electricity Usage in the Commercial Sector of an Energy Sensitive Utility Service Area."  Study prepared for RMI-Texas, Inc., 1986.

"A Multi-Regional Historical and Forecast Data Base for the Texas Utilities Service Area."  Series of nine studies prepared for Texas Utilities Electric Company, 1986.

"The Historical and Future Profile of Selected Texas Counties."  Study prepared for United Telephone Company of Texas, 1986.

"A Comprehensive Demographic Profile and Forecast for Bexar County."  Study prepared for Criterion, Inc., 1986.

"Output Variations in the South Texas-Rio Grande Valley Economy Through 1988."  Study prepared for Hewlett-Packard, Inc., 1986.

"The Near-Term Outlook for the Houston Economy."  Report prepared for Gannett Company, Inc., 1986.

"The Economic Outlook for Selected Texas Markets."  Study prepared for Bright Management, Inc., 1986.

"Demographic Profiles of Selected Texas Metropolitan Markets."  Study prepared for Southwestern Bell Telephone Company, 1986.

"The Economic and Real Estate Outlook for Texas and Selected Market Areas."  Study prepared for United Bankers, Inc., 1987 (used in underwriting of security market issues).

"An Assessment of the Economic and Real Estate Outlook for Texas and Selected Metropolitan Areas."  Study prepared for First Union Corporation of Charlotte, North Carolina, 1987.

"A Comprehensive Historical and Projected Data Base for Natural Gas Prices."  Project prepared for Brazos Electric Power Cooperative, 1987.

"A Demographic Analysis of Selected South Texas Markets."  Project prepared for Central Power & Light, 1987.

"Historical and Forecast Analysis of the Metropolitan Areas of Central Texas and the I-35 Corridor."  Quarterly analysis provided to First Republic Bank, 1987.

"An Economic Data Base for Major Market Areas of Texas."  Study prepared for Coca-Cola, 1987.

"The Gross Area Product of Grayson County."  Study prepared for the City of Sherman, 1987.

"The Long-Term Outlook for Texas: Implementation and Challenges for Texas Baptists."  Study prepared for the Baptist General Convention of Texas, 1987.

"A Comprehensive Forecast and Data Base for the Disaggregated Economic Regions Served by Texas Utilities Electric Company."  Series of nine studies prepared for Texas Utilities Electric Company, 1987.

"Disaggregated Energy Consumption and Customer Projections for the Service Areas of Brazos Electric Power Cooperative."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative and Affiliated Member Distribution Cooperatives, 1987.

"Historical Gross Area Product on a Disaggregated Industrial Basis for Cooke County."  Study prepared for the Gainesville Chamber of Commerce, 1987.

"Projection for Residential and Commercial Energy Usage and Customers in the City of College Station."  Project prepared for the City of College Station, 1987.

"A Demographic Profile of Selected Metropolitan and Regional Markets in South Texas: Simulations Under Alternative Economic Conditions."  Study prepared for Central Power & Light Company, 1988.

"Industrial and Demographic Factors Affecting Water Usage in the Regions of Texas."  Study and materials provided for the Texas Water Development Board as part of the Texas Water Plan, 1988.

"An Analysis of the Current Economic Prognosis for Texas."  Materials prepared for Goldman Sachs, 1988.

"The Economic Outlook for the Major Service Regions of Texas Utilities Electric Company."  Series of nine studies and data base prepared for Texas Utilities Electric Company, 1988.

"A Gross County Product Data Base by Major Industrial Category for the Brownsville Metropolitan Area."  Study prepared for the Brownsville Economic Development Commission, 1988.

"The Retail Market Outlook for Central Texas."  Study prepared for Cox Newspapers, 1988.

"A Quarterly Economic Outlook for Selected Texas Markets."  Study prepared for United Telephone of Texas, 1988.

"A Review of the Primary External Environmental Factors Affecting the Principle Interests of the Rosewood Corporation."  Study prepared for the Rosewood Corporation, 1988.

"Quarterly Economic Outlook for Selected Texas Markets on the I-35 Corridor."  Quarterly analysis prepared for NCNB-Texas, 1988.

"Gross County Product Estimates by Industry for Montgomery County."  Study prepared for Lewis and Howard, 1988.

"A Forecast for Employment and Population in the Midland Metropolitan Area Under Alternative Economic Scenarios."  Study prepared for Stribling Associates, 1988.

"An Economic and Energy Forecast for the Southwest Texas Electric Cooperative Service Area."  Study prepared for Somerville-Gonzales Engineering, 1989.

"Selected Economic and Demographic Information for the Dallas/Fort Worth and Oklahoma City Metropolitan Areas."  Study prepared for American Airlines, 1989.

"A Comprehensive Disaggregate Forecast of Energy Usage and Customers in the Service Region of Brazos Electric Power Cooperative."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative, 1989.

"An Analysis of the Sales Outlook for Selected West Texas Markets."  Study prepared for HEB Foods, 1989.

"The Economic and Real Estate Outlook for Selected Texas Markets."  Analysis for Home Abstract and Title, 1989.

"Historical and Projected Economic Activity in the Service Area of TU Electric Company: A Data Base and Assessment by Major Regions."  Series of nine studies and data base prepared for TU Electric Company, 1989.

"A Forecast of Selected Elements of the Heavy Construction Industry."  Study prepared for LaFarge Corporation, 1989.

"A Comprehensive Demographic Forecast for Metropolitan and Non-Metropolitan Segments of South Texas."  Study prepared for Central Power & Light Company, 1989.

"An Analysis of Revenue Forecasting Methodologies and Results and Their Implications for the Projected Revenue Patterns of the City of Dallas."  Study prepared for the City of Dallas, 1990.

"A Historical Data Base for Gross Regional Product and Employment in the Beaumont-Port Arthur-Orange Area."  Data base compiled for Horn, Wallace, Cole, and Company, 1990.

"A Review of Forecasting Methods Employed by Central Power & Light Company of Projections for Future Energy Usage."  Study prepared for Central Power & Light Company, 1990.

"The Greater Houston Economic Forecast and Population Projections for Fort Bend County."  Study prepared for Contel, 1990.

"Projected Economic and Demographic Factors in Selected Texas Markets."  Study prepared for Cox Newspapers, 1990.

"The Economic Base of the TU Electric Service Area: A Comprehensive, Multi-Regional Data Base and Forecast."  Series of nine studies and data base prepared for TU Electric Company, 1990.

"A Historical Data Base and Forecast for Key Economic Variables in the Parker County Area."  Study prepared for RMI-Texas, Inc., 1990.

"A Disaggregated Demographic Forecast for the South Texas Region."  Study prepared for Central Power & Light Company, 1990.

"The Economic Outlook for the McAllen-Edinburg-Mission Metropolitan Area."  Study prepared for Palmco, Inc., 1990.

"Projections of Residential and Commercial Energy Usage and Customers Among the Distribution Cooperatives of the Brazos System."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative, 1991.

"A Long-Term Forecast for Manufacturing Output in the Houston Area."  Study prepared for the Greater Houston Partnership, 1991.

"A Forecast of Energy Usage and Related Activity in the Service Area of Central Texas Electric Cooperative."  Study prepared for Central Texas Electric Cooperative and Alexander Utility Consultants, 1991.

"A Forecast of Energy Demand and Customer Growth in the City of College Station."  Study prepared for the City of College Station, 1991.

"Projected Residential Demand by Property Type for Selected Segments of the Dallas/Fort Worth Metropolitan Area."  Analysis prepared for Mobil Land Development Corporation, 1991.

"A Comprehensive Economic and Demographic Forecast for the Service Regions of TU Electric."  Series of nine studies prepared for TU Electric, 1991.

"An Economic Analysis of Selected Texas Markets."  Materials compiled for McCaw Communications, 1992.

"An Analysis of Projected Industry and Company Performance in the Water and Air Purification Industry."  Materials and studies prepared for Schooner's, Inc., 1992.

"Energy Usage and Customer Projections for the South Texas Electric Corporation and its Member Distribution Systems."  Series of seven studies prepared for the South Texas Electric Cooperative, 1992.

"An Analysis of the Future Course of the San Antonio Economy in Light of the Defense Realignment."  Study prepared for Southwest Capitol Group, 1992.

"A Comprehensive Model Respecification and a Forecast of Energy Usage and Customers in the Various Market Areas Comprising The Brazos System."  Series of twenty-five studies prepared for Brazos Electric Power Cooperative and Affiliated Distribution Cooperatives, 1992-1993.

"Multi-Regional Forecast of Personal Bankruptcies."  Study prepared for AT&T Universal Card Services, 1992-1994 (personal bankruptcy projections for 50 states and 30 MSAs—updated quarterly).

"Regional Econometric Forecasting Data for the Multi-State Service Area of the Southwest Power Pool."  Study prepared for the Southwest Power Pool, 1993.

"A Forecast of Sales Tax Receipts."  Study prepared for Capital Metro, 1993.

"The Economic and Demographic Outlook for the Brownsville-Harlingen Metropolitan Statistical Area."  Study prepared for the City of Brownsville, 1993.

"An Updated Tax Forecasting and Simulation System for the Dallas Area Rapid Transit (DART)." Analysis prepared for Dallas Area Rapid Transit, 1993.

"The Short-Term Economic Outlook for the Montgomery County Area." Study prepared for the South Montgomery County/The Woodlands Chamber of Commerce, 1994.

"The Short-Term Forecast for Corpus Christi." Analysis prepared for Corpus Christi Bay Area Economic Development Corporation, 1994.

"The Short-Term Forecast for San Antonio." Analysis prepared for Northside Independent School District, 1994.

"The Short-Term Forecast for Austin-San Marcos." Analysis prepared for Newmark Home Corporation, 1994.

"The Short-Term Forecast for Dallas/Fort Worth-Arlington." Analysis prepared for Grace Construction Products, 1994.

"The Short-Term Economic Outlook for the Austin-San Marcos, Dallas, and Houston Galveston-Brazoria Areas." Analysis prepared for Standard Pacific Corporation, 1994.

"The Short-Term Forecast of McAllen." Analysis prepared for City of McAllen, 1994.

"The Short-Term Forecast of Amarillo." Analysis prepared for First Perryton Bank Corporation, 1994.

"The Short-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas." Study prepared for Compass Bank, 1994.

"The Short-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Six Major Metropolitan Statistical Areas." Study prepared for KPMG Peat Marwick, 1994.

"The Short-Term Economic Outlook for Austin and San Antonio." Study prepared for BMC West, 1994.

"The Long-Term Economic Outlook for the State of Texas." Study prepared for the Irrigation Station, 1994.

"The Long-Term Economic Outlook for Austin and Dallas/Fort Worth." Study prepared for Clayton Williams & Sherwood, 1994.

"The Long-Term Dallas Metropolitan Area Detailed Economic Outlook." Study prepared for the City of Dallas, 1994.

"The Short-Term Economic Outlook for Austin and San Marcos." Study prepared for the Title Agency of Austin, 1994.

"The Long-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas." Study prepared for the Penobscot Group, 1994.

"The Long-Term Economic Outlook for El Paso."  Study prepared for El Paso Electric Company, 1994.

"The Short-Term Economic Outlook for Dallas/Fort Worth."  Study prepared for the Greater Dallas Chamber of Commerce, 1994.

"The Long-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas."  Study prepared for Texas Industries, Inc. (TXI), 1994.

"The Economic Outlook for Brownsville, San Angelo, and El Paso."  Study prepared for Crest Packaging, 1994.

"The Outlook for Retail Sales and Development Activity in the City of Garland."  Study prepared for Colliers Baldwin, 1995.

"A Forecast of Retail Sales and Tax Revenues in the Service Territory of the Dallas Area Rapid Transit Authority."  Study and automated projection system prepared for Dallas Area Rapid Transit Authority (DART), 1995.

"An Economic Data Base and Forecast for the Service Area of Brazos Electric Power Cooperative."  Study prepared for Brazos Electric Power Cooperative, 1995.

"Some Economic and Demographic Patterns Affecting the Market Environment Surrounding the Fiesta Texas Theme Park."  Study prepared for USAA Real Estate, 1995.

"The Economic Outlook for Manufactured Housing in Texas and Its Region."  Series of studies prepared for the Texas Manufactured Housing Association, 1995.

"The Economic Outlook for the Various States and Regions Served by the Southwest Power Pool."  Series of studies prepared for the Southwest Power Pool, 1995.

"The Short-Term Economic Outlook for Austin-San Marcos, and the South Texas Region."  Study prepared for Urban Engineering, 1995.

"The Short-Term Economic Outlook for Austin."  Study prepared for Palmer Homes, Inc., 1995.

"The Economic Outlook for the Upper East Texas and Deep East Texas Regions."  Analysis prepared for KLTV, 1996.

"An Assessment on the Long-Term Prospects for the Texas Economy."  Analysis prepared for Fleetline, Inc., 1996.

"An Economic Outlook for the Dallas/Fort Worth Region."  Analysis prepared for the Dallas/Fort Worth International Airport Board, 1996.

"The Economic Outlook for the Lubbock Metropolitan Area."  Analysis prepared for the City of Lubbock, 1996.

"The Short-Term Economic Outlook for the Houston PMSA."  Study prepared for KHOU-TV, 1996.

"An Economic Assessment of the Dallas PMSA."  Study prepared for the City of
Farmers Branch, 1996.

"An Economic Model of Sales Tax Collections in the Dallas Area Rapid Transit Service
Area."  Study prepared for Dallas Area Rapid Transit, 1996.

"The Economic Outlook for Factors Affecting the Demand for Cement in the Southwest
Region."  Study prepared for North Texas Cement, 1996.

"The Economic Outlook for the Dallas/Fort Worth Area and its Sub-Regions."  Analysis
prepared for KDFW-TV, 1996.

"The Retail Sales Outlook for the Service Area of Houston METRO."  Study prepared
for Houston Metropolitan Transit Authority, 1996.

"The Economic and Construction Outlook for the Dallas Area."  Study prepared for
Cushman Wakefield, 1996.

"The Economic Outlook for Manufactured Housing in Texas and its Regions."  Study
prepared for the Texas Manufactured Housing Association, 1996.

"The Short-Term Economic Outlook for the Lubbock Metropolitan Statistical Area."
Analysis prepared for the City of Lubbock, 1996.

"The Short-Term Outlook for the Upper East Texas Region."  Analysis prepared for
KLTV-TV, 1996.

"The Short-Term Outlook for the San Antonio Metropolitan Statistical Area."  Analysis
prepared for Powell Realty, 1996.

"The Economic Forecast for the Amarillo Metropolitan Statistical Area."  Analysis
prepared for Calmat, Inc., 1996.

"The Short-Term Outlook for the Deep East Texas Region" and "The Short-Term
Outlook for the Upper East Texas Region."  Analyses prepared for Fleetline, Inc.,
1996.

"The Short-Term Outlook for the San Antonio Metropolitan Statistical Area."  Analysis
prepared for the Northside Independent School District, 1996.

"The Short-Term Outlook for the Dallas Primary Metropolitan Statistical Area."
Analysis prepared for the Carbon Development Corporation, 1996.

"The Short-Term Outlook for the Houston Primary Metropolitan Statistical Area."
Analysis prepared for KHOU-TV, 1996.

"The Short-Term Outlook for the San Antonio Metropolitan Statistical Area."  Analysis
prepared for Fitch Investors Service, L.P., 1996.

"The Economic Outlook for the Construction Sector."  Study prepared for Gifford Hill
and Company, 1996.

"The Short-Term Economic and Residential Housing Outlook for the Austin-San Marcos
MSA."  Study prepared for Palmer Homes Company, 1996.

"The Economic and Financial Outlook for Selected Urban Areas."  Study prepared for
Coopers & Lybrand, 1996.

"The Short-Term Outlook for the Austin-San Marcos and South Texas Regions."  Report
prepared for Urban Engineering, 1996.

"The Short-Term Economic Outlook for the San Antonio Area."  Study prepared for
Maxxam Corporation, 1996.

"A Comprehensive Economic and Energy Price Forecast and Database for a Multi-State
Areas."  Study and database prepared for Southwest Power Pool, 1997.

"An Analysis of the Market Potential for Selected Fabricated Plastic Automobile Parts."
Market study prepared for Jamak Fabrication, 1997.

"A Forecast of Economic Activity in Selected Counties in the Service Region of Brazos
Electric Power Cooperative."  Study prepared for Brazos Electric Power
Cooperative, 1997.

"The Economic and Sales Tax Revenue Outlook for the Service Area of Dallas Area
Rapid Transit Authority."  Study prepared for Dallas Area Rapid Transit
Authority, 1997.

"The Economic Outlook for the Houston PMSA."  Analysis prepared for the Associated
General Contractors, 1997.

"An Economic and Demographic Profile of Selected Lending Markets."  Analysis
prepared for Chase Bank, 1997.

"The Short-Term Economic and Financial Forecast for San Antonio."  Analysis prepared
for JP Morgan Investment Management, 1997.

"A Comprehensive Detailed Database of Key Factors in the Counties Serviced by Brazos
Electric Power Cooperative."  Analysis and database prepared for Brazos Electric
Power Cooperative, 1997.

"A Multi-Regional Economic Profile of Key Financial Market Segments."  Study
prepared for Chase Bank, 1997.

"The Short-Term Economic Forecast for the Houston Metropolitan Region."  Study
prepared for Old Castle, Inc., 1997.

"Market Analysis and Forecast for Selected Texas Regions."  Analysis prepared for Ben
E. Keith, 1997.

"An Assessment of Financial Conditions, Economic Outlooks, and Lending
Environments in Selected Markets."  Analysis prepared for Chase Bank, 1997.

"The Short-Term and Long-Term Outlook for Business Activity in the Dallas/Fort Worth
CMSA."  Study prepared for the Greater Dallas Chamber of Commerce, 1998.

"The Economic Outlook for the McAllen-Edinburg-Mission and Brownsville-Harlingen-
San Benito MSAs."  Study prepared for Faison-Stone, 1998.

"An Economic and Sales Tax Revenue Forecasting Model for the Dallas Area Rapid Transit Service Area."  Study and customized system prepared for Dallas Area Rapid Transit (DART), 1998.

"The Economic Outlook for the Permian Basin Region."  Study prepared for Airmaster Equipment, 1998.

"The Short-Term Economic Perspective on the Lubbock Metropolitan Area."  Study prepared for the City of Lubbock, 1998.

"The Short-Term Outlook for the Economy of the Corpus Christi Area."  Study prepared for Manufactured Housing Resources, 1998.

"The Economic Outlook for the San Antonio Area: A Short-Term and Long-Term Perspective."  Analysis prepared for Northside Independent School District, 1998.

"The Short-Term Economic Outlook for the Upper East Texas Region."  Study prepared for KLTV, 1998.

"An Economic Forecast for Dallas/Fort Worth and the North Texas Region."  Study prepared for the Dallas/Fort Worth International Airport Board, 1998.

"An Economic Forecast of Key Energy Usage Indicators in the Austin Area."  Analysis prepared for the City of Austin, 1998.

"An Economic and Demographic Evaluation of Selected Retail Market Areas."  Analysis prepared for Ben E. Keith Company, 1998.

"The Economic Forecast for the Houston-Galveston-Brazoria CMSA."  Study prepared for Oldcastle, Inc., 1998.

"The Short-Term Economic Outlook for the Bryan-College Station, Waco, and Sherman-Denison MSAs."  Study prepared for Jefferson Pilot, 1998.

"The Short-Term Economic Outlook for the San Antonio Economy."  Analysis prepared for the San Antonio Express News, 1998.

"An Economic Outlook Under Alternative External Conditions for Counties in the Service Area of Brazos Electric Power Cooperative."  Study prepared for Brazos Electric Power Cooperative, 1999.

"The Economic Outlook for the Wichita Falls MSA."  Study prepared for GBN, Inc., 1999.

"The Economic Outlook for Selected Regions of the US-Mexico Border."  Study prepared for the Texas Workforce Insurance Fund, 1999.

"The Outlook for the Regional Economies Comprising the Southwest Power Pool."  Analysis prepared for the Southwest Power Pool, 1999.

"The Short-Term Forecast for the Corpus Christi Economy."  Study prepared for TransWestern Commercial Services, 1999.

"The Short-Term Economic Outlook for the Houston PMSA."  Study prepared for Savage, Inc., 1999.

"Market Research Analysis of Selected Texas Markets."  Analysis prepared for Chase Bank, 1999.

"Future Growth Prospects in Selected Cable Telecom Markets."  Analysis prepared for TCA Cable, Inc., 1999.

"Long-Term Quarterly Projections of the Factors Determining Future Sales Tax Revenue in the Service Area of Dallas Area Rapid Transit."  Study prepared for Dallas Area Rapid Transit Authority, 1999.

"The Economic Outlook for the Houston Area—A Long Range Perspective."  Study prepared for SouthTrust Bank, 1999.

"The Long-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 1999.

"An Analysis of Residential Construction Gross Output in Selected Geographic Areas."  Analysis prepared for A. O. Phillips and Associates, 1999.

"The Short-Term Economic Outlook for the Austin-San Marcos Metropolitan Region."  Study prepared for TransWestern Commercial Services, 1999.

"The Economic Outlook for Corpus Christi and the Surrounding Area."  Study prepared for Ryan Properties, 1999.

"The Short-Term Economic Forecast for the Houston-Galveston-Brazoria CMSA."  Study prepared for Reliant Energy, 1999.

"The Economic Prospects for the Lubbock MSA."  Study prepared for the City of Lubbock, 1999.

"The Economic Outlook for the Austin-San Marcos MSA."  Study prepared for Capital Market Research, 1999.

"A Long-Term Economic Perspective on the Travis County Area."  Study prepared for the City of Austin, 1999.

"The Short-Term Economic Forecast for the Austin and San Antonio MSAs."  Study prepared for the Manufactured Housing Resources Group, 1999.

"The Outlook for Economic Conditions, Residential Housing, and the Development of Manufactured Housing Neighborhoods in the Austin-San Antonio Corridor."  Study prepared for Sun Communities, 1999-2000.

"The Outlook for Manufactured Housing in Texas and Its Regional Submarkets."  Analysis prepared for the Texas Manufactured Housing Association, 2000.

"The Near-Term Outlook for the Austin-San Marcos Area."  Analysis prepared for TransWestern Commercial Services, 2000.

"The Outlook for the South Texas Region and the El Paso Metropolitan Area."  Study prepared for the Texas Workers Compensation Insurance Fund, 2000.

"Quarterly Economic Projections for Key Business Indicators in Texas and Its Major Metropolitan Areas."  Analysis prepared for JPI, Inc., 2000.

"An Economic Forecasting Model and Automated System for Projecting Sales Tax Revenues in the Service Area of Dallas Area Rapid Transit Authority with Emphasis on the Future Effects of E-Commerce."  Study prepared for Dallas Area Rapid Transit Authority, 2000.

"The Short-Term Economic Outlook for the US and Texas."  Study prepared for Alamo Cement Company, 2000.

"The Outlook for Business Activity in Hays and Comal Counties."  Study prepared for Martin Marietta, 2000.

"The Short-Term and Long-Term Outlook for the San Antonio Area."  Study prepared for Northside Independent School District, 2000.

"The Economic Outlook for the Dallas, Houston, and Austin Areas with a Focused Analysis of Travis County Employment."  Analysis prepared for the City of Austin, 2000.

"An Economic Profile and Forecast of the Dallas PMSA."  Study prepared for NBC Bank, 2001.

"A Short-Term Perspective on the San Antonio Economy."  Study prepared for the Northside Independent School District, 2001.

"The Potential Impact of a Proposed Card Room and Electronics Gaming Device Facility at Valley Race Park on the Economy of the Rio Grande Valley."  Analysis prepared for Valley Race Park, 2001.

"The Short-Term Outlook for Business Activity in the US and Texas."  Study prepared for Hanson Aggregates, 2001.

"Historical and Projected Economic Aggregates for Travis County and the Austin-San Marcos, Dallas, and Houston Metropolitan Areas."  Study prepared for Austin Energy, 2001.

"The Short-Term Outlook for the Houston Area."  Study prepared for Southwest Residential Partners, Inc., 2001.

"The Short-Term Economic Forecast for the Austin-San Marcos Metropolitan Statistical Area."  Study prepared for Capital Market Research, 2001.

"The Long-Term Economic Outlook for the Industrial Customers Served by The Brazos System Under Alternative Economic Conditions."  Study prepared for Brazos Electric Power Cooperative, 2001.

"The Economic Outlook and Sales Tax Prospects for the Dallas Area Rapid Transit Service Area."  Study prepared for Dallas Area Rapid Transit, 2001.

"The Economic Outlook for the North Central Texas Area."  Study prepared for the
North Central Texas Council of Governments, 2001.

"Quarterly Economic Projections for Key Business Indicators in Texas and Its Major
Metropolitan Areas."  Analysis prepared on a quarterly basis for JPI, Inc., 2001-
2003.

"A Long-Term, County-Level Forecast for Water-Intensive Industrial Output
Categories."  Study prepared for the Texas Water Development Board, 2002.

"The Short-Term Economic Forecast for the Dallas and Fort Worth Metropolitan Areas."
Study prepared for Bluestone Holdings, 2002.

"The Economic Outlook for Texas."  Study prepared for State Farm Insurance, 2002.

"The Short-Term Economic Outlook for the US, Texas, and Selected Metropolitan
Markets."  Analysis prepared on a quarterly basis for Frost Bank, 2002-2018.

"The Long-Term Economic and Fiscal Outlook for the Service Area of Dallas Area
Rapid Transit."  Analysis prepared for Dallas Area Rapid Transit, 2002.

"The Long-Term Economic Outlook for the Houston Area."  Study prepared for Reliant
Energy, 2002.

"The Long-Term Outlook for the US, Texas, and Large Metropolitan Areas."  Study
prepared for Hanson Aggregates, 2002.

"The Long-Term Forecast for the San Antonio Metropolitan Area."  Study prepared for
Northside Independent School District, 2002.

"The Outlook for National and State Business Conditions and Construction."  Study
prepared for the Texas Lehigh Cement Company, 2002.

"Alternative Long-Range Forecasts for the Counties Served by Brazos Electric Power
Cooperative."  Study prepared for Brazos Electric Power Cooperative, 2002.

"The Economic Outlook for the Dallas-Fort Worth Area."  Study prepared for the North
Texas Small Business Development Center, 2002.

"A Short-Term Economic Overview of the San Antonio Area."  Study prepared for
Northside Independent School District, 2002.

"The Economic Outlook for Travis County in the Context of National, State, and
Regional Performance."  Study prepared for Austin Energy, 2002.

"The Outlook for Business Activity in the San Antonio Area."  Analysis prepared for the
Real Estate Council of San Antonio, 2002.

"A Short-Term Outlook for the Texas Economy."  Study prepared for HDR Engineering,
2003.

"The Short-Term and Long-Term Economic Outlook for Texas and the San Antonio
MSA."  Study prepared for City Public Service, 2003.

"A Forecast of Relevant Economic Variables for the Houston Metropolitan Transit Authority (METRO)."  Study prepared for Houston METRO, 2003.

"The Economic Outlook for the US and Texas."  Study prepared for Bartlett Cocke, 2003.

"A Long-Term and Short-Term Outlook for Texas and Its Major Regions."  Study prepared for DFW Airport Research Center, 2003.

"A Short-Term Perspective on the Houston Economy."  Study prepared for Associated General Contractors of Texas, 2003.

"An Overall Economic Forecast for Texas Business Activity."  Study prepared for GDS Associates, 2003.

"County-Level Forecasts Under Alternative Conditions for the Area Served by Brazos Electric Power Cooperative."  Study prepared for Brazos Electric Power Cooperative, 2003.

"The Outlook for Economic Growth and Retail Sales Tax Collections in the Service Area of Dallas Area Rapid Transit."  Study prepared for Dallas Area Rapid Transit, 2003.

"An Economic Perspective on the San Antonio Area."  Study prepared for Transwestern Commercial Services, 2003.

"The Economic Outlook for the Houston Area."  Study prepared for CenterPoint Energy, 2003.

"The Economic Outlook for Austin and Travis County."  Study prepared for Austin Energy, 2003.

"The Impact of the Nucor Steel Facility on Business Activity in Jackson and Mississippi."  Study prepared for Nucor Steel, 2003.

"The Long-Term Outlook for the San Antonio Area."  Study prepared for Northside Independent School District, 2003.

"The Economic Outlook for Texas, Its Regions, and Metropolitan Areas."  Study prepared for the City of Austin, 2003.

"A Short-Term Perspective of the Texas Economy."  Study prepared for Ladd Holdings, 2003.

"A Retrospective Analysis of the Williamson County Housing Market."  Study prepared for Howard Frazier Barker Elliott, Inc., 2003.

"The Outlook for the US and San Antonio Economies with Emphasis on Energy-Related Factors."  Study prepared for City Public Service, 2003.

"The Economic Outlook for Dallas, Houston, and the Lower Rio Grande Valley."  Study prepared for Hibernia National Bank, 2004.

"An Analysis and Forecast of Factors Impacting Future Sales Tax Collections for Dallas Area Rapid Transit (DART)."  Analysis prepared for Dallas Area Rapid Transit, 2004.

"A Forecast of Selected Variables Impacting the Performance and Financing of Capital Metro Under Alternative Economic Scenarios."  Analysis prepared for Capital Metro, 2004.

"A Short-Term Outlook for the San Antonio Metropolitan Area."  Study prepared for the Northside Independent School District, 2004.

"An Assessment of Key Economic, Demographic, and Occupational Factors Impacting Future Office Development in the Northwestern Corridor of the Dallas/Fort Worth Area."  Study prepared for Maguire Partners, 2004.

"The Short-Term Economic Outlook for the Brownsville-Harlingen-San Benito Area."  Study prepared for Paseo de la Resaca, 2004.

"A Forecast of Key Economic Variables Impacting the Houston Metropolitan Transit Authority (METRO)."  Study prepared for the Houston Metropolitan Transit Authority, 2004.

"The Economic Outlook for Texas and Its Regions Through 2030."  Study prepared for GDS Associates, 2004.

"The Outlook for Inland Barge Activity on the US Economy."  Study prepared for Trinity Industries, 2004.

"A Short-Range and Long-Range Perspective on the Texas Economy."  Study prepared for Southwest Bank of Texas, 2004.

"The Long-Range Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2004.

"A Retrospective on the Short-Term and Long-Term Outlook for the Texas Economy."  Analysis prepared for the Public Utility Commission of Texas, 2004.

"The Short-Term Economic Outlook for San Antonio and the Surrounding Area."  Analysis prepared for Northside Independent School District, 2005.

"The Long-Range Economic Outlook, with Emphasis on Future Patterns on the Travis County Area."  Study prepared for Austin Energy, 2005.

"The Outlook for Selected Energy Prices and Economic Performance Under Alternative External Conditions in the Area Served by Brazos Electric Power Cooperative."  Analysis prepared for Brazos Electric Power Cooperative, 2005.

"A Long-Range Perspective on the San Antonio Economy."  Analysis prepared for the Northside Independent School District, 2005.

"An Economic Forecasting Model for Projecting Sales Tax Revenues and Related Input Components for the Service Region of Dallas Area Rapid Transit (DART)."  Study prepared for Dallas Area Rapid Transit, 2005.

"The Short-Term Outlook for San Antonio and the Surrounding Area."  Analysis prepared for Northside Independent School District, 2006.

"The Economic Outlook for the North Texas Area."  Analysis prepared for the North Texas Council of Governments, 2006.

"Long-Term Economic and Demographic Patterns in the North Central Texas Council of Governments Region."  Analysis prepared for the North Central Texas Council of Governments, 2006.

"The Economic Outlook for Key Performance Measures in the Counties Served by Brazos Electric Power Cooperative."  Analysis prepared for Brazos Electric Power Cooperative, 2006.

"An Interactive Forecasting Model for Projecting Sales Tax Receipts Under Alternative Economic Conditions in the Dallas Area Rapid Transit Service Area."  Analysis prepared for Dallas Area Rapid Transit, 2006.

"Short-Term Forecast of Employment by Detailed Industrial Category and Local Workforce Area."  Study prepared for the Texas Workforce Commission, 2006.

"The Long-Term Outlook for Business Conditions in San Antonio."  Analysis prepared for Northside Independent School District, 2006.

"Long-Term Economic and Real Estate Forecast for the San Antonio Metro Area."  Study prepared for CIRI Real Estate, 2006.

"The Economic Outlook for Travis County, the Austin Region, and Other Major Metropolitan Areas."  Analysis prepared for Austin Energy, 2006.

"The Economic Outlook for the Dallas/Fort Worth Area with Emphasis on Local Advertising Parameters."  Analysis prepared for NBC Universal, 2007.

"A Short-Term Assessment of the San Antonio Economy."  Analysis prepared for Northside Independent School District, 2007.

"A Detailed Economic Forecast for Bexar County Within the Context of National, State, and Regional Parameters."  Analysis prepared for CPS Energy, 2007.

"An Assessment of Gross Product in the Counties of the Houston-Galveston Area."  Analysis prepared for the Houston-Galveston Area Council, 2007.

"Econometric Model and Forecast for Sales Tax Revenues Available to Dallas Area Rapid Transit."  Analysis prepared for Dallas Area Rapid Transit, 2007.

"A Detailed Economic Forecast for the Houston Area."  Analysis prepared for the Greater Houston Partnership, 2007.

"The Long-Term Outlook for the San Antonio Metropolitan Area."  Analysis prepared for Northside Independent School District, 2007.

"A Short-Term and Long-Term Economic Perspective on the Texas and San Antonio Economies."  Analysis prepared for City Public Service, 2007.

"The Economic Outlook for the Austin Metropolitan Area and Travis County."  Study prepared for Austin Energy, 2007.

"An Assessment of Real Estate Trends and Related Factors in Selected Urban Markets." Analysis Prepared for CLB Holdings, 2007-2008.

"An Analysis of Future Construction Cost Patterns for Infrastructure Investments in the Dallas/Fort Worth Area."  Study prepared for Dallas Area Rapid Transit, 2008.

"A Short-Term Perspective on the San Antonio Economy."  Study prepared for Northside Independent School District, 2008.

"An Economic and Sales Tax Forecast for the Dallas Area Rapid Transit Study Area." Study prepared for Dallas Area Rapid Transit, 2008.

"The Short-Term and Long-Term Outlook for Texas and Selected Market Areas."  Study prepared for GDS Associates, 2008.

"An Economic Outlook for the Various Counties in the Service Region of Brazos Electric Power Cooperative."  Study prepared for Brazos Electric Power Cooperative, 2008.

"A Long-Term Prognosis for the San Antonio Area."  Study prepared for Northside Independent School District, 2008.

"The Short-Term Outlook for the Gulf Coast Region."  Analysis prepared for Houston-Galveston Area Council, 2008.

"A Sales Tax Projection Model and Analysis for the Dallas Area Rapid Transit (DART) System."  Analysis prepared for Dallas Area Rapid Transit. 2009.

"The Short-Term Outlook for Commercial Construction Costs in Light of Recent Market Developments."  Analysis prepared for Global EarthQuest Venture, LP, 2009

"A Construction Index and Forecast for the Dallas-Fort Worth Area."  Analysis prepared for Dallas Area Rapid Transit, 2009.

"A Long-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2009.

"The Short-Term Outlook for the Gulf Coast Region."  Analysis prepared for Houston-Galveston Area Council, 2009.

"A Comprehensive Forecasting Model for Sales Tax Revenues in the Service Area of Dallas Area Rapid Transit."  Study and modeling system prepared for Dallas Area Rapid Transit. 2009.

"A Comprehensive Forecast of Economic Activity in the Counties Served by The Brazos System under Alternative External Conditions."  Analysis prepared for The Brazos System, 2009.

"An Assessment of the Rio Grande Valley Economic Outlook with Emphasis on the Financial/Banking Sector."  Analysis prepared for Cameron County Financial Group, 2009.

"A Short-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2009.

"The Short-Term and Long-Term Outlook for Texas and Selected Market Areas."  Study prepared for Baylor University, 2010.

"A Forecast of Anticipated Sales Tax Revenues in the Dallas Area Rapid Transit Authority (DART) Service Area: An Analysis in Light of Recent Economic and Population Trends."  Analysis and simulation model prepared for Dallas Area Rapid Transit, 2010.

"The Long-Term Outlook for the United States and Texas."  Study prepared for LeighFisher, Inc., 2010.

"The Short-Term Outlook for San Antonio."  Study prepared for HFBE, Inc., 2010.

"Economic Outlook for the Counties in The Brazos System: A Scenario Analysis in Light of Recent Conditions."  Study prepared for The Brazos System, 2010.

"The Short-Term and Long-Term Outlook for Texas and Selected Market Areas."  Study prepared for GDS Associates, 2010.

"An Analysis of Anticipated Infrastructure Construction Cost Patterns in the Dallas-Fort Worth Area."  Analysis prepared for Dallas Area Rapid Transit, 2010.

"The Short-Term Outlook for the United States, Texas, Dallas and San Antonio."  Study prepared for TravisWolff Independent Advisors & Accountants, 2010.

"A Long-Term Forecast of Business Activity in Bexar County, San Antonio, and Other Major Metropolitan Areas: An Evaluation of Alternative Scenarios in Light of Recent Conditions."  Analysis prepared for CPS Energy, 2010.

"The Short-Term and Long-Term Outlooks for Business Conditions in San Antonio."  Analysis prepared for Northside Independent School District, 2010.

"The Impact of a Proposed Solar Panel Manufacturing Facility on Business Activity in Longview and Texas."  Analysis prepared for Longview Economic Development, 2010.

"The Outlook for Travis County, the Austin Metropolitan Area, and Other Major Texas Urban Regions."  Study prepared for Austin Energy, 2011.

"A Comprehensive Estimate of Oil Industry and Related Employment in Midland and Odessa."  Analysis prepared for Midland College, 2011.

"A Long-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2011.

 "The Short-Term Economic Outlook for Arizona and the Phoenix Area."  Analysis prepared for Security Service Federal Credit Union, 2011.

"The Outlook for Key Indicators and Drivers of Real Estate Construction and Related Activity for Texas, Dallas, Fort Worth, Waco, the Killeen-Temple-Fort Hood Area, and Austin." Analysis prepared for Summit Materials, 2011.

"An Economic and Sales Tax Revenue Forecasting Model for the Dallas Area Rapid Transit Service Area." Analysis prepared for Dallas Area Rapid Transit, 2011.

"A Projection of Infrastructure Construction Cost in the Dallas Area Rapid Transit Service Area." Analysis prepared for Dallas Area Rapid Transit, 2011.

"A Short-Term Outlook for the San Antonio Economy." Study prepared for Northside Independent School District, 2011.

"A Short-Term Forecast for the United States and Texas." Study prepared for Austin Ventures, 2012.

"Investing in Victoria's Future Prosperity and Quality of Life: Planning Considerations in a Growing Metropolitan Area." Analysis prepared for the City of Victoria, 2012.

"A Forecast of Long-Term Performance in Travis County, Austin, and Other Major Metropolitan Areas." Forecast prepared for Austin Energy, 2012.

"The Short-Term Outlook for the United States and Texas Economies." Study prepared for LeighFisher, Inc., 2012.

"The Economic and Sales Tax Revenue Outlook for the Service Area of Dallas Area Rapid Transit Authority." Analysis and simulation model prepared for Dallas Area Rapid Transit, 2012.

"A Long-Term and Short-Term Outlook for the San Antonio Economy." Study prepared for Northside Independent School District, 2012.

"A Model and Analysis for Identifying Prospective Beneficiaries of the British Petroleum Settlement in Various Areas." Study prepared for Baron & Budd, PC, 2012.

"The Short-Term Outlook for the United States and Texas." Study prepared for LeighFisher, Inc., 2013

"A Long-Term Economic and Demographic Forecast for the Counties in the North Central Texas Council of Governments Region." Study prepared for the North Central Texas Council of Governments, 2013.

"The Short-Term Outlook for the United States and Texas." Study prepared for EEM III Real Estate Services Group, Inc., 2013.

"An Economic Model of Sales Tax Collections in the Dallas Area Rapid Transit Service Area." Analysis prepared for Dallas Area Rapid Transit, 2013.

"A Long-Term Outlook for the San Antonio Economy." Study prepared for Northside Independent School District, 2013.

"The Short-Term and Long-Term Outlooks for the United States and Texas." Study prepared for Cotton Creek Capital, 2013.

"A Forecast of Long-Term Performance in Travis County, Austin, and Other Major Metropolitan Areas."  Forecast prepared for Austin Energy, 2013.

"A Short-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2013.

"An Analysis and Forecast of Factors Impacting Future Sales Tax Collections for Dallas Area Rapid Transit."  Analysis and simulation model prepared for Dallas Area Rapid Transit, 2014.

"The Short-Term Outlook for the United States and Texas."  Study prepared for LeighFisher, Inc., 2014.

"The Short-Term Outlook for the United States and Texas."  Study prepared for HVJ Associates, Inc., 2014.

"A Long-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2014.

"A Forecast of Long-Term Performance in Travis County, Austin, and Other Major Metropolitan Areas."  Forecast prepared for Austin Energy, 2014.

"The Long-Term Outlook for the United States, Texas, and the Houston-Sugar Land-Baytown Metropolitan Statistical Area."  Study prepared for Fairfield Residential Property Management, 2014.

"Future HVJ Revenue: A Specialized Forecast for the Firm and a Process to Link Performance to the General Economic Outlook."  Analysis prepared for HVJ Associates, Inc., 2014.

"A Short-Term Outlook for the San Antonio Economy."  Study prepared for Northside Independent School District, 2014.

"A Short-Term and Long-Term Outlooks for the San Antonio Economy."  Study prepared for Northside Independent School District, 2015.

"The Short-Term and Long-Term Outlook for Texas and Selected Market Areas."  Study prepared for GDS Associates, 2015.

"A Detailed Industrial Forecast for Texas Lehigh Cement Company to Assist in Location Decisions."  Analysis prepared for Texas Lehigh Cement Company, LP, 2015.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas."  Study prepared for Heritage Homes, Ltd., 2015.

"The Short-Term Outlook for the United States and Texas."  Study prepared for Nathan Associates, Inc., 2015.

"A Forecast of Long-Term Performance in Travis County, Austin, and Other Major Metropolitan Areas."  Forecast prepared for Austin Energy, 2015.

"Economic Outlook for Texas and the Dallas-Fort Worth-Arlington Metropolitan Statistical Area."  Analysis prepared for Southwest Bank, 2015.

"Short-Term Outlook for the United States, Texas, and Selected Texas Metropolitan Areas." Analysis prepared for P3 Holdings, 2015.

"A Forecast for Future Construction Cost Patterns in the Dallas Area Rapid Transit Service Area." Analysis prepared for Dallas Area Rapid Transit, 2015.

"An Econometric Projection Model for Sales Tax Collections by Dallas Area Rapid Transit (DART)." Analysis prepared for Dallas Area Rapid Transit, 2015.

"The Long-Term and Short-Term Outlooks for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Study prepared for Hill & Wilkinson General Contractors, 2015.

"The Outlook for Infrastructure Construction Costs in the Dallas Area Rapid Transit Service Area." Analysis prepared for Dallas Area Rapid Transit, 2016.

"Dynamic Sales Tax Forecasting System for the Revenue Base of Dallas Area Rapid Transit (DART)." Analysis prepared for Dallas Area Rapid Transit, 2016.

"A Long-Term Outlook for the San Antonio Economy." Study prepared for Northside Independent School District, 2016.

"A Forecast of Long-Term Performance in Travis County, Austin, and Other Major Metropolitan Areas." Forecast prepared for Austin Energy, 2016.

"The Outlook for the City of Houston Economy and City Tax Receipts." Analysis prepared for the Houston Firefighter's Relief and Retirement Fund, 2016.

"An Analysis of Patterns Affecting Sales Tax Collections in the Service Area of Dallas Area Rapid Transit: Results and Simulation System." Analysis prepared for Dallas Area Rapid Transit, 2017.

"The Outlook for Heavy Construction Costs in the Dallas Region." Analysis prepared for Dallas Area Rapid Transit, 2017.

"A Short-Term Outlook for the US, Texas, and the Houston-The Woodlands-Sugar Land Metropolitan Statistical Area." Study prepared for Hodges Ward Elliott, 2016.

"Long-Term and Short-Term Outlooks for the US, Texas, and Major Metropolitan Statistical Areas." Study prepared for the City of Grapevine, 2016.

"A Short-Term Outlook for the US, Texas, and Major Metropolitan Statistical Areas." Study prepared for Reliable Productions, 2016.

"2017 Perryman US, Texas, and the San Antonio Metropolitan Statistical Area (including complete Long-Term Forecast Tables and Quarterly Short-Term Forecast Updates)." Study prepared for Northside Independent School District, 2016.

"A Short-Term Outlook for the US, Texas, and the McAllen-Edinburg-Mission Metropolitan Statistical Area." Study prepared for Stephen Pyher, 2017.

"Long-Term and Short-Term Outlooks for the US, Texas, and Major Metropolitan Statistical Areas." Study prepared for N.C.M. Dallas North/Oncor, 2017.

**SURVEYS, INDUSTRY STUDIES, VALUATIONS, AND OTHER PROJECTS**

"An Initial Data Base for End Use Modeling System Power Requirements."  Series of twenty studies prepared for Brazos Electric Power Cooperative and Affiliated Distribution Systems, 1983.

"Agriculture in the Central Texas Economy."  Study prepared for the Greater Waco-McLennan County Chamber of Commerce, 1985.

"A Survey of Business Leadership in Central Texas."  Study prepared for the Greater Waco-McLennan County Chamber of Commerce, 1985.

"A Survey of Business Leadership in the Austin County Area."  Study prepared for the First National Bank of Bellville, Texas, 1985.

"A Survey of Business Leadership in the Rio Grande Valley."  Study prepared for Alamo Corporation of Texas, 1985.

"A Survey of Consumer Attitudes in Waco, Texas."  Study prepared for the Greater Waco-McLennan County Chamber of Commerce, 1985.

"Wage Rates in the Houston Manufacturing and Service Sectors."  Study prepared for Northrop Industries, 1985.

"Employee Attitudes, Perceptions, and Performance in the Banking Industry."  Series of surveys conducted and analyzed in cooperation with BFP Systems, Inc., 1985-1986.

"Customer Perceptions of Bank Performance and Products in Selected Bank Markets."  Series of surveys conducted and analyzed in cooperation with BFP Systems, Inc., 1985-1986.

"Economic Profile of Selected Bank Markets."  Series of studies prepared in cooperation with BFP Systems, Inc., 1985-1986.

"Perceptions Regarding Financial Institutions in Selected Texas Market Areas."  Series of studies conducted in cooperation with the Texas Financial Institutions Research League, 1985-1986.

"A Comprehensive On-Line Economic and Demographic Data Base for Texas and Its Major Metropolitan Areas and Counties."  Project prepared for Merrill Lynch Economics, Inc., 1986.

"A Survey of Business Leadership in the El Paso Metropolitan Area."  Study prepared for the El Paso Chamber of Commerce, 1986.

"An Analysis of Market Share Factors in the Food and Gasoline Markets of Selected Areas."  Study prepared for Mortgage Management Systems, Inc., 1986.

"Perceptions of Texas Bankers and Banking Activities."  Study prepared for the Texas Bankers Association (joint project with BFP Systems, Inc.), 1987.

"A Historical Economic Data Base for the State of Texas."  Project prepared for Tucker
        Anthony Management Group, 1987.

"A Historical Data Base of Oil and Gas Prices."  Project prepared for RMI-Texas, Inc.,
        1987.

"An Analysis of Corporate Relocations to Texas."  Study prepared for the <u>Dallas
        Morning News</u>, 1988.

"Property Valuation Issues in the San Antonio Market Area."  Materials prepared for
        Valero Energy, 1988.

"A Data Base for the Dallas Primary Metropolitan Statistical Area."  Materials prepared
        for Real Search, Inc., 1988.

"Factors Affecting the Feasibility of a Multi-Purpose Development at the Hunt Ranch."
        Study prepared for Douglas Neal, Inc., 1988.

"A Historical Economic Data Base for the Dallas and Fort Worth Areas."  Data base
        compiled for Grandy's, 1988.

"The Role of Venture Capital in the Texas Economy."  Review prepared for Arthur
        Young and Company and the Texas Department of Commerce, 1988.

"A Demographic and Survey Analysis of Factors Affecting Facility Locations and
        Advertising Patterns."  Study prepared for Charter Suburban Hospital, 1989.

"URCARCO Focus Group Analysis: A Relative Evaluation of Current Advertising and
        Spokespersons."  Study prepared for URCARCO, 1990.

"Factors Affecting the Construction Materials Industry in Texas."  Study prepared for
        Vulcan Materials, Inc., 1991.

"A Valuation Analysis of Undeveloped Land in the Comal County Area."  Study
        prepared for Bennett Properties, Inc., 1991.

"Survey Instrument Design for Water Usage Analysis."  Project prepared for the District
        of Columbia, 1991 (in association with A.D. Jackson Consultants, Inc.).

"A Survey of Client and Employee Perceptions at Leard Memorial Hospital."  Analysis
        prepared for Leard Memorial Hospital, 1992.

"The Evaluation of Foreign Exchange Experts."  Material prepared for Dell Computer
        Corporation, 1993.

"A Survey of Market Perceptions and Customer Needs."  Analysis prepared for Cameron
        Bank, 1993 (in association with The Carden Group).

"The Historical Employment Practices of the National Institutes of Health."  Study
        prepared for the National Institutes of Health, 1994 (in association with A.D.
        Jackson Consultants).

"The Economic Valuation of Warren Electric Company."  Study prepared for Warren
        Electric Company, 1995.

"A Valuation Analysis of the Warrants of Telserve Corporation."  Analysis prepared for Telserve Corporation, 1996 (in association with American Business Valuations).

"The Potential Feasibility of Establishing a Technology Transfer and Research Facility in Scotland."  Study prepared for Scottish Enterprise, 1996.

"A Valuation Analysis of a Diversified Trucking Company."  An analysis prepared for Davis Trucking and Equipment, 1996.

"An Initial Assessment of Potential Losses Associated with Wholesale Food Supplier Relationships."  Study prepared for United Supermarkets, 1996.

"A Strategic Marketing Plan for the Gregg County Airport."  Study prepared for the Gregg County Airport Board, 1997.

"A Valuation Analysis of the Assets and Operations of Warren Electric Company."  Analysis prepared for Warren Electric Company, 1997.

"A Comprehensive Valuation Analysis of a Unique Hospitality Facility."  Analysis prepared for the Inn at Little Washington, 1997.

"Market Research Analysis for Potential Acquisitions in the Manufacturing Sector."  Study prepared for Time Manufacturing, 1997.

"An Analysis of the US-Mexico Trade Environment for Construction Materials."  Analysis prepared for Cemex, 1997.

"A Market Valuation of a Private Educational Program."  Study prepared for Associated Christian Education, 1997.

"A Market Research Analysis of Selected Media Markets."  Analysis prepared for A. H. Belo Corporation, 1997.

"An Analysis of Lending Conditions in Texas Markets."  Analysis prepared for Chase Bank, 2000.

"The Affordable Housing Dilemma: Magnitude and Solutions."  Study prepared for the Foundation for Affordable Housing, 2001.

"An Appraisal and Valuation of Creative Educational Institute."  Study prepared for Central National Bank, 2003.

"Analysis of the Potential Market and Value for the StandUp Bed."  Study prepared for StandUp Bed Corporation, 2005.

"No Time Like the Present: An Analysis of Issues Surrounding the Current Status of Downtown Housing in Austin."  Analysis prepared for The Austonian, 2008.

"An Overview of Selected Aspects of the Hospital Bed Manufacturing Industry."  Analysis prepared for StandUp Bed Corporation, 2014.

# Regulatory, Congressional, and Legislative Testimony

## REGULATORY, CONGRESSIONAL, AND LEGISLATIVE TESTIMONY

"The Use of Economic Models in Small Area Forecasting."  Testimony delivered to the Rural Electric Administration of the United States Department of Agriculture, Washington, DC, 1983.

"Evidence Regarding the Central Texas Cellular Telephone Market."  Testimony provided to the Federal Communications Commission, Washington, DC, 1983.

"An Economic and Demographic Profile of Central Texas."  Testimony delivered to the Federal Communications Commission, Washington, DC, 1983.

"The Future of Fiscal Patterns in Texas."  Testimony delivered to the Special Public Hearing of the Joint Select Committee on Fiscal Policy of the Texas Legislature, Austin, Texas, 1984.

"The Economic Outlook for the Next Biennium."  Testimony delivered to the Committee on Ways and Means of the Texas House of Representatives, Austin, Texas, 1985.

"The Texas Economy: Prospects for the Current Biennium."  Testimony delivered to the Committee on Ways and Means of the Texas House of Representatives, Austin, Texas, 1987.

"Economic Development Initiatives for the Future of Texas."  Testimony delivered to the Texas House of Representatives, Austin, Texas, 1987.

"A Plan for Bond Financing to Stimulate a Real Estate and Banking Recovery in Texas."  Testimony before the Committee on Banking and Financial Institutions of the Texas House of Representatives, Austin, Texas, 1987.

"Economic Development and Water Resource Requirements: Some Evidence on the Potential Impact of Little Cypress Reservoir."  Testimony delivered to the Texas Water Commission, Austin, Texas, 1987.

"The Beginnings of the Economic Recovery in the Southwest."  Testimony delivered to the Joint Economic Committee and the Senate Finance Committee, Congress of the United States, Washington, DC, 1987.

"Appropriate Measures of the Relationship Between Economic Growth and Water Resources."  Testimony before the Texas Water Commission, Austin, Texas, 1987.

"An Economic and Impact Analysis of the Construction and Operation of Little Cypress Reservoir."  Written and oral testimony delivered to the Texas Water Commission, Austin, Texas, 1987.

"Looking Beyond the Numbers and Reading Beyond the Headlines: A Perspective on the Economic Recovery in Texas."  Written and oral testimony delivered before the Joint Economic Committee, Congress of the United States, Washington, DC, 1987.

"The Economic Structure of the Texas Triangle."  Testimony delivered before the Texas Turnpike Authority, Dallas, Texas, 1988.

"The Potential Impact of the Texas High Speed Rail Project on Business Activity in Texas and its Major Metropolitan Areas."  Testimony delivered before the Texas Turnpike Authority and the Committee on Transportation of the Texas Senate, Austin, Texas, 1988.

"The Impact of the Potential Natural Gas Price Reduction Associated with the Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Household Expenditures in the Central Power & Light Company Service Area."  Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1988.

"The Economic Impact of Changing the Definition of a Producer-Handler in Federal Order 126 on Gore's, Inc., the Milk Industry Within the Order, and Overall Business Activity."  Testimony delivered before the US Department of Agriculture, Washington, DC, 1988.

"The Impact of Electricity Rate Structures Associated with the Cost Recovery and Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Household Expenditures in the Central Power & Light Company Service Area: A Comprehensive Analysis with Additional Illustrations Related to the Significance of Fuel Diversity."  Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1988.

"The Impact of Electricity Rate Structures Associated with the Cost Recovery and Operation of Units 1 and 2 of the South Texas Nuclear Project (STP) on Industrial Expenditures in the Central Power & Light Company Service Area: A Comprehensive Analysis with Fully Disaggregated Results and an Illustration Related to the Significance of Fuel Diversity."  Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1988.

"An Analysis of Regulatory Forbearance Issues Related to the Current Financial Crisis in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1988.

"The Potential Economic Impact of the V-22 Tiltrotor Aircraft on Economic Activity in Dallas/Fort Worth and Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1988.

"Materials Related to the Banking and Real Estate Situation in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1988.

"A Survey of Industrial Recruiters Regarding the Effects of the Current Civil Justice System on Business Location Decisions in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1988.

"Estimates of the Economic Impact of the Proposed Bridge Closure on Business Activity in the Granbury-Hood County Area."  Testimony delivered before the Texas Highway Commission, Austin, Texas, 1988.

"The Viability of State Purchases for Office Space Expansion in the Austin Market Area."  Testimony delivered before the Legislature Budget Board of the Texas Legislature, Austin, Texas, 1988.

"The Texas Economy: Past, Present, and Future."  Testimony delivered to the Strategic Economic Policy Commission, State of Texas, Austin, Texas, 1988.

"The Potential for High Speed Rail in the Texas Triangle."  Testimony before the Texas Turnpike Authority, Dallas, Texas, 1988.

"The Current Status of the Austin Commercial Real Estate Market and the Role of State Investment."  Testimony delivered to the Legislative Budget Board, State of Texas, Austin, Texas, 1988.

"The Financial Crisis in Texas: A Strategy for the Long-Term Viability of Smaller Institutions."  Testimony delivered to the Texas Department of Banking, Austin, Texas, 1988.

"The Economic Impact of Large Dairy Operations in Small Rural Counties: A Case Study."  Testimony delivered to the United States Department of Agriculture, Washington, DC, 1988.

"The Texas Civil Justice System and its Impact on Business Activity in Texas."  Testimony delivered to the Judiciary Committee of the Texas House of Representatives, Austin, Texas, 1989.

"The Economic Outlook for Texas and its Implications for the State Fiscal Policy."  Testimony before the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 1989.

"The Economic Impact of the Proposed Rate Structure of Central Power and Light Company on the Economy of South Texas: A Comprehensive Perspective."  Testimony delivered to the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Financial Viability and Economic Impact of a High Speed Rail System in Texas."  Testimony before the Committee on Transportation of the Texas Senate, Austin, Texas, 1989.

"Forecasting Methodology for Small Utilities."  Testimony delivered to the Rural Electric Administration of the United States Department of Agriculture, Washington, DC, 1989.

"A Supplemental Review of Alternative Electric Rate Structures and their Effects on the South Texas Economy."  Testimony delivered to the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Economic Impact of the Current Civil Justice System on Expenditures, Earnings, and Employment in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1989.

"The Potential Impact of the 'Texas First' Program of Southwestern Bell Telephone Company on Economic Development in Texas."  Testimony delivered to the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Economic Effects of the American Airlines Facility on Denton County."  Testimony to the Commissioners Court of Denton County, Denton, Texas, 1989.

"Detailed Patterns of Growth and Development in the Houston Area."  Testimony
delivered to Moody's and Standard & Poors Municipal Bond Refinancing Boards,
New York, New York, 1989.

"Some Comments on Measuring the Economic Impact of 'Texas First' on the
Developmental Potential of Texas and its Regions."  Rebuttal testimony before
the Public Utility Commission of Texas, Austin, Texas, 1989.

"The South Texas Project, Rate Shock, and the Value of New Infrastructure to the
Economy of Texas."  Testimony delivered to the Public Utility Commission of
Texas, Austin, Texas, 1989.

"The Impact of Central Office Upgrades and Outside Plant Construction Associated with
the 'Texas First' Proposal of Southwestern Bell Telephone Company on the
Economy of Texas."  Testimony delivered before the Public Utility Commission
of Texas, Austin, Texas, 1989.

"An Evaluation of the Potential Demand for Extended Metropolitan Service (EMS) in
Texas as a Result of Implementing the 'Texas First' Proposal: Evidence from a
Survey of Rockwall County and Related Data from Southwestern Bell Telephone
Company for Other Areas."  Testimony delivered before the Public Utility
Commission of Texas, Austin, Texas, 1989.

"An Empirical Examination of the 'Rate Shock' Hypothesis Regarding Utility Rates and
Economic Activity: Evidence from an Extensive Socioeconomic Model and a
Comprehensive National Data Base."  Testimony delivered before the Public
Utility Commission of Texas, Austin, Texas, 1989.

"A Comprehensive Analysis of the Economic Effects Associated with the Displacement
of Natural Gas Associated with Units 1 and 2 of the South Texas Nuclear Project
(STP): An Impact Analysis Including Losses in Expenditures, Earnings, and
Employment with the South Texas Economy and Offsetting Savings in the
Commercial and Industrial Sectors."  Testimony delivered before the Public
Utility Commission of Texas, Austin, Texas, 1989.

"The Civil Justice System: A Synopsis of Its Impact on the Texas Business Climate."
Testimony delivered before the Texas Legislature, Austin, Texas, 1989.

"The Impact of the Overall Rate Structure Associated with the 'Texas First' Proposal of
Southwestern Bell Telephone Company on Industrial Expenditures in Texas and
Selected Sub-Regions."  Testimony delivered before the Public Utility
Commission of Texas, Austin, Texas, 1989.

"The Impact of Natural Gas Price Reductions of the Household Sector on the Central
Power & Light Company Service Area: An Extended Analysis Incorporating New
Capacity Factors of the South Texas Nuclear Plant."  Testimony delivered before
the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Economic Development Potential of an Enhanced Telecommunications System for
Texas and Various Regions: Selected Hypothetical Impacts of the Proposed
'Texas First' Proposal of Southwestern Bell Telephone Company."  Testimony
delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Impact of Proposed Rate Increases Associated with the Implementation of the South Texas Nuclear Project on Industrial Activity in the Central Power & Light Company Service Area: A Detailed Analysis Incorporating a Revised Nine-Year Phase-In Plan and Projected Natural Gas Market Responses." Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Impact of the American Airlines Facility and Related Activity on Tarrant County, Denton County, the City of Fort Worth, and the Northwest Independent School District." Testimony delivered before the Fort Worth City Council, the Denton County Commissioners Court, and the Northwest Independent School District Board of Trustees, Fort Worth and Denton, Texas, 1989.

"The Impact of the Overall Rate Structure Associated with the 'Texas First' Proposal of Southwestern Bell Telephone Company on Household Expenditures in Texas and Selected Sub-Regions." Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"Projections of Population and Employment in the Harris County Toll Road Authority Service Area: A Methodological Synopsis and Detailed Results by Census Tract." Testimony delivered before Moody's and Standard & Poor's, New York, New York, 1989.

"A Synopsis of the Current Economic and Demographic Status of the Houston Economy." Testimony delivered before Moody's and Standard & Poor's, New York, New York, 1989.

"A Survey of Market Penetration and Customer Satisfaction with Optional Telephone Services in the Dallas/Fort Worth Area." Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Overall Economic Impact of the Ongoing Operations of the South Texas Project on Business Activity in the Central Power & Light Company Service Area: A Comprehensive Assessment Accounting for Household and Industrial Rate Increases, Natural Gas Price Decreases, and the Economic Stimulus Associated with Plant Operations." Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"A Comparative Analysis of the Impact on the Economy of Texas of the 'Texas First' Proposal of Southwestern Bell Telephone Company and the Rate Structure Prepared by the Staff of the Public Utility Commission of Texas." Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 1989.

"The Role of Civil Justice Reform in Global Competitiveness." Testimony delivered to the Congress of the United States, Washington, DC, 1990.

"An Analysis of Future Water Resource Demand in McLennan County in Light of Recent Developments and Area-Specific Information." Testimony delivered before the Texas Water Commission, Austin, Texas, 1990.

"The Impact of Fiesta Texas on Business Activity and Fiscal Revenues in the San Antonio Metropolitan Area." Testimony delivered before the San Antonio City Council, San Antonio, Texas, 1990.

"A Comprehensive Demographic and Economic Profile of Ellis County and an Economic Development Plan to be Implemented as a Component of the Land Use and Infrastructure Plan in Association with the Superconducting Super Collider in Ellis County, Texas."  Testimony delivered before the Texas National Research Laboratory Commission, Dallas, Texas, 1990.

"The Economic Impact of Texas State Technical Institute on Business Activity in Waco, the Lower Rio Grande Valley, Amarillo, Sweetwater, and the State of Texas." Testimony delivered before the Texas Legislature, Austin, Texas, 1990.

"Alternative Scenarios Related to Water Resource Requirements in the Brazos River Basin."  Testimony delivered before the Texas Water Commission, Austin, Texas, 1990.

"The Economic Effects of a Free Trade Agreement with Mexico."  Testimony before the Joint Economic Committee, Congress of the United States, Washington, DC, 1991.

"The Role of Technical Education in Texas."  Testimony delivered to the Senate Committee on Economic Development, State of Texas, Austin, Texas, 1991.

"Tort Reform and Business Activity."  Testimony delivered before the Senate Judiciary Committee, State of Texas, Austin, Texas, 1991.

"Economic Impact of Future Production in the East Texas Oil Field."  Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 1991.

"High Speed Rail: Its Role in Economic Development."  Testimony delivered to the Texas High-Speed Rail Authority, 1991.

"The Significance of Financial Integrity and Capital Market Access on Economic Development in Texas."  Testimony delivered to the Public Utility Commission of Texas, Austin, Texas, 1991.

"The Economic Impact of the Proposed Camino Colombia Toll Road."  Testimony before the Texas Highway Commission, Austin, Texas, 1991.

"The Impact of the Little Cypress Reservoir on East Texas."  Testimony delivered before the Longview City Council, Longview, Texas, 1991.

"Economic Effects of Amendments to the Comprehensive Watersheds Ordinance (CWO)."  Testimony delivered to the Austin City Council, Austin, Texas, 1991.

"The Need for Large-Scale Financial Institutions to Promote Credit Availability in the US Economy."  Testimony delivered to the Board of Governors of the Federal Reserve System, Washington, DC, 1991.

"The Need for Large-Scale Financial Institutions to Promote Credit Availability in the US Economy."  Written testimony prepared for the Board of Governors of the Federal Reserve System, Washington, DC, 1991.

"A Comprehensive Analysis of the Economic Impact of the Proposed Texas High Speed Rail Project on Business Activity."  Testimony delivered before the Texas High Speed Rail Authority, Austin, Texas, 1991.

"The Impact of Expanded Oil Production in the East Texas Field on Business Activity in the Local Economy (Gregg, Rusk, Smith, and Upshur Counties)."  Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 1991.

"The Impact of Texas State Technical Institute on Business Activity in the State of Texas: An Analysis of the Value of a Well-Trained Technical Workforce." Testimony delivered before the Texas Legislature, Austin, Texas, 1991.

"Some Effects of a Free Trade Agreement with Mexico on the Domestic Economy." Testimony delivered before the Joint Economic Committee, Congress of the United States, Washington, DC, 1991.

"An Assessment of Tort Reform and Economic Activity."  Testimony delivered before the Texas Legislature, Austin, Texas, 1991.

"The Economic Impact of the Proposed Camino Columbia Toll Road on Business Activity in the Laredo-Webb County Area."  Testimony delivered before the Texas Highway Commission, Austin, Texas, 1991.

"A Comprehensive Analysis of Various Factors Affecting the Future Economic Development in the Austin Area in Light of Environmental and Regulatory Trends."  Testimony delivered before the Austin City Council, Austin, Texas, 1991.

"The Impact of Social Investment Practices on Public Portfolios."  Testimony delivered to the Nebraska State Legislature, Lincoln, Nebraska, 1992.

"The Role of Telecommunications Infrastructure in Rural Educational and Economic Development."  Testimony delivered to the Committee on Science and Technology of the Texas House of Representatives, Austin, Texas, 1992.

"Synopsis of Testimony Regarding Telecommunications Infrastructure, Education, and Rural Economic Development."  Written testimony prepared for the Committee on Science and Technology, Texas House of Representatives, Austin, Texas, 1992.

"The Future Prospects of the Retail Market in the Fort Worth Area."  Testimony delivered to the Texas Motor Vehicle Commission, Austin, Texas, 1992.

"The Role of Expanded Transportation Infrastructure in the Growth of the Border Region."  Testimony delivered to the Commissioner's Court of Webb County, Laredo, Texas, 1992.

"The Essential Nature of Infrastructure Enhancement in the Border Economic Complex." Testimony delivered to the Laredo City Council, Laredo, Texas, 1992.

"The Economic Impact of Camino Colombia Toll Road on the Laredo/Webb County Area."  Testimony delivered before the Texas Transportation and Commission, Austin, Texas, 1992.

"Analysis of the Future Viability of New Dealerships in the Fort Worth Metropolitan Area."  Testimony delivered before the Texas Motor Vehicle Commission, Austin, Texas, 1992.

"The Costs of Social Investment by State Governments."  Testimony delivered before the Nebraska State Legislature, Lincoln, Nebraska, 1992.

"The Economic Impact of the North American Free Trade Agreement on Traffic Patterns and Real Estate Development in the Laredo Metropolitan Statistical Area." Testimony delivered before the Texas Department of Transportation, Austin, Texas, 1992.

"The Impact of the Proposed Camino Colombia Toll Road on Economic Activity in Webb County and the City of Laredo: An Analysis with Emphasis on the Distribution of Effects Within the County and the Consequences Related to the North American Free Trade Agreement."  Testimony delivered before the Texas Department of Transportation, Austin, Texas, 1992-1993.

"An Economic Outlook for the City of Dallas and the State of Texas."  Testimony delivered before the Dallas City Council Planning Conference, Dallas, Texas, 1993.

"The Economic Outlook for the Texas Economy: An Assessment of Key Policy Issues and Other Impacts."  Testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1993.

"Synopsis of a Presentation Regarding the Outlook for the Texas Economy."  Written testimony prepared for the Business and Industry Committee, Texas House of Representatives, Austin, Texas, 1993.

"Demographic and Economic Consequences of Proposed Alternative Military Base Closure Programs."  Testimony delivered to the Federal Base Realignment and Closure Commission, San Antonio, Texas, 1993.

"Economic Impacts of Franchise Operations in Texas and their Contributions for Jobs and Growth."  Testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1993.

"Deregulation of Intrastate Trucking: The Costs of the Current System in Light of Recent Reforms."  Testimony delivered to the Committees on Transportation of the Texas House of Representatives and the Texas Senate, Austin, Texas, 1993.

"The Economic Consequences of a Landfill Siting in the Development Corridor of Denton County."  Testimony delivered before the Texas Water Commission, Austin, Texas, 1993.

"Methodological Issues in Assessing the Economic Impact of Toll Roads on Various Geographic Regions."  Testimony delivered to the Texas Department of Transportation, Austin, Texas, 1993.

"Economic Impact of the Superconducting Super Collider on Business Activity Among the Various States."  Testimony delivered to the Congress of the United States, Washington, DC, 1993.

"Small Area Forecast for the Laredo MSA."  Testimony delivered before the Texas Department of Transportation, Austin, Texas, 1993.

"Analysis of the Effects of a Landfill on Economic Development in Denton County." Testimony delivered before the Texas Water Commission, Austin, Texas, 1993.

"The Economic Impact of Elimination of the Air Logistics Center at Kelly Air Force Base on the San Antonio Economy: An Analysis with Emphasis on Selected Occupations and Demographic Segments." Testimony delivered before the Federal Base Realignment and Closure Commission, Washington, DC, 1993.

"The Impact of Intrastate Trucking Regulation on Business Activity and Economic Development in Texas and Its Metropolitan Areas—An Analysis in Light of Recent Legislative Initiatives." Testimony delivered before the Committees on Transportation of the Texas House of Representatives and the Texas Senate, Austin, Texas, 1993.

"The Impact of Franchising on the Economy of Texas: An Analysis Comparing Potential Effects of Legislative Restrictions on Future Expansion." Testimony delivered before the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1993.

"A Comparative Analysis of Agricultural and Industrial Losses Associated with Pumping Limitations in the Edwards Aquifer." Testimony delivered before the Texas Legislature, Austin, Texas, 1993.

"The Economic Impact of the Superconducting Super Collider on the United States and Each of the States." Testimony delivered before the Congress of the United States, Washington, DC, 1993.

"The Long-Term Consequences of Production Patterns in the East Texas Oil Field." Testimony delivered to a Special Hearing of the Railroad Commission of Texas, Longview, Texas, 1994.

"Economic Losses and the Texas Deceptive Trade Practices Act: A Comprehensive Assessment." Testimony delivered to the Economic Development Committee of the Texas Senate, Austin, Texas, 1994.

"Economic Benefits of a Proposed Convention Center Hotel on the Local Economy." Testimony delivered to the Kansas City Civic Commission, Kansas City, Missouri, 1994.

"The Policy Implications of NAFTA and GATT." Testimony delivered to the Interim Committee on NAFTA and GATT of the Texas House of Representatives, San Antonio, Texas, 1994.

"The Prospects for Casino Gaming in the Baton Rouge Metropolitan Area." Testimony delivered before the Louisiana Riverboat Gaming Commission, Baton Rouge, Louisiana, 1994.

"The State Budget Outlook and Its Implications for Taxation Policy." Testimony delivered to the Texas Conservative Coalition Task Force of the Texas Legislature, Austin, Texas, 1994.

"A Reassessment of the Benefits Derived from Full Allowable Production Activity in the East Texas Oil Fields." Testimony delivered before the Railroad Commission of Texas, Fort Worth, Texas, 1994.

"The Deceptive Trade Practices Act: An Analysis of Its Consequences for Economic Activity."  Testimony delivered before the Texas Senate, Austin, Texas, 1994.

"The Economic Impact of Proposed Hotel Construction on Activity in the Kansas City Area."  Testimony delivered before the Kansas City Civic Commission, Kansas City, Missouri, 1994.

"The Economic Impact of Three Alternative Casino Projects on the Baton Rouge Metropolitan Area and the State of Louisiana."  Testimony delivered before the Riverboat Gaming Commission of the State of Louisiana, Baton Rouge, Louisiana, 1994.

"Tort Reform Initiatives and the Performance of the Texas Economy."  Testimony given to the Economic Development Committee of the Texas Senate, Austin, Texas, 1995.

"Economic Issues Affecting the Texas Business Climate."  Testimony given to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1995.

"The Viability of La Entrada Al Pacifico as a Corridor for International Economic Development."  Testimony delivered before the Texas Transportation Commission, Austin, Texas, 1995.

"Economic Growth and Development Potential Along the Proposed I-69 Corridor."  Testimony delivered to the Texas Transportation Commission, Austin, Texas, 1995.

"The Economic Contributions of Cemex Production Facilities in the New Braunfels Area."  Testimony delivered to the New Braunfels City Council, New Braunfels, Texas, 1995.

"The Role of the Air Logistics Center at Kelly Air Force Base in the Economy of the San Antonio Area: An Analysis with Emphasis on Geographic and Ethnic Income and Employment Patterns."  Testimony delivered before the Federal Base Realignment and Closure Commission, San Antonio, Texas, 1995.

"The Economic Impact of Brooks Air Force Base on the San Antonio Economy and the Local Housing and Unemployment Situation."  Testimony delivered before the Federal Base Realignment and Closure Commission, Washington, DC, 1995.

"An Analysis of the Domestic and International Trade Potential Along Three Proposed Western Highway Corridors— An Analysis with Emphasis on La Entrada Al Pacifico."  Testimony delivered before the Texas Transportation Commission, Austin, Texas, 1995.

"The Impact of Kelly Air Force Base on San Antonio and the Hispanic Workforce."  Testimony delivered before the Federal Base Realignment and Closure Commission, Washington, DC, 1995.

"Economic and Competitive Factors in the Proposed Union Pacific—Southern Pacific Merger."  Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 1996.

"Economies and Professional Sports in Texas."  Testimony delivered to the Committee on Business and Industry, Texas House of Representatives, Austin, Texas, 1996.

"Testimony Regarding Economies and Professional Sports in Texas."  Written testimony prepared for the Committee on Business and Industry, Texas House of Representatives, Austin, Texas, 1996.

"Telecommunications and Economic Development."  Testimony delivered to the Subcommittee on Oversight of Major Information Systems Regarding Telecommunications and Economic Development, Texas House of Representatives, Austin, Texas, 1996.

"Economic Development and Professional Sports in Texas."  Testimony delivered to the Committee on Intergovernmental Relations for the Texas Senate, Austin, Texas, 1996.

"Summary of Testimony Before the House Committee on Business and Industry of the Texas Legislature: Sports Facilities and Economic Development."  Written testimony delivered to the House Committee on Business and Industry of the Texas House of Representatives, Houston, Texas, 1996.

"A Synopsis of Research for the Legislative Hearing on Sports and Economic Development for the Texas House Committee on Business and Industry." Written testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Houston, Texas, 1996.

"Testimony Regarding Telecommunications and Economic Development."  Written testimony prepared for the Subcommittee on Oversight of Major Information Systems, Texas House of Representatives, Austin, Texas, 1996.

"Testimony Regarding Economic Development and Professional Sports in Texas." Written testimony prepared for the Committee on Intergovernmental Relations, Texas Senate, Austin, Texas, 1996.

"The Net Impact of the Proposed Merger of Union Pacific and Southern Pacific on Business Activity and Competition in Texas."  Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 1996.

"The Potential Economic Impacts of the Proposed Union Pacific-Southern Pacific Merger."  Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 1997.

"The Economic Framework for the Current Fiscal Environment."  Testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1997.

"Taxation Options for the State of Texas."  Testimony delivered to the Special Joint Meeting of the Texas House of Representatives and the Texas Senate, Austin, Texas, 1997.

"Innovative Options for Funding Public Education in Texas."  Written and oral testimony delivered to the Select Committee on Revenue and Public Education Funding Committee of the Texas House of Representatives, Austin, Texas, 1997.

"An Analysis of Economic and Cost Factors Regarding Plutonium Conversion and MOX Fuel Fabrication at the Pantex Plant." Written and oral testimony delivered to the Hearing on Nuclear Waste Disposition, United States Department of Energy, Amarillo, Texas, 1997.

"The Economy and the Future of Tax Policy in Texas." Testimony provided to the Select Committee on Tax Reform and Public Education of the Texas Legislature, Austin, Texas, 1997.

"The Potential Trade Gains from a Mexico-Western Texas Highway Corridor." Written and oral testimony delivered to the Texas Department of Transportation, Austin, Texas, 1997.

"The Economic Impact of Projected Industrial Water Shortages in the Twelve-County Corpus Christi Service Area in the Absence of the Garward Water Purchase—A Preliminary Assessment." Written testimony prepared for the Interim Committee on Water Resources Development and Management, Corpus Christi, Texas, 1998.

"The Economic Impact of Potential Water Shortages on the Corpus Christi Region." Testimony delivered before the Select Committee on the State Water Plan of the Texas Senate, Austin, Texas, 1998.

"The Impact of the Proposed Longhorn Partners Pipeline on Business Activity in Texas, the Houston Metropolitan Area, the Odessa-Midland Metropolitan Area, and the El Paso Metropolitan Area." Testimony delivered before the Commerce Committee Subcommittee on Telecommunications, Trade, and Consumer Protection, United States House of Representatives, Washington, DC, 1998.

"The Economic Impact of Projected Industrial Water Shortages in the Twelve-County Corpus Christi Service Area in the Absence of the Garward Water Purchase—A Preliminary Assessment." Testimony delivered to the Interim Committee on Water Resources Development and Management, Texas House of Representatives, Corpus Christi, Texas, 1998.

"Economic Factors Shaping the Future of Texas." Testimony delivered to the Select Interim Committee on Economic Development of the Texas Legislature, Austin, Texas, 1998.

"The Economics of Competitive Gasoline Markets." Testimony delivered to the Transportation Hearing of the Congress of the United States, El Paso, Texas, 1998.

"The Economic Effects of Expanding the Scope of Environmental Impact Statements on US Business Activity." Testimony delivered to the Congress of the United States, Washington, DC, 1999.

"Economic Prospects on the Texas Economy." Testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 1999.

"The Economic Considerations Associated with Interstate Dairy Compacts." Testimony delivered to the Committee on Agriculture of the Texas House of Representatives, Austin, Texas, 1999.

"The Economic Impact of Investment Tax Credits and Related Incentives in Business Activity and Economic Development."  Written and oral testimony delivered to the Committee on Ways and Means of the Texas House of Representatives, Austin, Texas, 1999.

"The Economic Consequences of Internet Access Monopolies on the Texas Economy."  Written and oral testimony delivered to the State Affairs Committee of the Texas House of Representatives, Austin, Texas, 1999.

"Some Thoughts on Business Tax Incentive Issues and Economic Development."  Written testimony prepared for the Speaker of the House and the Committee on Appropriations, Texas House of Representatives, Austin, Texas, 1999.

"The Economic Consequences of Internet Access Monopolies on the Texas Economy."  Written testimony prepared for the Subcommittee on Technology and Business Growth, Committee on Economic Development, Texas Senate, Austin, Texas, 1999.

"The Economic Development Benefits of Electricity Deregulation."  Testimony delivered to the Economic Development Committee of the Texas Senate, Austin, Texas, 1999.

"The Impact of Alternative Business Tax Measures on Economic Activity in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 1999.

"Economic and Competitive Considerations in the Provision of Internet Service Via Cable Access."  Testimony delivered before the Committee on Public Utilities of the Texas Legislature, Austin, Texas, 1999.

"The Impact of a Proposed Investment Tax Credit for Large-Scale Projects on Business Activity in Texas: A Dynamic Estimate."  Testimony delivered before the Committee on Ways and Means of the Texas House of Representatives, Austin, Texas, 1999.

"The Economic Impacts of Extending Environmental Impact Statement Requests to Routine Permitting Cases."  Testimony delivered before the Energy Committee, US House of Representatives, El Paso, Texas, 1999.

"The Economic Consequences of Electric Power Deregulation on the Texas Economy Under Alternative Structural Programs."  Testimony delivered before the Committee on Economic Development of the Texas Senate, Austin, Texas, 1999.

"The Implications of the Clean Air Act Amendments for Business Activity in Attainment and Non-Attainment Areas."  Testimony delivered before a Special Briefing Session of the Texas Legislature, Austin, Texas, 2000.

"The Clean Air Act: An Analysis of Its Possible Consequences for Non-Attainment and Other Areas."  Testimony delivered to the Legislative Briefing of the Texas Clean Air Working Group, Austin, Texas, 2000.

"Impact of Investment in Health, Education, and Infrastructure on Border Economic Performance."  Written and oral testimony delivered to the Lieutenant Governor's Summit on Border Issues, Austin, Texas, 2001.

"Testimony Regarding Inventory Tax Reform."  Written testimony prepared for the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2001.

 "Testimony Regarding CSSB 1366."  Written and oral testimony delivered to the State Affairs Committee, Texas Senate, Austin, Texas, 2001.

"Economic Growth and State Contracting Practices: Some Thoughts on Effective Integration."  Testimony delivered to the Committee on State Affairs of the Texas Senate, Austin, Texas, 2001.

"Testimony of M. Ray Perryman Regarding the Economic Consequences of Inadequate Bank Credit in Texas."  Testimony delivered to the Committee on Business and Commerce, Texas Senate, Austin, Texas, 2001.

"Testimony on the Economic Significance of Critical Issues in the Southeast Texas Region."  Testimony delivered to the Committee on Redistricting of the Texas Senate, Austin, Texas, May 2001.

"The Impact of Joint Strike Fighter (JSF) Manufacturing on the Fort Worth Area."  Testimony delivered to Congressional briefing, Fort Worth, Texas, 2001.

"Transportation Funding Options and the Need for Infrastructure Development."  Invited testimony before the Committee on Transportation, Texas House of Representatives, Austin, Texas, 2001.

"The Economic Development Consequences of Developing a Cooperative Tax Mechanism for Large Industrial Locations in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2001.

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on Rural Growth and Development."  Testimony delivered before the Texas Legislature, Austin, Texas, 2001.

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on the Situation Confronting the Texas-Mexico Border Region."  Testimony delivered before the Texas Legislature, Austin, Texas, 2001.

"Telecommunications and the New Texas Economy: An Analysis with Emphasis on the Implications for Urban Areas in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2001.

"An Analysis of the Economic Consequences of Inadequate Bank Credit in Texas."  Testimony delivered before the Committee on Business and Commerce of the Texas Senate, 2001.

"The Impact of the Joint Strike Fighter (JSF) Contract on Business Activity in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2001.

"The Impact of the Three-Tiered Licensed Beverage Distribution System on Business Activity in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2002.

"Financing the Public Schools of Texas: Some Issues of Growth, Equity, and Efficiency."  Testimony delivered before the Texas Legislature, Austin, Texas, 2002.

"The Potential Impact of Proposed Judicial Reforms on Economic Activity in Mississippi."  Testimony delivered before the Mississippi Legislature, Jackson, Mississippi, 2002.

"A Retrospective Analysis of the Likely Outcome of an Automobile Dealership Siting in a Large Urban Market."  Testimony delivered before the Texas Motor Vehicle Commission, Austin, Texas, 2002.

"The Negative Impact of the Current Civil Justice System on Economic Activity in West Virginia."  Testimony delivered before the West Virginia Legislature, Charleston, West Virginia, 2002.

"The Effects of Access Management Policies on Business Activity."  Testimony delivered before the Texas Department of Transportation and the Texas Legislature, Austin, Texas, 2002.

"The Importance of Maintaining a Proper State Implementation Plan (SIP) to Address Air Quality Issues in Texas: An Economic and Fiscal Impact Assessment."  Testimony delivered before the Texas Legislature, Austin, Texas, 2002.

"The Consumer Impacts Associated with Inequitable Rate and Acquisition Interest of Cap Rock Electric Corporation."  Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 2002.

"Thoughts on Access-to-Capital Issue."  Testimony prepared for the Committee on Business and Commerce, Texas Senate, Austin, Texas, 2002.

"The Potential for Accelerated Transportation Development Through Toll Equity and Mobility Funds."  Invited testimony delivered to the Committee on State Affairs of the Texas Senate, Fort Worth, Texas, 2002.

"Demographic and Economic Patterns Shaping Public School Finance in Texas."  Invited testimony before the Joint Select Committee on Public School Finance, of the Texas Legislature, Austin, Texas, 2002.

"Testimony Regarding the Texas Mobility Fund."  Testimony delivered to the Committee on Transportation, Texas House of Representatives, Austin, Texas, 2002.

"Testimony Regarding the Texas Mobility Fund."  Testimony delivered to the Committee on State Affairs, Texas Senate, Austin, Texas, 2002.

"Alternative Funding Options for Public Education in Texas—An Assessment of Efficiency, Growth, and Equity."  Invited testimony before the Joint Select Committee on Public School Finance of the Texas Legislature, Austin, Texas, 2002.

"Workforce Development and Job Training Programs."  Written and oral testimony delivered to the Committee on Business and Commerce of the Texas Senate, Austin, Texas, 2002.

"Comments Regarding the Proposed Access Management Policies of the Texas Department of Transportation (TxDOT)."  Materials prepared for the Texas Department of Transportation Forum, Dallas, Texas, 2002.

"The Role of Access Management in Sustaining Mobility and Economic Progress."  Testimony delivered to the Texas Department of Transportation Forum, Dallas, Houston, and Austin, Texas, 2002.

"The Importance of Air Quality and Transportation Infrastructure on the Future Growth of the Texas Economy."  Testimony delivered to the Air Quality and Transportation Briefing of the 78th Texas Legislature, Austin, Texas, 2003.

"Testimony of M. Ray Perryman Regarding Judicial Reforms in Texas."  Testimony delivered to the Committee on Civil Practices, Texas House of Representatives, Austin, Texas, 2003.

"Invited Testimony of M. Ray Perryman Regarding the Economic Development Agenda for the State of Texas."  Testimony delivered to the Committee on Economic Development, Texas House of Representatives, Austin, Texas, 2003.

"Invited Testimony of M. Ray Perryman Regarding the Economics of Competition in the Provision of Health Insurance Plan Administration to the Teacher Retirement System."  Testimony delivered to the Select Committee on State Health Care Expenditures, Texas House of Representatives, Austin, Texas, 2003.

"Tax Treatment of Gas Distribution Infrastructure and Investment Incentives."  Testimony before the Committee on Regulated Industries of the Texas House of Representatives, Austin, Texas, 2003.

"Testimony of M. Ray Perryman Regarding Highway Access and Economic Development."  Testimony delivered to the Committee on Infrastructure Development and Security, Texas Senate, Austin, Texas, 2003.

"Testimony in Support of Incentives for Gas Utility Development."  Testimony delivered to the Committee on Regulated Industries, Texas House of Representatives, Austin, Texas, 2003.

"The Impact of Inventory Taxation Policy Within the Texas Economy."  Testimony delivered to the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2003.

"Testimony Regarding the Effect of Inventory Taxes on Business Activity in Texas."  Testimony prepared for the Committee on Local Government Ways and Means, Texas House of Representatives, Austin, Texas, 2003.

"Testimony of M. Ray Perryman Regarding the Potential Contribution of Expanded Gaming Options on the Economy of Texas."  Testimony delivered to the Committee on Licensing and Administrative Procedures, Texas House of Representatives, Austin, Texas, 2003.

"Testimony of M. Ray Perryman Regarding the Economic Consequences of the Current Beverage Distribution System in Texas."  Testimony before the Committee on Economic Development of the Texas House of Representatives, Austin, Texas, 2003.

"Testimony Regarding the Expansion of Community Health Facilities."  Testimony delivered before the Committee on Economic Development, Texas House of Representatives, Austin, Texas, 2003.

"Testimony Regarding the Relative Merits of Various Alternative Methods for Public School Finance."  Testimony prepared for the Select Committee on Public School Finance, Texas House of Representatives, Austin, Texas, 2003.

"The Impact of Restricted Information Flow on the Availability of Credit and Overall Economic Activity."  Testimony delivered to the Congressional Briefing on the Fair Credit Reporting Act, Washington, DC, 2003.

"An Economic Evaluation of the Proposed Gas Reliability Infrastructure Program (GRIP) to Encourage the Enhancement of the Natural Gas Distribution System in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2003.

"Medicaid and the Children's Health Insurance Program (CHIP): An Assessment of Their Impacts on Business Activity and the Consequences of Potential Funding Reductions."  Testimony delivered before the Texas Legislature, Austin, Texas, 2003.

"The Impact of the Proposed Judicial Reforms on Business Activity in Texas: An Initial Assessment."  Testimony delivered before the Texas Legislature, Austin, Texas, 2003.

"The Economic Consequences of Failing to Renew Current Provisions of the Fair Credit Reporting Act (FCRA) Which Promote Uniform National Standards."  Testimony delivered before the US Congress, Washington, DC, 2003.

"The Impact of Horse and Greyhound Racing on Business Activity in Texas: An Analysis Encompassing the Effects of Permitting Video Lottery Terminals (VLTs) at Licensed Track Facilities with Emphasis on the Contributions to Agriculture and Rural Development."  Testimony delivered before the Texas Legislature, Austin, Texas, 2003.

"The Impact of the Aggregates and Concrete Industry on the Economy of Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2003-2004.

"The Effects of Automobile Dealership Sitings on Sales Activity in the Dallas-Fort Worth Market Area."  Testimony delivered before the Texas Motor Vehicle Commission, Austin, Texas, 2003-2004.

"Redefining the Prospects for Sustainable Prosperity, Employment Expansion, and Environmental Quality in the US: An Assessment of the Economic Impact of the Initiatives Comprising the Apollo Project."  Testimony delivered before the US Congress, Washington, DC, 2004.

"Stalling the Engine of Economic Growth: An Analysis of the Potential Impacts of Implementing the US VISIT Program at the US-Mexico Border on the National and Texas Economies."  Testimony delivered before the US Congress, Washington, DC, 2004.

"The Economic and Competitive Effects of Relocating an Automobile Dealership in the North Austin Area."  Testimony delivered before the Texas Motor Vehicle Commission, Austin, Texas, 2004.

"'Critical Condition!'  An Assessment of the Impact of the Health Care Sector on the Texas Economy, with Emphasis on the Situation Confronting Hospitals and the Effects of Medicaid and Children's Health Insurance Program (CHIP) Funding Reductions."  Testimony delivered before the Texas Legislature, Austin, Texas, 2004.

"The Impact of the Aggregates and Concrete Industry on the Economy of Texas and Its Regions."  Testimony delivered to the Governor's Advisory Council, Austin, Texas, 2004.

"The Economic and Fiscal Impact of the Proposed Pecan Creek Village Center on the City of Colleyville."  Testimony delivered before the Colleyville City Council, Colleyville, Texas, 2004.

"The Impact of Implementing an Owner-Controlled Insurance Program (OCIP) for State Highway Construction on Business Activity in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2004.

"Texas Justice: An Evaluation of the Economic Development, Productivity, and Other Benefits to the Texas Economy Associated with Increased Investment in the State Court System."  Testimony delivered before the Texas Legislature, Austin, Texas, 2005.

"The Consequences of Selected Potential Tax Reforms for Real Estate Performance and Business Activity in Texas."  Testimony delivered before the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"The Consequences of a Proposed Measure for the Reform of Public School Finance for Business Activity in Texas."  Testimony delivered before the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"The Impact of Potential Restraints on Local Government Activity (Appraisal Caps, Expenditure Limits, and Revenue Limits) on the Economy of Texas."  Testimony delivered before the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"An Assessment of Selected Statistical Methods as a Proxy for Estimating Election Outcomes."  Testimony delivered before the Judiciary Committee, Texas House of Representatives, Austin, Texas, 2005.

"The Impact of Requiring Contractors to Provide Long-Term Warranties for Highway Construction on Business Activity in Texas."  Testimony delivered before the Texas Legislature, Austin, Texas, 2005.

"The Impact of Horse and Greyhound Racing on Business Activity in Texas: An Updated Analysis Encompassing the Effects of Permitting Video Lottery Terminals (VLTs) at Licensed Track Facilities with Emphasis on the Contributions to Agriculture and Rural Development and Selected House Districts."  Testimony delivered before the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"An Assessment of the Impact of Competition in the Delivery of Wireline Video Services on Business Activity in Texas."  Testimony delivered to the Regulated Industries Committee of the Texas House of Representatives, Austin, Texas, 2005.

"Testimony Regarding Trends in the Economics of Health Care."  Testimony delivered to the Committee on Public Health, Texas House of Representatives, Austin, Texas, 2005.

"Testimony Regarding a Tax Reform Initiative Involving Implementing a Broad-Based Business Tax, Reducing School Property Taxes, and Increasing School Funding."  Testimony delivered to the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"Testimony Regarding Proposals to Severely Limit Local Property Tax Revenue Growth (House Bill 1006 (HB1006)) or Appraised Values (House Joint Resolution 35 (HJR35))."  Testimony prepared for the Committee on Ways and Means, Texas House of Representatives, Austin, Texas, 2005.

"Testimony Regarding the Economic Impact of Video Lottery Terminals and Casino Gaming on the Economy of Texas."  Testimony prepared for the Ways and Means Committee, Texas House of Representatives, Austin, Texas, 2005.

"Invited Comments Regarding Video Competition, Universal Service, and Other Communications Issues."  Testimony prepared for the Committee on Regulated Industries, Texas House of Representatives, Austin, Texas, 2006.

"Invited Testimony Regarding the Current and Projected Impact of Pharmacy Benefit Managers on the Texas Economy and Potential Consequences of Various Potential Regulations."  Testimony delivered to the Joint Meeting of the Committee on State Affairs and the Committee on Health and Human Services, Texas Senate, Austin, Texas, 2006.

"Invited Testimony Regarding Proposals to Limit Local Tax Revenue Growth or Appraised Values."  Testimony prepared for the Task Force on Appraisal Reform, Texas State Legislature, Austin, Texas, 2006.

"Healthy Minds and Bodies: The Impact of Health Care Benefits Paid by the Teacher Retirement System of Texas (TRS) on Business Activity in Texas, Its Regions, Metropolitan Areas, and Counties."  Testimony delivered before the Board of Directors of the Texas Retirement System of Texas, Austin, Texas, 2006.

"The Impact of Pharmacy Benefit Managers (PBMs) on the Texas Economy: An Assessment of Current and Projected Benefits and the Consequences of Various Potential Regulations."  Testimony delivered before a Joint Hearing of the Committee on State Affairs and the Committee on Health and Human Services, Texas Senate, Austin, Texas, 2006.

"Invited Comments Regarding the Progress of and Prognosis for Electric Competition." Written testimony prepared for the Committee on Regulated Industries, Texas House of Representatives, Austin, Texas, 2006.

"Beyond the Classroom: The Impact of Pension Benefits Paid by the Teacher Retirement System of Texas (TRS) on Business Activity in Texas, Its Regions, Metropolitan Areas, and Counties." Testimony delivered before the Board of Directors of the Texas Retirement System of Texas, Austin, Texas, 2006.

"The Potential Impact of More Efficient Regulation of the Property/Casualty and Life Insurance Sectors on US Business Activity." Testimony delivered before the US Congress, Washington, DC, 2006.

"Risk, Return, Investment, and the Global Economy: Potential Obstacles to Sustainable Prosperity." Testimony delivered before the US Congress, Washington, DC, 2006.

"The Consequences of Specific Proposals to Limit Local Tax Revenues or Appraised Values from Business Activity and Fiscal Responsiveness in Texas." Testimony delivered before the Task Force on Appraisal Reform, Austin, Texas, 2006.

"The Economic Impact of Various In-State Common Carrier Pipeline Transportation Issues." Testimony delivered before the Railroad Commission of Texas, Austin, Texas, 2006.

"An Assessment of the Economy of the Tier 1 Windstorm Insurance Coverage Area (Texas Gulf Coast), Its Linkage to Other Parts of the State, and the Consequences of Substantial Insurance Rate Increases and Reduced Coverage Availability." Testimony delivered before the Texas Legislature, Austin, Texas, 2006-2007.

"Invited Testimony Regarding Enhanced Competition in Video Communications Stemming from SB5." Testimony prepared for the Committee on Regulated Industries, Texas House of Representatives, Austin, Texas, 2007.

"The Role of Undocumented Workers in the Texas Economy." Invited testimony delivered to the Committee on State Affairs and the Committee on Border and International Affairs, Texas House of Representatives, Austin, Texas, 2007.

"The US and Texas: An Economic Outlook for Tomorrow." Testimony delivered as a participant on the Economic Outlook for Texas Discussion Panel for the Texas Department of Insurance, Round Rock, Texas, 2007.

"The Economic Impact of Eliminating the Texas Universal Service Fund on Business Activity in Texas and Various Regions." Testimony delivered before the Regulated Industries Committee, Texas House of Representatives, Austin, Texas, 2007.

"An Assessment of the Impact of a Representative Scholarship Program Funded by Direct Fiscal Revenues from a Proposed Destination Casino Initiative on Business Activity in Texas." Testimony delivered before the Texas Legislature, Austin, Texas, 2007.

"The Impact of the Undocumented Workforce on Business Activity in Texas."
Testimony delivered before the Committee on State Affairs of the Texas House of
Representatives, Austin, Texas, 2007.

"The Potential Impact of an Initiative to Increase the Pool of Engineering and Computer
Science Graduates on Business Activity in Texas."  Testimony delivered before
the Committee on Higher Education, Texas Senate, Austin, Texas, 2007.

"It Ain't Broke!!  Don't Fix It!!  An Analysis of Electric Competition in Texas and the
Potential Effects of Proposed 'Reform' Legislation."  Testimony delivered before
the Committee on Regulated Industries of the Texas House of Representatives,
Austin, Texas, 2007.

"'An Ounce of Prevention!' The Potential Impact of Investments in Prevention,
Wellness, and Smoking Cessation Programs on Business Activity in Texas."
Testimony delivered before the Texas Legislature, Austin, Texas, 2007.

"An Economic Assessment of Alternative Approaches to Developing the State Highway
121 (SH121) Toll Road Project."  Testimony delivered before the North Central
Texas Regional Transportation Authority, Irving, Texas, 2007.

"Increasing Momentum and Sustaining Progress: The Impact of the Proposed 'Frisco
City' Mixed-Use Real Estate Development on Local Business Activity and Fiscal
Revenues."  Testimony delivered before the Frisco City Council, Frisco, Texas,
2007.

"An Analysis of the Potential Economic Impact of Alternative Retail Development
Strategies and Their Implications for Incentive Policy in the Corpus Christi Area."
Testimony delivered before the Corpus Christi City Council, Corpus Christi,
Texas, 2007.

"Potential Regional Economic Boundaries in Texas: An Analysis in Light of Current
Patterns and Linkages in Business Activity."  Testimony delivered before Texas
Workforce Investment Council, Austin, Texas, 2007.

"Beyond Public Service: An Assessment of the Economic Impact of Benefits Provided
Through the Texas Municipal Retirement System on Business Activity in Texas
and its Various Regions, Metropolitan Areas, and Counties."  Testimony
delivered before the Board of Directors of the Texas Municipal Retirement
System, Austin, Texas, 2007.

"Lights!  Cameras!  Action!  An Assessment of the Impact of the Villa Muse Studios and
Collateral Development on Business Activity in Texas and the Austin Area."
Testimony delivered before the Austin City Council, Austin, Texas, 2007.

"'Thinking About Tomorrow!'  The Texas Guaranteed Tuition Plan: An Economic
Assessment of Recent Evidence and Options for the Future."  Testimony
delivered before the Texas House of Representatives, Austin, Texas, 2007.

"An Analysis of the Economic Consequences of Proposed Annexation Plans in the City
of Midlothian."  Testimony delivered before the American Arbitration
Association, 2007.

"A Texas Turnaround: The Impact of Lawsuit Reform on Business Activity in the Lone Star State."  Testimony delivered before the Judiciary Committee, Texas Senate, Austin, Texas, 2008.

"The Economic and Fiscal Effects of the Proposed Investment in Padre Staples Mall on the City of Corpus Christi."  Testimony delivered before the Corpus Christi City Council, Corpus Christi, Texas, 2008.

"The Economic Consequences of Isolated Development and Infrastructure Outlays on Ellis County."  Testimony delivered before the Texas Commission on Environmental Quality, Austin, Texas, 2008.

"The Impact of Luminant's Proposed Investment in Nuclear Power Facilities in Somervell County on Business Activity in Somervell County, Water Planning Region G, and Texas."  Testimony delivered before the Texas Water Development Board and the US Nuclear Regulatory Commission, Glen Rose, Texas, 2008.

"The Economic Consequences of Proposed Changes in the Texas Universal Service Fund: A Comprehensive Analysis of Multiple Provisions."  Testimony delivered before the Public Utility Commission of Texas, Austin, Texas, 2008.

"Invited Testimony Regarding the American Recovery and Reinvestment Act."  Testimony delivered before the Select Committee on Federal Economic Stabilization Funding, Texas House of Representatives, Austin, Texas, 2009.

"The American Recovery and Reinvestment Act."  Invited testimony delivered to the Select Committee on Federal Economic Stabilization Funding, Texas House of Representatives, Austin, Texas, 2009.

"The Impact of Restrictions on the Use of Cement from the Ash Grove Plant on Business Activity in the Dallas-Fort Worth Area and Texas."  Testimony delivered before the Natural Resources Committees of the Texas House of Representatives and the Texas Senate, Austin, Texas, 2009.

"Water Supply Access and Reliability in the Lower Neches Valley Authority Service Area."  Testimony delivered before the Texas Commission on Environmental Quality, Austin, Texas, 2010.

"The Impact of Developing the Keystone XL Pipeline Project on Business Activity in the US: An Analysis Including State-by-State Construction Effects and an Assessment of the Potential Benefits of a More Stable Source of Domestic Supply."  Testimony delivered before the US Department of State, Washington, DC, 2010.

"The Potential Impact of the Proposed Plains & Eastern Clean Line Transmission Project on Business Activity in the US and Affected States."  Testimony delivered before the Corporation Commission of Oklahoma, Oklahoma City, Oklahoma, 2010.

"The Impact of Developing the Keystone XL Pipeline Project on the Hispanic Population of the US: A State-by-State Analysis."  Testimony delivered before the US Department of State, Washington, DC, 2010.

"The Impact of the Clean Lines Transmission Facilities on the Economy of Oklahoma." Testimony presented to the Corporation Commission of Oklahoma, Oklahoma City, Oklahoma, 2011.

"The Role of Community Pharmacies in Health Care Delivery and Medicaid Programs." Invited testimony before the Committee on Public Health of the Texas House of Representatives, Austin, Texas, 2011.

"Economic Development:  Historical Perspective and Future Requirements."  Invited testimony before the Committee on Economic Development of the Texas House of Representatives, Austin, Texas, 2011.

"Testimony of M. Ray Perryman Regarding the Economic Impact of the Keystone XL Pipeline on the United States."  Testimony before the US Department of State, Washington, DC, 2011.

"The Cost to Date of Delays in Permits for Development of the Keystone XL Pipeline Project on Business Activity in the US."  Testimony delivered before the US Department of State, Washington, DC, 2011.

"Testimony of M. Ray Perryman, PhD, Regarding the Economic Benefits of Greater Utilization of Advanced Practice Registered Nurses." Testimony before the Public Health Committee of the Texas House of Representatives, Houston, Texas, 2012.

"Past and Potential Future Economic Development in Texas."  Testimony delivered before the Select Committee on Economic Development of the Texas Legislature, Austin, Texas, 2012.

"The Economic Benefits of More Fully Utilizing Advanced Practice Registered Nurses in the Provision of Health Care in Texas: An Analysis of Local and Statewide Effects on Business Activity."  Testimony delivered before the Committee on Public Health of the Texas House of Representatives, Austin, Texas, 2012.

"Testimony of M. Ray Perryman Regarding the Texas Economy and Future Prospects and Challenges."  Testimony delivered to the Committee on Business and Industry of the Texas House of Representatives, Austin, Texas, 2014.

"Testimony of M. Ray Perryman Regarding the Adverse Impact of Banning Hydraulic Fracturing in the City of Denton on Business Activity and Tax Receipts in the City and State."  Testimony delivered to the Denton City Council, Denton, Texas, 2014.

"Testimony of M. Ray Perryman Regarding Economic Development Incentives." Testimony delivered to the Select Committee on Economic Development Incentives of the Texas House of Representatives, Austin, Texas, 2014.

"Testimony of M. Ray Perryman Regarding Food Banks House Bill (HB) 1, Article VI." Testimony delivered to the Appropriations Subcommittee of the Texas House of Representatives, 2015.

"Testimony of M. Ray Perryman Regarding Food Banks House Bill (HB) 1, Article VI." Testimony delivered to the Finance Committee of the Texas Senate, 2015.

159

"Testimony of M. Ray Perryman Regarding the Windstorm Insurance System in Texas." Testimony delivered to the Committee on Insurance of the Texas House of Representatives, 2015.

"Testimony of M. Ray Perryman Regarding the Windstorm Insurance System in Texas." Testimony delivered to the Committee on Business and Commerce of the Texas Senate, 2015.

"Testimony of M. Ray Perryman Regarding Energy Resources."  Written testimony prepared for the Committee on Energy Resources of the Texas House of Representatives, 2016.

"Testimony of M. Ray Perryman Regarding the Efficacy of Spending and Revenue Caps."  Testimony delivered to the Finance Committee of the Texas Senate, 2016.

"Testimony of M. Ray Perryman Regarding Food Banks."  Written testimony prepared for the Finance Committee of the Texas Senate, 2017.

"Testimony of M. Ray Perryman Regarding Immigration and the Benefits of Foreign Workers."  Testimony delivered to the Committee on International Trade and Intergovernmental Affairs of the Texas House of Representatives, 2017.

"Testimony of M. Ray Perryman Regarding Trade and a Potential Border Tax." Testimony delivered to the Committee on International Trade and Intergovernmental Affairs of the Texas House of Representatives, 2017.

"Testimony of M. Ray Perryman Regarding Selected Factors Impacting the Future Economic Performance of Texas."  Testimony delivered to the Select Committee on Economic Competitiveness of the Texas House of Representative, 2017.

"Testimony of M. Ray Perryman Regarding the Economic Benefits of Institutions of Higher Education."  Testimony delivered to the House Committee on Economic and Small Business Development of the Texas House of Representatives, 2017.

"Testimony of M. Ray Perryman Regarding Food Banks."  Testimony delivered to the Finance Committee of the Texas Senate, 2017.

# Trade & Professional Writing

### SELECTED TRADE ARTICLES AND RELATED PROFESSIONAL WRITING

"The Outlook for Texas Agriculture."  Material prepared for Southwest Farm Press,
    1982.

"Ready for Recovery."  Column prepared for Texas Bankers Record, December 1982.

"The Texas Economy in 1983: Toward a 'Return to Normalcy.'"  Article prepared for
    Texas Business, January 1983.

"Texas, the Nation, and Jobs."  Column prepared for Texas Bankers Record,
    January 1983.

"Joining the Union."  Column prepared for Texas Bankers Record, February 1983.

"Oil and Gas."  Column prepared for Texas Bankers Record, March 1983.

"The Texas Economy in the Next Two Years."  Article prepared for Business Review,
    Spring 1983.

"A Fearless Forecast."  Column prepared for Texas Bankers Record, April 1983.

"A Financial Prognostication."  Column prepared for Texas Bankers Record, May 1983.

"The Plight of the Farmer . . . Again."  Column prepared for Texas Bankers Record,
    June 1983.

"The Economic Outlook for 1984."  Article prepared for Texas Health Review,
    Summer 1983.

"Using a Forecast."  Column prepared for Texas Bankers Record, July 1983.

"'Fed-Watching' in Texas."  Column prepared for Texas Bankers Record, August 1983.

"One Economy, One Model, Two Views."  Column prepared for Texas Bankers Record,
    September 1983.

"Energy and Agriculture: A Look Ahead."  Article prepared for Business Review,
    Fall 1983.

"A Long-Run Perspective."  Column prepared for Texas Bankers Record, October 1983.

"The Changing Texas Economy."  Materials provided for feature in USA Today,
    October 1983.

"The Economic Outlook for the McAllen and Hidalgo County Area."  Special report
    prepared for the 1983 Hidalgo County Economic Outlook Conference,
    October 1983.

"The Economic Outlook for the Galveston-Texas City SMSA."  Special report prepared
    for the Galveston County Lyceum Association, November 1983.

"A Long-Run Perspective II: Some Further Thoughts."  Column prepared for Texas Bankers Record, November 1983.

"The Economic Outlook for the Victoria SMSA."  Special report prepared for the 1983 Victoria County Metropolitan Area Economic Outlook Conference, November 1983.

"Boomtown."  Column prepared for Texas Bankers Record, December 1983.

"The Texas Economy in the Year 2000."  Article prepared for Business Review, Winter 1983.

"The Metroplex."  Column prepared for Texas Bankers Record, January 1984.

"No Longer Wild and Free."  Article prepared for Texas Business, January 1984.

"The Economic Outlook for the San Antonio Metropolitan Area."  Special Report prepared for the 1984 San Antonio Economic Outlook Conference, January 1984.

"Out and About."  Column prepared for Texas Bankers Record, February 1984.

"Changing Times I: Where We've Been."  Column prepared for Texas Bankers Record, March 1984.

"Changing Times II: Where We're Going."  Column prepared for Texas Bankers Record, April 1984.

"The Texas Recovery."  Article prepared for Business Review, Spring 1984.

"'The Puzzlement' in the US Economy."  Column prepared for Texas Bankers Record, May 1984.

"What Lies Ahead?"  Column prepared for Texas Bankers Record, June 1984.

"The Texas Economy: A Midyear Perspective."  Article prepared for Business Review, Summer 1984.

"'What If . . . ?' or 'The Perryman Hedge.'"  Column prepared for Texas Bankers Record, July 1984.

"Out On a Limb."  Column prepared for Texas Bankers Record, August 1984.

"An Econometric Analysis of the Future Prospects for Technology Industries in Texas."  Special report prepared for the 1984 Texas Lyceum, September 1984.

"The Economy and the Election: What If Mondale Wins?"  Column prepared for Texas Bankers Record, September 1984.

"Stretching It Out."  Column prepared for Texas Bankers Record, October 1984.

"The Economies of Texas and the Lower Rio Grande Valley."  Special report prepared for the 1984 Hidalgo County Economic Outlook Conference, October 1984.

"The Outlook for Texas and the Galveston-Texas City Area."  Special report prepared for the 1984 meeting of the Galveston County Lyceum Association, October 1984.

"High Tech: Why All the Fuss?"  Column prepared for <u>Texas Bankers Record</u>, November 1984.

"The Outlook for Texas and the Abilene Metropolitan Area."  Special report prepared for the 1984 Abilene Economic Outlook Conference, December 1984.

"What is High Tech?"  Column prepared for <u>Texas Bankers Record</u>, December 1984.

"The Outlook for Texas and the Victoria County Metropolitan Area."  Special report prepared for the Victoria Metropolitan Area Economic Outlook Conference, December 1984.

"Where in the World is 'High Tech?'"  Column prepared for <u>Texas Bankers Record</u>, January 1985.

"'High Tech' in the United States."  Column prepared for the February 1985 issue of <u>Texas Bankers Record</u>.

"The Economic Outlook for Texas and the Dallas/Fort Worth Metropolitan Area."  Special report prepared for the 1985 First Annual Dallas/Fort Worth Economic Outlook Conference, February 1985.

"The Economic Outlook for Texas and the Houston Metropolitan Area."  Special report prepared for the 1985 First Annual Houston Economic Outlook Conference, February 1985.

"Texas 'Tech.'"  Column prepared for the March 1985 issue of <u>Texas Bankers Record</u>.

"The Clouded Crystal Ball."  Column prepared for the April 1985 issue of <u>Texas Bankers Record</u>.

"Silicon Gulch."  Column prepared for the May 1985 issue of <u>Texas Bankers Record</u>.

"A Few Years Without a Recession?"  Column prepared for the June 1985 issue of <u>Texas Bankers Record</u>.

"The Short-Term Economic Outlook for Texas, Dallas/Fort Worth, and Houston."  Article prepared for <u>Business Review,</u> Summer 1985.

"Excuses."  Column prepared for the July 1985 issue of <u>Texas Bankers Record</u>.

"The State Outlook: No Excuses."  Column prepared for the August 1985 issue of <u>Texas Bankers Record</u>.

"2001: An Economic Odyssey."  Column prepared for the September 1985 issue of <u>Texas Bankers Record</u>.

"The Long View of Texas: OK, But . . ."  Column prepared for the October 1985 issue of <u>Texas Bankers Record</u>.

"The Economic Prospects for the Abilene Metropolitan Area."  Special report prepared for the 1985 Abilene Economic Outlook Conference, October 1985.

"The Economic Outlook for the United States, Texas, and the Austin County Area."  Special report prepared for the 1985 Austin County Economic Outlook Conference, October 1985.

"The Economic Outlook for the United States, Texas, and the McAllen-Pharr-Edinburg Metropolitan Area."  Special report prepared for the 1985 Hidalgo County Economic Outlook Conference, October 1985.

"The Cities of Texas: A Long-Range Perspective and a Perspective on Long-Range Perspectives."  Column prepared for the November 1985 issue of Texas Bankers Record.

"The Economic Outlook for the United States, Texas, and the Victoria Metropolitan Area."  Special report prepared for the 1985 Victoria Economic Outlook Conference, December 1985.

"A Year Ahead Look at the Texas Economy."  Column prepared for the December 1985 issue of Texas Bankers Record.

"The Technology Industries in Texas: A Comprehensive Overview."  Article prepared for Business Review, Winter 1985.

"Long-Term Perspectives on the US Economy."  Article prepared for Business Review, Winter 1985.

"A Short-Term View of the 'Metroplex.'"  Column prepared for the January 1986 issue of the Texas Bankers Record.

"The Economic Outlook for the El Paso Metropolitan Area."  Special report prepared for the El Paso Economic Outlook Conference, January 1986.

"The Economic Outlook for the Midland Metropolitan Area."  Special report prepared for the 1986 Midland Economic Outlook Conference, February 1986.

"Houston: A Short-Range Perspective."  Column prepared for the February 1986 issue of the Texas Bankers Record.

"Texas and the Oil Price Drop."  Column prepared for the March 1986 issue of the Texas Bankers Record.

"Think Small: An Approach to the Diversification of the Texas Economy."  Article prepared for the April 1986 issue of Texas Business magazine.

"The Silver Lining."  Column prepared for the April 1986 issue of the Texas Bankers Record.

"The Economic Outlook for Texas and the Austin/San Antonio Corridor."  Special report prepared for the Second Annual Austin/San Antonio Economic Outlook Conference, April 1986.

"The Economic Outlook for Texas and the Dallas/Fort Worth Area."  Special report prepared for the Second Annual Dallas/Fort Worth Economic Outlook Conference, April 1986.

"The Economic Outlook for Texas and the Houston Metropolitan Area."  Special report prepared for the Second Annual Houston Economic Outlook Conference, April 1986.

"Here We Go Again!!"  Column prepared for the May 1986 issue of the Texas Bankers Record.

"Take Your Pick!"  Column prepared for the June 1986 issue of the Texas Bankers Record.

"The Rest of the Story."  Column prepared for the July 1986 issue of the Texas Bankers Record.

"Tough Times!"  Column prepared for the August 1986 issue of the Texas Bankers Record.

"What's Going To Happen In The Next Twenty Years?"  Column prepared for the September 1986 issue of the Texas Bankers Record.

"The Short-Term Outlook for the McAllen-Edinburg-Mission Metropolitan Area."  Special report for the Lower Rio Grande Valley Economic Outlook Conference, October 1986.

"What Happens If The Price Of Oil Goes To . . . ?"  Column prepared for the October 1986 issue of the Texas Bankers Record.

"The Central I-35 Corridor: Data and Analysis."  Materials compiled for Texas Business magazine, October 1986.

"Dallas and Fort Worth in the Long Run."  Column prepared for the November 1986 issue of the Texas Bankers Record.

"Houston: Beyond the Current Milieu."  Column prepared for the December 1986 issue of the Texas Bankers Record.

"The Slow Recovery in Texas."  Materials prepared for US News and World Report, 1987.

"A Global Perspective on the Investment Climate in the Dallas/Fort Worth Area."  Article prepared for Institutional Investor, 1987.

"Diversifying the Texas Economy."  Column prepared for the Texas Business Technology Development Newsletter, 1987.

"Messing with Texas."  Editorial prepared for the Dallas Morning News and the Houston Chronicle, 1987.

"The Recession Is Over!"  Column prepared for the January 1987 issue of Texas Banking.

"The Short-Term Outlook for Texas and the Houston Area."  Special report prepared for the Third Annual Houston Economic Outlook Conference, January 1987.

"The Short-Term Outlook for Texas and the Dallas/Fort Worth Area."  Special report prepared for the Third Annual Dallas/Fort Worth Economic Outlook Conference, January 1987.

"The Short-Term Outlook for Texas and the Austin and San Antonio Areas."  Special report prepared for the Third Annual Austin and San Antonio Economic Outlook Conference, January 1987.

"The Texas Economy: A Light at the End of the Tunnel."  Article prepared for the January 1987 issue of Texas Business magazine.

"The Dallas/Fort Worth Area: What Will Happen In The Next Two Years?"  Column prepared for the February 1987 issue of Texas Banking.

"The Economic Outlook for the Midland Metropolitan Area."  Special report prepared for the 1987 Midland Economic Outlook Conference, February 1987.

"Houston: A Little Light."  Column prepared for the March 1987 issue of Texas Banking.

"Austin."  Column prepared for the April 1987 issue of Texas Banking.

"The Growth Markets of Texas."  Forecast database for all metropolitan areas of Texas prepared for Texas Business magazine, April 1987.

"San Antonio."  Column prepared for the May 1987 issue of Texas Banking.

"What Lies Ahead."  Column prepared for the June 1987 issue of Texas Banking.

"Dallas/Fort Worth."  Column prepared for the July 1987 issue of Texas Banking.

"Houston: Beginning to Move!"  Column prepared for the August 1987 issue of Texas Banking.

"The Impact of Federal Spending on the Economy of Texas and its Regions."  Special report prepared for the Texas Lyceum, September 1987.

"What Lies Ahead?"  Column prepared for the September 1987 issue of Texas Banking.

"The Current Outlook for the Austin Area."  Column prepared for "The Perryman Comment" in Austin Perspective, September 1987.

"The Economic Outlook for Texas and Montgomery County."  Special report prepared for The Woodlands Economic Outlook Conference, October 1987.

"On the Other Hand . . . "  Column prepared for the October 1987 issue of Texas Banking.

"Economic Development in Texas."  Column prepared for "The Perryman Comment" in Austin Perspective, October 1987.

"Real Estate."  Column prepared for the November 1987 issue of Texas Banking.

"The Effects of the Stock Market Crash."  Column prepared for "The Perryman Comment" in Austin Perspective, November 1987.

"Corrective Forces in Motion."  Column prepared for the December 1987 issue of Texas Banking.

"Banking and Real Estate: The Austin Saga."  Column prepared for "The Perryman Comment" in Austin Perspective, December 1987.

"The Economic Outlook for the United States, Texas, and the Victoria Metropolitan Area."  Special report prepared for the 1987 Victoria Economic Outlook Conference, December 1987.

"Texas: You Ain't Seen Nothin' Yet."  Article prepared for Business Facilities magazine, 1988.

"Civil Justice and the Balance of Payments."  Editorial prepared for the Dallas Morning News, the Houston Chronicle, and other selected newspapers, 1988.

"The Future Prognosis for Real Estate Markets in Texas and the Metroplex."  Column prepared for the DFW Market Outlook, M/PF Research, 1988.

"Food Processing: An Agenda for Economic Expansion and Job Creation."  Materials prepared for Pride Publications, 1988.

"The Story Behind the Headlines: Small Business Growth in the Texas Economy."  Story prepared for CBS Evening News, 1988.

"Two Decades of Prosperity: The Long-Term Outlook for the Houston Economy."  Article prepared for the Houston Economic News, 1988.

"A Time for Action."  Column prepared for the January 1988 issue of Texas Banking.

"The Current Outlook for the Economy of Texas and the Dallas/Fort Worth Metropolitan Area."  Special report prepared for the Fourth Annual Dallas/Fort Worth Economic Outlook Conference, January 1988.

"The Current Outlook for the Economy of Texas and the Houston Metropolitan Area."  Special report prepared for the Fourth Annual Houston Economic Outlook Conference, January 1988.

"The Current Outlook for the Economy of Texas and the Austin and San Antonio Metropolitan Areas."  Special report prepared for the Fourth Annual Austin/San Antonio Economic Outlook Conference, January 1988.

"The Sematech Announcement and Other Announcements."  Column prepared for "The Perryman Comment" in Austin Perspective, January 1988.

"The Year Ahead."  Column prepared for the February 1988 issue of Texas Banking.

"The Texas Economy in 1988."  Column prepared for "The Perryman Comment" in Dallas Perspective, Austin Perspective, and San Antonio Perspective, February 1988.

"Some Thoughts on the Metroplex."  Column prepared for the March 1988 issue of <u>Texas Banking</u>.

"Positive Results—Negative Headlines: Texas Revisited."  Column prepared for "The Perryman Comment" in <u>Austin Perspective</u>, March 1988.

"Texas: The Mid-Year Perspective."  Column prepared for "The Perryman Comment" in <u>Texas Perspective</u>, March 1988.

"The Texas Economy in 1988."  Column prepared for <u>Quarterly Trends in the Economy</u>, International Association of Business Forecasters, Spring 1988.

"Impressions."  Column prepared for the April 1988 issue of <u>Texas Banking</u>.

"Austin and San Antonio."  Column prepared for the May 1988 issue of <u>Texas Banking</u>.

"A Mid-Year Look at Business Conditions."  Column prepared for the June 1988 issue of <u>Texas Banking</u>.

"The Short-Term Economic Outlook for the Metroplex."  Column prepared for "The Perryman Comment" in <u>Texas Perspective</u>, June 1988.

"Dallas/Fort Worth: Recovery—Yes; Boom—No."  Column prepared for the July 1988 issue of <u>Texas Banking</u>.

"Houston: The Uptrend is Strong."  Column prepared for "The Perryman Comment" in <u>Texas Perspective</u>, July 1988.

"Houston: At Last, Some Good News."  Column prepared for the August 1988 issue of <u>Texas Banking</u>.

"The Long-Term Outlook for the National Economy."  Column prepared for the September 1988 issue of <u>Texas Banking</u>.

"Potpourri: The Current Texas Economy."  Column prepared for "The Perryman Comment" in <u>Texas Perspective</u>, September 1988.

"A Long-Term Perspective on the Texas Economy."  Article prepared for the Fall 1988 issue of <u>Business Review</u>.

"A Long-Range Look at Texas."  Column prepared for the October 1988 issue of <u>Texas Banking</u>.

"Oil."  Column prepared for the November 1988 issue of <u>Texas Banking</u>.

"Christmas is Coming."  Column prepared for "The Perryman Comment" in <u>Texas Perspective</u>, November 1988.

"The Impact of the GTE Relocation on the Dallas/Fort Worth Area."  Materials compiled for the <u>Dallas Morning News</u>, November 1988.

"What About Next Week?"  Column prepared for the December 1988 issue of <u>Texas Banking</u>.

"Economic Information Profile Regarding the Lower Rio Grande Valley."  Materials
compiled for the <u>Dallas Morning News</u>, December 1988.

"Texas in 1989: The Road to Prosperity Continues."  Column prepared for the <u>Dallas
Business Journal</u>, December 1988.

"Leadership in the Future of Texas."  Material prepared for <u>Fortune</u> magazine, 1989.

"Product Liability and Economic Development."  Editorial prepared for the <u>Houston
Chronicle</u> and other selected newspapers, 1989.

"Texas: Taking Off From the '80s—Soaring Into the '90s."  Article prepared for
<u>Business Facilities</u> magazine, 1989.

"The Texas Economy and the Prospects for Service Sector Growth."  Article prepared for
<u>Texas CPA</u> magazine, 1989.

"Houston: Short-Term Recovery, Long-Term Prosperity."  Article prepared for the
<u>Houston Economic News</u>, 1989.

"Don't Sit on the Acorn."  Editorial prepared for the <u>Austin American-Statesman</u>, 1989.

"The Long-Term Outlook for the Victoria Metropolitan Area, with Emphasis on Recent
Plant Expansions."  Special report prepared for the 1989 Victoria Economic
Outlook Conference, January 1989.

"They May Go Up!"  Column prepared for the January 1989 issue of <u>Texas Banking</u>.

"The Economic Outlook for Texas, with Emphasis on the Dallas/Fort Worth
Metropolitan Area."  Special report prepared for the Fifth Annual Dallas/Fort
Worth Economic Outlook Conference, January 1989.

"The Economic Outlook for Texas, with Emphasis on the Houston Metropolitan Area."
Special report prepared for the Fifth Annual Houston Economic Outlook
Conference, January 1989.

"The Economic Outlook for Texas, with Emphasis on the Austin and San Antonio
Metropolitan Areas."  Special report prepared for the Fifth Annual Austin/San
Antonio Economic Outlook Conference, January 1989.

"Financial Services."  Column prepared for "The Perryman Comment" in <u>Texas
Perspective</u>, February 1989.

"You Ain't Seen Nothin' Yet: Part I."  Column prepared for the February 1989 issue of
<u>Texas Banking</u>.

"You Ain't Seen Nothin' Yet: Part II."  Column prepared for the March 1989 issue of
<u>Texas Banking</u>.

"You Ain't Seen Nothin' Yet: Part III."  Column prepared for the April 1989 issue of
<u>Texas Banking</u>.

"You Ain't Seen Nothin' Yet: Part IV."  Column prepared for the May 1989 issue of
Texas Banking.

"Ring, Telephone, Ring!"  Column prepared for the June 1989 issue of Texas Banking.

"Texas: Past, Present, and Future: Part I."  Column prepared for the July 1989 issue of
Texas Banking.

"Texas: Past, Present, and Future: Part II."  Column prepared for the August 1989 issue
of Texas Banking.

"Alliance."  Column prepared for the September 1989 issue of Texas Banking.

"The National Outlook."  Column prepared for the October 1989 issue of Texas Banking.

"The Short-Term Outlook for Texas."  Article prepared for the November 1989 issue of
Texas Banking.

"Oil Still Counts!!"  Article prepared for the December 1989 issue of Texas Banking.

"The National and Regional Economic and Real Estate Outlook—With a Focus on Real
Estate in the Dallas/Fort Worth Area."  Article prepared for Grubb & Ellis
Dallas/Fort Worth Real Estate Outlook, 1990.

"The National and Regional Economic and Real Estate Outlook—With a Focus on Real
Estate in the Houston Area."  Article prepared for Grubb & Ellis Houston Real
Estate Outlook, 1990.

"The National and Regional Economic and Real Estate Outlook—With a Focus on Real
Estate in the San Antonio Area."  Article prepared for Grubb & Ellis San Antonio
Real Estate Outlook, 1990.

"The National and Regional Economic and Real Estate Outlook—With a Focus on Real
Estate in the Austin Area."  Article prepared for Grubb & Ellis Austin Real Estate
Outlook, 1990.

"A Texas Agenda for the 1990s."  Article prepared for Texas Agenda, 1990.

"Texas Economic Outlook, 1990."  Special report prepared for the Sixth Annual
Economic Outlook Conference, sponsored by IBM and Perryman Consultants,
Inc., 1990.

"Short-Term Prospects for the Houston Economy."  Article prepared for the Houston
Economic News, 1990.

"Finishing the Ranch House."  Article prepared for Texas Builder magazine, 1990.

"The Changing Role of Oil in the Texas Economy."  Material prepared for Business
Week, 1990.

"The Economic Outlook for the Dallas/Fort Worth Area."  Article prepared for Pinnacle
magazine, 1990.

"The Outlook for Housing in Texas."  Article prepared for the <u>Texas Apartment Association</u> magazine, 1990.

"The Economic Prospects for Texas, Its Metropolitan Areas, and Real Estate Markets."  Article prepared for <u>Lomas Review</u>, 1990.

"Texas: Oasis of the Global Village."  Article prepared for <u>Business Facilities</u> magazine, 1990.

"The Extended Outlook for the Houston Area."  Article prepared for the <u>Houston Economic News</u>, 1990.

"An Overview of the Dallas Real Estate Market."  Article prepared for <u>Lomas Review</u>, 1990.

"Up, Up, and Away."  Article prepared for the January 1990 issue of <u>Texas Banking</u>.

"The Economic Outlook for Houston and the Montgomery County Area."  Special report prepared for The Woodlands Economic Outlook Conference, January 1990.

"The Economic Outlook for the McAllen-Edinburg-Mission Area."  Special report prepared for the McAllen Economic Outlook Seminar, May 1990.

"The Economic and Real Estate Outlook for 1991—A National Perspective with Emphasis on Dallas/Fort Worth."  Article prepared for <u>Grubb & Ellis Dallas/Fort Worth Real Estate Report</u>, 1991.

"The Economic and Real Estate Outlook for 1991—A National Perspective with Emphasis on Houston."  Article prepared for <u>Grubb & Ellis Houston Real Estate Report</u>, 1991.

"The Economic and Real Estate Outlook for 1991—A National Perspective with Emphasis on San Antonio."  Article prepared for <u>Grubb & Ellis San Antonio Real Estate Report</u>, 1991.

"The Economic and Real Estate Outlook for 1991—A National Perspective with Emphasis on Austin."  Article prepared for <u>Grubb & Ellis Austin Real Estate Report</u>, 1991.

"What Happened?"  Article prepared for <u>Texas Lawyer</u>, 1991.

"The Prognosis for Texas Construction."  Article prepared for <u>Texas Builder</u> magazine, 1991.

"No Jumping Out of Buildings—No Soaring With the Eagles—But A Lot of Wiggling Around: The Economy in 1991 and a Focus on Southwestern Real Estate Markets."  Article prepared for <u>Lawyers Title</u> magazine, 1991.

"Texas—A Bright Future."  Article prepared for the <u>Dallas/Fort Worth Commercial Real Estate Bulletin</u>, 1991.

"The Outlook for the San Antonio Economy."  Article prepared for <u>Pinnacle</u> magazine, 1991.

"Free Trade (or thereabouts) with Mexico."  Article prepared for <u>Border Trax</u> magazine, 1991.

"San Antonio—The Outlook for 1992."  Article prepared for the <u>North San Antonio Chamber of Commerce Newsletter</u>, 1991.

"Real Estate and the Bailout: The Economic Perspective."  Article prepared for <u>Legal Times</u>, 1991.

"The Short-Term Outlook for San Antonio."  Article prepared for <u>Pinnacle</u> magazine, 1991.

"The Economy and its Effect on Strategic Planning."  Article prepared for <u>Law Marketing Exchange</u>, 1991.

"The Future of the Houston Economy."  Article prepared for <u>Houston Economic News</u>, 1991.

"The Long-Term Outlook for the Texas Economy."  Article prepared for <u>Pinnacle</u> magazine, 1991.

"A Perspective on Selected Retail Markets."  Special report prepared for the Annual Report to Shareholders of Kentucky Fried Chicken, 1991.

"The Economic Outlook for the Houston Area."  Article prepared for <u>Pinnacle</u> magazine, 1991.

"Texas Economic Outlook—1991."  Special report prepared for the Seventh Annual Economic Outlook Conference (sponsored by Perryman Consultants, IBM, and <u>Texas Monthly</u>), January 1991.

"A Perspective on the Economy of Mexico, with Emphasis on the Free Trade Agreement and its Effects on the Texas Economy."  Special report prepared for the Seventh Annual Economic Outlook Conference (sponsored by Perryman Consultants, IBM, and <u>Texas Monthly</u>), January 1991.

"Growth Ahead on the Houston Horizon."  Article prepared for <u>Houston Economic News</u>, October 1991.

"The Texas Economy: Assets for the Future."  Article prepared for <u>Eye on Texas</u>, November 1991.

"Texas: In Partnership with the World."  Article prepared for <u>Business Facilities</u> magazine, December 1991.

"The Economic and Real Estate Outlook for 1992—A National Perspective with Emphasis on Dallas/Fort Worth."  Article prepared for <u>Grubb & Ellis Dallas/Fort Worth Real Estate Report</u>, 1992.

"The Economic and Real Estate Outlook for 1992—A National Perspective with Emphasis on Houston."  Article prepared for <u>Grubb & Ellis Houston Real Estate Report</u>, 1992.

"The Economic and Real Estate Outlook for 1992—A National Perspective with Emphasis on San Antonio."  Article prepared for Grubb & Ellis San Antonio Real Estate Report, 1992.

"The Economic and Real Estate Outlook for 1992—A National Perspective with Emphasis on Austin."  Article prepared for Grubb & Ellis Austin Real Estate Report, 1992.

"Houston: Leading the Way in the National Recovery."  Article prepared for Houston Economic News, 1992.

"The Economic Future of the Woodlands/Montgomery County."  Article prepared for The Woodlands/South Montgomery County Chamber of Commerce Economic Outlook Forum, January 1992.

"The Future of Real Estate in the Dallas/Fort Worth Metropolitan Area as Impacted by Economic Trends."  Special report presented during the Eighth Annual Economic Outlook Conference sponsored by Perryman Consultants and Texas Monthly, Dallas, Texas, January 1992.

"The Future of Real Estate in the Houston Metropolitan Area as Impacted by Economic Trends."  Special report presented during the Eighth Annual Economic Outlook Conference sponsored by Perryman Consultants and Texas Monthly, Houston, Texas, January 1992.

"The Future of Real Estate in the San Antonio Metropolitan Area as Impacted by Economic Trends."  Special report presented during the Eighth Annual Economic Outlook Conference sponsored by Perryman Consultants and Texas Monthly, San Antonio, Texas, January 1992.

"The Future of Real Estate in the Austin Metropolitan Area as Impacted by Economic Trends."  Special report presented during the Eighth Annual Economic Outlook Conference sponsored by Perryman Consultants and Texas Monthly, Austin, Texas, January 1992.

"The Texas Outlook—1992."  Report prepared for the Eighth Annual Economic Outlook Conference sponsored by Perryman Consultants and Texas Monthly, January 1992.

"TSTC: Training Tomorrow's Workforce."  Article written for Techline, a monthly newsletter of Texas State Technical College, March 1992.

"Dallas: A Good Choice for a Great Move."  Article prepared for DFW Relocator magazine, Spring 1992.

"Investing in Texas."  Special section feature article prepared for Texas Monthly, April 1992.

"Dallas and Fort Worth: Building a Strong Economy for the 1990s."  Article prepared for DFW Builder magazine, April 1992.

"The Super Collider and the Global Competitiveness of the US Economy."  Editorial published in numerous media outlets, June 1992.

"A Rationale Strategy for Economic Growth and Budgetary Reform."  Editorial
    published in various media outlets, September 1992.

"In Support of the Maastricht Treaty."  Editorial published in various media outlets,
    September 1992.

"The Future of Texas."  Article prepared for Texas Business Report, September 1992.

"What Will Put the Texas Economy Ahead of the Pack?  Believe It or Not, Just Four
    Things."  Article prepared for the Texas Chamber of Commerce Newsletter,
    October 1992.

"The Fallacies of the Proposed Economic Plans."  Editorial published in various media
    outlets, October 1992.

"We're Not Just Cowpokes Anymore!  Texas: The Lead Pony on the Global Frontier."
    Special section prepared for Business Facilities magazine, December 1992.

"Tips for the Texas Legislature."  Article prepared for the Quorum Report,
    December 1992.

"The Economic and Real Estate Outlook for 1993—A National Perspective with
    Emphasis on Dallas/Fort Worth."  Article prepared for Grubb & Ellis Dallas/Fort
    Worth Real Estate Report, 1993.

"The Economic and Real Estate Outlook for 1993—A National Perspective with
    Emphasis on Houston."  Article prepared for Grubb & Ellis Houston Real Estate
    Report, 1993.

"The Economic and Real Estate Outlook for 1993—A National Perspective with
    Emphasis on San Antonio."  Article prepared for Grubb & Ellis San Antonio Real
    Estate Report, 1993.

"The Economic and Real Estate Outlook for 1993—A National Perspective with
    Emphasis on Austin."  Article prepared for Grubb & Ellis Austin Real Estate
    Report, 1993.

"The Economic and Real Estate Outlook for 1993—A National Perspective with
    Emphasis on Texas."  Article prepared for Grubb & Ellis Real Estate Report,
    1993.

"The Strategic Importance of NAFTA."  Editorial published in various media outlets,
    January 1993.

"Of Pump Priming, Penguins, and Prosperity."  Editorial opinion published in various
    media outlets, January 1993.

"The Clinton Policy Dilemma."  Special report prepared for the Ninth Annual Economic
    Outlook Conference sponsored by Perryman Consultants, Texas Monthly, First
    Southwest Company, Blue Cross Blue Shield of Texas, and the Texas Chamber of
    Commerce, January 1993.

"1993 Metro Area Outlook."  Special report prepared for the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, <u>Texas Monthly</u>, First Southwest Company, Blue Cross Blue Shield of Texas, and the Texas Chamber of Commerce, January 1993.

"The North American Free Trade Agreement: The Explosion of Certain Myths."  Special report prepared for the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, <u>Texas Monthly</u>, First Southwest Company, Blue Cross Blue Shield of Texas, and the Texas Chamber of Commerce, January 1993.

"Texas: A Bright Future in the Global Economy."  Article written for <u>Texas Builder</u> magazine, January 1993.

"The DFW Economy: Building for the Years Ahead."  Article written for <u>DFW Builder</u> magazine, January 1993.

"Investing in Texas."  Special section written for <u>Texas Monthly</u> magazine, April 1993.

"Trucking Reform Measure is Not Enough."  Editorial published in numerous media outlets, May 1993.

"The Dallas/Fort Worth Region: Foundations for Future Growth."  Article prepared for <u>DFW Builder</u> magazine, November 1993.

"Texas: A Whole New World of Opportunities."  Special section prepared for <u>Business Facilities</u> magazine, December 1993.

"Some Dominant Trends Shaping the Texas Economy."  Special report prepared for the 10th Annual Economic Outlook Conference sponsored by Perryman Consultants, <u>Texas Monthly</u>, and Blue Cross Blue Shield of Texas, January 1994.

"The National, State, and Regional Economic Outlook for 1994."  Special report prepared for the 10th Annual Economic Outlook Conference sponsored by Perryman Consultants, <u>Texas Monthly</u>, and Blue Cross Blue Shield of Texas, January 1994.

"The Outlook for US, Texas, and the Dallas/Fort Worth Area."  Article written for <u>Grubb & Ellis Dallas/Fort Worth Real Estate Report</u>, January 1994.

"The Outlook for US, Texas, and the Austin Area."  Article written for <u>Grubb & Ellis Austin Real Estate Report</u>, January 1994.

"The Outlook for US, Texas, and the Houston Area."  Article written for <u>Grubb & Ellis Houston Real Estate Report</u>, January 1994.

"The Outlook for US, Texas, and the San Antonio Area."  Article written for <u>Grubb & Ellis San Antonio Real Estate Report</u>, January 1994.

"Building a Better Economy in '94."  Article prepared for <u>Texas Builder</u> magazine, January 1994.

"A Wealth of Opportunities: Economic Trends in the Houston Area."  Article prepared for <u>Building Trends</u> magazine, Spring 1994.

"The Latest Lowdown on the Half-Cent Sales Tax."  Article for <u>Texas Industrial Development Council Newsletter</u>, 2nd Quarter, 1994.

"The Prosperity Continues."  Article for <u>DFW Builder</u> magazine, Summer 1994.

"A Texas Development Update."  Commentary written for <u>Texas Industrial Development Council Newsletter</u>, 3rd Quarter, 1994.

"Long-Term Economic Prospects for the Houston Area."  Article written for <u>Texas Building & Remodeling</u>, Houston Edition, September & October 1994.

"Texas: Sssmmooookkin' Across the State."  Special section prepared for <u>Expansion Management</u> magazine, December 1994.

"Economic Forecast for the Houston CMSA."  Article prepared for the <u>Houston Business Journal</u>, December 1994.

"The Corpus Christi Economic Outlook."  Article prepared for <u>KIII-TV Newsletter</u>, Winter 1994.

"A Sunset on Texas Tax Abatements?"  Commentary written for <u>Texas Economic Development Council Newsletter</u>, 4th Quarter, 1994.

"The Short-Term Economic Outlook for the US, Texas, and the Metroplex."  Article prepared for <u>Grubb & Ellis Annual Economic Report</u>, January 1995.

"The Short-Term Outlook for the United States and Texas."  Article prepared for <u>Texas Builder</u> magazine, January 1995.

"Global Trade and its Effects on the Texas Economy."  Study prepared for The Perryman Group's 11th Annual Economic Outlook Conference, January 1995.

"The Economic Outlook for the US and Texas: Politics, Policy, and Prognosis."  Study prepared for The Perryman Group's 11th Annual Economic Outlook Conference, January 1995.

"Foreign Trade Zones and Trade in the 21st Century."  Commentary prepared for the <u>Texas Economic Development Council Newsletter</u>, 1st Quarter 1995.

"The PC Push for the 21st Century."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, March 1995.

"Competition is Good News."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, April 1995.

"An Angle on the Airline Industry."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, May 1995.

"The Future of Financial and Estate Planning."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, June 1995.

"The Lone Star's Link with Mexico."  Commentary prepared for the <u>Texas Economic Development Council Newsletter</u>, 2nd Quarter 1995.

"Car Wars."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, July 1995.

"Targeting the Healthcare Market."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, August 1995.

"A Look at the 4th Quarter."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, September 1995.

"Prospects for Development in the Lone Star State."  Commentary prepared for the <u>Texas Economic Development Council Newsletter</u>, 3rd Quarter 1995.

"A Short-Term US, Texas, and Dallas/Fort Worth Area Outlook."  Article prepared for <u>Grubb & Ellis Real Estate Report</u>, Fall 1995.

"Crossing New Borders in a Global Economy."  Article prepared for <u>Forum for Applied Research and Public Policy</u>, Fall 1995.

"Regional Economic Update."  Article prepared for the <u>Municipal Finance Journal</u>, Fall 1995.

"Trends in Retailing." Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, October 1995.

"Investing in the Expanding Information Industry."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, November 1995.

"GTT—Gone to Texas." Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, December 1995.

"A Forecast for the Houston Area Economy."  Analysis prepared for the <u>Houston Business Journal</u>, December 1995.

"Environmental Regulations and Its Effects on Long-Term Business Activity in Texas."  Study prepared for The Perryman Group's 12th Annual Economic Outlook Conference/SMU Management Briefing Series, Dallas, Texas, December 7, 1995.

"Outlook for The United States, Texas, and Major Texas MSAs."  Study prepared for The Perryman Group's 12th Annual Economic Outlook Conference/SMU Management Briefing Series, Dallas, Texas, December 7, 1995.

"The Outlook for the Corpus Christi Area."  Article prepared for <u>KIII-TV Newsletter</u>, January 1996.

"Surf's Up." Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, January 1996.

"Texas, We Don't Have a Problem."  Special section prepared for <u>Expansion Management</u> magazine, January/February 1996.

"Analysis of the Economies of Texas and its Metro Areas."  Information prepared for <u>Texas Building Trends</u> magazine, January/February 1996.

"Going Downtown."  Article prepared for the Texas Association of Broadcasters Newsletter, February 1996.

"The Cost of Compliance."  Article prepared for the Texas Association of Broadcasters Newsletter, March 1996.

"Environmental Costs to Texas Businesses."  Article prepared for the Texas Economic Development Council Newsletter, 1st Quarter 1996.

"Know Your Audience."  Article prepared for the Texas Association of Broadcasters Newsletter, April 1996.

"The Ball Park: A Win-Win Situation for the Public and for Sports."  Article prepared for the Arlington Morning News, April 1996.

"Working as a Temp."  Article prepared for the Texas Association of Broadcasters Newsletter, May 1996.

"Talk is No Longer Cheap."  Article prepared for the Texas Association of Broadcasters Newsletter, June 1996.

"Shine On."  Article prepared for the Dallas Business Journal, June 1996.

"Mid-Year Economic Update, 1996."  Article prepared for Texas Building Trends magazine, June 1996.

"Dallas: The Drawing Card for Business."  Article prepared for the Dallas Business Journal, July 1996.

"Corporate Tax Abatements: Why They're Crucial in Today's Economic Climate."  Article prepared for the Arlington Morning News, July 1996.

"Revitalization in the Inner City."  Article prepared for the Texas Economic Development Council Newsletter, 2nd Quarter 1996.

"Don't Worry About Inflation."  Article prepared for the Texas Association of Broadcasters Newsletter, August 1996.

"The Return of Texas' Oil and Gas Industry."  Article prepared for the Houston Chronicle and Midland Telegram, August 1996.

"Deregulating Electricity and Avoiding the Pitfalls."  Article prepared for the Texas Builder magazine, August-September 1996.

"Television—Influencing Teen Trends."  Article prepared for the Texas Association of Broadcasters Newsletter, September 1996.

"Outlook for The Dallas/Fort Worth Economy."  Article prepared for the Broker Agent Magazine, September 1996.

"Are Tax Abatements Necessary?"  Article prepared for the Texas Association of Broadcasters Newsletter, September 1996.

"Bright Lights in the Sky Line."  Article prepared for the <u>Dallas Business Journal,</u>
  September 1996.

"Temp Employment is Taking Off."  Article prepared for the <u>Texas Economic</u>
  <u>Development Council Newsletter</u>, 3rd Quarter 1996.

"The Short-Term Outlook for the US, Texas, and Dallas/Fort Worth Area."  Article
  prepared for the <u>Grubb & Ellis Real Estate Report</u>, October 1996.

"Economic Competitiveness in Texas."  Article prepared for the <u>Dallas Business Journal</u>,
  October 1996.

"Current Trends in Arlington Bode Well for the Future."  Article prepared for the
  <u>Arlington Morning News</u>, October 1996.

"Taxing Options in Texas."  Article prepared for the <u>Texas Association of Broadcasters</u>
  <u>Newsletter</u>, November 1996.

"Texas and Dallas: The Short-Term Forecast."  Article prepared for the <u>Dallas Business</u>
  <u>Journal</u>, November 1996.

"Economic Development Report."  Article prepared for the <u>Houston Business Journal</u>,
  December 1996.

"Trends in Mergers and Acquisitions."  Article prepared for the <u>Texas Association of</u>
  <u>Broadcasters Newsletter</u>, December 1996.

"The Impact of Legislative Issues and Potential Tax Reform on Business Conditions in
  Texas."  Study prepared for The Perryman Group's 13th Annual Economic
  Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank,
  December 1996.

"The Short-Term Outlook for the US, Texas, and the Austin Metro Area."  Study
  prepared for The Perryman Group's 13th Annual Economic Outlook Conference
  sponsored by Fulbright & Jaworski and Frost Bank, December 1996.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Study
  prepared for The Perryman Group's 13th Annual Economic Outlook Conference
  sponsored by Western National Bank, December 1996.

"The Economic Impact of Legislative Issues and Potential Tax Reform on Business
  Conditions in Texas."  Study prepared for The Perryman Group's 13th Annual
  Economic Outlook Conference sponsored by Western National Bank,
  December 1996.

"Winners and Losers in Property Tax Reform."  Article prepared for the <u>Texas Economic</u>
  <u>Development Council Newsletter</u>, 4th Quarter 1996.

"What's In Store for the Texas Economy."  Article prepared for the <u>Texas Association of</u>
  <u>Broadcasters Newsletter</u>, January 1997.

"Dallas—a Natural Beauty in the Eyes of Business."  Article prepared for the <u>Dallas</u>
  <u>Business Journal</u>, January 1997.

"The Short-Term Outlook for Texas and the Construction Sector."  Article prepared for
Texas Builder magazine, January 1997.

"Looking Ahead: Arlington's Economic Maturity."  Article prepared for the Arlington
Morning News, January 1997.

"Input on Texas Output."  Article prepared for the Texas Association of Broadcasters
Newsletter, February 1997.

"Now You See It, Now You Don't."  Article prepared for the Texas Association of
Broadcasters Newsletter, March 1997.

"The Changing Face of Industry in Dallas."  Article prepared for the Dallas Business
Journal, March 1997.

"The Serve Is In."  Article prepared for the Texas Economic Development Council
Newsletter, 1st Quarter 1997.

"Your Gain May Be My Pain."  Article prepared for the Texas Association of
Broadcasters Newsletter, April 1997.

"Health Services in Dallas."  Article prepared for the Dallas Business Journal,
April 1997.

"A Word is Worth a Billion Dollars."  Article prepared for the Texas Association of
Broadcasters Newsletter, April 1997.

"Sports Arena Funding: An Issue Beyond Economics."  Article prepared for the
Arlington Morning News, April 1997.

"The Long-Term Outlook for Texas and Dallas."  Article prepared for the Dallas
Business Journal, May 1997.

"Financial Services Go Online."  Article prepared for the Texas Association of
Broadcasters Newsletter, May 1997.

"The Value of Information."  Article prepared for the Texas Economic Development
Council Newsletter, June 1997.

"End of an Era."  Article prepared for the Dallas Business Journal, June 1997.

"The Short-Term Outlook for Texas and the Construction Sector."  Article prepared for
the Construction Magazine, June 1997.

"A Texas Legacy."  Article prepared for the Texas Association of Broadcasters
Newsletter, June 1997.

"The Outlook for Texas and Fort Worth-Arlington."  Article prepared for the Arlington
Morning News, July 1997.

"Future US Job Creation."  Article prepared for the Dallas Business Journal, July 1997.

"Freedom for Farmers."  Article prepared for the Texas Association of Broadcasters
Newsletter, July 1997.

"Job Growth in Texas."  Article prepared for the Dallas Business Journal, August 1997.

"The 140-Day Fight."  Article prepared for the Texas Economic Development Council Newsletter, August 1997.

"The Politics of Freer Trade."  Article prepared for the Texas Association of Broadcasters Newsletter, August 1997.

"The Journey: From Concept to Cash."  Article prepared for the Dallas Business Journal, September 1997.

"The Economic Outlook for The United States, Texas, and the Houston PMSA."  Report prepared for The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Morgan Keegan, Houston, Texas, Fall 1997.

"The Economic Outlook for The United States, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, Fall 1997.

"The Economic Outlook for The United States, Texas, and the Austin-San Marcos MSA."  Report prepared for The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, Fall 1997.

"The Mysteries of Inflation."  Article prepared for the Texas Association of Broadcasters Newsletter, September 1997.

"Trends in Texas Demographics."  Article prepared for the Dallas Business Journal, October 1997.

"Regional Decision-Making."  Article prepared for the Arlington Morning News, October 1997.

"A Synopsis of the Outlook for the US Economy and the Hospitality Industry."  Article prepared for The Bottomline, October 1997.

"San Antonio's Economy: The Last Decade."  Article prepared for the San Antonio Business Journal 10th Anniversary Issue, October 1997.

"Shades of Gray."  Article prepared for the Texas Association of Broadcasters Newsletter, October 1997.

"Regional Economic Development."  Article prepared for the Texas Economic Development Council Newsletter, November 1997.

"The Regional Concept of Economic Development."  Article prepared for the Texas Independent Banker, November 1997.

"Regional Decision-Making."  Article prepared for the Dallas Business Journal, November 1997.

"Around the Big Blue Marble."  Article prepared for the Texas Association of Broadcasters Newsletter, November 1997.

"Questions and Answers with Ray Perryman." Article prepared for <u>Texas Building Trends</u>, December 1997.

"Asian Flu."  Article prepared for the <u>Dallas Business Journal</u>, December 1997.

"Houston Economic Development Report."  Article prepared for the <u>Houston Business Journal</u>, December 1997.

"What's Ahead for Texas?"  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, December 1997.

"The Short-Term Outlook for the US, Texas, and the Dallas/Fort Worth Area."  Article prepared for the <u>Grubb & Ellis 1998 Forecast Book</u>, 1998.

"Common Sense, Capitalism, and The Dallas Arena."  Article prepared for the <u>Dallas Business Journal</u>, January 1998.

"The Arena—An Opportunity Not To Be Missed."  Article prepared for the <u>Dallas Morning News</u>, January 1998.

"The Best is Yet to Come."  Article prepared for the <u>Arlington Morning News</u>, January 1998.

"Broadcasting Meets High-Tech."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, February 1998.

"The Big Picture."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, March 1998.

"Information v. Inadequacy: The Battle for Funding."  Article prepared for the <u>Texas Economic Development Council Newsletter</u>, 1st Quarter 1998.

"Global Economic Trends."  Article prepared for the Dallas Mortgage Bankers Association, March 1998.

"The Federal Budget 'Surplus.'"  Article prepared for the <u>Dallas Business Journal</u>, March 1998.

"Evolution by Revolution."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, April 1998.

"The Short-Term Outlook for Texas and Fort Worth-Arlington."  Article prepared for the <u>Arlington Morning News</u>, April 1998.

"Oil Price Fallout."  Article prepared for the <u>Dallas Business Journal</u>, April 1998.

"The Midland-Odessa Economy."  Article prepared for Cotton Bledsoe Tighe & Dawson, April 1998.

"Is Bigger Better?  Perhaps."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, April, 1998.

"The Financial Services Smorgasbord."  Article prepared for the <u>Dallas Business Journal,</u> May 1998.

"The Millennium Bugaboo."  Article prepared for the <u>Texas Independent Banker</u>, May 1998.

"The Power of Tax Abatements: An Aggressive Economic Development Tool."  Article prepared for the <u>Economic Development</u> magazine, May 1998.

"Texas: A Long-Range Perspective."  Article prepared for the <u>Texas Economic Development Council Newsletter</u>, 2nd Quarter 1998.

"Economic Update."  Article prepared for <u>Texas Building Trends</u>, June 1998.

"Friendly Neighbors."  Article prepared for the <u>Dallas Business Journal</u>, June 1998.

"The Prototype."  Article prepared for the <u>Dallas Business Journal</u>, June 1998.

"Looking Ahead to 2025."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, June 1998.

"As Good as it Gets."  Article prepared for <u>Economic Development</u> magazine, July 1998.

"Outlook for Texas Metros."  Article prepared for the <u>Dallas Business Journal</u>, July 1998.

"The Economic Development Toolbox."  Article prepared for the <u>Arlington Morning News</u>, July 1998.

"The Future of Telecom."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, August 1998.

"Incentives, Consumers, and Antitrust."  Article prepared for the <u>Dallas Business Journal</u> and the <u>Economic Development</u> magazine, August 1998.

"The Economic Outlook for The United States, Texas, and the Houston PMSA."  Report prepared for The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Houston Industries, Inc., Houston, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, the Longview-Marshall MSA and the Tyler MSA."  Report prepared for The Perryman Group's 15th Annual Economic Outlook Conference sponsored by TU Electric and Lone Star Gas, Longview, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the San Antonio MSA."  Report prepared for The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Southwestern Bell, San Antonio, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the Austin-San Marcos MSA."  Report prepared for The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, Fall 1998.

"Sowing Seeds on the Internet."  Article prepared for the Texas Association of Broadcasters Newsletter, September 1998.

"The Financial Services Smorgasbord."  Article prepared for the Dallas Mortgage Bankers Association, September 1998.

"Trade and Texas."  Article prepared for the Dallas Business Journal, September 1998.

"Market Madness."  Article prepared for the Dallas Business Journal, October 1998.

"Foreign Trade and the Texas Economy."  Article prepared for the Arlington Morning News, October 1998.

"The Battle of the Bug."  Article prepared for the Texas Association of Broadcasters Newsletter, October 1998.

"The (Hidden) Costs of Freedom."  Article prepared for the Texas Association of Broadcasters Newsletter, November 1998.

"The Short-Term Outlook for the United States, Texas, and the Dallas/Fort Worth-Arlington Area: The US Economic Outlook Clouds Somewhat, Yet Remains Positive."  Article prepared for the Grubb & Ellis 1999 Forecast Book, November 1998.

"Is Economic Negativism Self-Fulfilling?"  Article prepared for the Dallas Business Journal, November 1998.

"Around the World."  Article prepared for the Dallas Business Journal, November 1998.

"Surplus Shenanigans."  Article prepared for the Texas Independent Banker, November 1998.

"Rearranging the Deck Chairs for the Next Ride."  Article prepared for the Texas Association of Broadcasters Newsletter, December 1998.

"The Next Five Years."  Article prepared for the Dallas Business Journal, December 1998.

"Electricity Deregulation."  Article prepared for the Dallas Business Journal, January 1999.

"Focusing on the Future."  Article prepared for the Texas Association of Broadcasters Newsletter, January 1999.

"Texas Short-Term Forecast."  Article prepared for the Arlington Morning News, January 1999.

"The Course after the Clinton Calamity."  Article prepared for the <u>Dallas Business Journal</u>, February 1999.

"The Beat Goes On."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, February, 1999.

"System Inspires Confidence."  Article prepared for the <u>Dallas Business Journal</u>, March 1999.

"Don't Look Back."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, March 1999.

"Y2K—Patterns and Prospects."  Article prepared for the <u>Arlington Morning News</u>, April 1999.

"The Three Phases of Y2K."  Article prepared for the <u>Dallas Business Journal</u>, April 1999.

"Y2K to Bring Unique Challenges to Texas."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, April 1999.

"Plugged In, On-Line, and On Call."  Article prepared for the <u>Dallas Business Journal</u>, May 1999.

"A World Economic View."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, May 1999.

"Predictions for the New Millennium."  Article prepared for the <u>Dallas Business Journal</u>, June 1999.

"Texas MSA Forecast."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, June 1999.

"What's Ahead in the Job Market."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, July 1999.

"They are Only a Stone's Throw Away."  Article prepared for the <u>Dallas Business Journal</u>, July 1999.

"Economic Performance to Remain Strong."  Article prepared for the <u>Arlington Morning News</u>, July 1999.

"Pay Raise to Teachers Will Benefit the State."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, August 1999.

"The New World of Financial Services."  Article prepared for the <u>Dallas Business Journal</u>, August 1999.

"Log On and Take a Look."  Article prepared for the <u>Dallas Business Journal</u>, September 1999.

"Our Fingers Are Doing the Walking."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, September 1999.

"The Residential Construction Outlook."  Article prepared for the <u>Arlington Morning News</u>, October 1999.

"Another Favorite Past Time."  Article prepared for the <u>Dallas Business Journal</u>, October 1999.

"The 'New House Itch.'"  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, October 1999.

"Make the Future Work for You."  Article prepared for the <u>Dallas Business Journal</u>, November 1999.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 1999.

"Economic Climate Continues Upward Spiral."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, November 1999.

"Looking Forward to Those 'Golden Years?'"  Article prepared for the <u>Dallas Business Journal</u>, December 1999.

"Texas, A Lighthouse to the World."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, December 1999.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Houston Area."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Reliant Energy, Houston, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the San Antonio Area."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Southwestern Bell and The North San Antonio Chamber of Commerce, San Antonio, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler MSAs."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by TXU Electric and Gas, Longview, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Frost Bank and Fulbright & Jaworski, Austin, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Bryan College Station MSA."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by The Adams Company, College Station, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Amarillo MSA."  Report prepared for The Perryman Group's 16th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce and First National Bank of Amarillo, Amarillo, Texas, January 2000.

"Research and Development Tax Credits."  Article prepared for the <u>Dallas Business Journal</u>, January 2000.

"Money and Change Make Life Interesting."  Article prepared for the <u>Arlington Morning News</u>, January 2000.

"A Review of Markets and Prices."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, January 2000.

"The Impact of The Clean Air Act Amendments on Business Activity in Attainment and Non-Attainment Areas."  Special report prepared for the Legislative Briefing sponsored by the Texas Association of Urban Counties, Austin, Texas, January 2000.

"Was it Worth the Cost?"  Article prepared for the <u>Dallas Business Journal</u>, February 2000.

"First on Anyone's 'Top Ten.'"  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, February 2000.

"The Place We Call Home."  Article prepared for the <u>Dallas Business Journal</u>, March 2000.

"Way Out Yonder."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, March 2000.

"Challenges and Opportunities."  Article prepared for the <u>Arlington Morning News</u>, April 2000.

"Cash is Still King."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, April 2000.

"Investing in the Future."  Article prepared for the <u>Dallas Business Journal</u>, April 2000.

"Fluctuating Markets."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, May 2000.

"Riding Out the Market's Ups and Downs."  Article prepared for the <u>Dallas Business Journal</u>, May 2000.

"The Future of Microsoft."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, June 2000.

"The Nature of Competition."  Article prepared for the <u>Dallas Business Journal</u>, June 2000.

"Forecast for the Future."  Article prepared for the <u>Arlington Morning News</u>, July 2000.

"Yeah!  Right!"  Article prepared for the <u>Dallas Business Journal</u>, July 2000.

"Pondering the Future."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, July 2000.

"Cash or Credit."  Article prepared for the <u>Dallas Business Journal</u>, August 2000.

"Buy Now, Pay Later?"  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, August 2000.

"The Big Three."  Article prepared for the <u>Dallas Business Journal</u>, September 2000.

"Forces that Shape."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, September 2000.

"Doing Business with Mexico."  Article prepared for the <u>Dallas Business Journal</u>, October 2000.

"South of the Border."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, October 2000.

"Economic Possibilities and Probabilities."  Article prepared for the <u>Arlington Morning News</u>, October 2000.

"The US Short-Term Forecast: 2000-2005."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October, 2000.

"Increasing Partnerships with Mexico."  Article prepared for the <u>Dallas Business Journal</u>, November 2000.

"Partnerships in Mexico Present Possibilities."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, November 2000.

"The Economic Outlook for the US, Texas, and the Bryan-College Station MSA." Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by The Adams Company, Bryan, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler MSAs."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by TXU Electric and Gas, Longview, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Amarillo MSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Frost National Bank and Fulbright & Jaworski, Austin, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Houston PMSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Houston Industries, Inc., Houston, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the San Antonio MSA."  Report prepared for The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Southwestern Bell, San Antonio, December 2000.

"Texas Economy Remains Sound."  Article prepared for the Dallas Business Journal, December 2000.

"Holiday Shopping Online."  Article prepared for the Texas Association of Broadcasters Newsletter, December 2000.

"Defining a Slowing Economy."  Article prepared for the Dallas Business Journal, January 2001.

"Evaluating the Economy."  Article prepared for the Texas Association of Broadcasters Newsletter, January 2001.

"Economic Optimism is a Good Policy."  Article prepared for the Water Valley Investment Newsletter, January 2001.

"Texans and Wannabe Texans."  Article prepared for the Dallas Business Journal, February 2001.

"Gone to Texas."  Article prepared for the Texas Association of Broadcasters Newsletter, February 2001.

"It's a Smart Idea."  Article prepared for the Dallas Business Journal, March 2001.

"Smart Jobs Must Stay Smart."  Article prepared for the Texas Association of Broadcasters Newsletter, March 2001.

"Black Gold in the Permian Basin: The History of West Texas Oil," The Perryman Permian Basin Oil Report, March 2001.

"Senate Bill 7 is a Good Idea."  Article prepared for the Dallas Business Journal, April 2001.

"The Texas Electric Choice Act."  Article prepared for the Texas Association of Broadcasters Newsletter, April 2001.

"Texas Forecast for Tomorrow."  Article prepared for the Dallas Business Journal, May 2001.

190

"Long-Term Look at What's Ahead for Texas."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, May 2001.

"The US Energy Situation," <u>The Perryman Permian Basin Oil Report</u>, May 2001.

"Evaluating the Tax Cut."  Article prepared for the <u>Dallas Business Journal</u>, June 2001.

"The Bush Tax Cut Reviewed."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, June 2001.

"Today's Economy."  Article prepared for the <u>Dallas Business Journal</u>, July 2001.

"An Economy of Transition."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, July 2001.

"The Worst May Be Over."  Article prepared for the <u>Water Valley Investment Newsletter</u>, July 2001.

"Eating Patterns Seeing Change."  Article prepared for the <u>Dallas Business Journal</u>, August 2001.

"Consumers and Eating Habits."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, August 2001.

"Oil Usage," <u>The Perryman Permian Basin Oil Report</u>, August 2001.

"Onward Through the Darkness."  Article prepared for the <u>Dallas Business Journal</u>, September 2001.

"Through the Perilous Night."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, September 2001.

"A Changing Tomorrow."  Article prepared for the <u>Dallas Business Journal</u>, October 2001.

"Rethinking the Future."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, October 2001.

"The US Short-Term Forecast: 2001-2006."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October, 2001.

"Economy Remains Secure."  Article prepared for the <u>Dallas Business Journal</u>, November 2001.

"Dock at Economic Home Shore."  Article prepared for the <u>Texas Association of Broadcasters Newsletter</u>, November 2001.

"Economic Realities for the United States, Texas, and Europe 2001-2006."  Report prepared for the British American Business Council of North Texas, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Dallas PMSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth CMSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by the Greater Dallas Chamber, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Bryan-College Station MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by The Phil Adams Company, Bryan, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the Amarillo MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the San Antonio MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Frost National Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the Tyler and Longview-Marshall MSAs."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by TXU, Tyler, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler MSAs."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by The Longview Partnership, Longview, Texas, December 2001.

"Texas Star is Bright."  Article prepared for the Dallas Business Journal, December 2001.

"The Lone Star Still Shines."  Article prepared for the Texas Association of Broadcasters Newsletter, December 2001.

"The Oil Market After September 11."  The Perryman Permian Basin Oil Report, December 2001.

"Trends for 2002."  Article prepared for the DFW TechBiz magazine, January 2002.

"The Economic Outlook for the US, Texas, and the Houston PMSA."  Report prepared for The Perryman Group's 18th Annual Economic Outlook Conference sponsored by the Houston Northwest Chamber of Commerce, Houston, Texas, January 2002.

"A Beautiful Idea."  Article prepared for the Dallas Business Journal, January 2002.

"Not Your Garden Variety."  Article prepared for the Texas Association of Broadcasters Newsletter, January 2002.

"The Road to Recovery."  Article prepared for the Water Valley Investment Newsletter, January 2002.

"Back to Basics."  Article prepared for the Dallas Business Journal, February 2002.

"Moving Ahead."  Article prepared for the Texas Association of Broadcasters Newsletter, February 2002.

"The World Supply and Demand Situation," The Perryman Permian Basin Oil Report, March 2002.

"A New World Order," The Perryman Permian Basin Oil Report, July 2002.

"The US Long-Term Forecast: 2001-2030."  Article prepared for the Water Valley Investment Newsletter, July 2002.

"Oil and War," The Perryman Permian Basin Oil Report, October 2002.

"Economic Growth to Continue."  Article prepared for the Water Valley Investment Newsletter, October 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference hosted by Fulbright & Jaworski, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and hosted by The Greater Dallas Chamber, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Bill J. Priest Institute, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan Area."  Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Wichita Falls Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Wichita Falls Board of Commerce and Industry, Wichita Falls, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Dallas Area Chapter for the Institute of Management Accounts, Addison, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area." Report prepared for the Perryman Group's 19th Annual Economic Outlook Conference sponsored by Strasburger & Price, LLP and hosted by The North San Antonio Chamber of Commerce, San Antonio, Texas, December 2002.

"Short-Term Forecasts for the US, Texas, and the Dallas-Fort Worth Metropolitan Area." Report prepared for the North Texas Chapter of the National Association of Industrial and Office Properties, Dallas, Texas, December 2002.

"Economic Forecasts for the US, Texas, and the Longview-Marshall & Tyler Metropolitan Areas." Report prepared for the Longview Partnership, Longview, Texas, December 2002.

"US to Achieve Moderate Growth in 2003." Article prepared for the Water Valley Investment Newsletter, January 2003.

"The Killeen-Temple Metropolitan Statistical Area Short-Term (2002-2007) Economic Forecast." Report prepared for the Greater Killeen Chamber of Commerce Economic Forecast Luncheon, Killeen, Texas, February 2003.

"The Brink," The Perryman Permian Basin Oil Report, March 2003.

"High Tech Oil," The Perryman Permian Basin Oil Report, July 2003.

"US Economy to Advance Over the Long Term: 2002-2030." Article prepared for the Water Valley Investment Newsletter, July 2003.

"The Post War Perception," The Perryman Permian Basin Oil Report, October, 2003.

"US Economy: Poised for a Rebound."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October 2003.

"The Short-Term Outlook for Fort Bend County."  Report prepared for the Fort Bend Chamber of Commerce Infrastructure Planning Conference, Fort Bend, Texas, November 2003.

"The Short-Term Outlook for Sugar Land, Texas."  Report prepared for the Sugar Land City Government, November 2003.

"The Short-Term Outlook for the US, Texas, and Williamson County."  Report prepared for the Williamson County Growth Summit sponsored by the <u>Austin Business Journal</u>, Austin, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and hosted by The Greater Dallas Chamber, Dallas, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Amarillo Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Strasburger & Price, LLP, and hosted by The North San Antonio Chamber of Commerce, San Antonio, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference hosted by Fulbright & Jaworski, LLP and Frost Bank, Austin, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan Area."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Tyler and Longview-Marshall Metropolitan Areas."  Report prepared for The Perryman Group's 20th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Houston Metropolitan Areas."
      Report prepared for The Perryman Group's 20th Annual Economic Outlook
      Conference hosted by the Houston Northwest Chamber of Commerce and
      sponsored by Leadership North Houston and North Harris County Community
      College District, January 2004.

"US Economic Forecast is Positive."  Article prepared for the Water Valley Investment
      Newsletter, January 2004.

"Recent Oil Market Developments" and "Alternative Energy in the Permian Basin," The
      Perryman Permian Basin Oil Report, April 2004.

"US Economic Picture Remains Bright."  Article prepared for the Water Valley
      Investment Newsletter, April 2004.

"Oil Prices Likely to Remain Volatile."  Article prepared for the Perryman Permian Basin
      Oil Report, July 2004.

"US Long-Term Economic Picture is Positive."  Article prepared for the Water Valley
      Investment Newsletter, July 2004.

"Energy Prices Still Surging," The Perryman Permian Basin Oil Report, October 2004.

"The US Short-Term Forecast 2004-2009."  Article prepared for the Water Valley
      Investment Newsletter, October 2004.

"The Economic Outlook for the US, Texas, and the Dallas and Fort Worth-Arlington
      Metropolitan Areas."  Report prepared for The Perryman Group's 21st Annual
      Economic Outlook Conference hosted by The Greater Dallas Chamber and
      sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan
      Area."  Report prepared for The Perryman Group's 21st Annual Economic
      Outlook Conference sponsored by The Phil Adams Company, College Station,
      Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan
      Area."  Report prepared for The Perryman Group's 21st Annual Economic
      Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP,
      Austin, Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan
      Area."  Report prepared for The Perryman Group's 21st Annual Economic
      Outlook Conference hosted by The McCoy College of Business Administration,
      The Greater San Marcos Economic Development Council, and Balcones Bank,
      San Marcos, Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler
      Metropolitan Areas."  Report prepared for The Perryman Group's 21st Annual
      Economic Outlook Conference sponsored by the Longview Partnership,
      Longview, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area."
Report prepared for The Perryman Group's 21st Annual Economic Outlook
Conference sponsored by Western National Bank, Midland, Texas,
December 2004.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area."
Report prepared for The Perryman Group's 21st Annual Economic Outlook
Conference hosted by the North San Antonio Chamber of Commerce, San
Antonio, December 2004.

"The Economic Outlook for the US, Texas, and the Houston Metropolitan Area."  Report
prepared for The Perryman Group's 21st Annual Economic Outlook Conference
sponsored by the FPA of Houston Foundation, Houston, Texas, January 2005.

"The Economic Outlook for the US, Texas, and the Amarillo Metropolitan Area."  Report
prepared for The Perryman Group's 21st Annual Economic Outlook Conference
sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas,
January 2005.

"The Outlook for 2005: Challenges Ahead, but Optimism Prevails."  Article prepared for
the Water Valley Investment Newsletter, January 2005.

"Demand, Growth, and Speculation Behind High Oil Prices."  Article prepared for the
Perryman Permian Basin Oil Report, March 2005.

"Optimism for Continued Economic Expansion."  Article prepared for the Water Valley
Investment Newsletter, April 2005.

"We Got It Right the First Time."  Article prepared for the Dallas Morning News,
April 2005.

"High Oil Prices Likely to Persist."  Article prepared for the Perryman Permian Basin Oil
Report, June 2005.

"High Energy Rates of Growing Concern."  Article prepared for the Water Valley
Investment Newsletter, July 2005.

"Hurricane Katrina Causes Serious Significant Disruptions."  Article prepared for the
Perryman Permian Basin Oil Report, September 2005.

"The US Short-Term Economic Outlook (2005-2010)."  Article prepared for the Water
Valley Investment Newsletter, October 2005

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's
22nd Annual Economic Outlook Conference hosted by The Greater Dallas
Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas,
November 2005.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan
Statistical Areas."  Report prepared for The Perryman Group's 22nd Annual
Economic Outlook Conference sponsored by Western National Bank, Odessa,
Texas, December 2005.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Report prepared for The Perryman Group's 22nd Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 22nd Annual Economic Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the San Marcos Area."  Report prepared for The Perryman Group's 22nd Annual Economic Outlook Conference hosted by Texas State Small Business Development Center, McCoy College of Business Administration, San Marcos Area Chamber of Commerce, and San Marcos Hispanic Chamber of Commerce, San Marcos, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Report prepared for The Perryman Group's 22nd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Spectrum Health Clubs, San Antonio, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the Houston-Baytown-Sugar Land Metropolitan Statistical Area."  Report prepared for The Perryman Group's 22nd Annual Economic Outlook Conference sponsored by The Rotary Club of Houston, Houston, Texas, January 2006.

"Nation's Economic Health Remains Promising."  Article prepared for the Water Valley Investment Newsletter, January 2006

"Gasoline Prices Continue at High Levels."  Article prepared for the Perryman Permian Basin Oil Report, March 2006.

"US Economy Continues to Expand."  Article prepared for the Water Valley Investment Newsletter, April 2006.

"US Oil Production, Consumption Expected to Rise."  Article prepared for the Perryman Permian Basin Oil Report, June 2006.

"Economic Growth Rate Likely to Slow, But Not Stall Entirely."  Article prepared for the Water Valley Investment Newsletter, July 2006.

"The Short-Term Economic Outlook: Continued Expansion Amid Ongoing Challenges."  Article prepared for the Water Valley Investment Newsletter, October 2006.

"New Oil Find in Gulf of Mexico has Substantial Potential."  Article prepared for the Perryman Permian Basin Oil Report, October 2006.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by The Greater Dallas Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2006.

"The Economic Outlook for the US, Texas, and the Fort Worth-Arlington and Dallas-Plano-Irving Metropolitan Divisions."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference sponsored by Summit Bank, Fort Worth, Texas, November 2006.

"The Economic Outlook for the US, Texas, and the North East Texas Region and Hopkins County."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by the Hopkins County Chamber of Commerce, Sulphur Springs, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Cingular Wireless, San Antonio, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Texarkana Metropolitan Statistical Area."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Texas Bank and Trust, Texarkana, Texas, January 2007.

"The Economic Outlook for the US, Texas, and the Tyler and Longview Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Allied Waste Services, Austin Bank, Bank of America, Capital One Bank, Southside Bank, and Texas Bank and Trust and sponsored by Tyler Economic Development Council, and the Tyler Area Chamber of Commerce, Tyler, Texas, January 2007.

"Economic Health of the National is Positive."  Article prepared for the <u>Water Valley Investment Newsletter</u>, January 2007.

"The Economic Outlook for the US, Texas, and the San Marcos Area."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by McCoy College of Business Administration at Texas State University, San Marcos Chamber of Commerce, and Economic Development San Marcos, San Marcos, Texas, January 2007.

"The Economic Outlook for the US, Texas, and the Wichita Falls Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Wichita Falls Board of Commerce & Industry and Times Record News and sponsored by KSWO-TV, First Bank, Kiowa Casino, Midwestern State University, TXU, and Wal-Mart, Wichita Falls, Texas, January 2007.

"Oil Prices Fluctuating."  Article prepared for the <u>Perryman Permian Basin Oil Report</u>, February 2007.

"The Short-Term Outlook for the United States."  Article prepared for the <u>Water Valley Investment Newsletter</u>, April 2007.

"A Perspective on the Victoria Economy."  Feature article prepared for the <u>Victoria Advocate</u>, May 2007.

"What is Different About the Current 'Oil Boom'?"  Article prepared for the <u>Perryman Permian Basin Oil Report</u>, May 2007.

"The Case for Wellness."  Article prepared for the <u>Dallas Morning News</u>, May 2007.

"US Economic Future is Optimistic."  Article prepared for the <u>Water Valley Investment Newsletter</u>, July 2007.

"World Affairs Affect Gasoline Prices."  Article prepared for the <u>Perryman Permian Basin Oil Report</u>, August 2007.

"Strange Days."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October 2007.

"Oil Prices: An Inside Look."  Article prepared for the <u>Perryman Permian Basin Oil Report</u>, October 2007.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 24th Annual Economic Outlook Conference hosted by the Greater Dallas Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2007.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 24th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2007.

"The Economic Outlook for the US, Texas, and the North East Texas COG Region."  Report prepared for The Perryman Group's 24th Annual Economic Outlook Conference hosted by the Hopkins County Chamber of Commerce, Sulphur Springs, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 24th Annual Economic Outlook Conference hosted by Fulbright & Jaworski, LLP and Frost Bank, Austin, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Report prepared for The Perryman Group's 24th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical
Area."  Report prepared for The Perryman Group's 24th Annual Economic
Outlook Conference hosted by Longview Partnership, Longview, Texas,
December 2007.

"The Economic Outlook for the US, Texas, and the Houston-Sugar Land-Baytown
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 24th
Annual Economic Outlook Conference hosted by the Houston Chapter of CoreNet
Global and the Houston Chapter of the National Association of Industrial and
Office Properties, Houston, Texas, January 2008.

"Economy Continues to Edge Forward."  Article prepared for the Water Valley
Investment Newsletter, January 2008.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Areas."
Report prepared for The Perryman Group's 24th Annual Economic Outlook
Conference hosted by Allied Waste Services, Austin Bank, Bank of America,
Bank of Tyler, Capital One Bank, Chase Bank, N.A., Citizens 1st Bank, Firstbank,
Franklin Bank, Heritage Land Bank, Southside Bank, and Texas Bank & Trust,
and Tyler Junior College and sponsored by Tyler Economic Development
Council, and the Tyler Area Chamber of Commerce, Tyler, Texas, January 2008.

"The Economic Outlook for the US, Texas, and the Houston-Sugar Land-Baytown
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 24th
Annual Economic Outlook Conference presented by the Bay Area Houston
Economic Partnership's Small Business Committee, Houston, Texas,
January 2008.

"Oil at $100!!  You Ain't Seen Nothing Yet!!"  Article prepared for EleGlance magazine,
January 2008.

"Leisure Tourism: An Ongoing Boon to the Texas Economy."  Article prepared for the
Texas Municipal League, February 2008.

"Concerns and Uncertainties Impact Oil Prices."  Article prepared for the Perryman
Permian Basin Oil Report, March 2008.

"Outlook for Waco Economy is Optimistic."  Article prepared for the Waco Tribune-
Herald, April 2008.

"Progress of Economy Remains Slow."  Article prepared for the Water Valley
Investment Newsletter, April 2008.

"Up, Down, and All Around."  Article prepared for the Perryman Permian Basin Oil
Report, July 2008.

"Economy Continues to Face Challenges."  Article prepared for the Water Valley
Investment Newsletter, July 2008.

"The Texas Economy Expected to Remain Relatively Stable."  Article prepared for the
AGC Houston's Winter 2008 issue of Cornerstone magazine, October 2008.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions with Special Focus on the Mansfield Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference presented by the EECU, Mansfield Texas Economic Development, and the Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Mount Pleasant Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Mount Pleasant Industrial Foundation, Mount Pleasant, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by The Phil Adams Company, Bryan, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by Plains Capital Bank, Lubbock, Texas, January 2009.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area." Report prepared for The Perryman Group's 25th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2009.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Report prepared for The Perryman Group's 25th Annual Economic Outlook
Conference hosted by the Tyler Economic Development Council, the Tyler Area
Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2009.

"Economy Continues to Face Challenges."  Article prepared for the Water Valley
Investment Newsletter, January 2009.

"Short-Term Outlook for Waco Economy is Encouraging."  Article prepared for the
Waco Tribune-Herald, April 2009.

"Economy Continues to Face Challenges."  Article prepared for the Water Valley
Investment Newsletter, April 2009.

"The Mortgage Crisis and the Economy."  Article prepared for Texas Builder Magazine,
May 2009.

"On the Horizon."  Article prepared for Today's CPA, October 2009.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's
26th Annual Economic Outlook Conference hosted by the Dallas Regional
Chamber, Dallas, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions with Special Focus on the Mansfield Area."
Report prepared for The Perryman Group's 26th Annual Economic Outlook
Conference hosted by Ameriprise Financial, Mansfield Texas Economic
Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas,
November 2009.

"The Economic Outlook for the US, Texas, and the Mount Pleasant/North East Texas
Area Outlook."  Report prepared for The Perryman Group's 26th Annual
Economic Outlook Conference hosted by the City of Mount Pleasant, Mount
Pleasant, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Nacogdoches and Deep East Texas
Region."  Report prepared for The Perryman Group's 26th Annual Economic
Outlook Conference hosted by the Deep East Texas Council of Governments,
Nacogdoches, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan
Statistical Area."  Report prepared for The Perryman Group's 26th Annual
Economic Outlook Conference hosted by The Phil Adams Company, Bryan,
Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Williamson County Area."  Report
prepared for the Austin-San Antonio Corridor Growth Summit, hosted by the
Austin Business Journal, Austin, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by Plains Capital Bank and Lubbock Country Club, Lubbock, Texas, January 2010.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area." Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2010.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 26th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2010.

"By Most Measures, Recovery is Now Underway."  Article prepared for the Water Valley Investment Newsletter, January 2010.

"Economic Recovery Continues, But Pace May Be Limited by Weakness In Employment and Consumer Spending."  Article prepared for the Water Valley Investment Newsletter, July 2010.

"Texas Economy Remains Relatively Healthy."  Article prepared for the AGC Houston's Winter 2010 issue of Cornerstone magazine, September 2010.

"Key Factors Shaping the Economy in 2011."  Article prepared for the Water Valley Investment Newsletter, October 2010.

"A Glimpse at 2011: What Texas CEOs Need to Know."  Article prepared for the Texas CEO Magazine, October 2010.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions with Special Focus on the Mansfield Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by Ameriprise Financial, Mansfield Texas Economic Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Mount Pleasant/North East Texas Area Outlook."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Mount Pleasant Industrial Foundation, Mount Pleasant, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by The Phil Adams Company, Bryan, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, January 2011.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2011.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 27th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2011.

"US Short-Term Economic Outlook Through 2015: Greater Stability and Strength." Article prepared for the Water Valley Investment Newsletter, January 2011.

"US Short-Term Economic Outlook Through 2015: Greater Stability and Strength." Article prepared for the Water Valley Investment Newsletter, April 2011.

"A Silent, But Substantial Threat."  Article prepared for the Austin-American Statesman, June 2011.

"The Outlook for the US Economy: Fall 2011."  Article prepared for the Water Valley Investment Newsletter, October 2011.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area with Special Focus on the Outlook for Mansfield."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference presented by Ameriprise Financial, Mansfield Texas Economic Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2011.

"Response Regarding the Cornell Critique of The Perryman Group's Study of the Keystone XL Pipeline."  Article prepared for TransCanada Pipeline, December 2011.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Longview Chamber of Commerce, Longview, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, January 2012.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Tyler Chamber of Commerce, Tyler, Texas, January 2012.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Report prepared for The Perryman Group's 28th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2012.

"US Short-Term Economic Outlook Through 2016: Challenges to the US Economy."  Article prepared for the Water Valley Investment Newsletter, January 2012.

"The United States Should Learn from the Euro Crisis."  Article prepared for the Schweizer Bank magazine, February 2012.

"Keystone Jobs and Common Sense."  Article prepared for TransCanada Pipeline, March 2012.

"US Short-Term Economic Outlook Through 2016: Challenges to the US Economy—April Update."  Article prepared for the Water Valley Investment Newsletter, April 2012.

"Perryman Short-Term US Economic Forecast."  Article prepared for the Water Valley Investment Newsletter, October 2012.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area with Special Focus on the Outlook for Mansfield."  Report prepared for The Perryman Group's 29th Annual Economic Outlook Conference presented by Mansfield Texas Economic Development and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2012.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 29th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2012.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 29th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2012.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report prepared for The Perryman Group's 29th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2012.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
Governments which includes the Sulphur Springs Area."  Report prepared for The
Perryman Group's 29th Annual Economic Outlook Conference hosted by the
Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
Springs, Texas, December 2012.

"Outlook for the US Economy."  Article prepared for the Water Valley Investment
Newsletter, January 2013.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Report prepared for The Perryman Group's 29th Annual Economic Outlook
Conference hosted by the Tyler Chamber of Commerce, Tyler, Texas,
January 2013.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 29th
Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas,
January 2013.

"Outlook for the US Economy: April 2013."  Article prepared for the Water Valley
Investment Newsletter, April 2013.

"Outlook for the US Economy: July 2013."  Article prepared for the Water Valley
Investment Newsletter, July 2013.

"Outlook for the US Economy: October 2013."  Article prepared for the Water Valley
Investment Newsletter, October 2013.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area
with Special Focus on the Colleyville Area."  Report prepared for The Perryman
Group's 30th Annual Economic Outlook Conference presented by the City of
Colleyville, Colleyville Area Chamber of Commerce, Fletcher Consulting, Frost
Bank, and Cantey Hanger, LLP, Colleyville, Texas, November 2013.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's
30th Annual Economic Outlook Conference hosted by the Dallas Regional
Chamber, Dallas, Texas, November 2013.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan
Statistical Areas."  Report prepared for The Perryman Group's 30th Annual
Economic Outlook Conference hosted by Western National Bank, Odessa, Texas,
November 2013.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 30th
Annual Economic Outlook Conference hosted by the North San Antonio Chamber
of Commerce, San Antonio, Texas, December 2013.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
Governments which includes the Sulphur Springs Area."  Report prepared for The
Perryman Group's 30th Annual Economic Outlook Conference hosted by the
Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
Springs, Texas, December 2013.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Report prepared for The Perryman Group's 30th Annual Economic Outlook
Conference hosted by the Tyler Economic Development Council, the Tyler Area
Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2014.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 30th
Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas,
January 2014.

"Outlook for the US Economy: January 2014."  Article prepared for the Water Valley
Investment Newsletter, January 2014.

"The Economic Benefits of Tourism in the Lone Star State." Article prepared for the
Texas Town & City magazine of the Texas Municipal League, January 2014.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical
Area."  Report prepared for The Perryman Group's 30th Annual Economic
Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas,
February 2014.

"Outlook for the US Economy: July 2014."  Article prepared for the Water Valley
Investment Newsletter, July 2014.

"Outlook for the US Economy: October 2014."  Article prepared for the Water Valley
Investment Newsletter, October 2014.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's
31st Annual Economic Outlook Conference hosted by the Dallas Regional
Chamber, Dallas, Texas, November 2014.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 31st
Annual Economic Outlook Conference hosted by the North San Antonio Chamber
of Commerce, San Antonio, Texas, December 2014.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
Governments which includes the Sulphur Springs Area."  Report prepared for The
Perryman Group's 31st Annual Economic Outlook Conference hosted by the
Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
Springs, Texas, December 2014.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Report prepared for The Perryman Group's 31st Annual Economic Outlook
Conference hosted by the Tyler Economic Development Council, the Tyler Area
Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2015.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos
Metropolitan Statistical Area."  Report prepared for The Perryman Group's 31st
Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas,
January 2015.

"Outlook for the US Economy: January 2015."  Article prepared for the <u>Water Valley Investment Newsletter</u>, January 2015.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 31st Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, February 2015.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 31st Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2015.

"The Economic Benefits of Travel and Tourism in the Lone Star State." Article prepared for the <u>Texas Town & City</u> magazine of the Texas Municipal League, April 2015.

"Outlook for the US Economy: April 2015."  Article prepared for the <u>Water Valley Investment Newsletter</u>, April 2015.

"Outlook for the US Economy: July 2015."  Article prepared for the <u>Water Valley Investment Newsletter</u>, July 2015.

"Outlook for the US Economy: October 2015."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October 2015.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2015.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2015.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2015.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2016.

"Outlook for the US Economy: January 2016."  Article prepared for the <u>Water Valley Investment Newsletter</u>, January 2016.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, February 2016.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, February 2016.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report prepared for The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2016.

"Outlook for the US Economy: April 2016."  Article prepared for the Water Valley Investment Newsletter, April 2016.

"Outlook for the US Economy: July 2016."  Article prepared for the Water Valley Investment Newsletter, July 2016.

"Outlook for the US Economy: October 2016."  Article prepared for the Water Valley Investment Newsletter, October 2016.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2016.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2016.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2016.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2017.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, February 2017.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by Texas Bank & Trust, Longview, Texas, February 2017.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report presented to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, February 2017.

"Outlook for the US Economy: April 2017."  Article prepared for the <u>Water Valley Investment Newsletter</u>, April 2017.

"Outlook for the US Economy: July 2017."  Article prepared for the <u>Water Valley Investment Newsletter</u>, July 2017.

"Outlook for the US Economy: October 2017."  Article prepared for the <u>Water Valley Investment Newsletter</u>, October 2017.

"The State of the Texas Economy."  Article prepared for the <u>Smart CEO</u>, November 2017.

"The Texas Economy: Looking Ahead."  Article prepared for <u>Today's CPA</u>, November 2017.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2017.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2017.

"The Economic Outlook for the US, Texas, and the East Texas Council of Governments."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Athens Economic Development Corporation, Athens, Texas, December 2017.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2018.

"The Economic Outlook for the US, Texas, and the Beaumont-Port Arthur Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Southeast Texas Economic Development Foundation, Beaumont, Texas, January 2018.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, February 2018.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by Texas Bank & Trust, Longview, Texas, February 2018.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2018.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Report presented to The Perryman Group's 34th Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, March 2018.

"Texas Dominates Wind Power."  Article written for the <u>Beaumont Business Journal,</u> May 2018.

# TEXAS ECONOMIC FORECAST
## Lead Articles

"The Economic Outlook for Texas—Short-Term and Long-Term."  January 1982

"The Short-Term and Long-Term Economic Outlook for Texas, Dallas/Fort Worth, and Houston."  July 1982

"The Economic Prognosis for Texas and Its Major Metropolitan Areas."  January 1983

"The Outlook for the Texas Economy: Short-Term, Long-Term, Metropolitan Areas, and Alternative Scenarios."  July 1983

"The Mexican Economic and Political Scene in 1984."  January 1984

"San Antonio: Perspective and Prognosis."  February 1984

"Galveston: An Analysis and Outlook."  March 1984

"The Short-Term Outlook for the Texas Economy."  April 1984

"Texas 'Tech': An Initial Look at the Technology Industries in Texas."  May 1984

"The Dallas/Fort Worth Economy: A Mid-Year Perspective."  June 1984

"The Long-Term Outlook for the Texas Economy."  July 1984

"The Houston Economy: A Mid-Year Perspective."  August 1984

"The Technology Industries in Texas: A Comprehensive Overview."  September 1984

"The Short-Term Outlook for the Texas Economy."  October 1984

"The Economic Outlook for the Dallas/Fort Worth Area: A Comprehensive Year-End Perspective."  November 1984

"The Economic Outlook for the Houston Area: A Comprehensive Year-End Perspective."  December 1984

"An Economic Outlook for Selected Metropolitan Areas: Galveston-Texas City and McAllen-Pharr-Edinburg."  January 1985

"An Economic Outlook for Selected Metropolitan Areas: Abilene and Victoria."  February 1985

"An Economic Outlook for Selected Metropolitan Areas: San Antonio and Austin."  March 1985

"The Short-Term Outlook for the Texas Economy."  April 1985

"The Short-Term Economic Outlook for the Dallas/Fort Worth Area."  May 1985

"The Short-Term Economic Outlook for the Houston Area."  June 1985

"The Long-Term Outlook for the Texas Economy."  July 1985

"The Long-Term Outlook for the Dallas/Fort Worth Area."  August 1985

"The Long-Term Outlook for the Houston Area."  September 1985

"The Short-Term Outlook for the Texas Economy."  October 1985

"The Short-Term Outlook for the Dallas/Fort Worth Area."  November 1985

"The Short-Term Outlook for the Houston Area."  December 1985

"An Economic Outlook for Selected Metropolitan Areas: Abilene, McAllen-Pharr-Edinburg, and Victoria County."  January 1986

"The Short-Term Outlook for Selected Metropolitan Areas: El Paso and Midland (and a Special Look at Texas in Light of Recent Oil Price Developments)."  February 1986

"The Short-Term Economic Outlook for the Austin and San Antonio Metropolitan Areas."  March 1986

"The Short-Term Outlook for the Texas Economy."  April 1986

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area"  May 1986

"The Short-Term Economic Outlook for the Houston Economy."  June 1986

"The Long-Term Outlook for the Texas Economy."  July 1986

"The Long-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  August 1986

"The Long-Term Economic Outlook for the Houston-Galveston-Brazoria Consolidated Metropolitan Statistical Area."  September 1986

"The Short-Term Outlook for the Texas Economy."  October 1986

"The Short-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  November 1986

"The Short-Term Economic Outlook for the Houston-Galveston-Brazoria Metropolitan Area."  December 1986

"The Texas Industrial Outlook."  January 1987

"An Occupational Outlook for the State of Texas."  February 1987

"The Short-Term Outlook for the Austin and San Antonio Metropolitan Areas."  March 1987

"The Short-Term Outlook for the Texas Economy."  April 1987

215

"The Short-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  May 1987

"The Short-Term Outlook for the Houston Economy."  June 1987

"The Long-Term Outlook for the Texas Economy."  July 1987

"The Long-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  August 1987

"The Long-Term Outlook for the Houston-Galveston-Brazoria Metropolitan Area."
        September 1987

"The Short-Term Outlook for the Texas Economy."  October 1987

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
        November 1987

"The Short-Term Economic Outlook for the Houston Economy."  December 1987

"The Texas Industrial Outlook."  January 1988

"An Occupational Outlook for the State of Texas."  February 1988

"The Short-Term Economic Outlook for the Austin and San Antonio Metropolitan
        Areas."  March 1988

"The Short-Term Outlook for the Texas Economy."  April 1988

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
        May 1988

"The Short-Term Economic Outlook for the Houston-Galveston-Brazoria Consolidated
        Metropolitan Statistical Area."  June 1988

"The Long-Term Outlook for the Texas Economy."  July 1988

"The Long-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  August 1988

"The Long-Term Outlook for the Houston Economy."  September 1988

"The Short-Term Outlook for the Texas Economy."  October 1988

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
        November 1988

"The Short-Term Economic Outlook for the Houston Metropolitan Area."
        December 1988

"The Short-Term Economic Outlook for the Austin and San Antonio Metropolitan
        Areas."  January 1989

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
        February 1989

"The Short-Term Economic Outlook for the Houston Metropolitan Area."  March 1989

"The Short-Term Economic Outlook for Texas."  April 1989

"The Long-Term Economic Outlook for Texas."  May 1989

"The Long-Term Economic Outlook for the Austin and San Antonio Metropolitan
    Areas."  June 1989

"The Long-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
    July 1989

"The Long-Term Outlook for the Houston Metropolitan Area."  August 1989

"The Short-Term Economic Outlook for Texas."  September 1989

"The Short-Term Economic Outlook for the Austin and San Antonio Metropolitan
    Areas."  October 1989

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."
    November 1989

"The Short-Term Economic Outlook for the Houston Metropolitan Area."
    December 1989

"The Short-Term Outlook for the Austin and San Antonio Metropolitan Areas."
    January 1990

"The Short-Term Outlook for Dallas/Fort Worth."  February 1990

"The Short-Term Outlook for Houston."  March 1990

"The Short-Term Outlook for El Paso."  March 1990

"The Short-Term Outlook for Texas and the United States."  April 1990

"The Long-Term Outlook for Texas and the United States."  May 1990

"The Long-Term Outlook for Austin and San Antonio."  June 1990

"The Long-Term Outlook for Dallas/Fort Worth."  July 1990

"The Long-Term Outlook for Houston."  August 1990

"The Long-Term Outlook for El Paso."  August 1990

"The Short-Term Outlook for Texas and the United States."  September 1990

"The Short-Term Outlook for Austin and San Antonio."  October 1990

"The Short-Term Outlook for Dallas/Fort Worth."  November 1990

"The Short-Term Outlook for Houston."  December 1990

"The Short-Term Outlook for El Paso."  December 1990

"The Short-Term Outlook for Austin and San Antonio."  January 1991

"The Short-Term Outlook for Dallas/Fort Worth Metroplex."  February 1991

"The Short-Term Outlook for Houston."  March 1991

"The Short-Term Outlook for El Paso."  March 1991

"The Short-Term Outlook for Texas and the United States."  April 1991

"The Long-Term Outlook for Texas and the United States."  May 1991

"The Long-Term Outlook for Austin and San Antonio."  June 1991

"The Long-Term Outlook for Dallas and Fort Worth."  July 1991

"The Long-Term Outlook for Houston."  August 1991

"The Long-Term Outlook for El Paso."  August 1991

"The Short-Term Outlook for Texas and the United States."  September 1991

"The Short-Term Outlook for Austin and San Antonio."  October 1991

"The Short-Term Outlook for Dallas/Fort Worth."  November 1991

"The Short-Term Outlook for Houston."  December 1991

"The Short-Term Outlook for El Paso."  December 1991

"The Short-Term Outlook for Austin and San Antonio."  January 1992

"The Short-Term Outlook for Dallas/Fort Worth."  February 1992

"The Short-Term Outlook for Houston."  March 1992

"The Short-Term Outlook for El Paso."  March 1992

"The Short-Term Outlook for Texas and the United States."  April 1992

"The Long-Term Outlook for Texas and the United States."  May 1992

"The Long-Term Outlook for Austin and San Antonio."  June 1992

"The Long-Term Outlook for Dallas/Fort Worth."  July 1992

"The Long-Term Outlook for Houston."  August 1992

"The Long-Term Outlook for El Paso."  August 1992

"The Short-Term Outlook for Texas and the United States."  September 1992

"Austin/San Antonio Metro Areas Short-Term Outlook."  October 1992

"The Short-Term Outlook for the Dallas/Fort Worth Economy."  November 1992

"The Short-Term Outlook for Houston."  December 1992

"The Short-Term Outlook for El Paso."  December 1992

"The Short-Term Outlook for Austin and San Antonio."  January 1993

"The Short-Term Outlook for Dallas/Fort Worth."  February 1993

"The Short-Term Outlook for Houston."  March 1993

"The Short-Term Outlook for El Paso."  March 1993

"The Short-Term Outlook for Texas and the United States."  April 1993

"The Long-Term Outlook for Texas and the United States."  May 1993

"The Long-Term Outlook for Austin and San Antonio."  June 1993

"The Long-Term Outlook for Dallas/Fort Worth."  July 1993

"The Long-Term Outlook for Houston."  August 1993

"The Long-Term Outlook for El Paso."  August 1993

"The Short-Term Outlook for Texas and the United States."  September 1993

"The Short-Term Outlook for Dallas/Fort Worth."  October 1993

"The Short-Term Outlook for Dallas/Fort Worth."  November 1993

"The Short-Term Outlook for Houston."  December 1993

"The Short-Term Outlook for El Paso."  December 1993

## PERRYMAN ECONOMIC FORECAST

"The Short-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Six Major Metropolitan Statistical Areas." April 1994

"The Long-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas." July 1994

"The Short-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas." November 1994

"The Short-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Seven Major Metropolitan Statistical Areas." April 1995

"The Long-Term Economic Outlook for the US, Texas, 10 Economic Regions, and Major Metropolitan Statistical Areas." July 1995

"The Short-Term Outlook for the United States, Texas, and Major Texas Metropolitan Statistical Areas." Fall 1995

"The Long-Term Outlook for the United States, Texas, and Major Texas Metropolitan Statistical Areas." Spring 1996

"The Short-Term Outlook for the United States, Texas, and Major Texas Metropolitan Statistical Areas." Fall 1996

"The Long-Term Outlook for the United States, Texas, and the Six Major Texas Metropolitan Statistical Areas." Spring 1997

"The Short-Term Outlook for the United States, Texas, and the Six Major Texas Metropolitan Statistical Areas." Winter 1998

"The Long-Term Outlook for the United States, Texas, and the Six Major Texas Metropolitan Statistical Areas." Spring 1998

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 1998

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 1999

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 1999

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2000

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2000

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2001

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2001

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2002

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2002

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2003

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2003

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2004.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2004.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2005.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2005.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2006.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2006.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2007.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2007.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring 2008.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2008.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring/Summer 2009.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2009.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring/Summer 2010.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2010.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Spring/Summer 2011.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2011.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Summer 2012.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2012.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Summer 2013.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Winter 2013.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Summer 2014.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2014.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Summer 2015.

"The Short-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Fall 2015.

"The Long-Term Outlook for the United States, Texas, and Six Major Texas Metropolitan Statistical Areas." Summer 2016.

"The 2017 Perryman Economic Forecast: The United States, Texas, and Major Texas Metropolitan Statistical Areas." March 2017

"Perryman Economic Update Economic Forecast for the US, Texas, and Major Texas Metropolitan Statistical Areas." Second Quarter 2017

"Perryman Economic Update Economic Forecast for the US, Texas, and Major Texas Metropolitan Statistical Areas." Third Quarter 2017

"Perryman Economic Update Economic Forecast for the US, Texas, and Major Texas Metropolitan Statistical Areas." Fourth Quarter 2017

"Perryman Economic Update Economic Forecast for the US, Texas, and Major Texas Metropolitan Statistical Areas." First Quarter 2018

"Perryman Economic Update Economic Forecast for the US, Texas, and Major Texas Metropolitan Statistical Areas." Second Quarter 2018

# THE PERRYMAN REPORT
## Lead Articles

"The Dallas/Fort Worth Outlook."  January 1985

"The Houston Outlook."  February 1985

"The Austin and San Antonio Outlook."  March 1985

"The US Economic Outlook."  April 1985

"The Mid-Year Short-Term Texas Outlook."  May 1985

"The Mid-Year Short-Term Alternative Outlooks."  June 1985

"The Long-Term Outlook for the US Economy."  July 1985

"The Long-Term Outlook for the Texas Economy."  August 1985

"The Long-Term Outlook: Alternative Views."  September 1985

"The Short-Term Economic Outlook for the United States."  October 1985

"The Short-Term Outlook for the Texas Economy."  November 1985

"Metropolitan Growth in Texas: A Long-Range Perspective."  December 1985

"The Short-Term Outlook for the Dallas/Fort Worth Area."  January 1986

"The Short-Term Outlook for the Houston Economy."  February 1986

"The Short-Term Economic Outlook for the Austin and San Antonio Economies."
    March 1986

"The Short-Term Economic Outlook for the United States Economy."  April 1986

"Oil Prices and the Short-Term Outlook for the Texas Economy."  May 1986

"A Regional Outlook for the Texas Economy."  June 1986

"The Long-Range Outlook for the US Economy."  July 1986

"The Long-Term Outlook for the Texas Economy."  August 1986

"The Long-Term Outlook for Texas: Alternative Oil Price Scenarios."  September 1986

"The Short-Term Outlook for the United States Economy."  October 1986

"The Year-End Outlook for the Texas Economy."  November 1986

"Dallas/Fort Worth and Houston: A Long-Run Perspective."  December 1986

"The Short-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  January 1987

"The Short-Term Economic Outlook for the Houston-Galveston-Brazoria Metropolitan Area."  February 1987

"The Short-Term Economic Outlook for the Austin and San Antonio Metropolitan Areas."  March 1987

"The Short-Term Outlook for the US Economy."  April 1987

"The Short-Term Outlook for the Texas Economy."  May 1987

"Alternative Outlooks: Oil Prices and the Texas Economy."  June 1987

"The Long-Term Outlook for the US Economy."  July 1987

"The Long-Term Outlook for the Texas Economy."  August 1987

"The Long-Range Outlook for the Texas Economy: Alternative Oil Price Scenarios."  September 1987

"The Short-Term Outlook for the United States Economy."  October 1987

"The Short-Term Outlook for the Texas Economy."  November 1987

"Alternative Outlooks: Oil Prices and the Texas Economy."  December 1987

"The Short-Term Economic Outlook for the Dallas/Fort Worth Metropolitan Area."  January 1988

"The Short-Term Outlook for the Houston Economy."  February 1988

"The Short-Term Outlook for the Austin and San Antonio Metropolitan Areas."  March 1988

"The Short-Term Economic Outlook for the United States—With a Special Look at the Hard Working People in Texas."  April 1988

"The Short-Term Outlook for the Texas Economy."  May 1988

"Some Thoughts on Financial Institutions and Real Estate in Texas."  June 1988

"The Long-Term Outlook for the US Economy."  July 1988

"The Long-Term Outlook for the Texas Economy."  August 1988

"The Long-Term Outlook for the Texas Economy: Alternative Oil Price Scenarios."  September 1988

"The Short-Term Outlook for the US Economy."  October 1988

"The Short-Term Outlook for the Texas Economy—With a Special Focus on the Impact of Oil Price Fluctuations."  November 1988

"A Focus on Economic Development Activity in Texas."  December 1988

"The Short-Term Outlook for the Dallas/Fort Worth Metropolitan Area."  January 1989

"The Outlook for the Houston Metropolitan Area."  February 1989

"The Outlook for the Austin and San Antonio Metropolitan Areas."  March 1989

"The Outlook for the United States Economy."  April 1989

"The Texas Economy—Past, Present, and Future."  May 1989

"The Short-Term Outlook for the Texas Economy."  June 1989

"The Long-Term Outlook for the United States—With a Special Look at Austin."
     July 1989

"The Long-Term Outlook for Texas."  August 1989

"The Long-Term Outlook for Dallas/Fort Worth and Houston."  September 1989

"The Short-Term Outlook for the US Economy."  October 1989

"The Short-Term Outlook for the Texas Economy."  November 1989

"Texas: Taking Off From the '80s—Soaring into the '90s."  December 1989

"Dallas/Fort Worth: The Short-Term Economic Outlook."  January 1990

"Houston: The Short-Term Economic Outlook."  February 1990

"Austin and San Antonio: The Short-Term Economic Outlook."  March 1990

"United States: The Short-Term Economic Outlook" and "The Short-Term Economic
     Outlook for El Paso."  April 1990

"Texas: The Short-Term Economic Outlook."  May 1990

"United States: The Long-Term Economic Outlook."  June 1990

"The Long-Term Outlook for the Texas Economy."  July 1990

"Oil Price Impact Update and The Long-Term Outlook for Austin and San Antonio."
     August 1990

"DFW: Growth Near Top of US Metro Areas."  September 1990

"Oil Prices and Texas: Impacts after the MidEast War."  October 1990

"Houston and El Paso: Two Fast-Paced Texas Generators."  November 1990

"Austin and San Antonio: Boosting Central Corridor Diversity."  December 1990

"Dallas/Fort Worth Metroplex: 1991-1992 Growth Prospects."  January 1991

"Houston and El Paso: 1991-92 Perspective."  February 1991

"Austin and San Antonio: 1991-92 Perspective."  March 1991

"The National Economy—Post-War Thoughts on the Recession."  April 1991

"The Texas Economy: Short-Term Gains Lie Ahead."  May 1991

"Texas and the United States: Long-Term Outlook."  June 1991

"Austin and San Antonio: Long-Term Outlook."  July 1991

"Dallas/Fort Worth Metroplex: Long-Term Outlook Holds Strength."  August 1991

"Houston and El Paso: Long-Term Forecasts."  September 1991

"Texas Short-Term Outlook."  October 1991

"Austin and San Antonio: Short-Term Forecast."  November 1991

"Dallas and Fort Worth: Short-Term Forecast."  December 1991

"The Hobsons' Choice Facing Fiscal Policy."  January 1992

"Texas Real Estate Outlook."  February 1992

"Economic Recovery: Could it Really Be Out There?"  March 1992

"Along the Border."  April 1992

"Texas Short-Term Outlook."  May 1992

"Metro Area Outlook."  June 1992

"NICs in the Emerging Global Economy."  July 1992

"Long-Term Outlook for Texas & the United States."  August 1992

"An Initial Review of the North American Free Trade Agreement."  September 1992

"Short-Term Outlook for Texas and the US."  October 1992

"A Texan's Perspective on the Clinton Plan."  November 1992

"We're Not Just Cowpokes Anymore."  December 1992

"1993 Metro Area Outlook."  January 1993

"The Essentials for Business with Mexico."  February 1993

"The US Economic Outlook."  March 1993

"Short-Term Outlook for the US and Texas Economies."  April 1993

"Advantage: Texas."  May 1993

"The Long-Term Outlook for Texas and the US."  June 1993

"Healthcare Reform Revisited."  July 1993

"A Selected Look at Pacific Rim Trade."  August 1993

"Long-Term Metro Area Outlook."  September 1993

"Short-Term Outlook for Texas and the US."  October 1993

"The World Energy Market in the 1990s."  November 1993

"Short-Term Metro Area Outlook."  December 1993

"Texas in 1993: A Whole New World of Opportunity."  January 1994

"A Sectoral Look at Texas."  February 1994

"The Short-Term Economic Outlook for the United States and Texas."  March 1994

"High Cotton to High Tech: Progress and Prosperity in Texas."  April 1994

"Mexico: Looking Ahead."  May 1994

"Rising Up after Building Down."  June 1994

"The Long-Term Economic Outlook for the United States and Texas."  July 1994

"The Economics of Immigration."  August 1994

"Inflation and Investment: The Rest of the Story."  September 1994

"Breaking the Stronghold: Some Thoughts on US-Japanese Trade."  October 1994

"1994 Texas Real Estate Review."  November 1994

"Texas is 'Smmmoookkin!!!'"  December 1994

"The Short-Term Economic Outlook for the United States and Texas."  January 1995

"Global Texas: Exports from the Lone Star State."  February 1995

"The Economic Crises of the Current Welfare System."  March 1995

"The Mexican Economic Agenda."  April 1995

"The Short-Term Economic Forecast for the United States and Texas."  May 1995

"The Texas Industrial Forecast."  June 1995

"Trading in on Trade."  July 1995

"The Long-Term Outlook for the US and Lone Star State."  August 1995

"A Look at the South Texas Region."  September 1995

"The Changing Faces of Texas."  October 1995

"Keeping Up With Information Technology."  November 1995

"The Outlook for the US and Texas."  December 1995

"The Outlook for Areas Across the State."  January 1996

"The Two Economic Faces of Environmental Compliance: Part One."  February 1996

"The Net Economic Cost of Environmental Regulation: Part Two."  March 1996

"Have Real Wages Really Fallen?"  April 1996

"Emerging Investment Markets: China, Vietnam, and Hong Kong."  May 1996

"Why Aren't We in [Your Town] Doing as Well as Those People in [Some Other Town]?"  June 1996

"Putting Texas in Perspective."  July 1996

"US Economic and Industrial Outlook."  August 1996

"Mergers and Acquisitions '90s Style."  September 1996

"Is the Stock Market Overheated?"  October 1996

"The Texas Legislature: Doing Business in 1997."  November 1996

"The Texas Outlook by Industry."  December 1996

"Electric Industry Restructuring in Texas."  January 1997

"Investing in IPOs."  February 1997

"An Overview of Futures Markets."  March 1997

"Investing Through and In the Internet."  April 1997

"Where We've Been and Where We're Going: The Texas Economy in Perspective."  May 1997

"The Long-Term Outlook for the US and Texas."  June 1997

"The Texas Sectoral Outlook."  July 1997

"Tools for Economic Development."  August 1997

"Trends in Economic Development."  September 1997

"Trends in Texas Demographics."  October 1997

"SPECIAL REPORT: . . . And Conquer."  November 1997

"SPECIAL REPORT: A Look at Recent Developments in Texas."  December 1997

"The US Outlook: Underlying Trends."  January 1998

"SPECIAL REPORT: The Short-Term Outlook for Texas and the State's Largest Metropolitan Areas."  February 1998

"Trends in Telecommunications."  March 1998

"Energy: Diminished Dominance."  April 1998

"The Financial Sector: Changing Times."  May 1998

"Dynamics Within the High-Tech Market."  June 1998

"The Long-Term Outlook for the US, Texas, and the State's Largest Metropolitan Areas."  July 1998

"Small Businesses in Texas."  August 1998

"Foreign Trade and the Texas Economy."  September 1998

"Stock Market Shivers."  October 1998

"Economic Negativism: A Potentially Self-Fulfilling Prophecy."  November 1998

"The Short-Term Forecast for the US (1998-2003)."  December 1998

"SPECIAL REPORT: Restructuring the Electricity Industry."  January 1999

"SPECIAL REPORT: The Outlook for Texas, its Regions, and its Largest Metro Areas."  February 1999

"Long-Term Demographic Changes."  March 1999

"SPECIAL REPORT: An Assessment of Potential Y2K Effects on the Texas Economy: Part One."  April 1999

"SPECIAL REPORT: The Effects of the Year 2000 Problem on the Texas Economy: Part Two."  May 1999

"SPECIAL REPORT: Rounding the Millennium Corner."  June 1999

"The Long-Term Outlook for the Texas Economy: State, Regional, and Metro Area Projections."  July 1999

"The US and Texas Job Outlook."  August 1999

"The Digital Economy."  September 1999

"SPECIAL REPORT: An Overview of the Short-Term Outlook (1999-2004) for Global Economies and the US."  October 1999

"SPECIAL REPORT: The Short-Term Outlook for the Texas Economy." November 1999

"SPECIAL REPORT: An Appraisal of the Economic Development Consequences of the 1999 Texas Legislative Session: First of a Two-Part Series."  December 1999

"SPECIAL REPORT: The Economic Development Implications of Competition in Electric Power Generation."  January 2000

"Balancing Economic Growth and Environmental Quality."  February 2000

"Texans in 2025."  March 2000

"Texas Construction and Real Estate Trends."  April 2000

"The Challenges of E-Banking."  May 2000

"SPECIAL REPORT: The Long-Term Outlook for the US, Texas, and the State's Largest Metropolitan Areas."  June/July 2000

"SPECIAL REPORT: Rural Texas Healthcare Over the Short Term."  August 2000

"SPECIAL REPORT: The Impact of Judicial Reforms on Economic Activity in Texas." September 2000

"Economic Issues for the US and Texas Over the Short Term."  October 2000

"An Overview of the Short-Term Outlook (2000-2005) for the US and Texas." November/December 2000

"SPECIAL REPORT: Catalyst for Creativity and Incubator for Progress: Arts, Culture, and the Texas Economy."  January 2001

"SPECIAL REPORT: Competitive Markets for Electric Power: An Update on Texas." February 2001

"SPECIAL REPORT: The Impact of the Proposed Texas Economic Development Act on Business Activity."  March 2001

"SPECIAL REPORT: The Impact of Excess Access Charges on Various Geographic Areas in Texas."  April 2001

"The Economic Consequences of Inadequate Bank Credit in Texas."  May 2001

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and Major Metropolitan Statistical Areas."  June/July 2001

"Energy: A Hot Topic."  August 2001

"Economic Effects of September 11."  September 2001

"The Economy Will Recover."  October 2001

"SPECIAL REPORT: The Short-Term Outlook for the United States, Texas, its Regions, and its Major Metro Areas."  November/December 2001

"Comparing Metro Area Performance."  January 2002

"Census 2000: New US and Texas Demographic Information."  February 2002

"Developing Our Greatest Resource."  March 2002

"Higher Education: A Critical Determinant of Texas' Economic Future."  April 2002

"SPECIAL REPORT: The Truth About Electric Competition in Texas: An Early Assessment."  May 2002

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and the State's Major Metropolitan Statistical Areas (2001-2030)."  June/July 2002

"SPECIAL REPORT: The Impact of the Three-Tiered Licensed Beverage Distribution System on Business Activity in Texas."  August 2002

"Ray's Way: Some Thoughts on the National Economic Recovery."  September 2002

"SPECIAL REPORT: Financing the Public Schools of Texas: Some Issues of Growth, Equity, and Efficiency."  October 2002

"SPECIAL REPORT: The Short-Term Outlook for the United States, Texas, its Regions, and its Major Metro Areas."  November/December 2002

"SPECIAL REPORT: Electric Competition: A Year in Review."  January 2003

"Texas, Our Texas: An Assessment of Economic Development Programs and Prospects in the Lone Star State."  February 2003

"SPECIAL REPORT: Framing the Issue of Economic Development."  March 2003

"SPECIAL REPORT: Target Industries for Texas and Its Regions."  April 2003

"SPECIAL REPORT: Medicaid and the Children's Health Insurance Program (CHIP): An Assessment of Their Impacts on Business Activity and the Consequences of Potential Funding Reductions."  May 2003

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and the State's Metro Areas."  June/July 2003

"The Potential Impact of Tort Reform on Business Activity in Texas."  August 2003

"The Higher Education Affordability Crisis."  September 2003

"The Outlook for Texas Trade."  October 2003

"SPECIAL REPORT: The Short-Term Outlook (2003-2004) for the United States and Texas."  November/December 2003

"SPECIAL REPORT: Redefining the Prospects for Sustainable Prosperity, Employment Expansion, and Environmental Quality in the US: An Assessment of the Economic Impact of the Initiatives Comprising the Apollo Project."  January 2004

"Two Years Into Electric Competition: Texas is a Winner."  February 2004.

"Travel and Tourism: A Boon to the Texas Economy."  March 2004

"The Right Thing to Do."  April 2004

"Bottom of the List."  May 2004

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and the State's Metro Areas."  June/July 2004

"SPECIAL REPORT: Stalling the Engine of Growth in a Global Economy: The Impact of Implementation of the US-VISIT Program at US-Mexico Border Crossings on Business Activity in the US, Texas, and the Border Region."  August 2004

"Mutual Benefits."  September 2004

"Reasons for Income Inequality."  October 2004

"SPECIAL REPORT: The Short-Term Outlook (2004-2009) for the United States and Texas."  November/December 2004

"SPECIAL REPORT: The  Short-Term Outlook (2004-2009) for Texas Metro Areas and Regions."  January 2005

"SPECIAL REPORT: An Assessment of the Impact of the Health Care Sector on the Texas Economy, with Emphasis on the Situation Confronting Hospitals and the Effects of Medicaid and Children's Health Insurance Program (CHIP) Funding Reductions."  February 2005

"SPECIAL REPORT: Three Years of Electric Competition: The Benefits for Texas and Texans."  March 2005

"Canada and Mexico—The Texas Connection."  April 2005

"SPECIAL REPORT: Letting Competition Work in the Electric Power Industry." May 2005

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and the State's Metro Areas."  June/July 2005

"SPECIAL REPORT: An Assessment of the Impact of Competition in the Delivery of Wireline Video Services on Business Activity in Texas."  August 2005

"New Federal and State Legislation Boosts Alternative Energy Possibilities." September 2005

"SPECIAL REPORT: Texas Higher Education."  October 2005

"SPECIAL REPORT: The Short-Term Outlook for the United States and Texas
        Economies."  November/December 2005

"SPECIAL REPORT: The Short-Term Outlook (2005-2010) for Texas' Major Metro
        Areas and Regions."  January 2006

"Texas Continues as US International Trade Leader."  February 2006

"Education Provides Foundation for State's Future."  March 2006

"SPECIAL REPORT: Electric Competition: Four Years of Cost Savings and Economic
        Benefits for Texas and Texans."  April 2006

"Oil and the US Economy: An Overview."  May 2006

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and the
        State's Metro Areas."  June/July 2006

"Emerging Technologies."  August 2006

"America on the Move."  September 2006

"Pharmacy Benefit Managers: An Important Aspect of Health Care Delivery in Texas."
        October 2006

"SPECIAL REPORT: The Short-Term Outlook for the United States and Texas
        Economies."  November/December 2006

**THE PERRYMAN REPORT & TEXAS LETTER**
**Lead Articles**

"Sunshine, Soccer, and Success: An Assessment of the Impact of Municipal Parks and
    Recreation Facilities and Programs on Business Activity in Texas."  January 2007

"Coastal Areas of Lone Star State Vital to Strength of Texas Economy."  February 2007

"Urban Texas."  March 2007

"Electric Power in Texas: Making it Happen."  April 2007

"An Ounce of Prevention!  Finding a Cure to the Looming Health Care Affordability
    Crisis."  May 2007

"SPECIAL REPORT: The Long-Term Outlook for the United States, Texas, and State's
    Metro Areas."  June/July 2007

"SPECIAL REPORT: Traffic Congestion: Challenges and Opportunities."  August 2007

"Higher Education Challenges."  September 2007

"Health Care Affordability: A Potential Crisis for Texans and the Texas Economy."
    October 2007

"SPECIAL REPORT: US and Texas Economies Forecast to Edge Forward."
    November/December 2007

"Short-Term Economic Forecast: Texas Metros and Regions Expected to See Moderate
    Gains."  January 2008

"Tight Market Contributes to Spike in Oil Prices."  February 2008

"An Essential Resource: An Analysis of the Economic Impact of Undocumented
    Workers on Business Activity in the US with Estimated Effects by State and by
    Industry."  March 2008

"SPECIAL REPORT: Bridging the Digital Divide."  April 2008

"A Texas Turnaround: The Impact of Lawsuit Reform on Business Activity in the Lone
    Star State."  May 2008

"SPECIAL REPORT: The Long-Term Outlook for the United States and Texas."
    June/July 2008

"SPECIAL REPORT: Metro Area Performance 2007-2030."  August 2008

"SPECIAL REPORT: Export Strength Buoys the Texas Economy."
    September/October 2008

"SPECIAL REPORT: Tracking the Economy in Turbulent Times."  November 2008

"SPECIAL REPORT: US and Texas are Both Expected to Experience Moderate
    Economic Growth Over the Short-Term Horizon (2008-2013)."  December 2008

"SPECIAL REPORT: Electric Power Generation and Transmission Infrastructure
    Investments Increase State Business Activity."  January 2009

"SPECIAL REPORT: Short-Term Economic Forecast for Texas Metros and Regions."
    February 2009

"The Residential Real Estate Market: Bad News and Good News." March/April 2009

"The Stimulus Package and Texas Education."  May 2009

"SPECIAL REPORT: The Long-Term Forecast for the US and Texas Economies."
    June 2009

"SPECIAL REPORT: Economic Projections for Metro Areas 2008-2035."  July 2009

"SPECIAL REPORT: New Era of Cooperation: China and the US Economy."
    August 2009

"Higher Education."  September 2009

"Texas' Energy Potential."  October 2009

"SPECIAL REPORT: US and Texas Forecast to Achieve Moderate Economic Growth
    Over the Short Term (2009-2014)."  November/December 2009

"SPECIAL REPORT: Texas as a "State of Minds."  January 2010

"SPECIAL REPORT: Short-Term Economic Forecast for Texas Metros and Regions."
    February 2010

"Signs of Economic Recovery."  March/April 2010

"SPECIAL REPORT: The Long-Term Forecast for the US and Texas Economies."
    May 2010

"Winds of Prosperity: The Impact of the Competitive Renewable Energy Zone (CREZ)
    Investment in Transmission Infrastructure and the Potential Effects on Renewable
    Generation, Electricity Cost Savings, and Economic Development," June 2010

"SPECIAL REPORT: Long-Term Economic Forecast for Texas Metros and Regions."
    July 2010

"SPECIAL REPORT: China: 'Sleeping Dragon' has Awakened as an Economic Force."
    August/September 2010

"SPECIAL REPORT: Making Sense of the Housing Market."  October 2010

"Education for the Future."  November 2010

"SPECIAL REPORT: Looking Ahead for the US and Texas."  December 2010

"Short-Term Economic Forecast for Texas Metropolitan Areas and Regions."
January 2011

"Keeping Texas on Top."  February/March 2011

"Continued Gains and Growing Pains: A Look at Texas' Population Change Over the
Past Decade."  April 2011

"A War Worth Waging: An Economic Assessment of the Cost of Cancer in Texas and
the Benefits of the Cancer Prevention and Research Institute of Texas (CPRIT)
and its Programs."  May 2011

"US and Texas Economic Outlook: Moderate Long-Term Growth, Though Challenges
Remain."  June/July 2011

"SPECIAL REPORT: Long-Term Outlook for the State's Metropolitan Areas."  August
2011

"The Global Economic Outlook."  September 2011

"Texas Then and Now."  October 2011

"Short-Term Outlook for the United States and Texas Economies."  November 2011

"Economic Forecast for Texas' Largest Cities."  December 2011

"A Closer Look at Income Inequality."  January 2012

"Energy, Water, and the Texas Economy."  February 2012

"Texas Travel."  March 2012

"The Long-Term Outlook for the US Economy."  April/May 2012

"The Long-Term Outlook for the Texas Economy."  June 2012

"The Long-Term Outlook for Texas Metropolitan Areas."  July 2012

"Services Jobs and the Minimum Wage."  August/September 2012

"SPECIAL REPORT: Only One Rational Choice: Texas Should Participate in Medicaid
Expansion Under the Affordable Care Act."  October 2012

"The Short-Term Outlook for the United States and Texas Economies."  November 2012

"Education: Cornerstone of Prosperity."  December 2012

"The Economic Forecast for Texas' Metropolitan Areas: 2012-2017."  January 2013

"The Potential Economic Benefits for Texas of a Free Trade Agreement between the
United States and the European Union."  February 2013

"Texas Strong."  March/April 2013

"Challenges to Texas' Future Prosperity."  May 2013

"The Long-Term Outlook for the US Economy."  June 2013

"The Long-Term Forecast for the Texas Economy."  July 2013

"The Long-Term Forecast for the Economies of Texas Metropolitan Areas."
        August/September 2013

"Toward Fiscal Responsibility."  October/November 2013

"Comparing the Current Oil Surge in Texas to the "Oil Boom" of the 1970s and Early
        1980s."  November/December 2013

"The US Short-Term Forecast 2013-2018."  December 2013

"The Forecast for the Texas Economy."  Vol. 31, No. 1

"The Economic Forecast for Texas Metropolitan Areas."  Vol. 31, No. 2

"Job Recovery Since the Recession."  Vol. 31, No. 3

"Changing Global Oil and Natural Gas Markets."  Vol. 31, No. 4

"The Long-Term Outlook for the US Economy."  Vol. 31, No. 5

"The Economic Benefits of Oil and Natural Gas Production for the United States and
        Major Energy-Producing States."  Vol. 31, No. 6

"The Long-Term Forecast for the Texas Economy."  Vol. 31, No. 7

"The Long-Term Economic Forecast for Texas Metropolitan Areas."  Vol. 31, No. 8

"Suffer the Little Children: An Assessment of the Economic Cost of Child
        Maltreatment."  Vol. 31, No. 9

"Catalyst for Growth: The Importance of 25 Years of Projects Facilitated by the Texas
        Sales Tax for Economic Development."  Vol. 31, No. 10

"The Short-Term Outlook for the US Economy."  Vol. 32, No. 1

"Short-Term Economic Forecast for Texas."  Vol. 32, No. 2

"The Economic Forecast for Texas' Largest Metropolitan Areas."  Vol. 32, No. 3

"College Enrollment Trends."  Vol. 32, No. 4

""…and Justice for All"  The Importance of the Judicial Infrastructure to Economic
        Growth."  Vol. 32, No. 5

"Long-Term Forecast for the US Economy."  Vol. 32, No. 6

"The Long-Term Forecast for the Texas Economy."  Vol. 32, No. 7

"SPECIAL REPORT: Economic Benefits of the Electronic Payment System."  Vol. 32, No. 8

"Long-Term Economic Forecast for Texas Metropolitan Areas."  Vol. 32, No. 9

"The High Cost of Payday Loans."  Vol. 32, No. 10

"The US Forecast."  Vol. 33, No. 1

"The Economic Outlook for Texas through 2020."  Vol. 33, No. 2

"The Economic Forecast for Texas Cities."  Vol. 33, No. 3

"Catalyst!!! The Role of Dallas/Fort Worth International Airport in the North Central Texas Regional Economy."  Vol. 33, No. 4

"Investing in Future Prosperity."  Vol. 33, No. 5

"Long-Term Forecast for the US Economy."  Vol. 33, No. 6

"The Long-Term Forecast for the Texas Economy."  Vol. 33, No. 7

"The Long-Term Economic Forecast for Texas Metropolitan Areas."  Vol. 33, No. 8

"The Texas Crisis: Toward Reducing Child Maltreatment."  Vol. 33, No. 9

"The Impact of Texas Travel and Tourism."  Vol. 33, No. 10

"The Forecast for the US Economy."  Vol. 34, No. 1

"SPECIAL REPORT: The Potential Impact of Social Legislation on Business Activity: A Case Study of Actions Which Could Adversely Affect Tourism in the San Antonio Area and Texas."  Vol. 34, No. 2

"The Economic Forecast for Texas."  Vol. 34, No. 3

"The Economic Forecast for Texas Cities."  Vol. 34, No. 4

"The Spread of Urban Culture."  Vol. 34, No. 5

"Immigrants Get the Job Done."  Vol. 34, No. 6

"Weathering the Storm: The Impact of Hurricane Harvey on Texas."  Vol. 34, No. 7

"The Long-Term Forecast for the United States and Texas."  Vol. 34, No. 8

"The Long-Term Economic Forecast for Texas Metropolitan Areas." Vol. 34, No. 9

"The Jobs of the Future."  Vol. 34, No. 10

"The Short-Term Forecast for the US Economy: Moderate Growth Through 2022."  Vol. 35, No. 1

"Bordernomics: The US-Mexico Border Region."  Vol. 35, No. 2

"Bordernomics: Enhancing Prosperity by Increasing Integration in the US-Mexico
Border Region."  Vol. 35, No. 3

## THE PERRYMAN REPORT
### "Perryman's Commentary"

"High Tech in Texas."  January 1985

"The Central Corridor."  February 1985

"Texas at the Crossroads."  April 1985

"Mexico and Latin America."  May 1985

"Will It Happen?"  June 1985

"The Reagan Tax Plan in the Long Run."  July 1985

"There is Life After Semiconductors."  August 1985

"Don't Press the Panic Button."  September 1985

"The Plight of the Farm Credit System."  October 1985

"Oil Prices and the National Economy."  November 1985

"'Tis the Season."  December 1985

"The World Oil Situation."  January 1986

"The Texas Economy and the Latest Oil Shock."  February 1986

"Oil Again!!"  March 1986

"Coming Attractions."  April 1986

"A Short View of the Long View."  May 1986

"Diversifying the State's Economic Base."  June 1986

"More About Diversifying the State Economy."  July 1986

"Home Grown Industry."  August 1986

"A Brief Note on the State Tax Structure."  September 1986

"Let's Promote the Regions."  October 1986

"Short and Sweet."  November 1986

"Happy Holidays."  December 1986

"Optimism and Action."  January 1987

"More About Promoting the Regions—With a Special Look at the East Texas Effort."
     February 1987

"The Signs are Pretty Good."  March 1987

"Keep It Up!"  April 1987

"The Recovery—It May Be A While Before You Notice It."  May 1987

"Investing in Texas."  June 1987

"Dallas/Fort Worth and Houston."  July 1987

"Let's Hear it for the Good People in Beaumont."  August 1987

"East Texas is on the Move!!"  September 1987

"A Few Words About Real Estate."  October 1987

"The Impact of Federal Spending on Texas."  November 1987

"Odds and Ends."  December 1987

"Sematech, Etc."  January 1988

"South Texas."  February 1988

"Headlines Again."  March 1988

"Impressions."  April 1988

"Food Processing."  May 1988

"More About the Financial Situation."  July 1988

"Miscellany."  August 1988

"Some Additional Notes on Economic Development in Texas."  September 1988

"Some Thoughts on Oil Prices and A Long-Term Look at Dallas/Fort Worth."
     October 1988

"Tis the Season."  December 1988

"Changes."  January 1989

"Bring on the Dough."  February 1989

"The Excitement Continues—But So Does the Challenge."  March 1989

"South of the Border."  April 1989

"The Short-Term Outlook for the Texas Economy."  June 1989

"Alliance."  July 1989

"A Few Rambling Thoughts."  August 1989

"A First Look Into the 1990s."  September 1989

"The Texas Recovery—A Few Opportunities."  October 1989

"Exciting Times."  November 1989

"Surviving the 1980s."  December 1989

"Still More Thoughts on the 1990s."  January 1990

"Education in the Current Legislative Session."  February 1990

"Investment in Texas—Good News and Bad News."  March 1990

"A Little Light."  April 1990

"Credit Unions."  May 1990

"The Economic Summit."  June 1990

"Education."  July 1990

"Some Thoughts on Foreign Activity in Texas."  August 1990

"There's Probably not Going to be an 'Oil Boom!'"  September 1990

"High Tech Hopes Revisited: A Lesson Not to Forget."  October 1990

"Trips to the Candy Store."  November 1990

"Wrapping Up the Year."  December 1990

"Thoughts on 1991."  January 1991

"The War and the Economy."  February 1991

"After the War."  March 1991

"Free Trade (or thereabouts) with Mexico."  April 1991

"Tax Reform, Texas-Style!"  May 1991

"Some Thoughts on Future Growth Resources."  June 1991

"To Grow, or not to Grow?  That is the Question."  July 1991

"No Gain—Lotsa Pain: Austin Revisited."  August 1991

"A Few Thoughts on a Few Things."  September 1991

"The Bailout Hits the Bar."  October 1991

"The European Community in 1992—What's It All About?"  November 1991

"Stacking Up the States on Taxes."  December 1991

"The Year Ahead."  January 1992

"In Partnership With the World."  February 1992

"How 'Ray's Law of Economics' Really Works."  March 1992

"A Texan In Taipei."  April 1992

"Back to Basics—or Why I Have Consistently Forecasted That Texas Will Outperform the Nation Over the Next Two Decades."  May 1992

"The Economy and the Environment—Toward a Rational Approach."  June 1992

"Social Investment."  July 1992

"Privatization."  August 1992

"Toward a Competitive Economy and a Balanced Budget—A Diatribe."  September 1992

"The Case for High Speed Rail in Texas—Again."  October 1992

"Deja Vu All Over Again."  November 1992

"We're Not Just Cowpokes Anymore."  December 1992

"A Tribute to our Old Friend Janus."  January 1993

"Trade with Mexico—How Sweet It Is."  February 1993

"The Clinton Plan."  March 1993

"Techno-World Wars."  April 1993

"Trucking—The Reform That Wasn't."  May 1993

"The Big Payback."  June 1993

"The Real Costs of Cutting the SSC."  July 1993

"Take a Deep Breath."  August 1993

"Bombs Away!"  September 1993

"A Tall Tale."  October 1993

"The Facts of the Fed."  November 1993

"Opportunity Lost."  December 1993

"Texas in 1993: A Whole New World of Opportunity."  January 1994

"Looking On Down the Road."  February 1994

"Regional Economics."  March 1994

"National Special: Lone Star Pie."  April 1994

"Nixon Revisited."  May 1994

"Retooling with Technology."  June 1994

"Looking Ahead."  July 1994

"Mexico on the Move."  August 1994

"Dodging Derivative Damages."  September 1994

"New Union."  October 1994

"Looking Past the Rainbow."  November 1994

"Review of the Regions."  January 1995

"International Trade Pacts."  February 1995

"The Rush Is On."  March 1995

"The New vs. China Trade Initiatives." April 1995

"Texas Regional Outlook." May 1995

"Regional Manufacturing." June 1995

"Texas and the World Economy." July 1995

"Gazing at the Horizon." August 1995

"A New Look at Venture Capital." September 1995

"Investing in Mexico: A Three-Part Series." October 1995

"Investing in Mexico: A Three-Part Series." November 1995

"Investing in Mexico: A Three-Part Series." December 1995

"Trends in the Texas Economy." January 1996

"US Agriculture: A New Era."  April 1996

"Global Banking."  May 1996

"The Expanding Services Sector."  June 1996

"Hard Work in Texas Industries."  July 1996

"Global Teens: The Media's Marketplace."  August 1996

"Strategic Planning: It's Back."  September 1996

"Skills for the Future."  October 1996

"The Outlook for US Business: Overview of US Economic Performance."
      November 1996

"Economic Outlook for Texas and Its Largest Metro Areas."  December 1996

"Putting the Texas Economy at Risk."  January 1997

"An Entrepreneur's Fondest Wish?"  February 1997

"Your Gain May Be My Pain."  March 1997

"A Quiet Exit."  April 1997

"Sports—Issues Beyond Economics."  May 1997

"Down the Road from Main Street."  June 1997

"Future US Job Creation."  July 1997

"The 1997 Texas Legislative Session."  August 1997

"Why Texas Does So Well."  September 1997

"Baby Boomers: Creating a Market and Funding It."  October 1997

"New Year's Resolution: Check Out These Job Opportunities."  January 1998

"The Untold Story Behind the Federal Budget 'Surplus.'"  March 1998

"Fallout from Falling Oil Prices."  April 1998

"Are Bigger Banks Better?"  May 1998

"Merger Madness."  June 1998

"Banking the *De Novo* Way."  August 1998

"Sowing Seeds and Venturing Forth."  September 1998

"The Battle of the Bug."  October 1998

"The Value of Diversification."  November 1998

"The Changing Oil Industry."  December 1998

"Texas-Sized Economic Growth Strategies."  March 1999

"The Texas Travel and Tourism Industry: Something for Everyone."  August 1999

"He Sells.  She Sells.  But Does 'e' Sell?"  September 1999

"Y2K: Waste of Money or Catalyst for Future Productivity?"  February 2000

"Rural Texas: Hot and Cold."  March 2000

"The Ag Sector: Short-Term Challenges, Long-Term Changes."  April 2000

"A Paradox of Time."  May 2000

"The Mexican Economy: Effects on Texas Business."  October 2000

"Urban Power Centers."  November/December 2000

"A Brief Economic Synopsis of The Border Region."  May 2001

"The Ongoing NAFTA Debate."  August 2001

"Strength in Numbers."  September 2001

"The Road to Progress."  October 2001

"Signs of Economic Life."  January 2002

"Changing the Nature of Transportation."  February 2002

"Full Speed Ahead."  March 2002

"Recent Moves Away from Free Trade: Bad News for the US Economy."  April 2002

"September 11—An Economic Retrospective."  September 2002

"Y2K—Forgotten, But Not Gone."  October 2002

"Sushi and Enchiladas."  March 2003

"Proposition 12 is a Win for Texas."  August 2003

"Gasoline Price Volatility."  September 2003

"Technology in Texas."  October 2003

"Job Search."  February 2004

"Texas Homeownership: An Overview."  March 2004

"Outsourcing/Offshoring."  April 2004

"Staying in the Saddle."  May 2004

"The Trade Deficit and How It Grew."  August 2004

"Measurement Error."  September 2004

"Who Pays Taxes?"  October 2004

"High Gasoline Prices—Anomaly or Fact of Life?"  April 2005

"Hurricanes Bring Challenges and Opportunities."  September 2005

"A Lesson in Sharing."  November/December 2005

"The Budget Debate—An American Reality Show."  February 2006

"Higher Education Historical Perspective."  March 2006

"What is Driving High Gasoline Prices?"  May 2006

"Keeping Texans Talking."  August 2006

"Mid-Decade Checkup."  September 2006

"International Investments Strengthen the US and Texas Economies."  October 2006

## THE PERRYMAN REPORT & TEXAS LETTER
### "Perryman's Perspective"

"Texas Legislature Facing Myriad Economic Issues."  January 2007

"Children's Health Care of Major Concern to All."  February 2007

"The Texas Universal Service Fund: A "Win-Win" for the Texas Economy."
March 2007

"Competition Works."  April 2007

"New Medical School Could Benefit All Texans."  February 2008

"The American Recovery and Reinvestment Act: A Bold Move with Potential for
Positive Results."  May 2009

"Riding it Out."  August 2009

"China Challenge."  September 2009

"The Recession: Second Anniversary Report."  November/December 2009

"A Setback Avoided."  December 2010

"Rainy Day Water."  November/December 2013

"Striving for STEM."  December 2013

"Oil Price Update."  Vol. 32, No. 2

"The Recent Presidential Election."  Vol. 33, No. 8

"To Choose or Not To Choose: The School Choice Debate."  Vol. 33, No. 9

"Global Trade: Let's Get Real!"  Vol. 34, No. 1

**THE ECONOMIST**
**(syndicated column series)**

"Economics and Marketing Plans."  March 19, 1992

"NAFTA (Notable Accelerator For Texas Activity)."  March 26, 1992

"The National Economy Roars (Well, at Least Whimpers) Back."  April 2, 1992

"Europe—1992!!  The Real Story."  April 9, 1992

"The Alamo City-Up Close and Personal."  April 16, 1992

"Back to Basics."  April 23, 1992

"Some Budget Deficit Musings."  April 30, 1992

"A Trip to Taiwan—Texas Style."  May 7, 1992

"Black Gold."  May 14, 1992

"Putting Up or Shutting Up!"  May 20, 1992

"Why is the Stock Market so High?"  June 4, 1992

"Why I Don't Like the Balanced Budget Amendment."  June 11, 1992

"Trips to the Candy Store."  June 18, 1992

"Eating our Seed Corn."  June 25, 1992

"A Modest Proposal for a New National Holiday."  July 1, 1992

"Reading the Coffee Leaves."  July 9, 1992

"The Olympics and the Economy?"  July 16, 1992

"It's Way Past Time to Build a Potato Shed!"  July 23, 1992

"Cryin' Time."  July 30, 1992

"A Child's Guide to Social Security."  August 6, 1992

"Of Mice, Men, Mountains, Molehills, Mouths, and Misinformation."  August 13, 1992

"Stinkin' Ain't Good; Starvin' Ain't Either."  August 20, 1992

"Pouring Water on Your Head and Telling You It's Raining."  August 27, 1992

"Soakin' and Sappin.'"  September 3, 1992

"Afta NAFTA."  September 10, 1992

"1-1 = 1!!"  September 17, 1992

"Europe, My Rope."  September 24, 1992

"Family Values and Such."  October 1, 1992

"Lessons From the Farm."  October 8, 1992

"Out of the Mouths of Babes."  October 14, 1992

"Ray's Final Analysis."  October 22, 1992

"Jobs, Justice, and Jawyers."  October 29, 1992

"Now What?"  November 5, 1992

"Of Carts and Horses."  November 12, 1992

"Oil of a Different Color."  November 19, 1992

"Happy Thanksgiving."  November 24, 1992

"There Will be Growth in the Spring."  December 2, 1992

"Street Sense."  December 10, 1992

"The Summit."  December 17, 1992

"Putting Legs on a Dream."  December 23, 1992

"A Tribute to our Old Friend Janus."  December 28, 1992

" . . . And Then There Are Recessions."  January 7, 1993

"Oops!"  January 14, 1993

"A Change of Diet."  January 21, 1993

"Of Myths and Mexico."  January 28, 1993

"National Economists Day!!"  February 4, 1993

"Don't Unstock the Storm Cellar . . . Yet."  February 11, 1993

"Freedom and the Frontier."  February 18, 1993

"A Fair Plan."  February 25, 1993

"How 'Bout Some Real Change Instead of Small Change for a Change?"  March 4, 1993

"Let the Dust Fly."  March 11, 1993

"Beating Swords into Plowshares."  March 18, 1993

"Don't Let the Cure Kill the Patient."  March 25, 1993

"An Ever-Changing Vision of An Ever-Changing View."  April 1, 1993

"A Brave New World."  April 8, 1993

"Two Bobs and a Bill."  April 15, 1993

"Scat! Scat! Go Away Little VAT!"  April 22, 1993

"Bill at 100 (days, that is)."  April 29, 1993

"Shook Down and Trucked Up."  May 6, 1993

"A Sit-Down in Singapore."  May 13, 1993

"The Bound To Upset (BTU) Tax."  May 20, 1993

"The Politics of Emotion."  May 27, 1993

"Money Talks."  June 3, 1993

"Pulling Back the Curtain."  June 10, 1993

"Level the Playing Field."  June 17, 1993

"No Matter Where You Hear It, It Sounds the Same."  June 24, 1993

"Sick and Tired."  July 1, 1993

"NAFTA Revisited."  July 7, 1993

"Of Promises and Payoffs."  July 15, 1993

"Killin' Flies With a Fryin' Pan."  July 22, 1993

"Small is Beautiful."  July 29, 1993

"The Currents of the Currency."  August 5, 1993

"Bombs Away!"  August 12, 1993

"Death, Taxes, and Changes."  August 19, 1993

"Read the Fine Print."  August 26, 1993

"Interest-ing Rates."  September 2, 1993

"Play It Again, Al."  September 9, 1993

"Doin' Poorly."  September 16, 1993

"Chapter One."  September 23, 1993

"The Great Oil Ride."  September 30, 1993

"Free Markets, Free People."  October 7, 1993

"Presidents, Prosperity, and Public Policy."  October 14, 1993

"Ghouls and Goals."  October 21, 1993

"Salt of the Earth: The Forgotten Farmer."  October 28, 1993

"Politics: Inflation's Friend."  November 4, 1993

"Kevorkian Economics."  November 11, 1993

"Be Prepared."  November 18, 1993

"Plaid."  November 23, 1993

"Penny Ante Politics."  December 2, 1993

"The Fruits of Labor."  December 9, 1993

"Count Your Blessings."  December 16, 1993

"Politically Correct."  December 23, 1993

"The Fits and Fusses of 1993."  December 28, 1993

"Promises and Prospects."  January 6, 1994

"Caring for the Nation's Health."  January 13, 1994

"Defining Class."  January 20, 1994

"Trading Images."  January 27, 1994

"A Force for Change."  February 3, 1994

"Here's to Youth."  February 10, 1994

"Banking on Optimism."  February 17, 1994

"Rising Sun vs. Risin' Son."  February 24, 1994

"I Spy You Playing Tag."  March 3, 1994

"All Economics is Local."  March 10, 1994

"It's Over, Folks!"  March 17, 1994

"City Slickers."  March 24, 1994

"Opening the Doors."  March 31, 1994

"A Little Slice of a Bad Pie."  April 7, 1994

"Mixed Signals on the Information Highway."  April 14, 1994

"Going Global."  April 21, 1994

"The Show Goes On."  April 28, 1994

"SSS (Social Security Smoke)."  May 5, 1994

"Inflation."  May 12, 1994

"Rebounding, Rebuilding, and Recharging."  May 19, 1994

"Take 2 Aspirin and Call Me in the Morning."  May 26, 1994

"Stewing Over Immigration."  June 2, 1994

"A Good Beginning."  June 9, 1994

"The Juggling Act."  June 16, 1994

"Reforming the Welfare Reform."  June 23, 1994

"Making Cents (or Dollars) of Sushi, Sauerkraut, and Salsa."  June 30, 1994

"Ready for a Second Wind."  July 7, 1994

"Where Math and Magic Meet: The Texas Long-Term Forecast."  July 14, 1994

"Right on the Money."  July 21, 1994

"The Lure of Derivatives."  July 28, 1994

"Mexico Update."  August 4, 1994

"The Real Estate Sector is OK."  August 11, 1994

"Trucking on Down the Road."  August 18, 1994

"A Slow Boat to Capitalism."  August 25, 1994

"The Price of Tea in China."  September 1, 1994

"And the Winner Is . . . "  September 8, 1994

"Ecosystems and the Economy."  September 15, 1994

"That was Then and This is Now."  September 22, 1994

"Life After the Death of National Healthcare."  September 29, 1994

"Lyndon Speaks."  October 6, 1994

"The NAFTA Boost."  October 13, 1994

"Of Coffee and Common Sense."  October 20, 1994

"Getting Our Arms Around GATT."  October 27, 1994

"Global Gold."  November 3, 1994

"Politics as Usual."  November 10, 1994

"Shutting the Window."  November 17, 1994

"The Texas Real Estate Roundup."  November 22, 1994

"Thoughts from Presidents Past."  December 1, 1994

"Gifts from GATT."  December 8, 1994

"Texas is Comin' 'Round the Mountain."  December 15, 1994

"Lookin' Ahead."  December 22, 1994

"Texas Tops the List."  December 29, 1994

"1994: A Year to Remember."  January 5, 1995

"The Balanced Budget and Other Feats of Magic."  January 12, 1995

"Texas Goes Global."  January 19, 1995

"NAFTA in a GATT Framework."  January 26, 1995

"SCORE: Congress-0, President-1."  February 2, 1995

"The Wages of Clinton."  February 9, 1995

"The World-Wide Gold Rush."  February 16, 1995

"Bypassing 'Contrast' and 'Contract' Politics."  February 23, 1995

"A Hacker's Round at Barings."  March 2, 1995

"Respites in the Welfare War."  March 9, 1995

"Playin' for Keeps."  March 16, 1995

"Rules in the Free Market."  March 23, 1995

"The Politics of Poverty."  March 30, 1995

"Zedillo's Plan Not Hot Air."  April 6, 1995

"The Flat Tax Flap."  April 13, 1995

"Fed-in-the-Box."  April 20, 1995

"Working in Texas."  April 27, 1995

"Texas Regions in the 1990s."  May 4, 1995

"Big Macroeconomics."  May 11, 1995

"Enough is Enough."  May 18, 1995

"The Same Ol' Trail."  May 25, 1995

"A Report on Texas Manufacturing."  June 1, 1995

"Rolling On to 2000."  June 8, 1995

"Back to Basics: A Tribute."  June 15, 1995

"Political Welfare."  June 22, 1995

"Texas: A Force to Reckon With."  June 29, 1995

"The Global Wagon Train."  July 6, 1995

"Small Business in the Republican Era."  July 13, 1995

"Lone Star Baby Boomers."  July 20, 1995

"Gazing at the Horizon."  July 27, 1995

"Economic Development: Prognosis for Texas."  August 3, 1995

"Banking—Texas Style."  August 10, 1995

"Waging Peace."  August 17, 1995

"A New Look at Venture Capital."  August 24, 1995

"Reverberations Through Retailing."  August 31, 1995

"Patience, Children."  September 7, 1995

"Reee-peat."  September 14, 1995

"Breaking Up Is So Very Hard To Do."  September 21, 1995

"A Hospital Visit."  September 28, 1995

"GTT."  October 5, 1995

"An Economist in the Stands."  October 12, 1995

"Technology and the Future of Energy."  October 19, 1995

"Reading Between the Lines."  October 26, 1995

"Go for Growth."  November 2, 1995

"Staying on Track."  November 9, 1995

"Three Amigos and a Chile."  November 16, 1995

"Much Ado About Nothing."  November 21, 1995

"Surf's Up."  November 30, 1995

"The Outlook for 1996."  December 7, 1995

"Turning the Corner."  December 14, 1995

"Fireworks Over Texas."  December 21, 1995

"Lookin' Back."  December 28, 1995

"What's in Store for 1996."  January 4, 1996

"The Cost of Compliance."  January 11, 1996

"Going Downtown."  January 18, 1996

"The Chaos of Market Theory."  January 25, 1996

"Checking Resolutions."  February 8, 1996

"Public vs. Private."  February 15, 1996

"Flowers for Free Trade."  February 22, 1996

"Muddy Windshields."  February 29, 1996

"Horatio Meets Jacob."  March 7, 1996

"Hold on to Your Hard Hat."  March 14, 1996

"Texas: Bigger, Better, and Different."  March 21, 1996

"Freedom to Farm."  March 28, 1996

"The New Hong Kong."  April 4, 1996

"The Great Facilitator."  April 10, 1996

"Working as a Temp."  April 18, 1996

"Together Again."  April 25, 1996

"Banking as Big Business."  May 2, 1996

"The American Dream Lives On."  May 9, 1996

"The New World of Finance."  May 16, 1996

"Springing into Services."  May 23, 1996

"Laying it on the Line."  May 30, 1996

"Rolling the Dice."  June 6, 1996

"Celebrating Industry."  June 13, 1996

"The Sega Solution."  June 20, 1996

"Hard Work in Texas Industries."  June 28, 1996

"Texas: Getting Even Better."  July 4, 1996

"Closing the Generation Gap."  July 11, 1996

"What About Inflation?"  July 18, 1996

"Global Gold."  July 25, 1996

"Come On, Rain!"  August 1, 1996

"Teens, Trends, and Television."  August 8, 1996

"Election Economics."  August 15, 1996

"Those Crucial Tax Abatements."  August 22, 1996

"The Millennium Bug."  August 29, 1996

"Strategizing in the '90s."  September 5, 1996

"Mergers and Acquisitions '90s Style."  September 12, 1996

"Sweet Dreams."  September 19, 1996

"Sweet Dreams: Part Two."  September 25, 1996

"Gearing Up for the Future."  October 3, 1996

"FDR—The Living Homage."  October 10, 1996

"New Life for Healthcare."  October 17, 1996

"The Art of Politics."  October 24, 1996

"Looking Ahead: The Next Four Years."  October 31, 1996

"Tax Alternatives for Texas."  November 7, 1996

"All About Texas."  November 14, 1996

"Why Invest in a Mutual Fund?"  November 21, 1996

"Texas in '97."  November 28, 1996

"Trading from the Inside."  December 5, 1996

"Input on Texas Output."  December 12, 1996

"Valuing Our Savings."  December 19, 1996

"Now You See It, Now You Don't."  December 26, 1996

"Goodbye to 1996."  January 2, 1997

"Mightier Than the Sword."  January 9, 1997

"Off and Running."  January 16, 1997

"Coming Down from the Clouds."  January 23, 1997

"'Nuf Sed."  January 30, 1997

"The Serve is In."  February 6, 1997

"Venturing into the Market."  February 13, 1997

"A Striking Dilemma."  February 20, 1997

"Your Gain May Be My Pain."  February 27, 1997

"A Quiet Exit."  March 6, 1997

"Investing In and On the Internet."  March 13, 1997

"Pit Stop for the State's Industries."  March 20, 1997

"Fighting Inflation."  March 27, 1997

"Stocks and the Business Cycle."  April 3, 1997

"Checking Out Books."  April 10, 1997

"A Word is Worth a Billion Dollars."  April 17, 1997

"Financial Services Go Online."  April 24, 1997

"Volunteerism."  May 1, 1997

"Fanfare over Funding."  May 8, 1997

"The Long-Term National Outlook."  May 15, 1997

"The Price of Entitlements."  May 22, 1997

"Down the Road to Main Street."  May 29, 1997

"The 140-Day Fight."  June 5, 1997

"End of an Era."  June 12, 1997

"The Year of the Millionaire."  June 19, 1997

"Desk Tops and Rocket Ships and Future Job Creation."  June 26, 1997

"Where Will the Jobs Be?"  July 3, 1997

"The Child is Father to the Man."  July 10, 1997

"The Reading Revolution."  July 17, 1997

"Freedom for Farmers."  July 24, 1997

"Job Growth in Texas."  July 31, 1997

"Capitalism with a Conscience."  August 7, 1997

"The World's Biggest Player."  August 14, 1997

"The Politics of Freer Trade."  August 21, 1997

"Trends in Economic Development."  August 28, 1997

"Affordable Housing: The New Manufactured Home."  September 4, 1997

"The Journey: From Concept to Cash."  September 11, 1997

"Retro Exercise."  September 18, 1997

"The Mysteries of Inflation."  September 25, 1997

"The Booming Market."  October 2, 1997

"Trends in Texas Demographics."  October 9, 1997

"In the Beginning . . ."  October 16, 1997

"Shades of Gray."  October 23, 1997

"Stirred, Not Shaken."  October 30, 1997

"Regional Decision-Making."  November 6, 1997

"Around the Big Blue Marble."  November 13, 1997

"Looking Ahead for the US."  November 20, 1997

"Asian Flu."  November 27, 1997

"A Broad View of the Texas Economy."  December 4, 1997

"Bright Lights in Texas."  December 11, 1997

"Jobs of the Future."  December 18, 1997

"Where to Find the Money."  December 23, 1997

"1997: The Year of the Web."  December 31, 1997

"Talking Taxes."  January 8, 1998

"It's Forecast Time Again."  January 15, 1998

"Life Support from Business Incubators."  January 22, 1998

"The Texas Economy: Up Close and Personal."  January 29, 1998

"Information v. Inadequacy: The Battle for Funding."  February 5, 1998

"The Big Picture."  February 12, 1998

"The Brave New World of Technology."  February 19, 1998

"The Federal Budget 'Surplus.'"  February 26, 1998

"The Rural Rebound."  March 5, 1998

"Evolution by Revolution."  March 12, 1998

"Small Businesses Are Alive and Well."  March 19, 1998

"Oil Price Fallout."  March 26, 1998

"As Good as it Gets."  April 2, 1998

"Manna from Markets."  April 9, 1998

"Is Bigger Better?  Perhaps."  April 16, 1998

"The Short-Term Outlook for Texas."  April 23, 1998

"The Financial Services Smorgasbord."  April 30, 1998

"NAFTA Now."  May 7, 1998

"The Millennium Bugaboo."  May 14, 1998

"What's the Big Deal?"  May 21, 1998

"Dusting Off Trust-Busting."  May 28, 1998

"Looking Ahead to 2025."  June 4, 1998

"Friendly Neighbors."  June 11, 1998

"The Prototype."  June 18, 1998

"Stargazing."  June 25, 1998

"The Future of Telecom."  July 2, 1998

"Going It On Your Own."  July 9, 1998

"Taking it to the Bank."  July 16, 1998

"Incentives, Consumers, and Antitrust."  July 23, 1998

"Bringing Big Bucks to Texas."  July 30, 1998

"Oil and the US Economy."  August 6, 1998

"In Praise of Small Businesses."  August 13, 1998

"Sowing Seeds on the Internet."  August 20, 1998

"Trade and Texas."  August 27, 1998

"Prerequisites for Prosperity."  September 3, 1998

"The Worth of Individuals."  September 10, 1998

"The Battle of the Bug."  September 17, 1998

"Shooting Starrs."  September 24, 1998

"The (Hidden) Costs of Freedom."  October 1, 1998

"Market Madness."  October 8, 1998

"Re-thinking Bretton Woods."  October 15, 1998

"Finding Value in Diversification."  October 22, 1998

"Is Economic Negativism Self-Fulfilling?"  October 29, 1998

"How Much for a (Free) Ride?"  November 5, 1998

"Rearranging the Deck Chairs for the Next Ride."  November 12, 1998

"Surplus Shenanigans."  November 19, 1998

"Around the World."  November 25, 1998

"Texas Lawmakers."  December 3, 1998

"The Next Five Years."  December 10, 1998

"Texas Forecast: The Short Haul."  December 17, 1998

"Lone Star Metros: The Next 5 Years."  December 23, 1998

"Restructuring an Industry."  December 31, 1998

"Black Gold."  January 7, 1999

"The Linked Decade."  January 14, 1999

"Capital Markets."  January 21, 1999

"The Beat Goes On."  January 28, 1999

"The Role of Profit in Resolving Millennium Bug Problems."  February 4, 1999

"Life After Lewinsky."  February 11, 1999

"It's Your Call."  February 18, 1999

"Texas-Sized Economic Growth Strategies."  February 25, 1999

"The People of Texas."  March 4, 1999

"System Inspires Confidence."  March 11, 1999

"Don't Look Back!"  May 18, 1999

"No Turning Back."  May 25, 1999

"The Industrial Bite of Y2K."  April 1, 1999

"Y2K and the Workplace."  April 8, 1999

"Y2K in the City."  April 15, 1999

"Keeping the Legend Alive."  April 22, 1999

"Electronic Competition."  April 29, 1999

"Plugged In, On-Line, and On Call."  May 6, 1999

"Protecting Internet Access."  May 13, 1999

"The International Outlook."  May 20, 1999

"Issues Ahead for Texas' Economy."  May 27, 1999

"Looking at the Long Haul."  June 3, 1999

"Growth in Texas Metros."  June 10, 1999

"Equity Market Outlook."  June 17, 1999

"The Results Are In."  June 24, 1999

"The US Job Outlook."  July 1, 1999

"Something for Everyone."  July 8, 1999

"Going to the Bank."  July 15, 1999

"It's a Big Deal."  July 22, 1999

"Latino Leverage."  July 29, 1999

"Electronic Commerce."  August 5, 1999

"Another Lane on the Information Highway."  August 12, 1999

"Teacher Pay Raise Benefits Texas."  August 19, 1999

"Caught Up in the Web."  August 26, 1999

"The Grand Obsession."  September 2, 1999

"Choosing Sides."  September 9, 1999

"High-Tech Growth."  September 16, 1999

"Building on the Economy."  September 23, 1999

"The Second Revolution."  September 30, 1999

"The Outlook for Oil Prices."  October 7, 1999

"International Outlook."  October 14, 1999

"The US Economy in the New Millennium."  October 21, 1999

"Out With the Old, In With the New."  October 28, 1999

"Shine on, Texas!"  November 4, 1999

"Bring It On."  November 11, 1999

"Texas Regions and Metro Areas."  November 18, 1999

"Saving for the Future."  November 25, 1999

"Thinking of Retirement?"  December 2, 1999

"The Power of Incentives."  December 9, 1999

"Tax Credits for Research and Development."  December 16, 1999

"Millennium Thoughts—Money."  December 23, 1999

"Millennium Thoughts II—Change."  December 30, 1999

"Millennium Thoughts III—Markets and Prices."  January 6, 2000

"Electric Power Deregulation: Something to Get Excited About!"  January 13, 2000

"Venture Capital Investment—Today and Tomorrow."  January 20, 2000

"Communications at Web Speed."  January 27, 2000

"How About that Y2K?"  February 3, 2000

"Take a Deep Breath."  February 10, 2000

"Three-Legged Stools and Centipedes."  February 17, 2000

"Living Out Yonder in Texas."  February 23, 2000

"Muchos Tejanos."  March 2, 2000

"Living Longer Under the Lone Star."  March 9, 2000

"On Volatility and Progress."  March 16, 2000

"Texas Agriculture: Challenges and Changes."  March 23, 2000

"A Paradox of Time."  March 30, 2000

"A Micro, Soft Fall for the Macro Giant."  April 6, 2000

"The Case for Contrariness."  April 13, 2000

"Diversification Revisited."  April 20, 2000

"Capital."  April 26, 2000

"Euro."  May 4, 2000

"Be Careful What You Ask For . . ."  May 11, 2000

"Old, New, Buckle My Shoe."  May 18, 2000

"Back to the Future."  May 25, 2000

"Urban Texas: What's Ahead?"  June 1, 2000

"Slippery Slope."  June 8, 2000

"Playing the Monopoly Game."  June 15, 2000

"OPEC."  June 22, 2000

"Yeah!  Right!"  June 29, 2000

"Competition Under a Microscope."  July 6, 2000

"Viva!"  July 13, 2000

"The Economics of Crime."  July 20, 2000

"Gravitation and Globalization."  July 27, 2000

"Healthcare in Rural Texas."  August 3, 2000

"New and Improved."  August 10, 2000

"Cash or Credit."  August 17, 2000

"Floppy Disks and Microprocessors."  August 24, 2000

"A New Challenge."  August 31, 2000

"Care to Merge?"  September 7, 2000

"The Big Three."  September 14, 2000

"Getting it Right."  September 21, 2000

"A Pat on the Back."  September 28, 2000

"Texas: Today and Tomorrow."  October 5, 2000

"Doing Business with Mexico."  October 12, 2000

"Presidential Prognostications."  October 19, 2000

"Better for Business."  October 26, 2000

"Mexico's Expanding Trade."  November 2, 2000

"Only in America."  November 9, 2000

"We, The People."  November 16, 2000

"The Short-Term Economy."  November 22, 2000

"Big Cities We Call Home."  November 30, 2000

"Packages Under the Tree."  December 7, 2000

"The British are Coming."  December 14, 2000

"From Swords to Plowshares."  December 21, 2000

"Inroads for Online Sales."  December 28, 2000

"Maquiladoras in the New Millennium."  January 4, 2001

"Judging the Economy."  January 11, 2001

"Human Resources and ED."  January 18, 2001

"Training Our Workforce."  January 25, 2001

"The Arts and the Economy: More Than Meets the Eye."  February 1, 2001

"Opening the Market."  February 8, 2001

"Welcome to Texas."  February 15, 2001

"Return to Main Street."  February 22, 2001

"The Border Economy."  March 1, 2001

"Broadband in Broad Lands."  March 8, 2001

"Regaining the Competitive Edge."  March 15, 2001

"A Smart Idea."  March 22, 2001

"E-commerce Makes It Easy."  March 29, 2001

"Working in Texas MSAs."  April 5, 2001

"If It Ain't Broke, Don't Fix It."  April 12, 2001

"Trade Proves Beneficial."  April 19, 2001

"New and Improved."  April 26, 2001

"Growth, Efficiency, and Economic Slowdowns."  May 3, 2001

"Energy Demands Continue Strong."  May 10, 2001

"Texas Forecast: The Long Haul."  May 17, 2001

"Pumping Up."  May 24, 2001

"Good News, Bad News."  May 31, 2001

"The Approach of E-Day."  June 7, 2001

"Evaluating the Tax Cut."  June 14, 2001

"Location, Location, Location."  June 21, 2001

"Creating Wealth."  June 28, 2001

"In or Out of the Market?"  July 5, 2001

"An Economy of Transition."  July 12, 2001

"NAFTA: An Update."  July 19, 2001

"Passage to China."  July 26, 2001

"One for Two."  August 1, 2001

"What's Up at the Pump."  August 9, 2001

"Eating Patterns Seeing Change."  August 16, 2001

"Just Do It!"  August 23, 2001

"Don't Count on It!"  August 30, 2001

"Getting Together."  September 6, 2001

"Through the Perilous Night."  September 13, 2001

"Strength in Numbers."  September 20, 2001

"Rethinking the Future."  September 27, 2001

"A Sleeper."  October 4, 2001

"The Nation's Economy."  October 11, 2001

"The Texas Economy."  October 18, 2001

"Let's Get Moving."  October 25, 2001

"Economy Springs Eternal."  November 1, 2001

"Dock at Economic Home Shore."  November 8, 2001

"Consumers To Economy: 'Let's Roll.'"  November 15, 2001

"Artoo-Detoo (R2-D2) et al."  November 22, 2001

"The Lone Star Still Shines."  November 29, 2001

"Looking Ahead at Texas Metro Areas."  December 6, 2001

"Value in Free Trade."  December 13, 2001

"Economic Sleigh Moves On."  December 20, 2001

"The Final Word on Christmas Sales?  Mixed."  December 27, 2001

"Texas Holding Its Own."  January 3, 2002

"A Beautiful Mind."  January 10, 2002

"The Stimulus Package."  January 17, 2002

"In Defense of Trading."  January 24, 2002

"A Bold Step for the Future."  January 31, 2002

"The World at Our Fingertips."  February 7, 2002

"USA!  USA!  USA!"  February 14, 2002

"Back to Basics."  February 21, 2002

"Full Speed Ahead."  February 28, 2002

"A Mistake."  March 7, 2002

"Our State's Greatest Resource."  March 14, 2002

"Back to Backwards."  March 21, 2002

"Born to Shop—Online!"  March 28, 2002

"Another False Symptom of Enronitis."  April 4, 2002

"An Imperfect (But Very Real) Relationship."  April 11, 2002

"Tax Time."  April 18, 2002

"$4,000,000,000 is NOT Enough."  April 25, 2002

"Wisely Sitting Tight."  May 2, 2002

"Doing it Right."  May 9, 2002

"Signs of Life."  May 16, 2002

"The Truth About Electric Competition in Texas."  May 23, 2002

"Interesting Numbers."  May 30, 2002

"Texas Needs Employer-Driver Workforce Training."  June 6, 2002

"The Long-Term Outlook for the United States."  June 13, 2002

"Looking Ahead for Texas."  June 20, 2002

"The Outlook for Texas' Major Metro Areas."  June 27, 2002

"Lemons and Rocks."  July 4, 2002

"A Summer of Discontent."  July 11, 2002

"Form Over Substance."  July 18, 2002

"Wow."  July 25, 2002

"Rules of the Game."  July 31, 2002

"Dips and Dots."  August 8, 2002

"The Forum."  August 15, 2002

"Dogs and Ducks."  August 22, 2002

"Roiled Oil."  August 29, 2002

"September 11—An Economic Retrospective."  September 5, 2002

"A Prescription for Employment Expansion."  September 12, 2002

"War—Again."  September 19, 2002

"Forgotten, But Not Gone."  September 26, 2002

"Taking Our Time and Getting It Right."  October 3, 2002

"Rippling Ponds and Butterfly Wings."  October 10, 2002

"Irrationality Lives."  October 17, 2002

"Buying is Believing"  October 23, 2002

"Timing is Everything."  October 30, 2002

"A Time to Govern."  November 7, 2002

"Crossing the Goal Line."  November 14, 2002

"A Challenge That Must Be Met."  November 21, 2002

"Texas Needs A New Job Training Program."  November 28, 2002

"A Quiet Legend."  December 5, 2002

"Texas, Our Texas."  December 12, 2002

"Attitude Adjustment!  The First Component of an Effective Economic Development Strategy."  December 19, 2002

"Keep It Simple!"  December 26, 2002

"New Year's Resolutions."  January 2, 2003

"Back in the Game."  January 9, 2003

"Electric Competition: A Year in Review."  January 16, 2003

"Education Plays Important Role in Economic Development."  January 23, 2003

"Air Quality Affects Economic Development."  January 30, 2003

"Water Resources Vital to Economic Advantage."  February 6, 2003

"Sushi and Enchiladas."  February 13, 2003

"Texas Tax Policy Should Be Revamped."  February 20, 2003

"A Great Man—A Great Mind."  February 27, 2003

"Forces Shaping Texas Economic Development."  March 6, 2003

"The Effects of Anticipation."  March 13, 2003

"Texas is on Top."  March 20, 2003

"The Market for Complexity."  March 27, 2003

"A Bad Idea."  April 3, 2003

"Targets for Texas."  April 10, 2003

"Time to Rev Up."  April 17, 2003

"Unintended Consequences."  April 24, 2003

"No Pay, No Play."  May 1, 2003

"A Lone Star Scribbler."  May 8, 2003

"It's Broke!  Let's Fix It!"  May 15, 2003

"Deflation."  May 22, 2003

"US and Texas Economies to 'See the Elephant.'"  May 29, 2003

"The Gorilla Awakens."  June 5, 2003

"Moving Around."  June 12, 2003

"Healthy Citizens and a Healthy Economy."  June 19, 2003

"A Gold Cow."  June 26, 2003

"Bearing Fruit."  July 3, 2003

"Jobs!"  July 10, 2003

"Fair Credit Reporting Act."  July 17, 2003

"I Believe."  July 24, 2003

"Do It Right."  July 31, 2003

"Medical Justice."  August 7, 2003

"Value."  August 14, 2003

"Blackout."  August 21, 2003

"Gas Prices."  August 28, 2003

"College Crunch Time."  September 4, 2003

"Two Years After."  September 11, 2003

"Brew-ha-ha."  September 18, 2003

"Guesstimation."  September 25, 2003

"The Outlook for the US Economy."  October 2, 2003

"Making Some Sense Out of Time."  October 9, 2003

"Getting the Job Done."  October 16, 2003

"Foreign Trade and the Lone Star State Economy."  October 23, 2003

"Texas Trade: Further Thoughts."  October 30, 2003

"Technology in Texas."  November 6, 2003

"How Did We Do It?"  November 13, 2003

"The US Economic Outlook."  November 20, 2003

"The Texas Outlook."  November 27, 2003

"Clean Energy: A Catalyst for Economic Growth."  December 4, 2003

"It's About Time."  December 11, 2003

"Looking Ahead for Texas' Metro Areas."  December 18, 2003

"Happy Holidays."  December 25, 2003

"Ring in the New."  January 1, 2004

"Bovine Bonkers."  January 8, 2004

"A Clearly Positive Direction."  January 15, 2004

"Being Prepared."  January 22, 2004

"The Power of Texas."  January 29, 2004

"Job Search."  February 5, 2004

"Fields to Neighborhoods."  February 12, 2004

"Degrees and Dollars."  February 19, 2004

"Traffic Trouble."  February 26, 2004

"Stock Market Growth."  March 4, 2004

"Spring Break Visitors Increase Economic Opportunities."  March 11, 2004

"Housing."  March 18, 2004

"Low-Carb Economics."  March 25, 2004

"Outsourcing."  April 1, 2004

"The Right Thing To Do."  April 8, 2004

"Delayed Reaction."  April 15, 2004

"A Favorite American Pastime."  April 22, 2004

"Teen Jobs."  April 29, 2004

"Texports."  May 6, 2004

"Through the Looking Glass."  May 13, 2004

"Staying in the Saddle."  May 20, 2004

"Bottom of the List."  May 27, 2004

"The US Economic Outlook."  June 3, 2004

"Reagan's Large Shadow."  June 10, 2004

"The Long-Term Future of Texas Looks Promising."  June 17, 2004

"Metros to be Major Contributors to State's Long-Term Economic Prosperity."
        June 24, 2004

"Let Freedom Reign."  July 1, 2004

"Value."  July 8, 2004

"Go to School."  July 15, 2004

"Stalling the Engine of Growth in a Global Economy."  July 22, 2004

"Straw on the Camel's Back."  July 29, 2004

"Sales Tax Holidaze."  August 5, 2004

"Productivity in Perspective."  August 12, 2004

"The Trade Deficit and How It Grew."  August 19, 2004

"Reaching for Olympic Gold."  August 26, 2004

"Toys 'R' Who?"  September 2, 2004

"The Competitive Edge."  September 9, 2004

"Measurement Error."  September 16, 2004

"Mutual Benefits."  September 23, 2004

"Metro Mania."  September 30, 2004

"No Longer Jobless."  October 7, 2004

"An Antidote to Arrogance."  October 14, 2004

"A Tale of Two 'Markets.'"  October 21, 2004

"Who Pays Taxes?"  October 28, 2004

"Reasons for Income Inequality."  November 3, 2004

"The Next Five Years."  November 11, 2004

"The Short-Term Outlook for Texas."  November 18, 2004

"Thanksgiving!"  November 25, 2004

"'Not-So-Dismal' Science."  December 2, 2004

"Metro Area Outlook."  December 9, 2004

"Ready to Emerge."  December 16, 2004

"Wonderful Time of Year."  December 22, 2004

"Year in Review 2004."  December 29, 2004

"Texas Regions to Experience Positive Growth Over Short Term."  January 6, 2005

"They're B-a-a-a-a-a-ck!!!"  January 13, 2005

"Dollar Weakness."  January 20, 2005

"Optimism for the Future."  January 27, 2005

"Growing the Smart Way."  February 3, 2005

"Health Care Funding Reductions Are a Losing Proposition."  February 10, 2005

"Texas Economic Evolution."  February 17, 2005

"Killing the Golden Goose."  February 24, 2005

"And Then There Were Three—A Perspective on Electric Competition."  March 3, 2005

"Capping Prosperity."  March 10, 2005

"Sausages."  March 17, 2005

"High Gasoline Prices—A Perennial Problem or a 2005 Anomaly?"  March 24, 2005

"Meeting the Neighbors."  March 31, 2005

"Texas-Mexico Ties."  April 7, 2005

"Pain and Gain."  April 14, 2005

"Red Letter Day."  April 21, 2005

"We Got it Right the First Time."  April 28, 2005

"Texas Power."  May 5, 2005

"Class of 2005."  May 12, 2005

"Fruit of the Vine."  May 19, 2005

"The Paradox of Productivity."  May 26, 2005

"Looking Ahead."  June 2, 2005

"If At First You Don't Succeed . . . "  June 9, 2005

"Long-Term Economic Outlook for US and Texas is Positive"  June 16, 2005

"The Age of Wi-Fi."  June 23, 2005

"Travel and Tourism."  June 30, 2005

"Video Competition."  July 7, 2005

"Baby Boomers—Planning for the Future."  July 14, 2005

"On the Road Again."  July 21, 2005

"The Major Question."  July 28, 2005

"A Different Kind of Weekend."  August 4, 2005

"The "eBay" Effect."  August 11, 2005

"New Trade Agreement Offers Positive Opportunities."  August 18, 2005

"Highway Can Prove Advantageous to Texas."  August 25, 2005

"Katrina—A Name to be Long Remembered."  September 1, 2005

"Making Life Livable Again."  September 8, 2005

"Why We Need Government—A Lesson from Katrina."  September 15, 2005

"Pain and Gain."  September 22, 2005

"Homeownership—The American Dream."  September 29, 2005

"Energy Conservations Depends on All of Us."  October 6, 2005

"Facing New Challenges."  October 13, 2005

"Games Economists Play."  October 20, 2005

"Changing of the Guard."  October 27, 2005

"Higher Education in Texas."  November 3, 2005

"Benefiting Judges and Texas."  November 10, 2005

"Walking the Wire."  November 17, 2005

"Taking Stock During the Thanksgiving Holiday."  November 24, 2005

"Ducks."  December 1, 2005

"Economic Outlook for 2006 is Favorable."  December 8, 2005

"The Tunes of Holiday Shopping."  December 15, 2005

"A Lesson in Sharing."  December 22, 2005

"Ringing Out, Ringing In."  December 29, 2005

"Resolutions and Reflections."  January 5, 2006

"The Texas Drought."  January 12, 2006

"Continuing the Legacy."  January 19, 2006

"Wealth and Poverty."  January 26, 2006

"The Economic Super Bowl."  February 2, 2006

"The Budget Debate: An American Reality Show."  February 9, 2006

"The Demise of the First Internet."  February 16, 2006

"Texas' Economic Engines."  February 23, 2006

"A National Celebration."  March 2, 2006

"Good News and Really Good News."  March 9, 2006

"Texas is Watching."  March 16, 2006

"Congratulations on Significant Success."  March 23, 2006

"Sharp Proposal Can Benefit the State."  March 30, 2006

"Class of 2006 Employment Looks Bright."  April 6, 2006

"Success of Competition in Retail Markets for Electricity Continues."  April 13, 2006

"At the Top of the List."  April 20, 2006

"Always in Perspective."  April 27, 2006

"Boycotts"  May 4, 2006

"Economies on the Rise."  May 11, 2006

"Tort Reform."  May 18, 2006

"The Driving Season."  May 25, 2006

"Communication and the Internet."  June 1, 2006

"The Challenges and Opportunities of Retirement."  June 8, 2006

"Long-Term Economic Outlook is Positive."  June 15, 2006

"A Step in the "Wright" Direction."  June 22, 2006

"US and Texas Population Projected to Experience Significant Expansion."
    June 29, 2006

"Philanthropy is Invaluable to America."  July 6, 2006

"Seniors Today and Tomorrow."  July 13, 2006

"As I See It."  July 20, 2006

"A Look at the Penny."  July 27, 2006

"Keep on Talkin'"  August 3, 2006

"The Alaskan Oil Situation: Disaster or Wake-up Call?"  August 10, 2006

"Emerging Technologies."  August 17, 2006

"How Dry I Am."  August 24, 2006

"Staying in Touch."  August 31, 2006

"A One-Man Economic Engine."  September 7, 2006

"Texas is Number One."  September 14, 2006

"America on the Move."  September 21, 2006

"Mid-Decade Checkup."  September 28, 2006

"Insourcing—Opportunity and Challenge."  October 5, 2006

"Another New Record."  October 12, 2006

"Selling Drugs."  October 19, 2006

"The Economics of Halloween."  October 26, 2006

"The Trans-Texas Corridor: An Idea Worth Pursuing."  November 2, 2006

"The Value of Higher Education."  November 9, 2006

"Mid-Term Elections and the Economy."  November 16, 2006

"A National Treasure."  November 23, 2006

"New Challenges and Opportunities."  November 30, 2006

"Small is Big."  December 7, 2006

"Texas Universal Service Fund."  December 14, 2006

"Holiday Sales."  December 21, 2006

"Short-Term Economic Forecast."  December 28, 2006

"Fueling Future Economic Growth."  January 4, 2007

"Minimum Wage."  January 11, 2007

"Weather."  January 18, 2007

"Education."  January 25, 2007

"Health Care."  February 1, 2007

"Local Parks."  February 8, 2007

"Coastal Area Vital to Texas Economy."  February 15, 2007

"Generating Electricity."  February 22, 2007

"A Winning Concept."  March 1, 2007

"Wind Power."  March 8, 2007

"Gasoline Prices."  March 15, 2007

"Power in Texas—Making it Happen."  March 22, 2007

"Undocumented Workforce."  March 29, 2007

"Engineering and Computer Science Graduates."  April 5, 2007

"Agriculture."  April 12, 2007

"Tourism in Texas."  April 19, 2007

"Wellness Programs are Winners—for Everyone!"  April 26, 2007

"Changing the Guard."  May 3, 2007

"Paying at the Pump."  May 10, 2007

"Closing the Gaps and Opening the Gates."  May 17, 2007

"It Pays to Educate."  May 24, 2007

"Long-Term Economic Outlook is Positive."  May 31, 2007

"Texas Major Metros Vital to State's Economic Future."  June 7, 2007

"High Tech is Back in the Saddle."  June 14, 2007

"The Icing on the Cake."  June 21, 2007

"Philanthropy is on the Rise."  June 28, 2007

"Retiring in Texas."  July 5, 2007

"Gone to Texas!"  July 12, 2007

"The Web."  July 19, 2007

"Traffic Congestion."  July 26, 2007

"Making Stuff."  August 2, 2007

"Dow Jones."  August 9, 2007

"America's Pastime."  August 16, 2007

"Through the Looking Glass."  August 23, 2007

"E-Commerce Offers Expanded Opportunities."  August 30, 2007

"Later School Start Benefits Economy."  September 6, 2007

"On Again, Off Again."  September 13, 2007

"Speak Up!!"  September 20, 2007

"Revival of Nuclear Power."  September 27, 2007

"Time-outs."  October 4, 2007

"Wake-up Call."  October 11, 2007

"Success in Fighting Cancer."  October 18, 2007

"Investing in Our Quality of Life."  October 25, 2007

"The Shrinking Dollar."  November 1, 2007

"Making Things Work Better."  November 8, 2007

"On the Right Road."  November 15, 2007

"Thankful to be a Texan."  November 22, 2007

"A Silver Lining."  November 29, 2007

"Retailer Relief."  December 6, 2007

"Homeowners Receive Helping Hand."  December 13, 2007

"Time Is Almost Up."  December 20, 2007

"Economy to Remain Strong."  December 27, 2007

"That Thing in Your Pocket."  January 3, 2008

"A Lasting Legacy."  January 10, 2008

"Economic Development Planning."  January 17, 2008

"Business Climate and Stormy Weather."  January 24, 2008

"Economic Stimulus Plan."  January 31, 2008

"Super Sunday."  February 7, 2008

"Economic Impact of the Writers' Strike."  February 14, 2008

"New Medical School Could Benefit All Texans."  February 21, 2008

"Working During Retirement Years Can Prove Beneficial to All."  February 28, 2008

"And the Winner Is . . ."  March 6, 2008

"Impact of "New Urbanism."  March 13, 2008

"March Madness."  March 20, 2008

"Old Dogs and New Tricks."  March 27, 2008

"Employment Positives."  April 3, 2008

"Texas—A Top Tier State."  April 10, 2008

"It's a Small World After All."  April 17, 2008

"Bridging the Digital Divide."  April 24, 2008

"A Texas Turnaround."  May 1, 2008

"Cinco de Mayo."  May 8, 2008

"Pain at the Pump!"  May 15, 2008

"Fruit of the Vine."  May 22, 2008

"Rising Food Prices."  May 29, 2008

"Wind Power in Texas."  June 5, 2008

"Graduates Pay Off."  June 12, 2008

"A New Norm in Air Travel?"  June 19, 2008

"The Changing Face of the Global Economy."  June 26, 2008

"Long-Term Forecast."  July 3, 2008

"Make Mine Metropolitan."  July 10, 2008

"Fannie and Freddie."  July 17, 2008

"Challenges in the Friendly Skies."  July 24, 2008

"Steps in the Right Direction."  July 31, 2008

"Not Even Close!!"  August 7, 2008

"Preparation is the Key to Success."  August 14, 2008

"The Greatest of the Great."  August 21, 2008

"Conventions: Economic Boosts."  August 28, 2008

"Ill Winds and Still Rigs."  September 4, 2008

"The Other Storm."  September 11, 2008

"A Double Whammy."  September 18, 2008

"Bubbles."  September 25, 2008

"How High's the Water."  October 2, 2008

"Texas Tax System Among the Best."  October 9, 2008

"Cheers!!!"  October 16, 2008

"How Big Becomes Huge!!"  October 23, 2008

"Another Play."  October 30, 2008

"Rewriting the Dictionary."  November 6, 2008

"Ropes."  November 13, 2008

"What's Up About the Ups and Downs."  November 20, 2008

"Time to be Thankful."  November 27, 2008

"Trying Times."  December 4, 2008

"Employment."  December 11, 2008

"The Rest of the Story."  December 18, 2008

"A Blessing from the Past."  December 25, 2008

"The End of the Beginning."  January 1, 2009

"The Cost of the Path Not Taken."  January 8, 2009

"They're Back!!!!!"  January 15, 2009

"Good News, Bad News."  January 22, 2009

"Stimulus Package."  January 29, 2009

"Electric Power Infrastructure Investments Benefit Texas Economy."  February 5, 2009

"The Employment Picture."  February 12, 2009

"Collisions."  February 19, 2009

"Thinking Positively."  February 26, 2009

"New Trade Opportunities."  March 5, 2009

"Unique Economic Stimulus."  March 12, 2009

"An Enduring Resource."  March 19, 2009

"Positive Expectations."  March 26, 2009

"Changing the Rules."  April 2, 2009

"New Steps."  April 9, 2009

"Piracy."  April 16, 2009

"Green Economics."  April 23, 2009

"Ten Years of Success."  April 30, 2009

"A Piece of the Puzzle."  May 7, 2009

"Spring Awakening."  May 14, 2009

"Stormy Weather."  May 21, 2009

"The Class of '09."  May 28, 2009

"Road Block?"  June 4, 2009

"Kick Start."  June 11, 2009

"Wise Investments."  June 18, 2009

"The Pendulum."  June 25, 2009

"Greener Grass."  July 2, 2009

"Beginning of the End."  July 9, 2009

"A Port in the Storm."  July 16, 2009

"One Giant Leap."  July 23, 2009

"Drought Conditions."  July 30, 2009

"Ring On!"  August 6, 2009

"New Rules."  August 13, 2009

"Clunkers."  August 20, 2009

"Riding it Out."  August 27, 2009

"An Enduring Legacy."  September 3, 2009

"Is the Recession Over?  Yes, but . . ."  September 10, 2009

"China Challenge."  September 17, 2009

"What a Difference a Year Makes!"  September 24, 2009

"The Three Rs."  October 1, 2009

"Going for the Gold."  October 8, 2009

"A Texas State of Minds."  October 15, 2009

"How Things Get Done!"  October 22, 2009

"The New Energy."  October 29, 2009

"Finally!!!! – But…."  November 5, 2009

"If You Build It…."  November 12, 2009

"Hitting the Road!!"  November 19, 2009

"A Different Sort of Headline."  November 26, 2009

"Christmas Shopping Prospects."  December 3, 2009

"Climate Change Conference."  December 10, 2009

"A Special Impact."  December 17, 2009

"Raising the Roof."  December 24, 2009

"Eyes Forward."  December 31, 2009

"Signs of the Times."  January 7, 2010

"Not a Jobless Recovery, Just an Early One."  January 14, 2010

"A Cautious Optimism."  January 21, 2010

"Power."  January 28, 2010

"Regions on the Rise."  February 4, 2010

"Whither Jobs."  February 11, 2010

"Setting the Record Straight."  February 18, 2010

"Crisis in Greece."  February 25, 2010

"Texas Job Growth."  March 4, 2010

"Census 2010."  March 11, 2010

"Broadband."  March 18, 2010

"Storms."  March 25, 2010

"Securing Social Security."  April 1, 2010

"Canton Trade Days – A Lesson in Small Town Economics."  April 8, 2010

"At Least It's Not $5 Trillion."  April 15, 2010

"Tiny Island, Global Impact."  April 22, 2010

"Economic Growth."  April 29, 2010

"Immigration."  May 6, 2010

"Texas Tops the Lists."  May 13, 2010

"Winds of Prosperity."  May 20, 2010

"Start Your Engines."  May 27, 2010

"Mammoth Disaster."  June 3, 2010

"Texas Trade."  June 10, 2010

"Rising from the Ashes."  June 17, 2010

"Jobs at Last!!!"  June 24, 2010

"Economic Legacy of Governor Dolph Briscoe."  July 1, 2010

"Economic Conditions."  July 8, 2010

"King James and the Bambino."  July 15, 2010

"Texas Takes the Prize—Again!!"  July 22, 2010

"China Top Energy Consumer."  July 29, 2010

"Getting the Picture."  August 5, 2010

"Better to Lose a Billion…"  August 12, 2010

"From Telegraph to Twitter."  August 19, 2010

"Peeling Back the Onion."  August 26, 2010

"The Scenic Route."  September 2, 2010

"The Economy and the Election."  September 9, 2010

"Basel III."  September 16, 2010

"It's Official!.  September 23, 2010

"Tourism is Basic."  September 30, 2010

"Texas Recovery Funding."  October 7, 2010

"Friction."  October 14, 2010

"The Next Move."  October 21, 2010

"The Fed – Again!"  October 28, 2010

"G20 Meeting in Seoul."  November 4, 2010

"The Economy and the Election."  November 11, 2010

"Legislators Face Budget Deficits."  November 18, 2010

"Early Holiday Shopping."  November 25, 2010

"So Far, So Good."  December 2, 2010

"Moment of Truth for the Deficit Commission."  December 9, 2010

"On the Horizon."  December 16, 2010

"A Setback Avoided."  December 23, 2010

"Shopping."  December 30, 2010

"Where The Growth Is!  January 5, 2011

"Texas Cities Lead the Way."  January 12, 2011

"The Great Divide."  January 19, 2011

"The Real Deal."  January 26, 2011

"Pennies and Seed Corn."  February 3, 2011

"Super Benefits."  February 10, 2011

"Two Steps Back."  February 17, 2011

"Shaken, Not Stopped."  February 24, 2011

"Still Some Slack."  March 3, 2011

"Where Were You in 1984?"  March 10, 2011

"Disaster in Japan."  March 17, 2011

"Gold."  March 24, 2011

"Back to Work."  March 31, 2011

"A Step in the Wrong Direction."  April 7, 2011

"A Taxing Week."  April 14. 2011

"A Shot Across the Bow."  April 21, 2011

"A New Era."  April 28, 2011

"A Safer World."  May 5, 2011

"The Missing Graduates."  May 12, 2011

"Public Pension Problems."  May 19, 2011

"Bone Dry."  May 26, 2011

"Start your Engines!!!  June 2, 2011

"A Legacy and a Challenge."  June 9, 2011

"A New Natural."  June 16, 2011

"The Greek Problem."  June 23, 2011

"A Silent, But Substantial Threat."  June 30, 2011

"Roller-Coaster Markets, July 7, 2011

"Trade Deficit Dilemma."  July 14, 2011

"Long-Term Growth for US, Texas Likely."  July 21, 2011

"Economic Outlook for Largest Texas Metropolitan Areas."  July 28, 2011

"Math."  August 4, 2011

"We Have To."  August 11, 2011

"Bad to Worse."  August 18, 2011

"Our Neighbor to the South."  August 25, 2011

"When All Was Said and Done…"  September 1, 2011

"Games are not just Games!"  September 8, 2011

"Sobering Statistics."  September 15, 2011

"Global Growth."  September 22, 2011

"Small Businesses: Big Impact."  September 29, 2011

"A 'No Brainer.'"  October 6, 2011

"Understanding Causes and Consequences."  October 13, 2011

"Texas Then and Now."  October 20, 2011

"Part 2: Texas Jobs Then and Now."  October 27, 2011

"7 Billion and Climbing."  November 3, 2011

"The Short-Term Forecast for the US Economy."  November 10, 2011

"Punting Energy Security."  November 17, 2011

"Super Committee Stumbles."  November 24, 2011

"Buying Bonanza!!!"  December 1, 2011

"A Warning Shot."  December 8, 2011

"Economic Forecast for Texas' Largest Cities."  December 15, 2011

"Growth All Around."  December 22, 2011

"A Look Back at 2011."  December 29, 2011

"Rising Tension in the Middle East."  January 5, 2012

"Are Half of All Americans Poor?"  January 12, 2012

"A Closer Look at Income Inequality."  January 19, 2012

"How Dry I Am!"  January 26, 2012

"Shale Game."  February 2, 2012

"Financial Security."  February 9, 2012

"Age and Employment."  February 16, 2012

"Giving!"  February 23, 2012

"Texas Travel."  March 1, 2012

"Protecting Parks."  March 8, 2012

"A Matter of Perspective."  March 15, 2012

"A Building Block."  March 22, 2012

"Balancing Payments."  March 29, 2012

"1940s Frenzy."  April 5, 2012

"A Step in the Right Direction."  April 12, 2012

"Looking Ahead to November."  April 19, 2012

"Dwindling Immigration."  April 26, 2012

"Texas Tops."  May 3, 2012

"Labor Force Participation in the Spotlight."  May 10, 2012

"Avoiding the Fiscal Cliff."  May 17, 2012

"The Long-Term Outlook for the US Economy."  May 24, 2012

"The New Kid on the Block."  May 31, 2012

"A Step in the Right Direction."  June 7, 2012

"Family Finances."  June 14, 2012

"Game Changer!!"  June 21, 2012

"Three Who Changed Our Thinking." June 28, 2012

"Cooperative Conservation."  July 5, 2012

"The Long-Term Outlook for the Texas Economy."  July 12, 2012

"Signs of Sluggishness."  July 19, 2012

"The Long-Term Outlook for Texas Metropolitan Areas."  July 26, 2012

"A Major Challenge."  August 2, 2012

"Where's the Growth?"  August 9, 2012

"Still a Long Way to Go."  August 16, 2012

"Services Stigma."  August 23, 2012

"Golden or Lone Star?"  August 30, 2012

"Texas Transportation."  September 6, 2012

"Keeping an Eye on the Ball."  September 13, 2012

"More Pain Than Necessary."  September 20, 2012

"Static or Dynamic Matters."  September 27, 2012

"Texas Has Only One Rational Choice About Medicaid Expansion."  October 4, 2012

"Falling Off the Cliff."  October 11, 2012

"Matchmaking."  October 18, 2012

"Black Gold."  October 25, 2012

"Texas Taxes."  November 1, 2012

"Not Child's Play."  November 8, 2012

"The American Dream?"  November 15, 2012

"Black Friday Fading?"  November 22, 2012

"Testing Dilemma."  November 29, 2012

"Education Issues."  December 6, 2012

"Cheap Gas."  December 13, 2012

"US Economic Outlook."  December 20, 2012

"Forecast for the Texas Economy."  December 27, 2012

"Stepping Back from the Cliff."  January 3, 2013

"Texas' Budget Surplus."  January 10, 2013

"Economic Forecast for Texas' Large Cities."  January 17, 2013

"Big Business."  January 24, 2013

"Immigration Reform."  January 31, 2013

"The End of Saturday Mail."  February 7, 2013

"Of Babies and Bathwater OR Preserving Economic Development Catalysts."
        February 14, 2013

"The Potential Economic Benefits for Texas of a Free Trade Agreement between the
        United States and the European Union."  February 21, 2013

"Expanding Medicaid Under the Affordable Care Act Benefits Industries, Communities
        Across Texas."  February 28, 2013

"The Dow Now."  March 7, 2013

"Economics of an Earlier School Start Date."  March 14, 2013

"Toward A 'Texas Solution'."  March 21, 2013

"Texas Back on Top."  March 28, 2013

"Too Much With Too Little."  April 4, 2013

"Fabulous at Forty."  April 11, 2013

"Texas in 2050."  April 18, 2013

"Texas and US Economic Performance." April 25, 2013

"Six Minute Madness."  May 2, 2013

"A Natural for Driving?"  May 9, 2013

"A Whale of a Shale."  May 16, 2013

"Texas and the Minimum Wage."  May 23, 2013

"$2 Billion Well Spent."  May 30, 2013

"Higher Education Progress."  June 6, 2013

"Student Debt Crisis?"  June 13, 2013

"Time for an Answer."  June 20, 2013

"Overreaction and Irony."  June 27, 2013

"Happy Workers."  July 4, 2013

"Temporary Workers."  July 11, 2013

"US Unemployment from a Global Perspective."  July 18, 2013

"The Long-Term Outlook for the US Economy."  July 25, 2013

"A Lasting Mark."  August 1, 2013

"Billion-Dollar Bandage."  August 8, 2013

"Long-Term Forecast for the Texas Economy."  August 15, 2013

"The Federal Reserve System."  August 22, 2013

"Monetary Policy 101."  August 29, 2013

"Trade Balancing."  September 5, 2013

"Simply Brilliant."  September 12, 2013

"College Enrollment Over Time."  September 19, 2013

"Back to the United States." September 26, 2013

"The Heart of the Shutdown Issue."  October 3, 2013

"The Long-Term Forecast for the Economies of Texas Metropolitan Areas."
    October 10, 2013

"Predicting Asset Prices."  October 17, 2013

"A Closer Look at US Debt."  October 24, 2013

"Income Trends."  October 31, 2013

"Is Social Security Insecure?"  November 7, 2013

"Rainy Day Water."  November 14, 2013

"Oil Price Drivers: Now and in the 1980s."  November 21, 2013

"Striving for STEM."  November 28, 2013

"The Future as History."  December 5, 2013

"Computer Skills."  December 12, 2013

"Working."  December 19, 2013

"The US and Texas Short-Term Forecast—2013-2018."  December 26, 2013

"Oil Production Records in Reach?"  January 1, 2014

"Changing of the Guard."  January 8, 2014

"Long-Term Unemployment."  January 15, 2014

"Blinders and Ear Plugs."  January 22, 2014

"A Farm Bill."  January 29, 2014

"The Forecast for the Texas Economy."  February 5, 2014

"A Lack of Assets."  February 12, 2014

"Texas Economic Forecast by Industry Group."  February 19, 2014

"Dots Connected."  February 26, 2014

"How Big is Texas?"  March 5, 2014

"Economic Forecast for Texas' Large Cities."  March 12, 2014

"Texas on Top (Again)."  March 19, 2014

"Economic Development Sales Tax Turns 25."  March 26, 2014

"Time for a Real "Doc Fix."  April 2, 2014

"A Pebble of a Milestone."  April 9, 2014

"Job Recovery by Industry."  April 16, 2014

"Considering College."  April 23, 2014

"Staying in School."  April 30, 2014

"Extending Economics."  May 7, 2014

"Entrepreneurial America."  May 14, 2014

"Tax Recovery."  May 21, 2014

"Texas Traffic Congestion."  May 28, 2014

"Carbon Confusion."  June 4, 2014

"Fixing Student Loans."  June 11, 2014

"Iraq and the Oil Market."  June 18, 2014

"Texas Oil Production."  June 25, 2014

"Challenges of an Aging Population."  July 2, 2014

"Export-Import Bank."  July 9, 2014

"STEM and the Economy."  July 16, 2014

"Water Worries."  July 23, 2014

Developing the Texas Economy."  July 30, 2014

"A Fresh Look at Employment Growth."  August 6, 2014

"The Long-Term Outlook for the US Economy."  August 13, 2014

"Economic Benefits of the Oil Industry."  August 20, 2014

"An International Perspective on Employment."  August 27, 2014

"The Long-Term Forecast for the Texas Economy."  September 3, 2014

"The Economic Cost of Deployment."  September 10, 2014

"Unconventional Formations Fuel the Economy."  September 17, 2014

"The Long-Term Economic Forecast for Texas' Largest Cities."  September 24, 2014

"Rising Texas Personal Income."  October 1, 2014

"Jobs for the Taking."  October 8, 2014

"Ending Wright."  October 15, 2014

"Managing Markets with a Few Powerful Firms."  October 22, 2014

"The US Energy Workforce."  October 29, 2014

"The End of Quantitative Easing."  November 5, 2014

"Suffer the Children – An Economic Perspective."  November 12, 2014

"Young Workers."  November 19, 2014

"Wired and Wireless."  November 26, 2014

"25 Years of the Economic Development Sales Tax."  December 3, 2014

"A Catalyst for Growth."  December 10, 2014

"The Economic Cost of Hunger."  December 17, 2014

"Economic Benefits of the Food Bank and Charitable Food Distribution Network."
      December 24, 2014

"Toward a Hunger Solution."  December 31, 2014

"The Short-Term Outlook for the US Economy."  January 7, 2015

"Short-Term Economic Forecast for Texas."  January 14, 2015

"Oil Price Fallout."  January 21, 2015

"The Economic Forecast for Texas Metropolitan Areas."  January 28, 2015

"Deciphering Fed-Speak."  February 4, 2015

"Finally Progress."  February 11, 2015

"Big Business."  February 18, 2015

"Gender Wage Inequality."  February 25, 2015

"Historic NASDAQ Composite High."  March 4, 2015

"Texas Cities Lead the Way."  March 11, 2015

"Water Worries Update."  March 18, 2015

"Five Years of the Affordable Care Act."  March 25, 2015

"Close, but No Cigar (Yet)."  April 1, 2015

"Small Business Optimism."  April 8, 2015

"Oil Update."  April 15, 2015

"College Attendance Trends."  April 22, 2015

"Youth Employment."  April 29, 2015

"Financial Literacy."  May 6, 2015

"The Changing American Workweek."  May 13, 2015

"Housing is Back!!!"  May 20, 2015

"A Perspective on Income Inequality."  June 3, 2015

"Lower Oil Prices and the Texas Economic Forecast."  June 10, 2015

"The Economic Forecast for Texas' Major Cities."  June 17, 2015

"The Final Frontier."  June 24, 2015

"The Affordable Care Act Lives!!"  July 1, 2015

"Greece."  July 8, 2015

"Texas Tech."  July 15, 2015

"Whither China?"  July 22, 2015

"Working Time."  July 29, 2015

"Hurricane Season."  August 5, 2015

"'…and Justice for All' – Courts and the Economy."  August 12, 2015

"Security of Social Security."  August 19, 2015

"Whole Lotta Shakin' Goin' On!!"  August 26, 2015

"Oil Outlook."  September 2, 2015

"State of the States."  September 9, 2015

"Closing the Gaps in Texas Higher Education."  September 16, 2015

"New Goals for Higher Education in Texas: 60% by 2030."  September 23, 2015

"Europe – We Have a Problem!!."  September 30, 2015

"Infrastructure Issues."  October 7, 2015

"2015 Nobel Prize in Economics: Thinking Small on Big Problems."  October 14, 2015

"As Expected."  October 21, 2015

"Free College Tuition: A Very Well Meaning, But Bad Idea."  October 28, 2015

"The Force Behind 1 in 5 Jobs."  November 4, 2015

"Keystone Denied."  November 11, 2015

"The Paris Tragedy."  November 18, 2015

"Black Friday's Demise."  November 25, 2015

"Chinese Currency."  December 2, 2015

"Expecting the 'Unexpected': The Need for Emergency Savings."  December 9, 2015

"The High Cost of Payday Loans."  December 16, 2015

"Year in Review: The US Economy."  December 23, 2015

"Year in Review: The Texas Economy."  December 30, 2015

"Exporting Oil: It's Time."  January 6, 2016

"Labor Force Future."  January 13, 2016

"Encouraging Work."  January 20, 2016

"US Economic Forecast."  January 27, 2016

"Texas Economic Forecast."  February 3, 2016

"Economic Benefits of the Undocumented Workforce."  February 10, 2016

"Tax Effects of Undocumented Workers."  February 17, 2016

"Texas Workforce Preparedness."  February 24, 2016

"Economic Forecast for Texas' Metropolitan Areas."  March 2, 2016

"Texas Domestic Migration."  March 9, 2016

"Catalyst!!: Dallas/Fort Worth International Airport."  March 16, 2016

"School Property Tax Incentives."  March 23, 2016

"Another Governors Cup Win for Texas."  March 30, 2016

"Wealth Concentration."  April 6, 2016

"Oil and Water."  April 13, 2016

"Taxes: Up Close and Personal."  April 20, 2016

"Credentials Work."  April 27, 2016

"Texas Population Evolution."  May 4, 2016

"Texas Spending."  May 11, 2016

"Financing Texas."  May 18, 2016

"Climbing Out of Holes."  May 25, 2016

"Stuck in the 1980s."  June 1, 2016

"Investing in Public Education."  June 8, 2016

"Boomerang Economics."  June 15, 2016

"The Long-Term Outlook for the US Economy."  June 22, 2016

"Texas and Brexit."  June 29, 2016

"Texas Economic Forecast: Long-Term Growth."  July 6, 2016

"Long-Term Economic Forecast for Texas' Largest Metropolitan Areas."  July 13, 2016

"Economic Outlook for Smaller Metropolitan Areas."  July 20, 2016

"The Travel Industry in Texas."  July 27, 2016

"A Look at Technology Jobs in Texas."  August 3, 2016

"A Man, a Plan, a Canal, Panama"  August 10, 2016

"Global Texas."  August 17, 2016

"The Cost of the Olympics."  August 24, 2016

"Higher Interest Rates Ahead?"  August 31, 2016

"Undocumented Immigration: Myths and Realities."  September 7, 2016

"Foster Care Redesign."  September 14, 2016

"This is Not the 1980s."  September 21, 2016

"Rainy Days May Be Here To Stay (for the Short-Term)."  September 28, 2016

"Texas Taxes: Good News and Bad."  October 5, 2016

"Let's Make A Deal!!."  October 12, 2016

"Bilingualism in Texas."  October 19, 2016

"Blinking!!"  October 26, 2016

"Time for Action."  November 2, 2016

"Brexit – On Steroids!!"  November 9, 2016

"A Texas Crisis: Toward Reducing Child Maltreatment."  November 16, 2016

"To Choose or Not To Choose: The School Choice Debate."  November 23, 2016

"An Urban-Rural Divide?"  November 30, 2016

"OPEC Blinked – A Strategy Shift."  December 7, 2016

"The Impact of Texas Travel and Tourism."  December 14, 2016

"The Forecast for the US Economy."  December 21, 2016

"The Economic Forecast for Texas."  December 28, 2016

"Year in Review: 2016."  January 4, 2017

"Bad News for the State Budget."  January 11, 2017

"Economic Forecast for Texas' Largest Metropolitan Areas."  January 18, 2017

"A Retrospective on the Past Eight Years."  January 25, 2017

"Global Trade: Let's Get Real!"  February 1, 2017

"Economic Forecast for Texas' Smaller Metropolitan Areas."  February 8, 2017

"Killing the Goose."  February 15, 2017

"'Give Me Your Tired, Your…Never Mind!'"  February 22, 2017

"A Mind for the Ages."  March 1, 2017

"Keeping it Real!"  March 8, 2017

"Starting with a Bang."  March 15, 2017

"Make that Five in a Row."  March 22, 2017

"$20,000,000,000,000!"  March 29, 2017

"100 Years Old and Just Getting Started."  April 5, 2017

"Getting Back to Normal."  April 12, 2017

"The Economic and Fiscal Price of Restricting Bathroom Access."  April 19, 2017

"Turning the Corner."  April 26, 2017

"A Free-Market, Common-Sense Approach to Immigration Reform."  May 3, 2017

"Change is Coming!"  May 10, 2017

"The Big Business of Small Businesses."  May 17, 2017

"The High Cost of Cybercrime."  May 24, 2017

"The Paradox of Pandemonium – From 'No Drama' to 'Total Trauma.'"  May 31, 2017

"Paris Discord."  June 7, 2017

"Marking a Milestone."  June 14, 2017

"The Passing of a Rite of Passage."  June 21, 2017

"The Importance of Ports."  June 28, 2017

"1776."  July 5, 2017

"Trade You Can't See."  July 12, 2017

"Productivity and Compensation."  July 19, 2017

"The Economics of Winning."  July 26, 2017

"Flushing Future Fortune."  August 2, 2017

"Mark White: Doing Right and Risking the Consequences."  August 9, 2017

"Six Reasons Not to be Concerned that the Texas Unemployment Rate is Higher than the US."  August 16, 2017

"The Emergence of Downtown Revitalization."  August 23, 2017

"Harvey—A First Look."  August 30, 2017

"The Economic Cost of Harvey – What We Know Now."  September 6, 2017

"And Then There was Irma…"  September 13, 2017

"Time for Immigration Reform."  September 20, 2017

"Atracting Amazon."  September 27, 2017

"Time to Unwind."  October 4, 2017

"The Reality of Irrationality."  October 11, 2017

"Job Market Mismatch."  October 18, 2017

"Where the New Jobs Will Be."  October 25, 2017

"Made in Texas."  November 1, 2017

"The Changing of the Guard."  November 8, 2017

"The Importance of the Hispanic Workforce."  November 15, 2017

"Keys to Texas' Economic Success."  November 22, 2017

"A Two-Million-Job Issue."  November 29, 2017

"The Long-Term Forecast for the United States."  December 6, 2017

"The Long-Term Economic Forecast for Texas."  December 13, 2017

"The Long-Term Economic Forecast for Texas Metropolitan Areas."  December 20, 2017

"A Look Back at 2017."  December 27, 2017

"Looking Ahead to 2018."  January 3, 2018

"The Count."  January 10, 2018

"Technology and Oil."  January 17, 2018

"Troubling Tarriffs."  January 24, 2018

"Savings."  January 31, 2018

"Manufacturing Expansion."  February 7, 2018

"Federal Budget Challenges."  February 14, 2018

"The State of the States."  February 21, 2018

"The US-Mexico Border Region."  February 28, 2018

"Of Tariffs, Trade, and Turmoil."  March 7, 2018

"Keeping the Texas Economy on Track."  March 14, 2018

"Another Win for Texas."  March 21, 2018

"Eighth Time's the Charm."  March 28, 2018

"The Texas Economic Forecast."  April 4, 2018

"Trade Tension."  April 11, 2018

"Incentive Issues."  April 18, 2018

"Help Wanted."  April 25, 2018

"Going Digital."  May 2, 2018

"Slow and Steady."  May 9, 2018

"There's $70…and Then There's $70."  May 16, 2018

"Economic (R)Evolution."  May 23, 2018

"Urban Texas Expansion."  May 30, 2018

"Texas Wind."  June 6, 2018

"Job Market Strength."  June 13, 2018

Speeches & Presentations

## SELECTED SPEECHES, PUBLIC PRESENTATIONS, AND RELATED ACTIVITY

"The National and State Economic Outlook for the Coming Year and Its Implication for the Economy of Central Texas."  Address delivered at the Economic Forecast Conference sponsored by the Greater Waco-McLennan County Chamber of Commerce, Waco, Texas, 1978.

"The Economic Outlook for the United States and Texas."  Address delivered to the Annual Economic Outlook Conference of the Temple Chamber of Commerce, Temple, Texas, 1978.

"Inflation, Unemployment, and Economic Policy."  Lectures delivered to the Rotary Scholars in Economics Program, 1979.

"Economic Outlook for the Nation, State, and Region in the 1980s."  Address delivered to the National Association of Accountants, 1979.

"The State and National Perspective for the 1980s."  Address delivered to the 1979 Economic Forecast Conference sponsored by the Greater Waco-McLennan County Chamber of Commerce, Waco, Texas, 1979.

"The Economic Outlook for the 1980s."  Address delivered to the 1979 Economic Outlook Conference of the Temple Chamber of Commerce, Temple, Texas, 1979.

"Economic Scenario for the 1980s."  Address delivered to the 1980 Economic Outlook Meeting of the McGregor Chamber of Commerce and Agriculture, McGregor, Texas, 1980.

"Economic Models and Business."  Address delivered to the Heart of Texas Lions Club, Waco, Texas, 1980.

"The Value of Economic Models to Society."  Lectures delivered to the Texas High School Leadership Seminar, 1980.

"The Outlook for Texas and the Nation in 1981."  Address delivered to the 1980 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, 1980.

"The Economic Prognosis for 1981."  Address delivered to the 1980 Economic Outlook Conference of the Temple Chamber of Commerce, Temple, Texas, 1980.

"What is Research and How is it Used?"  Lecture delivered to the participants in the Glasscock Gifted Student Project, 1981.

"The Role of Computers in Econometric Modeling."  Address delivered to the Association for Computing Machinery, 1981.

"Monetary Policy, Interest Rates, and the Housing Industry."  Address delivered to the Texas Association of Home Builders, 1981.

"The End of the US Recession: The National and State Outlook for 1982."  Address delivered to the 1981 Economic Outlook Conference sponsored by the Waco Chamber of Commerce, Waco, Texas, 1981.

"The Economic Outlook: 1983 and Beyond."  Address delivered to the Fall Planning Conference of Texas American Bancshares, Fort Worth, Texas, 1982.

"The State of Texas Econometric Model."  Address delivered to the Dallas Economists Club, Dallas, Texas, 1982.

"Oil Prices and the Economy: The Outlook for Texas and the Nation."  Address delivered to the 1982 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, 1982.

Plenary Panelist and Principal Speaker on "The Use of Economic Models in State Planning" at the Conference on Economic Models in State Planning sponsored jointly by the Texas Research League and the Office of the Governor, Austin, Texas, 1983.

"The Economy: What's It All About?"  Series of five lectures delivered to the Baylor University Gifted Students Program (for elementary school students), Waco, Texas, June 1983.

Plenary Panelist on "The Outlook for Texas in 1984" at the 1983 Public Utility Commission Educational Seminar, Dallas, Texas, July 1983.

"Interpreting and Using Economic Information."  Address delivered to the Seminar for Executive Bank Officers of the Center for Banking and Financial Institutions, June 1983.

"Economic Forecasting and Strategic Planning."  Address delivered to the Strategic Planning Seminar of the Center for Banking and Financial Institutions and the Texas Bankers Association, September 1983.

"The Economic Outlook for the McAllen and Hidalgo County Area." Address delivered to the 1983 Hidalgo County Economic Outlook Conference (including projections for 1984 from the McAllen-Pharr-Edinburg SMSA Econometric Model), McAllen, Texas, October 1983.

"The Economic Outlook for 1984: National, State, and Regional."  Address delivered to the 1983 Economic Outlook Conference of the Independent Bankers Association of Texas, Waco, Texas, October 1983.

"The Economic and Energy Demand Outlook."  Address delivered to the 1983 Planning Conference for Texas Utilities, November 1983.

"The Economic Outlook for the Galveston-Texas City SMSA."  Address delivered to the first meeting of the Galveston County Lyceum Association (including projections for 1984 from the Galveston-Texas City SMSA Econometric Model), Galveston, Texas, November 1983.

"The Economic Outlook for the Victoria SMSA."  Address delivered to the 1983 Victoria County Metropolitan Area Economic Outlook Conference (including projections for 1984 from the Victoria SMSA Econometric Model), Victoria, Texas, November 1983.

"The Short-Run Outlook for the Texas Economy."  Address delivered to the Wharton Econometric Forecasting Associates Economic Outlook Conference, Oklahoma City, Oklahoma, November 1983.

"The National and Texas Prognosis for 1984."  Address delivered to the 1983 Abilene Economic Forecast Conference (sponsored by the Abilene Chamber of Commerce), Abilene, Texas, December 1983.

"The Short-Term Outlook for Texas and the US."  Address delivered to the 1983 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, December 1983.

"The Economic Outlook for the Housing Industry in Texas."  Seminar delivered to Senior Executives Workshop of Certainteed Corporation, December 1983.

"The Economic Outlook for the San Antonio Metropolitan Area."  Address delivered to the 1984 San Antonio Economic Outlook Conference (including projections for 1984 from the San Antonio SMSA Econometric Model), San Antonio, Texas, January 1984.

"Technology Developments in Texas and the United States."  Address delivered to the Heart of Texas Lions Club, Waco, Texas, March 1984.

"The Current Environment for State Expansion in Technology Industries."  Address delivered to the Waco Kiwanis Club, Waco, Texas, March 1984.

"Central Texas as a Strategic Location for Economic Growth and Technological Expansion."  Address delivered to the Waco Rotary Club, Waco, Texas, March 1984.

"Educational Patterns in a Technological Environment."  Address delivered to the Baylor Alumni Association, Fort Worth, Texas, April 1984.

"The Economic Outlook for Texas Financial Institutions."  Address delivered to the 1984 Senior Financial Executives Seminar of the Center for Banking and Financial Institutions of the Texas Bankers Association, April 1984.

"The Long-Range Outlook for the Sun Belt."  Address delivered to the Economic Development Institute, Dallas, Texas, May 1984.

"The Texas Economy in 1984 and 1985."  Address delivered to the 1984 Meeting of the Texas Economic and Demographic Association, Austin, Texas, May 1984.

"Texas Consumption and Sales in 1984 and 1985."  Address delivered to the Annual Conference of the Texas Recreational Vehicle Association, July 1984.

"The Economic and Financial Outlook for the Coming Two Years."  Address delivered to the Advisory Board of MBank, July 1984.

"Basic Industrial Growth Patterns in a Regional Economy."  Address delivered to the Leadership Waco Forum of the Waco Chamber of Commerce, Waco, Texas, July 1984.

"Economic Analysis as a Strategic Planning Tool: An Implementation Strategy."  Address delivered to the 1984 Strategic Planning Seminar of the Center for Banking and Financial Institutions and the Texas Bankers Association, August 1984.

"The Technology Industries in Texas: A Comprehensive Overview and Some Surprising Results."  Address delivered to the 1984 Texas Lyceum, Dallas, Texas, September 1984.

"The Economies of Texas and the Lower Rio Grande Valley."  Address delivered to the 1984 Hidalgo County Economic Outlook Conference (including projections from the McAllen-Pharr-Edinburg Metropolitan Area Econometric Model), McAllen, Texas, October 1984.

"The Outlook for Economic Development in Texas."  Address delivered to the Fall Planning Conference of the Texas Economic Development Commission, Austin, Texas, October 1984.

"The Outlook for Texas and the Galveston-Texas City Area."  Address delivered to the 1984 meeting of the Galveston County Lyceum Association (including projections from the Galveston-Texas City Metropolitan Area Econometric Model), Galveston, Texas, October 1984.

"The Outlook for Texas and the Victoria County Metropolitan Area."  Address delivered to the Victoria Metropolitan Area Economic Outlook Conference (including projections from the Victoria County Metropolitan Area Econometric Model), Victoria, Texas, December 1984.

"The Outlook for Texas and the Abilene Metropolitan Area."  Address delivered to the 1984 Abilene Chamber of Commerce Economic Outlook Conference (including projections from the Abilene Metropolitan Area Econometric Model), Abilene, Texas, December 1984.

"The National and State Economy in 1985."  Address delivered to the 1984 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, December 1984.

"The Economic Outlook for Texas and the Dallas/Fort Worth Metropolitan Area."  Address delivered to the Texas Bankers Association Dallas/Fort Worth Economic Outlook Conference (sponsored jointly with Wharton Econometric Forecasting Associates and Baylor University Forecasting Service), Dallas, Texas, February 1985 (including projections for the Texas and Dallas/Fort Worth Econometric models).

"The Economic Outlook for Texas and the Houston Metropolitan Area."  Address delivered to the Texas Bankers Association Houston Economic Outlook Conference (sponsored jointly with Wharton Econometric Forecasting Associates and Baylor University Forecasting Service), Houston, Texas, February 1985 (including projections from the Texas and Houston-Galveston-Brazoria Econometric models).

"The Future of Texas and San Antonio to the End of the Century."  Address delivered to the Future '85 and Beyond Economic Outlook Conference (including projections from the San Antonio Metropolitan Area Econometric Model), San Antonio, Texas, February 1985.

"Economic Development Prospects of the Central Corridor."  Seminar series sponsored by Heart of Texas Council of Governments, Waco, Texas, March 1985.

"Economic Prospects in the Texas Banking Industry."  Address delivered to the Senior Financial Executives Seminar of the Center for Banking and Financial Institutions and the Texas Bankers Association, April 1985.

"Economic and Demographic Patterns in Texas."  Address delivered to Texas Newspaper Circulation Managers Association, Waco, Texas, April 1985.

"Economic and Philanthropic Patterns in the Southwest."  Address delivered to the Economic Development Institute, May 1985.

"The Prospects for Economic Development in the Regions of Texas."  Address delivered to the First Regional Development Workshop of the Texas Economic Development Commission, May 1985.

"The Economic Prospects for the Temple/Killeen Area."  Address delivered to the Executive Board of the Central Texas Private Industry Council, Temple, Texas, July 1985.

"The Economic Prospects for the Heart of Texas."  Seminar delivered to the Leadership Waco Program of the Greater Waco-McLennan County Chamber of Commerce, Waco, Texas, September 1985.

"The Economic Prospects for the Abilene Metropolitan Area."  Address delivered for the 1985 Abilene Economic Outlook Conference, Abilene, Texas, October 1985 (including projections for the Abilene Econometric Model).

"Growth Potential and Relative Attractiveness of the Central Sector of the I-35 Corridor."  Address delivered to the Executive Forum of the Heart of Texas Council of Governments, Waco, Texas, October 1985.

"The Economic Outlook for the United States, Texas, and the Austin County Area."  Address delivered to the 1985 Austin County Economic Outlook Conference, Bellville, Texas, October 1985 (including projections from the Bellville/Austin County Econometric Model).

"The Outlook for the United States, Texas, and the McAllen-Pharr-Edinburg Metropolitan Area."  Address delivered to the 1985 Hidalgo County Economic Outlook Conference, McAllen, Texas, October 1985 (including projections from the McAllen-Pharr-Edinburg Econometric Model).

"The Outlook for Demographic Expansion in Selected Texas Areas."  Address delivered to Senior Executives at the Fall Planning Conference of GTE of the Southwest, Dallas, Texas, October 1985.

"Economic Perspectives for 1986."  Address delivered to Senior Executives of Alamo Corporation of Texas, McAllen, Texas, October 1985.

305

"The Economic Outlook for Texas and the Houston Metropolitan Area."  Address delivered to the 1985 Economic Outlook Conference of the Texas Economic and Demographic Association, Houston, Texas, November 1985.

"The Economic Outlook for the United States, Texas, and the Victoria Metropolitan Area."  Address delivered to the 1985 Victoria Economic Outlook Conference, Victoria, Texas, December 1985 (including projections from the Victoria Econometric Model).

"The Outlook for National and State Business Activity."  Address delivered to the 1985 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, December 1985.

"The Economic Outlook for Texas and the Southwest."  Address delivered to the 1985 Economic Forum for the Texas Credit Union League, Dallas, Texas, December 1985.

"The Economic Outlook for Texas and the Dallas/Fort Worth Area."  Address delivered to the 1985 Economic Outlook Conference of the Fort Worth Chamber of Commerce, Fort Worth, Texas, December 1985.

"The Outlook for Texas after the OPEC Announcement."  Address delivered to the Financial Executives Institute, Dallas, Texas, December 1985.

"The Economic Outlook for the El Paso Metropolitan Area."  Address delivered to the 1986 El Paso Economic Outlook Conference, El Paso, Texas, January 1986 (including projections from the El Paso Econometric Model).

"A Strategic Forecast for the Texas Economy."  Address delivered to the Governor's Executive Development Program of the State of Texas, Austin, Texas, February 1986.

"Ten Major Elements of the Texas Economic Scene."  Address delivered to the 1986 Executive Development Seminar of Southwest Texas State University, San Marcos, Texas, February 1986.

"The Economic Outlook for the Midland Metropolitan Area."  Address delivered to the 1986 Midland Economic Outlook Conference, Midland, Texas, February 1986 (including projections from the Midland Econometric Model).

"The Economic and Financial Outlook for Texas and Its Planning Regions."  Film series developed, written, and narrated for the Regional Chief Executive Conference Series of the Texas Bankers Association, March 1986.

"Economic Trends in the Metroplex."  Address delivered to the Rotary Club of Irving, Irving, Texas, March 1986.

"A Perspective on National Economic and Financial Trends."  Address delivered to the 1986 Conference of the National Institute of Credit, April 1986.

"Factors Shaping the New Texas."  Address delivered as Invited Participant in The Future of Texas: A Sesquicentennial Forum program sponsored by the Lyndon Baines Johnson School of Public Affairs of The University of Texas, Austin, Texas, April 1986.

"A Short-Range and Long-Range Analysis of the Texas Economy."  Address delivered to the Executive Leadership Seminar of the Center for Banking and Financial Institutions, April 1986.

"The Economic Outlook for Texas and the Austin/San Antonio Corridor."  Address delivered to the 1986 Austin/San Antonio Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, San Antonio, Texas, April 1986 (including projections from the Texas, Austin, and San Antonio Econometric Models).

"The Economic Outlook for Texas and the Dallas/Fort Worth Metropolitan Area."  Address delivered to the 1986 Dallas/Fort Worth Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, Dallas, Texas, April 1986 (including projects from the Texas, Dallas, and Fort Worth Econometric Models).

"The Economic Outlook for Texas and the Houston Metropolitan Area."  Address delivered to the 1986 Houston Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, Houston, Texas, April 1986 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Models).

"The Economic Outlook for the West Texas and Panhandle Area during a Business Transition."  Address delivered to the Management in a Transitional Economy Seminar sponsored by Southwest Lubbock National Bank, Lubbock, Texas, May 1986.

"The Real Estate Outlook for Texas and Its Major Metropolitan Areas."  Address delivered to Economic/Investment Conference sponsored by Holiday, Fenoglio and Associates, Houston, Texas, May 1986.

"The Texas Economic and Financial Outlook."  Address delivered to the 1986 Conference of the Texas Savings and Loan League, Orlando, Florida, June 1986.

"Economic Development Along the Central I-35 Corridor."  Series of four seminars sponsored by the Central Texas Economic Development District, the Heart of Texas Council of Governments, and the Central Texas Council of Governments, June 1986.

"The Economic Outlook for East Texas in the Wake of the World Oil Price Collapse."  Address delivered to the Longview Economic Outlook Conference, Longview, Texas, June 1986.

"The San Antonio Economy in Relation to that of Texas."  Address delivered to the 1986 Outlook Seminar of the National Association of Industrial and Office Parks, San Antonio, Texas, June 1986.

"The Texas Economy and the Oil Crisis."  Address delivered to the Waco Rotary Club, Waco, Texas, July 1986.

"The Texas Econometric Model: Its Structure, Data Base, and Regional Properties." Seminar delivered to Texas Utilities Electric Company, August 1986.

"The Outlook for the Texas Market Area."  Address delivered to the Fall Planning Conference of A. H. Belo Corporation, Dallas, Texas, August 1986.

"The Economic Outlook for Texas and Its Regions."  Address delivered to the 1986 Conference of the Texas Association of Counties, Austin, Texas, August 1986.

"The Economy of Texas and Its Municipalities."  Seminar delivered to Arthur Andersen and affiliated companies, Chicago, Illinois, August 1986.

"The Future of the East Texas Economy."  Keynote address delivered to the 1986 United Way Banquet, Longview, Texas, September 1986.

"The External Economic Environment and the Banking Industry."  Address delivered to the Seminar for Lending Officers of the American Bankers Association, September 1986.

"The Short-Term and Long-Term Perspective on the Texas Economy."  Address delivered to the Fall Planning Conference of Texas American Bancshares, Fort Worth, Texas, September 1986.

"The Economic Outlook for Texas and the Fort Worth Area."  Address delivered to the Annual Economic Outlook Conference of the Fort Worth Chamber of Commerce, Fort Worth, Texas, October 1986.

"The Economic Outlook for Texas and the Forestry Industry."  Address delivered to the 1986 Conference of the Texas Forestry Association, Lufkin, Texas, October 1986.

"Prospects for the Texas Real Estate Markets."  Address delivered as Invited Participant, Conference on Real Estate Market Analysis sponsored by Texas A&M Real Estate Research Center, Austin, Texas, October 1986.

"The Current Prognosis for Texas Banking."  Address delivered to the Economic Advisory Council of InterFirst Bank, Temple, Texas, October 1986.

"The Long-Term Outlook for Texas and the Communications Industry."  Address delivered to the Fall Planning Conference of GTE of the Southwest, Dallas, Texas, October 1986.

"The Short-Term Outlook for the McAllen-Edinburg-Mission Metropolitan Area."  Address delivered to the Lower Rio Grande Valley Economic Outlook Conference, McAllen, Texas, October 1986 (including projections from the McAllen-Edinburg-Mission Econometric Model).

"The Texas Economy and the Use of Area Economic Indicators."  Address delivered to the Planning Conference of the Greater Austin-San Antonio Corridor Council, San Marcos, Texas, October 1986.

"The Short-Term Economic Outlook for the United States and Texas."  Address delivered to the 1986 Abilene Economic Outlook Conference, Abilene, Texas, October 1986.

"A Long-Term Perspective on the Regional Economy."  Address delivered to the 1986 US Long-Term Economic Outlook Meeting of Wharton Econometric Forecasting Associates, Houston, Texas, November 1986.

"A Perspective on the Role of Information in Economic Development."  Interviews series for National Public Radio, November 1986.

"The Concept of Regional Cooperation in Economic Development."  Address delivered to the Rotary Club of Waco (sponsored by Heart of Texas Council of Governments and Central Texas Economic Development District), Waco, Texas, November 1986.

"The Economic Outlook for Texas and its Regions."  Address delivered to the Biennial Planning Conference of Lawyers Title Insurance Company, Dallas, Texas, November 1986.

"The Economic Outlook for South Texas."  Address delivered to the 1986 Joint Conference of the Bank Administration Institute and the Texas Society of Certified Public Accountants, San Antonio, Texas, November 1986.

"The Texas Real Estate Outlook."  Address delivered to the 1986 Annual Meeting of the Greater San Antonio Builders Association, San Antonio, Texas, November 1986.

"The Short-Term Outlook for Economic Activity in the United States and Texas."  Address delivered to the 1986 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, December 1986.

"The Outlook for the United States and Texas in 1987."  Address delivered to the Annual Planning Conference of Southwest Corporate Federal Credit Union, Dallas, Texas, December 1986.

"Economic Perspectives."  Series of interviews for Today's Business (nationally syndicated television program), January 1987.

"The Future of Texas and the Challenge of Public Education."  Video presentation prepared for the Texas School Boards Association, January 1987.

"The Future of Agriculture in Texas and the East Texas Area."  Address delivered to the East Texas Bankers Association Agricultural Conference, Tyler, Texas, January 1987.

"The Outlook for Texas and the Mid-Cities Area."  Address delivered to Mid-Cities Economic Outlook Conference, Arlington, Texas, January 1987.

"The Short-Term Outlook for Texas and the Houston Area."  Address delivered to the 1987 Houston Economic Outlook Conference sponsored jointly by the Texas Bankers Association, Baylor University Forecasting Service, and Wharton Econometric Forecasting Associates, Houston, Texas, January 1987 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Model).

"The Short-Term Outlook for Texas and the Dallas/Fort Worth Area."  Address delivered to the 1987 Dallas/Fort Worth Economic Outlook Conference sponsored jointly by the Texas Bankers Association, Baylor University Forecasting Service, and Wharton Econometric Forecasting Associates, Dallas, Texas, January 1987 (including projections from the Texas, Dallas, and Fort Worth Econometric Models).

"The Short-Term Outlook for Texas and the Austin and San Antonio Area."  Address delivered to the 1987 San Antonio/Austin Economic Outlook Conference sponsored jointly by the Texas Bankers Association, Baylor University Forecasting Service, and Wharton Econometric Forecasting Associates, San Antonio, Texas, January 1987 (including projections from the Texas, Austin, and San Antonio Econometric Models).

"The Economic Outlook for the Midland Metropolitan Statistical Area."  Address delivered to the 1987 Midland Economic Outlook Conference, Midland, Texas, February 1987 (including projections from the Midland Econometric Model).

"A Regional Approach to Economic and Technological Development."  Address delivered to the Inaugural Conference of the Texas A&M University Center for Technology Business Development, College Station, Texas, February 1987.

"Strategies and Targets for Business Development in the Longview-Gregg County Area."  Address delivered to the Economic Development Seminar of the Longview Chamber of Commerce, Longview, Texas, February 1987.

"Economic Diversification and Development: Some Lessons for the Future of Texas."  Address delivered to the Annual Texas Legislative Conference, New Braunfels, Texas, March 1987.

"A Perspective on the Economies of Texas and the Houston Metropolitan Area."  Address delivered to the River Oaks Breakfast Club, Houston, Texas, March 1987.

"The Texas Economy: Long-Term and Short-Term Perspectives."  Address delivered to the Dallas Cash Management Association, Dallas, Texas, March 1987.

"The Challenge of the Media in the Economic Development of Texas."  Address delivered to the Texas Association of Broadcasters Television Executives Meeting, Austin, Texas, March 1987.

"The Healthcare Industry and the Texas Economy".  Address delivered to the 1987 Healthcare Conference of the Texas Society of Certified Public Accountants, Austin, Texas, April 1987.

"Implementation of a Strategic Plan for Industrial Revitalization in the Tyler-Smith County Area."  Address delivered to the Tyler Industrial Foundation Economic Development Seminar, Tyler, Texas, April 1987.

"The Houston Area: Perspectives on Economic Development."  Address delivered to the Baylor University Covenant Campaign Kick-off Luncheon, Houston, Texas, April 1987.

"The Economic Prospects for the East Texas Area."  Address delivered to Leadership
Tyler-Leadership Longview Joint Seminar, Tyler, Texas, April 1987.

"Building from Strength: An Approach to Business Development."  Address delivered to
the Jim Wells County Master Planners, April 1987.

"A Short-Range and Long-Range Perspective on the Texas Economy."  Address
delivered to the 1987 Conference of the Texas Society of Certified Public
Accountants, San Antonio, Texas, May 1987.

"The Sales Outlook for the Gulf Coast Area."  Address delivered to the Houston
Automobile Dealers Association, Houston, Texas, May 1987.

"Texas and the Houston Area: A Short-Term Economic Outlook."  Address delivered to
the 1987 Conference of the Houston Credit Union Association, Houston, Texas,
May 1987.

"Industrial Prospects and Regional Cooperation in East Texas."  Address delivered to the
Longview Chamber of Commerce Industrial Appreciation Breakfast, Longview,
Texas, May 1987.

"The Economic Future of Texas and the Southern I-35 Corridor."  Address delivered to
the Grand Opening and Economic Outlook Seminar sponsored by NBC-Austin,
Austin, Texas, May 1987.

"The Economy of Texas and the Dallas/Fort Worth Area: Some Thoughts on Future
Development."  Address delivered to the Salesmanship Club of Dallas, Dallas,
Texas, June 1987.

"The Economic and Financial Outlook for Texas."  Address delivered to the 1987 Annual
Conference of the Texas Instruments Federal Credit Union, Kerrville, Texas,
June 1987.

"The Future Path of Economic Development in East Texas."  Address delivered to the
1987 Leadership Palestine Commencement Program, Palestine, Texas, June 1987.

"The Texas Housing Market: A Regional Perspective."  Seminar delivered to senior
executives of Mortgage Guaranty Insurance Company, Dallas, Texas, July 1987.

"The Financial and Loan Portfolio Outlook for the San Antonio Economy."  Address
delivered to the Board of Directors of Texas Commerce Bank, San Antonio,
Texas, July 1987.

"Economic Development and Revenue Potential in the Dallas Area."  Address delivered
to the Dallas City Council, Dallas, Texas, July 1987.

"Strategies for Economic Development in East Texas."  Address delivered to the
Economic Development Workshop of the Palestine Chamber of Commerce,
Palestine, Texas, August 1987.

"The Outlook for Financial Markets in Selected Metropolitan Areas."  Address delivered
to the Board of Directors of First Union Corporation, Charlotte, North Carolina,
August 1987.

"The Economic Potential of the Palestine-Anderson County Area: Strategies for Success."  Address to the Economic Symposium of the Palestine Industrial Foundation, Palestine, Texas, August 1987.

"Optimism and Economic Development: The Role of the Individual in Community Development."  Address delivered to the Optimist Club of Waco, Waco, Texas, August 1987.

"Economic Activity in the Southwestern Region of the United States."  Address delivered to the Annual Planning Conference of Southwestern Bell Telephone Company, Boca Raton, Florida, September 1987.

"The Impact of Federal Spending on the Economy of Texas and its Regions."  Address delivered to the 1987 Texas Lyceum, San Antonio, Texas, September 1987.

"The Community Bank and its Role in Community Development: A Perspective."  Address delivered to the 1987 Conference of the Independent Bankers Association of Texas, San Antonio, Texas, September 1987.

"The Economic Prospects for Major Texas Markets."  Address delivered to the 1987 Conference of the Texas Rental Association, Fort Worth, Texas, September 1987.

"The Lending Environment in the Texas Economy during the Current Transition."  Address delivered to the 1988 Commercial Lending School of the American Bankers Association, Waco, Texas, September 1987.

"Central Texas Economic Development: Past, Present, and Future."  Address delivered to the 1987 Leadership Waco Program, Waco, Texas, September 1987.

"The Economic Outlook for Texas and Montgomery County."  Address delivered to the Woodlands Economic Outlook Conference, The Woodlands, Texas, October 1987 (including projections from the Montgomery County Econometric Model).

"A Global Perspective on the Economic Outlook for Texas."  Address delivered to the 1987 Planning Conference for Browning-Ferris Industries, Tucson, Arizona, October 1987.

"Prospects for West Texas Economic Development."  Address delivered to the Baylor University Alumni Business Forum, Abilene, Texas, October 1987.

"Economic Development Strategies and Opportunities."  Address delivered to the Rotary Club of Beaumont, Beaumont, Texas, October 1987.

"The Role of Local Leadership in Community Economic Development."  Inaugural address delivered to the 1987-88 Leadership Tyler Program, Tyler, Texas, October 1987.

"Economic Development and Economic Growth in the East Texas Area."  Address delivered to the Economic Development Seminar for Correspondent Banks sponsored by First Republic Bank, Tyler, Texas, October 1987.

"Recommendations for Industrial Recruitment and Economic Development in the Alice-Jim Wells County Area."  Address delivered to the Economic Development Seminar of the Alice Industrial Foundation, Alice, Texas, October 1987.

"Economic Development Initiatives and Alternatives for the South Texas Market Area."  Address delivered to the Economic Development Seminar of the Bee County Chamber of Commerce, Beeville, Texas, November 1987.

"The Prospects for the Gulf Coast Economy in 1988."  Address delivered to the Houston Rotary Club, Houston, Texas, November 1987.

"The Outlook for Texas and West Texas in 1988."  Address delivered to the 1987 Abilene Economic Outlook Conference, Abilene, Texas, November 1987.

"The Economic Environment and the Texas Housing Market."  Address delivered to the Strategic Planning Conference of Lawyers Title Insurance Company, Dallas, Texas, November 1987.

"The Prospects for Economic Activity in Northeast Texas."  Address delivered to the 1987 Economic Outlook Conference sponsored by First Republic Bank—Mt. Pleasant, Mt. Pleasant, Texas, November 1987.

"Economic Diversification, Leadership, and Community Progress."  Address delivered to the 1987 Leadership Corsicana Program, Corsicana, Texas, November 1987.

"The Future of Texas: Local Action for Economic Development."  Address delivered as Invited Plenary Panelist to the Future 1990 Conference sponsored by the Lyndon B. Johnson School of Public Affairs, the Dallas Morning News, and Texas Monthly, Dallas, Texas, November 1987.

"The Real Estate Market in 1988: What Lies Ahead?"  Address delivered to the 1988 Realtor Awards Program of Guy Chipman and Associates, San Antonio, Texas, November 1987.

"The Role of Information in an Economic Development Strategy for the Tri-County Area."  Address delivered to the Tri-County Seminar on Economic Development, Mt. Pleasant, Texas, November 1987.

"The Economic Outlook for the United States, Texas, and the Victoria Metropolitan Area."  Address delivered to the 1987 Victoria Economic Outlook Conference, Victoria, Texas, December 1987 (including projections from the Victoria Metropolitan Area Econometric Model).

"The Outlook for Financial Institutions and Real Estate Markets in 1988."  Address delivered to the Board of Directors of the Texas Bankers Association, Dallas, Texas, December 1987.

"The Outlook for Business Activity in Texas and the United States."  Address delivered to the 1987 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, December 1987.

"The Outlook for the National and Southwestern Economy in 1988."  Address delivered to the 1987 Annual Meeting of Southwest Corporate Federal Credit Union, Dallas, Texas, December 1987.

"The Real Estate Outlook for the Austin Economy."  Address delivered to the Austin Real Estate Revolution Seminar sponsored by Builders Update, Austin, Texas, December 1987.

"The Economic Outlook in the Dallas Retail Market."  Quarterly Seminar Series for DallaStats, 1988-1989.

"The Economic Outlook for Texas and San Antonio: A Short-Term and Long-Term Perspective."  Address delivered to the 1988 Economic Outlook Conference of the San Antonio Chamber of Commerce, San Antonio, Texas, January 1988.

"The Role of Federal Insurance and Regulation in the Thrift Crisis."  Interview series for Money Radio, Los Angeles, California, January 1988.

"The Economic Outlook for Texas in 1988."  Address delivered to the 1988 Annual Meeting of Texas State Optical, Austin, Texas, January 1988.

"The Dallas Economy and Real Estate Market in 1988."  Address delivered to the Dallas City Council, Dallas, Texas, January 1988.

"Agriculture in the Texas Economy: Prospects for Business Development."  Address delivered to the 1988 Annual Meeting of the Blackland Income Group, Waco, Texas, January 1988.

"The Current Outlook for the Economy of Texas and the Dallas/Fort Worth Metropolitan Area."  Address delivered to the 1988 Texas Bankers Association-Baylor-Wharton Dallas/Fort Worth Economic Outlook Conference, Dallas, Texas, January 1988 (including projections from the Texas, Dallas, and Fort Worth Econometric Models).

"The Current Outlook for the Economy of Texas and the Houston Metropolitan Area."  Address delivered to the 1988 Texas Bankers Association-Baylor-Wharton Houston Economic Outlook Conference, Houston, Texas, January 1988 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Models).

"The Current Outlook for the Economy of Texas and the Austin and San Antonio Metropolitan Areas."  Address delivered to the 1988 Texas Bankers Association-Baylor-Wharton Austin/San Antonio Economic Outlook Conference, San Antonio, Texas, January 1988 (including projections from the Texas, Austin, and San Antonio Econometric Models).

"The Economic Outlook for Texas and the Rio Grande Valley in 1988."  Address delivered to the Valley Retail Sales Outlook Conference, McAllen, Texas, January 1988.

"The Financial Outlook for 1988."  Address delivered to the East Texas Chapter of the Bank Administration Institute, Henderson, Texas, January 1988.

"A Perspective on Metropolitan and Non-Metropolitan Retail Markets."  Address delivered to marketing and planning personnel from Diamond-Shamrock, Inc., San Antonio, Texas, January 1988.

"The Economic Outlook for South Texas: The Time is Now."  Address delivered to the 1988 Planning Conference of Central Power and Light, Corpus Christi, Texas, February 1988.

"Economic Prospectus and Economic Diversification: Some Lessons for the Deep East Texas Area."  Address delivered to the First City Economic Seminar, Lufkin, Texas, February 1988.

"Building an Economy from Strength: Lessons for Local Action."  Address delivered to the Austin Rotary Club, Austin, Texas, February 1988.

"Emerging Patterns in the Global Economy."  Address delivered to the Board of Directors of the Southern Baptist Annuity Board, Dallas, Texas, February 1988.

"The Economic Challenge of the 1980s."  Address delivered to the Large Church Conference of the Baptist General Convention of Texas, Dallas, Texas, February 1988.

"Real Estate Markets: An Analysis of Future Challenges."  Address delivered to the Waco Board of Realtors, Waco, Texas, February 1988.

"Effective Community Organization and the Prospects for Economic Development."  Address delivered to the Southeast Texas Economic Summit, Beaumont, Texas, February 1988.

"The Challenge of Local Involvement in Economic Development."  Address delivered to the Baylor University Alumni Economic Outlook Banquet, Temple, Texas, February 1988.

"The Prospects for National and Regional Business Activity."  Address delivered to the 1988 Annual Conference of the Southern Newspaper Publishers Association, San Antonio, Texas, February 1988.

"Information, Modeling Systems, and the Restructuring of the Texas Economy."  Address delivered to the Baylor Development Council, Waco, Texas, February 1988.

"The Economic Prognosis for Texas."  Address delivered to the 1988 Annual Meeting of the Texas Bankers Association (District 7), Abilene, Texas, March 1988.

"Economic Development, Local Initiatives, and Information Resources."  Address delivered to the 1988 Conference of American Association of Government Marketing Assistance Systems, Beaumont, Texas, March 1988.

"The Job Creation Process and Economic Development."  Address delivered to the Texas Pension Fund and Venture Capital Conference, Houston, Texas, March 1988.

"The Economic Outlook for the Dallas Area."  Address delivered to the Baylor University Corporate Executives Luncheon, Dallas, Texas, March 1988.

"The Future of the East Texas Economy."  Address delivered to the 1988 Annual Banquet of the Hallsville Chamber of Commerce, Hallsville, Texas, March 1988.

"The Economic Challenges Confronting Texas in the Next Decade."  Address delivered to the 1988 Management Issues Forum of the Texas Bankers Association, Dallas, Texas, March 1988.

"Economic Perspectives for 1988."  Address delivered to the 1988 Planning Seminar of Stanley Smith Security, San Antonio, Texas, March 1988.

"The Prognosis for Industrial Expansion and Economic Development in the Cities of Texas."  Address delivered to the 1988 Conference of the Texas Municipal League, Lufkin, Texas, April 1988.

"Global Forces Shaping Economic and Investor Behavior."  Seminar delivered to the Board of Directors and Senior Management of Rosewood Corporation, Dallas, Texas, April 1988.

"Career Opportunities in the Texas Economy."  Address delivered to the Dedication Ceremony of the Graduate Center, Hankamer School of Business, Baylor University, Waco, Texas, April 1988.

"The Role of Utilities and Related Interests in Promoting Economic Development and Prosperity."  Address delivered to the Legislative Issues Conference of Texas Utilities Electric Company, Austin, Texas, April 1988.

"The Future is Now: The Role of the Business Community is Promoting Economic Development."  Address delivered to the 1988 Annual Banquet of the McKinney Chamber of Commerce, McKinney, Texas, April 1988.

"Future Patterns in the Economy of the Dallas/Fort Worth Area."  Address delivered to the Dallas/Fort Worth Corporate Development Seminar, Dallas, Texas, April 1988.

"The Philanthropic Challenge of the Modern Economy."  Address delivered to the 1988 Annual Meeting of the National Executives Association, Austin, Texas, April 1988.

"The Real Estate Situation and the Texas Thrift Institutions."  Address delivered to the 1988 Conference of the Texas Savings and Loan League, San Antonio, Texas, April 1988.

"The Recovery Process in the Texas Real Estate Market."  Address delivered to the Dallas Real Estate Market Outlook Conference sponsored by M/PF Research, Dallas, Texas, April 1988.

"The Outlook for Business Activity in the Denton County Area."  Address delivered to the 1988 Outlook Conference of the Denton County Chamber of Commerce, Denton, Texas, May 1988.

"The Residential Housing Market in Texas: An Assessment of Current Demand, Supply, and Investment Potential."  Address delivered to the 1988 Annual Meeting of the Texas Apartment Association, San Antonio, Texas, May 1988.

"An Assessment of Business and Real Estate Market Conditions in the Dallas Metropolitan Area."  Address delivered to the Dallas Cash Management Association, Dallas, Texas, May 1988.

"Some Solutions to the Real Estate Finance Dilemma."  Interview series for <u>Money Radio</u>, Los Angeles, California, May 1988.

"The Effect of Constructing a Fixed Rail System on Spending, Earnings, and Employment in Dallas/Fort Worth and the North Texas Region."  Seminar delivered for Dallas Area Rapid Transit, Dallas, Texas, May 1988.

"The Role of Agricultural Processing in the Future Economic Development of Texas."  Address delivered to the 1988 Conference of the Texas AgriBusiness Electric Council, College Station, Texas, May 1988.

"Economic Development and Information: The Texas Experience."  Address delivered to the 1988 Conference of the American Chambers of Commerce Researchers Association, Houston, Texas, June 1988.

"The Role of the City in Securing Economic Development."  Address delivered to the 1988 Conference of the Texas City Managers Association, Amarillo, Texas, June 1988.

"The Texas Economy: A Very Long-Term Perspective."  Address delivered to the 1988 Conference of the Texas Society of Association Executives, Houston, Texas, June 1988.

"The Role of Small Business Initiatives in the Economic Development Process."  Address delivered to the 1988 Economic Development Conference of the United States Department of Housing and Urban Development, Beaumont, Texas, June 1988.

"An Economic Outlook for Service Activity in the Dallas/Fort Worth Area."  Address delivered to the 1988 Annual Meeting of the Dallas Life Underwriters Association, Dallas, Texas, June 1988.

"A Perspective on the International Competitiveness of the United State in a Technological World."  Address delivered to the Futures Retreat of A. H. Belo Corporation, Dallas, Texas, June 1988.

"Future Patterns in Texas Real Estate Markets."  Address delivered to the Senior Management and Board of Directors of Justin Industries, Fort Worth, Texas, June 1988.

"The Role of Regional Leadership and Cooperation in Fostering Economic Development."  Address delivered to the 1988 Joint Meeting of Leadership Tyler and Leadership Longview, Longview, Texas, June 1988.

"The Economic Considerations Involved in the Development of the Texas High Speed Rail Project."  Address delivered to the High Speed Rail Transportation Conference of the Houston Chamber of Commerce, Houston, Texas, June 1988.

"The Outlook for Texas and the Healthcare Industry."  Address series delivered to the 1988 Healthcare Conference of the Texas Society of Certified Public Accountants, Dallas and Houston, Texas, June 1988.

"The Future Foreclosure Patterns for the Texas Economy."  Address delivered to the Senior Management of Swiss Reinsurance, Houston, Texas, June 1988.

"The Prognosis for Business and Financial Activity in the United States and the Southwest: Overview and Strategic Planning Considerations."  Seminar series delivered to the Corporate Credit Union of Arizona Strategic Planning Seminar, Phoenix, Arizona, July 1988.

"The Challenge of Texas Banking in the Years Ahead."  Address delivered to the 1988 Examiners Conference of the Federal Deposit Insurance Corporation, Dallas, Texas, July 1988.

"The Retail Sales Outlook for Texas and the Southwest."  Address delivered to the 1988 Regional Sales Conference of General Motors Corporation, Dallas, Texas, July 1988.

"The Economic Outlook for Rural Texas in 1989."  Address delivered to the 1988 Conference of the Association of Texas Electric Cooperatives, Fort Worth, Texas, July 1988.

"The Outlook for Texas Financial and Economic Markets."  Address delivered to the Board of Directors and Senior Management of First Union Corporation, Charlotte, North Carolina, August 1988.

"The Economic Outlook and the Construction Sector."  Address delivered to the 1988 Annual Meeting of the Southern Lumber Association, San Antonio, Texas, August 1988.

"The Future of Texas and Community Leadership and Support."  Address delivered to the 1988 Five Outstanding Young Texans Program of the Texas Jaycees, Waco, Texas, August 1988.

"Economic Expansion in the East Texas Area: An Agenda for Action."  Seminar series sponsored by the East Texas Private Industry Council and The University of Texas Health Center, August 1988.

"The Future Course of Thrift Institutions in the Southwest."  Address delivered to the 1989 National Mortgage Conference of the National Council of Savings Institutions, Washington, DC, September 1988.

"The Outlook for Commercial Real Estate Markets in the Major Cities of Texas."  Address delivered to the National Association of Industrial and Office Parks, Austin, Texas, September 1988.

"The Investment Climate in the Texas Economy."  Address delivered to the Client Investment Seminar of Rotan Mosle, Inc., Dallas, Texas, September 1988.

"A Program for Industrial Recruitment and Small Business Creation in the Angelina County Area."  Address delivered to an Economic Development Seminar sponsored jointly by the Angelina County Chamber of Commerce, the Lufkin Rotary Club, and the Diboll Rotary Club, Diboll, Texas, September 1988.

"The Economic Challenge of the Metroplex."  Address delivered to the Annual Meeting of the North Dallas Chamber of Commerce, Dallas, Texas, September 1988.

"The Role of Small Business Development in Local Job Creation."  Address delivered to the 1988 US Presidential Forum on Job Creation, September 1988.

"The Global Economy in Transition: Challenges for the Communications Industry."  Seminar series delivered to senior management of Southwestern Bell Corporation, St. Louis, Missouri, October 1988.

"Community Participation in the Economic Development of Smaller Cities."  Address delivered to Leadership Corsicana, Corsicana, Texas, October 1988.

"Economic Dislocations and Community Initiatives: Strategic Patterns in Business Development."  Address Delivered to the Community Outlook Seminar of the Lake Granbury Chamber of Commerce, Granbury, Texas, October 1988.

"The Outlook for Business Activity in Texas in the Coming Year."  Address delivered to the Abilene Economic Outlook Conference, Abilene, Texas, October 1988.

"The Short-Term Outlook for Texas and Fort Worth: A Forecast with Emphasis on New Initiatives for Economic Development."  Address delivered to the 1988 Economic Outlook Conference of the Fort Worth Chamber of Commerce, Fort Worth, Texas, October 1988.

"Business Incubators and Economic Development."  Address delivered at the Inauguration of the Heart of Texas Business Resource Center, Waco, Texas, October 1988.

"Real Estate Performance in the Secondary Housing Market of Texas."  Seminar conducted for the Senior Management of Mortgage Guaranty Insurance Corporation, October 1988.

"A Retrospective and Prospective on the Metroplex Economy."  Address delivered to the Fort Worth Business Guild Luncheon, Fort Worth, Texas, October 1988.

"The Challenge of Commercial Lending in the Contemporary Texas Economy."  Address delivered to the 1988 Commercial Lending Seminar of the American Bankers Association, Waco, Texas, October 1988.

"The Near-Term Outlook for Texas and the Nation."  Address delivered to the 1988 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, October 1988.

"The Retail and Service Outlook for Texas in 1989."  Address delivered to the 1988 Texas Marketing Conference of the Southwestern Bell Yellow Pages, Corpus Christi, Texas, November 1988.

"The Role of Public-Private Cooperation in Promoting Community Prosperity."  Address delivered to the inaugural meeting of the McKinney Partnership, McKinney, Texas, November 1988.

"An Assessment of the Impact of the Super Collider and Other Initiatives on the Central Texas Economy."  Address delivered to the Baylor University Development Seminar, Waco, Texas, November 1988.

"The Potential for Value-Added Expansion in the West Texas Economy."  Address delivered to the Midland 100 Conference, Midland, Texas, November 1988.

"The Future Course of International Activity in Texas."  Address delivered to the British American Commerce Association, Dallas, Texas, November 1988.

"The Role of Communications in the Future of Rural America."  Address delivered to the 1988 Annual Conference of the Texas Statewide Telephone Cooperatives, Lake Tahoe, Nevada, November 1988.

"International Forces Shaping the New Economy."  Address delivered to the American Association of University Women, Dallas, Texas, December 1988.

"The Outlook for the National and State Economies in 1989."  Address delivered to the 1988 Conference of the Southwest Corporate Federal Credit Union, Dallas, Texas, December 1988.

"The Impact of the Fujitsu Facility on the Metroplex Economy."  Address delivered at the announcement ceremony of the Fujitsu North American Telecommunications Research Center, Dallas, Texas, December 1988.

"Industrial Recruitment and Strategic Marketing in the Farmers Branch Area."  Address delivered to the City Council of the City of Farmers Branch, Farmers Branch, Texas, December 1988.

"The Role of Information in the Economic Future of the United States."  Address delivered to the 1988 Annual Meeting of Beta Alpha Psi, Waco, Texas, December 1988.

"The Role of the Civil Justice System in Economic Development."  Video presentation written and narrated for Texas Chambers of Commerce, January 1989.

"The Long-Term Outlook for the Victoria Metropolitan Area, with Emphasis on Recent Plant Expansions."  Address delivered to the 1989 Victoria Economic Outlook Conference sponsored by First Victoria National Bank, Victoria, Texas, January 1989 (including projections from the Victoria MSA Econometric Model).

"The Effects of the Alamodome on San Antonio."  Seminar series and press conferences sponsored by the Greater San Antonio Chamber of Commerce, San Antonio, Texas, January 1989.

"Marketing the Economic Development Potential of Biomedical Technology Transfer Programs."  Address delivered to the Board of Trustees of Baylor College of Medicine, Houston, Texas, January 1989.

"The Economic Outlook for Texas, with Emphasis on the Dallas/Fort Worth Metropolitan Area."  Address delivered to the 1989 Dallas/Fort Worth Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, Dallas, Texas, January 1989 (including projections from the Texas, Dallas, and Fort Worth Econometric Models).

"The Economic Outlook for Texas, with Emphasis on the Houston-Galveston-Brazoria Area."  Address delivered to the 1989 Houston Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, Houston, Texas, January 1989 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Models).

"The Economic Outlook for Texas, with Emphasis on the Austin and San Antonio Metropolitan Areas."  Address delivered to the 1989 Austin/San Antonio Economic Outlook Conference sponsored jointly by Baylor University Forecasting Service, Wharton Econometric Forecasting Associates, and the Texas Bankers Association, San Antonio, Texas, January 1989 (including projections from the Texas, Austin, and San Antonio Econometric Models).

"The Outlook for Construction in Texas in the 1990s."  Address delivered to the 1989 Conference of the Texas Society of Architects, Austin, Texas, January 1989.

"The Challenge of Economic Development in Small Communities."  Address delivered to the 1989 Banquet of the Sabine Chamber of Commerce, Sabine, Texas, January 1989.

"The Texas Economy and the Civil Justice System."  Address delivered to the 1989 Legislative Seminar on Civil Justice and Tort Reform, Austin, Texas, January 1989.

"The Future Occupational Demands in the Texas Economy."  Address delivered to Texas LINK (Job Creation) Project Seminar, Texas State Technical Institute, Waco, Texas, January 1989.

"The Future of Selected Industries in the Dallas/Fort Worth Area."  Address delivered to the Arthur Andersen Management Seminar, Dallas, Texas, January 1989.

"The Economic Outlook for the South Texas Area."  Address delivered to the Laredo Economic Outlook Conference, Laredo, Texas, February 1989.

"The Challenges of the Economic Future."  Address delivered to the Christian Life Commission, Austin, Texas, February 1989.

"The Current Prognosis for the Metroplex Economy."  Address delivered to the 1989 Dallas/Fort Worth Sales Conference of Southwestern Bell Yellow Pages, Dallas, Texas, February 1989.

"Economic Progress in East Texas: Some Opportunities for Smaller Communities."  Address delivered to the Overton Chamber of Commerce, Overton, Texas, February 1989.

"The Future of Texas: A Global Perspective on Competition and Development."  Address delivered to the Governor's Conference on Women, Austin, Texas, February 1989.

"Developmental Initiatives in the Deep East Texas Area: An Agenda for Action."  Address delivered for the Center Chamber of Commerce, Center, Texas, March 1989.

"The Economic and Real Estate Outlook for the Dallas/Fort Worth Area."  Address delivered to the Anderson Capital Management Seminar for Fund Managers, New York, New York, March 1989.

"Future Patterns in the Economy and the Energy Market."  Address delivered to National Association of Natural Gas Producers, Houston, Texas, March 1989.

"The Integrated Economy of the McAllen-Reynosa Area: An Analysis with Emphasis on Twin Plant Operations."  Address delivered to the McAllen Conference on Maquiladoras, McAllen, Texas, March 1989.

"The Economic Development Process: Information, Leadership, and Cooperation."  Address delivered to the Basic Industrial Development Conference of the Texas Industrial Development Council, College Station, Texas, March 1989.

"The Future of Texas: A Perspective on Economic and Demographic Patterns."  Address delivered to the 1989 Church Conference of the Baptist General Convention of Texas, Austin, Texas, March 1989.

"The Current Investment Climate in Texas."  Address delivered to the 1989 Financial Planning Day sponsored by Carter Financial Management, Dallas, Texas, March 1989.

"The Outlook for Energy and the Economy."  Address delivered to the 1989 National Conference of the Gas Processors Association, San Antonio, Texas, March 1989.

"The Prognosis for Investment and Finance in Texas."  Address delivered to the 1989 Fidelity Investment Conference, Dallas, Texas, March 1989.

"The Economy and the Media."  Address delivered to the Texas Public Broadcasting System (PBS) Meeting, Temple, Texas, March 1989.

"The Financial and Real Estate Prognosis for the United States."  Address delivered to the Utah Credit Union Association Annual Meeting, Salt Lake City, Utah, March 1989.

"The Economic Outlook for Texas and the Brazos Valley."  Address delivered to the Bryan/College Station Business Guild, College Station, Texas, April 1989.

"The Future of the Southeast Texas Economy and the Challenge of Regional Development."  Address delivered to Leadership Beaumont, Beaumont, Texas, April 1989.

"The Future of Texas: A Perspective on the Competitive Challenge of a Global Economy."  Address delivered to the 1989 Conference of Leadership Texas, Austin, Texas, April 1989.

"Telecommunications in the Future of Texas."  Address delivered to the 1989 Management Conference of CenTel, Austin, Texas, April 1989.

"The Past, The Present, and The Future."  Guest appearance in a play at The Lamar University Little Theatre, Beaumont, Texas, April 1989.

"The Current Prognosis for Real Estate Patterns in the Texas Economy."  Address
    delivered to the Texas Land Title Association, Austin, Texas, May 1989.

"The Outlook for Construction in Texas."  Address delivered to the 1989 Conference of
    the Associated General Contractors, San Antonio, Texas, June 1989.

"The Impact of the American Airlines Maintenance Base on the Future of the
    Metroplex."  Address delivered at the Announcement Conference sponsored by
    American Airlines, The Perot Group, and the Fort Worth Chamber of Commerce,
    Fort Worth, Texas, June 1989.

"The Role of Technical Occupations in the Global Economy of the Twenty-First
    Century."  Keynote address delivered to the 1989 Annual Conference of the
    National Association of Technical Education Institutions, Oklahoma City,
    Oklahoma, June 1989.

"The Economic Assets of East Texas."  Address delivered at the Inaugural Meeting of the
    East Texas Economic Development Commission, Kilgore, Texas, June 1989.

"Expanding Opportunities in the Technological Workplace of the Twenty-First Century."
    Address delivered to the National Women's Conference, Houston, Texas,
    June 1989.

"The Economic Needs and Challenges of the Next Decade."  Address delivered to the
    1989 Ministries Workshop of the Baptist General Convention of Texas, Belton,
    Texas, July 1989.

"The Future Growth of the Houston Economy."  Presentations before Moody's and
    Standard & Poors Bond Rating Committees, New York, New York, July 1989.

"The Future of the Central Texas Economy."  Address delivered to the Heart of Texas
    Lions Club, Waco, Texas, August 1989.

"The Economic Impact of New Aircraft Maintenance Facilities on the Revenues and
    Expenditures in the Northwest Independent School District."  Presentation to the
    Northwest Independent School District Board of Trustees, August 1989.

"The Future of Dallas as an International Economy."  Address delivered to the 1989
    North Dallas Trade Fair, Dallas, Texas, September 1989.

"A Perspective on the Future of Banking in Texas."  Address delivered to the East Texas
    Bankers Association Annual Meeting, Nacogdoches, Texas, September 1989.

"Opportunities in the Texas Housing Market."  Seminar delivered to the Senior
    Management of Mortgage Guaranty Insurance Company, Dallas, Texas,
    September 1989.

"The Future of Telecommunications in the Metroplex."  Address delivered at the
    groundbreaking of the Fujitsu North American Telecommunications Research
    Center, Richardson, Texas, October 1989.

"The Role of Incentives in Economic Development and Corporate Relocations."  Address
    delivered to the Metrocrest Chamber of Commerce, Grapevine, Texas,
    October 1989.

"The Energy Economy of the 1990s."  Keynote address delivered to the Senior Management Seminar of Diamond Shamrock Corporation, Horseshoe Bay, Texas, October 1989.

"Texas: The Challenge of the 1990s."  Address delivered to the Medical Consultation Committee of the Texas Rehabilitation Commission, Austin, Texas, October 1989.

"The Service Sector and the Challenge of a New Decade."  Address delivered to the Society for Marketing Professional Services, San Antonio, Texas, October 1989.

"The Outlook for Business Growth in the Western United States."  Address delivered to the Western Industrial Dealers Association, South Padre Island, Texas, October 1989.

"The Future of Texas and the Nation: The Emerging Economy of the 1990s."  Address delivered to the 1989 Economic Outlook Conference of the Waco Chamber of Commerce, Waco, Texas, October 1989.

"Impact of Changing Demographics on Today's Economy."  Address delivered to the Texas Society of Association Executives Winter Management Conference, Odessa, Texas, November 1989.

"The Economy, Real Estate, and the Challenges of a New Decade."  Address delivered to the New York State Credit Union, Saratoga Springs, New York, November 1989.

"Global Factors Impacting the Effect of the Texas Economy on Energy Sales."  Address delivered to the Texas Utilities Electric Company Seminar Executives Forum, Dallas, Texas, December 1989.

"The Finance and Real Estate Recovery in Texas."  Address delivered to the Texas Savings and Loan League Annual Managers Conference, El Paso, Texas, December 1989.

"The Texas Economy in the 1990s."  Address delivered to the Southwest Corporate Federal Credit Union, Dallas, Texas, December 1989.

"The Challenge of a New Decade in Texas and Houston."  Address delivered to the Rotary Club of Houston, Houston, Texas, January 1990.

"The Emerging Texas Economy of the 1990s."  Address delivered to the San Antonio Chamber of Commerce Outlook Conference, San Antonio, Texas, January 1990.

"The Super Collider and Federal Subcontracting Opportunities for the New Decade."  Address delivered to the Texas Economic Opportunities Forum, Waco, Texas, January 1990.

"Economic Opportunities in the Metroplex in the Coming Decade."  Address delivered to the Rockwall Chamber of Commerce, Rockwall, Texas, January 1990.

"The Future of the Houston Area Economy."  Address delivered to The Woodlands Chamber of Commerce Outlook Conference, The Woodlands, Texas, January 1990 (including projections from the Montgomery County Econometric Model).

"The World Economic Outlook for 1990."  Address delivered to the International Finance Association, Dallas, Texas, January 1990.

"The Educational Challenge of the 1990s."  Address delivered to the Texas State Technical Institute Development Foundation, South Padre Island, Texas, January 1990.

"The Economic Outlook for Texas, with a Focus on the Dallas/Fort Worth Metropolitan Area in the 1990s" and "The Strategic Use of Economic Information."  Addresses delivered to the 1990 Dallas/Fort Worth Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., and IBM, Dallas, Texas, January 1990 (including projections from the Texas, Dallas, and Fort Worth Econometric Models).

"The Economic Outlook for Texas, with a Focus on the Houston-Galveston-Brazoria Metropolitan Area in the 1990s" and "The Strategic Use of Economic Information."  Addresses delivered to the 1990 Houston-Galveston-Brazoria Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., and IBM, Houston, Texas, January 1990 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Models).

"The Economic Outlook for Texas, with a Focus on the San Antonio Metropolitan Area in the 1990s" and "The Strategic Use of Economic Information."  Addresses delivered to the 1990 San Antonio Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., and IBM, San Antonio, Texas, January 1990 (including projections from the Texas and San Antonio Econometric Models).

"The Economic Outlook for Texas, with a Focus on the Austin Metropolitan Area in the 1990s" and "The Strategic Use of Economic Information."  Addresses delivered to the 1990 Austin Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., and IBM, Austin, Texas, January 1990 (including projections from the Texas and Austin Econometric Models).

"The Real Estate Market Outlook for the 1990s."  Address delivered to the Texas Association of Appraisal Districts, San Antonio, Texas, February 1990.

"The Economic Challenge of the 1990s."  Address delivered to the Financial Executives Institute, Austin, Texas, February 1990.

"An Update on the Outlook for the Texas Economy."  Address delivered to the Southwestern Bell Management Conference, San Antonio, Texas, February 1990.

"The Outlook for South Texas in the 1990s."  Address delivered to the Laredo Economic Outlook Conference, Laredo, Texas, February 1990.

"The Texas Economy—Challenge of a New Decade for Small Area Economies."  Address delivered to the Annual Banquet of the Mineral Wells Chamber of Commerce, Mineral Wells, Texas, March 1990.

"The Opportunities of the Twenty-First Century."  Address delivered at the induction of the National Junior Honor Society, Waco, Texas, March 1990.

"The US Economy and the Financial Outlook in the 1990s."  Address delivered to the Arizona Credit Union Association, Phoenix, Arizona, March 1990.

"Texas Indeed Survived the 1980s: A Look at Philanthropic Opportunities in the Coming Decade."  Address delivered to the Texas Baptist Development Association, Dallas, Texas, April 1990.

"Outlook for the Texas Economy."  Address delivered to the Northern Trust Bank Outlook Conference, Dallas, Texas, April 1990.

"The Texas Economy in the 1990s."  Address delivered to the Senior Management and Financial Underwriters for Houston Industries, Houston, Texas, April 1990.

"The Synergistic Impact of Multiple Tourism Facilities on a Regional Economy."  Address delivered to the Board of Directors of the Confederate Air Force, San Antonio, Texas, April 1990.

"Alliance Airport and the Future of the Northwest Quadrant."  Address delivered to the Southeast Wise County Chamber of Commerce, Roanoke, Texas, April 1990.

"The Texas Economy and Its Opportunities for the Legal Profession."  Address delivered to the Partners' Planning Conference of Gardere & Wynne, Phoenix, Arizona, April 1990.

"The Texas Economy and the Automobile Industry."  Address delivered to the Texas Automobile Dealers Association, Dallas, Texas, May 1990.

"The Real Estate Market in the 1990s."  Address delivered to the Texas Land Title Association, Corpus Christi, Texas, May 1990.

"The Dream Becomes a Reality: The Future of High Speed Rail in America."  Keynote address delivered to the 1990 Annual Conference of the National High Speed Rail Association, San Antonio, Texas, May 1990.

"The Economic Growth Potential in the Rio Grande Valley."  Address delivered to the groundbreaking ceremony of the IntelliCall Manufacturing Facility, McAllen, Texas, May 1990 (including projections from the McAllen-Edinburg-Mission Econometric Model).

"The Texas Economy and Its Effect on the Rio Grande Valley."  Address delivered to the Brownsville Kiwanis Club, Brownsville, Texas, May 1990.

"The Emergence of the New Texas Economy."  Address delivered to the Dallas Cash Management Association, Dallas, Texas, May 1990.

"The Effect of the Economy on Local Government."  Address delivered to the County Auditors Association, Austin, Texas, May 1990.

"The Real Estate and Energy Markets in the 1990s."  Address delivered to the Financial Seminar of Mitchell Energy and Development, The Woodlands, Texas, May 1990.

"The Continued Need for Aggressive Economic Development in the Smaller Communities of Texas."  Address delivered to the Lindale Chamber of Commerce, Lindale, Texas, June 1990.

"The National Economy in the 1990s."  Address delivered to the Missouri Corporate Credit Union, Lake of the Ozarks, Missouri, June 1990.

"Teaching Economics through the Real World."  Workshop presentation for the Chair of Free Enterprise in the State of Texas, Waco, Texas, June 1990.

"Teaching Economics through the History of Texas."  Workshop presentation for the Chair of Free Enterprise in the State of Texas, Austin, Texas, June 1990.

"The Texas Economy."  Address delivered to the IBM Marketing Conference, Austin, Texas, July 1990.

Expert commentator for ABC News at the 1990 Economic Summit of Industrialized Nations, Houston, Texas, July 1990.

"Economic Prospects for Southern Bexar County."  Address delivered to Bexar County Economic Development Forum, San Antonio, Texas, July 1990.

"The Economy and a War with the Mideast."  Expert Analysis for KCEN-TV prime time special "Fort Hood: The Mideast Mission," Waco, Texas, August 1990.

"Economic Development, Ecological Integrity and Water Resource Planning."  Address given at the Joint Water and Wildlife Conference of the Texas Water Commission, the Texas Water Development Board, and the Texas Parks and Wildlife Commission (sponsored by Chevron, Inc.), Fort Davis, Texas, August 1990.

"What's Hot and What's Not in the Texas Economy."  Address delivered to Professional Services Marketing Association, Dallas, Texas, September 1990.

"The World Economy in the 1990s."  Address delivered to the Global Economic Outlook Seminar of the International Institute for Advanced Studies, Baden-Baden, Germany, September 1990.

"The Outlook for Texas and Austin."  Address delivered to the Annual First City Texas Executive Seminar, Austin, Texas, September 1990.

"The Economy in the Next Decade."  Address delivered to the McDonald's Corporation Annual Convention, Dallas, Texas, September 1990.

"Economic Perspectives on the Southwest."  Address delivered to the IBM Senior Executives Forum, Dallas, Texas, September 1990.

"The Future of the Texas Economy."  Address delivered to the Executive Breakfast of the Society of Human Resource Management, Dallas, Texas, October 1990.

"The Economic Prognosis for Texas and the United States."  Address delivered to the 1990 Waco Economic Outlook Conference, Waco, Texas, October 1990.

"The Value of Savings in Building the American Economy."  Address delivered at the announcement ceremonies for the Texas School Savings Program sponsored by First City Bank, San Antonio, Texas, October 1990.

"The Texas Economy in the 1990s."  Address delivered to the Texas Association of Broadcasters Annual Convention, San Antonio, Texas, October 1990.

"Future Prospects for the Fort Worth Economy."  Address delivered to the Fort Worth Business Guild, Fort Worth, Texas, October 1990.

"Investment Opportunities in the Texas Market."  Address delivered to Japanese Investment Forum of the JLB Company, Dallas, Texas, October 1990.

"The Future Course of Texas and its Municipalities."  Address delivered to the Texas Municipal League Conference, Corpus Christi, Texas, October 1990.

"Outlook for Texas and Houston Real Estate."  Address delivered to the Chase Manhattan National Speakers Forum, Houston, Texas, October 1990.

"The 'Build from Strength' Philosophy of Economic Development."  Address delivered to the Center for Energy and Economic Development, Odessa, Texas, November 1990.

"The Economy of the Metroplex."  Address delivered to Leadership Richardson, Richardson, Texas, November 1990.

"The Texas Economy in the 1990s and the Future of Fort Worth."  Address delivered to the Fort Worth Chamber of Commerce Outlook Conference, Fort Worth, Texas, November 1990.

"The Potential for Aircraft Development at Texas State Technical Institute."  Address delivered to the Waco Industrial Foundation, Waco, Texas, November 1990.

"The Future Path of the Texas Economy."  Address delivered to the Abilene Economic Outlook Conference, Abilene, Texas, November 1990.

"Economic Development Opportunities in East Texas."  Address delivered to Leadership Tyler, Tyler, Texas, November 1990.

"The Texas Economy: Projections and Implications for Property Taxation."  Address delivered to the Thirty-Second Institute on Property Taxation, Austin, Texas, December 1990.

"Constructive Approaches to Economic Development."  Keynote address delivered to the Texas Utilities Economic Development Institute, Sherman, Texas, December 1990.

"The Outlook for Texas in a Global Economy, with Emphasis on the Prospects for the Dallas/Fort Worth Metropolitan Area" and "The Effects of Free Trade with Mexico and other Global Issues on the Texas Economy."  Addresses delivered to the 1991 Dallas/Fort Worth Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., IBM, and Texas Monthly, Dallas, Texas, January 1991 (including projections from the Texas, Dallas, and Fort Worth Econometric Models).

"The Outlook for Texas in a Global Economy, with Emphasis on the Prospects for the Houston/Galveston/Brazoria Metropolitan Area" and "The Effects of Free Trade with Mexico and other Global Issues on the Texas Economy." Addresses delivered to the 1991 Houston Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., IBM, and Texas Monthly, Houston, Texas, January 1991 (including projections from the Texas and Houston-Galveston-Brazoria Econometric Models).

"The Outlook for Texas in a Global Economy, with Emphasis on the Prospects for the San Antonio Metropolitan Area" and "The Effects of Free Trade with Mexico and other Global Issues on the Texas Economy." Addresses delivered to the 1991 San Antonio Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., IBM, and Texas Monthly, San Antonio, Texas, January 1991 (including projections from the Texas and San Antonio Econometric Models).

"The Outlook for Texas in a Global Economy, with Emphasis on the Prospects for the Austin Metropolitan Area" and "The Effects of Free Trade with Mexico and other Global Issues on the Texas Economy." Addresses delivered to the 1991 Austin Economic Outlook Conference sponsored jointly by Perryman Consultants, Inc., IBM, and Texas Monthly, Austin, Texas, January 1991 (including projections from the Texas and Austin Econometric Models).

"Technical Education: The Time is Now—The Place is Here." Address delivered to the Texas State Technical Institute Silver Anniversary Banquet, Austin, Texas, January 1991.

"A Global Perspective on Trade and Business Activity." Address delivered to the InterAmerican Chamber of Commerce, Houston, Texas, January 1991.

"Credits on the Upswing: A Look at the Recovery in the Southwest." Address delivered to the Public Securities Association, New York, New York, January 1991.

"The Short-Term Outlook for Activity in the Metroplex." Address delivered to the Southwestern Bell Yellow Pages Marketing Conference, Dallas, Texas, February 1991.

"The Effects of a Major Racing and Transportation Technology Center on the Economy of the Metroplex." Address delivered to the announcement conference for the Metroplex Super Speedway and Transportation Technology Center, Dallas, Texas, February 1991.

"The Opportunities for Economic Development in Non-Metropolitan Areas." Address delivered to the Annual Banquet of the Polk County Chamber of Commerce, Livingston, Texas, February 1991.

"The Status of the Real Estate Market in the Dallas/Fort Worth Area." Address delivered to the Management and Client Seminar of Pannell Kerr Forster, Dallas, Texas, March 1991.

"The Future of Economic Development in Texas." Address delivered to the Economic Development Workshop of TU Electric Company, Waco, Texas, March 1991.

"The Dallas Metroplex: Looking Good!"  Address delivered to the Bank Administration
        Institute, Dallas, Texas, March 1991.

"The Future of the Southwest Economy."  Address delivered to the IBM Marketing
        Forum, Tulsa, Oklahoma, March 1991.

"The Retail and Construction Outlook in Texas."  Address delivered to the Sales
        Planning Conference of Goldthwaite of Texas, Dallas, Texas, March 1991.

"Industrial Development in the Central Texas Area."  Address delivered to the Temple
        Area Chamber of Commerce Business and Industry Week Luncheon, Temple,
        Texas, April 1991.

"A Prognosis for the National Economy."  Address delivered to the USTI Municipal
        Planning Conference, Dallas, Texas, April 1991.

"The Economy—Past, Present, and Future."  Address delivered to the Arlington Baylor
        Club Annual Banquet, Arlington, Texas, April 1991.

"Global and Technological Forces Impacting the Outlook for Future Business Activity."
        Address delivered to the IBM Executive Forum, Dallas, Texas, April 1991.

"The Outlook for West Texas Economic Development."  Address delivered to the Odessa
        Rotary Club, Odessa, Texas, April 1991.

"Dallas as a Key Element of the Global Economy."  Address delivered as Panelist of the
        Mayor's International Ambassadors Forum, Dallas, Texas, April 1991.

"Past and Future Financial Conditions in Texas."  Address delivered to TEXPO '91,
        Dallas, Texas, April 1991.

"Survive and Conquer—The Inside Story."  Address delivered to Friends of Temple
        Library Authors' Forum, Temple, Texas, April 1991.

"Future Prospects for the Domestic Oil Industry."  Address delivered to the Annual
        Conference of the Southwestern Petroleum Association, Corpus Christi, Texas,
        April 1991.

"The State of Various Housing Markets in Texas."  Seminar delivered to Executive
        Forum of Mortgage Guaranty Insurance Company, Dallas, Texas, April 1991.

"Investment Prospects in Dallas and Houston."  Address delivered to the JLB Company
        Japanese Investment Forum, Dallas, Texas, May 1991.

"Philanthropic Activity and the Economy of the Southwest."  Address delivered to the
        Meadows Foundation Executive Conference, Dallas, Texas, May 1991.

"The Outlook for the Metroplex Real Estate Market."  Address delivered to the Society
        for Marketing Professional Services, Dallas, Texas, May 1991.

"The Future of Multi-Family Housing Investment."  Address delivered to the Annual
        Convention of the Texas Apartment Association, San Antonio, Texas, May 1991.

"Economic Development and Its Role in the Future of Texas."  Address delivered to the Annual Convention of the Texas Industrial Development Commission, Waco, Texas, May 1991.

"Legislative Policy and Economic Competitiveness."  Address delivered to the Legislative Forum of The Dallas Assembly, Austin, Texas, May 1991.

"Economic Development: Progress and Achievements in the Tyler Metropolitan Area."  Address delivered to the Annual Conference of the Tyler Economic Development Council, Tyler, Texas, July 1991.

"Economic Aspects of Healthcare and Diabetes Treatment."  Address delivered to the Task Force on the Economic Impact of Diabetes, Dallas, Texas, August 1991.

"The Role of Job Training and the Workforce in the Future of the Permian Basin."  Address delivered to the Annual Conference of the Permian Basin Private Industry Council, Midland, Texas, August 1991.

"The Role of Transportation in the Future of South Texas—With Emphasis on the North American Free Trade Agreement."  Presentation delivered as a panelist on the Transportation Forum of the Laredo Chamber of Commerce, Laredo, Texas, August 1991.

"Global Patterns of Investment and Trade on the Twenty-First Century."  Address presented to the Future Outlook Seminar of the Philippine Consulate, Houston, Texas, September 1991.

"Leadership and Community Development in the Future of Texas."  Address delivered to Leadership Texas, Dallas, Texas, September 1991.

"East Texas: Historical Perspective and Future Economic Prognosis."  Address delivered to the Tyler Baylor Club, Tyler, Texas, September 1991.

"The Impact of the Proposed CenterPort International Development on Denver County."  Address delivered at the CenterPort Impact Presentation and press conference, Denver, Colorado, October 1991.

"Winning Approach to the Comprehensive Watersheds Ordinance (CWO) Amendments."  Address delivered to the Austin Chamber of Commerce, Austin, Texas, October 1991.

"Effects of the Comprehensive Watersheds Ordinance (CWO) Amendments on the Austin Economy."  Panelist for KLRU-TV's "Austin At Issue" program, Austin, Texas, October 1991.

"Texas, the Media, and the Economy."  Address delivered to The Texas Association of Broadcasters Annual Meeting, Houston, Texas, October 1991.

"A Prognosis for the Central Texas Economy."  Address delivered to the 1991 Economic Conference of the Greater Waco-McLennan County Chamber of Commerce, Waco, Texas, October 1991.

"Telecommunications and Future of the Texas Economy."  Address delivered to the 1991 Executive Seminar of GTE of the Southwest, Dallas, Texas, October 1991.

"Real Estate Patterns in the Texas Economy."  Address delivered to the Real Estate
Services Seminar of Coopers & Lybrand, Dallas, Texas, October 1991.

"State and Local Taxation Patterns and Economic Development: A Look at the Southern
States."  Address delivered to the 1991 Southern Legislative Conference,
Pinehurst, North Carolina, November 1991.

"Industrial Development, Transportation, and the Local Economy."  Address delivered to
Leadership Waco, Waco, Texas, November 1991.

"The Importance of Sino-American Cooperation in the Emerging Global Economy."
Address delivered in honor of Dr. John Kuan (Chairman of the Democracy
Foundation), Houston, Texas, November 1991.

"Why the Texas Economy is Leading the US Economy during the National Recession."
Video presentation with Governor Ann Richards for Blair Company, New York,
New York, December 1991.

"The Economic Impact of the Proposed Race Track on the Grand Prairie Economy."
Address delivered to the City of Grand Prairie, Grand Prairie, Texas,
December 1991.

"The Economic Future of the Woodlands/Montgomery County Area."  Address delivered
to The Woodlands/South Montgomery County Chamber of Commerce, The
Woodlands, Texas, January 1992.

"The Economic Future Outlook for Interest Rates and Automobile Sales."  Address
delivered to the Houston Area Automobile Dealers' Association, Houston, Texas,
January 1992.

"The Economic Prospects for the San Antonio Area."  Address delivered to the 1992
Greater San Antonio Chamber of Commerce Economic Outlook Conference, San
Antonio, Texas, January 1992.

"The National Economy and the Performance of the Dallas/Fort Worth Metropolitan
Area."  Opening address delivered to the Eighth Annual Dallas/Fort Worth
Economic Outlook Conference, (sponsored by Perryman Consultants and Texas
Monthly), Dallas, Texas, January 1992.

"Real Estate Patterns in Dallas/Fort Worth during the Next Twenty-Five Years."
Address delivered to the Eighth Annual Dallas/Fort Worth Economic Outlook
Conference, (sponsored by Perryman Consultants and Texas Monthly), Dallas,
Texas, January 1992.

"The National Economy and the Performance of the Houston Metropolitan Area."
Opening address delivered to the Eighth Annual Houston Economic Outlook
Conference, (sponsored by Perryman Consultants and Texas Monthly), Houston,
Texas, January 1992.

"Real Estate Patterns in Houston during the Next Twenty-Five Years."  Address
delivered to the Eighth Annual Houston Economic Outlook Conference,
(sponsored by Perryman Consultants and Texas Monthly), Houston, Texas,
January 1992.

"The National Economy and the Performance of the San Antonio Metropolitan Area."
Opening address delivered to the Eighth Annual San Antonio Economic Outlook
Conference, (sponsored by Perryman Consultants and Texas Monthly),
San Antonio, Texas, January 1992.

"Real Estate Patterns in San Antonio during the Next Twenty-Five Years."  Address
delivered to the Eighth Annual San Antonio Economic Outlook Conference,
(sponsored by Perryman Consultants and Texas Monthly), San Antonio, Texas,
January 1992.

"The National Economy and the Performance of the Austin Metropolitan Area."
Opening address delivered to the Eighth Annual Austin Economic Outlook
Conference, (sponsored by Perryman Consultants and Texas Monthly), Austin,
Texas, January 1992.

"Real Estate Patterns in Austin during the Next Twenty-Five Years."  Address delivered
to the Eighth Annual Austin Economic Outlook Conference, (sponsored by
Perryman Consultants and Texas Monthly), Austin, Texas, January 1992.

"The Economy and the Outlook for the Financial Community."  Address delivered to
Financial Executives Institute, Austin, Texas, January 1992.

"Future Patterns and Development in the El Campo Area."  Address delivered to El
Campo Chamber of Commerce Annual Banquet, El Campo, Texas,
January 1992.

"The Economic Outlook for Texas and the Nation."  Address delivered to the Abilene
Economic Outlook Conference, Abilene, Texas, January 1992.

"What Happened to Texas in the 1980s?"  Speech delivered to the World President's
Organization, Dallas, Texas, February 1992.

"Anticipated Sales and Production Patterns in the Texas Economy."  Address delivered to
the 1992 Annual Conference of the Wholesale Distributors Association,
San Antonio, Texas, March 1992.

"The Future of Sino-American Industrial Cooperation and Trade."  Address delivered to
the Asia and World Institute, Taipei, Taiwan, March 1992.

"The US Financial Environment in the Aftermath of the Thrift Crisis."  Seminar
delivered to the China Productivity Center, Taipei, Taiwan, March 1992.

"The Future of Southwestern Real Estate Investment Markets."  Address delivered to the
Real Estate Association of the Republic of China, Taipei, Taiwan, March 1992.

"The Emerging Global Trading Patterns in Europe, Asia, and North America."  Seminar
delivered to the China Productivity Center, Taipei, Taiwan, March 1992.

"The Effects of Air Transportation Infrastructure on Domestic and International
Economic Activity."  Keynote address delivered to the Annual Conference of the
American Association of Airport Executives, Fort Worth, Texas, March 1992.

"Trade Opportunities between Texas and the Pacific Rim."  Address delivered to the Economic and Trade Mission Press Conference, Texas Chamber of Commerce, Austin, Texas, March 1992.

"The Recovery Pattern of Construction in the Texas Economy."  Address delivered to the Annual Meeting of the Houston Area Cement Association, Houston, Texas, March 1992.

"Technology, Trade, and the Global Economy of the Twenty-First Century."  Address delivered to the International Trade Association, Dallas, Texas, March 1992.

"The Future of the Texas Economy."  Address delivered as moderator of the 1992 Institutional Investors Conference of Rauscher Pierce Refsnes, Dallas, Texas, April 1992.

"The Wealth Base of Texas and the Challenge of Philanthropic Endeavors."  Address delivered to the 1992 Conference of the Development Institute, Dallas, Texas, April 1992.

"Opportunities for Business Expansion in the Longview Area."  Address delivered to the 1992 Longview Scholarship Banquet, Longview, Texas, April 1992.

"The Future of Texas and the Financial Industry."  Address delivered to the Bank Administration Institute, San Antonio, Texas, April 1992.

"The Texas Economy and Emerging Investment Opportunities."  Address delivered to the French Business and Media Briefing of the Texas Department of Commerce, Austin, Texas, May 1992.

"The Texas Economy, Municipal Indebtedness, and Emerging Opportunities."  Address delivered to the Planning Retreat of First Southwest Corporation, Austin, Texas, May 1992.

"The Future Prospects of the Central Corridor."  Address delivered to the Round Rock Century Club, Round Rock, Texas, May 1992.

"The Strategy for Economic Development in the Longview Area."  Address delivered to the City of Longview Economic Development Seminar, Longview, Texas, May 1992.

"Long-Term Factors Shaping the Texas Economy."  Address delivered to the Free Enterprise Seminar of the Waco Rotary Club, Waco, Texas, June 1992.

"The Prospects and Patterns of the Texas Real Estate Industry."  Address delivered to the Dallas Bar Association, Dallas, Texas, June 1992.

"The Impacts of the Arts on the San Antonio Economy."  Address delivered to The Arts Press Conference of the City of San Antonio, San Antonio, Texas, June 1992.

"The Economic Future of West Texas: Seizing the Moment."  Address delivered to the United Way Kickoff Banquet, Odessa, Texas, June 1992.

"Privatization of Major Construction Projects: Case Studies and Principles."  Address delivered to the Workshop of Project Management for Major Construction, Public Construction Supervisory Board, Executive Yuan, Taipei, Taiwan, June 1992.

"The Prospects for Economic Growth and Tourism in South Texas."  Address delivered to the Board of Directors of the United States Automobile Association, San Antonio, Texas, June 1992.

"Projected Patterns in the Metropolitan Growth and Property Valuation."  Address delivered to the 1992 Conference of the Texas City Managers' Association, Lubbock, Texas, June 1992.

"The Prospects for the Southwestern Economy and their Implications for Financial Institutions."  Address delivered to the 1992 Examiners Conference of the Federal Deposit Insurance Corporation, Albuquerque, New Mexico, June 1992.

"Texas—Regaining the Economic Summit."  Address delivered to the 1992 Conference of the Texas Society of Certified Public Accountants, Beaver Creek, Colorado, June 1992.

"The Future of North American Trade and Immigration Policy."  Address delivered to the Canadian Consulate and Senior Canadian Government Officials, Dallas, Texas, June 1992.

"The Interaction of Education and the Economy: A Long-Range Perspective."  Keynote address delivered to the 44th Annual Workshop for Educational Leaders (sponsored by The University of Texas, Texas Association of School Administrators, and Texas Education Agency), Austin, Texas, July 1992.

"The Economic Prospects for Texas and the Austin Area."  Address delivered to the NationsBank Chairman's Council, Austin, Texas, July 1992.

"Transportation, Free Trade, and the Future of Lands."  Address delivered to the Laredo Rotary Club, Laredo, Texas, July 1992.

"Methodological Considerations in Demographic, Econometric, and Transportation Forecasting."  Address delivered to the Alamo Area Council of Governments, San Antonio, Texas, July 1992.

"Economic Prospects for the Metroplex."  Address delivered to the Dallas Real Estate Association Breakfast, Dallas, Texas, August 1992.

"Texas Economic Update."  Address delivered as a panelist for the State Government Planning Conference sponsored by the Texas Department of Commerce, Austin, Texas, August 1992.

"An Initial Review of the Economic Implication of NAFTA."  Address delivered to the Texas Conference on the North American Free Trade Agreement sponsored by the Texas Young Lawyers Association, Dallas, Texas, August 1992.

"Passport to the Future: The Link between Economics and Telecommunications."  Keynote address delivered to the Annual convention of the Texas Telephone Association, Houston, Texas, September 1992.

"Opportunities for Minorities in the Texas Economy."  Keynote address delivered to the Annual Business Opportunities Symposium of the Austin Metropolitan Business Resource Center, Austin, Texas, September 1992.

"Economic Prospects and Opportunities for the Midland/Odessa Area."  Keynote address delivered to the Annual Membership Banquet of the Midland Chamber of Commerce, Midland, Texas, October 1992.

"Economic and Occupational Prospects."  Address delivered to the Delta Sigma Pi Seminar, Waco, Texas, October 1992.

"The Texas Economic Outlook in Light of Election Politics."  Address delivered to the Annual Waco Economic Outlook Conference sponsored by the Greater Waco Chamber of Commerce, Waco, Texas, October 1992.

"The Economic Prospect for the South Plains."  Address delivered to the Lubbock Chamber of Commerce Chief Executives' Roundtable, Lubbock, Texas, October 1992.

"Ethics in Economics and Politics."  Address delivered to the Graduate Student Association Roundtable, Baylor University, Waco, Texas, October 1992.

"Some Insights into the Texas and National Economies."  Keynote address given to the 1992 Annual Convention of the Texas Association of Business, Fort Worth, Texas, October 1992.

"The Role of Telecommunications in the Global Economy."  Address delivered to the GTE Central Management Planning Meeting, Dallas, Texas, December 1992.

"The Future of the Texas Economy."  Address delivered to the Texas Hotel & Motel Association ExpoTel '92, Austin, Texas, December 1992.

"Outlook for the Greater San Antonio and Texas Region."  Keynote address delivered to the 1993 San Antonio Economic Outlook Conference sponsored by the Greater San Antonio Chamber of Commerce, San Antonio, Texas, January 1993.

"The Economic Outlook for Texas and the Austin Area: An Analysis in Light of the Clinton Economic Program."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Austin, Texas, January 1993.

"The Economic Outlook for Texas and the Dallas Area: An Analysis in Light of the Clinton Economic Program."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Dallas, Texas, January 1993.

"The Economic Outlook for Texas and the Houston Area: An Analysis in Light of the Clinton Economic Program."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Houston, Texas, January 1993.

"The Economic Outlook for Texas and the San Antonio Area: An Analysis in Light of the Clinton Economic Program."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, San Antonio, Texas, January 1993.

"The North American Free Trade Agreement (NAFTA): A Current Perspective on the Likely Impact on Texas and the Austin Region." Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Austin, Texas, January 1993.

"The North American Free Trade Agreement (NAFTA): A Current Perspective on the Likely Impact on Texas and the Dallas Region."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Dallas, Texas, January 1993.

"The North American Free Trade Agreement (NAFTA): A Current Perspective on the Likely Impact on Texas and the Houston Region."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, Houston, Texas, January 1993.

"The North American Free Trade Agreement (NAFTA): A Current Perspective on the Likely Impact on Texas and the San Antonio Region."  Address delivered to the Ninth Annual Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, Blue Cross Blue Shield of Texas, and First Southwest Corporation, San Antonio, Texas, January 1993.

"A Forecast of the Lone Star State's Economy."  Address delivered to the Abilene Economic Outlook Conference, Abilene, Texas, February 1993.

"National and International Economic Trends and Their Effects on Business Conditions and Advertising."  Presentation delivered to senior executives of A. H. Belo Corporation, Dallas, Texas, February 1993.

"The Economic Outlook for the Greater Lubbock Area."  Address delivered at the Lubbock Economic Outlook Conference, Lubbock, Texas, February 1993.

"The Central Texas Economy: Where Are We Going?"  Address delivered to the Heart of Texas Builders' Association, Waco, Texas, March 1993.

"What's Ahead for the Texas Economy."  Keynote address delivered to the Annual Clients Meeting of Northern Trust Bank, Houston, Texas, March 1993.

"How New Economic Policies and NAFTA will Affect Economic Development Opportunities in Texas."  Address delivered to the Annual Meeting of the Texas Industrial Development Council, Austin, Texas, March 1993.

"Economic Development Assets and Strategies for the Permian Basin."  Presentation delivered to the Odessa Chamber of Commerce Annual Retreat, Odessa, Texas, March 1993.

"The Clinton Administration's Effect on the Economy."  Address delivered to the Baylor University Student Open Forum, Waco, Texas, March 1993.

"The Farmer's Emerging Role in the New Texas Economy."  Address delivered to the Annual Convention of the Texas Agricultural Cooperative, San Antonio, Texas, March 1993.

"Texas: A Look at Future Prospects."  Address delivered to the Annual Meeting of the Texas Daily Newsletter Publishers Association, Austin, Texas, March 1993.

"Jobs, Jobs, and More Jobs."  Keynote address delivered to the 1993 Texas Legislative Conference, New Braunfels, Texas, March 1993.

"The Cattle Industry's Role in the Texas Economy."  Address delivered to the Texas Cattle Raisers' Association, Austin, Texas, March 1993.

"The Economic Impact of the Arts."  Keynote address delivered to the 1993 Annual Convention of the Association of Museums, Waco, Texas, April 1993.

"The Long-Term Perspective on the Economy."  Address delivered to the Wayland Baptist University Public Forum, Plainview, Texas, April 1993.

"NAFTA's Impact on Agriculture in Texas."  Address delivered to the Annual Shareholders' Meeting of the Farm Credit Bank, Austin, Texas, April 1993.

"Local and State Implications of Clinton's Economic Program."  Address delivered to the Ector County Democratic Women's Club, Odessa, Texas, May 1993.

"Political, Global, and Economic Challenges Facing the Modern Transportation System."  Keynote address delivered to the 65th Annual Conference of the Association of Airport Executives, Dallas, Texas, May 1993.

"A Look at Employment, Occupational, and Training Patterns."  Keynote address delivered to the US Department of Labor Annual Employment and Training Conference, Dallas, Texas, May 1993.

"The Economic Challenge for the Odessa Metropolitan Area."  Keynote address delivered to the Odessa Economic Summit, Odessa, Texas, May 1993.

"Global Ties Between the US, Mexico, and Asia."  Keynote address delivered to the Asian American Heritage Month Program of the Asian American Chamber of Commerce, Houston, Texas, May 1993.

"Looking Ahead at the Economy of the Deep East Texas Region."  Keynote address delivered to the 24th Annual Meeting of the Deep East Texas Council of Governments, Lufkin, Texas, May 1993.

"The North American Free Trade Agreement: Its Effects on Austin and Texas."  Address delivered to the Rotary Club of Austin, Austin, Texas, June 1993.

"The Role of Downtown Redevelopment in the Economic Future of Texas."  Address delivered to the Annual Conference of the Main Street Directors of Texas, Odessa, Texas, June 1993.

"The Importance of Regional Strategic Alliances for Austin and San Antonio: Positioning for the Emerging Global Economy."  Address delivered to the Austin/San Antonio Corridor Council Economic Development Strategy meeting, San Antonio, Texas, June 1993.

"The Effects of Trucking Regulation on Texas."  Analysis delivered during "The McCuistion Report" program, KDTN-TV, Dallas, Texas, June 1993.

"The Clinton Domestic Program: Impacts and Opportunities for the South."  Presentation given to the Southern Legislative Conference, Mobile, Alabama, July 1993.

"The Economic Role of PANTEX in the Amarillo Area."  Address delivered to the Amarillo Economic Development Corporation Forum, Amarillo, Texas, July 1993.

"The Economic Impact of NAFTA on Central Texas."  Address delivered before the McLennan County Leadership Forum, Waco, Texas, July 1993.

"Economic Outlook for Southeast Texas."  Address delivered before the Beaumont Rotary Club, Beaumont, Texas, August 1993.

"SPP Historical and Future Regional Economic Outlook with an Emphasis on Regulatory Requirements and Utilities Forecasting Methodologies."  Presentation given before the Southwest Power Pool Load Forecasting Subcommittee 1993 meeting, Amarillo, Texas, August 1993.

"Texas in the 90s."  Speech delivered during a panel discussion for the International Association of Financial Planners Convention, Dallas, Texas, September 1993.

"How Could NAFTA Affect the City of Dallas?"  Address delivered to the City of Dallas Management Forum, Dallas, Texas, September 1993.

"Today's Economic Climate and Its Effects on Financial Planning."  Presentation given before the Dallas Financial Planners Advisory Council, Dallas, Texas, September 1993.

"Global Economic Update."  Keynote address delivered to the Senior Management Meeting of Diamond Shamrock, Inc., San Antonio, Texas, September 1993.

"Minority Business Development and the Texas Economy."  Keynote address delivered to the BOSS VI '93 Conference, Austin, Texas, September 1993.

"Economic Development Opportunities in the Sulphur Springs and Hopkins County Region."  Address delivered to the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, October 1993.

"1994 Economic Outlook for Texas and the US."  Presentation given at the 1994 Waco Economic Outlook Conference (sponsored by Baylor University and the Waco Chamber of Commerce), Waco, Texas, October 1993.

"The Outlook for Banking in Light of the Changing Texas Economy."  Address delivered to the Independent Bankers Association of Texas 19th Annual Convention, Houston, Texas, October 1993.

"US/Japan Economic Overview: An Evaluation of Current Economic Conditions and Evolving Trade Patterns."  Address delivered to and panel discussion for the Japan-US Southern Conference, Dallas, Texas, October 1993.

"Potential Impact of NAFTA on Economic Growth in South Texas."  Presentation delivered during the 1993 South Texas-Mexico Economic Development Conference, South Padre Island, Texas, October 1993.

"Economic Perspectives on Victoria and Texas."  Address delivered to and panel discussion for the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Victoria, Texas, October 1993.

"Economic Summary and Forecast for the Greater San Antonio Region."  Address delivered during the Centennial Celebration of Stewart Title Company, San Antonio, Texas, October 1993.

"How the Economy Affects Interest Rates."  Address delivered to MC Planning Systems 1st Annual User Conference and Seminar, Houston, Texas, October 1993.

"Deficit Reduction: Its Impact on Texas."  Presentation delivered during the 3rd Annual Federal Reserve Bank Conference, Houston, Texas, October 1993.

"Economic Perspectives on Austin and Texas."  Address delivered to and panel discussion for the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Austin, Texas, October 1993.

"An Overview of the Mexico, US, and China Economies."  Keynote address delivered to the China-US-Mexico Technology Trade Expo, San Antonio, Texas, November 1993.

"Economic Perspectives on Odessa/Midland and Texas."  Presentation delivered at the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Odessa, Texas, November 1993.

"Economic Perspectives on Houston and Texas."  Presentation delivered during the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Houston, Texas, November 1993.

"NAFTA: Is There a Price for Free Trade?"  Debate at the 3rd Annual State Policy Analysis Conference, Austin, Texas, November 1993.

"Economic Perspectives on Dallas and Texas."  Presentation delivered during the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Dallas, Texas, November 1993.

"Future of the Texas Economy."  Keynote address presented during the 35th Institute on Property Taxation sponsored by the Lyndon Baines Johnson School of Public Affairs and the Comptroller's Property Tax Division, Austin, Texas, December 1993.

"Economic Perspectives on Tyler and Texas."  Presentation presented during the Texas Regional Economic Outlook Seminar (sponsored jointly by the Texas Comptroller of Public Accounts and Perryman Consultants), Tyler, Texas, December 1993.

"The Economic Impact of NAFTA."  Address delivered to the Texas Philosophical Society Annual Meeting, Laredo, Texas, December 1993.

"The Economic Outlook for Brenham and Washington County."  Address delivered to the Annual Washington County Chamber of Commerce Banquet, Brenham, Texas, January 1994.

"The Economic Outlook for the Nation, Texas, and the Houston Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Houston, Texas, January 1994.

"The Economic Outlook for the Nation, Texas, and the San Antonio Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, San Antonio, Texas, January 1994.

"The Economic Outlook for the Nation, Texas, and the Austin Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Austin, Texas, January 1994.

"The Economic Outlook for the Nation, Texas, and the Dallas Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Dallas, Texas, January 1994.

"The Economic Outlook for Brenham and Washington County."  Address delivered to the Annual Washington County Chamber of Commerce Banquet, Brenham, Texas, January 1994.

"Winners and Losers in the Texas Economy, with Emphasis on Patterns in the Houston Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Houston, Texas, January 1994.

"Winners and Losers in the Texas Economy, with Emphasis on Patterns in the San Antonio Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, San Antonio, Texas, January 1994.

"Winners and Losers in the Texas Economy, with Emphasis on Patterns in the Austin Area."  Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Austin, Texas, January 1994.

"Winners and Losers in the Texas Economy, with Emphasis on Patterns in the Dallas Area." Address delivered to the 1994 Economic Outlook Conference sponsored by Perryman Consultants, Texas Monthly, and Blue Cross Blue Shield of Texas, Dallas, Texas, January 1994.

"The Economic Outlook for the South Montgomery County Area." Address delivered to the 1994 Economic Outlook Conference of the South Montgomery County/The Woodlands Chamber of Commerce, The Woodlands, Texas, January 1994.

"NAFTA, Transportation and Technology: What's That Got to Do With Commercial Real Estate." Presentation presented to the Rattikin Title Company Seminar, Fort Worth, Texas, February 1994.

"The Economic Effects of the Texas Eastman Facility on East Texas." Address delivered to the Economic Development Committee of the Longview Economic Development Corporation, Longview, Texas, February 1994.

"A Briefing on the Economic Outlook for Dallas and Texas." Address delivered to the City of Dallas, Dallas, Texas, February 1994.

"The Long-Term Outlook for the Texas Economy." Address delivered to the Southern Municipal Finance Society Conference, Austin, Texas, February 1994.

"A Briefing on the Economic Outlook for Dallas in Light of the North American Free Trade Agreement." Address delivered to the Dallas City Council Budget Planning Workshop, Dallas, Texas, February 1994.

"NAFTA, Transportation, and Technology: What's That Got to Do With Commercial Real Estate." Presentation delivered to the Rattikin Title Company Seminar, Fort Worth, Texas, February 1994.

"The Economic Outlook for Texas and the Abilene Area." Address delivered to the 1994 Abilene Economic Outlook Conference, Abilene, Texas, February 1994.

"The Real Estate Outlook for the Coming Year." Address delivered to the Planning Seminar of Southwest Land Title Association, Dallas, Texas, February 1994.

"The Proper Use of Expert Testimony in Litigation." Address delivered to a seminar on the New World of Litigation sponsored by Corporate Legal Times, Chicago, Illinois, March 1994.

"The Emerging Policy Issues and Regulatory Process in Texas." Keynote address delivered to the Texas Safety Association's 1994 Southwest Conference and Exposition, Houston, Texas, March 1994.

"The Economic Forecast for Southwest Texas." Keynote address delivered to the Texas Safety Association's 1994 Southwest Conference and Exposition, Houston, Texas, March 1994.

"World Economy—Long-Term Lender—Texas, Alabama, Louisiana, and Mississippi." Presentation to the Farm Credit Bank of Texas Annual Stockholders Meeting, Austin, Texas, March 1994.

"The 123s of Structuring Damage Modeling So That All Bases Are Covered."
Presentation presented at Business Development Associates "Leveraging Your
Power As The Corporate Client" Conference, Chicago, Illinois, March 1994.

"The Economic Outlook for Estate Planning."  Address delivered to the Dallas Estate
Planning Council, Dallas, Texas, April 1994.

"Global Awareness and Future Trends in Leadership."  Address delivered to the 1994
Conference of the Association of Texas Leadership Programs, Waco, Texas,
April 1994.

"Economies of the Southwest Regions and Mexico in Light of NAFTA."  Address
delivered at the Arthur Anderson Southwest Region/Mexico Partners Retreat,
Houston, Texas, April 1994.

"A Look at the Strength and Weakness of the Economy of Gonzales."  Address delivered
to the Gonzales Area Development Corporation Annual Planning and Information
Conference, Gonzales, Texas, April 1994.

"An Overview of Economic Conditions in the Energy Industry and the Houston Area
Real Estate Market."  Address series delivered to the financial analysts meetings
for Mitchell Energy and Development, The Woodlands, Texas, May 1994.

"An Overview of Texas, Houston, Montgomery County, and The Woodlands."  Address
delivered to The Woodlands Corporation Analysts and Bankers Meeting,
Houston, Texas, May 1994.

"Philanthropy and the Economic Process."  Address delivered to the West Texas United
Way Planning Seminar, Odessa, Texas, June 1994.

"NAFTA and the Texas Economy from Austin to the Border."  Address delivered to the
Gulf State Utilities-Team City Community Development Conference, Conroe,
Texas, September 1994.

"The Role of Franchising in Economic Expansion: Challenges and Opportunities."
Address delivered to the International Franchise Association Conference, Dallas,
Texas, September 1994.

"NAFTA and Its Effects on the Broadcasting Industry and the Economy."  Address
delivered to the 1994 Conference of the Texas Association of Broadcasters,
Arlington, Texas, September 1994.

"The Global Economy."  Address delivered to the Women's Financial Series at Southern
Methodist University, Dallas, Texas, September 1994.

"Looking Toward the Texas Economy for the Next 20 Years."  Address delivered to the
20th Annual Convention of the Independent Bankers Association of Texas,
Austin, Texas, September 1994.

"Economic Outlook for the US and Texas."  Address delivered to the Waco Economic
Outlook Conference sponsored by Baylor University and the Waco Chamber of
Commerce, Waco, Texas, October 1994.

"The Economic Outlook for Residential Real Estate in the Dallas/Fort Worth Area." Address delivered to the Fall Planning Conference of RCS Investment Corporation, Comfort, Texas, October 1994.

"Technological and Trade Factors Affecting the Dynamics of the World Economy." Address delivered to the Dean Witter International Investment Seminar, Dallas, Texas, October 1994.

"The Old and the New Texas." Keynote address delivered to the Southern Methodist University MBA Showcase Event, Dallas, Texas, October 1994.

"Investment Opportunities in the Gaming Industry." Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, October 1994.

"Economic Forecast for Texas and the Southwest and Its Effect on Healthcare." Address delivered to the Scott & White Board of Visitors, Temple, Texas, October 1994.

"State of the Texas Economy and Its Impact on Texas Cities." Keynote address delivered to the Texas Municipal League's Annual Conference, Austin, Texas, October 1994.

"The Economic Outlook for Killeen-Temple, Texas, and the US." Address delivered to the Temple Chamber of Commerce Economic Outlook Conference, Belton, Texas, November 1994.

"Global Factors Impacting the Texas Economy." Address delivered to the "Wisdom of Dallas Luncheon," sponsored by the Dallas Morning News, Dallas, Texas, November 1994.

"The Telecommunications Revolution." Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, November 1994.

"Dallas and the Texas Economy." Address delivered to the Dallas Rotary Club, Dallas, Texas, November 1994.

"Globalization and Its Implications for Delivery of Services." Address delivered to the Arthur Andersen Consumer Products Advanced Industry Seminar, St. Charles, Illinois, December 1994.

"The Dallas/Fort Worth Economic Outlook." Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, January 1995.

"The Economic Outlook for the Sherman-Denison Area." Address delivered to the Sherman Chamber of Commerce, Sherman, Texas, January 1995.

"Emerging Global Demand and the Future of the Petroleum Market." Address delivered to the Permian Basin Petroleum Association, Odessa, Texas, January 1995.

"The Economic Outlook for the US, Texas, and the Austin and San Antonio Metropolitan Areas." Address delivered to the 11th Annual Austin/San Antonio Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Austin, Texas, January 1995.

344

"The Economic Outlook for the US, Texas, and the Dallas/Fort Worth Metropolitan Area." Address delivered to the 11th Annual Dallas/Fort Worth Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Dallas, Texas, January 1995.

"The Economic Outlook for the US, Texas, and the Houston Metropolitan Area." Address delivered to the 11th Annual Houston Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Houston, Texas, January 1995.

"Global Texas—The Impact of International Trade on Business Activity in Texas and the Austin and San Antonio Metropolitan Areas." Address delivered to the 11th Annual Austin/San Antonio Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Austin, Texas, January 1995.

"Global Texas—The Impact of International Trade on Business Activity in Texas and the Dallas/Fort Worth Metropolitan Area." Address delivered to the 11th Annual Dallas/Fort Worth Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Dallas, Texas, January 1995.

"Global Texas—The Impact of International Trade on Business Activity in Texas and the Houston Metropolitan Area." Address delivered to the 11th Annual Houston Economic Outlook Conference sponsored by The Perryman Group, Blue Cross Blue Shield of Texas, and Texas Monthly, Houston, Texas, January 1995.

"The Telecommunications Industry." Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, February 1995.

"Global Forces in the Texas Economy." Address delivered to the International Trade Advisory Council, Dallas, Texas, February 1995.

"The State and National Economic Outlook." Address delivered to the 1995 Abilene Economic Outlook Conference, Abilene, Texas, February 1995.

"Globalization and Technology." Speech presented to the International Alliance of the Dallas Chamber of Commerce, Dallas, Texas, February 1995.

"The Economy of the D/FW Metroplex and the State of Texas in Correlation to the Midlothian Area." Address delivered to the Midlothian Chamber of Commerce, Midlothian, Texas, February 1995.

"Review of the 1994 Economy for the Dallas Area and the State of Texas and the Forecast for 1995." Address delivered to the Salesmanship Club of Dallas, Dallas, Texas, February 1995.

"The Current Outlook for the Commercial Real Estate Market in the Metroplex." Address delivered to the Rattikin Title Company, Fort Worth, Texas, February 1995.

"Economic Trends for the Turn of the Century: The State of the State, The State of the Nation." Address delivered to the Annual Conference of the Texas Association of Appraisal Districts, Austin, Texas, February 1995.

"Emerging Technologies."  Address delivered to the Women's Financial Series at
Southern Methodist University, Dallas, Texas, March 1995.

"The Dallas/Fort Worth Outlook for the Real Estate Sector."  Address delivered to the
North Texas Association of Realtors, Dallas, Texas, March 1995.

"Investing in Utilities in the Era of Deregulation."  Address delivered to the Women's
Financial Series at Southern Methodist University, Dallas, Texas, April 1995.

"Domestic and International Factors Impacting National Economic Activity."  Address
delivered to the National Federation of Municipal Analysts, San Antonio, Texas,
April 1995.

"Entrepreneurship in the Emerging Global Economy."  Address delivered to the Family
Business Seminar at Southern Methodist University, Dallas, Texas, April 1995.

"Emerging Technologies and Industries—Information for an Effective Investment
Strategy."  Address delivered to the 1995 Investment Conference of Austin
Ventures, Austin, Texas, April 1995.

"National Economic and Real Estate Patterns, with emphasis on the Texas, Oklahoma,
Louisiana, and Mississippi Regions."  Address delivered at the Certified
Commercial Investment Member Conference, San Antonio, Texas, April 1995.

"Economic and Urban Development Strategies in the Emerging Global and
Technological Framework."  Address delivered to the National Council for Urban
and Economic Development, Dallas, Texas, April 1995.

"Derivatives."  Address delivered to the Women's Financial Series at Southern Methodist
University, Dallas, Texas, April 1995.

"Corporate Locations in the Metroplex—Strategic Advantages and Challenges."  Address
delivered to the South Dallas Development Corporation, Dallas, Texas, April
1995.

"Fundamental Forces Shaping Global Economic Activity."  Address delivered to the
Women's Financial Series at Southern Methodist University, Dallas, Texas,
May 1995.

"The Southwest Economy and the Future of Banking."  Address delivered to the
Southwestern Graduate School of Banking at Southern Methodist University,
Dallas, Texas, June 1995.

"Incentives and Economic Development—The Contributions of the Amarillo Economic
Development Corporation."  Address delivered to the Annual Public Forum of the
Amarillo Economic Development Corporation, Amarillo, Texas, June 1995.

"Future Patterns in the Health Care Industry."  Address delivered to the Annual
Conference of the Healthcare Financial Management Association, South Padre
Island, Texas, June 1995.

"The Future of the Texas Economy and the Texas Commercial Building Industry."
    Address delivered to the Annual Conference of the Texas Building Branch of the
    Associated General Contractors, Santa Fe, New Mexico, July 1995.

"An Economic Forecast for Texas with Emphasis on the Energy Sector."  Address
    delivered to the Annual Meeting of the Texas Mid-Continent Oil and Gas
    Association, Austin, Texas, September 1995.

"Trends, Warning Signs, Growing Pains."  Address delivered to the 1995 Annual
    Conference of the Texas Economic Development Council, Dallas, Texas,
    September 1995.

"A New Look at Investing in Venture Capital."  Address delivered to the Women's
    Financial Series at Southern Methodist University, Dallas, Texas,
    September 1995.

"The Investment Outlook for Mexican Businesses."  Address delivered to the Women's
    Financial Series at Southern Methodist University, Dallas, Texas, October 1995.

"Outlook for the Texas and East Texas Economies."  Address delivered to the major
    donor's appreciation banquet at East Texas Baptist University in Marshall, Texas,
    October 1995.

"The Outlook for the Expanding Information Industry."  Address delivered to the
    Women's Financial Series at Southern Methodist University, Dallas, Texas,
    November 1995.

"Forces Shaping the Future of Texas."  Address delivered to the MBA Showcase Event at
    Southern Methodist University, Dallas, Texas, November 1995.

"The Economic Outlook for the US, Texas, and the Killeen-Temple Metropolitan
    Statistical Area" and "Global Texas—A Retrospective and Prospective
    Assessment."  Addresses delivered to the Temple/Belton, Killeen Chambers of
    Commerce Economic Outlook Conference, Belton, Texas, November 1995.

"The Role of the Arts in the Economic Future of Texas."  Address delivered to the
    Annual Conference of the Texas Alliance for Education and the Arts, Odessa,
    Texas, November 1995.

"New Stock Market Opportunities."  Address delivered to the Women's Financial Series
    at Southern Methodist University, Dallas, Texas, November 1995

"The Outlook for the National, State, and Dallas/Fort Worth Economies."  Address
    delivered to the 12th Annual Dallas/Fort Worth Economic Outlook Conference
    sponsored by The Perryman Group and Southern Methodist University, Dallas,
    Texas, January 1996.

"The Outlook for the National, State, and Houston Economies."  Address delivered to the
    12th Annual Houston Economic Outlook Conference sponsored by The Perryman
    Group and Rauscher Pierce Refsnes, Houston, Texas, January 1996.

"The Outlook for the National, State, and Austin/San Antonio Economies."  Address delivered to the 12th Annual Austin/San Antonio Economic Outlook Conference sponsored by The Perryman Group and Rauscher Pierce Refsnes, Austin, Texas, January 1996.

"The Real Cost to the Texas Economy of Compliance with Environmental Regulations."  Address delivered to the 12th Annual Austin/San Antonio, Houston, and Dallas Economic Outlook Conferences sponsored by The Perryman Group, Rauscher Pierce Refsnes (Houston and Austin), and Southern Methodist University (Dallas), January 1996.

"Investment in Intellectual Property."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, January 1996.

"The Economic Outlook for the US, Texas, and the Wichita Falls Metropolitan Area."  Address delivered to the Wichita Falls Economic Outlook Conference, Wichita Falls, Texas, January 1996.

"The Workforce Situation in the Austin High-Technology Economy."  Address delivered to the Austin Advanced Research Organization, Austin, Texas, January 1996.

"The Economic Outlook for the Nation, Texas, Houston, and the Woodlands/South Montgomery County Areas."  Address delivered to The Woodlands/South Montgomery County Economic Outlook Conference, The Woodlands, Texas, January 1996.

"The Economic and Demographic Expansion Patterns in the Central Texas Economy."  Address delivered to the 1996 District Conference of Southwestern Bell Telephone Company, Austin, Texas, January 1996.

"The Strategic Options for Corporate Profitability in the Emerging Global Economy."  Address delivered to the Financial Managers Forum, Dallas, Texas, January 1996.

"The Outlook for the Professional Services Sector—Opportunities in an Evolving Environment."  Address delivered to the Society for Marketing Professional Services, Houston, Texas, January 1996.

"The State and National Economic Outlook."  Address delivered to the Abilene Economic Outlook Conference, Abilene, Texas, February 1996.

"An Economic Update During an Election Year."  Address delivered to the International Association of Financial Planners Annual Conference, Addison, Texas, February 1996.

"The Outlook for the Fashion Industry."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, February 1996.

"Investing in the Environment."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, March 1996.

"Trust: Opportunities for Growth Investing."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, March 1996.

"Odessa's Economic Future."  Address delivered to the Odessa Rotary Club, Odessa, Texas, April 1996.

"Emerging Markets: Vietnam, the New Hong Kong, and China."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, April 1996.

"The Energy Forecast for Texas, Oklahoma, Louisiana, and Arkansas."  Address delivered to the Petroleum Institute Conference, Houston, Texas, April 1996.

"Electronic Commerce: A Demonstration."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, April 1996.

"The Texas Forecast."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, May 1996.

"Housing Trends for the Southwest and Western US."  Address delivered to the Texas Manufactured Housing Association, Dallas, Texas, May 1996.

"How Demographics, Globalization, and Technology are Influencing Workforce Changes."  Address delivered to the Consulting and Systems Integration Managers of IBM, Dallas, Texas, June 1996.

"Economic Outlook for Central Texas and Texas: Scott & White's Role in the Future."  Address delivered to the Scott & White Hospital Government Affairs Committee, Temple, Texas, August 1996.

"Outlook for the West Texas Economy."  Address delivered to the Boy Scouts, Odessa, Texas, August 1996.

"The Economic Outlook for the Waco and Texas Economies."  Address delivered to the Waco Rotary Club, Waco, Texas, September 1996.

"Is the Stock Market Overheated?"  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, September 1996.

"The Outlook for the Texas Economy and its Financial Institutions."  Address delivered to the Texas Society of CPAs Financial Institutions Conference, San Antonio, Texas, September 1996.

"Small Cap Stocks."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, October 1996.

"The Economic Outlook for the US and Texas."  Address delivered to the Dallas Treasury Management Association, Dallas, Texas, October 1996.

"The Impact of Election Issues and Economic Policy on Business Conditions."  Address delivered at The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Hoak Breedlove & Wesneski, Dallas, Texas, October 1996.

"The Economic Outlook for the United States, Texas, Dallas, Fort Worth, and The Metroplex."  Address delivered at The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Hoak Breedlove & Wesneski, Dallas, Texas, October 1996.

"Election Issues and Their Effect on Philanthropy."  Address delivered to the Southwestern Medical Foundation, Dallas Foundation, Catholic Foundation, and Hoblitzelle, Dallas, Texas, October 1996.

"The Role of Fort Worth and Texas in the Global Economy."  Address delivered to the City of Fort Worth Managers' Retreat, Fort Worth, Texas, November 1996.

"The Power of Politics: 1996 Elections."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, November 1996.

"The Economic Outlook: Global Forces Shaping the National, State, and Local Economies."  Address delivered to the Financial Executives Institute, Dallas, Texas, November 1996.

"Economic Outlook for the Dallas/Fort Worth and Texas Economies."  Address delivered to the CEO Leadership Breakfast Series, Southern Methodist University, Dallas, Texas, November 1996.

"Why Invest in a Mutual Fund?"  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, November 1996.

"The Impact of Legislative Issues and Potential Tax Reform on Business Conditions in Texas."  Address delivered to The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, December 1996.

"The Economic Impact of Legislative Issues and Potential Tax Reform on Business Conditions in Texas."  Address delivered to The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 1996.

"The Economic Outlook for the US, Texas, and the Austin Metro Area."  Address delivered to The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, December 1996.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Address delivered to The Perryman Group's 13th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 1996.

"The Insider's Scoop on Insider Trading."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, December 1996.

"The Short-Term Economic Outlook for the Southwest Region."  Address delivered to Southwest Corporate Federal Credit Union Economic Forum, Dallas, Texas, December 1996.

"From Private to Public: The Popular IPO."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, January 1997.

"The Economic Outlook for the State of Texas."  Address delivered to the Texas Association of Business & Chambers of Commerce, Austin, Texas, January 1997.

"Forecast for Education and the Economy in Texas."  Address delivered to the Texas Education Agency, Austin, Texas, January 1997.

"The Future of Futures." Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, February 1997.

"Will Investments and the Economy Sizzle or Sputter Under Clinton?"  Address delivered to the Financial Institutions Marketing Association (FIMA), San Antonio, Texas, February 1997.

"The Future of the West Texas Economy."  Address delivered to the Fort Stockton Chamber of Commerce, Fort Stockton, Texas, February 1997.

"An Economic Review & Outlook for the Central Texas Area."  Address delivered to the Compass Bank Economic Forecast Luncheon, Temple, Texas, March 1997.

"Investing Via the Internet."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, March 1997.

"Electricity Deregulation."  Address delivered to the Texas Legislative Conference, New Braunfels, Texas, March 1997.

"The Ebb and Flow of Cyclical Stocks."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, April 1997.

"An Economic Outlook for the State of Texas."  Address delivered to the Annual Conference of the Texas Economic Development Council, Dallas, Texas, April 1997.

"The Outlook for the Texas Energy Industry with Deregulation on the Horizon."  Address delivered to the Corporate Management Meeting of Williams Field Service, Houston, Texas, April 1997.

"Wrap Up: What to Look for in the Coming Year."  Address delivered to the Women's Financial Series at Southern Methodist University, Dallas, Texas, May 1997.

"The Economic Outlook and Opportunities for the Dallas/Fort Worth Area."  Address delivered to the Grand Prairie Chamber of Commerce's Business Expo, Grand Prairie, Texas, June 1997.

"The East Texas Economic Outlook."  Address delivered to the Texas Business Magazine Breakfast Seminar, Tyler, Texas, July 1997.

"The Economic Outlook for The United States, Texas, and the Houston PMSA." Address delivered to The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Morgan Keegan, Houston, Texas, Fall 1997.

"The Economic Outlook for The United States, Texas, and the Odessa-Midland MSA." Address delivered to The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, Fall 1997.

"The Economic Outlook for The United States, Texas, and the Austin-San Marcos MSA."  Address delivered to The Perryman Group's 14th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, Fall 1997.

"Financing Business Endeavors in the Brave New World."  Address delivered to the National Association of Business Economists, New Orleans, Louisiana, September 1997.

"What a Difference a Decade Makes."  Address delivered to the Development Roundtable of The University of Texas of the Permian Basin, Odessa, Texas, September 1997.

"The Forecast for Business in Texas."  Address delivered to the Texas Society of Certified Public Accountants (CPAs), Houston, Texas, September 1997.

"The US Economic Outlook: Our Role in Global Competition."  Address delivered to the American Society of Chamber of Commerce Executives, Fort Worth, Texas, October 1997.

"Economics—State of the Industry."  Address delivered to the International Financial Management Association's Second Annual Certified Financial Officers Forum, San Antonio, Texas, October 1997.

"The Central Texas Economic Outlook."  Address delivered to the Waco Rotary Club, Waco, Texas, October 1997.

"Economic Prospects in the Emerging Environment."  Address delivered to the Frisco Allies Day, Frisco, Texas, October 1997.

"The Global Economy."  Address delivered to the Temple Chamber of Commerce Economic Outlook Conference, Belton, Texas, October 1997.

"The Economic Outlook for Texas and the Dallas Area."  Address delivered to the Real Estate Financial Executives Association, Dallas, Texas, January 1998.

"Emerging Opportunities in the Deep East Texas Area."  Address delivered to the Nacogdoches Rotary Club, Nacogdoches, Texas, January 1998.

"Trends in the US and Texas Economies and Montgomery County."  Address delivered to the South Montgomery County/The Woodlands Chamber of Commerce 12th Annual Economic Outlook Conference, The Woodlands, Texas, January 1998.

"The Impact of Reduced Gasoline Prices on the Economy of the El Paso Area."  Address delivered to the Longhorn Pipeline Forum, El Paso, Texas, March 1998.

"The Outlook for the US, Texas, and Metroplex Economies."  Address delivered to the Dallas Mortgage Bankers Monthly Meeting, Dallas, Texas, April 1998.

"Economic Prospects for the Collin County Area."  Address delivered to the Fourth Annual Collin County Economic Summit, Plano, Texas, April 1998.

"The Economic Outlook and Opportunities for the Dallas/Fort Worth Area."  Address delivered to the National Association of Purchasing Managers, Dallas, Texas, April 1998.

"The Brave New World of Finance."  Address delivered to the President's Forum Program, The Entrepreneurship Institute of Dallas, Dallas, Texas, April 1998.

"The Economic Outlook for the US, Texas, and the Banking Industry."  Address delivered to the 1998 National School of Community Bank Management Group at Texas Tech University, Lubbock, Texas, May 1998.

"The Macro- and Micro-Economic Environment."  Address delivered to the 1998 National School of Community Bank Management at Texas Tech University, Lubbock, Texas, May 1998.

"The Short-Term Texas Outlook."  Address delivered to the Harvard Business School, Fort Worth, Texas, June 1998.

"The Economic Impact of Enhanced Fuel Competition in the Permian Basin."  Address delivered to the Odessa Economic Development Corporation, Odessa, Texas, June 1998.

"The Economic Outlook for the State of Texas."  Address delivered to the Texas Land Title Association, San Antonio, Texas, June 1998.

"The Economic Outlook for The United States, Texas, and the Austin-San Marcos MSA."  Address delivered to The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the Houston PMSA."  Address delivered to The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Houston Industries, Inc., Houston, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, the Longview-Marshall MSA and the Tyler MSA."  Address delivered to The Perryman Group's 15th Annual Economic Outlook Conference sponsored by TU Electric and Lone Star Gas, Longview, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the Odessa-Midland MSA."  Address delivered to The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, Fall 1998.

"The Economic Outlook for The United States, Texas, and the San Antonio MSA."  Address delivered to The Perryman Group's 15th Annual Economic Outlook Conference sponsored by Southwestern Bell, San Antonio, Texas, Fall 1998.

"The Economic Outlook for Texas and Monahans."  Address delivered to the Monahans Chamber of Commerce, Monahans, Texas, October 1998.

"Workforce and Economic Development Issues on the Texas-Mexico Border."  Address delivered to the Texas Workforce Commission, El Paso, Texas, October 1998.

"The Economic Outlook for the Permian Basin Region."  Address delivered to the Permian Basin Regional Planning Commission, Odessa, Texas, October 1998.

"Commercial Real Estate Outlook for North Texas."  Address delivered to the Dallas Mortgage Bankers Commercial Luncheon, Dallas, Texas, November 1998.

"The Victoria Area Economic Outlook."  Address delivered to the Victoria Economic Development Corporation Economic Conference, Victoria, Texas, November 1998.

"Minority Business Opportunities in the Emerging Economy."  Address delivered to the Texas Association of Hispanic Chambers of Commerce, Odessa, Texas, November 1998.

"The Changing Nature of Texas."  Keynote address delivered to the Pre-Session Organizational Conference of the Texas Legislature, Austin, Texas, December 1998.

"The Economic Outlook for Texas and San Antonio."  Address delivered to the San Antonio Automobile Dealers Association, San Antonio, Texas, January 1999.

"The Economic Outlook for Texas and the Metroplex."  Address delivered to the CEO Institute, Dallas, Texas, January 1999.

"Economic Development and the Economic Outlook in Texas."  Address delivered to the Texas Leadership Institute Breakfast, Bastrop, Texas, January 1999.

"The Economic Outlook for East Texas."  Address delivered to the East Texas Bankers & Agriculture Conference, Tyler, Texas, February 1999.

"The Economic Outlook for the US, Texas, and Sherman-Denison."  Address delivered to the Denison Rotary Club, Denison, Texas, February 1999.

"Economic Development Prospects in a Changing Environment."  Address delivered to the Bay Area Economic Summit, Ann Arbor, Michigan, March 1999.

"Labor Deficiencies and Opportunities."  Address delivered to the Greater Corpus Christi Business Alliance, Corpus Christi, Texas, March 1999.

"Forecast of the US and Texas: Our Future—Possibilities and Probabilities."  Address delivered to the 9th Annual Investment Conference of AMR, Arlington, Texas, March 1999.

"Changing Demographics—Forecast for the Future."  Address delivered to the Rotary International District Conference Annual Meeting, Mexia, Texas, April 1999.

"Economic Overview for the United States and Texas."  Address delivered to the Trammell Crow Annual Conference of Lenders, Houston, Texas, April 1999.

"Economic Outlook for West Texas."  Address delivered to the Texas Tech College of Business and the Lubbock Chamber of Commerce Economic Outlook Breakfast, Lubbock, Texas, April 1999.

"Global Opportunities and Changes."  Address delivered to the CEO Council of Texas Tech University, Lubbock, Texas, April 1999.

"Economic Agenda in the Legislature."  Address delivered to the Republican Men's Club, Waco, Texas, April 1999.

"Economics and the Workforce: Changes Expected in the Next Century."  Address delivered to the 1999 Conference of the Texas Administrators of Continuing Education, Austin, Texas, April 1999.

"Economic Outlook for Texas."  Address delivered to the Annual Convention General Session of the Texas Land Title Association, Santa Fe, New Mexico, June 1999.

"Managing Risks in a Corporate Restructuring."  Address delivered to the Turnaround Management Association, Dallas, Texas, June 1999.

"Economic Outlook for Health Care for Texas and Bell County."  Address delivered to Scott and White's Special Economic Study Conference, Temple, Texas, August 1999.

"Trends in Workforce Patterns in the Economic Outlook for Texas."  Address delivered to the Texas Workforce Development Conference, Dallas, Texas, September 1999.

"The Texas and National Economy—Effect on Affordable Housing and Mortgage Interest Rates."  Address delivered to the Texas Association of Local Housing Finance Agencies Conference, Odessa, Texas, September 1999.

"The Economic Outlook for the US and Texas."  Address delivered to the Baylor Economic Forecast Conference, Waco, Texas, October 1999.

"The Texas Economy in the New Millennium."  Address delivered to the Municipal Advisory Council of Texas, Austin, Texas, October 1999.

"Looking Toward the Future: A Perspective on History, Technology, and the Future."  Seminar series delivered to the Special Conference for Redi-Mix Producers, Houston, Texas, October 1999.

"The Texas and Regional Economic Forecast."  Address delivered to the Southwest Corporate Federal Credit Union Conference, Dallas, Texas, November 1999.

"The Economic Outlook for Texas and the Rio Grande Valley."  Keynote address delivered to the Rio Grande Valley Economic Summit, Brownsville, Texas, November 1999.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 1999.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Area."  Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Frost Bank and Fulbright & Jaworski, Austin, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Bryan-College Station MSA." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by The Adams Company, College Station, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Houston Area." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Reliant Energy, Houston, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler MSAs." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by TXU Electric and Gas, Longview, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the San Antonio Area." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by Southwestern Bell and The North San Antonio Chamber of Commerce, San Antonio, Texas, December 1999.

"The Economic Outlook for the US, Texas, and the Amarillo MSA." Address delivered to The Perryman Group's 16th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce and First National Bank of Amarillo, Amarillo, Texas, January 2000.

"Education for Tomorrow: A Look at Emerging Trends in the New Millennium." Address delivered to the El Paso Community College Faculty Development General Session, El Paso, Texas, January 2000.

"The Future of the Metroplex Region in the New Century." Address delivered to the Southwest Metroplex Alliance General Assembly, Fort Worth, Texas, February 2000.

"The Role of Promotional Efforts in Regional Economic Development." Address delivered to the Partnership of Southeast Texas, Beaumont, Texas, February 2000.

"Economic Patterns and Evolving Paradigms for Electric Utilities." Address delivered to the Lower Colorado River Authority, Austin, Texas, February 2000.

"Economic Development Strategies in the New Millennium." Address delivered to the Midland Economic Summit, Midland, Texas, February 2000.

"The Economic Prospects for the Northeast Texas Area." Address delivered to the Annual Meeting of the Rusk County Chamber of Commerce, Henderson, Texas, March 2000.

"Major Trends Impacting Future Business Activity." Address delivered to the Comerica Business Forum Roundtable, Houston, Texas, March 2000.

"The Future of Construction in Texas."  Address delivered to the Annual Conference of the Lumbermen's Association of Texas, San Antonio, Texas, April 2000.

"Texas Rural Development."  Address delivered to the Select Committee on Rural Development of the Texas House of Representatives, Plainview, Texas, April 2000.

"Forces that Forged Waco."  Address delivered to Leadership Waco, Waco, Texas, May 2000.

"What Does the New Millennium Hold for the Valley and How Can We Capitalize on It?"  Address delivered to the Tenth Annual Urban County Conference, South Padre Island, Texas, May 2000.

"Charting the Course."  Address delivered to the Collin County Economic Summit, Frisco, Texas, May 2000.

"Economic Forces and Leadership Imperatives."  Address delivered to the Leadership in Free Enterprise Program, Waco Rotary Club, Waco, Texas, June 2000.

"Future Opportunities in Economic Development."  Address delivered to the East Texas Council of Governments, Longview, Texas, June 2000.

"Governmental Functions in Regional Economic Development."  Address delivered to the Ector County Council of Governments, Odessa, Texas, July 2000.

"The Economy of Texas—Today and Tomorrow."  Address delivered to Leadership Texas 2000, Amarillo, Texas, August 2000.

"Factors Shaping the Panhandle Region."  Address delivered to the Senate 31 Club, Amarillo, Texas, August 2000.

"Workforce Challenges in a Technological Economy."  Address delivered to the Faculty/Staff Conference, Trinity Valley Community College, Athens, Texas, August 2000.

"Factors Shaping the Future of Higher Education."  Address delivered to the Anne Arundel Community College Faculty Orientation, Arnold, Maryland, August 2000.

"Manufactured Housing in Texas."  Address delivered to the 48th Annual Meeting and Convention of the Texas Manufactured Housing Association, Austin, Texas, September 2000.

"Texas Today: An Economic Perspective."  Address delivered to the Texas Congressional Breakfast Club, Washington, DC, September 2000.

"Global Factors Shaping the Emerging Economic Environment."  Address delivered to the 52nd Annual Conference of Southwest Foundations, Santa Fe, New Mexico, September 2000.

"The Economic Outlook for Philanthropy in Texas."  Address delivered to The Meadows Foundation, Dallas, Texas, September 2000.

"A Perspective on the Forces Driving US Construction Activity."  Address delivered to the Master Builders Second Annual Regional Economic Outlook & Management Forum, Houston, Texas, October 2000.

"Changing Demographics and Their Effect on the Future of Higher Education."  Address delivered to the University of North Texas Rocky Mountain Chemistry Chairs Conference, Denton, Texas, October 2000.

"A Short-Term Forecast for the United States and Texas."  Address delivered to the Baylor University Hankamer School of Business Economic Forecast Conference, Waco, Texas, October 2000.

"The Economic Outlook for the US, Texas, and the Bryan-College Station MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by The Adams Company, Bryan, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 2000.

"The Economic Outlook for the US, Texas, and the Amarillo MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Frost National Bank and Fulbright & Jaworski, Austin, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Houston PMSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Reliant Energy, Inc., Houston, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler MSAs."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by TXU Electric and Gas, Longview, Texas, December 2000.

"The Economic Outlook for the US, Texas, and the San Antonio MSA."  Address delivered to The Perryman Group's 17th Annual Economic Outlook Conference sponsored by Southwestern Bell, San Antonio, Texas, December 2000.

"An Economic Perspective on Future Investment Patterns."  Address delivered to the Society of Pension Professionals, Dallas, Texas, December 2000.

"A Rich History and a Bright Future: A Perspective on the Sulphur Springs-Hopkins County Area."  Address delivered to the Annual Hopkins County Chamber of Commerce Membership Banquet, Sulphur Springs, Texas, January 2001.

"Diversification of Economies Based on Natural Resources."  Address delivered to the Lufkin/Angelina County Chamber of Commerce Annual Banquet, Lufkin, Texas, January 2001.

"Legislative Issues and the Implementation of the Texas Electric Choice Act."  Address delivered to the Legislative Briefing of the Association of Electric Companies of Texas, January 2001.

"The Role of Culture in the Future of Texas."  Address delivered to the Governor's Conference on Culture, Austin, Texas, January 2001.

"A Contemporary Perspective on Agribusiness Activity."  Address delivered to the East Texas Banking and Agricultural Conference, Tyler, Texas, February 2001.

"Economic Forces and the Emerging Real Estate Climate."  Address delivered to the Annual Conference of The Real Estate Council (TREC), Dallas, Texas, February 2001.

"Critical Factors in the Economy of Southeast Texas."  Address delivered to The Regional Economic Development Issues Conference at Lamar University, Beaumont, Texas, March 2001.

"Economic Development Issues in Rural Texas."  Address delivered to the Business/Industrial Appreciation Day, Mineola, Texas, March 2001.

"The Prospects for Future Development and Growth in the East Texas Region."  Address delivered to the Tyler Economic Development Council Annual Meeting, Tyler, Texas, March 2001.

"Environmental Quality and Economic Performance."  Address delivered to the Texas Legislative Conference, New Braunfels, Texas, March 2001.

"Economic Development Incentives and Their Role in Future Growth and Diversification."  Address delivered to the Midland Economic Development State of the Economy Conference, Midland, Texas, April 2001.

"Whatever Happened to the Downtown Drugstore?—Forecast for Tomorrow."  Address delivered to the Texas Downtown Association Mid-Year Conference, Midland, Texas, April 2001.

"The Arts as a Vehicle for Economic Development in Small Areas."  Address delivered to the San Angelo Chamber of Commerce, San Angelo, Texas, April 2001.

"Retail Electric Competition in Texas."  Address delivered to the Fort Worth Chamber of Commerce Business Leadership Meeting, Fort Worth, Texas, May 2001.

"The Economic Outlook for the Houston Area."  Address delivered to the Greater Conroe/Lake Conroe Area Chamber of Commerce Meeting, Conroe, Texas, May 2001.

"Issues in Health Care for the Socioeconomically Deprived: Rural, Border, and Urban."  Address delivered to the Annual Conference of the Texas Administrators of Continuing Education (TACE), Dallas, Texas, May 2001.

"Mega Forces Affecting the Texas Labor Market."  Address delivered to the Texas
Council on Workforce and Economic Competitiveness, Austin, Texas, June 2001.

"The Arts, Culture, and the Texas Economy."  Address delivered to the National
Conference of State Legislatures, San Antonio, Texas, August 2001.

"The Emerging Market for Electric Power."  Address delivered to the Texas Public
Power Association Annual Meeting, San Antonio, Texas, August 2001.

"The State and Regional Economic Forecast and Its Potential Effect on Restaurants."
Address delivered to the North Texas Owners and Operators of McDonald's
Restaurants, Dallas, Texas, August 2001.

"Economic Trends in the USA, Europe, and Asia: A Perspective on Emerging
Phenomena and Opportunities."  Address delivered to the Dynegy Five-Year
Strategic Business Planning Meeting, The Woodlands, Texas, August 2001.

"The North Texas Area—What Does the Future Have in Store?"  Address delivered to
the 6th Annual North Texas Conference, Denton, Texas, September 2001.

"The Economy—A National and International Perspective on Regional Performance."
Address delivered to the Conference of Louisiana Realtors and Texas Association
of Realtors, Dallas, Texas, September 2001.

"The Impact of the Cultural Arts on the Houston Economy."  Address delivered to the
Cultural Arts Council of Houston and Harris County, Houston, Texas,
September 2001.

"NAFTA: Impact on Jobs and Investments in Texas."  Address delivered to the Texas
Economic Development Council's Annual Conference, Dallas, Texas,
September 2001.

"Economic Opportunities and Challenges in Light of Recent Terrorism."  Keynote
address delivered to the Texas Society of Certified Public Accountants' Financial
Institutions Conference, Frisco, Texas, September 2001.

"The Trajectory of the Texas Economy: A Post September 11 Assessment."  Address
delivered to the 27th Annual Convention of the Independent Bankers Association
of Texas, Austin, Texas, September 2001.

"The East Texas Economic Forecast and the Role of Education in Local Economic
Development."  Address delivered to the East Texas Baptist University Fall
Donor Banquet, Marshall, Texas, September 2001.

"A Macroeconomic Perspective on Texas and Surrounding/Nearby States."  Address
delivered to Master Builder's Annual Regional Economic Outlook and
Management Forum, Houston, Texas, October 2001.

"Major Trends Affecting the Texas Economy."  Address delivered to the 97th Annual
Meeting of the Lamar County Chamber of Commerce, Beaumont, Texas,
October 2001.

"The US Economic Slowdown and Its Impact on the Mexican Economy."  Address delivered to the San Antonio Hispanic Chamber of Commerce, San Antonio, Texas, October 2001.

"Three Factors Defining Our Economic Future."  Address delivered to Baylor University's Institute for Learning, Waco, Texas, October 2001.

"Short-Term Forecast of the Texas Economy."  Address delivered to the Baylor University Economic Forecast Conference, Waco, Texas, October 2001.

"The Economy of Texas: Retrospect and Prospect."  Address delivered to the Cameron Works, Inc., Corporate Retreat, South Padre Island, Texas, October 2001.

"Workforce Issues and Their Role in South Texas Economic Development."  Address delivered to the Workforce Development Board of South Texas, South Padre Island, Texas, October 2001.

"Bold Ventures—Broad Results: A Perspective on Economic Development Resources."  Keynote address delivered to the Midland Chamber of Commerce Annual Meeting, Midland, Texas, October 2001.

"Architectural Challenges in the Emerging Business Environment."  Address delivered to the 62nd Annual Convention of the Texas Society of Architects, Dallas, Texas, November 2001.

"The Dynamic Nature of the North Texas Economy."  Address delivered to the Northeast Leadership Forum, Denton, Texas, November 2001.

"The Economy of the Southwest: A Perspective on Future Growth Patterns."  Address delivered to the ING Security Life Southwest Regional Meeting, Dallas, Texas, November 2001.

"Economic Realities for the United States, Texas, and Europe 2001-2006."  Address delivered to the British American Business Council of North Texas, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Dallas PMSA."  Address delivered to The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth CMSA."  Address delivered to The Perryman Group's 18th Annual Economic Outlook Conference sponsored by the Greater Dallas Chamber, Dallas, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Address delivered to The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Odessa-Midland MSA."  Address delivered to The Perryman Group's 18th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, November 2001.

"The Economic Outlook for the US, Texas, and the Bryan-College Station MSA."
Address delivered to The Perryman Group's 18th Annual Economic Outlook
Conference sponsored by The Phil Adams Company, Bryan, Texas,
December 2001.

"The Economic Outlook for the US, Texas, and the Amarillo MSA."  Address delivered
to The Perryman Group's 18th Annual Economic Outlook Conference sponsored
by the Amarillo Chamber of Commerce, Amarillo, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the San Antonio MSA."  Address
delivered to The Perryman Group's 18th Annual Economic Outlook Conference
sponsored by the North San Antonio Chamber of Commerce, San Antonio, Texas,
December 2001.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos MSA."  Address
delivered to The Perryman Group's 18th Annual Economic Outlook Conference
sponsored by Frost National Bank and Fulbright & Jaworski, LLP, Austin, Texas,
December 2001.

"The Economic Outlook for the US, Texas, and the Tyler and Longview-Marshall
MSAs."  Address delivered to The Perryman Group's 18th Annual Economic
Outlook Conference sponsored by TXU, Tyler, Texas, December 2001.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler
MSAs."  Address delivered to The Perryman Group's 18th Annual Economic
Outlook Conference sponsored by The Longview Partnership, Longview, Texas,
December 2001.

"The Economic Outlook for the US, Texas, and the Houston PMSA."  Address delivered
to The Perryman Group's 18th Annual Economic Outlook Conference sponsored
by the Houston Northwest Chamber of Commerce, Houston, Texas,
January 2002.

"The Potential Economic Benefits of the Trans Texas Corridor."  Address series for the
Governor's Transportation Initiative, Dallas, Tyler, and Houston, Texas,
January 2002.

"Austin's Role in a Dynamic Technology Environment."  Remarks delivered during the
360 Summit Debate, Austin, Texas, January 2002.

"Closing the Gaps: An Examination of Higher Education in the Texas Economy."
Address delivered to the Texas Higher Education Coordinating Board, Austin,
Texas, January 2002.

"Prospects and Challenges for Rural Economic Development."  Address delivered to the
Office of Rural Community Affairs' Inaugural Executive Committee Retreat,
Jefferson, Texas, January 2002.

"Regional Economic Issues in the Aftermath of September 11."  Address delivered at The
Dallas Morning News Board of Economists meeting, Dallas, Texas,
January 2002.

"Emerging Technologies Shaping the Future of Agriculture."  Address delivered to the East Texas Banking & Agriculture Conference, Tyler, Texas, February 2002.

"The Economic Landscape in a Post September 11 Environment."  Address delivered to the 2002 Texas Women's Alliance Issues Conference, Protecting Freedom: America's Security Challenge, Austin, Texas, February 2002.

"The Fundamentals of Future Real Estate Absorption."  Address delivered to The Real Estate Council (TREC) Conference, Dallas, Texas, February 2002.

"The Texas Economy: Current and Future."  Address delivered to the Texas Daily Newspaper Association 2002 Annual Meeting, Austin, Texas, March 2002.

"Issues Facing Texas: The Emerging World Order."  Address delivered as moderator to the 36th Annual Texas Legislative Conference, New Braunfels, Texas, March 2002.

"Critical Factors Shaping Future Real Estate Development Patterns."  Address delivered to the Crescent Realty Corporate Retreat, Sonoma, California, April 2002.

"The Economy of Texas—Where is it Going?"  Address delivered to The University of Texas Educational Forum, Austin, Texas, April 2002.

"A Perspective on the Dallas, Houston, and Austin Economies."  Address delivered to the CB Richard Ellis Annual Conference, Austin, Texas, April 2002.

"Economic Development in Texas: Past, Present, and Future."  Address delivered to the Texas Economic Development Council, Round Rock, Texas, April 2002.

"Diversification and the Midland-Odessa Regional Economy."  Address delivered to the Midland Chamber of Commerce Annual Meeting, Midland, Texas, May 2002.

"The Role of Effective Job Training on the Future of Texas."  Address delivered to the West Central Texas Workforce Development Board Meeting of the Rural Workforce Network, Abilene, Texas, May 2002.

"A Perspective on the Economic and Financial Outlook."  Address delivered to the Rotary Club of Waco, Texas, May 2002.

"The Impact of Pending Civil Justice Reforms on the Mississippi Economy."  Address delivered to Mississippi Legislative Briefing, Jackson, Mississippi, May 2002.

"The Current Outlook for Business Activity in North Texas."  Address delivered to the 2002 Collin County Economic Summit, Frisco, Texas, May 2002.

"Economic Factors and Political Outcomes."  Address delivered to the Town Hall Forum, Frisco, Texas, May 2002.

"The National and Regional Economic and Fiscal Outlook."  Address delivered to the National Association of State Budget Officers Meeting, Austin, Texas, June 2002.

"Global Economic Performance and Domestic Construction."  Address delivered to the Texas Aggregates and Concrete Association, Carlsbad, California, June 2002.

"Forecast for the Austin Real Estate Market."  Address delivered to the 2nd Annual Mid-Year Economic Forecast for the Austin Real Estate Market of The Real Estate Council, Austin, Texas, July 2002.

"Economic Prospects and Fiscal Realities in the Current Business Environment."  Address delivered to the 33rd Annual Summer Conference of the Texas State Agency Business Administrators' Association, San Antonio, Texas, July 2002.

"New Infrastructure Opportunities and the Texas Mobility Fund."  Address delivered to the Fifth Annual Texas Transportation Summit, Irving, Texas, August 2002.

"The National Economy—What Direction Is It Taking?"  Keynote address delivered to Guaranty Bank's Lending Management Conference, Dallas, Texas, August 2002.

"Global Competitive Factors Shaping US Economic Policy and Appropriate Policy Responses."  Address delivered as an invited speaker in the Economic Recovery and Job Creation Section of The President's Economic Forum, Waco, Texas, August 2002.

"The Economy, One Year Later."  Address delivered to the Fulbright & Jaworski Economic Forum, Dallas, Texas, September 2002.

"The Economy and Its Effect on Real Estate Performance."  Address delivered to the Real Estate Media's RealShare Conference, Dallas, Texas, September 2002.

"The North Texas Economy."  Address delivered to the Texas Pharmacy Services, Inc. Management Conference, Dallas, Texas, September 2002.

"The Economic and Financial Outlook for 2003."  Address delivered to the Plains Capital Corporation and PNB Financial Company Planning Retreat, Dallas, Texas, September 2002.

"Texas Economic Development Policy Update."  Address delivered to the Changes, Challenges, and Opportunities 2002 Annual Texas Economic Development Council (TEDC) Conference, San Antonio, Texas, September 2002.

"Are We Poised for a Rebound?  The Outlook for Construction and Related Activity in the Southwestern US."  Address delivered to the Master Builders Technologies Annual Regional Economic Outlook and Management Forum, Houston, Texas, October 2002.

"Short-Term Forecast of the Texas Economy."  Address delivered to the Baylor University Economic Forecast Conference, Waco, Texas, October 2002.

"An Economist Looks at Tomorrow."  Address delivered to the Ninth Annual Texas Midwest Conference of the Texas Midwest Community Network, Abilene, Texas, October 2002.

"A Perspective on the Global Economy."  Address delivered to the Pan North America Management Meeting, The Woodlands, Texas, October 2002.

"The Synergistic Forces Driving Future Economic Conditions and Educational Requirements."  Address delivered to The University of Texas System Management Seminar, Austin, Texas, October 2002.

"The Potential Effects of Judicial Reforms on the Economy of West Virginia."  Presentation to the West Virginia Legislative Forum, Charleston, West Virginia, October 2002.

"Comments Regarding the Proposed Access Management Policies of the Texas Department of Transportation" Series of presentations to the Texas Transportation Forum, Dallas, Houston, and Austin, Texas, October 2002.

"Are We or Are We Not Having a Recession?  The Texas Economy in 2002."  Address delivered to the Texas Tech University Center for Public Service Symposium, Lubbock, Texas, November 2002.

"Real Estate Patterns in the Texas Economy."  Address delivered to the Annual Conference of Commercial Property News, Addison, Texas, November 2002.

"The Economic Impact for Texas of Failure to Comply with Clean Air Standards."  Address delivered to the Urban Texas Fall Conference 2002, Austin, Texas, November 2002.

"The Economic Outlook for Texas and the Dallas-Fort Worth Area."  Address delivered to the Dallas Business Journal Economic Forecast Symposium, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference hosted by Fulbright & Jaworski, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and hosted by The Greater Dallas Chamber, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to the Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Bill J. Priest Institute, Dallas, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, November 2002.

"The Economic Outlook for the US, Texas, and the Wichita Falls Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Wichita Falls Board of Commerce and Industry, Wichita Falls, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by the Dallas Area Chapter for the Institute of Management Accounts, Addison, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and Frost Bank, Austin, Texas, December 2002.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area."  Address delivered to The Perryman Group's 19th Annual Economic Outlook Conference sponsored by Strasburger & Price, LLP and hosted by The North San Antonio Chamber of Commerce, San Antonio, Texas, December 2002.

"Short-Term Forecasts for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to the North Texas Chapter of the National Association of Industrial and Office Properties, Dallas, Texas, December 2002.

"Economic Forecasts for the US, Texas, and the Longview-Marshall and Tyler Metropolitan Areas."  Address delivered to the Longview Partnership, Longview, Texas, December 2002.

"The Prospects for the Economy in 2003."  Address delivered to the Conference of the National Association of Industrial and Office Parks, Dallas, Texas, December 2002.

"The Economic Outlook for Texas in the Coming Year."  Address delivered to the Texas Association of State Systems for Computing and Communications State of the State Conference, Austin, Texas, December 2002.

"Key Factors Affecting the US and Texas Economies."  Address delivered to the Town North Bank Card Services Executive Conference, New Orleans, Louisiana, January 2003.

"External Factors Affecting the Economic Environment and Their Implications for Strategic Planning."  Address delivered to the Texas Workforce Commission Planning Conference, Austin, Texas, January 2003.

"Economic Phenomena Impacting the Legal Profession."  Address delivered to the Dallas Chapter of the Association of Legal Administrators, Dallas, Texas, January 2003.

"The Short-Term Economic Outlook for Texas and the Local Area."  Address delivered to the Arlington Chamber of Commerce, Arlington, Texas, January 2003.

"A Current Perspective on the Central Texas Economy."  Address delivered to the Killeen Chamber of Commerce Economic Forecast Luncheon, Killeen, Texas, February 2003.

"The Economic Future of East Texas."  Address delivered to the East Texas Banking and Agricultural Conference, Tyler, Texas, February 2003.

"Shaping Public Policy for Economic Development."  Address delivered to the Texas Economic Development Council Legislative Breakfast, Austin, Texas, February 2003.

"The Future of Economic Development in Texas."  Address delivered to the Texas Economic Development Forum, Austin, Texas, March 2003.

"Economic Development: Initiatives of Governor Perry and an Economic Department Reorganization Update."  Address delivered to the Tyler Economic Development Council 14th Annual Membership Luncheon, Tyler, Texas, March 2003.

"The Role of Exports in Economic Development."  Address delivered to the Camino Real District Export Council, Waco, Texas, March 2003.

"The Economic Effects of Airport Development on the Central Texas Area."  Address delivered to Central Texas Community Leaders Forum, TSTC Campus, Waco, Texas, March 2003.

"Trends, Timing, and Trepidation: A Perspective on Economics and Public Policy."  Address delivered to the Seventh Annual Stenholm Forum, TSTC West Texas, Sweetwater, Texas, March 2003.

"The State of the Economy, Demographics and the Effects on Philanthropy."  Address delivered to the Texas Baptists Development Officers Association, Dallas, Texas, April 2003.

"The Benefits of Gaming at the Alabama-Coushatta Reservation on Business Activity in the Deep East Texas Region."  Address delivered to the Deep East Texas Council of Governments, Lufkin, Texas, April 2003.

"The Economy in Perspective: The Good, the Bad, and the Ugly."  Address delivered to the Federal Home Loan Bank of Dallas Third Annual Finance Conference, Dallas, Texas, April 2003.

"A Comprehensive Perspective on Technology and the Texas Economy."  Address delivered to the IBM Management Meeting, Coppell, Texas, April 2003.

"Medicaid and the Children's Health Insurance Program (CHIP): An Assessment of Their Impacts on Business Activity and the Consequences of Potential Funding Reductions."  Address delivered to the Texas Conference of Urban Counties, Austin, Texas, April 2003.

"Funding Priorities in Indigent Health Care."  Address delivered in a Session and Briefing Series sponsored by the Texas Medical Association and the Texas Hospital Association, Austin, Texas, April 2003.

"The Impact of Overly Restrictive Annexation Policy on Economic Activity in Texas and Its Metropolitan Regions."  Address delivered to the Texas Municipal League Legislative Status Report Meeting, Austin, Texas, April 2003.

"Major Economic Conditions in Shaping Future Cultural Outcomes."  Address delivered to the Pathways of Change Arlington 2025 Summit Meeting, Arlington, Texas, April 2003.

"Perspectives on the Future of the Manufacturing Economy."  Address delivered to the 2nd Annual Applied Manufacturing Conference, Houston, Texas, April 2003.

"Future Patterns in Business Activity for the High Plains Region."  Address delivered to the Lubbock Chamber of Commerce Business Expo Committee Meeting, Lubbock, Texas, May 2003.

"The State of the Texas Economy and the Role of Power Supply and Demand on Future Performance."  Keynote address delivered to the Annual Meeting of the Texas Public Power Association, San Antonio, Texas, July 2003.

"A Technological Education—What's Its Value?"  Address delivered to students at Texas State Technical College, Waco, Texas, July 2003.

"The Effects of Recent Legislative Actions on the Health Care Sector."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2003.

"The Importance of Technical Training on the Future of Texas."  Address delivered to the Business Forum of Texas State Technical College, Waco, Texas, July 2003.

"The State of the Texas Economy."  Keynote address delivered to the Texas Public Power Association Annual Meeting, San Antonio, Texas, July 2003.

"Recent and Prospective Trends in Economic Development."  Address delivered to the Texas Economic Development Council, Houston, Texas, September 2003.

"Today's Economy and Tomorrow's Outlook: Implications for Real Estate Development."  Address delivered to the Houston District Council of Urban Land Institute meeting, Houston, Texas, September 2003.

"Texas in the 21st Century: Turning Challenge into Opportunity."  Participant in panel discussion at the John Ben Shepperd Leadership Forum, Austin, Texas, September 2003.

"How Healthy is the Texas Economy?"  Address delivered to the Texas Medical Association Summit 2003, Austin, Texas, September 2003.

"Our Current and Future Economy."  Address delivered to the Economic Development Foundation of Brenham 50th Anniversary Conference, Brenham, Texas, September 2003.

"Tomorrow's Economy—How Bright Is It?"  Address delivered to the Texas Regional Economic Development Summit, Seguin, Texas, September 2003.

"Overview of US and Texas Economies and Their Effect on the Construction Industry."  Address delivered to Master Builders Annual Regional Economic Outlook and Management Forum, Houston, Texas, October 2003.

"Where Are We Headed?  A Short-Term Economic Forecast."  Address delivered to the Greater Dallas Association of Realtors, Dallas, Texas, October 2003.

"Short-Term Forecast for the Texas Rural Housing Market."  Address delivered to the Texas Association of Mutual Insurance Companies (TAMIC) 86th Annual Convention, Austin, Texas, October 2003.

"Is the Roller-Coaster Ride Over?  A Short-Term Look at the US, Texas, and the Dallas Metro Area Economies."  Address delivered to the Southwest Corporate Federal Credit Union, Dallas, Texas, October 2003.

"The Short-Term Outlook for Fort Bend County."  Address delivered to the Fort Bend Chamber of Commerce Infrastructure Planning Conference, Fort Bend, Texas, November 2003.

"The Short-Term Outlook for the US, Texas, and Williamson County."  Address delivered to the Williamson County Growth Summit sponsored by the Austin Business Journal, Austin, Texas, November 2003.

"An Overview of International, National, and State Economic Conditions—Where We Are and Where We Are Going."  Address delivered to the Carter Financial Management 24th Annual Investment Conference, Dallas, Texas, November 2003.

"The Short-Term Outlook for the US, Texas, and Williamson County."  Address delivered to the Williamson County Growth Summit sponsored by the Austin Business Journal, Austin, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Fulbright & Jaworski and hosted by The Greater Dallas Chamber, Dallas, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Amarillo Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, November 2003.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference sponsored by Strasburger & Price, LLP and hosted by The North San Antonio Chamber of Commerce, San Antonio, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference hosted by Fulbright & Jaworski, LLP and Frost Bank, Austin, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan Area."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, December 2003.

"The Economic Outlook for the US, Texas, and the Tyler and Longview-Marshall Metropolitan Areas."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, December 2003.

"The US, Texas, and Dallas PMSA Economies Today: Short-Term (2003-2008) Economic Forecast for US, Texas, and Dallas."  Address delivered to the Dallas Estate Planning Council Conference, Addison, Texas, January 2004.

"The Economic Outlook for the US, Texas, and the Houston Metropolitan Areas."  Address delivered to The Perryman Group's 20th Annual Economic Outlook Conference hosted by the Houston Northwest Chamber of Commerce and sponsored by Leadership North Houston and North Harris County Community College District, Houston, Texas, January 2004.

"Agriculture as a Part of the World Economy."  Address delivered to the Texas Farm Bureau Conference, College Station, Texas, January 2004.

"Taking the Economic Temperature: A Regional and National Forecast."  Address delivered to the AeA Texas CFO Forum, Richardson, Texas, January 2004.

"Where Are We Now, and Where Are We Going?"  Address delivered to the AeA Texas CFO Forum, Austin, Texas, January 2004.

"The Economy Today."  Forum discussion at The Dallas Morning News Board of Economists meeting, Dallas, Texas, February 2004.

"The State of the North Texas Economy: Where Are We Today and Where Are We Going?"  Address delivered to the Risk Management Association North Texas Chapter luncheon, Dallas, Texas, March 2004.

"Our Economy: Today and Tomorrow."  Address delivered to the Master Builders National Seminar, Cleveland, Ohio, March 2004.

"Globalization & The Economy—Can Texas Compete?"  Address delivered as moderator to the 38th Annual Texas Legislative Conference, New Braunfels, Texas, March 2004.

"Current Trends in Permian Basin Economic Development."  Address delivered to the Odessa-Midland Economic Development Summit, Odessa, Texas, March 2004.

"Texas—A Short-Term Economic Outlook."  Address delivered to the Commercial Real Estate Women's Texas Connection Conference, Dallas, Texas, April 2004.

"The Economic Vision for Texas."  Address delivered to the Texas State Technical
College Visions Twenty Fourteen (2014) Conference, Lake Buchanan, Texas,
April 2004.

"Where is Texas Headed?"  Address delivered to the Baylor Business Network of
Houston, Houston, Texas, April 2004.

"Global Linkage on Investment Opportunities Between Mexico and China."  Address
delivered to the US-China-Mexico Trade Summit, San Antonio, Texas,
June 2004.

"Texas Today and Tomorrow."  Address delivered to the Texas Aggregates and Concrete
Association's 50th Annual Meeting, Grapevine, Texas, June 2004.

"The Economic Consequences of Interrupting the Flow of People and Commerce at the
US-Mexico Border."  Briefing conducted for Senior Elected Officials and the
Alliance for Security and Trade, San Antonio, Texas, July 2004.

"The Role of Health Care as an Economic Engine."  Distinguished lecture delivered to
the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2004.

"Health Care and Its Future."  Address delivered to the HEART of Montgomery County
special luncheon, The Woodlands, Texas, September 2004.

"Texas International Trade: Today and Tomorrow."  Address delivered to Lockheed
Martin Aeronautics Company's 2004 North Texas District Export Council
meeting, Fort Worth, Texas, September 2004.

"The Metalcasting Industry: An Economic Perspective."  Address delivered to the
Executive Conference of the American Foundry Society, San Antonio, Texas,
September 2004.

"The Texas Economy: Where We Are Today and Forecast for Tomorrow."  Address
delivered to the Texas Economic Development Corporation's Annual Conference,
Dallas, Texas, October 2004.

"The Texas Economy: Moving Toward Tomorrow."  Address delivered to the Fall
Conference of the Texas Association of College Technical Educators (TACTE),
Austin, Texas, October 2004.

"The US and Texas Economy: Prospects for Tomorrow."  Annual Baylor University
Economic Conference for Central Texas Business and Community Leaders,
Waco, Texas, October 2004.

"Workforce Issues for the 21st Century."  Address delivered to the Annual Meeting of the
Permian Basin Workforce Board, Midland, Texas, October 2004.

"The Economic Outlook for US and Texas."  Address delivered to the Texas Public
Power Association Board of Directors' Meeting, San Antonio, Texas,
October 2004.

"Texas Economy Forecast Impact of Retirement Dollars."  Address delivered to the Texas Municipal Retirement System Annual Training Seminar, San Antonio, Texas, October 2004.

"The National Economic Picture: Today and Tomorrow."  Address delivered to the Greater Dallas Association of Realtors Forecast 2005 Conference, Dallas, Texas, October 2004.

"US, Texas, and Austin: An Economic Perspective."  Address delivered to the Baylor Business Network of Austin, Austin, Texas, October 2004.

"Proposed Cowboy Stadium: An Economic Outlook."  Address delivered to the Cowboy Stadium Information Rally, Arlington, Texas, October 2004.

"Texas Economic Short-Term Forecast: Expectations for the Future."  Address delivered to the McGinnis, Lochridge & Kilgore Annual Firm Retreat, San Antonio, Texas, October 2004.

"Williamson County: Outlook for Tomorrow."  Address delivered to the Williamson County Growth Summit, Round Rock, Texas, October 2004.

"Economic Outlook for Tomorrow."  Address delivered to the Master Builders Regional Economic and Management Forum, Houston, Texas, October 2004.

"The Post 9-11 Economy."  Address delivered to the Heart of North Texas Business Conference, Fort Worth, Texas, November 2004.

"Emerging Trends in Real Estate."  Address delivered as the moderator of a panel discussion to the Urban Land Institute, Grapevine, Texas, November 2004.

"Blueprint for Building Wealth."  Address delivered to the Carter Financial Management & Carter Advisory Services, Inc., Investment Conference XXV, Dallas, Texas, November 2004.

"The Impact of Regional Clusters on the Economy."  Address delivered to the Texas Workforce Commissions Eighth Annual Texas Workforce Conference, Grapevine, Texas, November 2004.

"The Strategic Impact on Technology."  Address delivered to the Tarleton State University Graduate Seminar, Killeen, Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Dallas and Fort Worth-Arlington Metropolitan Areas."  Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference hosted by The Greater Dallas Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2004.

"The Economic Outlook for the US, Texas, and the Bryan-College Station Metropolitan Area."  Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference sponsored by The Phil Adams Company, College Station, November 2004.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the Austin-San Marcos Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference hosted by The McCoy College of Business Administration, The Greater San Marcos Economic Development Council, and Balcones Bank, San Marcos, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the Longview-Marshall and Tyler Metropolitan Areas." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference sponsored by the Longview Partnership, Longview, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the Odessa-Midland Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference sponsored by Western National Bank, Midland, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2004.

"The US and Texas Economic Outlook: Focus on Real Estate." Address delivered to the KPMG 8th Annual Real Estate Symposium, Irving, Texas, December 2004.

"The Economic Outlook for the US, Texas, and the Houston Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference hosted by the Financial Planning Association of Houston, Houston, Texas, January 2005.

"The Economic Outlook for the US, Texas, and the Amarillo Metropolitan Area." Address delivered to The Perryman Group's 21st Annual Economic Outlook Conference sponsored by the Amarillo Chamber of Commerce, Amarillo, Texas, January 2005.

"Urban Revitalization and Economic Development." Address delivered to the Real Estate Council Foundation Annual Community Breakfast, Dallas, Texas, January 2005.

"Texas Economic Evolution: Yesterday-Today." Address delivered to the Sandler O'Neill & Partners, L.P., Texas Banking Roundup, Dallas, Texas, February 2005.

"Texas Today and Expectations for Tomorrow." Address delivered to the Texas Medical Association's Winter Conference, Austin, Texas, February 2005.

"Prospects for Economic Development in West Texas Over the Next 30 Years." Address delivered to The Center for Energy and Economic Diversification (CEED) The Group of Thirty Meeting, Odessa, Texas, March 2005.

"Our Economy Today and Tomorrow: Some Insights."  Address delivered to The DW Distribution Regional Spring Showcase 2005, Grapevine, Texas, March 2005.

"The Economic Impact of Health Care in Texas."  Address delivered to the Texas Institute for Health Policy Research, Austin, Texas, March 2005.

"Economic Trends Impacting Strategic Planning."  Address delivered to the Center for Workplace Learning's Regional Economic Summit for the Texoma Area, Sherman, Texas, March 2005.

"The Economic Impact of the Uninsured in Texas."  Address delivered to the Task Force on Access to Health Care in Texas, San Antonio, Texas, April 2005.

"Economic Outlook for Tomorrow."  Address delivered to The Finance Forum, Dallas, Texas, April 2005.

"Current Economic Conditions and Short-Term Outlook for the US and the Lone Star State."  Address delivered to the TXU Electric Delivery Economic Development Seminars, Mesquite and Abilene, Texas, April 2005.

"The Big Picture: The Changing Agricultural Economy and How Renewable Energy May Fit In."  Address delivered to the Rural Alliance for Renewable Energy Development Forum and Expo, Waco, Texas, April 2005.

"The Arts: A Key Resource of the Texas Economy."  Address delivered to the Texas Association for Symphony Orchestras, Waco, Texas, April 2005.

"The State of the Texas Economy."  Address delivered to The University of Texas at San Antonio Texas State Data Center, Austin, Texas, May 2005.

"The Texas Economy: How It Looks Today and Tomorrow."  Address delivered to the Farm Credit Bank Conference, Austin, Texas, May 2005.

"Economic Landscapes for Small to Medium Sized Businesses."  Address delivered to the Commercial Financial Association Entrepreneurial and Factoring Conference, Fort Worth, Texas, May 2005.

"Economic Analysis and Forecast for Texas and the Permian Basin."  Address delivered to the Texas Society of Professional Engineers Permian Basin Chapter, Odessa, Texas, May 2005.

"Economic Impact of the Arts on the Texas Economy."  Address delivered to the Rotary District Conference, Odessa, Texas, May 2005.

"The Texas Economy: How Are We Doing?"  Address delivered to the Texas Building Branch AGC Conference, San Diego, California, July 2005.

"The Effects of Tax/Revenue Caps on Local Government in Texas."  Address delivered to the Texas Association of Counties, Austin, Texas, August 2005.

"The Impact and Economics of Trade."  Address delivered at the Second Annual La Entrada al Pacifico Corridor Conference, Midland, Texas, Odessa, August 2005.

"The State of the Texas Economy Today and the Forecast for Tomorrow."  Address
delivered to the KPMG Insight Event, Houston, Texas, September 2005.

"The Future of Texas and the Economic Perspective."  Address delivered at the John Ben
Shepperd 21st Texas Leadership Forum, Austin, Texas, September, 2005.

"The 'New' Texas Economy."  Address delivered at The Annual Convention of the
Independent Bankers Association of Texas, Lake Grapevine, Texas,
September 2005.

"Our Economy: National and State Perspectives."  Address delivered at the Texas
Telephone Association's 2005 Annual Convention and Product Showcase,
Horseshoe Bay, Texas, September 2005.

"The State of the Texas Economy."  Address delivered to the Annual Conference of the
Texas Economic Development Council, San Antonio, Texas, October 2005.

"The Regional Economy and Its Impact on North Texas."  Address delivered to the
MetroTex Association of Realtors' Forecast 2006 Conference, Addison, Texas,
October 2005.

"The US and Texas Short-Term Forecast 2005-2010."  Address delivered to the Baylor
Economic Forecast Conference, Waco, Texas, October 2005.

"The Texas Economic Environment."  Address delivered to the Blue Cross and Blue
Shield of Texas Health Care Symposium, Frisco, Texas, October 2005.

"Financial Aftermath of Hurricanes Katrina and Rita on the Texas Economy."  Address
delivered to the Texas Real Estate Council's General Membership Meeting,
Dallas, Texas, October 2005.

"Peak Oil and the Hydrogen Economy: Another View."  Address delivered to the
Southwest Corporate Federal Credit Union's 2005 Economic Forum, Dallas,
Texas, October 2005.

"The Future Economy of Texas: What City Officials Need to Know."  Address delivered
to the 2005 Texas Municipal League's Annual Conference and Exhibition,
Grapevine, Texas, October 2005.

"The Texas Economy and Manufacturing, Today and Tomorrow."  Address delivered to
the Applied Manufacturing Conference, Arlington, Texas, October 2005.

"The Texas Economy—Historical Perspective and Outlook for Tomorrow."  Address
delivered to The University of Texas of the Permian Basin Falcon Legacy
Society, Midland, Texas, November 2005.

"Statewide and National Economic Forecast for 2006."  Address delivered to the Houston
Minority Business Council's Emerging Ten (E-10) Awards luncheon, Houston,
Texas, November 2005.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's
22nd Annual Economic Outlook Conference hosted by The Greater Dallas
Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas,

November 2005.

"The New Texas Economy."  Address delivered to the Independent Bankers Association of Texas (IBAT), Grapevine, Texas, November 2005.

"Economic and Demographic Factors Affecting Future Workforce Training Needs in Texas."  Address delivered to the Texas Association of Workforce Boards, Houston, Texas, November 2005.

"The Current Market Environment for Construction in the Southwestern United States."  Address delivered to the Master Builders' Economic Forum, Houston, Texas, November 2005.

"Opportunities and Challenges in the East Texas Economy."  Address delivered to Leadership Tyler, Tyler, Texas, November 2005.

"The Outlook for Global Technology and Its Impact on the Austin Economy."  Address delivered to the Austin Chamber of Commerce, Austin, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference sponsored by Western National Bank, Odessa, Texas, December 2005.

"State of the Economy."  Address delivered to the Texas Association of State Systems for Computers and Communication (TASSCC), Austin, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference hosted by The Phil Adams Company, College Station, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the San Marcos Area."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference hosted by Texas State Small Business Development Center, McCoy College of Business Administration, San Marcos Area Chamber of Commerce, and San Marcos Hispanic Chamber of Commerce, San Marcos, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Spectrum Health Clubs, San Antonio, Texas, December 2005.

"The Economic Outlook for the US, Texas, and the Houston-Baytown-Sugar Land Metropolitan Statistical Area."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference sponsored by The Rotary Club of Houston, Houston, Texas, January 2006.

"The Economic Outlook for the US, Texas, and the Tyler and Longview Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 22nd Annual Economic Outlook Conference hosted by Tyler Economic Development Council and Tyler Area Chamber of Commerce and sponsored by Allied Waste Services, Austin Bank, Hibernia National Bank and Southside Bank, Tyler, Texas, January 2006.

"A Short-Term Economic Outlook for the US, Texas, and Houston Metro Area."  Address delivered to the Associated General Contractors of America Annual Meeting, Houston, Texas, January 2006.

"Looking Ahead in 2006: An Optimistic Economic View."  Address delivered to the Financial Planning Association, Dallas, Texas, January 2006.

"The Economic Impact of Parks & Recreation Services on Local and State Economic Development."  Keynote address delivered to the Southwest Parks and Recreation Training Institute, Lake Texoma Resort State Park, Oklahoma, February 2006.

"Tomorrow—What's Ahead for the US and Texas."  Address delivered to the Abilene Christian University Economic Outlook Luncheon, Abilene, Texas, February 2006.

"The Potential Economic Benefits of Achieving the Goals of the 'Opportunity Houston' Program."  Address delivered to the Greater Houston Partnership Board of Directors meeting, Houston, Texas, February 2006.

"Economic Issues and the Legislative Process."  Keynote address delivered to the 40th Annual Texas Legislative Conference, New Braunfels, Texas, March 2006.

"The Implications of Economic and Demographic Trends for Wealth Transfer and Management."   Address delivered to the Wealth Management & Trust Conference, Galveston, Texas, March 2006.

"Overview of the Current Economic Situation."  Address delivered to The Bank CEO Network's Directors' Conference, Austin, Texas, March 2006.

"The Short-Term Outlook for the United States and Texas."  Address delivered to the Texas Bankers Association Wealth Management & Trust Conference, Galveston, Texas, March 2006.

"A Short-Term Economic Outlook for the United States and the Lone Star State."  Address delivered to the Jacksonville Chamber of Commerce's Industrial Appreciation Luncheon, Jacksonville, Texas, March 2006.

"An Overview of the Economy for Tomorrow."  Address delivered to CoBank, Corpus Christi, Texas, March 2006.

"The Challenges and Benefits of the Global Economy."  Address delivered to the Japanese Business Trade Seminar presented by the New Braunfels Industrial Development Corporation and the Greater New Braunfels Economic Development Foundation, New Braunfels, Texas, April 2006.

"The Economic Outlook for the Houston Area."  Address delivered to the National Association of Industry and Office Parks (NAIOP) Update on the Houston Economy Breakfast, Houston, Texas, April 2006.

"The Changing Face of the Agricultural and Rural Economic Landscape."  Address delivered to the Farm Credit Bank of Texas Spring Conference, Horseshoe Bay, Texas, May 2006.

"The Economics of Retailing in a Dynamic and Rapidly Evolving Environment."  Address delivered to the Structure Tone Conference, Irving, Texas, May 2006.

"Future Economic Trends and Their Effects on Legal Services Demand."  Address delivered to the Fulbright & Jaworski Austin/San Antonio Joint Attorney Retreat, San Antonio, Texas, May 2006.

"The Texas Economy Today and Outlook for Tomorrow."  Address delivered to the Austin Planners Conference, Austin, Texas, May 2006.

"The Economics of Tourism."  Address delivered to the Dallas/Fort Worth Area Tourism Council's National Tourism/See America Week Seminar and Luncheon, Grand Prairie, Texas, May 2006.

"The Market for Prosperity: Understanding the Economic Development Process."  Address delivered to the Victoria Economic Development Corporation, Victoria, Texas, May 2006.

"Transportation: A Vital Cog in the Texas Economy."  Address delivered to the First Annual Texas Transportation Forum, Austin, Texas, June 2006.

"Florida and Texas: Economic Outlook and Demographic Trends."  Address delivered to the Commercebank Strategic Planning Retreat, Naples, Florida, June 2006.

"The Global Economic and Investment Climate."  Address delivered to the Baylor University Investment Seminar Series, Waco, Texas. June 2006.

"The Economic Outlook and Its Implications for Health Care."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2006.

"The US Economy: New Directions and Challenges."  Address delivered to CoBank, Orange Beach, Alabama, July 2006.

"The World of Technology: Benefits to Texas."  Address delivered to the TSTC Regents Circle, Waco, Texas, August 2006.

"Current Issues Facing the Texas Economy."  Address delivered to the Lone Star Legislative Summit, Nacogdoches, Texas, August 2006.

"The State of the Texas Economy."  Address delivered to the Texas Economic Development Council's Annual Conference, Houston, Texas, September 2006.

"Energy: The Economic Impacts."  Address delivered to the Development Corporation of Snyder, Snyder, Texas, September 2006.

"China and the Texas Economy." Address delivered to the UT Quest Lecture, Austin, Texas, October 2006.

"The US and Texas Short-Term Forecast 2006-2011." Address delivered to the Baylor Economic Forecast Conference, Waco, Texas, October 2006.

"Short-Term Forecast and Overview of Economic Projects." Address delivered to Andrews Economic Development, Andrews, Texas, October 2006.

"Emerging Power Supply Issues Facing Texas." Address delivered to the Electric Supply Needs Forum hosted by the Arlington and US Chambers of Commerce, Arlington, Texas, October 2006.

"The Importance of Universal Service to the Border Region." Address delivered to the Texas Universal Service Fund Conference sponsored by the Rio Grande Valley Partnership and Texans for Economic Progress, Harlingen, Texas, October 2006.

"A Perspective on Global, National, and Regional Economic Patterns." Address delivered to the BASF Admixtures 8th Annual Economic Outlook and Management Forum, Houston, Texas, November 2006.

"Economic Prospects for the Future." Address delivered to Leadership Tyler, Tyler, Texas, November 2006.

"Texas Economic Expansion: Fact or Fiction." Address delivered to the Texas Lyceum Conference, San Antonio, Texas, November 2006

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions." Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by The Greater Dallas Chamber and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2006.

"The Economic Outlook for the US, Texas, and the Fort Worth-Arlington and Dallas-Plano-Irving Metropolitan Divisions." Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference sponsored by Summit Bank, Fort Worth, Texas, November 2006.

"The Texas Economy: Forecast for Tomorrow." Address delivered to the Wells Fargo Electronic Payments Conference 2006, Houston, Texas, November 2006.

"From Research to Results: A Perspective on Future Health Science/Life Science Prospects for the Research Valley." Address delivered for the Research Valley Presentation, College Station, Texas, November 2006.

"Growing the Economy and Protecting the Environment." Address delivered to the Waco Chamber of Commerce Board Retreat, Waco, Texas, November 2006.

"The Economic Outlook for the US, Texas, and the North East Texas Region and Hopkins County." Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by the Hopkins County Chamber of Commerce, Sulphur Springs, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Frost Bank and Fulbright & Jaworski, LLP, Austin, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Cingular Wireless, San Antonio, Texas, December 2006.

"The Economic Outlook for the US, Texas, and the Texarkana Metropolitan Statistical Area."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Texas Bank and Trust, Texarkana, Texas, January 2007.

"The Economic Outlook for the US, Texas, and the Tyler and Longview Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Allied Waste Services, Austin Bank, Bank of America, Capital One Bank, Southside Bank, and Texas Bank and Trust and sponsored by Tyler Economic Development Council and Tyler Area Chamber of Commerce, Tyler, Texas, January 2007.

"The Economic Outlook for the US, Texas, and the Wichita Falls Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by Wichita Falls Board of Commerce & Industry and Times Record News and sponsored by KSWO-TV, First Bank, Kiowa Casino, Midwestern State University, TXU, and Wal-Mart, Wichita Falls, Texas, January 2007.

"The Economic Outlook for the US, Texas, and the San Marcos Area."  Address delivered to The Perryman Group's 23rd Annual Economic Outlook Conference hosted by McCoy College of Business Administration at Texas State University, San Marcos Chamber of Commerce, and Economic Development San Marcos, San Marcos, Texas, January 2007.

"The Arts, Culture, and the Texas Economy."  Address delivered to the Texas Association of Music Schools, Austin, Texas, January 2007.

"The Transportation System and Its Role in Economic Development and Trade Expansion."  Address delivered to the 2007 Midland-Odessa Transportation Alliance Summit, Odessa, Texas, January 2007.

"The Importance of the Universal Service Fund to Rural Texas."  Address delivered to the Texas Universal Service Fund Seminar sponsored by Texans for Economic Progress, Roby, Texas, January 2007.

"The Role of Universal Service in the Economy of East Texas."  Address delivered to the Texas Universal Service Fund Seminar sponsored by Texans for Economic Progress and the Lindale Chamber of Commerce, Lindale, Texas, January 2007.

"The Texas Economy: What Does the Future Hold for Texas Cities?"  Address delivered to the Texas Municipal League Elected Officials' Conference, Austin, Texas, February 2007.

"An Economic Overview: US and Idaho."  Address delivered to the First Federal Savings Bank of Twin Falls, Twin Falls, Idaho, February 2007

"How a Defined Benefit Plan Helps a State's Economy."  Address delivered to the International Foundation's 2007 Benefits Conference for Public Employees, San Diego, California, March 2007.

"Economics of Philanthropy."  Address delivered to the Big 12 Development Conference, Dallas, Texas, March 2007.

"The State of the Economy in Texas and its Effect on Public Schools."  Address delivered to the Education Service Center Region 12 Conference, Waco, Texas, March 2007.

"The Texas Economic Outlook."  Address delivered to the 4th Annual Small Business Administration 504 Lenders Conference, Lindale, Texas, March 2007.

"Working and Living in the Future."  Address delivered to DW Distribution, Grapevine, Texas, March 2007.

"Trans-Texas Corridor—Detour or Full Speed Ahead?"  Address delivered to the 41st Annual Texas Legislative Conference, New Braunfels, Texas, March 2007.

"Who's on First???  Texas Economic and Legislative Outlook."  Address delivered to the Government Finance Officers Association of Texas, Austin, Texas, April 2007.

"The Future of the Economy."  Address delivered to the South Dakota Bankers Association Ag Bankers Conference, Pierre, South Dakota, April 2007.

"Texas Manufacturing in the Global Economy: Challenges & Opportunities."  Address delivered to the 2007 Regional Manufacturing Summit for North East Texas, Mount Pleasant, Texas, April 2007.

"The Market for Prosperity: A Framework for Economic Development Efforts."  Address delivered to the Corpus Christi Regional Economic Development Luncheon, Corpus Christi, Texas, April 2007.

"The Economic Prospects for Texas: Positive and Optimistic."  Address delivered to the Central Texas Economic Corridor Conference, Belton, Texas, April 2007.

"Short-Term Economic Perspectives and Projections for Texas, New Mexico, and Oklahoma."  Address delivered to the LandAmerica Financial Group, Glen Rose, Texas, April 2007.

"The Short-Term Outlook for the United States and Texas."  Address delivered to the Texas State Bank, McAllen, Texas, May 2007.

"Sunshine, Soccer, and Success."  Address delivered to the National Association of Recreation Resource Planners Conference, Austin, Texas, May 2007.

"The Market for Prosperity: Understanding the Economic Development Process."
Address delivered to the San Angelo Chamber of Commerce, San Angelo, Texas,
May 2007.

"Where We Are Today—Where We're Going Tomorrow."  Address delivered to the
Texas Mortgage Bankers Association, Lost Pines, Texas, June 2007.

"Energy Trends and Future Projections."  Address delivered as participant in panel
discussion at the Dallas Business Journal Energy Conference, Dallas, Texas,
June 2007.

"A Tale of Two States: The Economic Impact of 'Closing the Gaps.'"  Address delivered
as moderator at the P-16 Summit hosted by the Texas Higher Education
Coordinating Board, Austin, Texas, June 2007.

"The Impact and Trends of Advanced Technology on Government Services."  Address
delivered to the Texas Technology Forum, Grapevine, Texas, June 2007.

"The Outlook of Texas and the Austin Area."  Address delivered to the Economic
Outlook Conference of the Texas State University Higher Education Center,
Round Rock, Texas, July 2007.

"Basic Research, Creativity, Health Care, and the Economic Prosperity."  Distinguished
lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas,
July 2007.

"The Economics of Education."  Keynote address and discussion session delivered to the
Workforce Summit 2007, McAllen, Texas, August 2007.

"Economic Development Insights."  Address delivered to the Texas Association of
Regional Councils Conference on Regionalism, Austin, Texas, September 2007.

"The Texas Economy Today and Forecast for the Future."  Address delivered to the
KPMG Insights Event, Houston, Texas September 2007.

"The Border Economy: What's Hot and What's Not."  Address delivered to the Paso Del
Norte Group Breakfast Meeting, El Paso, Texas, September 2007.

"State of the Texas Economy."  Address delivered to the Texas Economic Development
Council (TEDC) 2007 Annual Conference, Dallas, Texas, September 2007

"The Role of Fargo and North Dakota in the Ongoing Global Economy."  Address
delivered to the Economic Development Association of North Dakota Annual
Conference, Fargo, North Dakota, October 2007.

"Texas Today and Tomorrow: A Journey of Optimism and significant Achievement.
Address delivered to the Texas Multi-Housing Conference, Austin, Texas,
October 2007.

"Facing the Future with Confidence.  Address delivered to Leadership Tyler Economic
Session, Tyler, Texas, October 2007.

"An Overview for Tomorrow."  Address delivered to the NAI Huff Partners Client
        Dinner, Fort Worth, Texas, October 2007.

"Short-Term Outlook for the US and Texas 2007-2012."  Address delivered to the Baylor
        Economic Forecast Luncheon, Waco, Texas, October 2007.

"The Economy: Which Way Is It Headed?"  Address delivered to the Hillwood
        Properties Retreat, Glen Rose, Texas, October 2007.

"Overview and Outlook" and "A Tale of Two States—And One Million Jobs!!"
        Addresses delivered to the Texas Higher Education Coordinating Board, Houston,
        Texas, October 2007.

"A Private Briefing on Key Economic Trends."  Address delivered to Western National
        Bank, San Antonio, Texas, November 2007.

"Economic Outlook for Texas and the Surrounding Areas."  Address delivered to the
        BASF Construction Chemical Company's Annual Economic Forum, Houston,
        Texas, November 2007.

"Energy Overview and Outlook."  Address delivered to The University of Texas of the
        Permian Basin, Odessa, Texas, November 2007.

"Economic Opportunities and Challenges for Tomorrow."  Address delivered to the
        USAA Annual Financial Conference, San Antonio, Texas, November 2007.

"Sunshine, Soccer, and Success."  Address delivered to the Texas Municipal League,
        Dallas, Texas, November 2007.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
        Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's
        24th Annual Economic Outlook Conference hosted by the Greater Dallas Chamber
        and sponsored by Fulbright & Jaworski, LLP, Dallas, Texas, November 2007.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan
        Statistical Areas."  Address delivered to The Perryman Group's 24th Annual
        Economic Outlook Conference hosted by Western National Bank, Odessa, Texas,
        November 2007.

"Impact of Ongoing Changes in the Texas Economy."  Address delivered to the Sandler
        O'Neill and Partners Conference, Bastrop, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the North East Texas COG Region."
        Address delivered to The Perryman Group's 24th Annual Economic Outlook
        Conference hosted by the Hopkins County Chamber of Commerce, Sulphur
        Springs, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan
        Statistical Area."  Address delivered to The Perryman Group's 24th Annual
        Economic Outlook Conference hosted by Fulbright & Jaworski, LLP and Frost
        Bank, Austin, Texas, December 2007.

"The Economic Outlook for the US, Texas, and San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 24th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2007.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 24th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2007.

"From the Present to the Future: What's Ahead for the Texas and Houston Area Economies."  Address delivered to The Perryman Group's 24th Annual Economic Outlook Conference hosted by the Houston Chapter of CoreNet Global and the Houston Chapter of the National Association of Industrial and Office Properties, Houston, Texas, January 2008.

"Economic Challenges and Opportunities: What Will Tomorrow Bring."  Address delivered to the Arlington Chamber of Commerce, Arlington, Texas, January 2008.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 24th Annual Economic Outlook Conference hosted by Allied Waste Services, Austin Bank, Bank of America, Bank of Tyler, Capital One Bank, Chase Bank, N.A., Citizens 1st Bank, Firstbank, Franklin Bank, Heritage Land Bank, Southside Bank, and Texas Bank & Trust, and Tyler Junior College and sponsored by Tyler Economic Development Council and Tyler Area Chamber of Commerce, Tyler, Texas, January 2008.

"The Economic Outlook for the US, Texas, and the Houston-Sugar Land-Baytown Metropolitan Statistical Area."  Address delivered to The Perryman Group's 24th Annual Economic Outlook Conference presented by the Bay Area Houston Economic Partnership's Small Business Committee, Houston, Texas, January 2008.

"Projections for US and Texas Economies."  Address delivered to the Waco Rotary Luncheon, Waco, Texas, January 2008.

"Closing the Gaps."  Address delivered to the 2008 Texas Association of State Senior College & University Business Officers Winter Workshop, Galveston, Texas, February 2008.

"State of the Economy and Educational Needs for Tomorrow."  Address delivered to the Fort Worth Chamber of Commerce Texas Business & Education Coalition, Fort Worth, Texas, February 2008.

"Barnett Shale: Truth and Consequences."  Address delivered to the North Texas Chapter of the Appraisal Institute, Dallas, Texas, March 2008.

"The State of the Real Estate Economy and the Prospects for the Future."  Address delivered to the CWS Capital Partners' Annual Investor Meeting, New Port Beach, California, March 2008.

"Making Alternative Energy Work for Texas."  Moderator for the 42nd Annual Texas Legislative Conference, New Braunfels, Texas, March 2008.

"Impact of Recent Developments in the US, Texas, and Fort Worth Economies." Address delivered to the Fort Worth City Council, Fort Worth, Texas, April 2008.

"The US and Texas Economies—Investment Challenges and Opportunities." Address delivered to the Annual CapStreet Group Investors Meeting, Austin, Texas, April 2008.

"The Texas and Austin Economies—Where Are We Today and What Are the Expectations for Tomorrow?" Address delivered to the Baylor Business Network Luncheon, Austin, Texas, April 2008.

"The State of the Texas Economy: Projections for the Future." Address delivered to Texas A&M Construction Science Scholarship & Awards Banquet, College Station, Texas, April 2008.

"The Economy: Today's Overview and Tomorrow's Outlook." Address delivered to the Electrocoat Association, Indianapolis, Indiana, May 2008.

"The Economy of Real Estate." Address delivered to the Urban Land Institute, Dallas, Texas, May 2008.

"The Economy's Impact on Nonprofit Organizations: Tomorrow's Challenges and Opportunities." Address delivered to the Texas Society of Certified Public Accountants, Dallas, Texas, May 2008.

"Temple: Forecast for Tomorrow." Address delivered to the Temple Economic Development Corporation, Temple, Texas, May 2008.

"Impact of the Barnett Shale on North Texas." Address delivered to the Bowie Bank, Bowie, Texas, May 2008.

"The Economic Impact of Downtowns." Address delivered to Downtown Fort Worth, Inc., Fort Worth, Texas, June 2008.

"Economic Outlook and Observations." Address delivered to Accenture Limited, Houston, Texas, June 2008.

"Challenges and Needs for Tomorrow." Address delivered to TASA—Texas Association of School Administrators, Austin, Texas, June 2008.

"Where We are Today and What's Ahead for Tomorrow." Address delivered to the 54th Annual Meeting of the Texas Aggregates and Concrete Association (TACA), Los Cabos, Mexico, June 2008.

"Economic Value of the Gulf Coast." Address delivered to the Galveston Economic Development Partnership, Galveston, Texas, July 2008.

"Round Rock: Economic Possibilities and Potentials." Address delivered to the Round Rock Chamber of Commerce, Round Rock, Texas, July 2008.

"The Financial Crisis: What Happened and What Comes Next?" Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2008.

"The Importance of Local Business Investment in a Complex Global Economy." Address delivered to Team Texas, Austin, Texas, July 2008.

"The Outlook for Multi-Family Real Estate in Selected Texas Markets." Address delivered to the Berkshire Group, Dallas, Texas, July 2008.

"Tomorrow's Economy: How Will It Look and How Will We Get There?" Address delivered to the Texas Workforce Commission, Austin, Texas, August 2008.

"Thinking Regionally—Responding Globally. The Diversity of the South Texas Economy." Address delivered to the Future of the Region, Inc. (FORI), Laredo, Texas, August 2008.

"How an Uncertain and Changing Global Economy Affects the State of Texas and Brazoria County." Address delivered to the Brazoria County Economic Symposium, Lake Jackson, Texas, September 2008.

"The Economy in Texas with a Focus on Houston." Address delivered to the Baylor Business Network of Houston, Houston, Texas, September 2008.

"The Board Perspective." Address delivered to the Health Care Service Corporation Legal Division Annual Meeting, Santa Ana Pueblo, New Mexico, September 2008.

"State of the State and Nation." Address delivered to the Texas Association of Realtors Annual Convention, San Antonio, Texas, September 2008.

"The Economic Downturn and Its Effects on the Texas Economy." Address delivered to McGinnis, Lochridge, and Kilgore, Horseshoe Bay, Texas, October 2008.

"The Economy—the Rescue Plan Plus an Outlook for Dallas." Address delivered to the Baylor Business Network of Dallas, Dallas, Texas, October 2008.

"Critical Update: The Financial System in Turmoil." Address delivered to Carter Financial Management, Dallas, Texas, October 2008.

"The Transformative Effects of High Energy Costs on Rural Texas." Address delivered to the Texas Rural Innovators Forum, Bastrop, Texas, October 2008.

"The Economy of Tomorrow." Address delivered to the USAA 2008 Wealth Management Conference, San Antonio, Texas, October 2008.

"Electing to Expand: Basing Decisions on Economic Forecasts for Texas and Beyond." Address delivered to TR Moore & Company, Houston, Texas, October 2008.

"State of the Texas Economy." Address delivered to the Texas Economic Development Council, Austin, Texas, October 2008.

"Opportunities and Challenges from the Current Energy and Financial Crisis." Address delivered to the Dallas Area Institute of Management Accountants, Dallas, Texas, October 2008.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions with Special Focus on the Mansfield Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference presented by the EECU, Mansfield Texas Economic Development, and the Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Mount Pleasant Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Mount Pleasant Industrial Foundation, Mount Pleasant, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by The Phil Adams Company, Bryan, Texas, November 2008.

"Lessons and Insights from the Barnett Shale."  Address delivered to the Haynesville Shale Expo, Shreveport, Louisiana, November 2008.

"Perspectives on the Economy."  Address delivered to the USAA Investor's Meeting, San Antonio, Texas, November 2008.

"Houston and Texas Economies."  Address delivered to the Houston Auto Dealers Association, Houston, Texas, November 2008.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2008.

"Construction Industry Economic Outlook."  Address delivered to BASF Construction Chemicals, LLC, Houston, Texas, December 2008.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by Plains Capital Bank, Lubbock, Texas, January 2009.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2009.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Address delivered to The Perryman Group's 25th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2009.

"The Economy: How Did We Get Here and What Do We Do Now?"  Address delivered to Associated General Contractors of America, Houston, Texas, January 2009.

"View on the Economy and the Commercial Real Estate Industry."  Address delivered to a joint meeting of the National Association of Industry and Office Parks (NAIOP) and Core Net, Houston, Texas January 2009.

"The State of the Central Texas Economy."  Address delivered to the Copperas Cove EDC and the Greater Killeen Chamber of Commerce, Killeen, Texas, February 2009.

"It's All About the Economy . . . Solutions to our Economic Challenges."  Address delivered to the South Montgomery County Woodlands Chamber of Commerce, The Woodlands, Texas, February 2009.

"Short-Term and Long-Term Economic Outlook (US and Texas) and How Health Care Will Be Affected."  Address delivered to the Scott and White Government Affairs Committee, Temple, Texas, February 2009.

"The Economic Situation: How Did We Get Here and How Are We Going to Get Out?"  Address delivered to the TCMA Region 7 Annual Retreat, Horseshoe Bay, Texas, March 2009.

"Economic Outlook and Impact on Texas."  Moderator for the 2009 Texas Legislative Conference, New Braunfels, Texas, March 2009.

"The Economy and Its Effects on the Commercial Real Estate Industry."  Address delivered to The Real Estate Council (TREC), Dallas, Texas, March 2009.

"Maximizing Resources in the Academic Setting."  Address delivered to the American Association of Colleges of Nursing, Washington, DC, March 2009.

"We're Not in Kansas Anymore, Dorothy: Today's Economy—How Did We Get Here and How Are We Going to Get Out?"  Address delivered to the Turnaround Management Association (TMA), Frisco, Texas, April 2009.

"Getting the Most Texas Bang with Federal Bucks."  Address delivered to the Texas Lyceum, Austin, Texas, April 2009.

"Our Economy—How Did We Get Here?"  Address delivered to the West Texas Home
        Builders Association, Lubbock, Texas, April 2009.

"The Stimulus—What Does it Mean for Central Texas?"  Address delivered to
        Workforce Solutions of Central Texas, Salado, Texas, April 2009.

"The State of the Economy: Yesterday, Today & Tomorrow."  Address delivered to the
        National Petroleum Energy Credit Association, San Antonio, Texas, April 2009.

"Economic Challenges and Opportunities in Texas Today and Tomorrow."  Address
        delivered to the Meadows Foundation, the Boone Family Foundation, and the
        Conference of Southwest Foundations, Dallas, Texas, May 2009.

"The Economy: How We Got Here and Where We Are Going."  Address delivered to the
        Texas Leadership Institute, Bastrop, Texas, June 2009.

"Our US and State Economies: How Did We Get Into This Mess, What Lies Ahead Over
        the Next Few Years, and How Will These Challenges Impact Higher Education?"
        Address delivered to the Baylor University Board of Regents, Waco, Texas,
        July 2009.

"The Texas Economy and the Stimulus Package."  Address delivered to the Texas
        Association of  State Systems for Computing and Communications (TASSCC),
        Houston, Texas, August 2009.

"Texas Short-Term Projection."  Address delivered to the Texas Association of
        Broadcasters Annual Convention and Trade Show, Austin, Texas, August 2009.

"Economic Successes and Opportunities."  Address delivered to the Stephenville
        Economic Development Corporation, Stephenville, Texas, August 2009.

"Outlook for the US and Texas."  Address delivered to the Council of State
        Governments' Southern Legislative Conference Annual Meeting, Winston-Salem,
        North Carolina, August 2009.

"The Light at the End of the Tunnel—Real or Imagined?"  Address delivered to the
        Dallas Estate Planning Council, Dallas, Texas, September 2009.

"Getting Into and Out of the Recent Debacle."  Address delivered to the Greater Houston
        Partnership and Houston Economics Club, Houston, Texas, September 2009.

"Economic Challenges, Looking Ahead." Address delivered to the Texas Conference on
        Regionalism, South Padre Island, Texas, September 2009.

"Current Economic Situation and Update of Big Picture Down to Texas."  Address
        delivered to KPMG, LLP, Houston, Texas, October, 2009.

"US and Texas Economies: A Status Report."  Address delivered to the Houston
        Financial Planning Association, Houston, Texas, October 2009.

"Recovery Prospects for Texas and Galveston."  Address delivered to the Texas
        American Planning Association, Galveston, Texas, October 2009.

"Short-Term Economic Forecast for US and Texas."  Address delivered to the Baylor Business Network of Dallas, Dallas, Texas, October 2009.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions with Special Focus on the Mansfield Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by Ameriprise Financial, Mansfield Texas Economic Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Mount Pleasant/North East Texas Area Outlook."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the City of Mount Pleasant, Mount Pleasant, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the Nacogdoches and Deep East Texas Region."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Deep East Texas Council of Governments, Nacogdoches, Texas, November 2009.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by The Phil Adams Company, Bryan, Texas, November 2009.

"The Economics of Life Sciences in Williamson County."  Address delivered to the Austin-San Antonio Corridor Growth Summit, hosted by the Austin Business Journal, Austin, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2009.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce and sponsored by Amegy Bank of Texas, San Antonio, Texas, December 2009.

"Tools for Economic Advancement: Imagination, Innovation, and Investment."  Address delivered to the 13th Annual Texas Workforce Conference, Grapevine, Texas, December 2009.

"Getting Into and Out of the Recent Economic Situation."  Address delivered to The Fortnightly of Chicago, Chicago, Illinois, December 2009.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by Plains Capital Bank and Lubbock Country Club, Lubbock, Texas, January 2010.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2010.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 26th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2010.

"Planning for the Future."  Address delivered to the Corsicana Chamber of Commerce, Corsicana, Texas, February 2010.

"How Did We Get Here and Where are We Going: Looking Ahead for US and Texas Economies."  Address delivered to the Association of Corporate Growth (ACG) Dallas/Fort Worth, Dallas, Texas, February 2010.

"Where are We Economically?  Why are We Here and Where are We Going?"  Address delivered to the Liberty-Dayton Area Chamber of Commerce, Dayton, Texas, March 2010.

"How Did We Get Here and Where are We Going?: Looking Ahead for the US and Texas Economies."  Address delivered to the Texas General Counsel Forum, Houston, Texas, March 2010.

"Analysis of US and Texas Economies."  Address delivered to the Bay Area Houston Economic Partnership, Clear Lake, Texas, March 2010.

"The Economic Outlook for Texas."  Address delivered to the Texas Municipal League Economic Summit, Irving, Texas, March 2010.

"Texas and McAllen Economies: Today and Tomorrow."  Address delivered to McAllen Chamber of Commerce, McAllen, Texas, March 2010.

"The State of the Texas Economy."  Address delivered to the Texas Economic Development Council's 2010 Spring Conference, Arlington, Texas, April 2010.

"The Texas Economy: Expectations for the Future."  Address delivered to the Wells Fargo Texas Region Business Banking Group, Houston, Texas, April 2010.

"An Economic Assessment of Issues Surrounding the Potential Expansion of the Victoria Citizens Medical Center."  Address delivered to Citizens Medical Center's Strategic Planning Session, Victoria, Texas, May 2010.

"The Future."  Commencement speech delivered to the graduates of The University of Texas of the Permian Basin, Odessa, Texas, May 2010.

"Our Economy: Insights on Where We Are, How We Got Here, and Where We're Headed in the Days Ahead."  Address delivered to the Greater Killeen Chamber of Commerce, Belton, Texas, May 2010.

"It's the Economy, Stupid!  A Forecast of Where Health and Welfare Benefits are Headed."  Address delivered to the SouthWest Benefits Association, San Antonio, Texas, May 2010.

"Texas Experience."  Address delivered to the Windpower 2010 Power Session, Dallas, Texas, May 2010.

"The US and Texas Economies: A Short-Term Forecast."  Address delivered to the Annual Business Appreciation Banquet of the Temple Economic Development Corporation, Temple, Texas, May 2010.

"The Economy and Future Impact on the Health Care Industry."  Address delivered to the Texas Tech University Nursing School, Odessa, Texas, July 2010.

"The US and Texas Economies: Issues Impacting Future Growth."  Address delivered to the Texas Surplus Lines Association, Dana Point, California, July 2010.

"Health Care Reform: Opportunities and Pitfalls."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2010.

"The Economy and Its Potential Impact on the Arts."  Address delivered to the Sammons Center for the Arts, Dallas Arts Advocacy Day, Dallas, Texas, August 2010.

"Today's Issues and Projections for Tomorrow."  Address delivered to the Southern District of Texas Bankruptcy Bench-Bar Conference, Corpus Christi, Texas, August 2010.

"Assessment and Projections."  Address delivered to the Sammons Enterprises, Inc., Leadership Meeting, Asheville, North Carolina, September 2010.

"What Lies Ahead!"  Address delivered to the Carter Financial Management Financial Intelligence in 2010, Dallas, Texas, September 2010.

"The Texas National Business Outlook."  Address delivered to the KPMG Insights Conference, Houston, Texas, September 2010.

"Challenges Ahead for the US and Texas Economies."  Address delivered to the Plano Chamber of Commerce, Plano, Texas, October 2010.

"State of the Texas Economy."  Address delivered to the Texas Economic Development Corporation, Houston, Texas, October 2010.

"The US Economy: Current Issues and Projections for the Future."  Address delivered to the American Reliable Insurance Company 2010 Owners Meeting, Scottsdale, Arizona, October 2010.

"What Lies Ahead for the Houston Economy."  Address delivered to the Baylor Business Network of Houston, Houston, Texas, October 2010.

"Interpreting the Current Economic Climate and Challenges."  Address delivered to the American Association of Colleges of Nursing 2010 Fall Semiannual Meeting, Washington, DC, October 2010.

"The US and Texas Short-Term Forecast 2010-2015."  Address delivered to the Baylor Economic Forecast Luncheon, Waco, Texas, November 2010.

"Winds of Prosperity."  Address delivered to the Big Country School Administrators, Salado, Texas, November 2010.

"The Texas Economy—Where are We Now and Where are We Going Over the Next 10 Years?"  Address delivered to The Meadows Foundation A Day Across Texas Workshop, Dallas, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions with Special Focus on the Mansfield Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by Ameriprise Financial, Mansfield Texas Economic Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Mount Pleasant/North East Texas Area Outlook."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Mount Pleasant Industrial Foundation, Mount Pleasant, Texas, November 2010.

"Outlook for the Texas Economy and Energy Market."  Address delivered to the Texas Electric Professionals Association (TEPA), Houston, Texas, November 2010.

"Today's Perspective: Trust in Context."  Address delivered to the 12th Annual Conference of The General Counsel Forum, San Antonio, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the College Station-Bryan Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by The Phil Adams Company, Bryan, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2010.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by Longview Partnership, Longview, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the San Antonio Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2010.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, January 2011.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2011.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 27th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2011.

"Building a Better Economy."  Address delivered to the Entrepreneurs' Organization (EO) Dallas Chapter, Dallas, Texas, January 2011.

"Projections for the Future: A Local and National Perspective."  Address delivered to the Houston Chapter of the National Association of Industry and Office Parks, (NAIOP),  Houston, Texas, January 2011.

"The Changing Face of the Lone Star State."  Address delivered to the Texas Farm Bureau Leadership Conference, Austin, Texas, January 2011.

"An Overview of the Economy and its Impact on the Business Community."  Address delivered to Leadership Tyler, Tyler, Texas, January 2011.

"Solving State Budget Woes."  Panelist for the 2011 Texas Legislative Conference, New Braunfels, Texas, March 2011.

"High Priorities for Human Capital Development in a Global Economy."  Address delivered to the US Department of Labor Employment and Training Administration Region 4 Technical Assistance and Training Forum—Retooling for the Recovery, Dallas, Texas, March 2011.

"The Arts Mean Business."  Address delivered to Arts of Collin County, Plano, Texas March 2011.

"Higher Education Partnerships and the Waco Economy."  Address delivered to the TSTC Board of Regents Dinner, Waco, Texas, May 2011.

"The Road to Economic Recovery."  Address delivered to the Wharton County Advisory Committee meeting, Wharton, Texas, May 2011.

"Endurance in a Tough Economy."  Address delivered to the Governor's Small Business Forum—Gulf Coast Region, Bay City, Texas, May 2011.

"Texas' Position in Today's Economy."  Address delivered to the FPA DFW Financial Planning Symposium, Frisco, Texas, May 2011.

"The East Texas Energy Industry—Outlook and Opportunities for the Future."  Address delivered to the East Texas Energy Expo, Center, Texas, May 2011.

"What's Lies Ahead for 2011?"  Address delivered to the 2001 Houston Growth Summit, Houston, Texas, May 2011.

"The National, State, and Local Economies: Expectations for the Future."  Address delivered to the Temple Economic Development Corporation's Business Appreciation Luncheon, Temple, Texas, May 2011.

"A Look at Today's Changing Economy and the Trends That Lie Ahead."  Address delivered to the KPMG Trending Topics in Accounting & Finance 2011 meeting, Addison, Texas, June 2011.

"Economic Perspectives and Real Estate Trends: Predictions for Texas and the Houston Area."  Address delivered to the Greater Houston Builders Association, Houston, Texas, June 2011.

"Transforming Health Care: The Light at the End of the Tunnel."  Address delivered to The University of Texas Health Science Center-San Antonio Summer Institute, San Antonio, Texas, June 2011.

"The Evolution of Health Care on the New Environment."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas, July 2011.

"QE2: Was it Good for You?"  Address delivered to TELIOS, Dallas, Texas, July 2011.

"Looking Forward at Our Economic Picture."  Address delivered to the Texas Forest Country Governor's Small Business Forum, Lufkin, Texas, August 2011.

"An Economic Picture for the High Plans—What Lies Ahead."  Address delivered to the FirstBank Southwest Panhandle Economics Conference, Amarillo, Texas, September 2011.

"Update on Economic Recoveries Around the World."  Address delivered to the Carter Financial Management Conference, Dallas, Texas September 2011.

"The Texas and National Business Outlook."  Address delivered to KPMG, Houston, Texas September 2011.

"A Decade of Drilling."  Address delivered to the Fort Worth Chamber of Commerce, Fort Worth, Texas, September 2011.

"A Perspective on the Economy and Kendall County: What's Next?"  Address delivered to the Kendall County Economic Development Corporation, Boerne, Texas, October 2011.

"Top 10 Events that Contributed to the Economic Success of Texas and Shaped the Texas Economy Over the Past 50 Years."  Address delivered to the Texas Economic Development Council (TEDC) 2011 Annual Conference 50th Anniversary, Fort Worth, Texas, October 2011.

"The US and Texas Short-Term Forecast 2011-2016."  Address delivered to the Baylor Economic Forecast Luncheon, Waco, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area with Special Focus on the Outlook for Mansfield."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference presented by Ameriprise Financial, Mansfield Texas Economic Development, and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2011.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Longview Chamber of Commerce, Longview, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2011.

"The Outlook for 2012: An Assessment with Emphasis on Using Public Resources to Promote Growth."  Address delivered to the LCRA – Government Resources Day, Austin, Texas, December 2011.

"State of the Economy."  Address delivered to the North Texas Appraisal District, Dallas, Texas, December 2011.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, January 2012.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by the Tyler Chamber of Commerce, Tyler, Texas, January 2012.

"Getting in Front of the Curve."  Address delivered to the Division for Enterprise Development, The University of Texas at Arlington, Arlington, Texas, January 2012.

"2012 Economic Forecast for Texas."  Address delivered to the International Council of Shopping Centers (ICSC) Texas 2012 Retail Forecast, Dallas, Texas, January 2012.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Address delivered to The Perryman Group's 28th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2012.

"An Outlook and Prospects for the Houston Area Economy."  Address delivered to the Houston Turnaround Management Association, Houston, Texas, January 2012.

"Looking Ahead in 2012: A Local and National Perspective."  Address delivered to the National Association of Industry and Office Parks (NAIOP), Houston, Texas, January 2012.

"Economic Challenges for Texas and the Retail Grocery Chain Industry."  Address delivered to the United Supermarkets Annual Leadership Conference, Lubbock, Texas, January 2012.

"A Look at What Lies Ahead for Texas and the East Texas Economy."  Address delivered to Leadership Tyler, Tyler, Texas, January 2012.

"The Health Care Sector on the Permian Basin Economy."  Address delivered to the Odessa Rotary Club, Odessa, Texas, January 2012.

"What Today's Economic Environment Means to the Fort Worth Real Estate Market."  Address delivered to the Fort Worth Commercial Real Estate Women (CREW), Fort Worth, Texas, February 2012.

"Texas and the Global Economy: What Do You Need to Know This Year?"  Address delivered to The General Counsel Forum, Dallas-Fort Worth Chapter, Dallas, Texas, February 2012.

"The Potential Impact of the Proposed Temple Medical and Education District on Local Economic Activity and Development."  Address delivered at the Temple Medical and Education District, Temple, Texas, February 2012.

"The Changing Economic Picture for East Texas and Gated Communities."  Address delivered to the Holly Lake Chamber of Commerce, Holly Lake Ranch, Texas, March 2012.

"The Federal Governments and Texas Jobs."  Panelist for the 2012 Texas Legislative Conference, New Braunfels, Texas, March 2012.

"Economic Loss and Business Viability as a Part of the Equation" and "Proposed Cost/Benefits for Port Arthur Resilience Plan."  Presentations delivered to the Southeast Texas Coastal Resilience Forum hosted by Entergy Corporation and Lamar University, Beaumont, Texas, April 2012.

"An Insider Briefing on Key Economic Issues."  Address delivered to the Western National Bank Conference, San Antonio, Texas, May 2012.

"The Current State of the Texas Economy and Prospects for the Future."  Address delivered to the Texas Business Leadership Council, Austin, Texas, May 2012.

"Texas Economic Outlook and Galveston Moving Forward."  Address delivered to the Galveston Economic Development Partnership and The University of Texas Medical Branch (UTMB) 2012 Developer Conference, Galveston, Texas, May 2012.

"The Texas and San Antonio Economies."  Address delivered to the Baylor Business Network, San Antonio, Texas May 2012.

"Outlook for the US and Global Economies."  Address delivered to Institute for Supply Management (ISM) 97th Annual International Supply Management Conference, Baltimore, Maryland, May 2012.

"The Effect of Natural Gas Severance Taxes on the Arkansas Economy."  Address delivered to the American Natural Gas Association Forum, Conway, Arkansas, May 2012.

"The State of the Texas Economy."  Address delivered to the annual meeting of the Texas Public Power Association, Austin, Texas, July 2012.

"An Outlook for the Energy Sector in Today's Global Economy."  Address delivered to Atwood Oceanics, Inc., Lost Pines, Texas, July 2012.

"Major Issues in Health Care Reform and the Economy."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), July 2012.

"Economic Impact of Recent Health Care Changes."  Address delivered to the Plano Chamber of Commerce, Plano, Texas, August 2012.

"Mid-Year Forecast for Austin and Central Texas."  Address delivered to The Real Estate Council of Austin, Inc., Austin, Texas, August 2012.

"You Heard it Here…A Global Economic Forecast."  Address delivered to a joint meeting of Leadership Texas and Leadership America, Houston, Texas, September 2012.

"The Current and Future State of the US and Texas Economies."  Address delivered to the Dallas Estate Planning Council, Dallas, Texas, September 2012.

"A Perspective on US Economic and Demographic Trends and the Implications for Nurses."  Address delivered to the Texas Nurses Association Leadership Conference, Austin, Texas, September 2012.

"The State of the Economy—A Look at Texas and the US."  Address delivered to KPMG, Houston, Texas, September 2012.

"State of the Texas Economy."  Address delivered to Texas Economic Development Council (TEDC) 2012 Annual Conference, Austin, Texas, September 2012.

"Energizing Today to Empower Tomorrow: Creating Success in a Global Economy."  Address delivered to the 2012 Annual Conference of the International Economic Development Council, Houston, Texas, September 2012.

"The Potential Impact of Expanding Alcohol Sales in the Tyler Area."  Address delivered to the Tyler Economic Development Corporation, Tyler, Texas, September 2012.

"An Outlook for Texas—Economic Challenges and Opportunities that Lie Ahead."  Address delivered to the Texas Association of Property Tax Professionals 25th Annual Conference, Addison, Texas, October 2012.

"Future Workforce Needs and the Potential Role of Community Colleges."  Address delivered to the National Council for Continuing Education and Training Annual Conference, Reno, Nevada, October 2012.

"Community Colleges as an Economic Development Asset."  Address delivered to the National Council for Continuing Education and Training Annual Conference, Reno, Nevada, October 2012.

"Economic Connectivity—Global Trends Translating into Local Opportunities."  Address delivered to the SEMI Austin Annual Industry Outlook Forum, Austin, Texas, October 2012.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area with Special Focus on the Outlook for Mansfield."  Address delivered to The Perryman Group's 29th Annual Economic Outlook Conference presented by Mansfield Texas Economic Development and Mansfield Area Chamber of Commerce, Mansfield, Texas, November 2012.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 29th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2012.

"The US and Texas Short-Term Forecast 2012-2017."  Address delivered to the Baylor Economic Forecast Luncheon, Waco, Texas, November 2012.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan
　　　Statistical Areas."  Address delivered to The Perryman Group's 29th Annual
　　　Economic Outlook Conference hosted by Western National Bank, Odessa, Texas,
　　　November 2012.

"Today's Economic Environment and What it Means for the Energy Industry."  Address
　　　delivered to the Annual Partners Meeting of Hurd Enterprises, Ltd., San Antonio,
　　　Texas, November 2012.

"Global and National Economic Trends—What Lies Ahead for Texas and the Real Estate
　　　Industry."  Address delivered to KPMG Dallas, Dallas, Texas, December 2012.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels
　　　Metropolitan Statistical Area."  Address delivered to The Perryman Group's 29th
　　　Annual Economic Outlook Conference hosted by the North San Antonio Chamber
　　　of Commerce, San Antonio, Texas, December 2012.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
　　　Governments which includes the Sulphur Springs Area."  Address delivered to
　　　The Perryman Group's 29th Annual Economic Outlook Conference hosted by the
　　　Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
　　　Springs, Texas, December 2012.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
　　　Address delivered to The Perryman Group's 29th Annual Economic Outlook
　　　Conference hosted by the Tyler Chamber of Commerce, Tyler, Texas,
　　　January 2013.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos
　　　Metropolitan Statistical Area."  Address delivered to The Perryman Group's 29th
　　　Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas,
　　　January 2013.

"A Look at Today's Economy and its Impact on the Corpus Christi Region."  Address
　　　delivered to the Corpus Christi Regional Economic Development Corporation,
　　　Corpus Christi, Texas, January 2013.

"A National and Local Perspective on the Economy and Real Estate Industry."  Address
　　　delivered to the National Association of Industry and Office Parks (NAIOP),
　　　Houston, Texas, January 2013.

"Economic Challenges and Success Stories from Texas and the US: An International
　　　Viewpoint."  Address delivered to Alberta's Industrial Heartland Association
　　　Annual Stakeholder Event, Edmonton, Alberta, Canada, January 2013.

"Impact of the Economy on Consumer Bankruptcy Filings."  Address delivered to the
　　　Texas Bar CLE – Advanced Consumer Bankruptcy Course, Dallas, Texas,
　　　January 2013.

"The Future of Texas" and "Future Careers You Need to Be Aware Of."  Keynote
　　　address and breakout session delivered to the JBS Leadership Institute 28th
　　　Annual Texas Leadership Forum, Austin, Texas, February 2013.

"Economic Trends, Challenges, and Strategies—What the Future Holds for Wisconsin." Address delivered to the Wisconsin Economic Development Association Annual Conference, Madison, Wisconsin, February 2013.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area." Address delivered to The Perryman Group's 29th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, February 2013.

"Economic Update 2013." Address delivered to Quest Capital Management, Inc., Dallas, Texas, February 2013.

"An Assessment of the Global Economic Environment." Address delivered to the Executive Advisory Council, San Antonio, Texas, February 2013.

"A Look at What Lies Ahead for the Texas Economy and Construction Industry." Capitol Aggregates Economic Forum, San Antonio, Texas, March 2013.

"An Overview of the Outlook for the Economy of Texas and the State's Largest Population Centers." Address delivered to Branch Bank and Trust, Dallas, Texas, March 2013.

"Issues Related to Medicare Funding and Medicaid Expansion in the Aftermath of the Affordable Care Act." Remarks delivered as Chair of the Medicare and Medicaid Session of the 2013 Texas Legislative Conference, New Braunfels, Texas, March 2013.

"An Evening with Dr. Ray Perryman, an Economic and Market Update." Address delivered to Carter Financial Management, Dallas, Texas, April 2013.

"Health Care and the Economy—What Lies Ahead." Address delivered to the Texas Business Leadership Council, Austin, Texas, April 2013.

"Texas and the Greater Boerne Area 2013 and Beyond." Address delivered to Kendall County EDC Forum, Boerne, Texas, April 2013.

"What's New in the Construction Industry? A Mid-Year Economic Update." Address delivered to the San Antonio Society for Marketing Professional Services, San Antonio, Texas, May 2013.

"Economic Opportunities and Challenges for Texas and the Gulf Coast Region." Address delivered to the Fort Bend Infrastructure Summit, Richmond, Texas, May 2013.

"A Look at What Lies Ahead for the State and Deep East Texas Economy." Address delivered to the Deep East Texas Council of Governments, Lufkin, Texas, May 2013.

"Changes Ahead for the Texas Economy." Address delivered to the CBRE/Capital Markets Multi-Housing Client Event, Austin, Texas, May 2013.

"An Economic Update on Texas and the Dallas Area." Address delivered to the Baylor Business Network, Dallas, Texas, June 2013.

"Economic Review and Outlook."  Address delivered to KPMG, Addison, Texas, June 2013.

"Opportunities of the Eagle Ford Shale."  Address delivered to the Governor's Small Business Forum, La Vernia, Texas, June 2013.

"The Permian Basin's Current Boom."  Address delivered to The Future of the Permian Basin Luncheon hosted by Energy Tower at City Center and Colliers International, Houston and Dallas, Texas, July 2013.

"US/Global Trends Over the Next Three Years and the Potential Impact to Business and the Snacks and Beverage Industry."  Address delivered to the Frito-Lay Leading Beyond Execution meeting, Frisco, Texas, July 2013.

"Medicaid Expansion and Economic Growth."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), July 2013.

"Economic Outlook for the West Texas Region."  Address delivered to the West Texas Rural Philanthropy Days, Alpine, Texas, August 2013.

"What the Future Holds for the Economy and Energy Industry."  Address delivered to the Mustang Cat Power Systems Economic Summit, Waller, Texas, August 2013.

"A Global Perspective of the Central Texas Economy and Real Estate Industry."  Address delivered to the Real Estate Council of Austin (RECA) 13th Annual Mid-Year Economic Forecast for the Austin Real Estate Market, Austin, Texas, August 2013.

"An Outlook on the Texas Economy and Opportunities for West Texas Communities."  Address delivered to the Governor's Small Business Forum, Lamesa, Texas, August 2013.

"Economic Forecast for the Rio Grande Valley."  Address delivered to the Governor's Small Business Forum, South Padre Island, Texas, September 2013.

"The Outlook for Real Estate Development in the Major Texas Urban Markets."  Address delivered to the Board of Directors of Cousins Property, Inc., Atlanta, Georgia, September 2013.

"Using the Ports-to-Plains Brand to Grow the Regional Economy."  Address delivered to the 16th Annual Ports-to-Plains Alliance Conference, Amarillo, Texas, October 2013.

"The Texas Economy—Meeting Challenges to Maintain Successes."  Address delivered to the Texas Economic Development Council (TEDC) 2013 Annual Conference, San Antonio, Texas, October 2013.

"Economic Development Trends and Challenges for the State of Texas."  Address delivered to the City of Big Spring, Big Spring, Texas, October 2013.

"Working for Business, Believing in Lubbock."  Address delivered to the Lubbock Chamber of Commerce, Lubbock, Texas, October 2013.

"Economic Information, Communications, and Leadership."  Address delivered to the Odessa College Leadership Forum, Odessa, Texas, October 2013.

"The Economic Outlook for the US, Texas, and the Dallas-Fort Worth Metropolitan Area with Special Focus on the Colleyville Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference presented by the City of Colleyville, Colleyville Area Chamber of Commerce, Fletcher Consulting, Frost Bank, and Cantey Hanger, LLP, Colleyville, Texas, November 2013.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2013.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by Western National Bank, Odessa, Texas, November 2013.

"The US and Texas Short-Term Forecast 2013-2018."  Address delivered to the Baylor Economic Forecast Luncheon, Waco, Texas, November 2013.

"The Economic Recovery in the United States and the Houston Region."  Address delivered to the Lone Star College System Workforce Development Consortium Strategy Forum, Houston, Texas, December 2013.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2013.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2013.

"The Texas Economy and Tourism Industry—How Can School Start Dates Impact?"  Address delivered to the Texas Travel Industry Association (TTIA) Board Retreat, Houston, Texas, December 2013.

"Looking Ahead to 2014—How Will Texas and the Fort Worth Area Economies Fair?"  Address delivered to the Baylor Business Network, Fort Worth, Texas, December 2013.

"Economic Opportunities and Challenges for 2014."  Address delivered to the National Association of Industry and Office Parks (NAIOP), Houston Annual Forecast Luncheon, Houston, Texas, January 2014.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2014.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2014.

"2013 In the Rearview – 2014 In the Windshield."  Address delivered to the Corpus Christi Regional Economic Development Corporation's annual meeting, Corpus Christi, Texas, January 2014.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 30th Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2014.

"The Oil Industry: Yesterday, Today, and Tomorrow."  Address delivered to United Pump and Supply, Inc., Odessa, Texas, March 2014.

"A Look at the Economics of Drought-Challenges for the Agriculture Industry and Affected Communities."  Address delivered to the National Cowboy & Western Heritage Museum Surviving the Elements Symposium – Land and Water Issues of the West (sponsored by the Coca-Cola Foundation), Oklahoma City, Oklahoma, March 2014.

"The Economic and Demographic Outlook for the San Antonio Area Within the Framework of National and State Performance."  Address delivered to GVTC Communications Executive and Leadership Meeting, Smithson Valley, Texas, March 2014.

"The Magnitude and Nature of the Texas Shale Oil Boom."  Remarks delivered as Chair and Panelist for the 2014 Texas Legislative Conference, New Braunfels, Texas, March 2014.

"The Impact of the National Economy on the Region."  Address delivered to the Society of Commercial Realtors, Fort Worth, Texas, April, 2014.

"Looking Closer into Local, State, and US Economic Conditions and Potential Outcomes—What Will be the Impact for the Construction Industry?"  Address delivered to Capital Aggregates, Inc., San Antonio, Texas, May 2014.

"An Economic Update on Texas and the Greater San Marcos Area."  Address delivered to the Greater San Marcos Partnership, San Marcos, Texas, May 2014.

"State of the Market 2014."  Address delivered to the Stream Realty Partners, Houston, Texas, May 2014.

"What's Ahead for Texas and the US."  Address delivered to the AGC Texas Building Branch Convention, Bastrop, Texas, June 2014.

"Texas, the Killeen-Temple-Fort Hood MSA, and Economic Development Opportunities—Where Do We Stand in Today's Economy and What Does the Future Hold?"  Address delivered to the Fort Hood Economic Region's 7th Annual Economic Conference, Killeen, Texas, June 2014.

"Global Issues Affecting the Economy."  Address delivered to KPMG, Addison, Texas, June 2014.

"Staying Competitive in Today's Economy—A Look at the Significant Roles of Education, Workforce Training, and Infrastructure."  Address delivered to the West Texas Energy Consortium, Abilene, Texas, June 2014.

"Texas Economic Outlook 2014-2015."  Address delivered to the Texas Economic Development Council's Mid-Year Conference, San Antonio, Texas, June 2014.

"Energy, the Economy, and the Evolving Health Care Complex."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), July 2014.

"Your Elevator Talk: Dollars the Oil and Gas Industry Brings to the Economic Table."  Address delivered to the 2014 NAPE Business Conference, Houston, Texas, August 2014.

"Economic Outlook for Texas and the Travel and Tourism Industry."  Address delivered to the Texas Travel Industry Association (TTIA), Galveston, Texas, September 2014.

"Trends and Opportunities in Today's Global Market."  Address delivered to the Berkadia Capital Markets Forum, Dallas, Texas, September 2014.

"Economic Update for Texas and the US."  Address delivered to the KPMG Annual Insights Event, Houston, Texas, September 2014.

"The US Energy Workforce: Synopsis of Current and Future Issues."  Address delivered to the Seyfarth Shaw Energy Workforce Summit, Houston, Texas, October 2014.

"The US and Texas Short-Term Forecast: 2014-2019."  Address delivered to the Baylor Economic Forecast Luncheon, Waco, Texas, October 2014.

"What Lies Ahead for the East Texas Economy."  Address delivered to the Nacogdoches Economic Development Corporation's Annual Meeting, Nacogdoches, Texas, October 2014.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2014.

"Economic Overview and Forecast."  Address delivered to the Texas Bank & Trust Insight Series, Longview, Texas, November 2014.

"Potential Economic Impacts from an Emerging Research University in the Coastal Bend Region."  Address delivered to the Corpus Christi 2020 Luncheon hosted by the Young Business Professionals of the Coastal Bend Region, Corpus Christi, Texas, November 2014.

"What Lies Ahead for the Odessa Economy."  Address delivered to the Mayor's State of the City Address Luncheon, Odessa, Texas, November 2014.

"Projections for Texas and the San Antonio Area Economy." Address delivered to the Baylor Business Network, San Antonio, Texas, November 2014.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area." Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2014.

"The Economic Outlook for the US, Texas, and the North East Texas Council of Governments which includes the Sulphur Springs Area." Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by the Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur Springs, Texas, December 2014.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area." Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by the Tyler Economic Development Council, the Tyler Area Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2015.

"What Lies Ahead for the Texas Economy." Address delivered to the Texas Mutual Insurance San Antonio Policyholder Advisory Group Meeting, San Antonio, Texas, January 2015.

"How Does Oil and Gas Affect the Texas Economy?" Address delivered to the Texas Municipal League (TML) Oil and Water Conference, Austin, Texas, January 2015.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area." Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, January 2015.

"2015 Economic Outlook for Southeast Texas." Address delivered to the Southeast Texas Economic Development Foundation Economic Forecast Breakfast, Beaumont, Texas, January 2015.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas." Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, February 2015.

"What Do Current and Future Economic Trends Mean for Health Care in Texas?" Address delivered to the Baylor Scott & White Holdings Strategy Retreat, Scottsdale, Arizona, February 2015.

"An Update on the Oil Situation and Its Impact on the Regional Economy." Address delivered to the Dallas Chamber of Commerce, Dallas, Texas, February 2015.

"Oil and the Texas Economy." Address delivered to the Texas Leadership Forum, Austin, Texas, February 2015.

"Hunger: Economic Perspectives—Sustainable Solutions." Address delivered to Feeding Texas, Austin, Texas, February 2015.

"Looking Ahead: The Texas Economy."  Address delivered to the 30th Annual Advanced Consumer Bankruptcy Course for the Texas Bar CLE, Houston, Texas, February 2015.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 31st Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2015.

"The Economics of Energy Exploration."  Moderator for the 2015 Texas Legislative Conference, New Braunfels, Texas, March 2015.

"Bubbling Crude or Housing Bubble?  Facing Uncertainty in the Energy and Housing Markets."  Address delivered to the Housing Relocation Professionals Spring 2015 Educational Event, Houston, Texas, March 2015.

"Projections for the Sunbelt Economy."  Address delivered to The Beck Group, Dallas, Texas, March 2015.

"Global and Domestic Economic Conditions and Their Effect on Wealth Management."  Address delivered to the Fiduciary and Investment Risk Management Association (FIRMA) 29th National Risk Management Training Conference, Nashville, Tennessee, April 2015.

"The Enormous Economic Impact of Child Maltreatment."  Address delivered to the Champions for Children Conference, Odessa, Texas, April 2015.

"Oil Price Fallout, Winners and Losers."  Address delivered to the Urban Land Institute (ULI), Houston, Texas, May 2015.

"State of the Economy."  Address delivered to KPMG, Houston, Texas, May 2015.

"Economic Conditions Affecting the Compressed Air Industry."  Address delivered to the Association of Independent Compressor Distributors (AICD) 30th Annual Meeting and Exhibition, Grapevine, Texas, May 2015.

"A Look at What Lies Ahead for Texas and the San Marcos Area."  Address delivered to the 2015 Greater San Marcos Economic Outlook, San Marcos, Texas, May 2015.

"Hunger is a Health Issue: The Link Between Food Insecurity and Poor Health."  Invited Panelist for the "It's Time" Texas Summit, presented by St. David's Foundation, Austin, Texas, June 2015.

"The Greek Crisis, Global Interaction, and the Future of US Health Care."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), July 2015.

"An Economic Overview and Outlook for Texas and the Dallas/Fort Worth Area."  Address delivered to American National Bank of Texas, Glen Rose, Texas, July 2015.

"Update on the Oil Market and its Impact on the Permian Basin Economy."  Address delivered to the Midland Exchange Club, Midland, Texas, August 2015.

"Economic Impact of Inadequate Judicial Infrastructure—Impact on Predictability, Jobs, and Growth."  Address delivered to the Judicial Infrastructure Planning Conference for the Eastern District of Texas, Plano, Texas, August 2015.

"Current Economic Conditions and the Energy Outlook—What Will be the Impact for the Construction Industry?"  Address delivered to Capital Aggregates, Inc., San Antonio, Texas, August 2015.

"A Two-Edged Sword: Energy, Low Taxes and Growth/Strained Infrastructure, Water Resources and Public Education."  Address delivered to The General Counsel Forum, DFW Quarterly Event, Dallas, Texas, September 2015.

"The Austin Economy: Challenges and Opportunities for the Future."  Address delivered to the Austin Chapter of the Association of Corporate Counsel, Austin, Texas, September 2015.

"What Lies Ahead for the Texas Economy."  Address delivered to the Texas House Republican Caucus Member Retreat, Bastrop, Texas, September 2015.

"The Texas Economy: Today and Tomorrow."  Address delivered to the Independent Bankers Association of Texas, Galveston, Texas, September 2015.

"An Economic Overview of the US, Texas, and Houston Area."  Address delivered to the 2015 Mustang CAT Machinery Division Economic Summit, Waller, Texas, September 2015.

"Economic Projections and Challenges for Texas and the US."  Address delivered to the TSCPA 2015 Financial Institutions Conference, Addison, Texas, September 2015.

"Judicial Infrastructure in the Eastern District of Texas and its Impact on Economic Development."  Address delivered to the SEDCO Summit Luncheon at Austin College, Sherman, Texas, September 2015.

"The Effect of Oil on the Texas Economy and Economic Development."  Address delivered to the Texas Economic Development Council's 2015 Annual Conference – Back to the Future, Dallas, Texas, October 2015.

"The Legend and the Legacy: Lessons for Today from the Wisdom of John Ben Shepperd."  Address delivered to the John Ben Shepperd Public Leadership Institute's 100th Birthday Celebration of John Ben Shepperd, Odessa, Texas, October 2015.

"The Economic Trends of Tourism."  Address delivered to the 2015 Nebraska Tourism Conference, Columbus, Nebraska, October 2015.

"When Will the Eastern District of Texas Sherman Division Become Bigger than Dallas?"  Address delivered to the 19th Annual Eastern District of Texas 2015 Bench Bar Conference, Plano, Texas, October 2015.

"The Economic Outlook for the US and Its Implications for Wholesale Distribution and Associated Financial Planning Approaches."  Address delivered to the National Association of Wholesalers-Distributors (NAW) Fall 2015 Large Company CFO Roundtable, Chicago, Illinois, October 2015.

"An Economic Overview and Outlook for the State and Texas Forest Country Region."
    Address delivered to the Texas Forest Country Partnership Economic
    Development Summit, Lufkin, Texas, November 2015.

"Surviving the Downturn, Scaling Back."  Address delivered to the North Texas Gas
    Processors Association, Dallas, Texas, November 2015.

"The Economic Outlook for the US, Texas, and Van Zandt County."  Address delivered
    to the Van Zandt County Economic Outlook presented by the Canton Texas
    Chamber of Commerce, Canton, Texas, November 2015.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-
    Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's
    32nd Annual Economic Outlook Conference hosted by the Dallas Regional
    Chamber, Dallas, Texas, November 2015.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels
    Metropolitan Statistical Area."  Address delivered to The Perryman Group's 32nd
    Annual Economic Outlook Conference hosted by the North San Antonio Chamber
    of Commerce, San Antonio, Texas, December 2015.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
    Governments which includes the Sulphur Springs Area."  Address delivered to
    The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the
    Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
    Springs, Texas, December 2015.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
    Address delivered to The Perryman Group's 32nd Annual Economic Outlook
    Conference hosted by the Tyler Economic Development Council, the Tyler Area
    Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2016.

"Projections and Challenges for the Economy in 2016."  Address delivered to the
    Feliciano Financial Group's Annual Economic Update 2016, Whitehouse, Texas,
    January 2016.

"Economic Challenges and Opportunities for Texas and the Houston Area in 2016."
    Address delivered to Telios-Houston, Houston, Texas January 2016.

"2016 Economic Outlook for Texas and the US."  Address delivered to the Independent
    Insurance Agents of Texas (IIAT) JEV Management Seminar, Austin, Texas,
    January 2016.

"Looking Ahead in 2016—What's in Store for the US and Houston Area Economy?"
    Address delivered to the National Association of Industry and Office Parks
    (NAIOP), Houston Annual Forecast Luncheon, Houston, Texas, January 2016.

"Current State of the Energy Industry and its Future Impact on the US Economy."
    Address delivered to the Texas Chapter of Metals Service Center Institute,
    Houston, Texas, January 2016.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Address delivered to The Perryman Group's 32nd Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, February 2016.

"Forecasting the Future."  Address delivered to Leadership Fort Worth—LeaderPrime, Fort Worth, Texas, February 2016.

"Transportation as an Economic Driver."  Address delivered to the Northeast Tarrant Transportation Summit, Hurst, Texas, February 2016.

"Success in the Market for Prosperity."  Address delivered to the North Texas Regional Leadership Day 2016, Plano, Texas, February 2016.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 32nd Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, February 2016.

"Today's Economy and its Impact on the Banking Industry."  Address delivered to the Citizens Bank of Las Cruces, Las Cruces, New Mexico, February 2016.

"An Economic Update for Texas and the Fort Worth Area."  Address delivered to Baylor Business Network – Fort Worth, Fort Worth, Texas, February 2016.

"Economic Update."  Address delivered to the Central Texas CCIM/CREW Austin, Austin, Texas, March 2016.

"Impact Assessments: A Budget Advocacy Tool."  Address delivered to the Texas Criminal Justice Coalition Budget Advocacy Workshop, Austin, Texas, March 2016.

"Sustaining the Texas Economic Miracle."  Panel moderator for the 2016 Texas Legislative Conference, New Braunfels, Texas, March 2016.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 32nd Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2016.

"What Lies Ahead for the Texas Economy and Oil and Gas Industry."  Address delivered to the Texas Department of Banking 2016 Examiner Training, Fort Worth, Texas, March 2016.

"Economic Development Trends Shaping the Future of Kendall County."  Address delivered to the Boerne Kendall County Economic Development Corporation Annual Investors Meeting, Boerne, Texas, March 2016.

"An Economic Update on the US, Texas, and Dallas Area."  Address delivered to Baylor Business Network – Dallas, Dallas, Texas, April 2016.

"The Impact of Poverty and Lack of Medicaid Expansion in Texas."  Address delivered to Leadership San Antonio, San Antonio, Texas, April 2016.

410

"The Economics of Water for Oil and Gas Drilling."  Invited address presented at the Economic Issues Arising from Use of Water During and After Drilling Panel, hosted by the Rocky Mountain Mineral Law Foundation, Houston, Texas, April 2016.

"An Economic Update on Texas and the San Antonio Area."  Address delivered to Baylor Business Network – San Antonio, San Antonio, Texas, May 2016.

"An Economic Update on Texas and the Austin Area."  Address delivered to Baylor Business Network – Austin, Austin, Texas, May 2016.

"The Economic Outlook and Its Implications for Business Activity in Wood County."  Address delivered to the Wood County Economic Outlook, Mineola, Texas, May 2016.

"An Examination of the Texas Economy and What's in Store for the Future."  Address delivered to the Houston CPA Society's 36th Annual Financial Reporting Symposium, Houston, Texas, May 2016.

"The Economic Outlook for the United States and Texas and the Implications for Real Estate."  Address delivered to the Texas Land Title Association Annual Conference and Business Meeting, Galveston, Texas, June 2016.

"Brexit, Interest Rates, and the US Health Care Environment."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), July 2016.

"Texas: The Economy and Evolving Demographics."  Address delivered to Sandler O'Neill + Partners meeting, Dallas, Texas, August 2016.

"Powering Tomorrow."  Panel moderator at the Great States Investment Summit sponsored by Conway Events and Team Texas, Dallas, Texas, September 2016.

"An Introduction to Texas and the US Economy."  Address delivered to the Globalscope International M&A Advisors Conference hosted by Allegiance Capital Corporation, Dallas, Texas, September 2016.

"Economic Trends and Projected Outcomes for the US and Texas." Address delivered to KPMG's Annual Executive Business Issues Forum, Dallas, Texas, September 2016.

"Energy – Will the Economy Have Enough?"  Address delivered to Catalyst Corporate Economic Forum presented by Catalyst Corporate Federal Credit Union, Irving, Texas, October 2016.

"Texas Economy Outlook and Trends." Address delivered to the 2016 Texas #AE Industry Conference presented by Morrissey Goodale LLC, Dallas, Texas, October 2016.

"The Economic Forecast for Texas and What it Means for the Travel and Tourism Industry."  Keynote address delivered to the 31st Annual Texas Travel Summit presented by the Texas Travel Industry Association (TTIA), Houston, Texas, October 2016.

"Oil and Gas and the Texas Economy."  Address delivered to the 2016 Mustang CAT Economic Summit, Waller, Texas, October 2016.

"The United States and Texas in a Global Context."  Address delivered to the 37th Annual Carter Investment Conference, Dallas, Texas, October 2016.

"Outlook for the Texas Economy." Address delivered to Hilltop Holdings, Inc., Dallas, Texas, October 2016.

"The Texas Economic Outlook."  Address delivered to the Texas Economic Development Council (TEDC) 2016 Annual Conference, San Antonio, Texas, October 2016.

"From Plano to Sherman: Diving Deep Into the Sherman Division. Who Are These New Judges? How Big is this Boom?"  Panel participant at the 20th Annual Eastern District of Texas 2016 Bench Bar Conference, Plano, Texas, October 2016.

"Regional Outlook for CHRISTUS Health and the Southeast Texas Economy."  Address delivered to the CHRISTUS Southeast Texas Board, Foundation, and Medical Staff Leadership Strategic Planning Retreat, Beaumont, Texas, October 2016.

"Economic Update."  Address delivered to the Waco Rotary Club, Waco, Texas, November 2016.

"Economics and Texas Schools, What Every School Administrator Should Know."  Address delivered to the John Hoyle Memorial Administrative Leadership Institute Fall 2016 Conference, College Station, Texas, November 2016.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2016.

"An Economic Outlook for Texas and the Houston, Austin, and San Antonio Metro Areas."  Address delivered to NAI Partners 2016 Client Event, Houston, Texas, November 2016.

"New President, Now What?"  Address delivered to the NAIOP North Texas Chapter Meeting, Dallas, Texas, November 2016.

"The Economic Outlook for the US, Texas, and the San Antonio Area."  Address delivered to the San Antonio Financial Executives International (FEI) Chapter Luncheon, San Antonio, Texas, December 2016.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels Metropolitan Statistical Area."  Address delivered to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the North San Antonio Chamber of Commerce, San Antonio, Texas, December 2016.

"The Economic Outlook for the US, Texas, and the North East Texas Council of
Governments which includes the Sulphur Springs Area."  Address delivered to
The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the
Sulphur Springs/Hopkins County Economic Development Corporation, Sulphur
Springs, Texas, December 2016.

"Oil and Gas and its Impact on the West Texas Economy."  Address delivered to the
Industry Appreciate Luncheon hosted by the Levelland Economic Development
Corporation, Levelland, Texas, December 2016.

"A Look at what Lies Ahead for the Houston Economy in 2017."  Address delivered to
Baylor Business Network - Houston, Houston, Texas, December 2016.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Address delivered to The Perryman Group's 33rd Annual Economic Outlook
Conference hosted by the Tyler Economic Development Council, the Tyler Area
Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2017.

"Global Uncertainty and Its Impact on the Economies of the US and Texas."  Address
delivered to the Stars Forum meeting of the World President's Organization,
Dallas, Texas, January 2017.

"The Post-Election Economy and its Impact on the Dallas-Fort Worth Region."  Address
delivered to the Frisco Executive Forum hosted by the Frisco Economic
Development Corporation, Frisco, Texas, January 2017.

"2017 Economic Forecast."  Address delivered to the McKinney Chamber of Commerce
Annual Meeting, McKinney, Texas, January 2017.

"A Look at Current Economic Conditions and Proposed Government Policies—What
Will Be the Impact on the Texas Workforce?"  Address delivered to the North
Central Texas Council of Governments meeting, Grand Prairie, Texas,
January 2017.

"The Consequences of Child Maltreatment and the Benefits of Foster Care Redesign: A
Comprehensive Economic Perspective."  Address delivered to the UT LAMP
(Learning Activities for Mature People) program, Austin, Texas, February 2017.

"State of the Industry."  Address delivered to the 27th Annual Texas Travel Industry
Unity Dinner, Austin, Texas, February 2017.

"State of the Industry in Texas Cities."  Moderator for a panel of Texas mayors at the 27th
Annual Texas Travel Industry Unity Dinner, Austin, Texas, February 2017.

"New President, Now What?"  Address delivered to the SIOR luncheon, Houston, Texas,
February 2017.

"Code Blue: A Perspective on the Critical Condition of Health Care Economics and
Policy."  Address delivered to the Texas Economic Development Council
Legislative Conference, Austin, Texas, February 2017.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan
Statistical Areas."  Address delivered to The Perryman Group's 33rd Annual
Economic Outlook Conference hosted by Frost Bank, Odessa, Texas,

February 2017.

"The Value of Higher Education."  Address delivered to the Tarleton State University Spring Forum and Luncheon, Stephenville, Texas, February 2017.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos Metropolitan Statistical Area."  Address delivered to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas, February 2017.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical Area."  Address delivered to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by Texas Bank & Trust, Longview, Texas, March 2017.

"Corporate Welfare or Good Jobs?"  Panel moderator for the 2017 Texas Legislative Conference, New Braunfels, Texas, March 2017.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical Area."  Address delivered to The Perryman Group's 33rd Annual Economic Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas, March 2017.

"Forecasting the Future."  Address delivered to Leadership Fort Worth – LeaderPrime, Fort Worth, Texas, March 2017.

"An Economic Perspective on Changes Affecting Health Care and Health Care Providers."  Address delivered to the Texas Surgical Society Spring Banquet, Midland, Texas, April 2017.

"A Local and Global Perspective on the Energy Industry and its Impact on the Economy."  Address delivered to Seimens' Oil & Gas Summit, Corpus Christi, Texas, April 2017.

"An Update on the Odessa Economy and Recent Trends in Downtown Development."  Address delivered to the 2017 State of Downtown Odessa, Odessa, Texas, May 2017.

"The Economic Impact of Tourism on Texas and the San Angelo Area."  Address delivered to the Tourism Luncheon sponsored by the San Angelo Chamber of Commerce and the San Angelo Convention and Visitors Bureau, San Angelo, Texas, May 2017.

"Emerging Issues in Health Economics."  Distinguished lecture delivered to the Texas Tech Graduate School of Nursing, Odessa, Texas (multiple locations via satellite), June 2017.

"The Future of Texas and Its Impact on the Local Economy."  Address delivered to the Tomball Economic Development Corporation's 9th Annual Economic Outlook Luncheon, Tomball, Texas, June 2017.

"The Economy of Wichita Falls – What Lies Ahead."  Address delivered to the Wichita Falls Chamber of Commerce, Wichita Falls, Texas, August 2017.

"Legislative Update – The Texas Economic Outlook."  Address delivered to the TASSCC 2017 Annual Conference, San Antonio, Texas, August 2017.

"'Making the Miles Beneficial'—Impact of Corridor Development to Communities."  Address delivered to the 20th Annual Ports-to-Plains Alliance Conference and Reunion, Lubbock, Texas, September 2017.

"The Texas Outlook: An Examination of Likely Patterns and Key Drivers."  Address delivered to the CIBC Atlantic Trust Economic and Investment Outlook: Texas and Beyond, Austin, Texas, September 2017.

"A Look at the Texas Economy and the Impact of Hurricane Harvey."  Address delivered to the Texas House Republican Caucus Retreat, Lost Pines, Texas, September 2017.

"The Texas Economy: Today and Tomorrow."  Address delivered to the IBAT 43rd Annual Convention, Austin, Texas, October 2017.

"A Historical Look at the Development of Fort Worth and What Lies Ahead for its Economy."  Address delivered to Pinnacle Bancorp, Inc. 2017 Fall Conference, Fort Worth, Texas, October 2017.

"The Economic Outlook for the US, Texas, and the South Texas Region."  Address delivered to the PlainsCapital South Texas Forum, McAllen, Texas, November 2017.

"Future of the Coastal Bend Area Economy."  Address delivered to the Corpus Christi Regional Economic Development Annual Investor Meeting, Corpus Christi, Texas, November 2017.

"The State of the Rio Grande Valley Economy and the Potential Effects of Major External Factors."  Address delivered to 1st Annual Economic Outlook Conference hosted by the Plains Capital Bank, McAllen, Texas, November 2017.

"The Economic Outlook for the US, Texas, and the Dallas-Plano-Irving and Fort Worth-Arlington Metropolitan Divisions."  Address delivered to The Perryman Group's 34th Annual Economic Outlook Conference hosted by the Dallas Regional Chamber, Dallas, Texas, November 2017.

"The Outlook for the Global, National, Regional, and Dallas Area Economies."  Address delivered to Ernest & Young's Annual Financial Services Accounting and Reporting Update, Addison, Texas, November 2017.

"The Outlook for the Global, National, Regional, and San Antonio Area Economies."  Address delivered to Ernest & Young's Annual Financial Services Accounting and Reporting Update, San Antonio, Texas, November 2017.

"The South Plains Economic Outlook in the Context of National and State Patterns."  Address delivered to the Levelland Economic Development Corporation, Levelland, Texas, November 2017.

"The Economic Outlook for the US, Texas, and the San Antonio-New Braunfels
Metropolitan Statistical Area."  Address delivered to The Perryman Group's 34th
Annual Economic Outlook Conference hosted by the North San Antonio Chamber
of Commerce, San Antonio, Texas, December 2017.

"The Economic Outlook for the US, Texas, and the East Texas Council of Governments."
Address delivered to The Perryman Group's 34th Annual Economic Outlook
Conference hosted by the Athens Economic Development Corporation, Athens,
Texas, December 2017.

"The Economic Outlook for the US, Texas, and the Tyler Metropolitan Statistical Area."
Address delivered to The Perryman Group's 34th Annual Economic Outlook
Conference hosted by the Tyler Economic Development Council, the Tyler Area
Chamber of Commerce, and Leadership Tyler, Tyler, Texas, January 2018.

"The Economic Outlook for the US, Texas, and the Beaumont-Port Arthur Metropolitan
Statistical Area."  Address delivered to The Perryman Group's 34th Annual
Economic Outlook Conference hosted by the Southeast Texas Economic
Development Foundation, Beaumont, Texas, January 2018.

"Projections for the for Texas Economy and Construction Industry."  Address delivered
to the Associated General Contractors of America (AGC) Annual "State of the
Chapter" Membership Meeting, Houston, Texas, February 2018.

"Expectations for the US, Texas, Houston-The Woodlands-Sugar Land MSA, and
Greater West Houston."  Address delivered to the West Houston Economic
Development Summit, Houston, Texas, February 2018.

"Economic Forecast and Trends for the US, Texas, and Fort Worth Area."  Address
delivered to the LeaderPrime class luncheon of Leadership Fort Worth, Fort
Worth, Texas, February 2018.

"The Economic Outlook for the US, Texas, and the Austin-Round Rock-San Marcos
Metropolitan Statistical Area."  Address delivered to The Perryman Group's 34th
Annual Economic Outlook Conference hosted by Frost Bank, Austin, Texas,
February 2018.

"The Economic Outlook for the US, Texas, and the Longview Metropolitan Statistical
Area."  Address delivered to The Perryman Group's 34th Annual Economic
Outlook Conference hosted by Texas Bank & Trust, Longview, Texas,
February 2018.

"The Economic Outlook for the US, Texas, and the Lubbock Metropolitan Statistical
Area."  Address delivered to The Perryman Group's 34th Annual Economic
Outlook Conference hosted by the Plains Capital Bank, Lubbock, Texas,
March 2018.

"Economic Challenges and Opportunities for the US and Texas Economies."  Address
delivered to the Waco Rotary Club, Waco, Texas, March 2018.

"Focus on Dallas Track."  Address and panel discussion delivered to the International Air
Transport Association (IATA) 12th World Cargo Symposium, Dallas, Texas,
March 2018.

"An Economic Overview of Texas and the Central Texas Region and the Impact of Immigration Policy on the Workforce."  Address delivered to the Workforce Solutions of Central Texas, Killeen, Texas, March 2018.

"Federal Tax Reform and Texas."  Panel moderator for the 2018 Texas Legislative Conference, New Braunfels, Texas, March 2018.

"The Economic Outlook for the US, Texas, and the Odessa and Midland Metropolitan Statistical Areas."  Address delivered to The Perryman Group's 34th Annual Economic Outlook Conference hosted by Frost Bank, Odessa, Texas, March 2018.

"Public Education as an Economic Engine for Texas."  Address delivered to the Community Partnership Forum sponsored by the Lubbock Independent School District and Lubbock Chamber of Commerce, Lubbock, Texas, April 2018.

"Economic Forecasting in the State of Texas."  Address delivered to the University of North Texas College of Business Luncheon, Denton, Texas, April 2018.

"Investment Into and Throughout the North American Region."  Panel participant at the NGA (National Governors Association) International Summit for North American Governors and Premiers, Scottsdale, Arizona, May 2018.

"Unlocking Opportunities."  Address and panel discussion delivered at the Health Care Service Corporation's Blue Leaders Sales Conference, Chicago, Illinois, May 2018.

Continuing commentary on international, domestic, state, and regional economic events for major media outlets (including Associated Press, United Press International, Cox News Service, Reuter's News Service, Bloomberg News Service, The Economist, USA Today, Time, Money, US News and World Report, The New York Times, The Wall Street Journal, Newsweek, The Financial Times of London, The Atlantic Monthly, Fortune, Forbes, Business Week, The Chicago Tribune, The Los Angeles Times, The Washington Post, The Boston Globe, Bond Buyer, Yahoo Finance, CBS News, NBC News, ABC News, CNN, CNBC, MSNBC, PBS, BBC, CBS Radio, Fox, Financial News Network, Money Radio, AP Radio, National Public Radio's Marketplace Radio, and numerous other major international financial and business publications and programs). Frequent appearances on major television and radio interview programs throughout the country.

# Academic Research

## ACADEMIC RESEARCH AND RELATED ACTIVITY

### Books Authored and Edited

Time Series Analysis.  Amsterdam: North-Holland, 1981 (co-edited with
O. D. Anderson).

Applied Time Series Analysis.  Amsterdam: North-Holland, 1982 (co-edited with
O. D. Anderson).

The Measurement of Monetary Policy.  Boston: Kluwer-Nijhoff, 1983.

Regional Econometric Modeling: The State of the Art.  Boston: Kluwer-Nijhoff, 1986
(co-edited with James R. Schmidt).

Survive and Conquer.  Dallas: Taylor Publishing, 1990.

### Selected Major Independent Research Reports

"The Current and Projected Impact of 'High Tech' Activity on the Economy of Texas: A
Comprehensive Economic Model and Analysis," 1984.

"A Detailed Industrial Forecast of the Texas Economy," Annual editions, 1987-2007.

"A Comprehensive Occupational Profile of the Texas Economy," Annual editions,
1987-1995.

"The Impact of Mexican Trade on the Texas Economy: An Analysis of Current Patterns
and Some Potential Effects of a Free Trade Agreement," 1991.

"The Future of Real Estate in Texas and its Major Metropolitan Areas as Impacted by
Economic Trends," 1992.

"The North American Free Trade Agreement (NAFTA): A Current Perspective on the
Likely Impact on Texas and Its Metropolitan Regions," 1993.

"Winners and Losers in the Texas Economy," 1994.

"Global Texas: An Analysis of Exports from the Lone Star State and their Effects on
Economic Activity," 1995.

"The Real Price of Compliance—A Comprehensive Analysis of the Net Costs and
Benefits of Environmental Regulation on the Economy of Texas," 1995.

"The Impact of Election Issues and Economic Policy on Business Conditions," 1996.

"The Impact of Deregulation of Electric Power Generation on the Texas Economy,"
1998.

"An Assessment of the Potential Effects of Y2K on the Texas Economy," 1999.

"An Assessment of the Economic Development Consequences of the 76th Session of the Texas Legislature," 2000.

"The Catalyst for Creativity and the Incubator for Progress: The Arts, Culture, and the Texas Economy," 2001.  *Pro bono* report prepared for the Texas Cultural Trust.

"Texas, Our Texas: An Assessment of Economic Development Programs and Prospects in the Lone Star State," 2002.  *Pro bono* report prepared for the Office of the Governor and the Texas Department of Economic Development.

"Redefining the Prospects for Sustainable Prosperity, Employment Expansion, and Environmental Quality in the US: An Assessment of the Economic Impact of the Initiatives Comprising the Apollo Project," 2003.  *Pro bono* report prepared for the Institute for America's Future.

"A State-by-State Analysis of the Economic Impact of the Apollo Project for Energy Conservation and Environmental Quality," 2004.  *Pro bono* impact prepared for the Institute for America's Future.

## Academic Publications and Presentations

"Some Problems Associated with the Mathematical Modeling of Collective Bargaining Structures: Comment." Papers and Proceedings of the Southwestern Society of Economists, 1978.

"Capital for Productivity and Jobs." Review of Business and Economic Research, Spring 1978 (Book Review).

"Some Methodological Notes Regarding the Control of the Money Stock." Baylor Business Studies, February 1978.

"Noncyclical Indicators of Dynamic Monetary Policy Derived from a Simultaneous Equation Econometric Model." Paper delivered to the Macroeconomic Theory Session of the 1978 Conference of the Western Economic Association, Honolulu, Hawaii, June 1978.

"An Empirical Measure of the Lag in the Countercyclical Response of Monetary Policy." Paper delivered to the Forecasting and Leading Economic Indicators Session of the 1978 Conference of the American Statistical Association, San Diego, California, August 1978.

"An Alternative Methodology for the Measurement of the Lag in the Countercyclical Response of Monetary Policy." Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1978.

"Actual vs. Intended Monetary Actions: An Assessment of Policy Effectiveness." Paper delivered to the Domestic Fiscal Theory and Policy Session of the 1978 Conference of the Atlantic Economic Society, Washington, DC, October 1978.

"The Relative Impacts of Monetary and Fiscal Policy: A Consistent Assessment." Paper delivered to the Monetary and Fiscal Policy Session of the 1978 Conference of the Southern Economic Association, Washington, DC, November 1978.

"On the Ex Poste Determination of the Nature of Exogenous Disturbances in an Economy." Paper delivered to the Quantitative Economic Theory Session of the 1979 Conference of the Missouri Valley Economic Association, St. Louis, Missouri, March 1979.

"A Difficulty in the Identification of Disturbances Which Produce Changes in Money National Income." The Journal of Economics, 1979.

"The Neutralized Money Stock: Reconstruction, Extension, and Application." Paper delivered to the Monetary and Fiscal Policy Session of the 1979 Conference of the Southwestern Federation of Administrative Disciplines, Houston, Texas, March 1979.

"An Alternative Characterization of Monetary Policy, 1953-1975." Papers and Proceedings of the Southwestern Society of Economists, 1979.

"Keynesianism vs. Neoclassicism: A Reevaluation." Papers and Proceedings of the Southwestern Society of Economists, 1979.

"A Theoretical Framework for the Analysis of Indicators of Monetary Policy."  Paper delivered to the Monetary Theory and Policy Session of the 1979 Conference of the Southwestern Social Science Association, Fort Worth, Texas, March 1979.

"Welfare Criteria as a Rationale for Redistribution: A Critical Evaluation."  Paper delivered to the Problems in Income Redistribution and Taxation Session of the 1979 Conference of the Southwestern Social Science Association, Fort Worth, Texas, March 1979.

"The Definition of Science and the Social 'Sciences': A Pragmatic Approach."  Invited paper delivered to the Problems in Business and Society Session of the 1979 Conference of the Southwestern Social Science Association, Fort Worth, Texas, March 1979.

"The Goals and Achievements of Countercyclical Monetary Policy."  <u>Atlantic Economic Journal</u>, March 1979.

"An Indirect Empirical Demonstration of the Bias Associated with the Employment of Endogenous Indicators of Monetary Policy."  Paper delivered to the Monetary Theory and Policy Session of the 1979 Conference of the Western Economic Association, Las Vegas, Nevada, June 1979.

"Secondary Distribution Schemes Among English Classical Economists: Some Exceptions to the Doctrine of Laissez-Faire."  Paper delivered to the History of Economic Thought Session of the 1979 Conference of the Western Economic Association, Las Vegas, Nevada, June 1979.

"A Generalized Nonlinear Methodology for the Estimation of Causal Path Models."  Paper delivered to the Problems in Modeling Session of the Second International Conference on Mathematical Modeling, St. Louis, Missouri, July 1979.

"The Theoretical Demonstration of a Basic Indeterminacy in a Mathematical Model for Analyzing Macroeconomic Disturbances."  Paper delivered to the Econometric Modeling Session of the Second International Conference on Mathematical Modeling, St. Louis, Missouri, July 1979.

"Estimation of Recursive Nonlinear Causal Path Models: An Extended Approach."  <u>Proceedings of the Second International Conference on Mathematical Modeling</u>, 1979.

"Indeterminacies in the Identification of Dominant Sources of Macroeconomic Disturbances: A Formal Analysis."  <u>Proceedings of the Second International Conference on Mathematical Modeling</u>, 1979.

"Employee Theft and Worker Attitudes: A Bivariate and Multivariate Analysis."  Paper delivered to the Employee Response to Pay Session of the Personnel Session of the 1979 Conference of the Academy of Management, Atlanta, Georgia, August 1979 (co-authored with Joe A. Cox).

"An Empirical Investigation of the Relationship Between Employee Theft Perceptions and Other Attitudinal Variables."  <u>Proceedings of the Academy of Management</u>, 1979 (co-authored with Joe A. Cox).

"An Estimator for Large Simultaneous Equation Models Which Contain Lagged Endogenous Variables and Serially Correlated Errors."  Paper delivered to the Econometric Theory Session of the 1979 Conference of the American Statistical Association, Washington, DC, August 1979.

"Monetary Policy and Income: A Causal Approach."  Paper delivered to the Monetary Analysis Session of the 1979 Conference of the American Statistical Association, Washington, DC, August 1979 (co-authored with James R. Schmidt).

"Estimation of Large Dynamic Equation Systems Under Conditions of Multicollinearity, Autocorrelation, and Limited Observations." Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1979.

"Money, Policy, Economic Activity, and Causality: An Empirical Analysis." Proceedings of the American Statistical Association, Business and Economic Statistics Session, 1979 (co-authored with James R. Schmidt).

"Some Advances in the Structural Specification, Estimation, and Evaluation of Regional Macroeconomic Systems."  Paper delivered to the Regional Economics Session of the 1979 Conference of the Atlantic Economic Society, Washington, DC, October 1979.

"On the Existence of Bias and Endogeneity Among Alternative Monetary Indicators."  Paper delivered to the Monetary Theory and Policy Session of the 1979 Conference of the Atlantic Economic Society, Washington, DC, October 1979.

"An Amended Simultaneous Equation Model of the US Monetary Sector and Its Viability for Indicator Construction." Baylor Business Studies, October 1979.

"Monetary Policy, Fiscal Policy, and Economic Activity: An Application of Multivariate Causality Analysis."  Paper delivered to the Monetary Theory and Policy Session of the 1979 Conference of the Southern Economic Association, Atlanta, Georgia, November 1979 (co-authored with James R. Schmidt).

"Evolution of the Financial Structure and the Behavior of the Economy: Some Implications for Economic Theory—Comments."  Paper delivered to the Financial Structure of Contemporary Western Capitalism Session of the 1979 Conference of the Association for Evolutionary Economics (Allied Social Science Associations), Atlanta, Georgia, December 1979.

"Social Science Structure and Social Science Practice: A Critique and a Perspective."  Invited paper delivered to the Industry and Economics Session of the 1980 Conference of the Academy of Science, New Orleans, Louisiana, February 1980.

"On the Irrelevance of Revolutions in the Social Sciences." Proceedings of the Academy of Sciences, 1980.

"Some Suggested Measures of the Stance of Monetary Policy."  Paper delivered to the Monetary Policy and Inflation Session of the 1980 Conference of the Missouri Valley Economic Association, Memphis, Tennessee, February 1980.

"An Alternative Unbiased Indicator of Dynamic Monetary Policy: Construction and Application." The Journal of Economics, 1980.

423

"Bias, Exogeneity, and Monetary Indicators: A Theoretical and Empirical Perspective."
<u>Atlantic Economic Journal,</u> March 1980.

"The Specification of a Regional Macroeconometric Forecasting Model of Texas."
<u>Atlantic Economic Journal,</u> March 1980.

"Do Federal Reserve Policy Makers Achieve Their Goals?  Yes, But. . . ."  Paper
delivered to the Monetary Theory and Policy Session of the 1980 Conference of
the Southwestern Federation of Administrative Disciplines, San Antonio, Texas,
March 1980.

"The Effectiveness of Federal Reserve Policy with Respect to Stated Open Market
Objectives: An Appraisal."  <u>Papers and Proceedings of the Southwestern Society
of Economists,</u> 1980.

"On Revisions in the Concept of Complimentary Comment."  <u>Papers and Proceedings of
the Southwestern Society of Economists,</u> 1980.

"Some Alternative Approaches to the Federal Reserve Function Problem."  Paper
delivered to the Monetary Theory and Policy Session of the 1980 Conference of
the Southwestern Social Science Association, Houston, Texas, April 1980.

"The Business Cycle: Theoretical and Empirical Origins and Development."  Paper
delivered to the History of Economic Thought Session of the 1980 Conference of
the Southwestern Social Science Association, Houston, Texas, April 1980.

"The State of Texas Econometric Model: A Survey of Preliminary Specifications."  Paper
delivered to the Economic Modeling and Planning Session of the 1980
Conference of the Southwestern Social Science Association, Houston, Texas,
April 1980.

"On the Specification and Estimation of Monetary Reaction Functions."  <u>Southwestern
Journal of Economic Abstracts,</u> 1980.

"Clement Juglar and the Theory and Measurement of Business Fluctuations."
<u>Southwestern Journal of Economic Abstracts,</u> 1980.

"Sectoral Specifications in the State of Texas Econometric Model."  <u>Southwestern
Journal of Economic Abstracts,</u> 1980.

"Supply Side Development in the State of Texas Econometric Model."  Invited paper
delivered to the Econometric Models of States Plenary Session of the Eleventh
Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1980.

"Economy and Self."  <u>Journal of Economic History,</u> June 1980 (Book Review).

"The Economic Impact of Economic Policy: Some Consistent Estimates of the St. Louis
Equation."  <u>Review of Business and Economic Research,</u> June 1980.

"A Test of the Functional Form of Production Relationships in a Regional Econometric
Model."  Paper delivered to the Regional Econometric Modeling Session of the
1980 Conference of the Western Economic Association, San Diego, California,
June 1980.

"Some Results on the Specification and Estimation of Supply and Demand Interactions in a Regional Macroeconometric System."  Paper delivered to the Econometrics Session of the 1980 Conference of the Western Economic Association, San Diego, California, June 1980.

"The Reaction of the Federal Reserve to the State of the Economy: An Analysis in Light of the Reverse Causation Controversy."  Paper delivered to the Monetary Policy and Inflation Session of the 1980 Conference of the Western Economic Association, San Diego, California, June 1980.

"Capitalist Financial Processes and the Instability of Capitalism: Comment."  Journal of Economic Issues, June 1980.

"The Reaction of the Federal Reserve to the State of the Economy: An Alternative Empirical Strategy."  Paper delivered to the Study of Industrial Structure and Economic Development Session of the 1980 Conference of the American Statistical Association, Houston, Texas, August 1980.

"Federal Reserve Responses to Economic Activity: Causality, Exogeneity, and Simultaneous Equation Bias."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1980.

"Bivariate and Multivariate Causal Relationships and Economic Policy: Some Time Series and Econometric Results."  Paper delivered to the Money and Inflation Session of the Third International Time Series Meeting, Houston, Texas, August 1980 (co-authored with James R. Schmidt).

"On the Use of Time Series and Autoregressive Techniques Within the Context of a Regional Econometric Simulatory Model."  Paper delivered to the Model Evaluation Session of the Third International Time Series Meeting, Houston, Texas, August 1980.

"Consistent Estimation of Large Dynamic Autoregressive Time Series Models: An Adaptable Multiple Stage Approach."  Paper delivered to the Time Series Approaches to Econometrics Session of the Third International Time Series Meeting, Houston, Texas, August 1980.

"Missing Analytical Elements in the Institutional Perspective on Labor."  Paper delivered to the Institutional Approaches to Labor: Property Rights Session of the 1980 Conference of the Association for Evolutionary Economics (Allied Social Science Associations), Denver, Colorado, September 1980.

"A Simple Multi-Stage Consistent Estimator for Dynamic Equations from Large Simultaneous Systems Which Exhibit First-Order Autoregressive Disturbances."  Paper delivered to the New Methods of Simultaneous Equation Estimation Session of the 1980 Conference of the Econometric Society (Allied Social Science Associations), Denver, Colorado, September 1980.

"The Supply Side of Regional Econometric Models."  Modeling and Simulation, 1980.

"Sherlock Holmes of Baker Street: A Neglected Practitioner of the Science of Political Economy."  Paper delivered to the Economic Methodology Session of the 1980 Conference of the Atlantic Economic Society, Boston, Massachusetts, October 1980.

"The Supply Side Interactions of Employment and Output Within a Large Regional Econometric Simulation Model."  Paper delivered to the Regional Economics Session of the 1980 Conference of the Atlantic Economic Society, Boston, Massachusetts, October 1980.

"An Integrated Causal Approach to the Specification of an Effective Federal Reserve Reaction Function."  Paper delivered to the Monetary Theory and Policy Session of the 1980 Conference of the Atlantic Economic Society, Boston, Massachusetts, October 1980.

"Econometric Modeling: A Case Study in Medical History."  Invited plenary paper delivered to the 1980 Conference of Sigma Xi (International Scientific Research Society), Dallas, Texas, November 1980.

"The Conception of a Monetary Indicator."  Baylor Business Studies, December 1980.

"Mathematical and Structural Properties of the Texas Economic Model."  Invited paper delivered to the Seminar in Econometric Theory, University of Houston, Houston, Texas, December 1980.

"Some Evidence Regarding the Lag in the Initial Countercyclical Impact of Monetary Policy."  Nebraska Journal of Economics and Business, Spring 1980 (Abstracted in The Journal of Economic Literature, December 1980).

"Normative Economics, Welfare Criteria, Economic Redistribution, and Justice: A Critical Historical Synthesis."  Paper delivered to the Economic Method Session of the 1981 Conference of the Missouri Valley Economic Association, Oklahoma City, Oklahoma, February 1981.

"Welfare Economics and the Modern Conception of Justice."  The Journal of Economics, 1981.

"On the Design of Sectoral Submodels in Large Scale Econometric Systems."  Paper delivered to the Econometric Methods and Analysis Session of the 1981 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1981.

"An Analysis of Changing Cyclical Proclivities in Regional Economics."  Paper delivered to the Urban and Regional Economics Session of the 1981 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1981.

"Sectoral Specifications for Large Regional Econometric Models."  Papers and Proceedings of the Southwestern Society of Economists, 1981.

"Techniques for Measuring Cyclical Sensitivity in Regional Economic Systems."  Papers and Proceedings of the Southwestern Society of Economists, 1981.

"Sherlock Holmes: A Missing Link Between English and German Economics."  Paper
delivered to the History of Economic Thought Session of the 1981 Conference of
the Southwestern Social Science Association, Dallas, Texas, March 1981.

"Manufacturing Demand Relations in a Large Regional Econometric Model."  Paper
delivered to the Econometrics Session of the 1981 Conference of the
Southwestern Social Science Association, Dallas, Texas, March 1981.

"Sherlock Holmes, Alfred Marshall, and Karl Marx."  Southwestern Journal of Economic
Abstracts, 1981.

"Manufacturing in the Texas Econometric Models: An Analysis of Input-Output and
Market Area Specifications."  Southwestern Journal of Economic Abstracts, 1981.

"Employment Relationships Within the Supply Side of Regional Econometric Models."
Atlantic Economic Journal, March 1981 (co-authored with Steven L. Green).

"A Complete Causal Examination of the Monetary Reaction Function Problem."  Atlantic
Economic Journal, March 1981.

"Sherlock Holmes as a Practical Student of Neoclassical Political Economy."  Atlantic
Economic Journal, March 1981.

"Time Series and Econometric Causality Procedures and the Monetary Indicator
Problem."  In O. D. Anderson and M. Ray Perryman, eds., Time Series Analysis,
Amsterdam: North-Holland, 1981 (co-authored with James R. Schmidt).

"Estimation of Large Dynamic Temporal Systems with Autoregressive Disturbances."  In
O. D. Anderson and M. Ray Perryman, eds., Time Series Analysis, Amsterdam:
North-Holland, 1981.

"Time Series Analysis as an Ex Poste Evaluation Criterion for Evaluating Econometric
Models."  In O. D. Anderson and M. Ray Perryman, eds., Time Series Analysis,
Amsterdam: North-Holland, 1981.

"Community Power and Population Increase: An Empirical Test of the Growth Machine
Model."  American Journal of Sociology, April 1981 (co-authored with J. Larry
Lyon and Lawrence Felice).

"Empirical Properties of Large Scale Simulation Systems."  Paper delivered to the
Econometric Methods Session of the Twelfth Conference on Modeling and
Simulation, Pittsburgh, Pennsylvania, April 1981.

"Structural Parameters and Properties in Regional Simulation Models."  Paper delivered
to the Regional Modeling Systems Session of the Twelfth Conference on
Modeling and Simulation, Pittsburgh, Pennsylvania, April 1981.

"Sherlock Holmes and the Origins of Practical Neoclassicism."  Forum for Social
Economics, Spring 1981.

"A Neglected Institutional Feature of the Labor Sector of the US Economy."  Journal of
Economic Issues, June 1981.

"An Econometric Assessment of the Relative Efficiency of Alternative Estimators of Gross State Product."  Paper delivered to the National Income Accounting Session of the 1981 Conference of the Western Economic Association, San Francisco, California, July 1981.

"On the Mathematical Properties of a Complete Regional Econometric Model."  Paper delivered to the Econometric Theory Session of the Third International Conference on Mathematical Modeling, Los Angeles, California, July 1981.

"Energy Specifications Within the Context of a General Regional Econometric Model."  Paper delivered to the Energy Modeling Session of the Third International Conference on Mathematical Modeling, Los Angeles, California, July 1981.

"A Quarterly Temporal Index for Measuring the Cyclical Sensitivity of a Regional Economy: Theory and an Application to the Texas Economy."  Paper delivered to the Economic Fluctuations Session of the 1981 Conference of the Western Economic Association, San Francisco, California, July 1981.

"ARIMA Models in a Complete Regional System."  Paper delivered to the Economic Applications Session of the Fourth International Time Series Meeting, Houston, Texas, August 1981.

"Temporal Causality and the Nature of Effective Monetary Responses."  Paper delivered to the Monetary Economics Session of the Fourth International Time Series Meeting, Houston, Texas, August 1981.

"Some Empirical Experiments in Regional Econometric Modeling."  Paper delivered to the Economic Modeling Session of the 1981 Conference of the American Statistical Association, Detroit, Michigan, August 1981.

"Alternative Approaches to Empirical Linkages in Regional Econometric Systems."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1981.

"Policy Intent, Policy Formulation, and Policy Effectiveness: An Appraisal of Federal Reserve Actions."  Applied Economics, 1981.

"Entrepreneurial Research: An Outsider's Perspective."  In Carl Vesper, Calvin Kent, and Donald Sexton, eds., The Encyclopedia of Entrepreneurship, Englewood Cliffs: Prentice-Hall, 1981.

"Non-Profit Firms and Managerial Syndicates: Comment."  Southwestern Journal of Economic Abstracts, 1981.

"A Mathematically Consistent Structural Specification for Regional Econometric Models."  Modeling and Simulation, 1981.

"On the Empirical Determination of Large Dynamic Economic Simulation Models."  Modeling and Simulation, 1981.

"Toward a Comprehensive Index of Cyclical Patterns and Interrelationships Within the United States Economy."  Paper delivered to the Economic Fluctuations Session of the 1981 Conference of the Atlantic Economic Society, New York, New York, October 1981.

"Geographical and Sectoral Linkages in Large Regional Econometric Models."  Paper delivered to the Regional Economics Session of the 1981 Conference of the Atlantic Economic Society, New York, New York, October 1981.

"Econometric Models and Underlying Economic Institutions: An Integrated Approach." Invited paper delivered to the Clarence E. Ayres Memorial Session of the 1981 Conference of the Association for Evolutionary Economics (Allied Social Science Associations), Washington, DC, December 1981.

"The Econometrics of Abnormal Security Behavior: The 'State of the Art' and Beyond." Invited lecture series delivered to the Graduate School of Business, Stanford University, Stanford, California, January 1982.

"The Optimal Indicator of Dynamic Monetary Policy: A Theoretical, Empirical and Historical Synthesis."  Paper delivered to the Monetary Economics Session of the 1982 Conference of the Missouri Valley Economic Association, Kansas City, Missouri, February 1982.

"On the Measurement of Regional Business Activity."  Atlantic Economic Journal, March 1982.

"Agricultural Relationships in the Regional Economy: A Synopsis of Sectoral Interactions."  Southwestern Journal of Economic Abstracts, 1982.

"Econometrics, Time Series Analysis, and the Assessment of Large Temporal Structural Systems."  Paper delivered to the Econometrics Session of the 1982 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1982.

"Regional Econometric Models: An Analysis of Structural Submodel Design."  Atlantic Economic Journal, March 1982.

"An Integrative Strategy for Estimating Regional Energy Responses."  Paper delivered to the Regional Economics Session of the 1982 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1982.

"A Simple Exposition of the Estimation Properties of Large Dynamic Autoregressive Simulation Systems."  Paper delivered to the Econometric and Data Issues Session of the 1982 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1982.

"The Agricultural Sector of a Complete Disaggregated Regional Econometric Model." Paper delivered to the Regional Economics Session of the 1982 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1982.

"Assessment of Large Dynamic Regional Systems."  Paper delivered to the Large Econometric Model Design Session of the Thirteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1982.

"System Structural Design for the Large Regional Model: A Complete Exposition." Paper delivered to the Large Econometric Model Design Session of the Thirteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1982.

"Disaggregation Experiments in the Context of a Complete Regional Econometric System."  Paper delivered to the Aspects of Large Econometric Model Design Session of the Thirteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1982.

"Assessment and Analysis of Structural Econometric Models: A Methodological Synthesis."  Papers and Proceedings of the Southwestern Society of Economists, 1982.

"Behavioral Modeling of Regional Energy Interactions in a General Structural Model." Papers and Proceedings of the Southwestern Society of Economists, 1982.

"Causality and the Temporal Characterization of Monetary Responses."  In O. D. Anderson and M. Ray Perryman, eds., Applied Time Series Analysis, Amsterdam: North Holland, 1982.

"Time Series Analysis, ARIMA Models, and Comprehensive Regional Evaluative Processes."  In O. D. Anderson and M. Ray Perryman, eds., Applied Time Series Analysis, Amsterdam: North Holland, 1982.

"Defining the Ideal Monetary Indicator: A Comprehensive Perspective."  The Journal of Economics, 1982.

"Institutionalism and Econometrics: Toward a Meaningful Synthesis."  Journal of Economic Issues, June 1982.

"The Simulation Performance of a Large Regional Econometric Model."  Paper delivered to the Economic Modeling Session of the 1982 Conference of the American Statistical Association, Cincinnati, Ohio, August 1982.

"An Assessment of the Simulation Capabilities of Complete Regional Models." Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1982.

"Evaluation and Testing of the Performance of a Large Regional Econometric System." Modeling and Simulation, 1982.

"On the Development of Efficient Simulation Structures for Extremely Large Econometric Models."  Modeling and Simulation, 1982.

"Some Extensions of the Basic Structural Form for the Complete Regional Model: Theory and Application."  Modeling and Simulation, 1982.

"The Impact of Exchange Rate Adjustments on Domestic Price Levels: The Question of Asymmetry—Comment."  Southwestern Journal of Economic Abstracts, 1982.

"Evaluation of the Predictive Performance of Econometric Models: Strategy and Implementation."  Paper delivered to the Econometrics Session of the 1982 Conference of the Atlantic Economic Society, Miami Beach, Florida, October 1982.

"On the Modeling of Extended Financial Structures in Regional Econometric Systems."
    Paper delivered to the Regional Economics Session of the 1982 Conference of the
    Atlantic Economic Society, Miami Beach, Florida, October 1982.

"On the Development and Use of Econometric Models to Examine the Interactions of
    Energy Phenomena and the Economy."  Paper delivered to the North American
    Energy Policies and Economics Session of the 1982 Conference of the American
    Economic Association (Allied Social Science Associations), New York, New
    York, December 1982.

"Regional Labor Migration in Response to Relative Economic Conditions: An Analysis
    Within the Context of an Econometric Model."  Paper delivered to the Migration
    Within and Across National Borders Session of the 1982 Conference of the
    American Economic Association (Allied Social Science Associations), New
    York, New York, December 1982.

"The Measurement of Monetary Policy in the United States and Other Advanced
    Economies."  Paper delivered to the Banking and Capital Markets Session of the
    1982 Conference of the American Economic Association (Allied Social Science
    Associations), New York, New York, December 1982.

"A Framework for Consistent Estimation and Efficient Simulation of Very Large
    Econometric Models."  Southwestern Journal of Economic Abstracts, 1982.

"Social Welfare and Income Redistribution: The Economist's Role in the Policy
    Process."  Invited Plenary Lecture delivered to the Southwestern Conference
    Humanities Consortium, Texas A&M University, College Station, Texas,
    February 1983.

"The Development of Dallas/Fort Worth and Houston Sub-Systems in the Texas
    Econometric Model."  Invited University Lecture Series delivered at Texas A&M
    University, College Station, Texas, February 1983.

"Sherlock Holmes: The Fact and Fiction of England's Most Prominent Practicing
    Economist."  Invited Plenary Lecture delivered to the Southwest Conference
    Humanities Consortium, Texas Tech University, Lubbock, Texas, March 1983.

"On the Empirical Evaluation of Large Econometric Systems."  Atlantic Economic
    Journal, March 1983.

"Simulation of Regional Financial Response to National Economic Conditions."  Atlantic
    Economic Journal, March 1983.

"The Growth Machine Revisited."  In Rowland Warren, ed., New Perspectives on the
    American Community, New York: Dorsey Press, 1983 (co-authored with J. Larry
    Lyon and Lawrence Felice).

"On the Characterization of Monetary Policy Responses in North America."  Issues in
    North American and Caribbean Economics and Finance, 1983.

"The Role of Energy in Regional Economic Performance: An Empirical Formulation."
    Issues in North American and Caribbean Economics and Finance, 1983.

"Migration Functions in Empirical Systems: Theory and Application."  Issues in North American and Caribbean Economics and Finance, 1983.

"The Simulation Performance of the Texas Econometric Model."  Invited University Lecture Series delivered at Texas Tech University, Lubbock, Texas, March 1983.

"Monetary Measurement, Causality, and the Relevance of Macroeconomic Data." Lecture delivered as Invited Panelist in the Session on the Relevance of Macroeconomic Data at the 1983 Conference of the Southwestern Social Science Association, Houston, Texas, March 1983.

"The Common Nature of Living Systems as Small as the Cell or as Complex as the Society."  Lecture delivered as Plenary Panelist for the Fourteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1983.

"Some Unresolved Questions in the Theory of Monetary Policy."  Invited lecture series delivered to the Seminar in Monetary Theory at Texas Tech University, Lubbock, Texas, April 1983.

"Toward Some Basic Extensions of the State of the Art in Empirical Social Modeling Systems."  Invited Plenary Paper delivered to the State of the Art in Statistical and Social Modeling Session of the Fourteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1983.

"Forecasting Cyclical Patterns in Regional Economies: An Integrated Econometric Modeling Approach."  Paper delivered to the Regional Econometric Modeling Session of the Fourteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1983.

"Econometric Modeling as a Basis for Policy Analysis: An Alternative Approach." Paper delivered to the Econometric Policy Modeling Session of the Fourteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1983.

"Some Initial Explorations of Interregional Linkages for Econometric Models."  In T. Basar and L. F. Pau, ed., Dynamic Modeling and Control of National Economies, New York: Pergamon Press, 1983 (co-authored with Steven L. Green).

"Econometric Modeling of Complex Social Processes: Some Initial Results."  Invited Plenary Paper delivered to the Session on Synthesis of the Four E's: Ethics, Epistemology, Economics, and Engineering of the 1983 Conference of the Society for General Systems Research and the American Association for the Advancement of Science, Detroit, Michigan, May 1983.

"How Do We Overcome Pluralism's Cultural Restraints in the Synthesis and Advancement of Scientific Disciplines?"  Lecture delivered as Plenary Panelist of the 1983 Conference of the Society of General Systems Research and the American Association for the Advancement of Science, Detroit, Michigan, May 1983.

"Historical and Predictive Output Simulations Within a Large Regional Econometric Model."  Paper delivered to the International Symposium on Forecasting, Wharton School of Business, Philadelphia, Pennsylvania, June 1983.

"The Design of SMSA Econometric Models Within the Framework of Functioning State Systems: A Theoretical Analysis with Exploratory Empirical Results."  Paper delivered to the International Symposium on Forecasting, Wharton School of Business, Philadelphia, Pennsylvania, June 1983.

"The Theory of Multi-Regional Integration of Econometric Systems."  Paper delivered to the Conference on Modeling and Control of National Economies (sponsored jointly by the International Federation of Automatic Control, the International Federation of Operational Research Societies, the Society of Economic Dynamics and Control, and the Institute of Electrical and Electronics Engineers), Washington, DC, June 1983 (co-authored with Steven L. Green).

"The Sensitivity of State Economies to National Business Fluctuations: An Inter-Regional Empirical Comparison."  Paper delivered to the Economic Fluctuations Session of the 1983 Conference of the Western Economic Association, Seattle, Washington, July 1983 (co-authored with Nancy S. Perryman).

"Intranational Population Flows and Perceived Economic Opportunity: An Analysis Within the Context of Regional and Multi-Regional Econometric Models."  Paper delivered to the Regional Economics Session of the 1983 Conference of the Western Economic Association, Seattle, Washington, July 1983.

"On the Generation of Viable Macroeconomic Information for Effective Policy Analysis."  Southwestern Journal of Economic Abstracts, 1983.

"Econometric Models: Some Methodological Approaches to the Integration with Social Phenomena."  In George Eric Lasker, ed., The Relation Between Major World Problems and Systems Theory.  Louisville: Intersystems, 1983.

"Econometric Models and the Generation of Policy Variables: A Formal Synthesis with Applications."  Modeling and Simulation, 1983.

"Some Advances in Statistical Modeling and Simulation of Dynamic Social Processes."  Modeling and Simulation, 1983.

"An Econometric Modeling Approach to the Prediction of Future Fluctuations in Regional Economies."  Modeling and Simulation, 1983.

"Simulation of Alternative Economic Performance Characteristics in a Dynamic Regional Empirical System."  Paper delivered to the Statistical Issues in Macroeconomics Session of the 1983 Conference of the American Statistical Association, Toronto, Ontario, Canada, August 1983.

"Simulation of Large Dynamic SMSA Models in a General Regional Empirical System."  Paper delivered to the Urban Economics Session of the 1983 Conference of the Atlantic Economic Society, Philadelphia, Pennsylvania, October 1983.

"Toward a Comprehensive Integrated Econometric Structure for Regional, Sub-Regional and Industrial Modeling."  Paper delivered to the Econometrics Session of the 1983 Conference of the Atlantic Economic Society, Philadelphia, Pennsylvania, October 1983.

"Dynamic Simulation of National Economic Scenarios in a Large Regional Econometric Model."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1983.

"On the Isolation and Prediction of the Cyclical Component in North American Economies."  Paper presented to the Econometric Models of North American Regions Session of the 1983 Conference of the American Economic Association (Allied Social Science Associations), San Francisco, California, December 1983.

"Cities and Farms: Some Results on the Econometric Modeling of Metropolitan Areas and Agricultural Regions."  Paper presented to the National and Regional Issues in Economic Growth Session of the 1983 Conference of the American Economic Association (Allied Social Science Associations), San Francisco, California, December 1983.

"The Political Economy of Austria: A Review."  The Journal of Economics, 1983.

"On the Forecasting Performance of Embedded SMSA Econometric Models."  Atlantic Economic Journal, March 1984.

"Some Advances in Econometric Model Linkage in a Regional Context."  Atlantic Economic Journal, March 1984.

"The Texas Econometric Model: Structural Design and Simulation Performance."  Paper delivered to the Southwestern Economic Models Session of the 1984 Conference of the Southwest Social Science Association, Fort Worth, Texas, March 1984.

"The North American Business Cycle: A Disaggregated Econometric Modeling Approach."  Issues in North American and Caribbean Economics and Finance, 1984.

"The Explicit Modeling of Urban and Agricultural Patterns in General Regional Systems."  Issues in North American and Caribbean Economics and Finance, 1984.

"The Current Status of the Texas Econometric Model."  Southwestern Journal of Economic Abstracts, 1984.

"A Comprehensive Econometric Structure for Categorical Electricity Demand Forecasting."  Paper delivered to the Electric Utility Modeling Session of the Fifteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1984.

"Nonlinear Modeling of Dynamic Societal Processes."  Paper delivered to the Social Modeling Session of the Fifteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1984.

"Toward the Development of Detailed Labor Market Models in Regional Econometric Models."  Paper delivered to the Regional Science Session of the Fifteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1984.

"Predictive Simulation of the Disaggregated Industrial Employment Components of a Dynamic Regional Empirical System."  Paper delivered to the Regional Economics Session of the 1984 Conference of the Western Economic Association, Las Vegas, Nevada, June 1984.

"The Regional Business Cycle: Some Interregional, Intertemporal, and Extrapolative Results."  Paper delivered to the Economic Fluctuations Session of the 1984 Conference of the Western Economic Association, Las Vegas, Nevada, June 1984 (co-authored with Nancy S. Perryman).

"The Impact of Technology Industries on Economic Growth in Texas: An Econometric Approach."  Lyceum, Fall 1984.

"Nonlinearities in Societal Processes: Detection and Modeling."  Journal of the Association for Modeling and Simulation in Enterprises, Fall 1984.

"Large Scale Empirical Systems: Design, Development, and Simulation."  Paper delivered to the Econometric Modeling Session of the 1984 Conference of the American Statistical Association, Philadelphia, Pennsylvania, August 1984.

"On the Implementation of Very Large Econometric Models."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1984.

"An Integrated Econometric Modeling Strategy for Projecting Energy Demand in Small Utility Service Areas: Theory and Application."  Modeling and Simulation, 1984.

"A Methodological Basis for the Use of Generalized Functional Forms in a Social Modeling Context."  Modeling and Simulation, 1984.

"An Industrial Employment Submodel Design for Dynamic Regional Econometric Systems: An Analysis with Initial Simulation Results."  Modeling and Simulation, 1984.

"Nonlinear Empirical Processes: Toward Their Extension to Societal Modeling Structures."  Paper presented to the Social Modeling Session of the 1984 Conference of the Association for Modeling and Simulation in Enterprises, Minneapolis, Minnesota, August 1984.

"Econometric Modeling Approaches to Energy Demand Prediction in Small Regions."  Paper presented to the Applied Business Forecasting Session of the 1984 Conference of the National Association of Business Economists, Atlanta, Georgia, September 1984.

"Alternative Simulations of Monetary Interactions in a Large Regional Empirical System."  Paper presented to the Monetary and Fiscal Theory Session of the 1984 Conference of the Atlantic Economic Society, Montreal, Quebec, Canada, October 1984.

"Predictive Simulation of the Disaggregated Industrial Employment Components of a Dynamic Regional Empirical System."  Paper presented to the Economic Fluctuations Session of the 1984 Conference of the Atlantic Economic Society, Montreal, Quebec, Canada, October 1984.

435

"Simulation Performance of an Embedded Econometric Model of a Small Border Region."  Paper delivered to the Issues in the Regional Econometric Modeling in the North American Nations Session of the 1984 Conference of the American Economic Association (Allied Social Science Associations), Dallas, Texas, December 1984.

"Central Bank Targets and Indicators: The Debate Reconsidered."  Paper delivered to the Central Bank Targets Session of the 1984 Conference of the American Economic Association (Allied Social Science Associations), Dallas, Texas, December 1984.

"The US Economy in 1984."  Address delivered to the Joint Economic Outlook Meeting of the American Economic Association and the National Association of Business Economists, Dallas, Texas, December 1984.

"Neo-Classicism as a Foundation for the Institutional Analysis of Corporate Concentration."  Paper delivered to the 1984 Conference of the Association for Evolutionary Economics (Allied Social Science Associations), Dallas, Texas, December 1984.

"Small Metropolitan Area Econometric Models: Development and Simulation."  Paper delivered to the Regional Economics Session of the 1985 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1985.

"Alternative Simulation Strategies for Energy Demand Projections for Econometric Models."  Paper delivered to the Public Utility Economics Session of the 1985 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1985.

"Forecasting Models for Industrial Activity Measures at the Regional Level."  Atlantic Economic Journal, March 1985.

"The Behavior of Financial Institutions in Regional Econometric Models."  Atlantic Economic Journal, March 1985.

"Estimation and Simulation of Industrial Performance in the 'High Tech' Sector: A Disaggregated Econometric Approach."  Paper delivered to the High Technology in the Southwest Session of the 1985 Conference of the Southwestern Social Science Association, Houston, Texas, March 1985.

"Models, Methods, and Forecasts: The Economies of Texas and its Metropolitan Areas."  Paper delivered to the Forecaster's Roundtable Session of the 1985 Conference of the Southwestern Social Science Association, Houston, Texas, March 1985.

"Energy Demand Forecasting: An Empirical Simulation Approach for Small Regions."  Journal of the Southwestern Society of Economists, 1985.

"Modeling Small Areas as 'Satellites' to Large Empirical Systems."  Journal of the Southwestern Society of Economists, 1985.

"The Technology Industry of Texas and Its Long-Range Prospects: An Empirical Interpretation."  Lyceum, Spring 1985.

"State Revenue Forecasting: A Comment on the Texas Situation." <u>Lyceum</u>, Spring 1985 (co-authored with Calvin A. Kent).

"Long-Range Models of Evolutionary Patterns in Socio-Economic Structure."  Paper delivered to the State of the Art in Methodology Session of the Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

"Regional Model Forecasts for Internationally-Linked Structural Systems: Methods and Applications."  Paper delivered to the Extensions and Applications of Regional Econometric Models Session of the Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

"Strategic Forecasting System Design: An Econometric Approach."  Paper delivered to the Extensions and Applications of Regional Econometric Models Session of the Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

"Defining Confidence Bands for Forecasts Under Conditions of Multidimensional Uncertainty: An Approach with Applications."  Paper delivered to the Extensions and Applications of Regional Econometric Models Session of the Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

"Short-Term Models of Dynamic Sectoral Processes: The Case of 'High Tech.'"  Paper delivered to the Extension and Applications of Regional Econometric Models Session of the Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

"An Econometric Structure for Border Economies."  <u>Issues in North American and Caribbean Economics and Finance</u>, 1985.

"Controversies Over Monetary Measurement: A Resolution."  <u>Issues in North American and Caribbean Economics and Finance</u>, 1985.

"Identification, Estimation, and Forecasting of Regional Cyclical Responses."  In M. Ray Perryman and James R. Schmidt, eds., <u>Regional Econometric Modeling: The State of the Art</u>, Boston Kluwer-Nijhoff, 1985 (co-authored with Nancy S. Perryman).

"Empirical Determination of Technological Patterns in Advanced Regional Systems." <u>Southwestern Journal of Economic Abstracts</u>, 1985.

"Forecasting Models and Methods."  <u>Southwestern Journal of Economic Abstracts</u>, 1985.

"The Impact of External Disturbances on Economic Activity: Some Empirical Evidence from Econometric Systems."  Paper delivered to the Econometric and Time Series Seminar in Honor of V. N. Joshi, London, Toronto, Ontario, Canada, May 1985.

"A Multi-Dimensional Integrated Econometric Modeling System: Structure and Simulation."  Paper delivered to the Development and Application of Regional Forecasting Models Seminar of the Fifth International Symposium on Forecasting, Montreal, Quebec, Canada, June 1985.

"Small Area Forecasting in Embedded Regional Systems."  Paper delivered to the Development and Application of Regional Forecasting Models Seminar of the Fifth International Symposium on Forecasting, Montreal, Quebec, Canada, June 1985.

"Sectoral Modeling in the Context of Evolving Structural Systems."  Paper delivered to the Development and Application of Regional Forecasting Models Seminar of the Fifth International Symposium on Forecasting, Montreal, Quebec, Canada, June 1985.

"Evolutionary Aspects of Corporate Concentration and Its Implications for Economic Theory and Policy."  Journal of Economic Issues, June 1985.

"Modeling 'Megatrends.'"  Modeling and Simulation, 1985.

"A Sub-Regional Model of an Economy with Significant International Dimensions: Some Exploratory Results."  Modeling and Simulation, 1985.

"On the Use of Econometric Models in Designing Forecast Information Systems for Small Businesses."  Modeling and Simulation, 1985.

"Alternative Simulations of an Energy Demand Model Derived from a General Regional Empirical System as a Means of Establishing Forecast Confidence Bounds." Modeling and Simulation, 1985.

"Disaggregated Projections of the Short-Term Performance of Output and Employment in an Embedded Regional Model of the Technology Sector."  Modeling and Simulation, 1985.

"Economic Forecasting for a Regional Economy: A Disaggregated Multi-Dimensional Econometric Approach."  Paper delivered to the Regional Econometric Modeling Session of the 1985 Conference of the American Statistical Association, Las Vegas, Nevada, August 1985.

"Elements of a Large Integrated Simulation System."  Proceedings of the American Statistical Association, Business and Economics Section, 1985.

"The Economic Outlook for the United States."  Panel presentation for the National Association of Business Economists, Denver, Colorado, September 1985.

"Some Observations Regarding the Origins of Laissez-Faire and Their Implications for Contemporary Economic Policy."  Paper delivered to the History of Economic Thought Session of the 1985 Conference of the Atlantic Economic Society, Washington, DC, September 1985.

"Some Eclectic Exercises in the Development and Simulation of Econometric Systems." Paper delivered to the Econometrics Session of the 1985 Conference of the Atlantic Economic Society, Washington, DC, September 1985.

"Oil Price Shocks in an Energy Sensitive Regional Economy: An Econometric Analysis." Paper delivered to the Issues in Econometric Modeling of North American Regions Session of the 1985 Conference of the American Economic Association (Allied Social Science Associations), New York, New York, December 1985.

"The Implications of High Technology for the Revision of Economic Theory and Structure."  Paper delivered to the Technology and Economics Session of the 1985 Conference of the American Economic Association, New York, New York, December 1985.

"The Theory of Capitalism and the Practice of Economic Policy."  Atlantic Economic Journal, March 1986.

"Complex Simulations of Dynamic Empirical Systems: Experiments in Varying Contexts."  Atlantic Economic Journal, March 1986.

"Simulation Tests for Price Responsiveness in Dynamic Energy Sensitive Systems."  Current Issues in North American Economics and Finance, 1986.

"Forecasting Systems in a Corporate Environment: Some Basic Approaches and Applications."  Paper delivered to the Economic Forecasting Session of the 1986 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1986.

"Estimation and Forecasting of 'High Tech' Production, Output, and Employment."  Paper delivered to the Economics and Technology Session of the 1986 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1986.

"Linked Econometric Models of Small Non-Metropolitan Regions: Structural Form and Its Application."  Paper delivered to the Empirical Models in Regional Economics Session of the 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

"An Econometric Model for the Interstate-35 Corridor: Specification and Preliminary Disaggregated Results."  Paper delivered to the Econometrics and Forecasting Session of the 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

"Economic Forecasting and Economic Development: Results from a Major Study of Their Interaction."  Paper delivered as invited panelist to the Quality of Life and Economic Development Panel of the 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

"Corporate Forecasting: Some Alternative Prospects and Observations."  Journal of the Southwestern Society of Economists, 1986.

"Pitfalls in 'High Tech' Development and Forecasting: Observations Regarding Low Base, High Growth Cyclical Industries."  Journal of the Southwestern Society of Economists, 1986.

"Long-Term Forecasts: A Perspective and Some Observations Regarding the United States and Texas."  Lyceum, Spring 1986.

"The 'Growth Gap': A Signal of the Potential for Economic Expansion."  Article prepared for Research Reports, Spring 1986.

"Small-Area Econometric Models: Some Techniques for Identification, Specification, and Simulation."  Paper delivered to the Recent Advances in Small Area Econometric and Energy Modeling Session of the Seventeenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1986.

"A Systematic Varying Parameters Technique for Application to Multi-Level Data: Theory and a Simple Application to Energy Modeling."  Paper delivered to the Recent Advances in Small Area Econometric and Energy Modeling Session of the Seventeenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1986.

"An Econometric Examination of Performance Variations in Contiguous Areas of a Dynamic Growth Region."  Paper delivered to the Recent Advances in Small Area Econometric and Energy Modeling Session of the Seventeenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1986.

"Energy Demand Models: Development and Simulation in a Dynamic Interactive Environment Characterized by Consumer Choice."  Paper delivered to the Recent Advances in Small Area Econometric and Energy Modeling Session of the Seventeenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1986.

"Economic Expansion, the Quality of Life, and the Economic Forecasting Process." Southwestern Journal of Economic Abstracts, 1986.

"The I-35 Corridor Model: A Synopsis of Recent Developments and Extensions." Southwestern Journal of Economic Abstracts, 1986.

"Econometric Models with a Limited Data Base: The Small Area Case."  Southwestern Journal of Economic Abstracts, 1986.

"Institutional Evolution in an Economy Characterized by Basic Industry Decline and Technological Expansion."  The Journal of Economic Issues, June 1986.

"An Extremely Large, Integrated Econometric System: Development, Forecasting, and Simulation."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1986.

"Growth Industries and Growth Areas: Some Results From Econometric Systems." Paper delivered to the Economic Forecasting Session of the 1986 Conference of the Western Economic Association International, San Francisco, California, July 1986.

"Inflationary Expectations, the Value of the Dollar, and a Sub-National Economic Performance."  Paper delivered to the Macroeconomic Theory Session of the 1986 Conference of the Western Economic Association International, San Francisco, California, July 1986.

"A Very Large, Multi-Dimensional, Multi-Regional, Multi-Sectoral Econometric Model: A Comprehensive Assessment of Structural Specifications and Results."  Paper presented to the Econometric Theory Session of the 1986 Conference of the American Statistical Association, Chicago, Illinois, August 1986.

"Complex Simulation Structures Under Alternative External Conditions: Examples in Aggregated, Disaggregated, and Multi-Regional Contexts."  Paper delivered to the Econometrics Session of the 1986 Conference of the Atlantic Economic Society, Boston, Massachusetts, September 1986.

"Large-Scale Econometric Energy Demand Forecasting Systems: Some Novel Approaches with Sequential Simulation Results."  Paper delivered to the Energy Economics Session of the 1986 Conference of the Atlantic Economic Society, Boston, Massachusetts, September 1986.

"Some Comments on the Petroleum Sector of the Louisiana Economy."  Journal of the Southwestern Society of Economists, 1986.

"Econometric Models of Non-Metropolitan Areas and Their Role in Econometric Development."  Modeling and Simulation, 1986.

"An Evolving Structural Parameters Technique for Developing Energy Usage Models in Small, Rapidly Emerging Growth Areas."  Modeling and Simulation, 1986.

"Econometric Models and Sub-Models of a Growth Corridor Characterized by Differential Performance Patterns."  Modeling and Simulation, 1986.

"Some Extensions of a Basic Energy Demand Forecasting Model."  Modeling and Simulation, 1986.

"Output, Employment, and Occupational Projections and Impacts for Selected Aspects of the Texas Information and Communications Industries: Some Methodological Perspectives."  Paper delivered to the Scholars Conference on The New Texas sponsored by the Center for Studies in Communication of The University of Texas, Austin, Texas, November 1986 (co-authored with Leigh Humphrey).

"Infrastructure, Technology, and the New Texas."  Address delivered as Invited Panelist and Speaker, Allen Shivers Memorial Public Seminar on The New Texas, sponsored by the Center for Studies in Communications of The University of Texas, Austin, Texas, November 1986.

"A Complete Exposition of the Simulation Performance of a Complex Integrated Modeling System."  Paper delivered to the North American Econometric Models Session of the 1986 Conference of the American Economic Association (Allied Social Science Associations), New Orleans, Louisiana, December 1986.

"Econometric Modeling Approaches to Forecasting and Strategic Planning in a Small Business Context."  Paper delivered to the Business Forecasting Session of the 1986 Conference of the International Association of Business Forecasting, New York, New York, December 1986.

"Integrated Economic Forecasting Models for Public Utilities: Theory, Implementation, and Applications."  Paper delivered to the Public Utility Forecasting Session of the 1986 Conference of the International Association of Business Forecasting, New York, New York, December 1986.

"The Rhetoric of Economics: A Critical Assessment."  The Journal of Economics, 1986.

"An Analysis of the Reliability of a Dynamic Simultaneous Set of Mutually Dependent Empirical Systems." <u>Current Issues in North American and Caribbean Economics and Finance</u>, 1987.

"The Short-Run and Long-Run Impacts of Oil Price Declines on an Energy-Sensitive Economy." Invited paper delivered to the 1987 Conference of the Missouri Valley Economic Association, Kansas City, Missouri, February 1987.

"Energy Forecasting in a Sequential Simulation Environment: A Synopsis." <u>Atlantic Economic Journal</u>, March 1987.

"Externally Generated Disturbances in Varying Contextual Systems: Some Econometric Results." <u>Atlantic Economic Journal</u>, March 1987.

"The Industrial Impacts of Oil Price Shocks." <u>The Journal of Economics</u>, 1987.

"An Extremely Comprehensive Approach to Economic Impact Analysis: A Methodological Synopsis." Paper delivered to the Regional Economics Session of the 1987 Conference of the Southwestern Social Science Association, Dallas, Texas, March 1987.

"An Analysis of the Current and Projected Industrial and Occupational Employment Structure of a Regional Economy." Paper delivered to the Econometrics Session of the 1987 Conference of the Southwestern Social Science Association, Dallas, Texas, March 1987 (co-authored with Leigh Humphrey).

"Some Notes on a New Approach to Economic Impact Analysis." <u>Southwestern Journal of Economic Abstracts</u>, 1987.

"An Econometric Analysis of Industry-Occupation Patterns in Texas." <u>Southwestern Journal of Economic Abstracts</u>, 1987 (co-authored with Leigh Humphrey).

"A Measure of Unit Labor Cost on a Disaggregated Regional and Industrial Basis: Some Historical and Forecast Results." Paper delivered to the Interregional Studies Session of the 1987 Conference of the Southwestern Federation of Administrative Disciplines, Houston, Texas, March 1987.

"An Extremely Comprehensive Forecasting System for State and Sub-State Areas: Some Initial Results." Paper delivered to the Regional Models and Analysis Session of the 1987 Conference of the Southwestern Federation of Administrative Disciplines, Houston, Texas, March 1987.

"Spatial and Temporal Variations in Unit Labor Cost: A New Index with Applications." <u>Journal of the Southwestern Society of Economists</u>, 1987.

"A Multi-Million Equation Integrated Economic Model: Description and Applications." <u>Journal of the Southwestern Society of Economists</u>, 1987.

"Designing Occupational Profiles and Projections for Small Areas: An Integrated Approach Utilizing Econometric Models." <u>Modeling and Simulation</u>, 1987 (co-authored with Leigh Humphrey).

"A Fully Integrated, 'Bottom-Up' Econometric Model of a Large, Heterogeneous Economic Region." <u>Modeling and Simulation</u>, 1987.

"An Econometric Technique for the Estimation and Prediction of a Detailed Unit Labor Cost Index on a Spatial and Temporal Basis." Modeling and Simulation, 1987.

"Large-Scale Econometric Systems: Their Potential Roles in Impact Assessment and Target Industry Analysis." Modeling and Simulation, 1987.

"Industry-Occupational Analysis on a Sectoral Basis in Small Areas: Some Results in a Predictive Environment." Paper delivered to the Extremely Large Empirical Systems Session of the Eighteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1987 (co-authored with Leigh Humphrey).

"The Structural Form of an Extremely Large, Multi-Million Equation Empirical System with Integrated Modeling Formats." Paper delivered to the Extremely Large Empirical Systems Session of the Eighteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1987.

"Unit Labor Costs: An Index Applicable to Alternative Spatial, Temporal, and Predictive Environments." Paper delivered to the Extremely Large Empirical Systems Session of the Eighteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1987.

"Integrated Economic Models as a Mechanism for Target Industry Identification." Paper delivered to the Extremely Large Empirical Systems Session of the Eighteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1987.

"The Tax Reform Act of 1987: A Review." The Journal of Economics, 1987.

"Researching the Information Society: An Analysis Within the Context of the Texas Economy." Paper presented to the 1987 Conference of the International Communications Association, Montreal, Quebec, Canada, May 1987 (co-authored with Leigh Humphrey).

"An Integrated Econometric, Input-Output, Industry-Occupation Model: A Description with Applications to High-Technology Sectors." Paper delivered to the Econometric Models Session of the 1987 International Symposium on Forecasting, Boston, Massachusetts, May 1987 (co-authored with Leigh Humphrey).

"Short-Term and Long-Term Forecasts Regarding Oil Price Responses in an Energy-Sensitive Regional Economy: An Impact Assessment." Paper delivered to the Econometric Models Session of the 1987 International Symposium on Forecasting, Boston, Massachusetts, May 1987.

"The Role of Economics in Regional Economic Development." Distinguished Lecture Series delivered to the Windsor-Richardson Scholars Program of The University of Texas at Tyler, Tyler, Texas, June 1987.

"The Classical Theory of Economy Growth: A Review." The Journal of Economic History, Fall 1987.

"The Impact of Oil Price Fluctuations on the Economies of Energy Producing States: Comment."  Review of Regional Studies, Fall 1987.

"A Consistent Model-Based Approach to Multi-Level Impact Assessment with Regard to Regional Disaggregation."  Paper delivered to the Issues in Aggregation Session of the 1988 Conference of the American Statistical Association, San Francisco, California, August 1987.

"An Alternative Methodology for a Multi-Regional Impact Assessment Within the Context of a Functional and Comprehensive Empirical System."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1987.

"Information Systems, Target Industries, and Economic Development: Some Theoretical and Empirical Considerations."  Distinguished Invited Lecture delivered to the John Grey Institute, Lamar University, Beaumont, Texas, October 1987.

"A Perspective on the Texas Economy as an Information Society."  In Frederick Williams, ed., Researching the Information Society, Sage Publications, 1987 (co-authored with Leigh Humphrey).

"Application of a Comprehensive Regional Modeling System to the Measurement of Alternative Impacts of Federal Spending."  Paper delivered to the Regional Policy Modeling Session of the 1987 Conference of the International Association of Business Forecasters, Pittsburgh, Pennsylvania, December 1987.

"Illustrations of the Utilization of a Large-Scale Modeling System as a Basis for Regional Economic Planning and Development."  Paper presented to the Models of North American Regions Session of the 1987 Conference of the North American Economics and Finance Association (Allied Social Science Associations), Chicago, Illinois, December 1987.

"The Impact of Excessive Lending Activity on the Construction Sector of a Regional Economy: A Case Study."  Paper presented to the Regional and Natural Resource Economics Session of the 1988 Conference of the Southwestern Social Science Association, Houston, Texas, March 1988.

"A Perspective on Future Economic Development in Texas."  In Max Sherman, ed., The Future of Texas, Austin: University of Texas Press, 1988.

"Economic Impacts of Distorted Market Signals: The Texas Real Estate Crisis."  Journal of Economic Abstracts, 1988.

"Impact Assessments, Spillover Effects, and Leakages: Some Illustrations of the Measurement of Impacts of Federal Spending in Alternative Contexts."  Paper presented to the Public Policy Session of the 1988 Conference of the Southwestern Federation of Administrative Disciplines, San Antonio, Texas, March 1988.

"An Integrated System for the Measurement of the Effects of Federal and Non-Defense Expenditures on Metropolitan and Non-Metropolitan Areas."  Journal of the Southwestern Society of Economists, 1988.

"On the Measurement of the Impact of New Retail Development on Local Economic Activity."  Paper presented to the Regional Impact Assessment Session of the Nineteenth World Conference in Modeling and Simulation, Pittsburgh, Pennsylvania, May 1988.

"A Comprehensive Impact Assessment System: Methodology and Application."  Paper presented to the Regional Impact Assessment Session of the Nineteenth World Conference in Modeling and Simulation, Pittsburgh, Pennsylvania, May 1988.

"The Effects of Health Care Delivery and Education in a Regional Economy: Evidence from Case Studies in Alternative Geographic Markets."  Paper presented to the Regional Impact Assessment Session of the Nineteenth World Conference in Modeling and Simulation, Pittsburgh, Pennsylvania, May 1988.

"The Impact of a Large Reservoir Development in Business Activity in a Sequential Multi-Regional Context."  Paper presented to the Regional Impact Assessment Session of the Nineteenth World Conference in Modeling and Simulation, Pittsburgh, Pennsylvania, May 1988.

"A Model for Defining County-Level Multipliers for a Derivative Development: An Application of an Impact Assessment System."  Modeling and Simulation, 1988.

"On the Development of Integrated Multi-Regional Impact Assessment Systems."  Modeling and Simulation, 1988.

"Educational and Health Care Systems: Their Relative Impacts on Small and Large Metropolitan Areas."  Modeling and Simulation, 1988.

"Measuring Recreational and Construction Impacts from a Major New Recreational Facility: A Complex Application of a Comprehensive Assessment Structure."  Modeling and Simulation, 1988.

"Measuring Regional Economic Impacts of Health Care Delivery and Education Systems: Methodology and Application."  Paper delivered to the Economic Applications Session of the 1988 Conference of the American Statistical Association, New Orleans, Louisiana, August 1988.

"The Economic Development Implications of Educational and Medical Programs in a Regional Context."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1988.

"Controlling the Growth of Monetary Aggregates: A Review."  The Journal of Economics, 1988.

"Integrated Modeling Systems and Their Use in the Corporate Planning Process."  Paper delivered to the Corporate Forecasting Session of the 1988 International Conference on Business Forecasting, Bethesda, Maryland, October 1988.

"The Role of Excessive Lending in Shaping an Economy: The Case of the Real Estate Crisis in the Texas Economy."  Paper delivered to the Financial Institutions Session of the 1988 Conference of the North American Economics and Finance Association (Allied Social Science Associations), New York, New York, December 1988.

"On the Use of Multi-Regional Econometric and Impact Models in Evaluating Major Dislocations: Some Integrated Simulation Results."  Current Issues in North American Economics and Finance, 1988.

"The Economic Impact of Technology Transfer Programs on Regional Business Activity."  Paper delivered to the Economic Theory, Development, and Growth Session of the 1989 Conference of the Midsouth Academy of Economics and Finance, Nashville, Tennessee, February 1989.

"On the Use of Integrated Multi-Dimensional Modeling Techniques in the Industrial Targeting Process."  International Journal of Modeling and Simulation, 1989.

"A Comprehensive Systems Approach to Industrial Targeting: Rationale and Applications."  Paper delivered to the Systems Theory in Economics Session of the 1989 International Conference on Signals and Systems, Miami, Florida, March 1989.

"The Potential Impacts of Avoidable Dislocations on Small, Non-Metropolitan Areas."  Paper delivered to the Regional Economics Session of the 1989 Conference of the Southwestern Social Science Association, Little Rock, Arkansas, March 1989.

"The Impact of Traffic Interruptions in Small Tourist Centers: A Case Study."  Journal of Economic Abstracts, 1989.

"Technology Transfer: Biomedical Research and Economic Development."  The Journal of Economics and Finance, 1989.

"Multi-Faceted Applicability of a Comprehensive Empirical System in the Public and Private Sectors."  Paper delivered to the Managerial Finance Issues Session of the 1989 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1989.

"The Role of the Economic Modeling Process in Contemporary Policy Planning."  Journal of the Southwestern Society of Economists, 1989.

"The Relative Impact of Alternative Economic Initiatives on a Regional Economic Development."  Paper delivered to the Impact Modeling and Analysis Session of the Twentieth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1989.

"The Effects of Major New Facilities in Tourist-Oriented Economies: A Comprehensive Case Study."  Paper delivered to the Impact Modeling and Analysis Session of the Twentieth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1989.

"The Impact of Judicial Initiatives on the Relative Attractiveness of Regional Economies."  Paper delivered to the Impact Modeling and Analysis Session of the Twentieth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1989.

"The Potential Influence of Major Transportation Systems on Regional Economic Activity."  Paper delivered to the Impact Modeling and Analysis Session of the Twentieth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1989.

"A Hypothetical Analysis of the Relative Importance of Major New Facilities in a Multi-Regional Context."  Modeling and Simulation, 1989.

"An Assessment of Tourism and Convention Potential and Impacts within the Framework of an Integrated Modeling System."  Modeling and Simulation, 1989.

"Civil Justice Practices and Business Development: An Input-Output Approach."  Modeling and Simulation, 1989.

"Unique Applications of a Comprehensive Multi-Regional Modeling System."  Paper delivered to the 1989 International Symposium on Forecasting, Vancouver, British Columbia, Canada, June 1989.

"Innovative Transportation Mechanisms and the Job Creation Process: An Illustration of an Import-Export Analysis in a Multi-Regional Impact Assessment System."  Modeling and Simulation, 1989.

"The Effect of Maquiladoras on US Activity: Induced Spending Analysis Within the Contexts of a Multi-Regional Modeling System."  Paper delivered to the Fifth International Congress on the Integration of North American Economies, The Economics Institute, Boulder, Colorado, July 1989.

"The Role of Twin Plants in Regional Economic Activity on the US-Mexico Border: An Input-Output Analysis."  Proceedings of the Fifth International Congress on the Integration of North American Economies, 1989.

"A Comprehensive Input-Output Analysis of the Impact of Substantial Utility Rate Increases on Household and Business Activity."  Paper delivered to the 1989 Conference of the American Statistical Association, Washington, DC, August 1989 (co-authored with Dr. Frank Wyman).

"A Case Study of the Effects of Utility Rate Increases on a Regional Economy."  Proceedings of the American Statistical Association, Business and Economic Statistics Section, 1989 (co-authored with Dr. Frank Wyman).

"The Economic Development Implications of Major Infrastructure Investments: Modeling Strategies and Applications in Transportation and Telecommunications."  Paper delivered to the 1990 Conference of the North American Economics and Finance Association, Atlanta, Georgia, December 1989.

"The Future of the Texas Economy."  In Texas Council on Economic Education, The Economy of Texas, Cincinnati: South-Western, 1990.

"The Role of Economic Models and Information in Societal Decision-Making and Business Development."  Invited paper delivered to the Global Economic Modeling Session of the Second International Symposium on Systems Research, Infomatics, and Cybernetics, International Institute for Advanced Studies, Baden-Baden, Germany, August 1990.

"Economic Information and Social Processes."  The Journal of Systems Research, 1990.

"A Comprehensive Approach to Analyzing and Forecasting the Effects of Changing Tariff Provisions on Domestic Economic Activity and Consumer Spending." Invited paper delivered to the International Symposium on Forecasting, New York, New York, June 1991.

"When Real Estate Investors Become Plaintiffs."  A Methodology for Determining Causality in Portfolio Losses."  National Law Journal, June 1991.

"The Role of Information on Global Competitiveness."  Invited paper delivered to the International Symposium on Economic Modeling, London School of Economics, London, England, July 1991.

"Global Competitiveness and Related Factors Impacting the Southwestern Economy." Southwestern Journal of Economic Abstracts, 1991.

"Economic Forecasting Systems and Asset Valuation: A Comprehensive Modeling Synthesis with Empirical Applications."  Paper delivered to the Global Economic Modeling Session of the Third International Symposium on Systems Research, Infomatics, and Cybernetics, International Institute for Advanced Studies, Baden-Baden, Germany, August 1991.

"A General Equilibrium Modeling System for Examining the Effects of Tariff and Trade Policy Changes in Consumer Spending and Industrial Activity: Illustrations Relating to the Proposed US-Mexico Free Trade Agreement."  Paper delivered to the Perspectives on the North American Free Trade Agreement Session of the 1991/1992 Conference of the North American Economics and Finance Association.  (Allied Social Service Associations), New Orleans, Louisiana, January 1992.

"A Multi-Faceted Modeling Approach to Assessing the Economic Effects of Environmental Policies."  Paper delivered to the Interdisciplinary Scientific Modeling Session of the Fourth International Symposium on Systems Research, Infomatics, and Cybernetics, International Institute for Advanced Studies, Baden-Baden, Germany, August 1992.

"On the Use of Multi-Faceted Modeling Systems to Project Long-Term Real Estate Absorption and Land-Use Patterns."  Paper delivered to the Regional Economics Session of the 1992 Conference of the International Atlantic Economic Society, Plymouth, Massachusetts, October 1992.

"Complex and Comprehensive Modeling Structures for Environmental and Economic Interactions."  The Journal of Systems Research, 1992.

"Sometimes When You're Right, You're Wrong—Some Lessons in Economic Forecasting."  Journal of Business Forecasting, 1992.

"Econometrics, Integrated Systems, and the Incorporation of Quantitative Information in the Predictive Environment."  Distinguished Lecture Series delivered to the Graduate School of Business, Texas Tech University, Lubbock, Texas, October 1992.

"An Economist Stumbles Indoors."  Indoor Pollution Law, 1992.

"The Impact of Transportation Infrastructure Investments on North American Regional and Trade Patterns."  Paper delivered to the North American Trade Session of the 1993 Conference of the North American Economics and Finance Association (Allied Social Science Associations), Anaheim, California, January 1993.

"A Comprehensive Model of Multi-National Trade Patterns: Theory and an Application." The Journal of Systems Research, 1993.

"Integrated Empirical Systems as a Predictive Basis for Absorption Analysis."  Atlantic Economic Journal, 1993.

"Insurance Investment Opportunities in Mexico."  Mexico Business Journal, 1993.

"The Economy, Society, and Future Patterns."  Wilson Distinguished Lecture Series delivered to the Wayland Baptist College Forum, Plainview, Texas, April 1993.

"Emerging Global Factors Shaping the Economy of the Next Century: An Analysis of Opportunities and Challenges."  Address delivered as part of the President's Distinguished Lecture Series of The University of Texas at San Antonio, San Antonio, Texas, 1993.

"Economic Aspects to Asset Valuation."  Paper delivered to the Sixth Annual Valuation of Assets in Bankruptcy Conference of The University of Texas School of Law, Dallas, Texas, July 1993.

"The Geographic and Industrial Distribution of Positive and Negative Impacts of Multi-National Free Trade: A Comprehensive Analysis."  Keynote paper delivered to the Systems Research in Economics Session of the Fifth International Symposium on Systems Research, Informatics, and Cybernetics, International Institute for Advanced Studies, Baden-Baden, Germany, August 1993.

"The Industrial and Geographic Impacts of the Expanding North American Free Trade Agreement: A Comprehensive Analytical Approach with Applications."  Paper delivered to the International Trade Session of the 1993 Conference of the International Atlantic Economic Society, Philadelphia, Pennsylvania, October 1993.

"The World Order as Current Trading Patterns Mature: The Role of NAFTA in the Global Economy."  Paper delivered to the 1993 Conference of the Texas Philosophical Society, Laredo, Texas, December 1993.

"The Future Path of World Trade."  Proceedings of the Texas Philosophical Society, 1993.

"Multi-National Trade Agreements: A Comprehensive Empirical Approach to the Evaluation."  The Journal of Systems Research, 1993.

"An Empirical Evaluation of Some Macroeconomic and Microeconomic Effects of the North American Free Trade Agreement (NAFTA)—Sectoral and Regional Results."  Paper delivered to the Economic Conditions Under NAFTA Session of the 1994 Conference of the North American Economics and Finance Association (Allied Social Science Associations), Boston, Massachusetts, January 1994.

"Damage Models and Testimony: The Essentials of an Integral Element of Case Presentation."  Paper delivered to the 1994 Corporate Counsel Conference of Business Development Associates, Chicago, Illinois, April 1994.

"The Distribution of Free Trade Impacts—The Case of NAFTA."  Atlantic Economic Journal, 1994.

"Immigrant Labor in an Increasingly Global Economy: The United States, Mexico, and Texas."  Forum Journal, 1995.

"Regional Economic Update."  Municipal Finance Journal, Fall 1995.

"Econometric Issues in Forecasting Governmental Revenues and Outlays."  Address delivered to the 1995 Southern Economic Association Convention, New Orleans, Louisiana, November 1995.

"Modeling Environmental Impacts in a Dynamic, Multi-Dimensional Context: An Extension and Application of Large-Scale General Equilibrium Analysis."  In George E. Lasker, ed., Advances in Systems Research, 1996.

"US Economic and Industrial Outlook."  Journal of Business Forecasting, Methods & Systems, June 1996.

"US Economic and Industrial Outlook."  Quarterly Domestic & Global Forecasts, June 1996.

"A Comprehensive Dynamic General Equilibrium System for Measuring the Interactions of the Economy and the Environment."  Keynote address delivered to the Eighth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 1996.

"The Outlook for US Business in the Short Term."  Journal of Business Forecasting, Methods & Systems, November 1996.

"The Outlook for Business and Financial Markets in the US."  Quarterly Domestic & Global Forecasts, November 1996.

"Rules for Financing New Ventures: Financial Innovation, Deregulation, and the Global Technological Revolution."  Paper presented to the 1997 Conference of the National Association of Business Economists, New Orleans, Louisiana, January 1997.

"Modeling Market Behavior and Responses to Exogenous Phenomena in Non-Homogenous Assets: An Extension of the Capital Asset Pricing Model."  In George E. Lasker, ed., Advances in Modeling and Simulation, 1997.

"Predicting Asset Behavior in Markets Characterized by Differentiated Assets."  Keynote address delivered to the Ninth International Symposium on Systems Research, International Institute for Advance Studies, Baden-Baden, Germany, August 1997.

"The Redefinition of the Risk Capital Financing System."  Paper presented to the Distinguished Lecture Series of The University of Texas of the Permian Basin, Odessa, Texas, September 1997.

"Economic Models, Public Policy, and the Media: Dynamic Interaction Mechanism." Paper printed for the Distinguished Lecture Series of The University of Texas of the Permian Basin, Center for Energy and Economic Diversification, Midland, Texas, September 1997.

"Modeling the Effects of Resource Constraints on the Economic Growth Process—Comparative Static and Dynamic Systems." In George E. Lasker, ed., Economic Models, 1998.

"The Short-Term US Outlook." Journal of Business Forecasting, Methods & Systems, January 1998.

"The Short-Term US Outlook." Quarterly Domestic & Global Forecasts, January 1998.

"Constrained Growth in Dynamic Systems: Theory and Applications to Limited Water Resources." Keynote address delivered to the Tenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 1998.

"The Economic Dynamics of Global Trade Agreements." Paper delivered to the Distinguished Lecture Series in Law and Economics, Texas Tech University, Lubbock, Texas, April 1999.

"NAFTA: Economic History and Evolution of a Complex Trade Agreement." Paper delivered to the Distinguished Lecture Series in Mexican History, The University of Texas of the Permian Basin, Odessa, Texas, April 1999.

"Multi-Regional Econometric Modeling of Unprecedented External Shocks: Theory and an Application to the Case of Y2K." Keynote address delivered to the Eleventh International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 1999.

"An Econometric Model of the Potential Effects of Y2K." In George E. Lasker, ed., Advances in Economic and Business Modeling, 1999.

"Texas: A Framework for Its Economic History and Prospects." Address series presented as Distinguished Lecture Series in Political Affairs at Southwest Texas State University, San Marcos, Texas, October 1999.

"The Future of Healthcare Access in Rural Texas: A Short-Term Economic Perspective." Texas Journal of Rural Health, June 2000.

"An Empirical Model of Culture and the Economy: Theory and Application." Keynote address delivered to the Twelfth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2000.

"Modeling the Role of Culture in the Economy: A Comprehensive, Integrated Approach." In George E. Lasker, ed., Advances in Economic Systems, 2000.

"The Current State of the Economy in Light of Recent Shocks."  Invited address as a panelist to the Presidential Economic Outlook Session of the 2001 Annual Conference of the Missouri Valley Economic Association, Kansas City, Missouri, February 2001.

"Measuring NAFTA Trade Through Infrastructure Development."  Invited address as plenary panelist to NAFTA: Transportation Issues Session of the 2001 Annual Conference of the Missouri Valley Economic Association, Kansas City, Missouri, February 2001.

"The Economic Impact of the Arts."  Article prepared for the Baylor Business Review, Spring/Summer 2001.

Broadband Access and Affordability as a Determinant of Regional Economic Growth." Keynote address delivered to the Thirteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2001.

"Modeling the Effects of Telecommunications Access Charge Disparities and Broadband Technology Deployment on Relative Economic Performance: A Multi-Regional Perspective."  In George E. Lasker, ed., Advances in Support Systems Research, 2001.

"Medical Technology and Future Economic Prospects."  Distinguished Lecture delivered to the Texas Tech University Health Sciences Center, Graduate School of Nursing, Odessa, Texas (and via satellite to campuses), April 2002.

"Technology, Globalization, Demographics, and the 'New' Economy."  Lecture delivered to the John Ben Shepperd Distinguished Lecture Series, The University of Texas of the Permian Basin, Odessa, Texas, March 2002.

"Dynamic Measurement of Economic Benefits in Continuous Time."  Keynote address delivered to the Fourteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2002.

"Measuring the Economic Effects of Competitive Power Markets in a Dynamic, Real-Time Environment: A Comprehensive, Multi-Sectoral Modeling Approach." Acta Cybernetica, 2003.

"Urban Dynamics and Constrained Outcomes: A Multi-Regional Econometric Analysis of Artificial Growth Impediments."  Keynote address delivered to the Sixteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2004.

"An Empirical Assessment of Artificial Constraints on Urban Growth in a Dynamic Context."  Acta Cybernetica, 2004.

"To Privatize or Not to Privatize: A Matter of Perspective."  Texas CPA Journal, 2005.

"The Market for Prosperity."  Texas Economic Development Council, 2005.

"Economics of Nursing and Nursing Faculty Shortage."  Distinguished Lecture delivered to the Texas Tech University Health Sciences Center, Graduate School of Nursing, Odessa, Texas (and via satellite to campuses), September 2005.

"Using Market Concepts for Economic Development."  Keynote address delivered to the Expansion Management "Roundtable in the South" Symposium on Economic Development, Pinehurst, North Carolina, 2006.

"The Use of Economic Models and Information Resources in the Public Policy Process."  Frost Distinguished Lecture, The University of Texas at San Antonio, 2006.

"Dollars and Sense: The Nursing Shortage."  Distinguished Lecture delivered to the Texas Tech University Health Sciences Center, Graduate School of Nursing, Lubbock, Texas (and via satellite to campuses), January 2007.

"The Economic Impact of Undocumented Workers on Business Activity in the US."  Social Policy, 2008.

"How Did We Get Into This Mess?—The Causes of the Financial Crisis."  Article prepared for the Texas Lyceum Journal, June 2009.

"The State of the United States and Texas Economies."  Distinguished Lecture delivered to the Texas Tech University Health Sciences Center, Guaduate School of Nursing, Odessa, Texas (and via satellite to campuses), July 2009.

"Obesity-Related Costs and the Economic Impact of Laparoscopic Adjustable Gastric Banding Procedures: Benefits in the Texas Employees Retirement System."  Journal of Medical Economics, 2010.

"The Difficult Question of Public Pensions."  Article prepared for The Texas Lyceum Journal, May 2011.

"The Mathematical Realities of Future Health Care Delivery."  Methodist Hospital Distinguished Lecture at The University of Texas Health Science Center, San Antonio, Texas, June 2011.

"Economic Implications of Health Care Reform."  Distinguished Lecture delivered to the Texas Tech University Health Sciences Center, Graduate School of Nursing, Odessa, Texas (and via satellite to campuses), July 2011.

"Domestic Monetary Policy in a Global Setting."  Distinguished Lecture in the John Ben Shepperd Leadership Forum, The University of Texas of the Permian Basin, Midland, Texas, October 2011.

"Madmen and the Village Watchman:  Mathematics in the Trenches of Economics and Public Policy."  Distinguished Lecture in Mathematics. Baylor University, March 2012.

"Blurred Lines: Are US Monetary and Fiscal Policy Mutually Supportive or Mutually Destructive?"  Distinguished Lecture in the John Ben Shepperd Leadership Forum, The University of Texas of the Permian Basin, Midland, Texas, March 2014.

"The Economic Framework and Context for the Current Surge in Domestic Drilling Activity."  Distinguished Lecture delivered to the University of Illinois College of Law, April 2014.

"Suffer the Little Children: Assessment of the Economic Cost of Child Maltreatment: Methodology and Results."  Presented to the 11th Conference on Forensic Sciences, South Padre Island, Texas, November 2014.

"The Power of Alignment."  Editorial prepared with Maria R. Shirey and Patricia S. Yoder-Wise for the Nursing Administration Quarterly, July-September 2015.

"A Comprehensive Assessment of the Economic Impact of Hunger on the United States."  Presented to the American Professional Society on the Abuse of Children (APSAC) 23rd Annual Colloquium, Boston, Massachusetts, July 2015.

"'…and Justice for All.'  The Potential Economic Benefits of Improving the Judicial Infrastructure in the Eastern District of Texas."  Paper presented to The Center for American and International Law, Plano, Texas, July 2015.

Invited Facilitator for the Paul L. Foster Campus for Business and Innovation Energy Forum at the 2015 Leadership + Innovation Summit, presented by Baylor University, Waco, Texas, September 2015.

"Texas Needs the Workers!! An Economic Analysis of the Economic and Fiscal Impact of Undocumented Workers."  Invited Lecture delivered to the "The Economics of Immigration Reform" Immigration Summit hosted by the American Jewish Committee (AJC) and the Ford Foundation, Austin, Texas, February 2016.

"Accelerating U.S. Economic Growth: How the Permian Basin Can Help."  Distinguished Lecture in the John Ben Shepperd Leadership Forum, The University of Texas of the Permian Basin, Midland, Texas, October 2017.

"The Economic Impact of DACA Recipients on the US and Texas: The Numbers and Beyond."  Panelist for DACA: The Impact on Economics and Individuals presented by the AJC, the World Affairs Council, and the Museum of Fine Arts in Houston, Houston, Texas, November 2017.

## Other Academic Conference Activity

Discussant, Economic Theory and Mathematical Economics Session, 1978 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1978.

Chairperson and Organizer, Omicron Delta Epsilon Session of the 1978 Conference of the Southwestern Social Science Association, Houston, Texas, March 1978.

Discussant, History of Economic Thought Session, 1978 Conference of the Western Economic Association, Honolulu, Hawaii, June 1978.

Discussant, Economic Theory Session, 1978 Conference of the Western Economic Association, Honolulu, Hawaii, June 1978.

Chairperson, Microeconomic Theory Session, 1979 Conference of the Southwestern Federation of Administrative Disciplines, Houston, Texas, March 1979.

Discussant, History of Economic Thought Session, 1979 Conference of the Southwestern Federation of Administrative Disciplines, Houston, Texas, March 1979.

Chairperson and Organizer, Omicron Delta Epsilon Session of the 1979 Conference of the Southwestern Social Science Association, Fort Worth, Texas, March 1979.

Discussant, Econometric Theory Session, 1979 Conference of the Western Economic Association, Las Vegas, Nevada, June 1979.

Discussant, Estimation of Disequilibrium Econometric Models Session, 1979 Conference of the Western Economic Association, Las Vegas, Nevada, June 1979.

Chairperson, Monetary Theory and Policy Session, 1979 Conference of the Atlantic Economic Society, Washington, DC, October 1979.

Chairperson, Econometrics Session of the 1979 Conference of the Southern Economic Association, Atlanta, Georgia, November 1979.

Discussant, Money and Credit Session of the 1980 Conference of the Missouri Valley Economic Association, Memphis, Tennessee, February 1980.

Discussant, Microeconomic Theory Session, 1980 Conference of the Southwestern Federation of Administrative Disciplines, San Antonio, Texas, March 1980.

Discussant, Econometric Analysis of Regional Systems Session, 1980 Conference of the Western Economic Association, San Diego, California, June 1980.

Session Organizer and Chairperson, Econometric Analysis of Regional Systems Session, 1980 Conference of the Western Economic Association, San Diego, California, June 1980.

Chairperson, Model Evaluation Session, Third International Time Series Meeting, Houston, Texas, August 1980.

Chairperson, Money and Inflation Session, Third International Time Series Meeting, Houston, Texas, August 1980.

Chairperson, Time Series Approaches to Econometrics Session, Third International Time Series Meeting, Houston, Texas, August 1980.

Chairperson, Advances in Time Series Analysis Plenary Session, Third International Time Series Meeting, Houston, Texas, August 1980.

Discussant, Demand for Money Session, 1981 Conference of the Missouri Valley Economic Association, Oklahoma City, Oklahoma, February 1981.

Chairperson, Microeconomic Theory Session, 1981 Conference of the Southwestern Social Science Association, Dallas, Texas, March 1981.

Discussant, Microeconomic Theory Session, 1981 Conference of the Southwestern Social Science Association, Dallas, Texas, March 1981.

Chairperson, Problems in Economic Modeling Session, Third International Conference on Mathematical Modeling, Los Angeles, California, July 1981.

Chairperson, Advances in Methodology and Analysis Plenary Session, Fourth International Time Series Meeting, Houston, Texas, August 1981.

Chairperson, Monetary Economics Session, Fourth International Time Series Meeting, Houston, Texas, August 1981.

Chairperson, Seasonality Session, Fourth International Time Series Meeting, Houston, Texas, August 1981.

Discussant, International Economics Session, 1982 Conference of the Southwest Social Science Association, San Antonio, Texas, March 1982.

Chairperson, History of Economic Thought: From Smith to Wallace Session of the 1982 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1982.

Chairperson, Aspects of Large Econometric Model Design Session, Thirteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1982.

Chairperson, Regional Economic Modeling Session, 1983 International Symposium of Forecasting, Wharton School of Business, Philadelphia, Pennsylvania, July 1983.

Chairperson, Econometric Models of North American Regions Session, 1983 Conference of the American Economic Association (Allied Social Science Associations), San Francisco, California, December 1983.

Discussant, North American Macroeconomic Policies Session, 1983 Conference of the American Economic Association (Allied Social Science Associations), San Francisco, California, December 1983.

Discussant, Regulatory Policies in Practice Session, 1983 Conference of the Association for Evolutionary Economics (Allied Social Science Associations), San Francisco, California, December 1983.

Organizer, Issues in Econometric Modeling of North American Regions, 1984 International Conference of the North American Economics and Finance Association, Mexico City, Mexico, July 1984.

Session Organizer and Chairperson, Issues in Regional Econometric Modeling in the North American Nations Session, 1984 Conference of the American Economic Association (Allied Social Science Associations), Dallas, Texas, December 1984.

Invited Panelist, Economic Outlook Joint Session of the American Economic Association and the National Association of Business Economists, 1984 Conference of the American Economic Association (Allied Social Science Associations), Dallas, Texas, December 1984.

Discussant, Regional Economics Session, 1985 Conference of the Southwestern Federation of Administrative Disciplines, New Orleans, Louisiana, March 1985.

Session Organizer and Chairperson, Economic Forecaster's Roundtable, 1985 Conference of the Southwestern Social Science Association, Houston, Texas, March 1985.

Chairperson, Extensions and Applications of Regional Econometric Models Session, Sixteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1985.

Chairperson, Development and Application of Regional Forecasting Models Session, Fifth International Symposium in Forecasting, Montreal, Quebec, Canada, June 1985.

Chairperson, Data Construction and Use Session, 1985 Conference of the American Statistical Association, Las Vegas, Nevada, August 1985.

Invited Discussant, Regional Economics Session, 1985 Conference of the Southern Economic Association, Dallas, Texas, November 1985.

Chairperson, Issues in Econometric Modeling of North American Regions Session, 1985 Conference of the American Economic Association (Allied Social Science Associations), New York, New York, December 1985.

Session Organizer and Discussant, Issues in Econometric Modeling of North American Regions Session, 1985 Conference of the American Economic Association (Allied Social Science Associations), New York, New York, December 1985.

Invited Panelist, Special Joint Session of the American Economic Association and the Association for Christian Economists on "The Founding of the American Economic Association: Religion, Science, and Professionalism," 1985 Conference of the American Economic Association (Allied Social Science Associations), New York, New York, December 1985.

Session Organizer and Chairperson, The Quality of Life and Economic Development Panel, 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

Chairperson, Empirical Models in Regional Economics Session, 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

Chairperson, The Structure of the Texas Economy Session, 1986 Conference of the Southwestern Social Science Association, San Antonio, Texas, March 1986.

Discussant, Regional Economics Session, 1986 Conference of the Southwestern Federation of Administrative Disciplines, Dallas, Texas, March 1986.

Chairperson, Recent Advances in Small Area Econometric and Energy Modeling Session, Seventeenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1986.

Discussant, Business Cycles Session, 1986 Conference of the Western Economic Association International, San Francisco, California, July 1986.

Chairperson, Regional Economics Session, 1986 Conference of the Atlantic Economic Society, Boston, Massachusetts, September 1986.

Session Organizer and Chairperson, North American Econometric Models Session, 1986 Conference of the American Economic Association (Allied Social Science Associations), New Orleans, Louisiana, December 1986.

Chairperson, Strategic Planning Session, 1986 Conference of the International Association of Business Forecasting, New York, New York, December 1986.

Chairperson, Regional Forecasting Session, 1986 Conference of the International Association of Business Forecasting, New York, New York, December 1986.

Organizer and Chairperson, Presidential Plenary Session of the 1987 Conference of the Southwestern Economics Association, Dallas, Texas, March 1987.

Session Organizer and Chairperson, Extremely large Empirical Systems Session, Eighteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, April 1987.

Session Organizer, Models of North American Regions Session, 1987 Conference of the North American Economics and Finance Association (Allied Social Science Associations), Chicago, Illinois, December 1987.

Plenary Panelist, The Role of Economic Models in Economic Development Session, 1987 Conference of the North American Economics and Finance Association, (Allied Social Science Associations), Chicago, Illinois, December 1987.

Session Organizer and Chairperson, Presidential Plenary Session, 1988 Conference of the Southwestern Society of Economists, San Antonio, Texas, March 1988.

Session Organizer and Chairperson, Regional Impact Assessment Session, Nineteenth World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania, May 1988.

Session Organizer, The Contribution of Economic Information to Regional Economic
Development Session, 1988 Conference of the North American Economics and
Finance Association (Allied Social Science Associations), New York, New York,
December 1988.

Discussant, Regional Economics Session, 1989 Conference of the Southwestern
Federation of Administrative Disciplines, New Orleans, Louisiana, March 1989.

Chairperson, Student Paper Session, 1989 Conference of the Southwestern Social Science
Association, Little Rock, Arkansas, March 1989.

Session Organizer and Chairperson, Impact Modeling and Analysis Session, Twentieth
World Conference on Modeling and Simulation, Pittsburgh, Pennsylvania,
May 1989.

Session Organizer and Chairperson, The Role of Modeling in North American Regional
Planning Session, 1990 Conference of the North American Economics and
Finance Association, (Allied Social Science Associations), Atlanta, Georgia,
December 1989.

Invited Panelist, A Perspective on the Global Economic Outlook, Second International
Symposium on Systems Research, Infomatics, and Cybernetics, International
Institute for Advanced Studies, Baden-Baden, Germany, August 1990.

Program Advisor, 1990 Conference of the North American Economics and Finance
Association, Allied Social Science Associations, Washington, DC,
December 1990.

Session Organizer, Chairperson, and Panelist, Plenary Panel on The Southwest in the
Global Economy, 1991 Conference of the Southwest Science Association, San
Antonio, Texas, March 1991.

Invited Panelist, Global Patterns in Trade and Development, Fourth International
Symposium on Systems Research, Informatics, and Cybernetics, International
Institute for Advanced Studies, Baden-Baden, Germany, August 1992.

Chairperson, Regional Economics Session, 1993 Conference of the International Atlantic
Economic Society, Philadelphia, Pennsylvania, October 1993.

Chairperson, Economic Modeling and Forecasting Session, Eighth International
Symposium on Systems Research, International Institute for Advanced Studies,
Baden-Baden, Germany, August 1996.

Session Organizer and Chairperson, Advances in Economic Systems Session, Ninth
International Symposium on Systems Research, International Institute for
Advanced Studies, Baden-Baden, Germany, August 1997.

Session Organizer and Chairperson, New Frontiers in Economic Modeling Session, Tenth
International Symposium on Systems Research, International Institute for
Advanced Studies, Baden-Baden, Germany, August 1998.

Session Organizer and Chairperson, Economic Modeling and Simulation Session,
Eleventh International Symposium on Systems Research, International Institute
for Advanced Studies, Baden-Baden, Germany, August 1999.

Conference Program Committee, Twelfth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2000.

Conference Program Committee, Thirteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2001.

Conference Program Committee, Fourteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2002.

Conference Program Committee, Fifteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2003.

Conference Program Committee, Sixteenth International Symposium on Systems Research, International Institute for Advanced Studies, Baden-Baden, Germany, August 2004.

# DEF-INTERV.
# EX. 130

February 2016

# TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers

## THE PERRYMAN GROUP



510 N. Valley Mills Dr., Suite 300

Waco, TX  76710

ph. 254.751.9595, fax 254.751.7855

*info@perrymangroup.com*

*www.perrymangroup.com*



Δ π EXHIBIT 3
Deponent Perryman
Date 2/27/15 Rptr 06
WWW.DEPOBOOK.COM

DEFINT03294

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# Table of Contents

Introduction.................................................................................................... 1

Immigration Trends ........................................................................................ 4

    CHARACTERISTICS OF THE TEXAS IMMIGRANT POPULATION ...................................................5

Undocumented Immigration............................................................................ 9

Economic Benefits and Costs of the Undocumented Workforce.......................... 13

    NET DIRECT ECONOMIC BENEFITS OF THE UNDOCUMENTED WORKFORCE ................................13

    TOTAL NET ECONOMIC BENEFITS OF THE UNDOCUMENTED WORKFORCE .................................17

Fiscal Implications for Federal, State, and Local Governments ........................... 19

Public Policy Implications and the Cost of Restrictive Immigration Policy ........... 22

    ECONOMIC COST OF RESTRICTIVE IMMIGRATION POLICY.........................................................23

Conclusion ................................................................................................... 24

Appendix A................................................................................................... 25

About The Perryman Group ........................................................................... 26

Methods Used .............................................................................................. 27

    Economic Impact Assessment...........................................................................................27

    Fiscal Impact Assessment ................................................................................................30

Detailed Sectoral Results ............................................................................... 31

w w w . p e r r y m a n g r o u p . c o m
Copyright 2016

DEFINT03295

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# Introduction

Immigration policy has long been a source of heated rhetoric and debate in the political arena, particularly as it relates to the undocumented population. While there are numerous considerations surrounding this issue, it is clear that immigrants, both legal and undocumented, influence business activity in fundamental ways. The value of a readily available workforce cannot be denied, but neither can costs of immigrants such as health care, education, and social services.

> *Immigrants, both legal and undocumented, influence business activity in fundamental ways.*

The issues surrounding immigration are complicated (particularly in the case of the undocumented segment), ranging from security to tax policy to the provision of social services. Moreover, given the emotional nature of the immigration debate at times, the statistics emphasized and the conclusions drawn vary widely. Radical proposals, such as immediate deportation of all undocumented individuals, are often suggested, as well as sensible reforms to make the labor force and the process more effective and efficient.

Beneath all of the sound and fury, however, is one incontrovertible fact: **TEXAS NEEDS THE WORKERS!!** In fact, **the estimated number of undocumented workers in Texas today is approximately twice as large as the total number of unemployed persons in the workforce.** Even if all currently unemployed persons filled jobs now held by undocumented workers (which is impossible for myriad reasons), the state would be left with a glaring gap of hundreds of thousands of workers if the undocumented workforce were no longer available.

In this study, The Perryman Group (TPG) took a balanced view of the economic costs and benefits of the undocumented workforce for Texas, considering factors such as the likely numbers of undocumented workers and concentration by industry, spillover effects as various supply chains and payrolls are affected, and relative differentials in skill levels and compensation associated with undocumented workers. On the cost side, expenses associated with the undocumented population were estimated based on available data regarding outlays by governmental entities.

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t  2 0 1 6

DEFINT03296

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



The analysis uses appropriate modeling techniques to provide an assessment of the magnitude of the impact of the undocumented workforce as well as the economic dependency of various sectors on this source of labor, and updates an April 2008 TPG study of the issue. The potential effects of restrictive immigration policy, including the dynamic adjustments that would be set in motion by such a change, were also quantified.

www.perrymangroup.com
Copyright 2016

DEFINT03297

TEXAS NEEDS THE WORKERS!!
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



---

SUMMARY OF FINDINGS FROM THE PERRYMAN GROUP'S ANALYSIS:
*The issues surrounding immigration are complicated (particularly in the case of the undocumented segment), but there is one incontrovertible fact:*
**TEXAS NEEDS THE WORKERS!!**

The Perryman Group took a balanced view of the economic benefits and costs of the undocumented workforce to Texas. The results indicate gains of millions of jobs and billions of dollars to taxing entities.

| Undocumented Workforce Benefits to the Texas Economy | | | |
|---|---|---|---|
| | **Total Expenditures** | **Output** (Gross Product) | **Permanent Jobs** |
| **Direct Net Benefits** (*Based on the best available information regarding employment patterns of undocumented workers translated into overall measures of resulting output, income, and spending based on the coefficients of the impact assessment model used in this analysis. Fully adjusted for the wage and productivity characteristics of the relevant population.*) | **$326.1 billion** (per year) | **$144.7 billion** (per year) | **1.2 million** |
| **TOTAL Net Benefits** (including multiplier effects) (*Based on the total economic benefits of the undocumented workforce adjusted to net out costs such as education, social services, and health care.*) | **$663.4 billion** (per year) | **$290.3 billion** (per year) | **3.3 million** |
| Source: The Perryman Group | | | |

Subtracting the costs from the total fiscal benefits yields an estimate of the net fiscal effect of the undocumented population. The Perryman Group estimates that the total net fiscal effect of the Texas undocumented population includes benefits of **$32.9 billion each year**, including

- **$20.1 billion** to the federal government,
- **$11.8 billion** to the State of Texas, and
- **$0.9 billion** to local governments within Texas.

Restrictive immigration policy will cause substantial economic and fiscal losses, and optimal policy would be crafted to minimize these dislocations.

---

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t   2 0 1 6

DEFINT03298

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



# Immigration Trends

Patterns in undocumented immigration and the undocumented workforce are linked to the larger question of immigration in general. Currently, more than one of every eight people living in the United States is an immigrant. The total has risen by about 11.3 million since 2000, to reach 42.4 million nationwide as of 2014.[1]



Immigrants comprised about 13.3% of the US population as of 2014, up from 6.2% in 1980.[2] In Texas, immigrants were about 16.5% of the population in 2013.[3] California, New York, and New Jersey have the highest percentages of immigrants, while California,

---

[1] Pew Research Center, http://www.pewresearch.org/data-trend/society-and-demographics/immigrants/ .

[2] Pew Research Center, http://www.pewresearch.org/data-trend/society-and-demographics/immigrants/ ;
Statistical Portrait of The Foreign-Born Population in The United States, Share of Foreign-born Population, by State: 1960-2013, Pew Research Center.

[3] Statistical Portrait of the Foreign-Born Population in the United States, Share of Foreign-born Population, by State: 1960-2013, Pew Research Center.

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t   2 0 1 6

DEFINT03299



New York, and Texas dominate in terms of the greatest absolute number of immigrants.[4]

The foreign-born population in Texas has risen dramatically, up from an estimated 2.9 million in 2000 to almost 4.4 million in 2013.



Foreign-born Population, Texas: 1960-2013

Source: Pew Research Center tabulations of 1960, 1970, 1980, 1990 and 2000 censuses and 2010 and 2013 American Community Surveys (IPUMS)

## CHARACTERISTICS OF THE TEXAS IMMIGRANT POPULATION

Immigrants in Texas tend to be employed at a slightly higher rate than the native-born population, but generally earn less. For Texas households headed by immigrants, 2014 median household income was $42,189, which is approximately 75% of native-born household median income ($56,432).[5] At the same time, immigrant households were on

---

[4] Statistical Portrait of the Foreign-Born Population in the United States, 1960-2013, Foreign-born Population, by State: 1960-2013, Pew Research Center.

[5] US Census Bureau, 2014 American Community Survey 1-Year Estimates.

w w w . p e r r y m a n g r o u p . c o m
Copyright 2016

DEFINT03300

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



average 34% larger than native households (3.57 persons compared to 2.66 persons) resulting in an even lower per-capita median income for immigrants.[6]

One factor in the lower incomes is a higher concentration among immigrants in lesser-skilled, lower-paying jobs due to lower average education levels. Of adult immigrants in Texas, 41.7% do not have a high school diploma compared to only 10.9% of the native-born population.[7] However, there are notable differences in education levels among segments of the immigrant population, and the proportion of immigrants with college

> *About 9.5% of total immigrants and 13.6% of foreign-born naturalized citizens in Texas hold graduate or professional degrees.*

degrees is comparable to native-born Texans. In fact, about 9.5% of total immigrants and 13.6% of foreign-born naturalized citizens hold graduate or professional degrees, thus contributing to professional and scientific industries as well as health care delivery.[8]



Educational Attainment of Native- and Foreign-born in Texas, 2014

Source: US Census Bureau, 2014 American Community Survey, 1-Year Estimates.

---

[6] US Census Bureau, 2014 American Community Survey 1-Year Estimates.

[7] US Census Bureau, 2014 American Community Survey 1-Year Estimates.

[8] US Census Bureau, 2014 American Community Survey 1-Year Estimates.

w w w . p e r r y m a n g r o u p . c o m
Copyright 2016

DEFINT03301



Among native-born workers in Texas, a large majority (38.2%) work in management, business, science, and arts occupations or sales and office occupations (26.5%). Foreign-born workers also tend to concentrate in service occupations (24.6%) and management, business, science and arts occupations (25.2%). The segment of foreign-born workers who are naturalized citizens, however, follows the trend of native-born workers, primarily holding occupations in the management, business, science, and arts fields (38%) or the sales and office occupations (19.8%).



Of the approximate 4.5 million immigrants estimated to live in Texas in 2014, about 65% are from Mexico and Central America, with another 20% from Asia. The number of immigrants from Mexico is estimated to be over 2.5 million, while other countries from Central America with significant populations in Texas include El Salvador (over 199,000) and Honduras (almost 103,000).[9]

---

[9]US Census Bureau, 2014 American Community Survey 1-Year Estimates.

DEFINT03302

**TEXAS NEEDS THE WORKERS!!**
An Analysis of the Economic and Fiscal Impact of Undocumented Workers





8 | Page

DEFINT03303



# Undocumented Immigration

Analysis of undocumented immigration and the undocumented workforce is complicated by a lack of detailed data. However, several thorough investigations of the issue have been conducted, and available information from well-respected organizations has been compiled. While there is some variation across studies due to such factors as methodological differences, the major findings are relatively consistent.

The Pew Research Center estimates that there are currently at least 11.3 million undocumented immigrants living in the United States, up from 8.6 million in 2000. Undocumented immigrants comprise a large component of the workforce in some industries and geographic areas. However, debate as to the costs and benefits of these undocumented residents is heated.



DEFINT03304



In Texas, a recently released study from The Center for Migration Studies estimates that the undocumented immigrant population exceeds 1.7 million.[10] Over the past several years, the number of undocumented immigrants in the state has remained fairly stable, with fluctuations linked to overall economic conditions.



As with immigrants as a whole, the vast majority of undocumented immigrants in Texas come from Mexico (78% as of 2013, according to the Migration Policy Institute[11]) although recent reports suggest the numbers from Mexico entering the US have been

---

[10] Warren, Robert, US Undocumented Population Drops Below 11 Million in 2014, with Continued Declines in the Mexican Undocumented Population, Journal on Migration and Human Security, Center for Migration Studies January 2016.

[11] Note that the Migration Policy Institute's 2013 estimates of the size of the total undocumented population in Texas are somewhat lower than those of the Center for Migration Studies or the Pew Research Center. However, the Migration Policy Institute study provided additional insights into the characteristics of the undocumented population which are reported herein.

www.perrymangroup.com
Copyright 2016

DEFINT03305



declining.[12] El Salvador and Honduras were the countries with the next highest numbers of undocumented immigrants in Texas in 2013.[13]

Of undocumented adult immigrants in 2013, 60% did not have a high school diploma.[14] However, an estimated 21% had a high school diploma or GED; approximately 10% had some college or an associate's degree; and 9% held a bachelor's, graduate, or professional degree.[15] School enrollment for ages 3-17 is approximately 91% within the undocumented immigrant population.[16]



Educational Attainment of Undocumented Immigrants in Texas, 2013

- 0-5 grade
- 6-8 grade
- 9-12 grade
- High school diploma or GED
- Some college or associate's degree
- Bachelor's, graduate, or professional degree

Source: Migration Policy Institute.

---

[12] Profile of the Unauthorized Population: Texas, Migration Policy Institute,
http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX; Warren, Robert, US Undocumented Population Drops Below 11 Million in 2014, with Continued Declines in the Mexican Undocumented Population, Journal on Migration and Human Security, Center for Migration Studies January 2016.
[13] Profile of the Unauthorized Population: Texas, Migration Policy Institute,
http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.
[14] Profile of the Unauthorized Population: Texas, Migration Policy Institute,
http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.
[15] Profile of the Unauthorized Population: Texas, Migration Policy Institute,
http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.
[16] Profile of the Unauthorized Population: Texas, Migration Policy Institute,
http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.

w w w . p e r r y m a n g r o u p . c o m
Copyright 2016

DEFINT03306

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



The labor force participation rate among undocumented immigrants in Texas is approximately 68%, while the unemployment rate is 8.6%.[17] The two primary industries that undocumented workers are employed in are construction (24%) and the arts, entertainment, recreation, accommodation, and food services (17%) industries.[18] Although the industry is often discussed in debates regarding immigration, the number of agricultural workers is a small percentage of the total. However, because agriculture is also a relatively small part of the overall workforce at present, these workers make up a substantial portion of overall farm labor.



Top Industries of Employment for Undocumented Immigrants in Texas, 2013

- Construction
- Arts, entertainment, recreation, accommodation, and food services
- Professional, scientific, management, administrative, and waste management
- Manufacturing
- Other services (except public administration)
- All Other Industries

Source: Migration Policy Institute.

---

[17] Profile of the Unauthorized Population: Texas, Migration Policy Institute, http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.
[18] Profile of the Unauthorized Population: Texas, Migration Policy Institute, http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.

www.perrymangroup.com
Copyright 2016

DEFINT03307

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# Economic Benefits and Costs of the Undocumented Workforce

Undocumented immigrants are an important component of the workforce and, thus, economic activity. As an initial phase of this analysis, The Perryman Group measured the direct contribution of the undocumented workforce by industry. Total net economic benefits were then quantified.

### NET DIRECT ECONOMIC BENEFITS OF THE UNDOCUMENTED WORKFORCE

The Perryman Group utilized available data related to the employment patterns of the undocumented workforce as a starting point for this phase of the analysis. These estimates were then allocated to various industries based on the best available information regarding employment patterns and translated into overall measures of resulting output, income, and spending based on the coefficients of the impact assessment model used in this analysis. They were fully adjusted for the wage and productivity characteristics of the relevant population in order to quantify benefits (see the Appendices for a more detailed discussion).

The net direct economic benefits of undocumented workers in Texas were found to include almost **$326.1 billion** in total expenditures and **$144.7 billion** in output (gross product) each year as well as **1.2 million** jobs.

DEFINT03308

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



## Net Direct Economic Benefits for the Texas Economy of Undocumented Workers
### *(Dollar Amounts in Billions of 2015 Dollars)*

| | |
|---|---|
| Total Expenditures | **$326.057** |
| Gross Product | **$144.654** |
| Personal Income | **$90.550** |
| Wages & Salaries | **$56.450** |
| Retail Sales | **$18.920** |
| Employment (Permanent Jobs) | **1,206,779** |

Note: These direct benefits were quantified based on the best available information regarding employment patterns and translated into overall measures of resulting output, income, and spending based on the coefficients of the impact assessment model used in this analysis. They were fully adjusted for the wage and productivity characteristics of the relevant population.
Source: The Perryman Group

Effects by industry are depicted in the graph below, with further detail in the Appendices.

DEFINT03309





DEFINT03310

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



## Measuring Economic Effects of the Undocumented Workforce

The direct economic contribution of the undocumented workforce generates multiplier effects across a spectrum of industries. These multiplier effects were measured using The Perryman Group's input-output assessment model (the US Multi-Regional Impact Assessment System), which is described in further detail in the Appendices to this report. The system has been consistently maintained and updated since it was developed by the firm some 30 years ago, and has been used in hundreds of analyses for clients ranging from major corporations to government agencies. It uses a variety of data (from surveys, industry information, and other sources) to describe the various goods and services (known as resources or inputs) required to produce another good/service. This process allows for estimation of the total economic impact (including multiplier effects) of the undocumented workforce, and the model used reflects the specific industrial composition and characteristics of the Texas economy. The model is also linked to a system for quantifying the tax effects associated with the gains business activity such as increases in retail sales taxes and property taxes. In addition, The Perryman Group analyzed costs associated with the undocumented workforce including social services, health care, and education for dependent children. These costs were subtracted from total economic benefits quantified to obtain an estimate of net effects. The likely economic cost of restrictive immigration policy was also examined. This segment of the analysis assumed that immigration policy was enacted which resulted in a net reduction in undocumented workers of about 35% (after sufficient time for dynamic adjustments and substitution), thus reducing the economic benefits stemming from this segment of the labor force.

Economic effects are quantified for key measures of business activity:

- **Total expenditures** (or total spending) measure the dollars changing hands as a result of the economic stimulus.
- **Gross product** (or output) is production of goods and services that will come about in each area as a result of the activity. This measure is parallel to the gross domestic product numbers commonly reported by various media outlets and is a subset of total expenditures.
- **Personal Income** is dollars that end up in the hands of people in the area; the vast majority of this aggregate derives from the earnings of employees, but payments such as interest and rents are also included.
- **Wages & Salaries** is a subset of personal income which is comprised of earnings of employees only.
- **Job gains** are expressed as permanent jobs for ongoing operational effects.

Industry-level detail is provided in the Appendices. Monetary values were quantified on a constant (2015) dollar basis. See the Appendices to this report for additional information regarding the methods and assumptions used in this analysis.

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t   2 0 1 6

DEFINT03311

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



## TOTAL NET ECONOMIC BENEFITS OF THE UNDOCUMENTED WORKFORCE

As noted, the direct economic activity stemming from the undocumented workforce generates multiplier effects through the economy, which were measured by The Perryman Group. Costs involved with undocumented workers such as health care, education, social services, and law enforcement were then subtracted to obtain a measure of the net economic benefits associated with the undocumented workforce.

> *The total net economic benefits of undocumented workers in Texas are estimated to include $663.4 billion in total expenditures and almost $290.3 billion in output (gross product) each year, as well as more than 3.3 million jobs.*

The total net economic benefits of undocumented workers in Texas are estimated to include **$663.4 billion** in total expenditures and almost **$290.3 billion** in output (gross product) each year, as well as more than **3.3 million** jobs when indirect and induced effects are considered.

| **Total Net Economic Benefits for the Texas Economy of Undocumented Workers Benefits (including Multiplier Effects and Fully Adjusted to Reflect Associated Costs)** *(Dollar Amounts in Billions of 2015 Dollars)* | |
|---|---|
| Total Expenditures | **$663.435** |
| Gross Product | **$290.276** |
| Personal Income | **$180.665** |
| Wages & Salaries | **$133.166** |
| Retail Sales | **$77.029** |
| Employment (Permanent Jobs) | **3,308,365** |
| Note: Based on the total economic benefits of the undocumented workforce adjusted to net out costs such as education, social services, and health care. Source: The Perryman Group | |

DEFINT03312

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



It should be noted that these effects represent approximately 17% of GDP in Texas and 25% of employment. These results reflect the facts that (1) about 11.5% of all private sector workers in Texas are presently undocumented and (2) many of them work in export-oriented industries.

Effects by industry are depicted in the graph below, with further detail in the Appendices.



Net increase in output (gross product) associated with undocumented workers by industry when multiplier effects are considered (in billions of dollars). FIRE is finance, insurance, and real estate.
Source: The Perryman Group

www.perrymangroup.com
Copyright 2016

DEFINT03313



# Fiscal Implications for Federal, State, and Local Governments

As noted, a key issue in ongoing policy debate related to undocumented immigrants is the fiscal effects for federal, state, and local government entities. The Perryman Group examined fiscal issues from both the benefit and the cost perspectives.

Undocumented workers pay taxes through various mechanisms such as retail sales. The Perryman Group estimates that undocumented workers in Texas generate direct taxes to federal, State of Texas, and local governments within the state totaling **$13.5 billion** per year. Note that these amounts are adjusted for the estimated compliance levels with regard to income taxes and other levies typically paid through payroll withholding.

In addition, the increase in economic activity associated with these workers generates additional fiscal revenues. The undocumented workforce in Texas generates an estimated **$32.2 billion** per year in indirect and induced taxes.

The total tax effect of the undocumented workforce in Texas includes estimated overall (direct, indirect, and induced) gains of **$45.7 billion** per year, including $23.2 billion to the federal government, $15.0 billion to the State of Texas, and $7.6 billion to local entities within the state.

> *The total revenue effect of the undocumented workforce in Texas includes estimated overall (direct, indirect, and induced) gains of $45.7 billion per year, including $23.2 billion to the federal government, $15.0 billion to the State of Texas, and $7.6 billion to local entities within the state.*

There are costs associated with the undocumented population which accrue to government entities such as education, social services, and health care. The Perryman Group measured these costs based on the best available information from various sources (including the Congressional Budget Office) and includes both the costs associated with the children of undocumented workers who were born in the US and

DEFINT03314



the allocated incremental expenses associated with the general provision of public services (such as police and fire protection).[19]

The amounts were updated to reflect current prices and population estimates. The total cost of the Texas undocumented population is estimated to be **$12.8 billion** per year, including $3.0 billion to the federal government, $3.1 billion to the State of Texas, and $6.7 billion to local entities within the state.

Subtracting the cost from the total fiscal benefit yields an estimate of the net fiscal effect of the undocumented population. The Perryman Group estimates that the total net fiscal effect of the Texas undocumented population includes benefits of **$32.9 billion**, including $20.1 billion to the federal government, $11.8 billion to the State of Texas, and $0.9 billion to local governments within Texas.

---

[19] The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments, Congress of the United States, Congressional Budget Office, December 2007.
Martin, Jack and Eric A. Ruark, The Fiscal Burden of Illegal Immigration on United States Taxpayers, The Federation for American Immigration Reform, July 2010, revised February 2011.
New Americans in Texas: The Political and Economic Power of Immigrants, Latinos, and Asians in the Lone Star State, American Immigration Council, January 2015.
US Census Bureau, 2013 Census of Governments: Finance – Surveys of State and Local Government Finances.

DEFINT03315



## Fiscal Benefits and Costs of Undocumented Immigrants in Texas

*(Dollar amounts in billions.)*

|  | Federal | State of Texas | Local Governments within Texas | TOTAL |
|---|---|---|---|---|
| **Direct Tax Receipts**<br>*(Includes taxes paid by undocumented workers such as retail sales tax, income tax, property tax, and other levies.)* | $6.855 | $4.202 | $2.480 | **$13.538** |
| **Indirect and Induced Tax Receipts**<br>*(Includes tax effects on indirect and induced economic activity such as retail sales taxes, income tax, property tax, and other levies.)* | $16.311 | $10.775 | $5.124 | **$32.210** |
| **Total Tax Effect**<br>*(Includes direct taxes paid as well as tax receipts associated with indirect and induced effects.)* | $23.166 | $14.978 | $7.604 | **$45.748** |
| **Costs**<br>*(Includes all costs associated with undocumented workers and their dependents such as social services, health care, education, and other government services.)* | $(3.033) | $(3.132) | $(6.685) | **$(12.849)** |
| **TOTAL NET EFFECT** | **$20.133** | **$11.846** | **$0.920** | **$32.899** |

\* Rows and columns may not sum to totals due to rounding.
Source: The Perryman Group

It should be noted, however, that many local governmental entities likely experience a net deficit from the presence of undocumented workers. This phenomenon occurs because much of the revenue is derived from sales taxes, which primarily flow to cities, while many of the expenses are incurred by school districts and public health care facilities, which typically rely on property taxes for much of their revenue. The overall fiscal surplus is quite substantial and certainly would permit intergovernmental transfers to eliminate any shortfalls, but this is an issue that should be addressed in future policy discussions.

DEFINT03316



# Public Policy Implications and the Cost of Restrictive Immigration Policy

One of the purposes of this analysis is to provide an economic framework to help in shaping the public policy debate in a reasonable manner. Clearly, the undocumented workforce in Texas generates substantial economic activity. Moreover, the fiscal effects are decidedly positive, even with costs are considered (although there are some allocation issues that merit attention).

While there are many issues relevant to the immigration policy debate, it is important to consider the potential economic cost of restrictive immigration policy. In order to illustrate these potential costs, The Perryman Group conducted a simulation of the potential effects of a restrictive immigration policy. The scenario did not assume the extreme and impractical measures proposed by some groups, but rather reflected a program that would restrict entry, have more enforcement mechanisms, and not provide a sensible approach to obtaining needed labor resources.

*The Perryman Group estimates that when multiplier effects are considered, the economic cost of restrictive immigration policy includes $101.8 billion in foregone total expenditures and almost $54.8 billion in gross product each year as well as a loss of more than 417,000 jobs in Texas.*

For comparative purposes, the scenario was conducted relative to the size of the Texas economy in 2015, but was conducted on a dynamic basis to allow time for the market to adjust to the reduced level of resources. Based on these postulates, it was found that the pool of labor now available through undocumented workers would be reduced by about 35%.

The adjustment process which would be required in this scenario would be disruptive, resulting in potential fallout ranging from failing farms due to unharvested crops to an inability to complete construction projects in a timely manner. Tourism would also likely be affected, as significant numbers of undocumented worker jobs fall within accommodations and food services industries. With a reduction in the undocumented workforce, economic activity would also be reduced across a spectrum of industries.

DEFINT03317



### ECONOMIC COST OF RESTRICTIVE IMMIGRATION POLICY

A restrictive immigration policy of the type described above would have significant detrimental effects on the Texas economy. The Perryman Group estimates that when multiplier effects are considered, the economic cost of restrictive immigration policy includes **$104.8 billion** in total expenditures and almost **$54.8 billion** in gross product each year as well as a loss of almost **418,000** jobs in Texas. Obviously, more extreme measures would bring correspondingly greater disruptions.

## Total Net Economic Cost (including Multiplier Effects) for the Texas Economy of Restrictive Immigration Policy
*(Dollar Amounts in Billions of 2015 Dollars)*

| | |
|---|---|
| Total Expenditures | **$(104.811)** |
| Gross Product | **$(54.751)** |
| Personal Income | **$(33.471)** |
| Wages & Salaries | **$(22.051)** |
| Retail Sales | **$(14.630)** |
| Employment (Permanent Jobs) | **(417,815)** |

Note: Based on immigration policy that would restrict entry, have more enforcement mechanisms, and not provide a sensible approach to obtaining needed labor resources, resulting in a reduction in the pool of labor now available through undocumented workers of about 35%.
Source: The Perryman Group

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t   2 0 1 6

DEFINT03318



# Conclusion

For a number of years, immigration and undocumented immigration have been the subject of heated debate. Unfortunately, there are no simple answers, because of the many complex elements of the issue. While immigration policy is important to national security and other priorities, there are also economic considerations.

> *Undocumented workers in Texas lead to economic benefits including than **3.3 million** jobs and net fiscal benefits of an estimated **$32.9 billion**, including $20.1 billion to the federal government, $11.8 billion to the State of Texas, and $0.9 billion to local governments within Texas.*

The Perryman Group estimates that the total net economic benefits of undocumented workers in Texas include **$663.4 billion** in total expenditures and almost **$290.3 billion** in output (gross product) each year as well as more than **3.3 million** jobs. These estimates fully reflect the costs of the undocumented population such as education, social services, and health care.

Fiscal benefits are also substantial. Even when costs of social services provided to the undocumented population by government entities are considered, the benefits include an estimated **$32.9 billion with** $20.1 billion to the federal government, $11.8 billion to the State of Texas, and $0.9 billion to local governments within Texas (although the allocation across units of government is not uniform).

Immigration policy is a source of controversy, with complex issues and no solutions that simultaneously please all stakeholders. While there are many considerations, the fact is that undocumented workers in Texas generate millions of jobs and billions in tax revenue. Restrictive immigration policy will cause substantial economic and fiscal losses, and optimal policy would be crafted to minimize these dislocations. In short, **TEXAS NEEDS THE WORKERS!!**

DEFINT03319

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# Appendix A

www.perrymangroup.com
Copyright 2016

DEFINT03320



# About The Perryman Group

The Perryman Group (TPG) is an economic research and analysis firm based in Waco, Texas. The firm has more than 30 years of experience in assessing the economic impact of corporate expansions, regulatory changes, real estate developments, public policy initiatives, and myriad other factors affecting business activity. TPG has conducted hundreds of impact analyses for local areas, regions, and states throughout the United States. Impact studies have been performed for hundreds of clients including many of the largest corporations in the world, governmental entities at all levels, educational institutions, major health care systems, utilities, and economic development organizations.

Dr. M. Ray Perryman, founder and President of the firm, developed the US Multi-Regional Impact Assessment System (used in this study) in the early 1980s and has consistently maintained, expanded, and updated it since that time. The model has been used in hundreds of diverse applications and has an excellent reputation for reliability. A major study developed using the relevant model was recently published in The Journal of Medical Economics.

The Perryman Group has analyzed the economic and fiscal effects of various types of taxes, policy changes, and economic stimuli on hundreds of occasions over the past 30 years. These assessments include effects of corporate locations and expansions, regulatory and other policy changes, benefits payments, legislative initiatives, tax reform, judicial reform, and many others. The firm has also examined issues related to immigration and the undocumented workforce on many occasions, including a comprehensive analysis of the effects on the US and each state prior to the most recent recession.

C o p y r i g h t   2 0 1 6

DEFINT03321



# Methods Used

## Economic Impact Assessment

The basic modeling technique employed in this study is known as dynamic input-output analysis.  This methodology essentially uses extensive survey data, industry information, and a variety of corroborative source materials to create a matrix describing the various goods and services (known as resources or inputs) required to produce one unit (a dollar's worth) of output for a given sector.  Once the base information is compiled, it can be mathematically simulated to generate evaluations of the magnitude of successive rounds of activity involved in the overall production process.

There are two essential steps in conducting an input-output analysis once the system is operational.  The first major endeavor is to accurately define the levels of direct activity to be evaluated.

In this instance, the direct effect of the undocumented workforce was quantified based on the best available estimates of undocumented workers from reliable sources, including appropriate adjustments for the Census undercount and recent population patterns. The workers were allocated across detailed industrial categories using current employment and occupational data. Other measures of direct effects (expenditures, gross product, personal income, and wages and salaries) were simulated using the direct coefficients of the model described below, with differentials in income and productivity being fully implemented. Once the direct activity was quantified, the next phase of the analysis involved the simulation of the firm's US Multi-Regional Impact Assessment System (USMRIAS) which was developed and is maintained by The Perryman Group.

In order to quantify the economic benefits of the undocumented workforce on a net basis, The Perryman Group also analyzed the costs of the undocumented population. These costs include social services, education, health care, and other public services. Once the total costs were quantified, they were subtracted from the total economic benefits to obtain an estimate of the net economic benefits. A simulation of the effects of a potential restrictive policy was also conducted, as described within the report.

The USMRIAS has been used in hundreds of diverse applications across the country and has an excellent reputation for accuracy and credibility.  The system used in the current simulations reflects the unique industrial structure and characteristics of the Texas economy.

The USMRIAS is somewhat similar in format to the Input-Output Model of the United States and the Regional Input-Output Modeling System, both of which are maintained by the US Department of Commerce.  The model developed by TPG, however, incorporates several important enhancements and

www.perrymangroup.com
Copyright 2016

DEFINT03322



refinements. Specifically, the expanded system includes (1) comprehensive 500-sector coverage for any county, multi-county, or urban region; (2) calculation of both total expenditures and value-added by industry and region; (3) direct estimation of expenditures for multiple basic input choices (expenditures, output, income, or employment); (4) extensive parameter localization; (5) price adjustments for real and nominal assessments by sectors and areas; (6) measurement of the induced impacts associated with payrolls and consumer spending; (7) embedded modules to estimate multi-sectoral direct spending effects; (8) estimation of retail spending activity by consumers; and (9) comprehensive linkage and integration capabilities with a wide variety of econometric, real estate, occupational, and fiscal impact models. The model has been thoroughly tested for reasonableness and historical reliability.

The impact assessment (input-output) process essentially estimates the amounts of all types of goods and services required to produce one unit (a dollar's worth) of a specific type of output. For purposes of illustrating the nature of the system, it is useful to think of inputs and outputs in dollar (rather than physical) terms. As an example, the construction of a new building will require specific dollar amounts of lumber, glass, concrete, hand tools, architectural services, interior design services, paint, plumbing, and numerous other elements. Each of these suppliers must, in turn, purchase additional dollar amounts of inputs. This process continues through multiple rounds of production, thus generating subsequent increments to business activity. The initial process of building the facility is known as the direct effect. The ensuing transactions in the output chain constitute the indirect effect.

Another pattern that arises in response to any direct economic activity comes from the payroll dollars received by employees at each stage of the production cycle. As workers are compensated, they use some of their income for taxes, savings, and purchases from external markets. A substantial portion, however, is spent locally on food, clothing, health care services, utilities, housing, recreation, and other items. Typical purchasing patterns in the relevant areas are obtained from the ACCRA Cost of Living Index, a privately compiled inter-regional measure which has been widely used for several decades, and the Consumer Expenditure Survey of the US Department of Labor. These initial outlays by area residents generate further secondary activity as local providers acquire inputs to meet this consumer demand. These consumer spending impacts are known as the *induced effect*. The USMRIAS is designed to provide realistic, yet conservative, estimates of these phenomena.

Sources for information used in this process include the Bureau of the Census, the Bureau of Labor Statistics, the Regional Economic Information System of the US Department of Commerce, and other public and private sources. The pricing data are compiled from the US Department of Labor and the US Department of Commerce. The verification and testing procedures make use of extensive public and private sources.

Impacts were measured in 2015 dollars to eliminate the effects of inflation.

The USMRIAS generates estimates of the effect on several measures of business activity. The most comprehensive measure of economic activity used in this study is **Total Expenditures**. This measure

DEFINT03323



incorporates every dollar that changes hands in any transaction. For example, suppose a farmer sells wheat to a miller for $0.50; the miller then sells flour to a baker for $0.75; the baker, in turn, sells bread to a customer for $1.25. The Total Expenditures recorded in this instance would be $2.50, that is, $0.50 + $0.75 + $1.25. This measure is quite broad, but is useful in that (1) it reflects the overall interplay of all industries in the economy, and (2) some key fiscal variables such as sales taxes are linked to aggregate spending.

A second measure of business activity frequently employed in this analysis is that of **Gross Product**, the most commonly reported statistic regarding national economic performance. It is defined as the value of all final goods produced in a given region for a specific period of time. Stated differently, it captures the amount of value-added (gross area product) over intermediate goods and services at each stage of the production process, that is, it eliminates the double counting in the Total Expenditures concept. Using the example above, the Gross Product is $1.25 (the value of the bread) rather than $2.50. Alternatively, it may be viewed as the sum of the value-added by the farmer, $0.50; the miller, $0.25 ($0.75 - $0.50); and the baker, $0.50 ($1.25 - $0.75). The total value-added is, therefore, $1.25, which is equivalent to the final value of the bread. In many industries, the primary component of value-added is the wage and salary payments to employees.

The third gauge of economic activity used in this evaluation is **Personal Income**. As the name implies, Personal Income is simply the income received by individuals, whether in the form of wages, salaries, interest, dividends, proprietors' profits, or other sources. It may thus be viewed as the segment of overall impacts which flows directly to the citizenry. The **Wage and Salary** segment of personal income was also reported separately.

The fourth measure, **Retail Sales**, represents the component of Total Expenditures which occurs in retail outlets (general merchandise stores, automobile dealers and service stations, building materials stores, food stores, drugstores, restaurants, and so forth). Retail Sales is a commonly used measure of consumer activity.

The final aggregate used is **Permanent Jobs and Person-Years of Employment**. The Person-Years of Employment measure reveals the full-time equivalent jobs generated by an activity. It should be noted that, unlike the dollar values described above, Permanent Jobs is a "stock" rather than a "flow." In other words, if an area produces $1 million in output in 2014 and $1 million in 2015, it is appropriate to say that $2 million was achieved in the 2014-2015 period. If the same area has 100 people working in 2014 and 100 in 2015, it only has 100 Permanent Jobs. When a flow of jobs is measured, such as in a construction project or a cumulative assessment over multiple years, it is appropriate to measure employment in Person-Years (a person working for a year). This concept is distinct from Permanent Jobs, which anticipates that the relevant positions will be maintained on a continuing basis.

DEFINT03324



## Fiscal Impact Assessment

The Perryman Group measured the tax effects of the undocumented workforce in Texas. These taxes stem from (1) direct taxes paid by undocumented residents and (2) indirect tax effects associated with economic benefits of the undocumented workforce.

The **direct tax effects** are based on simulations of the direct activity through the fiscal system noted below. The amounts actually paid by the undocumented workers were compared to other reliable estimates for reasonableness.

In order to measure **indirect tax effects**, The Perryman Group utilized its Fiscal Impact Assessment System, which is linked to the firm's US Multi-Regional Impact Assessment System previously described. Tax increases are based on gains stemming from incremental taxable retail sales and incremental property taxes. While these are the major sources of fiscal stimulus, there are others ranging from increased licenses and fees to enhanced franchise tax collections, severance taxes to the State, occupancy taxes from increased travel, and numerous other sources. The Perryman Group's model uses empirical evidence of the linkages between economic activity and tax collections, and the specific tax structure of the study area is incorporated.

Another element of the fiscal assessment involved estimating the costs to various government entities associated with the undocumented population. In order to estimate these costs, The Perryman Group used the best available estimates from various sources (including the Congressional Budget Office), with updates to capture the most recent undocumented population estimates. This segment of the analysis accounted for direct services (including those for the children of undocumented residents who were born in the US), as well as indirect allocations for other services (such as public safety).

DEFINT03325

TEXAS NEEDS THE WORKERS!!
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# Detailed Sectoral Results

www.perrymangroup.com
Copyright 2016

DEFINT03326

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



| | **The Net Direct Impact of Undocumented Workers on Business Activity in Texas** (Based on Size of the Texas Economy in 2015) | | | | |
|---|---|---|---|---|---|
| **Sector** | **Total Expenditures** | **Gross Product** | **Personal Income** | **Wages & Salaries** | **Employment** |
| | *(2015 Dollars)* | *(2015 Dollars)* | *(2015 Dollars)* | *(2015 Dollars)* | *(Permanent Jobs)* |
| Agriculture | $27,741,210,063 | $10,436,704,427 | $5,188,755,240 | $1,704,282,695 | 48,271 |
| Mining | $13,514,782,856 | $5,424,108,353 | $2,010,791,105 | $710,835,920 | 8,331 |
| Construction | $62,032,901,588 | $33,750,801,108 | $26,322,462,020 | $14,267,348,361 | 265,491 |
| Nondurable Manufacturing | $96,392,192,011 | $22,947,829,554 | $9,669,303,149 | $5,700,656,799 | 104,473 |
| Durable Manufacturing | $31,323,608,299 | $12,336,385,903 | $8,604,072,851 | $6,735,166,978 | 76,543 |
| Transportation and Utilities | $12,664,583,316 | $5,889,699,352 | $3,767,770,221 | $2,258,165,473 | 44,792 |
| Information | $2,120,811,971 | $1,422,886,111 | $694,172,227 | $525,484,018 | 6,969 |
| Wholesale Trade | $6,438,117,335 | $5,117,757,602 | $3,001,572,482 | $2,296,641,062 | 24,136 |
| Retail Trade | $18,920,319,057 | $14,544,949,555 | $8,479,383,848 | $6,204,345,759 | 265,491 |
| Finance, Insurance, and Real Estate | $18,059,399,946 | $7,073,291,001 | $2,370,601,289 | $1,612,121,218 | 21,217 |
| Business Services | $17,174,176,866 | $12,909,708,111 | $11,047,728,750 | $8,380,923,714 | 135,709 |
| Health Services | $3,174,955,583 | $2,690,546,344 | $2,216,874,720 | $1,554,663,453 | 35,251 |
| Other Services | $16,499,564,276 | $10,109,223,169 | $7,176,600,474 | $4,499,549,819 | 170,104 |
| **TOTAL** | $326,056,623,169 | $144,653,890,590 | $90,550,088,375 | $56,450,185,269 | 1,206,779 |

Note: These direct benefits were quantified based on the best available information regarding employment patterns and translated into overall measures of resulting output, income, and spending based on the coefficients of the impact assessment model used in this analysis. They were fully adjusted for the wage and productivity characteristics of the relevant population.

Source: US Multi-Regional Impact Assessment System, The Perryman Group

w w w . p e r r y m a n g r o u p . c o m
C o p y r i g h t  2 0 1 6

DEFINT03327

**TEXAS NEEDS THE WORKERS!!**
**An Analysis of the Economic and Fiscal Impact of Undocumented Workers**



## The Net Total Impact (including Multiplier Effects) of Undocumented Workers on Business Activity in Texas (Based on Size of the Texas Economy in 2015)

| Sector | Total Expenditures | Gross Product | Personal Income | Wages & Salaries | Employment |
|---|---|---|---|---|---|
| | *(2015 Dollars)* | *(2015 Dollars)* | *(2015 Dollars)* | *(2015 Dollars)* | *(Permanent Jobs)* |
| Agriculture | $40,422,719,937 | $10,875,678,443 | $7,236,494,860 | $2,994,847,325 | 117,779 |
| Mining | $26,994,747,920 | $6,031,370,749 | $2,871,687,450 | $1,444,105,643 | 19,078 |
| Construction | $59,097,704,385 | $28,283,420,424 | $23,307,299,991 | $15,987,323,173 | 336,769 |
| Nondurable Manufacturing | $123,657,016,766 | $29,751,437,275 | $13,705,777,619 | $11,099,551,193 | 280,030 |
| Durable Manufacturing | $49,656,360,948 | $19,532,120,247 | $12,212,410,765 | $10,113,891,782 | 192,585 |
| Transportation and Utilities | $54,163,645,146 | $23,667,909,307 | $14,172,202,280 | $9,784,362,096 | 174,364 |
| Information | $13,055,354,869 | $7,992,542,098 | $3,476,598,814 | $2,443,748,400 | 34,974 |
| Wholesale Trade | $29,404,823,425 | $19,896,604,412 | $11,472,559,315 | $9,939,590,916 | 134,019 |
| Retail Trade | $77,028,567,505 | $56,513,372,512 | $32,631,108,018 | $26,655,867,470 | 1,065,170 |
| Finance, Insurance, and Real Estate | $87,116,353,401 | $26,725,206,733 | $9,951,880,976 | $6,986,792,114 | 104,974 |
| Business Services | $43,920,708,870 | $27,382,026,014 | $22,336,716,839 | $16,786,785,968 | 279,536 |
| Health Services | $18,014,586,924 | $12,464,695,101 | $10,539,015,161 | $8,047,031,456 | 179,069 |
| Other Services | $40,902,170,668 | $21,159,714,253 | $16,750,837,932 | $10,882,266,932 | 390,019 |
| **TOTAL** | $663,434,760,762 | $290,276,097,569 | $180,664,590,022 | $133,166,164,469 | 3,308,365 |

Note: Based on the total economic benefits of the undocumented workforce adjusted to net out costs such as education, social services, and health care.

Source: US Multi-Regional Impact Assessment System, The Perryman Group

w w w . p e r r y m a n g r o u p . c o m
Copyright 2016

DEFINT03328

**TEXAS NEEDS THE WORKERS!!**
An Analysis of the Economic and Fiscal Impact of Undocumented Workers



# The Dynamic Effects of Significantly Restricting Undocumented Workers on Business Activity in Texas

## (Based on Size of the Texas Economy in 2015)

| Sector | Total Expenditures | Gross Product | Personal Income | Wages & Salaries | Employment |
|---|---|---|---|---|---|
| | (2015 Dollars) | (2015 Dollars) | (2015 Dollars) | (2015 Dollars) | (Permanent Jobs) |
| Agriculture | ($5,927,566,884) | ($1,896,666,562) | ($1,240,288,361) | ($406,865,535) | (10,916) |
| Mining | ($1,918,054,540) | ($736,527,386) | ($365,647,342) | ($197,738,672) | (2,054) |
| Construction | ($8,023,088,588) | ($4,977,375,853) | ($4,062,539,509) | ($2,201,984,995) | (37,686) |
| Nondurable Manufacturing | ($19,424,217,696) | ($5,587,670,803) | ($2,491,557,999) | ($1,635,997,594) | (30,595) |
| Durable Manufacturing | ($7,967,757,310) | ($3,559,674,934) | ($2,210,875,148) | ($1,735,360,949) | (20,866) |
| Transportation and Utilities | ($7,327,857,832) | ($3,924,838,496) | ($2,269,782,824) | ($1,349,899,131) | (19,833) |
| Information | ($1,942,910,492) | ($1,328,917,407) | ($569,755,742) | ($432,091,676) | (3,600) |
| Wholesale Trade | ($5,203,866,384) | ($4,094,195,155) | ($2,317,440,703) | ($1,773,180,394) | (15,517) |
| Retail Trade | ($14,630,275,049) | ($12,297,443,359) | ($6,969,554,173) | ($5,036,647,862) | (141,499) |
| Finance, Insurance, and Real Estate | ($15,586,311,546) | ($4,628,688,225) | ($1,610,604,710) | ($1,135,921,986) | (11,874) |
| Business Services | ($5,802,479,427) | ($4,270,159,999) | ($3,443,877,383) | ($2,612,561,757) | (31,729) |
| Health Services | ($2,861,012,051) | ($2,370,016,620) | ($1,967,109,363) | ($1,379,506,477) | (24,071) |
| Other Services | ($8,195,675,615) | ($5,078,737,140) | ($3,952,073,391) | ($2,152,795,878) | (67,575) |
| **TOTAL** | ($104,811,073,415) | ($54,750,911,940) | ($33,471,106,649) | ($22,050,552,908) | (417,815) |

Note: Based on immigration policy that would restrict entry, have more enforcement mechanisms, and not provide a sensible approach to obtaining needed labor resources, resulting in a reduction in the pool of labor now available through undocumented workers of about 35%.

Source: US Multi-Regional Impact Assessment System, The Perryman Group

www.perrymangroup.com
Copyright 2016

DEFINT03329

# DEF-INTERV.

# EX. 131

Leo Lopez                                                        June 14, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                   BROWNSVILLE DIVISION

 4   STATE OF TEXAS, et al.,      )
                                  )
 5            Plaintiffs,         )
                                  )
 6       v.                       ) Case No. 1:18-CV-68
                                  )
 7   UNITED STATES OF AMERICA, et )
     al.,                         )
 8                                )
              Defendants,         )
 9                                )
     and                          )
10                                )
     KARLA PEREZ, MARIA ROCHA,    )
11   JOSE MAGAÑA-SALGADO,         )
     NANCI J. PALACIOS GODINEZ,   )
12   ELLY MARISOL ESTRADA, KARINA )
     RUIZ DE DIAZ, CARLOS AGUILAR )
13   GONZALEZ, KARLA LOPEZ, LUIS  )
     A. RAFAEL, DARWIN VELASQUEZ, )
14   JIN PARK, OSCAR ALVAREZ,     )
     NANCY ADOSSI, DENISE ROMERO, )
15   PRATISHTHA KHANNA, JUNG WOO  )
     KIM, ANGEL SILVA, MOSES      )
16   KAMAU CHEGE, HYO-WON JEON,   )
     ELIZABETH DIAZ, MARIA DIAZ,  )
17   and BLANCA GONZALEZ,         )
                                  )
18                                )
          Defendant-Intervenors. )
19
     _____
20
              ORAL AND VIDEOTAPED DEPOSITION OF
21
                    LEO LOPEZ
22
                 JUNE 14, 2018
23   _____

24

25
```

**For Depo Excerpts**

**Transcripts**

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 20
1  that I'm hoping to talk with you about, which is
2  Texas Education Code 25.085(b).
3                Do you see that --
4        A.  Yes, ma'am.
5        Q.   -- on the second page?
6                And you'll see that -- I'll just read the
7  part that I'm interested in aloud.
8                (As read):   Unless specifically exempted by
9  25.086, a child who is at least six years of age or who
10  is younger than six years of age and has previously been
11  enrolled in first grade and who has not yet reached the
12  child's 19th birthday shall attend school.
13                Just from taking a look at this and your
14  experience, you would agree with me that if you're a
15  student between age 6 and 19 and you haven't graduated
16  or gotten a GED, you have to go to school in
17  Texas; right?
18        A.  It -- it's my understanding that -- that
19  students have to attend school, whether that's public
20  school or private school or homeschooled.
21        Q.   Right.   And if -- so you would agree that not
22  all -- it's correct that not all students of -- of
23  school age go to Texas public school?
24        A.   That -- that's -- that's my understanding, yes.
25        Q.   And in your declaration, you talk about

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 25
1        Q.   Sure.   No problem.
2                Please explain your understanding of the
3  obligation of Texas public schools to educate
4  undocumented students.
5        A.   So my understanding, just in general, of public
6  schools' responsibilities is if a student resides in
7  their -- in their geographic boundaries and then the
8  school district is supposed to educate the student.
9                And it's my understanding that their legal
10  status is not taken into consideration in terms of
11  providing that education or -- or they -- they don't ask
12  for any sort of proof of citizenship is my
13  understanding.
14        Q.   And so with respect to undocumented students,
15  Texas doesn't track -- TEA does not track who is
16  undocumented?
17                MR. BITTER:  Objection.  Vague.
18                You can answer if you know.

19    A.   Yeah, to my knowledge, we don't -- or the
20 TEA -- excuse me -- the TEA does not.
21        **Q.   (BY MS. MORENO)   And with respect to**
22 **undocumented students, Texas doesn't track which**
23 **students have DACA?**
24    A.   To my knowledge, that's -- can you -- can you
25 spell out DACA for me.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page: 25**
1        **Q.   Sure.   No problem.**
2                **Please explain your understanding of the**
3 **obligation of Texas public schools to educate**
4 **undocumented students.**
5    A.   So my understanding, just in general, of public
6 schools' responsibilities is if a student resides in
7 their -- in their geographic boundaries and then the
8 school district is supposed to educate the student.
9                And it's my understanding that their legal
10 status is not taken into consideration in terms of
11 providing that education or -- or they -- they don't ask
12 for any sort of proof of citizenship is my
13 understanding.
14        **Q.   And so with respect to undocumented students,**
15 **Texas doesn't track -- TEA does not track who is**
16 **undocumented?**
17                MR. BITTER:   Objection.   Vague.
18                You can answer if you know.
19    A.   Yeah, to my knowledge, we don't -- or the
20 TEA -- excuse me -- the TEA does not.
21        **Q.   (BY MS. MORENO)   And with respect to**
22 **undocumented students, Texas doesn't track which**
23 **students have DACA?**
24    A.   To my knowledge, that's -- can you -- can you
25 spell out DACA for me.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page: 27**
1    A.   Based on my understanding, yes, I would agree.
2        **Q.   And you'd agree that Texas doesn't track how**
3 **many students -- how many -- how many of its public**
4 **school students have DACA?**
5    A.   Yes, I would -- I would agree that -- that TEA
6 does not track that information.
7        **Q.   And so because Texas does not track how many**
8 **students have DACA, you're not aware how many DACA**
9 **recipients in Texas are school aged?**
10    A.   That's correct; I am not aware.
11        Q.   And it's correct, isn't it, that undocumented
12 students can't get DACA when they're under 15 years old?
13                MR. BITTER:   Objection.   Speculation.

14      A.   I -- I don't know.
15      **Q.   (BY MS. MORENO)   Okay.**
16           **(Exhibit 4 marked.)**
17      **Q.   (BY MS. MORENO)   I'd like to hand you what I'm**
18  **marking as Exhibit 4.   And this is -- this is just to**
19  **help us along the conversation.**
20           MS. PERALES:   I apologize.   We have a
21  complicated choreography with respect to marking
22  exhibits, and it's entirely my fault.   Sorry.
23           THE WITNESS:   That's okay.
24      **Q.   (BY MS. MORENO)   Have you ever seen this --**
25  **this document before?**

 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 30
1  under 15 -- I'm sorry -- 15 or over?
2      A.   I don't have any personal knowledge of any
3  middle school students 15 or older, no.
4      **Q.   Is it fair to say that you can't put a number**
5  **of DACA students who are in Texas public schools right**
6  **now?**
7      A.   Yes, that's fair.
8      **Q.   Would it -- would you also agree that you can't**
9  **put a number on how much money Texas spends on DACA**
10  **students in Texas?**
11      A.   On -- I'm sorry.   Can you repeat that question.
12      **Q.   Is it also fair to say that you can't put a**
13  **number on how much money Texas pays for DACA students in**
14  **Texas?**
15           MR. BITTER:   Objection.   Vague.   Objection.
16  Foundation.
17           You can answer if you know.
18      **Q.   (BY MS. MORENO)   Is it fair to say that you**
19  **can't put a number on how much money Texas pays in Texas**
20  **public schools for DACA students?**
21           MR. BITTER:   Same objections.
22      A.   Is it --
23      **Q.   (BY MS. MORENO)   You can go ahead and answer.**
24      A.   Oh.   Again, my declaration was on the
25  unaccompanied children, so I don't know if it's a

 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 31
1  different population.
2      **Q.   And we'll talk about that --**
3      A.   Okay.
4      **Q.   -- in just a little bit.**
5      A.   Okay.
6      **Q.   I'll have some questions for you on that.**
7           **But right now my question is:   Would I be**

8  **correct to say that Texas cannot put a number on how**
9  **much it pays for DACA -- to educate DACA students in**
10  **Texas?**
11         MR. BITTER:   Same objections.
12      A.  So I don't have -- I don't have personal
13  knowledge of -- of the DACA counts or numbers of
14  students, so I can't tell you if we have that
15  information somewhere else.   I could tell you that we
16  could certainly estimate the cost if we had estimated
17  numbers of DACA students.
18      **Q.  (BY MS. MORENO)   So you mentioned...**
19         **Is it fair to say that you cannot tell me**
20  **today how much Texas pays to educate DACA students?**
21      **A.   That's fair.**
22      **Q.   You mentioned unaccompanied children in your**
23  **declaration.**
24      A.  Yes, ma'am.
25      **Q.   Will you turn with me to your declaration to**

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 33
1  the website, but are you aware that unaccompanied
2  children includes children between -- as -- as young as
3  just born to up to 18 years old?
4      A.  I -- I -- I don't remember seeing that, no.
5      **Q.   Okay.**
6         (Exhibit 5 marked.)
7         (Counsel conferring.)
8      **Q.  (BY MS. MORENO)   I'm going to hand you what I'm**
9  **marking as Exhibit 5.**
10         **So I'm handing you what I've marked as**
11  **Exhibit 5.   And I represent to you that I printed this**
12  **document from the Office of Refugee Resettlement.   So**
13  **same main website that you went to --**
14      A.  Okay.   Okay.
15      **Q.   -- but a different page.   And you'll see that,**
16  **at the very top, it has "Facts and Data."**
17      A.  Yes, ma'am.
18      **Q.   And can you look at the top where it says**
19  **"Age"?**
20      A.  Yes.
21      **Q.   And you see that the first row, under -- under**
22  **"Age," it is age zero to 12.**
23         **Do you see that?**
24      A.  Yes.
25      **Q.   And do you see that, for fiscal year 2017,**

**Page:** 34
1  **17 percent of all unaccompanied children were age zero**
2  **to 12?**
3      A.  Yes.
4      **Q.   And we don't know how -- from this document,**
5  **how that group is broken down; right?**
6      A.  That's correct.

7    **Q.   But we can tell that the category includes**
8  **unaccompanied children that are ages zero to four?**
9        **A.   Yes.**
10        Q.   And Texas doesn't provide education services to
11  all children under the age of five; correct?
12        A.   That's -- that's correct.
13        Q.   And it's true that the number of unaccompanied
14  children cited in your declaration is not representative
15  of the number of unaccompanied children who actually
16  attend Texas schools; correct?
17              MR. BITTER:   Objection.   Speculation.
18        A.   Can you repeat the question so I can be sure
19  what you're asking.
20        Q.   (BY MS. MORENO)   So you mentioned earlier that
21  not all students of school age in Texas attend public
22  school.
23        A.   That's correct.
24        Q.   And so it is correct that not all unaccompanied
25  children of school age attend Texas public

📄 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 35
1  schools; correct?
2        A.   I don't --
3              MR. BITTER:   Objection.   Speculation.
4        A.   I don't know one way or the other.
5        Q.   (BY MS. MORENO)   So is it fair to say that you
6  cannot tell us what proportion of unaccompanied children
7  go to Texas public schools?
8        A.   If -- so in Texas public schools, over
9  5 million students -- I mean -- I'm sorry -- in Texas,
10  over 5 million students attend public schools.   And then
11  maybe another 100,000 -- or maybe 3- to 500,000, we
12  estimate, attend private or public school -- or private
13  or homeschool, we estimate.
14              And so it -- it would be reasonable to sort
15  of assume a similar breakdown, if not more towards --
16  for the UAC students, it would be -- or -- I mean for
17  DACA students.   I'm sorry.   Was that your question?
18  DACA or UAC?
19        Q.   UAC.   And so --
20        A.   Yeah.   Yeah.   It would be reasonable to assume
21  that -- that most of those students would have attended
22  public school.
23        **Q.   But it would be fair to say that you would not**
24  **know of what proportion of unaccompanied children attend**
25  **public schools in Texas?**

**Page:** 36
1        **A.   Yes, that would be fair.**
2        **Q.   And it's true that you don't track whether any**
3  **unaccompanied children are homeschooled in Texas?**
4        **A.   That's true; we do not.**
5        **Q.   And -- and it's true that you don't track**

6  **whether -- what proportion of unaccompanied children**
7  **attend private schools?**
8         A.   That's correct; the TEA does not track that.
9         **Q.   If you'll just be patient with me, I'm going to**
10 **turn back to your declaration.**
11                So if you'll turn to paragraph 4.
12        A.   Yes.
13        **Q.   And would you mind reading the second -- your**
14 **second sentence there.   Would you mind reading your**
15 **second sentence there.**
16        A.   (As read):   However, I am aware that data from
17 the U.S. Health and Human Services Office of Refugee
18 Resettlement indicates that 3,272 UAC were released to
19 sponsors during the 12-month period covering
20 October 2014 through September 2015, 6,550 UAC were
21 released to sponsors during the 12-month period covering
22 October 2015 through September 2016, and 5,374 UAC were
23 released to sponsors during the 12-month period covering
24 October 2016 through September of 2017.
25        **Q.   Thank you.**

📄 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 37
1                And is it correct to say that some of these
2  unaccompanied children are released in Texas and some
3  are not?
4                MR. BITTER:   Objection.   Vague.   Objection.
5  Speculation.
6         A.   So what I attempted to convey in this sentence
7  was based on the data I saw on the -- on the website
8  referenced earlier, was that all these counts were
9  released to sponsors.
10       **Q.   (BY MS. MORENO)   Can you provide the number of**
11 **unaccompanied children who remained in Texas after being**
12 **released to sponsors?**
13       A.   Can you rephrase the question?   Because I'm not
14 sure I understand.
15       **Q.   Sure.**
16              **Can you provide the number of unaccompanied**
17 **children who -- who stayed in Texas after being released**
18 **to sponsors?**
19       A.   I made the assumption that -- in my
20 declaration, that those sponsors in Texas, that those
21 students remained in Texas, for purposes of my
22 estimates.
23       **Q.   And so you're not aware of the number of**
24 **unaccompanied children who, after being released to**
25 **sponsors in Texas, remained in Texas?**

📄 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 38
1      A.   No, I am not.
2      **Q.   You would agree that unaccompanied children**
3   **enrolled in Texas public schools and DACA recipients**
4   **enrolled in Texas public schools are -- are two separate**
5   **categories of -- of students; correct?**
6      A.   I would agree that -- yes, that -- that
7   they're -- that they represent a different population or
8   it's a subset.
9      **Q.   And when drafting your declaration, why did you**
10   **decide to use unaccompanied children as -- as a point of**
11   **reference for this case?**
12      A.   So as -- as mentioned before, we don't collect
13   the -- the status of students or the DACA status or how
14   many are enrolled, but we do -- but this information is
15   publicly available from the federal government.   And so
16   you use -- this was sort of used as sort of a proxy to
17   sort of demonstrate the financial costs associated
18   with -- with DACA.   You know, you use -- again, using
19   this as a proxy for it, you know, and then make --
20   making certain assumptions about the programs that would
21   be eligible for, coming up with a cost for the public
22   education system in Texas.   So that -- that's why we --
23   that's why I used UAC.
24      **Q.   And so I heard you say you don't collect**
25   **DACA -- the number of DACA students, and you don't**

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 39
1   collect the number of undocumented students.
2      A.   That's right.
3      **Q.   Okay.   Are there any other assumptions -- you**
4   **said you -- you intended unaccompanied children to be a**
5   **proxy for DACA.   Are there any other assumptions that**
6   **you made in -- in drafting the declaration?**
7      A.   I mean -- so I assumed that they would -- that
8   they would all be attending the Texas public school
9   system.   And I assumed that each of these students would
10   be eligible for additional bilingual and compensatory
11   education, weighted funding.   And I would assume that
12   they would be in attendance for the entire school year
13   for -- for each of the years.
14      **Q.   And when you say "they," you mean unaccompanied**
15   **children?**
16      A.   Yes.   I'm sorry.   UAC.
17      **Q.   So what -- what is the overlap, then, between**
18   **unaccompanied children and DACA student populations in**
19   **Texas?**
20            MR. BITTER:   Objection.   Speculation.
21   Objection.   Vague.
22      A.   I don't know enough about the two to give, I
23   think, a -- a response you're looking -- might be
24   looking for.

25       Q.   (BY MS. MORENO)   Okay.   So it's fair to say

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 42
1        Q.   -- which is marked as Exhibit 5.
2        A.   Okay.
3        Q.   And the -- you understand the age breakdown for
4    unaccompanied children --
5        A.   Yes.
6        Q.   -- is from zero to -- to 15?
7        A.   Yes.
8        Q.   Seventeen.   I'm sorry.
9             And the last thing that we talked about is
10   what -- what's been marked as Exhibit 4, is that, to --
11   to be eligible for -- for DACA, by definition, looking
12   under the age guidelines, you have to be at least
13   15 years or -- or older just to request DACA.
14       A.   Right.
15             MR. BITTER:   Objection.   Speculation.
16       A.   I do see that sentence there.   It says that.
17       Q.   (BY MS. MORENO)   And if you go to the bottom
18   of -- of that page, it says -- do you see where, in the
19   table at the very bottom, it says you must
20   demonstrate -- and this is related to DACA -- that you
21   have resided continuously in the United States since
22   June 15th, 2007?
23       A.   Yes, I see that.
24       Q.   And if you go back to the ORR report.   So if
25   you go back to Exhibit 5 --

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 43
1        A.   Yes.
2        Q.   -- and under the first row, under "Age," it
3    goes -- it breaks down the unaccompanied children by the
4    years of entry; correct?
5        A.   Correct.   But you mean by -- by age-groups?
6        Q.   All right.   So within each age-group, it -- it
7    breaks down the -- how old somebody was, but by the year
8    that they entered the United States.
9        A.   Yes, ma'am.
10       Q.   And so you would agree with me that none of the
11   unaccompanied children in your analysis can be DACA
12   recipients; correct?
13             MR. BITTER:   Objection.   Speculation.
14       A.   So I don't -- so I don't know whether or not
15   any of the counts that I used from the OO -- ORR website
16   overlap with DACA.   But, again, knowing that,
17   presumably, DACA recipients were in the public school
18   system prior -- you know, prior to -- like, right here,

19  being under age of 31 as of 2012 -- for me, use --
20  again, using the UAC counts were a way to try to get a
21  proxy for those counts.   Because even if it -- even if I
22  think what you're saying is that the DACA recipients are
23  older than the -- than the counts I used, I think at one
24  point they were in public -- they were -- many of them
25  were in public school.   And so using current estimates

**Page: 44**
1  or current counts, again, would be a reasonable proxy
2  for that.
3       Q.   (BY MS. MORENO)   So what -- what I'm looking at
4  and what I'd ask you to look at with me is, on
5  Exhibit 5, the unaccompanied children that -- that you
6  looked at for your analysis --
7       A.   Uh-huh.
8       Q.   -- the dates of -- the years of entry go back
9  here from fiscal year 2017 back to fiscal year
10  2012; right?
11       A.   Yes.
12            MR. BITTER:   Objection.   Speculation.
13  Okay.
14       A.   It -- that -- it appears so, yes.
15       Q.   (BY MS. MORENO)   Okay.   And so you would agree
16  with me that none of the unaccompanied children here in
17  your analysis can be DACA recipients?
18            MR. BITTER:   Objection.   Speculation.
19  Objection.   Asked and answered.
20       A.   I don't know that I can say that because we
21  don't track -- again, we don't track status.
22       Q.   (BY MS. MORENO)   So let's -- let's go back to
23  Exhibit 4.
24       A.   Sure.
25       Q.   On page 3.

**Page: 45**
1       A.   Okay.
2       Q.   At the very bottom, can you read aloud what's
3  in the second column.
4       A.   (As read):   As of the date you filed your
5  request, you have resided continuously in the U.S. since
6  June 15, 2007.
7       Q.   And this is for DACA; correct?
8       A.   Yes.
9       Q.   These are the DACA guidelines.
10            And so you -- you'd agree with me that
11  to -- to be eligible for DACA, you have to have lived in
12  the U.S. since at least 27 -- 2007?
13            MR. BITTER:   Objection.   Speculation.
14       A.   Based on this document, that's what it appears
15  to me.   So going off of this, I would agree with that
16  statement.
17       Q.   (BY MS. MORENO)   Okay.   Thank you.
18            And then going back to Exhibit 5, I
19  understand that you've testified that you used
20  unaccompanied children as a proxy for DACA.

21     A.   Yes.
22        Q.   But I -- but I still need an answer.
23            Would you agree with me that none of the
24  unaccompanied children here on Exhibit 5 can be DACA
25  recipients?

📄 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 46
1              MR. BITTER:   Objection.   Speculation.
2      A.   Not -- not knowing the full breadth of DACA in
3  general, I mean, I don't -- I can't definitively say
4  that the students in Exhibit 5 can't be DACA because I
5  don't know if there's exceptions or -- I mean, I only
6  read that one -- few sentences on here.
7        Q.   (BY MS. MORENO)   So going back to your
8  declaration --
9      A.   Yes.
10       Q.   -- Exhibit 2, under Paragraph 4 --
11     A.   Uh-huh.
12       Q.   -- you -- you wrote that the unacc- -- you
13  wrote that the unaccompanied children that you looked at
14  were -- were released to sponsors during the three
15  different time periods; correct?
16     A.   Yes.
17       Q.   October 2014 being the earliest time
18  period; correct?
19     A.   In my declaration, yes.
20       Q.   And then you just testified that your
21  understanding is that, for DACA, you have to have
22  continuously resided in the country since 2007?
23     A.   I -- yes, I read that statement in Exhibit 4.
24       Q.   And so it's correct that the unaccompanied
25  children that you looked at, that you wrote about in

📄 Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 51
1  that you analyzed were DACA recipients, they would have
2  had to have been in the United States for at least seven
3  years?
4              MR. BITTER:   Objection.   Speculation.
5  Objection.   Vague.
6      A.   That -- that sounds right.
7        Q.   (BY MS. MORENO)   And so assume with me that --
8  that unaccompanied -- the unaccompanied children that
9  you were looking at in --
10     A.   Exhibit 6.
11       Q.   -- Exhibit 6 entered the United States the year
12  that they are recorded.
13     A.   Okay.   Do you want me to make that assumption?
14     Q.   Please.
15     A.   For the -- okay.

16      **Q.   You would agree that, under that assumption,**
17 **none of the 3,272 children that you looked at here**
18 **could -- could be a DACA recipient; correct?**
19           **MR. BITTER:   Objection.   Speculation.**
20      **A.   Right.   So assuming that they entered the**
21 **country in 2014 and then were released to sponsors in**
22 **2014, based on my understanding of DACA from this**
23 **Exhibit 4, I would agree with you that none of the 3,272**
24 **would be eligible for DACA based on the assumption that**
25 **we sort of agreed to just now.**

**Page:** 52
1      **Q.   (BY MS. MORENO)   And that would be correct for**
2 **the rest of the children in your analysis in**
3 **Exhibit 6; correct?**
4           **MR. BITTER:   Objection.   Speculation.**
5 **Objection.   Vague.**
6      **A.   If -- if we go with the assumption that you**
7 **asked me to agree to, then yes, I would -- I would --**
8 **that seems that they would not be DACA recipients.**
9           MR. BITTER:   Celina, when we have a
10 stopping point, can we take a short break.
11           MS. MORENO:   Sure.   Do you want to do that
12 now?
13           MR. BITTER:   This is good.
14           MS. MORENO:   We'll go off the record.
15           (A recess was taken from 10:14 a.m.
16            to 10:29 a.m.)
17           MS. MORENO:   We're ready to go back on the
18 record, and New Jersey wanted to make an announcement.
19           New Jersey, are y'all there.
20           MR. DOLINSKY:   Yes.   I just -- I just
21 wanted to note for the record -- again, this is
22 Nicholas Dolinsky with the State of New Jersey -- that
23 my last pro hac application is submitted, and I just
24 wanted to put that on the record.
25           Thank you.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 59
1 breakdown, and they seem to be different sources of --
2 of State funds; is that right?
3      A.   That's right.
4      **Q.   So one of the ones I see here is property tax**
5 **relief fund.**
6      A.   Yes.
7      **Q.   And you just mentioned that property taxes are**
8 **a local share.   Can you -- can you help me wrap my head**
9 **around that?**
10      A.   Sure.   So this -- this was a fund established,
11 I believe, in 2006, if I'm not mistaken, as -- called
12 the franchise tax or -- or the margins tax, as other
13 people refer to it.   And it -- it was a -- it was a -- a
14 new tax established to help pay for a reduction of

15  property taxes which occurred in 2006, beginning with
16  the 2006/'07 school year.
17            So even though it has the words "property
18  tax" in it, it's -- these aren't local property taxes.
19       Q.  Okay.   Thank you.
20       A.  Sure.
21       Q.   So can you walk me through, then, the
22  different -- each of these sources of State funds?   So
23  starting with the foundation fund, you -- you mentioned
24  that it's a set of formulas.   How is that revenue
25  generated?

**Page:** 60
 1       A.   It's largely -- largely funded -- the
 2  Foundation School Fund, the first -- the first row is
 3  largely driven by sales taxes.   There's a few other
 4  items in there, but the -- the large funding source
 5  would be sales tax from the State.
 6       Q.   So it says funded by sales taxes and then it
 7  says "occupation taxes" and then "revenue."
 8            Is -- is that supposed to be occupation
 9  revenue or is revenue something else?
10       A.  Yeah.   Occupation taxes and revenue, yes.
11       Q.  Okay.   And then if we go to recapture --
12       A.  Yes.
13       Q.   -- can you -- can you explain how that is
14  generated?
15       A.  Appropriate receipts, or otherwise known as
16  recapture, is authorized in chapter 41 of the education
17  code.   And what that is is certain districts that have
18  a -- a wealth per student that exceed a certain
19  threshold, instead of receiving State -- instead of
20  receiving funds from the State, they're actually
21  required to remit a certain portion of their local
22  collections that are generated.   And that gets sent back
23  to the State treasury, which is then used to finance the
24  Foundation School Program for other districts that --
25  that receive State aid.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 61
 1            So it -- it's a method of financing, just
 2  like lottery, just like sales tax, just like Available
 3  School Fund.   So it -- it starts off as local property
 4  taxes and then it gets sent to the State and then it's
 5  State revenue, and it's redistributed that way.
 6       Q.   So the origin of the appropriated receipts are
 7  local, but then are sent to the State and considered
 8  State funds; correct?
 9       A.  Yes, ma'am.
10       Q.  Okay.   How about the Available School Fund?
11       A.   That's primarily funded with -- that's
12  primarily funded from the permanent school fund.   And so
13  there's distributions that come from the permanent

14 school fund as well as a motor fuels tax revenue.
15            And then I think the general land office,
16 just recently, in the last few years, started
17 trancing -- transferring certain funds so they can all
18 comprise to facilitate the Available School Fund.
19      Q.  And the general land office, what -- what type
20 of funding is that?
21      A.  That's another State agency.
22      Q.  And when you say motor -- motor fuels tax,
23 like, are we talking about something that we all pay?
24      A.  I believe so.  Some of these questions are
25 more -- I think the -- the comptroller's office could

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 61
1            So it -- it's a method of financing, just
2 like lottery, just like sales tax, just like Available
3 School Fund.   So it -- it starts off as local property
4 taxes and then it gets sent to the State and then it's
5 State revenue, and it's redistributed that way.
6      Q.  So the origin of the appropriated receipts are
7 local, but then are sent to the State and considered
8 State funds; correct?
9      A.  Yes, ma'am.
10      Q.  Okay.   How about the Available School Fund?
11      A.  That's primarily funded with -- that's
12 primarily funded from the permanent school fund.   And so
13 there's distributions that come from the permanent
14 school fund as well as a motor fuels tax revenue.
15            And then I think the general land office,
16 just recently, in the last few years, started
17 trancing -- transferring certain funds so they can all
18 comprise to facilitate the Available School Fund.
19      Q.  And the general land office, what -- what type
20 of funding is that?
21      A.  That's another State agency.
22      Q.  And when you say motor -- motor fuels tax,
23 like, are we talking about something that we all pay?
24      A.  I believe so.  Some of these questions are
25 more -- I think the -- the comptroller's office could

**Page:** 62
1 explain it a little better.  But yes, that -- that's for
2 fuels taxes for fuel.
3      Q.  And then the lottery proceeds, I guess just
4 those of us who are dumb enough to play the lottery and
5 lose over and over again.
6      A.  The -- the lottery proceeds are -- again, as
7 noted in the slide, 60 percent of net proceeds get
8 transferred from the Texas Lottery Commission over to
9 the FSP.
10      Q.  Some day.
11            Okay.   So anything else?   Aside -- is this
12 an exhaustive list of the appropriation?

13      A.   For the -- for the Foundation School Program,
14 it is, but it's not an exhaustive -- an exhaustive list
15 of K12 spending.   So there is other items, you know,
16 like instruction materials or certain State grants.   But
17 in terms of the FSP, in terms of the entitlements, yes,
18 this would be the -- the major sources of State funds
19 for that.
20      **Q.   And federal funds are not included**
21 **here; correct?**
22      A.   That's correct.
23      **Q.   And -- and aside from the -- you mentioned in**
24 **your declaration State and local share.**
25      A.   Yes.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 88
1                  MS. MORENO:   Can you mark this as
2 Exhibit 13.
3                  MS. PERALES:   How many pages?
4                  MS. MORENO:   Just one.
5                  (Exhibit 13 marked.)
6                  MS. PERALES:   This is 13.
7      **Q.   (BY MS. MORENO)   So what -- do you recognize**
8 **that document?**
9      A.   Yes, I think -- I think it's a document that
10 the division of state funding publishes on our website,
11 on the TEA website.   Excuse me.
12      **Q.   And what is the name of the document?**
13      A.   Foundation School Program, FSP, Revenues By
14 Year, Local Versus State Funding Share Percentages.
15      **Q.   And what is -- what -- looking at that**
16 **document -- I'll give you a second to look at it.**
17 **What -- what does that tell you about the trends and**
18 **local and State shares over time?**
19      A.   In -- well, one trend is that overall funding
20 levels are -- are growing.   And then second trend is
21 that, over the last, say, four or five years, it looks
22 like -- it looks like the local -- it looks like the
23 local percent share of local -- excuse me -- it looks
24 like the percentage of local revenue is increasing while
25 the percentage of State revenue is decreasing.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 89
1      **Q.   And what are the -- what are the implications**
2 **of that to your experience?**
3      A.   Can you rephrase.
4      **Q.   What does that look -- what is -- what are the**
5 **implications of -- of that -- those two trends**
6 **working --**

7          MR. BITTER:  Objection.
8      **Q.  (BY MS. MORENO)  -- side by side together?**
9          MR. BITTER:  Sorry.
10         Objection.  Vague.  Objection.
11 Speculation.
12     A.  To me, that just shows that the formulas are
13 functioning as intended.  Totals -- I mean the formulas
14 in Texas are guaranteed an entitlement, you know, for --
15 for every student or for every district.  And it's --
16 it's going to be some combination of State and local
17 funds.  And so the number that -- so the fact that
18 the -- the percentages are shifting between one -- local
19 property taxes versus State taxes doesn't really have
20 any implication to me.  The local total revenue is -- is
21 increasing along with student growth.
22     **Q.  (BY MS. MORENO)  And based on -- on that course**
23 **over time, do you -- do you see -- are you projecting**
24 **that the State share funding's going to continue to**
25 **decline?**

**Page:** 90
1          MR. BITTER:  Objection.  Speculation.
2 Objection.  Vague.
3     A.  So assuming nothing else changes and property
4 values continue to grow, all else being equal, State
5 share would decline.  However, you do have increasing
6 student counts each biennium.  So that also plays a
7 role.
8          MS. MORENO:  Counsel, can we take a break?
9          MR. BITTER:  Yes.
10         (A recess was taken from 11:29 a.m.
11          to 11:46 a.m.)
12         (Whereupon Adam Bitter exits the
13          proceedings.)
14         MS. MORENO:  We're going back on the
15 record.  Hi, New Jersey and Daniel.
16     **Q.  (BY MS. MORENO)  I just have a few more**
17 **questions.**
18     A.  Okay.
19     **Q.  I wanted to go through the 2017/18 statewide**
20 **summary of finance.**
21     A.  Sure.
22     **Q.  And I see on that -- on that document the first**
23 **column is labeled "LPE."**
24     A.  Yes.
25     **Q.  And the second is labeled "DPE."  Can you tell**

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 93
1 said, that's the sum of -- of lines 47 and 48.
2     A.  Fifty-three is the sum -- 53 is the sum of 47
3 through 52.  So that one would include facilities
4 funding.
5     **Q.  Okay.  Okay.**

6     A.   So the other -- that -- that number includes
7 numbers that I did not use in -- in my analysis.
8        Q.   Okay.   Okay.   I see.
9             So the -- the -- the drop from the -- at
10 line 53, the total FSP/ASF State aid.   So there's a drop
11 between LPE here and the DPE; correct?
12     A.   Correct.
13     ==Q.   And does that mean that you're currently==
14 ==anticipating that the settle-up is going to go in the==
15 ==State's favor?==
16     ==A.   Based on -- as of March, yes, as of -- as of==
17 ==this document, that's what that looks like.==
18        Q.   And have you done any reports since then?
19     A.   These get published automatically whenever the
20 State funding division run -- creates a run is what --
21 what it's called.   And so I'm fairly certain that
22 there's been new reports since March 9th.
23        Q.   And those are all online?
24     A.   Yes, they're all -- they're all online.
25        Q.   Okay.   Thank you.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 96
1 what it had been.   So it -- it might be up or down a few
2 million from 143 million, but not -- not materially
3 different I guess is what I'm trying to say.
4        Q.   But still a deficit?
5     A.   Yes, ma'am.
6        Q.   And so that changes month to month,
7 though; correct?
8     A.   Yes, ma'am.   Uh-huh.
9        Q.   And how -- how big is the overall education
10 system funding?
11     A.   So it -- it's the 20-odd billion, you know,
12 that we've been talking about.   You mean on the State
13 portion?   Yes.
14        Q.   So you'd agree that 143.4 million, in relation,
15 is -- is a fairly small portion of that?
16        MR. DISHER:   Objection.   Form.
17     A.   It -- I haven't calculated what the percentage
18 is.
19     ==Q.   (BY MS. MORENO)   Does the -- is it -- is it==
20 ==pretty normal for the -- the 143.4 million deficit --==
21 ==for -- for that amount, for that estimate, to go up and==
22 ==down from surplus to deficit pretty regularly?==
23     ==MR. DISHER:   Objection.   Vague.==
24     ==Go ahead.==
25     ==A.   Within -- within the school year, it can vary.==

**Page:** 97
1 ==Typically -- you know, and in between school years,==
2 ==certainly it can vary from deficit.   So in one year, we==
3 ==might have a surplus and then another year we could have==
4 ==a deficit.   It just depends on the given school year.==
5        Q.   (BY MS. MORENO)   If the settle-up that we

6  **discussed earlier does, in fact, go in the State's**
7  **favor, could the State expect to recuperate all or part**
8  **of those funds next fall?**
9             MR. DISHER:  Objection.  Vague.  Objection.
10  Speculation.
11       A.   So assuming that there is a overall net
12  overpayment to school districts that's owed back to the
13  State, then yes, the State would -- in Foundation School
14  Fund, then the State would recoup those funds.   But --
15  but the settle-up is sort of different from the deficit
16  that we've been talking about.
17       **Q.   (BY MS. MORENO)   So -- so talking about the**
18  **settle-up and going back to the 2017/2018 statewide**
19  **summary finances, under the LPE columns for Foundation**
20  **School Fund, line 47 -- are you with me there?**
21       A.   Yes.
22       **Q.   Looking at the LPE figure compared to the DPE**
23  **figure, you see that there has been a drop; correct?**
24       A.   Correct.
25       **Q.   But the appropriations were made based on the**

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 100
1  if their DPE number is higher and we've underpaid them
2  during the year, then we will issue them a lump sum
3  payment by the end of September and make them whole
4  for -- for the entitlement.
5       **Q.   So as it stands from March 9th, 2018, the --**
6  **the State is -- is projected to recoup funds, correct,**
7  **based on the -- the line 47, the foundation --**
8       A.   Yes.   Yes.   The net -- the net settle-up would
9  be in the State's favor.
10             MS. MORENO:   I pass the witness.
11             MR. DISHER:   All right.   Thank you.
12  Mr. Lopez, I have a few follow-up questions for you.
13             EXAMINATION
14  BY MR. DISHER:
15       **Q.   Does the State --**
16             MS. PERALES:   I'm sorry.   I didn't mean to
17  interrupt --
18             MR. DISHER:   Oh, New Jersey.
19             MS. PERALES:   -- but did you want to
20  possibly let New Jersey ask --
21             MR. DISHER:   Yes, of course.   Thank you for
22  reminding me.
23             MS. PERALES:   I made eye contact with
24  Mr. Robins.
25             MR. DOLINSKY:   Hello.

Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 102
1  officials to address concerns they may have about the
2  care or impact of unaccompanied alien children in their
3  states, while making sure the children are treated
4  humanely and consistent with the law as they go through

5  immigration court proceedings that will determine
6  whether they will be removed and repatriated or qualify
7  for some form of relief.
8      **Q.   So, then, isn't it true that, as these -- these**
9  **unaccompanied alien children are being transferred to**
10 **sponsors, they are going through court proceedings where**
11 **they'll either be removed, repatriated, or qualify for**
12 **some other relief?**
13             MR. DISHER:   Objection.   Form.   Objection.
14 Speculation.
15     A.   That's what the state -- that's what the
16 sentence -- sentence says.
17     **Q.   (BY MR. DOLINSKY)   In your -- did you account**
18 **at all for any deportations of the unaccompanied**
19 **children in any of your calculations for paragraph 4?**
20             MR. DISHER:   Objection.   Vague.
21     A.   No.
22     **Q.   (BY MR. DOLINSKY)   Did you account for -- are**
23 **there any unaccompanied children were -- who received**
24 **any other legalized status -- for example, asylum or**
25 **refugee status -- in paragraph 4, specifically for the**

**Page:** 103
1  **time period covering October 2014 to September 2015,**
2  **October of 2015 to September of 2016, and October of**
3  **2016 to September 2017?**
4             MR. DISHER:   Objection.   Vague.
5      A.   I -- I simply used the numbers that were
6  provided on that Web page to do my analysis.   I did not
7  adjust those numbers in any way.
8      **Q.   (BY MR. DOLINSKY)   So is it correct, then, that**
9  **you didn't account for whether any of the unaccompanied**
10 **children were returned to the custody of family in their**
11 **home country?**
12             MR. DISHER:   Objection.   Asked and
13 answered.
14             MR. DOLINSKY:   Just to clarify, the prior
15 question asked as to whether he accounted for a
16 legalized status.
17     A.   Again --
18             MR. DISHER:   Objection.   Vague.
19     A.   Again, I didn't adjust any of the numbers that
20 were provided on the Web page for those enrolled.
21     **Q.   (BY MR. DOLINSKY)   And you -- and you did not**
22 **account for whether any of the children left the state,**
23 **correct, after being transferred to a sponsor?**
24             MR. DISHER:   Objection.   Asked and
25 answered.

📄  Jun 14, 2018 Lopez, Leo (6_14_2018)

**Page:** 112
1      **Q.   All right.   Mr. Lopez, earlier, I believe you**

2 were asked whether TEA can tell how much Texas pays to
3 educate DACA students.   Let me just ask you a more
4 granular question than that.   Can TEA estimate the cost
5 to the State of Texas to educate each individual student
6 in Texas public schools?
7       A.   So if you're asking can we calculate for a
8 particular student or...
9       Q.   On average.
10       A.   On average.   Yes, on average.
11       Q.   So TEA can calculate or estimate, on average,
12 what the State incurs to educate each student in its
13 public education system?
14       A.   Yes.
15       Q.   All right.   If a student had DACA status, would
16 that estimate apply to the -- to that DACA student?
17       A.   Yes.
18                MR. DISHER:   I have nothing further.
19                FURTHER EXAMINATION
20 BY MS. MORENO:
21       Q.   We just have one more question, a long
22 question.
23       A.   Okay.
24       Q.   So our only question is:   Is it fair to say
25 that if an undocumented student is in the public school

**Page:** 113
1 system that Texas would pay the same amount for that
2 student's education regardless of whether that student
3 has DACA?
4       A.   That's fair.
5                MS. MORENO:   Nothing further.
6                MS. PERALES:   We reserve the remainder of
7 our questions for the time of trial.
8                (Deposition concluded at 12:19 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                   BROWNSVILLE DIVISION

 4  STATE OF TEXAS, et al.,      )
                                 )
 5          Plaintiffs,          )
                                 )
 6       v.                      ) Case No. 1:18-CV-68
                                 )
 7  UNITED STATES OF AMERICA, et )
    al.,                         )
 8                               )
            Defendants,          )
 9                               )
    and                          )
10                               )
    KARLA PEREZ, MARIA ROCHA,    )
11  JOSE MAGAÑA-SALGADO,         )
    NANCI J. PALACIOS GODINEZ,   )
12  ELLY MARISOL ESTRADA, KARINA )
    RUIZ DE DIAZ, CARLOS AGUILAR )
13  GONZALEZ, KARLA LOPEZ, LUIS  )
    A. RAFAEL, DARWIN VELASQUEZ, )
14  JIN PARK, OSCAR ALVAREZ,     )
    NANCY ADOSSI, DENISE ROMERO, )
15  PRATISHTHA KHANNA, JUNG WOO  )
    KIM, ANGEL SILVA, MOSES      )
16  KAMAU CHEGE, HYO-WON JEON,   )
    ELIZABETH DIAZ, MARIA DIAZ,  )
17  and BLANCA GONZALEZ,         )
                                 )
18                               )
        Defendant-Intervenors.   )
19

20              REPORTER'S CERTIFICATION

21                ORAL DEPOSITION OF

22                    LEO LOPEZ

23                  JUNE 14, 2018

24       I, CANDICE ANDINO, Certified Shorthand Reporter in

25  and for the State of Texas, hereby certify to the
```

Leo Lopez                                                      June 14, 2018
                                                                  Page 117

1   following:

2        That the witness, LEO LOPEZ, was duly sworn by the

3   officer and that the transcript of the oral deposition

4   is a true record of the testimony given by the witness;

5        I further certify that pursuant to FRCP Rule

6   30(f)(1) that the signature of the deponent:

7        __X__ was requested by the deponent or a party

8   before the completion of the deposition and returned

9   within 30 days from date of receipt of the transcript.

10  If returned, the attached Changes and Signature Page

11  contains changes and the reasons therefor;

12       _____ was not requested by the deponent or a party

13  before the completion of the deposition.

14       I further certify that I am neither attorney nor

15  counsel for, related to, nor employed by any of the

16  parties to the action in which this testimony was taken.

17       Further, I am not a relative or employee of any

18  attorney of record in this cause, nor do I have a

19  financial interest in the action.

20       Subscribed and sworn to on this 20th day of June,

21  2018.

22                         _____
                           CANDICE ANDINO, Texas CSR 9332, RMR
23                         Expiration Date:  12/31/18
                           Firm Registration No. 631
24                         Kim Tindall & Associates, LLC
                           16414 San Pedro, Suite 900
25                         San Antonio, Texas 78232
                           Phone:  866.672.7880

# DEF-INTERV.

# EX. 132

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Esther Jeon on 06/15/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4
      STATE OF TEXAS, et al.,      )
 5                                 )
                   Plaintiffs,     )
 6                                 )
         vs                        ) No. 1:18-CV-68
 7                                 )
      UNITED STATES OF AMERICA,    )
 8    et al.,                      )
                                   )
 9                 Defendants.     )
                                   )
10         and                     )
                                   )
11    KARLA PEREZ, et al.,         )

12

13              The deposition of Esther Jeon called for

14    examination pursuant to notice and pursuant to the

15    Federal Rules of Civil Procedure for the United

16    States District Courts pertaining to the taking of

17    depositions taken before JO ANN LOSOYA, Certified

18    Shorthand Reporter within and for the County of Cook

19    and State of Illinois at 11 East Adams, Chicago,

20    Illinois, on June 15, 2018 at the hour of 11:00

21    o'clock a.m.

22

23

24

25
```

**Deposition Excerpts**

**Transcripts**

Jul 16, 2018 Jeon, Esther 06-15-2018_AMICUS

**Page:** 30

```
 1       A.      It is an award for being good at my
 2  position as senior advisor in AAWA and as
 3  co-president and as dialect chair previously.
 4       Q.      Have you received any other awards at
 5  Harvard?
 6       A.      Not that I can recall.
 7       Q.      Have you received any scholarships at
 8  Harvard?
 9       A.      No.
10       Q.      You talked a little bit about financial
11  aid in connection with the work with Act on a Dream.
12  Have you received any financial aid as part of your
13  attendance at Harvard?
14       A.      I received need-based private financial
15  aid from the college.
16       Q.      So apart from any need-based aid from the
17  college, there's no other aid that you have
18  received?
19       A.      No.
20       Q.      No federal or state financial aid?
21       A.      No.
22       Q.      And right now, you're on a one-year leave
23  of absence; is that right?
24       A.      Yes.
25       Q.      So talk to me about that.   Why are you on
```

Jul 16, 2018 Jeon, Esther 06-15-2018_AMICUS

**Page:** 62

```
 1       A.      Yes.
 2       Q.      You indicate in your declaration, which
 3  we have marked as Exhibit 1, that you applied and
 4  received renewal two times since then; is that
 5  right?
 6       A.      Yes.
 7       Q.      We can look in your declaration if we
 8  need to.   I think you indicated that you renewed in
 9  2014; is that right?
10       A.      Yes.
11       Q.      And then 2016; is that right?
12       A.      Yes.
13       Q.      So you understand these to be two-year
14  terms?
15       A.      Yes.
16       Q.      And are you up for renewal this year
17  then?
18       A.      Yes.
```

19    **Q.    And do you intend to apply for renewal?**
20    A.    I did.
21    **Q.    You have already applied for it?**
22    A.    Yes.
23    **Q.    Have you received the renewal yet?**
24    A.    Yes.
25    Q.    And when was that renewal accepted?

Jul 16, 2018 Jeon, Esther 06-15-2018_AMICUS

**Page: 77**

1    in the United States for the most of my life and I
2    wish to remain in the United States.   Receiving
3    deferred action is critical to my ability to live
4    and work in the United States and losing deferred
5    action would impose a great hardship on me;" is that
6    right?
7        A.    Yes.
8        **Q.    I want to unpack a few of those.**
9            **When you say receiving deferred**
10   **action is critical to your ability to live and work**
11   **in the United States, why is that so?**
12       A.    Without DACA, I cannot legally work in
13   the United States.
14       **Q.    Is that what makes it critical to you?**
15   **Is there anything else about DACA that makes it**
16   **critical to you?**
17       A.    Without DACA, I am also susceptible to
18   deportation.
19       **Q.    So, an inability to work without DACA and**
20   **susceptibility to removal; is that right?**
21       A.    Correct.
22       **Q.    Is there anything else from your**
23   **perspective that makes DACA critical to your life?**
24       A.    It gives me, even if temporarily, mental
25   reprieve from the fear I have to live with.

Jul 16, 2018 Jeon, Esther 06-15-2018_AMICUS

**Page: 78**

1        **Q.    Are you talking about the fear of being**
2    **removed from the country?**
3        A.    The fear of leaving everything I know
4    behind, having to be separated from my loved ones.
5        **Q.    Do you consider your life different with**
6    **DACA than when it was without DACA?**
7        A.    Yes.
8        **Q.    And apart from what we have already**
9    **discussed with the work ability, the not being**
10   **susceptible to removal, anything else that makes**
11   **your life with DACA different from it without it?**
12       A.    I believe I stated it clearly.   DACA gave
13   me a sense of mental and emotional safety and

14  physical safety that I did not have before I
15  received DACA.
16        Q.    I want to talk about -- you mentioned
17  something about work.   Obviously, we have talked a
18  lot about your employment.   Do you recall -- you
19  recall receiving work authorization in connection
20  with your DACA application; is that right?
21        A.    Yes.
22        Q.    Did you receive -- is it an employment
23  authorization document, is that what you received,
24  EAD?
25        A.    As far as I know, yes.

**Page:** 81

1        A.    No.
2        Q.    Have you received any Medicare benefits
3  since receiving DACA?
4        A.    No.
5        Q.    Are you familiar with something called
6  temporary assistance for needy families?
7        A.    I am on a very elementary level familiar
8  with it.
9        Q.    Is that a type of assistance that you
10  have received at all since obtaining DACA?
11        A.    I have not received that.
12        Q.    Are you familiar with something called
13  the earned income tax credit?
14        A.    I am on a very elementary level familiar
15  with that.
16        Q.    Is that something that you sought or
17  received since obtaining DACA?
18        A.    No.
19        Q.    Have you applied for a driver's license
20  since receiving DACA?
21        A.    Yes
22        Q.    When did you apply for a license?
23        A.    I believe I applied in 2012.
24        Q.    And when would that have been?
25        A    In Houston, Texas.

**Page:** 94

1  else.
2        Q.    Is that the same for your education and
3  current employment?
4        A.    I do not anticipate currently anything
5  else.
6              MR. BITTER:   Can we take a couple of
7  minute break?
8              MS. ORTA:   Yep.
9                    (Whereupon, a break in the
10                    proceedings was taken.)
11  BY MR. BITTER:
12        Q.    Just a couple of additional questions,
13  Ms. Jeon.
14              Looking back at your declaration,
15  which we marked as Exhibit 1.   I want to ask you, I

16   know we had talked about paragraph 9.   **I want to ask**
17   **you about one part of that we haven't discussed yet,**
18   **and that is you indicate that losing deferred action**
19   **would impose a great hardship on you; is that right?**
20       A.   Yes.
21       **Q.   Why do you say that?**
22       A.   Because I would legally lose my ability
23   to work, because I would be susceptible to
24   deportation in the United States.
25       Q.   Do you anticipate that if you lost work

**Page:** 95
1   authorization that you would continue to work?
2       A.   I don't know how I would be able to
3   legally work.
4       **Q.   Do you anticipate that you would be able**
5   **to work at your current employer?**
6       A.   I don't know.
7       **Q.   And of any of the employers that we have**
8   **talked about where you have worked, do you know of**
9   **any of those where you would be able to work if you**
10  **did not have the work authorization?**
11      A.   I don't know.
12      **Q.   Would you be able to stay at Harvard if**
13  **you lost deferred action or work authorization?**
14      A.   Yes.
15      **Q.   Would you still -- is it your**
16  **understanding you would still be eligible for aid**
17  **even if you were not a DACA recipient?**
18      A.   Harvard gives me private need-based
19  financial aid.
20      **Q.   It's not connected to whether you have**
21  **DACA status or not?**
22      A.   It is not connected to my DACA status.
23      **Q.   Do you anticipate that you would stay in**
24  **the United States even if you lost your DACA status?**
25      A.   Yes, absolutely.

Jul 16, 2018 Jeon, Esther 06-15-2018_AMICUS

**Page:** 96
1       **Q.   Is it possible that you could decide to**
2   **leave the United States?**
3       A.   No, that is not an option for me.
4       **Q.   Why is that?**
5       A.   Because this is my home.
6       **Q.   Now, when you say "impose a great**
7   **hardship," would it also impose a great hardship on**
8   **your family as well?**
9       MS. ORTA:   Objection.   We have already
10  discussed anything regarding her family
11  immigration-wise, status-wise.
12  BY MR. BITTER:
13      **Q.   Putting aside immigration status of your**
14  **family, would it impose a hardship on your family if**

15  you lost your DACA status?
16       A.    Yes, it would.
17       Q.    How so?
18       A.    It would be very painful for my family.
19  I would also no longer be able to legally work and
20  make income.   They would worry much more about me.
21       Q.    It may have a financial impact it sounds
22  like; is that right?
23       A.    It's possible.
24       Q.    And it sounds like it may just have an
25  impact beyond financial as well on your family; is

**Page:** 97
1  that fair?
2       A.    Yes.
3       Q.    Have you understood all my questions
4  today, Ms. Jeon?
5       A.    Yes.
6       Q.    Anything that you wish to clarify or
7  supplement in terms of your testimony?
8       A.    My last name is Jeon.
9       Q.    Jeon?
10      A.    Not Jeon. Jeon. (Pronunciation)
11      Q.    Jeon.   Anything in terms of your answers
12  that you wish to clarify or supplement today?
13      A.    Not currently.
14      Q.    Have I been courteous to you today during
15  the deposition?
16      A.    As courteous as you could possibly be.
17      Q.    Thank you.   I have no further questions
18  at this time.   Thank you, Ms. Jeon.
19           MS. ORTA:   We have no redirect.
20           MR. WALKER:   The government doesn't.
21           MR. BITTER:   Are there any questions from
22  New Jersey, Mr. Dolinsky?
23           MR. DOLINSKY:   No.
24           MR. BITTER:   Thank you.   That's it then.
25           MR. WALKER:   We'll take a copy.

Case 1:18-cv-00068   Document 225-5   Filed on 07/21/18 in TXSD   Page 642 of 902

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Esther Jeon on 06/15/2018                                    Page 99

1                    REPORTER CERTIFICATE

2

3          I, JO ANN LOSOYA, a Certified Shorthand

4    Reporter within and for the County of Cook and State

5    of Illinois, do hereby certify:

6                    That previous to the commencement

7    of the examination of the witness, the witness was

8    duly sworn to testify the whole truth concerning the

9    matters herein;

10                   That the foregoing deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15                   That the said deposition was taken

16   before me at the time and place specified;

17                   That I am not a relative or

18   employee or attorney or counsel, nor a relative or

19   employee of such attorney or counsel for any of the

20   parties hereto, nor interested directly or

21   indirectly in the outcome of this action.

22

23

24

25

Case 1:18-cv-00068   Document 225-5   Filed on 07/21/18 in TXSD   Page 643 of 902

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Esther Jeon on 06/15/2018                                    Page 100

```
 1              IN WITNESS WHEREOF, I do hereunto set my
 2     hand this June 27, 2018.
 3
 4
 5
 6
 7
 8
                    JO ANN LOSOYA, CSR
 9                  C.S.R. No. 84-002437
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# DEF-INTERV.

# EX. 133

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Jose Magana-Salgado on 06/15/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4    ------------------------------x

 5    STATE OF TEXAS, et al.,        :

 6                   Plaintiffs,     :

 7      vs.                          : Case No. 1:18-CV-68

 8    UNITED STATES OF AMERICA       :

 9    et al.,                        :

10      and                          :

11    KARLA PEREZ, MARIA ROCHA,      :

12    JOSE MAGANA-SALGADO, et al.,   :

13    Proposed Defendant-Intervenors.:

14    ------------------------------x

15                         Washington, D.C.

16                         Friday, June 15, 2018

17              * CONTAINS CONFIDENTIAL PORTIONS *

18              Deposition of JOSE MAGANA-SALGADO, a witness

19    herein, called for examination by counsel for

20    Plaintiff States in the above-entitled matter,

21    pursuant to notice, the witness being duly sworn by

22    MICHELE E. EDDY, RPR, CRR, and Notary Public in and

23    for the District of Columbia, taken at the offices of

24    MALDEF, 1016 16th Street, Northwest, Suite 100,

25    Washington, D.C., at 9:09 a.m.
```

**For Depo Excerpts**

**Transcripts**

📄 Jun 20, 2018 Magana-Salgado, Jose 06-15-2018_AMICUS

**Page:** 79
1  clarify?
2         MR. BIGGS:   Let me re-ask it.
3  BY MR. BIGGS:
4         Q      So, it's Masa Group is the one you
5  currently work for?
6      A     Correct.
7         Q      Are there any other employees?
8      A     No.
9         Q      Does Masa Group pay federal taxes?
10     A      Yes.
11        Q      Do you receive a W-2 from Masa Group?
12     A      No.
13        Q      Do you pay income tax in your personal
14  capacity completely detached from the Masa Group?
15     A     I pay state, local and federal taxes,
16  including income tax, Social Security, Medicare
17  and any other required taxes, through my own
18  financial identity on income earned through the
19  Masa Group.
20        Q      So let me ask this a shorter way.
21           Do you personally file tax returns in
22  your name?
23     A     Yes.
24        Q      And that is -- or do you file tax
25  returns in the Masa Group's name?

📄 Jun 20, 2018 Magana-Salgado, Jose 06-15-2018_AMICUS

**Page:** 95
1  and potentially revocable protection from
2  deportation and an ability to be lawfully employed
3  in this country which I view as critical and
4  important.
5         Q      Does deferred action also provide you
6  the ability to work in the United States?
7      A     Yes.
8         Q      You had mentioned a great hardship on
9  you if losing deferred -- let me back up.
10           "Losing deferred action would impose a
11  great hardship on me."   Will you explain what that
12  great hardship is.
13     A     The inability -- excuse me.   The
14  inability to be employed, potential deportation,
15  arrest and detention.
16        Q      Have you ever thought about what will
17  happen to you personally if deferred action is no

18  **longer available?**
19      A    Yes.
20      **Q     What do you believe will happen to you**
21  **personally if deferred action is no longer**
22  **available?**
23          MS. AVILA:   Objection.   Calls for
24  speculation.
25      A    Potential arrest, detention and

**Page:** 96
 1  deportation.
 2      **Q     In the event deferred action is no**
 3  **longer available, do you intend to remain in the**
 4  **United States?**
 5      A    Yes.
 6      **Q     If deferred action is no longer**
 7  **available, will you -- do you plan on continuing**
 8  **to work in the United States?**
 9      A    I don't know.
10      **Q     We're getting close.**
11          So under deferred action, are you
12  removable from the United States?
13          MS. AVILA:   Objection.   Calls for a
14  legal conclusion and vague.
15      A    Deferred action is a temporary and
16  revocable abeyance of deportation.   At any point,
17  to my knowledge, the U.S. Department of Homeland
18  Security can revoke my deferred action and place
19  me in removal proceedings.
20      **Q     Is that also true for the executive's**
21  **ability to revoke the entire program of deferred**
22  **action?**
23          MS. AVILA:   Objection.   Calls for a
24  legal conclusion and vague.
25      A    I don't know.

**Page:** 98
 1      A    Can you clarify, please?
 2      **Q     Sure.**
 3          **Is it your position that at any point**
 4  **the Executive can revoke your personal deferred**
 5  **action status?**
 6          MS. AVILA:   Objection.   Calls for a
 7  legal conclusion.
 8      A    If under the guidelines established by
 9  the administration I no longer continue to meet
10  the requirements for deferred action, I'm sure
11  that the government can terminate my deferred
12  action.
13      **Q     We've discussed work authorizations**
14  **quite a bit.**
15          **How does a work authorization affect**
16  **your ability to live in the United States?**
17      A    Can you clarify, please?
18      **Q     Sure.**

19          **On a day-to-day basis, how does the fact**
20 **you have a work authorization affect your life?**
21          A     My employment authorization allows me to
22 be employed and, as a result, pay federal, state
23 and local income taxes.
24      **Q     Without deferred action, you would not**
25 **be allowed to have that work authorization,**

**Page:** 99
1 **correct?**
2              MS. AVILA:   Objection.   Calls for a
3 legal conclusion.
4      A     I would no longer be able to have
5 employment authorization stemming from this
6 specific grant of deferred action.   I cannot
7 speculate whether or not I would be able to get
8 employment authorization through another form of
9 relief that is eventually made available to me.
10      **Q     What are the other forms of relief you**
11 **could possibly apply for in that situation?**
12              MS. AVILA:   Objection.   Calls for a
13 legal conclusion.
14      A     I don't know.
15      **Q     But back to my initial question.   Your**
16 **deferred action status allowed you to apply for**
17 **the work authorization.   Correct?**
18      A     Correct.
19      **Q     You mentioned earlier you have a Social**
20 **Security number.   Your deferred action status**
21 **allowed you to apply for that Social Security**
22 **number, correct?**
23      A     Yes.
24      **Q     Without deferred action, you would not**
25 **be eligible for that Social Security number,**

**Page:** 101
1 for unemployment benefits?
2              MS. AVILA:   Objection.   Calls for a
3 legal conclusion.
4      A     As I haven't looked into that, I don't
5 know.
6      **Q     Does deferred action status allow you to**
7 **qualify for Medicare?**
8              MS. AVILA:   Objection.   Calls for a
9 legal conclusion.
10      A     Not to my knowledge.
11      **Q     Have you ever applied or utilized**
12 **Medicaid since being in the United States?**
13      A     No.
14      **Q     Are you aware if deferred action status**
15 **allows an individual to obtain Medicaid benefits**
16 **if they receive that status?**
17              MS. AVILA:   Objection.   Calls for a
18 legal conclusion.

19     A     It is my understanding that DACA does
20 not make you eligible for Medicaid.
21     Q     What is that understanding based on?
22     A     Federal prohibitions on the allocation
23 of certain federal benefits to certain classes of
24 noncitizens.
25     Q     Has your deferred action status allowed

Jun 20, 2018 Magana-Salgado, Jose 06-15-2018_AMICUS

**Page:** 105
1     A     Just hanging out.
2     Q     Did you pay rent when you were in New
3 Mexico?
4     A     I stayed with a friend.
5     Q     Do you remember how long you were in New
6 Mexico?
7     A     I don't recall.
8     Q     Did you volunteer when you were in New
9 Mexico?
10    A     No.
11    Q     Have you ever had discussions with other
12 DACA recipients about their plans in the event
13 deferred action is no longer available?
14    A     General discussions.
15    Q     Have any of those general discussions
16 included individuals saying, if deferred action
17 would no longer be available, they would leave the
18 United States?
19    A     Generally the folks that I've spoken to
20 consider this their home and they would try as
21 hard as they can to remain here.
22    Q     Have any of them told you that they
23 would eventually return to their country of origin
24 or another country in the event deferred action is
25 no longer available?

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Jose Magana-Salgado on 06/15/2018                                    Page 135

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, JOSE MAGANA-SALGADO, do hereby

 4    acknowledge that I have read and examined the

 5    foregoing testimony, and the same is a true, correct

 6    and complete transcription of the testimony given by

 7    me, and any corrections appear on the attached Errata

 8    Sheet signed by me.

 9

10    5-25-18

11      (DATE)                        (SIGNATURE)

12

13             NOTARIZATION   (If Required)

14    State of  Washington

15    County of  DC

16    Subscribed and sworn to (or affirmed) before me on

17    this 25th day of June              , 20 18 , by

18    Jose  Magana-salgado , proved to me on the

19    basis of satisfactory evidence to be the person who

20    appeared before me.

21    Signature:

22                          (Seal)

23

24

25
```

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2

 3              I, Michele E. Eddy, Registered Professional

 4    Reporter and Certified Realtime Reporter, the court

 5    reporter before whom the foregoing deposition was

 6    taken, do hereby certify that the foregoing transcript

 7    is a true and correct record of the testimony given;

 8    that said testimony was taken by me stenographically

 9    and thereafter reduced to typewriting under my

10    supervision; and that I am neither counsel for,

11    related to, nor employed by any of the parties to this

12    case and have no interest, financial or otherwise, in

13    its outcome.

14

15              IN WITNESS WHEREOF, I have hereunto set my

16    hand and affixed my notarial seal this 20th day of

17    June, 2018.

18

19    My commission expires July 14, 2022

20

21

22    _____

23    MICHELE E. EDDY

24    NOTARY PUBLIC IN AND FOR

25    THE DISTRICT OF COLUMBIA
```

# DEF-INTERV.

# EX. 134

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3
      STATE OF TEXAS, ET. AL.         )
 4                                    )
               PLAINTIFFS,            )
 5                                    )
      V.                              )  CASE NO. 1:18-cv-00068
 6                                    )
      UNITED STATES OF AMERICA,       )
 7    ET. AL.,                        )
                                      )
 8             DEFENDANTS,            )
                                      )
 9    AND                             )
                                      )
10    KARLA PEREZ, ET. AL.,           )
                                      )
11         DEFENDANT-INTERVENORS.)

12

13

14

15

16    _____

17              ORAL DEPOSITION OF KARLA PEREZ

18                     June 16, 2018
      _____
19

20

21

22

23

24

25
```

```
 1        ORAL DEPOSITION OF KARLA PEREZ, produced as a

 2   witness at the instance of the Plaintiffs and duly

 3   sworn, was taken in the above-styled and numbered

 4   cause on June 16, 2018, from 11:06 a.m. to 1:55 p.m.,

 5   before Mia Cieslar, Certified Shorthand Reporter in

 6   and for the State of Texas, reported by computerized

 7   machine shorthand, at the offices of the Attorney

 8   General, Consumer Protection Division, 808 Travis

 9   Street, Suite 1520, Houston, Texas, pursuant to the

10   Federal Rules of Civil Procedure and the provisions

11   stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Deposition Excerpts**

**Transcripts**

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 10
1      A.    Actually, I want to -- can I clarify?
2      **Q.    Of course.**
3      A.    Pasadena.   It's almost basically southeast
4  Houston, but Pasadena.
5      **Q.    All right.   It's a -- it's a city, but**
6  **it's --**
7      A.    It's --
8      **Q.    -- a suburb of Houston?**
9      A.    Something like that.
10     **Q.    Okay.**
11     A.    Yeah.
12     **Q.    Fair enough.**
13             So today do you live in Houston or
14  Pasadena?
15     A.    I live in Houston.
16     **Q.    All right.   Fantastic.**
17             But you went to elementary and middle
18  school in Pasadena, Texas?
19     A.    Yes.
20     **Q.    All right.   And you went to public elementary**
21  **and a public middle school?**
22     A.    Yes.
23     **Q.    All right.   So if we look at the second**
24  **paragraph, it says you were born in Mexico and came to**
25  **the United States with your parents in 1995 when you**

**Page:** 11
1  **were two years old; is that true, right?**
2      **A.    That is correct.**
3      **Q.    Okay.   And now, when you came with your**
4  **parents in 1995, was it pursuant to any type of visa?**
5             MS. MORENO:   Objection.   Just wanted to
6  clarify.   We have an agreement not to discuss matter
7  of entry.
8             MR. DISHER:   The agreement doesn't reach
9  the manner of entry.   The agreement --
10            MS. MORENO:   I'm sorry.   We have -- we
11  have an agreement to mark the testimony along this
12  line of questioning as confidential.
13            MR. DISHER:   Right.   So the -- yes.   You
14  can designate those portions as confidential, but --
15            MS. MORENO:   And I'm doing it for the
16  record.
17            MR. DISHER:   Okay.   But the -- and the
18  agreement requires MALDEF to seek relief from the
19  Court --
20            MS. MORENO:   Correct.
21            MR. DISHER:   -- after the deposition to

22  maintain that confidentiality designation.
23                  MS. MORENO:   Correct.  I just want to
24  make clear for the record that we seek to mark
25  testimony along -- in -- responding to this line of

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 24
1      **Q.   Sure.   All right.**
2                  **And then I believe you said the other**
3  **one -- you had protect tuition equity.   And what was**
4  **the other initiative in 2017?**
5      A.   It was to oppose anti-immigrant legislation.
6  **Q.   Got it.**
7      A.   Such as Senate Bill 4.
8      **Q.   Other than Senate Bill 4, were there any**
9  **other anti-immigrant legislative proposals that UWD**
10  **campaigned against?**
11      A.   I cannot remember the exact bill numbers at
12  the time.   We were opposed to an expansion of family
13  detention.   We were also opposed to increased border
14  enforcement provided by the State.   That's what I can
15  recall at the time.
16      **Q.   Okay.**
17      A.   Yeah.
18      **Q.   All right.   Now let's look at Paragraph**
19  **No. 8.**
20      A.   Uh-huh.
21      **Q.   I'm a recipient of deferred action through**
22  **the initiative known as Deferred Action for Childhood**
23  **Arrivals, DACA.**
24                  **What year did you first receive DACA**
25  **status?**

**Page:** 25
1      A.   I re -- received deferred action in 2012.
2      **Q.   Okay.   Do you remember what month in 2012?**
3      A.   November 2012.
4      **Q.   All right.   What process did you go through**
5  **to receive deferred action in November of 2012?**
6                  MS. MORENO:   Objection, vague.
7      A.   Can you clarify by, like, pro -- like,
8  process?
9      **Q.   (BY MR. DISHER) What did you do in order to**
10  **receive deferred action in November of 2012?**
11      **A.   In order to apply for deferred action, there**
12  **were certain requirements that had to be met.   Showing**
13  **a continuance presence here in the United States.**
14  **Certain age, being over age 15.   Being present on the**
15  **day that the Deferred Action for Childhood Arrivals**
16  **initiative was announced.   And having -- meeting the**
17  **outlined length of time for that.   So what that meant**
18  **for me was gathering a lot of documents to show that I**
19  **met those time and length requirements.**
20      **Q.   All right.   What did you do with those**

21  **documents once you gathered them?**
22      A.    Once I gathered these documents, I met with a
23  private attorney who assisted me in completing the
24  accompanying application forms and organizing the --
25  the documents.   The documents were then filed with

📄 Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 26
1  United States Citizenship and Immigration Services for
2  them to adjudicate it.
3      **Q.    Okay.   Once you filed the documents with**
4  **USCIS, what happened next?**
5              MS. MORENO:   Objection, vague.
6      A.    Can you clarify?
7      **Q.    (BY MR. DISHER) So you filed the documents**
8  **with USCIS.   Then in terms of your application for**
9  **deferred status, did you have to do anything else?**
10     A.    So once I -- I filed my application, I waited
11  to hear back from USCIS that they had in fact received
12  my application along with its fee.   I received a -- a
13  notice from them to that effect.   Then I received a
14  notice scheduling me to attend biometrics in order to
15  have my -- my fingerprints and my photograph taken.
16  And then I waited for my application to -- to be
17  adjudicated.
18     **Q.    All right.   And your application was**
19  **ultimately adjudicated?**
20     A.    I -- my application for deferred action
21  was -- was approved by USCIS.
22     **Q.    All right.   So how long did the -- from the**
23  **time that you sent in all of the documents, how long**
24  **did you have to wait until you had final adjudication**
25  **from USCIS regarding your application?**

📄 Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 29
1      **Q.    Okay.   So that includes, you did not receive**
2  **a notice to deny, for example?**
3      A.    No.
4      **Q.    Okay.   All right.   The next sentence in**
5  **Paragraph 8 says, Since initially receiving DACA, I**
6  **have successfully renewed my deferred action in 2014,**
7  **2016 and 2018.**
8                  **That's true?**
9      A.    That's correct.
10     **Q.    All right.   So just describe to me the**
11  **renewal process.   What did you have to do to renew**
12  **your deferred action?**
13     A.    In order to renew deferred action, DACA, I
14  had to go through a similar application process with
15  USCIS in which I completed the requisite application

16  forms.   Provided supporting evidence to show that I
17  was able to renew DACA, which meant that I had DACA in
18  the first place.   Provided a filing fee and filed it
19  with USCIS.
20      Q.   Okay.   Is that it?
21      A.   That's about what I can remember.
22      Q.   All right.   And that would apply to the 2014,
23  2016 and 2018 process of renewing?
24      A.   Yes.
25      Q.   All right.   Do you remember -- from the time

**Page:** 30

1   you sent in the paperwork that you needed to in order
2   to renew your deferred action, how long did it take
3   before you got the grant of the renewal?
4       A.   I can't remember specifically for my
5   renewals.   I can say it -- I did apply approximately a
6   hundred and fifty days before my previous grant of
7   deferred action ended.   But I can't remember the
8   length of time for -- for the renewals.
9       Q.   All right.   Did the renewal always come in
10  before those 150 days expired?
11      A.   Yes, because I -- it's not something that I
12  put off last minute.
13      Q.   Right.
14              Okay.   Now, when you did the renewals in
15  2014, 2016 and 2018, did you talk to an immigration
16  service officer?
17      A.   I did not beyond the people that I saw at the
18  biometrics place that are, I guess, Government
19  employees, but they just take your picture and your
20  fingerprints.
21      Q.   Okay.   Did you do biometrics when you did
22  your renewals as well or just that first time?
23      A.   By first time, do you mean the -- the
24  first --
25      Q.   Yeah, in 2012.

**Page:** 31

1       A.   -- DACA application?   Biometrics every
2   renewal --
3       Q.   Got it.
4       A.   -- with every renewal grant.
5       Q.   Okay.   But other than talking to the
6   employees at the biometric center, you didn't talk to
7   any immigration service officers during your renewal
8   process?
9       A.   No.
10      Q.   Okay.   Did you ever receive any requests for
11  evidence for your three renewal processes?
12      A.   I did not.
13      Q.   Okay.   Did you ever receive a notice of
14  intent to deny any of your renewal applications?
15      A.   I did not.
16      Q.   Okay.   All right.   Now let's look at
17  Paragraph 9.   The second sentence says, Receiving

18  **deferred action is critical to my ability to live and**
19  **work in the United States.**
20              **You agree with that statement?**
21      A.    That's correct.
22      **Q.    All right.   Why do you agree with that?**
23      A.    Under the DACA initiative, those who -- who
24  qualify to apply and who -- those who -- who are found
25  eligible by USCIS, part of the -- the -- the DACA

📄 Jun 16, 2018 Perez, Karla (6_16_2018)


**Page:** 35
1  Proposed Defendant-Intervenors, Karla Perez.
2              That's you?
3      A.    Correct.
4      **Q.    All right.   Now, if we skip the names of the**
5  **other Intervenors, we go down, it says, Are recipients**
6  **of deferred action.**
7              **Do you see where I am?**
8      A.    Did you say are recipients?
9      **Q.    Yes.**
10     A.    Okay.
11     **Q.    All right.   (Reading) Are recipients of**
12  **deferred action pursuant to the Deferred Action for**
13  **Childhood Arrivals, DACA initiative, and are directly**
14  **affected by the resolution of the claims in this case.**
15              **Do you see where I am?**
16     A.    Yes.
17     **Q.    Okay.   So I want to ask you specifically**
18  **about that last clause, Are directly affected by the**
19  **resolution of the claims in this case.**
20              **Do you agree with that statement?**
21     A.    I agree.
22     **Q.    Okay.   How are you as well as the other**
23  **Proposed Defendant-Intervenors directly affected by**
24  **the resolution of the claims in this case?**
25              MS. MORENO:   Objection, calls for a

**Page:** 36
1  legal conclusion.
2      A.    I can speak as my -- as a DACA recipient.
3      **Q.    (BY MR. DISHER) Of course.**
4      A.    If this case is resolved in a manner that
5  would end in the DACA program being either stayed or
6  terminated, my livelihood is at stake, and I believe
7  that's -- that's why I'm directly affected.
8      **Q.    Okay.   You say your livelihood is directly at**
9  **stake.   How so?**
10     A.    My ability to work in this country and my
11  ability to remain in this country during my grant of
12  DACA.
13     **Q.    Okay.   The next sentence says, All Proposed**
14  **Defendant-Intervenors have authorized presence in the**
15  **United States, are authorized to work and are eligible**
16  **for renewal of their grants of deferred action.**

17            That's true for you individually, right?
18      A.   Yes, because I -- I currently have DACA, I
19 have work authorization, and having had DACA and
20 remaining eligible for renewal would be able to renew.
21      Q.   All right.   So -- and I just want to break
22 this down.
23            Because of DACA, you have authorized
24 presence in the United States, right?
25      A.   Because DACA I have a -- as I understand a

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 37
1 temporary protection from deportation.
2      Q.   All right.   And because of DACA, you were
3 authorized to work in the United States, correct?
4      A.   As a DACA recipient, with my application, I
5 am -- was eligible to apply for work authorization and
6 that was approved for me.
7      Q.   All right.   Yeah.   So if you turn to the next
8 page.
9            (Witness complied)
10      Q.   (BY MR. DISHER) The first sentence at the top
11 there, Moreover, they will lose their work
12 authorization which companies grant for -- a grant of
13 deferred action.
14            That's what you were just talking about,
15 right?
16      A.   Correct.
17      Q.   Okay.
18      A.   And -- yes.
19      Q.   Okay.   If you'll turn to Page 7, please.
20            (Witness complied)
21      Q.   (BY MR. DISHER) The last paragraph on the
22 page, in the middle of the paragraph, there's a
23 sentence that begins, Allowing the Proposed.
24            Do you see that?
25      A.   Four sentences, right?

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 42
1            MS. MORENO:   Objection, call for a legal
2 conclusion.
3      A.   I -- I don't -- I don't know.
4      Q.   (BY MR. DISHER) Okay.
5            All right.   The last paragraph on that
6 page reads, Second, the Proposed Defendant-Intervenors
7 have an interest in the employment opportunities that
8 would be available to them if they are granted
9 deferred action and employment authorization, the
10 former of which would make them eligible for the
11 latter.

12          **Did I read that right?**
13     A.   Yes.
14     **Q.   Okay.   So the last clause there, The former**
15 **of which would make them eligible for the latter.**
16          **The former is referring to the grant of**
17 **deferred action, right?**
18     A.   As I understand it.
19     **Q.   And the latter would be employment**
20 **authorization?**
21     A.   Correct.
22     **Q.   So this is saying that the grant of deferred**
23 **action made you eligible for employment authorization,**
24 **right?**
25     **A.   That is correct.**

**Page:** 43
1     **Q.   And you agree with that?**
2          MS. MORENO:   Calls for a -- objection,
3 calls for a legal conclusion.
4     A.   I'm aware that being granted deferred action
5 provides an individual with the ability to apply for
6 employment authorization.
7     **Q.   (BY MR. DISHER) All right.   Thank you.   Okay.**
8 **All right.   If you -- yeah, Page 12.   Thank you.   The**
9 **last sentence of the full big paragraph on that page**
10 **reads, In the same way, the Proposed**
11 **Defendant-Intervenors here have sought -- excuse me.**
12 **Let me start over.**
13          **In the same way the Proposed**
14 **Defendant-Intervenors here have shown strong and**
15 **legally cognizable interests related to DACA.**
16          **Did I read that right?**
17     A.   Yes.
18     **Q.   Okay.   And you agree that the Proposed**
19 **Defendant-Intervenors have strong and legally**
20 **cognizable interests related to DACA?**
21          MS. MORENO:   Objection, calls for a
22 legal conclusion.
23     A.   Could you clarify the strong and legally
24 cognizable interests?
25     **Q.   (BY MR. DISHER) Well, no.   I'm asking you --**

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 44
1     A.   Oh.
2     **Q.   -- if you agree with that statement?**
3          MS. MORENO:   Objection, calls for a
4 legal conclusion.
5     A.   I -- I agree.
6     **Q.   (BY MR. DISHER) Okay.   And so in your**
7 **opinion -- or what is your understand -- let me start**
8 **over.**
9          **What is your understanding of the strong**
10 **and legally cognizable interests that you have related**

11 **to DACA?**
12            MS. MORENO:   Objection, calls for a
13 legal conclusion.
14      A.   For my -- myself, the ability to -- to work
15 in the United States, the ability to -- to be here if
16 temporary pro -- protected from deportation, and
17 the -- the place that I have called home for over 20
18 years.
19      **Q.   (BY MR. DISHER) Okay.   What about your**
20 **interest in getting a Social Security number?**
21            MS. MORENO:   Objection, vague.
22      **A.   My understanding is I -- by having been**
23 **granted work authorization, I meet the requirements to**
24 **apply for a Social Security number that is limited in**
25 **use.   I believe my Social Security card says, Valid**

**Page: 45**
1 **with DH authorization only.**
2      **Q.   (BY MR. DISHER) Okay.   Is having that Social**
3 **Security number important to you?**
4      **A.   It is important to me.   I have been able to**
5 **establish credit with a Social Security number.   You**
6 **know, certainly in terms of the -- the driver's**
7 **license, that's part of it as well for me.   Yeah.**
8      **Q.   Okay --**
9            MS. MORENO:   Sorry.   Do you mind if we
10 take a break?   It's been an hour.
11            MR. DISHER:   Let me finish this one line
12 here and then sure.   Is that all right?
13            MS. MORENO:   Sure.
14            MR. DISHER:   All right.
15      **Q.   (BY MR. DISHER) So other than the Social**
16 **Security number, work authorization and driver's**
17 **license, do you know how DACA affects your ability to**
18 **get retirement benefit at all?**
19      **A.   I'm not aware.   But I do know that by having**
20 **the Social Security number, I'm also able to -- to**
21 **contribute to -- to that pool.**
22      **Q.   Okay.**
23      **A.   You know, for everybody else.**
24      **Q.   Right.**
25            **And same question, but with Social**

**Page: 46**
1 **Security disability benefits.   Do you know how that**
2 **affects your ability to draw on those should you need**
3 **them?**
4      **A.   I do not know.**
5      **Q.   Okay.   What about unemployment benefits.   Do**
6 **you know how having deferred action affects your**
7 **ability to get unemployment benefits?**
8      **A.   No.**
9      **Q.   All right.   What about your eligibility for**
10 **Medicare?**
11            MS. MORENO:   Objection, vague.
12      **Q.   (BY MR. DISHER) Do you know how having**

13  deferred action affects your ability to qualify for
14  Medicare?
15      A.   My understanding is that having deferred
16  action is not a legal status, certainly not one like
17  citizenship that would allow me to be eligible for
18  federal benefits.
19      Q.   Okay.   One last question.
20            What about the earned income tax credit,
21  do you know what that is?
22      A.   I have heard of it.
23      Q.   Okay.   Have you taken advantage of the earned
24  income tax credit?
25      A.   I don't know that I have.

Jun 16, 2018 Perez, Karla (6_16_2018)


**Page:** 48
 1  young people will directly impair the Proposed
 2  Defendant-Intervenors' lives.
 3            Do you agree with that statement?
 4      A.   Well, I'm not -- not an attorney yet, but as
 5  for my own life.
 6      Q.   Yes.
 7      A.   Terminating the deferred action and work
 8  authorization would certainly impair my life.
 9      Q.   Okay.   And how so?   How would it impair your
10  life?
11      A.   Not being able to work, not being able to
12  have my work authorization under DACA would keep me
13  from really starting my career much -- much less
14  furthering it.   And having poten -- that potential
15  risk of deportation more, I want to say, in front of
16  me all the time in -- in that way would also impair my
17  life in terms of my -- my health, my mental health.
18      Q.   Okay.   Couple of things I want to follow up
19  on that.   First, when you say your career, you plan on
20  having a career as a lawyer?
21      A.   That is correct.
22      Q.   All right.   Now, do you know whether without
23  DACA you could apply to become a member of the Texas
24  Bar?
25            MS. MORENO:   Objection, calls for a

Jun 16, 2018 Perez, Karla (6_16_2018)


**Page:** 70
 1      Q.   (BY MR. DISHER) Hand you Exhibit 7.   Have you
 2  seen this article before?
 3      A.   It's been sometime, but I have.
 4      Q.   And I forgot to mark where your quote is so
 5  just give me one second to find it.   So it's on Page 6
 6  of 7.   Do you see that?
 7      A.   Yes.

8      Q.   Okay.   First it says -- it paraphrases you
9  saying that DACA became a, quote, personal sanctuary
10 since your undergraduate days.
11              What do you mean by that?
12     A.   I felt safer.   And so what I meant to say is,
13 I think the purpose of a sanctuary is an -- is being
14 in a safe, comforting place.   And DACA simply allowed
15 me to feel safer, more secure.
16     Q.   Okay.
17     A.   In my life.
18     Q.   And how did DACA accomplish that?   How did it
19 make you feel safer?
20     A.   By providing me with the temporary protection
21 from -- from deportation.   By allowing me the
22 eligibility to apply for work authorization, which was
23 then granted by USCIS, which in turn allowed me to
24 apply for a Texas driver's license so that I could
25 finally really begin to drive and do so without fear

**Page:** 71
1  of law enforcement.
2      Q.   All right.   Then it says, She said she plans
3  to continue fighting to keep the program.
4              That's true, obviously.   How do you plan
5  to continue to fight to keep DACA?
6      A.   I believe that I'm doing that or here right
7  now in -- as a Defendant-Intervenor in this case.   And
8  certainly by when I -- when I get the opportunity to
9  do so, to advocate to elected officials of why the --
10 the program works for our country and for those who
11 benefit from it.
12     Q.   Have you advocated to any elected officials
13 specifically related to the DACA program?
14     A.   I have.
15     Q.   Okay.   And who have you advocated to about
16 DACA?
17     A.   I can't -- I can't say.   It's been quite a
18 few -- quite a lot of elected officials so it's --
19 it's hard to say exactly who.
20     Q.   Okay.   Are these, like, US congresspeople?
21     A.   Mostly state legislators.   Really a -- a call
22 on them to do what they can as state legislators to do
23 their own advocacy.
24     Q.   Okay.   Have you ever advocated to a federal
25 legislator related to DACA?

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 78
1  thing.   People not understanding that having DACA,
2  being a DACA recipient does not mean that you are a US
3  citizen or that you have legal status.   That's what I
4  meant by that type of misinformation.
5      Q.   All right.   Do you know any DACA recipients
6  who did participate in the college work study program?

 7     A.   I do not know.
 8     Q.   Okay.   Was this one of the legislative
 9  campaigns that United We Dream undertook during
10  the 2017 legislative session?
11     A.   It was not a campaign per se, but more
12  when -- I mean, there was a minor proposal that came
13  up when we were aware that we did what we could to
14  advocate against it.
15     Q.   And when you say we, you mean United We
16  Dream?
17     A.   Yes.
18     Q.   All right.
19          MR. DISHER:   We can take a break.
20          (Recess taken, 1:11 p.m. to 1:22 p.m.)
21     Q.   (BY MR. DISHER) All right.   We're back on the
22  record.   Ms. Perez, are you ready to continue?
23     A.   Yes.
24     Q.   All right.   I just have a few more questions
25  for you.

**Page:** 79
 1             First I just wanted to ask you about
 2  your work history.   Can you just kind of explain to me
 3  starting from the age of, I don't know, let's say --
 4  well, start it from the beginning.   What different
 5  jobs have you held over your life?
 6     A.   Okay.   My first job that I had, and it was
 7  kind of a reocurring job after that was as a
 8  translator and then an intern at the University of
 9  Houston Law Center's Immigration Clinic.
10     Q.   Okay.   What years did you hold those --
11     A.   That was --
12     Q.   -- positions?
13     A.   I started that in early 2013 after I had
14  received DACA November 2012.   I started January 2013
15  at the immigration clinic, and I continued to work
16  there as a -- as an unpaid intern until I graduated
17  from -- from the University of Houston in May of2015.
18     Q.   Okay.   So let me just make sure I have this
19  right.   So from 2013 to 2015, unpaid intern
20  translator?
21     A.   Yes.
22     Q.   Got it.
23     A.   I -- the summer of 2013, I was paid because
24  there had been a private, like, donation to pay a
25  translator.

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 80
 1     Q.   Okay.
 2     A.   That was the only time period, that summer
 3  of 2013.
 4     Q.   All right.
 5     A.   After that I remained there.

6       Q.    What was the, like, application process like
7  for that job?
8       A.    I reached out to the Law Center, the Law
9  Center's Immigration Clinic through a friend who was
10  already interning there.   And I sent in my résumé, had
11  an interview with all of the attorneys, professors.
12       Q.    Uh-huh.
13       A.    And then was brought on.
14       Q.    Okay.   Did you have to show work
15  authorization to get that job?
16       A.    I did when I was -- because I was going to be
17  receiving that -- the payment.
18       Q.    All right.
19       A.    In the summer.
20       Q.    Okay.   And then in 2015, you're no longer the
21  intern translator, and do you get a different job at
22  that point?
23       A.    During that time of 2013, 2015, summer
24  of 2014, I was a sales intern at Mattress Firm.
25       Q.    Okay.

Page: 81
1       A.    That was the only other internship that I had
2  during undergrad.   I was a marketing major.
3       Q.    Okay.   And for that internship, were you
4  paid?
5       A.    Yes.
6       Q.    Okay.   Did you -- again, did you have to
7  present work authorization to get that internship?
8       A.    Yes.   That was a requirement, valid work
9  authorization.
10       Q.    All right.   So then 2015 after your -- stop
11  being a translator, did you get a different job?
12       A.    I did not because that is when I started my
13  first year of law school.
14       Q.    Got it.
15       A.    So I did not work after I -- I graduated from
16  college.
17       Q.    Okay.   During law school, did you ever hold
18  any jobs?
19       A.    I had summer internships, yeah.
20       Q.    Were those paid?
21       A.    They were unpaid --
22       Q.    Okay.
23       A.    -- public interest.
24       Q.    All right.   And now since you have graduated
25  law school, do you have a job now?

Jun 16, 2018 Perez, Karla (6_16_2018)

Page: 82
1       A.    I do.
2       Q.    Congratulations.
3       A.    Thank you.
4       Q.    And what is your job now?

5      A.   I am going to be an equal justice works
6   fellow sponsored by Greenberg Traurig and the Texas
7   Access to Justice Foundation and hosted at the Tahirih
8   Justice Center in Houston.
9      Q.   All right.   What sort of duties or
10   responsibilities will you have as part of your new
11   job?
12      A.   I will be an immigration attorney there
13   working with survivors of gender-base violence.
14      Q.   All right.   Have you started yet?
15      A.   No.
16      Q.   Okay.   When do you start?
17      A.   September.
18      Q.   Oh, all right.   Have you taken the bar?
19      A.   No.
20      Q.   Okay.   I bet that's what you'll be doing this
21   summer.
22      A.   Yes.
23      Q.   All right.   To get that job, the one you're
24   going to start in September, did you have to show work
25   authorization to get that?

Page: 83
1      A.   Yes.
2      Q.   Okay.   So have we covered your entire work
3   history?
4      A.   Clinic, Mattress Firm, and then the public
5   interest fellowships during the school year during law
6   school, yes.
7      Q.   Okay.
8      A.   I -- during -- in 2017, I worked as a
9   contractor during the legislative period for United We
10   Dream, for that campaign.   And I was paid for that job
11   and had to provide work authorization.
12      Q.   All right.   Thank you.
13            Okay.   Shift gears a little bit.   Do you
14   still have family in Mexico?
15      A.   Yes.
16      Q.   What is their -- I don't need names or any of
17   their addresses, just what is their relation to you?
18            MS. MORENO:   Objection.   We have an
19   agreement not to talk about immediate relatives,
20   family members.
21            MR. DISHER:   About immigration status of
22   being a relative.
23      Q.   (BY MR. DISHER) I'm just asking if you have
24   relatives in Mexico.   That's all I want to know.
25      A.   Yes.

Jun 16, 2018 Perez, Karla (6_16_2018)

Page: 84
1      Q.   All right.   And just what relation are they
2   to you?
3      A.   Extended family only.

4      **Q.    Okay.   Since you came here in 1995, have you**
5  **left the United States?**
6      **A.    No.**
7      **Q.    Been here ever since?**
8      A.    Yes.
9      **Q.    All right.   Have you ever applied for advance**
10  **parole?**
11     A.    Yes.
12     **Q.    When did you apply for advance parole?**
13     A.    Early -- late -- late 2016, early 2017.   It
14  was over my school winter break.
15     **Q.    Okay.   Did you get advance parole?**
16     A.    I was -- my application for advance parole
17  was approved in early March.
18     **Q.    Of?**
19     A.    Of 2017.
20     **Q.    Okay.   And then why did you apply for advance**
21  **parole?**
22     A.    My maternal grandmother has gotten very sick
23  over the years, and I thought that I could have the
24  opportunity to see her during that time.   Yeah.
25     **Q.    And is she in Mexico?**

```
1                    CHANGES AND SIGNATURE

2                         KARLA PEREZ

3                       June 16, 2018

4

5   PAGE/LINE              CHANGE                    REASON

6    21, 21        Strike "and" in "created and by"   Transcription Error

7    40, 1         Correct "fighting it" to "finding it"   Transcription Error

8    45, 1         Correct "DH" to "DHS"              Typographical Error

9    65, 17        Replace "monitor" with "mentor"    Transcription Error

10   65, 21        Replace "monitor" with "mentor"    Transcription Error

11   75, 7         Replace "wasn't" with "was"        Transcription Error

12   78, 13        Strike "that"                      Transcription Error

13   87, 13        Replace "out" with "it"            Transcription Error

14   90, 22        Replace first "or" with "of"       Typographical Error

15   91, 15        Replace "confirm" with "confer"    Transcription Error

16   96, 11        Correct "Danielle" to "Daniel"     Transcription Error

17   96, 12        Correct "Candalaria" to "Candelaria"   Typographical Error

18   96, 12        Correct "Mela" to "Mirla"          Transcription Error

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1   I, KARLA PEREZ, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5                          *Karla Perez*
                    KARLA PEREZ

6

7

8   THE STATE OF *Texas* )

9   COUNTY OF *Harris* )

10

11  Before me, *Elsa Ramirez*, on this day

12  personally appeared KARLA PEREZ, known to me or proved

13  to me on the oath of *Texas Driver License* (or through

14  description of identity card or other document) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that he/she executed

17  the same for the purpose and consideration therein

18  expressed.

19  Given under my hand and seal of office on this

20  *12* day of *July*, 20*18*.

21

22

23  ELSA RAMIREZ              NOTARY PUBLIC IN AND FOR
    Notary Public, State of Texas

24  My Commission Expires     THE STATE OF *Texas*
    June 16, 2019

25                            My Commission Expires: *June 16, 2019*

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
    STATE OF TEXAS, ET. AL.         )
 4                                   )
             PLAINTIFFS,            )
 5                                   )
    V.                              ) CASE NO. 1:18-cv-00068
 6                                   )
    UNITED STATES OF AMERICA,       )
 7  ET. AL.,                        )
                                     )
 8            DEFENDANTS,           )
                                     )
 9  AND                             )
                                     )
10  KARLA PEREZ, ET. AL.,           )
                                     )
11        DEFENDANT-INTERVENORS.)

12

13               REPORTER'S CERTIFICATE

14          ORAL DEPOSITION OF KARLA PEREZ

15                  June 16, 2018

16

17        I, Mia Cieslar, Certified Shorthand Reporter

18  in and for the State of Texas, hereby certify that to

19  the following:

20        That the witness, KARLA PEREZ, was duly sworn

21  by the officer and that the transcript of the oral

22  deposition is a true record of the testimony given by

23  the witness;

24        I further certify that pursuant to FRCP Rule

25  30(f)(1) that the signature of the deponent:
```

Karla Perez                                                          June 16, 2018
                                                                       Page 103

1          __X__ was requested by the deponent or a party

2    before the completion of the deposition and returned

3    within 30 days from date of receipt of the transcript.

4    If returned, the attached Changes and Signature Page

5    contains any changes and the reasons therefor;

6          _____ was not requested by the deponent or a

7    party before the completion of the deposition.

8          I further certify that I am neither attorney

9    nor counsel for, related to, nor employed by any of

10   the parties in the action in which this testimony was

11   taken.

12         Further, I am not a relative or employee of

13   any attorney of record in this cause, nor do I have a

14   financial interest in the action.

15         Subscribed and sworn to on this the _____ day

16   of _____, 20____.

17

18

19         _____
                Mia Cieslar, CRC, RDR, CRR
20              Texas CSR 5763
                Expiration:  12/31/19
21              Kim Tindall & Associates, LLC
                Firm Registration No. 631
22              16414 San Pedro, Suite 900
                San Antonio, Texas  78232
23              Phone (210) 697-3400
                Fax (210) 697-3408
24

25

# DEF-INTERV.

# EX. 135

Monica Smoot                                            June 19, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3  STATE OF TEXAS, et al.,    )
                               )
 4       Plaintiffs,           )
                               )
 5  vs.                        )   CASE NO. 1:18:CV-68
                               )
 6  UNITED STATES OF AMERICA,  )
    et al.,                    )
 7                             )
         Defendants,           )
 8                             )
    and                        )
 9                             )
    KARLA PEREZ, MARIA ROCHA,  )
10  JOSE MAGAÑA-SALGADO, NANCI )
    J. PALACIOS GODINEZ, ELLY  )
11  MARISOL ESTRADA, KARINA    )
    RUIZ DE DIAZ, CARLOS       )
12  AGUILAR GONZALEZ, KARLA    )
    LOPEZ, LUIS A. RAFAEL,     )
13  DARWIN VELASQUEZ, JIN      )
    PARK, OSCAR ALVAREZ, NANCY )
14  ADOSSI, DENISE ROMERO,     )
    PRATHISHTHA KHANNA, JUNG   )
15  WOO KIM, ANGEL SILVA,      )
    MOSES KAMAU CHEGE, HYO-WON )
16  JEON, ELIZABETH DIAZ,      )
    MARIA DIAZ, and BLANCA     )
17  GONZALEZ,                  )
                               )
18       Defendant-Intervenors.)

19

20

21

22

23

24

25
```

Monica Smoot

June 19, 2018

Page 2

```
 1
 2                    ORAL DEPOSITION OF
 3                     MONICA SMOOT
 4                    June 19, 2018
 5
 6      ORAL DEPOSITION OF MONICA SMOOT, produced as a
 7  witness at the instance of the Proposed
 8  Defendant-Intervenors and duly sworn, was taken in the
 9  above-styled and numbered cause on the 19th day of
10  June, 2018, from 9:14 a.m. to 12:05 p.m., before
11  Amy M. Clark, Certified Shorthand Reporter in and for
12  the State of Texas, reported by computerized stenotype
13  machine at the offices of the Texas Attorney General,
14  300 West 15th Street, Austin, Texas 78701, pursuant to
15  the Federal Rules of Civil Procedure and the provisions
16  stated on the record or attached hereto.
17
18
19
20
21
22
23
24
25
```

**For Depo Excerpts**

**Transcripts**

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 6

1                               MONICA SMOOT,
2 having been first duly sworn, testified as follows:
3                               EXAMINATION
4 BY MR. HERRERA
5      **Q.    Good morning.**
6      A.    Good morning.
7      **Q.    My name is Ernest Herrera, and I'm representing**
8 **the Defendant-Intervenors in this case, and there are a**
9 **few of them, so I'm not gonna name all of them.**
10                          **But would you please state your name for**
11 **the record.**
12      **A.    My name is Monica Smoot.**
13                     MR. DISHER:   Let's go ahead and do
14 announcements around the table.
15                     MR. HERRERA:   Sure.   That's fine.
16                     MS. GREGORY:   Katherine Gregory, New
17 Jersey Office of the Attorney General.
18                     MR. WYATT:   My name is Keith Wyatt.   I'm
19 with the United States Attorney's Office in Houston,
20 Texas.   I represent the United States.
21                     MS. PICKLE:   Leslea Pickle, representative
22 from the Health and Human Services Commission.
23                     MR. PEROYEA:   Trent Peroyea with the Texas
24 Attorney General's Office.
25                     MR. DISHER:   Todd Disher with the Texas

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 9

1                     THE REPORTER:   Ms. Smoot, I'm gonna need
2 you to speak up.
3                     THE WITNESS:   Oh, I'm sorry.
4                     THE REPORTER:   That's okay.
5      **Q.    (By Mr. Herrera) And was there a specific focus**
6 **of your statistics degree, your master's?**
7      A.    Not really.
8      **Q.    Okay.   Have you done any research regarding**
9 **health care costs before working at your current**
10 **employer?**
11                     MR. DISHER:   Object to the form.
12      A.    No.
13      **Q.    (By Mr. Herrera) Well, let me back up a second.**
14                          **Where do you -- where are you currently**
15 **employed?**
16      **A.    Currently, I'm at the Texas Health and Human**
17 **Services Commission.**
18      **Q.    And can you describe briefly what your employer**
19 **is, what you do, what your office does?**
20      **A.    My office is the Center for Analytics and**

21 Decision Support, and we do research and analysis on
22 Health and Human Services programs that the agency
23 provides or oversees.
24    Q.    And what kind of advice do you give?   What kind
25 of advising does your office do?

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 11
1    Q.    And did you do the same kind of work for the
2 HHSC?
3            I know you described kind of your job
4 description a little bit.
5            But what is your -- what's your day-to-day
6 work like at the HHSC?
7    A.    Currently?
8    Q.    That's right.   Yes.
9    A.    Currently, I am the director of the Center for
10 Analytics and Decision Support, and that group does
11 research and analysis on Health and Human Services
12 programs.
13    Q.    I'm gonna take out a few items, and this might
14 help us get into a little more detail about where we're
15 going today.   I'm gonna mark a few exhibits at once.
16            MR. HERRERA:   Do Exhibit 1.
17            (Exhibit 1 marked.)
18    Q.    (By Mr. Herrera) I'm handing you what we're
19 marking as Exhibit 1.
20            And do you recognize this document?
21    A.    Yes, I do.
22    Q.    And what is this document?
23    A.    This is my declaration.
24    Q.    And when did you prepare -- or when did you
25 give the testimony that's in this declaration?

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 13
1 out another one of these.
2            (Exhibit 2 marked.)
3    Q.    (By Mr. Herrera) I'm gonna hand you what is
4 marked as Exhibit 2.
5            And what is this document, if you
6 recognize it?
7    A.    Yes.   This was a report that my department
8 wrote for -- to meet the requirement of Rider 59 out of
9 the legislative session.
10    Q.    And can you -- what is Rider 59?
11    A.    Rider 59 was a charge to us to look into the
12 health care spending for undocumented immigrants in
13 Texas.
14    Q.    And what is your role in compiling the Rider 59
15 reports?
16    A.    My role currently is to approve the final
17 version of the report.

18    Q.    And what does that involve, approving the final
19 version?
20    A.    Approval involves reading the document, talking
21 to the analyst who put the information together to make
22 sure I understand their methodology and the statements
23 that they're putting in there.
24    Q.    In your time at HHSC, did you ever work on the
25 methodological or analytical side of this as opposed to

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 14
1 being the one who approves it?
2                MR. DISHER:  Objection; vague.    Objection;
3 compound.  Go ahead.
4    Q.    (By Mr. Herrera) Go ahead.
5    A.    No.
6    Q.    For Rider 59 reports, are there -- is there a
7 set of minimum calculations or numbers that need to go
8 into these reports, or does HHSC -- go ahead and answer
9 that one?
10                MR. DISHER:  Objection; vague.
11    Q.    (By Mr. Herrera) You can answer.
12    A.    No.
13    Q.    No.
14                So what -- how does HHSC decide what to
15 put in these reports?
16                MR. DISHER:  Objection; vague.
17    A.    The decision is based on our research on which
18 programs serve immigrants through our programs.
19    Q.    (By Mr. Herrera) Does the reporting in the
20 Rider 59 reports include reporting on programs that
21 serve citizens in addition to immigrants?
22    A.    Yes.
23    Q.    Okay.    And in -- we'll look at this one first.
24                So let's go to page...
25                MR. WYATT:  Which exhibit are you on?

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 15
1                MR. HERRERA:  I'm sorry.  2, Exhibit 2.
2                MR. WYATT:  Okay.
3    Q.    (By Mr. Herrera) Let's go to page -- it'll say
4 App 0889 or Page 4 of the report.    And at the top it
5 says, executive -- executive data summary.
6                And you'll see -- because I'm sure you --
7 and excuse me if these questions sound a little obtuse.
8 But just going step by step here.
9                Texas Emergency Medicaid, Texas Family
10 Violence Program, and then Texas Public Hospital
11 Districts are the programs that are reported in this
12 report, correct?
13    A.    Correct.

14      Q.    Are there any other services or programs that
15  are reported by Rider 59?
16              MR. DISHER:   Objection; vague.
17      A.    For this current report, no.
18      Q.    (By Mr. Herrera) For the one we're looking at
19  now?
20      A.    No others.
21      Q.    Okay.   So you mentioned a little bit about
22  these -- why you prepared these reports or why HHSC
23  prepares these reports.
24              Let's -- would you agree with me that the
25  reason you have to estimate those costs that are in the

**Page:** 16
1  Rider 59 report is because none of the programs HHSC
2  administers require participants to report their
3  immigration status?
4              MR. DISHER:   Objection; vague.
5      A.    Correct.
6      Q.    (By Mr. Herrera) And the same question, but
7  with a slightly different ending.
8              Would you agree with me that the reason
9  you have to estimate those costs in the Rider 59
10  is because none of the programs HHSC administers require
11  participants to report their immigration status -- I'm
12  sorry -- report their residency status?
13      A.    No, I don't agree with you.
14      Q.    Okay.   And can you explain why -- why not?
15      A.    Because for eligibility for the programs,
16  residency status is a required element.
17      Q.    And how is that reported?   Or how is that
18  reported by, say, someone who walks in the door?   Or
19  is -- we'll back up a second and come back to that one.
20              Would you agree with me that the reason
21  you have to estimate the costs contained in the Rider 59
22  report is because none of the programs HHSC administers
23  require participants to report their citizenship?
24              MR. DISHER:   Objection; vague.
25      A.    That is not correct.

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 17
1      Q.    (By Mr. Herrera) Okay.   So among the programs
2  we mentioned, Texas Emergency Medicaid -- although, we
3  should probably back up.
4              What is Texas Emergency Medicaid?
5      A.    That is a federally required condition of
6  Medicaid in which noncitizens who present at the
7  hospital emergency room are allowed to receive services,
8  and Medicaid will pay for those services.
9      Q.    And at what kind of facilities would Texas
10  Emergency Medicaid be used?
11      A.    I don't think that I can list all of the
12  facilities that would.

13    Q.    Understood.   I get -- I get why.
14           But is there a -- are there kind of broad
15 categories that you-all consider for that?
16    A.   Typically, hospitals.
17    Q.    And you said noncitizens.   So would it be
18 correct to say that citizens don't receive Texas
19 Emergency Medicaid -- or rather that Texas Emergency
20 Medicaid is not used by citizens?
21    A.   The -- for the definition of Emergency Medicaid
22 in this report, it would only be noncitizens.
23    Q.    And why do you -- why do you make the
24 distinction of only for the purposes of this report?
25    A.   Because there are other instances where a

**Page:** 18
1 person may present at the hospital or emergency room who
2 is not currently enrolled in Medicaid, and they may be
3 considered presumptively eligible and receive services.
4    Q.    And that person might be --
5    A.   That could be anyone.
6    Q.    And that -- so that could be a citizen?
7    A.   (Nodding.)   Yes.
8    Q.    What kinds of services does Emergency Medicaid
9 cover?
10           And I know that's -- I'm sure there's a
11 long list somewhere that we're not gonna go into.
12           But is there -- does it include -- I'll
13 ask it this way:   Does Emergency Medicaid include
14 services associated with perinatal care?
15    A.   It will include deliveries.
16    Q.    Okay.   Now, I'm gonna ask you a little bit
17 about the Texas Family Violence Program.
18           What is that program?
19    A.   That is a program that is administered by the
20 Texas Department of Health or Texas State Health
21 Services, whatever they call it now.   And I -- I'm not
22 an expert on that program, so I really can't describe it
23 to you.
24    Q.    Now, here in this report, looking back, again,
25 at Exhibit 2, on Page 4, the second large category here

**Page:** 19
1 of B, it says, Texas Public Hospital Districts, and then
2 underneath, it says, estimated uncompensated care for
3 undocumented immigrants.
4           What does the term Texas Public Hospital
5 Districts include?
6    A.   That's an area I'm not an expert in, so I can't
7 give you a good definition.
8    Q.    Can we look at Page 7 of this report.
9    A.   Uh-huh.
10    Q.    Actually, Page 6.   I'm sorry.
11    A.   (Witness complies.)
12    Q.    So the first sentence in the Section B under
13 Texas Public Hospital Districts says, limited
14 information exists to estimate hospital-specific

15  uncompensated care for undocumented immigrants.
16          Do you agree with that statement?
17    A.   Yes.
18    Q.   Okay.   And would you be able to explain for me
19  what is -- why that information is limited?
20          MR. DISHER:   Objection; vague.   Objection;
21  calls for speculation.   Objection; outside the scope of
22  her declaration.
23          Go ahead and answer.
24          MR. HERRERA:   I'm gonna ask counsel to
25  stick to the allowable objections here, which would be

**Page: 20**
1  for foundation or form.
2          So I guess if it's vague, just say form.
3          MR. DISHER:   I'll tell you that that is
4  the Texas rule, and the federal rules are slightly
5  different.   And every lawyer in this case has been
6  objecting the stated basis for their objection,
7  including counsel MALDEF.
8    Q.   (By Mr. Herrera) You can go ahead and answer.
9    A.   The reason that I believe that it is limited
10  information is because undocumented status is not
11  information that is collected -- was not collected for
12  that purpose.
13    Q.   Okay.   And let's go down to the second
14  paragraph here that asks about -- well, first, it
15  says -- it says, first -- in that second sentence there,
16  first, the software company Network Sciences created a
17  web-based eligibility screening tool called the
18  Community Health and Social Services Information System.
19          Are you familiar with that screening tool?
20    A.   No, I'm not.
21    Q.    So do you know what information that system or
22  tool collects?
23    A.   No.
24    Q.   And we're gonna go so that we can stick more to
25  the scope of your declaration as -- as counsel was --

**Page: 21**
1  was mentioning.   We're gonna go to your declaration,
2  which is Exhibit 1.   And before we go into that, I want
3  to ask you if we can clarify for the record that the
4  terms DACA recipient and undocumented immigrant are not
5  the same.
6          Would you agree with that?
7    A.   They are not the same.
8    Q.   I'm going to ask you a few questions about your
9  declaration and make sure that we get an idea of what
10  the scope is.   So I'm not trying to be critical or
11  anything like that with these questions.
12          But my first question is:   In Exhibit 1,
13  the estimates that you report do not purport to estimate
14  the costs of providing HHSC services to DACA
15  recipients --
16          MR. DISHER:   Objection.

17    **Q.    (By Mr. Herrera) -- right?**
18             MR. DISHER:   Objection; vague.
19    A.   Can you repeat that.
20    **Q.    (By Mr. Herrera) Sure.   Do the estimates that**
21 **you report in your declaration estimate the costs of**
22 **providing HHSC services to DACA recipients?**
23             MR. DISHER:   Objection; vague.
24    **A.   No.**
25    **Q.    (By Mr. Herrera) Do the estimates contained in**

**Page:** 22
 1 **your declaration identify the role of DACA in the**
 2 **estimated costs?**
 3             MR. DISHER:   Objection; vague.
 4    **A.   No.**
 5    **Q.    (By Mr. Herrera) And your declaration does not**
 6 **address what would happen if there was no DACA program,**
 7 **right?**
 8             MR. DISHER:   Objection; vague.
 9    **A.   Correct.**
10    **Q.    (By Mr. Herrera) And your declaration does not**
11 **estimate what would happen to those estimates of costs**
12 **if suddenly all DACA recipients left Texas, correct?**
13             MR. DISHER:   Objection; vague.
14             Go ahead.
15    **A.   Correct.**
16    **Q.    (By Mr. Herrera) Would it be correct to say**
17 **that the estimates in your report are estimates of costs**
18 **of providing HHSC benefits and services to undocumented**
19 **immigrants in Texas?**
20    **A.   Yes.**
21    **Q.    Do you do any calculations of offsets of those**
22 **costs in your declaration?**
23    **A.   No.**
24    **Q.    For example, do you calculate the extent to**
25 **which undocumented immigrants contribute to those**

**Page:** 23
 1 **programs through taxes of any kind?**
 2             MR. DISHER:   Objection; form.
 3    **A.   No.**
 4    **Q.    (By Mr. Herrera) And your -- in your**
 5 **declaration, you don't offer overall net effects on**
 6 **costs and benefits for HHSC.**
 7             **For example, whether or not undocumented**
 8 **immigrants contribute to the program more or less than**
 9 **they benefit from them?**
10             MR. DISHER:   Objection; form.   Objection;
11 **vague.   Objection; compound.**
12    **A.   Correct.   I do not.   We do not.**
13    **Q.    (By Mr. Herrera) And in your declaration, you**
14 **don't offer any larger, overall analyses of net effects**
15 **on Texas' expenditures, in general.**
16             **For example, whether undocumented**
17 **immigrants contribute more or less to Texas overall --**
18 **Texas' overall budget than they cost Texas?**

19          MR. DISHER:   Objection; form.   Objection;
20   vague.   Objection; speculation.   Objection; calls for
21   assumption.
22     A.   Can you repeat the question.
23     Q.   (By Mr. Herrera) Sure.   No problem.
24              And in your declaration, you don't offer
25   any larger, overall net effects on Texas' expenditures

**Page: 24**
1   in general, correct?
2              MR. DISHER:   Objection; calls for
3   speculation.
4     A.   I do not.
5     Q.   (By Mr. Herrera) Do you -- for example,
6   considering the question just before it, do you, for
7   example, consider whether undocumented immigrants
8   contribute more or less to Texas' overall budget than
9   they cost Texas?
10             MR. DISHER:   Objection; vague.
11     A.   I do not.
12     Q.   (By Mr. Herrera) Okay.   So let's go a little
13   bit into the Medicaid program.
14              Let's say a pregnant woman comes into the
15   hospital for emergency care and she is in labor and she
16   is eligible for Medicaid emergency care.   So let's
17   consider that hypothetical for a minute.
18              Her medical claims data do not
19   conclusively identify her residency status, correct?
20             MR. DISHER:   Objection; vague.
21     A.   If she -- if she was eligible for Emergency
22   Medicaid services, she would be a noncitizen.
23     Q.   (By Mr. Herrera) And how would --
24             MR. WYATT:   Could you speak up.
25              She would be what?

**Page: 25**
1              THE WITNESS:   A noncitizen.
2              MR. WYATT:   Thank you.
3     Q.   (By Mr. Herrera) And how would that be
4   determined in her claim?
5     A.   I don't know.
6     Q.   How do you know whether or not that -- that
7   woman in that situation is a noncitizen?
8     A.   I would know by the type program that the
9   claims administrator would assign the claim.
10     Q.   And are you familiar with the process that a
11   claims administrator goes through to determine
12   citizenship?
13     A.   I'm not an expert in that.
14     Q.   Okay.   Do you have any knowledge of that area?
15             MR. DISHER:   Objection; vague.
16     A.   Of which?
17     Q.   (By Mr. Herrera) Do you have any knowledge of
18   how a claims administrator would determine a woman in
19   this situation, or any recipient of Emergency Medicaid,
20   were a citizen or not?

21          MR. DISHER:   Same objection.
22     A.   I'm not an expert in eligibility determination.
23     **Q.   (By Mr. Herrera) Okay.   All right.**
24          **Do you know whether you're testifying as**
25 **an expert witness in any capacity in this case?**

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page: 26**
1          MR. DISHER:   Objection; calls for a legal
2 conclusion.   Objection; vague.
3     A.   I'm an expert in the calculations that were
4 used to create this report.
5     **Q.   (By Mr. Herrera) Sure.   And I -- I don't**
6 **question the work you do.   I'm sure you're much smarter**
7 **than all the lawyers put together on this stuff.**
8          **But the -- I'm asking for the -- you know,**
9 **in this case, we have lay and expert witnesses.**
10          **But you con- -- you said you don't**
11 **consider yourself an expert on claims administration for**
12 **Emergency Medicaid.**
13          **Do you know anything about what they do or**
14 **what someone in that -- that job would do to determine**
15 **whether or not someone's a citizen?**
16     **A.   I know some information, but I can't**
17 **conclusively say yes or no.**
18     **Q.   Okay.   Can't conclusively say that you know**
19 **what they do?**
20     **A.   Yes.   Correct.**
21     **Q.   You said earlier that there are times where**
22 **someone might receive the services, even if they were a**
23 **citizen, just if they showed up at the hospital.**
24          **Let's go back to our hypothetical about a**
25 **pregnant woman in the hospital for emergency care in**

**Page: 27**
1 **labor and eligible for Medicaid emergency care -- or**
2 **rather -- I'm sorry, let's go back to this mother.**
3          **Even if she did not provide any proof of**
4 **her citizenship status, could she be given labor and**
5 **delivery services?**
6     **A.   Yes.**
7     **Q.   And after the delivery, even if the mother did**
8 **not provide any proof of her status, the baby would**
9 **receive care, as well, at least at first, correct?**
10     **A.   Correct.**
11     **Q.   And in those circumstances, Medicaid would**
12 **still cover the services, right?**
13          MR. DISHER:   Objection; vague.
14     A.   If the mother and child were ultimately deemed
15 eligible for Medicaid.
16     **Q.   (By Mr. Herrera) Thank you.**
17          **Let's go back to Exhibit 1, which is your**
18 **declaration, and look at Paragraph 8 in that**
19 **declaration.**

20      A.   (Witness complies.)
21      Q.   So actually let's go to -- okay.   So here in
22 the -- Paragraph 8.   If you can look at the statements
23 you made here, just to kind of get us on -- on course.
24 The first sentence of Paragraph 8 is, Emergency Medicaid
25 is a federally required program jointly funded by the

**Page:** 28
 1 government and the states, and then you give a
 2 description of the program.   And then at the end of --
 3 you have a sentence that starts with the words, the
 4 total estimated costs, right?
 5      A.   Yes.
 6      Q.   Okay.   So let's look again, with that in mind,
 7 at Exhibit 2.
 8      A.   Uh-huh.
 9      Q.   And we're gonna go to Page 5 of that report --
10      A.   Uh-huh.
11      Q.   -- where it says App 0890, and it says,
12 according to this report, HHSC Medicaid claims data
13 don't conclusively identify legal residency status.
14               MR. DISHER:   Counsel, where are you
15 reading from?
16               MR. HERRERA:   Sure.
17      Q.   (By Mr. Herrera) Oh, sorry.   If you look in the
18 middle paragraph under the first set of calculations --
19 or, rather, it's in the middle under Texas Emergency
20 Medicaid.   It's the second text paragraph.   And it
21 starts with the words, since HHSC Medicaid claims,
22 right?
23      A.   Uh-huh.   Yes.
24      Q.   So since HHSC Medicaid claims data do not
25 conclusively identify the legal residency status of

**Page:** 29
 1 immigrants, the portion -- and then it gives the portion
 2 in Emergency Medicaid payments attributable to
 3 undocumented immigrants must be estimated.
 4               And is this true for all of the Rider
 5 Reports?
 6               MR. DISHER:   Objection; vague.
 7      A.   For all Rider Reports?
 8      Q.   (By Mr. Herrera) No.   I'm sorry.   For the ones
 9 that you included as exhibits to your declaration.
10      A.   Yes, that is true.
11      Q.   So let's jump ahead.   I'm gonna mark -- I'm
12 gonna mark a few, bear with me, and then we'll look at
13 the most recent one.
14               And I forgot to mention at the beginning
15 of the deposition, if you need a break at any point, you
16 can go ahead and ask your counsel, and we can -- we can
17 take a break --
18      A.   Okay.
19      Q.   -- for any reason.   Okay?
20      A.   (Nodding.)
21               (Exhibit 3 marked.)

22      Q.    (By Mr. Herrera) Here we go.   I'm handing you
23 what is marked as Exhibit 3.
24            And this is another Rider Report, right,
25 but it says 2010 update?

**Page:** 30
1            So that's a 2010 update of the Rider
2 Report, right?
3      A.    Correct.
4            (Exhibit 4 marked.)
5      Q.    (By Mr. Herrera) Now, I'm handing you what I
6 marked as Exhibit 4.
7            And this is another Rider Report, but this
8 one says February 2013 update, right?
9      A.    Correct.
10            MR. WYATT:   Did you mark the February 2013
11 update as an exhibit?
12            MR. HERRERA:   Yes.   That was -- I believe
13 I marked that one as Exhibit 4.
14            MR. WYATT:   Thank you.
15            MR. HERRERA:   So 2010 update as Exhibit 3,
16 and February 2013 as Exhibit 4.
17            MR. WYATT:   Thank you.
18            (Exhibit 5 marked.)
19      Q.    (By Mr. Herrera) Now I'm handing you what I
20 marked as Exhibit 5.
21            And this is a Rider Report, but the date
22 here says December 2014 on it, right?
23      A.    Yes.
24            (Exhibit 6 marked.)
25      Q.    (By Mr. Herrera) I have one more of these.

**Page:** 31
1            And I'm handing you what is marked as
2 Exhibit 6, and this one says -- the date at the bottom
3 says March 2017, right?
4      A.    Yes.
5      Q.    Okay.   So let's keep this one on top here, the
6 No. 6.
7            And let's look at Page 6 of this report.
8      A.    (Witness complies.)
9      Q.    So the number at the bottom will say App 0937.
10            So let's -- so this page is estimating the
11 costs of the Emergency Medicaid program for Fiscal Year
12 2015.
13            And let's walk through this.
14            So the U.S. Census Bureau American
15 Community Survey, also known as the ACS, estimates that
16 approximately 2.96 million noncitizens reside in Texas,
17 correct?
18      A.    Correct.
19      Q.    And, presumably, some of those are undocumented
20 and some are not, right?
21      A.    Presumably.
22      Q.    Is it possible that some of them are on
23 temporary visas?

24          MR. DISHER:  Objection; calls for
25  speculation.

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 32
1      A.   I don't have that knowledge.
2      **Q.   (By Mr. Herrera) Is it possible that some of**
3  **them are DACA recipients?**
4                  MR. DISHER:  Objection; calls for
5  speculation.
6      A.   I don't have that knowledge.
7      **Q.   (By Mr. Herrera) And does the ACS break down**
8  **this 2.96 million noncitizen number according to**
9  **documented or undocumented status?**
10     **A.   No.**
11     **Q.   The HHSC estimates, according to this report,**
12  **that no less than 50 percent of those 2.96 million were**
13  **undocumented, right?**
14     **A.   Correct.**
15     **Q.   Okay.   And how does HHSC estimate that?**
16               **MR. DISHER:   Objection; vague.   Objection;**
17  **the document speaks for itself.**
18               **Go ahead and answer, if you can.**
19     **A.   Our estimates are based on the Census Bureau's**
20  **American Community Survey Population Estimates.**
21     **Q.   (By Mr. Herrera) Okay.**
22     **A.   And for this particular report, we used**
23  **previous methodology using the Department of Homeland**
24  **Security estimates on percentage of immigrants who are**
25  **documented versus non-documented.**

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Annotation Issues:** ▮ For Depo Excerpts
**Annotation Author:** cleija

**Page:** 33
1      **Q.   And that -- that DH -- let's talk a little bit**
2  **about that DHS estimate.**
3               **So we're looking still at Exhibit 6 on**
4  **Page 6.   Let's go to Page 5, the Rider Report.**
5               **That estimated percent of undocumented**
6  **residents used to be based on reports from the office of**
7  **DHS correct?**
8      **A.   Correct.**
9      **Q.   And those reports were estimates as opposed to**
10  **the hard data, correct?**
11     **A.   Correct.**
12     **Q.   Is it true that DHS suspended the publication**
13  **of those estimates after March 2013?**
14     **A.   At the time of this report, there were no more**
15  **updates.**
16     **Q.   Okay.   So let's go to the fourth -- or the**

17 third paragraph, I suppose, that starts with, in
18 contrast; do you see that one?
19     A.    Yes.
20     Q.    And, again, we're on Page 5 of Exhibit 6.    The
21 last sentence of that paragraph says, the last available
22 DHS estimates and reports were published in March 2013
23 for January 2012.    No updates have been provided since
24 then.
25                         Do you agree with all of that?

**Page:** 34
1     A.    At the time of the writing of this report, yes.
2     Q.    And why do you -- when you say at the time of
3 the writing of the report, are you saying that there
4 have been updates?   Were there updates after the --
5     A.    In July of 2017, they released a report.
6     Q.    Okay.   And by they, you mean DHS released a
7 report on undocumented estimates?
8     A.    Correct.
9     Q.    Did HHSC do anything to take the numbers or
10 estimates from that report and use them for
11 recalculation of the Rider Report numbers from March of
12 2017?
13     A.    I'm -- I'm not sure.   I don't know.
14     Q.    So going back to this report from March 2017.
15                   So when you no longer had those DHS
16 estimates of the percent of undocumented residents, the
17 HHSC opted to make what it believed was a conservative
18 guess, right?
19                   MR. DISHER:   Objection; vague.
20     A.    Correct.
21     Q.    (By Mr. Herrera) And I believe the words -- I
22 believe the words here are HHSC opted to assume a
23 conservative approach that presents -- that presently no
24 less than 50 percent of non U.S. citizens residing in
25 Texas are undocumented, right?

**Page:** 35
1     A.    Correct.
2     Q.    Can you tell me everything that that estimate
3 is based on?
4                   MR. DISHER:   Objection; vague.
5     A.    That estimate is based on historical
6 methodology -- methodological assumptions that were made
7 for these estimates for previous reports.   The range was
8 looked -- you know, was taken into account and
9 everything fell within approximately 50 percent.
10     Q.    (By Mr. Herrera) How does that work, the
11 historical -- when you say the historical methodological
12 estimates, what do you mean by that?   What -- what is --
13 can you explain that a little bit for me.
14     A.    Yes.   Our demographer who calculated that --
15 those percentages looked at the previous Rider Reports
16 and his previous calculation for those reports.
17     Q.    Okay.   So does that mean your -- the HHSC
18 analyst took the -- the estimates from prior -- so,

19  like, the 50 percent estimate, he took those from the
20  prior Rider Reports?
21              MR. DISHER:   Objection; form.
22      A.   He based that 50 percent on the previous Rider
23  Reports.
24      Q.    (By Mr. Herrera) What are some of the
25  historical methodological assumptions --

**Page:** 36
1              MR. DISHER:   Objection.
2      Q.    (By Mr. Herrera) -- that were used?
3              MR. DISHER:   Objection; vague.
4      A.   I don't know the details.
5      Q.    (By Mr. Herrera) And you mentioned the range
6  being around 50 percent.
7              So looking back at Exhibit 6 on Page 5
8  again.   It says that it's unlikely -- this is the last
9  clause of the last sentence there in that same
10  paragraph.   Given recent migration trends, it's unlikely
11  that the current estimate would be less than 50 percent.
12              How unlikely is that; do you know?
13              MR. DISHER:   Objection; vague.
14      A.   I don't know.
15      Q.    (By Mr. Herrera) Do you have any analysis or
16  have you done any analysis that would give you a
17  standard error on that estimate?
18              MR. DISHER:   Objection; vague.
19      A.   I don't know.
20      Q.    (By Mr. Herrera) You don't know if you've done
21  any analysis, or you just don't know the standard error?
22      A.   I have not done that analysis.
23      Q.   Oh, okay.   I see.   Thank you.
24              Do you know if anyone else in HHSC has?
25      A.   I don't know.

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 37
1      Q.    Is that something that HHSC analysts have done
2  in the past for Rider Reports, try to come up with a
3  standard error on that estimate?
4      A.   I don't know.
5      Q.    How likely is it that -- that it would be, for
6  example, 10 percent lower or 10 percent higher than
7  50 percent?
8              MR. DISHER:   Objection; calls for
9  speculation.
10      A.   I don't know.
11      Q.    (By Mr. Herrera) And you had to give -- or HHSC
12  had to give that ballpark 50 percent figure because no
13  other exact estimates -- estimate currently exists,
14  right?
15              MR. DISHER:   Objection; vague.
16      A.   Correct.
17      Q.    (By Mr. Herrera) So keeping in mind that

18  **number, once you had an -- a number for noncitizens from**
19  **ACS and your 50 percent HHSC estimate, then you could --**
20  **you could then divide the ACS estimate of the number of**
21  **noncitizens by the HHSC 50 percent estimate, right?**
22              MR. DISHER:   Objection; misstates her
23  testimony.
24      **Q.    (By Mr. Herrera) Okay.   Can you -- can you**
25  **explain the -- how the 50 percent number is used with**

**Page:** 38
 1  **the ACS number for the Rider Report?**
 2       **A.    The ACS number estimates the number of**
 3  **immigrants in Texas.   Our estimate of 50 percent are**
 4  **not -- are undocumented was then applied to the ACS**
 5  **number to come up with an estimate of the number of**
 6  **undocumented.**
 7      **Q.    So would you agree with me that the ultimate**
 8  **estimate is one estimate, being the ACS divided by the**
 9  **DHS's estimate?**
10              MR. DISHER:   Objection; misstates her
11  testimony.
12      A.   I don't know.   I don't recall.
13      **Q.    (By Mr. Herrera) Okay.   So the ACS number of --**
14  **of noncitizens, that's an estimate, right?**
15      A.    Correct.
16      **Q.    Okay.   And the DHS number that's used by**
17  **HHSC -- or rather percentage, the 50 percent, that's an**
18  **estimate, right?**
19      A.    That is an estimate.
20      **Q.   Okay.**
21              MR. DISHER:   Let's take a break.
22              MR. HERRERA:   Sure.   Okay.
23              (Recess from 10:14 a.m. to 10:28 a.m.).
24              MR. HERRERA:   We're back on the record?
25              THE REPORTER:   Yes.

  Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 40
 1      **Q.    Did you review any of the filings by the**
 2  **parties in this case, like the court filings, court**
 3  **papers?**
 4      A.   No.
 5      **Q.    Okay.   Let's go -- for a minute, go back to the**
 6  **hypothetical I had earlier about when we were talking**
 7  **about Emergency Medicaid.**
 8                 **So let's say a pregnant woman, again,**
 9  **comes into the hospital for emergency care, and she is**
10  **in labor, and she is eligible for Emergency Medicaid --**
11  **or Medicaid emergency care.**
12                 **I think we got a couple of -- we answered**
13  **a couple of these.**
14                 **But her medical claims data does not**
15  **conclusively identify her residency status, right?**
16              MR. DISHER:   Objection; vague.

17      **Q.    (By Mr. Herrera) You can go ahead and answer.**
18      A.    It will identify that the client received
19  Emergency Medicaid services.
20      **Q.    Will -- will that -- will that be able to**
21  **show that that person, that woman was undocumented or**
22  **not?**
23      A.    No.
24      **Q.    Would her medical claims data -- again, this is**
25  **the pregnant -- pregnant woman hypothetical.   Would her**

**Page:** 41
1  **medical claims data conclusively identify whether she**
2  **has some visa or any kind of other immigration status?**
3      A.    No.
4      **Q.    All right.   So before the break, we were**
5  **talking about -- so before we went on a break, we were**
6  **talking about the -- the ACS -- the use of the ACS**
7  **estimate and the DHS figure for undocumented immigrants**
8  **in coming up with the Emergency Medicaid figures.**
9             So we were on Page 5 of Exhibit 6, I
10  believe.   Yeah, Exhibit 6.   So let's go to Page 6 of
11  Exhibit 6.
12      A.    (Witness complies.)
13      **Q.    And in this Rider Report, according -- looking**
14  at this page, in this Rider Report, HHSC concludes that
15  about half of the $349 million compensated in 2015 went
16  to undocumented immigrants, right?
17             MR. DISHER:   Objection; form.   Objection;
18  vague.
19      A.    Correct.
20      **Q.    (By Mr. Herrera) That half -- just to be clear,**
21  that half is $174.8 million?
22      A.    No.
23      **Q.    Oh, what is -- what is that?**
24      A.    People.
25      **Q.    Right.   I'm sorry.   I should have been clear.**

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 42
1             So the estimate -- so I asked you that
2  about half of the $349 million expended in Fiscal Year
3  2015 went to undocumented immigrants.
4             So that half would be -- half of that
5  would be 174.8 million, right?
6      A.    1.48 million is the number of people.
7      **Q.    Okay.   In the last sentence here, it says,**
8  **therefore, the estimated amount paid for Emergency**
9  **Medicaid services to undocumented immigrants residing in**
10  **Texas is about 174.8 million, right?**
11      A.    Correct.
12      **Q.    And that is half of the 349 million number?**
13      A.    Correct.
14      **Q.    Okay.   And so looking at this estimate of**
15  **174.8 million of Emergency Medicaid services provided to**
16  **undocumented immigrants, you don't know how much of that**

17  **$174.8 million went to DACA recipients, correct?**
18          **MR. DISHER:   Objection; vague.**
19      **A.    Correct.**
20      **Q.    (By Mr. Herrera) You don't have an estimate for**
21  **how much of that went to DACA recipients, correct?**
22      **A.    I do not.**
23      **Q.    Therefore, you can't say whether**
24  **$174.8 million would have been lower had DACA not**
25  **existed?**

**Page:** 43
 1          **MR. DISHER:   Objection; calls for**
 2  **speculation.**
 3      **A.    I can't attribute any of that.   I cannot.**
 4      **Q.    (By Mr. Herrera) You cannot say?**
 5      **A.    Cannot say.**
 6          MR. DISHER:   Same objection.
 7      **Q.    (By Mr. Herrera) On page -- so the next page,**
 8  **Page 7 of Exhibit 6 or App 0938, this is the page of the**
 9  **2015 Rider 59 Report that estimated the Texas share of**
10  **Medicaid costs, right?**
11              **And there is a table here.**
12              **So the -- the estimating procedures we've**
13  **been talking about in these -- in this report so far,**
14  **taking the ACS estimate of the number of noncitizens and**
15  **dividing it by two, that procedure applies to the**
16  **numbers in this table, right?**
17          MR. DISHER:   Objection; vague.
18      **Q.    (By Mr. Herrera) And by this table, I mean the**
19  **only table that's on Page 7.**
20          MR. DISHER:   Same objection.
21      A.    It relates to the Fiscal Year 2015 numbers,
22  which are part of this version of the report.
23      **Q.    (By Mr. Herrera) And it would not apply to**
24  **Fiscal Year 2013 numbers?**
25      A.    The Fiscal Year 2013 numbers are based on the

📄  Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 44
 1  estimate that is reported in the 2013 report.
 2      **Q.    Okay.   So let's assume for a minute that the**
 3  **estimates of undocumented recipients of Texas Emergency**
 4  **Medicaid -- so that's 1.48 million people -- were real**
 5  **numbers instead of estimate -- estimates divided by**
 6  **estimates.**
 7              **Assume 1.48 million, for the sake of this**
 8  **question, was a hard number.**
 9              **Would you agree with me that you have no**
10  **basis to assume that documented and undocumented**
11  **residents receive Emergency Medicaid services at rates**
12  **equal to their proportion in the immigrant population?**
13          **MR. DISHER:   Objection; form.   Objection;**
14  **calls for speculation.   Objection; vague.**
15      **A.    Can you repeat that.**
16      **Q.    (By Mr. Herrera) Sure.   Would you agree with me**

17  **that you have no basis to assume that documented and**
18  **undocumented immigrants receive Emergency Medicaid**
19  **services at rates equal to their proportion in the**
20  **immigrant population?**
21                  MR. DISHER:   Same objections.
22       A.   I don't know.
23       **Q.    (By Mr. Herrera) So you don't have a basis to**
24  **assume --**
25                  MR. DISHER:   Same objections.

**Page:** 45
 1       **Q.    (By Mr. Herrera) -- that?**
 2       A.   I don't know.
 3       **Q.    You don't -- you don't know whether they use**
 4  **them at equal rates?**
 5       A.   Correct.
 6       Q.   Okay.   Are you aware that social science
 7  research suggests that undocumented immigrants are less
 8  likely to avail themselves of available medical services
 9  when compared to the rest of the immigrant population?
10                  MR. DISHER:   Objection; calls for
11  speculation.
12       A.   I'm not aware that that is a fact.
13       **Q.    (By Mr. Herrera) Are you aware of research that**
14  **suggests that?**
15       A.   Somewhat.
16       Q.   Okay.   And can you tell me a little bit about
17  what you are aware of or what you have heard of or read.
18                  MR. DISHER:   I'll object; outside the
19  scope of your declaration.
20                  But to the extent you can answer it, go
21  ahead.
22       A.   I read that same reference.   That's the extent.
23       **Q.    (By Mr. Herrera) But by that same reference,**
24  **what are you -- is there -- are you talking about**
25  **another declaration or something?**

**Page:** 47
 1  about it?
 2                  And you don't have to -- I'm not trying to
 3  get you to give your political opinion or anything like
 4  that.
 5                  But what is your knowledge of it?
 6                  MR. DISHER:   Also, objection to the extent
 7  that it calls for a legal conclusion.
 8       A.   Yeah.   I don't have -- I don't have enough
 9  knowledge to explain it.
10       **Q.    (By Mr. Herrera) Okay.   Would it be fair to say**
11  **that SB4, or the sanctuary cities bill, makes it so that**
12  **law enforcement must obtain -- and that's local law**
13  **enforcement must obtain or ask for proof of residency or**
14  **citizenship of anyone they speak to?**
15                  MR. DISHER:   Objection; calls for a legal
16  conclusion.   Objection; outside the scope of her

17 declaration.   Objection; calls for speculation.
18 Objection; vague.
19      A.   I don't -- I don't have the knowledge to answer
20 that question.
21      ==Q.   (By Mr. Herrera) Let's go to -- let's go to the==
22 ==next page here in Exhibit 6.==
23              ==And this is the section that talks about==
24 ==Texas Family Violence Program.==
25              ==So a little bit earlier, you said that==

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 48
1 you're not an expert in this program, and I understand
2 that.   But let's look at this first sentence.
3              It says, the Texas Family Violence
4 Program, FVP, provides emergency support and Medicaid
5 services for survivors of family violence and their
6 children through shelter, nonresidential, and special
7 nonresidential project contracts with local community
8 and faith-based nonprofit organizations.
9              MR. DISHER:   This says prevention
10 services, not Medicaid services.
11              MR. HERRERA:   Okay.   Sorry.
12              MR. DISHER:   I just want to make sure.
13              MR. HERRERA:   No.   Thank you.
14              What did I say?
15              MR. DISHER:   You said Medicaid services.
16              MR. HERRERA:   Okay.   Sorry.
17              MR. DISHER:   Prevention services.
18              Not a problem.
19              MR. HERRERA:   Got Medicaid on the brain
20 today, I guess.
21      ==Q.   (By Mr. Herrera) All right.   Well, so just with==
22 ==that in mind, let's look back at your declaration.   So==
23 ==that's Exhibit 1.   So in Paragraph 9, which is App 884.==
24              ==You can take a second to look over that==
25 ==paragraph.==

**Page:** 49
1              ==(Brief pause as witness reads.)==
2      ==Q.   (By Mr. Herrera) So this -- this paragraph==
3 ==addresses the Family Violence Program, right?==
4      A.   Correct.   Correct.
5      ==Q.   Okay.   So the Family Violence Program doesn't==
6 ==ask recipients of services under that program for==
7 ==residency or immigration status, correct?==
8      ==A.   Correct.==
9      ==Q.   Unlike the Emergency Medicaid program, where==
10 ==all of the recipients are supposed to be noncitizens,==
11 ==some of the recipients may be citizens for Family==
12 ==Violence Program, right?==
13      A.   Correct.
14      ==Q.   And some of them may be lawful, permitted==
15 ==resident noncitizens, right?==
16      ==A.   I don't know the details.==

17    Q.    Okay.   The details of who the noncitizens might
18 be or...
19    A.    The details of immigration status.
20    Q.    Okay.   Understood.
21          Unlike the Emergency Medicaid program
22 where all the recipients are noncitizens, some of the
23 recipients may be undocumented.
24          Would you agree with that?
25    A.    They may be.

**Page:** 50
1    Q.    And -- and some may -- some of the recipients
2 of Family Violence Program may be DACA recipients,
3 right?
4    A.    They may be.   I don't know.
5    Q.    So looking back at Exhibit 6.   So App 0939.
6          You use the ACS 2.96 million number for
7 noncitizens in Texas, right?
8          You can take a second to find it.
9    A.    Yes.
10    Q.    Okay.   And much like you did with -- or like
11 you did with the Emergency Medicaid estimate, you
12 estimate, again, that half of those noncitizens are
13 undocumented?
14    A.    Correct.
15    Q.    And then you take that 50 percent number and
16 determine that, therefore, 5.4 percent of the total
17 Texas population is undocumented?
18    A.    Correct.
19    Q.    So then you assume that undocumented people use
20 the Family Violence Program proportional to their
21 estimates present -- their estimated presence in the
22 population, right?
23    A.    Yes.
24    Q.    So if that assumption were incorrect for
25 whatever reason, if for some reason undocumented people

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 50
1    Q.    And -- and some may -- some of the recipients
2 of Family Violence Program may be DACA recipients,
3 right?
4    A.    They may be.   I don't know.
5    Q.    So looking back at Exhibit 6.   So App 0939.
6          You use the ACS 2.96 million number for
7 noncitizens in Texas, right?
8          You can take a second to find it.
9    A.    Yes.
10    Q.    Okay.   And much like you did with -- or like
11 you did with the Emergency Medicaid estimate, you
12 estimate, again, that half of those noncitizens are
13 undocumented?
14    A.    Correct.
15    Q.    And then you take that 50 percent number and

16 determine that, therefore, 5.4 percent of the total
17 Texas population is undocumented?
18      A.    Correct.
19      Q.    So then you assume that undocumented people use
20 the Family Violence Program proportional to their
21 estimates present -- their estimated presence in the
22 population, right?
23      A.    Yes.
24      Q.    So if that assumption were incorrect for
25 whatever reason, if for some reason undocumented people


**Page:** 51
 1 were actually 10 percent of the recipients of Family --
 2 the Family Violence Program, the amount of expenditures
 3 for that program -- the amount of expenditure shares for
 4 undocumented people would be high, right?
 5                    MR. DISHER:   Objection; vague.
 6      A.    Can you repeat that.
 7      Q.    (By Mr. Herrera) Sure.   So if that's not right,
 8 if for some reason undocumented people were actually
 9 10 percent of the recipients, the amount of expenditures
10 shared would be higher?
11      A.    Yes.
12      Q.    Okay.   Or if actually undocumented people were
13 reluctant to avail themselves of the program, fair share
14 of expenditures would be lower than you've estimated
15 here, right?
16      A.    Yes.
17      Q.    And you would agree with me that you actually
18 don't know whether undocumented people use the Family
19 Violence Program at all, right?
20      A.    Correct.
21                    MR. DISHER:   Objection; vague.
22      A.    Correct.
23      Q.    (By Mr. Herrera) That's correct?
24      A.    I do -- yes, we do not know.
25      Q.    Okay.   And you don't know if DACA recipients


**Page:** 52
 1 have availed themselves of this program, right?
 2      A.    Correct.   We do not know.
 3      Q.    How much less would the Family Violence Program
 4 have to spend if DACA were discontinued?
 5                    MR. DISHER:   Objection; calls for
 6 speculation.
 7      A.    I don't know.
 8      Q.    (By Mr. Herrera) Do you -- do you plan to offer
 9 any additional testimony on that -- on that question?
10                    MR. DISHER:   Objection; vague.
11      A.    No.
12      Q.    (By Mr. Herrera) The costs of the program of
13 the -- of the Family Violence Program pay for shelters
14 and personnel costs, right?
15      A.    I'm not entirely sure.
16      Q.    Okay.   So you don't know what proportion of the

17  **budget of the FVP pays for shelters and personnel costs?**
18      A.     The FVP program provided that information.
19      **Q.     Okay.**
20      A.     I'm not an expert in that program.   So...
21      **Q.     Okay.   So up here in the first paragraph at the**
22  **bottom -- or rather the last sentence, it says, in**
23  **Fiscal Year 2015, the FV -- the FVP funded 71 nonprofit**
24  **family violence shelters, 10 nonresidential centers, 20**
25  **special nonresidential projects, and 17 exceptional item**

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 53
1  funding projects providing comprehensive family violence
2  services to victims with a total budget of $27,360,863.
3                          MR. DISHER:   And just -- it says 28
4  special nonresidential projects.
5                          MR. HERRERA:   Sorry.
6      **Q.     (By Mr. Herrera) Okay.   10 nonresidential, 28**
7  **special nonresidential, and 17 exceptional item funding**
8  **projects with a total budget of about 27 million, right?**
9      **A.     Correct.**
10     **Q.     Okay.   So let's -- we're gonna move on to**
11  **Page 9, the section that addresses Texas' Children**
12  **Health Insurance Program perinatal coverage.**
13                          **And this program provides care to**
14  **low-income women in Texas, right?**
15     **A.     Yes.**
16     **Q.     Okay.   So it's gonna be some of the same**
17  **questions.   But...**
18                          **So this program they -- in this program,**
19  **the recipients or the people who use the program could**
20  **be citizens, documented noncitizen, undocumented**
21  **noncitizens, or people who are recipients of DACA,**
22  **right?**
23     **A.     Yes.**
24     **Q.     And the program doesn't require citizenship**
25  **documentation, correct?**

**Page:** 54
1      **A.     I don't know.**
2      **Q.     Do you -- do you know of any documentation or**
3  **references in the HHSC's possession that would point you**
4  **to whether the program requires citizenship**
5  **documentation or not?**
6      A.     That information would be part of Access and
7  Eligibility Services.
8      **Q.     And what -- is that, like, a -- is that like a**
9  **manual or a section or an office within HHSC?**
10     A.     It's an office within HHSC.
11     **Q.     Okay.   And can you repeat the name for me**
12  **again.   Sorry.**
13     A.     Access and Eligibility Services.
14     **Q.     And what -- what do they do?**
15     A.     Their role is to serve as that portal for

16 people to apply for benefits, and they determine
17 eligibility.
18      **Q.    So when you say portal, is there an office that**
19 **people go to, or is this something that people access**
20 **when they go to a hospital or something; do you know?**
21      A.   I don't know all of the ways that people can
22 access to find out if they're eligible for services.
23      **Q.   Okay.**
24      A.   There are multiple ways.
25      **Q.   Is there some kind of online portal for Access**

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 55
1 and Eligibility Services?
2      A.   Yes.
3      **Q.   Okay.   And that system, does it ask about**
4 **citizenship or not?**
5      A.   I don't know.
6      **Q.   Do you know what kinds of questions related to**
7 **residency status that the Access and Eligibility**
8 **Services asks?**
9      A.   I don't know the details.
10      **Q.   Okay.   Did you speak with anyone from Access**
11 **and Eligibility Services in preparation of your**
12 **declaration?**
13      A.   No.
14      **Q.   Did you refer to any materials that Access and**
15 **Eligibility Services creates or has created in order to**
16 **prepare your report?**
17      A.   No.
18      **Q.   Okay.   So let's go back to CHIP perinatal.**
19          **And -- so Texas CHIP perinatal, for the**
20 **cost estimates that you made -- that are in this Rider**
21 **59 Report, did you apply the 50 percent undocumented**
22 **estimate again to determine how many of the recipients**
23 **were undocumented?**
24          MR. DISHER:   Objection; form.
25      A.   Yes.

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 56
1      **Q.   (By Mr. Herrera) And did you calculate your**
2 **estimate for 2015 the same way you calculated the Family**
3 **Violence Program estimates?**
4          MR. DISHER:   Objection; vague.
5      A.   No.
6      **Q.   (By Mr. Herrera) Okay.   How is it different?**
7      A.   I'm -- can you clarify what you mean by
8 estimates.
9      **Q.   Sure.   Sure.**
10          **So in -- for CHIP perinatal, you took the**
11 **50 percent estimate.**

12          Did you -- did you make the same kind of
13 calculation with regard to the proportion or whether
14 undocumented citizen -- or -- sorry.   I'll strike that
15 one and start again.
16          You used the 50 percent estimate for CHIP
17 perinatal cost estimates, right?
18     A.    Yes.
19     Q.    And -- okay.   And did you use that estimate in
20 order -- did you use that estimate in the same way you
21 calculated the Family Violence Program estimates, in
22 other words, with regard to how much -- how much of the
23 services are used by undocumented people or not?
24          MR. DISHER:   Objection; vague.   Objection;
25 document speaks for itself.

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 57
1     A.    The -- the methodology to get the final
2 estimate is different for CHIP perinate [sic] than it
3 was for the Texas Family Violence Program.
4     Q.    Okay.   And why is that?
5     A.    The reason is because the Texas Family Violence
6 Program serves citizens and non- -- noncitizens.   The
7 CHIP perinate [sic] program, almost all of the clients
8 served are noncitizens.
9     Q.    Okay.   And that -- and it says that here,
10 right, nearly all CHIP perinatal coverage enrollees are
11 either documented or undocumented noncitizens, right?
12     A.    Yes.
13     Q.    What -- how does HHSC know that?
14     A.    How do they know?
15     Q.    How do they know that fact, that nearly all
16 CHIP perinatal coverage enrollees are either documented
17 or undocumented?
18     A.    That is -- I don't know.   I'm not an expert in
19 eligibility determination.   But we can verify that by
20 looking at residency status after they've received
21 services.
22     Q.    And what is -- do you know what is done to ask
23 about residency status after services are provided?
24     A.    I don't know.
25     Q.    Okay.

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 58
1     A.    It's not my area.
2     Q.    Do you know what the -- what do you know about
3 the process, generally?
4     A.    I really don't know a whole lot about the
5 process.
6     Q.    What do you know about the process?

 7      A.    What I know is what I see in the data after the
 8  fact.
 9      **Q.    Okay.**
10      A.    But how that information is collected, at what
11  point any information is collected, I have -- I do not
12  know about that.
13      **Q.    So because both documented and undocumented**
14  **residents or immigrants use CHIP perinatal in Texas,**
15  **are -- for your estimate, are you assuming that**
16  **undocumented people use the CHIP program proportional to**
17  **their estimated presence in the population?**
18              **MR. DISHER:   Objection; vague.**
19      **A.    We do make that assumption.**
20      **Q.    (By Mr. Herrera) So if for some reason that**
21  **assumption was wrong, and if for some reason**
22  **undocumented people were actually 10 percent of the**
23  **recipients of CHIP Perinatal, the amount of expenditures**
24  **share would be higher, right?**
25              MR. DISHER:   Objection; vague.

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 59
 1      A.    Can you repeat that.
 2      **Q.    (By Mr. Herrera) Sure.   I guess -- let's --**
 3  **let's go back to the calculation here.**
 4              **So Texas CHIP perinatal coverage**
 5  **expenditures, we start with -- in the year -- in Fiscal**
 6  **Year 2015, we start with $202.6 million, right?**
 7      **A.    Yes.**
 8      **Q.    Okay.   And we multiple that by 50 percent, so**
 9  **the percent of noncitizens who are undocumented**
10  **immigrants, right?**
11      **A.    Yes.**
12      **Q.    Okay.   So, effectively -- to begin with,**
13  **effectively, you're treating CHIP perinatal coverage**
14  **recipients pretty much as all immigrants, right?**
15      **A.    Yes.**
16      **Q.    Okay.   And that's -- that's despite the fact**
17  **that citizens can receive CHIP perinatal coverage,**
18  **right?**
19              **MR. DISHER:   Objection; asked and**
20  **answered.**
21      **A.    Yes.**
22      **Q.    (By Mr. Herrera) So the number you get when**
23  **you -- when you split the CHIP perinatal coverage number**
24  **in half, because that's the proportion that you've used**
25  **as an estimate for undocumented immigrants, that's**


**Page:** 60
 1  **$101 million, right?**
 2      **A.    Yes.**
 3      **Q.    Then you factor in the fact that Texas doesn't**
 4  **pay all of that.**
 5              **I assume the federal government pays part**

6  **of it, right?**
7       **A.    That's correct.**
8       **Q.    So Texas pays about, it says in the report,**
9  **29.32 percent of expenditures.**
10                   **Therefore, the total estimated state cost**
11  **for CHIP perinatal coverage to undocumented immigrants**
12  **residing in Texas in 2015 was about $30 million, right?**
13      A.    Correct.
14      **Q.    Okay.   So this -- so, again, we -- we are**
15  **talking about the fact that undocumented people -- that**
16  **you're assuming that undocumented people use the CHIP**
17  **program proportional to their estimated presence in the**
18  **population.   So that 50 percent of the users are -- and**
19  **you already answered this, but I'm just going back.**
20                   **Fifty percent of undocumented people -- or**
21  **50 percent of immigrants are undocumented; therefore,**
22  **CHIP perinatal users, 50 percent of them are**
23  **undocumented, right?**
24                   MR. DISHER:   Objection.
25      **Q.    (By Mr. Herrera) So you've made that**

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 60
1  $101 million, right?
2      A.    Yes.
3      **Q.    Then you factor in the fact that Texas doesn't**
4  **pay all of that.**
5                   **I assume the federal government pays part**
6  **of it, right?**
7      A.    That's correct.
8      **Q.    So Texas pays about, it says in the report,**
9  **29.32 percent of expenditures.**
10                   **Therefore, the total estimated state cost**
11  **for CHIP perinatal coverage to undocumented immigrants**
12  **residing in Texas in 2015 was about $30 million, right?**
13      A.    Correct.
14      **Q.    Okay.   So this -- so, again, we -- we are**
15  **talking about the fact that undocumented people -- that**
16  **you're assuming that undocumented people use the CHIP**
17  **program proportional to their estimated presence in the**
18  **population.   So that 50 percent of the users are -- and**
19  **you already answered this, but I'm just going back.**
20                   **Fifty percent of undocumented people -- or**
21  **50 percent of immigrants are undocumented; therefore,**
22  **CHIP perinatal users, 50 percent of them are**
23  **undocumented, right?**
24                   MR. DISHER:   Objection.
25      **Q.    (By Mr. Herrera) So you've made that**

**Page:** 61
1  **assumption.**
2                   **So using that -- so if that were wrong, if**
3  **for some reason undocumented people were actually**
4  **10 percent of the recipients, the amount of expenditures**

 5 **by Texas on CHIP perinatal would be higher -- or sorry,**
 6 **not 10 percent, if it were, like, 60 percent --**
 7            MR. DISHER:   Hold on.
 8    **Q.    (By Mr. Herrera) -- it would be higher?**
 9            MR. DISHER:   Objection; vague.   Objection;
10 compound.   Objection; asked and answered.
11            Go ahead.
12    **Q.    (By Mr. Herrera) Yes.**
13    A.    If it were higher, meaning 60 percent, then,
14 yes, the cost attributed to undocumented immigrants
15 would be higher.
16    **Q.    Okay.   So if actually undocumented people were**
17 **reluctant to avail themselves of the program, it could**
18 **be lower than you have estimated, right?**
19            MR. DISHER:   Objection; vague.   Objection;
20 calls for speculation.
21    A.    Correct.   Could be lower.
22    **Q.    (By Mr. Herrera) And you would agree with me**
23 **that you actually don't know whether undocumented people**
24 **use the program at all, right?**
25    A.    That is correct.   We do not know.

**Page:** 62
 1    **Q.    And you don't know if DACA recipients have**
 2 **availed themselves of CHIP perinatal in Texas?**
 3    A.    We do not know.
 4    **Q.    If DACA were discontinued, how much less would**
 5 **Texas have to spend on CHIP perinatal?**
 6            MR. DISHER:   Objection; calls for
 7 speculation.   Objection; outside the scope of her
 8 declaration.
 9    A.    I don't know.
10    **Q.    (By Mr. Herrera) Okay.   Sitting here now, do**
11 **you -- do you have some idea of where that would go,**
12 **whether Texas would spend more or less, if DACA were**
13 **discontinued?**
14            MR. DISHER:   Same objections.
15    A.    I don't know.
16    **Q.    (By Mr. Herrera) Okay.   Do you plan to develop**
17 **any kind of estimate on that hypothetical?**
18    A.    No.
19    **Q.    Okay.   Earlier -- just to go back to something**
20 **you said earlier about some of the sources.**
21            You talked about other documentation you
22 reviewed, the Perryman and Ku declarations, but you also
23 reviewed some of the data files for the Rider Reports
24 and the SAS code.
25            Which is the SAS code what you used to run

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 65
 1    A.    I believe --
 2    **Q.    -- system?**
 3    A.    I believe so.

4       Q.   Okay.   So let's look at Exhibit 3, which is the
5   one that says 2010 update on the front.
6       A.   (Witness complies.)
7       Q.    So we go to -- actually -- I'm sorry.   I meant
8   Exhibit 2.   So if we go to Page App 891, which would be
9   Page 6 of this report.   We have the -- the section that
10   says, Texas public hospital districts.
11              So, again, we're looking at Exhibit 2.
12   And these estimates are only for -- or rather these
13   estimates are simply estimates because limited -- and
14   I'm reading from the first paragraph here:   Limited
15   information exists to estimate hospital-specific
16   uncompensated care for undocumented immigrants, right?
17       A.   Correct.
18       Q.   Okay.   And the estimates here were regional,
19   right?
20       A.   (Witness reading document.)
21              I don't -- I don't think I can answer that
22   question.   I'm not -- I do not -- I don't have the
23   knowledge to really answer that question.
24       Q.   Okay.   So it says, as such, the method -- and
25   this is the second sentence there.   As such, the method

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 69
1       A.   (Witness complies.)
2       Q.   And if we look at Paragraph 8, would it be
3   correct to say that that $376 million figure is simply
4   adding up the years for which the Rider Reports are
5   available -- or the Rider 59 Reports are available?
6       A.   I'd have to do the math --
7       Q.   Sorry.
8       A.   -- to answer that question.
9              MR. DISHER:   Did you want her to add that
10   up?
11       A.   Do you want me to add that up?
12              MR. DISHER:   Do you have a calculator she
13   can use?
14       Q.   (By Mr. Herrera) Sorry to make you do math on
15   the fly.
16              MR. HERRERA:   I don't.
17       A.   I can do it on a piece of paper.
18       Q.   (By Mr. Herrera) We'll move on because it's not
19   that important.
20              But -- so here they have a total, and it's
21   referring to your report of $376 million.   And the next
22   sentence, also referring to your report, says Texas
23   spent approximately $136 million to provide CHIP
24   perinatal coverage to unlawfully present aliens over the
25   last nine years for which data are available.

**Page:** 70
1              Then in the next sentence, Texas argued or
2   said by incentivizing more unlawfully present aliens to

3   remain in the plaintiff states, DACA means more such
4   aliens will be in the plaintiff states' health care
5   facilities, thus imposing additional financial costs on
6   Plaintiffs.
7           Do you agree with that statement?
8           MR. DISHER:   Objection; calls for a legal
9   conclusion.   Objection; outside the scope of the
10  declaration provided by Ms. Smoot.
11      A.   I don't have an opinion on that.
12      Q.   (By Mr. Herrera) Okay.   Do you plan to offer an
13  opinion on that statement?
14      A.   No.
15      Q.   Do you care to now?
16      A.   No.
17      Q.   Do you know whether DACA incentivizes people to
18  stay in Texas?
19          MR. DISHER:   Same objections.
20      A.   I don't know.
21      Q.   (By Mr. Herrera) If more undocumented
22  immigrants received DACA, do you think that they would
23  still need to use Texas' health care facilities?
24          MR. DISHER:   Objection; calls for
25  speculation.

**Page:** 71
1       A.   I don't know.
2       Q.   (By Mr. Herrera) Are you aware that DACA
3   recipients receive employer authorization or work
4   authorization?
5           MR. DISHER:   Objection; calls for
6   speculation.   Objection; legal conclusion.   Objection;
7   outside the scope.
8       A.   I don't know.
9       Q.   (By Mr. Herrera) Okay.   Do you know whether
10  they receive higher incomes compared to other
11  undocumented immigrants?
12          MR. DISHER:   Objection; calls for
13  speculation.
14      A.   I don't know.
15      Q.   (By Mr. Herrera) If a DACA recipient in Texas
16  made enough money to be above a certain income level,
17  would that recipient still be eligible for Emergency
18  Medicaid?
19          MR. DISHER:   Objection; calls for a legal
20  conclusion.   Objection; speculation.
21      A.   I don't know.
22      Q.   (By Mr. Herrera) Is -- so I guess what I'm
23  asking is -- is a DACA recipient, even though he or she
24  is undocumented, would that recipient -- is it possible
25  for that person to make enough money to not qualify for

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 73
1           MR. DISHER:   Objection; calls for

2   speculation.   Objection; calls for a legal conclusion.
3       A.   I don't know.
4       **Q.   (By Mr. Herrera) Well, I mean, in this**
5   **hypothetical, let's -- let me be more specific.**
6              **So if we look back at Exhibit 6 on page 9.**
7   **It says the Texas Children's Health Insurance Program,**
8   **CHIP perinatal coverage provides prenatal care to**
9   **low-income women living up to -- living up to**
10  **200 percent of the federal poverty level who do not**
11  **otherwise qualify for Medicaid, typically due to their**
12  **citizenship status.**
13             **So if a DACA recipient made higher than**
14  **the 200 percent of the federal poverty level, then that**
15  **recipient would not be eligible for the CHIP perinatal**
16  **coverage, right?**
17             **MR. DISHER:   Objection; calls for a legal**
18  **conclusion.   Objection; calls for speculation.**
19      **A.   To my knowledge, that would be correct.**
20      Q.   (By Mr. Herrera) Okay.   Do you know whether
21  people who have private health insurance use Emergency
22  Medicaid or CHIP perinatal?
23             MR. DISHER:   Objection; calls for
24  speculation.
25      A.   I do not know for sure.

📄 **Jun 19, 2018 Smoot, Monica (6_19_2018)**

**Page:** 75
1       **Q.   Okay.**
2       A.   They would know.
3       **Q.   Did you do any -- in preparation of your**
4   **report -- or your declaration, rather, did you do any**
5   **investigation into whether immigrants possession or --**
6   **or status as being covered by private health insurance**
7   **would affect these numbers at all?**
8       **A.   No.**
9       Q.   Okay.
10             MR. HERRERA:   I am almost done.   Could we
11  take a quick break just so I can look over stuff really
12  quickly.
13             MR. DISHER:   That's fine.
14             MR. HERRERA:   Maybe like five minutes.
15             Go off the record.
16             (Recess from 11:33 a.m. to 11:41 a.m.)
17             MR. HERRERA:   Back on the record.
18      Q.   (By Mr. Herrera) I -- earlier I asked you
19  about -- and sorry to go back to them again -- but the
20  data files.   I know counsel said he produced them to us.
21             But I was just wondering, are they -- are
22  those files publicly available?
23      A.   No, they're not.
24      **Q.   Okay.   All right.   My only other questions --**
25  **so just with regard to all of the Rider 59 Reports, none**

**Page:** 76
1   **of them -- none of them are specific to DACA recipients,**

2  **right?**
3            MR. DISHER:   Objection; vague.
4      A.   That's correct.
5      **Q.   (By Mr. Herrera) Okay.   Your report does not**
6  **show how many DACA recipients receive any of the**
7  **benefits or programs mentioned, right?**
8      A.   Correct.
9      **Q.   DACA recipients are less likely -- well -- so**
10 **the numbers in your report are based on estimates from**
11 **the Rider 59 Reports of undocumented immigrants who use**
12 **the various programs, right?**
13     A.   Correct.
14     Q.   Okay.   And those estimates are not based on
15 individual reporting of whether those individual users
16 or recipients are themselves undocumented immigrants,
17 right?
18           MR. DISHER:   Objection; vague.
19     A.   Can you repeat that.
20     **Q.   (By Mr. Herrera) Sure.   So the data that goes**
21 **into these reports, the -- the baseline level data, does**
22 **not itself include individual data about whether people**
23 **are undocumented?**
24           MR. DISHER:   Objection; vague.
25     A.   Correct.

Jun 19, 2018 Smoot, Monica (6_19_2018)


**Page:** 78
1  requirements for DACA?
2      A.   I am not.
3      **Q.   Do you know when the United States Citizenship**
4  **Immigration Services began accepting applications for**
5  **the DACA program?**
6      A.   Nope.
7      **Q.   What percentage of undocumented immigrants**
8  **currently residing in Texas are DACA recipients?**
9            MR. DISHER:   Objection; calls for
10 speculation, outside the scope.
11     A.   I don't know.
12     **Q.   (By Ms. Gregory) Does HHSC collect that**
13 **information?**
14     A.   No.
15     **Q.   So you don't know what percentage of**
16 **undocumented immigrants reside in Texas for any of the**
17 **fiscal years from 2012 to the present?**
18           MR. DISHER:   Objection; asked and
19 answered.   Object; vague.
20     A.   We do not know exact numbers.
21     **Q.   (By Ms. Gregory) Does your declaration**
22 **attribute any specific costs incurred by Texas to the**
23 **DACA program?**
24           MR. DISHER:   Objection; vague.
25     A.   No.

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 80

1                    MR. DISHER:   Instruct the witness not to
2   answer to the extent that it might disclose
3   communications you may have had with counsel.
4                    But if you can talk about that outside of
5   discussions with counsel, then go ahead and answer.
6        A.    Discussions were between the analysts within my
7   area and also with financial services to get their
8   opinions on what data sources we may need to include.
9        Q.    (By Ms. Gregory) In Paragraph 8 of your
10   declaration, you reference Emergency Medicaid; is that
11   correct?
12       A.    Yes.
13       Q.    How many DACA grantees in Texas received Texas
14   Emergency Medicaid in Fiscal Year 2007?
15       A.    I don't know.
16       Q.    In Fiscal Year 2009?
17       A.    I don't know.
18       Q.    Fiscal Year 2011?
19       A.    I don't know.
20       Q.    Fiscal Year 2013?
21       A.    I don't know.
22       Q.    And Fiscal Year 2015?
23       A.    I don't know.
24       Q.    There are several dollar amounts referenced in
25   Paragraph 8.

**Page:** 81

1                    Of all of those costs described in
2   Paragraph 8, which ones were incurred by active DACA
3   grantees?
4                    MR. DISHER:   Objection; vague.
5        A.    I don't know.
6        Q.    (By Ms. Gregory) According to the costs set
7   forth in Paragraph 8, did Texas' Emergency Medicaid
8   costs for undocumented immigrants go up or down from
9   2007 to 2015?
10       A.    It varied.
11       Q.    In Fiscal Year 2007, the dollar amount is
12   approximately $8 million, correct?
13       A.    Correct.
14       Q.    And in Fiscal Year 2015, the amount is
15   approximately $73 million?
16       A.    Correct.
17       Q.    How much of that $7 million [sic] difference is
18   attributable to DACA?
19                    MR. DISHER:   Objection; calls for
20   speculation.
21       A.    I don't know.
22       Q.    (By Ms. Gregory) Are the total estimated costs
23   to the State for provision of the services in this
24   paragraph available for Fiscal Year 2012?
25                    MR. DISHER:   Objection; vague.

**Page:** 82

1    A.    They're not readily available.
2    **Q.    (By Ms. Gregory) And what do you mean by**
3 **readily available?**
4    A.    The calculations have not been done.
5    **Q.    Why were they only done for these years?**
6    A.    That's when the report was requested for us to
7 produce.
8    **Q.    Who was it requested by?**
9    A.    I don't know.
10    **Q.    Does HHSC only produce these upon request?**
11    A.    Other than the first, which was mandated by
12 Rider 59, the others have only been produced upon
13 request.
14    **Q.    There was a point earlier in your testimony**
15 **where residency was discussed quite a bit.**
16                **Does the Texas Emergency Medicaid Service**
17 **identify residency in the state of Texas?**
18                MR. DISHER:   Objection; vague?
19    A.    It identifies U.S. citizen resi- -- residency.
20    **Q.    (By Ms. Gregory) In estimating these costs that**
21 **are identified in Paragraph 8, did the Health and Human**
22 **Services Commission consider whether undocumented**
23 **immigrants seek health care at different rates than the**
24 **population as a whole?**
25    A.    I don't know.

**Page:** 83

1    **Q.    In estimating these costs in reference to the**
2 **Medicaid program in Paragraph 8, did HHSC consider**
3 **whether undocumented immigrants are more or less likely**
4 **to be uninsured than the population as a whole?**
5    A.    I don't know.
6    **Q.    Is there someone who would know?**
7    A.    The analysts -- the analyst that originally
8 created this report.
9    **Q.    With respect to Texas Family Violence Program,**
10 **how many DACA grantees in Texas received services from**
11 **the Family Violence Program in Fiscal Year 2007?**
12    A.    I don't know.
13    **Q.    How about Fiscal Year 2009?**
14    A.    I don't know.
15    **Q.    Fiscal Year 2011?**
16    A.    I don't know.
17    **Q.    Fiscal Year 2013?**
18    A.    I don't know.
19    **Q.    And Fiscal Year 2015?**
20    A.    I don't know.
21    **Q.    Looking at Paragraph 9 of your declaration,**
22 **paragraph in Exhibit 1, out of the costs described in**
23 **this paragraph, which ones were incurred by DACA**
24 **grantees?**
25                MR. DISHER:   Objection; vague.

**Page:** 84

1    A.    I don't know.
2      Q.    (By Ms. Gregory) Is the data referenced in
3    Paragraph 9 available for Fiscal Year 2012?
4    A.    I don't know.
5      Q.    Is it available for Fiscal Year 2014?
6    I don't know.
7      Q.    Is this -- are these costs estimated -- are --
8    are these cost estimates produced every year?
9    A.    No.
10     Q.    When are they produced?
11   A.    Upon request.
12     Q.    So similar to the Emergency Medicaid program
13   cost estimates?
14   A.    Correct.
15     Q.    Okay.   According to costs set forth in
16   Paragraph 9, did the FVP program costs go up or down
17   between 2007 and 2015?
18   A.    They also varied.
19     Q.    And the cost estimate for 2007 is 1.2 million?
20   A.    Yes.
21     Q.    And the cost estimate for 2015 is 1 million?
22   A.    Yes.
23     Q.    How much of that $200,000 decrease in cost is
24   attributable to DACA?
25   A.    I don't know.

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 85

1      Q.    You spoke before you testified that HHSC uses
2    the percentage of undocumented immigrants as a proxy --
3    or the percentage of the undocumented immigrants in the
4    population as a whole in assisting to determine the
5    percentage of services that they use from the FVP; is
6    that correct?
7                    MR. DISHER:   Objection; misstates her
8    testimony.
9    A.    Can you repeat that.
10     Q.    (By Ms. Gregory) Yes.   So HHSC -- and correct
11   me if this is incorrect.
12              So my understanding from your testimony is
13   that FVP estimates the cost of undocumented -- the cost
14   attributable to undocumented immigrants by using the
15   percentage in their population as a whole in applying
16   that to the total number; is that correct?
17   A.    HHSC makes those estimations.
18     Q.    Okay.   Is using the percentage of residents who
19   are undocumented immigrants in the entire population an
20   appropriate way to measure use of specific services by
21   that population?
22   A.    That is the best estimate that we're able to
23   do.
24     Q.    And why is that the best estimate?
25   A.    We have no other information to use.

**Page:** 86

1    Q.    In estimating the cost for the FVP program that
2  can be attributed to providing services to undocumented
3  immigrants, did HHSC consider whether undocumented
4  immigrants seek government or nonprofit assistance at
5  different rates than the population as a whole?
6         A.    I don't know.
7    Q.    In estimating the cost for the FVP program
8  referenced in Paragraph 9 of Exhibit 1, did the HHSC
9  consider whether undocumented immigrants are victims of
10  crime at different rates than the population as a whole?
11        A.    I don't know.
12        Q.    Can you briefly describe the Texas CHIP
13  perinatal coverage program to your understanding?
14        A.    That program is for women who are at or below a
15  certain federal poverty limit who are not eligible for
16  Medicaid.   They are eligible for prenatal care services,
17  and that -- that's about it.   The eligible -- the
18  eligible person is actually the unborn baby and not the
19  woman.
20        Q.    Okay.   So how many recipients of CHIP Prenatal
21  Coverage were DACA grantees in Fiscal Year 2007?
22        A.    I don't know.
23        Q.    Fiscal Year 2009?
24        A.    I don't know.
25        Q.    Fiscal Year 2011?

**Page:** 87

1         A.    I don't know.
2         Q.    Fiscal Year 2103?
3         A.    I don't know.
4         Q.    And Fiscal Year 2015?
5         A.    I don't know.
6         Q.    How many recipients of CHIP perinatal coverage
7  were eligible to apply for DACA in Fiscal Year 2007?
8         A.    I don't know.
9         Q.    Do you know for any of the years between 2008
10  and the present?
11        A.    No, I do not know.
12        Q.    In Paragraph 10 of Exhibit 1, of all of the
13  costs described in that paragraph, which ones were
14  incurred by DACA grantees?
15              MR. DISHER:   Objection; vague.
16        A.    I don't know.
17        Q.    (By Ms. Gregory) Does HHSC collect that
18  information?
19        A.    No.
20        Q.    According to the costs set forth in
21  Paragraph 10, did the CHIP perinatal coverage costs go
22  up or down between 2009 and 2015?
23        A.    It varied.
24        Q.    In 2009, the total estimated cost was
25  approximately 33 million?

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 88

1    A.    Yes.
2    **Q.    And it was approximately 30 million in Fiscal**
3 **Year 2015?**
4    A.    Yes.
5    **Q.    How much did the $3 million decrease in costs**
6 **between those years was attributable to DACA?**
7              MR. DISHER:   Objection; vague.
8    A.    I don't know.
9    **Q.    (By Ms. Gregory) Are the total estimated costs**
10 **to the State for the provision of services described in**
11 **Paragraph 10 available for Fiscal Year 2012?**
12    A.    They can be made available upon request.
13    **Q.    And would that -- would -- could they also be**
14 **made available for Fiscal Year 2014, '15, and '16?**
15    A.    Yes.
16    **Q.    What percentage of the undocumented immigrant**
17 **population in Texas is female?**
18    A.    I don't know.
19    **Q.    How many women in the undocumented immigrant**
20 **population are of child-bearing age?**
21    A.    I don't know.
22    **Q.    How many women of child-bearing age in the**
23 **undocumented immigrant population are low income?**
24    A.    I don't know.
25    **Q.    In calculating the cost associated with**

**Page:** 89

1 **undocumented immigrants referenced in Paragraph 10, did**
2 **HHSC consider what percentage of the population was**
3 **female?**
4    A.    I don't know.
5    **Q.    Is using the total percentage of undocumented**
6 **immigrant residents an appropriate way to measure the**
7 **specific use of services referenced in Paragraph 10?**
8    A.    Can you repeat that.
9    **Q.    Sure.   Is using the total percentage of**
10 **undocumented immigrants in the population as a whole an**
11 **appropriate way to measure the use of specific services,**
12 **like CHIP perinatal coverage?**
13    A.    That was the best methodology that we were able
14 to discover with the data we had.
15    **Q.    And why was it the best available?**
16    A.    There's not other -- there are no other sources
17 for us to use.
18    **Q.    In Paragraph 11 of Exhibit 1, you reference the**
19 **amount of uncompensated medical care provided by state**
20 **public hospital district facilities to undocumented**
21 **immigrants, correct?**
22    A.    Yes.
23    **Q.    Of the $596.8 million for Fiscal Year 2006, how**
24 **much of that care went to active DACA grantees?**
25              MR. DISHER:   Objection; vague.

**Page:** 90

1      A.    I don't know.
2      Q.    (By Ms. Gregory) The 716.8 million in Fiscal
3  Year 2008 referenced in Paragraph 11, how much of that
4  care went to DACA grantees?
5           MR. DISHER:   Same objection.
6      A.    I don't know.
7      Q.    (By Ms. Gregory) Are you aware that more than
8  half of DACA recipients who work have jobs with
9  employer-based private health care insurance?
10     A.    I did not know that.
11     Q.    Are individuals with employer-based private
12 health care insurance more or less likely to qualify for
13 Texas Emergency Medicaid?
14           MR. DISHER:   Objection; calls for
15 speculation.
16     A.    I don't know.
17     Q.    (By Ms. Gregory) Are those with employer-based
18 private health care insurance more or less likely to
19 qualify for the Texas CHIP program?
20           MR. DISHER:   Same objection.
21     A.    I don't know.
22     Q.    (By Ms. Gregory) Are those with employer-based
23 private health insurance more or less likely to receive
24 uncompensated medical care from state public hospital
25 district facilities?

Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 91

1           MR. DISHER:   Same objection.
2      A.    I don't know.
3      Q.    (By Ms. Gregory) If DACA is terminated and DACA
4  recipients lose their jobs, won't they also lose their
5  employer-based private health care insurance?
6           MR. DISHER:   Objection; calls for
7  speculation.
8      A.    I don't know.
9      Q.    (By Ms. Gregory) Would thousands of Texans
10 losing their private health insurance lead to fewer
11 health care costs for the State?
12           MR. DISHER:   Objection; calls for
13 speculation.
14     A.    I don't know.
15     Q.    (By Ms. Gregory) Do you know how many active
16 DACA grantees there are currently in Texas?
17     A.    No.
18     Q.    You testified earlier that you reviewed the
19 declaration of Professor Leighton Ku, K-u, as part of
20 this case?
21     A.    Yes.
22     Q.    Do you recall Professor Ku's estimate that
23 terminating DACA would cost Texas $55 million in
24 increased health care costs due to DACA grantees losing
25 their private health care insurance?

📄 Jun 19, 2018 Smoot, Monica (6_19_2018)

**Page:** 92
1                    MR. DISHER:   Objection; calls for
2   speculation.
3        A.   I don't remember that specific number.
4        **Q.   (By Ms. Gregory) If DACA were permanently**
5   **enjoined in July of 2008, how would that affect the**
6   **costs of the Texas Emergency Medicaid program?**
7                    MR. DISHER:   Objection; calls for
8   speculation.
9        A.   I don't know.
10       **Q.   (By Ms. Gregory) If DACA were permanently**
11  **enjoined in July of 2008, how would that affect the cost**
12  **of Texas CHIP perinatal program?**
13                   MR. DISHER:   Same objection.
14       A.   I don't know.
15       **Q.   (By Ms. Gregory) Why -- why don't you know?**
16       A.   There are too many factors involved, and I
17  don't have all that information at my disposal.
18       **Q.   Does HHSC have that information available?**
19                   MR. DISHER:   Objection; calls for
20  speculation.   Objection; outside the scope of your
21  testimony.
22       A.   I don't know.
23       ==**Q.   (By Ms. Gregory) If DACA were permanently**==
24  ==**enjoined in July of 2018, how would the cost of the**==
25  ==**Texas Family Violence Program be affected?**==

**Page:** 93
1                    ==MR. DISHER:   Same objection.==
2        ==A.   I don't know.==
3                    MS. GREGORY:   Just give me one moment.
4                    (Brief pause as Ms. Gregory goes over
5                    notes.)
6        **Q.   (By Ms. Gregory) Ms. Smoot, your declaration is**
7   **dated April 2018; is that correct?**
8                    I believe it's the last page --
9        A.   Yes.
10       **Q.   -- of Exhibit 1.**
11       A.   Yes.
12       **Q.   And do you stand by the accuracy of your**
13  **declaration as we sit here today?**
14       A.   Yes, I do.
15                   MS. GREGORY:   I have nothing further.
16  Thank you.
17                   MR. WYATT:   No questions.
18                        EXAMINATION
19  BY MR. DISHER
20       **Q.   Ms. Smoot, earlier -- I just want to clear a**
21  **couple of things up.**
22                    Earlier, there was a discussion about U.S.
23  citizens using certain types of services and whether
24  those services would then be covered by Texas Emergency
25  Medicaid.

1 | STATE OF TEXAS

2 | COUNTY OF TRAVIS

3 |

4 |                    REPORTER'S CERTIFICATE

5 |              ORAL DEPOSITION OF MONICA SMOOT

6 |                       June 19, 2018

7 |

8 |     I, the undersigned Certified Shorthand Reporter in

9 | and for the State of Texas, certify that the facts

10 | stated in the foregoing pages are true and correct.

11 |     I certify that in accordance with Rule 30(e)(1),

12 | signature was waived.

13 |     I further certify that I am neither attorney or

14 | counsel for, related to, nor employed by any parties to

15 | the action in which this testimony is taken and,

16 | further, that I am not a relative or employee of any

17 | counsel employed by the parties hereto or financially

18 | interested in the action.

19 |

20 |

21 |

22 |

23 |

24 |

25 |

Monica Smoot                                          June 19, 2018
                                                         Page 97

```
 1        SUBSCRIBED AND SWORN TO under my hand and seal of

 2   office on this the _____ day of _____,

 3   _____.

 4

 5                      _____

 6                      Amy M. Clark, CSR
                        Texas CSR 8753
 7                      Expiration:  12/31/2018
                        Kim Tindall and Associates
 8                      Firm No.: 631
                        16414 San Pedro, Suite 900
 9                      San Antonio, Texas 78232
                        (866)672-7880
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# DEF-INTERV.

# EX. 136

Kenneth Palinkas                                        June 19, 2018

 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE DIVISION

 3   - - - - - - - - - - - - - - - - - - - - - - - - - x

 4   STATE OF TEXAS, et al,

 5                               Plaintiffs,

 6               -against-

 7   UNITED STATES OF AMERICA, et al,

 8                               Defendants.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Case No.  1:14-cv-00254

11

12                     26 Federal Plaza
                       New York, New York
13

14                     June 19, 2018
                       1:00 p.m.
15

16            DEPOSITION of STATE OF TEXAS BY THE

17   WITNESS KENNETH PALINKAS, a Plaintiff herein, held

18   at the above place and time pursuant to Subpoena,

19   taken before Ephraim Jacobson, a shorthand

20   reporter and Notary Public within and for the

21   State of New York.

22

23

24

25

**For Depo Excerpts**

**Transcripts**

**Page:** 4

```
1                    PALINKAS
2            (Prior to commencing the EBT, a subpoena
3        was marked as Defendants' Exhibit A for
4        identification.)
5
6  K E N N E T H      P A L I N K A S, the witness
7  herein, after having first been duly sworn by a
8  Notary Public of the State of New York, was
9  examined and testified as follows.
10 EXAMINATION BY
11 MS. PERALES:
12          Q.    Please state your name for the record.
13          A.    Kenneth Palinkas.
14          Q.    Please state your address for the
15 record.
16          A.    26 Federal Plaza, New York, New York
17 10278.
18          Q.    Good afternoon.
19          A.    Good afternoon.
20          Q.    Before we get started we're just going
21 to say a few things for the sake of the record,
22 and I'd like to turn things over to Mr. Robins,
23 who's with the United States.
24          MR. ROBINS:   Thank you.   Good afternoon,
25          Mr. Palinkas.   I'm Jeff Robins with the
```

**Page:** 5

```
1                    PALINKAS
2        Department of Justice, and I represent the
3        federal defendants in this matter, and I just
4        wanted to be clear for the record that
5        pursuant to the hearing the judge's order
6        yesterday -- that's June 18 -- at our
7        discovery conference to state that federal
8        defendants do reserve the right to object to
9        any responses that may call for Mr. Palinkas
10       to disclose privileged information,
11       specifically but not limited to law
12       enforcement process, privilege, and
13       potentially, if necessary, to instruct him
14       not to answer a question on those grounds.
15          As I noted to the parties here today, to
16       the extent that we can go off the record and
17       find a way to answer the question that
18       doesn't require that disclosure of
19       information he will do so.
20          MS. PERALES:   The Defendant intervenors
21       agreed to that arrangement.
22          MR. LEVIN:   The same holds true for the
23       State of New Jersey.
24          MR. BITTER:   The same for the State of
```

    25        Texas as well.

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)


**Page:** 6
    1                    PALINKAS
    2        Q.    Can you please state your name for the
    3 record?
    4        A.    Kenneth Palinkas, K-E-N-N-E-T-H, P as in
    5 Peter, A-L-I-N-K-A-S.
    6        Q.    My name is Nina Peralas and I represent
    7 the Defendant Intervenors in this case.   Have you
    8 ever had your deposition taken before?
    9        A.    No, I have not.
   10        Q.    Because you haven't had your deposition
   11 taken before, I will go over some of the rules of
   12 the road for you.
   13        A.    Thank you.
   14        Q.    It's a good refresher for me as well.
   15 The first is whether you will agree to make your
   16 answers out loud with your voice as opposed to
   17 nodding or shaking your head?
   18        A.    Yes.
   19        Q.    Thank you.
   20              It is hard for our friend the court
   21 reporter to take down the nods and the shakes and
   22 all of that.   When I'm asking a question, if you
   23 would be so kind as to let me finish the question
   24 before you start your answer and I will endeavor
   25 to let you finish your answer before I start my

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)


**Page:** 8
    1                    PALINKAS
    2 you can ask for a break at any time.
    3              Is that all right?
    4        A.    Understood.
    5        Q.    Is there any reason today that you
    6 cannot give full or truthful answers, such as
    7 illness or taking medication?
    8        A.    No, there is not.
    9        Q.    I'm going to hand you what has been,
   10 marked Deposition Exhibit A.   Does this document
   11 look familiar to you?
   12        A.    Yes, it does.
   13        Q.    Do you recognize it as the subpoena for
   14 your deposition here today?
   15        A.    Yes, I do.
   16        Q.    Did you receive this subpoena?
   17        A.    Yes, I did.
   18        Q.    Are you here today giving your
   19 deposition pursuant to this subpoena?

```
20      A.   Yes, I am.
21      Q.   Thank you.
22           Before we get to your Declaration in the
23 case, can you just give me your general
24 understanding of what this case is about?
25      A.   This case is about Deferred Action for
```

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 9
```
 1                    PALINKAS
 2 Childhood Arrivals, and the court injunction that
 3 took place, I believe, in 2014 in the state of
 4 Texas and then now it's being revisited, and this
 5 is why I'm giving my deposition.
 6      Q.   Are you testifying here today based on
 7 your role as a union leader?
 8      A.   Yes, I am.
 9      Q.   Are you testifying today based on your
10 role as a USCIS employee?
11      A.   Yes, I am.
12      Q.   I'd like to talk to you a little bit
13 about your background.   This is the easy stuff.
14 Actually, all of it is going to be easy for you.
15 This isn't a very technical deposition, hopefully.
16           Where did you grow up?
17      A.   I grew up in Bay Ridge, Brooklyn, New
18 York.
19      Q.   There was a hint of that there.
20           Did you go to high school in Bay Ridge?
21      A.   I went to Xaverian High School in Bay
22 Ridge, Brooklyn.
23      Q.   What kind of high school is that?
24      A.   That's a Catholic high school.
25      Q.   Did you graduate from there?
```

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 15
```
 1                    PALINKAS
 2      A.   Currently I'm a -- they call us
 3 Immigration Service Officers now, the USCIS.   I'm
 4 a GS 12 Step 9.
 5      Q.   Are you an ISO Level 1?
 6      A.   I'm a Level 2.
 7      Q.   Where do you work?
 8      A.   I work at 26 Federal Plaza in the Queens
 9 Naturalization Unit.
10      Q.   Do you work in the USCIS Field Office?
11      A.   Yes, I do.   The New York District
12 office.
13      Q.   You are also the president of your
14 local; is that correct?
```

15   A.   That's correct.
16      Q.   How many members are in your local?
17   A.   Approximately 406.
18      Q.   Is that the same as the size of your
19 bargaining unit?
20      A.   I think the bargaining unit might be
21 close to 600.
22      Q.   For your local?
23      A.   For the New York District, yes, because
24 the New York District encompasses not only 26
25 Federal Plaza with the Queens Field Office, the

**Page:** 19
1                    PALINKAS
2      Q.   Will it be okay with you if I shorten
3 naturalization to NATS?
4      A.   That's fine with me.
5      Q.   Thank you.
6           In your day-to-day work today, what
7 portion of your work would you say day to day is
8 your responsibilities with the union?
9      A.   They fluctuate.   I don't have a set
10 schedule.   I actually put out a schedule for shop
11 stewards to man the office.   I divvy up the hours.
12 I have about 18 representatives besides myself,
13 and with the official time we're only allocated
14 446 hours.   So I don't -- I do not work 100
15 percent official time.   Most of my time is
16 probably spent adjudicating now.
17      Q.   If we were to look over the month of
18 May, what percent of your time would you say you
19 spent on your union responsibilities?
20      A.   Here at work probably about 15 percent.
21 But at home it never ends.
22      Q.   Of the remaining 85 percent of your time
23 that you spent at work in the month of May, what
24 were you doing?
25      A.   Reverifying.

**Page:** 20
1                    PALINKAS
2      Q.   Reverifying?
3      A.   Reverifying.
4      Q.   What were you reverifying?
5      A.   Okay.   So what a reverifier does is when
6 a NATS case is approved for citizenship, it's a
7 check and balance.   A reverifier will make sure
8 that the case has been adjudicated properly with
9 proper annotation to make sure a decision is
10 rendered properly.   If the supervisor reviewed,
11 make sure that the dispositions are there in that
12 file that are original, things of that nature.   So
13 in the process it's basically double checking the
14 work performed for a search certificate that's
15 printed out.

16        Q.    Would it be fair to say that you're
17   receiving a case file from another USCIS worker
18   that had already made a determination about
19   naturalization?
20        A.    Yes.
21        Q.    Then you go over it again and make sure
22   everything is correct?
23        A.    Correct.
24        Q.    Where does the case file go after you're
25   done with it?

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 23
1                    PALINKAS
2        Q.    For what period of time would you say
3   that you were working on training for adjudicating
4   adjustment of the status?   One month?   Two months?
5        A.    The training I got was really the
6   minimum, because I complained vehemently to
7   management.   It was maybe not even two weeks, and
8   then they put you and they throw you into the pool
9   and you got to swim.   But they put me on calendar,
10   you know, and they had me observe for a couple of
11   months, and then subsequent to that I went back to
12   naturalization.   You know, it's basically they're
13   going to shift you around where they need it.
14        Q.    Had you come from naturalization before
15   you went over to adjustment of status?
16        A.    Yes.   I started with naturalization.
17        Q.    From '99 up until sometime last year,
18   you were doing purely naturalization?
19        A.    Until probably 2015 when I came back to
20   New York, because when I was council president I
21   was on the road quite a bit, because we were
22   negotiating the 2016 contract.
23        Q.    During that time that you were council
24   president, were you doing any adjudications?
25        A.    Yes, on Saturdays.   Overtime.

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 24
1                    PALINKAS
2        Q.    During this period where management was
3   considering having you do adjustment of status
4   adjudications, there was, if I understand
5   correctly, a period of training and then a period
6   of observation and then a period where you were
7   actually doing adjudications; is that correct?
8        A.    Correct.
9        Q.    How long was the period that you were
10   actually doing adjudications?

11      A.    As I said before, a couple of months,
12 maybe.
13         Q.    In your current work in naturalizations
14 in your current office, from what geography do you
15 receive NATS applications?
16      A.    Because we're the Queens field office,
17 naturally Queens.   But it's mostly from the
18 Jackson Heights, Woodside, Sunnyside area, I would
19 imagine.   Flushing.   We -- it's funny about
20 Rockaway, because I lived out in Rockaway for some
21 time.   I think at one time they sent them out to
22 Holtsville, but I think they were trying to go
23 back to Queens.   But it's basically based in the
24 borough that you're -- the district represents.
25         Q.    Turning to your attention to your

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 25
1                    PALINKAS
2 Declaration, which is Exhibit B in front of you.
3 Moving past the first several paragraphs, I'd like
4 to look with you at the paragraph that's second
5 from the bottom that starts with "however."
6      A.    Okay.
7      Q.    We're looking at the paragraph that
8 starts with "however."   Can you read that sentence
9 to me "however"?
10      A.    "However, USCIS management unfortunately
11 has continually undermined the Immigration Service
12 Officers' abilities to do his or her job by
13 overscheduling work assignments or by not
14 providing sufficient time to make proper
15 adjudications."
16      Q.    Tell me the facts on which you rely to
17 say that management has overscheduled work
18 assignments?
19      A.    Well, you can do the math.   Typically
20 they would have us do ten naturalization
21 interviews a day.   In our eight-hour day you have
22 a half-hour lunch.   You have two 15-minute union
23 breaks.   It doesn't give you much more than like
24 45 minutes per interview.   You can have -- for
25 instance, in NATS you can have an interview where

**Page:** 26
1                    PALINKAS
2 somebody has a medical disability that has to be
3 reviewed, a form 648.   They may have a criminal
4 record.   You have to review all the charges.   They
5 may have other things that I don't think are -- I
6 shouldn't bring up to discuss, that are in the
7 file that would be just privy to law enforcement.
8         So given all those parameters,
9 45 minutes is not sufficient time to make a proper
10 decision.   To do the interview, yes, you can go

11 through the interview and ask all the question,
12 but you're not going to make a decision on that
13 case.   But yet management wants you to make that
14 decision, because they're over-subscribing because
15 they have a backlog of applications, and this
16 holds true for adjustment of the status cases
17 also.
18       Q.   So the example that you gave of
19 assigning, let's say, ten naturalization
20 interviews a day, does that then form the basis of
21 your statement in the rest of the sentence that
22 "overscheduling interviews and not providing
23 sufficient time to make proper adjudications"?
24       A.   Right, because you don't have time --
25 you're looking at somebody's life.   It's in a file

**Page:** 27

1                       PALINKAS
2 that has every piece of paper since they came to
3 the United States, from medical documentation to
4 how they entered to all the forms they adjusted
5 under -- it's just not proper time.   It's very
6 difficult, and realize this, that from the time I
7 started in 1999, the form N-400 went from four
8 pages to now it's 21, I believe.
9       Q.   Do you have any other facts that form
10 the basis of this statement that management has
11 undermined the officers' ability by overscheduling
12 work assignments or interviews and by not
13 providing sufficient time to make proper
14 adjudications?
15       A.   Again, it's same thing applies to
16 adjustment of status cases.   But I had brought
17 this situation to light, I think, back in 2004 or
18 2005.   The Daily News had come and interviewed us
19 in the union office, and I explained to them about
20 the backlog and why there's a backlog, because
21 what was happening is -- and there's still a
22 backlog.   I'm sure you're aware of it.   The
23 officers don't have the time to make a decision.
24 So they would go through the interview and put
25 that case to the side and do the next interview,

**Page:** 28

1                       PALINKAS
2 put that case to the side.   So they all become
3 continued cases, unadjudicated, and they -- and
4 the fingerprints expire, and this is -- different
5 systems expire that you need to have up to date.
6       Q.   Was that specifically with respect to
7 naturalization when --
8       A.   It's every -- no, it's every application
9 that we adjudicate in New York District and
10 throughout the United States, because as council
11 president, I was privy to see what was going on
12 elsewhere with all the applications.

13      Q.    When you say the New York Field Office,
14 and you work in the naturalization unit, what
15 other types of applications are adjudicated?
16      A.    It's not the New York Field Office; it's
17 the New York District.
18      Q.    I stand corrected.   The New York
19 District office.   What are the other types of
20 applications that are --
21      A.    Can you repeat that?
22      Q.    Yes, I will.   What are the other types
23 of applications that are adjudicated by the New
24 York City District office?
25      A.    The other types?

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 31
1                    PALINKAS
2 because we had asked to drop, you know, at least
3 one case.   But I don't know.   I'm not the council
4 president, so I can't truthfully answer that,
5 because I don't know what goes on elsewhere.   Only
6 in some discussions it seems to me that some
7 places do more than we do.   They do 13, I heard,
8 in Miami.   That's insane if that's true.   But I
9 can't qualify that.   That's 13 naturalizations.
10      Q.    Yes, yes.   I'm following you.   I'm
11 following you.
12          You mentioned in your last answer about
13 ELIS.   In your Declaration, you say that USCIS has
14 employed ELIS to allow applicants to request
15 immigration benefits online?
16      A.    Correct.
17      Q.    Is that mention of ELIS meant to support
18 your contention that USCIS has undermined the
19 ISOs' ability to do their job?
20      A.    Absolutely.
21      Q.    Can you explain that to me?
22      A.    If you're giving an alien the ability to
23 just upload whatever information they want into
24 their file electronically, without me checking the
25 validity of that document, whether it's fraudulent

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 33
1                    PALINKAS
2 mind that adjudicates, whether it be citizenship
3 or adjustment status, is giving that benefit to a
4 terrorist.
5      Q.    In ELIS, do you not see a visual image
6 of the document; you just receive information that
7 would have been on it?
8      A.    We see a visual, yes, because when you
9 go onto ELIS, you see the visual.   But again, it's

10 uploaded.   A lot of times you'll get an ELIS case
11 and it will give you a folder, brown folder with
12 nothing in it.   Do this case.   There's no
13 application.   Nothing.   You have to go into the
14 ELIS system and print out the N400 that's
15 contained therein.
16       Q.    Can you look at it on the screen if you
17 wanted to?
18       A.    Well, that was the whole premise of
19 ELIS, but I don't see that happening.   I see more
20 paperwork being generated.   You know, to
21 adjudicate properly, you need to have documents in
22 front of you.   I don't think that this is the
23 proper fit for this agency, this service.   I think
24 it was well-intentioned, but if you're not having
25 somebody checking what's being uploaded in it,

**Page:** 34
1                        PALINKAS
2 it's precarious at best to rely on an applicant,
3 an alien putting their own information in.   That's
4 inherently dangerous, because I can tell you,
5 there are a lot of adjudicators, a lot of
6 supervisors who will tell you in training there's
7 fraud in every file, and that's a statement that I
8 lot of people believe.
9       Q.    Do you believe it?
10       A.    I do.   I do.   In general, yes.
11 Absolutely.
12       Q.    So on the ELIS, it's -- it sounds from
13 your description that it partially applies in   the
14 sense that not every form is uploaded into ELIS,
15 but maybe only for --
16       A.    It's only the N400 and I think the I130
17 that I'm aware of.   But I do believe they're
18 trying to aggressively approach putting 485s in.
19 But I'm not again privy to that information,
20 because when I was on council president I had a
21 transformation team.   You know, I basically had
22 them negotiate whatever needed to be done, because
23 we weren't trying to hold anything up.   We wanted
24 to see it progress.   Listen, there's a huge
25 backlog.   We get all this.   There's people that

**Page:** 35
1                        PALINKAS
2 shouldn't be waiting this long for benefits.   But,
3 you know, it's overloaded.   Then when you have
4 people jumping lines to get benefits on top of
5 that, it creates an insurmountable problem.
6       Q.    You mentioned transformation team, and I
7 was thinking to myself I could use a
8 transformation team, too.   I guess we don't all
9 get one.
10             Tell me again, with respect to your
11 familiarity with ELIS and what types of

12 **applications were being, let's say, supported by**
13 **ELIS, did your sort of day-to-day knowledge of**
14 **that end when you stopped being the council**
15 **president?**
16      A.   No, because I deal with ELIS now.
17      **Q.   With respect to NATS?**
18      A.   I've adjudicated ELIS applications
19 myself.
20      **Q.   That's the N400, right?**
21      A.   The N400 is the only one that's on - to
22 my knowledge, I don't know who's doing the I90s,
23 because we don't do them.   I think they're done in
24 service centers, to be honest with you.
25      **Q.   Would it be fair to say then that when**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 36
1                    PALINKAS
2 you discuss the overscheduling of work assignments
3 and not providing sufficient time to make proper
4 adjudications, that these practices undermine the
5 ISOs' ability to do his or her job in all the
6 offices?
7      A.   Absolutely.
8      **Q.   You mentioned in your Declaration about**
9 **the change in title from adjudication officer to**
10 **ISOs, and would your criticism of this change of**
11 **title apply to all the offices of USCIS?**
12      A.   Yes.
13      **Q.   You discuss I believe here -- tell me**
14 **this.   Is it fair to say that you're observed a**
15 **shift away from interviewing benefits applicants**
16 **or has it been pretty steady in your time as**
17 **USCIS?**
18      A.   Well, there was a time when there was a
19 shift away.   But now it seems that we're going to
20 interview more and more cases, because
21 employment-based authorization was being done at
22 service centers.   So they were bypassing the whole
23 premise of making a proper decision, because for
24 those kinds of cases you really should be
25 interviewing those people.   It shouldn't be just

**Page:** 37
1                    PALINKAS
2 done, you know, by looking at a piece of paper.   I
3 don't know how you can get a true flavor of who
4 that person is applying for a benefit.
5      **Q.   You mentioned that you think you sense**
6 **that perhaps there's a shift back towards doing**
7 **more interviews; is that right?**
8      A.   Yes.
9      **Q.   Are the employment-based applications**
10 **then no longer being adjudicated at service**

11  **centers or --**
12       A.   I think they're being done at the field
13  offices now, because I know that we've been
14  inundated with them.   So the shift has been in
15  that general direction.   But I can't -- again, I
16  don't know if they're still doing some, depending
17  on when they were filed.   I don't know who makes
18  that determination.   That's something, you know, a
19  different level of that.
20       **Q.   When did your office start seeing a lot**
21  **more employment-based applications?**
22       A.   Maybe a couple months ago.
23       **Q.   It's a fairly recent thing?**
24       A.   Yes.
25       **Q.   You're doing interview on those?**

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 38
1                      PALINKAS
2       A.   I'm not, but the officers that I
3  represent are, yes.
4       **Q.   Is it your sense that officers that you**
5  **represent are doing these employment-based**
6  **application interviews because of specific**
7  **referrals or just that the workload has been**
8  **shifted?**
9       A.   No, the work has shifted.   That's not to
10  say they didn't do it before.   They had done them
11  before, but not on the level that they're being
12  presented now, because I think the shift is to
13  have them interviewed, have those people
14  interviewed.
15       **Q.   Have you noticed any other groups of**
16  **people who are getting more interviews now than**
17  **before?**
18                      MR. BITTER:   Objection; vague.
19       A.   I couldn't answer that.
20       **Q.   Is it that you can't answer it because**
21  **it's vague or because you don't know?**
22       A.   I don't know.
23       **Q.   With respect to ELIS, would it be fair**
24  **to say then that in your Declaration you are**
25  **discussing the adoption of ELIS is undermining the**

**Page:** 39
1                      **PALINKAS**
2  **ISOs' ability to do his or her job in all the**
3  **offices where ELIS is being used to present**
4  **information?**
5       A.   Again, yes, because we don't have the
6  documents in front of us to make a proper
7  decision.   Again, the background checks that are
8  being done on those files are done outside of our
9  jurisdiction.   We can check on them, we can rerun

10  them.   But whoever entered them originally can
11  make mistakes, and that's where the problem lies
12  with -- a lot of the officers don't feel
13  comfortable with at that program because of that
14  reason.
15      Q.   I am going to Page 2 of your
16  Declaration.
17      A.   Okay.
18      Q.   In the first paragraph at the top of
19  Page 2 of your Declaration, you mentioned again --
20  it's the third line from the bottom.   You mention
21  again over assigning the workload.   You see here
22  USCIS management has over assigned the workload
23  for the completion of these applications.
24          Do you see that?
25      A.   Yes, I see it.

📄  Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 41
1                  PALINKAS
2  adjudicators' indicators?
3      A.   I think the numbers that they were
4  coming up with demonstrate that.   Again, I don't
5  have that in front of me, the hard numbers, but
6  when I was told what they were back in 2012 I
7  think they started rolling it out, it seemed that
8  that was quite a high number.
9      Q.   When you say "that was quite a high
10  number," do you mean the number of approvals
11  relative to applications?
12      A.   No, just the number -- the number of
13  applications was again, there was so many that
14  were not denied.   So they were just being
15  processed into the computer based on the numbers
16  that I was presented.
17      Q.   Would it be fair to say then that your
18  statement about working over assigned for DACA
19  adjudicators is based on the overall number of
20  applications that were being processed?
21      A.   That's what I based it on, correct.
22      Q.   Would it also be fair to say that it's
23  the overall number of applications that are being
24  processed that provide the basis for your
25  statement that USCIS management has not provide

**Page:** 42
1                  PALINKAS
2  sufficient time to make proper adjudications, or
3  do you have any specific knowledge about whether
4  USCIS management allowed proper time to make
5  adjudications?
6      A.   In general, for everything?
7      Q.   For DACA?
8      A.   Just specifically for DACA?

9       Q.    Yes.
10      A.    Again, I based it on what I said
11  previously what I just -- that you asked and
12  answered.   I'm basing it on the numbers that were
13  being generated from what I saw, how many
14  approvals were occurring.   That's it, because I
15  didn't have anything firsthand, never having
16  adjudicated a DACA case.   But what perturbed me as
17  council president was here we have an application
18  where people broke the law, and they're not even
19  being interviewed and they're just processing
20  these applications.   So that again, that to me was
21  an inherent problem.
22      Q.    Would it be fair to say then, that it's
23  the number of applications that were getting
24  adjudicated that forms the basis of your statement
25  that applications were being rubber stamped?

**Page: 43**

1                   PALINKAS
2       A.    Because of the high number of approvals.
3   There didn't seem to be any balance whatsoever,
4   absolutely none.   That's why I said they were
5   being rubber stamped.
6       Q.    When you say "balance," what does that
7   mean?
8       A.    Well, normally it -- just in the normal
9   trend, you're going to have X amount of denials
10  compared to X amount of approvals.   It's just the
11  nature of the beast.   It's going to happen.
12      Q.    Is it correct to say that ISOs at
13  service centers adjudicate applications without
14  conducting interviews?
15      A.    Yes, they do.
16      Q.    So the fact that DACA applicants don't
17  receive an interview is similar to other types of
18  applicants who don't receive an interview whose
19  applications are processed by service centers?
20      A.    Again the difference would be that DACA
21  applicants broke the law.   That to me is a
22  problem.   I don't see how anyone can justify not
23  interviewing these people, given that premise,
24  especially when they broke the law.   You -- that's
25  where the exceptions should have been made, and it

**Page: 44**

1                   PALINKAS
2   wasn't.
3       Q.    I understand.   However, going back to my
4   question, just on a yes or no, is it correct that
5   a DACA applicant whose application is adjudicated
6   in the service center is not interviewed similar
7   to other applicants who are adjudicated in service
8   centers?
9       A.    That's -- they do.   Of course.   I've
10  already answered that.   They do DACA applications

11 at the service centers much like they do
12 employment-based authorizations.
13     Q.    Let's -- would it be fair to say then
14 that somebody who is applying for temporary
15 protected status is also present in the United
16 States unauthorized; is that correct?
17     A.    Correct.
18     Q.    That person who is applying for TPS,
19 that application is processed by the service
20 center; is that correct?
21     A.    Correct.
22     Q.    That person is also not interviewed,
23 correct?
24     A.    I don't know.  That, I can't answer,
25 because I don't know if they've changed.  A lot of

**Page:** 45
1                    PALINKAS
2 things have changed recently, and not being the
3 council president, I believe you may be correct.
4 But I don't know.
5     Q.    Would it be fair to say that when you
6 talk about some of the issues and problems that
7 you saw at the service center, that that
8 information would be current up to the end of your
9 service as council president?
10     A.    That's correct.
11     Q.    Let's talk about somebody who applies
12 for deferred action under the Violence Against
13 Women Act, the self-petitioner.  Is that
14 application adjudicated at the service center?
15     A.    To my knowledge, yes.
16     Q.    Is the self-petitioner typically
17 unauthorized to be in the United States?
18     A.    To my knowledge, yes.
19     Q.    It also correct to say that the VAWA
20 applicant is not interviewed?
21     A.    Again, to my knowledge, yes.
22     Q.    I wanted to ask you a question about
23 advanced parole.  You mentioned advanced parole.
24     A.    Right.
25     Q.    Here, let me get the right paragraph.

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 47
1                    PALINKAS
2 they have that distinct advantage, and that's why
3 I mentioned about jumping the line, because people
4 who apply for green cards legally without asking
5 for advanced parole or trying to circumvent the
6 system, okay, that's a whole different ball game.
7 I mean, people that would use advanced parole just
8 for that specific reason, they're jumping the line
9 of a person that did everything legitimately,
10 filed all the proper paperwork and entered or

11  whatever claim they have that was legitimized.
12      **Q.    When you say "jumping the line," is it**
13  **your understanding that if somebody re-enters with**
14  **the country advance parole that they are affecting**
15  **the ability of other people to adjust status?**
16      **A.    In the case of DACA recipients, yes.**
17      Q.    How do DACA recipients affect the
18  ability of other people?
19      A.    Because again, they're here on temporary
20  protected status.   They don't have any legal --
21  they're not here legally.   Once that time
22  expires -- I believe it's two years -- you know,
23  unfortunately they are out of status and now
24  they're here illegally.   That's system needs to be
25  fixed, absolutely.   But right now there's nothing

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 48
 1                    PALINKAS
 2  in place.
 3      Q.    Can you explain to me how a DACA
 4  recipient who re-enters the country with advanced
 5  parole affects the ability of some other person to
 6  adjust status?
 7      A.    I would assume, maybe I'm wrong, but if
 8  they're if you have somebody that did everything
 9  properly waiting for that green card to be issued,
10  you have a DACA recipient that now has status,
11  why?   Why should they?
12      Q.    But does --
13      A.    Based on what.
14      **Q.    Does a DACA person, though, affect the**
15  **ability of a person who is waiting in line to**
16  **adjust?**
17      **A.    I would think it's going to have some**
18  **impact.   Why wouldn't it?**
19      **Q.    Is it because there is a limited number**
20  **of green cards available?**
21      **A.    There's a limited number of visas**
22  **available.   Some people from countries that do it**
23  **legally can't come in.   But if you're a DACA**
24  **recipient, then you can come in.   It doesn't**
25  **matter.**

**Page:** 49
 1                    **PALINKAS**
 2      **Q.    I understand the difference in terms of**
 3  **entering the United States.   I guess what I'm**
 4  **trying to understand is whether the DACA recipient**
 5  **who does the advanced parole and make the entry,**
 6  **whether the fact of that entry has any impact at**
 7  **all on the ability of somebody else to adjust**
 8  **their status or whether these are separate**
 9  **processes?**
10      **A.    That, I can't answer, because I don't**

11  know how -- if there's some kind of system in
12  place per se that management -- but I would just
13  assume that that's what happens, because it's just
14  a process.   If you're going to have somebody
15  coming in legally, then spend that duration of
16  time to apply wait and wait for the interview, and
17  then you have somebody who's a DACA recipient that
18  gets the advanced parole, now has a legal entry.
19  I mean, they got a distinct advantage to become a
20  green card holder over somebody who's waiting in
21  line legitimately.
22      Q.   Is it your view that the DACA person
23  making the advanced parole entry somehow delays
24  the ability of somebody else to adjust their
25  status?

**Page:** 50
1                        PALINKAS
2      A.   I think that's a distinct possibility,
3  but again I'm not privy to that information,
4  because that's something that management would
5  have more tabs on and I don't know that they can
6  make that public.
7      Q.   You began to proceed into my next set of
8  questions when you talked about the immigration
9  testimony and how it's set up right now.   In the
10  paragraph that starts with the words "the
11  applicants for DACA are asking for temporary
12  protected status," do you see that there?
13      A.   Yes.
14      Q.   The next sentence says "under the
15  present system, there is no process in place to
16  achieve this, and we need to develop criteria that
17  protect the United States citizen at large while
18  we properly vet all DACA applicants."
19          Do you see that there?
20      A.   I see.
21      Q.   Tell me what the criteria is that you
22  believe should be developed that would protect a
23  U.S. States citizen and properly vet the DACA
24  applicant?
25      A.   Certainly they need to be vetted and I

**Page:** 51
1                        PALINKAS
2  think that entails being interviewed, and I go
3  back to my original statement where I say I think
4  that's necessitates an in-depth interview, because
5  you're basing -- you're basing a benefit for a
6  certain class of people who came here illegally.
7      Q.   Would it be fair to say then that your
8  criticism of the DACA criteria is that DACA
9  applicants are not interviewed?
10      A.   No, that's not the only reason.   Again,
11  it's because of illegal entry into the United
12  States.

13      Q.    I see.   So --
14      A.    I don't think that anybody should be
15 given any preferential treatment after breaking
16 the law.   I have an inherent problem that, and in
17 speaking with our membership throughout the United
18 States, that was basically the mindset of the
19 majority of district adjudication officers and
20 ISOs or whatever we were at that time.   I think we
21 were ISOs.
22      Q.    Would it be fair then to say that your
23 position is that DACA applicants should not get
24 deferred action because they were unlawfully
25 present in the United States or are unlawfully

**Page:** 52
1                    PALINKAS
2 present in the United States?
3      A.    I think that they need to be
4 interviewed.   Okay.   I'm not at will to make a
5 decision concerning the final outcome of these
6 people.   I don't think that mass deportation is
7 ever going to happen, because it's not even
8 practical.   But I do believe Congress has to take
9 that action.   They have to do something to make
10 this equitable for everybody.   Certainly most
11 adjudicators feel the same way.   We're not
12 heartless as the media is portraying us to be.
13      Q.    So if there were to be a deferred action
14 program for young people, what would be your
15 criteria in addition to an interview?
16             MR. BITTER:   Objection; speculation,
17 relevance.
18      Q.    You may answer the question.
19      A.    Again, it's difficult for me to answer
20 that because Congress can't even figure this out.
21      Q.    Yes.   But you state in your Declaration
22 that we need to develop criteria.
23      A.    Yes, we do.
24      Q.    So I'm asking you what is the criteria
25 that needs to be developed?

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 53
1                    PALINKAS
2      A.    Certainly, there has to be some kind of
3 semblance of a differentiation for people that are
4 under DACA, because I don't think it's equitable
5 to have them demand and be entitled to a path to
6 citizenship, because of the way they entered.   I
7 would think that they would have to make certain
8 concessions perhaps.   They could become permanent
9 residents.   But again, this is my opinion and I
10 don't know where it goes.
11      Q.    In terms of the criteria to give
12 somebody DACA, we know that there are some current

13 **criteria that you have to fulfill to be able to**
14 **get DACA.   Are you aware of the current criteria**
15 **that an applicant has to fulfill to get DACA?**
16        A.    I just know what I learned from it
17 originally.   I don't know that it's changed that
18 much.   Please clue me in.
19        **Q.    No, no.   Tell me.**
20        A.    I don't know that it's any different.
21        **Q.    Tell me what you do know about the DACA**
22 **criteria?**
23        A.    Well, the parents came here illegally,
24 correct?
25        **Q.    Well, in terms of the applicant, the**

**Page:** 54
1                        PALINKAS
2 **applicant would be here unauthorized in the United**
3 **States to apply for deferred action?**
4        A.    Correct.
5        **Q.    Are there any other criteria that you're**
6 **aware of?**
7        A.    I never adjudicated DACA, so I don't
8 know particulars.   But because of the fact that
9 how you're applying for this benefit, I think that
10 that has to be addressed and Congress is going to
11 have to make that kind of a decision.   I mean
12 it's --
13        **Q.    Is it your position that somebody who's**
14 **here unauthorized should not be allowed to apply**
15 **for a deferred action?**
16              MR. BITTER:   Objection; relevance,
17        vague.
18        A.    Deferred action is specifically for a
19 certain class, is it not?   A certain situation, is
20 it not?   So people that are here illegally,
21 there's different ways for them to adjust.   They
22 can go back to their country and come in legally.
23 These are the ways to do things.   Do it legally.
24 I don't think that we should hold such a need to
25 accommodate somebody that broke the law.   I think

**Page:** 55
1                        PALINKAS
2 that is inherently wrong with immigration to think
3 that way, because it doesn't make any sense.   You
4 might as well just have open borders then.   Why
5 even bother enforcing the law.
6        **Q.    Do you have a definition of deferred**
7 **action yourself?**
8        A.    A definition of it?
9        **Q.    Yes.   What is deferred action?**
10        A.    It's just a temporary protected status.
11 That's all I see it as.   I don't see it as
12 anything other than that.   You know, you can have
13 refugees come in.   You can have certain groups
14 come in because of the chaos that happened in

15   their countries.   They get that protected status,
16   and you never hear what happens with them.   They
17   just disappear into the woodwork, sort of.   The
18   majority go back to their countries.   This is the
19   way that the system works.
20          But DACA, it appears to me that, you
21   know, it's a reward system for doing something you
22   shouldn't have done.   I mean, when are the parents
23   going to take the responsibility for their
24   children?   That's the big question that I have,
25   and I don't see it happening.

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 56
1                    PALINKAS
2      Q.    So if somebody is -- was here
3   unlawfully -- I'm trying to still understand your
4   statement about needing to develop criteria.
5      A.   Okay.
6      Q.    When you say that we need to develop
7   criteria that protect the United States citizen at
8   large while we properly vet DACA applicants,
9   would -- in addition to an interview, which you're
10   already mentioned, what additional criteria would
11   you feel is necessary?
12          MR. BITTER:   Objection; speculation.
13      Objection; vague.   You can answer if you
14      know.
15      Q.    Please answer.
16      A.   I would like to find out, because what I
17   know, the percentage of DACA recipients that
18   supposedly claim they want to go to school and all
19   this stuff, it's a low percentage, from what I
20   understand.   So I would like to know that would be
21   be.   So then what is the real purpose of them
22   coming here, because they're Dreamers, but they're
23   not dreaming.   They're not going anywhere, and I
24   think that needs to be addressed and I don't see
25   it being addressed.

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 57
1                    PALINKAS
2      Q.    In your view perhaps, even though you
3   mentioned developing criteria, in your view
4   perhaps there should not be deferred action for
5   unauthorized youth?
6          MR. BITTER:   Objection; speculation.
7      Objection; relevance.
8      A.   I'd prefer not to answer that.
9      Q.    I'm sorry.   You have to answer.
10      A.   I have to answer?
11      Q.    Yes, you do.   But I -- it's okay.
12   Whatever it is you answer, there's just an

13 **exploration here between the two of us about this.**
14 **So the question is given your concerns that you've**
15 **expressed so far --**
16      A.   Right.   I think that they have to show
17 initiative that that's -- they have to show
18 reasons why they're here and they have to fulfill
19 those reasons.   I don't know under the represent
20 DACA program that's happening.   That's really my
21 main concern there.   But again, is this going to
22 turn into where everybody just applies for DACA,
23 because well hell, this is the easiest way to get
24 to the United States.   They could swing that way
25 very easily.   These people are not stupid.   They

**Page:** 58
1                    PALINKAS
2 know if they want to get here and get legal
3 footing in the United States, they're going to do
4 it any which way they can, legally, illegally.
5 They want to get here because it's a better life.
6 There's no doubt in anybody's mind.
7              But again, my question is this, when are
8 those parents going to take responsibility for
9 those children?   It's just like these people
10 crossing the borders now that are in camps.
11      **Q.    Do you know if it's possible for**
12 **somebody to have come to the United States, let's**
13 **say, three years ago as a youth and apply for DACA**
14 **today?**
15              MR. BITTER:   Objection; speculation.
16      **Q.    No.   I'm simply asking if you know.**
17      A.    No, I don't.   I don't know that.
18      **Q.    Do you know if there is any requirement**
19 **in DACA that you -- that the applicant be present**
20 **in the U.S. for any period of time?**
21      A.    I believe there is, yes.
22      **Q.    Do you know what that is?**
23      A.    I'm not sure offhand, because I'm not --
24 not having to do the application itself, it never
25 became an issue that was brought up to my

**Page:** 59
1                    PALINKAS
2 reasoning to, you know, take that into
3 consideration as far as DACA was concerned,
4 because it didn't seem to have any impact.
5      **Q.    Do you know if there's any requirement**
6 **for DACA to have had continuous presence in the**
7 **United States for any length of time?**
8      A.    Yes, there is.   But I don't --
9      **Q.    Do you know what that period is?**
10      A.    Not having done the application
11 itself --
12      **Q.    Do you know?**
13      A.    I know it's between certain ages and
14 things of that nature.   But I don't want to be

15 misquoted, because I don't know off the top of my
16 head.
17       Q.   Would it be fair to say then that you
18 don't know what the top age is that somebody can
19 still apply for DACA?
20       A.   It's 31.
21       Q.   Do you know what the bottom age is?
22       A.   I'm not sure.
23       Q.   What can you tell me -- do you know if
24 DACA applicants submit biometrics?
25       A.   I would hope so.

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 60
1                  PALINKAS
2       Q.   Do you know?
3       A.   Well, if they don't, that's a hell of a
4 thing.   They must be submitting them, because why
5 wouldn't they?   How are we going to identify who
6 these people are?
7       Q.   Do you have any specific knowledge about
8 whether DACA applicants are required to submit
9 biometrics?
10       A.   Not firsthand.   But I would have to
11 assume if they're applying for a benefit that we
12 need to identify them.   So yes, they need to ne
13 fingerprinted.   Why wouldn't they?
14       Q.   Do you have any specific knowledge about
15 what's done with the fingerprint for DACA
16 applicants?
17       A.   What's done with them?
18       Q.   Yes.   What happens after the
19 fingerprints are taken?
20          MR. ROBINS:   Objection.   To the extent
21       that the answer will cause him to disclose
22       law enforcement information, I'll allow the
23       Witness to answer.
24       Q.   Without disclosing anything law
25 enforcement.   So for example, I will say to you --

**Page:** 61
1                  PALINKAS
2 let me try this question again.   When individuals
3 apply for immigration benefits, it is often the
4 case that they submit their biometrics, including
5 fingerprints, and those fingerprints are run for a
6 background check.   Are you with me?
7       A.   Yes.
8       Q.   Do you know whether or not that happens
9 with DACA applicants?
10       A.   I would hope so.
11       Q.   Does that mean that you know or that you
12 don't know?
13       A.   I haven't adjudicated these cases so --
14 but I would assume that they're run.   But it

15 depends on the age, because if it's a child, I
16 don't know that they're going to run those prints.
17 There's certain ages.
18        **Q.    Would it be fair to say then that**
19 **because you don't adjudicate DACA applications,**
20 **that you don't have specific knowledge about**
21 **what's done with the biometrics data for DACA**
22 **applicants?**
23        A.    I would imagine they would remain in the
24 file.
25        **Q.    But if we put aside imagining or what**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 62
1                    PALINKAS
2 you hope, is it fair to say that you don't know
3 what's done with the biometrics information of
4 DACA applicants?
5        A.    They would have to remain in the file to
6 identify the person.
7        **Q.    Do you have any specific knowledge about**
8 **what's done with the biometrics data of DACA**
9 **applicants besides that data remaining in the**
10 **file?**
11        A.    I don't know what systems they use.
12        **Q.    In your paragraph on this page -- let's**
13 **see.   It's the second paragraph on the second page**
14 **of your Declaration.   It's the paragraph that**
15 **starts with the words "Since June 2012."   In the**
16 **second sentence you say "This has led to the**
17 **creation of a myriad of programs sanctioned by the**
18 **Federal Government that has allowed for**
19 **authorizing work permits, social security cards,**
20 **medical and welfare benefits to a multitude of**
21 **illegal immigrants."**
22             **Is that correct?**
23        A.    That's correct.
24        **Q.    Tell me what is the myriad of programs**
25 **that you're referring to here?**

**Page:** 63
1                    **PALINKAS**
2        A.    Well, it's the fact that DACA
3 recipients, for instance, would be able to get
4 these benefits now.   They can apply for these
5 things and they can apply for benefits through --
6 and now that they have temporary protected status
7 in the U.S.
8        **Q.    Would it be correct to say then that**
9 **when you talk about the myriad of programs, you**
10 **are talking about programs referring to --**
11        A.    I'm actually referring to the work
12 permits, the social security cards, the medical
13 and welfare benefits, those programs.
14        **Q.    The myriad of programs is what you**

15 **mentioned later in your sentence, work permits,**
16 **social security cards, medical and welfare**
17 **benefits; is that right?**
18      A.    Correct.   That's what I intended to
19 mean.   I'm Hungarian, so sometimes my -- I was
20 told when I was in NYU that I write things
21 backwards.   I never understood what they meant.   I
22 grew up in the United States, so it didn't mean
23 anything to me.
24      **Q.    You can tell them my copy of your**
25 **Declaration is leathery, my having pored over**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page: 64**
1                          PALINKAS
2 every word of it.   So it's perfectly okay to let
3 me know what you meant.
4                Would it be fair to say then that the
5 myriad of programs that you're referring to is the
6 same as work permits, social security cards,
7 medical and welfare benefits?
8      A.    Correct.
9      **Q.    Is it correct to say that when an**
10 **immigrant gets a work permit or EAD, that the**
11 **immigrant also gets a social security card?**
12      **A.    Yes.**
13      **Q.    Those two things go together, the work**
14 **permit and the social security card?**
15      A.    Right.   But they might get more than
16 one.   That's the problem.   I've seen cases in my
17 tenure that people have twenty, twenty-five social
18 security cards.
19      **Q.    Have you ever --**
20      A.    That's nothing unheard of.
21      **Q.    Have you ever heard of a DACA applicant**
22 **getting more than one permit or social security**
23 **card?**
24      **A.    I have not personally.**
25      **Q.    Let's move on to medical and welfare**

**Page: 65**
1                          **PALINKAS**
2 **benefits.   Can you tell me what medical benefits**
3 **are available to a DACA recipient that wouldn't be**
4 **be available if the person was just a plain**
5 **unauthorized immigrant?**
6      **A.    I would imagine if something God forbid**
7 **catastrophic happened, they wouldn't be refused**
8 **medical treatment in a hospital.**
9      **Q.    Is that also the case --**
10      **A.    I myself might be, though.   I have a**
11 **problem with that.**
12      **Q.    Is it also true that if a regular**
13 **undocumented person experiences a catastrophic**
14 **event and goes to the emergency room, that person**

```
15  must also be treated?
16      A.   To my knowledge, yes.
17      Q.   Would it be fair to say then that the
18  medical benefits that you're talking about with
19  respect to DACA are also available to undocumented
20  people?
21      A.   Yes.
22      Q.   It's not DACA that made the difference
23  there, correct?
24      A.   They just added to it.   They added to
25  the rolls.   I know for a fact that it's -- because
```

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 67

```
1                   PALINKAS
2   know. I really wouldn't.
3       Q.   When you say that DACA has allowed for
4   medical benefits, I'm trying to pinpoint whether
5   there are any additional medical benefits.
6       A.   No, I'm not saying additional.  I'm --
7   again, to clarify, it would be just adding to the
8   rolls of illegal aliens who are entitled to that
9   benefit.
10      Q.   So if the DACA person had been here
11  before unauthorized, let's say for ten years, and
12  then gets DACA, the receiving DACA wouldn't add to
13  the rolls of uncompensated medical care?
14      A.   Probably not, but again, why would
15  they -- if they're here illegally, now they're
16  trying to get legal status under DACA.  That's the
17  only difference.  So I guess that's kind of
18  self-explanatory.
19      Q.   Besides -- putting aside advanced
20  parole, is there any other way to use DACA to gain
21  legal status?
22      A.   Not to my knowledge.  I'm not that savvy
23  on that.
24      Q.   Same question with respect to welfare
25  benefits.  Can you tell me what welfare benefits
```

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 68

```
1                   PALINKAS
2   DACA recipients are entitled to?
3       A.   I would assume if, depending on their
4   financial situation, they could apply, they're not
5   going to be turned down, much like the illegal
6   aliens can apply.  I mean, I live in the City of
7   New York.  I see the ads every day on the trains.
8   So I -- you know, and then that's jurisdictional.
9   I know it doesn't happen everywhere through the
```

10   United States, but I know of it because I live in
11   New York.
12          Q.    Would it be fair to say then that with
13   respect to the welfare benefits that you're
14   talking about in your Declaration, that those
15   welfare benefits are actually available to
16   undocumented immigrants and to people with DACA?
17          A.    Yes.
18          Q.    The last sentence of this paragraph,
19   tell me if I read it correctly.   "In the
20   interim -- "
21          A.    What page?
22          Q.    Second page.
23          A.    Yes.
24          Q.    Second paragraph, last sentence.   I'll
25   read it to you and you tell me if I've read it

**Page:** 69
1                      PALINKAS
2    correctly.   "In the interim, taking a back seat to
3    this avalanche of benefits bestowed on illegal
4    aliens are the jobs, wages, benefits and security
5    that rightfully belong to Americans and their
6    families, as well as those individuals who applied
7    for immigration benefits in accordance with
8    existing law and procedure."
9               Is that correct?
10          A.    That's correct.
11          Q.    Tell me how DACA causes Americans and
12   their families to take a back seat on jobs?
13          A.    Well, I've seen in this country a lot of
14   Americans without jobs.   But I've seen a lot of
15   illegal aliens and a lot of people that get
16   benefits elsewhere, including DACA recipients,
17   that seem to have more opportunity, and I don't
18   buy the argument that oh, an American wouldn't do
19   that job.   I see that happening, but I know there
20   are checks and balances now with the system that
21   we have in place where they're not supposed to
22   give to jobs to people unless they have this
23   certain identifiable criteria.   So adding people
24   to a system that's already burdened with economic
25   woes right now, although we are making recovery,

**Page:** 70
1                      PALINKAS
2    they say, this just adds to that.
3          Q.    Would it be fair to say then that your
4    sentence that begins "in the interim" is about
5    undocumented immigrants or illegal aliens and is
6    not specific to DACA?
7          A.    It's not specific to DACA.   It's
8    basically illegal aliens in general.
9          Q.    Then with respect to the previous
10   sentence "This has led to the creation of a myriad
11   of programs," is that sentence also with respect

12  **to undocumented people and not necessarily DACA?**
13      A.   It would encompass both, because I would
14  think that the amount of DACA applicants is -- I
15  know that there's a big influx of them now.   I
16  think the -- it's hard to explain this, because
17  the illegal alien is probably going to be apt to
18  file something if they have kids through DACA if
19  they need that criteria.   I would.
20      **Q.   Do you understand DACA to be available**
21  **to parents of children?**
22      A.   Yes, there's DAPA.   But I think that
23  that didn't take off.   It's been kind of on a
24  hiatus.   But that was proposed around the same.
25      **Q.   When you said a moment ago, you used the**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 73
 1                  PALINKAS
 2  get an accurate grasp on it.   So I tend to
 3  disbelieve a lot of times when they come out with
 4  statistics.   However, this I pulled from their own
 5  website.   I'm assuming it's close, it's ballpark.
 6      **Q.   Do you know the date as of -- or let me**
 7  **try that again.**
 8          **Do you know the date that these numbers**
 9  **are current for?**
10      A.   Probably around the time I gave the
11  statement.   So I think April.   April 6 is when I
12  drafted this.   So sometime in April of this year.
13      **Q.   When you were looking at this number**
14  **814,058, do you know whether that number is for**
15  **initial DACA or renewal DACA or both?**
16      A.   I think the website just specified
17  current applications.   I didn't know -- I don't
18  recall that they delineated.   So I would have to
19  say it would be for all.
20      **Q.   You mentioned earlier that you**
21  **understood that DACA was for a two-year period; is**
22  **that right?**
23      A.   Yes.
24      **Q.   Do you understand DACA to be renewable?**
25      A.   Yes.

**Page:** 74
 1                  PALINKAS
 2      **Q.   Would you expect the approval rate to be**
 3  **higher in general for renewals than initials?**
 4          MR. BITTER:   Objection.   Speculation.
 5      **Q.   Based on your work as an ISO?**
 6      A.   If it follows suit of a green card, for
 7  instance, I would say that makes sense.
 8      **Q.   Did you make any attempt to break out**
 9  **the numbers for DACA initial applications,**
10  **approvals and denials?**

11      A.    No, I did not.
12         Q.    Did you look -- for your Declaration for
13  your testimony in this case, did you look at any
14  approval or denial rates for other types of
15  immigration benefits to compare to DACA?
16      A.    No, I did not.   After that number stuck
17  out, I didn't feel a necessity to compare it to
18  anything, because it was so skewed to approval
19  that I couldn't compare it to anything else that I
20  was aware of.
21         Q.    Are you aware of the approval versus
22  denial rate for NATS applications nationwide by
23  USCIS?
24      A.    I don't know an exact figure.   But if
25  you're asking me would I assume that there are

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page: 75**
1                    PALINKAS
2  more approvals, I would say yes.
3         Q.    Do you know the percent approval versus
4  denial for NATS applications?
5      A.    No, I do not.   But it's not 90 percent.
6         Q.    Do you know the approval versus denial
7  rate for I485s?
8      A.    Again, I would not know the exact
9  figure, but it's not 90 percent.
10        Q.    Would you know the approval or denial
11  rate for TPS, temporary protected status?
12      A.    No, I would not.
13        Q.    Same question for VAWA, do you know the
14  approval or denial rate for VAWA?
15      A.    I would assume that that would be a high
16  rate possibly.
17        Q.    Why is that?   Why for VAWA?
18      A.    Because of that special situation, it
19  might be a higher rate than normal.   But not
20  90 percent.   Nothing's in that category.   But
21  that's just my own guesstimate.   I'm not privy to
22  those figures.   But that's just my own assumption.
23        Q.    Did you make any effort to look at
24  whether the approval rates for DACA have changed
25  since January of 2017?

**Page: 76**
1                    PALINKAS
2      A.    Changed in what way?
3         Q.    That the approval rates have gone up or
4  down with respect to DACA since January of 2017,
5  since the new administration?
6      A.    I did not, but -- no, I did not.
7         Q.    You mentioned in your Declaration that
8  there should be proper procedure and vetting for
9  DACA applicants.   We had a longer conversation

10 **before about criteria, and I'm not going to ask**
11 **about criteria again.   With respect to proper**
12 **procedure and vetting of DACA applicants, in**
13 **addition to an interview what else would you**
14 **recommend for a proper procedure and vetting?**
15     A.    More background checks.
16     **Q.    Anything else?**
17     A.    No.   I think the background checks would
18 cover most of the stuff.   The officer could always
19 ask for any extraneous documentation that might be
20 needed.   You know, it's case by case.
21     Q.    So for example, an opportunity to issue
22 an RFE, Request for Evidence?
23     A.    Right.
24     Q.    That would be helpful, in your view?
25     A.    Absolutely.   I think it would help

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 80
1                           PALINKAS
2 and, you know, if you're -- if that's the way you
3 came in, you can't be equally considered before
4 the law because of that.   There's a difference.
5     Q.    If you entered on a visa when you were
6 six years old with your parents and then you
7 overstayed and now you're undocumented, are you in
8 a similar position to a different visa overstay,
9 let's say an adult?
10           MR. BITTER:   Objection; speculation.
11     Objection; vague.
12     A.    No.
13     **Q.    Is it your understanding that for DACA**
14 **individuals, that their parents made an entry**
15 **without inspection?**
16     A.    Correct.
17     **Q.    It possible that somebody could have**
18 **DACA and their parents made an entry with the visa**
19 **and overstayed?**
20     A.    Not having adjudicated them, I can't
21 answer that.
22     **Q.    Do you believe today that we have proper**
23 **procedure and vetting for TPS applicants?**
24     A.    I think everything could be improved..
25     **Q.    But as to whether it's a yes or a no, do**

**Page:** 81
1                           **PALINKAS**
2 **we have proper procedures and vetting for TPS**
3 **applicants?**
4     A.    I believe that that there is improvement
5 needed.   So I would say no, there's not proper
6 vetting.   We need to improve on anybody getting
7 protected status, not to exclude any certain
8 groups from the fray.
9     **Q.    Do you believe that we have proper**

10  **procedures and vetting for VAWA applicants?**
11      A.   Again, I think anybody applying for a
12  benefit, there should be no preferential treatment
13  giving.   So to answer that, I think that they
14  should also be vetted the same.
15      **Q.   Do we have proper --**
16      A.   We should improve upon -- all of our
17  systems need to be improved upon to insure and
18  protect America.
19      **Q.   Do we have proper procedure and vetting**
20  **for VAWA applicants, yes or no?**
21      A.   I just answered that.
22      **Q.   No, you did not give me a yes or no.**
23  **It's okay to explain your answer.**
24      A.   I'll say no.
25      **Q.   Then the same question.   Do we have**

**Page: 82**
1                      **PALINKAS**
2  **proper procedure and vetting for new visa**
3  **applicants?**
4      A.   Those are the people that get -- they're
5  smuggled in, I believe.
6      **Q.   Crime victims.**
7      A.   Crime victims.
8      **Q.   Do we have proper procedure and vetting**
9  **for U visa, the crime victims?**
10          MR. BITTER:   Objection; speculation
11      A.   To my opinion, I just again think that
12  every systems that we have, in today's world, we
13  need to strengthen everything that needs to be
14  improved.   So no.
15      **Q.   Then finally last one is whether you**
16  **believe we have proper procedure and vetting for T**
17  **visa applicants?**
18      A.   Apply the same.
19      **Q.   I have a few questions for you on**
20  **advanced parole.   We talked about advanced parole.**
21  **Would you agree with me that there are DACA**
22  **recipients who were originally visa overstays who**
23  **do partake in advanced parole, but that in that**
24  **situation, the advanced parole does not provide**
25  **them a lawful entry that they would otherwise need**

**Page: 83**
1                      **PALINKAS**
2  **to be addressed?**
3      A.   I'm not aware of that.
4      **Q.   Would you agree with me that we don't**
5  **know the number of DACA recipients who re-enter**
6  **the country with advanced parole and who**
7  **originally made an entry without inspection?**
8          MR. BITTER:   Objection; speculation.
9      A.   Having heard the comments from the field
10  about how people were circumventing immigration
11  law, I would say that that could be ascertained. I

12 think we could get a ballpark figure on that.   But
13 I don't know that anybody's done it.   But I would
14 think it's pretty prevalent, because it wouldn't
15 have been brought to light so quickly, because as
16 soon as they found that loophole it was used.
17        Q.    Would you agree that you don't know the
18 number of DACA recipients who re-entered the
19 country with advanced parole who originally made
20 an entry without inspection?
21        A.   I wouldn't know.
22        Q.    With respect to the 814,058
23 applications, some of which were denied.   So let's
24 say 730,000 people or more.   Based on the comments
25 that you heard about advanced parole, what

**Page: 84**
1                    PALINKAS
2 percent, ballpark, do you think were using
3 advanced parole to make a lawful entry?
4        A.   That's very hard to figure.
5        Q.    Based on --
6        A.   I wasn't good in math in high school.
7        Q.    You don't have to do the calculation.
8 But based on what you heard, was it more or less
9 than half?
10            MR. BITTER:   Objection, speculation.
11        A.   I would just say it was a large number.
12 But I wouldn't know if it was more than half.   I
13 wouldn't know that.
14        Q.    Would it be a large number?   Would it be
15 over one hundred thousand?
16        A.   I have no way of determining that,
17 figure-wise.
18        Q.    What is large to you, then?   You
19 mentioned many DACA applicants.   What is many to
20 you?   What is it, you know, formed your belief
21 that it's a large number?
22        A.   I would say a majority, but I don't -- I
23 can't give a hard and fast figure.   I don't know
24 how much.   I would say it's over 50 percent.
25 Maybe it's a majority, but it could be 51 percent.

**Page: 85**
1                    PALINKAS
2 That's all they have to do to get their benefit,
3 right?
4        Q.    In your -- granted that you haven't done
5 the exact math, but in your view, a majority of
6 DACA recipients have used advanced parole to make
7 a lawful entry into the U.S.?
8        A.   I have nothing to base that on.   I'm
9 saying that through the scuttlebutt that I heard
10 from the service centers where they were being
11 adjudicated, that it appeared to me to be an
12 excessive amount, more than I did not hear of them
13 not doing it that way.

14       Q.    So --
15       A.    I'm just basing it on basically what was
16 said to me from the officers out in the service
17 centers.
18       Q.    From that you gleaned --
19       A.    I formulated my own opinion.
20       Q.    Your opinion is that it's more than
21 fifty percent?
22       A.    I would believe so, because the amount
23 of times I was told that they were doing.
24       Q.    Do you have a sense of how many DACA
25 recipients have applied to adjust their status

**Page:** 86
1                      PALINKAS
2 since getting DACA?
3       A.    I wouldn't know.
4       Q.    Do you know whether people who have
5 DACA,   people who are undocumented and have DACA
6 could be 245I eligible?
7       A.    Hard to say.   I have no way of
8 ascertaining that.
9       Q.    What is a USCIS service center?
10      A.    It's basically houses -- I'd say eight
11 hundred to one thousand officers and clerks where
12 there are no interviews being done.   They are
13 processing applications.
14      Q.    Do you know where -- how many service
15 centers there in USCIS?
16      A.    I'm aware of -- let me see.   They have
17 the California Service Center, the Texas Service
18 Center, the Nebraska Service Center, the Vermont
19 Service Center.   So that's four.   I think that's
20 it.
21      Q.    Is there one in Texas?
22      A.    Yes, in Dallas.
23      Q.    Is it correct to say that you don't work
24 in a service center?
25      A.    I don't work in a service center.   I've

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 87
1                      PALINKAS
2 visited every one of them, but I don't work there.
3 The one in California is very interesting.
4       Q.    Is it correct to say that you have never
5 worked in a service center?
6       A.    That's correct.
7       Q.    Do you know the kinds of applications
8 that are adjudicated in service centers?
9       A.    Well, the DACA application, the
10 employment-based -- I believe I90s are done in the
11 service centers.   We also have the National
12 Benefits Center.   That's in Kansas, I believe.

13 There's other extraneous that they lessen the
14 requirements where they said they didn't need to
15 have interviews done, but I don't remember the
16 applications off the top of my head.
17      Q.  Do you know if service centers
18 adjudicate applications for EADs?
19      A.  I would believe they might.  But we used
20 to do that here and they moved it elsewhere.  So I
21 would assume they went to service centers.
22      Q.  Do you know how many applications are
23 approved annually at service centers?
24      A.  No, I don't.
25      Q.  Do you know if service centers

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 88
1                    PALINKAS
2 adjudicate applications for replacement cards?
3      A.  I believe they do.
4      Q.  Is it correct to say that if an
5 application is processed at a service center, it's
6 not being processed in the New York District
7 Office, meaning if it's the type of application,
8 like an I76 or 5.
9      A.  Again, things have changed and we've
10 been getting applications that were being done in
11 the service centers here in the New York District.
12 So it's transitioning.
13      Q.  Does the New York office process DACA
14 applications?
15      A.  No, which is why I have no idea about a
16 lot of details pertaining to it.
17      Q.  Have you ever adjudicated a VAWA
18 application?
19      A.  Not an adjustment, no.
20      Q.  Have you ever adjudicated a TPS
21 application?
22      A.  No, I have not.
23      Q.  Have you ever adjudicated a U visa
24 application?
25      A.  No, I have not.

**Page:** 89
1                    PALINKAS
2      Q.  Have you ever adjudicated a T visa?
3      A.  No, I haven't.
4      Q.  Have you ever personally adjudicated an
5 I765 for a person who is not applying to adjust
6 status?
7      A.  No.  Again, that goes back to my lack of
8 course training.
9      Q.  Have you ever personally adjudicated an
10 application that resulted in a grant of deferred
11 action?
12      A.  No, I have not.

13      Q.    Do you know where DACA applications are
14 sent by the applicants?
15      A.    I know they're sent to, I think, the
16 Nebraska service center.   I don't know if that's
17 the only place.   I know they go over there,
18 though.   It may go to Texas.
19      Q.    Do you know what the name of the place
20 is called that DACA applications go to, not
21 necessarily name of the office but --
22      A.    I don't know that it's a centralized one
23 location, but it might be at the National Benefits
24 Center.   I'm not really sure.
25      Q.    Have you ever heard of the term lockbox?

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 90
1                    PALINKAS
2      A.    Yes, that's at the National Benefit
3 Center, I believe.
4      Q.    Who are the workers at USCIS that
5 adjudicate DACA applications?
6      A.    They would be ISO Levels 1 one and 2 and
7 3.
8      Q.    Do you know how many workers at USCIS
9 adjudicate DACA applications?
10      A.    I wouldn't know the assignment of that
11 specific work, no.
12      Q.    Do you know the documents that are used
13 to guide ISOs in adjudicating DACA applications?
14      A.    They're readily available on the USCIS
15 website what's needed, but off the top of my head
16 I don't know what they use.
17      Q.    Are -- have you ever read the national
18 standard operating procedures for DACA?
19      A.    For DACA?
20      Q.    Yes.
21      A.    I might have in the beginning.   But
22 doesn't ask me about them now.
23      Q.    Would it be fair to say that you are no
24 longer familiar with the national --
25      A.    I'm no longer familiar with those

**Page:** 91
1                    PALINKAS
2 procedures, standard operating procedure.
3      Q.    For DACA?
4      A.    For DACA.
5      Q.    Do you know when the SOPs for DACA were
6 last updated?
7      A.    Probably 2017, I would think.   They must
8 have changed them.
9      Q.    Do you have any specific knowledge of
10 the DACA SOPs being updated?
11      A.    No, not specific.   No, I'm just giving a

12 a guesstimate.
13      Q.    Are you familiar with any specialized
14 training that's offered to ISOs that are
15 adjudicating DACA?
16      A.    Not specialized, no.
17      Q.    Would it be correct to say that you're
18 not familiar with the specific procedures set out
19 for DACA adjudicators to address suspected fraud
20 on the application?
21      A.    Not having done the actual application,
22 I am not privy to all the ins and outs of the
23 adjudication process.
24      Q.    So are you not familiar with the
25 procedures set out to address suspected fraud in

**Page:** 92
 1                    PALINKAS
 2 the DACA application?
 3      A.    Not in the DACA application, no.
 4      Q.    These are similar questions.   Is it
 5 correct to say that you're not familiar with the
 6 procedures set out for DACA adjudicators to
 7 address suspected threats to national security?
 8      A.    Again, I would assume all of that gets
 9 sent to the fraud -- to FDNS.
10      Q.    Even for national security concerns?
11      A.    Yes.
12      Q.    Is it correct to say then that you're
13 not familiar with the specific procedures set out
14 for DACA adjudicators to assess suspected threats
15 to national security?
16      A.    I'm not privy to that, no.
17      Q.    Is it correct to say that IS0s use their
18 judgment and experience to determine if derogatory
19 information is related to a specific DACA
20 applicant?
21      A.    I'd say that's safe to say, as long as
22 they've been trained properly.
23      Q.    Is it correct to say that ISOs use their
24 judgment and experience to determine if derogatory
25 information about a DACA applicant relates to

**Page:** 93
 1                    PALINKAS
 2 national security immigration fraud or other
 3 criminal cases?
 4      A.    I'd say it's safe say that they do that,
 5 given the time to do it.
 6      Q.    Is it correct to say that ISOs
 7 adjudicating DACA applications use their
 8 discretion to determine if past criminal activity
 9 of the applicant is germane to the request for
10 DACA?
11      A.    I would say that's part of their job.
12      Q.    Is it correct to say that ISOs
13 adjudicating DACA applications use their

14  discretion to determine if past credible activity
15  of the applicant makes him or her a public safety
16  concern under --
17      A.   Absolutely.
18      Q.   Is it correct to say that for each
19  related hit in the law enforcement databases for a
20  DACA applicant that there has to be a resolution
21  memorandum created to reconcile that hit?
22      A.   Absolutely.
23      Q.   Is it -- okay -- is it also true that
24  ISOs adjudicating DACA applications when there's a
25  hit in the criminal databases are instructed that

**Page:** 94
1                    PALINKAS
2  the decision whether to defer action in a
3  particular case is individualized and
4  discretionary?
5      A.   Individualized and discretionary, what
6  do you mean by that?
7      Q.   Well, the question is whether you're
8  aware whether ISOs adjudicating DACA applications
9  are instructed if there is a hit in criminal
10  databases?
11      A.   Yes.
12      Q.   That's a decision whether to defer
13  action is individualized and discretionary?
14      A.   I would think they have to follow
15  standard operating procedure.   So I don't know
16  about this individualized discretionary part.   But
17  we do employ discretion on certain applications.
18  Again, not having done the DACA application, I
19  can't truthfully answer that.
20      Q.   So if there was language in the standard
21  operating procedures for DACA instructing ISOs
22  that the decision whether to defer action in a
23  particular case is individualized and
24  discretionary, then the ISO would follow that
25  procedure?

**Page:** 95
1                    PALINKAS
2      A.   Yes, they would.
3      Q.   With respect to exercising discretion in
4  the application, would it be fair to say that
5  because you don't adjudicate DACA application that
6  you're not aware of the extent to which discretion
7  is exercised?
8      A.   That's true, because I don't know -- I'm
9  not familiar with that application.
10      Q.   If DACA requires the ISO to determine if
11  the applicant has a significant misdemeanor
12  conviction, would the ISO use discretion in
13  deciding whether a misdemeanor record was
14  significant or not?
15              MR. ROBINS:   Objection; calls for

16    speculation.
17        MR. BITTER:   We join in that objection.
18    **Q.    You may answer.**
19        A.    If it's significant, the adjudicator
20   would have to take that as the path to make the
21   decision, the significance of the crime.
22    **Q.    And the adjudicator would use**
23   **experience, knowledge and discretion to determine**
24   **whether or not a misdemeanor was significant for**
25   **DACA?**

**Page:** 96
1                   PALINKAS
2        MR. ROBINS:   Objection; speculation.
3        MR. BITTER:   Same objection.
4        A.    I'm almost positive they would define
5   what a significant misdemeanor would be.
6    **Q.    You're saying there would be some more**
7   **detail there guiding the ISO?**
8        A.    Yes.
9    **Q.    If there are criteria set out for the**
10   **ISO to consider whether a misdemeanor conviction**
11   **was significant, does the ISO use discretion in**
12   **going through those criteria and deciding whether**
13   **a misdemeanor is significant?**
14        MR. BITTER:   Objection; calls for
15    speculation.
16        MR. ROBINS:   Join in the objection.
17        A.    Can you restate that, because it sounds
18   similar to what you just asked?
19        MS. PERALES:   You can have a running
20    objection on this because I'm going to re-ask
21    the question.
22    **Q.    If the standard operating procedures set**
23   **out criteria to decide what is a significant**
24   **misdemeanor conviction, is the ISO using**
25   **knowledge, experience and discretion to decide**

**Page:** 97
1                   PALINKAS
2   **whether a misdemeanor is significant or not?**
3        A.    If the SOP allows for it.
4    **Q.    We would have to look at the SOP to**
5   **decide whether there was discretion?**
6        A.    Correct.
7    **Q.    How would the SOP be worded so that we**
8   **would understand that the ISO is being given**
9   **discretion?**
10        MR. BITTER:   Objection; calls for
11    speculation.
12    **Q.    Based on your familiarity with SOPs?**
13        A.    Well, it falls under the term
14   prosecutorial discretion.   It's kind of -- gives
15   some leeway, but you would not make that decision
16   on your own.   You would have to go to discuss it
17   with supervision.

18      **Q.      Would your supervisor be somewhere in**
19 **your office with you?**
20          A.    Well, the supervisor is somewhere.
21 That's what they're there for, I would assume.
22 They're supposed to assist you in not just making
23 sure that you're making a proper legal decision.
24 They can't influence your decision.
25          **Q.      If the SOPs set out criteria for an ISO**

**Page:** 98
1                    PALINKAS
2 **to decide whether somebody's absence from the**
3 **United States was previous and innocent, would the**
4 **ISO be exercising discretion in determining**
5 **whether somebody's absence from the United States**
6 **was previous or innocent?**
7          MR. BITTER:   Objection; speculation.
8          A.    Following the SOP.
9          **Q.      Isn't it correct to say that when the**
10 **ISO adjudicating the DACA application suspects**
11 **fraud, that he or she is required to complete a**
12 **fraud referral sheet and put aside the**
13 **application?**
14          MR. BITTER:   Same objection.
15          A.    Again, not having done it, I can only
16 tell from you naturalization and from adjustment,
17 that's how it's done there. I assume that's how
18 it's done.
19      **Q.    An ISO adjudicating a DAPA application?**
20      A.    DAPA?
21      **Q.    I'm sorry.   Let me try again.**
22          **Isn't it correct to say that when an ISO**
23 **is adjudicating a DACA application, the ISO is**
24 **using his or her own discretion to expect fraud?**
25          MR. BITTER:   Objection; speculation.

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 99
1                    PALINKAS
2      A.    The fraud could be evidenced in the
3 file.   So sometimes you don't need to use
4 discretion.   It can appear there.
5      **Q.    Are there also times when you suspect**
6 **fraud based on your discretion, not because**
7 **there's something -- like somebody's listed as**
8 **being eight-foot-four, as you mentioned earlier?**
9      A.    In a case like that, you would take a
10 sworn statement from the applicant and then you
11 could do a fraud rereferral based on what you
12 ascertained from the application, which is why the
13 problem is about not interviewing people, because
14 you can get so much more relevant information from
15 the applicant by doing, you know, an in-face
16 interview.
17      **Q.    Can ISO do fraud referrals without doing**

18  **an interview first?**
19       A.    We -- are you referring to, what kind of
20  application?
21       **Q.    I485?**
22       A.    You have to do the interview first.
23       **Q.    I130?**
24       A.    Interview.
25       **Q.    Are all I130s subject to interview?**

**Page:** 100
1                              PALINKAS
2       A.    Can they be adjudicated elsewhere?   They
3  adjudicate them in the service centers.   We're
4  fully aware of that.   So again, that's the basic
5  determination of the validity of the bona fides of
6  the marriage.   I believe it should be done in
7  person, but the policy was because of the backlog
8  they were having them done, I believe, at the
9  service centers for a while.   I don't know if
10  that's continued practice, because again --
11  because I'm not at the national level.   I'm not
12  privy to all of the -- I basically call people in
13  the service centers and ask them if they're doing
14  it.   But most of them are doing labor --
15  employment-based applications.
16       **Q.    Do you know what the criteria is for**
17  **rejecting versus accepting a DACA application?**
18       A.    Not having adjudicated it, I can't
19  answer.
20       **Q.    Would it be correct to say that you're**
21  **not aware of the specific criteria used by ISO in**
22  **deciding whether to issue an RFE on a DACA**
23  **application?**
24       A.    Not having done the actual application,
25  I can only tell you the parameters of whatever is

**Page:** 101
1                              PALINKAS
2  referenced to what they need to divide with the
3  application.   That's contained probably on the
4  website, which I referenced before.   But outside
5  of that, having not done the application, I don't
6  know what else they would be looking for.
7       **Q.    If an ISO adjudicating a DACA**
8  **application has to determine whether somebody has**
9  **been continuously present in the United States for**
10  **a certain amount of time, and the ISO is looking**
11  **at the material that had been provided to document**
12  **its continuous presence in the United States, does**
13  **the ISO use discretion in deciding, you know what,**
14  **I'm going to issue an RFE because I'm just not**
15  **convinced by what we have here?**
16             MR. BITTER:   Objection; speculation.
17       Objection; vague.
18       A.    There was law enforcement systems that
19  can be used to determine presence, physical

20 presence in continuity of residence.   Certainly
21 they can RFE for passports, entire pages of the
22 passport.
23        Q.    Would that be an act of discretion to
24 decide whether or not to issue that RFE?
25        A.    Again, not having adjudicated, I don't

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 102
1                           PALINKAS
2 know what the parameters are, and the supervision
3 requires them to sign off on it or if they allow
4 the officers to have that complete discretion.
5        Q.    If there is no supervisor's signature
6 required, would the discretion then lie with the
7 ISO?
8              MR. BITTER:   Objection; speculation.
9        A.    If the case is going to be adjudicated,
10 and that's the criteria that's used, I would
11 imagine yes.
12        Q.    If the ISOs had all the time that they
13 need and they could conduct interviews for DACA,
14 would you say that DACA is an effective way to
15 identify low priority immigrants for enforcement?
16             MR. BITTER:   Objection; calls for
17        speculation.   Also vague.
18        A.    I can't answer that because that's
19 assuming so many different things.   I mean, you
20 can have a mass murderer applying for DACA.
21        Q.    Would you agree with me that DHS
22 selected some criteria for DACA and excluded other
23 criteria, that there's a limited list of criteria
24 for DACA?
25        A.    Having not adjudicated a DACA case, it's

**Page:** 103
1                           PALINKAS
2 hard for me to say.   But I tend to believe that
3 there should be more vetting, which is what I
4 asked for in my statement.   So from what I
5 gathered, information-wise, from 2012 on, I would
6 say yes, there's more that's needed, more vetting.
7        Q.    Did DHS select the DACA criteria that
8 now applies to implement DACA?
9              MR. BITTER:   Objection; speculation.
10        A.    I don't know who made that decision.
11        Q.    It would have been somebody with the
12 agency, though, correct?
13        A.    Somebody with the agency probably
14 working with Congress, I would think.
15        Q.    Have you ever adjudicated a NATS
16 applications when you thought somebody was a
17 threat to national security?
18        A.    Yes.

19    Q.    Let me ask this in the question of DACA
20 now, if an ISO is reviewing a DACA application,
21 does the ISO have to weigh and consider different
22 kinds of evidence to decide whether the applicant
23 is a threat to national security?
24        MR. BITTER:   Objection; speculation.
25        MR. ROBINS:   Objection to the extent

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 104
 1                    PALINKAS
 2       that answer calls for exposure.
 3       Q.    You can answer that without disclosing
 4 any specific databases or anything.   I'm just
 5 asking about this process of deciding whether
 6 somebody is a threat to national security.   Would
 7 you agree with me that it involves weighing
 8 different pieces of information?
 9       A.    Absolutely.   You have to incorporate
10 different systems.
11       Q.    Once all of that thereafter is done, if
12 ultimately the ISOs training, discretion and
13 judgment that goes into forming the conclusion
14 whether or not this person is a national security
15 threat?
16       A.    I would believe that would be decided in
17 conjunction with the fraud detection and national
18 security unit.
19       Q.    Prior to the referral, to --
20       A.    You have to make a referral.   You can't
21 make that decision on your own.
22       Q.    What leads the individual ISO -- let's
23 say the ISO is going to adjudicate five DACA
24 applications that day, numbers one through four
25 pretty straightforward no concerns, is the ISO

**Page:** 105
 1                    PALINKAS
 2 using discretion in looking at that fifth
 3 application and forming a concern that this person
 4 is potentially a threat to national security?
 5       MR. BITTER:   Objection; speculation.
 6       A.    It's all on a case-by-case basis and you
 7 know, things, criteria change, Situations change.
 8       Q.    Is it ultimately the ISO's use of
 9 discretion that leads to that fraud referral when
10 it happens?
11       MR. BITTER:   Same objection.
12       A.    If you're going to do a fraud referral,
13 you better have it based on something so it's not
14 that subjective.   You're going to have to get a
15 statement and have some relevance in that file.
16 You may have information in that file that where
17 this person's been vetted as a threat to national
18 security.

19     Q.    Is it sometimes possible for an ISO to
20  form a suspicion that the person is a threat to
21  national security without getting like a big, you
22  know, giant star on a piece of paper that say we
23  have a hit in the criminal database?
24        A.    Again, not having adjudicated, I'm
25  assuming that all these background checks are done

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 106
1                         PALINKAS
2  before the application is given to the
3  adjudicator.   But I don't know.   Maybe they start
4  with ground zero.   Then there would be a whole
5  different situation.
6        Q.    With respect to public safety, I have a
7  similar question, does an ISO use discretion in
8  evaluating different pieces of information and
9  concluding that somebody is potentially a threat
10  to public safety?
11              MR. ROBINS:   Objection; speculation.
12              MR. BITTER:   We join in the objection.
13        A.    An adjudicator uses discretion.   But to
14  what extent, it would depend on how much is in
15  that file.   Not having the done the application, I
16  don't know.   It's there.   If it's just the DACA
17  application by itself and then the person comes
18  in -- I'm sorry -- the person mails in whatever
19  documents were asked for if they ever asked for,
20  or if there is a predecisional event that occurs
21  before the adjudicating officer gets the file.   I
22  don't know.
23        Q.    Do you know how many applications are
24  adjudicated monthly for an ISO that adjudicates
25  DACA?

**Page:** 107
1                         PALINKAS
2        A.    No, I do not.
3        Q.    Do you know how the monthly workload of
4  a DACA ISO adjudicator compares to other
5  adjudicators at the service centers?
6        A.    I have been told that they have more
7  applications, because that application is not as a
8  heavy lift, maybe, if that's the proper word, to
9  use two words to use, comparative speaking to
10  somebody that's looking for an employment-based
11  benefit.
12        Q.    When were you told that?
13        A.    When I was council president.
14        Q.    Before August '15?
15        A.    Before 2015, yes.
16        Q.    Do you have any specific facts related
17  to whether a DACA ISO adjudicator has a heavier
18  workload than another ISO at the service centers?

19     A.   The assignment of work is not -- I'm not
20  privy to that.   So I can't answer that.
21     **Q.   Do you know if whether an USO at a**
22  **service center thinks a DACA applicant should be**
23  **vetted more, that the ISO at the service center**
24  **can refer the DACA applicant for an interview by**
25  **an ISO field office?**

**Page: 108**
1                   PALINKAS
2     A.  I'm not aware of that happening.
3     **Q.   A couple of questions about the EAD.**
4  **Would you agree with me that USCIS issues**
5  **employment authorization documents to individuals**
6  **who lack authorized presence in the United States?**
7     A.   By mistake?
8     **Q.   No, on purpose.   Let me put it in your**
9  **terminology.**
10     A.   I'm not aware of that happening on
11  purpose.
12     **Q.   Let me put it in your terms.   Would you**
13  **agree with me that USCIS issues employment**
14  **authorization documents to illegal aliens?**
15     A.   Again by mistake?
16     **Q.   On purpose.**
17     A.   On purpose.   I'm not aware.
18     **Q.   When was last time you looked at the**
19  **instructions for the I765, employment**
20  **authorization document?**
21     A.   I couldn't tell you.
22     **Q.   Are you aware that there are**
23  **undocumented people in the United States who are**
24  **here on humanitarian parole?**
25     A.   Yes.

**Page: 109**
1                   PALINKAS
2     **Q.   Do you know if those people are eligible**
3  **for an EAD?**
4     A.   I'm not adjudicating those kind of cases
5  and not the case.   I can't answer them.
6     **Q.   Do you know if somebody here with TPS,**
7  **temporary protect status, is eligible for an EAD?**
8     A.   I believe would that would depend on
9  situation.   But that's a loaded question.   I don't
10  know this it pertains to all of them.
11     **Q.   Some people with PTS might be eligible**
12  **to apply for an EAD and others not?**
13     A.   I would say that's possible.
14     **Q.   Putting aside the financial situation of**
15  **the individual, do you know whether people who**
16  **have been granted withholding of removal are**
17  **eligible to apply for an EAD, meaning they have**
18  **been ordered removed, but then they've been**
19  **granted withholding?**
20     A.   I don't know that they could apply at

21 that time.   So I think they're kind of like you
22 know --
23        Q.    Do you know if people who've been
24 ordered removed, but have been granted an order of
25 supervision by ICE are eligible to apply for an

**Page:** 110
1                            PALINKAS
2 EAD?
3        A.    I'm not aware.
4        Q.    Do you know whether people who are
5 recipients of military parole in place are
6 eligible to apply for an EAD?
7        A.    They probably would have.
8        Q.    Does your district office grant military
9 parole in place?
10        A.    I would have to ask one of the
11 adjudicators who handles, because we have one
12 gentleman who that was his supervisor by the way
13 who was handing all the -- all the military cases.
14 So I can't answer that.
15        Q.    Are you aware whether individuals who
16 are the beneficiaries of family preference
17 petitions, but whose primary date is not current
18 are eligible for EADs?
19        A.    I think that's a case by case.   It
20 depends on a lot of situations.   I don't know
21 if -- you can't make a blanket statement.
22        Q.    Do you in your work have the opportunity
23 to look at the Visa bulletin?
24        A.    I would if I didn't lose my access to
25 the systems, because I haven't adjudicated an

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 111
1                            PALINKAS
2 adjustment case --
3        Q.    That would be --
4        A.    -- in a year and a half.
5        Q.    That would be something that somebody
6 who adjudicates I485 would look at?
7        A.    Absolutely.
8        Q.    You're not allowed to just roam around
9 and access the I485s?
10        A.    I would be accessing somebody else's
11 system.   No, you're not allowed.
12        Q.    Would you agree with me that USCIS
13 grants deferred action to VAWA self-petitioners
14 and their children?
15        A.    Yes.
16        Q.    Would you agree with me that USCIS
17 grants deferred action to U visas?
18        A.    Yes.
19        Q.    And T visas?

20      A.    Yes.
21      Q.    Would you agree with me that in general,
22 deferred action has become a regular feature of
23 the immigration removal system?
24          MR. BITTER:   Objection; vague.
25      A.    I'm having trouble answering that,

**Page: 112**
1                          PALINKAS
2 because a regular feature.
3      Q.    But it is a component of the removal
4 system, whether or not it's big or little, that
5 deferred action --
6      A.    It's a component, yes.
7      Q.    I'm going to ask you again about some
8 people, the same people I asked you about before
9 but a little bit differently.   Do you know if TPS
10 people get interviewed before they receive their
11 EAD?
12      A.    I don't know.
13      Q.    Do you know if people on humanitarian
14 parole receive an interview before they get an
15 EAD?
16      A.    I'm not privy to that.   I don't know.
17      Q.    Do you know if VAWA recipients are
18 interviewed before they get the EAD?
19      A.    Same situation.   I don't know.
20      Q.    U and T visas, do you know if they're
21 interviewed before they get the EAD?
22      A.    I don't know.
23      Q.    Do you know if when a U.S. citizen child
24 petitions for parents using an I130, do you know
25 whether those folks are interviewed before they

**Page: 113**
1                          PALINKAS
2 get an EAD?
3      A.    I believe they can get the EAD before by
4 the order of the file.
5      Q.    Since you ended your term as national
6 president of NCISC in August of 2015, have you
7 spoken to any individuals who adjudicate DACA
8 applications?
9      A.    I believe I have.
10      Q.    Do you know when?
11      A.    It wouldn't be recently.   Not recently.
12 If at all, it would have to have been probably
13 before 2016.   I haven't spoken to anybody that's
14 doing them now, because I don't really know of
15 anyone that's been doing them since, I guess,
16 2017.
17      Q.    Are you aware whether any DACA
18 applications are coming in to the service centers
19 right now?
20      A.    No, I'm not.
21      Q.    Do you have any knowledge of how DACA

22  **applications are being adjudicated right now at**
23  **service centers?**
24       A.   I don't know that they're not being put
25  on hold.   I had thought that's what was going on,

**Page:** 114
1                        PALINKAS
2  because I had asked in fact a friend of mine who
3  works in the service centers what kind of work are
4  you people doing, because they're sending all your
5  work our way.   What are they going to do with the
6  service centers.   I believe it was put on hiatus.
7       **Q.    If DACA applications are being**
8  **adjudicated right now, some number of them at**
9  **service centers, do you have any knowledge about**
10  **how they're being adjudicated?**
11       A.    They would probably be according to the
12  date they were filed, I guess.   I don't know.
13       A.    Yes.   But in terms of what criteria is
14  being applied and what the workload is like, no, I
15  don't, because I don't adjudicate that type of
16  form.
17       **Q.    If any small or great number of them**
18  **were being adjudicated right now, would you have**
19  **any knowledge regarding whether they're being**
20  **rubber stamped?**
21       A.    I wouldn't know until the figures come
22  out again.
23       MS. PERALES:   Let's mark this.
24       (Whereupon, a 2014 Declaration was
25       marked as Defendants' Exhibit C for

📄  Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 115
1                        PALINKAS
2  identification.)
3       **Q.    I'm going to hand you what has been**
4  **marked Deposition Exhibit C.   Do you recognize**
5  **this document?**
6       A.    Yes.   I believe this was the first
7  Declaration I made back in 2014.
8       **Q.    Do you stand by this document, this**
9  **Declaration, Exhibit C, today and the statements**
10  **that you made in it?**
11       A.    Yes, I do.
12       **Q.    Did you use this 2014 Declaration about**
13  **DACA as the basis for your 2018 Declaration for**
14  **DACA?**
15       A.    I used parts of it, because that was the
16  knowledge that I had at that time and what I had
17  ascertained as far as what was going on, I didn't
18  see any relevant change.
19       **Q.    As to the specific changes from the 2014**
20  **Declaration to the 2018 Declaration, did you speak**

21 **to anybody with the Texas attorney general's**
22 **office when you were preparing the new**
23 **declarations?**
24      A.   I had spoken to Todd Disher.
25      **Q.    Did Todd make specific recommendations--**

**Page:** 116
1                        **PALINKAS**
2      A.   No, he did not.
3      **Q.   -- on language?**
4      A.   No, this is my -- this is my statement.
5      **Q.    Did he make any recommendations about**
6 **things to take out?**
7      A.   I think he did make some recommendations
8 on things to take out because they weren't
9 relevant, because I have a habit of not only
10 writing things backward but going on with
11 irrelevant information.   So yes, some things were
12 redacted that I had in my second statement.
13     **Q.    Your second statement is the 2018**
14 **statement?**
15     A.    Yes.
16     **Q.    Were they more along the lines of**
17 **opinions?**
18     A.    Yes.
19     **Q.    Perhaps --**
20     A.    There was a lot of it.
21     **Q.    Perhaps political opinions?**
22     A.    Yes.
23     **Q.    Some of which you've showed today?**
24     A.   I believe I did.
25     **Q.    Did Mr. Disher just tell you it was a**

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 119
1                        PALINKAS
2      **Q.    You said at least 90 percent.   My first**
3 **question is are you using the same equivalent**
4 **figures there?   In other words --**
5      A.    I would assume I did, because I based
6 that on what I pulled off the USCIS website.   That
7 I know.
8      **Q.    Why is it that in 2014 it's an exact**
9 **figure of 99.5 percent, then more recently a round**
10 **figure of "at least 90 percent"?**
11     A.    Because I believe I -- when I made this
12 statement, that's how many -- they were just --
13 every application was being approved.   That was
14 just a fact.
15     **Q.    But -- I'm sorry.   Go ahead.**
16     A.    Then when I made this statement, I based
17 it on the numbers that were available on the USCIS
18 website.
19     **Q.    Just so the record is clear, when you**

20 **made this statement, basically every application**
21 **was approved, you were referring to your --**
22     A.    To the 2014 statement.
23     **Q.    Now when you say at least 90 percent in**
24 **your 2018 Declaration, what's the basis of that**
25 **number?**

**Page: 120**
1                    **PALINKAS**
2        A.    It's based on the statistics that were
3 given on the USCIS website, because I have -- I --
4 maybe my math was off, because I see the denials,
5 there were 75,000.   But out of 814,000
6 application, I think it you do the math, it's kind
7 of close.   Like I told you, I didn't do well in
8 math in school.
9        **Q.    Do you know why the approval rate may**
10 **have dropped from 2014 to 2017?**
11     A.    Because I would have to assume that the
12 multitude of applications that were being
13 received, eventually you're going to have a lot of
14 bad apples in that applications that are blatantly
15 not approved and I guess the system catches up
16 with itself in certain instances.
17     **Q.    Do you have any personal knowledge about**
18 **why the approval rates changed between 2014 and**
19 **2017?**
20     A.    No, I don't have knowledge.   I'm just
21 basing it on the stats.
22     **Q.    Do you know whether the DACA approval**
23 **rates have changed since 2000 --   since year 2017?**
24     A.    No, I do not, except for the fact that
25 remember, I pulled these -- I pulled these stats

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 122
1                    PALINKAS
2 didn't put a figure on how many applications had
3 been received then.   So it would be kind of hard
4 for me to prepare that.
5     **Q.    Do you know what it means for a DACA**
6 **application to be rejected?**
7     A.    Do I know what it means?
8     **Q.    Yes.**
9     A.    It means that person does not have legal
10 status.
11     **Q.    Do you know what it means for a DACA**
12 **application to be denied?**
13     A.    Isn't that what you just asked me?
14     **Q.    That's what I'm asking, are you aware of**
15 **any difference between a DACA application being**
16 **denied versus a DACA application being rejected?**
17     A.    Well, I guess the rejection would be
18 they didn't meet the criteria of what they needed

19 to do when they filed it, whereas when it's
20 denied, it's actually been adjudicated by an
21 officer and a decision rendered.
22      Q.    Do you know between August 15, 2012 and
23 December 31, 2014 how many requests for evidence
24 were issued in the process of adjudicating DACA
25 requests?

**Page: 123**
1                          PALINKAS
2      A.    No, I did not.
3                MR. LEVIN:   No further questions.   Thank
4      you.
5 EXAMINATION BY
6 MR. BITTER:
7      Q.    I have a few questions.   For the record,
8 Adam Bitter for the Texas Attorney General's
9 office.   Thank you for being here, Mr. Palinkas.
10 You went through a couple of issues with the other
11 counsel.   I just want to address a few of those
12 with you.   You were asked some questions about the
13 approval rate of DACA applications.   Do you recall
14 that?
15      A.    Yes.
16      Q.    Is that a concern of yours regarding the
17 DACA program?
18      A.    The approval rate, yes, because the
19 concern is that they're not being properly
20 adjudicated.
21      Q.    Was does that approval rate indicate to
22 you?
23      A.    Again, that they're being rubber
24 stamped, which is what I made -- which I stated
25 in -- both my original and my later statement

**Page: 124**
1                          PALINKAS
2 that I made.
3      Q.    What is that opinion based on?
4      A.    The approval rate itself, because it's
5 still quite high.   It doesn't seem like there's
6 enough -- whether there's not enough room for
7 denials for the officers or it's just the rate is
8 extremely high compared to any other application
9 that I am aware of in USCIS.
10      Q.    Are you basing your opinion with respect
11 to the approval rate on your experience with
12 USCIS?
13      A.   Yes, I am.
14      Q.    How so?
15      A.    In accordance with any other form that
16 I'm aware of that I've adjudicated or that I'm
17 aware of that gets adjudicated.   For instance at
18 the service centers or at our own field offices,
19 through discussion with various individuals who
20 work throughout the country.

21       Q.    You were asked some earlier about
22 applications being sent to service centers.    Did
23 you recall being asked about that?
24       A.    Yes.
25       Q.    Is that a concern of yours with respect

**Page:** 125
1                        PALINKAS
2 to the DACA application process?
3       A.    Yes.
4       Q.    Why is that a concern of yours?
5       A.    Again, since the DACA application is
6 based on an illegal entry into the United States,
7 the children of these people that enter illegally,
8 once you break the law it kind of -- that red flag
9 goes up and these people should be closely vetted,
10 more so than somebody who's just applying for a
11 benefit, because they've already committed a
12 crime, and when somebody commits a crime against
13 the United States, certainly that needs to be
14 taken into consideration.    It's not like they just
15 filed an application that they felt they were
16 eligible for.    They broke the law.    They
17 circumvented existing immigration law that's been
18 on the books for years.    That's the concern.
19       Q.    Is it your understand that a
20 application, whether DACA or others, is reviewed
21 differently at a service center versus a field
22 office?
23       A.    Absolutely, because you can get so much
24 more information from doing an in-person interview
25 versus adjudicating paper.

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 126
1                        PALINKAS
2       Q.    Are applications that are reviewed in
3 service centers -- strike that.
4             Do applications that are reviewed
5 through service centers include an in-person
6 interview component?
7       A.    No.
8       Q.    How did you have that understanding?
9       A.    Because a service center does not
10 interview, period.    They never have.
11       Q.    Is the lack of in-person interview a
12 concern of yours?
13       A.    Not for every application, but certainly
14 for a DACA application.
15       Q.    Why is that?
16       A.    Again, as I have stated previously, when
17 somebody breaks the law and then applies for a
18 benefit, I don't think that they should not --
19 they should bypass being interviewed.    I think
20 they need to be more scrutinized in the process.

21       Q.   I want to ask you a question about what
22   has been marked Exhibit C, the earlier
23   Declaration.   If you can go to Paragraph 10 on
24   Exhibit C.   I'll give you a chance to look it
25   over.   I just have a question to you about

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 128
 1                      PALINKAS
 2       A.   No, it does not.
 3       Q.    Does it change any of your opinions
 4   about the DACA application process?
 5       A.   No, it does not.
 6       Q.    You were just asked by my friend from
 7   New Jersey about any difference between rejection
 8   and denials.   Do you recall that?
 9       A.   Yes.
10       Q.    Do you have any personal knowledge of
11   any differentness between rejections and denials
12   as to DACA application?
13       A.   I don't have any personal knowledge, no.
14       Q.    You talk in your Declaration which is
15   marked as Exhibit B, in your Declaration for the
16   current case about -- you used the term "rubber
17   stamping."   Apart from the issues that we've
18   discussed, the approval rate, the service centers,
19   the lack of in-person interviews, are there other
20   issues that you're aware of that lead to your
21   concerns about rubber stamping?
22       A.   Yes.   We had this actually come to a
23   head with citizenship applications at one time
24   where we addressed this with the director of my
25   office who was in charge when I was on the

**Page:** 129
 1                      PALINKAS
 2   council, that we felt that because the officers
 3   were not given enough time to properly adjudicate,
 4   there tended to be a very strong belief that cases
 5   it's -- the case was being rubber stamped, because
 6   it's much easier on face value to approve an
 7   application than it is to deny.   It takes a lot
 8   more time to deny, and when a person is using
 9   prosecutorial discretion, you really ought to deny
10   that case, take the time to deny it.   Because of
11   pressure to get cases done, they had to be
12   finalized, granted or denied, that's where the
13   concern about the rubber stamping occurred, and
14   that also applied to adjustment of status cases.
15       Q.    You were asked some about instances in
16   which ISOs request further evidence from an
17   applicant.   Do you recall that?
18       A.   Yes.
19       Q.    If the data shows that applicants are
20   not asked for additional information on a frequent

21 **basis, would that be a concern of yours?**
22      A.    If they're not asked by certain officers
23 or just in general?
24      **Q.    In general, if the data showed that DACA**
25 **applicants were not being asked for further**

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 139
1                    PALINKAS
2      A.   You know --
3      **Q.    Let me see if I can get it clearer for**
4 **the record, and I didn't mean to say opinion,**
5 **because that was the wrong word.**
6      A.    That's all right.
7      ==**Q.    Just so that I can get it clear, rubber**==
8 ==**stamping is the result of high workloads, and the**==
9 ==**lack of an interview.   Would that be a fair**==
10 ==**summary?**==
11      ==A.    Not necessarily, because again, it==
12 ==depends on the form.   We have the same problem==
13 ==with N400s and 485s and I130s and 765s, all these==
14 ==applications because we're under the gun.   It's==
15 ==just this tremendous pressure.   I mean, I got==
16 ==people out there -- I'm the union rep -- they're==
17 ==like saying please, the number, you got to try to==
18 ==get it down.   Thank God management listened to us==
19 ==and they reduced it by one recently.   How long==
20 ==it's going to say there, I don't know.   But this==
21 ==is has been an inherent problem with this agency==
22 ==since I've been here.==
23      **Q.    So some rubber stamping occurs because**
24 **of a very high workload, even when there is an**
25 **interview --**

Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 141
1                    PALINKAS
2 up, is that the high approval rate for DACA, you
3 have concluded is related in part to not having an
4 interview; is that correct?
5      A.    That's correct.
6      **Q.    It's also related in part to the fact**
7 **that ISOs in service centers are doing the**
8 **adjudications instead of ISOs in field offices; is**
9 **that correct?**
10      A.    Because there's no interview.
11      **Q.    So that's really the same concern, no**
12 **interview?**
13      A.    Yes, it is the same.
14      ==**Q.    The high approval rate for DACA, do you**==
15 ==**have any understanding of what the fee is for a**==
16 ==**DACA application?**==

17      A.   No, I do not.
18      Q.   Do you know if DACA applicants have to
19 pay for biometrics?
20      A.   They may have fee waivers.   I don't
21 know.
22      Q.   Is it also possible that a high approval
23 rate can be at least partly due to people
24 self-selecting to apply for the benefit because
25 they don't want to spend a lot of money on

**Page:** 142
1                    PALINKAS
2 something that they might not qualify for?
3           MR. BITTER:   Objection; speculation.
4      A.   I can't answer that.   That's -- I can't
5 speak for other people.   I don't know.
6      Q.   We've been talking about the USCIS end
7 of things.   But I wanted to shift for a moment to
8 the -- to somebody who is considering applying.
9 Do you know whether or if DACA applicants consult
10 an attorney before they make the application?
11      A.   That's speculation.   I couldn't answer
12 that.
13      Q.   Do you know whether -- well, you'd
14 mentioned that the DACA criteria or at least some
15 of it is up on the website; is that right?
16      A.   Correct.
17      Q.   Would you agree with me that somebody
18 who looks at the criteria and looks at the
19 application fee could potentially decide not to
20 apply because they may not meet the criteria?
21           MR. BITTER:   Objection; speculation.
22      A.   Again, I can't speak for --
23      Q.   Is it possible that among these other
24 contributing factors to the high approval rate,
25 which is not having an interview, right, doing

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 145
1                    PALINKAS
2      speculation.
3      A.   It's hard to say.
4      Q.   We've talked about the workload being
5 high across offices, the number of interviews and
6 the number of adjudications that have to be made,
7 and I believe that you stated that this was really
8 an issue across the board for USCIS offices; is
9 that right?
10      A.   That's correct.
11      Q.   Did you ever speak specifically to a
12 DACA adjudicator about that?
13      A.   I may have in the past.   I can't recall.
14 Not recently.
15           MS. PERALES:   I'll pass the witness.
16           MR. LEVIN:   No followup.

17          MR. ROBINS:   I'm good.
18          MR. BITTER:   No questions.
19          MS. PERALES:   We reserve the rest of our
20     questions for the time of trial.   We'd like
21     to order a rough.
22          MR. BITTER:   I'll also order a rough.
23          (Time noted: 3:45 p.m.)
24
25                    _____

Kenneth Palinkas

June 19, 2018
Page 149

```
 1                        PALINKAS

 2                      CERTIFICATE

 3          I, Ephraim Jacobson, a shorthand

 4  reporter and Notary Public within and for the

 5  State of New York do hereby certify:

 6          That the witness whose testimony is

 7  hereinbefore set forth was duly sworn by me, and

 8  the foregoing transcript is a true and accurate

 9  record of the testimony given by such witness to

10  the best of my ability.

11          I further certify that I am not related

12  to any of the parties to this action by blood or

13  marriage, and that I am in no way interested in

14  the outcome of this matter.

15

16

17                          _____

18                          Ephraim Jacobson

19

20

21

22

23

24

25
```

# DEF-INTERV.

# EX. 137

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3    STATE OF TEXAS, et al.,      )
                       Plaintiffs,  )
 4                                  )
                                    )
 5    VS.                           ) CASE NO. 1:18-cv-00068
                                    )
 6                                  )
      UNITED STATES OF AMERICA,    )
 7    et al.,                       )
                       Defendants   )
 8                                  )
      and                           )
 9                                  )
      KARLA PEREZ, et al.,          )
10       Defendant-Intervenors     )

11    *******************************************************

12                      ORAL DEPOSITION OF

13                        BRIAN MANLEY

14                       JUNE 20, 2018

15    *******************************************************

16              ORAL DEPOSITION OF BRIAN MANLEY, produced as a

17    witness at the instance of the Plaintiff, and duly

18    sworn, was taken in the above-styled and numbered cause

19    on June 20, 2018, from 1:13 p.m. to 2:40 p.m., before

20    Christi Sanford, CSR in and for the State of Texas,

21    Registered Professional Reporter and Certified Realtime

22    Reporter, reported by machine shorthand, at the Austin

23    Police Department, 715 East 8th Street, 5th Floor,

24    Austin, Texas, pursuant to the Federal Rules of Civil

25    Procedure and the provisions stated on the record.
```

**For Depo Excerpts**

**Transcripts**

Jun 20, 2018 Manley, Brian (6_20_2018)

**Page:** 14

1       Q.    All right.   And what were the -- what was the
2   substance of your discussion about that issue?
3       A.    Whether or not the DACA program created an
4   additional expense for law enforcement agencies.
5       Q.    And what is your opinion about that?
6       A.   I do not believe that it does.
7       Q.   Okay.   And why not?
8       A.   I don't know of any extra expense my department
9   incurs based on the DACA program.
10       Q.    Do you track expenses incurred because of the
11   DACA program?
12       A.    We do not.
13       Q.    Do you remember seeing proposed language about
14   that issue in one of the drafts of the declaration?
15       A.   I do not.
16       Q.    Okay.   All right.   Let's start walking through
17   the declaration, which is Exhibit 1.   Let's start on
18   page 3, please, paragraph 8 talking about the APD
19   personnel budget and police operations.   Do you see
20   that?
21       A.   I do.
22       Q.    Okay.   Do you know whether APD employs anyone
23   who has received DACA deferred action?
24       A.   I do not.
25       Q.    Does APD track that information?

Jun 20, 2018 Manley, Brian (6_20_2018)

**Page:** 23

1       A.    No.
2       Q.    All right.   Anything about DACA specifically?
3       A.    No.
4       Q.    Or I should say anything about DACA recipients
5   specifically in there?
6       A.    No.
7       Q.    All right.   Paragraph 16, you testify, I
8   believe undocumented immigrants are at risk of being
9   preyed upon by criminals who know that undocumented
10   immigrants are among the least likely in our community
11   to report crime.   When you say you believe, what is your
12   belief based upon?
13       A.    My belief is based on 28 years of law
14   enforcement experience dealing with criminals and just
15   the fact that if there is the opportunity for a criminal
16   to select a victim who is not going to come forward to
17   the police and report the crime, then they are more
18   likely to be victimized because the criminal will know

19  that they can act potentially without fear of reprisal.
20      Q.   Okay.   Have you talked to -- you personally,
21  have you talked to undocumented immigrants who have said
22  that they are not likely to report crime?
23      A.   Yes.
24      Q.   How many?
25      A.   I don't have a number, but I have been at

**Page: 24**
 1  community forums and meetings where the discussion has
 2  been surrounding the concern that they would not want to
 3  come forward to report a crime for fear that they
 4  themselves or someone in their household could be
 5  subjected to a deportation.
 6      Q.   Okay.   Can you think of anybody specifically by
 7  name who has told you that?
 8      A.   No.
 9      Q.   Do you know -- have you heard that from more
10  than 50 people?
11      A.   No.
12      Q.   More than 20 people?
13      A.   I don't know if it was 10 or 20, but it's been
14  at a couple of different community meetings that I've
15  had this discussion.
16      Q.   Okay.   The next sentence, Undocumented
17  residents are particularly hesitant to report crime
18  because they believe that doing so, or assisting with an
19  investigation, could mean deportation and separation
20  from their families and support networks.   Again, that's
21  your belief, right?
22      A.   Correct.
23      Q.    And that belief is based on these same
24  conversations we just talked about or are there
25  additional conversations that go into that belief?

Jun 20, 2018 Manley, Brian (6_20_2018)

**Page: 25**
 1      A.   No.   It would be the same conversations, the
 2  same meetings, and then just what's even in mainstream
 3  media now as well.
 4      Q.   Okay.
 5      A.   But it is also fed by my personal experiences
 6  within those meetings we just discussed.
 7      Q.   All right.   Thank you.
 8               When did those meetings take place?
 9      A.   Over the past year and a half they have taken
10  place.
11      Q.   All right.   And you said a couple.   Do you know
12  if it was two meetings?   Three meetings?
13      A.   I don't have the specific number.   There have
14  been several.
15      Q.   Okay.   Less than five?
16      A.   It may be -- it may be ten.
17      Q.   Five to ten maybe?

18    A.    Five to ten is a fair estimate.
19       Q.    All right.   So is it your opinion that if the
20   risk of deportation is reduced, Austin becomes more
21   safe?
22       A.   I believe if someone is not fearful of being
23   deported, they're more likely to come forward if they
24   have been victimized or if they have witnessed somebody
25   else be victimized; therefore, we will have more crimes

**Page:** 26
1   being reported and more opportunities to capture
2   criminals.   So, yes, I do believe as an end result of
3   that that we would be safer.
4       Q.    Austin would be safer if the risk of
5   deportation was less?
6    A.    Correct.
7       Q.    If the President came out and said, I am no
8   longer going to deport anybody in the United States for
9   any reason, would that make Austin safer, in your
10  opinion?
11          MS. MORENO:   Objection, calls for
12  speculation.
13    A.    I would go back to my earlier comment that if
14  we have people that are not fearful of being deported,
15  then they're more likely to come forward and report
16  victimization; so I think that that would make a
17  community safer.
18       Q.   (BY MR. DISHER)   So if the President said, I'm
19  ending all threat of deportation to everybody, that
20  would make Austin safer?
21          MS. MORENO:   Objection, calls for
22  speculation.
23    A.    For those that might not come forward for fear
24  of deportation, yes, I think they would be more likely
25  to come forward.

Jun 20, 2018 Manley, Brian (6_20_2018)


**Page:** 40
1    A.    I am not aware of anything where they track
2   that.
3       Q.    Okay.   Have you ever seen any attempts to track
4   the rate of crime against DACA recipients pre- and
5   post-enactment of DACA?
6    A.    No.
7       Q.    Okay.   All right.   Let's go to the next
8   paragraph.   You write, DACA applicants come forward to
9   be registered, photographed and fingerprinted and that
10  aids the law enforcement activities of APD.   How does
11  registering, photographing and fingerprinting aid the
12  efforts of APD?
13    A.    It potentially will make it easier to identify
14  someone that we may interact with, because they may
15  have established a positive identification that we can
16  then go to if we are interacting with a DACA recipient

17  who is either a suspect or a victim of crime.   By the
18  mere fact that they've registered and been photographed
19  and fingerprinted, we can establish their identity more
20  quickly.
21       Q.   Okay.   And I just want to be clear about this
22  just so I understand it.   So the registration,
23  photographing and fingerprinting allows APD to identify
24  these folks faster; is that what you're saying?
25       A.   Correct.   If we had a need to identify someone,

**Page:** 41

 1  whether it be a victim or a suspect of a crime, this
 2  avenue may make it more quick for us to make that
 3  identification and, therefore, expedite the
 4  investigation.
 5       Q.   Okay.   So quicker to identify, speed up the
 6  investigation and that leads to the overall safety of
 7  Austin?
 8       A.   If it's someone who is committing crime and is
 9  going to commit repeated crimes and we can identify them
10  more quickly, then, yes, we would likely be able to
11  apprehend them more quickly as well once we've
12  established that identification.
13       Q.   Okay.   Do you think that everyone who lives in
14  Austin, regardless of legal status, should be
15  fingerprinted, registered and photographed?
16       A.   No.
17       Q.   Why not?
18       A.   I don't think there's a need to photograph and
19  fingerprint children in our community.
20       Q.   What about people who are over 18?
21       A.   As far as?
22       Q.   Do you think everybody over 18 should be
23  fingerprinted, photographed and registered in the city
24  of Austin?
25       A.   No.   That's not a requirement.   They have a

Brian Manley                                          June 20, 2018
                                                      Page 65

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME: BRIAN MANLEY  DATE: JUNE 20, 2018
3    Reason Codes:  (1) to clarify the record; (2) to conform
4    to the facts; (3) to correct a transcription error;
5    (4) others (Please explain)
6    PAGE  LINE  CHANGE              REASON
7     16   16   remove "Correct"    Not responsive to
8                                   question asked
9     19   13   Change "we issue to"
10              to "we certify or endorse for"   to confirm
11                                               to the facts
12    26   14   change "people" to "crime
13              victims or witnesses"    Clarification
14    26   23   insert "victims of crime
15              or witnesses" between "those"
16              and "that"               Clarification
17    27   25   add "Nonetheless it is the
18              policy of APD that it will
19              Provide reasonable and
20              necessary assistance to federal
21              immigration authorities."   Clarification
22    28   24   add "and nothing else"
23              to end of sentence       Clarification
24
25    Signature: _____ Date: 7.9.18
```

Brian Manley

June 20, 2018
Page 66

1              ACKNOWLEDGMENT OF DEPONENT

2

3      I, BRIAN MANLEY, do hereby certify that I have read

4  the foregoing pages and that the same is a correct

5  transcription of the answers given by me to the

6  questions therein propounded, except for the corrections

7  or changes in form or substance, if any, noted on the

8  attached errata page.

9

10

11

12    _____    7.9.18
        BRIAN MANLEY                  DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

Brian Manley                                                    June 20, 2018
                                                               Page 67

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3    STATE OF TEXAS, et al.,      )
                      Plaintiffs,  )
 4                                 )
      VS.                          ) CASE NO. 1:18-cv-00068
 5                                 )
      UNITED STATES OF AMERICA,    )
 6    et al.,                      )
                      Defendants   )
 7                                 )
      and                          )
 8                                 )
      KARLA PEREZ, et al.,         )
 9       Defendant-Intervenors     )

10   **********************************************************

11                 REPORTER'S CERTIFICATION

12              DEPOSITION OF BRIAN MANLEY

13                    JUNE 20, 2018

14   **********************************************************

15         I, Christi Sanford, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18         That the witness, BRIAN MANLEY, was duly sworn

19   by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22         That the original deposition was delivered to

23   Todd Lawrence Disher, Custodial Attorney;

24         That a copy of this certificate was served on

25   all parties and/or the witness shown herein on JuN16,2018
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                 210-697-3408

Brian Manley

June 20, 2018
Page 68

1        I further certify that pursuant to FRCP No.

2   30(f)(i), the signature of the deponent:

3        X   was requested by the deponent or a party

4   before the completion of the deposition and that the

5   signature is to be returned within 30 days from date of

6   receipt of the transcript.   If returned, the attached

7   Changes and Signature page contains any changes and the

8   reasons therefor;

9        _____ was not requested by the deponent or a

10  party before the completion of the deposition and that

11  it is being delivered to Todd Lawrence Disher.

12       I further certify that I am neither counsel

13  for, related to, nor employed by any of the parties or

14  attorneys in the action in which this proceeding was

15  taken.   Further, I am not a relative or employee of any

16  attorney on record in this case, nor am I financially or

17  otherwise interested in the outcome of the action.

18       Certified to by me this 22nd day of June, 2018.

19  

20  _____

21  Christi Sanford, CSR, CRR, RPR
    Texas Certification No. 6720
    Certificate Expires: 12/31/19

22

23  Kim Tindall & Associates
    Firm Registration No. 631
    16414 San Pedro, Suite 900

24  San Antonio, Texas 78232
    (210) 697-3400

25

# DEF-INTERV.

# EX. 138

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                    BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,      *
                             *
          Plaintiffs,        *
                             *
      v.                     *      CASE NO. 1:18-CV-68
                             *
UNITED STATES OF AMERICA,    *
et al.,                      *
                             *
          Defendants,        *
                             *
and                          *
                             *
KARLA PEREZ, MARIA ROCHA,    *
JOSE MAGANA-SALGADO, NANCI   *
J. PALACIOS GODINEZ, ELLY    *
MARISOL ESTRADA, KARINA      *
RUIZ DE DIAZ, CARLOS         *
AGUILAR GONZALEZ, KARLA      *
LOPEZ, LUIS A. RAFAEL,       *
DARWIN VELASQUEZ, JIN        *
PARK, OSCAR ALVAREZ, NANCY   *
ADOSSI, DENISE ROMERO,       *
PRATISHTHA KHANNA, JUNG      *
WOO KIM, ANGEL SILVA,        *
MOSES KAMAU CHEGE, HYO-WON   *
JEON, ELIZABETH DIAZ,        *
MARIA DIAZ, and BLANCA       *
GONZALEZ,                    *
                             *
          Defendant-         *
          Intervenors.       *
```

                    ORAL DEPOSITION OF

                        ART ACEVEDO

                  Wednesday, June 20, 2018

Reported by Debbie D. Cunningham, CSR

2

1           ORAL DEPOSITION OF ART ACEVEDO, produced as a

2    witness at the instance of the Plaintiffs, and duly

3    sworn, was taken in the above-styled and numbered cause

4    on Wednesday, June 20, 2018, from 1:13 p.m. to

5    3:51 p.m., before Debbie D. Cunningham, CSR, in and for

6    the State of Texas, reported via Machine Shorthand at

7    the Houston Police Department, 1200 Travis Street,

8    Houston, Texas 77002, pursuant to the Federal Rules of

9    Civil Procedure.

10                      --ooOoo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**For Depo Excerpts**

**Transcripts**

 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 10
1  ==Q.    So excluding deferring any immigration==
2  ==proceeding, the ability to obtain a driver's license, a==
3  ==work authorization, and full participation, as you==
4  ==described it, can you think of any other benefit that==
5  ==DACA status provides for its recipients?==
6            ==MR. HERRERA:   Objection, vague.==
7            ==You can answer.==
8       ==A.   I think it provides them the opportunity to==
9  ==fully engage law enforcement agencies, especially at the==
10 ==local level, where there's a lot of fear, from my==
11 ==personal experience, in terms of the immigration debate;==
12 ==and it gives them the opportunity as witnesses or==
13 ==victims to actually feel comfortable and not hiding,==
14 ==which, unfortunately, that happens.   So I think it==
15 ==actually creates a safe space and a safety net for==
16 ==individuals to fully participate in the public safety==
17 ==arena as well.==
18      **Q.    (BY MR. BIGGS)   What is your background in**
19 **terms of exposure to immigration laws?**
20      A.    Well, I mean, I'm not a lawyer by any means.
21      **Q.    I understand.**
22      A.    But I've worked in and around immigrant
23 communities over, you know, 32 years.   I started my
24 career in California, Los Angeles, as a patrol officer.
25            THE WITNESS:   And if I speak too fast, to

 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 16
1  particular legislation in terms of legislation in DC?
2       A.    Well, I won't say -- we're not lobbyists; but
3  we're subject-matter experts and we're called upon by
4  both sides, by both major political parties, both
5  Democrats and Republicans and both Democratic presidents
6  and news stations and Democratic administrations.   They
7  provide testimony and/or a view on issues involving
8  public safety; and immigration's one of them.
9       **Q.    You mentioned earlier that you had had**
10 **discussions with Secretary Napolitano previously; is**
11 **that correct?**
12      A.    Yes.
13      **Q.    Have you discussed DACA with**
14 **Secretary Napolitano?**
15      A.    I don't recall that.
16      ==Q.    Have you discussed DACA with any Federal==
17 ==official kind of in that leadership group you described==
18 ==earlier?==
19      ==A.    Yeah.   I don't remember the specific==

20  conversations; but I can say that generally speaking
21  police chiefs, we support DACA.   We believe that the
22  greatest force multiplier for fighting crime is the
23  public itself; and when you legitimize folks and bring
24  them out of the shadows, it actually enhances our
25  abilities to be able to interact and create safe spaces

**Page: 17**
 1  for people to cooperate.   While I can't tell you the
 2  specific conversations, there have been conversations
 3  over the years with different Federal sources about DACA
 4  and immigration policy.
 5          Q.    Can you recall any of the individuals you
 6  spoke with about DACA?
 7          A.    Oh, we've talked to Tom Homan over the years
 8  about it, and not just DACA but just, you know, the
 9  Priority Enforcement Program that Major Cities Chiefs
10  put a -- if you recall, in Secure Communities, an
11  evolution of Secure Communities was to employ the
12  Priority Enforcement Program.   And so in those
13  conversations, we talked about DACA with him and other
14  members of our Federal partners.
15          Q.    Do you know what prosecutorial discretion is?
16          A.    Yes.
17          Q.    What is prosecutorial discretion?
18          A.    That is the discretion that any prosecutor has
19  to either pursue or not pursue a violation of law and
20  how to resolve a potential violation of law.
21          Q.    Can you think of an example of prosecutorial
22  discretion that you've witnessed maybe firsthand?
23          A.    Okay.   I'll give you an example on a national
24  level.   The prosecutors have the discretion to not take
25  every officer-involved shooting before a grand jury.

Jun 25, 2018 Acevedo, Art 06-20-2018

**Page: 31**
 1  have direct contact with undocumented residents in
 2  Houston as the Chief of Police?
 3          A.    Well, I mean, I don't go around asking people
 4  about their immigration status; but I would say that we
 5  have about 600,000 undocumented immigrants, according to
 6  some of the studies and the data that I've read.   I
 7  would say frequently.
 8          Q.    Of those folks you frequently come into
 9  contact with, do any of them self-identify as being
10  undocumented to you?
11          A.    Yes.
12          Q.    How often does an individual in Houston that
13  you have contact with self-identify as being
14  undocumented?
15          A.    I wouldn't say it's a daily occurrence, but
16  it's not infrequent.

17      **Q.    Can you remember the last time it happened?**
18      A.    The last time.   Probably within the last week
19  or two.
20      **Q.    And what was that contact in relation to?**
21      A.    It was some sort of community meeting and a
22  lady came up to me and told me that she's undocumented
23  and she's really afraid of what's going on in the
24  country right now in terms of, you know, people that are
25  undocumented and expressed some concern and fear.

📄 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 32
1      Q.    Did she mention DACA during that conversation?
2      A.    No, but I -- DACA recipients have met with us
3  before, talking about DACA and expressing the fear that
4  it may go away.
5      Q.    Well, when is the last time -- actually,
6  withdrawn.
7            You said there's about 600,000
8  approximate -- approximately 600,000 undocumented
9  residents in Houston was your estimate; is that fair?
10      A.    Well, that's not my estimate.   That's just
11  reports that I've read.
12      Q.    Sure.   So let's go with 600,000 as a general
13  matter.   How many DACA recipients currently reside in
14  Houston?
15      A.    I don't know.
16      **Q.    When was the last time you had direct contact**
17  **with a DACA recipient?**
18      A.    Oh, lord.   I run into DACA recipients on a
19  regular basis.
20      **Q.    Okay.**
21      A.    We have community forums talking about some of
22  the issues, and individuals come up and either identify
23  themselves as a DACA person or -- I was on one panel
24  where there was a DACA person on the panel.   So there's
25  advocacy groups in Houston that interact with the police

**Page:** 33
1  department on a regular basis that are representing
2  Dreamers and so I've met with them or I see them out at
3  events.   So I would say that's on a regular basis.
4      **Q.    When was the last time you spoke directly to a**
5  **DACA recipient?**
6      A.    What's today, Wednesday?
7      Q.    Correct.
8      A.    Yesterday.
9      Q.    Who did you speak to yesterday?
10            MR. HERRERA:   Objection.   I'm going to --
11  if it was -- if this person belonged to an organization,
12  I'm going to object on the basis that you are eliciting
13  testimony where the government would be violating the
14  First Amendment associational privilege of the person.
15            So if it's a member of an organization,

16  please do not identify.
17                    MR. BIGGS:   You're instructing the
18  witness not to answer the question?
19                    MR. HERRERA:   If it's part of an
20  association, an organization, and you're revealing the
21  member.
22                    MR. BIGGS:   Hold on.   How are we -- we
23  actually need to get into the basis of this objection.
24  So how does revealing someone's name equal an
25  infringement of the right to associate?

📄 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page: 35**
1                    MR. BIGGS:   Yeah.
2                    THE WITNESS:   -- before you waste the
3  judge's time.
4                    MR. BIGGS:   I understand.
5                    THE WITNESS:   And you can put that on the
6  record so the judge knows I was worried about his time.
7        **Q.   (BY MR. BIGGS)   I appreciate that.   What group**
8  **did they belong to?**
9        A.    You know what?   There's so many advocacy group
10  out there, I'm not sure if it's a Dreamer group.   I know
11  that there's a United We Dream group that is a part of
12  DACA.   There's another group called FIEL, F-I-E-L.   I
13  think there were some high school kids that are all
14  Dreamers and they were -- they identified themselves as
15  high school kids and, you know, were Dreamers and but
16  for them telling me they were Dreamers, I couldn't tell
17  because they speak flawless English and they just look
18  like regular old kids.
19        **Q.    Did any of them say that they are less likely**
20  **to report crimes during your direct contact with them?**
21        A.    Yesterday?
22        **Q.    In any of your contact with, say, within the**
23  **last year with these self-identified Dreamers.**
24        A.    If DACA is abolished?
25        **Q.    Yes, sir.**

**Page: 36**
1        A.    Yes, that's an ongoing concern and an ongoing
2  issue here in Houston and with some of my colleagues
3  across the country.
4        **Q.    When they make those comments to you, what do**
5  **you say in return?**
6        A.    I tell them:   First and foremost, it hasn't
7  gone away as far as I know.   Secondly, our goal is still
8  to bring justice to victims and criminals to justice;
9  and I try to encourage them to, no matter what happens,
10  cooperate with the police department.
11        **Q.    Do you educate them about the existence of**
12  **U visas?**
13        A.    Oh, I think they understand U visas.
14        **Q.    Do you talk to them about any other particular**

15 **special status for victims of crimes or witnesses to**
16 **crimes?**
17     A.   I've talked to -- because of the chilling
18 effect that -- the immigration debate is kind of a mean-
19 spirited debate.   In a lot of ways it has really created
20 a perception and a fear in the community.   I actually
21 talk to people about, for example, SB 4 that
22 specifically prohibits asking under SB 4, as much as we
23 fought against it, which if you pull up records, "he's
24 fought against that."   We try to tell them even that
25 law, as controversial as it is, specifically prohibits

📄 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 41
1 focus on.
2     Q.   Okay.   Let's go to Paragraph 9, please.   If
3 **you can, read that and tell me when you've had a chance**
4 **to get all the way through it.**
5     A.   I'm through it.
6     Q.   Okay.   So this paragraph -- and I'll
7 **paraphrase; and if I don't paraphrase fairly, I'm sure**
8 **you'll tell me, and I'm sure he'll tell me.   But it**
9 **talks about your belief in community policing kind of**
10 **generally; is that fair?**
11     A.   Yes.
12     Q.   And it says you are -- "I am a big proponent
13 **of community policing and relational policing."   Is that**
14 **right?**
15     A.   Yes.
16     Q.   Okay.   I have a feeling you're going to want
17 to talk about this for a while, but can you give me the
18 elevator pitch for what community policing means, to the
19 best of your ability?
20     A.   Sure.   Yeah.   Let me just say that I talk more
21 about relational policing because too many police chiefs
22 when you say, "Well, are you engaging in community
23 policing," they say, "We don't have the resources,"
24 right?   And respect and the way you treat people is
25 really about -- and relationships, right?   Every contact

**Page:** 42
1 is the beginning of a relationship.   And relational
2 policing, they go hand in hand.
3                 Because it's not -- you don't need a lot
4 of cops.   You don't need more cops to engage in true
5 relational policing.   You just need cops with the right
6 mindset and the right heart, which means every time you
7 contact a member of the public, you're treating them
8 with respect.   You're being transparent.   You're engage
9 them.   You hold each other accountable.   And I think
10 when you do those things, you build trust.

11              And so the greatest force multiplier a
12 police department has is really the public itself,
13 right?   I mean, they're your witnesses.   They're your
14 victims.   They're your jury pools.   They're your voting
15 base.   I mean, they're everything to us.   We are in the
16 people business, right?   When you're in the people
17 business, relationships matter, right?
18              And so community policing and relational
19 policing is about leveraging the relationship with the
20 people that visit, right, work or live in your area of
21 responsibility because the greatest force multiplier
22 outside of the cops is the public itself.   And it is the
23 cornerstone of policing, which is why police chiefs have
24 pushed back very aggressively against SB 4 or against
25 DACA -- getting rid of DACA, because we want people to

**Page:** 43
1 feel like they can come out of the shadows and actually
2 be full participants in the criminal justice system.
3              And so, to me, community policing and
4 relational policing is about building trust.   It's about
5 building trust and collecting emotional capital that
6 you're going to need at some point to draw down on when
7 you have a critical incident or when something happens.
8              So it's really about that interaction and
9 building bridges of trust and not walls of mistrust
10 between all segments of society because that's what
11 we're charged with as a police department is to keep
12 everybody safe; and the collective safety of the commune
13 we call the City of Houston depends on every single
14 person residing, visiting, or working in Houston or in
15 any big city in this country being full participants in
16 that process of maintaining the safety and security of
17 everyone within the AOR, which the area of
18 responsibility.
19              Is that elevator enough?
20     Q.   Yeah, that's the best I could hope for.   I
21 assume you could probably teach a class on this.
22     A.   Yeah, probably.
23     Q.   So I'm going to take that.
24              All right.   You talked a lot about
25 building trust.

📄 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 44
1     A.   Yeah.
2     Q.   What techniques does the Houston Police
3 Department utilize to help them build trust with
4 undocumented populations in Houston?
5     A.   A lot of engagement, a lot of community
6 engagement.
7     Q.   Okay.
8     A.   You need to get out of your police cars.   You
9 need to talk to people, and you need to -- you know, you

10  can't be a stranger to any segment of the community; and
11  we don't want any segment of the community to be a
12  stranger to us.   It's a two-way street.
13       **Q.     If DACA were to be rescinded, would Houston PD**
14  **no longer be able to do that community engagement?**
15       A.    I think that my concern and our concern is --
16  because we've already seen it happening -- is that
17  anytime that you create -- if you take people as of
18  right now, as of today, they're actually -- you know,
19  the action against them is deferred, so they can
20  actually fully participate; and all of a sudden, they're
21  subjected to being deported.
22              I can assure you that a good chunk of
23  those people are going to go back into the darkness;
24  and, you know, when you have that -- and you're going to
25  have a lot of unintended consequences for us, including

**Page:** 45
1  the potential of losing -- some of the media reports
2  that I've seen is that there's upward of over a million
3  DACA recipients in the country.   I'm just going off of
4  media reports; don't hold me to it.
5              But potentially you will end up losing a
6  big chunk of a million witness; and the unintended
7  consequence is when my little son is ten years old and
8  he's at the bus stop and that nanny or that gardener, or
9  whatever the perception is of a traditional job for an
10  undocumented person, sees some pedophile grab my little
11  boy, right, and put him in a van and take him away --
12  you know, we have something called the Amber Alert
13  System -- that people may be more -- will be more
14  hesitant -- and they're already hesitant; we know that
15  because we're getting this from people in the community
16  now, as we speak.   They're going to be hesitant to come
17  forward.
18              MR. HERRERA:   Can we take a break here?
19  It's been about an hour.
20              MR. HU:   If you're finished.   You need to
21  finish.
22              THE WITNESS:   No, I'm finished with that.
23              MR. BIGGS:   Say about five minutes?
24              (Off the record from 2:08 to 2:20 p.m.)
25       **Q**    **(BY MR. BIGGS)   All right, Chief.   After a**

Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 47
1       A.    No, they will occur.   We are just hopeful that
2  people will continue to come.
3       **Q.    And I forget the name of the special group**
4  **that y'all created after SB 4.**
5       A.    Alianza?
6       **Q.    Yes.   And if DACA goes away, will that group**
7  **continue to operate?**
8       A.    That's not a group.
9              MR. HERRERA:   Objection, speculation.

10    Q.    (BY MR. BIGGS)    And if DACA goes away, do you
11    plan to have those -- are they events, or what would you
12    call them?    Let me back up.
13                    How would you categorize those?    It's not
14    a group.
15        A.    It is a forum, a community event.
16        Q.    Will those community events continue even if
17    DACA is no longer available?
18        A.    Yes.
19        Q.    All right.    Could you read Paragraph 10 for
20    me, please, and let me know when you've had a chance?
21        A.    Yes.    I've read it.
22        Q.    And just to paraphrase, this paragraph deals
23    with the allocation of resources when you have witnesses
24    or victims of crimes who fear deportation; and,
25    therefore, there's no trust or cooperation between HPD,

**Page:** 48
1    kind of generally speaking, correct?
2                    MR. HERRERA:    Objection -- well, go
3    ahead.    You can answer.
4        A.    Well, I think there's more to that; but, you
5    know, that's part of it.    If we erode trust in terms of
6    witnesses or victims, that ultimately creates and
7    enhances the workload for the police department; and it
8    negatively impacts its ability to solve crime and
9    probably makes us all less safe.
10        Q.    (BY MR. BIGGS)    Are there reasons outside of
11    immigration status that cause people to distrust police?
12                    MR. HERRERA:    Objection, vague.
13    Objection, speculation.
14        A.    Yes.
15        Q    (BY MR. BIGGS)    What are some of those reasons
16    outside of immigration status that make individuals
17    distrust police?
18        A.    Well, first of all, the police is part of the
19    government.    And I think the trust of government in
20    general, all levels of government, especially today, is
21    probably at historical lows; and we're one of the most
22    visible cogs of government.    When we have deadly
23    encounters with members of the public, that erodes
24    trust.    When we see these viral videos where an officer,
25    you know, is involved in the use of force or conduct --

Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 53
1    status.    HPD officers do not investigate immigration
2    statuses of individuals that are witnesses to crimes,
3    does it?
4        A.    Generally speaking, no.
5        Q.    Do HPD officers, when encountering a victim,
6    ask about the immigration statuses of family members of
7    the witness?
8        A.    Generally speaking, no.

 9     Q.    So would an undocumented immigrant's fear that
10 an interaction would lead to that type of investigation
11 be unfounded based on HPD practices?
12             MR. HERRERA:   Objection, vague.
13     A.    I would say generally speaking, yes; but,
14 again, perception is like the elephant that, you know,
15 you can hit over the head a hundred times; and it's
16 really hard to overcome.
17     Q.    (BY MR. BIGGS)   And overcoming that
18 perception, that's the goal of all the efforts you've
19 taken to get into the community and build trust,
20 correct?
21     A.    Yes.
22     Q.    Let's go down to 13 -- let's do 13 and 14
23 together.   If you could, read those and let me know.
24     A.    Okay.
25     Q.    Paragraph 13 talk about an April 2017

**Page: 54**
 1 announcement by HPD about a decrease in reporting of
 2 violent crimes, 13 percent by Latinos, as well as a
 3 42.8 percent decrease in the reporting of rape from the
 4 previous year.   Is that generally right?
 5     A.    Yes.
 6     Q.    Okay.   Why did you -- "you" being HPD -- why
 7 did HPD decide to investigate these statistics?
 8     A.    Because we were interested in:   Is there any
 9 noticeable difference between reporting patterns from
10 one year to the next because of the SB 4 debate and, you
11 know, all the things going on with the -- again, the
12 mean spiritedness of the immigration debate at the
13 national and even state level.   So we wanted to get a
14 snapshot of:   Has there been a difference between the
15 first 90 days of 16 versus 17, right?
16             And what we found was kind of alarming.
17 As the declaration indicated, the reporting of violent
18 crime by people of Hispanics -- you know, we know the
19 race and stuff -- was down, double digits, in all
20 violent crimes or Part I crimes; and sexual assault was
21 42.8 percent, which was really staggering; but when you
22 looked at the rest of the demographics of the city, they
23 had creeped up.
24             And, to us, that was an indication that
25 we were -- there's a strong likelihood that there's an

**Page: 55**
 1 underreporting or non-reporting of crime by the Hispanic
 2 community, which is kind of coming to fruition that fear
 3 that we're worried about when we create the percept that
 4 local law enforcement is going to become interested in
 5 immigration enforcement.   We just wanted to get a
 6 snapshot.
 7     Q.    And the Latino population you were talking
 8 about in this announcement, was that both lawful and
 9 without those without lawful status in the United
10 States?

11    A.   Yes.   I mean, we don't have a way to -- we
12 don't track.   We don't have a way to track the entire
13 population of who is lawful or unlawful in terms of when
14 they report a crime.
15       **Q.   Are there other factors besides distrust of**
16 **police based on immigration enforcement that could have**
17 **led to this drop between '16 and '17 in the Latino**
18 **population?**
19            MR. HERRERA:   Objection, asked and
20 answered.
21            You can answer.
22    A.   Our opinion is really -- and not only our
23 opinion based on the data but also the timing of the
24 debate at the state level and at the national level, the
25 passage of SB 4, this is all interrelated with the

Jun 25, 2018 Acevedo, Art 06-20-2018

**Page: 63**
1 you believe that DACA would cause an increase in
2 reporting by Latinos?
3    A.   Would?   I mean, we have DACA.
4    **Q.   Yeah, the creation.**
5            **Let me ask it a better way:   Is it your**
6 **contention that DACA has increased reporting for Latinos**
7 **in Houston after its creation in 2012?**
8            MR. HERRERA:   Objection, vague; and it
9 calls for speculation.
10            You can answer.
11    A.   I can say that having been a cop for 32 years,
12 dealing with a lot of undocumented immigrants in the
13 community, that I have personal knowledge -- first of
14 all, we don't know the totality -- we know that not all
15 crimes are reported from all segments of society to an
16 extent.   So we don't know how bad the underreporting is,
17 but we know it's underreported.
18            I have encountered plenty of situations
19 where a victim of a crime that's undocumented finally
20 reports it -- well, now, personally, as a police chief,
21 I've encountered it -- come to find out, they have been
22 a victim of a crime that's been an ongoing
23 victimization; and they never came forward out of fear
24 because they're undocumented.   So, for me, as, you know,
25 not the smartest guy in the room but not the dumbest,

**Page: 64**
1 either, if I create a program that actually defers
2 action and now I can freely say, "Hey, I'm here.   I'm
3 victimized.   I cannot be deported because there's
4 deferred action" -- and I've seen these examples
5 personally.   And I'm seeing them as the police chief; and
6 I don't even go out that often, right?   But when I do,
7 I've seen situations.
8            I just saw one the other day that -- and
9 I don't know if this person was DACA or not -- but where

10 a cop was sexually molesting a four-year-old; it was a
11 news report.   People have leveraged -- suspects have
12 leveraged a person's immigration status to victimize
13 that person.   I've seen that time and again.   So I can
14 tell you that I don't need statistics to tell me that a
15 reasonable conclusion would be, even without a report,
16 that if I can give somebody deferred action -- I think
17 that's what DACA is, the first two letters, deferred
18 action, am I right?   I can't remember.   Somebody tell
19 me; I don't want to be misspeaking.
20         Q.   I think you're okay.   You can keep going.
21         A.   Okay.   So, to me, my logical conclusion is
22 that if I have DACA, now, when that abuser, that person
23 that's doing whatever crime they're committing to me, I
24 don't have to have that fear because I've been
25 legitimized in terms of my ability to fully participate

📄 Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 80
1 provide a pathway to legitimacy and full participation,
2 especially for a lot of these kids that -- now, I know
3 DACA recipients.   One of my Explorers was a DACA
4 recipient, who graduated Number 2 out of his class in
5 high school and graduated from the University of Texas
6 and is a school teacher.
7                 I believe it's in our own best interest
8 to make the assessment and provide them legitimacy.   The
9 issue as to whether they should be citizens or not is a
10 discussion for policymakers.
11         **Q.   The opinion you expressed today is that the**
12 **threat of deportation makes some of those without status**
13 **and some with status not want to report crimes, correct?**
14         A.   Can you repeat the question?
15         **Q.   Sure.   Threat of deportation, you've stated**
16 **today, as well as in your declaration, that that threat**
17 **makes individuals distrust police and not want to report**
18 **crimes, correct?**
19                 MR. HERRERA:   Objection, misstates his
20 testimony.
21                 You can answer.
22         A.   I think that's a big part of it, yes.
23         **Q.   (BY MR. BIGGS)   And that non-reporting of**
24 **those crimes makes the public less safe, in your**
25 **opinion, right?**

**Page:** 81
1         A.   That's the opinion of most police executives.
2         **Q.   In order to remove that public safety issue,**
3 **do you believe that all deportation should be stopped?**
4         A.   No.
5         **Q.   Okay.   Do you consider yourself impartial**
6 **towards the DACA program generally?**
7                 MR. HERRERA:   Objection, vague.
8         A.   I don't think I understand that question.

9      Q.    (BY MR. BIGGS)   Are you an advocate for the
10  continued use of the DACA program?
11            MR. HERRERA:   Objection, vague.
12      A.   I would say that my opinion is based on the
13  impact that rescinding DACA would have from a public
14  safety perspective.   So I would say it's more as a
15  practitioner and based on the practical impact of how to
16  get rid of it; and also, to me, it would make us less
17  safe.
18      Q.    (BY MR. BIGGS)   Besides the safety aspect, are
19  you a proponent of the DACA program?   Do you believe it
20  should exist?
21            MR. HERRERA:   Objection, vague.
22  Objection, compound.
23            You can answer.
24      A.   I believe it's -- I think on balance it's a
25  good program that makes our community safer, and it's a

Jun 25, 2018 Acevedo, Art 06-20-2018

**Page:** 93
1      Q.    (BY MR. BIGGS)   Yes.
2      A.   Yes.
3      Q.    Okay.   Let's start with 5, please.
4      A.   Okay.
5      Q.    And let's go to page 3, please, at the top.
6      A.   Okay.
7      Q.    "The announcement of the end of Deferred
8  Action for Childhood Arrivals, also known as DACA, came
9  days after Harvey.   The timing was poignant.   As we
10  rebuild after so much loss, we can't afford to have
11  Dreamers pushed into the shadows in fear they will be
12  deported.   More than 124,000 DACA recipients have come
13  from Texas, putting us second in the country.   They
14  strengthen our economy and neighborhoods.   Alongside
15  other immigrants, those Dreamers in Houston will be
16  essential for dealing with, and helping us recover from
17  the estimated $108 billion in damages to the city."   Did
18  I generally read that correctly?
19      A.   Yes.
20      Q.    All right.   In your contact with DACA
21  recipients where they have expressed their fear of the
22  end of the program, have any of them stated to you that
23  they will leave the country if it goes away?
24      A.    Not that I recall.
25      Q.    Okay.

1  STATE OF TEXAS)

2                    REPORTER'S CERTIFICATION

3            I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7            I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10  proceeding was taken.  Further, I am not a relative or

11  employee of any attorney of record in this cause, nor am

12  I financially or otherwise interested in the outcome of

13  the action.

14            Subscribed and sworn to by me this day,

15  June 22, 2018.

16

17

18

19            _____
              Debbie D. Cunningham, CSR
20            CSR 2065
              Expiration:  12/31/18
21            INTEGRITY LEGAL SUPPORT SOLUTIONS
              3100 West Slaughter Lane, Suite A-10
22            Austin, Texas 78748
              www.integrity-texas.com
23            512-320-8690; FIRM # 528

24

25

# DEF-INTERV.

# EX. 139

NANCY ADOSSI                                              June 21, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,        )
          Plaintiffs,              )
 4                                  )
     vs.                            ) CASE NO. 1:18-cv-00068
 5                                  )
     UNITED STATES OF AMERICAN,     )
 6   et  al.,                       )
          Defendants               )
 7   and                            )
                                    )
 8   KARLA PEREZ, et al.,           )
        Defendants-Intervenors    )
 9   ********************************************************

10                    ORAL DEPOSITION OF

11                    DR. NANCY ADOSSI

12                      JUNE 21, 2018

13   ********************************************************

14        ORAL DEPOSITION OF DR. NANCY ADOSSI, produced as a

15   witness at the instance of the Plaintiff and duly sworn,

16   was taken in the above-styled and numbered cause on the

17   21st day of June, 2018, from 9:08 a.m. to 11:20 p.m.,

18   before LaDonna Ayers Burch  , Certified Shorthand

19   Reporter in and for the State of Texas, reported by

20   computerized stenotype machine at the Offices of the

21   Attorney General, Consumer Protection Division, 808

22   Travis Street, Suite 1520 Houston, Texas  77002,

23   pursuant to the Federal Rules of Civil Procedure and the

24   provisions stated on the record or attached hereto.

25
```

**Deposition Excerpts**

**Transcripts**

 Jun 21, 2018 Adossi, Nancy

**Page:** 4

```
 1                      (On the record at 9:08)
 2              DR. NANCY ADOSSI,
 3 having been first duly sworn, testified as follows:
 4              EXAMINATION
 5      BY MR. PEROYEA
 6      Q.    Thank you.   Could you state your name for the
 7 record?
 8      A.    My name is Dr. Nancy Adossi.
 9      Q.    Good morning, Dr. Adossi, my name is
10 Trent Peroyea and I'm going to ask you a couple of
11 questions today okay?
12      A.    Yes.
13      Q.    Have you ever had a deposition before or done a
14 deposition?
15      A.    No.
16      Q.    No.   So I'm going to lay out a few ground rules
17 for you as to how the deposition is going to go, okay?
18 First, do you understand that you're testifying under
19 oath today?
20      A.    Yes.
21      Q.    And that this serves the same penalties of
22 perjury as if you were testifying at trial?
23      A.    Yes.
24      Q.    So today do your best to try to give me verbal
25 answers.   Try to stay away from head nods and "uh-huhs"
```

 Jun 21, 2018 Adossi, Nancy

**Page:** 12

```
 1 ahead and answer as to the country.
 2              THE WITNESS:   My familiar and friends are
 3 here in the U. S.
 4      Q    (BY MR. PEROYEA) In the U. S   So all of your
 5 family and friends are here in the U. S.?
 6      A.    Yes.
 7      Q.    Okay.   So do you -- do you consider yourself to
 8 have any remaining connections to Togo?
 9      A.    No.
10      Q.    What language do they speak in Togo?
11      A.    French.
12      Q.    French.   Do you speak French?
13      A.    Yes.
14      Q.    Are you fluent in French?
15      A.    Yes.
16      Q.    And do you speak any other languages?
17      A.    I speak a little bit of the tribal language.   I
18 speak English and I speak Spanish.
```

19     Q.   Okay.   And what is the name of the tribal
20 language that you speak?
21     A.   Ewe.
22     Q.   And what country of origin is that?
23     A.   Togo.
24     Q.   Togo, okay.   And so when you moved to the
25 United States, how did you enter into the country?

Jun 21, 2018 Adossi, Nancy

**Page:** 15
24     Q.   Okay.   So now we're going to go back to your
25 declaration which is Exhibit 1, and I'm going to read

**Page:** 16
1 Paragraph 3 where it says, "I graduated from George W.
2 Carver High School in the top 10 percent of my class."
3 Is that correct?
4     A.   Yes.
5     Q.   And is that a high school in Houston?
6     A.   Yes.
7     Q.   Is that a public school, Dr. Adossi?
8     A.   Yes.
9     Q.   Okay.   And how many years did you attend this
10 high school?
11     A.   I attended it for three years.
12     Q.   Three years?
13     A.   Yes.
14     Q.   Okay.   Did you graduate early?
15     A.   No I did not.
16     Q.   Okay.   Did you attend another high school?
17     A.   Yes.
18     Q.   Okay.   What is the name of the other high
19 school?
20     A.   Nimitz High School.
21     Q.   Nimitz High School?
22     A.   Uh-huh.
23     Q.   And did you -- is that in Houston as well?
24     A.   Yes, sir.
25     Q.   When you graduated high school, did you go

**Page:** 17
1 straight to college?
2     A.   Yes, sir.
3     Q.   Okay.   You didn't take a gap year or anything
4 like that?
5     A.   No, sir.
6     Q.   Okay.   What year did you graduate high school?
7     A.   I graduated high school in 2007.
8     Q.   2007, okay.   So now we're going to go back to
9 your declaration and I'm going to read Paragraph 4.   "I
10 received a bachelor's degree in political science and
11 international relations from the University of Houston
12 where I graduated as the valedictorian and was the

13 keynote speaker for my class."   Is this correct?
14      A.    Yes.
15      Q.    So what year did you start at University of
16 Houston?
17      A.    2007.
18      Q.    And what year did you graduate?
19      A.    2011.
20      Q.    Okay.   Were you in any organizations while you
21 were at University of Houston?
22      A.    Yes.
23      Q.    What -- what organizations were you in?
24      A.    Model United Nations.
25      Q.    Okay.   Can you tell me a little bit about

Page: 18
 1 Model United?
 2      A.    I was presenter and I represented one country
 3 in a -- it was a conference for Model United Nations.   I
 4 did that in 2010.
 5      Q.    Were you in any other organizations?
 6      A.    No.
 7      Q.    Did you receive any scholarships while you were
 8 at University of Houston as an undergrad?
 9      A.    Scholarships, no.
10      Q.    And did you receive federal or state aid while
11 you were at University of Houston?
12      A.    State aid, yes.
13      Q.    What kind of state aid did you receive?
14      A.    It was through TASFA, and I don't remember the
15 whole name.
16      Q.    Okay.   We're going to go to the next page of
17 your declaration.   We're going to skip down to -- to
18 paragraph 11?
19      A.    Okay.   Yes.
20      Q.    And I'm going to start in the second sentence
21 where it says "In college."   Do you see that?
22      A.    Yes.
23      Q.    Okay.   "In college I received a public grant
24 through the Texas Application for State Financial Aid,
25 TAFSA, that helped me pay for most of my undergraduate

Jun 21, 2018 Adossi, Nancy

Page: 23
 1 you went to get your master's degree, correct?
 2      A.    Yes.
 3      Q.    So we're going to go back to your declaration.
 4      A.    Yes.
 5      Q.    Back to Paragraph 5 on the first page.
 6 Paragraph 5 says, "I also earned a master's degree in
 7 public administration from University of Houston which
 8 award me the 2013 Master's in Public Administration
 9 Alumni Award; is that correct?
10      A.    Yes.
11      Q.    What year did you start your master's at U of

12 H?
13     A.   I started my master's in the year of 2011.
14     Q.   Then what year did you finish your master's?
15     A.   I finished in 2013.
16     Q.   And did you receive any kind of scholarships
17 while you were at -- while you were getting your
18 master's?
19     A.   Yes, the master's in Public Administration
20 Alumni.
21     Q.   So that's the award that you received?
22     A.   Yes.
23     Q.   It was a scholarship, correct?
24     A.   And a plaque.
25     Q.   And a plaque, congrats.

Jun 21, 2018 Adossi, Nancy


**Page:** 24
 1     A.   Thank you.
 2     Q.   So this scholarship, how did you apply for it?
 3     A.   I did not directly apply for it.   It was given
 4 to me through my merit so it was given because of my GPA
 5 and my work at the time in the master's program.
 6     Q.   And were you a DACA recipient at this point
 7 while you were receiving your master's?
 8     A.   Yes.
 9     Q.   Okay.   Did you submit any -- or so you got
10 recommendations for this scholarship.   Did DACA have
11 anything to do with you receiving this scholarship?
12     A.   The work permit did, yes.
13     Q.   Okay.   So tell me about that with the work
14 permit.   You submitted the work permit when you were
15 suggested for the scholarship?
16     A.   I submitted the work permit when I received it.
17 I had to submit it to the university.
18     Q.   Okay.   Is this the only thing that you
19 submitted was your work permit?
20     A.   My work permit and my ID.
21     Q.   Okay.   Your -- what ID?
22     A.   My Texas ID.
23     Q.   Your Texas ID like Texas driver's license?
24     A.   Yes.
25     Q.   Okay.   Were you involved in any groups while

Jun 21, 2018 Adossi, Nancy


**Page:** 25
 1 you were earning your master's?
 2     A.   No.
 3     Q.   Okay.   So you went in -- you went on to earn
 4 your Doctorate of Education from U of H, correct?
 5     A.   Yes.
 6     Q.   I'm going to read to you Paragraph 6.   "I hold

7   a Doctorate of Education in Health Sciences Technology
8   from the University of Houston.   I was the youngest
9   graduate of my doctoral program."   Is that correct?
10      A.   Yes.
11      Q.   Congratulations on being the youngest.   That's
12  an accomplishment.
13      A.   Thank you.
14      Q.   So you got your doctorate in what year?
15      A.   I received my doctorate in the year of 2017.
16      Q.   And to go back to the scholarship that you
17  received while you were getting your master's, how did
18  your work permit help you receive that scholarship?
19          MR. HERRERA:   Objection, vague, but you
20  can answer.
21          THE WITNESS:   It was on my records.
22      Q   (BY MR. PEROYEA) What do you mean it was on
23  your records?
24      A.   From the University of Houston school student
25  record, they had to have my record renewed.

Jun 21, 2018 Adossi, Nancy


**Page:** 26
1       Q.   Okay.   So in order to receive that scholarship,
2   you had to submit a work permit, correct?
3       A.   A work permit and my ID.
4       Q.   Okay.   So now let's go to Paragraph 7 of your
5   declaration.   It says, "I am 28 years old and currently
6   work as a 6th grade teacher in a social studies program
7   at Paul Revere Middle School."   Is that correct?
8       A.   Yes.
9       Q.   What subject do you teach?
10      A.   Social studies.
11      Q.   How long did you worked at Paul Revere?
12      A.   I have worked there since August of 2017 so it
13  will be one year in August of this year.
14      Q.   Okay.   And tell me about the application
15  process.   How did you initially apply?
16      A.   I applied through Teach for America.
17      Q.   So you applied through Teach for America.   What
18  did you have to send in to Teach for America?
19      A.   I had to send in my work permit and my ID and
20  my degrees.
21      Q.   Okay.   So when -- in Teach for America is a --
22  is it a nonprofit organization?
23      A.   I just know it as an organization.   I'm not
24  sure of its status.
25      Q.   Okay.   But did you have to apply to Teach for

Jun 21, 2018 Adossi, Nancy


**Page:** 28
1       Q.   Okay.   So you're paid by HISD and when you

2  applied to work at Paul Revere, did you have to send any
3  kind of documents like an I-9 Form?
4      A.   What is that, I-9 Form.
5      Q.   An I-9 Form is as it pertains to employment
6  eligibility, like it's an employment eligibility form.
7      A.   I believe so.
8      Q.   Did you have to send in any other documents to
9  HISD?
10     A.   Yes.   My work permit and my Texas ID.
11     Q.   And you received the work permit after you
12 became a DACA recipient, correct?
13     A.   Yes.
14     Q.   Would you have been able to apply for Teach for
15 America if you had not received DACA?
16          MR. HERRERA:   Objection, vague.   You can
17 answer.
18          THE WITNESS:   No.
19     Q    (BY MR. PEROYEA) Why not?
20     A.   Because I wouldn't have had the work permit.
21     Q.   Okay.   So, and also we're going to -- or let's
22 move to Paragraph 8 where it says, "I'm a small business
23 owner.   I own a consulting firm, Adossi Consulting,
24 LLC."   Let's stop there.   Is that correct?
25     A.   Yes.

**Page:** 29
1      Q.   Okay.   What is -- what is the name -- or sorry,
2  if you could strike that.   What kind of consulting does
3  your firm do?
4      A.   My firm currently does data analysis consulting
5  and writing reports and proposals.
6      Q.   Do you write those data analyses and reports
7  for other companies?
8      A.   For other organizations and companies, yes.
9      Q.   What kind of research do you do?
10     A.   The very first research that I did was
11 immigration policy research.
12     Q.   And who did you do this immigration policy
13 research for?
14     A.   The Black Alliance for Just Immigration.
15     Q.   And is this a for-profit consulting company?
16     A.   I believe it's a non -- oh, for mine?
17     Q.   Yes, for your firm.
18     A.   This is a for-profit consulting company, yes.
19     Q.   Okay.   And what is the structure of your -- of
20 your consulting firm?
21          MR. HERRERA:   Objection, vague.   You can
22 answer.
23          THE WITNESS:   Restate the question.
24     Q    (BY MR. PEROYEA) Like what is the business
25 structure of your consulting firm?   Is it a sole

**Page:** 30
1  proprietorship or --
2      A.   It's a limited liability company.
3      Q.   Okay.   You're also a research consultant,

4 **correct?**
5    A.   Yes.
6    **Q.   And is this paid?**
7    A.   Yes.
8    **Q.   So, actually, I'm going to read -- let's go**
9 **back to Paragraph 8 where it says, "I also work as a**
10 **research consultant with Lift a Village and the**
11 **UndocuBlack Network.   I have previously worked research**
12 **consultant with the Black Alliance for Just**
13 **Immigration."   Is that all correct?**
14    A.   Yes.
15    **Q.   Okay.   So as a research consultant through**
16 **these organizations or networks, do you get paid for --**
17 **for this research?**
18    A.   I get paid for the UndocuBlack Network
19 research.   I do not get paid for Lift a Village because
20 I volunteer.
21    **Q.   Okay.   So how did you get these consultant**
22 **jobs?   Do you submit requests?   Do they find you?   How**
23 **does that work?**
24    A.   I submitted a proposal, and they look at it and
25 based on that they let me know if they want to hire me,

Jun 21, 2018 Adossi, Nancy

**Page:** 33
1    A.   I have done data analyses on immigration in
2 terms of black immigrants.
3    **Q.   And I can't remember, did you say you get paid**
4 **for -- as it pertains to the Black Alliance for Just**
5 **Immigration?**
6    A.   I was getting paid.   I'm no longer with them.
7    **Q.   Why are you no longer with them?**
8    A.   The contract ended.
9    **Q.   Okay.   So this contract -- what did you submit**
10 **for this contract?**
11         MR. HERRERA:   Objection, vague.   You can
12 answer.
13         THE WITNESS:   As -- like a work product?
14    **Q    (BY MR. PEROYEA) Uh-huh.**
15    A.   A report.
16    **Q.   A report, okay.   Okay.   So now we're going**
17 **to -- are these all the current jobs that -- that you --**
18 **that you are in right now?**
19    A.   Yes.   Currently, I am a teacher, a part-time
20 professor, and a research consultant for UndocuBlack
21 Network.
22    **Q.   Okay.   So you're a part-time professor where?**
23    A.   University of Houston at the downtown campus.
24    **Q.   Okay.   When did you start with University of**
25 **Houston Downtown?**

**Page:** 34
1    A.   In 2016, January.
2    **Q.   Okay.   And what did that application process**

3  look like?
4      A.    I had to apply online.   I had to -- through the
5  regular online application.   I had to submit my resume,
6  and I had to submit references and then they asked me
7  for my work permit.
8      Q.    Okay.   And you don't have any other current
9  jobs right now, other than the ones that you've
10  mentioned?
11      A.    I'm also a teacher trainer for Teach for
12  America.
13      Q.    Okay.   And do you get paid to be a teacher
14  trainer?
15      A.    Yes.
16      Q.    Okay.   And what did that application process
17  look like?
18      A.    That one was -- I had to submit my work permit
19  as well, and I had to submit my resume.
20      Q.    Okay.   So now let's talk about prior jobs that
21  you've had.   Can you tell me about any jobs that you've
22  had since receiving DACA that you haven't mentioned
23  already?
24      A.    Yes.   Since receiving DACA, I have worked at
25  Gallup, which is a research agency.   I've worked at

**Page:** 35
1  University of Houston Downtown as an advisor part-time,
2  and I worked at Lone Star College as an
3  advisor/coordinator.
4      Q.    So let's start with Gallup.   Can you give me
5  your dates of employment with Gallup?
6      A.    I know that it was -- I believe it was in 2012
7  or 2013.
8      Q.    And so you were there for about a year?
9      A.    I wasn't even there for a year.   I was there
10  for a few months.
11      Q.    And what were your duties or responsibilities
12  with Gallup?
13      A.    Calling people and asking them about their
14  opinions.
15      Q.    Okay.   Just their opinions on a variety of
16  topics?
17      A.    Yes.
18      Q.    Okay.   So nothing specific, correct?
19      A.    No.
20      Q.    And how did you apply for that job?
21      A.    Regular application, resume, submission of work
22  permit.
23      Q.    And then you also mentioned that you were an
24  advisor at University of Houston Downtown, correct?
25      A.    Yes.

**Page:** 36
1      Q.    And can you give me the dates of your
2  employment with them?
3      A.    I'm pretty sure it was 2012 to I stopped -- I
4  remember the date that I stopped was October of 2014.

5      **Q.    Okay.   And what documents did you send for your**
6  **application?**
7      **A.    Regular application, resume and work permit and**
8  **Social Security.**
9      Q.    Okay.   And was that a competitive process?
10     A.    Yes.
11     Q.    And did you receive your Social Security number
12  because you were a recipient of DACA?
13     A.    Yes.
14     Q.    And did you have to send any kind of I-9 Form
15  when you were applying as an advisor with University of
16  Houston Downtown?
17     A.    Yes.
18     **Q.    Okay.   And then you also you said you worked at**
19  **Lone Star College, correct?**
20     **A.    Yes.**
21     **Q.    And this was as an advisor?**
22     **A.    Yes, and a coordinator.**
23     **Q.    Oh, and a coordinator and could you also**
24  **provide your dates of employment with Lone Star?**
25     **A.    Yes.   November 3rd, 2014 to May 2017.**

**Page:** 37
1      **Q.    Okay.   And so what documents did you send in**
2  **for your application?**
3      **A.    Regular application process, resume, work**
4  **permit, and ID and Social Security as well, with the**
5  **work permit.**
6      Q.    Okay.   And when you say "ID," you're talking
7  about your Texas driver's license?
8      A.    Yes.
9      Q.    And did you receive your Texas driver's license
10  because you were a recipient of DACA?
11     A.    I had an ID prior to DACA, yes.
12     Q.    You had a driver's license prior to DACA?
13     A.    Yes.
14     Q.    Okay.   And when did you get that driver's
15  license?
16     A.    I received that in 2012, I believe.
17     Q.    Okay.   So you received your Texas driver's
18  license before being a recipient of DACA?
19     A.    Yes.
20     Q.    Okay.   What did you submit to --
21     A.    For my -- I submitted a prior work permit for
22  that.
23     Q.    Your prior -- your work permit was from a job
24  that you had had before?
25     A.    My work permit was from USCIS, but it was -- I

Jun 21, 2018 Adossi, Nancy

**Page:** 40
1      A.    Yes.
2      **Q.    Did you have any jobs prior to applying for a**
3  **work permit in 2011?**

4      A.    No.
5      Q.    And what job did you apply for after you
6  received your work permit in 2011?
7      A.    I applied for jobs at -- I applied for jobs at
8  University of Houston Downtown because I was -- my --
9  that's where most of the people, that I knew that's
10  where they were at.
11      Q.    And this was while you were still in undergrad?
12      A.    This was when I was transitioning to a master's
13  so I graduated in 2011 and I started in August 2011.
14      Q.    And are you involved in any organizations right
15  now outside of work?
16              MR. HERRERA:   ,Objection vague.   You can
17  answer.
18              THE WITNESS:   I volunteer with United We
19  Dream.
20      Q    (BY MR. PEROYEA) Okay.   How long have you been
21  volunteering with United We Dream?
22      A.    Since 2014.   Yeah, or 2013.
23      Q.    How did you find out about United We Dream?
24      A.    I was campaigning for the Affordable Care Act
25  and they approached me and told me about the

Jun 21, 2018 Adossi, Nancy

**Page:** 42
1  declaration?
2      A.    Okay.
3      Q.    We're going to go to Paragraph 9, where it
4  says, "I'm a recipient of deferred action through the
5  initiative known as with Deferred Action for Childhood
6  Arrivals, DACA.   Since initially receiving DACA, I've
7  successfully renewed my deferred action in 2015 and
8  2017."   Is this correct?
9      A.    Yes.
10      Q.    Okay.   So when did you actually apply for DACA?
11      A.    I applied for it as soon as it came out in June
12  of 2012.
13      Q.    So what is -- were you living in Texas at the
14  time when you applied for DACA?
15      A.    Yes.
16      Q.    So what did you do to apply for DACA?
17      A.    I had to submit documentation of pretty much
18  everything I did from the first day I came to the U.S.
19  Up until June of 2012, that included school records,
20  degrees, where I lived and anything else that they asked
21  me.
22      Q.    So you submitted all of these via
23  documentation?
24      A.    Yes, I had to make copies and put them in the
25  package with my application.

Jun 21, 2018 Adossi, Nancy

**Page:** 43
1      Q.     And so then you sent your documentation where?
2      A.    I sent it to USCIS.
3      Q.     And then what happened after that once you sent
4  it in?
5                 MR. HERRERA:   Objection, vague.   You can
6  answer.
7                 THE WITNESS:   After I sent it in, they
8  reviewed my documentation and they sent me the follow-up
9  letter, which was to -- it was to submit another form of
10 documentation that they were asking me and I submitted
11 that.   After that, they sent me another follow-up letter
12 telling me that they received my case.   It's in the
13 process, and then after that I got a follow-up letter to
14 go in to take my picture and fingerprints.
15     Q     (BY MR. PEROYEA) Okay.   So you went in to do I
16 think it's called biometrics?
17     A.    Yes.
18     Q.    Correct.   Did you have to do any kind of
19 in-person interview with USCIS for your application?
20     A.    No.   The biometrics was counted as an
21 interview.
22     Q.    How long did it take for you to hear back from
23 USCIS?
24     A.    It took quite a few months.   I want to say
25 three or four months.

📄 Jun 21, 2018 Adossi, Nancy

**Page:** 44
1     Q.    Through to four months?
2     A.    Yes.
3     Q.    And over the course of that three to four
4  months, you received two different notifications from
5  USCIS?
6     A.    I received the first notification to submit
7  further documentation.   The second notice was to say
8  that my case was on file, and the third notice was for
9  the biometrics.
10    Q.    And then did you apply for work authorization
11 with your DACA application?
12    A.    Yes.
13    Q.    And then once you received DACA, you
14 received -- you received your work authorization,
15 correct?
16    A.    Yes.   It came separately in the mail.
17    Q.    Do you -- do you remember how long it took for
18 you to receive your work authorization after you
19 received DACA?
20    A.    After I received the deferred action letter, it
21 took one week or a -- one week and a few more days to
22 receive the actual work permit in the mail.
23    Q.    And did you receive any kind of request for
24 evidence during the time period of while your DACA

25   application was pending?

**Page: 45**
1        A.     That was the first one request for further
2   evidence.
3        Q.     Okay.   So that was the first notice that you
4   received to send more documents?
5        A.     Yes.
6        Q.     Do you remember what they requested for you to
7   send?
8        A.     I don't remember, but I remember it being
9   something having to do with the records, my school
10   records, I believe.
11        Q.     Okay.   So maybe it more so pertained to
12   something that you had forgot to send in with the
13   initial documentation?
14        A.     Yes.
15        Q.     So you've also renewed your DACA status,
16   correct?
17        A.     I've renewed my deferred action letter, and
18   I've renewed my work permit, yes.
19        Q.     Okay.   So how many times have you renewed?
20        A.     I renewed it in 2015 and 2017.
21        Q.     And so you currently hold DACA right now,
22   correct?
23        A.     Currently, I have deferred action and the work
24   permit, yes.
25        Q.     And so walk me through the -- the renewal

**Page: 46**
1   process.   Did you have to provide any supporting
2   documentation when you had to reply for DACA?
3        A.     Yes.   So when I had to reply for DACA, I had to
4   submit my documentation from 2012 up to the day that I
5   was applying so all the activity I've been doing, school
6   records, work records.
7        Q.     So did this process differ from your initial
8   application?
9        A.     Yes.   The 2015 process was for everything from
10   2012 to 2015.   The 2017 was pretty much 2015 to 2017.
11        Q.     And was it -- how long did you have to wait to
12   renew your DACA -- your DACA?
13        A.     I had to renew it three months in advance of
14   the date that it was going to expire.
15        Q.     And did you receive your renewal before your
16   DACA expired from the first time?
17        A.     Yes.
18        Q.     So it took a little less than three months for
19   you to be approved for your renewal?
20        A.     Yes, but it was very close to three months, and
21   the 2017 application I actually waited longer so I
22   started earlier and so I waited longer.
23        Q.     Was there ever a time where you were waiting
24   for your renewal where your original or your first
25   renewal expired?

**Page: 47**

1      A.    No.

2      Q.    So you renewed for the last time in 2017,
3 correct?

4      A.    Yes.

5      Q.    When you are up for renewal again, do you
6 intend to apply?

7      A.    Yes.   I've actually started the application.

8      Q.    And, again, the application that you're
9 submitting for this new renewal is similar to your first
10 and second renewals, correct?

11      A.    Yes.

12      Q.    And really the only difference is that you're
13 submitting documentation of whatever the past few years
14 for that renewal would be?

15      A.    Submitting documentation and also writing about
16 why I need deferred action and why I need the work
17 permit.

18      Q.    Okay.   So now let's go to your declaration,
19 back to your declaration on Paragraph 14, where it says,
20 "Receiving deferred action is critical to my ability to
21 live and work in the United States, and losing deferred
22 action would pose a great hardship on me.   If I lose
23 deferred -- if I lose deferred action, I would lose my
24 work authorization."   Do you agree with that statement?

25      A.    Yes.

**Page: 48**

1      Q.    Why do you agree with that statement?

2      A.    Because deferred action basically defers me
3 from being deported, and also because the work permit
4 allows me to work in the United States.

5                      (Exhibit No. 5 marked)

6      Q    (BY MR. PEROYEA) So I'm going to show you
7 what's going to be Exhibit 5.  I'll let you have a
8 little bit of time to look it over, but have you ever
9 seen this document before?

10      A.    I've -- I've seen it, but I haven't read it
11 through.

12      Q.    You haven't read it through?

13      A.    No.

14      Q.    Have you read a little bit of it?

15      A.    Yes, I have a little bit.

16      Q.    Did you see this document before it was filed
17 with the Court?

18      A.    I don't recall when it was filed with the
19 Court, but I do recall seeing this document.

20      Q.    When you read through it initially from what
21 you remember, did you see anything that you disagreed
22 with?

23      A.    No.

24      Q.    Okay.   So what we're going to do is we're going
25 to read through specific parts of this document.

**Page:** 49
1     A.    Okay.
2     **Q.    Okay.    So where I want to start is, is on page**
3  **1.**
4     A.    Okay.
5     **Q.     So you see that first heading, right under that**
6  **first heading where it says the Proposed**
7  **Defendant-Intervenors, Karla Perez, that sentence?**
8     A.    Yes.
9     **Q.    And then you see a couple -- a couple of -- or**
10  **a couple sentences down you see your name, Nancy Adossi?**
11     A.    Yes.
12     **Q.     And it says as the Proposed**
13  **Defendant-Intervenors including you, Nancy Adossi, are**
14  **recipients of deferred action, pursuant to the Deferred**
15  **Action for Childhood Arrivals initiative and are**
16  **directly affected by the resolution of the claims in**
17  **this case."**
18     A.    Yes.
19     **Q.    Do you agree with that statement?**
20     A.    Yes.
21     **Q.    Okay.   So how are you affected by the**
22  **resolution of the claims in this case?**
23               MR. HERRERA:   Objection vague.   Objection,
24  calls for a legal conclusion.   You can answer if you
25  know.

**Page:** 50
1               THE WITNESS:   I would lose my work permit,
2  and I would lose my deferred action.
3     **Q     (BY MR. PEROYEA) What do you mean you would**
4  **lose your deferred action?**
5     A.    So deferred action is a letter that says that
6  the United States has deferred action on you because you
7  are undocumented so that you are not found to be
8  deportable based on your submission of the application.
9     **Q.    So let's go to the next sentence.   You see**
10  **where it says, "all Proposed Defendant-Intervenors"?**
11     A.    Yes.
12     **Q.    It says, "All Proposed Defendant-Intervenors**
13  **have authorized presence in the United States, are**
14  **authorized to work and are eligible for renewal of their**
15  **grants of deferred action," and so let's break this down**
16  **a little bit more.   So, because of DACA you have**
17  **authorized presence in the United States, correct?**
18     A.    I have authorized presence, yes.
19     **Q.    And because of DACA you are authorized to work**
20  **in the United States, right?**
21     A.    I have a work permit, yes.
22     **Q.    Would you agree with the statement of the**
23  **sentence that we just read where it says you are**
24  **authorized to work?**
25     A.    I do have a work permit, and I am authorized to

**Page:** 71

1  policy that you -- that they are not allowed to ask
2  about your immigration status when you report a crime?
3      A.   I am aware of it.
4      Q.   So -- so how would that change -- how has DACA
5  changed your ability to feel comfortable calling law
6  enforcement if you know that your immigration status
7  would not come up?
8      A.   Yes, so before when I was in college, I was not
9  aware of that law before when I was in college so seeing
10 things on the college campus I would want to report it,
11 but I didn't know if I would be asked for my Texas ID,
12 which I did not have because I didn't have any sort of
13 work permit to show for my Texas ID so that's why I said
14 that.
15     Q.   So it isn't necessarily that DACA has made you
16 feel more comfortable; it was more so when you received
17 the Texas ID?
18            MR. HERRERA:   Objection, mischaracterizes
19 the witness' testimony.
20            THE WITNESS:   Deferred action allowed me
21 to get the work permit so I could get the ID so...
22     Q    (BY MR. PEROYEA) But I thought you were saying
23 that you had an ID before you received DACA?
24     A.   Yeah, I had an ID before I received DACA, but
25 that was only for a short time so when I -- when I

**Page:** 72

1  received DACA, the ID was -- became a driver's license
2  basically so back then it was really different than it
3  is now.
4      Q.   Okay.   And would you say that you are anxious
5  about deportation on a basis once you received DACA
6  under the Obama administration?
7      A.   Was I anxious about deportation?
8      Q.   Yeah, and the fact that your DACA status could
9  be taken away at any time, were you -- were you anxious
10 about that fact under the Obama administration?
11     A.   I think I've always been a little bit anxious
12 just because DACA is not a status.   It's -- they've
13 decided to defer action on your case so prosecutorial
14 discretion means just that, discretion, so I mean the
15 U.S. has discretion to change so it's not a status.
16 It's just discretion and it's deferred action.
17     Q.   So you mentioned that there was a time where
18 you saw a crime.   What kind of crime did you witness?
19     A.   I believe it was somebody trying to get into
20 somebody else's car on campus so I wasn't sure if the
21 persons -- if that was her car and they had lost the key
22 or what was going on.
23     Q.   And so you didn't report that because of why?
24     A.   Because I didn't -- at the time I thought that
25 they would ask me like, you know, what is your name?   Do

**Page:** 73

1  you have an ID to prove what your name is?   So at the
2  time I thought they would ask me that so I didn't report
3  it, and also because I'm female and the person happened
4  to be a guy and I didn't want to be involved.
5      **Q.    And are there any other crimes that you have**
6  **witnessed that you did not report?**
7      A.   It was just campus, campus stuff, so it was
8  like people trying to break into cars and people,
9  usually men, harassing women on campus.
10     **Q.    And you didn't report those again as -- because**
11 **at that moment you didn't have any kind of ID so you**
12 **were afraid that they were going to ask you about the ID**
13 **when you reported the crime?**
14     A.   Exactly, because they would ask me for my name
15 and proof of my name.   That was my thought at the time.
16     **Q.    Okay.   So now we're going to go to Paragraph 18**
17 **of your declaration on page 4 where it says, "I joined**
18 **this case in order to defend DACA for myself and others**
19 **in my situation."**
20     A.   Yes.
21     **Q.    What does that mean, situation?**
22     A.   Other undocumented students who currently have
23 deferred action and have a work permit.
24     **Q.    Would you consider yourself an advocate for**
25 **DACA recipients?**

Jun 21, 2018 Adossi, Nancy

**Page:** 75

1  you've talked to who have expressed that they would not
2  return to their countries of origin?
3                    MR. HERRERA:   Objection, pursuant to NAACP
4  v. the State of Alabama ex rel Patterson, I'm going to
5  object to the question to the extent that it calls for
6  the identification of members of an organization under
7  the First Amendment right to associate.   You can answer.
8      **Q      (BY MR. PEROYEA) So we're going to mark that**
9  **for a ruling with the Court.   So you can still answer**
10 **that question?**
11                   MR. BIGGS:   Are you instructing her not to
12 answer?
13                   MR. HERRERA:   Yeah.
14                   MR. BIGGS:   So we'll take it up with the
15 Court.
16                   MR. KINCHELOE:   I'm sorry, I was confused.
17 I thought you made your objection then said you can
18 answer.
19                   MR. HERRERA:   Yeah.   No, I don't want her
20 to answer that.
21                   MR. KINCHELOE:   Oh, okay.
22     **Q      (BY MR. PEROYEA) So let's go back to -- can you**
23 **give me your best estimate because you did put it here**
24 **in your declaration that you've -- you've -- that you've**
25 **spoken to many DACA recipients.   About how many DACA**

**Page:** 76

1  recipients you've talked to who expressed that they
2  would not return to their home country?
3       A.   I can say it wasn't a hundred.   I would say
4  maybe less than 20.
5       Q.   Less than 20?
6       A.   Yeah.
7       Q.   And so if we can continue on your declaration
8  here where it says, "From the conversations I've had
9  with other DACA recipients, as well as my own
10 experiences and observations, it is my understanding
11 that the vast majority of DACA recipients would not
12 return to their country of origin if they lost their
13 DACA."   Do you agree with that statement?
14      A.   Yes.
15      Q.   So would you say that there are people that
16 you've talked to that are DACA recipients who have said
17 that they would return to their home country?
18      A.   They would return?
19      Q.   Yes, they would?
20      A.   I don't know anybody that would return because
21 we were all -- we were all pretty much here for our 15,
22 20 years.
23      Q.   Have you had any conversations with any other
24 parties or intervenors in the suit about this lawsuit
25 itself?

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3    STATE OF TEXAS, et al.,          )
             Plaintiffs,               )
 4                                     )
      vs.                              ) CASE NO. 1:18-cv-00068
 5                                     )
      UNITED STATES OF AMERICAN,       )
 6    et  al.,                         )
             Defendants                )
 7    and                             )
                                       )
 8    KARLA PEREZ, et al.,             )
         Defendants-Intervenors        )

 9

10                  REPORTER'S CERTIFICATE

11         ORAL DEPOSITION OF DR. NANCY ADOSSI

12                     JUNE 21, 2018

13        I, LADONNA AYERS BURCH, a Certified Shorthand

14    Reporter in and for the State of Texas, do hereby

15    certify that the foregoing deposition is a full, true

16    and correct transcript;

17        That the foregoing deposition of DR. NANCY ADOSSI,

18    the Witness, hereinbefore named was at the time named,

19    taken by me in stenograph on June 21st, 2018, the said

20    Witness having been by me first duly cautioned and sworn

21    to tell the truth, the whole truth, and nothing but the

22    truth, and the same were thereafter reduced to

23    typewriting by me or under my direction.  The charge for

24    the completed deposition is $_____ due from

25    Plaintiff;
```

1        That by agreement of counsel, the deposition officer

2    is instructed to release the original deposition

3    transcript to _____ on

4    _____,  for review and signature, and the

5    deposition officer is thereafter released of any further

6    responsibility with regard to the original.

7        That the Witness shall have thirty (30) days for

8    review and signature of the original transcript and if

9    any corrections returned are attached hereto.

10       That the signed transcript ( ) was ( ) was not

11   received from the Witness within 30 days.

12       That the amount of time used by each party at the

13   deposition is as follows:

14       Mr. Trent Peroyea - 1 hr. 54 min
         Mr. Adam Arthur Biggs
15       Mr. Ernest I. Herrera - 1 minute
         Mr. Rick Kincheloe - 4 minutes
16       That before the completion of the deposition, the
     the Defendant did request to review the transcript.
17       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
18   action in which this proceeding was taken, and further
     that I am not financially or otherwise interested in the
19   outcome of the action.
         Certified to by me this _____ day of _____
20   _____, 2018.

21                          _____

22                          LaDonna Ayers Burch, CSR
                            Texas CSR 3941
23                          Expiration:  12/31/2018
                            KIM TINDALL & ASSOCIATES, LLC
24                          Firm Registration No. 631
                            16414 San Pedro, Suite 900
25                          San Antonio, Texas  78232
                            (210) 697-3400

# DEF-INTERV.

# EX. 140

**STATE OF TEXAS, ET AL. - vs - UNITED STATES OF AMERICA, ET AL.**
**Douglas Massey on 06/26/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,          )
                      Plaintiffs,     )
 4       - vs -                       )Case No. 1:18-cv-00068
                                      )
 5   UNITED STATES OF AMERICA,        )
     et al.,                          )
 6                    Defendants,     )
     and                              )
 7                                    )
     KARLA PEREZ, et al.,             )
 8          Defendant-Intervenors.    )
                      VOLUME I
 9
                 D E P O S I T I O N
10                      of
                 DOUGLAS MASSEY
11       taken on the 26th day of June, 2018, at 9:58 a.m.
     at the office of Hampton Inn, 4519 Main Street,
12   Manchester, Vermont.
            _____
13

14   APPEARANCES:

15       ADAM N. BITTER, ASSISTANT ATTORNEY GENERAL, General
             Litigation Division, P.O. Box 12548, Austin,
16           Texas 78711-2548, on behalf of the Plaintiff
             States.
17           (512) 463-2120
             adam.bitter@oag.texas.gov
18
         DENISE HULETT, ESQUIRE, of the Mexican American
19           Legal Defense and Educational Fund, 110 Broadway,
             Suite 300, San Antonio, Texas 78205, on behalf of
20           the Defendant-Intervenors.
             dhulett@maldef.org
21

22       JAMES WALKER, ESQUIRE, of the Department of Justice,
             Civil Division, Office of Immigrant Litigation,
23           District Court Section, P.O. Box 868, Washington,
             D.C. 20044, on behalf of the Defendants.
24           james.walker3@usdoj.gov

25
```

**For Depo Excerpts**

**Transcripts**

 Jun 28, 2018 Massey, Douglas 06-26-2018_AMICUS

**Page:** 102
1     A.    We have information on DACA recipients in the
2 Mexican Migration Project but the numbers are really too
3 few to study at this point.
4         Q.    So does your conclusion -- strike that.
5             Is your conclusion in paragraph 18 based on
6 any of the surveys that you've conducted with the MMP
7 with respect to DACA recipients?
8     A.    It's not based on the surveys.   It's based on
9 my knowledge of the population of DACA recipients.
10         Q.    And you talked about this a little bit before,
11 but I want to ask it with respect to this conclusion.
12 Have you interviewed any DACA recipients about their
13 plans if they were to lose DACA status?
14     A.    I have not personally interviewed anyone about
15 their plans what happens if DACA disappears.
16         Q.    And so I just want to examine the basis of
17 your knowledge for the statement about voluntarily
18 returning.   It sounds like you're basing it on your work
19 through the MMP and LAMP surveys; is that right?
20         A.    I have 30 years of work in the field and my
21 knowledge of the DACA population.   It's really a unique
22 population.   There's really no basis to generalize to
23 it.   So if you look at prior studies of return
24 migration, there are people that are completely unlike
25 DACA recipients.   They didn't grow up in the United

**Page:** 103
1 States.   They don't speak English.   They don't -- often
2 have a very poor knowledge of Spanish, and they can't
3 read and write in Spanish.   They can speak household
4 Spanish typically, but their fluency is not up to the
5 high levels of education they've gotten in the United
6 States.   And they're actually -- most of them are
7 undocumented in Mexico and they don't have the Mexican
8 identification cards.
9             So this is really a whole new population and
10 it's very difficult to have a study to predict what
11 they're doing.   But I take them at their own word that
12 they want to stay here.   They see themselves as
13 Americans.   They want to remain.   They've applied for
14 DACA.   They're working.   They're productive citizens for
15 the most part and they pose no threat to national
16 security or to even community security, and I think that
17 they want to stay.
18         Q.    And you indicate in your declaration that the
19 group of DACA recipients, given their characteristics,
20 are unrepresentative of some of the prior return
21 migration studies; is that right?

22        A.    Totally unrepresentative because DACA didn't
23   exist when most of these studies were being done.   And
24   the thing about DACA is you really can't -- it's really
25   difficult to leave so most haven't left the country.

Jun 28, 2018 Massey, Douglas 06-26-2018_AMICUS

**Page:** 108
1   your travels.
2        **Q.    And you're not certain whether all DACA**
3   **recipients have consumed American culture; is that fair?**
4        A.    I'm fairly certain that all have consumed
5   American culture.   If you grew up in the United States,
6   you can't avoid consuming American culture; and if you
7   grew up in Mexico, you can't avoid consuming American
8   culture.
9        **Q.    It sounds like what you're saying, that's true**
10   **even for people who may not necessarily be in the**
11   **country; is that fair?**
12        A.    Yeah, that's a fair assessment.   But they've
13   consumed it pretty much exclusively as they came of age
14   in this country.   And they socialized with American
15   friends and American schools in American society with
16   American TV and American songs and American music.   And
17   I know, in general, among people in these circumstance,
18   if they came to the United States as children and grew
19   up, there is data on that, that English is their
20   preferred language.   And very relatively few end up
21   learning how to read and write properly in Spanish.   So,
22   basically, they're English dominant.
23        **Q.    And those analyses that you're referring to**
24   **are those ones that you've personally conducted.**
25        A.    I've done some of those analyses.   One showed

**Page:** 109
1   that in southern California, which is heavily dense with
2   Spanish speakers, in a second generation children switch
3   over to English overwhelmingly, and by the third
4   generation Spanish language ability is virtually gone.
5        **Q.    Have you done any analyses of ability to speak**
6   **Spanish among DACA recipients in the United States?**
7        A.    I have not done such an analysis.   There may
8   be one out there I don't know about.   I have spoken to
9   the DACA recipients that I know and they speak Spanish,
10   but I don't think they can write and read and they speak
11   a fairly low level of Spanish because they switched in
12   English and their education and training is in English.
13   So they have a hard time doing complicated, abstract
14   expressions in Spanish.   Actually, for some of these
15   students I'm better at it than they are.
16        **Q.    And with respect to the DACA recipients that**
17   **you're referring to, you're talking about the handful of**
18   **students that you know.**
19        A.    Yes.
20        **Q.    The handful of individuals that you know.**

21     A.   Yes.   And lots of second generation students
22 that I've met over the year.
23     **Q.   So not necessarily DACA recipients, just**
24 **second generation in general.**
25     A.   And the DACA recipients that I know.

Jun 28, 2018 Massey, Douglas 06-26-2018_AMICUS

**Page:** 110
1     **Q.   Just to back up one point on the consuming**
2 **American culture.   It's not something that you've**
3 **analyzed the extent to which DACA recipients --**
4     A.   No.   I haven't personally analyzed that facet
5 of their lives here.   I don't really have enough data on
6 DACA recipients to do any systemic analysis based on
7 MMP.   You would need a targeted study that actually
8 follows or interviews DACA recipients.   I think those
9 are out there, but I'm not aware of issues being
10 addressed using those data sets.
11     **Q.   A similar question with respect to your point**
12 **in paragraph 18 that DACA recipients are unprepared for**
13 **life and labor in their countries of birth.   That's**
14 **something that you say in your declaration; is that**
15 **right?**
16     A.   Yes, I believe that's true.
17     **Q.   And is that based on any analysis of DACA**
18 **recipients you've done specifically?**
19     A.   No.   And I've said, there are no -- in my data
20 sets there's not enough DACA recipients to analyze at
21 this point.   But I know about the troubles of people who
22 have grown up in the United States and what they're
23 experiencing in Mexico today.   There are about,
24 according to the U.S. embassies in Mexico, around
25 600,000 U.S.-born citizen kids who are back in Mexico

**Page:** 111
1 with a deported parent, and they're having a terrible
2 time, a rough time.   They don't speak Spanish to the
3 same fluency as other Mexico kids.   They didn't know how
4 to read and write in Spanish.   They learned how to do
5 that in English.   They don't know Mexican history that
6 well.   They know Mexican culture kind of filtered
7 through the U.S. and they're ostracized and sometimes
8 bullied in school and they're having a very difficult
9 time.   And I think this population is something -- is
10 the closest thing you can really generalize to what
11 would happen to DACA students if they were forced in
12 some way back into their countries of origin,
13 particularly Mexico.   These are U.S.-born kids who grew
14 up in the States and they are citizens so they will come
15 back.   But they're having terrible troubles and there's
16 a lot of ongoing studies that are going on on the
17 Mexican side about what is happening to these kids, and
18 their numbers are growing quite rapidly.
19     **Q.   And are those studies specific to DACA?**

20      A.   No, they're not specific to DACA, because the
21   DACA kids wouldn't be back.   Those are citizens kids who
22   are back with their deported parents.   But they have the
23   same kind of experience, life experience.   They grew up
24   in the States.
25      Q.   At the end of paragraph 18 you say "Most speak

Jun 28, 2018 Massey, Douglas 06-26-2018_AMICUS

**Page:** 119
1   knowledge of data that has gone through a peer-review
2   process with the exception here of the DACA recipients
3   that I don't know of any studies.   But I'm extrapolating
4   from other populations like the deported children who
5   were born in the States growing up in Mexico and
6   pointing out that it's very difficult to generalize from
7   past studies of return migration because the past
8   studies don't represent the circumstances of DACA
9   recipients.
10      Q.   I wanted to follow-up on that too because
11   counsel asked you a few questions about how the
12   population of the people that you've surveyed are
13   different from the DACA population, how the DACA
14   population is unique and there's a dearth of studies out
15   there.
16          So my question is:   How does your prior
17   research and data collection inform your opinion about
18   the likelihood that DACA recipients will return to their
19   country of origin?
20      A.   Well, I'm able to put DACA recipients into a
21   context, and I've watched the evolution of the
22   Mexico-U.S. migration system for almost 40 years.   I did
23   my first study of undocumented migration from Mexico in
24   1978 so it has been 40 years.   And I've seen the changes
25   in evolution of the system over time.   And I watched

**Page:** 120
1   what the settlement process that was being created and
2   prompted by the U.S. border enforcement that was
3   preventing what had been a male work force circulating
4   back and forth from following that pattern and
5   continuing to circulate back and forth, staying longer
6   in the United States and seeing family unification occur
7   and children being brought in and staying and growing up
8   in the United States.
9          And from the early 1990s on I could see that
10   this problem was going the evolve and face us at some
11   point and provide really terrible human rights dilemma
12   for these children who were growing up in the country.
13   So I've watched it unfold in real-time using the data
14   from the Mexican Migration Project.   And I've seen --
15   I've actually talked to people who have grown up in the
16   States who weren't DACA who -- and were living back in
17   Mexico that had green cards.   And those people come back
18   to Mexico for holidays, but they don't return

19  permanently.   If they've grown up in America, they stay
20  in America.   And this is particularly true of women who,
21  having grown up with the freedom of women in the United
22  States, are not particularly inclined to return to the
23  strictures of what's still, especially in rural areas, a
24  very patriarchal society.
25              But in general people who grow up in the

**Page:** 121

1   States don't want to come back to Mexico permanently.
2   They come back for visits.   They want to see their
3   relatives.   They're curious about where their parents
4   came from.   But I've seen over and over and over again
5   that these sorts of people have their foot, their base,
6   in the United States and prefer to stay.   And even if
7   they go back for a period of time, they return to the
8   U.S.
9              And so I've seen cases that mimic what DACA
10  students have now over the years and able to draw on
11  that long base of experience to make some
12  generalizations about what is likely to happen with the
13  DACA students.
14          Q.   Thank you.
15              Couple of more quick questions.   One is you
16  were asked about the numbers of users of the MMP and of
17  the LAMP project.   I think it is over -- somewhat over
18  4,000 for the MMP project.
19              I wanted to ask you.   Are any of those users
20  government agencies who rely on the data that you
21  collect?
22          A.   We've checked.   We know where these people
23  come from.   They sign up and tell us who they are.   And,
24  yes, there are a lot of people from the federal
25  government, from Congress, from Capitol Hill, from

```
 1                C E R T I F I C A T E

 2        I, DINEEN SQUILLANTE, Registered Professional

 3   Reporter and Notary Public, do hereby certify that the

 4   foregoing pages, numbered page 4 through page 126,

 5   inclusive, are a true and accurate transcript of my

 6   stenographic notes of the deposition of DOUGLAS MASSEY,

 7   taken before me on June 26, 2018, at 9:58 a.m., for use

 8   in the matter of STATE OF TEXAS, et al., -VS- UNITED

 9   STATES OF AMERICA, et al. and KARLA PEREZ, et al.

10

11

12

13

14

15

16

17        _____

18                DINEEN SQUILLANTE
          Commission Expires 02/10/19
19

20

21

22

23

24

25
```

# DEF-INTERV.

# EX. 141

**U.S. Department of Justice**
Immigration and Naturalization Service

_____

HQADN 70/6.2

_____

*Office of the Executive Associate Commissioner*                    *4257 Street NW*
*Washington, DC 20536*


MAY  8  2002

MEMORANDUM FOR JOHNNY N. WILLIAMS                                    ~
                EXECUTIVE ASSOCIATE COMMISSIONER
                OFFICE OF FIELD OPERATIONS

FROM:        Stuart Anderson /S/
             Executive Associate Commissioner
             Office of Policy and Planning


SUBJECT:     Deferred Action for Aliens with bona fide Applications for
             T Nonimmigrant Status

     This memorandum outlines changes in Immigration and Naturalization Service (INS)
procedures for deferred action determinations on behalf of victims of severe forms of trafficking
whose applications for T nonimmigrant status have been determined to be bona fide but are still
awaiting final adjudication by the Vermont Service Center (VSC).  It should be read as a
supplement to guidance by the Office of Programs on December 19, 2000, and
September 7, 2001, and to a memorandum dated August 30,2001, that instructed INS offices to
utilize deferred action as one means to provide possible victims the opportunity to avail
themselves of the provisions of the Victims of Trafficking and Violence Protection Act of 2000,
including applying for T or U nonimmigrant status.[1]

     Effective the date of this memorandum, the VSC is responsible for assessing deferred action
for all applicants whose applications have been determined to be bona fide. The duration of the
initial deferred action assessment shall be at the discretion of the Service Center Director but
shall not exceed 12 months.  The initial assessment may be for less than 12 months if the director
determines an application would be adjudicated within that time.  Deferred action <u>will not </u>be
considered or assessed for a T nonimmigrant status applicant if he or she is currently in

_____

1 This memorandum does not, however, after the guidance outlined in those memoranda regarding the interim
procedures to be followed while the regulations implementing the U nonimmigrant status are being promulgated.
Aliens who are identified as possibly eligible for U nonimmigrant status should not be removed from the United
States until they have had the opportunity to apply for such status.  Existing authority and mechanisms such as
parole, deferred action, and stays of removal should be used to achieve this objective.

Memorandum for Johnny N. Williams
Subject: Deferred Action for Aliens with Bona Fide Applications
         for T Nonimmigrant Status

removal proceedings unless the case has been administratively closed by the Immigration Judge
or the Board of Immigration Appeals. For purposes of this memorandum, removal proceedings
are defined as the period between the filing of the Notice to Appear with the Immigration Judge
and the issuance of the final decision.

    If a deferred action determination is made, the VSC will notify the alien to submit Form I-765,
Application for Employment Authorization. Applications for employment authorization based on
an assessment of deferred action at the VSC must be filed with the VSC.  After the initial
deferred action decision and issuance of a one-year Employment Authorization Document, the
VSC will hold those files and review each subsequent request for employment authorization and
deferred action upon receipt of each application.  Requests for extensions of employment
authorization and deferred action will be reviewed and granted in increments of twelve months.

    Field Offices (and other Service Centers) may continue to receive inquiries from T applicants
regarding determination of deferred action.  These may be initial requests or requests for an
extension of deferred action. These requests should be mailed to: **USINS- Vermont Service
Center, ATTN: Keith Canney, Box 1000, 75 Lower Weldon St., St. Albans, VT 05479-0001.**

    If you have any questions regarding this memorandum or other T nonimmigrant status issues,
please contact Laura Dawkins, Office of Adjudications at (202) 514-4754.

# DEF-INTERV.

# EX. 142

Barbara Hines                                           June 26, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3 STATE OF TEXAS, et al.,     )
                               )
 4           Plaintiffs,       )
                               )
 5 vs.                         )    CASE NO. 1:18:cv-00068
                               )
 6 UNITED STATES OF AMERICA,   )
   ET AL.,                     )
 7                             )
             Defendants,       )
 8                             )
   and                         )
 9                             )
   KARLA PEREZ, et al.,        )
10                             )
      Defendant-Intervenors.)
11 _____

12              ORAL VIDEOTAPED DEPOSITION

13                    BARBARA HINES

14                    JUNE 26, 2018
```

15      ORAL VIDEOTAPED DEPOSITION OF BARBARA HINES,

16 produced as a witness at the instance of the PLAINTIFF

17 STATES and duly sworn, was taken in the above-styled and

18 numbered cause on the 26th day of June, 2018, from

19 10:04 a.m. to 12:41 p.m., before Dana Richardson,

20 Certified Shorthand Reporter in and for the State of

21 Texas, reported by computerized stenotype machine at the

22 Office of the Attorney General, 300 West 15th Street,

23 Austin, Texas 78701, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.

**For Depo Excerpts**

**Transcripts**

 Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 30
1    Q.    All right.   So between all of those ways in
2  which you may have spoken with individual DACA
3  applicants, you think you've spoke to about half of the
4  applicants who came to the 13 clinics?
5    A.    I would say maybe one-third to one-half, yes.
6    Q.    Okay.   All right.   Thank you.
7                Okay.   If we jump back to Paragraph 14,
8  please.   Here you say, "The majority of applications for
9  immigration benefits are adjudicated at a remote USCIS
10 service center without an in-person interview."
11                I want to ask you a few questions about
12 that sentence.
13                So first you say, "The majority of
14 applications for immigration benefits are adjudicated at
15 a remote USCIS service center."
16                Do you know what percentage of
17 applications for immigration benefits are adjudicated at
18 a remote USCIS service center?
19    A.    I would need to look at the document that I
20 cited, "Service Center Forms Processing," in Exhibit
21 No. 3.
22    Q.    Okay.
23    A.    Forty-four different immigration benefits were
24 adjudicated there.
25    Q.    Do you know which immigration benefits are not

**Page:** 31
1  adjudicated at a remote USCIS service center?
2    A.    Naturalization applications.   Do you want some
3  examples?
4    Q.    Sure.
5    A.    Naturalization applications.   Adjustment of
6  status applications based on the family-based
7  immigration system.
8    Q.    Can you think of any others?
9    A.    Yes.   Any time the service center wants to have
10 an interview, they have an option to send an application
11 from a regional service center to a district immigration
12 office for an in-person interview.
13    Q.    All right.   Naturalization applications, if I'm
14 understanding you right, are adjudicated at USCIS field
15 offices?
16    A.    Yes.
17    Q.    The same with adjustment of status based on
18 family benefits?
19    A.    That's right.
20    Q.    Do you know whether an interview is a routine
21 portion of a naturalization application?

22     A.   Yes, it is.
23        Q.   What about an adjustment of status based on
24 family benefits application?
25     A.   Half of it is.

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 31
1 adjudicated at a remote USCIS service center?
2     A.   Naturalization applications.   Do you want some
3 examples?
4        **Q.   Sure.**
5     A.   Naturalization applications.   Adjustment of
6 status applications based on the family-based
7 immigration system.
8        **Q.   Can you think of any others?**
9     A.   Yes.   Any time the service center wants to have
10 an interview, they have an option to send an application
11 from a regional service center to a district immigration
12 office for an in-person interview.
13        **Q.   All right.   Naturalization applications, if I'm**
14 **understanding you right, are adjudicated at USCIS field**
15 **offices?**
16     A.   Yes.
17        **Q.   The same with adjustment of status based on**
18 **family benefits?**
19     A.   That's right.
20        **Q.   Do you know whether an interview is a routine**
21 **portion of a naturalization application?**
22     A.   Yes, it is.
23        **Q.   What about an adjustment of status based on**
24 **family benefits application?**
25     A.   Half of it is.

**Page:** 32
1        **Q.   There's about half time -- half the time --**
2     A.   No.   The initial family based petition that --
3 for the eligibility is adjudicated remotely in many
4 cases.
5        **Q.   I see.   The -- the initial eligibility is**
6 **adjudicated remotely.   And then what happens after that?**
7     A.   In some -- it depends on your category; but,
8 yes.   And then the adjustment of status application has
9 an interview.
10        **Q.   Okay.   So of the applications for immigration**
11 **benefits that are adjudicated at remote USCIS service**
12 **centers --**
13     A.   Uh-huh.
14        **Q.   -- do you know how often those applications are**
15 **referred to a field office for in-person interviews?**
16     A.   No, I don't.
17        **Q.   Do you know if that referral rate varies**
18 **depending on the type of application for immigration**
19 **benefits that is being adjudicated?**
20     A.   No, I don't.

21    Q.   Have you ever looked at that data?
22    A.   No.
23    Q.   All right.   Do you know how many DAPA -- excuse
24 me.   Do you know how many initial DACA applications have
25 been referred to field offices for in-person interviews?

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 34
1 resident to become a United States citizen.
2    Q.   Okay.   And the other one that we mentioned
3 earlier was the adjustment of status based on family
4 benefits.   Did I get that right?
5    A.   Uh-huh.
6    Q.   Okay.   And what is that application?
7    A.   That is an application for lawful permanent
8 resident status.
9    Q.   Okay.   So it would be somebody who doesn't have
10 lawful permanent resident status but is applying for
11 lawful permanent residence status?
12    A.   That's correct.
13    Q.   All right.   Thanks.
14         All right.   If we turn to the next page to
15 page -- or Paragraph 17, please.   The clause that begins
16 with, "I learned that applicants who would not qualify
17 for DACA do not apply."   Do you see that?
18    A.   Yes.
19    Q.   Okay.   So when you say "applicants who would
20 not qualify for DACA," are you talking about the
21 qualification criteria stated in the 2012 memo?
22    A.   I'm referring to that as well as disqualifying
23 or negative personal history.
24    Q.   What would that disqualifying or negative
25 personal history include?

**Page:** 35
1    A.   It would include criminal disqualifications.
2 It would include national security concerns.   It would
3 inc- -- or a series of factors that could lead to a
4 negative discretionary decision.
5    Q.   Okay.   So other than the two specific ones you
6 just mentioned, what would some of those other factors
7 be?
8    A.   Criminal history that was not disqualifying but
9 that I would consider serious.
10    Q.   Okay.   Anything else?
11    A.   National security concerns, gang -- gang
12 membership.
13    Q.   Okay.   Anything else?
14    A.   No.
15    Q.   All right.   What sort of criminal history that
16 wouldn't be disqualifying but may be looked upon
17 negatively, what would that include, in your opinion?
18    A.   Juvenile convictions.   Let's see.   A series,
19 perhaps, of dismissed cases.   It's a -- it's on a

20  case-by-case basis.   So what -- you know, what you're
21  evaluating is the positive and the negative to make that
22  determination.
23       **Q.   Okay.   So have you ever told an applicant that**
24  **he or she should not apply even though that applicant**
25  **met all of the stated criteria in the DACA memorandum?**

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 35
 1       A.   It would include criminal disqualifications.
 2  It would include national security concerns.   It would
 3  inc- -- or a series of factors that could lead to a
 4  negative discretionary decision.
 5       **Q.   Okay.   So other than the two specific ones you**
 6  **just mentioned, what would some of those other factors**
 7  **be?**
 8       A.   Criminal history that was not disqualifying but
 9  that I would consider serious.
10       **Q.   Okay.   Anything else?**
11       A.   National security concerns, gang -- gang
12  membership.
13       **Q.   Okay.   Anything else?**
14       A.   No.
15       **Q.   All right.   What sort of criminal history that**
16  **wouldn't be disqualifying but may be looked upon**
17  **negatively, what would that include, in your opinion?**
18       A.   Juvenile convictions.   Let's see.   A series,
19  perhaps, of dismissed cases.   It's a -- it's on a
20  case-by-case basis.   So what -- you know, what you're
21  evaluating is the positive and the negative to make that
22  determination.
23       **Q.   Okay.   So have you ever told an applicant that**
24  **he or she should not apply even though that applicant**
25  **met all of the stated criteria in the DACA memorandum?**

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 36
 1                 MS. PERALES:   Objection to the extent that
 2  it calls for privileged information.
 3                 You can answer if you can -- if you can
 4  provide that answer without revealing privileged
 5  information.
 6                 THE WITNESS:   Yeah.
 7       A.   I don't think I can.   And, you know, these were
 8  individual cases.   So I don't think I can provide you
 9  that information because we were counseling clients.
10       **Q.   (BY MR. DISHER)   Okay.   All right.   Fair**
11  **enough.**
12                 **Then the next sentence says, "As an**
13  **attorney, when I learned that potential applicant would**
14  **not meet the eligibility criteria for DACA, I counseled**

15   that individual not to apply."
16            And I'm not asking for specific names or
17   circumstances or individual clients that you may have
18   talked to about that.   I just want to know how many
19   times you may have counseled individuals not to apply
20   because they would not meet the eligibility criteria of
21   DACA?
22     A.   I can't recall the number of times since we saw
23   so many individuals, but we did tell -- I did tell
24   people who did not meet the eligibility guidelines not
25   to apply.

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 37
1     Q.   Okay.   Can you give me any estimate of how many
2   people you told that to?
3     A.   No, I can't.
4     Q.   More than a hundred people?
5     A.   No.
6     Q.   More than 50 people?
7     A.   Yes.
8     Q.   Somewhere between 50 and 100, though?
9     A.   Probably 50, yes.
10     Q.   Okay.   And then the next sentence refers to you
11   also saw some individuals who are not sure that they met
12   the high bar.
13            When you say "some individuals," how many
14   are you referring to here?
15     A.   I would say they were a minority of the
16   applicants that we counseled.   Because most of the
17   people that we saw met the standards.
18     Q.   And when you say "met the standards," you mean
19   the stated criteria in the 2012 memo?
20     A.   That's right.
21     Q.   So when you say "a minority of the people,"
22   again, can you give me an estimate about how many?
23     A.   Twenty.
24     Q.   Okay.
25     A.   Um -- never mind.

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 50
1   and the number listed in there, 3,024, right?
2     A.   Yes.
3     Q.   Okay.   But everything that we've been talking
4   about would apply equally to the denials of the initial
5   DACA applications for Q3, fiscal year 2017, for example?
6     A.   Yes.
7     Q.   That fiscal year 2017, Q3 DACA initial --
8     A.   2017 --
9     Q.   -- denial rate reported here includes denials,

10  **terminations, and withdrawals?**
11      A.   Yes.   For both initial and renewed.
12      **Q.    Yes.   And the same would apply to Q4, July**
13  **through September, of fiscal year 2017?**
14      A.   The 1,014?   Is that what we're talking about
15  here?
16      **Q.    Yes.**
17      A.   Yes.
18      **Q.    That 1,414 includes denials, terminations, and**
19  **withdrawals.**
20      A.   Just make sure.   One moment, please.
21      **Q.    Take your time.**
22      A.   Number of requests that were denied,
23  terminated -- (reading to self).
24              Yes.
25      **Q.    All right.   And you don't know -- for example,**

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)


**Page:** 55
1  adjustment status."
2                When you say "conversations with other
3  immigration lawyers," which other immigration lawyers
4  have you talked to about this?
5      A.   Many.   As people discuss cases.
6      **Q.    How many?**
7      A.   Over the years?
8      **Q.    Okay.**
9      A.   Many.   Fifty.
10      **Q.    Have you looked at data related to**
11  **discretionary applications other than the data we looked**
12  **at related to DACA applications?**
13      A.   Yes, I have.
14      **Q.    Okay.   Which other applications have you looked**
15  **at?**
16      A.   I've looked at the statistics for adjustment
17  status.
18      **Q.    Okay.   Do you remember what the denial rate is**
19  **for those applications?**
20      A.   Less than 10 percent.
21      **Q.    Okay.   Is that information available online?**
22      A.   Yes, it is.
23      **Q.    All right.   On the USCIS website?**
24      A.   Yes.
25      **Q.    All right.   Adjustment of status, what -- is**

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)


**Page:** 55
1  adjustment status."
2                When you say "conversations with other
3  immigration lawyers," which other immigration lawyers
4  have you talked to about this?

5      A.   Many.   As people discuss cases.
6      **Q.   How many?**
7      A.   Over the years?
8      **Q.   Okay.**
9      A.   Many.   Fifty.
10      **Q.   Have you looked at data related to**
11  **discretionary applications other than the data we looked**
12  **at related to DACA applications?**
13      A.   Yes, I have.
14      **Q.   Okay.   Which other applications have you looked**
15  **at?**
16      A.   I've looked at the statistics for adjustment
17  status.
18      **Q.   Okay.   Do you remember what the denial rate is**
19  **for those applications?**
20      A.   Less than 10 percent.
21      **Q.   Okay.   Is that information available online?**
22      A.   Yes, it is.
23      **Q.   All right.   On the USCIS website?**
24      A.   Yes.
25      ==**Q.   All right.   Adjustment of status, what -- is**==

**Page:** 56
1  ==**that just one type of application or is there a --**==
2      ==A.   No.==
3      ==**Q.   -- a category that includes adjustment status**==
4  ==**applications?**==
5      ==A.   Adjustment of status includes adjustment status==
6  ==based on the family preferences.   It includes adjustment==
7  ==of status based on the employment categories.   It==
8  ==includes adjustment status for humanitarian visas.   And==
9  ==then adjustment of status for, you know, odds and ends,==
10  ==other smaller immigration programs.==
11      **Q.   Okay.   And when you say that, "The DACA denial**
12  **rate is consistent with discretionary application such**
13  **as adjustment of status," are you including all of those**
14  **different types of applications in what you're referring**
15  **to here as adjustment status.**
16      A.   No.   I -- the TPS, for example, applications
17  are consistent with DACA and so are the U visas.
18      **Q.   And TPS is?**
19      A.   Temporary protective status.
20      **Q.   Any others that you can think of?**
21      A.   The U visas.
22      **Q.   Yeah.   Right.   TPS and U visas.   Anything else?**
23      A.   No.
24      **Q.   All right.   Now let's go to the next section.**
25  **"Advance parole and adjustment of status to lawful**

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 56
1  that just one type of application or is there a --
2      A.   No.
3      **Q.   -- a category that includes adjustment status**

4  applications?
5       A.   Adjustment of status includes adjustment status
6  based on the family preferences.   It includes adjustment
7  of status based on the employment categories.   It
8  includes adjustment status for humanitarian visas.   And
9  then adjustment of status for, you know, odds and ends,
10  other smaller immigration programs.
11       **Q.   Okay.   And when you say that, "The DACA denial**
12  **rate is consistent with discretionary application such**
13  **as adjustment of status," are you including all of those**
14  **different types of applications in what you're referring**
15  **to here as adjustment status.**
16       A.   No.   I -- the TPS, for example, applications
17  are consistent with DACA and so are the U visas.
18       **Q.   And TPS is?**
19       A.   Temporary protective status.
20       **Q.   Any others that you can think of?**
21       A.   The U visas.
22       **Q.   Yeah.   Right.   TPS and U visas.   Anything else?**
23       A.   No.
24       **Q.   All right.   Now let's go to the next section.**
25  **"Advance parole and adjustment of status to lawful**

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 56
1  that just one type of application or is there a --
2       A.   No.
3       **Q.   -- a category that includes adjustment status**
4  **applications?**
5       A.   Adjustment of status includes adjustment status
6  based on the family preferences.   It includes adjustment
7  of status based on the employment categories.   It
8  includes adjustment status for humanitarian visas.   And
9  then adjustment of status for, you know, odds and ends,
10  other smaller immigration programs.
11       **Q.   Okay.   And when you say that, "The DACA denial**
12  **rate is consistent with discretionary application such**
13  **as adjustment of status," are you including all of those**
14  **different types of applications in what you're referring**
15  **to here as adjustment status.**
16       A.   No.   I -- the TPS, for example, applications
17  are consistent with DACA and so are the U visas.
18       **Q.   And TPS is?**
19       A.   Temporary protective status.
20       **Q.   Any others that you can think of?**
21       A.   The U visas.
22       **Q.   Yeah.   Right.   TPS and U visas.   Anything else?**
23       A.   No.
24       **Q.   All right.   Now let's go to the next section.**
25  **"Advance parole and adjustment of status to lawful**

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 57

1 permanent residents."
2          First I want to ask you specifically about
3 21, 22 -- rather, Paragraphs 21 through 26.
4     A.   Yes.
5     **Q.   All right.   So what methodology did you use to**
6 **draft the opinions reflected in Paragraphs 21 through**
7 **26?**
8     A.   I included my expertise in immigration law, my
9 teaching work, the -- as well as the DHS regulations,
10 the statute, and their own documents.
11    **Q.   Okay.   Anything else?**
12    A.   Reviewing Mr. Palinkas' affidavit.   That's all.
13    **Q.   Okay.   So if we look at Paragraph 22.   At the**
14 **bottom of the page, there's a sentence that begins,**
15 **"Advance parole is available to a wide range of persons**
16 **other than DACA holders."**
17          Do you see that?
18    A.   Yes.
19    **Q.   And then if we flip to the next page, you**
20 **mentioned some of those other persons who advance parole**
21 **is available to, right?**
22    A.   Yes.
23    **Q.   Okay.   And that would include people with**
24 **temporary protected status?**
25    A.   Yes.

**Page:** 58

1     **Q.   People with T visas or U visas?**
2     A.   Yes.
3     **Q.   Okay.   And then what is this -- the next clause**
4 **there, the IMMACT 90 and Life Family Unity**
5 **beneficiaries?**
6     A.   Immigration secret code.   It is -- the LIFE Act
7 was a -- and IMMACT 90 was a program for what was --
8 what were late legalization filers out of the 1986
9 legalization law.
10    **Q.   Okay.   Is that the same thing, IMMACT 90 and**
11 **LIFE Act Family?**
12    A.   I believe it is.
13    **Q.   Okay.   That's one category of persons?**
14    A.   Yes.
15    **Q.   And then temporary resident applications under**
16 **INA Section 254A, right?**
17    A.   Yes.
18    **Q.   Okay.   So I want to talk just briefly about**
19 **each one of these.   So temporary protected status, is**
20 **that -- is that status included in a statute somewhere?**
21    A.   It is.
22          MS. PERALES:   Objection to the form.
23    **Q.   (BY MR. DISHER)   Do you know which statute**
24 **provides for temporary protected status?**
25    A.   Immigration and Nationality Act.

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 72
1               Do you see that sentence?
2      A.   Yes.
3      **Q.   Do you agree with that sentence?**
4      A.   No.
5      ==**Q.   Okay.   Why do you not agree with that sentence?**==
6      ==**A.   Because there are many DACA recipients who may**==
7  ==be eligible under 245I which does not require a lawful==
8  ==entry and other forms of adjustment of status that are==
9  ==available.==
10      **Q.   But in terms of the population who have**
11  **received DACA, you don't know what percentage would be**
12  **eligible for that verse what percentage wouldn't be**
13  **eligible for one of those other programs?**
14      A.   No.
15            MS. PERALES:   Objection, form.
16      **Q.   (BY MR. DISHER)   So it's true, isn't it, then,**
17  **that many DACA recipients originally entered the US**
18  **without inspection?   That's true, right?**
19      A.   I don't have the statistics on what "many"
20  means.
21      **Q.   Okay.   So you have no opinion about whether**
22  **many DACA recipients originally entered the US without**
23  **inspection?**
24      A.   Some DACA recipients entered the United States
25  without inspection.

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 75
1      A.   An explanation?
2      **Q.   (BY MR. DISHER)   No, no, no.   An estimate about**
3  **the overlap of those two potentially qualifying**
4  **populations?**
5      A.   I -- I can tell you that there are many people,
6  many Mexicans who are eligible for 245I because the
7  backlog and the quotas in the Mexican system, but I
8  cannot give you number.
9      **Q.   Okay.**
10      A.   In the Mexican quota system, I mean.
11      **Q.   What about just generally 245I across the**
12  **board?   Can you give me an estimate about how many**
13  **people were to qualify for 245I?**
14      A.   I cannot.
15      **Q.   Okay.   So you see in Paragraph 32, the second**
16  **sentence begins, "According to DHS statistics" --**
17      A.   Yes.
18      ==**Q.   -- "between 2013 and 2015, 4,833 DACA**==
19  ==**recipients adjusted their status to lawful permanent**==
20  ==**residents after obtaining advance parole."**==
21            ==**Can you explain that to me?   What does the**==
22  ==**4,833 number represent?**==
23      ==**A.   The 4,833 represents the statistic on page 8 of**==

24  Exhibit 5.
25        Q.    Table 4A?

**Page:** 76
 1        A.    Yes.   One thing that it does not show is how
 2  many of those DACA applicants actually needed advance
 3  parole to adjust their status because it's pointed out
 4  on little i, on the executive's status, that some
 5  recipients of deferred action under DACA may be eligible
 6  to file for adjustment of status independent of the
 7  grant of advance parole.
 8        Q.    Okay.   So of the 4,833, do you know what
 9  percentage of that could -- that population could have
10  filed for adjustment of status without first obtaining
11  advance parole?
12        A.    I do not.
13        Q.    Okay.   And do you know what percentage of that
14  4,833 number could not have filed for adjustment of
15  status without advance parole?
16        A.    I do not.
17        Q.    Do you have any opinion about whether that
18  4,833 number includes some percentage of DACA recipients
19  who could not have applied for adjustment of status
20  without advance parole?
21        A.    It includes people who could not and people who
22  could have --
23        Q.    Okay.
24        A.    -- applied with or without advance -- advance
25  parole.

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)


**Page:** 77
 1        Q.    Understood.
 2               But you don't know which -- you don't know
 3  the breakdown?   You don't know the percentages?
 4        A.    I do not.
 5        Q.    All right.   And if you ever want to take a
 6  break at any time, just let me know.
 7               MS. PERALES:   I'm looking at the clock.
 8  It's noon.   We did take a short break.   Would this be a
 9  good time --
10               MR. DISHER:   Let's go off the record for a
11  second.
12               THE REPORTER:   Off the record.
13               (Recess taken)
14               THE REPORTER:   We're back on the record.
15        Q.    (BY MR. DISHER)   All right, Ms. Hines, are you
16  ready to proceed?
17        A.    I am.
18        Q.    All right.   Now I want to turn to the section
19  in your declaration on page 13 that's under the heading
20  "Unlawful presence and DACA."   Do you see that?
21        A.    Yes.
22        Q.    Okay.   Here you say, "Periods of time in

23 **deferred action (and not any time before or after such**
24 **periods) have never been considered unlawful presence**
25 **for the purpose of INA Section 212(a)(9)."**

**Page:** 78
1                    **Do you see that?**
2      A.   Yes, I do.
3      **Q.   Okay.   Just explain to me what -- what does**
4 **that mean?**
5      A.   Unlawful presence is a provision in the
6 immigration law.   It's a ground of inadmissibility and
7 it is calculated by time you've spent in the United
8 States in unlawful presence.   The term "unlawful
9 presence" appears in Section 212(a)(9).
10     **Q.   Okay.   Does deferred action toll the running of**
11 **the unlawful presence clock?**
12     A.   Yes, it does.
13     **Q.   All right.   And does DACA specifically toll the**
14 **presence of the unlawful -- excuse me.   Let me -- I**
15 **miss- -- misspoke there.**
16                    **Does DACA specifically toll the running of**
17 **the unlawful presence clock?**
18     A.   No.
19     **Q.   Okay.   And why not?**
20     A.   Because it's the deferred action that tolls it.
21     **Q.   Okay.   But DACA is a type of deferred action,**
22 **right?**
23     A.   Yes.
24     **Q.   So if somebody is granted DACA, then the period**
25 **of time that that person has DACA does not count towards**

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 78
1                    Do you see that?
2      A.   Yes, I do.
3      **Q.   Okay.   Just explain to me what -- what does**
4 **that mean?**
5      A.   Unlawful presence is a provision in the
6 immigration law.   It's a ground of inadmissibility and
7 it is calculated by time you've spent in the United
8 States in unlawful presence.   The term "unlawful
9 presence" appears in Section 212(a)(9).
10     **Q.   Okay.   Does deferred action toll the running of**
11 **the unlawful presence clock?**
12     A.   Yes, it does.
13     **Q.   All right.   And does DACA specifically toll the**
14 **presence of the unlawful -- excuse me.   Let me -- I**
15 **miss- -- misspoke there.**
16                    **Does DACA specifically toll the running of**
17 **the unlawful presence clock?**
18     A.   No.
19     **Q.   Okay.   And why not?**
20     A.   Because it's the deferred action that tolls it.
21     **Q.   Okay.   But DACA is a type of deferred action,**

22 **right?**
23      A.   Yes.
24      **Q.    So if somebody is granted DACA, then the period**
25 **of time that that person has DACA does not count towards**

**Page: 79**
 1 **that person's unlawful presence?**
 2      **A.   Yes.**
 3      Q.    Okay.   So, then, the next section is titled,
 4 "Leaving the US if DACA is canceled"?
 5      A.   Yes.
 6      Q.    Okay.   What methodology did you use to form the
 7 opinions expressed in this section?
 8      A.    That is based on my expertise and my years of
 9 working with the DACA population, with -- with, I guess,
10 documents that I've read in order to teach, but
11 primarily from working with this population.
12      Q.    Okay.   The second -- third sentence says,
13 "Almost none of the them considered or made the decision
14 to leave the United States."
15           Do you see that?
16      A.   Yes, I do.
17      Q.    All right.   And what is that sentence based on?
18      A.    That's based on the fact that I have worked
19 with the population before they had DACA and they did
20 not -- and the -- the people that I counseled that were
21 undocumented, subsequently DACA, none of them were
22 making plans to leave the United States.
23      Q.    Okay.   And about how big of a group of people
24 **is that?**
25      A.   Is what?

📄 Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page: 79**
 1 that person's unlawful presence?
 2      A.   Yes.
 3      Q.    Okay.   So, then, the next section is titled,
 4 "Leaving the US if DACA is canceled"?
 5      A.   Yes.
 6      Q.    Okay.   What methodology did you use to form the
 7 opinions expressed in this section?
 8      A.    That is based on my expertise and my years of
 9 working with the DACA population, with -- with, I guess,
10 documents that I've read in order to teach, but
11 primarily from working with this population.
12      **Q.    Okay.   The second -- third sentence says,**
13 **"Almost none of the them considered or made the decision**
14 **to leave the United States."**
15           **Do you see that?**
16      **A.   Yes, I do.**
17      **Q.    All right.   And what is that sentence based on?**
18      **A.    That's based on the fact that I have worked**
19 **with the population before they had DACA and they did**
20 **not -- and the -- the people that I counseled that were**

21  undocumented, subsequently DACA, none of them were
22  making plans to leave the United States.
23      Q.   Okay.   And about how big of a group of people
24  is that?
25      A.   Is what?

Jun 26, 2018 Hines, Barbara (6_26_2018)

**Page:** 83
1  when you talk about "scholarly research demonstrates,"
2  are these the four studies that you're referring to when
3  you say "scholarly research demonstrates"?
4      A.   Yes.
5      **Q.   Okay.   Are there any other studies that you're**
6  **referring to when you say "scholarly research**
7  **demonstrates" in Paragraph 48?**
8      A.   There is more literature out there.
9      **Q.   Uh-huh.**
10     A.   There is a wealth of literature that
11  demonstrates that the Central American children are
12  fleeing because of violence.   There are many more.   And
13  there are many more that I have read.
14     **Q.   Okay.   So why did you just choose these four?**
15     A.   Because these were recent, because these were
16  the ones that I was looking at immediately, but I've
17  read many other articles of this nature.
18     **Q.   Okay.   Do you know Tom Wong?**
19     A.   Personally?
20     **Q.   Yes.**
21     A.   No.
22     **Q.   Have you ever worked with him before?**
23     A.   No.
24     **Q.   And that actually reminds me, I forgot to ask**
25  you this earlier.   Have you worked as an expert for

Barbara Hines

June 26, 2018
Page 94

1

2

3

4

5

6

7

8          I declare under penalty of perjury that the

9     foregoing is true and correct.

10

11

12                    BARBARA HINES

13

14

15          SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned

16     authority, by the witness, BARBARA HINES, on this the

17     _13th_ day of _____July_____, _2018_.

18

19

20                    NOTARY PUBLIC IN AND FOR

21                    THE STATE OF _Texas_

22

23     My Commission Expires: _11-01-19_

24

25

| Page | Line | Change | Reason |
|------|------|--------|--------|
| P. 12 | 7 | Advance to Advanced | Transcription |
| P. 14 | 3 and 4 | recision to rescission | Transcription |
| P. 20 | 25 | regulation to legislation | Transcription |
| P. 32 | | for to forms | Transcription |
| P. 43 | 4 and 5 | initials approved and denied to initial approvals and denials | Transcription |
| P. 72 | 7 | 245I to 245(i) | Correct citation |
| P. 73 | 20 | 245I to 245(i) | Correct citation |
| P. 74 | 12 | 245I to 245(i) | Correct citation |
| | 14 | 245I to 245(i) | Correct citation |
| | 18 | 245I to 245(i) | Correct citation |
| | 23 | 245I to 245(i) | Correct citation |
| P. 75 | 6 | 245I to 245(i) | Correct citation |
| | 11 | 245I to 245(i) | Correct citation |
| | 13 | 245I to 245(i) | Correct citation |
| P. 76 | 4 | executive's status to executive summary | Transcription |

1  STATE OF TEXAS
   COUNTY OF HARRIS
2                        REPORTER'S CERTIFICATE

3       I, Dana Richardson, a Certified Shorthand Reporter

4  in and for the State of Texas, do certify that this

5  deposition transcript is a true record of the testimony

6  given by the witness named herein, after said witness

7  was duly sworn by me.  The witness was requested to

8  review the deposition.

9       I further certify that I am neither attorney or

10 counsel for, related to, nor employed by any parties to

11 the action in which this testimony is taken and,

12 further, that I am not a relative or employee of any

13 counsel employed by the parties hereto or financially

14 interested in the action.

15      I further certify that the amount of time used by
   each party at the deposition is as follows:
16
           Mr. Todd Lawrence Disher - 02:09
17         Mr. Daniel Hu - 00:01

18      SUBSCRIBED AND SWORN TO under my hand and seal of
   office on this the 27th day of June, 2018.
19

20  _____

21           Dana Richardson, RPR, TX CSR 5386
             Expiration:  12/31/19
22           Kim Tindall & Associates, LLC, Firm No. 631
             16414 San Pedro, Suite 900
23           San Antonio, Texas 78232
             Phone (210) 697-3400
24           Fax (210) 697-3408

25

# DEF-INTERV.

# EX. 143

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,           )
        Plaintiffs,               )
                                  )
VS.                               )
                                  )
UNITED STATES OF AMERICA, et al.,)   Case No. 1:18-CV-68
        Defendants,               )
                                  )
and                               )
                                  )
KARLA PEREZ, et al.,              )
                                  )
        Defendant-Intervenors.    )

***********************************************

ORAL DEPOSITION OF
LLOYD POTTER, Ph.D.
JUNE 27, 2018

***********************************************

        ORAL DEPOSITION OF LLOYD POTTER, Ph.D., produced as
a witness at the instance of the Defendant-Intervenors,
and duly sworn, was taken in the above-styled and
numbered cause on the 27th of June, 2018, from 9:59 a.m.
to 1:46 p.m., before Kathleen Casey Collins, CSR, in and
for the State of Texas, reported by machine shorthand,
at the Offices of the Attorney General, 301 West
Fifteenth Street, Seventh Floor, Austin, Travis County,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

**For Depo Excerpts**

**Transcripts**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 4**

1                      LLOYD POTTER, Ph.D.
2  having being first duly sworn, testified as follows:
3                      EXAMINATION
4  BY MS. PERALES:
5      **Q.   Good morning.**
6      A.   Good morning.
7      **Q.   Please state your name for the record, please.**
8      A.   Lloyd Potter.
9      **Q.   And you are Dr. Potter.  Correct?**
10     A.   Yes.
11     Q.   All right.  That's what I'm going to call you
12  today.
13     A.   Okay.
14     Q.   My name is Nina Perales.  I represent the
15  defendant-intervenors in this case, who are
16  22 recipients of Deferred Action for Childhood Arrivals.
17              Will it be okay with you if I refer to
18  Deferred Action for Childhood Arrivals as DACA?
19     A.   Yes.
20     Q.   Have you ever had your deposition taken
21  before?
22     A.   No.
23     Q.   Because you haven't had your deposition taken,
24  I'll cover some of the rules of the road with you.
25  They're pretty simple.

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 11**

1  servant within the Centers for Disease Control and
2  Prevention in the Center for Injury Prevention and
3  Control.
4      **Q.   And that was located in Atlanta?**
5      A.   Yes.
6      **Q.   Prior to -- okay.  And what was the focus of**
7  **your work from 1993 to 1995?**
8      A.   It was doing research on injury and violence
9  prevention.  More specifically, I was focused on
10  research related to suicide prevention and then also
11  managed some of the grants and contracts work that CDC
12  was supporting.
13     Q.   In your work on suicide prevention, was it
14  suicide prevention in the general population or with
15  respect to any specific subpopulation?
16     A.   Well, it varied so -- but, generally, the
17  general population.
18     Q.   Okay.  And then did you remain with the CDC

19  **from 1995 to 2000 as a full-time employee?**
20      A.   Yes.
21      **Q.   Okay.  And tell me what your work generally**
22  **focused on from 1995 to 2000.**
23      A.  I think at that point I had been promoted to
24  the equivalent of a branch chief then and managed the
25  youth violence and suicide prevention activities at the


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 11**
 1  servant within the Centers for Disease Control and
 2  Prevention in the Center for Injury Prevention and
 3  Control.
 4      **Q.   And that was located in Atlanta?**
 5      A.   Yes.
 6      **Q.   Prior to -- okay.  And what was the focus of**
 7  **your work from 1993 to 1995?**
 8      A.   It was doing research on injury and violence
 9  prevention.  More specifically, I was focused on
10  research related to suicide prevention and then also
11  managed some of the grants and contracts work that CDC
12  was supporting.
13      **Q.   In your work on suicide prevention, was it**
14  **suicide prevention in the general population or with**
15  **respect to any specific subpopulation?**
16      A.   Well, it varied so -- but, generally, the
17  general population.
18      **Q.   Okay.  And then did you remain with the CDC**
19  **from 1995 to 2000 as a full-time employee?**
20      A.   Yes.
21      **Q.   Okay.  And tell me what your work generally**
22  **focused on from 1995 to 2000.**
23      A.  I think at that point I had been promoted to
24  the equivalent of a branch chief then and managed the
25  youth violence and suicide prevention activities at the
**Page: 12**
 1  Centers for Disease Control.
 2      **Q.   And the youth violence and suicide prevention**
 3  **activities, would that be a focus on youth suicide**
 4  **prevention?**
 5      A.   Yes.
 6      **Q.   Okay.**
 7      A.   Oh, no, no, no, not youth.  Youth violence,
 8  and the suicide was broad across age.
 9      **Q.   And was your work there then research or grant**
10  **making or grant oversight, or can you give me a sense of**
11  **what you were doing there from '95?**
12      A.   It was all of those things.  So I was
13  conducting research and then also writing requests for
14  proposals and review -- I didn't review but taking
15  reviews of applications, making funding decisions, and
16  then managing the grants after we funded them.
17      **Q.   It looks like you did some traveling while you**
18  **were with CDC and that you were detailed to Hanoi,**
19  **Vietnam --**

20   A.  Yes.
21   **Q.  -- and Massachusetts?**
22   A.  Yes.
23       **Q.  Okay.  And when you were doing the Field**
24  **Epidemiology Training Program in Taiwan, was that part**
25  **of the CDC?**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 15**
1  when you were with the Education Development Center?
2      A.  Yes.  I was still publishing then and was
3  doing -- I was conducting research and publishing it.
4      **Q.  All right.  And would it be fair to say that**
5  **the focus of your research and publication from 2000 to**
6  **2008 was on the prevention of injury, violence, and**
7  **suicide?**
8      A.  That was -- yeah.  I would say that was the
9  bulk of the work that I was doing.
10      **Q.  Okay.  What drew you to the work of injury and**
11  **violence prevention and suicide prevention?**
12      A.  There were probably a few things.  One, the
13  work I did on my dissertation was looking at racial
14  differences and life expectancy by cause of death; and
15  homicide is by and far the largest contributor to the
16  differential between African-Americans and non-Hispanic
17  whites, and so that led me to gain interest in public
18  health and prevention.  And so -- so, anyway, I ended up
19  going and studying public health and then moving into
20  the injury-prevention field, specifically in violence
21  prevention.
22              And then they -- the CDC needed somebody
23  to work on suicide prevention, and so I started doing
24  that and took over their -- initially took over their
25  portfolio with suicide prevention research and programs.

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 20**
1      A.  Yes.
2      **Q.  Would you say that you are an expert in youth**
3  **violence prevention?**
4      A.  Yes.  I'm not as current on that in the last
5  nine years as I was previously, but yes.  I keep up with
6  it, but I don't -- I'm not active in youth violence
7  prevention research any longer.
8      **Q.  And with respect to suicide prevention, would**
9  **you describe yourself as an expert?**
10      A.  It's similar to the youth violence.  I keep up
11  with it.  I read articles and so on on it.  But I'm not
12  doing -- actively doing research in suicide prevention
13  for the last eight years or so.
14      **Q.  Are you actively doing research right now on**
15  **any topic in demography?**

16    A.  Yes.
17    **Q.  What is that topic?**
18    A.  Well, one, we produce the population estimates
and projections for the state.  So there is applied
research to be done in the production of those
population estimates and projections, which involve
doing research into fertility, mortality, and migration,
which are the components of population change; and
having an understanding of those components and how they
act and behave within the Texas population are key

**Page: 21**

 1    elements to -- and having done research and
 2    understanding what's happening with that are key
 3    elements to us producing accurate population estimates
 4    and projections.
 5    **Q.  Would you say that today you are an expert in**
 6    **the subfield of demography that produces population**
 7    **estimates?**
 8    A.  Yes.
 9    **Q.  Okay.  When I'm quiet, I'm crossing off**
10    **questions --**
11    A.  Okay.
12    **Q.  -- because we've covered a lot.**
13    **When you teach demographic methods, do**
14    **you teach the methods that are used at your center to**
15    **make population estimates?**
16    A.  That's a component of the methods that we
17    teach, yes -- or that I teach.
18    **Q.  When your center makes population estimates**
19    **for Texas, what are the databases that you typically**
20    **rely upon?**
21    A.  For population estimates, there's quite a few.
22    So we receive vital statistics from the State department
23    of -- Department of State Health Services.  We conduct
24    surveys of a number of different entities.  So we survey
25    cities to get information on -- and counties on building

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 22**

 1    permits.  We have data from the Texas Education Agency
 2    on school enrollment.
 3    I'm trying to think what else.  Those are
 4    probably some of the major sources of data that we use.
 5    **Q.  How about data from the U.S. census?**
 6    A.  For our estimates, the census is the base of
 7    that, and so the decennial census is the foundation that
 8    we build off of.
 9    And then the Census Bureau also produces
10    population estimates, and we'll use those to examine our
11    estimates to see if they're in the ballpark; and if
12    they're not, then we do research to figure out if
13    they're wrong or if we're wrong and then to adjust them
14    if we are.
15    **Q.  Is it correct to say that sometimes you look**
16    **at the U.S. Census American Community Survey data?**

17    A.   Yes.  I frequently -- for -- for production --
18  not for actual production of the estimates; but we do
19  use the American Community Survey to identify certain
20  indicators that give us some sense of our level of
21  accuracy.
22    **Q.   Does your center provide estimates of the**
23  **undocumented or unauthorized population in Texas?**
24    A.   We do not currently do that.  We tend to rely
25  on the Pew Research Center estimates and then the

**Page:** 23

1  Department of Homeland Security estimates.  I mean,
2  those are the ones that we'll point to, and they tend to
3  be pretty close to each other.
4    **Q.   What are some of the methodological challenges**
5  **associated with estimating the unauthorized population**
6  **in Texas?**
7    A.   Well, one is you have to use an indirect
8  method because there's no source of directly asking --
9  identifying unauthorized immigrants and asking them
10  their status; and even if somebody did do that, I think
11  there would be some question as to the accuracy of
12  reporting.  And so essentially the methodology relies on
13  indicators of things that would be associated with being
14  undocumented.
15    **Q.   And so, for example, data regarding people who**
16  **are noncitizens is potentially associated with**
17  **undocumented.  Is that right?**
18        MR. DISHER:  Objection, vague.
19    A.   Yes.  The -- the methodology that is used by
20  the Pew Research Center identifies people who respond to
21  the American Community Survey as noncitizens and other
22  characteristics that they have in terms of assessing a
23  probability of them being undocumented immigrants.
24    **Q.   Are you familiar with any of the disclaimers**
25  **that the Pew center provides with its estimates of**

**Page:** 24

1  **undocumented population, for example, for Texas?**
2    A.   Yes, I am.
3    **Q.   What are some of those disclaimers?**
4    A.   Well, basically, what we've just talked about.
5  It's that it's an indirect method.  They produce a
6  margin of error now with their estimates, meaning they
7  think it falls within -- they're, like, 95 percent sure
8  the estimate falls within this range.  So they're --
9  they acknowledge that their estimates are that,
10  estimates, and they're not a count and that there is
11  some error associated with their estimates.
12    Q.   Do you have any other areas of research aside
13  from the area that you described earlier related to
14  creating population estimates through the center?
15    A.   Yes.
16    Q.   Can you tell me about those?
17    A.   So we also, similarly to the estimates, do
18  that same -- similar things for projections; and in
19  there the -- a lot of the work is looking at trends and
20  trying to anticipate what is likely to happen going
21  forward in terms of fertility, mortality, and migration.
22        And then there -- we have a contract with
23  the Texas Department of Transportation; and we produce

24   demographic data for -- largely for metropolitan
25   planning organizations who are doing transportation

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 28**

1        **Q.   Have you ever delivered a talk or presented a**
2   **report about the number of immigrants coming to Texas**
3   **decreasing after the great recession?**
4        A.   Not specifically.  What we have observed is --
5   and a lot of this -- and, now, this comes from the Pew
6   Research Center.  After the recession, there was a --
7   they detected and reported a decline in immigrants
8   coming from Mexico, and there were some reports on
9   return migration to Mexico following the recession and
10  then, also, reductions in unauthorized immigration as
11  well from Mexico.
12              There are -- in terms of the overall
13  immigration into Texas or the United States, there's --
14  at least in Texas, there's been a shift along with this
15  timing toward immigrants from Asian countries.  So -- so
16  we in Texas have seen a decline in the overall
17  percentage of immigrants coming both -- well, I'll say
18  immigrants coming from Mexico, Central America, and
19  South America and an increase in the number and percent
20  coming from, in particular, China and India but other
21  Asian countries as well.
22       **Q.   And are those observations based on data**
23  **generated by the Pew Research Center?**
24       A.   The trends that I was just referring to come
25  from the American Community Survey.  So reports when

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 31**

1   this -- I probably have articulated speculation that --
2   that it probably has to do with a lack of employment
3   opportunity within the United States, and so the
4   migrants are kind of not able to work here and so
5   they're returning home.
6        **Q.   And when you talk about that lack of**
7   **employment opportunity, is that associated with the**
8   **economic decline after --**
9        A.   Right.
10       **Q.   -- 2008?**
11       A.   So it would have been, yeah, post the
12  recession or kind of as the recession was really picking
13  up.
14              There were reports that immigrants, both
15  authorized and unauthorized, were returning to their
16  country of origin because they were losing -- again, the
17  reports were more speculative in terms of why they were
18  going.  I haven't seen anything that says we know that
19  this is the reason that they were leaving.

20    Q.   Okay.  You anticipated my next question, which
21 is is it correct to say that neither you nor your center
22 have done research on the reasons why individuals might
23 leave Texas and return to their home countries?
24         MR. DISHER:  Objection, vague.
25    A.   Yes, that's fair.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 32**
1    Q.   Okay.  In your center's work, have you noticed
2 an uptick in the most recent data in individuals coming
3 to Texas from Mexico?
4         MR. DISHER:  Objection, vague.
5    A.   I -- I'm not -- I'm not aware of that.  I've
6 not seen that.
7    Q.   And did your center or did your personal
8 research track trends in migration from Central America
9 to Texas let's say over the past five years?
10    A.   Not specifically, no.
11    Q.   Okay.  Have you presented in your public
12 presentations any analysis of arrivals of individuals
13 from Central America to Texas in the past five years?
14         MR. DISHER:  Objection, vague.
15    A.   Again, I think from the American Community
16 Survey.  I was trying to think if we break that out by
17 country of origin.  I know we do Mexico and other
18 countries, but I can't think specifically about if we --
19 if I have that specific for specific Central American
20 countries or South American countries.
21    Q.   Would it be fair to say then that your center
22 and you haven't personally done any analysis of the
23 increase in migration from Central America, sometimes
24 referred to as "the surge" in 2014?
25    A.   Yes.  We've not done any research into that.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 33**
1    Q.   Okay.  Would you say that you have a research
2 specialization in immigrant populations?
3         MR. DISHER:  Objection, vague.
4    A.   Yeah.  I don't know if I would say I have a
5 specialization.  I have pretty deep familiarity with it.
6 But I wouldn't say if -- if what's your -- if somebody
7 asks me what my area of research is, I wouldn't say I'm
8 an immigrant specialist.
9    Q.   Okay.  Do you have a research specialization
10 in the factors that lead to either legal or illegal
11 immigration to the United States?
12    A.   No.
13    Q.   Does your -- does your -- I'm sorry.  I want
14 to get the words right.
15         Does your institute conduct research

16 **specifically on unauthorized immigrants living in Texas?**
17    A.  We have.
18    **Q.  When was that?**
19    A.  Probably about five or six years ago.
20    **Q.  And what was that research?**
21    A.  We had attempted to estimate the geographic
22 distribution of the unauthorized immigrant population in
23 the state.
24    **Q.  Did you end up publishing those results?**
25    A.  No.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 33**
1    **Q.  Okay.  Would you say that you have a research**
2 **specialization in immigrant populations?**
3         MR. DISHER:  Objection, vague.
4    A.  Yeah.  I don't know if I would say I have a
5 specialization.  I have pretty deep familiarity with it.
6 But I wouldn't say if -- if what's your -- if somebody
7 asks me what my area of research is, I wouldn't say I'm
8 an immigrant specialist.
9    **Q.  Okay.  Do you have a research specialization**
10 **in the factors that lead to either legal or illegal**
11 **immigration to the United States?**
12    A.  No.
13    **Q.  Does your -- does your -- I'm sorry.  I want**
14 **to get the words right.**
15         **Does your institute conduct research**
16 **specifically on unauthorized immigrants living in Texas?**
17    **A.  We have.**
18    **Q.  When was that?**
19    **A.  Probably about five or six years ago.**
20    **Q.  And what was that research?**
21    **A.  We had attempted to estimate the geographic**
22 **distribution of the unauthorized immigrant population in**
23 **the state.**
24    **Q.  Did you end up publishing those results?**
25    **A.  No.**
**Page: 34**
1    **Q.  Was it because you weren't able to get sort of**
2 **confidence results?**
3    **A.  We attempted to publish them.  The methodology**
4 **that we had employed was questioned by one of the**
5 **reviewers, and the staff member that we had working on**
6 **this left and we never followed through and addressed**
7 **the -- it was doable, but we just didn't.  We weren't**
8 **able to address it.**
9    **Q.  Have either you or your institute ever**
10 **conducted research on the reasons that immigrants come**
11 **to or leave the United States, and specifically**
12 **undocumented immigrants?**
13         **MR. DISHER:  Objection, vague.**
14    **A.  No.**
15    Q.  Let's turn to your declaration, which is
16 Exhibit 3.

17   A.   Okay.
18       **Q.   I think we can put your CV aside for the**
19   **moment; although, I could ask you questions about it all**
20   **day because I think it's absolutely fascinating.  I'm**
21   **mindful of Andrew's airplane flight, and so let's turn**
22   **to your declaration.**
23           **Can you summarize for me the specific**
24   **opinions that you offer in your declaration?**
25       A.   Let's see.  I think probably one is that

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 35
1   there's pretty strong evidence that the bulk of
2   migration behavior, especially distance migration
3   behavior, is economically and specifically work
4   associated.
5           And -- and then probably the other
6   summary point would be that if DACA participants were
7   unable to work, some number and/or percentage of them
8   would likely leave the United States and return to their
9   country of origin or another country where they may be
10   able to work.
11       **Q.   Okay.  Do you offer any other opinions in the**
12   **report besides the two that you've given to me?**
13       A.   Well, I think I do articulate some of the
14   characteristics that I think we could anticipate would
15   be associated with the propensity for an immigrant to
16   return to their country of origin.
17       **Q.   Would it be fair to say that with your -- with**
18   **respect to your opinion about DACA participants**
19   **returning because of work-related reasons that that**
20   **opinion does not distinguish DACA recipients from other**
21   **unauthorized workers who might lose their employment?**
22           MR. DISHER:  Objection, vague.
23   Objection, misstates the testimony.
24           Go ahead and answer.
25       A.   Yeah.  I think there probably is a distinction

**Page:** 36
1   between the two that could be made.
2       **Q.   Okay.  And so specifically with respect to**
3   **return migration because of employment reasons, which is**
4   **what I understand your opinion about DACA recipients is,**
5   **tell me how your opinion would differentiate, if it**
6   **does, between a DACA recipient making the decision to**
7   **return and migrate versus a plain-old undocumented**
8   **person.**
9           MR. DISHER:  Objection, vague.
10       A.   I think a DACA participant has a -- currently
11   has a different status than an unauthorized immigrant;
12   and so a DACA participant probably has -- has other
13   motivations to potentially -- different -- different
14   sets of motivations than an unauthorized immigrant.
15       **Q.   I understand.  And so specifically with**
16   **respect to work-related reasons -- because I know that**
17   **people's motivations can really vary quite a bit.  So**

18 **let me ask you whether your opinion regarding the**
19 **likelihood of an individual to leave Texas upon losing**
20 **DACA and work authorization is similar to the likelihood**
21 **of an unauthorized person who is not somebody who just**
22 **lost DACA?**
23        MR. DISHER:  Objection, vague.  Go ahead.
24     A.  So the -- I think you had, like, two -- two
25 things about DACA.  Was there something about losing --


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 39
1     A.  Uh-huh.
2     **Q.   Do you understand that the loss of permission**
3 **to work would apply to working as an employee of a**
4 **company?**
5        MR. DISHER:  Objection, vague.
6     A.  Say that one more time.
7     **Q.   Do you understand that loss of permission to**
8 **work in the U.S. would mean loss of permission to work**
9 **as an employee for a company or a government?**
10        MR. DISHER:  Same objection.
11     A.  In the United States?
12     **Q.  Yes.**
13     A.  Yes.  Okay.
14     **Q.   Okay.  Do you understand whether loss of**
15 **permission to work in the U.S. would extend to working**
16 **as an independent consultant?**
17        MR. DISHER:  Objection, vague and to the
18 extent it calls a legal conclusion.
19        Other than that, go ahead.
20     A.  I would assume that it would mean work any
21 kind of work.
22     **Q.   And so it would also mean loss of permission**
23 **to work as an independent consultant.  Is that right?**
24     A.  I --
25        MR. DISHER:  Same objections.
**Page:** 40

1     A.  I think I would assume that, yes.
2     **Q.   Okay.  Would it also -- would loss of**
3 **permission to work in the U.S. in your mind also mean**
4 **loss of permission to mow lawns for money?**
5        MR. DISHER:  Objection, calls for
6 speculation.  Objection to the extent it calls for a
7 legal conclusion.
8        Go ahead again.
9     A.  Yes.  I would think, yes, that basically
10 working and receiving compensation for work would be
11 part of losing permission to work.
12     **Q.   Would your opinion regarding the likelihood of**
13 **return migration of DACA recipients change if the loss**
14 **of permission to work for them only extended to work as**
15 **employees and did not cover self-employed or independent**
16 **contractor work?**
17        MR. DISHER:  Objection, speculation.
18 Objection to the extent it calls for a legal conclusion.

19          Other than that, go ahead and answer.
20      A.  I think if -- I think probably if DACA
21  participants were denied -- so they continue to have
22  legal status and they were denied permission to work but
23  that they could go out and mow lawns and bring in some
24  revenue, that probably would reduce the number of DACA
25  participants that might return to their country of


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 40**
1      A.  I think I would assume that, yes.
2      Q.  Okay.  Would it also -- would loss of
3  permission to work in the U.S. in your mind also mean
4  loss of permission to mow lawns for money?
5          MR. DISHER:  Objection, calls for
6  speculation.  Objection to the extent it calls for a
7  legal conclusion.
8          Go ahead again.
9      A.  Yes.  I would think, yes, that basically
10  working and receiving compensation for work would be
11  part of losing permission to work.
12      Q.  Would your opinion regarding the likelihood of
13  return migration of DACA recipients change if the loss
14  of permission to work for them only extended to work as
15  employees and did not cover self-employed or independent
16  contractor work?
17          MR. DISHER:  Objection, speculation.
18  Objection to the extent it calls for a legal conclusion.
19          Other than that, go ahead and answer.
20      A.  I think if -- I think probably if DACA
21  participants were denied -- so they continue to have
22  legal status and they were denied permission to work but
23  that they could go out and mow lawns and bring in some
24  revenue, that probably would reduce the number of DACA
25  participants that might return to their country of
**Page: 41**
1  origin or another country.
2      Q.  Would it also be fair to say that the number
3  of DACA recipients likely to return to their home
4  country would be reduced if DACA recipients, in addition
5  to mowing lawns and making monies, could open their own
6  business and generate income either through being an
7  accountant or a restaurant owner?
8          MR. DISHER:  Same objections.
9      A.  Yes.
10      Q.  Okay.  I'm going to circle back around to my
11  original question, which I asked poorly because we
12  didn't have a common understanding of the loss of
13  permission to work.
14          So when we talk about DACA recipients
15  losing permission to work and their likelihood of
16  returning to their home country, in your opinion, does
17  the DACA recipient at that point stand in similar shoes
18  to an unauthorized immigrant who also does not have
19  permission to work, at least with respect to their

20 **employment opportunities?**
21          MR. DISHER:  Objection, speculation.
22 Objection, calls for a legal conclusion.
23          Go ahead and answer if you can.
24     A.  I'm not sure I followed you.
25     **Q.  Okay.**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 44**
1 DACA but is -- has lost permission to work, would those
2 two employment applicants be similarly situated?
3          MR. DISHER:  Objection, calls for
4 speculation.  Objection to the extent it calls for a
5 legal conclusion.
6     A.  I would think so, yes.
7     **Q.  So would it be fair to say then that -- that**
8 **your declaration does not posit that DACA recipients who**
9 **lose their permission to work are any more likely to**
10 **return to their home country than an unauthorized person**
11 **living in Texas?**
12          MR. DISHER:  Objection, vague.
13     A.  Yeah.  I don't -- I don't think I could state
14 that.  No, I don't think so.
15     **Q.  When you say "I can't state that," do you mean**
16 **that your report does not take a position on that, or is**
17 **that I asked a question that was so confusing you**
18 **couldn't answer it?**
19     A.  Probably a little bit of -- well, certainly
20 the latter.
21     **Q.  Okay.  Okay.  There's a little bit of a double**
22 **negative there, unfortunately, because of the way I have**
23 **to ask the question; but let me ask it a little bit more**
24 **in the positive sense.**
25          **Does your declaration opine that a DACA**
**Page: 45**

1 **recipient who loses permission to work is more likely to**
2 **return to their home country than an unauthorized**
3 **immigrant living in Texas who is similarly not --**
4 **doesn't have permission to work?**
5     A.  The -- is this -- my testimony or -- what's
6 the thing called, the --
7     **Q.  Your testimony.**
8     A.  It does not address the issue of -- and so I'm
9 not making a comparison between the two.
10     **Q.  All right.  So then is it fair to say that**
11 **your report or your declaration does not posit that DACA**
12 **recipients who lose permission to work are any more or**
13 **less likely to return to their home country than an**
14 **unauthorized person in Texas?**
15     A.  It doesn't make a comparison between the two.
16          MR. DISHER:  Let's take a five-minute
17 break.
18          MS. PERALES:  Absolutely.  Absolutely.
19          (RECESS TAKEN)
20     **Q.  (BY MS. PERALES) Dr. Potter, we've taken a**

21 **short break and now we're back together again.  Over the**
22 **break, we've discussed a little bit about this case**
23 **among all of the lawyers, and you've been here for that.**
24 **         So I'd like to start with a question of**
25 **whether you understand that the relief that Texas and**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 45
1 recipient who loses permission to work is more likely to
2 return to their home country than an unauthorized
3 immigrant living in Texas who is similarly not --
4 doesn't have permission to work?
5     A.  The -- is this -- my testimony or -- what's
6 the thing called, the --
7     **Q.  Your testimony.**
8     A.  It does not address the issue of -- and so I'm
9 not making a comparison between the two.
10     **Q.  All right.  So then is it fair to say that**
11 **your report or your declaration does not posit that DACA**
12 **recipients who lose permission to work are any more or**
13 **less likely to return to their home country than an**
14 **unauthorized person in Texas?**
15     A.  It doesn't make a comparison between the two.
16         MR. DISHER:  Let's take a five-minute
17 break.
18         MS. PERALES:  Absolutely.  Absolutely.
19         (RECESS TAKEN)
20     **Q.  (BY MS. PERALES) Dr. Potter, we've taken a**
21 **short break and now we're back together again.  Over the**
22 **break, we've discussed a little bit about this case**
23 **among all of the lawyers, and you've been here for that.**
24 **         So I'd like to start with a question of**
25 **whether you understand that the relief that Texas and**

**Page:** 46
1 **the other plaintiff states are seeking in this case is**
2 **an end to the DACA initiative?**
3     A.  I do understand that now.
4     **Q.  Okay.  And as you stated earlier, your**
5 **understanding is that if an individual were to lose**
6 **DACA, that individual would lose permission to work in**
7 **the U.S.?**
8     A.  Yes.
9     **Q.  Okay.  And our understanding is now the same**
10 **on that.**
11 **         Would it be correct to say that in your**
12 **report you do not offer the opinion that there will be a**
13 **positive effect on the size of the unauthorized**
14 **immigrant population in Texas because of DACA?**
15         MR. DISHER:  Objection, vague.
16     A.  Could you state that one more time?
17     **Q.  Yes.  Would it be correct to say that you do**
18 **not offer the opinion in your declaration that there is**
19 **a positive effect on the size of the unauthorized**
20 **immigrant population in Texas because of DACA?**
21         MR. DISHER:  Same objection.

22    A.  Yeah.  I don't -- I don't address that in it.
23       **Q.  Would it be correct to say that you do not**
24 **offer the opinion in your declaration that DACA creates**
25 **net negative effects on the Texas economy?**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 46**
 1 the other plaintiff states are seeking in this case is
 2 an end to the DACA initiative?
 3    A.  I do understand that now.
 4       **Q.  Okay.  And as you stated earlier, your**
 5 **understanding is that if an individual were to lose**
 6 **DACA, that individual would lose permission to work in**
 7 **the U.S.?**
 8    A.  Yes.
 9       **Q.  Okay.  And our understanding is now the same**
10 **on that.**
11          Would it be correct to say that in your
12 report you do not offer the opinion that there will be a
13 positive effect on the size of the unauthorized
14 immigrant population in Texas because of DACA?
15          MR. DISHER:  Objection, vague.
16    A.  Could you state that one more time?
17       **Q.  Yes.  Would it be correct to say that you do**
18 **not offer the opinion in your declaration that there is**
19 **a positive effect on the size of the unauthorized**
20 **immigrant population in Texas because of DACA?**
21          **MR. DISHER:  Same objection.**
22    A.  Yeah.  I don't -- I don't address that in it.
23       **Q.  Would it be correct to say that you do not**
24 **offer the opinion in your declaration that DACA creates**
25 **net negative effects on the Texas economy?**

**Page: 47**

 1    A.  I don't --
 2          MR. DISHER:  Objection, vague.  Go ahead.
 3    A.  I don't address that.
 4       **Q.  Would it be correct to say that you do not**
 5 **offer the opinion in your declaration that DACA causes**
 6 **specific expenditures by Texas State agencies that are**
 7 **different from expenditures made on unauthorized**
 8 **immigrants in Texas?**
 9          **MR. DISHER:  Same objection.**
10    A.  I don't address that.
11       **Q.  Would it be correct to say that you do not**
12 **offer the opinion that DACA increases unauthorized**
13 **immigration to the United States?**
14    A.  I don't address that.
15       Q.  Okay.  Now, in your declaration at the end are
16 a number of citations under the heading "References."
17 Do you see that?
18    A.  Yes.
19       Q.  Okay.  I count one, two, three, four, five,
20 six, seven, eight.  Is it correct to say there are eight
21 works cited in your report?
22    A.  Yes.

23    **Q.  Okay.  Do these articles or published studies**
24  **form the entire basis of the opinions that you offer in**
25  **your declaration?**

Jun 27, 2018 Potter, Lloyd

**Page:** 48

1            MR. DISHER:  Objection, vague.
2    A.  No.
3    **Q.  Okay.  In addition to the eight articles that**
4  **are cited in your declaration, what else do you rely on**
5  **to form your opinions?**
6    A.  My experience and knowledge of the field of
7  demography and population issues.
8    **Q.  Okay.  Would it be accurate to say that your**
9  **experience and knowledge in demography is not specific**
10  **as to the reasons why an immigrant would choose to**
11  **return or migrate to their home country?**
12            MR. DISHER:  Objection, vague.
13    A.  Could you say it one more time?
14    **Q.   Sure.  You've mentioned that your opinions are**
15  **based on your knowledge of demography and your past work**
16  **and experience.  Is that correct?**
17    **A.  Yes.**
18    **Q.   Is it correct to say that your knowledge of**
19  **demography and your past work and experience does not**
20  **include a specific study of the reasons why an**
21  **unauthorized immigrant might choose to return to their**
22  **home country?**
23            **MR. DISHER:  Objection, vague.  Go ahead.**
24    **A.  Yeah.  I think probably to get that specific**
25  **that would be true.**

Jun 27, 2018 Potter, Lloyd

**Page:** 49

1    **Q.   Okay.  Are there any other scholarly works or**
2  **studies other than the ones cited in your declaration**
3  **that support your opinion that losing permission to work**
4  **in the United States would cause some DACA recipients to**
5  **return to their home country?**
6    **A.  I believe there are other -- there is other**
7  **research that would support that.**
8    **Q.  Can you name any specifically today?**
9    **A.  No.**
10    Q.  Okay.  Paragraph 4, if you would turn with me.
11  In Paragraph 4, I'm going to read you a sentence from
12  Paragraph 4 after the parenthetical to the Aguila
13  article.
14            Is it correct to say that there is a
15  sentence in Paragraph 4 that says, quote, Most
16  undocumented migrants coming to the U.S. are doing so to
17  work, unquote?  Am I right in reading that?
18    A.  Yes.

19      Q.  Okay.  Do you believe that statement to be
20  true for Texas as well?
21      A.  I believe that it's true.
22      Q.  Would it also be correct to say that work is
23  the reason many migrants come to Texas even when the
24  migrants lack work authorization?
25          MR. DISHER:  Objection, calls for

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 50**
 1  speculation.
 2      A.  I think so.
 3      Q.  And, in fact, you cite Doug Massey's article
 4  and his finding that undocumented migration from Mexico
 5  appears to reflect U.S. labor demand and access to
 6  migrant networks.  Is that correct?
 7      A.  Yes.
 8      Q.  Let's take a look at your Paragraph 5.  You
 9  talk about inter-county migration within the
10  United States.  Is that correct?
11      A.  Yes.
12      Q.  And you are citing the Current Population
13  Survey and an article by Ihrke?
14      A.  Yes.
15      Q.  Would it be fair to say that the analysis that
16  you talk about in Paragraph 5 did not look specifically
17  at undocumented workers?
18      A.  It did not look at specifically undocumented
19  workers.
20      Q.  I have a similar question with respect to
21  Paragraph 6.  You talk about some work by Kennan and
22  Walker involving interstate migration decisions.  Is
23  that right?
24      A.  Yes.
25      Q.  Okay.  Would it be correct to say that the
**Page: 51**
 1  study that you're discussing here by Kennan and Walker
 2  did not look specifically at undocumented workers?
 3      A.  That's correct.
 4      Q.  Okay.  So would it then be fair to say, with
 5  respect to Paragraph 5 and 6, that we don't know if
 6  those findings hold true specifically for the
 7  undocumented-worker population?
 8          MR. DISHER:  Objection, vague.
 9      A.  Yes, it's fair to say we don't know that.
10      Q.  Would you agree with me that the income
11  prospects for undocumented workers might be tempered by
12  factors that are unique to them like the presence of
13  migrant networks or the concern about drawing
14  immigration enforcement by moving to a place with a job
15  where the immigrant doesn't look like the people in
16  their community?
17          MR. DISHER:  Objection, calls for
18  speculation.
19      A.  I'm not sure I followed it.

20      Q.  All right.  I'll break it down for you.
21          In Paragraph 5 and 6 and 4, you talk
22  about factors that are associated with migrant flows,
23  and we get more specific in Paragraph 4 with respect to
24  undocumented workers and the reason why they move where
25  they move for jobs.  Is that right?


📄 Jun 27, 2018 Potter, Lloyd


**Page:** 52

1       A.  Yes.
2       Q.  Okay.  Now, would you agree with me that
3   undocumented workers may have factors that affect their
4   decision about where to move for work that are unique to
5   undocumented immigrants such as the presence of migrant
6   networks?
7               MR. DISHER:  Objection, vague.
8   Objection, calls for speculation.
9       A.  I think the factors for undocumented migrants
10  and documented migrants are probably similar in some
11  respects and also different in some respects.
12      Q.  Would you agree with me that if an
13  undocumented worker is interested in taking a
14  higher-paying job in another state that that
15  undocumented worker would have to consider his or her
16  ability to get that higher-paying job despite the lack
17  of work authorization?
18              MR. DISHER:  Objection -- same objection.
19      A.  I'm not sure I can answer that.
20      Q.  Why not?
21      A.  I just don't know.  I mean, I'm not -- I've
22  not seen specific research that would address that
23  and --
24      Q.  When you say "address that," do you mean you
25  haven't seen specific research addressing what?

**Page:** 53

1       A.  The differential -- specifically what an
2   unauthorized immigrant's behavior would be in terms of
3   seeking a position for higher pay.
4       Q.  In another state?
5       A.  Yes.
6       Q.  Okay.  So, for example, in Paragraph 6 you
7   talk about interstate migration decisions.  Is that
8   correct?
9       A.  Yes.
10      Q.  And you mention that the research suggests
11  that the link between income and migration decisions is
12  driven both by geographic differences and mean wages and
13  by a tendency to move in search of a better locational
14  match when the income realization in the current
15  location is unfavorable.  Is that correct?
16      A.  Yes.
17      Q.  Now, specifically with respect to that issue,
18  isn't it also true that an undocumented worker has an
19  additional consideration when considering whether to
20  move for a higher-paying job and that consideration is

21  the ability to secure that job without work
22  authorization?
23          MR. DISHER:  Objection, vague.
24  Objection, calls for a legal conclusion.  Objection,
25  speculation.

**Page:** 54

1       A.  Yeah.  I don't know.
2       Q.  Let's look at Paragraph 7.  In Paragraph 7
3   you discuss a study by Orrenius and Zavodny.  Is that
4   correct?
5       A.  Yes.
6       Q.  By the way, I think those are superhero names,
7   Orrenius and Zavodny.  I went and looked it up.  They're
8   both women, which makes it even better.
9           I'm going to take a moment and mark that
10  study.
11          (Exhibit No. 4 marked)
12      Q.  You now have what has been marked Deposition
13  Exhibit No. 4.  Do you recognize this as the study by
14  Orrenius and Zavodny that you cited in your declaration?
15      A.  Yes.
16      Q.  Okay.  Is it correct to say that the Orrenius
17  study that is Exhibit 4 did not look at Texas?
18      A.  I think Texas was part of it.  So it wasn't
19  Texas was excluded.  It was, I think, focusing on the
20  United States.
21      Q.  Turn with me to the Table 1, which I believe
22  is the third page.
23      A.  Oh, yes.  Sorry.
24      Q.  No.  It's my fault for not pointing you to the
25  specific information.


📄 Jun 27, 2018 Potter, Lloyd


**Page:** 54

1       A.  Yeah.  I don't know.
2       Q.  Let's look at Paragraph 7.  In Paragraph 7
3   you discuss a study by Orrenius and Zavodny.  Is that
4   correct?
5       A.  Yes.
6       Q.  By the way, I think those are superhero names,
7   Orrenius and Zavodny.  I went and looked it up.  They're
8   both women, which makes it even better.
9           I'm going to take a moment and mark that
10  study.
11          (Exhibit No. 4 marked)
12      Q.  You now have what has been marked Deposition
13  Exhibit No. 4.  Do you recognize this as the study by
14  Orrenius and Zavodny that you cited in your declaration?
15      A.  Yes.
16      Q.  Okay.  Is it correct to say that the Orrenius
17  study that is Exhibit 4 did not look at Texas?
18      A.  I think Texas was part of it.  So it wasn't
19  Texas was excluded.  It was, I think, focusing on the
20  United States.
21      Q.  Turn with me to the Table 1, which I believe

22   **is the third page.**
23        A.   Oh, yes.  Sorry.
24        **Q.   No.  It's my fault for not pointing you to the**
25   **specific information.**

**Page:** 55

1                    **Can you tell me if Texas appears in**
2   **Table 1?**
3        A.   It does not.
4        **Q.   Do you understand the Orrenius study to be a**
5   **study of states with mandatory E-Verify laws?**
6        A.   Yes.
7        **Q.   Do you know whether Texas has a mandatory**
8   **E-Verify law?**
9        A.   I don't know.
10        **Q.   What is your understanding of mandatory**
11   **E-Verify?**
12        A.   My understanding would be that when somebody
13   applies for a position, they need to provide proof of
14   authorization to work.
15        **Q.   Do you understand the E-Verify system to be a**
16   **computer-based system to check work authorization?**
17        A.   That's my understanding, yes.
18        **Q.   And do you understand that in states that**
19   **have - let's see how they put it - laws mandating**
20   **universal use of E-Verify that employers are required to**
21   **screen job applicants in the E-Verify computer system?**
22             MR. DISHER:  Objection to the extent it
23   calls for a legal conclusion.
24        A.   That's my understanding.
25        **Q.   Okay.  And do you understand E-Verify to be a**

**Page:** 56

1   **system maintained by the federal government?**
2        A.   I don't know.  I think it's -- for some
3   reason, I think it's variable from state to state.
4        **Q.   Okay.  And it's possible there could be**
5   **variation from state to state on who is required to**
6   **screen their employees --**
7        A.   Correct.
8        **Q.   -- through E-Verify?**
9             **Would you agree with me that the**
10   **experience of an unauthorized immigrant in applying for**
11   **work in a universal E-Verify state is going to be**
12   **different from an unauthorized immigrant applying for**
13   **work in a state that doesn't require E-Verify like**
14   **Texas?**
15             MR. DISHER:  Objection, calls for
16   speculation.
17        A.   I would think so.
18        Q.   In Paragraph 7, you identify some findings in
19   the Orrenius study.  Look at Paragraph 7 with me and
20   count, if you would, the lines, one, two, three, four,
21   five.  On the sixth line down, I'm going to read you the
22   sentence and you tell me if I read it correctly.
23             Quote, Orrenius and Zavodny found that
24   possible undocumented immigrants in states that had
25   implemented such efforts may have more difficulty

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 57**

1   working and more difficulty changing jobs, unquote.
2               Is that correct?
3       A.  Yes.
4       **Q.   Would it be fair to say that if Orrenius and**
5   **Zavodny were looking at states with mandatory E-Verify**
6   **that their findings would not be applicable to a state**
7   **like Texas that does not have mandatory E-Verify with**
8   **respect to difficulty working and difficulty changing**
9   **jobs?**
10              MR. DISHER:  Objection, vague.
11  Objection, calls for speculation.
12      A.  Say it one more time.
13      **Q.   Sure.  I'll rephrase it slightly because I**
14  **think I can do a better job.**
15              **Would it be correct to say that Orrenius**
16  **and Zavodny's findings that undocumented immigrants**
17  **would have more difficulty working and more difficulty**
18  **changing jobs in mandatory E-Verify states do not apply**
19  **to a state like Texas that does not have mandatory**
20  **E-Verify?**
21              **MR. DISHER:  Same objections.**
22      **A.  I would expect there to be a differential.**
23      **Q.  All right.  But can you explain to me if their**
24  **findings, which were specifically based on studying**
25  **mandatory E-Verify in those particular states, whether**

**Page: 58**

1   **those findings can apply at all to Texas since Texas**
2   **doesn't have mandatory E-Verify?**
3               **MR. DISHER:  Objection, vague.**
4       **A.  I think it would probably apply to certain**
5   **types of jobs that do require some verification of work**
6   **status; but certainly there are, I think, a fair number**
7   **of jobs within Texas that don't require verification and**
8   **so it certainly wouldn't apply to those types of**
9   **positions.**
10      **Q.   And can you specifically identify any jobs in**
11  **Texas that are subject to E-Verify requirements?**
12      **A.  Well, I don't know specifically.  I do know**
13  **working for the State would be one.  So that would be**
14  **one.**
15      **Q.   Okay.  So can we agree then that with respect**
16  **to jobs in Texas that are not for the State of Texas, at**
17  **least, that the findings of Orrenius and Zavodny about**
18  **unauthorized immigrants having more difficulty working**
19  **and more difficulty changing jobs because of universal**
20  **E-Verify would not apply in Texas?**
21              **MR. DISHER:  Objection, vague.**
22  Objection, asked and answered.
23      **A.  Yeah.  I don't think you could make a blanket**
24  **statement about that, but probably some -- some aspects**
25  **of it would apply and others wouldn't, again, because**

**Page: 59**

1   **there are jobs that do -- would require verification of**
2   **permission to work within Texas.**

3      **Q.   But you can't identify any other than working**
4   **for the State of Texas?**
5      **A.  I'm not that familiar with -- I'm not familiar**
6   **with the other types of jobs that might require that in**
7   **Texas.**
8      Q.   Now, there's the -- I'd like to talk to you
9   about your last sentence in Paragraph 7 regarding the
10   findings of Orrenius and Zavodny suggesting that
11   unauthorized immigrants leave states that adopted
12   universal E-Verify laws.
13           Do you see that sentence there?
14   A.  Yes.
15      Q.   You say that Orrenius and Zavodny found some
16   evidence, and do you recall what that "some evidence"
17   was?
18      A.  I think, as I recall, they saw a decline in
19   estimates of the unauthorized immigrants in those
20   states, and they attributed -- and didn't -- did not
21   also see an increase in other states, and they
22   attributed that to the unauthorized immigrants moving
23   out of the United States.
24      Q.   And they attributed that to the states
25   adopting universal E-Verify laws.  Is that correct?

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 60**
1      A.   That was -- that was the -- they implied that
2   that was a likely explanation for their findings.
3      Q.   Would it be fair to say that that finding is
4   not applicable to Texas because Texas does not have
5   universal E-Verify?
6      A.  I don't think that I could say that.
7      **Q.   Okay.  Well, do you understand that Orrenius**
8   **and Zavodny looked at states that previously had**
9   **E-Verify, the voluntary program like Texas, and**
10   **subsequently adopted a universal E-Verify program?**
11      **A.  Yes.**
12      **Q.   Okay.  So the situation in those states before**
13   **the adoption of E-Verify we can agree would be similar**
14   **to the situation in Texas today, that it's a voluntary**
15   **program for employers?**
16           **MR. DISHER:  Objection, vague.**
17      **A.  Yes, I think so.**
18      **Q.   Okay.  So when Orrenius and Zavodny suggest**
19   **that unauthorized immigrants leave states that adopt**
20   **universal E-Verify laws, that suggestion or that finding**
21   **would not be applicable to Texas because Texas has not**
22   **adopted a universal E-Verify law.  Correct?**
23      **A.  I'm not sure that I can say that.**
24      **Q.   And why is that?**
25      **A.  I just don't -- I don't have any evidence or**
**Page: 61**

1   **information about whether or not it would apply.**
2      **Q.   And when you say "it would apply," you mean**
3   **Orrenius and Zavodny's findings regarding unauthorized**

4  **immigrants who leave states with universal E-Verify**
5  **laws?**
6          **MR. DISHER:  Objection, vague.**
7      **A.  Yes.**
8      **Q.  Turn with me, if you would, to the Orrenius**
9  **article at Page 7.  I'd like you to look with me at the**
10  **"Results" section, which is preceded by a number five.**
11  **Do you see that around the middle of the page?**
12      A.  Yes.
13      **Q.  Okay.  Now, if you read down with me to the**
14  **second paragraph -- okay.  It's actually not the second**
15  **paragraph.  It's the first paragraph.**
16          **There is a sentence, and I'm going to**
17  **count the lines down in the top - one, two, three, four,**
18  **five, six.  Is it correct to say that Orrenius and**
19  **Zavodny found no statistically significant negative**
20  **effect of universal E-Verify laws on non-recent**
21  **immigrants?**
22          MR. DISHER:  Objection, misstates the
23  document.
24      A.  Okay.  Could you state your question again?
25      **Q.  Uh-huh.  I'll ask a new question.**


📄 Jun 27, 2018 Potter, Lloyd


**Page:** 62

1          MS. PERALES:  If you want a running
2  objection, Todd, you can have it.
3      **Q.  In Paragraph 1 of this "Results" section,**
4  **after the sentence "Table 2 reports the results," is it**
5  **correct to say that Orrenius and Zavodny found, quote,**
6  **The presence of a universal E-Verify mandate last year**
7  **has a significant negative effect on the number of**
8  **likely unauthorized immigrants who arrived 1 to 5 years**
9  **ago, unquote?  Did I read that correctly?**
10      A.  Yes.
11      **Q.  And then in the next sentence do I read**
12  **correctly when I read, quote, The estimated effects for**
13  **likely unauthorized immigrants as a whole, non-recent**
14  **immigrants, and new immigrants are also negative but not**
15  **statistically different from zero, unquote?  Is that**
16  **correct?**
17      A.  Yes.
18      **Q.  Okay.  Is it fair to say then that Orrenius**
19  **and Zavodny found that with respect to immigrants who**
20  **had -- unauthorized immigrants who have been present**
21  **more than five years that there was a statistically**
22  **significant negative effect of universal E-Verify laws?**
23          MR. DISHER:  Objection.  The document
24  speaks for itself.
25      A.  That's my understanding of their conclusion.


📄 Jun 27, 2018 Potter, Lloyd

**Page:** 63
1　**Q.  Would you agree with me then that the Orrenius**
2　**study does not provide research support for the**
3　**contention that immigrant unauthorized workers in Texas**
4　**who have lived in the U.S. at least five years are**
5　**likely to leave the state?**
6　　　　　MR. DISHER:  Objection, vague.
7　　**A.  It does not specifically address Texas.**
8　**Q.  It also specifically found that with respect**
9　**to immigrants who had been present for more than five**
10　**years, there was no statistically significant negative**
11　**effect of universal E-Verify.  Correct?**
12　　**A.  Correct.**
13　　Q.  Let's look at Paragraph 8.  In your second
14　sentence, tell me if I read this correctly:  Quote, The
15　causes of return migration are difficult to address
16　because there is limited research and understanding of
17　return migration, unquote.
18　　　　　Did I read that correctly?
19　　A.  Yes.
20　　Q.  Can you explain that sentence a little bit
21　more or expand on it for me.
22　　A.  There just isn't that much research looking at
23　migrants who have returned to their country of origin
24　and their reasons for why they returned.
25　　Q.  Other than the articles that you cite in your


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 63
1　**Q.  Would you agree with me then that the Orrenius**
2　**study does not provide research support for the**
3　**contention that immigrant unauthorized workers in Texas**
4　**who have lived in the U.S. at least five years are**
5　**likely to leave the state?**
6　　　　　MR. DISHER:  Objection, vague.
7　　A.  It does not specifically address Texas.
8　**Q.  It also specifically found that with respect**
9　**to immigrants who had been present for more than five**
10　**years, there was no statistically significant negative**
11　**effect of universal E-Verify.  Correct?**
12　　A.  Correct.
13　　**Q.  Let's look at Paragraph 8.  In your second**
14　**sentence, tell me if I read this correctly:  Quote, The**
15　**causes of return migration are difficult to address**
16　**because there is limited research and understanding of**
17　**return migration, unquote.**
18　　　　　**Did I read that correctly?**
19　　**A.  Yes.**
20　　**Q.  Can you explain that sentence a little bit**
21　**more or expand on it for me.**
22　　**A.  There just isn't that much research looking at**
23　**migrants who have returned to their country of origin**
24　**and their reasons for why they returned.**
25　　**Q.  Other than the articles that you cite in your**
**Page:** 64

1   declaration, are you aware of any other research on the
2   topic of return migration?
3       A.   Not that I could cite today, but I believe
4   there are other articles and research out there that
5   have looked at that.
6       Q.   Okay.  Are you aware of any articles or
7   research that focused on return migration from Texas
8   specifically?
9       A.   I'm not familiar with them, but there may be
10  some that have.
11      Q.   Are you familiar with any research on the
12  possibility of return migration of people who receive
13  DACA?
14      A.   I'm not familiar with any research on that.
15      Q.   Are you aware of any research on return
16  migration that focuses on young adults brought to the
17  U.S. as children who have resided in the U.S. at least
18  10 years?
19      A.   So research on children who have come to the
20  United States as children?
21      Q.   And who have resided in the U.S. at least
22  10 years.
23      A.   Not specifically, but I believe there are some
24  studies that have looked at DACA recipients -- or DACA
25  participants.

**Page: 65**

1       Q.   Did you review or rely on any of those studies
2   for your declaration?
3       A.   No.
4       Q.   With respect to any of the research that
5   you've identified related to return migration that is
6   not cited in your report, did you rely on any of those
7   studies for your declaration?
8       A.   It's possible because I read a lot of stuff.
9   So, again, it's kind of -- and that kind of goes with
10  the last question.  It's kind of -- I read a lot, and so
11  I certainly think parts of my declaration are -- kind of
12  come from things that I've read and that I'm familiar
13  with.
14      Q.   Okay.  You signed your declaration on
15  April 26th.  Is that right?
16      A.   Yes.
17      Q.   So is this the two-month anniversary of your
18  finalizing your declaration?
19      A.   It's a day after that.
20           MR. DISHER:  It's the 27th.
21      Q.   The 27th.  I don't know what day it is.  So
22  it's been two months and a day since you signed your
23  declaration.  Is that correct?
24      A.   Yes.
25      Q.   Okay.  And sitting here today, can you name


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 65**

1       **Q.   Did you review or rely on any of those studies**

2   **for your declaration?**
3      A.  No.
4      **Q.   With respect to any of the research that**
5   **you've identified related to return migration that is**
6   **not cited in your report, did you rely on any of those**
7   **studies for your declaration?**
8      A.   It's possible because I read a lot of stuff.
9   So, again, it's kind of -- and that kind of goes with
10  the last question.  It's kind of -- I read a lot, and so
11  I certainly think parts of my declaration are -- kind of
12  come from things that I've read and that I'm familiar
13  with.
14     **Q.   Okay.  You signed your declaration on**
15  **April 26th.  Is that right?**
16     A.   Yes.
17     **Q.   So is this the two-month anniversary of your**
18  **finalizing your declaration?**
19     A.   It's a day after that.
20         MR. DISHER:  It's the 27th.
21     **Q.   The 27th.  I don't know what day it is.  So**
22  **it's been two months and a day since you signed your**
23  **declaration.  Is that correct?**
24     A.   Yes.
25     **Q.   Okay.  And sitting here today, can you name**

**Page: 66**

1   **any -- any specific studies about return migration that**
2   **you relied on for your declaration other than the ones**
3   **that are cited in your declaration?**
4      A.   That I --
5      **Q.   Relied on while preparing your declaration**
6   **that are not cited in your declaration.**
7      A.   Can I cite them today?
8      **Q.   Yes.**
9      A.   I don't think I can cite them today.
10     **Q.   Okay.  Let's take a look at Paragraph 8.  You**
11  **say in your first sentence after the comma, and tell me**
12  **if I read this correctly, quote, It is reasonable to**
13  **conclude that some DACA participants would return to**
14  **their country of origin if they lose or are not given**
15  **permission to work in the U.S., unquote.**
16         Did I read that correctly?
17     A.   Yes.
18     **Q.   How many is "some"?**
19     A.   More than one.
20     **Q.   Can you help me find a top number for "some"?**
21  **Do you have --**
22     A.   All of them.
23     **Q.   Do you think it's reasonable to conclude that**
24  **all DACA participants would return to their country of**
25  **origin if they lost work authorization?**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 66**

1   any -- any specific studies about return migration that
2   you relied on for your declaration other than the ones

3  that are cited in your declaration?
4      A.   That I --
5      **Q.   Relied on while preparing your declaration**
6  **that are not cited in your declaration.**
7      A.   Can I cite them today?
8      **Q.   Yes.**
9      A.   I don't think I can cite them today.
10      **Q.   Okay.  Let's take a look at Paragraph 8.  You**
11  **say in your first sentence after the comma, and tell me**
12  **if I read this correctly, quote, It is reasonable to**
13  **conclude that some DACA participants would return to**
14  **their country of origin if they lose or are not given**
15  **permission to work in the U.S., unquote.**
16          **Did I read that correctly?**
17      **A.   Yes.**
18      **Q.   How many is "some"?**
19      **A.   More than one.**
20      **Q.   Can you help me find a top number for "some"?**
21  **Do you have --**
22      **A.   All of them.**
23      **Q.   Do you think it's reasonable to conclude that**
24  **all DACA participants would return to their country of**
25  **origin if they lost work authorization?**

**Page:** 67

1      **A.   From everything I've looked at and thought**
2  **about, I don't think I could actually put a number on**
3  **it.**
4      **Q.   So larger than one but less than all.  Is that**
5  **it?**
6      **A.   Yes.**
7      **Q.   Okay.  Do you have any other more specific**
8  **estimate of the number of DACA participants who would**
9  **return to their country of origin?**
10      **A.   I do not.**
11      **Q.   Did you perform any analysis yourself**
12  **personally that would shed light on the number of DACA**
13  **participants that you think would return to their**
14  **country of origin if they lost work authorization?**
15          **MR. DISHER:  Objection, vague.**
16      **A.   I did not.**
17      **Q.   Would you agree with me that it is reasonable**
18  **to conclude that a DACA participant might return to**
19  **their country of origin for reasons unrelated to**
20  **employment?**
21          MR. DISHER:  Objection, calls for
22  speculation.
23      A.   I think that's reasonable that some DACA
24  participants do return to the their country of origin,
25  not necessarily for employment.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 66

1  any -- any specific studies about return migration that
2  you relied on for your declaration other than the ones
3  that are cited in your declaration?

4    A.  That I --
5    **Q.   Relied on while preparing your declaration**
6  **that are not cited in your declaration.**
7    A.  Can I cite them today?
8    **Q.   Yes.**
9    A.  I don't think I can cite them today.
10    **Q.   Okay.  Let's take a look at Paragraph 8.  You**
11  **say in your first sentence after the comma, and tell me**
12  **if I read this correctly, quote, It is reasonable to**
13  **conclude that some DACA participants would return to**
14  **their country of origin if they lose or are not given**
15  **permission to work in the U.S., unquote.**
16         **Did I read that correctly?**
17    A.  Yes.
18    **Q.   How many is "some"?**
19    A.  More than one.
20    **Q.   Can you help me find a top number for "some"?**
21  **Do you have --**
22    A.  All of them.
23    **Q.   Do you think it's reasonable to conclude that**
24  **all DACA participants would return to their country of**
25  **origin if they lost work authorization?**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 67

1    A.  From everything I've looked at and thought
2  about, I don't think I could actually put a number on
3  it.
4    **Q.  So larger than one but less than all.  Is that**
5  **it?**
6    A.  Yes.
7    **Q.   Okay.  Do you have any other more specific**
8  **estimate of the number of DACA participants who would**
9  **return to their country of origin?**
10    A.  I do not.
11    **Q.   Did you perform any analysis yourself**
12  **personally that would shed light on the number of DACA**
13  **participants that you think would return to their**
14  **country of origin if they lost work authorization?**
15         MR. DISHER:  Objection, vague.
16    A.  I did not.
17    **Q.   Would you agree with me that it is reasonable**
18  **to conclude that a DACA participant might return to**
19  **their country of origin for reasons unrelated to**
20  **employment?**
21         MR. DISHER:  Objection, calls for
22  speculation.
23    A.  I think that's reasonable that some DACA
24  participants do return to the their country of origin,
25  not necessarily for employment.

**Page:** 68

1    **Q.   So, for example, it might be possible that a**
2  **DACA participant returns to their country of origin to**
3  **marry.  Correct?**
4    A.  That's possible.

5        Q.  Or possible that the person returns to their
6   country of origin to care for an elderly parent.  Is
7   that correct?
8        A.  Yes.
9        Q.  Okay.  So given that there are various reasons
10   that DACA participants might return to their home
11   country, do you have any way of quantifying the number
12   of DACA recipients who might leave because of
13   employment-related reasons like losing work
14   authorization?
15        A.  I don't.  I think to do that you would have to
16   have some information about the number lost and look at
17   changes over time.  You'd have to look at it in terms of
18   what actually happens, which would be speculation at
19   this point.
20        Q.  Would you say that when you use the word
21   "some" when you say, some DACA participants would return
22   to their country of origin if they lose permission to
23   work in the U.S., that your use of the word "some" there
24   is hypothetical?
25             MR. DISHER:  Objection, vague.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 68
1        Q.  So, for example, it might be possible that a
2   DACA participant returns to their country of origin to
3   marry.  Correct?
4        A.  That's possible.
5        Q.  Or possible that the person returns to their
6   country of origin to care for an elderly parent.  Is
7   that correct?
8        A.  Yes.
9        Q.  Okay.  So given that there are various reasons
10   that DACA participants might return to their home
11   country, do you have any way of quantifying the number
12   of DACA recipients who might leave because of
13   employment-related reasons like losing work
14   authorization?
15        A.  I don't.  I think to do that you would have to
16   have some information about the number lost and look at
17   changes over time.  You'd have to look at it in terms of
18   what actually happens, which would be speculation at
19   this point.
20        Q.  Would you say that when you use the word
21   "some" when you say, some DACA participants would return
22   to their country of origin if they lose permission to
23   work in the U.S., that your use of the word "some" there
24   is hypothetical?
25             MR. DISHER:  Objection, vague.

**Page:** 69
1        A.  When you say "hypothetical"?
2        Q.  Meaning that you consider it a theoretical
3   possibility but you don't have a number to assign to
4   that group of "some."
5             MR. DISHER:  Objection, vague.

6   Objection, compound.
7        A.   I don't have a number.
8              What was the first part of the question?
9   **Q.   And, thus, the possibility is presented as one**
10  **that is theoretical but not quantified?**
11             MR. DISHER:  Same objection.
12  A.   Yeah.  I mean, I think -- I think it's
13  unlikely that it's just theoretical.  I mean, I believe
14  that if DACA participants lost permission to work that
15  would be a motivating factor for some of them to return
16  to their country of origin.
17  **Q.   But you're -- has any DACA participant told**
18  **you personally that they would return to their home**
19  **country if they lost work authorization?**
20       A.   No.
21  **Q.   In Paragraph 8, at the bottom of the page and**
22  **then flowing over to the top of the next page, you have**
23  **identified some characteristics that would make it more**
24  **or less likely for some DACA participants to emigrate if**
25  **they were denied permission to work in the U.S.  Is that**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 70**
1   correct?
2        A.   Yes.
3        **Q.   All right.  And so for the purpose of our**
4   **transcript, I'm not going to say "emigrate" with an "E."**
5   **I'm going to say "return" just to make sure we get a**
6   **clean transcript.  Okay?**
7        A.   Okay.
8              MR. DISHER:  Are you -- I just want to be
9   clear.  So are you asking him to define emigration with
10  an "E" as return?
11             MS. PERALES:  No.  I'm just telling him
12  that I'm going to use the word "return" instead of the
13  word "emigrate."
14             MR. DISHER:  All right.  Fair enough.
15             MS. PERALES:  Thank you.
16       **Q.   You've identified the characteristic of age at**
17  **immigration.  Is that right?**
18       A.   Yes.
19       **Q.   And is it fair to say then that the younger**
20  **the age at immigration, the less likely it would be for**
21  **a DACA participant to return if denied permission to**
22  **work in the U S.?**
23       A.   That -- previous research, other research,
24  supports that when immigrants come to the United States
25  at a young age, they're less likely to return.  If you

**Page: 71**
1   apply that to DACA participants, then that would be the
2   conclusion.
3        **Q.   What is the young age?  What exactly is that**
4   **age?**
5        A.   Young would be two or three, four or five.
6        **Q.   Could young be 12?**

 7          MR. DISHER:  Objection, vague.
 8     A.   For -- in terms of -- you'd have to define
 9  what the age range is that you're looking at --
10     **Q.   Yes.**
11     A.   -- and young would be toward the younger end
12  of that age range, and older would be toward the higher
13  end of that age range.
14     **Q.   Okay.  You mentioned that there was research**
15  **suggesting that if immigrants came to the United States**
16  **at a young age, they would be less likely to return.**
17          **Do you recall what age was used for young**
18  **in that research?**
19     A.   I don't recall.
20     **Q.   Okay.**
21          **(INTERRUPTION)**
22          MR. DISHER:  Did somebody just join?  It
23  might have been the dropped-off noise.
24     **Q.   So because you set out some characteristics**
25  **here in your paragraph but you don't tell us which way**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 71

 1  apply that to DACA participants, then that would be the
 2  conclusion.
 3     **Q.   What is the young age?  What exactly is that**
 4  **age?**
 5     A.   Young would be two or three, four or five.
 6     **Q.   Could young be 12?**
 7          MR. DISHER:  Objection, vague.
 8     A.   For -- in terms of -- you'd have to define
 9  what the age range is that you're looking at --
10     **Q.   Yes.**
11     A.   -- and young would be toward the younger end
12  of that age range, and older would be toward the higher
13  end of that age range.
14     **Q.   Okay.  You mentioned that there was research**
15  **suggesting that if immigrants came to the United States**
16  **at a young age, they would be less likely to return.**
17          **Do you recall what age was used for young**
18  **in that research?**
19     A.   I don't recall.
20     **Q.   Okay.**
21          **(INTERRUPTION)**
22          MR. DISHER:  Did somebody just join?  It
23  might have been the dropped-off noise.
24     **Q.   So because you set out some characteristics**
25  **here in your paragraph but you don't tell us which way**

**Page:** 72

 1  **they tend to influence likelihood to leave, I'd like to**
 2  **cover the rest of the characteristics that you identify.**
 3     A.   Okay.
 4     **Q.   We've just covered age at immigration.  And is**
 5  **it correct to say then that if a DACA recipient arrived**
 6  **in the United States at a young age, that person would**
 7  **be less likely to return to their home country if they**

8  lost permission to work?
9     A.  Yes.
10     Q.  Now, tell me about tenure in the U.S.  How
11  does that factor affect the likelihood of some DACA
12  participants to return to their home country if they're
13  denied permission to work?
14     A.  So the longer that an immigrant is living in
15  the receiving country, it makes it more -- less likely
16  for them to return to their country of origin.
17     Q.  And where do you know that from?
18     A.  That's -- I'd say I know it just from -- it's
19  kind of basic migration processes that most demographers
20  could articulate.
21     Q.  Okay.  And so tenure in the U.S., is that on
22  some kind of continuum, or is there a certain number of
23  years of tenure in the U.S. that makes a person less
24  likely to return if they lose work authorization?
25     A.  It probably would vary from population to

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 72**

1  they tend to influence likelihood to leave, I'd like to
2  cover the rest of the characteristics that you identify.
3     A.  Okay.
4     Q.  We've just covered age at immigration.  And is
5  it correct to say then that if a DACA recipient arrived
6  in the United States at a young age, that person would
7  be less likely to return to their home country if they
8  lost permission to work?
9     A.  Yes.
10     Q.  Now, tell me about tenure in the U.S.  How
11  does that factor affect the likelihood of some DACA
12  participants to return to their home country if they're
13  denied permission to work?
14     A.  So the longer that an immigrant is living in
15  the receiving country, it makes it more -- less likely
16  for them to return to their country of origin.
17     Q.  And where do you know that from?
18     A.  That's -- I'd say I know it just from -- it's
19  kind of basic migration processes that most demographers
20  could articulate.
21     Q.  Okay.  And so tenure in the U.S., is that on
22  some kind of continuum, or is there a certain number of
23  years of tenure in the U.S. that makes a person less
24  likely to return if they lose work authorization?
25     A.  It probably would vary from population to

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 73**

1  population, person to person.
2     Q.  Uh-huh.  Tell me about educational attainment
3  and how that affects a likelihood of return to the home

4  **country.**
5      A.  I think in some of the research that I'm
6  familiar with, in some ways, depending on their status,
7  that if somebody was here working legally, it would make
8  it less likely for them to return because they would
9  have employment opportunities here.
10              If they did not have the ability to work
11  legally, it would make them potentially more likely to
12  return to their country of origin where they would be
13  able to realize their human capital.
14      **Q.  Tell me about language fluency and how that**
15  **affects the likelihood to return to their home country.**
16      A.  There are probably two aspects to that.  So
17  one is language fluency in their country of origin; and
18  if somebody is not fluent in their language of country
19  of origin, that would make them less likely to return
20  because they would have difficulty integrating back into
21  their country of origin.
22              If they were fluent in the receiving
23  country, that also might make them less likely to return
24  because they're able to navigate economically and
25  socially within their -- the receiving country.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 74**
1      **Q.  Okay.  In that sentence you end with, quote,**
2  **"and others," unquote.  I'm wondering if you can name**
3  **any other characteristics that you would consider**
4  **affecting the likelihood of a DACA participant to return**
5  **to their home country if they lose their ability to**
6  **work.**
7      A.  There are probably factors in terms of family,
8  like, so if -- if most of their family were in their
9  country of origin, that might make them more likely to
10  return to their country of origin.  If most of their
11  family was in the United States, then it might make them
12  less likely to return to their country of origin.
13      **Q.  Okay.  So if I can state the characteristics**
14  **that fall on the side of less likely to return to their**
15  **home country for a DACA recipient who loses work**
16  **authorization, those would be young age at immigration,**
17  **longer tenure in the United States, more fluency in**
18  **English, less fluency in the language of the origin**
19  **country, and stronger family ties in the United States.**
20  **Is that correct?**
21              MR. DISHER:  Objection, misstates his
22  testimony.
23      A.  Generally, I think those -- that's correct.
24      **Q.  Now, with respect to educational attainment, I**
25  **forgot to ask you at what level of educational**


📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 74**
1    **Q.   Okay.  In that sentence you end with, quote,**
2    **"and others," unquote.  I'm wondering if you can name**
3    **any other characteristics that you would consider**
4    **affecting the likelihood of a DACA participant to return**
5    **to their home country if they lose their ability to**
6    **work.**
7         A.   There are probably factors in terms of family,
8    like, so if -- if most of their family were in their
9    country of origin, that might make them more likely to
10   return to their country of origin.  If most of their
11   family was in the United States, then it might make them
12   less likely to return to their country of origin.
13        **Q.   Okay.  So if I can state the characteristics**
14   **that fall on the side of less likely to return to their**
15   **home country for a DACA recipient who loses work**
16   **authorization, those would be young age at immigration,**
17   **longer tenure in the United States, more fluency in**
18   **English, less fluency in the language of the origin**
19   **country, and stronger family ties in the United States.**
20   **Is that correct?**
21             MR. DISHER:  Objection, misstates his
22   testimony.
23        **A.   Generally, I think those -- that's correct.**
24        **Q.   Now, with respect to educational attainment, I**
25   **forgot to ask you at what level of educational**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 76**
1    not in their field but something else.  And that's
2    generally true in the United States as well.  People
3    with higher levels of education have more flexibility in
4    terms of their employment opportunities.
5         **Q.   Okay.  Let's look at Paragraph 10 -- wait.**
6    **Let's go back to Paragraph 9 for a second.  In**
7    **Paragraph 9, you identify in your final sentence**
8    **"immigrants with college degrees were more likely to**
9    **return to their country of origin."**
10             Was that based on a specific study or
11   just your general recollection?
12        A.   I think it probably came from Regan and Olsen.
13        **Q.   Okay.  Do you know for Regan and Olsen what**
14   **the -- what the age range was that they used?**
15        A.   I don't recall that --
16        **Q.   Okay.**
17        A.   -- without looking at it.
18        **Q.   Okay.  Okay.  Going to Paragraph 10 now, you**
19   **reference a study by Van Hook and Zhang.  Is that**
20   **correct?**
21        **A.   Yes.**
22        **Q.   Okay.  And you've identified some additional**
23   **characteristics here that would tend to favor remaining**
24   **in the United States.  Is that correct?**
25        **A.   Both remaining and return --**
**Page: 77**

1      **Q.  Okay.**
2      A.  -- migration.
3      **Q.  So with respect to deterring return, those**
4  **characteristics would be home ownership, school**
5  **enrollment, poverty, having young children, longer**
6  **duration in the United States.  Is that correct?**
7      A.  I believe that's -- those were their findings,
8  yes.
9      **Q.  And do you agree with those findings?**
10     A.  They are what they are so...
11     **Q.  Well, they're also in your declaration and so**
12 **I'm wondering if you --**
13     A.  Yeah.  They seem --
14     **Q.  -- if you cite them --**
15     A.  They seem reasonable to me.
16     Q.  Okay.  Okay.  Now, in the -- you have a long
17 last paragraph that's Paragraph 11 flowing onto the last
18 page of your report.
19          You have a sentence -- the first full
20 sentence at the top of the last page says, quote, DACA
21 participants who would be more likely --
22          MR. DISHER:  Hold on.  The next page.
23          THE WITNESS:  I'm sorry?
24          MR. DISHER:  The next page.
25     Q.  I'm sorry.  The top of the very last page, the


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 79
1  to other undocumented immigrants who return to their
2  home country.  Is that right?
3      A.  Yes.
4      **Q.  But would you agree with me that in at least**
5  **one important respect, DACA recipients are different**
6  **from other undocumented immigrants because they have had**
7  **work authorization and they have been able to work**
8  **legally for at least a period of time?**
9          MR. DISHER:  Objection, vague.
10     A.  I think you -- you could probably say "some."
11     **Q.  So it's also possible, for example, that if a**
12 **DACA recipient has been working and made enough money to**
13 **buy a house that they might be more likely to have that**
14 **home ownership characteristic identified in your**
15 **previous paragraph when compared to another regular**
16 **undocumented immigrant?**
17          MR. DISHER:  Objection, vague.
18     A.  And what's a "regular undocumented immigrant"?
19     **Q.  Somebody who isn't work authorized.**
20          MR. DISHER:  Same objection.
21     A.  Yeah.  I don't think I can say that because I
22 believe there are undocumented immigrants -- regular
23 undocumented immigrants who have -- that own homes and
24 that kind of -- so I'm not clear what the distinctions
25 would be.  That said, there are distinctions to be made

**Page:** 80

1  between regular undocumented immigrants and DACA

2  participants.
3      **Q.   And would one of those distinctions be that**
4  **the DACA recipient may have been working with work**
5  **authorization for some period of time before losing it?**
6      **A.   Compared to undocumented immigrants, yes.**
7      **Q.   Okay.  In your last sentence you say, "The**
8  **variation in characteristics within the DACA applicant**
9  **population suggests that some do have characteristics**
10 **that have been associated with higher probability of**
11 **emigration from the U.S."**
12          **And is it fair to say that what you have**
13 **in the parentheses there are those characteristics that**
14 **you think some DACA recipients have that are associated**
15 **with a higher probability of return?**
16          **MR. DISHER:  Objection, misstates his**
17 **testimony.**
18          **Go ahead and answer.**
19     **A.   The -- so -- so these are some examples, not**
20 **necessarily an exhaustive list.  And, yes, that I think**
21 **there are some DACA participants that share similar**
22 **characteristics to unauthorized immigrants that are**
23 **associated with a probability of return migration.**
24     **Q.   Have you done any study of the characteristics**
25 **within the DACA population to assess how many have the**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 80
1  between regular undocumented immigrants and DACA
2  participants.
3      **Q.   And would one of those distinctions be that**
4  **the DACA recipient may have been working with work**
5  **authorization for some period of time before losing it?**
6      A.   Compared to undocumented immigrants, yes.
7      **Q.   Okay.  In your last sentence you say, "The**
8  **variation in characteristics within the DACA applicant**
9  **population suggests that some do have characteristics**
10 **that have been associated with higher probability of**
11 **emigration from the U.S."**
12          **And is it fair to say that what you have**
13 **in the parentheses there are those characteristics that**
14 **you think some DACA recipients have that are associated**
15 **with a higher probability of return?**
16          MR. DISHER:  Objection, misstates his
17 testimony.
18          Go ahead and answer.
19     A.   The -- so -- so these are some examples, not
20 necessarily an exhaustive list.  And, yes, that I think
21 there are some DACA participants that share similar
22 characteristics to unauthorized immigrants that are
23 associated with a probability of return migration.
24     **Q.   Have you done any study of the characteristics**
25 **within the DACA population to assess how many have the**

**Page:** 81

1  **characteristics that you associate with a probability --**
2  **a higher probability --**

3     A.  I have --
4     **Q.   -- of return?**
5     A.  I have not.
6     **Q.  Okay.**
7     A.  Sorry.  I didn't mean to --
8     **Q.   Are you aware of any studies not done by you**
9  **that examine the characteristics within the DACA**
10 **population to see whether some have a higher probability**
11 **of return to their home country?**
12     A.   Not specifically for probability of return
13 migration, but there are studies looking at the
14 characteristics of DACA participants.
15     **Q.   Did you look at any of those studies to try to**
16 **get a handle on the number of DACA participants who**
17 **might have characteristics associated with a higher**
18 **probability of return to their home country?**
19     A.  I did not.
20     **Q.   Can you tell me what year a DACA recipient had**
21 **to have arrived in the United States by in order to get**
22 **DACA?**
23     A.  I don't recall.
24     **Q.   Can you tell me the age under which a DACA**
25 **recipient had to have arrived in the United States in**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 81**
1  characteristics that you associate with a probability --
2  a higher probability --
3     A.  I have --
4     **Q.   -- of return?**
5     A.  I have not.
6     **Q.  Okay.**
7     A.  Sorry.  I didn't mean to --
8     **Q.   Are you aware of any studies not done by you**
9  **that examine the characteristics within the DACA**
10 **population to see whether some have a higher probability**
11 **of return to their home country?**
12     A.   Not specifically for probability of return
13 migration, but there are studies looking at the
14 characteristics of DACA participants.
15     **Q.   Did you look at any of those studies to try to**
16 **get a handle on the number of DACA participants who**
17 **might have characteristics associated with a higher**
18 **probability of return to their home country?**
19     A.  I did not.
20     **Q.   Can you tell me what year a DACA recipient had**
21 **to have arrived in the United States by in order to get**
22 **DACA?**
23     A.  I don't recall.
24     **Q.   Can you tell me the age under which a DACA**
25 **recipient had to have arrived in the United States in**


📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 83**

1  characteristics of a DACA recipient with respect to age
2  at migration, language, educational attainment,
3  relatives in the United States would all have to be
4  weighed together to conclude that an individual had a
5  higher probability of return?
6          MR. DISHER:  Objection, vague.
7      A.  I'm not sure I could say that.
8      **Q.  Would you conclude if somebody was a college**
9  **graduate and is a DACA recipient that they would be more**
10 **likely to return to their home country regardless of**
11 **whether they had immigrated at an early age and could**
12 **not speak the language of their home country?**
13         MR. DISHER:  Objection, vague.  Objection
14 compound.
15     A.  Yeah.
16         MR. DISHER:  I don't mean to interrupt.
17         MS. PERALES:  Oh, it's time.
18         MR. DISHER:  Yeah.
19         MS. PERALES:  Did we -- did we confirm?
20         THE REPORTER:  Do you want to go off the
21 record?
22         MS. PERALES:  Yes, please.
23             (RECESS TAKEN)
24         MS. PERALES:  We're back on the record.
25     **Q.  (BY MS. PERALES) Dr. Potter, let's see if I**

**Page: 84**

1  **can ask a question framed a little bit more clearly for**
2  **you.**
3          **Would it be fair to say that an**
4  **individual DACA recipient's likelihood of return would**
5  **be influenced by all of the characteristics that you**
6  **have identified; for example, age of immigration, length**
7  **of residency in the U.S., language fluency, educational**
8  **achievement, et cetera?**
9      **A.  Yes, that would be fair to say.**
10     **Q.  Would it also be fair to say that just because**
11 **a DACA recipient had one characteristic associated with**
12 **a higher probability of return such as a college degree**
13 **that characteristic doesn't necessarily predict the**
14 **individual would return?  Correct?**
15     **A.  Yes.**
16     Q.  Okay.  Do you offer any opinion regarding the
17 net economic effects on Texas of any group of DACA
18 recipients returning to their home country?
19     A.  No.
20     Q.  Are you familiar generally with research or
21 studies on net economic effects of immigrants returning
22 to their home country?
23         MR. DISHER:  Objection, outside the scope
24 of his testimony.
25     A.  I am familiar.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 87**

1 articles from 2012 could not have specifically tackled
2 topics related to DACA?
3       MR. DISHER:  Objection, vague.
4     A.  I think they -- they don't address DACA;
5 however, they do address aspects of migration and
6 factors associated with migration behavior.
7     **Q.  Okay.  You cite an article in your report by**
8 **Doug Massey.  Correct?**
9     **A.  Yes.**
10     **Q.  What is Doug Massey's area of specialization?**
11     **A.  He has a number of areas, but certainly one of**
12 **them is U.S./Mexico migration.**
13     **Q.  Do you consider him an expert in U.S. Mexican**
14 **migration?**
15     **A.  Yes.**
16     **Q.  Do you generally have a favorable opinion of**
17 **Doug Massey's scholarship?**
18     **A.  Yes.**
19     **Q.  Do you have a high opinion of Doug Massey's**
20 **scholarship?**
21       **MR. DISHER:  Objection, vague.**
22     **A.  Yeah.**
23     **Q.  You cite an article by Michael Wishnie, a law**
24 review article.  Is that correct?
25     A.  Yes.

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 89**
1 United States by making it more difficult for employers
2 to hire unauthorized immigrants.
3     **Q.  Do you know whether, in this article at least,**
4 **the author provides evidence showing that IRCA was**
5 **successful in deterring employment or nonsuccessful?**
6     A.  I didn't rely on this article for that, and
7 this -- again, it's kind of a legal thing; and I
8 don't -- wouldn't say that it's really a research
9 article per se.
10     **Q.  Do you know whether the Mike Wishnie article**
11 **observes that the unauthorized population in the**
12 **United States, from the time of IRCA's enactment, rose**
13 **from approximately 4,000,000 people to somewhere over**
14 **11,000,000 people?**
15     A.  I didn't -- I wasn't really reading it for
16 that, and so I'm not familiar.  I could go through and
17 look at it if you'd like but...
18     **Q.  Okay.  Are you generally familiar with the**
19 **increase in the unauthorized population in the**
20 **United States since --**
21     **A.  Yes.**
22     **Q.  -- IRCA's enactment?**
23     **A.  Yes, I am.**
24     **Q.  And would it be fair to say that the**
25 **unauthorized population has grown steadily in the**

**Page: 90**

1 **United States at least up until about 2008?**

2      A.  Yes.  Until about 2008, there was a steady
3  increase in the unauthorized population in the
4  United States --
5      Q.  Okay.
6      A.  -- or we estimate that there has been.
7      Q.  And IRCA was enacted sometime before then.  Is
8  that right?
9      A.  Yes.  I think it was '84.
10      Q.  '86, perhaps?
11      A.  86, yeah.
12      Q.  Okay.  We're going to leave the Wishnie
13  article alone now.
14      A.  Okay.
15      Q.  I'm not going to ask you any more questions
16  about it.
17          Would it be correct to say that the
18  opinions in your report are not based on speaking with
19  any individual DACA recipients?
20      A.  Yes.
21      Q.  Would it be correct to say that the opinions
22  in your report are not based on any survey research of
23  DACA recipients?
24      A.  Probably not completely.
25      Q.  Are you aware of any of the --

📄 Jun 27, 2018 Potter, Lloyd

**Page:** 90
1  United States at least up until about 2008?
2      A.  Yes.  Until about 2008, there was a steady
3  increase in the unauthorized population in the
4  United States --
5      Q.  Okay.
6      A.  -- or we estimate that there has been.
7      Q.  And IRCA was enacted sometime before then.  Is
8  that right?
9      A.  Yes.  I think it was '84.
10      Q.  '86, perhaps?
11      A.  86, yeah.
12      Q.  Okay.  We're going to leave the Wishnie
13  article alone now.
14      A.  Okay.
15      Q.  I'm not going to ask you any more questions
16  about it.
17          Would it be correct to say that the
18  opinions in your report are not based on speaking with
19  any individual DACA recipients?
20      A.  Yes.
21      Q.  Would it be correct to say that the opinions
22  in your report are not based on any survey research of
23  DACA recipients?
24      A.  Probably not completely.
25      Q.  Are you aware of any of the --

📄 Jun 27, 2018 Potter, Lloyd

**Page:** 91
1      A.  I think the Current Population Survey probably
2   surveyed some DACA participants.
3      **Q.  Good catch.  Yes.**
4               **So other than the Current Population**
5   **Survey or any other census survey that might have**
6   **captured the responses of DACA recipients, would it be**
7   **correct to say that the opinions in your report are not**
8   **based on survey research of DACA recipients?**
9      **A.  Yes.**
10     Q.  Okay.  Are you aware of any organizations of
11  undocumented students at UTSA?
12     A.  Vaguely.
13     Q.  Have you ever sought to attend a meeting of
14  any undocumented students at UTSA?
15     A.  No.
16     Q.  You talked about some of the possibilities
17  with respect to DACA recipients leaving Texas after
18  losing work authorization, and you described that --
19  that it's greater than one but less than all, and I'd
20  like to return for a minute to that.
21              Is it more likely than not, in your
22  estimation, that the number of DACA recipients who would
23  return to their home country from Texas after losing
24  work authorization would be fairly small?
25              MR. DISHER:  Objection, vague.

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 91
1      A.  I think the Current Population Survey probably
2   surveyed some DACA participants.
3      **Q.  Good catch.  Yes.**
4               **So other than the Current Population**
5   **Survey or any other census survey that might have**
6   **captured the responses of DACA recipients, would it be**
7   **correct to say that the opinions in your report are not**
8   **based on survey research of DACA recipients?**
9      A.  Yes.
10     Q.  Okay.  Are you aware of any organizations of
11  undocumented students at UTSA?
12     A.  Vaguely.
13     Q.  Have you ever sought to attend a meeting of
14  any undocumented students at UTSA?
15     A.  No.
16     **Q.  You talked about some of the possibilities**
17  **with respect to DACA recipients leaving Texas after**
18  **losing work authorization, and you described that --**
19  **that it's greater than one but less than all, and I'd**
20  **like to return for a minute to that.**
21              **Is it more likely than not, in your**
22  **estimation, that the number of DACA recipients who would**
23  **return to their home country from Texas after losing**
24  **work authorization would be fairly small?**
25              **MR. DISHER:  Objection, vague.**

**Page:** 92

1      A.  Yeah.  I don't -- I don't think I could say --
2  I don't believe that I can quantify a number other than
3  I think some would.
4      **Q.  Okay.  So then is it within the realm of**
5  **possibility that the number could be fairly small?**
6          MR. DISHER:  Objection, vague.
7      A.  Yes, in the same turn as it could be that it
8  could be really large.
9      **Q.  Do you consider it equally likely that the**
10 **number of DACA recipients who would return to their**
11 **country after losing work authorization is small or very**
12 **large?**
13         MR. DISHER:  Objection, vague.
14     A.  I don't think I could state that.
15     **Q.  Okay.  So is it your position that you cannot**
16 **say that it is more likely that the number of DACA**
17 **recipients who would return is small versus very large?**
18         MR. DISHER:  Objection, vague.
19     A.  Can you -- can you define what "small" and
20 what "large" is?
21     **Q.  Okay.  Well, is it -- okay.  Let's talk about**
22 **it in terms of percents because numbers could be**
23 **confusing.**
24             **Do you consider it equally likely that**
25 **more than 50 percent or less than 50 percent of DACA**

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 92

1      A.  Yeah.  I don't -- I don't think I could say --
2  I don't believe that I can quantify a number other than
3  I think some would.
4      **Q.  Okay.  So then is it within the realm of**
5  **possibility that the number could be fairly small?**
6          MR. DISHER:  Objection, vague.
7      A.  Yes, in the same turn as it could be that it
8  could be really large.
9      **Q.  Do you consider it equally likely that the**
10 **number of DACA recipients who would return to their**
11 **country after losing work authorization is small or very**
12 **large?**
13         MR. DISHER:  Objection, vague.
14     A.  I don't think I could state that.
15     **Q.  Okay.  So is it your position that you cannot**
16 **say that it is more likely that the number of DACA**
17 **recipients who would return is small versus very large?**
18         MR. DISHER:  Objection, vague.
19     A.  Can you -- can you define what "small" and
20 what "large" is?
21     **Q.  Okay.  Well, is it -- okay.  Let's talk about**
22 **it in terms of percents because numbers could be**
23 **confusing.**
24             **Do you consider it equally likely that**
25 **more than 50 percent or less than 50 percent of DACA**

**Page:** 93

1 ==recipients would return to their home country after==
2 ==losing work authorization?==
3 ==    A.   I really don't think I could put a percent on==
4 ==it, but I do state that I think most DACA participants==
5 ==would stay in the United States.==
6     Q.   Would you agree with me that if DACA
7 recipients had to arrive in the United States before
8 they were 16 years old that that characteristic of
9 arriving in the United States before age 16 would tend
10 to increase the probability of them staying in the
11 United States if they lost work authorization?
12           MR. DISHER:  Objection, vague.
13 Objection, asked and answered.  Objection, incomplete
14 hypothetical.
15     A.   Compared to?
16     Q.   Those who arrived in the United States after
17 the age of 16.
18           MR. DISHER:  Same objections.
19     A.   But then they're not eligible for DACA or --
20     Q.   Right.  So the characteristic -- would you
21 agree with me that the characteristic of DACA recipients
22 of having arrived in the United States before the age of
23 16 makes them less likely to return when compared to the
24 general unauthorized immigrant population?
25           MR. DISHER:  Objection, vague.


Jun 27, 2018 Potter, Lloyd


**Page:** 95
1     Q.   Well, I guess I'm asking the question a
2 different way, which is about your report's discussion
3 of the probability of return.  You talk about the
4 likelihood or the probability of return and those
5 characteristics that tend to increase the probability of
6 return or tend to decrease the probability of return.
7           So my question is if -- if all DACA
8 recipients arrived at the United States before they were
9 16 and have lived in the United States for at least
10 10 years, whether those characteristics increase their
11 probability of remaining in the United States upon
12 losing work authorization.
13           MR. DISHER:  Objection, vague.
14 Objection, asked and answered.  Objection, incomplete
15 hypothetical.
16     A.   As compared to?
17     Q.   Does it have to be a comparison?
18           MR. DISHER:  Same objections.
19     A.   I think.  I mean, if you're -- because if
20 you're saying it's -- are they more likely compared
21 to --
22     Q.   Okay.
23     A.   -- what?
24 ==    Q.   So I will -- I will ask it as a comparison,==
25 ==and we'll leave the DACA people off to the side for now.==
**Page:** 96

1 ==Let's just talk about people who are unauthorized, and==

2 **assume with me that DACA people are still considered**
3 **unauthorized.**
4    A.  Okay.
5    **Q.   Within the general population of unauthorized**
6 **immigrants, if one group of immigrants share the**
7 **characteristics of having come to the United States**
8 **before the age of 16 and have lived in the United States**
9 **for at least 10 years, would you consider that group to**
10 **have a higher probability of remaining in the**
11 **United States upon losing work authorization?**
12          MR. DISHER:  Well, objection, vague.
13 Objection, incomplete hypothetical.
14    A.   Compared to people who -- unauthorized
15 immigrants who arrived after they were 16 and who had
16 lived here less than 10 years, those individuals
17 would -- by the characteristics that I've articulated,
18 would be more likely to stay in the United States than
19 individuals who had been here a shorter period of time
20 and who had arrived when they were older.
21    **Q.   You published an article once called "Racial**
22 **Differences in Hopelessness as a Risk Factor."  Is that**
23 **correct?**
24    A.  Yes.
25    **Q.  I promised you wouldn't have to go back to**


📄 **Jun 27, 2018 Potter, Lloyd**


**Page:** 98
1  representing a defendant-intervenor in this case.  I am
2  just going to touch on a few areas and try not to take
3  up too much more of your time.
4           The same rules apply that Ms. Perales
5  explained earlier.  If you don't understand my question,
6  please just let me know and I will try to rephrase it.
7  We'll try not to talk over each other, and hopefully we
8  can move this right along.
9    A.  Okay.
10    **Q.  Okay.  I just want to ask a little bit about**
11 **the articles in your declaration.  Did you select the**
12 **articles that you cited in the declaration?**
13    A.  Yes.
14    **Q.  How did you select them?**
15    A.   Reading that during -- well, during a search
16 through bibliographic software and identifying a lot of
17 articles and sorting through the ones that I thought
18 were relevant to what I was asked to testify about.
19    **Q.   And why did you choose these particular**
20 **articles included in your declaration?**
21    A.   They seemed most relevant to the points that I
22 was hoping to make and also concise.  So there's some
23 degree of parsimony was also a factor.
24    **Q.  Did you select any research or articles**
25 **included in your declaration that directly address the**

**Page:** 99

1  **topics of DACA?**
2          MR. DISHER:  Objection, vague.

3      A.   No.
4      **Q.   Why not?**
5      A.   They weren't -- I didn't find any that
6  addressed the issue of probability of return migration
7  among DACA participants.
8      **Q.   In considering which scholarly references to**
9  **include in your declaration, did you consider the**
10 **reliability of the authors as a subject matter?**
11     A.   Yeah.  For those that I was familiar with,
12 yes, that was a factor.
13     **Q.   Which ones are you unfamiliar with?**
14     A.   I didn't -- I don't know Wishnie.  I shouldn't
15 say "know."  I've not read Wishnie -- Wishnie's work
16 before.  And then Kennan and Walker I wasn't familiar
17 with before.  The others I've had some familiarity with
18 before.
19     **Q.   Okay.  So I'd like to go to Paragraph 4 of**
20 **your declaration, which I believe is Exhibit 3.  I**
21 **believe this is an Emma Aguila article for the research.**
22          **Are you familiar with her work?**
23     A.   I'm sorry.  I'm -- I'm -- can you point me to
24 where we are?
25     **Q.   So Paragraph 4, about midway down, there's a**

**Jun 27, 2018 Potter, Lloyd**

**Page:** 105
1  status.
2      A.   And?
3      **Q.   Does that -- does that in any way affect the**
4  **weight that you give this article as far as reliability?**
5      A.   Yeah.  It's a -- it's a limitation of the
6  study.
7      **Q.   And what do you mean when you say "limitation**
8  **of the study"?**
9      A.   Well, they don't ask legal status, and so
10 they're using those indicators as a proxy for legal
11 status; and the reviewers of this article determined
12 that that was a reasonable proxy for legal status, and
13 the authors also did.
14     **Q.   Do you believe that's a reasonable proxy?**
15     A.   I think given the data that are available,
16 it's the best that we have; and I would say that it is
17 reasonable, that the -- the characteristics they used to
18 identify unauthorized immigrants is -- seems like it's a
19 reasonable proxy for that.
20     **Q.   Because it's the best data available?**
21     A.   Yes.
22     **Q.   Okay.  You can put Exhibit 4 to the side.**
23          **If we look at your declaration, which is**
24 **Exhibit 3, Paragraph 9, in this paragraph you cite to**
25 **the Regan and Olsen research dated 2000.  Is that**
**Page:** 106

1  correct?
2      A.   Yes.
3      **Q.   Okay.  Have there been any other studies that**

4   **address this issue in the last 17 years?**
5          MR. DISHER:  Objection, vague.
6      A.  If there are, there aren't many.
7      **Q.  Okay.  You don't know for sure?**
8      A.  I didn't -- I don't think I found any when I
9   looked that specifically address this.
10     **Q.  And when we say "this," do we mean young**
11  **immigrants -- how would you characterize the -- the**
12  **Regan and Olsen research as you cited it here in this**
13  **paragraph?**
14     A.  They were looking at return migration --
15     **Q.  Okay.**
16     A.  -- of immigrants.
17     **Q.  Okay.**
18          MS. GREGORY:  I'd like to have this
19  marked, please.
20          (Exhibit No. 7 marked)
21     **Q.  Dr. Potter, do you recognize Exhibit 7, titled**
22  **"You Can Go Home Again: Evidence From Longitudinal**
23  **Data"?**
24     A.  Yes.
25     **Q.  And is this the article that you cited in**


📄 Jun 27, 2018 Potter, Lloyd


**Page: 106**
1   correct?
2      A.  Yes.
3      **Q.  Okay.  Have there been any other studies that**
4   **address this issue in the last 17 years?**
5          MR. DISHER:  Objection, vague.
6      A.  If there are, there aren't many.
7      **Q.  Okay.  You don't know for sure?**
8      A.  I didn't -- I don't think I found any when I
9   looked that specifically address this.
10     **Q.  And when we say "this," do we mean young**
11  **immigrants -- how would you characterize the -- the**
12  **Regan and Olsen research as you cited it here in this**
13  **paragraph?**
14     A.  They were looking at return migration --
15     **Q.  Okay.**
16     A.  -- of immigrants.
17     **Q.  Okay.**
18          MS. GREGORY:  I'd like to have this
19  marked, please.
20          (Exhibit No. 7 marked)
21     **Q.  Dr. Potter, do you recognize Exhibit 7, titled**
22  **"You Can Go Home Again: Evidence From Longitudinal**
23  **Data"?**
24     A.  Yes.
25     **Q.  And is this the article that you cited in**
**Page: 107**

1   **Paragraph 9 of your declaration?**
2      A.  Yes.
3      **Q.  Did this study address DACA recipients?**
4      A.  No.

 5      **Q.   Did this study distinguish between documented**
 6 **and undocumented immigrants?**
 7      **A.  No.**
 8      **Q.   On Page 339, the first page, looking at the**
 9 **right-hand column, the second full paragraph, it begins**
10 **"in this paper."  Do you see where --**
11      A.  Yes.
12      **Q.   Okay.  So in this paragraph the author states**
13 **that they use longitudinal data from the 1979 youth**
14 **cohort of the National Longitudinal Surveys (NLSY79) to**
15 **study emigration, with an "E," in one cohort of**
16 **immigrants.**
17           **Did I read that correctly?**
18      A.  Yes.
19      **Q.   What is the National Longitudinal Surveys?**
20      A.  It's a survey that follows people over time
21 and asks a range of questions about their
22 characteristics and socioeconomic characteristics.
23      **Q.   So what would be the 1979 youth cohort of the**
24 **National Longitudinal Surveys?**
25      A.  That would be the cohort that they started

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 108
 1 following in 1979.
 2      **Q.  Do you know when -- or what age a cohort is**
 3 **when they begin following them?**
 4      A.  I don't know.
 5      **Q.   Okay.  So the sentence immediately after that**
 6 **I just read says that more than 750 NLSY79 respondents**
 7 **were born abroad to foreign nationals.**
 8           **Did I read that correctly?**
 9      A.  Yes.
10      **Q.   So this particular cohort was born in or**
11 **before 1979.  Is that correct?**
12      **A.  Yes.**
13      **Q.   Let's look at Footnote 2, which is on the same**
14 **page.  The very last sentence says, quote, By 1996, only**
15 **71 foreign cases were eligible to be interviewed for**
16 **NLSY79, end quote.**
17           **Did I read that correctly?**
18      A.  Yes.
19      **Q.   So in your reading, does that mean that there**
20 **were only -- there was only complete data for**
21 **71 individuals?**
22      A.  In the survey?
23      **Q.  Yes.**
24      A.  Not in the survey, but that they had
25 identified as, quote, unquote, foreign cases in the

📄 **Jun 27, 2018 Potter, Lloyd**

**Page:** 109

1 survey.
2    **Q.   So what does that mean, only 71 foreign cases**
3 **were eligible to be interviewed?  What is your**
4 **understanding of that?**
5    A.   So they were looking at people who started in
6 the 1979 cohort and followed them over time; and by
7 1996, they had identified 71 cases who had returned
8 to -- I think to their country of origin or had left the
9 United States.
10    **Q.   Dr. Potter, are you familiar with the DACA**
11 **eligibility requirements?**
12    A.   Vaguely.
13    **Q.   Are you aware that DACA applicants had to be**
14 **under 31 years old by 2012 to be eligible for deferred**
15 **status and, therefore, wouldn't have been born yet in**
16 **1979?**
17    A.   Yes.
18    **Q.   You can set that to the side, Exhibit 7.**
19          MS. GREGORY:  I'd like to have this
20 marked, please.
21          (Exhibit No. 8 marked)
22    **Q.   Dr. Potter, you're looking at Exhibit 8.  Is**
23 **this the article that you cite in Paragraph 10 of your**
24 **declaration?**
25    A.   Yes.


📄 Jun 27, 2018 Potter, Lloyd


**Page: 112**
1 of their effects vary considerably by age, gender, and
2 nationality.
3          So is it fair to say that DACA recipients
4 who also vary according to age, gender, and
5 nationality -- that this article's conclusions would
6 also vary among DACA recipients?
7    A.   I'm sorry.  I'm not following you.
8    **Q.   I'll move on.**
9    A.   Okay.
10    **Q.   All right.  Let's turn to Page 4.  Give me one**
11 **second to find out where I'm looking.  Actually, we can**
12 **put that to the side.  We're finished with this exhibit.**
13          **I just have a few questions about your CV**
14 **and then hopefully I'll be finished.  If you could pull**
15 **out that exhibit, I believe it's Exhibit 1.**
16    A.   Okay.
17    **Q.   No.  It is Exhibit 2.  My apologies.**
18    A.   Okay.
19    **Q.   So Ms. Perales went through this at length and**
20 **so I'll try to keep this sort.**
21          **Is it fair to say that this is a**
22 **comprehensive summary of your life's work?**
23    A.   Yeah, of my -- yes, of my work, yes.
24    **Q.   Yes, of your work, not of every facet of your**
25 **life?**
**Page: 113**

1    A.   Correct.

2      Q.   Okay.  Let's turn to the "Research Activities
3    Summary."  It is on Page 3 -- or it starts on Page 3.
4    Under "Peer Reviewed Research Activities Summary," there
5    are, like, 29 different peer-reviewed research
6    activities here.
7            Do any of these 29 peer-reviewed research
8    activities address the topic of immigration?
9      A.   I don't believe so.  I'd have to go through
10   and look.  So let me spend a minute to look at them.
11     Q.   Sure.
12           THE REPORTER:  Is that with an "I"?
13           MS. GREGORY:  Yes.
14     A.   Okay.  The question again.
15     Q.   So the question is of the peer-reviewed --
16   29 peer-reviewed research activities, how many address
17   the topic of immigration?
18     A.   Immigration.
19     Q.   With an "I."
20     A.   Immigration.  I think it would be fair to say
21   none.
22     Q.   What about emigration with an "E"?
23     A.   None.
24     Q.   Okay.  Do any address the topic of the
25   Immigration Reform and Control Act?

**Page: 114**

1      A.   No.
2      Q.   Do any of these 29 articles address DACA?
3      A.   No.
4      Q.   Okay.  If you turn to the 15 book chapters, it
5    starts on Page 5.  Do any of these 15 book chapters
6    address the topic of immigration with an "I"?
7      A.   No.
8      Q.   Did any of these book chapters address the
9    topic of the Immigration Reform and Control Act?
10     A.   No.
11     Q.   Did any of the book chapters listed address
12   the topic of DACA?
13     A.   No.
14     Q.   And if we turn to Page 6, I believe there's a
15   list of other -- quote, Other publications, about
16   21 listed there.
17           Of these 21 Other publications, do any of
18   them address the topic of immigration?
19     A.   Some of them --
20     Q.   Which ones?
21     A.   -- and none of them directly.
22           Probably under "Other," No. 1, but I'm
23   not sure about that.  I'd have to go back and look at
24   that.  3 probably does.  4 probably does.  6, 9, 10, 11.
25   I think that's it.

📄 **Jun 27, 2018 Potter, Lloyd**

**Page: 115**

1      Q.   Okay.  Do any of the 21 Other publications
2    address the topic of the Immigration Reform and Control

3 **Act?**
4     A.  No.
5     **Q.   Do any of the Other publications -- and I'm**
6 **using "Other" as the title of that section, Other**
7 **publications address DACA?**
8     A.  No.
9         MS. GREGORY:  I don't have anything
10 further.
11         MR. DISHER:  Mr. Bobb?
12         MR. BOBB:  No, no questions.
13         MS. PERALES:  Are your --
14         MR. DISHER:  I don't have anything.
15         MS. PERALES:  You don't have anything.  I
16 just have one question related to the -- we didn't get
17 any Potter disclosures.
18         MR. DISHER:  In terms of?
19         MS. PERALES:  Like other than the report
20 and the CV --
21         MR. DISHER:  And all the --
22         MS. PERALES:  -- and the articles.
23         MR. DISHER:  And the articles.  That's
24 right.
25         MS. PERALES:  Okay.


📄 **Jun 27, 2018 Potter, Lloyd**


**Page: 115**
1     **Q.   Okay.  Do any of the 21 Other publications**
2 **address the topic of the Immigration Reform and Control**
3 **Act?**
4     A.  No.
5     **Q.   Do any of the Other publications -- and I'm**
6 **using "Other" as the title of that section, Other**
7 **publications address DACA?**
8     A.  No.
9         MS. GREGORY:  I don't have anything
10 further.
11         MR. DISHER:  Mr. Bobb?
12         MR. BOBB:  No, no questions.
13         MS. PERALES:  Are your --
14         MR. DISHER:  I don't have anything.
15         MS. PERALES:  You don't have anything.  I
16 just have one question related to the -- we didn't get
17 any Potter disclosures.
18         MR. DISHER:  In terms of?
19         MS. PERALES:  Like other than the report
20 and the CV --
21         MR. DISHER:  And all the --
22         MS. PERALES:  -- and the articles.
23         MR. DISHER:  And the articles.  That's
24 right.
25         MS. PERALES:  Okay.

**Page: 116**

1         MR. DISHER:  That's all there was to
2 disclose.
3         MS. PERALES:  That's right?

4              MR. DISHER:  Yes.
5              MS. PERALES:  Okay.  I don't have any
6    others.  I reserve my questions for the time of trial.
7              MR. DISHER:  All right.
8                (END OF DEPOSITION)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3   STATE OF TEXAS, et al.,           )
          Plaintiffs,                  )
 4                                     )
     VS.                               )
 5                                     )
     UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
 6        Defendants,                  )
                                       )
 7   and                               )
                                       )
 8   KARLA PEREZ, et al.,              )
                                       )
 9           Defendant-Intervenors.    )
10
                     REPORTER'S CERTIFICATE
11             DEPOSITION OF LLOYD POTTER, Ph.D.
                     JUNE 27, 2018
12
13       I, Kathleen Casey Collins, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16       That the witness, LLOYD POTTER, Ph.D., was duly
17   sworn by the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20       That the deposition transcript was submitted on
21   _____, ____, to the witness or to the attorney for
22   the witness for examination, signature and return to me
23   by _____, _____;
24       That pursuant to information given to the
25   deposition officer at the time said testimony was
```

1  taken, the following includes counsel for all parties
2  of record:
3        Mr. Todd L. Disher and Mr. Trent Peroyea
             Attorneys for the Plaintiffs
4        Ms. Nina Perales, Attorney for
             Defendant-Intervenors
5        Mr. Andrew Bobb, Attorney for Defendants
       Ms. Katherine Gregory, Attorney for New Jersey
6             Office of Attorney General
7        I further certify that I am neither counsel for,
8  related to, nor employed by any of the parties or
9  attorneys in the action in which this proceeding was
10 taken, and further that I am not financially or
11 otherwise interested in the outcome of the action.
12       Certified to by me this _____ day of June,
13 2018.
14       _____
         KATHLEEN CASEY COLLINS
15       Texas CSR NO. 2018
         Certificate Expires 12/31/18
16       Ken Owen & Associates
         Firm Certificate No. 115
17       801 West Avenue
         Austin, Texas  78701
18       (512) 472-0880
19
20
21
22
23
24
25