**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Volume 13

# Exhibits 251 - 279

# DEF-INTERV.

# EX. 251

# DACA RTI Step-by-Step Process

## SFB-1

**<u>Steps to be completed before Submitting to ICE for consideration:</u>**

1. Ensure that an RTI is needed (be sure to check the RTI exception list).

2. Prepare an EPS-RTI memo and fill out the EPS-RTI-Coversheet.

3. When complete, Officer will scan his/her completed EPS-RTI memo including the supporting documents such as TECS/NCIC printouts, PD contact information, de-confliction emails, etc.

4. Officer will save a copy of his/her EPS-RTI memo (in word document) <u>and</u> the scanned PDF supporting documents in O'common drive at:
   a. O*: Brch_NSnF _SFB1  NTA  EPS RTI to BFU Cases  RTIs to ICE NCATC 2017*
      i. Note: doing this step so the clerk can copy and paste the Analysis section of your EPS-RTI memo to FDNS-DS, and the scanned supporting document can be uploaded to FDNS-DS for ICE to review.

5. Print out the EPS-RTI memo, attach to the A-file, and forward to supervisor for review.  Staple the EPS-RTI-Coversheet on the outside of the A-file.

6. Supervisor will initial next to his/her name on the EPS-RTI memo if he/she concurs and returns the case to Officer.  Note: if he/she rejects your RTI, do not create a TECS record.

7. Officer will create a TECS record in modernized TECS. Officer should insert the following verbiage in TECS:
   a. 
      
      # LE
      
      i. Note: Please refer to "How to Create a TECS Record in Mod TECS".

8. When TECS creation has been completed, Officer will forward the A-file to the SFB-1 Clerk for FDNS-DS update.

9. After FDNS-DS data entry complete, the Clerk will write the FDNS-DS case number on the EPS-RTI coversheet and return the case to the requesting Officer.

10. Officer will hold case in abeyance for 60 days waiting for ICE ERO's response.

11. Periodically, Supervisor Van Nguyen and/or a non-DACA EPS team member will forward ICE's responded emails to Officer.  Be sure to open and check if your case has been accepted or declined by ICE DRO.
    - Note: If you don't see your case on the spreadsheet, this **<u>does not</u>** mean that your case has been declined by ICE/ERO, continue hold the file until you receive a response or the 60-hold day has elapsed.

Revised 01/10/2017

DEF - 00001131

# DACA RTI Step-by-Step Process

SFB-1

Steps to be competed after receiving a response from ICE/ERO:

1. Update FDNS-DS.
2. Create another TECS record with updated information.
3. Adjudication and A-file disposition.

## Step 1: Updating FDNS-DS:

When officer receives a response from ICE, be sure to check FDNS-DS to see if it has been updated and closed. If it is not, please send an email with FDNS-DS    to Supervisor Van Nguyen and Ted Lewis and recommend one of the following:

- **Declined by ICE ERO:** The case does not meet ICE enforcement priorities.
- **Declined ICE Custody/ERO:** ICE has determined that the subject is already in ICE Custody and /or in removal proceedings. No additional actions can be taken by ERO.
- **Accepted-**Lead Sent: **NCATC** has referred the case to local ERO-Field Office for further t action.
- **Returned/Rejected:** USCIS did not provide enough information or it was determined that it did not meet the definition of an EPS concern.
- **Additional Vetting Time Requested:** ERO requests additional time to research and vet the case.

## Step 2: Create another TECS record with updated information

Create a TECS record and choose one of the below accordingly (be sure to link the newly created TECS to the old one).

*TECS Declined by ICE ERO update:*

> **LE**

*Cases Accepted by ICE:*

> **LE**

*No response from ICE after 60 days:*

> **LE**

Revised 01/10/2017

DEF - 00001132

# DACA RTI Step-by-Step Process
## SFB-1

### Step 3:  Adjudication and A-file disposition

### When ICE accepts the Case:

- Deny the case using "discretion."
- Prepare a denial letter in ECHO and update CLAIM/ELIS.
- Ask the clerk to mail out the denial notice.
- Prepare the "Memo for the Record" memo and attach it to the right hand side of the A-file
  *Memo can be found in O:  Brch_NSnF _SFB1  Deferred Action for Childhood Arrivals  DACA Vetting and Deconfliction  DACA RTI".*
- Look up ICE local ERO office address by going into this website:
  https://www.ice.gov/contact/ero
    Note:  One ERO office can serve multiple Cities or States. Be sure to check the "Area of Responsibility" to locate the requestor's current City or State.
- Once the local ERO office is found, ask the contractor to send the file to that ERO office.

### When ICE declines the case:

Officer will resume adjudicating the DACA request per current policy/guidance and follow below steps to complete the RTI process for non-EPS.

### Referral of Non EPS (after adjudication)
- Non EPS cases are the cases that ICE rejected.
- Once the file is adjudicated (approved or denied), the adjudicating Officer will enter the subject's information into the *Blank Non-EPS spreadsheet* located in the folder:
  O:  Brch_NSnF _SFB1  Non EPS blank spreadsheet
- A POC will send completed spreadsheets on the 1st and 15th of each month to **Tricia Lepine** (█████████ ice.dhs.gov) and **CC: Jeremy Sahagun** in Vermont.
- Route the physical A-file as normal.

    Acronym:
- ERO    Enforcement and Removal Operations
- NCATC    National Criminal Analysis and Targeting Center.

Revised 01/10/2017

DEF - 00001133

# DEF-INTERV.

# EX. 252



U.S. Citizenship
and Immigration
Services

# HOW TO DECONFLICT DACA

CSC BCU
05/2015

UNCLASSIFIED // FOR OFFICIAL USE ONLY (FOUO)
LAW ENFORCEMENT SENSITIVE

# Deconfliction defined

Deconfliction is the coordination between USCIS and another governmental agency or record owner to ensure that planned adjudicative activities (e.g., interview, request for evidence, site visit, decision to grant or deny, issue an NTA,  and the timing of such) do not compromise or impede an ongoing investigation or other record owner interest.

# TECS Resolution

Once it is determined that the information relates to the individual, determine if the results fall into the following categories, which require special processing:

- National Security;
- EPS or other criminal cases; or
- Articulated immigration fraud.

# TECS Resolution (continued)

Criminal hits, which involve a violation of U.S., state, or local criminal law, but do not rise to the level of an EPS concern, as defined in the November 7, 2011, NTA memorandum, impact each case differently and should be considered during the adjudication process to determine if such activity is germane to the request for DACA.

4

# TECS Resolution (continued)

Criminal activity occurring outside of the United States (including foreign convictions) that may be revealed during routine background checks or which the requestor may have disclosed on the DACA request, factor into the evaluation of whether the requestor poses a public safety concern, under the totality of the circumstances.

# TECS Resolution (continued)

- The resolution memorandum is the formal documentation of the reconciliation of a related hit.
- This is a mandatory action that must be completed before rendering a final adjudicative decision.
- Before completing the adjudication, the ISO should ensure that each resolution memorandum **<u>completely</u>** resolves the hit.

6

# TECS Resolution (continued)

- For a related hit, a separate resolution memorandum must be completed for each subject with a related hit and each file containing a related hit.

- For procedures and formats for the resolution of related hits, refer to the current NaBISCOP policy.

# TECS Resolution (continued)

A. Document the Resolution

Each hit requires documentation by the BCU DACA Team member of any resolution. Review the specific information for each background and security check for more information on documenting the resolution.

# Third Agency Rule

⊙ A practice that restricts the release of shared information.

It means that the recipient of shared information is prohibited from sharing the information with another (i.e., third) agency unless the agency from which the information originated approves of the release.

# Classification Levels

- **TOP SECRET** - Unauthorized disclosure could cause **exceptionally grave** damage.

- **SECRET** - Unauthorized disclosure could cause **serious** damage.

- **CONFIDENTIAL** - Unauthorized disclosure could cause **damage**.



10

# Eligibility Assessment

Purpose

To ensure that valuable time and resources are not unnecessarily expended externally vetting a case with a record owner when the individual is otherwise ineligible for the benefit sought.

If the adjudication will result in a denial, deconfliction may be reconsidered, (unless the hit relates to gang membership or public safety).

*You don't have a formal assessment, a quick cursory review can be performed

11

# Inquiry

- **Before the call, ISO should:** Review the TECS hits thoroughly, review the application/petition/request and supporting documents, conduct necessary system checks.

- **Things to consider during the call:** Biographical Information, Immigration History, Education & Employment, Address History, Military History, Membership in Groups (i.e. gangs), enforcement priority. Does Law Enforcement want to add anything?

- **After deconfliction:** Review notes, ensure the record owners name, contact info, date and time of call is annotated. Follow up on any leads and document the exchange of information on a memo to file.

# Deconfliction
## Deconfliction can occur at <span style="color:red">any</span> stage.

⊙ Coordination between USCIS and another governmental agency owner of derogatory information.

⊙ To ensure that planned adjudicative activities do not compromise or impede an ongoing investigation or other record owner interest.

⊙ Ensures that record owner is aware that the individual has a benefit pending with USCIS.

⊙ Request by Law Enforcement Official for Abeyance or Expedited Processing.

# DECONFLICTION



# External Vetting

Consists of inquiries to record owners in possession of the potential derogatory information to identify:

(a) fact or fact patterns necessary to determine the nature and relevance of the concern, including status and results of any ongoing investigation and the basis for closure of any previous investigation; and

(b) information that may be relevant in determining eligibility, and when appropriate, removability.

# Questions to ask

Is this is known gang member?

Is subject an enforcement priority?

Is your investigation open or closed?

What is the nature of your investigation?

Are there any other eligibility concerns?

Do you have any information we can use, that may assist us in

adjudicating this case?

If the investigation has been closed, why was it closed?

  Was it because the subject moved to a new jurisdiction?
  Was that jurisdiction notified regarding interest in subject?
  Was it because the agent retired/left the job?
  Was it because subject was cleared, and there were no concer
  found?

The instructions for deconfliction contained herein, do not supersede instructions for DACA Adjudication provided by SCOPS.  This is solely for the purposes of addressing the deconfliction process related to contacting record owners.

17

# Acknowledgment

The slides presented in this PowerPoint were adapted from the, DACA Refresher training POC Esther Allred and the FCPTC Student guide, originally authored by Scott Becker, and altered to meet DACA deconfliction guidelines by Raul Garcia.



# DEF-INTERV.

# EX. 253

**US DHS LIMITED OFFICIAL USE ONLY**

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**
**BACKGROUND CHECK UNIT – CALIFORNIA**

**<u>REFERRAL TO ICE</u>**

**FDNS-DS Number**:                                          **Date**:

**To**: ICE FOSC                                             **Attention**:
                                                                     Group Supervisor

**From**: CIS BCU – California                               **Contact**: Officer' Name
                                                                     Immigration Services Officer
                                                                     (949) 389-XXXX

**Approved by**: Supervisor' Name
                    Supervisor Immigration Services Officer, CIS, BCU

**Drafted by**: Officer' Name

**Subject**:        1. General:    Public Safety / Crime of Violence, Murder, Alien Smuggling, etc
                    2. Individual:  Subjects Name – Petitioner/Beneficiary/Applicant
                                    Aliases
                                    DOB: XX/XX/XXXX – COB: XXXXXX
                                    A ######### – SSN #########
                                    Current Immigration Status: XXXXXX

**<u>Case Synopsis</u>**:

This case was initiated after subject alien filed an application or petition with Citizenship and
Immigration Services (CIS), requesting a benefit regarding immigrant or non-immigrant status.  A
review of information available from the application or petition, as well as administrative and/or
criminal indices, indicate that subject may not qualify for the requested benefit and otherwise qualifies
to be placed in removal proceedings. The subject was convicted of XXXXX, in violation of XXXXX. The
case was referred to ICE EROas per Policy Memorandum #602-0050, as the subject qualifies as an EPS
risk under §101(a)(43)(X).

**<u>Summary</u>**:

**Receipt File #:**  [Enter related receipt file number]
**Form Type and Description**: [enter form type/number], [enter form description]
**Date Application/Petition Filed**:  [enter date application/petition filed]
**Subjects last reported address with immigration**:  [Enter subjects last reported address]

Upon conducting system checks of various criminal and administrative indices, it was found that subject alien sustained an arrest and/or conviction for a Crime Involving Moral Turpitude (CIMT) and/or an aggravated felony therefore subject may be qualified to be placed in removal proceedings.

A review of indices with the FBI, NCIC, and SID criminal databases revealed the following criminal records:

**FBI**:   [Enter FBI Number]
**SID**:   [Enter SID Number]

**Date of Conviction**:  [enter date of conviction]
**Convicting Court**:  [enter convicting court]
**Description of Crime**:  [enter description of crime]
**Statute**:  [enter statute]
**Level of crime**:  [enter level of crime]
**Sentence**:  [enter sentence and probation time]

**Date of Arrest**:  [enter date of arrest]
**Arresting Agency**:  [enter arresting agency]
**Description of Crime**:  [enter description of crime]
**Statute**:  [enter statute]
**Level of crime**:  [enter level of crime]
**Disposition**:  [disposition unknown, criminal charges pending, etc]

*(If there are additional convictions, repeat above for all convictions.  Please list in chronological order.)*

Due to the aforementioned, subject is in violation of the Immigration and Nationality Act (INA) as an alien convicted of a crime subsequent to entry and/or adjustment of status in the U.S.

**Currently in custody:**   ☐ YES   ☒ NO      **ICE Detainer:**   ☐ YES   ☒ NO
Holding agency and location:
Scheduled parole or release date:

*(If subject has been in removal proceedings, and appears to have reentered, insert the following)*

***Subject previously removed and appears to have reentered the United States***

**Date of Removal/ Deportation Order:**
**Removal/ Deportation Charge Code:**
**Date Removed/ Deported:**
**Source of information regarding reentry**: [Describe the evidence that indicates re-entry.]

Subject is therefore in violation of Title 8, USC, Section 1326, Re-entry After Deportation.

DEF - 00001211

*(If subject is a registered Sex Offender, insert the following)*

\*\*\* Subject is a registered Sex Offender \*\*\*
**State of registration**:      [Enter state of registration]
**NIC#**:      [Enter NIC #]
**Offense Description**:      [Enter offense description]
**Last registration date**:      [Enter last known registration date]
**Last reported address**:      [Enter last reported address, according to registry]

*(If subject has an outstanding want/warrant, insert the following)*

\*\*\* Subject has an active warrant for his/her arrest (NIC# - W000000000) \*\*\*

The ORI was contacted and the following information was verified:
**Agency Name**:      [Enter agency name]
**ORI Contact Name**:      [Enter name of contact at ORI]
**Telephone Number**:      [Enter ORI telephone Number]
**Date Contacted**:      [Enter date contacted]
**Offense:**      [Enter description of offense]
**Level of Crime**:      [Misdemeanor/Felony]
**Warrant Number**:      [Enter Warrant Number, or referral number]
**Date Warrant Issued**:      [Enter date warrant issued]
**Name on warrant**:      [Enter name on warrant and a.k.a.'s]
**Bond/Bail Information**:      [Enter bond/bail amount]
**Extradition Status**:      [Enter extradition status]

Subjects last known address, as listed on Form [enter Form Type], was provided to the ORI: [enter last known address provided to ORI]
  -OR-
Subjects last known address, as listed on Form [enter Form Type], was offered to the ORI; however ORI did not want the information.

*(If subject has an outstanding Interpol hit, insert the following)*

\*\*\* Subject has an active Interpol Notice (NIC# - W000000000) \*\*\*

Interpol, Washington, DC was contacted and the following information was verified:
**Interpol Contact Name**:      [Enter name of individual you spoke to at Interpol, DC]
**Telephone Number**:      [Enter Contact number for Interpol, DC]
**Date Contacted**:      [Enter date contact made]
**Offense**:      [Enter offense Interpol notice was placed for]
**Level of Crime**:      [Misdemeanor/Felony]
**Red Notice Number**:      [Enter Red Notice Number received from Interpol, DC]
**Date Red Notice Issued**:      [Enter date Interpol notice/Red notice was issued]
**Name on Red Notice**:      [Enter name on Red Notice]
**Extradition Treaty Status**:      [Where is extradition available?]

DEF - 00001212

Red Notice was received on [enter date Red Notice received].  Copy of Red Notice has been attached to the file.
 -OR-
Interpol, Washington, DC was contacted on [enter date(s) Interpol was contacted].   As of this date, a Red Notice has not been received.  All sources have been exhausted and this BCU investigation is now considered closed.  Should a Red Notice be received after the case has been returned to the adjudications floor, the Red Notice will be forwarded to the file for interfiling.

**Action Items**:

Per Memorandum of Agreement, we are withholding adjudication of the pending petitions and/or applications, and refer this case to ICE for action as appropriate.

***NOTE: In the event that this A-file and/or receipt file requires forwarding to a DRO office, please return the file to the RTI author to be adjudicated prior to forwarding.***

**Enclosures**:

All relevant information and documents are contained within the receipt and or A-file forwarded to the SAC/DRO office.

DEF - 00001213

# DEF-INTERV.

# EX. 254

**MEMO FOR THE RECORD**

From:  Officer Name, ISO, SFB1, BCU

To: Insert A-file or Receipt number

Date:  Today's date

Re: Insert Requestor's Name; DOB: Insert Requestor's DOB

**Form: I-821D/I-765**
**A#**
**FDNS-DS#**

**TRANSFER FILE TO ICE ERO/DRO:**

Subject's Name; DOB:XX/XX/XXXX, has been referred to ICE ERO NCATC as  previously deported alien who reentered the U.S. without permission,  per Policy Memorandum #602-0050 the subject qualifies as an EPS risk under 101(a)(43)(O) of the INA.

Local ICE ERO/DRO accepted the case for further enforcement action.


Thank you,

Your name

Contact information

# DEF-INTERV.

# EX. 255

| | |
|---|---|
| **From:** | Lopez, Jose M <        @uscis.dhs.gov> |
| **Sent:** | Wednesday, March 20, 2013 2:39 PM |
| **To:** | |
| **Subject:** | EID record in ATS-P May Indicate Additional Arrests |

When you notice DACA cases that have ENFORCE ID (EID) records in ATS-P showing ENFORCE entries under Operation Secure Community. Operation Secure Community is a program used by ICE (in partnership with the FBI) in which criminal aliens suspected to also be in violation of the INA are identified through their fingerprints. Aliens enrolled under Operation Secure Community are usually referred to ICE after being apprehended by state or local law enforcement agencies, and discovered to be in the U.S. illegally. During the alien's incarceration, ICE will enroll these individuals in ENFORCE to show that they are in violation of the INA.

When ENFORCE shows that the requestor was enrolled under Operation Secure Community, and the requestor was enrolled after being fingerprinted may show further criminal activity that needs to be addressed via an RFE.

For more info about Secure Communities Program see: http://www.ice.gov/secure_communities/

Congratulation and thank you to Sam Smitherman, he was the officer that bought this situation to our attention. Well done Sam…..

*Jose M. Lopez*
*Supervisory Immigration Service Officer*
*Texas Service Center*
*Background Check Unit*
      *@uscis.dhs.gov*
*Phone: 214-962-* ▮
*Fax: 214-962-* ▮

*The information contained in (or attached to) this e-mail is For Official Use Only (FOUO) and should be considered Sensitive Unclassified. The information contained within (or attached to) this e-mail is intended for the recipient only and should only be disseminated to others as required. The contents of this e-mail (and any attachments) are the property of the United States of America, Department of Homeland Security (DHS), US Citizenship and Immigration Services (USCIS). If you are the unintended recipient of this e-mail, please delete it (and all contents) IAW regulation and notify sender.*

DEF - 00001821

# DEF-INTERV.

# EX. 256

## Request for Adjudicative Guidance (RAG):

A new ECN process for the submission of DACA Requests for Adjudicative Guidance (RAGs) is in effect as of 09/14/2015. With this new process, RAG submissions to the HQSCOPSDACA mailbox are no longer required. Submit all future RAGs to SCOPS via the link below:

http://ecn.uscis.dhs.gov/team/scops/HQSCOPS/AD/DACA/HQSCO_DACA_Internal/Lists/DACA%20RAG%20List/Created%20By%20Me.aspx

By selecting the "Add New Item" icon, a RAG template will populate for you to insert all of the relevant case information.  Please attach any court documents, arrests or investigative reports, or law enforcement documents that will give a more complete picture of the circumstances.  After you enter the case information, you should select the button at the bottom of the screen to route the RAG to the NSC.BCU DACA Supervisor group through the standard work flow. An email notice should be sent via Outlook notifying the supervisor group once a new RAG has been sent for their review or returned with decision/edits.

RAGs concerning **ongoing/active investigations** should always include answers to the following:

- Does ICE consider the requestor to be an enforcement priority and/or a public safety concern?
- Does ICE have any objection to the approval of the DACA request?

NOTE:  Executive Summaries will still be composed in ECHO and attached to an email to your supervisor and ISO3 for review and submission to HQSCOPSDACA.

DEF - 00001888

# DEF-INTERV.

# EX. 257

# DACA Requestor in Immigration Detention

(Requestor is in detention <u>prior to filing</u> and <u>still in detention</u> at the time of adjudication.)

| Does ICE consider the requestor to be an enforcement priority? | Does ICE intend to admin close the proceedings and/or physically release the requestor within 30 days? | Action |
|---|---|---|
| Yes or No | No | Deny the DACA request using the checkbox denial – "USCIS lacks the authority to consider your request because you were in immigration detention at the time you filed your Form I-821D and you remain in immigration detention as of the date of this notice." |
| Yes | Yes | Deny the DACA request using the checkbox denial – You have not established that you warrant a favorable exercise of prosecutorial discretion. |
| No | Yes | Adjudicate the case on its merits. **The requestor's physical release must be verified via DHS electronic systems before the case is adjudicated.** |

DEF - 00002158

# DEF-INTERV.

# EX. 258

| | |
|---|---|
| Title | |
| Question | Should centers deny a DACA request without first issuing an RFE or NOID? |
| Answer | In general, SCOPS requires the Centers to issue either an RFE or NOID before denying a DACA request. An RFE is appropriate when the record lacks sufficient evidence to demonstrate that the requestor satisfies one or more of the guidelines, and a NOID is appropriate when the record contains evidence that the requestor clearly does not satisfy one or more of the guidelines (e.g., disqualifying action/event). |

However, the Centers may deny a DACA request without first issuing an RFE or NOID when the record contains irrefutable evidence that the requestor:

- Is deceased.
- Was in immigration detention at the time of filing, remains in immigration detention as of the date the I-821D is adjudicated, and
    - ICE indicates that it does not intend to physically release the requestor within 30 days; or
    - ICE confirms the individual is an enforcement priority.
- At the time of filing, was under age 15 and was not in removal proceedings, did not have a final removal order, or did not have a voluntary departure order.
- Did not arrive in the United States before reaching his/her 16th birthday.
- Was age 31 or older on 6/15/2012.
- Was convicted of a felony that poses a threat to public safety, as described on pages 3 & 4 of the 11/7/2011 NTA Memorandum.
- Already received deferred action as a childhood arrival from USCIS or ICE.
- Acquired lawful immigration status after 6/15/2012 and is in a lawful immigration status as of the date the I-821D is adjudicated.
- Was a lawful permanent resident on 6/15/2012.
- Was under an order of voluntary departure or deportation, exclusion, or removal **and** was physically removed by ICE **or** voluntarily departed the U.S. while their Form I-821D was pending with USCIS **and such departure was witnessed by a DHS official.**
- USCIS records show that the requestor's previous DACA request (initial or renewal) was terminated on the basis of 1) issuance of an NTA; 2) travel outside of the U.S. without advance parole; 3) being an enforcement priority/public safety concern; or 4) fraud.

When the Centers deny a DACA request without issuing an RFE or NOID, they will include a brief executive summary of the decision in the A-file.

Confidential DEF - 00002362

Please see the DACA SOP and Internal FAQs for additional information about handling procedures for these scenarios. If you believe a straight denial is appropriate for a particular case that does not fall within one of the categories identified above, please send a **Request for Adjudicative Guidance** to the HQSCOPSDACA mailbox.

| Associated Form | |
| --- | --- |
| DACA Category | **Decisions** |
| Sub-Category | **NOID Vs. Denial** |

Confidential

DEF - 00002363

**Question**    How should an ISO handle a case where the requestor submitted fraudulent documentation in attempt to satisfy certain DACA guidelines?

**Answer**    If an ISO suspects that a requestor has submitted questionable or fraudulent documentation in an attempt to satisfy one or more of the DACA guidelines listed below:

(1) Under the age of 31 as of June 15, 2012;
(2) Came to the United States before reaching your 16th birthday;
(3) Have been residing continuously in the United States since June 15, 2007, up to the present time; and
(4) Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;
*(5) Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

the ISO will complete a referral sheet citing the articulable elements of fraud found within the filing and refer the case to the CFDO prior to taking any adjudicative action, even if there are other issues present that may weigh against a favorable exercise of prosecutorial discretion in the case. If the CFDO returns the case with a Statement of Findings (SOF) indicating a confirmed finding of fraud (e.g., USCIS suspects, and in many cases has confirmed through further investigation, that the requestor knowingly submitted fraudulent or suspicious documents as evidence in an attempt to obtain DACA), the ISO should issue the DACA 414 NOID from the Appendix E (NOIDs). If the requestor is unable to overcome the basis for the intended denial, the case should be denied using the appropriate paragraph denial from Appendix F: "You have not established that you warrant a favorable exercise of prosecutorial discretion." Denials based on confirmed fraud must be supported by a properly documented SOF generated by the CFDO. FDNS-DS must be updated to show that the DACA request was actually denied for confirmed fraud. The Officer will provide information on the final outcome of a DACA request to the CFDO so they may update FDNS-DS accordingly.

Per the DACA SOP, DACA cases denied due to a confirmed finding of fraud shall be updated in C3 as "Denial Notice with a Finding of Fraud Ordered"[EC] for tracking purposes. In addition, DACA cases denied due to a confirmed finding of fraud shall be referred for NTA issuance in accordance with the NTA memorandum dated November 7, 2011. The appropriate NTA charge will be determined on a case-by-case basis in consultation with local counsel.

Centers are no longer required to elevate fraud cases related to any of the five DACA guidelines listed above to SCOPS attention unless they encounter a novel, complex or sensitive case.

Confidential    DEF - 00002364

departed the U.S. while their Form I-821D was pending with USCIS **and such departure was witnessed by a DHS official**.

- USCIS records show that the requestor's previous DACA request (initial or renewal) was terminated on the basis of 1) issuance of an NTA; 2) travel outside of the U.S. without advance parole; 3) being an enforcement priority/public safety concern; or 4) fraud.

When the Centers deny a DACA request without issuing an RFE or NOID, they will include a brief executive summary of the decision in the A-file.

Please see the DACA SOP and Internal FAQs for additional information about handling procedures for these scenarios. If you believe a straight denial is appropriate for a particular case that does not fall within one of the categories identified above, please send a Request for Adjudicative Guidance to the HQSCOPSDACA mailbox.

| Associated Form | |
|---|---|
| DACA Category | Decisions |
| Sub-Category | NOID Vs. Denial |

Confidential   DEF - 00002365

| Question | Do DACA requestors need to provide evidence of continuous residence "on or about" 6/15/2007? |
|---|---|
| Answer | No. Although the 6/15/2007 and 6/15/2012 dates are "bookends" for the Continuous Residence guideline, the date-specific Physical Presence guideline only applies to 6/15/2012. This means that an officer can determine on a case-by-case basis that the DACA requestor meets the Continuous Residence guideline based on the totality of evidence presented even if the DACA requestor does not submit evidence of residence on or about 6/15/2007.<br><br>If there is a gap of evidence for a significant period of time at the beginning of the Continuous Residence period, then the officer should determine whether residence since 6/15/2007 can be inferred based on the totality of evidence presented in that case. If not, then an RFE is appropriate, but the officer should be careful not to ask for evidence of residence "on or about" 6/15/2007 because this implies a physical presence guideline that does not exist. It is better to specify in the RFE the gap in the evidence received and then to ask more broadly for additional evidence of continuous residence since 6/15/2007. |
| Associated Form | |
| DACA Category | **Guidelines** |
| Sub-Category | **Continuous Residence** |

Confidential      DEF - 00002366

| | |
|---|---|
| Title | Disqualifying International Travel on or After 8/15/12 |
| Question | Does international travel on or after August 15, 2012 and before USCIS has determined whether to defer action under the DACA process disrupt continuous residence? |
| Answer | Yes. Continuous residence is disrupted if a DACA requestor travelled outside the United States on or after August 15, 2012 and before USCIS determined to defer action. Additionally, a DACA requestor cannot apply for advance parole unless and until USCIS has made a determination to defer action in his or her case. |
| | If routine systems checks, documentation submitted with the DACA request, or evidence in the A-file indicate that a departure was made on or after August 15, 2012, but before USCIS had determined whether to defer action on a case, issue a Notice of Intent to Deny (NOID) with the opportunity for the requestor to rebut the derogatory information. See **Appendix E** for NOID Template. |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Continuous Residence |

Confidential

DEF - 00002367

| Question | What should we do when criminal proceedings are still pending for a potentially disqualifying criminal offense? |
|---|---|
| Answer | For EPS cases, follow the guidance in the SOP (Chapter 8, Section G, Handling Procedures, EPS Cases). |

For Non-EPS cases where the requestor has been arrested for a potentially disqualifying criminal offense, but the court disposition is currently unavailable because the criminal proceedings are still pending, the BCU DACA Team will issue an RFE (DACA 151 Call Up). The BCU DACA Team will withhold adjudication until the requestor submits the court disposition or receives authorization from SCOPS to deny the case absent the court disposition. The BCU DACA Team will initially provide 87 days for the requestor to respond, but may issue a second RFE (DACA 151 Call Up) if the requestor fails to provide the final court disposition within 87 days because the criminal proceedings have not concluded.

| Associated Form | |
|---|---|
| DACA Category | **Guidelines** |
| Sub-Category | **Criminality Issues** |

Confidential

DEF - 00002368

| | |
|---|---|
| Question | Is an offense of driving after consuming alcohol always considered a significant misdemeanor for DACA purposes? |
| Answer | No; a criminal offense of driving after consuming alcohol is only a significant misdemeanor for DACA purposes if it is a misdemeanor as defined by federal law (i.e. maximum term of imprisonment authorized is more than 5 days but less than 1 year), and the statute requires, for a finding of guilt, that either: |

1. The person was intoxicated, impaired or under the influence; or
2. The person has a certain level of blood alcohol concentration (BAC), other than a negligible amount that can be measured (such as .01%).

Examples of alcohol-related driving offenses that are not significant misdemeanors for DACA purposes include, but are not limited to:
- Wisconsin offense for Operating While Under the Influence (§346.63(1)(a)) – not a significant misdemeanor because it carries no prison sentence and therefore does not meet the definition of a misdemeanor under federal law.
- California offense for Reckless Driving Involving Alcohol (§23103.5) – not a significant misdemeanor because it requires neither a particular BAC level nor intoxication/impairment. Instead, the statute defines the offense as driving where alcohol is involved.

If a DACA requestor has been convicted of an offense of driving after consuming alcohol, but it is not considered a significant misdemeanor for DACA purposes, follow the guidance in Chapter 8, Section G of the DACA SOP – although the conviction alone is not automatically disqualifying, consider the entire record, including all issues of criminality, when determining whether prosecutorial discretion should be exercised.

Please consult with your local counsel if you are unsure whether an alcohol-related driving offense is considered a significant misdemeanor for DACA purposes.

| | |
|---|---|
| Associated Form | |
| DACA Category | **Guidelines** |
| Sub-Category | **Criminality Issues** |

Confidential    DEF - 00002369

Title  Known or Suspected Gang Membership

Question

Answer

# LE

Associated Form

DACA Category  **Guidelines**

Sub-Category  **Criminality Issues**

Confidential  DEF - 00002370

itle    Juvenile Delinquency

Question

Answer



Associated Form

DACA Category        **Guidelines**

Sub-Category         **Criminality Issues**

Confidential

DEF - 00002371

| Title | Pending Criminal Proceedings Under Deferred Prosecution, Pretrial Diversion, and Rehabilitative Programs |
|---|---|

| Question | How should Centers process a case where the requestor has entered into a deferred prosecution, pretrial diversion or rehabilitative program, and completion of such program will remain pending for more than 6 months from the time a Center receives the related court documents? |
|---|---|

| Answer | Deferred prosecution, pretrial diversion or rehabilitative programs that do not require the defendant to plead guilty or nolo contendere or require the court to make any finding of guilt do not constitute a conviction for immigration purposes. However, for DACA purposes, certain pending criminal charges may raise public safety concerns which should be factored into whether or not a requestor merits a favorable exercise of prosecutorial discretion. |
|---|---|

**LE**

a) Each request should be evaluated on a case-by-case basis, taking into account the totality of the evidence to determine whether the requestor warrants a favorable exercise of prosecutorial discretion.

b)

**LE**

c) A recommended decision on the DACA request should be forwarded for supervisory approval and clearance from local counsel before a final determination is made.

d) All denials of Form I-821D for cases that fall under the scenario described above should be processed using call up **DACA 511 - DISCRETIONARY** from the Appendix F.

2) Alternately, if a requestor's court case indicates the pending criminal charges will be resolved <u>within 6 months</u> from the date a Center receives the related court documents (e.g., in the initial filing or in response to an RFE), Centers should withhold adjudication of the DACA request to await the outcome of the court proceedings and follow the guidance outlined below:

a) If the requestor successfully complies with the court order and the charges are subsequently dropped, the case should be adjudicated on its merits taking into account the totality of the evidence.

b) If the requestor fails to comply with the court order, resulting in a disqualifying conviction for DACA purposes, the case should be processed accordingly.

**Please note: The guidance above also applies to cases in which court proceedings have been repeatedly continued to a future date or have been**

Confidential DEF - 00002372

**continued indefinitely.**

**Centers are no longer required to elevate these cases to SCOPS attention unless they encounter a novel, complex or sensitive case.**

| | |
|---|---|
| Associated Form | |
| DACA Category | **Guidelines** |
| Sub-Category | **Criminality Issues** |

Confidential

DEF - 00002373

# DEF-INTERV.

# EX. 259

| Title | Deferred Enforced Departure (DED) |
| --- | --- |
| Question | Is a DACA requestor disqualified from satisfying the "unlawful immigration status as of 6/15/2012" guideline if he/she is a beneficiary of Deferred Enforced Departure (DED)? |
| Answer | No; DED is not considered lawful immigration status for DACA purposes. |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Unlawful Immigration Status |

Confidential

DEF - 00002386

| Title | Age outs within the DACA Context |
|---|---|
| Question | Can a DACA requestor satisfy the "Unlawful Immigration Status on June 15, 2012" guideline if he or she was admitted for "duration of status" or for a period of time that extended past June 14, 2012 but technically "aged out" of their dependent nonimmigrant status on June 15, 2012? |
| Answer | For the purposes of satisfying the DACA "Unlawful Immigration Status on June 15, 2012" guideline (meaning the person needed to be out of status on June 15, 2012), persons who were admitted for "duration of status" or for a period of time that extended past June 14, 2012 but technically "aged out" of their dependent nonimmigrant status, before June 15, 2012, will be considered persons whose lawful immigration status had expired as of June 15, 2012. |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Unlawful Immigration Status |

| | |
|---|---|
| Title | Status Terminated in SEVIS within the DACA Context |
| Question | Can a DACA requestor satisfy the "Unlawful Immigration Status on June 15, 2012" guideline if his or her status is listed as "terminated" in SEVIS? |
| Answer | Yes, assuming the requestor satisfies all other DACA guidelines, if his or her status on or before June 15, 2012 is listed as "terminated" in SEVIS and he or she did not otherwise have legal status, DHS will consider his or her lawful immigration status to have expired as of June 15, 2012 for DACA purposes. |

| | |
|---|---|
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Unlawful Immigration Status |

Confidential

DEF - 00002388

| Title | Canadians who entered as "non-controlled" aliens within the DACA Context |
|---|---|
| Question | Can a DACA requestor satisfy the "Unlawful Immigration Status on June 15, 2012" guideline if he or she entered as a "non-controlled" alien at the border? |
| Answer | For DACA purposes only, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) will be deemed to have been lawfully admitted for a period of six months unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that his or her last non-controlled entry occurred on or before December 14, 2011, DHS will consider his or her nonimmigrant visitor status to have expired as of June 15, 2012 and he or she may be considered for deferred action under this process. |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Unlawful Immigration Status |

Confidential DEF - 00002389

| | |
|---|---|
| Title | Border Crossing Cards Admissions within the DACA Context |
| Question | Can a DACA requestor satisfy the "Unlawful Immigration Status on June 15, 2012" guideline if he or she was admitted with a border crossing card (BCC)? |
| Answer | For DACA purposes only, a BCC holder who satisfies all other DACA guidelines, and who is admitted as a visitor and is not issued an I-94, Arrival/Departure Record, will be deemed to have been lawfully admitted for a period of thirty days unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time.  Accordingly, if DHS is able to verify from its records that his or her last admission using a BCC occurred on or before May 15, 2012, DHS will consider his or her nonimmigrant visitor status to have expired as of June 15, 2012 and he or she may be considered for deferred action under this process. |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Unlawful Immigration Status |

Confidential      DEF - 00002390

| | |
|---|---|
| Title | Acquired Lawful Immigration Status After 6/15/2012 |
| Question | If a DACA requestor was not in lawful immigration status on June 15, 2012 but acquired lawful immigration status after June 15, 2012, can USCIS defer action under DACA if the requestor appears to meet all of the other DACA guidelines? |
| Answer | The "Unlawful Immigration Status" guideline only addresses immigration status on June 15, 2012. However, USCIS has determined that we will not defer action under DACA for an individual who is currently in lawful immigration status. Therefore, if a DACA requestor acquired lawful immigration status or parole *after* June 15, 2012 and remains in lawful immigration status or his or her parole has not expired at the time of adjudication of the DACA request, we will not defer action under DACA as a matter of discretion. The centers should deny cases that fit these scenarios using either call up **DACA 530 ACQUIRED LAWFUL STATUS AFTER JUNE 15, 2012** or call up **DACA 531 - ACQUIRED PAROLE AFTER JUNE 15, 2012** from the Appendix F. |
| Associated Form | |
| DACA Category | Other |
| Sub-Category | Another USCIS Form Pending/Approved |

Confidential                                              DEF - 00002391

| | |
|---|---|
| Title | Acquired Deferred Action Pursuant to Other Programs |
| Question | How should centers process Form I-821D (initial or renewal) when the DACA requestor has acquired deferred action pursuant to other programs? |
| Answer | Deferred action does not confer lawful status; however, for future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. Deferred action for childhood arrivals is one form of deferred action. The relief an individual receives pursuant to DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

Individuals who receive deferred action through other programs may be eligible for DACA. However, if at the time of the adjudication of the DACA request, the requestor already has an unexpired deferred action, USCIS will deny their DACA request. USCIS also wants to prevent issuing two employment authorization documents to the same individual.

Centers shall use call up **DACA 535 - USCIS ALREADY DEFERRED ACTION UNDER ANOTHER (NON-DACA) PROGRAM** from the Appendix F the purpose of denying these cases. |

| | |
|---|---|
| Associated Form | |
| DACA Category | **Other** |
| Sub-Category | **Another USCIS Form Pending/Approved** |

Confidential

DEF - 00002392

| Title | Duplicate Filings |
|---|---|
| Question | How should we proceed when an individual files more than one DACA request? |
| Answer | If the first request was approved before the second request was filed, deny the other request using call up **DACA 533 -USCIS ALREADY DEFERRED ACTION UNDER DACA** from the Appendix F. |

If the first request was denied before the second request was filed, consider the second request on its merits.

If the first request was still pending when the second request was filed, the ISO should review both requests and supporting documentation. If it is the same requestor and there are no articulable elements of fraud, then the ISO should take the following action:

    a) If after reviewing both requests, only one request is approvable and there is no derogatory information in the other request that would otherwise disqualify the requestor:

        1. Approve the request that is approvable.

        2. Deny the other request using call up **DACA 533 -USCIS ALREADY DEFERRED ACTION UNDER DACA** from the Appendix F.

    b) If after reviewing both requests, both requests are approvable:

        1. Approve the request that was received first.

        2. Deny the other request using call up **DACA 533 -USCIS ALREADY DEFERRED ACTION UNDER DACA** from the Appendix F.

    c) If after reviewing both requests, neither request is approvable:

        1. Take action on each case as separate requests based on the merits of each case (i.e., RFE if insufficient evidence, NOID if clearly does not meet guidelines, etc.).

        2. If one or both requests become approvable after the RFE/NOID response is received, follow the guidance listed in a) or b) above for those scenarios.

        3. If neither request becomes approvable, deny both requests using the appropriate call up from the Appendix F.

| Associated Form | |
|---|---|
| DACA Category | Other |
| Sub-Category | Duplicate Filings; File Information Requests |

Confidential    DEF - 00002393

DACA FAQs - DACA FAQs

| Title | How to process a Form I-290B, Notice of Appeal or Motion, based on a denial of a Form I-821D. |
|---|---|
| Question | Should the Service Centers reject a Form I-290B, Notice of Appeal or Motion, based on a denial of a Form I-821D? |
| Answer | As stated in the DACA FAQs, an individual cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies his or her request for consideration of DACA. If a Form I-290B is filed as an appeal, the appeal must be forwarded to the AAO and should never be treated as a motion. Centers should issue the AAO Transmittal Notice - Underlying Form Types with No Appeal Rights. |

| Associated Form | I-290B |
|---|---|
| DACA Category | Other |
| Sub-Category | I-290B |

Confidential                                    DEF - 00002394

| Title | How to process a Form I-290B, Notice to Appeal or Motion, based on a denial of a Form I-765. |
| --- | --- |
| Question | Should the Service Centers process a motion based on a Form I-765 that was denied for abandonment in accordance with regulations? |
| Answer | Yes, the Service Center should process the form in accordance with regulations. |
| Associated Form | I-290B |
| DACA Category | Other |
| Sub-Category | I-290B |

Confidential DEF - 00002395

| Title | ICE Already Deferred Action Under DACA |
|---|---|
| Question | What should we do when ICE defers action under DACA but the DACA recipient files a complete DACA packet instead of simply requesting employment authorization? |
| Answer | When ICE defers action under DACA, sometimes the DACA recipient files the complete DACA packet instead of simply requesting an EAD. In such cases, you should be able to verify in EARM that ICE deferred action under DACA. If ICE already deferred action under DACA, the I-821D should be denied using the DACA 532 call-up in Appendix F, and the I-765 should be adjudicated based on the decision made by ICE. |
| Associated Form | |
| DACA Category | Removal Proceedings and ICE Actions |
| Sub-Category | Duplicate Filings; File Information Requests |

Confidential                                                                     DEF - 00002396

| Title | Immigration Detention After Filing Form I-821D |
|---|---|
| Question | How should we process a DACA request when the requestor was placed in immigration detention after filing Form I-821D? |
| Answer | If DHS electronic systems or information received from ICE identifies the requestor as having been placed in immigration detention after filing his/her Form I-821D, the Center should follow the below procedures. |

The BCU will contact local ICE operations having jurisdiction over the requestor to determine if the requestor is an ICE enforcement priority or if ICE intends on administratively closing the proceedings and/or physically releasing the requestor within 30 days.

1. If ICE indicates that the requestor is an ICE enforcement priority, USCIS will deny the DACA request using the call up DACA 511 -NOTICE OF DENIAL - DISCRETIONARY from the Appendix F (Denial Template) that states "you have not established that you warrant a favorable exercise of prosecutorial discretion." USCIS will notify ICE once the denial notice is issued

2. If ICE indicates that the case is not an ICE enforcement priority and ICE intends to physically release the requestor, the case will be adjudicated on its merits. A review of DHS electronic systems must be performed to ensure the requestor is physically released before the case is adjudicated on its merits.

If the BCU disagrees with ICE's determination of whether or not the requestor is an enforcement priority, the BCU should ask the Service Center's local counsel for assistance in contacting local ICE counsel to discuss the reasons why USCIS disagrees with ICE's determination. The Service Center's local counsel can seek assistance from USCIS Headquarters' Office of the Chief Counsel to contact ICE, if necessary.

| Associated Form | |
|---|---|
| DACA Category | **Removal Proceedings and ICE Actions** |
| Sub-Category | **Duplicate Filings; File Information Requests** |

Confidential    DEF - 00002397

| | |
|---|---|
| Title | ICE Takes Action Against a Requestor While the I-821D is Pending |
| Question | How should the Center process a DACA request when ICE takes action against a requestor while a DACA request is pending? |
| Answer | If DHS electronic systems or information received from ICE indicates that ICE has taken action against a requestor while a DACA request is pending, for example, by issuing a detainer against the requestor, placing him/her under an order of supervision, or placing him/her in an ankle bracelet monitoring system, <u>after</u> the requestor has filed Form I-821D, the Center should follow the below procedures. |

The BCU will contact local ICE operations having jurisdiction over the requestor to determine if the requestor is an ICE enforcement priority or if ICE intends on administratively closing the proceedings and/or physically releasing the requestor within 30 days.

1. If ICE indicates that the requestor is an ICE enforcement priority, regardless of whether ICE issues a detainer against him or her, places him or her under an order of supervision, or places him/her in an ankle bracelet monitoring system USCIS will deny the DACA request using the call up DACA 511 NOTICE OF DENIAL – DISCRETIONARY from the Appendix F (Denial Template) that states "You have not established that you warrant a favorable exercise of prosecutorial discretion." USCIS will notify ICE once the denial notice is issued.
2. If ICE indicates that the case is not an ICE enforcement priority, the case will be adjudicated on its merits.

If a BCU supervisor disagrees with ICE's determination of whether or not the requestor is an enforcement priority, the BCU should ask local counsel for assistance in contacting local ICE counsel to discuss the reasons why USCIS believes this individual is or is not an enforcement priority. The Service Center's local counsel can seek assistance from USCIS Headquarters' Office of the Chief Counsel to contact ICE, if necessary.

| | |
|---|---|
| Associated Form | |
| DACA Category | Removal Proceedings and ICE Actions |
| Sub-Category | Duplicate Filings; File Information Requests |

Confidential                                                    DEF - 00002398

# DEF-INTERV.

# EX. 260

# **Appendix B**



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

**November 7, 2011**                                             **PM-602-0050**

# Policy Memorandum

SUBJECT:   Revised Guidance for the Referral of Cases and Issuance of Notices to Appear
(NTAs) in Cases Involving Inadmissible and Removable Aliens

## Purpose

This Policy Memorandum (PM) establishes new USCIS guidelines for referring cases and
issuing Notices to Appear (NTAs) in a manner that promotes the sound use of the resources of
the Department of Homeland Security and the Department of Justice to enhance national
security, public safety, and the integrity of the immigration system. This PM supersedes Policy
Memorandum No. 110, *Disposition of Cases Involving Removable Aliens*, dated July 11, 2006.

## Scope

This PM applies to and is binding on all USCIS employees unless otherwise specifically
provided in this PM.

## Authority

Immigration and Nationality Act (INA) sections 101(a)(43), 103(a), 239, 240 and 318; Title 8,
Code of Federal Regulations (8 CFR) parts/sections 2.1, 103, 204, 207.9, 208, 216.3(a),
216.6(a)(5), 236.14(c), and 239; Adjudicator's Field Manual Chapter 10.11(a).

## Background

U.S. Citizenship and Immigration Services (USCIS) has authority, under the immigration laws,
*see, e.g.*, INA §§ 103(a), 239; 8 CFR §§ 2.1, 239.1, to issue Form I-862, Notice to Appear, to
initiate removal proceedings.[1]  U.S. Immigration and Customs Enforcement (ICE) and U.S.
Customs and Border Protection (CBP) also have authority to issue NTAs. Accordingly, USCIS
must ensure that its issuance of NTAs fits within and supports the Government's overall removal
priorities, while also ensuring that its NTA policies promote national security and the integrity of
the nation's immigration system.

To those ends, this PM identifies the circumstances under which USCIS will issue an NTA, or
will refer the case to ICE for NTA issuance, in order to effectively handle cases that involve
public safety threats, criminals, and aliens engaged in fraud.

---

[1] *Delegation by the Secretary of the Department of Homeland Security to the Bureau of Citizenship and Immigration
Services,* Delegation Number 0150.1; Paragraph 2(N). However, international District Directors and officers are not
authorized to issue NTAs.

www.uscis.gov

                                      DEF - 00002605

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 2

## Policy

### I. National Security Cases

This PM does not affect the handling of cases involving national security concerns.[2]
Guidance from the Fraud Detection and National Security Directorate (FDNS)[3] will continue
to govern the definition of these cases and the procedures for resolution and NTA issuance.

### II. NTA Issuance Required by Statute or Regulation

USCIS will issue an NTA in the following circumstances:[4]

A. Termination of Conditional Permanent Resident Status and Denials of Form I-751,
   Petition to Remove the Conditions of Residence (8 CFR 216.3, 216.4, 216.5)[5]
B. Denials of Form I-829, Petition by Entrepreneur to Remove Conditions (8 CFR 216.6)
C. Termination of refugee status by the District Director (8 CFR 207.9)
D. Denials of NACARA 202 and HRIFA adjustments
   1. NACARA 202 adjustment denials (8 CFR 245.13(m));
   2. HRIFA adjustment denials (8 CFR 245.15(r)(2)(i)).
E. Asylum[6], NACARA 203, and Credible Fear cases:[7]
   1. Asylum referrals (8 CFR 208.14(c)(1));
   2. Termination of asylum or termination of withholding of removal or deportation
      (8 CFR 208.24(e));[8]
   3. Positive credible fear findings (8 CFR 208.30(f));
   4. NACARA 203 cases where suspension of deportation or cancellation of removal
      is not granted, and the applicant does not have asylum status, or lawful immigrant
      or non-immigrant status (8 CFR 240.70(d)).

This PM does not apply to, or change, NTA or notification procedures for Temporary
Protected Status cases.[9]  Further, Form I-360, Petition for Amerasian, Widow(er), or Special
Immigrant, processed under the Violence Against Women Act (VAWA), should continue to

---

[2] National Security Cases include cases involving Terrorist Related Grounds of Inadmissibility (TRIG) pursuant to
sections 212(a)(3)(B) and 212(a)(3)(F) of the INA.
[3] See, e.g., *Policy for Vetting and Adjudicating Cases with National Security Concerns* (April 11, 2008).
[4] If any Form I-751 or I-829 cases are also Egregious Public Safety cases, they will be referred to ICE in accordance
with Section IV.A.1 of this PM.
[5] See the October 9, 2009 internal memo, *Adjudication of Form I-751, Petition to Remove Conditions on Residence
Where the CPR Has a Final Order of Removal, Is in Removal Proceedings, or Has Filed an Unexcused Untimely
Petition or Multiple Petitions.*  See also the April 3, 2009 memo, *I-751 Filed Prior to Termination of Marriage.*
[6] USCIS may issue an NTA when an asylum applicant withdraws his or her asylum application.
[7] This memo does not apply to the Asylum Division's issuance of Form I-863, Notice of Referral to Immigration
Judge, to certain stowaways, crewmembers, and VWP individuals who are requesting asylum or withholding of
removal; reasonable fear screenings and negative credible fear screenings.
[8] See also section 208(c)(3) of the INA describing removal when asylum is terminated.
[9] See the September 12, 2003 internal memo, *Service Center Issuance of Notice to Appear (Form I-862).*

Confidential

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 3

be processed under existing protocols.  If the VAWA applicant's Form I-485 is denied, this
memorandum is applicable in terms of NTA issuance.[10]

III. Fraud Cases with a Statement of Findings Substantiating Fraud

To protect the integrity of the immigration system and address fraud, USCIS will issue NTAs
when a Statement of Findings (SOF) substantiating fraud is part of the record.[11]  An NTA
will be issued upon final adjudicative action on the petition and/or application or other
appropriate eligibility determination.[12]  NTAs will be issued even if the petition and/or
application is denied for a ground other than fraud, such as lack of prosecution or
abandonment, is terminated based on a withdrawal by the petitioner/applicant, or where an
approval is revoked, so long as an SOF substantiating fraud is in the record.

The NTA should include the charge of fraud or misrepresentation, if possible.  The
appropriate charge(s) will be determined on a case-by-case basis.  Consultation with local
USCIS counsel to determine the appropriate charge(s) is recommended.

IV. Cases to be Referred to ICE for a Decision on NTA Issuance

A. Criminal Cases:  Criminal aliens are a top immigration enforcement priority for the
government.  The following guidance recognizes the prioritization and requires USCIS to
refer criminals to ICE for action or issue an NTA in accordance with this PM.

1. Egregious Public Safety (EPS) Cases

USCIS will refer all EPS cases, including cases with pending N-400s, to ICE
prior to adjudicating the case even if USCIS can deny the petition and/or
application on its merits.  An EPS case is defined by USCIS and ICE as a case
where information indicates the alien is under investigation for, has been arrested
for (without disposition), or has been convicted of, any of the following:
   a. Murder, rape, or sexual abuse of a minor as defined in
      section 101(a)(43)(A) of the INA.
   b. Illicit trafficking in firearms or destructive devices as defined in
      section 101(a)(43)(C) of the INA.
   c. Offenses relating to explosive materials or firearms as defined in
      section 101(a)(43)(E) of the INA.

---

[10] When making determinations, employees must keep in mind USCIS's obligations under 8 USC § 1367, which
prohibits the release of any information, outside of DHS, relating to aliens who are seeking or have been approved
for immigration benefit(s) under the provisions for battered spouses, children, and parents in the Violence Against
Women Act.
[11] Alternatively, ICE will determine whether to issue the NTA if a criminal investigation is conducted, fraud is
found, and the investigation results in criminal prosecution.
[12] This includes, but is not limited to, aliens that were granted asylum status by USCIS, adjusted to Lawful
Permanent Resident status, presented fraud indicators, were subject to the Post Adjustment Eligibility Review
(PAER) process in an Asylum Office, and met the PAER criteria for NTA issuance.

DEF - 00002607

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases Involving Inadmissible and Removable Aliens
Page 4

    d. Crimes of violence for which the term of imprisonment imposed, or where the penalty for a pending case, is at least one year as defined in section 101(a)(43)(F) of the INA.

    e. An offense relating to the demand for, or receipt of, ransom as defined in section 101(a)(43)(H) of the INA.

    f. An offense relating to child pornography as defined in section 101(a)(43)(I) of the INA.

    g. An offense relating to peonage, slavery, involuntary servitude, and trafficking in persons as defined in section 101(a)(43)(K)(iii) of the INA.

    h. An offense relating to alien smuggling as described in section 101(a)(43)(N) of the INA

    i. Human Rights Violators, known or suspected street gang members, or Interpol hits.

    j. Re-entry after an order of exclusion, deportation or removal subsequent to conviction for a felony where a Form I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal, has not been approved.

All EPS cases must be referred to ICE using the procedures outlined below. The case will be referred as soon as it is identified.  ICE will have an opportunity to decide if, when, and how to issue an NTA and/or detain the alien.  USCIS will not issue an NTA in these cases if ICE declines to issue an NTA.  If some other basis unrelated to the EPS concern becomes apparent during the course of adjudication, an NTA may be issued in accordance with this memo.

Referral Process

This referral process is utilized in order to give ICE the opportunity to determine the appropriate course of action before USCIS adjudicates the case.  A decision to issue an NTA may directly affect the processing of the pending petition and/or application.  Upon issuing the Referral to Immigration and Customs Enforcement (RTI), USCIS will suspend adjudication for 60 days, or until ICE provides notification of its action on the case, whichever is earlier.

In response to the RTI –

1.  ICE may issue an NTA.  ICE's issuance of an NTA allows USCIS to proceed with adjudication (unless jurisdiction transfers to EOIR or the pending application is an N-400), taking into account the basis for the NTA.

2.  If ICE does not issue an NTA or otherwise provide notification of its action on the case within 60 days of the RTI, USCIS may resume its adjudication of the case, taking into account the referral grounds.

Confidential

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 5

    a.  If the case is approvable, USCIS will consult with ICE prior to
        adjudication.

    b.  Once adjudicated, regardless of the decision, USCIS will notify
        ICE of the result by sending a copy of the original RTI to ICE with
        a cover memorandum advising of the outcome of the case.

EPS cases referred to ICE prior to adjudication should be called up and reviewed
no later than 60 days after referral. Normally, the case should be adjudicated by
USCIS. However, USCIS retains discretion to place the case on hold for more
than 60 days if ICE requests additional time to conduct an investigation.[13]

Office-Specific Processes

1.  Cases to be adjudicated by Service Centers and the National Benefits
     Center. Adjudication will be suspended and the case will immediately be
     sent to the appropriate Service Center Background Check Unit (BCU).
     The BCU will refer the case to the ICE Benefit Fraud Unit (BFU) via an
     RTI. A hard copy of the RTI will be placed in the A-file and/or receipt
     file. The BCU will retain the file unless ICE requests it or the 60 days
     expire.

2.  Cases to be adjudicated by Field Offices. The Immigration Services
     Officer (ISO) will suspend adjudication and the case will immediately be
     referred to the local ICE Special Agent in Charge (SAC) via an RTI. A
     hard copy of the RTI will be placed in the A-file and/or receipt file. A
     copy of the RTI must also be sent to the ICE BFU. USCIS will retain the
     file unless ICE requests the file for their review.

An RTI should include any relevant attachments that USCIS has at the time, such
as a copy of the RAP sheet and a copy of the petition and/or application.

2.  Non-Egregious Public Safety Criminal Cases

If it appears that the alien is inadmissible or removable for a criminal offense not
included on the EPS list, USCIS will complete the adjudication and then refer the
case to ICE. This section applies to N-400 cases if the N-400 has been denied on
good moral character (GMC) grounds based on the criminal offense.[14] ICE will
decide if, and how, it will institute removal proceedings and whether or not it will
detain the alien. USCIS will not issue an NTA if ICE declines to issue an NTA.

---

[13] Pursuant to 8 CFR 274a.13(d), USCIS must complete processing of an Employment Authorization Document
(EAD) within 90 days or issue an interim EAD card valid up to 240 days. Officers should be mindful of this
regulatory timeframe when cases with a pending Form I-765, Application for Employment Authorization, are
referred to ICE.
[14] See Section V of this memo addressing N-400 cases.

DEF - 00002609

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 6

If some other basis unrelated to the criminal offense becomes apparent upon
return of the case to USCIS, an NTA may be issued in accordance with this
memo.

Referral Process

The referral process is used to allow ICE to make a determination whether to
issue an NTA, based on the totality of circumstances and its priorities.  ICE will
determine the appropriate grounds for removal if an NTA is issued.

Once adjudication is complete, USCIS will send an RTI to ICE.  USCIS will
concurrently transmit a copy of the RTI to ICE Headquarters (HQ) Enforcement
and Removal Operations (ERO) Criminal Alien Division for statistical monitoring
purposes.  If there is any confusion or uncertainty about classifying a case as
egregious versus non-egregious, the USCIS ISO should refer the matter as an EPS
case using the process described above.

The accompanying A-file will be referred to ICE with the RTI, if the file is in the
possession of the referring USCIS office or center.  If the file is not at the
referring USCIS office or center, the RTI should include any relevant attachments
that USCIS has, such as a copy of the RAP sheet and a copy of the petition and/or
application. Where USCIS obtained certified conviction records through normal
processing of the case, USCIS will include the records with the RTI, but it will
not hold the RTI on a completed case solely to obtain disposition records.  Instead
ICE will decide whether, and how, it will obtain such records as part of its
decision to issue an NTA.

Office-Specific Processes

1. Cases adjudicated by Service Centers and the National Benefits Center.
   Once adjudication is completed, if the alien is removable on a criminal
   charge, regardless of the reason for the denial, the file will be referred to
   the BCU. The BCU will refer the case, along with the A-file and/or receipt
   file, to the appropriate ERO Field Office Director (FOD) via an RTI.

2. Cases adjudicated by Field Offices.  Once adjudication is completed, if the
   alien is removable on a criminal charge, regardless of the reason for the
   denial, USCIS will prepare an RTI and refer the case, along with the
   A-file and/or receipt file, to the local ERO FOD.

B. National Security Entry Exit Registration System (NSEERS) Violator Cases

USCIS will refer all cases in which an application is denied based on an NSEERS
violation to ICE for possible NTA issuance.

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 7

V.  Cases Involving Form N-400, Application for Naturalization

The following guidance applies to the issuance of NTAs in cases in which applicants for
naturalization are removable.  There are two primary situations in which NTAs may be
issued in connection with a filed Form N-400.  If the N-400 case involves fraud (documented
in the SOF) the procedures found in this section must be followed, rather than the procedures
found in Section III (Fraud Cases with a Statement of Findings Substantiating Fraud).
However, the below guidance does not apply to EPS cases.  EPS cases must be referred in
accordance with Section IV.A.1 (Egregious Public Safety Cases) of this memo.
Additionally, the below guidance does not apply to non-EPS criminal cases when the N-400
can be denied on GMC grounds based on the criminal act.  These cases must be denied and
referred in accordance with Section IV.A.2 (Non-Egregious Public Safety Criminal Cases).

A.  The first situation occurs when the applicant may be eligible to naturalize but is also
deportable under section 237 of the INA.  Examples include applicants convicted of
aggravated felonies prior to November 29, 1990, or applicants convicted of deportable
offenses after obtaining Lawful Permanent Resident (LPR) status that do not fall within
the GMC period.  The ISO should:

1.  Make a written recommendation on the issuance of an NTA through a review of
the totality of the circumstances to include factors such as: severity of crime, time
since crime committed, other criminal conduct, reformation, immigration history
including method of entry, length of presence in the U.S., and prior immigration
violations, and contributions to society to include the pursuit of education and
military service.[15]

2.  Once the ISO has made a recommendation on whether or not to issue an NTA, the
case should be forwarded to the N-400 NTA Review Panel (Review Panel), along
with the written recommendation.  A Review Panel must be formed in each Field
Office and include a local Supervisory Immigration Services Officer (SISO), a
local USCIS Office of Chief Counsel attorney, and a district representative.  An
attorney from ICE's local Office of Chief Counsel will be invited to participate
and will have an advisory role on the panel.  The Review Panel will make the
final determination on NTA issuance.  If consensus cannot be reached by the
Review Panel, the case will be elevated to the District Director, through the
district representative, for a final decision.

3.  If the Review Panel decides to issue an NTA, place the N-400 on hold until
removal proceedings have concluded.  Once proceedings have concluded, or if the
Review Panel declines to issue an NTA, adjudicate the case appropriately.

---

[15] Additional factors to be taken under consideration can be found in the June 17, 2011 ICE memo, *Exercising
Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens.*

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 8

B. The second situation occurs when it is determined that the applicant was inadmissible at
the time of adjustment or admission to the United States, thus deportable under section
237 of the INA and not eligible for naturalization under section 318 of the INA.[16] The
ISO should:

1. Make a written recommendation on the issuance of an NTA through a review of the
totality of the circumstances to include factors such as: willfulness of actions,
fraud factors, length of LPR status, criminal history, and officer error at time of
adjustment.

2. Once the ISO has made a recommendation on the issuance of the NTA, the case
should be forwarded to the Review Panel (see Section V.A.2), along with the
written recommendation. The Review Panel will make the final determination on
NTA issuance. If consensus cannot be reached by the Review Panel, the case will
be elevated to the District Director, through the district representative, for a final
decision.

3. If the Review Panel decides to issue an NTA, place the N-400 on hold until
removal proceedings have concluded. Once removal proceedings have
concluded, adjudicate the case appropriately. If the Review Panel declines to
issue an NTA, deny the case under section 318 of the INA.

VI. Other Cases

A. An alien may request NTA issuance to renew an application for adjustment or in certain
cases with a denied N-400. The request must be made in writing.[17]

B. An asylum applicant issued an NTA may request NTA issuance for family members not
included on the asylum application as dependents for family unification purposes. The
request must be made in writing.[18]

VII. Exceptions

Exceptions to the guidance in this PM require concurrence from Regional or Center
Directors, who will consult with ICE before issuing an NTA.

---

[16] In the Third Circuit *only* (Pennsylvania, New Jersey, Delaware, and the U.S. Virgin Islands), based on the holding
in *Garcia v. Att'y Gen.*, 553 F.3d 724 (3d Cir. 2009), if the alien has been an LPR for at least five years, the alien
cannot be placed in removal proceedings for fraud or willful misrepresentation of a material fact at time of
adjustment, if USCIS could have learned of the fraud or misrepresentation through reasonable diligence before the
five year rescission period expired. Please consult with USCIS counsel if there are questions regarding the
applicability of this precedent.
[17] USCIS retains discretion to deny a request. USCIS should consider ICE actions and determinations when making
an NTA issuance decision under this section.
[18] USCIS retains discretion to deny a request.

DEF - 00002612

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 9

VIII. <u>Coordination with ICE</u>

According to the June 2011 ICE memo regarding the exercise of prosecutorial discretion
consistent with priorities,[19] USCIS will receive notice before an ICE attorney exercises
prosecutorial discretion and dismisses, suspends, or closes a case. The local N-400 NTA
Review Panel will work with ICE to come to a resolution if USCIS does not agree with
ICE's use of prosecutorial discretion in a particular case. If concurrence cannot be reached,
the case should be elevated to the USCIS Office of Chief Counsel in headquarters.

**Implementation**
Each field office must form an N-400 NTA Review Panel and create a process to complete RTIs
and refer EPS and non-EPS criminal cases to ICE. A written list enumerating the members of
the Review Panel and a document outlining the process of referral must be sent to the appropriate
district office within 30 days of the issuance of this memorandum.

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their
official duties. It is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law, or by any individual or other party in
removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions or suggestions regarding this PM should be addressed through appropriate channels to
the Field Operations Directorate, Service Center Operations Directorate, or the Refugee,
Asylum, and International Operations Directorate.

---

[19] *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency
for the Apprehension, Detention, and Removal of Aliens*, signed June 17, 2011.

DEF - 00002613

# DEF-INTERV.

# EX. 261

**For Non EPS where no RTI is required, how does the BCU notify ICE of domestic battery charges  (is this a Non EPS?) because this is an ICE priority- Tier 2?**

Post adjudication RTIs are created in FDNS-DS by selecting "Public Safety- Non Egregious."

Per November 7, 2011, PM-602-0050, entitled "Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens", If it appears that the alien is inadmissible or removable for a criminal offense not included on the EPS list, USCIS will complete the adjudication and then refer the case to ICE.  ICE will decide if, and how, it will institute removal proceedings and whether or not it will detain the alien. USCIS will not issue an NTA if ICE declines to issue an NTA.

This guidance is also published in the NaBISCOP:
http://e███████████████████████████████████████████████████
███████████████████████████████████aspx

Referral to ICE for Other Criminal Cases In all cases in which it appears that the alien is inadmissible or removable for a criminal offense not included in the EPS case list, USCIS will complete the adjudication prior to referring the case to ICE.  ICE will decide whether and how it will institute proceedings and whether or not they will detain the alien.

Once adjudication is completed immediately refer the case to the appropriate officer or unit for creation of a RTI.

•Service Centers and the NBC: Route immediately to appropriate BCU.
•Field Offices: Route immediately to the FDNS-IO or other authorized personnel in accordance with local policy.
The appropriate officer or unit conducts the following:

1.Prepare RTI.
◦The RTI should include any relevant attachments that USCIS has at the time, such as a copy of the RAP sheet, arrest disposition, a copy of the application ◦Where USCIS obtains certified conviction records through normal processing of the application, include those records but do not hold an RTI on a completed case to obtain those records.
2.Update FDNS-DS as appropriate.
3.Forward a copy of the RTI and the accompanying file, if in the possession of the office or center issuing the RTI, directly to the appropriate ICE field operations director (FOD) or designated POC.
4.Concurrently transmit a copy of the RTI to ICE HQDRO Criminal Alien Division at CriminalNon-Egregious.CISRFI's@dhs.gov for statistical monitoring purposes.


Note-Priority 2 (misdemeanants and new immigration violators): Aliens described in this priority , who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:
(a) aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b) aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;1 sexual abuse or exploitation; burglary; un lawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c) aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014 ; and

(d) aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

DEF - 00003599

# DEF-INTERV.

# EX. 262

*DACA MATTERS – ISSUE 13*

**Known or Suspected Drug Cartel Membership**

**How should we handle DACA requests when there is a record that the requestor is a known or suspected drug cartel member?**

The BCU DACA Team should handle any DACA requests when the record indicates that the requestor was, is or may be a member of a drug cartel. Supervisors must refer the following cases to HQSCOPS through the normal chain of command:

- All DACA requests filed by a known or suspected drug cartel member the Center seeks to approve; and
- Any novel, complex, or sensitive DACA requests filed by a known or suspected drug cartel member the Center seeks to deny.

Therefore, if there is reason to believe the DACA requestor is a known or suspected drug cartel member because the record (e.g., a TECS record, as shown in the image below) indicates that the DACA requestor is under investigation for, or has been arrested for (without disposition), or has been convicted of a crime involving activities that suggest the requestor is a drug cartel member or a suspected drug cartel member, the DACA BCU Team should de-conflict further with the record owner. If it is determined that the requestor is a drug cartel member or a suspected drug cartel member, then the BCU will deny the request as a matter of discretion using the discretionary denial template (**DACA 511**), "*You have not established that you warrant a favorable exercise of prosecutorial discretion*",: and refer the case to ICE.



*Source: Internal FAQ's December 05, 2014*

DEF - 00004596

**"Wobbler" criminal offenses**

**What is a "Wobbler" criminal statute and should they be treated as felonies or misdemeanors for DACA purposes?**

Some states may have a "Wobbler" provision, which allows a criminal charge to be filed as either a "felony" or "misdemeanor" under state law.  These provisions allow the same elements to be charged as a more or less serious crime before any adjudication of guilt is made.  Which charge is selected then determines the possible range of sentences available.  In some cases the decision of how to charge is made by the prosecutor, in others it is made by the court.  Wobblers do not simply have a range of possible punishment; they effectively create two crimes, one of which is a felony and the other is a misdemeanor under state law.

When a requestor has been convicted of a Wobbler, the adjudicator must first determine whether the crime was treated as a felony or as a misdemeanor.   After the nature of the charge has been determined, the adjudicator must then look at the maximum possible sentence that could have been given *under the charging provisions selected* by the prosecutor or the court.  If the possible sentence could have been incarceration for more than 5 days but no more than one year, then it is a misdemeanor for DACA purposes, regardless of the time actually served.  If the possible sentence could have been more than one year of incarceration, then it is a felony, regardless of the time actually served.  This is the same analysis used for generally determining whether a state crime is a federal misdemeanor or felony, but Wobblers require a preliminary step of determining which "level" of crime was actually charged.

*Source: Internal FAQ's dated January 05, 2015*

**I-765 Approval EAD "Combo" Cards (C33P)**

USCIS is not providing combo cards for DACA recipients at this time.  A number of DACA-based EAD's were issued with category C33P, Combo Card, instead of C33.  Please use only category C33 for DACA related EAD cards. The combo card allows for travel outside the U.S – we do not approve travel outside the U.S.

*Source:  Internal SCOPS email guidance February 18, 2015*

DEF - 00004597

# DEF-INTERV.

# EX. 263

| From: | Lewis, Theodore R < ▮▮▮▮ @uscis.dhs.gov> |
|---|---|
| Sent: | Wednesday, September 24, 2014 1:24 PM |
| To: | Carlson, Deborah M < ▮▮▮▮ @uscis.dhs.gov>; Chhouy, Saobora < ▮▮▮▮ @uscis.dhs.gov>; Hoballah, Jamal A < ▮▮▮▮ @uscis.dhs.gov>; Kim, Kyong Y < ▮▮▮▮ @uscis.dhs.gov>; Lesher, Grace B < ▮▮▮▮ @uscis.dhs.gov>; Lok, Muoi M < ▮▮▮▮ @uscis.dhs.gov>; Namath, Robert E < ▮▮▮▮ @uscis.dhs.gov>; Nelson, Steven K < ▮▮▮▮ @uscis.dhs.gov>; Nguyen, Van T < ▮▮▮▮ @uscis.dhs.gov>; Pham, Vincent < ▮▮▮▮ @uscis.dhs.gov>; Rogers, Kathryne J < ▮▮▮▮ @uscis.dhs.gov>; Villalobos, Vanessa < ▮▮▮▮ @uscis.dhs.gov>; Wong, Suong T < ▮▮▮▮ @uscis.dhs.gov> |
| Subject: | FW: DACA ECN Update: New internal DACA FAQ |

Team,

If you get this scenario give me the file.

Thanks,

Ted

How should the Center process a DACA request when ICE takes action against a requestor while a DACA request is pending?

If DHS electronic systems or information received from ICE indicates that ICE has taken action against a requestor while a DACA request is pending, for example, by issuing a detainer against the requestor, placing him/her under an order of supervision, or placing him/her in an ankle bracelet monitoring system, after the requestor has filed Form I-821D, the Center should follow the below procedures.

The BCU will contact local ICE operations having jurisdiction over the requestor to determine if the requestor is an ICE enforcement priority or if ICE intends on administratively closing the proceedings and/or physically releasing the requestor within 30 days.

1. If ICE indicates that the requestor is an ICE enforcement priority, regardless of whether ICE issues a detainer against him or her, places him or her under an order of supervision, or places him/her in an ankle bracelet monitoring system USCIS will deny the DACA request using the checkbox within Appendix F (Denial Template) that states "You have not established that you warrant a favorable exercise of prosecutorial discretion." USCIS will notify ICE once the denial notice is issued.
2. If ICE indicates that the case is not an ICE enforcement priority, the case will be adjudicated on its merits.

If a BCU supervisor disagrees with ICE's determination of whether or not the requestor is an enforcement priority, the BCU should ask local counsel for assistance in contacting local ICE counsel to discuss the reasons why USCIS believes this individual is or is not an enforcement priority. The Service Center's local counsel can seek assistance from USCIS Headquarters' Office of the Chief Counsel to contact ICE, if necessary.

---

**From:** HQSCOPSDACA
**Sent:** Wednesday, September 24, 2014 8:54 AM
**To:** Soucie, Alisha D; Holmes-Okeawolam, Malethea S; Nguyen, Carolyn Q; Sherman, Lori A
**Cc:** Parsons, Tracey E; Massey, Scott A; Roman-Riefkohl, Guillermo; HQSCOPSDACA
**Subject:** DACA ECN Update: New internal DACA FAQ

Good morning,

I uploaded a *new* internal DACA FAQ on ICE actions that may occur while an I-821D is pending onto DACA ECN. Additionally, I revised the name of the category under which this FAQ is located. For your convenience, below you'll see an image showing the new items and their location within DACA ECN as well as the new FAQ.

Thank you.

guillermo

DEF - 00004859

**DACA Home Page**
**DACA Interviews**
**SOP and Templates**
**Training Materials**
**Teleconference Notes**
**Forms and Notices**
**HQSCO Review**
**Internal FAQ's**

Tags & Notes
Recycle Bin
All Site Content

⊞ **DACA Category : Advance Parole** (2)

⊞ **DACA Category : Employment Authorization** (2)

⊞ **DACA Category : Fraud** (1)

⊞ **DACA Category : Guidelines** (20)

⊞ **DACA Category : Other** (11)

⊟ **DACA Category : Removal Proceedings and ICE Actions** (3)

Sub-Category : Other (3)

ICE Already Deferred Action Under DACA

Immigration Detention After Filing Form I-821D

ICE Takes Action Against a Requestor While the I-821D is Pending

| | |
|---|---|
| Title | ICE Takes Action Against a Requestor While the I-821D is Pending |
| Question | How should the Center process a DACA request when ICE takes action against a requestor while a DACA request is pending? |
| Answer | If DHS electronic systems or information received from ICE indicates that ICE has taken action against a requestor while a DACA request is pending, for example, by issuing a detainer against the requestor, placing him/her under an order of supervision, or placing him/her in an ankle bracelet monitoring system, <u>after</u> the requestor has filed Form I-821D, the Center should follow the below procedures. The BCU will contact local ICE operations having jurisdiction over the requestor to determine if the requestor is an ICE enforcement priority or if ICE intends on administratively closing the proceedings and/or physically releasing the requestor within 30 days.<br><br>1. If ICE indicates that the requestor is an ICE enforcement priority, regardless of whether ICE issues a detainer against him or her, places him or her under an order of supervision, or places him/her in an ankle bracelet monitoring system USCIS will deny the DACA request using the checkbox within Appendix F (Denial Template) that states "You have not established that you warrant a favorable exercise of prosecutorial discretion." USCIS will notify ICE once the denial notice is issued.<br>2. If ICE indicates that the case is not an ICE enforcement priority, the case will be adjudicated on its merits.<br><br>If a BCU supervisor disagrees with ICE's determination of whether or not the requestor is an enforcement priority, the BCU should ask local counsel for |

assistance in contacting local ICE counsel to discuss the reasons why USCIS believes this individual is or is not an enforcement priority. The Service Center's local counsel can seek assistance from USCIS Headquarters' Office of the Chief Counsel to contact ICE, if necessary.

DEF - 00004861

# DEF-INTERV.

# EX. 264

**From:** Lewis, Theodore R <█████ @uscis.dhs.gov>
**Sent:** Saturday, September 13, 2014 2:57 PM
**To:** Carlson, Deborah M <████████ @uscis.dhs.gov>; Chhouy, Saobora <████ @uscis.dhs.gov>; Hoballah, Jamal A <████ @uscis.dhs.gov>; Kim, Kyong Y <████ @uscis.dhs.gov>; Lesher, Grace B <████ @uscis.dhs.gov>; Lok, Muoi M <████ @uscis.dhs.gov>; Namath, Robert E <████ @uscis.dhs.gov>; Nelson, Steven K <████ @uscis.dhs.gov>; Nguyen, Van T <████ @uscis.dhs.gov>; Pham, Vincent <████ @uscis.dhs.gov>; Rogers, Kathryne J <████ @uscis.dhs.gov>; Villalobos, Vanessa <████ @uscis.dhs.gov>; Wong, Suong T <████ @uscis.dhs.gov>
**Subject:** FW: Field Office POCs for DACA Interview Referrals

You'll need this info and procedures in the rare instance where we send a case out for a Field interview.

Ted

**From:** Rogers, Kathryne J
**Sent:** Saturday, September 13, 2014 10:44 AM
**To:** Nguyen, Van T; Lewis, Theodore R
**Subject:** FW: Field Office POCs for DACA Interview Referrals

Sharing

**From:** Nguyen, Carolyn Q
**Sent:** Tuesday, September 02, 2014 7:34 AM
**To:** Tran, Linhdieu A; Rogers, Kathryne J
**Subject:** FW: Field Office POCs for DACA Interview Referrals

**From:** HQSCOPSDACA
**Sent:** Tuesday, September 02, 2014 5:16 AM
**To:** Soucie, Alisha D; Holmes-Okeawolam, Malethea S; Nguyen, Carolyn Q; Sherman, Lori A
**Cc:** Rigdon, Jerry L; Roman-Riefkohl, Guillermo; Johnson, Tonya V; Massey, Scott A; Parsons, Tracey E
**Subject:** FW: Field Office POCs for DACA Interview Referrals

Good morning,

SCOPS has updated the **Regional and Field Office DACA POCs** announcement within ████████ The contact information in 1b from Norm DeMoose: ████████ **@uscis.dhs.gov** has been changed to OFO AOS & Legalization: ████████ @uscis.dhs.gov.

Thank you.

guillermo

Guillermo Roman-Riefkohl
Adjudications Officer
SCOPS
202.272█████

**From:** HQSCOPSDACA
**Sent:** Wednesday, August 20, 2014 2:30 PM
**To:** Soucie, Alisha D; Holmes-Okeawolam, Malethea S; Nguyen, Carolyn Q; Sherman, Lori A; Parsons, Tracey E
**Cc:** Rigdon, Jerry L; Roman-Riefkohl, Guillermo; Johnson, Tonya V
**Subject:** FW: Field Office POCs for DACA Interview Referrals

Good afternoon,

SCOPS has uploaded the Regional and Field Office POC list and related guidance for DACA Interview Referrals onto the ████████ You'll see this guidance as an announcement. Below you'll see its location within our collaboration and management site.

Thank you.

guillermo

Confidential

Welcome to the DACA collaboration and management site

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion and does not provide an individual with lawful status. The DACA collaboration site is established to provide guidance for Service Center adjudication of DACA requests.

If you would like to contribute information to this site, please email hqscopsdaca@uscis.dhs.gov through your respective chain of command and place "ECN" in the subject line.

Announcements

| | Title | Modified |
|---|---|---|
| |  Regional and Field Office DACA POCs | 8/20/2014 2:16 PM |
| | 3/28/2014 Updated DACA ... | 3/28/2014 11:45 AM |
| | DACA Teleconference | 1/7/2014 1:18 PM |

Guillermo Roman-Riefkohl
Adjudications Officer
SCOPS
202.272.8169

---

**From:** HQSCOPSDACA
**Sent:** Wednesday, August 20, 2014 10:27 AM
**To:** Soucie, Alisha D; Holmes-Okeawolam, Malethea S; Nguyen, Carolyn Q; Sherman, Lori A; Parsons, Tracey E
**Cc:** Rigdon, Jerry L; Roman-Riefkohl, Guillermo; Johnson, Tonya V
**Subject:** Field Office POCs for DACA Interview Referrals

Dear POCs,

I hope this finds you well. The attached spreadsheets contain a master list of contact information provided by FOD to help improve the DACA interview referral process. The first spreadsheet contains a list of POCs for the Central (CRO), Northeast (NER), Southeast (SER) and Western (WRO) regional offices. The second spreadsheet contains a list of designated POCs at all of the local field offices. Centers may begin using these contacts for DACA filings which require a referral to the field for an interview per current guidance as appropriate (e.g. suspected gang membership, etc.). Please follow the agreed upon procedures outlined below:

1) Centers will contact the appropriate POC at the local field office as they encounter a DACA request that requires a referral to the field for an interview, providing the reason for the referral and any other relevant details of the case. **Please ensure that you copy the designated regional POCs (attached) and HQ FOD DACA POCs for visibility, listed below:**
   a) Mary Flores: **mary.f.flores@uscis.dhs.gov**
   b) Norm DeMoose: **norman.demoose@uscis.dhs.gov**
2) Centers will ship the case and required documents to the attention of the designated POC at the appropriate field office.
3) The field office will interview the requestor and add the interview results to the case file. The case will then be shipped back to the center.
4) Centers will review the interview results and, based on the totality of the evidence, make a final determination on the DACA request.
5) Centers will provide a monthly report to SCOPS through the designated HQSCOPSDACA mailbox. In this report, please include:
   1) The total number of cases referred for an interview for the current month
   2) A number
   3) Receipt number
   4) Reason for the interview referral (e.g. gang concerns, fraud, failure to establish identity, etc.)
6) SCOPS will share this monthly report with the designated POCs at HQ FOD for visibility.

Please let us know if you have any questions regarding the process outlined above. This guidance will also be posted as an announcement to the DACA ECN later today. Lastly, an update has been made to the internal FAQ below based on these changes, highlighted in blue font.

| Title | Known or Suspected Gang Membership |
|---|---|
| Question | How should we handle DACA requests when there is a record that the requestor is a known or suspected criminal street gang member? |
| Answer | The BCU DACA Team should handle any DACA requests when the record indicates that the requestor was, is or may be a member of a criminal street gang. Supervisors should only refer novel, complex, or sensitive cases to HQSCOPS, through the normal chain of command. The Centers should not approve a DACA request filed by a known or suspected gang member without approval from HQSCOPS. |

USCIS's Notice to Appear (NTA) guidance includes "known or suspected street gang members" in its definition of an Egregious Public Safety (EPS) case. Therefore, if there is reason to believe the DACA requestor is a known or suspected gang member because the record indicates that the DACA requestor is under investigation for, or has been arrested for (without disposition), or has been convicted of a crime involving gang activities (e.g., a TECS record indicating the alien is a gang member or a suspected gang member as shown in the **images A and B**), the DACA BCU Team should follow the handling procedures for EPS cases described in Chapter 8, Section G, of the DACA SOP.

ICE Priority

If, in response to the referral to ICE (RTI), ICE issues an NTA or otherwise indicates that the DACA requestor is an enforcement priority, the DACA BCU Team should deny the I-821D using the checkbox in Appendix F that indicates "you have not established that you warrant a favorable exercise of prosecutorial discretion."

Known Gang Member

For a known street gang member, if an RTI is not required, as stated in the National Background Identity and Security Checks Operating Procedures (NaBISCOP), or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action that it has taken in the case within 60 days, the DACA BCU Team should deny the I-821D as a matter of discretion and notify ICE of the decision.

DEF - 00005014

<u>Suspected Gang Member</u>

For a suspected street gang member, if an RTI is not required, as stated in the NaBISCOP, or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action that it has taken in the case within 60 days, the DACA BCU Team must refer the case for an interview to determine whether or not the requestor is, in fact, a gang member. Please contact the appropriate Field Office POC through established channels to facilitate the interview process. HQSCOPS before referring the case for an interview in order to obtain the Field Office POC. If, after the interview, it is inconclusive whether the requestor is a gang member (e.g., based on the preponderance of the evidence the person is a street gang member), the DACA BCU Team should deny the I-821D as a matter of discretion because the person has not met the burden of showing he or she is 'more likely than not' not a street gang member and therefore does not pose a threat to public safety. The DACA BCU team must notify ICE of the decision.

Thank you,

*Scott Massey*
Adjudications Officer
Service Center Operations
USCIS Headquarters
202-272-8171

Confidential

DEF - 00005015

# DEF-INTERV.

# EX. 265

| From: | Lewis, Theodore R < ████████ @uscis.dhs.gov> |
|---|---|
| Sent: | Monday, December 8, 2014 10:15 AM |
| To: | Bagsic, Edgardo L < ████████ @uscis.dhs.gov>; Carlson, Deborah M < ████████ @uscis.dhs.gov>; Chhouy, Saobora ████████ @uscis.dhs.gov>; Gapuz, Brian Y < ████████ @uscis.dhs.gov>; Kim, Kyong Y < ████████ @uscis.dhs.gov>; Lesher, Grace B < ████████ @uscis.dhs.gov>; Namath, Robert E <Robert.E.Namath@uscis.dhs.gov>; Nelson, Steven K ████████ @uscis.dhs.gov>; Nguyen, Van T < ████████ @uscis.dhs.gov>; Pham, Vincent < ████████ @uscis.dhs.gov>; Villalobos, Vanessa < ████████ @uscis.dhs.gov>; Wong, Suong T < ████████ @uscis.dhs.gov> |
| Cc: | Rogers, Kathryne J < ████████ @uscis.dhs.gov> |
| Subject: | FW: New Internal DACA FAQ: Associations/ Affiliations with Criminal Street Gang Members |

Very important information to us. Also, if you have a case where you have gang affiliation please route it to Vanessa.

Regards,

Ted

**From:** Rogers, Kathryne J
**Sent:** Friday, December 05, 2014 12:39 PM
**To:** Lewis, Theodore R; Nguyen, Van T; Villalobos, Vanessa
**Subject:** FW: New Internal DACA FAQ: Associations/ Affiliations with Criminal Street Gang Members

Important information for us . . .

**From:** Nguyen, Carolyn Q
**Sent:** Friday, December 05, 2014 12:01 PM
**To:** Rogers, Kathryne J
**Subject:** FW: New Internal DACA FAQ: Associations/ Affiliations with Criminal Street Gang Members

**From:** Roman-Riefkohl, Guillermo
**Sent:** Friday, December 05, 2014 11:21 AM
**To:** Soucie, Alisha D; Petersen, Karen L; Hoatson, Mary A; Posvar, Sarah C; Holmes-Okeawolam, Malethea S; Sherman, Lori A; Nguyen, Carolyn Q
**Cc:** Massey, Scott A; Roman-Riefkohl, Guillermo
**Subject:** New Internal DACA FAQ: Associations/ Affiliations with Criminal Street Gang Members

Good afternoon.

SCOPS uploaded a new internal DACA FAQ on Associations/ Affiliations with Criminal Street Gang Members onto DACA ECN. Below you'll see the location of this FAQ. I also copied it below for your convenience.

Thank you.

guillermo



| Title | Associations/Affiliations with Criminal Street Gang Members |
|---|---|
| Question | How should we handle DACA requests when there is a reason to believe that the requestor is or has been associated or affiliated with criminal street gang members? |
| Answer | The DACA BCU Team should handle any DACA requests when there is a reason to believe that the requestor has been |

DEF - 00005040

associated or affiliated with a criminal street gang member.

If there is reason to believe the DACA requestor has been associated or affiliated with a criminal street gang member, but where there is insufficient evidence to deny the request based on the requestor's actual gang membership, the DACA BCU Team should vet the case thoroughly, but an RTI is not required unless the DACA BCU Team learns that the requestor is under investigation for, or has been arrested for, gang activities, or if an RTI is appropriate for another reason. If the DACA BCU Team determines that there are no EPS concerns and there is no evidence showing that the requestor has supported or assisted with the criminal activities of a criminal street gang member(s), the DACA BCU Team may consider the request on its merits, taking into account any derogatory information when determining whether favorable discretion is warranted. If the DACA BCU Team determines that there are EPS concerns, the DACA BCU Team should follow the handling procedures for EPS cases described in Chapter 8, Section G of the DACA SOP.

Associated Form

DACA Category          Guidelines

Sub-Category           Criminality Issues

Guillermo Roman-Riefkohl
Adjudications Officer
SCOPS
202.272.█████

DEF - 00005041

# DEF-INTERV.

# EX. 266

| **From:** | Nguyen, Van T < ████████ @uscis.dhs.gov> |
|---|---|
| **Sent:** | Wednesday, May 25, 2016 5:28 PM |
| **To:** | Bronola, Christine < ████████ @uscis.dhs.gov>; Curtis, Rana ████████ @uscis.dhs.gov>; Han, Myung H ████████ @uscis.dhs.gov>; Moselina, Nolasco M (Noli) < ████████ @uscis.dhs.gov>; Nguyen, Khanh K (Connie) < ████████ @uscis.dhs.gov>; Nguyen, Trinnie C ████████ @uscis.dhs.gov>; Pham, Vincent < ████████ @uscis.dhs.gov>; Vu, Toan K < ████████ @uscis.dhs.gov> |
| **Subject:** | FW: Questions regarding advance parole for DACA Applicants |

Information sharing...

*Van Nguyen*
*949-389-3154*
*949-389-3435 (Fax)*
*Van.t.nguyen@uscis.dhs.gov*

**From:** Gydesen, Justyn J
**Sent:** Monday, May 23, 2016 2:42:10 PM
**To:** Jacobson, Neil M; Hoti, Katie L; Johnson, Joel N
**Cc:** Jeffries, Lina T; Nguyen, Van T; Johnson, Joel N; DeBoer, Allan S; CSC BCU DACA Terminations; Lewis, Theodore R
**Subject:** RE: Questions regarding advance parole for DACA Applicants

A DACA requestor can file for advance parole as long as they have a valid grant and the travel is for educational, employment, or humanitarian purposes. If their current grant is close to expiring, we will not grant beyond the current expiration unless the DACA renewal is approved. If the requestor's removal proceedings have been admin closed, they shouldn't have any problems. However, as with any AP, the approval of the AP does not guarantee reentry.

If you have any specific questions, please let me know.

**Justyn J. Gydesen**
Section Chief – DACA/TPS/SIV
Nebraska Service Center
☎ 402-219-███

 
Click to contact me on Lync

**From:** Jacobson, Neil M
**Sent:** Monday, May 23, 2016 1:21 PM
**To:** Hoti, Katie L; Johnson, Joel N
**Cc:** Jeffries, Lina T; Nguyen, Van T; Johnson, Joel N; Gydesen, Justyn J; DeBoer, Allan S; CSC BCU DACA Terminations; Lewis, Theodore R
**Subject:** RE: Questions regarding advance parole for DACA Applicants

Hi Ted,

I'm forwarding the inquiry to Katie Hoti and Joel Johnson for a response to Ms. Jeffries.

Katie is our NSC supervisor over the DACA Advance Paroles, and Joel is the Senior assigned to our DACA portfolio.

Thanks

DEF - 00005052

**Neil Jacobson**
**Associate Center Director**
**Humanitarian Affairs Division**
**Nebraska Service Center**
**402-219-███**

**From:** Lewis, Theodore R **On Behalf Of** CSC BCU DACA Terminations
**Sent:** Monday, May 23, 2016 11:41 AM
**To:** DeBoer, Allan S; Jacobson, Neil M
**Cc:** Jeffries, Lina T; Nguyen, Van T
**Subject:** FW: Questions regarding advance parole for DACA Applicants

Sean or Neil,

Can you assist Lina with the below question regards I-131s?

Thanks Ted

---

**From:** McGuire, Regina A
**Sent:** Monday, May 23, 2016 6:55 AM
**To:** CSC BCU DACA Terminations; Van-Wagenen, Lowell F; Gapuz, Brian Y
**Cc:** Nguyen, Trinnie C; Kim, Kyong Y; Nguyen, Khanh K (Connie); Gomez Sanchez, Diana C; Curtis, Rana; Dunning, Pacentia M; Khoudaghoulian, Minas
**Subject:** RE: Questions regarding advance parole for DACA Applicants

Ted,

The I-131 Advanced Parole is not a work load that we process at the CSC. We have never had the training. Nebraska Service Center processes the I-131's. DACA would have to be approved before an I-131 is approved. I do know that there are very few approvals of advanced paroles. You could contact NSC to see what there procedure is or have Phoenix contact them. Neal Jacobson is a Supervisor there in DACA. I believe there is an exception for extreme emergent situations where an advance parole would be issued if a requestor's parent or child was in ICU or passed away where the service would grant an advanced parole even if the requestor was in removal proceedings. Since I have not been trained, we cannot provide the full answer for them.

Regina McGuire, ISO-3
SODA-3/ws24516/███

---

**From:** Lewis, Theodore R **On Behalf Of** CSC BCU DACA Terminations
**Sent:** Saturday, May 21, 2016 9:43 AM
**To:** Van-Wagenen, Lowell F; Gapuz, Brian Y; McGuire, Regina A
**Cc:** Nguyen, Trinnie C; Kim, Kyong Y; Nguyen, Khanh K (Connie); Gomez Sanchez, Diana C; Curtis, Rana; Dunning, Pacentia M; Khoudaghoulian, Minas
**Subject:** FW: Questions regarding advance parole for DACA Applicants
**Importance:** High

Seniors,

Can one of you answer the below question? I'm not familiar enough with the adjudication of Advance Parole as it pertains to DACA to adequately answer the below question. Can one of you respond and cc me so I can take it off my "to do" list?

Thanks,

DEF - 00005053

Ted

**From:** Jeffries, Lina T
**Sent:** Wednesday, May 18, 2016 3:14 PM
**To:** CSC BCU DACA Terminations
**Subject:** Questions regarding advance parole for DACA Applicants

CSC,

Will CSC consider and grant an advance parole request for a DACA recipient who is in removal proceedings that have been administratively closed?

The below memo regarding parole indicates that advance parole will not be issued to persons in proceedings:

https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2011/April/issuance-advance-parole.pdf

However, the instructions on the advance parole indicate that DACA recipients can get advance parole even if they are in removal proceedings.

Can you assist. I have an inquiry from ICE OPLA.

Thanks!

*Lina T. Jeffries Bueno*
USCIS Office of the Chief Counsel, D25
1330 S. 16th Street
Phoenix, AZ 85034
(d)602-226-■■■ (c) 202-997-6636; (f) 602-462-■■■
■■■■■@uscis.dhs.gov

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

 DEF - 00005054

# DEF-INTERV.

# EX. 267

**IMPORTANT: This document contains information that is no longer current but remains on our site for reference purposes.**

## Characteristics of Individuals Requesting and Approved for Deferred Action for Childhood Arrivals (DACA)

### Background Note

Existing data currently published by USCIS for DACA provides statistics on program operations (e.g., number of receipts accepted, rejected and approved, etc.). In contrast, this data table release disseminates information on the ***characteristics*** of DACA requestors in a manner which sufficiently protects their privacy. To do so, the following thresholds were applied when preparing this release of DACA information:

- ***Reference Period***: Data by population characteristics (including geography) will only be released in aggregate for a minimum of a 12-month period;
- ***Population Characteristics***: Geographic data will not be published below the *Metropolitan and Micropolitan Statistical Areas*[1] level; and
- ***Methods to Prevent Disclosure***: Values will be rounded to the nearest 100 and any data where the cell value is below 1,000 will not be published.

This release is limited to the following characteristics:

- Broad age groups;
- Sex;
- Country of birth;
- Broad marital status categories; and
- Geographic location at the time of filing (state, Metropolitan and Micropolitan Statistical Areas).

The characteristics data are presented by date received by USCIS for 1) the number of requests accepted by the USCIS Lockbox (all receipts except those rejected during the receipting process) and 2) the number of requests accepted by approval status (approvals only). Tables 1-8 presented below display the data by the aforementioned characteristics for all accepted requests and approvals—both as stand-alone tables and combined characteristics. As recommended above, all data presented are rounded. Unrounded data are used to calculate all table totals and percentages. As a result column and row totals may not add when rounded.

The DACA program was first implemented August 15, 2012. In order to report the information for a minimum of a 12-month period and to create a consistent reporting period (e.g., by fiscal year) for future releases, data are aggregated for August, 2012 to September, 2013 (13 and ½ months).

---

[1] Metropolitan and Micropolitan Statistical Areas are areas that contain a recognized population center and adjacent communities that have a high degree of social and economic integration with the center. Metropolitan areas contain at least one urbanized center with a population of 50,000 or more. A Micropolitan area contains at least one population center of between 10,000 and 49,999 people. The 2000 OMB "Standards for Defining Metropolitan and Micropolitan Statistical Areas" is available at

<www.whitehouse.gov/sites/default/files/omb/fedreg/metroareas122700.pdf>.

In order to present a full picture of all DACA requestors within the same reference period, the data are presented for all requests received and approval status.  Consequently, the actual USCIS approval of the request may have occurred before or after the end of fiscal year 2013.  USCIS's Office of Performance and Quality (OPQ) reports data on DACA approvals granted during a specific reference period. Thus, the numbers reported in this data release may not match OPQ DACA reports because the underlying reference period and purpose of the reporting are different.

# Characteristics of Individuals Requesting and Approved for Deferred Action for Childhood Arrivals (DACA)

Table 1.  DACA Requests Accepted and Approved by Requestor Age Group and Sex: August, 2012 to September, 2013

| Age Group (Years) | Requests Accepted | | | Requests Approved[1] | | |
|---|---|---|---|---|---|---|
| | Sex | | | Sex | | |
| | Female | Male | Total | Female | Male | Total |
| 19 and Under | 134,800 | 142,100 | 277,000 | 128,100 | 132,600 | 260,800 |
| 20 to 24 | 102,200 | 94,000 | 196,300 | 90,700 | 78,200 | 169,000 |
| 25 to 29 | 52,000 | 40,900 | 93,000 | 44,100 | 30,500 | 74,600 |
| 30 and Over | 8,000 | 5,900 | 13,800 | 6,400 | 4,000 | 10,500 |
| Total | 296,900 | 282,900 | 580,000 | 269,300 | 245,300 | 514,800 |
| *Percent by Age Group and Sex* | | | | | | |
| 19 and Under | 49 | 51 | | 49 | 51 | |
| 20 to 24 | 52 | 48 | | 54 | 46 | |
| 25 to 29 | 56 | 44 | | 59 | 41 | |
| 30 and Over | 58 | 42 | | 61 | 39 | |
| Total | 51 | 49 | | 52 | 48 | |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE:  A small number of cases that did not report a sex are not shown separately but are included in the total.

Totals may not add due to rounding.

[1]  Approval may occur outside of the reference period.

Table 2.   DACA Requests Accepted and Approved by Requestor Age Group and Marital Status: August, 2012 to September, 2013

| Age Group (Years) | Requests Accepted | | | Requests Approved[1] | | |
| | Marital Status | | | Marital Status | | |
| | Married | Other[2] | Total | Married | Other[2] | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 19 and Under | 2,700 | 274,200 | 277,000 | 2,400 | 258,400 | 260,800 |
| 20 to 24 | 26,600 | 169,700 | 196,300 | 22,200 | 146,800 | 169,000 |
| 25 to 29 | 29,300 | 63,700 | 93,000 | 23,400 | 51,200 | 74,600 |
| 30 and Over | 5,700 | 8,200 | 13,800 | 4,300 | 6,200 | 10,500 |
| *Total* | *64,300* | *515,800* | *580,000* | *52,300* | *462,500* | *514,800* |
| ***Percent by Age Group and Marital Status*** | | | | | | |
| 19 and Under | 1 | 99 | | 1 | 99 | |
| 20 to 24 | 14 | 86 | | 13 | 87 | |
| 25 to 29 | 32 | 68 | | 31 | 69 | |
| 30 and Over | 41 | 59 | | 41 | 59 | |
| *Total* | *11* | *89* | | *10* | *90* | |

Source:   USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE:  Totals may not add due to rounding.

[1]  Approval may occur outside of the reference period.

[2]  Other contains the categories of single, divorced, widowed, and unknown.

Table 3.  Number and Percent of DACA Requests Accepted by Requestor Country of Birth, Age Group, and Sex:
August, 2012 to September, 2013

| | | Requests Accepted | | | | | |
|---|---|---|---|---|---|---|---|
| | | Requests | | Age Group 20 Years and Over | | Sex Female | |
| No. | Country of Birth | Number | Percent | Number | Percent | Number | Percent |
| 1 | Mexico | 443,500 | 76 | 229,700 | 52 | 230,800 | 52 |
| 2 | El Salvador | 22,000 | 4 | 9,400 | 43 | 10,700 | 48 |
| 3 | Honduras | 14,900 | 3 | 6,900 | 46 | 7,500 | 50 |
| 4 | Guatemala | 14,600 | 3 | 8,200 | 56 | 6,600 | 45 |
| 5 | Korea, Republic of | 7,600 | 1 | 4,500 | 60 | 3,600 | 47 |
| 6 | Peru | 7,500 | 1 | 4,000 | 53 | 3,500 | 47 |
| 7 | Brazil | 6,200 | 1 | 3,500 | 57 | 3,100 | 50 |
| 8 | Colombia | 5,700 | 1 | 3,100 | 55 | 2,700 | 48 |
| 9 | Ecuador | 5,500 | 1 | 3,200 | 59 | 2,600 | 47 |
| 10 | Philippines | 3,700 | 1 | 2,200 | 60 | 1,700 | 45 |
| 11 | Argentina | 3,500 | 1 | 1,600 | 45 | 1,700 | 48 |
| 12 | Jamaica | 3,100 | 1 | 2,200 | 71 | 1,800 | 60 |
| 13 | India | 2,900 | - | 1,800 | 63 | 1,100 | 39 |
| 14 | Venezuela | 2,600 | - | 1,500 | 57 | 1,200 | 48 |
| 15 | Dominican Republic | 2,500 | - | 1,400 | 56 | 1,400 | 55 |
| 16 | Trinidad and Tobago | 2,300 | - | 1,500 | 67 | 1,200 | 54 |
| 17 | Bolivia | 1,700 | - | D | D | D | D |
| 18 | Costa Rica | 1,700 | - | D | D | D | D |
| 19 | Uruguay | 1,600 | - | D | D | D | D |
| 20 | Pakistan | 1,500 | - | D | D | D | D |
| 21 | Chile | 1,400 | - | D | D | D | D |
| 22 | Poland | 1,400 | - | D | D | D | D |
| 23 | Nicaragua | 1,200 | - | D | D | D | D |
| 24 | Nigeria | 1,200 | - | D | D | D | D |
| 25 | Guyana | 1,100 | - | D | D | D | D |
| | Other and Unknown | 19,200 | 3 | | | | |
| | Total | 580,000 | 100 | 303,100 | 52 | 296,900 | 51 |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE: D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

Table 4. Number and Percent of DACA Requests Accepted by Requestor State, Age Group, Sex, and Country of Birth: August, 2012 to September, 2013

| | | | | Requests Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Requests | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| No. | State | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1 | California | 165,400 | 29 | 91,900 | 56 | 86,600 | 52 | 142,900 | 86 |
| 2 | Texas | 95,300 | 16 | 49,200 | 52 | 48,500 | 51 | 83,500 | 88 |
| 3 | Illinois | 32,100 | 6 | 18,000 | 56 | 16,700 | 52 | 27,900 | 87 |
| 4 | New York | 30,700 | 5 | 18,000 | 59 | 15,200 | 49 | 7,900 | 26 |
| 5 | Florida | 24,500 | 4 | 12,600 | 51 | 11,900 | 49 | 10,300 | 42 |
| 6 | Arizona | 20,700 | 4 | 10,600 | 51 | 11,100 | 53 | 20,100 | 97 |
| 7 | North Carolina | 20,300 | 4 | 9,500 | 47 | 10,500 | 52 | 16,400 | 81 |
| 8 | Georgia | 18,900 | 3 | 9,100 | 48 | 9,500 | 50 | 14,400 | 76 |
| 9 | New Jersey | 16,700 | 3 | 9,200 | 55 | 8,100 | 49 | 5,500 | 33 |
| 10 | Colorado | 12,800 | 2 | 6,200 | 49 | 6,600 | 52 | 11,800 | 93 |
| 11 | Washington | 12,400 | 2 | 6,400 | 52 | 6,500 | 52 | 11,200 | 91 |
| 12 | Nevada | 9,500 | 2 | 4,500 | 48 | 5,000 | 52 | 8,500 | 90 |
| 13 | Virginia | 9,200 | 2 | 4,100 | 45 | 4,300 | 47 | 2,500 | 27 |
| 14 | Oregon | 8,200 | 1 | 4,300 | 52 | 4,300 | 52 | 7,800 | 95 |
| 15 | Maryland | 7,400 | 1 | 3,600 | 48 | 3,600 | 49 | 1,400 | 19 |
| 16 | Indiana | 7,200 | 1 | 3,300 | 45 | 3,700 | 51 | 6,300 | 87 |
| 17 | Utah | 6,900 | 1 | 3,500 | 50 | 3,600 | 52 | 5,600 | 81 |
| 18 | Massachusetts | 6,100 | 1 | 3,300 | 54 | 3,100 | 50 | D | D |
| 19 | Tennessee | 5,900 | 1 | 2,600 | 44 | 3,000 | 51 | 4,600 | 78 |
| 20 | Wisconsin | 5,400 | 1 | 2,600 | 48 | 2,800 | 53 | 5,000 | 92 |
| 21 | Kansas | 5,000 | 1 | 2,300 | 46 | 2,600 | 51 | 4,600 | 92 |
| 22 | Oklahoma | 4,900 | 1 | 2,300 | 47 | 2,600 | 52 | 4,500 | 92 |
| 23 | South Carolina | 4,800 | 1 | 2,000 | 43 | 2,400 | 50 | 3,800 | 79 |
| 24 | Michigan | 4,600 | 1 | 2,300 | 50 | 2,300 | 51 | 3,700 | 82 |
| 25 | Minnesota | 4,600 | 1 | 2,300 | 51 | 2,300 | 51 | 3,800 | 83 |
| 26 | New Mexico | 4,400 | 1 | 2,100 | 48 | 2,300 | 52 | 4,300 | 97 |
| 27 | Pennsylvania | 4,100 | 1 | 2,100 | 50 | 2,000 | 49 | 2,000 | 48 |
| 28 | Arkansas | 3,800 | 1 | 1,800 | 46 | 2,000 | 51 | 3,300 | 85 |
| 29 | Connecticut | 3,700 | 1 | 1,900 | 52 | 1,800 | 49 | D | D |
| 30 | Ohio | 3,100 | 1 | 1,400 | 45 | 1,500 | 47 | 2,200 | 70 |
| 31 | Alabama | 3,000 | 1 | 1,300 | 42 | 1,500 | 48 | 2,500 | 84 |
| 32 | Missouri | 2,500 | - | 1,100 | 45 | 1,300 | 52 | 2,100 | 84 |
| 33 | Nebraska | 2,500 | - | 1,200 | 48 | 1,300 | 52 | 2,200 | 86 |
| 34 | Idaho | 2,300 | - | 1,100 | 49 | 1,100 | 50 | 2,200 | 96 |
| 35 | Kentucky | 2,200 | - | 1,000 | 46 | 1,100 | 49 | 1,900 | 83 |
| 36 | Iowa | 2,100 | - | D | D | 1,100 | 51 | 1,700 | 84 |
| 37 | Louisiana | 1,500 | - | D | D | D | D | D | D |
| 38 | Mississippi | 1,100 | - | D | D | D | D | D | D |
| 39 | Delaware | 1,000 | - | D | D | D | D | D | D |
| | Other States & Territories and Unknown | 3,100 | 1 | | | | | | |
| | Total | 580,000 | 100 | 303,100 | 52 | 296,900 | 51 | 443,500 | 76 |

Source: USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE: D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

Table 5.  Number and Percent of DACA Requests Accepted by Requestor Metropolitan or Micropolitan Statistical Area[1], Age Group, Sex, and
Country of Birth:  August, 2012 to September, 2013

| | | Requests Accepted | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Requests | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| No. | Metropolitan and Micropolitan Statistical Area[1] | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1 | Los Angeles-Long Beach-Anaheim, CA | 78,000 | 13 | 46,300 | 59 | 40,800 | 52 | 63,500 | 81 |
| 2 | New York-Newark-Jersey City, NY-NJ-PA | 44,400 | 8 | 25,800 | 58 | 21,800 | 49 | 12,000 | 27 |
| 3 | Dallas-Fort Worth-Arlington, TX | 31,400 | 5 | 15,800 | 50 | 16,200 | 52 | 27,600 | 88 |
| 4 | Houston-The Woodlands-Sugar Land, TX | 30,900 | 5 | 16,500 | 53 | 15,800 | 51 | 24,500 | 79 |
| 5 | Chicago-Naperville-Elgin, IL-IN-WI | 30,600 | 5 | 17,300 | 57 | 15,900 | 52 | 26,500 | 86 |
| 6 | Riverside-San Bernardino-Ontario, CA | 19,000 | 3 | 10,000 | 53 | 9,900 | 52 | 17,200 | 90 |
| 7 | Phoenix-Mesa-Scottsdale, AZ | 17,700 | 3 | 9,300 | 52 | 9,600 | 54 | 17,200 | 97 |
| 8 | Atlanta-Sandy Springs-Roswell, GA | 13,200 | 2 | 6,300 | 48 | 6,700 | 50 | 9,500 | 72 |
| 9 | San Francisco-Oakland-Hayward, CA | 12,600 | 2 | 6,800 | 54 | 6,600 | 52 | 9,600 | 76 |
| 10 | Washington-Arlington-Alexandria, DC-VA-MD-WV | 12,200 | 2 | 5,700 | 47 | 5,900 | 48 | 1,800 | 15 |
| 11 | Miami-Fort Lauderdale-West Palm Beach, FL | 11,200 | 2 | 6,100 | 54 | 5,500 | 49 | 1,900 | 17 |
| 12 | San Diego-Carlsbad, CA | 9,200 | 2 | 5,000 | 55 | 4,800 | 53 | 8,700 | 95 |
| 13 | Denver-Aurora-Lakewood, CO | 8,000 | 1 | 3,900 | 49 | 4,200 | 52 | 7,400 | 92 |
| 14 | San Jose-Sunnyvale-Santa Clara, CA | 8,000 | 1 | 4,500 | 56 | 4,200 | 53 | 7,200 | 90 |
| 15 | Las Vegas-Henderson-Paradise, NV | 7,600 | 1 | 3,600 | 47 | 3,900 | 52 | 6,800 | 89 |
| 16 | Austin-Round Rock, TX | 5,600 | 1 | 2,800 | 50 | 2,800 | 51 | 5,000 | 90 |
| 17 | McAllen-Edinburg-Mission, TX | 5,600 | 1 | 3,000 | 54 | 2,700 | 49 | 5,500 | 99 |
| 18 | Seattle-Tacoma-Bellevue, WA | 5,400 | 1 | 2,700 | 50 | 2,800 | 51 | 4,440 | 82 |
| 19 | Portland-Vancouver-Hillsboro, OR-WA | 4,800 | 1 | 2,500 | 52 | 2,500 | 52 | 4,500 | 94 |
| 20 | Charlotte-Concord-Gastonia, NC-SC | 4,800 | 1 | 2,100 | 45 | 2,400 | 51 | 3,300 | 70 |
| 21 | Boston-Cambridge-Newton, MA-NH | 4,800 | 1 | 2,600 | 55 | 2,400 | 51 | D | D |
| 22 | Sacramento--Roseville--Arden-Arcade, CA | 4,500 | 1 | 2,200 | 48 | 2,300 | 51 | 4,000 | 90 |
| 23 | San Antonio-New Braunfels, TX | 4,400 | 1 | 2,300 | 52 | 2,100 | 49 | 4,100 | 93 |
| 24 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 3,900 | 1 | 1,900 | 50 | 1,900 | 49 | 2,000 | 50 |
| 25 | Fresno, CA | 3,900 | 1 | 2,000 | 52 | 2,100 | 54 | 3,700 | 96 |
| 26 | Bakersfield, CA | 3,800 | 1 | 1,900 | 51 | 2,000 | 54 | 3,600 | 94 |
| 27 | Salt Lake City, UT | 3,700 | 1 | 1,900 | 52 | 2,000 | 53 | 3,100 | 83 |
| 28 | Minneapolis-St. Paul-Bloomington, MN-WI | 3,600 | 1 | 1,800 | 52 | 1,800 | 51 | 2,900 | 82 |
| 29 | Oxnard-Thousand Oaks-Ventura, CA | 3,200 | 1 | 1,700 | 53 | 1,700 | 53 | 2,900 | 92 |
| 30 | Raleigh, NC | 3,000 | 1 | 1,400 | 46 | 1,500 | 51 | 2,400 | 78 |
| 31 | Indianapolis-Carmel-Anderson, IN | 3,000 | 1 | 1,300 | 43 | 1,500 | 51 | 2,600 | 86 |
| 32 | Kansas City, MO-KS | 3,000 | 1 | 1,400 | 46 | 1,500 | 51 | 2,600 | 89 |
| 33 | Visalia-Porterville, CA | 2,700 | - | 1,400 | 52 | 1,500 | 55 | 2,700 | 99 |
| 34 | Tampa-St. Petersburg-Clearwater, FL | 2,700 | - | 1,300 | 50 | 1,300 | 49 | 1,700 | 65 |
| 35 | Nashville-Davidson--Murfreesboro--Franklin, TN | 2,600 | - | 1,100 | 44 | 1,300 | 50 | 1,900 | 73 |
| 36 | Santa Maria-Santa Barbara, CA | 2,500 | - | 1,300 | 52 | 1,200 | 49 | 2,400 | 96 |
| 37 | Stockton-Lodi, CA | 2,500 | - | 1,200 | 47 | 1,300 | 51 | 2,300 | 95 |
| 38 | Orlando-Kissimmee-Sanford, FL | 2,400 | - | 1,200 | 49 | 1,200 | 49 | D | D |
| 39 | Salinas, CA | 2,300 | - | 1,000 | 44 | 1,200 | 51 | 2,200 | 96 |
| 40 | Modesto, CA | 2,200 | - | 1,100 | 49 | 1,100 | 52 | 2,100 | 96 |
| 41 | Oklahoma City, OK | 2,100 | - | 1,100 | 50 | 1,100 | 53 | 1,900 | 90 |
| 42 | Milwaukee-Waukesha-West Allis, WI | 2,100 | - | 1,100 | 51 | 1,100 | 54 | 2,000 | 93 |
| 43 | Santa Rosa, CA | 2,000 | - | 1,100 | 53 | 1,100 | 53 | 1,900 | 95 |
| 44 | Bridgeport-Stamford-Norwalk, CT | 2,000 | - | 1,000 | 52 | D | D | D | D |
| 45 | Albuquerque, NM | 1,900 | - | D | D | 1,000 | 52 | 1,900 | 97 |
| 46 | Detroit-Warren-Dearborn, MI | 1,900 | - | D | D | D | D | 1,500 | 76 |
| 47 | Brownsville-Harlingen, TX | 1,900 | - | 1,100 | 57 | D | D | 1,900 | 99 |
| 48 | Tucson, AZ | 1,900 | - | D | D | D | D | 1,800 | 98 |
| 49 | Baltimore-Columbia-Towson, MD | 1,800 | - | D | D | D | D | D | D |
| 50 | Winston-Salem, NC | 1,800 | - | D | D | D | D | 1,600 | 88 |
| 51 | Salem, OR | 1,800 | - | 1,000 | 59 | D | D | 1,800 | 98 |
| 52 | Greensboro-High Point, NC | 1,700 | - | D | D | D | D | 1,500 | 86 |
| 53 | Yakima, WA | 1,700 | - | D | D | D | D | 1,600 | 99 |
| 54 | El Paso, TX | 1,600 | - | D | D | D | D | 1,600 | 98 |

*(Continued)*

Table 5.  Number and Percent of DACA Requests Accepted by Requestor Metropolitan or Micropolitan Statistical Area[1], Age Group, Sex, and Country of Birth:  August, 2012 to September, 2013 *(Continued)*

| | | Requests | | Requests Accepted | | | | | |
| | | | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| No. | Metropolitan and Micropolitan Statistical Area[1] | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 55 | Durham-Chapel Hill, NC | 1,600 | - | D | D | D | D | 1,200 | 75 |
| 56 | Fayetteville-Springdale-Rogers, AR-MO | 1,500 | - | D | D | D | D | 1,300 | 84 |
| 57 | Tulsa, OK | 1,400 | - | D | D | D | D | 1,300 | 91 |
| 58 | Memphis, TN-MS-AR | 1,400 | - | D | D | D | D | 1,100 | 83 |
| 59 | Columbus, OH | 1,400 | - | D | D | D | D | D | D |
| 60 | Kennewick-Richland, WA | 1,300 | - | D | D | D | D | D | D |
| 61 | Provo-Orem, UT | 1,300 | - | D | D | D | D | D | D |
| 62 | Merced, CA | 1,300 | - | D | D | D | D | 1,300 | 97 |
| 63 | Gainesville, GA | 1,300 | - | D | D | D | D | 1,100 | 91 |
| 64 | North Port-Sarasota-Bradenton, FL | 1,200 | - | D | D | D | D | D | D |
| 65 | Cape Coral-Fort Myers, FL | 1,200 | - | D | D | D | D | D | D |
| 66 | Reno, NV | 1,200 | - | D | D | D | D | 1,100 | 91 |
| 67 | Providence-Warwick, RI-MA | 1,200 | - | D | D | D | D | D | D |
| 68 | Grand Rapids-Wyoming, MI | 1,200 | - | D | D | D | D | 1,100 | 87 |
| 69 | Santa Cruz-Watsonville, CA | 1,200 | - | D | D | D | D | 1,200 | 97 |
| 70 | Omaha-Council Bluffs, NE-IA | 1,100 | - | D | D | D | D | D | D |
| 71 | Vallejo-Fairfield, CA | 1,100 | - | D | D | D | D | D | D |
| 72 | Greenville-Anderson-Mauldin, SC | 1,100 | - | D | D | D | D | D | D |
| 73 | Birmingham-Hoover, AL | 1,100 | - | D | D | D | D | D | D |
| 74 | Naples-Immokalee-Marco Island, FL | 1,000 | - | D | D | D | D | D | D |
| 75 | Ogden-Clearfield, UT | 1,000 | - | D | D | D | D | D | D |
| | Other Metropolitan or Micropolitan Statistical Areas[2] | 89,300 | 15 | | | | | | |
| | All Other Areas | 13,400 | 2 | | | | | | |
| | Total | 580,000 | 100 | 303,100 | 52 | 296,900 | 51 | 443,500 | 76 |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE: D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

[1] Metropolitan and Micropolitan Statistical Areas are areas that contain a recognized population center and adjacent communities that have a high degree of social and economic integration with the center.  Metropolitan areas contain at least one urbanized center with a population of 50,000 or more.  A Micropolitan area contains at least one population center of between 10,000 and 49,999 people.  The 2000 OMB "Standards for Defining Metropolitan and Micropolitan Statistical Areas" is available at <www.whitehouse.gov/sites/default/files/omb/fedreg/metroareas122700.pdf>.  Statistical areas were created using delineations established in OMB BULLETIN NO. 13-01 for the entire reference period.

[2] Contains less than 1,000 requests with an unknown Metropolitan or Micropolitan Statistical Area.

Table 6.  Number and Percent of DACA Requests Accepted between August, 2012 to September, 2013 by Approval Status, Requestor Country of Birth, Age Group, and Sex

| | | Requests Approved[1] | | | | | |
|---|---|---|---|---|---|---|---|
| | | Approvals | | Age Group 20 Years and Over | | Sex Female | |
| No. | Country of Birth | Number | Percent | Number | Percent | Number | Percent |
| 1 | Mexico | 399,400 | 78 | 196,200 | 49 | 212,100 | 53 |
| 2 | El Salvador | 18,700 | 4 | 7,100 | 38 | 9,200 | 49 |
| 3 | Guatemala | 12,200 | 2 | 6,200 | 51 | 5,800 | 48 |
| 4 | Honduras | 11,900 | 2 | 4,800 | 40 | 6,100 | 51 |
| 5 | Korea, Republic of | 7,100 | 1 | 4,200 | 59 | 3,400 | 48 |
| 6 | Peru | 6,800 | 1 | 3,500 | 51 | 3,300 | 48 |
| 7 | Brazil | 5,300 | 1 | 2,900 | 54 | 2,700 | 51 |
| 8 | Colombia | 5,000 | 1 | 2,600 | 52 | 2,400 | 49 |
| 9 | Ecuador | 4,700 | 1 | 2,700 | 56 | 2,400 | 50 |
| 10 | Philippines | 3,500 | 1 | 2,000 | 59 | 1,600 | 45 |
| 11 | Argentina | 3,200 | 1 | 1,400 | 43 | 1,600 | 49 |
| 12 | India | 2,500 | - | 1,500 | 60 | D | D |
| 13 | Jamaica | 2,200 | - | 1,500 | 67 | 1,400 | 63 |
| 14 | Venezuela | 2,200 | - | 1,200 | 54 | 1,100 | 49 |
| 15 | Dominican Republic | 2,000 | - | 1,000 | 52 | 1,100 | 57 |
| 16 | Trinidad and Tobago | 1,800 | - | 1,200 | 64 | D | D |
| 17 | Costa Rica | 1,500 | - | D | D | D | D |
| 18 | Bolivia | 1,500 | - | D | D | D | D |
| 19 | Uruguay | 1,500 | - | D | D | D | D |
| 20 | Chile | 1,300 | - | D | D | D | D |
| 21 | Pakistan | 1,300 | - | D | D | D | D |
| 22 | Poland | 1,300 | - | D | D | D | D |
| 23 | Nicaragua | 1,000 | - | D | D | D | D |
| | Other and Unknown | 17,100 | 3 | | | | |
| | Total | 514,800 | 100 | 254,000 | 49 | 269,300 | 52 |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE: D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

[1] Approval may occur outside of the reference period.

Table 7. Number and Percent of DACA Requests Accepted between August, 2012 to September, 2013 by Approval Status, Requestor State,
   Age Group, Sex, and Country of Birth

| No. | State | Requests Approved[1] | | | | | | | |
| | | Approvals | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| | | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 1 | California | 152,900 | 30 | 82,000 | 54 | 81,400 | 53 | 132,600 | 87 |
| 2 | Texas | 83,500 | 16 | 40,100 | 48 | 43,000 | 52 | 73,600 | 88 |
| 3 | Illinois | 30,000 | 6 | 16,300 | 54 | 15,900 | 53 | 26,100 | 87 |
| 4 | New York | 25,000 | 5 | 13,800 | 55 | 12,800 | 51 | 6,600 | 27 |
| 5 | Florida | 19,100 | 4 | 8,700 | 45 | 9,700 | 51 | 8,200 | 43 |
| 6 | Arizona | 19,000 | 4 | 9,300 | 49 | 10,300 | 54 | 18,400 | 97 |
| 7 | North Carolina | 17,400 | 3 | 7,400 | 43 | 9,200 | 53 | 14,100 | 81 |
| 8 | Georgia | 16,400 | 3 | 7,100 | 43 | 8,400 | 51 | 12,500 | 76 |
| 9 | New Jersey | 14,900 | 3 | 7,900 | 53 | 7,400 | 50 | 5,000 | 33 |
| 10 | Washington | 11,300 | 2 | 5,600 | 50 | 6,000 | 53 | 10,200 | 90 |
| 11 | Colorado | 11,300 | 2 | 5,100 | 45 | 6,000 | 53 | 10,500 | 93 |
| 12 | Nevada | 8,000 | 2 | 3,500 | 44 | 4,300 | 53 | 7,200 | 90 |
| 13 | Oregon | 7,600 | 1 | 3,800 | 50 | 4,100 | 53 | 7,300 | 95 |
| 14 | Virginia | 7,600 | 1 | 3,100 | 40 | 3,700 | 48 | 2,100 | 27 |
| 15 | Maryland | 6,600 | 1 | 3,000 | 45 | 3,300 | 50 | 1,300 | 20 |
| 16 | Utah | 6,300 | 1 | 3,100 | 48 | 3,400 | 53 | 5,100 | 80 |
| 17 | Indiana | 5,800 | 1 | 2,300 | 39 | 3,100 | 53 | 5,100 | 87 |
| 18 | Wisconsin | 5,000 | 1 | 2,300 | 46 | 2,700 | 54 | 4,600 | 93 |
| 19 | Massachusetts | 4,900 | 1 | 2,400 | 50 | 2,500 | 52 | D | D |
| 20 | Tennessee | 4,700 | 1 | 1,800 | 38 | 2,500 | 52 | 3,700 | 79 |
| 21 | Kansas | 4,600 | 1 | 2,000 | 44 | 2,400 | 52 | 4,200 | 92 |
| 22 | Oklahoma | 4,500 | 1 | 2,000 | 45 | 2,400 | 53 | 4,200 | 92 |
| 23 | South Carolina | 4,300 | 1 | 1,700 | 39 | 2,200 | 52 | 3,400 | 78 |
| 24 | Minnesota | 4,100 | 1 | 2,000 | 48 | 2,200 | 53 | 3,500 | 83 |
| 25 | Michigan | 4,100 | 1 | 1,900 | 46 | 2,100 | 52 | 3,400 | 83 |
| 26 | New Mexico | 3,900 | 1 | 1,800 | 45 | 2,100 | 53 | 3,800 | 98 |
| 27 | Pennsylvania | 3,600 | 1 | 1,700 | 46 | 1,800 | 50 | 1,800 | 50 |
| 28 | Arkansas | 3,500 | 1 | 1,500 | 43 | 1,800 | 52 | 3,000 | 86 |
| 29 | Connecticut | 3,300 | 1 | 1,600 | 50 | 1,700 | 50 | D | D |
| 30 | Alabama | 2,700 | 1 | 1,100 | 38 | 1,400 | 49 | 2,300 | 85 |
| 31 | Ohio | 2,700 | 1 | 1,100 | 41 | 1,300 | 49 | 1,900 | 71 |
| 32 | Missouri | 2,300 | - | D | D | 1,200 | 53 | 1,900 | 84 |
| 33 | Nebraska | 2,300 | - | 1,000 | 44 | 1,200 | 53 | 2,000 | 87 |
| 34 | Idaho | 2,100 | - | D | D | 1,100 | 50 | 2,000 | 96 |
| 35 | Kentucky | 2,000 | - | D | D | D | D | 1,700 | 84 |
| 36 | Iowa | 1,900 | - | D | D | D | D | 1,600 | 84 |
| 37 | Louisiana | 1,300 | - | D | D | D | D | D | D |
| | Other States & Territories and Unknown | 4,500 | 1 | | | | | | |
| | Total | 514,800 | 100 | 254,000 | 49 | 269,300 | 52 | 399,400 | 78 |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE:  D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

[1] Approval may occur outside of the reference period.

Table 8.  Number and Percent of DACA Requests Accepted between August, 2012 to September, 2013 by Approval Status, Requestor Metropolitan
or Micropolitan Statistical Area[1], Age Group, Sex, and Country of Birth

| | | Requests Approved[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Approvals | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| No. | Metropolitan and Micropolitan Statistical Area[1] | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1 | Los Angeles-Long Beach-Anaheim, CA | 71,900 | 14 | 41,400 | 58 | 38,300 | 53 | 58,800 | 82 |
| 2 | New York-Newark-Jersey City, NY-NJ-PA | 37,400 | 7 | 20,500 | 55 | 18,900 | 51 | 10,400 | 28 |
| 3 | Chicago-Naperville-Elgin, IL-IN-WI | 28,500 | 6 | 15,600 | 55 | 15,100 | 53 | 24,700 | 87 |
| 4 | Dallas-Fort Worth-Arlington, TX | 27,900 | 5 | 13,200 | 47 | 14,600 | 52 | 24,600 | 88 |
| 5 | Houston-The Woodlands-Sugar Land, TX | 26,300 | 5 | 12,800 | 49 | 13,500 | 51 | 21,000 | 80 |
| 6 | Riverside-San Bernardino-Ontario, CA | 17,600 | 3 | 8,900 | 50 | 9,300 | 53 | 16,000 | 91 |
| 7 | Phoenix-Mesa-Scottsdale, AZ | 16,300 | 3 | 8,200 | 50 | 9,000 | 55 | 15,800 | 97 |
| 8 | San Francisco-Oakland-Hayward, CA | 11,600 | 2 | 6,000 | 52 | 6,200 | 53 | 8,900 | 77 |
| 9 | Atlanta-Sandy Springs-Roswell, GA | 11,400 | 2 | 4,800 | 42 | 5,800 | 51 | 8,200 | 72 |
| 10 | Washington-Arlington-Alexandria, DC-VA-MD-WV | 10,500 | 2 | 4,500 | 43 | 5,100 | 49 | 1,600 | 15 |
| 11 | Miami-Fort Lauderdale-West Palm Beach, FL | 8,700 | 2 | 4,200 | 48 | 4,400 | 50 | 1,500 | 17 |
| 12 | San Diego-Carlsbad, CA | 8,400 | 2 | 4,400 | 52 | 4,500 | 54 | 8,000 | 95 |
| 13 | San Jose-Sunnyvale-Santa Clara, CA | 7,400 | 1 | 4,000 | 54 | 4,000 | 54 | 6,700 | 91 |
| 14 | Denver-Aurora-Lakewood, CO | 7,100 | 1 | 3,200 | 46 | 3,800 | 53 | 6,500 | 92 |
| 15 | Las Vegas-Henderson-Paradise, NV | 6,400 | 1 | 2,800 | 44 | 3,400 | 53 | 5,700 | 90 |
| 16 | McAllen-Edinburg-Mission, TX | 5,000 | 1 | 2,600 | 53 | 2,500 | 50 | 5,000 | 99 |
| 17 | Austin-Round Rock, TX | 5,000 | 1 | 2,400 | 48 | 2,600 | 52 | 4,500 | 90 |
| 18 | Seattle-Tacoma-Bellevue, WA | 4,900 | 1 | 2,400 | 48 | 2,600 | 52 | 4,000 | 82 |
| 19 | Portland-Vancouver-Hillsboro, OR-WA | 4,400 | 1 | 2,200 | 50 | 2,300 | 53 | 4,200 | 94 |
| 20 | Sacramento-Roseville-Arden-Arcade, CA | 4,200 | 1 | 2,000 | 47 | 2,200 | 52 | 3,800 | 90 |
| 21 | Charlotte-Concord-Gastonia, NC-SC | 4,100 | 1 | 1,700 | 41 | 2,100 | 52 | 2,900 | 71 |
| 22 | San Antonio-New Braunfels, TX | 3,800 | 1 | 1,800 | 48 | 1,900 | 50 | 3,600 | 93 |
| 23 | Boston-Cambridge-Newton, MA-NH | 3,700 | 1 | 1,900 | 50 | 2,000 | 53 | D | D |
| 24 | Fresno, CA | 3,600 | 1 | 1,800 | 50 | 2,000 | 54 | 3,500 | 97 |
| 25 | Bakersfield, CA | 3,500 | 1 | 1,700 | 49 | 1,900 | 54 | 3,300 | 94 |
| 26 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 3,400 | 1 | 1,600 | 46 | 1,700 | 50 | 1,800 | 52 |
| 27 | Salt Lake City, UT | 3,400 | 1 | 1,700 | 51 | 1,800 | 53 | 2,800 | 82 |
| 28 | Minneapolis-St. Paul-Bloomington, MN-WI | 3,300 | 1 | 1,600 | 49 | 1,700 | 53 | 2,700 | 83 |
| 29 | Oxnard-Thousand Oaks-Ventura, CA | 2,900 | 1 | 1,500 | 51 | 1,600 | 54 | 2,700 | 92 |
| 30 | Kansas City, MO-KS | 2,700 | 1 | 1,200 | 44 | 1,400 | 52 | 2,400 | 89 |
| 31 | Raleigh, NC | 2,600 | 1 | 1,100 | 42 | 1,400 | 53 | 2,000 | 79 |
| 32 | Visalia-Porterville, CA | 2,500 | - | 1,300 | 50 | 1,400 | 55 | 2,500 | 99 |
| 33 | Indianapolis-Carmel-Anderson, IN | 2,400 | - | D | D | 1,300 | 52 | 2,100 | 86 |
| 34 | Santa Maria-Santa Barbara, CA | 2,400 | - | 1,200 | 50 | 1,200 | 49 | 2,300 | 97 |
| 35 | Stockton-Lodi, CA | 2,300 | - | 1,000 | 45 | 1,200 | 52 | 2,200 | 95 |
| 36 | Salinas, CA | 2,100 | - | D | D | 1,100 | 52 | 2,100 | 96 |
| 37 | Tampa-St. Petersburg-Clearwater, FL | 2,100 | - | D | D | 1,100 | 51 | 1,400 | 66 |
| 38 | Modesto, CA | 2,100 | - | D | D | 1,100 | 53 | 2,000 | 96 |
| 39 | Oklahoma City, OK | 2,000 | - | D | D | 1,100 | 54 | 1,800 | 90 |
| 40 | Milwaukee-Waukesha-West Allis, WI | 1,900 | - | D | D | 1,100 | 56 | 1,800 | 93 |
| 41 | Nashville-Davidson-Murfreesboro-Franklin, TN | 1,900 | - | D | D | 1,000 | 52 | 1,400 | 74 |
| 42 | Santa Rosa, CA | 1,800 | - | D | D | 1,000 | 55 | 1,800 | 95 |
| 43 | Orlando-Kissimmee-Sanford, FL | 1,800 | - | D | D | D | D | D | D |
| 44 | Bridgeport-Stamford-Norwalk, CT | 1,800 | - | D | D | D | D | D | D |
| 45 | Albuquerque, NM | 1,800 | - | D | D | D | D | 1,700 | 97 |
| 46 | Detroit-Warren-Dearborn, MI | 1,700 | - | D | D | D | D | 1,300 | 78 |
| 47 | Brownsville-Harlingen, TX | 1,700 | - | D | D | D | D | 1,700 | 99 |
| 48 | Salem, OR | 1,700 | - | D | D | D | D | 1,700 | 98 |
| 49 | Tucson, AZ | 1,700 | - | D | D | D | D | 1,600 | 98 |
| 50 | Baltimore-Columbia-Towson, MD | 1,600 | - | D | D | D | D | D | D |
| 51 | Winston-Salem, NC | 1,600 | - | D | D | D | D | 1,400 | 89 |
| 52 | Yakima, WA | 1,500 | - | D | D | D | D | 1,500 | 99 |
| 53 | Greensboro-High Point, NC | 1,500 | - | D | D | D | D | 1,300 | 87 |
| 54 | El Paso, TX | 1,400 | - | D | D | D | D | 1,400 | 99 |

*(Continued)*

Table 8.  Number and Percent of DACA Requests Accepted between August, 2012 to September, 2013 by Approval Status, Requestor Metropolitan
or Micropolitan Statistical Area[1], Age Group, Sex, and Country of Birth *(Continued)*

| | | | | Requests Approved[2] | | | | | |
| | | Approvals | | Age Group 20 Years and Over | | Sex Female | | Country of Birth Mexico Only | |
| No. | Metropolitan and Micropolitan Statistical Area[1] | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 55 | Fayetteville-Springdale-Rogers, AR-MO | 1,400 | - | D | D | D | D | 1,200 | 84 |
| 56 | Durham-Chapel Hill, NC | 1,400 | - | D | D | D | D | 1,000 | 76 |
| 57 | Tulsa, OK | 1,300 | - | D | D | D | D | 1,200 | 91 |
| 58 | Merced, CA | 1,200 | - | D | D | D | D | 1,200 | 98 |
| 59 | Provo-Orem, UT | 1,200 | - | D | D | D | D | D | D |
| 60 | Kennewick-Richland, WA | 1,200 | - | D | D | D | D | D | D |
| 61 | Columbus, OH | 1,200 | - | D | D | D | D | D | D |
| 62 | Memphis, TN-MS-AR | 1,200 | - | D | D | D | D | D | D |
| 63 | Santa Cruz-Watsonville, CA | 1,100 | - | D | D | D | D | 1,100 | 97 |
| 64 | Gainesville, GA | 1,100 | - | D | D | D | D | 1,000 | 91 |
| 65 | Grand Rapids-Wyoming, MI | 1,100 | - | D | D | D | D | D | D |
| 66 | Vallejo-Fairfield, CA | 1,100 | - | D | D | D | D | D | D |
| 67 | Omaha-Council Bluffs, NE-IA | 1,000 | - | D | D | D | D | D | D |
| 68 | Reno, NV | 1,000 | - | D | D | D | D | D | D |
| 69 | Providence-Warwick, RI-MA | 1,000 | - | D | D | D | D | D | D |
| 70 | North Port-Sarasota-Bradenton, FL | 1,000 | - | D | D | D | D | D | D |
| 71 | Greenville-Anderson-Mauldin, SC | 1,000 | - | D | D | D | D | D | D |
| | Other Metropolitan or Micropolitan Statistical Areas[3] | 82,100 | 16 | | | | | | |
| | All Other Areas | 11,800 | 2 | | | | | | |
| | Total | 514,800 | 100 | 254,000 | 49 | 269,300 | 52 | 399,400 | 78 |

Source:  USCIS, Computer-Linked Application Information Management System (CLAIMS) 3 (as of February 6, 2014).

NOTE:  D represents data withheld to protect requestors' privacy.

- Represents zero.

Totals may not add due to rounding.

[1] Metropolitan and Micropolitan Statistical Areas are areas that contain a recognized population center and adjacent communities that have a high degree of social and economic integration with the center.  Metropolitan areas contain at least one urbanized center with a population of 50,000 or more.  A Micropolitan area contains at least one population center of between 10,000 and 49,999 people.  The 2000 OMB "Standards for Defining Metropolitan and Micropolitan Statistical Areas" is available at <www.whitehouse.gov/sites/default/files/omb/fedreg/metroareas122700.pdf>.  Statistical areas were created using delineations established in OMB BULLETIN NO. 13-01 for the entire reference period.

[2] Approval may occur outside of the reference period.

[3] Contains less than 1,000 requests with an unknown Metropolitan or Micropolitan Statistical Area.

# DEF-INTERV.

# EX. 268



**U.S. Citizenship and Immigration Services**

**Number of Form I-914, Application for T Nonimmigrant Status by Fiscal Year, Quarter, and Case Status 2008-2017**

| Period | Applications by Case Status | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Victims of Trafficking[1] | | | | Family Members[1] | | | | Total | | | |
| | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] |
| **Fiscal Year - Total** | | | | | | | | | | | | |
| 2008 | 408 | 243 | 78 | 203 | 118 | 228 | 40 | - | 526 | 471 | 118 | 203 |
| 2009 | 475 | 313 | 77 | 318 | 235 | 273 | 54 | 247 | 710 | 586 | 131 | 565 |
| 2010 | 574 | 447 | 138 | 304 | 463 | 349 | 105 | 448 | 1,037 | 796 | 243 | 752 |
| 2011 | 967 | 557 | 223 | 494 | 795 | 722 | 137 | 500 | 1,762 | 1,279 | 360 | 994 |
| 2012 | 885 | 674 | 194 | 560 | 795 | 758 | 117 | 586 | 1,680 | 1,432 | 311 | 1,146 |
| 2013 | 799 | 848 | 104 | 421 | 1,021 | 975 | 91 | 546 | 1,820 | 1,823 | 195 | 967 |
| 2014 | 944 | 613 | 153 | 613 | 925 | 788 | 105 | 583 | 1,869 | 1,401 | 258 | 1,196 |
| 2015 | 1,062 | 610 | 294 | 808 | 1,162 | 694 | 192 | 858 | 2,224 | 1,304 | 486 | 1,666 |
| 2016 | 953 | 750 | 194 | 3,265 | 895 | 986 | 163 | 2,963 | 1,848 | 1,736 | 357 | 6,228 |
| **Fiscal Year 2017 by Quarter** | | | | | | | | | | | | |
| Q1. October - December | 244 | 110 | 26 | 978 | 260 | 150 | D | 837 | 504 | 260 | 33 | 1,815 |
| Q2. January - March | 341 | 144 | 42 | 1,141 | 292 | 150 | 26 | 983 | 633 | 294 | 68 | 2,124 |
| Q3. April - June | 263 | 235 | 102 | 1,110 | 305 | 211 | 55 | 1,042 | 568 | 446 | 157 | 2,152 |
| Q4. July - September | 293 | 183 | 56 | 1,175 | 261 | 179 | 34 | 1,101 | 554 | 362 | 90 | 2,276 |
| **Fiscal Year 2017 Total** | **1,141** | **672** | **226** | **1,175** | **1,118** | **690** | **115** | **1,101** | **2,259** | **1,362** | **348** | **2,276** |

D  Data withheld to protect applicants' privacy.

-  Represents zero.

[1] Refers to victims of severe forms of trafficking (T-1) and family members of victims (T-2,3,4,5).

[2] The number of new applications received and entered into a case-tracking system during the reporting period.

[3] The number of applications approved during the reporting period.

[4] The number of applications that were denied, terminated, or withdrawn during the reporting period.

[5] The number of applications awaiting a decision as of the end of the reporting period.

NOTE:  1) Some applications approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Reporting Tool, September 2017

# DEF-INTERV.

# EX. 269



**U.S. Citizenship and Immigration Services**

**Number of Form I-914, Application for T Nonimmigrant Status by Fiscal Year, Quarter, and Case Status 2008-2018**

| Period | Applications by Case Status | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Victims of Trafficking[1] | | | | Family Members[1] | | | | Total | | | |
| | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] | Applications Received[2] | Approved[3] | Denied[4] | Pending[5] |
| **Fiscal Year - Total** | | | | | | | | | | | | |
| 2008 | 408 | 243 | 78 | 203 | 118 | 228 | 40 | - | 526 | 471 | 118 | 203 |
| 2009 | 475 | 313 | 77 | 318 | 235 | 273 | 54 | 247 | 710 | 586 | 131 | 565 |
| 2010 | 574 | 447 | 138 | 304 | 463 | 349 | 105 | 448 | 1,037 | 796 | 243 | 752 |
| 2011 | 967 | 557 | 223 | 494 | 795 | 722 | 137 | 500 | 1,762 | 1,279 | 360 | 994 |
| 2012 | 885 | 674 | 194 | 560 | 795 | 758 | 117 | 586 | 1,680 | 1,432 | 311 | 1,146 |
| 2013 | 799 | 848 | 104 | 421 | 1,021 | 975 | 91 | 546 | 1,820 | 1,823 | 195 | 967 |
| 2014 | 944 | 613 | 153 | 613 | 925 | 788 | 105 | 583 | 1,869 | 1,401 | 258 | 1,196 |
| 2015 | 1,062 | 610 | 294 | 808 | 1,162 | 694 | 192 | 858 | 2,224 | 1,304 | 486 | 1,666 |
| 2016 | 953 | 750 | 194 | 866 | 895 | 986 | 163 | 715 | 1,848 | 1,736 | 357 | 1,581 |
| 2017 | 1,141 | 672 | 226 | 1,175 | 1,118 | 690 | 122 | 1,101 | 2,259 | 1,362 | 348 | 2,276 |
| **Fiscal Year 2018 by Quarter** | | | | | | | | | | | | |
| Q1. October - December | 323 | 141 | 76 | 1,291 | 306 | 175 | 54 | 1,191 | 629 | 316 | 130 | 2,482 |
| Q2. January - March | 505 | 183 | 79 | 1,541 | 365 | 181 | 71 | 1,317 | 870 | 364 | 150 | 2,858 |
| Q3. April - June | | | | | | | | | | | | |
| Q4. July - September | | | | | | | | | | | | |
| **Total** | **828** | **324** | **155** | **1,541** | **671** | **356** | **125** | **1,317** | **1,499** | **680** | **280** | **2,858** |

D  Data withheld to protect applicants' privacy.

-  Represents zero.

[1] Refers to victims of severe forms of trafficking (T-1) and family members of victims (T-2,3,4,5).

[2] The number of new applications received and entered into a case-tracking system during the reporting period.

[3] The number of applications approved during the reporting period.

[4] The number of applications that were denied, terminated, or withdrawn during the reporting period.

[5] The number of applications awaiting a decision as of the end of the reporting period.

NOTE:  1) Some applications approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Reporting Tool, March 2018.

# DEF-INTERV.

# EX. 270

**U.S. Citizenship and Immigration Services**

**Number of Form I-918, Petition for U Nonimmigrant Status, by Fiscal Year, Quarter, and Case Status  2009-2017**

| Period | Victims of Criminal Activities[1] | | | | Family Members[1] | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Petitions Received[2] | Approved[3] | Denied[4] | Pending[5] | Petitions Received[2] | Approved[3] | Denied[4] | Pending[5] | Petitions Received[2] | Approved[3,7] | Denied[4] | Pending[5] |
| **Fiscal Year - Total[6]** | | | | | | | | | | | | |
| 2009 | 6,835 | 5,825 | 688 | 11,863 | 4,102 | 2,838 | 158 | 9,275 | 10,937 | 8,663 | 846 | 21,138 |
| 2010 | 10,742 | 10,073 | 4,347 | 7,403 | 6,418 | 9,315 | 2,576 | 6,242 | 17,160 | 19,388 | 6,923 | 13,645 |
| 2011 | 16,768 | 10,088 | 2,929 | 10,184 | 10,033 | 7,602 | 1,645 | 8,329 | 26,801 | 17,690 | 4,574 | 18,513 |
| 2012 | 24,768 | 10,122 | 2,866 | 19,899 | 15,126 | 7,421 | 1,465 | 15,592 | 39,894 | 17,543 | 4,331 | 35,491 |
| 2013 | 25,432 | 10,030 | 1,829 | 33,540 | 18,263 | 8,198 | 1,440 | 24,956 | 43,695 | 18,228 | 3,269 | 58,496 |
| 2014 | 26,039 | 10,020 | 4,056 | 45,898 | 19,229 | 8,500 | 3,017 | 33,111 | 45,268 | 18,520 | 7,073 | 79,009 |
| 2015 | 30,106 | 10,026 | 2,715 | 63,762 | 22,560 | 7,662 | 1,965 | 46,541 | 52,666 | 17,694 | 4,680 | 110,303 |
| 2016 | 35,044 | 10,046 | 1,843 | 86,980 | 25,666 | 7,891 | 1,318 | 63,624 | 60,710 | 17,937 | 3,161 | 150,604 |
| | | | | | | | | | | | | |
| **Fiscal Year 2017 by Quarter** | | | | | | | | | | | | |
| Q1. October - December | 8,050 | 3,021 | 312 | 92,586 | 5,670 | 1,872 | 174 | 67,761 | 13,720 | 4,893 | 486 | 160,347 |
| Q2. January - March | 9,277 | 3,124 | 511 | 97,746 | 6,300 | 2,291 | 395 | 71,065 | 15,577 | 5,415 | 906 | 168,811 |
| Q3. April - June | 9,589 | 3,866 | 668 | 103,045 | 6,543 | 2,970 | 477 | 74,295 | 16,132 | 6,836 | 1,145 | 177,340 |
| Q4. July - September | 9,615 | 20 | 637 | 110,511 | 6,642 | 562 | 599 | 79,850 | 16,257 | 582 | 1,236 | 190,361 |
| **Fiscal Year 2017 Total** | **36,531** | **10,031** | **2,128** | **110,511** | **25,155** | **7,695** | **1,645** | **79,850** | **61,686** | **17,726** | **3,773** | **190,361** |

D  Data withheld to protect petitioners' privacy.

- Represents zero.

[1] Refers to victims of certain criminal activities (U-1) and family members of victims (U-2,3,4,5).

[2] The number of new petitions received and entered into a case-tracking system during the reporting period.

[3] The number of petitions approved during the reporting period.

[4] The number of petitions that were denied, terminated, or withdrawn during the reporting period.

[5] The number of petitions awaiting a decision as of the end of the reporting period.

[6] Data unavailable in the reporting system for previous fiscal years.

[7] The U visa cap is against the principal only.  The derivatives are not counted in the annual cap of 10,000. Congress has set a cap of 10,000 U visas for each fiscal year. The cap was reached January 4, 2016.
 Completions in the second quarter of the fiscal year are denials.

NOTE: 1) Some petitions approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Report Tool, September 2017

# DEF-INTERV.

# EX. 271



**U.S. Citizenship and Immigration Services**

**Number of Form I-918, Petition for U Nonimmigrant Status, by Fiscal Year, Quarter, and Case Status  2009-2018**

| Period | Petitions by Case Status | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Victims of Criminal Activities[1] | | | | Family Members[1] | | | | Total | | | |
| | Petitions Received[2] | Approved[3] | Denied[4] | Pending[5] | Petitions Received[2] | Approved[3] | Denied[4] | Pending[5] | Petitions Received[2] | Approved[3,7] | Denied[4] | Pending[5] |
| *Fiscal Year - Total*[6] | | | | | | | | | | | | |
| 2009 | 6,835 | 5,825 | 688 | 11,863 | 4,102 | 2,838 | 158 | 9,275 | 10,937 | 8,663 | 846 | 21,138 |
| 2010 | 10,742 | 10,073 | 4,347 | 7,403 | 6,418 | 9,315 | 2,576 | 6,242 | 17,160 | 19,388 | 6,923 | 13,645 |
| 2011 | 16,768 | 10,088 | 2,929 | 10,184 | 10,033 | 7,602 | 1,645 | 8,329 | 26,801 | 17,690 | 4,574 | 18,513 |
| 2012 | 24,768 | 10,122 | 2,866 | 19,899 | 15,126 | 7,421 | 1,465 | 15,592 | 39,894 | 17,543 | 4,331 | 35,491 |
| 2013 | 25,432 | 10,030 | 1,829 | 33,540 | 18,263 | 8,198 | 1,440 | 24,956 | 43,695 | 18,228 | 3,269 | 58,496 |
| 2014 | 26,039 | 10,020 | 4,056 | 45,898 | 19,229 | 8,500 | 3,017 | 33,111 | 45,268 | 18,520 | 7,073 | 79,009 |
| 2015 | 30,106 | 10,026 | 2,715 | 63,762 | 22,560 | 7,662 | 1,965 | 46,541 | 52,666 | 17,694 | 4,680 | 110,303 |
| 2016 | 35,044 | 10,046 | 1,843 | 86,980 | 25,666 | 7,891 | 1,318 | 63,624 | 60,710 | 17,937 | 3,161 | 150,604 |
| 2017 | 36,531 | 10,031 | 2,128 | 110,511 | 25,155 | 7,695 | 1,645 | 79,850 | 61,686 | 17,726 | 3,773 | 190,361 |
| | | | | | | | | | | | | |
| *Fiscal Year 2018 by Quarter* | | | | | | | | | | | | |
| Q1. October - December | 8,823 | 2,818 | 472 | 117,738 | 6,001 | 1,973 | 437 | 83,541 | 14,824 | 4,791 | 909 | 201,279 |
| Q2. January - March | 9,083 | 4,206 | 608 | 122,309 | 6,229 | 3,030 | 453 | 86,504 | 15,312 | 7,236 | 1,061 | 208,813 |
| Q3. April - June | | | | | | | | | | | | |
| Q4. July - September | | | | | | | | | | | | |
| **Total** | **17,906** | **7,024** | **1,080** | **122,309** | **12,230** | **5,003** | **890** | **86,504** | **30,136** | **12,027** | **1,970** | **208,813** |

D  Data withheld to protect petitioners' privacy.

- Represents zero.

[1] Refers to victims of certain criminal activities (U-1) and family members of victims (U-2,3,4,5).

[2] The number of new petitions received and entered into a case-tracking system during the reporting period.

[3] The number of petitions approved during the reporting period.

[4] The number of petitions that were denied, terminated, or withdrawn during the reporting period.

[5] The number of petitions awaiting a decision as of the end of the reporting period.

[6] Data unavailable in the reporting system for previous fiscal years.

[7] The U visa cap is against the principal only.  The derivatives are not counted in the annual cap of 10,000.  Congress has set a cap of 10,000 U visas for each fiscal year.

As of March 31, 2018, the cap for 2018 has not yet been reached.

NOTE: 1) Some petitions approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Report Tool, March 2018.

DEF-INTERV. EX. 272

WITHDRAWN

DEF-INTERV.

EX. 273

Appendix I

LEGALIZATION AND FAMILY FAIRNESS -- AN ANALYSIS

I.   GENERAL PURPOSE OF THE UNITED STATES IMMIGRATION LAWS AND THE
     IMMIGRATION REFORM AND CONTROL ACT OF 1986 (IRCA)

     On November 6, 1986, President Reagan signed the Immigration Reform and
     Control Act of 1986 (IRCA) into law.   This legislation, the most
     comprehensive reform of our Immigration laws since 1952, makes great
     strides to control illegal immigration while preserving our heritage of
     legal immigration.

     While the theme of this legislation is focused on gaining control of our
     borders and eliminating the illegal alien problem through firm yet fair
     enforcement, it also reflects the nation's concerns for aliens who have
     been long-time illegal residents of the United States.

     This is accomplished through a generous legalization program that is
     based on the same concepts of fairness that underlie the lawful
     immigration system.   Both paths offer an orderly transition to permanent
     residence for those who have established their eligibility and provide an
     opportunity for family members to immigrate under a process that does not
     reward people who have circumvented the law by entering illegally.

     Immigration by close relatives of permanent residents and citizens of the
     United States forms the core of a lawful system centered on the
     reunification of families; the overwhelming majority of some six hundred
     thousand people who immigrate each year are such immediate family
     members.   By legalizing their status, aliens who have been in this
     country since 1982 gain access to our family-oriented immigration policy,
     and ensure that their spouses and children may enter lawfully.

II.  CONCEPT OF LEGALIZATION UNDER IRCA

     IRCA is an enforcement law; its primary purpose is to stop illegal
     immigration.   The legalization program is one part of a package that
     includes employer sanctions, enhanced border enforcement, the Systematic
     Alien Verification for Entitlements (SAVE) program, and a provision for
     removal of criminal aliens.

     Legalization was the balance--a one-time program to legalize certain
     aliens, even though they were illegal, and allow them to become part of
     the American mainstream.   This delicate balance was achieved through a
     statute that was carefully constructed to make passage of the bill
     possible.   Even as crafted, legalization was still so controversial that
     the margin in favor of the provision in the House of Representatives was
     only seven votes.

     The Congress accomplished the legalization balance by limiting the
     program to aliens with substantial equities in the United States.   It did
     not intend to place all illegal aliens within a legal status. January 1,
     1982, was set as the eligibility date for legalization, thus setting
     forth clear boundaries for establishing ties to this country.   Those
     illegal aliens who arrived in the United States after January 1, 1982,
     remain illegal and are subject to deportation.

Appendix I, continued

This Congressional intent as it applies to each alien is evidence in the plain meaning of the statute. This intent is further magnified by the legislative history of the bill, including the House Report, the State Report, the Conference Report, and the Congressional floor debates (1986). There is nothing in these documents that would indicate Congress wanted to provide immigration benefits to others who didn't meet the basic criteria, including families of legalized aliens. To the contrary, the Senate Judiciary Committee stated in its report that:

> It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens. S. Rep. No. 99-131, 99th Cong., 1 Sess. 343 (1985).

With the legislative history so clear, the authority of the Attorney General to grant resident status must extend only to aliens who qualify on the merits of their own case, and not through a broad, extralegal derivative basis.

III. HOW LEGALIZATION HAS WORKED

In the six months allowed to prepare for implementation of the program, the INS engaged in an unprecedented action which opened the full regulatory process to the public. Comments were solicited at the earliest stage, and the thousands of responses were carefully considered in developing the final product. Meanwhile, INS undertook an implementation effort never matched in the agency's history. By May 5, 1987, one hundred and seven (107) new offices were opened with 2,000 people hired to staff these offices; a major automated data system was developed and installed; the public information campaign was begun; and training was provided to all that were to work in the legalization program.

As of October 16, 1987, roughly 5 1/2 months after opening, we have accepted over 865,000 applications. Over 85% of these applications were filed directly with the INS, indicating that there is no "fear factor" -- the alien population that has come forward exhibits trust in the Immigration Service. With this participation rate already doubling the results of all other legalization programs throughout the world in modern-day history, expectations are that 2 million illegal aliens will be processed by May 4, 1988.

IV. HOW LEGALIZATION SUPPORTS THE DUAL THEMES OF LEGAL IMMIGRATION AND FAMILY UNIFICATION

Through the legalization program made possible by IRCA, several million people will be able to shift from an illegal to a legal status. They will be able to come "out of the shadows", become full active participants in our society, and eventually become United States citizens. Many of these millions are in family units which have filed as a unit and have been found eligible for legalization. Many parents of United States citizen children have qualified on the merits of their own cases under IRCA.

The INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations.

Appendix I, continued

Many family members who would have otherwise been judged ineligible for legalization may now qualify due to recent policy decisions. Applicants who resided illegally in the United States prior to January 1, 1982, but who subsequently departed and then used legal nonimmigrant documents to re-enter the United States to resume their illegal residence, are now considered eligible for legalization benefits with the filing of a waiver to overcome the fraud at entry.

Upon being approved for permanent resident status, the legalized alien will be eligible to bring in immediate relatives under the current provisions of the Immigration and Nationality Act. Therefore, families of legalized aliens will be unified in the same manner as other immigrant families who have been waiting outside of the United States. (See the following chart for comparisons).

Legal Immigration

   1. Married couple with wife in U.S. and husband in foreign country

   2. Lawful resident wife files petition for husband

   3. Petition approved; husband gains right to immigrate under preference system

   4. Husband must wait for visa; cannot wait in U.S.

   5. If husband comes to U.S. illegally, he is subject to deportation if routinely encountered

   6. Husband must return to home country to obtain visa when it is available

Legalization

   1. Married couple apply for legalization

   2. Wife approved; husband denied

   3. No effort to deport husband based on legalization application

   4. Later INS contact (i.e., at place of work) could result in deportation proceedings against husband

   5. Wife gains permanent resident status; files petition for husband

   6. See steps 3 - 6 under Legal Immigration

V.   FAMILY FAIRNESS

Congress, as well as the INS, recognized that there is a basic issue of fairness involved in the enactment of IRCA. Fairness dictates that illegal alien family members of persons eligible for legalization not be treated more favorably than the family members of legal permanent residents who may have to wait years to come to the United States due to the backlog of a demand for visas. To grant a derivative legalization benefit to unqualified aliens who are merely related to a qualified applicant would be unfair when put in this context. Such a break from fairness and tradition would also act as a magnet for others to enter the United States in an illegal manner, marry a qualified legalization

Appendix I, continued

applicant, and attempt to gain benefits.  This would  create a second
legalization program contrary to the intent of Congress and upset the
delicate balance of IRCA.

Legalization is a unique act.  Basic equity between those legal
immigrants who patiently wait in foreign countries for legal visas and
those who entered illegally, but have contributed to America and are
being forgiven, should be maintained.  However, unqualified family
members will be in no worse a position than they were prior to the
enactment of IRCA.  In fact, as noted above, it is to the benefit of the
unqualified to have their eligible relative apply for legalization in
that it may qualify them in the future for permanent residence.

## VI.  UNFOUNDED BELIEF THAT UNLESS LEGALIZATION LAW BE EXPANDED, FAMILIES WILL BE BROKEN UP

As previously noted, legalization allows many families to stay in this
country legally.  Without legalization, individuals who are in the United
States illegally have no right to any benefits of the immigration law and
may not petition for relatives.

To the extent that there is a family separation, the separation was
usually accomplished by the alien who left his or her family behind in
the home country to seek an illegal life in the United States.  If the
family is separated because of legalization and decides not to wait for a
legal means to bring the family unit together again in the United States,
the option is always available for the family unit to return to the home
country.

## VII.  INS PROCEDURES TO HANDLE FAMILY FAIRNESS ISSUES

Under the law no information from the legalization application will be
used against any applicant or their family.  Once family members are
recorded on the application, there cannot be subsequent modifications.
Thus it is in the ineligible alien's best interest to be recorded as a
family member now.

The confidentiality factor of the application, which Congress included in
the legislation, prevents INS from taking any action as a result of
information provided in the application.  The only way family members of
a legalization applicant would come under deportation proceedings is if
they are apprehended during a routine INS operation at a workplace.

INS district directors may exercise the Attorney General's authority to
indefinitely defer deportation of anyone for specific humanitarian
reasons.  They will continue to examine any case that involves an
immediate relative of a successful legalization applicant.  The district
directors are instructed to review all evidence submitted, make a
recommended finding, and make available all such cases for review and
concurrence.  This unusual step is being taken to ensure the consistency
of decisions throughout the Service.

Guidelines for INS officials regarding the basis for issuing voluntary
departure are as follows:

1.  Voluntary departure shall generally not be granted to the ineligible
    spouses of legalized aliens whose only claim to such discretionary
    relief is by virtue of the marriage itself.  Likewise, such relief is
    not available to the ineligible parents of either legalized
    applicants or United States citizen children.

INTERPRETER RELEASES, October 26, 1987

1204

Appendix I, continued

2. Instead, certain compelling or humanitarian factors must exist in addition to the family relationship and hardships caused by separation.

3. In general, indefinite voluntary departure shall be granted to unmarried children under the age of eighteen (18) years who can establish that they were in an unlawful status prior to November 6, 1986. Such children should be residing with their parents and the granting of voluntary departure should be conditioned on the fact that both parents (or, in the case of a single parent household, the parent the child lives with) have achieved lawful temporary resident status.

IX.   CONCLUSION

The United States is now nearly half way through the largest program in world history to allow many illegal aliens to become legal. Legalization is a balance to enforcement efforts to deter and control illegal immigration through border enforcement, job market and entitlement enforcement to deny jobs and entitlements to illegal aliens and stronger efforts against criminal aliens. By May 1988, the United States will legalize an estimated 2 million people, five times those legalized by all other countries in the world.

Many of these 2 million being legalized are families. Additional exercise of the Attorney General's discretion by INS assures that minor children living with their parents will be covered. Spouse not directly eligible for legalization will be reviewed on a case-by-case basis and can be granted permission to remain if special humanitarian factors are present. Other ineligible spouses of legalized aliens are placed in the exact same position as spouses of legal immigrants — they can become legal residents through the petition process.

Therefore, legalization itself is the most significant effort of the Congress and the Administration to pursue the goal of U.S. immigration laws — family unification. Out of fairness to our legal system, to legal immigrants waiting patiently in line, and to adhere to Congressional intent, there is no basis to "blanket in" all ineligible spouses. They, like all American immigrants, must follow the laws and fundamental principles of fairness.

It is extremely important, however, that persons who believe they are eligible for legalization apply because of the unique protection the law offers through the confidentiality provision. They should appear at an INS Legalization Office or pursue their case through a church or other organization (Qualified Designated Entity) whether or not other family members qualify, in order to ensure that their family situation is resolved through the lawful immigration process.

Alan C. Nelson
Commissioner
U.S. Immigration & Naturalization Service

October 21, 1987

# DEF-INTERV.

# EX. 274

| Number of Form I-918 for U Nonimmigrant Status Approval and Denial Rates Jan 2017-Mar 2018 | | |
|---|---|---|
| Petitions by Case Status | | |
| Victims of Criminal Activites | | |
| | Approved | Denied |
| Jan-Mar 2017 | 3,124 | 511 |
| Apr-Jun 2017 | 3,866 | 668 |
| Jul-Sep 2017 | 20 | 637 |
| Oct-Dec 2017 | 2,818 | 472 |
| Jan-Mar 2018 | 4,206 | 608 |
| Total Jan 2017-Mar 2018 | 14,034 | 2,896 |
| | Approval Rate | Denial Rate |
| | 82.89% | 17.11% |
| Family Members | | |
| | Approved | Denied |
| Jan-Mar 2017 | 2,291 | 395 |
| Apr-Jun 2017 | 2,970 | 477 |
| Jul-Sep 2017 | 562 | 599 |
| Oct-Dec 2017 | 1,973 | 437 |
| Jan-Mar 2018 | 3,030 | 453 |
| Total Jan 2017-Mar 2018 | 10,826 | 2,361 |
| | Approval Rate | Denial Rate |
| | 82.10% | 17.90% |
| Total | | |
| | Approved | Denied |
| Jan-Mar 2017 | 5,415 | 906 |
| Apr-Jun 2017 | 6,836 | 1,145 |
| Jul-Sep 2017 | 582 | 1,236 |
| Oct-Dec 2017 | 4,791 | 909 |
| Jan-Mar 2018 | 7,236 | 1,061 |
| Total Jan 2017-Mar 2018 | 24,860 | 5,257 |
| | Approval Rate | Denial Rate |
| | 82.54% | 17.46% |

Source: USCIS Victims of Crime Form I-918 (U-Visa) FY 2017, 4th Qtr Ex. 270 and USCIS Victims of Crime Form I-918 (U Visa) FY 2018, 2nd Qtr Ex. 271.

# DEF-INTERV.

# EX. 275

| Form I-914 for T Nonimmigrant Status Approval and Denial Rates Jan 2017-Mar 2018 | | |
|---|---|---|
| Applications by Case Status | | |
| Victims of Trafficking | | |
| | Approved | Denied |
| Jan-Mar 2017 | 144 | 42 |
| Apr-Jun 2017 | 235 | 102 |
| Jul-Sep 2017 | 183 | 56 |
| Oct-Dec 2017 | 141 | 76 |
| Jan-Mar 2018 | 183 | 79 |
| Total Jan 2017-Mar 2018 | 886 | 355 |
| | Approval Rate | Denial Rate |
| | 71.39% | 28.61% |
| Family Members | | |
| | Approved | Denied |
| Jan-Mar 2017 | 150 | 26 |
| Apr-Jun 2017 | 211 | 55 |
| Jul-Sep 2017 | 179 | 34 |
| Oct-Dec 2017 | 175 | 54 |
| Jan-Mar 2018 | 181 | 71 |
| Total Jan 2017-Mar 2018 | 896 | 240 |
| | Approval Rate | Denial Rate |
| | 78.87% | 21.13% |
| Total | | |
| | Approved | Denied |
| Jan-Mar 2017 | 294 | 68 |
| Apr-Jun 2017 | 446 | 157 |
| Jul-Sep 2017 | 362 | 90 |
| Oct-Dec 2017 | 316 | 130 |
| Jan-Mar 2018 | 364 | 150 |
| Total Jan 2017-Mar 2018 | 1,782 | 595 |
| | Approval Rate | Denial Rate |
| | 74.97% | 25.03% |

Source: USCIS Victims of Trafficking Form I-914 (T) FY 2017, 4th Qtr Ex. 268 and USCIS Victims of Trafficking Form I-914 (T) FY 2018, 2nd Qtr  Ex. 269.

# DEF-INTERV.

# EX. 276

| DACA Initials<br>Approval and Denial Rates<br>January 2017-March 2018 | | |
|---|---|---|
| | Approved | Denied |
| Jan-Mar 2017 | 17,220 | 3,024 |
| Apr-Jun 2017 | 5,827 | 2,719 |
| Jul-Sep 2017 | 6,159 | 1,414 |
| Oct-Dec 2017 | 5,585 | 1,669 |
| Jan-Mar 2018 | 9,709 | 2,170 |
| Total Jan 2017-Mar 2018 | 44,500 | 10,996 |
| | Approval Rate | Denial Rate |
| | 80.19% | 19.81% |

Source: USCIS Number of Form I-821D, Consideration of Deferred
Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake,
Biometrics and Case Status FY 2012-2017 (September 30) Ex. 101 at 1.
and USCIS Number of Form I-821D, Consideration of Deferred Action
for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status
FY 2012-2018 (March 31, 2018) Ex. 102 at 1.

# DEF-INTERV.

# EX. 277

🇺🇸 Official website of the Department of Homeland Security


**U.S. Department of Homeland Security**

Enter Search Term

On DHS.gov

# Table 39. Aliens Removed Or Returned: Fiscal Years 1892 To 2016

The *2016 Yearbook of Immigration Statistics (/immigration-statistics/yearbook/2016)* is a compendium of tables that provide data on foreign nationals who are granted lawful permanent residence (i.e., immigrants who receive a "green card"), admitted as temporary nonimmigrants, granted asylum or refugee status, or are naturalized. The *Yearbook* also presents data on immigration enforcement actions, including apprehensions and arrests, removals, and returns.

*Table 39. Aliens Removed Or Returned: Fiscal Years 1892 To 2016*

| Year | Removals[1] | Returns[2] |
|------|------|------|
| 2016[4] | 340,056 | 106,167 |
| 2015 | 326,962 | 129,429 |
| 2014 | 405,589 | 163,223 |
| 2013 | 433,034 | 178,663 |
| 2012 | 415,900 | 230,333 |
| 2011 | 385,778 | 322,073 |
| 2010 | 381,593 | 474,166 |
| 2009 | 391,283 | 582,584 |
| 2008 | 359,795 | 811,263 |
| 2007 | 319,382 | 891,390 |
| 2006 | 280,974 | 1,043,381 |
| 2005 | 246,431 | 1,096,920 |
| 2004 | 240,665 | 1,166,576 |
| 2003 | 211,098 | 945,294 |

| 2002 | 165,168 | 1,012,116 |
| 2001 | 189,026 | 1,349,371 |
| 2000 | 188,467 | 1,675,876 |
| 1999 | 183,114 | 1,574,863 |
| 1998 | 174,813 | 1,570,127 |
| 1997 | 114,432 | 1,440,684 |
| 1996 | 69,680 | 1,573,428 |
| 1995 | 50,924 | 1,313,764 |
| 1994 | 45,674 | 1,029,107 |
| 1993 | 42,542 | 1,243,410 |
| 1992 | 43,671 | 1,105,829 |
| 1991 | 33,189 | 1,061,105 |
| 1990 | 30,039 | 1,022,533 |
| 1989 | 34,427 | 830,890 |
| 1988 | 25,829 | 911,790 |
| 1987 | 24,336 | 1,091,203 |
| 1986 | 24,592 | 1,586,320 |
| 1985 | 23,105 | 1,041,296 |
| 1984 | 18,696 | 909,833 |
| 1983 | 19,211 | 931,600 |
| 1982 | 15,216 | 812,572 |
| 1981 | 17,379 | 823,875 |
| 1980 | 18,013 | 719,211 |
| 1979 | 26,825 | 966,137 |
| 1978 | 29,277 | 975,515 |
| 1977 | 31,263 | 867,015 |
| 1976[3] | 38,471 | 955,374 |

| 1975 | 24,432 | 655,814 |
| 1974 | 19,413 | 718,740 |
| 1973 | 17,346 | 568,005 |
| 1972 | 16,883 | 450,927 |
| 1971 | 18,294 | 370,074 |
| 1970 | 17,469 | 303,348 |
| 1969 | 11,030 | 240,958 |
| 1968 | 9,590 | 179,952 |
| 1967 | 9,728 | 142,343 |
| 1966 | 9,680 | 123,683 |
| 1965 | 10,572 | 95,263 |
| 1964 | 9,167 | 73,042 |
| 1963 | 7,763 | 69,392 |
| 1962 | 8,025 | 54,164 |
| 1961 | 8,181 | 52,383 |
| 1960 | 7,240 | 52,796 |
| 1959 | 8,468 | 56,610 |
| 1958 | 7,875 | 60,600 |
| 1957 | 5,989 | 63,379 |
| 1956 | 9,006 | 80,891 |
| 1955 | 17,695 | 232,769 |
| 1954 | 30,264 | 1,074,277 |
| 1953 | 23,482 | 885,391 |
| 1952 | 23,125 | 703,778 |
| 1951 | 17,328 | 673,169 |
| 1950 | 10,199 | 572,477 |
| 1949 | 23,874 | 276,297 |

| 1948 | 25,276 | 197,184 |
| 1947 | 23,434 | 195,880 |
| 1946 | 17,317 | 101,945 |
| 1945 | 13,611 | 69,490 |
| 1944 | 8,821 | 32,270 |
| 1943 | 5,702 | 11,947 |
| 1942 | 5,542 | 6,904 |
| 1941 | 7,336 | 6,531 |
| 1940 | 12,254 | 8,594 |
| 1939 | 14,700 | 9,590 |
| 1938 | 17,341 | 9,278 |
| 1937 | 16,905 | 8,788 |
| 1936 | 16,195 | 8,251 |
| 1935 | 13,877 | 7,978 |
| 1934 | 14,263 | 8,010 |
| 1933 | 25,392 | 10,347 |
| 1932 | 26,490 | 10,775 |
| 1931 | 27,886 | 11,719 |
| 1930 | 24,864 | 11,387 |
| 1929 | 31,035 | 25,888 |
| 1928 | 30,464 | 19,946 |
| 1927 | 31,417 | 15,012 |
| 1926 | 31,454 | NA |
| 1925 | 34,885 | NA |
| 1924 | 36,693 | NA |
| 1923 | 24,280 | NA |
| 1922 | 18,076 | NA |

| Year | | |
|------|--------|----|
| 1921 | 18,296 | NA |
| 1920 | 14,557 | NA |
| 1919 | 11,694 | NA |
| 1918 | 8,866 | NA |
| 1917 | 17,881 | NA |
| 1916 | 21,648 | NA |
| 1915 | 26,675 | NA |
| 1914 | 37,651 | NA |
| 1913 | 23,399 | NA |
| 1912 | 18,513 | NA |
| 1911 | 25,137 | NA |
| 1910 | 26,965 | NA |
| 1909 | 12,535 | NA |
| 1908 | 12,971 | NA |
| 1907 | 14,059 | NA |
| 1906 | 13,108 | NA |
| 1905 | 12,724 | NA |
| 1904 | 8,773 | NA |
| 1903 | 9,316 | NA |
| 1902 | 5,439 | NA |
| 1901 | 3,879 | NA |
| 1900 | 4,602 | NA |
| 1899 | 4,052 | NA |
| 1898 | 3,229 | NA |
| 1897 | 1,880 | NA |
| 1896 | 3,037 | NA |
| 1895 | 2,596 | NA |

Case 1:18-cv-00068    Document 227-3    Filed on 07/22/18 in TXSD    Page 136 of 150

| 1894 | 1,806 | NA |
| 1893 | 1,630 | NA |
| 1892 | 2,801 | NA |

NA Not available.

[1] Removals are the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal. An alien who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal.

[2] Returns are the confirmed movement of an inadmissible or deportable alien out of the United States not based on an order of removal.

[3] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.

Source: U.S. Department of Homeland Security.

Last Published Date: November 30, 2017

# DEF-INTERV.

# EX. 278

**Population Estimates**

JULY 2017

# Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014

**BRYAN BAKER**

This report provides estimates of the size of the unauthorized immigrant population residing in the United States as of January 2014 by period of entry, region and country of origin, state of residence, age, and sex. The estimates were derived using the residual methodology employed for previous estimates of the unauthorized population (see Baker and Rytina, 2013). The unauthorized immigrant population is the remainder (or residual) after the legally resident foreign-born population—naturalized citizens, lawful permanent residents (LPRs), asylees, refugees, and nonimmigrants—is subtracted from the total foreign-born population. Data to estimate the legally resident foreign-born population were obtained primarily from the Department of Homeland Security (DHS), whereas the American Community Survey (ACS) of the U.S. Census Bureau was the source for estimates of the total foreign-born population.

In summary, DHS estimates that 12.1 million unauthorized immigrants were living in the United States in January 2014, compared to 11.6 million in 2010 and 11.8 million in 2007.[1] The increase of 0.5 million from 2010 to 2014 (125,000 per year on average) reflects relative stability, especially when contrasted against the increases of 0.5 million per year in the years leading up to the previous peak of 11.8 million in 2007. Of the total unauthorized immigrant population, more than 75 percent had resided in the United States for more than 10 years and only five percent entered during the previous five years (2009 to 2013); in 2007 fewer than 50 percent had been in the United States for longer than 10 years and more than 20 percent had entered in the previous five years. Fifty-five percent of unauthorized immigrants in 2014 were from Mexico, compared to 59 percent in 2007.

## DEFINITIONS

### Legal Residents

The legally resident immigrant population as defined for these estimates includes all persons who were granted lawful permanent residence; granted asylum; admitted as refugees; and nonimmigrants admitted under classes of admission associated with residence (e.g., students and temporary workers, as opposed to tourists) and not required to leave by January 1, 2014.

### Unauthorized Residents

The unauthorized resident immigrant population is defined as all foreign-born non-citizens who are not legal residents (see above). Most unauthorized residents either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. Persons who are beneficiaries of Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA) or other forms of prosecutorial discretion, or who are residing in the United States while awaiting removal proceedings in immigration court, are included among the unauthorized population estimates; data were not available in sufficient detail to estimate the sizes and characteristics of these populations or to distinguish them from other foreign-born populations in the ACS. Unauthorized immigrants applying for adjustment to LPR status under the Immigration and Nationality Act (INA) are considered to be part of the unauthorized resident population until they have been granted lawful permanent residence.

[1] Note that the ACS editions used for the 2007 and 2014 unauthorized population estimates were based on different Decennial Censuses; see Figure 1 for an illustration of the impact of the change in Decennial Census bases.



Homeland Security

Office of Immigration Statistics
**OFFICE OF STRATEGY, POLICY & PLANS**

## METHODOLOGY AND DATA

Two populations are estimated in order to derive the unauthorized population estimates: 1) the total foreign-born population living in the United States on January 1, 2014, and 2) the legally resident foreign-born population on the same date. The unauthorized population estimate is the residual when (2) is subtracted from (1). Foreign-born residents who entered the United States prior to 1980 are assumed to be legally resident since most would have become eligible to adjust to LPR status.[2] Therefore, the starting point for the estimates was January 1, 1980. The steps involved in estimating the components of each population are shown in **APPENDIX 1**. Data on the foreign-born population that entered during 1980–2013 by country of birth, state of residence, year of entry, age, and sex were obtained from the 2013 ACS. The ACS is a nationwide sample survey that collects information from U.S. households on social, demographic, and economic characteristics, including country of birth and year of entry of the foreign-born population. The ACS consists of non-overlapping samples from which information is collected monthly over the course of a year. The ACS was selected for the estimates because of its large sample size, about 3.6 million households in 2013 compared to 100,000 for the March 2014 Current Population Survey, the primary alternative source of national data on the foreign-born population.

Data on persons who obtained LPR status by country of birth, state of residence, age, sex, category of admission, and year of entry were obtained from DHS administrative records maintained in an application case tracking system of U.S. Citizenship and Immigration Services (USCIS). Data on refugees arriving in the United States by country of origin were obtained from the Department of State. Data on persons granted asylum by country of origin were obtained from USCIS for those granted asylum affirmatively and from the Executive Office for Immigration Review of the Department of Justice for those granted asylum defensively in removal proceedings. Data on nonimmigrant admissions by country of citizenship, state of residence, age, sex, and class of admission were obtained from I-94 arrival-departure records in the TECS database maintained by the U.S. Customs and Border Protection (see Baker, 2016 for a fuller discussion). Estimates of the unauthorized population were generated for the ten leading countries of birth and states of residence and were disaggregated by age and sex. The Cuban-born population living in the United States was excluded from the estimates since, under U.S. immigration law and policy, most Cubans who are admitted or paroled into the United States are eligible one year later to apply to adjust to LPR status.[3]

### Limitations

Annual estimates of the unauthorized immigrant population are subject to sampling error in the ACS and considerable nonsampling error because of uncertainty in some of the assumptions

required for estimation as indicated below.[4] Caution is recommended in interpreting year-to-year changes in the size of the unauthorized population.

*Assumptions about undercount of the foreign-born population in the ACS and rates of emigration.* The foreign-born, unauthorized immigrants and nonimmigrants in particular, are less likely than native-born Americans to respond to or to be included in responses to government surveys. To control for undercount of these "hard to count" populations, analysts must make assumptions about the extent of the undercount and then adjust the ACS survey estimates accordingly. The estimates are sensitive to these undercount adjustments (see **RESULTS**).

*Accuracy of year of entry reporting.* Concerns exist among immigration analysts regarding the validity and reliability of Census survey data on the year of entry question, "When did this person come to live in the United States?" Errors also occur in converting DHS administrative dates for legally resident immigrants to year of entry dates.

*Assumptions about the nonimmigrant population estimate.* The estimates are based on admission dates and length of visit by class of admission and country of citizenship and not actual population counts.

*Sampling error in the ACS.* The 2013 ACS data are based on a sample of the U.S. population. Thus the estimates of the total foreign-born population that moved to the United States in the 1980−2013 period are subject to sampling variability. The estimated margin of error for the estimate of the total foreign-born population in the 2013 ACS at the 90 percent confidence level is plus or minus approximately 125,000.

*Accuracy of state of residence for the non-naturalized legally resident population.* State of residence for the non-naturalized legally resident 1980− 2013 entrants is assumed to be the state of residence on the date the most recent status (e.g., refugee or LPR) was obtained; however, the accuracy of the estimates may be affected by state-to-state migration that occurred between the date of the status change and January 1, 2014.

*Comparisons across years.* Although DHS has been producing annual estimates since 2005, comparisons across multiple years can be problematic. In addition to sampling error and the uncertainty surrounding the estimates described above, the series of DHS estimates is not fully consistent. For example, estimates of the foreign-born population from the 2010-2014 ACS were based on the 2010 Decennial Census (adjusted for births, deaths, and migration), whereas estimates from earlier ACS editions were based on the 2000 Census. Comparisons across multiple years should be interpreted with caution.

*Unauthorized flow:* This report estimates the total size of the unauthorized population as of January 2014; it does not include an estimate of new unauthorized arrivals (i.e., unauthorized flow).

---

[2]Under Section 249 of the INA, the registry provision, qualified persons who have resided continuously in the United States since prior to January 1, 1972, may apply for LPR status. Additionally, qualified persons who had resided continuously in the United States since prior to January 1, 1982, as unauthorized residents were made eligible to adjust to LPR status under the Immigration Reform and Control Act (IRCA) of 1986, Pub. L. 99-603 (1986).

[3]Cuban Refugee Adjustment Act of 1966, Pub. L. No. 89-732, 80 Stat. 1161 (1966) (as amended); 8 U.S.C. § 1255 (1994 & Supp. II 1966).

[4]The methodology used for this report requires a number of assumptions that affect the composite estimates. Partly in response to a recommendation in GAO, CGD-98-164, this report outlines several of these assumptions and attempts to articulate caveats, such as the difficulty in comparing estimates across years. The Office of Immigration Statistics' population estimate methodology has improved considerably since the GAO's report. One improvement has been to replace U.S. Census Current Population Survey data with American Community Survey data, lowering sampling error. Additionally, the current methodology no longer requires estimates of overstays and the assumptions behind them.

## RESULTS

An estimated 12.1 million unauthorized immigrants were living in the United States on January 1, 2014, up from an estimated 11.9 million on January 1, 2013. Although this estimate is slightly larger than the 11.8 million estimated for the previous peak in 2007, the comparison across decades is problematic because of differences between the 2000 and 2010 decennial Censuses and related methodological issues. For example, as illustrated in Figure 1, DHS estimated 10.8 million unauthorized immigrants in 2010 using an ACS vintage based on the 2000 Census and 11.6 million for the same year using a later ACS vintage based on the 2010 Census. Because of the inconsistent series, it is not clear that the population size has increased since the previous peak in 2007. The data do suggest, however, that the population growth rate has been substantially lower in recent years (about 125,000 per year on average from 2010 to 2014) than in the years leading up to the previous peak in 2007 (about 500,000 per year on average from 2000 to 2007).

The DHS estimation method is similar to the methods used by the Pew Research Center and the Center for Migration Studies (Passel and Cohn, 2016; Warren, 2016). All three organizations apply variations of the residual method. The residual method starts with an estimate of the total foreign-born population and subtracts an estimate of the lawfully resident population to derive an estimate of the unauthorized population. Although the three estimates are based on similar high-level approaches, their methods are not identical. Some of the key areas in which the methods may differ include:

- **Survey undercount**. The residual model estimates the total foreign-born population based on U.S. Census data, but the Census is believed to under-count the foreign-born population—and particularly the unauthorized immigrant population—at higher rates than the native-born population. The exact degree of the undercount and how it may differ with time spent in the United States and for different sub-groups is unknown.

- **Emigration modeling**. The residual method uses estimates of the lawful permanent resident population which are based on previous immigration inflows, adjusted for mortality and return migration (i.e., lawful immigrants who depart the United States). Mortality rates can be estimated with precision based on standard demographic tables, but similar tables do not exist for emigration rates.

- **Methods for estimating the nonimmigrant, refugee, and asylee populations**. OIS estimates nonimmigrants, refugees, and asylees based on previous admissions data, controlling for estimated deaths and outflows. Pew and CMS identify these populations based on their expected characteristics in Census data. These methodological differences affect the estimated size of the legally present population and therefore have an influence on the estimated size of the unauthorized population.

- **Techniques used to control for entry-year heaping in the ACS**. Census data on the foreign-born population indicate an unexpectedly large number of immigrants who report entering the United States in 1980 relative to surrounding years ("heaping" on 1980). Unauthorized immigrants who entered prior to 1980 are assumed to have legalized through the Immigration Reform



Figure 1.
**Unauthorized Immigrant Population: 2000–2014**

Millions

Legend:
- Based on the 2000 census
- Based on the 2010 census

Values: 2000: 8.5; 2005: 10.5; 2006: 11.3; 2007: 11.8; 2008: 11.6; 2009: 10.8; 2010: 10.8 / 11.6; 2011: 11.5; 2012: 11.4; 2013: 11.9; 2014: 12.1

DHS estimates not produced for 2001–2004

Year

Source: U.S. Department of Homeland Security.

and Control Act, so how analysts control for this heaping effect has an impact on the resulting population estimate.

- **Base populations used in the residual method**. The residual method used by DHS starts with all foreign-born persons and subtracts off all lawfully resident foreign-born persons. One alternative would be to start with foreign-born noncitizens and subtract off all lawfully resident foreign-born noncitizens. These different choices of starting populations can lead to different estimates due to over-reporting of citizenship in the ACS.

These and other possible modeling differences result in differences among the three organizations' overall estimates.[5] In particular, Pew estimates showed 11.1 million unauthorized immigrants residing in the United States as of March 2014 and 11.2 million in 2013. The Center for Migration Studies estimate 10.9 million in 2014 and 11.0 million in 2013.

Figures 2 and 3 offer additional insight into differences among the three organizations' estimates. Figure 2 depicts estimated numbers of unauthorized Mexican nationals, and Figure 3 depicts estimated non-Mexicans. As the figures illustrate, all three organizations estimate the unauthorized Mexican population within a range of about six to seven million persons, and all three show declines of 10 to 15 percent from 2010 to 2014. The CMS estimate was more similar to the DHS estimate in 2010 and more similar to the Pew estimate in 2014, and shows a sharper drop over this time period. With respect to non-Mexicans, the CMS and Pew estimates were flat throughout the period, with the exception of a brief spike in the Pew estimate in 2012, while the DHS estimate increased substantially from 2012 to 2014. The increase in DHS's estimate may partly reflect the surge in unauthorized migration from countries in the Northern Triangle of Central America.[6] Despite these differences, all three estimates generally fall within a range of about 5.0 to 5.5 million people.

---

[5] See Appendix for details on DHS's modeling assumptions.

[6] The Northern Triangle of Central America is comprised of El Salvador, Guatemala, and Honduras.



Figure 2.
**Unauthorized Immigrant Population Estimates for Mexico: 2010-2014**

Sources: U.S. Department of Homeland Security; Center for Migration Studies; and Pew Research Center.



Figure 3.
**Unauthorized Immigrant Population Estimates for All Countries Other than Mexico: 2010–14**

Sources: U.S. Department of Homeland Security; Center for Migration Studies; and Pew Research Center.

## Period of Entry

Of the 12.1 million unauthorized immigrants in 2014, more than 75 percent had been in the United States for longer than 10 years, whereas only five percent had entered within the last five years (2009–2013) (see Table 1 and Figure 4). In the peak period in 2007, less than half of the population had been in the United States for longer than 10 years and more than 20 percent had entered within the most recent five-year period (2002–2006). This pattern suggests a declining rate of new unauthorized immigration, or that an increasing share of new unauthorized immigrants are being deported or otherwise returning home.

## Components of the Unauthorized Immigrant Population in 2014

The size of each component of the unauthorized immigrant population estimates for 2014 is displayed in Table 2.[7] For the foreign-

born population, the starting point was the estimated 33.5 million foreign-born residents in the 2013 ACS that entered the United States during 1980–2013. This population was increased by 2.4 million, or seven percent, by adjustments for the shift in the reference date from mid-year 2013 to January 1, 2014, and the addition of undercounts for the populations of nonimmigrants, legally resident immigrants, and unauthorized immigrants. The estimated undercount of the unauthorized immigrant population in the ACS was 1.2 million and represents slightly more than 50 percent of all adjustments to the foreign-born population.

---

[7] See APPENDIX 1 for a detailed explanation of each entry in Table 2.

**Table 1.**

**Period of Entry of the Unauthorized Immigrant Population: January 2014 and January 2007***

| | Estimated population size | | | |
|---|---|---|---|---|
| | January 2014 | | January 2007* | |
| Period of entry | Number | Percent | Number | Percent |
| All years (1980–2013) | 12,120,000 | 100 | 11,780,000 | 100 |
| Previous 5 years . . . . . | 630,000 | 5 | 2,460,000 | 21 |
| 6-10 years ago. . . . . . . | 2,040,000 | 17 | 4,070,000 | 35 |
| 11-20 years ago. . . . . . | 6,090,000 | 50 | 3,950,000 | 34 |
| More than 20 years ago | 3,360,000 | 28 | 1,300,000 | 11 |

Detail may not sum to totals because of rounding.
* The 2007 estimates were drawn from an earlier DHS report and were calculated using similar, but not identical, methods and data sources.
Source: U.S. Department of Homeland Security.



Figure 4.
**Years in the United States of the Unauthorized Immigrant Population: 2014 and 2007***

* The 2007 estimates are drawn from an earlier DHS report and were calculated using similar, but not identical, methods and data sources.
Source: U.S. Department of Homeland Security.

**Table 2.**

**Component Estimates of the Unauthorized Immigrant Population: January 2014**

| | 2014 |
|---|---:|
| **1)  Foreign-born population** | |
| a.  Foreign-born population, entered 1980–2013, 2013 ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,480,000 |
| b.  Adjustment for shift in reference date from July 1, 2013 to January 1, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . | 450,000 |
| c.  Undercount of nonimmigrants in ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170,000 |
| d.  Undercount of other legally resident immigrants (LPRs, recent refugee/asylee arrivals) in ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . | 550,000 |
| e.  Undercount of unauthorized immigrant population in ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,210,000 |
| f.  Estimated foreign-born population, January 1, 2014 (a.+b.+c.+d.+e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35,860,000 |
| **2)  Legally resident population** | |
| g.  LPR, refugee, and asylee flow January 1, 1980–December 31, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,610,000 |
| h.  Mortality 1980–2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,200,000 |
| i.  Emigration 1980–2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,390,000 |
| j.  LPR, refugee, and asylee resident population, January 1, 2014 (g.-h.-i.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,020,000 |
| k.  Nonimmigrant population on January 1, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,730,000 |
| l.  Estimated legally resident population, January 1, 2014 (j.+k.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,740,000 |
| **3)  Unauthorized immigrant population** | |
| m. Estimated resident unauthorized immigrant population, January 1, 2014 (f.-l.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,120,000 |

Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

For the legally resident population, the starting point was the flow of 28.6 million LPRs, refugees, and asylees during 1980–2013. By January 2014, the 28.6 million had been reduced by 6.6 million to 22.0 million due to mortality (2.2 million) and emigration (4.4 million). The addition of the nonimmigrant population, estimated at 1.7 million, resulted in a total estimated legally resident population of 23.7 million on January 1, 2014. Subtracting the 23.7 million legally resident immigrants and nonimmigrants from the total 35.9 million foreign-born population that entered the United States during 1980–2013 yields the final estimated unauthorized population of 12.1 million on January 1, 2014.

### Estimates by Region and Country of Birth

An estimated 9.1 million (75 percent) of the total 12.1 million unauthorized immigrants living in the United States in 2014 were from North America, including Canada, Mexico, the Caribbean, and Central America (see Figure 5). The next leading regions of origin were Asia (1.7 million) and South America (0.8 million). The relative proportions by region or country of origin were largely unchanged from the population peak in 2007.

Mexico continued to be the leading source country of unauthorized immigration to the United States, though the population size and share of the total have both declined since the peak in 2007 (see Table 3). There were 6.6 million unauthorized immigrants from Mexico in 2014, representing 55 percent of the unauthorized population, compared to 7.0 million representing 59 percent in 2007. The next leading source countries were El Salvador (700,000), Guatemala (640,000), India (430,000), Honduras (400,000), and the Philippines (360,000). The 10 leading countries of origin accounted for 83 percent of the unauthorized immigrant population in 2014. Among the top 10 countries, the largest percentage increases since 2007 were for India (90 percent), the

Dominican Republic (79 percent), and Vietnam (64 percent).[8] The unauthorized immigrant populations from Northern Triangle countries also increased: Honduras increased by 44 percent, El Salvador by 30 percent, and Guatemala by 27 percent.

### Estimates by State of Residence

California remained the leading state of residence of the unauthorized immigrant population in 2014, with 2.9 million, nearly

---

[8] Percentages and percent change were calculated prior to rounding.



Figure 5.

**Region and Country of Birth of the Unauthorized Immigrant Population: January 2014 and 2007\***

Millions

* The 2007 estimates are drawn from an earlier DHS report and were calculated using similar, but not identical, methods and data sources.
Source: U.S. Department of Homeland Security.

25 percent of the total number (see Table 4). The next leading state was Texas with 1.9 million unauthorized residents, followed by Florida (760,000), New York (640,000), and Illinois (550,000). The 10 leading states represented 72 percent of the unauthorized population in 2014. The population in Arizona declined by 31 percent between 2007 and 2014, Florida declined by 21 percent, and Georgia declined by 13 percent. The population sizes increased by 12 percent in Texas and by 11 percent in Washington.

## Estimates by Age and Sex

In 2014, 61 percent of unauthorized immigrants were ages 25 to 44 years, and 53 percent were male (see Figure 6 and Table 5). Males accounted for 57 percent of the unauthorized population in the 18 to 34 age group in 2014 while females accounted for 54 percent of the 45 and older age groups.



Figure 6.
**Age and Sex of the Unauthorized Immigrant Population: January 2014**

Source: U.S. Department of Homeland Security.

**Table 3.**

**Country of Birth of the Unauthorized Immigrant Population: January 2014 and 2007***

| Country of birth | Estimated population size in January | | | |
| | 2014 | | 2007 | |
| | Number | Percent | Number | Percent |
|---|---|---|---|---|
| All countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,120,000 | 100 | 11,780,000 | 100 |
| Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,640,000 | 55 | 6,980,000 | 59 |
| El Salvador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 700,000 | 6 | 540,000 | 5 |
| Guatemala . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 640,000 | 5 | 500,000 | 4 |
| India . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 430,000 | 4 | 220,000 | 2 |
| Honduras . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 400,000 | 3 | 280,000 | 2 |
| Philippines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 360,000 | 3 | 290,000 | 2 |
| China . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 270,000 | 2 | 290,000 | 2 |
| Korea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 250,000 | 2 | 230,000 | 2 |
| Vietnam . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 200,000 | 2 | 120,000 | 1 |
| Dominican Republic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 180,000 | 1 | 100,000 | 1 |
| Other countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,050,000 | 17 | 2,220,000 | 19 |

Detail may not sum to totals because of rounding.

* The 2007 estimates were drawn from an earlier DHS report and were calculated using similar, but not identical, methods and data sources.

Source: U.S. Department of Homeland Security.

**Table 4.**

**State of Residence of the Unauthorized Immigrant Population: January 2014 and 2007***

| State of residence | Estimated population size in January | | | |
| | 2014 | | 2007 | |
| | Number | Percent | Number | Percent |
|---|---|---|---|---|
| All states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,120,000 | 100 | 11,780,000 | 100 |
| California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,900,000 | 24 | 2,840,000 | 24 |
| Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,920,000 | 16 | 1,710,000 | 14 |
| Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 760,000 | 6 | 960,000 | 8 |
| New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 640,000 | 5 | 640,000 | 5 |
| Illinois . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 550,000 | 5 | 560,000 | 5 |
| New Jersey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 480,000 | 4 | 470,000 | 4 |
| Georgia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 430,000 | 4 | 490,000 | 4 |
| North Carolina . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 400,000 | 3 | 380,000 | 3 |
| Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 370,000 | 3 | 530,000 | 5 |
| Washington . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290,000 | 2 | 260,000 | 2 |
| Other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,370,000 | 28 | 2,940,000 | 25 |

Detail may not sum to totals because of rounding.

* The 2007 estimates were drawn from an earlier DHS report and were calculated using similar, but not identical, methods and data sources.

Source: U.S. Department of Homeland Security.

**Table 5.**

**Age by Sex of the Unauthorized Immigrant Population: January 2014**

| Age | Total | | Male | | Female | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| All ages . . . . . . . . . . . . . . . . . | 12,120,000 | 100 | 6,410,000 | 100 | 5,710,000 | 100 |
| Under 18 years . . . . . . . . . . . . . | 1,060,000 | 9 | 530,000 | 8 | 530,000 | 9 |
| 18 to 24 years. . . . . . . . . . . . . . | 1,240,000 | 10 | 730,000 | 11 | 500,000 | 9 |
| 25 to 34 years. . . . . . . . . . . . . . | 3,710,000 | 31 | 2,070,000 | 32 | 1,640,000 | 29 |
| 35 to 44 years. . . . . . . . . . . . . . | 3,670,000 | 30 | 1,960,000 | 31 | 1,710,000 | 30 |
| 45 to 54 years. . . . . . . . . . . . . . | 1,720,000 | 14 | 820,000 | 13 | 900,000 | 16 |
| 55 years and over . . . . . . . . . . . | 720,000 | 6 | 290,000 | 5 | 430,000 | 7 |

Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

## APPENDIX 1

### Components for Estimating the Unauthorized Immigrant Population

The material below describes how the components for the total foreign-born and legally resident populations were estimated.[9] The unauthorized population estimate is the residual when the legally resident population is subtracted from the total foreign-born population. Note that the labels for each component correspond with the entries in Table 2.

#### 1) Foreign-born population

##### a. Foreign-born population, entered 1980–2013

The estimated total foreign-born population that entered in 1980 to 2013 was obtained from the ACS's FactFinder. FactFinder is the Census-maintained online data portal for obtaining ACS estimates from the full sample for a particular year. Data on the distribution of the foreign born by country of origin, state of residence, year of entry, age, and sex were obtained from the 2013 Public Use Microdata Sample (PUMS). The overall FactFinder estimate for the total foreign-born population entering in the post-1979 period was reduced to remove PUMS estimates of the post-1979 Cuban-born population. Further, a three-year moving average was applied to PUMS data for year of entry to reduce heaping effects.

##### b. Shift in reference date to January 1, 2014

The 2013 ACS estimates of the foreign-born population are benchmarked to the middle of 2013 and therefore do not fully count the part of the population that arrived in 2013. For example, the 2013 ACS estimated about 75 percent more foreign-born persons who entered the United States in 2012 than were estimated in the 2012 ACS. To fully estimate the population who entered in 2013, the 2013 ACS estimates of 2013 entrants were adjusted upward according to the historical average of increases observed in consecutive ACS vintages. Specifically, the 2013 ACS estimates of 2013 entrants were multiplied by 1.68, the average of: (1) the ratio of 2012 entrants in the 2013 vs. 2012 ACS

vintages; (2) the ratio of 2011 entrants in the 2012 vs. 2011 ACS vintages; and (3) the ratio of 2010 entrants in the 2011 vs. 2010 ACS vintages. In effect, this shifts the reference date from mid-year 2013 to January 1, 2014.

##### c. Undercount of nonimmigrants in the ACS

Undercount refers to the number of persons who should have been counted in a survey or census, but were not. The undercount rate for nonimmigrants was assumed to be 10 percent. This rate was used in DHS unauthorized population estimates for 2000 and 2005–2012 (U.S. Department of Homeland Security, 2003; Baker and Rytina, 2013).

##### d. Undercount of LPRs, refugees, and asylees in the ACS

The undercount rate for LPRs, refugees, and asylees in the ACS was assumed to be 2.5 percent. This was the same rate used in DHS estimates for 2000 and 2005–2012 (U.S. Department of Homeland Security, 2003; Baker and Rytina, 2013).

##### e. Undercount of unauthorized immigrants in the ACS

The undercount rate for unauthorized immigrants in the ACS was assumed to be 10 percent. This was the same rate used in previous DHS estimates for 2000 and 2005–2012 (U.S. Department of Homeland Security, 2003; Baker and Rytina, 2013).

##### f. Estimated foreign-born population, January 1, 2014

The sum of 1a. through 1e. (above) is the estimated foreign-born population on January 1, 2014, that entered the United States during the 1980–2013 period.

#### 2) Legally Resident Population

##### g. LPR, refugee, and asylee flow, entered 1980–2013

The 1980–2013 flow was calculated separately for LPRs, refugees, and asylees using DHS administrative data. LPRs consist of two groups: new arrivals and those who have adjusted status. New arrivals include all persons with immigrant visas issued by the Department of State who were admitted at a U.S. port of entry. For new arrival LPRs, the date of entry into the United States is the same as the date of approval for LPR status. For LPRs adjusting status, year of entry was assumed to be the year of last entry between 1980 and 2013 prior to adjustment.

---

[9] The methods and assumptions underlying each component of the estimate are being reevaluated for 2015. Historic estimates may also be revised to provide a consistent time series.

Refugees and asylees, as defined in the legally resident flow, had not adjusted to LPR status as of January 1, 2014. The refugee and asylee flow was estimated based on the average time spent in the status before adjustment to LPR status—2.2 years for refugees and 4.2 years for asylees adjusting in 2013. The refugee and asylee portion of the legally resident flow therefore included refugees who arrived in the United States during the 2.2 years prior to 2014 and persons granted asylum during the 4.2 years preceding 2014.

### h. Mortality of legally resident flow 1980–2013

Data are not collected on the mortality of legally resident immigrants. The population was survived forward in time (from the year in which LPR status was obtained to 2014) using mortality rates by age and sex from 1999–2001 U.S. Census life tables (Arias et al., 2008).

### i. Emigration of legally resident flow 1980–2013

Emigration is a major component of immigrant population change. In the absence of data that directly measure emigration from the United States, researchers have developed indirect estimates based largely on Census data. For this report, annual emigration rates were calculated from estimates of emigration of the foreign-born population based on 1980 and 1990 Census data (Ahmed and Robinson, 1994). Refugees and asylees, with little likelihood of returning to their country of origin, were assumed not to emigrate. The effective rate of emigration for legally resident immigrants granted LPR status in 1993–1994 was about 20 percent during the twenty-year period through January 2014 (about 0.9 percent per year). For the entire LPR population that entered in 1980–2013, the average emigration rate was about 1.1 percent per year.

## APPENDIX 2

**Country of Birth and State of Residence of the Unauthorized Immigrant Population: January 2000 and 2005–2014**

| Country of birth and state of residence | Estimated population in January | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2005 | 2006* | 2007 | 2008 | 2009 | 2010 | 2010** | 2011 | 2012 | 2013 | 2014 |
| **Country of birth** | | | | | | | | | | | | |
| Total . . . . . . | 8,460,000 | 10,490,000 | 11,310,000 | 11,780,000 | 11,600,000 | 10,750,000 | 10,790,000 | 11,590,000 | 11,510,000 | 11,430,000 | 11,900,000 | 12,120,000 |
| Mexico . . . . . . . | 4,680,000 | 5,970,000 | 6,570,000 | 6,980,000 | 7,030,000 | 6,650,000 | 6,640,000 | 6,830,000 | 6,800,000 | 6,720,000 | 6,650,000 | 6,640,000 |
| El Salvador . . . . . | 430,000 | 470,000 | 510,000 | 540,000 | 570,000 | 530,000 | 620,000 | 670,000 | 660,000 | 690,000 | 710,000 | 700,000 |
| Guatemala . . . . . | 290,000 | 370,000 | 430,000 | 500,000 | 430,000 | 480,000 | 520,000 | 520,000 | 520,000 | 560,000 | 610,000 | 640,000 |
| India . . . . . . . . . | 120,000 | 280,000 | 210,000 | 220,000 | 160,000 | 200,000 | 200,000 | 270,000 | 240,000 | 260,000 | 360,000 | 430,000 |
| Honduras . . . . . . | 160,000 | 180,000 | 280,000 | 280,000 | 300,000 | 320,000 | 330,000 | 380,000 | 380,000 | 360,000 | 400,000 | 400,000 |
| Philippines . . . . . | 200,000 | 210,000 | 280,000 | 290,000 | 300,000 | 270,000 | 280,000 | 290,000 | 270,000 | 310,000 | 370,000 | 360,000 |
| China . . . . . . . | 190,000 | 230,000 | 170,000 | 290,000 | 220,000 | 120,000 | 130,000 | 300,000 | 280,000 | 210,000 | 230,000 | 270,000 |
| Korea . . . . . . . . | 180,000 | 210,000 | 230,000 | 230,000 | 240,000 | 200,000 | 170,000 | 220,000 | 230,000 | 230,000 | 270,000 | 250,000 |
| Vietnam. . . . . . . | 160,000 | 150,000 | 150,000 | 120,000 | 80,000 | 110,000 | 110,000 | 190,000 | 170,000 | 160,000 | 180,000 | 200,000 |
| Dominican Republic | *** | 120,000 | 80,000 | 100,000 | 80,000 | 70,000 | 70,000 | 130,000 | 110,000 | 80,000 | 140,000 | 180,000 |
| Other countries . . | 2,050,000 | 2,300,000 | 2,400,000 | 2,220,000 | 2,190,000 | 1,800,000 | 1,730,000 | 1,830,000 | 1,670,000 | 1,850,000 | 1,960,000 | 2,050,000 |
| **State of residence** | | | | | | | | | | | | |
| Total . . . . . . . . | 8,460,000 | 10,490,000 | 11,310,000 | 11,780,000 | 11,600,000 | 10,750,000 | 10,790,000 | 11,590,000 | 11,510,000 | 11,430,000 | 11,900,000 | 12,120,000 |
| California. . . . . . | 2,510,000 | 2,770,000 | 2,790,000 | 2,840,000 | 2,850,000 | 2,600,000 | 2,570,000 | 2,910,000 | 2,830,000 | 2,820,000 | 2,950,000 | 2,900,000 |
| Texas . . . . . . . . | 1,090,000 | 1,360,000 | 1,620,000 | 1,710,000 | 1,680,000 | 1,680,000 | 1,770,000 | 1,780,000 | 1,790,000 | 1,830,000 | 1,820,000 | 1,920,000 |
| Florida. . . . . . . . | 800,000 | 850,000 | 960,000 | 960,000 | 840,000 | 720,000 | 760,000 | 730,000 | 740,000 | 730,000 | 790,000 | 760,000 |
| New York . . . . . . | 540,000 | 560,000 | 510,000 | 640,000 | 640,000 | 550,000 | 460,000 | 690,000 | 630,000 | 580,000 | 690,000 | 640,000 |
| Illinois . . . . . . . . | 440,000 | 520,000 | 530,000 | 560,000 | 550,000 | 540,000 | 490,000 | 550,000 | 550,000 | 540,000 | 550,000 | 550,000 |
| New Jersey . . . . . | 350,000 | 380,000 | 420,000 | 470,000 | 400,000 | 360,000 | 370,000 | 440,000 | 420,000 | 430,000 | 440,000 | 480,000 |
| Georgia . . . . . . . | 220,000 | 470,000 | 490,000 | 490,000 | 460,000 | 480,000 | 460,000 | 430,000 | 440,000 | 400,000 | 410,000 | 430,000 |
| North Carolina . . . | 260,000 | 360,000 | 360,000 | 380,000 | 380,000 | 370,000 | 390,000 | 390,000 | 400,000 | 360,000 | 410,000 | 400,000 |
| Arizona . . . . . . . | 330,000 | 480,000 | 490,000 | 530,000 | 560,000 | 460,000 | 470,000 | 350,000 | 360,000 | 350,000 | 370,000 | 370,000 |
| Washington . . . . . | 170,000 | 240,000 | 280,000 | 260,000 | 260,000 | 230,000 | 200,000 | 260,000 | 260,000 | 270,000 | 260,000 | 290,000 |
| Other states . . . . | 1,750,000 | 2,510,000 | 2,860,000 | 2,940,000 | 2,980,000 | 2,760,000 | 2,840,000 | 3,040,000 | 3,100,000 | 3,110,000 | 3,170,000 | 3,370,000 |

*Revised as noted in the 1/1/2007 unauthorized estimates report published in September 2008.
**Revised to be consistent with estimates derived from the 2010 Census.
***Estimate not available for January 2000.
Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

**j.  LPR, refugee, and asylee population on January 1, 2014**

Subtracting mortality (2h.) and emigration (2i.) from the LPR, refugee, and asylee flow during 1980–2013 (2g.) results in the estimated LPR, refugee, and asylee resident population on January 1, 2014.

**k.  Nonimmigrant population on January 1, 2014**

The number of nonimmigrants living in the United States on January 1, 2014, was estimated by estimating days of presence between July 1, 2013, and June 30, 2014, and dividing the result by 365 (see Baker, 2016). The estimate was restricted to class of admission such as students, temporary workers, and exchange visitors where the length of stay typically exceeds two months. The estimate does not include border crossers or visitors for business or pleasure. Year of entry for the 2014 nonimmigrant population was based on the distribution of year of entry for nonimmigrants used in previous DHS unauthorized immigrant population estimates (U.S. Department of Homeland Security, 2003; Baker and Rytina, 2013).

**l.  Estimated legally resident immigrant population on January 1, 2014**

Adding the population of LPRs, refugees, and asylees on January 1, 2014 (2j.) to the nonimmigrant population on the same date (2k.) results in the total estimated legally resident immigrant population in the United States on January 1, 2014.

**3)  Unauthorized immigrant population**

**m.  Estimated unauthorized immigrant population on January 1, 2014**

Subtracting the estimated legally resident immigrant population (2l.) from the total foreign-born population on January 1, 2014 (1f.) yields the estimate of the unauthorized immigrant population.

## REFERENCES

Ahmed, Bashir and J. Gregory Robinson, 1994. "Estimates of Emigration of the Foreign-Born Population: 1980–1990," Technical Working Paper No. 9, U.S. Bureau of the Census, http://www.census.gov/population/www/documentation/twps0009/twps0009.html

Arias, Elizabeth and Lester R. Curtin, Rong Wei and Robert N. Anderson, 2008. "U.S. Decennial Life Tables for 1999–2001, United States Life Tables," *National Vital Statistics Report* 57 (1), National Center for Health Statistics, Centers for Disease Control, http://www.cdc.gov/nchs/data/nvsr/nvsr57/nvsr57_01.pdf

Baker, Bryan, 2016. "Estimates of the Size and Characteristics of the Resident Nonimmigrant Population in the United States: Fiscal Year 2014," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security, https://www.dhs.gov/sites/default/files/publications/Nonimmigrant_Population%20Estimates_2014.pdf

Baker, Bryan and Nancy Rytina, 2013. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security, http://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf

Passel, Jeffrey S. and D'Vera Cohn, 2016. "Unauthorized immigrant population stable for half a decade," Pew Research Center, http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/

U.S. Census Bureau, 2011. "Change in Population Controls," American Community Survey Research Note, http://www.census.gov/acs/www/Downloads/comparing_acs_data/2010_Change_Population_Controls.pdf

U.S. Department of Homeland Security, 2003. "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000," http://www.dhs.gov/xlibrary/assets/statistics/publications/Ill_Report_1211.pdf

Warren, Robert, 2016. "US Undocumented Population Drops Below 11 Million in 2014, with Continued Declines in the Mexican Undocumented Population," *Journal on Migration and Human Security* 4(1):1-15, http://jmhs.cmsny.org/index.php/jmhs/article/view/58

Warren, Robert and Jeffrey S. Passel, 1987. "A Count of the Uncountable: Estimates of Undocumented Aliens Counted in the 1980 United States Census," *Demography* 24:375-393.

# DEF-INTERV.

# EX. 279

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



<div align="center">

June 22, 2018

MEMORANDUM FROM SECRETARY KIRSTJEN M. NIELSEN

</div>

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke memorandum") rescinding the enforcement policy known as Deferred Action for Childhood Arrivals (DACA). Acting Secretary Duke concluded that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation [over the enforcement policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)], and the September 4, 2017 letter from the Attorney General [concerning DACA], it is clear that the June 15, 2012 DACA program should be terminated." Accordingly, "in the exercise of [her] authority in establishing national immigration policies and priorities," she "rescind[ed] the June 15, 2012 memorandum," subject to certain exceptions.

On April 24, 2018, the U.S. District Court for the District of Columbia held that the Duke memorandum was subject to judicial review under the Administrative Procedure Act and that it provided insufficient justification for rescinding the DACA policy. The court vacated the Duke memorandum and remanded to the Department of Homeland Security (DHS). The court issued a 90-day stay of vacatur, however, to afford DHS an opportunity to provide further explanation for rescinding the DACA policy.

Because the D.C. district court has requested further explanation, I am providing such explanation here. Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy, and it is my understanding that the Department of Justice will continue to seek appellate review of preliminary injunctions that restrict DHS from implementing the Duke memorandum and rescinding the DACA policy. This explanation reflects my understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound.

The Secretary of Homeland Security is vested with authority over "the administration and enforcement" of the immigration laws, 8 U.S.C. § 1103(a)(1), including the discretion to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The DACA policy of deferred action was cast as an exercise of enforcement discretion to forbear from removing a certain class of aliens who are subject to removal under law. DHS also had concluded that under pre-existing statutory and regulatory provisions a grant of deferred action would trigger certain collateral benefits for such aliens, such as eligibility for employment authorization. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons.

<div align="center">

**www.dhs.gov**

</div>

First, as the Attorney General concluded, the DACA policy was contrary to law. The Fifth Circuit ruled that DAPA should be enjoined on a nationwide basis on the ground, among other things, that it likely was contrary to the statutory scheme of the Immigration and Nationality Act (INA). As the Fifth Circuit held, "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas v. United States*, 809 F.3d 134, 186 n.202 (5th Cir. 2015). An equally divided Supreme Court affirmed that decision. In light of those decisions and other factors, Secretary Kelly rescinded the DAPA policy in June 2017. Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.

The memorandum announcing the DAPA policy both expanded the DACA policy by loosening the age and residency criteria and adopted a similar deferred action policy for parents of U.S. citizens and lawful permanent residents. The Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had). Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme. The Attorney General concluded that the DACA policy has the same statutory defects that the Fifth Circuit identified with DAPA—a determination and ruling by the Attorney General that, in any event, I am bound by pursuant to 8 U.S.C. § 1103(a)(1).

Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality. A central aspect of the exercise of a discretionary enforcement policy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy. Like Acting Secretary Duke, I lack sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not.

There are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable. Those reasons include the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work. The fact that some courts have recently held or suggested that the DACA policy is legal does not change my view that the DACA policy's legality is too questionable to warrant continuing the policy, especially in light of the Attorney General's contrary determination and ruling about the DACA policy and the contrary implication of the decisions of the Fifth Circuit Court of Appeals and the Supreme Court invalidating the DAPA policy.

Third, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

2

Accordingly, I agree with Acting Secretary Duke and the Attorney General that if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively.

In addition, DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis. While the DACA policy on its face did allow for individual considerations, a categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case. Without the DACA policy, DHS may consider deferred action on a case-by-case basis, consistent with the INA. Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens. All of those considerations lead me to conclude that Acting Secretary Duke's decision to rescind the DACA policy was, and remains, sound as a matter of both legal judgment and enforcement policy discretion.

I do not come to these conclusions lightly. I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives. Nevertheless, in considering DHS enforcement policy, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above. That is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options. In contrast, the DACA policy was announced as a temporary stopgap measure, not a permanent fix; it was expressly limited to two-year renewal periods, it expressly conferred no substantive rights, and it was revocable at any time. In my judgment, neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress, a status that the DACA non-enforcement policy did not change. And in all events, the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant.

For these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy.

Kirstjen M. Nielsen
Secretary

3