**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

STATE OF TEXAS, et al.,

        *Plaintiffs*,

        v.

UNITED STATES OF AMERICA, et al.,

        *Defendants*;

KARLA PEREZ, et al.,

        *Intervenors-Defendants*

Case No. 1:18-CV-68

Honorable Andrew Hanen

**PROPOSED AMICI'S MEMORANDUM OF LAW IN SUPPORT OF INTERVENORS**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.............................. 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 1

SUMMARY OF THE ARGUMENT .......................................................................... 1

STATEMENT OF INTEREST OF AMICI .................................................................... 1

ARGUMENT .............................................................................................................. 6

I.      The use of deferred action for victims of domestic violence is relevant to the legal
        question here. ...................................................................................................6

II.     The agency has authorized group-based deferred action for victims of human trafficking
        and victims of other listed offenses. ..................................................................9

III.    The history of deferred action in the context of domestic violence and victims of human
        trafficking and other criminal offenses supports the legality of deferred action in this
        context. ...........................................................................................................11

        A.      Deferred action is often used to remedy gaps in the statute. ...................12

        B.      Deferred action prevents unintended humanitarian harm.......................13

        C.      Group deferred action authorization is consistent with case-by-case
                decisionmaking. ...........................................................................14

        D.      Congress is well aware of the agency's use of deferred action. ...........15

CONCLUSION.................................................................................................... 16

CERTIFICATE OF COMPLIANCE ........................................................................ 17

CERTIFICATE OF SERVICE ................................................................................ 18

## TABLE OF AUTHORITIES

**Cases**

*Castro-O'Ryan v. INS*, 821 F.2d 1415 (9th Cir. 1987) ................................................... 13

*Chacku v. U.S. Att'y Gen.*, 555 F.3d 1281 (11th Cir. 2008) ........................................ 12

*Fornalik v. Perryman*, 223 F. 3d 523 (7th Cir. 2000) ..................................................... 8

*L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014) .......................................................... 2

*Lorillard v. Pons*, 434 U.S. 575 (1978) ......................................................................... 15

*Matter of N-J-B-*, 21 I&N Dec. 812 (BIA 1997) .......................................................... 13

*Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471 (1999) .................................... 15

*Rosario v. Holder*, 627 F.3d 58 (2d Cir. 2010) .............................................................. 2

*Sanchez v. Keisler*, 505 F.3d 641 (7th Cir. 2007) .......................................................... 2

**Statutes**

8 U.S.C. § 1101(a)(15)(T) ................................................................................................ 9

8 U.S.C. § 1101(a)(15)(U) ................................................................................................ 9

8 U.S.C. § 1151 ................................................................................................................. 6

8 U.S.C. § 1153 ................................................................................................................. 7

8 U.S.C. § 1154(a)(1)(A)(iii) ........................................................................................... 6

8 U.S.C. § 1154(a)(1)(A)(iv) ........................................................................................... 6

8 U.S.C. § 1154(a)(1)(A)(vii) .......................................................................................... 6

8 U.S.C. § 1154(a)(1)(D)(i)(II) ........................................................................................ 8

8 U.S.C. § 1154(a)(1)(D)(i)(IV) ...................................................................................... 8

8 U.S.C. § 1154(a)(1)(K) .................................................................................................. 8

8 U.S.C. § 1227(d)(2) ..................................................................................................... 11

8 U.S.C. § 1254(a) (1995) ............................................................................................... 14

8 U.S.C. § 1503(b)(3) ....................................................................................................... 8

Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II,
§ 203(a), 111 Stat. 2193 (1997) ................................................................................ 13

Pub. L. No. 105-139, 111 Stat. 2644 (1997) .................................................................. 13

Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464 (2000) ...................................... 8, 15

Pub. L. No. 106-386, § 1513, 114 Stat. 1464 (2000) ....................................................... 9

REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231 ............................... 15

The Violent Crime Control and Law Enforcement Act of 1994, Tit. IV, Pub. L. 103-322 (Sept. 13, 1994) ............................................................................ 6

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 238, 122 Stat. 5044 ........................................ 8, 11, 15

**Regulations**

8 C.F.R. § 214.11(k)(4) ............................................................................ 9

8 C.F.R. § 214.11(m)(2) ........................................................................... 9

8 C.F.R. § 214.14(d)(2) ............................................................................ 11

8 C.F.R. § 214.14(d)(3) ............................................................................ 11

8 C.F.R. § 274a.12(c)(14) ..................................................................... 7, 15

**Other Authorities**

Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary, 106th Cong. (July 20, 2000) ...................................................... 8, 12, 13, 14

Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 81 Fed. Reg. 92266 (Dec. 19, 2016) .................. 10

H.R. Rep. No. 104-828 (1996) ................................................................... 14

Memorandum for Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, from Stuart Anderson, INS, Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status at 1 (May 8, 2002) ............ 10

Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas (Aug. 30, 2001) ........................ 9

Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003) ...................................................................... 10, 11

Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs., Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children (June 15, 2012) ............................................................ 15

New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53014 (Sept. 17, 2007) ...................................... 11

New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 67 Fed. Reg. 4784 (Jan. 31, 2002) ...................... 9

Paul W. Virtue, Supplemental Guidance on Battered Alien Self-petitioning Process
    and Related Issues Memorandum, U.S. Dep't of Justice, Immigration and
    Naturalization Service (May 6, 1997)..................................................................... 7, 13, 14

Petition to Classify Alien as Immediate Relative of a United States Citizen or as a
    Preference Immigrant; Self-Petitioning for Certain Battered or Abused Spouses
    and Children, 61 Fed. Reg. 13061 (Mar 26, 1996)......................................................... 6, 7

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case involves Deferred Action for Childhood Arrivals (DACA), which Plaintiffs argue is unlawful.  Plaintiffs seek a preliminary injunction.

Proposed Amici assist noncitizens victims of domestic violence, human trafficking, and similar offenses.[1]

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

1. Whether DACA was adopted in violation of notice-and-comment requirements.

2. Whether DACA violates statutory law.

3.  Whether DACA violates the Take Care Clause of the Constitution.

## SUMMARY OF THE ARGUMENT

Amici write to explain the history and functioning of deferred action in the context of victims of domestic violence and human trafficking. This illustrates four basic points: (a) deferred action is often used to remedy gaps in the statute; (b) deferred action prevents unintended humanitarian harm; (c) group deferred action authorization is consistent with case-by-case decisionmaking; and (d) Congress is well aware of the agency's use of, and approach to, deferred action.

## STATEMENT OF INTEREST OF AMICI

Amici are public interest organizations with longstanding commitments to serving noncitizen survivors of domestic violence, human trafficking and related offenses.  Amici have decades of experience and an interest in this area, and can speak authoritatively to the use of deferred action in this context.

---

[1] This brief was authored by counsel for Amici.  No party or counsel for such party contributed money intended to fund preparing or submitting this brief.  No person other than Amici or their counsel contributed money intended to fund preparing or submitting this brief.  The parties have consented to the filing of this brief.

The National Immigrant Justice Center (NIJC) is a Chicago-based national non-profit organization that provides free legal representation to low-income noncitizens.  In collaboration with *pro bono* attorneys, NIJC represents hundreds of victims of domestic violence, human trafficking, and other specified criminal offenses at any given time, before the Asylum Office, the Immigration Courts, the Board of Immigration Appeals, and the Federal Courts.

ASISTA Immigration Assistance (ASISTA) worked with Congress to create and expand routes to secure immigration status for survivors of domestic violence, sexual assault, and other crimes, which were incorporated in the 1994 Violence Against Women Act (VAWA) and its progeny. ASISTA serves as liaison for the field with Department of Homeland Security (DHS) personnel charged with implementing these laws, most notably Citizenship and Immigration Services (CIS), Immigration and Customs Enforcement (ICE), and DHS's Office for Civil Rights and Civil Liberties. ASISTA also trains and provides technical support to local law enforcement officials, civil and criminal court judges, domestic violence and sexual assault advocates, and legal services, non-profit, pro bono, and private attorneys working with immigrant crime survivors. ASISTA has previously filed amicus briefs in the Second, Seventh, Eighth, and Ninth Circuits. *See Rosario v. Holder*, 627 F.3d 58 (2d Cir. 2010); *Sanchez v. Keisler*, 505 F.3d 641 (7th Cir. 2007); *L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014); *Lopez-Birrueta v. Holder*, 633 F.3d 1211 (9th Cir. 2011).

The National Immigrant Women's Advocacy Project (NIWAP) is a non-profit public policy advocacy organization that develops, reforms, and promotes the implementation and use of laws, policies and practices to improve legal rights, services and assistance to immigrant women, children and immigrant victims of domestic violence, sexual assault, stalking, human trafficking and other crimes. NIWAP is a national resource center offering technical assistance

and training to assist a wide range of professionals at the federal, state, and local levels who work with and/or whose work affects immigrant women, children, and immigrant crime victims. We provide direct technical assistance and training for attorneys, judges, police, sheriffs, prosecutors, advocates, and other professionals. NIWAP staff were closely involved in the drafting that led to the enactment of  VAWA legislation, including the VAWA self-petition in 1994 and the T and U visas in 2000 as well as 1996, 2000, 2005 and 2013 VAWA confidentiality protections. Congress enacted these protections to ensure that immigration protections for immigrant victims included ensuring that VAWA confidentiality and deferred action played an important role in VAWA's protections for immigrant victims.  Deferred action and VAWA confidentiality together provided protection for victims from deportation and the access to work authorization they needed to be able to escape abusive homes and employment situations and rebuild lives for themselves and their children independent from their abusers.  NIWAP has documented immigrant women's experiences illustrating the need for deferred action and VAWA confidentiality protections, and trained and provided technical assistance to advocates, attorneys and justice system professionals across the country.

The Asian Pacific Institute on Gender-Based Violence is a national resource center on domestic violence, sexual violence, human trafficking, and other forms of gender-based violence in the Asian and Pacific Islander and immigrant communities. The Institute serves a national network of advocates and community-based service programs that work with Asian and Pacific Islander and immigrant and refugee survivors, and provides analysis on critical issues facing victims in the Asian and Pacific Islander ("API") and immigrant and refugee communities, including training and technical assistance on implementation of the Violence Against Women Act, immigration law and practice, and how they impact API and immigrant survivors. The

Institute promotes culturally relevant intervention and prevention, provides expert consultation, technical assistance and training; conducts and disseminates critical research; and informs public policy.

Freedom Network USA (FNUSA) is the largest alliance of human trafficking advocates in the United States. Our 57 organizational and individual members work directly with human trafficking survivors in over 30 cities, providing comprehensive legal and social services, including representation in immigration cases. In total, our members serve over 2,000 trafficking survivors per year, over two-thirds of whom are foreign national survivors. Through our national effort, FNUSA increases awareness of human trafficking and provides decision makers, legislators and other stakeholders with the expertise and tools to make a positive and permanent impact in the lives of all survivors. FNUSA has been involved in the passage of the original Trafficking Victims Protection Act of 2000, as well as each subsequent reauthorization. FNUSA provides training and technical assistance to law enforcement, judges, and service providers in the US to increase the identification of victims and expand their access to immigration relief and other services and support. Trafficking survivors in the US may be granted Continued Presence, Deferred Action, Public Benefit Parole, T Visas, U Visas, asylum, DACA, or any other form of immigration relief. Human trafficking is, by definition, a financial crime. Survivors need access to legal, safe employment to recover from their financial, physical, and emotional harms. Deferred action is one route to legal employment that significantly contributes to the short and long term health of trafficking survivors.

Sanctuary for Families (SFF) is New York State's largest dedicated service provider and advocate for survivors of domestic violence, human trafficking, and related forms of gender violence. Each year, SFF provides legal, clinical, shelter, and economic empowerment services

to approximately 15,000 survivors and their children. SFF's legal arm, The Center for Battered Women's Legal Services (the "Center"), plays a leading role in advocating for legislative and public policy changes that further the rights and protections afforded battered women and their children, and provides training on domestic violence and trafficking to community advocates, pro bono attorneys, law students, service providers, and the judiciary. The Center also provides legal assistance and direct representation to indigent victims, mostly in family law and immigration matters. The Center is a subject-matter expert in humanitarian forms of immigration relief, like petitions for U nonimmigrant status. Center staff, together with volunteers from the private bar, law schools, and New York City's public interest community, file hundreds of petitions for U nonimmigrant status each year.

Tahirih Justice Center ("Tahirih") is the largest multi-city direct services and policy advocacy organization specializing in assisting immigrant women and girls who survive gender-based violence. Tahirih offers free legal and social services to women and girls fleeing all forms of gender-based violence, including human trafficking, forced labor, domestic violence, rape and sexual assault, and female genital cutting/mutilation. Since its beginning in 1997, Tahirih has assisted more than 20,000 individuals, including many who are eligible for and have received U and T status.  Deferred action has been a critical component in ensuring that the humanitarian relief  Congress provided is accessible to this vulnerable population.  Through direct services, policy advocacy, and training and education, Tahirih protects immigrant women and girls and promotes a world where they can enjoy  equality and live in safety and dignity. Tahirih amicus briefs have been accepted in numerous federal courts across the country.

## ARGUMENT

DACA authorizes deferred action for noncitizens brought to the U.S. at a young age. Group-based deferred action authorization is also employed for survivors of human trafficking, domestic violence, related criminal offenses. These uses of deferred action are consistent with, and permissible under, the statute.

**I.   The use of deferred action for victims of domestic violence is relevant to the legal question here.**

In 1994, Congress enacted VAWA, which created specific provisions for victims of domestic violence.  The Violent Crime Control and Law Enforcement Act of 1994, Tit. IV, Pub. L. 103-322 (1994).  VAWA functions by modifying the regular family-based process to account for domestic violence situations.  Normal family-based immigration requires a U.S. citizen or legal permanent resident family member to file a "visa petition" to allow the noncitizen relative to obtain lawful status.  8 U.S.C. § 1151.  This can create a power dynamic which abusive spouses exploit to control other family members.  Petition to Classify Alien as Immediate Relative of a United States Citizen or as a Preference Immigrant; Self-Petitioning for Certain Battered or Abused Spouses and Children, 61 Fed. Reg. 13061 (Mar 26, 1996) (hereinafter INS Interim Final Rule).  VAWA breaks this pattern by permitting abused noncitizen spouses to "self-petition" rather than being forced to rely on their abusive spouses to petition for them.  *Id*.; *see also* 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The VAWA statute requires the abused spouse to demonstrate, *inter alia*, battery or extreme mental cruelty, good moral character, and extreme hardship.  *Id*.

However, while the statute permitted battered spouses to apply for legal status, it included no provisions for work authorization.  Moreover, for some family visa preference categories, annual quotas impose a multi-year wait for visa availability.  *See* 8 U.S.C. §1153. Interim regulations implementing VAWA explained that battered spouses could become eligible for work authorization in one of three ways.  INS Interim Final Rule, at 13070-71.  A grant of deferred action was one of the ways identified in the regulation.  *See* 8 C.F.R. § 274a.12(c)(14) (allowing individuals with deferred action to be granted employment authorization).

Statutory and regulatory changes eliminated "extended voluntary departure," one of the routes to work authorization identified in regulation.  *See* Paul W. Virtue, Supplemental Guidance on Battered Alien Self-petitioning Process and Related Issues Memorandum, U.S. Dep't of Justice, Immigration and Naturalization Service 3 (May 6, 1997) [hereinafter *Supplemental Guidance*].  Because these battered spouses are eligible for certain welfare benefits, if there were no route to obtain work authorization, a perverse incentive would be created.  *Id*. Reasoning that it would be "counter to the spirit of welfare reform" to grant welfare benefits while preventing them from seeking employment, the agency adopted a policy of considering battered spouses for deferred action. *Id*.

The agency decided that in all VAWA cases, adjudicators ought to consider granting deferred action: "*[b]y their nature*, VAWA cases generally possess factors that warrant consideration for deferred action." *Id* (emphasis added). The agency found that "removal of battered aliens is not an INS priority" and concluded that "the exercise of discretion to place these cases in deferred action status will almost always be appropriate." *Id*.  However, the agency noted that "[i]n an unusual case, there may be factors present that would militate against deferred action," and required that each case should "receive individual scrutiny." *Id*. Granting deferred

7

action to battered immigrants (and their children) permits those noncitizens to obtain work authorization, and (absent other factors) to avoid removal.  *See Fornalik v. Perryman*, 223 F. 3d 523, 529-30 (7th Cir. 2000).

Congress was well aware of the use of the deferred action mechanism in the VAWA context.  For instance, when VAWA was reauthorized and expanded in 2000, the agency explained to Congress that VAWA applicants with "[a]pproved self-petition[s] are placed in deferred action status," and that this use had prevented VAWA self-petitioners from being removed. *See* Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary, 106th Cong. at 42-43 (July 20, 2000) (testimony of Barbara Strack, Acting Executive Associate Commissioner for Policy and Planning), [hereinafter *H.R. 3083 Hearing*].

Congress not only permitted this use of deferred action, but it mandated its expansion and required reporting.  The Victims of Trafficking and Violence Protection Act of 2000 explicitly expanded deferred action eligibility to include older children of self-petitioners.  Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)); *see also id.* at § 1503(b)(3), 114 Stat. at 1520 (expanding eligibility definitions for self-petitions, mandating applications be considered "under the procedures that apply to [other] self-petitioners.").  In 2008, Congress required reports from the agency on how long it took to decide victim-based immigration applications for deferred action, as well as "steps taken to improve in this area." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 238, 122 Stat. 5044, 5085 (TVPRA).

Congress later amended the statute to permit the agency to grant work authorization without use of deferred action.  8 U.S.C. § 1154(a)(1)(K).

8

**II.    The agency has authorized group-based deferred action for victims of human trafficking and victims of other listed offenses.**

The Victims of Trafficking and Violence Protection Act of 2000 not only amended the VAWA statute, but it created two new visa categories: the T and U visas.  Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533-37 (codified at 8 U.S.C. §§ 1101(a)(15)(T), (U).  The T visa is for victims of human trafficking; the U visa is for victims of a broader range of specified criminal activity, particularly domestic violence related offenses.  8 U.S.C. §§ 1101(a)(15)(T) , (U).

After enactment of the statute, and before regulations could be promulgated, the agency invoked its deferred action authority, *inter alia*, as a tool for making sure that it did not remove noncitizens before they had "the opportunity to avail themselves of the provisions of the VTVPA." Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas, at 2, 5 (Aug. 30, 2001).

The agency subsequently promulgated regulations which continued the use of deferred action.  First, the agency adopted regulations for T visas, for victims of trafficking. New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 67 Fed. Reg. 4784 (Jan. 31, 2002).  These regulations protected T applicants from removal once their application was determined to be a "bona fide" application, 8 C.F.R. § 214.11(k)(4), and kept the applicant in deferred action until the agency was ready to approve the application. 8 C.F.R. § 214.11(m)(2).  The comments accompanying the regulations explain that the agency "will use various means to prevent the removal of individuals who have filed bona fide applications, such as deferred action, parole, and stay of removal, until the Service issues a final decision on the application." 67 Fed. Reg. at 4790.

9

Subsequent regulations specifically clarified that deferred action may be granted for T visa applicants with bona fide determinations, allowing them to request employment authorization and crucial benefits from the U.S. Department of Health and Human Services while their application is pending. Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 81 Fed. Reg. 92266, 92279 (Dec. 19, 2016). These regulations emphasize the importance of protecting trafficking survivors who remain vulnerable while their application is pending. *Id.* ("DHS recognizes that a bona fide determination may offer a victim of trafficking some protection for immigration status purposes, employment authorization, and the availability of public benefits through HHS.") The new regulations ground support for deferred action in a longstanding memorandum that supports deferred action determinations for victims of human trafficking. Memorandum for Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, from Stuart Anderson, INS, Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status at 1 (May 8, 2002). The new regulations also provide additional "flexibility" for relief from deportation for survivors of trafficking who might be placed on a waitlist in the future. 81 Fed. Reg. at 92287.

The agency also employed deferred action for U visa applicants. The agency did not promulgate U visa regulations for several years; in the meantime, the agency considered noncitizens for "interim relief," principally deferred action. Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003). When an individual submitted "prima facie evidence of his/her eligibility," they would be assessed for deferred action "[a]bsent adverse factors." *Id.* at 5.  The agency noted that "deferred action does not confer any

immigration status" and further that "no alien has the right to deferred action." *Id*.  In 2007, the agency promulgated regulations enshrining the use of deferred action.  New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007). Under the regulations, "USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list." 8 C.F.R. § 214.14(d)(2).  However, the regulations also specify that deferred action "may be terminated at the discretion of USCIS." 8 C.F.R. § 214.14(d)(3). The regulatory explanations give some examples of when the agency might choose to exercise its discretion negatively: "USCIS may terminate deferred action or parole if the petitioner is convicted of a crime that renders him or her removable. USCIS also may terminate deferred action or parole if it becomes aware that a petitioner has failed to disclose a criminal conviction or has misrepresented a material fact in his or her petition." 72 Fed. Reg. at 53027.

Legislation adopted the following year noted and endorsed this approach.  It authorized "an administrative stay of a final order of removal" for the same people, i.e., individuals who had made out a prima facie claim to removal. TVPRA, § 204, 122 Stat. at 5060.  Congress further specified that the administrative stay option "shall not preclude the alien from applying for… deferred action." 8 U.S.C. § 1227(d)(2).  Within that same legislative enactment, Congress also mandated reporting on deferred action grants. TVPRA § 238, 122 Stat. at 5085.

## III.   The history of deferred action in the context of domestic violence and victims of human trafficking and other criminal offenses supports the legality of deferred action in this context.

Amici submit that four aspects of the foregoing history of deferred action in this context are relevant to this case.

## A.     Deferred action is often used to remedy gaps in the statute.

As the above examples demonstrate, deferred action is often employed where the agency identifies a gap in the statute and regulations which triggers a humanitarian concern.  In VAWA, deferred action was used for approved self-petitioners whom the statute did not make immediately eligible to obtain immediate lawful status.  The statute left these women with a path toward future lawful status, but no current protection from removal and no means of seeking lawful employment.[2]  Worse, until later amendments, the law made many VAWA eligible individuals ineligible to obtain legal status.  As the agency explained in testimony to Congress:

> many self-petitioners whose petitions have been approved find themselves either statutorily ineligible for adjustment of status in the United States, or forced to leave the country to obtain an immigrant visa… [M]any of them will be ineligible for admission for three or ten years.... These battered immigrants also risk exposing themselves to the very hardship and danger documented in the self-petition. Section 3 of HR 3083 would improve this situation by ensuring that battered immigrants with approved self-petitions could remain in the United States to seek adjustment of status.

H.R. 3083 Hearing at 41.  The agency identified "gaps in VAWA that we believe are unintended," *id*. at 40, and "expressed… support for specific provisions… which would eliminate those gaps." *Id*. at 40-41.

In the meantime, deferred action filled that statutory gap, protecting self-petitioners from removal and allowing lawful employment until Congress amended the statute.  DACA appears to fill a similar function.  While Congress negotiates the parameters of any fix for DACA individuals, including any other changes in the immigration statutes, deferred action fills the gap

---

[2] In the VAWA context, deferred action was used where battered spouses had approved self-petitions that could ultimately lead to lawful status, and where visa numbers were not available to the battered spouses.  It is well-established generally that the approval of a visa petition does not preclude removal where visa numbers are unavailable.  *See Chacku v. U.S. Att'y Gen.*, 555 F.3d 1281 (11th Cir. 2008).

and protects DACA-eligible individuals from removal, while also allowing them to obtain work authorization.

**B.      Deferred action prevents unintended humanitarian harm.**

Deferred action for VAWA, T, and U applicants was justified by the harm that removal would cause, as well as the harm triggered by leaving bona fide claimants without the possibility of work authorization.  *See* Supplemental Guidance at 3.  Without deferred action, the agency had limited means to protect even those VAWA applicants whom the agency had already found would suffer "extreme hardship" if deported.  H.R. 3083 Hearing at 41.

In the VAWA context, the agency explained its view that the harm was "unintended," *id*. at 40, flowing from the interplay of statutory provisions aimed at other problems.  *Id*. at 40-41.  It is widely acknowledged that the immigration statute is complex and intertwined.  *See Castro-O'Ryan v. INS*, 821 F.2d 1415, 1419 (9th Cir. 1987)

It appears that similar considerations are applicable here.  When the immigration statute underwent major changes in 1996, various proposed bills were blended together into what became the Illegal Immigration Reduction and Immigrant Responsibility Act of 1996, resulting in a particularly confused legislative history.  *See Matter of N-J-B-*, 21 I&N Dec. 812, 819-21, 829-30, 836-39 (BIA 1997) (multiple Board Members setting forth multiple versions of legislative history), *vacated on other grounds at* Att'y Gen. Order No. 2093-97 (July 10, 1997). Congress revisited and provided clarification of some points the following year.  Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, § 203(a), 111 Stat. 2193, 2196 (1997), amended by Pub. L. No. 105-139, 111 Stat. 2644 (1997). The upshot of the 1996 legislative amendments was to inadvertently foreclose relief for DACA-eligible youth, particularly by eliminating and reworking a form of relief called Suspension of Deportation, 8

13

U.S.C. § 1254(a) (1995) (repealed), without any discussion of noncitizens who arrived in the United States as children.  H.R. Rep. No. 104-828, at 213 (1996).

The resulting humanitarian tragedy appears to have been unforeseen at the time of the enactment.  DACA is an executive branch attempt to offer temporary relief to ameliorate the gap until an agreement can be reached to fix the problem.  In this respect, deferred action under DACA is similar to uses of deferred action in the VAWA, T, and U context.

C. **Group deferred action authorization is consistent with case-by-case decisionmaking.**

The use of deferred action in the context of VAWA, T visas, and U visas demonstrates that group-focused authorization for deferred action is consistent with case-by-case decisionmaking.  The agency has authorized agency adjudicators to grant deferred action when it has determined that considerations common to every case in the group are sufficiently alike and sufficiently compelling to support a deferred action grant in almost all cases.  Supplemental Guidance at 3.  That commonality makes case adjudication efficient and renders the handling of thousands of cases more manageable.

But in finding that deferred action is generally appropriate in the exercise of discretion, the agency is not forbidding its adjudicators to decide each case on the merits; to the contrary, the agency expressly mandates adjudicators to assess each case individually to make sure that deferred action is appropriate in that case.  Supplemental Guidance at 3.  In the VAWA context, the statute has been drawn in such a way that it has been rare for individuals to be qualified for VAWA but not to merit relief in the exercise of discretion.  *See* H.R. 3083 Hearing at 43.  Amici would expect a relatively similar record in DACA cases.  By definition, DACA-eligible youth have been present since a young age; they are required not to have been convicted of any serious offenses, and are required to have completed education or service in the armed forces.

14

Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs., Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children (June 15, 2012). These considerations are generally such strong factors in support of deferred action that most applicants will merit a positive exercise of that authority. But while deferred action is generally merited in DACA cases, each case must be decided on its own merits. That approach was permitted (and endorsed) by Congress in the VAWA, T, and U context; it is also permissible in DACA cases.

### D.      Congress is well aware of the agency's use of deferred action.

The history of the VAWA, T, and U visas demonstrates that Congress has long been aware of the agency's use of the deferred action mechanism. Congress has certainly legislated with the background awareness that the executive has understood itself to have deferred action authority. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Congress required reporting on deferred action grants and any delays in adjudication. TVPRA § 238, 122 Stat. at 5085. Congress also authorized the agency to employ that same mechanism in the context of older children. VTVPA § 1503(d)(2). It has expressly acknowledged the deferred action mechanism, and has treated "approved deferred action status" as a type of lawful status. REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302.

Deferred action has also long been a permissible basis for work authorization issuance, as recognized in regulations duly promulgated by the agency. 8 C.F.R. § 274a.12(c)(14). It has been expressly recognized by the Supreme Court. *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999). Congress is presumptively aware of "an administrative or judicial interpretation of a statute." *Lorillard*, 434 U.S. at 581-582.

Other uses of deferred action noted by the parties are beyond the scope of the brief, Amici simply note that Congress is well aware that deferred action is frequently used to ameliorate unintended harm caused by gaps or lacunae in the statute, including by group deferred action authorization.

## CONCLUSION

For these reasons, and for the reasons stated in the various other briefs presented to the Court, Amici urge the Court to find that a federal agency may pre-authorize its officers to exercise discretion to grant deferred action based on characteristics and considerations common to a group.

Respectfully submitted,

July 23, 2018

s/ Charles Roth
Charles Roth
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
(312) 660-1613
croth@heartlandalliance.org

16

## CERTIFICATE OF COMPLIANCE

I, Charles Roth, certify that:

This brief complies with the volume limitation because this brief is less than 20 pages in length;

This brief complies with typeface requirements and the type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 12-point font.

Respectfully submitted,

July 23, 2018

s/ Charles Roth
Charles Roth
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
(312) 660-1613
croth@heartlandalliance.org

17

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing, together with the attached

Appendix of Authorities, with the Clerk of the Court for the United States District Court of

Appeals for the Southern District of Texas by using the CM/ECF system on July 23, 2018. I

certify that all participants in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.


                    Respectfully submitted,

July 23, 2018                  s/ Charles Roth
                          Charles Roth
                          NATIONAL IMMIGRANT JUSTICE CENTER
                          208 South LaSalle Street, Suite 1300
                          Chicago, Illinois 60604
                          (312) 660-1613
                          croth@heartlandalliance.org

18