IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

---

STATE OF TEXAS, *et al.*,

        Plaintiffs,

   - against -

THE UNITED STATES OF AMERICA, *et al.*,

        Defendants,

   - and -

KARLA PEREZ, *et al.*,

        Defendant-Intervenors,

   - and -

STATE OF NEW JERSEY,

        Defendant-Intervenor.

Case No. 1:18-cv-00068

---

**AMICUS BRIEF FOR UNITED WE DREAM
IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

 

Peter Karanjia (admitted *pro hac vice*)
Geoffrey S. Brounell (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8230
peterkaranjia@dwt.com
geoffreybrounell@dwt.com

*Counsel for Amicus Curiae United We Dream*

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................................... ii

STATEMENT OF INTEREST .................................................................................................. 1

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ................................................................................................................................ 2

    A.    DACA Recipients Are Integral to the Lives and Livelihood of Their Families ............................................................................................................... 3

    B.    DACA Recipients Contribute to Their Local Communities ................................. 5

    C.    DACA Recipients Are Deeply Ingrained in the American Fabric ........................ 8

CONCLUSION ........................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ...................................................................................................2

**Statutes**

Ala. Code § 31-13-8..........................................................................................................9

S.C. Code Ann. § 59-101-430...........................................................................................9

**Other Authorities**

Memorandum from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children* (June 15, 2012) ..........................................................................................1

Tom K. Wong*, et. al., Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* (Oct. 2016),
  *available at* https://cdn.americanprogressaction.org/content/uploads/
  2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf ...................................3, 8

U.S. Citizenship and Immigration Services,
  *Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status*: 2012-2016
  (Sept. 30, 2016).............................................................................................................8

Zenen Jaimes Pérez, *How DACA Has Improved the Lives of Undocumented Young People*, Center for American Progress, at 4 (Nov. 19, 2014),
  *available at* http://ampr.gs/1O7iTHA......................................................................9

**STATEMENT OF INTEREST**

United We Dream ("UWD") is a national nonprofit, nonpartisan, membership-based organization comprising more than 300,000 immigrant youth and their allies, with 52 affiliate organizations in 25 states. UWD's primary purpose is to advocate for the dignity and fair treatment of immigrant youth and their families, regardless of their immigration status. Many UWD members are beneficiaries of the Deferred Action for Childhood Arrivals ("DACA") initiative announced on June 15, 2012. Because the government action in this case seeks to undo DACA — which has formed the basis for the most consequential life decisions of hundreds of thousands of immigrant youth — UWD has a substantial interest in the proper resolution of the issues presented in this case.

**INTRODUCTION**

When the United States government implemented DACA in 2012, it informed more than a million undocumented young people that, if they met DACA's eligibility criteria, they could rest assured that they would not be subject to governmental efforts to upend their lives by uprooting them from the United States. Exercising its enforcement discretion, the government assured these immigrants that they would not face removal proceedings for a renewable two-year period. DACA thus reflected the "low priority" associated with the removal of "certain young people who were brought to this country as children and know only this country as home." Memorandum from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children* (June 15, 2012). But, in practice, DACA also offered young immigrants much more than just deferred action. It allowed its recipients to obtain work authorization, a Social Security number and, in many states, driver's licenses and in-state tuition at public universities. DACA also enabled recipients to open bank accounts, apply for credit cards, buy homes and cars, and conduct other

aspects of daily life that are often impossible for undocumented immigrants. In other words, DACA enabled its recipients — many of whom were based in Texas — to participate fully in their communities and local economies.

UWD submits this amicus brief in support of Defendant-Intervenors Karla Perez's *et al.* and Defendant-Intervenor the State of New Jersey's (collectively, the "Defendant-Intervenors") opposition to Plaintiffs' motion for a preliminary injunction. Our goal is not to reiterate Defendant-Intervenors' arguments, but rather to highlight the enormous stakes of these cases for hundreds of thousands of individuals living not only in Texas but also across the United States. In particular, this brief provides a glimpse into the lives of the countless young men and women who placed their trust in and organized their lives around DACA. With the sample of stories below, UWD hopes to illustrate how, from their diverse backgrounds spanning the globe (some fleeing violence and abuse, while others searching for economic and educational opportunities), the DACA recipients discussed are now fully part of the fabric of America and their local communities in Texas. Simply put, they epitomize the American dream. The government's efforts to rescind DACA, which has given hope to so many, threatens to cause massive disruption to these individuals, their families, and their local communities — communities that extend well beyond recipients of DACA.

Against this backdrop, which is particularly relevant to the public interest prong of the standard for obtaining a preliminary injunction, *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), UWD respectfully requests that this Court deny the Plaintiffs' motion.

## ARGUMENT

Through DACA, thousands of young immigrant adults can give back to their communities. DACA recipients become teachers, community leaders, and small business owners. They provide for themselves and their families, support their friends, and are closely

knit into the fabric of the lives of those around them. The government's attempt to undo DACA protections for these individuals causes grave harm not only to DACA recipients, but also to their families and their communities at large.

A.     **DACA Recipients Are Integral to the Lives and Livelihood of Their Families**

With the greater job opportunities that come with work authorizations, DACA recipients are better able to shoulder the financial burden for themselves and their families. Indeed, over 60 percent of surveyed DACA recipients reported that as a result of obtaining work authorization through DACA, they could make enough money to financially support their family. Tom K. Wong *et al.*, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey*, at 2 (Oct. 2016).[1]

But work authorization is not the only protection that makes DACA so important to family life. A driver's license — which most Americans taken for granted — is a prized commodity to an undocumented household. In the case of *M.C.*, for example, the driver's license she obtained as a result of DACA has allowed her to drive her family to access basic services including grocery stores and healthcare, where previously they had to walk many miles in their rural Texas town of New Braunfels. As a DACA recipient, *M.C.* is able to support her family through her work for a non-profit organization.

*V.E.* likewise helps provide for her family's financial needs — and she has put her family's interests ahead of her own in doing so. *V.E.* is one of only two people in her immediate family of five legally able to work, so she has put her college plans are on hold while she helps pay her family's bills and her sister's tuition by working full-time as a manager of a clothing store in Houston. *V.E.* hopes to become a veterinarian and dreams of going to Texas A&M. If

---

[1] *Available at* https://cdn.americanprogressaction.org/content/uploads/ 2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf.

3

DACA is enjoined, this career opportunity will be abruptly closed off to her (as either a Social Security number or DACA is required to be a veterinarian).

Having a driver's license not only enables DACA recipients to help their families navigate day-to-day life, but also it is critical in times of hardship or emergencies. For example, because he was able to obtain a license as a result of DACA, *V.D.* was able to drive his father to and from the hospital for doctor appointments after a serious heart attack, as well as to take care of his disabled younger sister. In additional to enabling *V.D.* to support his family's medical care needs, DACA has provided *V.D.* the financial means to take care of his family. *V.D.*, who studies computer science at the University of Illinois, uses the savings from his summer technology jobs to both pay for his tuition and help support his family.

Like *M.C.*, *V.E.*, and *V.D.*, *P.Z.* is deeply committed to taking care of his family — and DACA provided him with the initial opportunity to do so. With undocumented parents suffering from an array of health problems, *P.Z.*'s responsibility was a heavy one, especially as an undocumented immigrant. But thanks to DACA, *P.Z.* got a job at Twitter, which allows him to provide his parents health insurance so they can receive the care they need. And, to be able to help his parents even more, *P.Z.* is saving money to help them move close to him in San Francisco.

The protections DACA provides to families are not limited to the families of *M.C.*, *V.E.*, *V.D.*, *P.Z.*, or the other young people identified in this brief. Hundreds of thousands of individuals are protected by DACA, from having work authorization to accessing employer-provided health insurance to providing financially for their families every day. DACA recipients help relieve their families from the stress of ordinary daily tasks that most U.S. citizens and other authorized immigrants need not think twice about. From picking up children at school to taking

relatives to the doctor to paying the cable bill, young immigrants who receive DACA can provide constant, stable support for their families. The government now threatens to undermine the foundations of thousands of families across the United States.

**B.    DACA Recipients Contribute to Their Local Communities**

DACA offers thousands of immigrants the chance to succeed in their chosen careers and contribute to their communities. *M.M.* for instance, is currently working at a nursing home in New Braunfels, and she will begin college as a freshman this fall at the University of Texas at Austin. In high school she was very involved in school organizations and hopes to continue on to law school or medical school. *S.A.* graduated from the University of North Texas at Dallas and currently works for a hospital. Working in healthcare, she recognizes the stigmas and lack of access that youth in the community of Oak Cliff face regarding mental health services. She hopes to start a nonprofit to promote higher education and provide counseling services to these at-risk youth.

DACA recipients have served their communities in a wide range of endeavors. Immediately after receiving DACA's protections and work authorization, *J.S.* — who comes from a family of indigenous Mexican origin that speaks Zapotec — used his work authorization to serve in state and federal courts as the nation's only court interpreter in the Zapotec dialect. In this capacity, he has traveled across California and New Mexico to ensure that Zapotec-speaking defendants are able to understand the legal proceedings in which they are involved. Without *J.S.*'s unique language skills to overcome linguistic obstacles, courts would face further delays — and immigration detainees would confront longer detentions.

Just as DACA enabled Zapotec-speaking defendants access to a fluent court interpreter, it has enabled students at an Austin, Texas high school to benefit from the guidance of a valuable teacher and mentor. *A.Z.* — a high-school salutatorian who earned a full scholarship to and

graduated from the University of Texas — teaches Spanish in the Austin Independent School District. And for *A.Z.*, teaching is a family affair. When she is not in her classroom, she works with her older brothers, also DACA recipients, as they finish their teaching degrees at the University of Texas. Because of DACA, *A.Z.* and her brothers are able to play an important part in the lives of hundreds of students.

Young entrepreneurs like *D.A.*, for example, rely on DACA to create and innovate. After *D.A.* received DACA's protections, she was able to obtain higher paying jobs, which allowed her to save money and eventually start her own business. With a business partner, *D.A.* bought a landscaping company and hired two employees to help her meet demand. In addition, to maximize the potential of the new venture, *D.A.* enrolled in classes on small business management at the local community college. As *D.A.*'s company continues to grow and prosper, its success and impact on the community will be closely entwined with the continuation of DACA. DACA also gave *M.R.* the confidence to launch his own landscaping business in New Jersey. Even though *M.R.* has lived in the United States for 13 years, he was detained by government agents in December of 2017. Thanks to DACA, *M.R.* was able to reunite with his family — and continue his business.

For *R.P.*, DACA provided the opportunity and confidence to become a leader in his local community. A Filipino immigrant who came to the United States when he was one year old, *R.P.* has lived in the United States almost his entire life. But only thanks to DACA could he truly contribute to his larger community in Georgia. Because of DACA, *R.P.* was offered and accepted a job with a nonprofit group assisting Asian immigrants and refugees. After DACA, *R.P.*'s capacity to contribute to his local community has grown. He recently traveled to a Christian leadership conference to further develop skills necessary to take on leadership roles in

6

his hometown. Without DACA, *R.P.*'s ability to openly and deeply involve himself in his community would be dramatically limited.

In the Arkansas hospital where he works, the people who meet *L.A.* do not know him as an undocumented Mexican immigrant who now enjoys DACA's protections; they know him as their nurse. But *L.A.*'s story, and the integral role he plays in the lives of his patients in the hospital's cardiovascular Intensive Care Unit, would not have been possible without DACA. In 2010, while *L.A.* was still a nursing student, the state of Arkansas passed a law making it impossible for any individual to obtain a nursing license without a Social Security card. For *L.A.*, who came to the United States at age seven and lacked formal authorization or lawful status, that requirement was an insurmountable obstacle. Everything changed in 2013 when the government granted *L.A.* deferred action under DACA. As a result, *L.A.* obtained a Social Security number, received his nursing license, and soon thereafter, was offered a position as a nurse in the cardiovascular Intensive Care Unit. Because of DACA, *L.A.* was able to fulfill his dream of being able to provide medical care to his community.

*D.R.*, an undocumented medical student at the Icahn School of Medicine at Mount Sinai in New York, has a similar dream. As an undergraduate at the University of California, Berkeley, *D.R.* worked 30 hours per week as a waitress to support herself through school. A talented student, *D.R.* was a double major in Integrative Biology and Sociology who graduated from Berkeley with a 3.6 GPA. *D.R.*'s ability to complete a medical residency and be employed as a doctor depends on the work authorization she has because of DACA. Simply put, DACA has allowed *D.R.* to pursue a goal that would otherwise have been unattainable.

Like the young people described above, DACA has enabled hundreds of thousands of undocumented individuals to improve their lives and also become integral parts of their

7

communities. According to one survey, after receiving DACA's protections, 42.5 percent of DACA recipients got their first job. Wong *et al.*, *supra*, at 3. About 61 percent pursued educational opportunities previously unavailable to them. *Id.* at 3. Indeed, 55 percent of DACA recipients surveyed are pursuing undergraduate degrees. *Id.* at 8. And 12 percent bought a home, 54 percent bought a car, and 14 percent paid off some or all their student loans. *Id.* at 2. For these individuals, DACA has opened a world of financial independence and opportunity that was previously unavailable.

### C. DACA Recipients Are Deeply Ingrained in the American Fabric

The individuals described above are representative of DACA recipients across the country. Indeed, as of 2016, all fifty states, as well as the District of Columbia and several territories, were home to at least one of the nearly 800,000 DACA recipients. See *infra* note 3. Because of DACA, these individuals — who were brought to the United States at a young age from countries across the world[2] — have access to better jobs, better education, and more stable financial positions. According to one survey, approximately two-thirds of DACA recipients were able to find a first job, or a job with better pay, after receiving DACA. Wong *et al.*, *supra*, at 3. They have increased their hourly wages by an average of nearly one-third. *Id.* at 5. Five percent of DACA recipients surveyed had started their own business. *Id.* at 2. Over 50 percent applied for and received their first credit card, and nearly 50 percent opened a bank account. *Id.* at 3.

The impact of DACA is particularly profound in Texas. For example, the job opportunities that come with DACA have made a significant impact on *E.R*'s life. *E.R.* came to the United States when he just seven years old. Right after his sixteenth birthday, he began to

---

[2] To date, DACA recipients are originally from over 20 countries, including Mexico, Poland, South Korea, and India. U.S. Citizenship and Immigration Services ("USCIS"), *Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2016* (Sept. 30, 2016).

8

apply for jobs, but with little success because he was undocumented. Under DACA, he was finally able to get a full-time job and his driver's license at age 21. Both the job and the license are critical to *E.R.* and his family as he is the primary caregiver for his mother. *E.R.* has been working in order to support his family while also attending school on a part-time basis at the University of Texas at Dallas.

DACA also offers greater access to higher education. For example, DACA enables students to enroll in public colleges and universities in states like Alabama and South Carolina, which undocumented students are otherwise barred from attending, *see* Ala. Code § 31-13-8; S.C. Code Ann. § 59-101-430, and to apply for in-state tuition in Virginia, *see* Zenen Jaimes Pérez, *How DACA Has Improved the Lives of Undocumented Young People*, Center for American Progress, at 4 (Nov. 19, 2014), *available at* http://ampr.gs/1O7iTHA. In addition, several states — including Texas, California, and New York — allow undocumented immigrants, including DACA recipients, to attend public colleges and universities at in-state or reduced tuition rates and to receive state and institutional financial assistance so long as they meet certain criteria. *Id.* Although they remain ineligible for financial aid in many states and under federal programs, DACA recipients can fill out the Free Application for Federal Student Aid, which schools use to determine financial need and eligibility for scholarships and institutional financial aid.

The educational opportunities available to a Texas DACA-recipient like *N.P.* have changed his life. Like most DACA recipients, *N.P.* has been in the United States for as long as he can remember. His family fled Juarez, Mexico, following a period of heightened violence when *N.P.* was seven years old. Yet despite having grown up in the United States, *N.P.* was never able to fully participate in living the American dream in the way that his U.S. citizen peers

9

had.  After being a DACA recipient, *N. P.* was able to go to college, get a job, get a driver's license, and accept internship offers.  This past spring he graduated from the University of Texas at El Paso and he is currently applying to graduate school at Texas Tech for next fall.

Like *N.P.*, *S.G.*'s life as far as she can remember has been in the United States, as she came from Mexico to the United States at the age of four.  After receiving DACA's protections, she was able to attend the University of Houston where she is studying Public Health and Business in hopes of going on to law school to study and practice health care law.  After becoming a DACA recipient, *S.G.* also obtained a job as a personal trainer and cycling instructor.

While DACA recipients have experienced the American Dream and have built their lives around it, many of them know all too well the hardships of family separation.  *V.A.* came to the United States as a young child escaping a violent, abusive father, and currently works full time as a camp counselor.  She will return to college this fall in San Marcos.  Her DACA protection will expire a month before she graduates from college, making planning for any sort of future almost impossible.  While *V.A.* has been able to benefit from DACA, her undocumented brother (who was not a DACA recipient) was less fortunate.  He was deported in 2008, and *V.A.* has not seen him since.  That painful experience has made *V.A.* acutely aware of the importance of the government's continued adherence to this critical initiative that has given hope to so many young people.

## CONCLUSION

As these stories demonstrate, enjoining DACA would disrupt the lives of individuals, families, and whole communities in Texas and throughout the United States, all of whom have organized their daily lives around DACA.  It would remove shopkeepers from their businesses; doctors and nurses from their hospitals; teachers from their classrooms; children from their parents' homes; and young men and women from the only country they have ever known.

Understanding and even expecting that DACA recipients would assume these roles in their families and their communities, the government created DACA and made basic commitments of procedural fairness to its recipients. Allowing the government to terminate DACA now would tear apart the lives of these young individuals as well as the fabric of families and entire communities.

Taking that context into account, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: July 20, 2018            Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By */s/ Peter Karanjia*
Peter Karanjia (admitted *pro hac vice*)
Geoffrey S. Brounell (admitted *pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8230
peterkaranjia@dwt.com
geoffreybrounell@dwt.com

*Counsel for Amicus Curiae
 United We Dream*[3]

---

[3] Counsel and UWD are grateful for the invaluable contributions to this brief of Davis Wright Tremaine summer associate Shontee Pant.