# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 2 3 2018

David J. Bradley, Clerk of Court

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br>　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES OF<br>AMERICA, et al.,<br>　　　Defendants,<br><br>KARLA PEREZ, et al.,<br>　　　Defendant-Intervenors,<br><br>and<br><br>STATE OF NEW JERSEY,<br>　　　Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Case No. 1:18-CV-68 |

---

## MEMORANDUM OF LAW OF AMERICAN PROFESSIONAL SOCIETY ON THE ABUSE OF CHILDREN IN SUPPORT OF UNOPPOSED MOTION FOR LEAVE TO FILE A BRIEF *AMICUS CURIAE* IN SUPPORT OF DEFENDANT – INTERVENORS

The American Professional Society on the Abuse of Children

("APSAC") respectfully moves the Court for leave to file a brief of *amicus*

*curiae* in support of Defendant – Intervenors, who oppose Plaintiffs' Motion

for a Preliminary Injunction in this matter. Exhibit A is a proposed copy of

the brief. *Amicus* has sought consent from the parties for this motion and the

filing of an amicus brief. Plaintiff States, Defendant United States,

1

Defendant – Intervenors Karla Perez et al., and Defendant – Intervenor State of New Jersey have consented.

## ARGUMENT

### I. THE COURT HAS DISCRETION TO ACCEPT BRIEFS OF *AMICI CURIAE*.

Federal district courts possess the inherent authority to accept amicus briefs. *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint 'friends of the court' to assist in their proceedings."); *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (2d Cir. 1982); *United States ex rel. Gudur v. Deloitte Consulting Llp*, 512 F. Supp. 2d 920, 927 (S.D. Tex. 2007) ("The extent to which the court permits or denies amicus briefing lies solely within the court's discretion."). "No statute, rule, or controlling case defines a federal district court's power to grant or deny leave to file an amicus brief, . . . and in the absence of controlling authority, district courts commonly refer to [Federal Rule of Appellate Procedure] 29 for guidance." *Gudur*, 512 F. Supp. 2d at 927.

In determining whether to allow amicus briefing, federal district courts consider "whether the proffered information is 'timely and useful' or otherwise necessary to the administration of justice." *Id. Amici*'s role is to assist the court "in cases of general public interest by making suggestions to

the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision." *N.A.A.C.P. v. Town of Harrison*, 940 F.2d 792, 808 (3d Cir. 1991). This authority supports the Court's exercise of its discretion to accept this amicus brief.

## II. PROPOSED *AMICUS* APSAC HAS A SUBSTANTIAL INTEREST IN THIS CASE.

APSAC is the leading national organization for professionals serving children and families affected by child maltreatment, which includes both abuse and neglect. A multidisciplinary group, APSAC achieves its mission through expert training and educational activities, policy leadership and collaboration, and consultation emphasizing theoretically sound, evidence-based principles.

For 30 years, APSAC has played a central role in developing guidelines that address child maltreatment. It is qualified to inform the Court about the damage maltreatment can inflict on children's brain development and cognitive ability. APSAC submits this brief to assist the Court in understanding the impact of parental detention and deportation—and the threat of such events—on children's physical, emotional, and mental development. These facts provide important background information useful

to a complete understanding of the potential impact of declaring DACA protection unlawful.

APSAC members have a direct and substantial interest in these issues because of their historical and scientific experience with juvenile brain development, especially where child maltreatment is involved. APSAC is therefore qualified to advise the Court on the impact of child maltreatment on child and youth health, well-being, and ability to survive.

APSAC has previously participated as *amicus curiae* in other cases addressing the potential impact on children of DACA's termination, including *Regents of the University of California, et al., v. U.S. Dep't of Homeland Security, et al.*, No. 18-15068 (9th Cir.), and *Batalla Vidal et al. v. Kirstjen Nielsen et al.*, Nos. 18-485, 18-488 (2d Cir.).

### III. APSAC's BRIEF *AMICUS CURIAE* ADDRESSES UNIQUE ISSUES OF VALUE TO THE CASE NOT OTHERWISE ADDRESSED BY THE PARTIES.

The question before this Court—whether Deferred Action for Childhood Arrivals, as it was established in 2012, is lawful—is of great moment. The papers submitted by the parties examine a broad range of issues concerning DACA and its termination. In preparing this brief, APSAC has endeavored to address a unique issue not yet explored: the potential impact of DACA's termination on the hundreds of thousands of

children of DACA recipients. APSAC is uniquely positioned to comment on the significant potential for childhood toxic stress if DACA comes to an end, and even if it falls under threat of termination. The proposed amicus brief explores these consequences for the health and well being of the most vulnerable persons affected.

## CONCLUSION

For the foregoing reasons, *amicus* American Professional Society on the Abuse of Children respectfully requests that this Court grant this Motion for Leave to File a Brief *Amicus Curiae*.

Dated:          July 20, 2018          Respectfully submitted,

Mary Kelly Persyn

s/ Mary Kelly Persyn

Mary Kelly Persyn* (CABN 264782)
Attorney-in-charge
Persyn Law & Policy
912 Cole Street PMB 124
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

* *Applied for admission pro hac vice*

*Counsel for Proposed* Amicus Curiae
*American Professional Society on the Abuse of Children*

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Local R. 5.3, I hereby certify that on July 20, 2018, I electronically filed the foregoing *amicus curiae* brief by using the CM/ECF system.

I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_____ s/ Mary Kelly Persyn _____

Mary Kelly Persyn* (CABN 264782)
Attorney-in-charge
Persyn Law & Policy
912 Cole Street PMB 124
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

*\* Applied for admission pro hac vice*

*Counsel for Proposed* Amicus Curiae
*American Professional Society on the*
*Abuse of Children*

# EXHIBIT A

**AMICUS AMERICAN PROFESSIONAL SOCIETY
ON THE ABUSE OF CHILDREN'S PROPOSED BRIEF
IN SUPPORT OF DEFENDANT – INTERVENORS**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*,<br>    Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES OF<br>AMERICA, et al.,<br>    Defendants, | ) ) ) ) | Case No. 1:18-CV-68 |
| KARLA PEREZ, et al.,<br>    Defendant-Intervenors, | ) ) ) | |
| and | ) ) | |
| STATE OF NEW JERSEY,<br>    Defendant-Intervenor. | ) ) | |

AMICUS AMERICAN PROFESSIONAL SOCIETY
ON THE ABUSE OF CHILDREN'S PROPOSED BRIEF
IN SUPPORT OF DEFENDANT – INTERVENORS

On June 15, 2012, former president Barack Obama announced the
Deferred Action for Childhood Arrivals ("DACA") policy. Under DACA,
certain individuals brought into the United States unlawfully as children
received a two-year period of protection from deportation and authorization
to work. On August 15, 2012, United States Citizenship and Immigration
Services began accepting requests for DACA protection. Plaintiff States now
seek a declaration that establishment of this policy was an unlawful act. This

1

would be a heavy blow indeed to a group that merits careful consideration by the Court: hundreds of thousands of children of DACA-protected parents.

*Amicus* American Professional Society on the Abuse of Children submits this brief to assist the Court in its review by providing key facts, some the product of very recent research, about the impact of DACA protections and its discontinuation on the children of recipients. An end to DACA puts recipients at risk of detention and deportation upon expiration of their individual grant of deferred action. Abundant evidence indicates that the fear that a parent will be deported, let alone the actual detention and deportation, can cause toxic stress that damages the mental, emotional, and physical health of children, which may impair their normal development.

Any review of the District Court's order must weigh, in the balance of the public interest, the impact of an end to DACA on the hundreds of thousands of U.S. citizen children who are at risk of separation from their DACA recipient parents if their protections are terminated.

## ARGUMENT

Termination of Deferred Action for Childhood Arrivals (DACA) protections would have grave human impact on U.S citizens and non-citizens alike. *Amicus* APSAC focuses here on the most vulnerable class of affected persons often overlooked in debates on DACA: the hundreds of

thousands of children of DACA recipients, most of whom are U.S. citizens. Because DACA termination places recipients at risk of immediate detention and deportation upon expiration of their individual protection, the danger to their children is immediate.[1]

These children are not at risk solely if their parent is actually detained and deported. Research shows that prior to detention and deportation, the very threat of ending DACA immediately causes high levels of anxiety and PTSD-like symptoms. Children risk loss of parental nurturance, but also loss of income; food security; housing security; access to health care; access to educational opportunity; and the sense of safety and security that is the foundation of healthy child development. Should the threat of deportation become real, children may face placement in the foster care system and potentially permanent separation from their parents.

---

[1] Plaintiffs aver that they do not seek an immediate end to DACA protections. Therefore, if DACA is declared unlawful, recipients retain their DACA protection until their individual grant of deferred action expires. Nevertheless, as of the termination date, DACA ceases as a policy actively granting protection. According to United States Citizenship and Immigration Services data, hundreds of recipients will lose their protection daily if DACA is eliminated. *See* U.S. Customs and Immigration Serv., Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted), https://www.uscis.gov/sites/default/files /USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_renewal_data.pdf.

Children of DACA recipients are not the only children who will suffer the mental and physical health impacts of anxiety related to deportation threat; children of documented parents also suffer increased stress, as do affected school communities. Living in families with an average of four members, often of different immigration statuses, and within larger communities, not one DACA recipient is an island. The visible effects of deportation touch neighbors, friends and family; children witness arrests; classmates tell stories of arrests within their families; "for every two adults deported, one citizen-child is directly affected."[2] What DACA recipients suffer post-termination of the policy will be carried by all who surround them—especially children.

## I.  TERMINATION OF DACA PROTECTION AFFECTS LARGE NUMBERS OF U.S. CITIZEN CHILDREN OF DACA RECIPIENTS.

Nearly 700,000 people benefit from DACA protection.[3] Reliable estimates find that over 25% of DACA recipients are parents of a U.S.

---

[2] Luis H. Zayas and Laurie Cook Heffron, Disrupting young lives: How detention and deportation affect U.S.-born children of immigrants, Amer. Psych. Ass'n (Nov. 2016), http://www.apa.org/pi/families/resources/newsletter/2016/11/detention-deportation.aspx.

[3] U.S. Customs and Immigration Serv., Active DACA Recipients: State of Residence as of Sept. 4, 2017, daca_population_data USCIS.pdf.

citizen child.[4] By this estimate, approximately 200,000 citizen children nationwide have a parent protected from removal by DACA.

Termination of DACA protections would reach far into the schools, churches, and communities of hundreds of thousands of children in America. The damage done thereby cannot and must not be underestimated.

## II.   TERMINATION OF DACA PROTECTION IMMEDIATELY PLACES DACA RECIPIENTS IN DANGER OF DETENTION AND DEPORTATION.

If DACA is terminated, individuals' DACA protections will expire and these former recipients will then be immediately eligible for detention and deportation. The DHS position on this question is clear:

> Recipients of DACA are currently unlawfully present in the U.S. with their removal deferred. When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be eligible for lawful employment.[5]

Nothing is known about how quickly persons formerly protected by DACA would be picked up. DHS does, after all, hold all the identifying

---

[4] United We Dream, A Portrait of Deferred Action for Childhood Arrivals Recipients 9 (2015), https://unitedwedream.org/ 2015/10/report-portrait-deferred-action-childhood-arrivals-daca-recipients/; Tom Wong, 2017 National DACA Study (University of California, San Diego) 9 (2017), https://cdn.americanprogress.org/content/uploads/ 2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.

[5] U.S. Dep't of Homeland Security, Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca.

information for these individuals. DHS states that it will not "proactively" share information on the identity of past DACA recipients unless certain conditions are met.[6] Nevertheless, DACA recipients have previously been detained and deported. According to Immigration and Customs Enforcement data recently acquired by the Washington Post, arrests of unauthorized immigrants with no criminal record doubled in fiscal year 2017, to 37,734.[7] Some of these detentions have involved DACA recipients, despite the relevant protections. While DHS does not keep robust data on DACA revocations and does not track DACA detentions, reliable reports do exist. Recent court cases feature DACA recipient plaintiffs issued Notices to Appear and notified that their DACA protections terminated as a result.[8]

---

[6] *Id.*

[7] B. Hart, Arrests of Undocumented Immigrants Without Criminal Records Skyrocketed in 2017 (Feb. 12, 2018), http://nymag.com/daily/intelligencer/2018/02/arrests-of-noncriminal-undocumented-immigrants-skyrocket.html.

[8] Issuance of a Notice to Appear initiates removal proceedings. In the most prominent of these cases to date, the Central District of California certified a plaintiff class of DACA recipients who had their DACA and work authorization terminated without notice and issued an order preliminarily enjoining the government from terminating DACA grants to individuals without proper procedure, from terminating grants of DACA based only on issuance of a Notice to Appear, and reversing decisions to terminate DACA without notice after January 19, 2017. *Inland Empire – Immigrant Youth Collective et al. v. Kirstjen Nielsen et al.*, Order granting Plaintiffs' motion for class certification and granting Plaintiffs' motion for classwide

Whether former DACA recipients are picked up right away or are never detained at all, the ever-present shadow of fear and anxiety that will loom over entire communities post-termination has real costs to public health, and especially to the health and well-being of children.

## III. TERMINATION OF DACA PROTECTIONS WILL CAUSE U.S. CITIZEN CHILDREN TO SUFFER CONTINUING DAMAGE TO THEIR MENTAL AND PHYSICAL HEALTH.

DACA termination would not result in immediate removal of all recipients, but it would immediately push DACA recipients out of the workforce and into the shadows upon expiration of their protection. Research shows that unauthorized parental status is a risk factor for children's health, whether or not it results in removal.

### A. Even the threat of detention and deportation causes children to suffer symptoms of traumatic stress and post-traumatic stress disorder.

Deportation of one or both parents is devastating for a child. And research shows that deportation trauma is not limited to those children whose parents are actually removed; children of DACA recipients and even children of documented immigrants also suffer great fear and anxiety.

---

preliminary injunction, Doc. 61 at 34-35, No. 17-2048 PSG (E.D. Cal. Feb. 26, 2018); *see also Ramirez-Medina v. U.S. Dep't of Homeland Security, et al.*, Order Granting Plaintiff's Motion for Preliminary Injunction, Doc. 132, No. 2:17-cv-00218-RSM (W.D. Wash. May 15, 2018).

Trauma to children who experience detention and deportation of a parent can be severe. Children suffer symptoms like anxiety and insomnia and exhibit signs of fear. Impacts can include mental health symptoms and disorders like depression, social isolation, self-stigma, aggression, withdrawal, negative academic consequences, separation anxiety, attachment disorder, and post-traumatic stress disorder.[9] Among children whose relatives have been detained or deported, anxiety, withdrawal and anger are common; more than 66% of youth aged 12-17 in one study showed withdrawal or detachment from others six months after a parent's immigration-related arrest.[10] Experiencing a parent's arrest, detention, and deportation accumulates on top of prior stress and can "detrimentally impact their mental health."[11] Moreover, children suffer symptoms such as depression, negative mood, physical symptoms, negative self-esteem, and anxiety disorders whether they accompany their deported parents or stay behind in the United States.[12]

---

[9] Zayas and Hefron, *supra* n. 2.

[10] Sara Satinsky et al., Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families 12 (2013), https://humanimpact.org/wp-content/uploads/2017/09/Family-Unity-Family-Health-2013.pdf.

[11] Zayas and Hefron, *supra* n. 2.

[12] *Id.*

Even the threat of deportation is highly traumatic for children. "As parents' risk of deportation rises, so too does the stress of their children...The lingering possibility of deportation of parents leaves children with constant anxiety and vigilance about the potential becoming real."[13] A 2013 study of family unity and health among mixed-status families found that almost 75% of undocumented parents reported signs of PTSD in their children, compared to 40% of documented parents.[14] Among youth with undocumented parents, 85% reported PTSD symptoms related to their parent's legal status and risk of deportation, compared to 57% of documented parents.[15]

## B. DACA termination threatens to cut off access to reliable health care.

Access to reliable health care is critical to child development and health. Unauthorized immigrants, including DACA recipients, are ineligible for Affordable Care Act coverage, but some DACA recipients have accessed health insurance via college or university health plans or have obtained employment-based insurance. In one survey, 57% obtained health insurance

---

[13] Zayas and Hefron, *supra* n.2.

[14] Satinsky, *supra* n. 10.

[15] *Id.* at 8.

through an employer.[16] These are positive indicators for the health of many DACA recipients' children, even though many others remain uncovered. However, DACA termination will cut off much of the access that exists; former recipients will no longer be able to work and access to higher education will be significantly reduced.

Further, parents no longer protected by DACA will be less likely to seek medical care for their children. Parents "may avoid encounters with providers for fear of discovery...undocumented immigrants make fewer visits to health care providers than citizens with authorized immigrant status."[17] Doctors and health care providers are bound by federal law to protect patient information,[18] but this fact, if widely known in the immigrant community, does not garner trust.[19]

---

[16] Wong, *supra* n. 4 at 3.

[17] Zayas and Hefron, *supra* n. 2.

[18] *See, e.g.*, Jeff Sconyers, JD, and Tyler Tate, MD, How Should Physicians Treat Patients Who Might Be Undocumented?, AMA Journal of Ethics 18(3) (March 2016): 229-236, doi:10.1001/ journalofethics.2016.18.03.ecas4-1603.

[19] *See, e.g.*, Immigrants, fearing Trump's deportation policies, avoid doctor visits, PBS (Feb. 27, 2017), https://www.pbs.org/ newshour/health/immigrants-trump-deportation-doctor ("Evidence that undocumented immigrants are avoiding clinics or hospitals because of the new guidelines is only anecdotal. But researchers have previously found that tightening of immigration policies have resulted in at least some increased fear in immigrant communities, with residents reluctant to leave their homes,

### C.   DACA termination is likely to cause income and food insecurity and reduce access to educational opportunity.

Loss of DACA protections means, among other things, loss of work authorization and income from employment. That loss of income can bring with it food insecurity for children of DACA recipients. Though U.S. citizen children can qualify for food stamps, immigrant families are less likely to apply for them, and children may live in food insecure households indefinitely. Detention of a family member can leave a household food insufficient, with 80% of respondents to one survey stating that they ran out of food six months after detention and lacked money to get more.[20] "Regardless of legal status, children of undocumented immigrants more often suffer from food insecurity than children of U.S. citizens."[21] Unauthorized immigrant parents "also may not use social services and

---

go to the doctor, or take other actions they think might put themselves at risk."); Lisa Zamosky, Health care options for undocumented immigrants, Los Angeles Times (Apr. 27, 2014), http://www.latimes.com/business/la-fi-healthcare-watch-20140420-story.html ("Many undocumented immigrants 'say fear of deportation for themselves or family members is a barrier in terms of signing up for coverage and accessing healthcare services,' says Laurel Lucia, policy analyst at the UC Berkeley Center for Labor Research and Education.").

[20] Satinsky, *supra* n. 10 at 32-33.

[21] Zayas and Hefron, *supra* n. 2.

public programs such as food stamps and child care subsidies, for which their citizen-children are eligible."[22]

DACA termination is likely to harm access to educational opportunity for several reasons. First, the anxiety, depression, and other symptoms that children will suffer interfere with cognitive ability and focus, and behavioral issues like aggression can interfere with focus and attendance. Second, fear of an unauthorized immigrant parent's discovery and detention creates a climate of fear and avoidance.[23] In one survey of immigration-related raids

---

[22] *Id.*

[23] Such fear is warranted. Media have reported many instances of parents arrested while taking their children to school. *See, e.g.*, Gary Klein, Marin man arrested in ICE bust while dropping off child at school, Marin Independent Journal (March 15, 2018), https://www.mercurynews.com/2018/03/15/marin-man-arrested-in-ice-bust-while-dropping-off-child-at-school/; Amy B. Wang, U.S. immigration authorities arrest chemistry professor after he finishes getting his children ready for school, Independent (Feb. 5, 2018), http://www.independent.co.uk/news/world/americas/syed-ahmed-jamal-us-ice-arrest-immigrant-student-visa-donald-trump-daca-lawrence-kansas-professor-a8194736.html (the detainee has three U.S. citizen children and no criminal record); Andrea Castillo, Immigrant arrested by ICE after dropping daughter off at school, sending shockwaves through neighborhood, Los Angeles Times (March 3, 2017), http://www.latimes.com/local/lanow/la-me-immigration-school-20170303-story.html (the detainee's 13-year-old daughter was present and filmed the arrest). There are a multitude of additional examples.

in six cities, about one in five children had difficulty keeping up in school after the raids.[24]

### D. Taken together, the factors impacting DACA recipients' children after termination put them at a high risk of child traumatic stress, causing immediate and long-term damage.

All of these impacts on children associated with detention and deportation, from anxiety and anger to loss of income and food security and possible permanent separation from parents, contribute to the development of child traumatic stress. Since a landmark study published by Kaiser Permanente and the Centers for Disease Control in 1998,[25] awareness of the significant physical and mental health impacts of traumatic stress on children has grown and its deleterious effects have been confirmed in study after study. Moreover, the American Academy of Pediatrics—America's premier professional association of pediatricians—issued a statement regarding the Executive Order issued January 25, 2017,[26] finding that:

---

[24] Satinsky, *supra* n. 10 at 16.

[25] *See* Ctrs. for Disease Control and Prevention, Adverse Childhood Experiences (ACEs), https://www.cdc.gov/violenceprevention/acestudy/index.html.

[26] Executive Order 13,767 ordered a wall built on the southern border of the United States, declaring that persons crossing the border without authorization are a "significant threat to national security and public safety." Exec. Order 13,767, 82 Fed. Reg. 8,793 (Jan. 30, 2017).

Far too many children in this country already live in constant fear that their parents will be taken into custody or deported, and the message these children received today from the highest levels of our federal government exacerbates that fear and anxiety. No child should ever live in fear. When children are scared, it can impact their health and development. Indeed, fear and stress, particularly prolonged exposure to serious stress—known as toxic stress—can harm the developing brain and negatively impact short- and long-term health.[27]

Left unbuffered, toxic stress may disrupt normal development and negatively affect the immune systems and other physiology of growing children—potentially for life. Pediatrician Alan Shapiro notes the amplified effect of toxic stress for children with unauthorized immigrant parents: "In this bio-ecological framework, parental deportation becomes a double whammy for children, compounding the negative effect on a child's health and well-being by increasing their risk for exposure to stressors and removing a key buffer to that stress, their parents."[28]

Children flooded with unrelenting toxic stress face negative consequences that potentially last a lifetime. An end to DACA brings with it unrelenting fear of losing either country or parents. And that choice leads to

---

[27] Am. Academy of Pediatrics, AAP Statement on Protecting Immigrant Children (Jan. 25, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/aapstatementonprotectingimmigrantchildren.aspx.

[28] Alan Shapiro, M.D., Immigration: deporting parents negatively affects kids' health, The Hill (May 13, 2016), http://thehill.com/blogs/congress-blog/healthcare/279544-immigration-deporting-parents-negatively-affects-kids-health.

worse health outcomes, lower productivity, and less quality of life for hundreds of thousands of American children.

**E.     Recent evidence shows the health benefits for the children of immigrants of establishing legal status for their parents.**

Abundant evidence demonstrates the negative health impacts on children of DACA termination. Recent evidence also demonstrates the health-promoting impact of DACA protections and other forms of legal status.

A 2016 analysis of survey results from Latino immigrant young adults demonstrated that while retrospective reports of past psychological wellness among undocumented individuals were predicted by socioeconomic status, DACA protection predicts current psychological wellness.[29] DACA essentially lowered the likelihood of psychological distress, such that "immigrants report better health after a transition to lawful presence."[30] Specifically, "[r]eceiving DACA reduced the odds of distress, negative

---

[29] Caitlin Patler, Ph.D., and Whitney Laster Pirtle, Ph.D., From undocumented to lawfully present: Do changes to legal status impact psychological wellbeing among latino immigrant young adults?, Social Science & Medicine 199 (2018) 39-48.

[30] *Id.* at 42, 44.

emotions, and worry about self-deportation by 76%-87%, compared to respondents without DACA."[31]

A 2017 study based on national retrospective data examined the physical and mental health effects of DACA, finding significant benefits to mental health but no significant impact on physical health.[32] Researchers found that the "effects on mental health were large and clinically significant, with the DACA programme significantly reducing the odds of individuals reporting moderate or worse psychological distress."[33] The authors noted further that these results should be expected, given other studies that show increasing anxiety and depression symptoms when policies raise the risk of deportation.[34]

In addition to studies relying on the self-reported health effects of DACA, a study recently showed the impact of a mother's DACA protection on the physical and mental health of her children. Researchers collected health information for children of DACA recipients with birthdates before

---

[31] *Id.* at 44.

[32] Atheendar S. Venkataramani et al., Health consequences of the U.S. Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study e175, Lancet Public Health 2017 2:e175-181, http://dx.doi.org/10.1016/S2468-2667(17)30047-6.

[33] *Id.* at e179.

[34] *Id.*

and after June 15, 2012, the date on which DACA requestors had to be less than 31 years old. Their analysis demonstrated that when DACA protections were established, children of mothers who qualified showed an immediate and statistically significant reduction in adjustment and anxiety disorder.[35]



**Figure 1.**

The data illustrated by Figure 1 demonstrate the clear decline of adjustment and anxiety disorders in children of DACA recipients after the protections were established. Specifically, "mothers' DACA eligibility

---

[35] Jens Hainmueller et al., Protecting unauthorized immigrant mothers improves their children's mental health, Science 357 (2017): 1041-1044. The authors chose to study mental health disorders because the effects were immediately observable upon establishment of DACA. "Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs." *Id.* at 1042.

reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points [] from a baseline rate of 7.9% among children of ineligible mothers at the threshold."[36] As the authors note, the study's results encourage further research on the impacts of DACA protections on the children of recipients—not only on the recipients themselves.

## IV. TERMINATION OF DACA PROTECTIONS RISKS THE SEPARATION OF CHILDREN FROM THEIR PARENTS.

If DACA is terminated, DACA recipient parents will need to decide whether to take their children with them or leave them behind in the United States, their country of citizenship and their birthright. For parents from countries deemed by the U.S. Department of State too dangerous for safe travel, the choice is particularly cruel. The State Department has derived a four-level travel advisory system where Level 4, "do not travel," indicates the presence of "life-threatening risks."[37] Hundreds of DACA recipients come from Level 4 countries including Haiti, Mali, Libya, Afghanistan, Iran, Yemen, and Syria.[38] Tens of thousands of DACA recipients come from

---

[36] *Id.* at 1043.

[37] U.S. Dep't of State—Bureau of Consular Affairs, Travel Advisory, https://travel.state.gov/content/travel/en/international-travel/before-you-go/about-our-new-products.html.

[38] U.S. Customs and Immigration Svcs., Approximate Active DACA Recipients: Country of Birth as of Jan. 31, 2018,

countries labeled Level 3, "reconsider travel" "due to serious risks to safety and security," including El Salvador, Guatemala, and Honduras.[39] Mexico, by far the most common country of origin with nearly 550,000 DACA recipients, is Level 2, but five Mexican states are Level 4—do not travel due to "life-threatening risks"—and an additional 11 are Level 3.[40]

Whether because they choose not to take their children into danger or because their country of origin affords insufficient means to support a family, some former DACA recipients will have to leave their children behind in the United States. Some will be able to place children with family or close friends, but many will not, whether due to immigration status, economic means, or other reasons. Those children may end up placed in the foster care system.

Regardless of the placement of these children, *amicus* advises that separating children from their parents and placing them into other

---

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf; U.S. Dep't of State—Bureau of Consular Affairs, Travel Advisories (interactive Web page), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories.html/.

[39] *Id.*

[40] U.S. Dep't of State—Bureau of Consular Affairs, Mexico Travel Advisory, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Mexico.html#/.

environments can cause extreme trauma, resulting in life-long developmental consequences including generalized anxiety, developmental delay, and chronic physical illness. Avoiding separation underpins the fundamental child welfare policy of making all efforts to ensure children's safety in their own families before any form of foster or residential care is considered. Indeed, the twin principles of family unity and child protection animate the United States laws that require child welfare agencies to help families access services necessary to reunification. But for a great many families, DACA termination will undercut these principles, forcing a choice between taking a child into danger or privation and separating the child from her parents.

Separating young children risks toxic stress, which can disrupt developing brain structures that regulate hormone activity in response to environmental stimuli, causing long-term emotional and behavioral pathology and stress-related disease. These effects of separation on children's psychological and emotional well being often persist for a lifetime. Traumatic separation can also interfere with the development of later healthy attachments and may negatively affect children's capacity to sustain close interpersonal relationships in their lives. Traumatic separation can create general low self-esteem and distrust of others.

The anxiety, stress, and resulting emotional, physical, and mental health challenges experienced by separated children create unique challenges for the families that receive them. Placements must be very well planned to minimize trauma. Foster parents must be screened and evaluated, including criminal background checks. Approved families must be thoroughly trained to ensure they can meet the special needs of children who have experienced trauma. A careful match between a child's needs and a foster family's capacity to meet them is crucial. Children must be fully prepared for placement, given opportunities to express distress, and given time to acclimate and trust their new caregivers. After placement, children need considerable emotional support from caregivers and professionals who understand and can respond to their grief, depression, and psychological terror, along with the challenging behaviors that constitute the frequent mode of expression of such emotions.

Child well being and family reunification are basic values of the child welfare system. Child safety is paramount. Parents protected by DACA were brought here as children and given no other choice of home. Termination of these protections puts their children at immediate risk and threatens their families with forced separation, in direct contravention of our nation's core commitment to the protection of children. *Amicus* respectfully requests that

the Court carefully weigh these equities in the balance when considering Plaintiffs' request for a preliminary injunction, and ultimately termination, of DACA protections.

## CONCLUSION

For the foregoing reasons, *amicus* American Professional Society on the Abuse of Children respectfully requests that this Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated:     July 20, 2018     Respectfully submitted,

Mary Kelly Persyn

_____
s/ Mary Kelly Persyn

Mary Kelly Persyn* (CABN 264782)
Attorney-in-charge
Persyn Law & Policy
912 Cole Street PMB 124
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

*Applied for admission pro hac vice*

*Counsel for Proposed* Amicus Curiae
*American Professional Society on the Abuse of Children*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Local R. 5.3, I hereby certify that on July 20, 2018, I electronically filed the foregoing *amicus curiae* brief by using the CM/ECF system.

I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_____ s/ Mary Kelly Persyn _____

Mary Kelly Persyn* (CABN 264782)
Attorney-in-charge
Persyn Law & Policy
912 Cole Street PMB 124
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

*Applied for admission pro hac vice*

*Counsel for Proposed* Amicus Curiae
*American Professional Society on the*
*Abuse of Children*