```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3
     STATE OF TEXAS ET AL          )
 4                                 )
     VS.                           )
 5                                 ) CIVIL ACTION NO.
     UNITED STATES OF AMERICA      ) 1:18-CV-68
 6   ET AL                         )

 7

 8

 9

10              SCHEDULING CONFERENCE HEARING
            BEFORE THE HONORABLE ANDREW S. HANEN
11                    MAY 30, 2018

12

13

14                A P P E A R A N C E S

15    FOR THE PLAINTIFF STATES:

16        MR. TODD DISHER
          MR. BRANTLEY STARR
17        MR. ADAM ARTHUR BIGGS
          OFFICE OF THE ATTORNEY GENERAL
18        Post Office Box 12548
          Austin, Texas 78711-2548
19        Phone:  512.936.2266

20

21    FOR THE UNITED STATES OF AMERICA:

22        MR. DANIEL DAVID HU
          OFFICE OF THE US ATTORNEYS
23        OFFICE
          1000 Louisiana, Suite 2300
24        Houston, Texas 77002
          Phone:  713.567.9518

25
```

```
 1   FOR THE UNITED STATES OF AMERICA:

 2       MR. BRETT A. SHUMATE
         UNITED STATES DEPARTMENT OF
 3       JUSTICE
         950 Pennsylvania Avenue
 4       Washington, D.C. 20530
         Phone:  202.514.2331
 5

 6   FOR THE UNITED STATES OF AMERICA:

 7       MR. JEFFREY S. ROBINS
         U.S. DEPARTMENT OF JUSTICE
 8       PO Box 868
         Washington, D.C. 20044
 9       Phone:  202.616.1246

10   FOR THE INTERVENOR:

11       MS. NINA PERALES
         MR. JOHN PAUL SALMON
12       MALDEF
         110 Broadway, Suite 300
13       San Antonio, Texas 78205
         Phone:  210.224.5476
14
     FOR THE INTERVENOR:
15
         MR. CARLOS MOCTEZUMA GARCIA
16       GARCIA & GARCIA ATTORNEYS AT
         LAW, PLLC
17       4905-A N. McColl
         McAllen, Texas 78504
18       Phone:  956.630.3889

19   FOR THE INTERVENOR DEFENDANT STATE OF NEW JERSEY:

20       MS. RACHEL WAINER APTER
         NEW JERSEY OFFICE OF THE
21       ATTORNEY GENERAL
         25 Market Street, 8th Floor
22       Trenton, New Jersey 08625
         Phone:  609.376.2702
23

24

25
```

| | | |
|---|---|---|
| 11:06:46 | 1 | THE COURT:  All right.  Be seated.  We're |
| 11:06:56 | 2 | here in B-18-68, State of Texas et al. versus U.S. |
| 11:07:02 | 3 | et al. |
| 11:07:04 | 4 | Who do I have for the State of Texas? |
| 11:07:06 | 5 | MR. DISHER:  Good morning, Your Honor, |
| 11:07:07 | 6 | Todd Disher for the Texas Attorney General's office. |
| 11:07:10 | 7 | With me today, I have Brantley Starr and Adam Biggs. |
| 11:07:13 | 8 | THE COURT:  All right. |
| 11:07:14 | 9 | For the United States, Mr. Hu, who is with |
| 11:07:17 | 10 | you? |
| 11:07:18 | 11 | MR. HU:  With me today is Brett Shumate from |
| 11:07:21 | 12 | the Deputy Assistant Attorney General.  He'll be |
| 11:07:23 | 13 | addressing the merits questions and the other cases. |
| 11:07:26 | 14 | And Jeff Robins from the Office of Immigration |
| 11:07:29 | 15 | Litigation who will address scheduling concerns. |
| 11:07:31 | 16 | THE COURT:  Okay. |
| 11:07:32 | 17 | And Ms. Perales, who's with you? |
| 11:07:34 | 18 | MS. PERALES:  Good morning, Your Honor, |
| 11:07:35 | 19 | Nina Perales for the Defendant Intervenors.  With me are |
| 11:07:38 | 20 | Mr. Jack Salmon and Mr. Carlos Garcia. |
| 11:07:43 | 21 | THE COURT:  All right.  And representing the |
| 11:07:45 | 22 | great State of New Jersey, we have? |
| 11:07:48 | 23 | MS. WAINER APTER:  Rachel Wainer Apter, |
| 11:07:50 | 24 | Your Honor. |
| 11:07:50 | 25 | THE COURT:  All right.  I love having |

11:07:54  1   New Jersey here because that allows me to, you know,

11:07:57  2   repeat the old joke about why does New Jersey have more

11:08:00  3   chemical plants and Texas has more lawyers?  Because

11:08:04  4   New Jersey got first choice.  You know, works out great.

11:08:10  5        All right.  I may be taking things in an

11:08:16  6   order that's a little unorthodox but does anyone have an

11:08:24  7   objection to New Jersey joining the fray?

11:08:28  8        MR. DISHER:  The State of Texas does have an

11:08:30  9   objection to that, Your Honor.

11:08:31  10        THE COURT:  All right.  Let's hear that.

11:08:34  11   Let's hear from you, then, Mr. Disher, if you will.

11:08:36  12        MR. DISHER:  Of course.  In their motion to

11:08:44  13   intervene, New Jersey has not overcome the presumption

11:08:47  14   of adequate representation.

11:08:49  15        The interests that they represent in this

11:08:51  16   case are represented by the individual DACA recipients

11:08:55  17   who have already intervened.

11:08:57  18        The presumption of adequate representation

11:08:59  19   arises when the would-be Intervenor has the same

11:09:02  20   ultimate objective as the party to this lawsuit.

11:09:04  21        New Jersey has the same ultimate objective

11:09:09  22   as the individual DACA recipients who have already

11:09:12  23   intervened in this case; therefore, those individual

11:09:14  24   DACA recipients represented by counsel already in the

11:09:18  25   case will adequately represent those interests.

| | |
|---|---|
| 11:09:21 | 1 |
| 11:09:23 | 2 |
| 11:09:27 | 3 |
| 11:09:31 | 4 |
| 11:09:35 | 5 |

1            To overcome the presumption of adequate

2    representation, New Jersey would have to show adversity

3    of interest, collusion, or nonfeasance.  And New Jersey

4    has not even attempted to show that, let alone allege

5    that in any way.

6            The only area where they address this in

7    memorandum in support of intervention is about a

8    paragraph in which they describe how their interests may

9    be slightly different than the interests of the DACA

10   recipients who have already intervened, but they do

11   nothing to allege why the intervention of the DACA

12   recipients is not adequate to represent the New --

13   New Jersey's interest or how they have a different goal.

14           They indeed have the same objection --

15   objective and have done nothing to show, again, this

16   adversity of interest, collusion, or nonfeasance on the

17   part of the individual DACA recipients who have already

18   intervened in this case.

19           Therefore, we believe that intervention as a

20   matter of right is not warranted in this case for

21   New Jersey and we do not believe that permissive

22   intervention is necessary in this case as well.

23           Again, their interests will be represented

24   by the individual DACA recipients and the intervention

25   of New Jersey will only lead to additional delay as

11:10:36   1   evidenced by their proposed schedule, which asks for a

11:10:38   2   four month extension of the -- of the deadline for the

11:10:43   3   briefing on our motion for preliminary injunction.

11:10:46   4         So we don't believe that permission --

11:10:48   5   intervention as a matter of right is warranted here and

11:10:50   6   we don't believe that intervention on a permissive basis

11:10:55   7   is warranted here as well.

11:10:56   8         We are happy to file a -- a -- a proposed --

11:10:59   9   or a response in opposition to their motion to intervene

11:11:03  10   and, if it would speed things along, we could do so

11:11:05  11   quickly if that would help the Court.

11:11:07  12         THE COURT:  All right.  Ms. Perales, do your

11:11:13  13   folks have a position one way or the other?

11:11:15  14         MS. PERALES:  Your Honor, we do not oppose

11:11:16  15   the motion.

11:11:17  16         THE COURT:  All right.  Mr. Hu, what about

11:11:19  17   the Government?

11:11:24  18         MR. HU:  Mr. Shumate will address that.

11:11:24  19         MR. SHUMATE:  Your Honor, I'm happy to

11:11:26  20   address that.  Again, Brett Shumate from the Department

11:11:29  21   of Justice.

11:11:29  22         We would identify an additional reason why

11:11:32  23   New Jersey should not be permitted to intervene is the

11:11:34  24   fact they do not have standing.

11:11:36  25         We did not oppose MALDEF's intervention

| | |
|---|---|
| 11:11:39 | 1 |
| 11:11:41 | 2 |
| 11:11:43 | 3 |
| 11:11:46 | 4 |
| 11:11:47 | 5 |
| 11:11:50 | 6 |
| 11:11:52 | 7 |
| 11:11:56 | 8 |
| 11:11:58 | 9 |
| 11:12:00 | 10 |
| 11:12:03 | 11 |
| 11:12:06 | 12 |
| 11:12:10 | 13 |
| 11:12:13 | 14 |
| 11:12:17 | 15 |
| 11:12:20 | 16 |
| 11:12:22 | 17 |
| 11:12:25 | 18 |
| 11:12:30 | 19 |
| 11:12:32 | 20 |
| 11:12:35 | 21 |
| 11:12:39 | 22 |
| 11:12:41 | 23 |
| 11:12:44 | 24 |
| 11:12:46 | 25 |

because we have no objection to the -- we -- we -- we do believe that the individual DACA recipients have standing in this case but the states are differently situated.

We opposed California and New York's standing in the DACA recision cases and for the -- for the same reason here, we don't believe New Jersey has standing to challenge and seek the continuation of DACA.

So for that additional reason, we don't think New Jersey has a basis to intervene in this case.

THE COURT:  All right.  Ms. Apter, do you want to weigh in?

And I'm particularly, as you walk up to the podium, I'm particularly interested in the point Mr. Disher made of why the -- you're not adequately represented by Ms. Perales' group.

MS. WAINER APTER:  Thank you, Your Honor. In terms of adequate representation by the MALDEF Defendant Intervenors, the Defendant Intervenors do not have the same ultimate objective as New Jersey.  The Defendant Intervenors objective is to protect the interests of the individual client DACA recipients who are current DACA grantees.

New Jersey's interest in this litigation is about protecting state agencies that have invested

11:12:49  1   resources and hiring and training DACA grantees, state

11:12:52  2   colleges that have invested resources in educating DACA

11:12:56  3   grantees and that benefit from having DACA grantees on

11:12:58  4   campus, the State economy which benefits from having the

11:13:02  5   State and local tax revenue paid by DACA grantees and

11:13:02  6   all of their contributions to the many sectors of the

11:13:07  7   New Jersey economy.

11:13:08  8          So New Jersey has a proprietary interest in

11:13:12  9   this case that is not shared by the MALDEF Defendant

11:13:12 10   Intervenors.

11:13:14 11          New Jersey also has a sovereign interest in

11:13:17 12   enforcing its criminal laws which is impacted by this

11:13:19 13   case where 48 percent of DACA grantees said they would

11:13:23 14   be less likely to go to report -- 53 percent, I'm sorry,

11:13:27 15   said they would be less likely to report a crime they

11:13:29 16   witnessed to the police if DACA were rescinded.

11:13:32 17          THE COURT:  Who did they say that to?

11:13:34 18          MS. WAINER APTER:  This is the declaration

11:13:36 19   of Tom Wong, which is attached to our motion to

11:13:39 20   intervene as an appendix.

11:13:40 21          THE COURT:  How was that information

11:13:41 22   gathered is what I'm asking really?

11:13:43 23          MS. WAINER APTER:  So it was a survey of

11:13:45 24   more than 3,000 current DACA grantees across the

11:13:50 25   country.  It was online.  And Mr. Wong explains in

11:13:53    1    detail the methodology of the survey and exactly how all

11:13:56    2    of the questions were phrased.  And he also provides, in

11:13:58    3    addition to the statistics, individual responses from

11:14:02    4    DACA grantees.  There was a place where people could

11:14:05    5    enter qualitative responses, not just multiple choice.

11:14:09    6             THE COURT:  How does -- how does he -- how

11:14:09    7    did he identify DACA recipients?

11:14:14    8             MS. WAINER APTER:  So the survey was pushed

11:14:16    9    out -- and this is explained in the declaration starting

11:14:21   10    at paragraph nine under the methodology.  So there were

11:14:25   11    several steps that were taken to get the survey to DACA

11:14:29   12    recipients.  Often times through outreach partners,

11:14:36   13    United We Dream, The National Immigration Law Center and

11:14:38   14    The Center for American Progress.  Those partners

11:14:40   15    distributed the survey link to e-mails lists and then it

11:14:42   16    was also distributed online.  There were multiple

11:14:46   17    actions that were taken to make sure that no one filled

11:14:48   18    out the survey more than once, that everyone who filled

11:14:50   19    out the survey actually was a DACA recipient.

11:14:53   20             THE COURT:  How -- I mean, that's what I'm

11:14:55   21    ask -- interested in.  Because when -- in the last

11:14:56   22    lawsuit that was here when I even suggested that a list

11:15:00   23    of DACA people filed under seal, I got barraged with

11:15:08   24    amicus's for DACA say, no, the only people that have

11:15:11   25    this information is the Government.  And even though I

11:15:12  1   was going to have it kept under seal, you know, people

11:15:16  2   said all this information is unavailable and if you make

11:15:19  3   it available, then -- then it endangers the privacy of

11:15:23  4   the DACA recipients.  So I'm wondering how -- if

11:15:28  5   that's -- if that was either not true or how do these

11:15:32  6   groups have lists of DACA recipients?

11:15:35  7            MS. WAINER APTER:  So I believe that

11:15:36  8   partners United We Dream, National Immigration Law

11:15:40  9   Center and Center for American Progress have general

11:15:44 10   e-mail lists and they sent the survey out but the way

11:15:46 11   that they were specifically making sure that only DACA

11:15:47 12   recipients were filling out the survey is they repeated

11:15:50 13   several questions during several parts of the survey

11:15:53 14   several times.

11:15:54 15            I'm looking at paragraph 10 of the Wong

11:15:56 16   declaration.  So, for example, the question, how old

11:15:58 17   were you when you first came to the United States?  In

11:16:01 18   what year did you first come to the United States?  That

11:16:03 19   question repeated several times throughout the survey to

11:16:07 20   make sure that no one was filling it out incorrectly.

11:16:10 21            And there was also, you know, steps taken to

11:16:13 22   make sure that no one could fill out the survey more

11:16:15 23   than once.

11:16:16 24            THE COURT:  What would keep me from filling

11:16:18 25   that out?

11:16:20  1            MS. WAINER APTER:  In viewing --

11:16:20  2            THE COURT:  As long as I gave consistent

11:16:22  3   answers.

11:16:23  4            MS. WAINER APTER:  So any inconsistencies

11:16:25  5   and the Respondent was -- was excluded.  You also

11:16:28  6   probably would not have received the link from United We

11:16:32  7   Dream or The National Immigration Law Center or The

11:16:37  8   Center for American Progress.  However, Mr. Wong does

11:16:39  9   explain in paragraph 10 that given -- that it is an

11:16:43 10   online opt-in survey.

11:16:45 11            THE COURT:  Okay.

11:16:46 12            MS. WAINER APTER:  In terms of New Jersey's

11:16:47 13   interest in this case, I just wanted to take a step back

11:16:51 14   and once again reiterate that we are looking to protect

11:16:54 15   proprietary interests both in state institutions that

11:16:58 16   employ DACA grantees.

11:17:00 17            So, for example, New Jersey's Department of

11:17:03 18   Children and Families, Division of Child Protection and

11:17:07 19   Permanency, employs a DACA grantee right now into its

11:17:11 20   prestigious -- it's called the Baccalaureate Child

11:17:11 21   Welfare Education Program.  The State has invested

11:17:16 22   already in Ms. Cynthia Osorio a -- an internship during

11:17:20 23   this past school year and a two year contract following

11:17:22 24   graduation.  That investment would never be able to be

11:17:25 25   re-cooped if DACA were terminated.

11:17:28  1        And there are many other state agencies that

11:17:31  2   also have similar stories.

11:17:32  3        And many DACA grantees are also currently

11:17:35  4   employed by New Jersey's public colleges and

11:17:37  5   universities and, so, if DACA were terminated, these

11:17:40  6   public institutions would lose the employees, they would

11:17:44  7   also lose the investment that they have made in hiring,

11:17:46  8   training and retaining them, they would be forced to

11:17:48  9   expend additional money recruiting, hiring and training

11:17:50  10  new employees.

11:17:50  11       THE COURT:  Is that -- I mean, they hired

11:17:53  12  them knowing that DACA was revocable.  I mean, the DACA

11:17:58  13  memo that creates it says it's revocable and that it

11:18:03  14  confers no substantive right.  So how does -- if -- if

11:18:05  15  the recipient doesn't have a substantive right, how does

11:18:09  16  New Jersey have a substantive right?

11:18:11  17       MS. WAINER APTER:  So having a substantive

11:18:12  18  right is different than having a proprietary interest

11:18:15  19  that could be affected by the litigation.

11:18:17  20       For purposes of intervention, New Jersey

11:18:19  21  needs to show a proprietary or sovereign interest that

11:18:24  22  could, in theory, be impacted by the litigation.

11:18:26  23       THE COURT:  So that would be the standing in

11:18:28  24  response to the Government's argument that you don't

11:18:30  25  have standing?

11:18:32   1          MS. WAINER APTER:  Correct.  So all

11:18:34   2   New Jersey has to show for purposes of standing or for

11:18:37   3   purposes of the motion to intervene is a proprietary or

11:18:40   4   sovereign, or quasi-sovereign interest even, that could,

11:18:43   5   in theory, be impacted by the intervention.

11:18:46   6          And this is a very minimal showing that is

11:18:48   7   required and New Jersey has --

11:18:49   8          THE COURT:  Let -- let me -- let me just ask

11:18:50   9   a general question because obviously I assume you've

11:18:53  10   read all the DACA cases.  Everybody in here's read them.

11:18:58  11          I mean, wouldn't a state under this current

11:19:06  12   interpretation, let's say, I mean, a state could --

11:19:10  13   could challenge anything; couldn't they?  I mean, how

11:19:14  14   could you -- how could you not have standing to

11:19:15  15   challenge anything given this?  I mean, you may or may

11:19:21  16   not know but, I mean, I spent 60 pages trying to figure

11:19:27  17   out if Texas had standing in the last case where

11:19:31  18   everybody else just -- is just saying, hey, you're a

11:19:34  19   state, you got standing.

11:19:35  20          MS. WAINER APTER:  So in this case,

11:19:36  21   New Jersey is specifically not relying on Parens patriae

11:19:40  22   standing or any form of general just solicitude to

11:19:44  23   states.  New Jersey is specifically raising standing

11:19:47  24   based on proprietary interests and sovereign interests

11:19:50  25   and has provided detailed declarations to explain both

11:19:54   1   of those interests.  And both of those are reasons that

11:19:58   2   New Jersey should be granted standing in this case even

11:20:01   3   without looking to the additional solicitude that states

11:20:06   4   may be entitled to.

11:20:07   5          So, for example, under -- as I spoke already

11:20:13   6   about the New Jersey Division of Child Protection and

11:20:16   7   Permanency but there are 2,200 current DACA recipients

11:20:20   8   who are students at New Jersey state colleges.  And many

11:20:23   9   of those DACA grantees will be forced to drop out of

11:20:25  10   school without finishing their degree.

11:20:27  11          So the State would lose hundreds of

11:20:29  12   thousands of dollars in tuition revenue if DACA were

11:20:33  13   terminated.  And that is an example of a proprietary

11:20:36  14   interest that New Jersey has in this case.

11:20:38  15          It would also lose all of the resources that

11:20:40  16   it has already --

11:20:40  17          THE COURT:  Why -- why would they drop out?

11:20:42  18          MS. WAINER APTER:  So actually we have a

11:20:43  19   declaration from a DACA grantee who explains she's

11:20:46  20   currently a student at Rutgers.  Her name is

11:20:51  21   Daniella Velez.  She explains that she will not be able

11:20:53  22   to finish her college degree if DACA is terminated

11:20:55  23   because she will not be able to afford tuition.

11:20:58  24          The declaration of -- we also have a

11:21:01  25   declaration from --

11:21:01   1          THE COURT:  Do the DACA recipients get
11:21:03   2   cheaper tuition?
11:21:05   3          MS. WAINER APTER:  So DACA recipients
11:21:06   4   currently can get New Jersey in-state tuition.
11:21:10   5          THE COURT:  Okay.  And she would -- if she
11:21:13   6   wasn't a DACA, even though she lived in New Jersey,
11:21:17   7   she'd get higher tuition?
11:21:19   8          MS. WAINER APTER:  Oh, no, the reason,
11:21:22   9   sorry, that she's saying that she would no longer be
11:21:23  10   able to afford her education is because DACA provides
11:21:25  11   her with work authorization.  And so she currently works
11:21:28  12   to support herself and to pay her tuition.
11:21:28  13          THE COURT:  All right.
11:21:30  14          MS. WAINER APTER:  And she would no longer
11:21:31  15   be able to do that if she did not have work
11:21:33  16   authorization.
11:21:33  17          We also have a declaration from Dr. Zakiya
11:21:37  18   Smith Ellis, who is the acting secretary of higher
11:21:39  19   education in New Jersey.  And she explains that without
11:21:42  20   the ability to work to support themselves, many DACA
11:21:45  21   students will be forced to drop out of school without
11:21:47  22   finishing their degrees.
11:21:48  23          And, again, that's 2,200 students in the
11:21:52  24   different universities, some public research
11:21:55  25   institutions, some state colleges and some county

11:21:58  1    colleges in New Jersey.

11:21:59  2              THE COURT:  Okay.

11:22:00  3              MS. WAINER APTER:  And those institutions,

11:22:02  4    I'm sorry, also employ DACA grantees and so those

11:22:05  5    institutions, in addition to losing tuition funds when

11:22:09  6    DACA grantees were forced to drop out of college, would

11:22:12  7    also lose money in that they would have to recruit new

11:22:16  8    employees to step into the roles that are currently

11:22:19  9    being filled by DACA grantees.

11:22:21  10              THE COURT:  And I assume if I grant

11:22:24  11   New Jersey intervention, they're willing to abide by

11:22:26  12   whatever scheduling order I enter?

11:22:28  13              MS. WAINER APTER:  Yes, correct, Your Honor.

11:22:29  14              THE COURT:  All right.  Anybody else want to

11:22:31  15   respond to Ms. Apter's --

11:22:33  16              MR. DISHER:  Briefly, Your Honor.

11:22:34  17              THE COURT:  You can stay there in case you

11:22:35  18   want to --

11:22:37  19              MS. WAINER APTER:  Okay.  Thank you.

11:22:38  20              THE COURT:  -- slap back.

11:22:40  21              MR. DISHER:  Your Honor, the Fifth Circuit

11:22:42  22   precedent is clear.  The Fifth Circuit recognizes that

11:22:46  23   there is, of course, a cost or a burden of adding

11:22:49  24   additional parties.  We will have to depose all of their

11:22:51  25   witnesses as we go forward through the litigation, they

11:22:54   1   will file additional briefing that we will respond to.

11:22:57   2              A additional party can, of course, can come

11:23:00   3   in if that party's interests are not represented by the

11:23:05   4   existing parties in the case but the Fifth Circuit,

11:23:07   5   recognizing the additional burden created by having

11:23:10   6   additional parties, created this presumption of adequate

11:23:13   7   representation when the ultimate objective of the new

11:23:18   8   potential parties is the same as the objective --

11:23:23   9   objective of an existing party.

11:23:25   10             THE COURT:  Well, let me ask you this,

11:23:26   11   Mr. Disher, that's the argument I bought in the last

11:23:32   12   case and Judge Elrod made it clear that she wasn't

11:23:37   13   buying it.  And -- and she sits on the Fifth Circuit, I

11:23:41   14   don't.

11:23:42   15             MR. DISHER:  Your Honor, in -- in the last

11:23:43   16   case, there was a -- a critical distinction and that was

11:23:47   17   the existing Defendants were the Department of Justice

11:23:50   18   who had all sorts of additional interests and

11:23:53   19   representations and objectives that the individual

11:23:57   20   potential DAPA recipients may not have had.

11:24:00   21             In this case, the objective of the

11:24:02   22   individual DACA recipients who are already in this case

11:24:06   23   is to continue DACA in its full force and effect into

11:24:09   24   the future.  That is the exact same objective --

11:24:13   25             THE COURT:  Wait.  Wait.  Wait.  Wait.

11:24:13  1    Whose objective is that?

11:24:15  2              MR. DISHER:  That -- that would be the

11:24:16  3    individual DACA recipients who have intervened.  Their

11:24:21  4    objective in this case is to defend DACA and -- and

11:24:23  5    maintain DACA's existence.  That is the same object --

11:24:25  6              THE COURT:  Well, at least for the 20 or so

11:24:27  7    that have intervened certainly.

11:24:28  8              MR. DISHER:  Yes, sir.  Yes, Your Honor.

11:24:29  9    That is correct.  That is their objective.  And that

11:24:31  10   objective is shared by New Jersey.

11:24:34  11             New Jersey is talking about the different

11:24:36  12   interests that they may have, but those interests are

11:24:38  13   protected if DACA continues in existence.  That is their

11:24:42  14   objective.  So the Fifth Circuit asks not whether you

11:24:46  15   have different interests with existing parties, the

11:24:49  16   Fifth Circuit asks whether you have different

11:24:51  17   objectives.

11:24:51  18             And in this case, New Jersey has the same

11:24:54  19   objective as the individual DACA recipients who are

11:24:58  20   already in this case.  And, again, to overcome that

11:25:01  21   presumption, when parties have the same objective,

11:25:04  22   New Jersey has to show adversity of interest, collusion,

11:25:08  23   or nonfeasance on the part of the existing party.

11:25:11  24   New Jersey has not alleged that, let alone shown that.

11:25:14  25             So we again believe that based -- based on

11:25:17  1   well established Fifth Circuit precedent, if the

11:25:20  2   parties, the potential intervening parties have the same

11:25:23  3   objective as an existing party to the case, intervention

11:25:27  4   is not granted as a matter of right.

11:25:31  5           And, again, we are happy to submit briefing

11:25:33  6   on that.  Our response date has not come and we can

11:25:35  7   submit that briefing as soon as possible if that would

11:25:37  8   assist Your Honor.

11:25:38  9           THE COURT:  All right.  Here's -- I want you

11:25:40  10  to give any kind of response brief in a week.  So by

11:25:46  11  June 6th.

11:25:52  12          MR. DISHER:  Yes, Your Honor.

11:25:53  13          THE COURT:  And Ms. Apter, if you want to

11:25:56  14  reply to their response, you have until June 11th.

11:25:59  15          MS. WAINER APTER:  Okay.  Thank you.  Does

11:26:01  16  that mean I should not reply now, Your Honor?

11:26:03  17          THE COURT:  No, if you have -- if you want

11:26:05  18  to weigh in on what he just said, you're welcome to do

11:26:08  19  that.

11:26:08  20          MS. WAINER APTER:  Just in terms of the

11:26:10  21  ultimate objective, I think as Your Honor recognized,

11:26:13  22  part of it is about what level of generality you're

11:26:15  23  looking at the ultimate objective.  But, in theory, in

11:26:18  24  the last DAPA lawsuit, the federal Government had the

11:26:20  25  same ultimate objective as any prospective DAPA grantees

| | | |
|---|---|---|
| 11:26:25 | 1 | and that was to keep the memo and the DAPA program to |
| 11:26:28 | 2 | allow it to go into effect. |
| 11:26:29 | 3 | Here, New Jersey does not have the same |
| 11:26:32 | 4 | ultimate objective as the individual DACA grantees |
| 11:26:34 | 5 | because New Jersey's ultimate objective is to protect |
| 11:26:38 | 6 | its proprietary and sovereign interests.  And the DACA |
| 11:26:42 | 7 | grantees simply cannot do that in this case.  But I will |
| 11:26:44 | 8 | submit a reply. |
| 11:26:45 | 9 | THE COURT:  All right.  Thank you. |
| 11:26:46 | 10 | MS. WAINER APTER:  Thank you. |
| 11:26:53 | 11 | THE COURT:  All right.  Ms. Perales, the |
| 11:26:55 | 12 | Intervenors have filed a motion to dismiss.  Do you want |
| 11:26:58 | 13 | to address that?  Or you, or one of your group, whoever |
| 11:27:02 | 14 | wants to -- |
| 11:27:04 | 15 | MS. PERALES:  Thank you, Your Honor.  And we |
| 11:27:09 | 16 | recognize that obviously the -- the State has not -- the |
| 11:27:14 | 17 | states have not had a chance to respond or possibly even |
| 11:27:20 | 18 | review the entire thing and so I will -- |
| 11:27:22 | 19 | THE COURT:  Well, I haven't reviewed the |
| 11:27:23 | 20 | entire notebook that was delivered to me about 10 |
| 11:27:26 | 21 | minutes ago but -- |
| 11:27:26 | 22 | MS. PERALES:  Yes, Your Honor. |
| 11:27:27 | 23 | THE COURT:  -- but it's the states that want |
| 11:27:29 | 24 | the fastest schedule so I'm putting them on a short |
| 11:27:33 | 25 | leash. |

11:27:33  1          So go ahead.

11:27:34  2          MS. PERALES:  Thank you, Your Honor.  The

11:27:35  3  reason that we filed the motion to dismiss when we did

11:27:38  4  was that it is part of the Court's consideration around

11:27:40  5  scheduling.  So it does dovetail --

11:27:43  6          THE COURT:  That's why I'm hearing it now.

11:27:45  7          MS. PERALES:  -- with the -- with the

11:27:47  8  scheduling issue.  It's simply that the Defendant

11:27:49  9  Intervenors have proposed a schedule that includes time

11:27:55  10  to consider motions under Rule 12 as well as the motion

11:27:59  11  that we filed yesterday because there are important

11:28:02  12  questions about whether the case should go forward here.

11:28:07  13          There is a Northern District of California

11:28:10  14  case that has taken up questions that substantially

11:28:15  15  overlap with the questions that are raised in this case

11:28:19  16  and that has also resulted in an injunction preserving

11:28:24  17  at least DACA renewals which is now -- that injunction

11:28:29  18  is pending before the Ninth Circuit.

11:28:33  19          Judge Alsup in the Northern District of

11:28:37  20  California has ruled that DACA is lawful, so that case

11:28:41  21  does involve some of the same core issues as this case.

11:28:45  22  There is both a -- a substantive APA aspect to this, as

11:28:51  23  well as a procedural APA aspect to Judge Alsup's ruling.

11:28:56  24          THE COURT:  Of course he's not bound by the

11:28:58  25  Fifth Circuit and I am.

11:29:00  1          MS. PERALES:  Yes, Your Honor.  And that's

11:29:02  2     why we believe that in the interest of comity and sound

11:29:06  3     judicial administration, that this Court should exercise

11:29:10  4     one of three options; either dismiss the case, transfer

11:29:14  5     the case, or stay proceedings in this case pending the

11:29:17  6     outcome of the rulings in --

11:29:21  7          THE COURT:  Was a motion filed in his court

11:29:23  8     similar to this?

11:29:24  9          MS. PERALES:  No, Your Honor, it was not.

11:29:25  10          THE COURT:  Okay.  Because I had the first

11:29:28  11     case.

11:29:29  12          MS. PERALES:  Your Honor, the --

11:29:29  13          THE COURT:  I --

11:29:30  14          MS. PERALES:  -- Plaintiffs -- I'm sorry.

11:29:31  15          THE COURT:  Hold on.

11:29:32  16          MS. PERALES:  I'm sorry, Your Honor.

11:29:34  17          THE COURT:  The stipulation of voluntary

11:29:37  18     dismissal, which Texas signed, which the United States

11:29:39  19     signed, in which you signed, was based on rescinding

11:29:45  20     the -- the DACA program.  I mean, I'm holding it right

11:29:50  21     here.  And it's all about that case being dismissed

11:29:57  22     based on that fact.  And, now, that's not happening.  So

11:30:04  23     don't I have a breach of my settlement agreement or a

11:30:07  24     breach of -- of -- or lack of consideration given for

11:30:10  25     the dismissal of that case?

11:30:12    1          MS. PERALES:  No, Your Honor, because Texas

11:30:14    2    and the other Plaintiffs in the DAPA case very clearly

11:30:19    3    represented to the Court that they were not challenging

11:30:22    4    the legality of 2012 DACA.

11:30:26    5          THE COURT:  They joined the -- as a matter

11:30:28    6    of fact, that's what the Justice Department lied to me

11:30:30    7    about, 108,000 DACA renewals.

11:30:37    8          MS. PERALES:  Plaintiffs --

11:30:38    9          THE COURT:  I mean, we had hearing, after

11:30:39   10    hearing, after hearing.  In fact, you were --

11:30:41   11    participated in a lot of those.

11:30:43   12          MS. PERALES:  Yes, Your Honor.  And the --

11:30:46   13    the initiative that was challenged in what we call the

11:30:50   14    DAPA case was the 2014 expansion of DACA.  And the

11:30:57   15    Plaintiffs in that case made clear a number of times

11:31:00   16    before this Court and also in their legal papers that

11:31:03   17    they were not challenging 2012 DACA.  And they made a

11:31:07   18    very strong distinction between that.

11:31:09   19          And then they talked about possibly amending

11:31:11   20    their complaint to challenge 2012 DACA.  And,

11:31:15   21    ultimately, in the course of the case, the Plaintiffs

11:31:18   22    did not amend their complaint to challenge.

11:31:21   23          THE COURT:  But wasn't it -- but -- but

11:31:21   24    because they were given assurances that DACA was going

11:31:25   25    away.  I mean, I'm -- on September 5th, 2017, the

| | | |
|---|---|---|
| 11:31:32 | 1 | Department released a memorandum entitled Rescission of |
| 11:31:35 | 2 | the June 15th, 2012 Memo.  "Given this" -- and I'm |
| 11:31:39 | 3 | skipping a part here -- "given this |
| 11:31:42 | 4 | memorandum rescinding the DAPA program and phasing out |
| 11:31:45 | 5 | DACA and expanded DACA, Plaintiffs have filed this |
| 11:31:48 | 6 | dismissal."  And all the parties agreed to that based on |
| 11:31:50 | 7 | that representation.  Don't I have a breach? |
| 11:31:53 | 8 |                 MS. PERALES:  No, Your Honor, you do not. |
| 11:31:55 | 9 | And in part because after the lawsuits were filed |
| 11:32:01 | 10 | challenging the rescission memo, Texas and the other |
| 11:32:06 | 11 | Plaintiffs still went ahead and dismissed their case. |
| 11:32:09 | 12 | So the California case was filed before the DAPA case |
| 11:32:13 | 13 | was dismissed in this court. |
| 11:32:14 | 14 |                 And then Texas and the other Plaintiffs did |
| 11:32:17 | 15 | not file a challenge to DACA.  They waited more than |
| 11:32:21 | 16 | eight months and more than five months after Judge Alsup |
| 11:32:25 | 17 | issued his preliminary injunction. |
| 11:32:28 | 18 |                 There is -- I mean, at this point, |
| 11:32:32 | 19 | Your Honor, it is the California case that is sitting in |
| 11:32:35 | 20 | the position of the first filed case. |
| 11:32:38 | 21 |                 THE COURT:  Well, why did the case in |
| 11:32:40 | 22 | Washington and the case in Maryland go forward? |
| 11:32:43 | 23 |                 MS. PERALES:  Those cases were filed and |
| 11:32:46 | 24 | have gone forward without a motion from the Department |
| 11:32:50 | 25 | of Justice to stay or dismiss or transfer, which the |

11:32:54 1    Department of Justice could have done.

11:32:55 2              THE COURT:  Okay.  Well, I don't have one of

11:32:57 3    those here.

11:32:57 4              MS. PERALES:  Well, Your Honor, we filed one

11:32:59 5    now.

11:33:02 6              THE COURT:  Okay.

11:33:03 7              MS. PERALES:  The other -- the other thing

11:33:05 8    besides substantial overlap is the question of the

11:33:08 9    jurisdiction of the Northern District of California.

11:33:11 10   There is now an injunction, it's pending before the

11:33:13 11   Ninth Circuit.  So putting aside the question of

11:33:16 12   substantial overlap, there is also the question of the

11:33:19 13   existing injunction and the concerns that if this Court

11:33:23 14   goes forward on a request for an injunction that is the

11:33:27 15   complete opposite of the injunction that we have right

11:33:30 16   now, it will cause confusion and disrupt the integrity

11:33:36 17   of the proceedings in the Northern District of

11:33:38 18   California.

11:33:38 19             THE COURT:  Well, if you -- if you will

11:33:40 20   read, and there's probably 10 law review articles in the

11:33:46 21   last year and a half over national injunctions, one of

11:33:49 22   the criticisms they have about national injunctions is

11:33:52 23   that the authors of those articles want conflicting

11:33:58 24   rulings so that the Supreme Court will take up the

11:34:00 25   decision and decide it.

| | | |
|---|---|---|
| 11:34:04 | 1 | Now, that's assuming what I would rule would |
| 11:34:06 | 2 | conflict, which it may or may not. |
| 11:34:08 | 3 | MS. PERALES:  It may or may not, Your Honor, |
| 11:34:10 | 4 | but it does -- hearing this request for what is very |
| 11:34:15 | 5 | clearly the opposite type of injunction from what we |
| 11:34:18 | 6 | have is very disruptive to the jurisdiction of the |
| 11:34:21 | 7 | Northern District of California. |
| 11:34:22 | 8 | And with respect to national injunctions, |
| 11:34:25 | 9 | Your Honor, Your Honor is one of the few judges in the |
| 11:34:27 | 10 | country who's been in that position and had to make |
| 11:34:29 | 11 | those considerations and chose to issue a national |
| 11:34:32 | 12 | injunction.  So it does happen and it can be |
| 11:34:36 | 13 | appropriate. |
| 11:34:37 | 14 | What we have at the moment is a national |
| 11:34:40 | 15 | injunction from the Northern District of California that |
| 11:34:44 | 16 | is pending on appeal in which the Supreme Court has |
| 11:34:48 | 17 | decided not to intervene in. |
| 11:34:51 | 18 | Texas is -- is well aware of all of those |
| 11:34:54 | 19 | things because it filed an amicus brief in the U.S. |
| 11:34:57 | 20 | Supreme Court arguing the very same things on the merits |
| 11:35:00 | 21 | of the legality of DACA that it is arguing here.  That |
| 11:35:05 | 22 | only demonstrates that these cases are very -- very |
| 11:35:08 | 23 | intertwined in terms of the merits questions. |
| 11:35:11 | 24 | And that, in this situation, the appropriate |
| 11:35:14 | 25 | first filed court is the Northern District of |

```
11:35:17   1   California.
11:35:17   2              THE COURT:  All right.  I'm -- I'm going to
11:35:19   3   deny the motion to dismiss on that basis but I'm denying
11:35:23   4   it without prejudice to allow you to bring it back up if
11:35:26   5   it later proves to be -- to be a problem because I think
11:35:34   6   mine was the first court that had this issue.  The
11:35:38   7   case -- the 2014 case was dismissed based on this.  The
11:35:43   8   parties all agreed to it and signed it based on this.
11:35:48   9   And mine involved an injunction, a nationwide injunction
11:35:54  10   involving DACA.  So I'm -- I'm denying it but I'm giving
11:35:58  11   you leave right now to bring it up again at a later time
11:36:03  12   should it prove important.
11:36:05  13              MS. PERALES:  Thank you, Your Honor.
11:36:08  14              THE COURT:  All right.  Let's talk schedule.
11:36:14  15   Texas obviously wants this fast-paced schedule and I --
11:36:22  16   I'm assuming it's driven by the Washington, D.C. order.
11:36:33  17              The Intervenors want to do some discovery.
11:36:41  18   And I guess, Ms. Perales, talk to me about discovery and
11:36:52  19   why you need it to decide a legal issue.
11:36:58  20              MS. PERALES:  Thank you, Your Honor.  There
11:36:59  21   are a number of fact issues that are very important to
11:37:02  22   resolve before deciding whether or not to issue the
11:37:05  23   preliminary injunction and the proposed period of
11:37:09  24   limited discovery provides for that.
11:37:11  25              Some of the facts that the Court needs to
```

11:37:15  1    resolve before issuing the preliminary injunction

11:37:18  2    include standing, also the injury to Plaintiffs, which

11:37:24  3    is part of standing and is also part of other factors

11:37:27  4    under the preliminary injunction, and then finally the

11:37:30  5    equitable factors under the preliminary injunction.

11:37:33  6             With respect to injury, the Plaintiffs have

11:37:37  7    submitted several affidavits which purport to be expert

11:37:43  8    opinions.  The Defendant Intervenors need the

11:37:48  9    opportunity to explore those opinions as the Court was

11:37:51  10   just a few minutes ago with the State of New Jersey

11:37:54  11   exploring those opinions and their bases and their

11:37:57  12   conclusions in order to be able to address this question

11:38:00  13   of injury facing the Plaintiff states and specifically

11:38:04  14   Texas.

11:38:05  15            Also, another key issue that is part of

11:38:09  16   considering whether or not to issue a preliminary

11:38:12  17   injunction is the current implementation of DACA, which

11:38:17  18   has changed under the current administration.  We do

11:38:22  19   know, based on recent reports about DACA applications

11:38:28  20   and acceptances, that the rate of DACA grants has gone

11:38:33  21   down as a percentage of applications that have been

11:38:37  22   accepted.

11:38:37  23            THE COURT:  Wait.  Wait.  Wait.  And -- and

11:38:39  24   I'm not arguing or fussing with you here, are you saying

11:38:41  25   the rate of acceptances have gone down or the rate of

| | | |
|---|---|---|
| 11:38:45 | 1 | applications has gone down?  Or both? |
| 11:38:46 | 2 | MS. PERALES:  The rate of acceptances has |
| 11:38:48 | 3 | gone down -- |
| 11:38:49 | 4 | THE COURT:  All right. |
| 11:38:50 | 5 | MS. PERALES:  -- Your Honor. |
| 11:38:50 | 6 | THE COURT:  Now, could that be due to the |
| 11:38:51 | 7 | fact that they're actually doing interviews and looking |
| 11:38:55 | 8 | at backgrounds and making sure that everybody's |
| 11:38:59 | 9 | eligible? |
| 11:38:59 | 10 | MS. PERALES:  It could very well be, |
| 11:39:01 | 11 | Your Honor, that there is an exercise of discretion that |
| 11:39:03 | 12 | is occurring since January of 2017 that was not |
| 11:39:06 | 13 | occurring previously.  And this data is now newly |
| 11:39:10 | 14 | available and we believe it's important to bring out the |
| 11:39:12 | 15 | facts around the current implementation of DACA because |
| 11:39:16 | 16 | it goes to some of the issues that lie at the heart of |
| 11:39:21 | 17 | the preliminary injunction. |
| 11:39:21 | 18 | And so that is why the Defendant Intervenors |
| 11:39:23 | 19 | have proposed limited discovery, no more than 10 |
| 11:39:26 | 20 | depositions, five of the current declarants.  And we |
| 11:39:31 | 21 | would -- we don't want to hide anything here, |
| 11:39:33 | 22 | Your Honor, we would probably want to take a couple of |
| 11:39:36 | 23 | depositions of federal representatives in order to |
| 11:39:41 | 24 | explore the facts around the implementation of DACA. |
| 11:39:44 | 25 | Can -- if I could, Your Honor, address the |

11:39:46  1    question of urgency?  Texas and the other Plaintiffs

11:39:50  2    have suggested a very fast schedule because of this date

11:39:55  3    that they've identified of July 23rd.  But July 23rd is

11:39:59  4    not a date on which Texas and the other Plaintiff states

11:40:02  5    will be injured because the Department of Justice is

11:40:06  6    considering, as Judge Bates has allowed them to do,

11:40:10  7    issuing a new memo rescinding DACA.

11:40:14  8              And the Department of Justice in the

11:40:15  9    Ninth Circuit argument in the Northern District of

11:40:19  10   California case stated, on the same day that we had our

11:40:22  11   original conference with the Court, that they were

11:40:24  12   considering responding to the stay of vacatur by issuing

11:40:29  13   a new memo regarding the recision of DACA.

11:40:33  14             Second, DOJ has represented that it is

11:40:36  15   considering other options, which is apparent to all,

11:40:40  16   include appealing.

11:40:41  17             THE COURT:  What would happen if DOJ just

11:40:44  18   came out and said, or DHS, whomever, I guess it's kind

11:40:48  19   of both because the DHS is the one that does it but they

11:40:52  20   relied on the Attorney General's letter, that we just

11:40:59  21   think DACA's bad policy, it encourages illegal

11:41:03  22   immigration, you know, whatever reason they give,

11:41:07  23   wouldn't that have worked?

11:41:08  24             MS. PERALES:  It would certainly restart the

11:41:10  25   clock in front of Judge Bates, in our perspective.

11:41:12   1    Obviously, we're not involved in -- in those cases,
11:41:14   2    we're not involved in the D.C. case.
11:41:16   3              But what Judge Bates has said is he's going
11:41:19   4    to postpone his injunction because he is waiting to see
11:41:22   5    what DOJ might issue.
11:41:24   6              THE COURT:  All right.  Let me -- let me
11:41:26   7    stop you right there.
11:41:26   8              Mr. Disher -- and I'll let the United States
11:41:30   9    weigh in, in a minute -- but, you know, what was
11:41:36  10    emergent, and I'll use that word advisory, but what was
11:41:44  11    emergent about DAPA when it was in front of this Court
11:41:47  12    was it was about to be implemented and it was going to
11:41:51  13    change the status quo.
11:41:52  14              What is emergent about this situation?
11:41:55  15              MR. DISHER:  Yes, Your Honor.
11:41:56  16              THE COURT:  Because right now DACA is the
11:41:58  17    status quo.
11:41:59  18              MR. DISHER:  Yes, Your Honor.  Thank you.
11:42:01  19    So, first of all, a couple points on that.  First of
11:42:05  20    all, the two injunctions, one from California and one
11:42:08  21    from New York, mandate -- they issued mandatory
11:42:13  22    injunctions requiring DHS to continue to accept DACA
11:42:17  23    renewal applications.  So that is one factor that played
11:42:21  24    into the emergency.
11:42:22  25              And then the second factor, and more

```
11:42:24   1   significantly, is that the Court in the District of
11:42:28   2   Columbia issued a complete vacatur of the DACA
11:42:32   3   rescission.
11:42:32   4          It, of course, stayed the effect of that
11:42:35   5   vacatur to July 23rd, 2018.  But what we know is, as we
11:42:41   6   sit here today, the facts on the ground are such that in
11:42:44   7   54 days DHS is going to continue to accept new DACA
11:42:49   8   applications and going to accept new applications for
11:42:53   9   advanced parole.
11:42:55  10          That means, in 54 days, hundreds of
11:42:58  11   thousands of new people will now be eligible to receive
11:43:01  12   DACA status who did not in the past and, in 54 days,
11:43:07  13   those who have already received DACA status will be
11:43:11  14   eligible to apply for advanced parole.
11:43:13  15          Advanced parole, as we now know, has in fact
11:43:17  16   created a pathway to citizenship for some DACA
11:43:20  17   recipients who otherwise would not have that option.  So
11:43:24  18   we know, as we sit here today, we don't know what DHS is
11:43:27  19   going to do, we don't know how the District Court in
11:43:30  20   D.C. is going to react to what -- whatever DHS does, but
11:43:34  21   what we know is that, as we sit here today, the facts on
11:43:37  22   the ground are such that, in 54 days, DHS will accept
11:43:41  23   new DACA applications and new applications for advanced
11:43:44  24   parole.  That is why we have asked for this preliminary
11:43:47  25   injunction to be finalized by July 23rd.
```

```
11:43:51    1            And acknowledging that all parties may want
11:43:54    2   to seek potential appellate avenues depending on how
11:43:58    3   this Court rules, we've respectfully requested a ruling
11:44:01    4   from this Court by the end of June to allow the 23 days
11:44:04    5   in July for all parties to have the potential or
11:44:08    6   possibility to seek expedited appellate stay
11:44:11    7   proceedings.
11:44:12    8            THE COURT:  All right.
11:44:17    9            MS. PERALES:  Your Honor, may I add, and
11:44:18   10   this is something that is in our -- in our filing as
11:44:21   11   well?  Besides the fact that it is more likely than not
11:44:24   12   that the Department of Justice will reissue a DACA memo
11:44:29   13   or seek a stay of the vacatur or take an appeal, all of
11:44:35   14   those things are more likely than anything going into
11:44:38   15   effect in 53 days with respect to new applications, it
11:44:41   16   is also true that when an application is sent, the
11:44:44   17   current processing times are upwards of five months.
11:44:47   18            And so July 23rd is not a magic date and, in
11:44:51   19   fact, even if, as the State of Texas predicts, somehow
11:44:56   20   the Department of Homeland Security refuses to do
11:44:59   21   anything in the Washington, D.C. case, it would still be
11:45:03   22   at least another five months that the Court has
11:45:06   23   available to it to make a decision on the preliminary
11:45:09   24   injunction.
11:45:10   25            THE COURT:  All right.  Here's what I'm
```

11:45:11   1   going to do.  Well, first of all, I want to hear from

11:45:14   2   the Government.

11:45:19   3              MR. SHUMATE:  Thank you, Your Honor.

11:45:22   4              In April, the D.C. District Court issued an

11:45:25   5   order vacating the rescission of DACA that the DHS had

11:45:29   6   issued in September of 2017 but stayed that order for 90

11:45:32   7   days to give DHS an opportunity to consider whether to

11:45:37   8   provide additional explanation about DACA's legality.

11:45:38   9              As my colleagues have represented that DHS

11:45:41  10   is still actively considering its options in response to

11:45:44  11   that order but I'm not prepared to give any assurances

11:45:47  12   or make any representations about how the department

11:45:49  13   will answer that order from the D.C. court.

11:45:51  14              But there's another point I'd like to make

11:45:55  15   on -- on the scheduling issue, Your Honor, which is that

11:45:57  16   the Ninth Circuit case involving DACA's recision was

11:46:00  17   argued on May 15th.  That case previously been at the

11:46:03  18   Supreme Court and the Supreme Court instructed the

11:46:06  19   Ninth Circuit to move expeditiously.

11:46:07  20              We expect the Ninth Circuit to issue a

11:46:09  21   ruling in that case in June and that case will quickly

11:46:11  22   be at the Supreme Court likely by the end of the summer.

11:46:15  23   I think all the parties in the Supreme Court would

11:46:17  24   appreciate knowing this Court's tentative views about

11:46:19  25   the outcome of this case since the legality of DACA

11:46:22   1   is -- has been at issue in the Ninth Circuit case as

11:46:25   2   well.

11:46:25   3              So that is another factor the Court should

11:46:28   4   consider in setting -- setting a schedule.

11:46:29   5              THE COURT:  Okay.

11:46:31   6              MR. DISHER:  Your Honor -- go ahead.

11:46:32   7              MR. SHUMATE:  And -- and I would like to

11:46:33   8   address the discovery issues at some point, Your Honor,

11:46:35   9   but I'll --

11:46:36   10             THE COURT:  Go ahead.  Go -- do it now.

11:46:38   11             MR. SHUMATE:  Sure.  Thank you, Your Honor.

11:46:39   12   We -- we take no view on discovery of the Plaintiffs but

11:46:42   13   as to discovery of the federal Defendants, we strongly

11:46:45   14   oppose that for a couple of reasons, Your Honor.

11:46:47   15             First, we don't think it's necessary because

11:46:49   16   the Fifth Circuit had ruled that DAPA and expanded DACA

11:46:52   17   are substantively unlawful.  That is a purely legal

11:46:56   18   question and in the Attorney General's view, DACA

11:46:58   19   suffers from the same legal defects as DAPA and expanded

11:47:02   20   DACA.  There is no discovery that is necessary to answer

11:47:05   21   that purely legal question.

11:47:06   22             Second, the Court made extensive factual

11:47:10   23   findings in the previous case about how DACA had been

11:47:12   24   implemented and that record can be used as a record for

11:47:15   25   appellate review in this case and for the Court to

11:47:17   1   decide the legality of DACA.

11:47:19   2           And, third, I would just point out there's a

11:47:21   3   footnote in the recision memo that DHS issued in

11:47:25   4   September of 2017 that says "significantly, while the

11:47:30   5   DACA denial notice indicates that the decision to deny

11:47:33   6   is made in the unreviewable discretion of USCIS, USCIS

11:47:37   7   has not been able to identify specific denial cases

11:47:40   8   where an applicant appeared to satisfy the programmatic

11:47:43   9   categorical criteria as outlined in the June 15, 2012

11:47:47   10  memorandum, but still had his or her application denied

11:47:50   11  based solely upon discretion".

11:47:52   12          So as of September 5th of 2017, DHS had made

11:47:57   13  that finding that they couldn't find any DACA denials

11:48:00   14  that were denied based on discretion.

11:48:06   15          So for those reasons, Your Honor, we

11:48:07   16  strongly oppose any discovery of the federal Defendants

11:48:10   17  in this case and don't think it's in any way necessary

11:48:12   18  to adjudicate the PI motion or on the merits.

11:48:16   19          Thank you, Your Honor.

11:48:16   20          MR. DISHER:  Your Honor, may I address the

11:48:18   21  discovery briefly?

11:48:20   22          THE COURT:  Go ahead.

11:48:21   23          MR. DISHER:  First thing to point out is

11:48:28   24  that on May 8th before the DACA Intervenors were in this

11:48:33   25  case, in fact when they were asking the Court to allow

11:48:36  1   them into the case, they said "we do not intend to

11:48:40  2   request any modification to the current briefing

11:48:43  3   schedule for the motion for a preliminary injunction.

11:48:46  4   An intervention, therefore, proposes no potential to

11:48:50  5   prejudice the rights of any current party".

11:48:52  6        The current briefing schedule at that point

11:48:55  7   would have had their response due on May 23rd.  Their

11:49:00  8   very next act after they were granted permission to

11:49:03  9   enter this case is to ask for a four month delay on

11:49:06  10  their response date for our motion for preliminary

11:49:09  11  injunction.

11:49:10  12       Nothing changed in those 17 days be -- when

11:49:14  13  it -- when the Intervenors made that representation to

11:49:17  14  the Court and when they asked for their four month delay

11:49:19  15  other than the fact that they were allowed into this

11:49:21  16  case.

11:49:22  17       Now, without filing a Rule 26(f) motion,

11:49:25  18  they want expedited discovery in this case to dispute

11:49:29  19  factual findings that this Court has already made and

11:49:32  20  that have been affirmed by the Fifth Circuit.  They

11:49:34  21  never say which facts they actually dispute.  And, of

11:49:37  22  course, they are allowed to file competing declarations

11:49:41  23  in their response to our motion for preliminary

11:49:44  24  injunction if they in fact do dispute some of these

11:49:47  25  facts.

| | | |
|---|---|---|
| 11:49:48 | 1 | And as the Department of Justice noted, |
| 11:49:52 | 2 | those factual findings have indeed only become stronger |
| 11:49:55 | 3 | since the Fifth Circuit affirmed the preliminary |
| 11:49:59 | 4 | injunction in this case.  Again, footnote one of the |
| 11:50:01 | 5 | DACA recision memo itself acknowledges that USCIS cannot |
| 11:50:06 | 6 | find a single case of discretionary denial under the |
| 11:50:10 | 7 | DACA program. |
| 11:50:11 | 8 | We now know that advanced parole is in fact |
| 11:50:14 | 9 | a pathway to citizenship for some DACA recipients that |
| 11:50:18 | 10 | did not have a pathway but for DACA. |
| 11:50:20 | 11 | We know that the Fifth Circuit has said |
| 11:50:23 | 12 | standing is not an accounting exercise, you simply look |
| 11:50:26 | 13 | at costs and not attendant benefits, whatever those may |
| 11:50:31 | 14 | be. |
| 11:50:31 | 15 | What the DACA Intervenors are seeking to do |
| 11:50:34 | 16 | is turn this into a full-fledged litigation culminating |
| 11:50:38 | 17 | in a final -- final judgment after a trial on the |
| 11:50:42 | 18 | merits.  There certainly will be time for that but if |
| 11:50:45 | 19 | discovery is allowed on the states, the states, of |
| 11:50:47 | 20 | course, will need discovery on the DACA Intervenors. |
| 11:50:51 | 21 | And all of that will take time and that will happen in |
| 11:50:54 | 22 | due time and we are happy to do that on an expedited |
| 11:50:57 | 23 | basis, but we do not believe that that can occur before |
| 11:51:00 | 24 | the July 23rd deadline in which DACA comes back into |
| 11:51:03 | 25 | full force and effect. |

| | | |
|---|---|---|
| 11:51:05 | 1 | So we don't believe at this point, like |
| 11:51:07 | 2 | Your Honor said these are largely legal issues and the |
| 11:51:11 | 3 | DACA Intervenors can, of course, file a response and |
| 11:51:15 | 4 | attach competing declarations all they want, but, at |
| 11:51:19 | 5 | this point, we do not believe that discovery is needed. |
| 11:51:24 | 6 | MS. PERALES:  Three short points in |
| 11:51:26 | 7 | response, Your Honor? |
| 11:51:27 | 8 | THE COURT:  Go ahead. |
| 11:51:28 | 9 | MS. PERALES:  Very short.  First of all, |
| 11:51:30 | 10 | with respect to the prior proceeding before this Court, |
| 11:51:33 | 11 | Defendant Intervenors were not participants in -- in the |
| 11:51:37 | 12 | case and didn't have an opportunity to request discovery |
| 11:51:41 | 13 | or explore the underpinnings of some of the factual |
| 11:51:45 | 14 | assertions that were made by Texas. |
| 11:51:47 | 15 | Second, in -- in the past proceeding, Texas |
| 11:51:52 | 16 | largely based its allegations of harm on issues related |
| 11:51:56 | 17 | to drivers' licenses.  The Court will note that in the |
| 11:51:59 | 18 | preliminary injunction motion, there is no argument |
| 11:52:01 | 19 | regarding injury or harm related to drivers' licenses |
| 11:52:06 | 20 | but, instead, health care, law enforcement and |
| 11:52:11 | 21 | education. |
| 11:52:11 | 22 | And it is important for this Court to |
| 11:52:14 | 23 | explore the facts related to both injury and the current |
| 11:52:19 | 24 | implementation of DACA, not the past implementation but |
| 11:52:22 | 25 | the current implementation of DACA, for its ruling on |

11:52:26  1    the preliminary injunction motion.

11:52:28  2            Defendant Intervenors believe it is too

11:52:31  3    early in this case for accusations of malfeasance and

11:52:34  4    only want to point out to the Court that in our May 15

11:52:37  5    hearing, Defendant Intervenors merely asked a question

11:52:40  6    of the Court which was whether or not local

11:52:45  7    rules/deadlines applied with respect to this preliminary

11:52:48  8    injunction motion.  And the Court on its own stated that

11:52:51  9    those local rules did not apply and that the Court

11:52:54  10   planned to set a -- a schedule for the consideration of

11:52:58  11   the preliminary injunction motion.

11:53:00  12           THE COURT:  We don't have local rules that

11:53:01  13   control preliminary injunctions.

11:53:03  14           MS. PERALES:  Thank you, Your Honor.  And

11:53:05  15   we're simply following the Court's guidance as it was

11:53:08  16   given on May 15th.  Thank you.

11:53:10  17           MR. DISHER:  May I make one --

11:53:11  18           THE COURT:  No.  No.  No.  No.  Here's --

11:53:12  19   here's what I'm going to do.  I want any response by

11:53:21  20   anybody to the request for injunction to be filed by

11:53:27  21   June 8th.

11:53:31  22           And Ms. Apter, if New Jersey joins us after

11:53:34  23   that, I'll give you a different deadline.

11:53:39  24           MS. WAINER APTER:  Okay.  So does that mean

11:53:42  25   New Jersey should not file any amicus papers on June

11:53:46  1    8th?

11:53:46  2            THE COURT:  You're welcome to weigh in but

11:53:49  3    I'm just -- I'm just -- I'm not barring you because I

11:53:51  4    may not have ruled by June 8th on whether you're in or

11:53:55  5    out.

11:53:55  6            I'm allowing discovery up to June 29th.  And

11:54:08  7    if that proves to be a problem, then the parties -- you

11:54:11  8    can come to me and let me know.

11:54:14  9            Now, Mr. Disher, you're the one that's in a

11:54:18  10   big hurry in this case so I expect you to cooperate with

11:54:22  11   the Intervenors in getting that discovery done to the

11:54:25  12   extent it's your guys.

11:54:27  13           MR. DISHER:  Of course, Your Honor.

11:54:29  14           MS. PERALES:  Your Honor, if I could ask for

11:54:31  15   clarification?  The Court would like responses to the

11:54:33  16   preliminary injunction motion on July 8 or June 8?

11:54:37  17           THE COURT:  June 8th.

11:54:38  18           MS. PERALES:  June 8th.

11:54:39  19           THE COURT:  Now, I -- I'm assuming what I'm

11:54:41  20   going to get from you is we're against it.  And then,

11:54:45  21   later on, you're going to brief why you're against it.

11:54:50  22           MR. SHUMATE:  Your Honor, if I may?  The

11:54:51  23   federal Defendants would ask the Court to enter an order

11:54:54  24   pre -- precluding any discovery of the federal

11:54:58  25   Defendants and make clear that any discovery would --

11:55:00   1   should only be directed to the Plaintiffs.

11:55:01   2           THE COURT:  Well, I -- and I'll -- if --

11:55:03   3   if -- if they have a reason to do discovery, they can

11:55:05   4   apply to me for it.

11:55:07   5           MR. SHUMATE:  Okay.  Thank you, Your Honor.

11:55:08   6           MR. DISHER:  And, Your Honor, does that same

11:55:09   7   application apply to the Plaintiff states as well?

11:55:13   8           THE COURT:  No.

11:55:14   9           MR. DISHER:  Okay.

11:55:16   10          THE COURT:  I want any preliminary briefing

11:55:26   11  as in here's why you shouldn't do it, shouldn't do it by

11:55:33   12  July 7th and any response to those by July 13th.  And

11:55:39   13  I'm setting a hearing at 11:00 on July 17th.

11:55:45   14          Now, I don't want to give the impression

11:55:51   15  either way that I'm going to rule by July 23rd.  Now, it

11:56:00   16  was clear in the last case among all the parties and

11:56:04   17  understood that the Court was -- had asked and everybody

11:56:08   18  agreed that I should rule before the roll out -- did I

11:56:15   19  say June 17th?  I -- I meant July 17th, I'm sorry, at

11:56:18   20  11:00.

11:56:21   21          MR. SHUMATE:  I'm -- I'm sorry, Your Honor,

11:56:22   22  I'm -- I'm confused about the schedule.  What -- there's

11:56:25   23  a deadline June 8th to respond to the PI motions.  What

11:56:28   24  is the July 7th deadline?

11:56:30   25          THE COURT:  Well, I -- I'm assuming that,

| | | |
|---|---|---|
| 11:56:32 | 1 | after discovery's taken, some people are going to file |
| 11:56:36 | 2 | briefs saying here's why our position's right or here's |
| 11:56:40 | 3 | why their position's wrong and then I'm letting |
| 11:56:44 | 4 | everybody respond to it by the 13th of July.  And then |
| 11:56:51 | 5 | I'm going to hold a hearing on July 17th at 11:00. |
| 11:56:56 | 6 | MR. ROBINS:  Your Honor, I think there's |
| 11:56:58 | 7 | just a confusion among all the parties.  The -- the |
| 11:57:00 | 8 | briefing beginning on July 7th, is that with regard to |
| 11:57:05 | 9 | the parties' views on the preliminary injunction -- |
| 11:57:05 | 10 | THE COURT:  Correct. |
| 11:57:07 | 11 | MR. ROBINS:  -- following discovery? |
| 11:57:08 | 12 | THE COURT:  No, not -- well, not involving |
| 11:57:11 | 13 | discovery but on -- |
| 11:57:11 | 14 | MR. ROBINS:  No, following, following |
| 11:57:12 | 15 | discovery. |
| 11:57:13 | 16 | THE COURT:  -- on the whole shebang.  Should |
| 11:57:15 | 17 | there be an injunction, should there not be an |
| 11:57:18 | 18 | injunction. |
| 11:57:18 | 19 | MR. ROBINS:  Is the Court aware I believe |
| 11:57:20 | 20 | July 7th is a Saturday? |
| 11:57:24 | 21 | THE COURT:  Well, I mean, you could -- it's |
| 11:57:26 | 22 | the deadline for filing, though, I mean, we have |
| 11:57:28 | 23 | electronic filing. |
| 11:57:30 | 24 | MR. ROBINS:  Okay. |
| 11:57:32 | 25 | MS. PERALES:  Your Honor, may I ask whether |

| | |
|---|---|
| 11:57:34 | 1 |
| 11:57:39 | 2 |
| 11:57:41 | 3 |
| 11:57:43 | 4 |
| 11:57:45 | 5 |
| 11:57:49 | 6 |
| 11:57:50 | 7 |
| 11:57:55 | 8 |
| 11:58:00 | 9 |
| 11:58:05 | 10 |
| 11:58:09 | 11 |
| 11:58:12 | 12 |
| 11:58:16 | 13 |
| 11:58:19 | 14 |
| 11:58:24 | 15 |
| 11:58:25 | 16 |
| 11:58:26 | 17 |
| 11:58:28 | 18 |
| 11:58:33 | 19 |
| 11:58:38 | 20 |
| 11:58:42 | 21 |
| 11:58:45 | 22 |
| 11:58:49 | 23 |
| 11:58:54 | 24 |
| 11:58:55 | 25 |

1  the hearing on July 17 at 11:00 a.m. is contemplated as

2  an evidentiary hearing or oral argument only?

3              THE COURT:  No.  No.  I'm not contemplating

4  it as an evidentiary.  I figure you're going to give me

5  deposition excerpts, affidavits, whatever, when you file

6  your responses on July 7th.

7              MS. PERALES:  Thank you, Your Honor.

8              MR. DISHER:  Your Honor, we would just ask,

9  and I'm not sure the best way to go about this, but, of

10  course, we have now filed our declarations from our

11  witnesses, so, presumably, those would be some of the

12  people that the Intervenors seek discovery on.  But we

13  would similarly like the opportunity to seek discovery

14  on the DACA Intervenors who have filed declarations in

15  support of their motion to --

16              THE COURT:  And you've got the same right.

17              MR. DISHER:  Okay.  Thank you, Your Honor.

18              And then also my concern is -- is we have

19  two expert declarations and I imagine that both DOJ and

20  the Plaintiff -- or the DACA Intervenors, as well as

21  perhaps New Jersey, might include expert declarations in

22  their PI briefing as well and so I would just ask that

23  we have a similar opportunity to depose their experts in

24  such a way that they do ours.

25              THE COURT:  Well, if someone has an expert,

11:58:57  1    I'll -- an -- an outside expert, I'm -- I'm granting

11:59:00  2    that.  And even against the DOJ.  If you guys get an

11:59:03  3    outside expert, then I'm going to let either side,

11:59:06  4    whoever wants to depose him, depose him.

11:59:08  5              MR. DISHER:  Thank you, Your Honor.  And --

11:59:09  6    and along those lines, given that discovery ends before

11:59:13  7    the briefing is due, we would request a deadline for all

11:59:18  8    parties to disclose potential experts that they might

11:59:21  9    include declarations for so we have a chance to depose

11:59:25  10   them before the -- the briefing is due and -- and before

11:59:28  11   the discovery period ends.

11:59:31  12             THE COURT:  Okay.  I'm -- I'm giving June

11:59:32  13   15th as that deadline.

11:59:34  14             MR. DISHER:  Thank you, Your Honor.

11:59:40  15             THE COURT:  Now, this is going to require

11:59:41  16   some coordination from everybody, so I'm -- I'm asking

11:59:46  17   y'all to work together and see what you can -- you know,

11:59:49  18   and you may be taking three depositions a day or

11:59:54  19   something some place.

11:59:55  20             Go ahead.

11:59:56  21             MS. PERALES:  One more question.  With

11:59:57  22   respect to the response brief that is due on June 8, may

12:00:02  23   that be something in the form of --

12:00:04  24             THE COURT:  That's not -- that's not really

12:00:05  25   a brief.  I'm -- that's more of a response to your

12:00:09  1   position on the actual -- you know, it's more like than

12:00:13  2   answer to their motion for preliminary injunction.

12:00:17  3              MS. PERALES:  So could --

12:00:18  4              THE COURT:  They have -- they have filed a

12:00:19  5   lawsuit and they filed a separate -- they filed a

12:00:22  6   complaint, they filed a separate motion for a

12:00:27  7   preliminary injunction.  So what I'm thinking is that --

12:00:34  8   now, and you guys had filed -- I can't remember if you

12:00:36  9   filed an answer or not.

12:00:37  10             MS. PERALES:  We did, Your Honor.

12:00:38  11             THE COURT:  But have you filed a response to

12:00:39  12  their motion for preliminary injunction?

12:00:41  13             MS. PERALES:  Not yet, Your Honor.

12:00:42  14             THE COURT:  That's what I'm talking about.

12:00:44  15             MS. PERALES:  Okay.

12:00:44  16             THE COURT:  But -- but I'm con -- what I'm

12:00:45  17  thinking is that's going to be more like an answer type

12:00:49  18  document saying don't grant a summary judgment, we don't

12:00:53  19  like it.  And then the actual briefing will be the brief

12:00:57  20  you file on July 7th.

12:00:59  21             MS. PERALES:  Thank you, Your Honor.  And --

12:01:01  22             THE COURT:  It's going to be more of a

12:01:02  23  statement of position.

12:01:03  24             MS. PERALES:  Yes, Your Honor.

12:01:04  25             THE COURT:  Like a -- like a federal court

12:01:06   1   answer.

12:01:06   2              MS. PERALES:  Thank you, Your Honor.  And

12:01:08   3   then with respect to -- we think we can hopefully take

12:01:12   4   less depositions if we're allowed to propound some

12:01:15   5   written discovery.  May we have written discovery on

12:01:19   6   a -- a 10 or a 15 day turn around?

12:01:22   7              THE COURT:  Well, let's make it reasonable

12:01:25   8   written discovery.  Let's don't have something that says

12:01:29   9   give me 10,000 documents because that's -- we

12:01:34   10  know that's going to be impossible to comply with.  But

12:01:34   11  if you have like some reasonably succinct

12:01:38   12  interrogatories or something like that, that you can get

12:01:41   13  an answer for --

12:01:44   14             MS. PERALES:  Thank you, Your Honor.

12:01:45   15             MR. DISHER:  And, Your Honor, one last point

12:01:47   16  of clarification?  On the June 15th deadline to disclose

12:01:50   17  experts, that will also include the bases for their

12:01:55   18  opinion and -- and a brief summary that's basically

12:01:57   19  either the declaration or a short report from the

12:01:59   20  expert?

12:01:59   21             THE COURT:  Right.

12:02:04   22             MR. ROBINS:  Your Honor, one last point for

12:02:07   23  federal Defendants, I believe.  With regard to the

12:02:10   24  filing you contemplate that you've ordered on June 8th,

12:02:13   25  the federal Defendants are prepared to respond to the

12:02:16  1   preliminary injunction request but to the extent that a

12:02:20  2   formal answer to the complaint is due --

12:02:22  3            THE COURT:  I'm not -- I wasn't counting

12:02:24  4   that.

12:02:24  5            MR. ROBINS:  Very well, Your Honor.  Should

12:02:26  6   we file by formal motion or request to extend that

12:02:29  7   response deadline out to after the conclusion of this

12:02:32  8   discovery and --

12:02:33  9            THE COURT:  When is it due?  I haven't

12:02:35  10  calculated it.

12:02:36  11           MR. ROBINS:  I believe it would be in -- in

12:02:37  12  the first few days of July, Your Honor.

12:02:39  13           THE COURT:  Okay.  Well, I -- why don't you

12:02:40  14  go ahead and file it whenever it's due.

12:02:44  15           MR. ROBINS:  Yes, Your Honor.

12:02:47  16           THE COURT:  All right.  Okay.  I want to --

12:02:54  17  I'm going to take New Jersey's intervention under

12:02:58  18  advisement.  I've -- I've denied Ms. Perales' motion to

12:03:02  19  dismiss but I've also denied that without prejudice to

12:03:06  20  re-assert it.

12:03:07  21           And but before y'all leave today, I want to

12:03:12  22  meet with all of y'all in chambers.  So I'm -- I'm

12:03:19  23  adjourning the hearing but I want to meet with y'all.

          24           (COURT IN RECESS.)

          25

1                      REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7

8                         /s/Sheila E. Perales_____
                          SHEILA E. PERALES, CSR RPR CRR
9                         Exp. Date:  Dec. 31, 2018

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25