**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF WEST VIRGINIA, | ) |
| | ) |
| GOVERNOR PHIL BRYANT, STATE OF MISSISSIPPI; AND | ) |
| | ) |
| GOVERNOR PAUL R. LEPAGE, STATE OF MAINE, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *vs.* | )   Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *And* | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendants-Intervenors.* | ) |
| | ) |

**PLAINTIFF STATES' POST-DISCOVERY RESPONSE BRIEF IN SUPPORT
OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents..............................................................................................i

Introduction ...................................................................................................1

Argument .......................................................................................................3

    I.    DACA Should Be Enjoined Because It Contravenes Federal Immigration Statutes, the APA, and the Take Care Clause.................3

        A.    DACA is contrary to federal immigration statutes. ....................4

        B.    DACA was unlawfully issued without APA notice and comment................................................................................... 18

        C.    DACA violates the Take Care Clause........................................ 28

    II.    Intervenors Have Offered No Persuasive Reason to Deviate from *Texas v. United States* and Uphold DACA. ................................. 31

        A.    Plaintiff States have standing, as Intervenors' expert has confirmed. .............................................................................. 32

            1.    No one disputes the causal link between DACA's continuation and Plaintiff States' provision of costly healthcare, education, and law-enforcement services to DACA recipients. ........................................................... 33

            2.    The amicus brief from the chambers of commerce confirms that DACA recipients have been hired over citizens and other lawfully present workers in violation of Congress's "careful employment-authorization scheme." ...................................................... 38

            3.    Intervenors do not dispute the facts underlying the Court's prior holding that the Executive's unilateral conferral of lawful presence and work authorization injures Plaintiff States' sovereign and quasi-sovereign interests. ........................................................... 41

            4.    Intervenors misunderstand the special solicitude owed to Plaintiff States.................................................... 43

            5.    There are no prudential standing obstacles to this Court's review. ................................................................ 44

        B.    DACA cannot be justified as an unreviewable act of prosecutorial discretion. ........................................................... 45

C.    Under *Texas v. United States* and the record before the Court, Plaintiff States are entitled to judgment as a matter of law. ........................................................................... 49

III.   The Remaining Preliminary Injunction Factors Favor Injunctive Relief. ................................................................. 50

A.    Plaintiff States' irreparable harm is largely undisputed and cannot be excused by the mere passage of time. ................. 50

B.    Intervenors have not alleged any interest that outweighs preserving Congress's duly enacted laws. .................................. 53

IV.   The Injunction Should Apply Nationwide and Would Not Contradict Injunctions Entered by Other Courts. ............................... 56

Conclusion ..................................................................................... 61

Certificate of Service ................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015) ................................................ 43

*Arizona v. United States,*
  567 U.S. 387 (2012) ................................................ 29, 44

*Batalla Vidal v. Nielsen,*
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................ 17-18, 61

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) (per curiam) ............................ 52, 53

*Cheney v. U.S. District Court for the District of Columbia,*
  542 U.S. 367 (2004) .................................................... 52

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare,*
  601 F.2d 199 (5th Cir. 1979) ........................................ 50

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) .................................................... 29

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ................................................ 38

*Heckler v. Cheney,*
  470 U.S. 821 (1985) .................................................... 48

*J.E. Riley Inv. Co. v. Comm'r of Internal Revenue,*
  311 U.S. 55 (1940) ...................................................... 29

*Kendall v. United States ex rel. Stokes,*
  37 U.S. 524 (1838) ...................................................... 30

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................ 28-29

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .............................................. 2, 43, 44

iii

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .................................................................................. 19

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ............................................................................. 44

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ............................................. 18, 51, 52

*NCAA v. Gov. of N.J.*,
    730 F.3d 208 (3d Cir. 2013) ................................................................... 38

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................. 17, 61

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................................................... 13, 46

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ................................................................... 12

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................... *passim*

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................... *passim*

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................... 19, 46, 48, 49

*United States v. Orellana*,
    405 F.3d 360 (5th Cir. 2005) ................................................................... 13

*Util. Air Reg. Grp. v. EPA*,
    134 S. Ct. 2427 (2014) ............................................................................. 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ......................................................... 29, 30, 31, 54

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. art. II, § 3 ................................................................................. 29

8 C.F.R.
    § 1.3(a)(4)(vi) ............................................................................................ 7
    § 274a.12(c)(14) ................................................................................. 11, 21

45 C.F.R. § 152.2(4)(vi) ........................................................................ 7

52 Fed. Reg. 46,092 (Dec. 4, 1987) ..................................................... 11

62 Fed. Reg. 10,312 (Mar. 6, 1997) ..................................................... 14

5 U.S.C. § 553(b)(A) ............................................................................ 20

6 U.S.C. § 202(5) ................................................................................. 9

8 U.S.C.
    § 1103 ........................................................................................... 9
    § 1103(a)(3) .................................................................................. 9
    § 1103(g)(2) .................................................................................. 9
    § 1160 ........................................................................................... 6
    § 1182(a)(6)(A)(i) ......................................................................... 8
    § 1182(d)(5) .................................................................................. 6
    § 1182(d)(5)(A) ........................................................................... 14
    § 1182(f) ................................................................................. 48, 49
    § 1227(a)(1)(B) ............................................................................. 8
    § 1229c ....................................................................................... 14
    § 1229c(a)(2)(A) ......................................................................... 14
    § 1231(a)(3) .................................................................................. 6
    § 1252(b) .................................................................................... 14
    § 1254(e) .................................................................................... 14
    § 1254a .................................................................................. 6, 15
    § 1255a ......................................................................................... 6
    § 1255a note ............................................................................... 15
    § 1324a(h)(3) ................................................................................ 6

Fed. R. Civ. P.
    56(a) ........................................................................................... 49
    56(f) ............................................................................................. 3

Pub. L. No. 101-649, tit. III, § 301, 104 Stat. 4978 .......................... 15

## Other Authorities

Br. for Plaintiff Cos., *Youngstown Sheet & Tube Co. v. Sawyer*, 343
    U.S. 579 (1952) (No. 51-744), 1952 WL 82173 ...................... 30

Br. for the State Respondents, *United States v. Texas*,
    136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267 ..............*passim*

v

Compl., *California v. U.S. Dep't of Homeland Sec.*,
No. 3:17-cv-05235-WHA (N.D. Cal. Sept. 11, 2017), ECF No. 1 ........................... 20

Compl., *Garcia v. United States*,
No. 3:17-cv-05380-WHA (N.D. Cal. Sept. 18, 2017), ECF No. 1 ..................... 20-21

Compl., *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
No. 3:17-cv-05211-WHA (N.D. Cal. Sept. 8, 2017), ECF No. 1 ........................... 20

Lomi Kriel, *DACA's Fate in Court's Hands*, HOUS. CHRON. (Apr. 16,
2016), *available at*
https://www.houstonchronicle.com/news/houston-
texas/houston/article/DACA-s-fate-in-court-s-hands-7253138.php .................... 3-4

Stephen Legomsky, *When a Judge Is Out of Control*, MEDIUM (June 3,
2016), *available at* https://medium.com/@legomsky/when-a-judge-is-
out-of-control-1e9ef0a15aa8 ................................................................................... 4

*Texas v. United States*, No. 1:14-cv-254 (S.D. Tex.)
Compl., ECF No. 1 .............................................................................................. 51, 52
Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Prelim. Inj.,
ECF No. 38 ...................................................................................................... 21

U.S. Br. as Amicus Curiae in Opp'n to Reh'g En Banc,
*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (No.
13-16248), ECF No. 75 ...................................................................................... 6-7

# INTRODUCTION

DACA is a complete abdication of federal immigration statutes, which carefully delineate when aliens may be lawfully present or work lawfully in this nation. And, even worse than DAPA and Expanded DACA, DACA provides a clear pathway to citizenship—which compounds its unlawfulness beyond the flaws of DAPA and Expanded DACA. For all these reasons, and those set out in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), DACA should be enjoined.

DACA cannot be defended under the binding *Texas* precedent—which is why DACA Intervenors ("Intervenors") make no serious effort to do so. They insist that *Texas* does not formally foreclose their claims as a matter of preclusion, but that is irrelevant: the *reasoning* of *Texas* leaves Intervenors no room to retry the same failed theories. Intervenors' brief devotes just three pages to defending the substantive lawfulness of DACA—yet never even *acknowledges* the Fifth Circuit's binding determination that DAPA and Expanded DACA were substantively unlawful for the same reasons that apply here. *See* Def.-Intervenors' Opp'n to Pls.' Mot. for Prelim. Inj. ("MALDEF Br.") 46-48, ECF No. 224. That Intervenors cannot muster any way of distinguishing *Texas* confirms there is no way to do so. Time after time, Intervenors either misunderstand the law or press arguments the Fifth Circuit has already rejected. Among other things, they rehash the tired claim that DACA is simply an exercise in "enforcement discretion." *Id.* at 30-36. The Fifth Circuit has already concluded the opposite as to DAPA and Expanded DACA, *Texas*, 809 F.3d at 167-68, and Intervenors offer no real reason to reach a different conclusion here.

Unable to distinguish *Texas*, Intervenors instead devote the bulk of their briefing to distractions. For example, their lead argument turns not on binding Fifth Circuit precedent, but rather the opinion of a "sister court" in California. *See* MALDEF Br. 9-12. But the Fifth Circuit has already *rejected* the premise underlying that and other related decisions, as Plaintiff States discussed at length in their initial post-discovery brief. *See* Plaintiff States' Post-Discovery Br. in Support of Mot. for Prelim. Inj. ("Plaintiff States' Br.") 21-27, ECF No. 218. This Court has thus correctly noted that it is not bound by other district courts—especially ones outside this Circuit, and especially where, as here, those courts cast off *Texas*. *See* May 30, 2018 Hr'g Tr. 21-22.

Intervenors' second argument is that Plaintiff States lack standing. But Intervenors crucially ignore the testimony of *their own experts*. There is no material dispute that the DACA program itself costs the Plaintiff States millions of dollars— as Intervenors' expert concedes. *See* Plaintiff States' Br. Exh. 21 (App. 1246). There is thus no denying that DACA creates a financial injury to the Plaintiff States. Intervenors might dispute the *extent* of that injury, but given Intervenors' experts' concession that at least some injury-in-fact exists, there is no genuine dispute that Plaintiff States have standing. And at any rate, Plaintiff States have presented ample evidence of their own confirming that DACA harms them. So at base, Intervenors misapprehend *Texas*, the "special solicitude" accorded to States in the standing inquiry by *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), and numerous other Supreme Court standing decisions.

In short, Intervenors' own briefing confirms that this is not a close case. Intervenors' experts have effectively conceded that the Plaintiff States have standing, and Intervenors have no real answer to *Texas*. Because there are no disputes of material fact, the Court should treat Plaintiff States' motion for a preliminary injunction as a motion for summary judgment and grant summary judgment to Plaintiff States. *See* Fed. R. Civ. P. 56(f). At a minimum, though, the Plaintiff States are entitled to a preliminary injunction.

## ARGUMENT

## I. DACA Should Be Enjoined Because It Contravenes Federal Immigration Statutes, the APA, and the Take Care Clause.

The Court should enjoin DACA because it is unlawful, just like the previously enjoined DAPA and Expanded DACA programs. None of the arguments advanced in support of DACA show that it comports substantively with federal immigration statutes, with the APA's procedural requirements, or with the Constitution's Take Care Clause. Moreover, these questions may be resolved as a matter of law in favor of Plaintiff States because there are no material fact disputes on the adduced evidence about DACA's unlawfulness.

In fact, Intervenors' own "expert"—the former chief counsel for USCIS, Stephen Legomsky, who offers nothing more than an impermissible legal opinion— previously admitted that "[i]t's hard for me to think of any ground striking DAPA that wouldn't apply to DACA." Exh. 43, Lomi Kriel, *DACA's Fate in Court's Hands*, HOUS. CHRON. (Apr. 16, 2016), *available at* https://www.houstonchronicle.com/news/houston-texas/houston/article/DACA-s-fate-

in-court-s-hands-7253138.php (App. 1485) *see also* Exh. 67, Aug. 1, 2018 Depo. of S. Legomsky 8:6-11:17 (App. 1804-07), 99:14-100:6 (App. 1833-34). Mr. Legomsky incorrectly disagrees with this Court's prior ruling (and the Fifth Circuit's opinion affirming that ruling), as with much else that this Court did in the prior challenge to DAPA and Expanded DACA. Exh. 44, Stephen Legomsky, *When a Judge Is Out of Control*, MEDIUM (June 3, 2016), *available at* https://medium.com/@legomsky/when-a-judge-is-out-of-control-1e9ef0a15aa8 (App. 1489-93); *see also* Exh. 67, Aug. 1, 2018 Depo. of S. Legomsky 11:21-29:8 (App. 1807-25). But the point remains: DACA suffers from the same legal defects as DAPA and Expanded DACA.

### A.   DACA is contrary to federal immigration statutes.

Intervenors cannot overcome the fact that DACA is contrary to law because it is "not authorized by statute" and is "foreclosed by Congress's careful plan." *Texas*, 809 F.3d at 184, 186. The Fifth Circuit's holding in *Texas* requires this conclusion. Both the Federal Defendants and at least one other federal district court have also recognized this reality. Plaintiff States' Br. 9-11. The arguments advanced to demonstrate DACA's purported lawfulness all fail because DACA cannot be squared with the INA.

**1.**   As Plaintiff States have extensively detailed, DACA is substantively unlawful because it flouts Congress's framework that regulates the lawful presence of aliens. *Id.* at 11-14. Congress has not given the Executive carte blanche to permit aliens to be lawfully present in the country. *Id.* at 11-12; Pls.' Mot. for Prelim. Inj. 22-23, ECF No. 5. As the Fifth Circuit held with respect to Expanded DACA and DAPA,

the Executive has no power to unilaterally create immigration classifications that authorize aliens' presence in this country, for "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F.3d at 179. That is controlling, and it conclusively shows that DACA is unlawful.

Intervenors argue that *Texas* "has no preclusive effect" on this case "because DACA was not actually litigated in Texas." MALDEF Br. 9. This preclusion argument misses the point. This Court previously enjoined DAPA and Expanded DACA by finding that "[n]othing about DAPA *genuinely* leaves the agency and its [employees] free to exercise discretion.'" *Texas*, 809 F.3d at 172 (alteration in original) (quoting *Texas v. United States*, 86 F. Supp. 3d 591, 670 (S.D. Tex. 2015)). And this Court based that finding on "the implementation of DACA." *Id.* Thus, the mere fact that *Texas* was addressing DAPA and Expanded DACA does not mean that its reasoning somehow does not apply to the materially identical DACA program—which this Court expressly analyzed. MALDEF Br. 9-10. As the Federal Defendants concede, "[DACA] is materially indistinguishable from the DAPA and expanded DACA policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of [the Supreme] Court voted to affirm." Pls.' Mot. for Prelim. Inj. Exh. 12 at 12 (App. 977); *see id.* Exh. 12 at 26 (App. 991) ("The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy."). Thus, *Texas* is the determinative precedent on the controlling legal issues regardless of whether there is issue- or claim-preclusive effect. *Cf.* MALDEF Br. 9.

Much of Intervenors' defense of DACA fails because it simply reiterates unsuccessful arguments that would have applied equally to DAPA. For example, Intervenors rely on supposed Executive authority for DACA in that "the INA specifically contemplates that the Secretary of DHS will use her discretion to grant relief from removal and permit noncitizens without status to live and work in the United States." *Id.* at 47 (citing 8 U.S.C. § 1231(a)(3) (orders of supervision); *id.* §§ 1160, 1255a (certain amnesty programs); *id.* § 1254a (Temporary Protected Status); *id.* § 1182(d)(5) (humanitarian parole); *id.* § 1324a(h)(3) (defining who is an alien unauthorized to work)). But, notably, none of those statutes authorizes DACA. Thus, this merely confirms what the Fifth Circuit already held: "Entirely absent from those specific classes is the group of . . . illegal aliens who would be eligible for lawful presence under" DACA. *Texas*, 809 F.3d at 179.

Nor can Intervenors avoid a conclusion that DACA contravenes the INA by rendering DACA recipients lawfully present. Intervenors pretend that "[l]awful presence is not immigration status." *E.g.*, MALDEF Br. 48; *accord* Def.-Intervenor State of N.J.'s Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("New Jersey Br.") 14-15, ECF No. 215. But DACA renders aliens lawfully present, and lawful presence is a meaningful immigration classification established by Congress. *See* Br. for the State Respondents 2-6, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267 ("Texas DAPA Br."). The Executive has previously acknowledged that DACA confers "deferred action status," which is a "lawful status." U.S. Br. as Amicus Curiae in Opp'n to Reh'g En Banc 16, *Ariz. Dream Act Coal. v. Brewer*, 757

F.3d 1053 (9th Cir. 2014) (No. 13-16248), ECF No. 75. And the Executive's own benefits regulations establish a "deferred action status." 8 C.F.R. § 1.3(a)(4)(vi); 45 C.F.R. § 152.2(4)(vi). As the Fifth Circuit held, the deferred action the Executive attempted to confer in DAPA and Expanded DACA "would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *See Texas*, 809 F.3d at 166. DACA is no different. Indeed, Intervenors have conceded—as they must—that DACA grants lawful presence and a host of attendant benefits, such as work authorization, to a group of people for whom Congress has foreclosed those benefits. Proposed Def.-Intervenors' Mem. of Law in Support of Mot. for Leave to Intervene 1, ECF No. 14 ("All Proposed Defendant-Intervenors have *authorized presence* in the United States, are *authorized to work*, and are eligible for renewals of their grants of deferred action." (emphases added)). Because DACA does so, it is unlawful, as the Fifth Circuit has already found in rejecting Expanded DACA. Plaintiff States' Br. 12; Pls.' Mot. for Prelim. Inj. 21-32; *Texas*, 809 F.3d at 178-86.

The consequences of lawful presence, as this Court and the Fifth Circuit recognized, are profound and have been explained thoroughly in Plaintiff States' briefing. Plaintiff States' Br. 11-14; Pls.' Mot. for Prelim. Inj. 21-27. For example, DACA gives unlawfully present aliens access to advance parole, which allows them to leave and reenter the country; this, in turn, removes a barrier to lawful permanent resident status and provides a pathway to citizenship for potentially thousands of DACA recipients. Pls.' Mot. for Prelim. Inj. 25-26.

This advance-parole loophole cannot be defended, as New Jersey attempts to do, on the grounds that some of the thousands of DACA aliens who adjusted status after receiving deferred action and ultimately gained citizenship "may have been otherwise eligible for adjustment of status regardless of the grant of advance parole." New Jersey Br. 17. Whether some DACA grantees might access some *other* pathway to citizenship says nothing about whether the advance parole pathway is lawful. Similarly, New Jersey is wrong that Plaintiff States suffer no harm from DACA's ability to allow a "qualifying individual's adjustment to LPR status or citizenship." *Id.* at 17 n.5. As Plaintiff States have explained, and as this Court found, that is merely one of many powerful incentives that DACA provides for unlawfully present aliens to remain in the country, Plaintiff States' Br. 33-34 (citing *Texas*, 86 F. Supp. 3d at 634), and further evidence of the Executive's abdication of immigration laws.

In addition, Intervenors cannot dispute that the lawful presence purportedly granted by DACA appears to negate the charge that an alien is removable. Pls.' Mot. for Prelim. Inj. 23-24 (citing 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)). Nor do Intervenors dispute that "lawful presence" is a requirement for benefits eligibility under the restrictions Congress imposed in 1996. *See* Plaintiff States' Br. 14; Pls.' Mot. for Prelim. Inj. 26-27. DACA purports to enable access to those benefits even though extensive statutory criteria define when an alien's presence is lawful, and these provisions do not give the Executive discretion to deem any alien in the country lawfully present. Plaintiff States' Br. 14; Pls.' Mot. for Prelim. Inj. 22-23. So any

attempt to distinguish DACA on the basis that the DACA memorandum itself does not expressly grant these benefits must fail.

Intervenors' remaining attempts to bolster DACA simply offer further distractions untethered to binding precedent. Intervenors suggest that DACA is somehow lawful because "Congress vested broad and explicit authority in the Secretary, charging her with 'the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,' *see* 8 U.S.C. § 1103, and the obligation to '[e]stablish[] national immigration enforcement policies and priorities.' 6 U.S.C. § 202(5)." MALDEF Br. 47 (alterations in original). So under Intervenors' view, the Executive has the unilateral authority to declare each and every alien in the country to be lawfully present and give them work authorization. The Fifth Circuit addressed and rejected virtually the same sweeping arguments regarding DAPA and Expanded DACA. *See Texas*, 809 F.3d at 183 ("[T]he broad grants of authority in 6 U.S.C. § 202(5), 8 U.S.C. § 1103(a)(3), and 8 U.S.C. § 1103(g)(2) cannot reasonably be construed as assigning decisions of vast economic and political significance, such as DAPA, to an agency." (citations, internal quotation marks, and footnotes omitted)).

Intervenors also rely on the Executive's purported "discretionary authority" in enforcing Congress's immigration statutes to argue that DACA is consistent with the INA. MALDEF Br. 47. But that argument fails for the same reason it could not support DAPA and Expanded DACA. Although the Executive "has discretion to make immigration decisions based on humanitarian grounds" in enforcing the INA,

Congress has limited the Executive's ability to exercise that discretion to provide relief similar to DACA "only for particular family relationships and specific forms of relief"—none of which include granting lawful presence and attendant benefits to the class of aliens eligible for DACA, Expanded DACA, or DAPA. *Texas*, 809 F.3d at 180.

It bears repeating that Plaintiff States do not challenge the Executive's separate discretion to pursue or defer removal proceedings, and enjoining DACA would not require the Executive to remove any alien. *See* Plaintiff States' Br. 45-46. Nor do Plaintiff States challenge the ability to defer removal proceedings to the class of aliens comprising DACA recipients. *Contra* New Jersey Br. 17-18. But DACA is unlawful precisely because it does much more than merely defer removal proceedings—it confers lawful presence and work authorization. *See* Plaintiff States' Br. 45-46. DACA contravenes the INA because it renders unlawful presence lawful and confers a host of benefits on that basis. *See* Pls.' Mot. for Prelim. Inj. 24-27.

New Jersey suggests that the benefits-eligibility restrictions that DACA lifts are immaterial because other regulations govern those benefits. New Jersey Br. 16. The fact that other regulations also govern those benefits does not somehow negate the fact that it is DACA itself that is conferring lawful presence and work authorization. DACA's removal of a barrier to those benefits renders it unlawful because nothing in Congress's comprehensive immigration scheme allows the Executive to do so. Texas DAPA Br. 16. Moreover, the Court should reject any suggestion that Plaintiff States must "point to a[] DACA grantee" who has received Social Security retirement or Medicare benefits to establish that DACA is unlawful.

New Jersey Br. 16. New Jersey concedes that DACA recipients become eligible for such benefits because of DACA's work authorization, *id.*, which is itself unlawful for the reasons explained below. Furthermore, New Jersey is wrong that Plaintiff States do not "allege that they have been harmed by the ability of DACA grantees to obtain Social Security, the Earned Income Tax Credit, Medicare, or federal railroad retirement benefits." *Id.* Not only does that argument confuse DACA's unlawfulness with standing, which Plaintiff States have demonstrated, *see infra* Part II.A, Plaintiff States have alleged that the numerous benefits conferred by DACA's grant of lawful presence, work authorization, a potential path to citizenship, and other attendant benefits incentivize unlawfully present aliens to remain in the Country, which causes significant financial harms to the States. Am. Compl. 53-54 ¶¶ 225-31, ECF No. 104.

2.    Regarding work authorization, Intervenors argue that DACA is lawful because the work authorization it grants "flows from a long-established federal regulation that Plaintiffs do not challenge here." MALDEF Br. 48 (citing 8 C.F.R. § 274a.12(c)(14)); *see also* New Jersey Br. 15. First of all, this characterization is wrong: The Plaintiff States expressly pleaded in their operative complaint that this work regulation is invalid as applied to DACA recipients. Am. Compl. 71 ¶¶ 344-46. 8 C.F.R. § 274a.12(c)(14) makes work authorization available to certain aliens granted deferred action. Intervenors and New Jersey suggest that this regulation—which the Executive claimed would affect very few aliens and have only modest effects on the labor market, *see* 52 Fed. Reg. 46,092, 46,092 (Dec. 4, 1987)—supports their current view that the Executive may authorize millions of aliens to work simply

11

because it has chosen not to remove them. *E.g.*, MALDEF Br. 48; New Jersey Br. 15-16. The regulation is correctly read, however, as "pertaining only to those classes of aliens identified by Congress as eligible for deferred action and work authorization." *Texas v. United States*, 787 F.3d 733, 762 n.95 (5th Cir. 2015). This provision would cover four categories of deferred-action recipients that Congress has made eligible for work authorization. *See* Texas DAPA Br. 57-58. But these four targeted provisions do not remotely ratify the power to grant work authorization to any of the millions of unlawfully present aliens the Executive chooses not to remove. To the contrary, such a view would render those specific provisions surplusage. *See id.* at 58.[1]

As the Fifth Circuit has confirmed, the numerous federal statutes defining which aliens are eligible for work authorization make "no mention of the class of persons whom" DACA "would make eligible for work authorization." *Texas*, 809 F.3d at 181. DACA's work-authorization component thus flouts numerous restrictions that Congress imposed on the employment of unauthorized aliens, including employer sanctions and status-adjustment consequences for the alien—not to mention enabling access to Social Security numbers and the Earned Income Tax Credit. Plaintiff States' Br. 15; Pls.' Mot. for Prelim. Inj. 30-31.

---

[1] If interpreted as broadly as Intervenors claim, this deferred-action regulation is invalid as applied to DACA recipients, and this claim did not accrue for statute-of-limitations purposes until DACA was issued. The regulation's granting of work-authorization eligibility to deferred-action recipients is valid in the four narrow contexts in which Congress, by statute, deemed deferred-action recipients eligible for work authorization. *See* Pls.' Mot. for Prelim. Inj. 29.

**3.**  Nor can DACA be squared with historical practice, as Intervenors insist. *See* MALDEF Br. 48. Previous programs are not like DACA. Plaintiff States' Br. 15-16; Pls.' Mot. for Prelim. Inj. 30-31. As the Fifth Circuit recognized, "many of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Texas*, 809 F.3d at 184.

Intervenors suggest that DACA follows a "regular practice . . . of exercising [prosecutorial] discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) ("*AADC*"). *See* MALDEF Br. 48. But DACA's granting of lawful presence pushes the concept of deferred action far beyond what the Supreme Court has ever recognized. "[D]eferred action" is merely the "discretion to abandon" the "initiation or prosecution of various stages in the deportation process." *AADC*, 525 U.S. at 483-84. But a decision not to initiate enforcement action cannot transform unlawful conduct into lawful conduct. *See, e.g.*, *United States v. Orellana*, 405 F.3d 360, 370 (5th Cir. 2005) ("[A] temporary stay of removal does not render an otherwise illegal alien's presence lawful."). As *AADC* recognized, an alien's unlawful presence is "*an ongoing violation* of United States law," even though the Executive has discretion to forbear from removal in certain circumstances. 525 U.S. at 491. DACA cannot be "an exercise of [the Executive's] enforcement discretion" because "it purports to *alter* [INA] requirements" and pronounce "that otherwise-prohibited conduct will not violate the

Act." *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014). So Intervenors and New Jersey cannot defend DACA on that basis. *See* New Jersey Br. 11; MALDEF Br. 48.

Moreover, other programs were based on Executive authority that Congress has since removed. *See* Texas DAPA Br. 54. For example, Intervenors and New Jersey argue that "practices almost identical to deferred action granted relief from removal on a classwide basis in favor of" various groups of aliens. MALDEF Br. 2 n.1; New Jersey Br. 11-14. The "parole" programs on which Intervenors and New Jersey rely were restricted by Congress's creation of the humanitarian-parole statute, 8 U.S.C. 1182(d)(5)(A). *See* New Jersey Br. 11-12. And the "Family Fairness" program on which they rely was an example of "extended voluntary departure" that was provided by statute at the time but has since been revoked.[2] *See* Texas DAPA Br. 54.

Specifically, Congress permitted the form of relief used for Family Fairness. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). But Congress took that power away in 1996, capping voluntary departure at 120 days. 8 U.S.C. § 1229c(a)(2)(A). Even the Executive recognized that this cabined authority could not plausibly support "employment authorization." 62 Fed. Reg. 10,312, 10,324 (Mar. 6, 1997); *see also* Exh. 67, Aug. 1, 2018 Depo. of S. Legomsky 33:1-34:3 (App. 1826-27). After the Executive's class-based

---

[2] Family Fairness granted relief to only about 1% of the country's unlawfully present aliens (about 47,000 people), Pls.' Mot. for Prelim. Inj. Exh. 7 (App. 404)—not 1.5 million people as New Jersey suggests, New Jersey Br. 12.

use of extended voluntary departure in the Family Fairness program, the Immigration Act of 1990 endorsed only a new, narrow status: "temporary protected status," which is limited to instances of disaster or unrest in an alien's home country. 8 U.S.C. § 1254a. To be sure, the Immigration Act of 1990 offered targeted relief to some beneficiaries of the Family Fairness program. *See* Pub. L. No. 101-649, tit. III, § 301, 104 Stat. 4978, 5029 (codified as amended at 8 U.S.C. § 1255a note). But Congress's decision to offer limited relief by statute in no way ratifies a claimed Executive authority to grant broader relief unilaterally. In fact, the 1990 Act did not even grant lawful presence. *See* § 301(a), 104 Stat. at 5029 (granting a "temporary stay of deportation and work authorization" (capitalization modified)).

Moreover, although Intervenors and New Jersey rely on past programmatic deferred-action schemes, MALDEF Br. 2-3; New Jersey Br. 14, they cannot point to more than a small number of deferred-action recipients up until 2012, when the Executive created DACA. As this Court already found, only 500-1,000 received deferred action annually from 2005 to 2010. *Texas*, 86 F. Supp. 3d at 639 n.46. Intervenors identify only a handful of class-based deferred-action programs in the past 50 years, which largely operated as "bridges from one legal status to another." Pls.' Mot. for Prelim Inj. 31 (quoting *Texas*, 809 F.3d at 184).

That extremely small number confirms that Congress could not have acquiesced to a practice of granting an exponentially larger number of work authorizations than in such deferred-action programs, as DACA does. And DACA is different not only in scale, but in kind: it renders aliens' unlawful presence to be

15

lawful. Previous programs are so dissimilar that they "shed[] no light on the [Executive]'s authority to implement DAPA." *Texas*, 809 F.3d at 185. This history does not show that Congress "endorsed deferred action by adopting these discretionary initiatives into the INA," let alone in the unfettered way that Intervenors and New Jersey suggest. MALDEF Br. 48 n.25; New Jersey Br. 14.[3] DACA thus cannot be defended as merely the "latest manifestation of the Executive's broad authority to use discretionary relief from removal to address pressing immigration issues." MALDEF Br. 48.

In sum, Intervenors cannot distinguish away the Fifth Circuit precedent holding that DAPA and Expanded DACA are substantively unlawful. DACA is unlawful for the same reasons, and similarly unsupported by historical practice. And given the use of advance parole as a pathway to citizenship, the case against DACA is only stronger. Plaintiff States' Br. 12-14.

**4.** New Jersey's attempts to avoid *Texas v. United States* by distinguishing the DACA program from the DAPA program also fail. *See* New Jersey Br. 18-19. First, as explained by Plaintiff States, the lack of a "path" to citizenship for DACA recipients

---

[3] Deferred action for VAWA self-petitioners and T- and U-visa applicants deferred removal while applications for imminent legal status were pending. *See* Pls.' Mot. for Prelim. Inj. Exh. 7 (App. 252-264, 269-274). Deferred action for students affected by Hurricane Katrina permitted F-visa holders a few months to re-enroll and maintain lawful status. *See* MALDEF Br. Exh. 55. Deferred action for widows and widowers who had a previous legal status maintained the status quo until Congress resolved the issue by eliminating the two-year-marriage requirement for adjusting to LPR status. *See id.* Exh. 57.

is no basis to distinguish *Texas*. New Jersey concedes that "the Fifth Circuit held that through the INA's 'specific and intricate provisions, Congress ha[d] directly addressed the precise question at issue' in that case: 'how parents may derive an immigration classification on the basis of their child's status.'" New Jersey Br. 18 (quoting *Texas*, 809 F.3d at 186). It also concedes that the INA "does not detail requirements for a person brought to the United States as a child, who knows only this country as home, to seek lawful status on that basis." *Id.* In other words, New Jersey concedes that there is no statutory basis for the relief that DACA provides. Thus, that makes DACA even *more unlawful* than DAPA: The Fifth Circuit found DAPA unlawful notwithstanding a purported pathway to citizenship under the INA, whereas DACA has none—so there is even less of a statutory basis for DACA than for DAPA. *See* Plaintiff States' Br. 16-17.

Nor do purported differences between the size of the group of aliens eligible for DACA and DAPA matter. *Contra* New Jersey Br. 19. New Jersey argues that *Texas* does not control because DAPA covered a larger population, and "[t]here is a difference between 4.3 million and 689,800." *Id.* (quoting *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1042 (N.D. Cal. 2018) ("*Cal. Regents*")). That argument fails because it does not track the Fifth Circuit's reasoning. Regardless of the size of the populations at issue, the rulings that have suggested that DACA is lawful rest on the notion that the federal government had the authority to extend lawful presence and work authorization through programmatic deferred action to unlawfully present aliens. *Cal. Regents*, 279 F. Supp. 3d at 1038; *Batalla*

17

*Vidal v. Nielsen*, 279 F. Supp. 3d 401, 422-23 (E.D.N.Y. 2018); *NAACP v. Trump*, 298 F. Supp. 3d 209, 238-40 (D.D.C. 2018). That is the precise argument that both this Court and the Fifth Circuit have previously rejected. *Texas*, 809 F.3d at 184; *see also Texas*, 86 F. Supp. 3d at 660 (recognizing the pretext of the administration's argument); *see also* Exh. 67, Aug. 1, 2018 Depo. of S. Legomsky 99:14-22 (App. 1833).

Thus, for the foregoing reasons, the Court must also reject the argument that DACA is lawful because it is "targeted at 'certain young people who were brought to this country as children and know only this country as home.'" New Jersey Br. 19 (quoting Pls.' Mot. for Prelim. Inj. Exh. 1 at 1 (App. 2)). New Jersey suggests that the "INA . . . recognizes that children are different." *Id.* at 19. But even if that argument supported the Executive's decision not to pursue removal for the group of individuals eligible for DACA, it cannot support a program that *contradicts* numerous immigration statutes on lawful presence and work authorization, as DACA does. *See supra* pp. 4-12; Plaintiff States' Br. 11-17. Without statutory authority or even an arguable bridge to lawful status for DACA-eligible aliens that is consistent with the INA, and without the authority to programmatically confer lawful presence and a host of benefits on millions of aliens for whom the Executive has chosen to forebear removal, DACA cannot stand.

### B. DACA was unlawfully issued without APA notice and comment.

As the Federal Defendants concede, ECF No. 71 at 15 n.5, "[b]ecause DACA is substantively unlawful under the INA and this Court can so hold as a pure question of law, this Court need not address whether DACA is also procedurally unlawful for

failure to undergo notice and comment under the APA." Plaintiff States agree, and a preliminary injunction or summary judgment may be based on the substantive APA violation alone.

Nevertheless, the Executive's procedural violation in announcing DACA without notice-and-comment procedure stands as an independent reason that DACA is invalid and should be enjoined. DACA was one of this nation's largest changes in immigration policy, as it substantively changes whether hundreds of thousands of aliens were lawfully present or permitted to work lawfully in this country. That is sufficient to find DACA was a substantive rule that required notice and comment. *See Morton v. Ruiz*, 415 U.S. 199, 234 (1974). That bears repeating: This Court does not have to reach the question of whether DACA actually allows discretionary determinations about who can obtain DACA relief to find that DACA needed to go through notice-and-comment procedure. But even if the Court were to examine that question, the evidentiary record before it confirms that the Executive rubber-stamps DACA applications that meet class-wide criteria without exercising any discretion.

1. As the Fifth Circuit held in *Texas*, 809 F.3d at 170-78, the lack of notice-and-comment rulemaking renders DACA unlawful because it is a substantive rule that was subject to the APA's procedural requirements. Nothing in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), disturbs that outcome, because *Trump* concerned an exercise of Executive authority expressly delegated by statute to the President. *See id.* at 2407-09. Further, if DACA were not a substantive rule, it would make little sense for those challenging the decision to wind down DACA to plead that the rescission memo

19

is "a substantive rule subject to APA's notice-and-comment requirements." Compl. 14 ¶ 61, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA (N.D. Cal. Sept. 8, 2017), ECF No. 1 ("*Cal. Regents* Compl.").

Intervenors and New Jersey argue that the DACA Memo was merely a general statement of policy that should be exempt from the APA's procedural requirements in 5 U.S.C. § 553(b)(A). MALDEF Br. 36-40; New Jersey Br. 20-21. To rebut the Plaintiff States' argument that DACA modifies "substantive rights and interests" by conferring "lawful presence and eligibility for attendant benefits," Plaintiff States' Br. 18, Intervenors and New Jersey seek to hide behind the language of the Memo that claims DACA does not confer substantive rights, MALDEF Br. 36; New Jersey Br. 21-22. But that fig leaf does not cover much. As with DAPA, the benefits are apparent. *See Cal. Regents* Compl. 8 ¶ 31 ("Individuals with DACA status were 'not considered to be unlawfully present during the period in which deferred action [was] in effect.'" (quoting USCIS FAQs)). Indeed, the substantive benefits of DACA claimed by those challenging the rescission memo are numerous and include: (1) the right not be detained; (2) employment authorization; (3) travel privileges; (4) Social Security benefits; (5) retirement benefits; (6) disability benefits; and (7) other finance benefits such as opening bank accounts, obtaining credit cards, and purchasing homes. Pls.' Mot. for Prelim. Inj. 35-36 (citing Compl. 17-18, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA (N.D. Cal. Sept. 11, 2017), ECF No. 1). Other challengers have admitted this as well. Compl. 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-05380-WHA (N.D. Cal. Sept. 18, 2017), ECF No. 1 ("DACA *confers* numerous

important *benefits* on those who apply for and are granted DACA status." (emphases added)). Tellingly, neither Intervenors nor New Jersey addresses this argument.

New Jersey also argues that DACA *itself* does not confer substantive benefits; it is instead the prior guidance that went through notice-and-comment rulemaking that provide any "legal consequences" flowing from DACA. New Jersey Br. 26-28. But this same sleight of hand was tried, and rejected, with respect to DAPA and Expanded DACA. Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Prelim. Inj. 37, 42 & n.34, *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Dec. 24, 2014), ECF No. 38. And it fails again here. More than merely "announc[ing] a new policy regarding Executive priorities for deferred action," New Jersey Br. 27, DACA—like DAPA and Expanded DACA—changes whether a group of individuals are lawfully present in the country and confers substantive benefits on them as a result of that designation. There is no statutory authorization for this action (and, as discussed above, 8 C.F.R. § 274a.12(c)(14) on work authorization is only valid as to the narrow types of deferred action authorized by statute, not the DACA (or DACA-related) classes).

Contrary to Intervenors' claim, this challenge is not about the "motivations of the Executive." MALDEF Br. 38. This suit, like its predecessor, is aimed at the legal basis for, and practical ramifications of, the ongoing DACA program. Both DACA's provision of real-world benefits and its uniform application counsel in favor of treating it for what it is: a substantive agency rule in need of notice and comment. *See* Plaintiff States' Br. 37 (citing cases).

**2.** The Court should reject any argument that DACA was exempted from notice and comment on the grounds that the Executive merely exercises enforcement discretion to grant relief consistent with guidelines in the DACA Memo. The alleged discretion in administering DACA—MALDEF Br. 40-45; New Jersey Br. 21-26—is illusory. Rather than being an *exercise* of discretion, DACA actually *removes* discretion. It creates a legal status or designation—lawful presence—for an entire class of individuals. So long as an unlawfully present alien of a certain class performs the correct ministerial steps, that individual will receive a lawful-presence determination. In this way, DACA is more like the cases where agencies purported to allow discretion, but treated qualifications as binding in practice. *See* Pls.' Mot. for Prelim. Inj. 33. New Jersey touts instances of individuals being denied DACA, New Jersey Br. 22-26, yet those are merely examples of people failing to meet the class-wide characteristics necessary to cancel the discretion to remove them.

To the extent that the denial rate of DACA applications is relevant, Intervenors and New Jersey wholly ignore the Executive's inability to identify a single case in which a DACA application was denied for an actually discretionary reason. When DHS rescinded DACA in September 2017, it made clear that:

> USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied *based solely upon discretion.*

Pls.' Mot. for Prelim. Inj. Exh. 5 n.1 (App. 22-23) (emphasis added).

Discovery from the Federal Defendants confirms this point. The USCIS Texas Service Center processed 76,259 DACA applications from August 2012 to June 2018. Exh. 45, Federal Defs.' Objections & Resps. to Def.-Intervenors' Third Set of Disc. Reqs., Resp. to Interrog. No. 8 (App. 1505, 1532). Yet as of May 8, 2018, high-ranking officials at the Texas Service Center confirmed that not a single one of those applications was denied for discretionary reasons:

> Good morning Brandon,
>
> I have confirmed with TSC's DACA Supervisory POC that to the best of our knowledge TSC has not issued a DACA denial purely on discretion when all other DACA guidelines have been met.
>
> Tyronda Lee, Section Chief

Exh. 46, E-mail from Tyronda E. Lee to Brandon M. Robinson et al. (May 8, 2018) (DEF-00001691) (App. 1535).

DHS Secretary Nielsen's June 22, 2018 memorandum further illustrates this point. In declining to disturb the September 2017 rescission of DACA, Secretary Nielsen reasoned that DHS "should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis." Plaintiff States' Br. Exh. 25 at 3 (App. 1276). Although DACA "on its face did allow for individual considerations," it did not so in practice, Secretary Nielsen noted: "[A] categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case." *Id.*

23

Likewise, the rates of DACA denials prove that USCIS Immigration Service Officers were not free to exercise discretion. *See* MALDEF Br. 45; New Jersey Br. 26. For one thing, the denial rates have hardly "skyrocketed." New Jersey Br. 26. As New Jersey acknowledges, USCIS statistics show that since 2012, nearly 92% of initial DACA applications were accepted. *See id.* (citing 8.4% denial rate since 2012). And according to the same USCIS data that New Jersey cites, the approval rate for renewal applications is even higher—as of May 31, 2018, only 1% of renewal applications had been denied over DACA's 6-year existence. *See id.* Exh. 33 at 1 (only 12,612 of 1,231,091 accepted requests were denied). What is more, the data on which the Intervenors and New Jersey rely sheds no light on the existence of any discretionary denials because USCIS's definition of "denial" includes applications that *did not meet the criteria* stated in the 2012 DACA memorandum, as well as applications that were withdrawn (*i.e.*, the applicant decides not to pursue the application) and those that were terminated (*i.e.*, USCIS denies an application because the applicant left the country without proper documents or USCIS could not make contact with the applicant). *See id.* Exh. 33 at 1-2; Exh. 47, June 26, 2018 Depo. of B. Hines 45:16-46:4 (App. 1540-41), 47:11-48:21 (App. 1542-43).

Lacking any statistical data to support their claims of discretionary denials, the Intervenors and New Jersey fall back on Donald Neufeld's declaration from the predecessor case over DAPA and Expanded DACA. New Jersey asserts, for example, that Mr. Neufeld "describes in great detail the numerous ways USCIS adjudicators can utilize their discretion on a case-by-case basis and the specific procedures for such

decisions." New Jersey Br. 24. The Court can quickly reject this argument, just as it did when it enjoined DAPA and Expanded DACA. *Texas*, 86 F. Supp. 3d at 609, 669 n.101. Three and a half years later, Mr. Neufeld's declaration still fails to provide evidence of any "requests that were denied even though the applicant met the DACA criteria." *Id.* at 609. As the Court previously recognized, the denial examples that Mr. Neufeld cites—*e.g.*, denials based on public-safety threats or fraud (such as false statements in the application process or false prior claims of U.S. citizenship)—are "specifically listed in the Operation Instructions as reasons to deny relief." *Id.* at 669 n.101. Besides, the DACA memorandum itself precludes relief for any individual who "poses a threat to national security or public safety." Pls.' Mot. for Prelim. Inj. Exh. 1 at 1 (App. 2). And fraud "always disqualifies someone from any program." *Texas*, 86 F. Supp. 3d at 669 n.101. Neither Intervenors nor New Jersey identifies any material dispute between Mr. Neufeld's three-year-old declaration and USCIS's September 2017 statement that it could not identify any discretionary denials.

Intervenors and New Jersey fare no better relying on documents that the Federal Defendants produced in discovery. Intervenors cite "DACA Team Meeting Minutes" that remind officers to "take the time to adjudicate correctly," MALDEF Br. 44 (quoting *id.* Exh. 194), along with portions of DACA's "Standard Operating Procedures" that "allow[ed] Officers to refer cases involving egregious threats to public safety . . . to a specialized unit" and which "encourage[d] Officers to seek the assistance" of a special USCIS group in making fraud determinations, *id.* at 43, 44-45 (citing, *e.g.*, *id.* Exh. 153 at 62, 67, 96). But none of these materials—nor any of the

other exhibits on which the Intervenors rely—rebuts DHS's admission that it could not identify a single discretionary denial under DACA. So too for New Jersey. It notes that "a June 2015 email explained that the Texas Service Center 'now denies significantly more DACA cases based on our view of discretionary denials shifting.'" New Jersey Br. 25 (quoting *id.* Exh. 38). But the cited email dealt with denials for "public safety concern[s]"—not applications that otherwise satisfied DACA's categorical criteria. *Id.* Exh. 38. More importantly, New Jersey does not mention that the Texas Service Center—which processed 76,259 DACA applications, *see* Exh. 45 (App. 1532)—confirmed in May 2018 it had not denied any DACA applications for purely discretionary reasons, *see* Exh. 46 (App. 1535).

If Defendants' documents are relevant at all, they prove Plaintiff States' point: Through DACA, the Executive created a massive bureaucracy that prevented officers from using individualized, case-by-case assessments. For example, a DACA reference guide informs officers that "[d]eferred action is discretionary" but that "[i]n setting the guidelines, the [DHS] Secretary has determined how this discretion is to be applied for individuals who arrived in the United States as children." Exh. 48, USCIS, DACA General Training Workshop Reference Guide 9 (Aug. 2014) (DEF-00004658) (App. 1554). The same guide notes that "[a] standard denial template in checkbox format will be used by officers." *Id.*; *see also id.* at 55 (DEF-00004704) (App. 1600) ("When an officer encounters an issue for which there is no check box on the denial template, the officer must work through his/her supervisor to identify the issue . . . so that the template can be amended."). And the guide reflects that officers must

obtain supervisory review in many denial cases, including denials for public-safety threats, criminal convictions, and fraud. *Id.* at 58 (DEF-00004707) (App. 1603); *see also* Exh. 49, USCIS, Decision Systems Processing 3 (DEF-00003611) (App. 1618); Exh. 50, USCIS, Known or Suspected Drug Cartel Membership 1 (DEF-00003622) (App. 1623) (identifying special USCIS unit to "handle any DACA requests when the record indicates that the requestor was, is or may be a member of a drug cartel"). These instructions are consistent with the Court's previous findings on DACA. *See, e.g.*, *Texas*, 86 F. Supp. 3d at 669 ("[T]he 'Operating Procedures' for implementation of DACA contains nearly 150 pages of specific instructions for granting or denying deferred action to applicants." (footnotes omitted)); *id.* ("Denials are recorded in a 'check the box' standardized form, for which USCIS personnel are provided templates."). Intervenors have no response to these documents.[4]

---

[4] The testimony of Mr. Legomsky does not change this conclusion. Mr. Legomsky worked at USCIS for just two years and for only a year and a half after DACA was announced. Exh. 67, Aug. 1, 2018 Depo. of S. Legomsky 35:20-25 (App. 1828). During his short tenure, he did not adjudicate any DACA applications himself; nor did any of his direct reports adjudicate any DACA applications. *Id.* 59:7-13 (App. 1829). And he has not reviewed any of the documents produced by the Federal Defendants. *Id.* 66:5-7 (App. 1830). His testimony is nothing more than improper legal opinion testimony, and any alleged "factual opinions" are based merely on his time at USCIS, conversations with other immigration scholars and practitioners, and publicly available documents. *Id.* 95:21-96:13 (App. 1831-32). In reality, Mr. Legomsky's testimony is an attempt to "piece it all together" to help the Court understand "the intricate network of statutory and regulatory provisions and case law that these decisions require." *Id.* 119:4-22 (App. 1835). But even Mr. Legomsky admits that his goal could be accomplished by a lawyer for one of the parties to the case. *Id.*

Intervenors are also wrong that Kenneth Palinkas's testimony provides no support for Plaintiff States' claim that DACA is bereft of discretion. Intervenors and New Jersey maintain that Mr. Palinkas should not be credited because he lacks "'firsthand' knowledge of the DACA adjudication process," including whether officers actually "exercise discretion on a case-by-case basis." New Jersey Br. 23; MALDEF Br. 40-41. These arguments miss the mark. Mr. Palinkas's testimony is based not on his own experiences adjudicating DACA applications but on his leadership roles with the USCIS union and his general understanding of the DACA program. Exh. 51, June 19, 2018 Depo. of K. Palinkas 130:19-131:8 (App. 1632-33). Mr. Palinkas also testified that his concerns about "rubber-stamping" of DACA applications were attributable to their high approval rate, *id.* 123:12-124:20 (App. 1628-29), and the processing of DACA applications by service centers in the first instance, *id.* 125:19-126:10 (App. 1630-31). Intervenors and New Jersey offer nothing to rebut these two points.[5]

### C.    DACA violates the Take Care Clause.

As Plaintiff States have noted before, the President's "most important constitutional duty [is] to 'take Care that the Laws be faithfully executed.'" *Lujan v.*

---

[5] Neither does the testimony of the current USCIS union president, Michael Knowles. Mr. Knowles, an asylum officer who has never worked for any unit of USCIS that handled DACA applications, admits his knowledge of DACA's operations is nearly nonexistent. He spoke with six people about DACA applications and could only identify four applications, via hearsay statements, that were allegedly referred to field offices for in-person interviews due to concerns about gang affiliation. Mr. Knowles was deposed on August 2, 2018. The Plaintiff States will file the relevant excerpts of Mr. Knowles's upon receipt of the transcript.

*Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (quoting U.S. Const. art. II, § 3); *see also* Texas DAPA Br. 71-76 (showing how DAPA was also a violation of the Take Care Clause). At the same time, the Take Care Clause shows precisely that the President is not a lawmaker. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). But as was the case with DAPA, the DACA program dispenses with immigration statutes by declaring lawful conduct that Congress has said was unlawful and amounts to unlawful Executive law-making by creating a class-based deferred-action program. This claim—independent of the statutory and APA arguments—furnishes another basis for this Court to overturn DACA. *J.E. Riley Inv. Co. v. Comm'r of Internal Revenue*, 311 U.S. 55, 59 (1940).

Intervenors claim, without citation, that "the Take Care Clause functions as a shield, not a sword. Litigants may not assert claims under it, and it does not give rise to a cause of action." MALDEF Br. 49. But the Take Care Clause imposes a duty on the Executive, and the Executive's failure to honor that duty is a constitutional violation capable of being challenged. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases to show a claim for injunctive relief against federal officials' unconstitutional acts). It is true that federal statutes preempt States from creating their own immigration classifications. *See Arizona v. United States*, 567 U.S. 387, 400-02 (2012). But that only reinforces why States can sue the Executive for abdicating those lawful-presence and work-authorization statutes that preempt state laws—especially when these actions trigger all sorts of benefits. Ultimately, Intervenors' position is equivalent to

the unreviewability argument offered by the Executive in *Youngstown*. *See* Texas DAPA Br. 72 (citing Br. for Plaintiff Cos., *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (No. 51-744), 1952 WL 82173 (App. 491). It was rejected there, *Youngstown*, 343 U.S. at 587-89, and fares no better now.

What Intervenors really challenge is the Plaintiff States' standing to bring such a claim—and though it was not addressed directly before, there is no basis for this argument to prevail in light of the States' standing in the DAPA litigation. *Texas*, 809 F.3d at 166-68; *see also infra* Part II.A (showing Plaintiff States' standing to bring this claim). Rather than being "unmoored" from manageable standards, the Plaintiff States have shown the conflict here between the statutory framework and the Executive's actions in propounding DACA. Plaintiff States' Br. 11-17. DACA "dispens[es]" with Congress's duly enacted immigration statutes by declaring lawful conduct that Congress established as unlawful. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838); Pls.' Mot. for Prelim Inj. 37-38. The Executive cannot exercise this legislative power by unilaterally declaring a class of aliens to be present lawfully and authorized to work lawfully.

Yet that is what DACA does. *See Texas*, 809 F.3d at 166 ("Deferred action, however, is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens."). By declaring unlawful conduct to be lawful, DACA violates the Take Care Clause and shows itself to be more than just a mere overreach of statutory authority. Compounding the problem, the Executive has used this lawful-presence dispensation

to grant a pathway to citizenship to otherwise unlawfully present aliens—in violation of what the Executive promised originally. Pls.' Mot. for Prelim. Inj. 38. This functional rewriting of the immigration statutes makes the Executive a lawmaker, thus violating the implicit promise of the Take Care Clause that the President avoid that role. *See Youngstown*, 343 U.S. at 587.

Relatedly, Intervenors misunderstand Justice Jackson's concurrence in *Youngstown*, 343 U.S. at 635-38. Not only does DACA violate Congress's 1996 decision to eliminate benefits for unlawfully present aliens, *see* Pls.' Mot. for Prelim. Inj. 26-27, it seeks to enact the very thing Congress has chosen not to do time and time again, Am. Compl. 10-11 ¶¶ 43-46. In unilaterally decreeing lawful presence for aliens, the Executive took "measures incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 637. Thus, in the *Youngstown* model Intervenors tout, the Executive's authority was at its nadir in adopting DACA. This, combined with the Fifth Circuit's recognition that DACA is a "complete abdication" of immigration statutes enumerating in careful detail which aliens may be lawfully present and obtain work authorization, *Texas*, 86 F. Supp. 3d at 663, amounts to a violation of the Executive's duty to take care that the laws are faithfully executed.

## II.   Intervenors Have Offered No Persuasive Reason to Deviate from *Texas v. United States* and Uphold DACA.

Intervenors fail to present any reason to depart from the settled law of *Texas*. Instead, their briefing offers distractions that this Court should disregard. Intervenors primarily argue that Plaintiff States lack standing, but their own experts confirm otherwise. They further assert that DACA is simply an act of prosecutorial

discretion that immunizes it from any APA concerns. That argument runs afoul of *Texas* and grossly misunderstands the record before this Court.

> ### A.   Plaintiff States have standing, as Intervenors' expert has confirmed.

Twenty states have sued over the 2017 rescission of DACA. *See* New Jersey Br. 4. No court has denied any of those states standing to challenge DACA's rescission. And New Jersey does not challenge Plaintiff States' standing to challenge DACA's implementation in this case—nor do the other 19 states and District of Columbia who filed an amicus brief in this case, *see* ECF No. 209.1. The post-discovery briefing only makes Plaintiff States' standing even more certain.

Plaintiff States offer four, separate bases for standing: (1) the healthcare, education, and law-enforcement costs incurred by Plaintiff States because of DACA; (2) the economic injury suffered by their citizens from hundreds of thousands of DACA recipients competing for jobs with citizens and lawfully present workers; (3) the institutional injury from the Executive's dispensation and abdication of duly enacted statutes; and (4) the special solicitude afforded to States in the standing inquiry.

In the post-discovery briefing, none of the parties dispute that there is a direct causal link between DACA and the provision of costly healthcare, education, and law-enforcement services by Plaintiff States. Amicus briefs filed by business groups estimate just how many DACA recipients compete with citizens for jobs, and they confirm that those employers will hire other lawful workers to fill those jobs should DACA end. The parties do nothing to dispute that DACA, like DAPA and Expanded

DACA, "necessitated identifying a class of individuals who are guilty of a violation of the country's immigration laws, and then announc[ed] that the law would not be enforced against them." *Texas*, 86 F. Supp. 3d at 641. And Intervenors' misconceptions about the special solicitude owed to Plaintiff States are laid bare— Plaintiff States have a statute through which to seek relief (*i.e.*, the APA), and recent case law does not change Plaintiff States' power to seek redress when the Executive fails to enforce laws in an area where Plaintiff States' powers have been preempted.

> **1.   No one disputes the causal link between DACA's continuation and Plaintiff States' provision of costly healthcare, education, and law-enforcement services to DACA recipients.**

In their post-discovery brief, Intervenors acknowledge that "any federal policy, and any federal immigration policy, is *certain* to have consequences for whether there are more (or fewer) residents in a given state, with attendant changes in healthcare, education, and law enforcement costs." MALDEF Br. 30 (emphasis added, internal quotations omitted). As such, none of their witnesses dispute that Plaintiff States spend money to provide such services to DACA recipients. And none of their witnesses allege that all DACA recipients will remain in the country should DACA end. Indeed, their witnesses admit the opposite.

For example, Intervenors retained Ray Perryman—an economist who has generated over $20,000,000 in fees to provide expert testimony over his career—to opine about the economic impact of DACA on Texas. Exh. 52, June 27, 2018 Depo. of R. Perryman 101:16-102:8 (App. 1661-62). Dr. Perryman admitted that "the State of Texas realizes some costs from DACA." *Id.* 12:23-25 (App. 1641); *see also id.* 47:9-17

(App. 1646) ("Q. So, again, just to reiterate, you say 'There are costs associated with the undocumented population which accrue to governmental entities such as education, social services and health care.' You still agree with that statement? A. Yes, sir. Q. And when you say undocumented population, that includes DACA recipients? A. I believe it would, yes."). And a calculation by Dr. Perryman estimates that Texas incurs over $250,000,000 annually in costs attributable to providing such services *to DACA recipients specifically*. Plaintiff States' Br. Exh. 21 (App. 1246).

One of those services provided to DACA recipients is public education. Again, the parties do not dispute that some DACA recipients attend public schools and do not dispute that public schools are funded in part by Plaintiff States. Exh. 53, June 28, 2018 Depo. of A. Brownson 8:3-6 (App. 1669), 27:25-28:4 (App. 1670-71), 65:12-66:3 (App. 1672-73), 82:10-19 (App. 1674); Exh. 52, June 27, 2018 Depo. of R. Perryman 19:15-19 (App. 1642); *see also* App'x to Chambers of Commerce Amicus Br. 123, ECF No. 221.2 (November 2017 study from Migration Policy Institute showing 20% of DACA recipients enrolled in secondary school); Exh. 54, June 15, 2018 Depo. of E. Jeon 21:4-22:21 (App. 1681-82) (Intervenor attended public high school after receiving DACA). One of the Intervenors herself lobbied for the continuation of DACA recipients' eligibility for the Texas college work-study program, which—just like driver's licenses—would not be available to DACA recipients but for the existence of the DACA program. *See* Plaintiff States' Br. Exh. 27, June 16, 2018 Depo. of K. Perez 74:24-75:25 (App. 1306-07). The expense to provide education to DACA recipients was one part of the $3.1 billion in annual costs of Texas's provision of services to

34

unlawfully present aliens estimated by Dr. Perryman. Exh. 52, June 27, 2018 Depo. of R. Perryman 53:12-54:4 (App. 1647-48). And that same education expense was part of Dr. Perryman's estimate of $250,007,800 in costs incurred by Texas because of its provision of services to DACA recipients specifically. *Id.* 67:2-76:9 (App. 1649-58); Plaintiff States' Br. Exh. 21 (App. 1246).

The same is true for Texas's cost to provide healthcare to DACA recipients. Exh. 52, June 27, 2018 Depo. of R. Perryman 74:8-13 (App. 1656) ("Do you remember those costs that you were trying to estimate, were those costs for the same types of services that are reported in Exhibit 3? A: They would be, yes. Q: So that would be health care, for example? A: Health care."); *see also* Exh. 55, June 27, 2018 Depo. of L. Ku 104:3-24 (App. 1691) (confirming that States incur costs to provide Emergency Medicaid services to DACA recipients). While Dr. Perryman may dispute the estimates used by Plaintiff States' witness to quantify the amount of services provided to unlawfully present aliens, he cannot dispute that Texas spends money to provide healthcare to DACA recipients. Exh. 52, June 27, 2018 Depo. of R. Perryman 76:13-24 (App. 1658) ("Q. [Y]ou don't dispute that the State of Texas does indeed incur a cost to provide health care to DACA recipients? . . . A. Again, the only clarification I would give is, again, for the undocumented population, since they use it, a little bit less for the DACA based population, but nonetheless I assume there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state."); *see also id.* 83:24-84:10 (App. 1659-60). That amount of money is included in his estimate of the $250,007,800 that Texas incurs

annually to provide such services to DACA recipients. *Id.* 74:8-75:13 (App. 1656-57);

Plaintiff States' Br. Exh. 21 (App. 1246)

That estimate also includes costs borne by Texas because of its provision of

law-enforcement services. Exh. 52, June 27, 2018 Depo. of R. Perryman 46:9-21 (App.

1645), 74:8-17 (App. 1656).[6] While Intervenors ignore Dr. Perryman's analysis of that

cost, they also create a false choice between those costs and public safety. For

example, they include the testimony of Austin Police Chief Brian Manley alleging

that DACA recipients would be less likely to report crime if DACA ends. Chief

Manley's declaration—which was drafted by the Intervenors' lawyers—initially

included testimony about Chief Manley personally "experiencing underreporting of

crime." Exh. 58, June 20, 2018 Depo. of B. Manley 57:14-59:3 (App. 1717-19). Chief

Manley removed that testimony because he *does not* have personal experience with

that issue. *Id.* In fact, Chief Manley expressed similar concerns about the effect of

Texas's 2017 legislation regarding local cooperation with federal immigration

officials. *Id.* 16:18-17:8 (App. 1710-11), 63:12-19 (App. 1721). Yet when Chief Manley's

department studied the effect of that legislation on rates of crime reporting, it found

there was no reduction at all. *Id.* 60:1-10 (App. 1720). Chief Manley's department has

not tracked the rate of underreporting of crime before and after DACA's

---

[6] Federal Defendants' publicly available information confirms this point. *See, e.g.,*
Exh. 56, USCIS, DACA Requestors with an IDENT Response 2-7 (App. 1695-1700);
Exh. 57, News Release, U.S. Customs & Border Protection, *Agents Arrest 2 DACA
Recipients for Involvement in Human Smuggling* (Jan. 29, 2018) (App. 1702-03).

implementation. *Id.* 18:16-25 (App. 1712). Chief Manley does not know how many DACA recipients live in Austin, in Texas, or in the U.S. *Id.* 29:20-30:2 (App. 1714-15). And Chief Manley can identify only *one* DACA recipient with whom he has talked, and they did not discuss the DACA recipient's willingness to report crime. *Id.* 30:12-31:3 (App. 1715-16).

In addition to the undisputed costs to provide services to DACA recipients, the direct causal link between DACA's continuation and those costs is not disputed. Notably absent from Intervenors' and New Jersey's post-discovery briefing is an acknowledgement of the survey results produced by their joint expert, Tom Wong. Dr. Wong's results show that 22.3% of surveyed DACA recipients are likely or very likely to leave the country should DACA end. Plaintiff States' Br. Exh. 22 at 13 (App. 1251). Likewise, Intervenors' demographer—Douglas Massey—testifies about DACA recipients' "ardent wish" to remain in the country even though he has not done any research on DACA recipients and has not interviewed any DACA recipients about their plans should DACA end. Exh. 59, June 26, 2018 Depo. of D. Massey 102:10-15 (App. 1726), 113:17-114:7 (App. 1727-28). Dr. Massey cannot testify that every DACA recipient will remain in the U.S. if DACA ends. And another expert retained by Intervenors acknowledged that it is possible that some DACA recipients will leave the country should DACA end. Exh. 60, June 27, 2018 Depo. of R. Gonzales 154:13-24 (App. 1734). That is consistent with this Court's prior holding, *Texas*, 86 F. Supp. 3d at 634; the testimony from Plaintiff States' demographer, Pls.' Mot. for Prelim. Inj. Exh. 8 (App. 860, 861-62); and one of New Jersey's DACA-recipient witnesses,

Plaintiff States' Br. Exh. 31 (App. 1348-51). Thus, Plaintiff States' injury is traceable to the continuation of DACA and redressable by the termination of DACA, and their standing is not defeated by the Federal Defendants' limited resources to deport only a certain number of people each year.

The Fifth Circuit has foreclosed Intervenors' response to this undisputed link between DACA and the costs it causes Plaintiff States to incur. In the predecessor case, the Fifth Circuit made clear that the "standing analysis is not an accounting exercise." *Texas*, 809 F.3d at 156 & n.61 (quoting *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).[7] Thus, the costs incurred by Plaintiff States are not "offset" for standing purposes by any alleged economic benefit from their continued presence.

### 2. The amicus brief from the chambers of commerce confirms that DACA recipients have been hired over citizens and other lawfully present workers in violation of Congress's "careful employment-authorization scheme."

Any doubts about the factual basis for Plaintiff States' standing based on the competitive injury suffered by its citizens are resolved by information provided by certain chambers of commerce and businesses. *See* Br. of Amici Curiae Hous.

---

[7] *Gill v. Whitford*, 138 S. Ct. 1916 (2018), does not change this analysis. *Gill* simply involved the application of *Lujan*'s settled principles to the distinct context of alleged injuries to individual voters caused by gerrymandering—and held that redistricting plaintiffs must live in the district alleged to be an unlawful gerrymander to have standing. *Id*. at 1929-31 ("[A] plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered."). That redistricting context has no relevance here, but even if it did, Plaintiff States have proven a "direct correlation" between their injury and the Executive action that brought about that injury. MALDEF Br. 22.

Hispanic Chamber of Commerce, Tex. Ass'n of Bus., *et al.*, ECF No. 221.1 ("Chambers of Commerce Br."). The chambers of commerce do not disagree that DACA is unlawful, and the facts stated in their brief proves precisely how DACA violates Congress's duly enacted statutes governing work authorization and the policy considerations that flow from granting such rights. Plaintiff States have standing to sue to protect the benefits of those statutes for their citizens.

As explained in Plaintiff States' post-discovery brief, none of the parties seriously dispute that granting work authorization to close to 700,000 unlawfully present aliens has prevented some citizens or lawfully present workers from losing out on jobs. *See* Plaintiff States' Br. 7, 39-40. And if employers had to create job openings to fill spots currently occupied by DACA recipients, citizens could see an increase in wages and labor participation rates. *See id.* Exh. 41 ¶ 23 (App. 1466-67); Exh. 52, June 27, 2018 Depo. of R. Perryman 25:17-20 (App. 1643), 27:20-24 (App. 1644); MALDEF Br. Exh. 74 at 10 ¶ 26 (an increase of 1% in the labor force participation rate would result in approximately 2.6 million more workers); *id.* Exh. 128 at 3 (finding that "[i]n contrast to the confusing array of results that now permeate the literature, the evidence consistently suggests that immigration has indeed harmed the employment opportunities of competing native workers.").

The amicus brief filed by the chambers of commerce only confirms this point. The chambers of commerce estimate that 382,000 DACA recipients are employed across many different industries, including nearly 70,000 DACA workers in Texas alone. Chambers of Commerce Br. 5, 11-12. The chambers of commerce allege that

39

DACA accelerates occupational mobility and that DACA recipients are only half as likely to work in the construction sector as other unlawfully present young adults. *Id.* at 12. That means DACA has allowed its recipients to compete with citizens and lawfully present workers for higher paying jobs. In particular, the chambers of commerce detail specific numbers of DACA recipients who work for various employers in Texas. *Id.* at 13-14 (*e.g.*, 57 DACA recipients work for Houston Methodist Hospital, 46 DACA recipients work for the University of Texas's MD Anderson Cancer Center, and 13 DACA recipients work for the Baylor College of Medicine). And the chambers of commerce make clear that citizens and other lawfully present workers will be hired to fill those positions should DACA end. *Id.* at 16 (alleging that businesses will "incur additional costs to fill positions now occupied by Dreamers"); *see also* Br. of Amici Curiae 114 Cos. & Ass'ns 10, ECF No. 204.1 (acknowledging that the companies will incur costs to hire new employees to replace DACA recipients); Br. of Amici New Jersey Businesses 5, ECF No. 192.1 (same); MALDEF Br. Exh. 45 at 4-5 ¶¶ 3-7 (confirming that Apple will hire replacements for its 250 DACA employees); *id.* Exh. 48 at 2-3 ¶¶ 7-10 (confirming that Univison will hire replacements for its approximately 60 DACA employees).

The chambers of commerce are concerned about losing their "valuable employees and customers." *Id.* at 6. The chambers of commerce overlook that Plaintiff States have not sought an immediate termination of all DACA permits, but rather the orderly wind-down of the unlawful program. *See* Am. Compl. 5 ¶ 16 (asking the Court to prevent the Federal Defendants from issuing any new DACA permits or

DACA renewals). But more fundamentally, they seek to put their profits over the express will of Congress. As the Fifth Circuit held in quoting this Court, the Immigration and Nationality Act's "careful employment-authorization scheme protect[s] against the displacement of workers in the United States, and a primary purpose in restricting immigration is to preserve jobs for American workers." *Texas*, 809 F.3d at 181 (alteration in original, internal quotations and footnote omitted). No doubt, the chambers of commerce can lobby their legislators to change the Immigration and Nationality Act because they disagree with its policy choices. Yet they have failed to entice Congress to act on their request to lawfully codify the DACA policy. And the brief from the chambers of commerce proves precisely how DACA violates the existing congressional framework and how Plaintiff States have standing to sue to protect the benefits of those statutes for their citizens.

> **3. Intervenors do not dispute the facts underlying the Court's prior holding that the Executive's unilateral conferral of lawful presence and work authorization injures Plaintiff States' sovereign and quasi-sovereign interests.**

Intervenors barely grapple with the Plaintiff States' standing based on their institutional injury caused by the Executive's dispensation and abdication of immigration statutes—an independent basis for standing this Court recognized in enjoining DAPA and Expanded DACA. Intervenors do not dispute this Court's earlier finding that the Federal Defendants claim total preemption in the classification of aliens. *Texas*, 86 F. Supp. 3d at 638. They further do not dispute that DACA recipients are subject to removal but for DACA. And they do not dispute that "[a]s demonstrated

by DACA . . . , however, the Government has decided that it will not enforce these immigration laws as they apply" to this population of over a million potentially qualified unlawfully present aliens. *Id.* at 639. Thus, Intervenors do not dispute the "fact pattern that exemplified the existence of standing due to federal abdication." *Id.*

That fact pattern is even stronger now in light of DACA recipients' use of advance parole to gain a pathway to citizenship. Advance parole was originally intended for urgent humanitarian reasons or significant public benefit. *See* Exh. 48 at 67 (DEF-00004716) (App. 1612). USCIS Immigration Service Officers are trained, however, to grant advance parole to DACA recipients for reasons such as semester-abroad programs or business meetings with clients overseas. *Id.* at 67-68 (DEF-00004716-17) (App. 1612-13). That misuse of advance parole then allows DACA recipients lawful entry back into the U.S., which can then allow them to adjust their immigration status. *See* Pls. Mot. for Prelim. Inj. 25-26. Intervenors do not dispute that this creates a pathway to citizenship for some DACA recipients.

In fact, one of the Intervenors has used advance parole twice to leave the country and reenter lawfully. Exh. 61, June 15, 2018 Depo. of J. Magaña-Salgado 18:20-19:1 (App. 1741-42), 23:3-19 (App. 1743). Another Intervenor (who originally entered the country unlawfully) received advance parole once by simply filing the application without any interview or follow-up from USCIS, but she could not make the trip due to a scheduling conflict. Exh. 62, June 16, 2018 Depo. of K. Perez 12:20-23 (App. 1753), 13:23-14:2 (App. 1754-55), 84:9-86:14 (App. 1758-60). She is now married to a U.S. citizen and has a pending application to adjust her status based on

her marriage. *Id.* 86:15-87:6 (App. 1760-61). Thus, if she applies for advance parole again (a grant that she has already received once) and uses it to lawfully reenter the country, she may remove a hurdle facing her application for adjustment of status.

Therefore, not only have Federal Defendants abdicated lawful-presence and work-authorization statutes as applied to DACA recipients, they have granted them a pathway to citizenship based on this abdication. Plaintiff States are powerless to enact legislation to protect that portion of their sovereignty preempted by Congress through duly enacted federal statutes. But that is exactly why Plaintiff States have standing to sue when the Executive dispenses with these preemptive federal statutes. In other words, Plaintiff States suffer an "institutional injury" when the Executive dispenses with or abdicates its responsibility to enforce those laws. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664-65 (2015).

### 4. Intervenors misunderstand the special solicitude owed to Plaintiff States.

Intervenors are simply wrong when they say Plaintiff States are not owed special solicitude in the standing analysis. *Massachusetts v. EPA* expressly says that States are owed "special solicitude" in the standing analysis. 549 U.S. at 520.

Intervenors claim that no statute gives Plaintiff States the right to seek relief here. MALDEF Br. 27. As this Court has already recognized, "Section 703 of the APA specifically authorizes a suit like this case where the States seek a mandatory injunction." *Texas*, 86 F. Supp. 3d at 632. The harm caused to Plaintiff States by DACA and the redressability of that harm by a court-order ending DACA has a much tighter causal link than rising sea levels due to the failure to regulate new car

43

emissions at issue in *Massachusetts v. EPA*, as the Fifth Circuit recognized. *Texas*, 809 F.3d at 153 (finding "the causal chain is especially direct" between DAPA and "Texas's injury"). Intervenors' own witnesses agree. *See supra* pp. 33-38. And Intervenors' citation of *Murphy v. NCAA*, 138 S. Ct. 1461, 1479-81 (2018), which involved anticommandeering principles not at issue in this case, overlooks that the opinion then cites *Arizona v. United States*, 567 U.S. at 401, for the proposition that "federal statutes 'provide a full set of standards governing alien registration.'" Thus, as in *Massachusetts v. EPA*, Plaintiff States have a right to seek redress for the Executive's failure to properly administer those laws. As the Fifth Circuit found in the predecessor lawsuit, Plaintiff States are due special solicitude in the standing analysis. *Texas*, 809 F.3d at 151. Nothing in Intervenors' or New Jersey's post-discovery briefs sets this case apart from that binding precedent.

### 5. There are no prudential standing obstacles to this Court's review.

Intervenors argue that Plaintiff States "lack standing based on prudential considerations." MALDEF Br. 8; *see id.* at 28-30. That is wrong because there is no principal of judicial deference in the immigration context that could preclude judicial review here. *See infra* Part II.B. That argument is also contrary to Fifth Circuit precedent, which exercised jurisdiction to review the virtually identical DAPA and Expanded DACA programs. The Court in *Texas* held that the Plaintiff States were within the zone of interests of the INA and that no prudential considerations could justify declining to exercise jurisdiction. 809 F.3d at 162-63, 169-70. The Court also explained that "Texas satisfies the zone-of-interests test not on account of a

44

generalized grievance but instead as a result of the same injury that gives it Article III standing." *Id.* at 163. As demonstrated in Part II.A, Texas has suffered injuries from DACA that confer Article III standing. So Intervenors cannot argue that Plaintiff States rely on mere "generalized policy grievances," MALDEF Br. 8, let alone demonstrate that the Court should decline to exercise jurisdiction on supposed prudential grounds. Similarly, Intervenors' suggestion that this case presents a nonjusticiable political question, *id.* at 30, fails under *Texas*. "[I]n invoking . . . jurisdiction, the states do not demand that the federal government 'control immigration and . . . pay for the consequences of federal immigration policy' or 'prevent illegal immigration.'" 809 F.3d at 170. As with the arguments against DAPA, the arguments against DACA are "about the [Executive]'s decision to change the immigration classification of millions of illegal aliens on a class-wide basis" and confer numerous benefits that contravene the INA. *Id.* "The federal courts are fully capable of adjudicating those disputes." *Id.*

## B. DACA cannot be justified as an unreviewable act of prosecutorial discretion.

Intervenors and New Jersey insist that DACA is simply an exercise in prosecutorial discretion. Notably, this argument is in direct contradiction with the arguments other States are making in challenging the 2017 DACA rescission memo. In all events, this argument woefully misunderstands the evidentiary record before this Court. DACA confers lawful presence and work authorization. And as the Fifth Circuit expressly held, this relief is "much more than nonenforcement" because it confers "'lawful presence' and associated benefits on a class of unlawfully present

45

aliens." *Texas*, 809 F.3d at 166. That means that DACA is much more than mere prosecutorial discretion.

As Plaintiff States have shown, there is no basis to deny relief on the basis that DACA is unreviewable agency action under the APA. Plaintiff States' Br. 44-46; Pls.' Mot. for Prelim. Inj. 17-27. Binding Fifth Circuit precedent holds that the materially indistinguishable Expanded DACA program is reviewable. *See Texas*, 809 F.3d at 169. Any differences between DACA and Expanded DACA and DAPA are immaterial because all these programs exceed mere prosecutorial discretion. Plaintiff States' Br. 44-46. So the Court cannot conclude that DACA is unreviewable on those grounds.

Intervenors are wrong that "principles of judicial deference" in the immigration context render DACA unreviewable. MALDEF Br. 31 (citing *Trump v. Hawaii*, 138 S. Ct. at 2402). If that remarkable assertion were correct, then DACA's rescission would also be unreviewable, and none of the courts reviewing the 2017 Rescission Memo have accepted that proposition. *See* Plaintiff States' Br. 7. The suggestion that the Executive has "discretion not to pursue removal" has no bearing on whether DACA's conferral of lawful presence and work authorizations is lawful or reviewable. MALDEF Br. 31. Plaintiff States have never challenged the Executive's enforcement priorities, which separately define priorities for "enforcement and removal activities," Pls.' Mot. for Prelim. Inj. Exh. 13 at 1 (App. 1000) (Feb. 20, 2017 memorandum). Nor do Plaintiff States challenge the Executive's "discretion to abandon" the "initiation or prosecution of various stages in the deportation process." *AADC*, 525 U.S. at 483.

The DACA Memorandum provides far more than "guidance on *which* non-citizens DHS should or should not consider for a favorable exercise of discretion." MALDEF Br. 32. "Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Texas*, 809 F.3d at 167. There is no need to "extrapolat[e]" from DACA to DAPA to realize that *Texas* controls this issue. MALDEF Br. 32 (quoting *Texas*, 809 F.3d at 173). The Fifth Circuit affirmed the injunction of not only DAPA, but of Expanded DACA. *Texas*, 809 F.3d at 169. Intervenors rely on purported differences between DACA and DAPA—that DACA covers a smaller population of unlawfully present aliens and that DACA applicants are more likely to have backgrounds that would warrant a discretionary denial. MALDEF Br. 34. But that is no basis to distinguish *Texas*, because the deferred action granted under DACA, Expanded DACA, and DAPA reflects far more than an alien's ability to "remain[]" in the United States." *Id.* at 34. These massive programs purport to confer lawful presence and numerous attendant benefits, as well as work authorization, to significant portions of the unlawfully present alien population, which has enormous "economic and political magnitude." *Texas*, 809 F.3d at 181.

Intervenors contend that DACA is unreviewable because "independent rules," not the DACA Memo itself, confer benefits to DACA grantees. MALDEF Br. 34 n.21. That argument fails because it ignores that DACA confers lawful presence and an attendant pathway to citizenship for numerous grantees. *See supra* Part I.A. Like Expanded DACA and DAPA, DACA is executive action creating a massive

bureaucracy to confer lawful-presence status and attendant benefits, so that executive action provides a "focus for judicial review." Plaintiff States' Br. 46 (quoting *Heckler v. Cheney*, 470 U.S. 821, 832 (1985)). So, too, does the fact that DACA removes categorical eligibility bars to benefits. *See id.* at 14. Also, *Heckler*'s unreviewability presumption, even if applicable, would be rebutted here: Agency policy that "is so extreme as to amount to an abdication of its statutory responsibilities" is reviewable. 470 U.S. at 833 n.4. The Executive has expressly abdicated its responsibility to enforce Congress's criteria for establishing lawful presence and work-permit eligibility. *See supra* Part I.A; Plaintiff States' Br. 41-43.

The Supreme Court did not undermine *Texas*'s reviewability holding in *Trump v. Hawaii. Contra* MALDEF Br. 34-36. *Trump* relied on a *specific*, *express* grant of broad statutory authority—8 U.S.C. § 1182(f)—for the President to restrict the entry of aliens to the country. 138 S. Ct. at 2407-09. It did not allow carte blanche Executive authority to create, under the guise of enforcement discretion, "immigration policies" that affirmatively grant lawful presence, work authorization, and attendant benefits to millions of aliens. MALDEF Br. 36 (quoting *Trump*, 138 S. Ct. at 2419). As explained in Plaintiff States' post-discovery brief, Congress has not given the Executive the broad and express statutory grant of discretion to unilaterally take such action. Plaintiff States' Br. 4-6, 20-21.

Nor is the Executive free to ignore governing statutes by conferring lawful presence, numerous benefits, and a pathway to citizenship contrary to substantive immigration law, contrary to procedural administrative law, and contrary to the Take

Care Clause of the Constitution. *Id.* at 4. *Trump v. Hawaii* recognized that Congress, through 8 U.S.C. § 1182(f), expressly granted the President broad power to deny aliens entry into the country. 138 S. Ct. at 2407-09. In contrast to that broad delegation over entry denials, Congress created a complex statutory scheme of 40 different classes of aliens who could be lawfully present and approximately 20 classes of aliens whose status authorized employment—all of which demonstrate that Congress did not delegate to the Executive the unilateral power to grant lawful presence or work authorization to whomever the Executive simply chooses not to deport. Plaintiff States' Br. 21. Stated differently, the President cannot "override particular provisions of the INA." *Trump*, 138 S. Ct. at 2411.

### C.  Under *Texas v. United States* and the record before the Court, Plaintiff States are entitled to judgment as a matter of law.

As explained in Plaintiff States' post-discovery brief, although Plaintiff States have satisfied all requirements for a preliminary injunction, Plaintiff States are also entitled to summary judgment as a matter of law. Plaintiff States' Br. 47-48. Nothing in the opposing briefs changes that result because there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56(a).

The Court can conclude on this record that DACA is unlawful as a matter of law. *See supra* Part I. There are no material fact disputes about whether DACA required notice and comment because DACA leaves no room for the exercise of discretion: not even the Federal Defendants can identify a *single* discretionary DACA denial. *See supra* pp. 22-23. And even if there were some factual dispute on that point, it is immaterial because DACA confers lawful presence and a host of benefits and was

49

thus required to go through notice-and-comment rulemaking. *See supra* Part I.B. Regardless, DACA is substantively unlawful as a matter of law because it contravenes the INA. *See supra* Part I.A.

Nor can Intervenors or the Federal Defendants show that material fact disputes preclude summary judgment on standing. Not only does Plaintiff States' evidence conclusively demonstrate that DACA imposes millions of dollars of costs on the States. *See supra* Part II.A.1. But Intervenors' own experts confirm as much, thus establishing there is no dispute of material fact on standing. *See supra* pp. 33-38.

## III.   The Remaining Preliminary Injunction Factors Favor Injunctive Relief.

### A.   Plaintiff States' irreparable harm is largely undisputed and cannot be excused by the mere passage of time.

Neither New Jersey nor Intervenors acknowledge the "sliding scale" approach endorsed by the Fifth Circuit: when likelihood of success on the merits is especially high, the harm that must be shown to merit an injunction is far less. Pls.' Mot. for Prelim. Inj. 7 (quoting *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)). Likewise, they overlook the millions of dollars of damage that DACA is causing Plaintiff States—which are largely admitted by their own witnesses. *See supra* pp. 33-38; Plaintiff States' Br. Exh. 21 (App. 1246).[8] And they make no mention of the injury to the citizens of Plaintiff States in attempting to

---

[8] Plaintiff States' argument concerning their injury for standing purposes as provided in Part I.A applies with each force to the irreparable-harm analysis. Plaintiff States reference and incorporate Part I.A herein.

secure employment or the institutional injury caused by the Executive's abdication of Congress's carefully designed scheme for granting lawful presence and work authorization—including the grant of full U.S. citizenship to otherwise unlawfully present aliens.

In response, Intervenors accuse Plaintiff States of a "six-year delay in challenging DACA." MALDEF Br. 50. According to Intervenors, Plaintiff States cannot show irreparable harm because of that alleged delay. *See id*. But the six-year delay Intervenors imagine does not exist, and in any case, Plaintiff States have undertaken a prudent approach to challenging DAPA, Expanded DACA, and DACA; that prudence should not weigh against them.

Plaintiff States have not unduly delayed in asserting their claims. President Obama announced his intention to create the DACA program on June 15, 2012. *See* Am. Compl. 14 ¶ 52. In November 2014, the Obama Administration announced the "Expanded DACA" program. *See id*. at 2 ¶¶ 2, 3; *see also Texas*, 809 F.3d at 147 (discussing Expanded DACA). Plaintiff States first brought legal action to enjoin President Obama's executive orders in 2014. *See* Compl., *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Dec. 3, 2014), ECF No. 1. That action described DACA as a "violation of the Nation's immigration laws." *Id*. at 4-5 ¶ 13. This court enjoined the Expanded DACA program in 2015. *Texas*, 86 F. Supp. 3d at 677-78. The Fifth Circuit affirmed. 809 F.3d at 187-88. In 2017, the President announced his decision to rescind DACA. *See* Am. Compl. 2-3 ¶¶ 3, 4, 5. That rescission was enjoined by another district court on April 24, 2018. *NAACP*, 298 F. Supp. 3d at 215-16, 248-49.

51

During that time, Plaintiff States challenged DAPA and Expanded DACA as unlawful. Because the legal principles at issue in that case would control the legality of DACA, Plaintiff States abided DACA while awaiting resolution of the DAPA and Expanded DACA litigation and while the President weighed DACA's lawfulness. When the President announced his intention to rescind DACA, he foreclosed any need for litigation. *See* Am. Compl. 3 ¶ 5. No need for litigation arose until April 24, 2018, when the district court for the District of Columbia issued its order enjoining DACA's rescission. *NAACP*, 298 F. Supp. 3d at 215-16, 248-49. The States brought this action one week later. *See* Compl., ECF No. 1.

That uncontested timeline shows that the States created no delay at all. To the contrary, the Plaintiff States adopted an "active litigation posture," *see Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 379 (2004), in which they specifically highlighted DACA's unlawfulness and presented the controlling legal principles now before the Court. *See* Compl., *Texas*, No. 1:14-cv-00254, ECF No. 1. That the Plaintiff States prudently first litigated the principles that control this action in the context of DAPA and Expanded DACA should not weigh against relief—especially since Intervenors cannot claim (and have not claimed) that they were unaware of Plaintiff States' position or suffered any prejudice.[9]

---

[9] Intervenors rely on the Supreme Court's recent unsigned opinion in *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (per curiam), but that case does not support their position. *See* MALDEF Br. 50. *Benisek* noted that "a party requesting a preliminary injunction must generally show reasonable diligence." 138 S. Ct. at 1944. The Court explained that a litigant may fall short of that standard if he delays many

### B.     Intervenors have not alleged any interest that outweighs preserving Congress's duly enacted laws.

The equitable arguments from Intervenors fall into three categories, none of which justifies allowing the Executive to ignore the express will of Congress. The economic impact of DACA alleged by the Intervenors and amici does not make lawful what is otherwise unlawful and ignores the benefits inherent in the stability and predictability of the proper enforcement of Congress's duly enacted laws. The same is true for the alleged public-safety concerns—however speculative they may be: all of the law-enforcement witnesses admit that they have a constitutional duty to enforce the law, even if non-enforcement benefited public safety. And Intervenors' alleged reliance interest is squarely inconsistent with their earlier acknowledgment that DACA is merely an act of prosecutorial discretion revocable at any time.

First, as Plaintiff States have made clear throughout this action, DACA embodies a dangerously broad conception of Executive power—one that if left unchecked, could allow future Executives to dismantle other duly enacted laws. In opposition to the preliminary injunction, Intervenors, New Jersey, and certain amici, including the Houston Hispanic Chamber of Commerce and the Texas Association of Business, ask the Court to simply ignore this unlawful use of Executive power because it may generate some economic benefit. It is easy to think of examples of how

---

years in presenting the core legal "theory" supporting relief when that "theory" could have been presented years earlier. *Id*. Here, Plaintiff States presented the legal "theory" underlying this litigation to this Court four years ago.

unlawful activities may generate some economic benefit through increased disposable income used to buy goods subject to State sales taxes. But no amount of benefit justifies such an unlawful and arbitrary erosion of the rule of law. *See Youngstown*, 343 U.S. at 613 (Frankfurter, J., concurring) ("The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power."). And any arguments about the policy of granting work authorization to the DACA population should be made to Congress, where the arguments can be fully debated and evaluated by the People's representatives.

The argument that ending DACA will harm public safety is similarly unfounded. Intervenors speculate, based solely on anecdotal evidence, that DACA recipients may cease reporting crime if the program ends. *See* MALDEF Br. 15-16. Their witnesses, however, do not even know how many DACA recipients reside in their jurisdiction and cannot recall a single conversation with a DACA recipient—let alone a discussion pertaining to the loss of DACA. Exh. 58, June 20, 2018 Depo. of B. Manley 29:20-22 (App. 1714) ("Q: Do you know how many people in Austin are DACA recipients? A: No."); Exh. 63, June 25, 2018 Depo. of A. Onofri 34:12-17 (App. 1767) ("Q: As you sit here today, can you recall one specific conversation with any DACA recipient? A: Again, I'm sure I had them but, no, I can't recall the specifics of any conversation."). In fact, Prosecutor Angelo Onofri could not conclusively state that a single DACA recipient lived in his county. Exh. 63, June 25, 2018 Depo. of A. Onofri

86:1-6 (App. 1772). Intervenors ask the Court to accept this sweeping public-safety justification despite a lack of any evidentiary support. *See supra* Part II.A.1.

Even if this generalized fear of law enforcement existed, it is misplaced. Chief Art Acevedo testified that his officers neither ask witnesses about immigration status nor report statuses to immigration officials. Exh. 64, June 20, 2018 Depo. of A. Acevedo 51:2-7 (App. 1780). He further confirmed that the fear of a police interaction resulting in the investigation of immigration status is generally "unfounded" based upon practice. *Id.* 53:1-16 (App. 1781). Each witness further confirmed that any lingering mistrust of police can be adequately addressed through community events and the use of specialized visas for witnesses and victims of crime—all of which will remain available after DACA is eliminated. *Id.* 99:18-100:21 (App. 1782-83); Exh. 63, June 25, 2018 Depo. of A. Onofri 43:12-16 (App. 1768), 45:25-46:15 (App. 1769-70), 77:20-22 (App. 1771).

Despite their unfounded opinions about DACA, these law-enforcement witness unequivocally concede that they had a constitutional duty to enforce the law, even if non-enforcement benefited public safety. Chief Brian Manley explained that Austin police officers are "required to abide by whatever laws are put upon us"—even if the law may make the community less safe. Exh. 58, June 20, 2018 Depo. of B. Manley 15:20-16:4 (App. 1709-10); *see also id.* 26:7-17 (App. 1713) (admitting that the logical extension of the public-safety argument would be for the Executive to announce that it was halting *all* deportations). Prosecutor Onofri also echoed Chief Manley's sentiment that it would be inappropriate to ignore the law simply because he believed

55

it would increase public safety. Exh. 63, June 25, 2018 Depo. of A. Onofri 87:4-10 (App. 1773). As the former director of Immigration and Customs Enforcement, Sarah Saldaña would have directed her employees to comply with a law even if she disagreed with it. Exh. 65, June 29, 2018 Depo. of S. Saldaña 27:13-18 (App. 1790). At bottom, the law-enforcement witnesses agree that the Constitution should not be cast aside based simply upon their personal views of public safety.

Lastly, Intervenors' alleged reliance interests should not be afforded any weight because of their own claim that DACA status is revocable at any time. Furthermore, Intervenors' reliance arguments highlight that DACA is not mere prosecutorial discretion, but instead is a grant of lawful status and substantial benefits—including a pathway to citizenship—to otherwise unlawfully present aliens. *See* Exh. 66, June 25, 2018 Depo. of D. Gonzalez 32:6-10 (App. 1796) (work authorization); Exh. 61, June 15, 2018 Depo. of J. Magaña-Salgado 73:3-75:4 (App. 1744-46) (social security number); Exh. 54, June 15, 2018 Depo. of E. Jeon 67:17-68:23 (App. 1683-84) (advance parole); Exh. 62, June 16, 2018 Depo. of K. Perez 84:9-87:6 (App. 1758-61) (advance parole and adjustment of immigration status). It is therefore the role of Congress, not this Court, to vindicate these alleged reliance interests, and the Intervenors are free to lobby Congress for such relief.

## IV. The Injunction Should Apply Nationwide and Would Not Contradict Injunctions Entered by Other Courts.

Consistent with the Fifth Circuit's holding in the predecessor litigation, the Court's injunction should apply nationwide. Pls.' Mot. for Prelim. Inj. 48-49 (citing *Texas*, 809 F.3d at 187-88). Because DACA was invalid in its entirety from its

inception, a nationwide injunction of DACA is warranted. *Id.* Only a nationwide injunction can fully remedy the harms to Plaintiff States from DACA, which dictates who can be lawfully present and authorized to work anywhere in the nation. Plaintiff States' Br. 55-56.

Contrary to Intervenors' suggestion, the other orders enjoining DACA's 2017 rescission memo are no basis to avoid enjoining DACA. The California and New York district courts' injunctions regarding the Executive's September 2017 DACA wind-down memorandum do not control this lawsuit. *See id.* at 55; Pls.' Mot. for Prelim. Inj. 48-49. Those orders concern the entirely separate action of the *2017 attempted rescinding* of DACA. Those cases thus deal with a question distinct from the question in this case—whether the attempted 2017 rescission of DACA was lawful. The plaintiffs in those cases argue that the attempted 2017 rescission was unlawful because the stated justification for the rescission was insufficient and because it did not go through notice and comment as required by the APA. Those questions regarding the lawfulness of the 2017 attempted Executive action are separate from the questions raised by Plaintiff States in this case regarding the unlawfulness of the 2012 Executive action and its continued 2018 implementation.

Indeed, the attempted 2017 rescission cases involve different parties, different courts, different executive actions, and ultimately different legal questions. The Defendants have not sought to stay the effect of those injunctions, and Defendants have not issued a new memorandum trying again to rescind DACA in an effort to moot the challenges to the 2017 memorandum. Instead, Defendants continue to

implement DACA (with some exceptions) indefinitely. *See* Pls.' Resp. in Opp'n to Def.-Intervenors' Mot. to Dismiss Exh. A, ECF No. 188.[10] And that implementation will only expand if the order from the District of Columbia district court takes effect and rescinds the 2017 memorandum entirely.

Intervenors argue that this Court should not weigh in on DACA because the California court not only rejected the 2017 rescission of DACA, but also "addressed" DACA's legality. MALDEF Br. 10. But as the States have explained, the other courts did not actually rule that DACA was lawful. Plaintiff States' Br. 22. Because those courts have not fully examined all the arguments that DACA is unlawful, and because DACA's lawfulness is a different—albeit related—issue from the DACA rescission memo's lawfulness, this Court is free to rule on the legality of the original DACA program by considering all the arguments against the program. *Id.* at 23-27. The partial analyses (and injunctions) from other district courts around the country—not tasked with fully explicating and determining DACA's lawfulness—are no obstacle to this Court's consideration of the question.

The Court should reject Intervenors' suggestion that a preliminary injunction would "undermine the valid judgment of a sister court, which was the first to issue a decision regarding the legality of DACA." MALDEF Br. 11. This Court already issued a decision enjoining Expanded DACA long before these other district courts addressed

---

[10] Plaintiff States incorporate by reference the entirety of their Response in Opposition to Defendant-Intervenors' Motion to Dismiss.

the 2017 DACA rescission memo. Intervenors suggest that, because the State of Texas filed an amicus brief in the California litigation, Plaintiff States are thus "seek[ing] here to relitigate arguments that have already been presented and rejected." *Id.* But nothing about Plaintiff States' ability to file an amicus brief in a separate lawsuit precludes their ability to file this lawsuit as party plaintiffs and seek relief in this Court. Plus, Intervenors' argument ignores that the California court was not bound by Fifth Circuit precedent, as this Court is.

To be clear, this case is not a collateral attack on the injunctions issued in the attempted-rescission cases. Indeed, it does not even touch on the question of whether the attempted 2017 DACA rescission followed proper procedures. This case solely examines whether DACA, from its inception in 2012 to its continued 2018 implementation, is lawful. That is in contrast to the rescission case pending in the Eastern District of New York, which began as a striking collateral attack on this Court's injunction of Expanded DACA. *See* Pls.' Resp. in Opp'n to Def.-Intervenors' Mot. to Dismiss Exh. B, Compl., *Batalla Vidal v. Baran*, No. 1-16-cv-4756 (E.D.N.Y. Aug. 25, 2016). The plaintiff in that case received a three-year Expanded DACA permit one day after this Court enjoined Expanded DACA. *Id.* Exh. B ¶ 32. The plaintiff filed suit in New York asking the court to "[e]njoin Defendants from revoking Mr. Batalla Vidal's three-year employment authorization on the basis of the injunction in *Texas v. United States*." *Id.* Exh. B at Prayer for Relief (e). If there were ever a request for a competing injunction, that is it—not the instant case properly before this Court. And despite that collateral attack in New York on this Court's

injunction, the judge in that case felt in no way constrained by this Court's first-in-time order. *See id.* Exh. C, Sept. 22, 2016 Conf. Tr. 11:22-12:25, *Batalla Vidal*.

Intervenors now argue that a ruling from that judge on a different Executive action somehow precludes this Court's ability to enjoin the 2012 Executive action. But this Court need not address any of those issues, because—in contrast to the plaintiff in *Batalla Vidal*—Plaintiff States here are not asking for a competing, collateral injunction regarding the same executive action. And this Court has before it Plaintiff States that are being harmed by continued consequences of the unlawful action that the Executive took in 2012 and continues to implement in 2018.

Any argument that Plaintiff States' injuries are not redressable by this Court because of the preliminary injunctions that enjoin the attempted 2017 rescission of DACA is wrong on its face. A court's ruling that the rescission of DACA in 2017 was unlawful does not ratify and legalize its creation in 2012 or even its continued implementation in 2018—just like the failure to properly repeal a statute would not cure any legal defects that may exist in the statute as initially created or implemented. Even if the DACA-rescission cases reach a final judgment that the 2017 rescission was unlawful, this Court can still rule on whether DACA's creation in 2012 or its continued implementation was and is unlawful. And if it decides that it is, the Court can issue an order enjoining DACA's continued enforcement. Such an order will redress Plaintiff States' injuries directly caused by DACA's ongoing implementation.

Finally, any argument that the Court should not enjoin DACA because it would submit the Federal Defendants to conflicting obligations fails. First, the other orders

from the California and New York courts do not require accepting new DACA applications or advance-parole applications. *See Cal. Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 437. So enjoining those elements of the DACA program would not conflict with any existing injunction. Second, even if the California and New York injunctions are read to require the Federal Defendants to continue to accept DACA renewal applications, this Court can moot those injunctions by enjoining DACA entirely. Also, read that way, those injunctions are improper because they are not tailored to the relief sought by the plaintiffs in those cases (*i.e.*, an injunction to stop the effect of the 2017 rescission memorandum). As Plaintiff States have explained, enjoining DACA would serve the public interest and equity because the California and New York injunctions were overbroad. Plaintiff States' Br. 56. So the Court would not "do a great disservice to the public interest," or "cause a constitutional crisis," by enjoining the unlawful DACA program. New Jersey Br. 49. And, finally, any concerns about competing obligations can easily be resolved by this Court granting summary judgment in favor of Plaintiff States and setting aside the 2012 DACA memorandum, even if the Court is inclined to stay the set-aside for a period of time to allow for an orderly winddown of the unlawful program.

## CONCLUSION

Because there is no genuine dispute of material fact, the Court can treat Plaintiff States' motion for a preliminary injunction as a motion for summary judgment and grant final judgment accordingly. At a minimum, though, the Court should grant a preliminary injunction.

August 3, 2018

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

PATRICK MORRISEY
Attorney General of West Virginia

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

62

## CERTIFICATE OF SERVICE

I certify that on August 3, 2018, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**