# Exhibit 44

# Exhibit 44

stephen legomsky [ Follow ]
Jun 3, 2016 · 7 min read

# WHEN A JUDGE IS OUT OF CONTROL

By Stephen Legomsky

June 3, 2016

Soon the Supreme Court is expected to hand down a decision in U.S. v. Texas, the lawsuit challenging President Obama's executive actions on immigration. In the meantime, Judge Andrew Hanen, the federal judge who had already put the President's program on hold nationwide, has now sanctioned the Justice Department attorneys for what he calls intentional misconduct. The Justice Department in fact has done nothing wrong. Judge Hanen has.

In 2012, the Administration announced a policy called DACA. Under this program, certain undocumented immigrants who were brought to the United States as children and have lived here continuously since 2007 may request "deferred action," an instrument that Administrations have used for several decades to formulate immigration enforcement priorities. When granted, deferred action provides a temporary reprieve from removal and eligibility for a temporary work permit.

On November 20, 2014 the President announced several additional initiatives, which Secretary of Homeland Security Jeh Johnson laid out the same day in a memo. One of those measures was to expand DACA —both by broadening the eligibility criteria and by lengthening the period of deferred action from two years to three years for those who receive it. Another measure, included in the same memo, was DAPA, a policy that would allow certain long-term resident parents of U.S. citizens and lawful permanent residents to request deferred action.

About two weeks after the November 20 announcements, a group of Republican governors and attorneys general, led by Texas, sued the federal government. They sought an injunction that would prohibit the Administration from implementing both DAPA and the expansion of

DACA. For strategic reasons, they elected not to challenge the original DACA.

They filed their suit in the federal district court in Brownsville, Texas. The only active judge in that court was Andrew Hanen. In an earlier case this judge had launched a bizarre, venomous attack on President Obama's immigration enforcement strategies, even though those policies had no legal relevance to any of the issues presented. Texas's lawyers knew an inviting forum when they saw one.

Judge Hanen did not disappoint. In a rambling, vitriolic 123-page opinion, issued the day before DHS was to begin accepting requests under the expanded DACA criteria, he issued a preliminary injunction that has prevented the Administration from implementing both DAPA and the expansion of DACA.

Judge Hanen's opinion was rife with factual errors, selective use of the evidence, and legal distortion. But many legal scholars have already exposed its multiple flaws. See https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf. In this article I focus on his side order sanctioning the Justice Department attorneys for its supposed misconduct.

Others have written very effectively about that as well. See http://thinkprogress.org/justice/2016/05/20/3780285/100000-innocent-peoples-home-addresses-become-public-thanks-judges-insane-order/. But their main emphasis has been on the remedy that Judge Hanen chose. He ordered the Justice Department to release the names and contact information for more than 100,000 undocumented immigrants who had received three-year grants under the original, unchallenged version of DACA *before* any court order prohibited them. He also announced that he would share this personal information with any states that show what he considers good cause. Finally, he imposed a range of ethics training requirements on all Justice Department attorneys who wish to appear in any cases in any federal or state courts in any of the 26 plaintiff states.

The problems with the wide sweep of that remedy—for the privacy and reliance interests of the individuals whom he seeks to out, for the effective functioning of government, and for the disconnect between

the claimed misconduct and the remedy—are manifold. I am confident that ultimately the order will be struck down for those reasons alone.

But the problem runs deeper: The government simply did nothing wrong to begin with. And that is what makes Judge Hanen's blistering attack on the Justice Department attorneys' ethics and the consequent public defamation of their character all the more shameful.

This is what happened: The Secretary's November 20, 2014 memo laid out the time schedule for implementing the various policies described above. For individuals who qualify under the *original* DACA policy, grants of deferred action would be issued for three-year periods (rather than the previous two years) beginning on November 24. For those who qualify for DACA only under the *expanded* eligibility criteria, US Citizenship and Immigration Services (USCIS), the Homeland Security agency that implements deferred action, would start accepting requests within 90 days. USCIS would begin accepting DAPA requests within 180 days.

As announced, USCIS on November 24, 2014 began granting deferred action and work permits for three-year periods to those who qualified under the original, unchallenged DACA criteria. From that date until Judge Hanen's February 16, 2015 injunction, about 108,000 of those three-year grants were issued.

During that period there were various oral hearings and written submissions. When the subject of timing came up, the Justice Department attorneys assured the court that it did not plan to take action on expanded DACA before February 18, 2015 or on DAPA until May 2015. On March 3, about two weeks after the injunction had issued, the Justice Department's attorneys realized that their earlier statements about no action being taken on expanded DACA might be misunderstood. They had meant only that USCIS had not yet begun accepting requests from the expanded group of DACA qualifiers, not that they had been holding off on the previously-announced decision to grant DACA for three years (rather than two years) to those who qualify under the original unchallenged version. Commendably, they filed an "Advisory" with the court in case anyone had misunderstood.

To Judge Hanen, the Advisory not only was not commendable; it was an admission that DOJ attorneys had lied to the court. They had said

they had not yet taken any action on "expanded" DACA, when in fact they had granted DACA to 108,000 people for three-year periods, albeit only to the original group.

Judge Hanen's accusation of deliberate deception is absurd for two reasons: DOJ attorneys would have had nothing to gain from such deception, and they could not conceivably have thought they would be able to get away with it even if there had been a motive for doing so.

As for motive, Judge Hanen speculated that they were trying to discourage Texas's attorneys from requesting a "temporary restraining order" (TRO). This is an order that takes effect immediately, preventing the government from acting before the judge has a chance to decide the longer-term preliminary injunction. Until then, however, the sole focus of all the arguments on both sides had related to the DACA expanded eligibility criteria and to DAPA—not to the question of two-year durations versus three years.

This was for good reason. While Texas argued that the increased number of deferred action recipients would raise the administrative costs it incurred in issuing driver's licenses, no part of their alleged harm depended on whether deferred action is issued for two years or for three. To the contrary, if Texas's claim is that expanded DACA and DAPA will require the state to process more driver's license applications, then having to process them only once every three years rather than once every two years would actually *reduce* their claimed losses. To date, Texas still has never explained how the issue of two years versus three years affects them.

Nor have either Texas's lawyers or Judge Hanen adequately explained how a TRO would have helped them, or how not knowing earlier about the 108,000 three-year grants hurt them. Remember: we are talking only about people who already qualified under the original DACA criteria—which no one was challenging. The third year, even if otherwise harmful to Texas in ways they still have not explained, would not kick in until long after Judge Hanen had ruled on the preliminary injunction. Issuing the injunction—as he ultimately did—negated the third year. And if he had denied the injunction, then the third year would rightly have gone into effect. Either way, that third year would never materialize unless Judge Hanen concluded that it should. So the government had no possible motive to conceal this information.

6/23/2018
Case 1:18-cv-00068   Document 284-2   Filed on 08/03/18 in TXSD   Page 6 of 8
WHEN A JUDGE IS OUT OF CONTROL – stephen legomsky – Medium

But let's pretend it had something to gain by deceiving the court. Think about how impossible that would have been. DHS had been up front about its timing intentions from day one. It announced the November 24, 2014 effective date for the three-year grants in its November 20 memo—the very memo that is in dispute in this case. Judge Hanen, in fact, quoted that memo verbatim—including the part specifying the November 24 starting date—in his own opinion. To claim surprise assumes he not only didn't read the very document he was enjoining, but also didn't read his own opinion. Moreover, the government specifically told the court, in an affidavit submitted on January 30, 2015, weeks before Judge Hanen's injunction, that the three-year approvals had begun on November 24, 2014. That starting date was also all over the USCIS website. Politicians and commenters discussed it publicly. And during the relevant period, more than 1500 USCIS adjudicators issued more than 100,000 three-year deferred action grants. Does Judge Hanen really believe that DOJ lawyers thought no one would notice this? Does he really believe the Justice Department's lawyers would take such a reckless risk with nothing to gain?

Judges, above all else, are to be impartial. That doesn't mean they cannot have preexisting policy preferences. It does mean they cannot let their political biases and their emotions overcome their fair appraisals of the evidence and their fair interpretations of the law. Judge Hanen has crossed that line—again.

*Stephen Legomsky is a recently-retired law professor at the Washington University School of Law, a former Chief Counsel of US Citizenship and Immigration Services in the Department of Homeland Security, and the principal author of "Immigration and Refugee Law and Policy," which has been the required text for immigration courses at 185 law schools.*

App. 1494