# Exhibit 52

Transcript of the Testimony of

**Ray Perryman**

**Date:**

June 27, 2018

**Case:**

STATE OF TEXAS vs UNITED STATES of AMERICA

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4

 5   STATE OF TEXAS,                    )

 6          Plaintiffs,                 ) Case No.

 7          vs.                         ) 1:18-cv-00068

 8   UNITED STATES OF AMERICA, et al., )

 9          Defendants,                 )

10          and                        )

11   KARLA PEREZ, et al.,               )

12          Defendant-Intervenors. )

13   --------------------------------------------

14                   ORAL DEPOSITION OF

15                     RAY PERRYMAN

16              Wednesday, June 27, 2018

17   --------------------------------------------

18          Oral deposition of RAY PERRYMAN, produced as

19   a witness at the instance of the Plaintiff States, and

20   duly sworn, was taken in the above-styled and numbered

21   cause on the 27th day of June, 2018, from 2:00 p.m. to

22   4:44 p.m., before Deborah L. Endler, Notary Public in

23   and for the State of Texas, reported by stenographic

24   means, at the offices of the Attorney General, 300

25   West 15th Street, 11th Floor, Austin, Texas 78701,
```

1  pursuant to the Federal Rules of Civil Procedure and

2  the provisions stated on the record or attached

3  hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF STATES:

 3   Todd Lawrence Disher, Attorney-in-Charge

 4   OAG - Assistant Attorney General

 5   Special Counsel for Civil Litigation

 6   General Litigation Division

 7   300 West 15th Street, 11th Floor

 8   Austin, Texas 78701

 9   512.463.2008

10   todd.disher@oag.texas.gov

11

12   FOR THE DEFENDANTS:

13   Keith Edward Wyatt, Assistant U.S. Attorney

14   U.S. Department of Justice, Civil Division

15   Southern District of Texas

16   1000 Louisiana Street, Suite 2300

17   Houston, Texas 77002

18   713.567.9713

19   keith.wyatt@usdoj.gov

20                    (continued)

21

22

23

24

25
```

Ray Perryman                                                    June 27, 2018
                                                                      Page 4

```
 1   APPEARANCES: (continued)

 2   FOR THE DEFENDANT-INTERVENORS:

 3   Katherine A. Gregory

 4   Office of the Attorney General of New Jersey

 5   25 Market Street, 8th Floor

 6   Trenton, New Jersey 08625

 7   katherine.gregory@dol.lps.state.nj.us

 8

 9   FOR MALDEF:

10   Ernest I. Herrera, Esquire

11   Mexican American Legal Defense and Educational Fund

12   1100 Broadway, Suite 300

13   San Antonio, Texas 78205

14   eherrera@maldef.org

15

16   ALSO PRESENT:  Joseph Shaneyfelt, Baylor Law Student

17

18

19

20

21

22

23

24

25
```

1   anyone who exists in a state, we contribute something

2   and we make use of the water systems and the sewer

3   systems and highways and potentially school districts

4   and we pay revenue into the system as well.  So it's a

5   case of balancing those things against one another.

6        Q.    And that's what you tried to do, in part,

7   in your Declaration?

8              MR. HERRERA:  Objection, vague.

9        A.    Yes, sir.  Well, actually, I'm sorry, in

10  prior work we've done that I incorporate in the

11  Declaration, that's correct.

12       Q.    Okay.  So fair to say in your opinion the

13  State of Texas benefits, to some degree, from the DACA

14  program?

15       A.    On a net basis, yes, sir.

16       Q.    And then if we go to below the net, net

17  means you took out the benefits, you took out the

18  costs and the benefits; right?

19       A.    That's correct.

20       Q.    So in that equation the State of Texas

21  realizes some benefit from DACA?

22       A.    That's correct.

23       Q.    And the State of Texas realizes some costs

24  from DACA?

25       A.    Correct.

1    currently in school?"  Do you see that?

2        A.     Yes.

3        Q.     And the "yes" response is 44.9 percent?

4        A.     Yes.

5        Q.     And do you think that's where you got the

6    45 percent cited in paragraph 19 in your Declaration?

7        A.     Yes.

8        Q.     Okay, great.  So then if we go to the next

9    page, we see "What degree are you currently pursuing"?

10   Do you see that?

11       A.     Yes, sir.

12       Q.     Then we have 2.7 percent getting their high

13   school diploma.  Do you see that?

14       A.     Yes, sir.

15       Q.     Based on that, do you think that some

16   portion of DACA recipients are currently in high

17   school?

18       A.     I would think so.  The age would suggest

19   that.

20       Q.     Right.  All right.  If we turn to the page

21   of your Declaration, I'm sorry, the sentence begins on

22   page 7.  It says "Overall, 36 percent of respondents

23   25 years or older have at least a bachelor's degree

24   and 94 percent of those currently in school indicated

25   that DACA allowed them to pursue educational

1   lot of females entered the workforce who had

2   historically had not been there, that's also

3   plateaued, starting to fall off a little bit now.

4        So a phenomenon that existed for a couple

5   decades has now reached its peak and start going the

6   other direction.  So that's something that can effect

7   it.

8        There is any number of situations that can

9   affect why a person chooses to participate or not

10  participate in a workforce.

11       Q.    If median wages go up, does that affect --

12       A.    It can.

13       Q.    How would it affect that?

14       A.    If you have a situation of higher wages,

15  that may well encourage some people to choose to enter

16  the workforce.

17       Q.    Okay.  What about the number of job

18  openings, can that affect the labor force

19  participation?

20       A.    It can, absolutely.

21       Q.    How would that happen?

22       A.    Well, if you, where you normally see this

23  where you have a recession sometimes, people will get

24  discouraged about the number of job openings or the

25  ability to find a job, and may, after searching for a

**App. 1643**

Ray Perryman

June 27, 2018
Page 27

1          A.     One more.  I'm with you.

2          Q.     In paragraph 31 you talk about the labor

3     shortage and then the third sentence says "Some

4     companies have increased wages to attract more

5     qualified applicants."

6          Why would a company increase wages to

7     attract more qualified applicants?

8          A.     Because they have a need for workers and

9     there is not, there is not workers available.

10         We have an interesting situation right now

11    we've never had in history before, since we have been

12    keeping data on some of these statistics, and that is

13    that we have a lot more job openings even in total

14    number of unemployed people.  So it's a really, it's a

15    very interesting phenomenon in the workforce right now

16    that we haven't seen before.  And a lot of areas where

17    there is workforce shortages, that's one way you try

18    to induce people to work, either to come into the

19    workforce or to change jobs.

20         Q.     Yeah, okay.  So if I can just summarize

21    that in my head to make it make sense to me, so if

22    there is a labor shortage, that can potentially

23    increase wages?

24         A.     Certainly.

25         Q.     Okay.  So if there is, let me say it a

 1   I've done a lot of work over the years is the area of
 2   hunger and the food banks, food pantries, that sort of
 3   thing, that provide that service to people
 4   irrespective of immigration status, do get some
 5   support from the state, so that might be one example.
 6        Q.    Okay.  Anything else you can think of?
 7        A.    I'm sure there are others.  That's one that
 8   comes to mind.
 9        Q.    What about law enforcement?  How does the
10   state incur a cost providing law enforcement services
11   related to undocumented workers?
12              MR. HERRERA:  Objection, vague.
13        A.    Well, generally we all benefit from the
14   availability.  If you are in an area, you benefit from
15   the availability of law enforcement.  But more
16   specifically, like any large group of people you
17   probably going to have some of these folks do some
18   things they shouldn't do and end up in the law
19   enforcement system which involves potentially court
20   costs, prosecutorial costs, costs of incarcerating
21   people, things of that nature.
22        Q.    On this sentence on page 17 when you say
23   "costs involved with undocumented workers," as we
24   talked about earlier, that phrase "undocumented
25   workers" includes the DACA population?

Ray Perryman                                                June 27, 2018
                                                                Page 47

1      A.      Again, it more than likely does because as
2  I understand it that's technically how they are still
3  classified.
4      Q.      Okay.  Let's move on.  Go to page 19,
5  please.
6      A.      Yes, sir.
7      Q.      The bottom paragraph on that page.
8      A.      Yes, sir.
9      Q.      So, again, just to reiterate, you say
10 "There are costs associated with the undocumented
11 population which accrue to governmental entities such
12 as education, social services and health care."  You
13 still agree with that statement?
14     A.      Yes, sir.
15     Q.      And when you say undocumented population,
16 that includes DACA recipients?
17     A.      I believe it would, yes.
18     Q.      And then you say "The Perryman Group
19 measured these costs based on the best available
20 information from various sources."  When I read that,
21 to me that sounds like it's an estimate; is that fair
22 to say?
23     A.      Well, certainly.  We don't know exactly a
24 lot of these.  There is not exact measures of
25 anything.  We don't know the exact amount.

 1    break it down then.  Do you know how you calculated

 2    the $3 billion estimated expense to the federal

 3    government caused by the undocumented population?

 4         A.    Not without working back through all the

 5    information from the time.  I'm sorry.

 6         Q.    What about the $3.1 billion to the State of

 7    Texas?

 8         A.    I would have to give the same answer there.

 9         Q.    And same for the $6.7 billion for local

10    entities?

11         A.    Yes.

12         Q.    So this $3.1 billion to the State of Texas

13    is the cost you estimated Texas incurred because of

14    its provision of services to the undocumented

15    population in Texas?

16         A.    Correct.

17         Q.    And that undocumented population included

18    the DACA population?

19         A.    I believe it would have, yes.

20         Q.    All right.

21         A.    As they are a percentage of it, and I would

22    have to probably use fewer services, but yes.

23         Q.    All right.  And you said fewer services but

24    you are not saying that the DACA population used none

25    of these services?

Ray Perryman                                         June 27, 2018
                                                          Page 54

```
 1       A.     I would not think so.  I can almost
 2  guarantee they used water and sewer.
 3       Q.     And health care and education?
 4       A.     Right.
 5       Q.     Okay.  If you flip to page 21, please.
 6       A.     Yes, sir.
 7       Q.     Will you just give me an explanation of
 8  what this chart calculates?
 9       A.     Certainly.  It looks at the direct and
10  indirect benefits broken out by state and local
11  governments, I'm sorry, federal, state and local
12  governments in Texas and then subtracts from those the
13  cost for those items referred to.
14       Q.     Okay, so the first three rows are benefits?
15       A.     Correct.  Correct, yes, the third row is
16  just the sum of the first two.
17       Q.     I see.  And then the last row is the cost?
18       A.     Correct.
19       Q.     So and then if we look at the total net
20  effect, total, it's 32.9 billion?
21       A.     Correct.
22       Q.     And what did you do with that 32.9 billion?
23       A.     It's just one of the numbers we report in
24  the report.
25       Q.     Fair enough.  But if we look back at page 3
```

1   it, but I think it was fine.

2        Q.     Now let's look at paragraph 39.  In here

3   you are talking about the benefits to the United

4   States and Texas because of the business activity

5   associated with DACA recipients?

6        A.     Correct.

7        Q.     Now, how did you calculate those benefits?

8        A.     The process was very similar to the one in

9   the report that you and I just went through at some

10  length.  Basically we took that same basic model and

11  made some adjustments to it.  One adjustment was it

12  was a couple years later so we had to do some price

13  adjustments.

14       But beyond that, we looked at the relative

15  wages of the DACA population versus the non-DACA and

16  made some of those type of adjustments.  But the

17  modeling structure process was the same as the one

18  that we used in the study that you referenced earlier.

19            (Deposition Exhibit 8 was marked.)

20       Q.     All right, I'm going to show you Exhibit 8.

21  This is from the production your counsel made to us --

22       A.     Yes, sir.

23       Q.     -- regarding your work file.

24       A.     Yes, sir.

25       Q.     These are the numbers that are ultimately

1   reflected in paragraph 39?

2       A.    Yes, sir.

3       Q.    And what is this document that I've marked

4   as Exhibit 8?

5       A.    It's just a document that my firm generated

6   from our programs that gave the, all the numbers, code

7   numbers.

8       Q.    And when I look at Exhibit 8, I see that,

9   and I compare Exhibit 8 to paragraph 39, if we just

10  look at the Texas specific portion, sentence in

11  paragraph 39 begins "For Texas, the direct gains in

12  business activity associated with DACA recipients

13  include an estimated $11.5 billion in output" and that

14  comes from the gross product Texas direct --

15      A.    That's correct.

16      Q.    -- in Exhibit 8?

17      A.    (Witness nodded.)

18      Q.    And then "$7.2 billion in income each

19  year," and that also comes from Exhibit 8, the

20  personal income number?

21      A.    Yes, sir.

22      Q.    For Texas direct.  "In addition to more

23  than 108,100 thousand jobs."

24      A.    Yes.

25      Q.    And that also comes from Exhibit 8?

1      A.     Yes, sir.

2      Q.     Okay.  So that's talking about the direct

3 benefits; right?

4      A.     Correct.

5      Q.     And then if we look on Exhibit 8, we see

6 the total benefits for Texas, and I assume that's the

7 multiplied benefits?

8      A.     Multiplied benefits.

9      Q.     Okay.

10     A.     And they are all nets as well.

11     Q.     How do we know that they are nets?

12     A.     Because that's how I set up the system.

13 It's exactly the same modeling structure that was used

14 in the prior report.

15     Q.     Okay.  So when you set up the system, it

16 did, in fact, calculate the projected costs incurred

17 by Texas because of DACA recipients in the state?

18     A.     Yes.

19     Q.     Is that information that you can provide to

20 your counsel?

21     A.     By cost, you're talking about the net cost

22 and benefits to the government as opposed to the --

23     Q.     Yes, sir.  So, for example, if we look at

24 Exhibit 3 --

25     A.     Yes.

1       Q.      -- which is a similar study you did for

2   undocumented workers generally; right?

3       A.      Yes, sir.

4       Q.      And on page 20 you have estimated the costs

5   of those undocumented workers to the State of Texas,

6   for example?

7       A.      Yes, sir.

8       Q.      You did that same estimating for DACA

9   specific recipients; right?

10      A.      I used the same program, so should be able

11  to go back and extract it.

12      Q.      Okay.

13      A.      The only other thing I could suggest, I

14  think we also provided you with, we didn't do a full

15  blown report on this, it was just for a seminar, but

16  we did do a column about it.  I think we provided you

17  a copy of it.  I would have to go back and extract it,

18  but that could be done.

19      Q.      I don't think that it does, but let's just

20  make sure.

21      A.      If it doesn't, then I would have to go back

22  and extract it.

23      Q.      I just want to make sure we're talking

24  about the same thing.

25              (Deposition Exhibit 9 was marked.)

1      A.     Looks like it.

2      Q.     I'm going to hand you Exhibit 9.  Is this

3    the article that you were just referencing?

4      A.     It is, yes, sir.

5      Q.     Okay.  And when I read this article, I may

6    have missed it, I didn't see anything about the costs

7    that you estimated related to the DACA population.

8      A.     It's not in there.  I don't see it.  So I

9    obviously did not include it in this.  So the number

10   exists inside the program.  I would have to go extract

11   it, but that could be done.

12          MR. DISHER:  Mr. Herrera, I would request

13   that you produce that portion of Mr. Perryman's work

14   product that directly relates to the opinions that

15   he's offering in paragraph 39.

16          MR. HERRERA:  Okay.  I would, and this

17   would be something we would discuss off the record.

18          MR. DISHER:  That's fine.

19          MR. HERRERA:  I think there may be some

20   trade secret concerns here just because it's a model

21   used.  You are looking for just the inputs, correct?

22          MR. DISHER:  I'm looking for the numbers

23   that Dr. Perryman used to calculate the net benefits

24   he is reporting in paragraph 39, and that would

25   include the total benefits as well as the total costs,

1   the two numbers that he then subtracted to come to the

2   net benefits.

3        A.    For the State of Texas; is that correct?

4        Q.    And federally.

5        A.    Restate.  For governmental entities as

6   opposed to the whole economy.  For the federal, state

7   and local governments as opposed -- these are the

8   numbers for the entire economy.

9        Q.    Okay.

10       A.    Which you recall we looked at that 600

11  something billion dollars for the economy and 39

12  billion or something for public entities.

13       Q.    Yes.

14       A.    You are looking for the public entity

15  number, is that correct?

16       Q.    I'm looking for both.  The public entity

17  numbers and the total numbers.

18       A.    Okay.  I think it was programmed to do the

19  net numbers to begin with on these total impacts which

20  is exactly the same as what's in that report.

21       Q.    Okay.

22       A.    So --

23       Q.    Whatever level of detail you can provide.

24       A.    Okay.

25       Q.    As detailed as your software will allow you

1   to do in terms of the cost estimations you used in

2   forming the numbers that are reported in paragraph 39.

3   As well as if you have any information related to the

4   specific costs incurred by the governmental entities

5   like on page 20 of Exhibit 3.

6        A.    Okay.  Assuming you guys say that's okay,

7   lawyer stuff.

8        Q.    Do you remember, as you are sitting here

9   today, and I'm not trying to, I'm just trying to ask

10  you do you remember today can you give me an estimate

11  about what the costs were that you estimated related

12  to the DACA recipients?

13       A.    No, I can't in all honesty because that

14  wasn't the focus in this instance.  Unlike the prior

15  one they were releasing a report.  This is literally

16  just a one night seminar and they asked me to do

17  economic benefits, and I used the same model and

18  updated everything and applied the DACA data to it.

19  And I don't think I ever looked at that.

20       Q.    Okay.  Do you know would it have been in

21  the millions of dollars?

22       A.    Again, I'll have to look at it.  I don't

23  want to sit here and give you numbers off the top of

24  my head.

25       Q.    I'm just asking you to estimate.

1      A.     I would hesitate to do that in the absence

2   of looking at the numbers.  But I believe I can get

3   you what you are asking for from the program.

4      Q.     Okay.

5      A.     I believe I can get you the same level as

6   that report.

7      Q.     That would be fantastic.  Thank you.

8      Do you remember those costs that you were

9   trying to estimate, were those for the same types of

10  services that are reported in Exhibit 3?

11     A.     They would be, yes.

12     Q.     So that would be health care, for example?

13     A.     Health care.

14     Q.     Education?

15     A.     Education.

16     Q.     Law enforcement?

17     A.     Law enforcement, social services.

18     Q.     And those would be costs incurred in part

19  by the state because of DACA recipients?

20     A.     Right, that's correct.

21     Q.     And you don't dispute that those costs

22  exist; right?

23            MR. HERRERA:  Objection, asked and

24  answered, several times.

25     A.     I don't dispute that, I use the analogy in

1    the report somewhere, for example, you're making a

2    car, you're making a profit on the car, you have to

3    buy wiper blades, I don't dispute the wiper blades

4    cost money, but you make money on the car.  I don't

5    dispute that there's cost and benefits, and the

6    benefits outweigh the costs.  I don't dispute that.

7         Q.    But you don't dispute that there is a cost

8    associated with DACA recipients borne by the State of

9    Texas?

10             MR. HERRERA:  Objection, asked and

11   answered.

12        A.    Subject to everything I said before

13   obviously by the last answer.

14        Q.    All right.  One of those costs borne by the

15   State of Texas because they're DACA recipients that

16   you have estimated relates to education to the DACA

17   recipients through Texas public school program?

18             MR. HERRERA:  Objection, asked and

19   answered.

20        A.    Yeah, that's one thing I would have to add

21   about that is, as I understand it, the schools have to

22   provide education to the undocumented population.  I

23   don't think it's really an issue whether or not they

24   are in DACA or not.

25             In other words, if you took DACA away, and

Ray Perryman

June 27, 2018
Page 76

 1   they all stayed, I don't think the number would

 2   change.  But clearly to the extent people are

 3   classified as DACA, persons who are in the high school

 4   at this point in time, their education is being

 5   funded.  But it's not because they are in DACA, it's

 6   because they are here.

 7        Q.    And is being funded in part by the State of

 8   Texas?

 9        A.    Correct, yes.

10        Q.    And I jumped ahead of myself there.  I

11   meant to ask you about health care.

12        A.    Okay.

13        Q.    But same question as a lead-in, you don't

14   dispute that the State of Texas does indeed incur a

15   cost to provide health care to DACA recipients?

16             MR. HERRERA:  Objection, asked and

17   answered.

18        A.    Again, the only clarification I would give

19   is, again, for the undocumented population, since they

20   use it, a little bit less for the DACA based

21   population, but nonetheless I assume there would be

22   some people in the DACA population who are likely to

23   have some type of care that is reimbursed in some way

24   by the state.

25        Q.    And those types of care would be things

1    nature set up, that you do tend to have, a lot of

2    costs are associated with the actual operation of the

3    facility, that there is a lot of things, costs

4    associated with it.   But I have not independently

5    evaluated these specific facilities.

6        Q.    All right.   Paragraph 49 says it begins

7    even if these were -- Start that over.

8        Paragraph 49 begins "Even if they were not

9    based on unreliable methodology, these estimates are

10   actually quite low."   Do you see that?

11       A.    Yes sir.

12       Q.    What methodology do you propose that HHSC

13   should have used to come up with these estimates?

14       A.    Well, I don't have a specific methodology

15   in mind because I didn't set out to do the analysis.

16   I wasn't sponsoring evidence of that nature.   I was

17   simply responding to what Ms. Smoot did.

18       I feel quite certain that I could come up

19   with some methodology if that were part of my assigned

20   task.   For example, in the reports we did come up with

21   the estimates of cost, direct costs to the state.

22       Q.    That's my next question.

23       A.    Okay.

24       Q.    Even though you may have criticisms about

25   the specific methodology you used, you don't disagree

1   that the state does incur some cost to provide these

2   services to DACA recipients?

3        A.    Well, certainly the analysis I've done

4   today suggests that there are some costs.  Not on a

5   net basis but just talking about the windshield wiper

6   not the car, there are some costs associated there

7   with undocumented immigrants in general.  I haven't

8   analyzed the DACA population specifically, but with a

9   population that size there is some probability that

10  there is.

11       Q.    All right.  Okay.  If you go to page 19,

12  please.

13       A.    Yes, sir.

14       Q.    If we look at paragraph 51?

15       A.    Yes, sir.

16       Q.    The second sentence begins "As mentioned

17  above, in a 2017 survey of DACA recipients -- "

18       A.    Yes, sir.

19       Q.    -- and then the cite to that again is

20  Dr. Wong's study; right?

21       A.    That's correct.

22       Q.    And so the rest of those numbers in that

23  paragraph all come from Dr. Wong's study; right?

24       A.    I believe so.  There is also, looks like

25  some updated numbers, also, yes.

1    into this case?

2        A.    Quite a few.  I don't know, because

3    obviously going to take more time than what I had

4    agreed to.  I didn't continue to track it, so I won't

5    be billing any time for the associates.

6        Q.    Understood.  Just your time.

7        A.    I'll just be billing the capped amount for

8    both pieces.

9        Q.    Is $800 an hour the normal rate that you

10   charge?

11       A.    It is, yes, sir.

12       Q.    How many years have you been charging $800?

13       A.    Seems like we raised it three years ago,

14   something like that.  Somewhere along those lines.  It

15   was 750 before that.

16       Q.    Do you have any estimate about total amount

17   of money that you have made as an expert witness for a

18   party in litigation over the course of 40 years?

19       A.    No, sir, I don't.

20       Q.    Over a million dollars?

21       A.    Absolutely.

22       Q.    3 million?

23       A.    Absolutely.

24       Q.    5 million?

25       A.    Yes, sir.

Ray Perryman                                                    June 27, 2018
                                                                    Page 102

1    Q.    10 million?

2    A.    Yes, sir.  And let me be very clear about

3    that when I say that, I'm talking about the amount

4    that was billed for my time.  I'm not talking about

5    net.  I'm talking about gross.  But billed for my time

6    over 40 years, absolutely, more than $10 million.

7    Q.    20?

8    A.    Yes, sir.

9    Q.    30?

10   A.    Not sure.

11   Q.    Okay.  Somewhere between 20 and 40 maybe?

12   A.    I have no idea.  Without doing some work,

13   you got me past my comfort level.

14   Q.    All right.  Fair enough.  In the last,

15   let's just say the last five years, what percentage of

16   your time professional time is devoted to your work as

17   an expert witness for a party in litigation?

18   A.    Boy, that varies a lot from year to year.

19   Rough estimate 35 or 40, maybe something like that.

20   That's very rough.  It could be plus or minus a little

21   on each side.

22   Q.    Okay.  Your CV is extensive.

23   A.    It is.

24   Q.    It's about 450 pages or so?

25   A.    Thereabouts.  I don't keep it up.

Ray Perryman                                    June 27, 2018
                                                   Page 110

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION

 3
   STATE OF TEXAS,                  )
 4      Plaintiffs,                 ) Case No.
        vs.                         ) 1:18-cv-00068
 5 UNITED STATES OF AMERICA, et al., )
        Defendants,                 )
 6        and                       )
   KARLA PEREZ, et al.,             )
 7        Defendant-Intervenors.    )

 8            REPORTER'S CERTIFICATION
            DEPOSITION OF RAY PERRYMAN
 9               June 27, 2018

10          I, Deborah Endler, Shorthand Reporter in and

11 for the State of Texas, do hereby certify that the

12 foregoing deposition is a full, true and correct

13 transcript:

14          That the foregoing deposition of RAY

15 PERRYMAN, the Witness, hereinbefore named was at the

16 time named, taken by me in stenograph on June 27,

17 2018, the said Witness having been by me first duly

18 cautioned and sworn to tell the truth, the whole truth

19 and nothing but the truth and the same were thereafter

20 reduced to typewriting by me or under my direction.

21          ( ) That by agreement of counsel, a reading

22 condensed copy of the deposition transcript along with

23 the full-sized original Changes and Signature Sheet

24 has been sent to _____ on

25 _____ for review and signature within 30 days
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

**App. 1663**

Ray Perryman                                                June 27, 2018
                                                            Page 111

```
 1   and if any corrections returned are attached hereto.

 2          ( ) That the Witness shall have thirty (30)

 3   days for review and signature of the original

 4   transcript and if any corrections returned are

 5   attached hereto.

 6          ( ) That the signed transcript ( ) was ( )

 7   was not received from the Witness within 30 days.

 8          That the amount of time used by each party at

 9   the deposition is as follows:

10          Mr. Disher - 2 hours, 44 minutes

11          That before the completion of the deposition,

12   the Deponent, andor the Plaintiff/Defendant _____ did

13   _____ did not request to review the transcript.

14          I further certify that I am neither counsel

15   for, related to, nor employed by any of the parties or

16   attorneys in this action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19          WITNESS MY HAND, this the 28th day of June,

20   2018.

21          _____

22          DEBORAH L. ENDLER, Reporter
            EXPIRATION DATE:
23          Firm Registration No. 631
            Kim Tindall & Associates, LLC
24          16414 San Pedro, Suite 900
            San Antonio, Texas 78232
25          Phone 210-697-3400
```

**App. 1664**