# Exhibit 58

# Transcript of the Testimony of

# Brian Manley

**Date:**

June 20, 2018

**Case:**

STATE OF TEXAS vs UNITED STATES OF AMERICA

Brian Manley  June 20, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3    STATE OF TEXAS, et al.,   )
              Plaintiffs,       )
 4                              )
                                )
 5    VS.                       )  CASE NO. 1:18-cv-00068
                                )
 6                              )
      UNITED STATES OF AMERICA, )
 7    et al.,                   )
              Defendants        )
 8                              )
      and                       )
 9                              )
      KARLA PEREZ, et al.,      )
10       Defendant-Intervenors  )

11    *********************************************************

12                       ORAL DEPOSITION OF

13                         BRIAN MANLEY

14                         JUNE 20, 2018

15    *********************************************************

16           ORAL DEPOSITION OF BRIAN MANLEY, produced as a

17    witness at the instance of the Plaintiff, and duly

18    sworn, was taken in the above-styled and numbered cause

19    on June 20, 2018, from 1:13 p.m. to 2:40 p.m., before

20    Christi Sanford, CSR in and for the State of Texas,

21    Registered Professional Reporter and Certified Realtime

22    Reporter, reported by machine shorthand, at the Austin

23    Police Department, 715 East 8th Street, 5th Floor,

24    Austin, Texas, pursuant to the Federal Rules of Civil

25    Procedure and the provisions stated on the record.
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900 San Antonio, Texas 78232
210-697-3400  210-697-3408

**App. 1706**

Brian Manley                                                                June 20, 2018
                                                                                  Page 2

```
 1                         APPEARANCES

 2   For the State of Texas:

 3        Todd Lawrence Disher
          Office of the Attorney General of Texas
 4        Civil Litigation Division
          300 West 15th, 11th Floor
 5        P.O. Box 12548
          Austin, Texas 78711-2548
 6        (512) 936-2266
          todd.disher@oag.texas.gov
 7
     For the State of New Jersey:
 8
          Katherine A. Gregory
 9        Office of the Attorney General of New Jersey
          Department of Law & Public Safety
10        124 Halsey Street
          P.O. Box 45029-5029
11        Newark, New Jersey 07101
          (973) 648-4846
12        katherine.gregory@law.njoag.gov
          jeremy.hollander@law.njoag.gov
13
     For the United States:
14
          Keith Edward Wyatt
15        United States Department of Justice
          United States Attorney's Office
16        Southern District of Texas
          1000 Louisiana Street, Suite 2300
17        Houston, Texas 77002
          (713) 567-9713
18        keith.wyatt@usdoj.gov

19   For the Witness:

20        Christopher Coppola
          City of Austin Law Department
21        301 West 2nd Street
          Box 1546
22        Austin, Texas 78767-1546
          (512) 974-2161
23        christopher.coppola@austintexas.gov

24

25
```

```
 1                    APPEARANCES CONTINUED

 2   For the Defendant-Intervenors:

 3        Celina Moreno
          Mexican American Legal Defense and
 4        Educational Fund
          110 Broadway, Suite 300
 5        San Antonio, Texas 78205
          (210) 224-5476
 6        cmoreno@maldef.org
          cleija@maldef.org
 7
     Also Present:
 8
          Joseph Shaneyfelt, Baylor Law Student
 9
     Reported by:
10
          Christi Sanford, CSR, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      A.    I don't believe we track that.
 2      Q.    Okay.  So you don't know one way or the other?
 3      A.    I don't believe we track that.
 4      Q.    Right.  Okay.  But in terms of whether you
 5  employ DACA recipients, you don't know if you do or if
 6  you don't?  You just don't know one way or the other?
 7      A.    Correct.
 8      Q.    Okay.  Fair enough.
 9            Okay.  Paragraph 9 talking about APD's
10  mission.  What is the mission of APD?
11      A.    The mission of the Austin Police Department is
12  to be trusted and respected by all Austin residents and
13  to collaborate with our community to make Austin the
14  safest city in America.
15      Q.    What about enforcing the law?  Is that part of
16  APD's mission?
17      A.    Well, to make Austin the safest city in America
18  implies that we will, you know, enforce the law to make
19  sure that we're keeping our city safe.
20      Q.    Okay.  In pursuit of its mission to keep people
21  safe, does APD have to abide by the duly enacted laws?
22      A.    Yes.
23      Q.    Why is that important?
24      A.    Well, because we're a law enforcement agency,
25  we're required to abide by whatever laws are put upon
```

```
 1   us.
 2       Q.   Okay.  Even if that law may make the community
 3   less safe, in your opinion?
 4       A.   Correct.
 5       Q.   Can you think of any examples of that?
 6       A.   Of what?
 7       Q.   Of a law that, in your opinion, makes a
 8   community less safe, but APD still has to comply with
 9   that.
10       A.   No.
11       Q.   Okay.  What about SB 4?
12       A.   Which part?
13       Q.   The part that prohibits police departments from
14   enacting policies that would prevent officers from
15   inquiring about immigration status.
16       A.   Correct.  Our policy allows officers to ask
17   immigration status.
18       Q.   Right.  And you were -- when SB 4 was being
19   debated, you were -- you testified against SB 4, right?
20       A.   Yes, I did.
21       Q.   And part of your testimony was that, in your
22   opinion, SB 4 would make communities less safe?
23       A.   So -- yes.  So the concern is if local law
24   enforcement is seen as an arm of the immigration
25   enforcement, that we might have individuals that feel
```

1  like they can't come forward if they've been victimized
2  or they witnessed somebody else be victimized.  And so,
3  yes, that -- that is something that I testified to at
4  the legislature, and I do believe that it is a concern
5  that if people feel like they have to live in the
6  shadows, then they may be less safe as a community
7  within the city and then that may impact the overall
8  city's safety.
9       Q.  Understand.  And even though you think SB 4 may
10 make Austin less safe, you, as chief of police, are
11 still required to comply with the terms of SB 4, right?
12      A.  Absolutely.
13      Q.  Okay.  And that's because SB 4 is a duly
14 enacted law and, as a law enforcement officer, you have
15 an obligation to comply with duly enacted laws?
16      A.  Correct.
17      Q.  All right.  Even if that duly enacted law, in
18 your opinion, may make a community less safe?
19      A.  Correct.
20      Q.  All right.  Okay.  Let's look at paragraph 11.
21 Specifically, I want to ask you about the last sentence
22 and the concern over the underreporting of crime.  Do
23 you see that?
24      A.  I do.
25      Q.  All right.  Do you have an opinion about how

1  many crimes go unreported in Austin?
2      A.   I don't have a specific estimation of
3  underreporting, but we know there are some crimes that
4  are more underreported than others, based on historical
5  knowledge.
6      Q.   Is that something that APD tracks on a
7  statistical basis?
8      A.   We do not because we don't -- we don't know
9  what's not being reported.
10     Q.   Right.  Do you know how -- or do you -- rather,
11 do you have an opinion about how the rate of potential
12 underreporting of crime has changed over the years?
13     A.   Again, since we can't track the level to which
14 it's underreported, we really can't track the change in
15 the level of underreporting.
16     Q.   Okay.  So you don't know whether prior to the
17 2012 issuance of the DACA memorandum, underreporting
18 crime may have been the same, different or lower or
19 higher than after the implementation of DACA?
20     A.   No, sir.
21     Q.   All right.  Let me ask that a different way
22 that's a bit more clear perhaps.  You don't know whether
23 the underreporting of crime has changed pre- and
24 post-DACA enactment, right?
25     A.   Correct.

1  being reported and more opportunities to capture
2  criminals.  So, yes, I do believe as an end result of
3  that that we would be safer.
4       Q.   Austin would be safer if the risk of
5  deportation was less?
6       A.   Correct.
7       Q.   If the President came out and said, I am no
8  longer going to deport anybody in the United States for
9  any reason, would that make Austin safer, in your
10 opinion?
11           MS. MORENO:  Objection, calls for
12 speculation.
13      A.   I would go back to my earlier comment that if
14 we have people that are not fearful of being deported,
15 then they're more likely to come forward and report
16 victimization; so I think that that would make a
17 community safer.
18      Q.   (BY MR. DISHER)  So if the President said, I'm
19 ending all threat of deportation to everybody, that
20 would make Austin safer?
21           MS. MORENO:  Objection, calls for
22 speculation.
23      A.   For those that might not come forward for fear
24 of deportation, yes, I think they would be more likely
25 to come forward.

     1     A.    -- is removed, then, yes.  Not testifying to if
     2  the threat of deportation against those that are
     3  committing crimes, because if they feel emboldened by
     4  that, then that would not.
     5     Q.    Okay.  Understand.
     6           All right.  Let's jump to paragraph 19.
     7  You say -- and we talked about this briefly earlier.
     8  But you say, I do not profess to be an expert on the
     9  DACA program.  That's true, right?
    10     A.    Correct.
    11     Q.    Okay.  So what do you know about the DACA
    12  program?
    13     A.    It's deferred action.  It's for, my
    14  understanding, normally individuals that are here, maybe
    15  students going to school, that any deportation action or
    16  immigration enforcement would be deferred for a period
    17  of time.
    18     Q.    All right.  Do you know when DACA was enacted?
    19     A.    No.
    20     Q.    Do you know how many people in Austin are DACA
    21  recipients?
    22     A.    No.
    23     Q.    Do you know how many in Texas are DACA
    24  recipients?
    25     A.    No.

```
 1      Q.   What about nationwide?
 2      A.   No.
 3      Q.   All right.  Do you know what the eligibility
 4  requirements are for DACA recipients?
 5      A.   No, sir.
 6      Q.   Do you know the rate of crime reporting by DACA
 7  recipients before DACA was enacted?
 8      A.   No, sir.
 9      Q.   Do you know the rate of crime reporting by DACA
10  recipients after DACA was enacted?
11      A.   No, sir.
12      Q.   Have you ever talked to somebody who has
13  received DACA about their DACA status?
14      A.   There was one forum I was at and it's a young
15  man who came through our Explorer Program, and I believe
16  he was in the DACA program.  That's my only
17  recollection.
18      Q.   Just that one?
19      A.   Yes.
20      Q.   All right.  Do you remember what you talked to
21  that one person about regarding his DACA status?
22      A.   Well, we were actually talking about his
23  interest in becoming a police officer and his status or
24  his work towards gaining citizenship so he could apply
25  to be a police officer.
```

```
 1      Q.  Did you talk about his willingness to report
 2  crime?
 3      A.  No.
 4      Q.  And as far as you can remember, that's the only
 5  person, that you know of, you have talked to about DACA
 6  status?
 7      A.  Yes.
 8      Q.  Okay.  Has anybody with DACA status told you, I
 9  am less likely to report crime should my DACA status be
10  revoked?
11      A.  No.  In the forums, when people were speaking
12  to that issue, I don't know whether or not they were
13  DACA recipients.  That wasn't linked to the
14  conversations about being fearful of coming forward
15  given their status.
16      Q.  Understood.  The next sentence says -- or,
17  rather, I skipped over one phrase.  The end of that
18  first sentence says, "or immigration law in general."
19  You're not an immigration law expert?
20      A.  No, sir.
21      Q.  All right.  And you're not a lawyer?
22      A.  No, sir.
23      Q.  Not a sociologist?
24      A.  No, sir.
25      Q.  All right.  A demographer?
```

1   apply for deferred action pursuant to the DACA program?
2        A.   I don't know the process.
3        Q.   Do you know what forms an individual has to
4   fill out?
5        A.   No.
6        Q.   All right.  Do you know whether -- or I guess
7   maybe let me ask specifically:  How did you know that an
8   individual who applies for DACA gets registered,
9   photographed and fingerprinted?
10       A.   That was part of the back-and-forth that I had
11  with MALDEF.
12       Q.   MALDEF told you about that?
13       A.   That came through in the affidavit, yes, sir.
14       Q.   Okay.  And then, finally, I just want to go
15  back to kind of where we began.  And other than in
16  paragraph 19 where you say, I do not profess to be an
17  expert on the DACA program, can you point me to specific
18  portions of this declaration that you, yourself,
19  authored?
20       A.   As far as like a complete number; is that what
21  you are talking about?
22       Q.   Or even portions within the number.  I just
23  want to know which words in this declaration you,
24  yourself, wrote.
25       A.   All right.  Give me a few minutes, then, and

1  let me go through it.
2      Q.  Take all the time you need.
3      A.  Most of these early bullets have come off of
4  public sourcing.  Are you concerned about grammatical
5  corrections that I may have made or only important --
6  and I'm not trying to be so, but, I mean, do you want me
7  to talk about all of that or just substantive changes?
8      Q.  Anything you can remember.
9      A.  Well, I made a lot of capitalization changes in
10 bullet 3 because all of our units are actually
11 capitalized.  And so, again, I made grammaticals to that
12 individual paragraph; however, the information in there
13 was accurate when I received it.
14     Q.  Okay.
15     A.  Prior to bullet 18 -- really, it's 18, 19 and
16 20 where there was the -- I guess the back-and-forth on
17 the actual content, those being the -- probably the
18 three most specific to the issues we're discussing
19 today.  Most of the other is just my background, my
20 history, and all of that is really from public sourcing.
21     Q.  Let me pause right there, then.  Paragraph 11,
22 for example, paragraph 11 was included in the draft that
23 you received from MALDEF?
24     A.  Paragraph 11 was included.  And in paragraph 11
25 there was -- my recollection is there was a reference to

```
 1   me experiencing underreporting of crime, and I removed
 2   that because I did not experience that here in Austin,
 3   as was experienced in Houston.
 4        Q.   Explain that to me.
 5        A.   There was work done in Houston, Chief Acevedo,
 6   where post-SB 4, they looked at reporting within their
 7   immigrant community, basically focusing, I believe, on
 8   the Hispanic community, and they saw marked drop in
 9   reporting in the Hispanic community.  We conducted a
10   similar study here in Austin to see if that was
11   occurring here, and we did not see that same drop.  And
12   so I was not comfortable with putting it here that that
13   was a local issue.  However, I am aware that it is an
14   issue in communities across -- well, at least Houston
15   and then, I believe, Los Angeles, based on reporting
16   that I've read.  So I made that more specific to
17   policing in general and not a local issue.
18        Q.   Understand.  So that was something that you
19   removed from paragraph 11?
20        A.   Yes, sir.
21        Q.   Did you add anything to paragraph 11?
22        A.   Other than reformatting the sentence to remove
23   my direct experience, I believe that this is the way it
24   came to me based on the conversations that I had had
25   with MALDEF when we first communicated on this.
```

```
 1      Q.   Okay.  Let's talk about that survey for a
 2   minute.  So there was a survey done in Austin?
 3      A.   Not a survey.  We looked at crime reporting.
 4   We looked at the number of reported crime victims that
 5   were of Hispanic descent.  That's how we track in our
 6   system.  And we compared that pre-SB 4 and post-SB 4 to
 7   see if we saw a reduction in reporting.
 8      Q.   Okay.  And you did not see a reduction in
 9   reporting?
10      A.   Not in Austin, no.
11      Q.   All right.  Okay.  Paragraph 16, did you write
12   anything that is included in paragraph 16?
13      A.   I don't believe that I wrote that.  However,
14   that is language that I regularly use when I speak about
15   it.  So I believe that it is coming from the
16   conversations that I had with MALDEF ahead of the
17   preparation of this, but I don't believe physically that
18   I wrote that.
19      Q.   All right.  Was there anything else included in
20   paragraph 16 that you took out?
21      A.   Not to my recollection.
22      Q.   All right.  So then starting at paragraph 18,
23   what changes did you make to paragraph 18?
24      A.   You know, I ended up putting it back, so -- and
25   it was just the title.  I had initially changed it to an
```

1  photographed and fingerprinted?
2      A.   I didn't understand the full process that they
3  go through to be a DACA recipient.
4      Q.   Okay.  And so that's a long way of saying no,
5  you didn't know that DACA recipients were photographed,
6  registered and fingerprinted?
7      A.   Correct.
8      Q.   All right.  Lastly, I just want to introduce
9  this.
10              (Exhibit Number 3 was marked)
11     Q.   Have you seen Exhibit 3 before?
12     A.   I'm believing this may have been my declaration
13  in the SB 4 lawsuit.
14     Q.   Is that what it is?
15     A.   I believe that's what this is.
16     Q.   All right.  And what was your involvement in
17  the SB 4 lawsuit?
18     A.   I was asked to put forward a declaration, as is
19  evidenced here, with my beliefs on SB 4 and its impacts.
20     Q.   Okay.  Who asked you to put forth that
21  declaration?
22              MR. COPPOLA:  I'll object to certain
23  attorney-client privilege.  The City was a party in that
24  case, and Chief Manley worked with the City Attorney's
25  office.

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,    )
                Plaintiffs,     )
 4                              )
     VS.                        )  CASE NO. 1:18-cv-00068
 5                              )
     UNITED STATES OF AMERICA,  )
 6   et al.,                    )
                Defendants      )
 7                              )
     and                        )
 8                              )
     KARLA PEREZ, et al.,       )
 9      Defendant-Intervenors   )

10   ************************************************************

11                     REPORTER'S CERTIFICATION

12                    DEPOSITION OF BRIAN MANLEY

13                         JUNE 20, 2018

14   ************************************************************

15           I, Christi Sanford, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18           That the witness, BRIAN MANLEY, was duly sworn

19   by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22           That the original deposition was delivered to

23   Todd Lawrence Disher, Custodial Attorney;

24           That a copy of this certificate was served on

25   all parties and/or the witness shown herein on _____.
```

Brian Manley

June 20, 2018
Page 68

```
 1        I further certify that pursuant to FRCP No.
 2  30(f)(i), the signature of the deponent:
 3        X   was requested by the deponent or a party
 4  before the completion of the deposition and that the
 5  signature is to be returned within 30 days from date of
 6  receipt of the transcript.  If returned, the attached
 7  Changes and Signature page contains any changes and the
 8  reasons therefor;
 9        _____ was not requested by the deponent or a
10  party before the completion of the deposition and that
11  it is being delivered to Todd Lawrence Disher.
12        I further certify that I am neither counsel
13  for, related to, nor employed by any of the parties or
14  attorneys in the action in which this proceeding was
15  taken.  Further, I am not a relative or employee of any
16  attorney on record in this case, nor am I financially or
17  otherwise interested in the outcome of the action.
18        Certified to by me this 22nd day of June, 2018.
19
20        _____
          Christi Sanford, CSR, CRR, RPR
21        Texas Certification No. 6720
          Certificate Expires: 12/31/19
22
          Kim Tindall & Associates
23        Firm Registration No. 631
          16414 San Pedro, Suite 900
24        San Antonio, Texas 78232
          (210) 697-3400
25
```