# Exhibit 67

App. 1798

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, ET AL.,          )
                                 )
Plaintiffs,                      )
                                 )
vs.                              )     Case No. 1:18-cv-00068
                                 )
UNITED STATES OF AMERICA, ET     )
AL.,                             )
                                 )
Defendants,                      )
                                 )
and                              )
                                 )
KARLA PEREZ, ET AL.,             )
                                 )
STATE OF NEW JERSEY,             )
                                 )
Defendant-Intervenors.           )


THE DEPOSITION OF STEPHEN LEGOMSKY


Taken on behalf of Plaintiffs

August 1, 2018


HUSEBY GLOBAL LITIGATION
1230 WEST MOREHEAD STREET, SUITE 408
CHARLOTTE, NC 28208
(800) 333-2082

```
 1           I N D E X   O F   E X A M I N A T I O N

 2

 3    WITNESS:  STEPHEN LEGOMSKY

 4         Examination By Mr. Disher .....................8

 5         Examination By Mr. Robins ..................100

 6         Examination By Ms. Perales .................106

 7         Examination By Mr. Disher ..................119

 8

 9
             I N D E X   O F   E X H I B I T S
10
      Exhibit 1 .........................................9
11         Houston Chronicle Article

12    Exhibit 2 ........................................11
           The Source Article
13
      Exhibit 3 ........................................13
14         Article

15    Exhibit 4 ........................................26
           Law Review Article
16
      Exhibit 5 ........................................34
17         Declaration

18    Exhibit 6 ........................................60
           DACA Statistics
19
      Exhibit 7 ........................................87
20         Neufeld Affidavit

21    Exhibit 8 ........................................89
           Declaration of Stephen H. Legomsky
22
      Exhibit 9 ........................................90
23         Congressional Testimony

24    Exhibit 10 .......................................92
           Congressional Testimony
25
```

App. 1800

```
 1    Exhibit 11 ......................................97
            Article
 2

 3
      The original exhibits were retained by the court reporter
 4    to be attached to COUNSELS' transcripts.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
          Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

                                                                  App. 1801

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   STATE OF TEXAS, ET AL.,        )
                                    )
 4   Plaintiffs,                    )
                                    )
 5   vs.                            )   Case No. 1:18-cv-00068
                                    )
 6   UNITED STATES OF AMERICA, ET   )
     AL.,                           )
 7                                  )
     Defendants,                    )
 8                                  )
     and                            )
 9                                  )
     KARLA PEREZ, ET AL.,           )
10                                  )
     STATE OF NEW JERSEY,           )
11                                  )
     Defendant-Intervenors.         )
12

13

14

15

16              THE DEPOSITION OF STEPHEN LEGOMSKY, produced,

17   sworn, and examined on behalf of the Plaintiffs, August

18   1, 2018, between the hours of eight o'clock in the

19   forenoon and five o'clock in the afternoon on that day,

20   at the offices of Alaris Litigation Services, 711 N.

21   11th Street, St. Louis, Missouri 63101, before Rebecca

22   L. Tuggle, a Registered Professional Reporter,

23   Certified Court Reporter, and Certified Shorthand

24   Reporter within and for the State of Missouri.

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1802

```
 1                    A P P E A R A N C E S

 2
         FOR THE PLAINTIFF STATES:
 3
                     TODD LAWRENCE DISHER
 4                   Attorney-in-Charge
                     Special Counsel for Civil Litigation
 5                   Assistant Attorney General State of Texas
                     300 W. 15th Street
 6                   Austin, TX 78701
                     (512) 463-2100
 7                   todd.disher@oag.texas.gov

 8       FOR KARLA PEREZ, ET AL.:

 9                   NINA PERALES
                     Mexican American Legal Defense and Education
10                   Fund
                     110 Broadway, Suite 300
11                   San Antonio, TX 78205
                     (210) 224-5476
12                   nperales@maldef.org

13       FOR THE FEDERAL DEFENDANTS:

14                   JEFFREY S. ROBINS
                     U.S. Department of Justice, Civil Division
15                   Office of Immigration Litigation
                     District Court Section
16                   P.O. Box 868
                     Washington, D.C. 20044
17                   jeffrey.robins@usdoj.gov

18       FOR THE STATE OF NEW JERSEY BY TELEPHONE:

19                   KENNETH LEVINE
                     Office of the Attorney General of New Jersey
20                   25 Market Street, 8th Floor
                     Trenton, NJ 08625
21                   (973) 648-2881
                     kenneth.levine@law.njoag.gov
22
         REPORTED BY:
23
                     REBECCA L. TUGGLE, RPR, CCR, CSR
24                   Huseby Global Litigation

25
```

App. 1803

```
 1   the part of the Plaintiffs, and after responding "Yes"
 2   to the oath administered by the court reporter, deposes
 3   and says:
 4                      EXAMINATION
 5   QUESTIONS BY MR. DISHER:
 6        Q    Mr. Legomsky, good afternoon.
 7        A    Good afternoon.
 8        Q    Can you please introduce yourself to the
 9   court?
10        A    Sure.  I apologize in advance, I'm losing a
11   little bit of my voice; so tell me if I need to pipe
12   up.  My name is Stephen Legomsky.  S-t-e-p-h-e-n
13   L-e-g-o-m, as in Mary, s-k-y.
14        Q    Thank you, Mr. Legomsky.  Mr. Legomsky, you
15   are a law professor so I'll spare you some of the
16   formalities about introducing the deposition process,
17   but two things to point out.  If you ever don't
18   understand any of my questions, please let me know.
19   Is that fair?
20        A    Yes.  Thank you.
21        Q    And then if you ever need to take a break
22   today, also just let me know and we'll take a break.
23   But if there is a question pending on the table, I'd
24   ask that you would answer that question before we take
25   a break.  Is that fair?
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1804

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                    Page 9

 1      A     Yes.

 2      Q     All right.  Mr. Legomsky, you have been

 3   vocal about your views about the legality of DAPA and

 4   DACA.  Is that fair to say?

 5      A     It really depends on what you mean by vocal,

 6   but I certainly have expressed my views.

 7      Q     For example, you have testified in Congress

 8   about those two areas, have you not?

 9      A     I have, yes.

10      Q     And you have also given interviews to

11   various media outlets about your views --

12            MS. PERALES:  Oh, give us that one.

13      Q     (By Mr. Disher) -- on the legality of DAPA

14   and DACA.  Is that fair to say?

15      A     Yes.

16      Q     All right.  I'm going to show you Exhibit 1.

17            (Exhibit 1, Houston Chronicle Article,

18             was marked for identification.)

19      Q     (By Mr. Disher) This is one of the articles

20   that quotes you, and if you would turn to -- or first

21   let me just establish, this is from the Houston

22   Chronicle, an article on April 16, 2016.  Is that what

23   it looks like to you?

24      A     Yes.

25      Q     And then if you turn to page 4, please,

1   starting with the fourth paragraph, the reporter is

2   summarizing some of the statements that you said to

3   her.  Do you see that?

4        A    Yes.

5        Q    Okay.  And you said that the, quote, "The

6   legal arguments for both DACA and its 2014 spin-off

7   for parents, DAPA, are basically identical."  You said

8   that; right?

9        A    Yes.

10       Q    And you still agree with that today?

11       A    Yes.  Provided the word "basically" is

12  understood not to mean exactly the same.

13       Q    Sure.  And then later, there's a direct

14  quote from you in which you say, quote, "It's hard for

15  me to think of any ground striking DAPA that wouldn't

16  apply to DACA."  Did I read that right?

17       A    Yes.

18       Q    And you still agree with that today; right?

19       A    Not entirely actually.  I might have spoken

20  too quickly in that brief conversation with the

21  reporter because I do think there are some ways in

22  which DACA could be distinguished from DAPA.

23       Q    Okay.  And what are those ways?

24       A    For one thing, one thing that concerns the

25  court in the DAPA litigation was the sheer size of the

1   potential affected population.  The DACA population is

2   also significant, but much, much smaller than the

3   opposed population for DAPA.

4            Secondly, in the case of DACA, we are

5   talking about an ongoing program in which many people

6   have placed reasonable reliance.  That is not quite

7   the same case as with DAPA where the program never did

8   take effect.

9        Q    Okay.  Anything else?

10       A    That's all I can think of at the moment.

11       Q    Okay.  And so just to summarize, the

12  differences between DAPA and DACA, in your mind, are

13  the sheer size of the population that's potentially

14  eligible and the current ongoing nature of DACA?

15       A    Those are the two distinctions that come to

16  mind off the top of my head, but I wouldn't want to

17  represent that there aren't any other differences.

18       Q    Okay.

19            (Exhibit 2, The Source Article, was

20             marked for identification.)

21       Q    (By Mr. Disher) Here is another article

22  that's quoting you from September 5, 2017, in a

23  publication called The Source.  Do you see that?

24       A    Yes.

25       Q    Okay.  And you are quoted at length, but I

www.huseby.com        Huseby, Inc. Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1807

 1   want to talk about the fourth paragraph.  You said in

 2   the article, quote, "And as I have shown in recent

 3   congressional testimony, both DAPA (Deferred Action

 4   for Parents of Americans) and DACA are well within the

 5   president's legal authority."  Did I read that right?

 6        A    Yes.

 7        Q    And you still agree with that today?

 8        A    Yes.

 9        Q    Okay.  And then you say, "Notwithstanding

10   Judge (Andrew S.) Hanen's badly flawed legal reasoning

11   to the contrary."  Did I read that right?

12        A    Yes.

13        Q    And you said that; right?

14        A    Yes.

15        Q    Okay.  And you do still agree today that

16   Judge Hanen's reasoning to the contrary was badly

17   flawed?

18        A    Yes.

19        Q    Okay.  Now, that's not the first time that

20   you have criticized a ruling by Judge Hanen.  Is that

21   fair to say?

22        A    It's not the only time.  I don't recall the

23   exact chronology.

24        Q    Okay.  Let's look at an article that you

25   have, in fact, written.  I'm going to mark it as

```
 1    Exhibit 3.

 2                     (Exhibit 3, Article, was marked for

 3                     identification.)

 4         Q     (By Mr. Disher) Exhibit 3 is an article

 5    titled "When a Judge is Out of Control"; right?

 6         A     Yes.

 7         Q     And you wrote this article; right?

 8         A     Yes.

 9         Q     You wrote this article in June 3rd -- on

10    June 3rd of 2016?

11         A     Correct.

12         Q     The judge you're referring to when you say

13    "a judge is out of control" is Judge Hanen; right?

14         A     Correct.

15         Q     Okay.  So let's talk about this article a

16    little bit.  The focus of this article was mainly the

17    sanction order that Judge Hanen entered against the

18    Department of Justice in the DAPA litigation; right?

19         A     Correct.

20         Q     Okay.  The end of the first paragraph says,

21    "The Justice Department in fact has done nothing

22    wrong."  Did I read that right?

23         A     Yes.

24         Q     And that was your view when you wrote this

25    article?
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1809

```
 1      A    Yes.

 2      Q    And that's still your view today?

 3      A    I'm not aware of any facts that have changed

 4 it, but yes.

 5      Q    Okay.  And then you say, "Judge Hanen has"?

 6      A    Yes.

 7      Q    You said that?

 8      A    Yes.

 9      Q    And that was your view then?

10      A    Yes.

11      Q    And that was still your view today?

12      A    Correct.

13      Q    And when you say "Judge Hanen has," that's

14 referring to Judge Hanen's sanctioning of the

15 Department of Justice in the DAPA extended DACA case;

16 correct?

17      A    That's correct.

18      Q    Okay.  So what you're meaning to say is that

19 Judge Hanen was wrong to sanction the Department of

20 Justice in the predecessor case; right?

21      A    In my opinion, yes.

22      Q    And that's still your opinion today?

23      A    Yes.

24      Q    Okay.  So let's turn the page.  Now, that is

25 not the only opinion from Judge Hanen that you
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                              Page 15

```
 1   criticize in this article.  Is that fair to say?

 2        A    Yes.

 3        Q    For example, in the second paragraph on the

 4   second page, you talk about a bizarre and venomous

 5   attack on President Obama's enforcement -- immigration

 6   enforcement strategies; right?

 7        A    Yes.

 8        Q    And do you remember which ruling you were

 9   referring to when you referred to it as a bizarre and

10   venomous attack?

11             MS. PERALES:  Excuse me, Todd.  Are you

12   pointing to something in particular?

13             MR. DISHER:  Yes.

14             MS. PERALES:  I'm sorry.  I'm having a hard

15   time following along.

16             MR. DISHER:  It's in the second paragraph of

17   the second page.

18             MS. PERALES:  Thank you.

19        A    I'm sorry.  Could you repeat the question,

20   please.

21        Q    (By Mr. Disher) Of course.  Do you remember

22   which opinion you were referring to that you labeled a

23   bizarre and venomous attack?

24        A    Yes.  I'm not one hundred percent sure that

25   I recall the name correctly, but I believe it was the
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1811

1    Martinez-Nava case.

2         Q    Okay.  And that was an opinion issued by

3    Judge Hanen?

4         A    Yes.

5         Q    Okay.  And it's still your opinion today

6    that that opinion was a bizarre and venomous attack on

7    President Obama's immigration enforcement strategies?

8         A    Yes.

9         Q    Okay.  Now, in the next paragraph on page 2,

10   you talk about a rambling, vitriolic 123-page opinion.

11   The opinion you're referring to there was Judge

12   Hanen's opinion in the DAPA expanded DACA case; is

13   that right?

14        A    Correct.

15        Q    And it's still your opinion today that that

16   decision was rambling and vitriolic?

17        A    Yes.

18        Q    Okay.  Then the next paragraph, you're still

19   talking about that same opinion from Judge Hanen and

20   you say, "Judge Hanen's opinion was rife with factual

21   errors, selective use of the evidence, and legal

22   distortion."  Did I read that right?

23        A    Yes.

24        Q    And that's still your opinion today?

25        A    Yes, it is.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1812

```
 1        Q     Okay.  Those flaws also existed in your

 2   opinion in the Fifth Circuit's decision to affirm the

 3   injunction against DAPA and expanded DACA.  Is that

 4   fair to say?

 5        A     I'm sorry.  Can you point me to the

 6   paragraph you're referring to now?

 7        Q     The same paragraph.  And I'm not referring

 8   to something you specifically say here, but I'm rather

 9   asking you a question.  Does the Fifth Circuit opinion

10   affirming Judge Hanen's injunction on DAPA and

11   expanded DACA contain factual errors, selective use of

12   the evidence, and legal distortion?

13        A     I think to some extent, but I have to say

14   that it's been a couple of years now since I've read

15   the opinion; so it would be hard for me to identify

16   specifics off the top of my head.

17        Q     Okay.  But to some extent it does?

18        A     To some extent, yes.

19        Q     In your opinion?

20        A     Yes.

21        Q     Okay.  Now you say -- the next sentence

22   says, "Many legal scholars have already exposed its

23   multiple flaws."  When you say "its multiple flaws,"

24   you're referring to Judge Hanen's opinion on DAPA and

25   expanded DACA; correct?
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1813

```
 1        A     Correct.

 2        Q     And then the source you cite to is your own

 3   testimony to Congress; right?

 4        A     That's right.  In my testimony, I cited

 5   other scholars.

 6        Q     Okay.  But, again, the thrust of this

 7   article is not Judge Hanen's opinion on DACA and

 8   expanded DACA, it's about Judge Hanen's opinion

 9   sanctioning DOJ in that case?

10        A     Correct.

11        Q     Okay.  So if you look at the bottom of page

12   2, your first criticism of his sanction is the, quote,

13   "Wide sweep of that remedy."  Do you see that?

14        A     Yes.

15        Q     Okay.  And today, you still are of the

16   opinion that his sanction order, the remedy was too

17   broad?

18        A     I felt that it was too broad at the time it

19   was first announced.  I understand, based on

20   information that I received recently, that the order

21   has since changed and that Judge Hanen, in particular,

22   decided not to require the government to release the

23   names of the DACA recipients.

24        Q     Do you know how Judge Hanen's order has

25   changed specifically?
```

App. 1814

```
 1      A    I don't know the specifics, no.

 2      Q    Okay.  So then if you turn to the next page,

 3  you say, "The problems with Judge Hanen's sanction

 4  order ran deeper than just the remedy"; right?

 5      A    Correct.

 6      Q    You say, quote, "The government simply did

 7  nothing wrong to begin with."  And that's still your

 8  opinion today?

 9      A    It is, yes.

10      Q    And then you say, quote, "And that is what

11  makes Judge Hanen's blistering attack on the Justice

12  Department attorneys' ethics and the consequent public

13  defamation of their character all the more shameful."

14  You said that; right?

15      A    Yes.

16      Q    And that's still your opinion today?

17      A    Yes.

18      Q    So you accused Judge Hanen of defaming the

19  Department of Justice?

20      A    This was not meant as a personal attack on

21  Judge Hanen.  It was meant to express my strong

22  disagreement with his analysis and his outcome and the

23  consequence of accusing Justice Department attorneys

24  of unethical conduct that I felt they were not guilty

25  of.
```

```
 1        Q    And the consequence you're referring to
 2   there is, in part, the public defamation of their
 3   character?
 4        A    Yes.
 5        Q    Okay.  And then you say that public
 6   defamation of their character was, quote, "shameful"?
 7        A    Yes.
 8        Q    And that's still your opinion today?
 9        A    Yes.
10        Q    Okay.  If you turn to the next page, the
11   first full paragraph on page 4, you say, "Judge
12   Hanen's accusation of deliberate deception is absurd
13   for two reasons."  Let's -- before we go any further,
14   you say that Judge Hanen deliberately deceived
15   somebody in his sanction order?
16        A    No.  I said that what he was accusing the
17   Justice Department attorneys of was deliberate
18   deception.
19        Q    Oh, I see.  And then -- but you say that
20   that accusation was absurd?
21        A    Correct.
22        Q    Okay.  And that's still your opinion today?
23        A    Yes.
24        Q    Okay.  If you look down to the last
25   paragraph on that page, the second sentence in talks
```

```
 1    about people who already qualified under the original

 2    DACA criteria, which no one was challenging?

 3         A    Yes.

 4         Q    Okay.  Is it your opinion that nobody was

 5    challenging the three-year extended DACA term in that

 6    first litigation?

 7         A    No.  I refer there to the original DACA

 8    criteria.  The keyword is criteria, not the duration

 9    of deferred absence for those people who meet those

10    criteria.

11         Q    I see.  So do you know, whether in that

12    case, the coalition of plaintiff states was, in fact,

13    challenging the three-year extended term created by

14    the 2014 memo?

15         A    My understanding is that they were

16    challenging that, yes.

17         Q    Okay.  So then if you go to the next page,

18    page 5, about middle way down the first paragraph, you

19    say, "To claim surprise assumes he not only didn't

20    read the very document he was enjoining, but also

21    didn't read his own opinion."  Do you see that?

22         A    Yes.

23         Q    And you said that then; right?

24         A    Yes.

25         Q    Is that still your opinion today?
```

App. 1817

```
 1      A     Yes.

 2      Q     Okay.  So you're accusing Judge Hanen of not

 3   reading the very document he was enjoining, which was

 4   the 2014 DAPA extended DACA memo?

 5      A     My point is that he could not have read his

 6   own opinion and still reached the conclusion that the

 7   issuance of three-year deferred action grants to those

 8   people who qualified under the original DACA criteria,

 9   he could not have reached the conclusion that -- that

10   they had not yet begun to issue three-year grant under

11   that program because they had announced as early as

12   November 20, 2014, that four days hence, on

13   November 24th, they would begin issuing three-year

14   grants to people who qualify under the original DACA

15   criteria.  Judge Hanen quoted that portion of the memo

16   in his own opinion.  So it seems to me that he could

17   not have read that part of his own opinion and still

18   reached the conclusion he did.

19      Q     So you're saying that he could not have read

20   his own opinion and still reached that conclusion that

21   he did?

22      A     And not correctly reached the conclusion he

23   did.

24      Q     But you don't really think that he didn't

25   read his own opinion, do you?
```

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1818

```
 1        A     There's no way for me to know that, though.

 2        Q     You think it's possible that he didn't read

 3   his own opinion?

 4        A     You're asking me to speculate about

 5   something I have no knowledge of.

 6        Q     So you're not going to -- you can't say one

 7   way or the other whether you think that Judge Hanen

 8   read his own opinion sanctioning the Department of

 9   Justice in the DAPA extended DACA case?

10        A     I have no basis for knowing the answer to

11   that.

12        Q     Okay.  So then let's look at the last

13   paragraph of the article.  You say, quote, "Judges,

14   above all else, are to be impartial.  That doesn't

15   mean they cannot have preexisting policy preferences.

16   It does mean they cannot let their political biases

17   and their emotions overcome their fair appraisals of

18   the evidence and their fair interpretations of the

19   law.  Judge Hanen has crossed that line again."  Did I

20   read that right?

21        A     Yes.

22        Q     Okay.  So when you say "again," first you're

23   talking about the order sanctioning the Department of

24   Justice; right?

25        A     Correct.
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1819

```
 1        Q     But the "again" also is referring to the
 2   injunction enjoining DAPA and expanded DACA?
 3        A     Correct.
 4        Q     Are you also referring to the bizarre and
 5   venomous attack that we talked about earlier?
 6        A     That was not the episode I was referring to
 7   in that sentence.
 8        Q     Okay.  So that sentence is simply referring
 9   to the sanction order against the Department of
10   Justice and the injunction blocking DAPA and expanded
11   DACA?
12        A     Correct.
13        Q     Okay.  Now, you understand that when Judge
14   Hanen's injunction went to the Fifth Circuit, Judge
15   Smith and Judge Elrod affirmed his injunction; right?
16        A     Yes.
17        Q     Okay.  Did, in your opinion, Judge Smith and
18   Judge Elrod let their political biases and emotions
19   overcome their fair appraisal of the evidence and fair
20   interpretation of the law?
21        A     I would have no basis for saying that.
22        Q     Why not?
23        A     Because I don't know who Judge Smith or
24   Judge Elrod are or anything else they've said that
25   would give an indication of what their biases are.
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1820

1      Q     But you've read their order or their opinion
2   affirming the injunction?
3      A     Yes.
4      Q     And based on reading that opinion, do you
5   think that they made a fair appraisal of the evidence
6   and a fair interpretation of the law?
7      A     I do not think the appraisal of the evidence
8   was consistent with the evidence actually offered, in
9   particular, on the subject of whether true discretion
10  was being exercised.  And as to the interpretation of
11  the law, I did not agree with them.  But I would not
12  go so far as to say that either of those judges was
13  inclined to be unfair.
14     Q     Okay.  Do you think that their opinion
15  affirming the injunction was fair?
16     A     It really depends on what you mean by fair.
17  I personally think it was incorrect.  And I think that
18  much of the analysis was flawed, in my humble opinion.
19  But I have no reason to question their sincerity in
20  issuing a decision that they felt was fair.
21     Q     Okay.  So since you have no reason to
22  question Judge Smith and Judge Elrod's ability to be
23  fair, why do you have a basis to question Judge
24  Hanen's ability to be fair?
25     A     Well, Judge Hanen in the Martinez-Nava case,

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1821

```
 1    if I have the name of that case correct, in my

 2    opinion, revealed a very strong bias against President

 3    Obama's immigration enforcement policies generally.

 4    There's no comparable history that I'm aware of with

 5    either Judge Smith or Judge Elrod.

 6             Secondly, I felt that the comments that

 7    Judge Hanen made on the issue of sanctions were very

 8    unfair toward the Justice Department attorneys.

 9    Q     Okay.  Anything else?

10    A     That's all I can think of at the moment.

11    Q     All right.

12             (Exhibit 4, Law Review Article, was

13              marked for identification.)

14    Q    (By Mr. Disher) Actually, before -- one last

15    question on Exhibit 3.  Today -- as we sit here today,

16    do you still think that Judge Hanen's injunction

17    against DAPA and expanded DACA shows that his

18    political bias and emotions overcame his fair

19    appraisal of the evidence and fair interpretation of

20    the law?

21    A     I would say that the opinion, combined with

22    the prior history, still leads me to that conclusion.

23    Q     Okay.

24    A     Thank you.

25    Q     I've handed you Exhibit 4.  This is a law
```

www.huseby.com              Huseby, Inc. Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1822

```
 1    review article that you wrote; right?

 2        A    Yes.

 3        Q    And it was published in the spring of 2018?

 4        A    Correct.

 5        Q    All right.  I just want to walk through this

 6    a little bit and ask you a few questions about it.

 7             Okay.  So first, if we turn to -- I'll use

 8    the pagination as it exists on the law review article.

 9    So if we turn to page 331 --

10        A    Okay.

11        Q    -- I just want to ask you, you say in the

12    second paragraph, there's a sentence that begins, "In

13    each of these contexts, the critics."  Do you see

14    that?

15        A    Yes.

16        Q    Okay.  So then you say, "We liberals are now

17    hoisted by our own petards."  Do you see that part?

18        A    Yes.

19        Q    And when you say "we liberals," I mean, you

20    consider yourself a liberal?

21        A    It depends on the issue, of course.  But on

22    the particular issues discussed in this paper, I would

23    describe my views as being on the liberal side.

24        Q    Okay.  So let's go to page 334, please.  The

25    last paragraph on the page, there's a sentence that
```

App. 1823

```
 1   begins, "No DACA supporter."  Do you see that?

 2        A    Oh, yes.  I see it now.

 3        Q    Okay.  So the sentence says as you wrote it,

 4   "No DACA supporter of whom I am aware has ever

 5   disputed that deferred action gives rise to lawful

 6   presence."  Did I read that right?

 7        A    Yes.

 8        Q    Okay.  And that's still your opinion today?

 9        A    Yes.

10        Q    Okay.  Do you know when DACA was announced,

11   or rather -- when -- when the 2012 DACA memo was

12   issued, did that memo include the phrase "lawful

13   presence"?

14        A    I'm going by memory, but I believe it did

15   not.

16        Q    Okay.  What about the 2014 DAPA extended

17   DACA memo, do you know if it did?

18        A    I'm pretty sure that it did, yes.

19        Q    Okay.  Okay.  If you turn the page, please,

20   there's a sentence in the middle of the first

21   paragraph that begins, "As I have argued."

22        A    Yes.

23        Q    Okay.  So it reads, "As I have argued

24   elsewhere, DACA and DAPA are well within the legal

25   authority of the executive branch, the Fifth Circuit's
```

App. 1824

```
 1    poorly-reasoned 2-1 panel decision notwithstanding."
 2    Did I read that right?
 3         A    Yes.
 4         Q    And that's still your opinion today?
 5         A    Yes.
 6         Q    Including the fact that the 2-1 panel
 7    decision from the Fifth Circuit was poorly-reasoned?
 8         A    Yes.
 9         Q    Okay.  Okay.  Then starting with the next
10    paragraph, you contrast DACA and DAPA to some other
11    executive actions.  Do you see that?
12         A    Yes.
13         Q    Okay.  And those other executive actions
14    that you contrast DACA and DAPA to are the travel ban
15    and the DACA rescission; correct?
16         A    Correct.
17         Q    Okay.  And you say at the beginning of that
18    paragraph, "Let us be clear about one fundamental
19    fact:  The specific legal issues in litigation
20    challenging DACA and DAPA have almost nothing relevant
21    in common with the legal issues in either the travel
22    ban litigation or the DACA rescission litigation."
23    Did I read that right?
24         A    Yes.
25         Q    Is that still your opinion today?
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
        Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

                                                          App. 1825

```
 1        Q    And one argument that certain people have
 2   put forth is that DAPA and DACA, and correct me if I'm
 3   wrong, but that DAPA and DACA have some parallel to
 4   the Family Fairness programs; is that right?
 5        A    It depends on what you mean by parallel.
 6   They do have some commonalities with that program.
 7        Q    Okay.  But then you say in -- starting in
 8   the middle of this paragraph, quote, "As a member of
 9   the Obama Administration integrally involved in the
10   rollout and implementation of DACA, I can attest
11   firsthand that this point was not a sine qua non for
12   the President's decision."  Did I read that right?
13        A    Yes.
14        Q    And that's still your opinion today?
15        A    Yes.
16        Q    And then you say, "Immigrant advocacy
17   organizations can claim the lion's share of credit for
18   that."
19        A    Yes.
20        Q    Still your opinion today?
21        A    Yes.
22        Q    And then you say, "The reference to the
23   Reagan/Bush policy was merely a makeweight; there is
24   no doubt that the policy would have been issued even
25   without analogous programs in the 1980s."
```

```
 1      A      Yes.

 2      Q      And that's still your opinion today?

 3      A      Yes.

 4      Q      Okay.   What does makeweight mean?

 5      A      Makeweight is an argument that bolsters

 6   one's argument, but is not essential to it.

 7      Q      Got it.

 8                   (Exhibit 5, Declaration, was marked for

 9                   identification.)

10      Q      (By Mr. Disher) Okay.   Now let's turn to the

11   declaration that you provided in this case.   I'm going

12   to mark that as Exhibit 5.

13              MS. PERALES:   I'm just going to -- while

14   you're doing your housekeeping there, I just want to

15   point out to the witness that if a document has a

16   yellow sticker on it, you have to give it back to the

17   court reporter at the end of the deposition.

18              THE WITNESS:   Okay.

19              MS. PERALES:   Don't take it away.

20              THE WITNESS:   And don't write on it.

21              MS. PERALES:   Unless counsel asks you to

22   write on it.   But most important is not to leave with

23   it because the court reporter needs those yellow

24   stickers.

25              THE WITNESS:   Okay.   Thank you.
```

```
 1      Q     (By Mr. Disher) And you know what?  Before
 2   we get to Exhibit 5, I had skipped a portion that I
 3   was intending to ask you about.  And that was I want
 4   to get a little bit of background about your
 5   employment by the Federal Government.  When -- what
 6   years were you employed by any portion of the Federal
 7   Government?
 8      A     From 1979 to 1981, I served as a staff
 9   attorney at the U.S. Court of Appeals for the Ninth
10   Circuit.  For a very brief period of time, and I can't
11   recall how many months, I was a paid employee of
12   the -- as a part-time consultant by the Immigration
13   and Naturalization Service at the beginning of the
14   administration of President George H.W. Bush.  And I
15   continued in that capacity, but on an unpaid basis for
16   most of the remainder of the president's term.
17           Then from October of 2011 to October of
18   2013, I served as the Chief Counsel of USCIS in the
19   Department of Homeland Security.
20      Q     Let me pause you right there.  So from 2011
21   to 2013, you served as the Chief Counsel for USCIS?
22      A     Correct.
23      Q     And that was during the time in which DACA
24   was announced?
25      A     That's right.
```

1      Q      Have -- no, that is correct, you have not

2    observed -- Let me ask -- let me ask the question

3    again.

4           Since 2013, you have not observed any DACA

5    adjudications; correct?

6      A      Correct.

7      Q      Okay.  How many DACA applications have you

8    personally adjudicated?

9      A      None.

10     Q      Okay.  How many DAPA applications have

11   people who report directly to you adjudicated?

12     A      None.  The only people who reported to me

13   were other attorneys, not adjudicators.

14     Q      All right.  Keep going.

15     A      Paragraph 39 comments on the -- interprets

16   and comments on the approval of denial -- wait,

17   approval/denial rates for DACA and what that approval

18   rate was.  That's extremely important information for

19   the issue of whether case-by-case adjudication is

20   truly taking place.

21     Q      And that paragraph is based on data released

22   by USCIS?

23     A      In part.  That -- those data require some

24   interpretation.  For example, the figures for denials

25   are accompanied by a footnote that also -- that says

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1829

```
 1    that if there were any indication of that happening, I

 2    would absolutely have been aware of it.

 3         Q    During the two years that you were at USCIS?

 4         A    Correct.

 5         Q    Have you reviewed any of the production from

 6    the federal defendants in this case?

 7         A    No, I have not.

 8         Q    Okay.

 9         A    In the case of paragraph 49, some of the

10    statements, or at least one of the statements, that

11    the adjudicator has to struggle with determining how

12    probable and how severe a danger has to be in order

13    for a denial to be warranted, is based on my

14    experience at USCIS and knowing how often that subject

15    can come up.  But I don't think I can comment on the

16    specifics of those discussions without breaching

17    privilege.

18         Q    Understood.

19         A    Okay.

20         Q    But, again, those discussions would have

21    only occurred during the two years that you were at

22    USCIS?

23         A    For those discussions, yes.

24         Q    Ending in 2013?

25         A    Yes.
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1830

1          Okay.  Going back to your declaration,

2    Exhibit No. 5, if somebody wanted to repeat your

3    methodology to test your opinions, how would that

4    person do that?

5          A    I guess it would depend on the particular

6    statement that they're challenging, whether it's a

7    factual statement or a legal statement, and in either

8    case, what -- what the basis for that statement was.

9          Q    Okay.

10         A    I don't know that I could generalize it.

11         Q    So if somebody was going to test your legal

12   opinions, how would they do that?

13         A    It would depend on what the opinion is.  For

14   example, if it were an interpretation of a case, they

15   would read that case and perhaps read other cases that

16   have followed that case or any other legal authority

17   that might shed light on what that case means.

18         Q    Okay.

19         A    Same if it were a statute or if it were a

20   regulation.

21         Q    All right.  And in terms of the factual

22   opinions in your declaration, the sources that I heard

23   you mention were your time at USCIS from 2011 to 2013?

24         A    Mm-hmm.

25         Q    That's one source; right?

1      A    Correct.

2      Q    Your other source was conversations that you

3  may have had with other immigration scholars?

4      A    Correct.

5      Q    And there was a third -- oh, and publicly

6  available documents?

7      A    Yes.  And conversations with immigration

8  practitioners.

9      Q    Okay.  Any other sources?

10     A    I can't think of any off the top of my head,

11  but perhaps there are others.  I would need to answer

12  that question in the context of specific factual

13  assertions.

14     Q    Okay.  When an immigration service officer

15  is looking at an application to determine whether the

16  stated criteria have been met, do you know what

17  standard of proof that immigration service officer is

18  to use in evaluating the application?

19     A    I believe it is a preponderance of the

20  evidence, which means more likely than not.

21     Q    Okay.  If a person is currently in a removal

22  proceeding and then applies for DACA, and gets DACA,

23  what happens to the removal proceeding?

24     A    I'm not one hundred percent sure, but during

25  the time that I was there, a removal proceeding would

```
 1        Q    And because they got work authorization, the
 2   regulations applying to protect those with work
 3   authorization applied to these individuals and their
 4   DACA status?
 5        A    That's right.  The practical effect of
 6   revoking DACA was that the work permit that depended
 7   on it was no longer in force.
 8        Q    And because of the protections of work
 9   authorization, the court in this case ruled that the
10   Department of Homeland Security could not revoke these
11   individuals' DACA status?
12        A    That's right.  They have to follow their own
13   regulations.
14        Q    Okay.  I forgot to ask you one additional
15   question.  So earlier we had talked about the
16   differences between DACA and DAPA; right?  And you can
17   think of two right now.  One is the size of the
18   population, which you said doesn't affect the merits
19   of whether DACA and DAPA are legally the same thing;
20   correct?
21        A    In my opinion, it should not have that
22   effect.
23        Q    Okay.  And then the second thing you
24   mentioned was the ongoing nature of the DACA program
25   as opposed to the soon-to-be implemented nature of the
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 1833

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                   Page 100

```
 1    DAPA program; correct?

 2         A    Correct.

 3         Q    But, again, in your opinion, going to the

 4    underlying merits of whether these two programs are

 5    legal, that shouldn't make a difference; correct?

 6         A    Correct.

 7              MR. DISHER:  Okay.  I have nothing further.

 8    I'll pass the witness.

 9              MS. PERALES:  Can we take a break before

10    Jeffrey gets his chance to ask questions?

11              MR. ROBINS:  Sure.

12              (Whereupon, a brief break was taken.)

13                         EXAMINATION

14    QUESTIONS BY MR. ROBINS:

15         Q    So thank you, Mr. Legomsky.  Again, my name

16    is Jeff Robins.  I'm the attorney representing the

17    federal defendants from the Department of Justice and

18    I probably only have three or four questions, give or

19    take some follow-up.

20              As we wound up Mr. Disher's questions, you

21    were indicating your understanding of what happened in

22    the Inland Empire matter based on Exhibit 11.  Do you

23    recall that?

24         A    Yes.

25         Q    And you stated that the court's ruling in
```

App. 1834

```
 1                          EXAMINATION
 2    QUESTIONS BY MR. DISHER:
 3         Q     Mr. Legomsky, a few follow-up questions.
 4               First, you mentioned piecing it all
 5    together; right?
 6         A     Yeah.
 7         Q     You don't dispute that Judge Hanen himself
 8    can piece it all together without your help, do you?
 9         A     I think that to reach a reliable decision,
10    anyone who is not an immigration specialist would need
11    the guidance of someone who understands the intricate
12    network of statutory and regulatory provisions and
13    case law that these decisions require.  I spend an
14    entire semester emersed in teaching the students the
15    complexities of immigration law.  And I would be very
16    wary of anyone who is not a specialist making these
17    decisions without input from a specialist.
18         Q     That specialist could be a lawyer for one of
19    the parties in the case?
20         A     It could be if the lawyers are specialists
21    in immigration law.
22         Q     Okay.
23         A     Otherwise, I think it would be unreliable.
24         Q     Going back to the idea of the outer limit of
25    the executive's ability to grant work authorization,
```

App. 1835

```
 1                    REPORTER CERTIFICATE

 2              I, REBECCA L. TUGGLE, a Registered
      Professional Reporter, Certified Court Reporter, and
 3    Certified Shorthand Reporter within and for the State
      of Missouri, do hereby certify that there came before
 4    me on August 1, 2018, at Alaris Litigation Services,
      711 N. 11th Street, St. Louis, Missouri 63101
 5
                    STEPHEN LEGOMSKY
 6
      who was by me first duly sworn; that the witness
 7    was carefully examined; that said examination was
      reported by myself, translated and proofread using
 8    computer-aided transcription; and the above transcript
      of proceedings is a true and accurate transcript of my
 9    notes as taken at the time of the examination of this
      witness.
10
              I further certify that I am neither attorney
11    nor counsel for nor related nor employed by any of the
      parties to the action in which this examination is
12    taken; further, that I am not a relative or employee of
      any attorney or counsel employed by the parties hereto
13    or financially interested in this action.

14

15            Dated this 2nd day of August, 2018.

16

17

18                  Becca Tuggle
19            _____
              Rebecca L. Tuggle, RPR, CCR, CSR
20

21

22

23

24

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
          Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

                                                          App. 1836