**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**APPENDIX**

Pursuant to this Court's Civil Procedures, Rule 7, Defendant-Intervenor, State of New Jersey, hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Reply in Opposition to Plaintiffs' Motion for Preliminary Injunction:

| Ex. | Description | Page |
|---|---|---|
| 60. | *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*, Ben Harrington, Congressional Research Serv., April 10, 2018 *available at* https://fas.org/sgp/crs/homesec/R45158.pdf | NJAPP0662* |
| 61. | Declaration of Stephen Legomsky | NJAPP0686 |
| 62. | Plaintiff's Objections and Response to Defendant-Intervenors' Second Set of Discovery Requests | NJAPP0710 |
| 63. | Plaintiff's Objections and Response to Defendant-Intervenors' Fourth Set of Discovery Requests | NJAPP0729 |

| 64. | Declaration of Tracy Renaud | NJAPP0738 |
|---|---|---|
| 65. | Excerpts from the deposition transcript of Daniela Velez | NJAPP0751 |
| 66. | Excerpts from the deposition transcript of Joana Costa | NJAPP0759 |
| 67. | Defendant-Intervenors' Third Set of Discovery Requests to Defendants | NJAPP0762 |
| 68. | Federal Defendants' Objections and Responses to Defendant-Intervenors' Third Set of Discovery Requests | NJAPP0776 |
| 69. | *McGinley v. Houston*, No. 03-0563-WS-M, 2003 U.S. Dist. LEXIS 14947 (S.D. Ala. Aug. 27, 2003) | NJAPP0812 |
| 70. | Excerpts from the deposition transcript of Michael Knowles | NJAPP0825 |

\* - These documents are supplements to "New Jersey's List of Exhibits" previously exchanged with the parties.

Dated: August 3, 2018

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:     */s/Rachel Wainer Apter*
        Assistant Attorney General
        Attorney-in-Charge
        (admitted pro hac vice)
        Richard J. Hughes Justice Complex
        25 Market Street, 8th Floor
        Trenton, New Jersey 08625-0116
        Phone: (609) 376-2702
        Fax: (609) 777-4015
        Rachel.Apter@njoag.gov

        Jeremy Hollander, Assistant Attorney General
        (admitted pro hac vice)
        Kenneth S. Levine, Deputy Attorney General
        (admitted pro hac vice)
        Paul H. Juzdan, Deputy Attorney General
        (admitted pro hac vice)
        Brian DeVito, Deputy Attorney General
        (admitted pro hac vice)
        Katherine Gregory, Deputy Attorney General
        (admitted pro hac vice)
        Nicholas Dolinsky, Deputy Attorney General
        (admitted pro hac vice)
        Office of the Attorney General

124 Halsey Street, 5th Floor
Newark, NJ 07101

*Attorneys for Defendant-Intervenor State of New Jersey*

# Exhibit 60

NJAPP0662



*Congressional*
*Research Service*
Informing the legislative debate since 1914

# An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others

**Ben Harrington**
Legislative Attorney

April 10, 2018

Congressional Research Service
7-5700
www.crs.gov
R45158

**CRS REPORT**
Prepared for Members and
Committees of Congress

NJAPP0663

# Summary

Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals (aliens) present in the United States in violation of the Immigration and Nationality Act (INA). Well-known types of reprieves include deferred action, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS). The authority to grant some types of discretionary reprieves from removal, including TPS, comes directly from the INA. The authority to grant other types of reprieves generally arises from the Department of Homeland Security's (DHS's) enforcement discretion—that is, its discretion to determine the best manner for enforcing the immigration laws, including by prioritizing some removal cases over others.

The primary benefit that a reprieve offers to an unlawfully present alien is an assurance that he or she does not face imminent removal. Reprieves also generally confer other benefits, including eligibility for employment authorization and nonaccrual of unlawful presence for purposes of the three- and ten-year bars on admission to the United States under the INA. Reprieves do not confer "lawful immigration status," in the narrow sense that reprieve recipients typically remain removable under the INA's grounds of inadmissibility or deportability (although they may have defenses to removal, including a statutory defense in the case of TPS) and in the more general sense that recipients do not enjoy most of the statutorily fixed protections that come with lawful permanent resident (LPR), refugee, asylee, and nonimmigrant status. The availability and duration of reprieves often turn upon executive policies, and accordingly reprieves do not offer steadfast protection from removal or reliable access to other benefits.

Categories of reprieves premised upon executive enforcement discretion include the following:

- **Deferred Action.** The generic term that DHS uses for a decision not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.
- **DACA.** A large-scale, programmatic type of deferred action available since 2012 for a subset of aliens who arrived in the United States as children.
- **Deferred Enforced Departure (DED).** A reprieve premised on the President's exercise of foreign policy powers to protect nationals of countries experiencing war or instability.
- **Extended Voluntary Departure (EVD).** An earlier version of DED little used since 1990.

Reprieves granted pursuant to statutory authority include the following:

- **TPS Relief.** A form of temporary protection from removal for aliens from countries that DHS designates as unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.
- **Parole.** A statutory power that authorizes DHS to grant entry (but not admission) to inadmissible aliens on a case-by-case basis.

Immigration authorities may grant other reprieves in connection with removal proceedings:

- **Administrative Closure.** A decision to discontinue temporarily a removal proceeding.
- **Voluntary Departure.** A brief reprieve that allows an alien to depart the United States at his own expense in lieu of removal proceedings or enforcement of a removal order.
- **Stay of Removal, Order of Supervision.** Mechanisms often used together that allow DHS or an immigration judge to postpone enforcement of a removal order.

NJAPP0664

# Contents

Introduction ........................................................................................................................... 1

Sources of Executive Authority to Grant Discretionary Reprieves from Removal ........................ 4

Nature of Protections for Recipients: In General ......................................................................... 8

Glossary of Discretionary Reprieves ........................................................................................... 11

    Generally Available Reprieves Premised upon Enforcement Discretion or Executive
       Powers ............................................................................................................................. 12

    Generally Available Reprieves Granted Pursuant to Statutory Authority ........................... 15

    Reprieves Granted Exclusively in Connection with the Removal Process .......................... 18

# Contacts

    Author Contact Information ..................................................................................................... 20

NJAPP0665

*An Overview of Discretionary Reprieves from Removal*

# Introduction

The Immigration and Nationality Act (INA) establishes a system of rules as to which non-U.S. nationals (aliens) may enter the United States and under what conditions.[1] It sets forth, for instance, three primary categories—family-based, employment-based, and diversity-based—through which an alien may qualify for an immigrant visa and thereby seek admission to the United States as a lawful permanent resident (LPR).[2] The INA also establishes requirements for the admission of refugees,[3] and delineates the categories of aliens who may be admitted temporarily as nonimmigrants for particular purposes such as study, tourism, or temporary work.[4]

Those aliens who enter or remain in the country in violation of the INA's restrictions generally are subject to removal based on their presence within the United States alone.[5] As a consequence, the Department of Homeland Security (DHS)—the federal agency primarily responsible for enforcing the INA—has a statutory basis to seek the removal of such aliens even if they have not committed crimes or violated other INA provisions.[6] According to recent estimates, there are currently between ten and twelve million aliens in the United States whose presence violates the INA.[7] They arrive in two ways primarily: (1) surreptitiously, by crossing the border without inspection; or (2) on a temporary nonimmigrant visa (e.g., on a B-1/B-2 tourist visa,[8] which typically allows them to remain for six months), which they then overstay.[9] DHS has estimated in

---

[1] 8 U.S.C. §§ 1101, *et seq.*

[2] *See* 8 U.S.C. § 1151(a) (setting forth the three categories of immigrant visa eligibility). For an overview of immigrant visa categories and application procedure, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*, by William A. Kandel.

[3] 8 U.S.C. § 1157; *see generally* CRS Report RL31269, *Refugee Admissions and Resettlement Policy*, by Andorra Bruno.

[4] 8 U.S.C. § 1101(a)(15); *see generally* CRS Report R45040, *Nonimmigrant (Temporary) Admissions to the United States: Policy and Trends*, by Jill H. Wilson.

[5] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *id.* § 1229a(e)(2)(B) (defining inadmissible aliens who have not been admitted to the United States as "removable"); *id.* § 1227(a)(1)(B)(rendering any alien "who is present in the United States in violation of this chapter or any other law of the United States" deportable and thus subject to removal); *id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, DAVID WEISSBRODT & LAURA DANIELSON, IMMIGRATION LAW AND PROCEDURE 349 (6th ed. 2011) ("Non-citizens who are present in the U.S. in violation of the INA or any other law of the U.S. are removable . . . as are those who fail to maintain the nonimmigrant . . . status in which they were admitted.").

[6] *See, e.g.*, Mondragón v. Holder, 706 F.3d 535, 541 (4th Cir. 2013) ("It is uncontroverted that Mondragón entered the United States illegally and is therefore removable."); Ghaffar v. Mukasey, 551 F.3d 651, 653 (7th Cir. 2008) (denying petition for review of final order of removal based on overstay of nonimmigrant visa).

[7] Ctr. for Migration Studies, *The US Undocumented Population Fell Sharply During the Obama Era: Estimates for 2016* (Feb. 22, 2018) (estimating 10.8 million in 2016), http://cmsny.org/publications/warren-undocumented-2016/; Dep't of Homeland Sec. Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014* (July 2017) (estimating 12.1 million in 2014), http://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf; Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009* (Sept. 20, 2016) (estimating 11.1 million in 2014), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

[8] *See generally* 9 Foreign Affairs Manual (FAM) 402.2.

[9] *See* Office of Immigration Statistics, *supra* note 7, at 1; David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 171 (2012) ("[E]ntrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical 'illegal alien' in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully (continued...)

NJAPP0666

the past that its resources allow it to remove a maximum of 400,000 aliens per year who are present in violation of the INA.[10]

For reasons that may range from administrative convenience to humanitarian concerns, immigration authorities sometimes decide not to seek the removal of unlawfully present aliens[11]—either during a specified timeframe or indefinitely—and communicate that decision to the affected aliens.[12] Well-known examples of such decisions include grants of deferred action,[13] protections granted under the Deferred Action for Childhood Arrivals (DACA) initiative,[14] and Temporary Protected Status (TPS).[15] The former two types of reprieves confer assurances from DHS, premised on its enforcement discretion, that the agency will not seek an alien's removal, often during a defined time period.[16] The latter, TPS, is a statutory mechanism that allows immigration authorities to grant temporary protection from removal to aliens from countries experiencing upheaval or instability.[17]

This report refers to executive decisions not to seek removal as "discretionary reprieves from removal" because their effective period generally depends on the duration of the Executive's inclination not to seek removal and because the reprieves (unlike statutory legalization

---

(...continued)

present population. The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission.").

[10] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014) ("DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year."); Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. Pa. L. Rev. 1753, 1759 (2016) (describing the "gap between the INA's putative scope and its enforceable scope").

[11] The INA defines unlawful presence as follows: "[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of Homeland Security] or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[12] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *see also* Arizona v. United States, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

[13] *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing deferred action).

[14] Memorandum from Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) [hereinafter DHS DACA Memo]; *see* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing DACA).

[15] 8 U.S.C. § 1254a. TPS and some other reprieve programs may also provide relief to nonimmigrants and other aliens present pursuant to a statutory immigration status. *See, e.g., id.* § 1254a(c) (requiring aliens to have been physically present since a date specified by DHS in order to qualify for TPS, but not excluding lawfully present aliens from eligibility). This report focuses on the use of discretionary reprieves to regulate the population of aliens present in violation of the INA.

[16] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action and DACA).

[17] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

---

NJAPP0667

mechanisms such as cancellation of removal,[18] registry,[19] or asylum[20]) do not confer LPR status or create a direct avenue to that status.[21] (However, in some jurisdictions, TPS may facilitate adjustment to LPR status for aliens who otherwise qualify for immigrant visas in a family-based, employment-based, or diversity-based category.)[22] Discretionary reprieves from removal do not, in other words, offer steadfast protection from removal,[23] although they typically confer eligibility for work authorization, among other benefits.[24] A burgeoning body of legal scholarship about discretionary reprieves has coined an array of terms for the peculiar sort of relief that they provide, including "quasi-legal status,"[25] "liminal"[26] or "twilight" status,[27] and the "status of nonstatus."[28] In recent decades, discretionary reprieves have grown in prevalence and become an increasingly significant aspect of the federal government's regulation of the unlawfully present population.[29] The prevalence of discretionary reprieves may well decline in the near term,

---

[18] 8 U.S.C. § 1229b(b) (authorizing the cancellation of removal and adjustment of status for certain nonpermanent residents).

[19] *Id.* § 1259 (authorizing the conferral of a record of admission for permanent residence in the case of certain aliens who entered the United States prior to January 1, 1972).

[20] *Id.* § 1158.

[21] *See* Arpaio v. Obama, 797 F.3d 11, 17 (D.C. Cir. 2015) ("[D]eferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'") (quoting DHS DACA Memo, *supra* note 14, at 3); Texas v. United States, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' [obtained through deferred action] is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) ("By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States.").

[22] *See* 8 U.S.C. § 1254a(f)(4) (providing that aliens granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status eligibility); *infra* note 141 (citing cases on adjustment of status eligibility for TPS recipients).

[23] *See Arpaio*, 797 F.3d at 17; *Texas*, 809 F.3d at 148. TPS provides perhaps the most rigid protection against removal of any discretionary reprieve. *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[24] *See* 8 C.F.R. § 274a.12(c) (establishing categories of aliens eligible to apply for employment authorization).

[25] *See, e.g.,* Ingrid V. Eagly, *Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement,* 88 N.Y.U. L. REV. 1126, 1217 (2013); Hiroshi Motomura, *What Is "Comprehensive Immigration Reform"? Taking the Long View,* 63 ARK. L. REV. 225, 226 (2010).

[26] Jennifer M. Chacon, *Producing Liminal Legality,* 92 DENV. UNIV. L. REV. 709, 713 (2015).

[27] David A. Martin, *Twilight Statuses: A Closer Examination of the Unauthorized Population,* 2 MIGRATION POLICY INST. 1, 7-8 (June 2005).

[28] *See* Geoffrey Heeren, *The Status of Nonstatus,* 64 AM. U. L. REV. 1115 (2015).

[29] *See id.* at 1120 ("[I]n recent years, the United States has expanded the number of persons placed in nonstatus."). Two events, in particular, did much to increase the number of aliens receiving discretionary reprieves: the enactment of the TPS statute in 1990 and the implementation of the DACA program in 2012. *See* CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues,* by Jill H. Wilson, at 11 (calculating that 436,866 people held TPS as of October 12, 2017); CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions,* by Andorra Bruno, at 6 ("As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved."); *see also* U.S. Citizenship and Immigration Servs., *Number of Approved Employment Authorization Documents, by Classification and Basis for Eligibility, Oct. 1, 2012 – June 29, 2017* (2017) (providing statistics for employment authorization documents approved for recipients of deferred action, DACA, parole, and other types of discretionary reprieves), http://www.uscis.gov/sites/default/files/USCIS/Resources/ Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/eads-by-basis-for-eligibility.pdf [hereinafter USCIS EAD Data]. The Obama Administration's proposed Deferred Action for Parents of Americans (DAPA) initiative, which federal courts enjoined before implementation, had the potential to make approximately four million unlawfully present aliens eligible for discretionary reprieves. *See* Texas v. United States, 809 F.3d 134, 148 (5th Cir. (continued...)

---

NJAPP0668

however, as a result of changes in executive policy concerning DACA, TPS, and Deferred Enforced Departure (DED).[30]

This report provides an overview of discretionary reprieves from removal. It discusses the primary sources of authority on which discretionary reprieves are premised and describes, in general, the nature of the protections that they confer. The report concludes with a glossary of the principal types of discretionary reprieves.

# Sources of Executive Authority to Grant Discretionary Reprieves from Removal

The Executive's power to grant most of the existing forms of discretionary reprieves—including deferred action, DACA, and DED, among others—is typically attributed to its enforcement discretion: that is, its authority to determine the best method for enforcing federal immigration law.[31] This enforcement discretion includes the authority to prioritize some cases over others to conserve resources or avoid unjust results.[32] Criminal prosecutors in the United States possess a similar type of discretion.[33] They need not prosecute every crime of which they become aware, and their ability to set prosecution priorities that maximize the impact of their limited resources is considered fundamental to the American criminal justice system.[34] Drawing from this criminal law tradition, courts, immigration officials, and commentators often call the Executive's authority

---

(...continued)

2015) (affirming injunction against DAPA and observing that of "the approximately 11.3 million illegal aliens in the United States, 4.3 million would be eligible for [reprieves] pursuant to DAPA."), *aff'd by an equally divided Court,*—U.S.—, 136 S. Ct. 2271, 2272 (2016); *Arpaio v. Obama*, 797 F.3d 11, 18 n.1 (D.C. Cir. 2015) (similar estimate); *cf.* Randy Capps et. al., *Deferred Action For Unauthorized Immigrant Parents*, MIGRATION POLICY INST. 3 (Feb. 2016) (estimating that DAPA could have potentially reached "as many as 3.6 million unauthorized immigrants"), https://www.migrationpolicy.org/research/deferred-action-unauthorized-immigrant-parents-analysis-dapas-potential-effects-families.

[30] *See* CRS Legal Sidebar LSB10052, *UPDATE: The End of the Deferred Action for Childhood Arrivals Program: Some Immediate Takeaways*, by Hillel R. Smith; CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[31] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999); *Arpaio*, 797 F.3d at 16 ("The Secretary of Homeland Security is charged with the administration and enforcement of the immigration laws. With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (some internal quotation marks and citations omitted).

[32] Arizona v. United States, 567 U.S. 387, 396 (2012); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84.

[33] *See* United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey, at 11 ("The judicial branch has traditionally accorded federal prosecutors 'broad' latitude in making a range of investigatory and prosecutorial determinations, including when, against whom, and whether to prosecute particular criminal violations of federal law.").

[34] *See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 682 (2014) ("With limited resources and broad charging options, federal prosecutors must choose how to allocate investigative and prosecutorial resources; they must prioritize some offenses at the expense of others."); *cf.* LUIGI FERRAJOLI, LAW AND REASON 574 (1989) (categorizing prosecutorial discretion as an attribute of the Anglo-American system of accusatorial criminal justice that belongs to its historical tradition but not its theoretical framework, and noting that prosecutorial discretion does not form part of the civil law tradition).

---

NJAPP0669

to decline to seek removal of some unlawfully present aliens "prosecutorial discretion,"[35] even though removal proceedings are civil rather than criminal in nature.[36]

Enforcement discretion in the immigration context has unique attributes that distinguish it from prosecutorial discretion in the criminal context. The INA puts no general statute of limitations on removal.[37] Thus, the Executive's decision not to seek removal of an alien lacks the definitive quality of many decisions not to prosecute crimes, which become irreversible if an applicable statute of limitations expires.[38] Aliens present in violation of the INA remain removable indefinitely (unless they otherwise acquire a legal status), so an assurance that the Executive will not seek their removal at a particular juncture does not redress their long-term situation.[39] Further, perhaps as a consequence of this reality, a discretionary reprieve from removal differs from a decision not to prosecute a crime in that a discretionary reprieve from removal often carries a fixed term, which can typically be renewed.[40] DACA, for instance, carries a two-year renewable term.[41]

Over time, the Executive has employed its enforcement discretion to grant various types of reprieves under inconstant terminology. In 1974, John Lennon famously pursued a type of

---

[35] *See, e.g.*, Shoba Shivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243 (2010); DHS DACA Memo, *supra* note 14, at 1.

[36] *Arizona*, 567 U.S. at 396 (2012) ("Removal is a civil, not criminal, matter."); *cf.* Maureen A. Sweeney, *Fact or Fiction: The Legal Construction of Immigration Removal for Crimes*, 27 YALE J. ON REG. 47, 49 (2010) ("[C]ourts have consistently held that removal is not punishment for crime but is instead a remedial civil sanction and a collateral, rather than direct, consequence of a conviction. This theoretical characterization of removal developed many decades ago in the context of the very different immigration law that existed then. It no longer corresponds in any meaningful way to the realities of immigration law and enforcement . . . .").

[37] *See* Adams v. Holder, 692 F.3d 91, 104 (2d Cir. 2012) ("[T]he INA . . . specifically imposes no time limitations on removal proceedings."); Asika v. Ashcroft, 362 F.3d 264, 269 (4th Cir. 2004) ("[T]he provisions of the [INA] that govern deportation [do not] refer . . . to any time limitation on deportation at all."). Some grounds of deportation, however, apply only to conduct that occurs within a certain time after entry. *See* 8 U.S.C. § 1227(a)(1)(E)(i) ("Any alien who (prior to the date of entry, at the time of any entry, or *within 5 years of the date of any entry*) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.") (emphasis added); *id.* § 1227(a)(5) ("Any alien who, *within five years after the date of entry*, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.") (emphasis added); WEISSBRODT & DANIELSON, *supra* note 5, at 279-80 ("[N]on-citizens who become dependent on government benefits are removable only if they become a public charge within five years of entry . . . . Because there is no general statute of limitations, however, ICE can remove [such non-citizens] . . . *at any time*—even if [they] cease[] to be a public charge.") (emphasis in original). Also, one INA provision imposes a limitations period on actions to *rescind* a person's LPR status if he obtained it through adjustment despite being ineligible, 8 U.S.C. § 1256(a), but every federal appellate court to consider the issue, except one, has held that limitations period does not apply to removal proceedings. *See* Adams, 692 F.3d at 101-02, 102 n.6 (collecting cases and explaining that only the Third Circuit "has applied § 1256(a)'s five-year limitations period to removal proceedings based on alleged fraudulent procurement of adjustment of status").

[38] *See* United States v. Marion, 404 U.S. 307, 322 (1971) ("[Criminal] statutes [of limitation] . . . 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.") (quoting Public Schools v. Walker, 9 Wall. 282, 288 (1870)).

[39] *See* 8 U.S.C. § 1182(a)(6)(A)(i); *id.* § 1227(a)(1)(B); Andrew Tae-Hyun Kim, *Deportation Deadline*, 95 WASH. U.L. REV. 531, 550 (2017) (noting the lack of any limitations period in the INA and explaining that because "deferred action is not an affirmative grant of relief from removal . . . a change in administrative policy or priorities could change what was once a low-priority case to a high-priority one. All this heightens the level of uncertainty for undocumented immigrants.").

[40] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (authorizing "deferring action for a period of two years" for qualified aliens).

[41] *Id.*

---

NJAPP0670

reprieve called "nonpriority status," which his lawyer accused the Immigration and Naturalization Service (INS)[42] of keeping secret.[43] Soon thereafter, the INS adopted the term "deferred action,"[44] which DHS continues to use today for a reprieve from removal granted under its general enforcement discretion.[45] Immigration authorities have also, however, granted reprieves under the labels "Extended Voluntary Departure" (EVD), DED, and DACA.[46] In some instances, such as DACA, these labels denote a particular reprieve type's focus on a discrete group.[47] In other instances, such as with EVD and DED, the bureaucratic terminology seems to supply multiple labels for the same type of reprieve.[48] The criteria for granting the reprieves (other than the statutorily authorized reprieves discussed below) are generally set forth in agency manuals and policy memoranda,[49] although for some reprieve types it can be difficult to locate a controlling document.[50] Federal statute does not set the criteria for reprieves grounded in enforcement discretion; nor does a particular law supply explicit authorization for the Executive to grant such reprieves,[51] although scattered provisions of the INA reference deferred action and describe narrow categories of aliens as eligible to receive it.[52] In recent years, questions have arisen as to

---

[42] The INS was the agency with primary responsibility for enforcing the INA until March 1, 2003, when it ceased to exist and most of its functions were transferred to DHS under the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135. *See* Nijar v. Holder, 689 F.3d 1077, 1078-79 (9th Cir. 2012).

[43] Heeren, *supra* note 28, at 1134; Wadhia, *supra* note 35, at 246-47.

[44] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

[45] *See* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[46] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion."

[47] *See* DHS DACA Memo, *supra* note 14, at 2 (describing the DACA initiative as premised on "the exercise of [] prosecutorial discretion . . . [for] certain young people who were brought to this country as children and know only this country as home").

[48] *See* U.S. IMMIGRATION AND NATURALIZATION SERVS, ADJUDICATOR'S FIELD MANUAL, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .") [hereinafter USCIS AFM].

[49] *See, e.g., id.*; IMMIGRATION AND CUSTOMS ENFORCEMENT, DETENTION AND REMOVAL OPERATIONS POLICY AND PROCEDURE MANUAL, ch. 20.8 (concerning deferred action), https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf [hereinafter DROPPM].

[50] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action); Heeren, *supra* note 28, at 1134 (contending that the controlling legal authority for discretionary reprieves "is tenuous and sometimes even secret . . . DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda").

[51] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (quoting treatise for the proposition that deferred action is a "commendable exercise in administrative discretion [] developed without express statutory authorization"); Texas v. United States, 809 F.3d 134, 167 (5th Cir. 2015) (same); *see also* Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015) ("With [DHS's] enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)).

[52] *See* 8 USC § 1227(d)(2) (providing that the denial of an administrative stay of removal to applicants for T or U nonimmigrant status "shall not preclude the alien from applying for . . . deferred action"); REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (emphasis added) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for driver's licenses). At least two statutory provisions go so far as to state that specific groups of aliens are "eligible" for deferred action. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain self-petitioners for LPR status under the Violence Against Women Act are "eligible for deferred action and work authorization"); National Defense Authorization Act of 2004, P.L. 108-136, Div. A, Title VII, § 1703(c), 117 Stat. 1693 (codified at 8 U.S.C. § 1151 NOTE) (providing that the spouses and children of certain deceased U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); *see also* Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 413 (E.D.N.Y. 2018) (reasoning that "Congress has repeatedly ratified immigration officials' practice of according (continued...)

---

NJAPP0671

whether the Executive may lawfully use its enforcement discretion to provide reprieves in a programmatic fashion for large populations of aliens that meet specific criteria, instead of granting reprieves on a purely case-by-case basis.[53] The Supreme Court has yet to decide this issue.[54]

Although most types of discretionary reprieves from removal are grounded entirely in enforcement discretion, a few types have a statutory footing. First, the INA expressly gives DHS authority to grant immigration parole on a case-by-case basis to certain aliens,[55] providing legal permission for their physical presence in the United States without granting them admission (thereby leaving them "at the boundary line" of the United States for most immigration purposes).[56] DHS interprets its parole authority to encompass two types of discretionary grants of parole with implications for aliens whose presence violates the INA: parole-in-place and advance parole.[57] Second, the INA gives DHS authority to grant TPS relief to nationals from designated countries,[58] which resembles a discretionary reprieve in many respects but confers more rigid protection from removal than most reprieves because the bases for terminating TPS are statutorily limited.[59] Although TPS eligibility is not limited to unlawfully present aliens,[60] TPS may be particularly consequential for aliens who otherwise lack a legal foothold to remain in the United States.[61] Finally, the INA gives DHS and immigration courts authority to grant some types of discretionary reprieves in conjunction with the removal process, including voluntary departure,[62] stays of removal,[63] and orders of supervision.[64] (Other types of reprieves granted during removal proceedings, such as administrative closure, have a basis only in principles of executive discretion and docket management.)[65]

---

(...continued)

deferred action to certain aliens without lawful immigration status").

[53] *See* Texas v. United States, 809 F.3d 134, 179-82 (5th Cir. 2015) (reasoning that the Deferred Action for Parents of Americans (DAPA) reprieve program was "manifestly contrary to the INA" because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present . . . [and] [e]ntirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA")."), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016); *contra Batalla Vidal*, 279 F. Supp. 3d at 422 ("The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action.").

[54] *See* United States v. Texas, 136 S. Ct. 2271 (2016) (Mem.).

[55] 8 U.S.C. § 1182(d)(5).

[56] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[57] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole-in-place and advance parole).

[58] 8 U.S.C. § 1254a.

[59] *Id.* § 1254(c)(3); *see infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[60] *See* 8 U.S.C. § 1254(c)(1) (setting forth TPS eligibility standards).

[61] *See, e.g.*, Ramirez v. Brown, 852 F.3d 954, 958 (9th Cir. 2017) (concerning adjustment of status ramifications of a grant of TPS to an alien who entered without inspection).

[62] 8 U.S.C. § 1229c.

[63] *Id.* § 1229a(b)(5)(C); *id.* § 1231(c)(2).

[64] 8 U.S.C. § 1231(a)(3); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing voluntary departure, stays of removal, and orders of supervision).

[65] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing administrative closure).

---

NJAPP0672

# Nature of Protections for Recipients: In General

The principal benefit of a discretionary reprieve is the temporary assurance it provides to an unlawfully present alien that he or she does not face imminent removal, even though his or her presence in the United States violates the INA.[66] The nature of the Executive's ability to retract this assurance—and the resulting reliability of the assurance to the alien—varies by reprieve type. A grant of TPS to an individual alien, due to the applicable statutory parameters, is relatively difficult for DHS to withdraw during the grant's validity period.[67] In contrast, DHS asserts that it may terminate a grant of deferred action or DACA at its discretion,[68] although the Administrative Procedure Act and constitutional principles may require DHS to have an adequate justification for doing so.[69] No type of reprieve offers a bulwark against removal as rigid as the statutorily authorized presence that comes with LPR, refugee, and asylee status, whose holders can be removed only if they acquired their status unlawfully (e.g., through fraud) or if they engage in specified forms of misconduct.[70] Aliens present in violation of the INA who receive discretionary reprieves remain technically removable under the inadmissibility or deportability grounds of the INA, and, except in the case of TPS recipients, do not have a statutory defense against removal based on the reprieve itself.[71]

Discretionary reprieves also typically carry advantages beyond protection from removal, including eligibility to seek an employment authorization document (EAD) from DHS that allows aliens to work legally in the United States.[72] Perhaps most significantly, under DHS regulations, recipients of most types of reprieves are not considered "unlawfully present" within the United

---

[66] *See Reno*, 525 U.S. at 484.

[67] *See* 8 U.S.C. § 1254a(c)(3) (enumerating three bases for withdrawal of TPS); *infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[68] DROPPM, *supra* note 49, ch. 20.8(f) (concerning deferred action termination); U.S. Citizenship & Immigration Servs., *DHS DACA FAQs*, at Q27 (Apr. 25, 2017) ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."), https://www.uscis.gov/archive/frequently-asked-questions [hereinafter DHS DACA FAQs].

[69] *See infra* note 119 (collecting precedents concerning potential limitations on termination of individual DACA grants and rescission of the DACA program).

[70] *See* 8 U.S.C. § 1227 (enumerating specific grounds of deportability for admitted aliens, including certain criminal convictions); *id.* § 1158(c)(2) (governing termination of asylum); *cf.* Amanda Frost, *Independence and Immigration*, 89 S. CAL. L. REV. 485, 503 (2016) ("Congress has expanded the grounds on which even longtime lawful permanent residents can be deported. Today, even longtime lawful permanent residents can be deported for fairly minor criminal offenses . . . ."). Nonimmigrant aliens do not enjoy a level of protection from removal commensurate with LPRs, asylees, and refugees, because the Department of State has discretion to revoke a nonimmigrant visa "at any time," 8 U.S.C. § 1201(i), and revocation renders the visa holder removable. 8 U.S.C. § 1227(a)(1)(B) (providing for the removal of any alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)"); *see Texas v. United States*, 809 F.3d 134, 167 n.102 (5th Cir. 2015); Mier-Fiorito v. Mukasey, 282 Fed. Appx. 536, 538 (9th Cir. 2008) (unpublished) (holding that revocation of alien's nonimmigrant visa rendered him deportable).

[71] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *Id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, Amanda Frost, *Cooperative Enforcement in Immigration Law*, 103 IOWA L. REV. 1, 51 n.78 (2017) ("[D]eferred action does not provide any defense to removal and the executive has absolute discretion to revoke deferred action unilaterally . . . .") (internal quotation marks and citation omitted); *cf.* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (reasoning that DACA was "*specifically designed* for persons without lawful immigration status" but that DHS must supply a non-arbitrary or capricious reason for terminating a DACA grant).

[72] *See* 8 C.F.R. § 274a.12(c); *see also* REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for federal recognition of state-issued driver's licenses and other identification documents).

---

NJAPP0673

States.[73] This is because DHS has "authorized" the aliens' presence by granting them reprieves.[74] As a consequence, time spent in the United States on deferred action, TPS, and most other types of reprieves does not count toward the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission set forth in INA § 212(a)(9)(B)(i) (although a reprieve does not cure, for purposes of the bars, any unlawful presence already accumulated).[75] A discretionary reprieve may also trigger eligibility for certain benefits or programs for which "lawful presence" is a qualifying criterion, such as in-state university tuition under certain state laws.[76] More generally, even though state governments typically have broad discretion to deny state benefits to unlawfully present aliens, that discretion might be more limited in the event that such aliens are granted a discretionary reprieve from removal by the federal government.[77]

It is often said that discretionary reprieves do not confer lawful immigration status.[78] But "lawful immigration status" is an imprecise term. The INA uses variations of it in some places[79] but does not define it.[80] Although a determination that an alien lacks "lawful immigration status" triggers consequences under some INA provisions—most notably, a potential bar to adjustment of status[81]—it does little to describe the alien's legal condition in a formal sense. According to DHS

---

[73] Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (en banc); Texas v. United States, 809 F.3d 134, 147-48 (5th Cir. 2015) (explaining that deferred action recipients are "lawfully present" based on agency memoranda); *see also* 8 C.F.R. § 1.3(a)(4) (defining recipients of several types of reprieves as "lawfully present in the United States" for purposes of applying for social security benefits).

[74] *Arizona Dream Act Coal.*, 855 F.3d at 974.

[75] USCIS AFM, *supra* note 48, ch. 40.9(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence."). Aliens who are unlawfully present for more than 180 days but less than one year are, following departure from the country, barred from admission for three years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Aliens unlawfully present for more than a year are subject to a ten-year bar on admission to the United States following departure or removal from the country. *Id.* § 1182(a)(9)(B)(i)(II).

[76] *See, e.g.*, 8 U.S.C. § 1623 (prohibiting states from providing any "postsecondary education benefit" on the basis of state residency to aliens who are "not lawfully present," unless the same benefit is made available to U.S. citizens without regard to residency). Some have argued that a discretionary reprieve recipient's lack of unlawful presence does not mean that he or she possesses lawful presence for purposes of other statutes. *Arizona Dream Act Coal.*, 855 F.3d at 960 n.3 (Kozinski, J., dissent from denial of rehearing en banc) ("Even if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.").

[77] *See Arizona Dream Act Coal.*, 855 F.3d at 963 (rejecting as preempted by federal law a state policy that deemed individuals with employment authorization through DED and deferred action to be unlawfully present and denied them state-issued driver's licenses on that basis).

[78] *See* USCIS, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, http://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca ("Deferred action does not provide lawful status."); United States v. Arrieta, 862 F.3d 512, 516 (5th Cir. 2017) (holding that DACA recipients lack "lawful status").

[79] *E.g.*, 8 U.S.C. § 1254a(f)(4) (providing that a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for adjustment of status purposes); *id.* § 1644 ("[N]o State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

[80] Gazeli v. Sessions, 856 F.3d 1101, 1105 (6th Cir. 2017) ("[T]he INA does not define 'lawful immigration status' . . . ."); *see also* Tula Rubio v. Lynch, 787 F.3d 288, 293 (5th Cir. 2015) ("Although the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'" (quoting BLACK'S LAW DICTIONARY 1542 (10th ed. 2014)).

[81] *See* 8 U.S.C. § 1255(c)(2) (rendering some aliens who "fail to maintain continuously a lawful status" ineligible for adjustment of status).

---

NJAPP0674

regulations, TPS holders do not have "lawful status,"[82] even though they have a statutory protection against removal.[83] Nonimmigrants, however, indisputably possess lawful status,[84] but it can be revoked more easily than TPS.[85] Similarly, under the DHS definition, parole is a lawful status,[86] even though it, too, can be terminated at DHS's discretion.[87] Perhaps the only concrete legal meaning that can be attributed to the term "lawful immigration status" is that aliens who lack it—including those unlawfully present aliens who are granted discretionary reprieves—are removable under the inadmissibility or deportability grounds of the INA.[88]

When understood as a general concept rather than a formal legal term, however, "lawful immigration status" usefully describes the bundle of statutorily defined privileges and protections that come with the major statuses set forth in the INA (LPR, asylee, refugee, and nonimmigrant status).[89] To say that unlawfully present aliens who receive discretionary reprieves do not have lawful immigration status means, generally speaking, that they lack most such privileges and protections or possess them only as a matter of executive grace.[90] For example, aliens who receive discretionary reprieves generally cannot work legally unless DHS, in its discretion, authorizes them to do so (unlike LPRs, refugees, asylees, and some nonimmigrants);[91] they have no statutorily established prospects of remaining permanently in the United States (unlike LPRs, asylees, and refugees);[92] they are generally subject to removal by virtue of their presence within the United States alone (unlike all aliens with LPR, refugee, asylee, and unexpired nonimmigrant status);[93] they have no legal basis to facilitate the admission of immediate relatives into the United States (unlike LPRs, refugees and asylees in some circumstances, and some

---

[82] *See* 8 C.F.R. § 1245.1(d)(1) (omitting TPS from definition of "lawful immigration status"); Dep't of Homeland Security Office of Immigration Statistics, *supra* note 7, at 1 (classifying TPS holders as "unauthorized immigrants"); *see also* Heeren, *supra* note 28, at 1141 ("TPS meets most of the characteristics for nonstatus, although it is a close call."); *but cf.* United States v. Orellana, 405 F.3d 360, 370-71(5th Cir. 2005) (disagreeing with agency interpretations and holding that a TPS recipient is not an alien "illegally or unlawfully in the United States" for purposes of a statute criminalizing firearm possession by such aliens).

[83] *See* 8 U.S.C. § 1254a(c)(3).

[84] *See* 8 C.F.R. § 1245.1(d)(1)(ii).

[85] *See supra* note 70.

[86] 8 C.F.R. § 1245.1(d)(1)(v).

[87] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole).

[88] *See* 8 U.S.C. § 1182(a)(1)(A) (inadmissibility); *id.* § 1227(a)(1)(C) (deportability); *see* Judulang v. Holder, 565 U.S. 42, 46 (2011) ("[T]he immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses, for [removal]. One list specifies what kinds of crime render an alien excludable (or in the term the statute now uses, 'inadmissible'), while another—sometimes overlapping and sometimes divergent—list specifies what kinds of crime render an alien deportable from the country.") (citations omitted); *see also, e.g.,* Matter of Ventura, 25 I. & N. Dec. 391, 392 (BIA 2010) ("[A] grant of TPS does not affect an alien's admissibility or inadmissibility for purposes of the Immigration and Nationality Act generally.").

[89] *See* Heeren, *supra* note 28, at 1122-24 (citing dictionaries for the proposition that "status" denotes "high standing" and explaining the statutory benefits of LPR, refugee, asylee, and nonimmigrant status).

[90] *Id.* at 1129-30; *see* Matter of Blancas–Lara, 23 I. & N. Dec. 458, 460 (B.I.A.2002) ("'Status' is a term of art . . . [that] denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant.").

[91] 8 C.F.R. § 274a.12.

[92] *Compare* DHS DACA FAQs, *supra* note 68, at Q68 ("Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship."), *with* 8 U.S.C. § 1101(a)(20) (providing that LPRs are "accorded the privilege of residing permanently in the United States"), *and id.* § 1159 (providing for the adjustment of refugees and asylees to LPR status).

[93] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility of aliens who enter without inspection); *id.* § 1227(a)(1)(C) (deportability of visa overstays).

---

NJAPP0675

nonimmigrants);[94] they face considerable restrictions on eligibility for federal public benefits (particularly as compared with LPRs, refugees, and asylees);[95] and, unless DHS decides to grant them advance parole, they generally cannot travel abroad with any legal basis to request re-entry to the United States (unlike all aliens with one of the four major statuses, except some nonimmigrants).[96] Strictly speaking, it is not correct to say that discretionary reprieves bestow no statutorily defined protections: TPS recipients have a statutory defense against removal, and recipients of most discretionary reprieves garner some advantages grounded in statute by virtue of DHS's authorization of their presence.[97] Generally speaking, however, the legal situation of aliens granted discretionary reprieves from removal ranks so low along the spectrum of immigration categories as to not be considered "lawful immigration status" in common parlance (even though most reprieves vitiate unlawful presence).[98]

In summary, recipients of discretionary reprieves obtain a temporary assurance against removal that varies in reliability by reprieve type. Such aliens, in most cases, are not unlawfully present in the United States during the term of the reprieve. Such aliens do not, however, possess "lawful immigration status," in the narrow sense that they remain technically removable under the INA's inadmissibility or deportability provisions and in the more general sense that they do not enjoy most of the statutorily fixed protections that come with LPR, refugee, asylee, and nonimmigrant status.

# Glossary of Discretionary Reprieves

This glossary describes the principal types of discretionary reprieves from removal granted by DHS or the Attorney General.[99] The glossary is divided into three categories: (1) reprieves

---

[94] *Compare* DHS DACA Memo, *supra* note 14, at 2 (not mentioning relief for family members of DACA recipients); *with, e.g.,* 8 U.S.C. § 1153(a)(2) (allocating immigrant visas to the "[s]pouses and unmarried sons and unmarried daughters" of LPRs), *id.* § 1159(a) (providing for the adjustment to LPR status of the spouses and children of refugees), and *id.* § 1101(a)(H) (providing for the issuance of nonimmigrant visas to the spouses and minor children of H-1B specialty occupation workers).

[95] The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), P.L. 104-193, 110 Stat. 2105, limited eligibility for many federal public benefits to "qualified aliens." *See* 8 U.S.C. §§ 1611-1613; *see generally* CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview,* coordinated by Audrey Singer. "Qualified alien" is defined to cover specific categories of aliens, such as LPRs, refugees, and asylees, but does not cover most aliens who obtain discretionary reprieves, other than aliens granted parole for at least one year. *See* 8 U.S.C. § 1641(b).

[96] *Compare, e.g.,* 8 U.S.C. § 1254a(f)(3) (providing that TPS holders "may travel abroad with the prior consent of the Attorney General"), *with* 8 U.S.C. § 1187(a)(7) (requiring possession of valid visa in order to apply for admission to the United States). Some nonimmigrants who have expired visas but still possess unexpired nonimmigrant status may not be able to leave and return to the United States without obtaining a new visa. *See* 9 FAM 403.9-4(A) ("For example, an alien whose B-1 visa may expire a month after entry into the United States, could be admitted by a Department of Homeland Security (DHS) officer at a port of entry (POE) for a stay of up to one year.").

[97] *See supra* text at notes 72-76.

[98] *See supra* note 78; Heeren, *supra* note 28, at 1132-33 (arguing that "immigration law affords a continuum of rights and privileges" and that holders of discretionary reprieves "fall in the nebulous middle of this spectrum," beneath holders of lawful status).

[99] The Attorney General, through the immigration judges of the Executive Office for Immigration Review (EOIR), administers removal proceedings and has authority to grant some discretionary reprieves from removal in those proceedings. *See* 8 U.S.C. § 1101(b)(4) (defining "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under [8 U.S.C.] § 1229a [concerning removal proceedings]"); *see, e.g., infra* note 134 (discussing Attorney General authority to adjudicate TPS applications in removal proceedings); *infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing Attorney General authority to (continued...)

---

NJAPP0676

premised upon enforcement discretion or presidential foreign policy powers (i.e., reprieves granted without express statutory authorization); (2) reprieves premised upon statutory authorization; and (3) reprieves granted exclusively in contemplation of or in connection with the removal process. The categories overlap—most of the reprieves in category (3) have statutory foundations,[100] and the reprieves in categories (1) and (2) can be granted to aliens before or after the initiation of removal proceedings[101]—but are nonetheless useful in conceptualizing the array of discretionary reprieves from removal available under current law and executive policy.

For additional information, or for information about any type of discretionary reprieve not listed below, please contact the author.

## Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers

*Deferred Action*. DHS regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority."[102] Thus, the term serves as a generic label for a decision by DHS not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.[103] Some other types of discretionary reprieves, such as DACA, are forms of deferred action tailored to particular groups or circumstances.[104] By regulation, deferred action recipients qualify for work authorization if they show "an economic necessity for employment."[105] They are not considered unlawfully present for purposes of the three- and ten-year bars on admission to the United States that the INA imposes on aliens who depart the country after being unlawfully present for more than 180 days.[106] According to DHS employment authorization data, only a small number of people receive generic deferred action each year as opposed to DACA.[107] There does not appear to be one central, publicly available agency memorandum or policy document that governs the criteria and procedures for deferred

---

(...continued)

grant voluntary departure and stays of removal.

[100] *See, e.g.,* 8 U.S.C. § 1229c (voluntary departure); *id.* § 1231(a)(3) (orders of supervision).

[101] *See, e.g.,* DHS DACA Memo, *supra* note 14, at 2 (providing guidance on granting DACA to aliens in removal proceedings); 8 U.S.C. § 1229c(b)(5)(B) (requiring that TPS relief be available to aliens in removal proceedings).

[102] 8 C.F.R. § 274a.12(c)(14); *see also* USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority . . . . Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws.").

[103] *See id.*; Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999).

[104] *See* DHS DACA Memo, *supra* note 14, at 2 (describing DACA relief as "deferred action").

[105] 8 C.F.R. § 274a.12(c)(14).

[106] *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (establishing a three-year bar for unlawful presence for "a period of more than 180 days but less than 1 year" following departure); *id.* § 1182(a)(9)(B)(i)(II) (establishing a ten-year bar for unlawful presence "for one year or more" following departure or removal); *id.* § 1182(a)(9)(B)(ii) (exempting any "period of stay authorized" by the Secretary of Homeland Security (formerly the Attorney General) from the construction of "unlawful presence" for purposes of the three- and ten-year bars); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017) ("[D]eferred action recipients do not accrue 'unlawful presence' for purposes of calculating when they may seek admission to the United States."); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.").

[107] *See* USCIS EAD Data, *supra* note 29 (showing 8,769 employment authorization documents approved under generic deferred action in fiscal year 2017, as opposed to 360,389 approved under DACA).

---

NJAPP0677

action.[108] According to one agency manual, when DHS grants deferred action, it informs recipients so that they may seek employment authorization.[109] DHS apparently does not specify a particular time period for which a grant of generic deferred action is valid (unlike DACA), but DHS does periodically review each grant.[110] DHS claims authority to terminate a grant of deferred action at any time in its discretion.[111]

***Deferred Action for Childhood Arrivals (DACA).*** DACA is a type of deferred action for aliens present in violation of the INA who meet the following criteria:

- came to the United States under the age of sixteen;

- have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012;

- are in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans;

- have not been convicted of certain criminal offenses and do not pose a threat to national security or public safety; and

- were under the age of thirty-one on June 15, 2012.[112]

The Secretary of Homeland Security created DACA by memorandum in 2012.[113] As a result, DACA has clearer eligibility criteria and application procedures than generic deferred action.[114] A grant of DACA lasts two years, subject to renewal.[115] DACA generally confers the same collateral advantages as generic deferred action (eligibility for work authorization, no unlawful presence).[116] Also like generic deferred action, DHS claims authority to terminate a grant of

---

[108] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999) ("Prior to 1997, deferred-action decisions were governed by internal INS guidelines . . . . These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis."); *Compare* DROPPM, *supra* note 49, ch. 20.8 (concerning deferred action), *with* DHS Office of Inspector General, *ICE Deportation Operations*, at 8 (Apr. 17, 2017) ("Officials we interviewed said ICE considers the 2003 Detention and Removal Operations Policy and Procedure Manual (manual) 'the official guide' to operations, but ICE has not periodically reviewed the manual or revised it since 2008. For a time, ICE would affix a memo to the front of the appropriate chapter to indicate changes, rather than incorporate changes and issue a revised manual."), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf; *cf.* Memorandum from Secretary of Homeland Security John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action . . . .").

[109] DROPPM, *supra* note 49, ch. 20.8(c)(1).

[110] *Id.* ch. 20.8(e), (f).

[111] *Id.* ch. 20.8(f). As noted below, there is some authority for the proposition that principles of due process and administrative procedure restrict DHS's ability to terminate an individual DACA grant without good justification, and that proposition could arguably extend to generic deferred action as well. *See infra* note 119 (collecting cases concerning limits on termination of individual DACA grants); DHS DACA Memo, *supra* note 14, at 2-3 (describing DACA as conferring "deferred action" relief).

[112] DHS DACA Memo, *supra* note 14, at 1; *see generally* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno.

[113] *Id.*

[114] *See id*; *Consideration of Deferred Action for Childhood Arrivals*, *supra* note 78**Error! Hyperlink reference not valid.** (describing eligibility criteria and filing process).

[115] *Id.*

[116] *See* 8 C.F.R. § 274a.12(c)(14); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9ᵗʰ Cir. 2017).

---

DACA at its discretion,[117] although its internal Standard Operating Procedures (SOP) apparently set forth specific bases (such as fraud or criminal issues) for DACA termination.[118] There is ongoing litigation over whether the Administrative Procedure Act (APA) or the Constitution restricts DHS's ability to terminate an individual DACA grant without proper justification or in a manner that does not follow the SOP.[119] There is also ongoing litigation over the extent of DHS's authority to rescind the DACA program in its entirety. DHS announced plans to rescind the DACA program effective March 5, 2018,[120] but federal courts have enjoined the rescission in most respects on the ground that it is likely "arbitrary and capricious" under the APA.[121]

***Deferred Enforced Departure (DED)***. DHS describes DED as follows:

> [A] temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS [which is authorized by statute], DED emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis . . . . The President designates DED for nationals of a particular country through either an Executive Order or a Presidential Memorandum.[122]

DED resembles TPS in that it protects nationals of certain designated countries from removal, except that DED is rooted in inherent executive power rather than in statutory authority.[123] Eligibility criteria depend on the relevant presidential directive.[124] DED recipients are generally

---

[117] DHS DACA FAQs, *supra* note 68, at Q27 ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.").

[118] DEP'T OF HOMELAND SEC., DACA NATIONAL STANDARD OPERATING PROCEDURES, 132-34 (April 4, 2013); *see* Medina v. U.S. Dep't of Homeland Sec., No. C17-0218RSM, 2017 WL 5176720, at *3 (W.D. Wash. Nov. 8, 2017) ("The National Standard Operating Procedures . . . issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.").

[119] *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (holding that a DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa" likely violates the APA); *Medina*, 2017 WL 5176720 at *9 ("[T]he Court finds that Plaintiff has alleged a plausible claim that the government violated the APA because its conduct [in terminating his DACA grant without notice] was arbitrary, capricious and an abuse of discretion, and contrary to its own procedures, and that claim may proceed."); Coyotl v. Kelly, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (granting preliminary injunction against the termination of an individual DACA grant on the ground DHS's "fail[ure] to present any evidence that they complied with their own administrative processes and procedures with regard to the termination" sufficed to show a likelihood of success on the claim that the termination violated the APA).

[120] Memorandum from U.S. Dep't of Homeland Sec., *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017).

[121] Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (holding that DHS's planned rescission of DACA program likely violates the APA because DHS based the rescission on an erroneous legal conclusion that DACA was unlawful); Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1037 (N.D. Cal. 2018) (same); *contra* Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("[T]he decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record."); *see* CRS Legal Sidebar LSB10057, *District Court Enjoins DACA Phase-Out: Explanation and Takeaways*, coordinated by Hillel R. Smith and Ben Harrington.

[122] USCIS AFM, *supra* note 48, ch. 38.2 (Deferred Enforced Departure).

[123] *See id*; Heeren, *supra* note 28, at 1131, 1140 ("Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations. TPS is similar to the [Extended Voluntary Departure] and DED programs after which it was modeled, but . . . there is a specific standard for TPS set out in the statute.").

[124] *See* Presidential Memorandum, *Deferred Enforced Departure for Liberians* (Sept. 28, 2016) (setting forth DED eligibility criteria for Liberian nationals); USCIS AFM, *supra* note 48, ch. 38.2(d) ("In general, eligibility requirements and ineligibility bars are set forth in the Presidential designation of DED for each specific group of aliens.").

NJAPP0679

eligible for work authorization.[125] They do not accrue unlawful presence during the period of DED.[126] According to USCIS, an individual cannot be removed while he or she possesses DED.[127] Agency materials do not make provision for the termination of an individual's DED grant.[128] Currently, Liberia is the only country designated for DED, but the Trump Administration has decided to terminate that designation effective March 31, 2019.[129]

***Extended Voluntary Departure (EVD).*** EVD was an earlier version of DED that fell mostly into disuse with the advent of DED in 1990,[130] although DHS apparently continues to grant EVD to a small number of aliens.[131] Under EVD, the Attorney General—rather than the President—designated countries for protection due to unstable conditions.[132]

***Nonpriority Status.*** Prior to 1975, immigration authorities used the term "nonpriority status" to describe the type of reprieve now labeled deferred action.[133]

## Generally Available Reprieves Granted Pursuant to Statutory Authority

***Temporary Protected Status (TPS).*** Section 244 of the INA authorizes DHS to grant TPS to aliens who are nationals of countries that the Secretary of Homeland Security has designated as

---

[125] USCIS AFM, *supra* note 48, ch. 38.2(b); 8 C.F.R. § 274a.12(a)(11).

[126] *See* 8 U.S.C. § 1182(a)(9)(B)(ii); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (rejecting state policy that deemed individuals with employment authorization through DED and deferred action as not "authorized to be present").

[127] U.S. CITIZENSHIP & IMMIGRATION SERVS, AFFIRMATIVE ASYLUM PROCEDURES MANUAL 37 (May 2016) ("DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED.").

[128] *See id*; DROPPM, *supra* note 49, ch. 20.10(c) ("Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired."). These agency materials do not clarify whether DHS claims authority to terminate an individual grant of DED by initiating removal proceedings—an authority that DHS claims with respect to other reprieve types. *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (describing DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa").

[129] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018).

[130] USCIS AFM, *supra* note 48, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .").

[131] Heeren, *supra* note 28, at 1138 (citing statistics obtained from DHS under the Freedom of Information Act for the proposition that the agency continued to grant "something it calls EVD to a small number of individuals" at least until 2014).

[132] *See* Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988) ("While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors."); Matter of Sosa Ventura, 25 I. & N. Dec. 391, 394 (BIA 2010) (noting that EVD "had existed for decades to address humanitarian concerns"); Matter of Medina, 19 I. & N. Dec. 734, 748 n.7 (BIA 1988) (defining EVD by explaining that "[t]hrough the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (e.g., Uganda, Ethiopia, Poland, Afghanistan).").

[133] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("'To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation . . . . This commendable exercise in administrative discretion . . . originally was known as nonpriority and is now designated as deferred action.'") (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03 [2][h] (1998)); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

---

NJAPP0680

unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.[134] A country's initial TPS designation is valid for up to 18 months and may be extended for up to 18 months, in the Secretary of Homeland Security's discretion, with no limit on the number of extensions.[135] Some countries, such as Sudan and Nicaragua, have been designated for TPS since the late 1990s, although the Trump Administration recently announced its intention not to extend those designations or the designations of Haiti and El Salvador when they expire in late 2018 and 2019.[136]

To qualify for TPS, nationals of designated countries must have resided in the United States since a specified date (usually, a date around the onset of the destabilizing conditions) and must meet certain other requirements set forth in the INA.[137] An alien granted TPS qualifies for work authorization[138] and does not accrue unlawful presence for purposes of the three- and ten-year bars to admission.[139] TPS provides statutorily based protection from removal: an alien cannot be removed while enrolled, and DHS may only withdraw the protection from an individual alien for specified statutory reasons (such as failure to maintain continuous residence in the United States or failure to comply with a yearly registration requirement).[140] Significantly, some (but not all) courts have held that a grant of TPS satisfies the lawful entry requirement for adjustment of status under INA § 245(a), such that aliens who enter the country surreptitiously and then receive TPS may adjust to LPR status if they become eligible for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[141]

---

[134] 8 U.S.C. § 1254a. DHS's authority to grant TPS is not exclusive. An immigration judge has jurisdiction to consider a TPS application from an alien in removal proceedings if DHS denied the application in the first instance. Matter of Lopez Aldana, 25 I. & N. Dec. 49, 51 (BIA 2009). Immigration judges may also have authority to consider TPS applications in the first instance in "certain limited circumstances," *id.* at 51 n.1, but in practice it appears that DHS typically considers applications in the first instance even for aliens already in removal proceedings. *See Matter of Sosa Ventura*, 25 I. & N. Dec. at 392-93 (considering docket management powers of immigration judge where DHS grants TPS during removal proceedings).

[135] *Id.* § 1254a(b)(2),(3).

[136] See CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[137] 8 U.S.C. § 1254a(a)(5); *see, e.g.,* Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010) (designating Haiti for TPS because of an earthquake that occurred on January 12, 2010, and restricting eligibility to Haitian nationals "who have continuously resided in the United States since January 12, 2010"); Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001) (designating El Salvador for TPS because of earthquakes that occurred on January 13, February 13, and February 17, 2001, and restricting eligibility to nationals of El Salvador "who have 'continuously resided' in the United States since February 13, 2001").

[138] 8 U.S.C. § 1254a(a)(1)(B).

[139] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1)(F)(iii).

[140] 8 U.S.C. § 1254a(c)(3); *cf.* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (holding that it was improper for immigration judge to terminate removal proceedings against alien who was granted TPS relief because "TPS only provides a temporary protection from removal," but that any removal order issued against the alien could not be executed during the period in which the alien had TPS relief).

[141] Ramirez v. Brown, 852 F.3d 954, 964 (9th Cir. 2017) (holding that "a TPS recipient is considered 'inspected and admitted' under [8 U.S.C.] § 1255(a)" and that an alien who entered surreptitiously before obtaining TPS was therefore eligible to adjust status on the basis of his marriage to a U.S. citizen); Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (same); *contra* Serrano v. Attorney General, 655 F.3d 1260, 1265 (11th Cir. 2011) (holding that a grant of TPS does not satisfy the lawful entry requirement of § 1255(a)). Time spent in TPS counts as time in lawful nonimmigrant status for adjustment of status purposes; the question that has divided the courts is whether TPS also satisfies the lawful entry requirement for adjustment of status purposes. *See* 8 U.S.C. § 1254a(f)(4) ("[F]or purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant"); *see Ramirez*, 852 F.3d at 957 ("Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid the [failure to (continued...)

---

NJAPP0681

***Parole.*** The INA authorizes DHS to "parole" inadmissible aliens into the United States, on a case-by-case basis, "for urgent humanitarian reasons or significant public benefit."[142] Paroled aliens are considered unadmitted for purposes of the INA despite their physical presence within the United States.[143] Parole offers little formal protection against removal: DHS typically grants parole for a fixed period[144] but has discretion to terminate the parole whenever it determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[145] Paroled aliens may obtain work authorization[146] and do not accrue unlawful presence while the parole remains valid.[147] DHS interprets its parole authority to include two types of discretionary grants of parole potentially relevant to aliens present in the United States in violation of the INA:

> ***Parole in place.*** Although the parole power generally applies to aliens seeking to enter the country, DHS claims the authority to grant parole to aliens who are physically present in the United States following surreptitious entry.[148] DHS calls this exercise of the parole power "parole in place" and, as a matter of policy, appears to reserve it primarily for the immediate relatives of certain members of the U.S. Armed Forces.[149] Parole in place removes significant legal obstacles to an unlawfully present alien's ability to obtain LPR status without leaving the United States, if the alien qualifies for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[150]

> ***Advance Parole.*** Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already

---

(...continued)

maintain lawful status] bar under § 1255(c)(2) but also to meet the 'inspected and admitted or paroled' requirement in § 1255(a).").

[142] 8 U.S.C. § 1182(d)(5); *see* 8 C.F.R. § 212.5 (DHS regulation implementing statutory parole authority and identifying circumstances in which granting parole "would generally be justified").

[143] 8 U.S.C. § 1182(d)(5) ("[P]arole . . . shall not be regarded as an admission of the alien . . . .").

[144] *See, e.g.*, Reganit v. Sec'y, Dep't of Homeland Sec., 814 F.3d 1253, 1255 (11th Cir. 2016) (addressing case in which alien was granted parole for one month); Chaudhry v. Holder, 705 F.3d 289, 293 (7th Cir. 2013) (addressing case in which alien was granted parole for one year).

[145] 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . ."); 8 C.F.R. § 212.5(e)(2)(i) ("[W]hen in the opinion of [specified] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated . . . ."); Hassan v. Chertoff, 593 F.3d 785, 789 (9th Cir. 2010) ("The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.").

[146] 8 C.F.R. § 274a.12(c)(11) (with narrow exceptions, enabling parolees to apply for employment authorization).

[147] 8 U.S.C. § 1182(a)(9)(B)(ii); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1) ("An alien does not accrue unlawful presence . . . if he or she has been inspected and paroled into the United States and the parole is still in effect.").

[148] *See* U.S. Citizenship & Immigration Servs., Policy Memorandum, *Parole of Spouses, Children, and Parents of Active Duty Members of the U.S. Armed Forces*, at 2 (Nov. 13, 2013) ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.").

[149] *Id.* at 3 ("[P]arole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.").

[150] *See* 8 U.S.C. § 1255(a) (rendering aliens who were not "inspected and admitted *or paroled*" ineligible for adjustment of status); *see generally*, Margaret D. Stock, *Parole in Place and Other Immigration Benefits for Military Family Members: An Update*, 16-02 IMMIGR. BRIEFINGS 1 (2016).

NJAPP0682

approved, so as to facilitate their re-entry.[151] Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).[152]

## Reprieves Granted Exclusively in Connection with the Removal Process

*Administrative Closure.* When Immigration and Customs Enforcement (ICE, a component of DHS responsible for interior enforcement) decides to discontinue temporarily a removal proceeding against a particular alien before the Department of Justice's Executive Office of Immigration Review (EOIR)—because ICE deems the case low-priority, because the alien has obtained or is seeking a form of discretionary relief such as DACA, or for some other reason—ICE may ask the presiding immigration judge to place the proceeding in a status called "administrative closure."[153] An immigration judge may also place removal proceedings in administrative closure upon the alien's motion and over the government's objection, although this course of events may be less common.[154] The effect of administrative closure is to suspend but not terminate the removal proceeding.[155] As such, administrative closure offers little formal protection from removal: the alien cannot be removed while the proceedings are suspended, but ICE can move to re-activate the proceedings at any time and will likely succeed in doing so if the alien is not in the midst of pursuing independent protections from removal outside of immigration court.[156] Furthermore, administrative closure does not itself confer any additional rights or

---

[151] *See* 8 C.F.R. § 212.5(f) ("Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."); Ibragimov v. Gonzales, 476 F.3d 125, 132 (2d Cir. 2007) ("'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry . . . . Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f) . . . .").

[152] *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 274a.12(c)(11).

[153] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012) ("Administrative closure, which is available to an Immigration Judge and the Board [of Immigration Appeals], is used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket. In general, administrative closure may be appropriate to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time.").

[154] *Id.* at 694-96 (holding that government consent to administrative closure is not required, but listing "the basis for any opposition" as a factor to consider when evaluating a closure motion and noting that the government may immediately appeal an administrative closure granted over its objection); *see also* Kristin Bohman, Avetisyan*'s Limited Improvements Within the Overburdened Immigration Court System*, 85 U. COLO. L. REV. 189, 201 (2014) ("*Avetisyan* provides that immigration judges can override an objection if they find that administrative closure is in the best interests of the immigrant and if there will be some palpable final resolution to the case in the near future.").

[155] *Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order . . . . In this way, administrative closure differs from termination of proceedings, where the Immigration Judge or the Board issues a final order, which constitutes a conclusion of the proceedings and which, in the absence of a successful appeal of that decision or a motion, would require the DHS to file another charging document to initiate new proceedings.").

[156] *See id.* ("[A]t any time after a case has been administratively closed, the DHS may move to recalendar it before the Immigration Judge or reinstate the appeal before the Board . . . ."); Matter of W-Y-U-, 27 I. & N. Dec. 17, 20 (BIA 2017) ("[T]he primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits."); Matter of Pascual, No. A086-963-266, 2012 WL 1705592, at *2 (BIA Apr. 30, 2012) (unpublished) ("Immigration Judges and the Board lack the authority to decide matters of prosecutorial discretion or to decide for humanitarian reasons whether an order of removal should be entered or is in the national interest . . . . If DHS is denied its request to recalendar proceedings after action on the case has been deferred for a period of time, particularly when DHS is not contributing to any delay in resolving any petition, collateral matter or (continued...)

NJAPP0683

protections, such as work authorization or lawful presence.[157] However, administrative closure is often granted in conjunction with other discretionary reprieves that do provide additional protections.[158] For example, an alien whose removal case is placed in administrative closure may also have enrolled in DACA, which confers eligibility for work authorization and vitiates unlawful presence.[159]

***Voluntary Departure***. The INA authorizes grants of a brief discretionary reprieve called "voluntary departure" for aliens who agree to leave the United States at their own expense either before or prior to the conclusion of removal proceedings.[160] For aliens not yet in removal proceedings, DHS may grant a voluntary departure period of 120 days or less.[161] For aliens in removal proceedings, either DHS or the immigration judge may grant voluntary departure[162] for a maximum period of 120 days.[163] At the conclusion of removal proceedings, the immigration judge alone may grant voluntary departure for a maximum of 60 days.[164] Voluntary departure does not confer eligibility for work authorization[165] but does suspend the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission following the alien's departure or removal from the United States.[166] Aliens who fail to leave the country within the voluntary departure period are subject to a fine and become ineligible to receive, for a period of ten years, adjustment of status, cancellation of removal, and certain other forms of relief from removal.[167]

---

(...continued)
other action that formed the basis for the administrative closure, the denial of the motion could undermine DHS's ability to enforce the immigration laws.").

[157] *See* 8 C.F.R. § 274a.12 (not listing administrative closure among bases for eligibility for work authorization); Amelia Wilson et. al., *Addressing All Heads of the Hydra: Reframing Safeguards for Mentally Impaired Detainees in Immigration Removal Proceedings*, 39 N.Y.U. REV. L. & SOC. CHANGE 313, 365 (2015) (explaining, based on agency practice and guidance, that administrative closure "does not confer any legal status or give rise to an independent basis to seek work authorization").

[158] *See* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (concluding that immigration judges may properly grant administrative closure in cases where aliens have received temporary forms of protections such as TPS).

[159] *See* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office of Immigration Review, Dep't of Justice, on Continuances and Administrative Closure (March 7, 2013) (encouraging immigration courts to grant administrative closure where the respondent in removal proceedings has received DACA).

[160] 8 U.S.C. § 1229c.

[161] *Id.* § 1229c(a)(2)(A).

[162] 8 C.F.R. § 240.25(d); *id.* § 1240.26(b)(1).

[163] 8 U.S.C. § 1229c(a)(1), (2)(A).

[164] *Id.* § 1229c(b)(2); 8 C.F.R. § 1240.26(c).

[165] *See* 8 C.F.R. § 274a.14(a)(iii) (providing that a grant of voluntary departure automatically terminates any employment authorization). Regulations also use the term "voluntary departure" for the relief from removal granted under the statutorily created (and now largely obsolete) Family Unity Program to spouses and children of aliens who legalized under the Immigration Reform and Control Act. 8 C.F.R. § 236.15 (implementing § 301 of the Immigration Act of 1990, 104 Stat. 4978, and authorizing "voluntary departure" for up to two years). Such aliens do qualify for work authorization. *Id.* § 236.15(d), § 274a.12(a)(13). Despite the overlapping terminology, the Family Unity Program, on the one hand, and voluntary departure under § 1229b, on the other hand, are separate and distinct forms of relief. *Compare id.* § 236.15 (governing voluntary departure under the Family Unity Program), *with id.* § 240.25 (governing voluntary departure under 8 U.S.C. § 1229b).

[166] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(H) ("Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure."); 9 FAM 302.11-3(B)(1)(b)(3).

[167] 8 U.S.C. § 1229c(d)(1).

---

NJAPP0684

***Stay of Removal.*** DHS, an immigration judge, or the Board of Immigration Appeals[168] may stay a final order of removal against an alien to allow him or her to pursue relief or in light of practical or humanitarian considerations.[169] A stay of removal does not confer eligibility for work authorization under DHS regulations,[170] but an order of supervision—which often accompanies a stay—does confer such eligibility in some circumstances.[171] Unlawful presence does not accrue during a stay of removal for purposes of the three- and ten-year bars on admission.[172]

***Order of Supervision*** (OSUP). If DHS does not remove an alien within ninety days of the date that a removal order becomes final—either because DHS cannot identify an appropriate destination country or because of practical or public interest-related considerations—in most cases DHS places the alien under an "order of supervision."[173] An OSUP requires the alien to check in periodically with DHS and may impose other restrictions.[174] DHS regulations provide for the grant of work authorization to aliens present pursuant to OSUPs—subject, however, to criteria stricter than those that govern work authorization for other types of discretionary reprieves.[175] An OSUP does not, by itself, suspend the accumulation of unlawful presence for purposes of the three- and ten year bars on admission.[176] At least one federal court has held that due process principles restrict the reasons and the manner in which DHS may revoke an OSUP.[177]

# Author Contact Information

Ben Harrington
Legislative Attorney
pharrington@crs.loc.gov, 7-8433

---

[168] The Board of Immigration Appeals (BIA) within EOIR, has administrative appellate jurisdiction over various matters decided by immigration judges in removal and other proceedings. 8 C.F.R. § 1003.1(b).

[169] *Id.* § 241.6 (DHS authority); *id.* § 1003.6 (BIA authority); *id.* § 1003.23(b)(1)(v) (immigration judge authority). A few provisions of the INA that concern discrete motions for relief or specific categories of aliens directly authorize or mandate stays of removal. *See* 8 U.S.C. § 1227(d)(2) (authorizing stays of removal for applicants for T or U nonimmigrant status); *id.* § 1229a(b)(5)(C) (providing for an automatic stay upon the filing of certain motions challenging *in absentia* removal orders); *id.* § 1231(c)(2) (authorizing stays of removal of aliens arriving at ports of entry).

[170] *See* 8 C.F.R. § 274a.12 (not listing stays of removal as a basis for granting work authorization).

[171] *Id.* § 274a.12(c)(18); *see* 8 U.S.C. § 1231(c)(3) (providing an alien who has been granted a stay of removal may be released from detention pursuant to "conditions [that the Secretary of Homeland Security] may prescribe"); Heeren, *supra* note 28, at 1147 (explaining that individuals who receive stays of removal "typically" receive orders of supervision).

[172] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(I).

[173] *See* 8 U.S.C. § 1231(a)(3) (authorizing supervision after 90-day period); 8 C.F.R. § 241.5(a) (order of supervision).

[174] 8 C.F.R. § 241.5(a).

[175] *See* 8 C.F.R. § 274a.12(c)(18).

[176] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(6) ("Unless protected by some other provision . . . an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision . . . .").

[177] Ragbir v. Sessions, No. 18-CV-236 (KBF), 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018).

---

NJAPP0685

# Exhibit 61

NJAPP0686

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DECLARATION OF STEPHEN H. LEGOMSKY**

My name is Stephen H. Legomsky.  I am over the age of 18 and fully competent to make this declaration.  I have personal knowledge of, and could testify in court concerning, the following statements of fact:

1.       I am the John S. Lehmann University Professor Emeritus at the Washington University School of Law in Saint Louis, Missouri.  I have taught United States immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school coursebook "Immigration and Refugee Law and Policy," the seventh edition of which is now in process.  This book is published by Foundation Press.  I am also the author of "Immigration and the Judiciary – Law and Policy in Britain and America," published by the Oxford

1

NJAPP0687

University Press in 1987, as well as numerous articles on immigration law in scholarly journals.

2.   From October 2011 to October 2013, which includes the times when the program known as Deferred Action for Childhood Arrivals ("DACA") was announced and initiated, I served as the Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), in the United States Department of Homeland Security (DHS). USCIS is the agency charged with implementing DACA.   From July 2015 to October 2015 I served as Senior Counselor to the Secretary of Homeland Security, also on immigration matters.   I have advised both Democratic and Republican Administrations on immigration policy. For example, I chaired the 5-member policy advisory group convened by Immigration and Naturalization Service Commissioner Gene McNary (during the administration of George H.W. Bush), which met with the Commissioner for a half-day every month.   I also advised the transition teams for President Clinton and President Obama.

3.   I have testified, as a private citizen, before both the U.S. House and U.S. Senate Judiciary Committees concerning the legality of large-scale deferred action programs.   My written statement submitted in conjunction with my House Judiciary Committee testimony of Feb. 25, 2015 (the latter of the two testimonies) analyzes the legal issues in detail and can be found at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

4.   At present, I am an inactive member of the State Bar of California.

2

## I.     DACA and Prosecutorial Discretion

5.      DHS routinely establishes priorities guiding its exercise of prosecutorial discretion in the enforcement of the immigration laws.  One of the instruments DHS uses for implementing enforcement priorities is deferred action. 8 CFR § 274a.12(c)(14) (deferred action "gives some cases lower priority").  DACA, in turn, is one particular deferred action initiative.

6.      DACA is a decision by the agency to defer action (immigration enforcement proceedings) against an individual.  To quote the U.S. Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), just as it true of other federal agencies, DHS's decision "not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. [DHS] must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing."

7.      When making a decision not to bring immigration enforcement proceedings against an individual, DHS must also balance factors specific to immigration -- national security, public safety, border security, degree of fault and compassionate circumstances, to name just a few.

3

8.    Reinforcing those considerations is the express mandate from Congress: The Secretary of Homeland Security is "responsible" for "establishing immigration enforcement policies and priorities." 6 USC § 202(5).

9.    There are occasions on which DHS selects deferred action as the preferred vehicle for implementing its prosecutorial priorities. Among the individuals who are low enforcement priorities, DHS has to decide which, if any, should receive deferred action. To make that decision DHS has to balance not only the same factors that affected its prosecutorial priorities generally, but several others as well.

10.    On the one hand, DACA requestors are present in the U.S. in violation of the immigration laws. On the other hand there are countervailing equities and there are benefits that DACA provides and that DHS has both the expertise and the responsibility to evaluate. These include the relative absence of moral culpability evidenced by the violation (DACA eligibles violated the immigration laws but were innocent children at the time, typically brought here by their parents). In addition, DACA eligibles had to have lived in the United States since 2007 and be under the age of 31, so that many know only this country.

11.    DACA, unlike a negative decision simply to forgo or delay active prosecution and release an individual, draws undocumented immigrants out of the shadows and into the open, so that DHS can know their names, addresses, and histories; if a DACA requestor or recipient has a criminal history or violates the law, DHS can immediately place that individual into removal proceedings by issuing a Notice to Appear. At the same time, if DHS officers come across an individual who has

NJAPP0690

obtained a DACA grant, the officers can quickly determine from that individual's paperwork, without redundant and time-consuming investigation, that the DACA recipient has been vetted and already deemed low-priority.

12.   Benefits that accrue beyond DHS include the fact that communities are safer when crime victims and witnesses feel secure enough to report crimes to the police; DACA boosts the tax contributions of the recipients; and unscrupulous employers who currently know they can hire unauthorized workers at low wages will have less reason to hire DACA recipients over U.S. workers and will be less able to drive down overall market wages or working conditions in the process.  As with other non-enforcement actions, the agency's expertise leaves it uniquely well-positioned to balance those policy factors.

13.   USCIS and its predecessor agency have utilized prosecutorial discretion, and deferred action in particular, for several decades.[1]

14.   During my time as Chief Counsel of USCIS I had ample occasion to study a range of issues related to deferred action generally and DACA in particular.  I am not aware of any law, court decision, or other legal authority that forbids the use of deferred action, or limits its use to specific statutorily-enumerated contexts, or allows it when the number of affected individuals is small but not when that number is large.

15.   Indeed, either deferred action or its functional equivalent has been used by several Administrations, of both political parties, to grant temporary reprieves from

---

[1] The history is described in Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 13-20; and in Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4.

NJAPP0691

removal, and in some cases temporary employment authorization, to large, specifically-defined subclasses of undocumented immigrants. A list of some 39 examples is provided by Amer. Immigration Council, Executive Grants of Temporary Immigration Relief, 1956-Present (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executiv e_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

16. These past Administrations granted temporary reprieves from removal to large subclasses of undocumented immigrants for a variety of reasons.  In some instances the beneficiaries tended to be those with a bridge to some form of legal status.  DACA too serves as such a bridge because many current DACA recipients are eligible to adjust as they grow older and marry.  But a bridge to a formal legal status is merely one reason for creating such programs; many such programs were designed to serve other humanitarian purposes.  Here again, DACA is similar to those programs.  Examples of deferred action or similar programs for classes of individuals who otherwise lacked any bridge to legal immigration status include:

- President George H.W. Bush's 1989 parole of Soviet and Indochinese who had been denied refugee status;

- President George H.W. Bush's 1992 grant of "deferred enforced departure" to certain Salvadorans whose temporary protected status had expired;

- President Clinton's 1994 extension of that 1992 grant;

- President George W. Bush's 2005 grant of deferred action to foreign students who had been adversely affected by Hurricane Katrina;

6

- President George W. Bush's 2007 grant of deferred enforced departure to Liberians after their temporary protected status had expired;

- President Obama's 2009 and 2011 extensions of that 2007 grant; and

- President Obama's 2009 grant of deferred action to widows and widowers of U.S. citizens and their children under age 21.

*Id.* These illustrate the broad range of humanitarian, foreign policy, and other reasons for executive action that spare large numbers of aliens from removal and in many cases grant temporary permission to work.

17. The number of individuals benefited by past deferred action or similar programs varies, but in some instances exceeds several hundred thousand. For example, the discretionary program for Cuban asylum seekers from 1959 to 1972 allowed over 600,000 individuals to be paroled into the U.S.; the discretionary program for people from Vietnam, Cambodia, and Laos from 1975-1979 allowed over 350,000 individuals to be paroled into the U.S.; President Reagan's 1987 program of deferred action for undocumented children of some noncitizens who applied to legalize after 1986 immigration reform involved more than 100,000 families; and, according to the congressional testimony of President Bush's Immigration and Naturalization Service Commissioner, the President's 1990 "family fairness" program was expected (at the time it was announced) to defer the deportation of, and authorize employment for, some 1.5 million undocumented spouses and children of the legalization beneficiaries under the 1986 Immigration Reform and Control Act (IRCA). For detailed support, *see* Stephen H. Legomsky, U.S. House Judiciary    Committee    testimony    of    February    25,    2015,

7

https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-

Testimony.pdf.

18.  Despite occasional imprecise language in various court filings, immigration law

recognizes a crucial difference between lawful "presence" and lawful "status."

USCIS has interpreted deferred action as giving rise to temporary lawful

"presence," but it cannot, and as the memo creating DACA explicitly provides,

does not, create any legal immigration "status."  Because the individual continues

to lack lawful immigration *status*, DACA, like any other grant of deferred action,

may be revoked, and the individual placed in removal proceedings, at any time.

Once DACA is revoked, one who had entered without inspection will be

removable under 8 USC § 1182(a)(6)(A)(i) (present in the United States without

being admitted or paroled).  One who overstayed a nonimmigrant visa will be

removable under 8 USC § 1227(a)(1)(C)(i) (failed to maintain nonimmigrant

status or comply with the conditions of such status).  Consequently, DACA is

never a barrier to the government commencing removal proceedings when it

wishes to do so.  Moreover, since all DACA recipients had to have been already

previously unlawfully present for much longer than the one-year period that

triggers the ten-year inadmissibility bar (with some narrow exceptions, including

those who were not unlawfully present for a year or more after age 18), and since

DACA does not erase that previous period of unlawful presence, the person will

ordinarily be inadmissible for ten years upon departure from the United States.  8

USC §§ 1182(a)(9)(B)(i)(II), 1182(a)(9)(B)(iii).

8

19.   Even if a court were to hold that the executive branch lacks the authority to deem deferred action recipients temporarily lawfully present, that conclusion would be at most a reason to invalidate the determination of lawful presence, not a reason to invalidate DACA itself.  No law makes lawful presence a prerequisite for deferred action or for the grant of work authorization (the latter discussed separately in section II below).

20.   A grant of DACA, like any other grant of deferred action, is simply a tentative, revocable signal to an alien that he or she is a low enforcement priority and that the government therefore does not intend to initiate removal proceedings for a specified period of time.  As the regulations explain, deferred action is simply "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14).

21.   In exchange, the DACA requestor must come forward, submit biographic and biometric data that will then be checked against various law enforcement and intelligence databases, provide his or her address, supply documentary proof of the DACA threshold criteria, and send payment of the processing fee ($465 at the inception of DACA).

22.   Like any other workers with U.S. income, DACA recipients are required to pay federal and state income taxes, including Social Security and Medicare taxes. One who receives deferred action and work authorization does become eligible for various federal benefits that flow from existing law – mainly various statutory provisions and in at least one instance a binding regulation.  Examples include 8 CFR § 274a.12(c)(14) (allowing deferred action recipients to apply for temporary

9

work permits if they can demonstrate economic necessity); 8 USC §§ 1611(b)(2,3) (Social Security and certain Medicare benefits, although DACA recipients, having been under age 31 since 2012 at the earliest, will ordinarily be ineligible for both Social Security and Medicare for the next several decades); and 26 USC § 32 (earned income tax credit).

23.  But the key point concerning these other benefits is that, in issuing DACA, the Obama Administration did not attempt to change any of the laws or policies that make deferred action recipients eligible for those benefits.  Nor am I aware of any legal problems with the laws that provide those benefits to DACA and other deferred action recipients.

24.  Because DACA requires continuous residence in the United States since June 15, 2007, it is not available to anyone who arrives today or in the future.  Thus it creates no incentive for future illegal immigration.

25.  DHS grants deferred action precisely when the INA does not provide a lawful immigration status to an individual but where there are equities that are felt to warrant deferred action.  Through its application of prosecutorial discretion, DHS routinely grants deferred action to undocumented individuals.  Examples include those who are seeking to adjust under the Violence Against Women Act (VAWA); who are applying for withholding of removal; who are applying for cancellation of removal; who are seeking to adjust status as beneficiaries of family preference petitions; who have applied for U-visas; or who have applied for T-visas.

10

## II.    Employment Authorization

26.    On the subject of the employment rights of aliens, perhaps the most important provision of the Immigration and Nationality Act (INA) is 8 USC § 1324a(h)(3). That is the definitional provision that lays out which aliens may work and which ones may not.  To be ineligible for employment authorization, the alien must *not* be "either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act *or by the* [*Secretary of Homeland Security*]"[2] [my emphasis].  *Id.*  The plain language of this provision makes clear that employment authorization is not limited to those aliens whom other provisions of the Immigration and Nationality Act (INA) already authorize to work; it extends also to those whom the Secretary of Homeland Security so authorizes.

27.    That plain language completes the statutory scheme in a way that comports with common sense and sound policy.  On the one hand, the INA identifies several specific categories of aliens who are eligible for employment authorization.  In addition to the LPRs explicitly mentioned in section 1324a(h)(3), a few examples are 8 USC §§ 1101(a)(15) (H,O, and P) (certain temporary workers), 1158(c)(1)(B) (asylees), and 1254a(a)(1)(B) (recipients of temporary protected status).  On the other hand, the INA also identifies several specific categories of aliens who are ineligible for employment authorization.  Examples include business visitors, 8 USC § 1101(a)(15)(B); visitors for pleasure, *id*; asylum applicants for the first 180 days after the filing of the application, 8 USC §

---

[2] The text refers to the Attorney General, but under the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), § 1517, that term is now to be read as referring to the Secretary of Homeland Security, to whom the relevant authority has been reassigned.

NJAPP0697

1158(d)(2); individuals in removal proceedings (unless already authorized to work), 8 USC § 1226(a)(3); and (with exceptions) those who are awaiting execution of final removal orders, 8 USC § 1231(a)(7). For all other aliens – i.e., those who (like the DACA recipients) typically do not fall within either of these two sets of provisions -- 8 USC § 1324a(h)(3) clarifies that the decision whether to authorize work is left to the Secretary of Homeland Security, who is the official to whom Congress has delegated principal responsibility for administering and enforcing the immigration laws, 8 USC § 1103(a); 6 USC § 202(5).

28.  The formal regulations supplement this carefully-constructed statutory scheme. They list numerous categories of aliens who are eligible for employment authorization. Many of the listed categories cover classes of aliens who are typically present in the United States unlawfully. These include individuals with pending *applications* for cancellation of removal, registry, temporary protected status, and (under 1986 legislation) legalization. See, respectively, 8 CFR §§ 274a.12(c) (10, 16, 19, and 22). In a similar vein, section 274a.12(c)(14), first adopted in 1982 during the Reagan Administration and in frequent and continuous use ever since, expressly makes deferred action recipients eligible for employment authorization, provided they can show an "economic necessity" to work.

III.  **Advance Parole**

29.  8 USC § 1182(d)(5) gives the Secretary of Homeland Security the discretion to "parole" an alien into the United States, on a case by case basis, "for urgent humanitarian reasons or significant public benefit." The term "advance parole"

12

refers to a decision by USCIS, upon request, to provide a reasonable assurance –
though not a guarantee – that a person who is currently in the United States and
who wishes to leave temporarily will "likely" be paroled back into the country
upon his or her return. *Matter of Arrabally and Yerrabelly*, 25 I. & N. Dec. 771,
778 n.6 (BIA 2012). This enables the person to leave the country temporarily
without undue fear of being unable to return.

30.     Parole can come into play in another context. To be eligible for adjustment of
status to lawful permanent residence under 8 USC § 1255, one has to have been
"admitted or paroled" at one time. Id. § 1255(a). A person who was admitted on
a nonimmigrant visa will meet this requirement even if he or she has now
overstayed, but a person who entered without inspection (and has never been
admitted or paroled) will not.

31.     In general, adjustment of status under 8 USC § 1255 requires proof that the
person meets all the substantive requirements for LPR status plus additional
requirements for the adjustment of status procedure. Although parole will satisfy
the "admitted or paroled" requirement, it will not result in adjustment of status
unless the applicant meets all those other requirements as well. These include not
only fitting within one of the categories of lawful permanent resident
affirmatively authorized by Congress (for example family, employment skills,
etc.), but also not falling within any of the more than 20 pages of inadmissibility
grounds laid out in 8 USC § 1182(a) (subject to a few narrowly drawn statutory
discretionary waivers). These alone are rigorous requirements.

13

32.     But there are others, one of which is of critical importance here.   Under 8 USC §
        1255(c)(2), almost all adjustment of status applicants who are not immediate
        relatives (a term defined narrowly in 8 USC § 1151(b)(2)(A)(i)  to encompass
        only certain very close family members of US citizens) must prove they have
        continuously maintained a lawful status in the U.S. since entry.  That requirement
        alone disqualifies the overwhelming majority of DACA recipients, regardless of
        advance parole.  The only numerically significant sub-group of DACA recipients
        for whom advance parole would remove that one remaining obstacle to
        adjustment of status consists of immediate relatives, and even then only if they
        entered without inspection.

33.     Understanding the effects of advance parole on DACA recipients is crucial,
        because some have relied on the possibility of advance parole to claim that
        DACA effectively creates a path to LPR status and eventual U.S. citizenship.  For
        two reasons, that characterization is faulty.  First, neither DACA nor advance
        parole creates that path.  As explained above, the person still needs some
        independent statutory route to LPR status; if such a route exists, and the person
        otherwise meets all the prescribed requirements, then advance parole merely helps
        to satisfy one of the many statutory requirements.  Second, as of December 31,
        2015, fewer than 1% of all DACA recipients had received advance parole and
        then received or even applied for adjustment of status.  Letter from Leon
        Rodríguez, Director, USCIS, to Charles E. Grassley, Chairman, Committee on the
        Judiciary, United States Senate (June 29, 2016).  The tiny percentage who do so
        are applying for a benefit expressly conferred by the INA.

14

34.    In his affidavit presented to this court, Mr. Palinkas states that DACA recipients who received advance parole and then applied for adjustment of status "jumped the line and were able to get permanent residence faster than the legal and eligible applicants who filed under current USCIS rules and regulations." That statement is incorrect. The small percentage of DACA recipients who receive advance parole and apply for adjustment of status are not permitted to "jump the line." As immediate relatives, they are statutorily exempt from numerical limitations and thus need only await administrative processing, just like all other immediate relatives seeking adjustment of status.

## IV.    The "Rubber-Stamping" Assertion

35.    Mr. Palinkas's affidavit asserts that USCIS adjudicators are forced to "rubber-stamp" their approvals of DACA requests. His premises for this claim are that DACA adjudications normally do not require personal interviews and that the approval rates are in his view high.

36.    As to the interview issue: the particular threshold criteria for DACA are ordinarily ascertainable from a combination of written documents and required background checks. For example, whether the requestor "has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on the date of this memorandum" can be ascertained through a combination of employment or school records, leases, or other documents. Once that timeline is established, the person's age at time of arrival, which must be under 16, can be determined from the birth certificate. The same is true of the requirement that the person not be above the age of 30 on the date of filing the

NJAPP0701

request.  Whether the person "is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States" is established through the official school or Armed Services records.  And the facts that relate to criminal history or threats to public safety or national security are gleaned from the required searches of the relevant law enforcement and intelligence databases.  The National Standard Operating Procedures ("SOPs") for DACA adjudicators lay out in detail the wide range of documents that the adjudicators are expected to consult.  See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 44-64.  For these determinations, personal interviews are not necessary and would add little if any value.

37.   To accept Mr. Palinkas's theory that the lack of a personal interview per se renders the results unreliable, one would have to condemn not only the DACA process, but the entire body of work performed by the USCIS Service Centers.  They receive applications in the mail or online and decide the cases on the basis of the required documentation and the background checks. See U.S. Citizenship and Immigration Services, USCIS Service Centers, https://egov.uscis.gov/crisgwi/go?action=offices.type&OfficeLocator.office_type =SC.  They handle more than 4 million cases per year.  See U.S. Citizenship and Immigration Services, "USCIS Service Center Operations," Fiscal Year 2016 Report to Congress (Jan. 18, 2017),

16

https://www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Service%20Center%20Operations.pdf, at 2.  See also U.S. Citizenship and Immigration Services, Service Center Forms Processing (last updated Apr. 16, 2018), https://www.uscis.gov/forms/service-center-forms-processing, which lists all the different forms that the five Service Centers adjudicate.  By my count there are 45 different benefit adjudications assigned to the Service Centers.  They include a number of benefits that are either prerequisites to, or applications for, formal legal status as immigrants or nonimmigrants -- i.e., cases in which the long-term consequences are far greater than for DACA requests.

38.   The DACA SOPs for the adjudicators include instructions to carefully examine all cases for possible fraud, "based on the standard fraud protocols." See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 7 and chap. I.

39.   As to the approval/denial rates: the most recent available official compilation of DACA approval and denial rates displays those data as of March 31, 2018.  See https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf.  The cumulative denial rate for initial DACA requests (i.e. as opposed to renewals), from the inception of the program through March 31, 2018, was approximately 8.5%.[3]

---

[3] Importantly, these are just the denials on the merits.  They are to be distinguished from, and do not include, "rejections," which entail returning the DACA file to the requestor upon arrival at the lockbox, for technical reasons

NJAPP0703

40.     One would expect the denial rate to be lowest in the early years of the program and highest as time goes on, because the initial batch of requests would be likely to be the strongest; the more marginal requests might be expected to be filed later. In fact, that is precisely what has happened; the compilation above shows the denial rate steadily increasing with time, reaching above 20% for the first two quarters of fiscal year 2018.  The annual denial rates for initial DACA requests for fiscal year 2013 through the first two quarters of 2018, calculated from the USCIS official report cited above (denials divided by the sum of approvals and denials), were as follows:

| Fiscal Year | Denial Rate |
|---|---|
| 2013 | 2.3% |
| 2014 | 13.4% |
| 2015 | 17.4% |
| 2016 | 17.7% |
| 2017 | 16.4% |
| 2018 | 20.1% |

41.     In all, some 75,510 DACA requests have been denied on the merits as of March 31, 2018.  *Id.*

42.     The roughly 80% current approval rate is not surprising when one considers the applicant pool.  A person who is undocumented, especially if there is some other negative information in his or her background, is highly unlikely to initiate contact with the immigration authorities, voluntarily reveal his or her name and address, confess to being undocumented, confess to any other negative history,

such as failure to sign the form, failure to enclose the required fee or the required documents, etc.

18

and send a check for $465 – all for a benefit that is most likely going to be denied. It is thus hardly surprising that the approval rate is as high as it is.  Given the applicant pool, the approval rate does not support any inference of rubber-stamping.

43.     In any given case, an adjudicator who determines that he or she needs additional information in order to reach a decision may issue a "Request for Evidence" (an "RFE").  I do not have access to the precise number of DACA RFEs, but on information and belief my impression is that they have numbered in the thousands.

44.     In the end, despite his conclusory assertions that the DACA adjudication process is insufficiently rigorous, Mr. Palinkas never identifies a single concrete piece of information that he claims adjudicators are unable to obtain or consider.  I am similarly unable to identify any such missing information.

## V.     Discretion

45.     Previously cited examples of deferred action or equivalent exercises aimed at large, specifically-defined classes of undocumented immigrants demonstrate that numerous Presidents have assumed they had the power to create such programs. While the fact that other Administrations have done something does not prove that it is legal to do so, it is instructive that Congress has long been fully aware of these actions and to date has never blocked the practice.  There is no indication that Congress believed these past practices to be unlawful.

46.     Even assuming *arguendo* that all deferred action must be issued on an individual basis, DACA satisfies that requirement.  The fact that the agency has announced

19

the general criteria that should guide the exercise of that discretion does not mean that there is no discretion to exercise.  Agency guidance as to the exercise of discretion in individual cases is a common practice that serves several crucial purposes.  Important general policy decisions like DACA should be made at the leadership level, because political accountability rests solely with leadership, not with the career employees whose job is to carry out the policies.  Further, only the leadership can disseminate guidance throughout the agency so that the people on the ground know what they are supposed to do, so that important priorities will be transparent to the public, and so that there will be some reasonable degree of consistency.  Consistency in turn is essential to equal treatment.  To the extent avoidable, the decision whether to arrest, detain, prosecute, or grant or deny deferred action should not depend on which officer happens to encounter the person or which prosecutor's desk the person's file happens to land on.  For all these reasons, the DACA process wisely entails adopting general threshold criteria at the front end while still requiring individualized, case-by-case discretion at the back end.

47.    The National Standard Operating Procedures issued by agency and departmental leadership to the USCIS adjudicators repeatedly and explicitly admonish them to approach each case individually and to exercise discretion. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 17 ("individual *may* be favorably *considered* for DACA if" the threshold criteria are met) (my emphasis); 44 (substantially similar instruction); 74 ("decision whether to defer

20

action in a particular case is *individualized and discretionary*, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns") (my emphasis); 75 ("criminal history … is a factor to be considered in the unreviewable *exercise of discretion*") (my emphasis).

48.   There is no evidence to support any counter-instinctive assumption that the USCIS adjudicators who decide DACA requests are systematically disobeying the Secretary's multiple clear instructions to exercise discretion on a case-by-case basis.  They are in fact exercising discretion at two different stages of the process:

49.   First, some of the threshold criteria themselves require fundamentally discretionary judgments.  Whether someone endangers the public safety, for example, is more than simply a matter of finding facts.  The adjudicator has to decide not only how probable and how severe a danger the particular individual poses, but also how probable and how severe it *has to be* before finding the person to be a threat to public safety.  There is no scientific answer to that question; it is a matter of opinion, not fact. The same is true when the question is whether the person is a threat to national security. There are foundational facts to be ascertained, but once they are, the adjudicator must decide whether the threat is probable enough and severe enough to warrant denying DACA.  This is the classic definition of a discretionary determination – one for which there is no uniquely correct answer.   See, e.g., S.A. de Smith, "Constitutional and Administrative Law" (4th ed. 1981), at 278.  The fact that the discretion is exercised in applying the threshold criteria rather than separately after the threshold criteria have been met does not make the determination any less

21

discretionary.  The adjudicator is still choosing between two permissible courses of action.  See, e.g., *Gonzalez-Oropeza v. U.S. Attorney General*, 321 F.3d 1331, 1332-33 (11th Cir. 2003) (determinations of "exceptional and extremely unusual hardship," which is a statutory prerequisite for cancellation of removal, are discretionary and therefore unreviewable); *Romero-Torrez v. Ashcroft*, 327 F.3d 887, 889-92 (9th Cir. 2003) (same).  Nor is there any apparent legal or policy reason to value either exercise of discretion more than the other.

50.    Second, the Neufeld affidavit submitted in the DAPA litigation in fact gave specific examples of cases in which DACA was denied in the exercise of discretion even though the threshold criteria had been met.  See *State of Texas v. United States*, Civ. No. B-14-254 (S.D. Tex. Feb. 16, 2015), Exh. 44, Declaration of [USCIS Associate Director for Service Operations] Donald W. Neufeld, at 510, para. 18.  In his sworn declaration, Mr. Neufeld stated that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met."  *Id.*  He furnished specific examples.  They included cases where a person had committed or had attempted to commit fraud in *prior* applications or petitions (not in connection with the DACA requests themselves), or where a person met all the threshold criteria but had previously made a false claim of U.S. citizenship and had had prior removals.  *Id.*

51.    For all the foregoing reasons, and for additional reasons elaborated in my U.S. House   Judiciary   Committee   testimony   of   February   25,   2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf, it is my firmly-held opinion that DACA is a case-by-case exercise

22

of prosecutorial discretion by which DHS fulfills the Congressional directive to set and carry out immigration enforcement priorities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this  16th  day of July, 2018 in  St. Louis, Missouri.


_____

Stephen H. Legomsky

23

NJAPP0709

# Exhibit 62

NJAPP0710

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

## PLAINTIFFS' OBJECTIONS AND RESPONSE TO DEFENDANT-INTERVENORS' SECOND SET OF DISCOVERY REQUESTS

TO:   Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

Plaintiff States serve these objections and responses to Defendant-Intervenors' second set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

1

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

/s/ Todd Lawrence Disher
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

PATRICK MORRISEY
Attorney General of West Virginia

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

2

## CERTIFICATE OF SERVICE

I certify that on June 14, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ *Adam N. Bitter*
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

NJAPP0713

## GENERAL OBJECTIONS

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id.* Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs objects to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information

4

that is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

NJAPP0715

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S SECOND SET OF INTERROGATORIES

### INTERROGATORY NO. 4:

Identify all costs that Plaintiffs, by state and year, have incurred since June 2012 or expect to incur in the future, with respect to providing goods, support and/or services to DACA recipients living in Plaintiff states. With respect to each cost identify:

     a.    the category of the cost;

     b.    the amount of the cost;

     c.    whether Plaintiff states have paid the cost;

     d.    the anticipated amount of future costs;

     e.    the complete factual basis for asserting and computing the above costs; and

     f.    all information, documents or other evidentiary material on which such assertions and computations are based.

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0716

**INTERROGATORY NO. 5:**

Identify the number of DACA recipients living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

    a.    the manner in which you determined the number of DACA recipients;

    b.    the manner in which you determined the individuals are DACA recipients;

    c.    the documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;

    d.    the number of DACA recipients who attend public colleges or universities;

    e.    the number of DACA recipients who attend public K-12 schools;

    f.    the number of DACA recipients who are unaccompanied children (UAC);

    g.    the number of DACA recipients who have received health care not compensated by the patient or an insurer.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 2 to the complaint and Exhibit 15 to the motion for preliminary injunction and the other exhibits attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0717

**INTERROGATORY NO. 6:**

Identify the number of unaccompanied children (UAC)[1] living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

    a.    the total number of UAC;
    b.    the total number of UAC who attend public K-12 schools;
    c.    the total number of UAC who attend public colleges or universities;
    d.    the amount of K-12 education costs each state incurs on UAC;
    e.    the amount of higher education costs each state incurs on UAC;
    f.    whether Plaintiff states have paid the cost;
    g.    the anticipated amount of future costs;
    h.    complete factual basis for asserting and computing the above costs; and
    i.    all information, documents or other evidentiary material on which such assertions and computations are based.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs.

    Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 9 attached to their motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

---

[1] The term "unaccompanied children" can refer to the broader category of any children not in the physical custody of a parent or guardian. For purposes of their response, Plaintiffs assume that this interrogatory seeks information regarding "unaccompanied alien children."

NJAPP0718

**INTERROGATORY NO. 7:**

Identify Plaintiff states' expenditures, by state and year, to provide Emergency Medicaid Services to DACA recipients since June 2012. For each Plaintiff state, please identify:

     a.    the manner in which you determined the number of DACA recipients who receive Emergency Medicaid services;

     b.    the manner in which you determined the individuals are or were DACA recipients; and

     c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Emergency Medical Services costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

9

**INTERROGATORY NO. 8:**

Identify Plaintiff states' expenditures, by year, to provide benefits under the Texas Children's Health Insurance Program (CHIP) Perinatal Coverage program to DACA recipients since 2012 and identify:

    a.    the manner in which you determined the number of DACA recipients who receive benefits under the CHIP Perinatal Coverage program;

    b.    the manner in which you determined the individuals are or were DACA recipients; and

    c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

    Subject to and without waiving their objections, the Texas Children's Health Insurance Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0720

**INTERROGATORY NO. 9:**

Identify Plaintiff states' expenditures, by year, to provide benefits under Texas's Family Violence Program to DACA recipients since 2012 and identify:

    a.    the manner in which you determined the number of DACA recipients who receive benefits under Texas's Family Violence Program;

    b.    the manner in which you determined the individuals are or were DACA recipients; and

    c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Texas Family Violence Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

11

**INTERROGATORY NO. 10:**

Identify each and every incident in Plaintiff states, by state and year, in which you contend that a DACA recipient was involved in the commission of a crime since 2012. For each such incident, please identify:

    a.    the name of the DACA recipient;
    b.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;
    c.    the crime which the DACA recipient was charged;
    d.    the court in which the DACA recipient was prosecuted;
    e.    whether the DACA recipient was convicted, and if so, of what crime or crimes; and
    f.    any information, documents or other evidentiary material related to the alleged crime, the identity of the victim or victims, and the conviction, if any.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0722

**INTERROGATORY NO. 11:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and crime in any of the Plaintiff states, by state, or in any other part of the United States since June 2012. For any such study or report, please identify:

      a.     the date you requested it;

      b.     the date you obtained it;

      c.     the author(s);

      d.     the person or entity who commissioned it;

      e.     the person or entity who paid for or is responsible for paying for it; and

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

13

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of education to residents in Plaintiff states, by state, since June 2012. For any such study or report, please identify:

      a.    the date you requested it;
      b.    the date you obtained it;
      c.    the author(s);
      d.    the person or entity who commissioned it; and
      e.    the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the education costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0724

## INTERROGATORY NO. 12:

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of healthcare services to residents in Plaintiff states, by state since June 2012. For any such study or report, please identify:

        a.    the date you requested it;
        b.    the date you obtained it;
        c.    the author(s);
        d.    the person or entity who commissioned it; and
        e.    the person or entity that paid for or is responsible for paying for it.

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the health care costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

15

NJAPP0725

**INTERROGATORY NO. 13:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of law enforcement services to residents in Plaintiff states, by state, since June 2012. If so, for each study or report, please identify:

      a. the date you requested it;

      b. the date you obtained it;

      c. the author(s);

      d. the person or entity who commissioned it; and

      e. the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 14:**

For each interrogatory, identify each person answering the interrogatory, supplying any information relied upon in answering the interrogatory, or assisting in any manner with the preparation of answering the interrogatory.

**RESPONSE:**

Plaintiffs object to this request. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

16

**INTERROGATORY NO. 15:**

Identify each employer who hired a DACA recipient instead of a U.S. citizen because of the employer penalty pursuant to The Patient Protection and Affordable Care Act.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0727

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S SECOND SET OF REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 2:

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' Interrogatories Nos. 4-15.

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents are based, to the extent that any additional information exists. Plaintiffs will produce any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response, if necessary, with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

18

# Exhibit 63

NJAPP0729

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT-
INTERVENORS' FOURTH SET OF DISCOVERY REQUESTS**

TO:   Defendant-Intervenors, by and through their attorneys of record, Nina Perales,
      Celina Moreno, Jack Salmon, Ernest I. Herrera, Alejandra Avila, Mexican
      American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San
      Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys
      at Law P.L.L.C., P.O. Box 4545, McAllen, Texas 78502.

      Plaintiff States serve these objections and responses to Defendant-Intervenors'

fourth set of interrogatories and requests for production of documents pursuant to

the Federal Rules of Civil Procedure.

NJAPP0730

June 29, 2018

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

/s/ *Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

2

NJAPP0731

## CERTIFICATE OF SERVICE

I certify that on June 29, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ Adam N. Bitter
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

3

## GENERAL OBJECTIONS

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id.* Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs object to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information that

4

NJAPP0733

is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

NJAPP0734

<u>SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' INTERROGATORIES</u>

## <u>INTERROGATORY NO. 16:</u>

Identify each document, study or report that you or any of your expert witnesses prepared, obtained, requested, or relied on relating to the projection of student growth in Texas public schools for the upcoming school year. For any such study or report, please identify:

     a.    the date you requested it;
     b.    the date you obtained it;
     c.    the author(s);
     d.    the person or entity who commissioned it; and
     e.    the person or entity that paid for or is responsible for paying for it.

## <u>RESPONSE:</u>

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 9 to the motion for preliminary injunction, other applicable exhibits attached to and cited in the complaint and motion for preliminary injunction, and documents produced by the Plaintiffs in this litigation (including documents being contemporaneously produced with these responses).

Plaintiffs may supplement this response, if necessary, as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

NJAPP0735

**INTERROGATORY NO. 17:**

Identify the number of Texas public school students, elementary through high school, by grade or program, who are currently enrolled in bilingual education or english as a second language (ESL) programs and identify:

    a.    the manner in which you determined the number of bilingual education or ESL students; and

    b.    all information, documents or other evidentiary material upon which you rely to support your conclusion that each such individual is a receiving bilingual education or ESL programming.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to publicly available English Language Learner student reports provided by the Texas Education Agency ("TEA"), including reports available at https://rptsvr1.tea.texas.gov/adhocrpt/adlepcg.html. These reports reflect the following student counts as of October 27, 2017, by grade and program, for the 2017–2018 school year:

| Grade | ESL Students | Bilingual Education Students |
|---|---|---|
| 1 | 29,285 | 79,777 |
| 2 | 28,378 | 78,303 |
| 3 | 29,025 | 76,997 |
| 4 | 26,723 | 69,489 |
| 5 | 26,770 | 60,872 |
| 6 | 58,821 | 9,660 |
| 7 | 58,531 | 2,292 |
| 8 | 49,985 | 1,609 |
| 9 | 48,983 | 720 |
| 10 | 36,667 | 407 |
| 11 | 28,032 | 294 |
| 12 | 21,348 | 227 |
| Early education | 29 | 82 |
| Kindergarten | 26,556 | 75,250 |
| Pre-kindergarten | 21,508 | 69,352 |

The above-referenced figures are based on data reported to TEA by Texas public school districts through the Public Education Information Management System.

NJAPP0736

Plaintiffs may supplement this response, if necessary, as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 6:

Please produce the Texas Education Agency Foundation School Program Monthly Activity/Projection Strategies A.1.1 and A.1.2 chart for March to May 2018. The February 2018 chart was produced by Plaintiffs at bates number STATES000052.

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

Subject to and without waiving their objections, Plaintiffs will produce non-privileged documents within the scope of Rule 26 of the Federal Rules of Civil Procedure on a rolling basis.

### REQUEST FOR PRODUCTION NO. 7:

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' Interrogatories Nos. 16-17.

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

Subject to and without waiving their objections, Plaintiffs will produce non-privileged documents within the scope of Rule 26 of the Federal Rules of Civil Procedure on a rolling basis.

8

# Exhibit 64

NJAPP0738

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

Plaintiffs,

v.

KIRSTJEN M. NIELSEN, *et al.*,

Defendants,

*and*

KARLA PEREZ, *et al.*,

Defendant-Intervenors.

Case No. 18-cv-00068

<u>**DECLARATION OF TRACY L. RENAUD**</u>

I, Tracy L. Renaud, hereby make the following declaration with respect to the above captioned matter.

1. I am the Acting Deputy Director of U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security. I began serving as the Acting Deputy Director on March 5, 2018. I also formerly served as the Acting Deputy Director of USCIS between January and October 2017.

2. As the Acting Deputy Director of USCIS, I am responsible, along with the Director, for overseeing approximately 19,000 federal employees and contractors, handling approximately 26,000 immigration benefit applications, petitions, and other requests on an average day.

1

NJAPP0739

3. Prior to March 2018, I served as the Associate Director of the Management Directorate within USCIS.

4. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

**Limitations on Information Captured in USCIS Databases**

5. USCIS began accepting initial DACA requests on August 15, 2012, and began accepting DACA renewal requests on June 4, 2014.

6. The Computer Linked Application Information Management System (CLAIMS 3) and the Electronic Immigration System (ELIS) are electronic case management systems that USCIS uses to process certain immigration requests. From the inception of the DACA policy in 2012 until November 2015, all DACA requests were manually data entered into and processed in CLAIMS 3. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf.  On November 1, 2015, USCIS began ingesting some DACA requests in ELIS.  In February 2016, USCIS transitioned to ELIS for the ingesting and processing of all newly filed DACA requests. *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

7. Based on its ordinary business practices, USCIS maintains electronic and/or paper copies of its initial and renewal DACA decisions and its Requests for Evidence (RFEs) in DACA cases.  However, USCIS' case management systems do not electronically capture the underlying basis (bases) for denial of an initial or renewal DACA request or the basis (bases)

2

NJAPP0740

on which a Request for Evidence (RFE) was sent, in a manner that can be systematically and reliably obtained.

8. Individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests (approximately 17,000 denied initial requests and approximately 2,000 denied renewal requests from Plaintiff States) to determine the underlying basis (bases) for the denials would be a highly burdensome undertaking.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision. For each case requiring paper A-file review, many variables would impact the time it would take for the A-file to be transferred to an officer for review, including the current location of the A-file and whether it is in use by another DHS component or another USCIS office. Assuming most paper A-files that would be needed for this review are located at USCIS' National Records Center (NRC) and not otherwise currently needed by another DHS component or USCIS office, USCIS estimates that it would take approximately 15 business days from the date the A-file is requested, to the date it is received by an officer for review. USCIS further estimates that manual review of a paper A-file or electronic record to determine the underlying basis for denial, including an assessment of the evidence upon which the officer made the denial determination, would take approximately 20 minutes per case.   Therefore, USCIS estimates that individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests would take more than approximately 6,300 hours to complete.

9. Individual case-by-case review of the electronic and/or paper copies of the Requests for Evidence (RFEs) sent for over approximately 60,100 initial and renewal DACA requests (approximately 50,600 initial requests received RFEs and approximately 9,500 renewal

NJAPP0741

requests received RFEs) to determine the basis (bases) for sending the RFE would also be an unduly burdensome undertaking. USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE, in order to determine the basis (bases) on which the RFE was sent. To conduct this case-by-case electronic review for approximately 60,100 requests would take more than approximately 5,008 hours to complete. Not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.

10. A response to Part 3, Question 4 on the Form I-821D is not required in order for USCIS to accept and process the Form I-821D. USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012. A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D. The three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status". Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations. Additionally, CLAIMS 3 does not electronically capture the standard, dropdown, responses to Part 3, Question 4, on the Form I-821D, and ELIS does not capture this information in a complete manner. Accordingly, individual, case-by-case review would be necessary to obtain this information.

NJAPP0742

11. Individual case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for over approximately 156,000 requests to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of approximately 26,000 hours. For any cases that require paper review of the original Form I-821D, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

12. USCIS databases do not electronically capture the underlying statutory basis for which an individual is eligible for adjustment of status to lawful permanent residence in a manner that can be systematically obtained.

13. USCIS estimates that individual case-by-case review of the electronic and/or paper records of more than approximately 7,000 individuals to determine the underlying statutory eligibility basis for adjustment of status to lawful permanent residence would take approximately five minutes per case, for a total of approximately 583 hours to complete. While it is possible some of the records for these cases have been digitized and therefore the records could be requested and obtained electronically for review quickly, additional time would be required to obtain the paper A-file for cases that have not been digitized. For paper A-files that need to be transferred to an officer for review, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

NJAPP0743

14. Individual case-by-case review of electronic or paper records would require the diversion of officers and employees from other mission critical work. To the extent officers would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer, which may take considerable time as such files are frequently in use by other DHS officers, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.

15. Many of the officers who would have to manually review the electronic and paper records on each case to determine the reasons for denial, RFE, or the responses selected on the Form I-821D to Part 3, Question 4 and 5a, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures. Those ongoing operations would be significantly and detrimentally affected if adjudicators were diverted to work on this burdensome discovery.

**Burden of Document Collection**

16. USCIS has identified more than approximately 65 potential non-attorney custodians throughout the agency in numerous components and directorates, including Service Center Operations (SCOPS), the Office of Intake and Document Production (OIDP), the Fraud Detection and National Security Directorate (FDNS), the Field Office Directorate (FOD), the Office of Policy & Strategy (OP&S), the Office of Public Affairs (OPA), the Office of Management Executive Secretariat (Exec Sec), the External Affairs Directorate (EXA), and the Office of Legislative and Intergovernmental Affairs (OLIA). USCIS has identified an additional approximately 59 potential custodians who are current agency counsel in the USCIS Office of the Chief Counsel. USCIS has also identified at least 12 potential

6

custodians who are no longer employees of USCIS, approximately 8 of whom were former agency counsel.

17. Due to multiple unknown variables involved, the USCIS Office of Information Technology (OIT) is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of current and former USCIS employees. This type of comprehensive collection requires, at a minimum, the following steps:

Step 1:    Searching of user archives using search terms and six-year data range. In order to search from 2012 to 2018 requires OIT to query every user archive for base searches to ensure the most complete results;

Step 2:    Accepting the results;

Step 3:    Deduplication and exporting the results to a server;

Step 4:    Transferring the files from the initial server to a forensic server;

Step 5:    Replicating the files to a second forensic server;

Step 6:    Replicating the files onto an encrypted DOJ hard drive.

18. OIT estimates that Step 1 could take approximately 6 to 8 hours per custodian to complete, due to the number of archives that would need to be searched to cover the six year time frame. In order not to inadvertently exclude potentially responsive documents, the keywords selected for searching emails would be so broad, *e.g.,* "DACA" or "deferred action," that they would likely result in an enormous volume in the hundreds of thousands of documents. Due to server limitations, OIT can run no more than 4 custodian searches simultaneously. Accordingly, OIT estimates that it would take approximately 204 to 272 hours to complete Step 1 for 136 custodians.

7

NJAPP0745

19. The time estimate for completing Step 2 is impossible to reliably determine due to the unknown volume of results.  At a minimum, OIT estimates that accepting the results could take approximately an hour per search, or approximately 136 hours for 136 custodians.

20. Likewise, the time estimate for completing Step 3 is impossible to reliably determine.   Due to software limitations, OIT can export no more than four sets of files at a time across the entire application.  Files are queued for export on a first in, first out basis, so if exports are already being run for other cases, the files for this case would be placed at the end of the queue, and therefore the exporting process for this case would be slowed significantly depending on the volume of files queued for export in other cases. A high volume of exports for this case would likewise significantly negatively impact OIT's ability to effectively comply with discovery requests in other USCIS litigation. Due to the large potential archive list, broad date range, and possible number of duplicates, OIT estimates that Step 3 would take approximately 1.5 hours per custodian to complete, or approximately 204 hours for 136 custodians.

21. It is also impossible to reliably estimate the time burden for completing Steps 4 through 6 as the burden entirely depends on the number of file results that remain after deduplication. Each transfer and replication step takes approximately 15 minutes per 1.5 GB to complete. If only 1.5 GB of email data per custodian remained after deduplication, it would take approximately 45 minutes per custodian to complete Steps 4 through 6, or approximately 102 hours for 136 custodians.  However, in light of the six year date range of the discovery requests and the broad search terms that would need to be used to conduct the search, 1.5GB is a very low benchmark for this calculation. It is likely that many custodians would have three to four times as much data to be transferred.

8

NJAPP0746

22. This overall estimate of approximately 493 to 561 hours to complete email searches and data transfers for 136 custodians is an exceedingly low estimate that assumes near perfect technological processing at every step.  Due to the high likelihood that custodians would have significantly more data to be transferred than the 1.5GB benchmark used above, as well as the high likelihood that data transfer speed would not be perfect, it is likely that the total time required to complete a search, collection, and transfer of this magnitude and complexity would be at least three to four times the number of hours indicated above.

23. Additionally, USCIS is not able to recover with 100% accuracy all emails that were sent or received prior to August 16, 2014.  Prior to this date, emails were maintained in individual user records, rather than through journaling on a server.  Therefore, emails sent or received prior to August 16, 2014, which were deleted by an individual user, may be unrecoverable.  In limited circumstances, deleted emails sent or received prior to August 16, 2016, may be recoverable if captured in the individual's archive or in another user's archive, but it can be very burdensome and time consuming to retrieve emails from individual user archives depending on where the archives are located. Deleted emails sent or received prior to August 16, 2016, may also be recoverable if captured on USCIS email backup tapes before the email was deleted, however the process to restore back-up tapes is unduly burdensome, expensive, and would take information technology staff resources away from their core mission.  Accessing these emails would require approximately 250 to 575 hours of active work per email account, plus additional time in transit from the storage site to the work site.

24. Documents only maintained locally on a former employee's hard drive cannot be recovered if the computer has been reimaged and reissued to another user.  Documents maintained on a former employee's share drive may be recovered if the share drive data was maintained on

NJAPP0747

the local office's server.  The burden of retrieving data from both current and former employees' personal share drive and/or local drive, and transferring this data to the Department of Justice (DOJ), and the burden of reviewing these records for responsiveness and privileges, depends entirely on the amount of data obtained.  Due to limitations in OIT's ability to search within all types of data files for keywords, entire contents of folders containing any files with relevant keywords would generally need to be extracted.  This method typically results in significantly large amounts of data to be obtained, transferred to DOJ, and reviewed for responsiveness and privileges.  OIT estimates that it would take a minimum of 2 hours to complete each data transfer per custodian to USCIS' forensic server, another 2 hours per custodian to transfer the data to the second forensic server, and an additional 2 hours per custodian to transfer the data to an encrypted DOJ hard drive.  Four searches and collections of this non-email data can be run simultaneously, therefore, OIT estimates that it would take a minimum of approximately 204 hours to complete this collection and transfer for 136 custodians.  This estimate would increase if custodians stored potentially responsive records in multiple locations, such that OIT would need to extract folders from both a personal share drive and a local drive.

25. If each of the approximately 65 non-agency counsel custodians were to individually attempt to conduct comprehensive searches of his or her own emails and non-email records to locate all responsive records, USCIS estimates that it would take more than approximately 6,000 hours combined just to locate and segregate the responsive records, not including the time for transferring large amounts of data to the Department of Justice (DOJ), and the time for review of the documents for responsiveness and privileges by agency counsel.  This time burden would increase significantly if an additional approximately 59 agency counsel

10

custodians were to individually attempt to conduct comprehensive email searches of his or her own emails and non-email records to locate all responsive records.  Individual searches by each custodian would require the diversion of officers and employees from other mission critical work.

26. All the time burden estimates regarding email and non-email record collection would increase if additional custodians are identified.

11

NJAPP0749

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 6th day of July of 2018.

*Tracy Renaud*

Tracy L. Renaud

NJAPP0750

# Exhibit 65

NJAPP0751

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                  BROWNSVILLE DIVISION

 4                CASE NO. 1:18-cv-00068

 5

 6      --------------------------------X

 7      STATE OF TEXAS, et al.,              :

 8                         Plaintiffs, :

 9          vs.                              :

10      UNITED STATES OF AMERICA, et al.,   :

11                         Defendants, :

12          and                              :

13      KARLA PEREZ, et al.,                 :

14              Defendant-Intervenors. :

15      --------------------------------X

16

17           DEPOSITION OF DANIELA VELEZ

18               (Taken by Plaintiff)

19              Trenton, New Jersey

20                June 19, 2018

21

22

23      Reported by:    Catherine Golembeski
                        Certified Court Reporter-NJ
24                      Registered Professional Reporter
                        Notary Public
25
```

NJAPP0752

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                    Pages 30..33

Page 30

1   what inspired your business idea?
2        A.   Yeah, through undergraduate research.
3        Q.   So you started that business in 2016.
4   Did you have any other jobs in addition to this
5   business?
6        A.   My current job.
7        Q.   What is your current job?
8        A.   I work for NJBIA.
9        Q.   Can you tell me what those initials
10  stand for?
11       A.   New Jersey Business and Industry
12  Association.
13       Q.   Okay.  And what's your job there?
14       A.   I do recruitment opportunities for
15  small businesses to take advantage of our programs
16  in the State of New Jersey.
17       Q.   Is this a government job?
18       A.   No.
19       Q.   And what kind of programs do they
20  offer?
21            MS. DROZ:  Objection.
22       A.   Cost savings, insurance, professional
23  development, networking events.
24       Q.   When did you start at that job?
25       A.   July of 2016.

Page 31

1        Q.   When you started at that job, did they
2   ask you to show a work authorization?
3        A.   Yes.
4        Q.   Did you have to fill out human
5   resources forms with the Social Security number?
6        A.   Yes.
7        Q.   Then through your current job, do you
8   have any, like, employee benefits, like, a
9   retirement plan?
10            MS. DROZ:  Objection.
11       Q.   If you know, you can answer.
12       A.   We have a benefits packet, but to be
13  honest, I don't even understand my benefits packet
14  yet.
15       Q.   Okay.  Let me, sometimes people refer
16  to the retirement plan as a 401K.  Do you know if
17  that's part of your benefits package?
18       A.   Yes.
19       Q.   And do you know if you have health
20  insurance through your job?
21       A.   Yes.
22       Q.   Did you have health insurance before
23  you had this job?
24       A.   No.
25       Q.   So I know you said at the beginning

Page 32

1   that when you got that first DACA work
2   authorization, it was valid for two years.  Have
3   you applied for renewals?
4        A.   Yes.
5        Q.   And how many times have you been able
6   to renew?
7        A.   Twice.
8        Q.   What do you have to do for the renewals
9   when you apply for them?
10            MS. DROZ:  Objection.
11       A.   Fill out the application.
12       Q.   Is there anything different from the
13  first time you applied to the renewal?
14       A.   No supporting documents.
15       Q.   And have you been approved for the
16  renewal both times that you applied for it?
17       A.   Yes.
18       Q.   Whenever your work authorization gets
19  renewed, have you had to apply it to your
20  employers?
21            MS. DROZ:  Objection.
22       Q.   I'm sorry, have you had to show it to
23  your employers?
24       A.   Yes.
25       Q.   Do you know when your next renewing is

Page 33

1   due?  Forget that question.  Let me ask it better.
2            How long is your current work
3   authorization valid for?
4        A.   March 2019.
5        Q.   Okay.  I'm looking here at your
6   declaration, and it says that you paid in 2017, you
7   paid state income taxes to New Jersey, and I
8   imagine you also paid Federal income taxes the same
9   year?
10       A.   Yes.
11       Q.   And do you know anything about an
12  earned income credit?
13       A.   No.
14            MS. DROZ:  Objection.
15       Q.   So you mentioned that your work
16  authorization is valid until March 2019.  And have
17  you spoken to your employer about what would happen
18  if DACA was ended and you lost that work
19  authorization?
20            MS. DROZ:  Objection.
21       A.   No.
22       Q.   Do you know if you'd be able to keep
23  the job you have now without the work
24  authorization?
25            MS. DROZ:  Objection.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0753

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018

Pages 34..37

Page 34

1      A.   No.
2      Q.   No, you don't know; or no, you couldn't
3 keep the job?
4      A.   I couldn't keep the job.
5      Q.   And then I also read here that you're
6 now -- are you enrolled at Rutgers or are you going
7 to start at Rutgers?
8      A.   Enrolled.
9      Q.   How many years have you been at
10 Rutgers?
11     A.   One year already.
12     Q.   Is Rutgers a state university?
13     A.   Yes.
14     Q.   And do you now qualify for the in-state
15 tuition?
16     A.   I don't know.  Wait for the bill.
17     Q.   Right.  Is your -- at Rutgers, do you
18 pay in-state tuition for the university?
19     A.   Yes.
20     Q.   And if DACA was ended, how would that
21 effect your enrollment at Rutgers?
22          MS. DROZ:  Objection.
23     Q.   If you know.
24     A.   I don't know.
25     Q.   I read in this article that it sounded

Page 35

1 like you and your sister have made the decision,
2 which I imagine was difficult, if DACA ended you
3 would leave?
4          MS. DROZ:  Objection.  Could we also
5 clarify exactly which article we're talking about
6 for the record?
7          MS. MORENO:  Yeah, the article marked
8 as Exhibit 2.  And I'll just read the first
9 sentence of the article which is: "Alex and
10 Daniela Velez have come to peace with the difficult
11 choice they will need to make if Congress doesn't
12 reach a deal for those covered by Deferred Action
13 for Childhood Arrivals by March 5th deadline.  They
14 will leave the country."  Is that accurate to, as
15 to the decision you and your sister have made?
16          MS. DROZ:  Objection.
17     A.   Could I have a moment with my lawyer?
18          MS. MORENO:  Sure.  Do you guys want to
19 step out?
20          MS. DROZ:  We'll step out.
21          (A recess transpired.)
22     Q.   And now we're back on the record.
23          Did you have a chance, and I don't want
24 to know what you talked about.  Did you have a
25 chance to talk to your attorney?

Page 36

1      A.   Yes.
2      Q.   So let me go back to the question I
3 asked before you stepped out.
4          In this article it references a
5 difficult decision that you and your sister have
6 made regarding what you would do if DACA was ended.
7 And in the article it says you had, at the time,
8 decided you would leave the country.  Is that
9 accurate?
10          MS. DROZ:  Objection.
11     A.   That was before the March 5th deadline.
12 And as we saw how the changes have been in the
13 administration, and we also saw the deterioration
14 of the political party in Venezuela, it will make
15 it very unsafe for us to even go back at this time.
16     Q.   Okay.  So you've changed your mind now.
17 You would stay?
18          MS. DROZ:  Objection.
19     A.   We don't know.
20     Q.   And in this article it said that you
21 are adamant about not living in the United States
22 as an undocumented person.  And it quotes you as
23 saying: "One thing I've learned, is my talent and
24 skill are mine.  No one can take those away.  It
25 will be hard to start life again, we will not stay

Page 37

1 the rest of 2008 in America."  Is that your quote?
2      A.   Yes.
3      Q.   And --
4          MS. DROZ:  I'm sorry, do you have
5 another copy of that so we could all be looking at
6 the exhibit together?
7          MS. MORENO:  Sure.
8          MS. DROZ:  I think that the record
9 should reflect that it says 2018 in that article
10 not 2008.
11          MS. MORENO:  I'm sorry.  2018.  I
12 misspoke when I read that then.
13     Q.   Is that quote accurate as to your
14 position at the time?
15          MS. DROZ:  Objection.
16     A.   Yes.
17     Q.   And on that same page, at the top it
18 also said you wouldn't stay in the United States if
19 your sister could not.  Is that accurate?
20          MS. DROZ:  Objection.
21     A.   Yes.
22     Q.   And are you also a citizen of Ecuador?
23          MS. DROZ:  Objection.
24     A.   No, I'm not.
25     Q.   You don't have dual citizenship?

NJAPP0754

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Daniela Velez on 06/19/2018                                   Pages 38..41

Page 38

1    A.    No.
2    Q.    Okay.  If you go back, at the bottom of
3  that it says:  "Alex and Daniela have dual
4  citizenship for Ecuador and Venezuela."  And it
5  quotes your sister as saying:  "Daniela and I will
6  go to Ecuador and start over with my family there."
7  Do you have dual citizenship for Ecuador and
8  Venezuela?
9         MS. DROZ:  Objection.
10   A.    I don't.
11   Q.    Who does?  Your sister has dual
12 citizenship in Ecuador and Venezuela?
13   A.    Yes.
14   Q.    Do you have family in Ecuador?
15   A.    Yes.
16   Q.    And then here I'm going to mark as
17 Exhibit 3, another article that I think also quotes
18 you.
19         (Exhibit 3, Article, was marked for
20         identification.)
21   Q.    So have you had a chance to review the
22 news article that's been marked as Exhibit 3, Miss
23 Velez?
24   A.    Yes.
25   Q.    Are you the Daniela Velez that's

Page 39

1  referenced in that article?
2    A.    Yes.
3    Q.    And the first sentence of that article
4  it says that your parents had transferred their
5  bank account and your tuition into your name.  Is
6  that accurate?
7    A.    Accurate.
8         MS. DROZ:  Objection.  Are you asking
9  if that's what the sentence says or if the facts
10 are accurate?
11         MS. MORENO:  I'll clarify.
12   Q.    Is it accurate that your parents
13 transferred their apartment in your name?
14   A.    Accurate.
15   Q.    And is it accurate that they
16 transferred their bank account to your name?
17   A.    Yes.
18   Q.    Is it accurate that your younger
19 sister's tuition was transferred to your name?
20   A.    Yes.
21   Q.    And is that because you have the right,
22 now you have the DACA work authorization?
23         MS. DROZ:  Objection.
24   A.    Correct.
25   Q.    Sorry.  What is your answer to that

Page 40

1  question?
2    A.    Yeah, correct.
3    Q.    I just want to make sure the record's
4  clear.
5         Do you know what advanced parole is?
6         MS. DROZ:  Objection.
7    A.    Yes.
8    Q.    And what is it?
9         MS. DROZ:  Objection.
10         You can answer.
11   A.    It's a permit to leave the country with
12 DACA.
13   Q.    And have you applied for advanced
14 parole?
15   A.    No.
16   Q.    Do you plan on applying for advanced
17 parole?
18   A.    No.
19   Q.    Do you know of DACA recipients who have
20 applied for advanced parole?
21   A.    No.
22   Q.    Have you ever left the country after
23 you entered in 2002?
24         MS. DROZ:  Objection.
25   A.    No.

Page 41

1    Q.    And when I say "the country", I mean
2  the United States?
3    A.    No.
4    Q.    Now, I'm about to finish up.  I'm just
5  going to ask you a couple of topics to see if you
6  know anything about them.  I have a feeling a lot
7  of the answers are going to be no.  If that's not
8  the case, obviously, just respond yes or no.  Is
9  that okay?
10         Do you know about the process that U.S.
11 Immigration takes when it reviews DACA
12 applications?
13         MS. DROZ:  Objection.
14   A.    No.
15   Q.    Do you know about the process that U.S.
16 Immigration takes to review advanced parole
17 applications?
18         MS. DROZ:  Objection.
19   A.    No, I don't.
20   Q.    And do you know the process that U.S.
21 Immigration takes to review DACA renewals?
22         MS. DROZ:  Objection.
23   A.    No.
24         MS. MORENO:  If I could have just one
25 minute just to look through my notes.

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0755

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Daniela Velez on 06/19/2018                                    Pages 42..45

---

**Page 42**

1            (A recess transpired.)
2        Q.    And then just on this last paragraph of
3    your declaration it says if you lost DACA, you
4    would most likely lose my job.  And why do you
5    believe that?
6        A.    They wouldn't allow me to work.  I lose
7    my status.
8        Q.    And it also says you would not be able
9    to finish your college degree because you couldn't
10    afford the tuition?
11        A.    Yes, correct.
12        Q.    Do you know if your tuition would also
13    increase if you lost DACA?
14        A.    I don't know.
15        Q.    And if you lost DACA, would you also
16    lose your driver's license?
17        A.    Yes.
18        Q.    And would that have an effect on your
19    ability to get to work or get to school?
20        A.    I couldn't drive anymore.
21        Q.    And do you now drive to work and to
22    school?
23        A.    Yes.
24        Q.    You also put that you would not be able
25    to provide for your family to whom you provide

---

**Page 43**

1    financial support for bills and groceries.  Is that
2    from the income that you earn through your job?
3        A.    Correct.
4        Q.    And so if you lost DACA and you lost
5    that job, that would reduce your income?
6        A.    Yes.
7            MS. MORENO:  All right.  I think that's
8    it for my questions.  Before I finish up, was there
9    anything that I asked you that was confusing that
10    you wish to clarify?
11            THE WITNESS:  No.  Everything was
12    straightforward.
13            MS. MORENO:  Okay.
14            (A recess transpired.)
15            MS. MORENO:  You know, I forgot to ask
16    you just two questions, if I could ask them.
17            THE WITNESS:  Yeah.
18        Q.    Do you know anyone else involved in
19    this lawsuit, any other witnesses or parties?
20            MS. DROZ:  Objection.
21        A.    No.
22        Q.    And have you ever testified in court
23    before?
24        A.    No.
25            MS. MORENO:  That's all.

---

**Page 44**

1    EXAMINATION BY MS. WAINER APTER:
2        Q.    I just have two follow-up questions.
3    You mentioned in response to a question about one
4    of the news articles some changes in Venezuela that
5    had happened recently?
6        A.    Correct.
7        Q.    That had, perhaps, changed your
8    prospective.  Could you just talk a little bit
9    about those changes?
10        A.    Due to the political manipulations of
11    the country, it would be unsafe for us, because we
12    are against the Marduda regime, so our stance in
13    the opposition would be against or cause us to be
14    in danger if we went back to Venezuela.
15        Q.    When you say "us," who do you mean?
16        A.    My sister and I.
17        Q.    Thank you.  And then when you were
18    speaking about your business, the Innovative Lab
19    Designs?
20        A.    Correct.
21        Q.    Can you talk about a little bit more
22    how that got started?
23        A.    In the graduate research our professor
24    proposed the idea of creating kits that would
25    allowed students to take online physics and

---

**Page 45**

1    astronomy courses.  So my partner and I designed
2    kits, 3D printed by computer.  And we order -- we
3    put together the kits, supplied them to the book
4    store, and then students go to Rowan College and
5    buy the kits.  So it's like when you're in college
6    you buy a college book, you buy the kits to take
7    the course online.
8        Q.    And when you said the book, do you mean
9    the Rowan College book store?
10        A.    Yes, Rowan College of Burlington County
11    Bookstore.
12        Q.    You said your partner.  Do you still
13    work with that person now?
14        A.    Yes.
15        Q.    So you still work on the business now?
16        A.    Correct.
17        Q.    Had you previously worked with that
18    physics professor?
19        A.    Just through undergraduate research.
20        Q.    Have you been a research assistant for
21    him?
22        A.    No.
23            MS. WAINER APTER:  Thank you.
24            MS. DROZ:  I just have one question on
25    redirect.

---

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0756

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                      Pages 46..49

Page 46

1   EXAMINATION BY MS. DROZ:
2       Q.   Daniela, earlier you talked about when
3   you were a camp counselor and you said you worked
4   as a contractor.  Can you clarify what you mean by
5   that?
6       A.   I was a 1099 employee through the
7   robotics camp.
8           MS. DROZ:  I have no further questions.
9   EXAMINATION BY MS. MORENO:
10      Q.   I have a follow-up based on her
11  questions.
12          MR. WALKER:  No questions here.
13      Q.   You talked about the change in the
14  politics in Venezuela between the day you made that
15  statement February 2018 and now.  Wasn't the
16  situation in Venezuela bad before February 2018?
17      A.   Correct.
18          MS. DROZ:  Objection.
19      A.   But there was a recent election that
20  just happened within the country.
21      Q.   And this article references that the
22  plan was not even to go back to Venezuela, it was
23  to go to Ecuador?
24          MS. DROZ:  Objection.
25      Q.   Did you change that also?

Page 47

1       A.   That was my sister's plan.
2       Q.   So you were going to separate from your
3   sister.  And you were going to go to Venezuela and
4   your sister was going to go to Ecuador.  Is that
5   your statement?
6           MS. DROZ:  Objection.
7       A.   We didn't have a concrete plan.  It was
8   just ideas.
9       Q.   Okay.  The article said you were
10  adamant about leaving the United States.
11          MS. DROZ:  Could you show us what
12  you're pointing to?
13      Q.   Looking at the last sentence of the
14  article, second to last sentence on the article,
15  it's on page four of Exhibit 2.  And it says:
16  "Daniel is adamant about not living in the U.S. as
17  an undocumented person."  I'm going to ask you
18  today, are you adamant about not living in the
19  United States as an undocumented person?
20      A.   If DACA is revoked and I have to go
21  through removal proceedings and deportation
22  proceedings, I will not go against the law.  So if
23  DACA is revoked in March 19 comes, and it's
24  expired, and I get a letter of deportation from the
25  U.S. Government, I will follow through.

Page 48

1       Q.   So otherwise it's your plan to stay in
2   the United States as an undocumented person?
3       A.   No.
4           MS. DROZ:  Objection.  That
5   mischaracterizes her testimony.
6       Q.   Let me clarify.  If DACA is revoked,
7   you don't have any work authorization, right?
8       A.   Correct.
9       Q.   But there's a second step that has to
10  happen, you have to go through the removal and
11  deportation proceeding, right?
12      A.   Correct.
13      Q.   So if you have no work authorization,
14  but no one comes to put you through the removal and
15  deportation proceedings, is it your plan to stay in
16  the United States?
17          MS. DROZ:  Objection.
18      A.   I don't know.
19      Q.   You said here that you were not going
20  to stay in the United States.  Has that changed?
21          MS. DROZ:  Objection.
22      A.   Again, that was with the March 5th
23  deadline, knowing that there will be a proceeding
24  of my removal, like, that was based on, if I'm
25  going through a removal proceeding after my DACA is

Page 49

1   expired.
2       Q.   Then you would leave?
3       A.   Yes.
4       Q.   Otherwise, you don't know what you
5   would do?
6       A.   I have no idea.
7           MS. MORENO:  No other questions.
8           (Deposition was concluded at 1:33 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

NJAPP0757

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                    Page 50

```
                                              Page 50
 1   UNITED STATES DISTRICT COURT)
 2                    : C-E-R-T-I-F-I-C-A-T-E
 3   DISTRICT OF TEXAS - BROWNSVILLE DIVISION)
 4
 5      I, Catherine Golembeski, RPR, CCR, Notary Public,
 6   certify that I did have Daniela Velez appear before
 7   me at 12:00 p.m. on June 19, 2018, in the New
 8   Jersey Attorney General's office, 25 Market Street,
 9   Trenton, New Jersey, that the witness was duly
10   sworn and cautioned to tell the truth, the whole
11   truth and nothing but the truth; that the foregoing
12   pages constitute a true and accurate transcript of
13   testimony given at the time and place.
14      I further certify that I am not of counsel or kin
15   to any of the parties to this cause of action, nor
16   am I interested in any manner in its outcome.
17      IN THE WITNESS WHEREOF I have hereunto set my
18   hand and seal this the 19th day of June 2018.
19
20
21
22       Catherine Golembeski, CCR, RPR
         Notary Public for New Jersey
23
24
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0758

# Exhibit 66

NJAPP0759

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Joana Costa on 06/18/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
        - - - - - - - - - - - - - - - - - - - - - - - - -
 3
      STATE OF TEXAS, et al.,        CASE NO. 1:18-CV-08
 4
          Plaintiffs,
 5
                    vs.
 6
      UNITED STATES OF AMERICA,
 7    et al.,
 8        Defendants,
 9    KARLA PEREZ, et al.,
10        Defendant-Intervenors,
11    and
12    STATE OF NEW JERSEY,
13        Proposed Defendant-Intervenor
14      - - - - - - - - - - - - - - - - - - - - - - - - -
15
16                       - - -
17                 Monday, June 18, 2018
18                       - - -
19                 DEPOSITION OF:
20                   JOANA COSTA
21                       - - -
22
23
24
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0760

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Joana Costa on 06/18/2018                                    Pages 50..53

Page 50

1    A.    No.
2    Q.    Has the DACA renewal ever been
3    denied?
4    A.    No.
5    Q.    Again, this may be personal, maybe
6    not.
7          Have you ever been arrested?
8    A.    No.
9    Q.    Okay.
10         And it looks like your DACA
11   application was renewed in April.
12         That is the most recent renewal?
13   A.    Yes.
14   Q.    So, now it is valid for two more
15   years from April?
16   A.    I'm not sure.
17   Q.    Okay.
18         Why aren't you sure?
19   A.    I don't remember the date of
20   expiration --
21   Q.    Okay.
22   A.    -- on renew.
23   Q.    On when you renew?
24   A.    Yeah.  Yes.
25   Q.    April, that is this April of 2018?

Page 51

1    A.    2018.
2    Q.    I see here you wrote you "could
3    stop worrying about losing" your job.
4          And is that a concern for you, that
5    if you lost your -- if the DACA wasn't renewed, you
6    would lose your job?
7    A.    Yes.
8    Q.    Have you had to talk to your
9    employer about that possibility?
10   A.    Yes.
11   Q.    And why -- what has your employer
12   said?
13   A.    He talks to my boss, because he
14   would be the first person to be impacted.
15         I spoke to HR, who -- the woman in
16   HR requests photocopies of your new card.
17   Q.    And have they told you if you could
18   not give them a new card, what have they said would
19   happen to your job?
20   A.    They didn't say that.
21         I did speak to them in October,
22   2017, when President Trump, you know, Jeff Sessions
23   spoke about cancelling the DACA program, and they
24   told me they would keep an eye on the news.
25   Q.    You wrote here in the last

Page 52

1    paragraph that, without DACA, you would not -- you
2    would have no source of income.
3          And is it your understanding that
4    it would be very difficult to get a job in the
5    United States without having the DACA card renewed?
6    A.    Yes.
7    Q.    And you also would lose your
8    driver's license.
9          Is it your understanding that if
10   DACA is cancelled, you would lose your driver's
11   license?
12   A.    Yes, because I can't find work.
13   Q.    And how would losing just your
14   driver's license effect your day-to-day?
15         (Pause)
16   Q.    Do you want to take a short break
17   or are you okay?
18   A.    It's okay.
19         I couldn't drive if I didn't have a
20   license.
21         One can't even get medication
22   without a driver's license.  Nowadays when you try
23   to buy Mucinex DM, if you are really sick, you have
24   to show ID.
25         To walk into this building, you

Page 53

1    have to show ID.
2          Rather simple tasks can't be
3    accomplished if one does not have the driver's
4    license.
5    Q.    Just, again, some of these answers
6    may be obvious, but if you didn't have -- in order
7    to keep -- if you weren't able to keep your job,
8    would you be able to keep your health insurance?
9    A.    No.
10   Q.    Do you know if you had any kind of
11   health insurance before you received DACA?
12   A.    I did not have any health insurance
13   before I received DACA.
14   Q.    Okay.
15         Do you know how any of your medical
16   bills were paid before you had health insurance?
17   MR. KAPLAN:  Objection to form.
18   MS. MORENO:  If you know.
19   THE WITNESS:  I did not go to the
20   doctor.  I'm rarely sick.
21                    - - -
22   CONTINUATION
23   BY MS. MORENO:
24   Q.    And if DACA was cancelled, and you
25   lost your -- lost that work authorization and your

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0761

# Exhibit 67

NJAPP0762

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DEFENDANT-INTERVENORS' THIRD SET OF DISCOVERY REQUESTS TO DEFENDANTS

TO:    Defendants United States of America, *et al.*, by and through their attorney of record, Jeffrey S. Robins, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, District Court Section, P.O. Box 868, Washington, D.C. 20044 (Jeffrey.Robins@usdoj.gov).

Pursuant to the Federal Rules of Civil Procedure and the Court's Scheduling Order issued on May 30, 2018 (ECF No. 53), Defendant-Intervenors hereby serve these discovery requests on Defendants. You are requested to serve your responses to these discovery requests upon the undersigned counsel for Defendant-Intervenors within 10 days of service of these requests.

Dated: June 10, 2018                    Respectfully submitted,

                                        **MEXICAN AMERICAN LEGAL
                                        DEFENSE AND EDUCATIONAL FUND**
                                        By: */s/ Nina Perales*
                                        Nina Perales (Tex. Bar No. 24005046);
                                        (SD of Tex. Bar No. 21127)
                                        Attorney-in-Charge
                                        Celina Moreno (Tex. Bar No. 24074754)

1

NJAPP0763

(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## CERTIFICATE OF SERVICE

I hereby certify that, on June 10, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Todd L. Disher
Special Counsel for Civil Litigation
P.O. Box 12548
Austin, TX 78711-2548
Todd.Disher@oag.texas.gov

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

*/s/ Alejandra Ávila*
Alejandra Ávila

NJAPP0764

# I.    DEFINITIONS

The following terms are defined and used in these discovery requests as follows:

A. The words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of these requests any document that might be deemed outside its scope by another construction.

B. "Communication" or "communications" shall mean and include every manner or means of disclosure, transfer, or exchange, and every disclosure, transfer, or exchange of information, whether orally or by document or whether face-to-face, by telephone, mail, e-mail, personal delivery, or otherwise.

C. "Defendants" shall refer to the named Defendants in this case, and any other persons acting or purporting to act on their behalf.

D. "Document" and "documents" are defined to be synonymous in meaning and equal in scope to the usage of the terms in Federal Rule of Civil Procedure 34(a), in its broadest sense, and shall mean and include all written, printed, typed, recorded or graphic matter of every kind and description, both originals and copies, and all attachments and appendices thereto, that are in the possession, custody or control of Defendants or in the possession, custody or control of counsel for Defendants. A draft of a non-identical copy is a separate document within the meaning of this term. Without limiting the term "control," a document is deemed to be within your control if you have ownership, possession or custody of the document, or the right to secure the document or copy thereof from any persons or public or private entity having physical control thereof.

E. The term "DACA initiative," "DACA program," or "DACA" shall refer to the guidance on exercising prosecutorial discretion with respect to individuals who came to the United States as children, as described in the June 15, 2012 memorandum by former Secretary of Homeland Security, Janet Napolitano.

F. The term "DACA recipients" shall mean a person who has been granted deferred action pursuant to the DACA initiative.

G. The term "USCIS" shall mean United States Citizenship and Immigration Services.

H. The term "DHS" or "Department of Homeland Security" shall mean the United States Department of Homeland Security, or any of its components, including USCIS, or any employees, agents, or other persons acting or purporting to act on the agency's behalf.

I. "Plaintiff State" shall refer to each of the named Plaintiff states in this case, and any other persons acting or purporting to act on its behalf.

J. To "identify" an individual means to state that individual's:
   a. full name;

3

NJAPP0765

      b.  current or last known telephone numbers at business and home; and

      c.  current or last known business and home addresses.

K.  To "identify" a person means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

L.  To "identify" an act, event, occurrence or communication means:

      a.  to state its date;

      b.  to identify the persons that were parties to and witnesses of the act, event, or occurrence, or communication;

      c.  to describe where and how it took place; and

      d.  to identify any document that constitutes or refers to such act, event, occurrence, or communication.

M.  To "identify" a file means:

      a.  to state the title contained therein; and

      b.  to identify the person for whom the file is maintained.

N.  To "identify" a statement means:

      a.  to identify who made it;

      b.  to identify who took or recorded it;

      c.  to identify all persons, if any, present during the making thereof;

      d.  to state when, where and how it was taken or recorded; and

      e.  to identify who has current or last know possession, custody or control thereof.

O.  To "identify" a document means:

      a.  to identify all files in which it and all copies of it are found;

      b.  to identify its author;

      c.  to identify its addresses, if any;

      d.  to identify those who received a copy thereof;

      e.  to identify its current custodian or the person that had last known    possession, custody or control thereof;

      f.  to state the date of its preparation; and

      g.  to state its general subject matter giving a reasonably detailed description thereof.

P.  To "identify" other tangible thing means:

      a.  to identify what it is, giving a reasonably detailed description thereof;

      b.  to state when, where and how it was made, if applicable;

      c.  to identify who made it, if applicable; and

      d.  to identify its current custodian or the person that had last known    possession, custody or control thereof.

Q.  The plural of any word used herein includes the singular, and the singular includes the

NJAPP0766

plural.

R.  The masculine gender of any word used herein includes the feminine and the neutral genders.

S.  The past tense of any verb used herein includes the present tense, and the present tense includes the past tense.

T.  The term "relating to" shall have its usual meaning and shall also specifically mean reflecting, related to, referring to, describing, representing, evidencing or constituting.

U.  Without limiting the term "control," a document is deemed to be within your control if you have ownership, possession or custody of the document, or the right to secure the document or copy thereof from any persons or public or private entity having physical control thereof.

V.  "Person" shall mean any individual, association, agency, commission, or other legal or governmental entity or association.

W.  "Statement" means and includes any written or graphic statement signed or otherwise adopted or approved by the users in making it, any stenographic, mechanical, electrical or other recording or a written transcription which is a substantially verbatim recital or an oral statement made by a person which is contemporaneously recorded.

X.  "You" and "your" shall mean the United States, as well as all other persons acting or purporting to act on behalf of the United States, including any attorney or other representative.

## II.   INSTRUCTIONS

A.  Regarding documents called for by these requests as to which you claim a privilege or which you contend are not subject to production, please provide at the time for production a listing that describes each document and states with respect to each such document:
1.  the type of document (e.g., letter, memorandum, report, etc.,);
2.  the date;
3.  the title;
4.  the number of pages;
5.  the author or addressor;
6.  the names and address or addresses of any persons who have received and/or who have obtained a copy of the document;
7.  the subject matter of the document;
8.  the factual and legal basis of the claim or privilege or ground of non-production asserted with respect to the document; and
9.  any other information which, without revealing the information which is itself privileged or protected, will enable the plaintiffs to assess the

5

application of the privilege asserted.

B.  If you contend that you are unable to produce fully and completely the documents requested herein, or any portion thereof, after exercising due diligence to locate those documents, please so state, specifying the basis for such limited production, the reasons for the inability to produce the documents requested, whether said documents have been destroyed and why, and whatever information or knowledge you may have related to the location of such documents.

C.  Unless the context clearly requires otherwise, this request for documents includes all documents within your custody or control, those within the custody or control of each of your attorneys, agents, associates, and/or employees, and those to which any of these persons has access.

D.  For all documents in electronic, magnetic, or format other than paper, please produce in the following formats:  printed hardcopy or electronic (700 Mb compact disk, Microsoft Word 2003 or later).

E.  If the documents are provided on an FTP site, a) all documents must be produced in a way that makes clear the exact location on the FTP site of materials responsive to each numbered request.

### III.   WARNINGS

A.  A failure to produce the documents requested on time or in good faith may result in sanctions being imposed against you under Rule 37 of the Federal Rules of Civil Procedure.

B.  An evasive or incomplete production will be treated as a failure to produce the requested documents.

6

NJAPP0768

<u>**INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 3**</u>

Please identify the number of initial DACA applications <u>received</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

    a.  the number of initial DACA applications <u>approved</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

    b.  the number of initial DACA applications <u>denied</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

    c.  the number of initial DACA applications <u>rejected</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

<u>**RESPONSE**</u>

<u>**INTERROGATORY NO. 4**</u>

Please identify the number of renewal DACA applications <u>received</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

    a.  the number of renewal DACA applications <u>approved</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

    b.  the number of renewal DACA applications <u>denied</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

    c.  the number of renewal DACA applications <u>rejected</u> by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

<u>**RESPONSE**</u>

<u>**INTERROGATORY NO. 5**</u>

Please identify the average number of months it took USCIS to adjudicate an accepted

NJAPP0769

DACA initial application:

    a.  For the period of June 2012 to January 2017

    b.  For the period of February 2017 to June 2018

**RESPONSE**


**INTERROGATORY NO. 6**

     Please identify the average number of months it took USCIS to adjudicate an accepted DACA renewal application:

    a.  For the period of June 2014 to January 2017

    b.  For the period of February 2017 to June 2018

**RESPONSE**


**INTERROGATORY NO. 7**

     Please identify the offices within USCIS that evaluate and adjudicate DACA applications.

**RESPONSE**


**INTERROGATORY NO. 8**

     Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of June 2012 to June 2018.

**RESPONSE**


**INTERROGATORY NO. 9**

     Please identify the number of DACA <u>initial</u> applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

    a.  the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

NJAPP0770

    b.   the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

    c.   the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

## RESPONSE

## INTERROGATORY NO. 10

Please identify the number of DACA <u>renewal</u> applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

    a.   the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

    b.   the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

    c.   the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

## RESPONSE

## INTERROGATORY NO. 11

Please identify the number of <u>initial</u> DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

    a.   the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

    b.   the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

    c.   the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

    d.   the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

NJAPP0771

    e.   the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

    f.   the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

    g.   the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**RESPONSE**


**INTERROGATORY NO. 12**

Please identify the number of <u>renewal</u> DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

    a.   the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

    b.   the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

    c.   the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

    d.   the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

    e.   the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

    f.   the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

    g.   the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**RESPONSE**

NJAPP0772

**INTERROGATORY NO. 13**

Please identify the number of approved, initial DACA applications submitted by individuals who indicated on their I-821D, in response to Part 3. Question 4., that their immigration status on June 15, 2012 was "Status Expired" or "Parole Expired," and who answered in the affirmative in response to Part 3. Question 5.a. ("Were you EVER issued an Arrival-Departure Record"), for each Plaintiff State for each month during the period of June 2012 to June 2018.

**RESPONSE**

**INTERROGATORY NO. 14**

Please identify the number of DACA recipients who adjusted their status to lawful permanent resident, for each Plaintiff State for each month during the period of June 2012 to June 2018, and identify among that number:

   a.   the number of DACA recipients who adjusted under 8 U.S.C. 1255(i)
   b.   the number of DACA recipients who adjusted under 8 U.S.C. 1255(a)

**RESPONSE**

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 5**:

Produce all documents relating to guidelines followed by DHS, and any of its subsidiary agencies, departments, agents, and employees, to evaluate, process, and adjudicate Deferred Action for Childhood Arrivals ("DACA") applications, including, but not limited to: (1) internal agency documents, memoranda, and communications that set forth any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications;   (2) training materials provided to agents or employees related to DACA evaluations and adjudications; and (3) changes following January 20, 2017 in any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 6**:

NJAPP0773

Produce all documents relating to the process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates, processes, and adjudicates DACA applications, including but not limited to: (1) under what circumstances a DACA application is rejected, denied, or approved; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of DACA applications; (3) the procedure(s) employed by agents and employees who work in the evaluation and adjudication of DACA applications; and (4) changes in the process for evaluating, processing, and adjudicating DACA applications following January 20, 2017.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7:**

Produce documents showing the number of DACA applications received, rejected, denied, and approved, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; (2) the number of renewal DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; and (3) the number of DACA applications accepted but denied, during the period of June 2012 to June 2018, after the adjudicator determined the applicant met the five criteria in the June 15, 2012 DACA memorandum but was otherwise not a qualifying applicant, including because the applicant posed a threat to national security or public safety, by each Plaintiff state, for each month.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8:**

Produce all documents relating to process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates and adjudicates applications or requests for deferred action other than DACA, including but not limited to: (1) under what circumstances an application or request is rejected, denied, or accepted; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of deferred action applications or requests; (3) and the procedure(s) employed by agents and employees who work in the evaluation and adjudication of deferred action applications or requests; and (4) any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017.

**RESPONSE:**

12

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents relating to the number of DACA applications received, rejected, denied, and approved at each of the five USCIS Service Centers, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018; and (2) the number of renewal DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 10:**

Produce all documents relating to the USCIS processing time of accepted and approved DACA applications, including but not limited to: (1) the amount of time that elapses between the date USCIS accepts an application and the time the application is approved; (2) the amount of time that elapses between the date USCIS approves an application and an applicant receives an employment authorization document; and (3) any changes in the processing time described above since January 20, 2017.

**RESPONSE:**

NJAPP0775

# Exhibit 68

NJAPP0776

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

        Plaintiffs,

     v.

KIRSTJEN M. NIELSEN, *et al.*,

        Defendants,

*and*

KARLA PEREZ, *et al.*,

        Defendant-Intervenors.

Case No. 18-cv-00068

## FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' THIRD SET OF DISCOVERY REQUESTS

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

     Federal Defendants serve these objections and responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

## GENERAL OBJECTIONS

     Federal Defendants state the following General Objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents, which are hereby incorporated in and made part of each of the following specific responses.

1.    Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of documents

1

NJAPP0777

or things outside the narrow scope of expedited discovery, are unduly burdensome, are overly broad, or seek information that is not relevant to this phase of this case and will not lead to the discovery of such relevant information, or are equally accessible to Defendant-Intervenors through third-party discovery requests, publicly available government websites other websites, or other sources.

2.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense.  Federal Defendants further object to these interrogatories and requests for production of documents to the extent that they are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

3.      Federal Defendants object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are vague and ambiguous, and therefore may lead to differing interpretations among the parties to this litigation as well as the Court, resulting in confusion.  Federal Defendants further object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are inconsistent with the Court's order dated June 20, 2018 (Dkt. 97) or to the extent that they are confusing or unduly burdensome.

4.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that Defendant-Intervenors seek disclosures of information protected from disclosure by the Privacy Act of 1974, 5 U.S.C. Section 552a(b), attorney-client privilege, attorney work product doctrine, deliberative process privilege, law enforcement / investigatory files privilege, self-critical analysis privilege, executive privilege, and official information privilege, and other applicable privileges.

5.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of electronically stored information on electronic media, including any general search of email or retrieval of backup tapes of U.S. Citizenship and Immigration Services ("USCIS") that are not reasonably accessible because of the undue time, burden, and cost associated with retrieving, reviewing, and producing the information, especially in relation to the limited scope of expedited discovery at this stage of proceedings.

6.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of material outside of a properly designated administrative record by USCIS, insofar as this action may be construed as a suit for judicial review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

7.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent they purport to require the disclosure of information in the possession, custody or control of entities other than properly named

2

Defendants on the grounds that such production is beyond the scope of Fed. R. Civ. P. 33 and 34 and other applicable law.

8. Federal Defendants object, in light of the Court's Order dated June 20, 2018 (Dkt. 97), to the extent Defendant-Intervenors' third set of interrogatories and requests for production of documents seek to compel Federal Defendants to search for, identify, or log drafts or non-final documents or produce documents in their native format.

9. Federal Defendants object to Defendant-Intervenors' third set of interrogatories to the extent that they exceed the limit of 25 interrogatories, including all subparts, allowed under Fed. R. Civ. P. 33, without stipulation or leave from the court. Defendant-Intervenors have clearly promulgated more than twenty-five interrogatories in this set alone, much less in all prior sets of interrogatories.

10. Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents are made without waiving:

(a) The right to object to the competence, relevance, materiality, or admissibility as evidence of any information, or the subject matter thereof, in any aspect of this civil action or any other matter;

(b) The right to object at any time and upon any grounds to any other discovery requests;

(c) The right at any time and for any reason to revise, supplement, correct, add or to clarify these responses;

(d) The right to amend or supplement these responses if the Federal Defendants discover additional information; and

(e) Any applicable privilege, including but not limited to the attorney/client privilege, the law enforcement privilege, the investigation files privilege, executive privilege, and the official information privilege.

11. Discovery has not concluded in this litigation. Accordingly, the Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents is based upon the information available at this stage of the litigation. Federal Defendants reserve the right to rely upon any facts, documents, or other evidence which may develop or come to its attention subsequent to this response.

Likewise, Federal Defendants' objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents are based upon the information presently known by the Federal Defendants, and are made without prejudice to the Federal Defendants' right to assert additional objections in the event that additional grounds for objections should be discovered by the Federal Defendants subsequent to this response.

12. Without waiving the above objections, Federal Defendants will provide responses to only relevant non-privileged matters based on information currently available to it and obtainable without undue burden.

3

## SPECIFIC OBJECTIONS AND RESPONSES TO
## DEFENDANT-INTERVENORS' THIRD SET OF INTERROGATORIES

**INTERROGATORY NO. 3**

Please identify the number of initial DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of initial DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of initial DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of initial DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 3**

Defendants specifically object to Interrogatory No. 3 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following terms and phrases in Interrogatory No. 3 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practice regarding DACA: "initial [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

Immigration and Customs Enforcement ("ICE") specifically objects to being required to search for information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012. It appears that ICE never compiled or "tracked" information responsive to Interrogatory No. 3 for this time period. Specifically, ICE has queried the Enforcement and Removal Operations ("ERO") database and found no information responsive to Interrogatory No. 3. In addition, ICE has queried several current agency employees who potentially might

4

have information responsive to Interrogatory No. 3 and has been advised that they possess no responsive information.  It appears likely that the only ICE individuals who may have information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012 are former agency employees.

**RESPONSE TO INTERROGATORY NO. 3**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, August 15, 2012 – June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012, therefore USCIS is not able to provide data on DACA initial requests from June 2012 to August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 4**

Please identify the number of renewal DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of renewal DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of renewal DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of renewal DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 4**

Defendants specifically object to Interrogatory No. 4 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following terms and phrases in Interrogatory No. 4 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common

5

use of the terms in its agency practices regarding DACA: "renewal [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

**RESPONSE TO INTERROGATORY NO. 4**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, June 4, 2014 – June 22, 2018." USCIS began accepting DACA renewal requests on June 4, 2014; therefore Federal Defendants are unable to provide data on DACA renewals from June 2012 to June 4, 2014 because it does not exist. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 5**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA initial application:

a. For the period of June 2012 to January 2017

b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 5**

Defendants specifically object to Interrogatory No. 5 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 5 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "initial [application]." The response to Interrogatory No. 5 is based on Defendant USCIS' common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

NJAPP0782

**RESPONSE TO INTERROGATORY NO. 5**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Initial Completions, August 15, 2012 - June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012; therefore the average processing time for part a. was calculated using data beginning August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 6**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA renewal application:

>   a. For the period of June 2014 to January 2017

>   b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 6**

Defendants specifically object to Interrogatory No. 6 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 6 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 6 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 6**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Renewal Completions, June 4, 2014 - June 22, 2018. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

7

**INTERROGATORY NO. 7**

Please identify the offices within USCIS that evaluate and adjudicate DACA applications.

**OBJECTIONS TO INTERROGATORY NO. 7**

Defendants specifically object to Interrogatory No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following terms and phrases in Interrogatory No. 7 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "evaluate" and "adjudicate." Defendant USCIS' response is based on its common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendants further object that "offices" do not "evaluate and adjudicate" DACA requests within USCIS, but rather USCIS officers employed at specific USCIS locations adjudicate DACA requests and other USCIS personnel may also be involved in evaluating DACA requests. Defendants also object that Interrogatory No. 7 is vague and ambiguous as to the time period it covers. Defendant USCIS' response will cover the period from August 1, 2012 through May 31, 2018, the period for which data is readily available.

**RESPONSE TO INTERROGATORY NO. 7**

Subject to this qualification and objection, Defendant DHS responds that only officers at USCIS Service Centers render final adjudicative decisions for DACA requests. However, individuals at other USCIS offices that may be or may have been involved in evaluation or review of DACA requests are or were employed at: Headquarters Service Center Operations, the Field Operations Directorate, the Office of Policy and Strategy, the Fraud Detection and National Security Directorate, the Office of Intake and Data Production, and the Office of the Chief Counsel.

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, USCIS Service Centers and Offices that Evaluate and Adjudicate DACA Requests, August 1, 2012 - May 31, 2018", which provides the name of each USCIS service center and USCIS field office that has transferred in or adjudicated at least one Form I-821D since August 1, 2012. The data provided in response to this Interrogatory reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 8**

8

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 8**

Defendants specifically object to Interrogatory No. 8 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following term in Interrogatory No. 8 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

**RESPONSE TO INTERROGATORY NO. 8**

Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Count of Adjudications by Service Center and Fiscal Year of Adjudication, August 15, 2012 - June 22, 2018." USCIS began accepting DACA requests on August 15, 2012; therefore USCIS service centers did not adjudicate any DACA requests between June 2012 and August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 9**

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

> a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

> b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

> c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 9:**

NJAPP0785

Defendants specifically object to Interrogatory No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in Interrogatory No. 9 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c., of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing).

Federal Defendants further object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 9 in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State (over 17,000 cases), as set forth in the

NJAPP0786

attached declaration. *See* Dkt. 97. Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 9, the number of denials of initial DACA requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 3 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 9**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Denials by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 9, Federal Defendants respond that based on an informal inquiry of relevant USCIS service centers and the information in the 2015 Neufeld Declaration, *see, e.g.*, para. 18,[1] Federal Defendants are aware of several initial DACA requests that were denied because the requestor either made false statements or committed fraud in other immigration or non-immigration government contexts, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 10**

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 10**

---

[1] Defs.' Sur-reply in Opp'n to Pls.' Mot. for Prelim. Inj., Ex. 44, *Texas v. U.S.*, 86 F.Supp.3d 591 (2015) (No. 1:14-cv-254), ECF No. 130-11.

11

Defendants specifically object to Interrogatory No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (over 2,000 cases), as set forth in the attached

NJAPP0788

declaration. *See* Dkt. 97. Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 10, the number of denials of DACA renewal requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 4 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 10**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Denials by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 11**

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

13

NJAPP0789

**OBJECTION TO INTERROGATORY NO. 11**

Defendants specifically object to Interrogatory No. 11 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 11 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial [DACA applications]," "accepted," "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to subparts a. through g. of this Interrogatory on the grounds that they are overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every initial DACA request from each Plaintiff State (more than 50,000), as set

NJAPP0790

forth in the attached declaration. *See* Dkt. 97. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 11, the number of initial DACA requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

**RESPONSE TO INTERROGATORY NO. 11**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Request for Evidence (RFE) by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 12**

Please identify the number of renewal DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;
c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

15

NJAPP0791

**OBJECTION TO INTERROGATORY NO. 12**

Defendants specifically object to Interrogatory No. 12 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 12 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [DACA applications]," "accepted," and "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC,* Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.,* 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.,* Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to subparts a. through g. of Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.,* Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every DACA renewal request from each Plaintiff State (more than 9,000), as set

NJAPP0792

forth in the attached declaration. *See* Dkt. 97. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 12, the number of DACA renewal requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

## RESPONSE TO INTERROGATORY NO. 12

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Request for Evidence (RFE) by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## INTERROGATORY NO. 13

Please identify the number of approved, initial DACA applications submitted by individuals who indicated on their I-821D, in response to Part 3. Question 4., that their immigration status on June 15, 2012 was "Status Expired" or "Parole Expired," and who answered in the affirmative in response to Part 3. Question 5.a. ("Were you EVER issued an Arrival-Departure Record"), for each Plaintiff State for each month during the period of June 2012 to June 2018.

## OBJECTION INTERROGATORY NO. 13

Defendants specifically object to Interrogatory No. 13 to the extent that it uses terms that do not apply to DACA, such as "applications." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in Interrogatory No. 13 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "approved," and "initial [DACA applications]." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter

NJAPP0793

related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a reliable, readily retrievable, systematic and complete manner, the responses to Part 3, Question 4 on the Form I-821D, in the ordinary course of business. USCIS databases also do not electronically capture, in a readily retrievable, systematic manner, responses to Part 3, Question 5a on the Form I-821D for DACA requests that were processed in USCIS' Computer Linked Application Information Management System (CLAIMS 3), in the ordinary course of business. CLAIMS 3 is an electronic case management system. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for every approved initial DACA request for each Plaintiff State (more than 150,000), as set forth in the attached declaration. *See* Dkt. 97.

Federal Defendants will provide a partial response regarding the number of approved initial DACA requests where "Yes" was marked in Part 3, Question 5a. on the Form I-821D, for cases processed in USCIS' Electronic Immigration System (ELIS).  ELIS is an online, electronic account and immigration case management system that stores information submitted or integrated into the system for the processing of specific applications, petitions, or requests. *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

## RESPONSE TO INTERROGATORY NO. 13

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Requests with 'Yes' marked in Part 3 Question 5a 'Were you EVER issued an Arrival-Departure Record' by Month and Selected State, November 1, 2015 - June 22, 2018," which provides information only from ELIS. The data

18

NJAPP0794

provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 14**

Please identify the number of DACA recipients who adjusted their status to lawful permanent resident, for each Plaintiff State for each month during the period of June 2012 to June 2018, and identify among that number:

> a. the number of DACA recipients who adjusted under 8 U.S.C. 1255(i)

> b. the number of DACA recipients who adjusted under 8 U.S.C. 1255(a)

**OBJECTION TO INTERROGATORY NO. 14**

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, whether an individual adjusted status to lawful permanent residence under 8 U.S.C. 1255(a), (i), or another basis, in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every DACA recipient who adjusted status to lawful permanent residence during the specified period for each Plaintiff State (more than 7,000), as set forth in the attached declaration. *See* Dkt. 97.

**RESPONSE TO INTERROGATORY NO. 14**

NJAPP0795

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, I-485, Application to Register Permanent Residence or Adjust Status, DACA Recipients who Adjusted Status by Date of Adjustment and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

NJAPP0796

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I am Tracy Renaud, Acting Deputy Director of USCIS. I believe, based on inquiry, that the foregoing USCIS answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed July 6, 2018.

_(Signature)_

Tracy Renaud
Acting Deputy Director, USCIS

NJAPP0797

<u>SPECIFIC OBJECTIONS AND RESPONSES TO</u>
<u>DEFENDANT-INTERVENORS' THIRD SET OF REQUESTS FOR PRODUCTION</u>

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents relating to guidelines followed by DHS, and any of its subsidiary agencies, departments, agents, and employees, to evaluate, process, and adjudicate Deferred Action for Childhood Arrivals ("DACA") applications, including, but not limited to: (1) internal agency documents, memoranda, and communications that set forth any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications; (2) training materials provided to agents or employees related to DACA evaluations and adjudications; and (3) changes following January 20, 2017 in any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 5:**

Defendants specifically object to Request for Production (RFP) No. 5 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in RFP No. 5 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to guidelines," "to evaluate, process and adjudicate," "guidance, rules or procedures," "training materials," and "changes following January 20, 2017 in any guidance, rules, or procedures." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Federal Defendants object to RFP No. 5 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants further object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97). This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction

NJAPP0798

hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc*., No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS is prepared to provide readily available, final versions of non-case specific responsive documents containing guidelines followed to evaluate, process, and adjudicate DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all emails or other documents "relating to guidelines followed by DHS . . . to evaluate, process, and adjudicate" DACA requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

Due to the breadth of RFP No. 5, including the six years it covers, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" guidelines followed by DHS to evaluate, process, and adjudicate DACA requests that would not be overly broad and result in hundreds of thousands of materials to be reviewed for responsiveness and privileges. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 5 for the period of time from June 2012 through August 2012. ICE has contacted several individuals currently employed by ICE and determined that they have no

23

documents responsive to Request No. 5.  To the extent that responsive documents do exist, they would be among the emails of former ICE employees.  ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).  It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents relating to the process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates, processes, and adjudicates DACA applications, including but not limited to: (1) under what circumstances a DACA application is rejected, denied, or approved; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of DACA applications; (3) the procedure(s) employed by agents and employees who work in the evaluation and adjudication of DACA applications; and (4) changes in the process for evaluating, processing, and adjudicating DACA applications following January 20, 2017.

**OBJECTION TO REQUEST NO. 6:**

Defendants specifically object to Request for Production (RFP) No. 6 to the extent that it uses terms that do not apply to DACA, such as "applications."  DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Federal Defendants object to RFP No. 6 to the extent that the request seeks documents that are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Defendants further object to the following terms in RFP No. 6 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to the process by which … evaluates, processes, adjudicates DACA [applications]," "rejected, denied, or approved," "evaluation and adjudication," and "changes in the process for evaluating, processing, and adjudicating DACA [applications] following January 20, 2017." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendants also object to RFP 6 to the extent that it is unclear what documents Defendant-Intervenor seeks that are different from documents sought in RFP 5, and to the extent that RFPs overlap, or that RFP 6 seeks documents that are duplicative of those sought in RFP 5. Such apparently duplicative and overlapping requests are overly burdensome and confusing for Defendants to interpret and understand how to respond. Defendants further object that the use of the word "and" in "who work in the evaluation and adjudication of DACA applications" is

24

ambiguous and creates confusion.  Defendants do not know whether each such employee noted must do *both* actions, "evaluation *and* adjudication," or whether each employee must be involved at least in either "evaluation" or "adjudication" of DACA requests.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc*., No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible).  More specifically, Federal Defendants object to this Request to the extent it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to subparts (1), (3) and (4), because they are duplicative of RFP No. 5.

USCIS is prepared to provide readily available final versions of non-case specific documents describing the process by which DHS evaluates, processes, and adjudicates DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all email and other documents "relating to the process by which DHS . . . evaluates, processes, and adjudicates DACA" requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

25

Due to the breadth of Request for Production No. 6, which covers six years, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" the process by which DHS evaluates, processes, and adjudicates DACA requests that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 6 for the period of time from June 2012 through August 2012. ICE has contacted several individuals currently employed by ICE and determined that they have no documents responsive to Request No. 6. To the extent that responsive documents do exist, they would be among the emails of former ICE employees. ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

**REQUEST FOR PRODUCTION NO. 7:**

Produce documents showing the number of DACA applications received, rejected, denied, and approved, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; (2) the number of renewal DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; and (3) the number of DACA applications accepted but denied, during the period of June 2012 to June 2018, after the adjudicator determined the applicant met the five criteria in the June 15, 2012 DACA memorandum but was otherwise not a qualifying applicant, including because the applicant posed a threat to national security or public safety, by each Plaintiff state, for each month.

**OBJECTION TO REQUEST NO. 7:**

Defendants specifically object to Request for Production (RFP) No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period

26

from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA.  Defendants further object to the following terms in RFP No. 7 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendant also objects that the phrase "met the five criteria in the June 15, 2012 DACA memorandum," is ambiguous, and Defendant is without sufficient knowledge to know exactly which "five criteria" Defendant-Intervenor is referencing with this phrase.  The reference to the "June 15, 2012 DACA memorandum" lacks specificity, and thus is ambiguous, but Defendants will interpret it to mean the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

NJAPP0803

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendant-Intervenors to the responses to Interrogatories and the following pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

**REQUEST FOR PRODUCTION NO. 8:**

Produce all documents relating to process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates and adjudicates applications or requests for deferred action other than DACA, including but not limited to: (1) under what circumstances an application or request is rejected, denied, or accepted; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of deferred action applications or requests; (3) and the procedure(s) employed by agents and employees who work in the evaluation and adjudication of deferred action applications or requests; and (4) any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 8:**

Defendants specifically object to Request for Production (RFP) No. 8 to the extent that it uses terms that do not apply to DACA or to deferred action generally, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. Non-DACA deferred action is also made by written request, not an application, to DHS. As such, neither DACA, nor non-DACA deferred action is

28

obtained through an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications…for deferred action other than DACA" to mean written requests for non-DACA deferred action.  Defendants further object to the following terms in RFP No. 8 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendants common use of the terms in its agency practices regarding deferred action: "evaluates," "adjudicates," "rejected,", "denied," "accepted," "evaluation and adjudication of deferred action applications or requests," "procedures(s) employed by…who work in the evaluation and adjudication of deferred action," and "any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017."  Defendants' response is based on Defendants' common usage of such terms in its agency practices. Federal Defendants object to RFP No. 8 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).  This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case and is outside the scope of the relief sought in this action.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent that it seeks every deferred action request that was ever denied. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

29

USCIS is prepared to provide readily available, final versions of non-case specific documents regarding the process by which USCIS evaluates, processes, and adjudicates requests for deferred action other than DACA, that were in existence and in use at any time between January 1, 2016 and June 22, 2018, and that are maintained by custodians who are currently employed by USCIS. USCIS will not conduct a comprehensive search for all emails or other documents "relating to [the] process by which DHS . . . evaluates and adjudicates" non-DACA deferred action requests, or conduct a comprehensive search for records that were maintained by former USCIS employees. Due to the breadth of this Request, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails relating to the process by which DHS evaluates and adjudicates requests for deferred action other than DACA that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges, or risk being under-inclusive in scope. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS, and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS or DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In addition to the responsive documents being produced, USCIS respectfully refers Defendant-Intervenors to the following publicly available information:

- Memorandum from Stuart Anderson, Executive Associate Commissioner, Office of Policy and Planning, INS, "Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status," May 8, 2002, 81 FR 92266 at 92279 (https://www.regulations.gov/document?D=USCIS-2011-0010-0004)
- "New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for 'T' Nonimmigrant Status," 67 Fed. Reg. 4784, 4790 (Jan. 31, 2002)
- "New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status," 72 FR 53014-01 (Sept. 17, 2007)

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents relating to the number of DACA applications received, rejected, denied, and approved at each of the five USCIS Service Centers, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018; and (2) the number of renewal DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018.

**OBJECTION TO REQUEST NO. 9:**

Defendants specifically object to Request for Production (RFP) No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be

NJAPP0806

submitted by certain individuals brought to the United States as children who seek DHS'
prosecutorial discretion not to subject them to removal action for a two-year period from
approval of the request.  As such, it is not an immigration benefit "application." For purposes of
responding to this RFP only, however, Defendants will interpret "applications" to mean such
requests for DACA.  Defendants further object to the following terms in RFP No. 9 to the extent
that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the
extent that Defendant-Intervenor intends them to have meaning that does not comport with
Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial
DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and
"approved."  Defendants' response is based on Defendant USCIS' common usage of such terms
in its DACA agency practices.

Federal Defendants object to this Request on the grounds that it is inconsistent with the
Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This
Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R.
Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case
No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's
discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish
their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives
Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for
expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v.
Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3
(E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests
were overly broad and not reasonably tailored to the specific issues to be addressed at the
preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to
the extent that it seeks to compel them to search for non-final, draft documents, to search for
documents maintained by custodians who are former USCIS employees, or compel the
production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad,
burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1)
("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's
claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v.
Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017)
("The intent of the recent amendments is to being about a change in the legal culture that
embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this RFP to the extent it seeks statistics that are
duplicative of information that is being provided in response to the Interrogatories. Federal
Defendants also object to this RFP as vague and ambiguous as to the time period for which it
requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms
sufficiently tailored to capture all responsive documents that would not be overly broad and
result in potentially hundreds of thousands of materials to be reviewed for responsiveness and
privileges. It would be unduly burdensome and not proportional to the needs of this case for

31

USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to the pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

**REQUEST FOR PRODUCTION NO. 10:**

Produce all documents relating to the USCIS processing time of accepted and approved DACA applications, including but not limited to: (1) the amount of time that elapses between the date USCIS accepts an application and the time the application is approved; (2) the amount of time that elapses between the date USCIS approves an application and an applicant receives an employment authorization document; and (3) any changes in the processing time described above since January 20, 2017.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 10:**

Defendants specifically object to Request for Production (RFP) No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in RFP No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "processing time," "accepted," "approved," and "any changes in the processing time described above since January 20, 2017."  Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices   Defendants also object that "amount of time that elapses" is vague and undefined, and therefore ambiguous.

32

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97). This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to the extent this Request seeks documents duplicative of information provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to its responses to the Interrogatories and publicly available documents on the following pages of the USCIS website:

33

- Website for checking current case processing times: https://egov.uscis.gov/processing-times/
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

34

Dated: July 6, 2018                          Respectfully submitted,

                                             CHAD A. READLER
                                             Acting Assistant Attorney General
                                             Civil Division
                                             BRETT A. SHUMATE
                                             Deputy Assistant Attorney General
                                             WILLIAM C. PEACHEY
                                             Director, Office of Immigration Litigation
                                             District Court Section

                                             /s/ *Jeffrey S. Robins*
                                             JEFFREY S. ROBINS
                                             Attorney-in-Charge
                                             Assistant Director
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation
                                             District Court Section
                                             P.O. Box 868, Washington, DC 20044
                                             Telephone: (202) 616-1246
                                             Facsimile: (202) 305-7000
Attorneys for Federal Defendants             jeffrey.robins@usdoj.gov

NJAPP0811

# Exhibit 69

NJAPP0812

 Neutral
As of: August 3, 2018 8:10 PM Z

# *McGinley v. Houston*

United States District Court for the Southern District of Alabama, Southern Division

August 27, 2003, Decided

CIVIL ACTION 03-0563-WS-M

**Reporter**

2003 U.S. Dist. LEXIS 14947 *

KELLY McGINLEY, et al., Plaintiffs, v. GORMAN HOUSTON, Senior Associate Justice of the Alabama Supreme Court, et al., Defendants.

**Prior History:** *Glassroth v. Moore, 278 F. Supp. 2d 1272, 2003 U.S. Dist. LEXIS 14637 (M.D. Ala., 2003)*

**Disposition:** **[*1]** Defendants' Motion to Dismiss granted and action dismissed without prejudice.

## Core Terms

injunction, Monument, district court, venue, plaintiffs', orders, resides, exercising jurisdiction, issues, temporary restraining order, decisions, declining, binding, lawsuit, parties, removal, defendants', religion, comity, courts, orderly administration of justice, asserting, reasons, enjoin, judicial district, rendering court, district judge, principles, restrained, situated

## Case Summary

### Procedural Posture

Plaintiffs asserted a claim under *42 U.S.C.S. § 1983* against defendant Associate Justices of the Alabama Supreme Court, in their official capacities, seeking to enjoin them from enforcing an injunction to remove a Ten Commandments monument from the Alabama State Judicial Building. The Associate Justices filed a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1), 12(b)(3),* and *12(b)(6).*

### Overview

One day after a deadline set by a judge of the United States District Court for the Middle District of Alabama ordering the removal of the monument, the eight Associate Justices of the Supreme Court of Alabama countermanded the administrative decision of the Chief Justice to disregard the federal court's injunction. The

United States District Court for the Southern District of Alabama concluded that it did not have jurisdiction over plaintiffs' claims. In effect, the plaintiffs were asking the court to invalidate the injunction entered by the judge (and upheld by the court of appeals) in an earlier case. However, the court lacked the power to do so. Alternatively, the court founds that venue was not proper in the Southern District since the residency of the Associate Justices for venue purposes, since they were sued in their official capacity, was the place where they performed their official duties: the Middle District of Alabama.

### Outcome

The Associate Justices' motion to dismiss for lack of jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)* was granted and the action was dismissed without prejudice.

## LexisNexis® Headnotes

Civil Procedure > Judicial Officers > Judges > General Overview

Governments > Courts > Judges

Governments > Courts > Judicial Precedent

*https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=LNHNREFclscc1*[⬇]
 Judicial Officers, Judges

The law does not allow a party to file a "horizontal appeal" from one district judge to another judge of the same rank, nor can a district judge overturn the decision of an appellate court in that circuit.

2003 U.S. Dist. LEXIS 14947, *1

Civil
Procedure > Remedies > Injunctions > Mandatory
Injunctions

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc2*[⬇️]
 **Injunctions, Mandatory Injunctions**

A district court is without jurisdiction to afford relief from
a mandatory injunction issued by a federal district court
sitting elsewhere.

Civil
Procedure > Remedies > Injunctions > Mandatory
Injunctions

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc3*[⬇️]
 **Injunctions, Mandatory Injunctions**

Persons subject to an injunctive order issued by a court
with jurisdiction are expected to obey that decree until it
is modified or reversed, even if they have proper
grounds to object to the order.

Governments > Courts > Judicial Precedent

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc4*[⬇️]
 **Courts, Judicial Precedent**

Until its decision is reversed for error by orderly review,
either by itself or by a higher court, a federal district
court's orders based on its decision are to be respected.

Civil Procedure > ... > Removal > Postremoval
Remands > Jurisdictional Defects

Governments > Courts > Judicial Comity

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > General Overview

Governments > Courts > Judicial Precedent

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc5*[⬇️]
 **Postremoval Remands, Jurisdictional Defects**

When a party effectively requests that one court grant it
relief from an injunction or judgment entered by another
court, considerations of comity and orderly
administration of justice demand that the nonrendering
court should decline jurisdiction of such an action and
remand the parties for their relief to the rendering court,
so long as it is apparent that a remedy is available
there.

Governments > Courts > Judicial Precedent

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc6*[⬇️]
 **Courts, Judicial Precedent**

Decisions of the United States Court of Appeals for the
Fifth Circuit rendered on or before September 30, 1981
constitute binding precedent in the Eleventh Circuit.

Civil Procedure > Judicial
Officers > Judges > General Overview

Governments > Courts > Judges

Governments > Courts > Judicial Precedent

*https://advance.lexis.com/api/document?collection=
cases&id=urn:contentItem:49F8-F9R0-0038-Y400-
00000-00&context=&link=LNHNREFclscc7*[⬇️]
 **Judicial Officers, Judges**

Federal district courts have a responsibility to litigants
and to our system of justice not to countermand their
brother and sister courts' decisions. An unsuccessful
plaintiff ought not be able to flit from one federal trial
judge to the next, finally seizing upon a favorable ruling
by one judge allowing him to do that which other judges
have expressly forbidden him from doing. Likewise, a
defendant ought not be impaled on the horns of an
intractable dilemma by being ordered to take
diametrically opposite action by two lateral courts of
coextensive power and authority. The rule of law
demands orderly, consistent administration of justice. In
turn, the orderly, consistent administration of justice

obliges a district court to respect the ruling of its peer tribunal in a particular matter, staying its hand by declining jurisdiction rather than creating a risk of conflicting orders in the same matter.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Remedies > Injunctions > Mandatory Injunctions

*https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=LNHNREFclscc8*[⬇]
**Standards of Review, Clearly Erroneous Review**

The United States Supreme Court has recognized that a court has the power to revisit its own previous decisions in extraordinary circumstances, such as where the initial decision was clearly erroneous and would work a manifest injustice. More importantly, there is no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Religion > Establishment of Religion

Constitutional Law > ... > Case or Controversy > Constitutional Questions > General Overview

*https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=LNHNREFclscc9*[⬇]
**Freedom of Religion, Establishment of Religion**

The fundamental and longstanding principle of judicial

restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.

**Counsel:** For Bernard Harwood, Defendant: Charles Brinsfield Campbell, John J. Park, Jr., LEAD ATTORNEYS, Office of the Attorney General, State of Alabama, Montgomery, AL.

For Kelly McGinley, Plaintiff: Brian R. Chavez-Ochoa, LEAD ATTORNEY, Valley Springs, CA.

For Kelly McGinley, Plaintiff: James W. Zeigler, LEAD ATTORNEY, Mobile, AL.

**Judges:** WILLIAM H. STEELE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM H. STEELE

# Opinion

<u>ORDER</u>

This matter is before the Court on the defendants' Motion to Dismiss (doc. 8) pursuant to *Rules 12(b)(1)*, *12(b)(3)*, and *12(b)(6) of the Federal Rules of Civil Procedure*.

## I. Overview.

The defendants have filed a motion asking the Court to dismiss the plaintiffs' lawsuit for several reasons. In light of the immediate and irreparable harm the plaintiffs claim to be facing, the Court has considered the motion on expedited basis to safeguard the rights of all parties.

Upon consideration, the Court concludes that it does not have jurisdiction over plaintiffs' claims. In effect, the plaintiffs are asking the Court to invalidate the injunction entered by the judge (and upheld **[*2]** by the court of appeals) in the *Glassroth* case. However, the Court lacks the power to do so. *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc1*[⬆] The law does not allow a party to file a "horizontal appeal" from one district judge to another judge of the same rank, nor can a district judge overturn the decision of an appellate court in that circuit. The *Glassroth* order will remain in place no matter what this Court does or does not do.

2003 U.S. Dist. LEXIS 14947, *2

That being the case, if the Court were to grant the plaintiffs the relief they seek and order the defendants not to remove the monument, chaos would ensue. The defendants would be forced to choose which of two binding, conflicting court orders to follow. They would be in violation of one of those orders no matter what they did. Under these circumstances, the orderly administration of justice and the respect for the rule of law demand that this Court not exercise jurisdiction over the plaintiffs' claims.

Alternatively, the Court finds that venue is not proper in this District. In other words, the plaintiffs have not satisfied the technical, statutory requirements for bringing this case here, as opposed to the Middle District of Alabama, seated in Montgomery, Alabama. None of the events, occurrences [*3] and property that are relevant to this case happened or may be found in this District. The defendants do not reside in this District. Because the defendants objected to venue on a timely basis, the Court finds that the venue statute entitles them to defend this case in the Middle District, not in the Southern District.

Both the jurisdiction and the venue issues lead to the same result. Accordingly, the Court **grants** the defendants' Motion to Dismiss, and **dismisses** this case **without prejudice.** If they so choose, plaintiffs may refile this case in the Middle District of Alabama immediately. This ruling does not address the merits of the case. The Court offers no opinion as to whether plaintiff's *First Amendment* argument is valid or whether plaintiffs can establish a constitutional deprivation of any stripe. Those questions are properly addressed to the Middle District of Alabama, in the first instance, and principles of judicial restraint require the Court to refrain from addressing those topics.

In light of the Court's ruling, the hearing on plaintiffs' Application for Temporary Restraining Order that had been set for Wednesday, August 27, 2003 at 3:00 p.m. is **[*4] canceled.**

## II. Procedural History.

A. The *Glassroth* Litigation.

On August 1, 2001, Roy S. Moore, Chief Justice of the Alabama Supreme Court, unveiled a 5,280-pound granite monument (the "Monument") in the rotunda of the Alabama State Judicial Building in Montgomery, Alabama. Located directly across from the main entrance of the building, the Monument is shaped like a cube, approximately three feet deep by four feet tall,

with two rounded tablets carved into its sloping top. These tablets are engraved with the Ten Commandments, while the sides of the Monument bear quotations "generally proclaiming the primacy of the law of God over the law of the citizenry." (Complaint, at 2.) According to the plaintiffs in this case, "the monument is intended to proclaim the Ten Commandments as the cornerstone of the judicial foundation of this nation and country." (*Id.*)

After the Monument was installed, three practicing attorneys in the Alabama courts - Stephen R. Glassroth, Melinda Maddox, and Beverly Howard - brought two separate actions against Justice Moore pursuant to *42 U.S.C. § 1983*, asserting that placement of the Monument in the rotunda violates [*5] their rights under the *Establishment Clause of the First Amendment*, made binding on the states through the *Fourteenth Amendment to the U.S. Constitution*. These consolidated lawsuits (collectively referred to herein as *Glassroth*) were filed in the U.S. District Court of the Middle District of Alabama, and were assigned to U.S. District Judge Myron Thompson.

Following a seven-day bench trial, Judge Thompson concluded that Justice Moore's fundamental purpose in displaying the Monument was non-secular, and that the Monument's primary effect was to advance religion. *Glassroth v. Moore, 229 F. Supp.2d 1290, 1299, 1304 (M.D. Ala. 2002)*. Based on his determination that the Monument is violative of the *Establishment Clause*, on November 18, 2002 Judge Thompson entered a "declaration that Justice Moore's placement of his Ten Commandments monument in the Alabama State Judicial Building was unconstitutional," and allowed him 30 days to remove it. *Id. at 1319*.

Justice Moore did not remove the Monument in response to Judge Thompson's Order and Judgment of November 18. Accordingly, on December 19, 2002, Judge Thompson entered a "Final Judgment and Injunction" [*6] enjoining and restraining Justice Moore from failing to relocate the Monument by no later than January 3, 2003. *Glassroth v. Moore, 242 F. Supp.2d 1067 (M.D. Ala. 2002)*. On December 23, 2002, upon motion by Justice Moore, Judge Thompson ordered that the permanent injunction be stayed pending appeal to the U.S. Court of Appeals for the Eleventh Circuit. *Glassroth v. Moore, 242 F. Supp.2d 1068, 1070 (M.D. Ala. 2002)*.

Just over six months later, a panel of the Eleventh Circuit affirmed Judge Thompson's order enjoining

NJAPP0816

2003 U.S. Dist. LEXIS 14947, *6

Justice Moore from failing to remove the Monument from public areas of the Judicial Building. *Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003)*. In so doing, the panel specifically held the Monument to be a violation of the *Establishment Clause*. *Id. at 1297*. The Eleventh Circuit concluded its opinion by expressing its expectation that "if he is unable to have the district court's order overturned through the usual appellate processes, when the time comes Chief Justice Moore will obey that order. If necessary the court order will be enforced. The rule of law will prevail." *Id. at 1303.* **[*7]**

On August 5, 2003, Judge Thompson, having received the appellate mandate of the Eleventh Circuit, entered a "Final Judgment and Injunction," providing in pertinent part that:

> "Having found that defendant Roy S. Moore, Chief Justice of the Alabama Supreme Court, violated the *Establishment Clause of the First Amendment to the United States Constitution* by placing a Ten Commandments monument in the rotunda of the Alabama Judicial Building, … it is the ORDER, JUDGMENT and DECREE of the Court as follows:
>
> ***
>
> "Defendant Roy S. Moore, his officers, agents, servants, and employees, and those persons in active concert or participation with him who receive actual notice of this injunction, be and they are each ENJOINED and RESTRAINED from failing to remove, by no later than August 20, 2003, the Ten Commandments monument at issue in this litigation from the non-private areas of the Alabama State Judicial Building."

*Glassroth v. Moore,      F. Supp.2d    , 275 F. Supp. 2d 1347, 2003 U.S. Dist. LEXIS 13907, *6 (M.D. Ala. Aug. 5, 2003)*. The Court understands that Justice Moore's direct appeal of Judge Thompson's injunction is ongoing and that he intends to file a **[*8]** petition for writ of certiorari in the United States Supreme Court. In the interim, however, no court at any level has entered a stay or otherwise excused Justice Moore from full compliance with Judge Thompson's injunction of August 5, 2003.

To date, the Monument has not been removed from the public areas of the Alabama State Judicial Building.

B. The Associate Justices' Order.

On August 21, 2003, one day after the deadline ordered

by Judge Thompson for removing the Monument, the eight Associate Justices of the Supreme Court of Alabama entered Order No. 03-01, in which they opined that "the refusal of officers of this Court to obey a binding order of a federal court of competent jurisdiction would impair the authority and ability of all of the courts of the State to enforce their judgments." (Order No. 03-01, at p. 6.) In light of this and other findings, the Associate Justices ordered that "the administrative decision of the Chief Justice to disregard the writ of injunction of the United States District Court for the Middle District of Alabama be, and the same hereby is, COUNTERMANDED" and that the Building Manager for the Judicial Building "take all steps necessary to comply **[*9]** with the injunction as soon as practicable." (*Id.* at p. 7.)

C. The *McGinley* Action.

On the afternoon of August 25, 2003, plaintiffs Kelly McGinley and Richard C. Dorley-residents of Mobile, Alabama and Tallassee, Alabama, [1] **[*10]** respectively - filed the instant Complaint in this Court, asserting a claim under *42 U.S.C. § 1983* against the Associate Justices of the Alabama Supreme Court, in their official capacities. Plaintiffs contend that the Associate Justices' announced intention of complying with Judge Thompson's injunction "clearly suggests that adherence to the religion of nontheistic beliefs is a prerequisite or an advantage to those seeking justice in Alabama." (Complaint, at P 20.) Plaintiffs further maintain that "removal of the Ten Commandments Monument constitutes an impermissible endorsement of the religion of nontheistic beliefs by the state" and would itself violate plaintiffs' rights under the *Establishment Clause.* (Complaint, at P 21.) [2]

In their Prayer for Relief, plaintiffs request a permanent

---

[1] Of course, Mobile lies in the Southern District of Alabama. Tallassee, however, is located in the Middle District of Alabama.

[2] Tellingly, the Complaint also asserts that "display of the Ten Commandments Monument in the Alabama State Judicial Building does not create an excessive entanglement of government with religion." (Complaint, at P 24.) This language strongly suggests that, even though they characterize this case as concerning whether the removal of the Monument violates the *Establishment Clause*, plaintiffs in fact intend to litigate the issue of whether the display of the Monument violates the *Establishment Clause*. Of course, that precise issue has already been decided by Judge Thompson and the Eleventh Circuit in the *Glassroth* litigation.

injunction requiring defendants "to refrain from and ease *[sic]* any efforts to remove the Ten Commandments Monument." (Complaint, at pp. 8-9.) Along with their Complaint, plaintiffs filed an Application for Temporary Restraining Order (doc. 6) requesting that defendants be restrained from removing the Monument from the rotunda of the Judicial Building, and asserting that in the absence of a temporary **[*11]** restraining order, defendants will cause the Monument to be moved, as a result of which plaintiffs would sustain irreparable harm. (Application for TRO, at p. 2.) [3]

**[*12]** Upon the filing of this Complaint and in regard for plaintiffs' claimed constitutional deprivation, the Court promptly scheduled a hearing on plaintiffs' Application for Temporary Restraining Order. In a conference call initiated by the Court with participation by counsel for both parties on August 25, the parties agreed to set this matter for hearing on August 27, 2003 at 3:00 p.m.

At approximately 2:00 p.m. on August 26, 2003, defendants filed a Motion to Dismiss, a supporting Memorandum of Law, and an Opposition to the Application for Temporary Restraining Order. [4] The

---

[3] A fair reading of the Memorandum of Law accompanying the Application for Temporary Restraining Order suggests that the true target of this lawsuit is not the Associate Justices, but rather the injunction entered by Judge Thompson and affirmed by the Eleventh Circuit in *Glassroth*. For example, plaintiffs argue as follows:

> "Here, the federal court in Montgomery has, in effect, respected one religion over another. By forcing out the Ten Commandments and replacing it with nothing (but in reality the nothing is the false god of nontheistic religion), the court has declared that the Lord God shall be removed from the public square and that the false god of nontheistic religion shall be the false god that the Alabama Supreme Court and society shall serve."

(Memorandum in Support of Motion for Temporary Restraining Order, at p. 9.) Thus, it is apparent from the face of their submissions that plaintiffs are asking this Court for not only an order restraining the Associate Justices, but also one whose effect is to restrain, negate or invalidate Judge Thompson's order, and presumably that of the Eleventh Circuit as well.

[4] Being cognizant of plaintiffs' claims of irreparable harm and constitutional deprivations absent immediate relief, the Court has reviewed and considered the Motion to Dismiss on an expedited basis. In so doing, the Court intends to minimize any delay or hardship that plaintiffs might otherwise incur if their Complaint and applications for *Rule 65* relief were held in suspended animation while the Motion to Dismiss is taken

Motion asserts that this Court lacks subject-matter jurisdiction (warranting dismissal under *Rule 12(b)(1), Fed.R.Civ.P.*), that venue does not properly lie in the Southern District of Alabama (warranting dismissal under *Rule 12(b)(3)*), and that the Complaint fails to state a claim upon which relief can be granted (warranting dismissal under *Rule 12(b)(6)*). Upon careful review of the legal issues raised by defendants' Motion, the Court is of the opinion that it should decline to exercise jurisdiction over this dispute and that venue is not proper in this District.

**[*13] III. Jurisdictional Issues.**

Reducing the claims to their essence, it is apparent that plaintiffs seek an injunction barring defendants from complying with the injunction entered by Judge Thompson of the Middle District of Alabama, and affirmed by the Eleventh Circuit Court of Appeals. [5]

**[*14]** A. The Status of the *Glassroth* Injunction.

Despite their strident expressions of dissatisfaction with the outcome of the *Glassroth* litigation to date, plaintiffs cannot ask this Court to reverse, overrule, invalidate or modify the ruling of Judge Thompson. The law is clear that the Court lacks the authority to do so. *See, e.g., Green v. Citigroup, Inc., 68 Fed. Appx. 934, 936 (10th Cir. June 25, 2003)* ("It is axiomatic that one district court has no jurisdiction to review the decision of another district court."); *Carter v. U.S., 733 F.2d 735, 736 (10th Cir. 1984)* (finding that *https://advance.lexis.com/api/document?collection= cases&id=urn:contentItem:49F8-F9R0-0038-Y400- 00000-00&context=&link=clscc2*[⬆] a district court is without jurisdiction to afford relief from a mandatory injunction issued by a federal district court sitting

---

under submission.

[5] This observation is valid, notwithstanding plaintiffs' framing of their objective as being merely to prevent defendants from removing the Monument. The Associate Justices' order dated August 21, 2003 plainly reflects that they are ordering the removal of the Monument for the sole purpose of complying with Judge Thompson's injunction, not in furtherance of their personal religious or constitutional viewpoints or other agendas. Indeed, defendants' Motion to Dismiss and related filings make clear that they are "complying with a federal injunction, with which the defendants do not necessarily agree." (Motion to Dismiss, at P 2.) Thus, ordering defendants not to move the Monument and ordering them not to abide by Judge Thompson's injunction are functional equivalents in all respects.

elsewhere); *In re. Persico, 362 F. Supp. 713, 714 (E.D.N.Y. 1973)* ("Judges of coordinate jurisdiction do not, except in the most extraordinary situations, have the function of reviewing each other's orders."); *United States v. Rabin, 263 F. Supp. 989, 990 (S.D. Fla. 1966)* (district court lacks jurisdiction to review ruling entered by another district court); *In re. Pusser, 123 F. Supp. 164, 167 (E.D.S.C. 1954)* **[*15]** (declaring in response to litigant's request that court revoke another judge's restraining order, "I have no power or authority to amend, modify or revoke an order of another United States District Judge"); *United States v. American Radiator & Standard Sanitary Corp., 388 F.2d 201, 203-04 (3rd Cir. 1967)* (noting that within a single circuit, there is rarely need or justification for one district court to interfere with the course of litigation pending in another); *Johnson v. England, 356 F.2d 44, 52 (9th Cir. 1966)* (deeming it "improper" for one district court to decline to follow prior order made by another district court staying an action in bankruptcy). More generally, an oft-cited principle of law dictates that judges of coordinate jurisdiction ought not overrule each other's decisions. *United States v. Koenig, 290 F.2d 166, 172 (5th Cir. 1961)*; *TCF Film Corp. v. Gourley, 240 F.2d 711, 713-14 (3d Cir. 1957)*; *De Maurez v. Swope, 110 F.2d 564, 565 (9th Cir. 1940)* (commenting in passing that it is "highly indiscreet and injudicious for one judge of equal rank and power to review identical matters **[*16]** passed upon by his colleague"). Accordingly, regardless of what action this Court may or may not take in this case, Judge Thompson's injunction will remain in full force and effect, and will continue to be binding on defendants unless and until Judge Thompson or a higher court rules otherwise.


## B. The Risk of Conflicting Orders.

This fact places defendants in a most untenable position. After all, *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc3*[⬆] "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of United States, Inc., 445 U.S. 375, 386, 100 S. Ct. 1194, 63 L. Ed. 2d 467 (1980)*. It is for the Middle District in the first instance to address the constitutionality of the placement or removal of the Monument. *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-*

*00000-00&context=&link=clscc4*[⬆] "Until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." *Celotex Corp. v. Edwards, 514 U.S. 300, 313, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995)* (quoting *Walker v. Birmingham, 388 U.S. 307, 314, 18 L. Ed. 2d 1210, 87 S. Ct. 1824 (1967)).* **[*17]** Assuming *arguendo* that the Court were to find in plaintiffs' favor and enjoin defendants from moving the Monument, what are the defendants to do? If they honored this Court's injunction, then they would be in violation of the corresponding injunction entered by Judge Thompson and upheld by the Eleventh Circuit. If they adhered to Judge Thompson's injunction at the expense of this Court's, then they would undoubtedly face contempt sanctions from this Court. In short, defendants would find themselves in the middle of an inter-district game of tug o' war, buffeted by conflicting and countervailing judicial forces in Mobile and Montgomery. Defendants would be in violation of an injunction no matter what they did, and would be forced to decide which of two binding federal orders they wished to flout.


## C. Comity and the Orderly Administration of Justice.

Fortunately, our legal system does not foist such a Hobson's choice on litigants. *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc5*[⬆] When a party effectively requests that one court grant it relief from an injunction or judgment entered by another court, "considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction **[*18]** of such an action and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there." *Lapin v. Shulton, Inc., 333 F.2d 169, 172 (9th Cir.)*, cert. denied, 379 U.S. 904, 85 S. Ct. 193, 13 L. Ed. 2d 177 (1964); *see also Carter v. Attorney General of United States, 782 F.2d 138, 142 n.4 (10th Cir. 1986)* (same); *Treadaway v. Academy of Motion Picture Arts and Sciences, 783 F.2d 1418, 1422 (9th Cir. 1986)* (holding that district court did not abuse discretion in declining to exercise jurisdiction over a request to review another district court's decision, reasoning that "when a court entertains an independent action for relief from the final order of another court, it interferes with and usurps the power of the rendering court just as much as it would if it were reviewing that court's equitable decree"); *Ord v. United States, 8 Fed. Appx. 852, 854 (9th Cir. Apr. 13, 2001)* (where heart of complaint was request that court

invalidate an order entered by another court, district court properly dismissed action based on principles of judicial comity, fairness **[\*19]** and efficiency, all underlying the basic rule against horizontal appeals); *Zdrok v. V Secret Catalogue, Inc., 215 F. Supp.2d 510, 515 (D.N.J. 2002)* (declining to disturb judgment entered by district court in Ohio, based on principles of judicial comity, where contrary action would usurp the power of the rendering court, and declining to exercise jurisdiction over independent collateral attack on that basis). [6]

   **[\*20]** Along those lines, a hoary decision from the Fifth Circuit [7] is quite instructive. In *Louisville & N.R. Co. v. Western Union Telegraph Co., 233 F. 82 (5th Cir. 1916)*, a federal district court in Kentucky had enjoined and restrained the appellant from taking possession of the

_____

[6] A host of other federal courts facing analogous situations have reached similar conclusions. *See, e.g., Green, 68 Fed. Appx. at 936* (finding that district court in Oklahoma properly declined to exercise jurisdiction over lawsuit seeking relief from judgments entered by district courts in Texas, and that action was properly dismissed without prejudice); *Martin-Trigona v. United States, 250 U.S. App. D.C. 272, 779 F.2d 72, 73 (D.C. Cir. 1985)* (affirming denial of leave to file complaints in district court for the District of Columbia where plaintiff sought to be excused from compliance with injunction previously entered against him by District of Connecticut, where considerations of comity, consistency of treatment, and orderly administration of justice require that such argument be directed to the *District of Connecticut); Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 408 (5th Cir. 1971)* (district court in one jurisdiction should not seriously interfere with or usurp the continuing power of another district court to supervise its injunction, but should instead decline jurisdiction and remand the parties to the rendering court if a remedy is available there); *American Radiator, 388 F.2d at 203-04 (3d Cir. 1967)* (where one district court is asked to enjoin proceedings in a sister district court, which injunctive relief has already been denied by the sister court, court should stay its hand, as proper procedure for aggrieved parties is to apply to reviewing court, not a coordinate tribunal); *see generally New Orleans Public Service, Inc. v. Majoue, 802 F.2d 166, 167 (5th Cir. 1986)* (district court should dismiss lawsuit seeking injunction of state court proceedings where suit is improper attempt to seek collateral review of prior remand order entered by district court).

[7] *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc6*[⬆]] Decisions of the Fifth Circuit rendered on or before September 30, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)*.

appellee's poles, wires and other telegraphic apparatus located on appellant's property. Unhappy with the outcome in that forum, the appellant filed a separate lawsuit in federal court in Mississippi seeking an injunction ordering the appellee to refrain from maintaining and operating its telegraphic equipment on appellant's property. The Fifth Circuit found that such a claim was not cognizable, reasoning that "we think it is apparent that *the necessary effect of granting the relief which the supplemental bill prayed would be to enable the appellant to do, under the protection of the orders of one court, what it has been forbidden to do by a valid order of another court,* which is in full force and effect. A bill, the object of which is to bring about such a result, is not maintainable." *Id. at 84* (emphasis added).

   **[\*21]** These judicial guideposts were echoed more recently in *Feller v. Brock, 802 F.2d 722 (4th Cir. 1986)*, in which the U.S. Department of Labor faced a binding, final injunction issued by a district court in the District of Columbia not to certify certain apple growers in its temporary foreign worker program. In response to that injunction, certain growers who were not parties to the D.C. proceedings and whom the DOL could not certify as a result of the D.C. injunction sued in federal district court in West Virginia seeking a preliminary injunction barring the DOL from refusing to certify them. The West Virginia court granted an injunction. On appeal, the Fourth Circuit reversed on an abuse of discretion standard, reasoning as follows:

   "… Issuance of the preliminary injunction did a grave disservice to the public interest in the orderly administration of justice. Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders ?. Whatever its label, there is an underlying policy of judicial administration which counsels against the creation of conflicts such as the one at bar."

*Id. at 727-28*. In light **[\*22]** of this conclusion, the *Feller* court vacated the injunction, strongly suggesting that the district court consider following *Lapin* and declining to exercise jurisdiction over the action given that the plaintiffs could seek redress from the court in D.C. *Feller, 802 F.2d at 728-29*.

A common thread runs through all of these decisions. That theme is the amorphous, ill-defined but still very tangible notion that *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc7*[⬆]] federal district

Case 1:18-cv-00068   Document 286-1   Filed on 08/03/18 in TXSD   Page 163 of 177

Page 9 of 12
2003 U.S. Dist. LEXIS 14947, *22

courts have a responsibility to litigants and to our system of justice not to countermand their brother and sister courts' decisions. An unsuccessful plaintiff ought not be able to flit from one federal trial judge to the next, finally seizing upon a favorable ruling by one judge allowing him to do that which other judges have expressly forbidden him from doing. Likewise, a defendant ought not be impaled on the horns of an intractable dilemma by being ordered to take diametrically opposite action by two lateral courts of coextensive power and authority. The rule of law demands orderly, consistent administration of justice. In turn, the orderly, consistent administration of justice obliges a district court to respect the ruling of its peer tribunal in [*23] a particular matter, staying its hand by declining jurisdiction rather than creating a risk of conflicting orders in the same matter.

D. Declining to Exercise Jurisdiction.

Considered *in toto,* these concepts militate in favor of the Court declining to exercise jurisdiction over this dispute. Such a result is both just and fair. Despite being cloaked in the garb of an independent action brought by parties separate and distinct from those in *Glassroth,* this case is at its core a thinly veiled attempt to countermand Judge Thompson's injunction. Principles of substantive and procedural law, equity and common sense are fully aligned in prompting the conclusion that such a horizontal appeal cannot and will not be suffered by this Court. [8]

[*24]  Nor does this result unfairly strip plaintiffs of a remedy for the alleged constitutional deprivations of which they complain. Plaintiffs' remedy, if any exists, lies in Montgomery, not Mobile. They have cited no reason -- and the Court is aware of none -- why plaintiffs cannot petition the Middle District for relief from the threatened removal of the Monument. The Middle District is the rendering court that ordered defendants to remove the Monument. The Middle District is intimately familiar with the factual and legal issues of the case. The Middle

District has continuing jurisdiction over its injunction, and is empowered to reconsider and/or modify that injunction (at least, to the extent permitted by the Eleventh Circuit's opinion in *Glassroth*) if plaintiffs' claims have merit. [9] The Middle District, or a higher court of competent jurisdiction, should be the final arbiter of plaintiffs' dissatisfactions with the effects of Judge Thompson's injunction. This Court simply has no place in that chain of review.

[*25]  Plaintiffs appear entirely capable of addressing their concerns to Judge Thompson and the Middle District. Yet, rather than pursuing such a course of action, plaintiffs chose to launch what is effectively a collateral attack of Judge Thompson's injunction in this District. In the words of Chief Justice Rehnquist, "this they cannot be permitted to do without seriously undercutting the orderly process of the law." *Celotex, 514 U.S. at 313.* For these reasons, the Court declines to exercise jurisdiction over this matter. [10] Defendants'

─────────────

[8] This rationale certainly holds if plaintiffs' complaint is characterized -- quite properly, in the Court's view -- as an attempt to overturn the injunction entered by Judge Thompson. It rings doubly true if plaintiffs' complaint is viewed -- as it reasonably may be -- as an inverse appeal of the Eleventh Circuit's opinion affirming Judge Thompson's injunction. *See, e.g., Phelps v. Hamilton, 59 F.3d 1058, 1078 (10th Cir. 1995)* ("A district court cannot review and reverse a decision of a court of appeals ….").

[9] In fact, https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc8[⬆] the Supreme Court has recognized that a court has the power to revisit its own previous decisions in extraordinary circumstances, such as where the initial decision was clearly erroneous and would work a manifest injustice. *Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988).* More importantly, "there is no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen …. The source of the power to modify is of course the fact that **an injunction often requires continuing supervision by the issuing court** and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *System Federation No. 91, Railway Emp. Dept., A.F.L.-C.I.O. v. Wright, 364 U.S. 642, 647, 81 S. Ct. 368, 371, 5 L. Ed. 2d 349 (1961)* (emphasis added).

[10] To be clear, the Court does not suggest that Judge Thompson's injunction is somehow binding on this Court under doctrines of *stare decisis,* law of the case, or otherwise. After all, it is well established that district courts generally are not bound by the decisions of other district courts, whether in the same or other judicial districts or circuits. *See, e.g., Fishman & Tobin, Inc. v. Tropical Shipping & Construction Co., Ltd., 240 F.3d 956, 965 (11th Cir. 2001)* (finding that "the district court cannot be said to be bound by a decision of one of its brother or sister judges"); *Fox v. Acadia State Bank, 937 F.2d 1566, 1570 (11th Cir. 1991).* Rather, the Court's finding is

Motion to dismiss for lack of jurisdiction pursuant to *Rule 12(b)(1), Fed.R.Civ.P.*, is accordingly **granted,** and this action is **dismissed without prejudice.**

### [*26] IV. Venue Issues.

As an alternative ground for dismissing this action, the Associate Justices maintain in their Motion that venue is improper in this District. The Court concludes that the venue analysis yields precisely the same outcome as the comity/administration of justice analysis *supra,* and therefore adopts the following conclusions of law as an alternative ground for its decision to dismiss this action without prejudice.

The Complaint alleges that venue for this action properly lies in this District pursuant to *28 U.S.C. § 1391* for three reasons: (a) plaintiff McGinley resides in Mobile, (b) the Monument is located in the Alabama State Judicial Building and therefore affects all citizens of the State of Alabama, and (c) plaintiff Dorley (who resides in Tallassee, which lies in the Middle District) regularly visits the Judicial Building, sometimes for the purpose of viewing the Monument. (Complaint, at P 3.)

It is well established that venue is not a jurisdictional prerequisite and that it may be waived by a defendant absent timely objection. *See, e.g., Harris Corp. v. National Iranian Radio and Television, 691 F.2d 1344, 1349 (11th Cir. 1982);* **[*27]** *see also 28 U.S.C. § 1406(b)* ("Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue."). In their Motion to Dismiss, the Associate Justices timely objected that venue in this District is improper; therefore, the Court will consider the merits of that objection at this time.

Federal jurisdiction over this action not being grounded on diversity of citizenship and plaintiffs having invoked no special venue statutes, venue is clearly governed by *28 U.S.C. § 1391(b),* which provides that in the absence of some other controlling provision venue properly lies only in:

---

simply that Judge Thompson's injunction is his injunction, and that it is not the role of this Court to review or contradict that injunction when the plaintiffs may reasonably seek redress of their grievances from him, or from the appellate courts responsible for reviewing his decisions. The Court's decision in this regard is rooted in time-honored considerations of judicial comity, fairness and the orderly administration of justice, rather than rigid doctrinal principles such as *stare decisis.*

"(1) a judicial district where any defendant resides, if all defendants reside in the same State,

"(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or

"(3) a judicial district in which any defendant may be found, if there is no district in which the action may be otherwise brought."

*Id.* **[*28]** When a defendant raises a timely venue objection, the burden of establishing the propriety of venue rests with the plaintiff. *Rogers v. Civil Air Patrol, 129 F. Supp.2d 1334, 1336 (M.D. Ala. 2001).* On the face of plaintiffs' Complaint, they cannot meet this burden.

The venue analysis under *§ 1391(b)(1)* hinges on the residency of defendants. The limited record before the Court does not reflect where each Associate Justice personally resides; however, that information is unnecessary because they have been sued solely in their official capacities. Where suit is brought against a public official exclusively in his official capacity, that official resides for venue purposes in the district where he performs his official duties. *See, e.g., Taylor v. White, 132 F.R.D. 636, 640 (E.D. Pa. 1990); Republican Party of North Carolina v. Martin, 682 F. Supp. 834, 836 (M.D.N.C. 1988); see generally* 17 *Moore's Federal Practice,* § 110.03[3] (2003). Defendants, as Associate Justices of the Alabama Supreme Court, perform their duties in the Alabama State Judicial Building in Montgomery, Alabama, which is located in the Middle District **[*29]** of Alabama. As such, defendants all reside in the Middle District for venue purposes, and venue does not properly lie in this District under *§ 1391(b)(1).*

With respect to *§ 1391(b)(2),* the critical inquiry is whether a substantial part of the events or omissions giving rise to the claim occurred in this District or, alternatively, whether a substantial part of the property that is the subject of the action is situated in this District. This action concerns a Monument located in the Middle District of Alabama, and in-house administrative decisions made by state government officials in the Middle District of Alabama. Neither the Complaint nor plaintiffs' accompanying submissions reflect that any events or omissions giving rise to their claims occurred in this District, or that any property that is the subject of this action is situated in this District. In fact, the only link

2003 U.S. Dist. LEXIS 14947, *29

between this District and plaintiffs' lawsuit that appears from the face of the Complaint is the bare fact that plaintiff McGinley resides in this District. Such a showing is manifestly inadequate to establish venue under *§ 1391(b)(2)*. *See, e.g.,* 17 *Moore's Federal Practice* § 110.02[2][b]  [*30] (2003) (noting that plaintiff's residence is "no longer relevant to venue" determinations under *§ 1391(b)*). [11]

The third and final prong of *§ 1391(b)* allows venue to reside in "a judicial district in which any defendant may be found, if there is no district in which the action may be otherwise brought." *§ 1391(b)(3)*. This provision cannot avail plaintiffs in their quest to establish venue in this District for two distinct reasons. First, no defendants "may be found" in this [*31] District. Second, there clearly is another "district in which the action may otherwise be brought" under both *§ 1391(b)(1)* and *§ 1391(b)(2)*; to-wit, the Middle District of Alabama.

Thus, straightforward application of the general venue statute inexorably confirms that which is already informed by common sense; namely, that this case does not belong in the Southern District of Alabama. It belongs in the Middle District, where all of the defendants reside, where the *res* that is the subject of the lawsuit (*i.e.,* the Monument) may be found, and where all or virtually all of the events and occurrences on which the litigation is predicated transpired.

It being clear that venue is improper in this District, the question remains as to what action the Court should take in response. By statute, a district court confronted with a case laying venue in the wrong district "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *28 U.S.C. § 1406(a)*. The decision of whether to dismiss the action or transfer it to the Middle District rests in the Court's sound discretion. *See, e.*  [*32] *g., First of Michigan Corp. v. Bramlet, 141 F.3d 260, 262 (6th Cir. 1998)*; *Minnette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir. 1993)*.

---

[11] The Court acknowledges plaintiffs' assertions in the Complaint that venue is appropriate here because the positioning of the Monument in the Alabama State Judicial Building affects all Alabama citizens and because plaintiff Dorley frequents the Monument and the Judicial Building from his residence in the Middle District. However, such contentions miss the mark because they ignore the analytical framework created by *§ 1391(b)* and because plaintiffs offer no explanation why these facts have any legal bearing on the question of venue.

The Court recognizes that the interests of justice typically militate in favor of transferring an improperly filed action, rather than dismissing it. However, considering the totality of the circumstances, the Court is of the opinion that this is one of those atypical cases in which transferring a case to a district where venue is proper may paradoxically harm the plaintiffs' interests to a greater extent than would dismissing it without prejudice. Plaintiffs' submissions have emphasized the time-sensitive nature of their prayer for relief, and the imminence of irreparable harm should the Monument be disturbed from its repose in the rotunda of the Judicial Building. If the Court transfers this case to the Middle District, the administrative process of transferring a case from this District's Clerk's Office to the Middle District's Clerk's Office - with its attendant paperwork and clerical tasks - might take days, during which time plaintiffs would be unable, for all practical purposes, to pursue their claims for relief [*33] in any forum. By contrast, if the Court dismisses the action without prejudice, plaintiffs may refile it in the Middle District as expeditiously as they wish, presumably within hours after the dismissal takes effect. For these reasons, and out of respect for the specter of constitutional injury that plaintiffs are purporting to confront at any moment, the Court will exercise its discretion under *§ 1406(a)* in favor of dismissing this action without prejudice for improper venue, pursuant to *Rule 12(b)(3), Fed.R.Civ.P.* [12]

### [*34] V. Conclusion.

For all of the reasons set forth herein, defendants' Motion to Dismiss is hereby **granted** and this action is **dismissed without prejudice.** The hearing set for 3:00

---

[12] Because both the jurisdictional and venue issues raised by the Associate Justices warrant dismissal of this action without prejudice, the Court finds it unnecessary to consider the constitutional issues raised by defendants' Motion (*e.g.,* whether plaintiffs' claims properly state a claim for relief under the **Establishment Clause** of the **First** and **Fourteenth Amendments**). In that regard, the Court acknowledges *https://advance.lexis.com/api/document?collection=cases&id=urn:contentItem:49F8-F9R0-0038-Y400-00000-00&context=&link=clscc9[⬆]* the "fundamental and longstanding principle of judicial restraint requir[ing] that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Santamorena v. Georgia Military College, 147 F.3d 1337, 1343 (11th Cir. 1998)*. The Court therefore refrains from expressing any opinion as to whether plaintiffs have established a cognizable claim for violation of the **Establishment Clause**.

2003 U.S. Dist. LEXIS 14947, *34

p.m. on August 27, 2003 on plaintiffs' Application for Temporary Restraining Order is **canceled.**

**DONE** and **ORDERED** this 27th day of August, 2003.

s/ WILLIAM H. STEELE

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Exhibit 70

NJAPP0825

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION

 3                   + + + + +

 4   _____
                                      :
 5   IN THE MATTER OF:                :
                                      :
 6   STATE OF TEXAS, ET AL.,          :
                                      :
 7                 Plaintiff,         :
                                      :
 8        v.                          :  Civil Action No.
                                      :  1:18-CV-00068
 9   UNITED STATES OF AMERICA,        :
     ET AL.,                          :
10                 Defendants,        :
                                      :
11   and                              :
                                      :
12   KARLA PEREZ, et al.,             :
                                      :
13                 Defendant-         :
                   Intervenors,       :
14   and                              :
                                      :
15   STATE OF NEW JERSEY,             :
                                      :
16                 Defendant-         :
17                 Intervenor.        :
                                      :
18   _____:

19                 Thursday,
                   August 2, 2018
20
                   Washington, D.C.
21

22   DEPOSITION OF:

23                      MICHAEL KNOWLES

24

25
```

NJAPP0826

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                    Pages 34..37

Page 34

1  line moving, the production line.
2       But, we're also told to take the time
3  that's needed to, you know, look at all aliases,
4  because many applicants have, you know, at
5  various times, different encounters with the
6  Agency or other immigration agencies have used
7  different names that, of course, we know with
8  various cultures and linguistic groups, you've
9  got different name orders, family name, given
10 name, matrilineal, patrilineal.
11      And, we have to -- well, all of us are
12 trained regardless of form type that you have to
13 meticulously run in our background checks all
14 possible aliases.
15      And, my performance is, we use the
16 term dinged.  We get dinged on our performance
17 quality if we fail to check all aliases.  It
18 comes back to the employee.
19      And so, the individual said, they're
20 told, you know, make the decision, but make sure
21 you get it right and that you do check all the
22 databases, you do check and follow up on all
23 possible hits and leads of criminal activity.
24      MS. PERALES:  I'm going to hand you
25 what has been marked Deposition Exhibit Number 2.

Page 35

1       And, I will represent to you that this
2  is a signed declaration from Mr. Kenneth Palinkas
3  from April 6, 2018.
4       And, you can find that information on
5  the very last page with the date and signature.
6       First, can you tell me who is the
7  president of the USCIS union on April 6th, 2018?
8            (Whereupon, the above-
9            referred to document was
10           marked as Deposition Exhibit
11           No. 2 for identification.)
12      MR. KNOWLES:  That would be me.  If
13 you're referring to the National CIS Council 119,
14 that would be me.
15      Mr. Palinkas is the former president
16 of the Council, as I said earlier.  And, he's
17 currently the president of Local 0235 in the New
18 York area, New York City area.
19      MS. PERALES:  I'd like you to turn
20 with me, if you would, to the first page of the
21 declaration.  And, I'd like you to look at
22 towards the bottom of the page, there is a
23 paragraph that starts with the word "however."
24      MR. KNOWLES:  Mm-hmm.
25      BY MS. PERALES:

Page 36

1       Q    And the second sentence, and let me
2  if I read this correctly, quote, management has
3  continually transformed USCIS from a service that
4  serves to protect our national security and the
5  rule of law into one that, instead, serves to
6  protect undocumented immigrants and their
7  lawyers, unquote.
8       Did I read that correctly?
9       A    Yes, that's how I read it.
10      Q    Okay.  Do you agree with that
11 statement?
12      A    I don't.
13      Q    Okay.
14      A    I do not, just to make sure you note
15 that.
16      Q    Did Mr. Palinkas consult with you
17 before making this statement in this declaration?
18      A    No.
19      Q    Looking at the next sentence in that
20 same paragraph, quote, this is what facilitated
21 the changes in our titles from Adjudications
22 Officers to Immigration Services Officers.
23 Aliens seeking benefits have been referred to as
24 customers further eroding the standards as
25 contained in the INA, unquote.

Page 37

1       Did I read that correctly?
2       A    Mm-hmm.
3       Q    Do you agree with that statement?
4       A    No.
5       Q    Do you believe that the change in
6  title from Adjudication Officer to Immigration
7  Service Officer has undermined the mission of the
8  Agency?
9       A    No.
10      Q    Do you believe that referring to non-
11 citizens who seek immigration benefits as
12 customers erodes the standards contained or
13 erodes the standards of your Agency?
14      A    No.
15      Q    Did Mr. Palinkas consult with you
16 before making that statement in his declaration?
17      A    No.
18      Q    Looking to the top of the next page,
19 if you would, with me.  I'm going to read to you
20 the first sentence of that paragraph.  You tell
21 me if I've read it correctly.
22      Quote, the so-called Deferred Action
23 for Childhood Arrivals, parentheses, DACA, close
24 parentheses, program has further compromised and
25 eroded the goals that USCIS Officers pursue every

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                            Pages 38..41

Page 38

1  day to protect our borders by ensuring that
2  immigration benefits are granted for those who
3  meet the criteria, unquote.
4            Did I read that correctly?
5       A    Mm-hmm.
6       Q    Do -- is it your opinion that DACA has
7  further compromised and eroded the goals that
8  USCIS Officers pursue every day?
9       A    No, I don't agree with that.
10      Q    Did Mr. Palinkas confer with you
11 before making this statement in his declaration?
12      A    No.  If could just make a comment,
13 you've asked me several times if he's conferred
14 with me, I'm not sure whom he has conferred with.
15 I'm, you know, maybe his colleagues, but
16 certainly not with me as a fellow Local
17 president.
18      Q    And, would it be fair to say that he
19 also did not confer with you as the president of
20 the USCIS union?
21      A    No, he did not, either -- when I --
22 since I've been president, he has not conferred
23 with me on things like that.  And, when he was
24 president of the National Council, I don't recall
25 him conferring with me or other Local presidents

Page 39

1  about such matters.
2       Q    Further down in the paragraph, there's
3  a sentence that begins with the word "and."  I'll
4  read that to you.
5            Quote, and, USCIS management has
6  ensured that these applications are not properly
7  screened as has it over assigned the workload for
8  the completion of these applications to be
9  favorably rubber-stamped as long as they meet
10 minimal requirements, unquote.
11           Did I read that correctly?
12      A    Mm-hmm.
13      Q    Based on your conversations with
14 members of the union and with DACA adjudicators
15 about their workload, do you agree with that
16 sentence?
17      A    I do not agree with that sentence.
18      Q    Okay.  The first sentence in the next
19 paragraph starting with the word "since."  I'll
20 read it to you and you let me know if that's what
21 it says.
22           Quote, since June 2012, USCIS has
23 continually bypassed Congress and existing
24 immigration law as contained in the Immigration
25 and Nationality Act with the enactment of the

Page 40

1  DACA program, unquote.
2            Did I read that correctly?
3       A    Yes.
4       Q    Do you agree with that statement?
5       A    I do not.
6       Q    Okay.  With respect to the final
7  sentence in the paragraph, quote, in the interim,
8  taking a backseat to this avalanche of benefits -
9  -
10      A    I'm sorry, I'm not sure where we are.
11      Q    We're still in the paragraph that
12 begins with the word "since."
13      A    Right.
14      Q    It's the very last sentence.
15      A    Uh-huh, oh, I see, in the interim,
16 okay.
17      Q    Yes, quote, in the interim, taking a
18 backseat to this avalanche of benefits bestowed
19 on illegal aliens are the jobs, wages, benefits
20 and security that rightfully belong to Americans
21 and their families as well as those individuals
22 who applied for immigration benefits in
23 accordance with existing law and procedure,
24 unquote.
25           Do you see that there?

Page 41

1       A    I do, although I'd like to read it
2  again because I'm not quite sure I follow.  So,
3  it's not your reading, but I'm trying to
4  understand the sentence.
5       Q    It might help to read the preceding
6  sentence as well.
7       A    Okay.
8       Q    Do you agree with the -- that sentence
9  that I read to you?
10      A    I do not.
11      Q    Is it the case that, from time to
12 time, an non-citizen seeks an immigration benefit
13 when that person holds no immigration status in
14 the United States?
15      A    Could you repeat that?
16      Q    Yes, I'll try to say it a little more
17 simply.
18      A    Yes.
19      Q    This sentence refers to illegal
20 aliens, do you see that?
21      A    Yes.
22      Q    Is it the case that, sometimes, an
23 individual who is not lawfully present in the
24 United States would seek an immigration benefit?
25 For example, like asylum?

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    Pages 42..45

Page 42

1      A     Yes.
2      Q     Is it the case that, sometimes, people
3   who are undocumented, let's say, for lack of a
4   better work, in the United States would seek
5   another kind of immigration benefit?
6      A     Yes, but I'm -- I guess I'm not
7   understanding the -- I'm not understanding the
8   question.
9      Q     Well, it's --
10      A     So, people apply for asylum, but, by
11   definition, one could conceivably be here
12   unlawfully and still qualify for asylum.  And,
13   the granting of asylum is a discretionary
14   decision.
15            Though there are many programs for
16   which they're not eligible and they're
17   ineligibility would be material to whether
18   they're lawfully here or not.  It really depends
19   on the benefit they have sought.
20            So, it's also known that an asylum
21   seeker, if their application is pending beyond a
22   certain amount of time, can quality to get
23   temporary work permit.
24            Through no fault of their own, their
25   case was not heard within the specified time

Page 43

1   frame.
2            But, I'm a little confused by the
3   sentence that you asked me to read because I'm
4   not sure what the writer or the speaker is saying
5   about an avalanche of benefits bestowed on
6   illegal immigrants.
7            I mean, people may apply for various
8   programs, and they're only granted a benefit if
9   they qualify for the benefit.  I'm not aware of
10   people having benefits bestowed on them for which
11   they don't qualify.
12      Q     Okay.  And, is it true that sometimes
13   people who are outside the United States apply
14   for a visa from USCIS before entering?
15      A     Yes.
16      Q     And, is it also true that sometimes
17   people are present in the United States without
18   immigration status and they might also apply for
19   --
20      A     Yes.
21      Q     -- a benefit?
22            Okay, going down to the bottom of the
23   page, if you would count with me three paragraphs
24   up.  So, there is a paragraph that starts "that
25   is why a moratorium."  Do you see that there?

Page 44

1      A     Mm-hmm.
2      Q     I'm going to read you that sentence.
3   Quote, that is why a moratorium on the existing
4   DACA program must be put into effect until a
5   system is established that will ensure proper
6   procedure and vetting for all.
7            Next sentence, we should stop
8   processing any and all pending DACA applications
9   immediately, unquote.
10            Do you see that?
11      A     I do.
12      Q     Do you agree with that sentence?
13      A     I don't and I, if I may, I'd like to
14   explain why I don't agree with it.  It's because,
15   to the best of my knowledge, which is admittedly
16   not firsthand because I don't process DACA, but
17   from what I've read in public news sources, the
18   Agency's own websites and talking to my members
19   who do this work, I have no reason to doubt that
20   we have proper procedures and vetting for all.
21            I'm confident that like all other CIS
22   programs, we have proper procedures and vetting.
23            I'm also confident, based on my
24   experience, the USCIS, like other immigration
25   agencies, are constantly reviewing and correcting

Page 45

1   course when necessary, revising, updating
2   technology when a threat is perceived, addressing
3   it properly when fraud is detected, taking
4   appropriate action.
5            When there are unscrupulous advocates,
6   there are various measures that are taken.
7            So, it's not that procedures are
8   static, they're always dynamic.  And, I think one
9   of the things that I know our workers are proud
10   of is that they participate, our workers, our
11   members, participate in constantly improving the
12   organization by bringing problems to the
13   attention of management.
14            And, we have a management that
15   actually seeks, you know, valid, current
16   information from the folks doing the work.
17            So, it's not that we're not in need of
18   improvement, we're always in need of improvement,
19   but to call for the shutting down of a program
20   for lack of proper procedure and vetting, I don't
21   believe that -- I'm not aware of any evidence
22   that we don't have proper procedure and vetting.
23            Whether one agrees with the program or
24   not as a policy is another matter.  And, I'm not
25   really a partisan on the public policy.  I'm

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                    Pages 46..49

Page 46

1  speaking to the work that I know my members do
2  and have told me they do.
3       Q    Do you think that adjudication like
4  DACA could be outsourced to individuals outside
5  the Agency?  What is your view of that?
6       A    I don't -- I'm not sure what you mean
7  by outsourced.
8       Q    Hire private contractors to simply
9  look at DACA applications?
10      A    Well, the union would vigorously
11  oppose, as it does almost all contracting out,
12  but certainly of what we call inherently
13  governmental functions.
14           I can give you a historic example.
15  Several years ago, the Agency, this was maybe
16  over ten years ago, the Agency attempted to do
17  what they call an A76 study of where contractors
18  were invited to compete for a contracting out of
19  what was then called Customer Contact
20  Representatives or the folks that work the front
21  window in a Field Office answering questions and
22  resolving cases.
23           And, the union successfully, with the
24  support of Congress, stopped and actually had
25  Congress defund that study because we argued

Page 47

1  these are inherently governmental functions, even
2  the contact rep at the front window requires very
3  specialized training, high accountability and
4  they do, sometimes, some level of adjudications.
5           Those individuals have now been
6  retitled to be Immigration Services Officers
7  Level I.  Those folks exercise a high degree of,
8  you know, required proficiency and
9  accountability.
10           I would never support the contracting
11  out of adjudication of any benefit.  That's
12  definitely, you know, according to the
13  Immigration and Naturalization Nationality Act,
14  sorry, those functions are to be performed by
15  Immigration Officers.
16      MS. PERALES:  I'd like to take a short
17  break before passing the witness.  It's been
18  about an hour.  So, if we could go off the
19  record.
20           (Whereupon, the above-entitled matter
21  went off the record at 12:07 p.m. and resumed at
22  12:28 p.m.)
23      MS. PERALES:  Okay, we're back on the
24  record.
25           I pass the witness.  And, I think I'm

Page 48

1  passing to Mr. Biggs.
2       MR. BIGGS:  If that's all right with
3  my federal counterparts.
4       MS. PERALES:  Well, we also remember
5  we're outside New Jersey.
6       MR. BIGGS:  Oh, you want to go ahead?
7       MR. HOLLANDER:  No, I'll wait for you.
8       MR. BIGGS:  All right.
9  DIRECT EXAMINATION
10     BY MR. BIGGS:
11      Q    All right, Mr. Knowles, I'm Adam
12  Biggs.  I work in the Plaintiff States in this
13  case.  I'm from the Attorney General's Office in
14  Texas.
15           I'm hopefully going to be brief today.
16  We'll find out if that's accurate.
17           What did you do to prepare for today's
18  deposition?
19      A    So, I was contacted initially by the
20  State of New Jersey, I do not remember your
21  colleague's name.  But, in any event --
22      MR. HOLLANDER:  That's okay.
23      MR. KNOWLES:  Those are the people
24  from Mr. Hollander's office.  And, they were
25  interested in -- this is before I was asked to

Page 49

1  participate in the deposition.  They just wanted
2  to understand my background, my perspective.
3           So, I was asked by the State of New
4  Jersey and later by MALDEF, similar questions,
5  just to better understand Mr. Palinkas's
6  statement.
7           So, I had maybe a couple of phone
8  calls with New Jersey and a couple of phone calls
9  with Ms. Perales along the same line -- pretty
10  much along the same lines we've talked about.
11      Q    Sure.
12      A    In order to answer some of the
13  questions, however, because I didn't -- I don't
14  have personal knowledge of DACA other than what I
15  read as a CIS employee, I couldn't, you know, I
16  called some of my colleagues in the Field Offices
17  and in the Service Centers and asked them, what
18  do you guys do?
19           What do you make of this statement
20  from our colleague, you know, fact, opinion,
21  whatever, so that I could speak somewhat
22  intelligently to the questions I know I'd be
23  asked.  That's pretty much it.
24           I came here earlier this morning and
25  Ms. Perales really walked me just through the

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                     Pages 50..53

Page 50

1   process of what is a deposition, you know, what's
2   the different roles, what are the expectations,
3   et cetera.
4       Q       You said a lot there, we'll try to
5   unpack it bit by bit.
6               So, when were you first contacted by
7   New Jersey approximately?
8       A       I really can't remember the dates.
9   It's within the last couple of months.  I mean, I
10  could go back, you know, through my date book.
11  But, I can't --
12      Q       Sure.
13      A       -- remember offhand.
14      Q       Well, let me ask about this then, this
15  might be a little bit easier.  In front of you is
16  a -- something you just referred to as your date
17  book.
18      A       My calendar, right.
19      Q       It's your calendar and it's been open
20  throughout the deposition, correct?  That's a
21  yes?
22      A       Yes.
23      Q       And, I'm not picking on you, I'm
24  sorry.
25      A       No, no, okay.

Page 51

1       Q       So, your date book has been open
2   throughout the deposition, correct?  That's a
3   yes?
4       A       Yes.
5       Q       Okay.  You've got verbally answer.
6       A       Yes.
7       Q       And, does your date book contain any
8   sort of indication of when you were originally
9   contacted about this case?
10      A       Probably not.
11      Q       What kind of information do you keep
12  in that date book?
13      A       Appointments.
14      Q       Okay.
15      A       Like I had this appointment in there.
16      Q       Does that date book contain any
17  notation about a call either from New Jersey or
18  MALDEF in it?
19      A       No.
20      Q       Okay.  What's the purpose of having
21  that date book open during your deposition?
22      A       I just always have my date book with
23  me to refer to.
24      Q       Did you take any notes about DACA or
25  DACA related topics in that notebook?

Page 52

1       A       No.
2       Q       Okay.  All right, so I won't --
3       A       I doubt that I took any notes.
4       Q       All right.
5       A       I --
6       Q       Well, I understand you probably don't
7   remember the exact dates, so let's just try to
8   estimate to the best of our ability.  You said
9   several months ago?
10      A       Within the last couple of months, I
11  really can't recall.
12      Q       And, what was the subject of that
13  initial call from New Jersey?
14      A       Just asking, as I just stated, you
15  know, who am I?  What's my role?  Am I familiar
16  with, you know, Mr. Palinkas?
17              I was sent a declaration that he made.
18  I don't know if it was the same declaration or a
19  previous declaration.  It was similar to this.
20      Q       Who sent you that declaration?
21      A       The State of New Jersey.
22      Q       Was there other -- any other
23  communication within that email besides see
24  attached or something like that?
25      A       I can't recall.

Page 53

1       Q       Okay.
2       A       But, I do recall it said, you know, we
3   sent you this statement and we'd like to know,
4   you know, do you agree with it?  Is this factual?
5   Not factual?  What would you say?
6               And, mostly, my response was, you
7   know, a lot of this appears to be opinion.  And,
8   I have opinions, too, but I usually don't try to
9   put my opinions forward as fact.
10              And, I could, you know, as you've
11  heard me say today, I said this to both the State
12  of New Jersey and MALDEF, I don't have personal
13  knowledge of every single program in USCIS.
14              I have personal knowledge of my own
15  and I have some knowledge, some more extensive
16  than others about other programs to the extent
17  that I've had occasion to interact with my
18  members working there.
19              I had not had much interaction with my
20  members about DACA because, frankly, they have
21  never brought it to me as an issue of concern
22  other than, as I said earlier in my declaration,
23  almost every office I deal with, every Service
24  Center, every Asylum Office, every Field Office,
25  have generic concerns about caseload and volume

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    Pages 54..57

Page 54

1  and general working conditions.
2          But, I had never had the folks who do
3  DACA call me and say, hey, we're going nuts here.
4  This program is a problem.
5          So, this declaration from Mr. Palinkas
6  was the first that I had heard of any of my union
7  colleagues raising this as an issue.
8          So, I then went, after reading the
9  statement, less I'd be, you know, said to be, you
10 know, just reacting with my own opinions, I
11 wanted to talk to my colleagues who have done the
12 work and said, what do you guys say about this?
13     Q    So, again, a few things there.  I just
14 want to make sure it's clear.  Before you
15 received the call from New Jersey, you had not
16 had many members ever talk to you about DACA,
17 correct?
18     A    I hadn't had any members talk to me
19 about DACA other than, you know, like a topic of
20 current events.  But, I hadn't had people calling
21 saying there's a problem here that we need to
22 talk about.
23     Q    Did the phone call from New Jersey,
24 did the individual calling you indicate how they
25 had gotten your number?

Page 55

1      A    No, I don't recall.
2      Q    Did they call your office?
3      A    They probably called my cell phone
4  which is widely circulated.  That's the number
5  that's on my business card.
6      Q    Before that call from the State of New
7  Jersey, had you had any contact with the lawyers
8  for the State of New Jersey?
9      A    No.
10     Q    Okay.  Had you had any contact with
11 the lawyers from MALDEF before that phone call?
12     A    No.
13     Q    Okay.  And so, the general gist of
14 that conversation was, here's this Palinkas dec,
15 what do you think?  Is that kind of --
16     A    Mm-hmm.
17     Q    That's a yes?
18     A    Yes.  I'm sorry, I'm must nodding my
19 head yes.
20     Q    And, you know, I think you did a great
21 -- Ms. Perales did a great job giving you kind of
22 the rules of the road.  I tend to be really
23 conversational with these depositions.
24     A    Okay.
25     Q    I talk quick.  I'll ask bad questions

Page 56

1  sometime.
2      A    Okay.
3      Q    So, let's just try not to talk over
4  each other and try give me verbal answers.
5      A    All right.
6      Q    So, after you received Mr. Palinkas's
7  declaration, what did you do next?
8      A    Well, I thought about it and I called
9  folks that I knew.  For example, I called my
10 colleagues in the Washington District Office.
11         These are all the people that I spoke
12 to are union representatives.  And, my -- I don't
13 have the capacity to like send out a broadcast
14 message, a survey, you know, assemble all the
15 people that work there.
16         And, I would not normally do that
17 unless the employees were making it an issue they
18 wanted me to take on.
19         So, just to -- for me to assess and be
20 able to answer the question, what do you think
21 about this statement, I wanted to find out from
22 folks who have more familiarity with the subject
23 what they do.
24         So, I called my colleagues, as I said,
25 one in Washington District.  The individual is

Page 57

1  one of my Local vice presidents and what we call
2  an ISO Level III.
3          So, their Senior Immigration Services
4  Officer said, hey, what do you think about this
5  statement?  And, do you, as an Immigration
6  Services Officer, in a Field Office, ever
7  interview DACA applicants?
8          Because, one of the statements that
9  Mr. Palinkas made was, no DACA applicant is every
10 interviewed.  I didn't know the answer to that so
11 I asked my colleague.
12         She says, well, not normally, but
13 sometimes we do.  And, I said like, for instance
14 what?  And, she said, well, I personally received
15 two different applications files from the Service
16 Center asking me to call in the individuals and
17 interview them about potential gang activity.
18         And, I said do you get involved in
19 adjudicating the case?  No, I was -- my mission
20 was to interview them about these things and send
21 my findings back to the Service Center.  I have
22 no idea, she said, what they did there.
23         Called my colleague in Atlanta --
24     Q    Stop really quick, let's -- before we
25 go to Atlanta, let's finish up, it's D.C.,

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                    Pages 58..61

Page 58

1  correct?
2        A      Yes.
3        Q      Okay.
4        A      Yes.
5        Q      Not Washington State?
6        A      No, no, it's call the Washington Field
7  Office which is actually located in Fairfax,
8  Virginia.
9        Q      Okay.  How many DACA interviews did
10 that person tell you they had personally
11 conducted?
12       A      Two.
13       Q      Okay.  And, did she -- you said it was
14 a she, I believe?
15       A      Mm-hmm.
16       Q      Did she indicate to you the substance
17 of those DACA interviews?
18       A      Only what I just said, that they -- it
19 had to do with -- to try to determine whether
20 they had any gang connections.
21       Q      Okay.
22       A      But, I didn't ask anything further
23 than that.
24       Q      Before you had that conversation, were
25 you aware of a single instance where a DACA

Page 59

1  application had been actually withdrawn?  Before
2  that phone conversation, were you aware of a
3  single interview of a DACA -- a potential DACA
4  recipient occurring anywhere in the United
5  States?
6        A      No, I, as I said to you a moment ago,
7  because I'm not familiar with the program, I was
8  reading Mr. Palinkas's statement where he said no
9  DACA applicants are ever interviewed.  Okay?
10       So, I know that Service Centers don't
11 do interviews.  But, I called a colleague that I
12 know a confident, they're a reliable source, do
13 you know if DACA applicants are ever interviewed
14 in a Field Office?
15       Because that's the only place that we
16 do interviews is in a Field Office or, in my
17 case, in an Asylum Officer.  Or in the case of
18 refugees officers abroad or --
19       She says, well, occasionally, yes.
20       Q      So, besides the two interviews she
21 personally did, did she tell you that other
22 interviews had occurred?
23       A      I just asked what was her own
24 experience and that's what she said.  And, I
25 didn't like exhaustively, you know, interrogate

Page 60

1  her to uncover, you know, other data or whatever.
2        Q      So, as you sit here today, you're
3  aware of only two instances at the Washington
4  District Office where DACA applicants were
5  interviewed?
6        A      Right.  Whether there were more, I
7  have no idea.
8        Q      Okay.
9        A      Because I didn't go and like do a data
10 call or, you know, call the district director.  I
11 didn't really feel that was my role.  I really
12 was trying to assess from my members and my
13 fellow union representatives, what was their own
14 knowledge of the matter?
15       Q      Could you have done a data call?
16       A      I suppose I could have as a union rep.
17 But, my -- I'm not involved in the case.  I was
18 just called and asked from information and
19 comment.
20       If we were involved in any kind of a
21 case as a moving party or whatever, we might do a
22 data call.  And, in our parlance, it's called a
23 request for information.
24       But, normally, the union's request,
25 you know, our right to request and the Agency's

Page 61

1  response of what responsibility to provide me
2  with information would be usually with respect to
3  a labor issue.
4        So, for example, if I was defending
5  somebody in an adverse action, I might ask for
6  data information pertaining to their personnel
7  file.
8        Or, if it affected, say, the overtime
9  practices of the Agency and we were litigating
10 over, you know, improper payment of overtime, I
11 might be asking for records pertaining to that.
12       But, wouldn't really have a reason to
13 ask the Agency for like statistics about DACA.
14 Because, I'm not involved in the case.
15       If my members, however, had brought to
16 me an issue about DACA that affected their
17 working conditions, for example, if they felt
18 like they were, you know, being overwhelmed with
19 the caseload or there was massive fraud or
20 rubber-stamping or whatever.
21       And, I wanted to bring that issue
22 forward to the Agency, yes, I might be asking for
23 information.
24       But, none of my members have ever
25 brought that to me as a concern.

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    Pages 62..65

Page 62

1     MR. BIGGS:  Sure.  So, this --
2         (Simultaneous speaking)
3         MR. KNOWLES:  So, I just want to
4  clarify, I was really just trying to, before I
5  commented on this, ask some people I could easily
6  access, what do you know about this?
7         MR. BIGGS:  A data call could have
8  answered the question about how many interviews
9  have occurred?
10        MR. KNOWLES:  Mm-hmm.
11        BY MR. BIGGS:
12    Q     That's a yes?  Your hand's over your
13 mouth.
14    A     Yes, it could have, but I would not
15 have normally had a reason to make a request of
16 that information.
17    Q     The individual you spoke to in the
18 Washington District Officer or Field Office, what
19 was her level in that particular office?  Like,
20 what was her job?
21    A     She is an ISO III which is also known
22 as a Senior Immigration Services Officer.  And,
23 they tend to do more complex cases.
24    Q     Is she a member of your Local?
25    A     Yes.  She's also an officer of the

Page 63

1  Local.
2     Q     All right, so, we have that call you
3  made.
4         Then, let's talk about the next call
5  you made.  Who'd you call?
6     A     I called -- well, no, mind you, I
7  don't know if sequentially, I don't have the
8  dates and the sequence of who I called when.
9     Q     All right, let's -- I won't hold you
10 to that --
11    A     But, I did call my colleague at the
12 Atlanta District --
13    Q     Mm-hmm.
14    A     -- who is the current Local president
15 of that Local union.
16    Q     Okay.
17    A     And, she is also an ISO Level III
18 Senior Adjudicator.
19    Q     And, what did you ask her?
20    A     Same thing.  Here's this statement,
21 what do you think?  Is it, you know, are you
22 aware of any occasions when DACA applicants are
23 every interviewed?
24        She goes, yes, I sometimes get cases.
25 I can't remember the specifics.  I think it might

Page 64

1  have been similar kind of thing, possible gang
2  activity.
3         But, the reason that she got these
4  files was the Service Center needed, in order to
5  complete their adjudication, a face to face
6  interview to verify tests or look at documents.
7         I didn't ask extensively, you know,
8  who, what, where, how and when occurred during
9  the interview.
10        But, she said, it's -- both
11 individuals said, it's highly unusual for people
12 to be interviewed.  But, when necessary, they
13 are.
14    Q     Did she tell you how many interviews
15 she had personally done?
16    A     I believe she said two.
17    Q     Are you aware besides those two of a
18 single DACA applicant being interviewed at the
19 Atlanta Field Office?
20    A     I have no, I mean, again, my only
21 source of knowledge about it was these phone
22 calls.
23    Q     So, that's a no?
24    A     I have -- yes, no.
25    Q     Okay.  And, what other phone calls did

Page 65

1  you make?
2     A     So, I called the former, I think I
3  stated this earlier on the record, former
4  president of the Local out in California that
5  represents California Service Center.
6         And, that individual is an ISO II.  I
7  believe had done some DACA, but I just, I frankly
8  cannot remember.  I did not take notes of these
9  phone calls.
10    Q     Okay.  So, you don't know if the
11 individual who's the former president of the
12 California Local had ever actually processed a
13 DACA application personally?
14    A     I cannot recall, but I asked him to
15 speak generally to the program.  And, he told me,
16 you know, the basic process and so on.
17        I do recall, however, the two
18 individuals that I spoke to in Nebraska, that the
19 current Local president and the vice president
20 both had been ISO in the DACA unit.
21    Q     So, let's go back to California real
22 quick before we get to Nebraska.
23    A     All right.
24    Q     Did the California former president
25 tell you that he had personally interviewed any

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0834

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    Pages 66..69

**Page 66**

1  DACA applicant?
2      A    No, because they don't do interviews
3  in Service Centers.
4      Q    Hold on.  So, was he the individual
5  who worked in the Service Center?
6      A    Yes.
7      Q    So, did he tell you that interviews
8  had ever been done at the California Service
9  Center.
10     A    No, and they would never have been
11 done because the Service Centers aren't set up
12 for interviews.  That's why my colleagues in the
13 Field Offices so that when an interview is
14 necessary, it's sent to a Field Office where the
15 Field Office, having jurisdiction over the
16 residence, the area residence of the applicant.
17     Q    Did the individual who's the former
18 president in California tell you that his Service
19 Center had ever sent a DACA applicant to be
20 interviewed by a Field Office?
21     A    I don't recall him saying that.  I'm
22 not sure I asked him that either.
23     Q    So, as you sit here today, you're
24 unaware of a single DACA applicant being
25 interviewed out of the California Service Center?

**Page 67**

1      A    I have no way to know that.
2      Q    Let's go to Nebraska now. What were
3  the job descriptions of the individuals in
4  Nebraska that you called?
5      A    They were both ISO IIs.
6      Q    What was their role with the union?
7      A    The one is the current president and
8  the other is the current vice president at the
9  Nebraska Service Center.
10     Q    What did you ask these individuals?
11     A    I sent them the statement.  I asked
12 did they have any comments about it?  They were
13 both somewhat surprised that most of it appeared
14 to be opinion rather than, you know, certainly
15 Mr. Palinkas, as an ISO II in a Field Office,
16 does not have personal knowledge of this.
17          They found a number of statements that
18 they thought were not factual.
19          And, I basically said, so, tell me
20 what you guys do.  How do you do it?  I asked
21 them about discretion.  I asked them about
22 rubber-stamping.
23          I think I -- I mean, I could repeat
24 myself --
25     Q    Okay.

**Page 68**

1      A    -- but, I said it earlier in the
2  record.
3      Q    Sure.
4      A    But, they both said, no, we don't
5  rubberstamp, we're extensively trained.  We are
6  to flag any problems, either a hit from the
7  database, criminal record, misdemeanor, whatever.
8          They both talked about the involvement
9  of their unit in uncovering some so-called
10 diploma mills with collaboration of FDMS fraud
11 detection national security Unit of CIS and ICE,
12 that resulted in prosecutions.
13     Q    Sure.
14     A    They both bristled at the idea that
15 they rubber-stamped.  They both said that they
16 were held to very high quality standards.
17          And, that, you know, that the question
18 of, you know, what does one need to do to be
19 approved?  Well, one needs to meet the criteria.
20 If they don't meet the criteria, they don't get
21 approved.
22          If they meet the criteria, they might
23 get approved provided they don't have bars to
24 seeking the benefit like a criminal record.
25     Q    Did those individuals tell you they

**Page 69**

1  had personally interviewed DACA applicants?
2      A    No, because they don't interview DACA
3  applicants in a Service Center.
4      Q    All right.  Did they tell you that
5  they had sent any DACA applicants to be
6  interviewed at Field Offices?
7      A    They -- I do not recall that they
8  personally said that they had sent cases, but I
9  do believe they affirmed that, on occasion, cases
10 are sent out to the Field Offices for further
11 inquiry.
12     Q    So, in their call to you, they did not
13 mention that they had personally sent any DACA
14 applicant to be interviewed at a Field Office,
15 right?
16     A    No, and I didn't really ask them.  My
17 job wasn't deposing them, it was like --
18     Q    Sure.
19     A    -- pretty quick conversations.
20     Q    And so, your only information about
21 what happens at the Field Offices with DACA
22 applicants from the Nebraska Service Center comes
23 from your conversation with these individuals,
24 correct?
25     A    Could you repeat that?