**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
SUPPLEMENTAL POST-DISCOVERY BRIEF IN SUPPORT OF THEIR MOTION FOR
PRELIMINARY INJUNCTION**

Defendant-Intervenors Karla Perez, *et al.* ("Defendant-Intervenors") submit this Response in Opposition and request respectfully that the Court deny Plaintiffs' Motion for Preliminary Injunction.

## TABLE OF CONTENTS

I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...................... 1

II.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................... 1

III.  SUMMARY OF ARGUMENT ...................................................................... 1

IV.   DISCUSSION ........................................................................................ 2

      A.    This Court Should Reject Plaintiffs' Request to Review Sister Court Orders ....... 2

      B.    DACA Does Not Cause Any of Texas' Purported Injuries and Enjoining DACA
            Does Not Redress Such Injuries ......................................................... 4

      C.    Plaintiffs' Novel Theory of "Abdication Standing" Fails.................................... 18

      D.    DACA is an Unreviewable Exercise of Enforcement Discretion, and Even
            if Reviewable Was Not Subject to Notice-and-Comment Rulemaking............... 19

      E.    Plaintiffs' Motion for Preliminary Injunction Is Unlikely To Succeed on the
            Merits ...................................................................................... 23

      F.    Plaintiffs Suffer No Irreparable Injury, and the Balance Of Equities Favor
            Defendant-Intervenors .................................................................... 27

      G.    Plaintiffs' Motion for Preliminary Injunction Should Not Be Resolved
            Through a Judgment on the Merits. ..................................................... 29

V.    CONCLUSION....................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Telecom, Inc. v. MCI Telecomm. Corp.*,
    197 F.3d 694 (5th Cir. 1999) .................................................30

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................26

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...............................1, 3

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018)...........................................................27

*Boire v. Pilot Freight Carriers, Inc.*,
    515 F.2d 1185 (5th Cir. 1975) ...............................................28

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)...............................................................24

*Colby v. J.C. Penney Co.*,
    811 F.2d 1119 (7th Cir. 1987) .................................................4

*Florida v. Mellon*,
    273 U.S. 12 (1927).................................................................10

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)...........................................................11

*Gonannies, Inc. v. Goaupair.com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) .................................28

*Heckler v. Chaney*,
    470 U.S. 821 (1985)...............................................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................10

*Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*,
    140 F.3d 622 (5th Cir. 1998) .................................................30

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)........................................................19, 20

*McGinley v. Houston*,
   No. 03-0563-WS-M, 2003 U.S. Dist. LEXIS 14947 (S.D. Ala. Aug. 27, 2003) ...................... 3

*Michigan Dep't of State Police v. Sitz*,
   496 U.S. 444 (1990) ............................................................................................................ 15

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ...................................................................................................... 19

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ..................................................................................... 1

*Plyler v. Doe*,
   457 U.S. 202 (1982) .............................................................................................................. 7

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................................................... 1, 3

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
   612 F. Supp. 2d 759 (S.D. Tex. 2007) ............................................................................... 27

*Texas v. Seatrain Int'l, S.A.*,
   518 F.2d 175 (5th Cir. 1975) ............................................................................................ 27

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) ............................................................................................ 12

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................................. 7, 21, 22

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ..................................................................... *passim*

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................... 2, 22, 25, 26

*Underwood v. Hunter*,
   604 F.2d 367 (5th Cir. 1979) ............................................................................................ 30

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
   330 U.S. 75 (1947) ............................................................................................................ 20

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) .......................................................................................................... 28

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
   751 F.2d 721 (5th Cir. 1985) .............................................................................................. 4

**Statutes**

5 U.S.C. § 701(a)(2) ...................................................................................................24

8 U.S.C. § 1103(a)(1) .................................................................................................26

8 U.S.C. §§ 1154(a)(1)(K), 1184(p)(6), 1255a note ..................................................24

8 U.S.C. § 1227(d)(2) .................................................................................................24

Administrative Procedure Act ................................................................................23, 24

Affordable Care Act ....................................................................................................16

Clean Air Act .........................................................................................................19, 20

Immigration and Nationality Act ...............................................................................2, 23

**Other Authorities**

8 C.F.R. § 109.1(b)(4)-(7) (1982) ...............................................................................15

46 Fed. Reg. 25,079-81 (May 5, 1981) .......................................................................15

Fed. R. Civ. P. 26(a)(2), 37(c)(1) ...............................................................................13

Fed R. Civ. P. 37(c)(1) ...............................................................................................13

Fed. R. Civ. P. 56(a) ..............................................................................................29, 30

Fed. R. Civ. P. 56(d) ..............................................................................................29, 30

Fed. R. Civ. P. 56(f) ...................................................................................................30

Judge Hanen R. Civ. P. 6.D .......................................................................................30

Judge Hanen R. Civ. P. 6.P ........................................................................................29

## I.  STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Plaintiffs filed this action and moved for preliminary injunction nearly six years after the Deferred Action for Childhood Arrivals ("DACA") policy was announced, and only after the first courts to address DACA had upheld its lawfulness and issued nationwide injunctions to preserve it.  *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).  Plaintiffs impermissibly seek "horizontal" appellate review of those sister courts' judgments.  Furthermore, Plaintiffs lack standing because they have no evidence that they have suffered an injury due to DACA.  DACA is, in any event, merely a policy guiding enforcement discretion, and relates to immigration, where the Executive enjoys particularly broad discretion.  Plaintiffs are therefore unlikely to succeed on the merits. Similarly, they would suffer no irreparable injury if preliminary relief were denied, as evidenced by their delay in challenging DACA.  Plaintiffs' request for a preliminary injunction should be denied.

## II.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Defendant-Intervenors incorporate by reference the Statement contained in their Opposition to Plaintiffs' Motion for Preliminary Injunction.  *See* Dkt. 224 at 1-7.

## III.  SUMMARY OF ARGUMENT

The additional brief submitted by Plaintiffs in support of their motion for a preliminary injunction to enjoin DACA confirms the futility of their request.  On the heels of other district court injunctions ordering the Federal Defendants to preserve DACA, Plaintiffs readily admit that their lawsuit amounts to a request that this Court countermand those other courts' orders. *See* Dkt. 5 at 15; Dkt. 218 at 30; *infra* Section IV.A.  They seek this extraordinary relief without identifying any specific costs they have suffered as a result of DACA.  They instead present

generalized grievances about immigration policy and speculation about "illegal crossings" in an attempt to manufacture standing where none exists.  *See* Dkt. 218 at 42-43; *infra* Section IV.B. Unable to show any concrete injury from DACA, Plaintiffs assert "abdication standing"—a doctrine not recognized by the Supreme Court or the Fifth Circuit.  *See* Dkt. 218 at 49-51; *infra* Section IV.C.

Even if Plaintiffs had standing, DACA itself is unreviewable policy guidance regarding the exercise of enforcement discretion.  Plaintiffs' arguments to the contrary are based both on assuming a false equivalency between DAPA and DACA and on a fundamental misreading of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).  *See* Dkt. 218 at 52-54; *infra* Section IV.D. Furthermore, even if DACA were reviewable, it is consistent with the Immigration and Nationality Act ("INA") and the unambiguously expressed intent of Congress to provide the Executive broad latitude in immigration matters.  *See* Dkt. 218 at 19-29; *infra* Section IV.E. Plaintiffs may not state a claim under the Take Care Clause of the Constitution, but even if they could, DACA is consistent with congressional mandates.  *See* Dkt. 218 at 27-28; *infra* Section IV.E.

For present purposes, however, the Court need not reach any of the merits issues or other factors, because the absence of irreparable injury alone is sufficient to deny preliminary injunctive relief.  While Plaintiffs raced to this Court four years ago to challenge DAPA, they offer no credible explanation for why—in the face of purported "irreparable harm"—they waited nearly six years to challenge DACA, even as they litigated DAPA.  *See* Dkt. 218 at 56-59; *infra* Section IV.F.  That delay, over a period of years, is a sufficient basis to reject Plaintiffs' belated plea for urgent relief from this Court.  Nor does the balance of equities favor Plaintiffs.

Finally, Plaintiffs' suggestion that the Court grant summary judgment on the basis of

preliminary injunction briefing is both procedurally and substantively improper.  *See* Dkt. 218 at

9, 13, 64; *infra* Section IV.G.

## IV.    DISCUSSION

### A.    This Court Should Reject Plaintiffs' Request to Review Sister Court Orders

The injunctions ordering Federal Defendants to preserve DACA prevent this Court from

being able to provide the relief Plaintiffs seek, and Plaintiffs advance no argument to the

contrary.  Tellingly, Plaintiffs instead argue that "those mandatory injunctions are overbroad"

and argue that this Court should issue an injunction "[i]rrespective of whether enjoining DACA

might arguably conflict with the California and New York injunctions."  Dkt. 218 at 29-35, 63-

64.   Specifically, Plaintiffs are asking this Court to "enjoin" Federal Defendants "from

implementing the 2012 memorandum that created DACA," Dkt. 5 at 15, specifically to

countermand other courts that have issued mirror opposite injunctions requiring Federal

Defendants "to maintain the DACA program on a nationwide basis."  *Regents*, 279 F. Supp. 3d.

at 1048; *see also Batalla Vidal*, 279 F. Supp. 3d at 437 ("Defendants are [] ORDERED to

maintain the DACA program").

This Court cannot provide the relief that Plaintiffs seek.  Federal Defendants, who agree

with Plaintiffs that "DACA is unlawful," Dkt. 71 at 17, continue to implement the DACA policy

"*only* because of preliminary injunctions issued by other courts requiring that result."  Dkt. 194

at 2 (emphasis added).  Orders by other district courts are the only obstacle standing between

Plaintiffs and the result they desire, but this Court cannot order Federal Defendants to cease

complying with other courts' orders.  *See, e.g.*, *McGinley v. Houston*, No. 03-0563-WS-M, 2003

U.S. Dist. LEXIS 14947, at *2 (S.D. Ala. Aug. 27, 2003) (holding that "the orderly

administration of justice and respect for the rule of law demand that . . . [courts] not exercise

jurisdiction" over "a 'horizontal appeal' from one district judge to another judge of the same

rank"). Plaintiffs' criticism of "the injunctions entered in the California and New York litigations" as "overbroad" provides no basis for this Court to revise those injunctions issued by other courts. *See* Dkt. 218 at 64. Based on long-standing principles of comity, as well as the first-filed doctrine,[1] this Court should decline to grant a directly conflicting injunction. *See W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985) ("[T]he principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs") (citation omitted)); *see also Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the defendant under inconsistent legal duties, the case for" avoiding a conflicting outcome "is particularly strong.").

### B.   DACA Does Not Cause Any of Texas' Purported Injuries and Enjoining DACA Does Not Redress Such Injuries

Even after the opportunity to brief the issue following discovery, Plaintiffs fail to establish standing for at least three reasons. First, Plaintiffs are unable to show a concrete and particularized injury. Second, Plaintiffs offer no evidence that DACA causes Texas' purported costs. Third, Plaintiffs cannot explain how ending DACA will redress those alleged costs. *See* Dkt. 224 at 32-35; *see also Texas v. United States*, 86 F. Supp. 3d 591, 630–31 (S.D. Tex. 2015) ("A plaintiff must still be able to satisfy all of the elements of standing—including causation and redressability—to pursue a remedy against the one who allegedly caused the harm.").

To the extent Texas spends any state funds on DACA recipients (Texas identifies none), Texas cannot show that DACA causes any of these costs or that an injunction would redress such costs because *Texas would have to spend these funds whether or not DACA recipients in Texas*

---

[1] The present action is not the "first-filed" DACA action on the basis of the previous DAPA litigation. Plaintiffs voluntarily dismissed that action and any ancillary references to DACA in the parties' stipulation dismissing that litigation have no effect on *this* litigation. Dkt. 218 at 58 n.6.

*receive DACA.  See* Dkt. 224 at 25, 27; *see also infra* Section IV.B.  Plaintiffs' sole attempt to meet their burden of proof as to causation and redressability is the conclusory claim that DACA causes Texas to incur "more healthcare, education, and law enforcement costs by incentivizing unlawfully present aliens to remain in the United States" and by increasing "illegal crossings." Dkt. 218 at 41-45.  All of these arguments are without merit.

        *1.     Plaintiffs offer no evidence that DACA imposes costs on Plaintiffs*

As their own experts concede, Plaintiffs cannot prove that implementation of DACA imposes any costs on Plaintiff States.  Plaintiffs attempt to mask this failure by mischaracterizing the testimony of Defendant-Intervenors' experts and ignoring the testimony of their own experts.

Plaintiffs point to the testimony of Defendant-Intervenors' expert, Dr. Ray Perryman, to support their claim that Texas incurs substantial costs each year to provide healthcare, education, and law enforcement services to DACA recipients.  *See* Dkt. 218 at 37-39.  However, Dr. Perryman explicitly rejected any causal relationship between DACA and any costs to state governments.  *See* Def-Int. Ex. 295 at Tr. 76:5-6 (explaining that DACA did not cause any alleged outlays: "[I]t's not because they are in DACA, it's because they are here.").  Dr. Perryman in fact opined that DACA recipients likely use fewer social services than the general population, due in part to their work authorization.  *See* Def-Int. Ex. 74 ¶¶ 52-53; Def-Int. Ex. 295 at Tr. 53:20-22.  Dr. Perryman further testified that if DACA were ended, recipients would remain in Texas and create costs as unauthorized workers.  *See* Def-Int. Ex. 74 ¶ 50; Def-Int. Ex. 295 at Tr. 11:22-12:5, 13:1-12.

Furthermore, as Plaintiffs concede, Dr. Perryman did not analyze the cost of providing services specifically for DACA recipients, but instead assumed that the cost of providing such services was a portion of the estimated costs of providing services to undocumented people generally.  *See* Dkt. 218 at 37 n.5; *see also* Def-Int. Ex. 295 at Tr. 69:5-14; Def-Int. Ex. 130;

Def-Int. Ex. 74 ¶¶ 39, 53 (citing Def-Int. Ex. 130).  Dr. Perryman did not identify specific DACA recipients that used any services, and the sources he relied upon also did not track any DACA-specific costs.  *See* Def-Int. Ex. 130 at 20 (citing multiple reports, none of which assess DACA recipients in particular); *see also* Def-Int. Ex. 295 at Tr. 14:2-11 (explaining that Dr. Perryman had not "seen anything that measures" alleged healthcare costs incurred by DACA recipients); Def-Int. Ex. 295 at Tr. 48:9-13 (stating that Dr. Perryman's estimates included "the costs associated with the children of undocumented workers even if" the children were U.S citizens, *i.e.*, not DACA recipients).  Dr. Perryman simply applied an estimate of the number of DACA recipients in Texas to the cost of social services used by undocumented Texans generally.  *See* Def-Int. Ex. 74 ¶ 50.  Tellingly, for the purposes of his cost/benefit analysis, Dr. Perryman used the same kind of estimates relied upon by Texas, and showed that DACA recipients generate greater benefits to Texas than any claimed costs.

> 2.   *Plaintiffs' efforts to establish specific education, healthcare, and law enforcement costs are futile*

Plaintiffs did not, nor could they, present any evidence to demonstrate that any alleged education costs are caused by or traceable to DACA, or can be redressed by terminating DACA.  *See* Dkt. 218 at 37-40; Dkt. 5 at 22-23Plaintiffs do not dispute Defendant-Intervenors' evidence that the unaccompanied children ("UAC") Texas' expert references are a wholly unreliable proxy to estimate any costs associated with educating *DACA recipients*.  *See id.*; Def-Int. Ex. 68 ¶¶ 11-12.  Plaintiffs further do not dispute evidence that DACA recipients and UAC are, in fact, mutually exclusive groups.  *See* Dkt. 218 at 40*;* Def-Int. Ex. 68 ¶ 11.  Neither do Plaintiffs dispute evidence that even the cost estimates of their flawed proxy for DACA recipients were replete with inappropriate assumptions.  *See* Dkt. 218 at 40*; see generally* Def-Int. Ex. 68.

Plaintiffs offer only that New Jersey too spends funds on DACA recipients, *see* Dkt. 218

at 38, but costs associated with offering a free public education cannot be attributed to DACA recipients because Supreme Court precedent requires each state to educate *all* undocumented students, regardless of DACA. *See Plyler v. Doe*, 457 U.S. 202 (1982).

Defendant-Intervenors and other DACA recipients pay federal, state, and local taxes, including those that fund Texas' K-12 public education system. *See* Def-Int. Ex. 61 ¶ 10 (pays sales and property taxes in Texas and federal income taxes); Def-Int. Ex. 62 ¶ 13 (pays sales and federal income taxes); Def-Int. Ex. 64 ¶ 4 (paid sales taxes in Texas). Tax revenues Defendant-Intervenors generate are exactly the types of offsetting benefits to the State of Texas that the Fifth Circuit contemplated would negate Texas' claim of injury. *See Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Thus, Plaintiffs not only fail to show harm from DACA, but in fact benefit from DACA recipients' financial contributions to their K-12 education systems.

Likewise, Texas cannot identify whether *any* of its expenditures on the Texas work study program are spent on DACA recipients. Texas claims DACA imposes educational costs on Plaintiff States by making DACA recipients eligible for state-subsidized wages under the state's college work-study program.[2] However, Plaintiffs provide no evidence that any DACA recipients have participated in the Texas work study program, and no Defendant-Intervenor has in fact participated. *See, e.g.*, Def-Int Ex. 281 at Tr. 76:12-14, 78:5-7; *see also* Def-Int Ex. 293 at Tr. 70:22-71:2. In fact, DACA recipients were virtually unaware that deferred action grantees were eligible for the Texas work study program. Def-Int Ex. 281 at Tr. 76:12-24.

Plaintiffs also claim Texas spends millions of dollars "by providing healthcare . . . to

---

[2] Plaintiffs raised this argument for the first time in post-discovery briefing, though the information was known to Texas before filing the case. Considering that argument at this point would prejudice Defendant-Intervenors, who had no opportunity through discovery to rebut these claims.

unlawfully present aliens generally and DACA recipients in particular." *See* Dkt. 218 at 40. Plaintiffs also continue to rely on the testimony of Monica Smoot and reports by the Texas Health and Human Services Commission ("HHSC"), which as explained in Defendant-Intervenors' Opposition, are without merit. *See* Dkt. 224 at 27-28.

Plaintiffs also point to Texas' expenditure of state funds on border security, but cannot explain how the expenditure in any way relates to DACA. *See* Dkt. 218 at 45. For support, Plaintiffs cite former ICE Director Sarah Saldaña's testimony that individuals use the same routes to smuggle narcotics and immigrants, but Plaintiffs fail to link her testimony to DACA. *See, e.g.*, Dkt. 219-13 at Tr. 25:13-26:4. Similarly, Plaintiffs reference a recent seizure of fentanyl in Nebraska, but do not demonstrate how that incident had any connection to DACA recipients, who by definition arrived in the United States before June 15, 2007, over a decade before the incident. *See* Dkt. 218 at 45. Rather than result in law enforcement costs, DACA in fact *conserves* law enforcement resources. *See* Def-Int. Ex. 66 ¶ 20; *see also* Def-Int. Ex. 149 at Tr. 68:25-69:15.

As of May 31, 2018, there were only 115,700 DACA recipients living in Texas, Def-Int. Ex. 301 at 6, which represents less than half of one percent of the total population of Texas (28,304,596) and only 4% of the Texas non-citizen population (2,904,541). *See* Def-Int. Exs. 296, 304. Even if Plaintiffs could show *de minimis* expenditures relating to DACA, such a small group of individuals would not cause the harms Plaintiffs assert.

> 3. *Plaintiffs offer no evidence in support of their "self-deportation" theory.*

Plaintiffs' self-deportation theory fails for at least three reasons. First, Plaintiffs offer no evidence in support of their assertion that DACA causes *other* undocumented immigrants to enter or stay in the United States. Instead, they mischaracterize this Court's holding in *Texas* by claiming that "[a]s the Court found" in the DAPA litigation, "DACA increases the health care,

education, and law-enforcement costs" by incentivizing such undocumented immigrants to remain in the Plaintiff States. Dkt. 218 at 41. In fact, this Court specifically found that the same type of costs now asserted by Texas were *indirect* and *speculative* and *did not* demonstrate redressability. *See Texas*, 86 F. Supp. 3d at 635; *see also Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting as "remote and indirect" attempts to base standing on federal policies that are alleged to "induc[e]" complained of third-party conduct); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).

Second, Texas' expert witness, Dr. Lloyd Potter, testified that a number of characteristics influence the likelihood of an immigrant's return to his or her country of origin, including older age at immigration, short tenure in the U.S., lack of English language fluency, lack of family ties in the U.S., lack of school enrollment, and lack of home ownership. *See* Def-Int. Ex. 143 at Tr. 70:16-71:2, 72:4-20, 73:14-25, 74:1-23, 95:24-96:20; *see also* Def-Int. Ex. 73 ¶¶ 14-15, 18-19 (DACA recipients are "children who were brought into the United States at young ages, who grew up speaking fluent English, attending U.S. schools, and consuming American culture" and are thus "unrepresentative of subjects included in prior studies of return migration"). Texas cannot identify *any* residents, let alone estimate a percentage of residents, who are DACA recipients and who possess the characteristics above that would make them likely to leave the United States.[3] *See* Dkt. 224 at 29-31 (citing Potter deposition). Indeed, Dr. Potter was unable

---

[3] As this Court noted in *Texas*, "[i]f the Court were to grant the requested relief, it would not change the presence of these individuals in this country, nor would it relieve the States of their obligations to pay for any associated costs." 86 F. Supp. 3d at 634 (finding also that DAPA-eligible individuals have "already been in the country for approximately five years," "the costs and damages associated with these individuals' presence have already been accruing for at least a five-year period," and "the status quo already includes costs associated with the presence of these putative DAPA recipients."). That reasoning applies with even greater force to DACA recipients, who must show continuous presence in the United States since June 15, 2007. Dkt. 6 at 3, Ex. 1.

to provide any estimate of the number of DACA recipients likely to leave Texas.  *See* Def-Int. Ex. 143 at Tr. 66:10-67:16, 91:16-92:3 ("I don't believe that I can quantify a number other than I think some would."); *see also id.* at Tr. 63:13-65:3 ("[T]he causes of return migration are difficult to address because there is limited research and understanding of return migration.").

Third, after its own expert failed to show that any DACA recipients in Texas would return to their country of origin if they lost DACA, *see id.*, Texas points to a study offered by New Jersey to claim that New Jersey provides the evidence that Texas lacks, *see* Dkt. 218 at 42. However, Plaintiffs' reliance on New Jersey's study is misplaced.  The survey reports national estimates, but does not estimate the number of DACA recipients in Texas (or any other Plaintiff State) who are likely to return to their country of origin.  *See* Dkt. 215-1 at 164-222.  The Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916, 1930-31 (2018), makes clear that Plaintiffs must be able to identify harms specific to them, and may not rely on generalized evidence (here, about immigrants on a nationwide basis).  Tellingly, Texas can point to only a statement by a New Jersey DACA recipient who claimed she would "close [her] business" and "leave with [her brother]" if she no longer had DACA.  Dkt. 218 at 42.  First, this individual testified at her deposition that she would in fact choose to remain in the United States.  Def-Int. Ex. 298 at Tr. 36:2-15.  This statement in any event provides no evidence that Texas DACA recipients, who are differently situated, *see* Def-Int. Ex. 296, would also leave the United States.

Even if Texas *could* provide an estimate of residents who are DACA recipients and possess characteristics that make them more likely to return to their country of origin, Texas has not shown that any use of public benefits are traceable to the DACA recipients whom Texas claims would leave the state.  In fact, expert testimony suggests a negative correlation between DACA recipients likely to use public benefits and DACA recipients likely to leave the country if

DACA ended.  *Compare, e.g.*, Def-Int. Ex. 74 ¶ 51 (undocumented immigrants who are "more likely to get paid more and have better economic outcomes . . . are less likely to need to rely on [public] services and benefits"), *with* Def-Int. Ex. 143 at Tr. 74:13-23, 76:18-77:15 (testifying that undocumented immigrants with college degrees are more likely to return to their country of origin, whereas low-income undocumented immigrants are less likely to return to their country of origin).[4]

The specific question in Dr. Wong's survey on which Texas relies—"How likely are you to leave the country if DACA ends?"—asked respondents to predict future behavior on a scale of "Very likely" to "Very unlikely."  Dkt. 251-1 at 215.  Responses to a question invoking such complex decisions and circumstances are inherently speculative. Further, research on survey design has long established that question order can inaccurately bias survey-takers.  *See, e.g.*, Def-Int. Ex. 288 (discussing "Question Order Bias" and "Priming effects" in surveys, and noting that survey takers are much more likely, for example, to support building new airports if they have just been asked if they agree current airport delays are "unacceptable"); Ex. 287 at 5-7 (discussing "order effects" and noting, for example, that survey takers are more likely to be dissatisfied with "the way things are going in this country" if they were just asked about the President).  Here, the several questions building up to the question about self-deportation highlighted perceived Government antagonism against DACA recipients, which influenced survey-takers to give emotional answers, including that they would leave the United States. There are thus strong reasons to doubt those answers are predictive of how respondents would

---

[4] The study reports that, nationwide, 683 DACA recipients said they were likely or very likely to return to their country of origin if they lost DACA.  Even if all of those 683 individuals live in Texas, the impact on the state's social services costs would be *de minimis*.  As the Fifth Circuit noted in *Texas v. United States*, an injury is not fairly traceable where there is an "intervening, independent act of a third party [that] has been a necessary condition of the harm's occurrence, or the challenged action has played a minor role."  787 F.3d 733, 752 (5th Cir. 2015).

truly behave.

Defendant-Intervenors' own testimony rebuts Plaintiffs' inferences from the Wong survey. Defendant-Intervenors testified, for example, that despite their fear of removal proceedings, they share an unequivocal desire to remain in the county and would consider all their options to stay even if DACA were ended. *See, e.g*., Def-Int. Ex. 61 ¶¶ 15-16 ("DACA provides me with a sense of security. It has helped alleviate the anxiety, stress, and fear of deportation. . . . I have lived in the United States for most of my life and I wish to remain in the United States. . . . If I lost my DACA, I would consider all my options to stay in the United States and I would not want to return to Togo."); Def-Int. Ex. 62 ¶¶ 10-11, 16 (same); Def-Int. Ex. 63 ¶¶ 8, 14 (same); Def-Int. Ex. 133 at Tr. 95:10-96:5 ("Losing deferred action would impose a great hardship on me," including "potential deportation," but "[in the event deferred action is no longer available,] Yes [I intend to remain in the United States].").[5]

> 4.  *Plaintiffs' claim that they are harmed because DACA encourages illegal immigration is speculative and unsupported by expert testimony*

Plaintiffs offer no expert[6] evidence in support of their assertion that DACA causes other

---

[5] Plaintiffs misleadingly claim that Defendant-Intervenors Karla Perez and Nancy Adossi testified they would leave the country if DACA were enjoined. *See* Dkt. 218 at 42. The opposite is true. They in fact unequivocally testified that they have lived in the United States for most of their lives and *intend to remain in the United States*. *See, e.g*., Dkt. 14-1 at 16, 70; *see also* Dkt. 224 at 31 (similar testimony from all *Perez* Defendant-Intervenors). Other DACA recipient fact witnesses also affirmed that "the United States is the only place [they] can call home," and should they lose DACA, they would consider all available options to remain in the United States. Def-Int. Ex. 61 ¶ 16; *see also* Def-Int. Ex. 280 at Tr. 69:4-22; Def-Int. Ex. 62 ¶ 16; Def-Int. Ex. 64 ¶ 15; Def-Int. Ex. 63 ¶ 14. Their friends and acquaintances who are DACA recipients are also unlikely to leave the United States should their deferred action be terminated. *See* Def-Int. Ex. 61 ¶ 17; Def-Int. Ex. 62 ¶ 17; Def-Int. Ex. 63 ¶ 15. Plaintiffs' claims are therefore devoid of any evidentiary support.

[6] Unable to prove that DACA causes "illegal crossings" through duly disclosed expert testimony, Plaintiffs attempt to rely on the statements of administration officials. First, Plaintiffs cite Defendant DHS Secretary Kirstjen Nielsen's June 22 memorandum that references "tens of thousands of minor aliens [that] have illegally crossed or been smuggled across our border in recent years." *See* Dkt. 218 at 43. But recently-arriving UAC are ineligible for DACA. *See*

undocumented immigrants to enter into the United States, and Plaintiffs' expert witness, Dr. Lloyd Potter, explicitly disclaims addressing this subject.  Def-Int. Ex. 143 at Tr. 47:11-14 ("Q. Would it be correct to say that you do not offer the opinion that DACA increases unauthorized immigration to the United States? A. I don't address that.").

In contrast, Defendant-Intervenors' expert testimony indicates that recent trends in migration to the United States have nothing to do with DACA.  Barbara Hines, a renowned immigration law professor and practitioner, offered expert testimony that the recent migration of UAC across the southern border "has no relationship" to DACA.  Def-Int. Ex. 69 ¶ 47.  Professor Hines cited multiple scholarly studies demonstrating that DACA did not lead to an increase of UAC arriving at the southern border, that the number of UAC from Central America had been steadily rising well before DACA, and that UAC fled their countries of origin due to increased violence rather than a desire to obtain DACA.  *Id.* ¶¶ 48-51 (citing Cato Institute study showing "[f]ewer UACs entered illegally in the 3 months after DACA than the 3 months before it" and "fewer children entered the United States illegally in 2014 than in 2004, indicating that illegal child migration is not a recent phenomenon"); *see also* Def-Int. Ex. 142 at Tr. 83:5-13.  Professor Hines further noted that because the increase in UAC arriving from Central America began in 2012, those UAC could not have qualified for DACA, which requires applicants to have lived continuously in the United States since June 15, 2007.  *See* Def-Int. Ex. 69. ¶ 47.

Lacking supportive expert testimony of their own, Plaintiffs mischaracterize the

---

Def-Int. Ex. 69 ¶ 47.  Plaintiffs also introduce the testimony of former Acting ICE Director Tom Homan and argue the Court "may consider these statements as the admission of a party opponent."  *See* Dkt. 218 at 42-43.  Plaintiffs have not introduced either Ms. Nielsen or Mr. Homan as expert witnesses.  To the extent Plaintiffs attempt to introduce these statements as expert testimony, the Court should reject it because Plaintiffs did not disclose these witnesses and have not provided justification for their failure to disclose any expert opinions by them.  *See* Fed. R. Civ. P. 26(a)(2), 37(c)(1).

testimony of former ICE Director Sarah Saldaña to imply that her statements support the claim that DACA functions as a "pull" factor for undocumented immigration. *See* Dkt. 218 at 44. Director Saldaña asserted the opposite.  In the very next question-and-answer exchange of her deposition after the portion cited by Plaintiffs, Director Saldaña unequivocally stated that DACA is not a pull factor for immigration into the United States. Def-Int. Ex. 149 at Tr. 49:10-19.  She also noted that, as ICE Director, she received weekly briefings on migration patterns with the Secretary of DHS, and "never once heard anything about DACA being a push-or-pull factor." *Id.* at Tr. 49:20-50:1.  Director Saldaña's testimony undercuts Plaintiffs' claims of injury due to DACA.

Plaintiffs' claim that DACA is a "magnet" for illegal immigration because it provides eligibility for work authorization is misdirected, as non-citizens must have entered the United States as children to be eligible for DACA.  *See* Def-Int. Ex. 80 at 2; *see also* Dkt. 218 at 44. Defendant-Intervenors, for example, came to the United States as children, not as adults seeking employment. *See, e.g.*, Def-Int. Ex. 62 ¶ 2; Def-Int. Ex. 63  ¶ 2; Def-Int. Ex. 64  ¶ 2.  Moreover, grantees of deferred action have been eligible to apply for work authorization since 1981—long before DACA.  *See* 46 Fed. Reg. 25,079-81 (May 5, 1981) (codified as 8 C.F.R. § 109.1(b)(4)-(7) (1982)).   Plaintiffs cite outdated anecdotal evidence from a 1986 Congressional report mentioned in a law review note from 1988 as support for their "magnet" argument, *see* Dkt. 218 at 44, but this source does not provide legitimate or contemporary evidence that DACA "incentivizes illegal immigration."  *Cf. Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 467 n.7 (1990) ("It is . . . inappropriate for the Court to [rely] on an outdated statistic from a tertiary source [such as] a 1983 law review note which quotes a 1982 House Committee Report").

Plaintiffs also ignore the fact that expert testimony shows that "undocumented Mexican

migration has been negative for a decade."  *See* Def-Int. Ex. 73 ¶ 12.  Defendant-Intervenors'
expert witness Dr. Douglas Massey testified that immigrants from Central America leave to the
United States not because of their potential eligibility for work authorization but rather because
of violence in the region.  *See* Def-Int. Ex. 73 ¶ 13.  Dr. Massey also testified that in the 1980s
when migration from Central America to the United States began, and still in more recent years,
immigrants fled conditions caused by U.S. military and political intervention.  *See id.*  To the
extent that there are "illegal crossings," Dkt. 218 at 42, the record is devoid of support for
Plaintiffs' claims that DACA causes undocumented migration.  Plaintiffs cannot establish injury
on that basis.

### 5.   *Plaintiffs have no evidence that establishes parens patriae standing*

A state does not have *parens patriae* standing to bring an action against the federal
government.  *See* Dkt. 224 at 35-39.  However, even if Plaintiffs *can* raise a *parens patriae* claim
to standing, their argument as it relates specifically to the Affordable Care Act ("ACA") fails for
ripeness.  In the DAPA case, this Court found that because the federal government had not yet
determined the applicability of the ACA employer mandate to DAPA recipients, Plaintiffs' claim
was not yet ripe.  *See Texas*, 86 F. Supp. 3d at 628.  Here, Plaintiffs similarly offer no evidence
that the IRS enforces the employer penalty.  *See* Dkt. 224 at 36-37 (citing Dkt. 5 at 25-26 and
Def-Int. Ex. 146 at Tr. 28:18-25, 72:13-16).  Plaintiffs cannot demonstrate that a hypothetical
harm to U.S. citizens that Dr. Deere speculates about has happened or will happen.  Plaintiffs'
efforts to mischaracterize Dr. Perryman's testimony about the maximum costs that Texas
employers *could* encounter *were* the ACA penalty actually assessed *and if* "there are not jobs
available to both workers" does not suffice.  *Compare* Dkt. 218 at 48-49 ("Texas employers
alone may have saved over $13,000,000 in ACA penalties") *with* Def-Int. Ex. 74 ¶¶ 56-60 ("The
affected employees, if any, would be distributed throughout the state . . . [I]t is highly unlikely

that this maximum level (or any level, for that matter) would ever be achieved.").  As Dr.

Perryman said, $13 million was the "maximum amount of penalty that could have been assessed

if all the other conditions in Dr. Deere's hypothetical were present, which by definition one of

them can't be," and "it's very unlikely there is any penalty whatsoever."  Def-Int. Ex. 145 at Tr.

94:6-16, 95:23-24.

Plaintiffs offer no evidence to establish *parens patriae* standing.  As they did in their

opening brief, Plaintiffs cite to (1) a statement by Attorney General Jefferson Sessions containing

no data or explanation of how DACA denies U.S. citizens jobs, and (2) Dr. Deere's declaration.

*See* Dkt. 218 at 47-48 (citing Dkt. 6 at 25-29; Dkt. 7 at 87-101).  They also rely on a paragraph

from a declaration by Dr. Wong that lists testimony by DACA recipients about the jobs they

would lose if DACA was revoked or ended.  *See id.* (citing Dkt. 40 at 43-44).  This paragraph

explains nothing about how citizens or lawful workers are denied jobs.  Rather, the testimony

demonstrates that DACA recipients strengthen the U.S. economy and society by running

businesses that could employ U.S. citizens and lawful workers, or by filling important jobs such

as EMTs, teachers, and medical doctors.  *See* Dkt. 40 at 43-44 (quoting DACA recipients who

responded that if DACA ends, "our restaurant would disappear," "I would no longer be able to

work as an EMT," and "I will not be able to practice medicine when I graduate from medical

school").

Plaintiffs present no evidence that DACA causes harmful labor market distortions.  *See*

Dkt. 224 at 36-37.  Plaintiffs cite a phrase from a declaration stating that "DACA allow[s]

recipients to better compete with legally present workers," but that statement contains no labor

market data or examples of DACA recipients taking the positions of U.S. citizens or lawfully

present workers.  Dkt. 218 at 48; Def-Int. Ex. 32 ¶ 12.  Plaintiffs' citation to Dr. Perryman also is

unavailing, because Dr. Perryman says that he does not "know one way or the other" whether "an employer has hired a DACA recipient for a job that a U.S. citizen also applied for."  Dkt. 219-8 at Tr. 97:13-17.  Plaintiffs also ignore Dr. Perryman's testimony about real-world, current circumstances, wherein firms have increased wages to attract workers due to a shortage of workers to fill open positions, *see* Def-Int. Ex. 295 at Tr. 27:2-19; Def-Int. Ex. 74 at ¶ 31. Plaintiffs' reference to the Brannon deposition is also misleading because it ignores the context of Brannon's statements.   Plaintiffs asked Dr. Brannon as "a general economic principle" whether the addition of work-eligible individuals have "any downward pressure upon the job market for those already in it."  Def-Int. Ex. 294 at Tr. 93:20-94:1; *see also id.* at Tr. 94:2-95:4. Once Dr. Brannon answered that the addition of skilled workers "tends to create more jobs for unskilled labor and also skilled labor[,]" *id.* at Tr. 94:13-16, Plaintiffs' attorney asked about DACA, and Dr. Brannon continued to speak in general terms without stating or providing any data-based view that DACA recipients, who are already-present immigrants, have actually increased competition. *Id.* at Tr. 95:8-96:3.

Plaintiffs' claims that DACA recipients take U.S. citizen workers' jobs are also unavailing because Texas can only cite two concrete instances in which "DACA recipients have been hired to fill jobs for which other applicants applied."  Dkt. 218 at 48.  Both cases involved positions open only to students enrolled in selective universities or internship programs who had unique personal experiences and professional training that made them uniquely suitable for the job.   One example involved a student on financial aid at Harvard chosen for a work-study position at Harvard to disseminate information on financial aid to other low-income students, Dkt. 219-19 at Tr. 37:21-39:3, and the other involved a social worker hired to provide social services to undocumented immigrants following specialized training in an intensive internship.

Def-Int. Ex. 282 at Tr. 47:11-21, 49:25-50:5, 55:1-56:23, 58:22-60:9, 62:18-63:9, 63:24-64:7.

Neither example is representative of a broad "distortion[] of the labor market."  Dkt. 218 at 15.

### C.    Plaintiffs' Novel Theory of "Abdication Standing" Fails

Unable to demonstrate cognizable injury, Plaintiffs claim in the alternative that they are "institutional plaintiffs" with "abdication standing" to challenge DACA, asserting that this "basis for standing . . . follows directly from Supreme Court precedent."  Dkt. 218 at 50-51.  However, Plaintiffs have identified no Supreme Court precedent—or, indeed, *any* controlling precedent—to support this novel theory.  None exists, and the authorities they have identified fall well short.

In *Arizona State Legislature v. Arizona Independent Redistricting Commission* (*AIRC*), the Arizona legislature sought to enjoin an Arizona ballot initiative that "amended the Arizona Constitution to remove congressional redistricting authority from the state legislature."  135 S. Ct. 2652, 2661 (2015); *see also* Dkt. 218 at 50.  The Supreme Court held that this initiative caused the Arizona Legislature concrete injury because it "strip[ped] the Legislature of its alleged prerogative to initiate redistricting" and so directly invaded legislative authority grounded in the Constitution.  *AIRC*, 135 S. Ct. at 2663.  By contrast, DACA does not divest Plaintiff States of *any* legal authority.  In fact, following the announcement of DACA, the former Governor of Texas expressly stated that a non-citizen's eligibility for deferred action "does not undermine or change our state laws" or "change our obligations" to establish eligibility for state benefits.  Def-Int. Ex. 297.  Moreover, DACA is a mere exercise of federal enforcement discretion that directly affects only the rights and restrictions applicable to *private parties* (*i.e.*, DACA recipients).  *See* Dkt. 224 at 38-39 (discussing *Murphy v. NCAA*, 138 S. Ct. 1461, 1479-1481 (2018)).  DACA does not operate on Plaintiffs, much less intrude on their sovereignty, and thus cannot cause them institutional injury.

For this reason, Plaintiff States' reliance on *Massachusetts v. EPA*, 549 U.S. 497 (2007),

is similarly futile.  *See* Dkt. 218 at 51-52.  Plaintiffs' purported institutional injury is not akin to

Massachusetts' legally protected interests in "the earth and air within its domain," which, under

the Clean Air Act, gave Massachusetts a specific procedural right to seek relief.  *Massachusetts*,

549 U.S. at 519-520.[7]   Nor does *Massachusetts*'s "abdication" discussion support Plaintiff

States' claim to have standing "[w]holly independent from financial injuries or *parens patriae*

interests."  Dkt. 218 at 49.  In that case, the EPA's alleged "abdicat[ion]" of responsibility

informed the Court's analysis and determination of the *actual and imminent harm* that

Massachusetts faced: specifically environmental damage.  *Id.* at 505, 521.  Thus, "abdication"

was simply part of the Court's standard injury-in-fact analysis, and provided no independent

basis for standing.  Neither the Supreme Court nor the Fifth Circuit has ever recognized such a

basis for standing.[8]  This is for good reason, as conferring "abdication standing" on States would

invite them to complain to a federal court virtually every time they had a policy disagreement

with the federal government over how to allocate limited resources.  *See United Pub. Workers of

Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90–91 (1947) (courts should not become "the organ of

political theories" or opine on "ill defined controversies").  No such basis for standing exists, and

this Court should not find one here.

> **D.  DACA is an Unreviewable Exercise of Enforcement Discretion, and Even if
> Reviewable Was Not Subject to Notice-and-Comment Rulemaking**

---

[7] No "special solicitude" for Plaintiff States' claims is warranted.  Dkt. 218 at 51-52.  Plaintiffs'
suit challenges the Federal government's policy in an area—immigration—in which the Federal
government has exclusive authority and, as the Supreme Court has reiterated, is entitled to
special deference.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2402 (2018).

[8] In addition, Plaintiffs cannot manufacture standing under the guise of "challenging" a purported
"act of Executive abdication" to "vindicate a procedural right [] to be heard under the APA's
notice-and-comment procedures."  Dkt. 218 at 51.  A generic cause of action under the APA
does not give Plaintiffs any specific "procedural right" to challenge DACA.  *Cf. Massachusetts*,
549 U.S. at 516, 518 (attaching "critical importance" to the "procedural right" afforded by the
Clean Air Act to challenge the EPA's denial of a petition for rulemaking on emissions
standards).

The Supreme Court has recognized that agencies like DHS are best positioned to determine whether a particular "enforcement action . . . best fits the agency's overall policies," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), and Congress has expressly exempted enforcement prioritization decisions from review, 5 U.S.C. § 701(a)(2).  DACA simply sets forth discretionary criteria for which immigrants subject to removal should be considered for a favorable exercise of discretion (*i.e.*, deferred action), consistent with DHS's enforcement priorities.  *See* Def-Int. Ex. 183 at 7.  It is therefore unreviewable under the Administrative Procedure Act ("APA").  Furthermore, even if DACA *were* subject to APA review at all, it would not have required notice-and-comment rulemaking.  DACA is merely a policy statement advising the public "of the manner in which the agency proposes to exercise [its] *discretionary* power" in prioritizing certain non-citizens for removal, and would therefore be exempt from the cumbersome procedural requirements of notice-and-comment rulemaking.  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (emphasis added).

Furthermore, unlike in DAPA, Defendant-Intervenors have demonstrated through "clear and convincing evidence that [USCIS] is making case-by-case decisions here."  Texas I, 809 F.3d at 165.  Michael Knowles,  the current USCIS union President testified credibly that DACA adjudicators were surprised by and "bristled at the thought" that someone would claim they "rubber-stamp" DACA requests and do not exercise discretion when adjudicating such requests.  Def-Int. Ex. 300 at Tr. 23:9-24, 24:9-21, 67:10-68:24.  Mr. Knowles testified that, for example, DACA adjudicators use their discretion to assess fraud, continuous presence, educational qualifications, and criminal records.  Id. at Tr. 26:11-27:16, 44:2-45:16, 75:24-76:12.  Mr. Knowles testified that DACA adjudication is a complex process carried out by specialists.  Id. at Tr. 46:8-47:9.  Mr. Knowles further testified to being told by a DACA

adjudicator that of all the requests he had processed at Service Centers, "DACA was the one that requires the most discretion."  Id. at Tr. 24:22-26:10.

Plaintiffs' arguments to the contrary are unavailing.  Plaintiffs first rely on statements made by the Federal Defendants about the purported unlawfulness of DACA.  Dkt. 218 at 25, 52-53.  As Defendant-Intervenors have explained, Plaintiffs and the Federal Defendants are on the same side; they are cooperating in an effort to obtain an injunction from this Court to undermine DACA.  Dkt. 118-1 at 13-14.  Any "concessions" from Federal Defendants should not be given any weight.

Plaintiffs also rely heavily on *Texas*, asserting that "DACA is not unreviewable prosecutorial discretion for the same reasons the Fifth Circuit held that Expanded DACA and DAPA are not," and citing *Texas* to establish Plaintiffs' assertion that "DACA modified substantive rights and interests."  Dkt. 218 at 26, 53.  However, as explained below, the Fifth Circuit's explicit observation that "any extrapolation from [DAPA to] DACA must be done carefully" as "DACA and DAPA are not identical" cautions here that the Fifth Circuit's ruling is not directly applicable to DACA.  *Texas*, 809 F.3d at 173, 174.  Plaintiffs' bare reliance on *Texas* therefore does little to prove that DACA is reviewable at all or, if so, that it required notice-and-comment rulemaking.

Finally, Plaintiffs entirely ignore the significant effect of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).  *Trump* plainly held that, in the context of immigration, courts may not look behind a "facially legitimate and bona fide reason for [Executive] action."  *Trump*, 138 S. Ct. at 2419 (citation omitted).  Plaintiffs assert that DACA is subject to more probing judicial inquiry because of its breadth, and because DHS cannot prove to Plaintiffs' satisfaction how individual employees exercise discretion.  Dkt. 218 at 26, 52-53.  Those arguments closely mirror ones that

were advanced and rejected in *Trump*.  *See* Dkt. 224 at 46-47, 49-50.  *Trump* makes clear that the Executive is entitled to broad deference even when it makes immigration-related enforcement decisions on a class-wide basis, *Trump*, 138 S. Ct. at 2419, and that the Executive need not prove that discretion is exercised on a case-by-case basis in order to receive that deference, *id.* at 2423 n.7.  Accordingly, Plaintiffs' arguments to the contrary are foreclosed.

Plaintiffs' sole argument for why *Trump* is inapposite is their assertion that *Trump* only spoke to the Executive's "broad authority to *exclude* aliens from the country," and did not provide that the Executive has any similar discretion to "*allow* aliens to be lawfully present in the country." Dkt. 218 at 29 (emphasis in original).  Plaintiffs mischaracterize *Trump*.  The majority opinion expressly noted that the Supreme Court's decisions have applied a "deferential standard of review across *different contexts* and constitutional claims," and observed that "it is not the judicial role in cases of this sort to probe and test the justifications of *immigration* policies." *Trump*, 138 S. Ct. at 2419 (emphasis added) (citation omitted).  In other words, *Trump* reiterated that the Executive is afforded broad discretion over immigration *generally*, as is expressly noted in the INA.  *See* 8 U.S.C. § 1103(a)(1); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials.").

Plaintiffs' cramped reading of *Trump* treats the Supreme Court as endorsing broad Executive authority in the immigration sphere only to take actions *hostile* to immigrants. Plaintiffs would convert the Supreme Court's decision from one about the limited judicial role in reviewing immigration policy into one in which the judiciary effectively enforces its own substantive immigration policy by applying strict review to *pro*-immigrant policies, but virtually no review of *anti*-immigrant action.   Nothing in *Trump* supports that interpretation.  Plaintiffs

fail to overcome the strong presumption that DACA is no more than an unreviewable exercise of that discretion.

### E.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Substantive APA and Take Care Claims

Plaintiffs' substantive APA and Take Care Clause arguments, *see, e.g.*, Dkt. 218 at 19, are unpersuasive because they are founded on mischaracterizations of federal immigration law, misstatements of fact, and sometimes both.

First, despite Plaintiffs' invention of the term "status of lawful presence" (Dkt. 218 at 15), deferred action is not an immigration status. *See Texas*, 809 F.3d at 168 (recognizing that DAPA was "a change in designation," not immigration status); 8 C.F.R. § 274a.12(c)(14))*; Def-Int. Ex. 69 ¶ 42; Ex. 150 ¶¶ 18-19; Ex. 151 at Tr. 109:8-10.[9]

Second, deferred action is an established practice of DHS recognized by Congress, the U.S. Supreme Court in *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999), and the Fifth Circuit in *Texas*. *See, e.g.* 8 U.S.C. § 1227(d)(2); 8 U.S.C. § 1154(a)(1)(D)(i)(II,IV); and Pub. L. 109-13, 119 Stat. 231, Div. B, § 202(c)(2)(B)(viii). By the time the Supreme Court praised deferred action as a "commendable exercise in administrative discretion, developed without express statutory authorization[,]" the INS had long-practiced deferred action and similar initiatives, agency regulations provided work authorization eligibility to deferred action recipients, and Congress had modified the INA to shield deferred action decisions from judicial review. *Reno*, 525 U.S. at 484-85; *see also, e.g., Mada-Luna v Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987).

---

[9] Plaintiffs incorrectly cite 8 U.S.C. § 1182(a)(9)(B)(ii) to claim that DACA is an improper "status change for unlawfully present aliens on a class basis[.]" Dkt. 218 at 34. That provision neither addresses immigration status nor forecloses grants of deferred action.

Third, the discretionary grant of work authorization does not render either deferred action or DACA legally infirm. Instead of restricting work authorization to defined classes of noncitizens, Congress did the opposite when it empowered the Secretary of DHS to grant work authorization to noncitizens not described in the statute. *See* 8 U.S.C. 1324a(h)(3); *see also* 8 C.F.R. § 274a.12(c). DHS made deferred action recipients eligible for work authorization ten years before *Reno* described deferred action as a "regular practice." *Reno*, 525 U.S. at 484*; see also* Def.-Int. Ex. 150 ¶¶ 26-28.

Fourth, deferred action does not entitle recipients to social welfare benefits foreclosed by Congress.[10] *See* 8 U.S.C. § 1611(b)(2)–(3); *Texas*, 809 F.3d at 148 (observing that the INA specifically provides that work authorized individuals may receive social security retirement benefits, social security disability benefits, or health insurance under Medicare Part A).

Plaintiffs also offer the unsupported claim that "[t]he Executive has granted thousands of DACA recipients citizenship or a pathway to citizenship—that would not have been available but for DACA." Dkt. 218 at 10. There is no evidence showing a single DACA recipient adjusted status or naturalized after securing a needed lawful entry through advance parole.[11]

Plaintiffs are also wrong in claiming that "multiple" DACA intervenors who testified in this case "have used advance parole to gain lawful reentry into the United States." Dkt. 218 at 21. In fact, *none* of the Perez intervenors who testified in this case travelled with an advance

---

[10] Plaintiffs erroneously suggest persons residing under color of law (PRUCOL) were work authorized. *See, e.g.,* Dkt. 5 at 37-40 and Dkt. 218 at 22-23. To the extent Plaintiffs further confuse the term "qualified alien" established in PROWRA (which DACA recipients are not) with work authorized individuals entitled to participate in the social security system (which some DACA recipients are), they are again wrong. *Compare* 8 U.S.C. § 1641(b) *with id.* § 1611(b)(2)–(3).

[11] Defendant Intervenors' expert Barbara Hines did not testify to the contrary. *Compare* Dkt. 218 at 21-22 *with* Def.-Int. Ex. 142 at Tr. 76:8-77:4.

parole document to secure a lawful entry. *See* Def.-Int. Ex. 280 at Tr. 66:10-19; Def.-Int. Ex. 281 at Tr. 84:9-85:11; Def.-Int. Ex. 293 at Tr. 112:25-113:4; Def.-Int. Ex. 305 at Tr. 68:6-12.

Advance parole neither creates grounds for adjustment that don't otherwise exist nor functions to remove barriers to adjustment that don't exist.  Any individual who travels with an advance parole document and who later seeks to adjust status must have independent grounds on which to obtain that immigration status.[12]  And a lawful entry after travelling with an advance parole document is not a prerequisite to adjustment of status for the many DACA recipients who have previously made a lawful entry (such as visa overstays) or who are eligible to adjust without making a lawful entry (such as adjustment under INA section 245i).  *See* 8 U.S.C. 1255(i); Def.-Int. Ex. 69 at ¶¶ 21-41; Def.-Int. Ex. 79 at ¶¶ 29-30.  Few DACA recipients travel with an advance parole document and subsequently file an application for adjustment -- 4,833 DACA recipients out of the 819,337 individuals who received initial grants of DACA since 2012 (.6%).  Def.-Int. Ex. 9 at 74.  Even that .6% does not support Plaintiffs' assertions about advance parole because there is no evidence that any of those 4,833 DACA recipients relied on their advance parole document to remove an obstacle to adjustment.

Plaintiffs are also wrong in claiming that DACA eliminates the "consequences" of unlawful presence, "including removability."  Dkt. 218 at 20, 22.  DACA, even with advance parole, provides neither the admission nor parole necessary to avoid a charge under 8 U.S.C § 1182(a)(6)(A)(i).  DACA further does not prevent DHS from either presenting deportation charges or persuading the immigration court to find a noncitizen deportable under 8 U.S.C. § 1227(a)(1)(B).

---

[12] Plaintiffs also err in suggesting that all lawful permanent residents are eligible for U.S. citizenship.  Dkt. 218 at 11.  Congress has established many grounds on which to deny naturalization to lawful permanent residents. *See, e.g.*, 8 U.S.C. §§ 1425-1427.

Plaintiffs also misread the INA when claiming that DACA "vitiates the INA's reentry bar." Dkt. 218 at 22.  The INA provides that children under age 18 do not accrue unlawful presence.  *See* 8 U.S.C. § 1182 (a)(9)(B)(iii).  At the same time, DACA recipients who received DACA after age 18 and six months would have already accrued unlawful presence and thus DACA would not relieve them of the reentry bar.  Finally, reentry bars are triggered only by leaving the U.S., and Plaintiffs provide no evidence that any DACA recipients leave the U.S. after receiving DACA and then reenter and are relieved of the reentry bars by DACA.

In the end, there is no basis for Plaintiffs' claim that "DACA is contrary to law because it violates congressional statutes."   Dkt. 218 at 18; *see Regents*, 279 F. Supp. 3d at 1039 (explaining that the various elements of DACA are present in statute, long-standing regulations and agency practice).

Even if the Court concludes that DACA is reviewable agency action —and here the evidence precludes such a finding —DACA is neither arbitrary nor capricious.  *Texas* does not dictate a different conclusion and took care to distinguish DAPA from DACA.  *See* 809 F.3d at 173-74.

Most important, *Texas* turned on whether the INA's provisions on adjustment of status for undocumented parents of U.S. citizen children were consistent with grants of deferred action to millions of those parents.  *See id. at* 180.  The question "whether Congress has 'directly addressed the precise question at issue'" is answered in the negative with respect to DACA.  *See id.* at 178-179 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)))..

The *Texas* court also observed "many of the previous [deferred action] programs were bridges from one legal status to another, whereas DAPA awards lawful presence to persons who have never had a legal status and may never receive one." *Id.* at 184.  By contrast, many DACA recipients, even if they currently lack immigration status, transition into an immigration status as they grow older and marry.   Def-Int. Ex. 69 ¶ 44; Def-Int. Ex. 150 ¶ 16.  The Fifth Circuit also observed that "DACA applicants are less likely [than DAPA applicants] to have backgrounds that would warrant a discretionary denial." *Id.* at 174.

Finally, *DAPA* focused on the scale of the DAPA and expanded DACA initiatives.  Here, there are only 702,250 DACA recipients nationwide.  Def-Int. Ex. 301.  By contrast, the Fifth Circuit in *Texas* opined that a "group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined." 809 F.3d at 179.  Similarly, with respect to work authorization, Fifth Circuit again found that size mattered:  "DAPA would dramatically increase the number of aliens eligible for work authorization, thereby undermining Congress's stated goal of closely guarding access to work authorization[.]" *Id.* at 181.  By contrast, DACA grants work authorization to a relatively small group of individuals, many of whom are also in school.  Ultimately, the Fifth Circuit decided that "we must be guided to a degree by common sense" and relied on the "magnitude" of DAPA to conclude that it was inconsistent with the INA.  *Id.*; *see also id.* at 184 ("millions of illegal immigrants").  The smaller size of DACA dictates a different conclusion here.

## F.      Plaintiffs Suffer No Irreparable Injury, and The Balance Of Equities Favor Defendant-Intervenors

The Court need not address *any* merits issues, however, in order to deny Plaintiffs' motion for a preliminary injunction, which may be denied for lack of irreparable harm alone.  Plaintiffs' delay of nearly six years before bringing this action shows Plaintiffs have not acted

with the urgency necessary for a finding of irreparable harm. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (weighing six-year delay in seeking preliminary injunction against plaintiffs); *see also All Access Today, L.P. v. Aderra Inc.*, No. A-08-CA-498 LY, 2009 WL 10669445, at *4 (W.D. Tex. July 7, 2009) (holding that it is well-settled that a "significant delay, on its own, provides an independent reason for finding there is no irreparable injury") (Def-Int. Ex. 302); *Amicus Commc'ns, L.P. v. Hewlett-Packard Co., Inc.*, No. CIV.A.SA-98CA1176PMA, 1999 WL 495921, at *19 (W.D. Tex. June 11, 1999) (holding that "delay in seeking injunctive relief . . . standing by itself . . . rebuts any presumption of irreparable harm") (Def-Int. Ex. 303); *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007) (finding that delay of over one year was evidence plaintiffs would not suffer irreparable harm).

Plaintiffs complain that the continuation of DACA causes them "irreparable injuries on an ongoing basis . . . because they [are] forced to continue spending millions of dollars to remediate DACA's consequences," Dkt. 218 at 16, but offer no explanation for why they waited so long to seek relief. By definition, DACA recipients have been living in the Plaintiff States for eleven years. Presumably, Plaintiffs have been suffering their claimed injuries for that entire period. Yet, while Plaintiffs now assert DACA is indistinguishable from DAPA, and was injuring Plaintiffs the entire time, Plaintiffs never challenged DACA while the DAPA suit, which they initiated within months of DAPA's announcement, was pending. Plaintiffs' inaction makes clear that any purported injuries from DACA are not irreparable. To the extent Plaintiffs have suffered any injuries, they cannot demonstrate any need for temporary relief on an urgent basis— to revert to a "status quo" from years ago—pending a final resolution of this action. *See Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (noting that six-month delay in seeking preliminary injunction "rebuts any presumption of irreparable

harm").

For this and for the additional reasons explained in Defendant-Intervenors' Opposition, Dkt. 224 at 61-65, Plaintiffs will suffer no irreparable harm from the continued implementation of DACA, and the balance of equities favors not enjoining DACA.

### G.   Plaintiffs' Motion for Preliminary Injunction Should Not Be Resolved Through a Judgment on the Merits

Since June 28, 2018, all Parties have been conducting discovery and briefing on Plaintiffs' Motion for Preliminary Injunction for the August 8 "Preliminary Injunction hearing." Dkts. 116, 161.  The Supreme Court has made clear that, at the preliminary injunction stage, "it is generally inappropriate for a federal court . . . to give a final judgment on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The Court should reject Plaintiffs' invitation to do so here.

As explained more fully in Defendant-Intervenors' Rule 56(d) Motion to Deny or Defer Consideration of Summary Judgment, Dkt. 287, which is incorporated herein by reference, due process requires that the Court decline or defer consideration of summary judgement at this time. First, to be clear, Plaintiffs have never expressly moved for summary judgment, and in fact refused to provide Defendant-Intervenors discovery in part on the ground that it was "outside the scope of limited expedited discovery" and that Plaintiffs would reconsider during "the normal discovery period after the Court's ruling on the motion for preliminary injunction." *See* Def-Int. Ex. 291 at 17.  It would thus be highly unfair to grant summary judgment now based on belated and underdeveloped references to summary judgment within a preliminary injunction brief that do not even constitute a "Motion for Summary Judgment."  Judge Hanen R. Civ. P. 6.P.

Second, summary judgment cannot be appropriate before the Federal Defendants have even filed an Answer to Plaintiffs' Amended Complaint.  *See* Dkt. 274 (granting Federal

Defendants' motion to delay filing their Answer until 30 days after the Court rules on the Preliminary Injunction motion).  Neither merits discovery nor a final judgment should occur without knowledge of Federal Defendants' impending Answer.

Third, the Court should not countenance a litigation tactic that forces Defendant-Intervenors to respond without any notice to a second dispositive motion within the confines of their Reply to an initial motion for preliminary relief, especially when the Court normally allows 21 days and 20 pages for parties to respond to such briefings.  *See* Judge Hanen R. Civ. P. 6.D. Both the Federal Rules and Fifth Circuit precedent underscore the importance of providing *notice* to the opposing party and an opportunity to address the distinctive standard for summary judgment.  *See* Fed. R. Civ. P. 56(f) (requiring "notice" of and a "reasonable time to respond"); *Underwood v. Hunter*, 604 F.2d 367, 369 (5th Cir. 1979) (vacating grant of summary judgment when the non-moving party "had no indication that summary judgment," rather than a preliminary injunction, "might result" from its submissions to the court).

Finally, Defendant-Intervenors have not had a "full and fair opportunity to discover information essential to [their] opposition to summary judgment."  *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999).  The evidentiary record is replete with "genuine dispute[s] as to [] material fact[s]" that would preclude summary judgment in Plaintiffs' favor in any event.  *See* Fed. R. Civ. P. 56(a); *see also Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998).  Defendant-Intervenors are entitled to additional discovery and clear notice before the Court considers the matter for final judgment.

## V.    CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: August 3, 2018                                 Respectfully Submitted

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By:  */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
Ernest I. Herrera (Tex. Bar No. 24094718);
(SD of Tex. Bar No. 2462211)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

Priscila Orta
Mexican American Legal Defense and
Educational Fund
11 East Adams, Suite 700
Chicago, IL 60603
Tel: (312) 427-0701
Email: porta@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)

Douglas.Hallward-
Driemeier@ropesgray.com
(pro hac vice application pending)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on the 3rd day of August, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perale*s

Nina Perales