**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

## APPENDIX: EXHIBITS

The Defendant-Intervenors Karla Perez, Maria Rocha, Jose Magaña-Salgado, Nanci J. Palacios Godinez, Elly Marisol Estrada, Karina Ruiz De Diaz, Carlos Aguilar Gonzalez, Karla Lopez, Luis A. Rafael, Darwin Velasquez, Jin Park, Oscar Alvarez, Nancy Adossi, Denise Romero, Pratishtha Khanna, Jung Woo Kim, Angel Silva, Moses Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz, and Blanca Gonzalez hereby provide the Court with copies of the following Exhibits cited in support of the Defendant-Intervenors' Response in Opposition to Plaintiffs' Supplemental Post-Discovery Brief in Support of Their Motion for Preliminary Injunction.

| EXHIBIT NO. | DESCRIPTION | VOL. |
|---|---|---|
| 150[1] | Stephen H. Legomsky Declaration | 1 |
| 151[2] | Michael Knowles Deposition Excerpts | 1 |
| 280 | Nancy Adossi Supplemental Deposition Excerpts | 2 |
| 281 | Karla Perez Supplemental Deposition Excerpts | 2 |
| 282 | Rose Arackathara Deposition Excerpts | 2 |
| 283 | CBO Study Excerpts | 2 |
| 284 | FAIR Report Excerpts | 2 |
| 285 | AIC Report Excerpts | 2 |
| 286 | Census Bureau, Census of Governments | 2 |
| 287 | Questionnaire Design, Pew Research Center | 2 |
| 288 | Questionnaire Design – Chapter 7 (Writing the Questionnaire) | 3 |
| 289 | Federal Defendants' Objections and Responses to Defendant-Intervenors' Third Set of Discovery Requests | 3 |
| 290 | Plaintiffs' Objections and Responses to Defendant-Intervenors' First Set of Discovery Requests | 3 |
| 291 | Plaintiffs' Objections and Responses to Defendant-Intervenors' Second Set of Discovery Requests | 3 |
| 292 | Special Report by the Office of the Comptroller: Undocumented Immigrants In Texas: A Financial Analysis of the Impact to the State Budget and Economy (Dec. 2006) | 3 |
| 293 | Jose Magana-Salgado Supplemental Deposition Excerpts | 3 |

---

[1] Exhibits 150 and 151 were filed as placeholders in the Appendix to *Perez* Defendant-Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction, filed with the Court on July 21, 2018.  *See* Dkt. 224-1 at 6; Dkt. 225-6 at 76, 77.
[2] *Perez* Defendant-Intervenors will supplement this item of the appendix when the final deposition transcript becomes available.

| 294 | Ike Brannon Deposition Excerpts | 3 |
|---|---|---|
| 295 | Ray Perryman Supplemental Deposition Excerpts | 3 |
| 296 | US Census Bureau, Quick Facts: United States, Texas | 4 |
| 297 | Letter from Rick Perry to Greg Abbott (Aug. 16, 2012) | 4 |
| 298 | Daniela Velez Deposition Excerpts | 4 |
| 299 | Congressional Research Service Report - Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others | 4 |
| 300 | Kenneth Palinkas Supplemental Deposition Excerpts | 4 |
| 301 | USCIS, Approximate Active DACA Recipients (as of May 31, 2018) | 4 |
| 302 | *All Access Today, L.P. v. Aderra Inc.*, No. A-08-CA-498, 2009 WL 10669445 (W.D. Tex. July 7, 2009) | 4 |
| 303 | *Amicus Comm'ns, L.P. v. Hewlett-Packard Co., Inc.*, No. Civ.A.SA-98CA1176PMA, 1999 WL 495921 (W.D. Tex. June 11, 1999) | 4 |
| 304 | U.S. Census Bureau, Nativity and Citizenship Status in the United States: Texas | 4 |
| 305 | Esther Jeon Supplemental Deposition Excerpts | 4 |
| 306[3] | Stephen H. Legomsky Deposition Excerpts | 5 |

---

[3] *Perez* Defendant-Intervenors will supplement this item of the appendix when the deposition transcript becomes available.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

## APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# Volume 1

# Exhibits 150 - 151

# DEF-INTERV.

# EX. 150

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DECLARATION OF STEPHEN H. LEGOMSKY**

My name is Stephen H. Legomsky.  I am over the age of 18 and fully competent to make this declaration.  I have personal knowledge of, and could testify in court concerning, the following statements of fact:

1.    I am the John S. Lehmann University Professor Emeritus at the Washington University School of Law in Saint Louis, Missouri.  I have taught United States immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school coursebook "Immigration and Refugee Law and Policy," the seventh edition of which is now in process.  This book is published by Foundation Press.  I am also the author of "Immigration and the Judiciary – Law and Policy in Britain and America," published by the Oxford

1

University Press in 1987, as well as numerous articles on immigration law in scholarly journals.

2.  From October 2011 to October 2013, which includes the times when the program known as Deferred Action for Childhood Arrivals ("DACA") was announced and initiated, I served as the Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), in the United States Department of Homeland Security (DHS). USCIS is the agency charged with implementing DACA.  From July 2015 to October 2015 I served as Senior Counselor to the Secretary of Homeland Security, also on immigration matters.  I have advised both Democratic and Republican Administrations on immigration policy. For example, I chaired the 5-member policy advisory group convened by Immigration and Naturalization Service Commissioner Gene McNary (during the administration of George H.W. Bush), which met with the Commissioner for a half-day every month.  I also advised the transition teams for President Clinton and President Obama.

3.  I have testified, as a private citizen, before both the U.S. House and U.S. Senate Judiciary Committees concerning the legality of large-scale deferred action programs.  My written statement submitted in conjunction with my House Judiciary Committee testimony of Feb. 25, 2015 (the latter of the two testimonies) analyzes the legal issues in detail and can be found at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

4.  At present, I am an inactive member of the State Bar of California.

## I.      DACA and Prosecutorial Discretion

5.      DHS routinely establishes priorities guiding its exercise of prosecutorial discretion in the enforcement of the immigration laws.  One of the instruments DHS uses for implementing enforcement priorities is deferred action. 8 CFR § 274a.12(c)(14) (deferred action "gives some cases lower priority").  DACA, in turn, is one particular deferred action initiative.

6.      DACA is a decision by the agency to defer action (immigration enforcement proceedings) against an individual.  To quote the U.S. Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), just as it true of other federal agencies, DHS's decision "not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. [DHS] must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing."

7.      When making a decision not to bring immigration enforcement proceedings against an individual, DHS must also balance factors specific to immigration -- national security, public safety, border security, degree of fault and compassionate circumstances, to name just a few.

3

8.     Reinforcing those considerations is the express mandate from Congress:   The Secretary of Homeland Security is "responsible" for "establishing immigration enforcement policies and priorities."  6 USC § 202(5).

9.     There are occasions on which DHS selects   deferred action as the preferred vehicle for implementing its prosecutorial priorities.  Among the individuals who are low enforcement priorities, DHS has to decide which, if any, should receive deferred action.  To make that decision DHS has to balance not only the same factors that affected its prosecutorial priorities generally, but several others as well.

10.     On the one hand, DACA requestors are present in the U.S. in violation of the immigration laws.  On the other hand there are countervailing equities and there are benefits that DACA provides and that DHS has both the expertise and the responsibility to evaluate.  These include the relative absence of moral culpability evidenced by the violation (DACA eligibles violated the immigration laws but were innocent children at the time, typically brought here by their parents).  In addition, DACA eligibles had to have lived in the United States since 2007 and be under the age of 31, so that many know only this country.

11.     DACA, unlike a negative decision simply to forgo or delay active prosecution and release an individual, draws undocumented immigrants out of the shadows and into the open, so that DHS can know their names, addresses, and histories; if a DACA requestor or recipient has a criminal history or violates the law, DHS can immediately place that individual into removal proceedings by issuing a Notice to Appear.  At the same time, if DHS officers come across an individual who has

4

obtained a DACA grant, the officers can quickly determine from that individual's paperwork, without redundant and time-consuming investigation, that the DACA recipient has been vetted and already deemed low-priority.

12.    Benefits that accrue beyond DHS include the fact that communities are safer when crime victims and witnesses feel secure enough to report crimes to the police; DACA boosts the tax contributions of the recipients; and unscrupulous employers who currently know they can hire unauthorized workers at low wages will have less reason to hire DACA recipients over U.S. workers and will be less able to drive down overall market wages or working conditions in the process.  As with other non-enforcement actions, the agency's expertise leaves it uniquely well-positioned to balance those policy factors.

13.    USCIS and its predecessor agency have utilized prosecutorial discretion, and deferred action in particular, for several decades.[1]

14.    During my time as Chief Counsel of USCIS I had ample occasion to study a range of issues related to deferred action generally and DACA in particular.  I am not aware of any law, court decision, or other legal authority that forbids the use of deferred action, or limits its use to specific statutorily-enumerated contexts, or allows it when the number of affected individuals is small but not when that number is large.

15.    Indeed, either deferred action or its functional equivalent has been used by several Administrations, of both political parties, to grant temporary reprieves from

---

[1] The history is described in Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 13-20; and in Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4.

removal, and in some cases temporary employment authorization, to large, specifically-defined subclasses of undocumented immigrants. A list of some 39 examples is provided by Amer. Immigration Council, Executive Grants of Temporary Immigration Relief, 1956-Present (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

16. These past Administrations granted temporary reprieves from removal to large subclasses of undocumented immigrants for a variety of reasons.  In some instances the beneficiaries tended to be those with a bridge to some form of legal status.  DACA too serves as such a bridge because many current DACA recipients are eligible to adjust as they grow older and marry.  But a bridge to a formal legal status is merely one reason for creating such programs; many such programs were designed to serve other humanitarian purposes.  Here again, DACA is similar to those programs.  Examples of deferred action or similar programs for classes of individuals who otherwise lacked any bridge to legal immigration status include:

- President George H.W. Bush's 1989 parole of Soviet and Indochinese who had been denied refugee status;

- President George H.W. Bush's 1992 grant of "deferred enforced departure" to certain Salvadorans whose temporary protected status had expired;

- President Clinton's 1994 extension of that 1992 grant;

- President George W. Bush's 2005 grant of deferred action to foreign students who had been adversely affected by Hurricane Katrina;

- President George W. Bush's 2007 grant of deferred enforced departure to Liberians after their temporary protected status had expired;

- President Obama's 2009 and 2011 extensions of that 2007 grant; and

- President Obama's 2009 grant of deferred action to widows and widowers of U.S. citizens and their children under age 21.

*Id*. These illustrate the broad range of humanitarian, foreign policy, and other reasons for executive action that spare large numbers of aliens from removal and in many cases grant temporary permission to work.

17. The number of individuals benefited by past deferred action or similar programs varies, but in some instances exceeds several hundred thousand. For example, the discretionary program for Cuban asylum seekers from 1959 to 1972 allowed over 600,000 individuals to be paroled into the U.S.; the discretionary program for people from Vietnam, Cambodia, and Laos from 1975-1979 allowed over 350,000 individuals to be paroled into the U.S.; President Reagan's 1987 program of deferred action for undocumented children of some noncitizens who applied to legalize after 1986 immigration reform involved more than 100,000 families; and, according to the congressional testimony of President Bush's Immigration and Naturalization Service Commissioner, the President's 1990 "family fairness" program was expected (at the time it was announced) to defer the deportation of, and authorize employment for, some 1.5 million undocumented spouses and children of the legalization beneficiaries under the 1986 Immigration Reform and Control Act (IRCA). For detailed support, *see* Stephen H. Legomsky, U.S. House Judiciary Committee testimony of February 25, 2015,

https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

18.     Despite occasional imprecise language in various court filings, immigration law recognizes a crucial difference between lawful "presence" and lawful "status." USCIS has interpreted deferred action as giving rise to temporary lawful "presence," but it cannot, and as the memo creating DACA explicitly provides, does not, create any legal immigration "status."  Because the individual continues to lack lawful immigration *status*, DACA, like any other grant of deferred action, may be revoked, and the individual placed in removal proceedings, at any time. Once DACA is revoked, one who had entered without inspection will be removable under 8 USC § 1182(a)(6)(A)(i) (present in the United States without being admitted or paroled).  One who overstayed a nonimmigrant visa will be removable under 8 USC § 1227(a)(1)(C)(i) (failed to maintain nonimmigrant status or comply with the conditions of such status).  Consequently, DACA is never a barrier to the government commencing removal proceedings when it wishes to do so.  Moreover, since all DACA recipients had to have been already previously unlawfully present for much longer than the one-year period that triggers the ten-year inadmissibility bar (with some narrow exceptions, including those who were not unlawfully present for a year or more after age 18), and since DACA does not erase that previous period of unlawful presence, the person will ordinarily be inadmissible for ten years upon departure from the United States.  8 USC §§ 1182(a)(9)(B)(i)(II), 1182(a)(9)(B)(iii).

19.     Even if a court were to hold that the executive branch lacks the authority to deem deferred action recipients temporarily lawfully present, that conclusion would be at most a reason to invalidate the determination of lawful presence, not a reason to invalidate DACA itself.  No law makes lawful presence a prerequisite for deferred action or for the grant of work authorization (the latter discussed separately in section II below).

20.     A grant of DACA, like any other grant of deferred action, is simply a tentative, revocable signal to an alien that he or she is a low enforcement priority and that the government therefore does not intend to initiate removal proceedings for a specified period of time.  As the regulations explain, deferred action is simply "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14).

21.     In exchange, the DACA requestor must come forward, submit biographic and biometric data that will then be checked against various law enforcement and intelligence databases, provide his or her address, supply documentary proof of the DACA threshold criteria, and send payment of the processing fee ($465 at the inception of DACA).

22.     Like any other workers with U.S. income, DACA recipients are required to pay federal and state income taxes, including Social Security and Medicare taxes. One who receives deferred action and work authorization does become eligible for various federal benefits that flow from existing law – mainly various statutory provisions and in at least one instance a binding regulation.  Examples include 8 CFR § 274a.12(c)(14) (allowing deferred action recipients to apply for temporary

9

work permits if they can demonstrate economic necessity); 8 USC §§ 1611(b)(2,3) (Social Security and certain Medicare benefits, although DACA recipients, having been under age 31 since 2012 at the earliest, will ordinarily be ineligible for both Social Security and Medicare for the next several decades); and 26 USC § 32 (earned income tax credit).

23. But the key point concerning these other benefits is that, in issuing DACA, the Obama Administration did not attempt to change any of the laws or policies that make deferred action recipients eligible for those benefits. Nor am I aware of any legal problems with the laws that provide those benefits to DACA and other deferred action recipients.

24. Because DACA requires continuous residence in the United States since June 15, 2007, it is not available to anyone who arrives today or in the future. Thus it creates no incentive for future illegal immigration.

25. DHS grants deferred action precisely when the INA does not provide a lawful immigration status to an individual but where there are equities that are felt to warrant deferred action. Through its application of prosecutorial discretion, DHS routinely grants deferred action to undocumented individuals. Examples include those who are seeking to adjust under the Violence Against Women Act (VAWA); who are applying for withholding of removal; who are applying for cancellation of removal; who are seeking to adjust status as beneficiaries of family preference petitions; who have applied for U-visas; or who have applied for T-visas.

## II.    Employment Authorization

26.    On the subject of the employment rights of aliens, perhaps the most important provision of the Immigration and Nationality Act (INA) is 8 USC § 1324a(h)(3). That is the definitional provision that lays out which aliens may work and which ones may not.  To be ineligible for employment authorization, the alien must *not* be "either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act *or by the* [*Secretary of Homeland Security*]"[2] [my emphasis].  *Id.*  The plain language of this provision makes clear that employment authorization is not limited to those aliens whom other provisions of the Immigration and Nationality Act (INA) already authorize to work; it extends also to those whom the Secretary of Homeland Security so authorizes.

27.    That plain language completes the statutory scheme in a way that comports with common sense and sound policy.  On the one hand, the INA identifies several specific categories of aliens who are eligible for employment authorization.  In addition to the LPRs explicitly mentioned in section 1324a(h)(3), a few examples are 8 USC §§ 1101(a)(15) (H,O, and P) (certain temporary workers), 1158(c)(1)(B) (asylees), and 1254a(a)(1)(B) (recipients of temporary protected status).  On the other hand, the INA also identifies several specific categories of aliens who are ineligible for employment authorization.  Examples include business visitors, 8 USC § 1101(a)(15)(B); visitors for pleasure, *id*; asylum applicants for the first 180 days after the filing of the application, 8 USC §

---

[2] The text refers to the Attorney General, but under the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), § 1517, that term is now to be read as referring to the Secretary of Homeland Security, to whom the relevant authority has been reassigned.

1158(d)(2); individuals in removal proceedings (unless already  authorized to work), 8 USC § 1226(a)(3); and (with exceptions) those who are awaiting execution of final removal orders, 8 USC § 1231(a)(7).  For all other aliens – i.e., those who (like the DACA recipients) typically do not fall within either of these two sets of provisions -- 8 USC § 1324a(h)(3) clarifies that the decision whether to authorize work is left to the Secretary of Homeland Security, who is the official to whom Congress has delegated principal responsibility for administering and enforcing the immigration laws, 8 USC § 1103(a); 6 USC § 202(5).

28.  The formal regulations supplement this carefully-constructed statutory scheme. They list numerous categories of aliens who are eligible for employment authorization.  Many of the listed categories cover classes of aliens who are typically present in the United States unlawfully.  These include individuals with pending *applications* for cancellation of removal, registry, temporary protected status, and (under 1986 legislation) legalization.  See, respectively, 8 CFR §§ 274a.12(c) (10, 16, 19, and 22).  In a similar vein, section 274a.12(c)(14), first adopted in 1982 during the Reagan Administration and in frequent and continuous use ever since, expressly makes deferred action recipients eligible for employment authorization, provided they can show an "economic necessity" to work.

## III.  Advance Parole

29.  8 USC § 1182(d)(5) gives the Secretary of Homeland Security the discretion to "parole" an alien into the United States, on a case by case basis, "for urgent humanitarian reasons or significant public benefit."  The term "advance parole"

refers to a decision by USCIS, upon request, to provide a reasonable assurance – though not a guarantee – that a person who is currently in the United States and who wishes to leave temporarily will "likely" be paroled back into the country upon his or her return. *Matter of Arrabally and Yerrabelly*, 25 I. & N. Dec. 771, 778 n.6 (BIA 2012).  This enables the person to leave the country temporarily without undue fear of being unable to return.

30.     Parole can come into play in another context.  To be eligible for adjustment of status to lawful permanent residence under 8 USC § 1255, one has to have been "admitted or paroled" at one time. Id. § 1255(a).  A person who was admitted on a nonimmigrant visa will meet this requirement even if he or she has now overstayed, but a person who entered without inspection (and has never been admitted or paroled) will not.

31.     In general, adjustment of status under 8 USC § 1255 requires proof that the person meets all the substantive requirements for LPR status plus additional requirements for the adjustment of status procedure.  Although parole will satisfy the "admitted or paroled" requirement, it will not result in adjustment of status unless the applicant meets all those other requirements as well.  These include not only fitting within one of the categories of lawful permanent resident affirmatively authorized by Congress (for example family, employment skills, etc.), but also not falling within any of the more than 20 pages of inadmissibility grounds laid out in 8 USC § 1182(a) (subject to a few narrowly drawn statutory discretionary waivers).  These alone are rigorous requirements.

32.     But there are others, one of which is of critical importance here.    Under 8 USC §

1255(c)(2), almost all adjustment of status applicants who are not immediate

relatives (a term defined narrowly in 8 USC § 1151(b)(2)(A)(i)  to encompass

only certain very close family members of US citizens) must prove they have

continuously maintained a lawful status in the U.S. since entry.  That requirement

alone disqualifies the overwhelming majority of DACA recipients, regardless of

advance parole.  The only numerically significant sub-group of DACA recipients

for whom advance parole would remove that one remaining obstacle to

adjustment of status consists of immediate relatives, and even then only if they

entered without inspection.

33.     Understanding the effects of advance parole on DACA recipients is crucial,

because some have relied on the possibility of advance parole to claim that

DACA effectively creates a path to LPR status and eventual U.S. citizenship.  For

two reasons, that characterization is faulty.  First, neither DACA nor advance

parole creates that path.   As explained above, the person still needs some

independent statutory route to LPR status; if such a route exists, and the person

otherwise meets all the prescribed requirements, then advance parole merely helps

to satisfy one of the many statutory requirements.  Second, as of December 31,

2015, fewer than 1% of all DACA recipients had received advance parole and

then received or even applied for adjustment of status.   Letter from Leon

Rodríguez, Director, USCIS, to Charles E. Grassley, Chairman, Committee on the

Judiciary, United States Senate (June 29, 2016).  The tiny percentage who do so

are applying for a benefit expressly conferred by the INA.

14

34.     In his affidavit presented to this court, Mr. Palinkas states that DACA recipients who received advance parole and then applied for adjustment of status "jumped the line and were able to get permanent residence faster than the legal and eligible applicants who filed under current USCIS rules and regulations."  That statement is incorrect.  The small percentage of DACA recipients who receive advance parole and apply for adjustment of status are not permitted to "jump the line."  As immediate relatives, they are statutorily exempt from numerical limitations and thus need only await administrative processing, just like all other immediate relatives seeking adjustment of status.

## IV.    The "Rubber-Stamping" Assertion

35.     Mr. Palinkas's affidavit asserts that USCIS adjudicators are forced to "rubber-stamp" their approvals of DACA requests.  His premises for this claim are that DACA adjudications normally do not require personal interviews and that the approval rates are in his view high.

36.     As to the interview issue: the particular threshold criteria for DACA are ordinarily ascertainable from a combination of written documents and required background checks.  For example, whether the requestor "has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on the date of this memorandum" can be ascertained through a combination of employment or school records, leases, or other documents.  Once that timeline is established, the person's age at time of arrival, which must be under 16, can be determined from the birth certificate.  The same is true of the requirement that the person not be above the age of 30 on the date of filing the

15

request.  Whether the person "is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States" is established through the official school or Armed Services records.  And the facts that relate to criminal history or threats to public safety or national security are gleaned from the required searches of the relevant law enforcement and intelligence databases.   The National Standard Operating Procedures ("SOPs") for DACA adjudicators lay out in detail the wide range of documents that the adjudicators are expected to consult.  See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 44-64.  For these determinations, personal interviews are not necessary and would add little if any value.

37.     To accept Mr. Palinkas's theory that the lack of a personal interview per se renders the results unreliable, one would have to condemn not only the DACA process, but the entire body of work performed by the USCIS Service Centers. They receive applications in the mail or online and decide the cases on the basis of the required documentation and the background checks. See U.S. Citizenship and Immigration Services, USCIS Service Centers, https://egov.uscis.gov/crisgwi/go?action=offices.type&OfficeLocator.office_type =SC. They handle more than 4 million cases per year.  See U.S. Citizenship and Immigration Services, "USCIS Service Center Operations," Fiscal Year 2016 Report to Congress (Jan. 18, 2017),

https://www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Service%20Center%20Operations.pdf, at 2.  See also U.S. Citizenship and Immigration Services, Service Center Forms Processing (last updated Apr. 16, 2018), https://www.uscis.gov/forms/service-center-forms-processing, which lists all the different forms that the five Service Centers adjudicate.  By my count there are 45 different benefit adjudications assigned to the Service Centers.  They include a number of benefits that are either prerequisites to, or applications for, formal legal status as immigrants or nonimmigrants  -- i.e., cases in which the long-term consequences are far greater than for DACA requests.

38.     The DACA SOPs for the adjudicators include instructions to carefully examine all cases for possible fraud, "based on the standard fraud protocols."  See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 7 and chap. I.

39.     As to the approval/denial rates: the most recent available official compilation of DACA approval and denial rates displays those data as of March 31, 2018.  See https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf.  The cumulative denial rate for initial DACA requests (i.e. as opposed to renewals), from the inception of the program through March 31, 2018, was approximately 8.5%.[3]

---

[3] Importantly, these are just the denials on the merits.  They are to be distinguished from, and do not include, "rejections," which entail returning the DACA file to the requestor upon arrival at the lockbox, for technical reasons

40.     One would expect the denial rate to be lowest in the early years of the program and highest as time goes on, because the initial batch of requests would be likely to be the strongest; the more marginal requests might be expected to be filed later. In fact, that is precisely what has happened; the compilation above shows the denial rate steadily increasing with time, reaching above 20% for the first two quarters of fiscal year 2018.  The annual denial rates for initial DACA requests for fiscal year 2013 through the first two quarters of 2018, calculated from the USCIS official report cited above (denials divided by the sum of approvals and denials), were as follows:

| Fiscal Year | Denial Rate |
| --- | --- |
| 2013 | 2.3% |
| 2014 | 13.4% |
| 2015 | 17.4% |
| 2016 | 17.7% |
| 2017 | 16.4% |
| 2018 | 20.1% |

41.     In all, some 75,510 DACA requests have been denied on the merits as of March 31, 2018.  *Id*.

42.     The roughly 80% current approval rate is not surprising when one considers the applicant pool.  A person who is undocumented, especially if there is some other negative information in his or her background, is highly unlikely to initiate contact with the immigration authorities, voluntarily reveal his or her name and address, confess to being undocumented, confess to any other negative history,

---

such as failure to sign the form, failure to enclose the required fee or the required documents, etc.

and send a check for $465 – all for a benefit that is most likely going to be denied. It is thus hardly surprising that the approval rate is as high as it is.  Given the applicant pool, the approval rate does not support any inference of rubber-stamping.

43.    In any given case, an adjudicator who determines that he or she needs additional information in order to reach a decision may issue a "Request for Evidence" (an "RFE").  I do not have access to the precise number of DACA RFEs, but on information and belief my impression is that they have numbered in the thousands.

44.    In the end, despite his conclusory assertions that the DACA adjudication process is insufficiently rigorous, Mr. Palinkas never identifies a single concrete piece of information that he claims adjudicators are unable to obtain or consider.  I am similarly unable to identify any such missing information.

## V.    Discretion

45.    Previously cited examples of deferred action or equivalent exercises aimed at large, specifically-defined classes of undocumented immigrants demonstrate that numerous Presidents have assumed they had the power to create such programs. While the fact that other Administrations have done something does not prove that it is legal to do so, it is instructive that Congress has long been fully aware of these actions and to date has never blocked the practice.  There is no indication that Congress believed these past practices to be unlawful.

46.    Even assuming *arguendo* that all deferred action must be issued on an individual basis, DACA satisfies that requirement.  The fact that the agency has announced

the general criteria that should guide the exercise of that discretion does not mean that there is no discretion to exercise. Agency guidance as to the exercise of discretion in individual cases is a common practice that serves several crucial purposes. Important general policy decisions like DACA should be made at the leadership level, because political accountability rests solely with leadership, not with the career employees whose job is to carry out the policies. Further, only the leadership can disseminate guidance throughout the agency so that the people on the ground know what they are supposed to do, so that important priorities will be transparent to the public, and so that there will be some reasonable degree of consistency. Consistency in turn is essential to equal treatment. To the extent avoidable, the decision whether to arrest, detain, prosecute, or grant or deny deferred action should not depend on which officer happens to encounter the person or which prosecutor's desk the person's file happens to land on. For all these reasons, the DACA process wisely entails adopting general threshold criteria at the front end while still requiring individualized, case-by-case discretion at the back end.

47. The National Standard Operating Procedures issued by agency and departmental leadership to the USCIS adjudicators repeatedly and explicitly admonish them to approach each case individually and to exercise discretion. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 17 ("individual *may* be favorably *considered* for DACA if" the threshold criteria are met) (my emphasis); 44 (substantially similar instruction); 74 ("decision whether to defer

20

action in a particular case is *individualized and discretionary*, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns") (my emphasis); 75 ("criminal history … is a factor to be considered in the unreviewable *exercise of discretion*") (my emphasis).

48.   There is no evidence to support any counter-instinctive assumption that the USCIS adjudicators who decide DACA requests are systematically disobeying the Secretary's multiple clear instructions to exercise discretion on a case-by-case basis.  They are in fact exercising discretion at two different stages of the process:

49.   First, some of the threshold criteria themselves require fundamentally discretionary judgments.   Whether someone endangers the public safety, for example, is more than simply a matter of finding facts.  The adjudicator has to decide not only how probable and how severe a danger the particular individual poses, but also how probable and how severe it *has to be* before finding the person to be a threat to public safety.   There is no scientific answer to that question; it is a matter of opinion, not fact. The same is true when the question is whether the person is a threat to national security. There are foundational facts to be ascertained, but once they are, the adjudicator must decide whether the threat is probable enough and severe enough to warrant denying DACA.   This is the classic definition of a discretionary determination – one for which there is no uniquely correct answer.    See, e.g., S.A. de Smith, "Constitutional and Administrative Law" (4th ed. 1981), at 278.   The fact that the discretion is exercised in applying the threshold criteria rather than separately after the threshold criteria have been met does not make the determination any less

discretionary.  The adjudicator is still choosing between two permissible courses of action.  See, e.g., *Gonzalez-Oropeza v. U.S. Attorney General*, 321 F.3d 1331, 1332-33 (11th Cir. 2003) (determinations of "exceptional and extremely unusual hardship," which is a statutory prerequisite for cancellation of removal, are discretionary and therefore unreviewable); *Romero-Torrez v. Ashcroft*, 327 F.3d 887, 889-92 (9th Cir. 2003) (same).  Nor is there any apparent legal or policy reason to value either exercise of discretion more than the other.

50.    Second, the Neufeld affidavit submitted in the DAPA litigation in fact gave specific examples of cases in which DACA was denied in the exercise of discretion even though the threshold criteria had been met.  See *State of Texas v. United States*, Civ. No. B-14-254 (S.D. Tex. Feb. 16, 2015), Exh. 44, Declaration of [USCIS Associate Director for Service Operations] Donald W. Neufeld, at 510, para. 18.  In his sworn declaration, Mr. Neufeld stated that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met."  *Id*.  He furnished specific examples.  They included cases where a person had committed or had attempted to commit fraud in *prior* applications or petitions (not in connection with the DACA requests themselves), or where a person met all the threshold criteria but had previously made a false claim of U.S. citizenship and had had prior removals.  *Id*.

51.    For all the foregoing reasons, and for additional reasons elaborated in my U.S. House Judiciary Committee testimony of February 25, 2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf, it is my firmly-held opinion that DACA is a case-by-case exercise

22

of prosecutorial discretion by which DHS fulfills the Congressional directive to set and carry out immigration enforcement priorities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this  16th  day of July, 2018 in  St. Louis, Missouri.


_____

Stephen H. Legomsky

# Def-Int. Ex. 151

# PLACEHOLDER[1]

---

[1] Defendant-Intervenors will supplement this item of the appendix when the final deposition transcript becomes available.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# Volume 2

# Exhibits 280 - 287

# DEF-INTERV.

# EX. 280

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,        )
          Plaintiffs,               )
 4                                  )
     vs.                            ) CASE NO. 1:18-cv-00068
 5                                  )
     UNITED STATES OF AMERICAN,     )
 6   et  al.,                       )
          Defendants                )
 7   and                            )
                                    )
 8   KARLA PEREZ, et al.,           )
        Defendants-Intervenors      )
 9   ********************************************************

10               ORAL DEPOSITION OF

11               DR. NANCY ADOSSI

12                 JUNE 21, 2018

13   ********************************************************

14       ORAL DEPOSITION OF DR. NANCY ADOSSI, produced as a

15   witness at the instance of the Plaintiff and duly sworn,

16   was taken in the above-styled and numbered cause on the

17   21st day of June, 2018, from 9:08 a.m. to 11:20 p.m.,

18   before LaDonna Ayers Burch  , Certified Shorthand

19   Reporter in and for the State of Texas, reported by

20   computerized stenotype machine at the Offices of the

21   Attorney General, Consumer Protection Division, 808

22   Travis Street, Suite 1520 Houston, Texas  77002,

23   pursuant to the Federal Rules of Civil Procedure and the

24   provisions stated on the record or attached hereto.

25
```

**Transcripts**

 Jun 21, 2018 Adossi, Nancy

**Page:** 66
1  question.
2      Q.    So was that after you became a DACA recipient
3  was you filed your first taxes?
4      A.    Yeah, uh-huh.   Yes.
5      Q.    Okay.   And so to reiterate, you received an
6  employment authorization when you received DACA and
7  that's what has allowed you to receive the current jobs
8  that you're in, correct?
9      A.    Yes.
10     **Q.    Okay.   Have you ever heard of advanced parole?**
11     **A.    Yes, I have.**
12     **Q.    Okay.   What's your understanding of it?**
13     **A.    I believe it's another application process to**
14  **receive permission to leave the United States for work,**
15  **for sickness in the family and I don't remember the**
16  **third category, but I remember work and sickness in the**
17  **family.**
18     **Q.    Okay.   Have you ever applied for it?**
19     **A.    I have never applied for it.**
20     Q.    Do you know any other DACA recipients who have
21  applied for advanced parole?
22     A.    No, not that I can recall.
23     Q.    And have you traveled outside of the U. S.
24  since your DACA request was approved?
25     A.    No, I have not.

 Jun 21, 2018 Adossi, Nancy

**Page:** 69
1  because it's a few different things sure.
2                  THE WITNESS:   Yes, I -- this is -- this is
3  where I've lived for 20 years.
4      **Q    (BY MR. PEROYEA) So you would want to remain in**
5  **the United States if you lost DACA?**
6      A.    If there was a legal path for me to be able to
7  apply to, yes.
8      **Q.    But if you lost DACA specifically, would you**
9  **consider all of your options as to where you would live?**
10     A.    Yes, I would go to a lawyer and ask them what
11  are my options.
12     **Q.    But would it be possible that you would leave**
13  **the United States?**
14                 **MR. HERRERA:   Objection, calls for**
15  **speculation.**
16                 **THE WITNESS:   I mean, like I said, my**
17  **entire life is here.**
18     **Q    (BY MR. PEROYEA) So -- so you would wait to see**
19  **the possibility as to whether or not you would stay or**
20  **go?**

21       A.    I would go to a lawyer to ask them what my
22 options are.
23       **Q.    And so what would happen if you lost your work**
24 **authorization?**
25       A.    I wouldn't have -- I wouldn't be able to work.

```
  1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
  2                     BROWNSVILLE DIVISION

  3    STATE OF TEXAS, et al.,        )
            Plaintiffs,               )
  4                                   )
       vs.                            ) CASE NO. 1:18-cv-00068
  5                                   )
       UNITED STATES OF AMERICAN,     )
  6    et  al.,                       )
            Defendants                )
  7    and                            )
                                      )
  8    KARLA PEREZ, et al.,           )
          Defendants-Intervenors      )

  9

 10                   REPORTER'S CERTIFICATE

 11           ORAL DEPOSITION OF DR. NANCY ADOSSI

 12                     JUNE 21, 2018

 13        I, LADONNA AYERS BURCH, a Certified Shorthand

 14    Reporter in and for the State of Texas, do hereby

 15    certify that the foregoing deposition is a full, true

 16    and correct transcript;

 17        That the foregoing deposition of DR. NANCY ADOSSI,

 18    the Witness, hereinbefore named was at the time named,

 19    taken by me in stenograph on June 21st, 2018, the said

 20    Witness having been by me first duly cautioned and sworn

 21    to tell the truth, the whole truth, and nothing but the

 22    truth, and the same were thereafter reduced to

 23    typewriting by me or under my direction.  The charge for

 24    the completed deposition is $_____ due from

 25    Plaintiff;
```

1      That by agreement of counsel, the deposition officer

2  is instructed to release the original deposition

3  transcript to _____ on

4  _____,  for review and signature, and the

5  deposition officer is thereafter released of any further

6  responsibility with regard to the original.

7      That the Witness shall have thirty (30) days for

8  review and signature of the original transcript and if

9  any corrections returned are attached hereto.

10     That the signed transcript ( ) was ( ) was not

11 received from the Witness within 30 days.

12     That the amount of time used by each party at the

13 deposition is as follows:

14     Mr. Trent Peroyea - 1 hr. 54 min
       Mr. Adam Arthur Biggs
15     Mr. Ernest I. Herrera - 1 minute
       Mr. Rick Kincheloe - 4 minutes
16     That before the completion of the deposition, the
   the Defendant did request to review the transcript.
17     I further certify that I am neither counsel for,
   related to, nor employed by any of the parties in the
18 action in which this proceeding was taken, and further
   that I am not financially or otherwise interested in the
19 outcome of the action.
       Certified to by me this _____ day of _____
20 _____, 2018.

21                           _____

22                           LaDonna Ayers Burch, CSR
                             Texas CSR 3941
23                           Expiration:  12/31/2018
                             KIM TINDALL & ASSOCIATES, LLC
24                           Firm Registration No. 631
                             16414 San Pedro, Suite 900
25                           San Antonio, Texas  78232
                             (210) 697-3400

# DEF-INTERV.

# EX. 281

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                 BROWNSVILLE DIVISION

3

STATE OF TEXAS, ET. AL.          )
4                                 )
          PLAINTIFFS,             )
5                                 )
V.                               ) CASE NO. 1:18-cv-00068
6                                 )
UNITED STATES OF AMERICA,         )
7 ET. AL.,                        )
                                 )
8          DEFENDANTS,            )
                                 )
9 AND                            )
                                 )
10 KARLA PEREZ, ET. AL.,          )
                                 )
11      DEFENDANT-INTERVENORS.)

12

13

14

15

16    _____

17         ORAL DEPOSITION OF KARLA PEREZ

18                 June 16, 2018
     _____
19

20

21

22

23

24

25

1        ORAL DEPOSITION OF KARLA PEREZ, produced as a

2   witness at the instance of the Plaintiffs and duly

3   sworn, was taken in the above-styled and numbered

4   cause on June 16, 2018, from 11:06 a.m. to 1:55 p.m.,

5   before Mia Cieslar, Certified Shorthand Reporter in

6   and for the State of Texas, reported by computerized

7   machine shorthand, at the offices of the Attorney

8   General, Consumer Protection Division, 808 Travis

9   Street, Suite 1520, Houston, Texas, pursuant to the

10  Federal Rules of Civil Procedure and the provisions

11  stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Transcripts**

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 76
1     Q.    All right.   What nuances did he not
2 understand?
3     A.    Senator Schwertner states, This amendment
4 simply requires that the student qualify for federal
5 financial aid.   You must have a Social Security card
6 and be a US citizen.
7                     That is incorrect.   I'm a DACA
8 recipient.   I have a Social Security card.   I cannot
9 apply for or qualify for federal financial aid.   So it
10 was just a -- it was clear to me that it -- it showed
11 a lack of understanding of how this works.
12     Q.    Okay.   Did you participate in the Texas
13 College Work-Study Program?
14     A.    I did not.
15     Q.    Okay.   Here it says -- I'm sorry?
16     A.    I was not aware of it.
17     Q.    Okay.   Yeah, and actually, that's what I was
18 going to ask you.   Here you say, There are a lot of
19 obstacles for DACA students, said Perez, 24, noting
20 that many of the DACA recipients she knew in Texas had
21 not even realized they could participate in the work
22 study program in the past.
23                     You agree with that statement, right?
24     A.    Yes.
25     Q.    Okay.   And did you inform those DACA

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 78
1 thing.   People not understanding that having DACA,
2 being a DACA recipient does not mean that you are a US
3 citizen or that you have legal status.   That's what I
4 meant by that type of misinformation.
5     Q.    All right.   Do you know any DACA recipients
6 who did participate in the college work study program?
7     A.    I do not know.
8     Q.    Okay.   Was this one of the legislative
9 campaigns that United We Dream undertook during
10 the 2017 legislative session?
11     A.    It was not a campaign per se, but more
12 when -- I mean, there was a minor proposal that came
13 up when we were aware that we did what we could to
14 advocate against it.
15     Q.    And when you say we, you mean United We
16 Dream?
17     A.    Yes.
18     Q.    All right.
19             MR. DISHER:  We can take a break.
20             (Recess taken, 1:11 p.m. to 1:22 p.m.)

21    Q.    (BY MR. DISHER) All right.   We're back on the
22    record.   Ms. Perez, are you ready to continue?
23    A.    Yes.
24    Q.    All right.   I just have a few more questions
25    for you.

📄 Jun 16, 2018 Perez, Karla (6_16_2018)

**Page: 84**
1    Q.    All right.   And just what relation are they
2    to you?
3    A.    Extended family only.
4    Q.    Okay.   Since you came here in 1995, have you
5    left the United States?
6    A.    No.
7    Q.    Been here ever since?
8    A.    Yes.
9    Q.    All right.   Have you ever applied for advance
10   parole?
11   A.    Yes.
12   Q.    When did you apply for advance parole?
13   A.    Early -- late -- late 2016, early 2017.   It
14   was over my school winter break.
15   Q.    Okay.   Did you get advance parole?
16   A.    I was -- my application for advance parole
17   was approved in early March.
18   Q.    Of?
19   A.    Of 2017.
20   Q.    Okay.   And then why did you apply for advance
21   parole?
22   A.    My maternal grandmother has gotten very sick
23   over the years, and I thought that I could have the
24   opportunity to see her during that time.   Yeah.
25   Q.    And is she in Mexico?

**Page: 85**
1    A.    Yes.
2    Q.    All right.   Did you go see her?
3    A.    No.
4    Q.    Right.   Because you haven't left since '95,
5    obviously.   And why --
6    A.    Yes.
7    Q.    -- why did you not go?
8    A.    I applied for advance parole, as I mentioned,
9    later in 2016 or earlier in 2017, and I didn't hear
10   back until March.   And when I received the approval,
11   my schedule just didn't allow it at that time.
12   Q.    Okay.   Will you just describe to me the
13   process of applying for advance parole.
14   A.    Yes.   There's a -- an application for advance
15   parole.   That's a USCIS application.   I completed the
16   application.   I had to provide documentation for why I
17   was requesting advance parole.   That was based on the
18   humanitarian reason of my sick grandmother.   So I
19   provided those documents showing that in my

20  application packet to USCIS, along with a sworn
21  declaration about why I was seeking advance parole.
22      **Q.    All right.**
23      A.    And I paid a filing fee as well.
24      **Q.    Okay.   So you submit the material and pay the**
25  **filing fee.   Did you have to do anything else?**

```
1                    CHANGES AND SIGNATURE

2                        KARLA PEREZ

3                       June 16, 2018

4

5    PAGE/LINE              CHANGE                  REASON
```

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| 21, 21 | Strike "and" in "created and by" | Transcription Error |
| 40, 1 | Correct "fighting it" to "finding it" | Transcription Error |
| 45, 1 | Correct "DH" to "DHS" | Typographical Error |
| 65, 17 | Replace "monitor" with "mentor" | Transcription Error |
| 65, 21 | Replace "monitor" with "mentor" | Transcription Error |
| 75, 7 | Replace "wasn't" with "was" | Transcription Error |
| 78, 13 | Strike "that" | Transcription Error |
| 87, 13 | Replace "out" with "it" | Transcription Error |
| 90, 22 | Replace first "or" with "of" | Typographical Error |
| 91, 15 | Replace "confirm" with "confer" | Transcription Error |
| 96, 11 | Correct "Danielle" to "Daniel" | Transcription Error |
| 96, 12 | Correct "Candalaria" to "Candelaria" | Typographical Error |
| 96, 12 | Correct "Mela" to "Mirla" | Transcription Error |

```
19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

```
 1        I, KARLA PEREZ, have read the foregoing deposition
 2   and hereby affix my signature that same is true and
 3   correct, except as noted above.
 4
 5                              Karla Perez
                               ─────────────────────────
 6                             KARLA PEREZ
 7
 8   THE STATE OF  Texas  )
 9   COUNTY OF  Harris    )
10
11        Before me,  Elsa Ramirez  , on this day
12   personally appeared KARLA PEREZ, known to me or proved
13   to me on the oath of  Texas Driver License (or through
14   description of identity card or other document) to be
15   the person whose name is subscribed to the foregoing
16   instrument and acknowledged to me that he/she executed
17   the same for the purpose and consideration therein
18   expressed.
19        Given under my hand and seal of office on this
20    12   day of   July          , 20 18 .
21
22                             ─────────────────────────
23   [SEAL: ELSA RAMIREZ         NOTARY PUBLIC IN AND FOR
         Notary Public, State of Texas
24       My Commission Expires   THE STATE OF  Texas
         June 16, 2019]
25                             My Commission Expires: June 16, 2019
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
     STATE OF TEXAS, ET. AL.        )
 4                                  )
             PLAINTIFFS,            )
 5                                  )
     V.                             ) CASE NO. 1:18-cv-00068
 6                                  )
     UNITED STATES OF AMERICA,      )
 7   ET. AL.,                       )
                                    )
 8           DEFENDANTS,            )
                                    )
 9   AND                            )
                                    )
10   KARLA PEREZ, ET. AL.,          )
                                    )
11           DEFENDANT-INTERVENORS.)

12

13              REPORTER'S CERTIFICATE

14          ORAL DEPOSITION OF KARLA PEREZ

15                   June 16, 2018

16

17          I, Mia Cieslar, Certified Shorthand Reporter

18   in and for the State of Texas, hereby certify that to

19   the following:

20          That the witness, KARLA PEREZ, was duly sworn

21   by the officer and that the transcript of the oral

22   deposition is a true record of the testimony given by

23   the witness;

24          I further certify that pursuant to FRCP Rule

25   30(f)(1) that the signature of the deponent:
```

1            __X__ was requested by the deponent or a party

2     before the completion of the deposition and returned

3     within 30 days from date of receipt of the transcript.

4     If returned, the attached Changes and Signature Page

5     contains any changes and the reasons therefor;

6            ____ was not requested by the deponent or a

7     party before the completion of the deposition.

8            I further certify that I am neither attorney

9     nor counsel for, related to, nor employed by any of

10    the parties in the action in which this testimony was

11    taken.

12           Further, I am not a relative or employee of

13    any attorney of record in this cause, nor do I have a

14    financial interest in the action.

15           Subscribed and sworn to on this the _____ day

16    of _____, 20____.

17

18

19           _____
              Mia Cieslar, CRC, RDR, CRR
20            Texas CSR 5763
              Expiration:  12/31/19
21            Kim Tindall & Associates, LLC
              Firm Registration No. 631
22            16414 San Pedro, Suite 900
              San Antonio, Texas  78232
23            Phone (210) 697-3400
              Fax (210) 697-3408

24

25

# DEF-INTERV.

# EX. 282

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Rose Arackathara on 06/18/2018**

```
1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION
     - - - - - - - - - - - - - - - - - - - - - - - - - -
3
     STATE OF TEXAS, et al.,          CASE NO. 1:18-CV-08
4
         Plaintiffs,
5
                 vs.
6
     UNITED STATES OF AMERICA,
7    et al.,

8        Defendants,

9    KARLA PEREZ, et al.,

10       Defendant-Intervenors,

11   and

12   STATE OF NEW JERSEY,

13       Proposed Defendant-Intervenor

14   - - - - - - - - - - - - - - - - - - - - - - - - - -

15                          - - -

16                 Monday, June 18, 2018

17                          - - -

18                   DEPOSITION OF:

19                 ROSE ARACKATHARA

20                          - - -

21

22

23

24

25
```

Case 1:18-cv-00068   Document 289-2   Filed in TXSD on 08/04/18   Page 20 of 64

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                    Page 2

1

2                   Oral Deposition of ROSE ARACKATHARA,

3       was taken pursuant to Notice at the offices of the

4       NEW JERSEY ATTORNEY GENERAL'S OFFICE, 124 Halsey

5       Street, 5th Floor, Newark, NJ 07101 on the above

6       date before DEBRA G. JOHNSON-SPALLONE, CCR, RPR,

7       Delaware CSR, Notary Public in and for the States of

8       Pennsylvania, New Jersey, and Delaware, and a

9       Federally Approved Reporter of the United States

10      District Court commencing on or about 10:10 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    are given work authorization.

2              Q.      That's your understanding of the --

3              A.      That's my understanding, yes.

4              Q.      And do you know whether Ms. Osorio

5    would have been selected for the internship without

6    having DACA status?

7              A.      I don't know for certain.  I would

8    -- I would -- again, I would think so based on just

9    a general assumption that an employment contract is

10   a part of the program.

11             Q.      You talk some in paragraph four of

12   your Declaration.

13                     Is it right that Ms. Osorio worked

14   with social workers conducting home visits in Morris

15   County, New Jersey?

16                     Is that right?

17             A.      Yes, that's correct.

18             Q.      And those were in response to

19   concerns about abuse or neglect or child welfare.

20                     Is that correct?

21             A.      Yes.

22             Q.      Was this work that's described in

23   paragraph four in your Declaration part of her work

24   at the Intake Unit?

25             A.      Yes.

1   specialized unit for adolescents.  So, I know she

2   did or that was done a few times.  Also to make sure

3   she reviewed some of the documents that they

4   generate in that process.

5              So, she had -- she had -- she had a

6   good broad experience through the Division, but,

7   again, it was primarily in the Intake Unit.

8        Q.    Is it typical of interns in the

9   DCP&P to get experience in various units within the

10  Division?

11             MR. HOLLANDER:  Objection.

12             THE WITNESS:  From my

13  understanding, I don't know if it's -- but from my

14  understanding is, it varies depending on the Field

15  Instructor.

16             I know from other Field Instructors

17  that I have spoken to they have a similar philosophy

18  in trying to get them to have a better understanding

19  of the Division, broader understanding of the

20  Division, but I don't -- it varies, the experience

21  varies per student -- per student.

22                  - - -

23  CONTINUATION

24  BY MR. BITTER:

25        Q.    But with respect to Ms. Osorio,

```
 1    you've been indicating that she got experience in a

 2    handful of units within the Division.

 3            A.      Yes.

 4            Q.      Is that right?

 5            A.      Yes.

 6                    MR. HOLLANDER:  Objection.

 7                         - - -

 8    CONTINUATION

 9    BY MR. BITTER:

10            Q.      In paragraph five of your

11    Declaration you talk about Ms. Osorio shadowing a

12    social worker in the Passaic County Permanency Unit.

13                    Do you see that?

14            A.      Yes.

15            Q.      Could you talk to me about some of

16    those functions that Ms. Osorio performed there?

17            A.      So, yes.

18                    During her internship, as I

19    mentioned before, towards the end of your internship

20    you will let the BCWEP program know what counties

21    you would like to work in.

22                    Cinthia reported me that her

23    primarily -- her primary town she would like to work

24    in was Morris County, but she was also interested in

25    working in Passaic County.
```

```
 1              Q.      You talk in paragraph six of your

 2    Declaration about Ms. Osorio having a natural

 3    rapport in the family she visited.

 4                      Do you see that?

 5              A.      Huh-huh.

 6              Q.      And what do you mean by that?

 7              A.      She -- in social work, in working

 8    with people and families, and especially when they

 9    are a new position, in a sense that we are an agency

10    with authority, it is a very delicate balance to

11    work with a family, and, you know, work on issues.

12                      We're primarily there to help, but

13    we are not always seen in that capacity by the

14    families we work with.  What they're afraid -- the

15    first thing that most families think of when we come

16    knocking on doors is; "are you going to take my

17    child?"

18                      So, it is a delicate balance in

19    working with families to assure them we are there

20    primarily to help.  We are not there primarily to

21    take their child, and we are there primarily for the

22    safety of the children in their household.

23                      So, Cinthia was -- it is very

24    important to show through our workers to have a good

25    way of working with families and individuals and
```

Case 1:18-cv-00068   Document 289-2   Filed in TXSD on 08/04/18   Page 25 of 64

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                              Page 56

1    ensuring them that we are there to help.

2                        If there is something that is

3    posing a risk with the child, we are there to help

4    mitigate that, and it is, honestly, not even

5    primarily by the means of removing the child from

6    the situation.

7                        So, it is -- it is important that

8    workers go into the home, and work with families,

9    and have that ability to convey that to them in how

10   we speak, how we interact with them, how we explain

11   things, and, you know, focusing on -- not only on

12   the negative, but also on the positive and strengths

13   that are in that family.

14                       And Cinthia was very, very natural

15   with that.  She -- even times when she came out with

16   me, she was first to point out strengths in that

17   individual, and they are talking about all these

18   things that are going wrong in your life right now.

19   She is typically the first to point out, "but look

20   how strong you are.  Look what you went through.

21   Look where you are today."

22                       So, that was what I have seen in

23   Cinthia.

24            Q.    So, you are not saying that other

25   interns in the program are unable to build that kind

```
 1    providing anything in the Declaration to the

 2    negative, if you will, of other interns and other

 3    workers within DCP&P.

 4                    Is that right?

 5         A.    Yes.

 6                    MR. HOLLANDER:  Objection to the

 7    question, but you can answer.  Okay.

 8                       - - -

 9    CONTINUATION

10    BY MR. BITTER:

11         Q.    In paragraph seven you indicate

12    that Ms. Osorio was able to truly understand DCP&P

13    clients.

14                    Do you see that?

15         A.    Yes.

16         Q.    A couple of things with respect to

17    this paragraph.

18                    First of all, Ms. Osorio is fluent

19    in Spanish.

20                    Is that correct?

21         A.    Yes.

22         Q.    And what do you mean by the fact

23    that she can truly --

24                    Let me rephrase that.

25                    What do you mean when you say that,
```

Case 1:18-cv-00068 Document 289-2 Filed in TXSD on 08/04/18 Page 27 of 64

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                    Page 59

1    "Ms. Osorio can truly understand DCP&P clients"?

2              A.      So, when it comes to working with

3    our families, a lot of the time they ask about us

4    personally; how do we know what we are talking about

5    when we never went through what they are going

6    through, and there's two different types of workers

7    in the Division, and there is the worker that, you

8    know, wants to help, and, you know, make a

9    difference in changing lives, but they don't have

10   personal experience, you know, and the difficulties

11   of growing up in a household that may have, you

12   know, safety risk issues in the household.

13                        And there is workers who have

14   personally gone through, not necessarily safety

15   issues, but struggle, and it -- they understand from

16   a firsthand perspective other -- other -- other

17   individuals understand intellectually what they are

18   going through, but it is completely different when

19   it is coming from a personal standpoint of what

20   personally you have gone through.

21                        In our attachment area, we do have

22   a large population of undocumented individuals that

23   we work with, and those clients are always

24   particularly worried and reluctant to work with us

25   because of the immigration status.

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.

Rose Arackathara on 06/18/2018

Page 60

 1                         And Cinthia herself had to go

 2       through that personal struggle of, "am I going to be

 3       able to work in my field of choice," because she was

 4       undocumented when she was a teen, and because DACA

 5       was going to possibly be rescinded, she can

 6       personally speak to those difficulties in her

 7       childhood, and that mind frame of going through what

 8       our clients go through, being undocumented and

 9       having those experiences that come with that.

10              Q.     Are you aware whether, during the

11       time that Ms. Osorio was an intern at DCP&P, there

12       were any other interns in the program who were DACA

13       recipients?

14              A.     Can you -- can you repeat your

15       question?

16              Q.     Sure.

17                     When Ms. Osorio was an intern at

18       DCP&P, are you aware whether there were other

19       interns at the same time who were also DACA

20       recipients?

21              A.     I'm aware of others, yes.

22              Q.     And are you aware -- at other

23       times, just beyond the times that Ms. Osorio was

24       there, are you aware whether DACA recipients that

25       were brought on by DCP&P as interns?

1   being able to truly understand DCP&P clients.

2                   You're -- again, you're focusing on

3   Ms. Osorio strengths in the internship program.

4                   Is that fair?

5        A.      Huh-huh.

6        Q.      You are not --

7                   Is that a yes?

8        A.      Oh, yes.  Yes.  Sorry.

9        Q.      And you are not providing that

10  testimony here today to the -- to the negative of

11  anybody else who works for DCP&P.

12                  Is that right?

13                  MR. HOLLANDER:  Objection.

14                  THE WITNESS:  Yes, that is right.

15                       - - -

16  CONTINUATION

17  BY MR. BITTER:

18          Q.      What do you mean in paragraph seven

19  about Ms. Osorio being able to connect with clients

20  in a natural way?

21          A.      Speaking to Ms. Osorio, speaking to

22  previously in that she has a natural rapport with

23  individuals, not just undocumented individuals.  It

24  is individuals in general.

25                  But also, you know, everybody --

Case 1:18-cv-00068   Document 289-2   Filed in TXSD on 08/04/18   Page 30 of 64

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                    Page 63

1    social work in particular, the way you work with

2    families, through personal experience and background

3    definitely plays a factor in that how you perceive a

4    family, how you work with the family, and through

5    supervision we challenge that in making sure that

6    you are not bias, but in the positive sense that she

7    personally, from firsthand experience, understands

8    the challenges that come with being undocumented,

9    and low income in -- in the State -- in the area.

10          Q.    Is it fair to say there are other

11   interns in the BCWEP program that are able to truly

12   understand DCP&P clients?

13                MR. HOLLANDER:  Objection.

14                THE WITNESS:  Can you repeat that?

15                MR. BITTER:  Sure.

16                     - - -

17   CONTINUATION

18   BY MR. BITTER:

19          Q.    Well, in your Declaration you talk

20   about Ms. Osorio being able to truly understand

21   DCP&P clients.

22                Is that right?

23          A.    Yes.

24          Q.    Is it fair to say there are other

25   interns in the program that are also truly able to

Case 1:18-cv-00068   Document 289-2   Filed in TXSD on 08/04/18   Page 31 of 64

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                   Page 64

 1    understand DCP&P clients?

 2              A.      They can truly understand them, but

 3    like I was saying previously, it is in a different

 4    capacities based on personal experience.

 5                      One can intellectually, cognitively

 6    understand, and one can understand from firsthand

 7    experience of going through some of the issues.

 8              Q.      And are other interns at DCP&P that

 9    are able to connect with clients the natural way as

10    what you refer in your Declaration?

11              A.      Yes, there are a couple.

12              Q.      And is that true for full-time

13    social workers as well?

14              A.      Yes, there are others.

15              Q.      Are you aware whether Ms. Osorio

16    was given any different tasks or responsibilities in

17    light of her DACA status during her internship?

18              A.      No, she was not.

19              Q.      Ms. Osorio's scheduled to start

20    working full time at the Division this August.

21                      Is that right?

22              A.      Yes.

23              Q.      And she -- it is your understanding

24    that she just graduated from Centenary College.

25                      Is that right?

1

2        I, Debra G. Johnson-Spallone, certify that the

3    foregoing is a true and accurate transcription of

4    the notes taken by me on the date set forth.

5        I further certify that I am not an attorney or

6    counsel of any of the parties, nor a relative or

7    employee of any attorney or counsel in connection

8    with the action, nor financially interested in the

9    action.

10

11

12

13

14    _____

15    DEBRA G. JOHNSON-SPALLONE, CSR, RPR

16

17

18

19    This transcript is not to be copied unless under the

20    direct control and supervision of the certifying

21    reporter.

22

23

24

25    Debra G. Johnson-Spallone, CSR, RPR

# DEF-INTERV.

# EX. 283

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

# A
# CBO
## PAPER



*A Series on Immigration*

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

**DECEMBER 2007**



Δ π EXHIBIT  4

Deponent Perlyman

Date 6/27/18  Rptr. DE

WWW.DEPOBOOK.COM

Pub. No. 2500



# The Impact of
# Unauthorized Immigrants on the
# Budgets of State and Local Governments

December 2007

The Congress of the United States ■ Congressional Budget Office



# Preface

**A**ccording to available estimates, there are about 12 million unauthorized immigrants in the United States. Federal, state, and local governments spend public funds that benefit those immigrants, and those immigrants pay individual income, sales, and property taxes. Most available studies conclude that the unauthorized population pays less in state and local taxes than it costs state and local governments to provide services to that population. However, those estimates have significant limitations; they are not a suitable basis for developing an aggregate national effect across all states.

This paper, requested by the Chairman and Ranking Member of the Senate Finance Committee, is one of several reports prepared by the Congressional Budget Office (CBO) that present facts and research on immigration. The paper focuses on the estimated costs that certain state and local governments incur for providing various services—especially those related to education, health care, and law enforcement—to unauthorized immigrants. It also looks at the estimated taxes those individuals pay and at certain types of federal assistance that are available to states to help provide such services. In keeping with CBO's mandate to provide objective, nonpartisan analysis, the paper makes no recommendations.

Melissa Merrell of CBO's State and Local Government Cost Estimates Unit wrote the paper under the supervision of Peter Fontaine, Theresa Gullo, and Robert Sunshine. Douglas Hamilton is the coordinator of CBO's series of reports on immigration. Raymond J. Hall and Eric Schatten reviewed the manuscript for factual accuracy, and Lauren McMahon provided research assistance. David Brauer, Patrice Gordon, Arlene Holen, Leo Lex, Noah Meyerson, Robert Murphy, Paige Piper/Bach, Lisa Ramirez-Branum, Eric Rollins, Ralph Smith, Shinobu Suzuki, and G. Thomas Woodward provided comments on early drafts of the paper, as did Paul Cullinan and Donald B. Marron (both formerly of CBO), and Alan Auerbach of the University of California, Berkeley. (The assistance of external reviewers implies no responsibility for the final product, which rests solely with CBO.)

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino prepared the paper for publication and designed the cover. Lenny Skutnik printed the initial copies, Linda Schimmel coordinated the print distribution, and Simone Thomas produced the electronic version for CBO's Web site (www.cbo.gov).

*Peter R. Orszag*
Director

December 2007



# Contents

Introduction                                                      1

The Budgetary Effects of Unauthorized Immigrants                 2

Size and Characteristics of the Unauthorized Population          3

Spending by State and Local Governments                          7
    Education                                 7
    Health Care                               8
    Law Enforcement                           9

Revenues Versus Spending                                         9

Federal Assistance                                              10
    Education                                10
    Health Care                              11
    Law Enforcement                          12

Bibliography                                                    13


Box

    1.   The Challenges of Estimating an Aggregate Effect    4



# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

## Introduction

Over the past two decades, most efforts to estimate the fiscal impact of immigration in the United States have concluded that, in aggregate and over the long term, tax revenues of all types generated by immigrants—both legal and unauthorized—exceed the cost of the services they use.[1,2] Generally, such estimates include revenues and spending at the federal, state, and local levels.[3] However, many estimates also show that the cost of providing public services to unauthorized immigrants at the state and local levels exceeds what that population pays in state and local taxes. It is important to note, though, that currently available estimates have significant limitations;

therefore, using them to determine an aggregate effect across all states would be difficult and prone to considerable error.

The impact of unauthorized immigrants on the federal budget differs from that population's effect on state and local budgets primarily because of the types of services provided at each level of government and the rules governing those programs. For instance, most unauthorized immigrants are prohibited from receiving many of the benefits that the federal government provides through Social Security and such need-based programs as Food Stamps, Medicaid (other than emergency services), and Temporary Assistance for Needy Families. At the same time, the federal government requires that state and local governments provide certain services to individuals, regardless of their immigration status or ability to pay, in order for those states or localities to participate in some of its assistance programs. Various court decisions also restrict the authority of state and local governments to avoid or constrain the cost of providing services to unauthorized immigrants who reside in their jurisdictions. In general, state and local governments bear much of the cost of providing certain public services—especially services related to education, health care, and law enforcement—to individuals residing in their jurisdictions. Such programs constitute a major portion of those governments' annual expenditures, but spending by state and local governments on services specifically provided to unauthorized immigrants makes up a small percentage of those governments' total spending.

Another factor that affects state and local spending is the extent to which the unauthorized population uses certain public services. For example, because unauthorized immigrants are less likely to have health insurance, they are

---

1. The term "unauthorized immigrants" refers to foreign citizens residing in the United States illegally. It applies to two categories of immigrants: those who enter the country without approval of the immigration process and those who violate the terms of a temporary admission without acquiring either permanent resident status or temporary protection from removal. Members of this population are also referred to as illegal or undocumented immigrants or aliens.

2. See Ronald D. Lee and Timothy W. Miller, "The Current Fiscal Impact of Immigrants and Their Descendants: Beyond the Immigrant Household," in James P. Smith and Barry Edmonston, eds., *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1998); James P. Smith and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1997); Georges Vernez and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996); and George Vernez and Kevin F. McCarthy, *Immigration in a Changing Economy: California's Experience* (Santa Monica, Calif.: RAND Corporation, 1998).

3. Typically, the estimates measure the costs and revenues attributed to immigrants during a specific period of time, usually one fiscal year.

# DEF-INTERV.

# EX. 284



# FAIR FEDERATION FOR AMERICAN IMMIGRATION REFORM

## THE FISCAL BURDEN OF ILLEGAL IMMIGRATION ON
# *United States Taxpayers*



Δ π EXHIBIT 5
Deponent McClullan
Date 6/27/18 Rptr J.E.
WWW.DEPOBOOK.COM

BY JACK MARTIN, DIRECTOR OF SPECIAL PROJECTS AND
ERIC A. RUARK, DIRECTOR OF RESEARCH



# THE FISCAL BURDEN OF ILLEGAL IMMIGRATION ON
# *United States Taxpayers*

BY JACK MARTIN, DIRECTOR OF SPECIAL PROJECTS AND
ERIC A. RUARK, DIRECTOR OF RESEARCH

**JULY 2010**
(REVISED FEBRUARY 2011)

# TABLE OF CONTENTS

**Executive Summary** ...................................................................................................................1

**Introduction** ...........................................................................................................................8

**I. Federal Outlays** ...............................................................................................................12
    A.  Educating the Children of Illegal Aliens ..................................................................13
    B.  Medical Expenses for Illegal Aliens and Their Children .........................................15
    C.  Criminal and Deportable Alien Prisoners ...............................................................18
    D.  Welfare Used by Illegal Alien Families ....................................................................26
    E.  General Federal Expenditures .................................................................................30
    F.  Total Federal Fiscal Costs........................................................................................31

**II. Federal Taxes Collected from Illegal Aliens**..................................................................32
    A.  Income Tax..............................................................................................................33
    B.  Earned Income Tax Credits (EITC) for Illegal Aliens.............................................35
    C.  Additional Child Tax Credit (ACTC) ....................................................................36
    D.  Net Income Tax Receipts from Illegal Aliens.........................................................38
    E.  Social Security Tax...................................................................................................38
    F.  Medicare Tax ..........................................................................................................40
    G.  Excise and Miscellaneous Taxes..............................................................................41
    H.  Other Taxes and Credits .........................................................................................41

**III. Net Federal Fiscal Costs of Illegal Aliens** ...................................................................42

**IV. Unquantified Federal Fiscal Impacts**...........................................................................43

**U.S. Map: Fiscal Costs per Native-Headed Household (Federal, State and Local)**...................44-45

**V. State and Local Outlays**................................................................................................46
    A.  Educating the Children of Illegal Aliens ................................................................47
    B.  Medical Care Costs of Illegal Aliens.......................................................................55
    C.  Administration of Justice Fiscal Costs ....................................................................63
    D.  Child Care...............................................................................................................65
    E.  Temporary Assistance to Needy Families ................................................................67
    F.  School Meal Programs.............................................................................................67
    G.  General Expenditures ..............................................................................................67
    H.  Other Costs.............................................................................................................69

**VI. State and Local Taxes Collected** ..................................................................................72
    The Illegal Alien Disposable Income Profile ................................................................73

**VII. Net Fiscal Costs** ..........................................................................................................77

**VIII. The Bottom Line**........................................................................................................79

**IX. The Economic Benefit Argument** ................................................................................80

**X. Effects of Amnesty**.........................................................................................................81
    A.  Amnesty Adoption .................................................................................................82
    B.  Attrition Through Enforcement ..............................................................................83

**XI. Conclusion** ...................................................................................................................87

**Endnotes** ...........................................................................................................................88

5
a report by the Federation for American Immigration Reform

## Receipts from Illegal Aliens

| TAX CATEGORY | FEDERAL | STATE/LOCAL |
|---|---|---|
| Income | -$2,302,800,000 | $244,200,000 |
| Social Security | $7,000,000,000 | |
| Medicare Tax | $1,637,100,000 | |
| Excise and Miscellaneous | $2,489,700,000 | |
| Employer (FUTA & Income) | $632,600,000 | |
| Property tax | | $1,378,000,000 |
| Sales Tax | | $2,333,000,000 |
| **TOTAL** | **$9,456,600,000** | **$3,955,200,000** |

## Methodology

All studies assessing the impact of illegal aliens begin with estimates of the size of that population. We use a population of 13 million broken down by state.

In our cost estimates we also include the minor children of illegal aliens born in the United States. That adds another 3.4 million children to the 1.3 million children who are illegal aliens themselves. We include these U.S. citizen children of illegal aliens because the fiscal outlays for them are a direct result of the illegal migration that led to their U.S. birth. We do so as well in the assumption that if the parents leave voluntarily or involuntarily they will take these children with them. The birth of these children and their subsequent medical care represent a large share of the estimated Medicaid and Child Health Insurance Program expenditures associated with illegal aliens.

We use data collected by the federal and state governments on school expenses, Limited English Proficiency enrollment, school meal programs, university enrollment, and other public assistance programs administered at the federal and state level. Estimates of incarceration expenses are based on data collected in the State Criminal Alien Assistance Program in which state and local detention facilities seek federal compensation for the cost of detention of criminal and deportable aliens. Estimates for other administration of justice expenditures are based on data collected from the states by the U.S. Department of Justice. General government expenditures are estimated for other non-enumerated functions of government at both the federal and local level. An example would be the cost of fire departments or the cost of the legislature.

Medical costs that amount to 10 percent of overall state and local outlays on illegal aliens derive from our estimate of the childbirths to illegal alien mothers covered by Medicaid, the subsequent medical insurance and treat-

# DEF-INTERV.

# EX. 285



**IMMIGRATION POLICY CENTER**

AMERICAN IMMIGRATION COUNCIL



Δ π EXHIBIT 6
Deponent Pullman
Date 6/27/18 Rptr. DE
WWW.DEPOBOOK.COM

May 2013

# NEW AMERICANS IN TEXAS:
## The Political and Economic Power of Immigrants, Latinos, and Asians in the Lone Star State

Immigrants, Latinos, and Asians account for growing shares of the economy and electorate in Texas. Immigrants (the foreign-born) make up roughly 1 in 6 Texans, and one-third of them are naturalized U.S. citizens who are eligible to vote. "New Americans"—immigrants and the children of immigrants—account for more than 1 in 10 registered voters in the state. Immigrants are not only integral to the state's economy as workers, but also account for billions of dollars in tax revenue and consumer purchasing power. Moreover, Latinos and Asians (both foreign-born and native-born) wield $265 billion in consumer purchasing power, and the businesses they own had sales and receipts of $102.1 billion and employed more than 600,000 people at last count. At a time when the economy is in a slump, Texas can ill-afford to alienate such a critical component of its labor force, tax base, and business community.

### *Immigrants and their children are growing shares of Texas's population and electorate.*

➢ **The foreign-born share** of Texas's population rose from 9.0% in 1990,[1] to 13.9% in 2000,[2] to 16.4% in 2011,[3] according to the U.S. Census Bureau. Texas was home to 4,201,675 immigrants in 2011,[4] which is more than the total population of Los Angeles, California.[5]

➢ **33.2% of immigrants (or 1,393,937 people) in Texas were naturalized U.S. citizens** in 2011[6]—meaning that they are eligible to vote.

➢ Unauthorized immigrants comprised roughly **6.7% of the state's population** (or 1.7 million people) in 2010, according to a report by the Pew Hispanic Center.[7]

➢ **11.8% (or 1,194,544) of registered voters** in Texas were "New Americans"—naturalized citizens or the U.S.-born children of immigrants who were raised during the current era of immigration from Latin America and Asia which began in 1965—according to an analysis of 2008 Census Bureau data by Rob Paral & Associates.[8]

### *More than 1 in 4 Texans are Latino or Asian—and they vote.*

➢ The **Latino share of Texas's population** grew from 25.5% in 1990,[9] to 32.0% in 2000,[10] to 38.1% (or 9,791,628 people) in 2011.[11] The **Asian share of the population** grew from 1.8% in 1990,[12] to 2.7% in 2000,[13] to 3.9% (or 999,118 people) in 2011,[14] according to the U.S. Census Bureau.

➢ **Latinos** accounted for 20.1% (or 1,697,000) **of Texas voters** in the 2008 elections, and Asians 1.4% (118,000), according to the U.S. Census Bureau.[15]

➢ In Texas, **87.7% of children with immigrant parents were U.S. citizens** in 2009, according to data from the Urban Institute.[16]

➢ In 2009, **86.2% of children in Asian families** in Texas were U.S. citizens, as were **93.2% of children in Latino families**.[17]

*Latino and Asian entrepreneurs and consumers add tens of billions of dollars and hundreds of thousands of jobs to Texas's economy.*

➢ **The 2012 purchasing power of Latinos in Texas totaled $216.2 billion**—an increase of 560% since 1990. **Asian buying power totaled $48.8 billion**—an increase of 969% since 1990, according to the Selig Center for Economic Growth at the University of Georgia.[18]

➢ Texas's 447,589 **Latino-owned businesses had sales and receipts of $61.9 billion and employed 395,673 people** in 2007, the last year for which data is available.[19] The state's 114,297 **Asian-owned businesses had sales and receipts of $40.2 billion and employed 206,545 people** in 2007, according to the U.S. Census Bureau's Survey of Business Owners.[20]

*Immigrants are integral to Texas's economy as workers and taxpayers.*

➢ Immigrants comprised **21% of the state's workforce** in 2011 (or 2,645,538 workers), according to the U.S. Census Bureau.[21]

➢ Immigrants accounted for **21% of total economic output** in the Houston metropolitan area and **16% of economic output** in the Dallas metropolitan area as of 2007, according to a study by the Fiscal Policy Institute.[22]

➢ Unauthorized immigrants in Texas paid **$1.6 billion** in state and local taxes in 2010, according to data from the Institute for Taxation and Economic Policy,[23] which includes:

  • $177.8 million in property taxes.
  • $1.4 billion in sales taxes.

➢ Unauthorized immigrants comprised **9% of the state's workforce** (or 1,100,000 workers) in 2010, according to a report by the Pew Hispanic Center.[24]

➢ If all unauthorized immigrants were removed from Texas, **the state would lose $69.3 billion in economic activity, $30.8 billion in gross state product, and approximately 403,174 jobs**, even accounting for adequate market adjustment time, according to a report by the Perryman Group.[25]

*Immigrants are integral to Texas's economy as students.*

➢ Texas's 61,511 **foreign students contributed $1.4 billion** to the state's economy in tuition, fees, and living expenses for the 2011-2012 academic year, according to NAFSA: Association of International Educators.[26]

*Naturalized citizens excel educationally.*

> In Texas, **28.9% of foreign-born persons** who were naturalized U.S. citizens in <u>2011</u> **had a bachelor's or higher degree**, compared to 15.2% of noncitizens. At the same time, only 29.3% of naturalized citizens lacked a high-school diploma, compared to 53.7% of noncitizens.[27]

> The number of immigrants in Texas with a college degree **increased by 91.5%** between 2000 and 2011, according to <u>data</u> from the Migration Policy Institute.[28]

> In Texas, **75.2% of children with immigrant parents** were considered "English proficient" as of <u>2009</u>, to data from the Urban Institute.[29]

> The English proficiency rate among **Asian children in Texas was 85.7%**, while for **Latino children it was 80.7%**, as of <u>2009</u>.[30]

## Endnotes

[1] U.S. Census Bureau, *The Foreign-Born Population: 2000*, December 2003.

[2] Ibid.

[3] 2011 American Community Survey (1-Year Estimates).

[4] Ibid.

[5] Ibid.

[6] Ibid.

[7] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 24.

[8] Rob Paral and Associates, *The New American Electorate: The Growing Political Power of Immigrants and Their Children* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, October 2010).

[9] U.S. Census Bureau, *The Hispanic Population: 2000*, May 2001.

[10] Ibid.

[11] 2011 American Community Survey (1-Year Estimates).

[12] U.S. Census Bureau, *The Asian Population: 2000*, February 2002.

[13] Ibid.

[14] 2011 American Community Survey (1-Year Estimates).

[15] U.S. Electoral College, 2008 Presidential Election: Popular Vote Totals.

[16] The Urban Institute, data from the Integrated Public Use Microdata Series datasets drawn from the 2005 - 2009 American Community Survey.

[17] Ibid.

[18] Jeffrey M. Humphreys, *The Multicultural Economy 2012* (Athens, GA: Selig Center for Economic Growth, University of Georgia, 2012).

[19] U.S. Census Bureau, *Estimates of Business Ownership by Gender, Ethnicity, Race, and Veteran Status: 2007*, June 2011.

[20] Ibid.

[21] 2011 American Community Survey (1-Year Estimates).

[22] David Dyssegaard Kallick, *Immigrants in the Economy: Contribution of Immigrant Workers to the Country's 25 Largest Metropolitan Areas* (New York, NY: Fiscal Policy Institute, December 2009), p. 11.

[23] The Immigration Policy Center, *Unauthorized Immigrants Pay Taxes, Too* (Washington, DC: April 2011).

[24] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 24.

[25] The Perryman Group, *An Essential Resource: An Analysis of the Economic Impact of Undocumented Workers on Business Activity in the US with Estimated Effects by State and by Industry* (Waco, TX: April 2008), p. 69.

[26] NAFSA: Association of International Educators, *The Economic Benefits of International Students to the U.S. Economy: Academic Year 2011-2012* (Washington, DC: 2012).

[27] Migration Policy Institute Data Hub, Texas: Language & Education.

[28] Ibid.

[29] The Urban Institute, data from the Integrated Public Use Microdata Series datasets drawn from the 2005 - 2009 American Community Survey.

[30] Ibid.

# DEF-INTERV.

# EX. 286

LF1300A1 | State and Local Government Finances by Level of Government and by State: 2013
2013 State and Local Government Finances

**Release Date : 10/19/2017**

Note: Data users who create their own estimates using these data should cite only the U.S. Census Bureau as the source of the original data. Data in this table are based on information from public records and contain no confidential data. Although the data in this table come from a census of governmental units and are not subject to sampling error, the census results may contain nonsampling error. Additional information on nonsampling error, response rates, and definitions may be found within the survey methodology and technical documentation.

| | |
|---|---|
| **Table Name** | State and Local Government Finances by Level of Government and by State: 2013 |
| **Release Schedule** | Data are released on a flow basis and will be replaced when updated data are available. |
| **Universe** | The universe of this file are state governments. |
| **Geography Coverage** | The data are shown at the State level. |
| **Data Items and Other Identifying Records** | This file contains data on: Amount($1,000) Coefficient of Variation for Amount (percent) |
| **Sort Order** | Data are presented in state sequence. |
| **FTP Download** | http://www2.census.gov/econ2013/LF/sector00/LF1300A1.zip |
| **Contact Information** | U.S. Census Bureau, U.S. Census Bureau, Economy Wide Statistics Division State & Local Finances Staff Washington, DC 20233-6900 Tel: 1-800-242-4523 ewd.local.finance@census.gov |

| 1 - 100 of 22,932 Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | Total Revenue | 2013 | 3,405,918,371 | 0.04 |
| United States | State and Local | General revenue, total | 2013 | 2,681,610,414 | 0.04 |
| United States | State and Local | General revenue, intergovernmental, total | 2013 | 583,106,379 | 0.04 |
| United States | State and Local | General revenue, intergovernmental from federal government | 2013 | 583,106,379 | 0.04 |
| United States | State and Local | General revenue, intergovernmental from state governments | 2013 | N | N |
| United States | State and Local | General revenue, intergovernmental from local governments | 2013 | N | N |
| United States | State and Local | General revenue from own sources | 2013 | 2,098,504,035 | 0.06 |
| United States | State and Local | General revenue from taxes, total | 2013 | 1,454,144,901 | 0.07 |
| United States | State and Local | General revenue from property taxes | 2013 | 453,010,647 | 0.22 |
| United States | State and Local | General revenue from sales taxes and gross receipts, total | 2013 | 498,428,097 | 0.05 |
| United States | State and Local | General revenue from sales taxes and gross receipts, general sales | 2013 | 330,089,018 | 0.06 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales | 2013 | 168,339,079 | 0.07 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, motor fuel | 2013 | 41,456,431 | 0.02 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, alcoholic beverage | 2013 | 6,628,916 | 0.06 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, tobacco products | 2013 | 17,499,922 | 0.01 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, public utilities | 2013 | 28,412,393 | 0.38 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, other selective sales | 2013 | 74,341,417 | 0.07 |
| United States | State and Local | General revenue from individual income taxes | 2013 | 338,635,647 | 0.04 |
| United States | State and Local | General revenue from corporate income taxes | 2013 | 52,903,217 | 0.03 |
| United States | State and Local | General revenue from motor vehicle licenses | 2013 | 24,874,551 | 0.05 |
| United States | State and Local | Taxes, NEC | 2013 | 86,292,742 | 0.10 |
| United States | State and Local | General revenue from charges and miscellaneous general revenue | 2013 | 644,359,134 | 0.09 |
| United States | State and Local | General revenue from current charges, total | 2013 | 439,926,826 | 0.13 |
| United States | State and Local | General revenue from current charges, education | 2013 | 117,590,764 | 0.02 |
| United States | State and Local | General revenue from current charges, education, institutions of higher education | 2013 | 101,892,825 | 0.01 |
| United States | State and Local | General revenue from current charges, education, school lunch sales (gross) | 2013 | 6,010,970 | 0.09 |
| United States | State and Local | General revenue from current charges, hospitals | 2013 | 128,269,493 | 0.21 |
| United States | State and Local | General revenue from current charges, highways | 2013 | 15,056,923 | 0.15 |
| United States | State and Local | General revenue from current charges, air transportation (airports) | 2013 | 20,581,897 | 0.14 |
| United States | State and Local | General revenue from current charges, parking facilities | 2013 | 2,732,188 | 0.54 |
| United States | State and Local | General revenue from current charges, sea and inland port facilities | 2013 | 4,520,499 | 0.46 |
| United States | State and Local | General revenue from current charges, natural resources | 2013 | 4,951,906 | 5.34 |
| United States | State and Local | General revenue from current charges, parks and recreation | 2013 | 9,684,470 | 0.51 |
| United States | State and Local | General revenue from current charges, housing and community development | 2013 | 6,190,241 | 0.71 |
| United States | State and Local | General revenue from current charges, sewerage | 2013 | 49,136,714 | 0.28 |
| United States | State and Local | General revenue from current charges, solid waste management | 2013 | 16,628,514 | 1.41 |
| United States | State and Local | General revenue from current charges, other charges | 2013 | 64,583,217 | 0.47 |
| United States | State and Local | General revenue from miscellaneous general revenue, total | 2013 | 204,432,308 | 0.09 |
| United States | State and Local | General revenue from miscellaneous general revenue, interest earnings | 2013 | 50,002,222 | 0.18 |
| United States | State and Local | General revenue from miscellaneous general revenue, special assessments | 2013 | 7,408,165 | 1.15 |
| United States | State and Local | General revenue from miscellaneous general revenue, sale of property | 2013 | 3,742,226 | 0.82 |
| United States | State and Local | General revenue from miscellaneous general revenue, other general revenue | 2013 | 143,279,695 | 0.10 |
| United States | State and Local | Utility revenue, total | 2013 | 155,313,710 | 0.24 |
| United States | State and Local | Utility revenue, water supply | 2013 | 57,643,309 | 0.31 |
| United States | State and Local | Utility revenue, electric power | 2013 | 76,158,831 | 0.42 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | Utility revenue, gas supply | 2013 | 6,529,916 | 1.12 |
| United States | State and Local | Utility revenue, transit | 2013 | 14,981,654 | 0.05 |
| United States | State and Local | Liquor store revenue | 2013 | 8,141,005 | 0.16 |
| United States | State and Local | Insurance trust revenue, total | 2013 | 560,853,242 | 0.06 |
| United States | State and Local | Insurance trust revenue, unemployment compensation | 2013 | 74,421,496 | 0.00 |
| United States | State and Local | Insurance trust revenue, employee retirement | 2013 | 464,823,040 | 0.08 |
| United States | State and Local | Insurance trust revenue, workers'compensation | 2013 | 14,326,968 | 0.00 |
| United States | State and Local | Insurance trust revenue, other insurance trust revenue | 2013 | 7,281,738 | 0.00 |
| United States | State and Local | Total expenditure | 2013 | 3,181,955,017 | 0.04 |
| United States | State and Local | Total expenditure by character and object: | 2013 | X | X |
| United States | State and Local | Intergovernmental expenditure | 2013 | 3,392,576 | 0.00 |
| United States | State and Local | Direct expenditure, total | 2013 | 3,178,562,441 | 0.04 |
| United States | State and Local | Direct expenditure from current operations | 2013 | 2,344,794,360 | 0.05 |
| United States | State and Local | Direct expenditure from capital outlay, total | 2013 | 320,691,628 | 0.18 |
| United States | State and Local | Direct expenditure from capital outlay, construction | 2013 | 255,947,651 | 0.20 |
| United States | State and Local | Direct expenditure from capital outlay excluding construction | 2013 | 64,743,977 | 0.36 |
| United States | State and Local | Direct expenditure from assistance and subsidies | 2013 | 52,343,669 | 0.05 |
| United States | State and Local | Direct expenditure from interest on debt | 2013 | 125,169,801 | 0.11 |
| United States | State and Local | Direct expenditure from insurance benefits and repayments | 2013 | 335,562,983 | 0.02 |
| United States | State and Local | Direct expenditure exhibit: Salaries and wages | 2013 | 856,855,886 | 0.06 |
| United States | State and Local | Direct expenditure by function: | 2013 | 3,178,562,441 | 0.04 |
| United States | State and Local | Direct general expenditure, total | 2013 | 2,624,648,971 | 0.04 |
| United States | State and Local | Direct general expenditure, capital outlay | 2013 | 270,976,435 | 0.20 |
| United States | State and Local | Direct general expenditure excluding capital outlay | 2013 | 2,353,672,536 | 0.04 |
| United States | State and Local | Direct general expenditure from education services: | 2013 | X | X |
| United States | State and Local | Direct general expenditure from education, total | 2013 | 877,271,507 | 0.05 |
| United States | State and Local | Direct general expenditure from education, capital outlay | 2013 | 80,598,391 | 0.19 |
| United States | State and Local | Direct general expenditure from education, higher education, total | 2013 | 260,854,561 | 0.02 |
| United States | State and Local | Direct general expenditure from education, higher education, capital outlay | 2013 | 31,868,504 | 0.03 |
| United States | State and Local | Direct general expenditure from education, elementary & secondary, total | 2013 | 569,576,574 | 0.07 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | Direct general expenditure from education, elementary & secondary, capital outlay | 2013 | 47,905,004 | 0.32 |
| United States | State and Local | Direct general expenditure from education, other education | 2013 | 46,840,372 | 0.00 |
| United States | State and Local | Direct general expenditure from education, libraries | 2013 | 11,144,189 | 1.00 |
| United States | State and Local | Direct general expenditure from social services and income maintenance: | 2013 | X | X |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, total | 2013 | 515,468,625 | 0.02 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, cash assistance payments | 2013 | 22,593,718 | 0.11 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, vendor payments | 2013 | 417,073,093 | 0.01 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, other public welfare | 2013 | 75,801,814 | 0.15 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, hospitals, total | 2013 | 158,025,792 | 0.18 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, hospitals, capital outlay | 2013 | 9,280,974 | 0.40 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, health | 2013 | 86,612,213 | 0.44 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, employment security administration | 2013 | 4,900,837 | 0.00 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, veterans' services | 2013 | 1,024,498 | 0.00 |
| United States | State and Local | Direct general expenditure from transportation, total | 2013 | X | X |
| United States | State and Local | Direct general expenditure from transportation, highways, total | 2013 | 157,426,594 | 0.20 |
| United States | State and Local | Direct general expenditure from transportation, highways, capital outlay | 2013 | 87,819,227 | 0.27 |
| United States | State and Local | Direct general expenditure from transportation, air transportation (airports) | 2013 | 21,448,256 | 0.53 |
| United States | State and Local | Direct general expenditure from transportation, parking facilities | 2013 | 1,903,489 | 0.50 |
| United States | State and Local | Direct general expenditure from transportation, sea and inland port facilities | 2013 | 5,319,363 | 0.82 |
| United States | State and Local | Direct general expenditure from public safety, total | 2013 | X | X |
| United States | State and Local | Direct general expenditure from public safety, police protection | 2013 | 98,941,340 | 0.29 |
| United States | State and Local | Direct general expenditure from public safety, fire protection | 2013 | 42,573,454 | 0.55 |
| United States | State and Local | Direct general expenditure from public safety, correction, total | 2013 | 72,969,615 | 0.28 |
| United States | State and Local | Direct general expenditure from public safety, correction, capital outlay | 2013 | 2,483,800 | 7.48 |
| United States | State and Local | Direct general expenditure from public safety, protective inspection and regulation | 2013 | 14,047,226 | 0.29 |

Source: U.S. Census Bureau, 2013 Annual Survey of State and Local Finances.

Symbols:
**X** - Not applicable
**N** - Not available or not comparable
For a complete list of all economic programs symbols, see the Symbols Glossary

# DEF-INTERV.

# EX. 287

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

ABOUT   FOLLOW   MY ACCOUNT ⌄    DONATE



MENU                    RESEARCH AREAS          SEARCH

U.S. SURVEY RESEARCH                                           

# Questionnaire design

Perhaps the most important part of the survey process is the creation of questions that accurately measure the opinions, experiences and behaviors of the public. Accurate random sampling and high response rates will be wasted if the information gathered is built on a shaky foundation of ambiguous or biased questions. Creating good measures involves both writing good questions and organizing them to form the questionnaire.

Questionnaire design is a multistage process that requires attention to many details at once. Designing the questionnaire is complicated because surveys can ask about topics in varying degrees of detail, questions can be asked in different ways, and questions asked earlier in a survey may influence how people respond to later questions. Researchers also are often interested in measuring change over time and therefore must be attentive to how opinions or behaviors have been measured in prior surveys.

Surveyors may conduct pilot tests or focus groups in the early stages of questionnaire development in order to better understand how people think about an issue or comprehend a question. Pretesting a survey is an essential step in the questionnaire design process to evaluate how people respond to the overall questionnaire and specific questions.

For many years, surveyors approached questionnaire design as an art, but substantial research over the past thirty years has demonstrated that there is a lot of science involved in crafting a good survey questionnaire. Here, we discuss the pitfalls and best practices of designing questionnaires.

## Question development

There are several steps involved in developing a survey questionnaire. The first is identifying what topics will be covered in the survey. For Pew Research Center surveys, this involves thinking about what is happening in our nation and the world and what will be relevant to the public, policymakers and the media. We also track opinion on a variety of issues over time so we often ensure that we update these trends on a regular basis so we can understand whether people's opinions are changing.

At Pew Research Center, questionnaire development is a collaborative and iterative process where staff meet to discuss drafts of the questionnaire several times over the course of its development. After the questionnaire is drafted and reviewed, we pretest (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#pretests) every questionnaire and make final changes before fielding the survey.

## Measuring change over time

Many surveyors want to track changes over time in people's attitudes, opinions and behaviors. To measure change, questions are asked at two or more points in time. A cross-sectional design, the most common one used in public opinion research, surveys different people in the same population at multiple points in time. A panel or longitudinal

design, frequently used in other types of social research, surveys the same people over time. Pew Research Center launched its own random sample panel survey in 2014; for more, see the section on the American Trends Panel (http://www.pewresearch.org/methodology/u-s-survey-research/collecting-survey-data/#atp) .

Many of the questions in Pew Research surveys have been asked in prior polls. Asking the same questions at different points in time allows us to report on changes in the overall views of the general public (or a subset of the public, such as registered voters, men or African Americans).

When measuring change over time, it is important to use the same question wording and to be sensitive to where the question is asked in the questionnaire to maintain a similar context as when the question was asked previously (see question wording (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#question-wording) and question order (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#question-order) for further information). All of our survey reports include a topline questionnaire that provides the exact question wording and sequencing, along with results from the current poll and previous polls in which the question was asked.

## Open- and closed-ended questions

One of the most significant decisions that can affect how people answer questions is whether the question is posed as an open-ended question, where respondents provide a response in their own words, or a closed-ended question, where they are asked to choose from a list of answer choices.

For example, in a poll conducted after the presidential election in 2008, people responded very differently to two versions of this question: "What one issue mattered most to you in deciding how you voted for president?" One was closed-ended and the other open-ended. In the closed-ended version, respondents were provided five options (and could volunteer an option not on the list).

When explicitly offered the economy as a response, more than half of respondents (58%) chose this answer; only 35% of those who responded to the open-ended version volunteered the economy. Moreover, among those asked the closed-ended version, fewer than one-in-ten (8%) provided a response other than the five they were read; by contrast fully 43% of those asked the open-ended version provided a response not listed in the closed-ended version of the question. All of the other issues were chosen at least slightly more often when explicitly offered in the closed-ended version than in the open-ended version. (Also see "High Marks for the Campaign, a High Bar for Obama" (http://www.people-press.org/2008/11/13/high-marks-for-the-campaign-a-high-bar-for-obama/) for more information.)

**Fewer People Mention Economy in Open-Ended Version**

What one issue mattered most to you in deciding how you voted for president?

| | Open-ended[1] | Closed-ended[2] |
|---|---|---|
| **The economy** | **35%** | **58%** |
| **The war in Iraq** | 5 | 10 |
| **Health care** | 4 | 8 |
| **Terrorism** | 6 | 8 |
| **Energy policy** | * | 6 |
| **Other** | 43 | 8 |
| Candidate mentions | 9 | - |
| Moral values/social issues | 7 | - |
| Taxes/dist. of income | 7 | - |
| Other issues | 5 | - |
| Other political mentions | 3 | - |
| Change | 3 | - |
| Other | 9 | - |
| **Don't know** | 7 | 2 |
| | 100 | 100 |

Data from Pew Research November 2008 Post-election survey

[1] Unprompted first responce to open-ended question.

[2] First choice from five options read to respondents.

Researchers will sometimes conduct a pilot study using open-ended questions to discover which answers are most common. They will then develop closed-ended questions that include the most common responses as answer choices. In this way, the questions may better reflect what the public is thinking or how they view a particular issue.

When asking closed-ended questions, the choice of options provided, how each option is described, the number of response options offered and the order in which options are read can all influence how people respond. One example of the impact of how categories are defined can be found in a Pew Research poll conducted in January 2002: When half of the sample was asked whether it was "more important for

President Bush to focus on domestic policy or foreign policy," 52% chose domestic policy while only 34% said foreign policy. When the category "foreign policy" was narrowed to a specific aspect – "the war on terrorism" – far more people chose it; only 33% chose domestic policy while 52% chose the war on terrorism.

In most circumstances, the number of answer choices should be kept to a relatively small number – just four or perhaps five at most – especially in telephone surveys. Psychological research indicates that people have a hard time keeping more than this number of choices in mind at one time. When the question is asking about an objective fact, such as the religious affiliation of the respondent, more categories can be used. For example, Pew Research Center's standard religion question includes 12 different categories, beginning with the most common affiliations (Protestant and Catholic). Most respondents have no trouble with this question because they can just wait until they hear their religious tradition read to respond.

> **What is your present religion, if any?** Are you Protestant, Roman Catholic, Mormon, Orthodox such as Greek or Russian Orthodox, Jewish, Muslim, Buddhist, Hindu, atheist, agnostic, something else, or nothing in particular?

In addition to the number and choice of response options offered, the order of answer categories can influence how people respond to closed-ended questions. Research suggests that in telephone surveys respondents more frequently choose items heard later in a list (a "recency effect").

Because of concerns about the effects of category order on responses to closed-ended questions, many sets of response options in Pew Research Center's surveys are programmed to be randomized (when questions have two or more response options) to ensure that the options are not asked in the same order for each respondent. For instance, in the example discussed above about what issue mattered most in people's vote, the order of the five issues in the closed-ended version of the question was randomized so that no one issue appeared early or late in the list for all respondents. Randomization of response items does not eliminate order effects, but it does ensure that this type of bias is spread randomly.

Questions with ordinal response categories – those with an underlying order (e.g., excellent, good, only fair, poor OR very favorable, mostly favorable, mostly unfavorable, very unfavorable) – are generally not randomized because the order of the categories conveys important information to help respondents answer the question. Generally, these types of scales should be presented in order so respondents can easily place their responses along the continuum, but the order can be reversed for some respondents. For example, in one of the Pew Research Center's questions about abortion, half of the sample is asked whether abortion should be "legal in all cases, legal in most cases, illegal in most cases, illegal in all cases" while the other half of the sample is asked the same question with the response categories read in reverse order, starting with "illegal in all cases." Again, reversing the order does not eliminate the recency effect but distributes it randomly across the population.

## Question wording

The choice of words and phrases in a question is critical in expressing the meaning and intent of the question to the respondent and ensuring that all respondents interpret the question the same way. Even small wording differences can substantially affect the answers people provide.

An example of a wording difference that had a significant impact on responses comes from a January 2003 Pew Research Center survey. When people were asked whether they would "favor or oppose taking military action in Iraq to end Saddam Hussein's rule," 68% said they favored military action while 25% said they opposed military action. However, when asked whether they would "favor or oppose taking military action in Iraq to end Saddam Hussein's rule

*even if it meant that U.S. forces might suffer thousands of casualties,*" responses were dramatically different; only 43% said they favored military action, while 48% said they opposed it. The introduction of U.S. casualties altered the context of the question and influenced whether people favored or opposed military action in Iraq.

There has been a substantial amount of research to gauge the impact of different ways of asking questions and how to minimize differences in the way respondents interpret what is being asked. The issues related to question wording are more numerous than can be treated adequately in this short space. Here are a few of the important things to consider in crafting survey questions:

First, it is important to ask questions that are clear and specific and that each respondent will be able to answer. If a question is open-ended, it should be evident to respondents that they can answer in their own words and what type of response they should provide (an issue or problem, a month, number of days, etc.). Closed-ended questions should include all reasonable responses (i.e., the list of options is exhaustive) and the response categories should not overlap (i.e., response options should be mutually exclusive).

It is also important to ask only one question at a time. Questions that ask respondents to evaluate more than one concept (known as double-barreled questions) – such as "How much confidence do you have in President Obama to handle domestic and foreign policy?" – are difficult for respondents to answer and often lead to responses that are difficult to interpret. In this example, it would be more effective to ask two separate questions, one about domestic policy and another about foreign policy.

In general, questions that use simple and concrete language are more easily understood by respondents. It is especially important to consider the education level of the survey population when thinking about how easy it will be for respondents to interpret and answer a question. Double negatives (e.g., do you favor or oppose *not* allowing gays and lesbians to legally marry) or unfamiliar abbreviations or jargon (e.g., ANWR instead of Arctic National Wildlife Refuge) can result in respondent confusion and should be avoided.

Similarly, it is important to consider whether certain words may be viewed as biased or potentially offensive to some respondents, as well as the emotional reaction that some words may provoke. For example, in a 2005 Pew Research survey, 51% of respondents said they favored "making it legal for doctors to give terminally ill patients the means to end their lives," but only 44% said they favored "making it legal for doctors to assist terminally ill patients in committing suicide." Although both versions of the question are asking about the same thing, the reaction of respondents was different. In another example, respondents have reacted differently to questions using the word "welfare" as opposed to the more generic "assistance to the poor." Several experiments have shown that there is much greater public support for expanding "assistance to the poor" than for expanding "welfare."

One of the most common formats used in survey questions is the "agree-disagree" format. In this type of question, respondents are asked whether they agree or disagree with a particular statement. Research has shown that, compared with the better educated and better informed, less educated and less informed respondents have a greater tendency to agree with such statements. This is sometimes called an "acquiescence bias" (since some kinds of respondents are more likely to acquiesce to the assertion than are others). A better practice is to offer respondents a choice between alternative statements. A Pew Research Center experiment with one of its routinely asked values questions illustrates the difference that question format can make. Not only does the forced choice format yield a very different result overall from the agree-disagree format, but the pattern of answers among better- and lesser-educated respondents also tends to be very different.

## Acquiescence Bias

**Agree-Disagree Format**
*The best way to ensure peace is through military strength
(55% agree, 42% disagree)*

**Forced Choice Format**
*The best way to ensure peace is through military strength (33%)
OR
Diplomacy is the best way to ensure peace (55%)*

PEW RESEARCH CENTER Agree-Disagree question from Oct. 1999. Forced choice question from Sep. 1999.

One other challenge in developing questionnaires is what is called "social desirability bias." People have a natural tendency to want to be accepted and liked, and this may lead people to provide inaccurate answers to questions that deal with sensitive subjects. Research has shown that respondents understate alcohol and drug use, tax evasion and racial bias; they also may overstate church attendance, charitable contributions and the likelihood that they will vote in an election. Researchers attempt to account for this potential bias in crafting questions about these topics. For instance, when Pew Research Center surveys ask about past voting behavior, it is important to note that circumstances may have prevented the respondent from voting: "In the 2012 presidential election between Barack Obama and Mitt Romney, did things come up that kept you from voting, or did you happen to vote?" The choice of response options can also make it easier for people to be honest; for example, a question about church attendance might include three of six response options that indicate infrequent attendance. Research has also shown that social desirability bias can be greater when an interviewer is present (e.g., telephone and face-to-face surveys) than when respondents complete the survey themselves (e.g., paper and web surveys).

Lastly, because slight modifications in question wording can affect responses, identical question wording should be used when the intention is to compare results to those from earlier surveys (see measuring change over time (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#measuring-change-over-time) for more information). Similarly, because question wording and responses can vary based on the mode used to survey respondents, researchers should carefully evaluate the likely effects on trend measurements if a different survey mode will be used to assess change in opinion over time (see collecting survey data (http://www.pewresearch.org/methodology/u-s-survey-research/collecting-survey-data/) for more information).

## Question order

Once the survey questions are developed, particular attention should be paid to how they are ordered in the questionnaire. The placement of a question can have a greater impact on the result than the particular choice of words used in the question.

When determining the order of questions within the questionnaire, surveyors must be attentive to how questions early in a questionnaire may have unintended effects on how respondents answer subsequent questions. Researchers have demonstrated that the order in which questions are asked can influence how people respond; earlier questions – in particular those directly preceding other questions – can provide context for the questions that follow (these effects are called "order effects").

One kind of order effect can be seen in responses to open-ended questions. Pew Research surveys generally ask open-ended questions about national problems, opinions about leaders and similar topics near the beginning of the questionnaire. If closed-ended questions that relate to the topic are placed before the open-ended question, respondents are much more likely to mention concepts or considerations raised in those earlier questions when responding to the open-ended question.

For closed-ended opinion questions, there are two main types of order effects: contrast effects, where the order results in greater differences in responses, and assimilation effects, where responses are more similar as a result of their order.

## More People Favor Civil Unions When Asked After Gay Marriage

| Asked first | Legal agreements | % | Gay marriage | % |
|---|---|---|---|---|
| | Favor | **37** | Favor | 33 |
| | Oppose | 55 | Oppose | 61 |
| | Don't know | 8 | Don't know | 6 |
| | | 100 | | 100 |
| | | | | |
| Asked second | Gay marriage | | Legal agreements | |
| | Favor | 30 | Favor | **45** |
| | Oppose | 58 | Oppose | 47 |
| | Don't know | 12 | Don't know | 8 |
| | | 100 | | 100 |
| N | | 780 | | 735 |

PEW RESEARCH CENTER Oct. 2003.

An example of a contrast effect can be seen in a Pew Research Center poll conducted in October 2003 that found that people were more likely to favor allowing gays and lesbians to enter into legal agreements that give them the same rights as married couples when this question was asked after one about whether they favored or opposed allowing gays and lesbians to marry (45% favored legal agreements when asked after the marriage question, but 37% favored legal agreements without the immediate preceding context of a question about gay marriage). Responses to the question about gay marriage, meanwhile, were not significantly affected by its placement before or after the legal agreements question.

## More Overall Dissatisfaction When Asked After Bush Approval

| Asked first | Overall satisfaction | % | Bush approval | % |
|---|---|---|---|---|
| | Satisfied | 17 | Approve | 25 |
| | Dissatisfied | **78** | Disapprove | 67 |
| | Don't know | 5 | Don't know | 8 |
| | | 100 | | 100 |
| | | | | |
| Asked second | Bush approval | | Overall satisfaction | |
| | Approve | 24 | Satisfied | 9 |
| | Disapprove | 68 | Dissatisfied | **88** |
| | Don't know | 8 | Don't know | 3 |
| | | 100 | | 100 |
| N | | 766 | | 723 |

PEW RESEARCH CENTER Dec. 2008.

Another experiment embedded in a December 2008 Pew Research poll also resulted in a contrast effect. When people were asked "All in all, are you satisfied or dissatisfied with the way things are going in this country today?" immediately after having been asked "Do you approve or disapprove of the way George W. Bush is handling his job as president?"; 88% said they were dissatisfied, compared with only 78% without the context of the prior question. Responses to

presidential approval remained relatively unchanged when national satisfaction was asked before or after it. A similar finding occurred in December 2004 when both satisfaction and presidential approval were much higher (57% were dissatisfied when Bush approval was asked first vs. 51% when general satisfaction was asked first).

Several studies also have shown that asking a more specific question before a more general question (e.g., asking about happiness with one's marriage before asking about one's overall happiness) can result in a contrast effect. Although some exceptions have been found, people tend to avoid redundancy by excluding the more specific question from the general rating.

**More Endorse Working Together When Asked Second**

| Asked first | Should Rep. leaders... | % | Should Dem. leaders... | % |
|---|---|---|---|---|
| | Work with Obama | 66 | Work with Rep. leaders | 82 |
| | Stand up to Obama | 28 | Stand up to Rep. leaders | 13 |
| | Don't know | 6 | Don't know | 5 |
| | | 100 | | 100 |
| Asked second | Should Dem. leaders... | | Should Rep. leaders... | |
| | Work with Rep. leaders | 71 | Work with Obama | 81 |
| | Stand up to Rep. leaders | 21 | Stand up to Obama | 15 |
| | Don't know | 8 | Don't know | 4 |
| | | 100 | | 100 |
| N | | 744 | | 756 |

PEW RESEARCH CENTER Nov. 2008 Post-election survey.

Assimilation effects occur when responses to two questions are more consistent or closer together because of their placement in the questionnaire. We found an example of an assimilation effect in a Pew Research poll conducted in November 2008 when we asked whether Republican leaders should work with Obama or stand up to him on important issues and whether Democratic leaders should work with Republican leaders or stand up to them on important issues. People are more likely to say that Republican leaders should work with Obama when the question was preceded by the one asking what Democratic leaders should do in working with Republican leaders (81% vs. 66%). However, when people were first asked about Republican leaders working with Obama, fewer said that Democratic leaders should work with Republican leaders (71% vs. 82%).

The order questions are asked is of particular importance when tracking trends over time. As a result, care should be taken to ensure that the context is similar each time a question is asked. Modifying the context of the question could call into question any observed changes over time (see measuring change over time (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#measuring-change-over-time) for more information).

A questionnaire, like a conversation, should be grouped by topic and unfold in a logical order. It is often helpful to begin the survey with simple questions that respondents will find interesting and engaging to help establish rapport and motivate them to continue to participate in the survey. Throughout the survey, an effort should be made to keep the survey interesting and not overburden respondents with several difficult questions right after one another. Demographic questions such as income, education or age should not be asked near the beginning of a survey unless they are needed to determine eligibility for the survey or for routing respondents through particular sections of the questionnaire. Even then, it is best to precede such items with more interesting and engaging questions.

## Pilot tests and focus groups

Similar to pretests (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#pretests) , pilot tests are used to evaluate how a sample of people from the survey population respond to the questionnaire. For a pilot test, surveyors typically contact a large number of people so that potential differences within and across groups in the population can be analyzed. In addition, pilot tests for many surveys test the full implementation procedures (e.g., contact letters, incentives, callbacks, etc.). Pilot tests are usually conducted well in advance of when the survey will be fielded so that more substantial changes to the questionnaire or procedures can be made. Pilot tests are particularly helpful when surveyors are testing new questions or making substantial changes to a questionnaire, testing new procedures or different ways of implementing the survey, and for large-scale surveys, such as the U.S. Census.

Focus groups are very different from pilot tests because people discuss the survey topic or respond to specific questions in a group setting, often face to face (though online focus groups are sometimes used). When conducting focus groups, the surveyor typically gathers a group of people and asks them questions, both as a group and individually. Focus group moderators may ask specific survey questions, but often focus group questions are less specific and allow participants to provide longer answers and discuss a topic with others. Focus groups can be particularly helpful in gathering information before developing a survey questionnaire to see what topics are salient to members of the population, how people understand a topic area and how people interpret questions (in particular, how framing a topic or question in different ways might affect responses). For these types of focus groups, the moderator typically asks broad questions to help elicit unedited reactions from the group members, and then may ask more specific follow-up questions.

For some projects, focus groups may be used in combination with a survey questionnaire to provide an opportunity for people to discuss topics in more detail or depth than is possible in the interview. An important aspect of focus groups is the interaction among participants. While focus groups can be a valuable component of the research process, providing a qualitative understanding of the topics that are quantified in survey research, the results of focus groups must be interpreted with caution. Because people respond in a group setting their answers can be influenced by the opinions expressed by others in the group, and because the total number of participants is often small (and not a randomly selected subset of the population), the results from focus groups should not be used to generalize to a broader population.

## Pretests

One of the most important ways to determine whether respondents are interpreting questions as intended and whether the order of questions may influence responses is to conduct a pretest using a small sample of people from the survey population. The pretest is conducted using the same protocol and setting as the survey and is typically conducted once the questionnaire and procedures have been finalized.

For telephone surveys, interviewers call respondents as they would in the actual survey. Surveyors often listen to respondents as they complete the questionnaire to understand if there are problems with particular questions or with the order questions are asked. In addition, surveyors get feedback from interviewers about the questions and an estimate of how much time it will take people to respond to the questionnaire.

Pew Research Center pretests all of its questionnaires, typically on the evening before a survey is scheduled to begin. The staff then meet the following day to discuss the pretest and make any changes to the questionnaire before the survey goes into the field. Information from pretesting is invaluable when making final decisions about the survey questionnaire.

MAKE A FINANCIAL CONTRIBUTION TO SUPPORT OUR WORK

DONATE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

<u>**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**</u>

# Volume 3

# Exhibits 288 - 295

# DEF-INTERV.

# EX. 288



INCLUDES FREE SAMPLE
QUESTIONNAIRES ONLINE

# QUESTIONNAIRE
# DESIGN

## HOW TO PLAN, STRUCTURE AND WRITE SURVEY MATERIAL FOR EFFECTIVE MARKET RESEARCH

*second edition*

IAN BRACE

MRS    MARKET RESEARCH IN PRACTICE

# QUESTIONNAIRE DESIGN

# MARKET RESEARCH IN PRACTICE SERIES

**Published in association with The Market Research Society**
**Consultant Editors: David Barr and Robin J Birn**

Kogan Page has joined forces with The Market Research Society (MRS) to publish this unique series of books designed to cover the latest developments in market research thinking and practice.

The series provides up-to-date knowledge on the techniques of market research and customer insight and best practice in implementing them. It also shows the contribution market research and customer information management techniques can make to helping organizations of all kinds in shaping their strategy, structure, customer focus and value creation.

The series consists of several essential guides that focus on the core skills developed in the MRS training and qualifications programmes (www.mrs.org.uk). It provides practical advice and case studies on how to plan, use, act on and follow-up research, and on how to combine it with other sources of information to develop deep insights into customers.

Fully international in scope of content, its readership is also from all over the world. The series is designed not only for specialist market researchers, but also for all those involved in developing and using deeper insights into their customers – marketers in all disciplines, including planning, communications, brand management, and interactive marketers.

**Other titles in the series:**

*Business to Business Market Research*, Ruth McNeil
*Consumer Insight*, Merlin Stone
*The Effective Use of Market Research*, Robin J Birn
*Market Intelligence: How and why organizations use market research*, Martin Callingham
*Market Research in Practice: A guide to the basics*, Paul Hague, Nick Hague and Carol-Ann Morgan
*Researching Customer Satisfaction and Loyalty*, Paul Szwarc

Kogan Page Ltd
120 Pentonville Road
London N1 9JN
Tel: 020 7278 0433
www.koganpage.com

**Publisher's note**

Every possible effort has been made to ensure that the information contained in this book is accurate at the time of going to press, and the publishers and authors cannot accept responsibility for any errors or omissions, however caused. No responsibility for loss or damage occasioned to any person acting, or refraining from action, as a result of the material in this publication can be accepted by the editor, the publisher or the author.

First published in Great Britain and the United States in 2004 by Kogan Page Limited
Reprinted 2005

Second edition 2008

Apart from any fair dealing for the purposes of research or private study, or criticism or review, as permitted under the Copyright, Designs and Patents Act 1988, this publication may only be reproduced, stored or transmitted, in any form or by any means, with the prior permission in writing of the publishers, or in the case of reprographic reproduction in accordance with the terms and licences issued by the CLA. Enquiries concerning reproduction outside these terms should be sent to the publishers at the undermentioned addresses:

| | |
|---|---|
| 120 Pentonville Road | 525 South 4th Street, #241 |
| London N1 9JN | Philadelphia PA 19147 |
| United Kingdom | USA |
| www.koganpage.com | |

© Ian Brace, 2004, 2008

The right of Ian Brace to be identified as the author of this work has been asserted by him in accordance with the Copyright, Designs and Patents Act 1988.

ISBN 978 0 7494 5028 1

**British Library Cataloguing-in-Publication Data**

A CIP record for this book is available from the British Library.

**Library of Congress Cataloging-in-Publication Data**

Brace, Ian, 1949–
  Questionnaire design: how to plan, structure and write survey material for effective market research / Ian Brace. — 2nd ed.
      p. cm.
  Includes bibliographical references and index
  ISBN 978-0-7494-5028-1
1. Market surveys—Methodology. 2. Questionnaires—Methodology. I. Title.
  HF5415.3.B683 2008
  658.8'3--dc22
                                        2008011509

Typeset by Saxon Graphics Ltd, Derby
Printed and bound in India by Replika Press Pvt Ltd

# Contents

| | |
|---|---|
| *About MRS* | *vii* |
| *The editorial board* | *viii* |
| *Preface* | *x* |
| *Preface to second edition* | *xii* |
| **Introduction** | **1** |
| **1. Objectives in writing a questionnaire** | **7** |
| Introduction 7; The questionnaire in the survey process 7; Stakeholders in the questionnaire 9; The objectives of the study 10; Recruitment questionnaires 12; Collecting unbiased and accurate data 12 | |
| **2. The data collection media** | **22** |
| Introduction 22; Interviewer-administered interviews 22; Self-completion surveys 29 | |
| **3. Planning the questionnaire** | **35** |
| Introduction 35; Defining the information required 36; Sequencing the sections 36; Exclusion question 36; Screening questions 38; Main questionnaire 40 | |
| **4. Types of question and data** | **45** |
| Introduction 45; Question types 45; Open and closed questions 46; Spontaneous questions 48; Prompted questions 51; Open-ended questions 51; Pre-coded questions 55; Data types 59 | |
| **5. Rating scales** | **66** |
| Attitude measurement 66; Itemized rating scales 66; Attitudinal rating scales 73; Comparative scaling techniques 84 | |
| **6. Applications** | **90** |
| Rating scales in customer satisfaction research 90; Measuring brand image 93; The dimensions 101 | |

7.  **Writing the questionnaire**                                105
    Introduction 105; Use of language 105; Avoiding ambiguity
    in the question 109; Determining the pre-codes 111;
    Using prompts 114; Order bias and prompts 117;
    Question order 123; Standardizing questions 126;
    Tracking studies 126; Omnibus studies 128

8.  **Laying out the questionnaire**                            130
    Introduction 130; Interviewer-administered paper
    questionnaires 130; Self-completion paper
    questionnaire 139; CAPI and CATI 146

9.  **Online questionnaires**                                  148
    Introduction 148; Replicating existing approaches 149;
    Enhancing the experience 159

10. **Piloting the questionnaire**                             174
    Introduction 174; Why pilot questionnaires? 174; Types
    of pilot surveys 177

11. **Ethical issues**                                         184
    Introduction 184; Responsibilities to respondents 185;
    Responsibilities to clients 193

12. **Social desirability bias**                               195
    Response bias 195; Social desirability bias 195; Dealing
    with SDB 198; Determining whether SDB exists 206

13. **International surveys**                                   208
    Introduction 208; Client presence 209; Common or
    tailored approaches 209; Translating the questionnaire 214;
    Demographic data 217; Cultural response differences 217;
    Laying out the questionnaire 218

    *Appendix 1: Example questionnaire*                         220
    *Appendix 2: The Market Research Society Code of Conduct*   262
    *References*                                                286
    *Further reading*                                           292
    *Index*                                                     294

# 7 Writing the questionnaire

## INTRODUCTION

In the previous chapters, we have examined the different types of question and technique that are available to the questionnaire writer. These represent the tools in the armoury that can be used to compile a questionnaire. A number of other issues, though, need to be considered in the process of writing the questionnaire. These issues include:

- the language and style of language in which it is written;
- ensuring that there is no ambiguity in the questions or the responses;
- whether pre-codes will be used or responses recorded verbatim;
- if pre-codes are to be used, what they should be;
- the use of prompt material and the choice between verbal and pictorial prompts;
- bias that can be caused by the order of the questions;
- bias that can be caused by the order of prompted responses.

This chapter considers these issues.

## USE OF LANGUAGE

When writing the questionnaire it is the questionnaire writer's job to ensure that the respondents will understand the questions and that the respondents will not feel intimidated, challenged or threatened by the questions.

Writing questionnaires is about helping respondents to give the best information that they can. Questions should be clear and unambiguous, and the respondent should be put at ease by the tone of the questions and

not made to feel challenged by the words and phrases used. Respondents who feel challenged because they don't understand the questions will quickly become alienated from the interview process and make little effort to respond accurately. They may become fatigued earlier than they would have done and fail to complete the interview.

Therefore, we must ensure that the questions are phrased in everyday language to which the respondents can relate. The interview can be seen as a conversation by proxy between the researcher and the respondent. The questionnaire should be suitably conversational in tone, while not seeking to be too familiar or condescending.

Researchers are frequently given briefs by clients that are expressed in technical terms that relate to the client's business. They may talk of 'channels of distribution' or 'above-the-line advertising'. It is the job of the questionnaire writer to turn this into phrases that will be part of the everyday speech of respondents, or at least readily understood by them.

---

**Seen in print**

In a study about aircraft noise, respondents were asked to indicate how important they thought it was that:

'Cash compensation should be offered to those households that suffer a significant increase in noise to a level greater than 57 decibels but less than 63 decibels, and who therefore do not qualify for insulation.'

This question falls down on two counts. First, it is difficult to understand what the question means because it is phrased in technical terms. Second, even if someone understands it, few people would be competent to answer it accurately. How many respondents understand exactly how loud 57 or 63 decibels is?

---

Getting rid of technical terms is not always easy to achieve. They exist because they are needed. Some sympathy must be felt for the writer of the question in the box above. How do you convey to respondents precise noise levels? But equally, how usable is any response to this question? Anyone using the data generated must be concerned about how well the question was understood.

Because technical terms are often the everyday language of the commissioners of the study, they do not always appreciate that others outside their industry or profession might not understand them, or might understand something different by them.

Sometimes technical terms are used in order to describe something, or to differentiate between objects or services, with far greater subtlety than the non-specialist can appreciate. To most motorists a petrol pump is a

petrol pump, and they would not distinguish between a 'high line fast flow' and a 'grouped hose blender'. Researchers must ask themselves if it is necessary for the respondent to be able to distinguish between them in the interview. If it is, then the differences must be clearly explained, if possible without reference to the technical terminology.

Some technical terms are words that have a different everyday use. Market researchers will use the terms 'random' and 'significance' with specific meanings that are different to the way that they are used by most people. The danger here is that researchers might think that respondents understand the terms in the same way that they do. The respondents, though, understand these terms differently, and so answer a different question to the one that the researcher thinks is being asked.

---

**Seen in print**

Q1. What do you think of Big Oil?
PROBE FULLY.
This was the opening question in the survey. The term 'Big Oil' was well understood by the questionnaire writer, who worked in the oil industry, but meant nothing to respondents.

---

## The interview as conversation

Previously in this chapter, the interview was described as a conversation by proxy between the researcher and the respondent. However, it is not the sort of conversation that two people who know each other would have.

With interviewer-administered interviews it is not unusual for respondents to try to enter into conversation with the interviewer, to give their views and elaborate on their responses. Only when the interviewer insists on reducing this answer to one of the pre-codes on the questionnaire does the respondent appreciate that this is not really a conversation but an interaction in which they have a specific and limited role to play (Suchman and Jordan, 1990).

The lack of conversation can mask incorrect answers. Through elaboration of answers such as 'Yes, but...' or 'I agree, except that...' it can become clear that the true answer is 'No' or 'I disagree'. If respondents are not allowed to elaborate in this way, then their true answer may not become apparent, and an incorrect answer may be recorded. With self-completion surveys we rely on respondents to think it through, to in effect elaborate to themselves, and not necessarily give their first reaction.

Thus, whilst we conceptualize the questionnaire as the medium of conversation, we must recognize that it is not a true conversation; that

this may mean that we do not acquire all of the information that respondents could give us or may wish to give us; and that it can, on occasion, lead to incorrect answers being recorded.

Schober (1999) points out two key differences between having a conversation with your aunt and carrying out an interview with a structured questionnaire, known as 'audience design' and 'grounding'.

## Audience design

When one person who knows another asks the second person a question or makes a statement, it is framed to be heard specifically by that other person, and draws on the knowledge that each has of the other. This is known as 'audience design'. The person to whom it is said is the addressee. Addressees are likely to give different interpretations and responses to the question 'How many hours a week do you work?' depending on whether it is asked by their aunt, their boss or someone from the tax office. Addressees will use their knowledge of the relationship to determine what type of response the questioner expects to hear.

In a survey questionnaire, the questions are not framed for specific respondents, but to have general applicability to as many people as possible. Interviewers are specifically instructed neither to deviate from the question script nor to tailor the question to the individual. In quantitative research, as hard as questionnaire writers may try, they cannot write a questionnaire to be one side of a conversation.

## Grounding

Grounding occurs in a conversation when the participants establish that each has understood what one of them has said, and that it has entered their common ground. This can come from an acknowledgement of the question or statement ('uh-huh', 'okay') or a request for elaboration as to what is meant from the addressee, or clarification volunteered by the questioner if it is clear that the addressee has not understood.

Some level of grounding is available in an interview, but interviewers are deliberately restricted in the procedures that they can use in order to avoid introducing bias. Often when asked for clarification, all the interviewer can do is to repeat the question, or describe the type of response that is needed, or ask for a best estimate. Elaboration of individual words in the question is to be avoided as, apart from potentially introducing bias, the interviewers themselves may not understand precisely what is meant and present a misinterpretation of the question to respondents.

These difficulties in audience design and grounding can lead to a number of response effects from prompt material, question ordering and interpretation of questions.

## *Minority languages*

There are many different types of question that can be asked and in many different ways. What is common to all questions, though, is that they must be worded in a way that is understood by the respondents and to which respondents can relate. This means ensuring that there are minority-language versions of the questionnaire if the sample is likely to include people who speak a language other than the majority language, or whose command of that language is unlikely to be sufficiently good to be able to complete an interview in it. By denying sections of the survey population the opportunity to participate in the study, the questionnaire writer is effectively disenfranchising them from influencing the findings.

For many studies commissioned by the public sector in many countries, it is important that the interview is capable of being conducted in any language that is spoken by a significant number of people in the survey population to avoid the danger of disenfranchisement. In the UK many government studies require questionnaire versions in Welsh, Urdu, Hindi and other languages, and in the USA a Spanish-language version will often be required.

The relevance of minority-language speakers to the study will naturally vary by the subject of the study and the degree of accuracy required in the data. For a study of housing conditions it is likely to be important that recently arrived immigrant communities are represented in the sample in their correct proportions. If the questionnaire is not available in a language that they understand, they will be effectively excluded and hence under-represented.

For many commercial studies, the issue of minority languages can be mostly ignored in many countries, although a Spanish version of the questionnaire is frequently necessary in the USA. This is because for most commercial studies the difference that a minority of non-majority-language-speaking consumers is likely to make to the findings is small, particularly in comparison to the variation caused by sampling error, non-response rates and even interviewer error.

## AVOIDING AMBIGUITY IN THE QUESTION

Ambiguity is to be avoided at all costs. If a question is ambiguous, then the respondent may be presented with the dilemma of hearing or seeing two different questions and will not know which to answer. With an interviewer-administered questionnaire the respondent may seek help from the interviewer. The interviewer may be able to assist with the knowledge of the context of the question in relation to other questions,

but this may not always be the case. With self-administered question-naires, respondents have to make their own decision as to what the question means. Either way, the researcher does not know which way the respondent has understood the question, except in the occasional instances where either the interviewer or respondent has recorded it. This rarely happens, though, except in pilot studies.

Ambiguity in the question can make it impossible for a respondent to know how to answer. Consider the following question:

> Do your parents work full time?
>> Yes
>> No

There is no difficulty for the respondent if both parents work full time or if neither parent does (although a definition of what constitutes 'full-time working' would be helpful). If, however, one works full time and the other does not, what is the respondent to answer? The question would be better asked:

> Do either or both of your parents work full time, that is more than 30 hours a week?
>> Both
>> One
>> Neither

There still remains the issue of what constitutes 'work', and whether it should include unpaid work, such as charity work, or only paid work.

While some respondents may see the ambiguity and make a decision which way to answer, others may not see it and understand it only in the sense in which it was not intended. Then the answer given will not be the one that would have been given to the intended question and, again, the researcher is unaware of this.

If the ambiguity in the question is not spotted until the data have been collected, then the researcher has no way of knowing which respondents answered the question as intended and which answered the alternative meaning. This can render the data from that question incapable of interpretation and therefore useless.

Ambiguity is obviously to be avoided in questions, but is not always easy to spot. This is because it is not always possible to anticipate every respondent's circumstances, and a question that may not be ambiguous to most respondents may, because of their circumstances, contain an ambiguity for a few. For example, 'How many bedrooms are there in this property?' is a simple question apparently incapable of more than one

possible answer for most people. But what is meant by a bedroom? If someone has a study that doubles as an occasional bedroom, should that be included?

In most instances this level of ambiguity will not be a major issue. Where the number of bedrooms is collected as classification data to provide a cross-analysis of data by approximate size of house, then this degree of ambiguity may be acceptable to the researchers.

Where this information is central to the data collected, then the ambiguity must be addressed. In the example of the number of bedrooms, such ambiguity would be unacceptable in, say, a study of housing conditions. Then the question would require expanding, possibly to ask the number of rooms currently used as bedrooms, the number occasionally used as bedrooms and the number that could be used as bedrooms, or as required by the study.

## DETERMINING THE PRE-CODES

The pre-codes that are used on the questionnaire determine what data are collected. If the pre-codes have insufficient accuracy or are incomplete, then data will be lost that may be important to answering the objectives. In many instances the responses will be obvious – yes–no, male–female – but in others care must be taken to ensure that they are:

- mutually exclusive;
- as exhaustive as possible;
- as precise as necessary;
- meaningful.

---

**Seen in print**

From a hotel customer satisfaction questionnaire:

| Level of satisfaction: | Low | | Average | | High |
|---|---|---|---|---|---|
| Friendly and efficient service at reception | ❏ | ❏ | ❏ | ❏ | ❏ |

Some of the friendliest receptionists are often the least efficient, and vice versa. How does the guest answer this question if that is the case? It is possible that the guest who wants to indicate that the service was friendly but not efficient, or that it was efficient but not friendly, will give up at this point and not complete the rest of the questionnaire.

---

**Figure 7.1** *An ambiguous question*

Unless they are mutually exclusive, it will be possible to code the same response against more than one response code. This is confusing for the interviewer (or respondent with a self-completion questionnaire) and makes the output ambiguous and impossible to interpret (see Figure 7.1).

The pre-codes need to be as exhaustive as they can in order to minimize the number of 'other answers' written in. If there are a lot of 'other answers' written in, the question would better have been recorded as an open-ended one.

## Recording values

When recording answers that are values, the level of detail needs to be as precise as is necessary to meet the research objectives without demanding more detail than respondents can accurately give. Sometimes it is possible to record precise values (eg the number of times the respondent has visited a pub or bar in the past week), but frequently we do not want to record that level of detail, and nor can respondents be expected to provide it. Then the answers will be recorded in value bands.

In Figure 7.2, the questionnaire writer has determined that bands of £200 are sufficiently accurate to meet the demands of the study. Bands of £50 would have given the researcher greater accuracy in calculating the average cost of a holiday and in making comparisons between sub-groups, but might have been difficult for respondents to recall accurately. This could have led to an increase in the proportion of 'Don't know' responses. In this example the response categories are exclusive. If someone had paid exactly £400, it is clear where the answer should be coded.

The pre-code response categories must also be meaningful to both respondent and researcher if the first is to be able to answer and the second to interpret. Precise wording is important in achieving clarity. Words such as 'often', 'frequently' and 'occasionally' are best avoided, as their interpretation varies between situations and between people.

Q. Into which of these ranges did the cost of your holiday fall, per person? SHOW CARD.

| | |
|---|---|
| UP TO £200 | 1 |
| £201 TO £400 | 2 |
| £401 TO £600 | 3 |
| £601 TO £800 | 4 |
| £801 TO £1,000 | 5 |
| £1,001 OR MORE | 6 |

**Figure 7.2**  *Determining the level of detail*

## Constructing ranges

Wherever possible, values should be recorded as absolute numbers (but beware of duplication, as illustrated in Figure 7.3). However, if values are to be recorded in ranges, the ranges should usually be constructed such that the most popular values occur in the middle of the ranges. For example, if the question is 'How much did you pay for the paperback novel that you are currently reading?', we know that most answers, if accurately given, will be £x.99. However, it would not be unusual to see the following ranges given for this question:

Under £4.99
£5 to £5.99
£6 to £6.99
£7 to £7.99
£8 to £8.99
£9 or more

---

**Seen in print**

Q. And, on average, how much do you pay for these text alerts, per text?
INTERVIEWER, IF DON'T KNOW, PROBE FOR AN ESTIMATE BEFORE CODING DK.

| | |
|---|---|
| FREE OF CHARGE | 1 |
| 1–5 PENCE | 2 |
| 5–10 PENCE | 3 |
| 11–15 PENCE | 4 |
| 16–20 PENCE | 5 |
| 21–25 PENCE | 6 |
| 26–30 PENCE | 7 |
| 31–35 PENCE | 8 |
| 36–40 PENCE | 9 |
| 41–45 PENCE | 10 |
| 46–50 PENCE | 11 |
| 50–75 PENCE | 12 |
| 75 PENCE – £1 | 13 |
| MORE THAN £1 | 14 |
| DON'T KNOW | 15 |

In this case, the duplications at 5, 50 and 75 pence were all spotted by the agency's checking procedures before the questionnaire went live. It is because this type of error is so easy to make that most agencies have strict checking procedures.

---

**Figure 7.3** *Duplications in the values*

This can cause loss of accuracy. A book costing £6.99 will be reported by some respondents as costing that amount precisely. Other respondents will round it up to £7, and the response will be recorded in the category above the one it should be in. Other respondents may say 'about £7', leaving the interviewer unsure as to where it should be coded. As importantly, in the analysis of these data we may want to produce an average price paid. Having collected the data in these ranges, we would normally allocate the value of the mid-point of each range to calculate the average. However, if nearly all of the actual values are at the top end of each range, the calculated average price paid will be around 50p below what it should be.

## USING PROMPTS

Show cards are frequently used to provide the respondents with prompted answers in face-to-face interviews. In self-completion inter-

---

**Seen in print**

Qa. How often do you make local telephone calls on your home line?
Qb. How often do you make national telephone calls on your home line?
Qc. How often do you make international calls on your home line?
Qd. How often do you make calls to mobile phones on your home line?

|  | (a) Local calls | (b) National calls | (c) International calls | (d) Calls to mobiles |
|---|---|---|---|---|
| VERY OFTEN | 1 | 1 | 1 | 1 |
| OFTEN | 2 | 2 | 2 | 2 |
| OCCASIONALLY | 3 | 3 | 3 | 3 |
| SELDOM | 4 | 4 | 4 | 4 |
| NEVER | 5 | 5 | 5 | 5 |

Respondents may or may not have had difficulty in interpreting what each code was intended to mean, but the researcher would have had serious problems analysing the resulting data. 'Frequently' used in relation to local calls is likely to mean several calls a day to most respondents. The same word applied to international calls may well be just one or two a week. So what framework have respondents used in giving their answers? Has the frequency been judged against a common standard, with one type of call (possibly the local call, as that is asked first) being used to define what is frequent for all four types of calls, or have the response codes been interpreted independently for each type of call, so that the meaning of 'frequent' varies between types of call? The researcher cannot know. Even if the researcher did know, he or she could not know how what is considered 'frequent' varies between respondents. These answers would have been better recorded as frequency values.

---

**Figure 7.4** *Imprecise wording*

views the prompts are provided with the question, either on a paper questionnaire or on-screen with a web-based questionnaire. With telephone interviews the prompts are frequently read out or, if they are to be repeated, as with a scale, respondents are sometimes asked to write them down.

Prompts can be scale points, attitudinal phrases, image dimensions, brands, income ranges or anything that the questionnaire writer wants to use to guide the respondents or to obtain reaction to. They can be purely verbal or they can utilize pictures, illustrations or logos. However, it is important to be clear about the different jobs that verbal and pictorial stimuli do.

## Picture prompts

Pictures can be used in a number of different ways as prompts. If they are to be used, then questionnaire writers must be careful to ensure that they know exactly what role the pictures are playing.

### Brand awareness

One use of picture prompts is to show brand logos or icons instead of a list of brand names, in order to measure prompted brand awareness. With CAPI and web-based interviews this is easy to do, and is often included in order to make the interview more interesting for the respondent. However, questionnaire writers should be aware that they might be changing the question.

Prompted awareness is a question of recognition. If a list of names is used, then the respondents are being asked which of the names they recognize. If brand logos are shown, then the question becomes which of the logos they recognize. The researcher infers awareness of the brand through recognition of the logo. This is likely to be higher than simple name recognition, as the logo gives more clues. The improvement in apparent brand awareness is likely to be stronger for the smaller brands in a market. Prompted awareness of Coca-Cola does not require the use of a visual prompt in order to be very high amongst carbonated drink users. There is little opportunity for visual prompts to make an improvement. But for smaller brands, the opportunities for improvement offered by visual prompts are much greater. The total average number of logos recognized per respondent is usually likely to be greater than the average number of brand names from a simple list. Neither approach is necessarily incorrect, but each is likely to give a different level of response.

## Likelihood to purchase

When asking likelihood to purchase, much more information is given to respondents if a pictorial stimulus is used. Rather than show a list of brands and prices, a mocked-up shelf can be shown as in Figure 7.5. The cues and information that are given by the pack shots mean that respondents do not have to rely on memory and recall of the brands when making their decision. Price information can easily be excluded, included or changed as required.

## Brand image

Showing logos can also alter the responses to questions about brand image. It is normal to establish prompted brand awareness before asking about images of certain brands. If prompted brand awareness is established using a list of names, then the mental picture taken into the image question is the image of the brand as it exists in isolation within the respondents' minds. The image is purely what the brand name stands for and the images that are associated with it.

After prompting with a logo or pack shot, however, respondents are given clues and reminders of what the brand is trying to stand for. The logo or pack will have been designed to reflect the desired brand positioning and may well communicate something of those values to the respondents in the interview, or at least act as a reminder of them. The image question is therefore also prompted with at least a partial reminder



**Figure 7.5**  *A mocked-up shelf*

of the brands' desired postionings, which is likely to yield slightly different responses.

Again it is not a question of one approach being incorrect. Using a brand list may be described as giving a 'purer' measure of image. This is an image, it can be argued, that the potential purchasers have in their minds before leaving home to go shopping, and it will act upon their intent to purchase the brand. But it can be equally argued that most brands are rarely seen without their logos, and that it is the image in the purchasers' minds at the point of purchase, when there are likely to be many visual cues, that is important.

The questionnaire writer should consider which is the more appropriate approach for the market in question, and decide which approach to use accordingly.

## Advertising recognition

Showing advertising to establish recognition is a particular case of showing picture prompts. Except for radio advertising, it is difficult to establish advertising recognition without the use of picture prompts. These often consist of a series of stills taken from the advertisement in question, known as a storyboard. This may or may not include the script of the characters or voice-over. It also may or may not have all references to the brand removed, depending on whether being able to name the correct brand is to be asked. With CAPI and web-based interviewing, however, there is a choice between showing a storyboard and showing the actual ad as film. The two methods will generally lead to different responses, with higher awareness recorded among respondents shown the film.

For press and poster ads, copies of the actual ad can be shown. It may be necessary to use a reduced format from the actual size (particularly for posters), in which case there should be an explanation that it has been reduced.

# ORDER BIAS AND PROMPTS

The order in which prompts are presented to respondents, whether on the questionnaire or screen, shown on a card or read out, can have a significant effect on the responses recorded. Such bias can occur with the presentation of:

■ scalar responses;
■ monadically rated batteries of attitude or image dimensions;
■ lists from which responses are chosen.

118 ■ Questionnaire Design

The questionnaire writer must consider how to minimize the order bias for each of these.

## Scalar responses

A considerable amount has been written about the effect that the order of presentation of prompted alternative answers has on responses. Artingstall (1978) showed that when respondents are given a scale from which to choose a response in face-to-face interviewing they are significantly more likely to choose the first response offered than the last. Of 72 end items that were offered in his test, 62 were given greater endorsement when offered first. This is known as 'the primacy effect'.

Thus if the positive end of a scale is always presented first a more favourable result will be found than if the negative end of the scale is always first. The finding held for any length of scale, and was independent of the demographic profile of the respondents. The difference was shown to be an increase of about 8 per cent to the positive responses.

What this and other work show is that the order of presentation has an effect. It does not say which order gives the best representation of the truth. However, it underlines the need to be consistent in the order in which scales are shown if comparisons are to be made between studies.

One approach to dealing with the bias is to rotate the order of presentation between two halves of the sample. This does not remove the bias but at least has the effect of averaging it.

In new product development research, it is not uncommon always to have the negative response presented first on scales rating the concept or the product. This then gives the least favourable response pattern, thereby providing a tougher test for the new product and ensuring that any positive reaction to the idea of the product is not overstated.

When visual prompts are used, the primacy effect is noticed, as demonstrated by Artingstall, as respondents notice and process the possible responses in the order that they are presented. Where prompts are read out, a recency effect is more marked, as respondents remember better the last option or last few options that they have been given. This effect has been demonstrated by Schwarz, Hippler and Noelle-Neumann (1991). With telephone interviewing, therefore, a recency effect should be expected, unless respondents are asked to write down the scale for reference before answering the question.

## *Batteries of statements*

### Fatigue effect

Where there is a large battery of either image or attitude statements, each of which is to be answered according to a scale, there is a real danger of respondent fatigue. This can occur both with self-completion batteries and where the interviewer reads them out. As discussed in Chapter 5, the precise point at which respondent fatigue is likely to set in will vary with the level of interest that each respondent has in the subject. However, it should be anticipated that, where there are more than about 30 statements, later statements are likely to suffer from inattention and pattern responding. To alleviate this type of bias, the presentation of the statement should be rotated between respondents. With electronic questionnaires, statements can often be presented in random order, or in rotation in a number of different sequences.

With paper questionnaires, rotating the order requires producing a number of different versions for self-completion, or careful instruction to interviewers if they are to read them out.

In the latter case it is common for the starting point on the battery for each respondent to be ticked or checked at the time of printing the questionnaires or before they are sent out to the interviewers. Ideally, the start point can be rotated between questionnaires so that the reading out starts at each statement an equal number of times. However, it may not always be possible to print this on automatically. It requires as many different versions of the page to be printed as there are statements in the battery. With possibly up to 30 statements the potential for error is considerable. Printing the questionnaire with no marked start points and marking each questionnaire by hand can be time-consuming where there are thousands of questionnaires. An alternative, which is usually acceptable, is to have a limited number of start points, and these can be printed using different versions of the page. Thus if there are 30 statements, six different start points can be used, spread throughout the battery. The statements are still reasonably well rotated and, with only six versions of the page to be printed, the scope for error is much reduced.

Where the battery of statements is to be read out by the interviewer using a paper questionnaire, it is important that every interviewer understands the process of rotating start points. In particular, interviewers must understand that every statement must be read out. It has been known for interviewers to read out only the statements from the designated start point to the end of the battery, and not to return to the beginning of the battery for the remaining statements. This is more likely to occur where the battery is on more than one page and the start point is not on the first page.

## Statement clarification

The order in which statements are presented to respondents can some-times be used to clarify their meanings. If there is a degree of ambiguity in a statement that would require a complex explanation, a preceding statement that deals with the alternative meaning can clarify what the questionnaire writer is seeking.

> For example:
>
> How would you rate the station for:
> The facilities and services at the station

On its own, it could be unclear to respondents whether car parking should be considered as one of the facilities or services at the station. If, however, this statement is preceded by one about car parking:

> Facilities for car parking
> The facilities and services at the station

or, even better:

> Facilities for car parking
> Other facilities and services at the station

then respondents can safely assume that the facilities and services are not meant to include car parking as that has already been asked about.

Where random presentation of statements is used, care must be taken to ensure that such explanatory pairs of statements always appear together and in the same order.

## *Response lists*

Showing a list of alternative responses is a common form of prompting in order to make respondents choose from a fixed set of options. For example:

> Thinking about the advertisement that you have just seen, which of the phrases on this card would you say describes it? You can mention as many or as few phrases as you wish.
>
> A        It was difficult to understand
> B        It made me more interested in visiting the store
> C        I found it irritating
> D        It's not right for this type of product

| | |
|---|---|
| E | I quickly got bored with it |
| F | I did not like the people in it |
| G | It said something relevant to me |
| H | I will remember it |
| I | It improved my opinion of the store |
| J | It told me something new about the store |
| K | It was aimed at me |
| L | I enjoyed watching it |
| M | None of these |

The respondent is expected to read through all of the options and select those that apply. In this question, respondents can choose as many statements as they feel are appropriate. In other questions, they may be asked to choose one option or any other specified number.

## Primacy and recency effects

Similar primacy effects as are seen with scales should be expected. The effects have been demonstrated by Schwarz, Hippler and Noelle-Neumann (1991), even where there are a small number of possible responses, down to three or even two if they are sufficiently complex to dissuade respondents from making an effort to process the possible answers in full. Duffy (2003) confirms the existence of primacy effects and adds that a significant minority read the list from the bottom. This would suggest that a recency effect can also be expected.

Indeed, both primacy and recency effects have been demonstrated by Ring (1975). He showed that with a list of 18 items there is a bias in favour of choosing responses in the first six and the last four positions (Table 7.1). The implication is that those in the middle of the list either are not read at all by some respondents or are not processed as possible responses to the same extent.

Where a list is of such size, then reversing the order and presenting one order to half of the sample and the reverse order to the other half does not adequately address the problem. Ring's experiments showed that with a list of 18 items the first 14 should be reversed and the last four reversed. The items that were fourteenth and fifteenth in the initial list then become first and last in the alternative list. This asymmetrical split better balances the bias across the items than simply reversing them. For further reduction in order bias Ring suggests additional splits after the seventh and sixteenth items, but for most research purposes these are not necessary.

In practice, many, if not most, researchers satisfy themselves with two or at most four rotations. With electronic questionnaires, statements can often be presented in random order, or in rotation in a larger number of

**Table 7.1** *Asymmetrical rotation of positions on the list*

| Item | Two-way split Position in: | | Four-way split Position in: | | | |
|------|--------|--------|--------|--------|--------|--------|
| | List 1 | List 2 | List 1 | List 2 | List 3 | List 4 |
| A | 1 | 14 | 1 | 14 | 7 | 8 |
| B | 2 | 13 | 2 | 13 | 6 | 9 |
| C | 3 | 12 | 3 | 12 | 5 | 10 |
| D | 4 | 11 | 4 | 11 | 4 | 11 |
| E | 5 | 10 | 5 | 10 | 3 | 12 |
| F | 6 | 9 | 6 | 9 | 2 | 13 |
| G | 7 | 8 | 7 | 8 | 1 | 14 |
| H | 8 | 7 | 8 | 7 | 14 | 1 |
| I | 9 | 6 | 9 | 6 | 13 | 2 |
| J | 10 | 5 | 10 | 5 | 12 | 3 |
| K | 11 | 4 | 11 | 4 | 11 | 4 |
| L | 12 | 3 | 12 | 3 | 10 | 5 |
| M | 13 | 2 | 13 | 2 | 9 | 6 |
| N | 14 | 1 | 14 | 1 | 8 | 7 |
| O | 15 | 18 | 15 | 18 | 16 | 17 |
| P | 16 | 17 | 16 | 17 | 15 | 18 |
| Q | 17 | 16 | 17 | 16 | 18 | 15 |
| R | 18 | 15 | 18 | 15 | 17 | 16 |

After Ring (1975)

different sequences. This does not eliminate bias but spreads it across the statements more evenly.

## Satisficing

Some people when buying items such as a washing machine, stereo system or car will spend a great deal of time researching which of the available models best meets their needs and requirements. Other people will buy one that satisfactorily meets their needs and requirements, and are not prepared to invest the time in researching all of the available models to determine whether there is one that is marginally better. The latter approach is known as 'satisficing', and occurs when choosing attitude statements from a list.

When presented with a list of statements from which to choose a response, satisficers will read it until they find an adequate answer that they feel reasonably reflects their view, or that they think will be acceptable to the interviewer, rather than reading or listening to all of the state-

ments to find the answer that best reflects their view. This is another source of order bias, which will tend to reinforce the primacy effect.

Satisficing is likely to increase with interview fatigue as respondents stop making the effort to answer to the best of their ability. It is also likely to be more prevalent with telephone than with face-to-face interviewing (Holbrook, Green and Krosnick, 2003).

## QUESTION ORDER

There are certain rules regarding the ordering of questions that must always be borne in mind. These have been covered in Chapter 3 and include:

- There must be no prompting of any information before spontaneous questions on the same subject.
- The interview should normally start with the more general questions relating to the topic and work through to the more specific or detailed subject matter.
- Behavioural questions should be asked before attitudinal questions on the same topic.

These issues should have been considered when the questionnaire was planned, but still need to be thought about as the detailed questionnaire is written.

### *Funnelling*

Funnelling sequences are used to take respondents from general questions on a topic through to questions that are more specific without allowing the earlier questions to condition or bias the responses to the later ones.

Typically in the funnelling sequence, whether respondents are asked a question depends on their response to the previous one. This means that people for whom questions are irrelevant can be routed round them. Because people are routed out without knowing what the criteria are for continuing the question sequence, we can be more confident that the response that we obtain to the final question is not biased. In the example in Figure 7.6, we would have little confidence that there was no bias had we asked the one question 'If you have seen any advertising for Bulmer's cider on television recently, what did it say?' This question would lead to overclaiming of having seen advertising, because there is an assumption that Bulmer's cider has been advertised on television recently. Some respondents would then claim to have seen it, even though they had not.

124 ■ Questionnaire Design



**Figure 7.6** *Funnelling sequence*

Funnelling sequences can be complicated for respondents to follow on paper self-completion questionnaires because of the routeing, and are best avoided. However, they can be used with any interviewer-administered questionnaire and work very well with electronic or web-based self-completion questionnaires where the routeing is hidden.

# *Question order bias*

## Priming effects

Where there is a key question to be asked, such as approval of a proposal, response to a new concept or rating of an issue, the act of asking questions about the respondent's feelings regarding the proposal, concept or issue prior to the key questions can have an effect on the response to it.

This can be desirable, as the researcher will want respondents to give an answer that takes into account their considered view. However, the researcher can suggest to respondents what they should answer. McFarland (1981) reported that asking a series of specific questions about the energy crisis led to a higher rating of the severity of the crisis than when the questions were not asked.

Questionnaire writers need to be aware of the influence that prior questions can have, and write the questions and interpret the responses accordingly.

## Consistency effect

A particular type of priming effect is the consistency effect. This can occur because respondents are led along a particular route of responses to a conclusion to which they can only answer one way if they are to appear consistent.

Consider the sequence in Figure 7.7.

Now compare Figure 7.7 with the sequence in Figure 7.8.

It should be expected that the responses to Q2 will show significant variation between Figures 7.7 and 7.8. By using statements that reflect one side of an argument, in this case for and against the building of a new airport, respondents are led to Q2 along different paths. Most people like to appear to be consistent. If they agree with the statements in Q1, it is then very difficult not to answer 'yes' at Q2 in the first example or 'no' in the second example.

To be even-handed, the preliminary question should contain statements that relate to both or all sides of an argument. The researcher may want to put questions to respondents about the issues before asking the key question, in order to help them to give a considered answer to that question. However, the preliminary questions must fairly represent all the issues if they are not to bias the response to the key question.

126 ■ Questionnaire Design

Q1. Please indicate whether you agree or disagree with each of the following statements, and how strongly, by ticking one box for each statement.

| | Agree strongly | Agree | Neither agree nor disagree | Disagree | Disagree strongly |
|---|---|---|---|---|---|
| Delays at airports in this country are becoming unacceptable. | ❏ | ❏ | ❏ | ❏ | ❏ |
| There is insufficient capacity at this country's airports. | ❏ | ❏ | ❏ | ❏ | ❏ |
| Airports in this country are dangerously overcrowded. | ❏ | ❏ | ❏ | ❏ | ❏ |
| There is a shortage of jobs in this region. | ❏ | ❏ | ❏ | ❏ | ❏ |

Q2. Do you support the government's proposal to build a new airport in this region?

YES ❏
NO ❏
DON'T KNOW ❏

**Figure 7.7** *The consistency effect (first sequence)*

# STANDARDIZING QUESTIONS

Where a question has been asked in a previous study it is usually to the advantage of the researcher to ensure that, unless there is a good reason otherwise, the same question should be used and the same pre-codes. Doing this allows the researcher to build up a body of knowledge about how this question is answered, and so spot any response pattern that deviates from this.

It also means that results from different studies can be compared more easily.

Many major manufacturers and some research companies have standard ways of asking particular questions that allow them to build up this body of knowledge.

# TRACKING STUDIES

Consistency of question wording is important in ongoing or tracking studies, in order to ensure that changes in data over time are not due to wording changes.

Q1. Please indicate whether you agree or disagree with each of the following statements, and how strongly, by ticking one box for each statement.

| | Agree strongly | Agree | Neither agree nor disagree | Disagree | Disagree strongly |
|---|---|---|---|---|---|
| The countryside round here is disappearing too quickly for my liking. | ❐ | ❐ | ❐ | ❐ | ❐ |
| There is too much building on green-field sites. | ❐ | ❐ | ❐ | ❐ | ❐ |
| I would not want to see this country's plant and animal life killed off. | ❐ | ❐ | ❐ | ❐ | ❐ |
| Noise pollution is a major nuisance round here. | ❐ | ❐ | ❐ | ❐ | ❐ |

Q2. Do you support the government's proposal to build a new airport in this region?

| | |
|---|---|
| YES | ❐ |
| NO | ❐ |
| DON'T KNOW | ❐ |

**Figure 7.8** *The consistency effect (second sequence)*

To ensure data consistency, it is also important to maintain the order in which the questions are asked, so that any order bias that exists is itself consistent. Keeping the question order means that adding new questions can cause problems, and the positioning of them must be considered very carefully. If possible, new questions should be added to the end of the questionnaire so as not to affect responses to any of the earlier questions. For the sake of the interview flow, though, this is not always possible.

For example, in an ongoing customer satisfaction survey, respondents were asked to give a rating of their overall satisfaction with the service received on their most recent visit to the client company. This has then been followed with questions rating various staff and service attributes, including one on efficiency. After a while, a competitor introduces a guarantee that all transactions will be completed within 10 minutes or customers get their money back. To measure the impact of this, the client now asks that, on the next wave of the survey, a new question is inserted between the overall satisfaction question and the service attribute ratings, on how quickly the customers perceive their transaction to have been handled and how satisfied they were with that. The introduction of these questions at this point could influence the way in which respondents rate the individual service attributes, in particular the one relating to effi-

ciency, as the speed of transaction has been raised higher in their consciousness than in previous waves of the study. Researchers must alert the client to the potential impact of such a change in the questionnaire on the comparability of the data with previous waves, and endeavour to find an alternative solution, such as a less sensitive position.

If no alternative solution can be found and the question changes are to be included for the foreseeable future, then it may be worth considering having a split run for one wave. For this, the sample is split randomly into two. One half is asked the existing questionnaire, the other the new questionnaire with the changes incorporated. Differences in results on the affected questions between the two halves of the sample can then be attributed to the changed questionnaire. An assessment of the impact of the changes can thus be made.

# OMNIBUS STUDIES

An omnibus survey is a particular type of study on which clients buy space for their own questions. The questionnaire can therefore cover a number of different subject areas for a number of different clients. The cost of sampling and contacting these respondents is effectively shared between all of the clients, making this a cost-effective way of asking a limited number of questions of a large sample or one that is expensive to sample.

Several different topics are asked about, and the question writer will not know what has been previously covered. The first question should therefore include a bridging phrase or sentence to indicate that a change of subject is about to occur.

Omnibus surveys are normally charged by the number of questions; whether they are pre-coded or open-ended; whether they use prompts or not; and the proportion of the sample of which they are asked. To keep down the cost, question writers must decide what are the most essential questions they need to cover, in order to limit the number.

The order of the questions may also be affected by the desire to keep down the cost. For example, we may be interested in asking some questions of people who have visited or considered visiting a particular resort. Normally we might ask:

Q1. SHOW CARD.
Which of the resorts on this card have you ever visited?

Q2. SHOW CARD.
And which others have you ever considered visiting?

Both questions would be asked of all respondents.

However, if the number who have visited or have considered visiting is a minority, the cost can be reduced by reversing the questions:

Q1. SHOW CARD.
Which of the following resorts have you ever considered visiting, regardless of whether you have actually visited them?

Q2. SHOW CARD.
And which have you actually visited?

The first question is still asked of all respondents, but the second one is only asked of people who say that they have considered the resort in which we are interested. We can still classify all respondents into the three categories – visited, considered but not visited, and not considered – but, because the second question is only asked of a minority of the sample, we have saved money.

# References

Albaum, G (1997) The Likert scale revisited, *Journal of the Market Research Society*, **39** (2), pp 331–348

Albaum, G, Roster, C, Yu, J H and Rogers, R D (2007) Simple rating scale formats: exploring extreme responses, *International Journal of Market Research*, **49** (5), pp 633–650

Artingstall, R (1978) Some random thoughts on non sampling error, *European Research*, **6** (6)

Basi, R K (1999) WWW response rates to socio-demographic items, *Journal of the Market Research Society*, **41** (4), pp 397–401

Bearden, W O and Netermeyer R G (1999) *Handbook of Marketing Scales*, Sage, Thousand Oaks, California

Booth-Kewley, S, Edwards J E and Rosenfeld P (1992) Impression management, social desirability and computer administration of attitude questionnaires: does the computer make a difference? *Journal of Applied Psychology*, **77** (4), pp 562–566

Brace, I, Nancarrow, C and McCloskey, J (1999) MR confidential: a help or a hindrance in the new marketing era? *The Journal of Database Marketing*, **7** (2), pp 173–185

Bradley, N (1999) Sampling for Internet surveys: an examination of respondent selection for Internet research, *Journal of the Market Research Society*, **41** (4), pp 387–395

Bronner, F and Kuijlen, T (2007) The live or digital interviewer: a comparison between CASI, CAPI and CATI with respect to differences in response behaviour, *International Journal of Market Research*, **49** (2), pp 167–190

Brown, G, Copeland, T and Millward, M (1973) Monadic testing of new products: an old problem and some partial solutions, *Journal of the Market Research Society*, **15** (2), pp 112–131

Cape, P, Lorch, J and Piekarski, L (2007) A tale of two questionnaires, *Proceedings of the ESOMAR Panel Research Conference*, Orlando, pp 136–149

Christian, L M and Dillman, D A (2004) The influence of graphical and symbolic language manipulations on responses to self-administered questions, *Public Opinion Quarterly*, **68** (1) pp 57–80

Christian, L M, Dillman, D A and Smyth, J D (2007) Helping respondents get it right the first time: the influence of words, symbols, and graphics in web surveys, *Public Opinion Quarterly*, **71** (1), pp 113–125

Chrzan, K and Golovashkina, N (2006) An empirical test of stated importance measures, *International Journal of Market Research*, **48** (6), pp 717–740

Cobanoglu, C, Warde, B, and Moreo, P J (2001) A comparison of mail, fax and web-based survey methods, *International Journal of Market Research*, **43** (4), pp 441–452

Coelho, P and Esteves, S (2007) The choice between a five-point and a ten-point scale in the framework of customer satisfaction measurement, *International Journal of Market Research*, **49** (3), pp 313–339

Conrad, F, Couper, M, Tourangeau, R and Peytchev, A (2005) Impact of progress feedback on task completion: first impressions matter, *Association for Computing Machinery, Conference on Human Factors in Computing Systems* 2005

Couper, M (2000) Web surveys: a review of issues and approaches, *Public Opinion Quarterly*, **64**, pp 464–494

Couper, M, Traugott, M and Lamias, M (2001) Web survey design and administration, *Public Opinion Quarterly*, **65**, pp 230–253

Cox, E (1980) The optimal number of response alternatives for a scale: a review, *Journal of Marketing Research*, **17**, pp 407–422

Crowne, D P and Marlowe, D (1960) A new scale of social desirability independent of psychopathology, *Journal of Consulting Psychology*, **24**, pp 349–354

Diamantopolous, A, Schlegelmilch, B and Reynolds, N (1994) Pre-testing in questionnaire design: the impact of respondent characteristics on error detection, *Journal of the Market Research Society*, **36** (4), pp 295–311

Dillman, D (2000) *Mail and Internet Surveys, 2nd edn, The Tailored Design Method*, John Wiley, New York

Dillman, D A, Singer, E, Clark, J R, and Treat, J B (1996) Effects of benefits appeals and variations in statements of confidentiality on completion rate for census questionnaires, *Public Opinion Quarterly*, **60** (3)

Duffy, B (2003) Response order effects: how do people read? *International Journal of Market Research*, **45** (4), pp 457–466

Duffy, B, Smith, K, Terhanian, G and Bremer, J (2005) Comparing data from online and face-to-face surveys, *International Journal of Market Research*, **47** (6), pp 615–640

Edwards, A L (1957) *The social desirability variable in personality assessment*, Dryden, New York

288 ▨ References

Eisenhower, D, Mathiowetz, N A and Morganstein, D (1991) Recall error: sources and bias reduction techniques, in *Measurement Error in Surveys*, ed P Biemer, S Sudman, and R M Groves, Wiley, New York

Greenwald, H J and Satow, Y (1970) A short social desirability scale, *Psychology Rep*, **27**, pp 131–135

Hogg, A and Masztal, J J (2001) A practical learning about online research, *Advertising Research Foundation Workshop*, October 2001

Holbrook, A L, Green, M C and Krosnick, J A (2003) Telephone versus face-to-face interviewing of national probability samples with long questionnaires, *Public Opinion Quarterly*, **67**, pp 79–125

Holtgraves, T, Eck, J and Lasky, B (1997) Face management, question wording and social desirability, *Journal of Applied Psychology*, **27**, pp 1650–1671

Ilieva, J, Baron, S and Healey, N M (2002) Online surveys in marketing research: pros and cons, *International Journal of Market Research*, **44** (3), pp 361–376

Kalton, G, Roberts, J and Holt, D (1980) The effects of offering a middle response option with opinion questions, *Statistician*, **29**, pp 65–78

Kalton, G and Schuman, H (1982) The effect of the question on survey responses: a review, *Journal of the Royal Statistical Society, Series A*, **145** (1), pp 42–73

Kellner, P (2004) Can online polls produce accurate findings? *International Journal of Marketing Research*, **46** (1), pp 3–21

Krosnick, J and Fabrigar, L (1997) Designing rating scales for effective measurement in surveys, in *Survey Measurement and Process Quality*, ed L Lyberg, P Biemer, M Collins, E De Leeuw, C Dippo, N Schwarz and D Trewin, John Wiley, New York

Lautenschlager, G J and Flaherty, V L (1990) Computer administration of questions: more desirable or more socially desirable, *Journal of Applied Psychology*, **75**, 310–314

Likert, R (1932) A technique for the measurement of attitudes, *Archives of Psychology*, **140**, pp 5–55

McDaniel, C Jr and Gates, R (1993) *Contemporary Marketing Research*, West Publishing Company, St Paul Minnesota, chapter 11 / 12

McFarland, S G (1981) Effects of question order on survey responses, *Public Opinion Quarterly*, **45**, pp 208–215

McKay, R and de la Puente, M (1996) Cognitive testing of racial and ethnic questions for the CPS supplement, *Monthly Labor Review*, September, pp 8–12

Nancarrow, C, Brace, I and Wright, L T (2000) Tell me lies, tell me sweet little lies: dealing with socially desirable responses in market research, *The Marketing Review*, **2** (1), pp 55–69

Nancarrow, C, Pallister, J and Brace, I (2001) A new research medium, new research populations and seven deadly sins for Internet researchers, *Qualitative Market Research: An International Journal*, **4** (3), pp 136–149

Oppenheim, A N (1992) *Questionnaire Design, Interviewing and Attitude Measurement*, 2nd edition, Continuum, London

Osgood, C E, Suci, G J and Tannenbaum P (1957) *The Measurement of Meaning*, University of Illinois Press, Urbana, Illinois

Paulhus, D L and Reid, D B (1991) Enhancement and denial in socially desirable responding, *Journal of Personality and Social Psychology*, **60** (2), pp 307–317

Peterson, R A (2000) *Constructing Effective Questionnaires*, Sage Publications. Thousand Oaks, California

Phillips, D L and Clancy, K J (1972) Some effects of 'social desirability' in survey studies, *American Journal of Sociology*, **77** (5), pp 921–938

Poynter, R and Comley, P (2003) Beyond online panels, *Proceedings of ESOMAR Technovate Conference*, Cannes

Presser, S and Schuman, H (1980) The measurement of a middle position in attitude studies, *Public Opinion Quarterly*, **44**, pp 70–85

Reid, J, Morden, M and Reid, A (2007) Maximizing respondent engagement: the use of rich media, *Proceedings of the ESOMAR Congress, Berlin*

Ring, E (1975) Asymmetrical rotation, *European Research*, **3** (3), pp 111–119

Roster, C, Albaum, G and Rogers, R (2006) Can cross-national/cultural studies presume etic equivalency in respondents' use of extreme categories of Likert rating scales? *International Journal of Market Research*, **48** (6), pp 741–759

Saris, W E and Gallhofer, I N (2007) Design, Evaluation, and Analysis of Questionnaires for Survey Research, John Wiley, Hoboken

Schober, M F (1999) Making sense of questions: an interactional approach, in *Cognition and Survey Research*, ed M G Sirken, D J Herrman, S Schechter, N Schwarz, J M Tanur and R Tourangeau, John Wiley, New York

Schuman, H and Presser, S (1981) *Questions and Answers in Attitude Surveys*, Sage Publications, Thousand Oaks, California

Schwarz, N, Hippler, H and Noelle-Neumann, E (1991) A cognitive model of response-order effects in survey measurement, in *Context effects in social and psychological research*, ed N Schwarz and S Sudman, pp 187–201, Springer Verlag, New York

Singer, E, Hippler, H-J and Schwarz, N (1992) Confidentiality assurances in surveys: reassurance or threat, *International Journal of Public Opinion Research*, **4** (34), pp 256–268

Singer, E, Von Thurn, D R and Miller, E R (1995) Confidentiality assurances and response: a quantitative review of the experimental literature, *Public Opinion Quarterly*, **59** (1), pp 67–77

Strahan, R and Gerbasi, K C (1972) Short homogeneous versions of the Marlowe–Crowne social desirability scale, *Journal of Clinical Psychology*, **28**, pp 191–193

Suchman, L and Jordan, B (1990) Interactional troubles in face-to-face survey interviews, *Journal of the American Statistical Association*, **85** (409), pp 232–241

Sudman, S and Bradburn, N (1973) Effects of time and memory factors on response in surveys, *Journal of the American Statistical Association*, **68**, pp 805–815

Sudman, S and Bradburn, N (1982) *Asking Questions: A practical guide to questionnaire design*, Jossey-Bass, San Francisco, California

Taylor, H (2000) Does Internet research work? *International Journal of Market Research*, **42** (1), pp 51–63

Thomas, R, Couper, M P, Bremer, J and Terhanian, G (2007) Truth in measurement: comparing web-based interviewing techniques, *Proceedings of the ESOMAR Congress, Berlin*, pp 195–206

Tourangeau, R (1984) Cognitive science and survey methods, in *Cognitive Aspects of Survey Methodology: Building a bridge between disciplines*, ed T Jabine, M Straf, J Tanur and R Tourangeau, National Academy Press, Washington, DC

Tourangeau, R, Couper, M and Conrad, F (2004) Spacing, position, and order: interpretive heuristics for visual features of survey questions, *Public Opinion Quarterly*, **68** (3), pp 368–393

Tourangeau, R, Couper, M and Conrad, F (2007) Color, labels and interpretative heuristics for response scales, *Public Opinion Quarterly*, **71** (1), pp 91–112

Tourangeau R, Rips, L J and Rasinski, K (2000) *The Psychology of Survey Response*, Cambridge University Press, Cambridge

Van Schaik, P and Ling, J (2007) Design parameters of rating scales for web sites, *ACM Transactions on Computer–Human Interaction*, **14**

Wable, N and Pall, S (1998) You just do not understand! More and more respondents are saying this to market researchers today, *ESOMAR Congress*

Warner, S L (1965) Randomised response: a survey technique for eliminating evasive answer bias, *Journal of the American Statistical Association*, **60**, pp 63–69

Wood, O (2007) Using faces: measuring emotional engagement for early stage creative, *Proceedings of the ESOMAR Congress, Berlin*, pp 412–437

Worcester, R and Downham, J (1978) *Consumer Market Research Handbook*, 2nd Edition, Van Nostrand Reinhold, Wokingham

Wright, L T and Crimp, M (2000) *The Marketing Research Process*, 5th edition, Pearson Education, Harlow

Zaichkowsky, J L (1999) Personal involvement inventory for advertising, in *Handbook of Marketing Scales*, ed W O Bearden and R G Netemeyer, Sage Publications, Thousand Oaks, California

DEF-INTERV.

EX. 289

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>Defendants,<br><br>*and*<br><br>KARLA PEREZ, *et al.*,<br><br>Defendant-Intervenors. | Case No. 18-cv-00068 |

**FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' THIRD SET OF DISCOVERY REQUESTS**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

 Federal Defendants serve these objections and responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

 Federal Defendants state the following General Objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents, which are hereby incorporated in and made part of each of the following specific responses.

1. Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of documents

1

or things outside the narrow scope of expedited discovery, are unduly burdensome, are overly broad, or seek information that is not relevant to this phase of this case and will not lead to the discovery of such relevant information, or are equally accessible to Defendant-Intervenors through third-party discovery requests, publicly available government websites other websites, or other sources.

2.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense.  Federal Defendants further object to these interrogatories and requests for production of documents to the extent that they are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

3.      Federal Defendants object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are vague and ambiguous, and therefore may lead to differing interpretations among the parties to this litigation as well as the Court, resulting in confusion.  Federal Defendants further object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are inconsistent with the Court's order dated June 20, 2018 (Dkt. 97) or to the extent that they are confusing or unduly burdensome.

4.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that Defendant-Intervenors seek disclosures of information protected from disclosure by the Privacy Act of 1974, 5 U.S.C. Section 552a(b), attorney-client privilege, attorney work product doctrine, deliberative process privilege, law enforcement / investigatory files privilege, self-critical analysis privilege, executive privilege, and official information privilege, and other applicable privileges.

5.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of electronically stored information on electronic media, including any general search of email or retrieval of backup tapes of U.S. Citizenship and Immigration Services ("USCIS") that are not reasonably accessible because of the undue time, burden, and cost associated with retrieving, reviewing, and producing the information, especially in relation to the limited scope of expedited discovery at this stage of proceedings.

6.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of material outside of a properly designated administrative record by USCIS, insofar as this action may be construed as a suit for judicial review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

7.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent they purport to require the disclosure of information in the possession, custody or control of entities other than properly named

Defendants on the grounds that such production is beyond the scope of Fed. R. Civ. P. 33 and 34 and other applicable law.

8.      Federal Defendants object, in light of the Court's Order dated June 20, 2018 (Dkt. 97), to the extent Defendant-Intervenors' third set of interrogatories and requests for production of documents seek to compel Federal Defendants to search for, identify, or log drafts or non-final documents or produce documents in their native format.

9.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories to the extent that they exceed the limit of 25 interrogatories, including all subparts, allowed under Fed. R. Civ. P. 33, without stipulation or leave from the court.  Defendant-Intervenors have clearly promulgated more than twenty-five interrogatories in this set alone, much less in all prior sets of interrogatories.

10.     Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents are made without waiving:

        (a)  The right to object to the competence, relevance, materiality, or admissibility as evidence of any information, or the subject matter thereof, in any aspect of this civil action or any other matter;

        (b)  The right to object at any time and upon any grounds to any other discovery requests;

        (c)  The right at any time and for any reason to revise, supplement, correct, add or to clarify these responses;

        (d)  The right to amend or supplement these responses if the Federal Defendants discover additional information; and

        (e)  Any applicable privilege, including but not limited to the attorney/client privilege, the law enforcement privilege, the investigation files privilege, executive privilege, and the official information privilege.

11.     Discovery has not concluded in this litigation.  Accordingly, the Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents is based upon the information available at this stage of the litigation.  Federal Defendants reserve the right to rely upon any facts, documents, or other evidence which may develop or come to its attention subsequent to this response.

        Likewise, Federal Defendants' objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents are based upon the information presently known by the Federal Defendants, and are made without prejudice to the Federal Defendants' right to assert additional objections in the event that additional grounds for objections should be discovered by the Federal Defendants subsequent to this response.

12.     Without waiving the above objections, Federal Defendants will provide responses to only relevant non-privileged matters based on information currently available to it and obtainable without undue burden.

**SPECIFIC OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' THIRD SET OF INTERROGATORIES**

**INTERROGATORY NO. 3**

Please identify the number of initial DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of initial DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of initial DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of initial DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 3**

Defendants specifically object to Interrogatory No. 3 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following terms and phrases in Interrogatory No. 3 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practice regarding DACA: "initial [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

Immigration and Customs Enforcement ("ICE") specifically objects to being required to search for information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012. It appears that ICE never compiled or "tracked" information responsive to Interrogatory No. 3 for this time period. Specifically, ICE has queried the Enforcement and Removal Operations ("ERO") database and found no information responsive to Interrogatory No. 3. In addition, ICE has queried several current agency employees who potentially might

4

have information responsive to Interrogatory No. 3 and has been advised that they possess no responsive information.  It appears likely that the only ICE individuals who may have information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012 are former agency employees.

**RESPONSE TO INTERROGATORY NO. 3**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, August 15, 2012 – June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012, therefore USCIS is not able to provide data on DACA initial requests from June 2012 to August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 4**

Please identify the number of renewal DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of renewal DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of renewal DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of renewal DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 4**

Defendants specifically object to Interrogatory No. 4 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.   Defendants object to the following terms and phrases in Interrogatory No. 4 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common

use of the terms in its agency practices regarding DACA: "renewal [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

**RESPONSE TO INTERROGATORY NO. 4**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, June 4, 2014 – June 22, 2018." USCIS began accepting DACA renewal requests on June 4, 2014; therefore Federal Defendants are unable to provide data on DACA renewals from June 2012 to June 4, 2014 because it does not exist. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 5**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA initial application:

a. For the period of June 2012 to January 2017

b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 5**

Defendants specifically object to Interrogatory No. 5 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 5 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "initial [application]." The response to Interrogatory No. 5 is based on Defendant USCIS' common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 5**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Initial Completions, August 15, 2012 - June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012; therefore the average processing time for part a. was calculated using data beginning August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 6**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA renewal application:

a. For the period of June 2014 to January 2017

b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 6**

Defendants specifically object to Interrogatory No. 6 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 6 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 6 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 6**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Renewal Completions, June 4, 2014 - June 22, 2018. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 7**

Please identify the offices within USCIS that evaluate and adjudicate DACA applications.

**OBJECTIONS TO INTERROGATORY NO. 7**

Defendants specifically object to Interrogatory No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following terms and phrases in Interrogatory No. 7 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "evaluate" and "adjudicate." Defendant USCIS' response is based on its common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendants further object that "offices" do not "evaluate and adjudicate" DACA requests within USCIS, but rather USCIS officers employed at specific USCIS locations adjudicate DACA requests and other USCIS personnel may also be involved in evaluating DACA requests. Defendants also object that Interrogatory No. 7 is vague and ambiguous as to the time period it covers. Defendant USCIS' response will cover the period from August 1, 2012 through May 31, 2018, the period for which data is readily available.

**RESPONSE TO INTERROGATORY NO. 7**

Subject to this qualification and objection, Defendant DHS responds that only officers at USCIS Service Centers render final adjudicative decisions for DACA requests. However, individuals at other USCIS offices that may be or may have been involved in evaluation or review of DACA requests are or were employed at: Headquarters Service Center Operations, the Field Operations Directorate, the Office of Policy and Strategy, the Fraud Detection and National Security Directorate, the Office of Intake and Data Production, and the Office of the Chief Counsel.

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, USCIS Service Centers and Offices that Evaluate and Adjudicate DACA Requests, August 1, 2012 - May 31, 2018", which provides the name of each USCIS service center and USCIS field office that has transferred in or adjudicated at least one Form I-821D since August 1, 2012. The data provided in response to this Interrogatory reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 8**

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of June 2012 to June 2018.

## OBJECTIONS TO INTERROGATORY NO. 8

Defendants specifically object to Interrogatory No. 8 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following term in Interrogatory No. 8 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

## RESPONSE TO INTERROGATORY NO. 8

Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Count of Adjudications by Service Center and Fiscal Year of Adjudication, August 15, 2012 - June 22, 2018." USCIS began accepting DACA requests on August 15, 2012; therefore USCIS service centers did not adjudicate any DACA requests between June 2012 and August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## INTERROGATORY NO. 9

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

## OBJECTION TO INTERROGATORY NO. 9:

Defendants specifically object to Interrogatory No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in Interrogatory No. 9 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security."   Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c., of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing).

Federal Defendants further object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 9 in the ordinary course of business.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State (over 17,000 cases), as set forth in the

attached declaration.  *See* Dkt. 97.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 9, the number of denials of initial DACA requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 3 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 9**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Denials by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.  In response to subpart c. of Interrogatory No. 9, Federal Defendants respond that based on an informal inquiry of relevant USCIS service centers and the information in the 2015 Neufeld Declaration, *see, e.g.*, para. 18,[1] Federal Defendants are aware of several initial DACA requests that were denied because the requestor either made false statements or committed fraud in other immigration or non-immigration government contexts, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 10**

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 10**

---

[1] Defs.' Sur-reply in Opp'n to Pls.' Mot. for Prelim. Inj., Ex. 44, *Texas v. U.S.*, 86 F.Supp.3d 591 (2015) (No. 1:14-cv-254), ECF No. 130-11.

Defendants specifically object to Interrogatory No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application," nor are requestors considered "applicants."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA.  Defendants further object to the following terms in Interrogatory No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security."   Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.  Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).  This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (over 2,000 cases), as set forth in the attached

declaration.  *See* Dkt. 97.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 10, the number of denials of DACA renewal requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 4 and is therefore duplicative.

## RESPONSE TO INTERROGATORY NO. 10

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Denials by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## INTERROGATORY NO. 11

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**OBJECTION TO INTERROGATORY NO. 11**

Defendants specifically object to Interrogatory No. 11 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application," nor are requestors considered "applicants."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA.  Defendants further object to the following terms in Interrogatory No. 11 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial [DACA applications]," "accepted," "and subsequently issued Requests for Evidence ("RFE")."  Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

 Federal Defendants further object to subparts a. through g. of this Interrogatory on the grounds that they are overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every initial DACA request from each Plaintiff State (more than 50,000), as set

forth in the attached declaration.  *See* Dkt. 97.  This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 11, the number of initial DACA requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

**RESPONSE TO INTERROGATORY NO. 11**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Request for Evidence (RFE) by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 12**

Please identify the number of renewal DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;
c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

15

**OBJECTION TO INTERROGATORY NO. 12**

Defendants specifically object to Interrogatory No. 12 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 12 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [DACA applications]," "accepted," and "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to subparts a. through g. of Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every DACA renewal request from each Plaintiff State (more than 9,000), as set

forth in the attached declaration.  *See* Dkt. 97. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 12, the number of DACA renewal requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

**RESPONSE TO INTERROGATORY NO. 12**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Request for Evidence (RFE) by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 13**

Please identify the number of approved, initial DACA applications submitted by individuals who indicated on their I-821D, in response to Part 3. Question 4., that their immigration status on June 15, 2012 was "Status Expired" or "Parole Expired," and who answered in the affirmative in response to Part 3. Question 5.a. ("Were you EVER issued an Arrival-Departure Record"), for each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTION INTERROGATORY NO. 13**

Defendants specifically object to Interrogatory No. 13 to the extent that it uses terms that do not apply to DACA, such as "applications."  DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in Interrogatory No. 13 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "approved," and "initial [DACA applications]." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter

17

related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a reliable, readily retrievable, systematic and complete manner, the responses to Part 3, Question 4 on the Form I-821D, in the ordinary course of business. USCIS databases also do not electronically capture, in a readily retrievable, systematic manner, responses to Part 3, Question 5a on the Form I-821D for DACA requests that were processed in USCIS' Computer Linked Application Information Management System (CLAIMS 3), in the ordinary course of business.  CLAIMS 3 is an electronic case management system. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for every approved initial DACA request for each Plaintiff State (more than 150,000), as set forth in the attached declaration.  *See* Dkt. 97.

Federal Defendants will provide a partial response regarding the number of approved initial DACA requests where "Yes" was marked in Part 3, Question 5a. on the Form I-821D, for cases processed in USCIS' Electronic Immigration System (ELIS).  ELIS is an online, electronic account and immigration case management system that stores information submitted or integrated into the system for the processing of specific applications, petitions, or requests.  *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

**RESPONSE TO INTERROGATORY NO. 13**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Requests with 'Yes' marked in Part 3 Question 5a 'Were you EVER issued an Arrival-Departure Record' by Month and Selected State, November 1, 2015 - June 22, 2018," which provides information only from ELIS. The data

provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 14**

Please identify the number of DACA recipients who adjusted their status to lawful permanent resident, for each Plaintiff State for each month during the period of June 2012 to June 2018, and identify among that number:

> a. the number of DACA recipients who adjusted under 8 U.S.C. 1255(i)

> b. the number of DACA recipients who adjusted under 8 U.S.C. 1255(a)

**OBJECTION TO INTERROGATORY NO. 14**

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

 Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, whether an individual adjusted status to lawful permanent residence under 8 U.S.C. 1255(a), (i), or another basis, in the ordinary course of business.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every DACA recipient who adjusted status to lawful permanent residence during the specified period for each Plaintiff State (more than 7,000), as set forth in the attached declaration.  *See* Dkt. 97.

**RESPONSE TO INTERROGATORY NO. 14**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, I-485, Application to Register Permanent Residence or Adjust Status, DACA Recipients who Adjusted Status by Date of Adjustment and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I am Tracy Renaud, Acting Deputy Director of USCIS.  I believe, based on inquiry, that the foregoing USCIS answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed July 6, 2018.

                                      (Signature)
                             Tracy Renaud
                             Acting Deputy Director, USCIS

21

<u>**SPECIFIC OBJECTIONS AND RESPONSES TO**</u>
<u>**DEFENDANT-INTERVENORS' THIRD SET OF REQUESTS FOR PRODUCTION**</u>

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents relating to guidelines followed by DHS, and any of its subsidiary agencies, departments, agents, and employees, to evaluate, process, and adjudicate Deferred Action for Childhood Arrivals ("DACA") applications, including, but not limited to: (1) internal agency documents, memoranda, and communications that set forth any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications; (2) training materials provided to agents or employees related to DACA evaluations and adjudications; and (3) changes following January 20, 2017 in any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 5:**

Defendants specifically object to Request for Production (RFP) No. 5 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in RFP No. 5 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to guidelines," "to evaluate, process and adjudicate," "guidance, rules or procedures," "training materials," and "changes following January 20, 2017 in any guidance, rules, or procedures." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Federal Defendants object to RFP No. 5 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants further object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97). This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g., OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction

hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc*., No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS is prepared to provide readily available, final versions of non-case specific responsive documents containing guidelines followed to evaluate, process, and adjudicate DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all emails or other documents "relating to guidelines followed by DHS . . . to evaluate, process, and adjudicate" DACA requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

Due to the breadth of RFP No. 5, including the six years it covers, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" guidelines followed by DHS to evaluate, process, and adjudicate DACA requests that would not be overly broad and result in hundreds of thousands of materials to be reviewed for responsiveness and privileges. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 5 for the period of time from June 2012 through August 2012. ICE has contacted several individuals currently employed by ICE and determined that they have no

23

documents responsive to Request No. 5.  To the extent that responsive documents do exist, they would be among the emails of former ICE employees.  ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).  It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents relating to the process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates, processes, and adjudicates DACA applications, including but not limited to: (1) under what circumstances a DACA application is rejected, denied, or approved; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of DACA applications; (3) the procedure(s) employed by agents and employees who work in the evaluation and adjudication of DACA applications; and (4) changes in the process for evaluating, processing, and adjudicating DACA applications following January 20, 2017.

**OBJECTION TO REQUEST NO. 6:**

Defendants specifically object to Request for Production (RFP) No. 6 to the extent that it uses terms that do not apply to DACA, such as "applications."  DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Federal Defendants object to RFP No. 6 to the extent that the request seeks documents that are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Defendants further object to the following terms in RFP No. 6 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to the process by which … evaluates, processes, adjudicates DACA [applications]," "rejected, denied, or approved," "evaluation and adjudication," and "changes in the process for evaluating, processing, and adjudicating DACA [applications] following January 20, 2017." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendants also object to RFP 6 to the extent that it is unclear what documents Defendant-Intervenor seeks that are different from documents sought in RFP 5, and to the extent that RFPs overlap, or that RFP 6 seeks documents that are duplicative of those sought in RFP 5. Such apparently duplicative and overlapping requests are overly burdensome and confusing for Defendants to interpret and understand how to respond. Defendants further object that the use of the word "and" in "who work in the evaluation and adjudication of DACA applications" is

24

ambiguous and creates confusion.  Defendants do not know whether each such employee noted must do *both* actions, "evaluation *and* adjudication," or whether each employee must be involved at least in either "evaluation" or "adjudication" of DACA requests.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).  This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc.*, No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to subparts (1), (3) and (4), because they are duplicative of RFP No. 5.

USCIS is prepared to provide readily available final versions of non-case specific documents describing the process by which DHS evaluates, processes, and adjudicates DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all email and other documents "relating to the process by which DHS . . . evaluates, processes, and adjudicates DACA" requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

Due to the breadth of Request for Production No. 6, which covers six years, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" the process by which DHS evaluates, processes, and adjudicates DACA requests that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges.  It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 6 for the period of time from June 2012 through August 2012.  ICE has contacted several individuals currently employed by ICE and determined that they have no documents responsive to Request No. 6.  To the extent that responsive documents do exist, they would be among the emails of former ICE employees.  ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).  It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

**REQUEST FOR PRODUCTION NO. 7:**

Produce documents showing the number of DACA applications received, rejected, denied, and approved, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; (2) the number of renewal DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; and (3) the number of DACA applications accepted but denied, during the period of June 2012 to June 2018, after the adjudicator determined the applicant met the five criteria in the June 15, 2012 DACA memorandum but was otherwise not a qualifying applicant, including because the applicant posed a threat to national security or public safety, by each Plaintiff state, for each month.

**OBJECTION TO REQUEST NO. 7:**

Defendants specifically object to Request for Production (RFP) No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period

26

from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA.  Defendants further object to the following terms in RFP No. 7 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendant also objects that the phrase "met the five criteria in the June 15, 2012 DACA memorandum," is ambiguous, and Defendant is without sufficient knowledge to know exactly which "five criteria" Defendant-Intervenor is referencing with this phrase.  The reference to the "June 15, 2012 DACA memorandum" lacks specificity, and thus is ambiguous, but Defendants will interpret it to mean the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

27

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendant-Intervenors to the responses to Interrogatories and the following pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

## REQUEST FOR PRODUCTION NO. 8:

Produce all documents relating to process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates and adjudicates applications or requests for deferred action other than DACA, including but not limited to: (1) under what circumstances an application or request is rejected, denied, or accepted; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of deferred action applications or requests; (3) and the procedure(s) employed by agents and employees who work in the evaluation and adjudication of deferred action applications or requests; and (4) any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017.

## OBJECTION TO REQUEST FOR PRODUCTION NO. 8:

Defendants specifically object to Request for Production (RFP) No. 8 to the extent that it uses terms that do not apply to DACA or to deferred action generally, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  Non-DACA deferred action is also made by written request, not an application, to DHS.  As such, neither DACA, nor non-DACA deferred action is

obtained through an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications…for deferred action other than DACA" to mean written requests for non-DACA deferred action.  Defendants further object to the following terms in RFP No. 8 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendants common use of the terms in its agency practices regarding deferred action: "evaluates," "adjudicates," "rejected,", "denied," "accepted," "evaluation and adjudication of deferred action applications or requests," "procedures(s) employed by…who work in the evaluation and adjudication of deferred action," and "any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017."  Defendants' response is based on Defendants' common usage of such terms in its agency practices. Federal Defendants object to RFP No. 8 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

 Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case and is outside the scope of the relief sought in this action.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent that it seeks every deferred action request that was ever denied. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

USCIS is prepared to provide readily available, final versions of non-case specific documents regarding the process by which USCIS evaluates, processes, and adjudicates requests for deferred action other than DACA, that were in existence and in use at any time between January 1, 2016 and June 22, 2018, and that are maintained by custodians who are currently employed by USCIS. USCIS will not conduct a comprehensive search for all emails or other documents "relating to [the] process by which DHS . . . evaluates and adjudicates" non-DACA deferred action requests, or conduct a comprehensive search for records that were maintained by former USCIS employees.  Due to the breadth of this Request, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails relating to the process by which DHS evaluates and adjudicates requests for deferred action other than DACA that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges, or risk being under-inclusive in scope. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS, and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS or DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In addition to the responsive documents being produced, USCIS respectfully refers Defendant-Intervenors to the following publicly available information:

- Memorandum from Stuart Anderson, Executive Associate Commissioner, Office of Policy and Planning, INS, "Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status," May 8, 2002, 81 FR 92266 at 92279 (https://www.regulations.gov/document?D=USCIS-2011-0010-0004)
- "New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for 'T' Nonimmigrant Status," 67 Fed. Reg. 4784, 4790 (Jan. 31, 2002)
- "New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status," 72 FR 53014-01 (Sept. 17, 2007)

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents relating to the number of DACA applications received, rejected, denied, and approved at each of the five USCIS Service Centers, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018; and (2) the number of renewal DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018.

**OBJECTION TO REQUEST NO. 9:**

Defendants specifically object to Request for Production (RFP) No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be

submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in RFP No. 9 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved."  Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).  This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this RFP to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to this RFP as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for

USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to the pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses  to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

**REQUEST FOR PRODUCTION NO. 10:**

Produce all documents relating to the USCIS processing time of accepted and approved DACA applications, including but not limited to: (1) the amount of time that elapses between the date USCIS accepts an application and the time the application is approved; (2) the amount of time that elapses between the date USCIS approves an application and an applicant receives an employment authorization document; and (3) any changes in the processing time described above since January 20, 2017.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 10:**

Defendants specifically object to Request for Production (RFP) No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in RFP No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "processing time," "accepted," "approved," and "any changes in the processing time described above since January 20, 2017."  Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices   Defendants also object that "amount of time that elapses" is vague and undefined, and therefore ambiguous.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).  This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

 Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to the extent this Request seeks documents duplicative of information provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to its responses to the Interrogatories and publicly available documents on the following pages of the USCIS website:

- Website for checking current case processing times: https://egov.uscis.gov/processing-times/
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

Dated: July 6, 2018                          Respectfully submitted,

                                             CHAD A. READLER
                                             Acting Assistant Attorney General
                                             Civil Division
                                             BRETT A. SHUMATE
                                             Deputy Assistant Attorney General
                                             WILLIAM C. PEACHEY
                                             Director, Office of Immigration Litigation
                                             District Court Section

                                             /s/ *Jeffrey S. Robins*
                                             JEFFREY S. ROBINS
                                             Attorney-in-Charge
                                             Assistant Director
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation
                                             District Court Section
                                             P.O. Box 868, Washington, DC 20044
                                             Telephone: (202) 616-1246
                                             Facsimile: (202) 305-7000
Attorneys for Federal Defendants             jeffrey.robins@usdoj.gov

# DEF-INTERV.

# EX. 290

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT-
INTERVENORS' FIRST SET OF DISCOVERY REQUESTS**

TO:   Defendant-Intervenors, by and through their attorney of record, Nina Perales,
Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite
300, San Antonio, Texas 78205.

Plaintiff States serve these objections and responses to Defendant-Intervenors'

first set of interrogatories and requests for production of documents pursuant to the

Federal Rules of Civil Procedure.

1

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

/s/ *Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

PATRICK MORRISEY
Attorney General of West Virginia

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

2

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ *Adam N. Bitter*
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

## **GENERAL OBJECTIONS**

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id.* Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs objects to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information

that is publicly available or otherwise equally available or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

### SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

Please provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that Plaintiffs may use to support their claims or defenses, unless solely for impeachment, identifying the subjects of the information. *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs will support their motion for preliminary injunction with factual declarations from the following individual fact witnesses. The subjects of their testimony can be found in the declarations attached to Plaintiffs' motion for preliminary injunction.

Leonardo R. Lopez
Associate Commissioner for School Finance/Chief School Finance Officer
Texas Education Agency
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Monica Smoot
Chief Data and Analytics Officer
Center for Analytics and Decision Support
Texas Health and Human Services Commission
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Kenneth Palinkas
President of Local 0235
American Federation of Government Employees, AFL-CIO
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Plaintiffs will provide the names of their expert witnesses by the June 15, 2018 deadline set by the Court. Plaintiffs will support their motion for preliminary injunction with the exhibits cited in and attached to their complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement. Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## INTERROGATORY NO. 2

Please provide a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of Plaintiffs and that Plaintiffs may use to support their claims or defenses, unless solely for impeachment. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii).

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the exhibits attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 3**

Please provide a computation of any financial harm that Plaintiffs claim to result from the implementation of DACA, and identify the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of financial harm suffered. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the computations supporting Plaintiffs' motion for preliminary injunction are included either in Plaintiffs' complaint, motion for preliminary injunction, or the documents cited or attached to those filings. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents and compilations are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S FIRST SET OF REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' interrogatories.

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents are based, to the extent that any additional information exists. Plaintiffs will produce any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response, if necessary, with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

# DEF-INTERV.

# EX. 291

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSE TO DEFENDANT-
INTERVENORS' SECOND SET OF DISCOVERY REQUESTS**

TO:   Defendant-Intervenors, by and through their attorneys of record, Nina Perales,
Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal
Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas
78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C.,
P.O. Box 4545 McAllen, Texas 78502.

Plaintiff States serve these objections and responses to Defendant-Intervenors'

second set of interrogatories and requests for production of documents pursuant to

the Federal Rules of Civil Procedure.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

2

## CERTIFICATE OF SERVICE

I certify that on June 14, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ *Adam N. Bitter*
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

## **GENERAL OBJECTIONS**

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id.* Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs objects to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information

that is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

5

**SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-
INTERVENOR'S SECOND SET OF INTERROGATORIES**

**INTERROGATORY NO. 4:**

Identify all costs that Plaintiffs, by state and year, have incurred since June 2012 or
expect to incur in the future, with respect to providing goods, support and/or services
to DACA recipients living in Plaintiff states. With respect to each cost identify:

    a.    the category of the cost;

    b.    the amount of the cost;

    c.    whether Plaintiff states have paid the cost;

    d.    the anticipated amount of future costs;

    e.    the complete factual basis for asserting and computing the above costs;
        and

    f.    all information, documents or other evidentiary material on which such
        assertions and computations are based.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It
seeks information that is outside the scope of limited expedited discovery.

    Subject to and without waiving their objections, the costs incurred by Plaintiffs
upon which their motion for preliminary injunction relies are detailed in the
complaint, the motion for preliminary injunction, and the exhibits attached to and
cited in those documents. Plaintiffs will produce the non-privileged relevant
information in their possession, custody, or control upon which those costs are based,
to the extent that any additional information exists. Plaintiffs will disclose any new
exhibits they intend to attach to their initial post-discovery brief on June 15, 2018,
pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and
with additional information once this case proceeds to the normal discovery period
after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 5:**

Identify the number of DACA recipients living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:
- a. the manner in which you determined the number of DACA recipients;
- b. the manner in which you determined the individuals are DACA recipients;
- c. the documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;
- d. the number of DACA recipients who attend public colleges or universities;
- e. the number of DACA recipients who attend public K-12 schools;
- f. the number of DACA recipients who are unaccompanied children (UAC);
- g. the number of DACA recipients who have received health care not compensated by the patient or an insurer.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 2 to the complaint and Exhibit 15 to the motion for preliminary injunction and the other exhibits attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 6:**

Identify the number of unaccompanied children (UAC)[1] living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

a.     the total number of UAC;
b.     the total number of UAC who attend public K-12 schools;
c.     the total number of UAC who attend public colleges or universities;
d.     the amount of K-12 education costs each state incurs on UAC;
e.     the amount of higher education costs each state incurs on UAC;
f.     whether Plaintiff states have paid the cost;
g.     the anticipated amount of future costs;
h.     complete factual basis for asserting and computing the above costs; and
i.     all information, documents or other evidentiary material on which such assertions and computations are based.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 9 attached to their motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

---

[1] The term "unaccompanied children" can refer to the broader category of any children not in the physical custody of a parent or guardian. For purposes of their response, Plaintiffs assume that this interrogatory seeks information regarding "unaccompanied alien children."

**INTERROGATORY NO. 7:**

Identify Plaintiff states' expenditures, by state and year, to provide Emergency Medicaid Services to DACA recipients since June 2012. For each Plaintiff state, please identify:

    a.    the manner in which you determined the number of DACA recipients who receive Emergency Medicaid services;

    b.    the manner in which you determined the individuals are or were DACA recipients; and

    c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Emergency Medical Services costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 8:**

Identify Plaintiff states' expenditures, by year, to provide benefits under the Texas Children's Health Insurance Program (CHIP) Perinatal Coverage program to DACA recipients since 2012 and identify:

      a.     the manner in which you determined the number of DACA recipients who receive benefits under the CHIP Perinatal Coverage program;

      b.     the manner in which you determined the individuals are or were DACA recipients; and

      c.     all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Texas Children's Health Insurance Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

10

**INTERROGATORY NO. 9:**

Identify Plaintiff states' expenditures, by year, to provide benefits under Texas's Family Violence Program to DACA recipients since 2012 and identify:

a. the manner in which you determined the number of DACA recipients who receive benefits under Texas's Family Violence Program;

b. the manner in which you determined the individuals are or were DACA recipients; and

c. all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Texas Family Violence Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 10:**

Identify each and every incident in Plaintiff states, by state and year, in which you contend that a DACA recipient was involved in the commission of a crime since 2012. For each such incident, please identify:

    a.    the name of the DACA recipient;
    b.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;
    c.    the crime which the DACA recipient was charged;
    d.    the court in which the DACA recipient was prosecuted;
    e.    whether the DACA recipient was convicted, and if so, of what crime or crimes; and
    f.    any information, documents or other evidentiary material related to the alleged crime, the identity of the victim or victims, and the conviction, if any.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

    Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 11:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and crime in any of the Plaintiff states, by state, or in any other part of the United States since June 2012. For any such study or report, please identify:

    a.    the date you requested it;
    b.    the date you obtained it;
    c.    the author(s);
    d.    the person or entity who commissioned it;
    e.    the person or entity who paid for or is responsible for paying for it; and

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

13

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of education to residents in Plaintiff states, by state, since June 2012. For any such study or report, please identify:

   a.   the date you requested it;
   b.   the date you obtained it;
   c.   the author(s);
   d.   the person or entity who commissioned it; and
   e.   the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

   Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

   Subject to and without waiving their objections, the education costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

   Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

14

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of healthcare services to residents in Plaintiff states, by state since June 2012. For any such study or report, please identify:

      a.     the date you requested it;

      b.     the date you obtained it;

      c.     the author(s);

      d.     the person or entity who commissioned it; and

      e.     the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the health care costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 13:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of law enforcement services to residents in Plaintiff states, by state, since June 2012. If so, for each study or report, please identify:
  a. the date you requested it;
  b. the date you obtained it;
  c. the author(s);
  d. the person or entity who commissioned it; and
  e. the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 14:**

For each interrogatory, identify each person answering the interrogatory, supplying any information relied upon in answering the interrogatory, or assisting in any manner with the preparation of answering the interrogatory.

**RESPONSE:**

Plaintiffs object to this request. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

16

**INTERROGATORY NO. 15:**

Identify each employer who hired a DACA recipient instead of a U.S. citizen because of the employer penalty pursuant to The Patient Protection and Affordable Care Act.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S SECOND SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 2:**

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' Interrogatories Nos. 4-15.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents are based, to the extent that any additional information exists. Plaintiffs will produce any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response, if necessary, with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

# DEF-INTERV.

# EX. 292



# *Special Report*

*December 2006*

## UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

**CAROLE KEETON STRAYHORN**

**Texas Comptroller**

STATES000013

STATES000014

*December 2006*

# Special Report

**CAROLE KEETON STRAYHORN • Texas Comptroller of Public Accounts**

# UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

*"This is the first time any state has done a comprehensive financial analysis of the impact of undocumented immigrants on a state's budget and economy, looking at gross state product, revenues generated, taxes paid and the cost of state services.*

*"The absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our gross state product of $17.7 billion. Undocumented immigrants produced $1.58 billion in state revenues, which exceeded the $1.16 billion in state services they received. However, local governments bore the burden of $1.44 billion in uncompensated health care costs and local law enforcement costs not paid for by the state."*

**— Carole Keeton Strayhorn, Texas Comptroller**

## I.   Introduction

Much has been written in recent months about the costs and economic benefits associated with the rising number of undocumented immigrants in Texas and the U.S. as a whole. Most reports tie the costs of the undocumented population to education, medical expenses, incarceration and the effects of low-paid workers on the salaries of legal residents. Revenue gains to governments resulting from undocumented immigrants consist primarily of taxes that cannot be avoided, such as sales taxes, various fees and user taxes on items such as gasoline and motor vehicle inspections.

This financial report focuses on the costs to the state of Texas; that is, services paid for with state revenue, including education, healthcare and incarceration. What government-sponsored services are available to undocumented immigrants is often determined by federal restrictions on spending (**Exhibit 1**). The report also identifies areas of costs to local governments and hospitals. Finally, it analyzes the $17.7 billion impact on the state's economy as well as state revenues generated by undocumented immigrants.

The Comptroller's report estimates that undocumented immigrants in Texas generate more taxes and other revenue than the state spends on them. This finding is contrary to two recent reports, FAIR's, "The Cost of Illegal Immigration to Texans" and the Bell Policy Center's "Costs of Federally Mandated Services to Undocumented Immigrants in Colorado", both of which identified costs exceeding revenue.

### EXHIBIT 1
### Major Government-Sponsored Programs and their Availability to Undocumented Immigrants

| Unavailable | Available |
|---|---|
| Medicare | K-12 Education |
| Medicaid | Emergency Medical Care |
| Cash Assistance (TANF-Welfare) | Children with Special Health Care Needs |
| Children's Health Insurance Program (CHIP) | Substance Abuse Services |
| Food Stamps | Mental Health Services |
| Supplemental Security Income (SSI) | Immunizations |
| Public Housing Assistance | Women and Children's Health Services |
| Job Opportunities for Low Income Individuals | Public Health |
| Child Care and Development | EMS |

*Source: United States Department of Health and Human Services.*

*Special Report:* Undocumented Immigrants in Texas

In education, FAIR's report included the costs of legal children to undocumented parents. The inclusion of these children dramatically increased the costs reported. The Comptroller's report focuses its attention on the costs directly attributed to undocumented persons. Colorado's report differed from the Comptroller's report in identifying which undocumented children should be included in any estimates. Colorado assumed all undocumented children between the ages of 5 and 17 were in public schools, and therefore did not account for children that did not attend school or were enrolled in private schools.

For health care costs, FAIR's report estimated costs to local taxpayers and not exclusively the state. Colorado's report states their estimate of state health care costs is overstated due to the fact the authors included legal permanent residents as well as other authorized immigrants in their count of undocumented immigrants.

The difference in the reports also may be related to the tax systems in the two states. Unlike Colorado, Texas has no income tax and relies heavily on consumption taxes at the state and local levels. Texas is more likely to capture tax revenue from workers who do not report income. Whereas income taxes will miss much activity in an underground economy, a sales tax will more likely be collected no matter how one earns an income.

Consumption taxes make up a greater percentage of total state revenue in Texas than in most other states. Since undocumented immigrants are more likely to work in the underground economy from which income taxes may not get collected, the Texas tax system, compared to other states, may capture a greater percentage of all the taxes that should be paid from the economic activity of undocumented immigrants.

As this report shows, calculating the impact of undocumented immigrants on the Texas economy and state budget is at best an educated guess. This is a result of the difficulty in calculating the number of undocumented immigrants in the state and the number who access state paid services. It is difficult to count a population that does not *want* to be counted, particularly when the law allows them access to many government services without regard to citizenship, such as those delivered by public hospitals and public schools.

This report uses some estimates of the Pew Hispanic center when calculating the number of undocumented immigrants in Texas, and of the U.S. Census Bureau when discussing foreign-born residents. Various methods are used in calculating the number of undocumented immigrants that received services.

All levels of government experience costs associated with undocumented immigrants. In fact, this report estimates the largest costs to local governments and hospitals; that is, incarceration and uncompensated health care costs. The Comptroller estimates costs of $1.3 billion for hospitals and $141.9 million for local incarceration attributed to undocumented immigrants. Likewise, the Comptroller estimates undocumented immigrants paid more than $513 million in local taxes. While this report acknowledges those costs, the main focus is the cost to the state of Texas, that is, costs paid with state revenues. While there may be costs of some state paid services not reported or deemed inestimable, the largest cost items are identified. Likewise, there may be some state revenue unaccounted for, but the largest revenue sources are used in the Comptroller's calculations.

As mentioned earlier, the Comptroller's office recognizes that there are costs associated with the legally resident children of undocumented immigrants. The Comptroller has chosen not to estimate these costs or revenues due to uncertainties concerning the estimated population and the question of whether to include the costs and revenues associated only with the first generation or to include subsequent generations, all of which could be seen as costs.

## II.  Background

The 2000 Census counted 31.1 million foreign-born residents in the U.S., a 57 percent increase over the 1990 Census total of 19.8 million. The total U.S. population, by contrast, rose by just 13 percent over the same period.[1] The Census Bureau defines the foreign-born population as "immigrants (legal permanent residents), temporary migrants (e.g., students), humanitarian migrants (e.g., refugees), and unauthorized migrants (people illegally residing in the United States)."[2]

Six states—California, New York, Texas, Florida, Illinois and New Jersey—accounted for more than two-thirds of the 2000 foreign-born resident count, with 21.3 million persons. And the immigrant population in these six states is rising rapidly. Their 2000 count of 21.3 million was nearly 50 percent higher than the equivalent 1990 Census count of 14.4 million, for an increase of 6.9 million persons.[3]

Texas, with 2.9 million foreign-born residents, had the third-highest total in the U.S. (after California and New York) and ranked seventh among all states in its percentage of residents who are immigrants, at 13.9 percent. Texas' foreign-born—71 percent of whom come from Mexico or other Latin American countries—are concentrated in the state's urban areas. Even so, the Census found foreign-born Hispanics in every Texas county except Loving County.[4]

STATES000016

Texas' foreign-born population is concentrated in seven council of government (COG) regions (Houston-Galveston, North Central Texas, Lower Rio Grande Valley, Upper Rio Grande, Alamo Area, Capital Area and South Texas). In 2000, these seven COGs accounted for almost three-quarters of the state's population and 88 percent of its foreign-born residents, 90 percent of whom were from Mexico or other Latin American countries.

### Undocumented Immigrants

This report uses the term "undocumented immigrants" to refer to foreign-born individuals who reside in the U.S. who are not U.S. citizens or do not possess permanent resident status. Undocumented immigrants also may be foreign-born individuals who entered the U.S. legally but overstayed the authorized time period.

The Pew Hispanic Center estimates that the U.S. had 11.1 million undocumented immigrants in 2005. Of these, Texas accounted for between 1.4 million and 1.6 million. The Center estimates that 30 percent of the foreign-born population is undocumented.[5]

Recent research detailing the demographic characteristics of undocumented immigrants has reported U.S. totals rather than state-level characteristics. Texas is estimated to have about 14 percent of all undocumented immigrants residing in the U.S.[6]

The Pew Hispanic Center estimates that as of March 2005, two-thirds of undocumented immigrants in the U.S. had been in the country for 10 years or less, and 40 percent had been here for five years or less. Adult males composed the largest number of undocumented immigrants. Adults accounted for 84 percent of all undocumented immigrants and males made up 58 percent of all adults.[7]

The largest number of undocumented immigrants came from Latin America, with the majority of those coming from Mexico. In 2005, 6.2 million of the nation's estimated 11.1 million undocumented immigrants came from Mexico, or 56 percent of the total (**Exhibit 2**). From 2000 to 2005, the number of undocumented immigrants from Mexico rose by 31.5 percent.[8]

Undocumented immigrants are more likely to work in low-wage occupations that do not require a high level of educational attainment. The largest numbers of undocumented immigrants (31 percent) work in service occupations, followed by construction (19 percent) and production, installation and repair (15 percent). The fewest number of undocumented immigrants work in farming (4 percent), primarily because farm workers make up a relatively small portion of all occupations in general. Farming, however, has the highest concentration of undocumented workers. Nearly a quarter (24 percent) of all farm workers are undocumented immigrants.

Other fields with large concentrations of undocumented labor include cleaning (17 percent of all workers), construction (14 percent) and food preparation (12 percent).[9]

## III. Education

Any estimate of state costs associated with undocumented immigrants is imprecise due to the difficulties involved in determining their numbers. In public education, federal guidelines prohibit questions of legal status. In higher education, state residency for tuition purposes is defined by the length of time an individual has lived in the state, regardless of legal status.

### Public Education Costs

Until 1982, Texas law prohibited local school districts from using state funds to educate undocumented immigrant children; furthermore, districts were allowed to deny enrollment to such children. In 1982, however, the Texas law was deemed unconstitutional. In *Plyler v. Doe*, the U.S. Supreme Court ruled that Texas law violated the equal protection provisions of the 14th Amendment. As a result of *Plyler v. Doe*, states may not deny access to public education to immigrant children residing within their boundaries, regardless of their legal status.[10] Subsequent court cases resulted in prohibitions against attempts to identify undocumented children because of the perception that they could then be discriminated against.



**EXHIBIT 2**
**Country of Origin of**
**Undocumented Immigrants in the U.S.**
**March 2005**

Mexico 56%
Other Latin America 22%
Asia 13%
Europe & Canada 6%
Africa & Other 3%

*Source: Pew Hispanic Center.*

STATES000017

**EXHIBIT 3**
**Public Education Cost Comparison**

| | FAIR 1999-2000 | FAIR 2003-2004 | Comptroller 2000-2001 | Comptroller 2004-2005 |
|---|---|---|---|---|
| Avg. Cost Per Student | $6,288 | $7,450 | $6,447 | $7,085 |
| Est. Number of Undocumented Immigrants | 164,000 | 225,000 | 125,000 | 135,000 |
| **Total Cost** | **$1.03 billion** | **$1.68 billion** | **$806 million** | **$957 million** |

Note: FAIR's estimates include federal dollars.
*Sources: Federation for American Immigration Reform and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As a result of the state school funding formulas, the cost ($7,085) of any student added to the enrollment of a local school district is borne by the state, regardless of legal status. Because the state system of school finance treats local property tax revenue as interchangeable with appropriated state funds, local and state costs are combined in the cost per student.

The Comptroller's office estimates that there were about 135,000 undocumented children in Texas public schools during the 2004-05 school year, or about 3 percent of total public school enrollment. Dr. Jeffery Passel of the Pew Hispanic Center estimated that there were 140,000 undocumented students in Texas public and private schools in 2001-02.[11] Applying the eight percent growth in total student enrollment from 2001-02 to 2004-05 school year (fiscal 2005) to the estimated 140,000 undocumented students resulted in an estimated 151,182 students in 2004-2005. A U.S. Government Accountability Office report's estimates that 89.3 percent of Texas students are enrolled in public school. That was applied to the estimated number of undocumented children in school, resulting in an estimated 135,013 undocumented children in Texas public schools.[12]

The Texas Education Agency reports that, during 2004-05, the average state and local expenditure per student was $7,085 (this excludes federal funds). Applying this figure to the estimated number of undocumented immigrant children in public schools, the Comptroller estimates that the cost of educating undocumented children in 2004-05 was slightly less than **$957 million** (**Exhibit 3**).

This estimate may be conservative, in that other reports have estimated higher costs. The 2004 report by the U.S. Government Accountability Office referenced earlier stated that Texas, in response to a survey, estimated these costs at $932 million in 1999-2000. Applying increases in enrollment and cost per student, this figure implies 2004-05 costs of nearly $1.2 billion. A more recent report by the Federation for American Immigration Reform (FAIR) estimates Texas' costs at nearly $1.7 billion for the 2003-04 school year.[13] These estimates, however, include federal spending, which the Comptroller's office has excluded, as this report focuses on state costs.

In addition, the varying estimates assume different numbers of undocumented children in public schools. FAIR estimated that Texas public schools educated 225,000 undocumented children in 2003-04, substantially more than the Comptroller's estimate. FAIR based its estimate on a 1994 Urban Institute estimate of 93,907.[14] One of the authors of that Urban Institute estimate is Dr. Passel, whose estimate of 140,000 was used in the Comptroller's calculation.

*Higher Education Costs*

The number of undocumented immigrants attending college in Texas also is unknown, as is the number of those paying in-state tuition rates, and thus the relevant costs to the state are difficult to estimate.

Prior to fall 2006, students who were not citizens or permanent residents of the U.S. (whether documented or not) still could become classified as Texas residents and thus be entitled to in-state college tuition rates under the provisions of Section 54.052(j) of the Texas Education Code, originally enacted by the 2001 Legislature as House Bill (H.B.) 1403. Prior to H.B. 1403 being signed into law in 2001, these students would have been considered international students, and therefore would have paid the more costly out-of-state tuition.

To qualify, the student must have lived in the state for at least three years before graduating from a Texas high school or receiving a high school equivalency diploma in Texas. The student also must have lived for at least part of that time with a parent or legal guardian and could not have an established residence outside of Texas. In addition, such students were required to sign an affidavit stating that they would apply for permanent residency as soon as they are eligible to do so.

The 2005 Legislature revisited the issue of resident status via Senate Bill (S.B.) 1528, which made residency requirements essentially uniform for all students, regardless of their legal status. As of fall 2006, anyone who has lived in Texas for three years before graduating or receiving a diploma equivalent from a high school, and has also lived in the state for a year prior to enrollment in college, qualifies for in-state tuition as a Texas resident. Any student

STATES000018

*Special Report:* **Undocumented Immigrants in Texas**

**EXHIBIT 4**
**A Comparison of Provisions of H.B. 1403 and S.B. 1528 for Establishing Texas Residency**

| H.B. 1403 Requirements To become residents, must (2001) | S.B. 1528 Requirements (2005) |
|---|---|
| 1. have resided with a parent or legal guardian or conservator during at least a portion of the 3 years leading up to high school graduation or the receipt of a GED certificate. | n/a |
| 2. have graduated from a public or private high school or received the equivalent of a high school diploma in this state; | same |
| 3. have resided in this state for at least three years as of the date the person graduated from high school or received the equivalent of a high school diploma; | same |
| 4. have registered as an entering student in an institution of higher education not earlier than the 2001 fall semester; | n/a |
| 5. provide to the institution an affidavit stating that the individual will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so; and | Only required if student is not a U.S. Citizen or Permanent Resident |
| 6. have not established a residence outside this state | Must have lived in Texas the 12 months prior to enrollment. |

Note: Opportunity available to all persons meeting these requirements, whatever their citizenship or INS status, including U.S. Citizens and Permanent Residents.
*Source: Texas Higher Education Coordinating Board.*

who is not a U.S. citizen or permanent resident still must sign the affidavit concerning permanent residency. **Exhibit 4** compares previous and current law on this issue.

According to the Texas Higher Education Coordinating Board, in fall 2001, 393 students attended institutions of higher education as Texas residents based on Section 54.052(j) of the Education Code; of these, 300 attended community colleges. In fall 2004, nearly 10 times as many students received in-state rates due to Section 54.052(j) provisions—3,792, more than 75 percent of whom attended community colleges (**Exhibit 5**).

As noted in **Exhibit 5**, average state funding per student fell between 2001 and 2004. Consequently, state costs did not go up at the same rate as the number of students; instead, there was about a 446 percent increase in total state funding for these students from 2001 to 2004. The

3,792 students in fall 2004 comprised 0.36 percent of total enrollment in the state's public institutions in 2004 (1,054,586 students in all).

It should be noted that these numbers are for all students who established residency for in-state rates under Section 54.052(j), regardless of their immigration status; not all were undocumented immigrants, despite the fact that the media often describes them as such. There are many types of visas for non-immigrants that could allow a foreign student to fulfill the residency requirements for in-state tuition; for example, the children of ambassadors and diplomats, or their employees. The Comptroller's office cannot determine the share of Section 54.052(j) students representing undocumented immigrants. If all these students were undocumented, the cost to the state in fiscal 2005 would have been **$11.2 million**.

**EXHIBIT 5**
**Cost to State of Non-Citizen College Student Classified as Texas Residents**

| | Fall 2001 Avg. State Cost per Student | Fall 2001 Resident Students | Fall 2001 Total | Fall 2004 Avg. State Cost per Student | Fall 2004 Resident Students | Fall 2004 Total |
|---|---|---|---|---|---|---|
| Universities | $5,366 | 64 | **$343,424** | $4,816 | 747 | **$3,597,552** |
| Health Related Inst. | $31,693 | 29 | **$919,097** | $25,237 | 16 | **$403,792** |
| Community Colleges | $2,627 | 300 | **$788,100** | $2,239 | 2,894 | **$6,479,666** |
| Tech. Colleges | | 0 | | $5,509 | 120 | **$661,080** |
| State Colleges | | 0 | | $4,265 | 15 | **$63,975** |
| **Total** | | **393** | **$2,050,621** | | **3,792** | **$11,206,065** |

*Sources: Texas Higher Education Coordinating Board and the University of Texas System.*

**Special Report:** Undocumented Immigrants in Texas

**EXHIBIT 6**
**Estimated State and Federal Medicaid Expenditures**
**for Undocumented Immigrants, 2000 and 2005**

| | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $45,206,381 | $96,864,943 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $45,206,381 | $89,698,067 | 98.4% |
| Average Number Recipient Months per Month | 1,528 | 2,762 | 80.8% |
| Medicaid Expenditures per Recipient Month | $2,466 | $2,923 | 18.5% |
| Medicaid Expenditures per Recipient Month (constant 2000 dollars) | $2,466 | $2,678 | 8.6% |

Note: Amounts may not add due to rounding.
Note: Recipient month equals one month's coverage for an eligible individual.
*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

## IV.  Health Care

State and federal-funded health benefits for undocumented immigrants are limited in Texas (see **Exhibit 1**). Costs for services are far more likely to fall on local governments, non-profit and private health care facilities.

### State Costs

Health-related benefits available for undocumented immigrants in Texas generally fall into three categories: emergency Medicaid; state-local programs such as mental health services and school-based health centers; and public health programs.

#### Emergency Medicaid

Medicaid is a federal/state funded program that provides healthcare to low income families, pregnant women, elderly people and those with disabilities and dependent children and related caretakers. Eligible persons must meet asset requirements.[15]

Emergency Medicaid payments represent the majority of state costs for medical care provided to undocumented immigrants. In the case of a medical emergency, such as childbirth and labor or other conditions that may threaten an individual's life, the federal government allows Medicaid to pay for services rendered to persons who would otherwise qualify for Medicaid regardless of their immigration status. Not all undocumented immigrants seeking medical care qualify for emergency Medicaid.

Medicaid expenditures for all immigrants, regardless of legal status, more than doubled (114 percent) from 2000 to 2005. When adjusted for inflation, spending rose by 98.4 percent. The average number of recipients per month increased by 81 percent during the same time period.

Because the Texas Health and Human Services Commission makes no distinction between legal immigrants, undocumented immigrants, refugees and those awarded asylum, costs attributed to undocumented immigrants must be estimated. The Pew Hispanic Center estimates that undocumented immigrants account for 30 percent of all immigrants. Based on that estimate, **Exhibit 6** details both state and federal estimated costs to emergency Medicaid.

The state shares the costs of Medicaid with the federal government. Texas pays approximately 40 percent of Medicaid costs; therefore, the total estimated state cost for Medicaid services for undocumented immigrants was **$38.7 million** in fiscal 2005 (**Exhibit 7**).

#### Children with Special Health Care Needs

The U.S. Department of Health and Human Services defines children with special health care needs (CSHCN),

> …as those who have or are at increased risk for a chronic physical, developmental, behavioral, or emotional condition and who also require health and related services of a type or amount beyond that required by children generally.[16]

Funding for this program is split between the states and federal Title V, Maternal Child Health Services Block Grants.

**EXHIBIT 7**
**Estimated State Medicaid Expenditures**
**for Undocumented Immigrants, 2000 and 2005**

| | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $18,082,552 | $38,745,977 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $18,082,552 | $35,879,227 | 98.4% |

*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

STATES000020

**EXHIBIT 8**
**Children with Special Health Care Needs**
**Treated in Texas, All Funds 2005**

| | Clients Served | Percent | Expenditures | Percent |
|---|---|---|---|---|
| Citizens/Legal Residents | 633 | 30.0% | $4,177,280 | 20.7% |
| Non-Citizens | 1,452 | 68.8% | $15,960,962 | 78.9% |
| Unknown | 25 | 1.2% | $89,921 | 0.4% |
| Total | 2,110 | 100.0% | $20,228,163 | 100.0% |

*Source: Texas Department of State Health Services.*

State and federal CSHCN expenditures in Texas totaled $20.2 million in fiscal 2005 (**Exhibit 8**).

CSHCN assistance is available for Texas residents, as defined by the Texas Administrative Code, regardless of their citizenship status in the U.S. In **Exhibit 8**, the "Non-Citizens" category accounts for foreign-born Texas residents who have reported to the Texas Department of State Health Services or another state entity that they are neither U.S. citizens nor legal residents. "Non-citizens" thus are likely to be undocumented immigrants.

The federal government requires states to expend at least 30 percent of their Title V funds on CSHCN. The fiscal 2005 block grant amount for Texas totaled $37 million, with a minimum of 30 percent ($11.1 million) dedicated to CSHCN. About 55 percent of the funds expended on CSHCN in fiscal 2005 were federal, with the state supplying the remaining 45 percent.

Applying the state share of 45 percent to the "Non-Citizens" category in **Exhibit 8** indicates that the estimated state cost for CSHCN services provided to undocumented immigrants was **$7.2 million** in fiscal 2005.

### Substance Abuse Services

The Texas Department of State Health Services (DSHS) spent about $17.3 million in state funding—or 16 percent of all funding—for substance abuse intervention and treatment in fiscal 2005. As with mental health services, substance abuse services base eligibility on diagnosis rather than income or citizenship. The vast majority of people receiving publicly funded treatment have an order issued by a court of law requiring that they participate in treatment as a part of their sentencing.

DSHS collects data on substance abusers receiving treatment in Texas. The information collected includes age at first drug use, gender, ethnicity, marital status, educational level, homelessness and criminal justice involvement. In 2005, DSHS began collecting citizenship information on individuals receiving publicly-funded substance abuse

treatment. About 5.5 percent or 8,446 of the 152,441 persons who received treatment reported that they were not U.S. citizens.[17]

While DSHS now collects data on citizenship, this information is not linked to the number or types of services individuals receive.

Such factors make it difficult to estimate the state's cost for providing substance abuse services to undocumented immigrants. The Comptroller estimates that the number of undocumented immigrants receiving services is 30 percent of the non-citizens identified above (again based on Pew estimate of percent undocumented), and therefore that 1.66 percent of all individuals receiving state-funded substance abuse services were undocumented immigrants in fiscal 2005. Applying that percentage to state expenditures for substance abuse results in a cost of about **$287,700**.

### Mental Health Services

Texas pays for state mental hospital services almost entirely with state general revenue. In fiscal 2005, the state spent $225.7 million on state mental hospitals.[18]

Unlike Medicaid, eligibility for mental health services is not means-based, but instead is based on a patient's diagnosis, the severity of his or her illness and the availability of funds. To qualify for state-funded mental health services, an individual must be a member of the "priority population"—those who are significantly functionally impaired and have a diagnosis of schizophrenia, bipolar disease (manic depression) or major clinical depression.[19]

State mental hospitals also are subject to the federal Emergency Treatment and Active Labor Act (EMTALA). EMTALA requires all hospitals receiving payments from Medicaid or Medicare—virtually all hospitals—to screen anyone presenting at an emergency department to determine if an emergency condition exists and, if so, to provide appropriate care regardless of ability to pay.

Therefore, persons entering a state mental hospital with an emergency medical condition cannot be turned away based on citizenship or for any other reason. If the event is an emergency, but a state mental hospital does not have capacity or is not found by staff assessing the person's condition to be the "least restrictive environment," the person is referred to a local mental health authority for care.

Under EMTALA, community mental health centers and state mental hospitals cannot inquire about a person's

**STATES000021**

## *Special Report:* Undocumented Immigrants in Texas

citizenship status unless the person is likely to qualify for Medicaid-reimbursed mental health services. As discussed earlier, only undocumented immigrants that would otherwise qualify for Medicaid could qualify for such funding, and then only in an outpatient setting, since Medicaid does not cover inpatient mental hospital stays for adults between 19 and 65. For this reason, the need to ask about citizenship would not arise often.

To obtain the most accurate number of undocumented immigrants receiving services in the public mental health system, it would be necessary to conduct primary research through interviews and surveys of local mental health authorities and state mental hospital directors. Using the same methodology used for substance abuse, the Comptroller estimates a state cost for mental health services of **$3.8 million** in fiscal 2005. This estimate assumes 1.66 percent of state expenditures were associated with undocumented immigrants.

### *Immunizations*

To attend public school, parents must provide proof that their children have been immunized before enrollment. Immunizations may be obtained from numerous outlets that are convenient for undocumented immigrants, including school-based health centers, local public health departments (LPHDs) and federally qualified health centers (FQHCs).

Texas spent about $46.9 million for adult and child immunizations in fiscal 2005, of which 57.3 percent or $26.9 million was state general revenue. In all, 17 immunization doses are required for a child to enter school. **Exhibit 9** summarizes the number and type of vaccinations required for Texas public schools.

---

#### EXHIBIT 9
#### Vaccinations Required
#### for Public School Admission

| Vaccine | Number of Doses |
|---|---|
| Diphtheria, Tetanus Toxoid, and Pertussis Vaccine (DTaP) | 5 |
| Polio Vaccine (IPV) | 4 |
| Measles, Mumps, Rubella (MMR) | 2 |
| Hepatitis B | 3 |
| Varicella | 1 |
| Hepatitis A (only required in 40 counties in Texas) | 2 |
| **Total Vaccinations** | **17** |

*Source: Texas Department of State Health Services.*

---

In 2002 (most recent year for which data is available) DSHS administered about 6 million doses of vaccine to persons under the age of 20. As noted in the Education section of this report, the Comptroller estimates 135,000 undocumented immigrants are enrolled in Texas schools. All of these children must have current vaccination records to attend school. Many undocumented children living in Texas, however, receive some or all required immunizations before they arrive in the U.S.

In Mexico, the largest country of origin of undocumented immigrants, almost 96 percent of children under the age of five have received all their vaccinations, compared to 79 percent of U.S. children under age three.[20] As a result, many undocumented school-aged children who arrive in Texas will have all their age-appropriate vaccinations. Students who do not have proof of their vaccinations must either provide documentation or receive another series of vaccinations. While many have documentation, the Comptroller is unable to determine the percent of those who do not.[21]

This makes estimating the state cost of providing immunizations to undocumented children attending Texas public schools difficult to calculate, because there is no way to determine when undocumented children currently enrolled in Texas schools arrived in the U.S., or the percent who had some or all their immunizations before immigrating. Costs associated with undocumented children are miniscule, with the Comptroller's estimate being about **$33,000** in fiscal 2005. This is based on four percent of undocumented children in public schools, or 5,400, receiving immunizations. These 5,400 children account for .12 percent of total school enrollment. This figure was applied to the $26.0 million in state funds.

### *Women and Children's Health Services/ School-based Programs*

Undocumented immigrant children enrolled in day care, preschools and primary schools may be eligible for state School-Based Health Center Services. These children as well as undocumented women also may receive health care through Women and Children's Health Services.

Texas has more than 100 school-based health centers that deliver services to about 200,000 children annually. DSHS funds four of these health centers. Schools may receive state funding for startup costs of up to $125,000 per year from DSHS.[22] School-based centers may provide comprehensive primary and preventive physical health, dental health, mental health and health education services to children and adolescents.[23]

The state funds school-based health centers to provide a "medical home" for children that otherwise have limited access to healthcare because they are uninsured or have

STATES000022

disabilities requiring care during the school day. The centers make no distinction between citizen and non-citizen students.

Most visits to the school-based health center are for services such as diagnosis and treatment of a simple illness or minor injury; immunizations; physical examinations, including sports physicals; preventive health visits, including Early Periodic Screening, Diagnosis, and Treatment; and mental health and psychosocial counseling.[24]

Another avenue to medical care for undocumented immigrants is the state Women's and Children's Health Services. Women and Children's Health Services provide community-based maternal and child health services for low-income persons not eligible for Medicaid or the Children's Health Insurance Program (CHIP). These services include preventive, primary and dental care for children and cancer screening for women.

Texas spent $21.9 million in state funds for these programs in fiscal 2005. The Comptroller estimates that slightly more than 3 percent of all students enrolled in public education were undocumented immigrants in fiscal 2005. The number of undocumented immigrant women receiving services is unknown. Therefore, a conservative estimate to the state for both services in fiscal 2005 is slightly more than 3 percent of state expenditures, or about **$674,000**.

### Public Health

State and local public health agencies provide all Texas residents with public health services regardless of citizenship status, because public health services are intended to protect all Texans' health. For example, care and treatment of infectious diseases are provided to anyone requiring them regardless of their ability to pay or citizenship status because such care protects the state's residents against the spread of those diseases.

DSHS funds 65 local public health departments (LPHD) that provide for the control and treatment of infectious diseases, as do some state-funded facilities such as the Texas Center for Infectious Disease and South Texas Health Care (formerly the South Texas Hospital). These two facilities spent $7.8 million and $5.4 million respectively in general revenue funds in fiscal 2005. The state also provided LPHDs and other health and education organizations with $38.1 million in 2005 state general revenue funding for HIV identification, prevention and treatment, while DSHS received about $13 million in state general revenue funds to combat tuberculosis (TB) and Hansen's disease (leprosy).[25]

The federal government also provides DSHS with funding for "Refugee Health Services," which primarily involve treating refugees who may be infected with TB and other infectious diseases.

In 2005, DSHS reported 1,535 cases of TB. Of these, 48.1 percent were foreign-born. Using the 30 percent share used earlier in this report to estimate the percent of foreign-born here without authorization results in an estimated 221 of those infected with TB being undocumented immigrants. The cost per TB case to the state is unknown.

Other high-incidence infectious diseases include HIV/AIDS, sexually transmitted diseases and meningitis. Data on country of origin for these individuals are not available. Assuming slightly more than 6 percent of the state's residents were undocumented immigrants, the Comptroller's estimated costs for fiscal 2005 were **$3.9 million**.

### Emergency Medical Services

In fiscal 2005, Texas spent about $55.2 million in state funds for emergency medical services (EMS), primarily ambulance and other emergency transportation and trauma facilities.

Little centralized demographic information exists for EMS. The U.S./Mexico Border Counties Coalition (U.S./MBCC) surveyed border counties in 2001 and found that about 7 percent of the costs these private and public ambulance service providers incurred was attributable to undocumented immigrants. The method used to identify these costs for the border region could be applied to the entire state with some modification. However, the Comptroller's office would need to know the total revenue for all ambulance providers in Texas to calculate a cost related to undocumented immigrants and that information is not available. Therefore, in estimating costs, the Comptroller applies the percent of undocumented immigrants in Texas to total state expenditures. This results in a cost to the state in fiscal 2005 of **$3.4 million**.

The Comptroller estimates the total cost for state funded healthcare services for undocumented immigrants was **$58 million** in fiscal 2005. **Exhibit 10** details the state cost associated with undocumented immigrants and the percent of state funds estimated.

## Local Government and the Private Sector

Local government and private businesses incur the largest share of health-related costs for undocumented immigrants in Texas. The state Indigent Healthcare and Treatment Act requires Texas counties to provide "safety net" services for indigent persons and others not covered

*Special Report:* Undocumented Immigrants in Texas

**EXHIBIT 10**
**State Healthcare Costs Associated**
**with Undocumented Immigrants**
**Fiscal 2005**

| Service Area | General Revenue | Percent of Expenditures on Undocumented Immigrants | Undocumented Immigrant Costs |
|---|---|---|---|
| Emergency Medicaid* | $129,153,257 | 30.0% | $38,745,977 |
| CSHCN | $9,111,352 | 78.9% | $7,189,280 |
| Substance Abuse | $17,305,929 | 1.7% | $287,651 |
| Mental Health | $225,650,365 | 1.7% | $3,750,650 |
| Immunizations | $26,906,780 | 0.1% | $33,143 |
| Women/School | $21,901,933 | 3.1% | $674,463 |
| Public Health | $64,300,000 | 6.1% | $3,937,888 |
| EMS | $55,156,810 | 6.1% | $3,377,937 |
| **Total** | **$549,486,426** | **10.6%** | **$57,996,990** |

\* Program Type 30 (Foreign-Born: 30 % undocumented)
*Sources: Texas Health and Human Services Commission and
Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

by private health insurance or public health insurance programs such as Medicare, Medicaid and CHIP.[26]

Texas law gives counties three basic options for delivering indigent healthcare, including hospital districts, public hospitals and county indigent health care programs (CIHCPs). All of these entities have a statutory obligation to cover a set of basic health care services including primary and preventative services designed to meet the needs of the community as well as inpatient and outpatient and nursing facility services.

*Hospital districts* are special taxing entities that may levy a tax not to exceed 75 cents per $100 in property valuation to fund indigent health care. Texas law requires hospital districts to provide services to persons with incomes below 21 percent of the federal poverty line. Hospital districts can, however, set higher income thresholds. Hospital districts also may receive financing from the state's unclaimed lottery revenue, the federal Disproportionate Share Hospital Program and supplemental Medicaid and Medicare payments to teaching hospitals through the Graduate Medical Education Program. These districts cover 144 of Texas' 254 counties.[27]

*Public hospitals* are funded in Texas by sales and use taxes and are eligible for the same types of funding as hospital districts. Texas law defines a public hospital as a hospital owned, operated, or leased by a county or municipality.[28] Texas public hospitals serve residents in all or parts of 29 Texas counties.[29]

*County indigent health care programs* (CIHCP) use both local and state funds to pay health care providers for services for eligible patients. Counties cover residents whose incomes place them below 21 percent of the federal poverty line, but they may adopt a less restrictive income standard. County CIHCPs' eligibility criteria also may impose resource limits (e.g. bank account balance limits, number/ value of vehicles, etc.) and residency requirements. While county *residency* may be a requirement for CIHCP eligibility, *citizenship* is not. The level of state funding is tied to the level of local funding provided. In fiscal 2005, the state set aside $5.2 million to reimburse 21 counties through the CIHCP State Assistance Fund. Counties must spend more than 8 percent of their general revenue tax levy on qualified healthcare expenditures to qualify for state funding. All or some parts of 150 Texas counties operate CIHCPs.[30]

Local indigent health care entities have always been legally responsible for providing emergency medical services to those who met the responsible entity's eligibility criteria. The issue of providing *preventive* health care for undocumented immigrants was addressed in 2003 with the passage of H.B. 2292, which granted local indigent health care entities explicit permission to provide preventive and acute care services to area residents without regard to their immigration status. This legislation eliminated any need to ask a patient about citizenship status for primary and preventive care, and most counties do not ask about citizenship status other than to determine eligibility for a federal or state payment program.

The Harris County Hospital District, the nation's third-busiest public hospital system, estimated about one-in-five of patients seen by the county's healthcare system were undocumented immigrants. Medical care for these patients, both emergency and non-emergency related, accounted for $97.3 million or approximately 14 percent of the system's total operating costs in 2005.[31]

In 2001, the U.S./Mexico Border Counties Coalition (U.S./MBCC) interviewed border hospital chief executive officers and chief financial officers to obtain an estimate of the share of their hospitals' uncompensated care attributable to undocumented immigrants. Based on their responses, the coalition estimated that about 25 percent

STATES000024

of these hospitals' uncompensated care costs resulted from uninsured, undocumented immigrants.

Since then, the Indigent Care Collaboration (ICC), an alliance of "safety net" providers in three Central Texas counties (Travis, Williamson and Hays), has begun tracking the percent of uninsured undocumented immigrants they serve using a web-based eligibility screening tool called the Community Health And Social Services Information System (CHASSIS™).

CHASSIS™ is used to screen uninsured/under-insured patients for eligibility in federal, state, and local medical assistance or payment programs (e.g. Medicaid, CHIP, CIHCP, Primary Health Care (PHC), SSI, local charity programs, etc.) In 2005, about 14 percent of all patients screened using CHASSIS™ in hospital settings were found to be undocumented. If only the patients screened through the hospitals' emergency departments are examined, however, the percent of undocumented immigrants increases to 25 percent. This finding regarding the percent of emergency room patients who are undocumented is in keeping with the conclusions of U.S./MBCC's 2001 study on emergency medical services provided to undocumented immigrants in Texas border counties.

Texas hospitals reported $9.2 billion in uncompensated care in 2004.[32] An estimate of 2005 costs was unavailable. Uncompensated care generally encompasses care provided to uninsured and underinsured individuals who cannot pay for the services they receive. Applying the ICC's estimate of 14 percent of patients to total uncompensated care provided by Texas hospitals produces a statewide estimate of uncompensated healthcare costs attributable to undocumented immigrants of **$1.3 billion**.

### Federally Qualified Health Centers

Federally qualified health centers (FQHC) include community health centers, migrant health centers, programs that provide health care for the homeless, public housing primary care programs and urban Indian and tribal health centers. FQHCs are supported by federal grants, Medicaid, Medicare, private insurance payments and state and local contributions.[33] Although anyone may seek services at an FQHC, nearly 71 percent of health center patients have family incomes at or below poverty. In addition, about 40 percent of health centers' patients are uninsured and another 36 percent depend on Medicaid.[34]

According to the Texas Association of Community Health Centers, Texas FQHCs receive about 40 percent of their funding from sources such as Medicaid (27 percent) and state and local funds (13 percent). Grants and contracts -- federal and non-federal -- account for another 41 percent of revenues. Their remaining funds come from a variety of sources including Medicare, Children's Health Insurance Program (CHIP), private insurance, self-pay patients and other miscellaneous sources.[35]

In 2005, Texas FQHC patients were covered by Medicaid/CHIP (25 percent), Medicare (7 percent), private insurance (7 percent) and other public programs (2 percent). The remaining 59 percent had no insurance.[36] Texas FQHCs served about 6 percent of the state's uninsured in 2004. More than half of the 562,000 patients seen preferred to be served in a language other than English. More than 14,000 were seasonal or migrant farm workers.

Texas FQHCs are not required to and do not collect data on their patients' citizenship status or place of birth. Therefore, it is impossible to estimate the percent of state or local funds spent by FQHCs that are attributable to undocumented immigrants.

### Clinics

Other sources of healthcare for Texas' undocumented immigrants include primary care and free clinics. ICC's member clinics screened about 84,000 patients in 2005.[37] Of those screened, slightly more than 50 percent were found to be undocumented immigrants. An average clinic visit costs about $230. No data are available on the number of clinic visits made by this population, and as a result the Comptroller cannot estimate the cost of clinic services provided to undocumented immigrants.

The Robert Wood Johnson and Annie E. Casey Foundations created the Access Project to assist local communities develop and sustain efforts that improve healthcare and promote universal coverage with a focus on the uninsured. The Access Project reported that Texas counties spent an estimated $870 million on all indigent health care in 1999.[38] The Access Project, however, was examining indigent health care in its entirety and did not distinguish between citizens and noncitizens. U.S./MBCC examined emergency medical care only—that is, care required by federal law. As a result, there are no studies that estimate Texas costs for non-emergency or primary care provided to undocumented immigrants at the county or municipal level.

### Section 1011

As mentioned above, Texas hospitals may be reimbursed for emergency healthcare provided to qualified undocumented immigrants by the Health and Human Services Commission, through the federal Emergency Medicaid program. More recently, the federal government has authorized payment for emergency medical care provided to undocumented immigrants under Section 1011 of the Medicare Modernization Act.

Section 1011 reimburses hospitals, physicians and ambulance providers based on Medicare reimbursement for services rendered to undocumented immigrants. Beginning in federal fiscal 2005, the federal government will pay about $250 million per year directly to providers that submit qualified claims. Texas' allotment under Section 1011 was $56 million per year for four years. At this time, however, eligible Texas providers, including hospitals, physicians and ambulance services, have not submitted claims for all of the $56 million available.

The difficulty in estimating the cost to LPHDs, physicians or EMS services of care provided to uninsured undocumented immigrants varies depending on the availability of data and the existence of previous primary research.

As a rule, none of these entities maintain data on the citizenship of the patients they treat. This lack of data makes it virtually impossible to place a dollar figure on the cost to these providers related to undocumented immigrants. While no data are available to estimate the magnitude of the cost, it is clear that, other than Emergency Medicaid, Section 1011 and the limited state funds available, local tax dollars or private donations must cover most of the cost of providing care to undocumented immigrants.

## V.   Incarceration

Texas' criminal justice system has three distinct parts. Undocumented immigrants who commit crimes affect all of them:

*   law enforcement and criminal prosecution—municipal police, county sheriffs, the Texas Department of Public Safety, district attorneys' offices and technical investigative organizations such as crime labs;
*   criminal trial and appeals—the criminal trial and appeals court system, including public defenders, the jury system and other court procedures; and
*   corrections—the system of incarceration and parole, including prisons, jails, and parole boards and the capital punishment apparatus.

Many elected officials including state governors and U.S. congressmen argue that the federal government should bear all the cost of capturing, prosecuting and housing undocumented immigrants who commit criminal offenses.[39] Under the Violent Crime Control and Law Enforcement Act (Public Law 103-317, or the Crime Act of 1994), the federal government authorized $1.8 billion over six years to reimburse states and local jurisdictions for criminal justice costs associated with undocumented immigrants.

This act also established the State Criminal Alien Assistance Program (SCAAP), which provides partial reimbursement to states and local jurisdictions for housing

criminal aliens.[40] The federal government limits SCAAP reimbursements to costs incurred related to undocumented immigrants who are convicted of felonies or multiple misdemeanors. SCAAP awards are based solely on a jurisdiction's costs for correctional officers, the number of "eligible" undocumented immigrant offenders and the number of inmate days involved. No other costs are included in the calculation of SCAAP awards.

Two other federal grants partly reimburse local jurisdictions for costs related to undocumented criminals: the Byrne Discretionary Grant and Community Oriented Policing (COP). One of the purposes of the Byrne Grant is to promote projects that are multi-jurisdictional or multinational in scope.[41] COP gives money directly to local jurisdictions including communities along the U.S.-Mexico border to boost the police presence at the community level.

### State Costs

Noncitizens who commit crimes in Texas are prosecuted and punished in the same way as U.S. citizens; after serving their sentences, however, some may be deported back to their home countries. This can apply both to documented and undocumented immigrants, depending on the severity of their crimes.

The Texas Department of Criminal Justice (TDCJ) operates a joint program with federal Immigrations Customs and Enforcement (ICE) to identify criminal aliens incarcerated in Texas, begin deportation proceedings against them while they are incarcerated and deport them after they serve their state prison sentences.

Deportation can occur only after completion of the inmate's sentence. The process begins, however, when the inmate is evaluated at one of TDCJ's intake sites after being sentenced and transported from the local county jail to TDCJ. The simplified process is as follows:

*   TDCJ identifies foreign-born offenders during intake.
*   TDCJ notifies ICE that the offender claims foreign birth or citizenship or that TDCJ suspects foreign birth or citizenship.
*   ICE interviews the offender and may ask TDCJ to hold the offender upon release.
*   ICE is notified when the offender's release is pending and assumes custody of the offender upon release, pending federal deportation proceedings.[42]

As of March 31, 2006, TDCJ had a total population of 151,852 inmates. TDCJ does not have an accurate count of undocumented immigrants held in its facilities, but has asked ICE to review its records and provide this number.

STATES000026

Of the total incarcerated in state jails and prisons in March 2006, 11,514 claimed to have been born in a foreign country and 10,280 claimed that they hold foreign citizenship. These claims are based on TDCJ's intake interviews and records forwarded with the prisoners and are subject to investigation and verification by ICE.

ICE had issued detainers (requests to detain) for 6,541 prisoners as of March 2006. Due to ICE staffing shortages, however, ICE has been unable to interview all inmates and investigate them to verify their immigration status; an undetermined number of undocumented offenders may be issued a detainer at a later date. ICE had final orders of deportation in place for at least 3,018 inmates as of March 2006, although both TDCJ and ICE say this number is inaccurate and probably low.[43]

Under current procedures, ICE provides TDCJ with information on detainers for male prison inmates only. ICE does not report figures for females in prison units or for both male and female offenders in state jails (**Exhibit 11**).

The process for releasing undocumented immigrant offenders varies for different types of offenders and facilities, which is one reason for the lack of accurate statewide data. For example, female Institutional Division offenders are released from Gatesville and processed by the San Antonio ICE office. State jail offenders are released from the Lyncher State Jail and processed by the Houston ICE office.

The vast majority of TDCJ offenders are males housed by the Institutional Division (ID), which administers the state's traditional prisons. TDCJ transfers male ID offenders who require a deportation hearing to a joint state/federal facility at Huntsville's Goree Unit under the Institutional Removal Program.[44] This process is geared to save money and ensure the deportation of eligible criminal aliens; it is based on a previous recommendation by the Comptroller's Texas Performance Review program.

TDCJ releases inmates who need a deportation hearing directly into federal custody. The federal government maintains detention facilities and a courtroom next to

the Goree Unit and court proceedings are held via teleconferencing with a federal judge located in Houston. TDCJ provides legal counsel for offenders who lack it.

Deportation includes several types of proceedings. *Stipulated* removal occurs when the alien voluntarily concurs with ICE's allegations and agrees to waive a hearing before an immigration judge. The federal immigration judge signs the order but the alien need not be present. *Reinstatement of a removal order* occurs when an alien illegally reenters the U.S. after having been removed before. No hearing is required for deportation in such cases. *Administrative* removal applies if the offender has not been admitted to the country legally and has been convicted of an aggravated felony, and a hearing is needed for a judge to determine the facts and reach a decision.[45]

Comptroller employees visited the Goree Unit in Huntsville in May 2006 to gather information about the Institutional Removal Program. They met with both TDCJ and ICE staff, who explained the program and provided some of the information used in this report. The Comptroller team reported that TDCJ staff members discussed aggregating all joint TDCJ/ICE operations at the Goree Unit to further streamline the process and save money.

### Federal reimbursement

The state of Texas receives partial reimbursement for costs associated with incarcerating illegal aliens from the U.S. Bureau of Justice Assistance's State Criminal Alien Assistance Program (SCAAP). SCAAP reimburses costs only for undocumented aliens who have been convicted of a felony or two or more misdemeanors and have been incarcerated for at least four consecutive days. The key factor is whether the individual was born outside the U.S. and has no reported or documented claim to U.S. citizenship. SCAAP reimburses costs only for a portion of correctional officer salaries and is based on estimates of incarceration days of both known and suspected illegal immigrants.

Texas will receive $18.6 million in SCAAP money to partially offset its costs in 2006. This is up from $17.1 million in 2005, but down sharply from earlier years, when Texas received about $34 million annually. Congress has cut the appropriation level in half, affecting all states and local jurisdictions.[46]

The outlook for federal SCAAP funding remains uncertain. The Bush administration's proposed federal fiscal 2007 budget recommended eliminating SCAAP, calling it no more than a form of revenue sharing and saying that the program has not demonstrated results. Meanwhile, various elected officials across the U.S. have called for

---

**EXHIBIT 11**
**Noncitizens Incarcerated in the Texas Department of Criminal Justice, March 31, 2006**

| | |
|---|---|
| Total TDCJ Population | 151, 852 |
| Offenders Claiming Foreign Place of Birth | 11,514 |
| Offenders Claiming Foreign Citizenship | 10,280 |
| Offenders with ICE Detainers | 6,541 |
| Offenders with Final Orders of Deportation | 3,018 |

*Source: Texas Department of Criminal Justice.*

STATES000027

more than doubling the current federal appropriation from $405 million to $850 million, saying the federal government has not lived up to its obligation to stop illegal immigration and that locals are bearing the costs.[47]

## State Fiscal Impact

As of June 2006, TDCJ did not have an exact count of the number of undocumented immigrants among its total population of 151,741. TDCJ staff members are investigating this question at the request of the TDCJ board chair and expect results by Winter 2006 at the earliest. Because of inconsistencies in various computer databases, ICE is expected to review thousands of files manually if necessary to obtain an accurate count.

The Legislative Budget Board reports that TDCJ's most recent cost per day per inmate is $40.06.[48] According to TDCJ, illegal aliens are distributed throughout the system, so that this particular subset of inmates should not reflect any different costs for housing or meals.

The lack of accurate data on the number of undocumented offenders in Texas prisons makes it difficult to estimate associated costs, but both the U.S. Government Accountability Office (GAO) and TDCJ have made some estimates. GAO has estimated that Texas spent $130 million to house SCAAP criminal aliens in 2002. GAO multiplied the average daily cost of housing inmates in Texas prisons by the number of days criminal aliens reimbursed under SCAAP were incarcerated in Texas prisons. Federal reimbursements amounted to $15 million, or 11.5 percent of costs. GAO estimated that SCAAP payments represented 25 percent or less of the total cost of incarcerating criminal aliens in the other four large states they evaluated in their 2005 study.[49]

Using a similar approach, TDCJ estimated that incarcerating undocumented immigrants cost the state $132,377,509 in 2005, in response to a request from the Texas Office of State-Federal Relations.[50] Using a similar method and data provided by TDCJ, the Comptroller estimates costs for fiscal 2006 at **$130.6 million**. This total was derived by multiplying the cost per day ($40.06) by the number of days undocumented offenders were incarcerated in Texas prisons as estimated by TDCJ (3,259,818).[51]

This implies that on average there were 8,931 undocumented offenders in TDCJ at any one time during fiscal 2006. TDCJ reported that there were 13,006 unique offenders incarcerated at some point in 2005 that had or were suspected to have had no claim on citizenship. These persons may have been incarcerated one or more times during the period.

## Local Costs

Texas' criminal justice system is based on cooperation and interaction between the state, local and federal governments. Local governments are the front line in the fight against crime, and they face the heaviest financial burden.

Counties are responsible for many aspects of local law enforcement, detention, adult and juvenile prosecution; adult and juvenile indigent defense; lower courts (for misdemeanors); district or superior courts (for felonies); court clerks; adult probation; and juvenile probation and detention.

Each county sheriff's department is responsible for the operation of county jails, criminal investigations, arrests of criminal offenders, warrants and civil papers, and the provision of bailiffs for all state courts. Texas counties have county and district attorneys as well as county and district clerks and elected constables. Each of these various offices can incur a cost whenever an undocumented immigrant commits a crime.

The district attorney (DA) represents the state in felony actions and criminal misdemeanors in county courts at law and justice of the peace courts. Most DAs serve a single county, although some serve more than one (typically in the case of rural areas). County attorneys try misdemeanors and juveniles while district attorneys try felonies.

Texas county courts at law hear both criminal and civil cases. Justices of the peace have original jurisdiction in Class "C" misdemeanor criminal cases subject to fines of up to $500.

Given available data, estimating the cost of undocumented offenders to Texas counties is not a simple matter. A few studies have attempted to quantify the cost to specific jurisdictions. In the mid-1990s, two studies examined the cost of illegal immigration on Texas, one by the Urban Institute and another by Dr. Donald Huddle of Rice University. Both studies examined the state cost of undocumented immigrants in response to a push by state officials to receive federal reimbursement for these costs. Neither study, however, examined costs to local units of government.[52]

Recently, GAO published a report examining costs in five states and five large counties that receive SCAAP funding. Harris County was among the five large counties reviewed. This study, however, included only costs related to county sheriff's offices. Using costs per day provided by these offices, GAO estimated that SCAAP awards cover between 7 percent (Maricopa County, AZ) and 25 percent (Los Angeles County, CA) of the costs reported.

STATES000028

## *Special Report:* Undocumented Immigrants in Texas

According to GAO, SCAAP covered about 20 percent of the Harris County Sheriff's office in 2003.[53] While Harris County's correctional salaries increased from slightly more than $76.4 million in 2003 to almost $109 million in 2005, their SCAAP award remained virtually unchanged. In 2003, Harris County received $2,693,979; in 2005, two dollars less—$2,693,977. The percent of incarceration-related costs covered by SCAAP funds appears to have declined between 2003 and 2005.

In federal fiscal 2005, 95 Texas counties received almost $7.9 million in SCAAP funds.[54] Using the method employed by ICE and the Federal Bureau of Justice Assistance to calculate a cost per inmate day, the Comptroller's office divided the reported correctional officer salaries by total inmate days reported for all offenders regardless of their immigration status.

The Comptroller then multiplied the cost per day by the number of ICE and "unknown" inmate days to arrive at a cost per undocumented immigrant offender related to correctional officer salaries of $24.5 million.

The Comptroller examined 2005 approved budgets for 15 of the 95 Texas counties that receive SCAAP funds. These 15 counties received about 88 percent of the 2005 SCAAP funds awarded last year. Salaries account for about 50 percent of county sheriff office budgets.[55] Thus costs related to salaries were doubled to arrive at a cost estimate for county sheriff's offices.

**Exhibit 12** indicates that Texas sheriff's offices spent about **$49.1 million** for undocumented immigrant offenders in 2005.

This, however, tells only part of the story. As noted above, other county offices incur costs related to handling undocumented offenders.

In 2000, the U.S./Mexican Border Counties Coalition (U.S./MBCC) commissioned a study to estimate criminal justice costs to county and municipal governments along the U.S.-Mexico border. The researchers completed detailed examinations of county budgets and cost information, fielded a survey and conducted in-depth interviews with county officials and relevant county staff

### EXHIBIT 12
### Estimated Costs to County Sheriff's Offices for Undocumented Offenders, 2005

| County | SCAAP Award 05 | Total Salaries | Inmate Days (Total) | Cost Per Day | ICE Inmate Days | ICE Inmate Costs | Unknown Inmate Days | "Unknown Inmate" Costs | Costs Sheriff's Salaries Only | Total Costs Sheriff's Ofc. |
|---|---|---|---|---|---|---|---|---|---|---|
| Bexar | $547,366 | $27,883,631 | 1,425,272 | $19.56 | 11,065 | $216,473 | 90,491 | $1,770,341 | $1,986,814 | $3,973,628 |
| Brazos | $87,090 | $3,613,269 | 163,410 | $22.11 | 3,583 | $79,226 | 10,207 | $225,694 | $304,920 | $609,840 |
| Cameron | $29,936 | $4,237,531 | 370,486 | $11.44 | 616 | $7,046 | 8,989 | $102,814 | $109,860 | $219,719 |
| Collin | $303,305 | $9,367,485 | 263,562 | $35.54 | 5,429 | $192,957 | 25,067 | $890,928 | $1,083,885 | $2,167,769 |
| Dallas | $636,166 | $48,828,400 | 2,265,666 | $21.55 | 14,850 | $320,039 | 91,496 | $1,971,872 | $2,291,911 | $4,583,822 |
| Denton | $163,183 | $7,929,953 | 327,021 | $24.25 | 3,679 | $89,212 | 20,493 | $496,936 | $586,148 | $1,172,297 |
| El Paso | $357,084 | $33,530,172 | 878,127 | $38.18 | 20,833 | $795,482 | 8,828 | $337,086 | $1,132,568 | $2,265,136 |
| Fort Bend | $118,802 | $4,981,686 | 251,158 | $19.83 | 2,919 | $57,898 | 18,684 | $370,595 | $428,493 | $856,985 |
| Galveston | $67,131 | $4,688,584 | 240,508 | $19.49 | 1,577 | $30,743 | 11,052 | $215,453 | $246,196 | $492,392 |
| Harris | $2,693,977 | $108,459,258 | 2,839,476 | $38.20 | 61,077 | $2,332,954 | 186,630 | $7,128,693 | $9,461,646 | $18,923,292 |
| Hidalgo | $714,808 | $7,831,155 | 410,487 | $19.08 | 8,271 | $157,792 | 129,367 | $2,468,027 | $2,625,819 | $5,251,638 |
| Tarrant | $403,123 | $24,801,490 | 1,262,382 | $19.65 | 11,490 | $225,739 | 62,126 | $1,220,563 | $1,446,303 | $2,892,605 |
| Travis | $658,636 | $41,826,681 | 929,068 | $45.02 | 9,106 | $409,953 | 43,167 | $1,943,380 | $2,353,333 | $4,706,665 |
| Webb | $64,069 | $4,422,071 | 234,797 | $18.83 | 3,537 | $66,614 | 8,263 | $155,622 | $222,236 | $444,473 |
| Williamson | $107,402 | $4,685,525 | 204,094 | $22.96 | 2,514 | $57,716 | 8,263 | $189,699 | $247,415 | $494,830 |
| **Total** | **$6,952,078** | **$337,086,891** | **12,065,514** | **$27.94** | **160,546** | **$5,039,843** | **723,123** | **$19,487,704** | **$24,527,546** | **$49,055,092** |

*Source: RH2 Consulting, Inc.*

to develop an estimate of the fiscal impacts to 14 Texas border counties. In addition to sheriff's offices, they calculated costs to the following offices for each county:

- District Attorney
- District Court
- District Clerk
- County Attorney
- Court at Law
- County Clerk
- Justice of the Peace
- Indigent Defense
- Adult Probation
- Juvenile Services

They also included an estimated emergency medical care cost, but their estimate included costs for both offenders and non-offenders who are undocumented immigrants. The Comptroller's report includes a separate calculation estimating Texas health care costs for undocumented immigrants, so these costs were subtracted from the U.S./MBCC estimate.

The U.S./MBCC estimated that the cost to these 14 border counties was approximately $21.5 million.[56] Of that amount, sheriff's offices accounted for approximately 60 percent of expenditures for undocumented immigrants. Applying this ratio to the figure calculated for sheriff's office costs produces an estimate of $81.7 million for costs related for processing and incarcerating undocumented immigrant offenders for the 15 highest SCAAP grant recipients.[57] These 15 counties received 88 percent of the 2005 SCAAP money awarded to Texas counties; $81.7 million divided by 0.88 produces an estimated total cost of **$92.9 million**.

This figure represents a conservative estimate, as the SCAAP grantees represent 95 of Texas' 254 counties and 87 percent of the state's population. Some of the remaining counties also may incur criminal justice costs related to the processing and incarceration of undocumented offenders. For example, five of the 14 border counties included in the U.S./MBCC study did not submit SCAAP applications in 2005.

Total estimated costs for education, health care and incarceration are detailed in **Exhibit 13**.

## VI.  Economic Benefits

This section analyzes two issues:

- the economic impact of undocumented immigrants in Texas, including their contributions to state employment, wages and revenues over a 20-year period (2005 through 2025); and

- the contributions of undocumented immigrants on Texas government revenues.

## Economic Impact

The Pew Hispanic Center estimates that between 1.4 million and 1.6 million undocumented immigrants resided in Texas in March 2005.[58] To achieve a conservative estimate, this analysis relies on the lower boundary of this range.

Using 2000 Census data for the number of foreign-born residents in Texas counties, it is possible to estimate how many undocumented immigrants reside in each of Texas' 24 Council of Government regions, based on the assumption that immigrants are distributed in the same proportion as the foreign-born. Based on an age profile of foreign-born immigrants into the U.S. from Mexico, it is possible to further disaggregate the estimates into age and gender groups.[59]

These data then can be put into the Comptroller's Regional Economic Model, Inc. (REMI) model to investigate the impact of undocumented immigrants on the Texas economy. This is accomplished by instructing REMI to act as if these immigrants were to suddenly vanish from Texas and then to examine the degree to which the underlying economic forecast for the state and for each region would be affected. The implicit assumption is 1.4 million undocumented immigrants have employment and spending patterns consistent with Hispanics in Texas with similar age and gender profiles.

To gauge the economic impact of undocumented immigrants, one additional change must be made in the REMI model. Because REMI is a general equilibrium model, it tries to compensate for changes in a variety of ways. In the case of workers eliminated from a region, the model assumes new workers will be recruited to make up for their loss.

While this is an expected "real-world" result, a true test of the effects of unauthorized immigrants would be seen only if the REMI model were prevented from importing additional workers into the state in compensation.

---

**EXHIBIT 13**
**Summary of Estimated State Costs Associated with Undocumented Immigrants (Fiscal 2005)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6 |
| Total | -$1,156.4 |

STATES000030

## *Special Report:* Undocumented Immigrants in Texas

**EXHIBIT 14**
**Estimated Effects of the Loss of 1.4 Million**
**Undocumented Immigrants from Texas in 2005**

| | Percent Change From Baseline Forecast | | | | |
|---|---|---|---|---|---|
| | 2005 | 2010 | 2015 | 2020 | 2025 |
| Total Employment | -2.3% | -2.1% | -2.1% | -2.0% | -2.0% |
| Total Gross State Product | -2.1% | -1.8% | -1.7% | -1.6% | -1.5% |
| Personal Income | -2.6% | -2.0% | -2.0% | -2.1% | -2.2% |
| Real Disposable Personal Income | -2.8% | -2.2% | -2.1% | -2.1% | -2.1% |
| Relative Cost of Production | 0.2% | 0.3% | 0.1% | 0.0% | -0.1% |
| Relative Labor Intensity | 0.0% | -0.1% | -0.2% | -0.2% | -0.2% |
| Exports to Rest of World | -0.1% | -0.3% | -0.4% | -0.2% | -0.1% |
| Average Annual Compensation Rate | 0.6% | 1.0% | 0.7% | 0.4% | 0.2% |
| Population | -5.7% | -4.2% | -3.5% | -3.1% | -2.8% |
| Labor Force | -6.3% | -3.6% | -2.7% | -2.2% | -2.1% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

The model eliminates the impact of all undocumented immigrants on the Texas economy. Some in-migration was allowed, but drawing in new Hispanic in-migrants in numbers disproportionate to their share of the indigenous population in the U.S. was prohibited. Effectively, this shut off return in-migration from Mexico and other Latin-American countries.

### Model Results

Probably the easiest way to summarize the contribution of undocumented immigrants to the Texas economy is to consider the percentage changes that might occur in various economic indicators as a result of their removal. (As a yardstick, it should be noted that 1.4 million people account for slightly more than 6 percent of the total Texas population.)

**Exhibit 14** and **15** summarize the changes in key economic indicators, and summarize the economic impact.

Without the undocumented immigrant population, Texas' work force would decrease by 6.3 percent. This decline is actually somewhat lower than the percentage of the work force actually accounted for by undocumented immigrants, since REMI assumes some additional immigration would occur to replace the workers lost. The most significant economic impact of losing undocumented workers would be a noticeable tightening in labor markets.

This tightening would induce increases in wages, as indicated by a rise in average annual compensation rate. Wage rates would rise by 0.6 percent in the first year and stay above the forecast rate throughout the entire 20-year period.

While pay increases can be viewed as a positive social and economic development, when they rise due to labor shortages they affect economic competitiveness. In this case, it would be expressed as a modest decline in the value of Texas' exports.

The remaining broad economic measures all point to an initial impact of undocumented immigrants of about 2.5 percent in terms of the value of production and wages in the Texas economy. Eliminating 1.4 million immigrants would have resulted in a 2.3 percent decline in employment, a 2.6 percent decline in personal income and a 2.8 percent decline in disposable personal income in 2005. This change also would generate a 2.1 percent decline in the gross state product (GSP), the broadest measure of the value of all goods and services produced in Texas.

While none of these changes are surprising, the one finding that may appear unusual is the persistence of the decline. If no in-migration were possible other than from natives or authorized immigrants, employment would remain 2 percent below the baseline forecast 20 years

**EXHIBIT 15**
**Estimated Effects of Removing 1.4 Million**
**Unauthorized Immigrants from Texas in 2005**

| | 2005 | 2010 | 2015 | 2020 | 2025 |
|---|---|---|---|---|---|
| Total Employment loss | 298,000 | 287,100 | 293,800 | 296,300 | 302,700 |
| Total Gross Regional Product loss (Billions of Fixed 2000$) | $17.7 | $18.7 | $20.5 | $21.4 | $22.6 |
| Personal Income loss (Billions, current dollars) | $18.5 | $19.0 | $24.6 | $32.6 | $42.9 |
| Loss in Exports to Rest of World (millions of Fixed 2000$) | $66.5 | $390.1 | $548.0 | $387.7 | $123.9 |
| Net Population loss from baseline | 1,309,000 | 1,033,000 | 899,400 | 831,300 | 784,400 |
| Labor Force Loss | 714,100 | 434,000 | 340,500 | 281,200 | 281,600 |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

**STATES000031**

later. The impact lessens over time, but remains sizable throughout the 20-year forecast period.

The primary adjustment the model makes to compensate for the loss of these undocumented migrants is initially a rise in the wage rate, which would induce some new in-migration into Texas and some additional participation in the labor force from current residents. Moreover, with wages rising relative to capital, there would be some substitution of capital for employees so the need for additional workers is lessened through productivity increases. But the fact that the Texas economy cannot adjust completely to the loss of this labor through these changes and retain its competitiveness ultimately means that relative to the rest of the world the cost of production in Texas is higher, making our goods less competitive in the international marketplace and decreasing the size of the Texas economy.

### Regional Distribution

Assuming that the current distribution of unauthorized immigrants is similar to the distribution of the foreign-born population in Texas from Central America and Mexico, as detailed in the 2000 Census, the economic impact of unauthorized immigrants varies substantially across Texas. As detailed in **Exhibit 16**, the loss of 1.4 million undocumented immigrants from the work force would produce work force declines ranging from 22.7 percent in the South Texas COG region (the Brownsville-McAllen area) to 1.7 percent in Southeast Texas (the Beaumont-Port Arthur area).

Generally, undocumented immigrants have the highest economic and demographic impact in the Border region, but they are a factor in the state's more urbanized areas as well. In all but one case (the Middle Rio Grande COG), Border COGs would see work force declines in excess of 20 percent (the Rio Grande, Lower Rio Grande and South Texas COGs). Even in the Middle Rio Grande COG (including Laredo), the work force impact of undocumented immigration is more than double that in the Houston-Galveston COG.

Other measures of economic impact are distributed similarly. Estimated population, employment and GSP declines would be highest along the border but also high in large metropolitan areas elsewhere in the state. The least affected regions in Texas would be those along the Louisiana and Oklahoma borders.

By 2025, a good portion of the work force and population changes would lessen, but in all regions the employment and gross regional product declines would remain sizable, indicating that the economic impact of undocu-

mented immigrants is unlikely to be replaced by other economic changes (**Exhibit 16**).

## Revenues

Estimating state government revenue attributable to undocumented immigrants is a difficult undertaking because any calculations must be based both on limited data and a number of significant assumptions about spending behavior. A review of the literature found several studies on undocumented immigrant impacts, but none that could be used as a model for Texas. Primarily, these studies focused on the impact of *all* immigrants, regardless of legal status, and the analyses focused on federal or state income tax revenue. Since Texas has no income tax, any estimate of state tax revenue must be based on its mix of consumption and business taxes.

Texas state government receives revenue from a wide variety of sources, but these generally can be grouped as tax collections, federal funding, licenses and fees and all other sources of revenue. In fiscal 2005, $29.8 billion of the state's total revenues of $65.8 billion came from tax collections. Federal revenue contributed $22.8 billion and licenses, fees, fines and penalties accounted for almost $6.2 billion. Other sources, such as interest income and lottery proceeds, generated the rest.

For the purposes of this analysis, major tax sources were analyzed to determine if a significant portion of collections could be attributed to consumer spending. Similarly, some major sources of revenue from fees and fines were identified as appropriate to the analysis. Sources of revenue excluded from the analysis include federal revenue and all other sources that could not be attributed directly to consumer behavior. While the state generates revenue from literally hundreds of taxes and fees, this estimate is based solely on revenue sources reflecting spending by undocumented immigrants.

State revenues included in the analysis can be grouped in five categories: consumption taxes and fees, lottery proceeds, utility taxes, court fees and all other revenue. In addition, local school property tax revenue is estimated. Consumption tax revenue totals are composed primarily of revenue from the sales tax, motor vehicle sales and use tax, gasoline tax, alcoholic beverage taxes, cigarette and tobacco taxes and the hotel tax.

Estimated revenue for each tax is calculated based on information from two sources. The Pew Hispanic Center produces data on average income and demographic characteristics of undocumented immigrants nationwide (again, no detailed demographic data are available at the state level). The estimate of annual average family income used in this analysis is $27,400. In addition,

STATES000032

*Special Report:* Undocumented Immigrants in Texas

data from the Comptroller's tax incidence model shows the tax impact for households at the estimated average income level.

State utility tax revenue mostly comprises the gas, electric, and water utility tax and this estimate uses the same basic data on average income along with the final incidence impact for this tax. Similarly, local school property tax revenue is based on the same data and the incidence specific to the school property tax.

Estimated lottery revenue is based on a Lottery Commission study of the percent of the population that plays lottery games and the average amount spent by each income level. Court costs and fees were calculated on a per capita basis since they are largely unrelated to income.

"All other revenue" consists of a number of smaller consumer taxes and fees that may well include some amounts paid by undocumented immigrants, but for which no data exist to base an estimate. The largest of these sources is higher education tuition; other sources include state park fees and the fireworks tax. This estimate assumes that undocumented immigrants contribute to the state through these revenues at the same rate as for the major consumption taxes and fees except for higher education tuition and fees. These contributions were calculated in proportion to higher education student enrollment.

---

**EXHIBIT 16**
**Estimated Regional Effects of the Loss of 1.4 Million**
**Undocumented Immigrants from Texas in 2005**

| Council of Government Region | Percent Change from Baseline in 2005 | | | | Percent Change from Baseline in 2025 | | | |
|---|---|---|---|---|---|---|---|---|
| | Labor Force | Population | Employment | Gross Regional Product | Labor Force | Population | Employment | Gross Regional Product |
| South Texas | -22.7% | -16.4% | -7.6% | -7.4% | -7.3% | -6.8% | -6.4% | -5.2% |
| Rio Grande | -20.7% | -15.3% | -6.9% | -6.8% | -6.4% | -6.0% | -5.8% | -4.7% |
| Lower Rio Grande | -20.6% | -14.8% | -7.9% | -8.1% | -6.5% | -6.2% | -6.4% | -5.7% |
| Middle Rio Grande | -17.9% | -13.0% | -5.2% | -4.7% | -4.3% | -4.2% | -4.0% | -2.8% |
| Houston-Galveston | -7.1% | -6.7% | -2.7% | -2.4% | -2.6% | -3.7% | -2.5% | -2.0% |
| Permian Basin | -6.0% | -5.3% | -1.9% | -1.6% | -1.9% | -2.8% | -1.7% | -1.3% |
| North Central Texas | -5.5% | -5.3% | -2.0% | -1.8% | -1.7% | -2.5% | -1.7% | -1.2% |
| Alamo | -5.0% | -4.1% | -1.9% | -1.9% | -1.5% | -1.6% | -1.5% | -1.3% |
| Capital Area | -4.3% | -3.9% | -2.0% | -1.8% | -1.3% | -1.5% | -1.4% | -1.0% |
| Panhandle | -4.3% | -3.8% | -1.2% | -1.1% | -1.1% | -1.8% | -1.1% | -0.8% |
| Concho Valley | -4.0% | -3.3% | -1.3% | -1.2% | -1.0% | -1.1% | -1.0% | -0.8% |
| Heart of Texas | -3.2% | -2.8% | -1.3% | -1.3% | -1.1% | -1.3% | -1.1% | -1.0% |
| Golden Crescent | -3.0% | -2.4% | -1.3% | -1.3% | -1.2% | -1.3% | -1.1% | -1.1% |
| Coastal Bend | -3.0% | -2.4% | -1.3% | -1.2% | -1.2% | -1.2% | -1.1% | -1.0% |
| Brazos Valley | -2.9% | -2.7% | -1.7% | -1.7% | -1.6% | -2.0% | -1.6% | -1.5% |
| Deep East Texas | -2.5% | -2.3% | -1.2% | -1.1% | -1.2% | -1.4% | -1.1% | -0.9% |
| East Texas | -2.5% | -2.4% | -1.1% | -1.1% | -1.1% | -1.5% | -1.1% | -0.9% |
| South Plains | -2.4% | -2.1% | -1.0% | -1.0% | -0.9% | -1.1% | -0.9% | -0.8% |
| Central Texas | -2.4% | -1.6% | -0.7% | -0.7% | -1.2% | -0.6% | -0.6% | -0.5% |
| West Central Texas | -2.1% | -1.7% | -0.8% | -0.8% | -0.7% | -0.9% | -0.7% | -0.6% |
| Texoma | -2.0% | -1.9% | -1.0% | -0.9% | -1.0% | -1.3% | -0.9% | -0.6% |
| Ark-Tex | -2.0% | -2.0% | -0.8% | -0.8% | -0.8% | -1.4% | -0.8% | -0.6% |
| Nortex | -1.8% | -1.4% | -0.6% | -0.5% | -0.6% | -0.6% | -0.5% | -0.4% |
| South East Texas | -1.7% | -1.7% | -1.0% | -0.9% | -1.0% | -1.4% | -1.0% | -0.8% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

STATES000033

*Special Report:* Undocumented Immigrants in Texas

**EXHIBIT 17**
**Estimated Revenue from Undocumented Immigrants**
**Fiscal 2005**
**(in millions)**

| Revenue Source | Total Revenue for Selected Taxes and Fees | Estimated Revenue from Undocumented Immigrants | Percent of Total |
|---|---|---|---|
| Major Consumption Taxes and Fees | $23,798.7 | $866.7 | 3.6% |
| Lottery | $1,584.1 | $60.9 | 3.8% |
| Utilities-Related | $664.0 | $19.5 | 2.9% |
| Court Costs and Fees | $337.9 | $20.6 | 6.1% |
| All Other Revenue | $1,640.5 | $31.2 | 1.9% |
| **State Revenue Subtotal** | **$28,025.1** | **$999.0** | **3.6%** |
| School Property Tax | $20,194.9 | $582.1 | 2.9% |
| **Total Estimated Revenue** | **$48,220.0** | **$1,581.1** | **3.3%** |

Note: Amounts may not add due to rounding.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As shown in **Exhibit 17**, estimated fiscal 2005 revenue to the state from undocumented immigrants in Texas is about $1.0 billion, or about 3.6 percent of the $28 billion in state revenue considered in this analysis. In addition, an estimated $582.1 million in school property tax revenue can be attributed to undocumented immigrants, or about 2.9 percent of the statewide total. Undocumented immigrants, thus, contributed nearly $1.6 billion in estimated revenue as taxpayers in fiscal 2005.

## VII. Conclusion

The immigration debate has become more heated in 2006. Congressional hearings were held across the U.S. to discuss the impact of undocumented immigrants on the economy and the culture. At the same time, two distinctly different pieces of legislation were voted out of the U.S. House and Senate.

*The Comptroller's office estimates the absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our Gross State Product of $17.7 billion. Also, the Comptroller's office estimates that state revenues collected from undocumented immigrants exceed what the state spent on services, with the difference being $424.7 million* (**Exhibit 18**).

The largest cost factor was education, followed by incarceration and healthcare. Consumption taxes and fees, the largest of which is the sales tax, were the largest revenue generators from undocumented immigrants.

While not the focus of this report, some local costs and revenues were estimated. State-paid health care costs are a small percentage of total health care spending for undocumented immigrants. The Comptroller estimates cost to hospitals not reimbursed by state funds

**EXHIBIT 18**
**State Costs, Revenues and Economic Impact to Texas of Undocumented Immigrants**
**Fiscal Year 2005**
**(in millions)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6* |
| **Total** | **-$1,156.4** |
| **Revenues** | |
| State Revenue | $999.0 |
| School Property Tax | $582.1 |
| **Total** | **$1,581.1** |
| **Net Impact to State** | **$424.7** |
| **Impact on the Economy** | |
| Gross State Product | $17,700.0 |

Notes: Costs are to the state, not local government, special districts or hospitals.
Economic Impact reports loss to Gross State Product in Fixed 2000 dollars.
State costs for higher education are slightly overstated. "State Expenditures" includes all state costs for Section 54.052(j). Not all are undocumented.
*Estimate of incarceration costs is for Fiscal Year 2006.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

totaled $1.3 billion in 2004. Similarly, 2005 local costs for incarceration are estimated to be $141.9 million. The Comptroller estimates that undocumented immigrants paid more than $513 million in fiscal 2005 in local taxes, including city, county and special district sales and property taxes. *While state revenues exceed state expenditures for undocumented immigrants, local governments and hospitals experience the opposite, with the estimated difference being $928.9 million for 2005.*

**STATES000034**

# Endnotes

1   U.S. Census Bureau, "Census 2000 Brief", December 2003 and http://www.census.gov/population/www/documentation/twps0029/tab01.html. (Last visited August 9, 2006.)

2   U.S. Census Bureau, "QuickFacts," http://quickfacts.census.gov/qfd/meta/long_101614.htm. (Last visited June 14, 2006.)

3   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County).

4   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County) and Census 1990 Summary Tape File (STF-3), PO42. Place of Birth.

5   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 4.

6   Pew Hispanic Center, *Unauthorized Migrants: Numbers and Characteristics* (Washington, D.C., June 14, 2005), p. 11.

7   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 1.

8   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 5-6.

9   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 10-11.

10  Hunter, James and Craig Howley, *Undocumented Children in Schools: Successful Strategies and Policies*, September, 1990, pp. 1-5.

11  Interview with Jeff Passel, Pew Hispanic Center, Washington, D.C., May 23, 2006. Passel said there were 140,000 undocumented immigrant children in K-12. Based on a 2004 GAO report, the Comptroller staff estimated 89.3 percent were in public school.

12  U.S. General Accounting Office, *Illegal Alien School Children: Issues in Estimating State-by-State Costs* (Washington, D.C., June, 2004), pp. 12-13.

13  Federation for American Immigration Reform, *The Costs of Illegal Immigration to Texans* (Washington, D.C., April, 2005), pp. 7-9.

14  Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994), Table 4.18.

15  Texas Health and Human Services Commission, *Texas Medicaid in Perspective, Fifth Edition* (Austin, Texas, June, 2004), p. 1-1.

16  U.S. Department of Health and Human Services, Health Resources and Services Administration, Maternal and Child Health Bureau. *Child Health USA 2004* (Rockville, Maryland, 2004), p. 1.

17  E-mail communication, Dave Wanser, deputy commissioner for Behavioral and Community Health services, July 5, 2006.

18  Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

19  Ball, Andrea, "New Mental Health System Under Way", *Austin American-Statesman* (October 20, 2004).

20  Hegstrom, Edward "Mexico More Effective Than U.S. At Immunizing Children" *Houston Chronicle* (December 22, 2002) viewed at Vaccination News Home Page, http://www.vaccinationnews.com/DailyNews/December2002/MexicoMron22.htm. (Last viewed June 17, 2006.)

21  Interview with Carla Contreras, Region 1 Education Service Center, Edinburg, Texas, July 27, 2006; and Laredo and McAllen ISDs, July 27, 2006.

22  Texas Department of State Health Services, "School-based Health Centers," http://www.dshs.state.tx.us/schoolhealth/healctr.shtm. (Last visited May 18, 2006.)

23  Texas Association of School-based Health Centers, http://www.tasbhc.org/. (Last visited May 16, 2006.)

24  Texas Department of State Health Services, School-Based Health Centers, http://www.dshs.state.tx.us/schoolhealth. (Last visited July 5, 2006.)

25  Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

26  Texas S. B. 1, 69th Leg., First Called Sess., Texas Health and Safety Code, Chapter 61; and Caton M. Fenz, "Providing Health Care to the Uninsured in Texas: A Guide for County Officials." The Access Project, September 2000.

27  Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

28  Tex. Health & Safety Code, § 61.002.

29  Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, CIHCP Directory of County, www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

30  Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

31  Preston, Julia, "Texas Hospitals Reflect Debate on Immigration," *New York Times* (July 18, 2006).

32  Gordon, Jennifer, "The Health Insurance Gamble," *Dallas Business Journal* (April 21, 2006).

33  National Conference of State Legislatures, "Federally Qualified Health Centers," http://www.ncsl.org/programs/health/fqhc.htm. (Last visited May 19, 2006.)

34  National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

35  National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

36  Texas Association of Community Health Centers, "Fact Sheet," www.tachc.org/Programs/Advocacy/2006%20Fact%20Sheet%20updated.pdf. (Last visited August 8, 2006.)

37  CHASSIS, Interview Analysis, http://www.medicaider.com/medicaid/manager/ListInterviews.asp?next=AnalyzeInterviews.asp. (Last visited July 25, 2006.)

38  The Access Project is a national health care policy initiative supported by the Robert Wood Johnson Foundation and the Anne E. Casey Foundation. For a lengthy discussion of indigent health care in Texas, see "Providing Health Care to the Uninsured in Texas: A Guide for County Officials," Caton M. Fenz, The Access Project, September 2000.

39  "Governor Schwarzenegger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

*Special Report:* **Undocumented Immigrants in Texas**

40  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

41  US/Mexico Boarders Coalition, At the Cross Roads: *US/Mexico Boarder Counties in Transition* (Washington, D.C., March, 2006), pp. 13-11 and 13-12.

42  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

43  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, June 6, 2006.

44  Letter from Gary Johnson, executive director, Texas Department of Criminal Justice, to the Honorable Ray Allen, Chair, House Corrections Committee, May 20, 2003.

45  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

46  E-mail communication from Sherry Koenig, assistant budget director, Budget Office, Texas Department of Criminal Justice, June 28, 2006; and telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, December 12, 2005.

47  "Governor Schwarzenegger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

48  Legislative Budget Board, *Current Correctional Population Indicators, Criminal Justice Uniform Cost Report Tables, Fiscal Years 2003-2004* (Austin, Texas, January, 2005).

49  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

50  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, June 16, 2006.

51  E-mail communication from Bob Moore, executive director's office, Texas Department of Criminal Justice, May 24, 2006.

52  Huddle, Donald, *The Net Costs of Immigration to Texas*, March 1994, Carrying Capacity Network, Washington, D.C. and Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994).

53  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

54  U.S. Bureau of Justice Assistance, p. 13-11

55  U.S. Department of Justice, "FY2005 SCAAP Payment List", www.ojp.usdoj.gov/BJA/grant/05SCAAP.pdf. (Last visited August 14, 2006.)

56  The total reported in the US/MBCC report was $23.3 million, however, this report includes $21.5 million after subtracting about $1.8 million in medical care costs.

57  Webb County was included although it was not the 15th highest grant recipient to ensure that border communities with the largest populations were included.

58  Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for states based on the March 2005 CPS* (Washington, D.C., April 26, 2006).

59  Migration Policy Institute, *Migration Information Source: Age-Sex Pyramids*, http://www.migrationinformation.org/DataTools/pyramids.cfm. (Last visited 5/3/2006.)

## Special Report

**CAROLE KEETON STRAYHORN • Texas Comptroller of Public Accounts**



PRSRT STD
US POSTAGE PAID
AUSTIN, TX
PERMIT NO. 1411

This publication is not copyrighted and may be reproduced. The Comptroller of Public Accounts would appreciate credit for material used and a copy of the reprint.

**Special Reports**
**Carole Keeton Strayhorn**
**Texas Comptroller of Public Accounts**
**P.O. Box 13528**
**Austin, TX  78711-3528**

For more information, call 1-800-531-5441, extension 3-4070.

This publication is also available on the World Wide Web by accessing the Comptroller's Window on State Government Web site at **<http://www.window.state.tx.us/specialrpt/undocumented/>**.

Texas Comptroller of Public Accounts publication #96-1224, December 2006.

STATES000036

# DEF-INTERV.

# EX. 293

Case 1:18-cv-00068   Document 289-3   Filed in TXSD on 08/04/18   Page 131 of 155

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Jose Magana-Salgado on 06/15/2018

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                  BROWNSVILLE DIVISION

 4     ------------------------------x

 5     STATE OF TEXAS, et al.,          :

 6                    Plaintiffs,       :

 7       vs.                           : Case No. 1:18-CV-68

 8     UNITED STATES OF AMERICA         :

 9     et al.,                          :

10       and                           :

11     KARLA PEREZ, MARIA ROCHA,        :

12     JOSE MAGANA-SALGADO, et al.,     :

13     Proposed Defendant-Intervenors.:

14     ------------------------------x

15                              Washington, D.C.

16                              Friday, June 15, 2018

17            * CONTAINS CONFIDENTIAL PORTIONS *

18            Deposition of JOSE MAGANA-SALGADO, a witness

19     herein, called for examination by counsel for

20     Plaintiff States in the above-entitled matter,

21     pursuant to notice, the witness being duly sworn by

22     MICHELE E. EDDY, RPR, CRR, and Notary Public in and

23     for the District of Columbia, taken at the offices of

24     MALDEF, 1016 16th Street, Northwest, Suite 100,

25     Washington, D.C., at 9:09 a.m.
```

**Transcripts**

 Jun 20, 2018 Magana-Salgado, Jose 06-15-2018

**Page:** 70
1 break?
2          MR. BIGGS:   Sure.
3          MS. AVILA:   Sure.   Let's go off the
4 record and take a break.
5              (A brief recess was taken.)
6          (Exhibit 1 was marked for identification
7 and attached to the deposition transcript.)
8          MR. BIGGS:   We can go back on.
9 BY MR. BIGGS:
10     **Q      After a short break, are you ready to**
11 **resume?**
12     A     Yes.
13     **Q      All right.   So we were kind of**
14 **discussing employment and DACA, the DACA program**
15 **application, things like that.   I want to**
16 **backtrack for just a couple questions to your time**
17 **at Arizona State and at Baylor.**
18     A     Sure.
19     **Q      Do you know what a federal work study**
20 **program is or what a work study program is?**
21     A     Generally, yes.
22     **Q      When you were at Arizona State, did you**
23 **have a work study job?**
24     A     No.
25     **Q      When you were at Baylor, did you have a**

**Page:** 71
1 **work study job?**
2     A     No.
3     **Q      Let's back up to you've just been given**
4 **the text from the folks at USCIS and you're**
5 **working at LCLAA?**
6     A     That's correct.
7     **Q      When did you stop working at LCLAA?**
8     A     Approximately December of 2012.
9     **Q      Why did you stop working at LCLAA?**
10     A     The agreement had been to work
11 approximately six months.
12     **Q      Who was that agreement with?**
13     A     With -- it was my independent contractor
14 contract with LCLAA as an organization.
15     **Q      So you have a written -- you had a**
16 **written independent contractor contract?**
17     A     Correct.
18     **Q      After you stopped working with LCLAA in**
19 **December of 2012, did you find employment**
20 **elsewhere?**
21     A     Yes.
22     **Q      Where was that?**
23     A     MALDEF.

24    **Q**    **When did you start working for MALDEF?**
25    A    Approximately the beginning of 2013.

Jun 20, 2018 Magana-Salgado, Jose 06-15-2018

**Page:** 112
25    **Q**    **How were you able to cross the border**

**Page:** 113
1 **check -- cross the border checkpoints without**
2 **providing identification for yourself?**
3    A    They did not request identification.
4 They inspected us and just waved us through.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _Jose Magana-Salgado_, do hereby

 4   acknowledge that I have read and examined the

 5   foregoing testimony, and the same is a true, correct

 6   and complete transcription of the testimony given by

 7   me, and any corrections appear on the attached Errata

 8   Sheet signed by me.

 9

10   5-25-18

11     (DATE)                      (SIGNATURE)

12

13              NOTARIZATION   (If Required)

14   State of _Washington_

15   County of _DC_

16   Subscribed and sworn to (or affirmed) before me on

17   this _25th_ day of _June_____, 20 _18_, by

18   _Jose  Magana-salgado_, proved to me on the

19   basis of satisfactory evidence to be the person who

20   appeared before me.

21   Signature: _____

22                      (Seal)

23

24

25
```

Case 1:18-cv-00068   Document 289-3   Filed in TXSD on 08/04/18   Page 135 of 155

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Jose Magana-Salgado on 06/15/2018                                    Page 133

1           CERTIFICATE OF SHORTHAND REPORTER

2

3           I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing transcript

7    is a true and correct record of the testimony given;

8    that said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   supervision; and that I am neither counsel for,

11   related to, nor employed by any of the parties to this

12   case and have no interest, financial or otherwise, in

13   its outcome.

14

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 20th day of

17   June, 2018.

18

19   My commission expires July 14, 2022

20

21

22   _____

23   MICHELE E. EDDY

24   NOTARY PUBLIC IN AND FOR

25   THE DISTRICT OF COLUMBIA

Case 1:18-cv-00068  Document 289-3  Filed in TXSD on 08/04/18  Page 136 of 155

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Jose Magana-Salgado on 06/15/2018                          Page 134

 1     FURTHER CERTIFICATION UNDER RULE 203 TRC

 2

 3          DEPOSITION TRANSCRIPT OF JOSE MAGANA-SALGADO.

 4   The original deposition was returned

 5   to the deposition officer on _____;

 6          If returned, the previously sent Changes and

 7   Signature pages contain any changes and the reasons

 8   therefore; If returned, the original deposition was

 9   delivered to Adam Arthur Biggs, Custodial Attorney;

10   That $_____ is the deposition officer's

11   charges to the Plaintiff States for preparing the

12   original deposition transcript and any copies of

13   exhibits;

14          That the deposition was delivered in

15   accordance with Rule 203.3, and that a copy of this

16   certificate was served on all parties shown herein

17   on _____.

18          Certified by me this 20th day of June, 2018.

19

20   _____

21   Michele E. Eddy

22   Registered Professional Reporter

23

24

25

# DEF-INTERV.

# EX. 294

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3

 4    -------------------------------x
                                     )
 5    STATE OF TEXAS, et al.,        )
                                     )
 6                       Plaintiffs, )
      v                              ) Case No.
 7                                   ) 1:18cv00068
      UNITED STATES OF AMERICA, et al.,)
 8                                   )
                         Defendants, )
 9                                   )
      and                            )
10                                   )
      KARLA PEREZ, et al.,           )
11                                   )
              Defendant-intervenors. )
12    -------------------------------x

13

14              DEPOSITION OF IKE BRANNON

15                  Washington, D C

16              Tuesday, June 26, 2018

17                     1:56 p.m.

18

19

20    Job No.: 207169

21    Pages: 1 - 138

22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3

 4     -------------------------------x
                                      )
 5     STATE OF TEXAS, et al.,        )
                                      )
 6                      Plaintiffs,   )
       v                              ) Case No.
 7                                    ) 1:18cv00068
       UNITED STATES OF AMERICA, et al.,)
 8                                    )
                        Defendants,   )
 9                                    )
       and                           )
10                                    )
       KARLA PEREZ, et al.,           )
11                                    )
              Defendant-intervenors.  )
12     -------------------------------x

13

14            Deposition of IKE BRANNON, held at Regus

15     Business Center, 2200 Pennsylvania Avenue, NW, 4th

16     Floor East, Washington, D C 20037, pursuant to

17     Notice, before Donna Marie Lewis, Registered

18     Professional Reporter and Notary Public of and for

19     the District of Columbia.

20

21

22
```

**Transcripts**

📄 Jun 29, 2018 Brannon, Ike 06-26-2018

**Page:** 93
1  that were previously not work eligible, that that
2  had no effect on the labor markets for individuals
3  that were already lawfully able to work in the
4  United States?
5           MR. LEVINE:  Objection.  Foundation.
6  Are you asking him whether he came to an opinion
7  about the 2012 market rather than the current
8  market?
9  BY MR. BIGGS:
10     **Q     I'm asking if he is offering that**
11  **opinion in this case?**
12     A     I don't think I'm offering an opinion on
13  that in this case.
14     **Q     Okay.   So do you have an opinion on**
15  **that?**
16     A     I really haven't thought about it too
17  much.  The one thing I would say is that they were
18  relatively young in 2012, so I don't think it was
19  going to have a big impact.
20     **Q     As a general economic principle does the**
21  **addition of 700,000 work eligible individuals**
22  **place any downward pressure upon the job market**

**Page:** 94
1  **for those already in it?**
2     A     So it depends.   So our labor market is
3  over 160 million workers, 170 million workers
4  right now.   So it's a relatively small cohort,
5  700,000, in the grand scheme of things.
6  Especially when you have an unemployment rate 3.8
7  percent unemployment, it's impact on the relative
8  unemployment rate is relatively low.
9           What we generally know, what economists
10  generally know about the labor market is that
11  immigration of unskilled immigrants tends to put
12  downward pressure on wages of unskilled
13  immigrants.   But if you import relatively skilled
14  immigrants skilled immigrants, skilled labor tends
15  to create more jobs for unskilled labor and also
16  skilled labor.   Especially true for immigrants.
17  Immigrants tend to create jobs at a higher
18  proportion than nonimmigrants.
19           So my professional opinion is that if
20  you have a cohort of these people and the majority
21  of them are skilled, I don't think it has much of
22  an impact on the aggregate labor market of 160

**Page:** 95
1  million.   It would have an impact on the labor
2  market if -- a more severe impact on the labor

3  market of low income people if they had 700,000
4  more people to compete with.
5      Q      Because it would increase competition
6  for those individuals, correct?
7      A    It would.
8      Q      How many DACA recipients are you aware
9  of that you would consider low skilled?
10     A     Well, two-thirds since -- we estimate
11 two-thirds are going to have some kind of college,
12 so at most it's going to be one-third or less.
13     Q      So one-third or less would be considered
14 low skilled, for lack of a better phrase?
15     A     Yeah.   And probably a little bit less
16 than that, yeah.
17     Q      That one-third, that would increase
18 competition with other people who are citizens who
19 are also competing for those low skilled jobs,
20 correct?
21     A     That's right.   But since these workers
22 are relatively mobile, we would argue that they

**Page:** 96

1  would have relatively low impact on their wages.
2      Q      But an impact nonetheless, correct?
3      A     Correct.
4          MR. BIGGS:   All right.   Let's actually
5  take five minutes, if that's okay.
6          THE WITNESS:   Sure.
7          MR. BIGGS:   I think I'm getting close to
8  being done.   We will get you out of here -- well,
9  subject to anybody else asking you questions.
10         THE WITNESS:   That's great.
11         MR. GOLDSMITH:   I will have some
12 questions.
13         (The proceedings recessed from 3:50 p.m.
14 to 3:59 p.m.)
15         (Exhibit No. 2 was marked for
16 identification.)
17 BY MR. BIGGS:
18     Q     I hand you what is marked as Exhibit 2
19 to your deposition.   I actually might be one
20 short.   I apologize for that.
21           Sir, have you seen Exhibit 1 before --
22 or Exhibit 2 before?

```
 1                    REPORTER'S CERTIFICATE

 2              I, DONNA M. LEWIS, RPR, Certified

 3   Shorthand Reporter, certify;

 4              That the foregoing proceedings were

 5   taken before me at the time and place therein set

 6   forth, at which time the witness, Ike Brannon, was

 7   put under oath by me;

 8              That the testimony of the witness, the

 9   questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13              I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16              As witness, my hand and notary seal this

17   28th day of June, 2018.

18
                          _____
19

20                        Donna M. Lewis, RPR
                          Notary Public
21
     My Commission expires:
22   March 14, 2023
```

# DEF-INTERV.

# EX. 295

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4

 5   STATE OF TEXAS,                    )

 6          Plaintiffs,                 ) Case No.

 7          vs.                         ) 1:18-cv-00068

 8   UNITED STATES OF AMERICA, et al., )

 9          Defendants,                 )

10          and                        )

11   KARLA PEREZ, et al.,               )

12              Defendant-Intervenors. )

13   ----------------------------------------------

14                   ORAL DEPOSITION OF

15                      RAY PERRYMAN

16                 Wednesday, June 27, 2018

17   ----------------------------------------------

18          Oral deposition of RAY PERRYMAN, produced as

19   a witness at the instance of the Plaintiff States, and

20   duly sworn, was taken in the above-styled and numbered

21   cause on the 27th day of June, 2018, from 2:00 p.m. to

22   4:44 p.m., before Deborah L. Endler, Notary Public in

23   and for the State of Texas, reported by stenographic

24   means, at the offices of the Attorney General, 300

25   West 15th Street, 11th Floor, Austin, Texas 78701,
```

1  pursuant to the Federal Rules of Civil Procedure and

2  the provisions stated on the record or attached

3  hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Transcripts**

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 11
1   A.     Sure.   Some of the analysis we've done over
2   time has looked at the costs and benefits from
3   economic and fiscal perspective.   By economic I mean
4   in terms of jobs, income, output, those types of
5   measures.
6        By fiscal, I mean by looking at the costs
7   that government entities pay and the benefits
8   government entities receive and the net effect of
9   that.   Again, I'm summarizing, but that's the gist of
10  it.
11      Q.     So first let's talk about the benefits of
12  DACA that you looked at.   What are some of the
13  benefits of DACA?
14      A.     Well, you have availability of a skilled
15  workforce by and large in a relatively tight labor
16  market, or very tight labor market, that can
17  contribute to a state's economy in terms of, directly
18  in terms of being employed, but also some other
19  startup businesses and other things that generate
20  economic activity.   And that economic activity has
21  ripple effects throughout the economy.
22      Q.     What about the other side, the costs?   What
23  are some of the costs of DACA that you have looked at?
24      A.     Well, there are situations which have been
25  addressed I think at length in this matter where like

**Page:** 12
1   anyone who exists in a state, we contribute something
2   and we make use of the water systems and the sewer
3   systems and highways and potentially school districts
4   and we pay revenue into the system as well.   So it's a
5   case of balancing those things against one another.
6      Q.     And that's what you tried to do, in part,
7   in your Declaration?
8           MR. HERRERA:   Objection, vague.
9      A.     Yes, sir.   Well, actually, I'm sorry, in
10  prior work we've done that I incorporate in the
11  Declaration, that's correct.
12      Q.     Okay.   So fair to say in your opinion the
13  State of Texas benefits, to some degree, from the DACA
14  program?
15      A.     On a net basis, yes, sir.
16      Q.     And then if we go to below the net, net
17  means you took out the benefits, you took out the
18  costs and the benefits; right?
19      A.     That's correct.
20      Q.     So in that equation the State of Texas
21  realizes some benefit from DACA?
22      A.     That's correct.
23      Q.     And the State of Texas realizes some costs

24 **from DACA?**
25     A.    Correct.

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 13
 1     **Q.     And what are those costs again?**
 2     A.    Well, not only DACA, anyone who lives in
 3  the area is going to consume some resources, water
 4  system, sewer system, school systems, highways, those
 5  types of things.
 6     **Q.     Right.**
 7     A.    City and county roads, so there is a
 8  variety of public services that all of us who live in
 9  an area consume, and then we pay back in to help
10  provide revenue to provide those services, help
11  balance the -- Our analysis shows that this particular
12  population provides a net benefit to these things.
13     **Q.     So DACA recipients consume some of those**
14  **services you talked about, for example, education**
15  **costs; right?**
16     A.    As do a lot of citizens, yes.   There are
17  some DACA recipients who consume education.
18     **Q.     And that's costs borne by the State of**
19  **Texas?**
20     A.    To some extent.   I know there is complex
21  formulas and that's not an area I claim any special
22  expertise in that.   But some of that cost is borne by
23  the State of Texas on a, with the idea being a net
24  benefit coming back from that.   But yes, there is a
25  cost associated with it and the state pays some of

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 14
 1  that in certain circumstances.
 2     **Q.     And then the same is true with health care**
 3  **costs, for example, the State of Texas incurs some**
 4  **portion of costs to provide health care to the DACA**
 5  **population?**
 6             MR. HERRERA:   Objection, vague.
 7     A.    Potentially.   I don't have firsthand
 8  knowledge that that occurs, but with any random
 9  segment of the population there is probably some.   I'm
10  not certain of the magnitude of that.   I haven't seen
11  anything that measures that.
12     **Q.     Let's go back to the very beginning of your**
13  **Declaration, please.**
14     A.    Okay.
15     **Q.     I want to jump right in, so we're going to**
16  **skip a few pages and we may come back to some of the**
17  **stuff in the beginning later in the afternoon.**
18     **But let's start with on paragraph, excuse**
19  **me, page 6.**
20     A.    Yes, sir.

21    Q.    Section that gives an "Overview of DACA"?
22    A.    Yes, sir.
23    Q.    Do you see that?    All right.    So we look to
24 paragraph 18 in that section, there are some cites to
25 a study done by Tom Wong; is that right?

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 27
1    A.    One more.    I'm with you.
2    **Q.    In paragraph 31 you talk about the labor
3 shortage and then the third sentence says "Some
4 companies have increased wages to attract more
5 qualified applicants."
6    Why would a company increase wages to
7 attract more qualified applicants?
8    A.    Because they have a need for workers and
9 there is not, there is not workers available.
10    We have an interesting situation right now
11 we've never had in history before, since we have been
12 keeping data on some of these statistics, and that is
13 that we have a lot more job openings even in total
14 number of unemployed people.    So it's a really, it's a
15 very interesting phenomenon in the workforce right now
16 that we haven't seen before.    And a lot of areas where
17 there is workforce shortages, that's one way you try
18 to induce people to work, either to come into the
19 workforce or to change jobs.**
20    Q.    Yeah, okay.    So if I can just summarize
21 that in my head to make it make sense to me, so if
22 there is a labor shortage, that can potentially
23 increase wages?
24    A.    Certainly.
25    Q.    Okay.    So if there is, let me say it a

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 48
1    Q.    Right.    But what you did is try to take the
2 best information you could find and make the most
3 educated estimate that you could?
4    A.    That's correct, yes, sir.
5    Q.    And then you have a brief discussion about
6 the sources with a cite footnote 19.    Do you see that?
7    A.    Yes, sir.
8    **Q.    And I have --
9    A.    One thing I should mention, going back to
10 the paragraph, I noticed when I was reading it, we
11 also include in that the costs associated with the
12 children of undocumented workers even if they were
13 born in the United States.**
14    Q.    Understand.
15    (Deposition Exhibit 4 was marked.)
16    Q.    Show you Exhibit 4.    I'm sorry, can I have
17 one of those back?    Exhibit 4 is the first source

18  **cited in Exhibit 19 -- footnote 19.   Let's clear that**
19  **up.**
20  **      Exhibit 4 is the first source cited in**
21  **footnote 19?**
22       A.      That's correct, yes, sir.
23       **Q.      So this formed a part of your estimate in**
24  **trying to determine the costs associated with**
25  **undocumented population?**

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 53
 1  break it down then.   Do you know how you calculated
 2  the $3 billion estimated expense to the federal
 3  government caused by the undocumented population?
 4       A.      Not without working back through all the
 5  information from the time.   I'm sorry.
 6       **Q.      What about the $3.1 billion to the State of**
 7  **Texas?**
 8       A.      I would have to give the same answer there.
 9       **Q.      And same for the $6.7 billion for local**
10  **entities?**
11       A.      Yes.
12       **Q.      So this $3.1 billion to the State of Texas**
13  **is the cost you estimated Texas incurred because of**
14  **its provision of services to the undocumented**
15  **population in Texas?**
16       A.      Correct.
17       **Q.      And that undocumented population included**
18  **the DACA population?**
19       A.      I believe it would have, yes.
20       **Q.      All right.**
21       A.      As they are a percentage of it, and I would
22  have to probably use fewer services, but yes.
23       **Q.      All right.   And you said fewer services but**
24  **you are not saying that the DACA population used none**
25  **of these services?**

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 69
 1       A.      Yes, sir.
 2       **Q.      Okay.   So that's talking about the direct**
 3  **benefits; right?**
 4       A.      Correct.
 5       **Q.      And then if we look on Exhibit 8, we see**
 6  **the total benefits for Texas, and I assume that's the**
 7  **multiplied benefits?**
 8       A.      Multiplied benefits.
 9       **Q.      Okay.**
10       A.      And they are all nets as well.
11       **Q.      How do we know that they are nets?**
12       A.      Because that's how I set up the system.
13  It's exactly the same modeling structure that was used
14  in the prior report.

15      Q.      Okay.   So when you set up the system, it
16  did, in fact, calculate the projected costs incurred
17  by Texas because of DACA recipients in the state?
18      A.      Yes.
19      Q.      Is that information that you can provide to
20  your counsel?
21      A.      By cost, you're talking about the net cost
22  and benefits to the government as opposed to the --
23      Q.      Yes, sir.   So, for example, if we look at
24  Exhibit 3 --
25      A.      Yes.

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 75
 1  the report somewhere, for example, you're making a
 2  car, you're making a profit on the car, you have to
 3  buy wiper blades, I don't dispute the wiper blades
 4  cost money, but you make money on the car.   I don't
 5  dispute that there's cost and benefits, and the
 6  benefits outweigh the costs.   I don't dispute that.
 7      Q.      But you don't dispute that there is a cost
 8  associated with DACA recipients borne by the State of
 9  Texas?
10              MR. HERRERA:   Objection, asked and
11  answered.
12      A.      Subject to everything I said before
13  obviously by the last answer.
14      Q.      All right.   One of those costs borne by the
15  State of Texas because they're DACA recipients that
16  you have estimated relates to education to the DACA
17  recipients through Texas public school program?
18              MR. HERRERA:   Objection, asked and
19  answered.
20      A.      Yeah, that's one thing I would have to add
21  about that is, as I understand it, the schools have to
22  provide education to the undocumented population.   I
23  don't think it's really an issue whether or not they
24  are in DACA or not.
25              In other words, if you took DACA away, and

**Page:** 76
 1  they all stayed, I don't think the number would
 2  change.   But clearly to the extent people are
 3  classified as DACA, persons who are in the high school
 4  at this point in time, their education is being
 5  funded.   But it's not because they are in DACA, it's
 6  because they are here.
 7      Q.      And is being funded in part by the State of
 8  Texas?
 9      A.      Correct, yes.
10      Q.      And I jumped ahead of myself there.   I
11  meant to ask you about health care.
12      A.      Okay.
13      Q.      But same question as a lead-in, you don't

14 **dispute that the State of Texas does indeed incur a**
15 **cost to provide health care to DACA recipients?**
16              MR. HERRERA:   Objection, asked and
17 answered.
18      A.    Again, the only clarification I would give
19 is, again, for the undocumented population, since they
20 use it, a little bit less for the DACA based
21 population, but nonetheless I assume there would be
22 some people in the DACA population who are likely to
23 have some type of care that is reimbursed in some way
24 by the state.
25      **Q.    And those types of care would be things**

Ray Perryman                                          June 27, 2018
                                                        Page 108

```
 1                 CHANGES AND SIGNATURE
 2   WITNESS NAME:_____M. Ray Perryman_____
 3   DATE OF DEPOSITION:__June 27, 2018____
 4   PAGE    LINE        CHANGE              REASON
 5   _32_____10_____"Pugh" to "Pew"_____Transcription___
 6   _35_____16_____"Pugh" to "Pew"_____Transcription___
 7   _35_____17_____"Resource" to "Research"___Transcription___
 8   _36_____14_____"Pugh" to "Pew"_____Transcription___
 9   _36_____22_____"Pugh" to "Pew"_____Transcription___
10   _92_____16_____"sides" to "sizes"_____Transcription___
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Ray Perryman

June 27, 2018
Page 109

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2         I, RAY PERRYMAN, have read the foregoing

 3    deposition and hereby affix my signature that same is

 4    true and correct, except as noted above.

 5

 6                    _____

 7                    RAY PERRYMAN

 8

 9    THE STATE OF TEXAS      )

10    COUNTY OF   Ector       )

11         Before me,  M Ray Perryman , on this day

12    personally appeared RAY PERRYMAN, known to me (or

13    proved to me under oath of through _____) to be

14    the person whose name is subscribed to the foregoing

15    instrument and acknowledged to me that they executed

16    the same for the purposes and consideration therein

17    expressed.

18         Given under my hand and seal of office this

19    6th   day of _____July_____, 2018 .

20

21

22

23                    _____

24                    NOTARY PUBLIC IN AND FOR

25                    THE STATE OF TEXAS
```

GERRIE LYNN SPURGEON
Notary Public, State of Texas
My Commission Expires
December 02, 2018

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION


 3
      STATE OF TEXAS,                    )
 4         Plaintiffs,                   ) Case No.
           vs.                           ) 1:18-cv-00068
 5    UNITED STATES OF AMERICA, et al., )
           Defendants,                   )
 6              and                      )
      KARLA PEREZ, et al.,               )
 7           Defendant-Intervenors. )

 8                    REPORTER'S CERTIFICATION
                    DEPOSITION OF RAY PERRYMAN
 9                       June 27, 2018
```

10              I, Deborah Endler, Shorthand Reporter in and

11    for the State of Texas, do hereby certify that the

12    foregoing deposition is a full, true and correct

13    transcript:

14              That the foregoing deposition of RAY

15    PERRYMAN, the Witness, hereinbefore named was at the

16    time named, taken by me in stenograph on June 27,

17    2018, the said Witness having been by me first duly

18    cautioned and sworn to tell the truth, the whole truth

19    and nothing but the truth and the same were thereafter

20    reduced to typewriting by me or under my direction.

21              ( ) That by agreement of counsel, a reading

22    condensed copy of the deposition transcript along with

23    the full-sized original Changes and Signature Sheet

24    has been sent to _____ on

25    _____ for review and signature within 30 days

Ray Perryman                                                    June 27, 2018
                                                               Page 111

```
 1   and if any corrections returned are attached hereto.
 2            ( ) That the Witness shall have thirty (30)
 3   days for review and signature of the original
 4   transcript and if any corrections returned are
 5   attached hereto.
 6            ( ) That the signed transcript ( ) was ( )
 7   was not received from the Witness within 30 days.
 8            That the amount of time used by each party at
 9   the deposition is as follows:
10            Mr. Disher - 2 hours, 44 minutes
11            That before the completion of the deposition,
12   the Deponent, andor the Plaintiff/Defendant _____ did
13   _____ did not request to review the transcript.
14            I further certify that I am neither counsel
15   for, related to, nor employed by any of the parties or
16   attorneys in this action in which this proceeding was
17   taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19            WITNESS MY HAND, this the 28th day of June,
20   2018.
21            _____
22            DEBORAH L. ENDLER, Reporter
             EXPIRATION DATE:
23            Firm Registration No. 631
             Kim Tindall & Associates, LLC
24            16414 San Pedro, Suite 900
             San Antonio, Texas 78232
25            Phone 210-697-3400
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,                    §
                                             §
                    Plaintiffs,              §
                                             §
        v.                                   §    Case No. 1:18-CV-68
                                             §
UNITED STATES OF AMERICA, *et al.*,          §
                                             §
                    Defendants,              §
                                             §
and                                          §
                                             §
KARLA PEREZ, *et al.*,                       §
                                             §
                    Defendant-Intervenors,   §
                                             §
and                                          §
                                             §
STATE OF NEW JERSEY,                         §
                                             §
                    Defendant-Intervenor.    §


**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**


# Volume 4

# Exhibits 296 - 305

# DEF-INTERV.

# EX. 296

|                                                                                                 | Search |
|---|---|

## QuickFacts

**UNITED STATES; Texas**

QuickFacts provides statistics for all states and counties, and for cities and towns with a population of 5,000 or more.

## Table

| All Topics | UNITED STATES | Texas |
|---|---|---|
| **Population, Census, April 1, 2010** | **308,745,538** | **25,145,561** |
| 👤 **PEOPLE** | | |
| **Population** | | |
| Population estimates, July 1, 2017, (V2017) | 325,719,178 | 28,304,596 |
| Population estimates base, April 1, 2010, (V2017) | 308,758,105 | 25,146,100 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2017, (V2017) | 5.5% | 12.6% |
| **Population, Census, April 1, 2010** | **308,745,538** | **25,145,561** |
| **Age and Sex** | | |
| Persons under 5 years, percent | 🔺 6.1% | 🔺 7.2% |
| Persons under 18 years, percent | 🔺 22.6% | 🔺 26.0% |
| Persons 65 years and over, percent | 🔺 15.6% | 🔺 12.3% |
| Female persons, percent | 🔺 50.8% | 🔺 50.3% |
| **Race and Hispanic Origin** | | |
| White alone, percent   (a) | 🔺 76.6% | 🔺 79.2% |
| Black or African American alone, percent   (a) | 🔺 13.4% | 🔺 12.7% |
| American Indian and Alaska Native alone, percent   (a) | 🔺 1.3% | 🔺 1.0% |
| Asian alone, percent   (a) | 🔺 5.8% | 🔺 5.0% |
| Native Hawaiian and Other Pacific Islander alone, percent   (a) | 🔺 0.2% | 🔺 0.1% |
| Two or More Races, percent | 🔺 2.7% | 🔺 2.0% |
| Hispanic or Latino, percent   (b) | 🔺 18.1% | 🔺 39.4% |
| White alone, not Hispanic or Latino, percent | 🔺 60.7% | 🔺 42.0% |
| **Population Characteristics** | | |
| Veterans, 2012-2016 | 19,535,341 | 1,513,294 |
| Foreign born persons, percent, 2012-2016 | 13.2% | 16.7% |
| **Housing** | | |
| Housing units, July 1, 2017, (V2017) | 137,403,460 | 10,932,870 |
| Owner-occupied housing unit rate, 2012-2016 | 63.6% | 61.9% |
| Median value of owner-occupied housing units, 2012-2016 | $184,700 | $142,700 |
| Median selected monthly owner costs -with a mortgage, 2012-2016 | $1,491 | $1,444 |
| Median selected monthly owner costs -without a mortgage, 2012-2016 | $462 | $467 |
| Median gross rent, 2012-2016 | $949 | $911 |
| Building permits, 2017 | 1,281,977 | 175,112 |
| **Families & Living Arrangements** | | |
| Households, 2012-2016 | 117,716,237 | 9,289,554 |
| Persons per household, 2012-2016 | 2.64 | 2.84 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2012-2016 | 85.2% | 83.5% |
| Language other than English spoken at home, percent of persons age 5 years+, 2012-2016 | 21.1% | 35.2% |
| **Education** | | |
| High school graduate or higher, percent of persons age 25 years+, 2012-2016 | 87.0% | 82.3% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2012-2016 | 30.3% | 28.1% |
| **Health** | | |
| With a disability, under age 65 years, percent, 2012-2016 | 8.6% | 8.1% |
| Persons without health insurance, under age 65 years, percent | 🔺 10.1% | 🔺 18.6% |
| **Economy** | | |
| In civilian labor force, total, percent of population age 16 years+, 2012-2016 | 63.1% | 64.2% |
| In civilian labor force, female, percent of population age 16 years+, 2012-2016 | 58.3% | 57.7% |
| Total accommodation and food services sales, 2012 ($1,000)   (c) | 708,138,598 | 54,480,811 |
| Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c) | 2,040,441,203 | 145,035,130 |
| Total manufacturers shipments, 2012 ($1,000)   (c) | 5,696,729,632 | 702,603,073 |
| Total merchant wholesaler sales, 2012 ($1,000)   (c) | 5,208,023,478 | 691,242,607 |

| Total retail sales, 2012 ($1,000)   (c) | $4,183,824,275 | $354,446,376 |
| Total retail sales per capita, 2012   (c) | $13,443 | $13,666 |

**Transportation**

| Mean travel time to work (minutes), workers age 16 years+, 2012-2016 | 26.1 | 25.9 |

**Income & Poverty**

| Median household income (in 2016 dollars), 2012-2016 | $55,322 | $54,727 |
| Per capita income in past 12 months (in 2016 dollars), 2012-2016 | $29,829 | $27,828 |
| Persons in poverty, percent | ▲ 12.7% | ▲ 15.6% |

### 🏭 BUSINESSES

**Businesses**

| Total employer establishments, 2016 | 7,757,807 | 579,168[1] |
| Total employment, 2016 | 126,752,238 | 10,429,924[1] |
| Total annual payroll, 2016 ($1,000) | 6,435,142,055 | 526,782,643[1] |
| Total employment, percent change, 2015-2016 | 2.1% | 1.9%[1] |
| Total nonemployer establishments, 2016 | 24,813,048 | 2,251,787 |
| All firms, 2012 | 27,626,360 | 2,356,748 |
| Men-owned firms, 2012 | 14,844,597 | 1,251,696 |
| Women-owned firms, 2012 | 9,878,397 | 866,678 |
| Minority-owned firms, 2012 | 7,952,386 | 1,070,392 |
| Nonminority-owned firms, 2012 | 18,987,918 | 1,224,845 |
| Veteran-owned firms, 2012 | 2,521,682 | 213,590 |
| Nonveteran-owned firms, 2012 | 24,070,685 | 2,057,218 |

### 🌐 GEOGRAPHY

**Geography**

| Population per square mile, 2010 | 87.4 | 96.3 |
| Land area in square miles, 2010 | 3,531,905.43 | 261,231.71 |
| FIPS Code | 00 | 48 |

**Value Notes**

    1.   Includes data not distributed by county.

&#9650;  Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info
left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2017) refers to the final year of the series (2010 thru 2017). Different vintage years of estimates are not comparable.

**Fact Notes**

    **(a)**   Includes persons reporting only one race
    **(b)**   Hispanics may be of any race, so also are included in applicable race categories
    **(c)**   Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

    **D**    Suppressed to avoid disclosure of confidential information
    **F**    Fewer than 25 firms
    **FN**   Footnote on this item in place of data
    **NA**   Not available
    **S**    Suppressed; does not meet publication standards
    **X**    Not applicable
    **Z**    Value greater than zero but less than half unit of measure shown
    **-**    Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowes
interval of an open ended distribution.

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area I
Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

| ABOUT US | FIND DATA | BUSINESS & INDUSTRY | PEOPLE & HOUSEHOLDS | SPECIAL TOPICS | NEWSROOM |
|---|---|---|---|---|---|
| Are You in a Survey? | QuickFacts | Help With Your Forms | 2020 Census | Advisors, Centers and Research Programs | News Releases |
| FAQs | American FactFinder | Economic Indicators | 2010 Census | Statistics in Schools | Release Schedule |
| Director's Corner | 2010 Census | Economic Census | American Community Survey | Tribal Resources (AIAN) | Facts for Features |
| Regional Offices | Economic Census | E-Stats | Income | Emergency Preparedness | Stats for Stories |
| History | Interactive Maps | International Trade | Poverty | Statistical Abstract | Blogs |
| Research | Training & Workshops | Export Codes | Population Estimates | Special Census Program | |
| Scientific Integrity | Data Tools | NAICS | Population Projections | Data Linkage Infrastructure | |
| Census Careers | Developers | Governments | Health Insurance | Fraudulent Activity & Scams | |
| Diversity @ Census | Catalogs | Longitudinal Employer-Household Dynamics (LEHD) | Housing | USA.gov | |
| Business Opportunities | Publications | | International | | |
| Congressional and Intergovernmental | | Survey of Business Owners | Genealogy | | |
| Contact Us | | | | | |

**CONNECT WITH US**

Accessibility  |  Information Quality  |  FOIA  |  Data Protection and Privacy Policy  |  U.S. Department of Commerce

# DEF-INTERV.

# EX. 297



## OFFICE OF THE GOVERNOR

August 16, 2012

RICK PERRY
GOVERNOR

The Honorable Greg Abbott
Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas  78711-2548

Dear General Abbott:

In a memo dated June 15, 2012, the Secretary of the U.S. Department of Homeland Security issued prosecutorial guidelines for certain unlawfully present aliens.  The guidelines, which were to take effect no later than August 15, 2012, outline the secretary's intent to defer deportation actions involving those aliens for a period of at least two years.  According to media reports, thousands of aliens in Texas are eligible to apply for relief from deportation under the guidelines.

I have previously expressed my position that the secretary was wrong to unilaterally undermine the law through a policy statement issued under the cover of so-called "prosecutorial discretion." I believe her actions were a slap in the face to the rule of law and our Constitutional framework of separated powers.

To avoid any confusion on the impact of the Obama administration's actions, I am writing to ensure that all Texas agencies understand that Secretary Napolitano's guidelines confer absolutely no legal status whatsoever to any alien who qualifies for the federal "deferred action" designation.  In fact, the secretary specifically closed her directive by explaining that "[t]his memorandum confers no substantive right, immigration status or pathway to citizenship."

These guidelines do not change our obligations under federal and Texas law to determine a person's eligibility for state and local public benefits.  Federal law prohibits conferring such benefits to most unlawfully present aliens, absent a state law to the contrary.  In Texas, our legislature has passed laws that reflect the policy choices that they believe are right for Texas. The secretary's directive does not undermine or change our state laws, or any federal laws that apply within the State of Texas.  I expect our state agencies to continue to comply with and enforce the laws for the protection of our citizens, communities and state treasury and in fulfillment of our constitutional duty as officials within the executive branch.

Sincerely,

*Rick Perry*

Rick Perry
Governor

RP:crp

# DEF-INTERV.

# EX. 298

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                 BROWNSVILLE DIVISION

 4                 CASE NO. 1:18-cv-00068

 5

 6    --------------------------------X

 7    STATE OF TEXAS, et al.,            :

 8                        Plaintiffs, :

 9         vs.                          :

10    UNITED STATES OF AMERICA, et al.,  :

11                        Defendants, :

12         and                          :

13    KARLA PEREZ, et al.,               :

14         Defendant-Intervenors. :

15    --------------------------------X

16

17            DEPOSITION OF DANIELA VELEZ

18                 (Taken by Plaintiff)

19                 Trenton, New Jersey

20                 June 19, 2018

21

22

23    Reported by:   Catherine Golembeski
                      Certified Court Reporter-NJ
24                    Registered Professional Reporter
                      Notary Public
25
```

Case 1:18-cv-00068   Document 289-4   Filed in TXSD on 08/04/18   Page 10 of 98

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Daniela Velez on 06/19/2018**                                    Page 2

```
 1    APPEARANCE OF COUNSEL:

 2
      FOR THE PLAINTIFF STATE OF TEXAS:
 3
                  CRISTINA M. MORENO, ESQ.
 4                THE ATTORNEY GENERAL KEN PAXTON
                  P.O. Box 12548
 5                Austin, Texas 78111-2584
                  (512) 463-2120
 6
      FOR THE PLAINTIFF STATE OF NEW JERSEY:
 7
                  OFFICE OF THE ATTORNEY GENERAL
 8                DEPARTMENT OF LAW & PUBLIC SAFETY
                  BY:  RACHEL WAINER APTER, ESQ.
 9                25 Market Street
                  Trenton, New Jersey 08625
10                (609) 376-2702

11    FOR THE U.S. DEPARTMENT OF JUSTICE

12                OFFICE OF IMMIGRATION LITIGATION
                  BY:  JAMES WALKER, ESQ.
13                Ben Franklin Station
                  P.O. BOX 868
14                Washington, DC 20044
                  (202) 532-4468
15
      FOR THE WITNESS:
16
                  ALEXANDRA DROZ, ESQ.
17                KATIE GLYNN, ESQ.
                  LOWENSTEIN SANDLER, LLP
18                1251 Avenue of the Americas
                  New York, New York 10020
19                (212) 262-6700

20

21            Deposition of DANIELA VELEZ, taken at 25
      Market Street, Trenton New Jesey, on the 19th day
22    of June 2018 at 12:00 p.m. before Catherine
      Golembeski, CCR-NJ, RPR, and Notary Public.
23

24

25
```

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 11 of 98

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Daniela Velez on 06/19/2018**                                    **Page 3**

```
 1                     CONTENTS
 2
    THE WITNESS:     DANIELA VELEZ          EXAMINATION
 3
 4              BY:  MS. MORENO             4, 46
 5              BY:  MS. WAINER APTER         44
 6              BY:  MS. DROZ                 46
 7
                 INDEX OF EXHIBITS
 8
 9  Exhibit-1   Declaration of Daniela Velez      5
10  Exhibit-2   Article 2/16/18                    7
11  Exhibit-3   Article                           38
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:18-cv-00068   Document 289-4   Filed in TXSD on 08/04/18   Page 12 of 98

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Daniela Velez on 06/19/2018**                                    Page 36

```
 1         A.   Yes.
 2         Q.   So let me go back to the question I
 3    asked before you stepped out.
 4              In this article it references a
 5    difficult decision that you and your sister have
 6    made regarding what you would do if DACA was ended.
 7    And in the article it says you had, at the time,
 8    decided you would leave the country.  Is that
 9    accurate?
10              MS. DROZ:  Objection.
11         A.   That was before the March 5th deadline.
12    And as we saw how the changes have been in the
13    administration, and we also saw the deterioration
14    of the political party in Venezuela, it will make
15    it very unsafe for us to even go back at this time.
16         Q.   Okay.  So you've changed your mind now.
17    You would stay?
18              MS. DROZ:  Objection.
19         A.   We don't know.
20         Q.   And in this article it said that you
21    are adamant about not living in the United States
22    as an undocumented person.  And it quotes you as
23    saying:  "One thing I've learned, is my talent and
24    skill are mine.  No one can take those away.  It
25    will be hard to start life again, we will not stay
```

Case 1:18-cv-00068  Document 289-4  Filed in TXSD on 08/04/18  Page 13 of 98

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                                    Page 50

```
 1   UNITED STATES DISTRICT COURT)

 2                            : C-E-R-T-I-F-I-C-A-T-E

 3   DISTRICT OF TEXAS - BROWNSVILLE DIVISION)

 4

 5     I, Catherine Golembeski, RPR, CCR, Notary Public,

 6   certify that I did have Daniela Velez appear before

 7   me at 12:00 p.m. on June 19, 2018, in the New

 8   Jersey Attorney General's office, 25 Market Street,

 9   Trenton, New Jersey, that the witness was duly

10   sworn and cautioned to tell the truth, the whole

11   truth and nothing but the truth; that the foregoing

12   pages constitute a true and accurate transcript of

13   testimony given at the time and place.

14     I further certify that I am not of counsel or kin

15   to any of the parties to this cause of action, nor

16   am I interested in any manner in its outcome.

17     IN THE WITNESS WHEREOF I have hereunto set my

18   hand and seal this the 19th day of June 2018.

19

20

21   _____

22             Catherine Golembeski, CCR, RPR
                Notary Public for New Jersey
23

24

25
```

# DEF-INTERV.

# EX. 299



# An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others

**Ben Harrington**
Legislative Attorney

April 10, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R45158

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals (aliens) present in the United States in violation of the Immigration and Nationality Act (INA). Well-known types of reprieves include deferred action, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS). The authority to grant some types of discretionary reprieves from removal, including TPS, comes directly from the INA. The authority to grant other types of reprieves generally arises from the Department of Homeland Security's (DHS's) enforcement discretion—that is, its discretion to determine the best manner for enforcing the immigration laws, including by prioritizing some removal cases over others.

The primary benefit that a reprieve offers to an unlawfully present alien is an assurance that he or she does not face imminent removal. Reprieves also generally confer other benefits, including eligibility for employment authorization and nonaccrual of unlawful presence for purposes of the three- and ten-year bars on admission to the United States under the INA. Reprieves do not confer "lawful immigration status," in the narrow sense that reprieve recipients typically remain removable under the INA's grounds of inadmissibility or deportability (although they may have defenses to removal, including a statutory defense in the case of TPS) and in the more general sense that recipients do not enjoy most of the statutorily fixed protections that come with lawful permanent resident (LPR), refugee, asylee, and nonimmigrant status. The availability and duration of reprieves often turn upon executive policies, and accordingly reprieves do not offer steadfast protection from removal or reliable access to other benefits.

Categories of reprieves premised upon executive enforcement discretion include the following:

- ***Deferred Action.*** The generic term that DHS uses for a decision not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.
- ***DACA.*** A large-scale, programmatic type of deferred action available since 2012 for a subset of aliens who arrived in the United States as children.
- ***Deferred Enforced Departure (DED).*** A reprieve premised on the President's exercise of foreign policy powers to protect nationals of countries experiencing war or instability.
- ***Extended Voluntary Departure (EVD).*** An earlier version of DED little used since 1990.

Reprieves granted pursuant to statutory authority include the following:

- ***TPS Relief.*** A form of temporary protection from removal for aliens from countries that DHS designates as unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.
- ***Parole.*** A statutory power that authorizes DHS to grant entry (but not admission) to inadmissible aliens on a case-by-case basis.

Immigration authorities may grant other reprieves in connection with removal proceedings:

- ***Administrative Closure.*** A decision to discontinue temporarily a removal proceeding.
- ***Voluntary Departure***. A brief reprieve that allows an alien to depart the United States at his own expense in lieu of removal proceedings or enforcement of a removal order.
- ***Stay of Removal, Order of Supervision.*** Mechanisms often used together that allow DHS or an immigration judge to postpone enforcement of a removal order.

# Contents

Introduction ............................................................................................................................. 1

Sources of Executive Authority to Grant Discretionary Reprieves from Removal ......................... 4

Nature of Protections for Recipients: In General ......................................................................... 8

Glossary of Discretionary Reprieves ......................................................................................... 11

    Generally Available Reprieves Premised upon Enforcement Discretion or Executive
       Powers ......................................................................................................................... 12

    Generally Available Reprieves Granted Pursuant to Statutory Authority ............................. 15

    Reprieves Granted Exclusively in Connection with the Removal Process ........................... 18

# Contacts

Author Contact Information ....................................................................................................... 20

# Introduction

The Immigration and Nationality Act (INA) establishes a system of rules as to which non-U.S. nationals (aliens) may enter the United States and under what conditions.[1] It sets forth, for instance, three primary categories—family-based, employment-based, and diversity-based—through which an alien may qualify for an immigrant visa and thereby seek admission to the United States as a lawful permanent resident (LPR).[2] The INA also establishes requirements for the admission of refugees,[3] and delineates the categories of aliens who may be admitted temporarily as nonimmigrants for particular purposes such as study, tourism, or temporary work.[4]

Those aliens who enter or remain in the country in violation of the INA's restrictions generally are subject to removal based on their presence within the United States alone.[5] As a consequence, the Department of Homeland Security (DHS)—the federal agency primarily responsible for enforcing the INA—has a statutory basis to seek the removal of such aliens even if they have not committed crimes or violated other INA provisions.[6] According to recent estimates, there are currently between ten and twelve million aliens in the United States whose presence violates the INA.[7] They arrive in two ways primarily: (1) surreptitiously, by crossing the border without inspection; or (2) on a temporary nonimmigrant visa (e.g., on a B-1/B-2 tourist visa,[8] which typically allows them to remain for six months), which they then overstay.[9] DHS has estimated in

---

[1] 8 U.S.C. §§ 1101, *et seq.*

[2] *See* 8 U.S.C. § 1151(a) (setting forth the three categories of immigrant visa eligibility). For an overview of immigrant visa categories and application procedure, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*, by William A. Kandel.

[3] 8 U.S.C. § 1157; *see generally* CRS Report RL31269, *Refugee Admissions and Resettlement Policy*, by Andorra Bruno.

[4] 8 U.S.C. § 1101(a)(15); *see generally* CRS Report R45040, *Nonimmigrant (Temporary) Admissions to the United States: Policy and Trends*, by Jill H. Wilson.

[5] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *id.* § 1229a(e)(2)(B) (defining inadmissible aliens who have not been admitted to the United States as "removable"); *id.* § 1227(a)(1)(B)(rendering any alien "who is present in the United States in violation of this chapter or any other law of the United States" deportable and thus subject to removal); *id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, DAVID WEISSBRODT & LAURA DANIELSON, IMMIGRATION LAW AND PROCEDURE 349 (6th ed. 2011) ("Non-citizens who are present in the U.S. in violation of the INA or any other law of the U.S. are removable . . . as are those who fail to maintain the nonimmigrant . . . status in which they were admitted.").

[6] *See, e.g.*, Mondragón v. Holder, 706 F.3d 535, 541 (4th Cir. 2013) ("It is uncontroverted that Mondragón entered the United States illegally and is therefore removable."); Ghaffar v. Mukasey, 551 F.3d 651, 653 (7th Cir. 2008) (denying petition for review of final order of removal based on overstay of nonimmigrant visa).

[7] Ctr. for Migration Studies, *The US Undocumented Population Fell Sharply During the Obama Era: Estimates for 2016* (Feb. 22, 2018) (estimating 10.8 million in 2016), http://cmsny.org/publications/warren-undocumented-2016/; Dep't of Homeland Sec. Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014* (July 2017) (estimating 12.1 million in 2014), http://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf; Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009* (Sept. 20, 2016) (estimating 11.1 million in 2014), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

[8] *See generally* 9 Foreign Affairs Manual (FAM) 402.2.

[9] *See* Office of Immigration Statistics, *supra* note 7, at 1; David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 171 (2012) ("[E]ntrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical 'illegal alien' in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully (continued...)

the past that its resources allow it to remove a maximum of 400,000 aliens per year who are present in violation of the INA.[10]

For reasons that may range from administrative convenience to humanitarian concerns, immigration authorities sometimes decide not to seek the removal of unlawfully present aliens[11]—either during a specified timeframe or indefinitely—and communicate that decision to the affected aliens.[12] Well-known examples of such decisions include grants of deferred action,[13] protections granted under the Deferred Action for Childhood Arrivals (DACA) initiative,[14] and Temporary Protected Status (TPS).[15] The former two types of reprieves confer assurances from DHS, premised on its enforcement discretion, that the agency will not seek an alien's removal, often during a defined time period.[16] The latter, TPS, is a statutory mechanism that allows immigration authorities to grant temporary protection from removal to aliens from countries experiencing upheaval or instability.[17]

This report refers to executive decisions not to seek removal as "discretionary reprieves from removal" because their effective period generally depends on the duration of the Executive's inclination not to seek removal and because the reprieves (unlike statutory legalization

---

(...continued)
present population. The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission.").

[10] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014) ("DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year."); Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. PA. L. REV. 1753, 1759 (2016) (describing the "gap between the INA's putative scope and its enforceable scope").

[11] The INA defines unlawful presence as follows: "[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of Homeland Security] or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[12] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *see also* Arizona v. United States, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

[13] *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing deferred action).

[14] Memorandum from Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) [hereinafter DHS DACA Memo]; *see* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing DACA).

[15] 8 U.S.C. § 1254a. TPS and some other reprieve programs may also provide relief to nonimmigrants and other aliens present pursuant to a statutory immigration status. *See, e.g., id.* § 1254a(c) (requiring aliens to have been physically present since a date specified by DHS in order to qualify for TPS, but not excluding lawfully present aliens from eligibility). This report focuses on the use of discretionary reprieves to regulate the population of aliens present in violation of the INA.

[16] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action and DACA).

[17] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

mechanisms such as cancellation of removal,[18] registry,[19] or asylum[20]) do not confer LPR status or create a direct avenue to that status.[21] (However, in some jurisdictions, TPS may facilitate adjustment to LPR status for aliens who otherwise qualify for immigrant visas in a family-based, employment-based, or diversity-based category.)[22] Discretionary reprieves from removal do not, in other words, offer steadfast protection from removal,[23] although they typically confer eligibility for work authorization, among other benefits.[24] A burgeoning body of legal scholarship about discretionary reprieves has coined an array of terms for the peculiar sort of relief that they provide, including "quasi-legal status,"[25] "liminal"[26] or "twilight" status,[27] and the "status of nonstatus."[28] In recent decades, discretionary reprieves have grown in prevalence and become an increasingly significant aspect of the federal government's regulation of the unlawfully present population.[29] The prevalence of discretionary reprieves may well decline in the near term,

---

[18] 8 U.S.C. § 1229b(b) (authorizing the cancellation of removal and adjustment of status for certain nonpermanent residents).

[19] *Id.* § 1259 (authorizing the conferral of a record of admission for permanent residence in the case of certain aliens who entered the United States prior to January 1, 1972).

[20] *Id.* § 1158.

[21] *See* Arpaio v. Obama, 797 F.3d 11, 17 (D.C. Cir. 2015) ("[D]eferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'") (quoting DHS DACA Memo, *supra* note 14, at 3); Texas v. United States, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' [obtained through deferred action] is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) ("By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States.").

[22] *See* 8 U.S.C. § 1254a(f)(4) (providing that aliens granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status eligibility); *infra* note 141 (citing cases on adjustment of status eligibility for TPS recipients).

[23] *See Arpaio*, 797 F.3d at 17; *Texas*, 809 F.3d at 148. TPS provides perhaps the most rigid protection against removal of any discretionary reprieve. *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[24] *See* 8 C.F.R. § 274a.12(c) (establishing categories of aliens eligible to apply for employment authorization).

[25] *See, e.g.,* Ingrid V. Eagly, *Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement*, 88 N.Y.U. L. REV. 1126, 1217 (2013); Hiroshi Motomura, *What Is "Comprehensive Immigration Reform"? Taking the Long View*, 63 ARK. L. REV. 225, 226 (2010).

[26] Jennifer M. Chacon, *Producing Liminal Legality*, 92 DENV. UNIV. L. REV. 709, 713 (2015).

[27] David A. Martin, *Twilight Statuses: A Closer Examination of the Unauthorized Population*, 2 MIGRATION POLICY INST. 1, 7-8 (June 2005).

[28] *See* Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115 (2015).

[29] *See id.* at 1120 ("[I]n recent years, the United States has expanded the number of persons placed in nonstatus."). Two events, in particular, did much to increase the number of aliens receiving discretionary reprieves: the enactment of the TPS statute in 1990 and the implementation of the DACA program in 2012. *See* CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*, by Jill H. Wilson, at 11 (calculating that 436,866 people held TPS as of October 12, 2017); CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno, at 6 ("As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved."); *see also* U.S. Citizenship and Immigration Servs., *Number of Approved Employment Authorization Documents, by Classification and Basis for Eligibility, Oct. 1, 2012 – June 29, 2017* (2017) (providing statistics for employment authorization documents approved for recipients of deferred action, DACA, parole, and other types of discretionary reprieves), http://www.uscis.gov/sites/default/files/USCIS/Resources/ Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/eads-by-basis-for-eligibility.pdf [hereinafter USCIS EAD Data]. The Obama Administration's proposed Deferred Action for Parents of Americans (DAPA) initiative, which federal courts enjoined before implementation, had the potential to make approximately four million unlawfully present aliens eligible for discretionary reprieves. *See* Texas v. United States, 809 F.3d 134, 138 (5th Cir. (continued...)

---

however, as a result of changes in executive policy concerning DACA, TPS, and Deferred Enforced Departure (DED).[30]

This report provides an overview of discretionary reprieves from removal. It discusses the primary sources of authority on which discretionary reprieves are premised and describes, in general, the nature of the protections that they confer. The report concludes with a glossary of the principal types of discretionary reprieves.

# Sources of Executive Authority to Grant Discretionary Reprieves from Removal

The Executive's power to grant most of the existing forms of discretionary reprieves—including deferred action, DACA, and DED, among others—is typically attributed to its enforcement discretion: that is, its authority to determine the best method for enforcing federal immigration law.[31] This enforcement discretion includes the authority to prioritize some cases over others to conserve resources or avoid unjust results.[32] Criminal prosecutors in the United States possess a similar type of discretion.[33] They need not prosecute every crime of which they become aware, and their ability to set prosecution priorities that maximize the impact of their limited resources is considered fundamental to the American criminal justice system.[34] Drawing from this criminal law tradition, courts, immigration officials, and commentators often call the Executive's authority

---

(...continued)

2015) (affirming injunction against DAPA and observing that of "the approximately 11.3 million illegal aliens in the United States, 4.3 million would be eligible for [reprieves] pursuant to DAPA."), *aff'd by an equally divided Court*,—U.S.—, 136 S. Ct. 2271, 2272 (2016); Arpaio v. Obama, 797 F.3d 11, 18 n.1 (D.C. Cir. 2015) (similar estimate); *cf.* Randy Capps et. al., *Deferred Action For Unauthorized Immigrant Parents*, MIGRATION POLICY INST. 3 (Feb. 2016) (estimating that DAPA could have potentially reached "as many as 3.6 million unauthorized immigrants"), https://www.migrationpolicy.org/research/deferred-action-unauthorized-immigrant-parents-analysis-dapas-potential-effects-families.

[30] *See* CRS Legal Sidebar LSB10052, *UPDATE: The End of the Deferred Action for Childhood Arrivals Program: Some Immediate Takeaways*, by Hillel R. Smith; CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[31] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999); *Arpaio*, 797 F.3d at 16 ("The Secretary of Homeland Security is charged with the administration and enforcement of the immigration laws. With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (some internal quotation marks and citations omitted).

[32] Arizona v. United States, 567 U.S. 387, 396 (2012); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84.

[33] *See* United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey, at 11 ("The judicial branch has traditionally accorded federal prosecutors 'broad' latitude in making a range of investigatory and prosecutorial determinations, including when, against whom, and whether to prosecute particular criminal violations of federal law.").

[34] *See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 682 (2014) ("With limited resources and broad charging options, federal prosecutors must choose how to allocate investigative and prosecutorial resources; they must prioritize some offenses at the expense of others."); *cf.* LUIGI FERRAJOLI, LAW AND REASON 574 (1989) (categorizing prosecutorial discretion as an attribute of the Anglo-American system of accusatorial criminal justice that belongs to its historical tradition but not its theoretical framework, and noting that prosecutorial discretion does not form part of the civil law tradition).

---

to decline to seek removal of some unlawfully present aliens "prosecutorial discretion,"[35] even though removal proceedings are civil rather than criminal in nature.[36]

Enforcement discretion in the immigration context has unique attributes that distinguish it from prosecutorial discretion in the criminal context. The INA puts no general statute of limitations on removal.[37] Thus, the Executive's decision not to seek removal of an alien lacks the definitive quality of many decisions not to prosecute crimes, which become irreversible if an applicable statute of limitations expires.[38] Aliens present in violation of the INA remain removable indefinitely (unless they otherwise acquire a legal status), so an assurance that the Executive will not seek their removal at a particular juncture does not redress their long-term situation.[39] Further, perhaps as a consequence of this reality, a discretionary reprieve from removal differs from a decision not to prosecute a crime in that a discretionary reprieve from removal often carries a fixed term, which can typically be renewed.[40] DACA, for instance, carries a two-year renewable term.[41]

Over time, the Executive has employed its enforcement discretion to grant various types of reprieves under inconstant terminology. In 1974, John Lennon famously pursued a type of

---

[35] *See, e.g.*, Shoba Shivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243 (2010); DHS DACA Memo, *supra* note 14, at 1.

[36] *Arizona*, 567 U.S. at 396 (2012) ("Removal is a civil, not criminal, matter."); *cf.* Maureen A. Sweeney, *Fact or Fiction: The Legal Construction of Immigration Removal for Crimes*, 27 YALE J. ON REG. 47, 49 (2010) ("[C]ourts have consistently held that removal is not punishment for crime but is instead a remedial civil sanction and a collateral, rather than direct, consequence of a conviction. This theoretical characterization of removal developed many decades ago in the context of the very different immigration law that existed then. It no longer corresponds in any meaningful way to the realities of immigration law and enforcement . . . .").

[37] *See* Adams v. Holder, 692 F.3d 91, 104 (2d Cir. 2012) ("[T]he INA . . . specifically imposes no time limitations on removal proceedings."); Asika v. Ashcroft, 362 F.3d 264, 269 (4th Cir. 2004) ("[T]he provisions of the [INA] that govern deportation [do not] refer . . . to any time limitation on deportation at all."). Some grounds of deportation, however, apply only to conduct that occurs within a certain time after entry. *See* 8 U.S.C. § 1227(a)(1)(E)(i) ("Any alien who (prior to the date of entry, at the time of any entry, or *within 5 years of the date of any entry*) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.") (emphasis added); *id.* § 1227(a)(5) ("Any alien who, *within five years after the date of entry*, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.") (emphasis added); WEISSBRODT & DANIELSON, *supra* note 5, at 279-80 ("[N]on-citizens who become dependent on government benefits are removable only if they become a public charge within five years of entry . . . . Because there is no general statute of limitations, however, ICE can remove [such non-citizens] . . . *at any time*—even if [they] cease[] to be a public charge.") (emphasis in original). Also, one INA provision imposes a limitations period on actions to *rescind* a person's LPR status if he obtained it through adjustment despite being ineligible, 8 U.S.C. § 1256(a), but every federal appellate court to consider the issue, except one, has held that limitations period does not apply to removal proceedings. *See Adams*, 692 F.3d at 101-02, 102 n.6 (collecting cases and explaining that only the Third Circuit "has applied § 1256(a)'s five-year limitations period to removal proceedings based on alleged fraudulent procurement of adjustment of status").

[38] *See* United States v. Marion, 404 U.S. 307, 322 (1971) ("[Criminal] statutes [of limitation] . . . 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.") (quoting Public Schools v. Walker, 9 Wall. 282, 288 (1870)).

[39] *See* 8 U.S.C. § 1182(a)(6)(A)(i); *id.* § 1227(a)(1)(B); Andrew Tae-Hyun Kim, *Deportation Deadline*, 95 WASH. U.L. REV. 531, 550 (2017) (noting the lack of any limitations period in the INA and explaining that because "deferred action is not an affirmative grant of relief from removal . . . a change in administrative policy or priorities could change what was once a low-priority case to a high-priority one. All this heightens the level of uncertainty for undocumented immigrants.").

[40] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (authorizing "deferring action for a period of two years" for qualified aliens).

[41] *Id.*

reprieve called "nonpriority status," which his lawyer accused the Immigration and Naturalization Service (INS)[42] of keeping secret.[43] Soon thereafter, the INS adopted the term "deferred action,"[44] which DHS continues to use today for a reprieve from removal granted under its general enforcement discretion.[45] Immigration authorities have also, however, granted reprieves under the labels "Extended Voluntary Departure" (EVD), DED, and DACA.[46] In some instances, such as DACA, these labels denote a particular reprieve type's focus on a discrete group.[47] In other instances, such as with EVD and DED, the bureaucratic terminology seems to supply multiple labels for the same type of reprieve.[48] The criteria for granting the reprieves (other than the statutorily authorized reprieves discussed below) are generally set forth in agency manuals and policy memoranda,[49] although for some reprieve types it can be difficult to locate a controlling document.[50] Federal statute does not set the criteria for reprieves grounded in enforcement discretion; nor does a particular law supply explicit authorization for the Executive to grant such reprieves,[51] although scattered provisions of the INA reference deferred action and describe narrow categories of aliens as eligible to receive it.[52] In recent years, questions have arisen as to

---

[42] The INS was the agency with primary responsibility for enforcing the INA until March 1, 2003, when it ceased to exist and most of its functions were transferred to DHS under the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135. *See* Nijar v. Holder, 689 F.3d 1077, 1078-79 (9th Cir. 2012).

[43] Heeren, *supra* note 28, at 1134; Wadhia, *supra* note 35, at 246-47.

[44] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

[45] *See* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[46] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion."

[47] *See* DHS DACA Memo, *supra* note 14, at 2 (describing the DACA initiative as premised on "the exercise of [] prosecutorial discretion . . . [for] certain young people who were brought to this country as children and know only this country as home").

[48] *See* U.S. IMMIGRATION AND NATURALIZATION SERVS, ADJUDICATOR'S FIELD MANUAL, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .") [hereinafter USCIS AFM].

[49] *See, e.g., id.*; IMMIGRATION AND CUSTOMS ENFORCEMENT, DETENTION AND REMOVAL OPERATIONS POLICY AND PROCEDURE MANUAL, ch. 20.8 (concerning deferred action), https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf [hereinafter DROPPM].

[50] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action); Heeren, *supra* note 28, at 1134 (contending that the controlling legal authority for discretionary reprieves "is tenuous and sometimes even secret . . . DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda").

[51] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (quoting treatise for the proposition that deferred action is a "commendable exercise in administrative discretion [] developed without express statutory authorization"); Texas v. United States, 809 F.3d 134, 167 (5th Cir. 2015) (same); *see also* Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015) ("With [DHS's] enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)).

[52] *See* 8 USC § 1227(d)(2) (providing that the denial of an administrative stay of removal to applicants for T or U nonimmigrant status "shall not preclude the alien from applying for . . . deferred action"); REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (emphasis added) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for driver's licenses). At least two statutory provisions go so far as to state that specific groups of aliens are "eligible" for deferred action. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain self-petitioners for LPR status under the Violence Against Women Act are "eligible for deferred action and work authorization"); National Defense Authorization Act of 2004, P.L. 108-136, Div. A, Title VII, § 1703(c), 117 Stat. 1693 (codified at 8 U.S.C. § 1151 NOTE) (providing that the spouses and children of certain deceased U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); *see also* Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 413 (E.D.N.Y. 2018) (reasoning that "Congress has repeatedly ratified immigration officials' practice of according (continued...)

whether the Executive may lawfully use its enforcement discretion to provide reprieves in a programmatic fashion for large populations of aliens that meet specific criteria, instead of granting reprieves on a purely case-by-case basis.[53] The Supreme Court has yet to decide this issue.[54]

Although most types of discretionary reprieves from removal are grounded entirely in enforcement discretion, a few types have a statutory footing. First, the INA expressly gives DHS authority to grant immigration parole on a case-by-case basis to certain aliens,[55] providing legal permission for their physical presence in the United States without granting them admission (thereby leaving them "at the boundary line" of the United States for most immigration purposes).[56] DHS interprets its parole authority to encompass two types of discretionary grants of parole with implications for aliens whose presence violates the INA: parole-in-place and advance parole.[57] Second, the INA gives DHS authority to grant TPS relief to nationals from designated countries,[58] which resembles a discretionary reprieve in many respects but confers more rigid protection from removal than most reprieves because the bases for terminating TPS are statutorily limited.[59] Although TPS eligibility is not limited to unlawfully present aliens,[60] TPS may be particularly consequential for aliens who otherwise lack a legal foothold to remain in the United States.[61] Finally, the INA gives DHS and immigration courts authority to grant some types of discretionary reprieves in conjunction with the removal process, including voluntary departure,[62] stays of removal,[63] and orders of supervision.[64] (Other types of reprieves granted during removal proceedings, such as administrative closure, have a basis only in principles of executive discretion and docket management.)[65]

---

(...continued)

deferred action to certain aliens without lawful immigration status").

[53] *See* Texas v. United States, 809 F.3d 134, 179-82 (5th Cir. 2015) (reasoning that the Deferred Action for Parents of Americans (DAPA) reprieve program was "manifestly contrary to the INA" because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present . . . [and] [e]ntirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA")."), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016); *contra Batalla Vidal*, 279 F. Supp. 3d at 422 ("The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action.").

[54] *See* United States v. Texas, 136 S. Ct. 2271 (2016) (Mem.).

[55] 8 U.S.C. § 1182(d)(5).

[56] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[57] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole-in-place and advance parole).

[58] 8 U.S.C. § 1254a.

[59] *Id*. § 1254(c)(3); *see infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[60] *See* 8 U.S.C. § 1254(c)(1) (setting forth TPS eligibility standards).

[61] *See, e.g.*, Ramirez v. Brown, 852 F.3d 954, 958 (9th Cir. 2017) (concerning adjustment of status ramifications of a grant of TPS to an alien who entered without inspection).

[62] 8 U.S.C. § 1229c.

[63] *Id*. § 1229a(b)(5)(C); *id*. § 1231(c)(2).

[64] 8 U.S.C. § 1231(a)(3); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing voluntary departure, stays of removal, and orders of supervision).

[65] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing administrative closure).

# Nature of Protections for Recipients: In General

The principal benefit of a discretionary reprieve is the temporary assurance it provides to an unlawfully present alien that he or she does not face imminent removal, even though his or her presence in the United States violates the INA.[66] The nature of the Executive's ability to retract this assurance—and the resulting reliability of the assurance to the alien—varies by reprieve type. A grant of TPS to an individual alien, due to the applicable statutory parameters, is relatively difficult for DHS to withdraw during the grant's validity period.[67] In contrast, DHS asserts that it may terminate a grant of deferred action or DACA at its discretion,[68] although the Administrative Procedure Act and constitutional principles may require DHS to have an adequate justification for doing so.[69] No type of reprieve offers a bulwark against removal as rigid as the statutorily authorized presence that comes with LPR, refugee, and asylee status, whose holders can be removed only if they acquired their status unlawfully (e.g., through fraud) or if they engage in specified forms of misconduct.[70] Aliens present in violation of the INA who receive discretionary reprieves remain technically removable under the inadmissibility or deportability grounds of the INA, and, except in the case of TPS recipients, do not have a statutory defense against removal based on the reprieve itself.[71]

Discretionary reprieves also typically carry advantages beyond protection from removal, including eligibility to seek an employment authorization document (EAD) from DHS that allows aliens to work legally in the United States.[72] Perhaps most significantly, under DHS regulations, recipients of most types of reprieves are not considered "unlawfully present" within the United

---

[66] *See Reno*, 525 U.S. at 484.

[67] *See* 8 U.S.C. § 1254a(c)(3) (enumerating three bases for withdrawal of TPS); *infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[68] DROPPM, *supra* note 49, ch. 20.8(f) (concerning deferred action termination); U.S. Citizenship & Immigration Servs., *DHS DACA FAQs*, at Q27 (Apr. 25, 2017) ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."), https://www.uscis.gov/archive/frequently-asked-questions [hereinafter DHS DACA FAQs].

[69] *See infra* note 119 (collecting precedents concerning potential limitations on termination of individual DACA grants and rescission of the DACA program).

[70] *See* 8 U.S.C. § 1227 (enumerating specific grounds of deportability for admitted aliens, including certain criminal convictions); *id.* § 1158(c)(2) (governing termination of asylum); *cf.* Amanda Frost, *Independence and Immigration*, 89 S. CAL. L. REV. 485, 503 (2016) ("Congress has expanded the grounds on which even longtime lawful permanent residents can be deported. Today, even longtime lawful permanent residents can be deported for fairly minor criminal offenses . . . ."). Nonimmigrant aliens do not enjoy a level of protection from removal commensurate with LPRs, asylees, and refugees, because the Department of State has discretion to revoke a nonimmigrant visa "at any time," 8 U.S.C. § 1201(i), and revocation renders the visa holder removable. 8 U.S.C. § 1227(a)(1)(B) (providing for the removal of any alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)"); *see* Texas v. United States, 809 F.3d 134, 167 n.102 (5th Cir. 2015); Mier-Fiorito v. Mukasey, 282 Fed. Appx. 536, 538 (9th Cir. 2008) (unpublished) (holding that revocation of alien's nonimmigrant visa rendered him deportable).

[71] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *Id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, Amanda Frost, *Cooperative Enforcement in Immigration Law*, 103 IOWA L. REV. 1, 51 n.78 (2017) ("[D]eferred action does not provide any defense to removal and the executive has absolute discretion to revoke deferred action unilaterally . . . .") (internal quotation marks and citation omitted); *cf.* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (reasoning that DACA was "*specifically designed* for persons without lawful immigration status" but that DHS must supply a non-arbitrary or capricious reason for terminating a DACA grant).

[72] *See* 8 C.F.R. § 274a.12(c); *see also* REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for federal recognition of state-issued driver's licenses and other identification documents).

States.[73] This is because DHS has "authorized" the aliens' presence by granting them reprieves.[74] As a consequence, time spent in the United States on deferred action, TPS, and most other types of reprieves does not count toward the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission set forth in INA § 212(a)(9)(B)(i) (although a reprieve does not cure, for purposes of the bars, any unlawful presence already accumulated).[75] A discretionary reprieve may also trigger eligibility for certain benefits or programs for which "lawful presence" is a qualifying criterion, such as in-state university tuition under certain state laws.[76] More generally, even though state governments typically have broad discretion to deny state benefits to unlawfully present aliens, that discretion might be more limited in the event that such aliens are granted a discretionary reprieve from removal by the federal government.[77]

It is often said that discretionary reprieves do not confer lawful immigration status.[78] But "lawful immigration status" is an imprecise term. The INA uses variations of it in some places[79] but does not define it.[80] Although a determination that an alien lacks "lawful immigration status" triggers consequences under some INA provisions—most notably, a potential bar to adjustment of status[81]—it does little to describe the alien's legal condition in a formal sense. According to DHS

---

[73] Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (en banc); Texas v. United States, 809 F.3d 134, 147-48 (5th Cir. 2015) (explaining that deferred action recipients are "lawfully present" based on agency memoranda); *see also* 8 C.F.R. § 1.3(a)(4) (defining recipients of several types of reprieves as "lawfully present in the United States" for purposes of applying for social security benefits).

[74] *Arizona Dream Act Coal.*, 855 F.3d at 974.

[75] USCIS AFM, *supra* note 48, ch. 40.9(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence."). Aliens who are unlawfully present for more than 180 days but less than one year are, following departure from the country, barred from admission for three years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Aliens unlawfully present for more than a year are subject to a ten-year bar on admission to the United States following departure or removal from the country. *Id.* § 1182(a)(9)(B)(i)(II).

[76] *See, e.g.*, 8 U.S.C. § 1623 (prohibiting states from providing any "postsecondary education benefit" on the basis of state residency to aliens who are "not lawfully present," unless the same benefit is made available to U.S. citizens without regard to residency). Some have argued that a discretionary reprieve recipient's lack of unlawful presence does not mean that he or she possesses lawful presence for purposes of other statutes. *Arizona Dream Act Coal.*, 855 F.3d at 960 n.3 (Kozinski, J., dissent from denial of rehearing en banc) ("Even if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.").

[77] *See Arizona Dream Act Coal.*, 855 F.3d at 963 (rejecting as preempted by federal law a state policy that deemed individuals with employment authorization through DED and deferred action to be unlawfully present and denied them state-issued driver's licenses on that basis).

[78] *See* USCIS, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, http://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca ("Deferred action does not provide lawful status."); United States v. Arrieta, 862 F.3d 512, 516 (5th Cir. 2017) (holding that DACA recipients lack "lawful status").

[79] *E.g.*, 8 U.S.C. § 1254a(f)(4) (providing that a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for adjustment of status purposes); *id.* § 1644 ("[N]o State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

[80] Gazeli v. Sessions, 856 F.3d 1101, 1105 (6th Cir. 2017) ("[T]he INA does not define 'lawful immigration status' . . . ."); *see also* Tula Rubio v. Lynch, 787 F.3d 288, 293 (5th Cir. 2015) ("Although the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'" (quoting BLACK'S LAW DICTIONARY 1542 (10th ed. 2014)).

[81] *See* 8 U.S.C. § 1255(c)(2) (rendering some aliens who "fail to maintain continuously a lawful status" ineligible for adjustment of status).

regulations, TPS holders do not have "lawful status,"[82] even though they have a statutory protection against removal.[83] Nonimmigrants, however, indisputably possess lawful status,[84] but it can be revoked more easily than TPS.[85] Similarly, under the DHS definition, parole is a lawful status,[86] even though it, too, can be terminated at DHS's discretion.[87] Perhaps the only concrete legal meaning that can be attributed to the term "lawful immigration status" is that aliens who lack it—including those unlawfully present aliens who are granted discretionary reprieves—are removable under the inadmissibility or deportability grounds of the INA.[88]

When understood as a general concept rather than a formal legal term, however, "lawful immigration status" usefully describes the bundle of statutorily defined privileges and protections that come with the major statuses set forth in the INA (LPR, asylee, refugee, and nonimmigrant status).[89] To say that unlawfully present aliens who receive discretionary reprieves do not have lawful immigration status means, generally speaking, that they lack most such privileges and protections or possess them only as a matter of executive grace.[90] For example, aliens who receive discretionary reprieves generally cannot work legally unless DHS, in its discretion, authorizes them to do so (unlike LPRs, refugees, asylees, and some nonimmigrants);[91] they have no statutorily established prospects of remaining permanently in the United States (unlike LPRs, asylees, and refugees);[92] they are generally subject to removal by virtue of their presence within the United States alone (unlike all aliens with LPR, refugee, asylee, and unexpired nonimmigrant status);[93] they have no legal basis to facilitate the admission of immediate relatives into the United States (unlike LPRs, refugees and asylees in some circumstances, and some

---

[82] *See* 8 C.F.R. § 1245.1(d)(1) (omitting TPS from definition of "lawful immigration status"); Dep't of Homeland Security Office of Immigration Statistics, *supra* note 7, at 1 (classifying TPS holders as "unauthorized immigrants"); *see also* Heeren, *supra* note 28, at 1141 ("TPS meets most of the characteristics for nonstatus, although it is a close call."); *but cf.* United States v. Orellana, 405 F.3d 360, 370-71(5th Cir. 2005) (disagreeing with agency interpretations and holding that a TPS recipient is not an alien "illegally or unlawfully in the United States" for purposes of a statute criminalizing firearm possession by such aliens).

[83] *See* 8 U.S.C. § 1254a(c)(3).

[84] *See* 8 C.F.R. § 1245.1(d)(1)(ii).

[85] *See supra* note 70.

[86] 8 C.F.R. § 1245.1(d)(1)(v).

[87] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole).

[88] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility); *id.* § 1227(a)(1)(C) (deportability); *see* Judulang v. Holder, 565 U.S. 42, 46 (2011) ("[T]he immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses, for [removal]. One list specifies what kinds of crime render an alien excludable (or in the term the statute now uses, 'inadmissible'), while another—sometimes overlapping and sometimes divergent—list specifies what kinds of crime render an alien deportable from the country.") (citations omitted); *see also, e.g.,* Matter of Ventura, 25 I. & N. Dec. 391, 392 (BIA 2010) ("[A] grant of TPS does not affect an alien's admissibility or inadmissibility for purposes of the Immigration and Nationality Act generally.").

[89] *See* Heeren, *supra* note 28, at 1122-24 (citing dictionaries for the proposition that "status" denotes "high standing" and explaining the statutory benefits of LPR, refugee, asylee, and nonimmigrant status).

[90] *Id.* at 1129-30; *see* Matter of Blancas–Lara, 23 I. & N. Dec. 458, 460 (B.I.A.2002) ("'Status' is a term of art . . . [that] denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant.").

[91] 8 C.F.R. § 274a.12.

[92] *Compare* DHS DACA FAQs, *supra* note 68, at Q68 ("Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship."), *with* 8 U.S.C. § 1101(a)(20) (providing that LPRs are "accorded the privilege of residing permanently in the United States"), *and id.* § 1159 (providing for the adjustment of refugees and asylees to LPR status).

[93] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility of aliens who enter without inspection); *id.* § 1227(a)(1)(C) (deportability of visa overstays).

nonimmigrants);[94] they face considerable restrictions on eligibility for federal public benefits (particularly as compared with LPRs, refugees, and asylees);[95] and, unless DHS decides to grant them advance parole, they generally cannot travel abroad with any legal basis to request re-entry to the United States (unlike all aliens with one of the four major statuses, except some nonimmigrants).[96] Strictly speaking, it is not correct to say that discretionary reprieves bestow no statutorily defined protection: TPS recipients have a statutory defense against removal, and recipients of most discretionary reprieves garner some advantages grounded in statute by virtue of DHS's authorization of their presence.[97] Generally speaking, however, the legal situation of aliens granted discretionary reprieves from removal ranks so low along the spectrum of immigration categories as to not be considered "lawful immigration status" in common parlance (even though most reprieves vitiate unlawful presence).[98]

In summary, recipients of discretionary reprieves obtain a temporary assurance against removal that varies in reliability by reprieve type. Such aliens, in most cases, are not unlawfully present in the United States during the term of the reprieve. Such aliens do not, however, possess "lawful immigration status," in the narrow sense that they remain technically removable under the INA's inadmissibility or deportability provisions and in the more general sense that they do not enjoy most of the statutorily fixed protections that come with LPR, refugee, asylee, and nonimmigrant status.

# Glossary of Discretionary Reprieves

This glossary describes the principal types of discretionary reprieves from removal granted by DHS or the Attorney General.[99] The glossary is divided into three categories: (1) reprieves

---

[94] *Compare* DHS DACA Memo, *supra* note 14, at 2 (not mentioning relief for family members of DACA recipients); *with, e.g.,* 8 U.S.C. § 1153(a)(2) (allocating immigrant visas to the "[s]pouses and unmarried sons and unmarried daughters" of LPRs), *id.* § 1159(a) (providing for the adjustment to LPR status of the spouses and children of refugees), and *id.* § 1101(a)(H) (providing for the issuance of nonimmigrant visas to the spouses and minor children of H-1B specialty occupation workers).

[95] The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), P.L. 104-193, 110 Stat. 2105, limited eligibility for many federal public benefits to "qualified aliens." *See* 8 U.S.C. §§ 1611-1613; *see generally* CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview*, coordinated by Audrey Singer. "Qualified alien" is defined to cover specific categories of aliens, such as LPRs, refugees, and asylees, but does not cover most aliens who obtain discretionary reprieves, other than aliens granted parole for at least one year. *See* 8 U.S.C. § 1641(b).

[96] *Compare, e.g.,* 8 U.S.C. § 1254a(f)(3) (providing that TPS holders "may travel abroad with the prior consent of the Attorney General"), *with* 8 U.S.C. § 1187(a)(7) (requiring possession of valid visa in order to apply for admission to the United States). Some nonimmigrants who have expired visas but still possess unexpired nonimmigrant status may not be able to leave and return to the United States without obtaining a new visa. *See* 9 FAM 403.9-4(A) ("For example, an alien whose B-1 visa may expire a month after entry into the United States, could be admitted by a Department of Homeland Security (DHS) officer at a port of entry (POE) for a stay of up to one year.").

[97] *See supra* text at notes 72-76.

[98] *See supra* note 78; Heeren, *supra* note 28, at 1132-33 (arguing that "immigration law affords a continuum of rights and privileges" and that holders of discretionary reprieves "fall in the nebulous middle of this spectrum," beneath holders of lawful status).

[99] The Attorney General, through the immigration judges of the Executive Office for Immigration Review (EOIR), administers removal proceedings and has authority to grant some discretionary reprieves from removal in those proceedings. *See* 8 U.S.C. § 1101(b)(4) (defining "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under [8 U.S.C.] § 1229a [concerning removal proceedings]"); *see, e.g., infra* note 134 (discussing Attorney General authority to adjudicate TPS applications in removal proceedings); *infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing Attorney General authority to (continued...)

premised upon enforcement discretion or presidential foreign policy powers (i.e., reprieves granted without express statutory authorization); (2) reprieves premised upon statutory authorization; and (3) reprieves granted exclusively in contemplation of or in connection with the removal process. The categories overlap—most of the reprieves in category (3) have statutory foundations,[100] and the reprieves in categories (1) and (2) can be granted to aliens before or after the initiation of removal proceedings[101]—but are nonetheless useful in conceptualizing the array of discretionary reprieves from removal available under current law and executive policy.

For additional information, or for information about any type of discretionary reprieve not listed below, please contact the author.

## Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers

*Deferred Action*. DHS regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority."[102] Thus, the term serves as a generic label for a decision by DHS not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.[103] Some other types of discretionary reprieves, such as DACA, are forms of deferred action tailored to particular groups or circumstances.[104] By regulation, deferred action recipients qualify for work authorization if they show "an economic necessity for employment."[105] They are not considered unlawfully present for purposes of the three- and ten-year bars on admission to the United States that the INA imposes on aliens who depart the country after being unlawfully present for more than 180 days.[106] According to DHS employment authorization data, only a small number of people receive generic deferred action each year as opposed to DACA.[107] There does not appear to be one central, publicly available agency memorandum or policy document that governs the criteria and procedures for deferred

---

(...continued)

grant voluntary departure and stays of removal).

[100] *See, e.g.,* 8 U.S.C. § 1229c (voluntary departure); *id.* § 1231(a)(3) (orders of supervision).

[101] *See, e.g.,* DHS DACA Memo, *supra* note 14, at 2 (providing guidance on granting DACA to aliens in removal proceedings); 8 U.S.C. § 1229c(b)(5)(B) (requiring that TPS relief be available to aliens in removal proceedings).

[102] 8 C.F.R. § 274a.12(c)(14); *see also* USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative discretion in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority . . . . Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws.").

[103] *See id.*; Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999).

[104] *See* DHS DACA Memo, *supra* note 14, at 2 (describing DACA relief as "deferred action").

[105] 8 C.F.R. § 274a.12(c)(14).

[106] *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (establishing a three-year bar for unlawful presence for "a period of more than 180 days but less than 1 year" following departure); *id.* § 1182(a)(9)(B)(i)(II) (establishing a ten-year bar for unlawful presence "for one year or more" following departure or removal); *id.* § 1182(a)(9)(B)(ii) (exempting any "period of stay authorized" by the Secretary of Homeland Security (formerly the Attorney General) from the construction of "unlawful presence" for purposes of the three- and ten-year bars); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017) ("[D]eferred action recipients do not accrue 'unlawful presence' for purposes of calculating when they may seek admission to the United States."); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.").

[107] *See* USCIS EAD Data, *supra* note 29 (showing 8,769 employment authorization documents approved under generic deferred action in fiscal year 2017, as opposed to 360,389 approved under DACA).

action.[108] According to one agency manual, when DHS grants deferred action, it informs recipients so that they may seek employment authorization.[109] DHS apparently does not specify a particular time period for which a grant of generic deferred action is valid (unlike DACA), but DHS does periodically review each grant.[110] DHS claims authority to terminate a grant of deferred action at any time in its discretion.[111]

***Deferred Action for Childhood Arrivals (DACA).*** DACA is a type of deferred action for aliens present in violation of the INA who meet the following criteria:

- came to the United States under the age of sixteen;

- have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012;

- are in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans;

- have not been convicted of certain criminal offenses and do not pose a threat to national security or public safety; and

- were under the age of thirty-one on June 15, 2012.[112]

The Secretary of Homeland Security created DACA by memorandum in 2012.[113] As a result, DACA has clearer eligibility criteria and application procedures than generic deferred action.[114] A grant of DACA lasts two years, subject to renewal.[115] DACA generally confers the same collateral advantages as generic deferred action (eligibility for work authorization, no unlawful presence).[116] Also like generic deferred action, DHS claims authority to terminate a grant of

---

[108] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999) ("Prior to 1997, deferred-action decisions were governed by internal INS guidelines . . . . These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis."); *Compare* DROPPM, *supra* note 49, ch. 20.8 (concerning deferred action), *with* DHS Office of Inspector General, *ICE Deportation Operations*, at 8 (Apr. 17, 2017) ("Officials we interviewed said ICE considers the 2003 Detention and Removal Operations Policy and Procedure Manual (manual) 'the official guide' to operations, but ICE has not periodically reviewed the manual or revised it since 2008. For a time, ICE would affix a memo to the front of the appropriate chapter to indicate changes, rather than incorporate changes and issue a revised manual."), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf; *cf.* Memorandum from Secretary of Homeland Security John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action . . . .").

[109] DROPPM, *supra* note 49, ch. 20.8(c)(1).

[110] *Id.* ch. 20.8(e), (f).

[111] *Id.* ch. 20.8(f). As noted below, there is some authority for the proposition that principles of due process and administrative procedure restrict DHS's ability to terminate an individual DACA grant without good justification, and that proposition could arguably extend to generic deferred action as well. *See infra* note 119 (collecting cases concerning limits on termination of individual DACA grants); DHS DACA Memo, *supra* note 14, at 2-3 (describing DACA as conferring "deferred action" relief).

[112] DHS DACA Memo, *supra* note 14, at 1; *see generally* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno.

[113] *Id.*

[114] *See id*; *Consideration of Deferred Action for Childhood Arrivals*, *supra* note 78**Error! Hyperlink reference not valid.** (describing eligibility criteria and filing process).

[115] *Id.*

[116] *See* 8 C.F.R. § 274a.12(c)(14); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017).

DACA at its discretion,[117] although its internal Standard Operating Procedures (SOP) apparently set forth specific bases (such as fraud or criminal issues) for DACA termination.[118] There is ongoing litigation over whether the Administrative Procedure Act (APA) or the Constitution restricts DHS's ability to terminate an individual DACA grant without proper justification or in a manner that does not follow the SOP.[119] There is also ongoing litigation over the extent of DHS's authority to rescind the DACA program in its entirety. DHS announced plans to rescind the DACA program effective March 5, 2018,[120] but federal courts have enjoined the rescission in most respects on the ground that it is likely "arbitrary and capricious" under the APA.[121]

**Deferred Enforced Departure (DED)**. DHS describes DED as follows:

> [A] temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS [which is authorized by statute], DED emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis . . . . The President designates DED for nationals of a particular country through either an Executive Order or a Presidential Memorandum.[122]

DED resembles TPS in that it protects nationals of certain designated countries from removal, except that DED is rooted in inherent executive power rather than in statutory authority.[123] Eligibility criteria depend on the relevant presidential directive.[124] DED recipients are generally

---

[117] DHS DACA FAQs, *supra* note 68, at Q27 ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.").

[118] DEP'T OF HOMELAND SEC., DACA NATIONAL STANDARD OPERATING PROCEDURES, 132-34 (April 4, 2013); *see* Medina v. U.S. Dep't of Homeland Sec., No. C17-0218RSM, 2017 WL 5176720, at *3 (W.D. Wash. Nov. 8, 2017) ("The National Standard Operating Procedures . . . issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.").

[119] *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (holding that a DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa" likely violates the APA); *Medina*, 2017 WL 5176720 at *9 ("[T]he Court finds that Plaintiff has alleged a plausible claim that the government violated the APA because its conduct [in terminating his DACA grant without notice] was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures, and that claim may proceed."); Coyotl v. Kelly, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (granting preliminary injunction against the termination of an individual DACA grant on the ground DHS's "fail[ure] to present any evidence that they complied with their own administrative processes and procedures with regard to the termination" sufficed to show a likelihood of success on the claim that the termination violated the APA).

[120] Memorandum from U.S. Dep't of Homeland Sec., *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017).

[121] Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (holding that DHS's planned rescission of DACA program likely violates the APA because DHS based the rescission on an erroneous legal conclusion that DACA was unlawful); Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1037 (N.D. Cal. 2018) (same); *contra* Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("[T]he decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record."); *see* CRS Legal Sidebar LSB10057, *District Court Enjoins DACA Phase-Out: Explanation and Takeaways*, coordinated by Hillel R. Smith and Ben Harrington.

[122] USCIS AFM, *supra* note 48, ch. 38.2 (Deferred Enforced Departure).

[123] *See id*; Heeren, *supra* note 28, at 1131, 1140 ("Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations. TPS is similar to the [Extended Voluntary Departure] and DED programs after which it was modeled, but . . . there is a specific standard for TPS set out in the statute.").

[124] *See* Presidential Memorandum, *Deferred Enforced Departure for Liberians* (Sept. 28, 2016) (setting forth DED eligibility criteria for Liberian nationals); USCIS AFM, *supra* note 48, ch. 38.2(d) ("In general, eligibility requirements and ineligibility bars are set forth in the Presidential designation of DED for each specific group of aliens.").

eligible for work authorization.[125] They do not accrue unlawful presence during the period of DED.[126] According to USCIS, an individual cannot be removed while he or she possesses DED.[127] Agency materials do not make provision for the termination of an individual's DED grant.[128] Currently, Liberia is the only country designated for DED, but the Trump Administration has decided to terminate that designation effective March 31, 2019.[129]

***Extended Voluntary Departure (EVD).*** EVD was an earlier version of DED that fell mostly into disuse with the advent of DED in 1990,[130] although DHS apparently continues to grant EVD to a small number of aliens.[131] Under EVD, the Attorney General—rather than the President—designated countries for protection due to unstable conditions.[132]

***Nonpriority Status.*** Prior to 1975, immigration authorities used the term "nonpriority status" to describe the type of reprieve now labeled deferred action.[133]

## Generally Available Reprieves Granted Pursuant to Statutory Authority

***Temporary Protected Status (TPS).*** Section 244 of the INA authorizes DHS to grant TPS to aliens who are nationals of countries that the Secretary of Homeland Security has designated as

---

[125] USCIS AFM, *supra* note 48, ch. 38.2(b); 8 C.F.R. § 274a.12(a)(11).

[126] *See* 8 U.S.C. § 1182(a)(9)(B)(ii); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9ᵗʰ Cir. 2017) (rejecting state policy that deemed individuals with employment authorization through DED and deferred action as not "authorized to be present").

[127] U.S. CITIZENSHIP & IMMIGRATION SERVS, AFFIRMATIVE ASYLUM PROCEDURES MANUAL 37 (May 2016) ("DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED.").

[128] *See id*; DROPPM, *supra* note 49, ch. 20.10(c) ("Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired."). These agency materials do not clarify whether DHS claims authority to terminate an individual grant of DED by initiating removal proceedings—an authority that DHS claims with respect to other reprieve types. *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (describing DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa").

[129] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018).

[130] USCIS AFM, *supra* note 48, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .").

[131] Heeren, *supra* note 28, at 1138 (citing statistics obtained from DHS under the Freedom of Information Act for the proposition that the agency continued to grant "something it calls EVD to a small number of individuals" at least until 2014).

[132] *See* Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988) ("While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors."); Matter of Sosa Ventura, 25 I. & N. Dec. 391, 394 (BIA 2010) (noting that EVD "had existed for decades to address humanitarian concerns"); Matter of Medina, 19 I. & N. Dec. 734, 748 n.7 (BIA 1988) (defining EVD by explaining that "[t]hrough the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (e.g., Uganda, Ethiopia, Poland, Afghanistan).").

[133] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("'To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation . . . . This commendable exercise in administrative discretion . . . originally was known as nonpriority and is now designated as deferred action.'") (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03 [2][h] (1998)); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.[134] A country's initial TPS designation is valid for up to 18 months and may be extended for up to 18 months, in the Secretary of Homeland Security's discretion, with no limit on the number of extensions.[135] Some countries, such as Sudan and Nicaragua, have been designated for TPS since the late 1990s, although the Trump Administration recently announced its intention not to extend those designations or the designations of Haiti and El Salvador when they expire in late 2018 and 2019.[136]

To qualify for TPS, nationals of designated countries must have resided in the United States since a specified date (usually, a date around the onset of the destabilizing conditions) and must meet certain other requirements set forth in the INA.[137] An alien granted TPS qualifies for work authorization[138] and does not accrue unlawful presence for purposes of the three- and ten-year bars to admission.[139] TPS provides statutorily based protection from removal: an alien cannot be removed while enrolled, and DHS may only withdraw the protection from an individual alien for specified statutory reasons (such as failure to maintain continuous residence in the United States or failure to comply with a yearly registration requirement).[140] Significantly, some (but not all) courts have held that a grant of TPS satisfies the lawful entry requirement for adjustment of status under INA § 245(a), such that aliens who enter the country surreptitiously and then receive TPS may adjust to LPR status if they become eligible for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[141]

---

[134] 8 U.S.C. § 1254a. DHS's authority to grant TPS is not exclusive. An immigration judge has jurisdiction to consider a TPS application from an alien in removal proceedings if DHS denied the application in the first instance. Matter of Lopez Aldana, 25 I. & N. Dec. 49, 51 (BIA 2009). Immigration judges may also have authority to consider TPS applications in the first instance in "certain limited circumstances," *id.* at 51 n.1, but in practice it appears that DHS typically considers applications in the first instance even for aliens already in removal proceedings. *See Matter of Sosa Ventura*, 25 I. & N. Dec. at 392-93 (considering docket management powers of immigration judge where DHS grants TPS during removal proceedings).

[135] *Id.* § 1254a(b)(2),(3).

[136] See CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[137] 8 U.S.C. § 1254a(a)(5); *see, e.g.,* Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010) (designating Haiti for TPS because of an earthquake that occurred on January 12, 2010, and restricting eligibility to Haitian nationals "who have continuously resided in the United States since January 12, 2010"); Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001) (designating El Salvador for TPS because of earthquakes that occurred on January 13, February 13, and February 17, 2001, and restricting eligibility to nationals of El Salvador "who have 'continuously resided' in the United States since February 13, 2001").

[138] 8 U.S.C. § 1254a(a)(1)(B).

[139] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1)(F)(iii).

[140] 8 U.S.C. § 1254(c)(3); *cf.* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (holding that it was improper for immigration judge to terminate removal proceedings against alien who was granted TPS relief because "TPS only provides a temporary protection from removal," but that any removal order issued against the alien could not be executed during the period in which the alien had TPS relief).

[141] Ramirez v. Brown, 852 F.3d 954, 964 (9th Cir. 2017) (holding that "a TPS recipient is considered 'inspected and admitted' under [8 U.S.C.] § 1255(a)" and that an alien who entered surreptitiously before obtaining TPS was therefore eligible to adjust status on the basis of his marriage to a U.S. citizen); Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (same); *contra* Serrano v. Attorney General, 655 F.3d 1260, 1265 (11th Cir. 2011) (holding that a grant of TPS does not satisfy the lawful entry requirement of § 1255(a)). Time spent in TPS counts as time in lawful nonimmigrant status for adjustment of status purposes; the question that has divided the courts is whether TPS also satisfies the lawful entry requirement for adjustment of status purposes. *See* 8 U.S.C. § 1254a(f)(4) ("[F]or purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant"); *see Ramirez*, 852 F.3d at 957 ("Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid the [failure to (continued...)

***Parole.*** The INA authorizes DHS to "parole" inadmissible aliens into the United States, on a case-by-case basis, "for urgent humanitarian reasons or significant public benefit."[142] Paroled aliens are considered unadmitted for purposes of the INA despite their physical presence within the United States.[143] Parole offers little formal protection against removal: DHS typically grants parole for a fixed period[144] but has discretion to terminate the parole whenever it determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[145] Paroled aliens may obtain work authorization[146] and do not accrue unlawful presence while the parole remains valid.[147] DHS interprets its parole authority to include two types of discretionary grants of parole potentially relevant to aliens present in the United States in violation of the INA:

> ***Parole in place.*** Although the parole power generally applies to aliens seeking to enter the country, DHS claims the authority to grant parole to aliens who are physically present in the United States following surreptitious entry.[148] DHS calls this exercise of the parole power "parole in place" and, as a matter of policy, appears to reserve it primarily for the immediate relatives of certain members of the U.S. Armed Forces.[149] Parole in place removes significant legal obstacles to an unlawfully present alien's ability to obtain LPR status without leaving the United States, if the alien qualifies for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[150]

> ***Advance Parole.*** Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already

---

(...continued)

maintain lawful status] bar under § 1255(c)(2) but also to meet the 'inspected and admitted or paroled' requirement in § 1255(a).").

[142] 8 U.S.C. § 1182(d)(5); *see* 8 C.F.R. § 212.5 (DHS regulation implementing statutory parole authority and identifying circumstances in which granting parole "would generally be justified").

[143] 8 U.S.C. § 1182(d)(5) ("[P]arole . . . shall not be regarded as an admission of the alien . . . .").

[144] *See, e.g.*, Reganit v. Sec'y, Dep't of Homeland Sec., 814 F.3d 1253, 1255 (11th Cir. 2016) (addressing case in which alien was granted parole for one month); Chaudhry v. Holder, 705 F.3d 289, 293 (7th Cir. 2013) (addressing case in which alien was granted parole for one year).

[145] 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . ."); 8 C.F.R. § 212.5(e)(2)(i) ("[W]hen in the opinion of [specified] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated . . . ."); Hassan v. Chertoff, 593 F.3d 785, 789 (9th Cir. 2010) ("The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.").

[146] 8 C.F.R. § 274a.12(c)(11) (with narrow exceptions, enabling parolees to apply for employment authorization).

[147] 8 U.S.C. § 1182(a)(9)(B)(ii); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1) ("An alien does not accrue unlawful presence . . . if he or she has been inspected and paroled into the United States and the parole is still in effect.").

[148] *See* U.S. Citizenship & Immigration Servs., Policy Memorandum, *Parole of Spouses, Children, and Parents of Active Duty Members of the U.S. Armed Forces*, at 2 (Nov. 13, 2013) ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.").

[149] *Id.* at 3 ("[P]arole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.").

[150] *See* 8 U.S.C. § 1255(a) (rendering aliens who were not "inspected and admitted *or paroled*" ineligible for adjustment of status); *see generally*, Margaret D. Stock, *Parole in Place and Other Immigration Benefits for Military Family Members: An Update*, 16-02 IMMIGR. BRIEFINGS 1 (2016).

approved, so as to facilitate their re-entry.[151] Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).[152]

## Reprieves Granted Exclusively in Connection with the Removal Process

*Administrative Closure*. When Immigration and Customs Enforcement (ICE, a component of DHS responsible for interior enforcement) decides to discontinue temporarily a removal proceeding against a particular alien before the Department of Justice's Executive Office of Immigration Review (EOIR)—because ICE deems the case low-priority, because the alien has obtained or is seeking a form of discretionary relief such as DACA, or for some other reason— ICE may ask the presiding immigration judge to place the proceeding in a status called "administrative closure."[153] An immigration judge may also place removal proceedings in administrative closure upon the alien's motion and over the government's objection, although this course of events may be less common.[154] The effect of administrative closure is to suspend but not terminate the removal proceeding.[155] As such, administrative closure offers little formal protection from removal: the alien cannot be removed while the proceedings are suspended, but ICE can move to re-activate the proceedings at any time and will likely succeed in doing so if the alien is not in the midst of pursuing independent protections from removal outside of immigration court.[156] Furthermore, administrative closure does not itself confer any additional rights or

---

[151] *See* 8 C.F.R. § 212.5(f) ("Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."); Ibragimov v. Gonzales, 476 F.3d 125, 132 (2d Cir. 2007) ("'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry . . . . Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f) . . . .").

[152] *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 274a.12(c)(11).

[153] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012) ("Administrative closure, which is available to an Immigration Judge and the Board [of Immigration Appeals], is used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket. In general, administrative closure may be appropriate to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time.").

[154] *Id.* at 694-96 (holding that government consent to administrative closure is not required, but listing "the basis for any opposition" as a factor to consider when evaluating a closure motion and noting that the government may immediately appeal an administrative closure granted over its objection); *see also* Kristin Bohman, Avetisyan*'s Limited Improvements Within the Overburdened Immigration Court System*, 85 U. COLO. L. REV. 189, 201 (2014) ("*Avetisyan* provides that immigration judges can override an objection if they find that administrative closure is in the best interests of the immigrant and if there will be some palpable final resolution to the case in the near future.").

[155] *Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order . . . . In this way, administrative closure differs from termination of proceedings, where the Immigration Judge or the Board issues a final order, which constitutes a conclusion of the proceedings and which, in the absence of a successful appeal of that decision or a motion, would require the DHS to file another charging document to initiate new proceedings.").

[156] *See id.* ("[A]t any time after a case has been administratively closed, the DHS may move to recalendar it before the Immigration Judge or reinstate the appeal before the Board . . . ."); Matter of W-Y-U-, 27 I. & N. Dec. 17, 20 (BIA 2017) ("[T]he primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits."); Matter of Pascual, No. A086-963-266, 2012 WL 1705592, at *2 (BIA Apr. 30, 2012) (unpublished) ("Immigration Judges and the Board lack the authority to decide matters of prosecutorial discretion or to decide for humanitarian reasons whether an order of removal should be entered or is in the national interest . . . . If DHS is denied its request to recalendar proceedings after action on the case has been deferred for a period of time, particularly when DHS is not contributing to any delay in resolving any petition, collateral matter or (continued...)

protections, such as work authorization or lawful presence.[157] However, administrative closure is often granted in conjunction with other discretionary reprieves that do provide additional protections.[158] For example, an alien whose removal case is placed in administrative closure may also have enrolled in DACA, which confers eligibility for work authorization and vitiates unlawful presence.[159]

***Voluntary Departure***. The INA authorizes grants of a brief discretionary reprieve called "voluntary departure" for aliens who agree to leave the United States at their own expense either before or prior to the conclusion of removal proceedings.[160] For aliens not yet in removal proceedings, DHS may grant a voluntary departure period of 120 days or less.[161] For aliens in removal proceedings, either DHS or the immigration judge may grant voluntary departure[162] for a maximum period of 120 days.[163] At the conclusion of removal proceedings, the immigration judge alone may grant voluntary departure for a maximum of 60 days.[164] Voluntary departure does not confer eligibility for work authorization[165] but does suspend the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission following the alien's departure or removal from the United States.[166] Aliens who fail to leave the country within the voluntary departure period are subject to a fine and become ineligible to receive, for a period of ten years, adjustment of status, cancellation of removal, and certain other forms of relief from removal.[167]

---

(...continued)
other action that formed the basis for the administrative closure, the denial of the motion could undermine DHS's ability to enforce the immigration laws.").

[157] *See* 8 C.F.R. § 274a.12 (not listing administrative closure among bases for eligibility for work authorization); Amelia Wilson et. al., *Addressing All Heads of the Hydra: Reframing Safeguards for Mentally Impaired Detainees in Immigration Removal Proceedings*, 39 N.Y.U. REV. L. & SOC. CHANGE 313, 365 (2015) (explaining, based on agency practice and guidance, that administrative closure "does not confer any legal status or give rise to an independent basis to seek work authorization").

[158] *See* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (concluding that immigration judges may properly grant administrative closure in cases where aliens have received temporary forms of protections such as TPS).

[159] *See* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office of Immigration Review, Dep't of Justice, on Continuances and Administrative Closure (March 7, 2013) (encouraging immigration courts to grant administrative closure where the respondent in removal proceedings has received DACA).

[160] 8 U.S.C. § 1229c.

[161] *Id*. § 1229c(a)(2)(A).

[162] 8 C.F.R. § 240.25(d); *id.* § 1240.26(b)(1).

[163] 8 U.S.C. § 1229c(a)(1), (2)(A).

[164] *Id*. § 1229c(b)(2); 8 C.F.R. § 1240.26(c).

[165] *See* 8 C.F.R. § 274a.14(a)(iii) (providing that a grant of voluntary departure automatically terminates any employment authorization). Regulations also use the term "voluntary departure" for the relief from removal granted under the statutorily created (and now largely obsolete) Family Unity Program to spouses and children of aliens who legalized under the Immigration Reform and Control Act. 8 C.F.R. § 236.15 (implementing § 301 of the Immigration Act of 1990, 104 Stat. 4978, and authorizing "voluntary departure" for up to two years). Such aliens do qualify for work authorization. *Id*. § 236.15(d), § 274a.12(a)(13). Despite the overlapping terminology, the Family Unity Program, on the one hand, and voluntary departure under § 1229b, on the other hand, are separate and distinct forms of relief. *Compare id*. § 236.15 (governing voluntary departure under the Family Unity Program), *with id*. § 240.25 (governing voluntary departure under 8 U.S.C. § 1229b).

[166] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(H) ("Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure."); 9 FAM 302.11-3(B)(1)(b)(3).

[167] 8 U.S.C. § 1229c(d)(1).

***Stay of Removal.*** DHS, an immigration judge, or the Board of Immigration Appeals[168] may stay a final order of removal against an alien to allow him or her to pursue relief or in light of practical or humanitarian considerations.[169] A stay of removal does not confer eligibility for work authorization under DHS regulations,[170] but an order of supervision—which often accompanies a stay—does confer such eligibility in some circumstances.[171] Unlawful presence does not accrue during a stay of removal for purposes of the three- and ten-year bars on admission.[172]

***Order of Supervision*** (OSUP). If DHS does not remove an alien within ninety days of the date that a removal order becomes final—either because DHS cannot identify an appropriate destination country or because of practical or public interest-related considerations—in most cases DHS places the alien under an "order of supervision."[173] An OSUP requires the alien to check in periodically with DHS and may impose other restrictions.[174] DHS regulations provide for the grant of work authorization to aliens present pursuant to OSUPs—subject, however, to criteria stricter than those that govern work authorization for other types of discretionary reprieves.[175] An OSUP does not, by itself, suspend the accumulation of unlawful presence for purposes of the three- and ten year bars on admission.[176] At least one federal court has held that due process principles restrict the reasons and the manner in which DHS may revoke an OSUP.[177]

# Author Contact Information

Ben Harrington
Legislative Attorney
pharrington@crs.loc.gov, 7-8433

---

[168] The Board of Immigration Appeals (BIA) within EOIR, has administrative appellate jurisdiction over various matters decided by immigration judges in removal and other proceedings. 8 C.F.R. § 1003.1(b).

[169] *Id.* § 241.6 (DHS authority); *id*. § 1003.6 (BIA authority); *id*. § 1003.23(b)(1)(v) (immigration judge authority). A few provisions of the INA that concern discrete motions for relief or specific categories of aliens directly authorize or mandate stays of removal. *See* 8 U.S.C. § 1227(d)(2) (authorizing stays of removal for applicants for T or U nonimmigrant status); *id*. § 1229a(b)(5)(C) (providing for an automatic stay upon the filing of certain motions challenging *in absentia* removal orders); *id*. § 1231(c)(2) (authorizing stays of removal of aliens arriving at ports of entry).

[170] *See* 8 C.F.R. § 274a.12 (not listing stays of removal as a basis for granting work authorization).

[171] *Id.* § 274a.12(c)(18); *see* 8 U.S.C. § 1231(c)(3) (providing an alien who has been granted a stay of removal) may be released from detention pursuant to "conditions [that the Secretary of Homeland Security] may prescribe"); Heeren, *supra* note 28, at 1147 (explaining that individuals who receive stays of removal "typically" receive orders of supervision).

[172] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(I).

[173] *See* 8 U.S.C. § 1231(a)(3) (authorizing supervision after 90-day period); 8 C.F.R. § 241.5(a) (order of supervision).

[174] 8 C.F.R. § 241.5(a).

[175] *See* 8 C.F.R. § 274a.12(c)(18).

[176] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(6) ("Unless protected by some other provision . . . an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision . . . .").

[177] Ragbir v. Sessions, No. 18-CV-236 (KBF), 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018).

# DEF-INTERV.

# EX. 300

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE DIVISION

3   - - - - - - - - - - - - - - - - - - - - - - - - - x

4   STATE OF TEXAS, et al,

5                                   Plaintiffs,

6               -against-

7   UNITED STATES OF AMERICA, et al,

8                                   Defendants.

9   - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Case No.  1:14-cv-00254

11

12                      26 Federal Plaza
                        New York, New York
13

14                      June 19, 2018
                        1:00 p.m.
15

16          DEPOSITION of STATE OF TEXAS BY THE

17  WITNESS KENNETH PALINKAS, a Plaintiff herein, held

18  at the above place and time pursuant to Subpoena,

19  taken before Ephraim Jacobson, a shorthand

20  reporter and Notary Public within and for the

21  State of New York.

22

23

24

25

**Transcripts**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 40

```
1                    PALINKAS
2        Q.    Tell me the facts that support your
3  statement that USCIS management has over assigned
4  the workload for ISOs adjudicating DACA?
5        A.    When I was council president, I spoke to
6  people that worked at the service centers that
7  were tasked with adjudicating the DACA
8  applications, and the vast majority informed me
9  that they weren't necessarily aware of how many
10 were being done, but that there were a lot being
11 assigned, and they told me basically that the
12 application itself is kind of bare bone, and since
13 there's no interview, that they were being -- a
14 vast majority were being approved, extremely vast
15 majority.   I think like 95 percent were being
16 approved.   Very few were being denied.   That sends
17 off a red light.
18        Q.    I definitely understand, and I know that
19 that that is in that first paragraph, and we will
20 talk about that part of it.   But I wanted to try
21 to understand each element of what you were saying
22 here.
23        A.    Right.
24        Q.    So so do you have any specific facts
25 tied to the idea that work is over assigned to
```

**Page:** 41

```
1                    PALINKAS
2  adjudicators' indicators?
3        A.    I think the numbers that they were
4  coming up with demonstrate that.   Again, I don't
5  have that in front of me, the hard numbers, but
6  when I was told what they were back in 2012 I
7  think they started rolling it out, it seemed that
8  that was quite a high number.
9        Q.    When you say "that was quite a high
10 number," do you mean the number of approvals
11 relative to applications?
12        A.    No, just the number -- the number of
13 applications was again, there was so many that
14 were not denied.   So they were just being
15 processed into the computer based on the numbers
16 that I was presented.
17        Q.    Would it be fair to say then that your
18 statement about working over assigned for DACA
19 adjudicators is based on the overall number of
20 applications that were being processed?
21        A.    That's what I based it on, correct.
22        Q.    Would it also be fair to say that it's
23 the overall number of applications that are being
```

24 **processed that provide the basis for your**
25 **statement that USCIS management has not provide**

```
 1                        PALINKAS

 2                       CERTIFICATE

 3          I, Ephraim Jacobson, a shorthand

 4   reporter and Notary Public within and for the

 5   State of New York do hereby certify:

 6          That the witness whose testimony is

 7   hereinbefore set forth was duly sworn by me, and

 8   the foregoing transcript is a true and accurate

 9   record of the testimony given by such witness to

10   the best of my ability.

11          I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15

16

17                           _____

18                           Ephraim Jacobson

19

20

21

22

23

24

25
```

# DEF-INTERV.

# EX. 301

| Approximate Active DACA Recipients: Country of Birth As of May 31, 2018 | |
|---|---|
| **Country of Birth** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Mexico | 560,020 |
| El Salvador | 26,550 |
| Guatemala | 18,150 |
| Honduras | 16,680 |
| Peru | 7,260 |
| Korea, South | 7,180 |
| Brazil | 5,810 |
| Ecuador | 5,400 |
| Colombia | 4,940 |
| Argentina | 3,920 |
| Philippines | 3,820 |
| Jamaica | 2,590 |
| India | 2,590 |
| Venezuela | 2,430 |
| Dominican Republic | 2,330 |
| Uruguay | 1,950 |
| Trinidad And Tobago | 1,870 |
| Bolivia | 1,670 |
| Costa Rica | 1,570 |
| Chile | 1,400 |
| Nicaragua | 1,400 |
| Poland | 1,380 |
| Pakistan | 1,310 |
| Nigeria | 1,030 |
| Guyana | 970 |
| Belize | 830 |
| Canada | 740 |
| Indonesia | 710 |
| China | 690 |
| Kenya | 690 |
| United Kingdom | 500 |
| Portugal | 500 |
| Bangladesh | 470 |
| Mongolia | 470 |
| Ghana | 470 |
| Panama | 430 |
| Israel | 350 |
| Italy | 350 |
| Bahamas, The | 300 |
| Saint Lucia | 270 |
| Albania | 250 |
| Taiwan | 240 |
| Jordan | 230 |
| Turkey | 220 |

| | |
|---|---|
| Germany | 220 |
| Paraguay | 210 |
| Thailand | 200 |
| Saudi Arabia | 190 |
| Zambia | 190 |
| South Africa | 190 |
| Hong Kong | 180 |
| Egypt | 170 |
| United Arab Emirates | 170 |
| Armenia | 170 |
| Lithuania | 160 |
| France | 160 |
| Malaysia | 160 |
| Haiti | 150 |
| Ukraine | 150 |
| Senegal | 150 |
| Russia | 140 |
| Guinea | 140 |
| Grenada | 130 |
| Saint Vincent And The Grenadines | 130 |
| Cameroon | 130 |
| Japan | 130 |
| Sri Lanka | 130 |
| Côte D'Ivoire | 130 |
| Morocco | 120 |
| Zimbabwe | 120 |
| Gambia, The | 120 |
| Liberia | 120 |
| Suriname | 120 |
| Spain | 110 |
| Lebanon | 110 |
| Greece | 110 |
| Romania | 100 |
| Barbados | 100 |
| Sierra Leone | 100 |
| Czech Republic | 90 |
| Dominica | 90 |
| Fiji | 90 |
| Hungary | 90 |
| Malawi | 80 |
| Antigua And Barbuda | 80 |
| Tanzania | 80 |
| New Zealand | 80 |
| Bulgaria | 70 |
| Macedonia | 70 |
| Nepal | 60 |
| Uganda | 60 |
| Cabo Verde | 60 |
| Kuwait | 60 |
| Iran | 60 |
| Netherlands | 60 |

| | |
|---|---|
| Tonga | 60 |
| Montenegro | 60 |
| Angola | 50 |
| Australia | 50 |
| Mali | 50 |
| Slovakia | 40 |
| Democratic Republic Of Congo | 40 |
| North Vietnam | 40 |
| Uzbekistan | 40 |
| Singapore | 40 |
| Qatar | 40 |
| Yemen | 40 |
| Cambodia | 40 |
| Ethiopia | 30 |
| Togo | 30 |
| Virgin Islands, British | 30 |
| Serbia | 30 |
| Turks And Caicos Islands | 30 |
| Estonia | 30 |
| Saint Kitts And Nevis | 30 |
| Sweden | 30 |
| Yugoslavia | 30 |
| Samoa | 30 |
| Belgium | 30 |
| Syria | 30 |
| Bahrain | 30 |
| Congo | 30 |
| Austria | 20 |
| Gabon | 20 |
| Ireland | 20 |
| Vietnam | 20 |
| Botswana | 20 |
| Cayman Islands | 20 |
| Western Samoa | 20 |
| Netherlands Antilles | 20 |
| Belarus | 20 |
| Bermuda | 20 |
| Kosovo | 20 |
| Algeria | 10 |
| Georgia | 10 |
| Laos | 10 |
| Latvia | 10 |
| Switzerland | 10 |
| Ussr | 10 |
| Benin | 10 |
| Croatia | 10 |
| Denmark | 10 |
| Libya | 10 |
| Burkina Faso | 10 |
| Burundi | 10 |
| French Guiana | 10 |

| | |
|---|---|
| Guadeloupe | 10 |
| Oman | 10 |
| Azerbaijan | 10 |
| Iraq | 10 |
| Kazakhstan | 10 |
| Montserrat | 10 |
| Afghanistan | 10 |
| Moldova | 10 |
| Namibia | 10 |
| Niger | 10 |
| Macau | D |
| Madagascar | D |
| Slovenia | D |
| Central African Republic | D |
| Kyrgyzstan | D |
| Norway | D |
| Somalia | D |
| Cyprus | D |
| Lesotho | D |
| Aruba | D |
| Bosnia And Herzegovina | D |
| Mauritius | D |
| Rwanda | D |
| Brunei | D |
| Chad | D |
| Luxembourg | D |
| Tunisia | D |
| Cuba | D |
| Mauritania | D |
| Mozambique | D |
| Sudan | D |
| Tuvalu | D |
| Zaire | D |
| Bhutan | D |
| Eritrea | D |
| Micronesia, Federated States Of | D |
| Palau | D |
| Tajikistan | D |
| Turkmenistan | D |
| Anguilla | D |
| Burma | D |
| Guinea-Bissau | D |
| Malta | D |
| Marshall Islands | D |
| Mayotte | D |
| Papua New Guinea | D |
| Swaziland | D |
| Andorra | D |
| British Virgin Islands | D |
| Equatorial Guinea | D |
| Finland | D |

| | |
|---|---|
| French Polynesia | D |
| Germany, West | D |
| Iceland | D |
| Kiribati | D |
| Korea, North | D |
| Martinique | D |
| Monaco | D |
| New Caledonia | D |
| Palestine | D |
| Not available | 1,400 |

1) The report reflects the most up-to-date data available at the time the report is generated.

2) The active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.

3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4) Totals may not sum due to rounding.

5) Countries with fewer than 10 active DACA recipients are notated with the letter "D."

6) Not available means the data is not available in the electronic systems.

| Approximate Active DACA Recipients: State or Territory of Residence As of May 31, 2018 | |
|---|---|
| **State or Territory of Residence** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| California | 201,350 |
| Texas | 115,700 |
| Illinois | 37,170 |
| New York | 32,200 |
| Florida | 27,250 |
| Arizona | 26,260 |
| North Carolina | 25,660 |
| Georgia | 22,150 |
| New Jersey | 18,070 |
| Washington | 17,140 |
| Colorado | 15,880 |
| Nevada | 12,790 |
| Virginia | 10,430 |
| Oregon | 10,410 |
| Indiana | 9,500 |
| Utah | 9,160 |
| Maryland | 8,530 |
| Tennessee | 8,110 |
| Wisconsin | 7,090 |
| Oklahoma | 6,550 |
| New Mexico | 6,300 |
| Kansas | 6,110 |
| South Carolina | 6,090 |
| Massachusetts | 6,070 |
| Minnesota | 5,680 |
| Michigan | 5,640 |
| Pennsylvania | 4,860 |
| Arkansas | 4,790 |
| Alabama | 4,170 |
| Ohio | 4,050 |
| Connecticut | 4,000 |
| Missouri | 3,210 |
| Nebraska | 3,140 |
| Idaho | 2,930 |
| Kentucky | 2,890 |
| Iowa | 2,600 |
| Louisiana | 1,910 |
| Mississippi | 1,430 |
| Delaware | 1,360 |
| Rhode Island | 980 |
| District Of Columbia | 640 |
| Wyoming | 560 |
| Hawaii | 350 |
| New Hampshire | 280 |

| | |
|---|---:|
| South Dakota | 210 |
| West Virginia | 120 |
| North Dakota | 110 |
| Puerto Rico | 90 |
| Montana | 80 |
| Alaska | 70 |
| Maine | 40 |
| Virgin Islands | 40 |
| Vermont | 20 |
| Guam | 20 |
| Northern Mariana Islands | D |
| Armed Forces Americas (except Canada) | D |
| Armed Forces Pacific | D |
| American Samoa | D |
| Armed Forces Africa, Canada, Europe, Middle East | D |
| Federated States Of Micronesia | D |

1) *The report reflects the most up-to-date data available at the time the report is generated.*

2) *The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

3) *Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

4) *Totals may not sum due to rounding.*

5) *States/Territories with fewer than 10 active DACA recipients are notated with the letter "D."*

| Approximate Active DACA Recipients: Core Based Statistical Area As of May 31, 2018 | |
|---|---|
| **Core Based Statistical Area** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Los Angeles-Long Beach-Anaheim, CA | 89,120 |
| New York-Newark-Jersey City, NY-NJ-PA | 46,830 |
| Dallas-Fort Worth-Arlington, TX | 37,900 |
| Chicago-Naperville-Elgin, IL-IN-WI | 35,440 |
| Houston-The Woodlands-Sugar Land, TX | 35,440 |
| Riverside-San Bernardino-Ontario, CA | 24,230 |
| Phoenix-Mesa-Scottsdale, AZ | 22,650 |
| Atlanta-Sandy Springs-Roswell, GA | 15,620 |
| San Francisco-Oakland-Hayward, CA | 15,080 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 13,440 |
| San Diego-Carlsbad, CA | 11,470 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 10,970 |
| Las Vegas-Henderson-Paradise, NV | 10,240 |
| Denver-Aurora-Lakewood, CO | 10,040 |
| San Jose-Sunnyvale-Santa Clara, CA | 9,440 |
| McAllen-Edinburg-Mission, TX | 7,780 |
| Seattle-Tacoma-Bellevue, WA | 7,670 |
| Austin-Round Rock, TX | 7,660 |
| Portland-Vancouver-Hillsboro, OR-WA | 6,060 |
| Charlotte-Concord-Gastonia, NC-SC | 6,040 |
| Sacramento--Roseville--Arden-Arcade, CA | 5,950 |
| San Antonio-New Braunfels, TX | 5,500 |
| Fresno, CA | 5,260 |
| Bakersfield, CA | 5,180 |
| Salt Lake City, UT | 4,900 |
| Boston-Cambridge-Newton, MA-NH | 4,670 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 4,640 |
| Minneapolis-St. Paul-Bloomington, MN-WI | 4,450 |
| Oxnard-Thousand Oaks-Ventura, CA | 4,180 |
| Indianapolis-Carmel-Anderson, IN | 4,110 |
| Raleigh, NC | 3,860 |
| Visalia-Porterville, CA | 3,750 |
| Kansas City, MO-KS | 3,740 |
| Stockton-Lodi, CA | 3,590 |
| Nashville-Davidson--Murfreesboro--Franklin, TN | 3,420 |
| Tampa-St. Petersburg-Clearwater, FL | 3,290 |
| Santa Maria-Santa Barbara, CA | 3,170 |
| Salinas, CA | 3,140 |
| Modesto, CA | 3,070 |
| Oklahoma City, OK | 3,000 |
| Albuquerque, NM | 2,930 |
| Orlando-Kissimmee-Sanford, FL | 2,880 |
| Milwaukee-Waukesha-West Allis, WI | 2,860 |
| Santa Rosa, CA | 2,630 |

| | |
|---|---|
| Detroit-Warren-Dearborn, MI | 2,440 |
| Winston-Salem, NC | 2,330 |
| Brownsville-Harlingen, TX | 2,290 |
| Baltimore-Columbia-Towson, MD | 2,270 |
| Tucson, AZ | 2,210 |
| Salem, OR | 2,180 |
| Yakima, WA | 2,120 |
| Greensboro-High Point, NC | 2,070 |
| Bridgeport-Stamford-Norwalk, CT | 2,060 |
| Tulsa, OK | 1,970 |
| Merced, CA | 1,950 |
| Kennewick-Richland, WA | 1,950 |
| Durham-Chapel Hill, NC | 1,930 |
| Memphis, TN-MS-AR | 1,910 |
| Columbus, OH | 1,890 |
| Fayetteville-Springdale-Rogers, AR-MO | 1,830 |
| El Paso, TX | 1,770 |
| Reno, NV | 1,770 |
| Provo-Orem, UT | 1,750 |
| North Port-Sarasota-Bradenton, FL | 1,610 |
| Vallejo-Fairfield, CA | 1,610 |
| Cape Coral-Fort Myers, FL | 1,540 |
| Omaha-Council Bluffs, NE-IA | 1,540 |
| Grand Rapids-Wyoming, MI | 1,500 |
| Birmingham-Hoover, AL | 1,450 |
| Gainesville, GA | 1,430 |
| Santa Cruz-Watsonville, CA | 1,430 |
| Greenville-Anderson-Mauldin, SC | 1,410 |
| Ogden-Clearfield, UT | 1,390 |
| Laredo, TX | 1,360 |
| Providence-Warwick, RI-MA | 1,340 |
| Wichita, KS | 1,300 |
| Boise City, ID | 1,240 |
| Lakeland-Winter Haven, FL | 1,230 |
| Elkhart-Goshen, IN | 1,210 |
| Richmond, VA | 1,150 |
| Naples-Immokalee-Marco Island, FL | 1,150 |
| Louisville/Jefferson County, KY-IN | 1,080 |
| New Haven-Milford, CT | 1,080 |
| Des Moines-West Des Moines, IA | 1,040 |
| Cincinnati, OH-KY-IN | 1,030 |
| Greeley, CO | 1,030 |
| Madera, CA | 1,030 |
| St. Louis, MO-IL | 1,010 |
| Other CBSA | 97,100 |
| Non CBSA | 15,800 |
| Not available | 1,260 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

4) *Core Based Statistical Areas (CBSA) at the time of most recent application. CBSAs are defined by the Office of Management and Budget.*

5) *CBSA with less than 1,000 individuals are included in Other CBSA.*

6) *Not available means the data is not available in the electronic systems.*

7) *Totals may not sum due to rounding.*

| Approximate Active DACA Recipients: Gender As of May 31, 2018 ||
|---|---|
| **Sex** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Female | 369,480 |
| Male | 332,700 |
| Not available | 70 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems*

| Approximate Active DACA Recipients: Age Group As of May 31, 2018 ||
|---|---|
| **Age as of 4/30/18** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Under 16 | 2,030 |
| 16-20 | 183,310 |
| 26-30 | 172,880 |
| 31-36 | 86,880 |
| 21-25 | 257,140 |
| Not available | D |
| Average Age | 24.2 |
| Median Age | 24 |
| Interquartile Range | 20 to 28 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity at as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems.*

| Approximate Active DACA Recipients: Marital Status As of May 31, 2018 ||
|---|---|
| **Marital Status** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Single | 569,330 |
| Married | 121,780 |
| Divorced | 8,820 |
| Widowed | 270 |
| Not available | 2,050 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems.*

# DEF-INTERV.

# EX. 302

2009 WL 10669445
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, Austin Division.

ALL ACCESS TODAY, L.P., Plaintiff,
v.
ADERRA INCORPORATED, Defendant.

CAUSE NO. A-08-CA-498 LY
|
Signed 07/07/2009

**Attorneys and Law Firms**

Jeffery Robert Johnson, Reed & Scardino LLP, Lawrence A. Waks, Jackson Walker, L.L.P., Austin, TX, for Plaintiff.

John Karl Buche, Buche & Associates, PC, La Jolla, CA, Randall S.D. Jacobs, Bienstock & Michael, P.C., New York, NY, for Defendant.

<u>**INTERIM REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**</u>

ROBERT PITMAN, UNITED STATES MAGISTRATE JUDGE

**\*1 TO: THE HONORABLE LEE YEAKEL UNITED STATES DISTRICT JUDGE**
Before the Court are Defendant's Motion & Application for Preliminary Injunction and Request for Oral Hearing, filed January 23, 2009 (Clerk's Dkt. #38); Plaintiff All Access Today's Response to Aderra Incorporated's Application for Preliminary Injunction, filed February 16, 2009 (Clerk's Dkt. #45); Plaintiff's Motion to Strike the Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, filed March 4, 2009 (Clerk's Dkt. #58); Defendant's Reply Declaration in Support of Preliminary Injunction Against AAT, filed March 10, 2009 (Clerk's Dkt. #63); Opposition of Defendant Aderra Incorporated to Plaintiff's Motion to Strike the Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, filed March 11, 2009 (Clerk's Dkt. #66); Plaintiff's Motion to Preserve Confidentiality Designations, filed March 23, 2009 (Clerk's Dkt. #71);

Defendant's Opposition to Plaintiff's Motion to Preserve "Attorneys' Eyes Only" Designations, filed March 30, 2009 (Clerk's Dkt. #75); and Plaintiff's Reply to Defendant's Memorandum in Opposition to Motion to Preserve Confidentiality Designations, filed April 13, 2009 (Clerk's Dkt. #76). The Magistrate Court submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. BACKGROUND**

Plaintiff All Access Today (Plaintiff) initiated this suit on June 27, 2008 against Defendant Aderra Incorporated (Defendant) and Aderra UK, LTD (Aderra UK). Plaintiff is a limited partnership, established in 2004, that provides services for musicians. [1] Defendant also provides services to musicians and is a business that began in January of 2007 as a d/b/a of Motherboard, L.L.C. [2] and became and independent corporation in April of 2007. [3] Plaintiff raised several causes of action primarily arising out of the alleged improper use of Plaintiff's trademark "Live in a Flash" (the Mark).

[1]     (Declaration of Chris Guggenheim ¶ 3, Clerk's Dkt. #52 (Guggenheim Decl.))

[2]     (Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, Donnelly Declaration ¶ 15, Clerk's Dkt. #38 (Donnelly Decl.))

[3]     (*Id.* ¶ 45.)

Defendant and Aderra UK moved to dismiss the action for lack of personal jurisdiction. [4] Following a report and recommendation from this Court, [5] Judge Yeakel denied the motion in part and granted the motion in part, removing Aderra UK from the litigation for lack of personal jurisdiction on October 28, 2008. [6]

[4]     (Clerk's Dkt. #7.)

[5]     (Clerk's Dkt. #27.)

[6]  (Clerk's Dkt. #28.)

Defendant filed its answer and nineteen counterclaims on November 18, 2008. [7] The counterclaims are based, in part, on Defendant's assertion that it is the true owner of the Mark as well as several other phrases that share key words with the Mark. It appears that both Plaintiff and Defendant use the Mark and related phrases in association with recordings of events that are transferred to USB devices and sold immediately following the events. [8] For a time, Plaintiff and Defendant operated together under a joint venture agreement (JV Agreement). [9]

[7]  (Clerk's Dkt. #30.)

[8]  (Donnelly Decl. ¶ 12; Guggenheim Decl. ¶ 10.)

[9]  (Donnelly Decl. ¶ 41; Guggenheim Decl. ¶ 25.)

## II. CURRENT MOTIONS

**\*2** Premised on its counterclaims, Defendant requests that the Court enter a preliminary injunction to prohibit Plaintiff from:

> unfairly competing with [Defendant], from selling, advertising or any other use of [Defendant's] Mark and name, selling or advertising Re-Recordable USB Media Services and Re-Recordable USB Media products using [Defendant's] Technology and Proprietary Information, from using any infringing trademarks on such products or in connection with such services, from any future use by [Plaintiff] of [Defendant's] trademarks and copyrighted materials on websites and on promotional literature and protect [Defendant's] 50% interest in the profits of the joint venture which have been concealed and converted by [Plaintiff]. [10]

Defendant's motion for preliminary injunction is based, in large part, on the Declaration by Edward J. Donnelly

(Donnelly). Donnelly is the founder, president and principal stockholder of the Defendant. [11]

[10]  (Clerk's Dkt. # 38 at 38-39.)

[11]  (Donnelly Decl. ¶ 2.)

In addition to filing a response, Plaintiff also brings a motion to strike portions of Donnelly's declaration. As part of its response, Plaintiff submitted a declaration from Chris Guggenheim (Guggenheim) as well as numerous supporting documentation. Guggenheim is the chief executive officer of the Plaintiff. [12] The declaration was filed separately [13] and significant portions of it are sealed, marked confidential and/or marked attorneys' eyes only, as permitted by the protective order in place in this case. [14]

[12]  (Guggenheim Decl. ¶ 2.)

[13]  (*See* attachments to Clerk's Dkt. #53.)

[14]  (Clerk's Dkt. #51.)

Defendant replied to Plaintiff's response to Defendant's motion for preliminary injunction by filing a declaration by Defendant's attorney. In it, Defendant's attorney objects to the confidentiality designations made by Plaintiff. [15] As a response to Defendant's objections, Plaintiff moves to preserve the confidentiality designations.

[15]  (Clerk's Dkt. #63.)

## III. ANALYSIS

A preliminary injunction is an extraordinary remedy that the Court may only impose where the party requesting the injunction demonstrates (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction would not disserve the public interest. *Winter v. NRDC, Inc.*, —— U.S. ——, 129 S. Ct. 365, 374 (2008); *Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). To be successful, the party requesting the injunction must clearly carry the burden of persuasion on each of the four factors. *Southern Co. v. Dauben, Inc.*, No. 08-10248, 2009 U.S. App. LEXIS 7993

at *11 (5th Cir. April 15, 2009). If a party fails to carry its burden on one factor, then the injunction must be denied. *Id.* The party resisting an injunction may assert that a claim is defeated by an affirmative defense, in which case, the party asserting the defense has the burden of proving its success. *Conan Properties, Inc. v. Conans Pizza*, 752 F.2d 145, 152 (5th Cir. 1985).

**\*3** Defendant asserts that it is entitled to a preliminary injunction based on the following counterclaims: (1) unfair competition and false designations of origin in violation of 15 U.S.C. § 1125; (2) palming-off and misappropriation of confidential information; (3) false advertising in violation of 15 U.S.C. § 1125(a); (4) common law unjust enrichment; (5) breach of fiduciary relationship, breach of non-disclosure agreement, breach of "a relationship of trust & confidence," and civil conspiracy; (6) constructive trust; (7) dilution under Texas law; (8) tortious interference with existing business relations and prospective contracts; and (9) copyright infringement.

### A. Failure to Make Clear Showing of Irreparable Injury

Defendant must show that there is a substantial threat of irreparable injury if the injunction is not issued. *Winter v. NRDC, Inc.*, 129 S. Ct. at 374-75; *Paulsson*, 529 F.3d at 309. The mere possibility of an irreparable injury is not sufficient. *Winter*, 129 S. Ct. at 375 ("'possibility' standard is too lenient.") Instead, Defendant must prove that irreparable injury is *likely* in the absence of a preliminary injunction. *Id.* The focus is not on the magnitude of the harm, but on its irreparability. *Id.* The party seeking injunctive relief, faces a heavy burden of clearly establishing irreparable harm. *Id.*

### 1. Lack of Presumption of Irreparable Harm

Defendant asserts that it is entitled to a presumption of irreparable injury for its claim of trademark infringement because it has demonstrated that consumer confusion is likely. [16] However, the Fifth Circuit explicitly stated in *Paulsson* that it has refused to adopt this position. 529 F.3d at 312-13. In fact, the Fifth Circuit stated that, in light of the United States Supreme Court decision in *eBay v. MercExchange*, the presumption of irreparable injury in a trademark case is "a difficult question." *Id.* at 313 (citing *eBay v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837 (2006)).

[16] (Clerk's Dkt. #38 at 21.)

Guided by the Fifth Circuit's decision in *Paulsson*, an independent inquiry of the four preliminary injunction factors must be done, even in trademark infringement suits, to determine whether there is irreparable injury.

Absent a presumption of harm, Defendant states that it will suffer irreparable harm through:

> (1) loss of market share; (2) because it is unclear whether [Plaintiff has] the financial wherewithal to pay monetary damages; (3) because monetary damages would require additional expense ... (4) that the goodwill of [Plaintiff's] duplicate trademark will dilute the value of [Defendant's] Mark; and (5) that the use of confusingly similar marks by [Plaintiff] will harm [Defendant's] reputation— which money may never correct. [17]

[17] (*Id.* at 22.)

After conducting an independent inquiry, the undersigned concludes that Defendant has failed to prove that it would suffer an irreparable injury if the injunction were not imposed.

### 2. Delay in Requesting Injunction Disproves Irreparable Injury

It is difficult to determine that an injury is irreparable if there is a significant delay between a party's request for a preliminary injunction and its discovery of the facts that form the basis for its request. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975); *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F. Supp. 2d 608, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.")

**\*4** Donnelly, the founder, president, principal stockholder and representative of the corporate Defendant requesting the injunction, states that he

learned in June 2007 that Defendant's name had been removed from some of the technical systems used to create the USB drives. [18] Also in the summer of 2007, Guggenheim informed Donnelly that it planned to begin selling recordings on USB drives under the name "Live in a Flash." [19] Donnelly did not object. [20] Additionally, Donnelly states that in January 2008, Plaintiff created and used banners with the mark "Live in a Flash" on them. [21] Donnelly emphasis that Plaintiff took this action – "*without any authorization to use the Mark by [Defendant].*" [22] At this time, Donnelly states that Defendant's "intent to steal had become manifest." [23] At the end of January 2008, Donnelly claims he was "threatened" by an employee of Plaintiff who demanded software without Defendant's alleged Mark. [24] In February 2008, Donnelly noticed an article in Billboard Magazine where "*Guggenheim was quoted therein as saying that [Plaintiff] created the USB media for MB20 and Ringo Starr without any mention of [Defendant].*" [25]

[18]    (Donnelly Decl. ¶ 62.)

[19]    (Guggenheim Decl. ¶ 46.)

[20]    (*Id.*)

[21]    (Donnelly Decl. ¶ 108.)

[22]    (*Id.*, emphasis in original.)

[23]    (*Id.* ¶ 111.)

[24]    (*Id.* ¶ 114.)

[25]    (*Id.* ¶ 119, emphasis in original.)

Despite Defendant's repeated and continued concerns about the actions of Plaintiff, despite Defendant's allegations of months of threats, stolen technology, misidentification of product origin, and the "manifest" intent of Plaintiff to steal, Defendant took no legal action. Plaintiff, not Defendant, initiated this suit in June 2008. [26] Although Defendant requested injunctive relief in its counterclaims, filed in November 2008, [27] Defendant did not file this motion for a preliminary injunction until January of 2009. Defendant's request for the extraordinary remedy of injunctive relief was filed some time between twelve and eighteen months after the allegedly improper actions were first identified. Defendant's inaction of a year or more, coupled with

Defendant's decision to wait to request an injunction until after being sued by Plaintiff leads the undersigned to conclude that Defendant would not suffer an irreparable injury absent an injunction.

[26]    (Clerk's Dkt. #1.)

[27]    (Clerk's Dkt. #29, 30.)

Courts which have considered far shorter delays have concluded that the delay demonstrates a lack of irreparable injury. *See, e.g., Rimkus Consulting Group v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008) (no irreparable injury due to delay of one year); *Symetra Life Ins. v. Rapid Settlements,* No. H-05-3167, 2007 U.S. Dist. LEXIS 52234 at *39-40 (S.D. Tex. July 19, 2007) (thirteen month delay, no irreparable injury); *Wireless Agents, v. T-Mobile,* 82 U.S.P.Q.2D (BNA) 1779, No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS 36590 *13-15 (N.D. Tex. June 6, 2006) (one year delay, no irreparable injury); *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 354 (S.D. N.Y. 2008) (six month delay, no irreparable injury); *Gorman v. Coogan*, 273 F. Supp. 2d 131, 134-35 (D. Me. 2003) (one year delay, no irreparable injury); *J&J Snack Foods v. Nestle USA*, 149 F. Supp. 2d 136, 158 (D.N.J. 2001) (eight month delay, no irreparable injury); *Kusan v. Alpha Distribs.*, 693 F. Supp. 1372, 1375 (D. Conn. 1988) (seven month delay, no irreparable injury); *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) (ten week delay, no irreparable injury). *See also, GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (commenting that delay in requesting injunctive relief demonstrates "no sense of urgency" by the moving party); *Sci. Weight Loss v. United States Med. Care*, No. CV 08-2852 PSG (FFMx), 2008 U.S. Dist. LEXIS 84454 at *17 (C.D. Cal. Oct. 6, 2008) (motion to continue filed by moving party, no irreparable injury).

A significant delay, on its own, provides an independent reason for finding there is no irreparable injury. *See Tough Traveler v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("delay alone may justify a denial of a preliminary injunction"); *Adventure Plus Enters. v. Gold Suit, Inc.*, No. 3-06-CV-2032-BD, 2008 U.S. Dist. LEXIS 27220 at *3 (N.D. Tex. Apr. 2, 2008) (eighteen month delay, no irreparable injury, injunction denied solely for that reason); *Amicus Communications, L.P. v. Hewlett-Packard Co., Inc.*, No. SA-98-CA-1176-PMA, 1999 WL 495921 at *17-19 (W.D. Tex. June 11, 1999) (concluding no irreparable injury solely based on delay).

**\*5** The undersigned concludes that there is no irreparable injury due to the considerable amount of time that passed between Donnelly's discovery of the allegedly improper conduct and Defendant's application for a preliminary injunction. Given Defendant's inability to demonstrate irreparable harm, his application for a preliminary injunction should be denied.

## IV. ADDITIONAL PENDING MOTIONS

### A. Motion to Strike

Plaintiff seeks to strike portions of Donnelly's declaration that Plaintiff claims are not based on personal knowledge and are improper statements of opinion.[28] The undersigned did not rely on any of the challenged portions of Donnelly's declaration in reaching the recommendation above. Accordingly, Plaintiff's motion to strike portions of Donnelly's declaration is dismissed.

[28]   (Clerk's Dkt. #58)

### B. Motion to Preserve Confidentiality Designations

Several portions of Guggenheim's declaration and attached exhibits are sealed and/or designated as "attorneys' eyes only." Under the protective order in place in this suit, parties are permitted to designate information as "Confidential" or "For Counsel Only" or "Attorneys' Eyes Only."[29]

[29]   (Clerk's Dkt. #51.)

In lieu of a proper reply to its motion for preliminary injunction, Defendant's counsel filed a reply declaration.[30] He objected to the confidentiality designations of Guggenheim's declaration and attached exhibits. Under the protective order, if a party disagrees with the opposing party's confidentiality designation of a document, they must object in writing.[31] Within fourteen days of receiving an objection, the party that produced the confidential information must file a motion with the Court to preserve the confidentiality designations.[32]

[30]   (Clerk's Dkt. #63.)

[31]   (Clerk's Dkt. #51. at ¶ 9.)

[32]   (*Id.*)

As provided in the protective order, Plaintiff moved the Court to preserve its confidentiality designations.[33] Plaintiff insists that the information it sealed and marked "attorneys' eyes only" is sensitive and contains trade secrets, financial and customer information. Defendant's counsel insists that he must be permitted to show these confidential portions to Donnelly in order to properly reply to Guggenheim's factual assertions.

[33]   (Clerk's Dkt. #71.)

The undersigned did not rely on any of the confidential portions of Guggenheim's declaration in reaching the recommendation above. The undersigned concluded that the injunction should be denied due to Defendant's delay in seeking it. The facts in support of this conclusion are primarily drawn from Donnelly's declaration, not Guggenheim's, and there is no reason to show the confidential portions of the declaration to Donnelly. Therefore, Defendant has proffered no compelling reason to disturb the confidentiality designations adopted by Plaintiff at this time.

Accordingly, the undersigned overrules Defendant's objections to Plaintiff's confidentiality designations and grants Plaintiff's motion to preserve its confidentiality designations.

## V. RECOMMENDATION AND ORDERS

In accordance with the statements above, the undersigned **RECOMMENDS** that the District Court **DENY** Defendant's Motion & Application for Preliminary Injunction and Request for Oral Hearing, filed January 23, 2009 (Clerk's Dkt. #38).

**IT IS ORDERED** that Plaintiff's Motion to Strike the Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, filed March 4, 2009 (Clerk's Dkt. #58) is **DISMISSED**;

**\*6 IT IS FURTHER ORDERED** that the objections contained in Defendant's Reply Declaration in Support of Preliminary Injunction Against AAT, filed March 10, 2009 (Clerk's Dkt. #63) are **OVERRULED**;

**IT IS FINALLY ORDERED** that Plaintiff's Motion to Preserve Confidentiality Designations, filed March 23, 2009 (Clerk's Dkt. #71) is **GRANTED**.

## VI. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**All Citations**

Slip Copy, 2009 WL 10669445

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 303

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 63 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

1999 WL 495921
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, San Antonio Division.

AMICUS COMMUNICATIONS, L.P., Plaintiff,

v.

HEWLETT–PACKARD CO., INC., Defendant.

No. CIV.A.SA–98CA1176PMA.
|
June 11, 1999.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AND ORDER

MATHY, Magistrate J.

**\*1** Pursuant to the consent of the parties filed on May 17 and May 18, 1999, [1] the Court enters the following Findings of Fact and Conclusions of Law and Order in connection with the May 17 and May 27, 1999 hearings on plaintiff's motion for issuance of a preliminary injunction.

[1]     Docket nos. 37 and 38.

## I. JURISDICTION

The Court has jurisdiction over the trademark infringement claims. 28 U.S.C. §§ 1331, 1332, 1338(a); 15 U.S.C. § 1121. The Court has supplemental jurisdiction over plaintiff's state law claim of dilution. 28 U.S.C. § 1367.

## II. PROCEDURAL HISTORY

This case concerns claims of alleged trademark infringement and dilution. On December 23, 1998, plaintiff, Amicus Communications, L.P. (hereinafter "plaintiff" or "Amicus" or "ACLP") filed its lawsuit under 5 U.S.C. §§ 1114 and 1125, Tex.Bus. & Com.Code § 16.29 and the common law. Plaintiff asserts that defendant, Hewlett–Packard Co., Inc. (hereinafter "defendant" or "Hewlett–Packard" or "HP") uses the product name "PAVILION" in order to produce, market

and sell its line of personal computers which feature software and design features to ease access to the internet and thereby infringes and dilutes plaintiff's federally registered trademark PAVILION®. [2] Plaintiff uses the PAVILION® mark in association with its provision of on-line communication services to affinity groups over the internet. [3] Plaintiff claims defendant's alleged illegal use of the PAVILION® mark has resulted in damages and a likelihood of further damage and injury through declining sales, loss of good will and profits, and plaintiff's loss of control over its own mark by reverse confusion. [4] Pursuant to its verified original complaint, plaintiff seeks preliminary and permanent injunctive relief and damages. [5] The defendant filed its answer on February 1, 1999. [6] The Court entered a Scheduling Order on February 5, 1999. [7]

[2]     Docket no. 1 at 1, 16–19.

[3]     *Id.* at 5.

[4]     *Id.* at 17.

[5]     *Id.* at 19–20.

[6]     Docket no. 4.

[7]     Docket no. 5.

On March 23, 1999 plaintiff filed its motion for issuance of a preliminary injunction. [8] In brief, plaintiff argues in its motion that it is entitled to an injunction to prevent defendant from using the name PAVILION during the course of this lawsuit and an expedited evidentiary hearing because of the existence of disputed fact issues in the case. [9] Plaintiff contends that defendant's use of the brand name PAVILION on personal computer systems designed to facilitate internet access infringes upon plaintiff's federally registered trademark protecting its right to use PAVILION® in conjunction with "providing ... affinity groups access to" the internet. [10] In response, defendant argues, in brief, that plaintiff's "emergency" motion for preliminary injunction is unfounded because plaintiff has been aware of sales of defendant's PAVILION brand multimedia home computers at least since September 1995 but waited more than three years before asking for an injunction. [11] Under these circumstances, defendant argues, preliminary relief should be refused on the ground that the delay in seeking it undercuts any credible claim

1999 WL 495921

of irreparable injury. [12] Further, defendant claims there is no likelihood of confusion supporting a presumption of irreparable harm.

[8]    Docket no. 10.

[9]    Docket no. 11 at 3–4.

[10]    Docket no. 11 at 5 and Exhibit 4.

[11]    Docket no. 12 at 1.

[12]    *Id.* at 4.

**\*2** After the filing of the motion for preliminary injunction, the parties were asked to confer to attempt to reach an agreement as to the schedule to apply to the disposition of the motion by the Court. On April 1, 1999 the parties filed simultaneous advisories as to their negotiations and respective recommendations as to the scheduling of the motion for preliminary injunction. [13] On April 6, 1999 [14] the Court entered an Order which established a briefing schedule on the motion for preliminary injunction and set the hearing for Monday, May 17, 1999. [15] On April 28, 1999 defendant filed a motion which asked the Court to amend the April 6, 1999 scheduling order. [16] The Court declined to modify that scheduling order in any respect other than to provide that if the in-court testimony of witnesses was required, that such testimony would not occur until May 24, 1999. [17]

[13]    Docket nos. 11 and 12.

[14]    This case initially was referred to Magistrate Court for pretrial matters on January 21, 1999 (docket no. 2). The referral order expressly did not refer motions for temporary, preliminary or permanent injunctive relief. The District Court entered an order specially referring the motion for preliminary injunction on April 6, 1999 (docket no. 13). Later, the parties consented.

[15]    Docket no. 14. This Order summarizes some of the key differences between the parties as to whether the motion for preliminary injunction should be joined with the merits of the case, whether a hearing should be held on the motion, the scope of the hearing, and the briefing schedule.

[16]    Docket no. 18.

[17]    Docket no. 20.

On May 17, 1999 the Court held a hearing on plaintiffs' motion for preliminary injunction. Prior to the hearing, each side filed affidavits, declarations, deposition excerpts and briefs. [18] At the hearing, the Court heard arguments from the parties as to their respective positions on the propriety of preliminary injunctive relief. Following the hearing, the Court entered a schedule to govern the parties' respective submission of additional matters to the Court and, with the concurrence of the parties, provided that any hearing to consider plaintiff's testimony regarding, most particularly, likelihood of confusion would be held on Thursday, May 27, 1999, following the Court's review of the evidentiary submissions of the parties.

[18]    Many of these items, as well as certain of the exhibits introduced into evidence at the May 27, 1999 hearing, were sealed pursuant to the confidentiality agreement between the parties as enforced by the protective order of the Court (docket no. 32). The protective order as well as the inherent authority of the Court allows the Court to order disclosure beyond the terms of the protective order (*see* docket no. 32 ¶ ¶ 7, 10 and 13). The Court concludes that the instant Order need not be sealed indefinitely because the confidential information herein has been referred to in unsealed court proceedings and/or because the Court considers such references to be necessary for proper documentation of the findings and conclusions. Nevertheless, this Order shall be temporarily sealed only for seven (7) days following filing so that the parties may have the opportunity to address redaction with the Court by submitting a proposed redacted Order within that period.

On May 27, 1999 the Court held an evidentiary hearing. Two witnesses, Bernard Lane and Dennis Passovoy, testified for plaintiff. The parties agreed to confer regarding testimony from a third witness and, on June 7, 1999, plaintiff tendered the deposition testimony of Dr. Joseph Picken. [19] Defendant elected to call no witnesses.

[19]    May 27, 1999 hearing, Plaintiff's Exhibits 34 and 35.

### III. ISSUE

Has plaintiff satisfied its burden of proving entitlement to a preliminary injunction to prevent defendant from

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 65 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

infringing and diluting use of the PAVILION® mark during the pendency of this lawsuit?

## IV. DISCUSSION: FINDINGS OF FACT; CONCLUSIONS OF LAW

A. *Preliminary Injunction Standards*

In this Circuit, the test for entitlement to a preliminary injunction has four parts. A preliminary injunction may be granted *only* if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. [20] A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. [21] These four elements are mixed questions of law and fact. [22]

[20]   *See e.g., Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Commission,* 123 F.3d 321, 325 (5th Cir.1997), *cert. denied,* 118 S.Ct. 1514 (1998); *Sunbeam Products, Inc., v. West Bend Company,* 123 F.3d 246, 250 (5th Cir.1997), *cert. denied,* 118 S.Ct. 1795 (1998); *Cherokee Pump & Equipment Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994); *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990).

[21]   *Valley v. Rapides Parish School Board,* 118 F.3d 1047, 1050 (5th Cir.1997).

[22]   *Sunbeam Products, Inc.,* 123 F.3d at 250.

**\*3** The Fifth Circuit reviews the district court's factual findings only for clear error, but it reviews the district court's legal conclusions *de novo.* Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision based on erroneous legal principles is reviewed *de novo.* [23] The Fifth Circuit has consistently held that likelihood of confusion is a question of fact, reviewed under the clearly erroneously standard. [24]

[23]   *Id.* (citing *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989)).

[24]   *Amstar v. Domino's Pizza,* 615 F.2d 252 (5th Cir.), *cert. denied,* 449 U.S. 899 (1980) (injunction reversed as clearly erroneous).

An evidentiary hearing is not always required before a court denies a preliminary injunction. If factual matters are not in dispute, no oral hearing is required and the parties need only be given "ample opportunity to present their views of the legal issues involved." [25] On the other hand, "when factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." [26] The basic question is whether the hearing will add anything material to the Court's consideration of the case. [27] Evidence at a hearing on a preliminary injunction need not be "testimonial" and affidavits may be considered by the Court. [28]

[25]   *Kaepa v. Achilles,* 76 F.3d 624, 628 (5th Cir.), *cert. denied,* 117 S.Ct. 77 (1996). *See Miller Brewing Co. v. Ft. Worth Distributing Co.,* 781 F.2d 494, 496 (5th Cir.1986); *Commerce Park at DFW Freeport v. Mardian Construction Co.,* 729 F.2d 334, 341 (5th Cir.1984). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467, 470 (1st Cir.1995); *Stanley v. University of Southern California,* 13 F.3d 1313, 1326 (9th Cir.1994)(no abuse of discretion to deny a party's right to call witnesses).

[26]   *Kaepa,* 76 F.3d at 628; *Commerce Park at DFW Freeport,* 729 F.2d at 341.

[27]   *Cf., Parker v. Ryan,* 959 F.2d 579, 584 (5th Cir.1992); *Worlds of Wonder, Inc. v. Veritel Learning System, Inc.,* 658 F.Supp. 351, 354 n.2 (N. D.Tex.1986).

[28]   *E.g., Miller Brewing Co.,* 781 F.2d at 496; *Worlds of Wonder,* 351 F.2d at 354 n.2.

An important issue of contention between the parties reflected in the advisories concerns the need for testimonial evidence at the hearing. Plaintiff argues that it wishes to call witnesses. [29] Defendant maintains that no testimonial evidence is required and that testimony by way of affidavit and/or deposition would be sufficient. [30] In this case, the Court held hearings on May 17 and May 24, 1999 because it determined that a hearing would assist the Court to properly ascertain the facts and to render a decision in accordance with the evidence and the law. [31] Defendant opposed an evidentiary hearing,

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 66 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

stating, in effect, its willingness to assume for the purposes of argument that plaintiff's factual averments are true, but argued that the preliminary injunction must be denied because plaintiff has not met its burden of proving an entitlement to injunctive relief.

29    Docket no. 11 at 7.

30    Docket no. 12 at 2.

31    FED. R. CIV. P. 65. *Cf., Parker,* 959 F.2d at 584; *Worlds of Wonder, Inc.,* 658 F.Supp. at 354 n.2.

The Court has considered plaintiff's arguments—as contained in the complaint, its motion for preliminary injunction, briefs, affidavits, declarations and deposition excerpts submitted in connection with the May 17 hearing and the oral arguments made at the May 17 hearing —as well as defendant's answer, responsive brief, the affidavits, declarations and deposition excerpts submitted in connection with the May 17 hearing and the oral arguments made at the May 17 hearing. The Court has adopted the approach, inferentially suggested by defendant, and has focused on the legal conclusions to be drawn from plaintiff's version of the facts, as measured against plaintiff's burden in seeking a preliminary injunction. In connection with the "fact-intensive inquiries" [32] relating to likelihood of confusion, the parties were allowed to present in-court testimony of witnesses on May 27, 1999, as supplemented on June 8, 1999. [33] For the purposes of this Order, to the extent that any disputed fact is relied upon, the May 17 and May 27 hearings allowed plaintiff adequate opportunity to present its version of those disputed facts in support of its legal arguments.

32    *Society of Financial Examiners v. National Assoc. of Certified Examiners, Inc.,* 41 F.3d 223, 224–25 (5th Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247 (1995)(summary judgment was not appropriate mechanism to determine likelihood of confusion).

33    On June 8, 1999 plaintiff supplemented the record of the May 27, 1999 through the filing of Plaintiff's Exhibits 34 and 35 consisting of the June 3, 1999 deposition of Dr. Joseph Picken.

### B. *Plaintiff Has Not Met Its Burden of Showing Entitlement to a Preliminary Injunction*

**\*4** Plaintiff's complaint and motion for injunctive relief asserts two primary claims: federal trademark infringement and a violation of the Texas anti-dilution statute. These claims will be examined in the context of plaintiff's burden of proof in seeking a preliminary injunction. Prior to an analysis of the facts in light of the applicable legal standards, a brief summary of background facts is undertaken.

### 1. *Introductory Factual Findings*

ACLP is a limited partnership formed by Bernard "Rick" Lane in 1993. [34] Initially, two principal operating divisions were created within ACLP: Alumnet (or Affinity) services and Amicus Networks (later known as ANI). [35] ACLP created the Toolbelt® software to publish restricted access web sites or extranets [36] accessible through the internet. [37] ACLP also used the software to promote the creation of a series of proprietary web sites or intranets accessible to the alumni of various universities (Alumnet) and to others with affiliations (*e.g.,* Faithnet and Armenianet). [38] ACLP decided to market its communications services under the trade name PAVILION. [39] On August 2, 1994, ACLP filed an intent-to-use application to register the mark PAVILION®. [40] In October 1994 ACLP acquired the internet domain name *www.pavilion.com.* [41] On November 20, 1995 Lane prepared a "declaration stating use" which represented that the first use in commerce of PAVILION® occurred on July 13, 1994 in connection with a demonstration of services to the University of Texas ex-Students' Association. [42]

34    Docket No. 36, Lane Declaration ¶ 4; May 27, 1999 Lane testimony.

35    May 27, 1999 Lane testimony; Passovoy testimony. At some other times, ACLP has conducted its business through other divisions. Docket No. 36, Lane Declaration ¶ 17.

36    Docket No. 36, Lane Declaration ¶ 13; Aroian Declaration ¶ 5. As used by ACLP, "extranets" are password-protected secure sites on the internet for the exchange of information; "intranets" are sites on the internet to receive or post information but are not alleged to be secure.

37    Docket No. 36, Lane Declaration ¶ 6; Aroian Declaration ¶¶ 3, 4: ANI was spun-off from ACLP in July 1996. ACLP owns in excess of 80% of ANI

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 67 of 98

1999 WL 495921

and controls ANI. Lane is President of the general partner of ACLP and Chairman of the Board of ANI. Passovoy is the CEO of ANI. Both ACLP and ANI are involved in activities which involve the mark PAVILION®. May 27, 1999 Lane testimony; Passovoy testimony.

38    Docket No. 36, Lane Declaration ¶¶ 17, 18; Aroian Declaration ¶ 5; May 27, 1999 Lane testimony; Passovoy testimony.

39    Docket No. 36, Lane Declaration ¶ 8.

40    Docket No. 36, Lane Declaration ¶ 11.

41    *Id.* at ¶ 9.

42    Docket No. 36, Lane Declaration ¶¶ 10, 11 and Exhibit C. Lane states that the declaration of use was prepared on November 20, 1994 but Exhibit C bears a 1995 date. The 1988 Trademark Revision Act authorizes filing applications to register trademarks based on an "intent to use" the mark on goods in commerce as well as on actual use. 15 U.S.C. § 1051. Section 5D[2][b] of the Act provides that no registration may issue until the applicant begins actual use of the mark. 15 U.S.C. § 1051(d). After registration, the application filings, whether based on actual use or on intent to use, become nationwide "constructive" use of the mark for priority. 15 U.S.C. § 1057(c). Defendant alleges that ACLP's declaration of first use was not filed until December 15, 1995. Docket No. 27, Hurst Affidavit, Exhibit F. For purposes of this Order, the Court considers ACLP's declaration of first use to have been filed on the date it was executed, November 20, 1995. In other words, this Order presumes ACLP's priority. On June 7, 1999, HP filed a motion for leave to file a counterclaim seeking the cancellation of ACLP's mark, an action which has the effect of challenging ACLP's priority. Docket nos. 55 and 56, Exhibit A ¶¶ 7–10.

Customers and proposed customers of ACLP are affinity groups or, more specifically, those individuals wishing to facilitate internet communications among members of an affinity group ("sponsors"). 43 ACLP has received revenue from sponsors of a web site and from advertisers who pay so that their ads appear on the intranets and extranets. 44 ACLP has never provided internet services under the PAVILION® mark as an internet service provider ("ISP"). 45 In January 1995 ACLP signed its first contract for an intranet site with Virginia

Tech. 46 In June 1995 ACLP contracted with Worchester Polytechnic Institute for an intranet site which was handed over to the client to administer in October 1995. 47 A Chevrolet dealer in Austin, Texas became a client for PAVILION® services in June 1995. 48 Current clients of ACLP include Virginia Tech's use of Alumnet services at *www.vt.alumnet.com.,* Armenianet, and Faithnet. 49 First USA is a sponsor of the Virginia Tech Alumnet site and is linked to Armenianet. 50 The PAVILION® services offered or promoted through Alumnet, Armenianet, Faithnet and the *www.amicus.com* and *www.pavilion.com* web sites are not password-protected but do require registration. 51 As a part its business, ACLP began exploring video-teleconferencing services for its customers as part of its package of communication services in mid–1998 and has been implemented. 52

43    Docket No. 36, Lane and Aroian Declarations; Docket No. 27, Hurst Affidavit, Exhibit H.

44    May 27, 1999 Lane testimony.

45    May 27, 1999 Lane testimony; *see also* docket no. 56, Exhibit B.

46    Docket No. 36, Lane Declaration ¶ 9.

47    *Id.*

48    Docket No. 36, Lane Declaration, Exhibit C (exhibits to intent-to-use application). These services were in effect until September 1996.

49    Docket No. 36, Lane Declaration ¶¶ 18, 19.

50    *Id.* at ¶ 17.

51    May 17, 1999 argument.

52    Docket No. 36, Aroian Declaration ¶ 10; May 27, 1999 Passovoy testimony.

**\*5** ANI, a spin-off of ACLP, offers so-called password-protected restricted access extranet web sites primarily to broker-dealers and financial services clients who pay approximately $100,000 for those services. 53 Defendant alleges that the services for broker-dealers are created using Toolbelt® software but are not offered under the PAVILION® mark. 54 Rather, HP contends that ANI uses the terms "PARTNER PAVILION" and "MY PAVILION TOOLS" to market its services. Indeed, HP argues that plaintiff's only uses of the word "pavilion"

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 68 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

are in the domain name *www.pavilion.com* and the links to that site using buttons on the Virginia Tech alumnet site and the Armenianet site labeled "pavilions." [55] Although the evidence establishes that ANI uses variants of "PAVILION" in connection with its services, for the purposes of this Order the Court considers that both ACLP and ANI use and/or intend to use the PAVILION® mark. [56] The evidence also shows that there is an existing federal registration for the mark PARTNER PAVILION® which is held by an un-related third party. [57] Current clients of ANI consist of broker-dealers and financial services entities/individuals. [58]

[53]    Docket No. 27, Hurst Affidavit, Passovoy Deposition; May 27, 1999 Passovoy testimony; Docket No. 36, Aroin Declaration ¶ 4.

[54]    Docket No. 25, Defendant's Brief at 8 and 9. On June 1, 1999 defendant filed a redacted copy of this brief, docket no. 54, which is identical to the original brief, docket no. 25, except that certain information considered to be confidential has been deleted. The Court in this Order refers only to the unredacted brief.

[55]    Docket No. 25, Defendant's Brief at 8–9.

[56]    Docket No. 36, Aroian Declaration ¶¶ 4 ("ANI also provides support services to ACLP accounts which utilize PAVILION services.") and 5 ("Beginning in early 1998, we ...(ANI) ... began marketing PAVILION as PARTNER PAVILION ....").

[57]    Docket No. 25, Defendant's Brief at 10 n.9. PARTNER PAVILION® is the registered mark of Symbol Technologies, Inc. for arranging, conducting and promoting trade show exhibitions in the field of "bar code data capture systems, portable data terminals, and radio frequency communication products, and software." Docket No. 27, Hurst Affidavit at ¶ 7 and Exhibit C at 54. HP also argues that the practice of ACLP in pluralizing PAVILION and in using words, such as PARTNER, to modify PAVILION show that ACLP inappropriately uses the mark as a noun, increasing its suggestiveness if not converting it to a descriptive mark. This factor is further considered below in reference to the "strength of the mark" digit of confusion.

[58]    Docket No. 36, Aroian Declaration ¶ 4.

At the May 17 hearing, ACLP represented that there are approximately 30,000 end users of PAVILION® services, with approximately 1,000 users of the services each day.

Passovoy testified on May 27 that ANI has approximately 24 broker-dealer clients who maintain approximately 28,000 financial planner accounts which, in total, register approximately 1,000 unique log-ins each day.

Registration of PAVILION® issued to ACLP on May 14, 1996. The United States Patent and Trademark Office registration certificate indicates that a federal service mark issued to ACLP for PAVILION®, typed in block letters, for the following service:

> Providing educational institutions and for-profit, non-profit and affinity groups access to an international digital electronic information and communication network for the transfer and dissemination of a wide range of information .... [59]

[59]    Docket No. 36, Lane Declaration, Exhibit D.

HP test-marketed its then-newly developed home computer in one nation-wide retailer, Circuit City, in April 1995. [60] This was HP's first entry into the home computing market as opposed to the business computing market in which HP had already established a competitive market. [61] On May 9, 1995 HP received an in-house legal opinion clearing the use of the mark PAVILION as a brand name for its home computer. [62] On June 12, 1995 —approximately ten months after the filing of the ACLP intent-to-use mark application—HP filed its trademark application for the PAVILION mark alleging a first use in commerce of August 14, 1995. [63] In August 1995, HP–PAVILION PCs were launched nationwide through placement in nine nation-wide retail outlets. [64] Lane first became aware of HP's intent to use the PAVILION name in September 1995. [65] In October 1996 HP's application was published for opposition. On January 31, 1997 ACLP filed its opposition to the HP trademark application. [66] The opposition proceeding is still pending. According to the uncontested data submitted by HP, the HP–PAVILION has enjoyed significant success in the market place. Approximately two million HP–PAVILION home computers have been sold from approximately April 1995 through the Spring of 1999. [67]

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 69 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

60 Each home computer sold in the market test was labeled "HP Multimedia PC." Docket No. 25, Defendant's Brief at 2. Docket No. 36, McKinney Deposition, Exhibit 29.

61 Docket No. 25, Defendant's Brief at 2; docket No. 27, Pedersen Affidavit ¶ 5.

62 Docket No. 36, Lemley Declaration, Exhibit D.

63 Docket No. 36, Braun Deposition, Ex. 68.

64 Docket No. 36, McKinney Deposition, Exhibit 29.

65 May 27, 1999 hearing, Lane testimony. Docket No. 36, Lane Declaration ¶ 21 and Exhibit I. Exhibit I ¶¶ 7–10 reflects that HP filed an Amendment to Allege Use on September 7, 1995 which claimed a first use in commerce on August 14, 1995. HP filed a trademark application on June 12, 1995, as amended on May 24, 1996 and July 22, 1996. *See also* Docket No. 27, Hurst Affidavit, Exhibit A. In his deposition, Lane testified he may have been aware of HP–PAVILION in August 1995. Docket No. 27, Hurst Affidavit at 1.

66 Docket No. 36, Lane Declaration, Exhibit I.

67 Docket No. 27, Pedersen Affidavit ¶ 14.

**\*6** On May 30, 1996—or, 16 days after ACLP's trademark issued and approximately eight months after Lane became aware of the HP–PAVILION—ACLP wrote a letter to HP protesting HP's use of the name PAVILION as a brand name.[68] HP responded that it considered that there would be little likelihood of confusion between the two uses but offered to negotiate a resolution with ACLP.[69]

68 Docket No. 36, Lane Declaration ¶¶ 19 and 21 and Exhibit G; docket No. 36, Mosleh Deposition, Exhibit 17.

69 Docket No. 36, Lane Declaration, Exhibit H.

ACLP argues that since the introduction of the HP–PAVILION, HP has continued to "expand" its market to promote internet access, an argument that will be addressed further below. For purposes of preliminary factual findings, the record shows that in January or February 1997 HP added a "one-touch" internet access button which made it easier for customers to reach the internet.[70] The internet short-cut key is pre-programmed to take the user to a screen offering a set number of hours of free full internet access.[71] On June 30, 1998

HP introduced its Message Board service which allowed the customer and those with that customer's password to share information on the internet.[72] Plaintiff argues that the Message Board was a system to allow affinity groups to exchange information.[73] HP subsequently discontinued the Message Board feature.[74] Although HP–PAVILION PCs were always "internet-ready" and although America on Line ("AOL"), Microsoft Network ("MSN") and other ISPs always were bundled with HP–PAVILION PCs,[75] ACLP argues that on August 31, 1998 HP began to specially promote AOL access through HP–PAVILION PCs.[76] Currently, HP offers a General Telephone and Telegraph ("GTE") web browser with 50 free hours of internet access to make it easier for the consumer to begin internet service.[77] After the free hours have been used, the user may discontinue access to the internet, pay to continue ISP through GTE, or contract with another ISP of the consumer's choosing and re-program the key to work with that provider.[78] In addition, HP–PAVILION PCs offer desk top icons for AOL and MSN, each of which also offer internet access, if the owner chooses.[79] Finally, one-touch Yahoo! access[80] would allow the customer to reach a "personalized internet start page" containing news, entertainment, horoscopes, weather reports, clubs and items of specialized interest offered by HP, such as information about new products.[81] The Yahoo portal, AOL and the internet access in general allow a user of an HP–PAVILION to access chat rooms and personalized market portfolios. HP established an internet site at the address of *www.hp-at-home.com* where individuals may learn about HP products or seek on-line help with computer problems.[82]

70 *See* Docket No. 27, Pedersen Affidavit, Exhibit A.

71 Docket No. 36, McKinney Deposition, Exhibits 29 and 45; *see also* exhibit 46.

72 Docket No. 36, McKinney Deposition at 79; docket No. 36, Lane Declaration ¶ 23 ("The Message Board provided the same functions as our TOOLBELT software."). Defendant argues in its brief that Lane has conceded that Message Board was not equivalent to Toolbelt as Toolbelt is a complex, expensive suit of software which costs $50,000–$100,000.

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 70 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

73    Docket No. 36, McKinney Deposition exhibits; Lane Declaration ¶ 23: "By the fall of 1998 ... our own expansion of use was running into direct conflict and confusion with HP's use of PAVILION ."

74    Docket No. 27, Hurst Affidavit, Haddock deposition; docket No. 36, McKinney Deposition at 84 (Message Board not offered on Summer 1999 product release).

75    Docket No. 36, McKinney Deposition at 53, 73 and 89.

76    Docket No. 36, Lane Declaration ¶ 23.

77    Docket No. 36, McKinney Deposition at 73 and 75. Glazer testified that there are typically two ways of accessing the internet: from an ISP, a company that sells access to the internet, or from an on-line service such as AOL or Microsoft Network ("MSN"), which offer internet access as well as access to its own private network. Docket No. 30 at 3. The process of accessing a web site was described in *Maritz, Inc. v. CyberGold, Inc.,* 947 F.Supp. 1328, 1329 (E.D.Mo.1996), as follows:

> Any internet user can access any web site, of which there are presumably hundreds of thousands, by entering into the computer the internet address they are seeking. Internet users can also perform searches on the internet to find websites within targeted areas of interest. Via telephone lines, the user is connected to the web site, and the user can obtain any information that has been printed at the web site for the user. The user can also interact with and send messages to that web site. Upon connecting to a web site, the information is transmitted electronically to the user's computer and quickly appears on the users screen.

78    Docket No. 36, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶¶ 10–12.

79    *Id.* at ¶ 12. MSN has been bundled by Microsoft with the Microsoft Windows operating system.

80    Docket No. 36, Lane Declaration ¶ 23; McKinney Deposition at 92–94. On May 17, particularly, there was argument concerning a co-branding agreement between HP and Yahoo! to provide an internet portal through a one-touch Yahoo! key on HP–PAVILION PCs. Plaintiff's counsel argued that HP–PAVILIONS were being sold with a branded My Yahoo! key. Defense counsel argued that the services had not yet been offered. For purposes of this Order, the Court finds that HP currently offers Yahoo! as an internet portal. Docket No. 36, McKinney Deposition at 92–93; May 27, 1999 hearing, Plaintiff's Exhibits 34, Picken Deposition at 52–53..

81    Docket No. 36, McKinney Deposition at 93–94. Docket no. 16 at 16; docket No. 36, Lane Declaration ¶ 23; McKinney Deposition, Exhibit 45 (HP wishes to provide "interactive community" for new HP users). ACLP also argued that HP offered other services with a co-branding agreement with Yahoo! but HP stated at the May 17 hearing that at least an aspect of the Yahoo! agreement had not yet been implemented.

82    The consumer separately must have an ISP to access this site, however. Docket No. 36, McKinney Deposition at 72.

### 2. *Likelihood of Success on the Merits*

#### a. Trademark Infringement

To prove trademark infringement under 15 U.S.C. § 1114(1)(a), ACLP must show that: (a) HP used ACLP's registered mark without consent;[83] (b) the use was in connection with the sale of goods or services; and (c) the use was likely to "create confusion in the minds of potential purchasers as to source, affiliation or sponsorship of the parties' products."[84] HP does not contest that it has marketed personal computers under the brand name PAVILION. HP does not allege that it had received the permission of ACLP to use the name PAVILION for the marketing of HP personal computers. HP does not contest that its use of PAVILION as a brand name for HP personal computers was in connection with the sale of goods in commerce. But, HP strenuously denies that its use of the PAVILION name was and is likely to "create confusion in the minds of potential buyers as to the source, affiliation, or sponsorship of the parties' products."[85] As in most trademark infringement cases, in this case, likelihood of confusion is the touchstone of the trademark infringement analysis.[86] Likelihood of confusion is "synonymous with a probability of confusion, which is more than a mere possibility of confusion."[87]

83    Proof of registration of a trademark is only *prima facie* evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration. A registration only becomes incontestable or conclusive evidence of the exclusive right to use a mark after five years of continuous use,

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 71 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

subject to a few enumerated defenses. 15 U.S.C. §§ 1065, 1115.

84    *Society of Financial Examiners,* 41 F.3d at 227.

85    Docket No. 54, Defendant's Brief. *See also National Football League Properties v. Playoff Corp.,* 808 F.Supp.1288, 1291 (N.D.Tex.1992).

86    *Society of Financial Examiners,* 41 F.3d at 225; *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 794 F.2d 591, 594 (5th Cir.1985).

87    *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188 (5th Cir.1998).

**\*7** ACLP relies on the doctrine of "reverse confusion" in arguing its likelihood of success on the merits of its trademark infringement claim.[88]

88    *See* Docket No. 36, Declarations of Lemley and Picken.

Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, ... the senior user is injured because [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected with the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.[89]

89    *Sands, Taylor & Wood, Co. v. Quaker Oats Co.,* 978 F.2d 947, 957 (7th Cir.1992), *quoting Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879 (1993).

Reverse confusion has been recognized by the Fifth Circuit as a redressable injury under the Lanham Act.[90]

90    *Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387, 394 (5th Cir.1980); *Fuji Photo Film,* 794 F.2d at 596.

The parties agree that in the Fifth Circuit, likelihood of confusion is determined primarily by the analysis of seven objective factors,[91] called "digits"in the Fifth Circuit precedent:

91    The 1938 Restatement of Torts sets forth four factors for determining likelihood of confusion and nine factors for determining whether a trademark owner's rights extend to non-competing goods. Courts have expanded and refined the Restatement factors. *See* Restatement (Third) Unfair Competition § 21, comment a (1999). "[T]rademark law is considered part of the law of unfair competition." *Union National Bank of Texas, Laredo. v. Union National Bank of Texas, Austin,* 909 F.2d 839, 844 n.10 (5th Cir.1990). The Fifth Circuit law has focused primarily on a non-exhaustive list of seven factors.

1. the type of the trademark at issue (i.e., the "strength" or distinctiveness of the mark);

2. similarity of the trademark and the accused term or design;

3. similarity of the products or services;

4. identity of retail outlets and purchasers;

5. identity of advertising media used;

6. the defendant's intent; and

7. actual confusion.[92]

92    *Playboy Enterprises, Inc. v. Webbworld, Inc.,* 991 F.Supp.543, 555 (N.D.Tex.1997) *citing Society of Financial Examiners,* 41 F.3d at 228 n.10; and *Fuji Photo Film Co., Inc.,* 754 F.2d at 595. *See also Elvis Presley Enterprises, Inc.,* 141 F .3d at 194; *Sno–Wizard Manufacturing, Inc. v. Eisemann Products, Co .,* 791 F.2d 423, 428 (5th Cir.1986); *Amstar,* 615 F.2d at 259; and *Roto–Rooter, Corp. v. O'Neal,* 513 F.2d 44 (5th Cir.1975) (reversing decision of Western District of Texas which held there was no likelihood of confusion). The parties present variations in their articulation of the digits. For example, plaintiff identifies "strength" of the mark as a digit whereas defendant discusses strength of the mark under the digit of "type" of mark. Docket No. 16, Plaintiff's Brief at 15; docket no. 25, Defendant's Brief at 11. The Court views these differences as being minor semantical variations in articulating the "digits" but not proposals of different criteria.

"None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved."[93]

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 72 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

Likelihood of confusion is a question of fact. [94] The burden of proving infringement must be borne by the party claiming injury. [95] In that regard, the Fifth Circuit has stated:

[93] *Marathon Manufacturing Co. v. Enerlite Products, Corp.,* 767 F.2d 214, 218 (5th Cir.1985).

[94] *National Football League Properties v. Playoff Corp.,* 808 F.Supp. at 1291–92 (N.D.Tex.1992); *Fuji Photo Film Co., Inc.,* 754 F.2d at 595 n.4; *Elvis Presley Enterprises, Inc.,* 141 F.3d at 196.

[95] *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619 (5th Cir.1963).

The "seven digits" are not elements of a plaintiff's cause of action, but instead comprise a nonexhaustive collection of considerations that may be relevant to the ultimate factual determination. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985). The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors. *Id.* [96]

[96] *Playboy Enterprises, Inc.,* 991 F.Supp. at 555.

In addition to the listed factors, a court may consider other factors in determining the likelihood of confusion. [97] In this case, the Court considers the sophistication of the buyers for both defendant's products and plaintiff's services and the relatively significant cost of the product and services in question as an aspect of the "actual confusion" analysis; although, arguably, it might merit separate consideration. [98]

[97] *Elvis Presley Enterprises, Inc.,* 141 F.3d at 194.

[98] The sophistication of the buyers is an eighth factor in the Second Circuit's test of likelihood of confusion. *Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1508 (2nd Cir.1997). In *Oreck Corp. v. U.S. Floor Systems,* Inc., 803 F.2d 166, 170 (5th Cir.1986), the Fifth Circuit recognized "degree of care exercised by potential purchasers" as an eighth factor under the facts of that case. *But see Fuji Photo Film Co., Inc.,* 754 F.2d at 595.

*i. the type/strength of the trademark at issue*

The degree to which a mark is entitled to protection depends on whether the mark is classified as generic, descriptive, suggestive or fanciful/arbitrary. [99] Strength of the mark is a question of fact. [100] There are two aspects to the strength of a trademark: intrinsic strength and commercial strength, which, again, is considered in connection with the type of the mark.

[99] *Estee Lauder Inc.,* 108 F.3d at 1508.

[100] *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1179 (5th Cir.1980)("Any given term's correct categorization is a factual issue.").

**\*8** The distinctiveness or "strength of a mark measures its capacity to indicate the source of the goods or services with which it is used. The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar description found on other goods, services or business with the prior user ... "[S]trength" ... ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source. [101]

[101] Restatement (Third), Unfair Competition § 21, comment i.

HP argues that PAVILION® should be accorded only limited protection outside of ACLP's web services in part because it is a suggestive mark and, as such, is entitled to the least amount of trademark protection. [102] Suggestive marks, which subtly connote something about the service or product, enjoy only a narrow scope of protection under the trademark laws. [103] "Pavilion" is a common name for a meeting place. [104] Webster's New World Dictionary defines "pavilion" as a large tent or a part of a building, often ornamental. [105] Lane testified that the word "pavilion" appealed to him because of "its suggestion of a virtual site in cyberspace." [106] "Pavilion" is not a coined word and is not purely fanciful. It should not be accorded the same degree of protection as a coined mark, such as "xerox." [107] But, even though suggestive, it "requires a mental leap from the mark to the product" and, thus, is strong enough to warrant trademark protection. [108]

[102] Docket No. 30, Glazer affidavit.

103  *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association,* 651 F.2d 311, 315 (5th Cir.1981)("Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning."); *Soweco, Inc.,* 617 F.2d at 1184.

104  "The dictionary definition of the word is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public." *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 11 n.5 (5th Cir.1974).

105  Webster's New World Dictionary, Third College Edition, 1988. Interestingly, the Oxford English Dictionary indicates that in 1393 the word "pavilion" also referred to an article of apparel worn by lawyers, a gown or cloak; that meaning is indicated as being obsolete.

106  Docket No. 27, Hurst Affidavit at 2 and Exhibit B; docket no. 30, Glazer Affidavit at 10 (ISPs often use "metaphors of physical space to describe the internet experience.").

107  *Sun Banks of Florida, Inc.,* 651 F.2d at 316 n.8 (25 active financial institutions use of the mark "sun" weakens likelihood of confusion and supports vacating injunction); *Amstar Corp.,* 615 F.2d at 259–60 (72 third party registrations of the "domino" mark "limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its marks" and support vacating injunction); *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 505 (5th Cir.1979) (multiple uses of mark "world" result in little likelihood of confusion and support denial of injunctive relief); *American Heritage Life Ins. Co,* 494 F.2d at 13 (multiple uses of word "heritage" support denial of injunctive relief); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir.1973) (common word "holiday" is of weak trademark significance and supports denial of injunctive relief); *El Chico, Inc. v. El Chico Café,* 214 F.2d 721 (5th Cir.1954) (27 third-party registrations of "Chico," "El Chico" and similar names support denial of injunctive relief).

108  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*___ F.3d ___, 50 U.S.P.Q. 1545, 1999 WL 232014 (9th Cir. Apr. 22, 1999).

On the other hand, ACLP argues that the mark PAVILION®, even if suggestive, is a distinctive mark entitled to trademark protection. Plaintiff emphasizes that HP's own market research indicates that the word "pavilion" is an "empty vessel," [109] and, therefore argues that PAVILION is not descriptive and plaintiff need not prove secondary meaning. [110]

109  Docket No. 36, Cahn Declaration, Exhibit B, Braun T.T.A.B. Declaration ¶ 9; docket no. 27, Pedersen Affidavit ¶ 13.

110  Docket No. 31, Plaintiff's Brief at 2.

Unlike "xerox" or "kodak," however, "pavilion" has a meaning apart from plaintiff's mark. [111] HP notes that ACLP has used "pavilion" descriptively when ACLP uses it in its plural form [112] and when it uses other words to modify it, such as in "PARTNER PAVILION." [113] Use of the mark as a noun treats it as a thing rather than a source designator and increases its generic meaning. [114] Although ACLP may not need to prove secondary meaning to receive trademark protection, secondary meaning is relevant to assessing commercial strength of the mark. "Secondary meaning attaches to a mark when 'the consuming public primarily associates the term with a particular source.' " [115] ACLP has not shown that the term "pavilion" and ACLP's business have "become synonymous in the mind of the public." [116] But, in a reverse confusion case, such as this, the Court emphasizes the distinctiveness of the mark rather than the lack of commercial strength of plaintiff's mark. [117]

111  Moreover, HP's references to "pavilion" being an "empty vessel" appear to refer to the fact that in August 1994 the focus groups "were not confused by the Pavilion name; specifically participants did not understand the mark PAVILION in this context to signify any other good or service...." Docket No. 22, Pedersen Affidavit ¶¶ 11–13. In context, the "empty vessel" references appear to relate as much to lack of confusion as to suggestiveness.

112  *E.g.,* May 27, 1999 Plaintiff's Exhibits 10A, 12, 13, 14, 16, 17, 23 and Defendant's Exhibit 5. Lane acknowledged at the May 27, 1999 hearing that the "Pavilions" buttons on the Virginia Tech alumnet and armenianet internet sites established by ACLP do not show ® after the mark name. *See also* Docket No. 27, Hurst Affidavit, Exhibit D at 5.

113  *E.g.,* May 27, 1999 Defendant's Exhibit 1 at ACLP 0152 & 01543; Defendant's Exhibit 3. *See also Estee*

*Lauder, Inc.,* 108 F .3d at 1509. ("In determining whether a mark should be classified as descriptive or suggestive, the court must focus on how the mark is used in context, rather than on its use in the abstract."). Even coined terms may be rendered generic by their use, subjecting their owners to cancellation of the registration. For example, "thermos," "trampoline," "aspirin," and "yo-yo" are former trademarks that now are generic words. *Union National Bank of Texas, Laredo,* 909 F.2d at 845 n.15.

114 *Security Center, Ltd. v. First National Centers,* 750 F.2d 1295, 1300 n.4 (5th Cir.1985)(use of mark as a noun suggests generic use). Docket No. 36, Aroian Declaration ¶¶ 5–8.

115 *Estee Lauder, Inc.,* 108 F.3d at 1509 (*quoting Bristol–Myers Squibb, Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir.1992).

116 *Estee Lauder, Inc.,* 108 F.3d at 1509 (*quoting Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995)).

117 *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 479 (3rd Cir.1994).

HP argues that PAVILION is a dilute mark because it is used in other web addresses, used to sell software, and used in other contexts which make it difficult to be used to identify a single source. Plaintiff argues that widespread use of "pavilion" is irrelevant because HP cannot show significant trademark uses of "pavilion." [118]

118 Docket No. 31, Plaintiff's Reply Brief at 4.

**\*9** Third party uses and registrations "limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." [119] Although 226 marks beginning with the word "service" did not render the "Service Merchandise" mark indistinct, the "Service Merchandise" mark was proved to have significant commercial strength. [120] HP has proved 32 federal registrations for the mark "PAVILION" or variants thereof, including one for computer software, as well as 100 additional state registrations of the mark and dozens of common law uses of the mark. [121] HP also has proved more than 35 different web sites which use "pavilion" or a variant thereof in the domain name. [122] There are several instances of "PARTNER PAVILION" on the internet, such as "COMPAQ Partner Pavilion" and Netscape's Partner Pavilion. [123] The widespread use

of the word "pavilion," including uses in the computer field "dilutes the strength of the mark and entitles it to a narrower range of protection." [124] The ability of the mark to indicate a single source is not strong for any user of that trade name or mark, including HP which has sold thousands of personal computers under that name. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less the likelihood of confusion." [125]

119 *Amstar,* 615 F.2d at 260 (Amstar's protection of "Domino" mark not afforded protection outside of plaintiff's sugars and related food products and did not encompass fast-food delivered pizzas).

120 *Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983 (S.D.Tex.1990). Docket No. 31, Plaintiff's Reply Brief at 4.

121 Docket No. 27, Hurst Affidavit at 2–4 and Exhibit C; docket No. 25, Defendant's Brief at 10.

122 Docket No. 27, Hurst Affidavit at 4–5 and Exhibit E. Examples include *www.pavilioncomms.com* associated with a company named pavilion which provides "web-site solutions;" *www.pavilion.net* associated with an internet provider in the United Kingdom; and *www.pavilionsys.com* associated with computer database design. Docket No. 30, Glazer Affidavit at 11 (more than 20 different web sites with "pavilion" or variant in domain name identified).

123 Docket No. 20, Glazer Affidavit at 12.

124 *Oreck Corp.,* 803 F.2d at 170.

125 *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir.1980).

A suggestive mark may be strengthened by factors such as "extensive advertising, length of exclusive use, public recognition and uniqueness." [126] As discussed further below, ACLP has not established that PAVILION® is strongly or uniquely associated with ACLP's business.

126 *Accuride International, Inc. v. Accuride Corporation,* 871 F.2d 1531, 1536 (9th Cir.1989).

In sum, this factor weighs in favor of HP because third party uses and registrations "limit the protection to be afforded plaintiff's mark outside the uses to which it has already put its mark." [127] Stated differently, the various uses of "Pavilion" and variants thereof increase

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 75 of 98

the likelihood that consumers would be unlikely to judge these two particular uses as being similar or related. This "digit," however, appears to be a key issue for trial.

127    *Amstar,* 615 F.2d at 260 (emphasis added).

### ii. similarity of the trademark and the accused term or design

In this case, the two marks are virtually identical in that both parties typically use the word in block typeface: "PAVILION." HP typically uses "HP–PAVILION" or "HP–PAVILION PC" as a designation for the personal computers rather than merely the block letters "PAVILION." [128] The "Hewlett–Packard–PAVILION" name appears on the central processing unit and the monitor. [129] Retailers receive each HP–PAVILION PC in a box marked "HP pavilion." [130] Although it is established that "[s]imilarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," [131] the two marks in question visually are very similar and audibly are identical. The source identifier "HP" and the product designator "PC" are noteworthy, but they are not always used. [132]

128    *E.g.,* May 27, 1999 Plaintiff Exhibit 18.

129    Docket No. 25, Defendant's Brief at 3 n.2; *see* May 27, 1999 Plaintiff's Exhibits 20, 21 and 22; docket No. 27, Pedersen Affidavit ¶ 3.

130    Docket No. 27, Anderson Affidavit at 2 ¶ 5.

131    *Sun Banks of Florida, Inc.,* 651 F.2d at 317–18 *quoting* Restatement of Torts § 729, comment b. Section 729 corresponds to §§ 21–23, Restatement (Third) Unfair Competition.

132    *Lambda Electronics Corp. v. Lambda Technology,* 515 F.Supp. 915, 925 (S.D.N.Y.1981)("Even if Lambda Technology consistently used only the full trade name "Lambda Technology" and not the shorter version "Lambda," the addition of this word would not avoid significant similarity between the two trademarks."). But, as in a product configuration case, labels and packaging and source data may eliminate confusion. *Sunbeam Products, Inc.,* 123 F.3d at 259.

**\*10**    This factor weighs in favor of ACLP.

### iii. similarity of the products or services

The greater the similarity of products and services, the greater the likelihood of confusion. [133] There are three aspects of ACLP's argument of similarity of products/ services: (1) ACLP and HP are in direct competition and likelihood of confusion is strong; (2) ACLP's services and HP's product and service promotions are "closely related" and likelihood of confusion is strong; and (3) HP is using ACLP's mark for products within ACLP's "zone of expansion" and likelihood of confusion is strong. This Order will first examine the direct competition and relationship arguments before briefly addressing zone of expansion.

133    *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 490 (5th Cir.1992); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d at 505.

Direct competition between the parties' services and products is not required in an analysis of likelihood of confusion. [134] Trademark law prohibits the use of a senior user's mark on products that are "closely related" to the senior user's. [135] "When products or services are not competing, the confusion at issue is one of sponsorship, affiliation, or connection." [136] The question is whether the buying public reasonably considers the products to come from the same source or affiliated sources. [137]

134    *Professional Golfer's Association of America v. Banker's Life and Casualty Co.,* 514 F.2d 665, 669–70 (5th Cir.1975).

135    *Sands, Taylor and Wood, Co.,* 978 F.2d at 957.

136    *Elvis Presley Enterprises, Inc.,* 141 F.3d at 202. *See also Oreck, Corp.,* 803 F.2d at 170.

137    3 J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:3 at 166 (4th ed.1998).

Plaintiff argues that HP is "directly competing" with plaintiff for the sale of the same product or services. [138] Alternatively, plaintiff argues that plaintiff's services and defendant's product are closely related such that confusion as to the source, sponsorship or affiliation of plaintiff's services and defendant's product is reasonable and likely. [139]

138    Docket no. 16 at 16.

139    Docket No. 36, Picken Declaration. Dr. Picken's declaration testimony concerns the "blurred boundaries between hardware, software and services." Dr. Picken expressed no opinion on likelihood of confusion by the reasonable consumer using computer hardware, software and services but does state, *inter alia,* it is likely that a vendor of one product would provide related services and vice versa (¶¶ 3.4.1 and 3.4.2); that HP–PAVILION personal computers and ACLP services are "functionally interdependent"(¶ 3.4.3); and that the parties' products and services are "likely to fall within each others' *current* product domains or natural areas of expansion" (¶ 3.4.4) (emphasis added). Dr. Picken's June 3, 1999 deposition focuses on the zones of expansion for ACLP in 1995. May 27, 1999 hearing, Plaintiff's Exhibit 34.

ACLP markets a service which consists of the creation of web spaces and the provision of web services for affinity groups. ACLP's original "marketing vision" in 1995 was to link certain individuals, referred to as an affinity group, to product/service marketers through an internet "Pavilion" site which has a commercial sponsor and which, in turn, is linked to other commercial sites. [140] On the other hand, HP sells home computers with multimedia features which are able to be used to access the internet . [141] As time has passed, ACLP argues, HP–PAVILION has made it easier for a customer to access the internet and now offers an internet short-cut key, a promotional tie-in for 50 free hours of internet access, AOL, the Yahoo portal, My Yahoo! key and web services for the "affinity group" of HP–PAVILION purchasers through its *www.hp-at-home.com* site. In brief, plaintiff argues that these marketing and co-branding agreements show that HP is in the business of promoting internet services through the HP–PAVILION PC in direct competition with plaintiff. Plaintiff further points to HP's now-discontinued Message Board service to show that the parties are in direct competition. [142]

140    May 27, 1999 hearing, Plaintiff's Exhibit 34 at 41–42.

141    Docket No. 36, Mosleh Deposition and Exhibits 8 and 9 (In March 1999 HP was realigned into two component companies or divisions and a new internet business unit was created); docket No. 27, Pedersen Affidavit ¶ 15 and Exhibit D.

142    HP, through GTE, offered in June 1998 a Message Board Service for HP customers through which

a PAVILION owner could post, for example, the photograph of a child, on a password protected message board which could only be seen by those who knew the password. HP has discontinued this service at least with the Summer 1999 product release. Docket No. 36, McKinney Deposition at 79 and 84.

The internet-related services which are available to the purchaser of the HP–PAVILION personal computer, through GTE, AOL and Yahoo!, are provided by other companies, not HP. HP is not an internet service provider ("ISP"); [143] HP has never sold software to computers under the PAVILION name; [144] HP sponsors no restricted access web site; [145] and no web site affiliated with HP uses pavilion or a variant of that word in its domain name. [146] The HP–PAVILION PC always was able to be used to access the internet. [147] HP does sponsor the HP-at-home web site, which is not restricted and which contains sales and other information related to HP; a customer can use the HP-at-home web site to obtain trouble-shooting advice concerning the operation of an HP–PAVILION. [148] On the other hand, ACLP has used PAVILION® to designate its service of linking an affinity group to product/service marketers through an internet site which has a commercial sponsor. [149] ACLP has not provided ISP services under the PAVILION® mark. [150] HP–PAVILION's direct customers are individual consumers who wish to own a home computer. ACLP's direct customers are entities or businesses, to include advertisers, who wish to sponsor an internet site. [151]

143    HP has entered into agreements with third party vendors for software and promotions to allow consumer to easily use the HP-PAVILION PC to access the internet. Docket No. 36, McKinney Deposition Exhibits 18–22.

144    Docket No. 25, Defendant's Brief at 3; docket No. 27, Pedersen Affidavit.

145    Docket No. 27, Pedersen Affidavit ¶ 18.

146    Docket No. 27, Pedersen Affidavit; docket No. 36, Cahn Declaration, Exhibit B, Pedersen T.T.A.B. Declaration ¶ 19.

147    Docket No. 25, Defendant's Brief at 16 n.13; May 27, 1999 Lane cross-examination; Docket No. 36, McKinney Deposition at 53, 73 and 89.

148    Docket No. 27, Pedersen Affidavit. To this extent *www.hp-at-home.com* is a web service for an affinity group, but the affinity group is anyone interested in obtaining information about HP products or services and is not restricted in access or focus to HP–PAVILION owners. No registration or password is required to access the cite, nor is the word "pavilion" used to access the cite.

149    May 27, 1999 hearing, Plaintiff's Exhibit 34, Picken Deposition at 41–42.

150    ACLP's trademark application sought the mark in association with providing affinity groups "access to an international digital electronic information and communication network." HP has sought leave to file a counterclaim for cancellation of the mark on the ground that ACLP has not used the mark in commerce in connection with the services described because it has not created a "network" and has not provided "access" to a network created by another. Docket Nos. 55 and 56, Exhibit C at ¶¶ 7–10. The Court does not address the proffered counterclaim, which has not yet been filed, in this Order.

151    Passovoy testified on May 27, 1999 that the broker-dealer clients of ANI frequently charge a technology fee to their clients for access to password-protected investment sites.

**\*11** The Court finds that plaintiff has not established a likelihood of proving that plaintiff and defendant are in direct competition. HP sells personal computers. ACLP provides web sites where information is available under commercial sponsorship. [152] HP's sale of personal computers under the name HP–PAVILION does place in the hands of the consumer a product which the consumer can use to access the internet. In that sense, the products are complementary. [153] ACLP's product is less marketable when access to the internet is not readily available to an affinity group. The HP–PAVILION is one means to access the internet and it has steadily improved the ease with which the internet may be accessed. But, ACLP has not established that ACLP and HP are competing in the same markets for the same customers with competing goods and services. [154]

152    Docket No. 30, Glazer Affidavit at 7.

153    The internet can also be accessed through palm-sized hand held devices, such as those marketed under the name Palm Pilot, pagers or devices that work

in conjunction with television sets. Complementary products and services, however, may be "particularly susceptible to confusion." *Fuji Photo Film, Co., Inc., 754 F.2d at 598* (citations omitted).

154    Thus, the Court concludes that *Sun Microsystems, Inc. v. SunRiver, Corp.* 36 U.S.P.Q.2d 1266 (N.D.Ca.1995), is distinguishable. Sun Microsystems made computer hardware and software under the SUN mark. SunRiver entered the market, first selling only computer terminals under the name SUNRIVER and then purchasing three computer companies, two of which directly competed with Sun Microsystems in the sale of general purpose computer display terminals and in marketing internet products and services under the name SUNRIVER. 36 U.S.P.Q. at 1268. The Court noted that although a systems manager might not be confused as to relatively expensive work stations, likelihood of confusion had been established with respect to the less expensive internet products. *Id.* at 1269 and 1270. In this case, both defendant's product and plaintiff's services are relatively expensive.

As noted, trademark protection is extended to non-competing goods and services that are "closely related" to create a likelihood of confusion and related goods are generally more likely tan unrelated goods to confuse the public as to the producers. [155] Under a relatedness test, the competitive proximity of the goods is relevant . [156] As Vera cosmetics and perfume were "closely related" to Vera apparel, as International Kennel Club toy dogs were "closely related" to International Kennel dog shows, as Black and White beer was "closely related" to Black and White scotch whiskey, [157] ACLP argues that its PAVILION® web services are closely related to the HP–PAVILION personal computer that promotes internet access. [158] Indeed, ACLP argues that all computer hardware, computer software and internet services are "closely related." [159] Accordingly, ACLP argues that no personal computer maker, such as HP, should be allowed to use the name of any company that provides internet services but "[c]ompanies that supply totally unrelated goods and which merely happen to have a web page are not in the same position." [160] This distinction arguably accounts for ACLP's settlement agreement with Pavilion Technologies regarding software sales, [161] but is not supported by consumer surveys or user information to support the policy-based argument regarding likely consumer confusion. [162]

155    15 U.S.C. § 1051.

156    *Brookfield Communications, Inc.,*___ F.3d ___, 1999 WL at *232015.

157    *See* cases collected in *Sands, Taylor & Wood Co.,* 978 F.2d at 958.

158    Docket No. 36, Lemley Declaration ¶¶ 3, 26–33.

159    Docket No. 36, Lemley Declaration ¶¶ 28–30.

160    Docket No. 36, Lemley Declaration ¶ 33.

161    Docket No. 27, Hurst Affidavit at 2 and Exhibit C (Pavilion Technologies, Austin, Texas registered PAVILION on November 24, 1998 for software relating to manufacturing plant operations and emissions).

162    Focus group studies conducted with HP consumers before 1998 "did not attribute any value, meaning, or associations to the mark other than a recognition of the PAVILION product as Hewlett–Packard's multimedia PC among some owners." Docket No. 27, Pedersen Affidavit ¶ 14.

Although plaintiff has offered expert opinion testimony on converging markets in the computer field[163] and three instances of actual confusion, discussed further below, defendant has offered testimony that "virtually all PC's today are bundled with third-party internet access software ... [and]... consumers are programmed to disassociate the provider of such access from the manufacturer of their computer. Indeed, that message is reinforced in HP's own on-line support and instruction manuals."[164] There is a difference between a personal computer which can be used to access the internet, and ISP which enables internet assess and services or sites which appear on the web.[165] Importantly, Passovoy, ANI's CEO who markets PAVILION® services, has testified that he did not consider there to be a current likelihood of confusion between HP's computer and ACLP's services.[166] Even Lane's statement that HP is "a 50 year old hardware maker" is hardly a description that furthers an argument of likely confusion.[167]

163    Docket No. 36, Picken Declaration; May 27, 1999 hearing, Exhibit 34, Picken Deposition.

164    Docket No. 36, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶ 15; *see also* Exhibit B, Pedersen T.T.A.B. Declaration ¶ 20 ("The experience of buying and using a PC compels an understanding of the differences between computer hardware and the web-related services on the other."); docket No. 27, Pedersen Affidavit ¶ 20.

165    Docket No. 27, Pedersen Affidavit ¶ 20; docket No. 30, Glazer Affidavit at 8.

166    Docket No. 27, Hurst Affidavit, Passovoy Deposition; May 27, 1999 Passovoy testimony (only a "small chance" of current consumer confusion).

167    Docket No. 36, Lane Declaration ¶ 23.

**\*12**  ACLP protests that HP–PAVILION one-touch internet access keys and co-branding agreements with AOL and Yahoo! well illustrate the blurring of markets within the computer field.[168] Plaintiff considers the ease of internet access to increase confusion.[169] ACLP argues that the consumers most likely to be confused as to source are those thousands of individuals who come into contact with plaintiff's trademark on-line. But, plaintiff makes no showing that anyone—other than a member of an affinity group who is visiting its web site or a customer of a broker dealer or other client of ANI —— does come in contact with plaintiff's mark on-line. Plaintiff has conceded that it does not pay to advertise its mark.[170] Since each of its web sites, including *www.amicus.com* and *www.pavilion.com*[171] require the visitor to register, casual browsing is discouraged. The most profitable venture of ANI concerns password-protected web sites which, *a fortiori,* preclude browsing by non-subscribers. Given the fact that ACLP's on-line access is limited to those who have passwords or those who expressly register to access the ACLP or ANI web space, plaintiff has not shown that such confusion on the internet at present is likely to occur.[172]

168    May 27, 1999 hearing, Plaintiff's Exhibit 34.

169    Docket No. 36, Declarations of Lane, Picken and Lemley.

170    Docket No. 52, Supplemental Hurst Affidavit (Lane Rebuttal T.T.A.B. Declaration: "We agree that we have not paid for any advertising of the PAVILION mark."). At the May 17 and May 27, 1999 hearings, plaintiff represented that plaintiff has marketed its

services through direct mail, "cold calls," trade shows, word of mouth and through any publicity achieved when there are visitors to its web sites.

[171]  May 27, 1999 Plaintiff Exhibit 21.

[172]  Plaintiff has produced three e-mails which could illustrate the likely confusion arising from plaintiff's ownership of the *www . pavilion.com* domain name and internet address. As explained in *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 499 (E.D.Va.1999), an intuitive domain name, such as "pavilion," makes it more likely that users will accurately surmise the web site address and visit it, rather than a competitor's site. In this case, only three HP–PAVILION users are alleged to have mistakenly sent emails to *www.pavilion.com* rather than to *www.hp-at-home.com.,* which is some support for inferring that the millions of other HP–PAVILION users view "hp" to be the more intuitive web address for trouble-shooting advise regarding the HP–PAVILION. This may also indicate that metatags or the "default setting" for HP–PAVILION PCs are causing the confusion —matters not fully explored in the record. *See Brookfield Communications, Inc.,___ F.3d ___, 1999 WL at *232018;* docket No. 36, Lemley Declaration ¶ 36.

Although each case must be evaluated on a totality of all of the facts, there is precedent for concluding that similar products are not confusingly similar. For example, in *Domino Sugar,* the Fifth Circuit held that there was no likelihood of confusion in connection with the marketing of food items, that is, condiments and pizza, under the same name. [173] In *Oreck,* the Fifth Circuit held that there was no likelihood of confusion between two vacuum cleaners. [174] In *Sno–Wizard,* the Fifth Circuit held that there was no likelihood of confusion between two sno-cone machines when one of them had the brand name affixed to the outside of the machine. [175] In *Estee Lauder, Inc.,* the Second Circuit held that there was no likelihood of confusion between two body care products. [176]

[173]  615 F.2d at 261.

[174]  Oreck's XL® cleaner, sold for commercial and consumer uses, weighing 14–45 pounds and costing $1500 was not confusingly similar to U.S. Floor System, Inc.'s Steamex Deluxe 15 XL cleaner sold to consumer and rental customers, weighing approximately 150 pounds and costing $2,000—

$4,000 because the two products were functionally dissimilar. 803 F.2d at 171.

[175]  791 F.2d at 427.

[176]  Gap's use of "100% body care" on its products sold exclusively in Old Navy Stores was not likely to cause confusion with Estee Lauder's "100%"® moisturizer marketed in high end retail stores, given, among other things, price disparities, the differences in markets and the differences in the types of moisturizers. 108 F.3d at 1503, 1506, 1511–12 ("No knowledgeable consumer would be likely to buy one product thinking it was the other").

More to the point, there are other instances of personal computers and internet services companies sharing names. For example, Presario is the name of a leading personal computer marketed by COMPAQ and Presario.com is an unrelated consulting company which offers advice on systems integration. [177] Indigo is the name of a work station marketed by Silicon Graphics and unrelated Indigo.com markets science-related equipment. [178] ASPIRE is the name of a personal computer and unrelated ASPIRING TECHNOLOGIES provides web page development and internet services. [179] VERSA is the name of notebook computer and unrelated Versa.com provides internet publishing and marketing services. [180] Poweredge is a sub-brand of Dell Computers and unrelated Poweredge.com provides internet site hosting. [181] Pavilion Technologies, Inc. in Austin, Texas markets software under the name Pavilion. [182] The Trademark Trial and Appeal Board has rejected plaintiff's premise that all computer hardware, software and internet services are "closely related" when it noted that: "[T]here must be some similarity between the goods and services beyond the fact that each involves the use of computers." [183] The Trademark Trial and Appeal Board has held that the fact the two parties provide computer programs in and of itself "does not establish a relationship between good or services such that consumers would believe that all computer software programs emanate from the same source simply because they are sold under similar marks." [184]

[177]  Docket No. 30, Glazer Affidavit at 9.

[178]  *Id.*

[179]  *Id.*

180    *Id.*

181    *Id.*

182    Docket No. 25, Defendant's Brief at 10–11; Docket
       No. 27, Hurst Affidavit. May 27, 1999 Defendant's
       Exhibit 7 is the settlement agreement between plaintiff
       and Pavilion Technologies.

183    *Reynolds and Reynolds Co. v. I.E. Systems,*
       *Inc.,* 5 U.S.P.Q.2d 1749, 1751 (T.T.A.B.1987)
       (accounting-related computer hardware, software
       and supplies sold under ACCU-prefixed marks
       "sufficiently different" from ACCULINK software
       kit then licensed primarily to manufacturers of
       microprocessors to avoid likelihood of confusion); *see*
       *also Electronic Data Systems Corp. v. EDSA Micro*
       *Corp.,* 23 U.S.P.Q. 1460, 1463 (T.T.A.B.1992).

       These cases and others reject the T.T.A.B.'s
       original formulation of what amounted to a *per*
       *se* confusion rule on the use of similar marks on
       both computer hardware and software. *See e .g.,*
       *In Re Graphics Technology Corp.,* 222 U.S.P.Q.
       179, 181 (T.T.A.B.1984), in which the T.T.A.B.
       held that AGILE software is confusingly similar
       to AGILE computer data terminals: "Moreover,
       since customers need both elements (hardware and
       software) to make computer systems work and
       to derive the benefits they offer, it is inevitable
       (except perhaps for the small segment who write
       their own programs) that they will come in contact
       with software and hardware goods offered by
       the industry and with the marks placed thereon
       by the myriad of producers and sellers in this
       burgeoning market. Such being the case, the Board
       concludes that it is highly likely, and probably
       close to unavoidable, that purchasers exposed to
       an identical mark on such basic compute hardware
       as terminals and on computer software programs
       would be likely to assume a common source ."

184    *Electronic Data Systems, Corp.,* 23 U.S.P.Q.2d at
       1463. Electronic Data Systems Corp. sold products
       and services under the names EDS Link, EDMD
       Electronic Document Management and Distribution
       and EDS Net whereas defendant used the mark
       EDSA.

    *13    Therefore, the likelihood of confusion test in
computer product related fields must be decided on the
specific facts of the competing uses. The computer filed
has become too large and too fragmented for a *per se*
rule. Accordingly, on the special facts presented, the
Ninth Circuit has concluded that two companies using

the mark ECLIPSE on computer software sold to the
same architectural, engineering and construction market
created a likelihood of confusion. [185] The United States
District Court for the Southern District of New York
has held that Lambda software is confusingly similar
to Lambda power supplies. [186] Recently, the Ninth
Circuit has held that a video rental chain's use of the
domain name "*www.moviebuff.com* " and use of HTML
metatags with the phrase "moviebuff" were confusingly
similar to an entertainment company's federal trademark
MovieBuff®. [187]

185    *Eclipse Association, Ltd. v. Data General Corp.,* 894
       F.2d 1114, 1117 (9th Cir.1990).

186    *Lambda Electronics Corp.,* 515 F.Supp. at 927.

187    *Brookfield Communications, Inc.,* ___F.3d at ___,
       1999 WL at *232018. The Court particularly
       emphasized that the two company's services are closed
       related and that each company competes for the
       patronage of an overlapping audience.

The crux of the relatedness of plaintiff's services and
defendant's product in this case, as illustrated in part
by the testimony of plaintiff's expert, is the growth and
change in computer and communications markets since
1995. As noted, because neither HP nor ACLP offer ISP
services under the mark PAVILION and because HP
sponsors no web site under the pavilion name, the current
record is merely suggestive of likely confusion as to source,
affiliation or sponsorship but does not establish that such
confusion is likely or probable.

One of the reasons courts have provided for protecting
owners against confusingly similar marks on related
products is to protect the owner's ability to enter markets
in which it might reasonably be expected to expand in
the future. [188] Likelihood of expansion is a factor in non-
competing products cases when the prior user is likely to
"bridge the gap" between its current market and that of a
subsequent user. The relatedness component is especially
important in a reverse confusion case in which the senior
user wishes to expand into the junior user's area. [189]
Development of both the senior user's market and the
junior user's market appears to be relevant to this analysis.
As noted by the Third Circuit in *Fisons Horticulture, Inc.,*
courts look "not only at the likelihood of expansion,
but also at facts 'suggesting the consuming public might
expect the prior owner to manufacture a product in the

Case 1:18-cv-00068   Document 289-4   Filed in TXSD on 08/04/18   Page 81 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

defendant's market." ' [190]  As noted by the Fifth Circuit in *Elvis Presley Enterprises,* "[i]f consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." [191]

[188]    *Sands, Taylor & Wood Co.,* 978 F.2d at 958; *Sun Microsystems, Inc.,* 36 U.S.P.Q.2d at 1270.

[189]    *Fisons Horticulture, Inc.,* 30 F.3d at 480.

[190]    *Id.*

[191]    141 F.3d at 202.

Plaintiff argued at the May 17, 1999 hearing that even in 1995, when HP first began to market a personal computer under the PAVILION name, the doctrine of zone of expansion would have allowed ACLP to use its mark, not then registered, to market, for example, personal computers or other internet access devices or services [192] Indeed, at argument on May 17 plaintiff argued that from the moment HP began marketing personal computers under the PAVILION name, plaintiff had a claim of infringement. [193]  Both plaintiff and defendant argue that zone of expansion should be measured at the time of the junior user's first use of the mark. [194]

[192]    Docket no. 16 at 3; docket No. 36, Lane Declaration ¶ 23: "By the fall of 1998 ... our own expansion of use was running into direct conflict and confusion with HP's use of PAVILION." Docket No. 36, Picken Declaration ¶¶ 3, 6.

[193]    This point also factors into the Court's assessment of delay, discussed further below.

[194]    Docket No. 16, Plaintiff's Brief at 18; docket No. 25, Defendant's Brief. As noted above, plaintiff argued that as soon as HP began marketing the PAVILION, ACLP had a claim of infringement. At the May 17 hearing, defendant, citing *Union National Bank, Laredo,* agreed that zone of expansion should be measured as of what reasonable consumers would have expected at the time the product entered the market in 1995. On May 27, 1999 both Passovoy and Lane testified as to plans for ACLP, ANI and the PAVILION® mark as of 1995 and today. Passovoy testified that as of October 1997 ANI did not use the PAVILION® mark but beginning in 1998 did use variations such as PARTNER

PAVILION and described plans for expanded PARTNER PAVILION and other services solidified since the inception of the litigation. Lane testified more extensively on plans for PAVILION® ) ) services as of 1995. May 27, 1999 Plaintiff's Exhibits 4, 5, 8, 10 and 10A.

**\*14**  At the preliminary injunction stage, at the time the Court assesses substantial likelihood of success on this one "digit" of likelihood of confusion, it is not necessary for the Court to resolve finally the applicability of the zone of expansion doctrine. [195]  Nevertheless, while it is recognized that plaintiff represents that it has plans to expand its services, [196] the focus is on whether plaintiff's services and defendant's product are similar enough to cause confusion as to source or affiliation and whether defendant's product is in a market into which plaintiff naturally would be perceived to expand. [197] Most determinative of the Court's assessment of the zone of expansion doctrine as it relates to this "digit" of likelihood of confusion at the preliminary injunction stage, is Passovoy's testimony on May 27, 1999 that the present likelihood of confusion between ANI's use of the un-registered variant PARTNER PAVILION and the HP–PAVILION PC is small, although the risk of confusion should increase. Given the practice of ACLP to use PAVILION® in connection with sponsored sites, the Court finds strong support for drawing the same conclusion regarding its use of the mark.

[195]    In *Union National Bank,* 909 F.2d at 843 n.9, the Fifth Circuit described the "zone of expansion" doctrine as a "conundrum within the conundrum of trademark law."

[196]    May 27, 1999 Hearing, Passovoy testimony; Lane testimony.

[197]    *Elvis Presley Enterprises,* 141 F.3d at 202.

In sum, for purposes of the preliminary injunction and drawing all inferences from the evidence in favor of ACLP, the Court finds that the similarity of products/ services "digit" weighs in favor of ACLP. This "digit" particularly, however, appear to be a central issue for trial. Issues to be further explored in the record include any likelihood of confusion engendered by HP–PAVILION's marketing agreements with internet service providers and portals such as AOL and Yahoo! as they affect the "relatedness" of the HP's product and ACLP's services,

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 82 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

whether HTML metatags engender confusion, and the zone of expansion theory.

*iv. identity of retail outlets and purchasers*

ACLP sells its services through calling ("cold calls") or writing ("direct mail") prospective customers to solicit business, appearing at trade shows, and promoting its services on the internet, primarily through the company's web sites at *www.amicus.com* and *www.pavilion.com.* ACLP has not adduced any evidence that it has a sales force or any other arrangement other than selling its own services. It is undisputed that plaintiff has never advertised PAVILION® services. [198] The customers of ACLP are the individuals who sponsor affinity groups web sites, such as armenianet, and the customers of ANI are primarily broker-dealers who contract for password-protected PAVILION® services to be offered to their customers. [199]

[198]   Docket No. 27, Hurst Affidavit, Lane Deposition at 422–424 and docket no. 52, Supplementary Hurst Affidavit.

[199]   May 27, 1999 testimony of Lane and Passovoy.

HP on the other hand sells most of its computers, estimated by HP to be approximately 98% of its HP–PAVILION sales, through retail outlets. [200] Approximately 1,000 retailers sell HP–PAVILION computers. HP notes that only 1% of its HP–PAVILION sales are through the internet via HP's own web site. [201]

[200]   Docket No. 36, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶¶ 8, 9.

[201]   Docket No. 25, Defendant's Brief at 4; docket no. 35, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶ 9.

The evidence establishes that the products are sold through different channels of communication and trade which lessens any likelihood of confusion. There is little likelihood that a potential customer approached by ACLP directly will be confused and think HP is the provider of services. On the other hand, the record does not demonstrate a sufficient likelihood that a purchaser of a HP–PAVILION computer will consider HP to be the source of separately marketed PAVILION® internet services costing thousands of dollars or even Pavilion Technologies PAVILION

software. Similarly, the evidence shows complementary purchasers. Purchasers of ACLP's services need ready access to computers. Purchasers of HP home computers increasingly have identified ready access to the internet to be a factor influencing purchase, presumably because of a desire to access web services such as those offered through plaintiff. [202] The existence of complementary uses of plaintiff's services and defendant's product, however, does not negate the "substantial dissimilarities between the predominant purchasers of plaintiff and defendant's products." [203]

[202]   Docket No. 36, McKinney Deposition Exhibits 42 and 45.

[203]   *Amstar Corp.,* 615 F.2d at 262 *(quoted in Society of Financial Examiners,* 41 F.3d at 228–29).

**\*15**   This factor weighs in favor of HP.

*v. identity of advertising media used*

ACLP offers its services through calling prospective customers, writing prospective customers, word-of-mouth and through *www.amicus.com* and *www.pavilion.com* web sites. ANI also attends trade shows for financial services. [204] ACLP has never paid a fee to feature PAVILION® in print, in radio or in television advertisements. [205]

[204]   May 27, 1999 Lane testimony; Passovoy testimony.

[205]   May 27, 1999 Lane testimony and Defendant's Exhibit 2.

HP advertises its products primarily through offering advertising discounts to retailers when the retailer advertises HP products. [206] HP products are also advertised on the *www.hp-at-home.com* web site and in trade publications. [207]

[206]   Docket No. 27, Pedersen Affidavit ¶ 13.

[207]   Docket No. 25, Defendant's Brief at 5.

HP argues that "affinity group" is not a substantial marketing focus. [208] Absent proof of any paid targeted advertising by plaintiff, the Court must agree that there is little overlap or convergence in the advertising media used by the parties.

[208]    *See* Docket No. 36, McKinney Deposition Exhibits.

This factor weighs in favor of HP.

#### vi. defendant's intent

ACLP argues that HP's bad intent is shown by its negligent trademark search before beginning to market its home computer line under the name HP–PAVILION. [209] Plaintiff argues that HP policy is to perform a three-part clearing process before adopting a mark, [210] which HP did not follow in this instance. [211] HP began considering the pavilion name in August 1994 when it first conducted focus group studies involving "pavilion." [212] HP argues that it relied on an August 1994 Thompson and Thompson trademark search for "pavilion" which included the database for "home personal computer" through May and June 1994. [213] HP encountered no obstacles to using the name at that time.

[209]    Docket No. 36, Lemley Declaration ¶¶ 2, 11–25.

[210]    Docket No. 36, Maker Deposition; docket No. 27, Maker Affidavit ¶ 3.

[211]    Docket No. 27, Maker Affidavit at 2 ¶ 8.

[212]    Docket No. 27, Pedersen Affidavit at 3 ¶ 7.

[213]    Docket No. 25, Defendant's Brief at 5; docket no. 27, Maker Affidavit ¶ 7. On August 2, 1994 ACLP filed its trademark application for "PAVILION." Docket No. 36, Lane Declaration ¶ 11.

"Proof of defendant's intent to benefit from the good reputation of plaintiff's products is not required to establish trademark infringement. If such intent can be shown, however, it may provide compelling evidence of a likelihood of confusion." [214] Bad faith, without more, may prove trademark infringement.

[214]    *Oreck Corp.,* 803 F.2d at 173 (citations omitted). *See also Amstar Corp.,* 615 F.2d at 263.

The Court concludes that HP's failure to up-date its trademark search prior to beginning to market the HP–PAVILION is relevant to a balancing of the hardships. [215] The intent on which the Court focuses in this aspect of the analysis is the intent to confuse—and not bad faith. In this reverse confusion case in which the junior user is selling

more of its product than the senior user, the record does not show that HP undertook its use of the PAVILION name with the plan to "palm off" HP goods as those of plaintiff's. [216] Even if HP was "careless" in its trademark search before launching HP–PAVILION PCs, the Court does not find that it was careless in furtherance of a goal to "palm off." [217]

[215]    *See Sands, Taylor and Wood Co.,* 978 F.2d at 961("Thus, the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case."). The Seventh Circuit in this case did not consider the applicability of defendant's intent to the balancing of the hardships element of the preliminary injunction test or, arguably, to the relatedness/"zone of expansion" issue. The Third Circuit, however, has considered carelessness in evaluation of likelihood of confusion under this factor. *Fishons Horticulture, Inc.,* 30 F.3d at 480.

[216]    Plaintiff is free to develop its theory that HP's bad faith is relevant to the zone of expansion argument. *See ACCU Personnel, Inc. v. Accustaff, Inc.,* 846 F.Supp. 1191, 1208–10 (D.Del.1994).

[217]    Docket No. 27, Maker Affidavit ¶ 8; Pedersen Affidavit ¶ 12.

This factor weighs in favor of HP.

#### vii. actual confusion

Sophistication of the buyers and the high cost of plaintiff's services and defendant's products indicate that neither are likely to be "bought on impulse, but rather with a great deal of care." [218] The cost of creating password protected web services for broker-dealer affinity groups was estimated to equal approximately $100,000. [219] The cost of the average HP–PAVILION personal computer, on the other hand, is approximately $ 1,000. [220] HP has introduced evidence that the purchasers of home computers" tend to be more educated, more professional and older than the average consumer in general," [221] take three to six weeks to obtain information before purchasing a home computer. [222] Neither home computers nor a web site for an affinity group are impulse purchases. Each of these purchasers, in reference to their respective markets, makes what this Court considers to be an important purchase involving a significant expenditure of resources. The degree of care exercised by potential purchasers of

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 84 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

either product or service is a factor that militates against finding a likelihood of confusion. [223]

218  *Fuji Photo Film Co., Inc.,* 754 F.2d at 595.

219  May 27, 1999 Passovoy testimony.

220  Docket No. 25, Defendant's Brief at 1 ("upwards of $1,000"); docket No. 27, Pedersen Affidavit ¶ 15.

221  Docket No. 25, Defendant's Brief at 3; docket No. 36, Cahn Declaration, Exhibit B, Pedersen T.T.A.B. Declaration ¶¶ 17, 18: The average HP–PAVILION–PC purchaser spends 3–6 weeks shopping, visits 2–3 retail stores before buying; 79% of the purchasers have some post-high school education and 46% are graduates of college or graduate school; two-thirds already own one personal computer. Docket No. 27, Pedersen Affidavit ¶¶ 16–17.

222  Docket No. 25, Defendant's Brief at 9; docket No. 27, Pedersen Affidavit ¶ 17.

223  *Oreck Corp.,* 803 F.2d at 171 ($1500 vacuum cleaner as opposed to a $3500 cleaner); *Sno–Wizard* (expensive sno-cone machine). In *Sun Microsystems, Inc. v. SunRiver Corp.,* 26 U.S.P.Q. at 1594, it was noted that consumers of internet products "are not likely to carefully discriminate among competing products;" but, the Court was considering relatively inexpensive internet software tools and applications.

 **\*16** Plaintiff has proffered three mis-directed e-mails received between October 1998 and January 1999 in support of its argument that there has been actual confusion on the part of three purchasers of HP–PAVILION personal computers regarding the ownership of *www.pavilion.com.* [224] Plaintiff argues that there will be more instances of confusion given the future development of internet services. [225] Preserving defendant's objection to the introduction into evidence of the three e-mails, [226] the Court notes the e-mails purport to be inquiries from individuals who are using HP–PAVILION personal computers and who are asking plaintiff for trouble-shooting advice. [227] Although the Court agrees with ACLP's argument that actual confusion is not required to prove likelihood of confusion and that actual confusion is the "best evidence of likelihood of confusion," [228] this is so only if the evidence of actual confusion is relatively significant. The Court cannot conclude that three misdirected e-mails, of "unsubstantiated legitimacy"

and with "lack of corroborating evidence," [229] received by ACLP in the last eight months—when HP has sold thousands and thousands of HP–PAVILION personal computers in that same time period—are dispositive of the issue of confusion. Although the Court is mindful that it may be difficult for ACLP to uncover evidence of actual confusion, [230] HP has produced testimony to establish that those who were and are in a position to know of actual confusion are not aware of any caller to HP who believed HP and ACLP were affiliated or who indicated confusion as to source or affiliation. [231] Because ACLP and ANI take pride in the more personalized relationships they develop with customers, likelihood of confusion is diminished. [232]

224  Docket No. 36, Aroian Declaration ¶ 11 and Exhibits I and J; Lane Declaration ¶¶ 4, 34–39. One of these e-mails purportedly from an apparent ACLP or ANI employee, David Baker, Jr., to Dennis Passovoy and Larry Krone refers to telephone inquires to Amicus regarding access to web pages. The inference is that HP customers are telephoning ACLP but the Court finds insufficient information in the record to make this finding.

225  Docket No. 36, Dr. Picken Declaration ¶¶ 3.4–3.6.

226  Defendant has insisted on plaintiff authenticating the e-mails by their authors so that meaningful cross-examination could occur. Although e-mail addresses appear, plaintiff represented that it has not been able to locate the senders of the e-mails to provide testimony to the Court.

227  The Court notes that the three mis-directed e-mails in three months might indicate that the HP-at-home affinity group is not strong, since HP would have sold thousands of personal computers in that time period. Additionally, the three mis-directed emails may evidence use of a variant of "pavilion" in the HTML metatag which might contribute to misidentification. The latter theory may be included within defense counsel's suggestion in cross-examination of Passovoy that instances of email concerning HP–PAVILION PCs by ANI might be "passive" rather than "active" mistakes.

228  *Amstar Corp.,* 615 F.2d at 263.

229  *Holiday Inns, Inc.,* 481 F.2d at 449.

230  Docket No. 36, Lemley Declaration.

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 85 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

231    Docket No. 27, Pedersen Affidavit ¶ 19; docket No. 28, Robertson Affidavit.

232    May 27, 1999 Lane and Passovoy testimony. Moreover, Passovoy testified on May 27, 1999 that ANI conducted a telephone campaign in approximately November 1998 when PARTNER PAVILION services were launched and that he was aware of no significant brand confusion pertaining to that arguable variant of the PAVILION mark.

The Court's consideration of this evidence appears to be in accord with the Fifth Circuit's decisions in *Oreck* (several mis-directed telephone calls in 17–months of concurrent use of similar marks raises a "presumption ... against likelihood of confusion in the future");[233] *Sno–Wizard* (district court properly rejected testimony of four allegedly confused witnesses);[234] *Society of Financial Examiners* (12 instances of actual confusion in five-year period "refutes the likelihood of confusion");[235] *Sun Banks* (15 misdirected inquiries in a three-year period is not sufficient);[236] *Holiday Inn* (nine letters and one telephone call are "of insignificant probative value to rise to the level of showing actual confusion");[237] and *Amstar Corp.* (three instances of actual confusion and four confused witnesses in nearly 15 years of concurrent sales are "isolated" and not significant).[238] In these cases, as in the present case, instances of actual confusion are anecdotal, isolated in context and of little probative value.[239]

233    803 F.2d at 173.

234    791 F.2d at 429.

235    41 F.3d at 228.

236    651 F.2d at 319.

237    481 F.2d at 449.

238    615 F.2d at 263.

239    *See also Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3rd Cir.1978)(19 misdirected letters over 4 years is insufficient to establish actual confusion); *Accuride International, Inc.,* 871 F.2d at 1536 (misdirected invoice and merchandise on one occasion, several misdirected telephone calls and several confused witnesses too weak to support finding of actual confusion).

This factor weighs in favor of HP.

*summary*

In sum, the key question in assessing likelihood of confusion at the preliminary injunction stage is a determination of whether it is likely that an appreciable number of ordinarily prudent potential purchasers are likely to be misled or confused as to source of ACLP's PAVILION® services. Although ACLP is not required to produce evidence on all seven "digits" recognized by the Fifth Circuit, although the "absence or presence of any one factor ordinarily is not dispositive" and although "a finding of likelihood of confusion need not be supported by even a majority of the seven factors,"[240] likelihood of confusion must be viewed in the over-all market context in which the mark is used. The Court concludes that ACLP has not sustained its burden in showing that a likelihood of confusion exists among consumers as to source, affiliation, connection or sponsorship of the PAVILION® mark. "[I]t is not sufficient if confusion is merely 'possible.' "[241] The particular battle grounds for trial appear to be type/strength of the mark and similarity of products/services.

240    *Conan Properties, Inc.,* 752 F.2d at 150.

241    3 J.McCarthy § 23:3 at 23–10 to –11.

b. state dilution
    **\*17** In order to establish a dilution claim under the Texas dilution statute, ACLP must show that it owns a distinctive mark and that there is a likelihood of dilution.[242] There is no requirement that plaintiff and defendant be in business competition, that the mark be "famous," or that likely consumer confusion be established .[243] "Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior users' mark with the possible future result that a strong mark becomes a weak mark."[244]

242    *See Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513 (S.D.Tex 1996), *aff'd,* 155 F.2d 526, 540 (5th

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 86 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

Cir.1998). *See, e.g.,* Restatement (Third) Unfair Competition § 25.

243    *Exxon Corp v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1081 (5th Cir.), *cert. denied,* 118 S.Ct. 299 (1977); *Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983, 993 (S.D.Tex.1990)

244    *Holiday Inns, Inc.,* 481 F.2d at 450. For example, dilution legislation flowed from a desire to prevent "hypothetical anomalies" such as "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, (2d Cir.1989).

Plaintiff argues that its mark is distinctive. "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." [245] Distinctiveness can be proved because the mark is strong or because it has acquired secondary meaning. [246] As noted above, HP argues that the proliferation in users of the word "pavilion" or a variant thereof shows that the mark lacks strength. [247] HP further argues that plaintiff's services and defendant's product are sufficiently distinct that there is no likelihood of dilution. "[T]here must be some mental association between plaintiff's and defendant's marks." [248] HP argues that ACLP has not produced evidence showing that association in this case.

245    *Mead Data Central, Inc.,* 875 F.2d at 1030 ("It has also been defined as uniqueness or as having acquired a secondary meaning .").

246    *Mead Data Central, Inc.,* 875 F.2d at 1032.

247    *Pebble Beach Co.,* 942 F.Supp. at 1564–65 (five factor test to measure distinctiveness of the mark to show dilution: (1) arbitrariness of the mark; (2) length of use of the mark; (3) scope of ads and promotions; (4) nature and extent of first user's business; and (5) scope of first user's reputation). *See also TV Land, L.P. v. Viacom International, Inc.,* 908 F.Supp. 543, 553 (N .D.Ill.1995).

248    *Mead Data Central, Inc.,* 875 F.2d at 1030.

On the present state of the record, and for the reasons stated above, the Court concludes that plaintiff's mark is in limited circulation and lacks commercial strength outside of its limited context. [249] Although the Court does not find that the mark is not sufficiently distinctive

to warrant trademark protection, the Court is troubled by the numerous third party uses of the mark which impair its distinctiveness for protection under the anti-dilution statute. Therefore, the Court does not now need to address whether defendant's use of the mark dilutes its distinctiveness. [250]

249    *See* discussion above regarding type/strength of the mark and similarity of products or services.

250    *Amstar Corp.,* 615 F.2d at 265. *See also Mead Data Central, Inc.,* 875 F.2d at 1034 ("Courts 'have consistently failed to analyze how a specific defendant's use has diluted a mark or its selling power when there is no likelihood of confusion." ') (J. Sweet, concurring).

c. summary of findings and conclusions on likelihood of success

The Court finds that ACLP has not demonstrated likelihood of succeeding on the merits of its trademark infringement or dilution claims. Because plaintiffs have failed to demonstrate an over-all substantial likelihood of prevailing on the merits, the Court undertakes a more abbreviated discussion of the remaining elements of plaintiffs' burden of proof. Nevertheless, the Court notes that ACLP's delay in initiating this federal lawsuit and its concomitant delay in requesting the issuance of a preliminary injunction strongly support this Court's decision to deny the motion for preliminary injunction. [251]

251    "[D]elay alone may justify denial of a preliminary injunction." *Citibank, N.A. v. City Trust,* 756 F.2d 273, 276 (2d Cir.1985); *but see* 756 F.2d at 969 ("Citibank does not preclude preliminary relief even if the district court finds unexcused delay. Delay is just one of several factors to consider.") (J. Jacobs, concurring).

3. *Irreparable Injury*

"The likelihood of confusion (a necessary element for success in a trademark infringement or unfair competition case) can constitute irreparable harm in a trademark case." [252] Indeed, when

252    *The TJM Corp. v. Xerox Corp.,* 25 U.S.P.Q.2d 1067, 1070 (E . D.La.1992).

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 87 of 98
Amicus Communications L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

**\*18** a plaintiff has shown a 'high probability of confusion,' there is normally a presumption of irreparable harm because "[w]hile an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; ... Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult....." [253]

[253]   *Tough Traveler, Ltd v. Outbound Products,* 60 F.3d 964, 967–68 (2nd Cir.1995), *quoting Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971). *See also Sunbeam Product, Inc. v. West Bend,* 123 F.3d at 257–58; *Chemlawn Services Corp. v. GNC Pumps, Inc.,* 690 F.Supp. 1560, 1569 (S.D.Tex.), *aff'd,* 856 F.2d 202 (Fed.Cir.1988). *See also National Football League Properties,* 808 F.Supp. at 1295 n.7 ("[T]he Fifth Circuit on more than one occasion has declined to presume the existence of irreparable harm.")

Defendant argues that any presumption of irreparable harm is inoperative or has been rebutted in this case by ACLP's delay in filing suit or in moving for preliminary injunctive relief. HP argues that because: HP has been using the Pavilion name to market millions of personal computers since at least August 1995; ACLP unrebuttably has known of HP's use of the mark at least since September 1995; [254] HP–PAVILION computers have always been internet enabled; [255] HP urges the Court to find that there is no justification for issuing "emergency" interim injunctive relief. Indeed, HP further argues that ACLP's nearly three-year delay in filing this lawsuit since actual notice of HP's use of the PAVILION name for its personal computers undercuts ACLP's arguments of irreparable harm and negates its claims of urgency. [256]

[254]   Docket No. 36, Lane Declaration ¶ 19.

[255]   May 27, 1999 Lane testimony.

[256]   *Citibank, N.A.,* 756 F.2d at 276 (nine-month delay in requesting preliminary injunction negates presumption of irreparable harm); *Tough Traveler, Ltd.,* 60 F.3d at 968 (nine-month delay in requesting preliminary injunction rebuts any presumption of irreparable harm and requires vacating preliminary injunction).

Plaintiff argues there has been no undue delay in filing this federal lawsuit because: initially the HP–PAVILION–PC was marketed as a multimedia and game computer; [257] it was not until 1997 that HP began promoting its HP–PAVILION's one-touch internet access; [258] it was not until 1998 that HP offered (and later discontinued) the Message Board service; [259] and not until October 1998 and after that ACLP received the three instances of actual confusion; and it was not until January 1999 that HP announced one-touch Yahoo! access. [260] Plaintiff further argues that its May 1996 protest letter, its formal opposition to the HP trademark for PAVILION for its personal computer, and its opposition to the use of the mark by Pavilion Technologies and others [261] also show vigilance. It is well-settled, however, that opposing a claim for registration is not the same as filing a federal lawsuit to enjoin use. [262]

[257]   Docket No. 25 n.1.

[258]   Docket No. 36, Lane Declaration ¶ 23; docket No. 27, Hurst Affidavit, McKinney deposition; Docket No. 36, McKinney Deposition, Exhibits 29, 45, 46, 49. Docket No. 25, Defendant's Brief at 3 ("By 1997, HP ranked third in the desktop home retail market with an approximate 10% market share."). *But see Roto–Rooter Corp,* 513 F.2d at 46 ("slightly less than five years" delay between first infringement and filing suit did not allow for laches defense because lawsuit concerning operation of El Paso franchise filed within four months of date on which El Paso operations begun).

[259]   Docket No. 36, Lane Declaration ¶ 23; docket No. 36, McKinney Deposition, Exhibits 51 and 52.

[260]   Docket No. 36, McKinney Deposition, Exhibit 55.

[261]   Docket No. 36, Lane Declaration ¶ 22 and Exhibit J.

[262]   Docket No. 25, Defendant's Brief, at 25 and cases cited therein.

The Court observes that ACLP's action in sending the May 1996 protest letter and in opposing HP's mark are sufficient to show that ACLP informed HP of its objection to HP's use of the PAVILION name in marketing personal computers. But, it is not sufficient to show that ACLP, almost four years after the introduction of the HP–PAVILION computers into the marketplace, is entitled to an "interim" order that would, as requested, force HP

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

to clear existing inventory of HP–PAVILION computers, stop making them, and stop selling them. ACLP did not file its declaration of use until approximately three months after HP had begun selling HP–PAVILION PCs, a fact relevant to HP's good faith, and approximately two months after Lane became aware of the marketing of HP–PAVILION PCs, a fact relevant to ACLP's delay. [263] "Delay in seeking relief ... undercuts any presumption that infringement alone has caused irreparable harm *pendente lite;* therefore, such delay may justify denial of a preliminary injunction for trademark infringement." [264] It has not been rebutted that HP–PAVILION PCs always have been marketed as multimedia computers [265] and that they always could access the internet. [266]

[263]     Docket No. 36, Lane Declaration ¶¶ 10, 11; Docket No. 27, Hurst Affidavit, Exhibit F; Docket No. 36, Braun Deposition, Exhibit 68; May 27, 1999 hearing, Lane Testimony. *See* note 65, above. At the May 27, 1999 hearing, Lane testified that after learning of the HP–PAVILION in August or September 1995, he did not investigate its features until the Spring of 1996.

[264]     *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984)(three-year delay in bringing suit or notifying of objection to use of mark undercuts urgency and requires vacating preliminary injunction). *Floralife, Inc. v. Floraline International, Inc.,* 633 F.Supp. 108, 113 (N.D.Ill.1985) (three week delay between allegedly infringing use and application for injunction was not undue delay).

[265]     Docket No. 27, Pedersen Affidavit ¶ 15 and Exhibit A at 2 (the internet access key is called "one touch multimedia key").

[266]     Docket No. 25, Defendant's Brief at 16 n.13; May 27, 1999 hearing, Lane testimony.

**\*19**  The Court finds that ACLP's delay in seeking injunctive relief in Court, standing by itself and in conjunction with the Court's findings on likelihood of success, rebuts any presumption of irreparable harm. In holding that delay is an important consideration in the assessment of irreparable harm, the Court does not address whether the defense of laches will bar relief at trial. [267]

[267]     *GTE Corp.,* 731 F.2d at 679; *Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc.,* 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied,* 434 U.S. 1070 (1978).

*See also Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155 (5th Cir.1982) (two years' delay not counted toward *laches* ); *Brookfield Communications, Inc.,____ F.3d ____,* 1999 WL *232021 (two years' delay did not estop claim under laches).

### 4. *Balancing*

Plaintiff argues that the cost to be incurred by HP if the preliminary injunction issues is outweighed by the harm to plaintiff if the preliminary injunction does not issue. The Court cannot agree. Using plaintiff's estimate that this "interim" injunctive relief will cost HP approximately $4.3 million in selling existing inventory, [268] this harm is to be balanced against ACLP's inability to identify any lost sale of ACLP PAVILION® services or any material detriment to any customer relationship suffered by ACLP or ANI due confusion with HP–PAVILION PCs. [269]

[268]     HP estimates the costs as being closer to $40 million in lost revenues to retailers, in addition to approximately $90 million to be incurred by HP, if the injunction is issued. Docket No. 25, Defendant's Brief at 28 n.30; docket No. 27, Anderson Affidavit at 3–4 ¶ 9.

[269]     Docket No. 27, Hurst Affidavit, Lane Deposition at 431; May 27, 1999 Lane testimony.

ACLP argues that HP did not follow an adequate trademark clearance process when it cleared PAVILION for use as a brand name of HP's home computer. Indeed, ACLP asserts that HP did not follow its own trademark clearance procedures when it cleared the name. [270] ACLP contends that this reckless conduct justifies immediate cessation of use of the PAVILION name by HP. ACLP argues at the hearing that HP "assumed the risk" when it began using a name which had not been properly cleared. On the other hand, HP argues that plaintiff's delay in seeking injunctive relief and plaintiff's failure to identify any loss of sales due to the alleged confusion weigh against finding a need for "emergency" interim relief.

[270]     Docket No. 36, Lemley Declaration.

Although neither party comes to the Court with an unblemished position on the balancing of the equities, the Court concludes that ACLP has not met its burden of showing that the threatened injury it would suffer if interim injunctive relief did not issue outweighs the damage granting the injunction would cause to defendant. If HP must change its product name now, it is "probably

Case 1:18-cv-00068 Document 289-4 Filed in TXSD on 08/04/18 Page 89 of 98

Amicus Communications, L.P. v. Hewlett Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

unrealistic" to expect that it would change the name of its popular personal computer back to "PAVILION" again if it wins on the merits. "The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." [271] In this case, the costs to be incurred by HP if the Court were to enter a preliminary injunction are so significant, that a preliminary injunction would have the practical effect of mooting a consideration of final injunctive relief: once HP has sold accumulated inventory of HP–PAVILION computers and stopped making and selling new ones, as requested by ACLP in its proposed interim injunction, it is unlikely that HP would again market the HP–PAVILION personal computer were HP to prevail on the merits. [272] Although the Court does not denigrate ACLP's legal position on the merits of this case, ACLP has not sustained its burden of establishing that the balance of the equities favors interim injunctive relief in this case.

[271] *GTE Corp.,* 731 F.2d at 678.

[272] *National Football League Properties,* 808 F. Supp at 1295 ("Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied. *Apple Barrel Prods. Inc. v. Beard,* 730 F.2d 384, 389–90 (5th Cir.1984)").

5. *Public Interest*

**\*20** Plaintiff argues that the public interest is served by protecting trademarks. [273] The Court does not quarrel with this black letter statement of law and public policy. Plaintiff has not shown that denying the injunction will dis-serve the public interest in the facts and circumstances of this case.

[273] *International Kennel Club v. Mighty Star,* 846 F.2d 1079, 1092 n.8 (7th Cir.1988).

## V. CONCLUSION

In sum, plaintiff's motion for a preliminary injunction [274] is DENIED on the ground that plaintiff has not sustained its burden of establishing its entitlement to preliminary injunctive relief pending the disposition of the merits of the case. This Order shall be SEALED only for seven (7) days following the date it is filed. *See* note 18, above.

[274] Docket no. 10.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 1999 WL 495921

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 304



AMERICAN
FactFinder

B05001 | NATIVITY AND CITIZENSHIP STATUS IN THE UNITED STATES

Universe: Total population in the United States
2012-2016 American Community Survey 5-Year Estimates

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

|  | Texas | |
|---|---|---|
|  | **Estimate** | **Margin of Error** |
| Total: | 26,956,435 | ***** |
| U.S. citizen, born in the United States | 22,086,661 | +/-19,454 |
| U.S. citizen, born in Puerto Rico or U.S. Island Areas | 85,050 | +/-3,852 |
| U.S. citizen, born abroad of American parent(s) | 290,379 | +/-4,592 |
| U.S. citizen by naturalization | 1,589,804 | +/-10,373 |
| Not a U.S. citizen | 2,904,541 | +/-19,889 |

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

Explanation of Symbols:

   1. An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
   2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
   3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
   4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
   5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.

6.  An '******' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

7.  An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

8.  An '(X)' means that the estimate is not applicable or not available.

# DEF-INTERV.

# EX. 305

**Transcripts**

 Jul 16, 2018 Jeon, Esther 06-15-2018

**Page:** 68
1   BY MR. BITTER:
2       **Q.      You can answer, if you know.**
3           A.      I understand that as it pertains to me,
4   as a DACA recipient, I would have been allowed to
5   leave the United States.
6           **Q.      So your understanding is that advanced**
7   **parole is what allows you to travel outside the**
8   **United States; is that right?**
9           A.      As it pertains to me a DACA recipient,
10  that is how I understand it.
11          **Q.      Have you applied for advanced parole?**
12          **A.      No.**
13          Q.      Are you aware of others who have applied,
14  other DACA recipients who applied for advanced
15  parole?
16          A.      Yes.
17          Q.      Do you have any understanding about the
18  advanced parole process based on others that you
19  know who have applied for it?
20          A.      No.
21          Q.      You just know that others have applied
22  for advanced parole; is that fair?
23          A.      Yes.
24          Q.      Do you know anything about the process
25  beyond that?

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF TEXAS

 3              BROWNSVILLE DIVISION

 4
     STATE OF TEXAS, et al.,      )
 5                                )
              Plaintiffs,         )
 6                                )
         vs                       ) No. 1:18-CV-68
 7                                )
     UNITED STATES OF AMERICA,    )
 8   et al.,                      )
                                  )
 9            Defendants.         )
                                  )
10       and                      )
                                  )
11   KARLA PEREZ, et al.,         )

12

13              The deposition of Esther Jeon called for

14   examination pursuant to notice and pursuant to the

15   Federal Rules of Civil Procedure for the United

16   States District Courts pertaining to the taking of

17   depositions taken before JO ANN LOSOYA, Certified

18   Shorthand Reporter within and for the County of Cook

19   and State of Illinois at 11 East Adams, Chicago,

20   Illinois, on June 15, 2018 at the hour of 11:00

21   o'clock a.m.

22

23

24

25
```

ERRATA SHEET

Case:
Witness:

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

Page _____    Line _____    Reason for change:

_____

7/13/2018

```
 1                    REPORTER CERTIFICATE

 2

 3          I, JO ANN LOSOYA, a Certified Shorthand

 4   Reporter within and for the County of Cook and State

 5   of Illinois, do hereby certify:

 6                    That previous to the commencement

 7   of the examination of the witness, the witness was

 8   duly sworn to testify the whole truth concerning the

 9   matters herein;

10                    That the foregoing deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15                    That the said deposition was taken

16   before me at the time and place specified;

17                    That I am not a relative or

18   employee or attorney or counsel, nor a relative or

19   employee of such attorney or counsel for any of the

20   parties hereto, nor interested directly or

21   indirectly in the outcome of this action.

22

23

24

25
```

1               IN WITNESS WHEREOF, I do hereunto set my

2       hand this June 27, 2018.

3

4

5

6

7

8               JO ANN LOSOYA, CSR

9               C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# Volume 5

# Exhibit 306

# Def-Int. Ex. 306

# PLACEHOLDER[1]

---

[1] Defendant Intervenors will supplement this item of the appendix when the deposition transcript becomes available.