**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# Volume 1

# Exhibits 150 - 151

# DEF-INTERV.

# EX. 150

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DECLARATION OF STEPHEN H. LEGOMSKY**

My name is Stephen H. Legomsky.  I am over the age of 18 and fully competent to make this declaration.  I have personal knowledge of, and could testify in court concerning, the following statements of fact:

1.     I am the John S. Lehmann University Professor Emeritus at the Washington University School of Law in Saint Louis, Missouri.  I have taught United States immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school coursebook "Immigration and Refugee Law and Policy," the seventh edition of which is now in process.  This book is published by Foundation Press.  I am also the author of "Immigration and the Judiciary – Law and Policy in Britain and America," published by the Oxford

1

University Press in 1987, as well as numerous articles on immigration law in scholarly journals.

2. From October 2011 to October 2013, which includes the times when the program known as Deferred Action for Childhood Arrivals ("DACA") was announced and initiated, I served as the Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), in the United States Department of Homeland Security (DHS). USCIS is the agency charged with implementing DACA.  From July 2015 to October 2015 I served as Senior Counselor to the Secretary of Homeland Security, also on immigration matters.  I have advised both Democratic and Republican Administrations on immigration policy. For example, I chaired the 5-member policy advisory group convened by Immigration and Naturalization Service Commissioner Gene McNary (during the administration of George H.W. Bush), which met with the Commissioner for a half-day every month.  I also advised the transition teams for President Clinton and President Obama.

3. I have testified, as a private citizen, before both the U.S. House and U.S. Senate Judiciary Committees concerning the legality of large-scale deferred action programs.  My written statement submitted in conjunction with my House Judiciary Committee testimony of Feb. 25, 2015 (the latter of the two testimonies) analyzes the legal issues in detail and can be found at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

4. At present, I am an inactive member of the State Bar of California.

### I.     DACA and Prosecutorial Discretion

5.     DHS routinely establishes priorities guiding its exercise of prosecutorial discretion in the enforcement of the immigration laws.  One of the instruments DHS uses for implementing enforcement priorities is deferred action. 8 CFR § 274a.12(c)(14) (deferred action "gives some cases lower priority").  DACA, in turn, is one particular deferred action initiative.

6.     DACA is a decision by the agency to defer action (immigration enforcement proceedings) against an individual.  To quote the U.S. Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), just as it true of other federal agencies, DHS's decision "not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. [DHS] must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing."

7.     When making a decision not to bring immigration enforcement proceedings against an individual, DHS must also balance factors specific to immigration -- national security, public safety, border security, degree of fault and compassionate circumstances, to name just a few.

8.      Reinforcing those considerations is the express mandate from Congress:  The Secretary of Homeland Security is "responsible" for "establishing immigration enforcement policies and priorities."  6 USC § 202(5).

9.      There are occasions on which DHS selects  deferred action as the preferred vehicle for implementing its prosecutorial priorities.  Among the individuals who are low enforcement priorities, DHS has to decide which, if any, should receive deferred action.  To make that decision DHS has to balance not only the same factors that affected its prosecutorial priorities generally, but several others as well.

10.     On the one hand, DACA requestors are present in the U.S. in violation of the immigration laws.  On the other hand there are countervailing equities and there are benefits that DACA provides and that DHS has both the expertise and the responsibility to evaluate.  These include the relative absence of moral culpability evidenced by the violation (DACA eligibles violated the immigration laws but were innocent children at the time, typically brought here by their parents).  In addition, DACA eligibles had to have lived in the United States since 2007 and be under the age of 31, so that many know only this country.

11.     DACA, unlike a negative decision simply to forgo or delay active prosecution and release an individual, draws undocumented immigrants out of the shadows and into the open, so that DHS can know their names, addresses, and histories; if a DACA requestor or recipient has a criminal history or violates the law, DHS can immediately place that individual into removal proceedings by issuing a Notice to Appear.  At the same time, if DHS officers come across an individual who has

4

obtained a DACA grant, the officers can quickly determine from that individual's paperwork, without redundant and time-consuming investigation, that the DACA recipient has been vetted and already deemed low-priority.

12.     Benefits that accrue beyond DHS include the fact that communities are safer when crime victims and witnesses feel secure enough to report crimes to the police; DACA boosts the tax contributions of the recipients; and unscrupulous employers who currently know they can hire unauthorized workers at low wages will have less reason to hire DACA recipients over U.S. workers and will be less able to drive down overall market wages or working conditions in the process. As with other non-enforcement actions, the agency's expertise leaves it uniquely well-positioned to balance those policy factors.

13.     USCIS and its predecessor agency have utilized prosecutorial discretion, and deferred action in particular, for several decades.[1]

14.     During my time as Chief Counsel of USCIS I had ample occasion to study a range of issues related to deferred action generally and DACA in particular. I am not aware of any law, court decision, or other legal authority that forbids the use of deferred action, or limits its use to specific statutorily-enumerated contexts, or allows it when the number of affected individuals is small but not when that number is large.

15.     Indeed, either deferred action or its functional equivalent has been used by several Administrations, of both political parties, to grant temporary reprieves from

---

[1] The history is described in Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 13-20; and in Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4.

removal, and in some cases temporary employment authorization, to large, specifically-defined subclasses of undocumented immigrants. A list of some 39 examples is provided by Amer. Immigration Council, Executive Grants of Temporary Immigration Relief, 1956-Present (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

16.     These past Administrations granted temporary reprieves from removal to large subclasses of undocumented immigrants for a variety of reasons.  In some instances the beneficiaries tended to be those with a bridge to some form of legal status.  DACA too serves as such a bridge because many current DACA recipients are eligible to adjust as they grow older and marry.  But a bridge to a formal legal status is merely one reason for creating such programs; many such programs were designed to serve other humanitarian purposes.  Here again, DACA is similar to those programs.  Examples of deferred action or similar programs for classes of individuals who otherwise lacked any bridge to legal immigration status include:

- President George H.W. Bush's 1989 parole of Soviet and Indochinese who had been denied refugee status;

- President George H.W. Bush's 1992 grant of "deferred enforced departure" to certain Salvadorans whose temporary protected status had expired;

- President Clinton's 1994 extension of that 1992 grant;

- President George W. Bush's 2005 grant of deferred action to foreign students who had been adversely affected by Hurricane Katrina;

- President George W. Bush's 2007 grant of deferred enforced departure to Liberians after their temporary protected status had expired;

- President Obama's 2009 and 2011 extensions of that 2007 grant; and

- President Obama's 2009 grant of deferred action to widows and widowers of U.S. citizens and their children under age 21.

*Id*.  These illustrate the broad range of humanitarian, foreign policy, and other reasons for executive action that spare large numbers of aliens from removal and in many cases grant temporary permission to work.

17.    The number of individuals benefited by past deferred action or similar programs varies, but in some instances exceeds several hundred thousand.  For example, the discretionary program for Cuban asylum seekers from 1959 to 1972 allowed over 600,000 individuals to be paroled into the U.S.; the discretionary program for people from Vietnam, Cambodia, and Laos from 1975-1979 allowed over 350,000 individuals to be paroled into the U.S.; President Reagan's 1987 program of deferred action for undocumented children of some noncitizens who applied to legalize after 1986 immigration reform involved more than 100,000 families; and, according to the congressional testimony of President Bush's Immigration and Naturalization Service Commissioner, the President's 1990 "family fairness" program was expected (at the time it was announced) to defer the deportation of, and authorize employment for, some 1.5 million undocumented spouses and children of the legalization beneficiaries under the 1986 Immigration Reform and Control Act (IRCA).  For detailed support, *see* Stephen H. Legomsky, U.S. House Judiciary    Committee    testimony    of    February    25,    2015,

https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

18.     Despite occasional imprecise language in various court filings, immigration law recognizes a crucial difference between lawful "presence" and lawful "status." USCIS has interpreted deferred action as giving rise to temporary lawful "presence," but it cannot, and as the memo creating DACA explicitly provides, does not, create any legal immigration "status."  Because the individual continues to lack lawful immigration *status*, DACA, like any other grant of deferred action, may be revoked, and the individual placed in removal proceedings, at any time. Once DACA is revoked, one who had entered without inspection will be removable under 8 USC § 1182(a)(6)(A)(i) (present in the United States without being admitted or paroled).  One who overstayed a nonimmigrant visa will be removable under 8 USC § 1227(a)(1)(C)(i) (failed to maintain nonimmigrant status or comply with the conditions of such status).  Consequently, DACA is never a barrier to the government commencing removal proceedings when it wishes to do so.  Moreover, since all DACA recipients had to have been already previously unlawfully present for much longer than the one-year period that triggers the ten-year inadmissibility bar (with some narrow exceptions, including those who were not unlawfully present for a year or more after age 18), and since DACA does not erase that previous period of unlawful presence, the person will ordinarily be inadmissible for ten years upon departure from the United States.  8 USC §§ 1182(a)(9)(B)(i)(II), 1182(a)(9)(B)(iii).

19.   Even if a court were to hold that the executive branch lacks the authority to deem deferred action recipients temporarily lawfully present, that conclusion would be at most a reason to invalidate the determination of lawful presence, not a reason to invalidate DACA itself.  No law makes lawful presence a prerequisite for deferred action or for the grant of work authorization (the latter discussed separately in section II below).

20.   A grant of DACA, like any other grant of deferred action, is simply a tentative, revocable signal to an alien that he or she is a low enforcement priority and that the government therefore does not intend to initiate removal proceedings for a specified period of time.  As the regulations explain, deferred action is simply "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14).

21.   In exchange, the DACA requestor must come forward, submit biographic and biometric data that will then be checked against various law enforcement and intelligence databases, provide his or her address, supply documentary proof of the DACA threshold criteria, and send payment of the processing fee ($465 at the inception of DACA).

22.   Like any other workers with U.S. income, DACA recipients are required to pay federal and state income taxes, including Social Security and Medicare taxes. One who receives deferred action and work authorization does become eligible for various federal benefits that flow from existing law – mainly various statutory provisions and in at least one instance a binding regulation.  Examples include 8 CFR § 274a.12(c)(14) (allowing deferred action recipients to apply for temporary

work permits if they can demonstrate economic necessity); 8 USC §§ 1611(b)(2,3) (Social Security and certain Medicare benefits, although DACA recipients, having been under age 31 since 2012 at the earliest, will ordinarily be ineligible for both Social Security and Medicare for the next several decades); and 26 USC § 32 (earned income tax credit).

23.    But the key point concerning these other benefits is that, in issuing DACA, the Obama Administration did not attempt to change any of the laws or policies that make deferred action recipients eligible for those benefits.  Nor am I aware of any legal problems with the laws that provide those benefits to DACA and other deferred action recipients.

24.    Because DACA requires continuous residence in the United States since June 15, 2007, it is not available to anyone who arrives today or in the future.  Thus it creates no incentive for future illegal immigration.

25.    DHS grants deferred action precisely when the INA does not provide a lawful immigration status to an individual but where there are equities that are felt to warrant deferred action.  Through its application of prosecutorial discretion, DHS routinely grants deferred action to undocumented individuals.  Examples include those who are seeking to adjust under the Violence Against Women Act (VAWA); who are applying for withholding of removal; who are applying for cancellation of removal; who are seeking to adjust status as beneficiaries of family preference petitions; who have applied for U-visas; or who have applied for T-visas.

10

## II.    Employment Authorization

26.    On the subject of the employment rights of aliens, perhaps the most important provision of the Immigration and Nationality Act (INA) is 8 USC § 1324a(h)(3). That is the definitional provision that lays out which aliens may work and which ones may not.  To be ineligible for employment authorization, the alien must *not* be "either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act *or by the* [*Secretary of Homeland Security*]"[2] [my emphasis].  *Id*.  The plain language of this provision makes clear that employment authorization is not limited to those aliens whom other provisions of the Immigration and Nationality Act (INA) already authorize to work; it extends also to those whom the Secretary of Homeland Security so authorizes.

27.    That plain language completes the statutory scheme in a way that comports with common sense and sound policy.  On the one hand, the INA identifies several specific categories of aliens who are eligible for employment authorization.  In addition to the LPRs explicitly mentioned in section 1324a(h)(3), a few examples are 8 USC §§ 1101(a)(15) (H,O, and P) (certain temporary workers), 1158(c)(1)(B) (asylees), and 1254a(a)(1)(B) (recipients of temporary protected status).  On the other hand, the INA also identifies several specific categories of aliens who are ineligible for employment authorization.  Examples include business visitors, 8 USC § 1101(a)(15)(B); visitors for pleasure, *id*; asylum applicants for the first 180 days after the filing of the application, 8 USC §

---

[2] The text refers to the Attorney General, but under the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), § 1517, that term is now to be read as referring to the Secretary of Homeland Security, to whom the relevant authority has been reassigned.

1158(d)(2); individuals in removal proceedings (unless already authorized to work), 8 USC § 1226(a)(3); and (with exceptions) those who are awaiting execution of final removal orders, 8 USC § 1231(a)(7). For all other aliens – i.e., those who (like the DACA recipients) typically do not fall within either of these two sets of provisions -- 8 USC § 1324a(h)(3) clarifies that the decision whether to authorize work is left to the Secretary of Homeland Security, who is the official to whom Congress has delegated principal responsibility for administering and enforcing the immigration laws, 8 USC § 1103(a); 6 USC § 202(5).

28.     The formal regulations supplement this carefully-constructed statutory scheme. They list numerous categories of aliens who are eligible for employment authorization. Many of the listed categories cover classes of aliens who are typically present in the United States unlawfully. These include individuals with pending *applications* for cancellation of removal, registry, temporary protected status, and (under 1986 legislation) legalization. See, respectively, 8 CFR §§ 274a.12(c) (10, 16, 19, and 22). In a similar vein, section 274a.12(c)(14), first adopted in 1982 during the Reagan Administration and in frequent and continuous use ever since, expressly makes deferred action recipients eligible for employment authorization, provided they can show an "economic necessity" to work.

**III.     Advance Parole**

29.     8 USC § 1182(d)(5) gives the Secretary of Homeland Security the discretion to "parole" an alien into the United States, on a case by case basis, "for urgent humanitarian reasons or significant public benefit." The term "advance parole"

refers to a decision by USCIS, upon request, to provide a reasonable assurance – though not a guarantee – that a person who is currently in the United States and who wishes to leave temporarily will "likely" be paroled back into the country upon his or her return. *Matter of Arrabally and Yerrabelly*, 25 I. & N. Dec. 771, 778 n.6 (BIA 2012). This enables the person to leave the country temporarily without undue fear of being unable to return.

30.    Parole can come into play in another context. To be eligible for adjustment of status to lawful permanent residence under 8 USC § 1255, one has to have been "admitted or paroled" at one time. Id. § 1255(a). A person who was admitted on a nonimmigrant visa will meet this requirement even if he or she has now overstayed, but a person who entered without inspection (and has never been admitted or paroled) will not.

31.    In general, adjustment of status under 8 USC § 1255 requires proof that the person meets all the substantive requirements for LPR status plus additional requirements for the adjustment of status procedure. Although parole will satisfy the "admitted or paroled" requirement, it will not result in adjustment of status unless the applicant meets all those other requirements as well. These include not only fitting within one of the categories of lawful permanent resident affirmatively authorized by Congress (for example family, employment skills, etc.), but also not falling within any of the more than 20 pages of inadmissibility grounds laid out in 8 USC § 1182(a) (subject to a few narrowly drawn statutory discretionary waivers). These alone are rigorous requirements.

13

32.     But there are others, one of which is of critical importance here.    Under 8 USC §

1255(c)(2), almost all adjustment of status applicants who are not immediate

relatives (a term defined narrowly in 8 USC § 1151(b)(2)(A)(i)  to encompass

only certain very close family members of US citizens) must prove they have

continuously maintained a lawful status in the U.S. since entry.  That requirement

alone disqualifies the overwhelming majority of DACA recipients, regardless of

advance parole.  The only numerically significant sub-group of DACA recipients

for whom advance parole would remove that one remaining obstacle to

adjustment of status consists of immediate relatives, and even then only if they

entered without inspection.

33.     Understanding the effects of advance parole on DACA recipients is crucial,

because some have relied on the possibility of advance parole to claim that

DACA effectively creates a path to LPR status and eventual U.S. citizenship.  For

two reasons, that characterization is faulty.  First, neither DACA nor advance

parole creates that path.   As explained above, the person still needs some

independent statutory route to LPR status; if such a route exists, and the person

otherwise meets all the prescribed requirements, then advance parole merely helps

to satisfy one of the many statutory requirements.  Second, as of December 31,

2015, fewer than 1% of all DACA recipients had received advance parole and

then received or even applied for adjustment of status.   Letter from Leon

Rodríguez, Director, USCIS, to Charles E. Grassley, Chairman, Committee on the

Judiciary, United States Senate (June 29, 2016).  The tiny percentage who do so

are applying for a benefit expressly conferred by the INA.

14

34.     In his affidavit presented to this court, Mr. Palinkas states that DACA recipients who received advance parole and then applied for adjustment of status "jumped the line and were able to get permanent residence faster than the legal and eligible applicants who filed under current USCIS rules and regulations." That statement is incorrect. The small percentage of DACA recipients who receive advance parole and apply for adjustment of status are not permitted to "jump the line." As immediate relatives, they are statutorily exempt from numerical limitations and thus need only await administrative processing, just like all other immediate relatives seeking adjustment of status.

## IV.    The "Rubber-Stamping" Assertion

35.     Mr. Palinkas's affidavit asserts that USCIS adjudicators are forced to "rubber-stamp" their approvals of DACA requests. His premises for this claim are that DACA adjudications normally do not require personal interviews and that the approval rates are in his view high.

36.     As to the interview issue: the particular threshold criteria for DACA are ordinarily ascertainable from a combination of written documents and required background checks. For example, whether the requestor "has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on the date of this memorandum" can be ascertained through a combination of employment or school records, leases, or other documents. Once that timeline is established, the person's age at time of arrival, which must be under 16, can be determined from the birth certificate. The same is true of the requirement that the person not be above the age of 30 on the date of filing the

request.  Whether the person "is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States" is established through the official school or Armed Services records.  And the facts that relate to criminal history or threats to public safety or national security are gleaned from the required searches of the relevant law enforcement and intelligence databases.  The National Standard Operating Procedures ("SOPs") for DACA adjudicators lay out in detail the wide range of documents that the adjudicators are expected to consult.  See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 44-64.  For these determinations, personal interviews are not necessary and would add little if any value.

37.    To accept Mr. Palinkas's theory that the lack of a personal interview per se renders the results unreliable, one would have to condemn not only the DACA process, but the entire body of work performed by the USCIS Service Centers. They receive applications in the mail or online and decide the cases on the basis of the required documentation and the background checks. See U.S. Citizenship and Immigration Services, USCIS Service Centers, https://egov.uscis.gov/crisgwi/go?action=offices.type&OfficeLocator.office_type=SC. They handle more than 4 million cases per year. See U.S. Citizenship and Immigration Services, "USCIS Service Center Operations," Fiscal Year 2016 Report to Congress (Jan. 18, 2017),

https://www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Service%20Center%20Operations.pdf, at 2.  See also U.S. Citizenship and Immigration Services, Service Center Forms Processing (last updated Apr. 16, 2018), https://www.uscis.gov/forms/service-center-forms-processing, which lists all the different forms that the five Service Centers adjudicate.  By my count there are 45 different benefit adjudications assigned to the Service Centers.  They include a number of benefits that are either prerequisites to, or applications for, formal legal status as immigrants or nonimmigrants  -- i.e., cases in which the long-term consequences are far greater than for DACA requests.

38.  The DACA SOPs for the adjudicators include instructions to carefully examine all cases for possible fraud, "based on the standard fraud protocols." See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 7 and chap. I.

39.  As to the approval/denial rates: the most recent available official compilation of DACA approval and denial rates displays those data as of March 31, 2018.  See https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf.  The cumulative denial rate for initial DACA requests (i.e. as opposed to renewals), from the inception of the program through March 31, 2018, was approximately 8.5%.[3]

---

[3] Importantly, these are just the denials on the merits.  They are to be distinguished from, and do not include, "rejections," which entail returning the DACA file to the requestor upon arrival at the lockbox, for technical reasons

40.    One would expect the denial rate to be lowest in the early years of the program and highest as time goes on, because the initial batch of requests would be likely to be the strongest; the more marginal requests might be expected to be filed later. In fact, that is precisely what has happened; the compilation above shows the denial rate steadily increasing with time, reaching above 20% for the first two quarters of fiscal year 2018.  The annual denial rates for initial DACA requests for fiscal year 2013 through the first two quarters of 2018, calculated from the USCIS official report cited above (denials divided by the sum of approvals and denials), were as follows:

| Fiscal Year | Denial Rate |
| --- | --- |
| 2013 | 2.3% |
| 2014 | 13.4% |
| 2015 | 17.4% |
| 2016 | 17.7% |
| 2017 | 16.4% |
| 2018 | 20.1% |

41.    In all, some 75,510 DACA requests have been denied on the merits as of March 31, 2018.  *Id*.

42.    The roughly 80% current approval rate is not surprising when one considers the applicant pool.  A person who is undocumented, especially if there is some other negative information in his or her background, is highly unlikely to initiate contact with the immigration authorities, voluntarily reveal his or her name and address, confess to being undocumented, confess to any other negative history,

---

such as failure to sign the form, failure to enclose the required fee or the required documents, etc.

and send a check for $465 – all for a benefit that is most likely going to be denied. It is thus hardly surprising that the approval rate is as high as it is.  Given the applicant pool, the approval rate does not support any inference of rubber-stamping.

43.     In any given case, an adjudicator who determines that he or she needs additional information in order to reach a decision may issue a "Request for Evidence" (an "RFE").  I do not have access to the precise number of DACA RFEs, but on information and belief my impression is that they have numbered in the thousands.

44.     In the end, despite his conclusory assertions that the DACA adjudication process is insufficiently rigorous, Mr. Palinkas never identifies a single concrete piece of information that he claims adjudicators are unable to obtain or consider.  I am similarly unable to identify any such missing information.

## V.     Discretion

45.     Previously cited examples of deferred action or equivalent exercises aimed at large, specifically-defined classes of undocumented immigrants demonstrate that numerous Presidents have assumed they had the power to create such programs. While the fact that other Administrations have done something does not prove that it is legal to do so, it is instructive that Congress has long been fully aware of these actions and to date has never blocked the practice.  There is no indication that Congress believed these past practices to be unlawful.

46.     Even assuming *arguendo* that all deferred action must be issued on an individual basis, DACA satisfies that requirement.  The fact that the agency has announced

the general criteria that should guide the exercise of that discretion does not mean that there is no discretion to exercise. Agency guidance as to the exercise of discretion in individual cases is a common practice that serves several crucial purposes. Important general policy decisions like DACA should be made at the leadership level, because political accountability rests solely with leadership, not with the career employees whose job is to carry out the policies. Further, only the leadership can disseminate guidance throughout the agency so that the people on the ground know what they are supposed to do, so that important priorities will be transparent to the public, and so that there will be some reasonable degree of consistency. Consistency in turn is essential to equal treatment. To the extent avoidable, the decision whether to arrest, detain, prosecute, or grant or deny deferred action should not depend on which officer happens to encounter the person or which prosecutor's desk the person's file happens to land on. For all these reasons, the DACA process wisely entails adopting general threshold criteria at the front end while still requiring individualized, case-by-case discretion at the back end.

47.   The National Standard Operating Procedures issued by agency and departmental leadership to the USCIS adjudicators repeatedly and explicitly admonish them to approach each case individually and to exercise discretion. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 17 ("individual *may* be favorably *considered* for DACA if" the threshold criteria are met) (my emphasis); 44 (substantially similar instruction); 74 ("decision whether to defer

20

action in a particular case is *individualized and discretionary*, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns") (my emphasis); 75 ("criminal history … is a factor to be considered in the unreviewable *exercise of discretion*") (my emphasis).

48.  There is no evidence to support any counter-instinctive assumption that the USCIS adjudicators who decide DACA requests are systematically disobeying the Secretary's multiple clear instructions to exercise discretion on a case-by-case basis.  They are in fact exercising discretion at two different stages of the process:

49.  First, some of the threshold criteria themselves require fundamentally discretionary judgments.  Whether someone endangers the public safety, for example, is more than simply a matter of finding facts.  The adjudicator has to decide not only how probable and how severe a danger the particular individual poses, but also how probable and how severe it *has to be* before finding the person to be a threat to public safety.  There is no scientific answer to that question; it is a matter of opinion, not fact. The same is true when the question is whether the person is a threat to national security. There are foundational facts to be ascertained, but once they are, the adjudicator must decide whether the threat is probable enough and severe enough to warrant denying DACA.  This is the classic definition of a discretionary determination – one for which there is no uniquely correct answer.  See, e.g., S.A. de Smith, "Constitutional and Administrative Law" (4th ed. 1981), at 278.  The fact that the discretion is exercised in applying the threshold criteria rather than separately after the threshold criteria have been met does not make the determination any less

discretionary.  The adjudicator is still choosing between two permissible courses of action.  See, e.g., *Gonzalez-Oropeza v. U.S. Attorney General*, 321 F.3d 1331, 1332-33 (11th Cir. 2003) (determinations of "exceptional and extremely unusual hardship," which is a statutory prerequisite for cancellation of removal, are discretionary and therefore unreviewable); *Romero-Torrez v. Ashcroft*, 327 F.3d 887, 889-92 (9th Cir. 2003) (same).  Nor is there any apparent legal or policy reason to value either exercise of discretion more than the other.

50.  Second, the Neufeld affidavit submitted in the DAPA litigation in fact gave specific examples of cases in which DACA was denied in the exercise of discretion even though the threshold criteria had been met.  See *State of Texas v. United States*, Civ. No. B-14-254 (S.D. Tex. Feb. 16, 2015), Exh. 44, Declaration of [USCIS Associate Director for Service Operations] Donald W. Neufeld, at 510, para. 18.  In his sworn declaration, Mr. Neufeld stated that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met."  *Id*.  He furnished specific examples.  They included cases where a person had committed or had attempted to commit fraud in *prior* applications or petitions (not in connection with the DACA requests themselves), or where a person met all the threshold criteria but had previously made a false claim of U.S. citizenship and had had prior removals.  *Id*.

51.  For all the foregoing reasons, and for additional reasons elaborated in my U.S. House Judiciary Committee testimony of February 25, 2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf, it is my firmly-held opinion that DACA is a case-by-case exercise

22

of prosecutorial discretion by which DHS fulfills the Congressional directive to set and carry out immigration enforcement priorities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this  16th   day of July, 2018 in  St. Louis, Missouri.


_____

Stephen H. Legomsky

# Def-Int. Ex. 151

# PLACEHOLDER[1]

---

[1] Defendant-Intervenors will supplement this item of the appendix when the final deposition transcript becomes available.