**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

<u>**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**</u>

# Volume 2

# Exhibits 280 - 287

# DEF-INTERV.

# EX. 280

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,        )
           Plaintiffs,             )
 4                                  )
     vs.                            ) CASE NO. 1:18-cv-00068
 5                                  )
     UNITED STATES OF AMERICAN,     )
 6   et  al.,                       )
           Defendants              )
 7   and                            )
                                    )
 8   KARLA PEREZ, et al.,           )
        Defendants-Intervenors     )
 9   ********************************************************

10                    ORAL DEPOSITION OF

11                    DR. NANCY ADOSSI

12                      JUNE 21, 2018

13   ********************************************************

14        ORAL DEPOSITION OF DR. NANCY ADOSSI, produced as a

15   witness at the instance of the Plaintiff and duly sworn,

16   was taken in the above-styled and numbered cause on the

17   21st day of June, 2018, from 9:08 a.m. to 11:20 p.m.,

18   before LaDonna Ayers Burch  , Certified Shorthand

19   Reporter in and for the State of Texas, reported by

20   computerized stenotype machine at the Offices of the

21   Attorney General, Consumer Protection Division, 808

22   Travis Street, Suite 1520 Houston, Texas  77002,

23   pursuant to the Federal Rules of Civil Procedure and the

24   provisions stated on the record or attached hereto.

25
```

**Transcripts**

 Jun 21, 2018 Adossi, Nancy

**Page:** 66
1  question.
2      Q.    So was that after you became a DACA recipient
3  was you filed your first taxes?
4      A.    Yeah, uh-huh.   Yes.
5      Q.    Okay.   And so to reiterate, you received an
6  employment authorization when you received DACA and
7  that's what has allowed you to receive the current jobs
8  that you're in, correct?
9      A.    Yes.
10      **Q.    Okay.   Have you ever heard of advanced parole?**
11      **A.    Yes, I have.**
12      **Q.    Okay.   What's your understanding of it?**
13      **A.    I believe it's another application process to**
14  **receive permission to leave the United States for work,**
15  **for sickness in the family and I don't remember the**
16  **third category, but I remember work and sickness in the**
17  **family.**
18      **Q.    Okay.   Have you ever applied for it?**
19      **A.    I have never applied for it.**
20      Q.    Do you know any other DACA recipients who have
21  applied for advanced parole?
22      A.    No, not that I can recall.
23      Q.    And have you traveled outside of the U. S.
24  since your DACA request was approved?
25      A.    No, I have not.

 Jun 21, 2018 Adossi, Nancy

**Page:** 69
1  because it's a few different things sure.
2                  THE WITNESS:   Yes, I -- this is -- this is
3  where I've lived for 20 years.
4      **Q     (BY MR. PEROYEA) So you would want to remain in**
5  **the United States if you lost DACA?**
6      A.    If there was a legal path for me to be able to
7  apply to, yes.
8      **Q.    But if you lost DACA specifically, would you**
9  **consider all of your options as to where you would live?**
10      A.    Yes, I would go to a lawyer and ask them what
11  are my options.
12      **Q.    But would it be possible that you would leave**
13  **the United States?**
14                  MR. HERRERA:   Objection, calls for
15  speculation.
16                  THE WITNESS:   I mean, like I said, my
17  entire life is here.
18      **Q     (BY MR. PEROYEA) So -- so you would wait to see**
19  **the possibility as to whether or not you would stay or**
20  **go?**

21      A.   I would go to a lawyer to ask them what my
22  options are.
23      **Q.   And so what would happen if you lost your work**
24  **authorization?**
25      A.   I wouldn't have -- I wouldn't be able to work.

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,        )
            Plaintiffs,            )
 4                                  )
     vs.                            ) CASE NO. 1:18-cv-00068
 5                                  )
     UNITED STATES OF AMERICAN,     )
 6   et  al.,                       )
            Defendants             )
 7   and                            )
                                    )
 8   KARLA PEREZ, et al.,           )
        Defendants-Intervenors      )
 9

10                 REPORTER'S CERTIFICATE

11          ORAL DEPOSITION OF DR. NANCY ADOSSI

12                    JUNE 21, 2018

13       I, LADONNA AYERS BURCH, a Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify that the foregoing deposition is a full, true

16   and correct transcript;

17       That the foregoing deposition of DR. NANCY ADOSSI,

18   the Witness, hereinbefore named was at the time named,

19   taken by me in stenograph on June 21st, 2018, the said

20   Witness having been by me first duly cautioned and sworn

21   to tell the truth, the whole truth, and nothing but the

22   truth, and the same were thereafter reduced to

23   typewriting by me or under my direction.  The charge for

24   the completed deposition is $_____ due from

25   Plaintiff;
```

NANCY ADOSSI

1    That by agreement of counsel, the deposition officer

2  is instructed to release the original deposition

3  transcript to _____ on

4  _____,  for review and signature, and the

5  deposition officer is thereafter released of any further

6  responsibility with regard to the original.

7    That the Witness shall have thirty (30) days for

8  review and signature of the original transcript and if

9  any corrections returned are attached hereto.

10    That the signed transcript ( ) was ( ) was not

11  received from the Witness within 30 days.

12    That the amount of time used by each party at the

13  deposition is as follows:

14    Mr. Trent Peroyea - 1 hr. 54 min
      Mr. Adam Arthur Biggs
15    Mr. Ernest I. Herrera - 1 minute
      Mr. Rick Kincheloe - 4 minutes
16    That before the completion of the deposition, the
    the Defendant did request to review the transcript.
17    I further certify that I am neither counsel for,
    related to, nor employed by any of the parties in the
18  action in which this proceeding was taken, and further
    that I am not financially or otherwise interested in the
19  outcome of the action.
      Certified to by me this _____ day of _____
20  _____, 2018.

21                       _____

22                       LaDonna Ayers Burch, CSR
                         Texas CSR 3941
23                       Expiration:  12/31/2018
                         KIM TINDALL & ASSOCIATES, LLC
24                       Firm Registration No. 631
                         16414 San Pedro, Suite 900
25                       San Antonio, Texas  78232
                         (210) 697-3400

# DEF-INTERV.

# EX. 281

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3
    STATE OF TEXAS, ET. AL.          )
4                                    )
            PLAINTIFFS,              )
5                                    )
    V.                               )  CASE NO. 1:18-cv-00068
6                                    )
    UNITED STATES OF AMERICA,        )
7   ET. AL.,                         )
                                     )
8            DEFENDANTS,             )
                                     )
9   AND                              )
                                     )
10  KARLA PEREZ, ET. AL.,            )
                                     )
11       DEFENDANT-INTERVENORS.)

12

13

14

15

16   _____

17            ORAL DEPOSITION OF KARLA PEREZ

18                   June 16, 2018
     _____
19

20

21

22

23

24

25

1       ORAL DEPOSITION OF KARLA PEREZ, produced as a

2   witness at the instance of the Plaintiffs and duly

3   sworn, was taken in the above-styled and numbered

4   cause on June 16, 2018, from 11:06 a.m. to 1:55 p.m.,

5   before Mia Cieslar, Certified Shorthand Reporter in

6   and for the State of Texas, reported by computerized

7   machine shorthand, at the offices of the Attorney

8   General, Consumer Protection Division, 808 Travis

9   Street, Suite 1520, Houston, Texas, pursuant to the

10  Federal Rules of Civil Procedure and the provisions

11  stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Transcripts**

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 76
1    Q.    All right.   What nuances did he not
2  understand?
3    A.    Senator Schwertner states, This amendment
4  simply requires that the student qualify for federal
5  financial aid.   You must have a Social Security card
6  and be a US citizen.
7              That is incorrect.  I'm a DACA
8  recipient.   I have a Social Security card.   I cannot
9  apply for or qualify for federal financial aid.   So it
10 was just a -- it was clear to me that it -- it showed
11 a lack of understanding of how this works.
12    Q.    Okay.   Did you participate in the Texas
13 College Work-Study Program?
14    A.    I did not.
15    Q.    Okay.   Here it says -- I'm sorry?
16    A.    I was not aware of it.
17    Q.    Okay.   Yeah, and actually, that's what I was
18 going to ask you.   Here you say, There are a lot of
19 obstacles for DACA students, said Perez, 24, noting
20 that many of the DACA recipients she knew in Texas had
21 not even realized they could participate in the work
22 study program in the past.
23              You agree with that statement, right?
24    A.    Yes.
25    Q.    Okay.   And did you inform those DACA

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 78
1  thing.   People not understanding that having DACA,
2  being a DACA recipient does not mean that you are a US
3  citizen or that you have legal status.   That's what I
4  meant by that type of misinformation.
5    Q.    All right.   Do you know any DACA recipients
6  who did participate in the college work study program?
7    A.    I do not know.
8    Q.    Okay.   Was this one of the legislative
9  campaigns that United We Dream undertook during
10 the 2017 legislative session?
11    A.    It was not a campaign per se, but more
12 when -- I mean, there was a minor proposal that came
13 up when we were aware that we did what we could to
14 advocate against it.
15    Q.    And when you say we, you mean United We
16 Dream?
17    A.    Yes.
18    Q.    All right.
19              MR. DISHER:  We can take a break.
20              (Recess taken, 1:11 p.m. to 1:22 p.m.)

21      Q.    (BY MR. DISHER) All right.   We're back on the
22 record.   Ms. Perez, are you ready to continue?
23      A.    Yes.
24      Q.    All right.   I just have a few more questions
25 for you.

Jun 16, 2018 Perez, Karla (6_16_2018)

**Page:** 84
 1      Q.    All right.   And just what relation are they
 2 to you?
 3      A.    Extended family only.
 4      Q.    Okay.   Since you came here in 1995, have you
 5 left the United States?
 6      A.    No.
 7      Q.    Been here ever since?
 8      A.    Yes.
 9      Q.    All right.   Have you ever applied for advance
10 parole?
11      A.    Yes.
12      Q.    When did you apply for advance parole?
13      A.    Early -- late -- late 2016, early 2017.   It
14 was over my school winter break.
15      Q.    Okay.   Did you get advance parole?
16      A.    I was -- my application for advance parole
17 was approved in early March.
18      Q.    Of?
19      A.    Of 2017.
20      Q.    Okay.   And then why did you apply for advance
21 parole?
22      A.    My maternal grandmother has gotten very sick
23 over the years, and I thought that I could have the
24 opportunity to see her during that time.   Yeah.
25      Q.    And is she in Mexico?

**Page:** 85
 1      A.    Yes.
 2      Q.    All right.   Did you go see her?
 3      A.    No.
 4      Q.    Right.   Because you haven't left since '95,
 5 obviously.   And why --
 6      A.    Yes.
 7      Q.    -- why did you not go?
 8      A.    I applied for advance parole, as I mentioned,
 9 later in 2016 or earlier in 2017, and I didn't hear
10 back until March.   And when I received the approval,
11 my schedule just didn't allow it at that time.
12      Q.    Okay.   Will you just describe to me the
13 process of applying for advance parole.
14      A.    Yes.   There's a -- an application for advance
15 parole.   That's a USCIS application.   I completed the
16 application.   I had to provide documentation for why I
17 was requesting advance parole.   That was based on the
18 humanitarian reason of my sick grandmother.   So I
19 provided those documents showing that in my

20  application packet to USCIS, along with a sworn
21  declaration about why I was seeking advance parole.
22      **Q.     All right.**
23      A.     And I paid a filing fee as well.
24      **Q.     Okay.   So you submit the material and pay the**
25  **filing fee.   Did you have to do anything else?**

```
1                    CHANGES AND SIGNATURE

2                         KARLA PEREZ

3                       June 16, 2018

4

5    PAGE/LINE              CHANGE                 REASON
```

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| 21, 21 | Strike "and" in "created and by" | Transcription Error |
| 40, 1 | Correct "fighting it" to "finding it" | Transcription Error |
| 45, 1 | Correct "DH" to "DHS" | Typographical Error |
| 65, 17 | Replace "monitor" with "mentor" | Transcription Error |
| 65, 21 | Replace "monitor" with "mentor" | Transcription Error |
| 75, 7 | Replace "wasn't" with "was" | Transcription Error |
| 78, 13 | Strike "that" | Transcription Error |
| 87, 13 | Replace "out" with "it" | Transcription Error |
| 90, 22 | Replace first "or" with "of" | Typographical Error |
| 91, 15 | Replace "confirm" with "confer" | Transcription Error |
| 96, 11 | Correct "Danielle" to "Daniel" | Transcription Error |
| 96, 12 | Correct "Candalaria" to "Candelaria" | Typographical Error |
| 96, 12 | Correct "Mela" to "Mirla" | Transcription Error |

```
19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

```
1        I, KARLA PEREZ, have read the foregoing deposition
2    and hereby affix my signature that same is true and
3    correct, except as noted above.
4
5                              _Karla Perez_____
                                  KARLA PEREZ
6
7
8    THE STATE OF  Texas  )
9    COUNTY OF  Harris    )
10
11       Before me,  Elsa Ramirez  , on this day
12   personally appeared KARLA PEREZ, known to me or proved
13   to me on the oath of  Texas Driver License (or through
14   description of identity card or other document) to be
15   the person whose name is subscribed to the foregoing
16   instrument and acknowledged to me that he/she executed
17   the same for the purpose and consideration therein
18   expressed.
19       Given under my hand and seal of office on this
20   _12_ day of _July_____ , 20_18_.
21
22                              _____
23                              NOTARY PUBLIC IN AND FOR
24                              THE STATE OF  Texas_____
25                              My Commission Expires: June 16, 2019
```

ELSA RAMIREZ
Notary Public, State of Texas
My Commission Expires
June 16, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
     STATE OF TEXAS, ET. AL.        )
 4                                  )
              PLAINTIFFS,           )
 5                                  )
     V.                             )  CASE NO. 1:18-cv-00068
 6                                  )
     UNITED STATES OF AMERICA,      )
 7   ET. AL.,                       )
                                    )
 8            DEFENDANTS,           )
                                    )
 9   AND                            )
                                    )
10   KARLA PEREZ, ET. AL.,          )
                                    )
11        DEFENDANT-INTERVENORS.)

12

13               REPORTER'S CERTIFICATE

14           ORAL DEPOSITION OF KARLA PEREZ

15                   June 16, 2018

16

17        I, Mia Cieslar, Certified Shorthand Reporter

18   in and for the State of Texas, hereby certify that to

19   the following:

20        That the witness, KARLA PEREZ, was duly sworn

21   by the officer and that the transcript of the oral

22   deposition is a true record of the testimony given by

23   the witness;

24        I further certify that pursuant to FRCP Rule

25   30(f)(1) that the signature of the deponent:
```

Karla Perez                                                    June 16, 2018
                                                               Page 103

1          __X__ was requested by the deponent or a party

2    before the completion of the deposition and returned

3    within 30 days from date of receipt of the transcript.

4    If returned, the attached Changes and Signature Page

5    contains any changes and the reasons therefor;

6          ____ was not requested by the deponent or a

7    party before the completion of the deposition.

8          I further certify that I am neither attorney

9    nor counsel for, related to, nor employed by any of

10   the parties in the action in which this testimony was

11   taken.

12         Further, I am not a relative or employee of

13   any attorney of record in this cause, nor do I have a

14   financial interest in the action.

15         Subscribed and sworn to on this the _____ day

16   of _____, 20____.

17

18

19         _____
                 Mia Cieslar, CRC, RDR, CRR
20               Texas CSR 5763
                 Expiration:  12/31/19
21               Kim Tindall & Associates, LLC
                 Firm Registration No. 631
22               16414 San Pedro, Suite 900
                 San Antonio, Texas  78232
23               Phone (210) 697-3400
                 Fax (210) 697-3408

24

25

# DEF-INTERV.

# EX. 282

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION
    - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
    STATE OF TEXAS, et al.,        CASE NO. 1:18-CV-08
 4
       Plaintiffs,
 5
                vs.
 6
    UNITED STATES OF AMERICA,
 7  et al.,

 8     Defendants,

 9  KARLA PEREZ, et al.,

10     Defendant-Intervenors,

11  and

12  STATE OF NEW JERSEY,

13     Proposed Defendant-Intervenor

14  - - - - - - - - - - - - - - - - - - - - - - - - - -

15                        - - -

16                Monday, June 18, 2018

17                        - - -

18                   DEPOSITION OF:

19                  ROSE ARACKATHARA

20                        - - -

21

22

23

24

25
```

 1

 2              Oral Deposition of ROSE ARACKATHARA,

 3   was taken pursuant to Notice at the offices of the

 4   NEW JERSEY ATTORNEY GENERAL'S OFFICE, 124 Halsey

 5   Street, 5th Floor, Newark, NJ 07101 on the above

 6   date before DEBRA G. JOHNSON-SPALLONE, CCR, RPR,

 7   Delaware CSR, Notary Public in and for the States of

 8   Pennsylvania, New Jersey, and Delaware, and a

 9   Federally Approved Reporter of the United States

10   District Court commencing on or about 10:10 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                              Page 47

```
 1   are given work authorization.
 2             Q.      That's your understanding of the --
 3             A.      That's my understanding, yes.
 4             Q.      And do you know whether Ms. Osorio
 5   would have been selected for the internship without
 6   having DACA status?
 7             A.      I don't know for certain.  I would
 8   -- I would -- again, I would think so based on just
 9   a general assumption that an employment contract is
10   a part of the program.
11             Q.      You talk some in paragraph four of
12   your Declaration.
13                     Is it right that Ms. Osorio worked
14   with social workers conducting home visits in Morris
15   County, New Jersey?
16                     Is that right?
17             A.      Yes, that's correct.
18             Q.      And those were in response to
19   concerns about abuse or neglect or child welfare.
20                     Is that correct?
21             A.      Yes.
22             Q.      Was this work that's described in
23   paragraph four in your Declaration part of her work
24   at the Intake Unit?
25             A.      Yes.
```

1    specialized unit for adolescents.  So, I know she

2    did or that was done a few times.  Also to make sure

3    she reviewed some of the documents that they

4    generate in that process.

5                     So, she had -- she had -- she had a

6    good broad experience through the Division, but,

7    again, it was primarily in the Intake Unit.

8           Q.     Is it typical of interns in the

9    DCP&P to get experience in various units within the

10   Division?

11                     MR. HOLLANDER:  Objection.

12                     THE WITNESS:  From my

13   understanding, I don't know if it's -- but from my

14   understanding is, it varies depending on the Field

15   Instructor.

16                     I know from other Field Instructors

17   that I have spoken to they have a similar philosophy

18   in trying to get them to have a better understanding

19   of the Division, broader understanding of the

20   Division, but I don't -- it varies, the experience

21   varies per student -- per student.

22                            - - -

23   CONTINUATION

24   BY MR. BITTER:

25           Q.     But with respect to Ms. Osorio,

Case 1:18-cv-00068   Document 289-2   Filed on 08/04/18 in TXSD   Page 23 of 64

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                    Page 50

```
 1   you've been indicating that she got experience in a

 2   handful of units within the Division.

 3            A.     Yes.

 4            Q.     Is that right?

 5            A.     Yes.

 6                     MR. HOLLANDER:  Objection.

 7                            - - -

 8   CONTINUATION

 9   BY MR. BITTER:

10            Q.     In paragraph five of your

11   Declaration you talk about Ms. Osorio shadowing a

12   social worker in the Passaic County Permanency Unit.

13                     Do you see that?

14            A.     Yes.

15            Q.     Could you talk to me about some of

16   those functions that Ms. Osorio performed there?

17            A.     So, yes.

18                     During her internship, as I

19   mentioned before, towards the end of your internship

20   you will let the BCWEP program know what counties

21   you would like to work in.

22                     Cinthia reported me that her

23   primarily -- her primary town she would like to work

24   in was Morris County, but she was also interested in

25   working in Passaic County.
```

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                    **Page 55**

```
 1              Q.      You talk in paragraph six of your

 2    Declaration about Ms. Osorio having a natural

 3    rapport in the family she visited.

 4                      Do you see that?

 5              A.      Huh-huh.

 6              Q.      And what do you mean by that?

 7              A.      She -- in social work, in working

 8    with people and families, and especially when they

 9    are a new position, in a sense that we are an agency

10    with authority, it is a very delicate balance to

11    work with a family, and, you know, work on issues.

12                      We're primarily there to help, but

13    we are not always seen in that capacity by the

14    families we work with.  What they're afraid -- the

15    first thing that most families think of when we come

16    knocking on doors is; "are you going to take my

17    child?"

18                      So, it is a delicate balance in

19    working with families to assure them we are there

20    primarily to help.  We are not there primarily to

21    take their child, and we are there primarily for the

22    safety of the children in their household.

23                      So, Cinthia was -- it is very

24    important to show through our workers to have a good

25    way of working with families and individuals and
```

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Rose Arackathara on 06/18/2018**                               Page 56

1    ensuring them that we are there to help.

2                    If there is something that is

3    posing a risk with the child, we are there to help

4    mitigate that, and it is, honestly, not even

5    primarily by the means of removing the child from

6    the situation.

7                    So, it is -- it is important that

8    workers go into the home, and work with families,

9    and have that ability to convey that to them in how

10   we speak, how we interact with them, how we explain

11   things, and, you know, focusing on -- not only on

12   the negative, but also on the positive and strengths

13   that are in that family.

14                   And Cinthia was very, very natural

15   with that.  She -- even times when she came out with

16   me, she was first to point out strengths in that

17   individual, and they are talking about all these

18   things that are going wrong in your life right now.

19   She is typically the first to point out, "but look

20   how strong you are.  Look what you went through.

21   Look where you are today."

22                   So, that was what I have seen in

23   Cinthia.

24          Q.    So, you are not saying that other

25   interns in the program are unable to build that kind

1   providing anything in the Declaration to the

2   negative, if you will, of other interns and other

3   workers within DCP&P.

4                    Is that right?

5        A.     Yes.

6                    MR. HOLLANDER:   Objection to the

7   question, but you can answer.   Okay.

8                       - - -

9   CONTINUATION

10  BY MR. BITTER:

11       Q.     In paragraph seven you indicate

12  that Ms. Osorio was able to truly understand DCP&P

13  clients.

14                   Do you see that?

15       A.     Yes.

16       Q.     A couple of things with respect to

17  this paragraph.

18                   First of all, Ms. Osorio is fluent

19  in Spanish.

20                   Is that correct?

21       A.     Yes.

22       Q.     And what do you mean by the fact

23  that she can truly --

24                   Let me rephrase that.

25                   What do you mean when you say that,

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.

Rose Arackathara on 06/18/2018                                    **Page 59**

1    "Ms. Osorio can truly understand DCP&P clients"?

2            A.      So, when it comes to working with

3    our families, a lot of the time they ask about us

4    personally; how do we know what we are talking about

5    when we never went through what they are going

6    through, and there's two different types of workers

7    in the Division, and there is the worker that, you

8    know, wants to help, and, you know, make a

9    difference in changing lives, but they don't have

10    personal experience, you know, and the difficulties

11    of growing up in a household that may have, you

12    know, safety risk issues in the household.

13                    And there is workers who have

14    personally gone through, not necessarily safety

15    issues, but struggle, and it -- they understand from

16    a firsthand perspective other -- other -- other

17    individuals understand intellectually what they are

18    going through, but it is completely different when

19    it is coming from a personal standpoint of what

20    personally you have gone through.

21                    In our attachment area, we do have

22    a large population of undocumented individuals that

23    we work with, and those clients are always

24    particularly worried and reluctant to work with us

25    because of the immigration status.

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                    Page 60

```
 1                           And Cinthia herself had to go
 2     through that personal struggle of, "am I going to be
 3     able to work in my field of choice," because she was
 4     undocumented when she was a teen, and because DACA
 5     was going to possibly be rescinded, she can
 6     personally speak to those difficulties in her
 7     childhood, and that mind frame of going through what
 8     our clients go through, being undocumented and
 9     having those experiences that come with that.
10            Q.     Are you aware whether, during the
11     time that Ms. Osorio was an intern at DCP&P, there
12     were any other interns in the program who were DACA
13     recipients?
14            A.     Can you -- can you repeat your
15     question?
16            Q.     Sure.
17                   When Ms. Osorio was an intern at
18     DCP&P, are you aware whether there were other
19     interns at the same time who were also DACA
20     recipients?
21            A.     I'm aware of others, yes.
22            Q.     And are you aware -- at other
23     times, just beyond the times that Ms. Osorio was
24     there, are you aware whether DACA recipients that
25     were brought on by DCP&P as interns?
```

Case 1:18-cv-00068   Document 289-2   Filed on 08/04/18 in TXSD   Page 29 of 64

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                    Page 62

```
 1   being able to truly understand DCP&P clients.

 2                  You're -- again, you're focusing on

 3   Ms. Osorio strengths in the internship program.

 4                  Is that fair?

 5        A.      Huh-huh.

 6        Q.      You are not --

 7                  Is that a yes?

 8        A.      Oh, yes.  Yes.  Sorry.

 9        Q.      And you are not providing that

10   testimony here today to the -- to the negative of

11   anybody else who works for DCP&P.

12                  Is that right?

13                  MR. HOLLANDER:  Objection.

14                  THE WITNESS:  Yes, that is right.

15                       - - -

16   CONTINUATION

17   BY MR. BITTER:

18        Q.      What do you mean in paragraph seven

19   about Ms. Osorio being able to connect with clients

20   in a natural way?

21        A.      Speaking to Ms. Osorio, speaking to

22   previously in that she has a natural rapport with

23   individuals, not just undocumented individuals.  It

24   is individuals in general.

25                  But also, you know, everybody --
```

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                    **Page 63**

```
 1   social work in particular, the way you work with

 2   families, through personal experience and background

 3   definitely plays a factor in that how you perceive a

 4   family, how you work with the family, and through

 5   supervision we challenge that in making sure that

 6   you are not bias, but in the positive sense that she

 7   personally, from firsthand experience, understands

 8   the challenges that come with being undocumented,

 9   and low income in -- in the State -- in the area.

10          Q.     Is it fair to say there are other

11   interns in the BCWEP program that are able to truly

12   understand DCP&P clients?

13               MR. HOLLANDER:  Objection.

14               THE WITNESS:  Can you repeat that?

15               MR. BITTER:  Sure.

16                    - - -

17   CONTINUATION

18   BY MR. BITTER:

19          Q.     Well, in your Declaration you talk

20   about Ms. Osorio being able to truly understand

21   DCP&P clients.

22               Is that right?

23          A.     Yes.

24          Q.     Is it fair to say there are other

25   interns in the program that are also truly able to
```

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Rose Arackathara on 06/18/2018                                   Page 64

```
 1    understand DCP&P clients?

 2              A.      They can truly understand them, but

 3    like I was saying previously, it is in a different

 4    capacities based on personal experience.

 5                      One can intellectually, cognitively

 6    understand, and one can understand from firsthand

 7    experience of going through some of the issues.

 8              Q.      And are other interns at DCP&P that

 9    are able to connect with clients the natural way as

10    what you refer in your Declaration?

11              A.      Yes, there are a couple.

12              Q.      And is that true for full-time

13    social workers as well?

14              A.      Yes, there are others.

15              Q.      Are you aware whether Ms. Osorio

16    was given any different tasks or responsibilities in

17    light of her DACA status during her internship?

18              A.      No, she was not.

19              Q.      Ms. Osorio's scheduled to start

20    working full time at the Division this August.

21                      Is that right?

22              A.      Yes.

23              Q.      And she -- it is your understanding

24    that she just graduated from Centenary College.

25                      Is that right?
```

```
 1
 2        I, Debra G. Johnson-Spallone, certify that the
 3   foregoing is a true and accurate transcription of
 4   the notes taken by me on the date set forth.
 5        I further certify that I am not an attorney or
 6   counsel of any of the parties, nor a relative or
 7   employee of any attorney or counsel in connection
 8   with the action, nor financially interested in the
 9   action.
10
11
12
13
14   _____
15   DEBRA G. JOHNSON-SPALLONE, CSR, RPR
16
17
18
19   This transcript is not to be copied unless under the
20   direct control and supervision of the certifying
21   reporter.
22
23
24
25   Debra G. Johnson-Spallone, CSR, RPR
```

# DEF-INTERV.

# EX. 283

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE



A
# CBO
**PAPER**



*A Series on Immigration*

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

**DECEMBER 2007**



Δ π EXHIBIT 4
Deponent Perryman
Date 6/27/18 Rptr. DE
WWW.DEPOBOOK.COM

Pub. No. 2500



# The Impact of
# Unauthorized Immigrants on the
# Budgets of State and Local Governments

December 2007

The Congress of the United States ■ Congressional Budget Office



# Preface

**A**ccording to available estimates, there are about 12 million unauthorized immigrants in the United States. Federal, state, and local governments spend public funds that benefit those immigrants, and those immigrants pay individual income, sales, and property taxes. Most available studies conclude that the unauthorized population pays less in state and local taxes than it costs state and local governments to provide services to that population. However, those estimates have significant limitations; they are not a suitable basis for developing an aggregate national effect across all states.

This paper, requested by the Chairman and Ranking Member of the Senate Finance Committee, is one of several reports prepared by the Congressional Budget Office (CBO) that present facts and research on immigration. The paper focuses on the estimated costs that certain state and local governments incur for providing various services—especially those related to education, health care, and law enforcement—to unauthorized immigrants. It also looks at the estimated taxes those individuals pay and at certain types of federal assistance that are available to states to help provide such services. In keeping with CBO's mandate to provide objective, nonpartisan analysis, the paper makes no recommendations.

Melissa Merrell of CBO's State and Local Government Cost Estimates Unit wrote the paper under the supervision of Peter Fontaine, Theresa Gullo, and Robert Sunshine. Douglas Hamilton is the coordinator of CBO's series of reports on immigration. Raymond J. Hall and Eric Schatten reviewed the manuscript for factual accuracy, and Lauren McMahon provided research assistance. David Brauer, Patrice Gordon, Arlene Holen, Leo Lex, Noah Meyerson, Robert Murphy, Paige Piper/Bach, Lisa Ramirez-Branum, Eric Rollins, Ralph Smith, Shinobu Suzuki, and G. Thomas Woodward provided comments on early drafts of the paper, as did Paul Cullinan and Donald B. Marron (both formerly of CBO), and Alan Auerbach of the University of California, Berkeley. (The assistance of external reviewers implies no responsibility for the final product, which rests solely with CBO.)

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino prepared the paper for publication and designed the cover. Lenny Skutnik printed the initial copies, Linda Schimmel coordinated the print distribution, and Simone Thomas produced the electronic version for CBO's Web site (www.cbo.gov).

*Peter R. Orszag*
Director

December 2007



# Contents

| | |
|---|---|
| **Introduction** | 1 |
| **The Budgetary Effects of Unauthorized Immigrants** | 2 |
| **Size and Characteristics of the Unauthorized Population** | 3 |
| **Spending by State and Local Governments** | 7 |
| Education | 7 |
| Health Care | 8 |
| Law Enforcement | 9 |
| **Revenues Versus Spending** | 9 |
| **Federal Assistance** | 10 |
| Education | 10 |
| Health Care | 11 |
| Law Enforcement | 12 |
| **Bibliography** | 13 |

**Box**

| | |
|---|---|
| 1.   The Challenges of Estimating an Aggregate Effect | 4 |



# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

## Introduction

Over the past two decades, most efforts to estimate the fiscal impact of immigration in the United States have concluded that, in aggregate and over the long term, tax revenues of all types generated by immigrants—both legal and unauthorized—exceed the cost of the services they use.[1,2] Generally, such estimates include revenues and spending at the federal, state, and local levels.[3] However, many estimates also show that the cost of providing public services to unauthorized immigrants at the state and local levels exceeds what that population pays in state and local taxes. It is important to note, though, that currently available estimates have significant limitations;

therefore, using them to determine an aggregate effect across all states would be difficult and prone to considerable error.

The impact of unauthorized immigrants on the federal budget differs from that population's effect on state and local budgets primarily because of the types of services provided at each level of government and the rules governing those programs. For instance, most unauthorized immigrants are prohibited from receiving many of the benefits that the federal government provides through Social Security and such need-based programs as Food Stamps, Medicaid (other than emergency services), and Temporary Assistance for Needy Families. At the same time, the federal government requires that state and local governments provide certain services to individuals, regardless of their immigration status or ability to pay, in order for those states or localities to participate in some of its assistance programs. Various court decisions also restrict the authority of state and local governments to avoid or constrain the cost of providing services to unauthorized immigrants who reside in their jurisdictions. In general, state and local governments bear much of the cost of providing certain public services—especially services related to education, health care, and law enforcement—to individuals residing in their jurisdictions. Such programs constitute a major portion of those governments' annual expenditures, but spending by state and local governments on services specifically provided to unauthorized immigrants makes up a small percentage of those governments' total spending.

Another factor that affects state and local spending is the extent to which the unauthorized population uses certain public services. For example, because unauthorized immigrants are less likely to have health insurance, they are

---

1. The term "unauthorized immigrants" refers to foreign citizens residing in the United States illegally. It applies to two categories of immigrants: those who enter the country without approval of the immigration process and those who violate the terms of a temporary admission without acquiring either permanent resident status or temporary protection from removal. Members of this population are also referred to as illegal or undocumented immigrants or aliens.

2. See Ronald D. Lee and Timothy W. Miller, "The Current Fiscal Impact of Immigrants and Their Descendants: Beyond the Immigrant Household," in James P. Smith and Barry Edmonston, eds., *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1998); James P. Smith and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1997); Georges Vernez and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996); and George Vernez and Kevin F. McCarthy, *Immigration in a Changing Economy: California's Experience* (Santa Monica, Calif.: RAND Corporation, 1998).

3. Typically, the estimates measure the costs and revenues attributed to immigrants during a specific period of time, usually one fiscal year.

# DEF-INTERV.

# EX. 284



FAIR FEDERATION FOR AMERICAN IMMIGRATION REFORM

THE FISCAL BURDEN OF ILLEGAL IMMIGRATION ON
# *United States Taxpayers*



Δ π EXHIBIT 5
Deponent Kelly Man
Date 6/27/18 Rptr JE
WWW.DEPOBOOK.COM

BY JACK MARTIN, DIRECTOR OF SPECIAL PROJECTS AND
ERIC A. RUARK, DIRECTOR OF RESEARCH



## THE FISCAL BURDEN OF ILLEGAL IMMIGRATION ON
# *United States Taxpayers*

BY JACK MARTIN, DIRECTOR OF SPECIAL PROJECTS AND
ERIC A. RUARK, DIRECTOR OF RESEARCH

**JULY 2010**
(REVISED FEBRUARY 2011)

# TABLE OF CONTENTS

**Executive Summary** ..............................................................................................................1

**Introduction** .......................................................................................................................8

**I. Federal Outlays** ...............................................................................................................12
    A.  Educating the Children of Illegal Aliens ...............................................................13
    B.  Medical Expenses for Illegal Aliens and Their Children ........................................15
    C.  Criminal and Deportable Alien Prisoners ............................................................18
    D.  Welfare Used by Illegal Alien Families .................................................................26
    E.  General Federal Expenditures ..............................................................................30
    F.  Total Federal Fiscal Costs....................................................................................31

**II. Federal Taxes Collected from Illegal Aliens**..................................................................32
    A.  Income Tax............................................................................................................33
    B.  Earned Income Tax Credits (EITC) for Illegal Aliens..........................................35
    C.  Additional Child Tax Credit (ACTC) ..................................................................36
    D.  Net Income Tax Receipts from Illegal Aliens.......................................................38
    E.  Social Security Tax................................................................................................38
    F.  Medicare Tax ........................................................................................................40
    G.  Excise and Miscellaneous Taxes...........................................................................41
    H.  Other Taxes and Credits ......................................................................................41

**III. Net Federal Fiscal Costs of Illegal Aliens** ...................................................................42

**IV. Unquantified Federal Fiscal Impacts**...........................................................................43

**U.S. Map: Fiscal Costs per Native-Headed Household (Federal, State and Local)**...................44-45

**V. State and Local Outlays**................................................................................................46
    A.  Educating the Children of Illegal Aliens .............................................................47
    B.  Medical Care Costs of Illegal Aliens.....................................................................55
    C.  Administration of Justice Fiscal Costs ..................................................................63
    D.  Child Care.............................................................................................................65
    E.  Temporary Assistance to Needy Families .............................................................67
    F.  School Meal Programs...........................................................................................67
    G.  General Expenditures ...........................................................................................67
    H.  Other Costs..........................................................................................................69

**VI. State and Local Taxes Collected** ..................................................................................72
    The Illegal Alien Disposable Income Profile .........................................................73

**VII. Net Fiscal Costs** ........................................................................................................77

**VIII. The Bottom Line**.......................................................................................................79

**IX. The Economic Benefit Argument** ...............................................................................80

**X. Effects of Amnesty**.......................................................................................................81
    A.  Amnesty Adoption ...............................................................................................82
    B.  Attrition Through Enforcement ...........................................................................83

**XI. Conclusion** ..................................................................................................................87

**Endnotes** ..........................................................................................................................88

a report by the Federation for American Immigration Reform

## Receipts from Illegal Aliens

| TAX CATEGORY | FEDERAL | STATE/LOCAL |
|---|---|---|
| Income | -$2,302,800,000 | $244,200,000 |
| Social Security | $7,000,000,000 | |
| Medicare Tax | $1,637,100,000 | |
| Excise and Miscellaneous | $2,489,700,000 | |
| Employer (FUTA & Income) | $632,600,000 | |
| Property tax | | $1,378,000,000 |
| Sales Tax | | $2,333,000,000 |
| **TOTAL** | **$9,456,600,000** | **$3,955,200,000** |

## Methodology

All studies assessing the impact of illegal aliens begin with estimates of the size of that population. We use a population of 13 million broken down by state.

In our cost estimates we also include the minor children of illegal aliens born in the United States. That adds another 3.4 million children to the 1.3 million children who are illegal aliens themselves. We include these U.S. citizen children of illegal aliens because the fiscal outlays for them are a direct result of the illegal migration that led to their U.S. birth. We do so as well in the assumption that if the parents leave voluntarily or involuntarily they will take these children with them. The birth of these children and their subsequent medical care represent a large share of the estimated Medicaid and Child Health Insurance Program expenditures associated with illegal aliens.

We use data collected by the federal and state governments on school expenses, Limited English Proficiency enrollment, school meal programs, university enrollment, and other public assistance programs administered at the federal and state level. Estimates of incarceration expenses are based on data collected in the State Criminal Alien Assistance Program in which state and local detention facilities seek federal compensation for the cost of detention of criminal and deportable aliens. Estimates for other administration of justice expenditures are based on data collected from the states by the U.S. Department of Justice. General government expenditures are estimated for other non-enumerated functions of government at both the federal and local level. An example would be the cost of fire departments or the cost of the legislature.

Medical costs that amount to 10 percent of overall state and local outlays on illegal aliens derive from our estimate of the childbirths to illegal alien mothers covered by Medicaid, the subsequent medical insurance and treat-

# DEF-INTERV.

# EX. 285

Δ π EXHIBIT 6
Deponent Pittman
Date 6 27 18 Rptr. DE
WWW.DEPOBOOK.COM



# IMMIGRATION
# POLICY
# CENTER

AMERICAN IMMIGRATION COUNCIL

May 2013

## NEW AMERICANS IN TEXAS:
### The Political and Economic Power of Immigrants, Latinos, and Asians in the Lone Star State

Immigrants, Latinos, and Asians account for growing shares of the economy and electorate in Texas. Immigrants (the foreign-born) make up roughly 1 in 6 Texans, and one-third of them are naturalized U.S. citizens who are eligible to vote. "New Americans"—immigrants and the children of immigrants—account for more than 1 in 10 registered voters in the state. Immigrants are not only integral to the state's economy as workers, but also account for billions of dollars in tax revenue and consumer purchasing power. Moreover, Latinos and Asians (both foreign-born and native-born) wield $265 billion in consumer purchasing power, and the businesses they own had sales and receipts of $102.1 billion and employed more than 600,000 people at last count. At a time when the economy is in a slump, Texas can ill-afford to alienate such a critical component of its labor force, tax base, and business community.

*Immigrants and their children are growing shares of Texas's population and electorate.*

> ➤ **The foreign-born share** of Texas's population rose from 9.0% in 1990,[1] to 13.9% in 2000,[2] to 16.4% in 2011,[3] according to the U.S. Census Bureau. Texas was home to 4,201,675 immigrants in 2011,[4] which is more than the total population of Los Angeles, California.[5]

> ➤ **33.2% of immigrants (or 1,393,937 people) in Texas were naturalized U.S. citizens** in 2011[6]—meaning that they are eligible to vote.

> ➤ Unauthorized immigrants comprised roughly **6.7% of the state's population** (or 1.7 million people) in 2010, according to a report by the Pew Hispanic Center.[7]

> ➤ **11.8% (or 1,194,544) of registered voters** in Texas were "New Americans"—naturalized citizens or the U.S.-born children of immigrants who were raised during the current era of immigration from Latin America and Asia which began in 1965—according to an analysis of 2008 Census Bureau data by Rob Paral & Associates.[8]

*More than 1 in 4 Texans are Latino or Asian—and they vote.*

> ➤ The **Latino share of Texas's population** grew from 25.5% in 1990,[9] to 32.0% in 2000,[10] to 38.1% (or 9,791,628 people) in 2011.[11] The **Asian share of the population** grew from 1.8% in 1990,[12] to 2.7% in 2000,[13] to 3.9% (or 999,118 people) in 2011,[14] according to the U.S. Census Bureau.

> ➤ **Latinos accounted for 20.1%** (or 1,697,000) **of Texas voters** in the 2008 elections, and Asians 1.4% (118,000), according to the U.S. Census Bureau.[15]

1331 G STREET, NW ● WASHINGTON, DC 20005 ● TEL: (202) 507-7500 ● FAX: (202) 742-5619
*www.immigrationpolicy.org*

> In Texas, **87.7% of children with immigrant parents were U.S. citizens** in <u>2009</u>, according to data from the Urban Institute.[16]

> In <u>2009</u>, **86.2% of children in Asian families** in Texas were U.S. citizens, as were **93.2% of children in Latino families**.[17]

*Latino and Asian entrepreneurs and consumers add tens of billions of dollars and hundreds of thousands of jobs to Texas's economy.*

> **The 2012 purchasing power of Latinos in Texas totaled $216.2 billion**—an increase of 560% since 1990. **Asian buying power totaled $48.8 billion**—an increase of 969% since 1990, according to the <u>Selig Center for Economic Growth</u> at the University of Georgia.[18]

> Texas's 447,589 <u>**Latino-owned**</u> **businesses had sales and receipts of $61.9 billion and employed 395,673 people** in 2007, the last year for which data is available.[19] The state's 114,297 <u>**Asian-owned**</u> **businesses had sales and receipts of $40.2 billion and employed 206,545 people** in 2007, according to the U.S. Census Bureau's Survey of Business Owners.[20]

*Immigrants are integral to Texas's economy as workers and taxpayers.*

> Immigrants comprised **21% of the state's workforce** in <u>2011</u> (or 2,645,538 workers), according to the U.S. Census Bureau.[21]

> Immigrants accounted for **21% of total economic output** in the Houston metropolitan area and **16% of economic output** in the Dallas metropolitan area as of <u>2007</u>, according to a study by the Fiscal Policy Institute.[22]

> Unauthorized immigrants in Texas paid **$1.6 billion** in state and local taxes in <u>2010</u>, according to data from the Institute for Taxation and Economic Policy,[23] which includes:

  - $177.8 million in property taxes.
  - $1.4 billion in sales taxes.

> Unauthorized immigrants comprised **9% of the state's workforce** (or 1,100,000 workers) in <u>2010</u>, according to a report by the Pew Hispanic Center.[24]

> If all unauthorized immigrants were removed from Texas, **the state would lose $69.3 billion in economic activity, $30.8 billion in gross state product, and approximately 403,174 jobs**, even accounting for adequate market adjustment time, according to a report by the <u>Perryman Group</u>.[25]

*Immigrants are integral to Texas's economy as students.*

> Texas's 61,511 **foreign students contributed $1.4 billion** to the state's economy in tuition, fees, and living expenses for the 2011-2012 academic year, according to <u>NAFSA: Association of International Educators</u>.[26]

*Naturalized citizens excel educationally.*

➢ In Texas, **28.9% of foreign-born persons** who were naturalized U.S. citizens in <u>2011</u> **had a bachelor's or higher degree**, compared to 15.2% of noncitizens. At the same time, only 29.3% of naturalized citizens lacked a high-school diploma, compared to 53.7% of noncitizens.[27]

➢ The number of immigrants in Texas with a college degree **increased by 91.5%** between 2000 and 2011, according to <u>data</u> from the Migration Policy Institute.[28]

➢ In Texas, **75.2% of children with immigrant parents** were considered "English proficient" as of <u>2009</u>, to data from the Urban Institute.[29]

➢ The English proficiency rate among **Asian children in Texas was 85.7%**, while for **Latino children it was 80.7%**, as of <u>2009</u>.[30]

## Endnotes

[1] U.S. Census Bureau, *The Foreign-Born Population: 2000*, December 2003.
[2] Ibid.
[3] 2011 American Community Survey (1-Year Estimates).
[4] Ibid.
[5] Ibid.
[6] Ibid.
[7] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 24.
[8] Rob Paral and Associates, *The New American Electorate: The Growing Political Power of Immigrants and Their Children* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, October 2010).
[9] U.S. Census Bureau, *The Hispanic Population: 2000*, May 2001.
[10] Ibid.
[11] 2011 American Community Survey (1-Year Estimates).
[12] U.S. Census Bureau, *The Asian Population: 2000*, February 2002.
[13] Ibid.
[14] 2011 American Community Survey (1-Year Estimates).
[15] U.S. Electoral College, 2008 Presidential Election: Popular Vote Totals.
[16] The Urban Institute, data from the Integrated Public Use Microdata Series datasets drawn from the 2005 - 2009 American Community Survey.
[17] Ibid.
[18] Jeffrey M. Humphreys, *The Multicultural Economy 2012* (Athens, GA: Selig Center for Economic Growth, University of Georgia, 2012).
[19] U.S. Census Bureau, *Estimates of Business Ownership by Gender, Ethnicity, Race, and Veteran Status: 2007*, June 2011.
[20] Ibid.
[21] 2011 American Community Survey (1-Year Estimates).
[22] David Dyssegaard Kallick, *Immigrants in the Economy: Contribution of Immigrant Workers to the Country's 25 Largest Metropolitan Areas* (New York, NY: Fiscal Policy Institute, December 2009), p. 11.
[23] The Immigration Policy Center, *Unauthorized Immigrants Pay Taxes, Too* (Washington, DC: April 2011).
[24] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 24.
[25] The Perryman Group, *An Essential Resource: An Analysis of the Economic Impact of Undocumented Workers on Business Activity in the US with Estimated Effects by State and by Industry* (Waco, TX: April 2008), p. 69.
[26] NAFSA: Association of International Educators, *The Economic Benefits of International Students to the U.S. Economy: Academic Year 2011-2012* (Washington, DC: 2012).
[27] Migration Policy Institute Data Hub, Texas: Language & Education.
[28] Ibid.
[29] The Urban Institute, data from the Integrated Public Use Microdata Series datasets drawn from the 2005 - 2009 American Community Survey.
[30] Ibid.

# DEF-INTERV.

# EX. 286

**LF1300A1**  |  **State and Local Government Finances by Level of Government and by State: 2013**
**2013 State and Local Government Finances**

**Release Date : 10/19/2017**

Note: Data users who create their own estimates using these data should cite only the U.S. Census Bureau as the source of the original data. Data in this table are based on information from public records and contain no confidential data. Although the data in this table come from a census of governmental units and are not subject to sampling error, the census results may contain nonsampling error. Additional information on nonsampling error, response rates, and definitions may be found within the survey methodology and technical documentation.

| | |
|---|---|
| **Table Name** | State and Local Government Finances by Level of Government and by State: 2013 |
| **Release Schedule** | Data are released on a flow basis and will be replaced when updated data are available. |
| **Universe** | The universe of this file are state governments. |
| **Geography Coverage** | The data are shown at the State level. |
| **Data Items and Other Identifying Records** | This file contains data on: Amount($1,000) Coefficient of Variation for Amount (percent) |
| **Sort Order** | Data are presented in state sequence. |
| **FTP Download** | http://www2.census.gov/econ2013/LF/sector00/LF1300A1.zip |
| **Contact Information** | U.S. Census Bureau, U.S. Census Bureau, Economy Wide Statistics Division State & Local Finances Staff Washington, DC 20233-6900 Tel: 1-800-242-4523 ewd.local.finance@census.gov |

| | Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|---|
| 1 - 100 of 22,932 | United States | State and Local | Total Revenue | 2013 | 3,405,918,371 | 0.04 |
| | United States | State and Local | General revenue, total | 2013 | 2,681,610,414 | 0.04 |
| | United States | State and Local | General revenue, intergovernmental, total | 2013 | 583,106,379 | 0.04 |
| | United States | State and Local | General revenue, intergovernmental from federal government | 2013 | 583,106,379 | 0.04 |
| | United States | State and Local | General revenue, intergovernmental from state governments | 2013 | N | N |
| | United States | State and Local | General revenue, intergovernmental from local governments | 2013 | N | N |
| | United States | State and Local | General revenue from own sources | 2013 | 2,098,504,035 | 0.06 |
| | United States | State and Local | General revenue from taxes, total | 2013 | 1,454,144,901 | 0.07 |
| | United States | State and Local | General revenue from property taxes | 2013 | 453,010,647 | 0.22 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, total | 2013 | 498,428,097 | 0.05 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, general sales | 2013 | 330,089,018 | 0.06 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, selective sales | 2013 | 168,339,079 | 0.07 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, motor fuel | 2013 | 41,456,431 | 0.02 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, alcoholic beverage | 2013 | 6,628,916 | 0.06 |
| | United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, tobacco products | 2013 | 17,499,922 | 0.01 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, public utilities | 2013 | 28,412,393 | 0.38 |
| United States | State and Local | General revenue from sales taxes and gross receipts, selective sales, other selective sales | 2013 | 74,341,417 | 0.07 |
| United States | State and Local | General revenue from individual income taxes | 2013 | 338,635,647 | 0.04 |
| United States | State and Local | General revenue from corporate income taxes | 2013 | 52,903,217 | 0.03 |
| United States | State and Local | General revenue from motor vehicle licenses | 2013 | 24,874,551 | 0.05 |
| United States | State and Local | Taxes, NEC | 2013 | 86,292,742 | 0.10 |
| United States | State and Local | General revenue from charges and miscellaneous general revenue | 2013 | 644,359,134 | 0.09 |
| United States | State and Local | General revenue from current charges, total | 2013 | 439,926,826 | 0.13 |
| United States | State and Local | General revenue from current charges, education | 2013 | 117,590,764 | 0.02 |
| United States | State and Local | General revenue from current charges, education, institutions of higher education | 2013 | 101,892,825 | 0.01 |
| United States | State and Local | General revenue from current charges, education, school lunch sales (gross) | 2013 | 6,010,970 | 0.09 |
| United States | State and Local | General revenue from current charges, hospitals | 2013 | 128,269,493 | 0.21 |
| United States | State and Local | General revenue from current charges, highways | 2013 | 15,056,923 | 0.15 |
| United States | State and Local | General revenue from current charges, air transportation (airports) | 2013 | 20,581,897 | 0.14 |
| United States | State and Local | General revenue from current charges, parking facilities | 2013 | 2,732,188 | 0.54 |
| United States | State and Local | General revenue from current charges, sea and inland port facilities | 2013 | 4,520,499 | 0.46 |
| United States | State and Local | General revenue from current charges, natural resources | 2013 | 4,951,906 | 5.34 |
| United States | State and Local | General revenue from current charges, parks and recreation | 2013 | 9,684,470 | 0.51 |
| United States | State and Local | General revenue from current charges, housing and community development | 2013 | 6,190,241 | 0.71 |
| United States | State and Local | General revenue from current charges, sewerage | 2013 | 49,136,714 | 0.28 |
| United States | State and Local | General revenue from current charges, solid waste management | 2013 | 16,628,514 | 1.41 |
| United States | State and Local | General revenue from current charges, other charges | 2013 | 64,583,217 | 0.47 |
| United States | State and Local | General revenue from miscellaneous general revenue, total | 2013 | 204,432,308 | 0.09 |
| United States | State and Local | General revenue from miscellaneous general revenue, interest earnings | 2013 | 50,002,222 | 0.18 |
| United States | State and Local | General revenue from miscellaneous general revenue, special assessments | 2013 | 7,408,165 | 1.15 |
| United States | State and Local | General revenue from miscellaneous general revenue, sale of property | 2013 | 3,742,226 | 0.82 |
| United States | State and Local | General revenue from miscellaneous general revenue, other general revenue | 2013 | 143,279,695 | 0.10 |
| United States | State and Local | Utility revenue, total | 2013 | 155,313,710 | 0.24 |
| United States | State and Local | Utility revenue, water supply | 2013 | 57,643,309 | 0.31 |
| United States | State and Local | Utility revenue, electric power | 2013 | 76,158,831 | 0.42 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | Utility revenue, gas supply | 2013 | 6,529,916 | 1.12 |
| United States | State and Local | Utility revenue, transit | 2013 | 14,981,654 | 0.05 |
| United States | State and Local | Liquor store revenue | 2013 | 8,141,005 | 0.16 |
| United States | State and Local | Insurance trust revenue, total | 2013 | 560,853,242 | 0.06 |
| United States | State and Local | Insurance trust revenue, unemployment compensation | 2013 | 74,421,496 | 0.00 |
| United States | State and Local | Insurance trust revenue, employee retirement | 2013 | 464,823,040 | 0.08 |
| United States | State and Local | Insurance trust revenue, workers'compensation | 2013 | 14,326,968 | 0.00 |
| United States | State and Local | Insurance trust revenue, other insurance trust revenue | 2013 | 7,281,738 | 0.00 |
| United States | State and Local | Total expenditure | 2013 | 3,181,955,017 | 0.04 |
| United States | State and Local | Total expenditure by character and object: | 2013 | X | X |
| United States | State and Local | Intergovernmental expenditure | 2013 | 3,392,576 | 0.00 |
| United States | State and Local | Direct expenditure, total | 2013 | 3,178,562,441 | 0.04 |
| United States | State and Local | Direct expenditure from current operations | 2013 | 2,344,794,360 | 0.05 |
| United States | State and Local | Direct expenditure from capital outlay, total | 2013 | 320,691,628 | 0.18 |
| United States | State and Local | Direct expenditure from capital outlay, construction | 2013 | 255,947,651 | 0.20 |
| United States | State and Local | Direct expenditure from capital outlay excluding construction | 2013 | 64,743,977 | 0.36 |
| United States | State and Local | Direct expenditure from assistance and subsidies | 2013 | 52,343,669 | 0.05 |
| United States | State and Local | Direct expenditure from interest on debt | 2013 | 125,169,801 | 0.11 |
| United States | State and Local | Direct expenditure from insurance benefits and repayments | 2013 | 335,562,983 | 0.02 |
| United States | State and Local | Direct expenditure exhibit: Salaries and wages | 2013 | 856,855,886 | 0.06 |
| United States | State and Local | Direct expenditure by function: | 2013 | 3,178,562,441 | 0.04 |
| United States | State and Local | Direct general expenditure, total | 2013 | 2,624,648,971 | 0.04 |
| United States | State and Local | Direct general expenditure, capital outlay | 2013 | 270,976,435 | 0.20 |
| United States | State and Local | Direct general expenditure excluding capital outlay | 2013 | 2,353,672,536 | 0.04 |
| United States | State and Local | Direct general expenditure from education services: | 2013 | X | X |
| United States | State and Local | Direct general expenditure from education, total | 2013 | 877,271,507 | 0.05 |
| United States | State and Local | Direct general expenditure from education, capital outlay | 2013 | 80,598,391 | 0.19 |
| United States | State and Local | Direct general expenditure from education, higher education, total | 2013 | 260,854,561 | 0.02 |
| United States | State and Local | Direct general expenditure from education, higher education, capital outlay | 2013 | 31,868,504 | 0.03 |
| United States | State and Local | Direct general expenditure from education, elementary & secondary, total | 2013 | 569,576,574 | 0.07 |

| Geographic area name | Meaning of Type of Government | Meaning of Revenue and Expenditures for State and Local Governments | Year | Amount | Coefficient of Variation for Amount (%) |
|---|---|---|---|---|---|
| United States | State and Local | Direct general expenditure from education, elementary & secondary, capital outlay | 2013 | 47,905,004 | 0.32 |
| United States | State and Local | Direct general expenditure from education, other education | 2013 | 46,840,372 | 0.00 |
| United States | State and Local | Direct general expenditure from education, libraries | 2013 | 11,144,189 | 1.00 |
| United States | State and Local | Direct general expenditure from social services and income maintenance: | 2013 | X | X |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, total | 2013 | 515,468,625 | 0.02 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, cash assistance payments | 2013 | 22,593,718 | 0.11 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, vendor payments | 2013 | 417,073,093 | 0.01 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, public welfare, other public welfare | 2013 | 75,801,814 | 0.15 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, hospitals, total | 2013 | 158,025,792 | 0.18 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, hospitals, capital outlay | 2013 | 9,280,974 | 0.40 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, health | 2013 | 86,612,213 | 0.44 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, employment security administration | 2013 | 4,900,837 | 0.00 |
| United States | State and Local | Direct general expenditure from social services and income maintenance, veterans' services | 2013 | 1,024,498 | 0.00 |
| United States | State and Local | Direct general expenditure from transportation, total | 2013 | X | X |
| United States | State and Local | Direct general expenditure from transportation, highways, total | 2013 | 157,426,594 | 0.20 |
| United States | State and Local | Direct general expenditure from transportation, highways, capital outlay | 2013 | 87,819,227 | 0.27 |
| United States | State and Local | Direct general expenditure from transportation, air transportation (airports) | 2013 | 21,448,256 | 0.53 |
| United States | State and Local | Direct general expenditure from transportation, parking facilities | 2013 | 1,903,489 | 0.50 |
| United States | State and Local | Direct general expenditure from transportation, sea and inland port facilities | 2013 | 5,319,363 | 0.82 |
| United States | State and Local | Direct general expenditure from public safety, total | 2013 | X | X |
| United States | State and Local | Direct general expenditure from public safety, police protection | 2013 | 98,941,340 | 0.29 |
| United States | State and Local | Direct general expenditure from public safety, fire protection | 2013 | 42,573,454 | 0.55 |
| United States | State and Local | Direct general expenditure from public safety, correction, total | 2013 | 72,969,615 | 0.28 |
| United States | State and Local | Direct general expenditure from public safety, correction, capital outlay | 2013 | 2,483,800 | 7.48 |
| United States | State and Local | Direct general expenditure from public safety, protective inspection and regulation | 2013 | 14,047,226 | 0.29 |

Source: U.S. Census Bureau, 2013 Annual Survey of State and Local Finances.

Symbols:
**X** - Not applicable
**N** - Not available or not comparable
For a complete list of all economic programs symbols, see the Symbols Glossary

# DEF-INTERV.

# EX. 287

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

ABOUT    FOLLOW    MY ACCOUNT ⌄         DONATE



MENU                    RESEARCH AREAS         SEARCH

U.S. SURVEY RESEARCH

   

# Questionnaire design

Perhaps the most important part of the survey process is the creation of questions that accurately measure the opinions, experiences and behaviors of the public. Accurate random sampling and high response rates will be wasted if the information gathered is built on a shaky foundation of ambiguous or biased questions. Creating good measures involves both writing good questions and organizing them to form the questionnaire.

Questionnaire design is a multistage process that requires attention to many details at once. Designing the questionnaire is complicated because surveys can ask about topics in varying degrees of detail, questions can be asked in different ways, and questions asked earlier in a survey may influence how people respond to later questions. Researchers also are often interested in measuring change over time and therefore must be attentive to how opinions or behaviors have been measured in prior surveys.

Surveyors may conduct pilot tests or focus groups in the early stages of questionnaire development in order to better understand how people think about an issue or comprehend a question. Pretesting a survey is an essential step in the questionnaire design process to evaluate how people respond to the overall questionnaire and specific questions.

For many years, surveyors approached questionnaire design as an art, but substantial research over the past thirty years has demonstrated that there is a lot of science involved in crafting a good survey questionnaire. Here, we discuss the pitfalls and best practices of designing questionnaires.

## Question development

There are several steps involved in developing a survey questionnaire. The first is identifying what topics will be covered in the survey. For Pew Research Center surveys, this involves thinking about what is happening in our nation and the world and what will be relevant to the public, policymakers and the media. We also track opinion on a variety of issues over time so we often ensure that we update these trends on a regular basis so we can understand whether people's opinions are changing.

At Pew Research Center, questionnaire development is a collaborative and iterative process where staff meet to discuss drafts of the questionnaire several times over the course of its development. After the questionnaire is drafted and reviewed, we pretest (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#pretests) every questionnaire and make final changes before fielding the survey.

## Measuring change over time

Many surveyors want to track changes over time in people's attitudes, opinions and behaviors. To measure change, questions are asked at two or more points in time. A cross-sectional design, the most common one used in public opinion research, surveys different people in the same population at multiple points in time. A panel or longitudinal

design, frequently used in other types of social research, surveys the same people over time. Pew Research Center launched its own random sample panel survey in 2014; for more, see the section on the American Trends Panel (http://www.pewresearch.org/methodology/u-s-survey-research/collecting-survey-data/#atp) .

Many of the questions in Pew Research surveys have been asked in prior polls. Asking the same questions at different points in time allows us to report on changes in the overall views of the general public (or a subset of the public, such as registered voters, men or African Americans).

When measuring change over time, it is important to use the same question wording and to be sensitive to where the question is asked in the questionnaire to maintain a similar context as when the question was asked previously (see question wording (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#question-wording) and question order (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#question-order) for further information). All of our survey reports include a topline questionnaire that provides the exact question wording and sequencing, along with results from the current poll and previous polls in which the question was asked.

## Open- and closed-ended questions

One of the most significant decisions that can affect how people answer questions is whether the question is posed as an open-ended question, where respondents provide a response in their own words, or a closed-ended question, where they are asked to choose from a list of answer choices.

For example, in a poll conducted after the presidential election in 2008, people responded very differently to two versions of this question: "What one issue mattered most to you in deciding how you voted for president?" One was closed-ended and the other open-ended. In the closed-ended version, respondents were provided five options (and could volunteer an option not on the list).

When explicitly offered the economy as a response, more than half of respondents (58%) chose this answer; only 35% of those who responded to the open-ended version volunteered the economy. Moreover, among those asked the closed-ended version, fewer than one-in-ten (8%) provided a response other than the five they were read; by contrast fully 43% of those asked the open-ended version provided a response not listed in the closed-ended version of the question. All of the other issues were chosen at least slightly more often when explicitly offered in the closed-ended version than in the open-ended version. (Also see "High Marks for the Campaign, a High Bar for Obama" (http://www.people-press.org/2008/11/13/high-marks-for-the-campaign-a-high-bar-for-obama/) for more information.)

**Fewer People Mention Economy in Open-Ended Version**

What one issue mattered most to you in deciding how you voted for president?

| | Open-ended[1] | Closed-ended[2] |
|---|---|---|
| The economy | 35% | 58% |
| The war in Iraq | 5 | 10 |
| Health care | 4 | 8 |
| Terrorism | 6 | 8 |
| Energy policy | * | 6 |
| Other | 43 | 8 |
| Candidate mentions | 9 | - |
| Moral values/social issues | 7 | - |
| Taxes/dist. of income | 7 | - |
| Other issues | 5 | - |
| Other political mentions | 3 | - |
| Change | 3 | - |
| Other | 9 | - |
| Don't know | 7 | 2 |
| | 100 | 100 |

Data from Pew Research November 2008 Post-election survey

[1] Unprompted first responce to open-ended question.

[2] First choice from five options read to respondents.

Researchers will sometimes conduct a pilot study using open-ended questions to discover which answers are most common. They will then develop closed-ended questions that include the most common responses as answer choices. In this way, the questions may better reflect what the public is thinking or how they view a particular issue.

When asking closed-ended questions, the choice of options provided, how each option is described, the number of response options offered and the order in which options are read can all influence how people respond. One example of the impact of how categories are defined can be found in a Pew Research poll conducted in January 2002: When half of the sample was asked whether it was "more important for

President Bush to focus on domestic policy or foreign policy," 52% chose domestic policy while only 34% said foreign policy. When the category "foreign policy" was narrowed to a specific aspect – "the war on terrorism" – far more people chose it; only 33% chose domestic policy while 52% chose the war on terrorism.

In most circumstances, the number of answer choices should be kept to a relatively small number – just four or perhaps five at most – especially in telephone surveys. Psychological research indicates that people have a hard time keeping more than this number of choices in mind at one time. When the question is asking about an objective fact, such as the religious affiliation of the respondent, more categories can be used. For example, Pew Research Center's standard religion question includes 12 different categories, beginning with the most common affiliations (Protestant and Catholic). Most respondents have no trouble with this question because they can just wait until they hear their religious tradition read to respond.

>**What is your present religion, if any?** Are you Protestant, Roman Catholic, Mormon, Orthodox such as Greek or Russian Orthodox, Jewish, Muslim, Buddhist, Hindu, atheist, agnostic, something else, or nothing in particular?

In addition to the number and choice of response options offered, the order of answer categories can influence how people respond to closed-ended questions. Research suggests that in telephone surveys respondents more frequently choose items heard later in a list (a "recency effect").

Because of concerns about the effects of category order on responses to closed-ended questions, many sets of response options in Pew Research Center's surveys are programmed to be randomized (when questions have two or more response options) to ensure that the options are not asked in the same order for each respondent. For instance, in the example discussed above about what issue mattered most in people's vote, the order of the five issues in the closed-ended version of the question was randomized so that no one issue appeared early or late in the list for all respondents. Randomization of response items does not eliminate order effects, but it does ensure that this type of bias is spread randomly.

Questions with ordinal response categories – those with an underlying order (e.g., excellent, good, only fair, poor OR very favorable, mostly favorable, mostly unfavorable, very unfavorable) – are generally not randomized because the order of the categories conveys important information to help respondents answer the question. Generally, these types of scales should be presented in order so respondents can easily place their responses along the continuum, but the order can be reversed for some respondents. For example, in one of the Pew Research Center's questions about abortion, half of the sample is asked whether abortion should be "legal in all cases, legal in most cases, illegal in most cases, illegal in all cases" while the other half of the sample is asked the same question with the response categories read in reverse order, starting with "illegal in all cases." Again, reversing the order does not eliminate the recency effect but distributes it randomly across the population.

## Question wording

The choice of words and phrases in a question is critical in expressing the meaning and intent of the question to the respondent and ensuring that all respondents interpret the question the same way. Even small wording differences can substantially affect the answers people provide.

An example of a wording difference that had a significant impact on responses comes from a January 2003 Pew Research Center survey. When people were asked whether they would "favor or oppose taking military action in Iraq to end Saddam Hussein's rule," 68% said they favored military action while 25% said they opposed military action. However, when asked whether they would "favor or oppose taking military action in Iraq to end Saddam Hussein's rule

*even if it meant that U.S. forces might suffer thousands of casualties,*" responses were dramatically different; only 43% said they favored military action, while 48% said they opposed it. The introduction of U.S. casualties altered the context of the question and influenced whether people favored or opposed military action in Iraq.

There has been a substantial amount of research to gauge the impact of different ways of asking questions and how to minimize differences in the way respondents interpret what is being asked. The issues related to question wording are more numerous than can be treated adequately in this short space. Here are a few of the important things to consider in crafting survey questions:

First, it is important to ask questions that are clear and specific and that each respondent will be able to answer. If a question is open-ended, it should be evident to respondents that they can answer in their own words and what type of response they should provide (an issue or problem, a month, number of days, etc.). Closed-ended questions should include all reasonable responses (i.e., the list of options is exhaustive) and the response categories should not overlap (i.e., response options should be mutually exclusive).

It is also important to ask only one question at a time. Questions that ask respondents to evaluate more than one concept (known as double-barreled questions) – such as "How much confidence do you have in President Obama to handle domestic and foreign policy?" – are difficult for respondents to answer and often lead to responses that are difficult to interpret. In this example, it would be more effective to ask two separate questions, one about domestic policy and another about foreign policy.

In general, questions that use simple and concrete language are more easily understood by respondents. It is especially important to consider the education level of the survey population when thinking about how easy it will be for respondents to interpret and answer a question. Double negatives (e.g., do you favor or oppose *not* allowing gays and lesbians to legally marry) or unfamiliar abbreviations or jargon (e.g., ANWR instead of Arctic National Wildlife Refuge) can result in respondent confusion and should be avoided.

Similarly, it is important to consider whether certain words may be viewed as biased or potentially offensive to some respondents, as well as the emotional reaction that some words may provoke. For example, in a 2005 Pew Research survey, 51% of respondents said they favored "making it legal for doctors to give terminally ill patients the means to end their lives," but only 44% said they favored "making it legal for doctors to assist terminally ill patients in committing suicide." Although both versions of the question are asking about the same thing, the reaction of respondents was different. In another example, respondents have reacted differently to questions using the word "welfare" as opposed to the more generic "assistance to the poor." Several experiments have shown that there is much greater public support for expanding "assistance to the poor" than for expanding "welfare."

One of the most common formats used in survey questions is the "agree-disagree" format. In this type of question, respondents are asked whether they agree or disagree with a particular statement. Research has shown that, compared with the better educated and better informed, less educated and less informed respondents have a greater tendency to agree with such statements. This is sometimes called an "acquiescence bias" (since some kinds of respondents are more likely to acquiesce to the assertion than are others). A better practice is to offer respondents a choice between alternative statements. A Pew Research Center experiment with one of its routinely asked values questions illustrates the difference that question format can make. Not only does the forced choice format yield a very different result overall from the agree-disagree format, but the pattern of answers among better- and lesser-educated respondents also tends to be very different.

## Acquiescence Bias

**Agree-Disagree Format**

*The best way to ensure peace is through military strength*
*(55% agree, 42% disagree)*

**Forced Choice Format**

*The best way to ensure peace is through military strength (33%)*
*OR*
*Diplomacy is the best way to ensure peace (55%)*

PEW RESEARCH CENTER Agree-Disagree question from Oct. 1999. Forced choice question from Sep. 1999.

One other challenge in developing questionnaires is what is called "social desirability bias." People have a natural tendency to want to be accepted and liked, and this may lead people to provide inaccurate answers to questions that deal with sensitive subjects. Research has shown that respondents understate alcohol and drug use, tax evasion and racial bias; they also may overstate church attendance, charitable contributions and the likelihood that they will vote in an election. Researchers attempt to account for this potential bias in crafting questions about these topics. For instance, when Pew Research Center surveys ask about past voting behavior, it is important to note that circumstances may have prevented the respondent from voting: "In the 2012 presidential election between Barack Obama and Mitt Romney, did things come up that kept you from voting, or did you happen to vote?" The choice of response options can also make it easier for people to be honest; for example, a question about church attendance might include three of six response options that indicate infrequent attendance. Research has also shown that social desirability bias can be greater when an interviewer is present (e.g., telephone and face-to-face surveys) than when respondents complete the survey themselves (e.g., paper and web surveys).

Lastly, because slight modifications in question wording can affect responses, identical question wording should be used when the intention is to compare results to those from earlier surveys (see measuring change over time (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#measuring-change-over-time) for more information). Similarly, because question wording and responses can vary based on the mode used to survey respondents, researchers should carefully evaluate the likely effects on trend measurements if a different survey mode will be used to assess change in opinion over time (see collecting survey data (http://www.pewresearch.org/methodology/u-s-survey-research/collecting-survey-data/) for more information).

## Question order

Once the survey questions are developed, particular attention should be paid to how they are ordered in the questionnaire. The placement of a question can have a greater impact on the result than the particular choice of words used in the question.

When determining the order of questions within the questionnaire, surveyors must be attentive to how questions early in a questionnaire may have unintended effects on how respondents answer subsequent questions. Researchers have demonstrated that the order in which questions are asked can influence how people respond; earlier questions – in particular those directly preceding other questions – can provide context for the questions that follow (these effects are called "order effects").

One kind of order effect can be seen in responses to open-ended questions. Pew Research surveys generally ask open-ended questions about national problems, opinions about leaders and similar topics near the beginning of the questionnaire. If closed-ended questions that relate to the topic are placed before the open-ended question, respondents are much more likely to mention concepts or considerations raised in those earlier questions when responding to the open-ended question.

For closed-ended opinion questions, there are two main types of order effects: contrast effects, where the order results in greater differences in responses, and assimilation effects, where responses are more similar as a result of their order.

### More People Favor Civil Unions When Asked After Gay Marriage

| Asked first | Legal agreements | % | Gay marriage | % |
|---|---|---|---|---|
| | Favor | **37** | Favor | 33 |
| | Oppose | 55 | Oppose | 61 |
| | Don't know | 8 | Don't know | 6 |
| | | 100 | | 100 |
| Asked second | Gay marriage | | Legal agreements | |
| | Favor | 30 | Favor | **45** |
| | Oppose | 58 | Oppose | 47 |
| | Don't know | 12 | Don't know | 8 |
| | | 100 | | 100 |
| N | | 780 | | 735 |

PEW RESEARCH CENTER Oct. 2003.

An example of a contrast effect can be seen in a Pew Research Center poll conducted in October 2003 that found that people were more likely to favor allowing gays and lesbians to enter into legal agreements that give them the same rights as married couples when this question was asked after one about whether they favored or opposed allowing gays and lesbians to marry (45% favored legal agreements when asked after the marriage question, but 37% favored legal agreements without the immediate preceding context of a question about gay marriage). Responses to the question about gay marriage, meanwhile, were not significantly affected by its placement before or after the legal agreements question.

### More Overall Dissatisfaction When Asked After Bush Approval

| Asked first | Overall satisfaction | % | Bush approval | % |
|---|---|---|---|---|
| | Satisfied | 17 | Approve | 25 |
| | Dissatisfied | **78** | Disapprove | 67 |
| | Don't know | 5 | Don't know | 8 |
| | | 100 | | 100 |
| Asked second | Bush approval | | Overall satisfaction | |
| | Approve | 24 | Satisfied | 9 |
| | Disapprove | 68 | Dissatisfied | **88** |
| | Don't know | 8 | Don't know | 3 |
| | | 100 | | 100 |
| N | | 766 | | 723 |

PEW RESEARCH CENTER Dec. 2008.

Another experiment embedded in a December 2008 Pew Research poll also resulted in a contrast effect. When people were asked "All in all, are you satisfied or dissatisfied with the way things are going in this country today?" immediately after having been asked "Do you approve or disapprove of the way George W. Bush is handling his job as president?"; 88% said they were dissatisfied, compared with only 78% without the context of the prior question. Responses to

presidential approval remained relatively unchanged whether national satisfaction was asked before or after it. A similar finding occurred in December 2004 when both satisfaction and presidential approval were much higher (57% were dissatisfied when Bush approval was asked first vs. 51% when general satisfaction was asked first).

Several studies also have shown that asking a more specific question before a more general question (e.g., asking about happiness with one's marriage before asking about one's overall happiness) can result in a contrast effect. Although some exceptions have been found, people tend to avoid redundancy by excluding the more specific question from the general rating.

### More Endorse Working Together When Asked Second

| Asked first | Should Rep. leaders... | % | Should Dem. leaders... | % |
|---|---|---|---|---|
| | Work with Obama | 66 | Work with Rep. leaders | 82 |
| | Stand up to Obama | 28 | Stand up to Rep. leaders | 13 |
| | Don't know | 6 | Don't know | 5 |
| | | 100 | | 100 |
| Asked second | Should Dem. leaders... | | Should Rep. leaders... | |
| | Work with Rep. leaders | 71 | Work with Obama | 81 |
| | Stand up to Rep. leaders | 21 | Stand up to Obama | 15 |
| | Don't know | 8 | Don't know | 4 |
| | | 100 | | 100 |
| N | | 744 | | 756 |

PEW RESEARCH CENTER Nov. 2008 Post-election survey.

Assimilation effects occur when responses to two questions are more consistent or closer together because of their placement in the questionnaire. We found an example of an assimilation effect in a Pew Research poll conducted in November 2008 when we asked whether Republican leaders should work with Obama or stand up to him on important issues and whether Democratic leaders should work with Republican leaders or stand up to them on important issues. People are more likely to say that Republican leaders should work with Obama when the question was preceded by the one asking what Democratic leaders should do in working with Republican leaders (81% vs. 66%). However, when people were first asked about Republican leaders working with Obama, fewer said that Democratic leaders should work with Republican leaders (71% vs. 82%).

The order questions are asked is of particular importance when tracking trends over time. As a result, care should be taken to ensure that the context is similar each time a question is asked. Modifying the context of the question could call into question any observed changes over time (see measuring change over time (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#measuring-change-over-time) for more information).

A questionnaire, like a conversation, should be grouped by topic and unfold in a logical order. It is often helpful to begin the survey with simple questions that respondents will find interesting and engaging to help establish rapport and motivate them to continue to participate in the survey. Throughout the survey, an effort should be made to keep the survey interesting and not overburden respondents with several difficult questions right after one another. Demographic questions such as income, education or age should not be asked near the beginning of a survey unless they are needed to determine eligibility for the survey or for routing respondents through particular sections of the questionnaire. Even then, it is best to precede such items with more interesting and engaging questions.

## Pilot tests and focus groups

Similar to pretests (http://www.pewresearch.org/methodology/u-s-survey-research/questionnaire-design/#pretests) , pilot tests are used to evaluate how a sample of people from the survey population respond to the questionnaire. For a pilot test, surveyors typically contact a large number of people so that potential differences within and across groups in the population can be analyzed. In addition, pilot tests for many surveys test the full implementation procedures (e.g., contact letters, incentives, callbacks, etc.). Pilot tests are usually conducted well in advance of when the survey will be fielded so that more substantial changes to the questionnaire or procedures can be made. Pilot tests are particularly helpful when surveyors are testing new questions or making substantial changes to a questionnaire, testing new procedures or different ways of implementing the survey, and for large-scale surveys, such as the U.S. Census.

Focus groups are very different from pilot tests because people discuss the survey topic or respond to specific questions in a group setting, often face to face (though online focus groups are sometimes used). When conducting focus groups, the surveyor typically gathers a group of people and asks them questions, both as a group and individually. Focus group moderators may ask specific survey questions, but often focus group questions are less specific and allow participants to provide longer answers and discuss a topic with others. Focus groups can be particularly helpful in gathering information before developing a survey questionnaire to see what topics are salient to members of the population, how people understand a topic area and how people interpret questions (in particular, how framing a topic or question in different ways might affect responses). For these types of focus groups, the moderator typically asks broad questions to help elicit unedited reactions from the group members, and then may ask more specific follow-up questions.

For some projects, focus groups may be used in combination with a survey questionnaire to provide an opportunity for people to discuss topics in more detail or depth than is possible in the interview. An important aspect of focus groups is the interaction among participants. While focus groups can be a valuable component of the research process, providing a qualitative understanding of the topics that are quantified in survey research, the results of focus groups must be interpreted with caution. Because people respond in a group setting their answers can be influenced by the opinions expressed by others in the group, and because the total number of participants is often small (and not a randomly selected subset of the population), the results from focus groups should not be used to generalize to a broader population.

## Pretests

One of the most important ways to determine whether respondents are interpreting questions as intended and whether the order of questions may influence responses is to conduct a pretest using a small sample of people from the survey population. The pretest is conducted using the same protocol and setting as the survey and is typically conducted once the questionnaire and procedures have been finalized.

For telephone surveys, interviewers call respondents as they would in the actual survey. Surveyors often listen to respondents as they complete the questionnaire to understand if there are problems with particular questions or with the order questions are asked. In addition, surveyors get feedback from interviewers about the questions and an estimate of how much time it will take people to respond to the questionnaire.

Pew Research Center pretests all of its questionnaires, typically on the evening before a survey is scheduled to begin. The staff then meet the following day to discuss the pretest and make any changes to the questionnaire before the survey goes into the field. Information from pretesting is invaluable when making final decisions about the survey questionnaire.

MAKE A FINANCIAL CONTRIBUTION TO SUPPORT OUR WORK

DONATE