**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

<u>**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN**</u>
<u>**OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN**</u>
<u>**SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**</u>

# Volume 3

# Exhibits 288 - 295

# DEF-INTERV.

# EX. 288



*INCLUDES FREE SAMPLE QUESTIONNAIRES ONLINE*

# QUESTIONNAIRE DESIGN

## HOW TO PLAN, STRUCTURE AND WRITE SURVEY MATERIAL FOR EFFECTIVE MARKET RESEARCH

*second edition*

### IAN BRACE


MARKET RESEARCH IN PRACTICE

# QUESTIONNAIRE DESIGN

# MARKET RESEARCH IN PRACTICE SERIES

**Published in association with The Market Research Society**
**Consultant Editors: David Barr and Robin J Birn**

Kogan Page has joined forces with The Market Research Society (MRS) to publish this unique series of books designed to cover the latest developments in market research thinking and practice.

The series provides up-to-date knowledge on the techniques of market research and customer insight and best practice in implementing them. It also shows the contribution market research and customer information management techniques can make to helping organizations of all kinds in shaping their strategy, structure, customer focus and value creation.

The series consists of several essential guides that focus on the core skills developed in the MRS training and qualifications programmes (www.mrs.org.uk). It provides practical advice and case studies on how to plan, use, act on and follow-up research, and on how to combine it with other sources of information to develop deep insights into customers.

Fully international in scope of content, its readership is also from all over the world. The series is designed not only for specialist market researchers, but also for all those involved in developing and using deeper insights into their customers – marketers in all disciplines, including planning, communications, brand management, and interactive marketers.

**Other titles in the series:**

*Business to Business Market Research*, Ruth McNeil
*Consumer Insight*, Merlin Stone
*The Effective Use of Market Research*, Robin J Birn
*Market Intelligence: How and why organizations use market research*, Martin Callingham
*Market Research in Practice: A guide to the basics*, Paul Hague, Nick Hague and Carol-Ann Morgan
*Researching Customer Satisfaction and Loyalty*, Paul Szwarc

Kogan Page Ltd
120 Pentonville Road
London N1 9JN
Tel: 020 7278 0433
www.koganpage.com

**Publisher's note**

Every possible effort has been made to ensure that the information contained in this book is accurate at the time of going to press, and the publishers and authors cannot accept responsibility for any errors or omissions, however caused. No responsibility for loss or damage occasioned to any person acting, or refraining from action, as a result of the material in this publication can be accepted by the editor, the publisher or the author.

First published in Great Britain and the United States in 2004 by Kogan Page Limited
Reprinted 2005

Second edition 2008

Apart from any fair dealing for the purposes of research or private study, or criticism or review, as permitted under the Copyright, Designs and Patents Act 1988, this publication may only be reproduced, stored or transmitted, in any form or by any means, with the prior permission in writing of the publishers, or in the case of reprographic reproduction in accordance with the terms and licences issued by the CLA. Enquiries concerning reproduction outside these terms should be sent to the publishers at the undermentioned addresses:

120 Pentonville Road
London N1 9JN
United Kingdom
www.koganpage.com

525 South 4th Street, #241
Philadelphia PA 19147
USA

© Ian Brace, 2004, 2008

The right of Ian Brace to be identified as the author of this work has been asserted by him in accordance with the Copyright, Designs and Patents Act 1988.

ISBN 978 0 7494 5028 1

**British Library Cataloguing-in-Publication Data**

A CIP record for this book is available from the British Library.

**Library of Congress Cataloging-in-Publication Data**

Brace, Ian, 1949–
   Questionnaire design: how to plan, structure and write survey material for effective market research / Ian Brace. — 2nd ed.
       p. cm.
   Includes bibliographical references and index
   ISBN 978-0-7494-5028-1
1. Market surveys—Methodology. 2. Questionnaires—Methodology. I. Title.
   HF5415.3.B683 2008
   658.8'3--dc22

                                                    2008011509

Typeset by Saxon Graphics Ltd, Derby
Printed and bound in India by Replika Press Pvt Ltd

# Contents

*About MRS* — *vii*
*The editorial board* — *viii*
*Preface* — *x*
*Preface to second edition* — *xii*

**Introduction** — **1**

1. **Objectives in writing a questionnaire** — **7**
   Introduction 7; The questionnaire in the survey process 7;
   Stakeholders in the questionnaire 9; The objectives of the
   study 10; Recruitment questionnaires 12; Collecting
   unbiased and accurate data 12

2. **The data collection media** — **22**
   Introduction 22; Interviewer-administered interviews 22;
   Self-completion surveys 29

3. **Planning the questionnaire** — **35**
   Introduction 35; Defining the information required 36;
   Sequencing the sections 36; Exclusion question 36;
   Screening questions 38; Main questionnaire 40

4. **Types of question and data** — **45**
   Introduction 45; Question types 45; Open and closed
   questions 46; Spontaneous questions 48; Prompted
   questions 51; Open-ended questions 51; Pre-coded
   questions 55; Data types 59

5. **Rating scales** — **66**
   Attitude measurement 66; Itemized rating scales 66;
   Attitudinal rating scales 73; Comparative scaling
   techniques 84

6. **Applications** — **90**
   Rating scales in customer satisfaction research 90;
   Measuring brand image 93; The dimensions 101

**7. Writing the questionnaire**                                            **105**
Introduction 105; Use of language 105; Avoiding ambiguity
in the question 109; Determining the pre-codes 111;
Using prompts 114; Order bias and prompts 117;
Question order 123; Standardizing questions 126;
Tracking studies 126; Omnibus studies 128

**8. Laying out the questionnaire**                                         **130**
Introduction 130; Interviewer-administered paper
questionnaires 130; Self-completion paper
questionnaire 139; CAPI and CATI 146

**9. Online questionnaires**                                                **148**
Introduction 148; Replicating existing approaches 149;
Enhancing the experience 159

**10. Piloting the questionnaire**                                          **174**
Introduction 174; Why pilot questionnaires? 174; Types
of pilot surveys 177

**11. Ethical issues**                                                      **184**
Introduction 184; Responsibilities to respondents 185;
Responsibilities to clients 193

**12. Social desirability bias**                                            **195**
Response bias 195; Social desirability bias 195; Dealing
with SDB 198; Determining whether SDB exists 206

**13. International surveys**                                               **208**
Introduction 208; Client presence 209; Common or
tailored approaches 209; Translating the questionnaire 214;
Demographic data 217; Cultural response differences 217;
Laying out the questionnaire 218

*Appendix 1: Example questionnaire*                                          *220*
*Appendix 2: The Market Research Society Code of Conduct*                    *262*
*References*                                                                 *286*
*Further reading*                                                            *292*
*Index*                                                                      *294*

# 7 Writing the questionnaire

## INTRODUCTION

In the previous chapters, we have examined the different types of question and technique that are available to the questionnaire writer. These represent the tools in the armoury that can be used to compile a questionnaire. A number of other issues, though, need to be considered in the process of writing the questionnaire. These issues include:

- the language and style of language in which it is written;
- ensuring that there is no ambiguity in the questions or the responses;
- whether pre-codes will be used or responses recorded verbatim;
- if pre-codes are to be used, what they should be;
- the use of prompt material and the choice between verbal and pictorial prompts;
- bias that can be caused by the order of the questions;
- bias that can be caused by the order of prompted responses.

This chapter considers these issues.

## USE OF LANGUAGE

When writing the questionnaire it is the questionnaire writer's job to ensure that the respondents will understand the questions and that the respondents will not feel intimidated, challenged or threatened by the questions.

Writing questionnaires is about helping respondents to give the best information that they can. Questions should be clear and unambiguous, and the respondent should be put at ease by the tone of the questions and

not made to feel challenged by the words and phrases used. Respondents who feel challenged because they don't understand the questions will quickly become alienated from the interview process and make little effort to respond accurately. They may become fatigued earlier than they would have done and fail to complete the interview.

Therefore, we must ensure that the questions are phrased in everyday language to which the respondents can relate. The interview can be seen as a conversation by proxy between the researcher and the respondent. The questionnaire should be suitably conversational in tone, while not seeking to be too familiar or condescending.

Researchers are frequently given briefs by clients that are expressed in technical terms that relate to the client's business. They may talk of 'channels of distribution' or 'above-the-line advertising'. It is the job of the questionnaire writer to turn this into phrases that will be part of the everyday speech of respondents, or at least readily understood by them.

---

### Seen in print

In a study about aircraft noise, respondents were asked to indicate how important they thought it was that:

'Cash compensation should be offered to those households that suffer a significant increase in noise to a level greater than 57 decibels but less than 63 decibels, and who therefore do not qualify for insulation.'

This question falls down on two counts. First, it is difficult to understand what the question means because it is phrased in technical terms. Second, even if someone understands it, few people would be competent to answer it accurately. How many respondents understand exactly how loud 57 or 63 decibels is?

---

Getting rid of technical terms is not always easy to achieve. They exist because they are needed. Some sympathy must be felt for the writer of the question in the box above. How do you convey to respondents precise noise levels? But equally, how usable is any response to this question? Anyone using the data generated must be concerned about how well the question was understood.

Because technical terms are often the everyday language of the commissioners of the study, they do not always appreciate that others outside their industry or profession might not understand them, or might understand something different by them.

Sometimes technical terms are used in order to describe something, or to differentiate between objects or services, with far greater subtlety than the non-specialist can appreciate. To most motorists a petrol pump is a

petrol pump, and they would not distinguish between a 'high line fast flow' and a 'grouped hose blender'. Researchers must ask themselves if it is necessary for the respondent to be able to distinguish between them in the interview. If it is, then the differences must be clearly explained, if possible without reference to the technical terminology.

Some technical terms are words that have a different everyday use. Market researchers will use the terms 'random' and 'significance' with specific meanings that are different to the way that they are used by most people. The danger here is that researchers might think that respondents understand the terms in the same way that they do. The respondents, though, understand these terms differently, and so answer a different question to the one that the researcher thinks is being asked.

---

**Seen in print**

Q1. What do you think of Big Oil?
PROBE FULLY.
This was the opening question in the survey. The term 'Big Oil' was well understood by the questionnaire writer, who worked in the oil industry, but meant nothing to respondents.

---

## The interview as conversation

Previously in this chapter, the interview was described as a conversation by proxy between the researcher and the respondent. However, it is not the sort of conversation that two people who know each other would have.

With interviewer-administered interviews it is not unusual for respondents to try to enter into conversation with the interviewer, to give their views and elaborate on their responses. Only when the interviewer insists on reducing this answer to one of the pre-codes on the questionnaire does the respondent appreciate that this is not really a conversation but an interaction in which they have a specific and limited role to play (Suchman and Jordan, 1990).

The lack of conversation can mask incorrect answers. Through elaboration of answers such as 'Yes, but…' or 'I agree, except that…' it can become clear that the true answer is 'No' or 'I disagree'. If respondents are not allowed to elaborate in this way, then their true answer may not become apparent, and an incorrect answer may be recorded. With self-completion surveys we rely on respondents to think it through, to in effect elaborate to themselves, and not necessarily give their first reaction.

Thus, whilst we conceptualize the questionnaire as the medium of conversation, we must recognize that it is not a true conversation; that

this may mean that we do not acquire all of the information that respondents could give us or may wish to give us; and that it can, on occasion, lead to incorrect answers being recorded.

Schober (1999) points out two key differences between having a conversation with your aunt and carrying out an interview with a structured questionnaire, known as 'audience design' and 'grounding'.

## Audience design

When one person who knows another asks the second person a question or makes a statement, it is framed to be heard specifically by that other person, and draws on the knowledge that each has of the other. This is known as 'audience design'. The person to whom it is said is the addressee. Addressees are likely to give different interpretations and responses to the question 'How many hours a week do you work?' depending on whether it is asked by their aunt, their boss or someone from the tax office. Addressees will use their knowledge of the relationship to determine what type of response the questioner expects to hear.

In a survey questionnaire, the questions are not framed for specific respondents, but to have general applicability to as many people as possible. Interviewers are specifically instructed neither to deviate from the question script nor to tailor the question to the individual. In quantitative research, as hard as questionnaire writers may try, they cannot write a questionnaire to be one side of a conversation.

## Grounding

Grounding occurs in a conversation when the participants establish that each has understood what one of them has said, and that it has entered their common ground. This can come from an acknowledgement of the question or statement ('uh-huh', 'okay') or a request for elaboration as to what is meant from the addressee, or clarification volunteered by the questioner if it is clear that the addressee has not understood.

Some level of grounding is available in an interview, but interviewers are deliberately restricted in the procedures that they can use in order to avoid introducing bias. Often when asked for clarification, all the interviewer can do is to repeat the question, or describe the type of response that is needed, or ask for a best estimate. Elaboration of individual words in the question is to be avoided as, apart from potentially introducing bias, the interviewers themselves may not understand precisely what is meant and present a misinterpretation of the question to respondents.

These difficulties in audience design and grounding can lead to a number of response effects from prompt material, question ordering and interpretation of questions.

## *Minority languages*

There are many different types of question that can be asked and in many different ways. What is common to all questions, though, is that they must be worded in a way that is understood by the respondents and to which respondents can relate. This means ensuring that there are minority-language versions of the questionnaire if the sample is likely to include people who speak a language other than the majority language, or whose command of that language is unlikely to be sufficiently good to be able to complete an interview in it. By denying sections of the survey population the opportunity to participate in the study, the questionnaire writer is effectively disenfranchising them from influencing the findings.

For many studies commissioned by the public sector in many countries, it is important that the interview is capable of being conducted in any language that is spoken by a significant number of people in the survey population to avoid the danger of disenfranchisement. In the UK many government studies require questionnaire versions in Welsh, Urdu, Hindi and other languages, and in the USA a Spanish-language version will often be required.

The relevance of minority-language speakers to the study will naturally vary by the subject of the study and the degree of accuracy required in the data. For a study of housing conditions it is likely to be important that recently arrived immigrant communities are represented in the sample in their correct proportions. If the questionnaire is not available in a language that they understand, they will be effectively excluded and hence under-represented.

For many commercial studies, the issue of minority languages can be mostly ignored in many countries, although a Spanish version of the questionnaire is frequently necessary in the USA. This is because for most commercial studies the difference that a minority of non-majority-language-speaking consumers is likely to make to the findings is small, particularly in comparison to the variation caused by sampling error, non-response rates and even interviewer error.

# AVOIDING AMBIGUITY IN THE QUESTION

Ambiguity is to be avoided at all costs. If a question is ambiguous, then the respondent may be presented with the dilemma of hearing or seeing two different questions and will not know which to answer. With an interviewer-administered questionnaire the respondent may seek help from the interviewer. The interviewer may be able to assist with the knowledge of the context of the question in relation to other questions,

but this may not always be the case. With self-administered question-naires, respondents have to make their own decision as to what the question means. Either way, the researcher does not know which way the respondent has understood the question, except in the occasional instances where either the interviewer or respondent has recorded it. This rarely happens, though, except in pilot studies.

Ambiguity in the question can make it impossible for a respondent to know how to answer. Consider the following question:

Do your parents work full time?
   Yes
   No

There is no difficulty for the respondent if both parents work full time or if neither parent does (although a definition of what constitutes 'full-time working' would be helpful). If, however, one works full time and the other does not, what is the respondent to answer? The question would be better asked:

Do either or both of your parents work full time, that is more than 30 hours a week?
   Both
   One
   Neither

There still remains the issue of what constitutes 'work', and whether it should include unpaid work, such as charity work, or only paid work.

While some respondents may see the ambiguity and make a decision which way to answer, others may not see it and understand it only in the sense in which it was not intended. Then the answer given will not be the one that would have been given to the intended question and, again, the researcher is unaware of this.

If the ambiguity in the question is not spotted until the data have been collected, then the researcher has no way of knowing which respondents answered the question as intended and which answered the alternative meaning. This can render the data from that question incapable of inter-pretation and therefore useless.

Ambiguity is obviously to be avoided in questions, but is not always easy to spot. This is because it is not always possible to anticipate every respondent's circumstances, and a question that may not be ambiguous to most respondents may, because of their circumstances, contain an ambiguity for a few. For example, 'How many bedrooms are there in this property?' is a simple question apparently incapable of more than one

possible answer for most people. But what is meant by a bedroom? If someone has a study that doubles as an occasional bedroom, should that be included?

In most instances this level of ambiguity will not be a major issue. Where the number of bedrooms is collected as classification data to provide a cross-analysis of data by approximate size of house, then this degree of ambiguity may be acceptable to the researchers.

Where this information is central to the data collected, then the ambiguity must be addressed. In the example of the number of bedrooms, such ambiguity would be unacceptable in, say, a study of housing conditions. Then the question would require expanding, possibly to ask the number of rooms currently used as bedrooms, the number occasionally used as bedrooms and the number that could be used as bedrooms, or as required by the study.

## DETERMINING THE PRE-CODES

The pre-codes that are used on the questionnaire determine what data are collected. If the pre-codes have insufficient accuracy or are incomplete, then data will be lost that may be important to answering the objectives. In many instances the responses will be obvious – yes–no, male–female – but in others care must be taken to ensure that they are:

■ mutually exclusive;
■ as exhaustive as possible;
■ as precise as necessary;
■ meaningful.

---

**Seen in print**

From a hotel customer satisfaction questionnaire:

| Level of satisfaction: | Low | | Average | | High |
|---|---|---|---|---|---|
| Friendly and efficient service at reception | ❒ | ❒ | ❒ | ❒ | ❒ |

Some of the friendliest receptionists are often the least efficient, and vice versa. How does the guest answer this question if that is the case? It is possible that the guest who wants to indicate that the service was friendly but not efficient, or that it was efficient but not friendly, will give up at this point and not complete the rest of the questionnaire.

---

**Figure 7.1** *An ambiguous question*

Unless they are mutually exclusive, it will be possible to code the same response against more than one response code. This is confusing for the interviewer (or respondent with a self-completion questionnaire) and makes the output ambiguous and impossible to interpret (see Figure 7.1).

The pre-codes need to be as exhaustive as they can in order to minimize the number of 'other answers' written in. If there are a lot of 'other answers' written in, the question would better have been recorded as an open-ended one.

## *Recording values*

When recording answers that are values, the level of detail needs to be as precise as is necessary to meet the research objectives without demanding more detail than respondents can accurately give. Sometimes it is possible to record precise values (eg the number of times the respondent has visited a pub or bar in the past week), but frequently we do not want to record that level of detail, and nor can respondents be expected to provide it. Then the answers will be recorded in value bands.

In Figure 7.2, the questionnaire writer has determined that bands of £200 are sufficiently accurate to meet the demands of the study. Bands of £50 would have given the researcher greater accuracy in calculating the average cost of a holiday and in making comparisons between sub-groups, but might have been difficult for respondents to recall accurately. This could have led to an increase in the proportion of 'Don't know' responses. In this example the response categories are exclusive. If someone had paid exactly £400, it is clear where the answer should be coded.

The pre-code response categories must also be meaningful to both respondent and researcher if the first is to be able to answer and the second to interpret. Precise wording is important in achieving clarity. Words such as 'often', 'frequently' and 'occasionally' are best avoided, as their interpretation varies between situations and between people.

Q. Into which of these ranges did the cost of your holiday fall, per person?
SHOW CARD.

| | |
|---|---|
| UP TO £200 | 1 |
| £201 TO £400 | 2 |
| £401 TO £600 | 3 |
| £601 TO £800 | 4 |
| £801 TO £1,000 | 5 |
| £1,001 OR MORE | 6 |

**Figure 7.2** *Determining the level of detail*

## Constructing ranges

Wherever possible, values should be recorded as absolute numbers (but beware of duplication, as illustrated in Figure 7.3). However, if values are to be recorded in ranges, the ranges should usually be constructed such that the most popular values occur in the middle of the ranges. For example, if the question is 'How much did you pay for the paperback novel that you are currently reading?', we know that most answers, if accurately given, will be £x.99. However, it would not be unusual to see the following ranges given for this question:

Under £4.99
£5 to £5.99
£6 to £6.99
£7 to £7.99
£8 to £8.99
£9 or more

---

**Seen in print**

Q. And, on average, how much do you pay for these text alerts, per text?
INTERVIEWER, IF DON'T KNOW, PROBE FOR AN ESTIMATE BEFORE CODING DK.

| | |
|---|---|
| FREE OF CHARGE | 1 |
| 1–5 PENCE | 2 |
| 5–10 PENCE | 3 |
| 11–15 PENCE | 4 |
| 16–20 PENCE | 5 |
| 21–25 PENCE | 6 |
| 26–30 PENCE | 7 |
| 31–35 PENCE | 8 |
| 36–40 PENCE | 9 |
| 41–45 PENCE | 10 |
| 46–50 PENCE | 11 |
| 50–75 PENCE | 12 |
| 75 PENCE – £1 | 13 |
| MORE THAN £1 | 14 |
| DON'T KNOW | 15 |

In this case, the duplications at 5, 50 and 75 pence were all spotted by the agency's checking procedures before the questionnaire went live. It is because this type of error is so easy to make that most agencies have strict checking procedures.

**Figure 7.3** *Duplications in the values*

This can cause loss of accuracy. A book costing £6.99 will be reported by some respondents as costing that amount precisely. Other respondents will round it up to £7, and the response will be recorded in the category above the one it should be in. Other respondents may say 'about £7', leaving the interviewer unsure as to where it should be coded. As importantly, in the analysis of these data we may want to produce an average price paid. Having collected the data in these ranges, we would normally allocate the value of the mid-point of each range to calculate the average. However, if nearly all of the actual values are at the top end of each range, the calculated average price paid will be around 50p below what it should be.

# USING PROMPTS

Show cards are frequently used to provide the respondents with prompted answers in face-to-face interviews. In self-completion inter-

---

**Seen in print**

Qa. How often do you make local telephone calls on your home line?
Qb. How often do you make national telephone calls on your home line?
Qc. How often do you make international calls on your home line?
Qd. How often do you make calls to mobile phones on your home line?

|  | (a) Local calls | (b) National calls | (c) International calls | (d) Calls to mobiles |
|---|---|---|---|---|
| VERY OFTEN | 1 | 1 | 1 | 1 |
| OFTEN | 2 | 2 | 2 | 2 |
| OCCASIONALLY | 3 | 3 | 3 | 3 |
| SELDOM | 4 | 4 | 4 | 4 |
| NEVER | 5 | 5 | 5 | 5 |

Respondents may or may not have had difficulty in interpreting what each code was intended to mean, but the researcher would have had serious problems analysing the resulting data. 'Frequently' used in relation to local calls is likely to mean several calls a day to most respondents. The same word applied to international calls may well be just one or two a week. So what framework have respondents used in giving their answers? Has the frequency been judged against a common standard, with one type of call (possibly the local call, as that is asked first) being used to define what is frequent for all four types of calls, or have the response codes been interpreted independently for each type of call, so that the meaning of 'frequent' varies between types of call? The researcher cannot know. Even if the researcher did know, he or she could not know how what is considered 'frequent' varies between respondents. These answers would have been better recorded as frequency values.

---

**Figure 7.4** *Imprecise wording*

Document 289-3 Filed on 08/04/18 in TXSD Page 19 of 155

views the prompts are provided with the question, either on a paper questionnaire or on-screen with a web-based questionnaire. With telephone interviews the prompts are frequently read out or, if they are to be repeated, as with a scale, respondents are sometimes asked to write them down.

Prompts can be scale points, attitudinal phrases, image dimensions, brands, income ranges or anything that the questionnaire writer wants to use to guide the respondents or to obtain reaction to. They can be purely verbal or they can utilize pictures, illustrations or logos. However, it is important to be clear about the different jobs that verbal and pictorial stimuli do.

## Picture prompts

Pictures can be used in a number of different ways as prompts. If they are to be used, then questionnaire writers must be careful to ensure that they know exactly what role the pictures are playing.

### Brand awareness

One use of picture prompts is to show brand logos or icons instead of a list of brand names, in order to measure prompted brand awareness. With CAPI and web-based interviews this is easy to do, and is often included in order to make the interview more interesting for the respondent. However, questionnaire writers should be aware that they might be changing the question.

Prompted awareness is a question of recognition. If a list of names is used, then the respondents are being asked which of the names they recognize. If brand logos are shown, then the question becomes which of the logos they recognize. The researcher infers awareness of the brand through recognition of the logo. This is likely to be higher than simple name recognition, as the logo gives more clues. The improvement in apparent brand awareness is likely to be stronger for the smaller brands in a market. Prompted awareness of Coca-Cola does not require the use of a visual prompt in order to be very high amongst carbonated drink users. There is little opportunity for visual prompts to make an improvement. But for smaller brands, the opportunities for improvement offered by visual prompts are much greater. The total average number of logos recognized per respondent is usually likely to be greater than the average number of brand names from a simple list. Neither approach is necessarily incorrect, but each is likely to give a different level of response.

## Likelihood to purchase

When asking likelihood to purchase, much more information is given to respondents if a pictorial stimulus is used. Rather than show a list of brands and prices, a mocked-up shelf can be shown as in Figure 7.5. The cues and information that are given by the pack shots mean that respondents do not have to rely on memory and recall of the brands when making their decision. Price information can easily be excluded, included or changed as required.

## Brand image

Showing logos can also alter the responses to questions about brand image. It is normal to establish prompted brand awareness before asking about images of certain brands. If prompted brand awareness is established using a list of names, then the mental picture taken into the image question is the image of the brand as it exists in isolation within the respondents' minds. The image is purely what the brand name stands for and the images that are associated with it.

After prompting with a logo or pack shot, however, respondents are given clues and reminders of what the brand is trying to stand for. The logo or pack will have been designed to reflect the desired brand positioning and may well communicate something of those values to the respondents in the interview, or at least act as a reminder of them. The image question is therefore also prompted with at least a partial reminder



**Figure 7.5**  *A mocked-up shelf*

of the brands' desired postionings, which is likely to yield slightly different responses.

Again it is not a question of one approach being incorrect. Using a brand list may be described as giving a 'purer' measure of image. This is an image, it can be argued, that the potential purchasers have in their minds before leaving home to go shopping, and it will act upon their intent to purchase the brand. But it can be equally argued that most brands are rarely seen without their logos, and that it is the image in the purchasers' minds at the point of purchase, when there are likely to be many visual cues, that is important.

The questionnaire writer should consider which is the more appropriate approach for the market in question, and decide which approach to use accordingly.

## Advertising recognition

Showing advertising to establish recognition is a particular case of showing picture prompts. Except for radio advertising, it is difficult to establish advertising recognition without the use of picture prompts. These often consist of a series of stills taken from the advertisement in question, known as a storyboard. This may or may not include the script of the characters or voice-over. It also may or may not have all references to the brand removed, depending on whether being able to name the correct brand is to be asked. With CAPI and web-based interviewing, however, there is a choice between showing a storyboard and showing the actual ad as film. The two methods will generally lead to different responses, with higher awareness recorded among respondents shown the film.

For press and poster ads, copies of the actual ad can be shown. It may be necessary to use a reduced format from the actual size (particularly for posters), in which case there should be an explanation that it has been reduced.

# ORDER BIAS AND PROMPTS

The order in which prompts are presented to respondents, whether on the questionnaire or screen, shown on a card or read out, can have a significant effect on the responses recorded. Such bias can occur with the presentation of:

- scalar responses;
- monadically rated batteries of attitude or image dimensions;
- lists from which responses are chosen.

The questionnaire writer must consider how to minimize the order bias for each of these.

## Scalar responses

A considerable amount has been written about the effect that the order of presentation of prompted alternative answers has on responses. Artingstall (1978) showed that when respondents are given a scale from which to choose a response in face-to-face interviewing they are significantly more likely to choose the first response offered than the last. Of 72 end items that were offered in his test, 62 were given greater endorsement when offered first. This is known as 'the primacy effect'.

Thus if the positive end of a scale is always presented first a more favourable result will be found than if the negative end of the scale is always first. The finding held for any length of scale, and was independent of the demographic profile of the respondents. The difference was shown to be an increase of about 8 per cent to the positive responses.

What this and other work show is that the order of presentation has an effect. It does not say which order gives the best representation of the truth. However, it underlines the need to be consistent in the order in which scales are shown if comparisons are to be made between studies.

One approach to dealing with the bias is to rotate the order of presentation between two halves of the sample. This does not remove the bias but at least has the effect of averaging it.

In new product development research, it is not uncommon always to have the negative response presented first on scales rating the concept or the product. This then gives the least favourable response pattern, thereby providing a tougher test for the new product and ensuring that any positive reaction to the idea of the product is not overstated.

When visual prompts are used, the primacy effect is noticed, as demonstrated by Artingstall, as respondents notice and process the possible responses in the order that they are presented. Where prompts are read out, a recency effect is more marked, as respondents remember better the last option or last few options that they have been given. This effect has been demonstrated by Schwarz, Hippler and Noelle-Neumann (1991). With telephone interviewing, therefore, a recency effect should be expected, unless respondents are asked to write down the scale for reference before answering the question.

## *Batteries of statements*

### Fatigue effect

Where there is a large battery of either image or attitude statements, each of which is to be answered according to a scale, there is a real danger of respondent fatigue. This can occur both with self-completion batteries and where the interviewer reads them out. As discussed in Chapter 5, the precise point at which respondent fatigue is likely to set in will vary with the level of interest that each respondent has in the subject. However, it should be anticipated that, where there are more than about 30 statements, later statements are likely to suffer from inattention and pattern responding. To alleviate this type of bias, the presentation of the statement should be rotated between respondents. With electronic questionnaires, statements can often be presented in random order, or in rotation in a number of different sequences.

With paper questionnaires, rotating the order requires producing a number of different versions for self-completion, or careful instruction to interviewers if they are to read them out.

In the latter case it is common for the starting point on the battery for each respondent to be ticked or checked at the time of printing the questionnaires or before they are sent out to the interviewers. Ideally, the start point can be rotated between questionnaires so that the reading out starts at each statement an equal number of times. However, it may not always be possible to print this on automatically. It requires as many different versions of the page to be printed as there are statements in the battery. With possibly up to 30 statements the potential for error is considerable. Printing the questionnaire with no marked start points and marking each questionnaire by hand can be time-consuming where there are thousands of questionnaires. An alternative, which is usually acceptable, is to have a limited number of start points, and these can be printed using different versions of the page. Thus if there are 30 statements, six different start points can be used, spread throughout the battery. The statements are still reasonably well rotated and, with only six versions of the page to be printed, the scope for error is much reduced.

Where the battery of statements is to be read out by the interviewer using a paper questionnaire, it is important that every interviewer understands the process of rotating start points. In particular, interviewers must understand that every statement must be read out. It has been known for interviewers to read out only the statements from the designated start point to the end of the battery, and not to return to the beginning of the battery for the remaining statements. This is more likely to occur where the battery is on more than one page and the start point is not on the first page.

## Statement clarification

The order in which statements are presented to respondents can some-times be used to clarify their meanings. If there is a degree of ambiguity in a statement that would require a complex explanation, a preceding statement that deals with the alternative meaning can clarify what the questionnaire writer is seeking.

For example:

How would you rate the station for:
The facilities and services at the station

On its own, it could be unclear to respondents whether car parking should be considered as one of the facilities or services at the station. If, however, this statement is preceded by one about car parking:

Facilities for car parking
The facilities and services at the station

or, even better:

Facilities for car parking
Other facilities and services at the station

then respondents can safely assume that the facilities and services are not meant to include car parking as that has already been asked about.

Where random presentation of statements is used, care must be taken to ensure that such explanatory pairs of statements always appear together and in the same order.

## *Response lists*

Showing a list of alternative responses is a common form of prompting in order to make respondents choose from a fixed set of options. For example:

Thinking about the advertisement that you have just seen, which of the phrases on this card would you say describes it? You can mention as many or as few phrases as you wish.

| A | It was difficult to understand |
|---|---|
| B | It made me more interested in visiting the store |
| C | I found it irritating |
| D | It's not right for this type of product |

| | |
|---|---|
| E | I quickly got bored with it |
| F | I did not like the people in it |
| G | It said something relevant to me |
| H | I will remember it |
| I | It improved my opinion of the store |
| J | It told me something new about the store |
| K | It was aimed at me |
| L | I enjoyed watching it |
| M | None of these |

The respondent is expected to read through all of the options and select those that apply. In this question, respondents can choose as many statements as they feel are appropriate. In other questions, they may be asked to choose one option or any other specified number.

## Primacy and recency effects

Similar primacy effects as are seen with scales should be expected. The effects have been demonstrated by Schwarz, Hippler and Noelle-Neumann (1991), even where there are a small number of possible responses, down to three or even two if they are sufficiently complex to dissuade respondents from making an effort to process the possible answers in full. Duffy (2003) confirms the existence of primacy effects and adds that a significant minority read the list from the bottom. This would suggest that a recency effect can also be expected.

Indeed, both primacy and recency effects have been demonstrated by Ring (1975). He showed that with a list of 18 items there is a bias in favour of choosing responses in the first six and the last four positions (Table 7.1). The implication is that those in the middle of the list either are not read at all by some respondents or are not processed as possible responses to the same extent.

Where a list is of such size, then reversing the order and presenting one order to half of the sample and the reverse order to the other half does not adequately address the problem. Ring's experiments showed that with a list of 18 items the first 14 should be reversed and the last four reversed. The items that were fourteenth and fifteenth in the initial list then become first and last in the alternative list. This asymmetrical split better balances the bias across the items than simply reversing them. For further reduction in order bias Ring suggests additional splits after the seventh and sixteenth items, but for most research purposes these are not necessary.

In practice, many, if not most, researchers satisfy themselves with two or at most four rotations. With electronic questionnaires, statements can often be presented in random order, or in rotation in a larger number of

**Table 7.1**  *Asymmetrical rotation of positions on the list*

|  | Two-way split | | Four-way split | | | |
|---|---|---|---|---|---|---|
|  | Position in: | | Position in: | | | |
| Item | List 1 | List 2 | List 1 | List 2 | List 3 | List 4 |
| A | 1 | 14 | 1 | 14 | 7 | 8 |
| B | 2 | 13 | 2 | 13 | 6 | 9 |
| C | 3 | 12 | 3 | 12 | 5 | 10 |
| D | 4 | 11 | 4 | 11 | 4 | 11 |
| E | 5 | 10 | 5 | 10 | 3 | 12 |
| F | 6 | 9 | 6 | 9 | 2 | 13 |
| G | 7 | 8 | 7 | 8 | 1 | 14 |
| H | 8 | 7 | 8 | 7 | 14 | 1 |
| I | 9 | 6 | 9 | 6 | 13 | 2 |
| J | 10 | 5 | 10 | 5 | 12 | 3 |
| K | 11 | 4 | 11 | 4 | 11 | 4 |
| L | 12 | 3 | 12 | 3 | 10 | 5 |
| M | 13 | 2 | 13 | 2 | 9 | 6 |
| N | 14 | 1 | 14 | 1 | 8 | 7 |
| O | 15 | 18 | 15 | 18 | 16 | 17 |
| P | 16 | 17 | 16 | 17 | 15 | 18 |
| Q | 17 | 16 | 17 | 16 | 18 | 15 |
| R | 18 | 15 | 18 | 15 | 17 | 16 |

After Ring (1975)

different sequences. This does not eliminate bias but spreads it across the statements more evenly.

## Satisficing

Some people when buying items such as a washing machine, stereo system or car will spend a great deal of time researching which of the available models best meets their needs and requirements. Other people will buy one that satisfactorily meets their needs and requirements, and are not prepared to invest the time in researching all of the available models to determine whether there is one that is marginally better. The latter approach is known as 'satisficing', and occurs when choosing attitude statements from a list.

When presented with a list of statements from which to choose a response, satisficers will read it until they find an adequate answer that they feel reasonably reflects their view, or that they think will be acceptable to the interviewer, rather than reading or listening to all of the state-

ments to find the answer that best reflects their view. This is another source of order bias, which will tend to reinforce the primacy effect.

Satisficing is likely to increase with interview fatigue as respondents stop making the effort to answer to the best of their ability. It is also likely to be more prevalent with telephone than with face-to-face interviewing (Holbrook, Green and Krosnick, 2003).

# QUESTION ORDER

There are certain rules regarding the ordering of questions that must always be borne in mind. These have been covered in Chapter 3 and include:

- There must be no prompting of any information before spontaneous questions on the same subject.
- The interview should normally start with the more general questions relating to the topic and work through to the more specific or detailed subject matter.
- Behavioural questions should be asked before attitudinal questions on the same topic.

These issues should have been considered when the questionnaire was planned, but still need to be thought about as the detailed questionnaire is written.

## *Funnelling*

Funnelling sequences are used to take respondents from general questions on a topic through to questions that are more specific without allowing the earlier questions to condition or bias the responses to the later ones.

Typically in the funnelling sequence, whether respondents are asked a question depends on their response to the previous one. This means that people for whom questions are irrelevant can be routed round them. Because people are routed out without knowing what the criteria are for continuing the question sequence, we can be more confident that the response that we obtain to the final question is not biased. In the example in Figure 7.6, we would have little confidence that there was no bias had we asked the one question 'If you have seen any advertising for Bulmer's cider on television recently, what did it say?' This question would lead to overclaiming of having seen advertising, because there is an assumption that Bulmer's cider has been advertised on television recently. Some respondents would then claim to have seen it, even though they had not.

124 ■ Questionnaire Design



**Figure 7.6** *Funnelling sequence*

Funnelling sequences can be complicated for respondents to follow on paper self-completion questionnaires because of the routeing, and are best avoided. However, they can be used with any interviewer-administered questionnaire and work very well with electronic or web-based self-completion questionnaires where the routeing is hidden.

# *Question order bias*

## Priming effects

Where there is a key question to be asked, such as approval of a proposal, response to a new concept or rating of an issue, the act of asking questions about the respondent's feelings regarding the proposal, concept or issue prior to the key questions can have an effect on the response to it.

This can be desirable, as the researcher will want respondents to give an answer that takes into account their considered view. However, the researcher can suggest to respondents what they should answer. McFarland (1981) reported that asking a series of specific questions about the energy crisis led to a higher rating of the severity of the crisis than when the questions were not asked.

Questionnaire writers need to be aware of the influence that prior questions can have, and write the questions and interpret the responses accordingly.

## Consistency effect

A particular type of priming effect is the consistency effect. This can occur because respondents are led along a particular route of responses to a conclusion to which they can only answer one way if they are to appear consistent.

Consider the sequence in Figure 7.7.

Now compare Figure 7.7 with the sequence in Figure 7.8.

It should be expected that the responses to Q2 will show significant variation between Figures 7.7 and 7.8. By using statements that reflect one side of an argument, in this case for and against the building of a new airport, respondents are led to Q2 along different paths. Most people like to appear to be consistent. If they agree with the statements in Q1, it is then very difficult not to answer 'yes' at Q2 in the first example or 'no' in the second example.

To be even-handed, the preliminary question should contain statements that relate to both or all sides of an argument. The researcher may want to put questions to respondents about the issues before asking the key question, in order to help them to give a considered answer to that question. However, the preliminary questions must fairly represent all the issues if they are not to bias the response to the key question.

Q1. Please indicate whether you agree or disagree with each of the following statements, and how strongly, by ticking one box for each statement.

| | Agree strongly | Agree | Neither agree nor disagree | Disagree | Disagree strongly |
|---|---|---|---|---|---|
| Delays at airports in this country are becoming unacceptable. | ☐ | ☐ | ☐ | ☐ | ☐ |
| There is insufficient capacity at this country's airports. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Airports in this country are dangerously overcrowded. | ☐ | ☐ | ☐ | ☐ | ☐ |
| There is a shortage of jobs in this region. | ☐ | ☐ | ☐ | ☐ | ☐ |

Q2. Do you support the government's proposal to build a new airport in this region?

YES ☐
NO ☐
DON'T KNOW ☐

**Figure 7.7** *The consistency effect (first sequence)*

# STANDARDIZING QUESTIONS

Where a question has been asked in a previous study it is usually to the advantage of the researcher to ensure that, unless there is a good reason otherwise, the same question should be used and the same pre-codes. Doing this allows the researcher to build up a body of knowledge about how this question is answered, and so spot any response pattern that deviates from this.

It also means that results from different studies can be compared more easily.

Many major manufacturers and some research companies have standard ways of asking particular questions that allow them to build up this body of knowledge.

# TRACKING STUDIES

Consistency of question wording is important in ongoing or tracking studies, in order to ensure that changes in data over time are not due to wording changes.

Q1. Please indicate whether you agree or disagree with each of the following statements, and how strongly, by ticking one box for each statement.

|  | Agree strongly | Agree | Neither agree nor disagree | Disagree | Disagree strongly |
|---|---|---|---|---|---|
| The countryside round here is disappearing too quickly for my liking. | ☐ | ☐ | ☐ | ☐ | ☐ |
| There is too much building on green-field sites. | ☐ | ☐ | ☐ | ☐ | ☐ |
| I would not want to see this country's plant and animal life killed off. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Noise pollution is a major nuisance round here. | ☐ | ☐ | ☐ | ☐ | ☐ |

Q2. Do you support the government's proposal to build a new airport in this region?

YES ☐

NO ☐

DON'T KNOW ☐

**Figure 7.8** *The consistency effect (second sequence)*

To ensure data consistency, it is also important to maintain the order in which the questions are asked, so that any order bias that exists is itself consistent. Keeping the question order means that adding new questions can cause problems, and the positioning of them must be considered very carefully. If possible, new questions should be added to the end of the questionnaire so as not to affect responses to any of the earlier questions. For the sake of the interview flow, though, this is not always possible.

For example, in an ongoing customer satisfaction survey, respondents were asked to give a rating of their overall satisfaction with the service received on their most recent visit to the client company. This has then been followed with questions rating various staff and service attributes, including one on efficiency. After a while, a competitor introduces a guarantee that all transactions will be completed within 10 minutes or customers get their money back. To measure the impact of this, the client now asks that, on the next wave of the survey, a new question is inserted between the overall satisfaction question and the service attribute ratings, on how quickly the customers perceive their transaction to have been handled and how satisfied they were with that. The introduction of these questions at this point could influence the way in which respondents rate the individual service attributes, in particular the one relating to effi-

ciency, as the speed of transaction has been raised higher in their consciousness than in previous waves of the study. Researchers must alert the client to the potential impact of such a change in the questionnaire on the comparability of the data with previous waves, and endeavour to find an alternative solution, such as a less sensitive position.

If no alternative solution can be found and the question changes are to be included for the foreseeable future, then it may be worth considering having a split run for one wave. For this, the sample is split randomly into two. One half is asked the existing questionnaire, the other the new questionnaire with the changes incorporated. Differences in results on the affected questions between the two halves of the sample can then be attributed to the changed questionnaire. An assessment of the impact of the changes can thus be made.

# OMNIBUS STUDIES

An omnibus survey is a particular type of study on which clients buy space for their own questions. The questionnaire can therefore cover a number of different subject areas for a number of different clients. The cost of sampling and contacting these respondents is effectively shared between all of the clients, making this a cost-effective way of asking a limited number of questions of a large sample or one that is expensive to sample.

Several different topics are asked about, and the question writer will not know what has been previously covered. The first question should therefore include a bridging phrase or sentence to indicate that a change of subject is about to occur.

Omnibus surveys are normally charged by the number of questions; whether they are pre-coded or open-ended; whether they use prompts or not; and the proportion of the sample of which they are asked. To keep down the cost, question writers must decide what are the most essential questions they need to cover, in order to limit the number.

The order of the questions may also be affected by the desire to keep down the cost. For example, we may be interested in asking some questions of people who have visited or considered visiting a particular resort. Normally we might ask:

Q1. SHOW CARD.
Which of the resorts on this card have you ever visited?

Q2. SHOW CARD.
And which others have you ever considered visiting?

Document 289-3   Filed on 08/04/18 in TXSD   Page 33 of 155

Both questions would be asked of all respondents.

However, if the number who have visited or have considered visiting is a minority, the cost can be reduced by reversing the questions:

Q1. SHOW CARD.
Which of the following resorts have you ever considered visiting, regardless of whether you have actually visited them?

Q2. SHOW CARD.
And which have you actually visited?

The first question is still asked of all respondents, but the second one is only asked of people who say that they have considered the resort in which we are interested. We can still classify all respondents into the three categories – visited, considered but not visited, and not considered – but, because the second question is only asked of a minority of the sample, we have saved money.

# References

Albaum, G (1997) The Likert scale revisited, *Journal of the Market Research Society*, **39** (2), pp 331–348

Albaum, G, Roster, C, Yu, J H and Rogers, R D (2007) Simple rating scale formats: exploring extreme responses, *International Journal of Market Research*, **49** (5), pp 633–650

Artingstall, R (1978) Some random thoughts on non sampling error, *European Research*, **6** (6)

Basi, R K (1999) WWW response rates to socio-demographic items, *Journal of the Market Research Society*, **41** (4), pp 397–401

Bearden, W O and Netermeyer R G (1999) *Handbook of Marketing Scales*, Sage, Thousand Oaks, California

Booth-Kewley, S, Edwards J E and Rosenfeld P (1992) Impression management, social desirability and computer administration of attitude questionnaires: does the computer make a difference? *Journal of Applied Psychology*, **77** (4), pp 562–566

Brace, I, Nancarrow, C and McCloskey, J (1999) MR confidential: a help or a hindrance in the new marketing era? *The Journal of Database Marketing*, **7** (2), pp 173–185

Bradley, N (1999) Sampling for Internet surveys: an examination of respondent selection for Internet research, *Journal of the Market Research Society*, **41** (4), pp 387–395

Bronner, F and Kuijlen, T (2007) The live or digital interviewer: a comparison between CASI, CAPI and CATI with respect to differences in response behaviour, *International Journal of Market Research*, **49** (2), pp 167–190

Brown, G, Copeland, T and Millward, M (1973) Monadic testing of new products: an old problem and some partial solutions, *Journal of the Market Research Society*, **15** (2), pp 112–131

Cape, P, Lorch, J and Piekarski, L (2007) A tale of two questionnaires, *Proceedings of the ESOMAR Panel Research Conference*, Orlando, pp 136–149

Christian, L M and Dillman, D A (2004) The influence of graphical and symbolic language manipulations on responses to self-administered questions, *Public Opinion Quarterly*, **68** (1) pp 57–80

Christian, L M, Dillman, D A and Smyth, J D (2007) Helping respondents get it right the first time: the influence of words, symbols, and graphics in web surveys, *Public Opinion Quarterly*, **71** (1), pp 113–125

Chrzan, K and Golovashkina, N (2006) An empirical test of stated importance measures, *International Journal of Market Research*, **48** (6), pp 717–740

Cobanoglu, C, Warde, B, and Moreo, P J (2001) A comparison of mail, fax and web-based survey methods, *International Journal of Market Research*, **43** (4), pp 441–452

Coelho, P and Esteves, S (2007) The choice between a five-point and a ten-point scale in the framework of customer satisfaction measurement, *International Journal of Market Research*, **49** (3), pp 313–339

Conrad, F, Couper, M, Tourangeau, R and Peytchev, A (2005) Impact of progress feedback on task completion: first impressions matter, *Association for Computing Machinery, Conference on Human Factors in Computing Systems* 2005

Couper, M (2000) Web surveys: a review of issues and approaches, *Public Opinion Quarterly*, **64**, pp 464–494

Couper, M, Traugott, M and Lamias, M (2001) Web survey design and administration, *Public Opinion Quarterly*, **65**, pp 230–253

Cox, E (1980) The optimal number of response alternatives for a scale: a review, *Journal of Marketing Research*, **17**, pp 407–422

Crowne, D P and Marlowe, D (1960) A new scale of social desirability independent of psychopathology, *Journal of Consulting Psychology*, **24**, pp 349–354

Diamantopolous, A, Schlegelmilch, B and Reynolds, N (1994) Pre-testing in questionnaire design: the impact of respondent characteristics on error detection, *Journal of the Market Research Society*, **36** (4), pp 295–311

Dillman, D (2000) *Mail and Internet Surveys, 2nd edn, The Tailored Design Method*, John Wiley, New York

Dillman, D A, Singer, E, Clark, J R, and Treat, J B (1996) Effects of benefits appeals and variations in statements of confidentiality on completion rate for census questionnaires, *Public Opinion Quarterly*, **60** (3)

Duffy, B (2003) Response order effects: how do people read? *International Journal of Market Research*, **45** (4), pp 457–466

Duffy, B, Smith, K, Terhanian, G and Bremer, J (2005) Comparing data from online and face-to-face surveys, *International Journal of Market Research*, **47** (6), pp 615–640

Edwards, A L (1957) *The social desirability variable in personality assessment*, Dryden, New York

Eisenhower, D, Mathiowetz, N A and Morganstein, D (1991) Recall error: sources and bias reduction techniques, in *Measurement Error in Surveys*, ed P Biemer, S Sudman, and R M Groves, Wiley, New York

Greenwald, H J and Satow, Y (1970) A short social desirability scale, *Psychology Rep*, **27**, pp 131–135

Hogg, A and Masztal, J J (2001) A practical learning about online research, *Advertising Research Foundation Workshop*, October 2001

Holbrook, A L, Green, M C and Krosnick, J A (2003) Telephone versus face-to-face interviewing of national probability samples with long questionnaires, *Public Opinion Quarterly*, **67**, pp 79–125

Holtgraves, T, Eck, J and Lasky, B (1997) Face management, question wording and social desirability, *Journal of Applied Psychology*, **27**, pp 1650–1671

Ilieva, J, Baron, S and Healey, N M (2002) Online surveys in marketing research: pros and cons, *International Journal of Market Research*, **44** (3), pp 361–376

Kalton, G, Roberts, J and Holt, D (1980) The effects of offering a middle response option with opinion questions, *Statistician*, **29**, pp 65–78

Kalton, G and Schuman, H (1982) The effect of the question on survey responses: a review, *Journal of the Royal Statistical Society, Series A*, **145** (1), pp 42–73

Kellner, P (2004) Can online polls produce accurate findings? *International Journal of Marketing Research*, **46** (1), pp 3–21

Krosnick, J and Fabrigar, L (1997) Designing rating scales for effective measurement in surveys, in *Survey Measurement and Process Quality*, ed L Lyberg, P Biemer, M Collins, E De Leeuw, C Dippo, N Schwarz and D Trewin, John Wiley, New York

Lautenschlager, G J and Flaherty, V L (1990) Computer administration of questions: more desirable or more socially desirable, *Journal of Applied Psychology*, **75**, 310–314

Likert, R (1932) A technique for the measurement of attitudes, *Archives of Psychology*, **140**, pp 5–55

McDaniel, C Jr and Gates, R (1993) *Contemporary Marketing Research*, West Publishing Company, St Paul Minnesota, chapter 11/12

McFarland, S G (1981) Effects of question order on survey responses, *Public Opinion Quarterly*, **45**, pp 208–215

McKay, R and de la Puente, M (1996) Cognitive testing of racial and ethnic questions for the CPS supplement, *Monthly Labor Review*, September, pp 8–12

Nancarrow, C, Brace, I and Wright, L T (2000) Tell me lies, tell me sweet little lies: dealing with socially desirable responses in market research, *The Marketing Review*, **2** (1), pp 55–69

Nancarrow, C, Pallister, J and Brace, I (2001) A new research medium, new research populations and seven deadly sins for Internet researchers, *Qualitative Market Research: An International Journal*, **4** (3), pp 136–149

Oppenheim, A N (1992) *Questionnaire Design, Interviewing and Attitude Measurement*, 2nd edition, Continuum, London

Osgood, C E, Suci, G J and Tannenbaum P (1957) *The Measurement of Meaning*, University of Illinois Press, Urbana, Illinois

Paulhus, D L and Reid, D B (1991) Enhancement and denial in socially desirable responding, *Journal of Personality and Social Psychology*, **60** (2), pp 307–317

Peterson, R A (2000) *Constructing Effective Questionnaires*, Sage Publications. Thousand Oaks, California

Phillips, D L and Clancy, K J (1972) Some effects of 'social desirability' in survey studies, *American Journal of Sociology*, **77** (5), pp 921–938

Poynter, R and Comley, P (2003) Beyond online panels, *Proceedings of ESOMAR Technovate Conference*, Cannes

Presser, S and Schuman, H (1980) The measurement of a middle position in attitude studies, *Public Opinion Quarterly*, **44**, pp 70–85

Reid, J, Morden, M and Reid, A (2007) Maximizing respondent engagement: the use of rich media, *Proceedings of the ESOMAR Congress, Berlin*

Ring, E (1975) Asymmetrical rotation, *European Research*, **3** (3), pp 111–119

Roster, C, Albaum, G and Rogers, R (2006) Can cross-national/cultural studies presume etic equivalency in respondents' use of extreme categories of Likert rating scales? *International Journal of Market Research*, **48** (6), pp 741–759

Saris, W E and Gallhofer, I N (2007) Design, Evaluation, and Analysis of Questionnaires for Survey Research, John Wiley, Hoboken

Schober, M F (1999) Making sense of questions: an interactional approach, in *Cognition and Survey Research*, ed M G Sirken, D J Herrman, S Schechter, N Schwarz, J M Tanur and R Tourangeau, John Wiley, New York

Schuman, H and Presser, S (1981) *Questions and Answers in Attitude Surveys*, Sage Publications, Thousand Oaks, California

Schwarz, N, Hippler, H and Noelle-Neumann, E (1991) A cognitive model of response-order effects in survey measurement, in *Context effects in social and psychological research*, ed N Schwarz and S Sudman, pp 187–201, Springer Verlag, New York

Singer, E, Hippler, H-J and Schwarz, N (1992) Confidentiality assurances in surveys: reassurance or threat, *International Journal of Public Opinion Research*, **4** (34), pp 256–268

Singer, E, Von Thurn, D R and Miller, E R (1995) Confidentiality assurances and response: a quantitative review of the experimental literature, *Public Opinion Quarterly*, **59** (1), pp 67–77

Strahan, R and Gerbasi, K C (1972) Short homogeneous versions of the Marlowe–Crowne social desirability scale, *Journal of Clinical Psychology*, **28**, pp 191–193

Suchman, L and Jordan, B (1990) Interactional troubles in face-to-face survey interviews, *Journal of the American Statistical Association*, **85** (409), pp 232–241

Sudman, S and Bradburn, N (1973) Effects of time and memory factors on response in surveys, *Journal of the American Statistical Association*, **68**, pp 805–815

Sudman, S and Bradburn, N (1982) *Asking Questions: A practical guide to questionnaire design*, Jossey-Bass, San Francisco, California

Taylor, H (2000) Does Internet research work? *International Journal of Market Research*, **42** (1), pp 51–63

Thomas, R, Couper, M P, Bremer, J and Terhanian, G (2007) Truth in measurement: comparing web-based interviewing techniques, *Proceedings of the ESOMAR Congress, Berlin*, pp 195–206

Tourangeau, R (1984) Cognitive science and survey methods, in *Cognitive Aspects of Survey Methodology: Building a bridge between disciplines*, ed T Jabine, M Straf, J Tanur and R Tourangeau, National Academy Press, Washington, DC

Tourangeau, R, Couper, M and Conrad, F (2004) Spacing, position, and order: interpretive heuristics for visual features of survey questions, *Public Opinion Quarterly*, **68** (3), pp 368–393

Tourangeau, R, Couper, M and Conrad, F (2007) Color, labels and interpretative heuristics for response scales, *Public Opinion Quarterly*, **71** (1), pp 91–112

Tourangeau R, Rips, L J and Rasinski, K (2000) *The Psychology of Survey Response*, Cambridge University Press, Cambridge

Van Schaik, P and Ling, J (2007) Design parameters of rating scales for web sites, *ACM Transactions on Computer–Human Interaction*, **14**

Wable, N and Pall, S (1998) You just do not understand! More and more respondents are saying this to market researchers today, *ESOMAR Congress*

Warner, S L (1965) Randomised response: a survey technique for eliminating evasive answer bias, *Journal of the American Statistical Association*, **60**, pp 63–69

Wood, O (2007) Using faces: measuring emotional engagement for early stage creative, *Proceedings of the ESOMAR Congress, Berlin*, pp 412–437

Worcester, R and Downham, J (1978) *Consumer Market Research Handbook*, 2nd Edition, Van Nostrand Reinhold, Wokingham

Wright, L T and Crimp, M (2000) *The Marketing Research Process*, 5th edition, Pearson Education, Harlow

Zaichkowsky, J L (1999) Personal involvement inventory for advertising, in *Handbook of Marketing Scales*, ed W O Bearden and R G Netemeyer, Sage Publications, Thousand Oaks, California

# DEF-INTERV.

# EX. 289

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KIRSTJEN M. NIELSEN, *et al.*, <br><br> Defendants, <br><br> *and* <br><br> KARLA PEREZ, *et al.*, <br><br> Defendant-Intervenors. | Case No. 18-cv-00068 |

**FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' THIRD SET OF DISCOVERY REQUESTS**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

Federal Defendants serve these objections and responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

Federal Defendants state the following General Objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents, which are hereby incorporated in and made part of each of the following specific responses.

1. Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of documents

1

or things outside the narrow scope of expedited discovery, are unduly burdensome, are overly broad, or seek information that is not relevant to this phase of this case and will not lead to the discovery of such relevant information, or are equally accessible to Defendant-Intervenors through third-party discovery requests, publicly available government websites other websites, or other sources.

2.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense.  Federal Defendants further object to these interrogatories and requests for production of documents to the extent that they are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

3.      Federal Defendants object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are vague and ambiguous, and therefore may lead to differing interpretations among the parties to this litigation as well as the Court, resulting in confusion.  Federal Defendants further object to Defendant-Intervenor's "Definitions and Instructions" to the extent that they are inconsistent with the Court's order dated June 20, 2018 (Dkt. 97) or to the extent that they are confusing or unduly burdensome.

4.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that Defendant-Intervenors seek disclosures of information protected from disclosure by the Privacy Act of 1974, 5 U.S.C. Section 552a(b), attorney-client privilege, attorney work product doctrine, deliberative process privilege, law enforcement / investigatory files privilege, self-critical analysis privilege, executive privilege, and official information privilege, and other applicable privileges.

5.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of electronically stored information on electronic media, including any general search of email or retrieval of backup tapes of U.S. Citizenship and Immigration Services ("USCIS") that are not reasonably accessible because of the undue time, burden, and cost associated with retrieving, reviewing, and producing the information, especially in relation to the limited scope of expedited discovery at this stage of proceedings.

6.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent that they require the production of material outside of a properly designated administrative record by USCIS, insofar as this action may be construed as a suit for judicial review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

7.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories and requests for production of documents to the extent they purport to require the disclosure of information in the possession, custody or control of entities other than properly named

2

Defendants on the grounds that such production is beyond the scope of Fed. R. Civ. P. 33 and 34 and other applicable law.

8.      Federal Defendants object, in light of the Court's Order dated June 20, 2018 (Dkt. 97), to the extent Defendant-Intervenors' third set of interrogatories and requests for production of documents seek to compel Federal Defendants to search for, identify, or log drafts or non-final documents or produce documents in their native format.

9.      Federal Defendants object to Defendant-Intervenors' third set of interrogatories to the extent that they exceed the limit of 25 interrogatories, including all subparts, allowed under Fed. R. Civ. P. 33, without stipulation or leave from the court.  Defendant-Intervenors have clearly promulgated more than twenty-five interrogatories in this set alone, much less in all prior sets of interrogatories.

10.     Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents are made without waiving:

(a)  The right to object to the competence, relevance, materiality, or admissibility as evidence of any information, or the subject matter thereof, in any aspect of this civil action or any other matter;

(b)  The right to object at any time and upon any grounds to any other discovery requests;

(c)  The right at any time and for any reason to revise, supplement, correct, add or to clarify these responses;

(d)  The right to amend or supplement these responses if the Federal Defendants discover additional information; and

(e)  Any applicable privilege, including but not limited to the attorney/client privilege, the law enforcement privilege, the investigation files privilege, executive privilege, and the official information privilege.

11.     Discovery has not concluded in this litigation.  Accordingly, the Federal Defendants' responses to Defendant-Intervenors' third set of interrogatories and requests for production of documents is based upon the information available at this stage of the litigation.  Federal Defendants reserve the right to rely upon any facts, documents, or other evidence which may develop or come to its attention subsequent to this response.

Likewise, Federal Defendants' objections to Defendant-Intervenors' third set of interrogatories and requests for production of documents are based upon the information presently known by the Federal Defendants, and are made without prejudice to the Federal Defendants' right to assert additional objections in the event that additional grounds for objections should be discovered by the Federal Defendants subsequent to this response.

12.     Without waiving the above objections, Federal Defendants will provide responses to only relevant non-privileged matters based on information currently available to it and obtainable without undue burden.

## SPECIFIC OBJECTIONS AND RESPONSES TO
## DEFENDANT-INTERVENORS' THIRD SET OF INTERROGATORIES

**INTERROGATORY NO. 3**

Please identify the number of initial DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of initial DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of initial DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of initial DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 3**

Defendants specifically object to Interrogatory No. 3 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.   Defendants object to the following terms and phrases in Interrogatory No. 3 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practice regarding DACA:  "initial [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security."  With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

Immigration and Customs Enforcement ("ICE") specifically objects to being required to search for information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012.  It appears that ICE never compiled or "tracked" information responsive to Interrogatory No. 3 for this time period.  Specifically, ICE has queried the Enforcement and Removal Operations ("ERO") database and found no information responsive to Interrogatory No. 3.  In addition, ICE has queried several current agency employees who potentially might

have information responsive to Interrogatory No. 3 and has been advised that they possess no responsive information.  It appears likely that the only ICE individuals who may have information responsive to Interrogatory No. 3 for the period from June 2012 through August 2012 are former agency employees.

**RESPONSE TO INTERROGATORY NO. 3**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, August 15, 2012 – June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012, therefore USCIS is not able to provide data on DACA initial requests from June 2012 to August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 4**

Please identify the number of renewal DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, of that number:

a. the number of renewal DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of renewal DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of renewal DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 4**

Defendants specifically object to Interrogatory No. 4 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.   Defendants object to the following terms and phrases in Interrogatory No. 4 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common

use of the terms in its agency practices regarding DACA: "renewal [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

**RESPONSE TO INTERROGATORY NO. 4**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State, June 4, 2014 – June 22, 2018." USCIS began accepting DACA renewal requests on June 4, 2014; therefore Federal Defendants are unable to provide data on DACA renewals from June 2012 to June 4, 2014 because it does not exist. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 5**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA initial application:

      a. For the period of June 2012 to January 2017

      b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 5**

Defendants specifically object to Interrogatory No. 5 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 5 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "initial [application]." The response to Interrogatory No. 5 is based on Defendant USCIS' common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 5**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Initial Completions, August 15, 2012 - June 22, 2018." USCIS began accepting initial DACA requests on August 15, 2012; therefore the average processing time for part a. was calculated using data beginning August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 6**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA renewal application:

a. For the period of June 2014 to January 2017

b. For the period of February 2017 to June 2018

**OBJECTIONS TO INTERROGATORY NO. 6**

Defendants specifically object to Interrogatory No. 6 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "application" to mean such a request for DACA. Defendants object to the following terms and phrases in Interrogatory No. 6 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 6 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 6**

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Average Processing Time for DACA Renewal Completions, June 4, 2014 - June 22, 2018. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 7**

Please identify the offices within USCIS that evaluate and adjudicate DACA applications.

**OBJECTIONS TO INTERROGATORY NO. 7**

Defendants specifically object to Interrogatory No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application."  For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.   Defendants object to the following terms and phrases in Interrogatory No. 7 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "evaluate" and "adjudicate." Defendant USCIS' response is based on its common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendants further object that "offices" do not "evaluate and adjudicate" DACA requests within USCIS, but rather USCIS officers employed at specific USCIS locations adjudicate DACA requests and other USCIS personnel may also be involved in evaluating DACA requests. Defendants also object that Interrogatory No. 7 is vague and ambiguous as to the time period it covers.  Defendant USCIS' response will cover the period from August 1, 2012 through May 31, 2018, the period for which data is readily available.

**RESPONSE TO INTERROGATORY NO. 7**

Subject to this qualification and objection, Defendant DHS responds that only officers at USCIS Service Centers render final adjudicative decisions for DACA requests.  However, individuals at other USCIS offices that may be or may have been involved in evaluation or review of DACA requests are or were employed at: Headquarters Service Center Operations, the Field Operations Directorate, the Office of Policy and Strategy, the Fraud Detection and National Security Directorate, the Office of Intake and Data Production, and the Office of the Chief Counsel.

See attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, USCIS Service Centers and Offices that Evaluate and Adjudicate DACA Requests, August 1, 2012 - May 31, 2018", which provides the name of each USCIS service center and USCIS field office that has transferred in or adjudicated at least one Form I-821D since August 1, 2012. The data provided in response to this Interrogatory reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 8**

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of June 2012 to June 2018.

**OBJECTIONS TO INTERROGATORY NO. 8**

Defendants specifically object to Interrogatory No. 8 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants object to the following term in Interrogatory No. 8 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

**RESPONSE TO INTERROGATORY NO. 8**

Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, Count of Adjudications by Service Center and Fiscal Year of Adjudication, August 15, 2012 - June 22, 2018." USCIS began accepting DACA requests on August 15, 2012; therefore USCIS service centers did not adjudicate any DACA requests between June 2012 and August 15, 2012. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 9**

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 9:**

Defendants specifically object to Interrogatory No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in Interrogatory No. 9 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c., of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing).

Federal Defendants further object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 9 in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State (over 17,000 cases), as set forth in the

attached declaration.  *See* Dkt. 97.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 9, the number of denials of initial DACA requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 3 and is therefore duplicative.

## RESPONSE TO INTERROGATORY NO. 9

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Denials by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.  In response to subpart c. of Interrogatory No. 9, Federal Defendants respond that based on an informal inquiry of relevant USCIS service centers and the information in the 2015 Neufeld Declaration, *see, e.g.*, para. 18,[1] Federal Defendants are aware of several initial DACA requests that were denied because the requestor either made false statements or committed fraud in other immigration or non-immigration government contexts, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

## INTERROGATORY NO. 10

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of June 2012 to June 2018.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of June 2012 to June 2018.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

## OBJECTION TO INTERROGATORY NO. 10

---

[1] Defs.' Sur-reply in Opp'n to Pls.' Mot. for Prelim. Inj., Ex. 44, *Texas v. U.S.*, 86 F.Supp.3d 591 (2015) (No. 1:14-cv-254), ECF No. 130-11.

Defendants specifically object to Interrogatory No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

 Federal Defendants further object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (over 2,000 cases), as set forth in the attached

declaration.  *See* Dkt. 97.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision.

Federal Defendants will provide a response to the main question within Interrogatory 10, the number of denials of DACA renewal requests from Plaintiff States by month, but notes that this information is already provided in the response to Interrogatory 4 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 10**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Denials by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 11**

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**OBJECTION TO INTERROGATORY NO. 11**

Defendants specifically object to Interrogatory No. 11 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 11 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial [DACA applications]," "accepted," "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to subparts a. through g. of this Interrogatory on the grounds that they are overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every initial DACA request from each Plaintiff State (more than 50,000), as set

forth in the attached declaration.  *See* Dkt. 97.  This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 11, the number of initial DACA requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

**RESPONSE TO INTERROGATORY NO. 11**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Request for Evidence (RFE) by Month and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 12**

Please identify the number of renewal DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of June 2012 to June 2018, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;
c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**OBJECTION TO INTERROGATORY NO. 12**

Defendants specifically object to Interrogatory No. 12 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in Interrogatory No. 12 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [DACA applications]," "accepted," and "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97). This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to subparts a. through g. of Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every DACA renewal request from each Plaintiff State (more than 9,000), as set

16

forth in the attached declaration.  *See* Dkt. 97. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well.

Federal Defendants will provide a response to the main question within Interrogatory 12, the number of DACA renewal requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

## RESPONSE TO INTERROGATORY NO. 12

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Request for Evidence (RFE) by Month and Selected State, June 4, 2014 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## INTERROGATORY NO. 13

Please identify the number of approved, initial DACA applications submitted by individuals who indicated on their I-821D, in response to Part 3. Question 4., that their immigration status on June 15, 2012 was "Status Expired" or "Parole Expired," and who answered in the affirmative in response to Part 3. Question 5.a. ("Were you EVER issued an Arrival-Departure Record"), for each Plaintiff State for each month during the period of June 2012 to June 2018.

## OBJECTION INTERROGATORY NO. 13

Defendants specifically object to Interrogatory No. 13 to the extent that it uses terms that do not apply to DACA, such as "applications."  DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in Interrogatory No. 13 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "approved," and "initial [DACA applications]." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter

related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a reliable, readily retrievable, systematic and complete manner, the responses to Part 3, Question 4 on the Form I-821D, in the ordinary course of business. USCIS databases also do not electronically capture, in a readily retrievable, systematic manner, responses to Part 3, Question 5a on the Form I-821D for DACA requests that were processed in USCIS' Computer Linked Application Information Management System (CLAIMS 3), in the ordinary course of business. CLAIMS 3 is an electronic case management system. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for every approved initial DACA request for each Plaintiff State (more than 150,000), as set forth in the attached declaration. *See* Dkt. 97.

Federal Defendants will provide a partial response regarding the number of approved initial DACA requests where "Yes" was marked in Part 3, Question 5a. on the Form I-821D, for cases processed in USCIS' Electronic Immigration System (ELIS). ELIS is an online, electronic account and immigration case management system that stores information submitted or integrated into the system for the processing of specific applications, petitions, or requests. *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

**RESPONSE TO INTERROGATORY NO. 13**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Requests with 'Yes' marked in Part 3 Question 5a 'Were you EVER issued an Arrival-Departure Record' by Month and Selected State, November 1, 2015 - June 22, 2018," which provides information only from ELIS. The data

provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## INTERROGATORY NO. 14

Please identify the number of DACA recipients who adjusted their status to lawful permanent resident, for each Plaintiff State for each month during the period of June 2012 to June 2018, and identify among that number:

      a. the number of DACA recipients who adjusted under 8 U.S.C. 1255(i)

      b. the number of DACA recipients who adjusted under 8 U.S.C. 1255(a)

## OBJECTION TO INTERROGATORY NO. 14

Federal Defendants object to this Interrogatory pursuant to this Court's order dated June 20, 2018 (Dkt. 97).   This Interrogatory is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).

  Federal Defendants further object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, whether an individual adjusted status to lawful permanent residence under 8 U.S.C. 1255(a), (i), or another basis, in the ordinary course of business.  This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every DACA recipient who adjusted status to lawful permanent residence during the specified period for each Plaintiff State (more than 7,000), as set forth in the attached declaration.  *See* Dkt. 97.

## RESPONSE TO INTERROGATORY NO. 14

Subject to these objections, Federal Defendants refer to the attached chart entitled, "United States Citizenship and Immigration Services (USCIS), I-821D, Consideration of Deferred Action for Childhood Arrivals, I-485, Application to Register Permanent Residence or Adjust Status, DACA Recipients who Adjusted Status by Date of Adjustment and Selected State, August 15, 2012 - June 22, 2018." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I am Tracy Renaud, Acting Deputy Director of USCIS.  I believe, based on inquiry, that the foregoing USCIS answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed July 6, 2018.

_(Signature)_

Tracy Renaud
Acting Deputy Director, USCIS

## SPECIFIC OBJECTIONS AND RESPONSES TO
## DEFENDANT-INTERVENORS' THIRD SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents relating to guidelines followed by DHS, and any of its subsidiary agencies, departments, agents, and employees, to evaluate, process, and adjudicate Deferred Action for Childhood Arrivals ("DACA") applications, including, but not limited to: (1) internal agency documents, memoranda, and communications that set forth any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications; (2) training materials provided to agents or employees related to DACA evaluations and adjudications; and (3) changes following January 20, 2017 in any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 5:**

Defendants specifically object to Request for Production (RFP) No. 5 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in RFP No. 5 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to guidelines," "to evaluate, process and adjudicate," "guidance, rules or procedures," "training materials," and "changes following January 20, 2017 in any guidance, rules, or procedures." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Federal Defendants object to RFP No. 5 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants further object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97). This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1). *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests even though they were probative of the issues to be addressed at the preliminary injunction

hearing because they were overly broad and not reasonably tailored to the specific issues to be addressed at the hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc.*, No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible).   More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS is prepared to provide readily available, final versions of non-case specific responsive documents containing guidelines followed to evaluate, process, and adjudicate DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all emails or other documents "relating to guidelines followed by DHS . . . to evaluate, process, and adjudicate" DACA requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

Due to the breadth of RFP No. 5, including the six years it covers, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" guidelines followed by DHS to evaluate, process, and adjudicate DACA requests that would not be overly broad and result in hundreds of thousands of materials to be reviewed for responsiveness and privileges. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 5 for the period of time from June 2012 through August 2012.  ICE has contacted several individuals currently employed by ICE and determined that they have no

documents responsive to Request No. 5. To the extent that responsive documents do exist, they would be among the emails of former ICE employees. ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents relating to the process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates, processes, and adjudicates DACA applications, including but not limited to: (1) under what circumstances a DACA application is rejected, denied, or approved; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of DACA applications; (3) the procedure(s) employed by agents and employees who work in the evaluation and adjudication of DACA applications; and (4) changes in the process for evaluating, processing, and adjudicating DACA applications following January 20, 2017.

**OBJECTION TO REQUEST NO. 6:**

Defendants specifically object to Request for Production (RFP) No. 6 to the extent that it uses terms that do not apply to DACA, such as “applications.” DACA may be requested by certain individuals brought to the United States as children who seek DHS’ prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request. As such, it is not an immigration benefit “application.” For purposes of responding to this RFP only, however, Defendants will interpret “applications” to mean such requests for DACA. Federal Defendants object to RFP No. 6 to the extent that the request seeks documents that are beyond the scope of the claims in this case or they are not relevant to any party’s claim or defense and not likely to lead to the discovery of relevant information.

Defendants further object to the following terms in RFP No. 6 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS’ common use of the terms in its agency practices regarding DACA: “relating to the process by which … evaluates, processes, adjudicates DACA [applications],” “rejected, denied, or approved,” “evaluation and adjudication,” and “changes in the process for evaluating, processing, and adjudicating DACA [applications] following January 20, 2017.” Defendants’ response is based on Defendant USCIS’ common usage of such terms in its DACA agency practices. Defendants also object to RFP 6 to the extent that it is unclear what documents Defendant-Intervenor seeks that are different from documents sought in RFP 5, and to the extent that RFPs overlap, or that RFP 6 seeks documents that are duplicative of those sought in RFP 5. Such apparently duplicative and overlapping requests are overly burdensome and confusing for Defendants to interpret and understand how to respond. Defendants further object that the use of the word “and” in “who work in the evaluation and adjudication of DACA applications” is

ambiguous and creates confusion.  Defendants do not know whether each such employee noted must do *both* actions, "evaluation *and* adjudication," or whether each employee must be involved at least in either "evaluation" or "adjudication" of DACA requests.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).  This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See, e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing); *Better Packages, Inc. v. Zheng*, No. CIV.A. 05-4477, 2006 WL 1373055, at *4-5 (D. N.J. May 17, 2006) (denying the plaintiff's request for expedited discovery in part because it "would lead to the parties conducting all discovery in an expedited fashion under the premise of preparing for a preliminary injunction hearing, which is not the purpose of expedited discovery"); *compare with Par. of Jefferson v. S. Recovery Mgmt., Inc.*, No. CIV. A. 95-2290, 1995 WL 542475, at *2 (E.D. La. Sept. 12, 1995) (granting motion for expedited discovery because it was limited to five request for documents which defendants should routinely maintain and have readily accessible).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

 Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to subparts (1), (3) and (4), because they are duplicative of RFP No. 5.

USCIS is prepared to provide readily available final versions of non-case specific documents describing the process by which DHS evaluates, processes, and adjudicates DACA requests maintained by custodians who are currently employed by USCIS, but not to conduct a comprehensive search for all email and other documents "relating to the process by which DHS . . . evaluates, processes, and adjudicates DACA" requests, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

Due to the breadth of Request for Production No. 6, which covers six years, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" the process by which DHS evaluates, processes, and adjudicates DACA requests that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges.  It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 6 for the period of time from June 2012 through August 2012.  ICE has contacted several individuals currently employed by ICE and determined that they have no documents responsive to Request No. 6.  To the extent that responsive documents do exist, they would be among the emails of former ICE employees.  ICE objects to being required to conduct an electronic search of such emails for the period of June 2012 through August 2012 on the grounds that such a requirement would be overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).  It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether there were any responsive emails were ever created, transmitted, and/or retained.

## REQUEST FOR PRODUCTION NO. 7:

Produce documents showing the number of DACA applications received, rejected, denied, and approved, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; (2) the number of renewal DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of June 2012 to June 2018; and (3) the number of DACA applications accepted but denied, during the period of June 2012 to June 2018, after the adjudicator determined the applicant met the five criteria in the June 15, 2012 DACA memorandum but was otherwise not a qualifying applicant, including because the applicant posed a threat to national security or public safety, by each Plaintiff state, for each month.

## OBJECTION TO REQUEST NO. 7:

Defendants specifically object to Request for Production (RFP) No. 7 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period

from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA.  Defendants further object to the following terms in RFP No. 7 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendant also objects that the phrase "met the five criteria in the June 15, 2012 DACA memorandum," is ambiguous, and Defendant is without sufficient knowledge to know exactly which "five criteria" Defendant-Intervenor is referencing with this phrase.  The reference to the "June 15, 2012 DACA memorandum" lacks specificity, and thus is ambiguous, but Defendants will interpret it to mean the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018, and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g*., *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendant-Intervenors to the responses to Interrogatories and the following pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

## REQUEST FOR PRODUCTION NO. 8:

Produce all documents relating to process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, evaluates and adjudicates applications or requests for deferred action other than DACA, including but not limited to: (1) under what circumstances an application or request is rejected, denied, or accepted; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of deferred action applications or requests; (3) and the procedure(s) employed by agents and employees who work in the evaluation and adjudication of deferred action applications or requests; and (4) any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017.

## OBJECTION TO REQUEST FOR PRODUCTION NO. 8:

Defendants specifically object to Request for Production (RFP) No. 8 to the extent that it uses terms that do not apply to DACA or to deferred action generally, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  Non-DACA deferred action is also made by written request, not an application, to DHS.  As such, neither DACA, nor non-DACA deferred action is

28

obtained through an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications…for deferred action other than DACA" to mean written requests for non-DACA deferred action.  Defendants further object to the following terms in RFP No. 8 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendants common use of the terms in its agency practices regarding deferred action: "evaluates," "adjudicates," "rejected,", "denied," "accepted," "evaluation and adjudication of deferred action applications or requests," "procedures(s) employed by…who work in the evaluation and adjudication of deferred action," and "any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017."  Defendants' response is based on Defendants' common usage of such terms in its agency practices. Federal Defendants object to RFP No. 8 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

 Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case and is outside the scope of the relief sought in this action.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this Request to the extent that it seeks every deferred action request that was ever denied. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

USCIS is prepared to provide readily available, final versions of non-case specific documents regarding the process by which USCIS evaluates, processes, and adjudicates requests for deferred action other than DACA, that were in existence and in use at any time between January 1, 2016 and June 22, 2018, and that are maintained by custodians who are currently employed by USCIS. USCIS will not conduct a comprehensive search for all emails or other documents "relating to [the] process by which DHS . . . evaluates and adjudicates" non-DACA deferred action requests, or conduct a comprehensive search for records that were maintained by former USCIS employees.  Due to the breadth of this Request, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails relating to the process by which DHS evaluates and adjudicates requests for deferred action other than DACA that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges, or risk being under-inclusive in scope. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS, and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS or DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In addition to the responsive documents being produced, USCIS respectfully refers Defendant-Intervenors to the following publicly available information:

- Memorandum from Stuart Anderson, Executive Associate Commissioner, Office of Policy and Planning, INS, "Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status," May 8, 2002, 81 FR 92266 at 92279 (https://www.regulations.gov/document?D=USCIS-2011-0010-0004)
- "New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for 'T' Nonimmigrant Status," 67 Fed. Reg. 4784, 4790 (Jan. 31, 2002)
- "New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status," 72 FR 53014-01 (Sept. 17, 2007)

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents relating to the number of DACA applications received, rejected, denied, and approved at each of the five USCIS Service Centers, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018; and (2) the number of renewal DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of June 2012 to June 2018.

**OBJECTION TO REQUEST NO. 9:**

Defendants specifically object to Request for Production (RFP) No. 9 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be

submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in RFP No. 9 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved."  Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices.

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp*., 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc*., Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing).  More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to this RFP to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to this RFP as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for

USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to the pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses  to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

## REQUEST FOR PRODUCTION NO. 10:

Produce all documents relating to the USCIS processing time of accepted and approved DACA applications, including but not limited to: (1) the amount of time that elapses between the date USCIS accepts an application and the time the application is approved; (2) the amount of time that elapses between the date USCIS approves an application and an applicant receives an employment authorization document; and (3) any changes in the processing time described above since January 20, 2017.

## OBJECTION TO REQUEST FOR PRODUCTION NO. 10:

Defendants specifically object to Request for Production (RFP) No. 10 to the extent that it uses terms that do not apply to DACA, such as "applications."  A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a two-year period from approval of the request.  As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA.  Defendants further object to the following terms in RFP No. 10 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "processing time," "accepted," "approved," and "any changes in the processing time described above since January 20, 2017."  Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices   Defendants also object that "amount of time that elapses" is vague and undefined, and therefore ambiguous.

32

Federal Defendants object to this Request on the grounds that it is inconsistent with the Court's guidance on June 20, 2018 and its subsequent order that same day (Dkt. 97).   This Request is inconsistent with the limited nature of expedited discovery contemplated by Fed. R. Civ. P. 26(d)(1).  *See*, *e.g.*, *OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC*, Case No. 4:16-cv-350, 2016 WL 3747222, *4 (S.D. Tex. 2016) ("The Court agrees that Plaintiff's discovery requests 'broadly seek any and all information necessary for Plaintiffs to establish their cause of action which is manifestly improper.'"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[T]he subject matter related to request for expedited discovery should be narrowly tailored in scope"); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, Case No. 98-cv-2782, 1998 WL 404820, at * 2-3 (E.D. Pa. 1998) (denying motion for expedited discovery where movant's discovery requests were overly broad and not reasonably tailored to the specific issues to be addressed at the preliminary injunction hearing). More specifically, Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

 Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants further object to the extent this Request seeks documents duplicative of information provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of this Request Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and result in potentially hundreds of thousands of materials to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians.  Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms.  It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to its responses to the Interrogatories and publicly available documents on the following pages of the USCIS website:

- Website for checking current case processing times:
  https://egov.uscis.gov/processing-times/
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable:
  https://www.uscis.gov/about-us/electronic-reading-room

Dated: July 6, 2018                         Respectfully submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General
                                            Civil Division
                                            BRETT A. SHUMATE
                                            Deputy Assistant Attorney General
                                            WILLIAM C. PEACHEY
                                            Director, Office of Immigration Litigation
                                            District Court Section

                                            /s/ *Jeffrey S. Robins*
                                            JEFFREY S. ROBINS
                                            Attorney-in-Charge
                                            Assistant Director
                                            U.S. Department of Justice, Civil Division
                                            Office of Immigration Litigation
                                            District Court Section
                                            P.O. Box 868, Washington, DC 20044
                                            Telephone: (202) 616-1246
                                            Facsimile: (202) 305-7000
Attorneys for Federal Defendants            jeffrey.robins@usdoj.gov

# DEF-INTERV.

# EX. 290

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' FIRST SET OF DISCOVERY REQUESTS

TO:   Defendant-Intervenors, by and through their attorney of record, Nina Perales, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205.

Plaintiff States serve these objections and responses to Defendant-Intervenors' first set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

1

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

/s/ *Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge

PATRICK MORRISEY
Attorney General of West Virginia

Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

## CERTIFICATE OF SERVICE

I certify that on June 11, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ *Adam N. Bitter*
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

## GENERAL OBJECTIONS

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id.* Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs objects to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information

that is publicly available or otherwise equally available or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

Please provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that Plaintiffs may use to support their claims or defenses, unless solely for impeachment, identifying the subjects of the information. *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs will support their motion for preliminary injunction with factual declarations from the following individual fact witnesses. The subjects of their testimony can be found in the declarations attached to Plaintiffs' motion for preliminary injunction.

Leonardo R. Lopez
Associate Commissioner for School Finance/Chief School Finance Officer
Texas Education Agency
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Monica Smoot
Chief Data and Analytics Officer
Center for Analytics and Decision Support
Texas Health and Human Services Commission
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Kenneth Palinkas
President of Local 0235
American Federation of Government Employees, AFL-CIO
c/o Todd Lawrence Disher
Tel.: (512) 463-2100
P.O. Box 12548
Austin, Texas 78711-2548

Plaintiffs will provide the names of their expert witnesses by the June 15, 2018 deadline set by the Court. Plaintiffs will support their motion for preliminary injunction with the exhibits cited in and attached to their complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement. Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## INTERROGATORY NO. 2

Please provide a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of Plaintiffs and that Plaintiffs may use to support their claims or defenses, unless solely for impeachment. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii).

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the exhibits attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 3**

Please provide a computation of any financial harm that Plaintiffs claim to result from the implementation of DACA, and identify the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of financial harm suffered. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the computations supporting Plaintiffs' motion for preliminary injunction are included either in Plaintiffs' complaint, motion for preliminary injunction, or the documents cited or attached to those filings. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents and compilations are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S FIRST SET OF REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' interrogatories.

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents are based, to the extent that any additional information exists. Plaintiffs will produce any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response, if necessary, with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

# DEF-INTERV.

# EX. 291

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSE TO DEFENDANT-
INTERVENORS' SECOND SET OF DISCOVERY REQUESTS**

TO:   Defendant-Intervenors, by and through their attorneys of record, Nina Perales,
Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal
Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas
78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C.,
P.O. Box 4545 McAllen, Texas 78502.

Plaintiff States serve these objections and responses to Defendant-Intervenors'

second set of interrogatories and requests for production of documents pursuant to

the Federal Rules of Civil Procedure.

1

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

/s/ *Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge

PATRICK MORRISEY
Attorney General of West Virginia

Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

2

## CERTIFICATE OF SERVICE

I certify that on June 14, 2018, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Rachel Wainer Apter
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Rachel.Apter@njoag.gov

/s/ *Adam N. Bitter*
ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

3

## GENERAL OBJECTIONS

At this juncture, the Court has allowed limited expedited discovery for purposes of the preliminary injunction hearing. Although the Federal Rules do not provide a standard for the court to use in evaluating requests for expedited discovery, district courts within the Fifth Circuit typically adopt a "good cause" standard. *See, e.g.*, *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004)). In a "good cause" analysis, courts examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Grp., Inc.* 275 F.R.D. at 239 (citations omitted). Moreover, the subject matter related to requests for expedited discovery should be narrowly tailored in scope. *Id*. Accordingly, the scope of discovery at this phase in the case is narrower than that typically provided under Rule 26.

Plaintiffs object to the extent that any of Defendant-Intervenors' requests are outside the narrow scope of expedited discovery, unduly burdensome, overly broad, or seek information that is not relevant to this phase of this case or equally accessible to Defendant-Intervenors through third-party discovery requests or other sources.

Additionally, Plaintiffs objects to each discovery request to the extent that: (1) it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise protected by legislative privilege, deliberative process privilege, or any other applicable privilege, protection, doctrine, or immunity; (2) it seeks information

that is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (3) it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (4) it seeks information not relevant to the subject matter of this litigation.

Plaintiffs object to each discovery request to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Many of the requests seek information from individuals or entities who are not parties to this lawsuit and are not under the direction and control of the parties. Those requests are subject to the rules governing third-party discovery.

These responses and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to Plaintiffs' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Plaintiffs likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Plaintiffs will provide their responses based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. Plaintiffs object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions. Plaintiffs will answer the requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Texas.

5

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S SECOND SET OF INTERROGATORIES

### INTERROGATORY NO. 4:

Identify all costs that Plaintiffs, by state and year, have incurred since June 2012 or expect to incur in the future, with respect to providing goods, support and/or services to DACA recipients living in Plaintiff states. With respect to each cost identify:

      a.     the category of the cost;

      b.     the amount of the cost;

      c.     whether Plaintiff states have paid the cost;

      d.     the anticipated amount of future costs;

      e.     the complete factual basis for asserting and computing the above costs; and

      f.     all information, documents or other evidentiary material on which such assertions and computations are based.

### RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 5:**

Identify the number of DACA recipients living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

    a.    the manner in which you determined the number of DACA recipients;

    b.    the manner in which you determined the individuals are DACA recipients;

    c.    the documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;

    d.    the number of DACA recipients who attend public colleges or universities;

    e.    the number of DACA recipients who attend public K-12 schools;

    f.    the number of DACA recipients who are unaccompanied children (UAC);

    g.    the number of DACA recipients who have received health care not compensated by the patient or an insurer.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 2 to the complaint and Exhibit 15 to the motion for preliminary injunction and the other exhibits attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 6:**

Identify the number of unaccompanied children (UAC)[1] living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

      a.      the total number of UAC;
      b.      the total number of UAC who attend public K-12 schools;
      c.      the total number of UAC who attend public colleges or universities;
      d.      the amount of K-12 education costs each state incurs on UAC;
      e.      the amount of higher education costs each state incurs on UAC;
      f.      whether Plaintiff states have paid the cost;
      g.      the anticipated amount of future costs;
      h.      complete factual basis for asserting and computing the above costs; and
      i.      all information, documents or other evidentiary material on which such assertions and computations are based.

**RESPONSE:**

      Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs.

      Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to Exhibit 9 attached to their motion for preliminary injunction. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

      Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

---

[1] The term "unaccompanied children" can refer to the broader category of any children not in the physical custody of a parent or guardian. For purposes of their response, Plaintiffs assume that this interrogatory seeks information regarding "unaccompanied alien children."

**INTERROGATORY NO. 7:**

Identify Plaintiff states' expenditures, by state and year, to provide Emergency Medicaid Services to DACA recipients since June 2012. For each Plaintiff state, please identify:

      a.    the manner in which you determined the number of DACA recipients who receive Emergency Medicaid services;

      b.    the manner in which you determined the individuals are or were DACA recipients; and

      c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Emergency Medical Services costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 8:**

Identify Plaintiff states' expenditures, by year, to provide benefits under the Texas Children's Health Insurance Program (CHIP) Perinatal Coverage program to DACA recipients since 2012 and identify:

      a.    the manner in which you determined the number of DACA recipients who receive benefits under the CHIP Perinatal Coverage program;

      b.    the manner in which you determined the individuals are or were DACA recipients; and

      c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Texas Children's Health Insurance Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

10

## INTERROGATORY NO. 9:

Identify Plaintiff states' expenditures, by year, to provide benefits under Texas's Family Violence Program to DACA recipients since 2012 and identify:

    a.    the manner in which you determined the number of DACA recipients who receive benefits under Texas's Family Violence Program;

    b.    the manner in which you determined the individuals are or were DACA recipients; and

    c.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

## RESPONSE:

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the Texas Family Violence Program costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those costs are based, to the extent that any additional information exists. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

11

**INTERROGATORY NO. 10:**

Identify each and every incident in Plaintiff states, by state and year, in which you contend that a DACA recipient was involved in the commission of a crime since 2012. For each such incident, please identify:

   a.   the name of the DACA recipient;
   b.   all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;
   c.   the crime which the DACA recipient was charged;
   d.   the court in which the DACA recipient was prosecuted;
   e.   whether the DACA recipient was convicted, and if so, of what crime or crimes; and
   f.   any information, documents or other evidentiary material related to the alleged crime, the identity of the victim or victims, and the conviction, if any.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**<u>INTERROGATORY NO. 11:</u>**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and crime in any of the Plaintiff states, by state, or in any other part of the United States since June 2012. For any such study or report, please identify:

a.    the date you requested it;

b.    the date you obtained it;

c.    the author(s);

d.    the person or entity who commissioned it;

e.    the person or entity who paid for or is responsible for paying for it; and

**<u>RESPONSE:</u>**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of education to residents in Plaintiff states, by state, since June 2012. For any such study or report, please identify:

      a.     the date you requested it;

      b.     the date you obtained it;

      c.     the author(s);

      d.     the person or entity who commissioned it; and

      e.     the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

Subject to and without waiving their objections, the education costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

14

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of healthcare services to residents in Plaintiff states, by state since June 2012. For any such study or report, please identify:

       a.      the date you requested it;

       b.      the date you obtained it;

       c.      the author(s);

       d.      the person or entity who commissioned it; and

       e.      the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

    Subject to and without waiving their objections, the health care costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

15

**INTERROGATORY NO. 13:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of law enforcement services to residents in Plaintiff states, by state, since June 2012. If so, for each study or report, please identify:
    a. the date you requested it;
    b. the date you obtained it;
    c. the author(s);
    d. the person or entity who commissioned it; and
    e. the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

    Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery.

    Subject to and without waiving their objections, the law enforcement costs incurred by Plaintiffs upon which their motion for preliminary injunction relies are detailed in the complaint, the motion for preliminary injunction, and the exhibits attached to and cited in those documents. Plaintiffs will disclose any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

    Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

**INTERROGATORY NO. 14:**

    For each interrogatory, identify each person answering the interrogatory, supplying any information relied upon in answering the interrogatory, or assisting in any manner with the preparation of answering the interrogatory.

**RESPONSE:**

    Plaintiffs object to this request. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

16

**INTERROGATORY NO. 15:**

Identify each employer who hired a DACA recipient instead of a U.S. citizen because of the employer penalty pursuant to The Patient Protection and Affordable Care Act.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not in the possession, custody, or control of Plaintiffs

Plaintiffs may supplement this response as expedited discovery proceeds and with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

17

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENOR'S SECOND SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 2:**

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' Interrogatories Nos. 4-15.

**RESPONSE:**

Plaintiffs object to this request. It is overly broad and unduly burdensome. It seeks information that is outside the scope of limited expedited discovery and not relevant to the preliminary injunction hearing.

Subject to and without waiving their objections, Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint and motion for preliminary injunction. Plaintiffs will produce the non-privileged relevant information in their possession, custody, or control upon which those documents are based, to the extent that any additional information exists. Plaintiffs will produce any new exhibits they intend to attach to their initial post-discovery brief on June 15, 2018, pursuant to the parties' letter agreement.

Plaintiffs may supplement this response, if necessary, with additional information once this case proceeds to the normal discovery period after the Court's ruling on the motion for preliminary injunction.

# DEF-INTERV.

# EX. 292



# *Special Report*

### *December 2006*

## UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

**CAROLE KEETON STRAYHORN**
**Texas Comptroller**

STATES000013

STATES000014

*December 2006*

# Special Report

**CAROLE KEETON STRAYHORN  •  Texas Comptroller of Public Accounts**

# UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

*"This is the first time any state has done a comprehensive financial analysis of the impact of undocumented immigrants on a state's budget and economy, looking at gross state product, revenues generated, taxes paid and the cost of state services.*

*"The absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our gross state product of $17.7 billion. Undocumented immigrants produced $1.58 billion in state revenues, which exceeded the $1.16 billion in state services they received. However, local governments bore the burden of $1.44 billion in uncompensated health care costs and local law enforcement costs not paid for by the state."*

**— Carole Keeton Strayhorn, Texas Comptroller**

## I.  Introduction

Much has been written in recent months about the costs and economic benefits associated with the rising number of undocumented immigrants in Texas and the U.S. as a whole. Most reports tie the costs of the undocumented population to education, medical expenses, incarceration and the effects of low-paid workers on the salaries of legal residents. Revenue gains to governments resulting from undocumented immigrants consist primarily of taxes that cannot be avoided, such as sales taxes, various fees and user taxes on items such as gasoline and motor vehicle inspections.

This financial report focuses on the costs to the state of Texas; that is, services paid for with state revenue, including education, healthcare and incarceration. What government-sponsored services are available to undocumented immigrants is often determined by federal restrictions on spending (**Exhibit 1**). The report also identifies areas of costs to local governments and hospitals. Finally, it analyzes the $17.7 billion impact on the state's economy as well as state revenues generated by undocumented immigrants.

The Comptroller's report estimates that undocumented immigrants in Texas generate more taxes and other revenue than the state spends on them. This finding is

contrary to two recent reports, FAIR's, "The Cost of Illegal Immigration to Texans" and the Bell Policy Center's "Costs of Federally Mandated Services to Undocumented Immigrants in Colorado", both of which identified costs exceeding revenue.

**EXHIBIT 1**

**Major Government-Sponsored Programs and their Availability to Undocumented Immigrants**

| Unavailable | Available |
|---|---|
| Medicare | K-12 Education |
| Medicaid | Emergency Medical Care |
| Cash Assistance (TANF-Welfare) | Children with Special Health Care Needs |
| Children's Health Insurance Program (CHIP) | Substance Abuse Services |
| Food Stamps | Mental Health Services |
| Supplemental Security Income (SSI) | Immunizations |
| Public Housing Assistance | Women and Children's Health Services |
| Job Opportunities for Low Income Individuals | Public Health |
| Child Care and Development | EMS |

*Source: United States Department of Health and Human Services.*

**Special Report:** Undocumented Immigrants in Texas

In education, FAIR's report included the costs of legal children to undocumented parents. The inclusion of these children dramatically increased the costs reported. The Comptroller's report focuses its attention on the costs directly attributed to undocumented persons. Colorado's report differed from the Comptroller's report in identifying which undocumented children should be included in any estimates. Colorado assumed all undocumented children between the ages of 5 and 17 were in public schools, and therefore did not account for children that did not attend school or were enrolled in private schools.

For health care costs, FAIR's report estimated costs to local taxpayers and not exclusively the state. Colorado's report states their estimate of state health care costs is overstated due to the fact the authors included legal permanent residents as well as other authorized immigrants in their count of undocumented immigrants.

The difference in the reports also may be related to the tax systems in the two states. Unlike Colorado, Texas has no income tax and relies heavily on consumption taxes at the state and local levels. Texas is more likely to capture tax revenue from workers who do not report income. Whereas income taxes will miss much activity in an underground economy, a sales tax will more likely be collected no matter how one earns an income.

Consumption taxes make up a greater percentage of total state revenue in Texas than in most other states. Since undocumented immigrants are more likely to work in the underground economy from which income taxes may not get collected, the Texas tax system, compared to other states, may capture a greater percentage of all the taxes that should be paid from the economic activity of undocumented immigrants.

As this report shows, calculating the impact of undocumented immigrants on the Texas economy and state budget is at best an educated guess. This is a result of the difficulty in calculating the number of undocumented immigrants in the state and the number who access state paid services. It is difficult to count a population that does not *want* to be counted, particularly when the law allows them access to many government services without regard to citizenship, such as those delivered by public hospitals and public schools.

This report uses some estimates of the Pew Hispanic center when calculating the number of undocumented immigrants in Texas, and of the U.S. Census Bureau when discussing foreign-born residents. Various methods are used in calculating the number of undocumented immigrants that received services.

All levels of government experience costs associated with undocumented immigrants. In fact, this report estimates the largest costs to local governments and hospitals; that is, incarceration and uncompensated health care costs. The Comptroller estimates costs of $1.3 billion for hospitals and $141.9 million for local incarceration attributed to undocumented immigrants. Likewise, the Comptroller estimates undocumented immigrants paid more than $513 million in local taxes. While this report acknowledges those costs, the main focus is the cost to the state of Texas, that is, costs paid with state revenues. While there may be costs of some state paid services not reported or deemed inestimable, the largest cost items are identified. Likewise, there may be some state revenue unaccounted for, but the largest revenue sources are used in the Comptroller's calculations.

As mentioned earlier, the Comptroller's office recognizes that there are costs associated with the legally resident children of undocumented immigrants. The Comptroller has chosen not to estimate these costs or revenues due to uncertainties concerning the estimated population and the question of whether to include the costs and revenues associated only with the first generation or to include subsequent generations, all of which could be seen as costs.

## II.  Background

The 2000 Census counted 31.1 million foreign-born residents in the U.S., a 57 percent increase over the 1990 Census total of 19.8 million. The total U.S. population, by contrast, rose by just 13 percent over the same period.[1] The Census Bureau defines the foreign-born population as "immigrants (legal permanent residents), temporary migrants (e.g., students), humanitarian migrants (e.g., refugees), and unauthorized migrants (people illegally residing in the United States)."[2]

Six states—California, New York, Texas, Florida, Illinois and New Jersey—accounted for more than two-thirds of the 2000 foreign-born resident count, with 21.3 million persons. And the immigrant population in these six states is rising rapidly. Their 2000 count of 21.3 million was nearly 50 percent higher than the equivalent 1990 Census count of 14.4 million, for an increase of 6.9 million persons.[3]

Texas, with 2.9 million foreign-born residents, had the third-highest total in the U.S. (after California and New York) and ranked seventh among all states in its percentage of residents who are immigrants, at 13.9 percent. Texas' foreign-born—71 percent of whom come from Mexico or other Latin American countries—are concentrated in the state's urban areas. Even so, the Census found foreign-born Hispanics in every Texas county except Loving County.[4]

STATES000016

*Special Report:* **Undocumented Immigrants in Texas**

Texas' foreign-born population is concentrated in seven council of government (COG) regions (Houston-Galveston, North Central Texas, Lower Rio Grande Valley, Upper Rio Grande, Alamo Area, Capital Area and South Texas). In 2000, these seven COGs accounted for almost three-quarters of the state's population and 88 percent of its foreign-born residents, 90 percent of whom were from Mexico or other Latin American countries.

### Undocumented Immigrants

This report uses the term "undocumented immigrants" to refer to foreign-born individuals who reside in the U.S. who are not U.S. citizens or do not possess permanent resident status. Undocumented immigrants also may be foreign-born individuals who entered the U.S. legally but overstayed the authorized time period.

The Pew Hispanic Center estimates that the U.S. had 11.1 million undocumented immigrants in 2005. Of these, Texas accounted for between 1.4 million and 1.6 million. The Center estimates that 30 percent of the foreign-born population is undocumented.[5]

Recent research detailing the demographic characteristics of undocumented immigrants has reported U.S. totals rather than state-level characteristics. Texas is estimated to have about 14 percent of all undocumented immigrants residing in the U.S.[6]

The Pew Hispanic Center estimates that as of March 2005, two-thirds of undocumented immigrants in the U.S. had been in the country for 10 years or less, and 40 percent had been here for five years or less. Adult males composed the largest number of undocumented immigrants. Adults accounted for 84 percent of all undocumented immigrants and males made up 58 percent of all adults.[7]

The largest number of undocumented immigrants came from Latin America, with the majority of those coming from Mexico. In 2005, 6.2 million of the nation's estimated 11.1 million undocumented immigrants came from Mexico, or 56 percent of the total (**Exhibit 2**). From 2000 to 2005, the number of undocumented immigrants from Mexico rose by 31.5 percent.[8]

Undocumented immigrants are more likely to work in low-wage occupations that do not require a high level of educational attainment. The largest numbers of undocumented immigrants (31 percent) work in service occupations, followed by construction (19 percent) and production, installation and repair (15 percent). The fewest number of undocumented immigrants work in farming (4 percent), primarily because farm workers make up a relatively small portion of all occupations in general. Farming, however, has the highest concentration of

undocumented workers. Nearly a quarter (24 percent) of all farm workers are undocumented immigrants.

Other fields with large concentrations of undocumented labor include cleaning (17 percent of all workers), construction (14 percent) and food preparation (12 percent).[9]

## III. Education

Any estimate of state costs associated with undocumented immigrants is imprecise due to the difficulties involved in determining their numbers. In public education, federal guidelines prohibit questions of legal status. In higher education, state residency for tuition purposes is defined by the length of time an individual has lived in the state, regardless of legal status.

### Public Education Costs

Until 1982, Texas law prohibited local school districts from using state funds to educate undocumented immigrant children; furthermore, districts were allowed to deny enrollment to such children. In 1982, however, the Texas law was deemed unconstitutional. In *Plyler v. Doe*, the U.S. Supreme Court ruled that Texas law violated the equal protection provisions of the 14th Amendment. As a result of *Plyler v. Doe*, states may not deny access to public education to immigrant children residing within their boundaries, regardless of their legal status.[10] Subsequent court cases resulted in prohibitions against attempts to identify undocumented children because of the perception that they could then be discriminated against.



**EXHIBIT 2**
**Country of Origin of**
**Undocumented Immigrants in the U.S.**
**March 2005**

Mexico 56%
Other Latin America 22%
Asia 13%
Europe & Canada 6%
Africa & Other 3%

*Source: Pew Hispanic Center.*

**Special Report:** Undocumented Immigrants in Texas

EXHIBIT 3
**Public Education Cost Comparison**

|  | FAIR 1999-2000 | FAIR 2003-2004 | Comptroller 2000-2001 | Comptroller 2004-2005 |
|---|---|---|---|---|
| Avg. Cost Per Student | $6,288 | $7,450 | $6,447 | $7,085 |
| Est. Number of Undocumented Immigrants | 164,000 | 225,000 | 125,000 | 135,000 |
| **Total Cost** | **$1.03 billion** | **$1.68 billion** | **$806 million** | **$957 million** |

Note: FAIR's estimates include federal dollars.
*Sources: Federation for American Immigration Reform and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As a result of the state school funding formulas, the cost ($7,085) of any student added to the enrollment of a local school district is borne by the state, regardless of legal status. Because the state system of school finance treats local property tax revenue as interchangeable with appropriated state funds, local and state costs are combined in the cost per student.

The Comptroller's office estimates that there were about 135,000 undocumented children in Texas public schools during the 2004-05 school year, or about 3 percent of total public school enrollment. Dr. Jeffery Passel of the Pew Hispanic Center estimated that there were 140,000 undocumented students in Texas public and private schools in 2001-02.[11] Applying the eight percent growth in total student enrollment from 2001-02 to 2004-05 school year (fiscal 2005) to the estimated 140,000 undocumented students resulted in an estimated 151,182 students in 2004-2005. A U.S. Government Accountability Office report's estimates that 89.3 percent of Texas students are enrolled in public school. That was applied to the estimated number of undocumented children in school, resulting in an estimated 135,013 undocumented children in Texas public schools.[12]

The Texas Education Agency reports that, during 2004-05, the average state and local expenditure per student was $7,085 (this excludes federal funds). Applying this figure to the estimated number of undocumented immigrant children in public schools, the Comptroller estimates that the cost of educating undocumented children in 2004-05 was slightly less than **$957 million** (**Exhibit 3**).

This estimate may be conservative, in that other reports have estimated higher costs. The 2004 report by the U.S. Government Accountability Office referenced earlier stated that Texas, in response to a survey, estimated these costs at $932 million in 1999-2000. Applying increases in enrollment and cost per student, this figure implies 2004-05 costs of nearly $1.2 billion. A more recent report by the Federation for American Immigration Reform (FAIR) estimates Texas' costs at nearly $1.7 billion for the 2003-04 school year.[13] These estimates, however, include federal spending, which the Comptroller's office has excluded, as this report focuses on state costs.

In addition, the varying estimates assume different numbers of undocumented children in public schools. FAIR estimated that Texas public schools educated 225,000 undocumented children in 2003-04, substantially more than the Comptroller's estimate. FAIR based its estimate on a 1994 Urban Institute estimate of 93,907.[14] One of the authors of that Urban Institute estimate is Dr. Passel, whose estimate of 140,000 was used in the Comptroller's calculation.

### Higher Education Costs

The number of undocumented immigrants attending college in Texas also is unknown, as is the number of those paying in-state tuition rates, and thus the relevant costs to the state are difficult to estimate.

Prior to fall 2006, students who were not citizens or permanent residents of the U.S. (whether documented or not) still could become classified as Texas residents and thus be entitled to in-state college tuition rates under the provisions of Section 54.052(j) of the Texas Education Code, originally enacted by the 2001 Legislature as House Bill (H.B.) 1403. Prior to H.B. 1403 being signed into law in 2001, these students would have been considered international students, and therefore would have paid the more costly out-of-state tuition.

To qualify, the student must have lived in the state for at least three years before graduating from a Texas high school or receiving a high school equivalency diploma in Texas. The student also must have lived for at least part of that time with a parent or legal guardian and could not have an established residence outside of Texas. In addition, such students were required to sign an affidavit stating that they would apply for permanent residency as soon as they are eligible to do so.

The 2005 Legislature revisited the issue of resident status via Senate Bill (S.B.) 1528, which made residency requirements essentially uniform for all students, regardless of their legal status. As of fall 2006, anyone who has lived in Texas for three years before graduating or receiving a diploma equivalent from a high school, and has also lived in the state for a year prior to enrollment in college, qualifies for in-state tuition as a Texas resident. Any student

STATES000018

*Special Report:* **Undocumented Immigrants in Texas**

### EXHIBIT 4
### A Comparison of Provisions of H.B. 1403 and S.B. 1528 for Establishing Texas Residency

| H.B. 1403 Requirements<br>To become residents, must<br>(2001) | S.B. 1528 Requirements<br>(2005) |
|---|---|
| 1. have resided with a parent or legal guardian or conservator during at least a portion of the 3 years leading up to high school graduation or the receipt of a GED certificate. | n/a |
| 2. have graduated from a public or private high school or received the equivalent of a high school diploma in this state; | same |
| 3. have resided in this state for at least three years as of the date the person graduated from high school or received the equivalent of a high school diploma; | same |
| 4. have registered as an entering student in an institution of higher education not earlier than the 2001 fall semester; | n/a |
| 5. provide to the institution an affidavit stating that the individual will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so; and | Only required if student is not a U.S. Citizen or Permanent Resident |
| 6. have not established a residence outside this state | Must have lived in Texas the 12 months prior to enrollment. |

Note: Opportunity available to all persons meeting these requirements, whatever their citizenship or INS status, including U.S. Citizens and Permanent Residents.
*Source: Texas Higher Education Coordinating Board.*

who is not a U.S. citizen or permanent resident still must sign the affidavit concerning permanent residency. **Exhibit 4** compares previous and current law on this issue.

According to the Texas Higher Education Coordinating Board, in fall 2001, 393 students attended institutions of higher education as Texas residents based on Section 54.052(j) of the Education Code; of these, 300 attended community colleges. In fall 2004, nearly 10 times as many students received in-state rates due to Section 54.052(j) provisions—3,792, more than 75 percent of whom attended community colleges (**Exhibit 5**).

As noted in **Exhibit 5**, average state funding per student fell between 2001 and 2004. Consequently, state costs did not go up at the same rate as the number of students; instead, there was about a 446 percent increase in total state funding for these students from 2001 to 2004. The

3,792 students in fall 2004 comprised 0.36 percent of total enrollment in the state's public institutions in 2004 (1,054,586 students in all).

It should be noted that these numbers are for all students who established residency for in-state rates under Section 54.052(j), regardless of their immigration status; not all were undocumented immigrants, despite the fact that the media often describes them as such. There are many types of visas for non-immigrants that could allow a foreign student to fulfill the residency requirements for in-state tuition; for example, the children of ambassadors and diplomats, or their employees. The Comptroller's office cannot determine the share of Section 54.052(j) students representing undocumented immigrants. If all these students were undocumented, the cost to the state in fiscal 2005 would have been **$11.2 million**.

### EXHIBIT 5
### Cost to State of Non-Citizen College Student Classified as Texas Residents

| | Fall 2001<br>Avg. State Cost<br>per Student | Fall 2001<br>Resident<br>Students | Fall 2001<br>Total | Fall 2004<br>Avg. State Cost<br>per Student | Fall 2004<br>Resident<br>Students | Fall 2004<br>Total |
|---|---|---|---|---|---|---|
| Universities | $5,366 | 64 | **$343,424** | $4,816 | 747 | **$3,597,552** |
| Health Related Inst. | $31,693 | 29 | **$919,097** | $25,237 | 16 | **$403,792** |
| Community Colleges | $2,627 | 300 | **$788,100** | $2,239 | 2,894 | **$6,479,666** |
| Tech. Colleges | | 0 | | $5,509 | 120 | **$661,080** |
| State Colleges | | 0 | | $4,265 | 15 | **$63,975** |
| **Total** | | 393 | **$2,050,621** | | 3,792 | **$11,206,065** |

*Sources: Texas Higher Education Coordinating Board and the University of Texas System.*

STATES000019

**Special Report: Undocumented Immigrants in Texas**

EXHIBIT 6
**Estimated State and Federal Medicaid Expenditures
for Undocumented Immigrants, 2000 and 2005**

| | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $45,206,381 | $96,864,943 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $45,206,381 | $89,698,067 | 98.4% |
| Average Number Recipient Months per Month | 1,528 | 2,762 | 80.8% |
| Medicaid Expenditures per Recipient Month | $2,466 | $2,923 | 18.5% |
| Medicaid Expenditures per Recipient Month (constant 2000 dollars) | $2,466 | $2,678 | 8.6% |

Note: Amounts may not add due to rounding.
Note: Recipient month equals one month's coverage for an eligible individual.
*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

## IV. Health Care

State and federal-funded health benefits for undocumented immigrants are limited in Texas (see **Exhibit 1**). Costs for services are far more likely to fall on local governments, non-profit and private health care facilities.

### State Costs

Health-related benefits available for undocumented immigrants in Texas generally fall into three categories: emergency Medicaid; state-local programs such as mental health services and school-based health centers; and public health programs.

#### Emergency Medicaid

Medicaid is a federal/state funded program that provides healthcare to low income families, pregnant women, elderly people and those with disabilities and dependent children and related caretakers. Eligible persons must meet asset requirements.[15]

Emergency Medicaid payments represent the majority of state costs for medical care provided to undocumented immigrants. In the case of a medical emergency, such as childbirth and labor or other conditions that may threaten an individual's life, the federal government allows Medicaid to pay for services rendered to persons who would otherwise qualify for Medicaid regardless of their immigration status. Not all undocumented immigrants seeking medical care qualify for emergency Medicaid.

Medicaid expenditures for all immigrants, regardless of legal status, more than doubled (114 percent) from 2000 to 2005. When adjusted for inflation, spending rose by 98.4 percent. The average number of recipients per month increased by 81 percent during the same time period.

Because the Texas Health and Human Services Commission makes no distinction between legal immigrants, undocumented immigrants, refugees and those awarded asylum, costs attributed to undocumented immigrants must be estimated. The Pew Hispanic Center estimates that undocumented immigrants account for 30 percent of all immigrants. Based on that estimate, **Exhibit 6** details both state and federal estimated costs to emergency Medicaid.

The state shares the costs of Medicaid with the federal government. Texas pays approximately 40 percent of Medicaid costs; therefore, the total estimated state cost for Medicaid services for undocumented immigrants was **$38.7 million** in fiscal 2005 (**Exhibit 7**).

#### Children with Special Health Care Needs

The U.S. Department of Health and Human Services defines children with special health care needs (CSHCN),

> …as those who have or are at increased risk for a chronic physical, developmental, behavioral, or emotional condition and who also require health and related services of a type or amount beyond that required by children generally.[16]

Funding for this program is split between the states and federal Title V, Maternal Child Health Services Block Grants.

EXHIBIT 7
**Estimated State Medicaid Expenditures
for Undocumented Immigrants, 2000 and 2005**

| | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $18,082,552 | $38,745,977 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $18,082,552 | $35,879,227 | 98.4% |

*Sources: Texas Health and Human Services Commission and
Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

STATES000020

**EXHIBIT 8**
**Children with Special Health Care Needs**
**Treated in Texas, All Funds 2005**

| | Clients Served | Percent | Expenditures | Percent |
|---|---|---|---|---|
| Citizens/Legal Residents | 633 | 30.0% | $4,177,280 | 20.7% |
| Non-Citizens | 1,452 | 68.8% | $15,960,962 | 78.9% |
| Unknown | 25 | 1.2% | $89,921 | 0.4% |
| Total | 2,110 | 100.0% | $20,228,163 | 100.0% |

*Source: Texas Department of State Health Services.*

State and federal CSHCN expenditures in Texas totaled $20.2 million in fiscal 2005 (**Exhibit 8**).

CSHCN assistance is available for Texas residents, as defined by the Texas Administrative Code, regardless of their citizenship status in the U.S. In **Exhibit 8**, the "Non-Citizens" category accounts for foreign-born Texas residents who have reported to the Texas Department of State Health Services or another state entity that they are neither U.S. citizens nor legal residents. "Non-citizens" thus are likely to be undocumented immigrants.

The federal government requires states to expend at least 30 percent of their Title V funds on CSHCN. The fiscal 2005 block grant amount for Texas totaled $37 million, with a minimum of 30 percent ($11.1 million) dedicated to CSHCN. About 55 percent of the funds expended on CSHCN in fiscal 2005 were federal, with the state supplying the remaining 45 percent.

Applying the state share of 45 percent to the "Non-Citizens" category in **Exhibit 8** indicates that the estimated state cost for CSHCN services provided to undocumented immigrants was **$7.2 million** in fiscal 2005.

### Substance Abuse Services

The Texas Department of State Health Services (DSHS) spent about $17.3 million in state funding—or 16 percent of all funding—for substance abuse intervention and treatment in fiscal 2005. As with mental health services, substance abuse services base eligibility on diagnosis rather than income or citizenship. The vast majority of people receiving publicly funded treatment have an order issued by a court of law requiring that they participate in treatment as a part of their sentencing.

DSHS collects data on substance abusers receiving treatment in Texas. The information collected includes age at first drug use, gender, ethnicity, marital status, educational level, homelessness and criminal justice involvement. In 2005, DSHS began collecting citizenship information on individuals receiving publicly-funded substance abuse

treatment. About 5.5 percent or 8,446 of the 152,441 persons who received treatment reported that they were not U.S. citizens.[17]

While DSHS now collects data on citizenship, this information is not linked to the number or types of services individuals receive.

Such factors make it difficult to estimate the state's cost for providing substance abuse services to undocumented immigrants. The Comptroller estimates that the number of undocumented immigrants receiving services is 30 percent of the non-citizens identified above (again based on Pew estimate of percent undocumented), and therefore that 1.66 percent of all individuals receiving state-funded substance abuse services were undocumented immigrants in fiscal 2005. Applying that percentage to state expenditures for substance abuse results in a cost of about **$287,700**.

### Mental Health Services

Texas pays for state mental hospital services almost entirely with state general revenue. In fiscal 2005, the state spent $225.7 million on state mental hospitals.[18]

Unlike Medicaid, eligibility for mental health services is not means-based, but instead is based on a patient's diagnosis, the severity of his or her illness and the availability of funds. To qualify for state-funded mental health services, an individual must be a member of the "priority population"—those who are significantly functionally impaired and have a diagnosis of schizophrenia, bipolar disease (manic depression) or major clinical depression.[19]

State mental hospitals also are subject to the federal Emergency Treatment and Active Labor Act (EMTALA). EMTALA requires all hospitals receiving payments from Medicaid or Medicare—virtually all hospitals—to screen anyone presenting at an emergency department to determine if an emergency condition exists and, if so, to provide appropriate care regardless of ability to pay.

Therefore, persons entering a state mental hospital with an emergency medical condition cannot be turned away based on citizenship or for any other reason. If the event is an emergency, but a state mental hospital does not have capacity or is not found by staff assessing the person's condition to be the "least restrictive environment," the person is referred to a local mental health authority for care.

Under EMTALA, community mental health centers and state mental hospitals cannot inquire about a person's

STATES000021

citizenship status unless the person is likely to qualify for Medicaid-reimbursed mental health services. As discussed earlier, only undocumented immigrants that would otherwise qualify for Medicaid could qualify for such funding, and then only in an outpatient setting, since Medicaid does not cover inpatient mental hospital stays for adults between 19 and 65. For this reason, the need to ask about citizenship would not arise often.

To obtain the most accurate number of undocumented immigrants receiving services in the public mental health system, it would be necessary to conduct primary research through interviews and surveys of local mental health authorities and state mental hospital directors. Using the same methodology used for substance abuse, the Comptroller estimates a state cost for mental health services of **$3.8 million** in fiscal 2005. This estimate assumes 1.66 percent of state expenditures were associated with undocumented immigrants.

### Immunizations

To attend public school, parents must provide proof that their children have been immunized before enrollment. Immunizations may be obtained from numerous outlets that are convenient for undocumented immigrants, including school-based health centers, local public health departments (LPHDs) and federally qualified health centers (FQHCs).

Texas spent about $46.9 million for adult and child immunizations in fiscal 2005, of which 57.3 percent or $26.9 million was state general revenue. In all, 17 immunization doses are required for a child to enter school. **Exhibit 9** summarizes the number and type of vaccinations required for Texas public schools.

---

**EXHIBIT 9**
**Vaccinations Required
for Public School Admission**

| Vaccine | Number of Doses |
|---------|:---:|
| Diphtheria, Tetanus Toxoid, and Pertussis Vaccine (DTaP) | 5 |
| Polio Vaccine (IPV) | 4 |
| Measles, Mumps, Rubella (MMR) | 2 |
| Hepatitis B | 3 |
| Varicella | 1 |
| Hepatitis A (only required in 40 counties in Texas) | 2 |
| **Total Vaccinations** | **17** |

*Source: Texas Department of State Health Services.*

---

In 2002 (most recent year for which data is available) DSHS administered about 6 million doses of vaccine to persons under the age of 20. As noted in the Education section of this report, the Comptroller estimates 135,000 undocumented immigrants are enrolled in Texas schools. All of these children must have current vaccination records to attend school. Many undocumented children living in Texas, however, receive some or all required immunizations before they arrive in the U.S.

In Mexico, the largest country of origin of undocumented immigrants, almost 96 percent of children under the age of five have received all their vaccinations, compared to 79 percent of U.S. children under age three.[20] As a result, many undocumented school-aged children who arrive in Texas will have all their age-appropriate vaccinations. Students who do not have proof of their vaccinations must either provide documentation or receive another series of vaccinations. While many have documentation, the Comptroller is unable to determine the percent of those who do not.[21]

This makes estimating the state cost of providing immunizations to undocumented children attending Texas public schools difficult to calculate, because there is no way to determine when undocumented children currently enrolled in Texas schools arrived in the U.S., or the percent who had some or all their immunizations before immigrating. Costs associated with undocumented children are miniscule, with the Comptroller's estimate being about **$33,000** in fiscal 2005. This is based on four percent of undocumented children in public schools, or 5,400, receiving immunizations. These 5,400 children account for .12 percent of total school enrollment. This figure was applied to the $26.0 million in state funds.

### Women and Children's Health Services/
### School-based Programs

Undocumented immigrant children enrolled in day care, preschools and primary schools may be eligible for state School-Based Health Center Services. These children as well as undocumented women also may receive health care through Women and Children's Health Services.

Texas has more than 100 school-based health centers that deliver services to about 200,000 children annually. DSHS funds four of these health centers. Schools may receive state funding for startup costs of up to $125,000 per year from DSHS.[22] School-based centers may provide comprehensive primary and preventive physical health, dental health, mental health and health education services to children and adolescents.[23]

The state funds school-based health centers to provide a "medical home" for children that otherwise have limited access to healthcare because they are uninsured or have

STATES000022

disabilities requiring care during the school day. The centers make no distinction between citizen and non-citizen students.

Most visits to the school-based health center are for services such as diagnosis and treatment of a simple illness or minor injury; immunizations; physical examinations, including sports physicals; preventive health visits, including Early Periodic Screening, Diagnosis, and Treatment; and mental health and psychosocial counseling.[24]

Another avenue to medical care for undocumented immigrants is the state Women's and Children's Health Services. Women and Children's Health Services provide community-based maternal and child health services for low-income persons not eligible for Medicaid or the Children's Health Insurance Program (CHIP). These services include preventive, primary and dental care for children and cancer screening for women.

Texas spent $21.9 million in state funds for these programs in fiscal 2005. The Comptroller estimates that slightly more than 3 percent of all students enrolled in public education were undocumented immigrants in fiscal 2005. The number of undocumented immigrant women receiving services is unknown. Therefore, a conservative estimate to the state for both services in fiscal 2005 is slightly more than 3 percent of state expenditures, or about **$674,000**.

### Public Health

State and local public health agencies provide all Texas residents with public health services regardless of citizenship status, because public health services are intended to protect all Texans' health. For example, care and treatment of infectious diseases are provided to anyone requiring them regardless of their ability to pay or citizenship status because such care protects the state's residents against the spread of those diseases.

DSHS funds 65 local public health departments (LPHD) that provide for the control and treatment of infectious diseases, as do some state-funded facilities such as the Texas Center for Infectious Disease and South Texas Health Care (formerly the South Texas Hospital). These two facilities spent $7.8 million and $5.4 million respectively in general revenue funds in fiscal 2005. The state also provided LPHDs and other health and education organizations with $38.1 million in 2005 state general revenue funding for HIV identification, prevention and treatment, while DSHS received about $13 million in state general revenue funds to combat tuberculosis (TB) and Hansen's disease (leprosy).[25]

The federal government also provides DSHS with funding for "Refugee Health Services," which primarily involve treating refugees who may be infected with TB and other infectious diseases.

In 2005, DSHS reported 1,535 cases of TB. Of these, 48.1 percent were foreign-born. Using the 30 percent share used earlier in this report to estimate the percent of foreign-born here without authorization results in an estimated 221 of those infected with TB being undocumented immigrants. The cost per TB case to the state is unknown.

Other high-incidence infectious diseases include HIV/AIDS, sexually transmitted diseases and meningitis. Data on country of origin for these individuals are not available. Assuming slightly more than 6 percent of the state's residents were undocumented immigrants, the Comptroller's estimated costs for fiscal 2005 were **$3.9 million**.

### Emergency Medical Services

In fiscal 2005, Texas spent about $55.2 million in state funds for emergency medical services (EMS), primarily ambulance and other emergency transportation and trauma facilities.

Little centralized demographic information exists for EMS. The U.S./Mexico Border Counties Coalition (U.S./MBCC) surveyed border counties in 2001 and found that about 7 percent of the costs these private and public ambulance service providers incurred was attributable to undocumented immigrants. The method used to identify these costs for the border region could be applied to the entire state with some modification. However, the Comptroller's office would need to know the total revenue for all ambulance providers in Texas to calculate a cost related to undocumented immigrants and that information is not available. Therefore, in estimating costs, the Comptroller applies the percent of undocumented immigrants in Texas to total state expenditures. This results in a cost to the state in fiscal 2005 of **$3.4 million**.

The Comptroller estimates the total cost for state funded healthcare services for undocumented immigrants was **$58 million** in fiscal 2005. **Exhibit 10** details the state cost associated with undocumented immigrants and the percent of state funds estimated.

## Local Government and the Private Sector

Local government and private businesses incur the largest share of health-related costs for undocumented immigrants in Texas. The state Indigent Healthcare and Treatment Act requires Texas counties to provide "safety net" services for indigent persons and others not covered

## *Special Report:* Undocumented Immigrants in Texas

**EXHIBIT 10**
**State Healthcare Costs Associated**
**with Undocumented Immigrants**
**Fiscal 2005**

| Service Area | General Revenue | Percent of Expenditures on Undocumented Immigrants | Undocumented Immigrant Costs |
|---|---|---|---|
| Emergency Medicaid* | $129,153,257 | 30.0% | $38,745,977 |
| CSHCN | $9,111,352 | 78.9% | $7,189,280 |
| Substance Abuse | $17,305,929 | 1.7% | $287,651 |
| Mental Health | $225,650,365 | 1.7% | $3,750,650 |
| Immunizations | $26,906,780 | 0.1% | $33,143 |
| Women/School | $21,901,933 | 3.1% | $674,463 |
| Public Health | $64,300,000 | 6.1% | $3,937,888 |
| EMS | $55,156,810 | 6.1% | $3,377,937 |
| **Total** | **$549,486,426** | **10.6%** | **$57,996,990** |

\* Program Type 30 (Foreign-Born: 30 % undocumented)
*Sources: Texas Health and Human Services Commission and*
*Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

by private health insurance or public health insurance programs such as Medicare, Medicaid and CHIP.[26]

Texas law gives counties three basic options for delivering indigent healthcare, including hospital districts, public hospitals and county indigent health care programs (CIHCPs). All of these entities have a statutory obligation to cover a set of basic health care services including primary and preventative services designed to meet the needs of the community as well as inpatient and outpatient and nursing facility services.

*Hospital districts* are special taxing entities that may levy a tax not to exceed 75 cents per $100 in property valuation to fund indigent health care. Texas law requires hospital districts to provide services to persons with incomes below 21 percent of the federal poverty line. Hospital districts can, however, set higher income thresholds. Hospital districts also may receive financing from the state's unclaimed lottery revenue, the federal Disproportionate Share Hospital Program and supplemental Medicaid and Medicare payments to teaching hospitals through the Graduate Medical Education Program. These districts cover 144 of Texas' 254 counties.[27]

*Public hospitals* are funded in Texas by sales and use taxes and are eligible for the same types of funding as hospital districts. Texas law defines a public hospital as a hospital owned, operated, or leased by a county or municipality.[28] Texas public hospitals serve residents in all or parts of 29 Texas counties.[29]

*County indigent health care programs* (CIHCP) use both local and state funds to pay health care providers for services for eligible patients. Counties cover residents whose incomes place them below 21 percent of the federal poverty line, but they may adopt a less restrictive income standard. County CIHCPs' eligibility criteria also may impose resource limits (e.g. bank account balance limits, number/value of vehicles, etc.) and residency requirements. While county *residency* may be a requirement for CIHCP eligibility, *citizenship* is not. The level of state funding is tied to the level of local funding provided. In fiscal 2005, the state set aside $5.2 million to reimburse 21 counties through the CIHCP State Assistance Fund. Counties must spend more than 8 percent of their general revenue tax levy on qualified healthcare expenditures to qualify for state funding. All or some parts of 150 Texas counties operate CIHCPs.[30]

Local indigent health care entities have always been legally responsible for providing emergency medical services to those who met the responsible entity's eligibility criteria. The issue of providing *preventive* health care for undocumented immigrants was addressed in 2003 with the passage of H.B. 2292, which granted local indigent health care entities explicit permission to provide preventive and acute care services to area residents without regard to their immigration status. This legislation eliminated any need to ask a patient about citizenship status for primary and preventive care, and most counties do not ask about citizenship status other than to determine eligibility for a federal or state payment program.

The Harris County Hospital District, the nation's third-busiest public hospital system, estimated about one-in-five of patients seen by the county's healthcare system were undocumented immigrants. Medical care for these patients, both emergency and non-emergency related, accounted for $97.3 million or approximately 14 percent of the system's total operating costs in 2005.[31]

In 2001, the U.S./Mexico Border Counties Coalition (U.S./MBCC) interviewed border hospital chief executive officers and chief financial officers to obtain an estimate of the share of their hospitals' uncompensated care attributable to undocumented immigrants. Based on their responses, the coalition estimated that about 25 percent

STATES000024

of these hospitals' uncompensated care costs resulted from uninsured, undocumented immigrants.

Since then, the Indigent Care Collaboration (ICC), an alliance of "safety net" providers in three Central Texas counties (Travis, Williamson and Hays), has begun tracking the percent of uninsured undocumented immigrants they serve using a web-based eligibility screening tool called the Community Health And Social Services Information System (CHASSIS™).

CHASSIS™ is used to screen uninsured/under-insured patients for eligibility in federal, state, and local medical assistance or payment programs (e.g. Medicaid, CHIP, CIHCP, Primary Health Care (PHC), SSI, local charity programs, etc.) In 2005, about 14 percent of all patients screened using CHASSIS™ in hospital settings were found to be undocumented. If only the patients screened through the hospitals' emergency departments are examined, however, the percent of undocumented immigrants increases to 25 percent. This finding regarding the percent of emergency room patients who are undocumented is in keeping with the conclusions of U.S./MBCC's 2001 study on emergency medical services provided to undocumented immigrants in Texas border counties.

Texas hospitals reported $9.2 billion in uncompensated care in 2004.[32] An estimate of 2005 costs was unavailable. Uncompensated care generally encompasses care provided to uninsured and underinsured individuals who cannot pay for the services they receive. Applying the ICC's estimate of 14 percent of patients to total uncompensated care provided by Texas hospitals produces a statewide estimate of uncompensated healthcare costs attributable to undocumented immigrants of **$1.3 billion**.

### Federally Qualified Health Centers

Federally qualified health centers (FQHC) include community health centers, migrant health centers, programs that provide health care for the homeless, public housing primary care programs and urban Indian and tribal health centers. FQHCs are supported by federal grants, Medicaid, Medicare, private insurance payments and state and local contributions.[33] Although anyone may seek services at an FQHC, nearly 71 percent of health center patients have family incomes at or below poverty. In addition, about 40 percent of health centers' patients are uninsured and another 36 percent depend on Medicaid.[34]

According to the Texas Association of Community Health Centers, Texas FQHCs receive about 40 percent of their funding from sources such as Medicaid (27 percent) and state and local funds (13 percent). Grants and contracts -- federal and non-federal -- account for another 41 percent of revenues. Their remaining funds come from a variety of sources including Medicare, Children's Health Insurance Program (CHIP), private insurance, self-pay patients and other miscellaneous sources.[35]

In 2005, Texas FQHC patients were covered by Medicaid/CHIP (25 percent), Medicare (7 percent), private insurance (7 percent) and other public programs (2 percent). The remaining 59 percent had no insurance.[36] Texas FQHCs served about 6 percent of the state's uninsured in 2004. More than half of the 562,000 patients seen preferred to be served in a language other than English. More than 14,000 were seasonal or migrant farm workers.

Texas FQHCs are not required to and do not collect data on their patients' citizenship status or place of birth. Therefore, it is impossible to estimate the percent of state or local funds spent by FQHCs that are attributable to undocumented immigrants.

### Clinics

Other sources of healthcare for Texas' undocumented immigrants include primary care and free clinics. ICC's member clinics screened about 84,000 patients in 2005.[37] Of those screened, slightly more than 50 percent were found to be undocumented immigrants. An average clinic visit costs about $230. No data are available on the number of clinic visits made by this population, and as a result the Comptroller cannot estimate the cost of clinic services provided to undocumented immigrants.

The Robert Wood Johnson and Annie E. Casey Foundations created the Access Project to assist local communities develop and sustain efforts that improve healthcare and promote universal coverage with a focus on the uninsured. The Access Project reported that Texas counties spent an estimated $870 million on all indigent health care in 1999.[38] The Access Project, however, was examining indigent health care in its entirety and did not distinguish between citizens and noncitizens. U.S./MBCC examined emergency medical care only—that is, care required by federal law. As a result, there are no studies that estimate Texas costs for non-emergency or primary care provided to undocumented immigrants at the county or municipal level.

### Section 1011

As mentioned above, Texas hospitals may be reimbursed for emergency healthcare provided to qualified undocumented immigrants by the Health and Human Services Commission, through the federal Emergency Medicaid program. More recently, the federal government has authorized payment for emergency medical care provided to undocumented immigrants under Section 1011 of the Medicare Modernization Act.

STATES000025

**Special Report: Undocumented Immigrants in Texas**

Section 1011 reimburses hospitals, physicians and ambulance providers based on Medicare reimbursement for services rendered to undocumented immigrants. Beginning in federal fiscal 2005, the federal government will pay about $250 million per year directly to providers that submit qualified claims. Texas' allotment under Section 1011 was $56 million per year for four years. At this time, however, eligible Texas providers, including hospitals, physicians and ambulance services, have not submitted claims for all of the $56 million available.

The difficulty in estimating the cost to LPHDs, physicians or EMS services of care provided to uninsured undocumented immigrants varies depending on the availability of data and the existence of previous primary research.

As a rule, none of these entities maintain data on the citizenship of the patients they treat. This lack of data makes it virtually impossible to place a dollar figure on the cost to these providers related to undocumented immigrants. While no data are available to estimate the magnitude of the cost, it is clear that, other than Emergency Medicaid, Section 1011 and the limited state funds available, local tax dollars or private donations must cover most of the cost of providing care to undocumented immigrants.

## V.  Incarceration

Texas' criminal justice system has three distinct parts. Undocumented immigrants who commit crimes affect all of them:

- law enforcement and criminal prosecution—municipal police, county sheriffs, the Texas Department of Public Safety, district attorneys' offices and technical investigative organizations such as crime labs;
- criminal trial and appeals—the criminal trial and appeals court system, including public defenders, the jury system and other court procedures; and
- corrections—the system of incarceration and parole, including prisons, jails, and parole boards and the capital punishment apparatus.

Many elected officials including state governors and U.S. congressmen argue that the federal government should bear all the cost of capturing, prosecuting and housing undocumented immigrants who commit criminal offenses.[39] Under the Violent Crime Control and Law Enforcement Act (Public Law 103-317, or the Crime Act of 1994), the federal government authorized $1.8 billion over six years to reimburse states and local jurisdictions for criminal justice costs associated with undocumented immigrants.

This act also established the State Criminal Alien Assistance Program (SCAAP), which provides partial reimbursement to states and local jurisdictions for housing

criminal aliens.[40] The federal government limits SCAAP reimbursements to costs incurred related to undocumented immigrants who are convicted of felonies or multiple misdemeanors. SCAAP awards are based solely on a jurisdiction's costs for correctional officers, the number of "eligible" undocumented immigrant offenders and the number of inmate days involved. No other costs are included in the calculation of SCAAP awards.

Two other federal grants partly reimburse local jurisdictions for costs related to undocumented criminals: the Byrne Discretionary Grant and Community Oriented Policing (COP). One of the purposes of the Byrne Grant is to promote projects that are multi-jurisdictional or multinational in scope.[41] COP gives money directly to local jurisdictions including communities along the U.S.-Mexico border to boost the police presence at the community level.

### State Costs

Noncitizens who commit crimes in Texas are prosecuted and punished in the same way as U.S. citizens; after serving their sentences, however, some may be deported back to their home countries. This can apply both to documented and undocumented immigrants, depending on the severity of their crimes.

The Texas Department of Criminal Justice (TDCJ) operates a joint program with federal Immigrations Customs and Enforcement (ICE) to identify criminal aliens incarcerated in Texas, begin deportation proceedings against them while they are incarcerated and deport them after they serve their state prison sentences.

Deportation can occur only after completion of the inmate's sentence. The process begins, however, when the inmate is evaluated at one of TDCJ's intake sites after being sentenced and transported from the local county jail to TDCJ. The simplified process is as follows:

- TDCJ identifies foreign-born offenders during intake.
- TDCJ notifies ICE that the offender claims foreign birth or citizenship or that TDCJ suspects foreign birth or citizenship.
- ICE interviews the offender and may ask TDCJ to hold the offender upon release.
- ICE is notified when the offender's release is pending and assumes custody of the offender upon release, pending federal deportation proceedings.[42]

As of March 31, 2006, TDCJ had a total population of 151,852 inmates. TDCJ does not have an accurate count of undocumented immigrants held in its facilities, but has asked ICE to review its records and provide this number.

**STATES000026**

Of the total incarcerated in state jails and prisons in March 2006, 11,514 claimed to have been born in a foreign country and 10,280 claimed that they hold foreign citizenship. These claims are based on TDCJ's intake interviews and records forwarded with the prisoners and are subject to investigation and verification by ICE.

ICE had issued detainers (requests to detain) for 6,541 prisoners as of March 2006. Due to ICE staffing shortages, however, ICE has been unable to interview all inmates and investigate them to verify their immigration status; an undetermined number of undocumented offenders may be issued a detainer at a later date. ICE had final orders of deportation in place for at least 3,018 inmates as of March 2006, although both TDCJ and ICE say this number is inaccurate and probably low.[43]

Under current procedures, ICE provides TDCJ with information on detainers for male prison inmates only. ICE does not report figures for females in prison units or for both male and female offenders in state jails (**Exhibit 11**).

The process for releasing undocumented immigrant offenders varies for different types of offenders and facilities, which is one reason for the lack of accurate statewide data. For example, female Institutional Division offenders are released from Gatesville and processed by the San Antonio ICE office. State jail offenders are released from the Lyncher State Jail and processed by the Houston ICE office.

The vast majority of TDCJ offenders are males housed by the Institutional Division (ID), which administers the state's traditional prisons. TDCJ transfers male ID offenders who require a deportation hearing to a joint state/federal facility at Huntsville's Goree Unit under the Institutional Removal Program.[44] This process is geared to save money and ensure the deportation of eligible criminal aliens; it is based on a previous recommendation by the Comptroller's Texas Performance Review program.

TDCJ releases inmates who need a deportation hearing directly into federal custody. The federal government maintains detention facilities and a courtroom next to

the Goree Unit and court proceedings are held via teleconferencing with a federal judge located in Houston. TDCJ provides legal counsel for offenders who lack it.

Deportation includes several types of proceedings. *Stipulated* removal occurs when the alien voluntarily concurs with ICE's allegations and agrees to waive a hearing before an immigration judge. The federal immigration judge signs the order but the alien need not be present. *Reinstatement of a removal order* occurs when an alien illegally reenters the U.S. after having been removed before. No hearing is required for deportation in such cases. *Administrative* removal applies if the offender has not been admitted to the country legally and has been convicted of an aggravated felony, and a hearing is needed for a judge to determine the facts and reach a decision.[45]

Comptroller employees visited the Goree Unit in Huntsville in May 2006 to gather information about the Institutional Removal Program. They met with both TDCJ and ICE staff, who explained the program and provided some of the information used in this report. The Comptroller team reported that TDCJ staff members discussed aggregating all joint TDCJ/ICE operations at the Goree Unit to further streamline the process and save money.

### Federal reimbursement

The state of Texas receives partial reimbursement for costs associated with incarcerating illegal aliens from the U.S. Bureau of Justice Assistance's State Criminal Alien Assistance Program (SCAAP). SCAAP reimburses costs only for undocumented aliens who have been convicted of a felony or two or more misdemeanors and have been incarcerated for at least four consecutive days. The key factor is whether the individual was born outside the U.S. and has no reported or documented claim to U.S. citizenship. SCAAP reimburses costs only for a portion of correctional officer salaries and is based on estimates of incarceration days of both known and suspected illegal immigrants.

Texas will receive $18.6 million in SCAAP money to partially offset its costs in 2006. This is up from $17.1 million in 2005, but down sharply from earlier years, when Texas received about $34 million annually. Congress has cut the appropriation level in half, affecting all states and local jurisdictions.[46]

The outlook for federal SCAAP funding remains uncertain. The Bush administration's proposed federal fiscal 2007 budget recommended eliminating SCAAP, calling it no more than a form of revenue sharing and saying that the program has not demonstrated results. Meanwhile, various elected officials across the U.S. have called for

---

**EXHIBIT 11**
**Noncitizens Incarcerated in the Texas Department of Criminal Justice, March 31, 2006**

| | |
|---|---|
| Total TDCJ Population | 151, 852 |
| Offenders Claiming Foreign Place of Birth | 11,514 |
| Offenders Claiming Foreign Citizenship | 10,280 |
| Offenders with ICE Detainers | 6,541 |
| Offenders with Final Orders of Deportation | 3,018 |

*Source: Texas Department of Criminal Justice.*

STATES000027

more than doubling the current federal appropriation from $405 million to $850 million, saying the federal government has not lived up to its obligation to stop illegal immigration and that locals are bearing the costs.[47]

## State Fiscal Impact

As of June 2006, TDCJ did not have an exact count of the number of undocumented immigrants among its total population of 151,741. TDCJ staff members are investigating this question at the request of the TDCJ board chair and expect results by Winter 2006 at the earliest. Because of inconsistencies in various computer databases, ICE is expected to review thousands of files manually if necessary to obtain an accurate count.

The Legislative Budget Board reports that TDCJ's most recent cost per day per inmate is $40.06.[48] According to TDCJ, illegal aliens are distributed throughout the system, so that this particular subset of inmates should not reflect any different costs for housing or meals.

The lack of accurate data on the number of undocumented offenders in Texas prisons makes it difficult to estimate associated costs, but both the U.S. Government Accountability Office (GAO) and TDCJ have made some estimates. GAO has estimated that Texas spent $130 million to house SCAAP criminal aliens in 2002. GAO multiplied the average daily cost of housing inmates in Texas prisons by the number of days criminal aliens reimbursed under SCAAP were incarcerated in Texas prisons. Federal reimbursements amounted to $15 million, or 11.5 percent of costs. GAO estimated that SCAAP payments represented 25 percent or less of the total cost of incarcerating criminal aliens in the other four large states they evaluated in their 2005 study.[49]

Using a similar approach, TDCJ estimated that incarcerating undocumented immigrants cost the state $132,377,509 in 2005, in response to a request from the Texas Office of State-Federal Relations.[50] Using a similar method and data provided by TDCJ, the Comptroller estimates costs for fiscal 2006 at **$130.6 million**. This total was derived by multiplying the cost per day ($40.06) by the number of days undocumented offenders were incarcerated in Texas prisons as estimated by TDCJ (3,259,818).[51]

This implies that on average there were 8,931 undocumented offenders in TDCJ at any one time during fiscal 2006. TDCJ reported that there were 13,006 unique offenders incarcerated at some point in 2005 that had or were suspected to have had no claim on citizenship. These persons may have been incarcerated one or more times during the period.

## Local Costs

Texas' criminal justice system is based on cooperation and interaction between the state, local and federal governments. Local governments are the front line in the fight against crime, and they face the heaviest financial burden.

Counties are responsible for many aspects of local law enforcement, detention, adult and juvenile prosecution; adult and juvenile indigent defense; lower courts (for misdemeanors); district or superior courts (for felonies); court clerks; adult probation; and juvenile probation and detention.

Each county sheriff's department is responsible for the operation of county jails, criminal investigations, arrests of criminal offenders, warrants and civil papers, and the provision of bailiffs for all state courts. Texas counties have county and district attorneys as well as county and district clerks and elected constables. Each of these various offices can incur a cost whenever an undocumented immigrant commits a crime.

The district attorney (DA) represents the state in felony actions and criminal misdemeanors in county courts at law and justice of the peace courts. Most DAs serve a single county, although some serve more than one (typically in the case of rural areas). County attorneys try misdemeanors and juveniles while district attorneys try felonies.

Texas county courts at law hear both criminal and civil cases. Justices of the peace have original jurisdiction in Class "C" misdemeanor criminal cases subject to fines of up to $500.

Given available data, estimating the cost of undocumented offenders to Texas counties is not a simple matter. A few studies have attempted to quantify the cost to specific jurisdictions. In the mid-1990s, two studies examined the cost of illegal immigration on Texas, one by the Urban Institute and another by Dr. Donald Huddle of Rice University. Both studies examined the state cost of undocumented immigrants in response to a push by state officials to receive federal reimbursement for these costs. Neither study, however, examined costs to local units of government.[52]

Recently, GAO published a report examining costs in five states and five large counties that receive SCAAP funding. Harris County was among the five large counties reviewed. This study, however, included only costs related to county sheriff's offices. Using costs per day provided by these offices, GAO estimated that SCAAP awards cover between 7 percent (Maricopa County, AZ) and 25 percent (Los Angeles County, CA) of the costs reported.

STATES000028

*Special Report:* Undocumented Immigrants in Texas

According to GAO, SCAAP covered about 20 percent of the Harris County Sheriff's office in 2003.[53] While Harris County's correctional salaries increased from slightly more than $76.4 million in 2003 to almost $109 million in 2005, their SCAAP award remained virtually unchanged. In 2003, Harris County received $2,693,979; in 2005, two dollars less—$2,693,977. The percent of incarceration-related costs covered by SCAAP funds appears to have declined between 2003 and 2005.

In federal fiscal 2005, 95 Texas counties received almost $7.9 million in SCAAP funds.[54] Using the method employed by ICE and the Federal Bureau of Justice Assistance to calculate a cost per inmate day, the Comptroller's office divided the reported correctional officer salaries by total inmate days reported for all offenders regardless of their immigration status.

The Comptroller then multiplied the cost per day by the number of ICE and "unknown" inmate days to arrive at a cost per undocumented immigrant offender related to correctional officer salaries of $24.5 million.

The Comptroller examined 2005 approved budgets for 15 of the 95 Texas counties that receive SCAAP funds. These 15 counties received about 88 percent of the 2005 SCAAP funds awarded last year. Salaries account for about 50 percent of county sheriff office budgets.[55] Thus costs related to salaries were doubled to arrive at a cost estimate for county sheriff's offices.

**Exhibit 12** indicates that Texas sheriff's offices spent about **$49.1 million** for undocumented immigrant offenders in 2005.

This, however, tells only part of the story. As noted above, other county offices incur costs related to handling undocumented offenders.

In 2000, the U.S./Mexican Border Counties Coalition (U.S./MBCC) commissioned a study to estimate criminal justice costs to county and municipal governments along the U.S.-Mexico border. The researchers completed detailed examinations of county budgets and cost information, fielded a survey and conducted in-depth interviews with county officials and relevant county staff

### EXHIBIT 12
### Estimated Costs to County Sheriff's Offices for Undocumented Offenders, 2005

| County | SCAAP Award 05 | Total Salaries | Inmate Days (Total) | Cost Per Day | ICE Inmate Days | ICE Inmate Costs | Unknown Inmate Days | "Unknown Inmate" Costs | Costs Sheriff's Salaries Only | Total Costs Sheriff's Ofc. |
|---|---|---|---|---|---|---|---|---|---|---|
| Bexar | $547,366 | $27,883,631 | 1,425,272 | $19.56 | 11,065 | $216,473 | 90,491 | $1,770,341 | $1,986,814 | $3,973,628 |
| Brazos | $87,090 | $3,613,269 | 163,410 | $22.11 | 3,583 | $79,226 | 10,207 | $225,694 | $304,920 | $609,840 |
| Cameron | $29,936 | $4,237,531 | 370,486 | $11.44 | 616 | $7,046 | 8,989 | $102,814 | $109,860 | $219,719 |
| Collin | $303,305 | $9,367,485 | 263,562 | $35.54 | 5,429 | $192,957 | 25,067 | $890,928 | $1,083,885 | $2,167,769 |
| Dallas | $636,166 | $48,828,400 | 2,265,666 | $21.55 | 14,850 | $320,039 | 91,496 | $1,971,872 | $2,291,911 | $4,583,822 |
| Denton | $163,183 | $7,929,953 | 327,021 | $24.25 | 3,679 | $89,212 | 20,493 | $496,936 | $586,148 | $1,172,297 |
| El Paso | $357,084 | $33,530,172 | 878,127 | $38.18 | 20,833 | $795,482 | 8,828 | $337,086 | $1,132,568 | $2,265,136 |
| Fort Bend | $118,802 | $4,981,686 | 251,158 | $19.83 | 2,919 | $57,898 | 18,684 | $370,595 | $428,493 | $856,985 |
| Galveston | $67,131 | $4,688,584 | 240,508 | $19.49 | 1,577 | $30,743 | 11,052 | $215,453 | $246,196 | $492,392 |
| Harris | $2,693,977 | $108,459,258 | 2,839,476 | $38.20 | 61,077 | $2,332,954 | 186,630 | $7,128,693 | $9,461,646 | $18,923,292 |
| Hidalgo | $714,808 | $7,831,155 | 410,487 | $19.08 | 8,271 | $157,792 | 129,367 | $2,468,027 | $2,625,819 | $5,251,638 |
| Tarrant | $403,123 | $24,801,490 | 1,262,382 | $19.65 | 11,490 | $225,739 | 62,126 | $1,220,563 | $1,446,303 | $2,892,605 |
| Travis | $658,636 | $41,826,681 | 929,068 | $45.02 | 9,106 | $409,953 | 43,167 | $1,943,380 | $2,353,333 | $4,706,665 |
| Webb | $64,069 | $4,422,071 | 234,797 | $18.83 | 3,537 | $66,614 | 8,263 | $155,622 | $222,236 | $444,473 |
| Williamson | $107,402 | $4,685,525 | 204,094 | $22.96 | 2,514 | $57,716 | 8,263 | $189,699 | $247,415 | $494,830 |
| **Total** | **$6,952,078** | **$337,086,891** | **12,065,514** | **$27.94** | **160,546** | **$5,039,843** | **723,123** | **$19,487,704** | **$24,527,546** | **$49,055,092** |

*Source: RH2 Consulting, Inc.*

**Special Report: Undocumented Immigrants in Texas**

to develop an estimate of the fiscal impacts to 14 Texas border counties. In addition to sheriff's offices, they calculated costs to the following offices for each county:

• District Attorney
• District Court
• District Clerk
• County Attorney
• Court at Law
• County Clerk
• Justice of the Peace
• Indigent Defense
• Adult Probation
• Juvenile Services

They also included an estimated emergency medical care cost, but their estimate included costs for both offenders and non-offenders who are undocumented immigrants. The Comptroller's report includes a separate calculation estimating Texas health care costs for undocumented immigrants, so these costs were subtracted from the U.S./MBCC estimate.

The U.S./MBCC estimated that the cost to these 14 border counties was approximately $21.5 million.[56] Of that amount, sheriff's offices accounted for approximately 60 percent of expenditures for undocumented immigrants. Applying this ratio to the figure calculated for sheriff's office costs produces an estimate of $81.7 million for costs related for processing and incarcerating undocumented immigrant offenders for the 15 highest SCAAP grant recipients.[57] These 15 counties received 88 percent of the 2005 SCAAP money awarded to Texas counties; $81.7 million divided by 0.88 produces an estimated total cost of **$92.9 million**.

This figure represents a conservative estimate, as the SCAAP grantees represent 95 of Texas' 254 counties and 87 percent of the state's population. Some of the remaining counties also may incur criminal justice costs related to the processing and incarceration of undocumented offenders. For example, five of the 14 border counties included in the U.S./MBCC study did not submit SCAAP applications in 2005.

Total estimated costs for education, health care and incarceration are detailed in **Exhibit 13**.

## VI.  Economic Benefits

This section analyzes two issues:

• the economic impact of undocumented immigrants in Texas, including their contributions to state employment, wages and revenues over a 20-year period (2005 through 2025); and

• the contributions of undocumented immigrants on Texas government revenues.

### Economic Impact

The Pew Hispanic Center estimates that between 1.4 million and 1.6 million undocumented immigrants resided in Texas in March 2005.[58] To achieve a conservative estimate, this analysis relies on the lower boundary of this range.

Using 2000 Census data for the number of foreign-born residents in Texas counties, it is possible to estimate how many undocumented immigrants reside in each of Texas' 24 Council of Government regions, based on the assumption that immigrants are distributed in the same proportion as the foreign-born. Based on an age profile of foreign-born immigrants into the U.S. from Mexico, it is possible to further disaggregate the estimates into age and gender groups.[59]

These data then can be put into the Comptroller's Regional Economic Model, Inc. (REMI) model to investigate the impact of undocumented immigrants on the Texas economy. This is accomplished by instructing REMI to act as if these immigrants were to suddenly vanish from Texas and then to examine the degree to which the underlying economic forecast for the state and for each region would be affected. The implicit assumption is 1.4 million undocumented immigrants have employment and spending patterns consistent with Hispanics in Texas with similar age and gender profiles.

To gauge the economic impact of undocumented immigrants, one additional change must be made in the REMI model. Because REMI is a general equilibrium model, it tries to compensate for changes in a variety of ways. In the case of workers eliminated from a region, the model assumes new workers will be recruited to make up for their loss.

While this is an expected "real-world" result, a true test of the effects of unauthorized immigrants would be seen only if the REMI model were prevented from importing additional workers into the state in compensation.

**EXHIBIT 13**
**Summary of Estimated State Costs Associated with Undocumented Immigrants (Fiscal 2005)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6 |
| Total | -$1,156.4 |

STATES000030

*Special Report:* Undocumented Immigrants in Texas

**EXHIBIT 14**
**Estimated Effects of the Loss of 1.4 Million**
**Undocumented Immigrants from Texas in 2005**

| | Percent Change From Baseline Forecast | | | | |
|---|---|---|---|---|---|
| | 2005 | 2010 | 2015 | 2020 | 2025 |
| Total Employment | -2.3% | -2.1% | -2.1% | -2.0% | -2.0% |
| Total Gross State Product | -2.1% | -1.8% | -1.7% | -1.6% | -1.5% |
| Personal Income | -2.6% | -2.0% | -2.0% | -2.1% | -2.2% |
| Real Disposable Personal Income | -2.8% | -2.2% | -2.1% | -2.1% | -2.1% |
| Relative Cost of Production | 0.2% | 0.3% | 0.1% | 0.0% | -0.1% |
| Relative Labor Intensity | 0.0% | -0.1% | -0.2% | -0.2% | -0.2% |
| Exports to Rest of World | -0.1% | -0.3% | -0.4% | -0.2% | -0.1% |
| Average Annual Compensation Rate | 0.6% | 1.0% | 0.7% | 0.4% | 0.2% |
| Population | -5.7% | -4.2% | -3.5% | -3.1% | -2.8% |
| Labor Force | -6.3% | -3.6% | -2.7% | -2.2% | -2.1% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

The model eliminates the impact of all undocumented immigrants on the Texas economy. Some in-migration was allowed, but drawing in new Hispanic in-migrants in numbers disproportionate to their share of the indigenous population in the U.S. was prohibited. Effectively, this shut off return in-migration from Mexico and other Latin-American countries.

### Model Results

Probably the easiest way to summarize the contribution of undocumented immigrants to the Texas economy is to consider the percentage changes that might occur in various economic indicators as a result of their removal. (As a yardstick, it should be noted that 1.4 million people account for slightly more than 6 percent of the total Texas population.)

**Exhibit 14** and **15** summarize the changes in key economic indicators, and summarize the economic impact.

Without the undocumented immigrant population, Texas' work force would decrease by 6.3 percent. This decline is actually somewhat lower than the percentage of the work force actually accounted for by undocumented immigrants, since REMI assumes some additional immigration would occur to replace the workers lost. The most significant economic impact of losing undocumented workers would be a noticeable tightening in labor markets.

This tightening would induce increases in wages, as indicated by a rise in average annual compensation rate. Wage rates would rise by 0.6 percent in the first year and stay above the forecast rate throughout the entire 20-year period.

While pay increases can be viewed as a positive social and economic development, when they rise due to labor shortages they affect economic competitiveness. In this case, it would be expressed as a modest decline in the value of Texas' exports.

The remaining broad economic measures all point to an initial impact of undocumented immigrants of about 2.5 percent in terms of the value of production and wages in the Texas economy. Eliminating 1.4 million immigrants would have resulted in a 2.3 percent decline in employment, a 2.6 percent decline in personal income and a 2.8 percent decline in disposable personal income in 2005. This change also would generate a 2.1 percent decline in the gross state product (GSP), the broadest measure of the value of all goods and services produced in Texas.

While none of these changes are surprising, the one finding that may appear unusual is the persistence of the decline. If no in-migration were possible other than from natives or authorized immigrants, employment would remain 2 percent below the baseline forecast 20 years

**EXHIBIT 15**
**Estimated Effects of Removing 1.4 Million**
**Unauthorized Immigrants from Texas in 2005**

| | 2005 | 2010 | 2015 | 2020 | 2025 |
|---|---|---|---|---|---|
| Total Employment loss | 298,000 | 287,100 | 293,800 | 296,300 | 302,700 |
| Total Gross Regional Product loss (Billions of Fixed 2000$) | $17.7 | $18.7 | $20.5 | $21.4 | $22.6 |
| Personal Income loss (Billions, current dollars) | $18.5 | $19.0 | $24.6 | $32.6 | $42.9 |
| Loss in Exports to Rest of World (millions of Fixed 2000$) | $66.5 | $390.1 | $548.0 | $387.7 | $123.9 |
| Net Population loss from baseline | 1,309,000 | 1,033,000 | 899,400 | 831,300 | 784,400 |
| Labor Force Loss | 714,100 | 434,000 | 340,500 | 281,200 | 281,600 |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

later. The impact lessens over time, but remains sizable throughout the 20-year forecast period.

The primary adjustment the model makes to compensate for the loss of these undocumented migrants is initially a rise in the wage rate, which would induce some new in-migration into Texas and some additional participation in the labor force from current residents. Moreover, with wages rising relative to capital, there would be some substitution of capital for employees so the need for additional workers is lessened through productivity increases. But the fact that the Texas economy cannot adjust completely to the loss of this labor through these changes and retain its competitiveness ultimately means that relative to the rest of the world the cost of production in Texas is higher, making our goods less competitive in the international marketplace and decreasing the size of the Texas economy.

### Regional Distribution

Assuming that the current distribution of unauthorized immigrants is similar to the distribution of the foreign-born population in Texas from Central America and Mexico, as detailed in the 2000 Census, the economic impact of unauthorized immigrants varies substantially across Texas. As detailed in **Exhibit 16**, the loss of 1.4 million undocumented immigrants from the work force would produce work force declines ranging from 22.7 percent in the South Texas COG region (the Brownsville-McAllen area) to 1.7 percent in Southeast Texas (the Beaumont-Port Arthur area).

Generally, undocumented immigrants have the highest economic and demographic impact in the Border region, but they are a factor in the state's more urbanized areas as well. In all but one case (the Middle Rio Grande COG), Border COGs would see work force declines in excess of 20 percent (the Rio Grande, Lower Rio Grande and South Texas COGs). Even in the Middle Rio Grande COG (including Laredo), the work force impact of undocumented immigration is more than double that in the Houston-Galveston COG.

Other measures of economic impact are distributed similarly. Estimated population, employment and GSP declines would be highest along the border but also high in large metropolitan areas elsewhere in the state. The least affected regions in Texas would be those along the Louisiana and Oklahoma borders.

By 2025, a good portion of the work force and population changes would lessen, but in all regions the employment and gross regional product declines would remain sizable, indicating that the economic impact of undocu-

mented immigrants is unlikely to be replaced by other economic changes (**Exhibit 16**).

## Revenues

Estimating state government revenue attributable to undocumented immigrants is a difficult undertaking because any calculations must be based both on limited data and a number of significant assumptions about spending behavior. A review of the literature found several studies on undocumented immigrant impacts, but none that could be used as a model for Texas. Primarily, these studies focused on the impact of *all* immigrants, regardless of legal status, and the analyses focused on federal or state income tax revenue. Since Texas has no income tax, any estimate of state tax revenue must be based on its mix of consumption and business taxes.

Texas state government receives revenue from a wide variety of sources, but these generally can be grouped as tax collections, federal funding, licenses and fees and all other sources of revenue. In fiscal 2005, $29.8 billion of the state's total revenues of $65.8 billion came from tax collections. Federal revenue contributed $22.8 billion and licenses, fees, fines and penalties accounted for almost $6.2 billion. Other sources, such as interest income and lottery proceeds, generated the rest.

For the purposes of this analysis, major tax sources were analyzed to determine if a significant portion of collections could be attributed to consumer spending. Similarly, some major sources of revenue from fees and fines were identified as appropriate to the analysis. Sources of revenue excluded from the analysis include federal revenue and all other sources that could not be attributed directly to consumer behavior. While the state generates revenue from literally hundreds of taxes and fees, this estimate is based solely on revenue sources reflecting spending by undocumented immigrants.

State revenues included in the analysis can be grouped in five categories: consumption taxes and fees, lottery proceeds, utility taxes, court fees and all other revenue. In addition, local school property tax revenue is estimated. Consumption tax revenue totals are composed primarily of revenue from the sales tax, motor vehicle sales and use tax, gasoline tax, alcoholic beverage taxes, cigarette and tobacco taxes and the hotel tax.

Estimated revenue for each tax is calculated based on information from two sources. The Pew Hispanic Center produces data on average income and demographic characteristics of undocumented immigrants nationwide (again, no detailed demographic data are available at the state level). The estimate of annual average family income used in this analysis is $27,400. In addition,

STATES000032

*Special Report:* **Undocumented Immigrants in Texas**

data from the Comptroller's tax incidence model shows the tax impact for households at the estimated average income level.

State utility tax revenue mostly comprises the gas, electric, and water utility tax and this estimate uses the same basic data on average income along with the final incidence impact for this tax. Similarly, local school property tax revenue is based on the same data and the incidence specific to the school property tax.

Estimated lottery revenue is based on a Lottery Commission study of the percent of the population that plays lottery games and the average amount spent by each income level. Court costs and fees were calculated on a per capita basis since they are largely unrelated to income.

"All other revenue" consists of a number of smaller consumer taxes and fees that may well include some amounts paid by undocumented immigrants, but for which no data exist to base an estimate. The largest of these sources is higher education tuition; other sources include state park fees and the fireworks tax. This estimate assumes that undocumented immigrants contribute to the state through these revenues at the same rate as for the major consumption taxes and fees except for higher education tuition and fees. These contributions were calculated in proportion to higher education student enrollment.

---

**EXHIBIT 16**
**Estimated Regional Effects of the Loss of 1.4 Million**
**Undocumented Immigrants from Texas in 2005**

| Council of Government Region | Percent Change from Baseline in 2005 | | | | Percent Change from Baseline in 2025 | | | |
|---|---|---|---|---|---|---|---|---|
| | Labor Force | Population | Employment | Gross Regional Product | Labor Force | Population | Employment | Gross Regional Product |
| South Texas | -22.7% | -16.4% | -7.6% | -7.4% | -7.3% | -6.8% | -6.4% | -5.2% |
| Rio Grande | -20.7% | -15.3% | -6.9% | -6.8% | -6.4% | -6.0% | -5.8% | -4.7% |
| Lower Rio Grande | -20.6% | -14.8% | -7.9% | -8.1% | -6.5% | -6.2% | -6.4% | -5.7% |
| Middle Rio Grande | -17.9% | -13.0% | -5.2% | -4.7% | -4.3% | -4.2% | -4.0% | -2.8% |
| Houston-Galveston | -7.1% | -6.7% | -2.7% | -2.4% | -2.6% | -3.7% | -2.5% | -2.0% |
| Permian Basin | -6.0% | -5.3% | -1.9% | -1.6% | -1.9% | -2.8% | -1.7% | -1.3% |
| North Central Texas | -5.5% | -5.3% | -2.0% | -1.8% | -1.7% | -2.5% | -1.7% | -1.2% |
| Alamo | -5.0% | -4.1% | -1.9% | -1.9% | -1.5% | -1.6% | -1.5% | -1.3% |
| Capital Area | -4.3% | -3.9% | -2.0% | -1.8% | -1.3% | -1.5% | -1.4% | -1.0% |
| Panhandle | -4.3% | -3.8% | -1.2% | -1.1% | -1.1% | -1.8% | -1.1% | -0.8% |
| Concho Valley | -4.0% | -3.3% | -1.3% | -1.2% | -1.0% | -1.1% | -1.0% | -0.8% |
| Heart of Texas | -3.2% | -2.8% | -1.3% | -1.3% | -1.1% | -1.3% | -1.1% | -1.0% |
| Golden Crescent | -3.0% | -2.4% | -1.3% | -1.3% | -1.2% | -1.3% | -1.1% | -1.1% |
| Coastal Bend | -3.0% | -2.4% | -1.3% | -1.2% | -1.2% | -1.2% | -1.1% | -1.0% |
| Brazos Valley | -2.9% | -2.7% | -1.7% | -1.7% | -1.6% | -2.0% | -1.6% | -1.5% |
| Deep East Texas | -2.5% | -2.3% | -1.2% | -1.1% | -1.2% | -1.4% | -1.1% | -0.9% |
| East Texas | -2.5% | -2.4% | -1.1% | -1.1% | -1.1% | -1.5% | -1.1% | -0.9% |
| South Plains | -2.4% | -2.1% | -1.0% | -1.0% | -0.9% | -1.1% | -0.9% | -0.8% |
| Central Texas | -2.4% | -1.6% | -0.7% | -0.7% | -1.2% | -0.6% | -0.6% | -0.5% |
| West Central Texas | -2.1% | -1.7% | -0.8% | -0.8% | -0.7% | -0.9% | -0.7% | -0.6% |
| Texoma | -2.0% | -1.9% | -1.0% | -0.9% | -1.0% | -1.3% | -0.9% | -0.6% |
| Ark-Tex | -2.0% | -2.0% | -0.8% | -0.8% | -0.8% | -1.4% | -0.8% | -0.6% |
| Nortex | -1.8% | -1.4% | -0.6% | -0.5% | -0.6% | -0.6% | -0.5% | -0.4% |
| South East Texas | -1.7% | -1.7% | -1.0% | -0.9% | -1.0% | -1.4% | -1.0% | -0.8% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

*Special Report:* Undocumented Immigrants in Texas

EXHIBIT 17

**Estimated Revenue from Undocumented Immigrants**

**Fiscal 2005**

**(in millions)**

| Revenue Source | Total Revenue for Selected Taxes and Fees | Estimated Revenue from Undocumented Immigrants | Percent of Total |
|---|---|---|---|
| Major Consumption Taxes and Fees | $23,798.7 | $866.7 | 3.6% |
| Lottery | $1,584.1 | $60.9 | 3.8% |
| Utilities-Related | $664.0 | $19.5 | 2.9% |
| Court Costs and Fees | $337.9 | $20.6 | 6.1% |
| All Other Revenue | $1,640.5 | $31.2 | 1.9% |
| **State Revenue Subtotal** | **$28,025.1** | **$999.0** | **3.6%** |
| School Property Tax | $20,194.9 | $582.1 | 2.9% |
| **Total Estimated Revenue** | **$48,220.0** | **$1,581.1** | **3.3%** |

Note: Amounts may not add due to rounding.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As shown in **Exhibit 17**, estimated fiscal 2005 revenue to the state from undocumented immigrants in Texas is about $1.0 billion, or about 3.6 percent of the $28 billion in state revenue considered in this analysis. In addition, an estimated $582.1 million in school property tax revenue can be attributed to undocumented immigrants, or about 2.9 percent of the statewide total. Undocumented immigrants, thus, contributed nearly $1.6 billion in estimated revenue as taxpayers in fiscal 2005.

## VII. Conclusion

The immigration debate has become more heated in 2006. Congressional hearings were held across the U.S. to discuss the impact of undocumented immigrants on the economy and the culture. At the same time, two distinctly different pieces of legislation were voted out of the U.S. House and Senate.

*The Comptroller's office estimates the absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our Gross State Product of $17.7 billion. Also, the Comptroller's office estimates that state revenues collected from undocumented immigrants exceed what the state spent on services, with the difference being $424.7 million* (**Exhibit 18**).

The largest cost factor was education, followed by incarceration and healthcare. Consumption taxes and fees, the largest of which is the sales tax, were the largest revenue generators from undocumented immigrants.

While not the focus of this report, some local costs and revenues were estimated. State-paid health care costs are a small percentage of total health care spending for undocumented immigrants. The Comptroller estimates cost to hospitals not reimbursed by state funds

EXHIBIT 18

**State Costs, Revenues and Economic Impact to Texas of Undocumented Immigrants Fiscal Year 2005**

**(in millions)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6* |
| **Total** | **-$1,156.4** |
| **Revenues** | |
| State Revenue | $999.0 |
| School Property Tax | $582.1 |
| **Total** | **$1,581.1** |
| **Net Impact to State** | **$424.7** |
| **Impact on the Economy** | |
| Gross State Product | $17,700.0 |

Notes: Costs are to the state, not local government, special districts or hospitals.
Economic Impact reports loss to Gross State Product in Fixed 2000 dollars.
State costs for higher education are slightly overstated. "State Expenditures" includes all state costs for Section 54.052(j). Not all are undocumented.
*Estimate of incarceration costs is for Fiscal Year 2006.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

totaled $1.3 billion in 2004. Similarly, 2005 local costs for incarceration are estimated to be $141.9 million. The Comptroller estimates that undocumented immigrants paid more than $513 million in fiscal 2005 in local taxes, including city, county and special district sales and property taxes. *While state revenues exceed state expenditures for undocumented immigrants, local governments and hospitals experience the opposite, with the estimated difference being $928.9 million for 2005.*

STATES000034

# Endnotes

1   U.S. Census Bureau, "Census 2000 Brief", December 2003 and http://www.census.gov/population/www/documentation/twps0029/tab01.html. (Last visited August 9, 2006.)

2   U.S. Census Bureau, "QuickFacts," http://quickfacts.census.gov/qfd/meta/long_101614.htm. (Last visited June 14, 2006.)

3   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County).

4   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County) and Census 1990 Summary Tape File (STF-3), PO42. Place of Birth.

5   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 4.

6   Pew Hispanic Center, *Unauthorized Migrants: Numbers and Characteristics* (Washington, D.C., June 14, 2005), p. 11.

7   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 1.

8   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 5-6.

9   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 10-11.

10  Hunter, James and Craig Howley, *Undocumented Children in Schools: Successful Strategies and Policies*, September, 1990, pp. 1-5.

11  Interview with Jeff Passel, Pew Hispanic Center, Washington, D.C., May 23, 2006. Passel said there were 140,000 undocumented immigrant children in K-12. Based on a 2004 GAO report, the Comptroller staff estimated 89.3 percent were in public school.

12  U.S. General Accounting Office, *Illegal Alien School Children: Issues in Estimating State-by-State Costs* (Washington, D.C., Business, 2004), pp. 12-13.

13  Federation for American Immigration Reform, *The Costs of Illegal Immigration to Texans* (Washington, D.C., April, 2005), pp. 7-9.

14  Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994), Table 4.18.

15  Texas Health and Human Services Commission, *Texas Medicaid in Perspective, Fifth Edition* (Austin, Texas, June, 2004), p. 1-1.

16  U.S. Department of Health and Human Services, Health Resources and Services Administration, Maternal and Child Health Bureau. *Child Health USA 2004* (Rockville, Maryland, 2004), p. 1.

17  E-mail communication, Dave Wanser, deputy commissioner for Behavioral and Community Health services, July 5, 2006.

18  Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

19  Ball, Andrea, "New Mental Health System Under Way", *Austin American-Statesman* (October 20, 2004).

20  Hegstrom, Edward "Mexico More Effective Than U.S. At Immunizing Children" *Houston Chronicle* (December 22, 2002) viewed at Vaccination News Home Page, http://www.vaccinationnews.com/DailyNews/December2002/MexicoMar22.htm. (Last viewed June 17, 2006.)

21  Interview with Carla Contreras, Region 1 Education Service Center, Edinburg, Texas, July 27, 2006; and Laredo and McAllen ISDs, July 27, 2006.

22  Texas Department of State Health Services, "School-based Health Centers," http://www.dshs.state.tx.us/schoolhealth/healctr.shtm. (Last visited May 18, 2006.)

23  Texas Association of School-based Health Centers, http://www.tasbhc.org/. (Last visited May 16, 2006.)

24  Texas Department of State Health Services, School-Based Health Centers, http://www.dshs.state.tx.us/schoolhealth. (Last visited July 5, 2006.)

25  Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

26  Texas S. B. 1, 69th Leg., First Called Sess., Texas Health and Safety Code, Chapter 61; and Caton M. Fenz, "Providing Health Care to the Uninsured in Texas: A Guide for County Officials." The Access Project, September 2000.

27  Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

28  Tex. Health & Safety Code, § 61.002.

29  Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, CIHCP Directory of County, www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

30  Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

31  Preston, Julia, "Texas Hospitals Reflect Debate on Immigration," *New York Times* (July 18, 2006).

32  Gordon, Jennifer, "The Health Insurance Gamble," *Dallas Business Journal* (April 21, 2006).

33  National Conference of State Legislatures, "Federally Qualified Health Centers," http://www.ncsl.org/programs/health/fqhc.htm. (Last visited May 19, 2006.)

34  National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

35  National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

36  Texas Association of Community Health Centers, "Fact Sheet," www.tachc.org/Programs/Advocacy/2006%20Fact%20Sheet%20updated.pdf. (Last visited August 8, 2006.)

37  CHASSIS, Interview Analysis, http://www.medicaider.com/medicaid/manager/ListInterviews.asp?next=AnalyzeInterviews.asp. (Last visited July 25, 2006.)

38  The Access Project is a national health care policy initiative supported by the Robert Wood Johnson Foundation and the Anne E. Casey Foundation. For a lengthy discussion of indigent health care in Texas, see "Providing Health Care to the Uninsured in Texas: A Guide for County Officials," Caton M. Fenz, The Access Project, September 2000.

39  "Governor Schwarzenegger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

## *Special Report:* Undocumented Immigrants in Texas

40  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

41  US/Mexico Boarders Coalition, At the Cross Roads: *US/Mexico Boarder Counties in Transition* (Washington, D.C., March, 2006), pp. 13-11 and 13-12.

42  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

43  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, June 6, 2006.

44  Letter from Gary Johnson, executive director, Texas Department of Criminal Justice, to the Honorable Ray Allen, Chair, House Corrections Committee, May 20, 2003.

45  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

46  E-mail communication from Sherry Koenig, assistant budget director, Budget Office, Texas Department of Criminal Justice, June 28, 2006; and telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, December 12, 2005.

47  "Governor Schwarzenegger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

48  Legislative Budget Board, *Current Correctional Population Indicators, Criminal Justice Uniform Cost Report Tables, Fiscal Years 2003-2004* (Austin, Texas, January, 2005).

49  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

50  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, June 16, 2006.

51  E-mail communication from Bob Moore, executive director's office, Texas Department of Criminal Justice, May 24, 2006.

52  Huddle, Donald, *The Net Costs of Immigration to Texas*, March 1994, Carrying Capacity Network, Washington, D.C. and Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994).

53  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

54  U.S. Bureau of Justice Assistance, p. 13-11

55  U.S. Department of Justice, "FY2005 SCAAP Payment List", www.ojp.usdoj.gov/BJA/grant/05SCAAP.pdf. (Last visited August 14, 2006.)

56  The total reported in the US/MBCC report was $23.3 million, however, this report includes $21.5 million after subtracting about $1.8 million in medical care costs.

57  Webb County was included although it was not the 15th highest grant recipient to ensure that border communities with the largest populations were included.

58  Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for states based on the March 2005 CPS* (Washington, D.C., April 26, 2006).

59  Migration Policy Institute, *Migration Information Source: Age-Sex Pyramids*, http://www.migrationinformation.org/DataTools/pyramids.cfm. (Last visited 5/3/2006.)

# *Special Report*
**CAROLE KEETON STRAYHORN • Texas Comptroller of Public Accounts**



PRSRT STD
US POSTAGE PAID
AUSTIN, TX
PERMIT NO. 1411

This publication is not copyrighted and may be reproduced. The Comptroller of Public Accounts would appreciate credit for material used and a copy of the reprint.

**Special Reports
Carole Keeton Strayhorn
Texas Comptroller of Public Accounts
P.O. Box 13528
Austin, TX 78711-3528**

For more information, call 1-800-531-5441, extension 3-4070.

This publication is also available on the World Wide Web by accessing the Comptroller's Window on State Government Web site at <**http://www.window.state.tx.us/specialrpt/undocumented/**>.

Texas Comptroller of Public Accounts publication #96-1224, December 2006.

STATES000036

# DEF-INTERV.

# EX. 293

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Jose Magana-Salgado on 06/15/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4     -----------------------------x

 5     STATE OF TEXAS, et al.,          :

 6                    Plaintiffs,       :

 7       vs.                            : Case No. 1:18-CV-68

 8     UNITED STATES OF AMERICA         :

 9     et al.,                          :

10       and                           :

11     KARLA PEREZ, MARIA ROCHA,        :

12     JOSE MAGANA-SALGADO, et al.,     :

13     Proposed Defendant-Intervenors.:

14     -----------------------------x

15                         Washington, D.C.

16                         Friday, June 15, 2018

17            * CONTAINS CONFIDENTIAL PORTIONS *

18            Deposition of JOSE MAGANA-SALGADO, a witness

19     herein, called for examination by counsel for

20     Plaintiff States in the above-entitled matter,

21     pursuant to notice, the witness being duly sworn by

22     MICHELE E. EDDY, RPR, CRR, and Notary Public in and

23     for the District of Columbia, taken at the offices of

24     MALDEF, 1016 16th Street, Northwest, Suite 100,

25     Washington, D.C., at 9:09 a.m.
```

**Transcripts**

 Jun 20, 2018 Magana-Salgado, Jose 06-15-2018

**Page:** 70
1 break?
2            MR. BIGGS:   Sure.
3            MS. AVILA:   Sure.   Let's go off the
4 record and take a break.
5              (A brief recess was taken.)
6              (Exhibit 1 was marked for identification
7 and attached to the deposition transcript.)
8            MR. BIGGS:   We can go back on.
9 BY MR. BIGGS:
10       **Q       After a short break, are you ready to**
11 **resume?**
12       A     Yes.
13       **Q       All right.   So we were kind of**
14 **discussing employment and DACA, the DACA program**
15 **application, things like that.   I want to**
16 **backtrack for just a couple questions to your time**
17 **at Arizona State and at Baylor.**
18       A     Sure.
19       **Q       Do you know what a federal work study**
20 **program is or what a work study program is?**
21       A     Generally, yes.
22       **Q       When you were at Arizona State, did you**
23 **have a work study job?**
24       A     No.
25       **Q       When you were at Baylor, did you have a**

**Page:** 71
1 **work study job?**
2       A     No.
3       **Q       Let's back up to you've just been given**
4 **the text from the folks at USCIS and you're**
5 **working at LCLAA?**
6       A     That's correct.
7       **Q       When did you stop working at LCLAA?**
8       A     Approximately December of 2012.
9       **Q       Why did you stop working at LCLAA?**
10       A     The agreement had been to work
11 approximately six months.
12       **Q       Who was that agreement with?**
13       A     With -- it was my independent contractor
14 contract with LCLAA as an organization.
15       **Q       So you have a written -- you had a**
16 **written independent contractor contract?**
17       A     Correct.
18       **Q       After you stopped working with LCLAA in**
19 **December of 2012, did you find employment**
20 **elsewhere?**
21       A     Yes.
22       **Q       Where was that?**
23       A     MALDEF.

24    **Q**    **When did you start working for MALDEF?**
25    A    Approximately the beginning of 2013.

Jun 20, 2018 Magana-Salgado, Jose 06-15-2018

**Page:** 112
25    **Q**    **How were you able to cross the border**

**Page:** 113
1  **check -- cross the border checkpoints without**
2  **providing identification for yourself?**
3     A    They did not request identification.
4  They inspected us and just waved us through.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, JOSE MAGANA-SALGADO, do hereby

 4    acknowledge that I have read and examined the

 5    foregoing testimony, and the same is a true, correct

 6    and complete transcription of the testimony given by

 7    me, and any corrections appear on the attached Errata

 8    Sheet signed by me.

 9

10    5-25-18

11    (DATE)                         (SIGNATURE)

12

13              NOTARIZATION   (If Required)

14    State of  Washington

15    County of  DC

16    Subscribed and sworn to (or affirmed) before me on

17    this 25th day of  June          , 20 18 , by

18    Jose  Magana-salgado , proved to me on the

19    basis of satisfactory evidence to be the person who

20    appeared before me.

21    Signature:

22                      (Seal)

23

24

25
```

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.

1            CERTIFICATE OF SHORTHAND REPORTER

2

3            I, Michele E. Eddy, Registered Professional

4     Reporter and Certified Realtime Reporter, the court

5     reporter before whom the foregoing deposition was

6     taken, do hereby certify that the foregoing transcript

7     is a true and correct record of the testimony given;

8     that said testimony was taken by me stenographically

9     and thereafter reduced to typewriting under my

10    supervision; and that I am neither counsel for,

11    related to, nor employed by any of the parties to this

12    case and have no interest, financial or otherwise, in

13    its outcome.

14

15           IN WITNESS WHEREOF, I have hereunto set my

16    hand and affixed my notarial seal this 20th day of

17    June, 2018.

18

19    My commission expires July 14, 2022

20

21

22    _____

23    MICHELE E. EDDY

24    NOTARY PUBLIC IN AND FOR

25    THE DISTRICT OF COLUMBIA

Case 1:18-cv-00068 Document 289-3 Filed on 08/04/18 in TXSD Page 136 of 155

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Jose Magana-Salgado on 06/15/2018                    Page 134

```
 1    FURTHER CERTIFICATION UNDER RULE 203 TRC

 2

 3         DEPOSITION TRANSCRIPT OF JOSE MAGANA-SALGADO.

 4    The original deposition was returned

 5    to the deposition officer on _____;

 6         If returned, the previously sent Changes and

 7    Signature pages contain any changes and the reasons

 8    therefore; If returned, the original deposition was

 9    delivered to Adam Arthur Biggs, Custodial Attorney;

10    That $_____ is the deposition officer's

11    charges to the Plaintiff States for preparing the

12    original deposition transcript and any copies of

13    exhibits;

14         That the deposition was delivered in

15    accordance with Rule 203.3, and that a copy of this

16    certificate was served on all parties shown herein

17    on _____.

18         Certified by me this 20th day of June, 2018.

19

20    _____

21    Michele E. Eddy

22    Registered Professional Reporter

23

24

25
```

# DEF-INTERV.

# EX. 294

**STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.**
Ike Brannon on 06/26/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3

 4    -------------------------------x
                                     )
 5    STATE OF TEXAS, et al.,        )
                                     )
 6                    Plaintiffs, )
      v                              ) Case No.
 7                                   ) 1:18cv00068
      UNITED STATES OF AMERICA, et al.,)
 8                                   )
                      Defendants, )
 9                                   )
      and                            )
10                                   )
      KARLA PEREZ, et al.,           )
11                                   )
              Defendant-intervenors. )
12    -------------------------------x

13

14             DEPOSITION OF IKE BRANNON

15                  Washington, D C

16               Tuesday, June 26, 2018

17                      1:56 p.m.

18

19

20    Job No.: 207169

21    Pages: 1 - 138

22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Ike Brannon on 06/26/2018                                    Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3

 4    --------------------------------x
                                      )
 5    STATE OF TEXAS, et al.,         )
                                      )
 6                      Plaintiffs, )
      v                               ) Case No.
 7                                    ) 1:18cv00068
      UNITED STATES OF AMERICA, et al.,)
 8                                    )
                        Defendants, )
 9                                    )
      and                             )
10                                    )
      KARLA PEREZ, et al.,            )
11                                    )
              Defendant-intervenors. )
12    --------------------------------x

13

14            Deposition of IKE BRANNON, held at Regus

15    Business Center, 2200 Pennsylvania Avenue, NW, 4th

16    Floor East, Washington, D C 20037, pursuant to

17    Notice, before Donna Marie Lewis, Registered

18    Professional Reporter and Notary Public of and for

19    the District of Columbia.

20

21

22
```

**Transcripts**

Jun 29, 2018 Brannon, Ike 06-26-2018

**Page:** 93
1  that were previously not work eligible, that that
2  had no effect on the labor markets for individuals
3  that were already lawfully able to work in the
4  United States?
5            MR. LEVINE:   Objection.   Foundation.
6  Are you asking him whether he came to an opinion
7  about the 2012 market rather than the current
8  market?
9  BY MR. BIGGS:
10      **Q      I'm asking if he is offering that**
11  **opinion in this case?**
12      A      I don't think I'm offering an opinion on
13  that in this case.
14      **Q      Okay.   So do you have an opinion on**
15  **that?**
16      A      I really haven't thought about it too
17  much.   The one thing I would say is that they were
18  relatively young in 2012, so I don't think it was
19  going to have a big impact.
20      **Q      As a general economic principle does the**
21  **addition of 700,000 work eligible individuals**
22  **place any downward pressure upon the job market**

**Page:** 94
1  **for those already in it?**
2      A      So it depends.   So our labor market is
3  over 160 million workers, 170 million workers
4  right now.   So it's a relatively small cohort,
5  700,000, in the grand scheme of things.
6  Especially when you have an unemployment rate 3.8
7  percent unemployment, it's impact on the relative
8  unemployment rate is relatively low.
9            What we generally know, what economists
10  generally know about the labor market is that
11  immigration of unskilled immigrants tends to put
12  downward pressure on wages of unskilled
13  immigrants.   But if you import relatively skilled
14  immigrants skilled immigrants, skilled labor tends
15  to create more jobs for unskilled labor and also
16  skilled labor.   Especially true for immigrants.
17  Immigrants tend to create jobs at a higher
18  proportion than nonimmigrants.
19            So my professional opinion is that if
20  you have a cohort of these people and the majority
21  of them are skilled, I don't think it has much of
22  an impact on the aggregate labor market of 160

**Page:** 95
1  million.   It would have an impact on the labor
2  market if -- a more severe impact on the labor

3  market of low income people if they had 700,000
4  more people to compete with.
5       Q      Because it would increase competition
6  for those individuals, correct?
7       A    It would.
8       Q      How many DACA recipients are you aware
9  of that you would consider low skilled?
10       A     Well, two-thirds since -- we estimate
11  two-thirds are going to have some kind of college,
12  so at most it's going to be one-third or less.
13       Q      So one-third or less would be considered
14  low skilled, for lack of a better phrase?
15       A     Yeah.   And probably a little bit less
16  than that, yeah.
17       Q      That one-third, that would increase
18  competition with other people who are citizens who
19  are also competing for those low skilled jobs,
20  correct?
21       A     That's right.   But since these workers
22  are relatively mobile, we would argue that they

**Page:** 96
1  would have relatively low impact on their wages.
2       Q      But an impact nonetheless, correct?
3       A     Correct.
4           MR. BIGGS:   All right.   Let's actually
5  take five minutes, if that's okay.
6           THE WITNESS:   Sure.
7           MR. BIGGS:   I think I'm getting close to
8  being done.   We will get you out of here -- well,
9  subject to anybody else asking you questions.
10           THE WITNESS:   That's great.
11           MR. GOLDSMITH:   I will have some
12  questions.
13           (The proceedings recessed from 3:50 p.m.
14  to 3:59 p.m.)
15           (Exhibit No. 2 was marked for
16  identification.)
17  BY MR. BIGGS:
18       Q     I hand you what is marked as Exhibit 2
19  to your deposition.   I actually might be one
20  short.   I apologize for that.
21             Sir, have you seen Exhibit 1 before --
22  or Exhibit 2 before?

```
 1                    REPORTER'S CERTIFICATE

 2              I, DONNA M. LEWIS, RPR, Certified

 3   Shorthand Reporter, certify;

 4              That the foregoing proceedings were

 5   taken before me at the time and place therein set

 6   forth, at which time the witness, Ike Brannon, was

 7   put under oath by me;

 8              That the testimony of the witness, the

 9   questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13              I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16              As witness, my hand and notary seal this

17   28th day of June, 2018.

18

19                        _____

20                        Donna M. Lewis, RPR
                          Notary Public
21
     My Commission expires:
22   March 14, 2023
```

# DEF-INTERV.

# EX. 295

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                  BROWNSVILLE DIVISION

4

5  STATE OF TEXAS,                    )

6          Plaintiffs,               ) Case No.

7          vs.                       ) 1:18-cv-00068

8  UNITED STATES OF AMERICA, et al., )

9          Defendants,               )

10          and                      )

11  KARLA PEREZ, et al.,             )

12          Defendant-Intervenors. )

13  ---------------------------------------------

14                 ORAL DEPOSITION OF

15                   RAY PERRYMAN

16              Wednesday, June 27, 2018

17  ---------------------------------------------

18          Oral deposition of RAY PERRYMAN, produced as

19  a witness at the instance of the Plaintiff States, and

20  duly sworn, was taken in the above-styled and numbered

21  cause on the 27th day of June, 2018, from 2:00 p.m. to

22  4:44 p.m., before Deborah L. Endler, Notary Public in

23  and for the State of Texas, reported by stenographic

24  means, at the offices of the Attorney General, 300

25  West 15th Street, 11th Floor, Austin, Texas 78701,

Ray Perryman

June 27, 2018
Page 2

1  pursuant to the Federal Rules of Civil Procedure and

2  the provisions stated on the record or attached

3  hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Transcripts**

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 11
1    A.    Sure.   Some of the analysis we've done over
2   time has looked at the costs and benefits from
3   economic and fiscal perspective.   By economic I mean
4   in terms of jobs, income, output, those types of
5   measures.
6         By fiscal, I mean by looking at the costs
7   that government entities pay and the benefits
8   government entities receive and the net effect of
9   that.   Again, I'm summarizing, but that's the gist of
10  it.
11       Q.    So first let's talk about the benefits of
12  DACA that you looked at.   What are some of the
13  benefits of DACA?
14       A.    Well, you have availability of a skilled
15  workforce by and large in a relatively tight labor
16  market, or very tight labor market, that can
17  contribute to a state's economy in terms of, directly
18  in terms of being employed, but also some other
19  startup businesses and other things that generate
20  economic activity.   And that economic activity has
21  ripple effects throughout the economy.
22       Q.    What about the other side, the costs?   What
23  are some of the costs of DACA that you have looked at?
24       A.    Well, there are situations which have been
25  addressed I think at length in this matter where like

**Page:** 12
1   anyone who exists in a state, we contribute something
2   and we make use of the water systems and the sewer
3   systems and highways and potentially school districts
4   and we pay revenue into the system as well.   So it's a
5   case of balancing those things against one another.
6        Q.    And that's what you tried to do, in part,
7   in your Declaration?
8             MR. HERRERA:   Objection, vague.
9        A.    Yes, sir.   Well, actually, I'm sorry, in
10  prior work we've done that I incorporate in the
11  Declaration, that's correct.
12       Q.    Okay.   So fair to say in your opinion the
13  State of Texas benefits, to some degree, from the DACA
14  program?
15       A.    On a net basis, yes, sir.
16       Q.    And then if we go to below the net, net
17  means you took out the benefits, you took out the
18  costs and the benefits; right?
19       A.    That's correct.
20       Q.    So in that equation the State of Texas
21  realizes some benefit from DACA?
22       A.    That's correct.
23       Q.    And the State of Texas realizes some costs

24  **from DACA?**
25      A.      Correct.

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 13
 1      **Q.      And what are those costs again?**
 2      A.      Well, not only DACA, anyone who lives in
 3  the area is going to consume some resources, water
 4  system, sewer system, school systems, highways, those
 5  types of things.
 6      **Q.      Right.**
 7      A.      City and county roads, so there is a
 8  variety of public services that all of us who live in
 9  an area consume, and then we pay back in to help
10  provide revenue to provide those services, help
11  balance the -- Our analysis shows that this particular
12  population provides a net benefit to these things.
13      **Q.      So DACA recipients consume some of those**
14  **services you talked about, for example, education**
15  **costs; right?**
16      A.      As do a lot of citizens, yes.   There are
17  some DACA recipients who consume education.
18      **Q.      And that's costs borne by the State of**
19  **Texas?**
20      A.      To some extent.   I know there is complex
21  formulas and that's not an area I claim any special
22  expertise in that.   But some of that cost is borne by
23  the State of Texas on a, with the idea being a net
24  benefit coming back from that.   But yes, there is a
25  cost associated with it and the state pays some of

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 14
 1  that in certain circumstances.
 2      **Q.      And then the same is true with health care**
 3  **costs, for example, the State of Texas incurs some**
 4  **portion of costs to provide health care to the DACA**
 5  **population?**
 6              MR. HERRERA:   Objection, vague.
 7      A.      Potentially.   I don't have firsthand
 8  knowledge that that occurs, but with any random
 9  segment of the population there is probably some.   I'm
10  not certain of the magnitude of that.   I haven't seen
11  anything that measures that.
12      **Q.      Let's go back to the very beginning of your**
13  **Declaration, please.**
14      A.      Okay.
15      **Q.      I want to jump right in, so we're going to**
16  **skip a few pages and we may come back to some of the**
17  **stuff in the beginning later in the afternoon.**
18          **But let's start with on paragraph, excuse**
19  **me, page 6.**
20      A.      Yes, sir.

21    Q.    Section that gives an "Overview of DACA"?
22    A.    Yes, sir.
23    Q.    Do you see that?   All right.   So we look to
24 paragraph 18 in that section, there are some cites to
25 a study done by Tom Wong; is that right?

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 27

1    A.    One more.   I'm with you.
2    Q.    In paragraph 31 you talk about the labor
3 shortage and then the third sentence says "Some
4 companies have increased wages to attract more
5 qualified applicants."
6       Why would a company increase wages to
7 attract more qualified applicants?
8    A.    Because they have a need for workers and
9 there is not, there is not workers available.
10       We have an interesting situation right now
11 we've never had in history before, since we have been
12 keeping data on some of these statistics, and that is
13 that we have a lot more job openings even in total
14 number of unemployed people.   So it's a really, it's a
15 very interesting phenomenon in the workforce right now
16 that we haven't seen before.   And a lot of areas where
17 there is workforce shortages, that's one way you try
18 to induce people to work, either to come into the
19 workforce or to change jobs.
20    Q.    Yeah, okay.   So if I can just summarize
21 that in my head to make it make sense to me, so if
22 there is a labor shortage, that can potentially
23 increase wages?
24    A.    Certainly.
25    Q.    Okay.   So if there is, let me say it a

📄 Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 48

1    Q.    Right.   But what you did is try to take the
2 best information you could find and make the most
3 educated estimate that you could?
4    A.    That's correct, yes, sir.
5    Q.    And then you have a brief discussion about
6 the sources with a cite footnote 19.   Do you see that?
7    A.    Yes, sir.
8    Q.    And I have --
9    A.    One thing I should mention, going back to
10 the paragraph, I noticed when I was reading it, we
11 also include in that the costs associated with the
12 children of undocumented workers even if they were
13 born in the United States.
14    Q.    Understand.
15       (Deposition Exhibit 4 was marked.)
16    Q.    Show you Exhibit 4.   I'm sorry, can I have
17 one of those back?   Exhibit 4 is the first source

18 **cited in Exhibit 19 -- footnote 19.   Let's clear that**
19 **up.**
20         **Exhibit 4 is the first source cited in**
21 **footnote 19?**
22     A.     That's correct, yes, sir.
23     **Q.     So this formed a part of your estimate in**
24 **trying to determine the costs associated with**
25 **undocumented population?**

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 53
1 break it down then.   Do you know how you calculated
2 the $3 billion estimated expense to the federal
3 government caused by the undocumented population?
4     A.     Not without working back through all the
5 information from the time.   I'm sorry.
6     **Q.     What about the $3.1 billion to the State of**
7 **Texas?**
8     A.     I would have to give the same answer there.
9     **Q.     And same for the $6.7 billion for local**
10 **entities?**
11     A.     Yes.
12     **Q.     So this $3.1 billion to the State of Texas**
13 **is the cost you estimated Texas incurred because of**
14 **its provision of services to the undocumented**
15 **population in Texas?**
16     A.     Correct.
17     **Q.     And that undocumented population included**
18 **the DACA population?**
19     A.     I believe it would have, yes.
20     **Q.     All right.**
21     A.     As they are a percentage of it, and I would
22 have to probably use fewer services, but yes.
23     **Q.     All right.   And you said fewer services but**
24 **you are not saying that the DACA population used none**
25 **of these services?**

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 69
1     A.     Yes, sir.
2     **Q.     Okay.   So that's talking about the direct**
3 **benefits; right?**
4     A.     Correct.
5     **Q.     And then if we look on Exhibit 8, we see**
6 **the total benefits for Texas, and I assume that's the**
7 **multiplied benefits?**
8     A.     Multiplied benefits.
9     **Q.     Okay.**
10     A.     And they are all nets as well.
11     **Q.     How do we know that they are nets?**
12     A.     Because that's how I set up the system.
13 It's exactly the same modeling structure that was used
14 in the prior report.

15      Q.      Okay.   So when you set up the system, it
16 did, in fact, calculate the projected costs incurred
17 by Texas because of DACA recipients in the state?
18      A.      Yes.
19      Q.      Is that information that you can provide to
20 your counsel?
21      A.      By cost, you're talking about the net cost
22 and benefits to the government as opposed to the --
23      Q.      Yes, sir.   So, for example, if we look at
24 Exhibit 3 --
25      A.      Yes.

Jun 27, 2018 Perryman, Ray (6_27_2018)

**Page:** 75
1 the report somewhere, for example, you're making a
2 car, you're making a profit on the car, you have to
3 buy wiper blades, I don't dispute the wiper blades
4 cost money, but you make money on the car.   I don't
5 dispute that there's cost and benefits, and the
6 benefits outweigh the costs.   I don't dispute that.
7      Q.      But you don't dispute that there is a cost
8 associated with DACA recipients borne by the State of
9 Texas?
10             MR. HERRERA:   Objection, asked and
11 answered.
12      A.      Subject to everything I said before
13 obviously by the last answer.
14      Q.      All right.   One of those costs borne by the
15 State of Texas because they're DACA recipients that
16 you have estimated relates to education to the DACA
17 recipients through Texas public school program?
18             MR. HERRERA:   Objection, asked and
19 answered.
20      A.      Yeah, that's one thing I would have to add
21 about that is, as I understand it, the schools have to
22 provide education to the undocumented population.   I
23 don't think it's really an issue whether or not they
24 are in DACA or not.
25      In other words, if you took DACA away, and

**Page:** 76
1 they all stayed, I don't think the number would
2 change.   But clearly to the extent people are
3 classified as DACA, persons who are in the high school
4 at this point in time, their education is being
5 funded.   But it's not because they are in DACA, it's
6 because they are here.
7      Q.      And is being funded in part by the State of
8 Texas?
9      A.      Correct, yes.
10      Q.      And I jumped ahead of myself there.   I
11 meant to ask you about health care.
12      A.      Okay.
13      Q.      But same question as a lead-in, you don't

14 **dispute that the State of Texas does indeed incur a**
15 **cost to provide health care to DACA recipients?**
16             MR. HERRERA:   Objection, asked and
17 answered.
18      A.      Again, the only clarification I would give
19 is, again, for the undocumented population, since they
20 use it, a little bit less for the DACA based
21 population, but nonetheless I assume there would be
22 some people in the DACA population who are likely to
23 have some type of care that is reimbursed in some way
24 by the state.
25      **Q.      And those types of care would be things**

Ray Perryman                                                    June 27, 2018
                                                               Page 108

```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME:    M. Ray Perryman

 3   DATE OF DEPOSITION:  June 27, 2018

 4   PAGE     LINE        CHANGE              REASON

 5    32       10        "Pugh" to "Pew"      Transcription

 6    35       16        "Pugh" to "Pew"      Transcription

 7    35       17        "Resource" to "Research"   Transcription

 8    36       14        "Pugh" to "Pew"      Transcription

 9    36       22        "Pugh" to "Pew"      Transcription

10    92       16        "sides" to "sizes"   Transcription

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Ray Perryman

June 27, 2018
Page 109

```
1              ACKNOWLEDGMENT OF DEPONENT

2         I, RAY PERRYMAN, have read the foregoing

3    deposition and hereby affix my signature that same is

4    true and correct, except as noted above.

5

6                        _____

7                        RAY PERRYMAN

8

9    THE STATE OF TEXAS       )

10   COUNTY OF ___Ector___    )

11         Before me, _M Ray Perryman_, on this day

12   personally appeared RAY PERRYMAN, known to me (or

13   proved to me under oath of through _____) to be

14   the person whose name is subscribed to the foregoing

15   instrument and acknowledged to me that they executed

16   the same for the purposes and consideration therein

17   expressed.

18         Given under my hand and seal of office this

19   _6th_ day of _____July_____, _2018_.

20

21

22

23                        _____

24                        NOTARY PUBLIC IN AND FOR

25                        THE STATE OF TEXAS
```

GERRIE LYNN SPURGEON
Notary Public, State of Texas
My Commission Expires
December 02, 2018

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Ray Perryman                                              June 27, 2018
                                                          Page 110

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
    STATE OF TEXAS,                      )
 4        Plaintiffs,                    ) Case No.
          vs.                            ) 1:18-cv-00068
 5  UNITED STATES OF AMERICA, et al., )
          Defendants,                    )
 6            and                        )
    KARLA PEREZ, et al.,                 )
 7           Defendant-Intervenors. )

 8                 REPORTER'S CERTIFICATION
                 DEPOSITION OF RAY PERRYMAN
 9                      June 27, 2018

10              I, Deborah Endler, Shorthand Reporter in and

11  for the State of Texas, do hereby certify that the

12  foregoing deposition is a full, true and correct

13  transcript:

14              That the foregoing deposition of RAY

15  PERRYMAN, the Witness, hereinbefore named was at the

16  time named, taken by me in stenograph on June 27,

17  2018, the said Witness having been by me first duly

18  cautioned and sworn to tell the truth, the whole truth

19  and nothing but the truth and the same were thereafter

20  reduced to typewriting by me or under my direction.

21              ( ) That by agreement of counsel, a reading

22  condensed copy of the deposition transcript along with

23  the full-sized original Changes and Signature Sheet

24  has been sent to _____ on

25  _____ for review and signature within 30 days
```

Ray Perryman                                            June 27, 2018
                                                        Page 111

1   and if any corrections returned are attached hereto.

2          ( ) That the Witness shall have thirty (30)

3   days for review and signature of the original

4   transcript and if any corrections returned are

5   attached hereto.

6          ( ) That the signed transcript ( ) was ( )

7   was not received from the Witness within 30 days.

8          That the amount of time used by each party at

9   the deposition is as follows:

10          Mr. Disher - 2 hours, 44 minutes

11          That before the completion of the deposition,

12   the Deponent, andor the Plaintiff/Defendant _____ did

13   _____ did not request to review the transcript.

14          I further certify that I am neither counsel

15   for, related to, nor employed by any of the parties or

16   attorneys in this action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19          WITNESS MY HAND, this the 28th day of June,

20   2018.

21          _____

22          DEBORAH L. ENDLER, Reporter
            EXPIRATION DATE:
23          Firm Registration No. 631
            Kim Tindall & Associates, LLC
24          16414 San Pedro, Suite 900
            San Antonio, Texas 78232
25          Phone 210-697-3400