**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-DISCOVERY BRIEF IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# Volume 4

# Exhibits 296 - 305

# DEF-INTERV.

# EX. 296

|   |   |
|---|---|
|   | Search |

## QuickFacts
**UNITED STATES; Texas**

QuickFacts provides statistics for all states and counties, and for cities and towns with a population of 5,000 or more.

## Table

| All Topics | UNITED STATES | Texas |
|---|---|---|
| **Population, Census, April 1, 2010** | **308,745,538** | **25,145,561** |
| 👤 **PEOPLE** | | |
| **Population** | | |
| Population estimates, July 1, 2017, (V2017) | 325,719,178 | 28,304,596 |
| Population estimates base, April 1, 2010, (V2017) | 308,758,105 | 25,146,100 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2017, (V2017) | 5.5% | 12.6% |
| **Population, Census, April 1, 2010** | **308,745,538** | **25,145,561** |
| **Age and Sex** | | |
| Persons under 5 years, percent | ▲ 6.1% | ▲ 7.2% |
| Persons under 18 years, percent | ▲ 22.6% | ▲ 26.0% |
| Persons 65 years and over, percent | ▲ 15.6% | ▲ 12.3% |
| Female persons, percent | ▲ 50.8% | ▲ 50.3% |
| **Race and Hispanic Origin** | | |
| White alone, percent   (a) | ▲ 76.6% | ▲ 79.2% |
| Black or African American alone, percent   (a) | ▲ 13.4% | ▲ 12.7% |
| American Indian and Alaska Native alone, percent   (a) | ▲ 1.3% | ▲ 1.0% |
| Asian alone, percent   (a) | ▲ 5.8% | ▲ 5.0% |
| Native Hawaiian and Other Pacific Islander alone, percent   (a) | ▲ 0.2% | ▲ 0.1% |
| Two or More Races, percent | ▲ 2.7% | ▲ 2.0% |
| Hispanic or Latino, percent   (b) | ▲ 18.1% | ▲ 39.4% |
| White alone, not Hispanic or Latino, percent | ▲ 60.7% | ▲ 42.0% |
| **Population Characteristics** | | |
| Veterans, 2012-2016 | 19,535,341 | 1,513,294 |
| Foreign born persons, percent, 2012-2016 | 13.2% | 16.7% |
| **Housing** | | |
| Housing units, July 1, 2017, (V2017) | 137,403,460 | 10,932,870 |
| Owner-occupied housing unit rate, 2012-2016 | 63.6% | 61.9% |
| Median value of owner-occupied housing units, 2012-2016 | $184,700 | $142,700 |
| Median selected monthly owner costs -with a mortgage, 2012-2016 | $1,491 | $1,444 |
| Median selected monthly owner costs -without a mortgage, 2012-2016 | $462 | $467 |
| Median gross rent, 2012-2016 | $949 | $911 |
| Building permits, 2017 | 1,281,977 | 175,112 |
| **Families & Living Arrangements** | | |
| Households, 2012-2016 | 117,716,237 | 9,289,554 |
| Persons per household, 2012-2016 | 2.64 | 2.84 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2012-2016 | 85.2% | 83.5% |
| Language other than English spoken at home, percent of persons age 5 years+, 2012-2016 | 21.1% | 35.2% |
| **Education** | | |
| High school graduate or higher, percent of persons age 25 years+, 2012-2016 | 87.0% | 82.3% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2012-2016 | 30.3% | 28.1% |
| **Health** | | |
| With a disability, under age 65 years, percent, 2012-2016 | 8.6% | 8.1% |
| Persons without health insurance, under age 65 years, percent | ▲ 10.1% | ▲ 18.6% |
| **Economy** | | |
| In civilian labor force, total, percent of population age 16 years+, 2012-2016 | 63.1% | 64.2% |
| In civilian labor force, female, percent of population age 16 years+, 2012-2016 | 58.3% | 57.7% |
| Total accommodation and food services sales, 2012 ($1,000)   (c) | 708,138,598 | 54,480,811 |
| Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c) | 2,040,441,203 | 145,035,130 |
| Total manufacturers shipments, 2012 ($1,000)   (c) | 5,696,729,632 | 702,603,073 |
| Total merchant wholesaler sales, 2012 ($1,000)   (c) | 5,208,023,478 | 691,242,607 |

| | | |
|---|---:|---:|
| Total retail sales, 2012 ($1,000) | | 316,376 |
| Total retail sales per capita, 2012   (c) | $13,443 | $13,666 |
| **Transportation** | | |
| Mean travel time to work (minutes), workers age 16 years+, 2012-2016 | 26.1 | 25.9 |
| **Income & Poverty** | | |
| Median household income (in 2016 dollars), 2012-2016 | $55,322 | $54,727 |
| Per capita income in past 12 months (in 2016 dollars), 2012-2016 | $29,829 | $27,828 |
| Persons in poverty, percent | ▲ 12.7% | ▲ 15.6% |

## 🏭 BUSINESSES

| Businesses | | |
|---|---:|---:|
| Total employer establishments, 2016 | 7,757,807 | 579,168[1] |
| Total employment, 2016 | 126,752,238 | 10,429,924[1] |
| Total annual payroll, 2016 ($1,000) | 6,435,142,055 | 526,782,643[1] |
| Total employment, percent change, 2015-2016 | 2.1% | 1.9%[1] |
| Total nonemployer establishments, 2016 | 24,813,048 | 2,251,787 |
| All firms, 2012 | 27,626,360 | 2,356,748 |
| Men-owned firms, 2012 | 14,844,597 | 1,251,696 |
| Women-owned firms, 2012 | 9,878,397 | 866,678 |
| Minority-owned firms, 2012 | 7,952,386 | 1,070,392 |
| Nonminority-owned firms, 2012 | 18,987,918 | 1,224,845 |
| Veteran-owned firms, 2012 | 2,521,682 | 213,590 |
| Nonveteran-owned firms, 2012 | 24,070,685 | 2,057,218 |

## 🌐 GEOGRAPHY

| Geography | | |
|---|---:|---:|
| Population per square mile, 2010 | 87.4 | 96.3 |
| Land area in square miles, 2010 | 3,531,905.43 | 261,231.71 |
| FIPS Code | 00 | 48 |

**Value Notes**

    **1.**   Includes data not distributed by county.

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2017) refers to the final year of the series (2010 thru 2017). Different vintage years of estimates are not comparable.

**Fact Notes**

    **(a)**   Includes persons reporting only one race
    **(b)**   Hispanics may be of any race, so also are included in applicable race categories
    **(c)**   Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

    **D**    Suppressed to avoid disclosure of confidential information
    **F**    Fewer than 25 firms
    **FN**   Footnote on this item in place of data
    **NA**   Not available
    **S**    Suppressed; does not meet publication standards
    **X**    Not applicable
    **Z**    Value greater than zero but less than half unit of measure shown
    **-**    Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval of an open ended distribution.

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

| ABOUT US | FIND DATA | BUSINESS & INDUSTRY | PEOPLE & HOUSEHOLDS | SPECIAL TOPICS | NEWSROOM |
|---|---|---|---|---|---|
| Are You in a Survey? | QuickFacts | Help With Your Forms | 2020 Census | Advisors, Centers and Research Programs | News Releases |
| FAQs | American FactFinder | Economic Indicators | 2010 Census | Statistics in Schools | Release Schedule |
| Director's Corner | 2010 Census | Economic Census | American Community Survey | Tribal Resources (AIAN) | Facts for Features |
| Regional Offices | Economic Census | E-Stats | Income | Emergency Preparedness | Stats for Stories |
| History | Interactive Maps | International Trade | Poverty | Statistical Abstract | Blogs |
| Research | Training & Workshops | Export Codes | Population Estimates | Special Census Program | |
| Scientific Integrity | Data Tools | NAICS | Population Projections | Data Linkage Infrastructure | |
| Census Careers | Developers | Governments | Health Insurance | Fraudulent Activity & Scams | |
| Diversity @ Census | Catalogs | Longitudinal Employer-Household Dynamics (LEHD) | Housing | USA.gov | |
| Business Opportunities | Publications | | International | | |
| Congressional and Intergovernmental | | Survey of Business Owners | Genealogy | | |
| Contact Us | | | | | |

**CONNECT WITH US**

Accessibility | Information Quality | FOIA | Data Protection and Privacy Policy | U.S. Department of Commerce

# DEF-INTERV.

# EX. 297



### OFFICE OF THE GOVERNOR

August 16, 2012

RICK PERRY
GOVERNOR

The Honorable Greg Abbott
Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas  78711-2548

Dear General Abbott:

In a memo dated June 15, 2012, the Secretary of the U.S. Department of Homeland Security issued prosecutorial guidelines for certain unlawfully present aliens.  The guidelines, which were to take effect no later than August 15, 2012, outline the secretary's intent to defer deportation actions involving those aliens for a period of at least two years.  According to media reports, thousands of aliens in Texas are eligible to apply for relief from deportation under the guidelines.

I have previously expressed my position that the secretary was wrong to unilaterally undermine the law through a policy statement issued under the cover of so-called "prosecutorial discretion."  I believe her actions were a slap in the face to the rule of law and our Constitutional framework of separated powers.

To avoid any confusion on the impact of the Obama administration's actions, I am writing to ensure that all Texas agencies understand that Secretary Napolitano's guidelines confer absolutely no legal status whatsoever to any alien who qualifies for the federal "deferred action" designation.  In fact, the secretary specifically closed her directive by explaining that "[t]his memorandum confers no substantive right, immigration status or pathway to citizenship."

These guidelines do not change our obligations under federal and Texas law to determine a person's eligibility for state and local public benefits.  Federal law prohibits conferring such benefits to most unlawfully present aliens, absent a state law to the contrary.  In Texas, our legislature has passed laws that reflect the policy choices that they believe are right for Texas.  The secretary's directive does not undermine or change our state laws, or any federal laws that apply within the State of Texas.  I expect our state agencies to continue to comply with and enforce the laws for the protection of our citizens, communities and state treasury and in fulfillment of our constitutional duty as officials within the executive branch.

Sincerely,

*Rick Perry*

Rick Perry
Governor

RP:crp

# DEF-INTERV.

# EX. 298

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                  BROWNSVILLE DIVISION

 4                CASE NO. 1:18-cv-00068

 5

 6      --------------------------------X

 7      STATE OF TEXAS, et al.,            :

 8                        Plaintiffs, :

 9          vs.                           :

10      UNITED STATES OF AMERICA, et al., :

11                        Defendants, :

12          and                          :

13      KARLA PEREZ, et al.,              :

14           Defendant-Intervenors. :

15      --------------------------------X

16

17            DEPOSITION OF DANIELA VELEZ

18               (Taken by Plaintiff)

19               Trenton, New Jersey

20                  June 19, 2018

21

22

23      Reported by:   Catherine Golembeski
                        Certified Court Reporter-NJ
24                      Registered Professional Reporter
                        Notary Public
25
```

Case 1:18-cv-00068   Document 289-4   Filed on 08/04/18 in TXSD   Page 10 of 98

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                      Page 2

```
 1    APPEARANCE OF COUNSEL:

 2

      FOR THE PLAINTIFF STATE OF TEXAS:
 3
                   CRISTINA M. MORENO, ESQ.
 4                 THE ATTORNEY GENERAL KEN PAXTON
                   P.O. Box 12548
 5                 Austin, Texas 78111-2584
                   (512) 463-2120
 6
      FOR THE PLAINTIFF STATE OF NEW JERSEY:
 7
                   OFFICE OF THE ATTORNEY GENERAL
 8                 DEPARTMENT OF LAW & PUBLIC SAFETY
                   BY:  RACHEL WAINER APTER, ESQ.
 9                 25 Market Street
                   Trenton, New Jersey 08625
10                 (609) 376-2702

11    FOR THE U.S. DEPARTMENT OF JUSTICE

12                 OFFICE OF IMMIGRATION LITIGATION
                   BY:  JAMES WALKER, ESQ.
13                 Ben Franklin Station
                   P.O. BOX 868
14                 Washington, DC 20044
                   (202) 532-4468
15
      FOR THE WITNESS:
16
                   ALEXANDRA DROZ, ESQ.
17                 KATIE GLYNN, ESQ.
                   LOWENSTEIN SANDLER, LLP
18                 1251 Avenue of the Americas
                   New York, New York 10020
19                 (212) 262-6700

20

21            Deposition of DANIELA VELEZ, taken at 25
      Market Street, Trenton New Jesey, on the 19th day
22    of June 2018 at 12:00 p.m. before Catherine
      Golembeski, CCR-NJ, RPR, and Notary Public.
23

24

25
```

```
 1
                          CONTENTS
 2
        THE WITNESS:    DANIELA VELEZ         EXAMINATION
 3
 4                  BY:  MS. MORENO                4, 46

 5                  BY:  MS. WAINER APTER            44

 6                  BY:  MS. DROZ                    46

 7
                     INDEX OF EXHIBITS
 8
 9    Exhibit-1   Declaration of Daniela Velez        5

10    Exhibit-2   Article 2/16/18                     7

11    Exhibit-3   Article                            38

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A.   Yes.

 2        Q.   So let me go back to the question I

 3   asked before you stepped out.

 4             In this article it references a

 5   difficult decision that you and your sister have

 6   made regarding what you would do if DACA was ended.

 7   And in the article it says you had, at the time,

 8   decided you would leave the country.  Is that

 9   accurate?

10             MS. DROZ:  Objection.

11        A.   That was before the March 5th deadline.

12   And as we saw how the changes have been in the

13   administration, and we also saw the deterioration

14   of the political party in Venezuela, it will make

15   it very unsafe for us to even go back at this time.

16        Q.   Okay.  So you've changed your mind now.

17   You would stay?

18             MS. DROZ:  Objection.

19        A.   We don't know.

20        Q.   And in this article it said that you

21   are adamant about not living in the United States

22   as an undocumented person.  And it quotes you as

23   saying:  "One thing I've learned, is my talent and

24   skill are mine.  No one can take those away.  It

25   will be hard to start life again, we will not stay
```

Case 1:18-cv-00068  Document 289-4  Filed on 08/04/18 in TXSD  Page 13 of 98

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                    Page 50

```
 1   UNITED STATES DISTRICT COURT)

 2                              : C-E-R-T-I-F-I-C-A-T-E

 3   DISTRICT OF TEXAS - BROWNSVILLE DIVISION)

 4

 5      I, Catherine Golembeski, RPR, CCR, Notary Public,

 6   certify that I did have Daniela Velez appear before

 7   me at 12:00 p.m. on June 19, 2018, in the New

 8   Jersey Attorney General's office, 25 Market Street,

 9   Trenton, New Jersey, that the witness was duly

10   sworn and cautioned to tell the truth, the whole

11   truth and nothing but the truth; that the foregoing

12   pages constitute a true and accurate transcript of

13   testimony given at the time and place.

14      I further certify that I am not of counsel or kin

15   to any of the parties to this cause of action, nor

16   am I interested in any manner in its outcome.

17      IN THE WITNESS WHEREOF I have hereunto set my

18   hand and seal this the 19th day of June 2018.

19

20

21

22              Catherine Golembeski, CCR, RPR
                Notary Public for New Jersey
23

24

25
```

# DEF-INTERV.

# EX. 299



# An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others

**Ben Harrington**
Legislative Attorney

April 10, 2018

**Congressional Research Service**
7-5700
www.crs.gov
R45158

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals (aliens) present in the United States in violation of the Immigration and Nationality Act (INA). Well-known types of reprieves include deferred action, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS). The authority to grant some types of discretionary reprieves from removal, including TPS, comes directly from the INA. The authority to grant other types of reprieves generally arises from the Department of Homeland Security's (DHS's) enforcement discretion—that is, its discretion to determine the best manner for enforcing the immigration laws, including by prioritizing some removal cases over others.

The primary benefit that a reprieve offers to an unlawfully present alien is an assurance that he or she does not face imminent removal. Reprieves also generally confer other benefits, including eligibility for employment authorization and nonaccrual of unlawful presence for purposes of the three- and ten-year bars on admission to the United States under the INA. Reprieves do not confer "lawful immigration status," in the narrow sense that reprieve recipients typically remain removable under the INA's grounds of inadmissibility or deportability (although they may have defenses to removal, including a statutory defense in the case of TPS) and in the more general sense that recipients do not enjoy most of the statutorily fixed protections that come with lawful permanent resident (LPR), refugee, asylee, and nonimmigrant status. The availability and duration of reprieves often turn upon executive policies, and accordingly reprieves do not offer steadfast protection from removal or reliable access to other benefits.

Categories of reprieves premised upon executive enforcement discretion include the following:

- ***Deferred Action.*** The generic term that DHS uses for a decision not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.
- ***DACA.*** A large-scale, programmatic type of deferred action available since 2012 for a subset of aliens who arrived in the United States as children.
- ***Deferred Enforced Departure (DED).*** A reprieve premised on the President's exercise of foreign policy powers to protect nationals of countries experiencing war or instability.
- ***Extended Voluntary Departure (EVD).*** An earlier version of DED little used since 1990.

Reprieves granted pursuant to statutory authority include the following:

- ***TPS Relief.*** A form of temporary protection from removal for aliens from countries that DHS designates as unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.
- ***Parole.*** A statutory power that authorizes DHS to grant entry (but not admission) to inadmissible aliens on a case-by-case basis.

Immigration authorities may grant other reprieves in connection with removal proceedings:

- ***Administrative Closure.*** A decision to discontinue temporarily a removal proceeding.
- ***Voluntary Departure***. A brief reprieve that allows an alien to depart the United States at his own expense in lieu of removal proceedings or enforcement of a removal order.
- ***Stay of Removal, Order of Supervision.*** Mechanisms often used together that allow DHS or an immigration judge to postpone enforcement of a removal order.

# Contents

Introduction ....................................................................................................................... 1

Sources of Executive Authority to Grant Discretionary Reprieves from Removal ......................... 4

Nature of Protections for Recipients: In General .......................................................................... 8

Glossary of Discretionary Reprieves ............................................................................................11

    Generally Available Reprieves Premised upon Enforcement Discretion or Executive
      Powers.................................................................................................................... 12

    Generally Available Reprieves Granted Pursuant to Statutory Authority ............................. 15

    Reprieves Granted Exclusively in Connection with the Removal Process ........................... 18

# Contacts

Author Contact Information ....................................................................................................... 20

# Introduction

The Immigration and Nationality Act (INA) establishes a system of rules as to which non-U.S. nationals (aliens) may enter the United States and under what conditions.[1] It sets forth, for instance, three primary categories—family-based, employment-based, and diversity-based—through which an alien may qualify for an immigrant visa and thereby seek admission to the United States as a lawful permanent resident (LPR).[2] The INA also establishes requirements for the admission of refugees,[3] and delineates the categories of aliens who may be admitted temporarily as nonimmigrants for particular purposes such as study, tourism, or temporary work.[4]

Those aliens who enter or remain in the country in violation of the INA's restrictions generally are subject to removal based on their presence within the United States alone.[5] As a consequence, the Department of Homeland Security (DHS)—the federal agency primarily responsible for enforcing the INA—has a statutory basis to seek the removal of such aliens even if they have not committed crimes or violated other INA provisions.[6] According to recent estimates, there are currently between ten and twelve million aliens in the United States whose presence violates the INA.[7] They arrive in two ways primarily: (1) surreptitiously, by crossing the border without inspection; or (2) on a temporary nonimmigrant visa (e.g., on a B-1/B-2 tourist visa,[8] which typically allows them to remain for six months), which they then overstay.[9] DHS has estimated in

---

[1] 8 U.S.C. §§ 1101, *et seq.*

[2] *See* 8 U.S.C. § 1151(a) (setting forth the three categories of immigrant visa eligibility). For an overview of immigrant visa categories and application procedure, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*, by William A. Kandel.

[3] 8 U.S.C. § 1157; *see generally* CRS Report RL31269, *Refugee Admissions and Resettlement Policy*, by Andorra Bruno.

[4] 8 U.S.C. § 1101(a)(15); *see generally* CRS Report R45040, *Nonimmigrant (Temporary) Admissions to the United States: Policy and Trends*, by Jill H. Wilson.

[5] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *id.* § 1229a(e)(2)(B) (defining inadmissible aliens who have not been admitted to the United States as "removable"); *id.* § 1227(a)(1)(B)(rendering any alien "who is present in the United States in violation of this chapter or any other law of the United States" deportable and thus subject to removal); *id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, DAVID WEISSBRODT & LAURA DANIELSON, IMMIGRATION LAW AND PROCEDURE 349 (6th ed. 2011) ("Non-citizens who are present in the U.S. in violation of the INA or any other law of the U.S. are removable . . . as are those who fail to maintain the nonimmigrant . . . status in which they were admitted.").

[6] *See, e.g.,* Mondragón v. Holder, 706 F.3d 535, 541 (4th Cir. 2013) ("It is uncontroverted that Mondragón entered the United States illegally and is therefore removable."); Ghaffar v. Mukasey, 551 F.3d 651, 653 (7th Cir. 2008) (denying petition for review of final order of removal based on overstay of nonimmigrant visa).

[7] Ctr. for Migration Studies, *The US Undocumented Population Fell Sharply During the Obama Era: Estimates for 2016* (Feb. 22, 2018) (estimating 10.8 million in 2016), http://cmsny.org/publications/warren-undocumented-2016/; Dep't of Homeland Sec. Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014* (July 2017) (estimating 12.1 million in 2014), http://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf; Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009* (Sept. 20, 2016) (estimating 11.1 million in 2014), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

[8] *See generally* 9 Foreign Affairs Manual (FAM) 402.2.

[9] *See* Office of Immigration Statistics, *supra* note 7, at 1; David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 171 (2012) ("[E]ntrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical 'illegal alien' in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully (continued...)

the past that its resources allow it to remove a maximum of 400,000 aliens per year who are present in violation of the INA.[10]

For reasons that may range from administrative convenience to humanitarian concerns, immigration authorities sometimes decide not to seek the removal of unlawfully present aliens[11]—either during a specified timeframe or indefinitely—and communicate that decision to the affected aliens.[12] Well-known examples of such decisions include grants of deferred action,[13] protections granted under the Deferred Action for Childhood Arrivals (DACA) initiative,[14] and Temporary Protected Status (TPS).[15] The former two types of reprieves confer assurances from DHS, premised on its enforcement discretion, that the agency will not seek an alien's removal, often during a defined time period.[16] The latter, TPS, is a statutory mechanism that allows immigration authorities to grant temporary protection from removal to aliens from countries experiencing upheaval or instability.[17]

This report refers to executive decisions not to seek removal as "discretionary reprieves from removal" because their effective period generally depends on the duration of the Executive's inclination not to seek removal and because the reprieves (unlike statutory legalization

---

(...continued)
present population. The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission.").

[10] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014) ("DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year."); Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. PA. L. REV. 1753, 1759 (2016) (describing the "gap between the INA's putative scope and its enforceable scope").

[11] The INA defines unlawful presence as follows: "[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of Homeland Security] or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[12] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *see also* Arizona v. United States, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

[13] *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing deferred action).

[14] Memorandum from Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) [hereinafter DHS DACA Memo]; *see* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing DACA).

[15] 8 U.S.C. § 1254a. TPS and some other reprieve programs may also provide relief to nonimmigrants and other aliens present pursuant to a statutory immigration status. See, *e.g.*, *id.* § 1254a(c) (requiring aliens to have been physically present since a date specified by DHS in order to qualify for TPS, but not excluding lawfully present aliens from eligibility). This report focuses on the use of discretionary reprieves to regulate the population of aliens present in violation of the INA.

[16] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action and DACA).

[17] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

---

mechanisms such as cancellation of removal,[18] registry,[19] or asylum[20]) do not confer LPR status or create a direct avenue to that status.[21] (However, in some jurisdictions, TPS may facilitate adjustment to LPR status for aliens who otherwise qualify for immigrant visas in a family-based, employment-based, or diversity-based category.)[22] Discretionary reprieves from removal do not, in other words, offer steadfast protection from removal,[23] although they typically confer eligibility for work authorization, among other benefits.[24] A burgeoning body of legal scholarship about discretionary reprieves has coined an array of terms for the peculiar sort of relief that they provide, including "quasi-legal status,"[25] "liminal"[26] or "twilight" status,[27] and the "status of nonstatus."[28] In recent decades, discretionary reprieves have grown in prevalence and become an increasingly significant aspect of the federal government's regulation of the unlawfully present population.[29] The prevalence of discretionary reprieves may well decline in the near term,

---

[18] 8 U.S.C. § 1229b(b) (authorizing the cancellation of removal and adjustment of status for certain nonpermanent residents).

[19] *Id.* § 1259 (authorizing the conferral of a record of admission for permanent residence in the case of certain aliens who entered the United States prior to January 1, 1972).

[20] *Id.* § 1158.

[21] *See* Arpaio v. Obama, 797 F.3d 11, 17 (D.C. Cir. 2015) ("[D]eferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'") (quoting DHS DACA Memo, *supra* note 14, at 3); Texas v. United States, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' [obtained through deferred action] is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) ("By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States.").

[22] *See* 8 U.S.C. § 1254a(f)(4) (providing that aliens granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status eligibility); *infra* note 141 (citing cases on adjustment of status eligibility for TPS recipients).

[23] *See Arpaio*, 797 F.3d at 17; *Texas*, 809 F.3d at 148. TPS provides perhaps the most rigid protection against removal of any discretionary reprieve. *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[24] *See* 8 C.F.R. § 274a.12(c) (establishing categories of aliens eligible to apply for employment authorization).

[25] *See, e.g.,* Ingrid V. Eagly, *Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement*, 88 N.Y.U. L. REV. 1126, 1217 (2013); Hiroshi Motomura, *What Is "Comprehensive Immigration Reform"? Taking the Long View*, 63 ARK. L. REV. 225, 226 (2010).

[26] Jennifer M. Chacon, *Producing Liminal Legality*, 92 DENV. UNIV. L. REV. 709, 713 (2015).

[27] David A. Martin, *Twilight Statuses: A Closer Examination of the Unauthorized Population*, 2 MIGRATION POLICY INST. 1, 7-8 (June 2005).

[28] *See* Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115 (2015).

[29] *See id.* at 1120 ("[I]n recent years, the United States has expanded the number of persons placed in nonstatus."). Two events, in particular, did much to increase the number of aliens receiving discretionary reprieves: the enactment of the TPS statute in 1990 and the implementation of the DACA program in 2012. *See* CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*, by Jill H. Wilson, at 11 (calculating that 436,866 people held TPS as of October 12, 2017); CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno, at 6 ("As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved."); *see also* U.S. Citizenship and Immigration Servs., *Number of Approved Employment Authorization Documents, by Classification and Basis for Eligibility, Oct. 1, 2012 – June 29, 2017* (2017) (providing statistics for employment authorization documents approved for recipients of deferred action, DACA, parole, and other types of discretionary reprieves), http://www.uscis.gov/sites/default/files/USCIS/Resources/ Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/eads-by-basis-for-eligibility.pdf [hereinafter USCIS EAD Data]. The Obama Administration's proposed Deferred Action for Parents of Americans (DAPA) initiative, which federal courts enjoined before implementation, had the potential to make approximately four million unlawfully present aliens eligible for discretionary reprieves. *See* Texas v. United States, 809 F.3d 134, 148 (5th Cir. (continued...)

however, as a result of changes in executive policy concerning DACA, TPS, and Deferred Enforced Departure (DED).[30]

This report provides an overview of discretionary reprieves from removal. It discusses the primary sources of authority on which discretionary reprieves are premised and describes, in general, the nature of the protections that they confer. The report concludes with a glossary of the principal types of discretionary reprieves.

# Sources of Executive Authority to Grant Discretionary Reprieves from Removal

The Executive's power to grant most of the existing forms of discretionary reprieves—including deferred action, DACA, and DED, among others—is typically attributed to its enforcement discretion: that is, its authority to determine the best method for enforcing federal immigration law.[31] This enforcement discretion includes the authority to prioritize some cases over others to conserve resources or avoid unjust results.[32] Criminal prosecutors in the United States possess a similar type of discretion.[33] They need not prosecute every crime of which they become aware, and their ability to set prosecution priorities that maximize the impact of their limited resources is considered fundamental to the American criminal justice system.[34] Drawing from this criminal law tradition, courts, immigration officials, and commentators often call the Executive's authority

---

(...continued)

2015) (affirming injunction against DAPA and observing that of "the approximately 11.3 million illegal aliens in the United States, 4.3 million would be eligible for [reprieves] pursuant to DAPA."), *aff'd by an equally divided Court*,—U.S.—, 136 S. Ct. 2271, 2272 (2016); Arpaio v. Obama, 797 F.3d 11, 18 n.1 (D.C. Cir. 2015) (similar estimate); *cf.* Randy Capps et. al., *Deferred Action For Unauthorized Immigrant Parents*, MIGRATION POLICY INST. 3 (Feb. 2016) (estimating that DAPA could have potentially reached "as many as 3.6 million unauthorized immigrants"), https://www.migrationpolicy.org/research/deferred-action-unauthorized-immigrant-parents-analysis-dapas-potential-effects-families.

[30] *See* CRS Legal Sidebar LSB10052, *UPDATE: The End of the Deferred Action for Childhood Arrivals Program: Some Immediate Takeaways*, by Hillel R. Smith; CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[31] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999); *Arpaio*, 797 F.3d at 16 ("The Secretary of Homeland Security is charged with the administration and enforcement of the immigration laws. With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (some internal quotation marks and citations omitted).

[32] Arizona v. United States, 567 U.S. 387, 396 (2012); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84.

[33] *See* United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey, at 11 ("The judicial branch has traditionally accorded federal prosecutors 'broad' latitude in making a range of investigatory and prosecutorial determinations, including when, against whom, and whether to prosecute particular criminal violations of federal law.").

[34] *See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 682 (2014) ("With limited resources and broad charging options, federal prosecutors must choose how to allocate investigative and prosecutorial resources; they must prioritize some offenses at the expense of others."); *cf.* LUIGI FERRAJOLI, LAW AND REASON 574 (1989) (categorizing prosecutorial discretion as an attribute of the Anglo-American system of accusatorial criminal justice that belongs to its historical tradition but not its theoretical framework, and noting that prosecutorial discretion does not form part of the civil law tradition).

to decline to seek removal of some unlawfully present aliens "prosecutorial discretion,"[35] even though removal proceedings are civil rather than criminal in nature.[36]

Enforcement discretion in the immigration context has unique attributes that distinguish it from prosecutorial discretion in the criminal context. The INA puts no general statute of limitations on removal.[37] Thus, the Executive's decision not to seek removal of an alien lacks the definitive quality of many decisions not to prosecute crimes, which become irreversible if an applicable statute of limitations expires.[38] Aliens present in violation of the INA remain removable indefinitely (unless they otherwise acquire a legal status), so an assurance that the Executive will not seek their removal at a particular juncture does not redress their long-term situation.[39] Further, perhaps as a consequence of this reality, a discretionary reprieve from removal differs from a decision not to prosecute a crime in that a discretionary reprieve from removal often carries a fixed term, which can typically be renewed.[40] DACA, for instance, carries a two-year renewable term.[41]

Over time, the Executive has employed its enforcement discretion to grant various types of reprieves under inconstant terminology. In 1974, John Lennon famously pursued a type of

---

[35] *See, e.g.,* Shoba Shivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243 (2010); DHS DACA Memo, *supra* note 14, at 1.

[36] *Arizona*, 567 U.S. at 396 (2012) ("Removal is a civil, not criminal, matter."); *cf.* Maureen A. Sweeney, *Fact or Fiction: The Legal Construction of Immigration Removal for Crimes*, 27 YALE J. ON REG. 47, 49 (2010) ("[C]ourts have consistently held that removal is not punishment for crime but is instead a remedial civil sanction and a collateral, rather than direct, consequence of a conviction. This theoretical characterization of removal developed many decades ago in the context of the very different immigration law that existed then. It no longer corresponds in any meaningful way to the realities of immigration law and enforcement . . . .").

[37] *See* Adams v. Holder, 692 F.3d 91, 104 (2d Cir. 2012) ("[T]he INA . . . specifically imposes no time limitations on removal proceedings."); Asika v. Ashcroft, 362 F.3d 264, 269 (4ᵗʰ Cir. 2004) ("[T]he provisions of the [INA] that govern deportation [do not] refer . . . to any time limitation on deportation at all."). Some grounds of deportation, however, apply only to conduct that occurs within a certain time after entry. *See* 8 U.S.C. § 1227(a)(1)(E)(i) ("Any alien who (prior to the date of entry, at the time of any entry, or *within 5 years of the date of any entry*) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.") (emphasis added); *id.* § 1227(a)(5) ("Any alien who, *within five years after the date of entry*, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.") (emphasis added); WEISSBRODT & DANIELSON, *supra* note 5, at 279-80 ("[N]on-citizens who become dependent on government benefits are removable only if they become a public charge within five years of entry . . . . Because there is no general statute of limitations, however, ICE can remove [such non-citizens] . . . *at any time*—even if [they] cease[] to be a public charge.") (emphasis in original). Also, one INA provision imposes a limitations period on actions to *rescind* a person's LPR status if he obtained it through adjustment despite being ineligible, 8 U.S.C. § 1256(a), but every federal appellate court to consider the issue, except one, has held that limitations period does not apply to removal proceedings. *See Adams*, 692 F.3d at 101-02, 102 n.6 (collecting cases and explaining that only the Third Circuit "has applied § 1256(a)'s five-year limitations period to removal proceedings based on alleged fraudulent procurement of adjustment of status").

[38] *See* United States v. Marion, 404 U.S. 307, 322 (1971) ("[Criminal] statutes [of limitation] . . . 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.") (quoting Public Schools v. Walker, 9 Wall. 282, 288 (1870)).

[39] *See* 8 U.S.C. § 1182(h)(6)(A)(i); *id.* § 1227(a)(1)(B); Andrew Tae-Hyun Kim, *Deportation Deadline*, 95 WASH. U.L. REV. 531, 550 (2017) (noting the lack of any limitations period in the INA and explaining that because "deferred action is not an affirmative grant of relief from removal . . . a change in administrative policy or priorities could change what was once a low-priority case to a high-priority one. All this heightens the level of uncertainty for undocumented immigrants.").

[40] *See, e.g.,* DHS DACA Memo, *supra* note 14, at 2 (authorizing "deferring action for a period of two years" for qualified aliens).

[41] *Id.*

reprieve called "nonpriority status," which his lawyer accused the Immigration and Naturalization Service (INS)[42] of keeping secret.[43] Soon thereafter, the INS adopted the term "deferred action,"[44] which DHS continues to use today for a reprieve from removal granted under its general enforcement discretion.[45] Immigration authorities have also, however, granted reprieves under the labels "Extended Voluntary Departure" (EVD), DED, and DACA.[46] In some instances, such as DACA, these labels denote a particular reprieve type's focus on a discrete group.[47] In other instances, such as with EVD and DED, the bureaucratic terminology seems to supply multiple labels for the same type of reprieve.[48] The criteria for granting the reprieves (other than the statutorily authorized reprieves discussed below) are generally set forth in agency manuals and policy memoranda,[49] although for some reprieve types it can be difficult to locate a controlling document.[50] Federal statute does not set the criteria for reprieves grounded in enforcement discretion; nor does a particular law supply explicit authorization for the Executive to grant such reprieves,[51] although scattered provisions of the INA reference deferred action and describe narrow categories of aliens as eligible to receive it.[52] In recent years, questions have arisen as to

---

[42] The INS was the agency with primary responsibility for enforcing the INA until March 1, 2003, when it ceased to exist and most of its functions were transferred to DHS under the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135. *See* Nijar v. Holder, 689 F.3d 1077, 1078-79 (9th Cir. 2012).

[43] Heeren, *supra* note 28, at 1134; Wadhia, *supra* note 35, at 246-47.

[44] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

[45] *See* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[46] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion."

[47] *See* DHS DACA Memo, *supra* note 14, at 2 (describing the DACA initiative as premised on "the exercise of [] prosecutorial discretion . . . [for] certain young people who were brought to this country as children and know only this country as home").

[48] *See* U.S. IMMIGRATION AND NATURALIZATION SERVS, ADJUDICATOR'S FIELD MANUAL, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .") [hereinafter USCIS AFM].

[49] *See, e.g., id.*; IMMIGRATION AND CUSTOMS ENFORCEMENT, DETENTION AND REMOVAL OPERATIONS POLICY AND PROCEDURE MANUAL, ch. 20.8 (concerning deferred action), https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf [hereinafter DROPPM].

[50] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action); Heeren, *supra* note 28, at 1134 (contending that the controlling legal authority for discretionary reprieves "is tenuous and sometimes even secret . . . DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda").

[51] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (quoting treatise for the proposition that deferred action is a "commendable exercise in administrative discretion [] developed without express statutory authorization"); Texas v. United States, 809 F.3d 134, 167 (5th Cir. 2015) (same); *see also* Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015) ("With [DHS's] enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)).

[52] *See* 8 USC § 1227(d)(2) (providing that the denial of an administrative stay of removal to applicants for T or U nonimmigrant status "shall not preclude the alien from applying for . . . deferred action"); REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (emphasis added) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for driver's licenses). At least two statutory provisions go so far as to state that specific groups of aliens are "eligible" for deferred action. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain self-petitioners for LPR status under the Violence Against Women Act are "eligible for deferred action and work authorization"); National Defense Authorization Act of 2004, P.L. 108-136, Div. A, Title VII, § 1703(c), 117 Stat. 1693 (codified at 8 U.S.C. § 1151 NOTE) (providing that the spouses and children of certain deceased U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); *see also* Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 413 (E.D.N.Y. 2018) (reasoning that "Congress has repeatedly ratified immigration officials' practice of according (continued...)

whether the Executive may lawfully use its enforcement discretion to provide reprieves in a programmatic fashion for large populations of aliens that meet specific criteria, instead of granting reprieves on a purely case-by-case basis.[53] The Supreme Court has yet to decide this issue.[54]

Although most types of discretionary reprieves from removal are grounded entirely in enforcement discretion, a few types have a statutory footing. First, the INA expressly gives DHS authority to grant immigration parole on a case-by-case basis to certain aliens,[55] providing legal permission for their physical presence in the United States without granting them admission (thereby leaving them "at the boundary line" of the United States for most immigration purposes).[56] DHS interprets its parole authority to encompass two types of discretionary grants of parole with implications for aliens whose presence violates the INA: parole-in-place and advance parole.[57] Second, the INA gives DHS authority to grant TPS relief to nationals from designated countries,[58] which resembles a discretionary reprieve in many respects but confers more rigid protection from removal than most reprieves because the bases for terminating TPS are statutorily limited.[59] Although TPS eligibility is not limited to unlawfully present aliens,[60] TPS may be particularly consequential for aliens who otherwise lack a legal foothold to remain in the United States.[61] Finally, the INA gives DHS and immigration courts authority to grant some types of discretionary reprieves in conjunction with the removal process, including voluntary departure,[62] stays of removal,[63] and orders of supervision.[64] (Other types of reprieves granted during removal proceedings, such as administrative closure, have a basis only in principles of executive discretion and docket management.)[65]

---

(...continued)

deferred action to certain aliens without lawful immigration status").

[53] *See* Texas v. United States, 809 F.3d 134, 179-82 (5th Cir. 2015) (reasoning that the Deferred Action for Parents of Americans (DAPA) reprieve program was "manifestly contrary to the INA" because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present . . . [and] [e]ntirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA")."), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016); *contra Batalla Vidal*, 279 F. Supp. 3d at 422 ("The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action.").

[54] *See* United States v. Texas, 136 S. Ct. 2271 (2016) (Mem.).

[55] 8 U.S.C. § 1182(d)(5).

[56] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[57] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole-in-place and advance parole).

[58] 8 U.S.C. § 1254a.

[59] *Id*. § 1254(c)(3); *see infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[60] *See* 8 U.S.C. § 1254(c)(1) (setting forth TPS eligibility standards).

[61] *See, e.g.,* Ramirez v. Brown, 852 F.3d 954, 958 (9th Cir. 2017) (concerning adjustment of status ramifications of a grant of TPS to an alien who entered without inspection).

[62] 8 U.S.C. § 1229c.

[63] *Id*. § 1229a(b)(5)(C); *id*. § 1231(c)(2).

[64] 8 U.S.C. § 1231(a)(3); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing voluntary departure, stays of removal, and orders of supervision).

[65] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing administrative closure).

# Nature of Protections for Recipients: In General

The principal benefit of a discretionary reprieve is the temporary assurance it provides to an unlawfully present alien that he or she does not face imminent removal, even though his or her presence in the United States violates the INA.[66] The nature of the Executive's ability to retract this assurance—and the resulting reliability of the assurance to the alien—varies by reprieve type. A grant of TPS to an individual alien, due to the applicable statutory parameters, is relatively difficult for DHS to withdraw during the grant's validity period.[67] In contrast, DHS asserts that it may terminate a grant of deferred action or DACA at its discretion,[68] although the Administrative Procedure Act and constitutional principles may require DHS to have an adequate justification for doing so.[69] No type of reprieve offers a bulwark against removal as rigid as the statutorily authorized presence that comes with LPR, refugee, and asylee status, whose holders can be removed only if they acquired their status unlawfully (e.g., through fraud) or if they engage in specified forms of misconduct.[70] Aliens present in violation of the INA who receive discretionary reprieves remain technically removable under the inadmissibility or deportability grounds of the INA, and, except in the case of TPS recipients, do not have a statutory defense against removal based on the reprieve itself.[71]

Discretionary reprieves also typically carry advantages beyond protection from removal, including eligibility to seek an employment authorization document (EAD) from DHS that allows aliens to work legally in the United States.[72] Perhaps most significantly, under DHS regulations, recipients of most types of reprieves are not considered "unlawfully present" within the United

---

[66] *See Reno*, 525 U.S. at 484.

[67] *See* 8 U.S.C. § 1254a(c)(3) (enumerating three bases for withdrawal of TPS); *infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[68] DROPPM, *supra* note 49, ch. 20.8(f) (concerning deferred action termination); U.S. Citizenship & Immigration Servs., *DHS DACA FAQs*, at Q27 (Apr. 25, 2017) ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."), https://www.uscis.gov/archive/frequently-asked-questions [hereinafter DHS DACA FAQs].

[69] *See infra* note 119 (collecting precedents concerning potential limitations on termination of individual DACA grants and rescission of the DACA program).

[70] *See* 8 U.S.C. § 1227 (enumerating specific grounds of deportability for admitted aliens, including certain criminal convictions); *id.* § 1158(c)(2) (governing termination of asylum); *cf.* Amanda Frost, *Independence and Immigration*, 89 S. CAL. L. REV. 485, 503 (2016) ("Congress has expanded the grounds on which even longtime lawful permanent residents can be deported. Today, even longtime lawful permanent residents can be deported for fairly minor criminal offenses . . . ."). Nonimmigrant aliens do not enjoy a level of protection from removal commensurate with LPRs, asylees, and refugees, because the Department of State has discretion to revoke a nonimmigrant visa "at any time," 8 U.S.C. § 1201(i), and revocation renders the visa holder removable. 8 U.S.C. § 1227(a)(1)(B) (providing for the removal of any alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)"); *see* Texas v. United States, 809 F.3d 134, 167 n.102 (5th Cir. 2015); Mier-Fiorito v. Mukasey, 282 Fed. Appx. 536, 538 (9th Cir. 2008) (unpublished) (holding that revocation of alien's nonimmigrant visa rendered him deportable).

[71] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *Id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, Amanda Frost, *Cooperative Enforcement in Immigration Law*, 103 IOWA L. REV. 1, 51 n.78 (2017) ("[D]eferred action does not provide any defense to removal and the executive has absolute discretion to revoke deferred action unilaterally . . . .") (internal quotation marks and citation omitted); *cf.* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (reasoning that DACA was "*specifically designed* for persons without lawful immigration status" but that DHS must supply a non-arbitrary or capricious reason for terminating a DACA grant).

[72] *See* 8 C.F.R. § 274a.12(c); *see also* REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for federal recognition of state-issued driver's licenses and other identification documents).

States.[73] This is because DHS has "authorized" the aliens' presence by granting them reprieves.[74] As a consequence, time spent in the United States on deferred action, TPS, and most other types of reprieves does not count toward the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission set forth in INA § 212(a)(9)(B)(i) (although a reprieve does not cure, for purposes of the bars, any unlawful presence already accumulated).[75] A discretionary reprieve may also trigger eligibility for certain benefits or programs for which "lawful presence" is a qualifying criterion, such as in-state university tuition under certain state laws.[76] More generally, even though state governments typically have broad discretion to deny state benefits to unlawfully present aliens, that discretion might be more limited in the event that such aliens are granted a discretionary reprieve from removal by the federal government.[77]

It is often said that discretionary reprieves do not confer lawful immigration status.[78] But "lawful immigration status" is an imprecise term. The INA uses variations of it in some places[79] but does not define it.[80] Although a determination that an alien lacks "lawful immigration status" triggers consequences under some INA provisions—most notably, a potential bar to adjustment of status[81]—it does little to describe the alien's legal condition in a formal sense. According to DHS

---

[73] Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (en banc); Texas v. United States, 809 F.3d 134, 147-48 (5th Cir. 2015) (explaining that deferred action recipients are "lawfully present" based on agency memoranda); *see also* 8 C.F.R. § 1.3(a)(4) (defining recipients of several types of reprieves as "lawfully present in the United States" for purposes of applying for social security benefits).

[74] *Arizona Dream Act Coal.*, 855 F.3d at 974.

[75] USCIS AFM, *supra* note 48, ch. 40.9(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence."). Aliens who are unlawfully present for more than 180 days but less than one year are, following departure from the country, barred from admission for three years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Aliens unlawfully present for more than a year are subject to a ten-year bar on admission to the United States following departure or removal from the country. *Id.* § 1182(a)(9)(B)(i)(II).

[76] *See, e.g.*, 8 U.S.C. § 1623 (prohibiting states from providing any "postsecondary education benefit" on the basis of state residency to aliens who are "not lawfully present," unless the same benefit is made available to U.S. citizens without regard to residency). Some have argued that a discretionary reprieve recipient's lack of unlawful presence does not mean that he or she possesses lawful presence for purposes of other statutes. *Arizona Dream Act Coal.*, 855 F.3d at 960 n.3 (Kozinski, J., dissent from denial of rehearing en banc) ("Even if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.").

[77] *See Arizona Dream Act Coal.*, 855 F.3d at 963 (rejecting as preempted by federal law a state policy that deemed individuals with employment authorization through DED and deferred action to be unlawfully present and denied them state-issued driver's licenses on that basis).

[78] *See* USCIS, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, http://www.uscis.gov/archive/ consideration-deferred-action-childhood-arrivals-daca ("Deferred action does not provide lawful status."); United States v. Arrieta, 862 F.3d 512, 516 (5th Cir. 2017) (holding that DACA recipients lack "lawful status").

[79] *E.g.*, 8 U.S.C. § 1254a(f)(4) (providing that a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for adjustment of status purposes); *id.* § 1644 ("[N]o State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

[80] Gazeli v. Sessions, 856 F.3d 1101, 1105 (6th Cir. 2017) ("[T]he INA does not define 'lawful immigration status' . . . ."); *see also* Tula Rubio v. Lynch, 787 F.3d 288, 293 (5th Cir. 2015) ("Although the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'") (quoting BLACK'S LAW DICTIONARY 1542 (10th ed. 2014)).

[81] *See* 8 U.S.C. § 1255(c)(2) (rendering some aliens who "fail to maintain continuously a lawful status" ineligible for adjustment of status).

regulations, TPS holders do not have "lawful status,"[82] even though they have a statutory protection against removal.[83] Nonimmigrants, however, indisputably possess lawful status,[84] but it can be revoked more easily than TPS.[85] Similarly, under the DHS definition, parole is a lawful status,[86] even though it, too, can be terminated at DHS's discretion.[87] Perhaps the only concrete legal meaning that can be attributed to the term "lawful immigration status" is that aliens who lack it—including those unlawfully present aliens who are granted discretionary reprieves—are removable under the inadmissibility or deportability grounds of the INA.[88]

When understood as a general concept rather than a formal legal term, however, "lawful immigration status" usefully describes the bundle of statutorily defined privileges and protections that come with the major statuses set forth in the INA (LPR, asylee, refugee, and nonimmigrant status).[89] To say that unlawfully present aliens who receive discretionary reprieves do not have lawful immigration status means, generally speaking, that they lack most such privileges and protections or possess them only as a matter of executive grace.[90] For example, aliens who receive discretionary reprieves generally cannot work legally unless DHS, in its discretion, authorizes them to do so (unlike LPRs, refugees, asylees, and some nonimmigrants);[91] they have no statutorily established prospects of remaining permanently in the United States (unlike LPRs, asylees, and refugees);[92] they are generally subject to removal by virtue of their presence within the United States alone (unlike all aliens with LPR, refugee, asylee, and unexpired nonimmigrant status);[93] they have no legal basis to facilitate the admission of immediate relatives into the United States (unlike LPRs, refugees and asylees in some circumstances, and some

---

[82] *See* 8 C.F.R. § 1245.1(d)(1) (omitting TPS from definition of "lawful immigration status"); Dep't of Homeland Security Office of Immigration Statistics, *supra* note 7, at 1 (classifying TPS holders as "unauthorized immigrants"); *see also* Heeren, *supra* note 28, at 1141 ("TPS meets most of the characteristics for nonstatus, although it is a close call."); *but cf.* United States v. Orellana, 405 F.3d 360, 370-71(5th Cir. 2005) (disagreeing with agency interpretations and holding that a TPS recipient is not an alien "illegally or unlawfully in the United States" for purposes of a statute criminalizing firearm possession by such aliens).

[83] *See* 8 U.S.C. § 1254a(c)(3).

[84] *See* 8 C.F.R. § 1245.1(d)(1)(ii).

[85] *See supra* note 70.

[86] 8 C.F.R. § 1245.1(d)(1)(v).

[87] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole).

[88] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility); *id.* § 1227(a)(1)(C) (deportability); *see* Judulang v. Holder, 565 U.S. 42, 46 (2011) ("[T]he immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses, for [removal]. One list specifies what kinds of crime render an alien excludable (or in the term the statute now uses, 'inadmissible'), while another—sometimes overlapping and sometimes divergent—list specifies what kinds of crime render an alien deportable from the country.") (citations omitted); *see also, e.g.,* Matter of Ventura, 25 I. & N. Dec. 391, 392 (BIA 2010) ("[A] grant of TPS does not affect an alien's admissibility or inadmissibility for purposes of the Immigration and Nationality Act generally.").

[89] *See* Heeren, *supra* note 28, at 1122-24 (citing dictionaries for the proposition that "status" denotes "high standing" and explaining the statutory benefits of LPR, refugee, asylee, and nonimmigrant status).

[90] *Id.* at 1129-30; *see* Matter of Blancas–Lara, 23 I. & N. Dec. 458, 460 (B.I.A.2002) ("'Status' is a term of art . . . [that] denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant.").

[91] 8 C.F.R. § 274a.12.

[92] *Compare* DHS DACA FAQs, *supra* note 68, at Q68 ("Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship."), *with* 8 U.S.C. § 1101(a)(20) (providing that LPRs are "accorded the privilege of residing permanently in the United States"), *and id.* § 1159 (providing for the adjustment of refugees and asylees to LPR status).

[93] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility of aliens who enter without inspection); *id.* § 1227(a)(1)(C) (deportability of visa overstays).

nonimmigrants);[94] they face considerable restrictions on eligibility for federal public benefits (particularly as compared with LPRs, refugees, and asylees);[95] and, unless DHS decides to grant them advance parole, they generally cannot travel abroad with any legal basis to request re-entry to the United States (unlike all aliens with one of the four major statuses, except some nonimmigrants).[96] Strictly speaking, it is not correct to say that discretionary reprieves bestow no statutorily defined protections: TPS recipients have a statutory defense against removal, and recipients of most discretionary reprieves garner some advantages grounded in statute by virtue of DHS's authorization of their presence.[97] Generally speaking, however, the legal situation of aliens granted discretionary reprieves from removal ranks so low along the spectrum of immigration categories as to not be considered "lawful immigration status" in common parlance (even though most reprieves vitiate unlawful presence).[98]

In summary, recipients of discretionary reprieves obtain a temporary assurance against removal that varies in reliability by reprieve type. Such aliens, in most cases, are not unlawfully present in the United States during the term of the reprieve. Such aliens do not, however, possess "lawful immigration status," in the narrow sense that they remain technically removable under the INA's inadmissibility or deportability provisions and in the more general sense that they do not enjoy most of the statutorily fixed protections that come with LPR, refugee, asylee, and nonimmigrant status.

# Glossary of Discretionary Reprieves

This glossary describes the principal types of discretionary reprieves from removal granted by DHS or the Attorney General.[99] The glossary is divided into three categories: (1) reprieves

---

[94] *Compare* DHS DACA Memo, *supra* note 14, at 2 (not mentioning relief for family members of DACA recipients); *with, e.g.,* 8 U.S.C. § 1153(a)(2) (allocating immigrant visas to the "[s]pouses and unmarried sons and unmarried daughters" of LPRs), *id.* § 1159(a) (providing for the adjustment to LPR status of the spouses and children of refugees), and *id.* § 1101(a)(H) (providing for the issuance of nonimmigrant visas to the spouses and minor children of H-1B specialty occupation workers).

[95] The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), P.L. 104-193, 110 Stat. 2105, limited eligibility for many federal public benefits to "qualified aliens." *See* 8 U.S.C. §§ 1611-1613; *see generally* CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview*, coordinated by Audrey Singer. "Qualified alien" is defined to cover specific categories of aliens, such as LPRs, refugees, and asylees, but does not cover most aliens who obtain discretionary reprieves, other than aliens granted parole for at least one year. *See* 8 U.S.C. § 1641(b).

[96] *Compare, e.g.,* 8 U.S.C. § 1254a(f)(3) (providing that TPS holders "may travel abroad with the prior consent of the Attorney General"), *with* 8 U.S.C. § 1187(a)(7) (requiring possession of valid visa in order to apply for admission to the United States). Some nonimmigrants who have expired visas but still possess unexpired nonimmigrant status may not be able to leave and return to the United States without obtaining a new visa. *See* 9 FAM 403.9-4(A) ("For example, an alien whose B-1 visa may expire a month after entry into the United States, could be admitted by a Department of Homeland Security (DHS) officer at a port of entry (POE) for a stay of up to one year.").

[97] *See supra* text at notes 72-76.

[98] *See supra* note 78; Heeren, *supra* note 28, at 1132-33 (arguing that "immigration law affords a continuum of rights and privileges" and that holders of discretionary reprieves "fall in the nebulous middle of this spectrum," beneath holders of lawful status).

[99] The Attorney General, through the immigration judges of the Executive Office for Immigration Review (EOIR), administers removal proceedings and has authority to grant some discretionary reprieves from removal in those proceedings. *See* 8 U.S.C. § 1101(b)(4) (defining "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under [8 U.S.C.] § 1229a [concerning removal proceedings]"); *see, e.g., infra* note 134 (discussing Attorney General authority to adjudicate TPS applications in removal proceedings); *infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing Attorney General authority to (continued...)

premised upon enforcement discretion or presidential foreign policy powers (i.e., reprieves granted without express statutory authorization); (2) reprieves premised upon statutory authorization; and (3) reprieves granted exclusively in contemplation of or in connection with the removal process. The categories overlap—most of the reprieves in category (3) have statutory foundations,[100] and the reprieves in categories (1) and (2) can be granted to aliens before or after the initiation of removal proceedings[101]—but are nonetheless useful in conceptualizing the array of discretionary reprieves from removal available under current law and executive policy.

For additional information, or for information about any type of discretionary reprieve not listed below, please contact the author.

## Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers

*Deferred Action*. DHS regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority."[102] Thus, the term serves as a generic label for a decision by DHS not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.[103] Some other types of discretionary reprieves, such as DACA, are forms of deferred action tailored to particular groups or circumstances.[104] By regulation, deferred action recipients qualify for work authorization if they show "an economic necessity for employment."[105] They are not considered unlawfully present for purposes of the three- and ten-year bars on admission to the United States that the INA imposes on aliens who depart the country after being unlawfully present for more than 180 days.[106] According to DHS employment authorization data, only a small number of people receive generic deferred action each year as opposed to DACA.[107] There does not appear to be one central, publicly available agency memorandum or policy document that governs the criteria and procedures for deferred

---

(...continued)

grant voluntary departure and stays of removal).

[100] *See, e.g.,* 8 U.S.C. § 1229c (voluntary departure); *id.* § 1231(a)(3) (orders of supervision).

[101] *See, e.g.,* DHS DACA Memo, *supra* note 14, at 2 (providing guidance on granting DACA to aliens in removal proceedings); 8 U.S.C. § 1229c(b)(5)(B) (requiring that TPS relief be available to aliens in removal proceedings).

[102] 8 C.F.R. § 274a.12(c)(14); *see also* USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative discretion in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority . . . . Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws.").

[103] *See id.*; Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999).

[104] *See* DHS DACA Memo, *supra* note 14, at 2 (describing DACA relief as "deferred action").

[105] 8 C.F.R. § 274a.12(c)(14).

[106] *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (establishing a three-year bar for unlawful presence for "a period of more than 180 days but less than 1 year" following departure); *id.* § 1182(a)(9)(B)(i)(II) (establishing a ten-year bar for unlawful presence "for one year or more" following departure or removal); *id.* § 1182(a)(9)(B)(ii) (exempting any "period of stay authorized" by the Secretary of Homeland Security (formerly the Attorney General) from the construction of "unlawful presence" for purposes of the three- and ten-year bars); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017) ("[D]eferred action recipients do not accrue 'unlawful presence' for purposes of calculating when they may seek admission to the United States."); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.").

[107] *See* USCIS EAD Data, *supra* note 29 (showing 8,769 employment authorization documents approved under generic deferred action in fiscal year 2017, as opposed to 360,389 approved under DACA).

action.[108] According to one agency manual, when DHS grants deferred action, it informs recipients so that they may seek employment authorization.[109] DHS apparently does not specify a particular time period for which a grant of generic deferred action is valid (unlike DACA), but DHS does periodically review each grant.[110] DHS claims authority to terminate a grant of deferred action at any time in its discretion.[111]

***Deferred Action for Childhood Arrivals (DACA).*** DACA is a type of deferred action for aliens present in violation of the INA who meet the following criteria:

- came to the United States under the age of sixteen;

- have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012;

- are in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans;

- have not been convicted of certain criminal offenses and do not pose a threat to national security or public safety; and

- were under the age of thirty-one on June 15, 2012.[112]

The Secretary of Homeland Security created DACA by memorandum in 2012.[113] As a result, DACA has clearer eligibility criteria and application procedures than generic deferred action.[114] A grant of DACA lasts two years, subject to renewal.[115] DACA generally confers the same collateral advantages as generic deferred action (eligibility for work authorization, no unlawful presence).[116] Also like generic deferred action, DHS claims authority to terminate a grant of

---

[108] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999) ("Prior to 1997, deferred-action decisions were governed by internal INS guidelines . . . . These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis."); *Compare* DROPPM, *supra* note 49, ch. 20.8 (concerning deferred action), *with* DHS Office of Inspector General, *ICE Deportation Operations*, at 8 (Apr. 17, 2017) ("Officials we interviewed said ICE considers the 2003 Detention and Removal Operations Policy and Procedure Manual (manual) 'the official guide' to operations, but ICE has not periodically reviewed the manual or revised it since 2008. For a time, ICE would affix a memo to the front of the appropriate chapter to indicate changes, rather than incorporate changes and issue a revised manual."), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf; *cf.* Memorandum from Secretary of Homeland Security John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action . . . .").

[109] DROPPM, *supra* note 49, ch. 20.8(c)(1).

[110] *Id.* ch. 20.8(e), (f).

[111] *Id.* ch. 20.8(f). As noted below, there is some authority for the proposition that principles of due process and administrative procedure restrict DHS's ability to terminate an individual DACA grant without good justification, and that proposition could arguably extend to generic deferred action as well. *See infra* note 119 (collecting cases concerning limits on termination of individual DACA grants); DHS DACA Memo, *supra* note 14, at 2-3 (describing DACA as conferring "deferred action" relief).

[112] DHS DACA Memo, *supra* note 14, at 1; *see generally* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno.

[113] *Id.*

[114] *See id*; *Consideration of Deferred Action for Childhood Arrivals*, *supra* note 78**Error! Hyperlink reference not valid.** (describing eligibility criteria and filing process).

[115] *Id.*

[116] *See* 8 C.F.R. § 274a.12(c)(14); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017).

DACA at its discretion,[117] although its internal Standard Operating Procedures (SOP) apparently set forth specific bases (such as fraud or criminal issues) for DACA termination.[118] There is ongoing litigation over whether the Administrative Procedure Act (APA) or the Constitution restricts DHS's ability to terminate an individual DACA grant without proper justification or in a manner that does not follow the SOP.[119] There is also ongoing litigation over the extent of DHS's authority to rescind the DACA program in its entirety. DHS announced plans to rescind the DACA program effective March 5, 2018,[120] but federal courts have enjoined the rescission in most respects on the ground that it is likely "arbitrary and capricious" under the APA.[121]

***Deferred Enforced Departure (DED)***. DHS describes DED as follows:

> [A] temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS [which is authorized by statute], DED emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis . . . . The President designates DED for nationals of a particular country through either an Executive Order or a Presidential Memorandum.[122]

DED resembles TPS in that it protects nationals of certain designated countries from removal, except that DED is rooted in inherent executive power rather than in statutory authority.[123] Eligibility criteria depend on the relevant presidential directive.[124] DED recipients are generally

---

[117] DHS DACA FAQs, *supra* note 68, at Q27 ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.").

[118] Dep't of Homeland Sec., DACA National Standard Operating Procedures, 132-34 (April 4, 2013); *see* Medina v. U.S. Dep't of Homeland Sec., No. C17-0218RSM, 2017 WL 5176720, at *3 (W.D. Wash. Nov. 8, 2017) ("The National Standard Operating Procedures . . . issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.").

[119] *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (holding that a DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa" likely violates the APA); *Medina*, 2017 WL 5176720 at *9 ("[T]he Court finds that Plaintiff has alleged a plausible claim that the government violated the APA because its conduct [in terminating his DACA grant without notice] was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures, and that claim may proceed."); Coyotl v. Kelly, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (granting preliminary injunction against the termination of an individual DACA grant on the ground DHS's "fail[ure] to present any evidence that they complied with their own administrative processes and procedures with regard to the termination" sufficed to show a likelihood of success on the claim that the termination violated the APA).

[120] Memorandum from U.S. Dep't of Homeland Sec., *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017).

[121] Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (holding that DHS's planned rescission of DACA program likely violates the APA because DHS based the rescission on an erroneous legal conclusion that DACA was unlawful); Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1037 (N.D. Cal. 2018) (same); *contra* Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("[T]he decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record."); *see* CRS Legal Sidebar LSB10057, *District Court Enjoins DACA Phase-Out: Explanation and Takeaways*, coordinated by Hillel R. Smith and Ben Harrington.

[122] USCIS AFM, *supra* note 48, ch. 38.2 (Deferred Enforced Departure).

[123] *See id*; Heeren, *supra* note 28, at 1131, 1140 ("Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations. TPS is similar to the [Extended Voluntary Departure] and DED programs after which it was modeled, but . . . there is a specific standard for TPS set out in the statute.").

[124] *See* Presidential Memorandum, *Deferred Enforced Departure for Liberians* (Sept. 28, 2016) (setting forth DED eligibility criteria for Liberian nationals); USCIS AFM, *supra* note 48, ch. 38.2(d) ("In general, eligibility requirements and ineligibility bars are set forth in the Presidential designation of DED for each specific group of aliens.").

eligible for work authorization.[125] They do not accrue unlawful presence during the period of DED.[126] According to USCIS, an individual cannot be removed while he or she possesses DED.[127] Agency materials do not make provision for the termination of an individual's DED grant.[128] Currently, Liberia is the only country designated for DED, but the Trump Administration has decided to terminate that designation effective March 31, 2019.[129]

***Extended Voluntary Departure (EVD).*** EVD was an earlier version of DED that fell mostly into disuse with the advent of DED in 1990,[130] although DHS apparently continues to grant EVD to a small number of aliens.[131] Under EVD, the Attorney General—rather than the President—designated countries for protection due to unstable conditions.[132]

***Nonpriority Status.*** Prior to 1975, immigration authorities used the term "nonpriority status" to describe the type of reprieve now labeled deferred action.[133]

## Generally Available Reprieves Granted Pursuant to Statutory Authority

***Temporary Protected Status (TPS).*** Section 244 of the INA authorizes DHS to grant TPS to aliens who are nationals of countries that the Secretary of Homeland Security has designated as

---

[125] USCIS AFM, *supra* note 48, ch. 38.2(b); 8 C.F.R. § 274a.12(a)(11).

[126] *See* 8 U.S.C. § 1182(a)(9)(B)(ii); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (rejecting state policy that deemed individuals with employment authorization through DED and deferred action as not "authorized to be present").

[127] U.S. CITIZENSHIP & IMMIGRATION SERVS, AFFIRMATIVE ASYLUM PROCEDURES MANUAL 37 (May 2016) ("DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED.").

[128] *See id*; DROPPM, *supra* note 49, ch. 20.10(c) ("Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired."). These agency materials do not clarify whether DHS claims authority to terminate an individual grant of DED by initiating removal proceedings—an authority that DHS claims with respect to other reprieve types. *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (describing DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa").

[129] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018).

[130] USCIS AFM, *supra* note 48, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .").

[131] Heeren, *supra* note 28, at 1138 (citing statistics obtained from DHS under the Freedom of Information Act for the proposition that the agency continued to grant "something it calls EVD to a small number of individuals" at least until 2014).

[132] *See* Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988) ("While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors."); Matter of Sosa Ventura, 25 I. & N. Dec. 391, 394 (BIA 2010) (noting that EVD "had existed for decades to address humanitarian concerns"); Matter of Medina, 19 I. & N. Dec. 734, 748 n.7 (BIA 1988) (defining EVD by explaining that "[t]hrough the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (e.g., Uganda, Ethiopia, Poland, Afghanistan).").

[133] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("'To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation . . . . This commendable exercise in administrative discretion . . . originally was known as nonpriority and is now designated as deferred action.'") (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03 [2][h] (1998)); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.[134] A country's initial TPS designation is valid for up to 18 months and may be extended for up to 18 months, in the Secretary of Homeland Security's discretion, with no limit on the number of extensions.[135] Some countries, such as Sudan and Nicaragua, have been designated for TPS since the late 1990s, although the Trump Administration recently announced its intention not to extend those designations or the designations of Haiti and El Salvador when they expire in late 2018 and 2019.[136]

To qualify for TPS, nationals of designated countries must have resided in the United States since a specified date (usually, a date around the onset of the destabilizing conditions) and must meet certain other requirements set forth in the INA.[137] An alien granted TPS qualifies for work authorization[138] and does not accrue unlawful presence for purposes of the three- and ten-year bars to admission.[139] TPS provides statutorily based protection from removal: an alien cannot be removed while enrolled, and DHS may only withdraw the protection from an individual alien for specified statutory reasons (such as failure to maintain continuous residence in the United States or failure to comply with a yearly registration requirement).[140] Significantly, some (but not all) courts have held that a grant of TPS satisfies the lawful entry requirement for adjustment of status under INA § 245(a), such that aliens who enter the country surreptitiously and then receive TPS may adjust to LPR status if they become eligible for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[141]

---

[134] 8 U.S.C. § 1254a. DHS's authority to grant TPS is not exclusive. An immigration judge has jurisdiction to consider a TPS application from an alien in removal proceedings if DHS denied the application in the first instance. Matter of Lopez Aldana, 25 I. & N. Dec. 49, 51 (BIA 2009). Immigration judges may also have authority to consider TPS applications in the first instance in "certain limited circumstances," *id.* at 51 n.1, but in practice it appears that DHS typically considers applications in the first instance even for aliens already in removal proceedings. *See Matter of Sosa Ventura*, 25 I. & N. Dec. at 392-93 (considering docket management powers of immigration judge where DHS grants TPS during removal proceedings).

[135] *Id.* § 1254a(b)(2),(3).

[136] See CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[137] 8 U.S.C. § 1254a(a)(5); *see, e.g.,* Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010) (designating Haiti for TPS because of an earthquake that occurred on January 12, 2010, and restricting eligibility to Haitian nationals "who have continuously resided in the United States since January 12, 2010"); Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001) (designating El Salvador for TPS because of earthquakes that occurred on January 13, February 13, and February 17, 2001, and restricting eligibility to nationals of El Salvador "who have 'continuously resided' in the United States since February 13, 2001").

[138] 8 U.S.C. § 1254a(a)(1)(B).

[139] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1)(F)(iii).

[140] 8 U.S.C. § 1254(c)(3); *cf.* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (holding that it was improper for immigration judge to terminate removal proceedings against alien who was granted TPS relief because "TPS only provides a temporary protection from removal," but that any removal order issued against the alien could not be executed during the period in which the alien had TPS relief).

[141] Ramirez v. Brown, 852 F.3d 954, 964 (9th Cir. 2017) (holding that "a TPS recipient is considered 'inspected and admitted' under [8 U.S.C.] § 1255(a)" and that an alien who entered surreptitiously before obtaining TPS was therefore eligible to adjust status on the basis of his marriage to a U.S. citizen); Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (same); *contra* Serrano v. Attorney General, 655 F.3d 1260, 1265 (11th Cir. 2011) (holding that a grant of TPS does not satisfy the lawful entry requirement of § 1255(a)). Time spent in TPS counts as time in lawful nonimmigrant status for adjustment of status purposes; the question that has divided the courts is whether TPS also satisfies the lawful entry requirement for adjustment of status purposes. *See* 8 U.S.C. § 1254a(f)(4) ("[F]or purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant"); *see Ramirez*, 852 F.3d at 957 ("Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid the [failure to (continued...)

***Parole.*** The INA authorizes DHS to "parole" inadmissible aliens into the United States, on a case-by-case basis, "for urgent humanitarian reasons or significant public benefit."[142] Paroled aliens are considered unadmitted for purposes of the INA despite their physical presence within the United States.[143] Parole offers little formal protection against removal: DHS typically grants parole for a fixed period[144] but has discretion to terminate the parole whenever it determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[145] Paroled aliens may obtain work authorization[146] and do not accrue unlawful presence while the parole remains valid.[147] DHS interprets its parole authority to include two types of discretionary grants of parole potentially relevant to aliens present in the United States in violation of the INA:

> ***Parole in place.*** Although the parole power generally applies to aliens seeking to enter the country, DHS claims the authority to grant parole to aliens who are physically present in the United States following surreptitious entry.[148] DHS calls this exercise of the parole power "parole in place" and, as a matter of policy, appears to reserve it primarily for the immediate relatives of certain members of the U.S. Armed Forces.[149] Parole in place removes significant legal obstacles to an unlawfully present alien's ability to obtain LPR status without leaving the United States, if the alien qualifies for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[150]

> ***Advance Parole.*** Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already

---

(...continued)

maintain lawful status] bar under § 1255(c)(2) but also to meet the 'inspected and admitted or paroled' requirement in § 1255(a).").

[142] 8 U.S.C. § 1182(d)(5); *see* 8 C.F.R. § 212.5 (DHS regulation implementing statutory parole authority and identifying circumstances in which granting parole "would generally be justified").

[143] 8 U.S.C. § 1182(d)(5) ("[P]arole . . . shall not be regarded as an admission of the alien . . . .").

[144] *See, e.g.*, Reganit v. Sec'y, Dep't of Homeland Sec., 814 F.3d 1253, 1255 (11th Cir. 2016) (addressing case in which alien was granted parole for one month); Chaudhry v. Holder, 705 F.3d 289, 293 (7th Cir. 2013) (addressing case in which alien was granted parole for one year).

[145] 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . ."); 8 C.F.R. § 212.5(e)(2)(i) ("[W]hen in the opinion of [specified] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated . . . ."); Hassan v. Chertoff, 593 F.3d 785, 789 (9th Cir. 2010) ("The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.").

[146] 8 C.F.R. § 274a.12(c)(11) (with narrow exceptions, enabling parolees to apply for employment authorization).

[147] 8 U.S.C. § 1182(a)(9)(B)(ii); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1) ("An alien does not accrue unlawful presence . . . if he or she has been inspected and paroled into the United States and the parole is still in effect.").

[148] *See* U.S. Citizenship & Immigration Servs., Policy Memorandum, *Parole of Spouses, Children, and Parents of Active Duty Members of the U.S. Armed Forces*, at 2 (Nov. 13, 2013) ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.").

[149] *Id.* at 3 ("[P]arole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.").

[150] *See* 8 U.S.C. § 1255(a) (rendering aliens who were not "inspected and admitted *or paroled*" ineligible for adjustment of status); *see generally*, Margaret D. Stock, *Parole in Place and Other Immigration Benefits for Military Family Members: An Update*, 16-02 Immigr. Briefings 1 (2016).

---

approved, so as to facilitate their re-entry.[151] Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).[152]

# Reprieves Granted Exclusively in Connection with the Removal Process

*Administrative Closure*. When Immigration and Customs Enforcement (ICE, a component of DHS responsible for interior enforcement) decides to discontinue temporarily a removal proceeding against a particular alien before the Department of Justice's Executive Office of Immigration Review (EOIR)—because ICE deems the case low-priority, because the alien has obtained or is seeking a form of discretionary relief such as DACA, or for some other reason—ICE may ask the presiding immigration judge to place the proceeding in a status called "administrative closure."[153] An immigration judge may also place removal proceedings in administrative closure upon the alien's motion and over the government's objection, although this course of events may be less common.[154] The effect of administrative closure is to suspend but not terminate the removal proceeding.[155] As such, administrative closure offers little formal protection from removal: the alien cannot be removed while the proceedings are suspended, but ICE can move to re-activate the proceedings at any time and will likely succeed in doing so if the alien is not in the midst of pursuing independent protections from removal outside of immigration court.[156] Furthermore, administrative closure does not itself confer any additional rights or

---

[151] *See* 8 C.F.R. § 212.5(f) ("Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."); Ibragimov v. Gonzales, 476 F.3d 125, 132 (2d Cir. 2007) ("'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry . . . . Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f) . . . .").

[152] *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 274a.12(c)(11).

[153] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012) ("Administrative closure, which is available to an Immigration Judge and the Board [of Immigration Appeals], is used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket. In general, administrative closure may be appropriate to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time.").

[154] *Id*. at 694-96 (holding that government consent to administrative closure is not required, but listing "the basis for any opposition" as a factor to consider when evaluating a closure motion and noting that the government may immediately appeal an administrative closure granted over its objection); *see also* Kristin Bohman, Avetisyan*'s Limited Improvements Within the Overburdened Immigration Court System*, 85 U. COLO. L. REV. 189, 201 (2014) ("*Avetisyan* provides that immigration judges can override an objection if they find that administrative closure is in the best interests of the immigrant and if there will be some palpable final resolution to the case in the near future.").

[155] *Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order . . . . In this way, administrative closure differs from termination of proceedings, where the Immigration Judge or the Board issues a final order, which constitutes a conclusion of the proceedings and which, in the absence of a successful appeal of that decision or a motion, would require the DHS to file another charging document to initiate new proceedings.").

[156] *See id*. ("[A]t any time after a case has been administratively closed, the DHS may move to recalendar it before the Immigration Judge or reinstate the appeal before the Board . . . ."); Matter of W-Y-U-, 27 I. & N. Dec. 17, 20 (BIA 2017) ("[T]he primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits."); Matter of Pascual, No. A086-963-266, 2012 WL 1705592, at *2 (BIA Apr. 30, 2012) (unpublished) ("Immigration Judges and the Board lack the authority to decide matters of prosecutorial discretion or to decide for humanitarian reasons whether an order of removal should be entered or is in the national interest . . . . If DHS is denied its request to recalendar proceedings after action on the case has been deferred for a period of time, particularly when DHS is not contributing to any delay in resolving any petition, collateral matter or (continued...)

protections, such as work authorization or lawful presence.[157] However, administrative closure is often granted in conjunction with other discretionary reprieves that do provide additional protections.[158] For example, an alien whose removal case is placed in administrative closure may also have enrolled in DACA, which confers eligibility for work authorization and vitiates unlawful presence.[159]

***Voluntary Departure***. The INA authorizes grants of a brief discretionary reprieve called "voluntary departure" for aliens who agree to leave the United States at their own expense either before or prior to the conclusion of removal proceedings.[160] For aliens not yet in removal proceedings, DHS may grant a voluntary departure period of 120 days or less.[161] For aliens in removal proceedings, either DHS or the immigration judge may grant voluntary departure[162] for a maximum period of 120 days.[163] At the conclusion of removal proceedings, the immigration judge alone may grant voluntary departure for a maximum of 60 days.[164] Voluntary departure does not confer eligibility for work authorization[165] but does suspend the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission following the alien's departure or removal from the United States.[166] Aliens who fail to leave the country within the voluntary departure period are subject to a fine and become ineligible to receive, for a period of ten years, adjustment of status, cancellation of removal, and certain other forms of relief from removal.[167]

---

(...continued)

other action that formed the basis for the administrative closure, the denial of the motion could undermine DHS's ability to enforce the immigration laws.").

[157] *See* 8 C.F.R. § 274a.12 (not listing administrative closure among bases for eligibility for work authorization); Amelia Wilson et. al., *Addressing All Heads of the Hydra: Reframing Safeguards for Mentally Impaired Detainees in Immigration Removal Proceedings*, 39 N.Y.U. REV. L. & SOC. CHANGE 313, 365 (2015) (explaining, based on agency practice and guidance, that administrative closure "does not confer any legal status or give rise to an independent basis to seek work authorization").

[158] *See* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (concluding that immigration judges may properly grant administrative closure in cases where aliens have received temporary forms of protections such as TPS).

[159] *See* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office of Immigration Review, Dep't of Justice, on Continuances and Administrative Closure (March 7, 2013) (encouraging immigration courts to grant administrative closure where the respondent in removal proceedings has received DACA).

[160] 8 U.S.C. § 1229c.

[161] *Id*. § 1229c(a)(2)(A).

[162] 8 C.F.R. § 240.25(d); *id*. § 1240.26(b)(1).

[163] 8 U.S.C. § 1229c(a)(1), (2)(A).

[164] *Id*. § 1229c(b)(2); 8 C.F.R. § 1240.26(c).

[165] *See* 8 C.F.R. § 274a.14(a)(iii) (providing that a grant of voluntary departure automatically terminates any employment authorization). Regulations also use the term "voluntary departure" for the relief from removal granted under the statutorily created (and now largely obsolete) Family Unity Program to spouses and children of aliens who legalized under the Immigration Reform and Control Act. 8 C.F.R. § 236.15 (implementing § 301 of the Immigration Act of 1990, 104 Stat. 4978, and authorizing "voluntary departure" for up to two years). Such aliens do qualify for work authorization. *Id*. § 236.15(d), § 274a.12(a)(13). Despite the overlapping terminology, the Family Unity Program, on the one hand, and voluntary departure under § 1229b, on the other hand, are separate and distinct forms of relief. *Compare id*. § 236.15 (governing voluntary departure under the Family Unity Program), *with id*. § 240.25 (governing voluntary departure under 8 U.S.C. § 1229b).

[166] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(H) ("Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure."); 9 FAM 302.11-3(B)(1)(b)(3).

[167] 8 U.S.C. § 1229c(d)(1).

**Stay of Removal.** DHS, an immigration judge, or the Board of Immigration Appeals[168] may stay a final order of removal against an alien to allow him or her to pursue relief or in light of practical or humanitarian considerations.[169] A stay of removal does not confer eligibility for work authorization under DHS regulations,[170] but an order of supervision—which often accompanies a stay—does confer such eligibility in some circumstances.[171] Unlawful presence does not accrue during a stay of removal for purposes of the three- and ten-year bars on admission.[172]

**Order of Supervision** (OSUP). If DHS does not remove an alien within ninety days of the date that a removal order becomes final—either because DHS cannot identify an appropriate destination country or because of practical or public interest-related considerations—in most cases DHS places the alien under an "order of supervision."[173] An OSUP requires the alien to check in periodically with DHS and may impose other restrictions.[174] DHS regulations provide for the grant of work authorization to aliens present pursuant to OSUPs—subject, however, to criteria stricter than those that govern work authorization for other types of discretionary reprieves.[175] An OSUP does not, by itself, suspend the accumulation of unlawful presence for purposes of the three- and ten year bars on admission.[176] At least one federal court has held that due process principles restrict the reasons and the manner in which DHS may revoke an OSUP.[177]

# Author Contact Information

Ben Harrington
Legislative Attorney
pharrington@crs.loc.gov, 7-8433

---

[168] The Board of Immigration Appeals (BIA) within EOIR, has administrative appellate jurisdiction over various matters decided by immigration judges in removal and other proceedings. 8 C.F.R. § 1003.1(b).

[169] *Id.* § 241.6 (DHS authority); *id.* § 1003.6 (BIA authority); *id.* § 1003.23(b)(1)(v) (immigration judge authority). A few provisions of the INA that concern discrete motions for relief or specific categories of aliens directly authorize or mandate stays of removal. *See* 8 U.S.C. § 1227(d)(2) (authorizing stays of removal for applicants for T or U nonimmigrant status); *id.* § 1229a(b)(5)(C) (providing for an automatic stay upon the filing of certain motions challenging *in absentia* removal orders); *id.* § 1231(c)(2) (authorizing stays of removal of aliens arriving at ports of entry).

[170] *See* 8 C.F.R. § 274a.12 (not listing stays of removal as a basis for granting work authorization).

[171] *Id.* § 274a.12(c)(18); *see* 8 U.S.C. § 1231(c)(3) (providing an alien who has been granted a stay of removal may be released from detention pursuant to "conditions [that the Secretary of Homeland Security] may prescribe"); Heeren, *supra* note 28, at 1147 (explaining that individuals who receive stays of removal "typically" receive orders of supervision).

[172] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(I).

[173] *See* 8 U.S.C. § 1231(a)(3) (authorizing supervision after 90-day period); 8 C.F.R. § 241.5(a) (order of supervision).

[174] 8 C.F.R. § 241.5(a).

[175] *See* 8 C.F.R. § 274a.12(c)(18).

[176] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(6) ("Unless protected by some other provision . . . an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision . . . .").

[177] Ragbir v. Sessions, No. 18-CV-236 (KBF), 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018).

# DEF-INTERV.

# EX. 300

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE DIVISION

3   - - - - - - - - - - - - - - - - - - - - - - - - - x

4   STATE OF TEXAS, et al,

5                                   Plaintiffs,

6                   -against-

7   UNITED STATES OF AMERICA, et al,

8                                   Defendants.

9   - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Case No.  1:14-cv-00254

11

12                      26 Federal Plaza
                        New York, New York
13

14                      June 19, 2018
                        1:00 p.m.
15

16          DEPOSITION of STATE OF TEXAS BY THE

17  WITNESS KENNETH PALINKAS, a Plaintiff herein, held

18  at the above place and time pursuant to Subpoena,

19  taken before Ephraim Jacobson, a shorthand

20  reporter and Notary Public within and for the

21  State of New York.

22

23

24

25

**Transcripts**

📄 Jun 19, 2018 Palinkas, Kenneth (6_19_2018)

**Page:** 40

```
1                    PALINKAS
2          Q.    Tell me the facts that support your
3   statement that USCIS management has over assigned
4   the workload for ISOs adjudicating DACA?
5          A.    When I was council president, I spoke to
6   people that worked at the service centers that
7   were tasked with adjudicating the DACA
8   applications, and the vast majority informed me
9   that they weren't necessarily aware of how many
10  were being done, but that there were a lot being
11  assigned, and they told me basically that the
12  application itself is kind of bare bone, and since
13  there's no interview, that they were being -- a
14  vast majority were being approved, extremely vast
15  majority.   I think like 95 percent were being
16  approved.   Very few were being denied.   That sends
17  off a red light.
18          Q.    I definitely understand, and I know that
19  that that is in that first paragraph, and we will
20  talk about that part of it.   But I wanted to try
21  to understand each element of what you were saying
22  here.
23          A.    Right.
24          Q.    So so do you have any specific facts
25  tied to the idea that work is over assigned to
```

**Page:** 41

```
1                    PALINKAS
2   adjudicators' indicators?
3          A.    I think the numbers that they were
4   coming up with demonstrate that.   Again, I don't
5   have that in front of me, the hard numbers, but
6   when I was told what they were back in 2012 I
7   think they started rolling it out, it seemed that
8   that was quite a high number.
9          Q.    When you say "that was quite a high
10  number," do you mean the number of approvals
11  relative to applications?
12          A.    No, just the number -- the number of
13  applications was again, there was so many that
14  were not denied.   So they were just being
15  processed into the computer based on the numbers
16  that I was presented.
17          Q.    Would it be fair to say then that your
18  statement about working over assigned for DACA
19  adjudicators is based on the overall number of
20  applications that were being processed?
21          A.    That's what I based it on, correct.
22          Q.    Would it also be fair to say that it's
23  the overall number of applications that are being
```

24  **processed that provide the basis for your**
25  **statement that USCIS management has not provide**

```
 1                         PALINKAS

 2                        CERTIFICATE

 3            I, Ephraim Jacobson, a shorthand

 4    reporter and Notary Public within and for the

 5    State of New York do hereby certify:

 6            That the witness whose testimony is

 7    hereinbefore set forth was duly sworn by me, and

 8    the foregoing transcript is a true and accurate

 9    record of the testimony given by such witness to

10    the best of my ability.

11            I further certify that I am not related

12    to any of the parties to this action by blood or

13    marriage, and that I am in no way interested in

14    the outcome of this matter.

15

16

17                          _____

18                          Ephraim Jacobson

19

20

21

22

23

24

25
```

# DEF-INTERV.

# EX. 301

| Approximate Active DACA Recipients: Country of Birth As of May 31, 2018 | |
|---|---|
| **Country of Birth** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Mexico | 560,020 |
| El Salvador | 26,550 |
| Guatemala | 18,150 |
| Honduras | 16,680 |
| Peru | 7,260 |
| Korea, South | 7,180 |
| Brazil | 5,810 |
| Ecuador | 5,400 |
| Colombia | 4,940 |
| Argentina | 3,920 |
| Philippines | 3,820 |
| Jamaica | 2,590 |
| India | 2,590 |
| Venezuela | 2,430 |
| Dominican Republic | 2,330 |
| Uruguay | 1,950 |
| Trinidad And Tobago | 1,870 |
| Bolivia | 1,670 |
| Costa Rica | 1,570 |
| Chile | 1,400 |
| Nicaragua | 1,400 |
| Poland | 1,380 |
| Pakistan | 1,310 |
| Nigeria | 1,030 |
| Guyana | 970 |
| Belize | 830 |
| Canada | 740 |
| Indonesia | 710 |
| China | 690 |
| Kenya | 690 |
| United Kingdom | 500 |
| Portugal | 500 |
| Bangladesh | 470 |
| Mongolia | 470 |
| Ghana | 470 |
| Panama | 430 |
| Israel | 350 |
| Italy | 350 |
| Bahamas, The | 300 |
| Saint Lucia | 270 |
| Albania | 250 |
| Taiwan | 240 |
| Jordan | 230 |
| Turkey | 220 |

| | |
|---|---|
| Germany | 220 |
| Paraguay | 210 |
| Thailand | 200 |
| Saudi Arabia | 190 |
| Zambia | 190 |
| South Africa | 190 |
| Hong Kong | 180 |
| Egypt | 170 |
| United Arab Emirates | 170 |
| Armenia | 170 |
| Lithuania | 160 |
| France | 160 |
| Malaysia | 160 |
| Haiti | 150 |
| Ukraine | 150 |
| Senegal | 150 |
| Russia | 140 |
| Guinea | 140 |
| Grenada | 130 |
| Saint Vincent And The Grenadines | 130 |
| Cameroon | 130 |
| Japan | 130 |
| Sri Lanka | 130 |
| Côte D'Ivoire | 130 |
| Morocco | 120 |
| Zimbabwe | 120 |
| Gambia, The | 120 |
| Liberia | 120 |
| Suriname | 120 |
| Spain | 110 |
| Lebanon | 110 |
| Greece | 110 |
| Romania | 100 |
| Barbados | 100 |
| Sierra Leone | 100 |
| Czech Republic | 90 |
| Dominica | 90 |
| Fiji | 90 |
| Hungary | 90 |
| Malawi | 80 |
| Antigua And Barbuda | 80 |
| Tanzania | 80 |
| New Zealand | 80 |
| Bulgaria | 70 |
| Macedonia | 70 |
| Nepal | 60 |
| Uganda | 60 |
| Cabo Verde | 60 |
| Kuwait | 60 |
| Iran | 60 |
| Netherlands | 60 |

| | |
|---|---|
| Tonga | 60 |
| Montenegro | 60 |
| Angola | 50 |
| Australia | 50 |
| Mali | 50 |
| Slovakia | 40 |
| Democratic Republic Of Congo | 40 |
| North Vietnam | 40 |
| Uzbekistan | 40 |
| Singapore | 40 |
| Qatar | 40 |
| Yemen | 40 |
| Cambodia | 40 |
| Ethiopia | 30 |
| Togo | 30 |
| Virgin Islands, British | 30 |
| Serbia | 30 |
| Turks And Caicos Islands | 30 |
| Estonia | 30 |
| Saint Kitts And Nevis | 30 |
| Sweden | 30 |
| Yugoslavia | 30 |
| Samoa | 30 |
| Belgium | 30 |
| Syria | 30 |
| Bahrain | 30 |
| Congo | 30 |
| Austria | 20 |
| Gabon | 20 |
| Ireland | 20 |
| Vietnam | 20 |
| Botswana | 20 |
| Cayman Islands | 20 |
| Western Samoa | 20 |
| Netherlands Antilles | 20 |
| Belarus | 20 |
| Bermuda | 20 |
| Kosovo | 20 |
| Algeria | 10 |
| Georgia | 10 |
| Laos | 10 |
| Latvia | 10 |
| Switzerland | 10 |
| Ussr | 10 |
| Benin | 10 |
| Croatia | 10 |
| Denmark | 10 |
| Libya | 10 |
| Burkina Faso | 10 |
| Burundi | 10 |
| French Guiana | 10 |

| | |
|---|---|
| Guadeloupe | 10 |
| Oman | 10 |
| Azerbaijan | 10 |
| Iraq | 10 |
| Kazakhstan | 10 |
| Montserrat | 10 |
| Afghanistan | 10 |
| Moldova | 10 |
| Namibia | 10 |
| Niger | 10 |
| Macau | D |
| Madagascar | D |
| Slovenia | D |
| Central African Republic | D |
| Kyrgyzstan | D |
| Norway | D |
| Somalia | D |
| Cyprus | D |
| Lesotho | D |
| Aruba | D |
| Bosnia And Herzegovina | D |
| Mauritius | D |
| Rwanda | D |
| Brunei | D |
| Chad | D |
| Luxembourg | D |
| Tunisia | D |
| Cuba | D |
| Mauritania | D |
| Mozambique | D |
| Sudan | D |
| Tuvalu | D |
| Zaire | D |
| Bhutan | D |
| Eritrea | D |
| Micronesia, Federated States Of | D |
| Palau | D |
| Tajikistan | D |
| Turkmenistan | D |
| Anguilla | D |
| Burma | D |
| Guinea-Bissau | D |
| Malta | D |
| Marshall Islands | D |
| Mayotte | D |
| Papua New Guinea | D |
| Swaziland | D |
| Andorra | D |
| British Virgin Islands | D |
| Equatorial Guinea | D |
| Finland | D |

| | |
|---|---|
| French Polynesia | D |
| Germany, West | D |
| Iceland | D |
| Kiribati | D |
| Korea, North | D |
| Martinique | D |
| Monaco | D |
| New Caledonia | D |
| Palestine | D |
| Not available | 1,400 |

1) *The report reflects the most up-to-date data available at the time the report is generated.*

2) *The active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

3) *Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

4) *Totals may not sum due to rounding.*

5) *Countries with fewer than 10 active DACA recipients are notated with the letter "D."*

6) *Not available means the data is not available in the electronic systems.*

| Approximate Active DACA Recipients: State or Territory of Residence As of May 31, 2018 | |
| --- | --- |
| **State or Territory of Residence** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| California | 201,350 |
| Texas | 115,700 |
| Illinois | 37,170 |
| New York | 32,200 |
| Florida | 27,250 |
| Arizona | 26,260 |
| North Carolina | 25,660 |
| Georgia | 22,150 |
| New Jersey | 18,070 |
| Washington | 17,140 |
| Colorado | 15,880 |
| Nevada | 12,790 |
| Virginia | 10,430 |
| Oregon | 10,410 |
| Indiana | 9,500 |
| Utah | 9,160 |
| Maryland | 8,530 |
| Tennessee | 8,110 |
| Wisconsin | 7,090 |
| Oklahoma | 6,550 |
| New Mexico | 6,300 |
| Kansas | 6,110 |
| South Carolina | 6,090 |
| Massachusetts | 6,070 |
| Minnesota | 5,680 |
| Michigan | 5,640 |
| Pennsylvania | 4,860 |
| Arkansas | 4,790 |
| Alabama | 4,170 |
| Ohio | 4,050 |
| Connecticut | 4,000 |
| Missouri | 3,210 |
| Nebraska | 3,140 |
| Idaho | 2,930 |
| Kentucky | 2,890 |
| Iowa | 2,600 |
| Louisiana | 1,910 |
| Mississippi | 1,430 |
| Delaware | 1,360 |
| Rhode Island | 980 |
| District Of Columbia | 640 |
| Wyoming | 560 |
| Hawaii | 350 |
| New Hampshire | 280 |

| | |
|---|---|
| South Dakota | 210 |
| West Virginia | 120 |
| North Dakota | 110 |
| Puerto Rico | 90 |
| Montana | 80 |
| Alaska | 70 |
| Maine | 40 |
| Virgin Islands | 40 |
| Vermont | 20 |
| Guam | 20 |
| Northern Mariana Islands | D |
| Armed Forces Americas (except Canada) | D |
| Armed Forces Pacific | D |
| American Samoa | D |
| Armed Forces Africa, Canada, Europe, Middle East | D |
| Federated States Of Micronesia | D |

1) *The report reflects the most up-to-date data available at the time the report is generated.*

2) *The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

3) *Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

4) *Totals may not sum due to rounding.*

5) *States/Territories with fewer than 10 active DACA recipients are notated with the letter "D."*

| Approximate Active DACA Recipients: Core Based Statistical Area As of May 31, 2018 | |
|---|---|
| **Core Based Statistical Area** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Los Angeles-Long Beach-Anaheim, CA | 89,120 |
| New York-Newark-Jersey City, NY-NJ-PA | 46,830 |
| Dallas-Fort Worth-Arlington, TX | 37,900 |
| Chicago-Naperville-Elgin, IL-IN-WI | 35,440 |
| Houston-The Woodlands-Sugar Land, TX | 35,440 |
| Riverside-San Bernardino-Ontario, CA | 24,230 |
| Phoenix-Mesa-Scottsdale, AZ | 22,650 |
| Atlanta-Sandy Springs-Roswell, GA | 15,620 |
| San Francisco-Oakland-Hayward, CA | 15,080 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 13,440 |
| San Diego-Carlsbad, CA | 11,470 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 10,970 |
| Las Vegas-Henderson-Paradise, NV | 10,240 |
| Denver-Aurora-Lakewood, CO | 10,040 |
| San Jose-Sunnyvale-Santa Clara, CA | 9,440 |
| McAllen-Edinburg-Mission, TX | 7,780 |
| Seattle-Tacoma-Bellevue, WA | 7,670 |
| Austin-Round Rock, TX | 7,660 |
| Portland-Vancouver-Hillsboro, OR-WA | 6,060 |
| Charlotte-Concord-Gastonia, NC-SC | 6,040 |
| Sacramento--Roseville--Arden-Arcade, CA | 5,950 |
| San Antonio-New Braunfels, TX | 5,500 |
| Fresno, CA | 5,260 |
| Bakersfield, CA | 5,180 |
| Salt Lake City, UT | 4,900 |
| Boston-Cambridge-Newton, MA-NH | 4,670 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 4,640 |
| Minneapolis-St. Paul-Bloomington, MN-WI | 4,450 |
| Oxnard-Thousand Oaks-Ventura, CA | 4,180 |
| Indianapolis-Carmel-Anderson, IN | 4,110 |
| Raleigh, NC | 3,860 |
| Visalia-Porterville, CA | 3,750 |
| Kansas City, MO-KS | 3,740 |
| Stockton-Lodi, CA | 3,590 |
| Nashville-Davidson--Murfreesboro--Franklin, TN | 3,420 |
| Tampa-St. Petersburg-Clearwater, FL | 3,290 |
| Santa Maria-Santa Barbara, CA | 3,170 |
| Salinas, CA | 3,140 |
| Modesto, CA | 3,070 |
| Oklahoma City, OK | 3,000 |
| Albuquerque, NM | 2,930 |
| Orlando-Kissimmee-Sanford, FL | 2,880 |
| Milwaukee-Waukesha-West Allis, WI | 2,860 |
| Santa Rosa, CA | 2,630 |

| | |
|---|---|
| Detroit-Warren-Dearborn, MI | 2,440 |
| Winston-Salem, NC | 2,330 |
| Brownsville-Harlingen, TX | 2,290 |
| Baltimore-Columbia-Towson, MD | 2,270 |
| Tucson, AZ | 2,210 |
| Salem, OR | 2,180 |
| Yakima, WA | 2,120 |
| Greensboro-High Point, NC | 2,070 |
| Bridgeport-Stamford-Norwalk, CT | 2,060 |
| Tulsa, OK | 1,970 |
| Merced, CA | 1,950 |
| Kennewick-Richland, WA | 1,950 |
| Durham-Chapel Hill, NC | 1,930 |
| Memphis, TN-MS-AR | 1,910 |
| Columbus, OH | 1,890 |
| Fayetteville-Springdale-Rogers, AR-MO | 1,830 |
| El Paso, TX | 1,770 |
| Reno, NV | 1,770 |
| Provo-Orem, UT | 1,750 |
| North Port-Sarasota-Bradenton, FL | 1,610 |
| Vallejo-Fairfield, CA | 1,610 |
| Cape Coral-Fort Myers, FL | 1,540 |
| Omaha-Council Bluffs, NE-IA | 1,540 |
| Grand Rapids-Wyoming, MI | 1,500 |
| Birmingham-Hoover, AL | 1,450 |
| Gainesville, GA | 1,430 |
| Santa Cruz-Watsonville, CA | 1,430 |
| Greenville-Anderson-Mauldin, SC | 1,410 |
| Ogden-Clearfield, UT | 1,390 |
| Laredo, TX | 1,360 |
| Providence-Warwick, RI-MA | 1,340 |
| Wichita, KS | 1,300 |
| Boise City, ID | 1,240 |
| Lakeland-Winter Haven, FL | 1,230 |
| Elkhart-Goshen, IN | 1,210 |
| Richmond, VA | 1,150 |
| Naples-Immokalee-Marco Island, FL | 1,150 |
| Louisville/Jefferson County, KY-IN | 1,080 |
| New Haven-Milford, CT | 1,080 |
| Des Moines-West Des Moines, IA | 1,040 |
| Cincinnati, OH-KY-IN | 1,030 |
| Greeley, CO | 1,030 |
| Madera, CA | 1,030 |
| St. Louis, MO-IL | 1,010 |
| Other CBSA | 97,100 |
| Non CBSA | 15,800 |
| Not available | 1,260 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

4)  *Core Based Statistical Areas (CBSA) at the time of most recent application. CBSAs are defined by the Office of Management and Budget.*

5)  *CBSA with less than 1,000 individuals are included in Other CBSA.*

6)  *Not available means the data is not available in the electronic systems.*

7)  *Totals may not sum due to rounding.*

| Approximate Active DACA Recipients: Gender As of May 31, 2018 ||
| --- | --- |
| **Sex** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Female | 369,480 |
| Male | 332,700 |
| Not available | 70 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems*

| Approximate Active DACA Recipients: Age Group As of May 31, 2018 ||
| --- | --- |
| **Age as of 4/30/18** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Under 16 | 2,030 |
| 16-20 | 183,310 |
| 26-30 | 172,880 |
| 31-36 | 86,880 |
| 21-25 | 257,140 |
| Not available | D |
| Average Age | 24.2 |
| Median Age | 24 |
| Interquartile Range | 20 to 28 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity at as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems.*

| Approximate Active DACA Recipients: Marital Status As of May 31, 2018 ||
| --- | --- |
| **Marital Status** | **Number (rounded)** |
| **Grand Total** | **702,250** |
| Single | 569,330 |
| Married | 121,780 |
| Divorced | 8,820 |
| Widowed | 270 |
| Not available | 2,050 |

*1) The report reflects the most up-to-date data available at the time the report is generated.*

*2) The Active DACA population are individuals who have an approved I-821D with validity as of May 31, 2018.*

*3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.*

*4) Totals may not sum due to rounding.*

*5) Not available means the data is not available in the electronic systems.*

# DEF-INTERV.

# EX. 302

2009 WL 10669445
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, Austin Division.

ALL ACCESS TODAY, L.P., Plaintiff,

v.

ADERRA INCORPORATED, Defendant.

CAUSE NO. A-08-CA-498 LY
|
Signed 07/07/2009

**Attorneys and Law Firms**

Jeffery Robert Johnson, Reed & Scardino LLP, Lawrence
A. Waks, Jackson Walker, L.L.P., Austin, TX, for
Plaintiff.

John Karl Buche, Buche & Associates, PC, La Jolla, CA,
Randall S.D. Jacobs, Bienstock & Michael, P.C., New
York, NY, for Defendant.

**INTERIM REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

ROBERT PITMAN, UNITED STATES
MAGISTRATE JUDGE

**\*1 TO: THE HONORABLE LEE YEAKEL UNITED
STATES DISTRICT JUDGE**
Before the Court are Defendant's Motion & Application
for Preliminary Injunction and Request for Oral Hearing,
filed January 23, 2009 (Clerk's Dkt. #38); Plaintiff
All Access Today's Response to Aderra Incorporated's
Application for Preliminary Injunction, filed February
16, 2009 (Clerk's Dkt. #45); Plaintiff's Motion to
Strike the Declaration of Edward J. Donnelly in
Support of Aderra's Motion for a Preliminary Injunction,
filed March 4, 2009 (Clerk's Dkt. #58); Defendant's
Reply Declaration in Support of Preliminary Injunction
Against AAT, filed March 10, 2009 (Clerk's Dkt.
#63); Opposition of Defendant Aderra Incorporated to
Plaintiff's Motion to Strike the Declaration of Edward
J. Donnelly in Support of Aderra's Motion for a
Preliminary Injunction, filed March 11, 2009 (Clerk's
Dkt. #66); Plaintiff's Motion to Preserve Confidentiality
Designations, filed March 23, 2009 (Clerk's Dkt. #71);

Defendant's Opposition to Plaintiff's Motion to Preserve
"Attorneys' Eyes Only" Designations, filed March 30,
2009 (Clerk's Dkt. #75); and Plaintiff's Reply to
Defendant's Memorandum in Opposition to Motion to
Preserve Confidentiality Designations, filed April 13,
2009 (Clerk's Dkt. #76). The Magistrate Court submits
this Report and Recommendation to the United States
District Court pursuant to 28 U.S.C. § 636(b) and Rule
1(h) of Appendix C of the Local Court Rules of the United
States District Court for the Western District of Texas,
Local Rules for the Assignment of Duties to United States
Magistrate Judges.

## I. BACKGROUND

Plaintiff All Access Today (Plaintiff) initiated this suit
on June 27, 2008 against Defendant Aderra Incorporated
(Defendant) and Aderra UK, LTD (Aderra UK). Plaintiff
is a limited partnership, established in 2004, that provides
services for musicians. [1] Defendant also provides services
to musicians and is a business that began in January of
2007 as a d/b/a of Motherboard, L.L.C. [2] and became
and independent corporation in April of 2007. [3] Plaintiff
raised several causes of action primarily arising out of the
alleged improper use of Plaintiff's trademark "Live in a
Flash" (the Mark).

[1]   (Declaration of Chris Guggenheim ¶ 3, Clerk's Dkt.
#52 (Guggenheim Decl.))

[2]   (Declaration of Edward J. Donnelly in Support
of Aderra's Motion for a Preliminary Injunction,
Donnelly Declaration ¶ 15, Clerk's Dkt. #38
(Donnelly Decl.))

[3]   (*Id.* ¶ 45.)

Defendant and Aderra UK moved to dismiss the action
for lack of personal jurisdiction. [4] Following a report
and recommendation from this Court, [5] Judge Yeakel
denied the motion in part and granted the motion in
part, removing Aderra UK from the litigation for lack of
personal jurisdiction on October 28, 2008. [6]

[4]   (Clerk's Dkt. #7.)

[5]   (Clerk's Dkt. #27.)

2009 WL 10669445

6 (Clerk's Dkt. #28.)

Defendant filed its answer and nineteen counterclaims on November 18, 2008. 7 The counterclaims are based, in part, on Defendant's assertion that it is the true owner of the Mark as well as several other phrases that share key words with the Mark. It appears that both Plaintiff and Defendant use the Mark and related phrases in association with recordings of events that are transferred to USB devices and sold immediately following the events. 8 For a time, Plaintiff and Defendant operated together under a joint venture agreement (JV Agreement). 9

7 (Clerk's Dkt. #30.)

8 (Donnelly Decl. ¶ 12; Guggenheim Decl. ¶ 10.)

9 (Donnelly Decl. ¶ 41; Guggenheim Decl. ¶ 25.)

## II. CURRENT MOTIONS

*2 Premised on its counterclaims, Defendant requests that the Court enter a preliminary injunction to prohibit Plaintiff from:

> unfairly competing with [Defendant], from selling, advertising or any other use of [Defendant's] Mark and name, selling or advertising Re-Recordable USB Media Services and Re-Recordable USB Media products using [Defendant's] Technology and Proprietary Information, from using any infringing trademarks on such products or in connection with such services, from any future use by [Plaintiff] of [Defendant's] trademarks and copyrighted materials on websites and on promotional literature and protect [Defendant's] 50% interest in the profits of the joint venture which have been concealed and converted by [Plaintiff]. 10

Defendant's motion for preliminary injunction is based, in large part, on the Declaration by Edward J. Donnelly

(Donnelly). Donnelly is the founder, president and principal stockholder of the Defendant. 11

10 (Clerk's Dkt. # 38 at 38-39.)

11 (Donnelly Decl. ¶ 2.)

In addition to filing a response, Plaintiff also brings a motion to strike portions of Donnelly's declaration. As part of its response, Plaintiff submitted a declaration from Chris Guggenheim (Guggenheim) as well as numerous supporting documentation. Guggenheim is the chief executive officer of the Plaintiff. 12 The declaration was filed separately 13 and significant portions of it are sealed, marked confidential and/or marked attorneys' eyes only, as permitted by the protective order in place in this case. 14

12 (Guggenheim Decl. ¶ 2.)

13 (*See* attachments to Clerk's Dkt. #53.)

14 (Clerk's Dkt. #51.)

Defendant replied to Plaintiff's response to Defendant's motion for preliminary injunction by filing a declaration by Defendant's attorney. In it, Defendant's attorney objects to the confidentiality designations made by Plaintiff. 15 As a response to Defendant's objections, Plaintiff moves to preserve the confidentiality designations.

15 (Clerk's Dkt. #63.)

## III. ANALYSIS

A preliminary injunction is an extraordinary remedy that the Court may only impose where the party requesting the injunction demonstrates (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction would not disserve the public interest. *Winter v. NRDC, Inc.*, —— U.S. ——, 129 S. Ct. 365, 374 (2008); *Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). To be successful, the party requesting the injunction must clearly carry the burden of persuasion on each of the four factors. *Southern Co. v. Dauben, Inc.*, No. 08-10248, 2009 U.S. App. LEXIS 7993

2009 WL 10669445

at *11 (5th Cir. April 15, 2009). If a party fails to carry its burden on one factor, then the injunction must be denied. *Id.* The party resisting an injunction may assert that a claim is defeated by an affirmative defense, in which case, the party asserting the defense has the burden of proving its success. *Conan Properties, Inc. v. Conans Pizza*, 752 F.2d 145, 152 (5th Cir. 1985).

**\*3** Defendant asserts that it is entitled to a preliminary injunction based on the following counterclaims: (1) unfair competition and false designations of origin in violation of 15 U.S.C. § 1125; (2) palming-off and misappropriation of confidential information; (3) false advertising in violation of 15 U.S.C. § 1125(a); (4) common law unjust enrichment; (5) breach of fiduciary relationship, breach of non-disclosure agreement, breach of "a relationship of trust & confidence," and civil conspiracy; (6) constructive trust; (7) dilution under Texas law; (8) tortious interference with existing business relations and prospective contracts; and (9) copyright infringement.

### A. Failure to Make Clear Showing of Irreparable Injury

Defendant must show that there is a substantial threat of irreparable injury if the injunction is not issued. *Winter v. NRDC, Inc.*, 129 S. Ct. at 374-75; *Paulsson*, 529 F.3d at 309. The mere possibility of an irreparable injury is not sufficient. *Winter*, 129 S. Ct. at 375 (" 'possibility' standard is too lenient.") Instead, Defendant must prove that irreparable injury is *likely* in the absence of a preliminary injunction. *Id.* The focus is not on the magnitude of the harm, but on its irreparability. *Id.* The party seeking injunctive relief, faces a heavy burden of clearly establishing irreparable harm. *Id.*

### 1. Lack of Presumption of Irreparable Harm

Defendant asserts that it is entitled to a presumption of irreparable injury for its claim of trademark infringement because it has demonstrated that consumer confusion is likely. [16] However, the Fifth Circuit explicitly stated in *Paulsson* that it has refused to adopt this position. 529 F.3d at 312-13. In fact, the Fifth Circuit stated that, in light of the United States Supreme Court decision in *eBay v. MercExchange*, the presumption of irreparable injury in a trademark case is "a difficult question." *Id.* at 313 (citing *eBay v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837 (2006)).

[16]        (Clerk's Dkt. #38 at 21.)

Guided by the Fifth Circuit's decision in *Paulsson*, an independent inquiry of the four preliminary injunction factors must be done, even in trademark infringement suits, to determine whether there is irreparable injury.

Absent a presumption of harm, Defendant states that it will suffer irreparable harm through:

> (1) loss of market share; (2) because it is unclear whether [Plaintiff has] the financial wherewithal to pay monetary damages; (3) because monetary damages would require additional expense ... (4) that the goodwill of [Plaintiff's] duplicate trademark will dilute the value of [Defendant's] Mark; and (5) that the use of confusingly similar marks by [Plaintiff] will harm [Defendant's] reputation—which money may never correct. [17]

[17]        (*Id.* at 22.)

After conducting an independent inquiry, the undersigned concludes that Defendant has failed to prove that it would suffer an irreparable injury if the injunction were not imposed.

### 2. Delay in Requesting Injunction Disproves Irreparable Injury

It is difficult to determine that an injury is irreparable if there is a significant delay between a party's request for a preliminary injunction and its discovery of the facts that form the basis for its request. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975); *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F. Supp. 2d 608, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.")

**\*4** Donnelly, the founder, president, principal stockholder and representative of the corporate Defendant requesting the injunction, states that he

2009 WL 10669445

learned in June 2007 that Defendant's name had been removed from some of the technical systems used to create the USB drives.[18] Also in the summer of 2007, Guggenheim informed Donnelly that it planned to begin selling recordings on USB drives under the name "Live in a Flash."[19] Donnelly did not object.[20] Additionally, Donnelly states that in January 2008, Plaintiff created and used banners with the mark "Live in a Flash" on them.[21] Donnelly emphasis that Plaintiff took this action – "*without any authorization to use the Mark by [Defendant].*"[22] At this time, Donnelly states that Defendant's "intent to steal had become manifest."[23] At the end of January 2008, Donnelly claims he was "threatened" by an employee of Plaintiff who demanded software without Defendant's alleged Mark.[24] In February 2008, Donnelly noticed an article in Billboard Magazine where "*Guggenheim was quoted therein as saying that [Plaintiff] created the USB media for MB20 and Ringo Starr without any mention of [Defendant].*"[25]

[18]    (Donnelly Decl. ¶ 62.)

[19]    (Guggenheim Decl. ¶ 46.)

[20]    (*Id.*)

[21]    (Donnelly Decl. ¶ 108.)

[22]    (*Id.*, emphasis in original.)

[23]    (*Id.* ¶ 111.)

[24]    (*Id.* ¶ 114.)

[25]    (*Id.* ¶ 119, emphasis in original.)

Despite Defendant's repeated and continued concerns about the actions of Plaintiff, despite Defendant's allegations of months of threats, stolen technology, misidentification of product origin, and the "manifest" intent of Plaintiff to steal, Defendant took no legal action. Plaintiff, not Defendant, initiated this suit in June 2008.[26] Although Defendant requested injunctive relief in its counterclaims, filed in November 2008,[27] Defendant did not file this motion for a preliminary injunction until January of 2009. Defendant's request for the extraordinary remedy of injunctive relief was filed some time between twelve and eighteen months after the allegedly improper actions were first identified. Defendant's inaction of a year or more, coupled with

Defendant's decision to wait to request an injunction until after being sued by Plaintiff leads the undersigned to conclude that Defendant would not suffer an irreparable injury absent an injunction.

[26]    (Clerk's Dkt. #1.)

[27]    (Clerk's Dkt. #29, 30.)

Courts which have considered far shorter delays have concluded that the delay demonstrates a lack of irreparable injury. *See, e.g., Rimkus Consulting Group v. Cammarata,* 255 F.R.D. 417, 438 (S.D. Tex. 2008) (no irreparable injury due to delay of one year); *Symetra Life Ins. v. Rapid Settlements,* No. H-05-3167, 2007 U.S. Dist. LEXIS 52234 at *39-40 (S.D. Tex. July 19, 2007) (thirteen month delay, no irreparable injury); *Wireless Agents, v. T-Mobile,* 82 U.S.P.Q.2D (BNA) 1779, No. 3:05-CV-0094-D. 2006 U.S. Dist. LEXIS 36590 *13-15 (N.D. Tex. June 6, 2006) (one year delay, no irreparable injury); *P&G v. Ultreo, Inc.,* 574 F. Supp. 2d 339, 354 (S.D. N.Y. 2008) (six month delay, no irreparable injury); *Gorman v. Coogan,* 273 F. Supp. 2d 131, 134-35 (D. Me. 2003) (one year delay, no irreparable injury); *J&J Snack Foods v. Nestle USA,* 149 F. Supp. 2d 136, 158 (D.N.J. 2001) (eight month delay, no irreparable injury); *Kusan v. Alpha Distribs.,* 693 F. Supp. 1372, 1375 (D. Conn. 1988) (seven month delay, no irreparable injury); *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir. 1985) (ten week delay, no irreparable injury). *See also, GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984) (commenting that delay in requesting injunctive relief demonstrates "no sense of urgency" by the moving party); *Sci. Weight Loss v. United States Med. Care,* No. CV 08-2852 PSG (FFMx), 2008 U.S. Dist. LEXIS 84454 at *17 (C.D. Cal. Oct. 6, 2008) (motion to continue filed by moving party, no irreparable injury).

A significant delay, on its own, provides an independent reason for finding there is no irreparable injury. *See Tough Traveler v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995) ("delay alone may justify a denial of a preliminary injunction"); *Adventure Plus Enters. v. Gold Suit, Inc.,* No. 3-06-CV-2032-BD, 2008 U.S. Dist. LEXIS 27220 at *3 (N.D. Tex. Apr. 2, 2008) (eighteen month delay, no irreparable injury, injunction denied solely for that reason); *Amicus Communications, L.P. v. Hewlett-Packard Co., Inc.,* No. SA-98-CA-1176-PMA, 1999 WL 495921 at *17-19 (W.D. Tex. June 11, 1999) (concluding no irreparable injury solely based on delay).

**\*5** The undersigned concludes that there is no irreparable injury due to the considerable amount of time that passed between Donnelly's discovery of the allegedly improper conduct and Defendant's application for a preliminary injunction. Given Defendant's inability to demonstrate irreparable harm, his application for a preliminary injunction should be denied.

## IV. ADDITIONAL PENDING MOTIONS

### A. Motion to Strike

Plaintiff seeks to strike portions of Donnelly's declaration that Plaintiff claims are not based on personal knowledge and are improper statements of opinion.[28] The undersigned did not rely on any of the challenged portions of Donnelly's declaration in reaching the recommendation above. Accordingly, Plaintiff's motion to strike portions of Donnelly's declaration is dismissed.

[28]    (Clerk's Dkt. #58)

### B. Motion to Preserve Confidentiality Designations

Several portions of Guggenheim's declaration and attached exhibits are sealed and/or designated as "attorneys' eyes only." Under the protective order in place in this suit, parties are permitted to designate information as "Confidential" or "For Counsel Only" or "Attorneys' Eyes Only."[29]

[29]    (Clerk's Dkt. #51.)

In lieu of a proper reply to its motion for preliminary injunction, Defendant's counsel filed a reply declaration.[30] He objected to the confidentiality designations of Guggenheim's declaration and attached exhibits. Under the protective order, if a party disagrees with the opposing party's confidentiality designation of a document, they must object in writing.[31] Within fourteen days of receiving an objection, the party that produced the confidential information must file a motion with the Court to preserve the confidentiality designations.[32]

[30]    (Clerk's Dkt. #63.)

[31]    (Clerk's Dkt. #51. at ¶ 9.)

[32]    (*Id.*)

As provided in the protective order, Plaintiff moved the Court to preserve its confidentiality designations.[33] Plaintiff insists that the information it sealed and marked "attorneys' eyes only" is sensitive and contains trade secrets, financial and customer information. Defendant's counsel insists that he must be permitted to show these confidential portions to Donnelly in order to properly reply to Guggenheim's factual assertions.

[33]    (Clerk's Dkt. #71.)

The undersigned did not rely on any of the confidential portions of Guggenheim's declaration in reaching the recommendation above. The undersigned concluded that the injunction should be denied due to Defendant's delay in seeking it. The facts in support of this conclusion are primarily drawn from Donnelly's declaration, not Guggenheim's, and there is no reason to show the confidential portions of the declaration to Donnelly. Therefore, Defendant has proffered no compelling reason to disturb the confidentiality designations adopted by Plaintiff at this time.

Accordingly, the undersigned overrules Defendant's objections to Plaintiff's confidentiality designations and grants Plaintiff's motion to preserve its confidentiality designations.

## V. RECOMMENDATION AND ORDERS

In accordance with the statements above, the undersigned **RECOMMENDS** that the District Court **DENY** Defendant's Motion & Application for Preliminary Injunction and Request for Oral Hearing, filed January 23, 2009 (Clerk's Dkt. #38).

**IT IS ORDERED** that Plaintiff's Motion to Strike the Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, filed March 4, 2009 (Clerk's Dkt. #58) is **DISMISSED**;

**\*6 IT IS FURTHER ORDERED** that the objections contained in Defendant's Reply Declaration in Support of Preliminary Injunction Against AAT, filed March 10, 2009 (Clerk's Dkt. #63) are **OVERRULED**;

2009 WL 10669445

**IT IS FINALLY ORDERED** that Plaintiff's Motion to Preserve Confidentiality Designations, filed March 23, 2009 (Clerk's Dkt. #71) is **GRANTED**.

## VI. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**All Citations**

Slip Copy, 2009 WL 10669445

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 303

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 63 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

1999 WL 495921
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, San Antonio Division.

AMICUS COMMUNICATIONS, L.P., Plaintiff,
v.
HEWLETT–PACKARD CO., INC., Defendant.

No. CIV.A.SA–98CA1176PMA.
|
June 11, 1999.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW AND ORDER

MATHY, Magistrate J.

**\*1** Pursuant to the consent of the parties filed on May 17 and May 18, 1999,[1] the Court enters the following Findings of Fact and Conclusions of Law and Order in connection with the May 17 and May 27, 1999 hearings on plaintiff's motion for issuance of a preliminary injunction.

[1]    Docket nos. 37 and 38.

### I. JURISDICTION

The Court has jurisdiction over the trademark infringement claims. 28 U.S.C. §§ 1331, 1332, 1338(a); 15 U.S.C. § 1121. The Court has supplemental jurisdiction over plaintiff's state law claim of dilution. 28 U.S.C. § 1367.

### II. PROCEDURAL HISTORY

This case concerns claims of alleged trademark infringement and dilution. On December 23, 1998, plaintiff, Amicus Communications, L.P. (hereinafter "plaintiff" or "Amicus" or "ACLP") filed its lawsuit under 5 U.S.C. §§ 1114 and 1125, Tex.Bus. & Com.Code § 16.29 and the common law. Plaintiff asserts that defendant, Hewlett–Packard Co., Inc. (hereinafter "defendant" or "Hewlett–Packard" or "HP") uses the product name "PAVILION" in order to produce, market

and sell its line of personal computers which feature software and design features to ease access to the internet and thereby infringes and dilutes plaintiff's federally registered trademark PAVILION®.[2] Plaintiff uses the PAVILION® mark in association with its provision of on-line communication services to affinity groups over the internet.[3] Plaintiff claims defendant's alleged illegal use of the PAVILION® mark has resulted in damages and a likelihood of further damage and injury through declining sales, loss of good will and profits, and plaintiff's loss of control over its own mark by reverse confusion.[4] Pursuant to its verified original complaint, plaintiff seeks preliminary and permanent injunctive relief and damages.[5] The defendant filed its answer on February 1, 1999.[6] The Court entered a Scheduling Order on February 5, 1999.[7]

[2]    Docket no. 1 at 1, 16–19.

[3]    *Id.* at 5.

[4]    *Id.* at 17.

[5]    *Id.* at 19–20.

[6]    Docket no. 4.

[7]    Docket no. 5.

On March 23, 1999 plaintiff filed its motion for issuance of a preliminary injunction.[8] In brief, plaintiff argues in its motion that it is entitled to an injunction to prevent defendant from using the name PAVILION during the course of this lawsuit and an expedited evidentiary hearing because of the existence of disputed fact issues in the case.[9] Plaintiff contends that defendant's use of the brand name PAVILION on personal computer systems designed to facilitate internet access infringes upon plaintiff's federally registered trademark protecting its right to use PAVILION® in conjunction with "providing ... affinity groups access to" the internet.[10] In response, defendant argues, in brief, that plaintiff's "emergency" motion for preliminary injunction is unfounded because plaintiff has been aware of sales of defendant's PAVILION brand multimedia home computers at least since September 1995 but waited more than three years before asking for an injunction.[11] Under these circumstances, defendant argues, preliminary relief should be refused on the ground that the delay in seeking it undercuts any credible claim

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 64 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

of irreparable injury. [12] Further, defendant claims there is no likelihood of confusion supporting a presumption of irreparable harm.

[8]     Docket no. 10.

[9]     Docket no. 11 at 3–4.

[10]    Docket no. 11 at 5 and Exhibit 4.

[11]    Docket no. 12 at 1.

[12]    *Id.* at 4.

**\*2** After the filing of the motion for preliminary injunction, the parties were asked to confer to attempt to reach an agreement as to the schedule to apply to the disposition of the motion by the Court. On April 1, 1999 the parties filed simultaneous advisories as to their negotiations and respective recommendations as to the scheduling of the motion for preliminary injunction. [13] On April 6, 1999 [14] the Court entered an Order which established a briefing schedule on the motion for preliminary injunction and set the hearing for Monday, May 17, 1999. [15] On April 28, 1999 defendant filed a motion which asked the Court to amend the April 6, 1999 scheduling order. [16] The Court declined to modify that scheduling order in any respect other than to provide that if the in-court testimony of witnesses was required, that such testimony would not occur until May 24, 1999. [17]

[13]    Docket nos. 11 and 12.

[14]    This case initially was referred to Magistrate Court for pretrial matters on January 21, 1999 (docket no. 2). The referral order expressly did not refer motions for temporary, preliminary or permanent injunctive relief. The District Court entered an order specially referring the motion for preliminary injunction on April 6, 1999 (docket no. 13). Later, the parties consented.

[15]    Docket no. 14. This Order summarizes some of the key differences between the parties as to whether the motion for preliminary injunction should be joined with the merits of the case, whether a hearing should be held on the motion, the scope of the hearing, and the briefing schedule.

[16]    Docket no. 18.

[17]    Docket no. 20.

On May 17, 1999 the Court held a hearing on plaintiffs' motion for preliminary injunction. Prior to the hearing, each side filed affidavits, declarations, deposition excerpts and briefs. [18] At the hearing, the Court heard arguments from the parties as to their respective positions on the propriety of preliminary injunctive relief. Following the hearing, the Court entered a schedule to govern the parties' respective submission of additional matters to the Court and, with the concurrence of the parties, provided that any hearing to consider plaintiff's testimony regarding, most particularly, likelihood of confusion would be held on Thursday, May 27, 1999, following the Court's review of the evidentiary submissions of the parties.

[18]    Many of these items, as well as certain of the exhibits introduced into evidence at the May 27, 1999 hearing, were sealed pursuant to the confidentiality agreement between the parties as enforced by the protective order of the Court (docket no. 32). The protective order as well as the inherent authority of the Court allows the Court to order disclosure beyond the terms of the protective order (*see* docket no. 32 ¶ ¶ 7, 10 and 13). The Court concludes that the instant Order need not be sealed indefinitely because the confidential information herein has been referred to in unsealed court proceedings and/or because the Court considers such references to be necessary for proper documentation of the findings and conclusions. Nevertheless, this Order shall be temporarily sealed only for seven (7) days following filing so that the parties may have the opportunity to address redaction with the Court by submitting a proposed redacted Order within that period.

On May 27, 1999 the Court held an evidentiary hearing. Two witnesses, Bernard Lane and Dennis Passovoy, testified for plaintiff. The parties agreed to confer regarding testimony from a third witness and, on June 7, 1999, plaintiff tendered the deposition testimony of Dr. Joseph Picken. [19] Defendant elected to call no witnesses.

[19]    May 27, 1999 hearing, Plaintiff's Exhibits 34 and 35.

### III. ISSUE

Has plaintiff satisfied its burden of proving entitlement to a preliminary injunction to prevent defendant from

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 65 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

infringing and diluting use of the PAVILION® mark during the pendency of this lawsuit?

## IV. DISCUSSION: FINDINGS OF FACT; CONCLUSIONS OF LAW

A. *Preliminary Injunction Standards*

In this Circuit, the test for entitlement to a preliminary injunction has four parts. A preliminary injunction may be granted *only* if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. [20] A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. [21] These four elements are mixed questions of law and fact. [22]

[20]     *See e.g., Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Commission,* 123 F.3d 321, 325 (5th Cir.1997), *cert. denied,* 118 S.Ct. 1514 (1998); *Sunbeam Products, Inc., v. West Bend Company,* 123 F.3d 246, 250 (5th Cir.1997), *cert. denied,* 118 S.Ct. 1795 (1998); *Cherokee Pump & Equipment Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994); *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990).

[21]     *Valley v. Rapides Parish School Board,* 118 F.3d 1047, 1050 (5th Cir.1997).

[22]     *Sunbeam Products, Inc.,* 123 F.3d at 250.

**\*3** The Fifth Circuit reviews the district court's factual findings only for clear error, but it reviews the district court's legal conclusions *de novo.* Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision based on erroneous legal principles is reviewed *de novo.* [23] The Fifth Circuit has consistently held that likelihood of confusion is a question of fact, reviewed under the clearly erroneous standard. [24]

[23]     *Id.* (citing *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989)).

[24]     *Amstar v. Domino's Pizza,* 615 F.2d 252 (5th Cir.), *cert. denied,* 449 U.S. 899 (1980) (injunction reversed as clearly erroneous).

An evidentiary hearing is not always required before a court denies a preliminary injunction. If factual matters are not in dispute, no oral hearing is required and the parties need only be given "ample opportunity to present their views of the legal issues involved." [25] On the other hand, "when factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." [26] The basic question is whether the hearing will add anything material to the Court's consideration of the case. [27] Evidence at a hearing on a preliminary injunction need not be "testimonial" and affidavits may be considered by the Court. [28]

[25]     *Kaepa v. Achilles,* 76 F.3d 624, 628 (5th Cir.), *cert. denied,* 117 S.Ct. 77 (1996). *See Miller Brewing Co. v. Ft. Worth Distributing Co.,* 781 F.2d 494, 496 (5th Cir.1986); *Commerce Park at DFW Freeport v. Mardian Construction Co.,* 729 F.2d 334, 341 (5th Cir.1984). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467, 470 (1st Cir.1995); *Stanley v. University of Southern California,* 13 F.3d 1313, 1326 (9th Cir.1994)(no abuse of discretion to deny a party's right to call witnesses).

[26]     *Kaepa,* 76 F.3d at 628; *Commerce Park at DFW Freeport,* 729 F.2d at 341.

[27]     *Cf., Parker v. Ryan,* 959 F.2d 579, 584 (5th Cir.1992); *Worlds of Wonder, Inc. v. Veritel Learning System, Inc.,* 658 F.Supp. 351, 354 n.2 (N. D.Tex.1986).

[28]     *E.g., Miller Brewing Co.,* 781 F.2d at 496; *Worlds of Wonder,* 351 F.2d at 354 n.2.

An important issue of contention between the parties reflected in the advisories concerns the need for testimonial evidence at the hearing. Plaintiff argues that it wishes to call witnesses. [29] Defendant maintains that no testimonial evidence is required and that testimony by way of affidavit and/or deposition would be sufficient. [30] In this case, the Court held hearings on May 17 and May 24, 1999 because it determined that a hearing would assist the Court to properly ascertain the facts and to render a decision in accordance with the evidence and the law. [31] Defendant opposed an evidentiary hearing,

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 66 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

stating, in effect, its willingness to assume for the purposes of argument that plaintiff's factual averments are true, but argued that the preliminary injunction must be denied because plaintiff has not met its burden of proving an entitlement to injunctive relief.

29    Docket no. 11 at 7.

30    Docket no. 12 at 2.

31    FED. R. CIV. P. 65. *Cf., Parker,* 959 F.2d at 584; *Worlds of Wonder, Inc.,* 658 F.Supp. at 354 n.2.

The Court has considered plaintiff's arguments—as contained in the complaint, its motion for preliminary injunction, briefs, affidavits, declarations and deposition excerpts submitted in connection with the May 17 hearing and the oral arguments made at the May 17 hearing —as well as defendant's answer, responsive brief, the affidavits, declarations and deposition excerpts submitted in connection with the May 17 hearing and the oral arguments made at the May 17 hearing. The Court has adopted the approach, inferentially suggested by defendant, and has focused on the legal conclusions to be drawn from plaintiff's version of the facts, as measured against plaintiff's burden in seeking a preliminary injunction. In connection with the "fact-intensive inquiries" [32] relating to likelihood of confusion, the parties were allowed to present in-court testimony of witnesses on May 27, 1999, as supplemented on June 8, 1999. [33] For the purposes of this Order, to the extent that any disputed fact is relied upon, the May 17 and May 27 hearings allowed plaintiff adequate opportunity to present its version of those disputed facts in support of its legal arguments.

32    *Society of Financial Examiners v. National Assoc. of Certified Examiners, Inc.,* 41 F.3d 223, 224–25 (5th Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247 (1995)(summary judgment was not appropriate mechanism to determine likelihood of confusion).

33    On June 8, 1999 plaintiff supplemented the record of the May 27, 1999 through the filing of Plaintiff's Exhibits 34 and 35 consisting of the June 3, 1999 deposition of Dr. Joseph Picken.

**B.** *Plaintiff Has Not Met Its Burden of Showing Entitlement to a Preliminary Injunction*

**\*4** Plaintiff's complaint and motion for injunctive relief asserts two primary claims: federal trademark infringement and a violation of the Texas anti-dilution statute. These claims will be examined in the context of plaintiff's burden of proof in seeking a preliminary injunction. Prior to an analysis of the facts in light of the applicable legal standards, a brief summary of background facts is undertaken.

1. *Introductory Factual Findings*

ACLP is a limited partnership formed by Bernard "Rick" Lane in 1993. [34] Initially, two principal operating divisions were created within ACLP: Alumnet (or Affinity) services and Amicus Networks (later known as ANI). [35] ACLP created the Toolbelt® software to publish restricted access web sites or extranets [36] accessible through the internet. [37] ACLP also used the software to promote the creation of a series of proprietary web sites or intranets accessible to the alumni of various universities (Alumnet) and to others with affiliations (*e.g.,* Faithnet and Armenianet). [38] ACLP decided to market its communications services under the trade name PAVILION. [39] On August 2, 1994, ACLP filed an intent-to-use application to register the mark PAVILION®. [40] In October 1994 ACLP acquired the internet domain name *www.pavilion.com.* [41] On November 20, 1995 Lane prepared a "declaration stating use" which represented that the first use in commerce of PAVILION® occurred on July 13, 1994 in connection with a demonstration of services to the University of Texas ex-Students' Association. [42]

34    Docket No. 36, Lane Declaration ¶ 4; May 27, 1999 Lane testimony.

35    May 27, 1999 Lane testimony; Passovoy testimony. At some other times, ACLP has conducted its business through other divisions. Docket No. 36, Lane Declaration ¶ 17.

36    Docket No. 36, Lane Declaration ¶ 13; Aroian Declaration ¶ 5. As used by ACLP, "extranets" are password-protected secure sites on the internet for the exchange of information; "intranets" are sites on the internet to receive or post information but are not alleged to be secure.

37    Docket No. 36, Lane Declaration ¶ 6; Aroian Declaration ¶¶ 3, 4: ANI was spun-off from ACLP in July 1996. ACLP owns in excess of 80% of ANI

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 67 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

and controls ANI. Lane is President of the general partner of ACLP and Chairman of the Board of ANI. Passovoy is the CEO of ANI. Both ACLP and ANI are involved in activities which involve the mark PAVILION®. May 27, 1999 Lane testimony; Passovoy testimony.

38  Docket No. 36, Lane Declaration ¶ ¶ 17, 18; Aroian Declaration ¶ 5; May 27, 1999 Lane testimony; Passovoy testimony.

39  Docket No. 36, Lane Declaration ¶ 8.

40  Docket No. 36, Lane Declaration ¶ 11.

41  *Id.* at ¶ 9.

42  Docket No. 36, Lane Declaration ¶¶ 10, 11 and Exhibit C. Lane states that the declaration of use was prepared on November 20, 1994 but Exhibit C bears a 1995 date. The 1988 Trademark Revision Act authorizes filing applications to register trademarks based on an "intent to use" the mark on goods in commerce as well as on actual use. 15 U.S.C. § 1051. Section 5D[2][b] of the Act provides that no registration may issue until the applicant begins actual use of the mark. 15 U.S.C. § 1051(d). After registration, the application filings, whether based on actual use or on intent to use, become nationwide "constructive" use of the mark for priority. 15 U.S.C. § 1057(c). Defendant alleges that ACLP's declaration of first use was not filed until December 15, 1995. Docket No. 27, Hurst Affidavit, Exhibit F. For purposes of this Order, the Court considers ACLP's declaration of first use to have been filed on the date it was executed, November 20, 1995. In other words, this Order presumes ACLP's priority. On June 7, 1999, HP filed a motion for leave to file a counterclaim seeking the cancellation of ACLP's mark, an action which has the effect of challenging ACLP's priority. Docket nos. 55 and 56, Exhibit A ¶¶ 7–10.

Customers and proposed customers of ACLP are affinity groups or, more specifically, those individuals wishing to facilitate internet communications among members of an affinity group ("sponsors"). [43] ACLP has received revenue from sponsors of a web site and from advertisers who pay so that their ads appear on the intranets and extranets. [44] ACLP has never provided internet services under the PAVILION® mark as an internet service provider ("ISP"). [45] In January 1995 ACLP signed its first contract for an intranet site with Virginia

Tech. [46] In June 1995 ACLP contracted with Worchester Polytechnic Institute for an intranet site which was handed over to the client to administer in October 1995. [47] A Chevrolet dealer in Austin, Texas became a client for PAVILION® services in June 1995. [48] Current clients of ACLP include Virginia Tech's use of Alumnet services at *www.vt.alumnet.com.,* Armenianet, and Faithnet. [49] First USA is a sponsor of the Virginia Tech Alumnet site and is linked to Armenianet. [50] The PAVILION® services offered or promoted through Alumnet, Armenianet, Faithnet and the *www.amicus.com* and *www.pavilion.com* web sites are not password-protected but do require registration. [51] As a part its business, ACLP began exploring video-teleconferencing services for its customers as part of its package of communication services in mid–1998 and has been implemented. [52]

43  Docket No. 36, Lane and Aroian Declarations; Docket No. 27, Hurst Affidavit, Exhibit H.

44  May 27, 1999 Lane testimony.

45  May 27, 1999 Lane testimony; *see also* docket no. 56, Exhibit B.

46  Docket No. 36, Lane Declaration ¶ 9.

47  *Id.*

48  Docket No. 36, Lane Declaration, Exhibit C (exhibits to intent-to-use application). These services were in effect until September 1996.

49  Docket No. 36, Lane Declaration ¶¶ 18, 19.

50  *Id.* at ¶ 17.

51  May 17, 1999 argument.

52  Docket No. 36, Aroian Declaration ¶ 10; May 27, 1999 Passovoy testimony.

**\*5** ANI, a spin-off of ACLP, offers so-called password-protected restricted access extranet web sites primarily to broker-dealers and financial services clients who pay approximately $100,000 for those services. [53] Defendant alleges that the services for broker-dealers are created using Toolbelt® software but are not offered under the PAVILION® mark. [54] Rather, HP contends that ANI uses the terms "PARTNER PAVILION" and "MY PAVILION TOOLS" to market its services. Indeed, HP argues that plaintiff's only uses of the word "pavilion"

Case 1:18-cv-00068   Document 289-4   Filed on 08/04/18 in TXSD   Page 68 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

are in the domain name *www.pavilion.com* and the links to that site using buttons on the Virginia Tech alumnet site and the Armenianet site labeled "pavilions."[55] Although the evidence establishes that ANI uses variants of "PAVILION" in connection with its services, for the purposes of this Order the Court considers that both ACLP and ANI use and/or intend to use the PAVILION® mark.[56] The evidence also shows that there is an existing federal registration for the mark PARTNER PAVILION® which is held by an un-related third party.[57] Current clients of ANI consist of broker-dealers and financial services entities/individuals.[58]

[53]    Docket No. 27, Hurst Affidavit, Passovoy Deposition; May 27, 1999 Passovoy testimony; Docket No. 36, Aroin Declaration ¶ 4.

[54]    Docket No. 25, Defendant's Brief at 8 and 9. On June 1, 1999 defendant filed a redacted copy of this brief, docket no. 54, which is identical to the original brief, docket no. 25, except that certain information considered to be confidential has been deleted. The Court in this Order refers only to the unredacted brief.

[55]    Docket No. 25, Defendant's Brief at 8–9.

[56]    Docket No. 36, Aroian Declaration ¶¶ 4 ("ANI also provides support services to ACLP accounts which utilize PAVILION services.") and 5 ("Beginning in early 1998, we ...(ANI) ... began marketing PAVILION as PARTNER PAVILION ....").

[57]    Docket No. 25, Defendant's Brief at 10 n.9. PARTNER PAVILION® is the registered mark of Symbol Technologies, Inc. for arranging, conducting and promoting trade show exhibitions in the field of "bar code data capture systems, portable data terminals, and radio frequency communication products, and software." Docket No. 27, Hurst Affidavit at ¶ 7 and Exhibit C at 54. HP also argues that the practice of ACLP in pluralizing PAVILION and in using words, such as PARTNER, to modify PAVILION show that ACLP inappropriately uses the mark as a noun, increasing its suggestiveness if not converting it to a descriptive mark. This factor is further considered below in reference to the "strength of the mark" digit of confusion.

[58]    Docket No. 36, Aroian Declaration ¶ 4.

At the May 17 hearing, ACLP represented that there are approximately 30,000 end users of PAVILION® services, with approximately 1,000 users of the services each day.

Passovoy testified on May 27 that ANI has approximately 24 broker-dealer clients who maintain approximately 28,000 financial planner accounts which, in total, register approximately 1,000 unique log-ins each day.

Registration of PAVILION® issued to ACLP on May 14, 1996. The United States Patent and Trademark Office registration certificate indicates that a federal service mark issued to ACLP for PAVILION®, typed in block letters, for the following service:

> Providing educational institutions and for-profit, non-profit and affinity groups access to an international digital electronic information and communication network for the transfer and dissemination of a wide range of information ....[59]

[59]    Docket No. 36, Lane Declaration, Exhibit D.

HP test-marketed its then-newly developed home computer in one nation-wide retailer, Circuit City, in April 1995.[60] This was HP's first entry into the home computing market as opposed to the business computing market in which HP had already established a competitive market.[61] On May 9, 1995 HP received an in-house legal opinion clearing the use of the mark PAVILION as a brand name for its home computer.[62] On June 12, 1995 —approximately ten months after the filing of the ACLP intent-to-use mark application—HP filed its trademark application for the PAVILION mark alleging a first use in commerce of August 14, 1995.[63] In August 1995, HP–PAVILION PCs were launched nationwide through placement in nine nation-wide retail outlets.[64] Lane first became aware of HP's intent to use the PAVILION name in September 1995.[65] In October 1996 HP's application was published for opposition. On January 31, 1997 ACLP filed its opposition to the HP trademark application.[66] The opposition proceeding is still pending. According to the uncontested data submitted by HP, the HP–PAVILION has enjoyed significant success in the market place. Approximately two million HP–PAVILION home computers have been sold from approximately April 1995 through the Spring of 1999.[67]

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 69 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

60    Each home computer sold in the market test was labeled "HP Multimedia PC." Docket No. 25, Defendant's Brief at 2. Docket No. 36, McKinney Deposition, Exhibit 29.

61    Docket No. 25, Defendant's Brief at 2; docket No. 27, Pedersen Affidavit ¶ 5.

62    Docket No. 36, Lemley Declaration, Exhibit D.

63    Docket No. 36, Braun Deposition, Ex. 68.

64    Docket No. 36, McKinney Deposition, Exhibit 29.

65    May 27, 1999 hearing, Lane testimony. Docket No. 36, Lane Declaration ¶ 21 and Exhibit I. Exhibit I ¶¶ 7–10 reflects that HP filed an Amendment to Allege Use on September 7, 1995 which claimed a first use in commerce on August 14, 1995. HP filed a trademark application on June 12, 1995, as amended on May 24, 1996 and July 22, 1996. *See also* Docket No. 27, Hurst Affidavit, Exhibit A. In his deposition, Lane testified he may have been aware of HP–PAVILION in August 1995. Docket No. 27, Hurst Affidavit at 1.

66    Docket No. 36, Lane Declaration, Exhibit I.

67    Docket No. 27, Pedersen Affidavit ¶ 14.

**\*6** On May 30, 1996—or, 16 days after ACLP's trademark issued and approximately eight months after Lane became aware of the HP–PAVILION—ACLP wrote a letter to HP protesting HP's use of the name PAVILION as a brand name.[68] HP responded that it considered that there would be little likelihood of confusion between the two uses but offered to negotiate a resolution with ACLP.[69]

68    Docket No. 36, Lane Declaration ¶¶ 19 and 21 and Exhibit G; docket No. 36, Mosleh Deposition, Exhibit 17.

69    Docket No. 36, Lane Declaration, Exhibit H.

ACLP argues that since the introduction of the HP–PAVILION, HP has continued to "expand" its market to promote internet access, an argument that will be addressed further below. For purposes of preliminary factual findings, the record shows that in January or February 1997 HP added a "one-touch" internet access button which made it easier for customers to reach the internet.[70] The internet short-cut key is pre-programmed to take the user to a screen offering a set number of hours of free full internet access.[71] On June 30, 1998

HP introduced its Message Board service which allowed the customer and those with that customer's password to share information on the internet.[72] Plaintiff argues that the Message Board was a system to allow affinity groups to exchange information.[73] HP subsequently discontinued the Message Board feature.[74] Although HP–PAVILION PCs were always "internet-ready" and although America on Line ("AOL"), Microsoft Network ("MSN") and other ISPs always were bundled with HP–PAVILION PCs,[75] ACLP argues that on August 31, 1998 HP began to specially promote AOL access through HP–PAVILION PCs.[76] Currently, HP offers a General Telephone and Telegraph ("GTE") web browser with 50 free hours of internet access to make it easier for the consumer to begin internet service.[77] After the free hours have been used, the user may discontinue access to the internet, pay to continue ISP through GTE, or contract with another ISP of the consumer's choosing and re-program the key to work with that provider.[78] In addition, HP–PAVILION PCs offer desk top icons for AOL and MSN, each of which also offer internet access, if the owner chooses.[79] Finally, one-touch Yahoo! access[80] would allow the customer to reach a "personalized internet start page" containing news, entertainment, horoscopes, weather reports, clubs and items of specialized interest offered by HP, such as information about new products.[81] The Yahoo portal, AOL and the internet access in general allow a user of an HP–PAVILION to access chat rooms and personalized market portfolios. HP established an internet site at the address of *www.hp-at-home.com* where individuals may learn about HP products or seek on-line help with computer problems.[82]

70    *See* Docket No. 27, Pedersen Affidavit, Exhibit A.

71    Docket No. 36, McKinney Deposition, Exhibits 29 and 45; *see also* exhibit 46.

72    Docket No. 36, McKinney Deposition at 79; docket No. 36, Lane Declaration ¶ 23 ("The Message Board provided the same functions as our TOOLBELT software."). Defendant argues in its brief that Lane has conceded that Message Board was not equivalent to Toolbelt as Toolbelt is a complex, expensive suit of software which costs $50,000–$100,000.

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 70 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

73    Docket No. 36, McKinney Deposition exhibits; Lane
      Declaration ¶ 23: "By the fall of 1998 ... our own
      expansion of use was running into direct conflict and
      confusion with HP's use of PAVILION ."

74    Docket No. 27, Hurst Affidavit, Haddock deposition;
      docket No. 36, McKinney Deposition at 84 (Message
      Board not offered on Summer 1999 product release).

75    Docket No. 36, McKinney Deposition at 53, 73 and
      89.

76    Docket No. 36, Lane Declaration ¶ 23.

77    Docket No. 36, McKinney Deposition at 73 and 75.
      Glazer testified that there are typically two ways of
      accessing the internet: from an ISP, a company that
      sells access to the internet, or from an on-line service
      such as AOL or Microsoft Network ("MSN"), which
      offer internet access as well as access to its own private
      network. Docket No. 30 at 3. The process of accessing
      a web site was described in *Maritz, Inc. v. CyberGold,*
      *Inc.,* 947 F.Supp. 1328, 1329 (E.D.Mo.1996), as
      follows:

> Any internet user can access any web site,
> of which there are presumably hundreds of
> thousands, by entering into the computer the
> internet address they are seeking. Internet users
> can also perform searches on the internet to find
> websites within targeted areas of interest. Via
> telephone lines, the user is connected to the web
> site, and the user can obtain any information that
> has been posted at the web site for the user. The
> user can also interact with and send messages to
> that web site. Upon connecting to a web site, the
> information is transmitted electronically to the
> user's computer and quickly appears on the users
> screen.

78    Docket No. 36, Cahn Declaration, Exhibit A, Walker
      T.T.A.B. Declaration ¶¶ 10–12.

79    *Id.* at ¶ 12. MSN has been bundled by Microsoft with
      the Microsoft Windows operating system.

80    Docket No. 36, Lane Declaration ¶ 23; McKinney
      Deposition at 92–94. On May 17, particularly, there
      was argument concerning a co-branding agreement
      between HP and Yahoo! to provide an internet portal
      through a one-touch Yahoo! key on HP–PAVILION
      PCs. Plaintiff's counsel argued that HP–PAVILIONS
      were being sold with a branded My Yahoo! key.
      Defense counsel argued that the services had not yet
      been offered. For purposes of this Order, the Court
      finds that HP currently offers Yahoo! as an internet

portal. Docket No. 36, McKinney Deposition at 92–
93; May 27, 1999 hearing, Plaintiff's Exhibits 34,
Picken Deposition at 52–53..

81    Docket No. 36, McKinney Deposition at 93–94.
      Docket no. 16 at 16; docket No. 36, Lane Declaration
      ¶ 23; McKinney Deposition, Exhibit 45 (HP wishes to
      provide "interactive community" for new HP users).
      ACLP also argued that HP offered other services with
      a co-branding agreement with Yahoo! but HP stated
      at the May 17 hearing that at least an aspect of the
      Yahoo! agreement had not yet been implemented.

82    The consumer separately must have an ISP to
      access this site, however. Docket No. 36, McKinney
      Deposition at 72.

### 2. *Likelihood of Success on the Merits*

#### a. Trademark Infringement

To prove trademark infringement under 15 U.S.C. §
1114(1)(a), ACLP must show that: (a) HP used ACLP's
registered mark without consent;[83] (b) the use was
in connection with the sale of goods or services; and
(c) the use was likely to "create confusion in the
minds of potential purchasers as to source, affiliation
or sponsorship of the parties' products."[84] HP does
not contest that it has marketed personal computers
under the brand name PAVILION. HP does not allege
that it had received the permission of ACLP to use
the name PAVILION for the marketing of HP personal
computers. HP does not contest that its use of PAVILION
as a brand name for HP personal computers was in
connection with the sale of goods in commerce. But,
HP strenuously denies that its use of the PAVILION
name was and is likely to "create confusion in the
minds of potential buyers as to the source, affiliation,
or sponsorship of the parties' products."[85] As in most
trademark infringement cases, in this case, likelihood of
confusion is the touchstone of the trademark infringement
analysis.[86] Likelihood of confusion is "synonymous with
a probability of confusion, which is more than a mere
possibility of confusion."[87]

83    Proof of registration of a trademark is only *prima*
      *facie* evidence of the registrant's exclusive right to
      use the mark in commerce for the services specified
      in the registration. A registration only becomes
      incontestable or conclusive evidence of the exclusive
      right to use a mark after five years of continuous use,

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

Case 1:18-cv-00068   Document 289-4   Filed on 08/04/18 in TXSD   Page 71 of 98

1999 WL 495921

subject to a few enumerated defenses. 15 U.S.C. §§ 1065, 1115.

84    *Society of Financial Examiners,* 41 F.3d at 227.

85    Docket No. 54, Defendant's Brief. *See also National Football League Properties v. Playoff Corp.,* 808 F.Supp.1288, 1291 (N.D.Tex.1992).

86    *Society of Financial Examiners,* 41 F.3d at 225; *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 794 F.2d 591, 594 (5th Cir.1985).

87    *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188 (5th Cir.1998).

**\*7** ACLP relies on the doctrine of "reverse confusion" in arguing its likelihood of success on the merits of its trademark infringement claim. [88]

88    *See* Docket No. 36, Declarations of Lemley and Picken.

Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, ... the senior user is injured because [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected with the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets. [89]

89    *Sands, Taylor & Wood, Co. v. Quaker Oats Co.,* 978 F.2d 947, 957 (7th Cir.1992), *quoting Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879 (1993).

Reverse confusion has been recognized by the Fifth Circuit as a redressable injury under the Lanham Act. [90]

90    *Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387, 394 (5th Cir.1980); *Fuji Photo Film,* 794 F.2d at 596.

The parties agree that in the Fifth Circuit, likelihood of confusion is determined primarily by the analysis of seven objective factors, [91] called "digits"in the Fifth Circuit precedent:

91    The 1938 Restatement of Torts sets forth four factors for determining likelihood of confusion and nine factors for determining whether a trademark owner's rights extend to non-competing goods. Courts have expanded and refined the Restatement factors. *See* Restatement (Third) Unfair Competition § 21, comment a (1999). "[T]rademark law is considered part of the law of unfair competition." *Union National Bank of Texas, Laredo. v. Union National Bank of Texas, Austin,* 909 F.2d 839, 844 n.10 (5th Cir.1990). The Fifth Circuit law has focused primarily on a non-exhaustive list of seven factors.

1. the type of the trademark at issue (i.e., the "strength" or distinctiveness of the mark);

2. similarity of the trademark and the accused term or design;

3. similarity of the products or services;

4. identity of retail outlets and purchasers;

5. identity of advertising media used;

6. the defendant's intent; and

7. actual confusion. [92]

92    *Playboy Enterprises, Inc. v. Webbworld, Inc.,* 991 F.Supp.543, 555 (N.D.Tex.1997) *citing Society of Financial Examiners,* 41 F.3d at 228 n.10; and *Fuji Photo Film Co., Inc.,* 754 F.2d at 595. *See also Elvis Presley Enterprises, Inc.,* 141 F .3d at 194; *Sno–Wizard Manufacturing, Inc. v. Eisemann Products, Co .,* 791 F.2d 423, 428 (5th Cir.1986); *Amstar,* 615 F.2d at 259; and *Roto–Rooter, Corp. v. O'Neal,* 513 F.2d 44 (5th Cir.1975) (reversing decision of Western District of Texas which held there was no likelihood of confusion). The parties present variations in their articulation of the digits. For example, plaintiff identifies "strength" of the mark as a digit whereas defendant discusses strength of the mark under the digit of "type" of mark. Docket No. 16, Plaintiff's Brief at 15; docket no. 25, Defendant's Brief at 11. The Court views these differences as being minor semantical variations in articulating the "digits" but not proposals of different criteria.

"None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." [93]

Likelihood of confusion is a question of fact. [94] The burden of proving infringement must be borne by the party claiming injury. [95] In that regard, the Fifth Circuit has stated:

[93] *Marathon Manufacturing Co. v. Enerlite Products, Corp.,* 767 F.2d 214, 218 (5th Cir.1985).

[94] *National Football League Properties v. Playoff Corp.,* 808 F.Supp. at 1291–92 (N.D.Tex.1992); *Fuji Photo Film Co., Inc.,* 754 F.2d at 595 n.4; *Elvis Presley Enterprises, Inc.,* 141 F.3d at 196.

[95] *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619 (5th Cir.1963).

The "seven digits" are not elements of a plaintiff's cause of action, but instead comprise a nonexhaustive collection of considerations that may be relevant to the ultimate factual determination. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985). The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors. *Id.* [96]

[96] *Playboy Enterprises, Inc.,* 991 F.Supp. at 555.

In addition to the listed factors, a court may consider other factors in determining the likelihood of confusion. [97] In this case, the Court considers the sophistication of the buyers for both defendant's products and plaintiff's services and the relatively significant cost of the product and services in question as an aspect of the "actual confusion" analysis; although, arguably, it might merit separate consideration. [98]

[97] *Elvis Presley Enterprises, Inc.,* 141 F.3d at 194.

[98] The sophistication of the buyers is an eighth factor in the Second Circuit's test of likelihood of confusion. *Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1508 (2nd Cir.1997). In *Oreck Corp. v. U.S. Floor Systems,* Inc., 803 F.2d 166, 170 (5th Cir.1986), the Fifth Circuit recognized "degree of care exercised by potential purchasers" as an eighth factor under the facts of that case. *But see Fuji Photo Film Co., Inc.,* 754 F.2d at 595.

*i. the type/strength of the trademark at issue*

The degree to which a mark is entitled to protection depends on whether the mark is classified as generic, descriptive, suggestive or fanciful/arbitrary. [99] Strength of the mark is a question of fact. [100] There are two aspects to the strength of a trademark: intrinsic strength and commercial strength, which, again, is considered in connection with the type of the mark.

[99] *Estee Lauder Inc.,* 108 F.3d at 1508.

[100] *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1179 (5th Cir.1980)("Any given term's correct categorization is a factual issue.").

**\*8** The distinctiveness or "strength of a mark measures its capacity to indicate the source of the goods or services with which it is used. The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar description found on other goods, services or business with the prior user ... "[S]trength" ... ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source. [101]

[101] Restatement (Third), Unfair Competition § 21, comment i.

HP argues that PAVILION® should be accorded only limited protection outside of ACLP's web services in part because it is a suggestive mark and, as such, is entitled to the least amount of trademark protection. [102] Suggestive marks, which subtly connote something about the service or product, enjoy only a narrow scope of protection under the trademark laws. [103] "Pavilion" is a common name for a meeting place. [104] Webster's New World Dictionary defines "pavilion" as a large tent or a part of a building, often ornamental. [105] Lane testified that the word "pavilion" appealed to him because of "its suggestion of a virtual site in cyberspace." [106] "Pavilion" is not a coined word and is not purely fanciful. It should not be accorded the same degree of protection as a coined mark, such as "xerox." [107] But, even though suggestive, it "requires a mental leap from the mark to the product" and, thus, is strong enough to warrant trademark protection. [108]

[102] Docket No. 30, Glazer affidavit.

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 73 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

103   *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association,* 651 F.2d 311, 315 (5th Cir.1981)("Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning."); *Soweco, Inc.,* 617 F.2d at 1184.

104   "The dictionary definition of the word is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public." *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 11 n.5 (5th Cir.1974).

105   Webster's New World Dictionary, Third College Edition, 1988. Interestingly, the Oxford English Dictionary indicates that in 1393 the word "pavilion" also referred to an article of apparel worn by lawyers, a gown or cloak; that meaning is indicated as being obsolete.

106   Docket No. 27, Hurst Affidavit at 2 and Exhibit B; docket no. 30, Glazer Affidavit at 10 (ISPs often use "metaphors of physical space to describe the internet experience.").

107   *Sun Banks of Florida, Inc.,* 651 F.2d at 316 n.8 (25 active financial institutions use of the mark "sun" weakens likelihood of confusion and supports vacating injunction); *Amstar Corp.,* 615 F.2d at 259–60 (72 third party registrations of the "domino" mark "limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its marks" and support vacating injunction); *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 505 (5th Cir.1979) (multiple uses of mark "world" result in little likelihood of confusion and support denial of injunctive relief); *American Heritage Life Ins. Co,* 494 F.2d at 13 (multiple uses of word "heritage" support denial of injunctive relief); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir.1973) (common word "holiday" is of weak trademark significance and supports denial of injunctive relief); *El Chico, Inc. v. El Chico Café,* 214 F.2d 721 (5th Cir.1954) (27 third-party registrations of "Chico," "El Chico" and similar names support denial of injunctive relief).

108   *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*___ F.3d ___, 50 U.S.P.Q. 1545, 1999 WL 232014 (9th Cir. Apr. 22, 1999).

On the other hand, ACLP argues that the mark PAVILION®, even if suggestive, is a distinctive mark entitled to trademark protection. Plaintiff emphasizes that HP's own market research indicates that the word "pavilion" is an "empty vessel," [109] and, therefore argues that PAVILION is not descriptive and plaintiff need not prove secondary meaning. [110]

109   Docket No. 36, Cahn Declaration, Exhibit B, Braun T.T.A.B. Declaration ¶ 9; docket no. 27, Pedersen Affidavit ¶ 13.

110   Docket No. 31, Plaintiff's Brief at 2.

Unlike "xerox" or "kodak," however, "pavilion" has a meaning apart from plaintiff's mark. [111] HP notes that ACLP has used "pavilion" descriptively when ACLP uses it in its plural form [112] and when it uses other words to modify it, such as in "PARTNER PAVILION." [113] Use of the mark as a noun treats it as a thing rather than a source designator and increases its generic meaning. [114] Although ACLP may not need to prove secondary meaning to receive trademark protection, secondary meaning is relevant to assessing commercial strength of the mark. "Secondary meaning attaches to a mark when 'the consuming public primarily associates the term with a particular source.' " [115] ACLP has not shown that the term "pavilion" and ACLP's business have "become synonymous in the mind of the public." [116] But, in a reverse confusion case, such as this, the Court emphasizes the distinctiveness of the mark rather than the lack of commercial strength of plaintiff's mark. [117]

111   Moreover, HP's references to "pavilion" being an "empty vessel" appear to refer to the fact that in August 1994 the focus groups "were not confused by the Pavilion name; specifically participants did not understand the mark PAVILION in this context to signify any other good or service...." Docket No. 22, Pedersen Affidavit ¶¶ 11–13. In context, the "empty vessel" references appear to relate as much to lack of confusion as to suggestiveness.

112   *E.g.,* May 27, 1999 Plaintiff's Exhibits 10A, 12, 13, 14, 16, 17, 23 and Defendant's Exhibit 5. Lane acknowledged at the May 27, 1999 hearing that the "Pavilions" buttons on the Virginia Tech alumnet and armenianet internet sites established by ACLP do not show ® after the mark name. *See also* Docket No. 27, Hurst Affidavit, Exhibit D at 5.

113   *E.g.,* May 27, 1999 Defendant's Exhibit 1 at ACLP 0152 & 01543; Defendant's Exhibit 3. *See also Estee*

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 74 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

*Lauder, Inc.,* 108 F .3d at 1509. ("In determining whether a mark should be classified as descriptive or suggestive, the court must focus on how the mark is used in context, rather than on its use in the abstract."). Even coined terms may be rendered generic by their use, subjecting their owners to cancellation of the registration. For example, "thermos," "trampoline," "aspirin," and "yo-yo" are former trademarks that now are generic words. *Union National Bank of Texas, Laredo,* 909 F.2d at 845 n.15.

114  *Security Center, Ltd. v. First National Centers,* 750 F.2d 1295, 1300 n.4 (5th Cir.1985)(use of mark as a noun suggests generic use). Docket No. 36, Aroian Declaration ¶¶ 5–8.

115  *Estee Lauder, Inc.,* 108 F.3d at 1509 (*quoting Bristol– Myers Squibb, Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir.1992).

116  *Estee Lauder, Inc.,* 108 F.3d at 1509 (*quoting Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995)).

117  *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 479 (3rd Cir.1994).

HP argues that PAVILION is a dilute mark because it is used in other web addresses, used to sell software, and used in other contexts which make it difficult to be used to identify a single source. Plaintiff argues that widespread use of "pavilion" is irrelevant because HP cannot show significant trademark uses of "pavilion." [118]

118  Docket No. 31, Plaintiff's Reply Brief at 4.

**\*9** Third party uses and registrations "limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." [119] Although 226 marks beginning with the word "service" did not render the "Service Merchandise" mark indistinct, the "Service Merchandise" mark was proved to have significant commercial strength. [120] HP has proved 32 federal registrations for the mark "PAVILION" or variants thereof, including one for computer software, as well as 100 additional state registrations of the mark and dozens of common law uses of the mark. [121] HP also has proved more than 35 different web sites which use "pavilion" or a variant thereof in the domain name. [122] There are several instances of "PARTNER PAVILION" on the internet, such as "COMPAQ Partner Pavilion" and Netscape's Partner Pavilion. [123] The widespread use

of the word "pavilion," including uses in the computer field "dilutes the strength of the mark and entitles it to a narrower range of protection." [124] The ability of the mark to indicate a single source is not strong for any user of that trade name or mark, including HP which has sold thousands of personal computers under that name. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less the likelihood of confusion." [125]

119  *Amstar,* 615 F.2d at 260 (Amstar's protection of "Domino" mark not afforded protection outside of plaintiff's sugars and related food products and did not encompass fast-food delivered pizzas).

120  *Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983 (S.D.Tex.1990). Docket No. 31, Plaintiff's Reply Brief at 4.

121  Docket No. 27, Hurst Affidavit at 2–4 and Exhibit C; docket No. 25, Defendant's Brief at 10.

122  Docket No. 27, Hurst Affidavit at 4–5 and Exhibit E. Examples include *www.pavilioncomms.com* associated with a company named pavilion which provides "web-site solutions;" *www.pavilion.net* associated with an internet provider in the United Kingdom; and *www.pavilionsys.com* associated with computer database design. Docket No. 30, Glazer Affidavit at 11 (more than 20 different web sites with "pavilion" or variant in domain name identified).

123  Docket No. 20, Glazer Affidavit at 12.

124  *Oreck Corp.,* 803 F.2d at 170.

125  *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir.1980).

A suggestive mark may be strengthened by factors such as "extensive advertising, length of exclusive use, public recognition and uniqueness." [126] As discussed further below, ACLP has not established that PAVILION® is strongly or uniquely associated with ACLP's business.

126  *Accuride International, Inc. v. Accuride Corporation,* 871 F.2d 1531, 1536 (9th Cir.1989).

In sum, this factor weighs in favor of HP because third party uses and registrations "limit the protection to be afforded plaintiff's mark outside the uses to which it has already put its mark." [127] Stated differently, the various uses of "Pavilion" and variants thereof increase

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 75 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

the likelihood that consumers would be unlikely to judge these two particular uses as being similar or related. This "digit," however, appears to be a key issue for trial.

127    *Amstar,* 615 F.2d at 260 (emphasis added).

*ii. similarity of the trademark and the accused term or design*

In this case, the two marks are virtually identical in that both parties typically use the word in block typeface: "PAVILION." HP typically uses "HP–PAVILION" or "HP–PAVILION PC" as a designation for the personal computers rather than merely the block letters "PAVILION." [128] The "Hewlett–Packard–PAVILION" name appears on the central processing unit and the monitor. [129] Retailers receive each HP–PAVILION PC in a box marked "HP pavilion." [130] Although it is established that "[s]imilarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," [131] the two marks in question visually are very similar and audibly are identical. The source identifier "HP" and the product designator "PC" are noteworthy, but they are not always used. [132]

128    *E.g.,* May 27, 1999 Plaintiff Exhibit 18.

129    Docket No. 25, Defendant's Brief at 3 n.2; *see* May 27, 1999 Plaintiff's Exhibits 20, 21 and 22; docket No. 27, Pedersen Affidavit ¶ 3.

130    Docket No. 27, Anderson Affidavit at 2 ¶ 5.

131    *Sun Banks of Florida, Inc.,* 651 F.2d at 317–18 *quoting* Restatement of Torts § 729, comment b. Section 729 corresponds to §§ 21–23, Restatement (Third) Unfair Competition.

132    *Lambda Electronics Corp. v. Lambda Technology,* 515 F.Supp. 915, 925 (S.D.N.Y.1981)("Even if Lambda Technology consistently used only the full trade name "Lambda Technology" and not the shorter version "Lambda," the addition of this word would not avoid significant similarity between the two trademarks."). But, as in a product configuration case, labels and packaging and source data may eliminate confusion. *Sunbeam Products, Inc.,* 123 F.3d at 259.

**\*10**  This factor weighs in favor of ACLP.

*iii. similarity of the products or services*

The greater the similarity of products and services, the greater the likelihood of confusion. [133] There are three aspects of ACLP's argument of similarity of products/services: (1) ACLP and HP are in direct competition and likelihood of confusion is strong; (2) ACLP's services and HP's product and service promotions are "closely related" and likelihood of confusion is strong; and (3) HP is using ACLP's mark for products within ACLP's "zone of expansion" and likelihood of confusion is strong. This Order will first examine the direct competition and relationship arguments before briefly addressing zone of expansion.

133    *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 490 (5th Cir.1992); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d at 505.

Direct competition between the parties' services and products is not required in an analysis of likelihood of confusion. [134] Trademark law prohibits the use of a senior user's mark on products that are "closely related" to the senior user's. [135] "When products or services are not competing, the confusion at issue is one of sponsorship, affiliation, or connection." [136] The question is whether the buying public reasonably considers the products to come from the same source or affiliated sources. [137]

134    *Professional Golfer's Association of America v. Banker's Life and Casualty Co.,* 514 F.2d 665, 669–70 (5th Cir.1975).

135    *Sands, Taylor and Wood, Co.,* 978 F.2d at 957.

136    *Elvis Presley Enterprises, Inc.,* 141 F.3d at 202. *See also Oreck, Corp.,* 803 F.2d at 170.

137    3 J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:3 at 166 (4th ed.1998).

Plaintiff argues that HP is "directly competing" with plaintiff for the sale of the same product or services. [138] Alternatively, plaintiff argues that plaintiff's services and defendant's product are closely related such that confusion as to the source, sponsorship or affiliation of plaintiff's services and defendant's product is reasonable and likely. [139]

138    Docket no. 16 at 16.

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 76 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

139     Docket No. 36, Picken Declaration. Dr. Picken's
        declaration testimony concerns the "blurred
        boundaries between hardware, software and
        services." Dr. Picken expressed no opinion on
        likelihood of confusion by the reasonable consumer
        using computer hardware, software and services but
        does state, *inter alia,* it is likely that a vendor
        of one product would provide related services
        and vice versa (¶¶ 3.4.1 and 3.4.2); that HP–
        PAVILION personal computers and ACLP services
        are "functionally interdependent"(¶ 3.4.3); and that
        the parties' products and services are "likely to
        fall within each others' *current* product domains
        or natural areas of expansion" (¶ 3.4.4) (emphasis
        added). Dr. Picken's June 3, 1999 deposition focuses
        on the zones of expansion for ACLP in 1995. May 27,
        1999 hearing, Plaintiff's Exhibit 34.

ACLP markets a service which consists of the creation
of web spaces and the provision of web services for
affinity groups. ACLP's original "marketing vision" in
1995 was to link certain individuals, referred to as an
affinity group, to product/service marketers through an
internet "Pavilion" site which has a commercial sponsor
and which, in turn, is linked to other commercial sites. [140]
On the other hand, HP sells home computers with
multimedia features which are able to be used to access
the internet . [141] As time has passed, ACLP argues,
HP–PAVILION has made it easier for a customer to
access the internet and now offers an internet short-cut
key, a promotional tie-in for 50 free hours of internet
access, AOL, the Yahoo portal, My Yahoo! key and
web services for the "affinity group" of HP–PAVILION
purchasers through its *www.hp-at-home.com* site. In brief,
plaintiff argues that these marketing and co-branding
agreements show that HP is in the business of promoting
internet services through the HP–PAVILION PC in direct
competition with plaintiff. Plaintiff further points to HP's
now-discontinued Message Board service to show that the
parties are in direct competition. [142]

140     May 27, 1999 hearing, Plaintiff's Exhibit 34 at 41–42.

141     Docket No. 36, Mosleh Deposition and Exhibits 8
        and 9 (In March 1999 HP was realigned into two
        component companies or divisions and a new internet
        business unit was created); docket No. 27, Pedersen
        Affidavit ¶ 15 and Exhibit D.

142     HP, through GTE, offered in June 1998 a Message
        Board Service for HP customers through which

a PAVILION owner could post, for example, the
photograph of a child, on a password protected
message board which could only be seen by those
who knew the password. HP has discontinued this
service at least with the Summer 1999 product release.
Docket No. 36, McKinney Deposition at 79 and 84.

The internet-related services which are available to the
purchaser of the HP–PAVILION personal computer,
through GTE, AOL and Yahoo!, are provided by other
companies, not HP. HP is not an internet service
provider ("ISP"); [143] HP has never sold software to
computers under the PAVILION name; [144] HP sponsors
no restricted access web site; [145] and no web site affiliated
with HP uses pavilion or a variant of that word in
its domain name. [146] The HP–PAVILION PC always
was able to be used to access the internet. [147] HP
does sponsor the HP-at-home web site, which is not
restricted and which contains sales and other information
related to HP; a customer can use the HP-at-home
web site to obtain trouble-shooting advice concerning
the operation of an HP–PAVILION. [148] On the other
hand, ACLP has used PAVILION® to designate its
service of linking an affinity group to product/service
marketers through an internet site which has a commercial
sponsor. [149] ACLP has not provided ISP services under
the PAVILION® mark. [150] HP–PAVILION's direct
customers are individual consumers who wish to own a
home computer. ACLP's direct customers are entities or
businesses, to include advertisers, who wish to sponsor an
internet site. [151]

143     HP has entered into agreements with third party
        vendors for software and promotions to allow
        consumer to easily use the HP–PAVILION PC
        to access the internet. Docket No. 36, McKinney
        Deposition Exhibits 18–22.

144     Docket No. 25, Defendant's Brief at 3; docket No. 27,
        Pedersen Affidavit.

145     Docket No. 27, Pedersen Affidavit ¶ 18.

146     Docket No. 27, Pedersen Affidavit; docket No. 36,
        Cahn Declaration, Exhibit B, Pedersen T.T.A.B.
        Declaration ¶ 19.

147     Docket No. 25, Defendant's Brief at 16 n.13; May
        27, 1999 Lane cross-examination; Docket No. 36,
        McKinney Deposition at 53, 73 and 89.

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 77 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

148    Docket No. 27, Pedersen Affidavit. To this extent *www.hp-at-home.com* is a web service for an affinity group, but the affinity group is anyone interested in obtaining information about HP products or services and is not restricted in access or focus to HP–PAVILION owners. No registration or password is required to access the cite, nor is the word "pavilion" used to access the cite.

149    May 27, 1999 hearing, Plaintiff's Exhibit 34, Picken Deposition at 41–42.

150    ACLP's trademark application sought the mark in association with providing affinity groups "access to an international digital electronic information and communication network." HP has sought leave to file a counterclaim for cancellation of the mark on the ground that ACLP has not used the mark in commerce in connection with the services described because it has not created a "network" and has not provided "access" to a network created by another. Docket Nos. 55 and 56, Exhibit C at ¶¶ 7–10. The Court does not address the proffered counterclaim, which has not yet been filed, in this Order.

151    Passovoy testified on May 27, 1999 that the broker-dealer clients of ANI frequently charge a technology fee to their clients for access to password-protected investment sites.

**\*11** The Court finds that plaintiff has not established a likelihood of proving that plaintiff and defendant are in direct competition. HP sells personal computers. ACLP provides web sites where information is available under commercial sponsorship. [152] HP's sale of personal computers under the name HP–PAVILION does place in the hands of the consumer a product which the consumer can use to access the internet. In that sense, the products are complementary. [153] ACLP's product is less marketable when access to the internet is not readily available to an affinity group. The HP–PAVILION is one means to access the internet and it has steadily improved the ease with which the internet may be accessed. But, ACLP has not established that ACLP and HP are competing in the same markets for the same customers with competing goods and services. [154]

152    Docket No. 30, Glazer Affidavit at 7.

153    The internet can also be accessed through palm-sized hand held devices, such as those marketed under the name Palm Pilot, pagers or devices that work in conjunction with television sets. Complementary products and services, however, may be "particularly susceptible to confusion." *Fuji Photo Film, Co., Inc.,* 754 F.2d at 598 (citations omitted).

154    Thus, the Court concludes that *Sun Microsystems, Inc. v. SunRiver, Corp.* 36 U.S.P.Q.2d 1266 (N.D.Ca.1995), is distinguishable. Sun Microsystems made computer hardware and software under the SUN mark. SunRiver entered the market, first selling only computer terminals under the name SUNRIVER and then purchasing three computer companies, two of which directly competed with Sun Microsystems in the sale of general purpose computer display terminals and in marketing internet products and services under the name SUNRIVER. 36 U.S.P.Q. at 1268. The Court noted that although a systems manager might not be confused as to relatively expensive work stations, likelihood of confusion had been established with respect to the less expensive internet products. *Id.* at 1269 and 1270. In this case, both defendant's product and plaintiff's services are relatively expensive.

As noted, trademark protection is extended to non-competing goods and services that are "closely related" to create a likelihood of confusion and related goods are generally more likely tan unrelated goods to confuse the public as to the producers. [155] Under a relatedness test, the competitive proximity of the goods is relevant . [156] As Vera cosmetics and perfume were "closely related" to Vera apparel, as International Kennel Club toy dogs were "closely related" to International Kennel dog shows, as Black and White beer was "closely related" to Black and White scotch whiskey, [157] ACLP argues that its PAVILION® web services are closely related to the HP–PAVILION personal computer that promotes internet access. [158] Indeed, ACLP argues that all computer hardware, computer software and internet services are "closely related." [159] Accordingly, ACLP argues that no personal computer maker, such as HP, should be allowed to use the name of any company that provides internet services but "[c]ompanies that supply totally unrelated goods and which merely happen to have a web page are not in the same position." [160] This distinction arguably accounts for ACLP's settlement agreement with Pavilion Technologies regarding software sales, [161] but is not supported by consumer surveys or user information to support the policy-based argument regarding likely consumer confusion. [162]

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 78 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

155    *15 U.S.C. § 1051.*

156    *Brookfield Communications, Inc.,___ F.3d ___, 1999 WL at \*232015.*

157    *See* cases collected in *Sands, Taylor & Wood Co.,* 978 F.2d at 958.

158    Docket No. 36, Lemley Declaration ¶¶ 3, 26–33.

159    Docket No. 36, Lemley Declaration ¶¶ 28–30.

160    Docket No. 36, Lemley Declaration ¶ 33.

161    Docket No. 27, Hurst Affidavit at 2 and Exhibit C (Pavilion Technologies, Austin, Texas registered PAVILION on November 24, 1998 for software relating to manufacturing plant operations and emissions).

162    Focus group studies conducted with HP consumers before 1998 "did not attribute any value, meaning, or associations to the mark other than a recognition of the PAVILION product as Hewlett–Packard's multimedia PC among some owners." Docket No. 27, Pedersen Affidavit ¶ 14.

Although plaintiff has offered expert opinion testimony on converging markets in the computer field [163] and three instances of actual confusion, discussed further below, defendant has offered testimony that "virtually all PC's today are bundled with third-party internet access software ... [and]... consumers are programmed to disassociate the provider of such access from the manufacturer of their computer. Indeed, that message is reinforced in HP's own on-line support and instruction manuals." [164] There is a difference between a personal computer which can be used to access the internet, and ISP which enables internet assess and services or sites which appear on the web. [165] Importantly, Passovoy, ANI's CEO who markets PAVILION® services, has testified that he did not consider there to be a current likelihood of confusion between HP's computer and ACLP's services. [166] Even Lane's statement that HP is "a 50 year old hardware maker" is hardly a description that furthers an argument of likely confusion. [167]

163    Docket No. 36, Picken Declaration; May 27, 1999 hearing, Exhibit 34, Picken Deposition.

164    Docket No. 36, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶ 15; *see also* Exhibit B, Pedersen T.T.A.B. Declaration ¶ 20 ("The experience of buying and using a PC compels an understanding of the differences between computer hardware and the web-related services on the other."); docket No. 27, Pedersen Affidavit ¶ 20.

165    Docket No. 27, Pedersen Affidavit ¶ 20; docket No. 30, Glazer Affidavit at 8.

166    Docket No. 27, Hurst Affidavit, Passovoy Deposition; May 27, 1999 Passovoy testimony (only a "small chance" of current consumer confusion).

167    Docket No. 36, Lane Declaration ¶ 23.

**\*12** ACLP protests that HP–PAVILION one-touch internet access keys and co-branding agreements with AOL and Yahoo! well illustrate the blurring of markets within the computer field. [168] Plaintiff considers the ease of internet access to increase confusion. [169] ACLP argues that the consumers most likely to be confused as to source are those thousands of individuals who come into contact with plaintiff's trademark on-line. But, plaintiff makes no showing that anyone—other than a member of an affinity group who is visiting its web site or a customer of a broker dealer or other client of ANI —— does come in contact with plaintiff's mark on-line. Plaintiff has conceded that it does not pay to advertise its mark. [170] Since each of its web sites, including *www.amicus.com* and *www.pavilion.com* [171] require the visitor to register, casual browsing is discouraged. The most profitable venture of ANI concerns password-protected web sites which, *a fortiori,* preclude browsing by non-subscribers. Given the fact that ACLP's on-line access is limited to those who have passwords or those who expressly register to access the ACLP or ANI web space, plaintiff has not shown that such confusion on the internet at present is likely to occur. [172]

168    May 27, 1999 hearing, Plaintiff's Exhibit 34.

169    Docket No. 36, Declarations of Lane, Picken and Lemley.

170    Docket No. 52, Supplemental Hurst Affidavit (Lane Rebuttal T.T.A.B. Declaration: "We agree that we have not paid for any advertising of the PAVILION mark."). At the May 17 and May 27, 1999 hearings, plaintiff represented that plaintiff has marketed its

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 79 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

services through direct mail, "cold calls," trade shows, word of mouth and through any publicity achieved when there are visitors to its web sites.

171    May 27, 1999 Plaintiff Exhibit 21.

172    Plaintiff has produced three e-mails which could illustrate the likely confusion arising from plaintiff's ownership of the *www . pavilion.com* domain name and internet address. As explained in *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 499 (E.D.Va.1999), an intuitive domain name, such as "pavilion," makes it more likely that users will accurately surmise the web site address and visit it, rather than a competitor's site. In this case, only three HP–PAVILION users are alleged to have mistakenly sent emails to *www.pavilion.com* rather than to *www.hp-at-home.com.,* which is some support for inferring that the millions of other HP–PAVILION users view "hp" to be the more intuitive web address for trouble-shooting advise regarding the HP–PAVILION. This may also indicate that metatags or the "default setting" for HP–PAVILION PCs are causing the confusion —matters not fully explored in the record. *See Brookfield Communications, Inc.,___ F.3d ___, 1999 WL at *232018*; docket No. 36, Lemley Declaration ¶ 36.

Although each case must be evaluated on a totality of all of the facts, there is precedent for concluding that similar products are not confusingly similar. For example, in *Domino Sugar,* the Fifth Circuit held that there was no likelihood of confusion in connection with the marketing of food items, that is, condiments and pizza, under the same name. 173   In *Oreck,* the Fifth Circuit held that there was no likelihood of confusion between two vacuum cleaners. 174   In *Sno–Wizard,* the Fifth Circuit held that there was no likelihood of confusion between two sno-cone machines when one of them had the brand name affixed to the outside of the machine. 175   In *Estee Lauder, Inc.,* the Second Circuit held that there was no likelihood of confusion between two body care products. 176

173    615 F.2d at 261.

174    Oreck's XL® cleaner, sold for commercial and consumer uses, weighing 14–45 pounds and costing $1500 was not confusingly similar to U.S. Floor System, Inc.'s Steamex Deluxe 15 XL cleaner sold to consumer and rental customers, weighing approximately 150 pounds and costing $2,000—

$4,000 because the two products were functionally dissimilar. 803 F.2d at 171.

175    791 F.2d at 427.

176    Gap's use of "100% body care" on its products sold exclusively in Old Navy Stores was not likely to cause confusion with Estee Lauder's "100%"® moisturizer marketed in high end retail stores, given, among other things, price disparities, the differences in markets and the differences in the types of moisturizers. 108 F.3d at 1503, 1506, 1511–12 ("No knowledgeable consumer would be likely to buy one product thinking it was the other").

More to the point, there are other instances of personal computers and internet services companies sharing names. For example, Presario is the name of a leading personal computer marketed by COMPAQ and Presario.com is an unrelated consulting company which offers advice on systems integration. 177   Indigo is the name of a work station marketed by Silicon Graphics and unrelated Indigo.com markets science-related equipment. 178   ASPIRE is the name of a personal computer and unrelated ASPIRING TECHNOLOGIES provides web page development and internet services. 179   VERSA is the name of notebook computer and unrelated Versa.com provides internet publishing and marketing services. 180   Poweredge is a sub-brand of Dell Computers and unrelated Poweredge.com provides internet site hosting. 181   Pavilion Technologies, Inc. in Austin, Texas markets software under the name Pavilion. 182   The Trademark Trial and Appeal Board has rejected plaintiff's premise that all computer hardware, software and internet services are "closely related" when it noted that: "[T]here must be some similarity between the goods and services beyond the fact that each involves the use of computers." 183   The Trademark Trial and Appeal Board has held that the fact the two parties provide computer programs in and of itself "does not establish a relationship between good or services such that consumers would believe that all computer software programs emanate from the same source simply because they are sold under similar marks." 184

177    Docket No. 30, Glazer Affidavit at 9.

178    *Id.*

179    *Id.*

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 80 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

180    *Id.*

181    *Id.*

182    Docket No. 25, Defendant's Brief at 10–11; Docket No. 27, Hurst Affidavit. May 27, 1999 Defendant's Exhibit 7 is the settlement agreement between plaintiff and Pavilion Technologies.

183    *Reynolds and Reynolds Co. v. I.E. Systems, Inc.,* 5 U.S.P.Q.2d 1749, 1751 (T.T.A.B.1987) (accounting-related computer hardware, software and supplies sold under ACCU-prefixed marks "sufficiently different" from ACCULINK software kit then licensed primarily to manufacturers of microprocessors to avoid likelihood of confusion); *see also Electronic Data Systems Corp. v. EDSA Micro Corp.,* 23 U.S.P.Q. 1460, 1463 (T.T.A.B.1992).

These cases and others reject the T.T.A.B.'s original formulation of what amounted to a *per se* confusion rule on the use of similar marks on both computer hardware and software. *See e .g., In Re Graphics Technology Corp,* 222 U.S.P.Q. 179, 181 (T.T.A.B.1984), in which the T.T.A.B. held that AGILE software is confusingly similar to AGILE computer data terminals: "Moreover, since customers need both elements (hardware and software) to make computer systems work and to derive the benefits they offer, it is inevitable (except perhaps for the small segment who write their own programs) that they will come in contact with software and hardware goods offered by the industry and with the marks placed thereon by the myriad of producers and sellers in this burgeoning market. Such being the case, the Board concludes that it is highly likely, and probably close to unavoidable, that purchasers exposed to an identical mark on such basic compute hardware as terminals and on computer software programs would be likely to assume a common source ."

184    *Electronic Data Systems, Corp.,* 23 U.S.P.Q.2d at 1463. Electronic Data Systems Corp. sold products and services under the names EDS Link, EDMD Electronic Document Management and Distribution and EDS Net whereas defendant used the mark EDSA.

**\*13** Therefore, the likelihood of confusion test in computer product related fields must be decided on the specific facts of the competing uses. The computer filed has become too large and too fragmented for a *per se* rule. Accordingly, on the special facts presented, the Ninth Circuit has concluded that two companies using the mark ECLIPSE on computer software sold to the same architectural, engineering and construction market created a likelihood of confusion. 185 The United States District Court for the Southern District of New York has held that Lambda software is confusingly similar to Lambda power supplies. 186 Recently, the Ninth Circuit has held that a video rental chain's use of the domain name "*www.moviebuff.com* " and use of HTML metatags with the phrase "moviebuff" were confusingly similar to an entertainment company's federal trademark MovieBuff®. 187

185    *Eclipse Association, Ltd. v. Data General Corp.,* 894 F.2d 1114, 1117 (9th Cir.1990).

186    *Lambda Electronics Corp.,* 515 F.Supp. at 927.

187    *Brookfield Communications, Inc.,* ___F.3d at ___, 1999 WL at *232018. The Court particularly emphasized that the two company's services are closed related and that each company competes for the patronage of an overlapping audience.

The crux of the relatedness of plaintiff's services and defendant's product in this case, as illustrated in part by the testimony of plaintiff's expert, is the growth and change in computer and communications markets since 1995. As noted, because neither HP nor ACLP offer ISP services under the mark PAVILION and because HP sponsors no web site under the pavilion name, the current record is merely suggestive of likely confusion as to source, affiliation or sponsorship but does not establish that such confusion is likely or probable.

One of the reasons courts have provided for protecting owners against confusingly similar marks on related products is to protect the owner's ability to enter markets in which it might reasonably be expected to expand in the future. 188 Likelihood of expansion is a factor in non-competing products cases when the prior user is likely to "bridge the gap" between its current market and that of a subsequent user. The relatedness component is especially important in a reverse confusion case in which the senior user wishes to expand into the junior user's area. 189 Development of both the senior user's market and the junior user's market appears to be relevant to this analysis. As noted by the Third Circuit in *Fisons Horticulture, Inc.,* courts look "not only at the likelihood of expansion, but also at facts 'suggesting the consuming public might expect the prior owner to manufacture a product in the

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 81 of 98
Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
1999 WL 495921

defendant's market." ' [190] As noted by the Fifth Circuit in *Elvis Presley Enterprises,* "[i]f consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." [191]

[188] *Sands, Taylor & Wood Co.,* 978 F.2d at 958; *Sun Microsystems, Inc.,* 36 U.S.P.Q.2d at 1270.

[189] *Fisons Horticulture, Inc.,* 30 F.3d at 480.

[190] *Id.*

[191] 141 F.3d at 202.

Plaintiff argued at the May 17, 1999 hearing that even in 1995, when HP first began to market a personal computer under the PAVILION name, the doctrine of zone of expansion would have allowed ACLP to use its mark, not then registered, to market, for example, personal computers or other internet access devices or services [192] Indeed, at argument on May 17 plaintiff argued that from the moment HP began marketing personal computers under the PAVILION name, plaintiff had a claim of infringement. [193] Both plaintiff and defendant argue that zone of expansion should be measured at the time of the junior user's first use of the mark. [194]

[192] Docket no. 16 at 3; docket No. 36, Lane Declaration ¶ 23: "By the fall of 1998 ... our own expansion of use was running into direct conflict and confusion with HP's use of PAVILION." Docket No. 36, Picken Declaration ¶¶ 3, 6.

[193] This point also factors into the Court's assessment of delay, discussed further below.

[194] Docket No. 16, Plaintiff's Brief at 18; docket No. 25, Defendant's Brief. As noted above, plaintiff argued that as soon as HP began marketing the PAVILION, ACLP had a claim of infringement. At the May 17 hearing, defendant, citing *Union National Bank, Laredo,* agreed that zone of expansion should be measured as of what reasonable consumers would have expected at the time the product entered the market in 1995. On May 27, 1999 both Passovoy and Lane testified as to plans for ACLP, ANI and the PAVILION® mark as of 1995 and today. Passovoy testified that as of October 1997 ANI did not use the PAVILION® mark but beginning in 1998 did use variations such as PARTNER

PAVILION and described plans for expanded PARTNER PAVILION and other services solidified since the inception of the litigation. Lane testified more extensively on plans for PAVILION® ) ) services as of 1995. May 27, 1999 Plaintiff's Exhibits 4, 5, 8, 10 and 10A.

**\*14** At the preliminary injunction stage, at the time the Court assesses substantial likelihood of success on this one "digit" of likelihood of confusion, it is not necessary for the Court to resolve finally the applicability of the zone of expansion doctrine. [195] Nevertheless, while it is recognized that plaintiff represents that it has plans to expand its services, [196] the focus is on whether plaintiff's services and defendant's product are similar enough to cause confusion as to source or affiliation and whether defendant's product is in a market into which plaintiff naturally would be perceived to expand. [197] Most determinative of the Court's assessment of the zone of expansion doctrine as it relates to this "digit" of likelihood of confusion at the preliminary injunction stage, is Passovoy's testimony on May 27, 1999 that the present likelihood of confusion between ANI's use of the un-registered variant PARTNER PAVILION and the HP–PAVILION PC is small, although the risk of confusion should increase. Given the practice of ACLP to use PAVILION® in connection with sponsored sites, the Court finds strong support for drawing the same conclusion regarding its use of the mark.

[195] In *Union National Bank,* 909 F.2d at 843 n.9, the Fifth Circuit described the "zone of expansion" doctrine as a "conundrum within the conundrum of trademark law."

[196] May 27, 1999 Hearing, Passovoy testimony; Lane testimony.

[197] *Elvis Presley Enterprises,* 141 F.3d at 202.

In sum, for purposes of the preliminary injunction and drawing all inferences from the evidence in favor of ACLP, the Court finds that the similarity of products/ services "digit" weighs in favor of ACLP. This "digit" particularly, however, appear to be a central issue for trial. Issues to be further explored in the record include any likelihood of confusion engendered by HP–PAVILION's marketing agreements with internet service providers and portals such as AOL and Yahoo! as they affect the "relatedness" of the HP's product and ACLP's services,

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...
Case 1:18-cv-00068   Document 289-4   Filed on 08/04/18 in TXSD   Page 82 of 98

1999 WL 495921

whether HTML metatags engender confusion, and the zone of expansion theory.

*iv. identity of retail outlets and purchasers*

ACLP sells its services through calling ("cold calls") or writing ("direct mail") prospective customers to solicit business, appearing at trade shows, and promoting its services on the internet, primarily through the company's web sites at *www.amicus.com* and *www.pavilion.com.* ACLP has not adduced any evidence that it has a sales force or any other arrangement other than selling its own services. It is undisputed that plaintiff has never advertised PAVILION® services. [198] The customers of ACLP are the individuals who sponsor affinity groups web sites, such as armenianet, and the customers of ANI are primarily broker-dealers who contract for password-protected PAVILION® services to be offered to their customers. [199]

[198]   Docket No. 27, Hurst Affidavit, Lane Deposition at 422–424 and docket no. 52, Supplementary Hurst Affidavit.

[199]   May 27, 1999 testimony of Lane and Passovoy.

HP on the other hand sells most of its computers, estimated by HP to be approximately 98% of its HP–PAVILION sales, through retail outlets. [200] Approximately 1,000 retailers sell HP–PAVILION computers. HP notes that only 1% of its HP–PAVILION sales are through the internet via HP's own web site. [201]

[200]   Docket No. 36, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶¶ 8, 9.

[201]   Docket No. 25, Defendant's Brief at 4; docket no. 35, Cahn Declaration, Exhibit A, Walker T.T.A.B. Declaration ¶ 9.

The evidence establishes that the products are sold through different channels of communication and trade which lessens any likelihood of confusion. There is little likelihood that a potential customer approached by ACLP directly will be confused and think HP is the provider of services. On the other hand, the record does not demonstrate a sufficient likelihood that a purchaser of a HP–PAVILION computer will consider HP to be the source of separately marketed PAVILION® internet services costing thousands of dollars or even Pavilion Technologies PAVILION

software. Similarly, the evidence shows complementary purchasers. Purchasers of ACLP's services need ready access to computers. Purchasers of HP home computers increasingly have identified ready access to the internet to be a factor influencing purchase, presumably because of a desire to access web services such as those offered through plaintiff. [202] The existence of complementary uses of plaintiff's services and defendant's product, however, does not negate the "substantial dissimilarities between the predominant purchasers of plaintiff and defendant's products." [203]

[202]   Docket No. 36, McKinney Deposition Exhibits 42 and 45.

[203]   *Amstar Corp.,* 615 F.2d at 262 *(quoted in Society of Financial Examiners,* 41 F.3d at 228–29).

**\*15**  This factor weighs in favor of HP.

*v. identity of advertising media used*

ACLP offers its services through calling prospective customers, writing prospective customers, word-of-mouth and through *www.amicus.com* and *www.pavilion.com* web sites. ANI also attends trade shows for financial services. [204] ACLP has never paid a fee to feature PAVILION® in print, in radio or in television advertisements. [205]

[204]   May 27, 1999 Lane testimony; Passovoy testimony.

[205]   May 27, 1999 Lane testimony and Defendant's Exhibit 2.

HP advertises its products primarily through offering advertising discounts to retailers when the retailer advertises HP products. [206] HP products are also advertised on the *www.hp-at-home.com* web site and in trade publications. [207]

[206]   Docket No. 27, Pedersen Affidavit ¶ 13.

[207]   Docket No. 25, Defendant's Brief at 5.

HP argues that "affinity group" is not a substantial marketing focus. [208] Absent proof of any paid targeted advertising by plaintiff, the Court must agree that there is little overlap or convergence in the advertising media used by the parties.

208     *See* Docket No. 36, McKinney Deposition Exhibits.

This factor weighs in favor of HP.

### vi. defendant's intent

ACLP argues that HP's bad intent is shown by its negligent trademark search before beginning to market its home computer line under the name HP–PAVILION. [209] Plaintiff argues that HP policy is to perform a three-part clearing process before adopting a mark, [210] which HP did not follow in this instance. [211] HP began considering the pavilion name in August 1994 when it first conducted focus group studies involving "pavilion." [212] HP argues that it relied on an August 1994 Thompson and Thompson trademark search for "pavilion" which included the database for "home personal computer" through May and June 1994. [213] HP encountered no obstacles to using the name at that time.

209     Docket No. 36, Lemley Declaration ¶¶ 2, 11–25.

210     Docket No. 36, Maker Deposition; docket No. 27, Maker Affidavit ¶ 3.

211     Docket No. 27, Maker Affidavit at 2 ¶ 8.

212     Docket No. 27, Pedersen Affidavit at 3 ¶ 7.

213     Docket No. 25, Defendant's Brief at 5; docket no. 27, Maker Affidavit ¶ 7. On August 2, 1994 ACLP filed its trademark application for "PAVILION." Docket No. 36, Lane Declaration ¶ 11.

"Proof of defendant's intent to benefit from the good reputation of plaintiff's products is not required to establish trademark infringement. If such intent can be shown, however, it may provide compelling evidence of a likelihood of confusion." [214] Bad faith, without more, may prove trademark infringement.

214     *Oreck Corp.,* 803 F.2d at 173 (citations omitted). *See also Amstar Corp.,* 615 F.2d at 263.

The Court concludes that HP's failure to up-date its trademark search prior to beginning to market the HP–PAVILION is relevant to a balancing of the hardships. [215] The intent on which the Court focuses in this aspect of the analysis is the intent to confuse—and not bad faith. In this reverse confusion case in which the junior user is selling more of its product than the senior user, the record does not show that HP undertook its use of the PAVILION name with the plan to "palm off" HP goods as those of plaintiff's. [216] Even if HP was "careless" in its trademark search before launching HP–PAVILION PCs, the Court does not find that it was careless in furtherance of a goal to "palm off." [217]

215     *See Sands, Taylor and Wood Co.,* 978 F.2d at 961 ("Thus, the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case."). The Seventh Circuit in this case did not consider the applicability of defendant's intent to the balancing of the hardships element of the preliminary injunction test or, arguably, to the relatedness/"zone of expansion" issue. The Third Circuit, however, has considered carelessness in evaluation of likelihood of confusion under this factor. *Fishons Horticulture, Inc.,* 30 F.3d at 480.

216     Plaintiff is free to develop its theory that HP's bad faith is relevant to the zone of expansion argument. *See ACCU Personnel, Inc. v. Accustaff, Inc.,* 846 F.Supp. 1191, 1208–10 (D.Del.1994).

217     Docket No. 27, Maker Affidavit ¶ 8; Pedersen Affidavit ¶ 12.

This factor weighs in favor of HP.

### vii. actual confusion

Sophistication of the buyers and the high cost of plaintiff's services and defendant's products indicate that neither are likely to be "bought on impulse, but rather with a great deal of care." [218] The cost of creating password protected web services for broker-dealer affinity groups was estimated to equal approximately \$100,000. [219] The cost of the average HP–PAVILION personal computer, on the other hand, is approximately \$ 1,000. [220] HP has introduced evidence that the purchasers of home computers" tend to be more educated, more professional and older than the average consumer in general," [221] take three to six weeks to obtain information before purchasing a home computer. [222] Neither home computers nor a web site for an affinity group are impulse purchases. Each of these purchasers, in reference to their respective markets, makes what this Court considers to be an important purchase involving a significant expenditure of resources. The degree of care exercised by potential purchasers of

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 84 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

either product or service is a factor that militates against finding a likelihood of confusion. [223]

218  *Fuji Photo Film Co., Inc.,* 754 F.2d at 595.

219  May 27, 1999 Passovoy testimony.

220  Docket No. 25, Defendant's Brief at 1 ("upwards of $1,000"); docket No. 27, Pedersen Affidavit ¶ 15.

221  Docket No. 25, Defendant's Brief at 3; docket No. 36, Cahn Declaration, Exhibit B, Pedersen T.T.A.B. Declaration ¶¶ 17, 18: The average HP–PAVILION–PC purchaser spends 3–6 weeks shopping, visits 2–3 retail stores before buying; 79% of the purchasers have some post-high school education and 46% are graduates of college or graduate school; two-thirds already own one personal computer. Docket No. 27, Pedersen Affidavit ¶¶ 16–17.

222  Docket No. 25, Defendant's Brief at 9; docket No. 27, Pedersen Affidavit ¶ 17.

223  *Oreck Corp.,* 803 F.2d at 171 ($1500 vacuum cleaner as opposed to a $3500 cleaner); *Sno–Wizard* (expensive sno-cone machine). In *Sun Microsystems, Inc. v. SunRiver Corp.,* 26 U.S.P.Q. at 1270, it was noted that consumers of internet products "are not likely to carefully discriminate among competing products;" but, the Court was considering relatively inexpensive internet software tools and applications.

*16 Plaintiff has proffered three mis-directed e-mails received between October 1998 and January 1999 in support of its argument that there has been actual confusion on the part of three purchasers of HP–PAVILION personal computers regarding the ownership of *www.pavilion.com.* [224] Plaintiff argues that there will be more instances of confusion given the future development of internet services. [225] Preserving defendant's objection to the introduction into evidence of the three e-mails, [226] the Court notes the e-mails purport to be inquiries from individuals who are using HP–PAVILION personal computers and who are asking plaintiff for trouble-shooting advice. [227] Although the Court agrees with ACLP's argument that actual confusion is not required to prove likelihood of confusion and that actual confusion is the "best evidence of likelihood of confusion," [228] this is so only if the evidence of actual confusion is relatively significant. The Court cannot conclude that three misdirected e-mails, of "unsubstantiated legitimacy"

and with "lack of corroborating evidence," [229] received by ACLP in the last eight months—when HP has sold thousands and thousands of HP–PAVILION personal computers in that same time period—are dispositive of the issue of confusion. Although the Court is mindful that it may be difficult for ACLP to uncover evidence of actual confusion, [230] HP has produced testimony to establish that those who were and are in a position to know of actual confusion are not aware of any caller to HP who believed HP and ACLP were affiliated or who indicated confusion as to source or affiliation. [231] Because ACLP and ANI take pride in the more personalized relationships they develop with customers, likelihood of confusion is diminished. [232]

224  Docket No. 36, Aroian Declaration ¶ 11 and Exhibits I and J; Lane Declaration ¶¶ 4, 34–39. One of these e-mails purportedly from an apparent ACLP or ANI employee, David Baker, Jr., to Dennis Passovoy and Larry Krone refers to telephone inquires to Amicus regarding access to web pages. The inference is that HP customers are telephoning ACLP but the Court finds insufficient information in the record to make this finding.

225  Docket No. 36, Dr. Picken Declaration ¶¶ 3.4–3.6.

226  Defendant has insisted on plaintiff authenticating the e-mails by their authors so that meaningful cross-examination could occur. Although e-mail addresses appear, plaintiff represented that it has not been able to locate the senders of the e-mails to provide testimony to the Court.

227  The Court notes that the three mis-directed e-mails in three months might indicate that the HP-at-home affinity group is not strong, since HP would have sold thousands of personal computers in that time period. Additionally, the three mis-directed emails may evidence use of a variant of "pavilion" in the HTML metatag which might contribute to misidentification. The latter theory may be included within defense counsel's suggestion in cross-examination of Passovoy that instances of email concerning HP–PAVILION PCs by ANI might be "passive" rather than "active" mistakes.

228  *Amstar Corp.,* 615 F.2d at 263.

229  *Holiday Inns, Inc.,* 481 F.2d at 449.

230  Docket No. 36, Lemley Declaration.

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 85 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

231    Docket No. 27, Pedersen Affidavit ¶ 19; docket No. 28, Robertson Affidavit.

232    May 27, 1999 Lane and Passovoy testimony. Moreover, Passovoy testified on May 27, 1999 that ANI conducted a telephone campaign in approximately November 1998 when PARTNER PAVILION services were launched and that he was aware of no significant brand confusion pertaining to that arguable variant of the PAVILION mark.

The Court's consideration of this evidence appears to be in accord with the Fifth Circuit's decisions in *Oreck* (several mis-directed telephone calls in 17–months of concurrent use of similar marks raises a "presumption ... against likelihood of confusion in the future");[233] *Sno– Wizard* (district court properly rejected testimony of four allegedly confused witnesses);[234] *Society of Financial Examiners* (12 instances of actual confusion in five-year period "refutes the likelihood of confusion");[235] *Sun Banks* (15 misdirected inquiries in a three-year period is not sufficient);[236] *Holiday Inn* (nine letters and one telephone call are "of insignificant probative value to rise to the level of showing actual confusion");[237] and *Amstar Corp.* (three instances of actual confusion and four confused witnesses in nearly 15 years of concurrent sales are "isolated" and not significant).[238] In these cases, as in the present case, instances of actual confusion are anecdotal, isolated in context and of little probative value.[239]

233    803 F.2d at 173.

234    791 F.2d at 429.

235    41 F.3d at 228.

236    651 F.2d at 319.

237    481 F.2d at 449.

238    615 F.2d at 263.

239    *See also Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3rd Cir.1978)(19 misdirected letters over 4 years is insufficient to establish actual confusion); *Accuride International, Inc.,* 871 F.2d at 1536 (misdirected invoice and merchandise on one occasion, several misdirected telephone calls and several confused witnesses too weak to support finding of actual confusion).

This factor weighs in favor of HP.

*summary*

In sum, the key question in assessing likelihood of confusion at the preliminary injunction stage is a determination of whether it is likely that an appreciable number of ordinarily prudent potential purchasers are likely to be misled or confused as to source of ACLP's PAVILION® services. Although ACLP is not required to produce evidence on all seven "digits" recognized by the Fifth Circuit, although the "absence or presence of any one factor ordinarily is not dispositive" and although "a finding of likelihood of confusion need not be supported by even a majority of the seven factors,"[240] likelihood of confusion must be viewed in the over-all market context in which the mark is used. The Court concludes that ACLP has not sustained its burden in showing that a likelihood of confusion exists among consumers as to source, affiliation, connection or sponsorship of the PAVILION® mark. "[I]t is not sufficient if confusion is merely 'possible.' "[241] The particular battle grounds for trial appear to be type/strength of the mark and similarity of products/services.

240    *Conan Properties, Inc.,* 752 F.2d at 150.

241    3 J.McCarthy § 23:3 at 23–10 to –11.

b. state dilution

**\*17** In order to establish a dilution claim under the Texas dilution statute, ACLP must show that it owns a distinctive mark and that there is a likelihood of dilution.[242] There is no requirement that plaintiff and defendant be in business competition, that the mark be "famous," or that likely consumer confusion be established.[243] "Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior users' mark with the possible future result that a strong mark becomes a weak mark."[244]

242    *See Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513 (S.D.Tex 1996), *aff'd,* 155 F.2d 526, 540 (5th

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 86 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

Cir.1998). *See, e.g.,* Restatement (Third) Unfair Competition § 25.

243     *Exxon Corp v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1081 (5th Cir.), *cert. denied,* 118 S.Ct. 299 (1977); *Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983, 993 (S.D.Tex.1990).

244     *Holiday Inns, Inc.,* 481 F.2d at 450. For example, dilution legislation flowed from a desire to prevent "hypothetical anomalies" such as "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, (2d Cir.1989).

Plaintiff argues that its mark is distinctive. "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." [245] Distinctiveness can be proved because the mark is strong or because it has acquired secondary meaning. [246] As noted above, HP argues that the proliferation in users of the word "pavilion" or a variant thereof shows that the mark lacks strength. [247] HP further argues that plaintiff's services and defendant's product are sufficiently distinct that there is no likelihood of dilution. "[T]here must be some mental association between plaintiff's and defendant's marks." [248] HP argues that ACLP has not produced evidence showing that association in this case.

245     *Mead Data Central, Inc.,* 875 F.2d at 1030 ("It has also been defined as uniqueness or as having acquired a secondary meaning .").

246     *Mead Data Central, Inc.,* 875 F.2d at 1032.

247     *Pebble Beach Co.,* 942 F.Supp. at 1564–65 (five factor test to measure distinctiveness of the mark to show dilution: (1) arbitrariness of the mark; (2) length of use of the mark; (3) scope of ads and promotions; (4) nature and extent of first user's business; and (5) scope of first user's reputation). *See also TV Land, L.P. v. Viacom International, Inc.,* 908 F.Supp. 543, 553 (N .D.Ill.1995).

248     *Mead Data Central, Inc.,* 875 F.2d at 1030.

On the present state of the record, and for the reasons stated above, the Court concludes that plaintiff's mark is in limited circulation and lacks commercial strength outside of its limited context. [249] Although the Court does not find that the mark is not sufficiently distinctive

to warrant trademark protection, the Court is troubled by the numerous third party uses of the mark which impair its distinctiveness for protection under the anti-dilution statute. Therefore, the Court does not now need to address whether defendant's use of the mark dilutes its distinctiveness. [250]

249     *See* discussion above regarding type/strength of the mark and similarity of products or services.

250     *Amstar Corp.,* 615 F.2d at 265. *See also Mead Data Central, Inc.,* 875 F.2d at 1034 ("Courts 'have consistently failed to analyze how a specific defendant's use has diluted a mark or its selling power when there is no likelihood of confusion." ') (J. Sweet, concurring).

c. summary of findings and conclusions on likelihood of success

The Court finds that ACLP has not demonstrated likelihood of succeeding on the merits of its trademark infringement or dilution claims. Because plaintiffs have failed to demonstrate an over-all substantial likelihood of prevailing on the merits, the Court undertakes a more abbreviated discussion of the remaining elements of plaintiffs' burden of proof. Nevertheless, the Court notes that ACLP's delay in initiating this federal lawsuit and its concomitant delay in requesting the issuance of a preliminary injunction strongly support this Court's decision to deny the motion for preliminary injunction. [251]

251     "[D]elay alone may justify denial of a preliminary injunction." *Citibank, N.A. v. City Trust,* 756 F.2d 273, 276 (2d Cir.1985); *but see* 756 F.2d at 969 ("Citibank does not preclude preliminary relief even if the district court finds unexcused delay. Delay is just one of several factors to consider.") (J. Jacobs, concurring).

3. *Irreparable Injury*

"The likelihood of confusion (a necessary element for success in a trademark infringement or unfair competition case) can constitute irreparable harm in a trademark case." [252] Indeed, when

252     *The TJM Corp. v. Xerox Corp.,* 25 U.S.P.Q.2d 1067, 1070 (E . D.La.1992).

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 87 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

**\*18** a plaintiff has shown a 'high probability of confusion,' there is normally a presumption of irreparable harm because "[w]hile an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; ... Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult....." [253]

[253] *Tough Traveler, Ltd v. Outbound Products,* 60 F.3d 964, 967–68 (2nd Cir.1995), *quoting Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971). *See also Sunbeam Product, Inc. v. West Bend,* 123 F.3d at 257–58; *Chemlawn Services Corp. v. GNC Pumps, Inc.,* 690 F.Supp. 1560, 1569 (S.D.Tex.), *aff'd,* 856 F.2d 202 (Fed.Cir.1988). *See also National Football League Properties,* 808 F.Supp. at 1295 n.7 ("[T]he Fifth Circuit on more than one occasion has declined to presume the existence of irreparable harm.")

Defendant argues that any presumption of irreparable harm is inoperative or has been rebutted in this case by ACLP's delay in filing suit or in moving for preliminary injunctive relief. HP argues that because: HP has been using the Pavilion name to market millions of personal computers since at least August 1995; ACLP unrebuttably has known of HP's use of the mark at least since September 1995; [254] HP–PAVILION computers have always been internet enabled; [255] HP urges the Court to find that there is no justification for issuing "emergency" interim injunctive relief. Indeed, HP further argues that ACLP's nearly three-year delay in filing this lawsuit since actual notice of HP's use of the PAVILION name for its personal computers undercuts ACLP's arguments of irreparable harm and negates its claims of urgency. [256]

[254] Docket No. 36, Lane Declaration ¶ 19.

[255] May 27, 1999 Lane testimony.

[256] *Citibank, N.A.,* 756 F.2d at 276 (nine-month delay in requesting preliminary injunction negates presumption of irreparable harm); *Tough Traveler, Ltd.,* 60 F.3d at 968 (nine-month delay in requesting preliminary injunction rebuts any presumption of irreparable harm and requires vacating preliminary injunction).

Plaintiff argues there has been no undue delay in filing this federal lawsuit because: initially the HP–PAVILION–PC was marketed as a multimedia and game computer; [257] it was not until 1997 that HP began promoting its HP–PAVILION's one-touch internet access; [258] it was not until 1998 that HP offered (and later discontinued) the Message Board service; [259] and not until October 1998 and after that ACLP received the three instances of actual confusion; and it was not until January 1999 that HP announced one-touch Yahoo! access. [260] Plaintiff further argues that its May 1996 protest letter, its formal opposition to the HP trademark for PAVILION for its personal computer, and its opposition to the use of the mark by Pavilion Technologies and others [261] also show vigilance. It is well-settled, however, that opposing a claim for registration is not the same as filing a federal lawsuit to enjoin use. [262]

[257] Docket No. 25 n.1.

[258] Docket No. 36, Lane Declaration ¶ 23; docket No. 27, Hurst Affidavit, McKinney deposition; Docket No. 36, McKinney Deposition, Exhibits 29, 45, 46, 49. Docket No. 25, Defendant's Brief at 3 ("By 1997, HP ranked third in the desktop home retail market with an approximate 10% market share."). *But see Roto–Rooter Corp,* 513 F.2d at 46 ("slightly less than five years" delay between first infringement and filing suit did not allow for laches defense because lawsuit concerning operation of El Paso franchise filed within four months of date on which El Paso operations begun).

[259] Docket No. 36, Lane Declaration ¶ 23; docket No. 36, McKinney Deposition, Exhibits 51 and 52.

[260] Docket No. 36, McKinney Deposition, Exhibit 55.

[261] Docket No. 36, Lane Declaration ¶ 22 and Exhibit J.

[262] Docket No. 25, Defendant's Brief, at 25 and cases cited therein.

The Court observes that ACLP's action in sending the May 1996 protest letter and in opposing HP's mark are sufficient to show that ACLP informed HP of its objection to HP's use of the PAVILION name in marketing personal computers. But, it is not sufficient to show that ACLP, almost four years after the introduction of the HP–PAVILION computers into the marketplace, is entitled to an "interim" order that would, as requested, force HP

Case 1:18-cv-00068 Document 289-4 Filed on 08/04/18 in TXSD Page 88 of 98

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

to clear existing inventory of HP–PAVILION computers, stop making them, and stop selling them. ACLP did not file its declaration of use until approximately three months after HP had begun selling HP–PAVILION PCs, a fact relevant to HP's good faith, and approximately two months after Lane became aware of the marketing of HP–PAVILION PCs, a fact relevant to ACLP's delay.[263] "Delay in seeking relief ... undercuts any presumption that infringement alone has caused irreparable harm *pendente lite;* therefore, such delay may justify denial of a preliminary injunction for trademark infringement."[264] It has not been rebutted that HP–PAVILION PCs always have been marketed as multimedia computers[265] and that they always could access the internet.[266]

[263]   Docket No. 36, Lane Declaration ¶¶ 10, 11; Docket No. 27, Hurst Affidavit, Exhibit F; Docket No. 36, Braun Deposition, Exhibit 68; May 27, 1999 hearing, Lane Testimony. *See* note 65, above. At the May 27, 1999 hearing, Lane testified that after learning of the HP–PAVILION in August or September 1995, he did not investigate its features until the Spring of 1996.

[264]   *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984)(three-year delay in bringing suit or notifying of objection to use of mark undercuts urgency and requires vacating preliminary injunction). *Floralife, Inc. v. Floraline International, Inc.,* 633 F.Supp. 108, 113 (N.D.Ill.1985) (three week delay between allegedly infringing use and application for injunction was not undue delay).

[265]   Docket No. 27, Pedersen Affidavit ¶ 15 and Exhibit A at 2 (the internet access key is called "one touch multimedia key").

[266]   Docket No. 25, Defendant's Brief at 16 n.13; May 27, 1999 hearing, Lane testimony.

**\*19** The Court finds that ACLP's delay in seeking injunctive relief in Court, standing by itself and in conjunction with the Court's findings on likelihood of success, rebuts any presumption of irreparable harm. In holding that delay is an important consideration in the assessment of irreparable harm, the Court does not address whether the defense of laches will bar relief at trial.[267]

[267]   *GTE Corp.,* 731 F.2d at 679; *Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc.,* 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied,* 434 U.S. 1070 (1978).

*See also Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155 (5th Cir.1982) (two years' delay not counted toward *laches* ); *Brookfield Communications, Inc.,\_\_\_\_* F.3d \_\_\_\_, 1999 WL *232021 (two years' delay did not estop claim under laches).

### 4. *Balancing*

Plaintiff argues that the cost to be incurred by HP if the preliminary injunction issues is outweighed by the harm to plaintiff if the preliminary injunction does not issue. The Court cannot agree. Using plaintiff's estimate that this "interim" injunctive relief will cost HP approximately $4.3 million in selling existing inventory,[268] this harm is to be balanced against ACLP's inability to identify any lost sale of ACLP PAVILION® services or any material detriment to any customer relationship suffered by ACLP or ANI due confusion with HP–PAVILION PCs.[269]

[268]   HP estimates the costs as being closer to $40 million in lost revenues to retailers, in addition to approximately $90 million to be incurred by HP, if the injunction is issued. Docket No. 25, Defendant's Brief at 28 n.30; docket No. 27, Anderson Affidavit at 3–4 ¶ 9.

[269]   Docket No. 27, Hurst Affidavit, Lane Deposition at 431; May 27, 1999 Lane testimony.

ACLP argues that HP did not follow an adequate trademark clearance process when it cleared PAVILION for use as a brand name of HP's home computer. Indeed, ACLP asserts that HP did not follow its own trademark clearance procedures when it cleared the name.[270] ACLP contends that this reckless conduct justifies immediate cessation of use of the PAVILION name by HP. ACLP argues at the hearing that HP "assumed the risk" when it began using a name which had not been properly cleared. On the other hand, HP argues that plaintiff's delay in seeking injunctive relief and plaintiff's failure to identify any loss of sales due to the alleged confusion weigh against finding a need for "emergency" interim relief.

[270]   Docket No. 36, Lemley Declaration.

Although neither party comes to the Court with an unblemished position on the balancing of the equities, the Court concludes that ACLP has not met its burden of showing that the threatened injury it would suffer if interim injunctive relief did not issue outweighs the damage granting the injunction would cause to defendant. If HP must change its product name now, it is "probably

Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., Not Reported in F.Supp.2d...

1999 WL 495921

unrealistic" to expect that it would change the name of its popular personal computer back to "PAVILION" again if it wins on the merits. "The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." [271] In this case, the costs to be incurred by HP if the Court were to enter a preliminary injunction are so significant, that a preliminary injunction would have the practical effect of mooting a consideration of final injunctive relief: once HP has sold accumulated inventory of HP–PAVILION computers and stopped making and selling new ones, as requested by ACLP in its proposed interim injunction, it is unlikely that HP would again market the HP–PAVILION personal computer were HP to prevail on the merits. [272] Although the Court does not denigrate ACLP's legal position on the merits of this case, ACLP has not sustained its burden of establishing that the balance of the equities favors interim injunctive relief in this case.

[271] *GTE Corp.,* 731 F.2d at 678.

[272] *National Football League Properties,* 808 F. Supp at 1295 ("Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied. *Apple Barrel Prods. Inc. v. Beard,* 730 F.2d 384, 389–90 (5th Cir.1984)").

### 5. *Public Interest*

**\*20** Plaintiff argues that the public interest is served by protecting trademarks. [273] The Court does not quarrel with this black letter statement of law and public policy. Plaintiff has not shown that denying the injunction will dis-serve the public interest in the facts and circumstances of this case.

[273] *International Kennel Club v. Mighty Star,* 846 F.2d 1079, 1092 n.8 (7th Cir.1988).

## V. CONCLUSION

In sum, plaintiff's motion for a preliminary injunction [274] is DENIED on the ground that plaintiff has not sustained its burden of establishing its entitlement to preliminary injunctive relief pending the disposition of the merits of the case. This Order shall be SEALED only for seven (7) days following the date it is filed. *See* note 18, above.

[274] Docket no. 10.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 1999 WL 495921

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 304



B05001

### NATIVITY AND CITIZENSHIP STATUS IN THE UNITED STATES
Universe: Total population in the United States
2012-2016 American Community Survey 5-Year Estimates

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

|  | Texas | |
|---|---|---|
|  | **Estimate** | **Margin of Error** |
| Total: | 26,956,435 | ***** |
| U.S. citizen, born in the United States | 22,086,661 | +/-19,454 |
| U.S. citizen, born in Puerto Rico or U.S. Island Areas | 85,050 | +/-3,852 |
| U.S. citizen, born abroad of American parent(s) | 290,379 | +/-4,592 |
| U.S. citizen by naturalization | 1,589,804 | +/-10,373 |
| Not a U.S. citizen | 2,904,541 | +/-19,889 |

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

Explanation of Symbols:

  1. An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
  2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
  3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
  4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
  5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.

6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

7. An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

8. An '(X)' means that the estimate is not applicable or not available.

# DEF-INTERV.

# EX. 305

**Transcripts**

 Jul 16, 2018 Jeon, Esther 06-15-2018

**Page:** 68

1  BY MR. BITTER:
2      **Q.    You can answer, if you know.**
3      A.    I understand that as it pertains to me,
4  as a DACA recipient, I would have been allowed to
5  leave the United States.
6      **Q.    So your understanding is that advanced**
7  **parole is what allows you to travel outside the**
8  **United States; is that right?**
9      A.    As it pertains to me a DACA recipient,
10 that is how I understand it.
11     **Q.    Have you applied for advanced parole?**
12     A.    No.
13     **Q.    Are you aware of others who have applied,**
14 other DACA recipients who applied for advanced
15 parole?
16     A.    Yes.
17     **Q.    Do you have any understanding about the**
18 advanced parole process based on others that you
19 know who have applied for it?
20     A.    No.
21     **Q.    You just know that others have applied**
22 for advanced parole; is that fair?
23     A.    Yes.
24     **Q.    Do you know anything about the process**
25 beyond that?

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Esther Jeon on 06/15/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF TEXAS

 3                   BROWNSVILLE DIVISION

 4
      STATE OF TEXAS, et al.,      )
 5                                 )
                  Plaintiffs,      )
 6                                 )
          vs                       ) No. 1:18-CV-68
 7                                 )
      UNITED STATES OF AMERICA,    )
 8    et al.,                      )
                                   )
 9                Defendants.      )
                                   )
10          and                    )
                                   )
11    KARLA PEREZ, et al.,         )

12

13              The deposition of Esther Jeon called for

14    examination pursuant to notice and pursuant to the

15    Federal Rules of Civil Procedure for the United

16    States District Courts pertaining to the taking of

17    depositions taken before JO ANN LOSOYA, Certified

18    Shorthand Reporter within and for the County of Cook

19    and State of Illinois at 11 East Adams, Chicago,

20    Illinois, on June 15, 2018 at the hour of 11:00

21    o'clock a.m.

22

23

24

25
```

ERRATA SHEET

Case:
Witness:

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

Page _____   Line _____   Reason for change:

_____

7/13/2018

```
 1                    REPORTER CERTIFICATE

 2

 3          I, JO ANN LOSOYA, a Certified Shorthand

 4    Reporter within and for the County of Cook and State

 5    of Illinois, do hereby certify:

 6                    That previous to the commencement

 7    of the examination of the witness, the witness was

 8    duly sworn to testify the whole truth concerning the

 9    matters herein;

10                    That the foregoing deposition

11    transcript was reported stenographically by me, was

12    thereafter reduced to typewriting under my personal

13    direction and constitutes a true record of the

14    testimony given and the proceedings had;

15                    That the said deposition was taken

16    before me at the time and place specified;

17                    That I am not a relative or

18    employee or attorney or counsel, nor a relative or

19    employee of such attorney or counsel for any of the

20    parties hereto, nor interested directly or

21    indirectly in the outcome of this action.

22

23

24

25
```

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Esther Jeon on 06/15/2018                                    Page 100

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2    hand this June 27, 2018.

 3

 4

 5

 6

 7

 8

 9              JO ANN LOSOYA, CSR
                C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```