**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**DEFENDANT-INTERVENORS' SUPPLEMENTAL APPENDIX IN SUPPORT OF
THEIR RESPONSE IN OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL POST-
DISCOVERY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
INJUNCTION**

| EXH. NO. | DOCUMENT |
|---|---|
| 151 | Michael Knowles Deposition Excerpts |
| 306 | Stephen H. Legomsky Deposition Excerpts |

Dated: August 4, 2018                              Respectfully Submitted

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
Ernest I. Herrera (Tex. Bar No. 24094718);
(SD of Tex. Bar No. 2462211)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

Priscila Orta
Mexican American Legal Defense and
Educational Fund
11 East Adams, Suite 700
Chicago, IL 60603
Tel: (312) 427-0701
Email: porta@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600

(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(pro hac vice application pending)

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## <u>CERTIFICATE OF SERVICE</u>

     I, the undersigned, hereby certify that, on the 4th day of August, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perale*s

Nina Perales

# Def-Int. Ex. 151

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**

```
 1               UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3                   + + + + +

 4      _____
                                       :
 5    IN THE MATTER OF:                 :
                                       :
 6    STATE OF TEXAS, ET AL.,           :
                                       :
 7                    Plaintiff,        :
                                       :
 8       v.                             :   Civil Action No.
                                       :   1:18-CV-00068
 9    UNITED STATES OF AMERICA,         :
      ET AL.,                           :
10                    Defendants,       :
                                       :
11    and                               :
                                       :
12    KARLA PEREZ, et al.,              :
                                       :
13                    Defendant-        :
                      Intervenors,      :
14                                      :
      and                               :
15                                      :
      STATE OF NEW JERSEY,              :
16                                      :
                      Defendant-        :
17                    Intervenor.       :
                                       :
18      _____:

19                    Thursday,
                      August 2, 2018
20
                      Washington, D.C.
21

22    DEPOSITION OF:

23                    MICHAEL KNOWLES

24

25
```

     1   called for examination by Counsel for the
         Defendant-Intervenors, pursuant to Notice of
     2   Subpoena, in the law offices of Mexican American
         Legal Defense Fund, located at 1016 16th Street,
     3   NW, Washington, D.C., when were present on behalf
         of the respective parties:

     4
         APPEARANCES:
     5
         On Behalf of Mexican American Legal Defense Fund:
     6
         NINA PERALES, ESQ.
     7   1016 16th Street, NW
         Suite 100
     8   Washington, D.C. 20036
         210-845-5147
     9   nperales@maldef.org

    10   On Behalf of the State of Texas:

    11   ADAM ARTHUR BIGGS, ESQ.
         Special Counsel for Civil Litigation
    12   Office of the Attorney General of Texas
         P.O. Box 12548
    13   Austin, Texas 78711-2548
         512-936-0750
    14   adam.biggs@oag.texas.gov

    15

    16   On Behalf of the State of New Jersey:

    17

    18   JEREMY E. HOLLANDER, ESQ.

    19   Assistant Attorney General

    20   124 Halsey Street

    21   P.O. Box 45029

    22   Newark, New Jersey 07101-5029

    23   973-648-7453

    24   jeremy.hollander@law.njoag.gov

    25

```
 1

 2

 3

 4

 5

 6   APPEARANCES: (cont.)

 7

 8   On Behalf of the United States:

 9

10   JEFFREY WALKER, ESQ.

11   U.S. Department of Justice

12   Trial Attorney

13   Ben Franklin Station

14   P.O. Box 868

15   Washington, D.C. 20044

16   202-532-4468

17   james.walker3@usdoj.gov

18

19   ALSO PRESENT:

20

21   ALEJANDRA AVILA*

22   RAI SHAY LIN

23

24   *Present telephonically

25
```

```
 1

 2

 3

 4

 5

 6                         CONTENTS

 7

 8   WITNESS                DIRECT  CROSS

 9

10   Michael Knowles

11   By Ms. Perales          6      144

12   By Mr. Biggs           48      147

13   By Mr. Hollander      137

14

15

16   EXHIBIT NO.                           PAGE

17

18   1    Deposition Subpoena. . . . . . . . . . . . . 7

19   2    Signed Declaration from

20        Kenneth Palinkas April 6, 2018 . . . . . . .35

21

22

23

24

25
```

1                    P-R-O-C-E-E-D-I-N-G-S

2                                              11:05 a.m.

3              MS. PERALES:  We're on the record.

4              COURT REPORT:  Mr. Knowles, can you

5     please raise your hand?

6              MR. KNOWLES:  Mm-hmm.

7              COURT REPORTER:  Do you solemnly swear

8     or affirm that the testimony you're about to give

9     is the truth, the whole truth and nothing but the

10    truth?

11             MR. KNOWLES:  I do so affirm.

12             COURT REPORTER:  Thank you so much.

13             MS. PERALES:  Good morning, Mr.

14    Knowles.

15             MR. KNOWLES:  Good morning.

16             MS. PERALES:  My name is Nina Perales

17    and I am an attorney for the Perez Defendant

18    Interveners in this case.

19             Before we get started, I'd like to

20    have everybody else here introduce themselves

21    because we'll probably have several people

22    questioning you today.

23             So, to my right, if you wanted to

24    introduce yourself.

25             MR. HOLLANDER:  Yes, I'm Jeremy

1  separate from the field office directorate.

2         Q     Okay.  Do you have -- are you a member

3  of a union?

4         A     I am.

5         Q     What is the name of the union that you

6  are a member of?

7         A     The American Federation of Government

8  Employees.  And within that larger organization,

9  there is the National Citizenship and Immigration

10  Services Council of which I'm the president.

11               And, it's also known as Council 119.

12  Within that council there are 22 local unions

13  representing USCIS employees.  And, I'm the

14  president of Local 1924 which is the local union

15  in the National capitol area representing USCIS

16  employees.

17         Q     Would it be okay for me to refer to

18  Council 119 as NCISC?

19         A     Yes.

20         Q     And, would it also be okay for me to

21  refer to it as the USCIS Union?

22         A     That would be okay.  It's less

23  cumbersome.

24         Q     Yes, and so I might refer to it --

25  would it also be okay if from time to time,

1  instead of saying USCIS, that I might just say

2  CIS?

3        A      Mm-hmm, yes.

4        Q      Okay.  How many people are in the

5  bargaining unit of the NCISC?

6        A      It's approximately 12,500 in what we

7  call the nonprofessional bargaining unit.  And,

8  there's approximately 100 in what we call the

9  professional bargaining unit.

10             Professional would be attorneys,

11  accountants, statisticians, social scientists

12  that whose job requires a particular specialized

13  degree.

14             But Council 119 represents only the

15  nonprofessional unit which is about 12,500.

16        Q      And, does that 12,500 include

17  employees who are known as Immigration Service

18  Officers?

19        A      Yes.

20        Q      And, will it be okay if I refer to

21  Immigration Service Officers as ISOs?

22        A      Yes.

23        Q      All right.  Now, you mentioned that

24  you are also the president of your Local 1924.

25  Is that right?

 1        A      Yes.

 2        Q      So, you hold two presidencies at the

 3   same time?

 4        A      That's right.

 5        Q      And, how many members in the

 6   bargaining unit of your Local?

 7        A      In Local 1924 represents approximately

 8   2,000, the bargaining unit from the

 9   nonprofessionals.  We also represent the 100

10   bargaining unit employees in the professional

11   unit.

12              And, they are generally located in the

13   National capitol area, although we have some who

14   are posted abroad.

15        Q      All right.

16        A      That would be the CIS Headquarters,

17   the Asylum Office, the Washington District and

18   Field Office, the Potomac Service Center, the

19   Administrative Appeals Unit, the Investor Program

20   Office and our international officers that have

21   deployed abroad.

22        Q      With a bargaining unit of

23   approximately 2,000 people, how large is your

24   Local compared to some of the other constituent

25   parts of the CIS union?

```
 1         A      Right.  So, remember, I said there are
 2    22 Local unions around worldwide that represent
 3    CIS employees.
 4                Local 1924 is probably the largest in
 5    terms of bargaining unit size as well as
 6    membership.
 7                Of the 2,000 bargaining unit, about
 8    800 members.
 9                The second largest would be our Local
10    that's based out in Nebraska and the Upper-Mid-
11    West that includes the Nebraska Service Center,
12    the National Benefit Center, the National Records
13    Center and various field offices there.
14                They are roughly about the same size,
15    but slightly smaller.
16         Q      Okay.  When did you become president
17    of Local 1924?
18         A      In 2000, the year 2000.
19         Q      And, have you held the position of
20    president continuously since 2000?
21         A      Yes, I've been re-elected many times.
22         Q      And, can you briefly summarize your
23    responsibilities as president of Local 1924?
24         A      So, I provide general oversight to the
25    affairs of the Local.  I'm the Chief Executive of
```

1   our Executive Board.

2            I'm, you know, ultimately responsible

3   for the legal and financial affairs of the Local.

4   And, I represent the Local in other union

5   settings with AFGE National, our AFG District,

6   and of course, our CIS Council, National CIS

7   Council.

8        Q    And, can --

9        A    And, we, you know, we bargain and

10  negotiate contracts, agreements.  We handle

11  grievances, arbitrations, dispute resolutions and

12  generally represent the bargaining unit in

13  matters affecting their working conditions and

14  dealing with the Agency.

15       Q    And, when you say the Agency, do you

16  mean USCIS?

17       A    Yes, yes.

18       Q    Can you briefly summarize your duties

19  as the president of the USCIS union?

20       A    Yes, as president of the Council, I'm

21  the Chair of our Executive Board.  And, I provide

22  general oversight to the affairs of the Council.

23            It is a Council of 22 Locals.  It's

24  not really a separate organization, it's really

25  more of a steering committee.  And, we represent

1  the 22 Locals in matters that affect them

2  collectively.

3            So, for example, I was the chief

4  negotiator of the USCIS -- chief negotiator for

5  the union of the USCIS Labor Contract, also known

6  as the collective bargaining agreement.

7            I would negotiate national agreements

8  with the Agency that affect the nationwide

9  workforce or matters that affected more than one

10  Local.

11           Sometimes we might engage in

12  litigation on behalf of the Council,

13  arbitrations, EEO complaints, appeals to the

14  Merit Systems Protection Board.

15           And, we provide assistance and

16  guidance to our Locals.  The Locals are

17  autonomous within our Council.  So, I don't

18  direct, you know, I don't direct the other Local

19  presidents, but I represent them.

20           And, when they need assistance, we

21  provide training, guidance.  We might help

22  intervene on behalf of those Locals with the

23  higher Agency leadership.

24      Q    When did you become the USCIS

25  president?

```
 1        A      This is -- I've served two different

 2   terms.  The first one was from 2007 to 2009.

 3              And, my current term from 2015 to the

 4   present.  It's a three-year term.

 5        Q      Does that mean you're up for election?

 6        A      Yes, our elections are in August.

 7        Q      So, this --

 8        A      The 11th of August is our election.

 9        Q      Okay.  Are you in a contested

10   election?

11        A      Yes.

12        Q      Okay.  Now, when you were elected

13   USCIS president in 2015, was that a contested

14   election?

15        A      It was.

16        Q      And, what was the name of your

17   opponent?

18        A      Kenneth Palinkas.

19        Q      Okay.

20        A      He was the incumbent president.

21        Q      Okay.

22        A      At the time.

23        Q      In your role as USCIS president -- in

24   your role as USCIS union president, do you have

25   interactions with union members in offices other
```

 1   than your own?

 2        A     Yes, frequently.

 3        Q     Can you describe those interactions?

 4        A     Yes, I mean, normally, well, for the

 5   Local as the Local president, I'm, you know, I'm

 6   constantly moving among all of the units, meeting

 7   with employees, attending town hall meetings,

 8   meeting with management.

 9             I like to talk with as many employees

10   as possible so I get a good sense of what their

11   concerns and interests are.  Individuals call me

12   asking for advice and assistance.

13             With respect to the other Locals, the

14   usual point of contact would be with the Local

15   president or their designee.

16             Sometimes, I might get a call from a

17   random employee and office around the country and

18   I would then direct them, you know, for proper

19   assistance to their Local president.

20             We have periodic conference calls,

21   conferences.  I visit other offices and other

22   Local unions jurisdictions.  So, there's quite a

23   bit of interaction.

24        Q     Have you ever bene to a USCIS Service

25   Center?

```
 1          A      I have.  In fact, our Local 1924

 2    represents the Potomac Service Center which is in

 3    Crystal City, Arlington, Virginia.  I go there

 4    frequently.

 5                 And, I've visited all of the other

 6    Service Centers, Vermont, Nebraska, Texas,

 7    California in the course of my work with the

 8    union.

 9          Q      And, when you visit Service Centers,

10    do you have an opportunity to speak to the staff

11    at those Service Centers?

12          A      Yes.  Yes, sometimes we've had

13    negotiations, meetings.  Sometimes, it's a

14    courtesy visit.

15                 When we signed the current collective

16    bargaining agreement with the Agency, we actually

17    did that in conjunction with the visit of the

18    former director, Leon Rodriguez, to the Nebraska

19    Service Center.

20                 And, I traveled there with our AFG

21    National president.  We sought and made a big

22    ceremony signing the CBA with Director Rodriguez.

23                 And then, we actually toured the

24    entire Service Center and met, you know, went

25    desk to desk, the Director and I, and the
```

```
 1    National Union president went and basically met

 2    every employee in the building.

 3         Q    All right.  Now, are you familiar in

 4    a general sense with the types of applications

 5    that are adjudicated at Service Centers?

 6         A    I'm not familiar as a worker with

 7    those form types because my job is just

 8    adjudicating asylum claims.  But, I have general

 9    familiarity with the kinds of benefits that

10    various offices adjudicate.

11         Q    And, do you know where DACA requests

12    are adjudicated?

13         A    Generally, in Nebraska, the Nebraska

14    Service Center.  And, at some time, they have

15    been also done at the California Service Center.

16              But, if you're familiar with the

17    Service Center operations, they tend to shift

18    work around the country.  I think at one time

19    earlier in the Agency's evolution, they would,

20    you know, they had different portfolios assigned

21    to different Centers.

22              But, it's really a mobile work,

23    depending on volume, backlogs, staffing and so

24    on.

25         Q    Do adjudications at USCIS Service
```

```
 1    Centers typically include an interview?

 2         A     No, they do not.

 3         Q     Are you aware of DACA --

 4         A     In fact, I'm sorry, I'm not aware of

 5    any interviews being conducted in Service

 6    Centers.  They're really not set up, you know,

 7    there's no interview offices, no -- there's no

 8    what we call public interface between the Service

 9    Centers and the public.

10              Although, sometimes, a Service Center

11    may send a case to a field office with a request

12    that the field officer interview the applicant to

13    obtain further information or evidence.

14         Q     Are you aware of any specific

15    instances where a DACA request was referred to a

16    field office for interview?

17         A     Yes, I'm aware of, you know,

18    anecdotally.  I don't -- because I don't do the

19    work.  But, I have spoken with several of my

20    colleagues in recent months about that question.

21              I've spoken specifically with our

22    union reps in the Washington, D.C. Field Office

23    and the Atlanta, Georgia Field Office.  And, they

24    told me about doing interviews on behalf of the

25    Service Center in several cases where the Service
```

```
 1   Center needed more information.  They called in
 2   the DACA applicant.
 3             I think in these cases, they were
 4   suspected of gang activity or gang association.
 5   And so, they brought in the applicants and
 6   pursued the lines of questioning requested by the
 7   Service Center.  Sent the cases back to the
 8   Service Center with the findings.
 9        Q    Have you had an opportunity to speak
10   with members of the USCIS union about how they
11   adjudicate DACA applications?
12        A    Yes, I've spoken with the former
13   president of the Local that represents employees
14   at the California Service Center.  I say former
15   because they just had an election.  That
16   individual is now the vice president, same Local.
17             I've spoken with the president of the
18   Nebraska Service Center and the vice president of
19   the Nebraska Service Center.
20             I can't recall whether the California
21   president has personally adjudicated DACA cases.
22   I believe he may have.
23             But, the two individuals in Nebraska
24   both -- they are ISOs who had done DACA.
25        Q    And, you spoke to those two?
```

```
 1        A     Yes, yes.

 2        Q     Okay.  And, did you have occasion to

 3   speak with these union members who include DACA

 4   adjudications about whether they rubberstamp

 5   applications?

 6        A     Yes.

 7        Q     And, can you convey or share with us

 8   what you learned from those conversations?

 9        A     Well, I asked them, you know, what

10   would you say to the criticism that this

11   adjudication is a rubberstamp operation?

12              They said no, far from it.  We have

13   very specific training and guidance.  Every case

14   is treated on its own merits.  We do thorough

15   examination of the evidence.

16              We do the necessary background checks.

17   We flag any cases that are of concern or

18   supervisory review.

19              The individuals kind of bristled at

20   the thought that they would -- it would be said

21   that their colleagues rubber-stamped anything.

22        Q     Did you have occasion to talk with any

23   DACA adjudicator about how much consideration

24   they gave and how much discretion they exercised

25   with respect to DACA applications compared to
```

1   other applications that they may adjudicate?

2          A     Yes, I mean, I asked them, it's really

3   in the same conversation about so-called rubber-

4   stamping.  I said, it's been said by critics of

5   the program that you guys don't have any

6   discretion.

7               And, they were quite surprised and

8   said, well, yes, we -- by definition, any

9   adjudication requires some discretion.  That's

10  why we have immigration officers who are trained

11  in immigration law to apply the law on a case by

12  case basis and use discretion in their decisions.

13              They're not under orders to

14  automatically approve or deny a case.  They're

15  looking at case by case.

16              Does the applicant -- I would say this

17  of any adjudication, does the applicant meet the

18  stated criteria or not?  And, even if they do

19  meet the stated criteria, are there any

20  discretionary reasons to deny them or any

21  mandatory reasons such as criminal record or

22  possible terrorist, national security threat, et

23  cetera, et cetera.

24              So, they -- one individual said, of

25  all the form types that he had adjudicated at the

```
 1   Nebraska Service Center, DACA, he felt, was the

 2   most -- the one that required the most

 3   discretion.

 4              And, he said, particularly, because

 5   the requirements were quite stringent to show the

 6   physical presence, to show the continuous

 7   physical presence and also to make sure that

 8   there was no criminal record.

 9              And, also, that there was no fraud

10   involved.

11       Q    Did you have occasion to speak with

12   DACA adjudicators or other union members about

13   the use of discretion and the criteria related to

14   education?  The DACA criteria that the individual

15   either be in school or have completed high

16   school?

17       A    I didn't ask specifically, you know,

18   do you discretion with that?  I asked just in

19   general, do you use discretion to making your

20   decision.

21              Now, they did, in the course of

22   describing their work, they were describing their

23   work because I asked them to describe their work,

24   because I don't know their work other than what I

25   read in the newspapers about the program.
```

1          So, what are you looking for in terms

2     of qualification?  They're looking at, of course,

3     continuous presence, time of entry, the age,

4     education, military service and criminal records.

5          The only thing I remember them telling

6     me about specifically about the education was

7     that they were particularly attentive to looking

8     at potential fraud.

9          And, they referred to with some pride

10    of ownership that their unit had successfully

11    worked with our fraud detection and national

12    security folks and ICE to uncover and pursue

13    prosecution because ICE pursued the prosecution

14    of so-called diploma mills.

15         And so, they were particularly

16    vigilant about possible document fraud.

17    Q     And, in order for a DACA adjudicator

18    to figure out whether an applicant was presenting

19    information that might be related to a diploma

20    mill, did they describe that they were using

21    discretion in that consideration?

22    A     I didn't ask those kind of questions.

23    I don't have any personal knowledge of how they

24    pursued their adjudications.

25    Q     Okay.

```
 1        A       They just, you know, reiterated that

 2   they do it with due diligence and coordination,

 3   they don't do it in a vacuum.  They work, as I

 4   said, closely with the Fraud Detection and

 5   National Security folks.

 6                When there are indicators of problems,

 7   they're instructed to flag them, bring them to

 8   their supervisors and pursue whatever avenues are

 9   necessary.

10        Q       Is it fair to say that DACA requests

11   are adjudicated by Immigration Service Officers?

12        A       Yes.

13        Q       And, are you familiar with the

14   training generally that is offered Immigration

15   Services Officers?

16        A       Yes, well, there is the BASIC

17   Immigration Service Officer Training, also known

18   as BASIC, all caps.

19                It is a -- it was historically, I

20   think a four-week course.  It's now been extended

21   this year.  I can't recall to five or six weeks,

22   which every Immigration Services Officer must

23   take.  And, so a requirement of their employment,

24   must take it and pass.

25                And, that's conducted at our Service
```

```
 1   Academy in Charleston, South Carolina.  But,
 2   sometimes, like in the case of our Service Center
 3   here in Arlington, Virginia, that was a fairly
 4   new Service Center.  They had to hire a lot of
 5   employees at one time.
 6              They actually brought the training
 7   staff up and trained them on the site.
 8              Similarly, asylum officers and refugee
 9   officers also go to BASIC training.  Anyone who
10   adjudicates an application has to go the BASIC
11   training course.
12              And then, there's additional training,
13   depending on the job.  So, for asylum, we have a
14   whole asylum training academy.  Same thing for
15   the refugee officers.
16              In the Field Offices, they may get
17   additional specialized training in interviewing.
18   And, in the Service Centers, and all offices,
19   there are on site trainers who provide continuous
20   training that's specific to the form types, the
21   use of the databases.
22              There's lots of ongoing required
23   training about privacy, computer security,
24   integrity, EEO, safety and health.  So, there's
25   constant training going on.
```

```
 1        Q       From time to time, do you, as the
 2   union president, advocate to management regarding
 3   workload or work conditions of your union
 4   members?
 5        A       Well, that's one of the main things
 6   that we do.  There are things which we sometimes
 7   negotiate in a formal agreement.  And, there are
 8   other areas of advocacy that are what we would
 9   call in the nonnegotiable category.
10                Because, according to the Labor Law,
11   there are things that are exclusive management
12   rights such as assignment of work, the methods
13   and means of production, the technology that's
14   used.  You can't negotiate over, you know, what
15   system they're going to use, but we negotiate
16   over how it's applied, the effect there is on the
17   workforce.
18                We recently negotiated over the
19   implementation of new performance measures.  That
20   was partly due to standardization from DHS and
21   OPM, but also we were looking for more standard
22   performance measures within the Agency.
23                Now, during those negotiations, of
24   course, it was made very clear by the Agency that
25   things like metrics that are used to evaluate
```

1   productivity was in the area of management's

2   exclusive rights.  And, our views were welcomed,

3   but it was a nonnegotiable issue.

4            Now, for our constituents, I would say

5   across the Agency, whether it's Field Offices,

6   Service Centers, Asylum Offices, are very, very

7   concerned about their caseload.

8            And, I would say that's probably one

9   of the universal themes among my members is they

10  feel that they've got too much work to do in too

11  little time.  And, they are working under

12  extremely stringent quality control standards.

13           And so, there's a lot of pressure.

14  There's a lot stress.  There's a lot of people

15  saying they're working through their lunch or

16  they sometimes come in early or stay late, which

17  they're not supposed to be according to the Fair

18  Labor Standards Act, you're not supposed to be

19  working for free.

20           But, a lot of people work, as we say,

21  off the clock because they feel they have to meet

22  the production standards.

23           So, we, even though those -- it's not

24  a negotiable area, I'm constantly talking to the

25  senior leadership says, you know, it's your right

```
 1   to assign the work, but make sure it's a
 2   reasonable caseload.  Make sure that you're on
 3   top of your staffing.  Make sure that people have
 4   the right training, the right equipment and that
 5   the supervision that they get should be of a
 6   coaching and a mentoring kind of leadership, not
 7   just counting widgets.
 8              So, it's an area of constant, well, I
 9   would say creative tension between quality and
10   quantity.
11              But, having said that, we are held to
12   very high quality standards.  And, my own office,
13   we have a 100 percent review, supervisory review.
14   If I don't get it right, they send the case back
15   and have me do it over again.
16        Q    Has any DACA adjudicator that you've
17   spoken to or any union member in a Service Center
18   told you that DACA applications are rubber-
19   stamped because of high workload?
20        A    Not specifically.  I mean, they did
21   not describe it to me as, hey, you know, DACA is
22   the worst of all as far as assembly line.
23              That the pressure to produce, I would
24   say, is equally felt among form types in Service
25   Centers, in Field Offices, in Asylum Offices.
```

 1              We, you know, we're adjudicating

 2      benefits that involve people on an industrial

 3      scale.  And, there's always those that had a

 4      tension.

 5              So, I did, however, have our union

 6      reps from Nebraska say that they were often told

 7      to make sure that they got the decisions right

 8      and that they should take the time that they

 9      needed to do the case correctly.

10              That doesn't mean that the pressure's

11      off to produce, but they were specifically told

12      not to sacrifice quality in order to make their

13      production.

14         Q    And, were any -- did anybody

15      communicate to you that that was the case

16      specifically with DACA that they ought to take

17      the time --

18         A    Yes.

19         Q    -- to do it right?

20         A    Yes, yes.

21         Q    And, can you share that with us?

22         A    Well, I thought I just did, like the

23      individual said. I, you know, said are you

24      pressured to keep the line moving?  He said,

25      well, yes, we're always pressured to keep the

 1   line moving, the production line.

 2              But, we're also told to take the time

 3   that's needed to, you know, look at all aliases,

 4   because many applicants have, you know, at

 5   various times, different encounters with the

 6   Agency or other immigration agencies have used

 7   different names that, of course, we know with

 8   various cultures and linguistic groups, you've

 9   got different name orders, family name, given

10   name, matrilineal, patrilineal.

11              And, we have to -- well, all of us are

12   trained regardless of form type that you have to

13   meticulously run in our background checks all

14   possible aliases.

15              And, my performance is, we use the

16   term dinged.  We get dinged on our performance

17   quality if we fail to check all aliases.  It

18   comes back to the employee.

19              And so, the individual said, they're

20   told, you know, make the decision, but make sure

21   you get it right and that you do check all the

22   databases, you do check and follow up on all

23   possible hits and leads of criminal activity.

24              MS. PERALES:  I'm going to hand you

25   what has been marked Deposition Exhibit Number 2.

1            And, I will represent to you that this

2    is a signed declaration from Mr. Kenneth Palinkas

3    from April 6, 2018.

4            And, you can find that information on

5    the very last page with the date and signature.

6            First, can you tell me who is the

7    president of the USCIS union on April 6th, 2018?

8                        (Whereupon, the above-

9                        referred to document was

10                       marked as Deposition Exhibit

11                       No. 2 for identification.)

12           MR. KNOWLES:  That would be me.  If

13   you're referring to the National CIS Council 119,

14   that would be me.

15           Mr. Palinkas is the former president

16   of the Council, as I said earlier.  And, he's

17   currently the president of Local 0235 in the New

18   York area, New York City area.

19           MS. PERALES:  I'd like you to turn

20   with me, if you would, to the first page of the

21   declaration.  And, I'd like you to look at

22   towards the bottom of the page, there is a

23   paragraph that starts with the word "however."

24           MR. KNOWLES:  Mm-hmm.

25           BY MS. PERALES:

```
 1          Q       And the second sentence, and tell me
 2    if I read this correctly, quote, management has
 3    continually transformed USCIS from a service that
 4    serves to protect our national security and the
 5    rule of law into one that, instead, serves to
 6    protect undocumented immigrants and their
 7    lawyers, unquote.
 8                  Did I read that correctly?
 9          A       Yes, that's how I read it.
10          Q       Okay.  Do you agree with that
11    statement?
12          A       I don't.
13          Q       Okay.
14          A       I do not, just to make sure you note
15    that.
16          Q       Did Mr. Palinkas consult with you
17    before making this statement in this declaration?
18          A       No.
19          Q       Looking at the next sentence in that
20    same paragraph, quote, this is what facilitated
21    the changes in our titles from Adjudications
22    Officers to Immigration Services Officers.
23    Aliens seeking benefits have been referred to as
24    customers further eroding the standards as
25    contained in the INA, unquote.
```

```
 1                    Did I read that correctly?
 2        A     Mm-hmm.
 3        Q     Do you agree with that statement?
 4        A     No.
 5        Q     Do you believe that the change in
 6   title from Adjudication Officer to Immigration
 7   Service Officer has undermined the mission of the
 8   Agency?
 9        A     No.
10        Q     Do you believe that referring to non-
11   citizens who seek immigration benefits as
12   customers erodes the standards contained or
13   erodes the standards of your Agency?
14        A     No.
15        Q     Did Mr. Palinkas consult with you
16   before making that statement in his declaration?
17        A     No.
18        Q     Looking to the top of the next page,
19   if you would, with me.  I'm going to read to you
20   the first sentence of that paragraph.  You tell
21   me if I've read it correctly.
22                    Quote, the so-called Deferred Action
23   for Childhood Arrivals, parentheses, DACA, close
24   parentheses, program has further compromised and
25   eroded the goals that USCIS Officers pursue every
```

 1    day to protect our borders by ensuring that

 2    immigration benefits are granted for those who

 3    meet the criteria, unquote.

 4              Did I read that correctly?

 5      A     Mm-hmm.

 6      Q     Do -- is it your opinion that DACA has

 7    further compromised and eroded the goals that

 8    USCIS Officers pursue every day?

 9      A     No, I don't agree with that.

10      Q     Did Mr. Palinkas confer with you

11    before making this statement in his declaration?

12      A     No.  If could just make a comment,

13    you've asked me several times if he's conferred

14    with me, I'm not sure whom he has conferred with.

15    I'm, you know, maybe his colleagues, but

16    certainly not with me as a fellow Local

17    president.

18      Q     And, would it be fair to say that he

19    also did not confer with you as the president of

20    the USCIS union?

21      A     No, he did not, either -- when I --

22    since I've been president, he has not conferred

23    with me on things like that.  And, when he was

24    president of the National Council, I don't recall

25    him conferring with me or other Local presidents

 1   about such matters.

 2        Q     Further down in the paragraph, there's

 3   a sentence that begins with the word "and."  I'll

 4   read that to you.

 5              Quote, and, USCIS management has

 6   ensured that these applications are not properly

 7   screened as has it over assigned the workload for

 8   the completion of these applications to be

 9   favorably rubber-stamped as long as they meet

10   minimal requirements, unquote.

11              Did I read that correctly?

12        A     Mm-hmm.

13        Q     Based on your conversations with

14   members of the union and with DACA adjudicators

15   about their workload, do you agree with that

16   sentence?

17        A     I do not agree with that sentence.

18        Q     Okay.  The first sentence in the next

19   paragraph starting with the word "since."  I'll

20   read it to you and you let me know if that's what

21   it says.

22              Quote, since June 2012, USCIS has

23   continually bypassed Congress and existing

24   immigration law as contained in the Immigration

25   and Nationality Act with the enactment of the

1    DACA program, unquote.

2              Did I read that correctly?

3        A    Yes.

4        Q    Do you agree with that statement?

5        A    I do not.

6        Q    Okay.  With respect to the final

7    sentence in the paragraph, quote, in the interim,

8    taking a backseat to this avalanche of benefits -

9    -

10       A    I'm sorry, I'm not sure where we are.

11       Q    We're still in the paragraph that

12   begins with the word "since."

13       A    Right.

14       Q    It's the very last sentence.

15       A    Uh-huh, oh, I see, in the interim,

16   okay.

17       Q    Yes, quote, in the interim, taking a

18   backseat to this avalanche of benefits bestowed

19   on illegal aliens are the jobs, wages, benefits

20   and security that rightfully belong to Americans

21   and their families as well as those individuals

22   who applied for immigration benefits in

23   accordance with existing law and procedure,

24   unquote.

25              Do you see that there?

```
 1          A      I do, although I'd like to read it

 2    again because I'm not quite sure I follow.  So,

 3    it's not your reading, but I'm trying to

 4    understand the sentence.

 5          Q      It might help to read the preceding

 6    sentence as well.

 7          A      Okay.

 8          Q      Do you agree with the -- that sentence

 9    that I read to you?

10          A      I do not.

11          Q      Is it the case that, from time to

12    time, an non-citizen seeks an immigration benefit

13    when that person holds no immigration status in

14    the United States?

15          A      Could you repeat that?

16          Q      Yes, I'll try to say it a little more

17    simply.

18          A      Yes.

19          Q      This sentence refers to illegal

20    aliens, do you see that?

21          A      Yes.

22          Q      Is it the case that, sometimes, an

23    individual who is not lawfully present in the

24    United States would seek an immigration benefit?

25    For example, like asylum?
```

1       A      Yes.

2       Q      Is it the case that, sometimes, people

3    who are undocumented, let's say, for lack of a

4    better work, in the United States would seek

5    another kind of immigration benefit?

6       A      Yes, but I'm -- I guess I'm not

7    understanding the -- I'm not understanding the

8    question.

9       Q      Well, it's --

10      A      So, people apply for asylum, but, by

11   definition, one could conceivably be here

12   unlawfully and still qualify for asylum.  And,

13   the granting of asylum is a discretionary

14   decision.

15           Though there are many programs for

16   which they're not eligible and they're

17   ineligibility would be material to whether

18   they're lawfully here or not.  It really depends

19   on the benefit they have sought.

20           So, it's also known that an asylum

21   seeker, if their application is pending beyond a

22   certain amount of time, can quality to get

23   temporary work permit.

24           Through no fault of their own, their

25   case was not heard within the specified time

```
 1   frame.

 2              But, I'm a little confused by the

 3   sentence that you asked me to read because I'm

 4   not sure what the writer or the speaker is saying

 5   about an avalanche of benefits bestowed on

 6   illegal immigrants.

 7              I mean, people may apply for various

 8   programs, and they're only granted a benefit if

 9   they qualify for the benefit.  I'm not aware of

10   people having benefits bestowed on them for which

11   they don't qualify.

12       Q    Okay.  And, is it true that sometimes

13   people who are outside the United States apply

14   for a visa from USCIS before entering?

15       A    Yes.

16       Q    And, is it also true that sometimes

17   people are present in the United States without

18   immigration status and they might also apply for

19   --

20       A    Yes.

21       Q    -- a benefit?

22              Okay, going down to the bottom of the

23   page, if you would count with me three paragraphs

24   up.  So, there is a paragraph that starts "that

25   is why a moratorium."  Do you see that there?
```

1        A       Mm-hmm.

2        Q       I'm going to read you that sentence.

3   Quote, that is why a moratorium on the existing

4   DACA program must be put into effect until a

5   system is established that will ensure proper

6   procedure and vetting for all.

7                Next sentence, we should stop

8   processing any and all pending DACA applications

9   immediately, unquote.

10               Do you see that?

11       A       I do.

12       Q       Do you agree with that sentence?

13       A       I don't and I, if I may, I'd like to

14  explain why I don't agree with it.  It's because,

15  to the best of my knowledge, which is admittedly

16  not firsthand because I don't process DACA, but

17  from what I've read in public news sources, the

18  Agency's own websites and talking to my members

19  who do this work, I have no reason to doubt that

20  we have proper procedures and vetting for all.

21               I'm confident that like all other CIS

22  programs, we have proper procedures and vetting.

23               I'm also confident, based on my

24  experience, the USCIS, like other immigration

25  agencies, are constantly reviewing and correcting

 1  course when necessary, revising, updating

 2  technology when a threat is perceived, addressing

 3  it properly when fraud is detected, taking

 4  appropriate action.

 5              When there are unscrupulous advocates,

 6  there are various measures that are taken.

 7              So, it's not that procedures are

 8  static, they're always dynamic.  And, I think one

 9  of the things that I know our workers are proud

10  of is that they participate, our workers, our

11  members, participate in constantly improving the

12  organization by bringing problems to the

13  attention of management.

14              And, we have a management that

15  actually seeks, you know, valid, current

16  information from the folks doing the work.

17              So, it's not that we're not in need of

18  improvement, we're always in need of improvement,

19  but to call for the shutting down of a program

20  for lack of proper procedure and vetting, I don't

21  believe that -- I'm not aware of any evidence

22  that we don't have proper procedure and vetting.

23              Whether one agrees with the program or

24  not as a policy is another matter.  And, I'm not

25  really a partisan on the public policy.  I'm

 1   speaking to the work that I know my members do

 2   and have told me they do.

 3       Q    Do you think that adjudication like

 4   DACA could be outsourced to individuals outside

 5   the Agency?  What is your view of that?

 6       A    I don't -- I'm not sure what you mean

 7   by outsourced.

 8       Q    Hire private contractors to simply

 9   look at DACA applications?

10       A    Well, the union would vigorously

11   oppose, as it does almost all contracting out,

12   but certainly of what we call inherently

13   governmental functions.

14            I can give you a historic example.

15   Several years ago, the Agency, this was maybe

16   over ten years ago, the Agency attempted to do

17   what they call an A76 study of where contractors

18   were invited to compete for a contracting out of

19   what was then called Customer Contact

20   Representatives or the folks that work the front

21   window in a Field Office answering questions and

22   resolving cases.

23            And, the union successfully, with the

24   support of Congress, stopped and actually had

25   Congress defund that study because we argued

1   these are inherently governmental functions, even

2   the contact rep at the front window requires very

3   specialized training, high accountability and

4   they do, sometimes, some level of adjudications.

5            Those individuals have now been

6   retitled to be Immigration Services Officers

7   Level I.  Those folks exercise a high degree of,

8   you know, required proficiency and

9   accountability.

10           I would never support the contracting

11   out of adjudication of any benefit.  That's

12   definitely, you know, according to the

13   Immigration and Naturalization Nationality Act,

14   sorry, those functions are to be performed by

15   Immigration Officers.

16           MS. PERALES:  I'd like to take a short

17   break before passing the witness.  It's been

18   about an hour.  So, if we could go off the

19   record.

20           (Whereupon, the above-entitled matter

21   went off the record at 12:07 p.m. and resumed at

22   12:28 p.m.)

23           MS. PERALES:  Okay, we're back on the

24   record.

25           I pass the witness.  And, I think I'm

 1    sometime.

 2         A     Okay.

 3         Q     So, let's just try not to talk over

 4    each other and try give me verbal answers.

 5         A     All right.

 6         Q     So, after you received Mr. Palinkas's

 7    declaration, what did you do next?

 8         A     Well, I thought about it and I called

 9    folks that I knew.  For example, I called my

10    colleagues in the Washington District Office.

11              These are all the people that I spoke

12    to are union representatives.  And, my -- I don't

13    have the capacity to like send out a broadcast

14    message, a survey, you know, assemble all the

15    people that work there.

16              And, I would not normally do that

17    unless the employees were making it an issue they

18    wanted me to take on.

19              So, just to -- for me to assess and be

20    able to answer the question, what do you think

21    about this statement, I wanted to find out from

22    folks who have more familiarity with the subject

23    what they do.

24              So, I called my colleagues, as I said,

25    one in Washington District.  The individual is

```
 1    one of my Local vice presidents and what we call

 2    an ISO Level III.

 3              So, their Senior Immigration Services

 4    Officer said, hey, what do you think about this

 5    statement?  And, do you, as an Immigration

 6    Services Officer, in a Field Office, ever

 7    interview DACA applicants?

 8              Because, one of the statements that

 9    Mr. Palinkas made was, no DACA applicant is every

10    interviewed.  I didn't know the answer to that so

11    I asked my colleague.

12              She says, well, not normally, but

13    sometimes we do.  And, I said like, for instance

14    what?  And, she said, well, I personally received

15    two different applications files from the Service

16    Center asking me to call in the individuals and

17    interview them about potential gang activity.

18              And, I said do you get involved in

19    adjudicating the case?  No, I was -- my mission

20    was to interview them about these things and send

21    my findings back to the Service Center.  I have

22    no idea, she said, what they did there.

23              Called my colleague in Atlanta --

24        Q    Stop really quick, let's -- before we

25    go to Atlanta, let's finish up, it's D.C.,
```

```
 1    correct?

 2         A     Yes.

 3         Q     Okay.

 4         A     Yes.

 5         Q     Not Washington State?

 6         A     No, no, it's call the Washington Field

 7    Office which is actually located in Fairfax,

 8    Virginia.

 9         Q     Okay.  How many DACA interviews did

10    that person tell you they had personally

11    conducted?

12         A     Two.

13         Q     Okay.  And, did she -- you said it was

14    a she, I believe?

15         A     Mm-hmm.

16         Q     Did she indicate to you the substance

17    of those DACA interviews?

18         A     Only what I just said, that they -- it

19    had to do with -- to try to determine whether

20    they had any gang connections.

21         Q     Okay.

22         A     But, I didn't ask anything further

23    than that.

24         Q     Before you had that conversation, were

25    you aware of a single instance where a DACA
```

```
 1   application had been actually withdrawn?  Before

 2   that phone conversation, were you aware of a

 3   single interview of a DACA -- a potential DACA

 4   recipient occurring anywhere in the United

 5   States?

 6        A     No, I, as I said to you a moment ago,

 7   because I'm not familiar with the program, I was

 8   reading Mr. Palinkas's statement where he said no

 9   DACA applicants are ever interviewed.  Okay?

10              So, I know that Service Centers don't

11   do interviews.  But, I called a colleague that I

12   know a confident, they're a reliable source, do

13   you know if DACA applicants are ever interviewed

14   in a Field Office?

15              Because that's the only place that we

16   do interviews is in a Field Office or, in my

17   case, in an Asylum Officer.  Or in the case of

18   refugees officers abroad or --

19              She says, well, occasionally, yes.

20        Q     So, besides the two interviews she

21   personally did, did she tell you that other

22   interviews had occurred?

23        A     I just asked what was her own

24   experience and that's what she said.  And, I

25   didn't like exhaustively, you know, interrogate
```

 1   her to uncover, you know, other data or whatever.

 2        Q    So, as you sit here today, you're

 3   aware of only two instances at the Washington

 4   District Office where DACA applicants were

 5   interviewed?

 6        A    Right.  Whether there were more, I

 7   have no idea.

 8        Q    Okay.

 9        A    Because I didn't go and like do a data

10   call or, you know, call the district director.  I

11   didn't really feel that was my role.  I really

12   was trying to assess from my members and my

13   fellow union representatives, what was their own

14   knowledge of the matter?

15        Q    Could you have done a data call?

16        A    I suppose I could have as a union rep.

17   But, my -- I'm not involved in the case.  I was

18   just called and asked from information and

19   comment.

20             If we were involved in any kind of a

21   case as a moving party or whatever, we might do a

22   data call.  And, in our parlance, it's called a

23   request for information.

24             But, normally, the union's request,

25   you know, our right to request and the Agency's

1    response of what responsibility to provide me

2    with information would be usually with respect to

3    a labor issue.

4              So, for example, if I was defending

5    somebody in an adverse action, I might ask for

6    data information pertaining to their personnel

7    file.

8              Or, if it affected, say, the overtime

9    practices of the Agency and we were litigating

10   over, you know, improper payment of overtime, I

11   might be asking for records pertaining to that.

12             But, wouldn't really have a reason to

13   ask the Agency for like statistics about DACA.

14   Because, I'm not involved in the case.

15             If my members, however, had brought to

16   me an issue about DACA that affected their

17   working conditions, for example, if they felt

18   like they were, you know, being overwhelmed with

19   the caseload or there was massive fraud or

20   rubber-stamping or whatever.

21             And, I wanted to bring that issue

22   forward to the Agency, yes, I might be asking for

23   information.

24             But, none of my members have ever

25   brought that to me as a concern.

```
 1   Local.

 2        Q     All right, so, we have that call you

 3   made.

 4              Then, let's talk about the next call

 5   you made.  Who'd you call?

 6        A     I called -- well, no, mind you, I

 7   don't know if sequentially, I don't have the

 8   dates and the sequence of who I called when.

 9        Q     All right, let's -- I won't hold you

10   to that --

11        A     But, I did call my colleague at the

12   Atlanta District --

13        Q     Mm-hmm.

14        A     -- who is the current Local president

15   of that Local union.

16        Q     Okay.

17        A     And, she is also an ISO Level III

18   Senior Adjudicator.

19        Q     And, what did you ask her?

20        A     Same thing.  Here's this statement,

21   what do you think?  Is it, you know, are you

22   aware of any occasions when DACA applicants are

23   every interviewed?

24              She goes, yes, I sometimes get cases.

25   I can't remember the specifics.  I think it might
```

 1   have been similar kind of thing, possible gang

 2   activity.

 3              But, the reason that she got these

 4   files was the Service Center needed, in order to

 5   complete their adjudication, a face to face

 6   interview to verify tests or look at documents.

 7              I didn't ask extensively, you know,

 8   who, what, where, how and when occurred during

 9   the interview.

10              But, she said, it's -- both

11   individuals said, it's highly unusual for people

12   to be interviewed.  But, when necessary, they

13   are.

14        Q    Did she tell you how many interviews

15   she had personally done?

16        A    I believe she said two.

17        Q    Are you aware besides those two of a

18   single DACA applicant being interviewed at the

19   Atlanta Field Office?

20        A    I have no, I mean, again, my only

21   source of knowledge about it was these phone

22   calls.

23        Q    So, that's a no?

24        A    I have -- yes, no.

25        Q    Okay.  And, what other phone calls did

1        A     I have no way to know that.

2        Q     Let's go to Nebraska now. What were

3    the job descriptions of the individuals in

4    Nebraska that you called?

5        A     They were both ISO IIs.

6        Q     What was their role with the union?

7        A     The one is the current president and

8    the other is the current vice president at the

9    Nebraska Service Center.

10       Q     What did you ask these individuals?

11       A     I sent them the statement.  I asked

12   did they have any comments about it?  They were

13   both somewhat surprised that most of it appeared

14   to be opinion rather than, you know, certainly

15   Mr. Palinkas, as an ISO II in a Field Office,

16   does not have personal knowledge of this.

17             They found a number of statements that

18   they thought were not factual.

19             And, I basically said, so, tell me

20   what you guys do.  How do you do it?  I asked

21   them about discretion.  I asked them about

22   rubber-stamping.

23             I think I -- I mean, I could repeat

24   myself --

25       Q     Okay.

    1        A        -- but, I said it earlier in the

    2    record.

    3        Q        Sure.

    4        A        But, they both said, no, we don't

    5    rubberstamp, we're extensively trained.  We are

    6    to flag any problems, either a hit from the

    7    database, criminal record, misdemeanor, whatever.

    8              They both talked about the involvement

    9    of their unit in uncovering some so-called

   10    diploma mills with collaboration of FDMS fraud

   11    detection national security Unit of CIS and ICE,

   12    that resulted in prosecutions.

   13        Q        Sure.

   14        A        They both bristled at the idea that

   15    they rubber-stamped.  They both said that they

   16    were held to very high quality standards.

   17              And, that, you know, that the question

   18    of, you know, what does one need to do to be

   19    approved?  Well, one needs to meet the criteria.

   20    If they don't meet the criteria, they don't get

   21    approved.

   22              If they meet the criteria, they might

   23    get approved provided they don't have bars to

   24    seeking the benefit like a criminal record.

   25        Q        Did those individuals tell you they

```
 1   had personally interviewed DACA applicants?

 2        A     No, because they don't interview DACA

 3   applicants in a Service Center.

 4        Q     All right.  Did they tell you that

 5   they had sent any DACA applicants to be

 6   interviewed at Field Offices?

 7        A     They -- I do not recall that they

 8   personally said that they had sent cases, but I

 9   do believe they affirmed that, on occasion, cases

10   are sent out to the Field Offices for further

11   inquiry.

12        Q     So, in their call to you, they did not

13   mention that they had personally sent any DACA

14   applicant to be interviewed at a Field Office,

15   right?

16        A     No, and I didn't really ask them.  My

17   job wasn't deposing them, it was like --

18        Q     Sure.

19        A     -- pretty quick conversations.

20        Q     And so, your only information about

21   what happens at the Field Offices with DACA

22   applicants from the Nebraska Service Center comes

23   from your conversation with these individuals,

24   correct?

25        A     Could you repeat that?
```

1      Q      Let me stop you there.  We'll get back

2   to the question.

3      A      All right.

4      Q      So, the question is, your knowledge

5   about what happens with DACA applicants at the

6   Nebraska Service Center --

7      A      Right.

8      Q      -- is based solely upon your

9   conversation --

10     A      Largely in part, my conversations,

11  because I do have other knowledge based on

12  reading  the generally available information

13  about DACA.

14            I can't say that I only have knowledge

15  based on my conversations.

16     Q      And, the generally available

17  information you've read, none of that said that

18  Service Centers send DACA applicants to be

19  interviewed at Field Service Centers?

20     A      I don't recall reading that.

21     Q      Did you call anyone at the Texas

22  Service Center location?

23     A      I did, and I was told they don't do

24  DACA.

25     Q      They don't do DACA at all?

```
 1        A      Right.  I was told by the Local
 2   president there.
 3        Q      What's that person's name?
 4        A      Kevin Tinker.
 5        Q      Tinker?
 6        A      Tinker, T-I-N --
 7        Q      Tinker?
 8        A      -- K-E-R.
 9        Q      Had that Service Center ever done
10   DACA?
11        A      I'm not sure I asked that question.
12        Q      So, do you know if they have ever --
13        A      I do not know that.
14        Q      Okay.
15        A      But, as I said earlier, although
16   historically, some Centers will do particular
17   caseloads increasingly work is shifted.  But, I
18   do not believe it is correct in Mr. Palinkas's
19   statement that DACA is done at all Service
20   Centers.
21             To the best of my limited query, they
22   were done in California and Nebraska.
23        Q      So, they're not done in Washington,
24   D.C.?
25        A      No.
```

```
 1        Q       They're not done in Atlanta?

 2        A       No.  No, there's no Service Center in

 3   Atlanta.  There's a Service Center in Arlington,

 4   Virginia, one in Vermont, one in Nebraska, one in

 5   Texas, one in California.  And, to the best of my

 6   knowledge, they are done primarily in Nebraska,

 7   but some at some point have been done in

 8   California.

 9        Q       Are you aware of any Field Office in

10   Texas that has interviewed a DACA recipient?

11        A       No, I didn't ask.

12        Q       How many Filed Offices are you aware

13   of throughout the entire country that have

14   interviewed DACA recipients?

15        A       Well, I'm only aware of two because

16   those were the calls that I made.  I have not

17   called each and every Field Office to ask.

18        Q       So, it's fair to say, as you sit here

19   today, you're aware of four instances where DACA

20   recipients were interviewed at a Field Center?

21        A       Mm-hmm.

22        Q       That's a yes?

23        A       That is yes, that is yes.

24        Q       Sorry.

25        A       Sorry, I keep giving you a nonverbal
```

1  nod.  That is yes.

2        Q     Very good.

3              Sorry, and I do the exact same thing,

4  I apologize.

5        A     And, I have to reiterate, I did not do

6  a comprehensive data call.  I mean, this

7  information should be readily available to the

8  parties from the Agency.

9        Q     Let's talk about your personal

10  background.  You're an Asylum Officer?

11        A     I am an Asylum Officer.

12        Q     Have you ever personally processed a

13  DACA application?

14        A     Have what?

15        Q     Have you ever personally processed a

16  DACA application?

17        A     No, I have no reason to.

18        Q     Have you ever adjudicated a DACA

19  application?

20        A     No, I would have no reason to.

21        Q     Okay.  Do you know what the criteria

22  are to qualify for DACA?

23        A     Vaguely.  I mean, based on what I've

24  read in the public information.

25        Q     You mentioned earlier something about

```
 1   and my colleagues told me about the kinds of
 2   cases that would be denied, but I didn't ask
 3   about specific cases.
 4        Q    Sure.  So you know that applications
 5   have been denied based on statistics that are
 6   posted on USCIS's website?
 7        A    Right.  And by the testimony of my
 8   colleagues that they have denied cases or
 9   colleagues have denied cases and for what reasons
10   they have denied cases.
11        Q    So your colleagues have told you they
12   denied cases?
13        A    Yes.
14        Q    Okay.  Did they tell you why they
15   denied those cases?
16        A    Yes, because they didn't meet the
17   criteria or because there was some, you know,
18   discretionary reason.
19        Q    What discretionary reason?
20        A    That maybe the evidence was in
21   question or there was fraud or if there was
22   evidence of criminal activity.
23        Q    Okay.  Besides the evidence being in
24   question, evidence of fraud or lack of, I think
25   you said a lack of --
```

```
 1        A      It didn't meet the criteria, right.
 2        Q      Are you aware of any discretionary
 3   denial of the DACA application?
 4        A      I wouldn't have that kind of knowledge
 5   not having worked there, but, you know, the use
 6   of the word "discretion" I think sometimes is
 7   misused.
 8              So it implies -- Based in my line of
 9   business, which is highly discretionary, it's not
10   like a flip of a coin or I don't feel like it,
11   right, you know, it is my authority to make or
12   not make a decision but it has to be based on
13   evidence based on proper application of the law,
14   such as how I feel about it.
15              Oh, yes, they meet the criteria but
16   I'm just not going to approve it.  That would be
17   an abuse of discretion.  So we often in my trade
18   as an asylum officer we are trained in the proper
19   use of discretion and in the, you know, the
20   favorable exercise of discretion when the
21   evidence merits that.
22        Q      Did you send Mr. Palinkas's
23   declaration to anyone else besides the
24   individuals you just named?
25        A      No.
```

1          Q      Did you call Mr. Palinkas to ask him

2     about his declaration?

3          A      No.

4          Q      How many locals make up the National

5     Union?

6          A      Twenty-two.

7          Q      How many of those locals did you call

8     the presidents of to ask about the adjudication

9     of DACA?

10         A      So it would have been my own local,

11    the Washington District, the Atlanta District,

12    the Texas Service Center.  Mr. Tinker, by the

13    way, is also in National Council.

14                The local President in Texas is also

15    the Executive Vice President of the National

16    Council.  He has seen and commented to me on Mr.

17    Palinkas's declaration.  I called California

18    Service Center and the Nebraska Service Center.

19         Q      Did you call the local where Mr.

20    Palinkas is a member?

21         A      No.

22         Q      All right.  So that was kind of like

23    the bucket of things you did after talking to New

24    Jersey and getting Mr. Palinkas's deposition.

25                Is there anything else during that

1        A      I have no -- Since I am not a party to

2    the case I don't, you know, I was not involved in

3    the discussions with the court.

4        Q      Would you have testified in this

5    deposition if you didn't believe the court had

6    ordered you to?

7        A      You know, I am not a lawyer and I am

8    not familiar with legal process.  I wish to be

9    cooperative in this proceeding and I think it is

10   in the public interest and in the interest of my

11   union that the matters be made clear and I am

12   here to testify as the Union President.

13       Q      Did you --

14       A      Because a colleague testified as a

15   Union President it became clear to me that there

16   is more to it than, there is more to the reality

17   of what the Union has to say than one man's

18   opinion.

19              I am sure that my testimony could be

20   called another man's opinion.  But I have tried

21   to the extent possible to keep my opinion out of

22   it and speak to the facts that I know or don't

23   know.

24       Q      Did you discuss your testimony today

25   with the Board that oversees the National Union?

```
 1        A      No.  It's his statement.

 2        Q      Are you speaking today as Union

 3   President on behalf of the entire Union?

 4        A      I am.

 5        Q      Okay.  And you did not receive any

 6   authorization from the Union as a whole to offer

 7   that opinion, correct?

 8        A      I don't -- We don't have that

 9   requirement.

10        Q      Did you ask in any way the opinions of

11   your members about the DACA process besides what

12   you have already described?

13        A      I did not but I would like to place

14   that in context, right.  I do not believe that I

15   am offering an opinion about DACA, the program,

16   its appropriateness, its legality, whatever.

17               I have been asked to comment on Mr.

18   Palinkas's statement.  Now one of my comments is

19   that to the best of my understanding a lot of his

20   statement is opinion.

21               It's something that I would, you know,

22   expect as op-ed piece.  He is certainly entitled

23   to his opinion, but there is a lot of opinion

24   about the program.

25               I don't have an opinion about the
```

1   program that I am putting forward here, and if I

2   were to do so I would be canvassing my members,

3   right.

4           We don't typically put out statements

5   on public policy except to the extent that the

6   public policy in question is affecting the

7   working conditions of our members.

8           And you may have seen statements I

9   have made about the asylum and refugee program

10  and I made them with respect to the views that

11  those employees expected me to put forward and as

12  they pertain to their working conditions.

13          But I have not been contacted by my

14  members to advocate on their behalf about the

15  DACA program.

16      Q    Okay.  So --

17      A    So if my organization was going to

18  take a position on DACA I would be consulting

19  with my members and saying, you know, what is our

20  position on DACA, for, against, should,

21  shouldn't, et cetera.

22      Q    Sure.  Have you ever testified before

23  Congress before?

24      A    I have not.

25      Q    You have not.  Have you ever testified

 1    might be -- they might do 8 or 10 or 12,

 2    depending on the complexity.

 3             Adjustment of status, I'm not sure.

 4        Q    Okay.  Why is it important to do such

 5    in depth interviews for asylum purposes?

 6        A    Because the scope of what you're

 7    discussing is so universal.  I mean, you're

 8    looking at identity, looking at manner of entry.

 9             You're looking at their documents.

10    You're looking at their testimony.  And, some of

11    the stories, I mean, in some cases, you're

12    looking at gathering someone's life story.

13             Where were they born?  What tribe?

14    What about their parents?  And, what's the

15    political party?

16             And, when a lot of the testimony --

17    when a lot of the decision based on the

18    testimony, you have to pursue many, many avenues.

19             And, you know, with other types of

20    immigration interviews, you're looking, again, at

21    a very limited scope of inquiry.

22        Q    You're not testifying on behalf of

23    USCIS today, are you?

24        A    No, I'm not.

25        Q    And, you don't speak for the federal

1   Walker's turn.

2              MR. WALKER:  I have no other

3   questions.

4              MS. PERALES:  Oh, you pass?  It's my

5   turn then.

6              MR. WALKER:  Yes.

7              MS. PERALES:  I only have one

8   question.

9       CROSS EXAMINATION

10             BY MS. PERALES:

11      Q    Mr. Knowles, you spoke a few moments

12   ago with Mr. Biggs about approval rates.

13      A    Mm-hmm.

14      Q    And, my question is whether you would

15   expect different form applications to have the

16   same approval rate across the Agency?

17      A    No, I would not.

18      Q    Why not?

19      A    Well, I think I said earlier,

20   comparing  the asylum adjudication to DACA is

21   really apples and oranges, elephants and zebras,

22   whatever.

23             My reference in my testimony to what

24   I do is really to talk about what I do.  That's

25   what I know and what I do is very specific to

 1    asylum.

 2              But, there are some things that are

 3    consistent throughout the Agency like security

 4    checks and, you know, performance measures and

 5    accountability and all of those things.

 6              But, I would expect different approval

 7    rates because, and I think I alluded to this in

 8    some of my earlier statements, each form type is

 9    very specific.  The scope of it is very

10    different.

11              So, you know, when you're adjudicating

12    a work permit, it's a work permit whether you're

13    adjudicating an asylum application, it's that.

14    And there are -- the scope is very different.

15              For some cases, it's very limited.

16    And the threshold of -- that one has to meet is

17    different.

18              So, you know, in DACA, my limited

19    understanding is, you know, I'm sure there's all

20    kinds of subcategories, but it's, you know, age,

21    time of entry, continuous presence and school

22    records and military records, et cetera, and

23    criminal history.

24              It's a very limited scope because the

25    program itself is very limited.  It's not even a

1   status, it's a deferred action.  Their status is

2   still they're unlawfully here.

3            Prosecutorial action is deferred, as

4   I understand it from the public information.  I'm

5   not trying to redefine what DACA is.

6            And, they get a work permit for

7   dependency of that status.  But, it's not even a

8   status as we commonly understand it.  They're

9   still in unlawful status.

10           So, many applicants that I interview

11   are not in status, right, when they come to me.

12   Some are in status.

13           If I deny an applicant asylum who is

14   not in status, they're actually referred to the

15   immigration court.

16           If they are in status, they're just

17   denied asylum and they retain the status that

18   they have for as long as that status is valid.

19           So, approval rates, I mean, it's the

20   approval rate should be reflective of, as I said

21   earlier, to Mr. Biggs, did they qualify or didn't

22   they?  Right?  And, if all the people qualify,

23   well, you would expect there to be a high

24   approval rate.

25           If they didn't qualify, you would

1    expect it to be reflective of the caseload.

2              MS. PERALES:  Thank you.

3              I pass the witness.

4              MR. BIGGS:  I think I have one more or

5    maybe two --

6              MR. KNOWLES:  Sure.

7              MR. BIGGS:  -- depends on how we talk

8    to each other.

9        CROSS EXAMINATION

10             MR. BIGGS:  Is it your understanding

11   that once someone's DACA application is approved

12   that they maintain an unlawful presence in the

13   United States?

14             MS. PERALES:  Objection,

15   mischaracterizes the testimony.  Objection, calls

16   for a legal conclusion.

17             MR. BIGGS:  You can answer.

18             MR. KNOWLES:  Yes, I don't have

19   personal knowledge of that.  I am -- I would

20   probably say I'm speculating, I'm guessing based

21   on my knowledge as an asylum officer, when I

22   interview somebody, I ascertain, what is their

23   immigration status?  Right?

24             So, they're either, you know, entry

25   without inspection.  They're either a current,

```
 1   C E R T I F I C A T E

 2   This is to certify that the foregoing transcript

 3   Deposition of: Michael Knowles

 4   In the matter of: State of Texas v USA

 5   Before: US District Court

 6   Date: 08-02-18

 7   Place: Washington, DC

 8   were duly recorded and accurately transcribed

 9   under my direction; further, that said transcript

10   is a true and accurate record of the proceedings;

11   and that I am neither counsel for, related to,

12   nor employed by any of the parties to this action

13   in which this deposition was taken; and further

14   that I am not a relative nor an employee of any

15   of the parties nor counsel employed by the

16   parties, and I am not financially or otherwise

17   interested in the outcome of the action.

18

19   ---------------------

20   Jennifer Bernardi

21   Court Reporter

22

23

24

25
```

# Def-Int. Ex. 306

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, ET AL.,          )
                                 )
Plaintiffs,                      )
                                 )
vs.                              )   Case No. 1:18-cv-00068
                                 )
UNITED STATES OF AMERICA, ET     )
AL.,                             )
                                 )
Defendants,                      )
                                 )
and                              )
                                 )
KARLA PEREZ, ET AL.,             )
                                 )
STATE OF NEW JERSEY,             )
                                 )
Defendant-Intervenors.           )


THE DEPOSITION OF STEPHEN LEGOMSKY


Taken on behalf of Plaintiffs

August 1, 2018


HUSEBY GLOBAL LITIGATION
1230 WEST MOREHEAD STREET, SUITE 408
CHARLOTTE, NC 28208
(800) 333-2082

```
 1         I N D E X   O F   E X A M I N A T I O N

 2

 3   WITNESS:  STEPHEN LEGOMSKY
```

```
 4         Examination By Mr. Disher ......................8

 5         Examination By Mr. Robins ...................100

 6         Examination By Ms. Perales ..................106

 7         Examination By Mr. Disher ...................119
```

```
 8

 9
           I N D E X   O F   E X H I B I T S
10
```

```
     Exhibit 1 ........................................9
11        Houston Chronicle Article

12   Exhibit 2 .......................................11
          The Source Article
13
     Exhibit 3 .......................................13
14        Article

15   Exhibit 4 .......................................26
          Law Review Article
16
     Exhibit 5 .......................................34
17        Declaration

18   Exhibit 6 .......................................60
          DACA Statistics
19
     Exhibit 7 .......................................87
20        Neufeld Affidavit

21   Exhibit 8 .......................................89
          Declaration of Stephen H. Legomsky
22
     Exhibit 9 .......................................90
23        Congressional Testimony

24   Exhibit 10 ......................................92
          Congressional Testimony
25
```

```
 1   Exhibit 11 .......................................97
         Article
 2


 3
     The original exhibits were retained by the court reporter
 4   to be attached to COUNSELS' transcripts.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   STATE OF TEXAS, ET AL.,        )
                                    )
 4   Plaintiffs,                    )
                                    )
 5   vs.                            )  Case No. 1:18-cv-00068
                                    )
 6   UNITED STATES OF AMERICA, ET   )
     AL.,                           )
 7                                  )
     Defendants,                    )
 8                                  )
     and                           )
 9                                  )
     KARLA PEREZ, ET AL.,           )
10                                  )
     STATE OF NEW JERSEY,           )
11                                  )
     Defendant-Intervenors.         )
12

13

14

15

16            THE DEPOSITION OF STEPHEN LEGOMSKY, produced,

17   sworn, and examined on behalf of the Plaintiffs, August

18   1, 2018, between the hours of eight o'clock in the

19   forenoon and five o'clock in the afternoon on that day,

20   at the offices of Alaris Litigation Services, 711 N.

21   11th Street, St. Louis, Missouri 63101, before Rebecca

22   L. Tuggle, a Registered Professional Reporter,

23   Certified Court Reporter, and Certified Shorthand

24   Reporter within and for the State of Missouri.

25
```

```
 1                    A P P E A R A N C E S

 2
      FOR THE PLAINTIFF STATES:
 3
                 TODD LAWRENCE DISHER
 4               Attorney-in-Charge
                 Special Counsel for Civil Litigation
 5               Assistant Attorney General State of Texas
                 300 W. 15th Street
 6               Austin, TX 78701
                 (512) 463-2100
 7               todd.disher@oag.texas.gov

 8    FOR KARLA PEREZ, ET AL.:

 9               NINA PERALES
                 Mexican American Legal Defense and Education
10               Fund
                 110 Broadway, Suite 300
11               San Antonio, TX 78205
                 (210) 224-5476
12               nperales@maldef.org

13    FOR THE FEDERAL DEFENDANTS:

14               JEFFREY S. ROBINS
                 U.S. Department of Justice, Civil Division
15               Office of Immigration Litigation
                 District Court Section
16               P.O. Box 868
                 Washington, D.C. 20044
17               jeffrey.robins@usdoj.gov

18    FOR THE STATE OF NEW JERSEY BY TELEPHONE:

19               KENNETH LEVINE
                 Office of the Attorney General of New Jersey
20               25 Market Street, 8th Floor
                 Trenton, NJ 08625
21               (973) 648-2881
                 kenneth.levine@law.njoag.gov

22
      REPORTED BY:
23
                 REBECCA L. TUGGLE, RPR, CCR, CSR
24               Huseby Global Litigation

25
```

```
 1              MR. ROBINS:  All right.  So this is Jeffrey
 2    Robins for the federal defendants from the Department
 3    of Justice.  And I just want to lay down the ground
 4    rules that I would prefer we use today given that the
 5    federal defendants do have concerns, as you may know,
 6    Mr. Legomsky, and certainly as the parties know, about
 7    testimony that you may give today that would call for
 8    the disclosure of information privileged, either under
 9    the attorney-client privilege or potentially
10    deliberative process privilege or any other privileges
11    that may apply.  I would just ask that to the extent
12    that any answer or testimony that you're going to
13    provide today is based on or calls for the disclosure
14    of communications, including advice or guidance that
15    you gave to your clients or to the agencies, to either
16    USCIS or DHS or other sub-components in your role as
17    chief counsel of USCIS, or as counselor to the
18    Secretary of Department of Homeland Security, that in
19    the case that your testimony would call for the
20    disclosure of that -- those forms of communication,
21    the federal defendants assert that that would call for
22    the disclosure of confidential or privileged
23    information and would instruct that you not answer
24    those questions and not disclose that information.
25    Recognizing that there may be some questions where
```

1    it's unclear of what capacity you're being called upon

2    to answer them, if you could please clarify if you

3    believe before you answer a question that the answer

4    would call for the disclosure of such information,

5    give federal defendants the opportunity to raise that

6    objection, for the parties to potentially discuss the

7    nature of that answer off the record and determine

8    whether federal defendants will, in fact, object to

9    such answer on the basis of privilege.

10             THE WITNESS:  I understand.

11             MR. ROBINS:  Thank you.

12             IT IS STIPULATED AND AGREED by and between

13   counsel for the Plaintiffs and counsel for the

14   Defendants that the deposition of STEPHEN LEGOMSKY may

15   be taken in shorthand by Rebecca L. Tuggle, a

16   Registered Professional Reporter, Certified Court

17   Reporter, and Certified Shorthand Reporter, and

18   afterwards transcribed into typewriting, and the

19   signature of the witness is reserved by agreement of

20   counsel and the witness.

21   PROCEEDINGS BEGAN AT 1:00 P.M.

22                        *  *  *  *  *

23

24             STEPHEN LEGOMSKY,

25   of lawful age, being produced, sworn, and examined on

1   the part of the Plaintiffs, and after responding "Yes"

2   to the oath administered by the court reporter, deposes

3   and says:

4                              EXAMINATION

5   QUESTIONS BY MR. DISHER:

6       Q     Mr. Legomsky, good afternoon.

7       A     Good afternoon.

8       Q     Can you please introduce yourself to the

9   court?

10      A     Sure.  I apologize in advance, I'm losing a

11  little bit of my voice; so tell me if I need to pipe

12  up.  My name is Stephen Legomsky.  S-t-e-p-h-e-n

13  L-e-g-o-m, as in Mary, s-k-y.

14      Q     Thank you, Mr. Legomsky.  Mr. Legomsky, you

15  are a law professor so I'll spare you some of the

16  formalities about introducing the deposition process,

17  but two things to point out.  If you ever don't

18  understand any of my questions, please let me know.

19  Is that fair?

20      A     Yes.  Thank you.

21      Q     And then if you ever need to take a break

22  today, also just let me know and we'll take a break.

23  But if there is a question pending on the table, I'd

24  ask that you would answer that question before we take

25  a break.  Is that fair?

```
 1        Q    Okay.  Go ahead.

 2        A    And finally, for a brief period in 2015, I

 3   believe from July to October of 2015, I served as

 4   Senior Counselor to the Secretary of Homeland

 5   Security.

 6        Q    Okay.  Going back to what we had talked

 7   about earlier, you can pull it up if you need to, but

 8   in Exhibit 4, you say -- again, you said that you were

 9   a member of the Obama Administration in a -- Let me

10   start that over.

11        A    I'm sorry.  What page are we on?

12        Q    Of course.  Exhibit 4, page 339.

13        A    Okay.

14        Q    You said that you were a member of the Obama

15   Administration integrally involved in the rollout and

16   implementation of DACA; right?

17        A    Yes.

18        Q    And I don't want to ask you about any of the

19   substance of the communications that you may have had

20   in your role as chief counsel, okay?  But I do want to

21   ask you, can you give me a general sense about what

22   your integral involvement was in the rollout and

23   implementation of DACA?

24        A    Yes.  One of the things that the agency,

25   USCIS, had to do after DACA was announced was refine
```

1   some of the details.  For example, which sorts of

2   crimes would disqualify someone, what sorts of

3   documentation should we require for proving that you

4   meet the education requirements and those sorts of

5   things.

6             MR. ROBINS:  I just want to pause real fast

7   and just to be clear that I would object to the extent

8   that anything your -- your testimony now relates to

9   anything that is deliberative in nature that didn't

10  result in any final guidance or actions or relates to

11  any specifics of the communications you had with

12  regard to even both non-final and final guidance.

13            THE WITNESS:  I appreciate that and I will

14  be careful.  The two examples I just gave, however,

15  were both things that were, in fact, published and are

16  still in the public domain.

17            So my role as chief counsel was to supervise

18  those attorneys in my office who were working on these

19  various issues from the legal side, as well as to

20  participate in discussions with agency leadership and

21  operational folks as to how this might be implemented.

22       Q    (By Mr. Disher) Okay.

23            MS. PERALES:  Just a caution.  With respect

24  to discussions or communications, you may want to keep

25  in mind the privilege issue.

 1   testimony.  I reviewed the memo that then USCIS

 2   Director Leon Rodriquez wrote to Senator Grassley in

 3   response to a request for information -- statistical

 4   information about DACA and advance parole.

 5            I also read the more extended subsequent

 6   memo on that subject that Director Rodriquez also

 7   wrote in response to congressional inquiries.  I

 8   reviewed the document that USCIS posted on its public

 9   website on approval and denial rates for DACA

10   requesters.

11            There might have been other documents that

12   are not coming to mind at the moment.

13       Q    Okay.  What was your methodology to reach

14   the opinions that are disclosed in your declaration?

15       A    It depends on the particular declarations.

16   Some are based solely on my general knowledge of

17   immigration law from both teaching and researching.

18   Some other conclusions were based on the information

19   that I gleaned from those public documents.  Some were

20   simply based on what I felt to be internal logic.

21       Q    Okay.  What specialized skill or expertise

22   did you bring to bear in order to prepare this

23   declaration?

24       A    Well, again, my several decades of

25   experience in the field of immigration law.  My

1    training and my legal education and my subsequent

2    training, my research skills, and hopefully my

3    analytical skills.

4         Q    Okay.  What fact issue do you think this

5    declaration will help Judge Hanen decide?

6         A    Without making the statement sound

7    exclusive, one issue that comes immediately to mind is

8    the fact question of whether USCIS adjudicators were,

9    in fact, performing the discretionary case-by-case

10   evaluation of individual DACA requests that the

11   Secretary's memo explicitly instructed them to do

12   so -- to do and that the standard operating procedures

13   issued to the adjudicators requested them to do.

14        Q    Any other fact issues you can think of?  And

15   take your time to look through it if you want.

16        A    I would have to go through statement by

17   statement.  Do you have any specific statements in

18   mind that I should focus on?

19        Q    Well, can you -- I just want to see if you

20   can point to any fact issues in here, other than, in

21   your opinion, whether individual adjudicators

22   exercised discretion.

23        A    You'll have to give me a moment because

24   there are --

25        Q    Take your time, please.

1        A     -- 40-something statements in this

2    declaration.  And you said factual determinations;

3    right?

4        Q     Yes.

5        A     One factual assertion that runs through

6    several of the statements is that the Department of

7    Homeland Security is uniquely positioned by virtue of

8    both its expertise and its delegation of authority

9    from Congress to make the kinds of determinations on

10   which the decision to announce DACA and the way in

11   which they are implementing it.  That's one.

12       Q     What sources did you rely on for your

13   opinions related to that fact issue?

14       A     Partly the express delegation from Congress

15   of the authority to the -- of the responsibility to

16   the Secretary of Homeland Security to establish

17   immigration enforcement policies and priorities.

18   Partly through my own knowledge of the professionalism

19   of the DHS employees.  Partly from my own experience

20   in knowing that the DHS employees are involved in

21   these issues, bring, in most cases, many years of

22   expertise to the subject.

23       Q     Okay.

24       A     Would you like me to continue going through

25   it?

1       Q     Okay.  Keep going.

2       A     Yes, the other factual statements in

3   paragraph 12, I would say the same thing about, that

4   they come from published reports and that they are

5   examples of facts that I would hope might be helpful

6   to a court in assessing whether there was a rational

7   basis for DACA.

8       Q     But in paragraph 12, the opinions you're

9   expressing, you have not done any studies or reports

10  yourself related to the issues detailed in paragraph

11  12?

12      A     No.  Except that with respect to the very

13  last sentence of that paragraph, although I have not

14  done a report, again, my exposure over the course of

15  two years to DHS officials dealing with these issues

16  enables me to see that these officials are uniquely

17  well-positioned to balance the various policy factors.

18      Q     Okay.

19      A     The statement in paragraph 13 could be

20  characterized as one of fact and so I think it's

21  relevant to your question.  And as to that, I believe

22  the facts that USCIS and its predecessor agency abused

23  both the prosecutorial discussion generally and

24  deferred action, in particular, for many decades could

25  help a decision-maker determine its legality today

 1   regulations," unquote.  I point out there that they

 2   are not jumping the line.

 3        Q    And your opinion that they are not jumping

 4   the line is, again, based on the relevant immigration

 5   statutes and regulations?

 6        A    Yes.  In paragraph 36, I make the point that

 7   most, if not all, of the criteria for DACA are ones

 8   that can easily be determined based solely on written

 9   documents and the background checks that the

10   adjudicators perform.  And that, therefore, personal

11   interviews are seldom necessary or even particularly

12   helpful.  That could be relevant to Mr. Palinkas'

13   assertion that the mere absence of a personal

14   interview somehow renders the adjudication unreliable.

15             Looks like you're about to ask me something.

16        Q    Yes.  I'm thinking.  Give me one second.

17   What is the foundation for that opinion?

18        A    I lay out the specific found -- the

19   specifics of that foundation in paragraph 36 itself.

20   I identify the specific DACA criteria and explain why

21   each one is amenable to particular documentary

22   evidence.  For example, the person has to be under a

23   certain age at the time of application and not over a

24   certain age.  Birth certificates provide that

25   information.

1        Q     Okay.

2        A     A person has to meet certain educational

3    requirements.  And documents from the educational

4    institutions or from the Armed Services provide that

5    information.

6        Q     Do you think that the judge himself could

7    look at those stated criteria and determine whether

8    the criteria could be determined by simple factual

9    determinations?

10       A     I'm not sure what you mean by simple

11   factual.  Do you mean non-interview?

12       Q     Yes.

13       A     Yes, could.  If the judge is aware of these

14   facts.

15       Q     Okay.  And those facts are spelled out in

16   the DACA memo itself?

17       A     The facts as to what the criteria are are

18   spelled out in the DACA memo.  The required

19   documentation is spelled out in other documents,

20   including the standard operating procedures given to

21   the adjudicators.

22       Q     Okay.  As well as the frequently-asked

23   questions on USCIS's website?

24       A     Correct.

25       Q     Okay.  But looking at those sources, the

1    judge can make a determination for himself that these

2    particular criteria could be determined solely on

3    documentary evidence and not interviews?

4         A    Yes.

5         Q    Okay.

6         A    I think paragraph 37 provides information

7    that is available on the basis of public records, but

8    which without specific mention might not be obvious to

9    a judge.  And, therefore, I think the observations

10   contained in paragraph 37 could be helpful to a judge

11   in understanding the implications of accepting

12   Mr. Palinkas' theory that the lack of an interview

13   renders the results unreliable.

14        Q    So you pointed that information out to the

15   judge?

16        A    Yes.

17        Q    And what about your specialized training or

18   knowledge makes you uniquely qualified to point that

19   information out to the judge?

20        A    Well, I'm very familiar with the work that

21   the USCIS service centers do and how that workload

22   is -- how the USCIS workload is divided between those

23   adjudicators and those who work in the field offices.

24        Q    But if anybody went to this website that's

25   cited here, they could also make that determination;

```
 1   right?

 2        A    If they knew of the website, yes.

 3        Q    Okay.

 4        A    Also in paragraph 37, I point out that many

 5   of the benefits that USCIS service center adjudicators

 6   decide are ones that are either ones that -- I need to

 7   rephrase.

 8             Many of the things they adjudicate are

 9   either prerequisites to or applications for a formal

10   legal status.  That might not be obvious to a person

11   who is not familiar with immigration law as a

12   specialty.

13        Q    But, again, all that information is

14   available on the USCIS website?

15        A    Not all of it.  Some of it a person would

16   have to know to go to the relevant parts of the

17   statute and make those determinations, prerequisites

18   to other benefits.

19        Q    Okay.  So it's either on the USCIS website

20   or referenced in the statute?

21        A    Correct.

22        Q    Got it.

23             MS. PERALES:  Before you do your next

24   question, I know we're coming up on an hour.  May we

25   ask the court reporter to tell us how long we've been
```

```
1    on the record?

2              REPORTER:  An hour and 10 minutes.

3              MS. PERALES:  Hour and ten.  All right.

4    Would it be all right before you ask your next

5    question?

6         Q    (By Mr. Disher) Would you like a break?

7         A    Sure.

8              MS. PERALES:  Thank you.

9              (Whereupon, a brief break was taken.)

10        Q    (By Mr. Disher) All right, Mr. Legomsky.

11   We're back on the record and we were going through

12   your declaration to identify the opinions on factual

13   issues that you have given, and I believe we were on

14   page 17.  And so I just want to continue that and make

15   our way through the rest of it to see what facts you

16   offer opinions about.

17        A    Well, in paragraph 38, I discuss the

18   instructions given in the standard operating

19   procedures for DACA adjudicators.  And, in particular,

20   the instruction that they carefully examine all cases

21   of possible fraud based on the standard fraud

22   protocols.  That's very important to anyone who might

23   be concerned that there is not enough attention given

24   to possible fraud.

25        Q    And that opinion is based on your review of
```

 1   the standard operating procedures?

 2        A    In part.  It's based also on my ability to

 3   interpret the standard operating procedures and on my

 4   knowledge from having been at USCIS of how carefully

 5   the fraud adjudicators scrutinize these cases.  I

 6   happen to know that they take them very seriously and,

 7   therefore, the factual information in paragraph 38 is

 8   probably more important than might meet the eye for a

 9   person who is not familiar with these processes.

10        Q    And that is based on your personal

11   observation of their process to review these

12   applications?

13        A    Yes.

14        Q    How many --

15        A    Based on -- I'm sorry.  It's based on my

16   general observations of the fraud officers at USCIS.

17        Q    And that --

18        A    Not -- not just -- sorry -- not just

19   specifically DACA.

20        Q    And that would have occurred during your

21   stint from 2011 to 2013?

22        A    Yes.

23        Q    Okay.  You have not observed any DACA

24   adjudications since 2013?

25        A    No.

1      Q    Have -- no, that is correct, you have not

2   observed -- Let me ask -- let me ask the question

3   again.

4           Since 2013, you have not observed any DACA

5   adjudications; correct?

6      A    Correct.

7      Q    Okay.  How many DACA applications have you

8   personally adjudicated?

9      A    None.

10     Q    Okay.  How many DAPA applications have

11  people who report directly to you adjudicated?

12     A    None.  The only people who reported to me

13  were other attorneys, not adjudicators.

14     Q    All right.  Keep going.

15     A    Paragraph 39 comments on the -- interprets

16  and comments on the approval of denial -- wait,

17  approval/denial rates for DACA and what that approval

18  rate was.  That's extremely important information for

19  the issue of whether case-by-case adjudication is

20  truly taking place.

21     Q    And that paragraph is based on data released

22  by USCIS?

23     A    In part.  That -- those data require some

24  interpretation.  For example, the figures for denials

25  are accompanied by a footnote that also -- that says

1    by denial, we need to include denials, terminations,

2    and withdraws.  I don't know that a person without

3    expertise in immigration law or familiarity with the

4    process would understand what terminations are.  But

5    they are, in effect, a form of denial.  Something I

6    know because of my expertise in immigration.

7         Q    All right.  And I was going to ask you about

8    that later, but since we're on that point anyway, I

9    can just give you a copy of this.

10                   (Exhibit 6, DACA Statistics, were

11                    marked for identification.)

12        Q    (By Mr. Disher) We'll mark this as Exhibit

13   6.  So this is the DACA statistics as of May 31, 2018.

14        A    Okay.

15        Q    And you've seen documents like this before?

16        A    The most recent one I had seen was from

17   March 31st, but yes.

18        Q    Okay.  Now, if we look at the second page,

19   there's the column at the top for denied under case

20   review?

21        A    Yes.

22        Q    And then that's -- there's a footnote to

23   footnote number eight; right?

24        A    Yes.

25        Q    Okay.  And then if we look at footnote

```
 1   number eight, it says the number of requests that were

 2   denied, terminated, or withdrawn during the reporting

 3   period; right?

 4        A    Correct.

 5        Q    Okay.  So let's talk about each of those, in

 6   particular.  When you say -- or rather when the

 7   footnote says requests that were denied, that would

 8   include requests that did not meet one or more of the

 9   stated criteria in the 2012 DACA memo; is that

10   correct?

11        A    Or that were denied in the exercise of

12   discretion.

13        Q    I understand.  And I just want to make sure

14   we cover the entire universe here, okay?

15        A    Okay.  I'm sorry.  But, yes, it would

16   include those.

17        Q    So to -- and let's -- let's walk through it

18   one by one.  To put a fine point on it, in USCIS's

19   reporting of these statistics about the DACA denials,

20   the number of applications that are denied includes

21   applications that did not meet one or more of the

22   stated criteria in the DACA memo; correct?

23        A    Correct.

24        Q    It also included or includes, potentially,

25   applications that met all of those criteria and then
```

1    were denied anyway?

2         A    Correct.

3         Q    It also includes applications that were

4    terminated?

5         A    Correct.

6         Q    And what does it mean for an application to

7    be terminated?

8         A    Sometimes a DACA request is granted, but

9    either the person subsequently does something that

10   would have been a disqualification or evidence comes

11   to light showing that a person had previously

12   committed what should have been a disqualifying act

13   and so the grant of DACA is terminated.  In effect,

14   it's a denial after the fact.

15        Q    Okay.  Those terminations would occur

16   because the applicant did something that then

17   disqualified him or her from DACA eligibility?

18        A    Either that or the person had already done

19   something, but the evidence of it did not come to

20   light until after DACA had been granted.

21        Q    Understood.  And then the number of denials

22   also includes applications that were withdrawn?

23        A    Correct.

24        Q    What does it mean for an application to be

25   withdrawn?

1      A      Sometimes a person might withdraw an

2   application when it becomes fairly clear that the

3   application is going to be denied.  An application

4   might also be deemed withdrawn if a person leaves the

5   country or if the person -- or if anything happens to

6   cause the person to be ineligible for DACA, the

7   application might be withdrawn.

8      Q      Okay.  All right.  Let's get back to your

9   declaration.  We were on paragraph 39.

10     A      Okay.  If I could just finish the answer to

11  that last question?

12     Q      Yes.

13     A      Those would be -- you were asking me whether

14  this is information that would require a specialized

15  expertise to understand, and as your questions

16  indicate, it might not have been obvious to a

17  non-specialist what terminations include or what

18  withdrawals include.  So interpretation of that

19  important chart is something that I think benefits

20  from the expertise that I have to offer.

21     Q      Where did you get the expertise that you're

22  using to offer that opinion?

23     A      It's a combination of my own general

24  knowledge from teaching and researching immigration

25  law and from my familiarity with the DACA process from

1  my time at USCIS.

2       Q    Okay.  Go ahead.

3       A    Should I go on?

4       Q    Yes, please.

5       A    Paragraph 42 is formed partly by just common

6  sense and logic.  One would expect a person to be

7  pretty sure DACA is going to be denied and who is

8  undocumented not to apply for it.  That's just

9  instinctive.  But in addition to that, over the years

10  I've had many conversations with immigration

11  practitioners who have dealt with DACA applicants.

12  And it's clear from those consistent conversations

13  that attorneys and other representatives simply

14  counsel people not to apply if it's fairly clear they

15  will be denied.  That's something that I don't think I

16  would have known but for both my expertise in the

17  field and my interactions with many attorneys over the

18  years.

19       Q    Okay.  Have you ever counseled anybody about

20  applying for DACA?

21       A    I have not.

22       Q    Okay.

23       A    In paragraph 46, in the portion that appears

24  on page 20, one sentence a few lines down reads,

25  "Further, only the leadership can disseminate guidance

1    throughout the agencies so that people on the ground

2    know what they are supposed to do, so that important

3    priorities will be transparent to the public and so

4    that there will be some reasonable degree of

5    consistency," unquote.  It's based partly on my

6    experience at USCIS that I have come to understand the

7    importance of centralized guidance to adjudicators and

8    the fact that such guidance, in order to be

9    meaningful, must come from agency leadership.

10        Q    And that's based on your two years at USCIS?

11        A    Yes.

12        Q    Okay.  And that's not something that's

13   unique to USCIS?

14        A    No, it's not.  But even though it's not

15   unique to USCIS, I don't know that that's the case

16   with every agency.  And so expertise and exposure

17   enable me to know that that is particular to USCIS.

18             In paragraph 48, I say that, "There's no

19   evidence to support any counter-instinctive assumption

20   that the USCIS adjudicators who decide DACA requests

21   are systematically disobeying the Secretary's multiple

22   clear instructions to exercise discretion on a

23   case-by-case basis," unquote.  Impressed in that

24   statement is that I am personally unaware of any

25   evidence and I think that my exposure to USCIS is such

```
 1   that if there were any indication of that happening, I

 2   would absolutely have been aware of it.

 3        Q    During the two years that you were at USCIS?

 4        A    Correct.

 5        Q    Have you reviewed any of the production from

 6   the federal defendants in this case?

 7        A    No, I have not.

 8        Q    Okay.

 9        A    In the case of paragraph 49, some of the

10   statements, or at least one of the statements, that

11   the adjudicator has to struggle with determining how

12   probable and how severe a danger has to be in order

13   for a denial to be warranted, is based on my

14   experience at USCIS and knowing how often that subject

15   can come up.  But I don't think I can comment on the

16   specifics of those discussions without breaching

17   privilege.

18        Q    Understood.

19        A    Okay.

20        Q    But, again, those discussions would have

21   only occurred during the two years that you were at

22   USCIS?

23        A    For those discussions, yes.

24        Q    Ending in 2013?

25        A    Yes.
```

1        Q     Okay.

2        A     But I have to say, I can't think of any

3    reason that that would change after I left.

4              In paragraph 50 -- no, I'm sorry, my

5    mistake, paragraph 49.  I discuss the fact that a

6    decision that is discretionary in character does not

7    become any less discretionary just because it goes to

8    one of the criteria, rather than to a determination

9    made after those criteria have been satisfied.  I

10   think my expertise in immigration law enables me to

11   understand why those determinations are, in fact,

12   discretionary.

13       Q     Your expertise in immigration law leads you

14   to that conclusion?

15       A     Yes.

16       Q     Which immigration laws, in particular?

17       A     Immigration law, in general, because I --

18   there are many, many provisions of the Immigration and

19   Nationality Act that require adjudicators to exercise

20   discretion in one form or another.  Sometimes it's a

21   very specific discretion, sometimes it's a more

22   residual discretion.

23       Q     And those areas are spelled out either in a

24   statute or a regulation?

25       A     The examples I'm thinking of are included in

```
 1   the statute, but it is not always clear, unless one is
 2   familiar with the case law, that those determinations
 3   are, in fact, discretionary.
 4        Q    Understand.  So it's either a statute or
 5   regulation or case law?
 6        A    Yes.  Case law --
 7        Q    Okay.
 8        A    -- and actual practice.
 9        Q    When you say "actual practice," what do you
10   mean by that?
11        A    By actual practice, if, for example, an
12   adjudicator has to decide whether removal would result
13   in, quote, "extreme hardship," unquote, which is a
14   prerequisite to many forms of discretionary relief, it
15   might not be obvious to someone that in order to
16   determine extreme hardship, the person is doing a
17   weighing and balancing, rather than looking for
18   specific prerequisites.  But knowing from -- knowing
19   from the fact that this is done in practice, that
20   these determinations require a weighing and a
21   balancing, is something that I think might not be
22   self-evident or non-specialized.
23        Q    Okay.  And what is the basis for your
24   knowledge about the practice that an individual
25   adjudicator goes through?
```

 1      A    Well, discussions of extreme hardship come

 2   up all the time.  Again, I can't reveal the specifics

 3   of those discussions without breaching confidence.

 4      Q    And those discussions occurred during your

 5   stint at USCIS?

 6      A    Yeah.  The ones I was referring to now

 7   occurred during my stint at USCIS.  But, in addition,

 8   there is always a lot of discussion among immigration

 9   scholars, a very sophisticated debate about how

10   discretion -- how discretionary decisions are, in

11   fact, made in immigration law.  There's been a great

12   deal written, a tremendous body of scholarly

13   commentary on that subject, and I think the

14   familiarity with that commentary enables me to

15   understand and hopefully to communicate how inherently

16   discretionary these judgments really are, even if the

17   statute doesn't use the specific word "discretion."

18      Q    Where are those scholarly publications

19   published?

20      A    In law review articles, in books.

21      Q    Okay.

22      A    In reports, yeah.

23      Q    All right.  When you say "immigration

24   scholars," are these immigration professors, for

25   example?

1        A    Typically, yes.

2        Q    Okay.

3        A    Sometimes practitioners, sometimes scholars.

4        Q    When you say "practitioners," you mean

5    immigration lawyers?

6        A    Yes.  People who -- yes, immigration

7    lawyers.  They might be in the private sector.  They

8    might be in the public sector.

9        Q    Okay.

10       A    But they're not professors.

11       Q    So it's either the immigration professors or

12   the immigration lawyers who are debating this idea

13   about how discretion is actually exercised?

14       A    How it is exercised and how you can tell

15   whether a statutory delegation of responsibility is,

16   in fact, discretionary in the first place.

17       Q    Thank you.

18       A    I think that's the end of my list.

19       Q    Okay.  Let's talk about the conclusion

20   briefly in paragraph 51.  You say, "It is my

21   firmly-held opinion that DACA is a case-by-case

22   exercise of prosecutorial discretion by which DHS

23   fulfills the Congressional directive to set and carry

24   out immigration enforcement priorities."

25       A    Yes.

1    the Secretary of Homeland Security has discretion to

2    grant employment authorization to aliens based on this

3    statute?

4         A    Based both on this statute and on what the

5    old INS, back in the days of the Reagan

6    Administration, understood to be the general conferral

7    of authority to the agency to implement and administer

8    the immigration laws.

9         Q    Okay.  And --

10        A    So it's a combination of both sources of

11   authority.

12        Q    And what was the second source again?

13        A    In 1981 or 1982, the Reagan Administration,

14   before the provision mentioned in paragraph 26 was

15   enacted, asserted the authority to grant employment

16   authorization to deferred action recipients.  It did

17   so by issuing a formal notice and comment rule

18   specifically saying that deferred action recipients

19   could qualify.  It elaborated on its authority to do

20   that in the federal registered notice accompanying the

21   regulation.  And the authority it cited was the

22   general delegation of authority, from Congress to the

23   Executive Branch, to administer the immigration laws.

24        Q    All right.

25        A    After that, this provision was enacted,

 1   thereby making explicit what the Reagan Administration

 2   had assumed was implicit.

 3        Q    Okay.  And the thing that it made explicit

 4   is that the executive has the authority to grant work

 5   authorization to aliens, even if a particular statute

 6   does not?

 7        A    That's correct.  More specifically, the

 8   Attorney General and now the Secretary of Homeland

 9   Security.

10        Q    Right.  Are there any limits to the

11   Secretary of Homeland Security's ability to do that?

12        A    There are no explicit limits in the statute

13   itself.  Undecided by the courts is whether there

14   might be some implicit limit.  No court that I'm aware

15   of had occasion to decide that question so I would

16   only be speculating.

17        Q    Okay.  And I just want to know, in your

18   opinion, as a retained expert for the intervenors in

19   this case, is there a limit to the Secretary of

20   Homeland Security's ability to grant work

21   authorization to aliens?

22        A    My view is that there is an outside limit,

23   but that this policy, DACA, does not even remotely

24   approach that limit.  The limit -- one limit that I

25   would suggest, and I don't mean to imply there are no

 1  details of that without exposing that type of

 2  information, okay?

 3           MR. ROBINS:  Understood.

 4      Q    (By Mr. Disher) All right.  So is there a

 5  special unit that looks at applications which may pose

 6  some national security threat?

 7           THE WITNESS:  May I answer that?

 8           MR. ROBINS:  I'm not objecting.

 9           MS. PERALES:  You follow his lead here.

10           THE WITNESS:  Okay.

11      A    If a case -- during the time I was there.

12  And, again, I can speak only to that period.  During

13  the time I was there, if a national security issue

14  arose, it would go straight to the -- it would go

15  eventually to the director of the agency.  Those cases

16  would be taken very seriously and the director would

17  want to know about them.

18      Q    (By Mr. Disher) Understood.  And then do you

19  know who would make the ultimate decision about that?

20      A    There would be a conversation between the

21  director and whoever he wishes to consult.

22      Q    Okay.  While you were there, do you know how

23  often that happened?

24      A    No, I don't know the numbers.

25      Q    Was it more than 10 times?

1              MR. ROBINS:  Objection.  Again, on law

2    enforcement privilege grounds.

3              MR. DISHER:  Yeah, I just can't -- can I get

4    an estimate from him?

5              MR. ROBINS:  No.

6        Q    (By Mr. Disher) What about the public safety

7    decision, how many -- do you have any estimate about

8    how many applications were initially flagged because

9    they may pose some threat to public safety?

10       A    I don't have an estimate as to that.  I know

11   that, according to the published statistics, as of the

12   end of calendar year 2015, there were already

13   approximately 75,000 denials of DACA on the merits.

14   And my assumption would be the significant proportion

15   of those were on public safety grounds, but I can't

16   estimate what that proportion would be.

17       Q    Okay.  All right.  In paragraph 50, you talk

18   about the affidavit from Donald Neufeld.

19       A    Yes.

20              (Exhibit 7, Neufeld Affidavit, was

21              marked for identification.)

22              MR. DISHER:  Mark that as Exhibit 7.

23              MS. PERALES:  Seven?

24              MR. DISHER:  Yes.

25       Q    (By Mr. Disher) Now, you say, "The Neufeld

1   reason to think it might be denied, you might not

2   apply at all.  And that's why I think the more

3   successful applicants are those who apply at the

4   beginning.

5       Q    And I'm going to ask you to speculate, but

6   might there be other scenarios by which individual --

7   by which of these rates would increase over time the

8   denial rates?

9       A    Possibly a different administration, but the

10  denial rates were continuing to increase even during

11  the first few -- the last few years of the Obama

12  Administration; so I don't think that would account

13  for an increase.  I can't offhand think of any other

14  alternative explanation.

15      Q    In preparing this declaration, have you done

16  anything to exclude other possibilities?

17      A    I can't identify any other possibilities to

18  exclude.

19           MR. ROBINS:  Okay.  That's all I have.  Pass

20  the witness.

21                          EXAMINATION

22  QUESTIONS BY MS. PERALES:

23      Q    I have a few questions for you, Mr.

24  Legomsky.  With respect to differences between DAPA

25  and DACA that you discussed with Mr. Disher, is it

```
 1   also fair to observe that the INA sets out provisions

 2   under which parents of U.S. citizen children may

 3   acquire an immigration status, but that the INA does

 4   not have analogous provisions for undocumented people

 5   brought to the U.S. as children?

 6               MR. DISHER:  Objection.  Leading.

 7               MS. PERALES:  Yes.

 8        Q    (By Ms. Perales) Go ahead and answer.

 9        A    I think that is a fair argument because of

10   the fact that in the original Texas versus U.S. DAPA

11   case, if my recollection is correct, the Fifth Circuit

12   did include as one of the reasons for rejecting DAPA,

13   that the INA makes specific provision for certain

14   classes of family members, but not all the ones

15   included in DAPA.  And as your question implies, the

16   same could not be said of DACA; so I would say, yes,

17   that is a fair argument to make.

18        Q    You spoke a few moments ago about two

19   exhibits today that represented two different drafts

20   of your declaration.  One is marked as Exhibit 5 and

21   the other one is marked Exhibit 8 from the deposition.

22   Can you just, in a brief sense, give us an

23   understanding of the differences between those two

24   drafts?

25        A    Yeah.  The main effect -- my main purpose in
```

 1   redrafting was that when I discovered that I had time

 2   for one more rigorous edit, I decided to take

 3   advantage of that opportunity and so I wanted to

 4   enhance the clarity and the specificity of the

 5   statements I had made, as well as to make the document

 6   a little bit cleaner by deleting information that I

 7   thought might be redundant.  And so that was what I

 8   was trying to do in the second draft.

 9        Q    Okay.  You spoke to Mr. Disher through a

10   series of questions and answers about the possible

11   legal limits of the authority of DHS to grant work

12   authorization to a very large number of undocumented

13   immigrants.  And I was hoping that you would be able

14   to summarize the different limitations that you

15   identified in that colloquy in the answer to my

16   question.

17        A    Certainly.  And these are simply limitations

18   that I can think of.  I don't want to exclude the

19   possibility that there are still other limitations,

20   but the ones that come most readily to mind are,

21   first, the resource limitations rationale takes you

22   only so far.  There might be a certain point at which

23   the resources are available to remove a far greater

24   number than what the administration is removing, and

25   there could at least be an argument that by not fully

 1   using the enforcement resources, the administration is

 2   not acting consistently with the congressional intent

 3   in passing the various Appropriations Act.  That's

 4   one.

 5           Secondly, the particular priorities that the

 6   administration uses in deciding whom to focus on and

 7   whom not to focus on need to be -- need to have some

 8   rational basis.

 9           Third, they cannot violate Equal Protection;

10   so they cannot draw their priorities along lines that

11   would violate the Equal Protection Clause.

12           And fourth, the particular priorities, in my

13   view, cannot come into direct conflict with priorities

14   that Congress has explicitly ordered the

15   administration to take into account.

16           Again, there might be still others that are

17   not coming readily to mind.

18       Q   Okay.  And then for my last set of questions

19   to you, I'd like you to turn to your declaration dated

20   July 16, which is Legomsky Deposition Exhibit No. 5.

21       A   Okay.

22       Q   You identified some statements of fact in

23   the declaration with Mr. Disher and I'd like to go

24   over some additional fact statements with you that may

25   have been left out.

1              So with respect to page 3, paragraph 5, can

2      you identify for me the fact statements in that

3      paragraph?

4          A    Well, certainly the first sentence is a

5      statement of fact.  "DHS routinely establishes

6      priorities guiding its exercise of prosecutorial

7      discretion in the enforcement of the immigration

8      laws."

9              The second statement is also one of fact,

10     that deferred action is one of the instruments it uses

11     for this purpose.  The third statement could be

12     characterized as one of fact, that deferred action is

13     one particular -- I'm sorry -- that DACA is one

14     particular deferred action initiative.

15         Q    And with respect to the facts that you set

16     out in paragraph 3 of your declaration, can you

17     explain to us what you drew upon to state those facts

18     as being true?

19             MR. DISHER:  I'm sorry.  You mean paragraph

20     5.

21         Q    (By Ms. Perales) I'm sorry.  Page 3,

22     paragraph 5.  I'm sorry.  I apologize.

23             With respect to the fact statement on page

24     3, paragraph 5, can you explain what you drew upon to

25     make those factual statements?

1      A     Well, as to the first sentence, I

2  specifically drew on my general expertise in

3  immigration law and my experience from teaching, from

4  researching, from lots and lots of conferences and

5  conversations with other immigration scholars, with

6  lots of conversations over the years with immigration

7  practitioners and with other experts.  I know that it

8  is very routine for DHS to establish priorities and

9  also for meeting the various documents in which they

10  have done precisely that.

11     Q     And with respect to paragraph 5, did you

12  also draw on your experience as USCI -- working with

13  the Federal Government with DHS?

14     A     Yes, I should have added that as well.  That

15  certainly informs my knowledge as to the first

16  sentence and with respect to the second and third

17  sentences in that paragraph as well.

18     Q     And then with respect to paragraph 6, in the

19  first sentence, "DACA is a decision by the agency to

20  defer action (immigration enforcement proceedings)

21  against an individual."  Can you describe for me what

22  you drew upon to make that fact statement?

23     A     Again, my general expertise derived from the

24  sources that I described a moment ago.

25     Q     Okay.  With respect to paragraph 7, which

1   begins at the bottom of page 3, can you identify fact

2   statements in that paragraph?

3        A    Yes.  Yes.  The entire paragraph is a

4   statement of fact.  It describes what DHS has to do

5   when it makes decision not to bring enforcement

6   proceedings.

7        Q    And specifically the listing of the factors

8   that DHS balances, can you describe for me what you

9   drew upon to make that fact statement?

10       A    The same as before.  My general expertise

11  from many decades of experience, plus my service time

12  at USCIS.

13       Q    With respect to page 4, paragraph 9, can you

14  identify any fact statements in that paragraph?

15       A    Certainly the first sentence is a statement

16  of fact.  The second statement as well.  And the third

17  statement as well.  I'm sorry.  The third sentence as

18  well.

19       Q    And what did you draw upon to make those

20  fact statements?

21       A    The same.  My general expertise, plus my

22  time at USCIS.

23       Q    Okay.  With respect to paragraph 11, which

24  begins at the bottom of page 4, can you identify your

25  fact statements there?

1      A    All of the statements in paragraph 11 I

2  would describe as statements of fact.

3      Q    And what did you draw upon to make those

4  fact statements in paragraph 11?

5      A    The same.  My general expertise in

6  immigration law and my time at USCIS.

7      Q    At the bottom of page 5 where paragraph 15

8  begins -- I think you covered this one with Mr. Disher

9  so I'll move on.

10     A    Yes.

11     Q    With respect to paragraph 16 and the

12 statements in paragraph 16, on what did you base your

13 statement that in some instances, the beneficiaries

14 tended to be those with a bridge to some form of legal

15 status?

16     A    Partly on the basis of what I've described

17 before, my general expertise.  But in addition to

18 that, by examining summaries of the occasions on which

19 prior presidents have granted relief to large

20 number -- large categories of undocumented immigrants.

21     Q    And upon what do you base your statement in

22 the following sentence, quote, "DACA too serves as

23 such a bridge because many current DACA recipients are

24 eligible to adjust as they grow older and marry,"

25 unquote?

1        A    I base that on -- again, on my general

2    knowledge of immigration law, but also on the specific

3    terms of DACA.  I'll leave it at that.

4        Q    Because of your background in immigration

5    law and experience at USCIS, are you familiar with the

6    methods by which an individual may be able to gain

7    legal permanent resident status?

8        A    Yes, I am.

9        Q    And are those provisions in the INA

10   standalone or must they be interpreted in the context

11   of other provisions?

12       A    They absolutely have to be interpreted in

13   the context of many other provisions.  In fact, I

14   should add that that last sentence applies to many of

15   the factual determinations that I've identified

16   earlier.  Expertise is critical in these cases, not

17   only for the purpose of ferreting out individual

18   pieces of information as I've described in the

19   declaration, but perhaps even more importantly,

20   piecing it all together.

21            The Immigration and Nationality Act, as

22   specialists know, contain many, many provisions that a

23   person would not ordinarily discover by looking only

24   at the part of the INA in which one provision appears.

25   It's very common to read a provision of the INA and

1   not know that 200 pages later, there's another

2   provision that qualifies it.  So being able to

3   understand how all these pieces fit together with each

4   other and how they fit together with various factual

5   statements that I've been identifying requires a good

6   deal of experience and specialized expertise.

7        Q    And do you have that experience and

8   expertise?

9        A    I do.

10       Q    Moving forward to page 9, paragraph 22 at

11  the bottom of the page, can you tell me what you base

12  the fact statements in paragraph 22 upon when you made

13  them?

14       A    On general expertise and on examination of

15  the specific provisions of the statute and provisions

16  of the regulations that are cited in that paragraph.

17       Q    On page 10, paragraph 25, upon what did you

18  base your fact statements in paragraph 25?

19       A    The first statement is based on general

20  expertise and, in particular, on being able to see

21  patterns of grants of preferred action or its function

22  of equivalence over the years.  The same is true of

23  the second sentence.  And the third sentence is based

24  both on the information that I've just described and

25  on examination of the particular statutory provisions

```
 1   and provisions of the regulations on which those

 2   benefits are specifically based.

 3        Q    Are favorable exercise of discretion

 4   sometimes also embodied in memoranda or procedure

 5   documents at DHS?

 6        A    Yes, they are.

 7        Q    And would one require a familiarity with

 8   those memoranda and procedure documents in order to be

 9   able to present the full context of deferred action in

10   similar exercises of discretion?

11        A    I would say, yes, that would be

12   indispensable.

13        Q    And do you have that familiarity?

14        A    Yes, I do.

15        Q    On page 14, paragraph 33, the very beginning

16   of the paragraph begins with the words, quote,

17   "Understanding the effects of advance parole on DACA

18   recipients," unquote.  Do you see that there?

19        A    Yes.

20        Q    Do you understand the effects of advance

21   parole on DACA recipients?

22        A    I do.

23        Q    And upon what do you draw when you convey

24   your understanding of the effects of advance parole on

25   DACA recipients?
```

1        A    My general knowledge, plus my understanding

2    of how several different provisions of the INA work

3    together and on the basis of the experience I accrued

4    at USCIS.

5        Q    Does understanding the effects of advance

6    parole on DACA recipients require an understanding of

7    the routes by which an individual is able to adjust

8    status under the INA?

9        A    Yes.

10       Q    Does it also require an understanding of

11   inadmissibility?

12       A    Yes, absolutely.

13       Q    Does it require an understanding of the

14   three and ten-year bars?

15       A    Yes.

16       Q    Does it require an understanding of other

17   barriers to adjustment of status that may be located

18   elsewhere in the INA?

19       A    Yes.

20       Q    With respect to paragraph -- page 15,

21   paragraph 34, when you talk about this concept of

22   jumping the line, upon what do you base that -- those

23   statements in paragraph 34?

24       A    During the time that I was at USCIS, I know

25   that advance parole -- I'm sorry -- I know that

1   adjustment of status applications by people who had

2   received DACA and who had later received advance

3   parole were handled in the same way and all other

4   people in the same immigration category and in the

5   same order.  So, for example, if you were applying for

6   adjustment of status based on being an immediate

7   relative of a U.S. citizen, there are no statutory

8   numerical limits and, therefore, the only waiting time

9   is processing time.  There was no provision for

10  putting the DACA recipients ahead of the line of

11  people who were otherwise similarly situated.

12      Q    And does your familiarity with this topic of

13  "the line," quote, unquote, include familiarity with

14  the availability of Visas, permanent resident Visas,

15  for different categories of individuals seeking to

16  adjust status?

17      A    Yes, very much so.

18      Q    And what is that based on?  What is your

19  familiarity based on there?

20      A    General knowledge of the Immigration and

21  Nationality Act and particularly how these numerous,

22  extremely complex statutory provisions work together.

23           MS. PERALES:  I pass the witness.

24

25

```
 1                        EXAMINATION
 2   QUESTIONS BY MR. DISHER:
 3        Q    Mr. Legomsky, a few follow-up questions.
 4             First, you mentioned piecing it all
 5   together; right?
 6        A    Yeah.
 7        Q    You don't dispute that Judge Hanen himself
 8   can piece it all together without your help, do you?
 9        A    I think that to reach a reliable decision,
10   anyone who is not an immigration specialist would need
11   the guidance of someone who understands the intricate
12   network of statutory and regulatory provisions and
13   case law that these decisions require.  I spend an
14   entire semester emersed in teaching the students the
15   complexities of immigration law.  And I would be very
16   wary of anyone who is not a specialist making these
17   decisions without input from a specialist.
18        Q    That specialist could be a lawyer for one of
19   the parties in the case?
20        A    It could be if the lawyers are specialists
21   in immigration law.
22        Q    Okay.
23        A    Otherwise, I think it would be unreliable.
24        Q    Going back to the idea of the outer limit of
25   the executive's ability to grant work authorization,
```

```
 1                    REPORTER CERTIFICATE

 2           I, REBECCA L. TUGGLE, a Registered
      Professional Reporter, Certified Court Reporter, and
 3    Certified Shorthand Reporter within and for the State
      of Missouri, do hereby certify that there came before
 4    me on August 1, 2018, at Alaris Litigation Services,
      711 N. 11th Street, St. Louis, Missouri 63101
 5
                      STEPHEN LEGOMSKY
 6
      who was by me first duly sworn; that the witness
 7    was carefully examined; that said examination was
      reported by myself, translated and proofread using
 8    computer-aided transcription; and the above transcript
      of proceedings is a true and accurate transcript of my
 9    notes as taken at the time of the examination of this
      witness.
10
             I further certify that I am neither attorney
11    nor counsel for nor related nor employed by any of the
      parties to the action in which this examination is
12    taken; further, that I am not a relative or employee of
      any attorney or counsel employed by the parties hereto
13    or financially interested in this action.

14

15           Dated this 2nd day of August, 2018.

16

17

18                    Becca Tuggle

19    _____
                 Rebecca L. Tuggle, RPR, CCR, CSR
20

21

22

23

24

25
```