# Def-Int. Ex. 151

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION

 3                    + + + + +

 4   _____
                                    :
 5   IN THE MATTER OF:              :
                                    :
 6   STATE OF TEXAS, ET AL.,        :
                                    :
 7              Plaintiff,          :
                                    :
 8       v.                         :  Civil Action No.
                                    :  1:18-CV-00068
 9   UNITED STATES OF AMERICA,      :
     ET AL.,                        :
10              Defendants,         :
                                    :
11   and                            :
                                    :
12   KARLA PEREZ, et al.,           :
                                    :
13              Defendant-          :
                Intervenors,        :
14                                  :
     and                            :
15                                  :
     STATE OF NEW JERSEY,           :
16                                  :
                Defendant-          :
17              Intervenor.         :
                                    :
18   _____:

19                 Thursday,
                   August 2, 2018
20
                   Washington, D.C.
21

22   DEPOSITION OF:

23                 MICHAEL KNOWLES

24

25
```

```
 1   called for examination by Counsel for the
     Defendant-Intervenors, pursuant to Notice of
 2   Subpoena, in the law offices of Mexican American
     Legal Defense Fund, located at 1016 16th Street,
 3   NW, Washington, D.C., when were present on behalf
     of the respective parties:
 4
     APPEARANCES:
 5
     On Behalf of Mexican American Legal Defense Fund:
 6
     NINA PERALES, ESQ.
 7   1016 16th Street, NW
     Suite 100
 8   Washington, D.C. 20036
     210-845-5147
 9   nperales@maldef.org

10   On Behalf of the State of Texas:

11   ADAM ARTHUR BIGGS, ESQ.
     Special Counsel for Civil Litigation
12   Office of the Attorney General of Texas
     P.O. Box 12548
13   Austin, Texas 78711-2548
     512-936-0750
14   adam.biggs@oag.texas.gov

15

16   On Behalf of the State of New Jersey:

17

18   JEREMY E. HOLLANDER, ESQ.

19   Assistant Attorney General

20   124 Halsey Street

21   P.O. Box 45029

22   Newark, New Jersey 07101-5029

23   973-648-7453

24   jeremy.hollander@law.njoag.gov

25
```

```
 1

 2

 3

 4

 5

 6    APPEARANCES: (cont.)

 7

 8    On Behalf of the United States:

 9

10    JEFFREY WALKER, ESQ.

11    U.S. Department of Justice

12    Trial Attorney

13    Ben Franklin Station

14    P.O. Box 868

15    Washington, D.C. 20044

16    202-532-4468

17    james.walker3@usdoj.gov

18

19    ALSO PRESENT:

20

21    ALEJANDRA AVILA*

22    RAI SHAY LIN

23

24    *Present telephonically

25
```

```
 1
 2
 3
 4
 5
 6                    CONTENTS
 7
 8   WITNESS                DIRECT  CROSS
 9
10   Michael Knowles
11   By Ms. Perales          6      144
12   By Mr. Biggs           48      147
13   By Mr. Hollander      137
14
15
16   EXHIBIT NO.                           PAGE
17
18   1    Deposition Subpoena. . . . . . . . . . . . 7
19   2    Signed Declaration from
20        Kenneth Palinkas April 6, 2018 . . . . . . .35
21
22
23
24
25
```

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2                                        11:05 a.m.

 3             MS. PERALES:  We're on the record.

 4             COURT REPORT:  Mr. Knowles, can you

 5   please raise your hand?

 6             MR. KNOWLES:  Mm-hmm.

 7             COURT REPORTER:  Do you solemnly swear

 8   or affirm that the testimony you're about to give

 9   is the truth, the whole truth and nothing but the

10   truth?

11             MR. KNOWLES:  I do so affirm.

12             COURT REPORTER:  Thank you so much.

13             MS. PERALES:  Good morning, Mr.

14   Knowles.

15             MR. KNOWLES:  Good morning.

16             MS. PERALES:  My name is Nina Perales

17   and I am an attorney for the Perez Defendant

18   Interveners in this case.

19             Before we get started, I'd like to

20   have everybody else here introduce themselves

21   because we'll probably have several people

22   questioning you today.

23             So, to my right, if you wanted to

24   introduce yourself.

25             MR. HOLLANDER:  Yes, I'm Jeremy
```

1   separate from the field office directorate.

2          Q     Okay.  Do you have -- are you a member

3   of a union?

4          A     I am.

5          Q     What is the name of the union that you

6   are a member of?

7          A     The American Federation of Government

8   Employees.  And within that larger organization,

9   there is the National Citizenship and Immigration

10  Services Council of which I'm the president.

11             And, it's also known as Council 119.

12  Within that council there are 22 local unions

13  representing USCIS employees.  And, I'm the

14  president of Local 1924 which is the local union

15  in the National capitol area representing USCIS

16  employees.

17         Q     Would it be okay for me to refer to

18  Council 119 as NCISC?

19         A     Yes.

20         Q     And, would it also be okay for me to

21  refer to it as the USCIS Union?

22         A     That would be okay.  It's less

23  cumbersome.

24         Q     Yes, and so I might refer to it --

25  would it also be okay if from time to time,

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 13

1    instead of saying USCIS, that I might just say

2    CIS?

3         A       Mm-hmm, yes.

4         Q       Okay.  How many people are in the

5    bargaining unit of the NCISC?

6         A       It's approximately 12,500 in what we

7    call the nonprofessional bargaining unit.  And,

8    there's approximately 100 in what we call the

9    professional bargaining unit.

10               Professional would be attorneys,

11   accountants, statisticians, social scientists

12   that whose job requires a particular specialized

13   degree.

14               But Council 119 represents only the

15   nonprofessional unit which is about 12,500.

16        Q       And, does that 12,500 include

17   employees who are known as Immigration Service

18   Officers?

19        A       Yes.

20        Q       And, will it be okay if I refer to

21   Immigration Service Officers as ISOs?

22        A       Yes.

23        Q       All right.  Now, you mentioned that

24   you are also the president of your Local 1924.

25   Is that right?

```
 1        A      Yes.

 2        Q      So, you hold two presidencies at the

 3   same time?

 4        A      That's right.

 5        Q      And, how many members in the

 6   bargaining unit of your Local?

 7        A      In Local 1924 represents approximately

 8   2,000, the bargaining unit from the

 9   nonprofessionals.  We also represent the 100

10   bargaining unit employees in the professional

11   unit.

12             And, they are generally located in the

13   National capitol area, although we have some who

14   are posted abroad.

15        Q      All right.

16        A      That would be the CIS Headquarters,

17   the Asylum Office, the Washington District and

18   Field Office, the Potomac Service Center, the

19   Administrative Appeals Unit, the Investor Program

20   Office and our international officers that have

21   deployed abroad.

22        Q      With a bargaining unit of

23   approximately 2,000 people, how large is your

24   Local compared to some of the other constituent

25   parts of the CIS union?
```

```
 1        A      Right.  So, remember, I said there are
 2   22 Local unions around worldwide that represent
 3   CIS employees.
 4               Local 1924 is probably the largest in
 5   terms of bargaining unit size as well as
 6   membership.
 7               Of the 2,000 bargaining unit, about
 8   800 members.
 9               The second largest would be our Local
10   that's based out in Nebraska and the Upper-Mid-
11   West that includes the Nebraska Service Center,
12   the National Benefit Center, the National Records
13   Center and various field offices there.
14               They are roughly about the same size,
15   but slightly smaller.
16        Q      Okay.  When did you become president
17   of Local 1924?
18        A      In 2000, the year 2000.
19        Q      And, have you held the position of
20   president continuously since 2000?
21        A      Yes, I've been re-elected many times.
22        Q      And, can you briefly summarize your
23   responsibilities as president of Local 1924?
24        A      So, I provide general oversight to the
25   affairs of the Local.  I'm the Chief Executive of
```

1    our Executive Board.

2            I'm, you know, ultimately responsible

3    for the legal and financial affairs of the Local.

4    And, I represent the Local in other union

5    settings with AFGE National, our AFG District,

6    and of course, our CIS Council, National CIS

7    Council.

8        Q     And, can --

9        A     And, we, you know, we bargain and

10   negotiate contracts, agreements.  We handle

11   grievances, arbitrations, dispute resolutions and

12   generally represent the bargaining unit in

13   matters affecting their working conditions and

14   dealing with the Agency.

15       Q     And, when you say the Agency, do you

16   mean USCIS?

17       A     Yes, yes.

18       Q     Can you briefly summarize your duties

19   as the president of the USCIS union?

20       A     Yes, as president of the Council, I'm

21   the Chair of our Executive Board.  And, I provide

22   general oversight to the affairs of the Council.

23            It is a Council of 22 Locals.  It's

24   not really a separate organization, it's really

25   more of a steering committee.  And, we represent

1    the 22 Locals in matters that affect them

2    collectively.

3              So, for example, I was the chief

4    negotiator of the USCIS -- chief negotiator for

5    the union of the USCIS Labor Contract, also known

6    as the collective bargaining agreement.

7              I would negotiate national agreements

8    with the Agency that affect the nationwide

9    workforce or matters that affected more than one

10   Local.

11             Sometimes we might engage in

12   litigation on behalf of the Council,

13   arbitrations, EEO complaints, appeals to the

14   Merit Systems Protection Board.

15             And, we provide assistance and

16   guidance to our Locals.  The Locals are

17   autonomous within our Council.  So, I don't

18   direct, you know, I don't direct the other Local

19   presidents, but I represent them.

20             And, when they need assistance, we

21   provide training, guidance.  We might help

22   intervene on behalf of those Locals with the

23   higher Agency leadership.

24        Q    When did you become the USCIS

25   president?

```
 1        A      This is -- I've served two different
 2   terms.  The first one was from 2007 to 2009.
 3              And, my current term from 2015 to the
 4   present.  It's a three-year term.
 5        Q      Does that mean you're up for election?
 6        A      Yes, our elections are in August.
 7        Q      So, this --
 8        A      The 11th of August is our election.
 9        Q      Okay.  Are you in a contested
10   election?
11        A      Yes.
12        Q      Okay.  Now, when you were elected
13   USCIS president in 2015, was that a contested
14   election?
15        A      It was.
16        Q      And, what was the name of your
17   opponent?
18        A      Kenneth Palinkas.
19        Q      Okay.
20        A      He was the incumbent president.
21        Q      Okay.
22        A      At the time.
23        Q      In your role as USCIS president -- in
24   your role as USCIS union president, do you have
25   interactions with union members in offices other
```

1    than your own?

2         A      Yes, frequently.

3         Q      Can you describe those interactions?

4         A      Yes, I mean, normally, well, for the

5    Local as the Local president, I'm, you know, I'm

6    constantly moving among all of the units, meeting

7    with employees, attending town hall meetings,

8    meeting with management.

9              I like to talk with as many employees

10   as possible so I get a good sense of what their

11   concerns and interests are.  Individuals call me

12   asking for advice and assistance.

13             With respect to the other Locals, the

14   usual point of contact would be with the Local

15   president or their designee.

16             Sometimes, I might get a call from a

17   random employee and office around the country and

18   I would then direct them, you know, for proper

19   assistance to their Local president.

20             We have periodic conference calls,

21   conferences.  I visit other offices and other

22   Local unions jurisdictions.  So, there's quite a

23   bit of interaction.

24        Q      Have you ever bene to a USCIS Service

25   Center?

```
 1        A     I have.  In fact, our Local 1924
 2   represents the Potomac Service Center which is in
 3   Crystal City, Arlington, Virginia.  I go there
 4   frequently.
 5              And, I've visited all of the other
 6   Service Centers, Vermont, Nebraska, Texas,
 7   California in the course of my work with the
 8   union.
 9        Q     And, when you visit Service Centers,
10   do you have an opportunity to speak to the staff
11   at those Service Centers?
12        A     Yes.  Yes, sometimes we've had
13   negotiations, meetings.  Sometimes, it's a
14   courtesy visit.
15              When we signed the current collective
16   bargaining agreement with the Agency, we actually
17   did that in conjunction with the visit of the
18   former director, Leon Rodriguez, to the Nebraska
19   Service Center.
20              And, I traveled there with our AFG
21   National president.  We sought and made a big
22   ceremony signing the CBA with Director Rodriguez.
23              And then, we actually toured the
24   entire Service Center and met, you know, went
25   desk to desk, the Director and I, and the
```

 1    National Union president went and basically met

 2    every employee in the building.

 3          Q      All right.  Now, are you familiar in

 4    a general sense with the types of applications

 5    that are adjudicated at Service Centers?

 6          A      I'm not familiar as a worker with

 7    those form types because my job is just

 8    adjudicating asylum claims.  But, I have general

 9    familiarity with the kinds of benefits that

10    various offices adjudicate.

11          Q      And, do you know where DACA requests

12    are adjudicated?

13          A      Generally, in Nebraska, the Nebraska

14    Service Center.  And, at some time, they have

15    been also done at the California Service Center.

16                 But, if you're familiar with the

17    Service Center operations, they tend to shift

18    work around the country.  I think at one time

19    earlier in the Agency's evolution, they would,

20    you know, they had different portfolios assigned

21    to different Centers.

22                 But, it's really a mobile work,

23    depending on volume, backlogs, staffing and so

24    on.

25          Q      Do adjudications at USCIS Service

1    Centers typically include an interview?

2         A      No, they do not.

3         Q      Are you aware of DACA --

4         A      In fact, I'm sorry, I'm not aware of

5    any interviews being conducted in Service

6    Centers.  They're really not set up, you know,

7    there's no interview offices, no -- there's no

8    what we call public interface between the Service

9    Centers and the public.

10              Although, sometimes, a Service Center

11   may send a case to a field office with a request

12   that the field officer interview the applicant to

13   obtain further information or evidence.

14        Q      Are you aware of any specific

15   instances where a DACA request was referred to a

16   field office for interview?

17        A      Yes, I'm aware of, you know,

18   anecdotally.  I don't -- because I don't do the

19   work.  But, I have spoken with several of my

20   colleagues in recent months about that question.

21              I've spoken specifically with our

22   union reps in the Washington, D.C. Field Office

23   and the Atlanta, Georgia Field Office.  And, they

24   told me about doing interviews on behalf of the

25   Service Center in several cases where the Service

1    Center needed more information.  They called in

2    the DACA applicant.

3            I think in these cases, they were

4    suspected of gang activity or gang association.

5    And so, they brought in the applicants and

6    pursued the lines of questioning requested by the

7    Service Center.  Sent the cases back to the

8    Service Center with the findings.

9        Q     Have you had an opportunity to speak

10   with members of the USCIS union about how they

11   adjudicate DACA applications?

12       A     Yes, I've spoken with the former

13   president of the Local that represents employees

14   at the California Service Center.  I say former

15   because they just had an election.  That

16   individual is now the vice president, same Local.

17           I've spoken with the president of the

18   Nebraska Service Center and the vice president of

19   the Nebraska Service Center.

20           I can't recall whether the California

21   president has personally adjudicated DACA cases.

22   I believe he may have.

23           But, the two individuals in Nebraska

24   both -- they are ISOs who had done DACA.

25       Q     And, you spoke to those two?

```
 1        A     Yes, yes.

 2        Q     Okay.  And, did you have occasion to

 3   speak with these union members who include DACA

 4   adjudications about whether they rubberstamp

 5   applications?

 6        A     Yes.

 7        Q     And, can you convey or share with us

 8   what you learned from those conversations?

 9        A     Well, I asked them, you know, what

10   would you say to the criticism that this

11   adjudication is a rubberstamp operation?

12             They said no, far from it.  We have

13   very specific training and guidance.  Every case

14   is treated on its own merits.  We do thorough

15   examination of the evidence.

16             We do the necessary background checks.

17   We flag any cases that are of concern or

18   supervisory review.

19             The individuals kind of bristled at

20   the thought that they would -- it would be said

21   that their colleagues rubber-stamped anything.

22        Q     Did you have occasion to talk with any

23   DACA adjudicator about how much consideration

24   they gave and how much discretion they exercised

25   with respect to DACA applications compared to
```

1    other applications that they may adjudicate?

2         A     Yes, I mean, it's really

3    in the same conversation about so-called rubber-

4    stamping.  I said, it's been said by critics of

5    the program that you guys don't have any

6    discretion.

7              And, they were quite surprised and

8    said, well, yes, we -- by definition, any

9    adjudication requires some discretion.  That's

10   why we have immigration officers who are trained

11   in immigration law to apply the law on a case by

12   case basis and use discretion in their decisions.

13             They're not under orders to

14   automatically approve or deny a case.  They're

15   looking at case by case.

16             Does the applicant -- I would say this

17   of any adjudication, does the applicant meet the

18   stated criteria or not?  And, even if they do

19   meet the stated criteria, are there any

20   discretionary reasons to deny them or any

21   mandatory reasons such as criminal record or

22   possible terrorist, national security threat, et

23   cetera, et cetera.

24             So, they -- one individual said, of

25   all the form types that he had adjudicated at the

 1   Nebraska Service Center, DACA, he felt, was the

 2   most -- the one that required the most

 3   discretion.

 4             And, he said, particularly, because

 5   the requirements were quite stringent to show the

 6   physical presence, to show the continuous

 7   physical presence and also to make sure that

 8   there was no criminal record.

 9             And, also, that there was no fraud

10   involved.

11       Q    Did you have occasion to speak with

12   DACA adjudicators or other union members about

13   the use of discretion and the criteria related to

14   education?  The DACA criteria that the individual

15   either be in school or have completed high

16   school?

17       A    I didn't ask specifically, you know,

18   do you discretion with that?  I asked just in

19   general, do you use discretion to making your

20   decision.

21             Now, they did, in the course of

22   describing their work, they were describing their

23   work because I asked them to describe their work,

24   because I don't know their work other than what I

25   read in the newspapers about the program.

1              So, what are you looking for in terms

2    of qualification?  They're looking at, of course,

3    continuous presence, time of entry, the age,

4    education, military service and criminal records.

5              The only thing I remember them telling

6    me about specifically about the education was

7    that they were particularly attentive to looking

8    at potential fraud.

9              And, they referred to with some pride

10   of ownership that their unit had successfully

11   worked with our fraud detection and national

12   security folks and ICE to uncover and pursue

13   prosecution because ICE pursued the prosecution

14   of so-called diploma mills.

15             And so, they were particularly

16   vigilant about possible document fraud.

17        Q    And, in order for a DACA adjudicator

18   to figure out whether an applicant was presenting

19   information that might be related to a diploma

20   mill, did they describe that they were using

21   discretion in that consideration?

22        A    I didn't ask those kind of questions.

23   I don't have any personal knowledge of how they

24   pursued their adjudications.

25        Q    Okay.

```
 1        A      They just, you know, reiterated that

 2   they do it with due diligence and coordination,

 3   they don't do it in a vacuum.  They work, as I

 4   said, closely with the Fraud Detection and

 5   National Security folks.

 6               When there are indicators of problems,

 7   they're instructed to flag them, bring them to

 8   their supervisors and pursue whatever avenues are

 9   necessary.

10        Q      Is it fair to say that DACA requests

11   are adjudicated by Immigration Service Officers?

12        A      Yes.

13        Q      And, are you familiar with the

14   training generally that is offered Immigration

15   Services Officers?

16        A      Yes, well, there is the BASIC

17   Immigration Service Officer Training, also known

18   as BASIC, all caps.

19               It is a -- it was historically, I

20   think a four-week course.  It's now been extended

21   this year.  I can't recall to five or six weeks,

22   which every Immigration Services Officer must

23   take.  And, so a requirement of their employment,

24   must take it and pass.

25               And, that's conducted at our Service
```

```
 1   Academy in Charleston, South Carolina.  But,
 2   sometimes, like in the case of our Service Center
 3   here in Arlington, Virginia, that was a fairly
 4   new Service Center.  They had to hire a lot of
 5   employees at one time.
 6              They actually brought the training
 7   staff up and trained them on the site.
 8              Similarly, asylum officers and refugee
 9   officers also go to BASIC training.  Anyone who
10   adjudicates an application has to go the BASIC
11   training course.
12              And then, there's additional training,
13   depending on the job.  So, for asylum, we have a
14   whole asylum training academy.  Same thing for
15   the refugee officers.
16              In the Field Offices, they may get
17   additional specialized training in interviewing.
18   And, in the Service Centers, and all offices,
19   there are on site trainers who provide continuous
20   training that's specific to the form types, the
21   use of the databases.
22              There's lots of ongoing required
23   training about privacy, computer security,
24   integrity, EEO, safety and health.  So, there's
25   constant training going on.
```

1        Q       From time to time, do you, as the

2   union president, advocate to management regarding

3   workload or work conditions of your union

4   members?

5        A       Well, that's one of the main things

6   that we do.  There are things which we sometimes

7   negotiate in a formal agreement.  And, there are

8   other areas of advocacy that are what we would

9   call in the nonnegotiable category.

10              Because, according to the Labor Law,

11  there are things that are exclusive management

12  rights such as assignment of work, the methods

13  and means of production, the technology that's

14  used.  You can't negotiate over, you know, what

15  system they're going to use, but we negotiate

16  over how it's applied, the effect there is on the

17  workforce.

18              We recently negotiated over the

19  implementation of new performance measures.  That

20  was partly due to standardization from DHS and

21  OPM, but also we were looking for more standard

22  performance measures within the Agency.

23              Now, during those negotiations, of

24  course, it was made very clear by the Agency that

25  things like metrics that are used to evaluate

1   productivity was in the area of management's

2   exclusive rights.  And, our views were welcomed,

3   but it was a nonnegotiable issue.

4              Now, for our constituents, I would say

5   across the Agency, whether it's Field Offices,

6   Service Centers, Asylum Offices, are very, very

7   concerned about their caseload.

8              And, I would say that's probably one

9   of the universal themes among my members is they

10  feel that they've got too much work to do in too

11  little time.  And, they are working under

12  extremely stringent quality control standards.

13             And so, there's a lot of pressure.

14  There's a lot stress.  There's a lot of people

15  saying they're working through their lunch or

16  they sometimes come in early or stay late, which

17  they're not supposed to be according to the Fair

18  Labor Standards Act, you're not supposed to be

19  working for free.

20             But, a lot of people work, as we say,

21  off the clock because they feel they have to meet

22  the production standards.

23             So, we, even though those -- it's not

24  a negotiable area, I'm constantly talking to the

25  senior leadership says, you know, it's your right

1   to assign the work, but make sure it's a

2   reasonable caseload.  Make sure that you're on

3   top of your staffing.  Make sure that people have

4   the right training, the right equipment and that

5   the supervision that they get should be of a

6   coaching and a mentoring kind of leadership, not

7   just counting widgets.

8           So, it's an area of constant, well, I

9   would say creative tension between quality and

10  quantity.

11          But, having said that, we are held to

12  very high quality standards.  And, my own office,

13  we have a 100 percent review, supervisory review.

14  If I don't get it right, they send the case back

15  and have me do it over again.

16      Q   Has any DACA adjudicator that you've

17  spoken to or any union member in a Service Center

18  told you that DACA applications are rubber-

19  stamped because of high workload?

20      A   Not specifically.  I mean, they did

21  not describe it to me as, hey, you know, DACA is

22  the worst of all as far as assembly line.

23          That the pressure to produce, I would

24  say, is equally felt among form types in Service

25  Centers, in Field Offices, in Asylum Offices.

```
 1              We, you know, we're adjudicating

 2   benefits that involve people on an industrial

 3   scale.  And, there's always those that had a

 4   tension.

 5              So, I did, however, have our union

 6   reps from Nebraska say that they were often told

 7   to make sure that they got the decisions right

 8   and that they should take the time that they

 9   needed to do the case correctly.

10              That doesn't mean that the pressure's

11   off to produce, but they were specifically told

12   not to sacrifice quality in order to make their

13   production.

14       Q     And, were any -- did anybody

15   communicate to you that that was the case

16   specifically with DACA that they ought to take

17   the time --

18       A     Yes.

19       Q     -- to do it right?

20       A     Yes, yes.

21       Q     And, can you share that with us?

22       A     Well, I thought I just did, like the

23   individual said. I, you know, said are you

24   pressured to keep the line moving?  He said,

25   well, yes, we're always pressured to keep the
```

 1   line moving, the production line.

 2              But, we're also told to take the time

 3   that's needed to, you know, look at all aliases,

 4   because many applicants have, you know, at

 5   various times, different encounters with the

 6   Agency or other immigration agencies have used

 7   different names that, of course, we know with

 8   various cultures and linguistic groups, you've

 9   got different name orders, family name, given

10   name, matrilineal, patrilineal.

11              And, we have to -- well, all of us are

12   trained regardless of form type that you have to

13   meticulously run in our background checks all

14   possible aliases.

15              And, my performance is, we use the

16   term dinged.  We get dinged on our performance

17   quality if we fail to check all aliases.  It

18   comes back to the employee.

19              And so, the individual said, they're

20   told, you know, make the decision, but make sure

21   you get it right and that you do check all the

22   databases, you do check and follow up on all

23   possible hits and leads of criminal activity.

24              MS. PERALES:  I'm going to hand you

25   what has been marked Deposition Exhibit Number 2.

 1                 And, I will represent to you that this

 2     is a signed declaration from Mr. Kenneth Palinkas

 3     from April 6, 2018.

 4                 And, you can find that information on

 5     the very last page with the date and signature.

 6                 First, can you tell me who is the

 7     president of the USCIS union on April 6th, 2018?

 8                         (Whereupon, the above-

 9                          referred to document was

10                          marked as Deposition Exhibit

11                          No. 2 for identification.)

12                 MR. KNOWLES:  That would be me.  If

13     you're referring to the National CIS Council 119,

14     that would be me.

15                 Mr. Palinkas is the former president

16     of the Council, as I said earlier.  And, he's

17     currently the president of Local 0235 in the New

18     York area, New York City area.

19                 MS. PERALES:  I'd like you to turn

20     with me, if you would, to the first page of the

21     declaration.  And, I'd like you to look at

22     towards the bottom of the page, there is a

23     paragraph that starts with the word "however."

24                 MR. KNOWLES:  Mm-hmm.

25                 BY MS. PERALES:

```
 1        Q      And the second sentence, and tell me
 2   if I read this correctly, quote, management has
 3   continually transformed USCIS from a service that
 4   serves to protect our national security and the
 5   rule of law into one that, instead, serves to
 6   protect undocumented immigrants and their
 7   lawyers, unquote.
 8               Did I read that correctly?
 9        A      Yes, that's how I read it.
10        Q      Okay.  Do you agree with that
11   statement?
12        A      I don't.
13        Q      Okay.
14        A      I do not, just to make sure you note
15   that.
16        Q      Did Mr. Palinkas consult with you
17   before making this statement in this declaration?
18        A      No.
19        Q      Looking at the next sentence in that
20   same paragraph, quote, this is what facilitated
21   the changes in our titles from Adjudications
22   Officers to Immigration Services Officers.
23   Aliens seeking benefits have been referred to as
24   customers further eroding the standards as
25   contained in the INA, unquote.
```

```
 1                    Did I read that correctly?

 2          A      Mm-hmm.

 3          Q      Do you agree with that statement?

 4          A      No.

 5          Q      Do you believe that the change in

 6   title from Adjudication Officer to Immigration

 7   Service Officer has undermined the mission of the

 8   Agency?

 9          A      No.

10          Q      Do you believe that referring to non-

11   citizens who seek immigration benefits as

12   customers erodes the standards contained or

13   erodes the standards of your Agency?

14          A      No.

15          Q      Did Mr. Palinkas consult with you

16   before making that statement in his declaration?

17          A      No.

18          Q      Looking to the top of the next page,

19   if you would, with me.  I'm going to read to you

20   the first sentence of that paragraph.  You tell

21   me if I've read it correctly.

22                    Quote, the so-called Deferred Action

23   for Childhood Arrivals, parentheses, DACA, close

24   parentheses, program has further compromised and

25   eroded the goals that USCIS Officers pursue every
```

1    day to protect our borders by ensuring that

2    immigration benefits are granted for those who

3    meet the criteria, unquote.

4              Did I read that correctly?

5         A    Mm-hmm.

6         Q    Do -- is it your opinion that DACA has

7    further compromised and eroded the goals that

8    USCIS Officers pursue every day?

9         A    No, I don't agree with that.

10        Q    Did Mr. Palinkas confer with you

11   before making this statement in his declaration?

12        A    No.  If could just make a comment,

13   you've asked me several times if he's conferred

14   with me, I'm not sure whom he has conferred with.

15   I'm, you know, maybe his colleagues, but

16   certainly not with me as a fellow Local

17   president.

18        Q    And, would it be fair to say that he

19   also did not confer with you as the president of

20   the USCIS union?

21        A    No, he did not, either -- when I --

22   since I've been president, he has not conferred

23   with me on things like that.  And, when he was

24   president of the National Council, I don't recall

25   him conferring with me or other Local presidents

1    about such matters.

2        Q    Further down in the paragraph, there's

3    a sentence that begins with the word "and."  I'll

4    read that to you.

5            Quote, and, USCIS management has

6    ensured that these applications are not properly

7    screened as has it over assigned the workload for

8    the completion of these applications to be

9    favorably rubber-stamped as long as they meet

10   minimal requirements, unquote.

11           Did I read that correctly?

12       A    Mm-hmm.

13       Q    Based on your conversations with

14   members of the union and with DACA adjudicators

15   about their workload, do you agree with that

16   sentence?

17       A    I do not agree with that sentence.

18       Q    Okay.  The first sentence in the next

19   paragraph starting with the word "since."  I'll

20   read it to you and you let me know if that's what

21   it says.

22           Quote, since June 2012, USCIS has

23   continually bypassed Congress and existing

24   immigration law as contained in the Immigration

25   and Nationality Act with the enactment of the

1    DACA program, unquote.

2              Did I read that correctly?

3        A    Yes.

4        Q    Do you agree with that statement?

5        A    I do not.

6        Q    Okay.  With respect to the final

7    sentence in the paragraph, quote, in the interim,

8    taking a backseat to this avalanche of benefits -

9    -

10       A    I'm sorry, I'm not sure where we are.

11       Q    We're still in the paragraph that

12   begins with the word "since."

13       A    Right.

14       Q    It's the very last sentence.

15       A    Uh-huh, oh, I see, in the interim,

16   okay.

17       Q    Yes, quote, in the interim, taking a

18   backseat to this avalanche of benefits bestowed

19   on illegal aliens are the jobs, wages, benefits

20   and security that rightfully belong to Americans

21   and their families as well as those individuals

22   who applied for immigration benefits in

23   accordance with existing law and procedure,

24   unquote.

25              Do you see that there?

1         A     I do, although I'd like to read it

2    again because I'm not quite sure I follow.  So,

3    it's not your reading, but I'm trying to

4    understand the sentence.

5         Q     It might help to read the preceding

6    sentence as well.

7         A     Okay.

8         Q     Do you agree with the -- that sentence

9    that I read to you?

10        A     I do not.

11        Q     Is it the case that, from time to

12   time, an non-citizen seeks an immigration benefit

13   when that person holds no immigration status in

14   the United States?

15        A     Could you repeat that?

16        Q     Yes, I'll try to say it a little more

17   simply.

18        A     Yes.

19        Q     This sentence refers to illegal

20   aliens, do you see that?

21        A     Yes.

22        Q     Is it the case that, sometimes, an

23   individual who is not lawfully present in the

24   United States would seek an immigration benefit?

25   For example, like asylum?

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                          Page 42

1          A      Yes.

2          Q      Is it the case that, sometimes, people

3    who are undocumented, let's say, for lack of a

4    better work, in the United States would seek

5    another kind of immigration benefit?

6          A      Yes, but I'm -- I guess I'm not

7    understanding the -- I'm not understanding the

8    question.

9          Q      Well, it's --

10         A      So, people apply for asylum, but, by

11   definition, one could conceivably be here

12   unlawfully and still qualify for asylum.  And,

13   the granting of asylum is a discretionary

14   decision.

15               Though there are many programs for

16   which they're not eligible and they're

17   ineligibility would be material to whether

18   they're lawfully here or not.  It really depends

19   on the benefit they have sought.

20               So, it's also known that an asylum

21   seeker, if their application is pending beyond a

22   certain amount of time, can quality to get

23   temporary work permit.

24               Through no fault of their own, their

25   case was not heard within the specified time

```
 1   frame.

 2              But, I'm a little confused by the

 3   sentence that you asked me to read because I'm

 4   not sure what the writer or the speaker is saying

 5   about an avalanche of benefits bestowed on

 6   illegal immigrants.

 7              I mean, people may apply for various

 8   programs, and they're only granted a benefit if

 9   they qualify for the benefit.  I'm not aware of

10   people having benefits bestowed on them for which

11   they don't qualify.

12       Q    Okay.  And, is it true that sometimes

13   people who are outside the United States apply

14   for a visa from USCIS before entering?

15       A    Yes.

16       Q    And, is it also true that sometimes

17   people are present in the United States without

18   immigration status and they might also apply for

19   --

20       A    Yes.

21       Q    -- a benefit?

22              Okay, going down to the bottom of the

23   page, if you would count with me three paragraphs

24   up.  So, there is a paragraph that starts "that

25   is why a moratorium."  Do you see that there?
```

1        A       Mm-hmm.

2        Q       I'm going to read you that sentence.

3    Quote, that is why a moratorium on the existing

4    DACA program must be put into effect until a

5    system is established that will ensure proper

6    procedure and vetting for all.

7                Next sentence, we should stop

8    processing any and all pending DACA applications

9    immediately, unquote.

10               Do you see that?

11       A       I do.

12       Q       Do you agree with that sentence?

13       A       I don't and I, if I may, I'd like to

14   explain why I don't agree with it.  It's because,

15   to the best of my knowledge, which is admittedly

16   not firsthand because I don't process DACA, but

17   from what I've read in public news sources, the

18   Agency's own websites and talking to my members

19   who do this work, I have no reason to doubt that

20   we have proper procedures and vetting for all.

21               I'm confident that like all other CIS

22   programs, we have proper procedures and vetting.

23               I'm also confident, based on my

24   experience, the USCIS, like other immigration

25   agencies, are constantly reviewing and correcting

1  course when necessary, revising, updating

2  technology when a threat is perceived, addressing

3  it properly when fraud is detected, taking

4  appropriate action.

5           When there are unscrupulous advocates,

6  there are various measures that are taken.

7           So, it's not that procedures are

8  static, they're always dynamic.  And, I think one

9  of the things that I know our workers are proud

10  of is that they participate, our workers, our

11  members, participate in constantly improving the

12  organization by bringing problems to the

13  attention of management.

14           And, we have a management that

15  actually seeks, you know, valid, current

16  information from the folks doing the work.

17           So, it's not that we're not in need of

18  improvement, we're always in need of improvement,

19  but to call for the shutting down of a program

20  for lack of proper procedure and vetting, I don't

21  believe that -- I'm not aware of any evidence

22  that we don't have proper procedure and vetting.

23           Whether one agrees with the program or

24  not as a policy is another matter.  And, I'm not

25  really a partisan on the public policy.  I'm

1   speaking to the work that I know my members do

2   and have told me they do.

3        Q    Do you think that adjudication like

4   DACA could be outsourced to individuals outside

5   the Agency?  What is your view of that?

6        A    I don't -- I'm not sure what you mean

7   by outsourced.

8        Q    Hire private contractors to simply

9   look at DACA applications?

10       A    Well, the union would vigorously

11  oppose, as it does almost all contracting out,

12  but certainly of what we call inherently

13  governmental functions.

14            I can give you a historic example.

15  Several years ago, the Agency, this was maybe

16  over ten years ago, the Agency attempted to do

17  what they call an A76 study of where contractors

18  were invited to compete for a contracting out of

19  what was then called Customer Contact

20  Representatives or the folks that work the front

21  window in a Field Office answering questions and

22  resolving cases.

23            And, the union successfully, with the

24  support of Congress, stopped and actually had

25  Congress defund that study because we argued

1  these are inherently governmental functions, even

2  the contact rep at the front window requires very

3  specialized training, high accountability and

4  they do, sometimes, some level of adjudications.

5          Those individuals have now been

6  retitled to be Immigration Services Officers

7  Level I.  Those folks exercise a high degree of,

8  you know, required proficiency and

9  accountability.

10         I would never support the contracting

11 out of adjudication of any benefit.  That's

12 definitely, you know, according to the

13 Immigration and Naturalization Nationality Act,

14 sorry, those functions are to be performed by

15 Immigration Officers.

16         MS. PERALES:  I'd like to take a short

17 break before passing the witness.  It's been

18 about an hour.  So, if we could go off the

19 record.

20         (Whereupon, the above-entitled matter

21 went off the record at 12:07 p.m. and resumed at

22 12:28 p.m.)

23         MS. PERALES:  Okay, we're back on the

24 record.

25         I pass the witness.  And, I think I'm

 1    sometime.

 2          A    Okay.

 3          Q    So, let's just try not to talk over

 4    each other and try give me verbal answers.

 5          A    All right.

 6          Q    So, after you received Mr. Palinkas's

 7    declaration, what did you do next?

 8          A    Well, I thought about it and I called

 9    folks that I knew.  For example, I called my

10    colleagues in the Washington District Office.

11               These are all the people that I spoke

12    to are union representatives.  And, my -- I don't

13    have the capacity to like send out a broadcast

14    message, a survey, you know, assemble all the

15    people that work there.

16               And, I would not normally do that

17    unless the employees were making it an issue they

18    wanted me to take on.

19               So, just to -- for me to assess and be

20    able to answer the question, what do you think

21    about this statement, I wanted to find out from

22    folks who have more familiarity with the subject

23    what they do.

24               So, I called my colleagues, as I said,

25    one in Washington District.  The individual is

```
 1    one of my Local vice presidents and what we call

 2    an ISO Level III.

 3              So, their Senior Immigration Services

 4    Officer said, hey, what do you think about this

 5    statement?  And, do you, as an Immigration

 6    Services Officer, in a Field Office, ever

 7    interview DACA applicants?

 8              Because, one of the statements that

 9    Mr. Palinkas made was, no DACA applicant is every

10    interviewed.  I didn't know the answer to that so

11    I asked my colleague.

12              She says, well, not normally, but

13    sometimes we do.  And, I said like, for instance

14    what?  And, she said, well, I personally received

15    two different applications files from the Service

16    Center asking me to call in the individuals and

17    interview them about potential gang activity.

18              And, I said do you get involved in

19    adjudicating the case?  No, I was -- my mission

20    was to interview them about these things and send

21    my findings back to the Service Center.  I have

22    no idea, she said, what they did there.

23              Called my colleague in Atlanta --

24        Q    Stop really quick, let's -- before we

25    go to Atlanta, let's finish up, it's D.C.,
```

1   correct?

2        A     Yes.

3        Q     Okay.

4        A     Yes.

5        Q     Not Washington State?

6        A     No, no, it's call the Washington Field

7   Office which is actually located in Fairfax,

8   Virginia.

9        Q     Okay.  How many DACA interviews did

10  that person tell you they had personally

11  conducted?

12       A     Two.

13       Q     Okay.  And, did she -- you said it was

14  a she, I believe?

15       A     Mm-hmm.

16       Q     Did she indicate to you the substance

17  of those DACA interviews?

18       A     Only what I just said, that they -- it

19  had to do with -- to try to determine whether

20  they had any gang connections.

21       Q     Okay.

22       A     But, I didn't ask anything further

23  than that.

24       Q     Before you had that conversation, were

25  you aware of a single instance where a DACA

 1   application had been actually withdrawn?  Before

 2   that phone conversation, were you aware of a

 3   single interview of a DACA -- a potential DACA

 4   recipient occurring anywhere in the United

 5   States?

 6        A     No, I, as I said to you a moment ago,

 7   because I'm not familiar with the program, I was

 8   reading Mr. Palinkas's statement where he said no

 9   DACA applicants are ever interviewed.  Okay?

10              So, I know that Service Centers don't

11   do interviews.  But, I called a colleague that I

12   know a confident, they're a reliable source, do

13   you know if DACA applicants are ever interviewed

14   in a Field Office?

15              Because that's the only place that we

16   do interviews is in a Field Office or, in my

17   case, in an Asylum Officer.  Or in the case of

18   refugees officers abroad or --

19              She says, well, occasionally, yes.

20        Q     So, besides the two interviews she

21   personally did, did she tell you that other

22   interviews had occurred?

23        A     I just asked what was her own

24   experience and that's what she said.  And, I

25   didn't like exhaustively, you know, interrogate

 1    her to uncover, you know, other data or whatever.

 2         Q    So, as you sit here today, you're

 3    aware of only two instances at the Washington

 4    District Office where DACA applicants were

 5    interviewed?

 6         A    Right.  Whether there were more, I

 7    have no idea.

 8         Q    Okay.

 9         A    Because I didn't go and like do a data

10    call or, you know, call the district director.  I

11    didn't really feel that was my role.  I really

12    was trying to assess from my members and my

13    fellow union representatives, what was their own

14    knowledge of the matter?

15         Q    Could you have done a data call?

16         A    I suppose I could have as a union rep.

17    But, my -- I'm not involved in the case.  I was

18    just called and asked from information and

19    comment.

20              If we were involved in any kind of a

21    case as a moving party or whatever, we might do a

22    data call.  And, in our parlance, it's called a

23    request for information.

24              But, normally, the union's request,

25    you know, our right to request and the Agency's

1    response of what responsibility to provide me

2    with information would be usually with respect to

3    a labor issue.

4                So, for example, if I was defending

5    somebody in an adverse action, I might ask for

6    data information pertaining to their personnel

7    file.

8                Or, if it affected, say, the overtime

9    practices of the Agency and we were litigating

10   over, you know, improper payment of overtime, I

11   might be asking for records pertaining to that.

12               But, wouldn't really have a reason to

13   ask the Agency for like statistics about DACA.

14   Because, I'm not involved in the case.

15               If my members, however, had brought to

16   me an issue about DACA that affected their

17   working conditions, for example, if they felt

18   like they were, you know, being overwhelmed with

19   the caseload or there was massive fraud or

20   rubber-stamping or whatever.

21               And, I wanted to bring that issue

22   forward to the Agency, yes, I might be asking for

23   information.

24               But, none of my members have ever

25   brought that to me as a concern.

```
 1   Local.

 2        Q     All right, so, we have that call you

 3   made.

 4              Then, let's talk about the next call

 5   you made.  Who'd you call?

 6        A     I called -- well, no, mind you, I

 7   don't know if sequentially, I don't have the

 8   dates and the sequence of who I called when.

 9        Q     All right, let's -- I won't hold you

10   to that --

11        A     But, I did call my colleague at the

12   Atlanta District --

13        Q     Mm-hmm.

14        A     -- who is the current Local president

15   of that Local union.

16        Q     Okay.

17        A     And, she is also an ISO Level III

18   Senior Adjudicator.

19        Q     And, what did you ask her?

20        A     Same thing.  Here's this statement,

21   what do you think?  Is it, you know, are you

22   aware of any occasions when DACA applicants are

23   every interviewed?

24              She goes, yes, I sometimes get cases.

25   I can't remember the specifics.  I think it might
```

1   have been similar kind of thing, possible gang

2   activity.

3           But, the reason that she got these

4   files was the Service Center needed, in order to

5   complete their adjudication, a face to face

6   interview to verify tests or look at documents.

7           I didn't ask extensively, you know,

8   who, what, where, how and when occurred during

9   the interview.

10          But, she said, it's -- both

11  individuals said, it's highly unusual for people

12  to be interviewed.  But, when necessary, they

13  are.

14      Q    Did she tell you how many interviews

15  she had personally done?

16      A    I believe she said two.

17      Q    Are you aware besides those two of a

18  single DACA applicant being interviewed at the

19  Atlanta Field Office?

20      A    I have no, I mean, again, my only

21  source of knowledge about it was these phone

22  calls.

23      Q    So, that's a no?

24      A    I have -- yes, no.

25      Q    Okay.  And, what other phone calls did

```
 1        A      I have no way to know that.

 2        Q      Let's go to Nebraska now. What were

 3   the job descriptions of the individuals in

 4   Nebraska that you called?

 5        A      They were both ISO IIs.

 6        Q      What was their role with the union?

 7        A      The one is the current president and

 8   the other is the current vice president at the

 9   Nebraska Service Center.

10        Q      What did you ask these individuals?

11        A      I sent them the statement.  I asked

12   did they have any comments about it?  They were

13   both somewhat surprised that most of it appeared

14   to be opinion rather than, you know, certainly

15   Mr. Palinkas, as an ISO II in a Field Office,

16   does not have personal knowledge of this.

17               They found a number of statements that

18   they thought were not factual.

19               And, I basically said, so, tell me

20   what you guys do.  How do you do it?  I asked

21   them about discretion.  I asked them about

22   rubber-stamping.

23               I think I -- I mean, I could repeat

24   myself --

25        Q      Okay.
```

```
 1        A     -- but, I said it earlier in the

 2   record.

 3        Q     Sure.

 4        A     But, they both said, no, we don't

 5   rubberstamp, we're extensively trained.  We are

 6   to flag any problems, either a hit from the

 7   database, criminal record, misdemeanor, whatever.

 8             They both talked about the involvement

 9   of their unit in uncovering some so-called

10   diploma mills with collaboration of FDMS fraud

11   detection national security Unit of CIS and ICE,

12   that resulted in prosecutions.

13        Q     Sure.

14        A     They both bristled at the idea that

15   they rubber-stamped.  They both said that they

16   were held to very high quality standards.

17             And, that, you know, that the question

18   of, you know, what does one need to do to be

19   approved?  Well, one needs to meet the criteria.

20   If they don't meet the criteria, they don't get

21   approved.

22             If they meet the criteria, they might

23   get approved provided they don't have bars to

24   seeking the benefit like a criminal record.

25        Q     Did those individuals tell you they
```

1   had personally interviewed DACA applicants?

2        A     No, because they don't interview DACA

3   applicants in a Service Center.

4        Q     All right.  Did they tell you that

5   they had sent any DACA applicants to be

6   interviewed at Field Offices?

7        A     They -- I do not recall that they

8   personally said that they had sent cases, but I

9   do believe they affirmed that, on occasion, cases

10  are sent out to the Field Offices for further

11  inquiry.

12       Q     So, in their call to you, they did not

13  mention that they had personally sent any DACA

14  applicant to be interviewed at a Field Office,

15  right?

16       A     No, and I didn't really ask them.  My

17  job wasn't deposing them, it was like --

18       Q     Sure.

19       A     -- pretty quick conversations.

20       Q     And so, your only information about

21  what happens at the Field Offices with DACA

22  applicants from the Nebraska Service Center comes

23  from your conversation with these individuals,

24  correct?

25       A     Could you repeat that?

1        Q     Let me stop you there.  We'll get back

2    to the question.

3        A     All right.

4        Q     So, the question is, your knowledge

5    about what happens with DACA applicants at the

6    Nebraska Service Center --

7        A     Right.

8        Q     -- is based solely upon your

9    conversation --

10       A     Largely in part, my conversations,

11   because I do have other knowledge based on

12   reading  the generally available information

13   about DACA.

14             I can't say that I only have knowledge

15   based on my conversations.

16       Q     And, the generally available

17   information you've read, none of that said that

18   Service Centers send DACA applicants to be

19   interviewed at Field Service Centers?

20       A     I don't recall reading that.

21       Q     Did you call anyone at the Texas

22   Service Center location?

23       A     I did, and I was told they don't do

24   DACA.

25       Q     They don't do DACA at all?

```
 1        A      Right.  I was told by the Local

 2   president there.

 3        Q      What's that person's name?

 4        A      Kevin Tinker.

 5        Q      Tinker?

 6        A      Tinker, T-I-N --

 7        Q      Tinker?

 8        A      -- K-E-R.

 9        Q      Had that Service Center ever done

10   DACA?

11        A      I'm not sure I asked that question.

12        Q      So, do you know if they have ever --

13        A      I do not know that.

14        Q      Okay.

15        A      But, as I said earlier, although

16   historically, some Centers will do particular

17   caseloads increasingly work is shifted.  But, I

18   do not believe it is correct in Mr. Palinkas's

19   statement that DACA is done at all Service

20   Centers.

21               To the best of my limited query, they

22   were done in California and Nebraska.

23        Q      So, they're not done in Washington,

24   D.C.?

25        A      No.
```

```
 1        Q      They're not done in Atlanta?

 2        A      No.  No, there's no Service Center in

 3   Atlanta.  There's a Service Center in Arlington,

 4   Virginia, one in Vermont, one in Nebraska, one in

 5   Texas, one in California.  And, to the best of my

 6   knowledge, they are done primarily in Nebraska,

 7   but some at some point have been done in

 8   California.

 9        Q      Are you aware of any Field Office in

10   Texas that has interviewed a DACA recipient?

11        A      No, I didn't ask.

12        Q      How many Filed Offices are you aware

13   of throughout the entire country that have

14   interviewed DACA recipients?

15        A      Well, I'm only aware of two because

16   those were the calls that I made.  I have not

17   called each and every Field Office to ask.

18        Q      So, it's fair to say, as you sit here

19   today, you're aware of four instances where DACA

20   recipients were interviewed at a Field Center?

21        A      Mm-hmm.

22        Q      That's a yes?

23        A      That is yes, that is yes.

24        Q      Sorry.

25        A      Sorry, I keep giving you a nonverbal
```

```
 1   nod.  That is yes.

 2          Q      Very good.

 3                 Sorry, and I do the exact same thing,

 4   I apologize.

 5          A      And, I have to reiterate, I did not do

 6   a comprehensive data call.  I mean, this

 7   information should be readily available to the

 8   parties from the Agency.

 9          Q      Let's talk about your personal

10   background.  You're an Asylum Officer?

11          A      I am an Asylum Officer.

12          Q      Have you ever personally processed a

13   DACA application?

14          A      Have what?

15          Q      Have you ever personally processed a

16   DACA application?

17          A      No, I have no reason to.

18          Q      Have you ever adjudicated a DACA

19   application?

20          A      No, I would have no reason to.

21          Q      Okay.  Do you know what the criteria

22   are to qualify for DACA?

23          A      Vaguely.  I mean, based on what I've

24   read in the public information.

25          Q      You mentioned earlier something about
```

1   and my colleagues told me about the kinds of

2   cases that would be denied, but I didn't ask

3   about specific cases.

4        Q     Sure.  So you know that applications

5   have been denied based on statistics that are

6   posted on USCIS's website?

7        A     Right.  And by the testimony of my

8   colleagues that they have denied cases or

9   colleagues have denied cases and for what reasons

10  they have denied cases.

11       Q     So your colleagues have told you they

12  denied cases?

13       A     Yes.

14       Q     Okay.  Did they tell you why they

15  denied those cases?

16       A     Yes, because they didn't meet the

17  criteria or because there was some, you know,

18  discretionary reason.

19       Q     What discretionary reason?

20       A     That maybe the evidence was in

21  question or there was fraud or if there was

22  evidence of criminal activity.

23       Q     Okay.  Besides the evidence being in

24  question, evidence of fraud or lack of, I think

25  you said a lack of --

```
 1        A     It didn't meet the criteria, right.

 2        Q     Are you aware of any discretionary

 3   denial of the DACA application?

 4        A     I wouldn't have that kind of knowledge

 5   not having worked there, but, you know, the use

 6   of the word "discretion" I think sometimes is

 7   misused.

 8              So it implies -- Based in my line of

 9   business, which is highly discretionary, it's not

10   like a flip of a coin or I don't feel like it,

11   right, you know, it is my authority to make or

12   not make a decision but it has to be based on

13   evidence based on proper application of the law,

14   such as how I feel about it.

15              Oh, yes, they meet the criteria but

16   I'm just not going to approve it.  That would be

17   an abuse of discretion.  So we often in my trade

18   as an asylum officer we are trained in the proper

19   use of discretion and in the, you know, the

20   favorable exercise of discretion when the

21   evidence merits that.

22        Q     Did you send Mr. Palinkas's

23   declaration to anyone else besides the

24   individuals you just named?

25        A     No.
```

1        Q      Did you call Mr. Palinkas to ask him

2    about his declaration?

3        A      No.

4        Q      How many locals make up the National

5    Union?

6        A      Twenty-two.

7        Q      How many of those locals did you call

8    the presidents of to ask about the adjudication

9    of DACA?

10        A      So it would have been my own local,

11    the Washington District, the Atlanta District,

12    the Texas Service Center.  Mr. Tinker, by the

13    way, is also in National Council.

14              The local President in Texas is also

15    the Executive Vice President of the National

16    Council.  He has seen and commented to me on Mr.

17    Palinkas's declaration.  I called California

18    Service Center and the Nebraska Service Center.

19        Q      Did you call the local where Mr.

20    Palinkas is a member?

21        A      No.

22        Q      All right.  So that was kind of like

23    the bucket of things you did after talking to New

24    Jersey and getting Mr. Palinkas's deposition.

25              Is there anything else during that

1        A     I have no -- Since I am not a party to

2   the case I don't, you know, I was not involved in

3   the discussions with the court.

4        Q     Would you have testified in this

5   deposition if you didn't believe the court had

6   ordered you to?

7        A     You know, I am not a lawyer and I am

8   not familiar with legal process.  I wish to be

9   cooperative in this proceeding and I think it is

10  in the public interest and in the interest of my

11  union that the matters be made clear and I am

12  here to testify as the Union President.

13       Q     Did you --

14       A     Because a colleague testified as a

15  Union President it became clear to me that there

16  is more to it than, there is more to the reality

17  of what the Union has to say than one man's

18  opinion.

19             I am sure that my testimony could be

20  called another man's opinion.  But I have tried

21  to the extent possible to keep my opinion out of

22  it and speak to the facts that I know or don't

23  know.

24       Q     Did you discuss your testimony today

25  with the Board that oversees the National Union?

1      A      No.  It's his statement.

2      Q      Are you speaking today as Union

3  President on behalf of the entire Union?

4      A      I am.

5      Q      Okay.  And you did not receive any

6  authorization from the Union as a whole to offer

7  that opinion, correct?

8      A      I don't -- We don't have that

9  requirement.

10     Q      Did you ask in any way the opinions of

11  your members about the DACA process besides what

12  you have already described?

13     A      I did not but I would like to place

14  that in context, right.  I do not believe that I

15  am offering an opinion about DACA, the program,

16  its appropriateness, its legality, whatever.

17            I have been asked to comment on Mr.

18  Palinkas's statement.  Now one of my comments is

19  that to the best of my understanding a lot of his

20  statement is opinion.

21            It's something that I would, you know,

22  expect as op-ed piece.  He is certainly entitled

23  to his opinion, but there is a lot of opinion

24  about the program.

25            I don't have an opinion about the

1    program that I am putting forward here, and if I

2    were to do so I would be canvassing my members,

3    right.

4             We don't typically put out statements

5    on public policy except to the extent that the

6    public policy in question is affecting the

7    working conditions of our members.

8             And you may have seen statements I

9    have made about the asylum and refugee program

10   and I made them with respect to the views that

11   those employees expected me to put forward and as

12   they pertain to their working conditions.

13            But I have not been contacted by my

14   members to advocate on their behalf about the

15   DACA program.

16        Q    Okay.  So --

17        A    So if my organization was going to

18   take a position on DACA I would be consulting

19   with my members and saying, you know, what is our

20   position on DACA, for, against, should,

21   shouldn't, et cetera.

22        Q    Sure.  Have you ever testified before

23   Congress before?

24        A    I have not.

25        Q    You have not.  Have you ever testified

 1   might be -- they might do 8 or 10 or 12,

 2   depending on the complexity.

 3               Adjustment of status, I'm not sure.

 4        Q     Okay.  Why is it important to do such

 5   in depth interviews for asylum purposes?

 6        A     Because the scope of what you're

 7   discussing is so universal.  I mean, you're

 8   looking at identity, looking at manner of entry.

 9               You're looking at their documents.

10   You're looking at their testimony.  And, some of

11   the stories, I mean, in some cases, you're

12   looking at gathering someone's life story.

13               Where were they born?  What tribe?

14   What about their parents?  And, what's the

15   political party?

16               And, when a lot of the testimony --

17   when a lot of the decision based on the

18   testimony, you have to pursue many, many avenues.

19               And, you know, with other types of

20   immigration interviews, you're looking, again, at

21   a very limited scope of inquiry.

22        Q     You're not testifying on behalf of

23   USCIS today, are you?

24        A     No, I'm not.

25        Q     And, you don't speak for the federal

```
 1   Walker's turn.

 2               MR. WALKER:  I have no other

 3   questions.

 4               MS. PERALES:  Oh, you pass?  It's my

 5   turn then.

 6               MR. WALKER:  Yes.

 7               MS. PERALES:  I only have one

 8   question.

 9        CROSS EXAMINATION

10               BY MS. PERALES:

11        Q     Mr. Knowles, you spoke a few moments

12   ago with Mr. Biggs about approval rates.

13        A     Mm-hmm.

14        Q     And, my question is whether you would

15   expect different form applications to have the

16   same approval rate across the Agency?

17        A     No, I would not.

18        Q     Why not?

19        A     Well, I think I said earlier,

20   comparing  the asylum adjudication to DACA is

21   really apples and oranges, elephants and zebras,

22   whatever.

23               My reference in my testimony to what

24   I do is really to talk about what I do.  That's

25   what I know and what I do is very specific to
```

 1   asylum.

 2               But, there are some things that are

 3   consistent throughout the Agency like security

 4   checks and, you know, performance measures and

 5   accountability and all of those things.

 6               But, I would expect different approval

 7   rates because, and I think I alluded to this in

 8   some of my earlier statements, each form type is

 9   very specific.  The scope of it is very

10   different.

11               So, you know, when you're adjudicating

12   a work permit, it's a work permit whether you're

13   adjudicating an asylum application, it's that.

14   And there are -- the scope is very different.

15               For some cases, it's very limited.

16   And the threshold of -- that one has to meet is

17   different.

18               So, you know, in DACA, my limited

19   understanding is, you know, I'm sure there's all

20   kinds of subcategories, but it's, you know, age,

21   time of entry, continuous presence and school

22   records and military records, et cetera, and

23   criminal history.

24               It's a very limited scope because the

25   program itself is very limited.  It's not even a

1   status, it's a deferred action.  Their status is

2   still they're unlawfully here.

3               Prosecutorial action is deferred, as

4   I understand it from the public information.  I'm

5   not trying to redefine what DACA is.

6               And, they get a work permit for

7   dependency of that status.  But, it's not even a

8   status as we commonly understand it.  They're

9   still in unlawful status.

10              So, many applicants that I interview

11  are not in status, right, when they come to me.

12  Some are in status.

13              If I deny an applicant asylum who is

14  not in status, they're actually referred to the

15  immigration court.

16              If they are in status, they're just

17  denied asylum and they retain the status that

18  they have for as long as that status is valid.

19              So, approval rates, I mean, it's the

20  approval rate should be reflective of, as I said

21  earlier, to Mr. Biggs, did they qualify or didn't

22  they?  Right?  And, if all the people qualify,

23  well, you would expect there to be a high

24  approval rate.

25              If they didn't qualify, you would

1    expect it to be reflective of the caseload.

2                   MS. PERALES:  Thank you.

3                   I pass the witness.

4                   MR. BIGGS:  I think I have one more or

5    maybe two --

6                   MR. KNOWLES:  Sure.

7                   MR. BIGGS:  -- depends on how we talk

8    to each other.

9         CROSS EXAMINATION

10                  MR. BIGGS:  Is it your understanding

11   that once someone's DACA application is approved

12   that they maintain an unlawful presence in the

13   United States?

14                  MS. PERALES:  Objection,

15   mischaracterizes the testimony.  Objection, calls

16   for a legal conclusion.

17                  MR. BIGGS:  You can answer.

18                  MR. KNOWLES:  Yes, I don't have

19   personal knowledge of that.  I am -- I would

20   probably say I'm speculating, I'm guessing based

21   on my knowledge as an asylum officer, when I

22   interview somebody, I ascertain, what is their

23   immigration status?  Right?

24                  So, they're either, you know, entry

25   without inspection.  They're either a current,

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                   Page 151

```
 1   C E R T I F I C A T E

 2   This is to certify that the foregoing transcript

 3   Deposition of: Michael Knowles

 4   In the matter of: State of Texas v USA

 5   Before: US District Court

 6   Date: 08-02-18

 7   Place: Washington, DC

 8   were duly recorded and accurately transcribed

 9   under my direction; further, that said transcript

10   is a true and accurate record of the proceedings;

11   and that I am neither counsel for, related to,

12   nor employed by any of the parties to this action

13   in which this deposition was taken; and further

14   that I am not a relative nor an employee of any

15   of the parties nor counsel employed by the

16   parties, and I am not financially or otherwise

17   interested in the outcome of the action.

18

19   ------------------------

20   Jennifer Bernardi

21   Court Reporter

22

23

24

25
```