# Def-Int. Ex. 306

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018

```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                      BROWNSVILLE DIVISION

STATE OF TEXAS, ET AL.,          )
                                 )
Plaintiffs,                      )
                                 )
vs.                              )   Case No. 1:18-cv-00068
                                 )
UNITED STATES OF AMERICA, ET     )
AL.,                             )
                                 )
Defendants,                      )
                                 )
and                              )
                                 )
KARLA PEREZ, ET AL.,             )
                                 )
STATE OF NEW JERSEY,             )
                                 )
Defendant-Intervenors.           )




              THE DEPOSITION OF STEPHEN LEGOMSKY




              Taken on behalf of Plaintiffs

                    August 1, 2018




                 HUSEBY GLOBAL LITIGATION
           1230 WEST MOREHEAD STREET, SUITE 408
                   CHARLOTTE, NC 28208
                     (800) 333-2082
```

```
 1      I N D E X   O F   E X A M I N A T I O N

 2

 3   WITNESS:  STEPHEN LEGOMSKY

 4        Examination By Mr. Disher ......................8

 5        Examination By Mr. Robins ...................100

 6        Examination By Ms. Perales ..................106

 7        Examination By Mr. Disher ...................119

 8

 9           I N D E X   O F   E X H I B I T S
10
     Exhibit 1 ........................................9
11       Houston Chronicle Article

12   Exhibit 2 .......................................11
         The Source Article
13
     Exhibit 3 .......................................13
14       Article

15   Exhibit 4 .......................................26
         Law Review Article
16
     Exhibit 5 .......................................34
17       Declaration

18   Exhibit 6 .......................................60
         DACA Statistics
19
     Exhibit 7 .......................................87
20       Neufeld Affidavit

21   Exhibit 8 .......................................89
         Declaration of Stephen H. Legomsky
22
     Exhibit 9 .......................................90
23       Congressional Testimony

24   Exhibit 10 ......................................92
         Congressional Testimony
25
```

```
 1   Exhibit 11 ......................................97
          Article
 2

 3
     The original exhibits were retained by the court reporter
 4   to be attached to COUNSELS' transcripts.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3   STATE OF TEXAS, ET AL.,       )
                                   )
 4   Plaintiffs,                   )
                                   )
 5   vs.                           )   Case No. 1:18-cv-00068
                                   )
 6   UNITED STATES OF AMERICA, ET  )
     AL.,                          )
 7                                 )
     Defendants,                   )
 8                                 )
     and                           )
 9                                 )
     KARLA PEREZ, ET AL.,          )
10                                 )
     STATE OF NEW JERSEY,          )
11                                 )
     Defendant-Intervenors.        )
12

13

14

15

16            THE DEPOSITION OF STEPHEN LEGOMSKY, produced,

17   sworn, and examined on behalf of the Plaintiffs, August

18   1, 2018, between the hours of eight o'clock in the

19   forenoon and five o'clock in the afternoon on that day,

20   at the offices of Alaris Litigation Services, 711 N.

21   11th Street, St. Louis, Missouri 63101, before Rebecca

22   L. Tuggle, a Registered Professional Reporter,

23   Certified Court Reporter, and Certified Shorthand

24   Reporter within and for the State of Missouri.

25
```

```
 1                 A P P E A R A N C E S

 2
        FOR THE PLAINTIFF STATES:
 3
                   TODD LAWRENCE DISHER
 4                 Attorney-in-Charge
                   Special Counsel for Civil Litigation
 5                 Assistant Attorney General State of Texas
                   300 W. 15th Street
 6                 Austin, TX 78701
                   (512) 463-2100
 7                 todd.disher@oag.texas.gov

 8      FOR KARLA PEREZ, ET AL.:

 9                 NINA PERALES
                   Mexican American Legal Defense and Education
10                 Fund
                   110 Broadway, Suite 300
11                 San Antonio, TX 78205
                   (210) 224-5476
12                 nperales@maldef.org

13      FOR THE FEDERAL DEFENDANTS:

14                 JEFFREY S. ROBINS
                   U.S. Department of Justice, Civil Division
15                 Office of Immigration Litigation
                   District Court Section
16                 P.O. Box 868
                   Washington, D.C. 20044
17                 jeffrey.robins@usdoj.gov

18      FOR THE STATE OF NEW JERSEY BY TELEPHONE:

19                 KENNETH LEVINE
                   Office of the Attorney General of New Jersey
20                 25 Market Street, 8th Floor
                   Trenton, NJ 08625
21                 (973) 648-2881
                   kenneth.levine@law.njoag.gov
22
        REPORTED BY:
23
                   REBECCA L. TUGGLE, RPR, CCR, CSR
24                 Huseby Global Litigation

25
```

```
 1              MR. ROBINS:  All right.  So this is Jeffrey
 2    Robins for the federal defendants from the Department
 3    of Justice.  And I just want to lay down the ground
 4    rules that I would prefer we use today given that the
 5    federal defendants do have concerns, as you may know,
 6    Mr. Legomsky, and certainly as the parties know, about
 7    testimony that you may give today that would call for
 8    the disclosure of information privileged, either under
 9    the attorney-client privilege or potentially
10    deliberative process privilege or any other privileges
11    that may apply.  I would just ask that to the extent
12    that any answer or testimony that you're going to
13    provide today is based on or calls for the disclosure
14    of communications, including advice or guidance that
15    you gave to your clients or to the agencies, to either
16    USCIS or DHS or other sub-components in your role as
17    chief counsel of USCIS, or as counselor to the
18    Secretary of Department of Homeland Security, that in
19    the case that your testimony would call for the
20    disclosure of that -- those forms of communication,
21    the federal defendants assert that that would call for
22    the disclosure of confidential or privileged
23    information and would instruct that you not answer
24    those questions and not disclose that information.
25    Recognizing that there may be some questions where
```

```
 1   it's unclear of what capacity you're being called upon

 2   to answer them, if you could please clarify if you

 3   believe before you answer a question that the answer

 4   would call for the disclosure of such information,

 5   give federal defendants the opportunity to raise that

 6   objection, for the parties to potentially discuss the

 7   nature of that answer off the record and determine

 8   whether federal defendants will, in fact, object to

 9   such answer on the basis of privilege.

10             THE WITNESS:  I understand.

11             MR. ROBINS:  Thank you.

12             IT IS STIPULATED AND AGREED by and between

13   counsel for the Plaintiffs and counsel for the

14   Defendants that the deposition of STEPHEN LEGOMSKY may

15   be taken in shorthand by Rebecca L. Tuggle, a

16   Registered Professional Reporter, Certified Court

17   Reporter, and Certified Shorthand Reporter, and

18   afterwards transcribed into typewriting, and the

19   signature of the witness is reserved by agreement of

20   counsel and the witness.

21   PROCEEDINGS BEGAN AT 1:00 P.M.

22                         * * * * *

23

24             STEPHEN LEGOMSKY,

25   of lawful age, being produced, sworn, and examined on
```

1    the part of the Plaintiffs, and after responding "Yes"

2    to the oath administered by the court reporter, deposes

3    and says:

4                           EXAMINATION

5    QUESTIONS BY MR. DISHER:

6        Q    Mr. Legomsky, good afternoon.

7        A    Good afternoon.

8        Q    Can you please introduce yourself to the

9    court?

10       A    Sure.  I apologize in advance, I'm losing a

11   little bit of my voice; so tell me if I need to pipe

12   up.  My name is Stephen Legomsky.  S-t-e-p-h-e-n

13   L-e-g-o-m, as in Mary, s-k-y.

14       Q    Thank you, Mr. Legomsky.  Mr. Legomsky, you

15   are a law professor so I'll spare you some of the

16   formalities about introducing the deposition process,

17   but two things to point out.  If you ever don't

18   understand any of my questions, please let me know.

19   Is that fair?

20       A    Yes.  Thank you.

21       Q    And then if you ever need to take a break

22   today, also just let me know and we'll take a break.

23   But if there is a question pending on the table, I'd

24   ask that you would answer that question before we take

25   a break.  Is that fair?

1      Q     Okay.  Go ahead.

2      A     And finally, for a brief period in 2015, I

3   believe from July to October of 2015, I served as

4   Senior Counselor to the Secretary of Homeland

5   Security.

6      Q     Okay.  Going back to what we had talked

7   about earlier, you can pull it up if you need to, but

8   in Exhibit 4, you say -- again, you said that you were

9   a member of the Obama Administration in a -- Let me

10  start that over.

11     A     I'm sorry.  What page are we on?

12     Q     Of course.  Exhibit 4, page 339.

13     A     Okay.

14     Q     You said that you were a member of the Obama

15  Administration integrally involved in the rollout and

16  implementation of DACA; right?

17     A     Yes.

18     Q     And I don't want to ask you about any of the

19  substance of the communications that you may have had

20  in your role as chief counsel, okay?  But I do want to

21  ask you, can you give me a general sense about what

22  your integral involvement was in the rollout and

23  implementation of DACA?

24     A     Yes.  One of the things that the agency,

25  USCIS, had to do after DACA was announced was refine

1   some of the details.  For example, which sorts of

2   crimes would disqualify someone, what sorts of

3   documentation should we require for proving that you

4   meet the education requirements and those sorts of

5   things.

6           MR. ROBINS:  I just want to pause real fast

7   and just to be clear that I would object to the extent

8   that anything your -- your testimony now relates to

9   anything that is deliberative in nature that didn't

10  result in any final guidance or actions or relates to

11  any specifics of the communications you had with

12  regard to even both non-final and final guidance.

13          THE WITNESS:  I appreciate that and I will

14  be careful.  The two examples I just gave, however,

15  were both things that were, in fact, published and are

16  still in the public domain.

17          So my role as chief counsel was to supervise

18  those attorneys in my office who were working on these

19  various issues from the legal side, as well as to

20  participate in discussions with agency leadership and

21  operational folks as to how this might be implemented.

22      Q   (By Mr. Disher) Okay.

23          MS. PERALES:  Just a caution.  With respect

24  to discussions or communications, you may want to keep

25  in mind the privilege issue.

```
 1   testimony.  I reviewed the memo that then USCIS
 2   Director Leon Rodriquez wrote to Senator Grassley in
 3   response to a request for information -- statistical
 4   information about DACA and advance parole.
 5            I also read the more extended subsequent
 6   memo on that subject that Director Rodriquez also
 7   wrote in response to congressional inquiries.  I
 8   reviewed the document that USCIS posted on its public
 9   website on approval and denial rates for DACA
10   requesters.
11            There might have been other documents that
12   are not coming to mind at the moment.
13      Q    Okay.  What was your methodology to reach
14   the opinions that are disclosed in your declaration?
15      A    It depends on the particular declarations.
16   Some are based solely on my general knowledge of
17   immigration law from both teaching and researching.
18   Some other conclusions were based on the information
19   that I gleaned from those public documents.  Some were
20   simply based on what I felt to be internal logic.
21      Q    Okay.  What specialized skill or expertise
22   did you bring to bear in order to prepare this
23   declaration?
24      A    Well, again, my several decades of
25   experience in the field of immigration law.  My
```

1   training and my legal education and my subsequent

2   training, my research skills, and hopefully my

3   analytical skills.

4        Q    Okay.  What fact issue do you think this

5   declaration will help Judge Hanen decide?

6        A    Without making the statement sound

7   exclusive, one issue that comes immediately to mind is

8   the fact question of whether USCIS adjudicators were,

9   in fact, performing the discretionary case-by-case

10  evaluation of individual DACA requests that the

11  Secretary's memo explicitly instructed them to do

12  so -- to do and that the standard operating procedures

13  issued to the adjudicators requested them to do.

14       Q    Any other fact issues you can think of?  And

15  take your time to look through it if you want.

16       A    I would have to go through statement by

17  statement.  Do you have any specific statements in

18  mind that I should focus on?

19       Q    Well, can you -- I just want to see if you

20  can point to any fact issues in here, other than, in

21  your opinion, whether individual adjudicators

22  exercised discretion.

23       A    You'll have to give me a moment because

24  there are --

25       Q    Take your time, please.

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.

Stephen Legomsky on 08/01/2018

Page 47

```
 1       A    -- 40-something statements in this

 2   declaration.  And you said factual determinations;

 3   right?

 4       Q    Yes.

 5       A    One factual assertion that runs through

 6   several of the statements is that the Department of

 7   Homeland Security is uniquely positioned by virtue of

 8   both its expertise and its delegation of authority

 9   from Congress to make the kinds of determinations on

10   which the decision to announce DACA and the way in

11   which they are implementing it.  That's one.

12       Q    What sources did you rely on for your

13   opinions related to that fact issue?

14       A    Partly the express delegation from Congress

15   of the authority to the -- of the responsibility to

16   the Secretary of Homeland Security to establish

17   immigration enforcement policies and priorities.

18   Partly through my own knowledge of the professionalism

19   of the DHS employees.  Partly from my own experience

20   in knowing that the DHS employees are involved in

21   these issues, bring, in most cases, many years of

22   expertise to the subject.

23       Q    Okay.

24       A    Would you like me to continue going through

25   it?
```

1      Q    Okay.  Keep going.

2      A    Yes, the other factual statements in

3  paragraph 12, I would say the same thing about, that

4  they come from published reports and that they are

5  examples of facts that I would hope might be helpful

6  to a court in assessing whether there was a rational

7  basis for DACA.

8      Q    But in paragraph 12, the opinions you're

9  expressing, you have not done any studies or reports

10  yourself related to the issues detailed in paragraph

11  12?

12     A    No.  Except that with respect to the very

13  last sentence of that paragraph, although I have not

14  done a report, again, my exposure over the course of

15  two years to DHS officials dealing with these issues

16  enables me to see that these officials are uniquely

17  well-positioned to balance the various policy factors.

18     Q    Okay.

19     A    The statement in paragraph 13 could be

20  characterized as one of fact and so I think it's

21  relevant to your question.  And as to that, I believe

22  the facts that USCIS and its predecessor agency abused

23  both the prosecutorial discussion generally and

24  deferred action, in particular, for many decades could

25  help a decision-maker determine its legality today

1  regulations," unquote.  I point out there that they

2  are not jumping the line.

3       Q    And your opinion that they are not jumping

4  the line is, again, based on the relevant immigration

5  statutes and regulations?

6       A    Yes.  In paragraph 36, I make the point that

7  most, if not all, of the criteria for DACA are ones

8  that can easily be determined based solely on written

9  documents and the background checks that the

10  adjudicators perform.  And that, therefore, personal

11  interviews are seldom necessary or even particularly

12  helpful.  That could be relevant to Mr. Palinkas'

13  assertion that the mere absence of a personal

14  interview somehow renders the adjudication unreliable.

15            Looks like you're about to ask me something.

16       Q    Yes.  I'm thinking.  Give me one second.

17  What is the foundation for that opinion?

18       A    I lay out the specific found -- the

19  specifics of that foundation in paragraph 36 itself.

20  I identify the specific DACA criteria and explain why

21  each one is amenable to particular documentary

22  evidence.  For example, the person has to be under a

23  certain age at the time of application and not over a

24  certain age.  Birth certificates provide that

25  information.

1      Q     Okay.

2      A     A person has to meet certain educational

3   requirements.  And documents from the educational

4   institutions or from the Armed Services provide that

5   information.

6      Q     Do you think that the judge himself could

7   look at those stated criteria and determine whether

8   the criteria could be determined by simple factual

9   determinations?

10     A     I'm not sure what you mean by simple

11  factual.  Do you mean non-interview?

12     Q     Yes.

13     A     Yes, could.  If the judge is aware of these

14  facts.

15     Q     Okay.  And those facts are spelled out in

16  the DACA memo itself?

17     A     The facts as to what the criteria are are

18  spelled out in the DACA memo.  The required

19  documentation is spelled out in other documents,

20  including the standard operating procedures given to

21  the adjudicators.

22     Q     Okay.  As well as the frequently-asked

23  questions on USCIS's website?

24     A     Correct.

25     Q     Okay.  But looking at those sources, the

 1    judge can make a determination for himself that these

 2    particular criteria could be determined solely on

 3    documentary evidence and not interviews?

 4         A    Yes.

 5         Q    Okay.

 6         A    I think paragraph 37 provides information

 7    that is available on the basis of public records, but

 8    which without specific mention might not be obvious to

 9    a judge.  And, therefore, I think the observations

10    contained in paragraph 37 could be helpful to a judge

11    in understanding the implications of accepting

12    Mr. Palinkas' theory that the lack of an interview

13    renders the results unreliable.

14         Q    So you pointed that information out to the

15    judge?

16         A    Yes.

17         Q    And what about your specialized training or

18    knowledge makes you uniquely qualified to point that

19    information out to the judge?

20         A    Well, I'm very familiar with the work that

21    the USCIS service centers do and how that workload

22    is -- how the USCIS workload is divided between those

23    adjudicators and those who work in the field offices.

24         Q    But if anybody went to this website that's

25    cited here, they could also make that determination;

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018

1   right?

2        A    If they knew of the website, yes.

3        Q    Okay.

4        A    Also in paragraph 37, I point out that many

5   of the benefits that USCIS service center adjudicators

6   decide are ones that are either ones that -- I need to

7   rephrase.

8            Many of the things they adjudicate are

9   either prerequisites to or applications for a formal

10  legal status.  That might not be obvious to a person

11  who is not familiar with immigration law as a

12  specialty.

13       Q    But, again, all that information is

14  available on the USCIS website?

15       A    Not all of it.  Some of it a person would

16  have to know to go to the relevant parts of the

17  statute and make those determinations, prerequisites

18  to other benefits.

19       Q    Okay.  So it's either on the USCIS website

20  or referenced in the statute?

21       A    Correct.

22       Q    Got it.

23            MS. PERALES:  Before you do your next

24  question, I know we're coming up on an hour.  May we

25  ask the court reporter to tell us how long we've been

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                    Page 57

```
 1   on the record?
 2             REPORTER:  An hour and 10 minutes.
 3             MS. PERALES:  Hour and ten.  All right.
 4   Would it be all right before you ask your next
 5   question?
 6        Q    (By Mr. Disher) Would you like a break?
 7        A    Sure.
 8             MS. PERALES:  Thank you.
 9             (Whereupon, a brief break was taken.)
10        Q    (By Mr. Disher) All right, Mr. Legomsky.
11   We're back on the record and we were going through
12   your declaration to identify the opinions on factual
13   issues that you have given, and I believe we were on
14   page 17.  And so I just want to continue that and make
15   our way through the rest of it to see what facts you
16   offer opinions about.
17        A    Well, in paragraph 38, I discuss the
18   instructions given in the standard operating
19   procedures for DACA adjudicators.  And, in particular,
20   the instruction that they carefully examine all cases
21   of possible fraud based on the standard fraud
22   protocols.  That's very important to anyone who might
23   be concerned that there is not enough attention given
24   to possible fraud.
25        Q    And that opinion is based on your review of
```

1   the standard operating procedures?

2       A    In part.  It's based also on my ability to

3   interpret the standard operating procedures and on my

4   knowledge from having been at USCIS of how carefully

5   the fraud adjudicators scrutinize these cases.  I

6   happen to know that they take them very seriously and,

7   therefore, the factual information in paragraph 38 is

8   probably more important than might meet the eye for a

9   person who is not familiar with these processes.

10      Q    And that is based on your personal

11  observation of their process to review these

12  applications?

13      A    Yes.

14      Q    How many --

15      A    Based on -- I'm sorry.  It's based on my

16  general observations of the fraud officers at USCIS.

17      Q    And that --

18      A    Not -- not just -- sorry -- not just

19  specifically DACA.

20      Q    And that would have occurred during your

21  stint from 2011 to 2013?

22      A    Yes.

23      Q    Okay.  You have not observed any DACA

24  adjudications since 2013?

25      A    No.

1    Q    Have -- no, that is correct, you have not

2    observed -- Let me ask -- let me ask the question

3    again.

4              Since 2013, you have not observed any DACA

5    adjudications; correct?

6    A    Correct.

7    Q    Okay.  How many DACA applications have you

8    personally adjudicated?

9    A    None.

10   Q    Okay.  How many DAPA applications have

11   people who report directly to you adjudicated?

12   A    None.  The only people who reported to me

13   were other attorneys, not adjudicators.

14   Q    All right.  Keep going.

15   A    Paragraph 39 comments on the -- interprets

16   and comments on the approval of denial -- wait,

17   approval/denial rates for DACA and what that approval

18   rate was.  That's extremely important information for

19   the issue of whether case-by-case adjudication is

20   truly taking place.

21   Q    And that paragraph is based on data released

22   by USCIS?

23   A    In part.  That -- those data require some

24   interpretation.  For example, the figures for denials

25   are accompanied by a footnote that also -- that says

1    by denial, we need to include denials, terminations,

2    and withdraws.  I don't know that a person without

3    expertise in immigration law or familiarity with the

4    process would understand what terminations are.  But

5    they are, in effect, a form of denial.  Something I

6    know because of my expertise in immigration.

7         Q    All right.  And I was going to ask you about

8    that later, but since we're on that point anyway, I

9    can just give you a copy of this.

10                   (Exhibit 6, DACA Statistics, were

11                    marked for identification.)

12        Q    (By Mr. Disher) We'll mark this as Exhibit

13   6.  So this is the DACA statistics as of May 31, 2018.

14        A    Okay.

15        Q    And you've seen documents like this before?

16        A    The most recent one I had seen was from

17   March 31st, but yes.

18        Q    Okay.  Now, if we look at the second page,

19   there's the column at the top for denied under case

20   review?

21        A    Yes.

22        Q    And then that's -- there's a footnote to

23   footnote number eight; right?

24        A    Yes.

25        Q    Okay.  And then if we look at footnote

1  number eight, it says the number of requests that were

2  denied, terminated, or withdrawn during the reporting

3  period; right?

4       A    Correct.

5       Q    Okay.  So let's talk about each of those, in

6  particular.  When you say -- or rather when the

7  footnote says requests that were denied, that would

8  include requests that did not meet one or more of the

9  stated criteria in the 2012 DACA memo; is that

10  correct?

11       A    Or that were denied in the exercise of

12  discretion.

13       Q    I understand.  And I just want to make sure

14  we cover the entire universe here, okay?

15       A    Okay.  I'm sorry.  But, yes, it would

16  include those.

17       Q    So to -- and let's -- let's walk through it

18  one by one.  To put a fine point on it, in USCIS's

19  reporting of these statistics about the DACA denials,

20  the number of applications that are denied includes

21  applications that did not meet one or more of the

22  stated criteria in the DACA memo; correct?

23       A    Correct.

24       Q    It also included or includes, potentially,

25  applications that met all of those criteria and then

1   were denied anyway?

2        A    Correct.

3        Q    It also includes applications that were

4   terminated?

5        A    Correct.

6        Q    And what does it mean for an application to

7   be terminated?

8        A    Sometimes a DACA request is granted, but

9   either the person subsequently does something that

10  would have been a disqualification or evidence comes

11  to light showing that a person had previously

12  committed what should have been a disqualifying act

13  and so the grant of DACA is terminated.  In effect,

14  it's a denial after the fact.

15       Q    Okay.  Those terminations would occur

16  because the applicant did something that then

17  disqualified him or her from DACA eligibility?

18       A    Either that or the person had already done

19  something, but the evidence of it did not come to

20  light until after DACA had been granted.

21       Q    Understood.  And then the number of denials

22  also includes applications that were withdrawn?

23       A    Correct.

24       Q    What does it mean for an application to be

25  withdrawn?

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                              Page 63

```
 1        A     Sometimes a person might withdraw an
 2   application when it becomes fairly clear that the
 3   application is going to be denied.  An application
 4   might also be deemed withdrawn if a person leaves the
 5   country or if the person -- or if anything happens to
 6   cause the person to be ineligible for DACA, the
 7   application might be withdrawn.
 8        Q     Okay.  All right.  Let's get back to your
 9   declaration.  We were on paragraph 39.
10        A     Okay.  If I could just finish the answer to
11   that last question?
12        Q     Yes.
13        A     Those would be -- you were asking me whether
14   this is information that would require a specialized
15   expertise to understand, and as your questions
16   indicate, it might not have been obvious to a
17   non-specialist what terminations include or what
18   withdrawals include.  So interpretation of that
19   important chart is something that I think benefits
20   from the expertise that I have to offer.
21        Q     Where did you get the expertise that you're
22   using to offer that opinion?
23        A     It's a combination of my own general
24   knowledge from teaching and researching immigration
25   law and from my familiarity with the DACA process from
```

1    my time at USCIS.

2         Q    Okay.  Go ahead.

3         A    Should I go on?

4         Q    Yes, please.

5         A    Paragraph 42 is formed partly by just common

6    sense and logic.  One would expect a person to be

7    pretty sure DACA is going to be denied and who is

8    undocumented not to apply for it.  That's just

9    instinctive.  But in addition to that, over the years

10   I've had many conversations with immigration

11   practitioners who have dealt with DACA applicants.

12   And it's clear from those consistent conversations

13   that attorneys and other representatives simply

14   counsel people not to apply if it's fairly clear they

15   will be denied.  That's something that I don't think I

16   would have known but for both my expertise in the

17   field and my interactions with many attorneys over the

18   years.

19        Q    Okay.  Have you ever counseled anybody about

20   applying for DACA?

21        A    I have not.

22        Q    Okay.

23        A    In paragraph 46, in the portion that appears

24   on page 20, one sentence a few lines down reads,

25   "Further, only the leadership can disseminate guidance

1    throughout the agencies so that people on the ground

2    know what they are supposed to do, so that important

3    priorities will be transparent to the public and so

4    that there will be some reasonable degree of

5    consistency," unquote.  It's based partly on my

6    experience at USCIS that I have come to understand the

7    importance of centralized guidance to adjudicators and

8    the fact that such guidance, in order to be

9    meaningful, must come from agency leadership.

10       Q    And that's based on your two years at USCIS?

11       A    Yes.

12       Q    Okay.  And that's not something that's

13   unique to USCIS?

14       A    No, it's not.  But even though it's not

15   unique to USCIS, I don't know that that's the case

16   with every agency.  And so expertise and exposure

17   enable me to know that that is particular to USCIS.

18            In paragraph 48, I say that, "There's no

19   evidence to support any counter-instinctive assumption

20   that the USCIS adjudicators who decide DACA requests

21   are systematically disobeying the Secretary's multiple

22   clear instructions to exercise discretion on a

23   case-by-case basis," unquote.  Impressed in that

24   statement is that I am personally unaware of any

25   evidence and I think that my exposure to USCIS is such

1  that if there were any indication of that happening, I

2  would absolutely have been aware of it.

3      Q    During the two years that you were at USCIS?

4      A    Correct.

5      Q    Have you reviewed any of the production from

6  the federal defendants in this case?

7      A    No, I have not.

8      Q    Okay.

9      A    In the case of paragraph 49, some of the

10  statements, or at least one of the statements, that

11  the adjudicator has to struggle with determining how

12  probable and how severe a danger has to be in order

13  for a denial to be warranted, is based on my

14  experience at USCIS and knowing how often that subject

15  can come up.  But I don't think I can comment on the

16  specifics of those discussions without breaching

17  privilege.

18      Q    Understood.

19      A    Okay.

20      Q    But, again, those discussions would have

21  only occurred during the two years that you were at

22  USCIS?

23      A    For those discussions, yes.

24      Q    Ending in 2013?

25      A    Yes.

1        Q     Okay.

2        A     But I have to say, I can't think of any

3    reason that that would change after I left.

4              In paragraph 50 -- no, I'm sorry, my

5    mistake, paragraph 49.  I discuss the fact that a

6    decision that is discretionary in character does not

7    become any less discretionary just because it goes to

8    one of the criteria, rather than to a determination

9    made after those criteria have been satisfied.  I

10   think my expertise in immigration law enables me to

11   understand why those determinations are, in fact,

12   discretionary.

13       Q     Your expertise in immigration law leads you

14   to that conclusion?

15       A     Yes.

16       Q     Which immigration laws, in particular?

17       A     Immigration law, in general, because I --

18   there are many, many provisions of the Immigration and

19   Nationality Act that require adjudicators to exercise

20   discretion in one form or another.  Sometimes it's a

21   very specific discretion, sometimes it's a more

22   residual discretion.

23       Q     And those areas are spelled out either in a

24   statute or a regulation?

25       A     The examples I'm thinking of are included in

1  the statute, but it is not always clear, unless one is

2  familiar with the case law, that those determinations

3  are, in fact, discretionary.

4       Q   Understand.  So it's either a statute or

5  regulation or case law?

6       A   Yes.  Case law --

7       Q   Okay.

8       A   -- and actual practice.

9       Q   When you say "actual practice," what do you

10  mean by that?

11       A   By actual practice, if, for example, an

12  adjudicator has to decide whether removal would result

13  in, quote, "extreme hardship," unquote, which is a

14  prerequisite to many forms of discretionary relief, it

15  might not be obvious to someone that in order to

16  determine extreme hardship, the person is doing a

17  weighing and balancing, rather than looking for

18  specific prerequisites.  But knowing from -- knowing

19  from the fact that this is done in practice, that

20  these determinations require a weighing and a

21  balancing, is something that I think might not be

22  self-evident or non-specialized.

23       Q   Okay.  And what is the basis for your

24  knowledge about the practice that an individual

25  adjudicator goes through?

1      A     Well, discussions of extreme hardship come

2  up all the time.  Again, I can't reveal the specifics

3  of those discussions without breaching confidence.

4      Q     And those discussions occurred during your

5  stint at USCIS?

6      A     Yeah.  The ones I was referring to now

7  occurred during my stint at USCIS.  But, in addition,

8  there is always a lot of discussion among immigration

9  scholars, a very sophisticated debate about how

10  discretion -- how discretionary decisions are, in

11  fact, made in immigration law.  There's been a great

12  deal written, a tremendous body of scholarly

13  commentary on that subject, and I think the

14  familiarity with that commentary enables me to

15  understand and hopefully to communicate how inherently

16  discretionary these judgments really are, even if the

17  statute doesn't use the specific word "discretion."

18      Q     Where are those scholarly publications

19  published?

20      A     In law review articles, in books.

21      Q     Okay.

22      A     In reports, yeah.

23      Q     All right.  When you say "immigration

24  scholars," are these immigration professors, for

25  example?

1        A     Typically, yes.

2        Q     Okay.

3        A     Sometimes practitioners, sometimes scholars.

4        Q     When you say "practitioners," you mean

5    immigration lawyers?

6        A     Yes.  People who -- yes, immigration

7    lawyers.  They might be in the private sector.  They

8    might be in the public sector.

9        Q     Okay.

10       A     But they're not professors.

11       Q     So it's either the immigration professors or

12   the immigration lawyers who are debating this idea

13   about how discretion is actually exercised?

14       A     How it is exercised and how you can tell

15   whether a statutory delegation of responsibility is,

16   in fact, discretionary in the first place.

17       Q     Thank you.

18       A     I think that's the end of my list.

19       Q     Okay.  Let's talk about the conclusion

20   briefly in paragraph 51.  You say, "It is my

21   firmly-held opinion that DACA is a case-by-case

22   exercise of prosecutorial discretion by which DHS

23   fulfills the Congressional directive to set and carry

24   out immigration enforcement priorities."

25       A     Yes.

1    the Secretary of Homeland Security has discretion to

2    grant employment authorization to aliens based on this

3    statute?

4         A    Based both on this statute and on what the

5    old INS, back in the days of the Reagan

6    Administration, understood to be the general conferral

7    of authority to the agency to implement and administer

8    the immigration laws.

9         Q    Okay.  And --

10        A    So it's a combination of both sources of

11   authority.

12        Q    And what was the second source again?

13        A    In 1981 or 1982, the Reagan Administration,

14   before the provision mentioned in paragraph 26 was

15   enacted, asserted the authority to grant employment

16   authorization to deferred action recipients.  It did

17   so by issuing a formal notice and comment rule

18   specifically saying that deferred action recipients

19   could qualify.  It elaborated on its authority to do

20   that in the federal registered notice accompanying the

21   regulation.  And the authority it cited was the

22   general delegation of authority, from Congress to the

23   Executive Branch, to administer the immigration laws.

24        Q    All right.

25        A    After that, this provision was enacted,

1   thereby making explicit what the Reagan Administration

2   had assumed was implicit.

3        Q    Okay.  And the thing that it made explicit

4   is that the executive has the authority to grant work

5   authorization to aliens, even if a particular statute

6   does not?

7        A    That's correct.  More specifically, the

8   Attorney General and now the Secretary of Homeland

9   Security.

10       Q    Right.  Are there any limits to the

11  Secretary of Homeland Security's ability to do that?

12       A    There are no explicit limits in the statute

13  itself.  Undecided by the courts is whether there

14  might be some implicit limit.  No court that I'm aware

15  of had occasion to decide that question so I would

16  only be speculating.

17       Q    Okay.  And I just want to know, in your

18  opinion, as a retained expert for the intervenors in

19  this case, is there a limit to the Secretary of

20  Homeland Security's ability to grant work

21  authorization to aliens?

22       A    My view is that there is an outside limit,

23  but that this policy, DACA, does not even remotely

24  approach that limit.  The limit -- one limit that I

25  would suggest, and I don't mean to imply there are no

```
 1    details of that without exposing that type of

 2    information, okay?

 3              MR. ROBINS:  Understood.

 4       Q    (By Mr. Disher) All right.  So is there a

 5    special unit that looks at applications which may pose

 6    some national security threat?

 7              THE WITNESS:  May I answer that?

 8              MR. ROBINS:  I'm not objecting.

 9              MS. PERALES:  You follow his lead here.

10              THE WITNESS:  Okay.

11       A    If a case -- during the time I was there.

12    And, again, I can speak only to that period.  During

13    the time I was there, if a national security issue

14    arose, it would go straight to the -- it would go

15    eventually to the director of the agency.  Those cases

16    would be taken very seriously and the director would

17    want to know about them.

18       Q    (By Mr. Disher) Understood.  And then do you

19    know who would make the ultimate decision about that?

20       A    There would be a conversation between the

21    director and whoever he wishes to consult.

22       Q    Okay.  While you were there, do you know how

23    often that happened?

24       A    No, I don't know the numbers.

25       Q    Was it more than 10 times?
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                      Page 87

1                   MR. ROBINS:  Objection.  Again, on law

2      enforcement privilege grounds.

3                   MR. DISHER:  Yeah, I just can't -- can I get

4      an estimate from him?

5                   MR. ROBINS:  No.

6         Q    (By Mr. Disher) What about the public safety

7      decision, how many -- do you have any estimate about

8      how many applications were initially flagged because

9      they may pose some threat to public safety?

10        A    I don't have an estimate as to that.  I know

11     that, according to the published statistics, as of the

12     end of calendar year 2015, there were already

13     approximately 75,000 denials of DACA on the merits.

14     And my assumption would be the significant proportion

15     of those were on public safety grounds, but I can't

16     estimate what that proportion would be.

17        Q    Okay.  All right.  In paragraph 50, you talk

18     about the affidavit from Donald Neufeld.

19        A    Yes.

20                  (Exhibit 7, Neufeld Affidavit, was

21                  marked for identification.)

22                  MR. DISHER:  Mark that as Exhibit 7.

23                  MS. PERALES:  Seven?

24                  MR. DISHER:  Yes.

25        Q    (By Mr. Disher) Now, you say, "The Neufeld

1   reason to think it might be denied, you might not

2   apply at all.  And that's why I think the more

3   successful applicants are those who apply at the

4   beginning.

5       Q    And I'm going to ask you to speculate, but

6   might there be other scenarios by which individual --

7   by which of these rates would increase over time the

8   denial rates?

9       A    Possibly a different administration, but the

10  denial rates were continuing to increase even during

11  the first few -- the last few years of the Obama

12  Administration; so I don't think that would account

13  for an increase.  I can't offhand think of any other

14  alternative explanation.

15      Q    In preparing this declaration, have you done

16  anything to exclude other possibilities?

17      A    I can't identify any other possibilities to

18  exclude.

19           MR. ROBINS:  Okay.  That's all I have.  Pass

20  the witness.

21                          EXAMINATION

22  QUESTIONS BY MS. PERALES:

23      Q    I have a few questions for you, Mr.

24  Legomsky.  With respect to differences between DAPA

25  and DACA that you discussed with Mr. Disher, is it

```
 1   also fair to observe that the INA sets out provisions

 2   under which parents of U.S. citizen children may

 3   acquire an immigration status, but that the INA does

 4   not have analogous provisions for undocumented people

 5   brought to the U.S. as children?

 6              MR. DISHER:  Objection.  Leading.

 7              MS. PERALES:  Yes.

 8        Q    (By Ms. Perales) Go ahead and answer.

 9        A    I think that is a fair argument because of

10   the fact that in the original Texas versus U.S. DAPA

11   case, if my recollection is correct, the Fifth Circuit

12   did include as one of the reasons for rejecting DAPA,

13   that the INA makes specific provision for certain

14   classes of family members, but not all the ones

15   included in DAPA.  And as your question implies, the

16   same could not be said of DACA; so I would say, yes,

17   that is a fair argument to make.

18        Q    You spoke a few moments ago about two

19   exhibits today that represented two different drafts

20   of your declaration.  One is marked as Exhibit 5 and

21   the other one is marked Exhibit 8 from the deposition.

22   Can you just, in a brief sense, give us an

23   understanding of the differences between those two

24   drafts?

25        A    Yeah.  The main effect -- my main purpose in
```

1  redrafting was that when I discovered that I had time

2  for one more rigorous edit, I decided to take

3  advantage of that opportunity and so I wanted to

4  enhance the clarity and the specificity of the

5  statements I had made, as well as to make the document

6  a little bit cleaner by deleting information that I

7  thought might be redundant.  And so that was what I

8  was trying to do in the second draft.

9       Q    Okay.  You spoke to Mr. Disher through a

10  series of questions and answers about the possible

11  legal limits of the authority of DHS to grant work

12  authorization to a very large number of undocumented

13  immigrants.  And I was hoping that you would be able

14  to summarize the different limitations that you

15  identified in that colloquy in the answer to my

16  question.

17       A    Certainly.  And these are simply limitations

18  that I can think of.  I don't want to exclude the

19  possibility that there are still other limitations,

20  but the ones that come most readily to mind are,

21  first, the resource limitations rationale takes you

22  only so far.  There might be a certain point at which

23  the resources are available to remove a far greater

24  number than what the administration is removing, and

25  there could at least be an argument that by not fully

```
 1   using the enforcement resources, the administration is
 2   not acting consistently with the congressional intent
 3   in passing the various Appropriations Act.  That's
 4   one.
 5              Secondly, the particular priorities that the
 6   administration uses in deciding whom to focus on and
 7   whom not to focus on need to be -- need to have some
 8   rational basis.
 9              Third, they cannot violate Equal Protection;
10   so they cannot draw their priorities along lines that
11   would violate the Equal Protection Clause.
12              And fourth, the particular priorities, in my
13   view, cannot come into direct conflict with priorities
14   that Congress has explicitly ordered the
15   administration to take into account.
16              Again, there might be still others that are
17   not coming readily to mind.
18        Q    Okay.  And then for my last set of questions
19   to you, I'd like you to turn to your declaration dated
20   July 16, which is Legomsky Deposition Exhibit No. 5.
21        A    Okay.
22        Q    You identified some statements of fact in
23   the declaration with Mr. Disher and I'd like to go
24   over some additional fact statements with you that may
25   have been left out.
```

1           So with respect to page 3, paragraph 5, can

2    you identify for me the fact statements in that

3    paragraph?

4      A    Well, certainly the first sentence is a

5    statement of fact.  "DHS routinely establishes

6    priorities guiding its exercise of prosecutorial

7    discretion in the enforcement of the immigration

8    laws."

9           The second statement is also one of fact,

10   that deferred action is one of the instruments it uses

11   for this purpose.  The third statement could be

12   characterized as one of fact, that deferred action is

13   one particular -- I'm sorry -- that DACA is one

14   particular deferred action initiative.

15     Q    And with respect to the facts that you set

16   out in paragraph 3 of your declaration, can you

17   explain to us what you drew upon to state those facts

18   as being true?

19          MR. DISHER:  I'm sorry.  You mean paragraph

20   5.

21     Q    (By Ms. Perales) I'm sorry.  Page 3,

22   paragraph 5.  I'm sorry.  I apologize.

23          With respect to the fact statement on page

24   3, paragraph 5, can you explain what you drew upon to

25   make those factual statements?

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Stephen Legomsky on 08/01/2018                                    Page 111

1       A    Well, as to the first sentence, I

2   specifically drew on my general expertise in

3   immigration law and my experience from teaching, from

4   researching, from lots and lots of conferences and

5   conversations with other immigration scholars, with

6   lots of conversations over the years with immigration

7   practitioners and with other experts.  I know that it

8   is very routine for DHS to establish priorities and

9   also for meeting the various documents in which they

10  have done precisely that.

11      Q    And with respect to paragraph 5, did you

12  also draw on your experience as USCI -- working with

13  the Federal Government with DHS?

14      A    Yes, I should have added that as well.  That

15  certainly informs my knowledge as to the first

16  sentence and with respect to the second and third

17  sentences in that paragraph as well.

18      Q    And then with respect to paragraph 6, in the

19  first sentence, "DACA is a decision by the agency to

20  defer action (immigration enforcement proceedings)

21  against an individual."  Can you describe for me what

22  you drew upon to make that fact statement?

23      A    Again, my general expertise derived from the

24  sources that I described a moment ago.

25      Q    Okay.  With respect to paragraph 7, which

1    begins at the bottom of page 3, can you identify fact

2    statements in that paragraph?

3         A    Yes.  Yes.  The entire paragraph is a

4    statement of fact.  It describes what DHS has to do

5    when it makes decision not to bring enforcement

6    proceedings.

7         Q    And specifically the listing of the factors

8    that DHS balances, can you describe for me what you

9    drew upon to make that fact statement?

10        A    The same as before.  My general expertise

11   from many decades of experience, plus my service time

12   at USCIS.

13        Q    With respect to page 4, paragraph 9, can you

14   identify any fact statements in that paragraph?

15        A    Certainly the first sentence is a statement

16   of fact.  The second statement as well.  And the third

17   statement as well.  I'm sorry.  The third sentence as

18   well.

19        Q    And what did you draw upon to make those

20   fact statements?

21        A    The same.  My general expertise, plus my

22   time at USCIS.

23        Q    Okay.  With respect to paragraph 11, which

24   begins at the bottom of page 4, can you identify your

25   fact statements there?

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                    Page 113

1        A    All of the statements in paragraph 11 I

2    would describe as statements of fact.

3        Q    And what did you draw upon to make those

4    fact statements in paragraph 11?

5        A    The same.  My general expertise in

6    immigration law and my time at USCIS.

7        Q    At the bottom of page 5 where paragraph 15

8    begins -- I think you covered this one with Mr. Disher

9    so I'll move on.

10       A    Yes.

11       Q    With respect to paragraph 16 and the

12   statements in paragraph 16, on what did you base your

13   statement that in some instances, the beneficiaries

14   tended to be those with a bridge to some form of legal

15   status?

16       A    Partly on the basis of what I've described

17   before, my general expertise.  But in addition to

18   that, by examining summaries of the occasions on which

19   prior presidents have granted relief to large

20   number -- large categories of undocumented immigrants.

21       Q    And upon what do you base your statement in

22   the following sentence, quote, "DACA too serves as

23   such a bridge because many current DACA recipients are

24   eligible to adjust as they grow older and marry,"

25   unquote?

1      A    I base that on -- again, on my general

2   knowledge of immigration law, but also on the specific

3   terms of DACA.  I'll leave it at that.

4      Q    Because of your background in immigration

5   law and experience at USCIS, are you familiar with the

6   methods by which an individual may be able to gain

7   legal permanent resident status?

8      A    Yes, I am.

9      Q    And are those provisions in the INA

10  standalone or must they be interpreted in the context

11  of other provisions?

12     A    They absolutely have to be interpreted in

13  the context of many other provisions.  In fact, I

14  should add that that last sentence applies to many of

15  the factual determinations that I've identified

16  earlier.  Expertise is critical in these cases, not

17  only for the purpose of ferreting out individual

18  pieces of information as I've described in the

19  declaration, but perhaps even more importantly,

20  piecing it all together.

21          The Immigration and Nationality Act, as

22  specialists know, contain many, many provisions that a

23  person would not ordinarily discover by looking only

24  at the part of the INA in which one provision appears.

25  It's very common to read a provision of the INA and

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018                                    Page 115

```
 1   not know that 200 pages later, there's another
 2   provision that qualifies it.  So being able to
 3   understand how all these pieces fit together with each
 4   other and how they fit together with various factual
 5   statements that I've been identifying requires a good
 6   deal of experience and specialized expertise.
 7        Q    And do you have that experience and
 8   expertise?
 9        A    I do.
10        Q    Moving forward to page 9, paragraph 22 at
11   the bottom of the page, can you tell me what you base
12   the fact statements in paragraph 22 upon when you made
13   them?
14        A    On general expertise and on examination of
15   the specific provisions of the statute and provisions
16   of the regulations that are cited in that paragraph.
17        Q    On page 10, paragraph 25, upon what did you
18   base your fact statements in paragraph 25?
19        A    The first statement is based on general
20   expertise and, in particular, on being able to see
21   patterns of grants of preferred action or its function
22   of equivalence over the years.  The same is true of
23   the second sentence.  And the third sentence is based
24   both on the information that I've just described and
25   on examination of the particular statutory provisions
```

 1    and provisions of the regulations on which those

 2    benefits are specifically based.

 3         Q    Are favorable exercise of discretion

 4    sometimes also embodied in memoranda or procedure

 5    documents at DHS?

 6         A    Yes, they are.

 7         Q    And would one require a familiarity with

 8    those memoranda and procedure documents in order to be

 9    able to present the full context of deferred action in

10    similar exercises of discretion?

11         A    I would say, yes, that would be

12    indispensable.

13         Q    And do you have that familiarity?

14         A    Yes, I do.

15         Q    On page 14, paragraph 33, the very beginning

16    of the paragraph begins with the words, quote,

17    "Understanding the effects of advance parole on DACA

18    recipients," unquote.  Do you see that there?

19         A    Yes.

20         Q    Do you understand the effects of advance

21    parole on DACA recipients?

22         A    I do.

23         Q    And upon what do you draw when you convey

24    your understanding of the effects of advance parole on

25    DACA recipients?

1      A    My general knowledge, plus my understanding

2   of how several different provisions of the INA work

3   together and on the basis of the experience I accrued

4   at USCIS.

5      Q    Does understanding the effects of advance

6   parole on DACA recipients require an understanding of

7   the routes by which an individual is able to adjust

8   status under the INA?

9      A    Yes.

10     Q    Does it also require an understanding of

11  inadmissibility?

12     A    Yes, absolutely.

13     Q    Does it require an understanding of the

14  three and ten-year bars?

15     A    Yes.

16     Q    Does it require an understanding of other

17  barriers to adjustment of status that may be located

18  elsewhere in the INA?

19     A    Yes.

20     Q    With respect to paragraph -- page 15,

21  paragraph 34, when you talk about this concept of

22  jumping the line, upon what do you base that -- those

23  statements in paragraph 34?

24     A    During the time that I was at USCIS, I know

25  that advance parole -- I'm sorry -- I know that

 1    adjustment of status applications by people who had

 2    received DACA and who had later received advance

 3    parole were handled in the same way and all other

 4    people in the same immigration category and in the

 5    same order.  So, for example, if you were applying for

 6    adjustment of status based on being an immediate

 7    relative of a U.S. citizen, there are no statutory

 8    numerical limits and, therefore, the only waiting time

 9    is processing time.  There was no provision for

10    putting the DACA recipients ahead of the line of

11    people who were otherwise similarly situated.

12         Q    And does your familiarity with this topic of

13    "the line," quote, unquote, include familiarity with

14    the availability of Visas, permanent resident Visas,

15    for different categories of individuals seeking to

16    adjust status?

17         A    Yes, very much so.

18         Q    And what is that based on?  What is your

19    familiarity based on there?

20         A    General knowledge of the Immigration and

21    Nationality Act and particularly how these numerous,

22    extremely complex statutory provisions work together.

23              MS. PERALES:  I pass the witness.

24

25

```
 1                        EXAMINATION

 2   QUESTIONS BY MR. DISHER:

 3        Q    Mr. Legomsky, a few follow-up questions.

 4             First, you mentioned piecing it all

 5   together; right?

 6        A    Yeah.

 7        Q    You don't dispute that Judge Hanen himself

 8   can piece it all together without your help, do you?

 9        A    I think that to reach a reliable decision,

10   anyone who is not an immigration specialist would need

11   the guidance of someone who understands the intricate

12   network of statutory and regulatory provisions and

13   case law that these decisions require.  I spend an

14   entire semester emersed in teaching the students the

15   complexities of immigration law.  And I would be very

16   wary of anyone who is not a specialist making these

17   decisions without input from a specialist.

18        Q    That specialist could be a lawyer for one of

19   the parties in the case?

20        A    It could be if the lawyers are specialists

21   in immigration law.

22        Q    Okay.

23        A    Otherwise, I think it would be unreliable.

24        Q    Going back to the idea of the outer limit of

25   the executive's ability to grant work authorization,
```

1                    REPORTER CERTIFICATE

2          I, REBECCA L. TUGGLE, a Registered
    Professional Reporter, Certified Court Reporter, and
3   Certified Shorthand Reporter within and for the State
    of Missouri, do hereby certify that there came before
4   me on August 1, 2018, at Alaris Litigation Services,
    711 N. 11th Street, St. Louis, Missouri 63101
5
                    STEPHEN LEGOMSKY
6
    who was by me first duly sworn; that the witness
7   was carefully examined; that said examination was
    reported by myself, translated and proofread using
8   computer-aided transcription; and the above transcript
    of proceedings is a true and accurate transcript of my
9   notes as taken at the time of the examination of this
    witness.
10
           I further certify that I am neither attorney
11  nor counsel for nor related nor employed by any of the
    parties to the action in which this examination is
12  taken; further, that I am not a relative or employee of
    any attorney or counsel employed by the parties hereto
13  or financially interested in this action.

14

15         Dated this 2nd day of August, 2018.

16

17

18                    Becca Tuggle
19         _____
           Rebecca L. Tuggle, RPR, CCR, CSR
20

21

22

23

24

25