# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, <br><br> Defendants. | **PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL** <br><br> Civil Action No. 17-cv-1907 (JDB) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and KIRSTJEN NIELSEN, in her official capacity as Secretary of the Department of Homeland Security, <br><br> Defendants. | Civil Action No. 17-cv-2325 (JDB) |

**INTRODUCTION**

Defendants' request that this Court stay its order *in its entirety* during their appeal should be dismissed out of hand. Each of the traditional stay factors weighs heavily against that relief. *First*, Defendants have not demonstrated a likelihood of success on the merits—and while that failure may not be independently fatal to Defendants' stay request, it substantially raises the bar for the showing they must make on the equities. *Second*, Defendants have identified no irreparable harm they will suffer if they are required to continue processing DACA renewals. Indeed, Defendants have been doing just that pursuant to court orders since January and have never before even sought a stay of that obligation. *Third*, staying this Court's order with respect to renewals would threaten Plaintiffs, their similarly situated *amici*, and hundreds of thousands of others with grave and irreparable harm. Most importantly, DACA recipients will begin to lose their status by the hundreds each day. Nothing plausibly justifies inflicting that catastrophic injury pursuant to an agency action that this Court and two others have already found to be unlawful. *Fourth*, for similar reasons, the public interest weighs heavily against Defendants' broad stay request as well.

Defendants' alternative proposal for a stay limited to new applications for DACA or advance parole raises different issues. Although Defendants' position on the merits is no stronger, the equities are different. Plaintiffs believe that DACA should be available to all those eligible, including new applicants, but they also recognize that an imperfect "status quo"—no new applicants, but renewals continue—has developed, and that this interim arrangement has allowed for the orderly consideration of legal issues concerning the rescission of DACA and DACA's legality. For reasons and on terms explained in more detail below, Plaintiffs do not oppose a limited stay with respect to new applicants.

1

**ARGUMENT**

I.  **Legal Standard.**

Courts weigh four factors in deciding whether to grant a stay: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see, e.g.*, *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017).[1]

II. **The Court Should Not Stay Its Order With Respect To DACA Renewals.**

Defendants' request for a broad stay of this Court's order, encompassing even the continued processing of DACA renewals, should be denied. In the context of renewals, each of the stay factors weighs heavily against that relief.

A.  **Defendants Are Very Unlikely To Succeed On The Merits.**

Defendants claim that the D.C. Circuit is likely to reverse this Court on appeal, or at least that they will "present a substantial challenge" to this Court's holding. Mot. (Dkt. 82) at 6. But this Court already considered and rejected each of Defendants' arguments in two detailed opinions, and nothing in either opinion suggests that this was a close case. Accordingly, Defendants cannot explain why any of their arguments are likely to prevail on appeal.

---

[1] As this Court has observed, "[t]here is an ongoing debate as to whether courts may still use a 'sliding scale' approach in analyzing these four factors, where a strong showing on one factor may compensate for a weaker showing on another." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 245 n.1 (D.D.C. 2017) (addressing preliminary injunction standard); *see, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (reserving the question). For present purposes, Plaintiffs do not contest that the Court may weigh its assessment of Defendants' likelihood of success on appeal together with the various equities in determining whether—or to what extent— to grant the relief Defendants seek. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, No. 1:16-cv-01460-APM, --- F. Supp. 3d ---, 2018 WL 3304627, at *3 (D.D.C. July 5, 2018); *accord* Mot. (Dkt. 82) at 4.

2

First, the D.C. Circuit is very unlikely to hold that the rescission is insulated from review by *Heckler v. Chaney*, 470 U.S. 821 (1985). Indeed, this Court found it "clear" that "courts have the authority to review an agency's interpretation of the law if," as in this case, "it is relied on to justify an enforcement policy." *NAACP v. Trump (NAACP I)*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). As this Court has now explained on two occasions, that rule simply reflects the limits on *Chaney*'s holding that the D.C. Circuit recognized in *Crowley Caribbean Transport, Inc. v. Peña*, 37 F.3d 671 (D.C. Cir. 1994), and *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998), among other cases. *See NAACP v. Trump (NAACP II)*, No. 17-cv-1907-JDB, --- F. Supp. 3d ---, 2018 WL 3702588, at *7-8 & nn.8-9 (D.D.C. Aug. 3, 2018); *NAACP I*, 298 F. Supp. 3d at 227-34. In fact, as *NAACP II* pointed out, the D.C. Circuit "recently confirmed" in *Citizens for Responsibility & Ethics in Washington v. FEC*, 892 F.3d 434 (D.C. Cir. 2018), that Defendants' reviewability arguments are at odds with "Circuit law." *NAACP II*, 2018 WL 3702588, at *7-8 nn.8-9.

Defendants claim that *International Union, UAW of America v. Brock*, 783 F.2d 237 (D.C. Cir. 1986), shows this Court's analysis to be "susceptible to serious debate." Mot. 6. But to the contrary, *International Union* concluded that when an enforcement decision "is predicated solely on the agency's interpretation of a statute," "the court has law to apply in determining whether the agency erred." 783 F.2d at 245 n.10; *see id.* at 246 ("[I]t seems almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*."); *see also NAACP I*, 298 F. Supp. 3d at 228 (citing *International Union* as an example of a *broad* view of reviewability). In any event, it is highly unlikely that the D.C. Circuit will hold that a general policy predicated exclusively or overwhelmingly on a legal judgment is entirely immune from judicial review—such that an agency official may "claim that the law ties her hands while at the

3

same time denying the courts' power to unbind her" and thereby escape both "political accountability" and "judicial review." *Id.* at 249.[2]

Defendants' merits arguments with respect to Plaintiffs' substantive APA claim are no more persuasive. As this Court has explained, the Duke and Nielsen Memos "offer[] nothing *even remotely approaching* a considered legal assessment that this Court could subject to judicial review." *NAACP II*, 2018 WL 3702588, at *11 (emphasis added). By making clear that its resolution of Plaintiffs' arbitrary-and-capricious challenge was not a close call, this Court has already effectively rejected Defendants' assertion that their contrary position on the same issue is at least "substantial and compelling." Mot. 6. In any case, Defendants' "conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or *post hoc* policy assertions," is very unlikely to persuade the D.C. Circuit to reverse. *NAACP II*, 2018 WL 3702588, at *13.[3]

Furthermore, reversal on the merits is especially unlikely because, even if Defendants could somehow persuade the D.C. Circuit of the explanatory sufficiency of the barebones Duke and Nielsen Memos, that would only mean that the question of the *correctness* of Defendants' legal analysis would be squarely presented in the court of appeals. *See, e.g.*, *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 420 (E.D.N.Y. 2018) ("An agency decision that is based on an

---

[2] Defendants' likelihood of success on the reviewability issue is further diminished by the possibility that, even in the unlikely event that the D.C. Circuit rejects this Court's analysis, the court of appeals *still* could hold for Plaintiffs on alternative grounds that this Court rejected. *Compare Regents of Univ. of Cal. v. U.S. DHS*, 279 F. Supp. 3d 1011, 1030-31 (N.D. Cal. 2018) (finding the Duke Memo reviewable in part because it is not a *non*-enforcement decision and rescinds an existing program), *with NAACP I*, 298 F. Supp. 3d at 230-31 (rejecting similar arguments).

[3] Defendants point once again (Mot. 7-8) to the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), but that case remains "'inapposite' here given the meaningful distinctions between DAPA and DACA, which include DAPA's open-ended nature, broad scope, and apparent conflict with express provisions of the INA." *NAACP II*, 2018 WL 3702588, at *11 (quoting *NAACP I*, 298 F. Supp. 3d at 239).

4

erroneous legal premise cannot withstand arbitrary-and-capricious review."); *see also NAACP I*, 298 F. Supp. 3d at 242 & n.26 (finding it unnecessary to reach this issue in light of Defendants' inadequate explanation). In order to reverse this Court's judgment, therefore, the D.C. Circuit would *also* need to side with Defendants on the ultimate question of DACA's legality. Yet every court to reach DACA's legality thus far has upheld it, and the merits of the legal arguments strongly favor that result. *See Regents of Univ. of Cal. v. U.S. DHS*, 279 F. Supp. 3d 1011, 1042 (N.D. Cal. 2018) (concluding that "DACA was and remains a lawful exercise of authority by DHS"); *Batalla Vidal*, 279 F. Supp. 3d at 426 (similar); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 208-09 (D.D.C. 2014) (concluding that substantive APA challenge to DACA was unlikely to succeed), *aff'd on other grounds*, 797 F.3d 11 (D.C. Cir. 2015); *see also* Pls.' Mot. For Summ. J. ("MSJ") at 17-27 (Dkt. 28-1) (explaining why DACA is legal). Because Defendants will need to win on not one but two long-shot arguments, their compound probability of success on the merits is significantly lower than even their slim chances of clearing either hurdle standing alone.[4]

Defendants emphasize the District of Maryland's disagreement with this Court's ultimate conclusion about the rescission (Mot. 2, 6-7). But that court did not have the benefit of this Court's reasoning, and in any event Defendants do not identify any actual analysis in that court's opinion that is likely to persuade the D.C. Circuit. As the Supreme Court has made clear, "the mere existence … of conflicting authority in state or lower federal courts[ ] does not establish" that both conflicting positions are "reasonable," let alone that they are both substantially likely to be vindicated on appeal. *Chaidez v. United States*, 568 U.S. 342, 353 & n.11 (2013) (internal

---

[4] Defendants' prospects for success are further undermined by the possibility that the D.C. Circuit could affirm on the basis of Plaintiffs' notice-and-comment argument (even though this Court rejected it). And, notably, that challenge to the rescission is wholly independent of Defendants' reviewability arguments. *See Lincoln v. Vigil*, 508 U.S. 182, 195-96 (1993).

5

quotation marks omitted). Here, the three separate decisions invalidating the Duke Memo are both more persuasive and more predictive than the decision identified by Defendants.

Finally, Defendants stress that, under the sliding-scale approach, they need not show that they are *more likely than not* to prevail on the merits. Mot. 4-5. But if the most the Court can say for Defendants' merits arguments is that they "at least leave 'fair ground for litigation,'" Mot. 7 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977))—and, for the reasons given above, that is the very most the Court could conclude here—then Defendants' showing on the other stay factors must be unusually robust to compensate for that deficiency.[5] While Defendants' unpersuasive position on the merits is not independently fatal, then, it requires them to make up a great deal of ground on the equitable factors. As explained below, however, Defendants' case on the equities—at least with respect to renewals for current DACA beneficiaries—is only *weaker* than their showing on the merits.

### B. The Equities Weigh Heavily Against A Stay With Respect To Renewals.

Insofar as DACA renewals are concerned, the practical effect of this Court's vacatur is the same as that of the *Regents* and *Batalla Vidal* injunctions. *Accord* Mot. 10. Thus, this Court's stay decision with respect to renewals will only have any effect in the event that those other injunctions are reversed, narrowed, or stayed while Defendants' appeal is ongoing. As this Court has explained, "although the preliminary injunctions in *Regents* and *Batalla Vidal* currently protect

---

[5] Thus, for example, raising a "serious question" on the merits is only a permissible substitute for establishing a genuine likelihood of success if the movant also shows that "the balance of hardships tips *sharply* in his favor." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (emphasis added); *see id.* (indicating that a genuine probability of success on appeal must be established "when interim relief would cause substantial harm to another party"); *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (noting that a "lower standard can be applied for likelihood of success," but only if "the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant").

6

aliens who have already received DACA grants, those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future." *NAACP I*, 298 F. Supp. 3d at 245. In addition, those injunctions depend on "the propriety of so-called nationwide injunctions," a "debate [that] is not implicated" by this Court's order. *NAACP II*, 2018 WL 3702588, at *13 n.13; *cf.* Federal Appellants' Opening Brief at 53, *Regents of Univ. of Cal. v. U.S. DHS*, No. 18-15068 (9th Cir. Feb. 13, 2018) (arguing that the *Regents* injunction should at least be narrowed so that it protects only "particular DACA recipients whose loss of DACA would cognizably injure [the *Regents*] plaintiffs"). It is thus possible that the *Regents* and *Batalla Vidal* injunctions could be narrowed in a manner that deprives Plaintiffs and others of their protection.

In light of these circumstances, this Court should weigh the equities bearing on Defendants' stay motion by evaluating the effects that a stay would have if, during the pendency of Defendants' appeal in this case, the *Regents* and *Batalla Vidal* injunctions cease to require DACA renewals (or at least cease to require them on a nationwide basis). As explained below, leaving this Court's order in place with regard to renewals would not inflict any meaningful irreparable harm on Defendants in that scenario, but Plaintiffs and other interested parties would be profoundly injured by the cessation of renewals, and the public interest cuts sharply against allowing that outcome as well.

> **1. Defendants Have Not Established That They Will Suffer Any Meaningful Harm Absent A Stay With Respect To Renewals.**

Defendants make a perfunctory assertion that they would suffer irreparable harm from continuing to process renewals, but they focus overwhelmingly on the alleged harm from processing new applications. *See* Mot. 8-10. Setting the latter issue aside for the moment, *see infra* § III (discussing the equities with respect to new applications), Defendants' assertion of harm *from processing renewals* lacks any substance.

7

First of all, Defendants' one-paragraph discussion rests almost entirely on a generic interest in enforcing the law as they see fit. *See* Mot. 8. Absent a showing of actual, concrete harm from the delay in implementing their preferred policy, however, that boilerplate assertion carries little weight. *Cf. Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (detailing the "ongoing and concrete harm to Maryland's law enforcement and public safety interests"). Indeed, Defendants' failure to actually explain how, in real-world terms, anyone is harmed by continuing DACA renewals echoes their persistent failure, throughout this litigation, to defend their rescission decision on policy grounds. Defendants' abstract claim of injury to the government's enforcement policies is particularly weak when the President himself has argued that, as a policy matter, exposing DACA beneficiaries to the risk of removal would be a grave mistake. *See Regents*, 279 F. Supp. 3d at 1047 ("'Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!'" (quoting a public statement by President Trump)).

In any event, it is simply untrue that this Court's order "prevent[s] the Secretary from exercising her authority … to administer and enforce the INA" (Mot. 8). In fact, the Court took pains in *NAACP II* to disavow any such implication—explaining that "[t]he Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program," but rather "simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision." *NAACP II*, 2018 WL 3702588, at *13; *see also id.* at *7 n.7 (noting that Secretary Nielsen could have "opted to issue a new decision rescinding DACA" on policy grounds but chose not to do so).

8

Finally, Defendants' claim of irreparable harm in connection with renewal applications is also fatally undermined by their decision not to seek any stay of the *Regents* and *Batalla Vidal* injunctions. The government has already been processing renewals pursuant to those court orders since January. *See Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 437. Government agencies suffering serious and irreparable injuries do not ordinarily wait seven months to act. Defendants' unexplained delay in seeking relief from the processing of renewal applications thus eviscerates whatever remains of their claim of irreparable harm. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317-18 (1983) (Blackmun, J., in chambers) (explaining that an agency "ha[d] not been particularly expeditious in seeking a stay" and that the "failure to act with greater dispatch tends to blunt [its] claim of urgency and counsels against the grant of a stay"); *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers) ("The applicants' delay in … seeking a stay vitiates much of the force of their allegations of irreparable harm"); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) ("In considering the balance of equities among the parties, we think that plaintiffs' unnecessary … delay in asking for preliminary injunctive relief weighed against their request.").

### 2. A Stay With Respect To Renewals Will Seriously Injure Plaintiffs, Other Interested Parties, And The Public Interest.

Staying this Court's order with respect to DACA renewals would "substantially injure the other parties interested in the proceeding," including both Plaintiffs and their numerous similarly situated *amici*,[6] and it would gravely disserve "the public interest" as well. *Nken*, 556 U.S. at 434. Indeed, under the circumstances, the weight of this factor alone should dispose of the renewals portion of Defendants' stay motion.

---

[6] *See, e.g.*, Dkt. 31 (112 companies); Dkt. 32 (legal aid organizations); Dkts. 33, 34 (numerous colleges and universities).

9

*First,* as this Court has explained, "DACA … engendered the reliance of hundreds of thousands of beneficiaries, many of whom ha[ve] structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits." *NAACP I*, 298 F. Supp. 3d at 240; *see id.* at 240 n.24 (collecting examples in the record); *see also NAACP II*, 2018 WL 3702588, at *12 (emphasizing again "the serious reliance interests at issue here"). But if renewals are discontinued, DACA recipients will begin to lose their status at an alarming rate—between 500 and 1,000 people per day. *See* DHS Quarterly Summary Report, ex. B, at 1, *Regents*, No. 3:17-cv-5211 (N.D. Cal. July 2, 2018), Dkt. 277-2 (reporting that 17,500 grants expire in September 2018; that 30,320 expire in October 2018; and that 24,040 expire in November 2018). This will be a catastrophic event for each of the affected individuals, as well as for their families and communities. *See NAACP I*, 298 F. Supp. 3d at 245 (noting the "troubling humanitarian consequences" of allowing the rescission to take effect).

The assorted devastating consequences of a lapse in DACA status will be irreversible even if this Court's order is ultimately upheld on appeal. First, the thousands of DACA beneficiaries who lose their DACA status will also lose their work authorization, and consequently their jobs. Many of them will no longer be able to support their families as a result. *See Regents*, 279 F. Supp. 3d at 1047 (explaining that allowing the rescission to take effect "would tear authorized workers from our nation's economy and would prejudice their being able to support themselves and their families"); MSJ App. 2681-82 Topics 9, 10. All who lose status or face the prospect of doing so will also undergo a period of profound disruption and uncertainty, exacting a personal, professional, and psychological toll that cannot be remedied even if the uncertainty is ultimately resolved in their favor. *See* MSJ at 42-43. And worst of all, a lapse in the DACA program will expose thousands of people to an immediate risk of deportation, potentially ripping them from

10

their families and sending them to countries they may never have known at all—an irreversible harm that is "the equivalent of banishment or exile." *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (quotation marks omitted). That result is severe under any circumstances, particularly with respect to people who "were brought to this country as children" and "lacked the intent to violate the law." AR 1. But it would be particularly harsh to impose this harm pursuant to an agency action that this Court has *already* adjudged unlawful, and with no way to ensure that those who may be deported will be able to return to this country and resume their prior status if and when this Court's order is upheld on appeal.

*Second*, companies that employ DACA beneficiaries, such as Plaintiff Microsoft, will suffer irreparable harms from a stay as well. As the amicus brief for 112 companies explains in detail, allowing the rescission to take effect would wreak havoc throughout the economy, with tens of thousands of trained employees becoming suddenly ineligible to continue in their jobs. *See* Dkt. 31, at 5-11. Because all DACA beneficiaries have at least a high school degree or equivalent, and many have pursued higher education as well, they are now enmeshed in vital positions throughout the private sector. Thus, for example, Plaintiff Microsoft and its subsidiary LinkedIn would potentially forfeit all they have invested to recruit, hire, and train their DACA recipient employees and bear costs and disruptions imposed by the need to identify, recruit, hire, train, and integrate new workers. *See* MSJ App. 96-98 (Radu Decl. ¶¶ 3-4, 6, 9).

*Third*, colleges and universities that educate DACA beneficiaries, such as Princeton, will suffer equally serious harms. As explained in the two amicus briefs submitted by dozens of colleges and universities, allowing DACA's rescission to proceed will preclude DACA beneficiary students from deriving the full benefit of their time on campus, Dkt. 34, at 2, and it will preclude the universities from enjoying the benefits of their full participation, Dkt. 33, at 13-14. Likewise,

the rescission of DACA will disrupt schools' access to a pipeline of talented students with unique contributions to make. Dkt. 34, at 7.

*Fourth*, the Association Plaintiffs will all be irreparably harmed if any of their members' DACA status is lost. For example, NAACP members who are DACA recipients are integral to the organization's local, community-based grassroots work. As those members lose their status, the NAACP will lose the value of the comprehensive training it has provided to them, including with respect to advocacy on issues affecting the African Diaspora. *See* MSJ App. 2623 (Johnson Decl. ¶¶ 22-24). Likewise, the labor union plaintiffs will lose their valued members who are DACA beneficiaries, and the myriad contributions they make to the unions' work, as those individuals lose their work authorization. *See* MSJ App. 2599 (Weingarten Decl. ¶ 20); MSJ App. 2646-47 (Lopez Decl. ¶¶ 23-24).

It simply makes no sense to impose these catastrophic disruptions *before* the court of appeals even addresses the merits of this case, let alone when this Court's order is likely to be affirmed and Defendants face no meaningful harm in the interim.

## III. A Stay with Respect to Initial DACA Applications Or Advance Parole Presents a Different Question.

Many of the same considerations outlined above also weigh against staying the Court's order with respect to initial DACA applications and advance parole. The merits questions are exactly the same, as this Court pointed out in its original opinion. *See NAACP I*, 298 F. Supp. 3d at 245 n.30. And as this Court also recognized, there is a powerful equitable interest in ensuring prompt relief to initial DACA applicants who have so far been denied the opportunity to seek protection from removal only because of unlawful agency action. *See id*. at 245 ("[E]ach day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action."). Indeed, Defendants

12

report that there are nearly 50,000 people "who were projected to have requested initial DACA in September 2017 and FY 2018, but who were unable to do so due to the rescission of the DACA policy." Renaud Decl. ¶ 9, Dkt. 82-1.

At the same time, the Court's order follows two nationwide injunctions that have compelled the government to continue processing DACA renewals, but not to accept new applications (for DACA status or advance parole). *See Batalla Vidal*, 279 F. Supp. 3d at 437 ("[T]he court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications."); *Regents*, 279 F. Supp. 3d at 1049 ("[W]hile plaintiffs have demonstrated that DACA recipients, as well as their families, schools, employers, and communities, are likely to suffer substantial, irreparable harm as a result of the rescission, they have not made a comparable showing as to individuals who have never applied for or obtained DACA."). Defendants have thus suggested the possibility of a compromise in which this Court's order is stayed only with respect to new DACA applications and advance parole, so that its immediate effect continues to be essentially coterminous with the existing injunctions. *See* Mot. 8-11. Defendants also claim that requiring the processing of new DACA applications in the short term would impose significant administrative burdens that could interfere with the administration of other forms of immigration relief. *Id.* at 9-10; *see* Renaud Decl. ¶ 11, Dkt. 82-1.

Because DACA has not lawfully been rescinded, Plaintiffs believe that DACA should be available to all those eligible, including new applicants. That said, Plaintiffs also recognize that, over the last eight months, multiple courts have drawn a distinction between new applicants and renewals, and that an imperfect "status quo"—no new applicants, but renewals continue—has

13

developed which has allowed for the orderly consideration of legal issues concerning the rescission of DACA and DACA's legality. The government has generally eschewed emergency relief because it cannot plausibly claim irreparable harm with respect to renewals, and courts have been able to consider DACA matters in the ordinary course (albeit expeditiously). Plaintiffs acknowledge that this orderly progression through the judicial-review process, allowing full and fair consideration of the issues, has significant benefits for Plaintiffs and ultimately for all current and potential DACA beneficiaries.

Plaintiffs are also cognizant that the litigation strategy recently adopted by the State of Texas and other plaintiffs in the Southern District of Texas threatens to upend the interim status quo, with potentially destructive consequences for Plaintiffs and for hundreds of thousands of current DACA beneficiaries. *See Texas v. United States*, No. 1:18-cv-68 (S.D. Tex. filed May 1, 2018) ("*Texas II*"). In particular, the *Texas II* plaintiffs have sought to use the prospect that *new* DACA applications will soon be granted (pursuant to this Court's order) as a basis for a misguided claim of imminent and irreparable harm warranting an urgent preliminary injunction in that case—even though such an order would conflict with the other injunctions, and even though those plaintiffs failed to challenge DACA in any way for more than five years. For example, the States have asserted that this Court's August 3 order imposes a "shot clock [of] August 23rd" for injunctive relief in the *Texas II* case and have specifically "ask[ed] for an injunction now to prevent that unlawful program from coming back into full existence" pursuant to this Court's order. Aug. 8, 2018 Hr'g Tr. at 79-80, *Texas II*, Dkt. 302 (attached hereto as Ex. A).[7]

---

[7] *See also* State Pls.' *Post-Discovery Response Br.* at 52, *Texas II*, Dkt. 282 ("No need for litigation arose until April 24, 2018, when the district court for the District of Columbia issued its order enjoining DACA's rescission."); Mot. for Prelim. Injunction at 8, *Texas II*, Dkt. 5 (arguing that a preliminary injunction is needed because "the District of Columbia district court recently ordered the Executive to process not only DACA renewals, but *new* DACA applications").

14

Plaintiffs do not believe that the grant of DACA status to those eligible is a basis for anyone to claim irreparable harm. But Plaintiffs also do not wish to facilitate the States' attempt to use this Court's order in aid of their effort to procure an order that enjoins DACA itself—thereby potentially disrupting the program both for Plaintiffs and for hundreds of thousands of existing beneficiaries who rely on their DACA status. For that reason, Plaintiffs believe that the Court could consider a limited stay of its order with respect to new applicants and advance parole, subject to the following understandings:

- Under the sliding-scale approach, such a limited stay, based on the recognition that multiple courts are currently considering the rescission of DACA and related matters, would not suggest that Defendants are likely to prevail on the merits. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *see also NAACP I*, 298 F. Supp. 3d at 245 n.30 (explaining that "a court has discretion to craft preliminary injunctive relief based on a number of equitable factors," whereas "its discretion in fashioning administrative remedies," such as this Court's underlying vacatur order, "is somewhat more limited").

- Such a limited stay would affirm that the equities favor permitting current DACA beneficiaries to retain their status and to continue to rely on their protection from removal and work authorization while litigation proceeds.

- Such a limited stay would preserve the "status quo" outlined above, allowing for the orderly consideration of the ongoing legal challenges to the rescission of DACA and, Plaintiffs expect, leading ultimately to an affirmance of the legality of DACA (and the illegality of the Duke Memo) by the courts.

15

Framed in this manner, Plaintiffs do not oppose such a limited stay, despite their belief that DACA should be available to all those eligible. Plaintiffs adamantly oppose a stay with respect to renewals, in light of all of the profoundly harmful and disruptive consequences such a stay would impose.[8]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' stay motion with respect to DACA renewals, and Plaintiffs do not oppose Defendants' stay motion with respect to new applications for DACA or advance parole.

Dated: August 15, 2018

By: /s/ Joseph M. Sellers
Joseph M. Sellers (D.C. Bar No. 318410)
Julie S. Selesnick (D.C. Bar No. 485558)
Julia A. Horwitz (D.C. Bar No. 1018561)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
T: (202) 408-4600
F: (202) 408-4699
jsellers@cohenmilstein.com

*Attorneys for Plaintiffs NAACP; American Federation of Teachers, AFL-CIO; United Food and Commercial International Union, AFL-CIO, CLC*

Respectfully submitted,

By: /s/ Thomas J. Perrelli
Thomas J. Perrelli (D.C. Bar No. 438929)
Lindsay C. Harrison (D.C. Bar No. 977407)
Sam Hirsch (D.C. Bar No. 455688)
Ishan Bhabha (D.C. Bar No. 101567)
Benjamin M. Eidelson (D.C. Bar No. 1031574)
Alex Trepp (D.C. Bar No. 1031036)
Kendall Turner (D.C. Bar No. 144701)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
tperrelli@jenner.com

*Attorneys for The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez*

---

[8] If the Court does not grant a stay pending appeal with respect to new applications, Plaintiffs do not oppose (1) affording Defendants an initial, fixed-term stay for a reasonable period so that they may operationally prepare for compliance, and (2) affording Defendants a brief administrative stay (with respect to new applications) while they seek a stay pending appeal in higher courts. Plaintiffs oppose any stay with respect to DACA renewals.

16