United States District Court
Southern District of Texas
**ENTERED**
August 31, 2018
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

State of Texas, *et al.*,
    *Plaintiffs*,

v.

The United States of America, *et al.*,
    *Defendants*,

Karla Perez, *et al.*,
    *Defendant-Intervenors*,

and

State of New Jersey,
    *Defendant-Intervenor*.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 1:18-CV-00068

## MEMORANDUM OPINION AND ORDER

Eight states and two governors[1] are seeking declaratory and injunctive relief and ask this Court to hold that the Deferred Action for Childhood Arrivals ("DACA") program is illegal because its creation and continued existence violate the procedural and substantive aspects of the Administrative Procedure Act ("APA"). 5 U.S.C. § 500 *et seq*. Plaintiffs also seek relief based on their claim that DACA violates the Take Care Clause[2] of the United States Constitution. U.S. Const. art. II, § 3. This order addresses the States' request for a preliminary injunction.

The Defendants in this matter are the United States, Secretary of the Department of Homeland Security ("DHS") Kirstjen M. Nielsen, Commissioner of the Customs and Border Protection ("CBP") Kevin K. McAleenan, Deputy Director of the United States Immigration and

---

[1] The Plaintiffs are Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and the governors of Mississippi and Maine. They will be referred to collectively as "Plaintiff States" or "States."

[2] This Court will refer to the Take Care Clause with initial capital letters, although many authorities use a lower case initial letter in the word "take," as that is how it appears in the Constitution.

Customs Enforcement Agency ("ICE") Thomas D. Homan,[3] Director of the United States Citizenship and Immigration Services ("USCIS") L. Francis Cissna, and Chief of the United States Border Patrol Carla L. Provost.[4] After the case was filed but before any substantive activity had taken place, twenty-two DACA recipients intervened as Defendants. The State of New Jersey also requested and received permission to intervene as a Defendant.[5] Finally, numerous other groups and entities have asked for and received this Court's permission to act as amicus curiae.

The Plaintiff States have asked this Court to preliminarily enjoin the Government from issuing or renewing any DACA permits in the future. If this relief is granted, and ultimately if this relief becomes permanent, it could have the effect of terminating the DACA program—a result the Defendant-Intervenors vehemently oppose. The Plaintiff States also request a declaratory judgment that DACA is contrary to the standards of the APA, as well as the Take Care Clause of the United States Constitution, findings which, if upheld, would also require the termination of the DACA program.

## I.    What Is and Is Not Before the Court

The Court is not faced with questions about a duly enacted statute or a duly enacted federal regulation or even an order by the President. DACA was a program instituted pursuant to the orders of then-Secretary of Homeland Security, Janet Napolitano. Those instructions were set forth in a memorandum dated June 15, 2012, and remained in force without amendment until 2014 when her successor, Secretary Jeh Johnson, attempted to create a sister program, Deferred

---

[3] Thomas D. Homan was named as a Defendant when this lawsuit was filed. He has since retired and Ronald D. Vitiello now serves as the Deputy Director and Senior Official Performing the Duties of Director.

[4] These Defendants will be collectively referred to as "the Government" or "the Defendants."

[5] The DACA recipients and New Jersey will be collectively referred to as the "Defendant-Intervenors." When necessary to refer to one group specifically, the Court will use the terms "individual Defendant-Intervenors" and "New Jersey."

Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). At that time, Secretary Johnson also attempted to put into place certain expansions of the DACA program ("Expanded DACA"). Both the implementation of the DAPA program and Expanded DACA were enjoined by this Court in 2015. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). This injunction was affirmed by the Fifth Circuit Court of Appeals, *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), and then later by a split vote in the Supreme Court of the United States. *United States v. Texas*, 136 S. Ct. 2271 (2016) (this litigation will be referred to as *Texas I*).

Upon remand, the parties asked this Court to postpone entering a scheduling order that would have otherwise governed the proceedings to a final conclusion on the merits. Throughout this time, the original 2012 DACA memorandum remained in force. Ultimately, the parties all agreed to dismiss the case:

### Plaintiffs' Stipulation of Voluntary Dismissal

> On June 15, 2017, the U.S. Department of Homeland Security released a memorandum entitled *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").* On September 5, 2017, the Department released a memorandum entitled *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Given these memoranda rescinding the DAPA program and phasing out the DACA and Expanded DACA programs, Plaintiffs file this stipulation of voluntary dismissal.* See Fed. R. Civ. P. 41(a)(1)(A)(ii) (allowing plaintiffs to dismiss an action, without court order, by filing a stipulation of dismissal by all parties who have appeared).

*Texas I*, [Doc No. 473] (emphasis added).

This stipulation of dismissal was signed by the attorneys for the plaintiffs (a group that included all of the Plaintiff States in this case), the United States and the federal government defendants, and the putative DAPA recipients who had intervened. As is evident from its text,

3

the stipulation was clearly based in part upon the Government "phasing out the DACA and Expanded DACA programs." It is also clear that all parties agreed to the stipulation, which otherwise would have required court action. As per its very language, the stipulation was based upon Fed. R. Civ. P. 41(a)(1)(A)(ii), which requires the dismissal to be signed by counsel for all parties who have appeared in order to be effective.

While this Court has no way of knowing the decision-making process exercised by the parties in *Texas I*, it seems that at least the Plaintiff States here seek the same result they thought they had achieved with the stipulation of dismissal. The Government has attempted to phase out DACA, as it represented to the Plaintiff States it would, but it is prevented from doing so by various orders of other courts around the nation that have enjoined or vacated the attempt to end the program. The Government is thus thrust into the position of a somewhat reluctant warrior— having to defend a program (in order to comply with court orders) that it had agreed to phase out in order to rid itself of the 2014 lawsuit that was pending in this Court. As stated earlier, the Defendant-Intervenors are DACA recipients who wish to prevent the abolition of this program and who have been joined in this effort by the State of New Jersey. They are clearly not reluctant warriors and are squarely pitted against the propositions argued by the Plaintiff States.

## A.     What Issues Are Before the Court

Thus, this Court is faced with only three primary issues involving the DACA program in the context of a request for a preliminary injunction:

1) Did the creation of DACA, and its continued operation, violate the Take Care Clause of the Constitution?

2) Does the DACA program violate the substantive standards of the APA?

3) Did the manner in which DACA was created violate the procedural requirements of the APA?

While these three primary issues have many elements and ancillary questions that will be addressed, the parties have raised many extraneous issues with their arguments, evidence, and pleadings that will not be discussed.

**B.      What Issues Are Not Before the Court**

Consequently, all other issues, including the following, are not before the Court:

1) This Court is not commenting on or deciding the popularity of or the relative wisdom of Secretary Napolitano's decision to implement the DACA program or the DHS's decision to phase out the DACA program.

2) This order does not and should not be read to suggest or require the DHS or the Department of Justice to prosecute or initiate immigration or deportation proceedings against any individual or group of individuals.

3) This Court is not deciding whether the DACA recipients are ultimately beneficial or detrimental to the well-being of the States, nor is it deciding if they ultimately benefit or burden the States' economies.

4) This opinion does not address, nor should be read as a comment upon, the relative merits of immigration, legal or otherwise, except insofar as it must to decide whether the DACA program itself (and the manner in which it was instituted) is legal.

5) The DACA program was not created as an asylum program, and nothing herein should be read as affecting the rules and laws governing asylum. While there seem to be differences of opinion as to what constitutes an "amnesty" program, nothing herein should be read as favoring or disfavoring the concept of asylum or amnesty.

6) The Court is not called upon to, nor will it, create or substitute its own notion of an immigration policy, as Courts are not the vehicles to enact the legislative policies that

control immigration. That is the sole province of Congress.[6]

7) This Court cannot and will not weigh or critique the attributes and qualities of any of the individual DACA recipients, including the Defendant-Intervenors herein. For purposes of this order concerning injunctive relief, the Court accepts as true the testimony and affidavits of the individual Defendant-Intervenors, assumes they are individuals of sound character, and relies *in toto* on the representations made by their counsel as to each one being a person of good repute.

8) Since the DACA program is one of non-enforcement of the laws enacted by Congress and since it is one allegedly predicated on the Executive Branch's historical right to exercise prosecutorial discretion, this Court may necessarily need to discuss certain aspects of law enforcement. Nevertheless, nothing herein should be interpreted as representing this Court's opinion either in favor of, or in opposition to, the means or methods of law enforcement being utilized by this or any prior administration. Further, nothing in this opinion should be read as ordering law-enforcement officials how to prioritize objectives, deploy individuals, or marshal their resources. It is not within this or any other court's purview to dictate to the Executive Branch what means or methods it should use to enforce the law—as long as the means and methods are legal and the Executive Branch is actually enforcing the law.

## II. Factual Background

For many years, Congress has considered granting legal status to the so-called "Dreamers" (typically defined as aliens who came to or were brought to the United States as

---

[6] *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (citing U.S. Const. art. I, § 8, cl. 4 ["The Congress . . . shall have Power . . . To establish an uniform Rule of Naturalization"] and explaining that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens").

children). Nevertheless, for whatever reason, Congress has failed or refused to pass any such legislation. In June of 2012, the DHS adopted such a program by means of a memorandum issued by then-Secretary Janet Napolitano. Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1]. An illegal alien[7] applicant can qualify for the DACA program if he or she:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

*Id.* Instead of just using its power of prosecutorial discretion not to enforce the national immigration laws as to these qualifying individuals, the DHS, as an integral part of the DACA

---

[7] The Court understands that some people find the phrase "illegal alien" offensive. The Court uses this term because it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of law. *See Arizona v. United States*, 567 U.S. 387, 397 (2012). Furthermore, the Fifth Circuit in the *Texas I* opinion explains why "illegal alien" is a preferable label in a case like this:

> "The usual and preferable term in [American English] is *illegal alien*. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, 'not having the requisite documents to enter or stay in the country legally.' But the word strongly suggests 'unaccounted for' to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
>
> More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[] the implication that one's unauthorized presence in the United States is a crime . . . . Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence 'illegal')."
>
> (quoting Bryan A. Garner, Garner's Dictionary of Legal Usage 912 (Oxford 3d ed. 2011)). "*[Il]legal alien* has going for it both history and well-documented, generally accepted use." Matthew Salzwedel, *The Lawyer's Struggle to Write*, 16 Scribes Journal of Legal Writing 69, 76 (2015).

*Texas I*, 809 F.3d at 148 n.14.

program, went further and conferred "lawful presence" on them. Not only does DACA effectively exempt its recipients from prosecution and placement into immigration proceedings for a renewable two-year period, but it also makes the recipients eligible for numerous federal and state benefits, despite the INA's general rule that unlawfully present aliens are "not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). For example, unlawfully present aliens would normally be barred from receiving Social Security retirement benefits, Social Security disability benefits, and health insurance under Part A of the Medicare program because these are federal public benefits. DACA, however, by making its recipients lawfully present, removes an otherwise insurmountable roadblock to their receipt of Social Security, Medicare, and other benefits.[8] *Id.* § 1611(b)(2)–(4); *see also Texas I*, 809 F.3d at 148–49.

Additionally, DACA not only allows, but requires its recipients to apply for work authorization. [Doc. No. 6, at 5] (instructing USCIS to consider DACA applicants for work authorization); [Doc. No 5, Ex. 20, at 23] (requiring DACA applicants to submit an application for work authorization). Once a recipient has work authorization, he or she can become eligible for a Social Security number, along with its attendant benefits.[9] 20 C.F.R. §§ 422.104(a)(2), 422.105(a); 8 C.F.R. § 1.3(a)(4)(vi). Further, DACA recipients are also eligible for certain state benefits, such as a Texas driver's license and access to Texas's state-subsidized work-study program. *See* Tex. Transp. Code § 521.142(a); Tex. Educ. Code § 56.075(a)(1); 19 Tex. Admin. Code § 22.128(12); *id.* § 21.24(d)(5).

---

[8] DACA recipients must still meet the normal criteria to qualify for these benefits. Without lawful presence, however, even an alien who met those criteria would still be ineligible for the benefits. *Texas I*, 809 F.3d at 148–49. In addition to Social Security and Medicare benefits, DACA recipients also can become eligible for benefits under the Railroad Retirement Act of 1974 and the Railroad Unemployment Insurance Act. 8 U.S.C. § 1611(b)(4).

[9] Among these benefits are earned income tax credits, which require a Social Security number. *See* 26 U.S.C. § 32(c)(1)(E), (m); *see also Texas I*, 809 F.3d at 149.

An estimated population of 1.5 million people[10]—greater than the populations of at least ten states—potentially qualify for these benefits. The Napolitano memorandum, however, specifically concluded by stating that:

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.[11]

Over the years, more than 800,000 individuals have applied for and received "lawful presence" via DACA which, despite the Secretary's statement, is a form of status, as it prevents one from being put into removal proceedings and qualifies an individual for a variety of benefits or privileges under state and federal law. This status and its exact parameters have led to confusion even at the highest levels. For example, during the appeal of *Texas I*, the following exchange took place during the Supreme Court argument:

---

[10] Evidence provided to the Court differs in its estimates of the total number of actual and potential DACA recipients. *See* Decl. of Douglas S. Massey [Doc. No. 225, Ex. 73, at 7] ("According to the latest statistics from U.S. Citizen and Immigration Services (2018), there are 814,000 young people registered for DACA."); Decl. of M. Ray Perryman [Doc. No. 225, Ex. 74, at 6] ("As of March 31, 2018, there were 693,850 persons across the country enrolled in DACA . . . ."); *see also* Gustavo Lopez & Jens Manuel Krogstad, Pew Research Center, *Key Facts About Unauthorized Immigrants Enrolled in DACA* (Sept. 25, 2017), http://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/ ("About 70,000 former DACA participants did not renew their benefits or had their renewal applications denied. Another 40,000 have adjusted their legal status and obtained green cards, which grant lawful permanent residence."). At oral argument, counsel for Defendant-Intervenors suggested that the current total of individuals holding DACA status is approximately 702,000, down from a number exceeding 800,000 due to either the failure to renew or the adjustment of status. Hearing Tr. 100:24 (Aug. 8, 2018) [Doc. No. 302]. These numbers do not include those people who have not yet applied for DACA, which may bring the total number of eligible persons as high as 1.9 million, according to evidence provided by Defendant-Intervenors. *See* Decl. of M. Ray Perryman [Doc. No. 225, Ex. 74, at 6] (estimating "1.3 million people nationwide are eligible to apply for DACA"); Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, Cato at Liberty (Jan. 18, 2017, 3:00 PM) [Doc. No. 225, Ex. 113] ("[I]t is estimated that there could be another one million eligible residents who have not yet applied [in addition to an estimate of 750,000 current participants]."); Roberto G. Gonzales *et al.*, Ctr. for Am. Progress, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark* (2017) [Doc. No. 225, Ex. 125, at 1] (describing DACA as "a policy that temporarily defers deportations . . . for up to an estimated 1.9 million eligible unauthorized young adults"). Rather than relying on extrinsic sources or arguments of counsel, the Court instead will consider the evidence presented in this case. Based on that evidence, the Court will use a midrange number of approximately 1.5 million eligible people.

[11] Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1].

Chief Justice John Roberts: Lawfully present does not mean you're legally present?

Solicitor General Verrilli: Correct.

\* \* \*

Justice Samuel Alito: How can you – how can it be lawful to work here but not lawful to be here?[12]

The DACA program started with approximately 152,431 approvals in 2012, 427,616 in 2013, and 238,899 in 2014.[13] In late November of 2014, then-Secretary of DHS, Jeh Johnson, attempted to expand the DACA program and implement a new lawful presence program entitled Deferred Action for Parents of Americans and Lawful Permanent Residents or DAPA. Projections varied about the size of the population that would have been eligible under these proposed amendments, but most projections for Expanded DACA and the DAPA program estimated they would give an additional 4.3 million individuals lawful presence. Thus, the possible population of illegal aliens with lawful presence due to DACA, Expanded DACA, and DAPA would have been raised to just under 6 million (or more than 50% of the estimated 11.3 million illegal aliens in the country).[14]

Twenty-six states, including all of the Plaintiff States in this case, filed the *Texas I* lawsuit to stop the implementation of the DAPA program and the expansion of the DACA program. In *Texas I*, all parties agreed that DAPA would be run like DACA and that the Court could assume as much for purposes of considering the request for an injunction. After extensive

---

[12] Transcript of Oral Argument at 28, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674).

[13] U.S. Citizenship and Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by FY, Quarter, Intake, Biometrics and Case Status FY 2012-2017 (March 31, 2018) [Doc. No. 225, Ex. 23].

[14] Most parties, many experts, and most governmental units rely on an estimate of 11.3 million illegal aliens. It originates with a study done by the Pew Research Center that estimated the illegal alien population as of March 2013. *See* Jeffrey S. Passel et al., Pew Research Center, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Sept. 3, 2014) [Doc. No. 225, Ex. 52, at 4]. Given the nature of being in the country illegally, no person, entity, or governmental unit really knows how many aliens are illegally in the country.

briefing and a full hearing, this Court entered a preliminary injunction based upon the likelihood that the DAPA and Expanded DACA programs should have, at the very least, undergone the notice-and-comment procedures required by the APA.

After the order issued, the Government explained all of its known law-enforcement objectives that to its mind undergirded the creation of the two deferred action programs. In a later hearing, this Court pointed out that the injunction did *not* enjoin any of those functions. The injunction only prohibited the DHS from giving lawful status (and many other benefits) to millions whom Congress had categorized as illegal. The DHS then explained that the reason they wanted to award lawful presence was not to support any direct law-enforcement goal, but was instead to incentivize aliens to participate in the program.[15] After this Court ruled, the Government chose to appeal in lieu of beginning the notice-and-comment procedures. The Fifth Circuit affirmed this Court's ruling regarding DAPA and Expanded DACA and the procedural APA violation, but it went further and ruled that the programs also violated the substantive requirements of the APA. It stated in pertinent part:

> The interpretation of those provisions that the Secretary advances would allow him to grant lawful presence and work authorization to any illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility. Even with "special deference" to the Secretary, the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization.

> \* \* \*

> Moreover, if deferred action meant only nonprosecution, it would not necessarily result in lawful presence. Although prosecutorial discretion is broad, it is not 'unfettered.' Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change. Regardless of whether the Secretary has the authority to offer lawful presence and employment authorization in exchange for

---

[15] *Texas I* Hearing Tr. 28–30 (Mar. 19, 2015).

participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion.

\* \* \*

In summary, the states have established a substantial likelihood of success on the merits of their procedural claim.[16]

The Supreme Court not only undertook to review *Texas I* on both APA grounds, but actually entered an order expanding the appeal:

> The petition for a writ of certiorari is granted. In addition to the questions presented by the petition, the parties are directed to brief and argue the following question: "Whether the Guidance violates the Take Care Clause of the Constitution, Art. II § 3."[17]

Ultimately, after the death of Justice Antonin Scalia, which left the Supreme Court with only eight justices, the Court affirmed the Fifth Circuit with a one-sentence opinion, indicating that the eight remaining justices were deadlocked and that the judgment was affirmed by an equally divided Court.[18] *Texas I* was returned to this Court for a trial on the merits but was ultimately dismissed with all parties signing the stipulation quoted above.

As is evident, the Plaintiff States in *Texas I* dismissed that case with the understanding that DACA was to be dissolved. The Government's attempt to phase out the program has been blocked by two injunctions from district courts in California and New York. Those injunctions only applied to people already enrolled in the DACA program. In late April, however, a District of Columbia district court indicated that it intended to block the DHS's attempts to rescind any aspect of DACA, which would effectively require the Government to accept even new DACA applications. This order has since been stayed in part, but it seems to have prompted the Plaintiff States to file this action.

---

[16] *Texas I*, 809 F.3d at 184, 167, 178.

[17] Order Granting Certiorari, *Texas v. United States*, 136 S. Ct. 906 (2016) (No. 15-674).

[18] *Texas v. United States*, 136 S.Ct. 2271 (2016).

III.    **The Other Recent DACA Decisions Do Not Suggest That This Court Should Refrain From Ruling.**

The Defendant-Intervenors moved for dismissal or alternatively asked this Court to defer ruling in this case based upon other ongoing cases that deal with the decision of the DHS to phase out DACA. Their primary argument was that those courts were the first to address the program and that this Court should therefore defer to their rulings as a matter of comity.

This Court denied the request for several reasons. First, this Court need not defer to the rulings in the four cases discussed below because those decisions involve the legality of the DACA rescission memorandum—an issue this Court does not address. Second, the argument's primary premise is incorrect. This Court was the first to address these issues—well before any of the courts in question. This can be seen quite clearly when one reviews the transcript of one of the very first hearings of the earliest case in question, *Batalla Vidal v. Trump*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). As the following exchange indicates, the main thrust of the September 22, 2016 hearing was based upon this Court's injunction in *Texas I*:

> The Court: . . . So, tell me why are you here after my colleague down in the Southern District of Texas, that erudite jurist, has issued nationwide preliminary injunction and you want me to carve out what you might call the Second Circuit exception to that, if you will?
>
> \* \* \*
>
> The Court: That's why you feel you can be here and that the preliminary injunctive relief that was granted in the Southern District of Texas and affirmed by the Fifth Circuit would not reach his situation here in New York? Is that it?
>
> Mr. Bloom: Yes.
>
> \* \* \*
>
> The Court: I understand. I know you have a problem. Understood. But then, again, I have a problem which is the rights of this individual, all right, and whoever else comes along. So I understand that and maybe perhaps I'll decide whatever I decide. Someone will take it up to the Second Circuit and guess what?

> *There might be a circuit split or the circuit will say they agree with the Fifth Circuit or we should give full faith and credit and comity, whatever you want to call it, to the actions of the Fifth Circuit in order to avoid placing the government in an untenable position.*
>
> By that time there will be a new president and there will be a new Congress and it may be an issue in the political branches and we may not have anything to do here. I have no idea. But right now the question is the plaintiff has brought this problem to me and, as sympathetic as I am to the government's predicament, the plaintiff has brought the issue to the court and I should be dealing with the issue if I can. Maybe I can't, and we're going to find out if I should. That's all.
>
> So I understand your problem. I sympathize with your problem, but I do not sympathize with the idea that I am hamstrung in dealing with an issue involving individual rights and including the right to go make a living and have a life as an immigrant in the United States. *So I don't know what's going on out there in Texas on the border but I know what's going on in New York. And I'm very concerned about it and have absolutely no intention of simply marching behind in the parade that's going on out there in Texas*, if this person has rights here.[19]

This exchange is important for multiple reasons. First, it illustrates the point that those cases involved some of the same issues as those involved in *Texas I*. The first plaintiff in the first case was seeking an order to avoid this Court's injunction. Second, it illustrates that neither comity nor a nationwide injunction prevents a district court from hearing a case. Third, to a casual reader, the New York court's comments may seem off-hand, as the judge was just getting into the case; however, the point the judge was making concerning circuit splits has gained more and more interest among commentators and courts.

Justice Clarence Thomas recently questioned the advisability of a district court entering a nationwide injunction. *Trump v. Hawaii*, 138 S. Ct. 2392, 2424 (2018) (Thomas, J., concurring). Similar questions have been raised in the lay press as well. *See, e.g.,* Jason, L. Riley, *When District Judges Try to Run the Country*, Wall Street J. (July 18, 2018), at A17. This Court agrees with the overall tenor of both Justice Thomas's concurrence and Mr. Riley's thoughtful opinion piece. Moreover, several recent law review articles have addressed the pros and cons of

---

[19] [Doc. No. 188, Ex. 3, at 3–4, 12–13] (emphasis added).

nationwide injunctions. *See* Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017); Michael T. Morley, *Nationwide Injunctions, Rule 23(b)(2) and the Remedial Powers of Lower Courts*, 97 B.U. L. Rev. 611 (2017); Zayn Siddique, *Nationwide Injunctions*, 117 Colum. L. Rev. 2095 (2017); Gretzel Burger, Note, *Nationwide Injunctions Against the Federal Government: A Structural Approach*, 92 N.Y.U. L. Rev. 1068 (2017). Some of these authors have suggested that some of the advantages of nationwide injunctions are uniformity, judicial efficiency, and the ability of a court to award complete relief. They have also suggested that some of the disadvantages include a premature freezing of the law, the weakening of the certiorari process by preventing circuit splits, territorial clashes between courts, plaintiffs filing cases until they find a court that will rule in their favor, and forum shopping. Each of these reasons for and against such an injunction is not without some degree of merit.

Most of those same authors have suggested a variety of remedies such as: limiting relief to the physical limits of the court's jurisdiction, limiting relief to highly significant questions, limiting relief to issues involving questions of general applicability, limiting relief to the circuit in which each court sits, and giving the narrowest relief possible. All of these proposed solutions merit consideration as well.

The problem that a district court encounters is how to craft an order that gives the appropriate relief to the prevailing party, but also makes sense in an immigration context. Interestingly, after noting the recent concern over nationwide injunctions, the New York court eventually entered one. The court encountered some of the same problematic and practical factors this Court faced in *Texas I*. It wrote:

> Nevertheless, the court finds that a nationwide injunction is warranted in these cases. First, it is hard to conceive of how the court would craft a narrower

injunction that would adequately protect Plaintiffs' interests. Plaintiffs include not only several individuals and a nonprofit organization, but also sixteen states and the District of Columbia. To protect the State Plaintiffs' interests, the court would presumably need to enjoin Defendants from rescinding the DACA program with respect to the State Plaintiffs' residents and employees, including the employees of any instrumentalities of the state, such as public hospitals, schools, and universities. Such an injunction would be unworkable, partly in light of the simple fact that people move from state to state and job to job, and would likely create administrative problems for Defendants. Furthermore, there is a strong federal interest in the uniformity of federal immigration law. *See* U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish a uniform Rule of Naturalization"); *Texas*, 809 F.3d at 187–88. Because the decision to rescind the DACA program had a "systemwide impact," the court will preliminarily impose a "systemwide remedy." *Lewis v. Casey*, 518 U.S. 343, 359, 116 S. Ct. 2174, 135 L.Ed.2d 606 (1996) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)).[20]

These are many of the same factors pointed out in *Texas I* by this Court and the Fifth Circuit. The court in New York could not envision any effective relief narrower than a nationwide injunction in part because it had sixteen states as plaintiffs. *Texas I* involved twenty-six states from eleven different circuits, so fashioning a circuit-based remedy was, for all practical purposes, impossible. These states ranged from North Dakota to Texas and from North Carolina to Nevada. Limiting an injunction to those twenty-six states or a geographic area was a virtual impossibility when an individual can freely travel. Such an injunction would have been ineffective. The DAPA and Expanded DACA programs would have gone into effect in less than half of the country. Could a DAPA recipient with lawful presence in New York travel to Texas, have an encounter with immigration officers in Texas, and be placed in immigration proceedings because there was an injunction forbidding its rollout in Texas? The court in *Batalla Vidal*, like this one in *Texas I*, clearly gave consideration to limiting the relief it awarded, and it too could not conceive of a narrower path to follow:

---

[20] *Batalla Vidal*, 279 F. Supp. 3d at 437–38.

The court enjoins rescission of the DACA program on a universal or "nationwide" basis. Again, it does not do so lightly. As Defendants correctly note, equitable principles provide that the court should not enter an injunction that is broader than "necessary to provide complete relief to the plaintiffs." (Defs. Opp'n at 50 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)).) *See also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) ("[I]njunctive relief should be no broader than necessary to cure the effects of the harm caused by the violation...." (internal quotation marks and citations omitted) ). Moreover, several academic commentators have insightfully observed various problems with the practice of granting nationwide injunctions against the Government, including that such injunctions thwart the development of law in different courts, encourage forum-shopping, and create the possibility that different courts will issue conflicting nationwide injunctions.[21]

While not referenced in Justice Thomas's *Trump v. Hawaii* concurrence, the broad grant of standing articulated in *Massachusetts v. EPA* and its progeny further complicates the national injunction issue, as does the imperative that immigration policy be uniform. Broad grants of standing for states, municipalities, and groups combine with the requirement that immigration policy be uniform, and together they create a perfect storm that results in remedies no one prefers—not judges, not lawyers, not lay people.

The third reason this Court will not defer to the other courts is that it is not entering an order that is contrary to any of the quartet of orders discussed below. While this opinion certainly expresses views contrary to some of those expressed by the other courts, its ruling herein does not leave the parties facing conflicting injunctions.

Finally, there are four decisions concerning the DACA phase out, and they did not reach the same result on the issues they addressed.[22] Their results are inconsistent; consequently, a

---

[21] *Batalla Vidal*, 279 F. Supp. 3d at 437–38.

[22] Actually, Defendant-Intervenors claim this Court is either bound by or should defer to *Regents of Univ. of Cal. v. U.S. Dept. of Homeland Sec.*, 279 F.Supp.3d 1011 (N.D. Cal. 2018), *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018), and/or *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) that, of course, issued rulings favorable to their positions. They did not argue that this Court should follow the ruling in *Casa de Maryland v. U.S. Dept. of Homeland Sec.*, 284 F. Supp. 3d 758 (D. Md. 2018), a case that ruled contrary to the continuation of the DACA program.

different result here certainly would not disrupt any sense of uniformity.

This Court has reviewed each of those opinions carefully and finds none to be controlling. While various aspects of each opinion are informative, none were decided by a court that is bound to follow Fifth Circuit precedent. Additionally, each court worked with records different from the record in *Texas I* and the record now before this Court. As one would expect given different records, each ultimate ruling could also be different. The Court will briefly recount each case in chronological order of their actual decisions.

The first decision from the quartet was issued in January of this year in *Regents of the University of California v. U.S. Department of Homeland Security*. 279 F. Supp. 3d 1011 (N.D. Cal. 2018). That court was asked whether the decision of the DHS to rescind DACA, as articulated by the September 5, 2017 memorandum of Acting DHS Secretary Elaine C. Duke, was effective. That court held that it was not, as the court found the memorandum's reasoning to be insufficient and flawed, and therefore ineffective. *Id.* at 1037–43. It further ruled that the additional reasons proffered by Government lawyers were "*post hoc* rationalizations" and refused to consider them. *Id.* at 1043–46. While conceding that "at least some of the [Fifth Circuit] majority reasons for holding DAPA illegal would apply [to DACA]," in large part it found a memorandum from the Office of Legal Counsel ("OLC memorandum"), [23] written about DAPA two years after DACA was instituted, to be more persuasive. *Regents*, 279 F. Supp. 3d at 1042. The California court ultimately entered an order enjoining the rescission of any DACA status already granted and any renewals for existing DACA recipients. *Id.* at 1048–49. It held

---

[23] U.S. Department of Justice's November 19, 2014, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President (Nov. 19, 2014) [Doc. No. 5, Ex. 19]. In the OLC memorandum, DACA was discussed as a blueprint for DAPA and Expanded DACA. Nevertheless, given the ruling in *Regents* and the other cases discussed herein, this Court assumes those judges who relied on the OLC memorandum concerning DAPA did so in part due to the OLC footnote that actually recounts advice given as to DACA's legality.

that new DACA applications need not be processed and that DHS could stop allotting advance parole (which provides an easier pathway to legal status for some DACA recipients). *Id.*

One month later in the case discussed above, a district court in New York awarded substantially the same relief in *Batalla Vidal v. Trump.* 279 F. Supp. 3d 401 (E.D.N.Y. 2018). The court disagreed with the assertion that DACA might violate the APA, basing its decision on many of the same factors discussed above. *Id.* at 420–29. While acknowledging that the Fifth Circuit had ruled on DAPA, it did not mention or give any credence to the fact that the Fifth Circuit had also ruled against Expanded DACA and the fact that both DAPA and those amendments were instituted in the same manner as the original DACA program. *Id.* Ultimately, the *Batalla Vidal* court concluded that DACA did not conflict with the INA and, like the California court, arrived at that conclusion by citing the OLC memorandum, as well as the briefs filed by the Solicitor General in the Supreme Court and the Fifth Circuit dissent in *Texas I. Id.* at 426–27.

Next, a district court in Maryland reached a decision in *Casa de Maryland v. U.S. Department of Homeland Security.* 284 F. Supp. 3d 758 (D. Md. 2018). It ruled that "the decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record." *Id.* at 772.

> The rescission of a policy relating to prosecutorial discretion does not shock the conscience of this Court. *Absent congressional action, the benefits given to Dreamers by DACA were in potential violation of congressional immigration laws; the only thing that has changed is that deferred status will expire, and enforcement of immigration laws may recommence in the absence of action by Congress, which the President has requested.* There is nothing surprising or unfair about policies, laws, or enforcement thereof changing with an election cycle. *Furthermore, the election process, and not federal litigation, is the appropriate method for resolving any fairness implicated in DACA's rescission.*[24]

---

[24] *Id.* at 777 (emphasis added).

Both the California and New York decisions were cited as authority by the plaintiffs in the Maryland case, but the court rejected their conclusions:

> All courts reviewing the DACA rescission would benefit from a prior generation's wisdom regarding the separation of powers: "A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, to 'take Care that the Laws be faithfully executed.'" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 709, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

> The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious. Respectfully, this Court disagrees. *Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a reasoned decision to rescind DACA based on the Administrative Record. Any alternative inquiry would impermissibly require a court to "substitute its judgment for that of the agency." See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).* Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore its decision to rescind DACA cannot be arbitrary and capricious.[25]

The Maryland court concluded that the Government was free to rescind DACA, but it enjoined the Government from using any information provided by a DACA recipient during the DACA application process against that recipient. *Id.* at 779.

Finally, a district court in Washington, D.C. ruled in a fourth DACA-rescission case, *NAACP v. Trump.* 298 F. Supp. 3d 209 (D.D.C. 2018). It originally indicated that it would vacate the Government's memorandum rescinding DACA (including all new applications and renewals) but temporarily suspended that ruling to allow a supplementation of the record:

---

[25] *Id.* at 767–68 (internal footnote omitted).

Here, the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful. That legal judgment was virtually unexplained, however, and so it cannot support the agency's decision. And although the government suggests that DACA's rescission was also predicated on the Department's assessment of litigation risk, this consideration is insufficiently distinct from the agency's legal judgment to alter the reviewability analysis. It was also arbitrary and capricious in its own right, and thus likewise cannot support the agency's action. For these reasons, DACA's rescission was unlawful and must be set aside.[26]

The court realized the DHS decision was based upon its review of the Fifth Circuit's decision on DAPA and Expanded DACA, but concluded:

The Department's conclusion that DACA was implemented without statutory authority—based only on an incongruous reference to the Fifth Circuit's decision on DAPA—therefore cannot support the program's rescission.[27]

Thereafter, the D.C. court analyzed a subsequent memorandum from DHS Secretary Kirstjen Nielsen and found it equally deficient. *NAACP v. Trump*, No. 17-1907, 2018 WL 3702588 (D.D.C. Aug. 3, 2018). The court, instead of refusing to consider the memorandum at all, as urged by the plaintiffs, elected to treat part of the June 2018 memorandum as a "further explanation" of the original rescission memorandum. *Id.* at *5. It declined to consider the DHS's claim that DACA encourages more illegal immigration because it appeared "for the first time on remand and is therefore impermissibly *post hoc*." *Id.* at *7. It analyzed the remaining portions of the Nielsen memorandum and found that they were "legal determination[s] dressed up as a policy judgment." *Id.* at *9. It further rejected the Government's concession that the DHS was not using individualized discretion in the implementation of DACA because the court concluded,

---

[26] *Id.* at 249.

[27] *Id.* at 239.

quite reasonably, that this was a problem that Secretary Nielsen herself could fix.[28] *Id.*

On the actual merits of the second memorandum, the court found it to be a mere rehashing of the original September 5, 2017 Duke memorandum with no "meaningful elaboration on the Duke Memo's assertion that DACA is unlawful." *Id.* at *11. Ultimately, the second memorandum provided no convincing rationale to persuade the court to revise its prior conclusion that DACA's rescission was "arbitrary and capricious." *Id.* at *12–13. The court explained its decision in its closing paragraph:

> Finally, a few words about the nature of the relief being granted by this Court. The Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program. Rather, the Court simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision. *See* 5 U.S.C. § 706(2). A conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or *post hoc* policy assertions, simply will not do. The Court therefore reaffirms its conclusion that DACA's rescission was unlawful and must be set aside.[29]

The *NAACP* court also relied upon the OLC memorandum as authority to dispute the Attorney General's conclusion that DACA might also violate the Constitution.[30] *NAACP*, 2018 WL 3702588, at *11. The Government has appealed the D.C. court's order vacating the rescission of DACA. In its most recent ruling, the D.C. court stayed its earlier order in part and will not require the Government to accept new initial applications or applications for advance parole during the pendency of the appeal. It ordered that the DHS rescission decision as to

---

[28] While this Court agrees with the conclusion that the DHS Secretary might be able to exert pressure to actually effectuate individual discretion, it carries with it the basic assumption that no court will subsequently enjoin the DACA processors from actually exercising that discretion.

[29] *Id.* at *13.

[30] The OLC memorandum analyzed the concepts of prosecutorial discretion and deferred action in the context of the Take Care Clause. *See* U.S. Department of Justice's November 19, 2014, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President (Nov. 19, 2014) [Doc. No. 5, Ex. 19]. The OLC memorandum did not address potential procedural and substantive violations of the APA by name, although certain passages can be read as referring to the APA.

current DACA recipients and renewals was vacated. Thus, its current orders effectively match the rulings in California and New York. [Doc. No. 313, Exs. 1–2.]

Overall, there is little to be gleaned from these prior DACA decisions that is applicable to the questions posed in this case. Three courts found the DHS rescission ineffective and enjoined or vacated it, and one found it legal and did not enjoin the rescission but did enjoin any use of DACA recipient information. Only the *Casa De Maryland* court seemed to give any credence to the fact that the original 2014 challenge to DAPA and Expanded DACA was only dismissed due to the DHS's decision to rescind DACA, which seems at least relevant to the DHS's claim that it considered the litigation risk prior to its decision:

> DAPA—an analogous program, promulgated by the analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself. The same plaintiffs who defeated DAPA threatened to challenge DACA imminently. The Attorney General of the United States—the nation's chief legal officer—provided legal advice that DACA was likewise unlawful and likely ill-fated against a legal challenge. All of this is in the Administrative Record—the remnants of the DAPA litigation, the threatened legal challenge, and the Attorney General's advisory letter.
>
> *Therefore, what did the Acting Secretary of DHS do? She opted for a six-month wind-down period instead of the chaotic possibility of an immediate termination, which would come at a time known only to the judge resolving a future challenge to the DACA program. This decision took control of a pell-mell situation and provided Congress—the branch of government charged with determining immigration policy—an opportunity to remedy it. Given the reasonable belief that DACA was unlawful, the decision to wind down DACA in an orderly manner was rational.*[31]

As stated above, it is important to note that these courts were primarily faced with the issue of the Government's rescission of DACA—not its creation and implementation. Second, one must note that none of these courts are bound by Fifth Circuit precedent. In fact, more than

---

[31] *Casa de Maryland*, 284 F. Supp. 3d at 772–73 (emphasis added and internal footnotes omitted).

one judge referred to the dissent in the Fifth Circuit's opinion with approval. Obviously, being a court in the Fifth Circuit, this Court cannot adopt and follow a Fifth Circuit dissent. Third, some courts seem to assume that DACA's use of program-wide discretion was sufficient. For example, both of the courts in *Regents* and *Batalla Vidal* took issue with the Fifth Circuit's conclusion in *Texas I* that the APA requires the actual personnel reviewing DACA applications to be the individuals exercising discretion. Those courts felt that the agency exercised its discretion by setting out the criteria in the 2012 memorandum and that "exercise" was all that was necessary. In other words, a "programmatic" exercise of discretion would suffice. *See Regents*, 279 F. Supp. 3d at 1039; *Batalla Vidal*, 279 F. Supp. 3d at 424–25 (suggesting that discretion at the agency level, as opposed to the individual officer level, would suffice to exempt DACA from notice and comment).

This Court ruled differently for many reasons, but it will mention three. This approach is contrary to the very essence of prosecutorial discretion. Under that approach, the Secretary could have given lawful presence to every alien unlawfully in the country. Further, that procedure is contrary to the very OLC memorandum upon which those courts rely. That memorandum specifically recounted an oral warning the OLC gave the DHS regarding DACA:

> *Before DACA was announced*, our Office was consulted about whether such a program would be legally permissible. *As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis.* We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. *We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical* that, like past policies that made deferred action available to certain classes of aliens, *the DACA program require immigration officials to evaluate each application for deferred*

> *action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria.*[32]

Thus, it advised that an exercise of program-wide discretion by the Secretary was problematic. The record in *Texas I* compelled this Court's finding that no individual discretion was being exercised by those actually evaluating applications. Consequently, the DHS could find no support from the OLC memorandum. Finally, given the benefits DAPA was to confer, and the binding programmatic protocols issued by the Secretary of the DHS, the conclusion that there must be compliance with the notice-and-comment requirements of the APA was unassailable.

These decisions also gloss over the fact that the Fifth Circuit affirmed an injunction not just against DAPA, but also against Expanded DACA. Finally, all three courts that actually ruled against the DHS's decision to rescind DACA seemed to put heavy reliance on the OLC memorandum. That memorandum did not address the advice given concerning the legality of DACA,[33] except for the footnote quoted above. What was more important for this Court, and no doubt for the Fifth Circuit in *Texas I*, was the fact that the OLC memorandum did not include an in-depth APA analysis. The decisions enjoining DAPA and Expanded DACA were based on those programs' failure to comply with the requirements of the APA, not on the other legal challenges.

Perhaps the only common thread between all four of these decisions, at least as analyzed by this Court, was aptly expressed by the court in *Casa de Maryland*:

> The result of this case is not one that this Court would choose if it were a member

---

[32] U.S. Department of Justice's November 19, 2014, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President (Nov. 19, 2014) [Doc. No. 5, Ex. 19, at 18 n.8] (emphasis added).

[33] The OLC memorandum addressed an expansion of deferred action to include parents of United States citizens and of lawful permanent residents and parents of DACA recipients, the latter of which it found impermissible because "[t]he logic underlying such an expansion does not have a clear stopping point . . . ." *Id.* at 33. Ultimately, no counsel defending the DAPA or Expanded DACA programs could articulate any reason that the criteria could not be expanded to include the entire illegal alien population.

of a different branch of our government. An overwhelming percentage of Americans support protections for "Dreamers," yet it is not the province of the judiciary to provide legislative or executive actions when those entrusted with those responsibilities fail to act. As Justice Gorsuch noted during his confirmation hearing, "a judge who likes every outcome he reaches is probably a pretty bad judge, stretching for the policy results he prefers rather than those the law compels."

This Court does not like the outcome of this case, but is constrained by its constitutionally limited role to the result that it has reached. Hopefully, the Congress and the President will finally get their job done.[34]

Although the other courts reached different conclusions, given the tenor of their decisions, this Court feels safe assuming that each would agree with the hope for a legislative fix. Having found that there is no reason to defer to the decisions governing the DHS's rescission of DACA, this Court proceeds to address the merits.

## IV.     This Case Unquestionably Presents a Case or Controversy.

Separate from the preliminary injunction motion, the Defendant-Intervenors have filed a motion to dismiss this case for lack of subject matter jurisdiction. [Doc. No. 118]. In the motion, they argue that this case does not meet Article III's case-or-controversy requirement and is therefore not justiciable. *See* U.S. Const. art. III, § 2. As Defendant-Intervenors suggest the case should be dismissed without reaching the merits of the preliminary injunction motion, the Court addresses this issue first.

To be justiciable under Article III, a case must present a genuine controversy between adverse parties. *See INS v. Chadha*, 462 U.S. 919, 939 (1983). The Defendant-Intervenors argue that this case does not present such a controversy, as the Plaintiff States and the Government "take the same position" regarding DACA's legality and "desire the same result—that it be

---

[34] *Casa de Maryland*, 284 F. Supp. 3d at 779 (internal footnotes omitted).

rescinded." [Doc. No. 188, Ex. 1, at 13]. Even under this framing, however, the Supreme Court's modern pronouncements on the case-and-controversy requirement indicate that this case presents a justiciable controversy.

In *United States v. Windsor*, 570 U.S. 744 (2013), the Supreme Court considered whether a justiciable controversy existed where the Executive Branch continued to enforce a statute against an individual despite agreeing with her that the statute was unconstitutional. Edith Windsor and Thea Spyer married as a same-sex couple outside the United States.[35] *Windsor*, 570 U.S. at 753. They lived in New York, which recognized their marriage. *Id.* After Spyer died and left her estate to Windsor, Windsor paid federal estate taxes on the property she received. *Id.* Windsor sought a refund of those taxes under the marital exemption from the estate tax, but the Internal Revenue Service denied her the refund because the Defense of Marriage Act ("DOMA") prevented same-sex couples from being considered "spouses" for purposes of the marital exemption. *Id.* Windsor sued, arguing that DOMA violated the Fifth Amendment's guarantee of equal protection. *Id.*

During the pendency of the suit, the United States Attorney General notified Congress that the Department of Justice did not intend to defend the constitutionality of DOMA because the President concluded the statute was unconstitutional. *Id.* Despite that conclusion, the President instructed the Department of Justice to continue enforcing the statute, recognizing "the judiciary as the final arbiter of the constitutional claims raised." *Id.* at 754 (citation omitted). The district court ultimately held that Windsor was entitled to a refund because DOMA was unconstitutional, and the Second Circuit affirmed that conclusion. *Id.* at 754–55. The United

---

[35] At the time, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), which recognized a fundamental right to marry for couples of the same sex, had not yet been decided.

States continued to withhold the tax refund, however, and the Supreme Court granted certiorari to review the judgment. *Id.* at 755.

Due to the case's posture, the Supreme Court appointed an amicus curiae to argue against the Court's jurisdiction over the case. The amicus argued that the suit was no longer adverse after the district court had ordered payment and the United States and Windsor agreed on the issue of the illegality of DOMA. *Id.* at 756. In that sense, both sides had prevailed in the lower courts. *Id.* Granting certiorari and ruling on the merits was therefore inappropriate, according to the argument, because neither party actually sought any true redress from the tax-refund judgment. *Id.*

The Supreme Court, however, took a broader view of adverseness and controversy. Under the majority's reasoning, the United States "retain[ed] a stake sufficient to support Article III jurisdiction":

> The judgment in question orders the United States to pay Windsor the refund she seeks. An order directing the Treasury to pay money is "a real and immediate economic injury," *Hein*, 551 U.S., at 599, 127 S.Ct. 2553, indeed as real and immediate as an order directing an individual to pay a tax. That the Executive may welcome this order to pay the refund if it is accompanied by the constitutional ruling it wants does not eliminate the injury to the national Treasury if payment is made, or to the taxpayer if it is not. The judgment orders the United States to pay money that it would not disburse but for the court's order. The Government of the United States has a valid legal argument that it is injured even if the Executive disagrees with § 3 of DOMA, which results in Windsor's liability for the tax. Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction. It would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled under the District Court's ruling.[36]

Thus, the Supreme Court found that even where "the Government largely agree[s] with the opposing party on the merits of the controversy," the Government's intent to enforce the

---

[36] *Id.* at 757–58.

challenged law provided sufficient adverseness to maintain jurisdiction over the suit. *Id.* at 759

(quoting *Chadha*, 462 U.S. at 940 n.12).

The dispute between the Plaintiff States and the Government easily fits within the fact

pattern affirmed by *Windsor*. Though they "largely agree . . . on the merits" of DACA's legality,

the Government continues to administer the program to comply with the California, New York,

and D.C. courts' injunctions/vacatur.[37] The Government's promulgation and continued operation

of the DACA program is the alleged source of the Plaintiff States' injuries, which is true

regardless of whether the Government agrees with the States on the merits. Due to the fact that

the Government continues to operate the DACA program and indicates they will continue to

operate it in the future to the detriment of the Plaintiff States, this case presents an Article III

controversy between adverse parties under *Windsor*.

In addition to the jurisdictional requirements discussed above, the Court must also

consider the prudence of exercising its jurisdiction here. *Windsor*, 570 U.S. at 760. Situations

where opposing parties in a lawsuit take the same position on the primary legal issues in the case

present a great risk of judicial misstep, as the suit may "lack the concrete adverseness which

sharpens the presentation of issues upon which the court so largely depends for illumination of

difficult constitutional questions." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Given

how the proceedings have unfolded to date, however, that risk does not exist here. The parties

have more than ably illuminated the challenging issues upon which this case turns. Though they

---

[37] The fact that the Government continues DACA because of these injunctions does not change the Article III case-or-controversy analysis. *See INS v. Chadha*, 462 U.S. 919, 940 n.12 (1983) (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 585 n.9 (1983) ("[In *Bob Jones University v. United States*], the United States agreed with Bob Jones University and Goldsboro Christian Schools that certain Revenue Rulings denying tax exempt status to schools that discriminated on the basis of race were invalid. Despite its agreement with the schools, however, the United States was complying *with a court order enjoining it from granting tax-exempt status* to any school that discriminated on the basis of race. *Even though the government largely agreed with the opposing party on the merits of the controversy*, we found an adequate basis for jurisdiction in the fact that the government intended to enforce the challenged law against that party." (emphasis added)).

happen to agree on many of the legal aspects of the DACA program, it is clear that the Government is vigorously guarding its own interests rather than serving in a "friendly, non-adversary" role relative to the Plaintiff States. *See, e.g.*, [Doc. No. 305, at 4–5] (Government arguing—in contradiction to the Plaintiff States' position—that the DACA memorandum did not modify substantive rights and benefits in a way that would require notice and comment).

Further, the presence of the Defendant-Intervenors and the State of New Jersey—each of which vehemently opposes the legal positions taken by the Plaintiff States—adds additional clarity to the Court's consideration of the issues in this case. The Supreme Court in *Windsor* noted that one consideration that may assist in determining the appropriateness of exercising jurisdiction is "the extent to which adversarial presentation of the issues is assured by the participation of *amici curiae* prepared to defend with vigor" the legal issues at hand. *Windsor*, 570 U.S. at 760. The Defendant-Intervenors surely fill this role—perhaps even better than an amicus as suggested by *Windsor*—due to their demonstrated, concrete interest in the outcome of the litigation. Even if their participation was considered insufficient for some reason, this Court has also been provided with numerous amicus curiae briefs that buoy their position. Consequently, this case is much more adverse than *Windsor*.

For these reasons, the Court is assured that this case presents a justiciable, adverse controversy and that there are minimal prudential concerns with its exercise of jurisdiction.[38] The Court turns next to consider whether the Plaintiff States have standing.

## V.   The Plaintiff States Have Standing.

Article III of the Constitution limits the judicial power of the United States to "Cases" and "Controversies." U.S. Const. art. III, § 2. Though these terms are not self-defining, they have

---

[38] In the same motion to dismiss, the Defendant-Intervenors present an additional jurisdictional argument—that the Plaintiff States' injuries are not redressable. The Court discusses that argument in its standing analysis below.

long been understood to confine "the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). Federal courts have deduced certain requirements from the text and structure of the Constitution that ensure they act only within their proper adjudicatory role. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Among those requirements is standing.

Article III standing has three elements. A plaintiff must show that he or she has suffered (1) an injury in fact, (2) that is fairly traceable to the defendant's challenged conduct, (3) which is likely to be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Defendant-Intervenors contend that this case should be dismissed for lack of standing. As the parties invoking federal jurisdiction, the States bear the burden of proving standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the preliminary injunction stage, satisfying this burden requires the States to make a "clear showing that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citations and internal quotation marks omitted). A single plaintiff with standing satisfies the case-or-controversy requirement of Article III. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). As the States have centered their standing arguments around DACA's impact in Texas, the Court's analysis focuses on whether Texas has standing to sue.

The States assert multiple independent theories of standing. Additionally, they claim they are entitled to special solicitude when this Court makes its standing determination due to the

Supreme Court's decision in *Massachusetts v. EPA*. This Court first considers whether Texas is entitled to special solicitude in the standing analysis, then considers whether any of the proffered theories support standing.

### A.    Special Solicitude

The Court first considers whether Texas is entitled to special solicitude. The Supreme Court in *Massachusetts* did not precisely explain what effect special solicitude has on the standing analysis,[39] but at the very least, it appears to shore up weaknesses presented by attenuated causation and redressability arguments. *See Massachusetts*, 549 U.S. at 523 (finding causation and redressability despite the agency's arguments that "its decision not to regulate greenhouse gas emissions . . . contribute[d] so insignificantly to petitioners' injuries that [it could not] be haled into federal court to answer for them" and that there was not "any realistic possibility . . . that the relief petitioners [sought] would mitigate global climate change and remedy their injuries"). The Fifth Circuit interpreted special solicitude to lessen the certainty needed in the traditional causation and redressability analysis, and this Court must give effect to that interpretation, as it is binding precedent. *See Texas I*, 809 F.3d at 159 ("In addition to its notion that Texas could avoid injury, the government theorizes that Texas's injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But *Massachusetts v. EPA* establishes that the causal connection is adequate. Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here."). Under the law set forth in *Massachusetts v. EPA* and *Texas I*, the Court finds that Texas is entitled to special solicitude.

---

[39] *See Massachusetts*, 549 U.S. at 540 (Roberts, C.J., dissenting) ("It is not at all clear how the Court's 'special solicitude' for Massachusetts plays out in the standing analysis, except as an implicit concession that petitioners cannot establish standing on traditional terms.")

In *Massachusetts v. EPA*, the State of Massachusetts challenged the decision of the Environmental Protection Agency ("EPA") not to regulate certain vehicle emissions. 549 U.S. at 505. The EPA sought dismissal of the case on the ground that Massachusetts lacked standing to sue. *Id.* In deciding that Massachusetts did have standing, the Supreme Court's analysis turned in part on Massachusetts's status as a state. *Id.* at 518–20. Unlike most private parties, the majority reasoned, "[s]tates are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518. Certain circumstances may entitle them to special solicitude in the Court's standing analysis because of their unique position in the federal system. *Id.* at 520.

The Court focused on two factors in its standing analysis before granting special solicitude to Massachusetts. First, it noted that Congress had provided Massachusetts a procedural right to challenge the action in question. *Id.* at 519–20. Through the Clean Air Act, Congress had ordered the EPA to protect Massachusetts and others against air pollution by prescribing emissions standards for motor vehicles. *Id.* Alongside this command came a procedural right by which Massachusetts could challenge the rejection of its rulemaking petition as arbitrary and capricious. *Id.* at 520. The Court suggested that this type of litigation, which "turn[ed] on the proper construction of a congressional statute," presented "a question eminently suitable to resolution in federal court." *Id.* at 516.

Second, the Court focused on Massachusetts's desire to protect its quasi-sovereign interest in its territory. *Id.* at 518–19. According to the majority, early twentieth-century case law recognized that a state's "independent interest 'in all the earth and air within its domain'" could "support[] federal jurisdiction." *Id.* (quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)). The Court recognized that Massachusetts similarly desired to preserve its sovereign territory, specifically its coastline from the threat of rising sea levels. *Id.* at 518–19, 522. Due to

its status as a state in the union, however, Massachusetts had "surrender[ed] certain sovereign prerogatives" that would otherwise afford it the ability to protect its own interest. *Id.* at 519. As stated by the Court:

> Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers").[40]

Since those prerogatives "are now lodged in the Federal Government," rendering Massachusetts unable to regulate the harms associated with air pollutants, the Court stressed Congress's command to the EPA to protect Massachusetts from those harms. *Id.* at 519–20. In light of these two factors—Massachusetts's procedural right to challenge the EPA's (in)action and its quasi-sovereign interest in protecting its territory—the Court found that Massachusetts was "entitled to special solicitude" in the Court's standing analysis. *Id.* at 520.

For purposes of this analysis, this Court does not write on a clean slate. The Fifth Circuit in the DAPA litigation analyzed the special solicitude question on facts substantially similar to the ones here. *See Texas I*, 809 F.3d at 151–55. First, it found Texas's procedural right to challenge the DHS's DAPA guidelines to be analogous to Massachusetts's right to challenge the EPA's decision not to promulgate emissions standards:

> Like Massachusetts, the instant plaintiffs—the states—"are not normal litigants for the purposes of invoking federal jurisdiction," *id.* at 518, 127 S.Ct. 1438 and the same two additional factors are present. First, "[t]he parties' dispute turns on the proper construction of a congressional statute," the APA, which authorizes challenges to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Similarly, the disagreement in *Massachusetts v. EPA*

---

[40] *Id.*

34

concerned the interpretation of the Clean Air Act, which provides for judicial review of "final action taken[ ] by the Administrator." 42 U.S.C. § 7607(b)(1).[41]

Additionally, though the Clean Air Act provided a more specific procedural right than the APA's, the Fifth Circuit found that the difference did not change *Massachusetts v. EPA*'s applicability:

> In enacting the APA, Congress intended for those "suffering legal wrong because of agency action" to have judicial recourse, and the states fall well within that definition. The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify "special solicitude" here. The procedural right to challenge EPA decisions created by the Clean Air Act provided important support to Massachusetts because the challenge Massachusetts sought to bring—a challenge to an agency's decision *not to act*—is traditionally the type for which it is most difficult to establish standing and a justiciable issue. Texas, by contrast, challenges DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens. Because the states here challenge DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing. *See* 5 U.S.C. § 704.[42]

The Fifth Circuit's analysis applies equally to Texas's procedural right to challenge DACA. As such, Texas satisfies the first factor to qualify for special solicitude.

The Fifth Circuit's analysis of the second factor—affecting the States' quasi-sovereign interests—does not translate to this case as easily as the first factor. The majority opinion in the DAPA litigation focused on DAPA's "imposing substantial pressure on [the plaintiff states] to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses." *Id.* at 153. Texas in this litigation has not asserted standing on the basis of driver's-license costs. Nevertheless, as explained more fully in this Court's *parens patriae* standing analysis, Texas has demonstrated a quasi-sovereign interest in the economic well-being

---

[41] *Id.* at 152.
[42] *Id.*

of its citizens, which amply supports Texas's entitlement to special solicitude in the standing analysis.

The Supreme Court in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez* recognized that a state has a "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." 458 U.S. 592, 607 (1982). The Court noted that the challenged conduct or program, whether by its direct or indirect effects, must injure "a sufficiently substantial segment of [the state's] population." *Id.* In other words, "more must be alleged than injury to an identifiable group of individual residents." *Id.* A helpful indicator of whether such an injury suffices, the Court remarked, is "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.*

Texas has certainly demonstrated such an interest. The States accurately allege that the DACA program bypasses Congress's comprehensive immigration framework to grant unlawfully present individuals lawful presence and thereafter work authorizations. DACA recipients in turn may compete with legally present individuals for available jobs, which can result in DACA recipients being hired for jobs for which legally present individuals have applied and otherwise would have been hired. The States further argue that the Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H ("ACA"), exacerbates this problem. As explained in the Court's *parens patriae* analysis, businesses are not required to provide health insurance to DACA recipients like they are to legally present employees. This makes DACA recipients less costly to employ, incentivizing employers to hire DACA recipients over similarly qualified Texas residents. Taken together, these elements create a more competitive labor market in which it is more difficult for legal residents of Texas to obtain jobs.

In its quasi-sovereign interest analysis in *Texas I*, the Fifth Circuit found that the States'

interests also implicated the same sorts of sovereignty concerns as Massachusetts's interests did

in *Massachusetts v. EPA*:

> When the states joined the union, they surrendered some of their sovereign
> prerogatives over immigration. They cannot establish their own classifications of
> aliens, just as "Massachusetts cannot invade Rhode Island to force reductions in
> greenhouse gas emissions [and] cannot negotiate an emissions treaty with China
> or India."

*Texas I*, 809 F.3d at 153 (quoting *Massachusetts*, 549 U.S. at 519); *see also Arizona v. United*

*States*, 567 U.S. 387 (2012) (discussing the ways in which federal law preempts state law in the

area of immigration).

As in *Massachusetts v. EPA* and *Texas I*, the States "rely on the federal government to

protect their interests," and Congress has provided them a procedural vehicle—the APA—to do

so. *Texas I*, 809 F.3d at 154.[43] That being the case, the Plaintiff States have shown that Texas is

entitled to special solicitude in this Court's standing analysis.

**B.      *Parens Patriae* Standing**

The States assert their standing to sue on the basis of the *parens patriae* doctrine. *Parens*

*patriae* standing allows a state to sue a defendant to protect the interests of its citizens at large.

*Alfred L. Snapp & Son*, 458 U.S. at 600–02. To do so, however, the state must have its own

specific type of interest—separate from that of its citizens—that has been injured. In Supreme

Court parlance, this type of interest has been termed a "quasi-sovereign" interest. *Id.* at 601.

The concept of a quasi-sovereign interest is "a judicial construct that does not lend itself

---

[43] In addition to its quasi-sovereign interest in preserving its sovereign territory, Massachusetts also directly owned some of the coastal land it alleged would be harmed by rising sea levels. *Massachusetts*, 549 U.S. at 519. The majority found this fact significant to the special solicitude analysis, though apparently not dispositive. *See id.* ("That Massachusetts does in fact own a great deal of the 'territory alleged to be affected' *only reinforces* the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power." (emphasis added)). To the extent direct injury to a State's interests is relevant, the Court finds that DACA causes direct financial injuries to Texas in the form of increased social services costs. That finding is discussed in detail below in Section V.C.

to a simple or exact definition." *Id.* Recognizing the imprecision inherent in the term, the Supreme Court in *Alfred L. Snapp & Son* sought to explain what could qualify as a quasi-sovereign interest. The Court first defined quasi-sovereign interests by describing what they were not. "They are not sovereign interests," such as the power to write and enforce a legal code or maintain a border. *Id.* They are not a state's "proprietary interests, or private interests pursued by the State as a nominal party." *Id.* at 602. Instead, quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Id.*

Not all such interests count, however. A quasi-sovereign interest must also be "sufficiently concrete to create an actual controversy between the State and the defendant," a concept that "[could] only be filled in by turning to individual cases." *Id.* After surveying the case law, two general categories of quasi-sovereign interests emerge: a state's interest "in the health and well-being—both physical and economic—of its residents in general" and a state's "interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

The States seek standing under the first category. Under their theory, DACA injures the economic well-being of their citizens because those citizens are forced to compete in distorted labor markets in which it is more difficult to obtain a job. This is true for two reasons. First, DACA recipients receive work authorization under the program, which Texas argues allows them to compete with a state's legal residents for jobs. *See* Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children* (June 15, 2012) [Doc. No. 6, Ex. 1, at 5]; Decl. of Donald Deere [Doc. No. 7, Ex. 11, at 92] ("[T]he addition of some 683,000 work-eligible individuals nationwide, with 112,000 of these in Texas . . . make it more difficult for some U.S. citizens to find employment."). Second,

Texas alleges DACA recipients actually have a competitive advantage over those citizens because they may cost less to employ. Under the ACA, employers with fifty or more employees are required to offer health insurance to each of their full-time employees, and employers who do not offer insurance incur a monetary penalty. The additional cost of providing coverage (or paying the penalty), however, does not apply when the employee is a DACA recipient. All else being equal, an employer wishing to minimize costs may rationally prefer to hire a DACA recipient as opposed to someone legally in the state because employing the DACA recipient costs less.

Evidence in the preliminary injunction record supports this theory. For instance, in response to a question asking whether low-skilled DACA recipients "would increase competition with other people who are citizens who are also competing for those low skilled jobs," Defendant-Intervenors' expert, Dr. Ike Brannon, replied that they would. Dep. of Ike Brannon [Doc. No. 289, Ex. 3, at 141]. Further, the record demonstrates that some DACA individuals have been selected over other candidates for highly competitive positions.[44]

In addition to the arguments brought forth by the parties, many businesses appearing as amici curiae in this case have indicated they would hire non-DACA employees if the DACA program ceased. *See* [Doc. No. 221, Ex. 1, at 20] ("[T]he Texas business community, including many *Amici* and their members, stand to suffer substantial and irreparable injury if DACA is enjoined because Texas businesses will . . . incur additional costs to fill positions now occupied by Dreamers."); [Doc. No. 204, Ex. 1, at 18] ("If this Court were to enjoin DACA and thereby

---

[44] Although not in Texas, one DACA recipient was selected over other applicants for positions in Harvard University's Financial Aid Initiative and its Office of Equity, Diversity, and Inclusion. [Doc. No. 219, Ex. 19, at 5–6]. Another was selected over other applicants for a competitive internship, and ultimately a full-time position, as a social worker in New Jersey's Department of Children and Families. [Doc. No. 40, at 170–72]; [Doc. No. 219, Ex. 20, at 5]. At this stage, the record does not indicate why these candidates were chosen. It could be they were better qualified, cheaper to hire, or due to any number of other reasons. The Court does not need to resolve every factual controversy to make a standing determination.

permit Dreamers' work authorizations to expire, companies will face an estimated $6.3 billion in costs to replace Dreamers . . . ."); [Doc. No. 192, Ex. 1, at 5] (explaining that New Jersey businesses would incur substantial costs related to hiring and training new workers if DACA were terminated). In other words, but for DACA, these businesses would need work-authorized individuals to meet their business needs, and they would have to hire applicants from a pool consisting of those legally in the United States. This market imbalance undoubtedly supports Texas's claim that an injury to the economic well-being of those legally in Texas exists and the economic well-being of its residents is a quasi-sovereign interest sufficient to support standing. Both courts in *Regents of California* and *Batalla Vidal*, which are cited favorably by the Defendant-Intervenors, found that states or state agencies that were plaintiffs in their cases had standing to protect their work force. *Regents*, 279 F. Supp. 3d at 1033–35 (finding two states and two cities had standing); *see also Batalla Vidal*, 279 F. Supp. 3d at 437–38 (entering an injunction in favor of sixteen plaintiff states).

Though the States have demonstrated a quasi-sovereign interest, Defendant-Intervenors argue that *parens patriae* cannot apply here because the applicable case law states that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." [Doc. No. 224, at 35] (quoting *Alfred L. Snapp & Son*, 458 U.S. at 610 n.16). As an initial matter, the Court notes that the cited language is dictum, as the federal government was not a defendant in the case. Nevertheless, there are undoubtedly limits on a state's ability to sue the federal government as *parens patriae*, as evidenced by case law from nearly a century ago. *See Massachusetts v. Mellon*, 262 U.S. 447 (1923). The question this Court must answer is whether those limits forbid *parens patriae* standing under the circumstances of this case. The Court finds they do not.

The language cited from the *Snapp* case by the Defendant-Intervenors finds its origins in *Massachusetts v. Mellon.* In *Mellon*, the Supreme Court considered the justiciability of an action between the State of Massachusetts and the United States Secretary of the Treasury Andrew Mellon. *Id.* at 479–80. Massachusetts challenged the constitutionality of the Maternity Act, which funded state agencies seeking to reduce maternal and infant mortality rates. *Id.* To participate in the program, states were required to structure their programs according to federal guidelines. *Id.* at 479. Failing to do so could result in the federal government withholding funds. *Id.* Massachusetts sued, arguing (among other things) that the Act exceeded Congress's legislative authority prescribed by the Constitution—in other words, Congress acted unconstitutionally by legislating "for purposes not national, but local to the states." *Id.* at 479–80. The Supreme Court considered Massachusetts's alleged bases for the invocation of judicial power and, finding them unsatisfactory, dismissed the case. *Id.* at 480.

After canvassing its precedent on what types of cases were justiciable, the Court considered Massachusetts's arguments for justiciability, of which there were two. First, Massachusetts sought to sue in its own behalf. The Court rejected the argument, on the basis that Massachusetts had not called upon the Court to adjudicate concrete rights, such as those of "person or property," "dominion over physical domain," or "quasi sovereign rights actually invaded or threatened." *Id.* at 484–85. Rather, Massachusetts was seeking to invoke the power of the judiciary for nothing more than an "abstract question[] of political power." *Id.* at 485. Since "[n]o rights of the state falling within the scope of the judicial power" were presented for adjudication, Massachusetts could not invoke the power of the judiciary to pass judgment on the Maternity Act. *Id.*

Massachusetts also argued that it could bring suit "as the representative of its citizens"—

in other words, as their *parens patriae*. *Id.* Under the facts of the case, the Supreme Court held that Massachusetts could not "institute judicial proceedings to protect citizens of the United States *from the operation* of [federal statutes]." *Id.* (emphasis added). Since "the citizens of Massachusetts are also citizens of the United States," it was not part of Massachusetts's "duty or power to enforce their rights in respect of their relations with the federal government." *Id.* at 485–86. "In that field," the Court declared, "it is the United States, and not the state, which represents them as *parens patriae*." *Id.* at 486. In other words, because the United States was the superior *parens patriae* to Massachusetts, the state could not sue on behalf of its citizens to protect them from the operation of a federal statute.

It was against this backdrop that the Supreme Court in *Alfred L. Snapp & Son* noted that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. at 610 n.16 (citing *Mellon*, 262 U.S. 485–86). That statement, however, is dictum relegated to a closing footnote in the case, unnecessary to the Court's holding that Puerto Rico had *parens patriae* standing to sue private businesses in Virginia. *Id.* Furthermore, subsequent development in the case law makes clear that states can sue the federal government on a *parens patriae* theory, at least in some circumstances.

In *Massachusetts v. EPA*, the Court specifically rejected the argument that state *parens patriae* standing is categorically barred in suits against the federal government. Justice John Paul Stevens, writing for the majority, stated that *Massachusetts v. Mellon* had "disavowed" a "broad reading" of the limits on *parens patriae* standing because the Court was not "called upon to adjudicate . . . *quasi-sovereign rights actually invaded or threatened*." *Massachusetts v. EPA*, 549 U.S. at 520 n.17. Bolstering the argument, he added that the Court's holding in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 447 (1945), recognized a "critical difference between

allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* Relating those principles to the case at hand, the majority stated that "Massachusetts does not here dispute that the Clean Air Act *applies* to its citizens; it rather seeks to assert its right under the Act." *Id.* In a dissent accusing the Court of "devis[ing] a new doctrine of state standing," Chief Justice Roberts wrote that the majority overlooked Supreme Court precedent—*Massachusetts v. Mellon* and *Alfred L. Snapp & Son*—that "cast significant doubt on a State's standing to assert a quasi-sovereign interest . . . against the Federal Government." *Id.* Nevertheless, in sum, after *Massachusetts v. EPA*, *parens patriae* standing is prohibited where a state seeks to "protect her citizens from the operation of federal statutes," but permitted where a state wishes "to assert its rights under federal law."

Applying that framework to the present lawsuit, Texas is asserting rights under federal law rather than attempting to protect its citizens from the operation of federal statutes. Like Massachusetts "asserting its rights under [the Clean Air] Act," Texas brings this APA action to assert its right to comment on what it alleges to be a legislative rule, its right to challenge agency action it alleges to be outside of the DHS's statutory authority, and its right to enforce the INA's protections for American workers. *Id.* Texas has not submitted "abstract questions of political power" to this Court. *Mellon*, 262 U.S. at 485. It has demonstrated a concrete injury to its quasi-sovereign interest in the economic well-being of its citizens, "assur[ing] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Texas has demonstrated a judicially cognizable injury.

It is also clear the alleged injuries were caused by DACA. Without the lawful presence and work authorizations conferred by the program, DACA recipients would be unable to compete with legally present Texas residents for many jobs in the state. Since the benefits derived from the DACA program allow its recipients to compete with legally present residents, the causation element is satisfied.

The final issue the Court must address is whether there is redressability—"a likelihood that the requested relief will redress the alleged injury."[45] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The redressability inquiry turns on whether the plaintiff "personally would benefit in a tangible way from the court's intervention." *Id.* at 103 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). Since the States' quasi-sovereign interest in the economic well-being of lawful residents is the injury under consideration, the Court considers whether the requested relief is likely to redress that injury.

The States seek an order enjoining the Government from issuing or renewing all future DACA permits, as well as a declaratory judgment that DACA violates the Take Care Clause and the APA. If the Court were to declare that DACA violated law and enjoin or vacate the program, DACA recipients would no longer be entitled to work authorization. Without work authorization, they could not compete with the States' citizens and other legally present residents in the labor market, thereby reducing the labor market distortions about which the States complain.

---

[45] Typically, when a litigant seeks to vindicate a procedural right, "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas I*, 809 F.3d at 150–51 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)). Under most circumstances, a procedural right relaxes standing requirements, but that framework does not apply precisely here. The "injury-causing party," the Government, continues administering the DACA program because they have been ordered to, rather than by their own volition. It therefore seems inaccurate to say that judicial relief will cause the Government to "reconsider" their decision to continue DACA—it has already reconsidered the decision by attempting twice to rescind the program. Since it is in this posture, the Court will analyze redressability under the traditional test.

Accordingly, the States "personally would benefit in a tangible way from the court's intervention." *Steel Co.*, 523 U.S. at 103 n.5 (quoting *Warth*, 422 U.S. at 508).

In their motion to dismiss for lack of subject matter jurisdiction, the Defendant-Intervenors argue that the States cannot satisfy the redressability requirement. [Doc. No. 118]. They argue that any order by this Court would not be able to redress the States' injuries because the Government is enjoined by other court orders from ending the DACA program and this Court's order could not relieve the Government of its obligation to comply with the other courts' injunctions.

The Court is unpersuaded that other courts' injunctions deprive this Court of jurisdiction for at least four reasons. First, those courts were not asked to determine the lawfulness of DACA; rather, they were asked to determine the lawfulness of its rescission. Second, as a general matter, redressability does not turn on the likelihood that a defendant will comply with a court's injunction. In fact, courts typically assume as much, and with good reason: were that not the rule, a defendant could thwart a court's jurisdiction simply by announcing the intention to not follow the court's order. Courts properly do not engage in this inquiry and instead determine whether an injunction would redress the plaintiff's injury, *assuming* the defendant complies with the injunction. Third, the injunctions do not bar this Court from awarding declaratory relief vacating the 2012 DACA memorandum. Finally, the States seek relief from some injuries that are wholly outside the activity enjoined by other courts. The States have asked this Court to enjoin both DACA renewals *and* new DACA applications. *See* Pls.' First Am. Compl. [Doc. No. 104, at 73]. As of the date of this opinion, the California, New York, and D.C. courts' injunctions/vacatur only require the Government to process DACA renewals, leaving the Government free to decide whether to accept new DACA applications. Thus, were this Court to enjoin the Government from

processing new DACA applications, that relief would certainly redress some of the States' injuries, without implicating any of the Defendant-Intervenors' concerns related to conflicting injunctions.

The Defendant-Intervenors argue that any injunction granted by this Court would not "unquestionably" redress the States' harm because the order of "another court would continue to stand between Plaintiffs and their desired outcome." [*Id.* at 16–17]; [*Id.* at 17 (quoting *Texas I*, 86 F. Supp. 3d 591, 624 (S.D. Tex. 2015))]. First of all, that premise is incorrect—nothing prevents this Court from granting a declaratory judgment giving them complete relief. Further, it is not the States' burden to show that this Court's order would "unquestionably" redress the States' harm; rather, the States must only show that the injury is "likely" to be redressed by a favorable decision. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). A declaratory judgment that DACA was implemented illegally or that it was contrary to law could require the Government to cease the program, the very result the Plaintiff States are seeking. Further, if this Court were to grant an injunction, it could redress all of Texas's concerns.

Fifth Circuit case law supports this result. In *Hanson v. Veterans Administration*, the Fifth Circuit found redressability on facts less certain than those in this case. 800 F.2d 1381, 1385–86 (5th Cir. 1986). *Hanson* concerned the Veterans Administration's ("VA") Home Loan Guaranty Program, which allowed veterans to obtain home loans under favorable terms from private lenders. *Id.* at 1383. Lenders were incentivized to issue such loans because, among other things, the VA would guarantee up to sixty percent of each loan. *Id.* Before the VA would guarantee a loan, however, it hired an appraiser to determine the value of the home. *Id.* The appraisal was to be based in part on the value of recently sold comparable homes, which would then be submitted to a VA review appraiser who could adopt, modify, or reject the appraisal. *Id.*

The VA would not guarantee any loan for more than the figure approved by the VA review appraiser. *Id.*

The plaintiffs in the case were a number of individual veterans seeking home loans under the program. *Id.* They alleged that the VA appraisers injured their ability to receive a guaranteed loan by discriminatorily adjusting the appraisals of certain properties downwards because they were in a racially mixed neighborhood. *Id.* at 1384. The Fifth Circuit found that one plaintiff, Professor Otis King, had standing. *Id.* at 1385. King contracted to buy a house for $46,950, but he was unable to complete the sale because the VA had issued an appraisal for only $40,000, "thereby limiting the amount of the loan they would guarantee." *Id.* King was unable to personally finance the difference and therefore was unable to purchase the house due to the low appraisal.

The court considered whether enjoining the discriminatory appraisal practices would redress King's injury. *Id.* The question to be asked, the court explained, is whether "the prospect of obtaining relief from the injury as a result of a favorable ruling is too speculative[.]" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). Despite the lack of certainty as to whether a discrimination-free appraisal would have allowed King to purchase the house, the Fifth Circuit found that he had shown redressability, as the injunction "might permit [King] to purchase" the house. *Id.* at 1386. Like in *Hanson*, an injunction of DACA or a favorable declaratory ruling "might permit" the States to have redress of their injuries. This is particularly true in light of the special solicitude this Court must afford Texas under *Massachusetts v. EPA*.[46]

---

[46] As stated earlier, two of the four DACA rescission cases included states as plaintiffs. It is difficult to conceive how states could have standing to challenge the rescission of the DACA program but not have standing to challenge its enactment.

47

### C.     Standing for Healthcare, Education, and Law-Enforcement Costs

The States also assert standing on the basis of the costs they incur providing DACA recipients with healthcare, education, and law-enforcement services. The award of lawful presence triggers many state and federal benefits. Additionally, there are other costs implicated by DACA. For example, by its own terms, the DACA memorandum does not require the States to provide educational services, but other aspects of federal law do. The States are required under *Plyler v. Doe*, 457 U.S. 202 (1982), to educate all children, regardless of their immigration status. Similarly, as a condition to participate in federal Medicare and Medicaid, states must provide emergency services to all individuals, also regardless of immigration status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. The States argue that DACA increases these costs because it "incentivize[s] aliens—who would otherwise be unlawfully present and unauthorized to work without these programs—to remain in the country, including in the Plaintiff States." [Doc. No. 218, at 42]. In other words, because DACA increases the total number of aliens in the States by disincentivizing those already present from leaving, the States must provide more of these social services, which cost more. The States have demonstrated both aspects of this causal chain: they bear the costs of providing these social services required by federal law, and the DACA program increases the volume of individuals to whom they must provide these services.

First, as explained above, federal law requires the States to provide certain social services to individuals regardless of their immigration status. For example, Texas alleges it spent more than $375,000,000 over the past eleven years providing emergency Medicaid services to illegal aliens. Decl. of Monica Smoot [Doc. No. 7, at 28]. While that figure also captures the expenses borne from non-DACA aliens, DACA recipients certainly constitute some of those expenses, too. This is corroborated by the Defendant-Intervenors' expert, who opined that Texas incurs

more than $250,000,000 in total direct costs from DACA recipients per year. [Doc. No. 219, Ex. 1, at 4].

Second, the DACA program increases the total number of individuals using Texas's social services. DACA relief has been conferred on approximately 115,000 individuals in Texas as of September 2017. [Doc. No. 1, at 82]; [Doc. No. 302, at 93]. Texas argues that some percentage of these recipients would leave the country if DACA ends. The State Demographer of Texas, Lloyd B. Potter, found that some DACA recipients "could be expected to migrate out of the U.S." if they did not have permission to work, and that it was "reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S." Decl. of Lloyd B. Potter [Doc. No. 7, at 5–7]. This claim is supported by the empirical findings of the Defendant-Intervenors' expert, who conducted a survey of over 3,000 DACA recipients that found over twenty-two percent of survey respondents were either likely or very likely to leave the United States if DACA ended. [Doc. No. 219, Ex. 2, at 4] (survey of Tom K. Wong). Since enjoining DACA would invalidate DACA recipients' deferred action status and work authorization, this study shows that a quantifiable percentage of individuals would likely leave the United States. Under those circumstances, Texas would no longer be obliged to pay for those DACA recipients' social services costs, thereby reducing some of its financial losses.

Speaking broadly, Defendant-Intervenors have three responses to this argument: first, that there is no evidence of injury to Texas nor evidence that DACA recipients would leave the United States if DACA ended; second, that Texas's purported injuries are not traceable to DACA; and third, that the revenues generated by DACA recipients offset any purported injuries to Texas.

The Defendant-Intervenors' first argument—that there is no evidence of injury—focuses on the fact that the States rely on cost estimates that the Defendant-Intervenors claim are inaccurate or methodologically flawed. First, for purposes of the Plaintiff States' standing vis-à-vis their declaratory judgment action, the Court accepts the States' allegations from their pleadings that invalidating DACA would reduce the number of DACA recipients using the States' social services. *Cf. Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 841 (5th Cir. 2003) (assuming the truth of plaintiff's pleaded allegations to review a motion to dismiss plaintiff's declaratory action for lack of justiciability). Second, even with respect to the preliminary injunction, the Court finds that the States have carried their burden regarding standing. Though the Defendant-Intervenors lodge attacks against the evidence supporting each type of cost—education, healthcare, and law-enforcement services—the Court need not address those arguments line-by-line because the States only must show *some* injury, as opposed to a "substantial" injury. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial; 'it need not measure more than an "identifiable trifle."' This is because 'the injury in fact requirement under Article III is qualitative, not quantitative, in nature.'" (internal citations omitted)).

The Court is satisfied that Texas's evidence demonstrates an injury. Texas has established that it bears hundreds of millions of dollars in costs providing emergency Medicaid services to illegal aliens. As discussed above, Texas's estimates include the costs of providing emergency services to both DACA recipients and those who do not have DACA status. The Defendant-Intervenors argue that these costs cannot constitute any "direct evidence that even a single DACA recipient benefitted from these programs" because the costs are estimated and

because Texas does not inquire about residency or citizenship when providing these services. [Doc. No. 224, at 27]. For standing purposes, Texas need not plead damages from a particular individual when it pleads and has proof that it is being damaged by the entire program. In the scope of a program the size of DACA, with over 115,000 recipients in Texas alone, it is virtually certain that at least some DACA recipients utilize the emergency Medicaid services Texas is required to provide them. The Court is not deciding a motion on the merits, rather it is only determining standing. Finally, and perhaps most importantly for this topic, Defendant-Intervenors' own witness directly connected the dots for the Plaintiff States. *See* [Doc. No. 219, Ex. 1, at 4] (estimate of M. Ray Perryman that DACA recipients impose over $250,000,000 in costs to Texas annually).

The Defendant-Intervenors' own evidence not only cures any flaws of which they complain, it also supports the Plaintiff States' arguments in other ways as well. They cite a national survey that found approximately fifty-seven percent of DACA recipients have employer-based, private health insurance. [Doc. No. 224, at 28]. Their same expert who discusses that survey also notes that "[w]ithout private health insurance, DACA recipients would become *more reliant on emergency Medicaid* and community-based uncompensated care." Decl. of Leighton Ku [Doc. No. 225, Ex. 3, at 121] (emphasis added). Provided these are both true, the forty-three percent of DACA recipients who do not have employer-based, private health insurance are likely "more reliant on emergency Medicaid."[47] [*Id.*]; *see also* Decl. of Leighton Ku [*Id.* at 124] ("2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care in the last 12 months."); Dep. of M. Ray

---

[47] That is not to say that forty-three percent of DACA recipients rely on emergency Medicaid services. It is possible that the DACA recipients without employer-based health insurance acquire their own insurance, rely on community-based uncompensated care, or self-finance their medical expenses. The point is not that *every* DACA recipient contributes to these costs—it is sufficient that some do. *OCA-Greater Houston*, 867 F.3d at 612 ("[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature." (citations omitted)).

Perryman [Doc. No. 219, Ex. 8, at 15] (Question: "You don't dispute that the State of Texas does indeed incur a cost to provide health care to DACA recipients?" Answer: ". . . I assume there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state."). This is a sufficient showing of injury for purposes of demonstrating standing at this stage.

The Defendant-Intervenors' second argument, that Texas's purported injuries are not traceable to DACA, is also unpersuasive. The States argue that DACA disincentivizes self-deportation, thereby causing the States injury because more people use the States' social services. The Defendant-Intervenors contest the factual basis of this theory, arguing that DACA does not encourage DACA recipients to stay in the States. They do so primarily by attacking the credibility of the States' expert on the subject. Even totally discounting the declaration of the States' expert, however, the Defendant-Intervenors' own expert sufficiently demonstrates the causal link between DACA and Texas's injuries; as mentioned above, Dr. Tom K. Wong's survey found that just over twenty-two percent of DACA recipients were either likely or very likely to leave if the DACA program ended.[48] [Doc. No. 219, Ex. 2, at 4]. The Defendant-Intervenors' response to this finding is to challenge their own expert's survey. They claim that Dr. Wong's question required DACA recipients to "predict future behavior," that it concerned

---

[48] This evidence is also related to another argument made by the Defendant-Intervenors—that there is no redressability (and thus no standing) when an injury stems from the independent actions of third parties rather than a government policy. *See* [Doc. No. 224, at 28–29] (citing *Texas v. United States*, No. B-94-228, at *7 (S.D. Tex. Aug. 7, 1995), for the proposition that "the decision to cross the border without documented status results from the 'conscious actions of aliens,' rather than a policy decision of the U.S. government"). The Court rejects this argument for two reasons. First, this is not a case where causation and redressability depend on the unmediated and untethered wills of DACA recipients. Their decisions are, in fact, both mediated by and tethered to DACA, as many DACA recipients have indicated that their decision to stay or leave the country turns on the continued existence of the DACA program. In that sense, the injury Plaintiff States complain about *is* caused by the DACA program and would be redressed, at least to some extent, if the program were to end. Second, the dissolution of DACA would void the DACA recipients' deferred action, making them removable. Though not every individual would be removed, some might, which would reduce the social services costs of which the Plaintiff States complain. Particularly under the relaxed causation and redressability standards this Court must afford the Plaintiff States under *Massachusetts v. EPA*, the Court finds that this argument does not undermine the Plaintiff States' case for standing.

complex decisions that are "inherently speculative," and that the question order might have "inaccurately bias[ed]" the survey takers, all leading to the conclusion that there are "strong reasons to doubt those answers are predictive" of whether former DACA recipients would leave. [Doc. No. 288, at 16].

These arguments are unavailing at least for standing purposes. People routinely "predict [their] future behavior," even in the face of considerable contingencies. [*Id.*] Although it is possible that some of the study's participants might change their minds, that does not destroy standing for Texas. Further, if some former recipients were to change their minds, more might decide to leave than to stay. No one can know the answer to this question. What is evident, however, is that it was the Defendant-Intervenors who decided to seek Dr. Wong's expert assistance and submitted his survey for consideration in this lawsuit. Had they taken issue with the survey's methodology or results, they could have expressed those concerns to Dr. Wong or simply not introduced his survey into the preliminary injunction record. Instead, the Defendant-Intervenors chose an expert with this opinion, knowing from the beginning of the suit that the States were asserting this basis for standing. *See* [Doc. No. 5, at 10] ("DACA, Expanded DACA, and DAPA cause those costs because these programs incentivize aliens—who would otherwise be unlawfully present and unauthorized to work without these programs—to remain in the country, including in the Plaintiff States."). While Defendant-Intervenors seem to complain about the evidence which emanates from their own experts, which they are entitled to do, those complaints do not change the facts established by those individuals.[49]

---

[49] Defendant-Intervenors make three additional arguments attempting to undermine the results of their own expert's survey. They may be dispatched quickly.

First, the Defendant-Intervenors argue that even if that entire twenty-two percent—the 683 DACA recipients who reported they would likely or very likely leave if DACA ended—lived in Texas, their impact on Texas's social services costs would be *de minimis*. [Doc. No. 288, at 16 n.4]. Defendant-Intervenors do not cite a case supporting the proposition that a *de minimis* injury is not an injury for Article III purposes. In fact, the opposite is true. *See*

The Defendant-Intervenors' third argument is that "any purported costs" borne by Texas as a result of DACA "would be more than offset by the positive impacts DACA recipients have on the economy." [Doc. No. 224, at 32]. The offsetting-benefit theory to defeat standing was rejected in *Texas I* by the Fifth Circuit. *See Texas I*, 809 F.3d at 155–56 ("'Once injury is shown, no attempt is made to ask whether the injury is out-weighed by benefits the plaintiff has enjoyed from the relationship with the defendant.' ... 'Our standing analysis is not an accounting exercise.'" (quoting 13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.4; *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)). Finding no material difference between the argument there and the one made here, this Court similarly rejects the argument.[50]

---

*OCA-Greater Houston*, 867 F.3d at 612 ("[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature." (citations omitted)). Even if a *de minimis* injury was insufficient for Article III purposes, however, Defendant-Intervenors' criticism misses the point: the States' reliance on the survey is not to show that 683 specific individuals would leave, but rather that some of the people across the entire DACA population (115,000 of which live in Texas) would leave.

Second, the Defendant-Intervenors claim that they personally would not leave if DACA ended, which they argue "rebuts Plaintiffs' inferences from the Wong survey." [Doc. No. 288, at 17]. That fact only proves that some DACA recipients would intend to stay. It does not "rebut" the survey result that some would leave, which is the proposition the States seek to establish here. It also assumes that these recipients who are illegal aliens can stay.

Third, the Defendant-Intervenors claim that "Texas has not shown that any use of public benefits are traceable to the DACA recipients whom Texas claims would leave the state." [Doc. No. 288, at 15]. In response to a similar traceability argument in the DAPA litigation, the Fifth Circuit invoked Texas's special solicitude under *Massachusetts v. EPA*. *Texas I*, 809 F.3d at 159. "For Texas to incur injury, DAPA beneficiaries would have to apply for driver's licenses as a consequence of DHS's action, and it is apparent that many would do so. For Massachusetts's injury to have occurred, individuals would have had to drive less fuel-efficient cars as a result of the EPA's decision, and that would have had to contribute meaningfully to a rise in sea levels, causing the erosion of the state's shoreline." *Id.* at 159–60. The Fifth Circuit concluded that DAPA would cause financial harm to Texas, which followed *a fortiori* from the Supreme Court's conclusion that the EPA's decision would cause the erosion of Massachusetts's coast. *Id.* Since Texas is also entitled to special solicitude here, the same reasoning applies.

[50] The Defendant-Intervenors make two additional arguments, related to "generalized injur[ies]" and "generalized grievances," that warrant brief discussion. They first claim that the Supreme Court's decision in *Gill v. Whitford*, a political gerrymandering case, stands for the proposition that "a plaintiff may seek redress of a particularized harm, but may not cite such narrow interest as grounds to seek redress for a generalized injury." [Doc. No. 224, at 33]. In *Gill*, the Supreme Court held that individual voters did not have standing to challenge "the statewide harm to their interests in their collective representation in state legislature, and in influencing legislature's overall composition and policymaking." 138 S. Ct. 1916, 1931 (2018) (quotations omitted). Rather, because a person's right to vote is "individual and personal in nature," the Court ruled that the alleged harm—dilution of the power of one's vote—is a "district specific" injury. *Id.* at 1930. Since those harms were district specific, the plaintiffs could only have standing to seek revision of the boundaries of their own districts. *Id.* The Plaintiff States allege that DACA injures the economic well-being of its citizens and presents direct, garden-variety financial injuries to the States' treasuries. Defendant-Intervenors do not explain nor cite authority discussing why either of these types of injury must be

The Court finds Texas has standing because DACA causes them to incur greater social services costs.[51] Since one party has standing, the Court may proceed to address the merits.

## VI.   DACA is Reviewable Under the APA.

In addition to Article III's requirements, the APA imposes several statutory[52] standards that must be met before a federal court can review agency action. First, the States must show they are "arguably within the zone of interests to be protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Second, the DACA memorandum must constitute "final agency action" to be reviewable. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Third, the Court must determine whether a statute precludes judicial review. 5 U.S.C. § 701(a)(1). Finally, the Court must determine whether the DACA memorandum is "agency action . . . committed to agency discretion by law." *Id.* § 701(a)(2). The first three reviewability requirements are uncontested and discussed briefly

---

"district specific," as in the instance of one's right to vote. As such, the Court declines the opportunity to extend *Gill* to this context.

The Defendant-Intervenors also argue that the Court should not review DACA because the Plaintiff States' grievances would be better resolved by the political branches of the federal government. [Doc. No. 224, at 39]. The Supreme Court has repeatedly "rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." *Valley Forge*, 454 U.S. at 482–83 (citations and quotations omitted). Such claims, the Court recognized, "amount to little more than attempts to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government." *Id.* at 483 (citations and quotations omitted). Here, the Plaintiff States do not seek to invoke federal court jurisdiction solely to "require that the Government be administered according to law." They assert their own particularized interests in protecting the economic well-being of their lawful residents and protecting their treasuries from excess social services costs. These are not generalized interests in the Government adhering to the rule of law, where "each person has suffered the same, indistinct injury" that cannot support standing. 33 Charles Alan Wright et al., *Federal Practice and Procedure* § 8412. Since the Plaintiff States have demonstrated particularized injuries separate from the widely shared interest all citizens have in the Government abiding by our laws, the generalized grievance bar does not prevent the Court from hearing this case.

[51] The Court notes that even without a finding of special solicitude under *Massachusetts v. EPA*, it still would have found the Plaintiff States had standing.

[52] The Supreme Court historically considered the zone-of-interests test discussed below to be a prudential standing requirement. *See, e.g., Bennett v. Spear*, 520 U.S. 154, 162 (1997). Since *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), however, the Supreme Court has begun to interpret the test as a statutory question, rather than one dictated by Article III of the Constitution. *See Lexmark*, 572 U.S. at 125–28. Under either classification, the result in this case is the same.

below. The fourth requirement, whether the agency action is committed to agency discretion by law, is contested and is therefore fully addressed.

### A. Zone of Interests, Final Agency Action, and Preclusion by Statute

To proceed under the APA, a plaintiff's asserted interest must be "arguably within the zone of interests to be protected or regulated by the statute" that allegedly was violated. *Texas I*, 809 F.3d at 162 (quoting *Patchak*, 567 U.S. at 224). The test is "not meant to be especially demanding," a point emphasized by the Supreme Court's consistent and conspicuous use of the word "arguably" in it. *Id.* (quoting *Patchak*, 567 U.S. at 225). The zone-of-interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Patchak*, 567 U.S. at 225).

No party in this case appears to challenge that the States' interests are within the zone of interests of the INA, and in *Texas I* the Fifth Circuit held as much. *Texas I*, 809 F.3d at 162–63. The States meet the zone-of-interests test.

A challenged action must also be "final agency action" to be reviewable under the APA. *See Nat'l Wildlife Fed'n*, 497 U.S. at 882 ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)). Like in *Texas I* regarding the DAPA memorandum, no party contests that the DACA memorandum is final agency action. *See Texas I*, 809 F.3d at 163 n.82. This Court finds only one distinction between the DAPA and DACA memoranda on this point. Unlike DAPA, which had not yet taken effect, DACA went into immediate effect in 2012 and has been in operation since that time. Therefore, there is no question that the DACA memorandum constitutes final agency

action.

Further, agency action is not reviewable if there is a statute that precludes judicial review. 5 U.S.C. § 701(a)(1). In *Texas I*, the Government argued that a section of the INA expressly prohibited judicial review. 809 F.3d at 164.[53] The Fifth Circuit rejected the argument, based on the Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), which took a narrow view of the statute. That holding is binding on this Court, and no parties argue to the contrary. As such, judicial review is not precluded by statute. *See* 5 U.S.C. § 701(a)(1).

**B.     DACA Is Not Action Committed to Agency Discretion by Law.**

The Defendant-Intervenors argue that the DACA memorandum is an exercise of enforcement discretion that is unreviewable under the APA. [Doc. No. 224, at 41]. While persons adversely affected or aggrieved by final agency action are generally entitled to review of that action,[54] the APA excludes certain kinds of agency action from judicial review altogether. The Defendant-Intervenors argue that DACA is unreviewable under the APA because it falls into one of the categories of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Section 701(a)(2) "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas I*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Examples of decisions not

---

[53] The section in question was 8 U.S.C. § 1252(g), which states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

[54] *See* 5 U.S.C. §§ 702, 704.

subject to judicial review are "an agency's decision not to institute enforcement proceedings" and agency action where the statute authorizing agency discretion is "drawn in such broad terms that in a given case there is no law to apply." *Id.* (quoting *Lincoln*, 508 U.S. at 191; *Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir. 1990)). The Defendant-Intervenors assert that DACA is an exercise of the Secretary's enforcement discretion with respect to the removal of aliens and that the INA does not "set constraints on DHS's exercise" of that discretion. [Doc. No. 224, at 42]. As they recognize, however, the Fifth Circuit in *Texas I* held DAPA and Expanded DACA to be reviewable. [*Id.* at 43]. The reasons stated by the Fifth Circuit are equally applicable to DACA.

The Fifth Circuit rejected the argument that DAPA and Expanded DACA's grant of deferred action constituted an unreviewable exercise of prosecutorial discretion. *Texas I*, 809 F.3d at 166. Though the bare decision not to prosecute may be presumptively unreviewable, the Fifth Circuit found that deferred action under the program was "much more than nonenforcement" because the DAPA program "would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Id.* By removing a categorical bar to the receipt of federal benefits, DAPA made a class of individuals eligible for those benefits, thereby "providing a focus for judicial review." *Id.* The majority found that this constituted "affirmative agency action" with "meaningful standards against which to judge [DAPA]." *Id.* at 168–69.

DAPA and Expanded DACA were thus reviewable under Section 701(a)(2). *Id.* at 169. The same is true of the original DACA, which provides lawful presence and the exact same benefits. Though the Defendant-Intervenors caution this Court not to extrapolate between DAPA and DACA, they have not suggested any meaningful distinction between the two with respect to

Section 702(a)(2) reviewability. Like DAPA and Expanded DACA, DACA is not simply non-enforcement; its grant of deferred action confers lawful status and the benefits that flow from it, including work authorization.

The Defendant-Intervenors attempt to distinguish DACA from the Fifth Circuit's analysis of DAPA in two ways. First, they suggest that the analysis should be different because the DACA-eligible population is a smaller proportion of the total undocumented population in the United States compared to the DAPA-eligible population—approximately ten percent versus thirty-eight percent, according to the Defendant-Intervenors. *See* [Doc. No. 224, at 44] (citing *Texas I*, 809 F.3d at 147–48). This difference may be relevant for purposes of the Court's consideration of the merits, but it is immaterial to whether this Court may review an APA challenge to DACA. *See Texas I*, 809 F.3d at 167 ("Regardless of whether the Secretary has the authority to offer lawful presence and employment authorization in exchange for participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion."). The Defendant-Intervenors' second argument is that the DACA memorandum "did not fundamentally shift the likelihood of DACA-eligible non-citizens remaining in the United States, or create a change of 'economic and political magnitude'" because DACA-eligible individuals have backgrounds that make them unlikely to be prioritized for removal, even without the DACA memorandum. [Doc. No. 224, at 45]. Even assuming the truth of this assertion, it has no bearing on whether there are "meaningful standards against which to judge" DACA. The Expanded DACA and DAPA populations may be different, but, like DACA, both programs would have granted deferred action to confer lawful presence and numerous federal benefits[55] to

---

[55] The Defendant-Intervenors also argue that DACA does not confer benefits on DACA recipients. They assert DACA recipients actually receive benefits from regulations independent of the program. DACA, however, grants lawful presence, which is a prerequisite to eligibility for those benefits. The Fifth Circuit made clear that "DAPA need not directly confer public benefits" to be reviewable; instead, "removing a categorical bar on receipt of those

eligible individuals who would otherwise be ineligible. As such, this Court finds the programs indistinguishable for purposes of determining their reviewability under the APA.

Defendant-Intervenors make one additional argument that is not based on trying to distinguish DACA from DAPA or Expanded DACA. Instead, their argument focuses on subsequent Supreme Court precedent that arguably "clarifie[s] the law in a way that undermines the Fifth Circuit's earlier reasoning." [Doc. No. 224, at 45]. They claim that *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), stands for the proposition that when "the Executive addresses enforcement discretion with respect to a class, such a decision is unreviewable under the APA." [*Id.* at 47]. Although both *Trump v. Hawaii* and this case concern Executive Branch discretion with respect to immigration, differences in the relevant law and facts make *Trump v. Hawaii* inapplicable to this case.

*Trump v. Hawaii* considered the interaction between the Establishment Clause and the President's statutory authority to restrict alien entry into the United States. Section 1182(f) of the INA authorizes the President to "suspend the entry of all aliens or any class of aliens" whenever he finds that their entry "would be detrimental to the interests of the United States." 5 U.S.C. § 1182(f); *Trump v. Hawaii*, 138 S. Ct. at 2407. Pursuant to that authority, the President issued a proclamation deeming it necessary to restrict the entry of nationals from certain countries that either posed a national security risk or did not adequately share information for an informed entry decision. *Trump v. Hawaii*, 138 S. Ct. at 2403. After finding that the proclamation had been validly issued under the statute, the Court turned to the plaintiffs' claim that the proclamation violated the Establishment Clause because most of the countries subject to entry restrictions had

---

benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" *Texas I*, 809 F.3d at 167 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). In this regard, DACA is no different. Furthermore, as discussed later in this opinion, many courts have noted the benefits that DACA recipients receive. This argument does not preclude the Court's review of the program.

Muslim-majority populations and because it "singl[ed] out Muslims for disfavored treatment." *Id.* at 2417. The Court noted that decisions admitting or excluding foreign nationals were more appropriate for the political branches than the Judiciary, but it recognized that it had previously engaged in "a circumscribed judicial inquiry" of the Executive's decision to exclude foreign nationals when that exclusion allegedly burdened the constitutional rights of a U.S. citizen. *Id.* at 2418–19; *see also Kleindienst v. Mandel*, 408 U.S. 753 (1972). Without explaining the precise contours of its inquiry, the Court assumed it could evaluate the proclamation using rational basis review, and it ultimately found that the proclamation passed muster. *Trump v. Hawaii*, 138 S. Ct. at 2420, 2423.

The Defendant-Intervenors excerpt certain passages from the opinion to support their argument that DACA is not reviewable under the APA. They state the Supreme Court held that "when the Executive exercises [its delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion." [Doc. No. 224, at 46] (quoting *Trump v. Hawaii*, 138 S. Ct. at 2419). That language, however, addressed a fundamentally different inquiry. The Supreme Court was considering whether it could look past a facially valid proclamation to determine whether the discretionary decision to exclude some classes of aliens was a pretext for constitutional violations. There is no claim in this case that the DACA program should be scrutinized to determine whether executive discretion was used to violate an individual right guaranteed by the Constitution. *Trump v. Hawaii* only speaks to the circumstances under which a court may look behind the Executive's discretionary exclusion of certain aliens to determine whether the decision was *motivated by unconstitutional reasons.* On the other hand, reviewability under Section 702(a)(2) turns on whether Congress delegated to an agency the role of policing its own conduct and whether there

even are standards by which a court can meaningfully review agency action. *See Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985). Tellingly, Section 702(a)(2) makes no appearance in the *Trump v. Hawaii* case. These differences lead the Court to conclude that *Trump v. Hawaii* did not overrule the Fifth Circuit's Section 702(a)(2) analysis. As such, Section 702(a)(2) does not preclude this Court's review of DACA.[56]

## VII.   Preliminary Injunction

A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)). Before a court will grant a preliminary injunction, the movants must clearly show "(1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on

---

[56] Notably, the D.C. court ruled on the second rescission memorandum after the Supreme Court decided *Trump v. Hawaii*. Like this Court, the D.C. court did not find that the case affected the reviewability of DACA.

the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

### A.    Preliminary Injunction Factor One: Likelihood of Success on the Merits

A plaintiff seeking a preliminary injunction must first show a likelihood of succeeding on the merits of his or her claim. The Fifth Circuit has previously stated "[t]he importance of this requirement varies with the relative balance of threatened hardships facing each of the parties." *Callaway*, 489 F.2d at 576. While some courts have questioned the continued validity of this "sliding scale" approach in light of the Supreme Court's *Winter* decision,[57] this Court need not resolve that issue here. There is at least agreement among courts that a "plaintiff must present a prima facie case but need not show a certainty of winning." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.3.

The Plaintiff States argue that they will prevail on the merits because the DACA policy runs afoul of the Take Care Clause of the Constitution, substantively violates the APA, and the manner in which it was created failed to comply with the APA's notice-and-comment requirements. The Court addresses each argument in turn.

### 1.   The Take Care Clause

The Court will not rule on whether the DACA program violates the Constitution's Take Care Clause. U.S. Const. art. II, § 3. The Court declines to address this claim for several reasons. First, there is no need to rule on the Take Care Clause issue because the Court has reached a conclusion on a non-constitutional basis. It is a long-standing precept, steeped in the traditions of federal jurisprudence, that courts should avoid ruling on constitutional issues when a matter can be resolved on non-constitutional grounds. *See Escambia Cty. v. McMillan*, 466 U.S. 48, 51

---

[57] *See, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (agreeing with another D.C. Circuit opinion that "the *Winter* Court seemed to treat the four factors as independent requirements and specifically to reject the Ninth Circuit's statement that a strong likelihood of success on the merits lessens the movant's burden to showing merely a possibility rather than a likelihood of irreparable harm").

(1984) (per curiam).

Second, the Take Care Clause could actually be the basis for arguing that DACA is both constitutionally permissible and constitutionally impermissible. While it is one of the least understood clauses in the Constitution, and one of the clauses least explored by both commentators and courts,[58] the Supreme Court has held that the Take Care Clause is the source of the President's (and the Executive Branch's) power of prosecutorial discretion. *See United States v. Armstrong*, 504 U.S. 456, 464 (1996); *Heckler*, 470 U.S. at 832. DACA, at least nominally, was instituted as an exercise of prosecutorial discretion. Conversely, the Supreme Court has also held that the Take Care Clause directly commands the President to respect (and enforce) the law as passed by Congress. *See Youngstown Steel & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). "[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be the lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* at 587. In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Postmaster General (Kendall) refused to pay a bill Congress had specifically appropriated funds to pay. The Court held that the Postmaster General could be compelled by mandamus to "execute" the law. The Court rejected Kendall's claim that only the President could compel him to act:

> This is a doctrine that cannot receive the sanction of this court. It would be vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice.

---

[58] *See* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 64–68 (1994) ("[A]t the founding the clause received relatively little consideration by practically everyone in the debate. Hamilton devoted only a few lines in the Federalist Papers to discussion of this 'minor' executive power or responsibility.").

To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible.[59]

Moreover, Supreme Court precedent seems to have pitted different interpretations of the clause against each other.

The second striking element is that *the functions that the Court ascribes to the Take Care Clause are often in unacknowledged tension with one another*. For instance, deriving a strong prosecutorial discretion from the clause may collide with the scruple against dispensation that the Court also reads into it. Similarly, the Court has said that the Take Care Clause precludes presidential lawmaking while also finding that the clause justifies the exercise of a presidential completion power—an implied presidential authority to prescribe extrastatutory means when necessary to execute a statute. *The internal tensions, moreover, often give rise to doctrines that ask for judgments of degree—line drawing that does not lend itself readily to judicially manageable standards.*[60]

The instant case pits the concept of faithfully enforcing the law against the concept of prosecutorial discretion. Given that the Court need not rule on the constitutional issues at play to resolve this case and that the very clause at issue has been read as both an authorization and a prohibition on executive action, this Court finds that question is best left to the Fifth Circuit or the Supreme Court.

Even if these two reasons were not sufficient to support a refusal to opine, there is a third reason for avoiding the constitutional issue raised in this case. The number of cases that interpret the Take Care Clause are relatively few, and those few cases rarely, if ever, set out discernable guideposts for use by lower courts. In a non-scientific survey of Supreme Court jurisprudence, this Court has located fewer than ten cases in which the Take Care Clause is actually discussed by name.[61]

---

[59] *Id.* at 613.

[60] Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1838 (2016).

[61] A similar search for the text of the clause "take care that the laws be faithfully executed," yielded fewer than sixty cases.

Nevertheless, even when one uses the entirety of Supreme Court jurisprudence as guidance, the interpretation of the clause seems somewhat case-specific and fact-driven. In fact, some commentators have described the Supreme Court's interpretations of the clause as "(Non)interpretations."

> Two things stand out about the Court's reliance on the Take Care Clause to serve so many ends simultaneously. The first is that, in each of these contexts, *the Court treats the meaning of the clause as obvious when it is anything but that*. The Court's decisions rely heavily on the Take Care Clause but almost never interpret it, at least not in any conventional way. The Court does not typically parse the text of the clause or try to situate it in the broader constitutional structure that gives it context. Nor does the Court typically examine the clause's historical provenance (except to invoke an almost equally conclusory set of interpretations by members of the First Congress in the Decision of 1789).

* * *

> . . . the Court has [interpreted the clause] so casually and at a high level of generality, without any attention to detailed interpretive questions about the clause's meaning or history.  The Court has also failed to recognize the degree to which its explication of Take Care Clause doctrine in distinct and sometimes conflicting ways requires judgments of degree and line drawing that defy judicially manageable standards.

> A.  *(Non)interpretation of the Take Care Clause*

> The most striking feature of the Court's Take Care Clause jurisprudence is that the Court almost never construes the clause, at least not in any conventional way. It does not look at any of the evidence one would expect an interpreter to consider in determining the clause's relevance to the many uses to which the Court has put it. The Court has never taken more than a glancing look at the text, its common law meaning, the subsequent practical construction ("liquidation" of the clause's meaning), the clause's place in the broader constitutional structure, or the political context from which it emerged.

* * *

> Nor has the Court sought to reconcile its various Take Care Clause doctrines with one another or troubled itself about its own capacity to resolve the intractable line-drawing problems that its doctrine has created. Instead, the Take Care Clause has been a placeholder for broad judicial judgments about the appropriate

66

relations among the branches in our constitutional system—like the Court's own Key Number for freestanding separation-of-powers principles.[62]

This Court has no desire to use a discussion of the legality of DACA as a vehicle for creating new, innovative separation-of-powers principles. More importantly, it has no need to do so. Given the fact that federal courts strive to avoid constitutional issues when possible; given the fact that the clause at issue seems to be a vehicle for both bestowing and restricting executive authority; and given the fact that the Supreme Court's analysis seems to be very case-specific and somewhat devoid of useful, uniform guidance, this Court finds caution to be the better part of wisdom and constitutional avoidance to be the best course of action at this preliminary stage. This Court therefore defers judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue.

### 2.  Substantive APA Claim

The Plaintiff States also argue that "DACA is contrary to law because it is 'not authorized by statute,' and is 'foreclosed by Congress's careful plan.'" [Doc. No. 218, at 19] (citing *Texas I*, 809 F.3d at 184, 186). The APA instructs a reviewing court to "hold unlawful and set aside agency action . . . found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Here, the Court must consider the legality of the 2012 memorandum that instituted DACA and its relationship to the Immigration and Nationality Act ("INA").

---

[62] Goldsmith & Manning, *supra* note 60, at 1838, 1853–54, 1867. While the Court does not necessarily adopt the interpretations of Professors Goldsmith and Manning *in toto*, their article is certainly the best overview to be published in recent years. Another helpful source is Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671 (2014).

### a.  DACA Does Not Pass *Chevron*'s First Step

As did the Fifth Circuit in *Texas I*, the Court will assume, *arguendo*, that the test announced in *Chevron U.S.A., Inc. v. NRDC* applies in this case. *Texas I*, 809 F.3d at 178–79 (citing *Chevron*, 467 U.S. 837, 843 (1984)).[63] This test requires a court to defer to an agency's interpretation of its own statute only if the text of the statute is ambiguous and the agency's interpretation is reasonable. *Chevron*, 467 U.S. at 844; *Delek Refining v. Occupational Safety & Health Comm'n*, 845 F.3d 170, 175 (5th Cir. 2016).

At *Chevron*'s first step, a court asks "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842–43; *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2001). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"; if so, the court owes no deference to the agency. *Chevron*, 467 U.S. at 844; *see also City of Arlington v. FCC*, 569 U.S. 290, 306 (2013) ("Where Congress has established a clear line, the agency cannot go beyond it . . . ."); *Lari v. Holder*, 697 F.3d at 273, 278 (5th Cir. 2012).

### i.  The Agency Lacks Statutory Authority to Implement DACA.

DACA beneficiaries primarily entered the country either by overstaying a visa or by

---

[63] This Court follows the Fifth Circuit's blueprint as set out in *Texas I* and concludes it is unnecessary to determine whether *Chevron* or another standard applies because it has concluded that DACA cannot withstand review even under *Chevron. See Texas I*, 809 F.3d at 179 n.160. It is therefore unnecessary to employ the test described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (the amount of deference to an agency interpretation depends on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements") or to consider the factors described in *Barnhart v. Walton*, 535 U.S. 212 (2002), which sets out how to determine the appropriate standard of review. The fact that the agency reached its judgment through informal means also does not impact the Court's determination. *See Texas I*, 809 F.3d at 179 n.160 (citing *Walton*, 535 U.S. at 221 ("Judicial deference is ordinarily given to agencies' interpretations of their own statutes, even if those agencies reach their interpretations through means other than notice-and-comment rulemaking.")).

entering without inspection,[64] and the INA instructs that aliens in both classes are removable. First, recipients who entered legally but overstayed their legal permission to be in the country are deportable under section 1227(a)(1)(C): "Any alien . . . who has failed to maintain the nonimmigrant status in which the alien was admitted . . . is deportable." An alien who is "deportable" under section 1227 is "removable." *Id.* § 1229a(e)(2).

Second, those who enter the country illegally are also removable. The INA defines "[a]n alien present in the United States who has not been admitted" as an "applicant for admission," 8 U.S.C. § 1225(a)(1), and requires all applicants for admission to "be inspected by immigration officers." *Id.* § 1225(a)(3). "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [of the INA]." *Id.* § 1225(b)(2)(A). In a section 1229a removal proceeding, the alien has the burden of proof to show that he or she is not removable for one of two reasons: the alien may show that he or she is "clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182"[65] of the INA, or the alien may show "by clear and convincing evidence" that he or she is "lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(A)–(B). If the alien cannot carry his or her burden of proof under one of these tests, he or she is deemed "removable." *Id.* § 1229a(e)(2).

Thus, all DACA recipients fall into a category for removal regardless of their mode of

---

[64] Approximately half of the DACA population is present in the United States because they entered the country without inspection, and half are present because they have overstayed a visa. *See* Glenn Kessler, *Did Obama Allow a 'Back Door' to Citizenship Through DACA?*, Wash. Post, Sept. 7, 2017 [Doc. No. 225, Ex. 4] ("Robert Warren, a demographer and senior visiting fellow at the Center for Migration Studies, estimates that about 50 percent of the 1.258 million people eligible for DACA are visa overstays.").

[65] Section 1182 describes various classifications of "Inadmissible Aliens" who are "ineligible to receive visas and ineligible to be admitted to the United States." *Id.* § 1182(a).

entry. The DACA program prevents immigration officials from enforcing these parts of the INA, regardless of whether the recipient has not yet entered removal proceedings, is "[currently] in removal proceedings," or is "subject to a final order of removal." Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1] ("USCIS should establish a clear and efficient process for exercising prosecutorial discretion . . . in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."). In other words, DACA prevents the removal of its recipients—whom Congress has deemed removable.

Although no statute specifically grants the Government the authority to institute DACA, Defendant-Intervenors argue that several general grants of authority give the agency the power to defer prosecution for its recipients. [Doc. No. 225, at 47] (citing 6 U.S.C. § 202(5)[66] and 8 U.S.C. § 1103[67]). In *Texas I*, the Fifth Circuit held that neither of these sections (nor any other section)[68] provided the authority for the DHS to implement DAPA or Expanded DACA because the agency's interpretation of the statutes was overly broad, and the statutes did not convey the claimed authority to institute the programs. *See Texas I*, 809 F.3d at 183–84. The DHS had argued that those statutes allowed it to enact virtually any kind of deferred action program. The

---

[66] "The Secretary . . . shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."

[67] *See* 8 U.S.C. § 1103(a)(3) ("[The Secretary] . . . shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."); § 1103(g)(2) ("The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.").

[68] The court also ruled that the agency could not rely on 8 U.S.C. § 1324a(h)(3), a "'miscellaneous' definitional provision" for the authority to implement a sweeping change in national immigration policy, and cited the common refrain found in *Whitman v. Am. Trucking Ass'ns*: "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." 531 U.S. 457, 468 (2001); *see Texas I*, 809 F.3d at 183–84.

court reasoned that if it were to give force to the agency's interpretation of those statutes, it would allow the Secretary to grant lawful presence and work authorization to every illegal alien in the United States. *Texas I*, 809 F.3d at 184. This possibility was, in fact, highlighted by Chief Justice Roberts in the arguments before the Supreme Court.[69] Given the INA's intricate system for allocating immigration status, the Fifth Circuit said that this limitless position was "untenable." *Texas I*, 809 F.3d at 184. The same problem exists in this case.[70]

This Court, guided by Fifth Circuit precedent, holds that none of the claimed statutory provisions give the DHS the authority to implement DACA. While the provisions certainly grant some authority to the agency, they do not extend to include the power to institute a program that gives lawful presence, work authorization, and multiple other benefits to 1.5 million people. These laws "cannot reasonably be construed as assigning decisions of vast economic and political significance, such as [DACA], to an agency." *Texas I*, 809 F.3d at 184.

### ii. The INA Provides a Comprehensive Statutory Scheme for the Allocation of Lawful Presence.

As the Fifth Circuit ruled in *Texas I*, the INA describes several methods—detailed systems, carefully planned and deliberately installed—by which immigrants may acquire lawful presence in the United States. *Texas I*, 809 F.3d at 179; *see also id.* ("Federal governance of immigration and alien status is extensive and complex.") (citing *Arizona v. United States*, 567 U.S. 387, 395 (2012)). The INA specifies several particular groups of aliens for whom lawful presence is available[71] and groups of aliens eligible for "discretionary relief allowing [aliens in

---

[69] Transcript of Oral Argument at 19–20, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674).

[70] *See infra* Section VII.A.2.a.iv.

[71] *E.g.*, 8 U.S.C. §§ 1101(a)(20), 1255 (lawful-permanent-resident ("LPR") status); 1101(a)(15), 1201(a)(1) (nonimmigrant status); 1101(a)(42), 1157–59, 1231(b)(3) (refugee and asylum status); 1182(d)(5) (humanitarian parole); 1254a (temporary protected status).

deportation proceedings] to remain in the country."[72] Congress has also passed a multitude of statutes allocating lawful presence to persons who have served in the armed forces[73] and persons seeking or possessing a higher education.[74] The *Texas I* court recognized that this statutory scheme did not encompass the groups of persons described by the DAPA and Expanded DACA programs at issue in that case. *See Texas I*, 809 F.3d at 179 ("Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA."). It also does not encompass the group of persons given lawful status by DACA.

Where Congress has explicitly described a statutory scheme with the detail present in these instances, an agency may not supplant the scheme with its own methods. *See Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 507 (D.C. Cir. 2013) (where Congress "employed specific statutory mechanisms" to delineate agency authority, the agency cannot "simply cho[o]se to ignore" the statutory scheme); *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Disagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy."). In this instance, Congress's careful plan for the allotment of lawful presence forecloses the possibility that the agency may designate a group of

---

[72] *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); *see also* 8 U.S.C. § 1227(d) (administrative stays of removal for T-and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

[73] *E.g.*, 8 U.S.C. §§ 1438(a) (persons who lost United States citizenship because they served in the armed forces of a United States ally during World War II); 1439 (noncitizens who have served honorably in the United States armed forces for at least one year); 1440 (noncitizens who served in the United States armed forces during World War I, World War II, Korean hostilities, Vietnam hostilities, or other periods of military hostilities); 1440-1 (posthumous conferral of United Sates citizenship to noncitizens who died as a result of injuries incurred while serving in periods of hostilities).

[74] *E.g.*, 8 U.S.C. §§ 1101(a)(15)(F) (the "F-1" visa for full-time students) (the "F-2 visa" for dependents of full-time students) (the "F-3" visa for students from Canada and Mexico who commute across the border); 1101(a)(15)(H) (the "H-1B" visa for skilled workers) (the "H-4" visa for dependents of "H-1B" visa holders); 1101(a)(15)(J) (the "J-1" visa for students, scholars, trainees, teachers, professors, research assistants, specialists, or leaders in a field of specialized knowledge or skill participating in cultural exchange); 1101(a)(15)(L) (the "L-1A" visa for foreign employees of a corporation, executives or managers) (the "L-1B" visa for foreign employees of a corporation with specialized knowledge of the company's techniques or methodologies); 1101(a)(15)(M) (the "M-1" visa for vocational or technical students) (the "M-2 visa" for dependents of vocational or technical students).

814,000 persons who have already enrolled in DACA to be lawfully present, in addition to another group of approximately the same size who either have not yet applied or who will soon become eligible. While Congress has allowed the Executive Branch to create regulations and to selectively grant deferred action in some specific instances,[75] nothing in this scheme of laws can be read to encompass an undertaking as broad as what has been attempted by the agency here.[76] The specificity of these statutes demonstrates that Congress has reserved for itself the authority to determine the nation's immigration laws.

Ultimately, "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present," and Congress has not granted the Executive Branch free rein to grant lawful presence to such a large class of persons outside the ambit of the statutory scheme. *Texas I*, 809 F.3d at 179. Finally, it should be noted that the Fifth Circuit's judgment in *Texas I* not only covered DAPA but also Expanded DACA, and it found no legal reason to distinguish between the two.

### iii. The INA Provides a Comprehensive Statutory Scheme for the Allocation of Work Authorization.

In addition to its allocation of lawful presence, the INA also describes specific groups of aliens for whom Congress intended work authorization to be available. *See Texas I*, 809 F.3d at 180–81 ("The INA also specifies classes of aliens eligible and ineligible for work authorization, including those eligible for work authorization and deferred action—with no mention of the class of persons whom DAPA would make eligible for work authorization." (quotations omitted)).

---

[75] *See, e.g., Reno v. AAADC*, 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, [including by] engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience.").

[76] Equally compelling is the number of times Congress has rejected legislation that would accomplish what DACA purports to, namely the DREAM Acts that have been repeatedly considered and rejected. *See infra* section iv. It is evident that Congress has spoken both affirmatively and negatively in this area by what it has passed and what it has not passed.

These statutory provisions also make no mention of the group of aliens described by DACA.

The INA's statutory scheme intricately and particularly describes groups to whom Congress wished to grant work authorization, delineating precise categories of aliens for whom work authorization *is*, *may be*, or *is not* available. Where Congress has expressed its intent to provide certain groups of aliens with work authorization, it has promulgated specific laws requiring the DHS to do so.[77] These categories do not include the aliens encompassed by the DACA memorandum. Further, Congress has specified particular instances where the DHS "may" issue work authorization, specifically delegating to the agency areas in which it may exercise discretion.[78] These parts of Congress's statutory scheme also do not include the DACA recipients.

As noted in *Texas I*, Congress has in other places specified groups of aliens to be *ineligible* for work authorization. *E.g.*, 8 U.S.C. §§ 1226(a)(3) (limits work authorizations for aliens with pending removal proceedings to those who are lawfully admitted for permanent residency or otherwise authorized). DACA specifically applies to individuals in removal proceedings and contradicts Congress's intent, as it enables those aliens to apply for work authorizations.

The Supreme Court has "often recognized that a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991) (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 889 (1984)). This is one

---

[77] *E.g.*, 8 U.S.C. §§ 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T-visa), 1158(c)(1)(B), (d)(2) (asylum applicants and grantees), 1160(a)(4) (certain agricultural workers in lawful-temporary resident status), 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U-visa), 1254a(a)(1)(B) (temporary-protected status holders), 1255a(b)(3)(B) (temporary-resident status holders).

[78] *E.g.*, 8 U.S.C. §§ 1158(d) (asylum applicants); 1105a(a) (certain battered spouses of nonimmigrants); 1154(a)(1)(K) (grantees of self-petitions under the Violence Against Women Act); 1160(d)(3)(A) (agricultural worker preliminary applicants); 1184(p)(6) (deferred-action U-visa applicants).

of the exact claims made in this lawsuit by the Plaintiff States. In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA"), which provides "a comprehensive framework for combating the employment of illegal aliens" and "'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.'" *Arizona*, 567 U.S. at 404 (citation omitted); *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (citing *INS*, 502 U.S. at 194). Through criminal and civil penalties for employers and civil penalties for employees, the IRCA made it "illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers." *See Arizona*, 567 U.S. at 404–05 (citing 8 U.S.C. § 1324a). Thus, it is illegal for anyone to hire DACA recipients, but for DACA. DACA specifically avoids this ban and adds up to 1.5 million individuals to the workforce. Congress's careful delineation in the realm of work authorization represents a specified intent to closely guard jobs for American workers.

DACA undermines this intent. The program goes so far as to *require* applicants to apply for work authorization. *See* USCIS, *DACA Toolkit: Resources for Community Partners* 4 [Doc. No. 5, Ex. 20, at 23] ("In addition to the [DACA renewal and application form], all individuals must also submit a Form I-795, Application for Employment Authorization . . . ."). Permitting the agency to allow 1.5 million aliens to receive work authorization contradicts the clear congressional purpose of preserving employment opportunities for those persons legally residing in the United States. The DACA program is therefore contrary to the statute and to Congress's goal of "closely guarding access to work authorization and preserving jobs for those lawfully in the country." *Texas I*, 809 F.3d at 181.[79]

---

[79] Defendant-Intervenors also argue it is not the 2012 DACA memorandum, but a separate federal regulation that permits DACA recipients to obtain work authorization. *See* 8 C.F.R. § 274a.12(c)(14) ("An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity

### iv. For Some, DACA Defies the Statutory Scheme by Awarding Advance Parole and a Clearer Path to Legal Status, Contrary to 8 U.S.C. § 1182(a)(6)(A)(i) and 1182(a)(9)(B).

The Plaintiff States also complain that DACA contradicts the statutory scheme by allowing recipients access to "advance parole." Advance parole is a program that allows aliens to leave the United States and then to lawfully re-enter the country without being turned away at a port of entry. Dep't of Homeland Sec., *DACA Nat'l Standard Operating Procedures (SOP)* 135 (2013) [Doc. No. 224, Ex. 153] (citing § 1182(d)(5)(A)). It is designed to be awarded only "on a case-by-case basis for *urgent humanitarian reasons* or *significant public benefit*." 8 U.S.C. § 1182(d)(5)(A). DACA, however, makes the entire DACA population eligible to apply for advance parole, and expands these two enumerated categories beyond recognition. Specifically, the DACA program allows its recipients to travel outside the United States for a host of reasons, including work-related conferences, semester-abroad programs, and job interviews.[80]

In addition to the incredible way that the DHS interprets the phrases "urgent humanitarian reasons" and "significant public benefit" for DACA recipients,[81] allocating advance parole to some recipients subverts statutory law in two ways: 1) it lets certain individuals adjust illegal status to lawful presence and then possibly to legal status by curing the inadmissibility bar, and 2) it lets recipients avoid the statutory "unlawful presence bars." *See* Lena Graber & Jose Magaña-Salgado, *DACA, Advance Parole, and Family Petitions* 5, 8 (2016)

---

for employment."). This argument was specifically dispatched by the Fifth Circuit in *Texas I*, 809 F.3d at 168–69. There, the court said that such a reading of the regulation—to allow the agency to issue employment authorization to any class of illegal aliens whom the DHS declines to remove—would be outside the powers authorized by the INA. *Id.*

[80] *See* Dep't of Homeland Sec., *DACA Nat'l Standard Operating Procedures (SOP)* 139–42 (2013) [Doc. No. 224, Ex. 153] ("Generally, USCIS will only grant advance parole if the applicant's travel abroad will be in furtherance of: humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative; educational purposes, such as semester-abroad programs and academic research, or; employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas. Travel for vacation is not a valid basis for advance parole.").

[81] It is hard to fathom why a semester in Paris, a conference, or a meeting with a client equates to either an urgent humanitarian reason or a significant public benefit.

[Doc. No. 219, Ex. 23].[82]

First, DACA recipients' entitlement to apply for advance parole contradicts the statutory scheme by curing the bar for unlawful entry. *See id.* at 8. Ordinarily, an alien present in the United States may apply for an adjustment of status to change his or her legal immigration classification to that of an LPR (this is also known as receiving a "Green Card"). *See* Magaña-Salgado, *supra*, at 7. There are several ways to do this, including an employment qualification or a specified family relationship (like marriage to a United States citizen), but applicants will be deemed inadmissible—that is, they will be unable to adjust their status—if they are present "without being admitted or paroled into the United States." *Id.* (citing 8 U.S.C. § 1182(a)(6)(A)(i)); 8 U.S.C. § 1255). Generally, immigrants who first entered the United States without inspection are ineligible to adjust their status because they were not "admitted" legally when they first entered the country. *Id.* Approximately one half of the DACA population is in this category. *See* Kessler, *supra* note 64 (stating half of DACA recipients overstayed a visa and half entered the country illegally).

DACA, however, allows this latter segment to circumvent the requirement that aliens be "admitted or paroled into the United States" by allowing its recipients who entered the country illegally to be eligible for advance parole. *See* Magaña-Salgado, *supra*, at 7; Dep't of Homeland Sec., *DACA Nat'l Standard Operating Procedures (SOP)* 139–42 (2013) [Doc. No. 224, Ex. 153] (describing procedures for processing advance parole applications for DACA recipients). Once a DACA recipient leaves the country and returns to the United States through advance parole, that individual, who was an illegal alien subject to the inadmissibility bar because he or she originally entered the country illegally, is no longer barred by the requirement that aliens be

---

[82] This ten-page document, a veritable roadmap to DACA recipients' avoidance of statutory requirements, was co-authored by one of the Defendant-Intervenors in this case.

"admitted or paroled into the United States" to adjust status because he or she now has been paroled legally back into the United States. *See Magaña-Salgado, supra*, at 8–9; *see also* A. Molina, *Immigration: Undocumented College Students Find a Way to Study Abroad, Return Legally*, Press-Enterprise, Riverside California (Feb. 14, 2016). He or she may then apply for adjustment of status. Thus, DACA's grant of advance parole eligibility allows its recipients to circumvent the INA's statutory requirement.[83]

Through 2015, over 20,000 DACA recipients had been approved for advance parole, and of those, approximately 3,000 were subsequently granted an adjustment of status.[84] Although this number may seem small compared to the total DACA population of 1.5 million people, it is not insignificant. Despite the fact that the instituting memorandum claims that it "confers no substantive right, immigration status or pathway to citizenship," the DACA program does, in fact, enable certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled category and in some cases provides a clearer pathway to citizenship. [Doc. No. 5, at 3; Napolitano Memo, Doc. No. 6, Ex. 1].[85] It directly undermines the intent and deterrent effect intended by Congress, and contradicts the express wording of the DACA program's instituting memorandum.

---

[83] This "loophole" is not needed by those DACA recipients who overstayed their visas, as they were "admitted" when they first entered the country. Also, all legal permanent resident applicants must still meet other requirements, such as having a family relationship. Nevertheless, for a number of DACA recipients, the program's grant of eligibility for advance parole allows many DACA recipients to adjust status where they otherwise would be barred by law.

[84] According to a June 29, 2016 letter from USCIS Director Leon Rodriguez to Senator Charles Grassley, the agency had granted advance parole to 22,340 DACA recipients through December 31, 2015. Of those, 2,994 had been approved for adjustment of status. [Doc. No. 224, Ex. 2]. That letter did not specify how many applications for adjustments through advance parole are pending.

[85] *See also* Ben Harrington, Cong. Res. Serv., *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (2018) [Doc. No. 289, Ex. 299, at 17–18] ("Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already approved, so as to facilitate their re-entry. Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status.")).

Second, advance parole for DACA recipients subverts the "unlawful presence bars" instituted by statute. *See* 8 U.S.C. § 1182(a)(9)(B)(i). Under these provisions, an alien who entered the United States illegally or remained in the United States longer than allowed is inadmissible to return to the United States upon leaving. *Id.* Individuals who have left the country after having been illegally present for more than 180 days must remain out of the United States for three years, and those illegally present for more than a year must remain out for ten years before they may again become admissible to the United States. *Id.* By definition, the ten-year bar would apply to most DACA recipients. DACA's grant of advance parole eligibility, however, allows DACA recipients to travel abroad and then return to the United States without complying with either the three- or ten-year bar. Through DACA, these recipients effectively avoid the dictates of Congress while thousands of other individuals who have complied with the law are waiting for their bar period to run. This, too, is contrary to the statutory scheme devised by Congress.

In sum, DACA cannot withstand analysis under *Chevron* because Congress has directly addressed many of the relevant issues. *See Chevron*, 467 U.S. at 842–43; *see also Texas I*, 809 F.3d at 179 (ruling that Congress has directly addressed the issues of lawful presence and work authorization). Congress's clear articulation of laws for the allocation of lawful presence and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the nation's immigration system. Against the backdrop of Congress's "careful plan," the agency may not award lawful presence and work authorization to well over a million aliens for whom Congress has made no provision. *Texas I*, 809 F.3d at 186. DACA is "in excess of statutory jurisdiction" and "short of statutory right," and therefore violates the APA. 5 U.S.C. § 706(2).

Although the Court recognizes that the Government has long been allowed to grant deferred action on a case-by-case basis, this fact alone does not make DACA lawful. *See Reno*, 525 U.S. at 483–84 (endorsing deferred action on an *ad hoc* basis). Under the interpretation of those who instituted DACA, the entire illegal population could receive deferred action. During the Supreme Court's oral argument in *Texas I*, Chief Justice Roberts questioned the Government on precisely this point:

> Chief Justice Roberts: Under your argument, could the President grant deferred removal to every unlawful – unlawfully present alien in the United States right now?
>
> General Verrilli: Definitely not.
>
> Chief Justice Roberts: Why not?
>
> General Verrilli: Here are the limits. Because the deferred action has - over time, there have been built up a set of administrative limits, which I'll talk about, some administrative policy limits, and then there's substantive statutory limits. The administrative policy limits are these: Deferred action has always been for the lowest priorities for removal. And everybody agrees –
>
> Chief Justice Roberts: I'm sorry. By "administrative," you mean by the Executive branch?
>
> General Verrilli: Correct. Yes. But –
>
> Chief Justice Roberts: So that somehow binds the Executive branch now, the fact that – I mean, this hasn't been approved by the Executive branch prior to this point, either, and yet it's a fairly significant departure.[86]

In *Texas I*, counsel for the Government could not answer the Chief Justice's question directly. It was not an inconsequential question because this Court and the Fifth Circuit had asked it as well, but as one can see, the Solicitor General's response to Chief Justice Roberts was, in effect, "the Executive Branch just would never do that." This response was less than reassuring, since at the same time it was the Executive Branch that was attempting to give lawful presence to a

---

[86] Transcript of Oral Argument at 19–20, *Texas I*, 136 S. Ct. 2271 (No. 15-674).

combined DACA, Expanded DACA, and DAPA population of approximately 5.8 million individuals, over half of the country's 11.3 million estimated illegal aliens. Utilizing the Defendant-Intervenors' position in this case, the Executive Branch could still give every illegal alien currently present in the United States lawful status, if only the DHS were to do it in smaller numbers, group-by-group. This cannot be a correct interpretation of the law. The DACA program, like DAPA, which attempts to give lawful presence and a wide variety of benefits to upwards of a million individuals, is far from any program conducted in the past.

More importantly, unlike the DAPA situation, Congress has directly addressed DACA or a DACA-like population, so one need not guess its position. Both houses of Congress have, time after time, considered and rejected bills that would afford lawful immigration status to the same or a similar group of individuals contemplated by DACA.[87] These proposals, while not necessarily covering identical populations or attempting to achieve the exact same goals, are often labelled in the popular press as "DREAM Acts." Over a period of more than a decade, they have been filed, considered, and have at times even been put to vote (both before and after the implementation of DACA).[88] As recently as June of this year, the House of Representatives rejected a bill by an almost 3-to-1 margin that would have legalized the DACA recipients.[89] Congress's consistent rejection of these bills cannot be read as a tacit approval of DACA. To the contrary, its underlying concept has been rejected time and again.

---

[87] *See, e.g.*, DREAM Act of 2003, S. 1545, 108th Cong. (2003); DREAM Act of 2005, S. 2075, 109th Cong. (2005); DREAM Act of 2007, S. 2205, 110th Cong. (2007); DREAM Act of 2009 S. 729, 111th Cong. (2009); American Dream Act, H.R. 1751, 111th Cong. (2009); DREAM Act of 2011 S. 952, 112th Cong. (2011); Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 113th Cong. (2013); BRIDGE Act, S. 3542, 114th Cong. (2016); BRIDGE Act, H.R. 496, 115th Cong. (2017).

[88] The following bills were actually put to vote: DREAM Act of 2007, S. 2205, 110th Cong. (2007) (failed cloture in Senate, 52-44); Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 113th Cong. (2013) (passed Senate 68-32, no House vote); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018) (failed House, 121-301).

[89] Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018).

However attractive it might be as a matter of policy, the DACA program appears to violate the proper respect for congressional primacy in lawmaking that should guide executive action, even when substantial exercises of prosecutorial discretion are inevitable. To the extent Congress has adopted overly broad and unduly harsh immigration laws, Congress should remain accountable for its choice. The executive branch [or in this case the judicial branch] should not presume the authority to let Congress off the hook.

*See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 761 (2014).[90]

### b. Even if DACA Did Pass *Chevron*'s First Step, It Would Not Pass the Second.

This Court's ruling at the first step of *Chevron* alone provides a sufficient ground to settle the question presented, and it would ordinarily be unnecessary for the Court to conduct a further analysis. Nevertheless, if the Court were to analyze the DACA program under the second step of *Chevron*, the Court would hold that the agency's interpretation fails that test as well.[91]

At the second *Chevron* step, a court asks "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The court should uphold an agency's rule if it is "a 'reasonable interpretation' of the enacted text," but should overturn it if it is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found.*, 562 U.S. at 58; *id.* at 53. Stated differently, the Court must ask "whether Congress would have intended, and expected, courts to treat [the regulation] as within, or outside, its delegation to the

---

[90] This Court recognizes that many of America's states, municipalities, cities, civic groups, and individuals are very sympathetic to and very supportive of the DACA recipients. Many of these groups have provided this Court with amicus curiae briefs which, in addition to being helpful, are demonstrative displays of support. Indeed, this Court is likewise enamored with the thought of young people overcoming many hardships and hurdles and becoming productive members, if not leaders, of our communities. The Judiciary, however, is not the branch of government that can make decisions based upon the popularity of an idea or because many are sympathetic toward or biased against a particular group or program. Congress is the branch of government that weighs competing public sentiments when it enacts or refuses to enact legislation. Pointedly, if the Congressmen and women of New Jersey and of the states that have appeared as friends of this Court had voted for the dreamer population in this latest bill, it would have passed the House by a two-to-one margin. Instead, a majority of each delegation voted against it.

[91] *See Texas I*, 809 F.3d at 183, n.191 ("Now, even assuming the government had survived *Chevron* Step One, we would strike down DAPA as manifestly contrary to the INA under Step Two.") (citing *Chevron*, 467 U.S. at 844; *Mayo Found.*, 562 U.S. at 53).

agency of 'gap-filling' authority." *Id.* at 58. (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007)).

Assuming, *arguendo*, the Court were to apply this test, it still would not defer to the agency's interpretation. DACA is "manifestly contrary" to the statutory scheme promulgated by Congress. *Texas I*, 809 F.3d at 186. For the same reasons discussed in this Court's analysis under the first step, the program would not pass the second step: DACA usurps the power of Congress to dictate a national scheme of immigration laws, and it is therefore contrary to the INA and unreasonable. *Id.*

As the Fifth Circuit explained in *Texas I*, Congress has clearly implemented a detailed statutory scheme for the adjudication of immigration laws, and the scheme has no room for the program the DHS has instituted. 809 F.3d at 181. DACA would grant lawful presence and work authorization to a million people or more for whom Congress has made no provision and has refused to make such a provision time and time again. *See id.* ("[H]ad Congress wished to assign [a decision of such 'deep economic and political significance'] to an agency, it surely would have done so expressly." (citing *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015)). The Court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Common sense instructs that the creation of this program, as was true for the establishment of DAPA and Expanded DACA, is too important to be delegated to an administrative agency. In the end, the Fifth Circuit's decision in *Texas I* controls this case; it is binding case law for this Court, and the result here is inescapable.[92]

---

[92] The Court has concentrated its *Chevron* analysis on the facts that surrounded DACA's origination. The current DHS view, as expressed by Secretary Nielsen, is:

### c. The Differences Between DAPA and DACA Do Not Compel a Different Result.

Defendant-Intervenors argue the Fifth Circuit's ruling in *Texas I* is not applicable here because "DACA and DAPA are not identical." [Doc. No. 215, at 27] (citing *Texas I*, 809 F.3d at 173). They point to two salient differences: 1) there is arguably no analogous statutory provision that DACA would displace; and 2) DACA affects fewer people than DAPA.

To distinguish DACA from DAPA and Expanded DACA, Defendant-Intervenors first point to a passage in the *Texas I* opinion citing a specific collection of INA provisions that provides "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Id.* at 179–80 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). The *Texas I* court held that DAPA was unlawful in part because permitting DAPA would nullify the particular group of provisions and displace it with a new method for alien parents to acquire citizenship through their children. The Defendant-Intervenors argue that because no analogous set of provisions exists for DACA, the Fifth

---

[R]egardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

* * *

Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens.

[Doc. No. 100, Ex. A].

Consequently, if this Court gave *Chevron* deference to the current agency position, the ultimate result would be the same.

Circuit's ruling does not apply.

This Court cannot agree. First, the Fifth Circuit's ruling in *Texas I* did not rely exclusively on the existence of the provisions allowing illegal aliens to derive a lawful immigration classification from their children's immigration status. The court, in fact, relied at least as much on DAPA's incompatibility with the INA's provisions for lawful presence and work authorization, as discussed above. Moreover, the Fifth Circuit's ruling in *Texas I* clearly was not predicated solely on the existence of those provisions, as evidenced by the court's holding that Expanded DACA was also unlawful. That program had no overlap with the cited provisions, and the court obviously did not rely on their existence in ruling against it.

Second, analogous provisions *do* exist regulating the lawful admission of children, as well as for students and veterans. Congress has passed many acts relating to the immigration of children, and at least two of them provide methods for attaining status that significantly overlap with the DACA age group: derivative citizenship and naturalization upon application. Congress has allocated a method for children to derive citizenship from a parent, whereby a child born outside of the United States may become a citizen if the child: 1) has an American citizen parent; 2) is under 18 years of age; 3) lives in the legal and physical custody of the American citizen parent; and 4) is a lawful permanent resident. 8 U.S.C. § 1431. Another provision provides for the naturalization of a child born outside the United States upon application of the parent, if the child: 1) has a U.S. citizen parent; 2) has a parent who has been physically present in the United States for at least five years, two after the age of fourteen; 3) is under eighteen years of age; 4) is residing outside of the United States in the legal and physical custody of the applicant; and 5) is temporarily present in the United States pursuant to a lawful admission. 8 U.S.C. § 1433. This Court earlier discussed the statutes that Congress has passed concerning students and veterans.

Suffice it to say DACA allows certain recipients to acquire lawful presence without complying with any of Congress's requirements. This is especially troubling when one considers that Congress has consistently rejected any legislative effort to give the DACA recipients legal status.

Defendant-Intervenors also argue that DACA is different from DAPA because it affects fewer people. [Doc. No. 215, at 19]. This contention, based solely on a numerical difference, is factually accurate, but provides no legal distinction. The 1.5 million people DACA would permit to receive lawful presence and work authorization are still too numerous to fit into the individualized notion of deferred action that courts have found permissible in other contexts. Over a million individuals is still an outsized number, and it remains outside the authority of the agency to defer action for this many people. As were DAPA and Expanded DACA, DACA is "foreclosed by Congress's careful plan." *Id.* at 186.

The fact that DAPA was three times the size of DACA is of no *legal* significance. One of Defendant-Intervenors' experts is an immigration law professor and was Chief Counsel to the United States Customs and Immigration Service from 2011 to 2013, during which time DACA was instituted. He finds only two differences between DACA and DAPA: 1) the size; and 2) DACA is an active program at the time of litigation, whereas DAPA had yet to be instituted when it was challenged. He testified as follows:

> Q:    Okay. I forgot to ask you one additional question. So earlier we had talked about the differences between DACA and DAPA; right? And you can think of two right now. One is the size of the population, which you said doesn't affect the merits of whether DACA and DAPA are legally the same thing; correct?

> A:    In my opinion, it should not have that effect.

> Q:    Okay. And then the second thing you mentioned was the ongoing nature of the DACA program as opposed to the soon-to-be implemented nature of the DAPA program; correct?

A:      Correct.

Q:      But, again, in your opinion, going to the underlying merits of whether these two programs are legal, that shouldn't make a difference; correct?

A:      Correct.

Dep. of Stephen Legomsky [Doc. No. 284, Ex. 67, at 99:14–100:6.].

Consequently, even one of the Defendant-Intervenors' own experts—one who was involved in immigration policy at the time of the implementation of the DACA program—finds that the difference in the possible number of participants between it (1.5 million) and Expanded DACA–DAPA (4.3 million) is of no legal significance. The most troubling aspect of the position of the Defendant-Intervenors is that, using their logic, the DHS could just grant deferred action to smaller groups of 750,000 to 1.5 million (DACA size) more frequently and still give the entire illegal population lawful presence.

There may be one other significant difference between DAPA and DACA, but it too has no effect on legality. Many of the amici argue that DACA has garnered much national media attention and clearly invokes the sympathetic nature of the nation's populace. DACA affects a younger population. Many came to this country unlawfully or stayed in this country without permission through no fault of their own. Further, the DACA population is generally better educated and, according to many of the amicus briefs, better situated to contribute to the well-being of this nation than other immigrant populations. For many, these factors make the DACA population a much more appealing group. Although the group of DACA recipients may be smaller, more deserving of sympathy, and perhaps even more worthy than those who would have been covered by DAPA, those facts do not alter the legal reasoning underpinning this Court's conclusion. The result here is compelled by law. "The law's function is understood to be to

neutralize the emotionality that legal disputes arouse in the participants and lay observers."[93]

As much as this Court might agree with these arguments, and as popular as this program might be, the proper origination point for the DACA program is Congress.[94]

### d. This Exercise of Deferred Action Is Not Supported by Historical Precedent.

Defendant-Intervenors also argue historical precedent provides a source of authority for the institution of DACA. They cite past examples in which the Executive has deferred prosecution for particular groups of aliens[95] and argue that those instances provide precedent for the program at issue here.

In distinguishing previous deferred action programs from DAPA, the Fifth Circuit rejected precisely this argument: those programs, unlike DAPA, were "[mostly] done on a country-specific basis, usually in response to war, civil unrest, or natural disasters," or "were bridges from one legal status to another." *Texas I*, 809 F.3d at 184. The same shortfalls present in *Texas I* are also present here, and DACA fares no better.

DACA, although closer in size, is no more analogous than DAPA to the cited historical programs. The DACA program is by no means a "bridge" to anywhere; in fact, the very

---

[93] Richard A. Posner, *Frontiers of Legal Theory* 226 (2001).

[94] *See* Transcript of Oral Argument at 24, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674) (Justice Anthony Kennedy: "[T]he briefs go on for pages to the effect that the President has admitted a certain number of people and then Congress approves it. *That seems to me to have it backwards. It's as if that the President is setting the policy and the Congress is executing it. That's just upside down.*") (emphasis added).

[95] *See* [Doc. No. 225, at 2 n.1 ("250,000 Cuban nationals in 1977; 80,000 Chinese nationals in 1989; 190,000 Salvadoran nationals in 1992; 40,000 Haitian nationals in 1997; and 3,600 Liberian nationals in 2007")]; [Doc. No. 215, at 12 ("President Eisenhower's parole of Hungarian refugees in 1956 . . . the parole of more than 600,000 Cubans in the United States through a series of discretionary programs that took place over the course of four Presidential administrations . . . President Kennedy's establishment of the Hong Kong Parole Program, which provided extended voluntary departure to 15,000 Chinese refugees.")].

memorandum that created it states it is not.[96] DACA awards lawful presence to individuals who have never before received or no longer possess lawful status, and it was not implemented in response to any natural disaster or other similar crisis. Its closest analog is not any of the programs cited by Defendant-Intervenors; DACA is most like DAPA and is directly analogous to Expanded DACA. As was DAPA, the DACA program is not authorized by historical precedent.

Additionally, Defendant-Intervenors highlight a particular example of deferred action— the "Family Fairness" policies of 1987 and 1990—as allegedly analogous to the DACA program. These policies are attractive candidates for comparison because of their size: they allegedly provided deferred action for approximately 1.5 million individuals. [Doc. No. 215 at 12]. The Fifth Circuit, however, already specifically rejected this analogy as well. *Texas I*, 809 F.3d at 185. Deeming the policies distinguishable from the DAPA and Expanded DACA programs, the court called Family Fairness "interstitial to a statutory legalization scheme," because the policies' purpose was to delay prosecution until Congress could enact legislation providing the same benefits. Congress later passed the Immigration Act of 1990, which superseded the Family Fairness Program. Pub. L. No. 101-649, 104 Stat. 4978 (enacted Nov. 29, 1990). The court said that Family Fairness was unlike DAPA because Congress had consistently declined to enact a DREAM Act, and DAPA was therefore not interstitial to any piece of legislation. *See id.* ("DAPA is far from interstitial: Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA.").

The same conclusion applies here because DACA is not interstitial to an act of Congress.

---

[96] Although, as noted above, it can under certain circumstances allow individuals to achieve a clearer pathway to legal status by curing the bar for unlawful entry and allowing individuals to avoid mandatory wait periods through advance parole eligibility.

In fact, just the opposite situation exists. Congress has repeatedly considered and declined to pass a DREAM Act to provide benefits to the same or a similar class of aliens protected by DACA. Although the Defendant-Intervenors would have the Court view DACA as a means of waiting for congressional action, given the DREAM Act's history in Congress, the Court is unable to predict that Congress will pass such an act in the future. Although Congress may someday enact such a DREAM Act, until it does, its continued rejection of bills coextensive with DACA evinces a rejection of this policy. The Fifth Circuit found DAPA to be contrary to law because it clearly was not "a bridge[ ] from one legal status to another." *Texas I*, 809 F.3d at 184. DACA suffers from the same deficiency. The very memorandum which creates it specifically states it is not a pathway to citizenship and that it confers no immigration status.

For the reasons provided above, DACA violates the substantive provisions of the APA.

### 3. Procedural APA Claim

The Plaintiff States claim that DACA violates the APA because it is a "legislative" or "substantive" rule that was effectuated without undergoing the required notice-and-comment procedures.

The parties do not contest that the DACA program is a "rule" as described by the APA,[97] nor that the APA's "rule making" requirements are applicable here.[98] Section 553 of Title 5, United States Code, outlines the requirements of formal rule making, which mandates that "[g]eneral notice of proposed rule making shall be published in the Federal Register" and that the

---

[97] 5 U.S.C. § 551(4) ("'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]").

[98] 5 U.S.C. § 551(5) ("'[R]ule making' means agency process for formulating, amending, or repealing a rule[.]"); *see also* 5 U.S.C. § 553 (describing the notice-and-comment procedures).

agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c). The parties also agree that the 2012 DACA memorandum was issued without such notice and comment. The dispute between the parties is whether DACA is exempt from these requirements.

Section 553 provides two exceptions that allow a proposed rule to circumvent the notice-and-comment requirements. The first exempts rules that are "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(3)(A). The second, which allows an agency to find notice and comment "impractical, unnecessary, or contrary to the public interest," is clearly inapplicable and has not been argued in this case. *Id.* § 553(b)(3)(B). A rule that is "substantive" cannot fall within these exceptions, and the notice-and-comment procedures must be adhered to "scrupulously." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). The notice-and-comment exemptions must be narrowly construed. *Id.* (citing *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989)).[99]

### a. DACA Is Not a Procedural Rule

A rule may avoid the notice-and-comment requirements if it is one of "agency organization, procedure or practice." 5 U.S.C. § 553(b)(A). DACA clearly has nothing to do with the organization or practice of the DHS. The Defendant-Intervenors, however, claim that it is a procedural rule. In *Texas I*, the Fifth Circuit applied two tests to determine whether DAPA and Expanded DACA were "procedural." *Texas I*, 809 F.3d at 176–77. First, it used the "substantial impact test" to "look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Texas I*, 809 F.3d at 176 (quoting *U.S.*

---

[99] No party has argued that DACA should be exempt from notice-and-comment because it is an "interpretive rule" as described by section 553(b)(3)(A), nor have they argued that it falls within the exemption in section 553(a)(2) for "matter[s] relating to . . . public property, loans, grants, benefits, or contracts." Consequently, the Court will not address those provisions.

*Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984)). "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Id.* (quoting *Kast Metals*, 744 F.2d at 1153). The Circuit held that "DAPA undoubtedly [met] that test" because it conferred lawful presence on 500,000 aliens for whom Texas was required to provide driver's licenses. *Id.* Here, the same reasoning applies. DACA also undoubtedly meets this test because it has forced the states to spend money on various social services costs, which are clearly "modif[ications]" of "substantive rights." *Id.* (quoting *Kast Metals*, 744 F.2d at 1153). Over 800,000 individuals have already received the benefit of lawful presence. Most have received work authorization, and over half a million more individuals are or will be eligible to apply. Moreover, the individual Defendant-Intervenors, New Jersey, and the many states appearing through amicus curiae briefs have without exception urged this Court to consider the substantial positive impact these recipients have made. No matter which party's briefs and exhibits one reviews, each stresses the impact of the DACA program. DACA clearly has impacted the entire country. Although the DACA program has conferred lawful presence on a smaller number of people than DAPA would have, it has nonetheless impacted the Plaintiff States and affected individuals in an equally important manner.

Next, the Fifth Circuit employed a test originating in the D.C. Circuit. This test considers the "effect on those interests ultimately at stake in the agency proceeding," and whether a rule "impose[s] 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals." *Texas I*, 809 F.3d at 176 (quoting *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). The court elaborated on the test:

> [A] procedural rule generally may not encode [ ] a substantive value judgment or put[ ] a stamp of approval or disapproval on a given type of behavior, but the fact

that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one. A corollary to this principle is that rules are generally considered procedural so long as they do not change the *substantive standards* by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide.[100]

Under this test, the Fifth Circuit reached the same conclusion as it had using the substantial impact test: DAPA and Expanded DACA were not procedural rules. It looked to the fact that DAPA established "the substantive standards by which the [agency] evaluate[d] applications which [sought] a benefit that the agency [purportedly] ha[d] the power to provide." *Id.* at 177. The same is true in this case. The five criteria by which DACA applicants are evaluated are clearly substantive standards and are no different than the DAPA criteria at issue in *Texas I.* What could be more of an inherent value judgment than requiring an individual to pass a background check? The DACA memorandum changes the substantive standards significantly by creating a broad new category of aliens for whom lawful presence and work authorization are available. It provides the criteria by which the agency allocates "benefit[s] that the agency has the power to provide": lawful presence and employability. *Id.* at 177 (citations omitted). Indeed, it is an understatement to say that DACA changes the way the DHS and other agencies viewed work authorizations and parole applications. Furthermore, it changes the way that other federal agencies, such as the Social Security Administration, view applications from the DACA recipients. This is, as it was in *Texas I,* a "critical fact requiring notice and comment." *Id.* The June 2012 DHS memorandum is clearly not a procedural rule.

### b.  DACA Is Not a General Policy Statement

A general policy statement need not comply with the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(A). While the Act defines neither the term "substantive" nor the

---

[100] *Id.* (citations and quotations omitted) (emphasis in original).

phrase "general statement of policy," the case law in this area has become fairly well-developed, and courts consistently look to precedent for guidance. *Shalala*, 56 F.3d at 595. Even so, the facts of each case are unique. If the DACA memorandum is a substantive rule, it is unlawful, for a substantive rule may not be promulgated without notice and comment.[101]

### i.   The Agency's Characterization

In assessing whether a rule is substantive, courts begin by looking to the agency's characterization of its own rule. "While mindful but suspicious of the agency's own characterization, [courts] . . . focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Texas I*, 809 F.3d at 171 (quoting *Shalala*, 56 F.3d at 595). However, the "label that the . . . agency puts upon its given exercise of administrative power is not . . . conclusive; rather it is what the agency does in fact." *Shalala*, 56 F.3d at 596 (quoting *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979)).

Thus, while labels are not unimportant, the true test is how the program is actually administered and whether it affects rights and obligations. Secretary Napolitano describes a program based upon individual acts of prosecutorial discretion. Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1]. Acting DHS Secretary Duke subsequently described DACA to be "programmatic," meaning that the June 15, 2012 memorandum dictated the qualifying factors and left the actual application processors little to no

---

[101] Courts have struggled to define the dividing line between rules that are substantive and rules that are not. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) ("The distinction between legislative rules and interpretative rules or policy statements has been described at various times as 'tenuous,' *Chisholm v. FCC*, 538 F.2d 349, 393 (D.C. Cir.), cert. denied, 429 U.S. 890, 97 S. Ct. 247, 50 L.Ed.2d 173 (1976), 'fuzzy,' *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974), 'blurred,' Saunders, *Interpretative Rules With Legislative Effect: An Analysis and a Proposal for Public Participation*, 1986 Duke L.J. 346, 352, and, perhaps most picturesquely, 'enshrouded in considerable smog.' *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.), cert. denied, 423 U.S. 824, 96 S. Ct. 37, 46 L.Ed.2d 40 (1975), quoted in *American Bus Association v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980).").

room to exercise discretion. Memorandum from Elaine C. Duke, *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) [Doc. No. 6, Ex. 5, at n.1]. Both the *Regents* and *Batalla Vidal* courts echoed the Duke memorandum's conclusion. Consequently, the DHS's own characterization is of little or no help.

To distinguish policy statements from substantive rules, courts employ two primary criteria. *Texas I*, 809 F.3d at 171. First, courts have said that "unless a pronouncement acts prospectively, it is a binding norm," however, the "binding effect, not the timing, . . . is the essence of criterion one." *Shalala*, 56 F.3d at 595. The June 15, 2012 memorandum instructed the DHS's employees that "ICE and CBP *should immediately* apply DACA to eligible individuals who have been encountered." Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1]. The memorandum also immediately applied to individuals already in removal proceedings. It clearly had an immediate binding effect because by the end of 2012 over 150,000 applicants had been approved. *See* U.S. Citizenship and Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by FY, Quarter, Intake, Biometrics and Case Status FY 2012-2017 (March 31, 2018) [Doc. 225, Ex. 23]. Six years later, it is still in operation. Clearly, this policy was instituted immediately after it was announced, and it has been binding ever since.

A general statement of policy "genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas I*, 809 F.3d at 171 (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)). Stated another way, "a 'general statement of policy' is one that does not impose any rights and obligations." *Shalala*, 56 F.3d at 595. These two prongs "overlap" to some extent "because [i]f a statement denies the decisionmaker discretion in the

area of its coverage . . . then the statement is binding, and creates rights or obligations." *Texas I*, 809 F.3d at 171 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).

The Fifth Circuit in *Texas I* stated the criteria to distinguish policy statements from substantive rules as follows: "whether the rule (1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas I*, 809 F.3d at 171 (internal quotations omitted). It cited multiple cases for the use of these criteria but ultimately traced the concept back through *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995), to *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). Due to its location and resulting docket, the D.C. Circuit has long been looked to in the field of administrative law. That circuit describes these two factors as criteria that can be used to "fathom the interpretive/legislative distinction." *Cmty. Nutrition*, 818 F.2d at 946. These factors are not treated like different elements of a cause of action, both of which must be proved; but instead a "matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Am. Bus Ass'n v. United States*, 627 F.2d 525, 530 (D.C. Cir. 1980).

### ii.  Rights and Obligations

The Court first considers whether the program "imposes rights and obligations" such that it is "binding" in its effect. *Shalala*, 56 F.3d at 595. In this case, it is clear that the DACA program confers rights and imposes obligations.

The Fifth Circuit in *Texas I* held that DAPA affected rights and obligations not only for the illegal aliens who would benefit from the program, but also for the states and the federal government. *See Texas I*, 809 F.3d at 148 ("[Those] granted lawful presence pursuant to DAPA are no longer bar[red] . . . from receiving social security retirement benefits, social security

disability benefits, or health insurance under Part A of the Medicare program."); *id.* at 149 ("The district court determined—and the Government does not dispute—that DAPA recipients would be eligible for earned income tax credits once they received a Social Security number."); *id.* at 173 n.137 ("DAPA . . . has an effect on []illegal aliens[]. DAPA removes a categorical bar to illegal aliens who are receiving state and federal benefits, so it places a cost on the states.").

DACA has exactly the same effect.[102] The program affects the rights and obligations of the DACA recipients because it gives them lawful presence, the right to apply for work authorization, Social Security, Medicare, access to advance parole, and an array of other federal and state benefits. In this case, as opposed to *Texas I*, the Court need not project into the future. Over 800,000 individuals have received these rights with another large group of applicants yet to come. DACA also impacts the obligations of the individual States. As described in the section on standing, *supra*, the program requires states to spend money on various social services. Moreover, the program affects the obligations of the United States Government. In addition to the benefits described above, it obligates the Government to forebear from implementing immigration enforcement proceedings. These are certainly the kinds of rights and obligations that give a program "binding effect" such that the notice-and-comment procedures are required. *Shalala*, 56 F.3d at 595.

In *Texas I*, it was clear to this Court and the Fifth Circuit that DAPA and Expanded

---

[102] Some of the other cases that have considered the recent DHS rescission memorandum concluded that DACA confers important benefits. In *Regents*, the Northern District of California court found so directly, noting its effect on employment authorization, safety from detention and removal, advance parole eligibility, and avoidance of the accrual of time for unlawful presence. *See Regents*, 279 F. Supp. 3d at 1023. Similarly, in *Casa De Maryland*, the District of Maryland court implied that the program provided certain benefits to the actual recipients of DACA (as opposed to various immigrant-rights groups), "including the ability to (1) obtain employment authorization, (2) travel internationally, (3) attend schools, (4) pay into and receive payment from Social Security and disability, (5) secure other opportunities like obtaining bank accounts or credit cards, and (6) otherwise be considered 'lawfully present.'" *Casa De Maryland*, 284 F. Supp. 3d at 776. While the Maryland court did not find these benefits were rights that could not be withdrawn, it did find that DACA imposed obligations on the government not to misuse certain information provided by the recipients.

DACA conferred benefits, and that fact also became clear to at least one of the Justices in the

Supreme Court oral argument:

> Justice Alito: If an employer took the position that the employer was not going to hire a DAPA beneficiary because the employer believes that they are not – that they are not lawfully authorized to work, would prefer someone else over them, could that person sue on any theory of discrimination, for example, under Section 1981?
>
> Mr. Saenz: They could, Your Honor. And – and the outcome of that case, I think, has not been clearly established by precedent so far, but it would be a clash between folks with concrete interest, an employer who wants to hire someone, not the individual who –
>
> Justice Alito: *If that's true then, DAPA gives them a legal right. It's more than just putting them in a low-priority prosecution status.*[103]

DACA, of course, bestows the same benefits. Furthermore, as discussed above, employment is

only one of the plethora of rights and benefits conferred.

### iii. Do the Actual Decision-Makers Exercise Discretion?

Next, the Court asks whether "the agency and its decision-makers [are] free to exercise

discretion." *Cmty. Nutrition*, 818 F.2d at 946. On the record before it, this Court does not find the

evidence of discretion by the individuals processing DACA applications to be compelling either

way.

The Plaintiff States rely strongly on two different statements from the DHS to argue that

the personnel reviewing DACA applications do not exercise discretion. First, in *Texas I*, the

DHS could not find one example of anyone who complied with all of the DACA requirements

and was turned down for a discretionary reason. Second, some years later, Acting DHS Secretary

Duke confirmed that "USCIS has not been able to identify specific denial cases where an

applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15,

---

[103] Transcript of Oral Argument at 41, *United States v. Texas I*, 136 S. Ct. 2271 (No. 15-674) (emphasis added).

2012 memorandum, but still had his or her application denied based solely upon discretion."
[Pls. Motion for Prelim. Inj., Ex. 5 n.1, App. 22–23].

The Plaintiff States have brought forth other evidence on this point as well. For instance, the USCIS Texas Service Center, which no longer handles DACA applications but did for many years, has never turned anyone down who met the June 15, 2012 criteria. [Doc. No. 284, Ex. 4]. The States have also presented hundreds of pages of DHS manuals and procedures that instruct, in painful detail, each step a reviewer should take and what types of evidence each reviewer may consider as evidence that the DACA applicant has satisfied each of the criteria. Further, the States point to the fact that if DACA applicants satisfy the criteria, they are not interviewed, as their applications are granted by the service centers sight unseen.

Finally, there is the June 15, 2012 memorandum itself, which states that the USCIS should establish a clear and efficient process for exercising prosecutorial discretion on an individual basis, but then instructs the agency on exactly what factors to use. For example:

> 3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:
> - USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
> - The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
> - USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.[104]

Thus, while employing the words "prosecutorial discretion," the memorandum itself lays out who is eligible—"the individuals . . . who meet the above criteria and pass a background

---

[104] Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) [Doc. No. 5, Ex. 1, at 2–3].

check"—and then instructs the reviewer to grant eligible applicants deferred action.[105]

The Defendant-Intervenors respond by pointing to the increase in the denial rate of DACA applicants in recent years. They also have provided this Court with multiple emails from instructors who teach the DACA processors that suggest that a shift may have taken place following this Court's opinion in *Texas I* in early 2015. [Doc. No. 215, Ex. 1]. After that decision, DHS began denying (even in the Texas Service Center) more applications than it had in the first three years of the DACA program. The Defendant-Intervenors claim this was due to an exercise of discretion, as opposed to applicants not meeting the established criteria, but this conclusion is not necessarily proven by facts. Finally, Defendant-Intervenors produced a post-*Texas I* email from one instructor that, while talking about the established criteria, said that she liked to "jokingly say our standard is whether or not you would want to live next door to the person." [Doc. No. 215, Ex. 1, at 405]. While this Court will not opine on whether the "neighbor" standard is one capable of refined precision or even whether it would be legally enforceable, if it were routinely being used, it would certainly be indicative of a discretionary standard.

The Court recognizes that one of two possibilities is more than likely true regarding the current state of discretion in the DACA program. It could be that the June 15, 2012 memorandum still controls, and that any discretion being exercised is not based upon outside factors, but rather solely on whether an applicant satisfies the June 15, 2012 "programmatic" criteria. It could also be that, following this Court's opinion in 2015, the DHS may have begun to

---

[105] The States also rely on the statements by Kenneth Palinkas to the effect that no discretion was being exercised by the DHS personnel actually making the decisions. This Court did not find either the deposition of Kenneth Palinkas, or the deposition of Michael Knowles (apparently called by Defendant-Intervenors), to be compelling. On cross-examination, both conceded that most of what they had to say was either opinion or based upon hearsay. This Court earlier emphasized to all counsel in a hearing concerning discovery that the witnesses needed to have personal knowledge. Hearing Tr. (June 28, 2018) [Doc. No. 111, at 15–16]. Neither of these witnesses has ever processed a DACA application.

shift its process[106] to allow its application processors more discretion. If the former scenario is actually the case, then the only actual discretion in the DACA program was that exercised by the Secretary in 2012, and her instructions have bound everyone since that time. This kind of situation has been considered by the D.C. Circuit, which found similar guidelines to be substantive:

> In applying the second criterion in *Pickus v. U. S. Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974), we took into account the language, structure, and calculable effect of the statement. The Parole Board claimed that guidelines specifying many of the factors it used in deciding whether to parole prisoners were "general statements of policy." The court disagreed, on the grounds that those guidelines "were of a kind calculated to have a substantial effect on ultimate parole decisions. . . . *Although they provide no formula for parole determination, they cannot help but focus the decisionmaker's attention on the Board-approved criteria. They thus narrow his field of vision, minimizing the influence of other factors and encouraging decisive reliance upon factors whose significance might have been differently articulated had Section 4 (now section 553 of the APA) been followed.*" In sum, the court held, the guidelines "*are substantive agency action, for they define a fairly tight framework to circumscribe the Board's statutorily broad power.*"[107]

The evidence presented thus far has not convinced the Court which of these alternatives, if either, is accurate. Some evidence suggests that individual decision-makers are not exercising, and are not allowed to exercise, discretion. That evidence, however, is not convincing, either in its quantity or quality, and there is at least some evidence presented by the Defendant-Intervenors to the contrary—that the actual individuals screening the applications may have some discretion.

That being the case, this Court looks to which party bears the burden of proof.

---

[106] This Court finds that it is not bound by the facts as they existed when DACA was first implemented, or even by the facts as they existed when this Court issued the injunction in *Texas I*. This Court holds that it may consider later evidence, including evidence as to how DACA is being operated today.

[107] *Am. Bus*, 627 F.2d at 530 (emphasis added). *See also*, the OLC memorandum which advised that case-by-case discretion needed to be given to the actual "immigration officials," otherwise the DHS could be viewed as having "abdicated its statutory enforcement responsibilities" or the DAPA program might be viewed as having "created a categorical rule-like entitlement." U.S. Department of Justice's November 19, 2014, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President (Nov. 19, 2014) [Doc. No 5, Ex. 19, at 28–29].

Preliminary injunctions "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.")). Based on the evidence in the preliminary injunction record, the Court holds that the Plaintiff States have not made a "clear showing" that those processing DACA applications are not free to exercise discretion.

### iv. Weighing a Policy that Imposes Rights and Obligations but Allows Discretion

Given this Court's findings—that DACA imposes rights and obligations, but that the Plaintiff States have not clearly shown an absence of discretion—the resolution of the "policy statement vs. substantive rule" test turns on whether the criteria set out in *Texas I* are factors to consider or are like elements of a cause of action, where each must be proven. The Plaintiff States argue that their evidence on the first criterion—whether DACA confers rights and imposes obligations—is so overwhelming that they need not prevail on the second—whether a lack of discretion exists. In other words, they claim that the evidence in the first category is so persuasive that the Court can rule that DACA is not a statement of general policy as a matter of law regardless of the eventual outcome concerning the issue of discretion. The Defendant-Intervenors respond by arguing that an adverse finding (or a failure by the States to carry their burden of proof) on the "discretion" prong means the Plaintiff States have not made a clear showing that DACA is a substantive rule. If the States have not proven DACA is a substantive rule, then the States have failed to prove a violation of the procedural requirements of the APA.

The Court finds the evidence concerning the exercise of discretion to be equivocal and lacking the quality that one would require to find that it equates to a clear showing. Conversely,

the evidence that DACA confers rights and imposes obligations is overwhelming. The program confers lawful presence and an entire array of benefits on DACA recipients. Additionally, it imposes upon the States and the Government multiple obligations, many of which flow automatically from DACA's award of lawful presence.

While this Court need not decide the merits of the procedural aspects of the APA claims, given its eventual ruling below, it may be in the best interests of all concerned and in the interests of any subsequent appeal for this Court to indicate its holding on these issues. The Fifth Circuit specifically described these factors as "criteria" that "[w]e evaluate." *Texas I*, 809 F.3d at 171. If the criteria were to be considered as elements that must be proven, there would certainly be clearer ways to express that concept. Consequently, this Court holds that the Plaintiff States need not prove (or clearly show a likelihood of success) on both criteria; rather this Court evaluates each independently. Despite the less-than-convincing evidence regarding discretion and given the overwhelming evidence concerning the rights conferred and the obligations imposed, this Court holds that the Plaintiff States have shown DACA to be a substantive rule that should have complied with the notice-and-comment procedures required by the APA.[108]

In conclusion, despite not ruling on the Take Care Clause issue, this Court finds that, as a matter of law, the Plaintiff States have made a clear showing they are likely to succeed on the merits at trial. For the purpose of a preliminary injunction, they have shown their substantive APA claim is likely to be successful. The DACA program contradicts statutory law and violates the APA because the INA directly addresses the issues of lawful presence and work authorization for aliens in this country but does not include those designated by DACA.

---

[108] If the Defendant-Intervenors are right and the States must prevail on both criteria, this Court would find that the Plaintiff States have not clearly shown that the actual decision-makers do not exercise discretion and consequently their proof at this stage would not support a conclusion of a likelihood to succeed on the merits on the procedural APA issue.

Furthermore, the award of lawful presence and an entire array of federal, state, and local rights and benefits to aliens Congress has deemed inadmissible flies in the face of the INA's goals of deciding who comes to and stays in the United States, who works in the United States, and who qualifies for government-funded benefits. This Court also holds that the States have shown a likelihood to succeed on their procedural APA claim. As the Fifth Circuit stated in *Texas I*, and as is basically true here, "[a]t its core, this case is about the Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis." *Texas I*, 809 F.3d at 170. This program, which allots lawful presence and its corresponding benefits to more than a million aliens, must be committed to the decision-making power of Congress, not the Executive alone. Nevertheless, if implemented by the Executive Branch, it must at least undergo the formalities of notice and comment.

For these reasons, the Court holds that the Plaintiff States have clearly shown, as a matter of law, that they are likely to succeed on the merits.

## B.    Preliminary Injunction Factor Two: Irreparable Harm

In addition to showing a likelihood of success on the merits on at least one of their claims, the Plaintiff States must also demonstrate a "likelihood of substantial and immediate irreparable injury" if the injunction is not granted, and the "inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).

Speculative injuries are not enough to satisfy this factor; "there must be more than an unfounded fear on the part of [Plaintiffs]." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1. Thus, courts will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury." *Id.* Instead, the Plaintiff States must show a "presently existing actual threat." *Id.*; *see also Winter*, 555 U.S. at 22 ("We agree . . . that the Ninth

Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (internal citations omitted)). The Plaintiffs' injury need not have already been inflicted or be *certain* to occur; a strong threat of irreparable injury before a trial on the merits is adequate for a preliminary injunction to issue. *See, e.g.*, 11A Charles Alan Wright et al., *Federal Practice and Procedure*, § 2948.1.

The Plaintiff States allege they will suffer injuries due to various causes should an injunction be denied. First, they claim that they are paying millions of dollars annually to provide for uncompensated healthcare expenses and other state-provided benefits. [Doc. No. 5, at 41]. Additionally, they will suffer increased law-enforcement and educational costs "imposed by aliens who would not remain in the country but for the removal of their unlawful-presence status and work authorizations." [Doc. No. 218, at 49]. Further, they claim the increased presence of the DACA recipients causes injury to their legal residents, as the DACA recipients diminish the chances for employment for legal residents.

The Plaintiff States maintain that these expenses are incurred on a daily basis and accurately claim that they stand little or no chance of getting monetary compensation from the federal government for these costs. *See Texas v. United States*, 106 F.3d 661, 662 (5th Cir. 1997). This category of damages was rejected by this Court in *Texas I* because the damages claimed were actually projected costs and were not based on the actual policy being challenged or the costs associated with the DAPA or Expanded DACA recipients. Instead, these damages were allegedly being caused by other aliens, who, inspired by the existence of DACA and the prospect of DAPA, chose to illegally come to the United States.

In the instant case, Texas has proven that it suffers some amount of costs associated with

increased social services expenses that are directly associated with the continued presence of its over 100,000 DACA-recipient residents. The Defendant-Intervenors maintain that Texas, the only state that attempted to prove damages, did not suffer any real loss on a net basis, and that these costs are more than offset by the economic advantages that Texas derives from the DACA recipients, a position on which they may ultimately be proven correct when this case is tried on the merits. Despite the fact that Defendant-Intervenors purport to question the existence of these damages, their own expert, Dr. M. Ray Perryman, estimated that DACA recipients cost the State of Texas $250,007,800 annually. The States maintain, again based upon studies proffered to the Court by Defendant-Intervenors, that if DACA was rescinded, at least twenty percent of DACA recipients would return to their home country. [Doc. No. 219, Ex. 22, at 13]. The Plaintiff States reasonably conclude that they would save that same percentage of their annual DACA-related expenditures if the program was enjoined.

Most of Texas's own testimony and evidence concerning DACA recipients is encompassed in much larger figures that relate to costs incurred by the State for *all* illegal aliens or for unaccompanied alien children. Nevertheless, whatever holes were created by the deficits in the evidence offered by the States' experts were filled in by the testimony of the Defendant-Intervenors' experts. The Plaintiff States presented evidence that these costs continuously accrue as DACA continues, in addition to the argument that DACA continues to incentivize more illegal immigration.[109] Stated differently, Texas argues that DACA's continued existence allows its recipients to stay legally in the United States, which continues to compel Texas to expend funds that it would not otherwise be compelled to spend. Indeed, several of the Defendant-Intervenors

---

[109] This latter argument, concerning incentivizing more illegal immigration, was made in *Texas I*, and this Court refused to consider this claim. While it may be valid in its premise to a certain extent, the Court found in *Texas I* and still finds here that as a legal issue it was not one that was redressable as pleaded.

went to public school in Texas, each of which cost the State of Texas thousands of dollars per year.

Defendant-Intervenors have gone to great lengths to prove that, aside from these costs, the overwhelming majority of DACA recipients provide a decidedly positive economic effect on the states in which they reside. The Defendant-Intervenors claim that the States might actually suffer more irreparable damage should the DACA recipients lose their lawful presence and have produced multiple affidavits and studies which do indeed support that claim. That is certainly the position voiced by New Jersey and a large number of amicus curiae states. Texas, however, argues that the Fifth Circuit held that the "standing analysis is not an accounting exercise." *Texas I*, 809 F.3d at 156. This Court quoted this language previously when it found that Texas has standing; however, that does not necessarily mean that the Plaintiff States automatically have proven that they will suffer irreparable harm—a necessary element for obtaining a preliminary injunction.

The Court at this stage need not go through an extensive accounting exercise that analyzes each of the Plaintiff States' economic arguments and each of the Defendant-Intervenors' rebuttals. Initially, a plaintiff is not precluded from claiming damages in one area just because there is a possibility that the damages might ultimately be offset in another. Moreover, the States correctly argue that the law allows a lesser level of precision and proof in a case where the proof of damages is clear and where the movant has clearly shown a likelihood of success on the merits. *Fla. Med. Ass'n. Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). This Court has reviewed the evidence of ongoing damages and finds it sufficient to support a finding of injury that is irreparable, as there is no source of recompense.

Nevertheless, this does not resolve the issue. The Defendant-Intervenors claim the States' delay in bringing this action forecloses any injunctive relief. All concede that Texas and the other Plaintiff States dismissed *Texas I* after the DHS agreed to phase out DACA. The DHS attempted to make good on this representation in September of 2017, and it would have but for the injunctions and vacatur issued by district courts in California, New York, and the District of Columbia. Texas filed this lawsuit in May of 2018, less than a week after the district court in Washington, D.C. indicated in *NAACP* that it would order DACA continued indefinitely into the future. (California and New York had issued their respective injunctions as to current DACA recipients and renewals in January and February of this year.) Why the first two injunctions did not provoke the filing of this case, but the D.C. order did, is beyond the knowledge of this Court. One would suspect it was because the order in *NAACP* indicated the D.C. court would order the DHS to process new DACA applications in addition to the renewal applications the other courts had already mandated. This Court finds that Texas's reaction to this group of injunctions was timely, especially when one takes into account the fact that it had just dismissed its 2014 lawsuit based upon the Government's promise to dissolve the DACA program. If these were the only relevant considerations, the Court would stop here. This timeline, however, is not the only one the Court finds important.

The DACA program was instituted in June of 2012. No pertinent congressional or agency action regarding this program (except for the repeated refusal of Congress to enact a corresponding DREAM Act and the 2014 attempt to expand DACA) has taken place in the meantime; nor have there been any impediments suggested or convincing reasons given for the fact that the Plaintiff States waited almost six years to file this suit. The Plaintiff States correctly argue that the statute of limitations has not expired as to their claims and that they are still able to

assert their rights as sovereign states to protect their citizens from the ongoing damages that they perceive flow from the DACA program. In fact, the Defendant-Intervenors more or less concede the accuracy of this point.

The problem with this proposition, however, is that the issuance of a preliminary injunction is a matter of equity. *See* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2947 ("[T]he grant or denial of a preliminary injunction remains a matter for the trial court's discretion, which is exercised in conformity with historic federal equity practice."). A delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction:

> A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (and the many cases cited therein).

Federal courts in Texas have long recognized this principle. For example, in *Symetra Life Insurance Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759 (S.D. Tex. 2007), Judge Rosenthal, dealing with a thirteen-month delay, opined:

> Rapid Settlements also waited more than one year after the state court confirmed the arbitration award in May 2005 before filing suit in August 2006, evidence that it will not suffer irreparable injury. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. *Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.*" *Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*, No. 3:05–cv–0094–D, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006); *see also Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1985) (vacating a preliminary injunction where the movant waited four months to seek relief after filing suit); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (finding that a ten-week delay in seeking an

> injunction for trademark infringement undercut the claim of irreparable harm);
> *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975)
> (affirming the district court's denial of temporary injunctive relief where the
> movant, among other things, delayed three months in making its request).
> Injunctive relief is unavailable.

*Id.* at 774. (emphasis added); *see also All Access Today LP v. Aderra Inc.*, 2009 WL 10669445

(W.D. Tex. 2009) (six-month delay provided independent reason for denial of preliminary

injunction), *Amicus Commc'ns v. Hewlett-Packard Co., Inc.*, 1999 WL 495921 (W.D. Tex.

1999) (three-year-plus delay provided independent reason for denial of preliminary injunction).

Courts from other circuits have likewise found this concept to be especially compelling

when defendants (or in this case the Defendant-Intervenors) have relied upon the movant's

inaction. *See, e.g.*, *Celebration Int'l, Inc. v. Chosun Int'l*, 234 F. Supp. 2d 905 (S.D. Ind. 2002).

This proposition has been described in various ways. Some courts find a delay to be

"inconsistent" with a claim of irreparable injury, *see, e.g.*, *Taylor v. Biglari*, 971 F. Supp. 2d 847

(S.D. Ind. 2013) (a three-month delay), while others find a delay to "destroy the presumption" of

irreparable harm. *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432 (E.D.N.Y. 2013).

Not all delays have been found to preclude preliminary injunctive relief, however. For

example, where a defendant was unable to pinpoint either the cause of a certain harm or discover

the harm itself, a reasonable delay did not undermine a determination of irreparable injury. *7–*

*Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214 (E.D.N.Y. 2013). Similarly, delays have been found to

be reasonable if the parties have been trying to reach an amicable resolution short of litigation.

*Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014). This Court will assume, as

the Plaintiff States claim, that the resolution of the 2014 *Texas I* lawsuit accounted for some of

the delay in this matter, but even that does not explain the nearly six-year wait. For example, in

*Texas I*, the Plaintiff States sought and received extraordinary relief that enjoined certain

amendments intended to expand DACA—these amendments were adopted in the same manner DACA was and were subjected to most of the same arguments being made in this lawsuit. The Plaintiff States have not explained why DACA itself was not included in that 2014 suit and why extraordinary interlocutory relief is warranted now, but could not have been sought in December of 2014. After all, when *Texas I* was filed in December of 2014, DACA had been in effect for over two years, and almost all of the proof as to why DAPA and DACA's expansion were legally defective was either based upon arguments equally applicable to the original DACA or based upon facts derived from the implementation and operation of DACA. At oral argument in this case, counsel for the States voiced what can best be described as "strategic reasons" for not including DACA in *Texas I*. It may have been an effective strategy, but one's strategy in a prior lawsuit does not legally justify delay in another.

One might argue that a finding of delay should not apply to those who have not yet applied, to those who are just "aging-in" to DACA eligibility, or to any future renewals. This Court disagrees. The States could have brought a lawsuit against the entire program in 2012 or anytime thereafter. Renewals occurred as early as 2014 and those claims could have been included in *Texas I* but were not. The entire population that could ever be eligible for DACA (absent the amendments that were enjoined in *Texas I*) was fixed in 2012, and since that finite population is not growing and since a determination as to DACA's legality is ongoing, this Court does not consider the possibility of new applicants or renewals to be an emergent situation demanding injunctive relief.

The Plaintiff States have put forth what would otherwise be sufficient proof of irreparable damage and have shown that they have no other viable legal remedy. Nevertheless, the Court finds that the Plaintiff States cannot prevail on the legal element of irreparable harm due to their

delay in pursuing the claims they now bring concerning DACA.

### C. Preliminary Injunction Factors Three and Four: Hardship to Parties and the Public Interest[110]

Before issuing an injunction, courts must "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Thus, in addition to demonstrating a likelihood of success on the merits and irreparable harm, a movant must show that it would suffer more harm without the injunction than the enjoined party would if it was granted. The award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of interests of—and possible injuries to—the respective parties. *Yakus v. United States*, 321 U.S. 414, 440 (1944). If there is reason to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips toward denying preliminary relief. *See Winter*, 555 U.S. at 27 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome." (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.2)).

The final factor in the preliminary injunction analysis focuses on policy considerations. Plaintiffs have the burden to show that if granted, a preliminary injunction would not be adverse to public interest. *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). If no public

---

[110] This opinion concentrates its analysis on the comparative damage to the Plaintiff States and the Defendant-Intervenors, but the Federal Defendants would also be damaged by an injunction, as it would put them in between a rock and a hard place. The DHS would be faced with dueling injunctions, and while this situation might be pleasing to those in academia who find circuit splits to be healthy for the legal system, it would be difficult for the Government to comply with each order. This Court would not hesitate to enter an injunction, even in the face of opposing rulings from sister courts, if compelled by law, but the Court for the reasons discussed in the text does not face this situation.

interest supports granting preliminary relief, such relief should ordinarily be denied, "even if the public interest would not be harmed by one." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.4. "Consequently, an evaluation of the public interest should be given considerable weight in determining whether a motion for preliminary injunction should be granted." *Id.*

Unlike in *Texas I*, the Plaintiff States ask this Court to enjoin a program that has been ongoing for more than six years. Instead of maintaining the status quo, they want this Court to halt the operation of DACA. As noted in this Court's opinion in *Texas I*, the existence of DACA in its 2012 configuration was and still is the status quo. *See Texas v. United States*, 86 F. Supp. 3d 591, 608 (S.D. Tex. 2015).

In this case, the factor concerning significant hardship to the parties has a particular significance. The dissolution or the enjoining of the ongoing DACA program would have immediate effects—it would deprive the individual Defendant-Intervenors of their ongoing lawful status and their ability to work. The proposed injunction could cause the DACA recipients to lose their ability to travel within the United States and many other benefits that flow from lawful presence. For many, this could, in theory, make them susceptible to immigration proceedings and eventual removal where applicable.[111] Further, New Jersey and those states, cities, and employers who find themselves in the shoes of New Jersey (a status which many of the amicus curiae purport to hold), could lose residents whom they consider to be valuable

---

[111] This Court specifically includes the phrase "in theory." Just as this Court indicated when it enjoined DAPA and Expanded DACA in 2015, nothing in that order compelled the Government to take any action regarding either the Expanded DACA or DAPA populations, nor did it enjoin any traditional concepts of prosecutorial discretion. This Court did not order anyone arrested, prosecuted, or deported. It did not even prohibit the DHS from identifying each recipient and giving each an ID card identifying them as a low enforcement priority—which was the stated purpose of the program. It only enjoined the DHS from giving lawful status to individuals whom Congress declared to be removable and from bestowing a wide variety of federal and state benefits—many of which damaged the Plaintiff States—which follow from having lawful presence in the United States.

members of their communities or employees who are integral to various schools, municipalities, and industries.

Conversely, if the court were to enter an injunction, Texas and the other Plaintiff States would be able to escape the kinds of costs and damages that they have suffered and continue to suffer as a consequence of DACA. Nevertheless, due to the continued presence of a large illegal alien population (which would still include approximately eighty percent of the DACA recipients even based on the most favorable evidence), many of the secondary costs about which they complain would still remain. The Plaintiff States would still incur medical, education, and law-enforcement expenses, albeit to a lesser extent. The Plaintiff States may also have some resident workers who would gain job opportunities that they might otherwise not have, but others would still lose opportunities to individuals who are illegally in the country and are hired because they are less expensive than legal workers. According to the evidence, the number of illegal aliens would decrease due to the approximately twenty percent of DACA recipients who said they would leave the country, but the States, nonetheless, would still be forced to absorb the costs of those who remained.

When this Court weighs the evidence produced by all parties, it is convinced that both the third and the fourth factors favor maintaining the status quo and denying the injunction. This Court does not necessarily agree with some of the reasoning (and the bases given for the decisions made) by the other courts that have addressed the rescission of DACA. Nonetheless, in each case in which an injunction or order of vacatur was issued and in this case in which an injunction is not being issued, the purpose of the orders was to maintain the status quo until a definitive decision could be reached. If this Court were to grant an injunction, it would upset that balance.

Moreover, this Court used two time-worn sayings in *Texas I* and its associated hearings when it ruled that an injunction was warranted to stop the implementation of DAPA and Expanded DACA: "one cannot put the toothpaste back in the tube" and "one cannot unscramble the egg." It enjoined those programs so that a decision could be reached on the front end, before individuals and society had developed a reliance on a program that would later have to be set aside. Here, the egg has been scrambled. To try to put it back in the shell with only a preliminary injunction record, and perhaps at great risk to many, does not make sense nor serve the best interests of this country. The States argue that any reliance on DACA was misplaced because DACA status was always revocable and because it did not confer any permanent rights. This Court does not dispute that premise based upon the language of the June 15, 2012 memorandum, but the reality of the situation is that it conferred lawful presence and numerous other benefits, and many DACA recipients and others nationwide have relied upon it for the last six years.

Some might engage in conjecture as to what this or any other court would have ruled if the Plaintiff States had challenged DACA in 2014 when *Texas I* was filed, but conjecture is all that it would be. This case is taking place almost four years later, and throughout that time individuals have continued to apply for and renew their DACA status. The Plaintiff States may ultimately prevail and prove their right to declaratory relief, but given the delay in confronting DACA, and given that the interests of the Defendant-Intervenors and the public outweigh those of the Plaintiff States, the Court denies the request for preliminary relief.

## VIII.   Conclusion

In *Casa de Maryland*, the court expressed the sentiment that the question of the eligibility of the DACA recipients to remain in the United States and to continue contributing their skills and abilities to the betterment of this country is an issue crying out for a legislative solution. This

Court agrees. Nevertheless, the failure of Congress to act does not bestow legislative authority on either the Executive or Judicial Branches, and the need for legislation cannot take precedence over the application of the Constitution and the laws of the United States, which this and all other federal courts are sworn to uphold.

Counsel for the defendants and intervenors in *Texas I* argued that DAPA and Expanded DACA must be legal because Congress had not said otherwise—an argument that Justice Kennedy rightly described as "upside-down" and "backwards." Transcript of Oral Argument at 24, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674). Justice Kennedy's reaction that this proposition is upside-down is unassailable. It turns the entire Constitution on its head. The Defendant-Intervenors suggested at oral argument that oft times Congress rejected DREAM Act legislation because the proposals either made the recipients citizens or guaranteed them a pathway to some permanent status or because they included some other controversial provision. This Court has no means to determine why each Representative or Senator voted against a particular bill, but it is clear that someone in Congress could have introduced a bill that simply authorized DACA—especially after the legal challenges to DAPA and Expanded DACA were sustained—and if Congress so desired it could have become law. This Court cannot view Congress's repeated rejection of the concept as an indication that DACA complies with its dictates.

That being the case, this Court is forced to view the DACA question just as one of the Defendant-Intervenors' experts did when asked to comment on the plaintiffs' decision not to challenge DACA in *Texas I*:

> It's an interesting exclusion, given that the legal arguments for both *DACA and its 2014 spin-off for parents, DAPA, are basically identical . . . . It's hard for me to think of any ground striking DAPA that wouldn't apply to DACA . . . .* So why not challenge DACA? They might have worried [that] the court wouldn't want to

strike down such a popular program. So they think go after DAPA and if they win, then they have a nice precedent to go after DACA.[112]

Both assumptions appear to be correct. DACA and DAPA are basically identical, and there is no legal ground for "striking DAPA that wouldn't apply to DACA" (and certainly no legal ground for striking Expanded DACA that does not apply to DACA itself). Further, DACA is a popular program and one that Congress should consider saving. Unfortunately, the Judiciary is not the branch of government designed to salvage a program that should have emanated from Congress, or at the very least complied with the APA. The *Casa de Maryland* court cited a recent dissent from a Fourth Circuit decision that aptly expressed the need for judicial restraint:

> The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues. But public respect for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives.

*Casa De Maryland*, 284 F. Supp. 3d at 767 n.21 (citing *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 376–77 (4th Cir. 2018) (Niemeyer, J., dissenting)). This Court will not succumb to the temptation to set aside legal principles and to substitute its judgment in lieu of legislative action. If the nation truly wants to have a DACA program, it is up to Congress to say so.

Nevertheless, for the reasons discussed above, this Court denies the request for preliminary injunctive relief.

Signed this 31st day of August, 2018.

Andrew S. Hanen
United States District Court Judge

---

[112] Lomi Kriel, *DACA's Fate in Court's Hands*, Houston Chronicle (Apr. 16, 2016) [Doc. No. 284, Ex. 1, at 5] (emphasis added and internal quotation marks omitted).