**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, ET AL.; | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, ET AL.; | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| *Defendants-Intervenors.* | ) | |
| | ) | |

**PLAINTIFF STATES' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE
COURT ....................................................................................................... 4

SUMMARY OF ARGUMENT .................................................................... 5

FACTUAL BACKGROUND ....................................................................... 6

       A.   Congress has created an extensive statutory
           framework governing immigration. ....................................... 6

       B.   Congress declines to pass the DREAM Act ........................... 7

       C.   The Obama Administration unilaterally creates
           DACA, Expanded DACA, and DAPA. .................................... 9

       D.   Courts rule that Expanded DACA and DAPA are
           unlawful. .............................................................................. 13

       E.   DHS Secretary Kelly rescinds DAPA and Expanded
           DACA. .................................................................................. 14

       F.   DHS attempts to rescind DACA in response to an
           imminent legal challenge. ................................................... 14

       G.   Numerous parties seek to halt the rescission of DACA.
           ................................................................................................ 16

STATEMENT OF THE NATURE AND STAGE OF THE
PROCEEDING ........................................................................................ 17

ARGUMENT ........................................................................................... 19

    I.   No threshold issue bars this Court's review of DACA ................ 19

       A.   Other DACA rulings do not suggest that this Court should
           refrain from ruling. .............................................................. 19

       B.   This lawsuit unquestionably presents a case or
           controversy. ......................................................................... 20

       C.   Plaintiff States have standing. ............................................ 21

           1.   Plaintiff States are due special solicitude in
                the standing analysis. ........................................... 21

           2.   Plaintiff States have parens patriae
                standing to protect the economic well-being
                of their populace. .................................................. 24

3.     Plaintiff States suffer an injury from DACA through increased healthcare, education, and law-enforcement costs.................................. 27

4.     Plaintiff States have standing based on DACA's dispensing and abdication of congressional statutes that preempt state prerogatives.......................................................... 29

D.  DACA is reviewable under the APA.................................... 30

II.     DACA is unlawful. ...................................................................... 31

A.  DACA was unlawfully issued without notice-and-comment rulemaking. ............................................................................ 31

1.     DACA modifies substantive rights...................... 32

2.     DACA is not a general policy statement. ............ 33

B.  DACA is contrary to substantive federal law. ..................... 34

1.     DACA does not pass Chevron's first step because Congress's immigration scheme unambiguously forecloses DACA........................ 34

a.     The agency lacks statutory authority to implement DACA.......................................... 35

b.     The INA provides a comprehensive statutory scheme for the allocation of lawful presence. ........................................... 37

c.     The INA provides a comprehensive statutory scheme for the allocation of work authorization. ..................................... 38

d.     For some, DACA defies Congress's scheme through advance parole, which clears a path to legal status contrary to 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1182(a)(9)(B) ................................................. 39

2.     Even if DACA did pass Chevron's first step, it would not pass the second. ............................... 41

3.     Differences between DAPA and DACA do not compel a different result............................... 42

4.     This exercise of deferred action under DACA is not supported by historical precedent. ............ 43

C.  DACA violates the Take Care Clause. ................................. 44

iii

D.  The APA requires that the 2012 Memorandum creating DACA be set aside, and the Court should allow for an orderly winddown of the unlawful program. ............................................................................. 45

Conclusion ........................................................................................................ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ............................................................... 29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ............................................................... 22, 24, 29

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993)............................................................... 32

*Arizona v. United States*,
  567 U.S. 387 (2012) ...................................................................*passim*

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015) ............................................................... 29

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ............................................................... 35

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018)............................................................... 3, 26

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ............................................................... 21

*Casa de Maryland v. U.S. Dep't of Homeland Sec.*,
  284 F. Supp. 3d 758 (D. Md. 2018) ............................................................... 20, 34, 46

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................... 4

*Cent. United Life Ins. Co v. Burwell*,
  827 F.3d 70 (D.C. Cir. 2016) ............................................................... 37

*Chevron U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ............................................................... 34, 35

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ............................................................... 32

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................. 31

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ................................................................. 35

*Galvan v. Press,*
    347 U.S. 522 (1954) ................................................................... 6

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................. 31

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ..................................................................... 6

*Hoffman Plastic Compounds, Inc. v. NLRB,*
    535 U.S. 137 (2002) .............................................................. 7, 38

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................. 21

*INS v. Nat'l Ctr. For Immigrants' Rights,*
    502 U.S. 183 (1991) ................................................................. 38

*Kendall v. United States,*
    37 U.S. 524 (1838) ................................................................... 44

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015) ............................................................. 31

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .............................................. 21, 22, 26, 29

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014)................................................ 30

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ................................................................. 32

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018) ......................................... 3

*NCAA v. Gov. of N.J.,*
    730 F.3d 208 (3d Cir. 2013)..................................................... 28

*Pratt v. Harris Cty.*,
　822 F.3d 174 (5th Cir. 2016) ................................................................. 4

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
　279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................. 3, 17, 20, 26

*Regents of Univ. of Cal. v. U.S. Dept. of Homeland Sec.*,
　908 F.3d 476 (9th Cir. 2018) ........................................................... 3, 17

*Texas v. United States* ("*Texas I*"),
　809 F.3d 134 (5th Cir. 2015) ...................................................*passim*

*Texas v. United States* ("*Texas I*"),
　86 F. Supp. 3d 591 (S.D. Tex. 2015)................................... 13, 14, 30, 33

*Topalian v. Ehrman*,
　954 F.2d 1125 (5th Cir. 1992) ............................................................. 4

*United States v. Texas*,
　136 S. Ct. 2271 (2016) (per curiam) ............................................... 3, 14

*United States v. Windsor*,
　570 U.S. 744 (2013) ........................................................................ 20, 21

**Statutes**

U.S. Const. art. II, § 3 (Take Care Clause) ......................................... 5, 44

5 U.S.C.
　§ 553 ............................................................................................... 9
　§ 553(b)(A)...................................................................................... 32
　§ 701(a)(2) ...................................................................................... 31
　§ 706(2)................................................................................. 4, 34, 41
　§ 706(s) .......................................................................................... 45

6 U.S.C. § 202(5) ................................................................................. 36

8 U.S.C.
    §§ 1101 *et seq.* ("INA") ................................................................ 6, 31, 35, 36
    § 1103 ............................................................................................................ 36
    § 1182(a) ........................................................................................................ 36
    § 1182(a)(6)(A)(i) ......................................................................................... 40
    § 1182(a)(9)(B)(i) ......................................................................................... 41
    § 1182(d)(5)(A) ............................................................................................ 11
    § 1225(a)(1) ................................................................................................... 35
    § 1225(a)(3) ................................................................................................... 35
    § 1225(b)(2)(A) ............................................................................................ 35
    § 1226(a)(3) ................................................................................................... 38
    § 1227(a)(1)(C) ............................................................................................. 35
    § 1229a(c)(2)(A)–(B) ................................................................................... 36
    § 1229a(e)(2) ........................................................................................... 35, 36
    § 1255 ............................................................................................................ 40
    § 1433 ............................................................................................................ 42
    § 1611(a) ....................................................................................................... 23
    § 1611(b)(2) .................................................................................................. 10
    § 1611(b)(3) .................................................................................................. 10
    § 1611(b)(4) .................................................................................................. 10

26 U.S.C. § 4980H(b) .......................................................................................... 23

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq* ............................*passim*

Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-
    603, 100 Stat. 3359 ..................................................................................... 6, 38

Patient Protection and Affordable Care Act ("ACA"), 26 U.S.C. § 4980H ........... 23, 25

**Other Authorities**

2d Am. Compl., *Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 19,
    2017), ECF No. 60 .......................................................................................... 17

A. Molina, *Immigration: Undocumented College Students Find a Way
    to Study Abroad, Return Legally,* Press-Enterprise, Riverside
    California (Feb. 14, 2016) ............................................................................... 40

Compl., *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2018),
    ECF No. 1 ....................................................................................................... 17

Compl., *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017),
    ECF No. 1 ....................................................................................................... 17

Compl., *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325
 (D.D.C. Nov. 3, 2017), ECF No. 1.............................................................. 17

142 Cong. Rec. 26,680 (1996)...................................................................... 7

Development, Relief, and Education for Alien Minors (DREAM) Act.................. 7, 8

Fed. R. Civ. P. 56(a) ...................................................................................... 4

Fed. R. Civ. P. 56(c) ...................................................................................... 4

Fed. R. Civ. P. 65(a)(2).............................................................................. 6, 19

H.R. 496, 115th Cong. (2017) ...................................................................... 7

H.R. 1751, 111th Cong. (2009) .................................................................... 7

Harold Levanthal, *A Modest Proposal for a Multi-Circuit Court of
 Appeals*, 24 AM. U. L. REV. 881, 907 (1975) ............................................ 20

Letter from Attorney General Sessions to Acting Secretary Duke (Sept.
 4, 2017),
 https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_A
 G-letter-DACA.pdf....................................................................................... 15

President Barack Obama, Remarks at Univision Town Hall (Mar. 28,
 2011), https://obamawhitehouse.archives.gov/the-press-
 office/2011/03/28/remarks-president-univision-town-hall ........................ 8

President Barack Obama, Remarks on Comprehensive Immigration
 Reform in El Paso, Texas (May 10, 2011),
 https://obamawhitehouse.archives.gov/the-press-
 office/2011/05/10/remarks-president-comprehensive-immigration-
 reform-el-paso-texas ................................................................................... 8

President Barack Obama, Remarks on Immigration (June 15, 2012),
 https://www.whitehouse.gov/the-press-office/2012/06/15/remarks-
 president-immigration ................................................................................ 11

S. 1545, 108th Cong. (2003).......................................................................... 7

S. 2075, 109th Cong. (2005).......................................................................... 7

S. 2205, 110th Cong. (2007).......................................................................... 7

S. 3542, 114th Cong. (2016).......................................................................... 7

S. 729, 111th Cong. (2009)...........................................................................7

S. 744, 113th Cong. (2013)...........................................................................7

S. 952, 112th Cong. (2011)...........................................................................7

Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV 417 (2017).............................................. 20

Steven T. Dennis, *Obama on Immigration: "I Just Took an Action to Change the Law,"* ROLL CALL (Nov. 25, 2014), http://www.rollcall.com/news/home/immigration-reform-news-obama-immigration-action-law............................................................ 12

Stipulation of Dismissal, *Texas I*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473 ......................................................................... 16

U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca............................................. 16

## INTRODUCTION

No President can unilaterally override Congress's duly enacted laws simply because he prefers different policy choices. And even if the President could grant lawful presence and work authorization to over one million people Congress has deemed unlawfully present, the rest of the Nation is due, at the very least, the right to first be heard through notice-and-comment rulemaking. The United States Court of Appeals for the Fifth Circuit affirmed those principles when it held unlawful the Deferred Action for Parents of Americans (DAPA) program and the expansion of the Deferred Action for Childhood Arrivals (DACA) program. And this Court has already ruled that those principles and that binding precedent make the original DACA program just as unlawful. *See* ECF No. 319.

This lawsuit is not about the wisdom of any particular immigration policy. As this Court correctly pointed out in ruling on Plaintiff States' request for a preliminary injunction, it is "the sole province of Congress"—not the Executive Branch or the Judiciary—"to enact the legislative policies that control immigration." ECF No. 319 at 5-6. This case does not concern "the relative merits of immigration, legal or otherwise, except insofar as it must to decide whether the DACA program itself (and the manner in which it was instituted) is legal." ECF No. 319 at 5. Congress may choose to change immigration law to adopt new policies. But after legislative efforts to grant legal status to individuals who came to the United States as minors stalled, the Executive Branch effectuated that same policy by means of the 2012 memorandum that created DACA. Ex. 1 (App. 2). The issue here, the Court correctly

1

notes, is not "the popularity of or the relative wisdom of [the] decision to implement the DACA program," but "whether the DACA program itself (and the manner in which it was instituted) is legal." ECF No. 319 at 5.

Whatever its policy merits, DACA is clearly unlawful, as this Court has already held. ECF No. 319 at 104. The Executive Branch is not free to ignore governing law by conferring a legal status and benefits that are contrary to substantive immigration law, contrary to procedural administrative requirements, and contrary to the U.S. Constitution.

At the time DACA was created, the Executive purported merely to define criteria "to be considered" in the "exercise of prosecutorial discretion" for deciding whether to pursue an alien's removal. Ex. 1 at 1, 2 (App. 2, 3). In reality, as the Court has already acknowledged, DACA "gives lawful presence, work authorization, and multiple other benefits to 1.5 million people." ECF No. 319 at 71. The Executive grants those benefits by rubber-stamping applications that meet the DACA criteria. The result is clear: satisfy the Executive Branch's unilaterally specified criteria and receive the status of lawful presence in the United States and numerous benefits otherwise foreclosed by federal law. This is a textbook example of prohibited executive lawmaking.

Plaintiff States sued over this practice in 2014 after the Executive sought to create DAPA and to expand and increase the benefits bestowed by DACA (Expanded DACA). This Court enjoined DAPA for its failure to comply with notice-and-comment procedural requirements. The Fifth Circuit affirmed this Court's injunction and

further held that DAPA and Expanded DACA were contrary to substantive federal law. *Texas v. United States ("Texas I")*, 809 F.3d 134, 146, 167, 184 (5th Cir. 2015). An equally-divided Supreme Court affirmed the Fifth Circuit's ruling. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

After the litigation over DAPA and Expanded DACA, the federal government agreed in September 2017 to wind down DACA. District courts in California, New York, and the District of Columbia, however, have stopped the Executive from rescinding DACA. *Regents of Univ. of Cal. v. U.S. Dept. of Homeland Sec.,* 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen,* 279 F. Supp. 3d 401 (E.D.N.Y. 2018); *NAACP v. Trump,* 298 F. Supp. 3d 209 (D.D.C. 2018). The U.S. Court of Appeals for the Ninth Circuit has upheld one such injunction. *Regents of Univ. of Cal. v. U.S. Dept. of Homeland Sec.,* 908 F.3d 476 (9th Cir. 2018). The Executive's decision to rescind DACA now stands enjoined for the indefinite future.

The United States is a nation of laws. DACA violates the solemn duty that binds the Executive to enforce the laws duly enacted by Congress. The Court has recognized that DACA is unlawful for the same reasons that the Fifth Circuit affirmed the injunction of DAPA and Expanded DACA. ECF No. 319 at 84-88. These programs depend on a limitless theory of administrative power that would allow the Executive to legalize *any* unlawfully present alien in the United States without statutory authorization. *Id.* at 87. But the Fifth Circuit struck down that sweeping conception of Executive power, holding that the "INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them

newly eligible for a host of federal and state benefits, including work authorization." *Texas I*, 809 F.3d at 184. In other words, the President cannot rewrite the law. *See* ECF No. 319 at 88 ("[T]he proper origination point for the DACA program is Congress.").

Plaintiff States ask for a return to the rule of law. DACA is untenable under the U.S. Constitution's principles regarding separation of powers, under Congress's duly enacted immigration laws, and under judicial precedent binding on this Court. Therefore, Plaintiff States respectfully request that the Court hold that DACA is unlawful, set aside the 2012 memorandum that created the program, and allow existing DACA permits to expire at the end of their stated term.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The issue is whether the Court should grant Plaintiff States summary judgment and (1) declare that DACA is unlawful; (2) order that, under 5 U.S.C. § 706(2), the 2012 memorandum creating DACA be set aside; and (3) tailor a remedy that allows for the orderly winddown of the unlawful program.

Summary judgment is warranted where there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Such a showing entitles the movant to summary judgment as a matter of law." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(c)). This Court has already ruled that Plaintiff States "have clearly shown, *as a matter of law*, that they are likely to succeed on the

merits." ECF No. 319 at 104 (emphasis added). This case is ripe for resolution through a final judgment confirming that DACA is unlawful.

## SUMMARY OF ARGUMENT

No threshold issue bars the Court's review of DACA's unlawfulness. Other DACA rulings from other courts outside the Fifth Circuit do not suggest that this Court should refrain from ruling. This lawsuit unquestionably presents a "case or controversy." Plaintiff States have standing to challenge DACA. And DACA is a reviewable agency action.

On the merits, DACA is unlawful for three reasons. First, DACA violated the procedural requirements of the Administrative Procedure Act ("APA") because the Executive issued DACA without following the requirements of notice-and-comment rulemaking. Second, DACA is contrary to the statutory regime enacted by Congress, as the Fifth Circuit correctly concluded that the Executive lacks the power to unilaterally confer lawful presence and work authorization to millions of unlawfully present aliens. *Texas I*, 809 F.3d at 186. Third, DACA violates the President's obligation to "take Care that the Laws be faithfully executed . . . ." U.S. CONST. art. II, § 3. DACA purports to make lawful what Congress has declared unlawful. DACA thus dispenses with statutes, which the Take Care Clause forbids the Executive from doing.

# FACTUAL BACKGROUND[1]

## A. Congress has created an extensive statutory framework governing immigration.

"Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ." *Arizona v. United States*, 567 U.S. 387, 409 (2012) (alteration in original) (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)). Congress has exercised this exclusive authority and enacted "extensive and complex" statutes governing "immigration and alien status." 567 U.S. at 395. Title 8 of the United States Code functions as a "single integrated and all-embracing system" governing the presence of aliens in the country. *Id.* at 400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)). The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, delineates "specifi[c] categories of aliens" who may be admitted into and lawfully present in the country as well as the consequences for unlawful presence. *Arizona*, 567 U.S. at 395. Congress has enacted complex provisions detailing how over forty different classes of immigrants, nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *See Texas I*, 809 F.3d at 179.

Moreover, under the Immigration Reform and Control Act of 1986 ("IRCA"), Congress created "a comprehensive framework for 'combating the employment of

---

[1] Plaintiff States incorporate the facts set forth in their First Amended Complaint, briefing on the Motion for Preliminary Injunction, and all other matters already properly before the Court. *See* Fed. R. Civ. P. 65(a)(2).

illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). Congress reinforced immigration laws with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), responding to the States' concerns about the effects of extending benefits to unlawfully present aliens. *E.g.*, 142 CONG. REC. 26,680 (1996) (statement of Sen. Kyl) ("With this immigration bill, we have the opportunity to lift this financial burden off the States by forcing the Federal Government to take responsibility for reducing illegal immigration . . . ."). Congress never gave the Executive Branch free rein to sidestep these statutes and unilaterally permit unlawfully present aliens to be lawfully present or obtain attendant benefits and work authorization simply because the Executive chooses not to remove them.

**B.     Congress declines to pass the DREAM Act.**

On August 1, 2001, the Development, Relief, and Education for Alien Minors (DREAM) Act was first introduced in Congress. *See* S. 1291, 107th Cong. (2001). The DREAM Act has been introduced in some form in each Congress since then. *See, e.g.*, S. 1545, 108th Cong. (2003); S. 2075, 109th Cong. (2005); S. 2205, 110th Cong. (2007); S. 729, 111th Cong. (2009); H.R. 1751, 111th Cong. (2009); S. 952, 112th Cong. (2011); S. 744, 113th Cong. (2013); S. 3542, 114th Cong. (2016); H.R. 496, 115th Cong. (2017). The proposed DREAM Act would have allowed unlawfully present aliens to apply for lawful presence through conditional-permanent-resident status if, among other things, they entered the United States before the age of 16, and they had been in the

United States continuously for five years. Features of the DREAM Act closely resemble DACA. Both offer legal status to aliens who entered the United States before the age of 16 and meet a five-year residency requirement.

President Obama repeatedly asserted that he could not achieve the goals of the DREAM Act on his own through unilateral Executive action. For example, he said in response to a question about whether he could stop deportation of unlawfully present students with an executive order: "With respect to the notion that I can just *suspend deportations through executive order, that's just not the case*, because there are laws on the books that Congress has passed. . . . There are enough laws on the books by Congress that are *very clear in terms of how we have to enforce our immigration system* that for me to simply through executive order *ignore those congressional mandates* would not conform with my appropriate role as President." President Barack Obama, Remarks at Univision Town Hall (Mar. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/03/28/remarks-president-univision-town-hall (emphasis added).

Likewise, President Obama explained on another occasion: "And sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works. What we really need to do is to keep up the fight to pass genuine, comprehensive reform. That is the ultimate solution to this problem." President Barack Obama, Remarks on Comprehensive Immigration Reform in El Paso, Texas (May 10, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/05/10/remarks-

president-comprehensive-immigration-reform-el-paso-texas; *see also* ECF No. 104 ¶ 50 (compiling additional quotations from President Obama on the limitations preventing the Executive from changing the law).

## C. The Obama Administration unilaterally creates DACA, Expanded DACA, and DAPA.

Despite President Obama's statements that the Executive was bound by federal immigration law, Department of Homeland Security (DHS) Secretary Janet Napolitano announced the unilateral creation of the DACA program on June 15, 2012. *See* Ex. 1 (App. 2). The Department of Homeland Security issued this memorandum without going through the notice-and-comment procedures set forth in the Administrative Procedures Act. 5 U.S.C. § 553. The DACA memo makes qualifying unlawfully present aliens eligible to receive "deferred action" status if they (1) entered the United States before the age of 16; (2) had been in the United States continuously for at least five years; (3) met certain educational standards or were veterans; (4) had not been convicted of a felony, a "significant" misdemeanor or "multiple" misdemeanors, or otherwise posed a threat to national security or public safety; and (5) were not above the age of thirty. Ex. 1 at 1 (App. 2). DACA's "deferred action" terms last for two years and are renewable. *Id*. at 2 (App. 3).

Approximately 800,000 otherwise unlawfully present aliens have applied for and received deferred action pursuant to DACA, including around 125,000 Texas residents. *See* USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Fiscal Year 2012-2017. Ex. 2 (App. 6-7). DACA's conferral of deferred action entails much more than the Executive simply choosing not to remove

9

an alien with DACA. It also confers lawful presence. According to the Executive Branch: "An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect." *See, e.g.*, Ex. 3 at 2 (App. 10) (USCIS, *Frequently Asked Questions*, https://www.uscis.gov/archive/frequently-asked-questions (last visited Jan. 28, 2019)). Thus, "while [a DACA recipient's] deferred action is in effect and, for admissibility purposes, [the DACA recipient is] considered to be lawfully present in the United States during that time." *Id.* at 3 (App. 11). This has been true since 2012.

DACA's conferral of lawful presence creates eligibility for a host of benefits otherwise unavailable to unlawfully present aliens. DACA's conferral of lawful presence means a DACA recipient satisfies the lawful-presence prerequisite for the alien to be eligible for Social Security; *see* 8 U.S.C. § 1611(b)(2); for Medicare; *see id.* § 1611(b)(3); for a retirement benefit in PRWORA; *see id.* § 1611(b)(4); and for various State benefits—including a driver's license in most States.

Additionally, the Executive treats DACA's conferral of "deferred action" as conferring eligibility for "work authorization." Ex. 1 at 3 (App. 4). The Executive has consistently told aliens that their DACA applications *must* be accompanied by applications for a Form I-765 application for work authorization. Ex. 3 at 3 (App. 11). The Executive further "concedes that '[a]n alien with work authorization may obtain a Social Security Number,' 'accrue quarters of covered employment,' and 'correct wage records to add prior covered employment within approximately three years of the year

in which the wages were earned or in limited circumstances thereafter.'" *Texas I*, 809 F.3d at 149 (citation omitted).

And despite statements from President Obama and Secretary Napolitano to the contrary,[2] DACA clears a pathway to citizenship. The program allows DACA recipients to apply for advance parole, which removes a significant impediment that would otherwise prevent many unlawfully present aliens from adjusting their immigration status. ECF No. 104 ¶¶ 87-116. Advanced parole allows aliens to leave the United States and then lawfully re-enter the country without being turned away at a port of entry. *See* 8 U.S.C. § 1182(d)(5)(A). Congress designed it to be awarded only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id*. Despite that limited purpose, the Executive made the entire DACA population eligible to apply for advanced parole subject to the statutorily-prescribed conditions. Ex. 4, U.S. Dep't of Homeland Security, DACA National Standard Operating Procedures (2013) at 171 (App. 203). Further, the DACA program defines the conditions sufficient to meet the requirements for advance parole broadly to include "education purposes, such as semester-abroad programs and academic research" and "employment purposes such as overseas assignments, interviews, conferences, training, or meetings with clients overseas." *Id*. at 172-73 (App. 204-05).

---

[2] President Barack Obama, Remarks on Immigration (June 15, 2012), https://www.whitehouse.gov/the-press-office/2012/06/15/remarks-president-immigration ("This is not a path to citizenship"); Ex. 1 at 3 (App. 4) ("This memorandum confers no . . . pathway to citizenship").

One of the individual Defendant-Intervenors co-authored what this Court termed a "veritable roadmap" for DACA recipients interested in avoiding statutory requirements through the advanced parole program. ECF No. 319 at 77 n.82. He explained that once a DACA recipient leaves the country and returns to the United States through advance parole, that individual may then apply for adjustment to lawful-permanent-resident status. Ex. 5 (App. 258). Through 2015, more than 20,000 DACA recipients had been approved for advance parole, and approximately 3,000 were later granted an adjustment of status. Ex. 6 (App. 269).

On November 20, 2014, former DHS Secretary Jeh Johnson issued the Deferred Action for Parents of Americans (DAPA) memo creating Expanded DACA and DAPA. *See Texas I*, 809 F.3d at 146-48; Ex. 7 (App. 272). The DAPA memo first expanded the class eligible for DACA relief by: (1) eliminating the DACA criteria's age cap, (2) increasing the DACA term from two years to three years, and (3) pushing the DACA date-of-entry deadline from 2007 to 2010. Ex. 7 at 3-4 (App. 274-75). The DAPA memo then directed USCIS "to establish a process, similar to DACA," for granting three-year terms of deferred action to a new class of aliens: unlawfully present aliens who were parents of United States citizens and other lawful permanent residents who were not enforcement priorities. *Id.* at 4 (App. 275). President Obama candidly acknowledged that DAPA was unilateral executive lawmaking: "What you're not paying attention to is, *I just took an action to change the law*." Steven T. Dennis, *Obama on Immigration: "I Just Took an Action to Change the Law*,*" ROLL CALL (Nov. 25, 2014) (emphasis added),

12

http://www.rollcall.com/news/home/immigration-reform-news-obama-immigration-action-law.

Before the 2014 DAPA memo issued, President Obama asked the Department of Justice's Office of Legal Counsel (OLC) whether DACA "would be legally permissible." Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President 18 n.8 (Nov. 19, 2014) ("OLC Memo"), attached as Ex. 8 at 18 (App. 278). The OLC Memo does not mention that DACA confers lawful presence or a pathway to citizenship. OLC's "preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." *Id*. Applying deferred action to individuals "on a class-wide basis," however, "would raise distinct questions not implicated by ad hoc grants of deferred action." *Id*. Thus, OLC lawyers deemed it "critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Id*.

## D.    Courts rule that Expanded DACA and DAPA are unlawful.

On December 3, 2014, Plaintiffs and other States filed a lawsuit to stop the implementation of Expanded DACA and DAPA. On February 16, 2015, this Court granted the requested relief, finding that the programs "should have undergone the notice-and-comment procedures mandated by [the APA]." *See Texas v. United States*

("*Texas I*"), 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit affirmed the Court's "impressive and thorough" opinion and added that DAPA and Expanded DACA violated the substantive requirements of the APA because the programs exceeded prosecutorial discretion and were "flatly" impermissible under the controlling statutory framework. *Texas I*, 809 F.3d at 146, 167, 184. An equally-divided Supreme Court affirmed the Fifth Circuit's ruling. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

### E.    DHS Secretary Kelly rescinds DAPA and Expanded DACA.

On June 15, 2017, DHS Secretary John F. Kelly issued a new memorandum rescinding the 2014 DAPA memorandum. Ex. 9 at 2 (App. 312). Secretary Kelly added that the 2012 DACA memorandum remained in effect. *Id*. And he "remind[ed] [USCIS] officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis." *Id*. This reminder echoes the DACA memo language that this Count found pretextual in Texas's challenge to DAPA and Expanded DACA. *See Texas I*, 86 F. Supp. 3d 591, 669 n.101.

### F.    DHS attempts to rescind DACA in response to an imminent legal challenge.

On June 29, 2017, Texas Attorney General Ken Paxton, the attorneys general of nine other states (including Plaintiff States), and the Idaho governor sent a letter to the Trump Administration urging it to phase out DACA. *See* Ex. 10 (App. 316). Plaintiffs requested that DHS rescind the June 15, 2012 DACA memorandum and "order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future." *Id*. at 2 (App 317).

14

Plaintiffs explained how DACA is unlawful under the Fifth Circuit's decision in *Texas I. Id.* at 1-2 (App. 316-17). The letter proposed a resolution of the then-pending lawsuit over Expanded DACA and DAPA, and a path to avoid additional litigation relating to DACA: "If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits." *Id.* at 2 (App. 317).

On September 4, 2017, United States Attorney General Sessions wrote the DHS Acting Secretary, advising that DHS should rescind DACA. Letter from Attorney General Sessions to Acting Secretary Duke, https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf. Ex. 11 (App. 320). Attorney General Sessions noted that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." *Id.* Attorney General Sessions advised: "Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id.* On September 5, 2017, United States Attorney General Sessions publicly announced

that DHS would rescind the 2012 DACA memorandum. U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

On September 5, 2017, DHS issued a memorandum rescinding the 2012 DACA memorandum. *See* Ex. 12 (App. 322). The September 2017 memorandum initiated the DACA wind-down process. The memorandum provided that DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of [September 5, 2017], and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id*. at 5 (App. 326).

DHS's September 2017 memorandum and the impending wind-down of DACA thus satisfied the condition proposed by Plaintiff States' June 29, 2017 letter. The parties to the pending DAPA and Expanded DACA lawsuit filed a stipulation of dismissal on September 12, 2017. Stipulation of Dismissal, *Texas I*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473.

**G.    Numerous parties seek to halt the rescission of DACA.**

After DHS's September 2017 DACA rescission memorandum, lawsuits were filed claiming that the decision to rescind DACA was itself unlawful. Five of these actions were filed in the U.S. District Court for the Northern District of California,

16

and at least four other lawsuits were filed in other federal district courts. *See* Compl.,

*Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF

No. 1; Compl., *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2018), ECF No.

1; 2d Am. Compl., *Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 19, 2017), ECF

No. 60; Compl., *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF

No. 104.

On January 9, 2018, the U.S. District Court for the Northern District of

California issued an injunction in the challenge brought by the University of

California and other plaintiffs to the 2017 executive action rescinding DACA. *See*

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D.

Cal. 2018). The Northern District of California ordered DHS, "pending final judgment

herein or other order, to maintain the DACA program on a nationwide basis on the

same terms and conditions as were in effect before the rescission on September 5,

2017, including allowing DACA enrollees to renew their enrollments," subject to

several exceptions. *Id.* at 1048-49. The Ninth Circuit affirmed the district court's

order preliminarily enjoining the DACA wind-down. *Regents of the Univ. of Cal. v.*

*U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018). Because the Supreme

Court has not granted certiorari on the Ninth Circuit's ruling, the federal

government's 2017 decision to rescind DACA stands enjoined for the indefinite future.

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On May 1, 2018, Plaintiff States filed suit against the United States and the

officials responsible for administering DACA (the "Federal Defendants"). ECF No. 1.

The lawsuit does not seek to resolve any of the pending challenges about the validity of the 2017 DACA wind-down memorandum. Rather, it challenges the unilateral executive action creating DACA in the first place. *Id*. ¶ 9.

On May 2, 2018, Plaintiff States moved for a preliminary injunction barring the continuation of DACA. ECF. No. 5. The Federal Defendants agreed that DACA is unlawful under *Texas I* because the program is "materially indistinguishable" from DAPA and Expanded DACA. ECF No. 71 at 13, 15-16. Twenty-three DACA recipients and the State of New Jersey ("Defendant-Intervenors") intervened and opposed the preliminary injunction motion on jurisdictional and substantive grounds. ECF Nos. 215; 224.

In ruling on Plaintiff States' motion for a preliminary injunction, the Court found that this case satisfies Article III's "case or controversy" requirement, that Plaintiff States have standing to challenge DACA, and that the statutory prerequisites for judicial review of DACA are satisfied. ECF No. 319 at 26-62. The Court further ruled that DACA lacked congressional authorization and was foreclosed by Congress's intricate statutory framework. *Id*. at 67-82. And the Court held that there are no differences of legal significance between DACA and DAPA. *Id*. at 84-90. Likewise, the Court determined that Plaintiff States were likely to succeed on their procedural APA challenge, ruling that even if the Executive had the authority to implement DACA, it must do so through notice-and-comment rulemaking. *Id*. at 104. Although the Court concluded that the preliminary injunction factors weighed against halting DACA, it noted that Plaintiff States "have clearly

18

shown, *as a matter of law*, that they are likely to succeed on the merits." *Id*. (emphasis added). Plaintiff States now move for summary judgment on each of the causes of actions set forth in their Amended Complaint (ECF No. 104).

**ARGUMENT**[3]

## I.    No threshold issue bars this Court's review of DACA.

### A.    Other DACA rulings do not suggest that this Court should refrain from ruling.

This Court need not wait for further developments in cases challenging the DACA wind-down to reach the merits here. The issues in this case are distinguishable from those presented in the rescission cases. Those cases "involve the legality of the DACA rescission memo—an issue this Court does not address." ECF No. 319 at 13. Each of those cases involve "records different from the record in *Texas I* and the record now before this Court." *Id*. at 18. And none of these cases have been litigated before a court bound to follow Fifth Circuit precedent. *Id*. Indeed, more than one of the judges in these cases relied on the opinion dissenting from the Fifth Circuit's decision in *Texas I. Id*. at 23-24. As the Court correctly found, the courts in the other DACA cases "were primarily faced with the issue of the Government's rescission of DACA—not its creation and implementation," which is the issue in this case. *Id*. at 23.

Moreover, the developments in the other DACA cases affirm this Court's decision to proceed with this case. The other DACA cases reached different rulings

---

[3] Plaintiff States incorporate the arguments set forth in their First Amended Complaint, briefing on their Motion for Preliminary Injunction, and all other matters already properly before the Court. *See* Fed. R. Civ. P. 65(a)(2).

19

on the issues they addressed. *Compare Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,* 279 F. Supp. 3d 1011 (N.D. Cal. 2018), *aff'd* 908 F.3d 476 (9th Cir. 2018) (enjoining DACA rescission memo) *with Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 772, 777 (D. Md. 2018) (concluding that the rescission of DACA was "carefully crafted" and that the appropriate method for addressing any perceived unfairness implicated in that decision is through "the election process, and not federal litigation"). The Supreme Court has not granted certiorari on the appellate decision regarding DACA's rescission. The legal questions that various parties have raised—in this lawsuit as well as those before other courts—concerning the continuation of DACA remain unresolved. It is entirely appropriate for this Court therefore to contribute to the "percolation among the [courts], with room for a healthful difference that may balance the final result." Harold Levanthal, *A Modest Proposal for a Multi-Circuit Court of Appeals*, 24 AM. U. L. REV. 881, 907 (1975), *quoted in* Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV 417, 461 (2017).

### B.    This lawsuit unquestionably presents a case or controversy.

As this Court has already found, this dispute presents a "Case or Controversy" within the meaning of Article III. ECF No. 319 at 30. Although Plaintiffs and the Federal Defendants agree that DACA is unlawful, the "case or controversy" requirement is satisfied where, as here, the government continues to enforce the challenged policy. *United States v. Windsor*, 570 U.S. 744, 758-59 (2013). That Federal Defendants continues to administer DACA to comply with court injunctions

20

does not remove the adverseness necessary for Article III jurisdiction. *INS v. Chadha*, 462 U.S. 919, 939-40 n.12 (1983) (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 585 n.9 (1983)). Furthermore, another relevant consideration is "the extent to which adversarial presentation of the issues is assured by the participation of *amicus curiae* prepared to defend with vigor" the legal questions presented. *Windsor*, 570 U.S. at 760. Here, Defendant-Intervenors fill that role. ECF No. 319 at 30. Thus, as the Court concluded, "this case is much more adverse than *Windsor*," where the case-or-controversy requirement was deemed sufficient. *Id.*

C.   **Plaintiff States have standing.**

Likewise, the Court has already found that Plaintiff States have standing to challenge DACA, both with the special solicitude due to States in the standing analysis and without. ECF No. 319 at 55 n.51. The legal bases and facts supporting Plaintiff States' standing have not changed, so the Court's analysis remains true. Plaintiff States have suffered, and will continue to suffer, concrete injuries that are traceable to DACA, and an injunction of DACA will redress those injuries.

1.   *Plaintiff States are due special solicitude in the standing analysis.*

As this Court properly held, Plaintiff States are entitled to special solicitude under the law set forth in *Massachusetts v. EPA,* 549 U.S. 497 (2007), and *Texas I.* ECF No. 319 at 32. In *Massachusetts v. EPA,* the Supreme Court focused on two factors that weighed in favor of granting Massachusetts special solicitude. ECF No. 319 at 33. First, the Court noted that Congress had granted the States a procedural right to challenge the action in question. *Massachusetts*, 549 U.S. at 519-20. Second,

the Court found that Massachusetts had a quasi-sovereign interest in its territory. *Id.* at 520.

The Fifth Circuit analyzed and affirmed the applicability of special solicitude standing on facts nearly identical to those present in this case when it decided *Texas I. See* ECF No. 319 at 116-17. In affirming this Court, the Fifth Circuit found that the same two factors identified in *Massachusetts* were present in Plaintiff States' challenge to DAPA and Expanded DACA. *See Texas I,* 809 F.3d at 151-55.

The Fifth Circuit's analysis in *Texas I* applies equally to Plaintiff States' right to challenge DACA. First, "'the parties' dispute turns on the proper construction of a congressional statute,' the APA, which authorizes challenges to 'final agency action for which there is no other adequate remedy in a court.'" *Texas I*, 803 F.3d at 152 (citing 5 U.S.C. § 704 and quoting *Massachusetts* at 516). As such, Plaintiff States satisfy the first factor to qualify for special solicitude. *See* ECF No. 319 at 35.

Furthermore, as this Court recognized, Plaintiff States satisfy the second factor because they have demonstrated a "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." ECF No. 319 at 36 (quoting *Alfred L. Snapp* & *Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607 (1982)). Specifically, Plaintiff States seek to protect their citizens' "economic and commercial interests" from labor-market distortions caused by DACA. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609. The DACA program "bypasses Congress's comprehensive immigration framework to grant unlawfully present individuals lawful presence and thereafter work authorizations." ECF No. 319 at 36. DACA

22

recipients may then "compete with legally present individuals for available jobs, which can result in DACA recipients being hired for jobs for which legally present individuals have applied and otherwise would have been hired." *Id.* Indeed, the U.S. Attorney General has recognized that DACA will "den[y] jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." U.S. Dep't of Justice, *supra* section F, Factual Background; *see also* Ex. 13, Decl. of D. Deere ¶ 13 (App. 333) (noting that DACA increases competition for available jobs); *see also* Ex. 14, June 26, 2018 Depo. of I. Brannon 95-96 (App. 348-49); Ex. 15, Br. of *Amici Curiae* Tex. Ass'n of Bus., et al. 16, ECF. No. 221-1 (App. 371); Ex. 16, Br. of *Amici Curiae* 114 Cos. 10, ECF No. 204-1 (App. 394); Ex. 17, Br. of *Amici Curiae* New Jersey Buss. 5, ECF No. 192-1 (App. 412); Ex. 18, June 15, 2018 Depo. of E. Jeon 38-39 (App. 423-24); Ex. 19, Decl. of R. Arackathara 1-3 (App. 428-30); Ex. 20, June 18, 2018 Depo. of R. Arackathara 65 (App. 436).

As this Court has already recognized, the Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H ("ACA"), only exacerbates this problem. ECF No. 319 at 36. Under the ACA, businesses are not required to provide health insurance to DACA recipients like they must to legally present employees. *See* 8 U.S.C. § 1611(a); 26 U.S.C. § 4980H(b). This makes DACA recipients less costly to employ, incentivizing employers to hire DACA recipients over similarly qualified Texas residents. Ex. 13 ¶ 25 (App. 336). "Taken together, these elements create a more competitive labor market in which it is more difficult for legal residents of Texas to obtain jobs." ECF

No. 319 at 36. Plaintiff States have a quasi-sovereign interest in protecting their citizens from this harm. *Id*.

As this Court has already recognized, "the States 'rely on the federal government to protect their interests,' and Congress has provided them a procedural vehicle—the APA—to do so." ECF No. 319 at 37 (quoting *Texas I,* 809 F.3d at 154). That being the case, the Plaintiff States have shown that they are "entitled to special solicitude in this Court's standing analysis." ECF No. 319 at 37.

### 2. *Plaintiff States have parens patriae standing to protect the economic well-being of their populace.*

Recognizing DACA's grant of work authorization, this Court has held that Plaintiff States have standing under the *parens patriae* doctrine. ECF No. 319 at 43. *Parens patriae* standing allows a State to sue a defendant to protect an interest "in the health and well-being—both physical and economic—of its residents." ECF No. 319 at 38. (quoting *Alfred L. Snapp & Son*, 458 U.S. at 607). As shown in the discussion of the special solicitude due to Plaintiff States, DACA creates a distorted labor market and thereby injures the economic well-being of Plaintiff States' citizens by making it harder for them to obtain jobs. As the Court has already found, "[t]his is true for two reasons." ECF No. 319 at 38.

First, DACA grants its recipients work authorization, thus infusing the job market with hundreds of thousands of additional workers who compete with Plaintiff States' legal residents for jobs. *See* ECF No. 319 at 38; Ex. 1 (App. 2); Ex. 13, Decl. of D. Deere ¶ 13 (App. 333) ("[T]he addition of some 683,000 work-eligible individuals nationwide, with 112,000 of these in Texas . . . make it more difficult for some U.S.

citizens to find employment."); Ex. 14, June 26, 2018 Depo. of I. Brannon 95-96 (App. 348-49). As this Court noted, many businesses appearing as amici curiae in this case indicated they would hire non-DACA employees if DACA ceased. Ex. 15, Br. of *Amici Curiae* Tex. Ass'n of Bus., et al. 16, ECF. No. 221-1 (App. 371); Ex. 16, Br. of *Amici Curiae* 114 Cos. 10, ECF No. 204-1 (App. 394); Ex. 17, Br. of *Amici Curiae* New Jersey Buss. 5, ECF No. 192-1 (App. 412). And testimony from some Intervenors in this case confirms that DACA recipients have been hired to fill jobs for which other non-DACA recipients applied. Ex. 18, June 15, 2018 Depo. of E. Jeon 38-39 (App. 423-24); Ex. 19, Decl. of R. Arackathara 1-3 (App. 428-30); Ex. 20, June 18, 2018 Depo. of R. Arackathara 65 (App. 436).

Second, the harm to Plaintiff States' citizens are exacerbated by the Affordable Care Act, which incentivizes employers to save money by hiring DACA recipients instead of citizens. ECF 319 at 39; *see also* Ex. 21, Suppl. Decl. of Donald Deere ¶ 24 (App. 439); *see also* Ex. 22, June 27, 2018 Depo. of L. Ku 68:13-17 (App. 458).

Defendant-Intervenors' own experts admitted that work authorizations granted through DACA allow recipients to compete with legally present workers for jobs. *See*, *e.g.,* Ex. 23, Decl. of M. Wiehe & M. Hill ¶ 6a (App. 467) ("[T]he work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers . . . ."); Ex. 24, June 27, 2018 Depo. of R. Perryman 97:13-17 (App. 488); Ex. 14, June 26, 2018 Depo. of I. Brannon 95:8-96:3 (App. 348-49); *see also* Ex. 25, Decl. of T. Wong ¶ 23 (App. 503) (survey responses from

a number of DACA recipients who reported career opportunities as what they would "lose if DACA ends").

Moreover, the influx of additional workers as a result of DACA not only increases competition, it potentially depresses wages for similarly skilled workers who are lawfully present. Ex. 21, Suppl. Decl. of Donald Deere ¶ 23 (App. 445-46). Defendant-Intervenors' own expert agreed, as he must, that decreasing the number of workers in the workforce can lead to an increase in wages. Ex. 24, June 27, 2018 Depo. of R. Perryman 28:1-5 (App. 486).

Indeed, district courts in *Regents of California* and *Batalla Vidal,* cited by the Defendant-Intervenors, found that the states or state agencies had standing to protect their work force. *Id.* citing to *Regents of California,* 279 F. Supp. 3d at 1033-35 (finding two states and two cities had standing); *see also Batalla Vidal,* 279 F. Supp. 3d at 437-38 (entering an injunction in favor of sixteen plaintiff states).

Finally, to the extent there may be some limits on a State's ability to sue the federal government as *parens patriae,* this Court properly found that those potential limits would not apply in this case. *See* ECF No. 319 at 40-43. Plaintiff States here are suing the federal government not to "'protect [their] citizens from the operation of federal statutes,'" but "to assert [their] rights under federal law." *Id.* at 43 (citing *Massachusetts v. EPA*, 549 U.S. at 520 n.17). Plaintiff States have "demonstrated a concrete injury to [their] quasi-sovereign interest in the economic well-being of [their] citizens." *Id.* DACA causes that injury because it grants its recipients lawful presence and work authorization, without which they could not compete with lawful workers

for many jobs. *Id.* at 44. And that injury is redressable by a ruling from this Court because nothing prevents this Court from setting aside DACA, which would remove lawful presence and work authorization for its recipients. *Id.*; *see also* Section V.A.

### 3. *Plaintiff States suffer an injury from DACA through increased healthcare, education, and law-enforcement costs.*

Independently, Plaintiff States have standing because DACA has caused and will cause them to incur financial injuries in the form of increased social services costs. ECF No. 319 at 48-55. As this Court has already found, DACA increases the States' expenditures associated with education, healthcare, and law enforcement in these areas by incentivizing unlawfully present aliens to remain in the country, including in the Plaintiff States. *Id.* at 48. Plaintiff States have sufficiently established "both aspects of this causal chain: they bear the costs of providing these social services required by federal law, and the DACA program increases the volume of individuals to whom they must provide those services." *Id.*

The evidence introduced by the Plaintiff States' showed that Texas bears hundreds of millions of dollars in costs providing social services to unlawfully present aliens. Ex. 26, Decl. of M. Smoot ¶¶ 7-8 (App. 520); Ex. 27, Decl. of L. Lopez (App. 580); *see also* ECF No. 319 at 48-53. For example, Defendant-Intervenors' own experts estimates that Texas spends over $250,000,000 each year in the provision of social services to DACA recipients. Ex. 28, Estimated Annual Net Fiscal Benefits of DACA Recipients in Texas 3 (App. 587). Defendant-Intervenors' own expert confirms that DACA recipients rely on emergency Medicaid services, a portion of

which is funded by the States. Ex. 24, June 27, 2018 Depo. of R. Perryman 76 (App. 487); Ex. 29, Decl. of L. Ku 19, 22 (App. 608, 611). Moreover, a report by Defendant-Intervenor's expert supports the causal link between DACA and Texas' injuries. ECF No. 319 at 52; Ex. 30 at 13 (Survey of Tom K. Wong (App. 621) (showing that 22.3% of surveyed DACA recipients would be likely or very likely to leave the country should DACA end) ; *see also* Ex. 31 ¶ 8 (Decl. of Dr. L. Potter) (App. 625) ("[I]t is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S."). Lastly, to the extent any of these costs are offset by alleged positive impacts DACA recipients may have on the economy, this "offsetting-benefit theory to defeat standing was rejected in *Texas I* by the Fifth Circuit." ECF No. 319 at 54. As the Fifth Circuit explained, "none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset." *Texas I*, 809 F.3d at 156; *see also id.* ("Our standing analysis is not an accounting exercise." (quoting *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013))).

Accordingly, the Fifth Circuit has dispensed with the only obstacle to finding standing on account of healthcare, education, and law-enforcement costs caused by deferred-action programs such as DACA. As this Court has already found, these harms provide an independent basis for the Plaintiff States' standing. ECF No. 319 at 54-55.

### 4.     *Plaintiff States have standing based on DACA's dispensing and abdication of congressional statutes that preempt state prerogatives.*

Finally, Plaintiff States have standing to challenge DACA as it constitutes an unlawful dispensation by the Executive of statutes on lawful presence and work authorization that preempt state prerogatives. In short, States plainly have sovereign interests and standing regarding policies dictating who is lawfully present within their borders.

Plaintiffs are "institutional plaintiff[s]" under *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, 2664 (2015), and thus have standing for their "institutional injury." *Id.* That injury here exists because Plaintiffs' immigration prerogatives have been "strip[ped]" or "nullif[ied]." *Id.* at 2663, 2665. Due to the preemption of their sovereign prerogative to determine who is lawfully present and able to work within their borders, States have at least a "quasi-sovereign," if not purely sovereign, interest in the enforcement of federal laws that preempt the States' surrendered prerogatives to determine who is lawfully present within their borders. *Massachusetts v. EPA*, 549 U.S. at 520. So, when the Executive Branch "has abdicated its responsibility under [federal statutes]," it negates the basis on which the States agreed to allow federal preemption of their sovereign prerogatives. *Id.* at 505; *cf. Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 & n.1 (D.C. Cir. 1989) (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601) (finding that states have a "sovereign interest" in "the power to create and enforce a legal code"). Thus, as this Court previously concluded in enjoining DAPA, Plaintiff States have

"abdication standing" to challenge federal Executive agency action that dispenses with statutes passed by Congress when those statutes preempt state prerogatives. *Texas I*, 86 F. Supp. 3d at 636-43.

Plaintiff States also have standing because, in challenging this act of Executive abdication, they "seek to vindicate a procedural right—namely, the right to be heard under the APA's notice-and-comment procedures." Am. Compl. ¶ 246, ECF No. 104. As this Court already explained in the DAPA litigation, "[w]hen seeking review of agency action under the APA's procedural provisions, Plaintiffs are also operating under a favorable presumption. They are presumed to satisfy the necessary requirements for standing." 86 F. Supp. 3d at 615 (citing *Mendoza v. Perez*, 754 F.3d 1002, 1012 (D.C. Cir. 2014)). "'[P]laintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link.'" 86 F. Supp. 3d at 615-16 (quoting *Mendoza*, 754 F.3d at 1012). The States have standing on that basis here as well.

### D.   DACA is reviewable under the APA.

As this Court has held, DACA is a reviewable agency action under the APA. ECF No. 319 at 55. The zone-of-interests test is an easy test to meet and is met here under circuit precedent, which dictates that Plaintiff States pass that test because their interests are at least arguably within the zone of interests of federal immigration statutes and the APA. *See Texas I*, 809 F.3d at 163. The DACA memorandum took effect in 2012. Thus, "there is no question that the DACA

memorandum constitutes final agency action." ECF No. 319 at 56-57. And in *Texas I*, the Fifth Circuit held that the INA did not prohibit judicial review of DAPA. 809 F.3d at 164. That precedent is binding on this case, as this Court has already recognized. ECF No. 319 at 57.

Likewise, DACA does not fall within the APA's narrow exception barring judicial review when an agency decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is "very narrow." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). There is a "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quotation marks omitted). The Fifth Circuit ruled that DAPA and Expanded DACA were not committed to agency discretion by law. *Texas I*, 809 F.3d at 166. And as the Court found in this case regarding reviewability, "[t]he reasons stated by the Fifth Circuit are equally applicable to DACA." ECF No. 319 at 58. DACA is reviewable under Section 701(a)(2) of the APA because "DACA is not simply non-enforcement; its grant of deferred action confers lawful status and the benefits that flow from it, including work authorization." *Id.* at 59.

II. **DACA is unlawful.**

A. **DACA was unlawfully issued without notice-and-comment rulemaking.**

DACA is unlawful because it was created without the notice-and-comment procedure required for a program like this. ECF No. 319 at 103. As the Fifth Circuit held with respect to DAPA, DACA is a substantive rule and not exempt from the

APA's notice-and-comment requirements as either an interpretive rule, a general statement of policy, or a rule of agency organization, procedure, or practice. *See* 5 U.S.C. § 553(b)(A); *see also Texas I*, 809 F.3d at 171-78.

### 1. *DACA modifies substantive rights.*

In *Texas I*, the Fifth Circuit held that DAPA was a substantive rule because it affected rights and obligations not only for the program's would-be recipients, but also for the states and federal government. 809 F.3d at 171-78. This Court correctly found that "DACA has exactly the same effect." ECF No. 319 at 97. DACA has granted lawful presence to over 800,000 recipients, with a larger group eligible to apply for the same benefit. Ex. 2 (App. 6-7). DACA recipients have been granted work authorization and access to Social Security, Medicare, advance parole, and an array of other federal and state benefits. Indeed, even (and perhaps especially) DACA recipients have affirmatively acknowledged the actual and substantive benefits that the program has provided them. ECF No. 5 at 35-37; ECF No 319 at 97 n.102. DACA has undoubtedly affected the rights of its recipients and imposed obligations on the federal and state governments. ECF No. 319 at 97.

This Court previously recognized that "the evidence that DACA confers rights and imposes obligations is overwhelming." ECF No. 319 at 103. DACA changed the law and is a substantive rule because "in the absence of the rule there would not been adequate legislative basis for . . . agency action to confer benefits . . . ." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *Morton v. Ruiz*, 415

U.S. 199, 232 (1974). Thus, based on this finding alone, the Court correctly held that Plaintiffs "have shown DACA to be a substantive rule that should have complied with the notice-and-comment procedures requires by the APA." ECF No. 319 at 103.

### 2.     *DACA is not a general policy statement.*

While not necessary to find DACA subject to the notice and comment process, the evidence demonstrates that DACA is not a policy statement exempt from notice and comment. The undisputed evidence demonstrates that the Immigration Service Officers have no genuine discretion in adjudicating DACA applications. DHS Secretary Duke confirmed that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion." Ex. 12 (App. 326-27). The USCIS Texas Service Center, which handled DACA applications for many years, has never turned anyone down who met the June 15, 2012 criteria. Ex. 32, Email from Tyronda Lee, Section Chief, U.S. Citizenship and Immigration Services, to Brandon Robinson (May 8, 2018 12:09 CST) (on file with Plaintiffs' counsel) (App. 641). And, as the Court found, the 2012 DACA memo clearly lays out who is eligible for the program and then directs the Immigration Service Officers to grant eligible applicants deferred action. ECF No. 319 at 99-100. In sum, "[n]othing about [DACA] 'genuinely leaves the agency and its [employees] free to exercise discretion.'" *Texas I*, 86 F. Supp. 3d at 670 (internal quotations omitted).

B. **DACA is contrary to substantive federal law.**

Like DAPA and Expanded DACA, DACA is contrary to law because it is "not authorized by statute," *Texas I*, 809 F.3d at 184, and is "foreclosed by Congress's careful plan . . . ." *Id.* at 186; *see also Casa de Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself."). DACA does not withstand scrutiny under *Chevron* or any other standard of agency deference. As this Court correctly found, there are no differences of legal significance between DACA and DAPA. And the historical precedents offered to justify DACA are inapposite. DACA is unlawful.

1. ***DACA does not pass Chevron's first step because Congress's immigration scheme unambiguously forecloses DACA.***

Courts must hold unlawful agency actions that are in "excess of statutory jurisdiction" or "short of statutory right." 5 U.S.C. § 706(2). The Fifth Circuit assumed without deciding that the standard set forth in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), controlled the review of DAPA. *Texas I*, 809 F.3d at 178-79. Under *Chevron*'s familiar two-part test, a court must defer to an agency's interpretation of its own statute if the text of the statute is ambiguous and the agency's interpretation is reasonable. *Chevron*, 467 U.S. at 844. Although the federal government did not undertake the notice-and-comment process before issuing DACA, courts still apply judicial deference where an agency arrives at an interpretation of a statute "through

means less formal than notice-and-comment rulemaking." *Texas I*, 809 F.3d at 178 n.160 (quoting *Barnhart v. Walton*, 535 U.S. 212, 221 (2002)).

*Chevron's* first step asks whether the statute directly speaks to the precise question at issue. 467 U.S. at 842-43. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"; if so, the court owes no deference to the agency. *Id.* at 844; *see also City of Arlington v. FCC,* 569 U.S. 290, 307 (2013) ("Where Congress has established a clear line, the agency cannot go beyond it . . . .").

### a.   *The agency lacks statutory authority to implement DACA.*

As this Court found, "DACA beneficiaries primarily entered the country either by overstaying a visa or by entering without inspection, and the INA instructs that aliens in both classes are removable." ECF No. 319 at 68-69. First, recipients who entered the country legally but overstayed their legal permission are deportable under 8 U.S.C. § 1227(a)(1)(C), which renders these individuals "removable." *See* 8 U.S.C. § 1229a(e)(2). Second, DACA recipients who entered the country illegally are also removable because the INA requires all applicants for admission, including aliens present in the United States who have not been admitted, to be inspected by immigration officers. *Id.* §§ 1225(a)(1), (a)(3). "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [of the INA]." *Id.* § 1225(b)(2)(A). The alien has the burden of proof in a section 1229a removal proceeding to show that he or she is not removable either because he or she

is "clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182,"[4] or because "by clear and convincing evidence" he or she is "lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(A)-(B). Aliens who cannot carry the burden of proof under one of these tests are deemed "removable." 8 U.S.C. § 1229a(e)(2).

"Thus," as the Court found, "all DACA recipients fall into a category for removal regardless of their mode of entry." ECF No. 319 at 69-70. But DACA bars immigration officials from enforcing these parts of the INA and, as to DACA recipients, prevents the removal of individuals whom Congress has deemed removable. *Id.* at 70. The Executive lacks authority to nullify the clear text of the INA in this way.

Moreover, no statute authorizes the Executive to override Congress's intricate framework and implement DACA. Defendant-Intervenors point to the DHS Secretary's general duties under 6 U.S.C. § 202(5) and 8 U.S.C. § 1103. But *Texas I* "held that neither of these sections (nor any other section)" authorized DHS to create DAPA or Expanded DACA. ECF No. 319 at 70. In that case, the Fifth Circuit rejected the interpretation of those statutes that would permit the Executive to grant lawful presence and work authorization to every illegal alien in the United States. *Texas I*, 809 F.3d at 184. None of the claimed statutory authority behind DACA can be

---

[4] Section 1182 defines classes of aliens who are ineligible to receive visas and admission to the United States. 8 U.S.C. § 1182(a).

reasonably construed as assigning to the Executive a decision of such "vast economic and political significance." *Id*. at 188 (internal quotation omitted).

     **b.**   ***The INA provides a comprehensive statutory scheme for the allocation of lawful presence.***

"Federal governance of immigration and alien status is extensive and complex." *Texas I*, 809 F.3d at 179 (quoting *Arizona v. United States*, 567 U.S. 387, 395 (2012)). As this Court noted, Congress has specified particular groups of aliens for whom lawful presence is available and groups of aliens eligible to remain in the country during deportation hearings. ECF No. 319 at 71-72. Congress has enacted statutes allocating lawful presence based on service in the armed service, work or educational status. *Id*. at 72. Neither DAPA nor DACA recipients are among the groups described in the multitude of provisions Congress has passed granting lawful presence to classes of aliens. *See Texas I*, 809 F.3d at 179; ECF No. 319 at 72.

The Executive may not substitute its own policies where Congress describes a statutory scheme with detail. *Cent. United Life Ins. Co v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Disagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy."). Here, the Court correctly found that "Congress's careful plan for the allotment of lawful presence forecloses the possibility that the agency may designate a group of 814,000 persons who have already enrolled in DACA to be lawfully present, in addition to another group of approximately the same size who either have not yet applied or who will soon become eligible." ECF No. 319 at 72-73 While deferred action may be granted in specific instances, the specificity of the statutory framework demonstrates that Congress has not granted

37

the Executive free rein to confer lawful presence on "such a large class of person outside the ambit of the statutory scheme." *Id.* at 73 (citing *Texas I*, 809 F.3d at 179).

### c.  *The INA provides a comprehensive statutory scheme for the allocation of work authorization.*

"The INA also specifies classes of aliens eligible and ineligible for work authorization, including those eligible for work authorization and deferred action." *Texas I*, 809 F.3d at 180-81. But Congress has made no mention of or provision for the classes of persons that DAPA or DACA purport to make eligible for work authorization. *Id*; ECF No. 319 at 74. Further, DACA contradicts the INA's express limitations on work authorization because the program enables aliens with pending removal proceedings to apply for work authorization. *E.g.*, 8 U.S.C. § 1226(a)(3) (limiting work authorization for aliens with pending removal proceedings to those lawfully admitted for permanent residence or who would otherwise be authorized to work).

"[A] primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Nat'l Ctr. For Immigrants' Rights*, 502 U.S. 183, 194 (1991). In 1986, Congress enacted the Immigration Reform and Control Act, which provides "a comprehensive framework for combating the employment of illegal aliens" that "'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.'" *Arizona,* 567 U.S. at 404 (citation omitted); *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 147 (citing *INS,* 502 U.S. at 194). IRCA makes it "illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers," and imposes criminal and civil penalties for

38

employers and civil penalties for employees. *See Arizona,* 567 U.S. at 404-05 (citing 8 U.S.C. § 1324a).

As the Court correctly concluded, it "is illegal for anyone to hire DACA recipients, but for DACA." ECF No. 319 at 75. DACA avoids the ban on hiring DACA recipients and adds 1.5 million individuals to the workforce. *Id.* The Executive goes so far as to tell aliens that their DACA applications *must* be accompanied by applications for a Form I-765 application for work authorization. *See* Ex. 3 (App. 11), USCIS, *supra* section C, Factual Background. Thus, DACA is incompatible with "Congress's careful delineation" in the area of work authorization. ECF No. 319 at 75.

> **d.**   ***For some, DACA defies Congress's scheme through advance parole, which clears a path to legal status contrary to 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1182(a)(9)(B)***

DACA also is contrary to law because it allows recipients access to "advance parole." DACA expands the two statutorily-prescribed conditions for advanced parole—humanitarian reasons or significant public benefit—beyond recognition. As the Court aptly observed: "It is hard to fathom why a semester in Paris, a conference, or a meeting with a client equates to either an urgent humanitarian reason or a significant public benefit." ECF No. 319 at 76 n.81. But all are within DHS's interpretation of the conditions sufficient to satisfy advanced parole under DACA.

The Court already determined that allocating advance parole to DACA recipients subverts statutory law in two ways: "1) it lets certain individuals adjust illegal status to lawful presence and then possibly to legal status by curing the

inadmissibility bar, and 2) it lets recipients avoid the statutory "'unlawful presence bars.'" ECF No. 319 at 76 (citing Ex. 5 at 7-8 (App. 264-65)).

First, DACA recipients' entitlement to apply for advance parole contradicts the statutory scheme by curing the bar for unlawful entry. *See id.* at 8. Ordinarily, an alien present in the United States may apply for an adjustment of status to change his or her legal immigration classification to that of a legal permanent resident or Green Card holder. *See* Ex. 5 at 7 (App. 264). Applicants are unable to adjust their status, however, if they are present "without being admitted or paroled into the United States." *Id.* (citing 8 U.S.C. § 1182(a)(6)(A)(i)); 8 U.S.C. § 1255). Generally, immigrants who first entered the United States without inspection are ineligible to adjust their status because they were not "admitted" legally when they first entered the country. Ex. 5 (App. 258).

DACA, however, allows its recipients who entered the country illegally to circumvent the requirement that aliens be "admitted or paroled into the United States" to be eligible for advance parole. *Id.* (App. 258); Ex. 4 (App. 203-05) (describing procedures for processing advance parole applications for DACA recipients). Once a DACA recipient who entered the country illegally leaves the United States and returns through advance parole, that individual is considered to have been paroled legally back into the United States and is no longer barred by the requirement that aliens must be "admitted or paroled into the United States" to adjust their status. *See* Ex. 5 at 8-9 (App. 265-66); *see also* A. Molina, *Immigration: Undocumented College Students Find a Way to Study Abroad, Return Legally,* Press-Enterprise, Riverside

California (Feb. 14, 2016). "Thus, DACA's grant of advance parole eligibility allows its recipients to circumvent the INA's statutory requirement." ECF No. 319 at 78.

Second, advance parole for DACA recipients subverts the "unlawful presence bars" instituted by statute. *See* 8 U.S.C. § 1182(a)(9)(B)(i). Under these provisions, individuals who have left the country after having been illegally present for more than 180 days must remain out of the United States for three years, and those illegally present for more than a year must remain out for ten years before they may again become admissible to the United States. *Id.* DACA's grant of advance parole eligibility, however, allows DACA recipients to travel abroad and then return to the United States without complying with either the three- or ten-year bar. "Through DACA," this Court observed, "these recipients effectively avoid the dictates of Congress while thousands of other individuals who have complied with the law are waiting for their bar period to run. This, too, is contrary to the statutory scheme devised by Congress." ECF No. 319 at 79.

### 2.      *Even if DACA did pass Chevron's first step, it would not pass the second.*

DACA fails to clear *Chevron's* first step because Congress has directly addressed the issues of lawful presence and work authorization. In light of Congress's "careful plan," the Executive may not award lawful presence and work authorization for well over a million unlawfully present aliens for whom Congress has made no provision. Accordingly, Plaintiff States respectfully ask the Court to hold DACA unlawful because it exceeds "statutory jurisdiction" and is "short of statutory right" and therefore violates the APA. 5 U.S.C. § 706(2).

But even if the Court were to proceed to *Chevron*'s second step, DACA would not survive for the same reasons discussed under the first step. As the Court has already found, DACA usurps the power of Congress to dictate a national scheme of immigration laws. Just as with DAPA and Expanded DACA, the program is "manifestly contrary" to the statutory scheme promulgated by Congress and therefore unreasonable. ECF No. 319 at 83 (quoting *Texas I,* 809 F.3d at 186).

### 3. *Differences between DAPA and DACA do not compel a different result.*

There are no legally significant differences between DAPA and DACA that compel a different result here than that reached in *Texas I*. Defendant-Intervenors previously argued that *Texas I* is inapplicable because DAPA nullified the particular group of provisions related to how parents may acquire citizenship through their children and displaced it with a new method for that same process. ECF No. 215 at 18. The Fifth Circuit's ruling in *Texas I*, however, was clearly not predicated solely on the existence of those existing provisions because the court held that Expanded DACA was also unlawful. As this Court correctly notes: "That program had no overlap with the cited provisions, and the court obviously did not rely on their existence in ruling against it." ECF No. 319 at 85. And, as the Court also found, "analogous provisions *do* exist regulating the lawful admission of children, as well as for students and veterans." *Id*. (citing 8 U.S.C. §§ 1431, 1433).

"Defendant-Intervenors also argue that DACA is different from DAPA because it affects fewer people." ECF No. 319 at 86 (citing ECF No. 215 at 19). This numerical difference provides, however, no legal distinction. As the Court correctly notes: "The

1.5 million people DACA would permit to receive lawful presence and work authorization are still too numerous to fit into the individualized notion of deferred action that courts have found permissible in other contexts." ECF No. 319 at 86; *see also* Ex. 33, Aug. 1, 2018 Depo. of S. Legomsky 99:14-100:6 (App. 645-46). Like DAPA, DACA is "foreclosed by Congress's careful plan . . . ." *Texas I*, 809 F.3d at 186.

### 4. *This exercise of deferred action under DACA is not supported by historical precedent.*

Defendant-Intervenors' contention that historical precedent provides a source of authority for the institution of DACA is also misplaced. ECF No. 224, at 2 n.1. The Fifth Circuit rejected precisely this argument and distinguished previous deferred action programs from DAPA. *Texas I,* 809 F.3d at 184 (explaining that those programs, unlike DAPA, were "[mostly] done on a country-specific basis, usually in response to war, civil unrest, or natural disasters," or "were bridges from one legal status to another.") *Texas I,* 809 F.3d at 184.

DACA likewise is not analogous to previous deferred action programs. As this Court determined: "DACA awards lawful presence to individuals who have never before received or no longer possess lawful status, and it was not implemented in response to any natural disaster or other similar crisis." ECF No. 319 at 89. Defendant-Intervenor highlight the "Family Fairness" policies of 1987 and 1990 as a relevant precedent for DACA, but the Fifth Circuit specifically rejected any substantive connection between those policies and DAPA for reasons that are applicable here. *Texas I*, 809 F.3d at 185 (describing the Family Fairness policies as

"interstitial to a statutory legalization scheme" while characterizing DAPA as "far from interstitial"). [5]

### C.   DACA violates the Take Care Clause.

DACA does not merely lack statutory authorization; DACA violates the Take Care Clause of the Constitution because DACA "dispens[es]" with certain immigration statutes. U.S. CONST. art. II sec. 3; *Kendall v. United States*, 37 U.S. 524, 613 (1838). DACA does so by declaring lawful conduct that Congress established as unlawful. Under the Constitution, the Executive cannot exercise such legislative power—it cannot dispense with statutes addressing unlawful presence by declaring a class of aliens to henceforth be present lawfully. Yet the Executive did just that through DACA. *See Texas*, 809 F.3d at 166 ("Deferred action, however, is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens.").

Worse yet, the Executive then used this lawful-presence dispensation to grant a pathway to citizenship to potentially tens of thousands of otherwise unlawfully present aliens. The Executive did this by treating DACA recipients as eligible for advance parole, which allowed the program to function a pathway to permanent legal residence and citizenship. *See* Ex. 4 (App. 203-05), Ex. 5 (App. 258). Thus, DACA violates the Take Care Clause even under the analytical framework used by the

---

[5] Additionally, Family Fairness granted relief to only about 1% of the country's unlawfully present aliens (about 47,000 people), Pls.' Mot. for Prelim. Inj. Ex. 7, ECF No. 6 (App. 404)—not 1.5 million people.

Obama Administration's Office of Legal Counsel. ECF No. 5 at 39-40; Ex. 8 at 21 (App. 298) ("As we have previously noted, deferred action confers no lawful immigration status, *provides no path to lawful permanent residence or citizenship*, and is revocable at any time in the agency's discretion." (emphasis added)).

> **D.    The APA requires that the 2012 Memorandum creating DACA be set aside, and the Court should allow for an orderly winddown of the unlawful program.**

Under the APA, an agency action that a court holds unlawful is "set aside." 5 U.S.C. § 706(2). Thus, because the Executive unlawfully created DACA through its 2012 memorandum, that 2012 memorandum must be set aside. However, Plaintiff States are not seeking the immediate termination of existing grants of deferred action status pursuant to DACA. Plaintiff States would agree to a stay of the Court's Order to allow for an orderly winddown of DACA. That could be accomplished in either of two ways. First, the Court could partially stay its Order to make the setting aside of the 2012 memorandum immediately effective against only new grants of deferred action and grants of renewed deferred action. In other words, the Order would be stayed in its effect of setting aside the 2012 memorandum as it relates to existing grants of deferred action. That would allow existing grants of deferred action to expire over their stated terms and winddown the program over the next two years. Second, the Court could stay the effect of its Order in its entirety for two years. That would allow for orderly appellate review of the Court's Order and make it known that— subject to appellate review—the unlawful program will terminate in two years.

## CONCLUSION

DACA is exactly the kind of government action that would have benefited from "a prior generation's wisdom regarding the separation of powers." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 767 (D. Md. 2018). Underlying the program is a limitless notion of executive power which, if left unchecked, could allow future Presidents to dismantle other duly enacted laws. The Court must not allow that to occur. Plaintiff States respectfully request that the Court declare DACA unlawful and prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits to allow for an orderly winddown of the unlawful program.

February 4, 2019

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Trial Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

MICHAEL TOTH
Special Counsel for Civil Litigation

ADAM ARTHUR BIGGS
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

47

## CERTIFICATE OF SERVICE

I certify that on February 4, 2019, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**

48