# Exhibit 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF LEIGHTON KU, PhD, MPH

I, Leighton Ku, declare as follows:

1. My name is Leighton Ku and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University in Washington, DC. I have attached my Curriculum Vitae as Exhibit A to this declaration.

3. I am a nationally-known health policy researcher with over 25 years of experience. I have conducted substantial research about immigrant health, health care, and costs. I have authored or co-authored more than a dozen articles and reports about immigrant health issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and

1

App. 590

American Journal of Public Health, as well as scholarly reports published by diverse non-profit organizations including the Migration Policy Institute, the Cato Institute and the Commonwealth Fund, as well as many more articles and reports on other subjects. I have testified before the U.S. Senate Finance Committee about immigrant health issues and provided analyses and advice to state governments and non-governmental organizations in many states about immigrant health.

4. In November 2017, I provided an expert declaration about the effects of terminating DACA on health insurance coverage and states (*State of New York, et al. v Trump, et al.*).[1] I have not provided testimony in any other court cases in the past four years.

5. In addition, I have conducted substantial research about health policy and employment. For example, in 2017, I authored studies about how repealing the Affordable Care Act (ACA) would affect employment levels and state economies, including "Repealing Federal Health Reform: The Economic and Employment Consequences for States" (2017). This research is attached as Exhibit B.

6. I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace, formed under the federal ACA. This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7. I have a PhD in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York. Nov. 22, 2017.

(1979).  Prior to becoming a faculty member at George Washington University, I was on

the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8.  I have been engaged by the Mexican American Legal Defense and Educational Fund and

the Office of the Attorney General of the State of New Jersey for this case. I am being

paid at a rate of $187.50 per hour.

### Overview

9.  This declaration discusses five topics: (1) a response to the declaration of Dr. Donald

Deere on joint effects of Deferred Action for Childhood Arrivals (DACA) and the ACA

on employment,[2] (2) the effects of terminating DACA on employment in the health sector

and on patient care, (3) a brief description of DACA recipients' eligibility for insurance

coverage under the ACA, (4) a review of the effects of DACA on mental health, and (5)

the effects of terminating DACA on health expenditures by states.  In that final section, I

also briefly discuss the declaration of Ms. Monica Smoot about medical expenditures in

Texas for undocumented immigrants.

### DACA and the ACA Do Not Create Incentives to Hire
### DACA Recipients Instead of U.S.-Born Citizens

10.  Dr. Donald Deere, a consultant paid by the Office of the Attorney General of Texas,

alleges that the combined effect of the ACA and DACA reduces the employment of

citizens in favor of DACA recipients (or as he calls them, "undocumented immigrants

who are authorized to work").

11. Dr. Deere's hypothesis that the ACA creates an incentive to hire DACA recipients

instead of citizens is misplaced.  I am not aware of any empirical evidence about the

---

[2] Declaration of Donald Deere, PhD, in *State of Texas, et al. v United States of America, et al.* in
the United States District Court for the Southern District of Texas, Brownsville Division.  April
27, 2018.

3

number of citizens who are unemployed because of such a possibility or aware of any empirical evidence that employers are hiring DACA recipients in lieu of citizens because of potential differences in ACA-related penalties. Nor does Dr. Deere show any such actual evidence. His hypothesis is built on a series of unsupported assumptions. His argument contradicts logic and well-established research.

12. To understand his claim, a brief review of applicable provisions of the ACA is necessary. Under §1513 of the ACA, a large employer with 50 or more full-time employees may be assessed federal tax penalties if it fails to offer affordable employer-based insurance and one or more of its employees instead obtains coverage in a health insurance exchange and receives federal premium tax credits. Specifically, large employers who do not offer any health insurance coverage may be penalized $2,320 per full-time employee (minus first 30) if at least one full-time employee receives a federal premium subsidy for marketplace coverage. Moreover, if the employer offers health insurance but does not cover at least 60% of total allowed costs or the insurance is not affordable because the employee's share of an individual premium (not the premium for the full family) exceeds 9.56% of income (in 2018), then the employer may be assessed fines of the lesser of $3,480 per full-time employee receiving a premium tax credit or $2,320 per full-time employee, minus the first 30 employees.[3] This provision is also known as the "employer shared responsibility" requirement or "employer mandate."

---

[3] Cigna. Employer Mandate Fact Sheet. 2018. https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/employer-mandate-fact-sheet.pdf

4

13. The employer shared responsibility does not apply to smaller firms with fewer than 50 employees.[4]

14. The employer shared responsibility was designed to ensure that large employers did not stop offering health insurance to their workers when the exchanges became available.

15. Large firms (50 or more workers) employ about three-quarters of all American workers,[5] and virtually all (97%) of businesses with 50 or more employees offer health insurance coverage to their employees and did so even before the ACA (for example, 96% in 2010). More specifically, in Texas, 97% of firms with 50 or more workers offered health insurance in 2016 and 95% did so in 2010.[6] Thus, the employer penalties are virtually irrelevant to employers with more than 50 workers and should not affect their hiring or wage decisions. The lack of employer-sponsored health insurance coverage is primarily a problem of smaller businesses, but the ACA penalty does not apply to them, so it ought not affect their hiring decisions either.

16. DACA recipients are not eligible for premium tax credits or for the health insurance exchanges (like other undocumented immigrants), in contrast to U.S. citizens or other immigrants like those who are lawful permanent residents.[7]

---

[4] Kaiser Family Foundation. Employer Responsibility Under the Affordable Care Act. Mar. 5, 2018. https://www.kff.org/infographic/employer-responsibility-under-the-affordable-care-act/.
[5] Bureau of Labor Statistics. Distribution of private sector employment by firm size class. ttps://www.bls.gov/web/cewbd/table_f.txt
[6] Agency for Healthcare Research and Quality. Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016. https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiia2.pdf; see also https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2010/tiia2.htm
[7] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013. http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

17. Dr. Deere makes it seem like large numbers of citizen workers could get premium tax credits and therefore could trigger penalties for their employers. This is misleading. In order to be eligible for the health insurance exchanges and premium tax credits, a person cannot be eligible for other insurance coverage, such as employer-sponsored coverage, Medicaid or Medicare. (In unusual cases where the employer coverage is too low, as described above, a person may be eligible for exchange coverage). That is, whether or not an employee takes insurance from his or her employer is irrelevant. The key issue is whether the employer offers insurance to full-time employees. In addition, to get the premium tax credits, people must generally have incomes between 100 and 400 percent of the poverty line. According to Census data for 2017, about 49% percent of adults 18 to 35 (roughly the DACA age range) have incomes in this range, and the other half would not be eligible for tax credits.[8] Therefore, only a small share of citizen workers could get the premium tax credits that might trigger federal tax penalties. The overwhelming majority of citizen workers in large businesses are not eligible for premium tax credits and their employment poses no risk to their employers.

18. Dr. Deere hypothesizes that ACA and DACA policies combined create an incentive for employers to hire DACA recipients instead of citizens, since employers are potentially subject to tax penalties under the employer shared responsibility provisions when they hire citizens but not when they hire DACA recipients, and since citizens are eligible for premium tax credits, but not DACA recipients. He suggests that these policies make it harder for U.S. citizens to find work and depresses their wages. Although he does not indicate how many citizens may be affected, he suggests the number is large by

---

[8] Based on analyses of the Census Bureau's Annual Social and Economic Survey, March 2018, as tabulated by https://www.census.gov/cps/data/cpstablecreator.html

6

mentioning that there are about 683,000 DACA recipients, of which 112,000 are in Texas. This is a huge exaggeration of the potential scope. Dr. Deere also exaggerates the number of people receiving premium tax credits by citing an outdated statistic that 64 million people are eligible for premium tax credits. The actual number receiving them was 8.7 million in 2017.[9]

19. Moreover, the extent to which an employer would hire a DACA recipient in lieu of a citizen worker because the DACA recipient is not eligible for premium tax credits relies on the dubious assumption that many employers are aware of this obscure nuance of health law. To the extent that this minor incentive exists, it may be counteracted by other employment compliance barriers that firms may face in hiring DACA recipients.[10] There are small conflicting conceptual incentives which may favor or disfavor hiring citizens vs. DACA recipients. It is plausible that they balance out and are, in reality, immaterial.

20. At the current time, unemployment rates are at record lows and many businesses have serious problems finding enough qualified workers.[11] In fact, the cancellation of DACA and the resulting loss of work authorization for hundreds of thousands of workers who have DACA will compound this shortage of qualified workers and create a severe hardship for many businesses and their customers. Hundreds of business leaders have

---

[9] Kaiser Family Foundation. Estimated Total Premium Tax Credits Received by Marketplace Enrollees. https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[10] Jones D, Ombok O. DACA and the Challenges Faced by Employers in Workplace Compliance. Association of Corporate Counsel. May 20, 2015. http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm
[11] Lynch D. 'This is super tight': Companies struggle to find, retain workers in a hot economy." Washington Post. Jan. 12, 2018. https://www.washingtonpost.com/business/economy/this-is-super-tight-companies-struggle-to-find-retain-workers-in-a-hot-economy/2018/01/12/0c1ce97e-f7cf-11e7-b34a-b85626af34ef_story.html?noredirect=on&utm_term=.94ad14c9418e

7

noted that DACA recipients are vital to their firms and to the economy and have opposed its termination.[12]

21. More fundamentally, Dr. Deere's hypothesis about DACA recipients displacing citizen workers is based on a belief that there is a fixed number of jobs available for which citizens and non-citizen immigrants compete and, if one gains, then the other must inherently lose. If we believe that line of reasoning, then it also follows that hiring women inevitably harms men's employment, hiring African Americans inevitably harms white Americans, etc. There is not a "fixed number" of jobs in the U.S. economy; the economy is dynamic and having more qualified workers, as well as more entrepreneurs, whether immigrants, women or African Americans, can contribute to economic growth, creating more employment opportunities for both citizens and immigrants alike. It is certainly plausible that, in specific cases, a qualified DACA immigrant may be hired for a job over a similarly qualified citizen worker, or vice versa, but economic growth leads to better employment for both qualified citizens and qualified immigrants.

22. Dr. Deere's belief that DACA and the ACA harm employment is not supported by rigorous research.

23. Evidence suggests that the overall effect of DACA and related policies is to stimulate the economy and thereby to increase employment of both citizens and non-citizens. Analyses conducted in 2014 by the White House Council of Economic Advisers examined the effect of administrative actions on immigration taken by President Obama,

---

[12] America's Voice. Hundreds of Business Leaders Write Letter in Support of DACA, Dreamers. Sept. 1, 2017. https://americasvoice.org/blog/business-leaders-support-daca/

particularly DACA, on employment and the economy.[13]  Its analyses indicated that these

immigration policies lead to increased growth in the U.S. economy and more jobs and

create no harm to employment or wages of U.S.-born workers.  (It is noteworthy that this

analysis was conducted after the ACA was enacted and includes effects of the Act.)

24. More recently, analyses by the Cato Institute indicated that terminating DACA could

reduce economic growth in the U.S. by $280 billion over the next decade.[14] These

reductions in economic growth ultimately cause a loss of jobs.

25. In a parallel study that I conducted last year, we found that repealing key elements of the

ACA (specifically the Medicaid expansion, health insurance exchanges (or marketplaces)

and premium tax credits) would have caused 3 million jobs to be lost by 2021, almost a

third of which would have been in the health care sector, and would have lowered states'

economies by $1.5 trillion over five years.[15]

26. A recent review of several economic studies, conducted since the ACA was adopted,

found that the Act did not reduce employment or lower wages.[16]

27. More broadly speaking, there is a strong scientific consensus that immigration benefits

the U.S. economy.  A distinguished panel of researchers was convened by the National

---

[13] White House Council of Economic Advisers. *The Economic Effect of Administrative Action on Immigration*. Nov. 2014.
https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf
[14] Brannon I, Albright L.  *The Economic and Fiscal Impact of Repealing DACA*.  The Cato Institute.  Jan. 18,2017.
[15] Ku L Steinmetz E, Brantley E, Bruen B.  *Repealing Federal Health Reform: The Economic and Employment Consequences for States.*  Brief, Commonwealth Fund, Jan. 6, 2017.
http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform
[16] Abraham J, Royalty A.  *How Has the Affordable Care Act Affected Work and Wages? Evidence Shows the Law Has Had Little Effect.*  Leonard Davis Institute of Health Economics, University of Pennsylvania.  Jan. 2017.  https://ldi.upenn.edu/brief/how-has-affordable-care-act-affected-work-and-wages

9

Academy of Sciences in 2016 to consider the economic and fiscal impact of immigration in the U.S.[17]  It concluded that, based on many years of rigorous research, that there is little evidence that immigration significantly reduces employment or wages of native-born workers in the U.S.  Even more recently, a letter signed by 1,470 economists, including Nobel Prize winners and former directors of the Office of Management and Budget, the Council of Economic Advisers and Congressional Budget Office from both parties, agreed that immigration strengthens the economy and policies that threaten immigrants would harm the economy.[18]

28. The skills of immigrant workers typically complement those of the U.S.-born workforce, enabling both to be more productive.  For example, the contributions of immigrant construction workers help build homes, office buildings, factories and roads that enable citizens to be employed in other sectors of the economy.  In addition, immigrant entrepreneurs have been important contributors to innovation and economic growth in the United States.[19]  Immigration helps lead to further economic growth and cancelling DACA would set back employment and the economy.

29. A simple and direct way to illustrate the flaw with Dr. Deere's arguments is to present Census data about changes over several years in unemployment levels, comparing U.S.-born citizens and non-citizens who are 18 to 30-year-old adults, the approximate age

---

[17] Blau F, Mackie , eds. *The Economic and Fiscal Consequences of Immigration*.  National Academy of Sciences.  Washington DC: National Academy Press.  2016.
[18] *An Open Letter from 1,470 Economists on Immigration* (written to President Trump and leaders of both houses of Congress).  April 12, 2017.
https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/
[19] Akcigit U, Grigsby J, Nicholas T.  *Research: Immigrants Played an Outsize Role in America's Age of Innovation.  Harvard Business Review.*  April 21, 2017.  https://hbr.org/2017/04/research-immigrants-played-an-outsize-role-in-americas-age-of-innovation?referral=03759&cm_vc=rr_item_page.bottom.

range for working DACA recipients.  The Census data do not provide the detailed immigration status that would enable us to separate DACA recipients from other non-citizen immigrants, including those who are lawful permanent residents, temporary legal immigrants (e.g., those with work or student visas) and the undocumented.  For the sake of simplicity, I exclude data about naturalized citizens, who tend to have high employment levels.  The chart below illustrates trends from 2011 to 2016 for Texas and the overall United States.[20]



30. Under Dr. Deere's hypothesis that DACA and the ACA increase unemployment by citizens, we would expect rising unemployment by U.S.-born citizens, while non-citizen unemployment falls.  In fact, the data reveal that both citizens and non-citizens have had falling unemployment rates in recent years.  In Texas, a high immigrant state, unemployment levels fell faster for U.S. born citizens than for non-citizens.  There has

---

[20] These data are tabulated from a web-based application of the U.S. Census Bureau, located at https://www.census.gov/cps/data/cpstablecreator.html

not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA.  DACA, the ACA and the strong economy have combined to fuel employment for citizens and non-citizens alike.

### Effects of the Loss of DACA for Health Care Providers

31. Termination of DACA will create very specific and substantial harm for those who have DACA and for the employers and customers of the DACA recipients.  One area that exemplifies the harm that will occur is the health care sector.  Many DACA recipients are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide additional manpower, but they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA would cause them to lose work authorization, which would create hardships both for their employers as well as for their potential patients.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

32. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support

12

staff (e.g., medical aides, home health staff, etc.).[21]  More are engaged in other positions in health care organizations, such as administration, computer services, food service, etc. It estimated that 40,700 DACA recipients work in education, health care or social services organizations.  In addition, a large number of DACA recipients are receiving training to be health care professionals in the future, including doctors, nurses, etc. and the loss of status would short-circuit their ability to provide those services in the future.

33. Health care executives representing a number of Catholic hospitals have written to President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[22]  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[23]  Similar problems are likely to occur for those in training for nursing and other health professions.

34. The loss of immigrant health workers would have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing nursing home and community-based care to senior citizens and those with disabilities.[24]  It is particularly worth noting that the Medicaid

---

[21] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.

[22] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf

[23] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.*  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06

[24] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported. *New York Times.  S*ept. 7, 2017.

program is the leading payer for long-term care services in the U.S.  The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

**How DACA Affects Heath Insurance Coverage and Access to Health Care**

35. Under DACA, recipients have a temporary deferral of removal proceedings, can receive authorization to work legally and can engage in other activities of civil society such as continue their education, obtain drivers' licenses, etc.  The survey and analysis conducted by Professor Tom Wong of the University of California at San Diego found that most DACA recipients are employed and most have private health insurance coverage.[25]

36. Federal law does not accord DACA recipients eligibility for federal health insurance benefits, including Medicaid, the health insurance program for low-income populations, nor are they permitted to enroll in the health insurance exchanges (marketplaces) formed under the ACA or to receive federal health insurance premium tax credits that are designed to make this insurance more affordable.  DACA recipients are barred from federal health insurance assistance, like other undocumented immigrants.  State or local governments may opt to offer public insurance coverage for certain undocumented immigrants, including DACA recipients, using state or local funds without federal funding support.[26]  For example, the District of Columbia supports a state-funded Health

---

[25] Declaration of Prof. Tom Wong, *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  May 16, 2018.

[26] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health

Care Alliance, which provides medical assistance to low-income adults not eligible for Medicaid including undocumented immigrants and DACA recipients; no federal funding is used.[27]  New York State provides Medicaid coverage to DACA recipients, but not other undocumented immigrants, without federal funding support.[28]

37. The only federal health insurance benefit available to low-income undocumented immigrants is very limited emergency Medicaid coverage (42 U.S.C. § 1396b(v)).[29]  The costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be covered under Medicaid.  However, this limited benefit does not provide broader coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It provides reimbursement to emergency providers for care rendered to low-income undocumented immigrants, including labor and delivery costs for children born to undocumented immigrant mothers.  Hospitals are separately required to provide emergency care, to at least screen and stabilize their emergency medical conditions, to all potential patients regardless of insurance coverage or citizenship status, under the Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. § 1395dd). The Medicaid emergency care benefit essentially provides a mechanism to reimburse providers for the emergency care they are otherwise required to offer to low-income undocumented immigrants.

---

Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.
[27] District of Columbia Department of Health Care Finance.  Health Care Alliance.
https://dhcf.dc.gov/service/health-care-alliance
[28] New York State Department of Health.  GIS 13 MA/011: Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens.
https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.
[29] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

38. In addition, many community-based health care providers provide free- or subsidized ambulatory health care services to needy or uninsured patients, including undocumented immigrants.  Perhaps most important, community health centers that receive federal grants under Section 330 of the Public Health Service Act, sometimes also called Federally Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that focus on care for migrant workers, are required to provide primary health care to all patients regardless of insurance or immigration status.  Many other "safety net providers – including non-profit, charitable and state or local public clinics – often provide free or subsidized care to uninsured persons, including undocumented immigrants, although the basis for that care varies.  In some cases, state or local laws or regulations require such service, in other cases it is a matter of clinical practice and a belief in charitable mission.

39. Because of the barriers they face in securing health insurance coverage, non-citizen immigrants, which include DACA recipients, undocumented immigrants and other immigrants who have been legally admitted but are not citizens, are much more likely to be uninsured than U.S.-born or naturalized citizens and to have less private insurance and less Medicaid coverage, even when one compares low-income (below 200% of the poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates financial barriers and as a result non-citizens have substantially less access to and use of medical services, including primary health care services, emergency medical care, hospital care and most other forms of health care, than citizens.[30]

---

[30] Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org

40. DACA enables recipients to work and many are thereby able to obtain employment-based private health insurance, which is the dominant form of insurance in the United States.  If DACA is lost, the former DACA recipients would lose their work authorization and, as a result, lose their jobs and their employer-based health insurance.  If they are not working they have few other options to obtain health insurance, other than emergency Medicaid.  Moreover, if the breadwinner in a family loses his or her job and private health insurance, his or her dependents may also lose their insurance coverage, even if they are U.S. born citizens.  In principle, a person without employer-based health insurance, Medicaid, or other publicly subsidized coverage, could purchase individual (non-group) health insurance on the private market.  The sad reality, however, is that individual health insurance is expensive and a person who is no longer employed or who has low income generally cannot afford individual health insurance premiums.  Thus, the health insurance prospects for undocumented immigrants without DACA and unemployed are bleak.

**Mental Health Consequences of the Loss of DACA**

41. Even though DACA does not generally provide health insurance coverage benefits, research indicates that DACA improves the mental health of recipients and their families by reducing stress related to their undocumented status and the fear of adverse actions, such as deportation, loss of work, loss of educational opportunities, separation from their families, etc.  Research, including studies published in peer-review journals by investigators at Harvard Medical School,[31] the University of California at Davis,[32] and

---

[31] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.*  2017; 2(4): e175-e181; Venkataramani AS, Tsai AC.  Dreams Deferred: The Public Health Consequences of Rescinding DACA.  *New England J Medicine*.  2017; 377(18):1707-9.

17

the Universities of California at Berkeley and at San Francisco,[33] show that the receipt of DACA has significantly reduced psychological stress and improves mental health status. The researchers warn that the loss of DACA will lead to higher stress and additional mental health problems for hundreds of thousands of people. Recent research by my colleagues at George Washington University also indicates that recent threats to legal immigration status have created major psychological stress on immigrant parents, who are worried about their own status as well as the future well-being of their children.[34]  In addition, a study by Stanford University researchers found that the DACA that protected mothers also led to better mental health status for their U.S.-born citizen children; children feel more secure when their parents do not fear deportation and can safely work. This shows the broader repercussions of changes in DACA policy which can even affect citizen children.[35]

42. The stress caused by loss of DACA could compound the harmful effects of employment and economic loss and could result in additional demands placed on our mental health and social welfare systems system and, in some cases, may lead to increased risk of disruptive behavior that could pose broader risks and further tax our social, educational

---

[32] Patler C, Laster Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Social Science and Medicine.* 2017 March 9 (Epub ahead of print).

33 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA).  *J Immigr Minor Health*. 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.

[34] Roche K, Vaquera E, White R, Rivera MI.  Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents.  *J Adolescent Health*.  2018 Mar; 62(5): 525–531.

35 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

and criminal justice systems. DACA has helped many youth and young adults "come out of the shadows." Loss of DACA will push them back into the shadows and jeopardize the mental health of DACA recipients and their families, with broader societal effects within states. States have an inherent interest in the well-being, public health and safety of their residents. Terminating DACA undermines the interests of states.

### Estimates of Potential Health Costs at State Levels Due to the Loss of DACA

43. The loss of DACA would harm states because the loss of private health insurance coverage will increase public expenditures for emergency Medicaid and other uncompensated care for those who become uninsured, creating additional financial burdens on the states. States would have to bear higher expenditures for medical care that would be rendered to former DACA recipients who become uninsured. Without private health insurance, DACA recipients would become more reliant on emergency Medicaid and community-based uncompensated care. In the analysis below, I describe paths by which undocumented immigrants can get emergency medical care reimbursed by Medicaid and some forms of community-based uncompensated care. Nonetheless, these are not optimal forms of health care and would still leave many former DACA recipients with reduced access to medical care, which could endanger their health.

44. In this section, I estimate potential financial costs for states if DACA is lost. DACA provides work authorization to young adults who would otherwise be without immigration status and thereby enables them to work legally. A majority of working DACA recipients get private health insurance through their jobs. Loss of work authorization would cause them to lose their jobs. The loss of employment would also trigger the loss of employment benefits, like health insurance coverage for them and their

dependents.  In principle, some of those losing employment-based insurance might be

able to purchase individual (non-group) health insurance on the private market, but

without the income of a job, the cost of individual health insurance would be essentially

unaffordable.  Undocumented immigrants, including DACA recipients, are ineligible for

Medicaid or health insurance marketplaces (exchanges) and premium tax credits.  As a

result, former DACA recipients must instead rely on emergency Medicaid coverage

and/or community-based care for those without insurance, such as that provided by

community health centers or state or local public health clinics.  I use recent national

survey data to estimate the costs of emergency Medicaid and community-based care for

individual states, as well as for the nation, if DACA recipients lose their status and, as a

result, lose employment and private health insurance coverage.

45. I describe the basis and sources of data for my estimates below.  I note that these are

estimates and that differences in methods or data sources could change the results

somewhat, but the general magnitude and direction of results ought to be robust and

valid.

46. For estimates of the number of people affected, I draw on data from the U.S. Citizenship

and Immigration Services (USCIS) agency about persons approved for DACA as of June

30, 2017.[36]  I apply these data about the number of DACA recipients to Prof. Tom

Wong's estimate that 91.4% of DACA recipients are employed and 57% have employer-

based private insurance,[37] based on his survey of DACA recipients, to estimate the effects

---

[36] U.S. Citizenship and Immigration Services.  DACA Performance Data, 3rd Quarter, Fiscal
Year 2017.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat
ion%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf
[37] Declaration of Prof. Tom Wong, *op cit.*

of potential loss of employment and private insurance coverage. (A Migration Policy Institute report[38] estimates somewhat lower employment levels, but their data are for DACA-eligible youth, not actual DACA recipients.  For example, they report that 83% of DACA-eligible men 16-32 not in secondary school were employed vs. 79% of average U.S. men that age.  It seems likely that actual DACA recipients work more than those who are DACA-eligible, since they must apply for DACA and receive it in order to get work authorization).

47. I conducted my own analyses of the 2016 National Health Interview Survey, conducted by the Centers for Disease Control and Prevention, and found that 55% of working DACA-eligible immigrants have private insurance (based on the criteria of being non-citizen immigrants between the ages of 18 and 36 residing in the U.S for more than 5 years, excluding Medicaid recipients since DACA recipients are not eligible for Medicaid, except emergency Medicaid coverage).  This level is essentially the same as Prof. Wong's estimate and corroborates it.

48. For estimates of the implications and costs of alternative sources of medical care that former DACA recipients are likely to use I draw on my own analyses of the Center for Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey (MEPS). I am an experienced analyst of these data and have published numerous studies using these nationally representative survey data.

49. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an estimate of DACA eligibility.  I use Prof. Wong's estimate that 57% of employed DACA

---

[38] Capps R, Fix M, Zong J.  The Education and Work Profiles of the DACA Population. August 2017.

recipients get insurance through work.  (My analysis of NHIS data show that 55% of the

DACA-eligible immigrants, as described above, who are working have private insurance,

about the same as Prof. Wong's estimate of employer-based insurance coverage among

DACA recipients.  Two separate data sources yield almost the same estimate,

corroborating each other). The loss of DACA and work authorization would trigger the

loss of their jobs and therefore their private health insurance.

50. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19

percent probability of using emergency room care in the last 12 months.  Since the loss of

DACA would result in the loss of work authorization, legal work and employment-based

insurance, it is reasonable to assume that about 19% of former DACA recipients would

need to rely on emergency Medicaid to pay their emergency medical bills.  Although they

may have had incomes above Medicaid eligibility limits when they were employed, the

loss of DACA and work authorization will cause them to lose income and often become

impoverished, so more will fall within Medicaid income criteria.  To estimate the costs of

emergency medical care, I relied on my analyses of MEPS data and estimated that the

average annual cost of emergency room care received by an 18-36 year old immigrant

who had been in the US for more than five years was $1,275 in 2015.  I used estimates of

national health expenditure price increases per capita from 2015 to 2018, conducted by

the federal Centers for Medicare and Medicaid Services,[39] to estimate that the annual cost

would rise by 13.7% to $1,450 each for the 19% of adults who had previously been

---

[39] Centers for Medicare and Medicaid Services.  National Health Expenditures.
https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-
Reports/NationalHealthExpendData/index.html

Case 1:18-cv-00068   Document 253-3   Filed on 07/21/18   Page 23 of 395

privately-insured working DACA recipients in each state, but who would now be uninsured.

51. I estimated the costs of community-based uncompensated care that would be received by the newly uninsured immigrant adults, due to the loss of DACA. For this, I drew on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[40] That study estimated that in 2013, the average uninsured person received uncompensated medical care costing $1,702 per person, of which 26% was provided as uncompensated care at publicly-supported state or local community-based ambulatory sites, such as community health centers or state or local clinics. This is equal to $449 in community-based ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for health care cost inflation between 2013 and 2018 to $559 per uninsured person. I multiplied this amount by the number of former DACA recipients who would lose their jobs and private health insurance in each state.

52. Based on the methods and sources, described above, the additional public costs that would be borne at state levels in 2018 are shown in Table 1 below. These are annual costs in 2018; the cumulative costs over several years would be substantially higher. These estimates are conservative, since they do not include the additional costs that might be borne by states if dependents of DACA recipients – their spouses or children – lose private health insurance if the DACA recipient loses his or her job.

53. Table 1 presents estimates for the United States (excluding the territories, such as Puerto Rico and the Virgin Islands), for the seven plaintiff states in this case (Texas, Alabama,

---

[40] Coughlin T, Holahan J, Caswell K, McGrath M. *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.* Kaiser Commission on Medicaid and the Uninsured. May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

23

Arkansas, Louisiana, Nebraska, South Carolina and West Virginia) and for all other states and the District of Columbia. These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

24

**Table 1.  Estimates of Additional Public Costs Due to the Loss of DACA Status**

| State | Number Currently Employed (1) | Number Who Could Lose Private Insurance If They Lose Their Jobs (2) | Number Who Might Require Emergency Room Use If Uninsured (3) | 2018 Costs of Emergency Room Care (4) | 2018 Cost of Community-Based Uncompensated Care (5) | Total Estimated 2018 Public Costs Due to Loss of DACA (6) |
|---|---|---|---|---|---|---|
| Total, U.S. | 716,618 | 408,472 | 77,610 | $112,508,841 | $228,521,352 | $341,030,194 |
| **Plaintiff States** | | | | | | |
| Alabama | 3,918 | 2,233 | 424 | $615,125 | $1,249,406 | $1,864,531 |
| Arkansas | 4,663 | 2,658 | 505 | $732,126 | $1,487,051 | $2,219,177 |
| Louisiana | 1,892 | 1,078 | 205 | $297,040 | $603,331 | $900,372 |
| Nebraska | 3,093 | 1,763 | 335 | $485,597 | $986,315 | $1,471,912 |
| South Carolina | 5,879 | 3,351 | 637 | $922,978 | $1,874,699 | $2,797,677 |
| Texas | 114,043 | 65,005 | 12,351 | $17,904,797 | $36,367,172 | $54,271,969 |
| West Virginia | 108 | 61 | 12 | $16,933 | $34,393 | $51,326 |
| **Other States** | | | | | | |
| Alaska | 133 | 76 | 14 | $20,951 | $42,554 | $63,504 |
| Arizona | 25,530 | 14,552 | 2,765 | $4,008,181 | $8,141,182 | $12,149,363 |
| California | 204,507 | 116,569 | 22,148 | $32,107,494 | $65,214,856 | $97,322,349 |
| Colorado | 15,821 | 9,018 | 1,713 | $2,483,947 | $5,045,248 | $7,529,195 |
| Connecticut | 4,560 | 2,599 | 494 | $715,911 | $1,454,116 | $2,170,026 |
| Delaware | 1,326 | 756 | 144 | $208,215 | $422,915 | $631,130 |
| Dist Columbia | 707 | 403 | 77 | $110,924 | $225,302 | $336,226 |
| Florida | 30,351 | 17,300 | 3,287 | $4,765,132 | $9,678,657 | $14,443,789 |
| Georgia | 22,150 | 12,625 | 2,399 | $3,477,526 | $7,063,347 | $10,540,873 |
| Hawaii | 532 | 303 | 58 | $83,516 | $169,632 | $253,148 |
| Idaho | 2,873 | 1,637 | 311 | $451,014 | $916,072 | $1,367,086 |
| Illinois | 38,879 | 22,161 | 4,211 | $6,103,967 | $12,398,019 | $18,501,986 |
| Indiana | 9,020 | 5,142 | 977 | $1,416,180 | $2,876,462 | $4,292,642 |
| Iowa | 2,570 | 1,465 | 278 | $403,516 | $819,598 | $1,223,114 |
| Kansas | 6,234 | 3,554 | 675 | $978,799 | $1,988,078 | $2,966,877 |
| Kentucky | 2,814 | 1,604 | 305 | $441,830 | $897,419 | $1,339,249 |
| Maine | 90 | 51 | 10 | $14,063 | $28,564 | $42,626 |
| Maryland | 9,023 | 5,143 | 977 | $1,416,610 | $2,877,336 | $4,293,946 |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,588 | $2,347,162 | $3,502,750 |
| Michigan | 5,946 | 3,389 | 644 | $933,597 | $1,896,267 | $2,829,864 |
| Minnesota | 5,743 | 3,273 | 622 | $901,597 | $1,831,270 | $2,732,867 |
| Mississippi | 1,344 | 766 | 146 | $211,085 | $428,744 | $639,829 |
| Missouri | 3,244 | 1,849 | 351 | $509,274 | $1,034,407 | $1,543,681 |
| Montana | 69 | 40 | 8 | $10,906 | $22,151 | $33,057 |
| Nevada | 11,988 | 6,833 | 1,298 | $1,882,117 | $3,822,846 | $5,704,964 |
| New Hampshire | 342 | 195 | 37 | $53,668 | $109,008 | $162,676 |
| New Jersey | 20,315 | 11,580 | 2,200 | $3,189,526 | $6,478,378 | $9,667,904 |
| New Mexico | 6,250 | 3,562 | 677 | $981,238 | $1,993,033 | $2,974,271 |
| New York | 38,848 | 22,143 | 4,207 | $6,099,088 | $12,388,109 | $18,487,197 |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,733 | $8,002,154 | $11,941,886 |
| North Dakota | 94 | 54 | 10 | $14,780 | $30,021 | $44,801 |
| Ohio | 4,101 | 2,338 | 444 | $643,875 | $1,307,801 | $1,951,675 |
| Oklahoma | 6,296 | 3,589 | 682 | $988,413 | $2,007,606 | $2,996,019 |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,539 | $3,299,668 | $4,924,207 |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,404 | $1,743,540 | $2,601,944 |
| Rhode Island | 1,141 | 650 | 124 | $179,085 | $363,748 | $542,833 |
| South Dakota | 233 | 133 | 25 | $36,592 | $74,323 | $110,915 |
| Tennessee | 7,653 | 4,362 | 829 | $1,201,507 | $2,440,431 | $3,641,938 |
| Utah | 8,895 | 5,070 | 963 | $1,396,521 | $2,836,531 | $4,233,052 |
| Vermont | 40 | 23 | 4 | $6,314 | $12,824 | $19,138 |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,561 | $3,569,855 | $5,327,417 |
| Washington | 16,394 | 9,345 | 1,776 | $2,573,920 | $5,227,996 | $7,801,916 |
| Wisconsin | 6,931 | 3,951 | 751 | $1,088,144 | $2,210,174 | $3,298,318 |
| Wyoming | 569 | 325 | 62 | $89,399 | $181,582 | $270,981 |

Notes:  See text for explanation of the source of estimates.
Analyses by Leighton Ku, June 11, 2018

25

App. 614

54. For the overall United States (not including the territories), about 408,000 DACA recipients would lose their private health insurance and become uninsured if DACA is terminated.  Of them, about 78,000 would require emergency care in 2018, which would lead to about $113 million in additional Medicaid emergency care expenditures.  The 408,000 newly uninsured individuals would incur about $229 million in community-based uncompensated care at community health centers, public clinics and other safety net sites.  In total, the public costs of increased public health care would rise by about $341 million in 2018 due to the loss of DACA.  It is worth noting that, despite the emergency or charity care provided, DACA recipients would still have substantial unmet medical needs because they would lack insurance coverage for other medical costs, such as specialty ambulatory care, medications and inpatient hospital care.

55. I also illustrate the effects for two states: Texas, the largest of the plaintiff states, and for New Jersey.

56. In Texas, the loss of DACA could lead about 65,000 more people to become uninsured.  Of them, more than 12,000 would require emergency medical care in 2018, costing about $18 million.  And the 65,000 uninsured people would require about $36 million in additional community-based uncompensated care.  The total increase in one year in additional public medical expenditures in Texas would equal about $55 million in 2018 as a result of the termination of DACA.

57. For New Jersey, the loss of DACA could cause the number of uninsured people to rise by about 11,500.  This would increase public medical care costs by $7.6 million, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs.  New Jersey also has an innovative Charity Care – Hospital

Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients.[41] Increasing the number of uninsured patients, due to loss of DACA, would create additional financial burdens for this program and create hardships for hospitals across the state.

58. In her declaration, Ms. Monica Smoot of the Texas Health and Human Services Commission[42] notes that her agency incurs costs to provide emergency Medicaid services, family violence services and CHIP perinatal coverage for undocumented immigrants, as well as additional uncompensated medical care provided by state public hospitals. She does not provide estimates of the costs of these services for DACA recipients. While I cannot comment on the accuracy of her estimates, I note, as described above, that if DACA is lost, then a substantial number of those who currently have employer-sponsored health insurance will lose their work authorization and thereby lose their jobs and private health insurance and will become uninsured (and often become impoverished). They will still have medical needs, however, and many will have to receive services such as emergency Medicaid or other charity care type facilities (including uncompensated care at state hospitals) that previously could have been financed by their private health insurance. The loss of DACA will cause public expenditures for emergency Medicaid services and related services for uninsured people to rise even higher, creating additional costs for the state of Texas.

---

[41] New Jersey Department of Health. Charity Care – New Jersey Hospital Care Payment Assistance Program. http://www.nj.gov/health/charitycare/
[42] Declaration of Monica Smoot in in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division. April 9, 2018.

App. 616

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

June 15, 2018

28