# EXHIBIT 19



**Office of the Attorney General**
**Washington, D. C. 20530**

September 13, 2018

MEMORANDUM FOR:     HEADS OF CIVIL LITIGATING COMPONENTS
                                   UNITED STATES ATTORNEYS

FROM:                      THE ATTORNEY GENERAL

SUBJECT:                 Litigation Guidelines for Cases Presenting the Possibility of
                                   Nationwide Injunctions

       This Memorandum provides general guidelines for Department of Justice attorneys involved in litigation challenging a federal government program, regulation, order, or law. Its purpose is to ensure that principled and consistent positions are advocated by the Department's litigators handling cases that present the possibility of overbroad injunctive relief, and that Department attorneys take opportunities as appropriate to reaffirm the constitutional and prudential limitations on the remedial authority available to judges.

       "Nationwide injunctions" purport to bar the federal government from enforcing a law or policy as to any person or organization, anywhere in the United States, regardless whether those persons or organizations are parties to the case, and regardless whether such broad injunctions are necessary to provide relief to the plaintiff in the case. A number of such injunctions in recent years have brought to the fore the problem of judges acting outside the bounds of their authority and granting relief that reaches far beyond the confines of the particular case or controversy before them. Consistent with the longstanding position of the Executive Branch under Administrations of both parties, the Department of Justice opposes the issuance of such nationwide injunctions.

       The Department consistently has argued against granting relief outside of the parties to a case. In briefs filed during the Administration of President George W. Bush, for example, the Department argued that "equitable relief must be tailored to the particular final agency action and parties before the court and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs'" Brief for Petitioners at 41, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (No. 07-463) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The Department under the Administration of President Barack Obama repeated these arguments in briefs filed in *Los Angeles Haven Hospice, Inc. v. Sebelius*, No. 09-5631 (9th Cir. 2010), and *Sequoia Forestkeeper v. Tidwell*, No. 12-16206 (9th Cir. 2012), among others. And more recently, the Department has continued to challenge the entry of nationwide injunctions in a number of cases on constitutional and equitable grounds. *See, e.g.*, Petition for a Writ of Certiorari at 31–33, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (No. 16-1436) (2017).

Department litigators defending against cases that carry the potential for issuance of a nationwide injunction should maintain the Department's considered and longstanding position. Specifically, litigators should, as appropriate, make arguments to convey that nationwide injunctions (1) exceed the constitutional limitations on judicial power; (2) deviate from longstanding historical exercise of equitable power; (3) impede reasoned discussion of legal issues among the lower courts; (4) undermine legal rules meant to ensure orderly resolution of disputed issues; (5) interfere with judgments proper to the other branches of government; and (6) undermine public confidence in the judiciary. In cases brought pursuant to the Administrative Procedure Act (APA) that present the possibility of a universal vacatur of a challenged rule, litigators should make similar arguments as appropriate, as well as note that nothing in the APA supersedes the traditional equitable limitation of relief to the parties before the court. Litigators should always be mindful of relevant local precedent, and to the extent that binding precedent forecloses any of the foregoing arguments in a particular jurisdiction, litigators should typically preserve those arguments for further appellate review. Under no circumstances should Department litigators make arguments inconsistent with these points, unless with the express authorization of the Deputy Attorney General or the Associate Attorney General, as appropriate.

The information contained in this Memorandum is offered for use by litigators preparing to present these arguments. It is not meant to be exhaustive, and litigators are encouraged to conduct further research when briefing each of these points, as needed.[1]

## I. Nationwide Injunctions are Inconsistent with Constitutional Limitations on Judicial Power.

Department litigators should remind courts that the constitutional limitations on their authority do not permit them to issue injunctions that extend beyond the parties to the case before them if such action is unnecessary to provide relief to the parties to the case.

Injunctive relief that extends beyond the parties to a case cannot be squared with the Constitution's limitation of the "judicial Power" vested in Article III courts.[2] The Supreme Court, from early in its history, has interpreted the equitable power of Article III courts as the power "to render a judgment or decree upon the rights of the litigant parties" consistent with the exercise of such powers at common law or in English courts of equity. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838).

Modern standing doctrine, drawn from Article III's limitation on "the exercise of the judicial power to 'Cases' and 'Controversies,'" requires a plaintiff to "demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe*

---

[1] In order to see the arguments contained herein in the context of a specific case, litigators may wish to consult a brief filed by the Department of Justice that addresses the scope-of-remedy question. The Department's en banc brief in the Seventh Circuit case *City of Chicago v. Sessions*, No. 17-2991, is available for this purpose at https://www.justice.gov/file/1064606/download.

[2] Justice Thomas, concurring in *Trump v. Hawaii,* stated that "[e]ven if Congress someday enacted a statute that clearly and expressly authorized [nationwide] injunctions, courts would need to consider whether that statute complies with the limits that Article III places on the authority of federal courts." 584 U.S. __ (2018) (Thomas, J., concurring) (slip op. at 3 n.2).

*Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). But nationwide injunctions often afford relief not only to persons who are not parties to a case, but even to those who would have had no standing to seek an injunction in the first place—thereby affording relief far beyond "the inadequacy that produced the injury in fact that the plaintiff has established." *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).

## II.   Nationwide Injunctions Have No Basis in Equitable Practice.

Department litigators should, as appropriate, emphasize that the recent rise in nationwide injunctions is an ahistorical anomaly inconsistent with centuries of judicial practice by courts sitting in equity. The Supreme Court has recognized the "[g]eneral rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotations and citation omitted). And it has held, more specifically, that the Judiciary Act of 1789, which confers jurisdiction on the federal courts over suits at equity, confers only the authority that was historically available at the time of its enactment. *See Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (The Court "ha[s] long held that 'the jurisdiction'" conferred by the Judiciary Act of 1789, ch. 20, 1 Stat. 73, "over 'all suits . . . in equity' * * * 'is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.'") (brackets and citations omitted); *see also Trump v. Hawaii*, 584 U.S. __ (2018) (Thomas, J., concurring) (slip op. at 5) (stating that "district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding.").

Nationwide injunctions are a relatively recent phenomenon. They were unknown in the English courts of equity and so were not part of the jurisdictional grant made by the Judiciary Act. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 425 (2017). Scholars have not identified any such injunctions issued in the U.S. prior to 1963. (The first nationwide injunction appears to have been issued by the D.C. Circuit in *Wirtz v. Baldor Electric Company*, 337 F.2d 518 (D.C. Cir. 1963)). Before that—for close to two hundred years of American judicial history—courts issuing injunctions consistently limited relief to the plaintiffs to a case. In fact, it appears that injunctions with nationwide scope simply were not contemplated; litigants did not request them, and courts did not issue them. *See* Bray, *supra*, at 438 n.121. Instead, when faced with the types of challenges to federal action that might result in a nationwide injunction today, courts carefully circumscribed their remedies to the parties and case or controversy at hand.[3] *Cf. Trump*, 584 U.S. __, __ (Thomas, J., concurring) (slip op. at 7, 10)

---

[3] New Deal legislation prompted a spate of injunctions, but not of the national sort with which the federal government recently has had to contend. For example, more than 1,600 injunctions issued against the enforcement of the Agricultural Adjustment Act's processing tax—but the government was still able to collect the tax from more than 71,000 taxpayers who had not challenged the tax in court. *See* Report of Attorney General Homer Cummings, *Injunctions in Cases Involving Acts of Congress*, Sen. Doc. No. 42, 75th Cong., 1st Sess., at 3 (Mar. 25, 1937). Similar patterns occurred pursuant to other laws as well.

3

(noting that "[f]or most of our history, courts understood judicial power as fundamentally the power to render judgments in individual cases," and concluding that nationwide injunctions "are legally and historically dubious.") (quotations and brackets omitted).

Scholars have not found a single example of any judge issuing this type of extreme remedy in the first 175 years of the Republic. It took more than 200 years for the first 22 nationwide injunctions to be issued; recently, courts issued 22 in just over one year.

### III. Nationwide Injunctions Impede the Consideration of a Disputed Legal Issue By Different Courts.

Department litigators should remind courts of the utility of multiple lower court decisions on a contested legal issue. The issuance of nationwide injunctions seriously impedes decision-making in the federal courts by interfering with percolation of a contested legal issue. One of the primary benefits of our judicial system is the ongoing dialogue that develops over time among the lower courts, whose decisions ordinarily do not bind one another pending review by the Supreme Court. *See Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488-89 (1900). This dialogue occasionally will lead circuit courts to resolve conflicts on their own; at a minimum, it provides useful information to the Supreme Court in the form of multiple reasoned lower court opinions and the consequences that have flowed from them. The Supreme Court has explicitly affirmed the importance of percolation in the lower courts—particularly when the government is involved—saying that "[g]overnment litigation frequently involves legal questions of substantial public importance," and a rule allowing one court to issue a definitive ruling against the government in such cases "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *See United States v. Mendoza*, 464 U.S. 154, 160 (1984); *see also Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court."); *McCray v. New York*, 461 U.S. 961, 963 (1983) (Stevens, J., statement respecting the denial of certiorari) ("[F]urther consideration of the substantive and procedural ramifications of the problem by other courts will enable us to deal with the issue more wisely at a later date.").

Nationwide injunctions often cut off this organic development and discussion of the law. When a lower court enjoins a federal law, regulation, or policy on a nationwide basis, that decision typically forces the government to appeal and, if necessary, petition for a writ of certiorari—even if a different case might have more cleanly presented the issue, or even if review by another court might have provided helpful additional material for the Supreme Court's eventual consideration. The issuance of an injunction with nationwide scope may also discourage other litigants from challenging that law, rule, regulation, or policy, exacerbating the isolation of the first, purportedly definitive ruling.

## IV. Nationwide Injunctions Undermine Legal Rules Intended to Ensure the Orderly Resolution of Disputed Legal Issues.

Department litigators should remind courts that the practice of issuing nationwide injunctions improperly undermines well-established legal rules that reflect considered judgments about how to ensure the orderly resolution of disputed legal issues in specific circumstances. First, a court that issues a nationwide injunction flouts the specific mechanism that the law provides for large numbers of similarly situated persons to pursue relief efficiently: the class action system. *See McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs. . . . A wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions?"); *Zepeda v. INS*, 753 F.2d 719, 727, 730 n.1 (9th Cir. 1983) (holding that "the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs," because "[plaintiffs] are not entitled to relief for people whom they do not represent. If this elementary principle were not true, there would be no need for class actions."). Class action rules have safeguards in place that are faithful to the limits on judicial power established by the Constitution and that protect the interests of both parties. While class action requirements ensure that each side in a legal dispute is equally bound by the outcome, litigation culminating in a nationwide injunction is lopsided: a win for the plaintiff resulting in a nationwide injunction binds the government, but a win by the government allows additional plaintiffs to continue to challenge a law or policy until one of them succeeds. In other words, the government must litigate a number of suits all across the country and must win them all, while litigants challenging the law or policy need only win once.

Second, nationwide injunctions contravene the principle, recognized by the Supreme Court, that legal issues involving the federal government should be subject to relitigation in different circuits. A nationwide injunction is an attempt at preventing the government from having a second or subsequent opportunity to litigate an issue that it lost as to a single individual plaintiff. But in *Mendoza*, 464 U.S. at 162, which concerned the similar practice of nonmutual offensive collateral estoppel, the Court declared that the latter "does not apply against the [g]overnment in such a way as to preclude relitigation of issues." Instead, in recognition that "the [g]overnment is not in a position identical to that of a private litigant," *id.* at 159 (internal quotation marks and citation omitted), the government should be afforded the opportunity to press its case in different courts and against different plaintiffs.[4]

Third, in some circumstances, nationwide injunctions may result in conflicting obligations placed on the federal government, in which it is logically impossible for the government to comply with all court orders.[5] Such an outcome might leave the Supreme Court as the only court with the

---

[4] Relitigation in different circuits benefits not only the government but also the Supreme Court, as discussed *supra* in Section III.

[5] For example, the government may occasionally face a situation in which one lawsuit seeks to end a particular program or policy, and another simultaneous lawsuit seeks to preserve it. If nationwide injunctions issue in the plaintiffs' favor in both suits, the government will be required by law to take two directly opposing actions.

5

authority to resolve the conflict. Unless and until the Supreme Court settles the issue, conflicting injunctions may place government agencies and attorneys in the untenable position of choosing which court order to comply with and which to—unavoidably—contravene.

### V. Nationwide Injunctions Interfere With Judgments that Properly Belong to the Other Branches of Government.

Department litigators should argue, when appropriate, that the issuance of a nationwide injunction interferes with judgments that properly belong to Congress and to the Executive Branch. First, it falls to Congress to establish by statute limited and specific contexts in which a single court has the authority to review agency actions with nationwide applicability. (The Clean Air Act, for example, explicitly assigns certain rule challenges to the D.C. Circuit where the rule is "nationally applicable." *See* 42 U.S.C. § 7607(b)(1).) Nationwide injunctions may in some instances undermine Congress' authority to determine when definitive review by a single court is appropriate. Second, nationwide injunctions deprive the Executive Branch of the opportunity to determine whether or how to apply a particular ruling beyond the parties in the case. Traditionally, the Executive has had the discretion, taking into account the contours of an adverse lower court ruling, its own policy priorities, and other prudential factors, to decide whether to abide by an adverse ruling even outside of the geographical area in which the ruling is legally binding.[6] *Cf. Mendoza*, 464 U.S. at 161 (recognizing that the conduct of government litigation involves policy choices, including whether and when to appeal adverse rulings). A nationwide injunction takes away that discretion that belongs properly to the Executive Branch.

### VI. The Availability of Nationwide Injunctions Undermines Public Confidence in the Judiciary.

Department litigators should highlight the institutional dangers to the judiciary raised by the issuance of nationwide injunctions. The availability of nationwide injunctions offers would-be plaintiffs a strong incentive to forum shop. Sophisticated litigants and interest groups carefully choose their federal district court, intra-district division, and corresponding circuit court, with an eye toward the courts most likely to be sympathetic to their claims. Such forum shopping in litigation of high-profile, politically-sensitive cases designed to achieve nationwide injunctions may do lasting harm to the public's confidence in the rule of law and the fairness and impartiality of the federal judiciary.

Nationwide injunctions may further undermine the public's confidence in the judiciary because they may be perceived as a sign of disrespect from one court to another. A lower court issuing a nationwide injunction effectively takes away from the other courts any opportunity they might have had to resolve similar issues pending or soon to come before them. Even worse, a nationwide injunction sometimes has the effect of granting relief to parties that raised the same issues before another court that declined to grant relief to those parties. A judge's refusal to respect

---

[6] When defending a regulation that was promulgated through notice and comment procedures required by the APA, Department attorneys advising their clients after an adverse ruling should note that an agency may not choose to give broader effect to a vacatur ruling that is limited in scope—that is, it may not itself effectively repeal the challenged rule—without again going through notice and comment.

the judgment of his or her colleagues sends a strong signal to the public that their own respect for judicial decision-making is misplaced.

### VII. In APA Cases: Universal Vacatur Is Not Contemplated by the APA.

In any case brought pursuant to the APA that presents the possibility of universal vacatur (*i.e.* the possibility that the court might vacate the rule with respect to all persons, even those who are not parties to the case), Department litigators should, as appropriate, and where not inconsistent with circuit precedent, additionally argue that the APA's text should not be read to displace the traditional equitable limitation of relief to the parties before the court. Some courts have vacated regulations in their entirety, citing the text of the APA's judicial review provision, which instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be" arbitrary and capricious, contrary to constitutional rights, in excess of statutory jurisdiction, without observance of procedure, unsupported by substantial evidence, or unwarranted by the facts. 5 U.S.C. § 706; *see also Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998). But the APA's text does not permit, let alone require, such a broad remedy. *Cf. Trump*, 584 U.S. __ (Thomas, J., concurring) (slip op. at 3) ("No statute expressly grants district courts the power to issue universal injunctions.").

First, in some cases the relevant "agency action" that is subject to challenge by a plaintiff is the *application* of a regulation to the plaintiff—not the regulation itself. The APA authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. When no special statutory provision "permit[s] broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly," the final agency action that is the proper object of judicial review must be "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). If the court finds that a regulation on which the agency relied in taking the concrete action that is the proper subject of legal challenge is legally flawed, the appropriate relief is for the court to invalidate the *concrete action*—that is, to "hold unlawful" the reviewable "agency action," in the APA's terminology. The court should not go beyond the boundaries of the case and invalidate the regulation itself, which was not properly before the court. Section 706 cannot authorize "setting aside" an entire regulation under these circumstances.

Second, even where the rule itself is the subject of legal challenge, the text of section 706 does not specify whether the rule, if found invalid, should be set aside *on its face* or *as applied to the challenger*. In the absence of a clear statement in the APA that it displaces traditional rules of equity, courts should adopt the latter reading of the "set aside" language. The historical backdrop to the APA's enactment lends further support to this reading. The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over fifteen years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief.

Finally, the APA provides that in the absence of a special statutory review provision, the proper "form of proceeding" under the APA is a traditional suit for declaratory or injunctive relief. *See* 5 U.S.C. 703. Declaratory and injunctive remedies are equitable in nature and, as discussed

7

*supra*, equitable relief traditionally has been limited to determining the rights of the parties before the court.  *See supra* at I-II.

*          *          *

These guidelines are intended only for Department of Justice litigators and should not be relied upon by any party as a limitation on any Department attorney's authority to assert any argument in any particular case or as a standard against which the government's arguments in briefs are to be measured.