IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**DEFENDANT-INTERVENORS' MOTION TO STRIKE PLAINTIFFS' EXPERTS**

## TABLE OF CONTENTS

I.     STATEMENT OF THE ISSUES TO BE RULED UPON BY
       THE COURT ................................................................................................1

II.    STATEMENT OF THE NATURE AND STAGE OF THE
       PROCEEDINGS ...........................................................................................1

III.   LEGAL STANDARD ...................................................................................2

IV.    SUMMARY OF THE ARGUMENT ...........................................................3

V.     ARGUMENT .................................................................................................4

       A.  Donald Deere .......................................................................................4

       B.  Lloyd Potter ......................................................................................13

VI.    CONCLUSION ...........................................................................................16

## **TABLE OF AUTHORITIES**

**Cases**

*CQ, Inc. v. TXU Min. Co., L.P.*,
    565 F.3d 268 (5th Cir. 2009)......................................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................................................3

*Gilmore v. WWL-TV, Inc.*,
    No. CIV.A. 01-3606, 2002 WL 31819135 (E.D. La. Dec. 12, 2002) .........................10

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007)......................................................................................9

*Hixson v. Houston Indep. Sch. Dist.*,
    No. 4:09-CV-3949, 2011 WL 3648104 (S.D. Tex. Aug. 17, 2011) ...........................10

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012).............................................................................2, 3, 11

*Kossman Contracting, Co. v. City of Houston*,
    No. CV H-14-1203, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016)......................2, 10

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................3

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................11

*Michael Kors, L.L.C. v. Hernandez Int'l Inc.*,
    No. 4:15-CV-0844, 2016 WL 6306129 (S.D. Tex. Oct. 27, 2016)....................3, 5, 14

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000)................................................................................3, 10

*Paz v. Brush Engineered Materials, Inc.*,
    555 F.3d 383 (5th Cir. 2009)....................................................................................16

*Pipitone v. Biomextrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002)................................................................................2, 11

*U.S. v. John Stapp, Inc.*,
    448 F. Supp. 2d 819 (S.D. Tex. 2006) ................................................................3, 11

*Wells v. SmithKline Beecham Corp.*,
    601 F.3d 375 (5th Cir. 2010)...............................................................................12, 16

*Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*,
    516 F. Supp. 2d 802 (S.D. Tex. 2007) .....................................................................14

*Wilson v. Woods*,
    163 F.3d 935, 937 (5th Cir. 1999)…………………………………………………….5, 14

**Statutes**

8 U.S.C. § 1324a………..……..………………………………………………………………14

ii

8 C.F.R. § 274a.1…………………………………………………………………………………………...14

**Rules**

Fed. R. Evid. 401 ........................................................................................................................... 2

Fed. R. Evid. 702 ........................................................................................................................ 2, 3

## I.      STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Defendant-Intervenors Karla Perez, *et al.,* respectfully submit this Motion to Strike Plaintiffs' Experts and request that the Court strike the expert reports of Plaintiffs' designated experts Dr. Donald Deere (*see* Dkt. 7 at 88, 219-21 at 2, 358-13, 358-21) and Dr. Lloyd Potter (*see* Dkt. 7 at 3, 358-31) from the record because their testimony is irrelevant and unreliable. Defendant-Intervenors further request that the Court find that Dr. Potter and Dr. Deere are unqualified to testify as experts on the subjects on which they purport to offer an expert opinion. Defendant-Intervenors request that the Court do not consider their testimony.

## II.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

After this Court denied their request for summary judgment and motion for preliminary injunction (*see* Dkt. 319), and after denying Defendant-Intervenors an opportunity to obtain discovery (*see* Dkt. 383), Plaintiffs filed a motion for summary judgment on February 4, 2019. *See* Dkt. 357.  In their motion, Plaintiffs ask the Court to "declare DACA unlawful and prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits to allow for an orderly winddown of the unlawful program." *Id.* at 56.

Shortly thereafter, on March 19, 2019, Plaintiffs served their expert disclosures on Defendant-Intervenors.  *See* Dkt. 383-18.  Plaintiffs disclosed only two experts, Dr. Donald Deere and Dr. Lloyd B. Potter, both whom previously offered an expert opinion in this case at the preliminary injunction stage.  *See id.*  Dr. Potter is an appointed State Demographer of Texas who offers an opinion about the likelihood that DACA recipients will return to their country of origin. Dkt. 358-31 at ¶¶ 2-11.  Dr. Deere is an economist who offers an opinion about the labor market impact of DACA and the employer mandate provision of the Affordable Care Act ("ACA").  *See* Dkt. 358-21 ¶¶ 5, 13.

1

Plaintiffs rely on these two experts in support of their motion for summary judgment. *See* Dkt. 357 at 33-36, 38. Defendant-Intervenors now file this motion and request that the Court strike these expert reports from the record and do not consider the testimony of Dr. Deere and Dr. Potter.

## III.    LEGAL STANDARD

The Federal Rules of Evidence provide that an expert that is qualified "by knowledge, skill, experience, training, or education" may offer an expert opinion in the case if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In short, the expert's testimony must be both "reliable and relevant." *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks and citations omitted).

"The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.*; *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 n. 21 (5th Cir. 2002) ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (quoting Fed. R. Evid. 401). On the other hand, "[t]he reliability prong mandates that [the] expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson*, 685 F.3d at 459. "Reliability hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case." *See Kossman*

*Contracting, Co. v. City of Houston*, No. CV H-14-1203, 2016 WL 11473826, at *9 (S.D. Tex. Feb. 17, 2016) (citing Fed. R. Evid. 702).[1]  The expert's proponent bears the burden of proving the testimony is admissible by a preponderance of the evidence.  *Johnson*, 685 F.3d at 459; *Michael Kors, L.L.C. v. Hernandez Int'l Inc.*, No. 4:15-CV-0844, 2016 WL 6306129, at *16 (S.D. Tex. Oct. 27, 2016).

Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert* and its progeny require this Court to act as a gatekeeper to ensure expert testimony meets these standards and is indeed admissible.  *See id.*; *see also Daubert*, 509 U.S. at 597; *Kumho Tire Co. Ltd.*, 526 U.S. at 147.  When deciding a motion for summary judgment, this Court has discretion to disregard an expert opinion that is unreliable or irrelevant, or both.  *See, e.g., Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *U.S. v. John Stapp, Inc.*, 448 F. Supp. 2d 819, 826 (S.D. Tex. 2006).

## IV.   SUMMARY OF THE ARGUMENT

Plaintiffs' expert reports are unreliable because they are based on flawed assumptions and insufficient data, and are not the product of reliable principles and methodology.  Dr. Deere merely speculates, without relying on any evidence or support, about what an employer would do if a hypothetical DACA recipient and a U.S. citizen applied for the same job.  Dr. Deere also claims that DACA recipients depress the wages of U.S. citizen workers, but does not rely on any studies or research on this subject.  He also admits that, to the extent scholarly literature exists on the effect of immigration (more broadly speaking) on wages of U.S. citizens, there is no consensus on

---

[1] "*Daubert* outlined several reliability factors for scientific testimony: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it is generally accepted or has gained only minimal support within the relevant community." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)). "When the testimony is not scientific, these factors may apply even though the focus is on experience and personal knowledge." *Id.* (citing *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999)). Ultimately, the court must ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

the magnitude of this effect at best and studies contradict his conclusion at worst.  Similarly, Dr. Potter speculates about what DACA recipients would do if they lost their work authorization under DACA, without relying on any research or information that supports this speculation.

The reports are also irrelevant and unreliable because they neither prove harm to Plaintiffs as a result of DACA nor assist the Court in determining whether Plaintiffs have standing.  Dr. Deere and Dr. Potter can neither quantify the harm to Plaintiffs nor prove that any such harm, to the extent it exists, is caused by DACA.  For example, Dr. Deere does not know how many job applicants who are U.S. citizens lose out on job opportunities to applicants who have DACA, or how many U.S. citizens will be hired to fill jobs that DACA recipients currently hold if DACA ended.  Similarly, Dr. Potter testified that he could not specify the number of DACA recipients who would leave if they lost DACA, describing them as "some" and between one and all of them.

Finally, Dr. Deere and Dr. Potter are not qualified to offer the expert opinions they purport to offer.  Dr. Deere has no knowledge of or prior experience with the penalty under the ACA employer mandate and its impact on employment and hiring decisions.  He also has no knowledge of or experience with the impact of DACA on the wages of U.S. citizen workers.  Similarly, Dr. Potter is not qualified to testify on the emigration patterns of DACA recipients because he does not have a research specialization in immigrant populations or emigration patterns of undocumented immigrants, let alone the reasons why DACA recipients might choose to return to their country of origin.

## V.     ARGUMENT

### A.  <u>**Donald Deere**</u>

In his report, Dr. Deere purports to offer two expert opinions:  (1) the interaction between the ACA and DACA results in lower wages and less hiring of U.S. citizens, and (2) immigration

puts downward pressure on wages, which makes it more difficult for some U.S. citizens to find employment. *See* Dkt. 358-21 ¶¶ 13, 23-26.

As a threshold matter, Dr. Deere is not qualified to offer these expert opinions because he lacks any relevant experience in the field in which he purports to have knowledge.  Dr. Deere works for a consulting company that provides testimony in three types of employment cases: wage and hour; employment discrimination on the basis of protected status such as age or race; and disability and wrongful termination.  Ex. 1 (Deere Depo.) Tr. 7:5-14, 10:24-11:19.  Dr. Deere admitted that he:

- Has never conducted research or written any articles regarding the effects of immigration on the labor market;

- Has not conducted research or written any articles regarding the effects of immigration on wages;

-  Has never published an article regarding the interaction between immigration and public benefits;

- Had never researched the interaction between immigration and public benefits prior to his report in this case; and

- Reviewed only "a couple of pieces" of literature about the impact of immigration on the labor market before writing his supplemental report.

*Id*. Tr. 8:9-9:18, 14:10-15:14. Thus, as established by his own testimony, Dr. Deere lacks the necessary training and experience to be able to offer an opinion about the effect of DACA recipients on the labor market in Texas.  *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject"); *see also Michael Kors, L.L.C.*,

2016 WL 6306129, at *17 (finding expert was unqualified, where expert had general experience in counterfeit investigations but "provide[d] no support for the contention that he ha[d] any specific knowledge of or [was] qualified to identify counterfeits of [the particular product at issue].").

With respect to his expert report, Dr. Deere's first conclusion is too speculative to pass muster under the Federal Rules of Evidence. Dr. Deere speculates that the interaction between DACA and the employer mandate provisions of the ACA "makes some U.S. citizens more expensive to hire than equally productive immigrants who are not lawfully present" and "gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled [U.S.] citizen in certain instances," and therefore "there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired." Dkt. 358-21 ¶¶ 24-26. To arrive at this conclusion, Dr. Deere did not conduct any type of scientific or statistical analysis or rely on any studies related to the ACA and its effect on employment hiring practices. Quite the opposite, he relies solely on untested hypotheses and a number of unsupported assumptions about job applicants and the hiring practices of employers. *See id*. ¶¶ 14-22 (providing hypothetical scenarios involving two prospective employees, a U.S. citizen and a DACA recipient, and speculating that under a series of conditions, an employer "would be expected" to hire the DACA recipient). Dr. Deere made these assumptions without talking to any hiring managers or human resource representatives. *See* Ex. 1 (Deere Depo.) Tr. 72:13-72:16.

First, Dr. Deere has zero information on how many businesses fit into his hypothetical scenario. Dr. Deere did not determine how many businesses in Texas have less than 50 employees and thus would be excluded from the ACA penalty he discusses. *Id*. Tr. 72:17-19; *see also id*. Tr. 27:11-18. Dr. Deere did not determine how many of Texas's larger businesses offer adequate

health coverage and thus are also excluded from the ACA penalty he discusses. *Id*. Tr. 69:25-70:4. He merely speculated, without conducting any research or analysis, that businesses exist in Texas that would fit his hypothetical scenario.

Second, Dr. Deere assumed that employers in his theoretical scenario would be in the position of choosing between two equally qualified applicants (one of whom is a DACA recipient) but did not determine how often, if ever, private companies find themselves in that position. *Id*. Tr. 29:9-23. Dr. Deere layered this second speculation on top of the first, again without any concrete information.

Third, with respect to his opinion that businesses favor DACA applicants in hiring because DACA applicants do not raise the threat of the employer mandate penalty under the ACA, Dr. Deere did not do any analysis of businesses' knowledge of how the penalty applies. *Id*. Tr. 28:18-21. He also did not consult any studies or surveys that discuss businesses' knowledge or possession of information regarding the penalty. *Id*. Tr. 28:22-25. Dr. Deere did no analysis of employer awareness of eligibility of employees for premium subsidies. *Id*. Tr. 38:19-22. Dr. Deere simply assumed, without confirming through any investigation, that employer hiring managers have knowledge of, and base their hiring decisions on, this provision of the ACA.

Fourth, although he assumed that employers would consider DACA job applicants less expensive, Dr. Deere did no analysis of how many U.S. citizens or lawful residents (the comparison job applicants) are equally inexpensive in that they do not trigger the ACA penalty because they earn low wages, earn high wages, are eligible for Medicaid, are eligible for Medicare, or decline health care subsidies. *Id*. Tr. 36:1-38:3, 38:12-18. Thus, for example, Dr. Deere did not consider how many DACA applicants with college degrees apply for jobs for which the ACA penalty is an irrelevant consideration to the employer because both applicants, DACA and non-

DACA, would not trigger the ACA penalty.  *Id*. Tr. 50:15-51:8.  As a result, Dr. Deere could not say how many how many Texas residents are exempt from the coverage requirements of the ACA or how many U.S. citizens are more expensive to hire.  *Id*. Tr. 68:6-14, 73:9-13.  He merely layered this speculation (that employers would always and automatically consider DACA applicants less expensive than other employees) on top of all his previous speculations and assumptions.

Fifth, although his entire opinion is based on the idea that employers know a job applicant receives DACA *before* the employers make the hiring decision, Dr. Deere conceded that he was unaware of the point at which newly hired employees complete the I-9 document and show their work authorization to their employers, and he did not know whether employers even know of an applicant's work authorization through DACA before being hired.  *Id*. Tr. 33:25-34:10, 35:15-22; 38:23-39:9.  Dr. Deere simply assumed employers have this knowledge before hiring, and added this assumption to the growing pile of assumptions in his analysis.

Sixth, although he lacked any information showing that businesses base their hiring decisions on the possibility of an ACA penalty, Dr. Deere assumed for the purpose of his analysis that employers would favor DACA applicants as less expensive.  *Id*. Tr. 30:17-24.

Seventh, Dr. Deere did not consider any other variables affecting hiring decisions, such as cost of training, employee demographics, and applicants' earning potential.  *See id*. Tr. 33:14-24 (assumed same training costs); *id*. Tr. 49:17-19 (did not consider employee characteristics such as race, ethnicity, or gender); *id.* Tr. 43:21-44:7 (did not consider applicants' earning potential); *id*. Tr. 78:17-19 (does not know how many employers base hiring decisions entirely on costs associated with the ACA).  Again, he speculated that his hypothetical employers would never make any considerations of job applicants other than DACA.

Eighth, Dr. Deere held all other factors in the economy constant, even though he conceded that overall market demand conditions change.  *Id*. Tr. 73:25-75:15 (conceding that you cannot attribute observed employment differences to DACA because "there's other things going on, changing" including "[t]he general level of demand from, you know, other countries for U.S. exports; the -- the general level of consumer spending in the U.S.; the birth rate; the other population sources in the U.S., the other sources of immigration.").

In this way, Dr. Deere created a mountain of unsupported assumptions, and concluded from these assumptions that employers, applicants, the ACA, and DACA interact to cause U.S. citizens to suffer from a loss of employment opportunities as a result of DACA.  His conclusion is entirely baseless.  In fact, Dr. Deere can neither quantify *nor even provide a single example* of a Texas business that fits into his scenario in which a company chooses to hire a DACA recipient over an equally qualified U.S. citizen.  *Id*. Tr. 78:17-23.

In sum, Dr. Deere's opinion relies on no information at all suggesting that employers hire DACA recipients to avoid financial penalties under the ACA.  Therefore, his testimony is not reliable expert opinion, and Plaintiffs cannot demonstrate that this hypothetical harm about which Dr. Deere speculates has ever happened in the past or will happen in the future.  *See CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 278–79 (5th Cir. 2009) (finding expert's computation of damages not reliable where "it requires numerous speculative leaps to conclude that the parties would have negotiated an ongoing licensing agreement . . . A hypothetical licensing agreement based on speculation and conjecture cannot be said to reliably measure [plaintiff's] actual loss."); *Hathaway v. Bazany*, 507 F.3d 312, 318–19 (5th Cir. 2007) (where expert testified that, assuming police officer was holding his gun a particular way, the car was facing a particular direction, and driver was sitting with a particular posture, the bullet would have had to enter through the

9

windshield of the car, finding that witness's opinion was based on speculative premises and he failed to offer any specific factual support for the reliability of his assumptions); *Munoz*, 200 F.3d at 301 (affirming district court's order excluding plaintiff's expert where expert failed to consider variables such as education and experience as explanations for any observed discrepancy between promotion rates); *Kossman*, 2016 WL 11473826, at *12 (finding expert report not relevant or reliable where expert offered untested hypotheses and expert opinion testimony "not founded in cited professional social science or econometric standards, and his suggestions [were] not backed by his personal prior application or by cites to professional application by experts in the social sciences"); *Hixson v. Houston Indep. Sch. Dist.*, No. 4:09-CV-3949, 2011 WL 3648104, at *11 (S.D. Tex. Aug. 17, 2011) (excluding plaintiff's expert opinion on hiring practices due to the insufficient facts and data upon which opinion was based, including lack of relevant labor market variables, and granting summary judgment in favor of defendant); *Gilmore v. WWL-TV, Inc.*, No. CIV.A. 01-3606, 2002 WL 31819135, at *6 (E.D. La. Dec. 12, 2002) (excluding economic expert opinion as rank speculation where expert relied on possibility that plaintiff might someday dance pointe ballet with a company in New York, and noting that "[a]lthough the case law makes it clear that absolute certainty is impossible, considerations of reliability and relevance require that any economic analysis be ensconced with some resemblance to reality. The slender reed on which the economist's projection rests warrants no credence from the gatekeeper."); *see also* Dkt. 225-3 at 142 (Def-Interv. Ex. 74, Perryman Decl.) ¶¶ 55-61; Dkt. 225-3 at 102 (Def-Interv. Ex. 72, Ku Decl.) ¶¶ 10-30.

Dr. Deere's testimony is also unreliable and irrelevant because he cannot quantify with any degree of certainty the harm that he hypothesizes is caused by DACA to Plaintiffs.  Dr. Deere does not know how many U.S. citizens would trigger the employer mandate penalty, how many job

applicants who are U.S. citizens lose out on job opportunities to applicants who have DACA, or how many U.S. citizens will be hired to fill jobs that DACA recipients currently hold if DACA ended.  *See* Ex. 1 (Deere Depo.) Tr. 38:12-18, 51:1-8, 66:10-17, 72:20-23, 85:1-10.  Dr. Deere does not attempt to offer an estimate of the number of U.S. citizen workers who would be displaced by DACA recipients, describing the number only as "more than zero."  *Id.* Tr. 42:9-43:2, 66:10-17, 76:11-17.  As such, this testimony is irrelevant and does not assist the Court in determining whether Plaintiffs can prove their standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (holding that to prove standing, plaintiff must show injury is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'") (citations omitted); *Johnson*, 685 F.3d at 459 ("The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue."); *see also Pipitone*, 288 F.3d at 245 (affirming district court's decision to exclude expert testimony as irrelevant where expert was unable to conclude that it was more likely than not that drug at issue caused the plaintiff's infection, noting that "[a] perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *John Stapp, Inc.*, 448 F. Supp. 2d at 826 (holding that the reliability prong does not require absolute scientific certainty but "[r]eliability and validity . . . must be demonstrated by evidence that the knowledge is more than speculation" and finding expert's damages estimate insufficient to raise a genuine material issue of fact).

Dr. Deere also offers a second opinion:  DACA harms U.S. citizens because "the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment."  Dkt. 358-21 ¶ 13.  In support of this conclusion, Dr. Deere explains that

> Economic theory implies that the demand curve for a labor input slopes downward.  In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor input will fall, other things equal.

*Id.* ¶ 23.

This testimony is equally unreliable because, notwithstanding his sweeping claim that "immigration reduces the wages of native workers with the same skills," Dr. Deere admits—on the face of his own report—that "there is no consensus in the economic literature on the magnitude of this effect."  *Id*.  Similarly, the scholarly research upon which Dr. Deere relies explains that the "measured impact of immigration on the wage of native workers fluctuates widely from study to study (and sometimes even within the same study), *but seems to cluster around zero*."  Dkt. 225-5 at 57 (emphasis added); *see* Dkt. 358-21 ¶ 23 n. 15.  Dr. Deere made no calculations regarding the degree to which wages would be reduced because of immigration and has not studied immigration's effect on the economy.  Ex. 1 (Deere Depo.) Tr. 8:9-25, 64:11-20.

In addition, this testimony is irrelevant because Dr. Deere did not conduct an analysis or rely on any studies focused on the DACA population, and merely speculates about the effect of DACA on wages of U.S. citizens.  *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010) (where experts relied on a study of a class of drugs known as "dopamine agonists" in support of their conclusion that a specific drug within the class, Requip, could have potentially caused the appellant's compulsive gambling problem, affirming district court's decision to exclude experts, in part, because they failed to bridge the analytical gap between the generalized nature of the class-wide dopamine agonist study and the specific characteristics of Requip).  Therefore, Dr. Deere's testimony offers no proper application to the facts of this case.

**B.  Lloyd Potter**

In his report, Dr. Potter opines that, "[w]ith the loss of permission to work in the U.S., some DACA participants could be expected to migrate out of the U.S. back to their country of origin or to another country where they would be able to work."  Dkt. 358-31 ¶, 11.

However, Dr. Potter admits he does not have a research specialization in immigrant populations or the factors that lead to legal and unauthorized migration.  *See* Ex. 2 (Potter Depo.) Tr. 33:1-12; *see also id.* Tr. 48:14-25 (admitting he offers his expert opinions based on his knowledge and prior experience, which do not include specific study of the reasons why an unauthorized immigrant might choose to return to their country of origin).  Dr. Potter further testified that:

- He is an expert on youth violence prevention;

- His current research involves producing population estimates for Texas;

- His research center does not provide estimates of the undocumented population of Texas;

- His research center does not analyze return migration from Texas to other countries;

- Neither he nor his research center has ever researched the reasons that undocumented immigrants come to or leave the United States;

- Neither he nor his research center has ever researched the reasons why individuals might leave Texas and return to their country of origin; and

- He does not have any understanding of the legal relationship between DACA and federal work authorization.

13

*Id.* Tr. 20:2-7, 20:14-21:8, 22:22-23:3, 29:19-30:4, 31:20-25, 34:9-14, 38:15-21.  He is therefore unqualified to offer an opinion on DACA recipients' likelihood of return to their country of origin. *See Wilson*, 163 F.3d at 937; *see also Michael Kors, L.L.C.*, 2016 WL 6306129, at *17.

Dr. Potter summarized his conclusion regarding DACA as follows:   "[I]f DACA participants were unable to work, some number and/or percentage of them would likely leave the United States and return to their country of origin or another country where they may be able to work."  *See* Ex. 2 (Potter Depo.) Tr. 34:18-35:10.  However, Dr. Potter made flawed assumptions that doomed his analysis and render his conclusions untrue.  Critically, Dr. Potter assumed that loss of DACA would mean that DACA recipients could not work.  *Id.* Tr. 37:9-15.  This assumption lies at the heart of his conclusion that DACA recipients would leave Texas upon losing DACA. Dr. Potter conceded that he assumed that loss of work authorization meant that a DACA recipient could not work in any capacity, either as an employee or an independent consultant, or someone who mows lawns for money.  *Id.* Tr. 39:7-40:11.  However, this assumption is untrue.  *See, e.g.,* 8 U.S.C. § 1324a(a)(1); 8 C.F.R. § 274a.1(f), (h), (j); *see also Whitney Nat'l. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 817 (S.D. Tex. 2007) ("Incorrect assumptions critical to an expert's opinion make that opinion unreliable.") (citation omitted).  Dr. Potter further conceded that if DACA recipients who lost work authorization could still work as independent contractors, consultants, and business owners, this ability to work would reduce the number of DACA recipients who might return to their country of origin or move to another country upon losing federal work authorization.  Ex. 2 (Potter Depo.) Tr. 40:12-41:9.  In fact, Dr. Potter conceded that he had not thought through at all the implications of DACA recipients losing their

work authorization, admitting:   "Well, I hadn't really kind of thought that whole thing through."  *Id*. Tr. 42:15-44:6.[2]

Furthermore, Dr. Potter admitted that "the causes of return migration are difficult to address because there is limited research and understanding of return migration."  *Id.* Tr. 63:13-19; *see also id.* 63:22-24 ("There just isn't that much research looking at migrants who have returned to their country of origin and their reasons for why they returned").   More specifically, he could not identify (and did not study or rely on) any research on the possibility of return migration of DACA recipients.  *Id.* Tr. 64:11-3; 81:8-19.   Dr. Potter did not:  (1) conduct a study of his own into the question of DACA recipients' likelihood of return to their country of origin, *see id.* at Tr. 31:20-25, 67:11-16, 80:24-81:5; (2) look at studies by others on characteristics within the DACA population associated with a higher probability of return, *id.* Tr. 81:8-19, 106:21-107:4; (3) review scholarly articles that directly addressed DACA, *id.* Tr. 98:24-99:7; (4) rely on any survey research of DACA recipients, *id*. Tr. 91:4-9; or (5) speak to any individual DACA recipients, *id*. Tr. 90:17-20.

Dr. Potter admitted that he based his opinion on eight articles, and that his knowledge of demography, past work, and experience did not include study of the reasons why an unauthorized immigrant might choose to return to his or her country of origin.  *Id.* Tr. 47:15-48:7, 48:14-49:9. However, these eight articles cannot form the basis of the opinion Dr. Potter offers in his report. The articles did not study undocumented immigrants, did not study Texas, did not study states with different work authorization verification schemes, and did not analyze populations similar to DACA recipients.  *Id.* 50:15-51:9, 54:12-56:17, 57:13-59:7, 60:7-61:7, 62:18-63:12, 106:21-107:7, 108:10-12, 109:13-17; *see also id.* Tr. 35:17-36:1 (admitting expert opinion does not distinguish DACA recipients from other unauthorized workers who might lose their employment); *id*. Tr.

---

[2] Dr. Potter further admitted that he did not understand that Texas, for whom he prepared his report, sought an end to DACA in this litigation.  *Id*. Tr. 45:20-46:3.

45:10-15 (admitting report does not posit that DACA recipients who lose work authorization are any more or less likely to return to their home country than an undocumented person).

Because he had no information on the likelihood of DACA recipients to return to their country of origin upon losing DACA, and relied only on unfounded assumptions, Dr. Potter was unable to provide any estimate at all of the number of DACA recipients in his prediction, describing them as "some" and more than one but up to all of them. *Id.* Tr. 66:10-67:16, 91:16-92:3, 92:21-93:5, 68:20-69:16.

Because Dr. Potter's opinion is not based on data, research, or studies on the DACA population, his testimony on DACA recipients' likelihood of migration to another country is nothing more than unsubstantiated and subjective belief. *See Wells*, 601 F.3d at 380; *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable") (citation omitted).

## VI.      CONCLUSION

Defendant-Intervenors respectfully request that the Court strike the expert reports of Dr. Donald Deere (*see* Dkt. 7 at 88, 219-21 at 2, 358-13, 358-21) and Dr. Lloyd Potter (*see* Dkt. 7 at 3, 358-31) from the record because their testimony is irrelevant and unreliable.   Defendant-Intervenors further request that the Court find that Dr. Potter and Dr. Deere are unqualified to testify on the subjects on which they purport to offer an expert opinion.   Defendant-Intervenors request that the Court do not consider their testimony.

Dated:  June 5, 2019                              Respectfully Submitted

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge

16

Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
Ernest I. Herrera (Tex. Bar No. 24094718);
(SD of Tex. Bar No. 2462211)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for DACA Defendant-Intervenors

17

**CERTIFICATE OF CONFERENCE**

I, the undersigned, hereby certify that, on June 4, 2019, I e-mailed Todd Disher, counsel for Plaintiffs, to request Plaintiffs' position on the motion.  Mr. Disher responded that Plaintiffs oppose the motion.  On June 4, 2019, I also e-mailed Jeffrey Robins, counsel for Federal Defendants, about the motion.  Mr. Robins responded:  "Federal Defendants take no position at this time."  Also on June 4, 2019, I e-mailed Glenn Moramarco, counsel for the State of New Jersey, who advised the State of New Jersey does not oppose the motion.

*/s/Alejandra Ávila*
Alejandra Ávila

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on June 5, 2019, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/Alejandra Ávila*
Alejandra Ávila

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,          )
        Plaintiffs,              )
                                 )
VS.                              )
                                 )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
        Defendants,              )
                                 )
and                              )
                                 )
KARLA PEREZ, et al.,             )
                                 )
        Defendant-Intervenors.   )

*********************************************

ORAL DEPOSITION OF

DONALD R. DEERE, Ph.D.

JUNE 28, 2018

*********************************************

    ORAL DEPOSITION OF DONALD R. DEERE, Ph.D., produced
as a witness at the instance of the
Defendant-Intervenors, and duly sworn, was taken in the
above-styled and numbered cause on the 28th of June,
2018, from 10:15 a.m. to 12:45 p.m., before Kathleen
Casey Collins, CSR, in and for the State of Texas,
reported by machine shorthand, at the Office of the
Attorney General, 301 West Fifteenth Street, Seventh
Floor, Austin, Travis County, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

Electronically signed by Kathleen Collins (401-120-388-4874)

b7b3c090-8ab5-4a9e-9752-64bcd2cf2ef6

1   economics in most of your classes?

2       A.   Analysis of the labor market.  So labor

3   supply, labor demand, and labor market equilibrium.  I'd

4   say that pretty much covers it.

5       Q.   Okay.  Currently, what are -- what is your

6   occupation or what are you doing now?

7       A.   Well, I'm still an economist.  I work for

8   Welch Consulting.  I started there, actually, as an

9   employee in 2005.  I had worked for Welch Consulting as

10  a consultant for some years prior to that, and I retired

11  from the university and moved to Welch Consulting full

12  time at that time.  And what we do is economic and

13  statistical work, primary litigation support most often

14  in the labor employment sphere.

15      Q.   When you say "litigation support," what is --

16  what does that involve for you?

17      A.   Well, it involves both testifying and

18  consulting expert engagements.  So a testifying expert

19  like this where, you know, we write a report or

20  declaration, sometimes be deposed, rarely testify in

21  court.

22              Consulting engagements are where we're

23  engaged by law firms and/or companies directly to

24  analyze various aspects of their employment data and

25  provide them the information that they would -- that the

1   lawyers would then use to provide legal advice to their

2   clients.

3        Q.   What -- what did your focus -- what did your

4   research focus on when you were at Texas A&M?

5        A.   Primary labor economics.  You can see the list

6   of publications on the -- on the vita that are pretty

7   much -- not all of them, but most of them have something

8   to the with aspects of -- of the labor market.

9        Q.   Have you ever conducted research regarding the

10  effects of immigration on the labor market?

11       A.   No, I have not done that.

12       Q.   Have you ever written any articles regarding

13  the effects of immigration on the labor market?

14       A.   No.

15       Q.   Have you ever conducted research regarding the

16  effects of immigration on wages?

17       A.   No.

18       Q.   Have you ever written any article, even if it

19  was an op-ed or anything like that, regarding the

20  effects of immigration on wages?

21       A.   I don't think so, no.

22       Q.   Have you ever conducted research regarding the

23  interaction between immigration and public benefits?

24       A.   Well, other than what I've done in my

25  declaration with regard to the ACA, I would say no.

1        Q.    Have ever -- have you ever written any

2   articles regarding the interaction between immigration

3   and public benefits, so as opposed to research?

4        A.    I'm sorry.  Would you --

5        Q.    Sure.

6        A.    -- repeat.

7        Q.    No problem.

8        A.    I'm trying to distinguish that question from

9   the prior question.

10       Q.    The prior question, unless I misspoke, it

11   was -- I was asking about research.

12              But have you ever written anything

13   published, even if it was in a newspaper or a magazine,

14   regarding the interaction between immigration and public

15   benefits?

16       A.    And I would say the only thing I've written

17   about that would be the declaration that brings us here

18   today.

19       Q.    Well, we have that out today as exhibit --

20   Exhibit 1; and if we can go to the first page of this

21   exhibit, it says here in the body of this text,

22   "Plaintiff States disclose the following experts in

23   accordance with the Court's scheduling order," and your

24   name is listed here.

25              Do you understand that the parties

```
 1    called -- going by the name Plaintiff States are calling

 2    you as an expert witness?

 3         A.   Yes.

 4         Q.   Let's go to Page 4, again, the beginning of

 5    your supplemental declaration.

 6                   A quick question about Welch Consulting

 7    itself more broadly.  Is that -- where is that based?

 8         A.   It's based in Bryan, Texas.

 9         Q.   So is that -- is that where you -- I imagine

10    you lived in the area already from working at A&M?

11         A.   I live in College Station, which is right next

12    to Bryan, yes.

13         Q.   Okay.  So you didn't have to go too far.

14                   Okay.  What kind of research has Welch

15    Consulting done around the issue of immigration?

16         A.   I don't know that it has.  I mean, you know,

17    again, Welch Consulting is a -- we're engaged by clients

18    in primarily litigation-support-type roles.  And so

19    maybe there's been something involving immigration that

20    someone in the firm -- because we have offices in

21    California, Los Angeles, and D.C. as well, that someone

22    else has worked on, but I can't immediately call that to

23    mind.

24         Q.   Are there any -- what are the major areas of

25    the Texas Welch Consulting in terms of their -- their
```

1  advice and research?

2       A.    It's -- it's typically labor employment.   I

3  mean, we really have two areas -- well, three areas

4  about which we are engaged most often.

5                One is wage and hour type of litigation.

6  So it's allegations about violations of the FLSA or

7  State wage and hour laws and the implications of that.

8  We typically analyze data to assist in those cases.

9                The second type of cases are

10  discrimination cases like Title VII and/or EEOC or LLFC

11  agency actions, or sometimes they're State actions as

12  well, that are involving claims of discrimination based

13  on protected characteristics in employment of either

14  pay, promotion, hiring, or termination.

15                And then a third area would be damages in

16  wrongful termination or personal injury cases where

17  we're making economic damage calculations, typically for

18  individuals who are claiming either they were hurt or

19  they were fired inappropriately.

20       Q.    Well, I don't believe I've brought it with me,

21  but I wanted to ask you about your recent testimony

22  history.  You said that -- that Welch does some

23  discrimination cases.

24                Let's go to the back -- the very last

25  page of Exhibit 1.  Do any of these cases deal with --

```
 1        A.    Yes.

 2        Q.    When did you prepare your first declaration?

 3        A.    Well, it -- I would say April 27th, 2018, and

 4   obviously some days before that.  I didn't write it all

 5   in one day.

 6        Q.    Sure.  When did you prepare your supplemental

 7   declaration?

 8        A.    June 14th, 2018, and some of the days leading

 9   up to that.

10        Q.    Why did you prepare your supplemental

11   declaration?

12              MR. DISHER:  And I'll just instruct the

13   witness you can answer to the extent you can without

14   disclosing conversations you may have had with counsel

15   for this case.  Go ahead and answer.

16        A.    Well, I -- I thought a little more about the

17   issue of immigration and its impact on the labor market

18   and DACA recipients specifically and impact on the

19   market, because the initial declaration was focused

20   primarily, if not solely, on the interaction of DACA and

21   the ACA; and really the -- there are broader aspects to

22   the implications for the labor market of the DACA

23   recipients and their labor supply or their work status,

24   and that -- so I wanted to expand the declaration and

25   cover what is really sort of the broader aspects of the
```

1    impact of that impact.

2         Q.    Did you do any additional quantitative

3    analysis or research --

4         A.    Yes.

5         Q.    -- for that question?

6         A.    Yes.

7         Q.    Okay.   And what -- what was that?

8         A.    Well, as I note in the -- my supplemental

9    declaration, there's a -- there's a -- there is a pretty

10   big literature in economics about the impacts of

11   immigration generally on the labor market; and I

12   reviewed certainly not all but some of that literature,

13   a couple of pieces of which I cited in my supplemental

14   declaration.

15        Q.    In the supplemental declaration, which is

16   Exhibit 1, could we go to Page 7, and if you look at

17   Paragraph 23, the sentence that starts with "Economic

18   theory implies," if you can review this paragraph, and

19   take your time answering and reviewing.

20              Is this the paragraph that you inserted

21   with regard to looking at the issue of immigration and

22   its effect on the labor market?

23        A.    Well, this is a paragraph that I inserted in

24   the supplemental declaration, and it does refer to the

25   issue of the impact of immigration on the labor market.

```
 1        Q.    Sure thing.

 2              Can we look at 221, which is in the

 3  middle of Page 8.  There's a paragraph there that starts

 4  with the word "thus" in the middle.  Do you see that?

 5        A.    Yes.

 6        Q.    And it says, "Thus, many small businesses are

 7  exempt from the employer penalty because they do not

 8  reach the minimum employee threshold."

 9              Do you agree with that?

10        A.    Yes.  The law is the law.

11        Q.    Okay.  Therefore, the scenario in your

12  declaration would not apply to small businesses with

13  fewer than 50 employees.  Right?

14        A.    That is correct.  I think -- I think

15  technically the 50 is sort of an average.  You know, if

16  you were 49 in months and 51 in other months, there's --

17  there are rules for how to decide.  But, yeah,

18  basically, small employers it wouldn't apply.

19        Q.    Okay.  So based on -- what you were talking

20  about is there could be instances where a company has

21  seasonal workers and regardless of the number of those

22  workers, if they don't meet a certain number of hours,

23  then they might not qualify for the -- for the mandate

24  either or the penalty?

25        A.    I don't know what the rules are in that case.
```

1  But, again, there are clearly smaller employers, however

2  defined, to which this does not apply.  I agree with

3  that.  To which the ACA penalty interaction part of my

4  declaration does not apply.

5      Q.   Okay.  Well, let's look back at your

6  declaration and look at -- so this is going back to

7  Exhibit 1, and look at Paragraph 7.  You say that

8  individuals with an EAD are not eligible for premium

9  subsidies.  Right?

10     A.   Yes.

11     Q.   Isn't it true that you assume that firms have

12 perfect knowledge or complete information regarding the

13 laws and regulations associated with the Affordable Care

14 Act penalty?

15          MR. DISHER:  Objection, vague.

16     A.   I wouldn't say complete and perfect

17 information, no.

18     Q.   Did you do any analysis of when businesses

19 have knowledge of how the employer mandate or employer

20 penalty will apply?

21     A.   No.

22     Q.   Did you consult any studies or surveys that

23 would discuss a firm's knowledge or possession of

24 information regarding the ACA employer penalty?

25     A.   No.

```
 1      Q.   For your scenario in the declaration, you also

 2  assume that employers are not considering other factors

 3  such as training costs of U.S. citizen workers or other,

 4  as you say, lawfully present workers versus DACA

 5  recipients.  Right?

 6              MR. DISHER:  I'm sorry.  Could you repeat

 7  that question?

 8              MR. HERRERA:  Sure.

 9      Q.   For -- looking at the scenario you have in

10  your declaration, the -- of Worker A versus Worker B,

11  you assume that employers are not considering other

12  factors such as training costs of -- of lawfully present

13  workers versus DACA recipient workers.  Right?

14              MR. DISHER:  Objection, vague.

15  Objection --

16      A.   I wouldn't --

17              MR. DISHER:  -- mischaracterizes his

18  testimony.

19              Go ahead.

20      A.   I wouldn't agree with that.  I'm assuming that

21  the employer is viewing the two workers as close

22  substitutes, that they might both need training or they

23  would both need training.  I mean, they're --

24      Q.   Okay.  So if -- going back to the knowledge

25  question, if you did no analysis or examined no other
```

1    research regarding a firm's knowledge of information

2    regarding the employer penalty, then how do you know how

3    that factor -- how that factors into your scenario?

4              MR. DISHER:  Objection, mischaracterizes

5    testimony.

6         A.   Well, I mean, certainly employers are aware of

7    the ACA.  You're talking about the largest employers

8    here that are presumably the most sophisticated and have

9    the most resources and have the most at stake if they

10   screw up with regard to employment law.  So there's an

11   incentive for employers to understand the law.

12              So I -- you know, I don't know that --

13   I'm certainly not assuming they have perfect knowledge.

14   I think it's sort of silly to assume they're completely

15   unaware of any aspects of the ACA whatsoever.  So maybe

16   it's somewhere in the middle.

17        Q.   Okay.  And when you say -- would it be fair to

18   say that you assumed for the purposes of your report

19   that employers are aware of the fact that employees with

20   EAD are not eligible for premium subsidies?

21              MR. DISHER:  Objection, vague.

22        A.   Well, they're at least differentially

23   eligible, less likely to get.  Yeah, that would be a --

24   a part of it.

25        Q.   Okay.  Would it be fair to say that you

```
 1   criteria, meaning that they're less likely to get the --
 2   the premium subsidy?
 3       A.   I don't know that it matters why they view
 4   them as -- as less expensive.  It matters that they view
 5   them as less expensive because of the ACA, whether it's
 6   they would get a -- they would be less likely to claim
 7   the credit or they would be less likely to be eligible
 8   for the credit or whatever.  It really doesn't matter.
 9   What matters is that the employer -- you've got two
10   choices, "A" and "B," and they're otherwise the same
11   except "A" costs more because of the ACA.  I'm going
12   to choose "B."  That's what is assumed in that
13   scenario.
14       Q.   Okay.  So you're saying that -- that they --
15   that otherwise they would be the same.  So you're
16   controlling in this scenario for other cost factors such
17   as training.  Right?
18               MR. DISHER:  Objection, vague.
19       A.   Well, as I said, it's sort of all other things
20   equal is the -- is the theoretical point that the
21   example is talking about, yes.
22       Q.   Okay.  And all other things being equal would
23   include something like training costs?
24       A.   Yes.
25       Q.   Okay.  Would it be fair -- would it be correct
```

1    to say that you assume that employers are aware that a

2    job applicant has an EAD authorizing employment before

3    making the hiring decision?

4              MR. DISHER:  Objection, asked and

5    answered.  Objection, vague.

6        A.   Well, I don't know immigration employment law.

7    But I know that you've got to have I-9 information, and

8    I would think that the EAD would be shown at the I-9

9    stage.  Now, whether that's post offer or not, I'm not

10   completely sure.

11       Q.   Okay.

12       A.   But, again, the assumption here -- as I said,

13   the key assumption is that the employer views the DACA

14   recipient as cheaper, other things equal.  And if other

15   things aren't equal, maybe training is a little bit more

16   expensive for the DACA recipient, but maybe the subsidy

17   more than offsets that so...

18              But the discussion in the supplement --

19   supplemental declaration is other things equal, the

20   employer views the DACA recipient, who he knows the DACA

21   recipient is more expensive because of the ACA relative

22   to the lawfully present individual, who they apparently

23   know is lawfully present, and that's the comparison.

24       Q.   Sure.  And I get the -- I get the point of

25   the -- of the comparison and what -- what your analysis

1   has concluded.  But I'm just trying to get at what the

2   decision-making is here for an employer for -- so in

3   your example, the employer, when making the decision,

4   this is the -- you talked about immigration law and I-9.

5   You're assuming here that the employer already knows

6   that the applicant has an EAD?

7       A.   As I just said, the employer has two options.

8   One is a DACA recipient.  They know that.  One is

9   lawfully present.  They know that.  And they view the

10  DACA recipient as cheaper because of the ACA regulations

11  and law, period.  That's the -- the key assumption for

12  the hypothetical in the supplemental declaration.

13               MR. HERRERA:  Okay.  Objection,

14  nonresponsive.

15      Q.   So just -- just answering that specific

16  question, you're -- you're assuming that the employer

17  knows that that person has an EAD before making the

18  hiring decision?

19               MR. DISHER:  Objection, asked and

20  answered.

21      A.   I said they knew they were a DACA recipient

22  so -- and -- and have an EAD.

23      Q.   Okay.  What other assumptions did you make for

24  the purpose of this scenario?

25      A.   None.

1      Q.   Okay.  Let's look at Page 9 of Exhibit 4 --

2   or, rather, Exhibit 3, and so that's the Page 9 that's

3   at the top right.

4            In the first full paragraph there that

5   begins with "Employee demographics," there is a numbered

6   list before which the article says, "Certain kinds of

7   employees will not trigger the penalty, including," and

8   then so there's that list.

9            So "Certain kinds of employees will not

10  trigger the penalty, including, No. 1, highly

11  compensated employees (i.e., those earning at least

12  400 percent of the applicable federal poverty level),

13  who are not eligible for subsidies in any event."

14            Do you agree with that?

15            MR. DISHER:  Objection to the extent it

16  calls for a legal conclusion.

17      A.   I mean, my understanding is that individuals

18  between 104 percent -- 100 percent and 400 percent of

19  the poverty level are the ones that are eligible.  Below

20  100 I think would be No. 3, Medicaid.  And above 400

21  would be No. 1, highly compensated.  So that is my

22  understanding, yes.

23      Q.   Okay.  And do you agree that employees covered

24  by a policy owned by a parent or a spouse will not

25  trigger the penalty?

```
 1                    MR. DISHER:   Same objection.
 2        A.    If that's part of the law, I agree.
 3        Q.    And do you agree that employees eligible for
 4   Medicaid coverage, which are not eligible for the
 5   subsidized policies, would not trigger the penalty?
 6                    MR. DISHER:   Same objection.
 7        A.    Same answer.   I said that already.   Yes.
 8        Q.    And slightly -- slightly different.   Would you
 9   agree that employees eligible for Medicare coverage
10   would not trigger the penalty?
11                    MR. DISHER:   Objection, calls for a legal
12   conclusion.
13        A.    And my answer is if that's what the law says,
14   I'll agree.
15        Q.    And would you agree that those who choose to
16   be uninsured do not trigger the -- the penalty?
17                    MR. DISHER:   Same objection.
18        A.    I agree with whatever the law says.
19        Q.    Did you attempt to make any calculation of
20   U.S. citizens or other lawful residents in the
21   United States who currently match at least one of the
22   criteria that we just went over from Page 9 of
23   Exhibit 3?
24        A.    No.
25        Q.    Conversely, you don't know how many U.S.
```

1  citizens in the U.S. would meet none of the criteria in
2  that list on Page 9.  Right?
3       A.   No.
4       Q.   Therefore, isn't it true that you don't know
5  how many U.S. citizens in the U.S. there are who would
6  trigger the penalty?
7       A.   I'm not sure what "would trigger the penalty"
8  means.  But I do know that, you know, there's -- in the
9  reference somewhere, 8.7 million are the number who
10  actually receive premium tax credits.  So it's at least
11  that many.
12       Q.   Okay.  Well, let's -- before we go -- before
13  we look at that figure, you -- it's true that you don't
14  know how many U.S. citizens or other lawful residents in
15  the United States there are who would trigger -- trigger
16  the penalty based on this list of criteria on Page 9?
17            MR. DISHER:  Objection, vague.
18       A.   I do not.
19       Q.   Did you conduct any analysis of employer
20  awareness of eligibility of employees for premium
21  subsidies?
22       A.   No.
23       Q.   And based on your answer earlier about the
24  I-9, is it correct to say you did not research whether
25  an individual presents I-9 documentation before or after

 1  hiring?

 2              MR. DISHER:  Objection, vague.

 3      A.   I -- I don't know how that works.  I'm not

 4  sure what the law is there so...

 5      Q.   Okay.  So you didn't --

 6      A.   I didn't -- I'm sorry.  What was your --

 7      Q.   Sure.

 8      A.   I did not do any research to answer that

 9  question either.

10      Q.   Okay.  Well, let's look at -- and you brought

11  up a figure a second ago.  Let's look back at your

12  declaration on Page 3.  So that's Exhibit 1, Page 3.

13              In the footnote of Page 3 of your

14  declaration, is that the 8.7 million number you were

15  referring to?

16      A.   In Footnote 4 on Page 3 of Exhibit 1, yes.

17      Q.   Okay.  And the footnote belongs to a

18  paragraph, Paragraph 8, which says that the resulting

19  estimates from a -- from the CBO study that you cite,

20  the resulting estimates are that 64,000,000 -- let's go

21  back and read the whole paragraph.

22              "The Congressional Budget Office and the

23  Joint Committee On Taxation in March 2012 estimated the

24  impact of the ACA on nonelderly workers and their

25  families who were projected to receive employment-based

```
 1  getting a subsidy or if it's some subset of the

 2  8.7 million.  But with that caveat, yes, 8.7 million is

 3  the number who were getting a subsidy in February of

 4  2017.

 5                    MR. DISHER:  Can we take a 10-minute

 6  break?

 7                    MR. HERRERA:  Sure.

 8                    (RECESS TAKEN)

 9       Q.   (BY MR. HERRERA) All right.  Let's look at

10  your declaration again, and keep in mind the whole

11  declaration, and I'm really asking for your -- your

12  opinions in this case, but I want to give you a certain

13  place on Page 8 of your declaration just to -- to kind

14  of guide your thinking.  This is where your conclusions

15  are.  This is Exhibit 1, the page numbered eight.

16                    And your conclusion in Paragraph 26 is

17  "This result will have adverse consequences for certain

18  U.S. citizens because some employers will find it

19  financially advantageous to hire an immigrant who is not

20  lawfully present and who is authorized to work in the

21  U.S. instead of an equally productive U.S. citizen."

22                    Isn't it true that you do not give an

23  estimate of how many U.S. citizen workers would be

24  displaced by DACA workers in the situation that you

25  describe in your declaration?
```

1    A.    I do not give an estimate of the number.   That

2 is correct.

3    Q.    Okay.  It is true that you do not consider the

4 income levels of DACA recipients.  Correct?

5                MR. DISHER:  Objection, vague.

6    A.    I -- there's nothing in my declaration that

7 makes reference to the income levels of DACA recipients.

8 That's true.

9    Q.    Do you plan to -- well, we'll come back.

10               You don't know how many DACA recipients

11 have received bachelor degrees.  Right?

12   A.    I do not.

13   Q.    You don't know how many DACA recipients have

14 received doctorate-level degrees.  Right?

15   A.    I do not.

16   Q.    You don't know how many DACA recipients have

17 received law degrees.  Right?

18   A.    I do not.

19   Q.    And got forbid, we -- we don't need anymore

20 lawyers.

21               But did you examine any factors relating

22 to the earning potential of DACA recipients for your

23 analysis?

24               MR. DISHER:  Objection, vague.

25   A.    Other than the illustrative calculations about

1   what happens at various pay levels for the two examples

2   I illustrate.   Now, I make no reference to earnings

3   levels.

4        Q.   And that would be -- and, also, that would

5   include no analysis of what a DACA recipient who earns

6   an advanced degree might make in the future.   Correct?

7        A.   I did not look at that, no.

8        Q.   Okay.  Now, keeping in mind your scenario

9   again of Worker A versus Worker B or a U.S. citizen or

10  lawfully present worker versus a DACA recipient, as you

11  describe it, if a DACA recipient earns a certain income

12  level, then wouldn't the U.S. citizen counterpart

13  applicant in your scenario also be making that income

14  level?

15                  MR. DISHER:   Objection, vague.

16       Q.   Or -- and I'll phrase it differently.

17                  Going to your scenario again, if a DACA

18  recipient is being considered for earning a certain

19  income level in that -- in that job application, then

20  wouldn't the U.S. citizen counterpart job applicant in

21  your scenario also be offered that same income level?

22                  MR. DISHER:   Same objection.

23       A.   Well, let me -- let me answer it this way:   I

24  think what you're saying if -- in my scenario here, I've

25  got a DACA recipient and a lawfully present individual

1   Those factors relevant to the position for which they've

2   applied, period.

3        Q.   Do employers always stick to factors which are

4   relevant to the job?

5             MR. DISHER:  Objection, calls for

6   speculation.  Objection, outside the scope of his

7   testimony.

8        A.   I don't know.

9        Q.   You did no analysis of how ethnic or racial

10  discrimination could factor into an employer's

11  decision-making when considering a U.S. citizen versus a

12  DACA recipient.  Right?

13            MR. DISHER:  Objection -- go ahead and

14  answer the question.

15            Objection, calls for an assumption.

16  There we go.  Thank you.  Go right ahead.

17       A.   I did not consider race, ethnicity, gender, or

18  any other characteristic irrelevant to the position for

19  which people have applied in this -- in my analysis.

20       Q.   Going back -- okay.  So a little -- a second

21  ago -- a few minutes ago, we got a little sidetracked.

22  We were talking about income or -- or possible earnings.

23            So if -- if a -- so going back to your

24  scenario again, if a DACA recipient is being considered

25  for a job that will make a certain level of income, then

```
 1    in your scenario the U.S. citizen counterpart is being

 2    considered for that same wage or income.  Right?

 3         A.   Yes.

 4         Q.   Okay.  And if the U.S. citizen applicant is

 5    being considered for an income level or a wage that

 6    makes that applicant ineligible for the subsidy, then

 7    the employer would not choose the DACA recipient

 8    applicant -- or, rather, then the employer would not

 9    choose the U.S. citizen applicant because of fear of

10    incurring the ACA penalty.  Right?

11                   MR. DISHER:  Objection, vague.

12         A.   I think you said that backwards.

13         Q.   Okay.  I think I did.

14         A.   So my answer is no, I disagree.

15         Q.   Okay.  Okay.  Fair enough.

16              Okay.  So if the U.S. citizen counterpart

17    applicant is being considered for a certain wage and

18    that makes that applicant ineligible for the subsidy,

19    then the employer would not choose the DACA recipient

20    applicant over the U.S. citizen applicant because of

21    fear of incurring the ACA penalty.  Right?

22         A.   That makes sense.  I mean, again, yeah.

23    Income over 400 -- so $150,000-a-year job, the ACA

24    penalty is not going to be a deciding factor.  I would

25    agree with that.
```

1      Q.   Okay.  And because you did not consider the

2   income levels or income earning potential of DACA

3   recipients, you have no way of knowing how many U.S.

4   citizen applicants in your scenario would lose out on

5   job opportunities to DACA recipient applicants, do you?

6              MR. DISHER:  Objection, vague.

7      A.   I don't know the number.  I was not asked to

8   provide the number.

9      Q.   All right.  Let's look at -- let's go back to

10   your declaration and look at the paragraph that we

11   were -- we looked at kind of earlier on today,

12   Paragraph 23, which is on Page 7 of your supplemental

13   declaration.  So you've already reviewed this and we

14   went over it a little bit, and so keep this in mind.

15   I'm going to show you something else.

16              (Exhibit No. 5 marked)

17      Q.   So I'm handing you what is marked as

18   Exhibit 5.  And when you're discussing the issue in your

19   declaration -- the issue of the interaction of the DHS

20   Memorandum and the ACA on the labor market, you cite at

21   some point to this article, right, that article that is

22   Exhibit 5?

23      A.   Well, not exactly.  This article appears to be

24   the working-paper version of what was eventually

25   published.  They were the same name.  But I suspect it's

1  equal.  Other" -- "Although the theoretical implication

2  that, other things being equal, immigration reduces the

3  wages of native workers..."

4         So did you do any analysis of whether

5  that theoretical implication has any bearing on the

6  current reality in the United States?

7         MR. DISHER:  Objection, vague.

8     A.   To the extent that economic theory is useful

9  in predicting what happens, it does have bearing on

10  what's happening.

11     Q.   Okay.  But for -- for this declaration, you

12  didn't do any calculations about the degree to which

13  wages would be reduced because of immigration?

14     A.   I did not make a calculation about the

15  magnitude, no.  I would -- that's why I cited the papers

16  by Borjas and Card because, you know, they talk about

17  theirs and many other studies that try to assess the

18  implications of immigration on native wages for -- to

19  get -- you know, to say -- to get an estimate of

20  magnitudes.

21     Q.   Okay.  And you say -- but Borjas says that the

22  impact of immigration on the wages of native workers

23  seems to cluster around zero.  Right?

24         MR. DISHER:  Objection, misstates the

25  document.

1  been difficult to find very large effects on wages; and

2  that's, I believe, an accurate assessment of what the

3  literature says.

4               MS. PERALES:  If I can take a second off

5  the record.

6               MR. DISHER:  Yeah.

7               (DISCUSSION OFF THE RECORD)

8               MR. HERRERA:  Back on.  Bear with me for

9  one minute.

10     Q.    (BY MR. HERRERA) Would you -- you don't know

11  how many jobs will be denied to United States citizens

12  because of the scenario that you describe in your

13  declaration, do you?

14               MR. DISHER:  Objection, vague.

15     A.    Well, it's not just "will be."  I suppose it's

16  "has been" -- "have been."  But I do not know the

17  number, no.

18     Q.    Okay.  Would it be correct to say that under

19  the compensation principle, Texas overall could be

20  better off as a result of the work authorization of DACA

21  recipients?

22               MR. DISHER:  Objection, vague.

23  Objection, outside the scope of his testimony.

24     A.    Possible -- well, Texas overall, but I don't

25  understand what "Texas overall better off" means.  What

```
 1  opportunities.  Right?

 2      A.   Well, sure, they have other opportunities; but

 3  it may -- in general, those opportunities are inferior

 4  to the one that they lost out on by the fact that it

 5  wasn't their first choice.

 6      Q.   Let's go to Paragraph 25 of your declaration.

 7  You say in the second sentence on that paragraph -- in

 8  that paragraph, "The interplay between the DHS

 9  Memorandum and the ACA makes some U.S. citizens more

10  expensive to hire than equally productive immigrants who

11  are not lawfully present."

12               You cannot say how many U.S. citizens are

13  more expensive to hire, can you?

14      A.   Well, I don't know that number.

15      Q.   Because you made a number of assumptions, the

16  ones we've already discussed, can you calculate the

17  actual cost of equally productive U.S. citizens and DACA

18  recipients in the situation you described?

19               MR. DISHER:  Objection, misstates the

20  testimony.  Objection, vague.

21      A.   I don't understand that question.

22      Q.   Okay.  So you -- you made a number of

23  assumptions including -- or you held a number of things

24  equal, right, in your scenario?

25      A.   Okay.
```

```
1        Q.   However, in many instances, job applicants are

2   not equal in that regard or in that many regards.

3   Right?

4              MR. DISHER:  Objection, vague.

5        A.   Not all job applicants are going to be

6   identical.  That's correct.

7        Q.   Okay.  So you don't always know the actual

8   cost difference between a U.S. citizen worker and a DACA

9   recipient applying for the same job.  Right?

10             MR. DISHER:  Objection, vague.

11       A.   Well, the 3400 -- whatever, $3400-plus

12  shared-responsibility payment, you know that.  So --

13       Q.   Right.

14       A.   -- I'm not sure what your question is.

15       Q.   You said that you examined the declarations of

16  other experts in this case.  Right?

17       A.   Yes.

18       Q.   Okay.  Which ones did you examine?

19       A.   Dr. Ray Perryman and doctor -- I think it's

20  Leighton Ku, K-u.

21             MR. HERRERA:  Can we take a break now?

22             MR. DISHER:  Sure.

23                 (RECESS TAKEN)

24             MR. HERRERA:  Okay.  Back on the record.

25       Q.   (BY MR. HERRERA) Dr. Deere, did you do any
```

1 analysis of whether firms with 50 or more employees

2 offer health insurance to all of their workers?

3            MR. DISHER:  Objection, vague.

4      A.    No, I did not.

5            MR. HERRERA:  The intervenors pass the

6 witness.

7                      EXAMINATION

8 BY MS. GREGORY:

9      Q.    Good afternoon.  My name is Katherine Gregory.

10 I'm a Deputy Attorney General with the New Jersey Office

11 of Attorney General, and I'm representing the

12 defendant-intervenor the State of New Jersey in this

13 case.

14            I just have a few more questions for you.

15 I'll try to keep it brief; and I'm going to try not to

16 touch on any areas that we've already hit, but I can't

17 make any promises.

18            Just talking about your two declarations

19 generally, did you review any research or documentation

20 in addition to the specific citations in your

21 declaration?  So was there anything not cited that you

22 reviewed in preparing those declarations?

23      A.    There's some other papers that are probably

24 generally cited by either Borjas or Card that I did

25 cite, more of that -- more of that immigration

1      A.   I think I looked at the Long -- it's, you

2  know, a brief writeup of his that's cited by, I think,

3  Perryman and Ku.  They talk -- you know, that's where

4  the 91 percent employed number comes from.  You know,

5  it's got a little bit of info about who the DACA

6  recipients are.  I looked at that.

7      Q.   Did you perform any research in preparing

8  these declarations relating to Texas businesses?

9               MR. DISHER:  Objection, vague.

10     A.   I looked at what the current labor force

11 numbers are for Texas, which would be generally employed

12 by Texas businesses; but otherwise, no.

13     Q.   Did you talk to any hiring managers or human

14 resource representatives in preparing these

15 declarations?

16     A.   No.

17     Q.   Do you know how many Texas employers have 50

18 or more full-time employees?

19     A.   No.

20     Q.   Do you know how many DACA recipients are

21 employed in companies with 50 or more full-time

22 employees?

23     A.   No.

24     Q.   Are all Texas residents, DACA recipients or

25 citizens required to purchase health insurance?

```
 1                    MR. DISHER:  Objection to the extent it

 2   calls for a legal conclusion.

 3        A.   Well, you know, I thought the answer to the

 4   question was sort of yes in light of the ACA, but then I

 5   think something recently was -- the individual mandate

 6   was rescinded.  I'm not -- I'm not sure I know how to

 7   answer that question.  I kind of would have said yes,

 8   but now I'm saying maybe it's no.

 9        Q.   That's fine.  Do you know how many Texas

10   residents are exempt from the coverage requirements of

11   the ACA?

12                    MR. DISHER:  Same objection.

13        A.   No.

14                    MS. GREGORY:  Do you have a copy of the

15   supplemental declaration I could look at?

16                    MS. PERALES:  Uh-huh.  Is that Deere 2 or

17   Deere 1?

18                    MR. DISHER:  Deere 1.

19                    MS. GREGORY:  It's right there.  I'm

20   sorry.

21                    MS. PERALES:  I'll give it to you.  I'll

22   give it to you.

23                    MS. GREGORY:  I promise I won't --

24                    MS. PERALES:  Don't worry.

25        Q.   (BY MS. GREGORY) Okay.  If you could pull out
```

1  Deere 1 and turn to Page 5.  Okay.  Paragraph 13.  We
2  talked a little bit about all other things equal, that
3  term you use in Paragraph 13, "other things equal."
4             Can you describe some of the
5  characteristics or traits that would be included in
6  "other things equal"?  You mentioned relevant
7  characteristics to the job, but could you just describe
8  what some of those could entail?
9             MR. DISHER:  Objection, asked and
10 answered.
11      A.   Well, the sentence here in which that resides
12 is "As a threshold matter, the addition of some 694,000
13 work-eligible individuals nationwide, with 114,000 of
14 these in Texas, will, other things equal, put downward
15 pressure on wages and make it more difficult for some
16 U.S. citizens to find employment."
17             So there the "other things" is really
18 talking about overall market demand conditions.  In
19 other words, this factor alone, not changing anything
20 else about the economy, will have this kind of effect.
21 It will put downward pressure on wages and make it more
22 difficult.
23             But does that mean if you go out and you
24 look over a period of time during which DACA recipients
25 expanded and lots of other things were going on, could

1   you look at, you know, January of one year and December

2   the next and subtract the employment difference and say,

3   ah, that's the effect of whatever happened in DACA that

4   year, no, you couldn't because there's other things

5   going on, changing.

6               And so that's -- that's really what --

7   it's holding other things that would affect wages and

8   employment in the U.S. and in Texas constant.

9        Q.   And what are -- can you give an example of

10   some of those other things?

11       A.   The general level of demand from, you know,

12   other countries for U.S. exports; the -- the general

13   level of consumer spending in the U.S.; the birth rate;

14   the other population sources in the U.S., the other

15   sources of immigration.  Holding all of that constant.

16       Q.   Okay.  And what do you mean when you say

17   "work-eligible" in this paragraph?

18       A.   Having -- in this particular, I mean holding

19   an EAD because I'm talking about the DACA recipients.

20       Q.   Okay.  Does "work-eligible" mean all of those

21   individuals are employed?

22       A.   No.

23       Q.   Does it mean that they're all seeking

24   employment?

25       A.   No.

1      Q.   So if -- so you can't say how many of those

2  are seeking employment or employed?

3      A.   Well, according to the Wong study about

4  91 percent employed.  You can take that unemployment

5  rate and then add that in.  So, you know, 90-plus

6  percent would be in the labor force if you take the Wong

7  study as a source.

8      Q.   Okay.  Did you take that as a source in

9  drafting this declaration?

10     A.   No.

11     Q.   In Paragraph 13, you also say it would make --

12  quote, make it more difficult for some U.S. citizens to

13  find employment, end quote.  How many is some?

14     A.   More than one -- more than zero.

15     Q.   Okay.  But you can't give a more exact number

16  than that?

17     A.   I've not been asked to calculate that number.

18     Q.   Okay.

19     A.   I mean, you could -- think of the following

20  mental experiment.  Suppose all 694,000 work-eligible

21  individuals disappeared, including the -- whatever

22  percentage of them were actually employed.  What would

23  then happen?  Would every single employer stay exactly

24  where they are, or would they hire some more people?

25  And if they hired some more people, well, that might

1  best worker they can.  So I'm not sure how to answer

2  that.

3      Q.   Okay.  So would salary history be a relevant

4  aspect to an employer?

5      A.   The salary history of the two individuals who

6  applied?

7      Q.   Yes.

8      A.   It might well be; but as you may know, in some

9  jurisdictions it's illegal for the employers to ask

10  about that now.

11      Q.   Is it illegal in Texas?

12      A.   No.

13      Q.   What about salary requirements of the two

14  individuals?  Would that be a relevant aspect?

15      A.   It could be, and it is legal to ask about that

16  as far as I know.

17      Q.   Okay.  How many employers in Texas base hiring

18  decisions entirely on costs associated with the ACA?

19      A.   I don't know.

20      Q.   Are those careers for which it's difficult for

21  employers to find U.S. citizens willing to undertake

22  that labor?

23      A.   I don't know.

24      Q.   Are there costs associated with replacing

25  employees who leave a business?

1    Q.   If DACA is enjoined in July of 2018, how many

2    U.S. citizens will be hired by Texas businesses?

3    A.   Well, I don't know what "enjoined" would mean,

4    first of all.  Does that mean that those individuals

5    would no longer be able to work?  But let's assume the

6    answer is yes.  It's equivalent to what I said a minute

7    ago about if all 680,000 just disappeared.  I would

8    assume that there would be some hiring to replace them.

9    I do not know the number.  I have not been asked to

10   calculate that.

11   Q.   If DACA were enjoined in July of 2018 and

12   hundreds of thousands of DACA recipients suddenly lost

13   the ability to work, how would Texas businesses be

14   affected?

15            MR. DISHER:  Objection, vague.

16   Objection, outside the scope of his testimony.

17   A.   Some of them would have to -- would be without

18   some employees that they previously had and would have

19   to go from there, either hiring other employees or

20   making other adjustments.

21   Q.   What kinds of other adjustments?

22            MR. DISHER:  Same objection.

23   A.   Cutting back on the output they produce or the

24   level of service they provide.  It depends -- it depends

25   on what industry they're in.

```
 1                    BROWNSVILLE DIVISION
 2  STATE OF TEXAS, et al.,              )
           Plaintiffs,                   )
 3                                       )
    VS.                                  )
 4                                       )
    UNITED STATES OF AMERICA, et al.,)   Case No. 1:18-CV-68
 5          Defendants,                  )
                                         )
 6  and                                  )
                                         )
 7  KARLA PEREZ, et al.,                 )
                                         )
 8          Defendant-Intervenors.   )
 9
                    REPORTER'S CERTIFICATE
10          DEPOSITION OF DONALD R. DEERE, Ph.D.
                     JUNE 28, 2018
11
12      I, Kathleen Casey Collins, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15      That the witness, DONALD R. DEERE, Ph.D., was duly
16  sworn by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19      That the deposition transcript was submitted on
20  _____, ____, to the witness or to the attorney for
21  the witness for examination, signature and return to me
22  by _____, _____;
23      That pursuant to information given to the
24  deposition officer at the time said testimony was
25  taken, the following includes counsel for all parties
```

```
 1  of record:
 2       Mr. Todd L. Disher, Attorney for the Plaintiffs
         Mr. Ernest Herrera and Ms. Nina Perales, Attorneys
 3           for Defendant-Intervenors
         Mr. Daniel David Hu, Attorney for Defendants
 4       Ms. Katherine Gregory, Attorney for New Jersey
             Office of Attorney General
 5
 6       I further certify that I am neither counsel for,
 7  related to, nor employed by any of the parties or
 8  attorneys in the action in which this proceeding was
 9  taken, and further that I am not financially or
10  otherwise interested in the outcome of the acti
11       Certified to by me this _____ day of June
12  2018.
13                      _____
                        KATHLEEN CASEY COLLINS
14                      Texas CSR NO. 2018
                        Certificate Expires 12/31/18
15                      Ken Owen & Associates
                        Firm Certificate No. 115
16                      801 West Avenue
                        Austin, Texas  78701
17                      (512) 472-0880
18
19
20
21
22
23
24
25
```

# EXHIBIT 2

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  BROWNSVILLE DIVISION
STATE OF TEXAS, et al.,          )
        Plaintiffs,              )
                                 )
VS.                              )
                                 )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
        Defendants,              )
                                 )
and                              )
                                 )
KARLA PEREZ, et al.,             )
                                 )
        Defendant-Intervenors.   )
        ***********************************************
                    ORAL DEPOSITION OF
                    LLOYD POTTER, Ph.D.
                       JUNE 27, 2018
        ***********************************************
```

     ORAL DEPOSITION OF LLOYD POTTER, Ph.D., produced as
a witness at the instance of the Defendant-Intervenors,
and duly sworn, was taken in the above-styled and
numbered cause on the 27th of June, 2018, from 9:59 a.m.
to 1:46 p.m., before Kathleen Casey Collins, CSR, in and
for the State of Texas, reported by machine shorthand,
at the Offices of the Attorney General, 301 West
Fifteenth Street, Seventh Floor, Austin, Travis County,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

```
 1        A.   Yes.
 2        Q.   Would you say that you are an expert in youth
 3   violence prevention?
 4        A.   Yes.  I'm not as current on that in the last
 5   nine years as I was previously, but yes.  I keep up with
 6   it, but I don't -- I'm not active in youth violence
 7   prevention research any longer.
 8        Q.   And with respect to suicide prevention, would
 9   you describe yourself as an expert?
10        A.   It's similar to the youth violence.  I keep up
11   with it.  I read articles and so on on it.  But I'm not
12   doing -- actively doing research in suicide prevention
13   for the last eight years or so.
14        Q.   Are you actively doing research right now on
15   any topic in demography?
16        A.   Yes.
17        Q.   What is that topic?
18        A.   Well, one, we produce the population estimates
19   and projections for the state.  So there is applied
20   research to be done in the production of those
21   population estimates and projections, which involve
22   doing research into fertility, mortality, and migration,
23   which are the components of population change; and
24   having an understanding of those components and how they
25   act and behave within the Texas population are key
```

1    elements to -- and having done research and

2    understanding what's happening with that are key

3    elements to us producing accurate population estimates

4    and projections.

5        Q.    Would you say that today you are an expert in

6    the subfield of demography that produces population

7    estimates?

8        A.    Yes.

9        Q.    Okay.  When I'm quiet, I'm crossing off

10   questions --

11       A.    Okay.

12       Q.    -- because we've covered a lot.

13            When you teach demographic methods, do

14   you teach the methods that are used at your center to

15   make population estimates?

16       A.    That's a component of the methods that we

17   teach, yes -- or that I teach.

18       Q.    When your center makes population estimates

19   for Texas, what are the databases that you typically

20   rely upon?

21       A.    For population estimates, there's quite a few.

22   So we receive vital statistics from the State department

23   of -- Department of State Health Services.  We conduct

24   surveys of a number of different entities.  So we survey

25   cities to get information on -- and counties on building

1  permits.  We have data from the Texas Education Agency

2  on school enrollment.

3            I'm trying to think what else.  Those are

4  probably some of the major sources of data that we use.

5       Q.   How about data from the U.S. census?

6       A.   For our estimates, the census is the base of

7  that, and so the decennial census is the foundation that

8  we build off of.

9            And then the Census Bureau also produces

10  population estimates, and we'll use those to examine our

11  estimates to see if they're in the ballpark; and if

12  they're not, then we do research to figure out if

13  they're wrong or if we're wrong and then to adjust them

14  if we are.

15       Q.   Is it correct to say that sometimes you look

16  at the U.S. Census American Community Survey data?

17       A.   Yes.  I frequently -- for -- for production --

18  not for actual production of the estimates; but we do

19  use the American Community Survey to identify certain

20  indicators that give us some sense of our level of

21  accuracy.

22       Q.   Does your center provide estimates of the

23  undocumented or unauthorized population in Texas?

24       A.   We do not currently do that.  We tend to rely

25  on the Pew Research Center estimates and then the

1  Department of Homeland Security estimates.  I mean,

2  those are the ones that we'll point to, and they tend to

3  be pretty close to each other.

4       Q.   What are some of the methodological challenges

5  associated with estimating the unauthorized population

6  in Texas?

7       A.   Well, one is you have to use an indirect

8  method because there's no source of directly asking --

9  identifying unauthorized immigrants and asking them

10  their status; and even if somebody did do that, I think

11  there would be some question as to the accuracy of the

12  reporting.  And so essentially the methodology relies on

13  indicators of things that would be associated with being

14  undocumented.

15       Q.   And so, for example, data regarding people who

16  are noncitizens is potentially associated with

17  undocumented.  Is that right?

18                 MR. DISHER:  Objection, vague.

19       A.   Yes.  The -- the methodology that is used by

20  the Pew Research Center identifies people who respond to

21  the American Community Survey as noncitizens and other

22  characteristics that they have in terms of assessing a

23  probability of them being undocumented immigrants.

24       Q.   Are you familiar with any of the disclaimers

25  that the Pew center provides with its estimates of

```
 1  people respond to the American Community Survey asking
 2  where they lived last year, if they lived in a foreign
 3  country, that's the foundation of the shift that we've
 4  seen in the number and percent from -- toward Asian
 5  countries and away from Mexico and Central and South
 6  American countries.
 7       Q.   Has your center or have you done any research
 8  specific to any decline in immigration from Mexico to
 9  Texas?
10       A.   Could you say that one more time?
11       Q.   Has either you on your center done any
12  research specifically on the decline of migrants coming
13  from Mexico to Texas?
14       A.   I wouldn't say we've done research.  We've
15  done -- other than just tabulating and reporting.  If
16  you call that research then...but we've not, like,
17  looked to see, well, why is that happening and looking
18  at that.
19       Q.   And, similarly, with respect to return
20  migration, has your center tabulated and reported data
21  on return migration from Texas to other countries?
22       A.   We have, again, from -- let me take back the
23  "we have."
24            I think we've just reported from other
25  sources.  So we've not -- so, again, from, I think, a
```

1   number of researchers that have looked at return

2   migration.   So we have not because you -- with the

3   American Community Survey, you don't know who's

4   returned.

5       Q.   Okay.  So you have -- in your center, you have

6   reported data or reported analysis by others regarding

7   return migration from -- of people living in Texas?

8       A.   Yeah.  I'm not -- when you say "reporting," do

9   you mean --

10      Q.   Well, making public in any manner.

11      A.   Yes.  I mean, so from the report I was

12  mentioning earlier, the Pew research report that --

13  that -- research that has looked at return migration,

14  and I have presented that in presentations that I've

15  given.

16      Q.   Okay.  And the data that you're talking about

17  from the Pew Research Center, was that specific to

18  Texas?

19      A.   No.  It was for the U.S.

20      Q.   And would it be fair to say that when you've

21  reported the data for the U.S. about return migration,

22  you haven't provided any analysis of the reasons why

23  people are returning to their home countries?

24                  MR. DISHER:  Objection, vague.

25      A.    I think in the context of that, there is

```
 1   this -- I probably have articulated speculation that --

 2   that it probably has to do with a lack of employment

 3   opportunity within the United States, and so the

 4   migrants are kind of not able to work here and so

 5   they're returning home.

 6        Q.   And when you talk about that lack of

 7   employment opportunity, is that associated with the

 8   economic decline after --

 9        A.   Right.

10        Q.   -- 2008?

11        A.   So it would have been, yeah, post the

12   recession or kind of as the recession was really picking

13   up.

14             There were reports that immigrants, both

15   authorized and unauthorized, were returning to their

16   country of origin because they were losing -- again, the

17   reports were more speculative in terms of why they were

18   going.  I haven't seen anything that says we know that

19   this is the reason that they were leaving.

20        Q.   Okay.  You anticipated my next question, which

21   is is it correct to say that neither you nor your center

22   have done research on the reasons why individuals might

23   leave Texas and return to their home countries?

24             MR. DISHER:  Objection, vague.

25        A.   Yes, that's fair.
```

1      Q.    Okay.   Would you say that you have a research

2    specialization in immigrant populations?

3                      MR. DISHER:   Objection, vague.

4      A.    Yeah.   I don't know if I would say I have a

5    specialization.   I have pretty deep familiarity with it.

6    But I wouldn't say if -- if what's your -- if somebody

7    asks me what my area of research is, I wouldn't say I'm

8    an immigrant specialist.

9      Q.    Okay.   Do you have a research specialization

10   in the factors that lead to either legal or illegal

11   immigration to the United States?

12     A.    No.

13     Q.    Does your -- does your -- I'm sorry.  I want

14   to get the words right.

15                 Does your institute conduct research

16   specifically on unauthorized immigrants living in Texas?

17     A.    We have.

18     Q.    When was that?

19     A.    Probably about five or six years ago.

20     Q.    And what was that research?

21     A.    We had attempted to estimate the geographic

22   distribution of the unauthorized immigrant population in

23   the state.

24     Q.    Did you end up publishing those results?

25     A.    No.

1        Q.    Was it because you weren't able to get sort of

2    confidence results?

3        A.    We attempted to publish them.   The methodology

4    that we had employed was questioned by one of the

5    reviewers, and the staff member that we had working on

6    this left and we never followed through and addressed

7    the -- it was doable, but we just didn't.   We weren't

8    able to address it.

9        Q.    Have either you or your institute ever

10   conducted research on the reasons that immigrants come

11   to or leave the United States, and specifically

12   undocumented immigrants?

13                  MR. DISHER:   Objection, vague.

14       A.    No.

15       Q.    Let's turn to your declaration, which is

16   Exhibit 3.

17       A.    Okay.

18       Q.    I think we can put your CV aside for the

19   moment; although, I could ask you questions about it all

20   day because I think it's absolutely fascinating.   I'm

21   mindful of Andrew's airplane flight, and so let's turn

22   to your declaration.

23                  Can you summarize for me the specific

24   opinions that you offer in your declaration?

25       A.    Let's see.   I think probably one is that

1    there's pretty strong evidence that the bulk of

2    migration behavior, especially distance migration

3    behavior, is economically and specifically work

4    associated.

5                     And -- and then probably the other

6    summary point would be that if DACA participants were

7    unable to work, some number and/or percentage of them

8    would likely leave the United States and return to their

9    country of origin or another country where they may be

10   able to work.

11       Q.    Okay.  Do you offer any other opinions in the

12   report besides the two that you've given to me?

13       A.    Well, I think I do articulate some of the

14   characteristics that I think we could anticipate would

15   be associated with the propensity for an immigrant to

16   return to their country of origin.

17       Q.    Would it be fair to say that with your -- with

18   respect to your opinion about DACA participants

19   returning because of work-related reasons that that

20   opinion does not distinguish DACA recipients from other

21   unauthorized workers who might lose their employment?

22                     MR. DISHER:  Objection, vague.

23   Objection, misstates the testimony.

24                     Go ahead and answer.

25       A.    Yeah.  I think there probably is a distinction

1  between the two that could be made.

2      Q.   Okay.  And so specifically with respect to

3  return migration because of employment reasons, which is

4  what I understand your opinion about DACA recipients is,

5  tell me how your opinion would differentiate, if it

6  does, between a DACA recipient making the decision to

7  return and migrate versus a plain-old undocumented

8  person.

9              MR. DISHER:  Objection, vague.

10     A.   I think a DACA participant has a -- currently

11 has a different status than an unauthorized immigrant;

12 and so a DACA participant probably has -- has other

13 motivations to potentially -- different -- different

14 sets of motivations than an unauthorized immigrant.

15     Q.   I understand.  And so specifically with

16 respect to work-related reasons -- because I know that

17 people's motivations can really vary quite a bit.  So

18 let me ask you whether your opinion regarding the

19 likelihood of an individual to leave Texas upon losing

20 DACA and work authorization is similar to the likelihood

21 of an unauthorized person who is not somebody who just

22 lost DACA?

23              MR. DISHER:  Objection, vague.  Go ahead.

24     A.   So the -- I think you had, like, two -- two

25 things about DACA.  Was there something about losing --

```
 1        Q.    Okay.  I'll back up and break it down.

 2        A.    Okay.

 3        Q.    Your -- your report, and specifically

 4   Paragraph 11, talks about loss of permission to work in

 5   the United States.

 6              Do you see that in the very first words

 7   of your Paragraph 11?

 8        A.    Uh-huh.

 9        Q.    Okay.  So do you understand that when an

10   individual loses Deferred Action for Childhood Arrivals,

11   loses DACA, that that individual also loses permission

12   to work in the United States?

13        A.    I would assume those two that -- yes, that if

14   they lost DACA status, then they would also not be

15   eligible to work in the United States.

16        Q.    And is that what you're talking about in

17   Paragraph 11 when you say, "some DACA participants could

18   be expected to migrate out of the U.S. back to their

19   country of origin"?

20              MR. DISHER:  Objection.  It misstates his

21   testimony.

22              THE REPORTER:  Objection what?

23              MR. DISHER:  Misstates his testimony.  Go

24   ahead.

25        A.    Can you say that one more time?
```

```
 1        Q.    Sure.   You -- you mentioned a moment ago that
 2   you understand that if somebody loses DACA, that
 3   individual loses work authorization.   Is that right?
 4        A.    Yes.   But that's not what I'm saying here.
 5        Q.    Okay.   Okay.   Help me understand what you're
 6   saying in Paragraph 11 when you say "with loss of
 7   permission to work in the U.S."
 8        A.    So that would be if DACA participants, as part
 9   of the DACA program, were not able to work in the
10   United States.   I was not making any statement about
11   loss of DACA status so that -- so that there the
12   concept, I think, would be that assuming that DACA
13   status was still present and they were unable to work,
14   lost permission to work.
15        Q.    Okay.   Do you have any understanding of the
16   legal relationship between Deferred Action for Childhood
17   Arrivals and federal work authorization?
18               MR. DISHER:   Object to the extent it
19   calls for a legal conclusion.
20               Go ahead and answer if you can.
21        A.    I don't.
22        Q.    Okay.   So I'm going to talk with you within
23   that frame that you were just discussing.   We will posit
24   a DACA recipient that has lost work authorization and
25   can no longer work -- be employed legally.
```

```
 1        A.    Uh-huh.

 2        Q.    Do you understand that the loss of permission

 3   to work would apply to working as an employee of a

 4   company?

 5                    MR. DISHER:  Objection, vague.

 6        A.    Say that one more time.

 7        Q.    Do you understand that loss of permission to

 8   work in the U.S. would mean loss of permission to work

 9   as an employee for a company or a government?

10                    MR. DISHER:  Same objection.

11        A.    In the United States?

12        Q.    Yes.

13        A.    Yes.  Okay.

14        Q.    Okay.  Do you understand whether loss of

15   permission to work in the U.S. would extend to working

16   as an independent consultant?

17                    MR. DISHER:  Objection, vague and to the

18   extent it calls a legal conclusion.

19                    Other than that, go ahead.

20        A.    I would assume that it would mean work any

21   kind of work.

22        Q.    And so it would also mean loss of permission

23   to work as an independent consultant.  Is that right?

24        A.    I --

25                    MR. DISHER:  Same objections.
```

```
 1        A.    I think I would assume that, yes.
 2        Q.    Okay.  Would it also -- would loss of
 3  permission to work in the U.S. in your mind also mean
 4  loss of permission to mow lawns for money?
 5                   MR. DISHER:  Objection, calls for
 6  speculation.  Objection to the extent it calls for a
 7  legal conclusion.
 8                   Go ahead again.
 9        A.    Yes.  I would think, yes, that basically
10  working and receiving compensation for work would be
11  part of losing permission to work.
12        Q.    Would your opinion regarding the likelihood of
13  return migration of DACA recipients change if the loss
14  of permission to work for them only extended to work as
15  employees and did not cover self-employed or independent
16  contractor work?
17                   MR. DISHER:  Objection, speculation.
18  Objection to the extent it calls for a legal conclusion.
19                   Other than that, go ahead and answer.
20        A.    I think if -- I think probably if DACA
21  participants were denied -- so they continue to have
22  legal status and they were denied permission to work but
23  that they could go out and mow lawns and bring in some
24  revenue, that probably would reduce the number of DACA
25  participants that might return to their country of
```

1   origin or another country.

2        Q.    Would it also be fair to say that the number

3   of DACA recipients likely to return to their home

4   country would be reduced if DACA recipients, in addition

5   to mowing lawns and making monies, could open their own

6   business and generate income either through being an

7   accountant or a restaurant owner?

8               MR. DISHER:  Same objections.

9        A.    Yes.

10       Q.    Okay.  I'm going to circle back around to my

11  original question, which I asked poorly because we

12  didn't have a common understanding of the loss of

13  permission to work.

14              So when we talk about DACA recipients

15  losing permission to work and their likelihood of

16  returning to their home country, in your opinion, does

17  the DACA recipient at that point stand in similar shoes

18  to an unauthorized immigrant who also does not have

19  permission to work, at least with respect to their

20  employment opportunities?

21              MR. DISHER:  Objection, speculation.

22  Objection, calls for a legal conclusion.

23              Go ahead and answer if you can.

24       A.    I'm not sure I followed you.

25       Q.    Okay.

```
1          A.    Try one more time.

2          Q.    Would you agree with me that an unauthorized

3    immigrant who is not authorized to work has limited

4    employment possibilities?

5                    MR. DISHER:   Same objections.

6          A.    An authorized immigrant who does not have

7    permission to work?

8          Q.    Has limited employment opportunities.

9          A.    Yes.

10         Q.    Okay.  And would you agree to me -- with me

11   that a DACA recipient who has lost permission to work

12   also has limited employment opportunities?

13         A.    Yes.

14                   MR. DISHER:   Same objections.

15         Q.    So would you agree with me then that the DACA

16   recipient who has lost work authorization is, at least

17   with respect to employment opportunities, similarly

18   positioned to an unauthorized immigrant?

19                   MR. DISHER:   Same objections.

20         A.    Yeah.  I don't -- don't know that, because I

21   know -- know relatively little about the details of the

22   DACA -- kind of what their status would be.

23                   So I would anticipate there would be a

24   difference between the two, because if one is here

25   legally, or meaning they have permission to live here
```

1   and couldn't be deported, assuming they were compliant

2   with the DACA requirements, and the person who was

3   undocumented but not here legally and regardless of if

4   they were identified that they could be deported, there

5   would probably be some differential between the two.

6        Q.   And would there be a differential with respect

7   to employment opportunities?

8               MR. DISHER:  Same objections.

9        A.   I would expect so, yes.

10       Q.   What might those differentials with respect to

11  employment opportunities be?

12              MR. DISHER:  Same objections.

13       A.   I would think that an employer would be more

14  likely to employ somebody who was here legally as

15  opposed to somebody who wasn't.

16       Q.   Even if they were both not work authorized?

17              MR. DISHER:  Objection.  It calls for

18  speculation.

19       A.   Yeah.  Probably not.

20       Q.   So when you say "probably not" --

21       A.   Well, I hadn't really kind of thought that

22  whole thing through.

23       Q.   Okay.  So if an employer is hiring for an open

24  position and has an applicant who is undocumented and

25  thus lacks permission to work and somebody who received

1  DACA but is -- has lost permission to work, would those

2  two employment applicants be similarly situated?

3             MR. DISHER:  Objection, calls for

4  speculation.  Objection to the extent it calls for a

5  legal conclusion.

6     A.   I would think so, yes.

7     Q.   So would it be fair to say then that -- that

8  your declaration does not posit that DACA recipients who

9  lose their permission to work are any more likely to

10 return to their home country than an unauthorized person

11 living in Texas?

12            MR. DISHER:  Objection, vague.

13    A.   Yeah.  I don't -- I don't think I could state

14 that.  No, I don't think so.

15    Q.   When you say "I can't state that," do you mean

16 that your report does not take a position on that, or is

17 that I asked a question that was so confusing you

18 couldn't answer it?

19    A.   Probably a little bit of -- well, certainly

20 the latter.

21    Q.   Okay.  Okay.  There's a little bit of a double

22 negative there, unfortunately, because of the way I have

23 to ask the question; but let me ask it a little bit more

24 in the positive sense.

25            Does your declaration opine that a DACA

1  recipient who loses permission to work is more likely to

2  return to their home country than an unauthorized

3  immigrant living in Texas who is similarly not --

4  doesn't have permission to work?

5      A.   The -- is this -- my testimony or -- what's

6  the thing called, the --

7      Q.   Your testimony.

8      A.   It does not address the issue of -- and so I'm

9  not making a comparison between the two.

10      Q.   All right.  So then is it fair to say that

11  your report or your declaration does not posit that DACA

12  recipients who lose permission to work are any more or

13  less likely to return to their home country than an

14  unauthorized person in Texas?

15      A.   It doesn't make a comparison between the two.

16            MR. DISHER:  Let's take a five-minute

17  break.

18            MS. PERALES:  Absolutely.  Absolutely.

19            (RECESS TAKEN)

20      Q.  (BY MS. PERALES) Dr. Potter, we've taken a

21  short break and now we're back together again.  Over the

22  break, we've discussed a little bit about this case

23  among all of the lawyers, and you've been here for that.

24            So I'd like to start with a question of

25  whether you understand that the relief that Texas and

1   the other plaintiff states are seeking in this case is

2   an end to the DACA initiative?

3        A.   I do understand that now.

4        Q.   Okay.  And as you stated earlier, your

5   understanding is that if an individual were to lose

6   DACA, that individual would lose permission to work in

7   the U.S.?

8        A.   Yes.

9        Q.   Okay.  And our understanding is now the same

10  on that.

11             Would it be correct to say that in your

12  report you do not offer the opinion that there will be a

13  positive effect on the size of the unauthorized

14  immigrant population in Texas because of DACA?

15             MR. DISHER:  Objection, vague.

16       A.   Could you state that one more time?

17       Q.   Yes.  Would it be correct to say that you do

18  not offer the opinion in your declaration that there is

19  a positive effect on the size of the unauthorized

20  immigrant population in Texas because of DACA?

21             MR. DISHER:  Same objection.

22       A.   Yeah.  I don't -- I don't address that in it.

23       Q.   Would it be correct to say that you do not

24  offer the opinion in your declaration that DACA creates

25  net negative effects on the Texas economy?

```
 1          A.   I don't --

 2                    MR. DISHER:  Objection, vague.  Go ahead.

 3          A.   I don't address that.

 4          Q.   Would it be correct to say that you do not

 5     offer the opinion in your declaration that DACA causes

 6     specific expenditures by Texas State agencies that are

 7     different from expenditures made on unauthorized

 8     immigrants in Texas?

 9                    MR. DISHER:  Same objection.

10          A.   I don't address that.

11          Q.   Would it be correct to say that you do not

12     offer the opinion that DACA increases unauthorized

13     immigration to the United States?

14          A.   I don't address that.

15          Q.   Okay.  Now, in your declaration at the end are

16     a number of citations under the heading "References."

17     Do you see that?

18          A.   Yes.

19          Q.   Okay.  I count one, two, three, four, five,

20     six, seven, eight.  Is it correct to say there are eight

21     works cited in your report?

22          A.   Yes.

23          Q.   Okay.  Do these articles or published studies

24     form the entire basis of the opinions that you offer in

25     your declaration?
```

```
 1              MR. DISHER:  Objection, vague.
 2       A.    No.
 3       Q.    Okay.  In addition to the eight articles that
 4  are cited in your declaration, what else do you rely on
 5  to form your opinions?
 6       A.    My experience and knowledge of the field of
 7  demography and population issues.
 8       Q.    Okay.  Would it be accurate to say that your
 9  experience and knowledge in demography is not specific
10  as to the reasons why an immigrant would choose to
11  return or migrate to their home country?
12              MR. DISHER:  Objection, vague.
13       A.    Could you say it one more time?
14       Q.    Sure.  You've mentioned that your opinions are
15  based on your knowledge of demography and your past work
16  and experience.  Is that correct?
17       A.    Yes.
18       Q.    Is it correct to say that your knowledge of
19  demography and your past work and experience does not
20  include a specific study of the reasons why an
21  unauthorized immigrant might choose to return to their
22  home country?
23              MR. DISHER:  Objection, vague.  Go ahead.
24       A.    Yeah.  I think probably to get that specific
25  that would be true.
```

```
 1        Q.    Okay.   Are there any other scholarly works or
 2   studies other than the ones cited in your declaration
 3   that support your opinion that losing permission to work
 4   in the United States would cause some DACA recipients to
 5   return to their home country?
 6        A.    I believe there are other -- there is other
 7   research that would support that.
 8        Q.    Can you name any specifically today?
 9        A.    No.
10        Q.    Okay.  Paragraph 4, if you would turn with me.
11   In Paragraph 4, I'm going to read you a sentence from
12   Paragraph 4 after the parenthetical to the Aguila
13   article.
14              Is it correct to say that there is a
15   sentence in Paragraph 4 that says, quote, Most
16   undocumented migrants coming to the U.S. are doing so to
17   work, unquote?  Am I right in reading that?
18        A.    Yes.
19        Q.    Okay.  Do you believe that statement to be
20   true for Texas as well?
21        A.    I believe that it's true.
22        Q.    Would it also be correct to say that work is
23   the reason many migrants come to Texas even when the
24   migrants lack work authorization?
25              MR. DISHER:  Objection, calls for
```

1   speculation.

2        A.   I think so.

3        Q.   And, in fact, you cite Doug Massey's article

4   and his finding that undocumented migration from Mexico

5   appears to reflect U.S. labor demand and access to

6   migrant networks.  Is that correct?

7        A.   Yes.

8        Q.   Let's take a look at your Paragraph 5.  You

9   talk about inter-county migration within the

10  United States.  Is that correct?

11       A.   Yes.

12       Q.   And you are citing the Current Population

13  Survey and an article by Ihrke?

14       A.   Yes.

15       Q.   Would it be fair to say that the analysis that

16  you talk about in Paragraph 5 did not look specifically

17  at undocumented workers?

18       A.   It did not look at specifically undocumented

19  workers.

20       Q.   I have a similar question with respect to

21  Paragraph 6.  You talk about some work by Kennan and

22  Walker involving interstate migration decisions.  Is

23  that right?

24       A.   Yes.

25       Q.   Okay.  Would it be correct to say that the

1  study that you're discussing here by Kennan and Walker

2  did not look specifically at undocumented workers?

3      A.   That's correct.

4      Q.   Okay.  So would it then be fair to say, with

5  respect to Paragraph 5 and 6, that we don't know if

6  those findings hold true specifically for the

7  undocumented-worker population?

8              MR. DISHER:  Objection, vague.

9      A.   Yes, it's fair to say we don't know that.

10     Q.   Would you agree with me that the income

11  prospects for undocumented workers might be tempered by

12  factors that are unique to them like the presence of

13  migrant networks or the concern about drawing

14  immigration enforcement by moving to a place with a job

15  where the immigrant doesn't look like the people in

16  their community?

17             MR. DISHER:  Objection, calls for

18  speculation.

19     A.   I'm not sure I followed it.

20     Q.   All right.  I'll break it down for you.

21             In Paragraph 5 and 6 and 4, you talk

22  about factors that are associated with migrant flows,

23  and we get more specific in Paragraph 4 with respect to

24  undocumented workers and the reason why they move where

25  they move for jobs.  Is that right?

1       A.    Yeah.   I don't know.

2       Q.    Let's look at Paragraph 7.   In Paragraph 7

3   you discuss a study by Orrenius and Zavodny.   Is that

4   correct?

5       A.    Yes.

6       Q.    By the way, I think those are superhero names,

7   Orrenius and Zavodny.   I went and looked it up.   They're

8   both women, which makes it even better.

9             I'm going to take a moment and mark that

10  study.

11            (Exhibit No. 4 marked)

12      Q.    You now have what has been marked Deposition

13  Exhibit No. 4.   Do you recognize this as the study by

14  Orrenius and Zavodny that you cited in your declaration?

15      A.    Yes.

16      Q.    Okay.   Is it correct to say that the Orrenius

17  study that is Exhibit 4 did not look at Texas?

18      A.    I think Texas was part of it.   So it wasn't

19  Texas was excluded.   It was, I think, focusing on the

20  United States.

21      Q.    Turn with me to the Table 1, which I believe

22  is the third page.

23      A.    Oh, yes.   Sorry.

24      Q.    No.   It's my fault for not pointing you to the

25  specific information.

1                  Can you tell me if Texas appears in
2  Table 1?
3        A.    It does not.
4        Q.    Do you understand the Orrenius study to be a
5  study of states with mandatory E-Verify laws?
6        A.    Yes.
7        Q.    Do you know whether Texas has a mandatory
8  E-Verify law?
9        A.    I don't know.
10        Q.    What is your understanding of mandatory
11  E-Verify?
12        A.    My understanding would be that when somebody
13  applies for a position, they need to provide proof of
14  authorization to work.
15        Q.    Do you understand the E-Verify system to be a
16  computer-based system to check work authorization?
17        A.    That's my understanding, yes.
18        Q.    And do you understand that in states that
19  have - let's see how they put it - laws mandating
20  universal use of E-Verify that employers are required to
21  screen job applicants in the E-Verify computer system?
22              MR. DISHER:  Objection to the extent it
23  calls for a legal conclusion.
24        A.    That's my understanding.
25        Q.    Okay.  And do you understand E-Verify to be a

1   system maintained by the federal government?

2       A.   I don't know.  I think it's -- for some

3   reason, I think it's variable from state to state.

4       Q.   Okay.  And it's possible there could be

5   variation from state to state on who is required to

6   screen their employees --

7       A.   Correct.

8       Q.   -- through E-Verify?

9           Would you agree with me that the

10  experience of an unauthorized immigrant in applying for

11  work in a universal E-Verify state is going to be

12  different from an unauthorized immigrant applying for

13  work in a state that doesn't require E-Verify like

14  Texas?

15          MR. DISHER:  Objection, calls for

16  speculation.

17      A.   I would think so.

18      Q.   In Paragraph 7, you identify some findings in

19  the Orrenius study.  Look at Paragraph 7 with me and

20  count, if you would, the lines, one, two, three, four,

21  five.  On the sixth line down, I'm going to read you the

22  sentence and you tell me if I read it correctly.

23          Quote, Orrenius and Zavodny found that

24  possible undocumented immigrants in states that had

25  implemented such efforts may have more difficulty

1  working and more difficulty changing jobs, unquote.

2          Is that correct?

3      A.   Yes.

4      Q.   Would it be fair to say that if Orrenius and

5  Zavodny were looking at states with mandatory E-Verify

6  that their findings would not be applicable to a state

7  like Texas that does not have mandatory E-Verify with

8  respect to difficulty working and difficulty changing

9  jobs?

10          MR. DISHER:  Objection, vague.

11  Objection, calls for speculation.

12      A.   Say it one more time.

13      Q.   Sure.  I'll rephrase it slightly because I

14  think I can do a better job.

15          Would it be correct to say that Orrenius

16  and Zavodny's findings that undocumented immigrants

17  would have more difficulty working and more difficulty

18  changing jobs in mandatory E-Verify states do not apply

19  to a state like Texas that does not have mandatory

20  E-Verify?

21          MR. DISHER:  Same objections.

22      A.   I would expect there to be a differential.

23      Q.   All right.  But can you explain to me if their

24  findings, which were specifically based on studying

25  mandatory E-Verify in those particular states, whether

1   those findings can apply at all to Texas since Texas

2   doesn't have mandatory E-Verify?

3            MR. DISHER:  Objection, vague.

4       A.   I think it would probably apply to certain

5   types of jobs that do require some verification of work

6   status; but certainly there are, I think, a fair number

7   of jobs within Texas that don't require verification and

8   so it certainly wouldn't apply to those types of

9   positions.

10      Q.   And can you specifically identify any jobs in

11  Texas that are subject to E-Verify requirements?

12      A.   Well, I don't know specifically.  I do know

13  working for the State would be one.  So that would be

14  one.

15      Q.   Okay.  So can we agree then that with respect

16  to jobs in Texas that are not for the State of Texas, at

17  least, that the findings of Orrenius and Zavodny about

18  unauthorized immigrants having more difficulty working

19  and more difficulty changing jobs because of universal

20  E-Verify would not apply in Texas?

21            MR. DISHER:  Objection, vague.

22  Objection, asked and answered.

23      A.   Yeah.  I don't think you could make a blanket

24  statement about that, but probably some -- some aspects

25  of it would apply and others wouldn't, again, because

1  there are jobs that do -- would require verification of

2  permission to work within Texas.

3       Q.   But you can't identify any other than working

4  for the State of Texas?

5       A.   I'm not that familiar with -- I'm not familiar

6  with the other types of jobs that might require that in

7  Texas.

8       Q.   Now, there's the -- I'd like to talk to you

9  about your last sentence in Paragraph 7 regarding the

10 findings of Orrenius and Zavodny suggesting that

11 unauthorized immigrants leave states that adopted

12 universal E-Verify laws.

13           Do you see that sentence there?

14      A.   Yes.

15      Q.   You say that Orrenius and Zavodny found some

16 evidence, and do you recall what that "some evidence"

17 was?

18      A.   I think, as I recall, they saw a decline in

19 estimates of the unauthorized immigrants in those

20 states, and they attributed -- and didn't -- did not

21 also see an increase in other states, and they

22 attributed that to the unauthorized immigrants moving

23 out of the United States.

24      Q.   And they attributed that to the states

25 adopting universal E-Verify laws.  Is that correct?

Page 60

1      A.   That was -- that was the -- they implied that
2  that was a likely explanation for their findings.
3      Q.   Would it be fair to say that that finding is
4  not applicable to Texas because Texas does not have
5  universal E-Verify?
6      A.   I don't think that I could say that.
7      Q.   Okay.  Well, do you understand that Orrenius
8  and Zavodny looked at states that previously had
9  E-Verify, the voluntary program like Texas, and
10 subsequently adopted a universal E-Verify program?
11     A.   Yes.
12     Q.   Okay.  So the situation in those states before
13 the adoption of E-Verify we can agree would be similar
14 to the situation in Texas today, that it's a voluntary
15 program for employers?
16               MR. DISHER:   Objection, vague.
17     A.   Yes, I think so.
18     Q.   Okay.  So when Orrenius and Zavodny suggest
19 that unauthorized immigrants leave states that adopt
20 universal E-Verify laws, that suggestion or that finding
21 would not be applicable to Texas because Texas has not
22 adopted a universal E-Verify law.  Correct?
23     A.   I'm not sure that I can say that.
24     Q.   And why is that?
25     A.   I just don't -- I don't have any evidence or

1   information about whether or not it would apply.

2        Q.   And when you say "it would apply," you mean

3   Orrenius and Zavodny's findings regarding unauthorized

4   immigrants who leave states with universal E-Verify

5   laws?

6                  MR. DISHER:  Objection, vague.

7        A.   Yes.

8        Q.   Turn with me, if you would, to the Orrenius

9   article at Page 7.  I'd like you to look with me at the

10  "Results" section, which is preceded by a number five.

11  Do you see that around the middle of the page?

12       A.   Yes.

13       Q.   Okay.  Now, if you read down with me to the

14  second paragraph -- okay.  It's actually not the second

15  paragraph.  It's the first paragraph.

16                  There is a sentence, and I'm going to

17  count the lines down in the top - one, two, three, four,

18  five, six.  Is it correct to say that Orrenius and

19  Zavodny found no statistically significant negative

20  effect of universal E-Verify laws on non-recent

21  immigrants?

22                  MR. DISHER:  Objection, misstates the

23  document.

24       A.   Okay.  Could you state your question again?

25       Q.   Uh-huh.  I'll ask a new question.

```
 1                MS. PERALES:  If you want a running
 2   objection, Todd, you can have it.
 3        Q.   In Paragraph 1 of this "Results" section,
 4   after the sentence "Table 2 reports the results," is it
 5   correct to say that Orrenius and Zavodny found, quote,
 6   The presence of a universal E-Verify mandate last year
 7   has a significant negative effect on the number of
 8   likely unauthorized immigrants who arrived 1 to 5 years
 9   ago, unquote?  Did I read that correctly?
10        A.   Yes.
11        Q.    And then in the next sentence do I read
12   correctly when I read, quote, The estimated effects for
13   likely unauthorized immigrants as a whole, non-recent
14   immigrants, and new immigrants are also negative but not
15   statistically different from zero, unquote?  Is that
16   correct?
17        A.   Yes.
18        Q.   Okay.  Is it fair to say then that Orrenius
19   and Zavodny found that with respect to immigrants who
20   had -- unauthorized immigrants who have been present
21   more than five years that there was a statistically
22   significant negative effect of universal E-Verify laws?
23                MR. DISHER:  Objection.  The document
24   speaks for itself.
25        A.   That's my understanding of their conclusion.
```

1      Q.   Would you agree with me then that the Orrenius
2  study does not provide research support for the
3  contention that immigrant unauthorized workers in Texas
4  who have lived in the U.S. at least five years are
5  likely to leave the state?
6                 MR. DISHER:  Objection, vague.
7      A.   It does not specifically address Texas.
8      Q.   It also specifically found that with respect
9  to immigrants who had been present for more than five
10  years, there was no statistically significant negative
11  effect of universal E-Verify.  Correct?
12      A.   Correct.
13      Q.   Let's look at Paragraph 8.  In your second
14  sentence, tell me if I read this correctly:  Quote, The
15  causes of return migration are difficult to address
16  because there is limited research and understanding of
17  return migration, unquote.
18                 Did I read that correctly?
19      A.   Yes.
20      Q.   Can you explain that sentence a little bit
21  more or expand on it for me.
22      A.   There just isn't that much research looking at
23  migrants who have returned to their country of origin
24  and their reasons for why they returned.
25      Q.   Other than the articles that you cite in your

1  declaration, are you aware of any other research on the

2  topic of return migration?

3      A.   Not that I could cite today, but I believe

4  there are other articles and research out there that

5  have looked at that.

6      Q.   Okay.  Are you aware of any articles or

7  research that focused on return migration from Texas

8  specifically?

9      A.   I'm not familiar with them, but there may be

10  some that have.

11      Q.   Are you familiar with any research on the

12  possibility of return migration of people who receive

13  DACA?

14      A.   I'm not familiar with any research on that.

15      Q.   Are you aware of any research on return

16  migration that focuses on young adults brought to the

17  U.S. as children who have resided in the U.S. at least

18  10 years?

19      A.   So research on children who have come to the

20  United States as children?

21      Q.   And who have resided in the U.S. at least

22  10 years.

23      A.   Not specifically, but I believe there are some

24  studies that have looked at DACA recipients -- or DACA

25  participants.

```
 1   any -- any specific studies about return migration that

 2   you relied on for your declaration other than the ones

 3   that are cited in your declaration?

 4        A.   That I --

 5        Q.   Relied on while preparing your declaration

 6   that are not cited in your declaration.

 7        A.   Can I cite them today?

 8        Q.   Yes.

 9        A.   I don't think I can cite them today.

10        Q.   Okay.  Let's take a look at Paragraph 8.  You

11   say in your first sentence after the comma, and tell me

12   if I read this correctly, quote, It is reasonable to

13   conclude that some DACA participants would return to

14   their country of origin if they lose or are not given

15   permission to work in the U.S., unquote.

16             Did I read that correctly?

17        A.   Yes.

18        Q.   How many is "some"?

19        A.   More than one.

20        Q.   Can you help me find a top number for "some"?

21   Do you have --

22        A.   All of them.

23        Q.   Do you think it's reasonable to conclude that

24   all DACA participants would return to their country of

25   origin if they lost work authorization?
```

1      A.   From everything I've looked at and thought

2  about, I don't think I could actually put a number on

3  it.

4      Q.   So larger than one but less than all.  Is that

5  it?

6      A.   Yes.

7      Q.   Okay.  Do you have any other more specific

8  estimate of the number of DACA participants who would

9  return to their country of origin?

10      A.   I do not.

11      Q.   Did you perform any analysis yourself

12  personally that would shed light on the number of DACA

13  participants that you think would return to their

14  country of origin if they lost work authorization?

15               MR. DISHER:  Objection, vague.

16      A.   I did not.

17      Q.   Would you agree with me that it is reasonable

18  to conclude that a DACA participant might return to

19  their country of origin for reasons unrelated to

20  employment?

21               MR. DISHER:  Objection, calls for

22  speculation.

23      A.   I think that's reasonable that some DACA

24  participants do return to the their country of origin,

25  not necessarily for employment.

```
 1        Q.   So, for example, it might be possible that a
 2   DACA participant returns to their country of origin to
 3   marry.  Correct?
 4        A.   That's possible.
 5        Q.   Or possible that the person returns to their
 6   country of origin to care for an elderly parent.  Is
 7   that correct?
 8        A.   Yes.
 9        Q.   Okay.  So given that there are various reasons
10   that DACA participants might return to their home
11   country, do you have any way of quantifying the number
12   of DACA recipients who might leave because of
13   employment-related reasons like losing work
14   authorization?
15        A.   I don't.  I think to do that you would have to
16   have some information about the number lost and look at
17   changes over time.  You'd have to look at it in terms of
18   what actually happens, which would be speculation at
19   this point.
20        Q.   Would you say that when you use the word
21   "some" when you say, some DACA participants would return
22   to their country of origin if they lose permission to
23   work in the U.S., that your use of the word "some" there
24   is hypothetical?
25                  MR. DISHER:  Objection, vague.
```

1     A.    When you say "hypothetical"?

2     Q.    Meaning that you consider it a theoretical

3  possibility but you don't have a number to assign to

4  that group of "some."

5                MR. DISHER:  Objection, vague.

6  Objection, compound.

7     A.    I don't have a number.

8            What was the first part of the question?

9     Q.    And, thus, the possibility is presented as one

10  that is theoretical but not quantified?

11                MR. DISHER:  Same objection.

12     A.    Yeah.  I mean, I think -- I think it's

13  unlikely that it's just theoretical.  I mean, I believe

14  that if DACA participants lost permission to work that

15  would be a motivating factor for some of them to return

16  to their country of origin.

17     Q.    But you're -- has any DACA participant told

18  you personally that they would return to their home

19  country if they lost work authorization?

20     A.    No.

21     Q.    In Paragraph 8, at the bottom of the page and

22  then flowing over to the top of the next page, you have

23  identified some characteristics that would make it more

24  or less likely for some DACA participants to emigrate if

25  they were denied permission to work in the U.S.  Is that

1  between regular undocumented immigrants and DACA

2  participants.

3      Q.   And would one of those distinctions be that

4  the DACA recipient may have been working with work

5  authorization for some period of time before losing it?

6      A.   Compared to undocumented immigrants, yes.

7      Q.   Okay.  In your last sentence you say, "The

8  variation in characteristics within the DACA applicant

9  population suggests that some do have characteristics

10 that have been associated with higher probability of

11 emigration from the U.S."

12          And is it fair to say that what you have

13 in the parentheses there are those characteristics that

14 you think some DACA recipients have that are associated

15 with a higher probability of return?

16          MR. DISHER:  Objection, misstates his

17 testimony.

18          Go ahead and answer.

19     A.   The -- so -- so these are some examples, not

20 necessarily an exhaustive list.  And, yes, that I think

21 there are some DACA participants that share similar

22 characteristics to unauthorized immigrants that are

23 associated with a probability of return migration.

24     Q.   Have you done any study of the characteristics

25 within the DACA population to assess how many have the

1    characteristics that you associate with a probability --

2    a higher probability --

3         A.    I have --

4         Q.    -- of return?

5         A.    I have not.

6         Q.    Okay.

7         A.    Sorry.  I didn't mean to --

8         Q.    Are you aware of any studies not done by you

9    that examine the characteristics within the DACA

10   population to see whether some have a higher probability

11   of return to their home country?

12        A.    Not specifically for probability of return

13   migration, but there are studies looking at the

14   characteristics of DACA participants.

15        Q.    Did you look at any of those studies to try to

16   get a handle on the number of DACA participants who

17   might have characteristics associated with a higher

18   probability of return to their home country?

19        A.    I did not.

20        Q.    Can you tell me what year a DACA recipient had

21   to have arrived in the United States by in order to get

22   DACA?

23        A.    I don't recall.

24        Q.    Can you tell me the age under which a DACA

25   recipient had to have arrived in the United States in

1  United States at least up until about 2008?

2      A.    Yes.   Until about 2008, there was a steady

3  increase in the unauthorized population in the

4  United States --

5      Q.    Okay.

6      A.    -- or we estimate that there has been.

7      Q.    And IRCA was enacted sometime before then.   Is

8  that right?

9      A.    Yes.   I think it was '84.

10     Q.    '86, perhaps?

11     A.    86, yeah.

12     Q.    Okay.   We're going to leave the Wishnie

13  article alone now.

14     A.    Okay.

15     Q.    I'm not going to ask you any more questions

16  about it.

17               Would it be correct to say that the

18  opinions in your report are not based on speaking with

19  any individual DACA recipients?

20     A.    Yes.

21     Q.    Would it be correct to say that the opinions

22  in your report are not based on any survey research of

23  DACA recipients?

24     A.    Probably not completely.

25     Q.    Are you aware of any of the --

```
 1        A.    I think the Current Population Survey probably

 2   surveyed some DACA participants.

 3        Q.    Good catch.   Yes.

 4                   So other than the Current Population

 5   Survey or any other census survey that might have

 6   captured the responses of DACA recipients, would it be

 7   correct to say that the opinions in your report are not

 8   based on survey research of DACA recipients?

 9        A.    Yes.

10        Q.    Okay.   Are you aware of any organizations of

11   undocumented students at UTSA?

12        A.    Vaguely.

13        Q.    Have you ever sought to attend a meeting of

14   any undocumented students at UTSA?

15        A.    No.

16        Q.    You talked about some of the possibilities

17   with respect to DACA recipients leaving Texas after

18   losing work authorization, and you described that --

19   that it's greater than one but less than all, and I'd

20   like to return for a minute to that.

21                   Is it more likely than not, in your

22   estimation, that the number of DACA recipients who would

23   return to their home country from Texas after losing

24   work authorization would be fairly small?

25                   MR. DISHER:   Objection, vague.
```

1      A.   Yeah.   I don't -- I don't think I could say --

2  I don't believe that I can quantify a number other than

3  I think some would.

4      Q.   Okay.  So then is it within the realm of

5  possibility that the number could be fairly small?

6                  MR. DISHER:  Objection, vague.

7      A.   Yes, in the same turn as it could be that it

8  could be really large.

9      Q.   Do you consider it equally likely that the

10  number of DACA recipients who would return to their

11  country after losing work authorization is small or very

12  large?

13                 MR. DISHER:  Objection, vague.

14     A.   I don't think I could state that.

15     Q.   Okay.  So is it your position that you cannot

16  say that it is more likely that the number of DACA

17  recipients who would return is small versus very large?

18                 MR. DISHER:  Objection, vague.

19     A.   Can you -- can you define what "small" and

20  what "large" is?

21     Q.   Okay.  Well, is it -- okay.  Let's talk about

22  it in terms of percents because numbers could be

23  confusing.

24                  Do you consider it equally likely that

25  more than 50 percent or less than 50 percent of DACA

1 recipients would return to their home country after

2 losing work authorization?

3      A.   I really don't think I could put a percent on

4 it, but I do state that I think most DACA participants

5 would stay in the United States.

6      Q.   Would you agree with me that if DACA

7 recipients had to arrive in the United States before

8 they were 16 years old that that characteristic of

9 arriving in the United States before age 16 would tend

10 to increase the probability of them staying in the

11 United States if they lost work authorization?

12           MR. DISHER:  Objection, vague.

13 Objection, asked and answered.  Objection, incomplete

14 hypothetical.

15      A.   Compared to?

16      Q.   Those who arrived in the United States after

17 the age of 16.

18           MR. DISHER:  Same objections.

19      A.   But then they're not eligible for DACA or --

20      Q.   Right.  So the characteristic -- would you

21 agree with me that the characteristic of DACA recipients

22 of having arrived in the United States before the age of

23 16 makes them less likely to return when compared to the

24 general unauthorized immigrant population?

25           MR. DISHER:  Objection, vague.

1   representing a defendant-intervenor in this case.  I am

2   just going to touch on a few areas and try not to take

3   up too much more of your time.

4            The same rules apply that Ms. Perales

5   explained earlier.  If you don't understand my question,

6   please just let me know and I will try to rephrase it.

7   We'll try not to talk over each other, and hopefully we

8   can move this right along.

9        A.   Okay.

10       Q.   Okay.  I just want to ask a little bit about

11   the articles in your declaration.  Did you select the

12   articles that you cited in the declaration?

13       A.   Yes.

14       Q.   How did you select them?

15       A.   Reading that during -- well, during a search

16   through bibliographic software and identifying a lot of

17   articles and sorting through the ones that I thought

18   were relevant to what I was asked to testify about.

19       Q.   And why did you choose these particular

20   articles included in your declaration?

21       A.   They seemed most relevant to the points that I

22   was hoping to make and also concise.  So there's some

23   degree of parsimony was also a factor.

24       Q.   Did you select any research or articles

25   included in your declaration that directly address the

1   topics of DACA?

2                   MR. DISHER:  Objection, vague.

3       A.    No.

4       Q.    Why not?

5       A.    They weren't -- I didn't find any that

6   addressed the issue of probability of return migration

7   among DACA participants.

8       Q.    In considering which scholarly references to

9   include in your declaration, did you consider the

10  reliability of the authors as a subject matter?

11      A.    Yeah.  For those that I was familiar with,

12  yes, that was a factor.

13      Q.    Which ones are you unfamiliar with?

14      A.    I didn't -- I don't know Wishnie.  I shouldn't

15  say "know."  I've not read Wishnie -- Wishnie's work

16  before.  And then Kennan and Walker I wasn't familiar

17  with before.  The others I've had some familiarity with

18  before.

19      Q.    Okay.  So I'd like to go to Paragraph 4 of

20  your declaration, which I believe is Exhibit 3.  I

21  believe this is an Emma Aguila article for the research.

22                   Are you familiar with her work?

23      A.    I'm sorry.  I'm -- I'm -- can you point me to

24  where we are?

25      Q.    So Paragraph 4, about midway down, there's a

 1    correct?

 2        A.    Yes.

 3        Q.    Okay.  Have there been any other studies that

 4    address this issue in the last 17 years?

 5                    MR. DISHER:  Objection, vague.

 6        A.    If there are, there aren't many.

 7        Q.    Okay.  You don't know for sure?

 8        A.    I didn't -- I don't think I found any when I

 9    looked that specifically address this.

10        Q.    And when we say "this," do we mean young

11    immigrants -- how would you characterize the -- the

12    Regan and Olsen research as you cited it here in this

13    paragraph?

14        A.    They were looking at return migration --

15        Q.    Okay.

16        A.    -- of immigrants.

17        Q.    Okay.

18                    MS. GREGORY:  I'd like to have this

19    marked, please.

20                    (Exhibit No. 7 marked)

21        Q.    Dr. Potter, do you recognize Exhibit 7, titled

22    "You Can Go Home Again: Evidence From Longitudinal

23    Data"?

24        A.    Yes.

25        Q.    And is this the article that you cited in

1    Paragraph 9 of your declaration?

2         A.    Yes.

3         Q.    Did this study address DACA recipients?

4         A.    No.

5         Q.    Did this study distinguish between documented

6    and undocumented immigrants?

7         A.    No.

8         Q.    On Page 339, the first page, looking at the

9    right-hand column, the second full paragraph, it begins

10   "in this paper."  Do you see where --

11        A.    Yes.

12        Q.    Okay.  So in this paragraph the author states

13   that they use longitudinal data from the 1979 youth

14   cohort of the National Longitudinal Surveys (NLSY79) to

15   study emigration, with an "E," in one cohort of

16   immigrants.

17              Did I read that correctly?

18        A.    Yes.

19        Q.    What is the National Longitudinal Surveys?

20        A.    It's a survey that follows people over time

21   and asks a range of questions about their

22   characteristics and socioeconomic characteristics.

23        Q.    So what would be the 1979 youth cohort of the

24   National Longitudinal Surveys?

25        A.    That would be the cohort that they started

1  following in 1979.

2       Q.    Do you know when -- or what age a cohort is

3  when they begin following them?

4       A.    I don't know.

5       Q.    Okay.  So the sentence immediately after that

6  I just read says that more than 750 NLSY79 respondents

7  were born abroad to foreign nationals.

8             Did I read that correctly?

9       A.    Yes.

10      Q.    So this particular cohort was born in or

11  before 1979.  Is that correct?

12      A.    Yes.

13      Q.    Let's look at Footnote 2, which is on the same

14  page.  The very last sentence says, quote, By 1996, only

15  71 foreign cases were eligible to be interviewed for

16  NLSY79, end quote.

17            Did I read that correctly?

18      A.    Yes.

19      Q.    So in your reading, does that mean that there

20  were only -- there was only complete data for

21  71 individuals?

22      A.    In the survey?

23      Q.    Yes.

24      A.    Not in the survey, but that they had

25  identified as, quote, unquote, foreign cases in the

```
 1   survey.
 2        Q.   So what does that mean, only 71 foreign cases
 3   were eligible to be interviewed?  What is your
 4   understanding of that?
 5        A.   So they were looking at people who started in
 6   the 1979 cohort and followed them over time; and by
 7   1996, they had identified 71 cases who had returned
 8   to -- I think to their country of origin or had left the
 9   United States.
10        Q.   Dr. Potter, are you familiar with the DACA
11   eligibility requirements?
12        A.   Vaguely.
13        Q.   Are you aware that DACA applicants had to be
14   under 31 years old by 2012 to be eligible for deferred
15   status and, therefore, wouldn't have been born yet in
16   1979?
17        A.   Yes.
18        Q.   You can set that to the side, Exhibit 7.
19             MS. GREGORY:  I'd like to have this
20   marked, please.
21             (Exhibit No. 8 marked)
22        Q.   Dr. Potter, you're looking at Exhibit 8.  Is
23   this the article that you cite in Paragraph 10 of your
24   declaration?
25        A.   Yes.
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
 3   STATE OF TEXAS, et al.,          )
          Plaintiffs,                 )
 4                                    )
     VS.                              )
 5                                    )
     UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
 6        Defendants,                 )
                                      )
 7   and                             )
                                      )
 8   KARLA PEREZ, et al.,             )
                                      )
 9         Defendant-Intervenors.  )
10
                     REPORTER'S CERTIFICATE
11             DEPOSITION OF LLOYD POTTER, Ph.D.
                      JUNE 27, 2018
12
13       I, Kathleen Casey Collins, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16       That the witness, LLOYD POTTER, Ph.D., was duly
17   sworn by the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20       That the deposition transcript was submitted on
21   _____, ____, to the witness or to the attorney for
22   the witness for examination, signature and return to me
23   by _____, _____;
24       That pursuant to information given to the
25   deposition officer at the time said testimony was
```

```
 1  taken, the following includes counsel for all parties
 2  of record:
 3        Mr. Todd L. Disher and Mr. Trent Peroyea
                 Attorneys for the Plaintiffs
 4        Ms. Nina Perales, Attorney for
                 Defendant-Intervenors
 5        Mr. Andrew Bobb, Attorney for Defendants
          Ms. Katherine Gregory, Attorney for New Jersey
 6                Office of Attorney General
 7        I further certify that I am neither counsel for,
 8  related to, nor employed by any of the parties or
 9  attorneys in the action in which this proceeding was
10  taken, and further that I am not financially or
11  otherwise interested in the outcome of the action.
12        Certified to by me this _____ day of June,
13  2018.
14                       _____
                         KATHLEEN CASEY COLLINS
15                       Texas CSR NO. 2018
                         Certificate Expires 12/31/18
16                       Ken Owen & Associates
                         Firm Certificate No. 115
17                       801 West Avenue
                         Austin, Texas  78701
18                       (512) 472-0880
19
20
21
22
23
24
25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

## <u>ORDER</u>

On this date, the Court considered Defendant-Intervenors' Motion to Strike Plaintiffs' Experts.  After reviewing the Motion and arguments, the motion is **GRANTED**.

It is hereby **ORDERED** that expert reports of Dr. Donald Deere (Dkt. 7 at 88, Dkt. 219-21 at 2, Dkt. 358-13, Dkt. 358-21) and Lloyd Potter (Dkt. 7 at 3, Dkt. 358-31) are stricken from the record, and the Court will not consider the report or testimony (deposition or live) of Dr. Deere and Dr. Potter.

SO ORDERED this ____day of _____, 2019.

_____
HON. ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE