# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,           )
        Plaintiffs,               )
                                  )
VS.                               )
                                  )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
        Defendants,               )
                                  )
and                               )
                                  )
KARLA PEREZ, et al.,              )
                                  )
        Defendant-Intervenors.    )

***********************************************

ORAL DEPOSITION OF

DONALD R. DEERE, Ph.D.

JUNE 28, 2018

***********************************************

ORAL DEPOSITION OF DONALD R. DEERE, Ph.D., produced
as a witness at the instance of the
Defendant-Intervenors, and duly sworn, was taken in the
above-styled and numbered cause on the 28th of June,
2018, from 10:15 a.m. to 12:45 p.m., before Kathleen
Casey Collins, CSR, in and for the State of Texas,
reported by machine shorthand, at the Office of the
Attorney General, 301 West Fifteenth Street, Seventh
Floor, Austin, Travis County, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

1   economics in most of your classes?

2       A.    Analysis of the labor market.  So labor

3   supply, labor demand, and labor market equilibrium.  I'd

4   say that pretty much covers it.

5       Q.    Okay.  Currently, what are -- what is your

6   occupation or what are you doing now?

7       A.    Well, I'm still an economist.  I work for

8   Welch Consulting.  I started there, actually, as an

9   employee in 2005.  I had worked for Welch Consulting as

10  a consultant for some years prior to that, and I retired

11  from the university and moved to Welch Consulting full

12  time at that time.  And what we do is economic and

13  statistical work, primary litigation support most often

14  in the labor employment sphere.

15      Q.    When you say "litigation support," what is --

16  what does that involve for you?

17      A.    Well, it involves both testifying and

18  consulting expert engagements.  So a testifying expert

19  like this where, you know, we write a report or

20  declaration, sometimes be deposed, rarely testify in

21  court.

22            Consulting engagements are where we're

23  engaged by law firms and/or companies directly to

24  analyze various aspects of their employment data and

25  provide them the information that they would -- that the

1  lawyers would then use to provide legal advice to their

2  clients.

3       Q.   What -- what did your focus -- what did your

4  research focus on when you were at Texas A&M?

5       A.   Primary labor economics.  You can see the list

6  of publications on the -- on the vita that are pretty

7  much -- not all of them, but most of them have something

8  to the with aspects of -- of the labor market.

9       Q.   Have you ever conducted research regarding the

10 effects of immigration on the labor market?

11      A.   No, I have not done that.

12      Q.   Have you ever written any articles regarding

13 the effects of immigration on the labor market?

14      A.   No.

15      Q.   Have you ever conducted research regarding the

16 effects of immigration on wages?

17      A.   No.

18      Q.   Have you ever written any article, even if it

19 was an op-ed or anything like that, regarding the

20 effects of immigration on wages?

21      A.   I don't think so, no.

22      Q.   Have you ever conducted research regarding the

23 interaction between immigration and public benefits?

24      A.   Well, other than what I've done in my

25 declaration with regard to the ACA, I would say no.

1     Q.   Have ever -- have you ever written any

2  articles regarding the interaction between immigration

3  and public benefits, so as opposed to research?

4     A.   I'm sorry.  Would you --

5     Q.   Sure.

6     A.   -- repeat.

7     Q.   No problem.

8     A.   I'm trying to distinguish that question from

9  the prior question.

10    Q.   The prior question, unless I misspoke, it

11 was -- I was asking about research.

12               But have you ever written anything

13 published, even if it was in a newspaper or a magazine,

14 regarding the interaction between immigration and public

15 benefits?

16    A.   And I would say the only thing I've written

17 about that would be the declaration that brings us here

18 today.

19    Q.   Well, we have that out today as exhibit --

20 Exhibit 1; and if we can go to the first page of this

21 exhibit, it says here in the body of this text,

22 "Plaintiff States disclose the following experts in

23 accordance with the Court's scheduling order," and your

24 name is listed here.

25               Do you understand that the parties

```
1   called -- going by the name Plaintiff States are calling

2   you as an expert witness?

3       A.   Yes.

4       Q.   Let's go to Page 4, again, the beginning of

5   your supplemental declaration.

6                A quick question about Welch Consulting

7   itself more broadly.  Is that -- where is that based?

8       A.   It's based in Bryan, Texas.

9       Q.   So is that -- is that where you -- I imagine

10  you lived in the area already from working at A&M?

11      A.   I live in College Station, which is right next

12  to Bryan, yes.

13      Q.   Okay.  So you didn't have to go too far.

14               Okay.  What kind of research has Welch

15  Consulting done around the issue of immigration?

16      A.   I don't know that it has.  I mean, you know,

17  again, Welch Consulting is a -- we're engaged by clients

18  in primarily litigation-support-type roles.  And so

19  maybe there's been something involving immigration that

20  someone in the firm -- because we have offices in

21  California, Los Angeles, and D.C. as well, that someone

22  else has worked on, but I can't immediately call that to

23  mind.

24      Q.   Are there any -- what are the major areas of

25  the Texas Welch Consulting in terms of their -- their
```

1  advice and research?

2       A.   It's -- it's typically labor employment.   I

3  mean, we really have two areas -- well, three areas

4  about which we are engaged most often.

5             One is wage and hour type of litigation.

6  So it's allegations about violations of the FLSA or

7  State wage and hour laws and the implications of that.

8  We typically analyze data to assist in those cases.

9             The second type of cases are

10  discrimination cases like Title VII and/or EEOC or LLFC

11  agency actions, or sometimes they're State actions as

12  well, that are involving claims of discrimination based

13  on protected characteristics in employment of either

14  pay, promotion, hiring, or termination.

15             And then a third area would be damages in

16  wrongful termination or personal injury cases where

17  we're making economic damage calculations, typically for

18  individuals who are claiming either they were hurt or

19  they were fired inappropriately.

20       Q.   Well, I don't believe I've brought it with me,

21  but I wanted to ask you about your recent testimony

22  history.  You said that -- that Welch does some

23  discrimination cases.

24             Let's go to the back -- the very last

25  page of Exhibit 1.  Do any of these cases deal with --

```
 1        A.    Yes.

 2        Q.    When did you prepare your first declaration?

 3        A.    Well, it -- I would say April 27th, 2018, and

 4   obviously some days before that.  I didn't write it all

 5   in one day.

 6        Q.    Sure.  When did you prepare your supplemental

 7   declaration?

 8        A.    June 14th, 2018, and some of the days leading

 9   up to that.

10        Q.    Why did you prepare your supplemental

11   declaration?

12               MR. DISHER:  And I'll just instruct the

13   witness you can answer to the extent you can without

14   disclosing conversations you may have had with counsel

15   for this case.  Go ahead and answer.

16        A.    Well, I -- I thought a little more about the

17   issue of immigration and its impact on the labor market

18   and DACA recipients specifically and impact on the

19   market, because the initial declaration was focused

20   primarily, if not solely, on the interaction of DACA and

21   the ACA; and really the -- there are broader aspects to

22   the implications for the labor market of the DACA

23   recipients and their labor supply or their work status,

24   and that -- so I wanted to expand the declaration and

25   cover what is really sort of the broader aspects of the
```

Page 15

1    impact of that impact.

2        Q.    Did you do any additional quantitative

3    analysis or research --

4        A.    Yes.

5        Q.    -- for that question?

6        A.    Yes.

7        Q.    Okay.  And what -- what was that?

8        A.    Well, as I note in the -- my supplemental

9    declaration, there's a -- there's a -- there is a pretty

10   big literature in economics about the impacts of

11   immigration generally on the labor market; and I

12   reviewed certainly not all but some of that literature,

13   a couple of pieces of which I cited in my supplemental

14   declaration.

15       Q.    In the supplemental declaration, which is

16   Exhibit 1, could we go to Page 7, and if you look at

17   Paragraph 23, the sentence that starts with "Economic

18   theory implies," if you can review this paragraph, and

19   take your time answering and reviewing.

20               Is this the paragraph that you inserted

21   with regard to looking at the issue of immigration and

22   its effect on the labor market?

23       A.    Well, this is a paragraph that I inserted in

24   the supplemental declaration, and it does refer to the

25   issue of the impact of immigration on the labor market.

```
1          Q.   Sure thing.
2               Can we look at 221, which is in the
3     middle of Page 8.  There's a paragraph there that starts
4     with the word "thus" in the middle.  Do you see that?
5          A.   Yes.
6          Q.   And it says, "Thus, many small businesses are
7     exempt from the employer penalty because they do not
8     reach the minimum employee threshold."
9               Do you agree with that?
10         A.   Yes.  The law is the law.
11         Q.   Okay.  Therefore, the scenario in your
12    declaration would not apply to small businesses with
13    fewer than 50 employees.  Right?
14         A.   That is correct.  I think -- I think
15    technically the 50 is sort of an average.  You know, if
16    you were 49 in months and 51 in other months, there's --
17    there are rules for how to decide.  But, yeah,
18    basically, small employers it wouldn't apply.
19         Q.   Okay.  So based on -- what you were talking
20    about is there could be instances where a company has
21    seasonal workers and regardless of the number of those
22    workers, if they don't meet a certain number of hours,
23    then they might not qualify for the -- for the mandate
24    either or the penalty?
25         A.   I don't know what the rules are in that case.
```

1  But, again, there are clearly smaller employers, however

2  defined, to which this does not apply.  I agree with

3  that.  To which the ACA penalty interaction part of my

4  declaration does not apply.

5       Q.   Okay.  Well, let's look back at your

6  declaration and look at -- so this is going back to

7  Exhibit 1, and look at Paragraph 7.  You say that

8  individuals with an EAD are not eligible for premium

9  subsidies.  Right?

10      A.   Yes.

11      Q.   Isn't it true that you assume that firms have

12  perfect knowledge or complete information regarding the

13  laws and regulations associated with the Affordable Care

14  Act penalty?

15              MR. DISHER:  Objection, vague.

16      A.   I wouldn't say complete and perfect

17  information, no.

18      Q.   Did you do any analysis of when businesses

19  have knowledge of how the employer mandate or employer

20  penalty will apply?

21      A.   No.

22      Q.   Did you consult any studies or surveys that

23  would discuss a firm's knowledge or possession of

24  information regarding the ACA employer penalty?

25      A.   No.

1        Q.   For your scenario in the declaration, you also

2   assume that employers are not considering other factors

3   such as training costs of U.S. citizen workers or other,

4   as you say, lawfully present workers versus DACA

5   recipients.   Right?

6                MR. DISHER:  I'm sorry.  Could you repeat

7   that question?

8                MR. HERRERA:  Sure.

9        Q.   For -- looking at the scenario you have in

10  your declaration, the -- of Worker A versus Worker B,

11  you assume that employers are not considering other

12  factors such as training costs of -- of lawfully present

13  workers versus DACA recipient workers.   Right?

14                MR. DISHER:  Objection, vague.

15  Objection --

16       A.   I wouldn't --

17                MR. DISHER:   -- mischaracterizes his

18  testimony.

19                Go ahead.

20       A.   I wouldn't agree with that.  I'm assuming that

21  the employer is viewing the two workers as close

22  substitutes, that they might both need training or they

23  would both need training.  I mean, they're --

24       Q.   Okay.  So if -- going back to the knowledge

25  question, if you did no analysis or examined no other

1    research regarding a firm's knowledge of information

2    regarding the employer penalty, then how do you know how

3    that factor -- how that factors into your scenario?

4                    MR. DISHER:  Objection, mischaracterizes

5    testimony.

6          A.    Well, I mean, certainly employers are aware of

7    the ACA.    You're talking about the largest employers

8    here that are presumably the most sophisticated and have

9    the most resources and have the most at stake if they

10   screw up with regard to employment law.    So there's an

11   incentive for employers to understand the law.

12                    So I -- you know, I don't know that --

13   I'm certainly not assuming they have perfect knowledge.

14   I think it's sort of silly to assume they're completely

15   unaware of any aspects of the ACA whatsoever.    So maybe

16   it's somewhere in the middle.

17         Q.    Okay.    And when you say -- would it be fair to

18   say that you assumed for the purposes of your report

19   that employers are aware of the fact that employees with

20   EAD are not eligible for premium subsidies?

21                    MR. DISHER:  Objection, vague.

22         A.    Well, they're at least differentially

23   eligible, less likely to get.    Yeah, that would be a --

24   a part of it.

25         Q.    Okay.  Would it be fair to say that you

1    criteria, meaning that they're less likely to get the --

2    the premium subsidy?

3        A.   I don't know that it matters why they view

4    them as -- as less expensive.  It matters that they view

5    them as less expensive because of the ACA, whether it's

6    they would get a -- they would be less likely to claim

7    the credit or they would be less likely to be eligible

8    for the credit or whatever.  It really doesn't matter.

9    What matters is that the employer -- you've got two

10   choices, "A" and "B," and they're otherwise the same

11   except "A" costs more because of the ACA.  I'm going

12   to choose "B."  That's what is assumed in that

13   scenario.

14       Q.   Okay.  So you're saying that -- that they --

15   that otherwise they would be the same.  So you're

16   controlling in this scenario for other cost factors such

17   as training.  Right?

18                  MR. DISHER:  Objection, vague.

19       A.   Well, as I said, it's sort of all other things

20   equal is the -- is the theoretical point that the

21   example is talking about, yes.

22       Q.   Okay.  And all other things being equal would

23   include something like training costs?

24       A.   Yes.

25       Q.   Okay.  Would it be fair -- would it be correct

1  to say that you assume that employers are aware that a

2  job applicant has an EAD authorizing employment before

3  making the hiring decision?

4            MR. DISHER:  Objection, asked and

5  answered.  Objection, vague.

6       A.   Well, I don't know immigration employment law.

7  But I know that you've got to have I-9 information, and

8  I would think that the EAD would be shown at the I-9

9  stage.  Now, whether that's post offer or not, I'm not

10  completely sure.

11       Q.   Okay.

12       A.   But, again, the assumption here -- as I said,

13  the key assumption is that the employer views the DACA

14  recipient as cheaper, other things equal.  And if other

15  things aren't equal, maybe training is a little bit more

16  expensive for the DACA recipient, but maybe the subsidy

17  more than offsets that so...

18            But the discussion in the supplement --

19  supplemental declaration is other things equal, the

20  employer views the DACA recipient, who he knows the DACA

21  recipient is more expensive because of the ACA relative

22  to the lawfully present individual, who they apparently

23  know is lawfully present, and that's the comparison.

24       Q.   Sure.  And I get the -- I get the point of

25  the -- of the comparison and what -- what your analysis

1  has concluded.  But I'm just trying to get at what the

2  decision-making is here for an employer for -- so in

3  your example, the employer, when making the decision,

4  this is the -- you talked about immigration law and I-9.

5  You're assuming here that the employer already knows

6  that the applicant has an EAD?

7       A.   As I just said, the employer has two options.

8  One is a DACA recipient.  They know that.  One is

9  lawfully present.  They know that.  And they view the

10 DACA recipient as cheaper because of the ACA regulations

11 and law, period.  That's the -- the key assumption for

12 the hypothetical in the supplemental declaration.

13            MR. HERRERA:  Okay.  Objection,

14 nonresponsive.

15      Q.   So just -- just answering that specific

16 question, you're -- you're assuming that the employer

17 knows that that person has an EAD before making the

18 hiring decision?

19            MR. DISHER:  Objection, asked and

20 answered.

21      A.   I said they knew they were a DACA recipient

22 so -- and -- and have an EAD.

23      Q.   Okay.  What other assumptions did you make for

24 the purpose of this scenario?

25      A.   None.

1    Q.   Okay.  Let's look at Page 9 of Exhibit 4 --

2    or, rather, Exhibit 3, and so that's the Page 9 that's

3    at the top right.

4              In the first full paragraph there that

5    begins with "Employee demographics," there is a numbered

6    list before which the article says, "Certain kinds of

7    employees will not trigger the penalty, including," and

8    then so there's that list.

9              So "Certain kinds of employees will not

10   trigger the penalty, including, No. 1, highly

11   compensated employees (i.e., those earning at least

12   400 percent of the applicable federal poverty level),

13   who are not eligible for subsidies in any event."

14             Do you agree with that?

15             MR. DISHER:   Objection to the extent it

16   calls for a legal conclusion.

17        A.   I mean, my understanding is that individuals

18   between 104 percent -- 100 percent and 400 percent of

19   the poverty level are the ones that are eligible.  Below

20   100 I think would be No. 3, Medicaid.  And above 400

21   would be No. 1, highly compensated.  So that is my

22   understanding, yes.

23        Q.   Okay.  And do you agree that employees covered

24   by a policy owned by a parent or a spouse will not

25   trigger the penalty?

```
 1                    MR. DISHER:   Same objection.
 2        A.    If that's part of the law, I agree.
 3        Q.    And do you agree that employees eligible for
 4   Medicaid coverage, which are not eligible for the
 5   subsidized policies, would not trigger the penalty?
 6                    MR. DISHER:   Same objection.
 7        A.    Same answer.  I said that already.  Yes.
 8        Q.    And slightly -- slightly different.  Would you
 9   agree that employees eligible for Medicare coverage
10   would not trigger the penalty?
11                    MR. DISHER:   Objection, calls for a legal
12   conclusion.
13        A.    And my answer is if that's what the law says,
14   I'll agree.
15        Q.    And would you agree that those who choose to
16   be uninsured do not trigger the -- the penalty?
17                    MR. DISHER:   Same objection.
18        A.    I agree with whatever the law says.
19        Q.    Did you attempt to make any calculation of
20   U.S. citizens or other lawful residents in the
21   United States who currently match at least one of the
22   criteria that we just went over from Page 9 of
23   Exhibit 3?
24        A.    No.
25        Q.    Conversely, you don't know how many U.S.
```

1  citizens in the U.S. would meet none of the criteria in

2  that list on Page 9.  Right?

3      A.   No.

4      Q.   Therefore, isn't it true that you don't know

5  how many U.S. citizens in the U.S. there are who would

6  trigger the penalty?

7      A.   I'm not sure what "would trigger the penalty"

8  means.  But I do know that, you know, there's -- in the

9  reference somewhere, 8.7 million are the number who

10 actually receive premium tax credits.  So it's at least

11 that many.

12     Q.   Okay.  Well, let's -- before we go -- before

13 we look at that figure, you -- it's true that you don't

14 know how many U.S. citizens or other lawful residents in

15 the United States there are who would trigger -- trigger

16 the penalty based on this list of criteria on Page 9?

17             MR. DISHER:  Objection, vague.

18     A.   I do not.

19     Q.   Did you conduct any analysis of employer

20 awareness of eligibility of employees for premium

21 subsidies?

22     A.   No.

23     Q.   And based on your answer earlier about the

24 I-9, is it correct to say you did not research whether

25 an individual presents I-9 documentation before or after

1   hiring?

2             MR. DISHER:   Objection, vague.

3        A.   I -- I don't know how that works.   I'm not

4   sure what the law is there so...

5        Q.   Okay.   So you didn't --

6        A.   I didn't -- I'm sorry.   What was your --

7        Q.   Sure.

8        A.   I did not do any research to answer that

9   question either.

10       Q.   Okay.   Well, let's look at -- and you brought

11  up a figure a second ago.   Let's look back at your

12  declaration on Page 3.   So that's Exhibit 1, Page 3.

13            In the footnote of Page 3 of your

14  declaration, is that the 8.7 million number you were

15  referring to?

16       A.   In Footnote 4 on Page 3 of Exhibit 1, yes.

17       Q.   Okay.   And the footnote belongs to a

18  paragraph, Paragraph 8, which says that the resulting

19  estimates from a -- from the CBO study that you cite,

20  the resulting estimates are that 64,000,000 -- let's go

21  back and read the whole paragraph.

22            "The Congressional Budget Office and the

23  Joint Committee On Taxation in March 2012 estimated the

24  impact of the ACA on nonelderly workers and their

25  families who were projected to receive employment-based

1  getting a subsidy or if it's some subset of the

2  8.7 million.  But with that caveat, yes, 8.7 million is

3  the number who were getting a subsidy in February of

4  2017.

5            MR. DISHER:  Can we take a 10-minute

6  break?

7            MR. HERRERA:  Sure.

8            (RECESS TAKEN)

9      Q.    (BY MR. HERRERA) All right.  Let's look at

10  your declaration again, and keep in mind the whole

11  declaration, and I'm really asking for your -- your

12  opinions in this case, but I want to give you a certain

13  place on Page 8 of your declaration just to -- to kind

14  of guide your thinking.  This is where your conclusions

15  are.  This is Exhibit 1, the page numbered eight.

16            And your conclusion in Paragraph 26 is

17  "This result will have adverse consequences for certain

18  U.S. citizens because some employers will find it

19  financially advantageous to hire an immigrant who is not

20  lawfully present and who is authorized to work in the

21  U.S. instead of an equally productive U.S. citizen."

22            Isn't it true that you do not give an

23  estimate of how many U.S. citizen workers would be

24  displaced by DACA workers in the situation that you

25  describe in your declaration?

 1      A.   I do not give an estimate of the number.   That
 2 is correct.
 3      Q.   Okay.  It is true that you do not consider the
 4 income levels of DACA recipients.  Correct?
 5                MR. DISHER:  Objection, vague.
 6      A.   I -- there's nothing in my declaration that
 7 makes reference to the income levels of DACA recipients.
 8 That's true.
 9      Q.   Do you plan to -- well, we'll come back.
10                You don't know how many DACA recipients
11 have received bachelor degrees.  Right?
12      A.   I do not.
13      Q.   You don't know how many DACA recipients have
14 received doctorate-level degrees.  Right?
15      A.   I do not.
16      Q.   You don't know how many DACA recipients have
17 received law degrees.  Right?
18      A.   I do not.
19      Q.   And got forbid, we -- we don't need anymore
20 lawyers.
21                But did you examine any factors relating
22 to the earning potential of DACA recipients for your
23 analysis?
24                MR. DISHER:  Objection, vague.
25      A.   Other than the illustrative calculations about

1  what happens at various pay levels for the two examples

2  I illustrate.  Now, I make no reference to earnings

3  levels.

4      Q.   And that would be -- and, also, that would

5  include no analysis of what a DACA recipient who earns

6  an advanced degree might make in the future.  Correct?

7      A.   I did not look at that, no.

8      Q.   Okay.  Now, keeping in mind your scenario

9  again of Worker A versus Worker B or a U.S. citizen or

10 lawfully present worker versus a DACA recipient, as you

11 describe it, if a DACA recipient earns a certain income

12 level, then wouldn't the U.S. citizen counterpart

13 applicant in your scenario also be making that income

14 level?

15              MR. DISHER:  Objection, vague.

16     Q.   Or -- and I'll phrase it differently.

17              Going to your scenario again, if a DACA

18 recipient is being considered for earning a certain

19 income level in that -- in that job application, then

20 wouldn't the U.S. citizen counterpart job applicant in

21 your scenario also be offered that same income level?

22              MR. DISHER:  Same objection.

23     A.   Well, let me -- let me answer it this way:  I

24 think what you're saying if if -- in my scenario here, I've

25 got a DACA recipient and a lawfully present individual

1  Those factors relevant to the position for which they've

2  applied, period.

3      Q.   Do employers always stick to factors which are

4  relevant to the job?

5              MR. DISHER:  Objection, calls for

6  speculation.  Objection, outside the scope of his

7  testimony.

8      A.   I don't know.

9      Q.   You did no analysis of how ethnic or racial

10 discrimination could factor into an employer's

11 decision-making when considering a U.S. citizen versus a

12 DACA recipient.  Right?

13             MR. DISHER:  Objection -- go ahead and

14 answer the question.

15             Objection, calls for an assumption.

16 There we go.  Thank you.  Go right ahead.

17     A.   I did not consider race, ethnicity, gender, or

18 any other characteristic irrelevant to the position for

19 which people have applied in this -- in my analysis.

20     Q.   Going back -- okay.  So a little -- a second

21 ago -- a few minutes ago, we got a little sidetracked.

22 We were talking about income or -- or possible earnings.

23             So if -- if a -- so going back to your

24 scenario again, if a DACA recipient is being considered

25 for a job that will make a certain level of income, then

```
 1   in your scenario the U.S. citizen counterpart is being

 2   considered for that same wage or income.  Right?

 3        A.   Yes.

 4        Q.   Okay.  And if the U.S. citizen applicant is

 5   being considered for an income level or a wage that

 6   makes that applicant ineligible for the subsidy, then

 7   the employer would not choose the DACA recipient

 8   applicant -- or, rather, then the employer would not

 9   choose the U.S. citizen applicant because of fear of

10   incurring the ACA penalty.  Right?

11              MR. DISHER:  Objection, vague.

12        A.   I think you said that backwards.

13        Q.   Okay.  I think I did.

14        A.   So my answer is no, I disagree.

15        Q.   Okay.  Okay.  Fair enough.

16              Okay.  So if the U.S. citizen counterpart

17   applicant is being considered for a certain wage and

18   that makes that applicant ineligible for the subsidy,

19   then the employer would not choose the DACA recipient

20   applicant over the U.S. citizen applicant because of

21   fear of incurring the ACA penalty.  Right?

22        A.   That makes sense.  I mean, again, yeah.

23   Income over 400 -- so $150,000-a-year job, the ACA

24   penalty is not going to be a deciding factor.  I would

25   agree with that.
```

1      Q.   Okay.   And because you did not consider the
2  income levels or income earning potential of DACA
3  recipients, you have no way of knowing how many U.S.
4  citizen applicants in your scenario would lose out on
5  job opportunities to DACA recipient applicants, do you?
6                MR. DISHER:   Objection, vague.
7      A.   I don't know the number.   I was not asked to
8  provide the number.
9      Q.   All right.   Let's look at -- let's go back to
10  your declaration and look at the paragraph that we
11  were -- we looked at kind of earlier on today,
12  Paragraph 23, which is on Page 7 of your supplemental
13  declaration.   So you've already reviewed this and we
14  went over it a little bit, and so keep this in mind.
15  I'm going to show you something else.
16                (Exhibit No. 5 marked)
17      Q.   So I'm handing you what is marked as
18  Exhibit 5.   And when you're discussing the issue in your
19  declaration -- the issue of the interaction of the DHS
20  Memorandum and the ACA on the labor market, you cite at
21  some point to this article, right, that article that is
22  Exhibit 5?
23      A.   Well, not exactly.   This article appears to be
24  the working-paper version of what was eventually
25  published.   They were the same name.   But I suspect it's

1   equal.  Other" -- "Although the theoretical implication

2   that, other things being equal, immigration reduces the

3   wages of native workers..."

4             So did you do any analysis of whether

5   that theoretical implication has any bearing on the

6   current reality in the United States?

7             MR. DISHER:  Objection, vague.

8       A.   To the extent that economic theory is useful

9   in predicting what happens, it does have bearing on

10  what's happening.

11      Q.   Okay.  But for -- for this declaration, you

12  didn't do any calculations about the degree to which

13  wages would be reduced because of immigration?

14      A.   I did not make a calculation about the

15  magnitude, no.  I would -- that's why I cited the papers

16  by Borjas and Card because, you know, they talk about

17  theirs and many other studies that try to assess the

18  implications of immigration on native wages for -- to

19  get -- you know, to say -- to get an estimate of

20  magnitudes.

21      Q.   Okay.  And you say -- but Borjas says that the

22  impact of immigration on the wages of native workers

23  seems to cluster around zero.  Right?

24             MR. DISHER:  Objection, misstates the

25  document.

```
 1   been difficult to find very large effects on wages; and
 2   that's, I believe, an accurate assessment of what the
 3   literature says.
 4                  MS. PERALES:  If I can take a second off
 5   the record.
 6                  MR. DISHER:  Yeah.
 7                  (DISCUSSION OFF THE RECORD)
 8                  MR. HERRERA:  Back on.  Bear with me for
 9   one minute.
10      Q.   (BY MR. HERRERA) Would you -- you don't know
11   how many jobs will be denied to United States citizens
12   because of the scenario that you describe in your
13   declaration, do you?
14                  MR. DISHER:  Objection, vague.
15      A.   Well, it's not just "will be."  I suppose it's
16   "has been" -- "have been."  But I do not know the
17   number, no.
18      Q.   Okay.  Would it be correct to say that under
19   the compensation principle, Texas overall could be
20   better off as a result of the work authorization of DACA
21   recipients?
22                  MR. DISHER:  Objection, vague.
23   Objection, outside the scope of his testimony.
24      A.   Possible -- well, Texas overall, but I don't
25   understand what "Texas overall better off" means.  What
```

1   opportunities.  Right?

2        A.   Well, sure, they have other opportunities; but

3   it may -- in general, those opportunities are inferior

4   to the one that they lost out on by the fact that it

5   wasn't their first choice.

6        Q.   Let's go to Paragraph 25 of your declaration.

7   You say in the second sentence on that paragraph -- in

8   that paragraph, "The interplay between the DHS

9   Memorandum and the ACA makes some U.S. citizens more

10  expensive to hire than equally productive immigrants who

11  are not lawfully present."

12             You cannot say how many U.S. citizens are

13  more expensive to hire, can you?

14       A.   Well, I don't know that number.

15       Q.   Because you made a number of assumptions, the

16  ones we've already discussed, can you calculate the

17  actual cost of equally productive U.S. citizens and DACA

18  recipients in the situation you described?

19             MR. DISHER:  Objection, misstates the

20  testimony.  Objection, vague.

21       A.   I don't understand that question.

22       Q.   Okay.  So you -- you made a number of

23  assumptions including -- or you held a number of things

24  equal, right, in your scenario?

25       A.   Okay.

1    Q.   However, in many instances, job applicants are
2  not equal in that regard or in that many regards.
3  Right?
4              MR. DISHER:  Objection, vague.
5    A.   Not all job applicants are going to be
6  identical.  That's correct.
7    Q.   Okay.  So you don't always know the actual
8  cost difference between a U.S. citizen worker and a DACA
9  recipient applying for the same job.  Right?
10             MR. DISHER:  Objection, vague.
11   A.   Well, the 3400 -- whatever, $3400-plus
12 shared-responsibility payment, you know that.  So --
13   Q.   Right.
14   A.   -- I'm not sure what your question is.
15   Q.   You said that you examined the declarations of
16 other experts in this case.  Right?
17   A.   Yes.
18   Q.   Okay.  Which ones did you examine?
19   A.   Dr. Ray Perryman and doctor -- I think it's
20 Leighton Ku, K-u.
21             MR. HERRERA:  Can we take a break now?
22             MR. DISHER:  Sure.
23                (RECESS TAKEN)
24             MR. HERRERA:  Okay.  Back on the record.
25   Q.   (BY MR. HERRERA) Dr. Deere, did you do any

1    analysis of whether firms with 50 or more employees

2    offer health insurance to all of their workers?

3                    MR. DISHER:  Objection, vague.

4         A.    No, I did not.

5                    MR. HERRERA:  The intervenors pass the

6    witness.

7                         EXAMINATION

8    BY MS. GREGORY:

9         Q.    Good afternoon.  My name is Katherine Gregory.

10   I'm a Deputy Attorney General with the New Jersey Office

11   of Attorney General, and I'm representing the

12   defendant-intervenor the State of New Jersey in this

13   case.

14                    I just have a few more questions for you.

15   I'll try to keep it brief; and I'm going to try not to

16   touch on any areas that we've already hit, but I can't

17   make any promises.

18                    Just talking about your two declarations

19   generally, did you review any research or documentation

20   in addition to the specific citations in your

21   declaration?  So was there anything not cited that you

22   reviewed in preparing those declarations?

23        A.    There's some other papers that are probably

24   generally cited by either Borjas or Card that I did

25   cite, more of that -- more of that immigration

1      A.   I think I looked at the Long -- it's, you

2  know, a brief writeup of his that's cited by, I think,

3  Perryman and Ku.  They talk -- you know, that's where

4  the 91 percent employed number comes from.  You know,

5  it's got a little bit of info about who the DACA

6  recipients are.  I looked at that.

7      Q.   Did you perform any research in preparing

8  these declarations relating to Texas businesses?

9               MR. DISHER:   Objection, vague.

10     A.   I looked at what the current labor force

11 numbers are for Texas, which would be generally employed

12 by Texas businesses; but otherwise, no.

13     Q.   Did you talk to any hiring managers or human

14 resource representatives in preparing these

15 declarations?

16     A.   No.

17     Q.   Do you know how many Texas employers have 50

18 or more full-time employees?

19     A.   No.

20     Q.   Do you know how many DACA recipients are

21 employed in companies with 50 or more full-time

22 employees?

23     A.   No.

24     Q.   Are all Texas residents, DACA recipients or

25 citizens required to purchase health insurance?

```
 1              MR. DISHER:  Objection to the extent it
 2    calls for a legal conclusion.
 3        A.   Well, you know, I thought the answer to the
 4    question was sort of yes in light of the ACA, but then I
 5    think something recently was -- the individual mandate
 6    was rescinded.  I'm not -- I'm not sure I know how to
 7    answer that question.  I kind of would have said yes,
 8    but now I'm saying maybe it's no.
 9        Q.   That's fine.  Do you know how many Texas
10    residents are exempt from the coverage requirements of
11    the ACA?
12              MR. DISHER:  Same objection.
13        A.   No.
14              MS. GREGORY:  Do you have a copy of the
15    supplemental declaration I could look at?
16              MS. PERALES:  Uh-huh.  Is that Deere 2 or
17    Deere 1?
18              MR. DISHER:  Deere 1.
19              MS. GREGORY:  It's right there.  I'm
20    sorry.
21              MS. PERALES:  I'll give it to you.  I'll
22    give it to you.
23              MS. GREGORY:  I promise I won't --
24              MS. PERALES:  Don't worry.
25        Q.   (BY MS. GREGORY) Okay.  If you could pull out
```

```
 1    Deere 1 and turn to Page 5.  Okay.  Paragraph 13.  We
 2    talked a little bit about all other things equal, that
 3    term you use in Paragraph 13, "other things equal."
 4              Can you describe some of the
 5    characteristics or traits that would be included in
 6    "other things equal"?  You mentioned relevant
 7    characteristics to the job, but could you just describe
 8    what some of those could entail?
 9              MR. DISHER:  Objection, asked and
10    answered.
11         A.   Well, the sentence here in which that resides
12    is "As a threshold matter, the addition of some 694,000
13    work-eligible individuals nationwide, with 114,000 of
14    these in Texas, will, other things equal, put downward
15    pressure on wages and make it more difficult for some
16    U.S. citizens to find employment."
17              So there the "other things" is really
18    talking about overall market demand conditions.  In
19    other words, this factor alone, not changing anything
20    else about the economy, will have this kind of effect.
21    It will put downward pressure on wages and make it more
22    difficult.
23              But does that mean if you go out and you
24    look over a period of time during which DACA recipients
25    expanded and lots of other things were going on, could
```

1   you look at, you know, January of one year and December

2   the next and subtract the employment difference and say,

3   ah, that's the effect of whatever happened in DACA that

4   year, no, you couldn't because there's other things

5   going on, changing.

6                   And so that's -- that's really what --

7   it's holding other things that would affect wages and

8   employment in the U.S. and in Texas constant.

9        Q.   And what are -- can you give an example of

10   some of those other things?

11       A.   The general level of demand from, you know,

12   other countries for U.S. exports; the -- the general

13   level of consumer spending in the U.S.; the birth rate;

14   the other population sources in the U.S., the other

15   sources of immigration.  Holding all of that constant.

16       Q.   Okay.  And what do you mean when you say

17   "work-eligible" in this paragraph?

18       A.   Having -- in this particular, I mean holding

19   an EAD because I'm talking about the DACA recipients.

20       Q.   Okay.  Does "work-eligible" mean all of those

21   individuals are employed?

22       A.   No.

23       Q.   Does it mean that they're all seeking

24   employment?

25       A.   No.

```
 1       Q.   So if -- so you can't say how many of those
 2  are seeking employment or employed?
 3       A.   Well, according to the Wong study about
 4  91 percent employed.  You can take that unemployment
 5  rate and then add that in.  So, you know, 90-plus
 6  percent would be in the labor force if you take the Wong
 7  study as a source.
 8       Q.   Okay.  Did you take that as a source in
 9  drafting this declaration?
10       A.   No.
11       Q.   In Paragraph 13, you also say it would make --
12  quote, make it more difficult for some U.S. citizens to
13  find employment, end quote.  How many is some?
14       A.   More than one -- more than zero.
15       Q.   Okay.  But you can't give a more exact number
16  than that?
17       A.   I've not been asked to calculate that number.
18       Q.   Okay.
19       A.   I mean, you could -- think of the following
20  mental experiment.  Suppose all 694,000 work-eligible
21  individuals disappeared, including the -- whatever
22  percentage of them were actually employed.  What would
23  then happen?  Would every single employer stay exactly
24  where they are, or would they hire some more people?
25  And if they hired some more people, well, that might
```

```
 1   best worker they can.  So I'm not sure how to answer
 2   that.
 3         Q.   Okay.  So would salary history be a relevant
 4   aspect to an employer?
 5         A.   The salary history of the two individuals who
 6   applied?
 7         Q.   Yes.
 8         A.   It might well be; but as you may know, in some
 9   jurisdictions it's illegal for the employers to ask
10   about that now.
11         Q.   Is it illegal in Texas?
12         A.   No.
13         Q.   What about salary requirements of the two
14   individuals?  Would that be a relevant aspect?
15         A.   It could be, and it is legal to ask about that
16   as far as I know.
17         Q.   Okay.  How many employers in Texas base hiring
18   decisions entirely on costs associated with the ACA?
19         A.   I don't know.
20         Q.   Are those careers for which it's difficult for
21   employers to find U.S. citizens willing to undertake
22   that labor?
23         A.   I don't know.
24         Q.   Are there costs associated with replacing
25   employees who leave a business?
```

1      Q.    If DACA is enjoined in July of 2018, how many
2  U.S. citizens will be hired by Texas businesses?
3      A.    Well, I don't know what "enjoined" would mean,
4  first of all.  Does that mean that those individuals
5  would no longer be able to work?  But let's assume the
6  answer is yes.  It's equivalent to what I said a minute
7  ago about if all 680,000 just disappeared.  I would
8  assume that there would be some hiring to replace them.
9  I do not know the number.  I have not been asked to
10  calculate that.
11      Q.    If DACA were enjoined in July of 2018 and
12  hundreds of thousands of DACA recipients suddenly lost
13  the ability to work, how would Texas businesses be
14  affected?
15            MR. DISHER:  Objection, vague.
16  Objection, outside the scope of his testimony.
17      A.    Some of them would have to -- would be without
18  some employees that they previously had and would have
19  to go from there, either hiring other employees or
20  making other adjustments.
21      Q.    What kinds of other adjustments?
22            MR. DISHER:  Same objection.
23      A.    Cutting back on the output they produce or the
24  level of service they provide.  It depends -- it depends
25  on what industry they're in.

```
 1                    BROWNSVILLE DIVISION
 2  STATE OF TEXAS, et al.,              )
            Plaintiffs,                  )
 3                                       )
    VS.                                  )
 4                                       )
    UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
 5          Defendants,                  )
                                         )
 6  and                                  )
                                         )
 7  KARLA PEREZ, et al.,                 )
                                         )
 8             Defendant-Intervenors.  )
 9
                     REPORTER'S CERTIFICATE
10          DEPOSITION OF DONALD R. DEERE, Ph.D.
                     JUNE 28, 2018
11
12       I, Kathleen Casey Collins, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15       That the witness, DONALD R. DEERE, Ph.D., was duly
16  sworn by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19       That the deposition transcript was submitted on
20  _____, ____, to the witness or to the attorney for
21  the witness for examination, signature and return to me
22  by _____, _____;
23       That pursuant to information given to the
24  deposition officer at the time said testimony was
25  taken, the following includes counsel for all parties
```

```
 1   of record:
 2        Mr. Todd L. Disher, Attorney for the Plaintiffs
          Mr. Ernest Herrera and Ms. Nina Perales, Attorneys
 3             for Defendant-Intervenors
          Mr. Daniel David Hu, Attorney for Defendants
 4        Ms. Katherine Gregory, Attorney for New Jersey
               Office of Attorney General
 5
 6        I further certify that I am neither counsel for,
 7   related to, nor employed by any of the parties or
 8   attorneys in the action in which this proceeding was
 9   taken, and further that I am not financially or
10   otherwise interested in the outcome of the acti___
11        Certified to by me this _____ day of June___
12   2018.
13                       _____
                         KATHLEEN CASEY COLLINS
14                       Texas CSR NO. 2018
                         Certificate Expires 12/31/18
15                       Ken Owen & Associates
                         Firm Certificate No. 115
16                       801 West Avenue
                         Austin, Texas  78701
17                       (512) 472-0880
18
19
20
21
22
23
24
25
```