# EXHIBIT 2

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                     BROWNSVILLE DIVISION
STATE OF TEXAS, et al.,          )
          Plaintiffs,            )
                                 )
VS.                              )
                                 )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
          Defendants,            )
                                 )
and                              )
                                 )
KARLA PEREZ, et al.,             )
                                 )
          Defendant-Intervenors. )
          ***********************************************
                        ORAL DEPOSITION OF
                        LLOYD POTTER, Ph.D.
                          JUNE 27, 2018
          ***********************************************
```

     ORAL DEPOSITION OF LLOYD POTTER, Ph.D., produced as
a witness at the instance of the Defendant-Intervenors,
and duly sworn, was taken in the above-styled and
numbered cause on the 27th of June, 2018, from 9:59 a.m.
to 1:46 p.m., before Kathleen Casey Collins, CSR, in and
for the State of Texas, reported by machine shorthand,
at the Offices of the Attorney General, 301 West
Fifteenth Street, Seventh Floor, Austin, Travis County,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

1       A.    Yes.

2       Q.    Would you say that you are an expert in youth

3   violence prevention?

4       A.    Yes.  I'm not as current on that in the last

5   nine years as I was previously, but yes.  I keep up with

6   it, but I don't -- I'm not active in youth violence

7   prevention research any longer.

8       Q.    And with respect to suicide prevention, would

9   you describe yourself as an expert?

10      A.    It's similar to the youth violence.  I keep up

11  with it.  I read articles and so on on it.  But I'm not

12  doing -- actively doing research in suicide prevention

13  for the last eight years or so.

14      Q.    Are you actively doing research right now on

15  any topic in demography?

16      A.    Yes.

17      Q.    What is that topic?

18      A.    Well, one, we produce the population estimates

19  and projections for the state.  So there is applied

20  research to be done in the production of those

21  population estimates and projections, which involve

22  doing research into fertility, mortality, and migration,

23  which are the components of population change; and

24  having an understanding of those components and how they

25  act and behave within the Texas population are key

1    elements to -- and having done research and

2    understanding what's happening with that are key

3    elements to us producing accurate population estimates

4    and projections.

5         Q.   Would you say that today you are an expert in

6    the subfield of demography that produces population

7    estimates?

8         A.   Yes.

9         Q.   Okay.  When I'm quiet, I'm crossing off

10   questions --

11        A.   Okay.

12        Q.   -- because we've covered a lot.

13             When you teach demographic methods, do

14   you teach the methods that are used at your center to

15   make population estimates?

16        A.   That's a component of the methods that we

17   teach, yes -- or that I teach.

18        Q.   When your center makes population estimates

19   for Texas, what are the databases that you typically

20   rely upon?

21        A.   For population estimates, there's quite a few.

22   So we receive vital statistics from the State department

23   of -- Department of State Health Services.  We conduct

24   surveys of a number of different entities.  So we survey

25   cities to get information on -- and counties on building

1    permits.  We have data from the Texas Education Agency

2    on school enrollment.

3                    I'm trying to think what else.  Those are

4    probably some of the major sources of data that we use.

5        Q.   How about data from the U.S. census?

6        A.   For our estimates, the census is the base of

7    that, and so the decennial census is the foundation that

8    we build off of.

9                    And then the Census Bureau also produces

10   population estimates, and we'll use those to examine our

11   estimates to see if they're in the ballpark; and if

12   they're not, then we do research to figure out if

13   they're wrong or if we're wrong and then to adjust them

14   if we are.

15       Q.   Is it correct to say that sometimes you look

16   at the U.S. Census American Community Survey data?

17       A.   Yes.  I frequently -- for -- for production --

18   not for actual production of the estimates; but we do

19   use the American Community Survey to identify certain

20   indicators that give us some sense of our level of

21   accuracy.

22       Q.   Does your center provide estimates of the

23   undocumented or unauthorized population in Texas?

24       A.   We do not currently do that.  We tend to rely

25   on the Pew Research Center estimates and then the

1  Department of Homeland Security estimates.  I mean,

2  those are the ones that we'll point to, and they tend to

3  be pretty close to each other.

4      Q.   What are some of the methodological challenges

5  associated with estimating the unauthorized population

6  in Texas?

7      A.   Well, one is you have to use an indirect

8  method because there's no source of directly asking --

9  identifying unauthorized immigrants and asking them

10 their status; and even if somebody did do that, I think

11 there would be some question as to the accuracy of the

12 reporting.  And so essentially the methodology relies on

13 indicators of things that would be associated with being

14 undocumented.

15     Q.   And so, for example, data regarding people who

16 are noncitizens is potentially associated with

17 undocumented.  Is that right?

18               MR. DISHER:  Objection, vague.

19     A.   Yes.  The -- the methodology that is used by

20 the Pew Research Center identifies people who respond to

21 the American Community Survey as noncitizens and other

22 characteristics that they have in terms of assessing a

23 probability of them being undocumented immigrants.

24     Q.   Are you familiar with any of the disclaimers

25 that the Pew center provides with its estimates of

1  people respond to the American Community Survey asking

2  where they lived last year, if they lived in a foreign

3  country, that's the foundation of the shift that we've

4  seen in the number and percent from -- toward Asian

5  countries and away from Mexico and Central and South

6  American countries.

7       Q.   Has your center or have you done any research

8  specific to any decline in immigration from Mexico to

9  Texas?

10      A.   Could you say that one more time?

11      Q.   Has either you on your center done any

12  research specifically on the decline of migrants coming

13  from Mexico to Texas?

14      A.   I wouldn't say we've done research.  We've

15  done -- other than just tabulating and reporting.  If

16  you call that research then...but we've not, like,

17  looked to see, well, why is that happening and looking

18  at that.

19      Q.   And, similarly, with respect to return

20  migration, has your center tabulated and reported data

21  on return migration from Texas to other countries?

22      A.   We have, again, from -- let me take back the

23  "we have."

24           I think we've just reported from other

25  sources.  So we've not -- so, again, from, I think, a

1  number of researchers that have looked at return

2  migration.  So we have not because you -- with the

3  American Community Survey, you don't know who's

4  returned.

5       Q.   Okay.  So you have -- in your center, you have

6  reported data or reported analysis by others regarding

7  return migration from -- of people living in Texas?

8       A.   Yeah.  I'm not -- when you say "reporting," do

9  you mean --

10      Q.   Well, making public in any manner.

11      A.   Yes.  I mean, so from the report I was

12  mentioning earlier, the Pew research report that --

13  that -- research that has looked at return migration,

14  and I have presented that in presentations that I've

15  given.

16      Q.   Okay.  And the data that you're talking about

17  from the Pew Research Center, was that specific to

18  Texas?

19      A.   No.  It was for the U.S.

20      Q.   And would it be fair to say that when you've

21  reported the data for the U.S. about return migration,

22  you haven't provided any analysis of the reasons why

23  people are returning to their home countries?

24           MR. DISHER:  Objection, vague.

25      A.   I think in the context of that, there is

```
1   this -- I probably have articulated speculation that --
2   that it probably has to do with a lack of employment
3   opportunity within the United States, and so the
4   migrants are kind of not able to work here and so
5   they're returning home.
6        Q.   And when you talk about that lack of
7   employment opportunity, is that associated with the
8   economic decline after --
9        A.   Right.
10       Q.   -- 2008?
11       A.   So it would have been, yeah, post the
12  recession or kind of as the recession was really picking
13  up.
14             There were reports that immigrants, both
15  authorized and unauthorized, were returning to their
16  country of origin because they were losing -- again, the
17  reports were more speculative in terms of why they were
18  going.  I haven't seen anything that says we know that
19  this is the reason that they were leaving.
20       Q.   Okay.  You anticipated my next question, which
21  is is it correct to say that neither you nor your center
22  have done research on the reasons why individuals might
23  leave Texas and return to their home countries?
24             MR. DISHER:  Objection, vague.
25       A.   Yes, that's fair.
```

1      Q.    Okay.  Would you say that you have a research

2   specialization in immigrant populations?

3                    MR. DISHER:  Objection, vague.

4      A.    Yeah.  I don't know if I would say I have a

5   specialization.  I have pretty deep familiarity with it.

6   But I wouldn't say if -- if what's your -- if somebody

7   asks me what my area of research is, I wouldn't say I'm

8   an immigrant specialist.

9      Q.    Okay.  Do you have a research specialization

10  in the factors that lead to either legal or illegal

11  immigration to the United States?

12     A.    No.

13     Q.    Does your -- does your -- I'm sorry.  I want

14  to get the words right.

15                   Does your institute conduct research

16  specifically on unauthorized immigrants living in Texas?

17     A.    We have.

18     Q.    When was that?

19     A.    Probably about five or six years ago.

20     Q.    And what was that research?

21     A.    We had attempted to estimate the geographic

22  distribution of the unauthorized immigrant population in

23  the state.

24     Q.    Did you end up publishing those results?

25     A.    No.

1    Q.   Was it because you weren't able to get sort of

2    confidence results?

3    A.   We attempted to publish them.  The methodology

4    that we had employed was questioned by one of the

5    reviewers, and the staff member that we had working on

6    this left and we never followed through and addressed

7    the -- it was doable, but we just didn't.  We weren't

8    able to address it.

9    Q.   Have either you or your institute ever

10   conducted research on the reasons that immigrants come

11   to or leave the United States, and specifically

12   undocumented immigrants?

13            MR. DISHER:   Objection, vague.

14   A.   No.

15   Q.   Let's turn to your declaration, which is

16   Exhibit 3.

17   A.   Okay.

18   Q.   I think we can put your CV aside for the

19   moment; although, I could ask you questions about it all

20   day because I think it's absolutely fascinating.  I'm

21   mindful of Andrew's airplane flight, and so let's turn

22   to your declaration.

23            Can you summarize for me the specific

24   opinions that you offer in your declaration?

25   A.   Let's see.  I think probably one is that

1    there's pretty strong evidence that the bulk of

2    migration behavior, especially distance migration

3    behavior, is economically and specifically work

4    associated.

5                    And -- and then probably the other

6    summary point would be that if DACA participants were

7    unable to work, some number and/or percentage of them

8    would likely leave the United States and return to their

9    country of origin or another country where they may be

10   able to work.

11        Q.    Okay.  Do you offer any other opinions in the

12   report besides the two that you've given to me?

13        A.    Well, I think I do articulate some of the

14   characteristics that I think we could anticipate would

15   be associated with the propensity for an immigrant to

16   return to their country of origin.

17        Q.    Would it be fair to say that with your -- with

18   respect to your opinion about DACA participants

19   returning because of work-related reasons that that

20   opinion does not distinguish DACA recipients from other

21   unauthorized workers who might lose their employment?

22                    MR. DISHER:  Objection, vague.

23   Objection, misstates the testimony.

24                    Go ahead and answer.

25        A.    Yeah.  I think there probably is a distinction

1   between the two that could be made.

2       Q.   Okay.  And so specifically with respect to

3   return migration because of employment reasons, which is

4   what I understand your opinion about DACA recipients is,

5   tell me how your opinion would differentiate, if it

6   does, between a DACA recipient making the decision to

7   return and migrate versus a plain-old undocumented

8   person.

9                MR. DISHER:  Objection, vague.

10      A.   I think a DACA participant has a -- currently

11  has a different status than an unauthorized immigrant;

12  and so a DACA participant probably has -- has other

13  motivations to potentially -- different -- different

14  sets of motivations than an unauthorized immigrant.

15      Q.   I understand.  And so specifically with

16  respect to work-related reasons -- because I know that

17  people's motivations can really vary quite a bit.  So

18  let me ask you whether your opinion regarding the

19  likelihood of an individual to leave Texas upon losing

20  DACA and work authorization is similar to the likelihood

21  of an unauthorized person who is not somebody who just

22  lost DACA?

23               MR. DISHER:  Objection, vague.  Go ahead.

24      A.   So the -- I think you had, like, two -- two

25  things about DACA.  Was there something about losing --

```
 1        Q.    Okay.  I'll back up and break it down.

 2        A.    Okay.

 3        Q.    Your -- your report, and specifically

 4   Paragraph 11, talks about loss of permission to work in

 5   the United States.

 6              Do you see that in the very first words

 7   of your Paragraph 11?

 8        A.    Uh-huh.

 9        Q.    Okay.  So do you understand that when an

10   individual loses Deferred Action for Childhood Arrivals,

11   loses DACA, that that individual also loses permission

12   to work in the United States?

13        A.    I would assume those two that -- yes, that if

14   they lost DACA status, then they would also not be

15   eligible to work in the United States.

16        Q.    And is that what you're talking about in

17   Paragraph 11 when you say, "some DACA participants could

18   be expected to migrate out of the U.S. back to their

19   country of origin"?

20              MR. DISHER:  Objection.  It misstates his

21   testimony.

22              THE REPORTER:  Objection what?

23              MR. DISHER:  Misstates his testimony.  Go

24   ahead.

25        A.    Can you say that one more time?
```

```
 1        Q.    Sure.   You -- you mentioned a moment ago that

 2   you understand that if somebody loses DACA, that

 3   individual loses work authorization.   Is that right?

 4        A.    Yes.   But that's not what I'm saying here.

 5        Q.    Okay.   Okay.   Help me understand what you're

 6   saying in Paragraph 11 when you say "with loss of

 7   permission to work in the U.S."

 8        A.    So that would be if DACA participants, as part

 9   of the DACA program, were not able to work in the

10   United States.   I was not making any statement about

11   loss of DACA status so that -- so that there the

12   concept, I think, would be that assuming that DACA

13   status was still present and they were unable to work,

14   lost permission to work.

15        Q.    Okay.   Do you have any understanding of the

16   legal relationship between Deferred Action for Childhood

17   Arrivals and federal work authorization?

18              MR. DISHER:   Object to the extent it

19   calls for a legal conclusion.

20              Go ahead and answer if you can.

21        A.    I don't.

22        Q.    Okay.   So I'm going to talk with you within

23   that frame that you were just discussing.   We will posit

24   a DACA recipient that has lost work authorization and

25   can no longer work -- be employed legally.
```

1          A.    Uh-huh.

2          Q.    Do you understand that the loss of permission

3    to work would apply to working as an employee of a

4    company?

5                    MR. DISHER:   Objection, vague.

6          A.    Say that one more time.

7          Q.    Do you understand that loss of permission to

8    work in the U.S. would mean loss of permission to work

9    as an employee for a company or a government?

10                   MR. DISHER:   Same objection.

11         A.    In the United States?

12         Q.    Yes.

13         A.    Yes.   Okay.

14         Q.    Okay.   Do you understand whether loss of

15   permission to work in the U.S. would extend to working

16   as an independent consultant?

17                   MR. DISHER:   Objection, vague and to the

18   extent it calls a legal conclusion.

19                   Other than that, go ahead.

20         A.    I would assume that it would mean work any

21   kind of work.

22         Q.    And so it would also mean loss of permission

23   to work as an independent consultant.   Is that right?

24         A.    I --

25                   MR. DISHER:   Same objections.

1       A.    I think I would assume that, yes.

2       Q.    Okay.   Would it also -- would loss of

3  permission to work in the U.S. in your mind also mean

4  loss of permission to mow lawns for money?

5                 MR. DISHER:   Objection, calls for

6  speculation.   Objection to the extent it calls for a

7  legal conclusion.

8                 Go ahead again.

9       A.    Yes.   I would think, yes, that basically

10 working and receiving compensation for work would be

11 part of losing permission to work.

12      Q.    Would your opinion regarding the likelihood of

13 return migration of DACA recipients change if the loss

14 of permission to work for them only extended to work as

15 employees and did not cover self-employed or independent

16 contractor work?

17                MR. DISHER:   Objection, speculation.

18 Objection to the extent it calls for a legal conclusion.

19                Other than that, go ahead and answer.

20      A.    I think if -- I think probably if DACA

21 participants were denied -- so they continue to have

22 legal status and they were denied permission to work but

23 that they could go out and mow lawns and bring in some

24 revenue, that probably would reduce the number of DACA

25 participants that might return to their country of

1  origin or another country.

2       Q.   Would it also be fair to say that the number

3  of DACA recipients likely to return to their home

4  country would be reduced if DACA recipients, in addition

5  to mowing lawns and making monies, could open their own

6  business and generate income either through being an

7  accountant or a restaurant owner?

8                MR. DISHER:  Same objections.

9       A.   Yes.

10      Q.   Okay.  I'm going to circle back around to my

11  original question, which I asked poorly because we

12  didn't have a common understanding of the loss of

13  permission to work.

14                So when we talk about DACA recipients

15  losing permission to work and their likelihood of

16  returning to their home country, in your opinion, does

17  the DACA recipient at that point stand in similar shoes

18  to an unauthorized immigrant who also does not have

19  permission to work, at least with respect to their

20  employment opportunities?

21                MR. DISHER:  Objection, speculation.

22  Objection, calls for a legal conclusion.

23                Go ahead and answer if you can.

24      A.   I'm not sure I followed you.

25      Q.   Okay.

```
 1        A.    Try one more time.

 2        Q.    Would you agree with me that an unauthorized

 3   immigrant who is not authorized to work has limited

 4   employment possibilities?

 5               MR. DISHER:  Same objections.

 6        A.    An authorized immigrant who does not have

 7   permission to work?

 8        Q.    Has limited employment opportunities.

 9        A.    Yes.

10        Q.    Okay.  And would you agree to me -- with me

11   that a DACA recipient who has lost permission to work

12   also has limited employment opportunities?

13        A.    Yes.

14               MR. DISHER:  Same objections.

15        Q.    So would you agree with me then that the DACA

16   recipient who has lost work authorization is, at least

17   with respect to employment opportunities, similarly

18   positioned to an unauthorized immigrant?

19               MR. DISHER:  Same objections.

20        A.    Yeah.  I don't -- don't know that, because I

21   know -- know relatively little about the details of the

22   DACA -- kind of what their status would be.

23                    So I would anticipate there would be a

24   difference between the two, because if one is here

25   legally, or meaning they have permission to live here
```

1  and couldn't be deported, assuming they were compliant
2  with the DACA requirements, and the person who was
3  undocumented but not here legally and regardless of if
4  they were identified that they could be deported, there
5  would probably be some differential between the two.
6      Q.   And would there be a differential with respect
7  to employment opportunities?
8              MR. DISHER:  Same objections.
9      A.   I would expect so, yes.
10      Q.   What might those differentials with respect to
11  employment opportunities be?
12              MR. DISHER:  Same objections.
13      A.   I would think that an employer would be more
14  likely to employ somebody who was here legally as
15  opposed to somebody who wasn't.
16      Q.   Even if they were both not work authorized?
17              MR. DISHER:  Objection.  It calls for
18  speculation.
19      A.   Yeah.  Probably not.
20      Q.   So when you say "probably not" --
21      A.   Well, I hadn't really kind of thought that
22  whole thing through.
23      Q.   Okay.  So if an employer is hiring for an open
24  position and has an applicant who is undocumented and
25  thus lacks permission to work and somebody who received

1  DACA but is -- has lost permission to work, would those

2  two employment applicants be similarly situated?

3              MR. DISHER:  Objection, calls for

4  speculation.  Objection to the extent it calls for a

5  legal conclusion.

6      A.   I would think so, yes.

7      Q.   So would it be fair to say then that -- that

8  your declaration does not posit that DACA recipients who

9  lose their permission to work are any more likely to

10 return to their home country than an unauthorized person

11 living in Texas?

12             MR. DISHER:  Objection, vague.

13     A.   Yeah.  I don't -- I don't think I could state

14 that.  No, I don't think so.

15     Q.   When you say "I can't state that," do you mean

16 that your report does not take a position on that, or is

17 that I asked a question that was so confusing you

18 couldn't answer it?

19     A.   Probably a little bit of -- well, certainly

20 the latter.

21     Q.   Okay.  Okay.  There's a little bit of a double

22 negative there, unfortunately, because of the way I have

23 to ask the question; but let me ask it a little bit more

24 in the positive sense.

25             Does your declaration opine that a DACA

```
 1  recipient who loses permission to work is more likely to

 2  return to their home country than an unauthorized

 3  immigrant living in Texas who is similarly not --

 4  doesn't have permission to work?

 5      A.   The -- is this -- my testimony or -- what's

 6  the thing called, the --

 7      Q.   Your testimony.

 8      A.   It does not address the issue of -- and so I'm

 9  not making a comparison between the two.

10      Q.   All right.  So then is it fair to say that

11  your report or your declaration does not posit that DACA

12  recipients who lose permission to work are any more or

13  less likely to return to their home country than an

14  unauthorized person in Texas?

15      A.   It doesn't make a comparison between the two.

16              MR. DISHER:  Let's take a five-minute

17  break.

18              MS. PERALES:  Absolutely.  Absolutely.

19                  (RECESS TAKEN)

20      Q.   (BY MS. PERALES) Dr. Potter, we've taken a

21  short break and now we're back together again.  Over the

22  break, we've discussed a little bit about this case

23  among all of the lawyers, and you've been here for that.

24              So I'd like to start with a question of

25  whether you understand that the relief that Texas and
```

1  the other plaintiff states are seeking in this case is

2  an end to the DACA initiative?

3       A.   I do understand that now.

4       Q.   Okay.  And as you stated earlier, your

5  understanding is that if an individual were to lose

6  DACA, that individual would lose permission to work in

7  the U.S.?

8       A.   Yes.

9       Q.   Okay.  And our understanding is now the same

10  on that.

11            Would it be correct to say that in your

12  report you do not offer the opinion that there will be a

13  positive effect on the size of the unauthorized

14  immigrant population in Texas because of DACA?

15            MR. DISHER:  Objection, vague.

16       A.   Could you state that one more time?

17       Q.   Yes.  Would it be correct to say that you do

18  not offer the opinion in your declaration that there is

19  a positive effect on the size of the unauthorized

20  immigrant population in Texas because of DACA?

21            MR. DISHER:  Same objection.

22       A.   Yeah.  I don't -- I don't address that in it.

23       Q.   Would it be correct to say that you do not

24  offer the opinion in your declaration that DACA creates

25  net negative effects on the Texas economy?

```
 1        A.    I don't --
 2               MR. DISHER:   Objection, vague.  Go ahead.
 3        A.    I don't address that.
 4        Q.    Would it be correct to say that you do not
 5   offer the opinion in your declaration that DACA causes
 6   specific expenditures by Texas State agencies that are
 7   different from expenditures made on unauthorized
 8   immigrants in Texas?
 9               MR. DISHER:   Same objection.
10        A.    I don't address that.
11        Q.    Would it be correct to say that you do not
12   offer the opinion that DACA increases unauthorized
13   immigration to the United States?
14        A.    I don't address that.
15        Q.    Okay.  Now, in your declaration at the end are
16   a number of citations under the heading "References."
17   Do you see that?
18        A.    Yes.
19        Q.    Okay.  I count one, two, three, four, five,
20   six, seven, eight.  Is it correct to say there are eight
21   works cited in your report?
22        A.    Yes.
23        Q.    Okay.  Do these articles or published studies
24   form the entire basis of the opinions that you offer in
25   your declaration?
```

```
 1              MR. DISHER:  Objection, vague.
 2       A.    No.
 3       Q.    Okay.  In addition to the eight articles that
 4  are cited in your declaration, what else do you rely on
 5  to form your opinions?
 6       A.    My experience and knowledge of the field of
 7  demography and population issues.
 8       Q.    Okay.  Would it be accurate to say that your
 9  experience and knowledge in demography is not specific
10  as to the reasons why an immigrant would choose to
11  return or migrate to their home country?
12              MR. DISHER:  Objection, vague.
13       A.    Could you say it one more time?
14       Q.    Sure.  You've mentioned that your opinions are
15  based on your knowledge of demography and your past work
16  and experience.  Is that correct?
17       A.    Yes.
18       Q.    Is it correct to say that your knowledge of
19  demography and your past work and experience does not
20  include a specific study of the reasons why an
21  unauthorized immigrant might choose to return to their
22  home country?
23              MR. DISHER:  Objection, vague.  Go ahead.
24       A.    Yeah.  I think probably to get that specific
25  that would be true.
```

1      Q.   Okay.  Are there any other scholarly works or
2  studies other than the ones cited in your declaration
3  that support your opinion that losing permission to work
4  in the United States would cause some DACA recipients to
5  return to their home country?
6      A.   I believe there are other -- there is other
7  research that would support that.
8      Q.   Can you name any specifically today?
9      A.   No.
10      Q.   Okay.  Paragraph 4, if you would turn with me.
11  In Paragraph 4, I'm going to read you a sentence from
12  Paragraph 4 after the parenthetical to the Aguila
13  article.
14              Is it correct to say that there is a
15  sentence in Paragraph 4 that says, quote, Most
16  undocumented migrants coming to the U.S. are doing so to
17  work, unquote?  Am I right in reading that?
18      A.   Yes.
19      Q.   Okay.  Do you believe that statement to be
20  true for Texas as well?
21      A.   I believe that it's true.
22      Q.   Would it also be correct to say that work is
23  the reason many migrants come to Texas even when the
24  migrants lack work authorization?
25              MR. DISHER:  Objection, calls for

```
 1   speculation.
 2       A.   I think so.
 3       Q.   And, in fact, you cite Doug Massey's article
 4   and his finding that undocumented migration from Mexico
 5   appears to reflect U.S. labor demand and access to
 6   migrant networks.  Is that correct?
 7       A.   Yes.
 8       Q.   Let's take a look at your Paragraph 5.  You
 9   talk about inter-county migration within the
10   United States.  Is that correct?
11       A.   Yes.
12       Q.   And you are citing the Current Population
13   Survey and an article by Ihrke?
14       A.   Yes.
15       Q.   Would it be fair to say that the analysis that
16   you talk about in Paragraph 5 did not look specifically
17   at undocumented workers?
18       A.   It did not look at specifically undocumented
19   workers.
20       Q.   I have a similar question with respect to
21   Paragraph 6.  You talk about some work by Kennan and
22   Walker involving interstate migration decisions.  Is
23   that right?
24       A.   Yes.
25       Q.   Okay.  Would it be correct to say that the
```

1   study that you're discussing here by Kennan and Walker

2   did not look specifically at undocumented workers?

3        A.   That's correct.

4        Q.   Okay.  So would it then be fair to say, with

5   respect to Paragraph 5 and 6, that we don't know if

6   those findings hold true specifically for the

7   undocumented-worker population?

8                MR. DISHER:  Objection, vague.

9        A.   Yes, it's fair to say we don't know that.

10       Q.   Would you agree with me that the income

11  prospects for undocumented workers might be tempered by

12  factors that are unique to them like the presence of

13  migrant networks or the concern about drawing

14  immigration enforcement by moving to a place with a job

15  where the immigrant doesn't look like the people in

16  their community?

17               MR. DISHER:  Objection, calls for

18  speculation.

19       A.   I'm not sure I followed it.

20       Q.   All right.  I'll break it down for you.

21               In Paragraph 5 and 6 and 4, you talk

22  about factors that are associated with migrant flows,

23  and we get more specific in Paragraph 4 with respect to

24  undocumented workers and the reason why they move where

25  they move for jobs.  Is that right?

1      A.    Yeah.  I don't know.

2      Q.    Let's look at Paragraph 7.  In Paragraph 7

3 you discuss a study by Orrenius and Zavodny.  Is that

4 correct?

5      A.    Yes.

6      Q.    By the way, I think those are superhero names,

7 Orrenius and Zavodny.  I went and looked it up.  They're

8 both women, which makes it even better.

9                I'm going to take a moment and mark that

10 study.

11                (Exhibit No. 4 marked)

12      Q.    You now have what has been marked Deposition

13 Exhibit No. 4.  Do you recognize this as the study by

14 Orrenius and Zavodny that you cited in your declaration?

15      A.    Yes.

16      Q.    Okay.  Is it correct to say that the Orrenius

17 study that is Exhibit 4 did not look at Texas?

18      A.    I think Texas was part of it.  So it wasn't

19 Texas was excluded.  It was, I think, focusing on the

20 United States.

21      Q.    Turn with me to the Table 1, which I believe

22 is the third page.

23      A.    Oh, yes.  Sorry.

24      Q.    No.  It's my fault for not pointing you to the

25 specific information.

1          Can you tell me if Texas appears in
2  Table 1?
3      A.   It does not.
4      Q.   Do you understand the Orrenius study to be a
5  study of states with mandatory E-Verify laws?
6      A.   Yes.
7      Q.   Do you know whether Texas has a mandatory
8  E-Verify law?
9      A.   I don't know.
10      Q.   What is your understanding of mandatory
11  E-Verify?
12      A.   My understanding would be that when somebody
13  applies for a position, they need to provide proof of
14  authorization to work.
15      Q.   Do you understand the E-Verify system to be a
16  computer-based system to check work authorization?
17      A.   That's my understanding, yes.
18      Q.   And do you understand that in states that
19  have - let's see how they put it - laws mandating
20  universal use of E-Verify that employers are required to
21  screen job applicants in the E-Verify computer system?
22          MR. DISHER:  Objection to the extent it
23  calls for a legal conclusion.
24      A.   That's my understanding.
25      Q.   Okay.  And do you understand E-Verify to be a

1  system maintained by the federal government?

2       A.   I don't know.  I think it's -- for some

3  reason, I think it's variable from state to state.

4       Q.   Okay.  And it's possible there could be

5  variation from state to state on who is required to

6  screen their employees --

7       A.   Correct.

8       Q.   -- through E-Verify?

9            Would you agree with me that the

10 experience of an unauthorized immigrant in applying for

11 work in a universal E-Verify state is going to be

12 different from an unauthorized immigrant applying for

13 work in a state that doesn't require E-Verify like

14 Texas?

15            MR. DISHER:  Objection, calls for

16 speculation.

17      A.   I would think so.

18      Q.   In Paragraph 7, you identify some findings in

19 the Orrenius study.  Look at Paragraph 7 with me and

20 count, if you would, the lines, one, two, three, four,

21 five.  On the sixth line down, I'm going to read you the

22 sentence and you tell me if I read it correctly.

23            Quote, Orrenius and Zavodny found that

24 possible undocumented immigrants in states that had

25 implemented such efforts may have more difficulty

1    working and more difficulty changing jobs, unquote.

2            Is that correct?

3        A.    Yes.

4        Q.    Would it be fair to say that if Orrenius and

5    Zavodny were looking at states with mandatory E-Verify

6    that their findings would not be applicable to a state

7    like Texas that does not have mandatory E-Verify with

8    respect to difficulty working and difficulty changing

9    jobs?

10            MR. DISHER:  Objection, vague.

11   Objection, calls for speculation.

12       A.    Say it one more time.

13       Q.    Sure.  I'll rephrase it slightly because I

14   think I can do a better job.

15            Would it be correct to say that Orrenius

16   and Zavodny's findings that undocumented immigrants

17   would have more difficulty working and more difficulty

18   changing jobs in mandatory E-Verify states do not apply

19   to a state like Texas that does not have mandatory

20   E-Verify?

21            MR. DISHER:  Same objections.

22       A.    I would expect there to be a differential.

23       Q.    All right.  But can you explain to me if their

24   findings, which were specifically based on studying

25   mandatory E-Verify in those particular states, whether

1    those findings can apply at all to Texas since Texas

2    doesn't have mandatory E-Verify?

3              MR. DISHER:  Objection, vague.

4         A.   I think it would probably apply to certain

5    types of jobs that do require some verification of work

6    status; but certainly there are, I think, a fair number

7    of jobs within Texas that don't require verification and

8    so it certainly wouldn't apply to those types of

9    positions.

10        Q.   And can you specifically identify any jobs in

11   Texas that are subject to E-Verify requirements?

12        A.   Well, I don't know specifically.  I do know

13   working for the State would be one.  So that would be

14   one.

15        Q.   Okay.  So can we agree then that with respect

16   to jobs in Texas that are not for the State of Texas, at

17   least, that the findings of Orrenius and Zavodny about

18   unauthorized immigrants having more difficulty working

19   and more difficulty changing jobs because of universal

20   E-Verify would not apply in Texas?

21             MR. DISHER:  Objection, vague.

22   Objection, asked and answered.

23        A.   Yeah.  I don't think you could make a blanket

24   statement about that, but probably some -- some aspects

25   of it would apply and others wouldn't, again, because

1    there are jobs that do -- would require verification of

2    permission to work within Texas.

3         Q.    But you can't identify any other than working

4    for the State of Texas?

5         A.    I'm not that familiar with -- I'm not familiar

6    with the other types of jobs that might require that in

7    Texas.

8         Q.    Now, there's the -- I'd like to talk to you

9    about your last sentence in Paragraph 7 regarding the

10   findings of Orrenius and Zavodny suggesting that

11   unauthorized immigrants leave states that adopted

12   universal E-Verify laws.

13              Do you see that sentence there?

14        A.    Yes.

15        Q.    You say that Orrenius and Zavodny found some

16   evidence, and do you recall what that "some evidence"

17   was?

18        A.    I think, as I recall, they saw a decline in

19   estimates of the unauthorized immigrants in those

20   states, and they attributed -- and didn't -- did not

21   also see an increase in other states, and they

22   attributed that to the unauthorized immigrants moving

23   out of the United States.

24        Q.    And they attributed that to the states

25   adopting universal E-Verify laws.  Is that correct?

1       A.   That was -- that was the -- they implied that
2  that was a likely explanation for their findings.
3       Q.   Would it be fair to say that that finding is
4  not applicable to Texas because Texas does not have
5  universal E-Verify?
6       A.   I don't think that I could say that.
7       Q.   Okay.  Well, do you understand that Orrenius
8  and Zavodny looked at states that previously had
9  E-Verify, the voluntary program like Texas, and
10  subsequently adopted a universal E-Verify program?
11       A.   Yes.
12       Q.   Okay.  So the situation in those states before
13  the adoption of E-Verify we can agree would be similar
14  to the situation in Texas today, that it's a voluntary
15  program for employers?
16                 MR. DISHER:   Objection, vague.
17       A.   Yes, I think so.
18       Q.   Okay.  So when Orrenius and Zavodny suggest
19  that unauthorized immigrants leave states that adopt
20  universal E-Verify laws, that suggestion or that finding
21  would not be applicable to Texas because Texas has not
22  adopted a universal E-Verify law.  Correct?
23       A.   I'm not sure that I can say that.
24       Q.   And why is that?
25       A.   I just don't -- I don't have any evidence or

1    information about whether or not it would apply.

2        Q.    And when you say "it would apply," you mean

3    Orrenius and Zavodny's findings regarding unauthorized

4    immigrants who leave states with universal E-Verify

5    laws?

6              MR. DISHER:  Objection, vague.

7        A.    Yes.

8        Q.    Turn with me, if you would, to the Orrenius

9    article at Page 7.  I'd like you to look with me at the

10   "Results" section, which is preceded by a number five.

11   Do you see that around the middle of the page?

12       A.    Yes.

13       Q.    Okay.  Now, if you read down with me to the

14   second paragraph -- okay.  It's actually not the second

15   paragraph.  It's the first paragraph.

16              There is a sentence, and I'm going to

17   count the lines down in the top - one, two, three, four,

18   five, six.  Is it correct to say that Orrenius and

19   Zavodny found no statistically significant negative

20   effect of universal E-Verify laws on non-recent

21   immigrants?

22              MR. DISHER:  Objection, misstates the

23   document.

24       A.    Okay.  Could you state your question again?

25       Q.    Uh-huh.  I'll ask a new question.

1              MS. PERALES:  If you want a running

2   objection, Todd, you can have it.

3        Q.   In Paragraph 1 of this "Results" section,

4   after the sentence "Table 2 reports the results," is it

5   correct to say that Orrenius and Zavodny found, quote,

6   The presence of a universal E-Verify mandate last year

7   has a significant negative effect on the number of

8   likely unauthorized immigrants who arrived 1 to 5 years

9   ago, unquote?  Did I read that correctly?

10       A.   Yes.

11       Q.   And then in the next sentence do I read

12   correctly when I read, quote, The estimated effects for

13   likely unauthorized immigrants as a whole, non-recent

14   immigrants, and new immigrants are also negative but not

15   statistically different from zero, unquote?  Is that

16   correct?

17       A.   Yes.

18       Q.   Okay.  Is it fair to say then that Orrenius

19   and Zavodny found that with respect to immigrants who

20   had -- unauthorized immigrants who have been present

21   more than five years that there was a statistically

22   significant negative effect of universal E-Verify laws?

23              MR. DISHER:  Objection.  The document

24   speaks for itself.

25       A.   That's my understanding of their conclusion.

1    Q.   Would you agree with me then that the Orrenius

2  study does not provide research support for the

3  contention that immigrant unauthorized workers in Texas

4  who have lived in the U.S. at least five years are

5  likely to leave the state?

6                MR. DISHER:  Objection, vague.

7    A.   It does not specifically address Texas.

8    Q.   It also specifically found that with respect

9  to immigrants who had been present for more than five

10  years, there was no statistically significant negative

11  effect of universal E-Verify.  Correct?

12    A.   Correct.

13    Q.   Let's look at Paragraph 8.  In your second

14  sentence, tell me if I read this correctly:  Quote, The

15  causes of return migration are difficult to address

16  because there is limited research and understanding of

17  return migration, unquote.

18                Did I read that correctly?

19    A.   Yes.

20    Q.   Can you explain that sentence a little bit

21  more or expand on it for me.

22    A.   There just isn't that much research looking at

23  migrants who have returned to their country of origin

24  and their reasons for why they returned.

25    Q.   Other than the articles that you cite in your

1   declaration, are you aware of any other research on the

2   topic of return migration?

3       A.   Not that I could cite today, but I believe

4   there are other articles and research out there that

5   have looked at that.

6       Q.   Okay.  Are you aware of any articles or

7   research that focused on return migration from Texas

8   specifically?

9       A.   I'm not familiar with them, but there may be

10  some that have.

11      Q.   Are you familiar with any research on the

12  possibility of return migration of people who receive

13  DACA?

14      A.   I'm not familiar with any research on that.

15      Q.   Are you aware of any research on return

16  migration that focuses on young adults brought to the

17  U.S. as children who have resided in the U.S. at least

18  10 years?

19      A.   So research on children who have come to the

20  United States as children?

21      Q.   And who have resided in the U.S. at least

22  10 years.

23      A.   Not specifically, but I believe there are some

24  studies that have looked at DACA recipients -- or DACA

25  participants.

1  any -- any specific studies about return migration that

2  you relied on for your declaration other than the ones

3  that are cited in your declaration?

4       A.   That I --

5       Q.   Relied on while preparing your declaration

6  that are not cited in your declaration.

7       A.   Can I cite them today?

8       Q.   Yes.

9       A.   I don't think I can cite them today.

10      Q.   Okay.  Let's take a look at Paragraph 8.  You

11  say in your first sentence after the comma, and tell me

12  if I read this correctly, quote, It is reasonable to

13  conclude that some DACA participants would return to

14  their country of origin if they lose or are not given

15  permission to work in the U.S., unquote.

16            Did I read that correctly?

17      A.   Yes.

18      Q.   How many is "some"?

19      A.   More than one.

20      Q.   Can you help me find a top number for "some"?

21  Do you have --

22      A.   All of them.

23      Q.   Do you think it's reasonable to conclude that

24  all DACA participants would return to their country of

25  origin if they lost work authorization?

1       A.    From everything I've looked at and thought
2    about, I don't think I could actually put a number on
3    it.
4       Q.    So larger than one but less than all.  Is that
5    it?
6       A.    Yes.
7       Q.    Okay.  Do you have any other more specific
8    estimate of the number of DACA participants who would
9    return to their country of origin?
10      A.    I do not.
11      Q.    Did you perform any analysis yourself
12    personally that would shed light on the number of DACA
13    participants that you think would return to their
14    country of origin if they lost work authorization?
15                MR. DISHER:  Objection, vague.
16      A.    I did not.
17      Q.    Would you agree with me that it is reasonable
18    to conclude that a DACA participant might return to
19    their country of origin for reasons unrelated to
20    employment?
21                MR. DISHER:  Objection, calls for
22    speculation.
23      A.    I think that's reasonable that some DACA
24    participants do return to the their country of origin,
25    not necessarily for employment.

1      Q.    So, for example, it might be possible that a

2    DACA participant returns to their country of origin to

3    marry.  Correct?

4      A.    That's possible.

5      Q.    Or possible that the person returns to their

6    country of origin to care for an elderly parent.  Is

7    that correct?

8      A.    Yes.

9      Q.    Okay.  So given that there are various reasons

10   that DACA participants might return to their home

11   country, do you have any way of quantifying the number

12   of DACA recipients who might leave because of

13   employment-related reasons like losing work

14   authorization?

15     A.    I don't.  I think to do that you would have to

16   have some information about the number lost and look at

17   changes over time.  You'd have to look at it in terms of

18   what actually happens, which would be speculation at

19   this point.

20     Q.    Would you say that when you use the word

21   "some" when you say, some DACA participants would return

22   to their country of origin if they lose permission to

23   work in the U.S., that your use of the word "some" there

24   is hypothetical?

25                 MR. DISHER:  Objection, vague.

1       A.    When you say "hypothetical"?

2       Q.    Meaning that you consider it a theoretical

3   possibility but you don't have a number to assign to

4   that group of "some."

5                   MR. DISHER:  Objection, vague.

6   Objection, compound.

7       A.    I don't have a number.

8             What was the first part of the question?

9       Q.    And, thus, the possibility is presented as one

10  that is theoretical but not quantified?

11                  MR. DISHER:  Same objection.

12      A.    Yeah.  I mean, I think -- I think it's

13  unlikely that it's just theoretical.  I mean, I believe

14  that if DACA participants lost permission to work that

15  would be a motivating factor for some of them to return

16  to their country of origin.

17      Q.    But you're -- has any DACA participant told

18  you personally that they would return to their home

19  country if they lost work authorization?

20      A.    No.

21      Q.    In Paragraph 8, at the bottom of the page and

22  then flowing over to the top of the next page, you have

23  identified some characteristics that would make it more

24  or less likely for some DACA participants to emigrate if

25  they were denied permission to work in the U.S.  Is that

```
 1   between regular undocumented immigrants and DACA
 2   participants.
 3        Q.   And would one of those distinctions be that
 4   the DACA recipient may have been working with work
 5   authorization for some period of time before losing it?
 6        A.   Compared to undocumented immigrants, yes.
 7        Q.   Okay.  In your last sentence you say, "The
 8   variation in characteristics within the DACA applicant
 9   population suggests that some do have characteristics
10   that have been associated with higher probability of
11   emigration from the U.S."
12             And is it fair to say that what you have
13   in the parentheses there are those characteristics that
14   you think some DACA recipients have that are associated
15   with a higher probability of return?
16             MR. DISHER:  Objection, misstates his
17   testimony.
18             Go ahead and answer.
19        A.   The -- so -- so these are some examples, not
20   necessarily an exhaustive list.  And, yes, that I think
21   there are some DACA participants that share similar
22   characteristics to unauthorized immigrants that are
23   associated with a probability of return migration.
24        Q.   Have you done any study of the characteristics
25   within the DACA population to assess how many have the
```

```
 1    characteristics that you associate with a probability --
 2    a higher probability --
 3         A.    I have --
 4         Q.    -- of return?
 5         A.    I have not.
 6         Q.    Okay.
 7         A.    Sorry.  I didn't mean to --
 8         Q.    Are you aware of any studies not done by you
 9    that examine the characteristics within the DACA
10    population to see whether some have a higher probability
11    of return to their home country?
12         A.    Not specifically for probability of return
13    migration, but there are studies looking at the
14    characteristics of DACA participants.
15         Q.    Did you look at any of those studies to try to
16    get a handle on the number of DACA participants who
17    might have characteristics associated with a higher
18    probability of return to their home country?
19         A.    I did not.
20         Q.    Can you tell me what year a DACA recipient had
21    to have arrived in the United States by in order to get
22    DACA?
23         A.    I don't recall.
24         Q.    Can you tell me the age under which a DACA
25    recipient had to have arrived in the United States in
```

```
 1   United States at least up until about 2008?

 2        A.   Yes.   Until about 2008, there was a steady

 3   increase in the unauthorized population in the

 4   United States --

 5        Q.   Okay.

 6        A.   -- or we estimate that there has been.

 7        Q.   And IRCA was enacted sometime before then.  Is

 8   that right?

 9        A.   Yes.  I think it was '84.

10        Q.   '86, perhaps?

11        A.   86, yeah.

12        Q.   Okay.  We're going to leave the Wishnie

13   article alone now.

14        A.   Okay.

15        Q.   I'm not going to ask you any more questions

16   about it.

17                  Would it be correct to say that the

18   opinions in your report are not based on speaking with

19   any individual DACA recipients?

20        A.   Yes.

21        Q.   Would it be correct to say that the opinions

22   in your report are not based on any survey research of

23   DACA recipients?

24        A.   Probably not completely.

25        Q.   Are you aware of any of the --
```

```
 1        A.    I think the Current Population Survey probably
 2   surveyed some DACA participants.
 3        Q.    Good catch.   Yes.
 4                   So other than the Current Population
 5   Survey or any other census survey that might have
 6   captured the responses of DACA recipients, would it be
 7   correct to say that the opinions in your report are not
 8   based on survey research of DACA recipients?
 9        A.    Yes.
10        Q.    Okay.   Are you aware of any organizations of
11   undocumented students at UTSA?
12        A.    Vaguely.
13        Q.    Have you ever sought to attend a meeting of
14   any undocumented students at UTSA?
15        A.    No.
16        Q.    You talked about some of the possibilities
17   with respect to DACA recipients leaving Texas after
18   losing work authorization, and you described that --
19   that it's greater than one but less than all, and I'd
20   like to return for a minute to that.
21                   Is it more likely than not, in your
22   estimation, that the number of DACA recipients who would
23   return to their home country from Texas after losing
24   work authorization would be fairly small?
25                   MR. DISHER:   Objection, vague.
```

1     A.   Yeah.   I don't -- I don't think I could say --

2   I don't believe that I can quantify a number other than

3   I think some would.

4     Q.   Okay.   So then is it within the realm of

5   possibility that the number could be fairly small?

6                 MR. DISHER:   Objection, vague.

7     A.   Yes, in the same turn as it could be that it

8   could be really large.

9     Q.   Do you consider it equally likely that the

10  number of DACA recipients who would return to their

11  country after losing work authorization is small or very

12  large?

13                MR. DISHER:   Objection, vague.

14    A.   I don't think I could state that.

15    Q.   Okay.   So is it your position that you cannot

16  say that it is more likely that the number of DACA

17  recipients who would return is small versus very large?

18                MR. DISHER:   Objection, vague.

19    A.   Can you -- can you define what "small" and

20  what "large" is?

21    Q.   Okay.   Well, is it -- okay.   Let's talk about

22  it in terms of percents because numbers could be

23  confusing.

24                Do you consider it equally likely that

25  more than 50 percent or less than 50 percent of DACA

1  recipients would return to their home country after

2  losing work authorization?

3      A.   I really don't think I could put a percent on

4  it, but I do state that I think most DACA participants

5  would stay in the United States.

6      Q.   Would you agree with me that if DACA

7  recipients had to arrive in the United States before

8  they were 16 years old that that characteristic of

9  arriving in the United States before age 16 would tend

10 to increase the probability of them staying in the

11 United States if they lost work authorization?

12          MR. DISHER:  Objection, vague.

13 Objection, asked and answered.  Objection, incomplete

14 hypothetical.

15     A.   Compared to?

16     Q.   Those who arrived in the United States after

17 the age of 16.

18          MR. DISHER:  Same objections.

19     A.   But then they're not eligible for DACA or --

20     Q.   Right.  So the characteristic -- would you

21 agree with me that the characteristic of DACA recipients

22 of having arrived in the United States before the age of

23 16 makes them less likely to return when compared to the

24 general unauthorized immigrant population?

25          MR. DISHER:  Objection, vague.

1  representing a defendant-intervenor in this case.  I am

2  just going to touch on a few areas and try not to take

3  up too much more of your time.

4          The same rules apply that Ms. Perales

5  explained earlier.  If you don't understand my question,

6  please just let me know and I will try to rephrase it.

7  We'll try not to talk over each other, and hopefully we

8  can move this right along.

9      A.   Okay.

10     Q.   Okay.  I just want to ask a little bit about

11 the articles in your declaration.  Did you select the

12 articles that you cited in the declaration?

13     A.   Yes.

14     Q.   How did you select them?

15     A.   Reading that during -- well, during a search

16 through bibliographic software and identifying a lot of

17 articles and sorting through the ones that I thought

18 were relevant to what I was asked to testify about.

19     Q.   And why did you choose these particular

20 articles included in your declaration?

21     A.   They seemed most relevant to the points that I

22 was hoping to make and also concise.  So there's some

23 degree of parsimony was also a factor.

24     Q.   Did you select any research or articles

25 included in your declaration that directly address the

1    topics of DACA?

2              MR. DISHER:  Objection, vague.

3        A.   No.

4        Q.   Why not?

5        A.   They weren't -- I didn't find any that

6    addressed the issue of probability of return migration

7    among DACA participants.

8        Q.   In considering which scholarly references to

9    include in your declaration, did you consider the

10   reliability of the authors as a subject matter?

11       A.   Yeah.  For those that I was familiar with,

12   yes, that was a factor.

13       Q.   Which ones are you unfamiliar with?

14       A.   I didn't -- I don't know Wishnie.  I shouldn't

15   say "know."  I've not read Wishnie -- Wishnie's work

16   before.  And then Kennan and Walker I wasn't familiar

17   with before.  The others I've had some familiarity with

18   before.

19       Q.   Okay.  So I'd like to go to Paragraph 4 of

20   your declaration, which I believe is Exhibit 3.  I

21   believe this is an Emma Aguila article for the research.

22              Are you familiar with her work?

23       A.   I'm sorry.  I'm -- I'm -- can you point me to

24   where we are?

25       Q.   So Paragraph 4, about midway down, there's a

1    correct?

2         A.   Yes.

3         Q.   Okay.  Have there been any other studies that

4    address this issue in the last 17 years?

5                   MR. DISHER:  Objection, vague.

6         A.   If there are, there aren't many.

7         Q.   Okay.  You don't know for sure?

8         A.   I didn't -- I don't think I found any when I

9    looked that specifically address this.

10        Q.   And when we say "this," do we mean young

11   immigrants -- how would you characterize the -- the

12   Regan and Olsen research as you cited it here in this

13   paragraph?

14        A.   They were looking at return migration --

15        Q.   Okay.

16        A.   -- of immigrants.

17        Q.   Okay.

18                  MS. GREGORY:  I'd like to have this

19   marked, please.

20                  (Exhibit No. 7 marked)

21        Q.   Dr. Potter, do you recognize Exhibit 7, titled

22   "You Can Go Home Again: Evidence From Longitudinal

23   Data"?

24        A.   Yes.

25        Q.   And is this the article that you cited in

1    Paragraph 9 of your declaration?

2        A.    Yes.

3        Q.    Did this study address DACA recipients?

4        A.    No.

5        Q.    Did this study distinguish between documented

6    and undocumented immigrants?

7        A.    No.

8        Q.    On Page 339, the first page, looking at the

9    right-hand column, the second full paragraph, it begins

10   "in this paper."  Do you see where --

11       A.    Yes.

12       Q.    Okay.  So in this paragraph the author states

13   that they use longitudinal data from the 1979 youth

14   cohort of the National Longitudinal Surveys (NLSY79) to

15   study emigration, with an "E," in one cohort of

16   immigrants.

17              Did I read that correctly?

18       A.    Yes.

19       Q.    What is the National Longitudinal Surveys?

20       A.    It's a survey that follows people over time

21   and asks a range of questions about their

22   characteristics and socioeconomic characteristics.

23       Q.    So what would be the 1979 youth cohort of the

24   National Longitudinal Surveys?

25       A.    That would be the cohort that they started

1  following in 1979.

2      Q.   Do you know when -- or what age a cohort is

3  when they begin following them?

4      A.   I don't know.

5      Q.   Okay.  So the sentence immediately after that

6  I just read says that more than 750 NLSY79 respondents

7  were born abroad to foreign nationals.

8           Did I read that correctly?

9      A.   Yes.

10     Q.   So this particular cohort was born in or

11  before 1979.  Is that correct?

12     A.   Yes.

13     Q.   Let's look at Footnote 2, which is on the same

14  page.  The very last sentence says, quote, By 1996, only

15  71 foreign cases were eligible to be interviewed for

16  NLSY79, end quote.

17           Did I read that correctly?

18     A.   Yes.

19     Q.   So in your reading, does that mean that there

20  were only -- there was only complete data for

21  71 individuals?

22     A.   In the survey?

23     Q.   Yes.

24     A.   Not in the survey, but that they had

25  identified as, quote, unquote, foreign cases in the

1    survey.

2         Q.   So what does that mean, only 71 foreign cases

3    were eligible to be interviewed?  What is your

4    understanding of that?

5         A.   So they were looking at people who started in

6    the 1979 cohort and followed them over time; and by

7    1996, they had identified 71 cases who had returned

8    to -- I think to their country of origin or had left the

9    United States.

10        Q.   Dr. Potter, are you familiar with the DACA

11   eligibility requirements?

12        A.   Vaguely.

13        Q.   Are you aware that DACA applicants had to be

14   under 31 years old by 2012 to be eligible for deferred

15   status and, therefore, wouldn't have been born yet in

16   1979?

17        A.   Yes.

18        Q.   You can set that to the side, Exhibit 7.

19             MS. GREGORY:  I'd like to have this

20   marked, please.

21             (Exhibit No. 8 marked)

22        Q.   Dr. Potter, you're looking at Exhibit 8.  Is

23   this the article that you cite in Paragraph 10 of your

24   declaration?

25        A.   Yes.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
 3  STATE OF TEXAS, et al.,              )
          Plaintiffs,                    )
 4                                       )
    VS.                                  )
 5                                       )
    UNITED STATES OF AMERICA, et al.,)   Case No. 1:18-CV-68
 6          Defendants,                  )
                                         )
 7  and                                  )
                                         )
 8  KARLA PEREZ, et al.,                 )
                                         )
 9          Defendant-Intervenors.   )
10
                      REPORTER'S CERTIFICATE
11              DEPOSITION OF LLOYD POTTER, Ph.D.
                        JUNE 27, 2018
12
13      I, Kathleen Casey Collins, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16      That the witness, LLOYD POTTER, Ph.D., was duly
17  sworn by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20      That the deposition transcript was submitted on
21  _____, ____, to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, _____;
24      That pursuant to information given to the
25  deposition officer at the time said testimony was
```

```
 1   taken, the following includes counsel for all parties
 2   of record:
 3        Mr. Todd L. Disher and Mr. Trent Peroyea
               Attorneys for the Plaintiffs
 4        Ms. Nina Perales, Attorney for
               Defendant-Intervenors
 5        Mr. Andrew Bobb, Attorney for Defendants
          Ms. Katherine Gregory, Attorney for New Jersey
 6             Office of Attorney General
 7        I further certify that I am neither counsel for,
 8   related to, nor employed by any of the parties or
 9   attorneys in the action in which this proceeding was
10   taken, and further that I am not financially or
11   otherwise interested in the outcome of the action.
12        Certified to by me this _____ day of June,
13   2018.
14                    _____
                      KATHLEEN CASEY COLLINS
15                    Texas CSR NO. 2018
                      Certificate Expires 12/31/18
16                    Ken Owen & Associates
                      Firm Certificate No. 115
17                    801 West Avenue
                      Austin, Texas  78701
18                    (512) 472-0880
19
20
21
22
23
24
25
```