**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et at.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**FEDERAL DEFENDANTS' RESPONSE TO**
**PEREZ DEFENDANT-INTERVENORS' MOTION**
**TO COMPEL DISCOVERY FROM FEDERAL DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF THE ISSUES............................................................................................. 1

SUMMARY OF THE ARGUMENT ...................................................................................... 1

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS .................................... 2

ARGUMENT ........................................................................................................................ 3

   I. Defendant-Intervenors' interrogatories and requests for production are outside the scope of discovery ........................................................................................................................ 5

      A.    Defendant-Intervenors' discovery requests pose an extreme and undue burden on Federal Defendants. ................................................................................. 5

      B.    Defendant-Intervenors' proposed alternatives do not alleviate the undue burden their discovery poses for Federal Defendants. .............................................. 11

      C.    This burden is not proportional to the needs of the case. .......................................... 14

   II.    Federal Defendants have exceeded the requirements for Initial Disclosures under Federal Rules of Civil Procedure 26(a)(1). ............................................................................... 16

   III.    Sanctions and award for costs are inappropriate at this time. ....................................... 17

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Adame v. Refugio County,*
  No. 2:16-CV-139, 2018 WL 1918656 (S.D. Tex. Apr. 24, 2018) ........................................... 17

*Areuzaga v. ADW Corporation*,
  314 F.R.D. 428 (N.D. Tex. 2016) ........................................................................................... 5

*Baker v. Holder,*
  No. 06-CV-91-HRW, 2010 WL 1334924 (E.D. Ky. Mar. 30, 2010) ..................................... 14

*Bark v. Northrop,*
  2 F. Supp. 3d 1147 (D. Or. 2014) ......................................................................................... 16

*BuzzFeed, Inc. v. U.S. Dep't of Justice,*
  318 F. Supp. 3d 347 (D.D.C. 2018) ....................................................................................... 6

*Camp v. Pitts,*
  411 U.S. 138 (1973) ............................................................................................................. 16

*Cazorla v. Koch Foods of Mississippi, L.L.C.,*
  838 F.3d 540 (5th Cir. 2016) ................................................................................................. 3

*Crosby v. Louisiana Health Serv. & Indem. Co.*,
  647 F.3d 258 (5th Cir. 2011) ................................................................................................. 5

*Enron Corp Savings Plan v. Hewitt Associates, L.L.C.*,
  258 F.R.D. 149 (S.D. Tex. 2009) ..................................................................................... 4, 18

*GFI Computer Industries, Inc. v. Fry*,
  476 F.2d 1 (5th Cir. 1973) ................................................................................................... 17

*Guajardo v. Martinez,*
  No. 2:14-CV-450, 2015 WL 12831683 (S.D. Tex. Dec. 22, 2015) ....................................... 14

*In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009,*
  279 F.R.D. 18 (D.D.C. 2011) .............................................................................................. 16

*Kilmon v. Saulsbury Indus., Inc.,*
  No. MO:17-CV-99, 2018 WL 5800757 (W.D. Tex. Feb. 28, 2018) ....................................... 4

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO,*
  901 F.2d 404 (5th Cir. 1990) .............................................................................................. 14

*Lopez v. Don Herring Ltd.*,
    327 F.R.D. 567 (N.D. Tex. 2018) ........................................................... 17

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*,
    894 F.2d 1482 (5th Cir. 1990) ................................................................. 4

*McPeek v. Ashcroft*,
    202 F.R.D. 31 (D.D.C. 2001) ................................................................... 6

*Merrill v. Waffle House, Inc.*,
    227 F.R.D. 475 (N.D. Tex. 2005) ............................................................. 4

*Montoya v. State Farm Lloyds*,
    No. 7:14-CV-182, 2015 WL 12940020 (S.D. Tex. Jan. 27, 2015)............. 5

*Munoz-Santana v. U.S. I.N.S.*,
    742 F.2d 561 (9th Cir. 1984) ................................................................... 5

*Northcross v. Bd. of Ed. of City of Memphis*,
    333 F.2d 661 (6th Cir. 1964) ................................................................... 6

*S.E.C. v. Brady*,
    238 F.R.D. 429 (N.D. Tex. 2006) ............................................................. 4

*Scott v. Monsanto Co.*,
    868 F.2d 786 (5th Cir. 1989) ................................................................... 3

*Small v. Amgen, Inc.*,
    No. 212CV476FTM29MRM, 2016 WL 7228863 (M.D. Fla. Sept. 28, 2016)......... 5

*Smith v. Conway Organization, Inc.*,
    154 F.R.D. 73 (S.D.N.Y 1994) ............................................................... 18

*Texas v. United States (Texas I)*,
    809 F.3d 134 (5th Cir. 2015) ................................................................. 15

*Texas v. United States (Texas II)*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................... 15

*U.S., ex rel., Rigsby v. State Farm Fire & Cas. Co.*,
    794 F.3d 457 (5th Cir. 2015) ................................................................... 3

*United States v. All Assets Held at Bank Julius*,
    170 F. Supp.3d 161 (D.C. Cir. 2016)................................................... 4, 5

iv

*USA Group Loan Services, Inc. v. Riley*,
    82 F.3d 708 (7th Cir. 1996) ................................................................................... 16

*Watts v. S.E.C.*,
    482 F.3d 501 (D.C. Cir. 2007) .................................................................................. 6

**Statutes**

8 U.S.C. § 1367 ....................................................................................................... 11, 13

**Rules**

Fed. R. Civ. P. 1 ........................................................................................................ 3, 15

Fed. R. Civ. P. 26 ........................................................................................................ 1, 6

Fed. R. Civ. P. 26(a) .................................................................................................. 1, 18

Fed. R. Civ. P. 26(a)(1) ................................................................................................. 15

Fed. R. Civ. P. 26(a)(1)(B)(i) .......................................................................................... 2

Fed. R. Civ. P. 26(b)(1) .................................................................................................. 3

Fed. R. Civ. P. 33(b)(4) .................................................................................................. 3

Fed. R. Civ. P. 37 ............................................................................................................ 1

Fed. R. Civ. P. 37(5)(A) .................................................................................................. 1

Fed. R. Civ. P. 37(5)(B) .................................................................................................. 1

Fed. R. Civ. P. 37(d)(3) .............................................................................................. 1, 17

**Regulations**

42 C.F.R. § 137.309 ...................................................................................................... 16

**Other Authorities**

Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment.................................... 16

Fed. R. Civ. P. 37(d)(1)(A)(ii) advisory committee's note to 1970 amendment.......................... 17

## STATEMENT OF THE ISSUE

The question presented is whether this Court should grant Perez Defendant-Intervenors' (Defendant-Intervenors') motion to compel discovery from Federal Defendants pursuant to Fed. R. Civ. P. 37. Specifically, Defendant-Intervenors seek answers to Interrogatories Nos. 9 through 13, documents responsive to Request for Production No. 7(3), and amendment of Federal Defendants' Initial Disclosures. Defendant-Intervenors also seek payment of reasonable expenses incurred by them in connection with their motion pursuant to Federal Rules of Civil Procedure 37(d)(3) and 37(c)(1)(a).

Rule 37 permits a district court to issue sanctions to compel a party to make disclosures required by Federal Rule of Civil Procedure 26(a) or respond to interrogatories and requests for production submitted under Rules 33 and 34. Sanctions are not permitted if an "opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(5)(A).

Pursuant to Rule 26(c), a district court may issue a protective order forbidding discovery to protect a party from, among other things, "embarrassment, oppression, or undue burden or expense . . . ." A district court may deny a motion to compel, issue a protective order, and award reasonable fees and costs to the opposing party if the court finds the motion was unjustified. Fed. R. Civ. P. 37(5)(B). Federal Defendants are cross-moving for a protective order concurrently with this response for the Court's consideration. *See* Fed. Defs.' Mot. Protective Order, ECF No. 393.

## SUMMARY OF THE ARGUMENT

This Court should deny Defendant-Intervenors' Motion to Compel because Federal Defendants have fulfilled their discovery obligations under Federal Rules of Civil Procedure 26,

33, 34, and this Court's order for Federal Defendants to respond to certain discovery requests of Defendant-Intervenors. *See* ECF No. 97. The information Defendant-Intervenors seek in their interrogatories and requests for production is outside the scope of discovery under Rule 26(b)(1). This matter is a record review claim under the Administrative Procedure Act, and the effort and means required for Federal Defendants to answer these interrogatories and requests for production are prohibitively costly and burdensome. *See* Ex. A (Declaration of Tracy L. Renaud); ECF No. 386, Defendant-Intervenors' Mot. Compel, Ex. 1.

The burden of responding to Defendant-Intervenors' discovery requests is not proportional to the needs of the case – the requests seek information solely related to Plaintiffs' procedural APA claims. But this Court has already held that Plaintiffs may receive complete relief under their substantive APA claims. And the Court current has before it a motion for summary judgment that includes that claim.

Federal Defendants have complied with their discovery requirements under Rule 26(a)(1). Federal Defendants maintain that initial disclosures are not required in this matter as it is an action for review of an administrative record. Fed. R. Civ. P. 26(a)(1)(B)(i). Notwithstanding this objection, Federal Defendants have fulfilled their obligation under Rule 26(a)(1) and disclosed all information they may use to support their claims or defenses as required by the rules in light of the limited nature of the action before the court.

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Federal Defendants are filing a cross motion for a protective order concurrently with this response which contains Federal Defendants' statement of the nature and state of proceedings. *See* Fed. Defs.' Mot. Protective Order 2–5, ECF No. 393.

**ARGUMENT**

Federal Defendants have fulfilled their discovery obligations in this matter and have properly objected to Defendant-Intervenors' interrogatories and requests for production as beyond the scope of discovery. Federal Defendants have continued to confer and work with Defendant-Intervenors to resolve any issues regarding Federal Defendants' responses to discovery without the involvement of the Court as required by Rules 26(c)(1). *See* Defendant-Intervenors' Mot. Compel Exs. 10–12, 14. Insofar as any other action is required by Federal Defendants to protect themselves from this discovery, they are simultaneously filing a cross motion for a protective order alongside this response.

The scope of discovery is governed by Federal Rule of Civil Procedure 26(b)(1) and is "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The scope of discovery is a balancing test that asks in part "whether the burden or expense of the proposed discovery outweighs its likely benefit." *See Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540, 554 n.42 (5th Cir. 2016) (citing Fed. R. Civ. P. 26(b)(1)). Other factors that courts consider when determining proportionality are "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1). Trial courts have broad discretion in discovery matters, see *Scott v. Monsanto Co.*, 868 F.2d 786, 793 (5th Cir. 1989), but must exercise this discretion in light of Fed. R. Civ. P. 1, which requires the rules to be "construed and administered to secure the just, speedy, and inexpensive determination of every action." *U.S., ex rel., Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 468 (5th Cir. 2015) (citing Fed. R. Civ. P. 1).

A party may object to a discovery request as disproportional and overly burdensome, provided the objection is valid and plead with a degree of specificity for each request objected to. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (holding that "a party must have a valid objection to each [discovery request] in order to escape the production requirement"); Fed. R. Civ. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity."). A party may not just state that a request is overly broad or disproportional, but must show "how" it is so; something generally done through affidavits or declarations. *See Kilmon v. Saulsbury Indus., Inc.,* No. MO:17-CV-99, 2018 WL 5800757, at \*4 (W.D. Tex. Feb. 28, 2018) ("A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." (citing *Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005))); *Enron Corp Savings Plan v. Hewitt Associates, L.L.C.*, 258 F.R.D. 149, 159 (S.D. Tex. 2009) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request." (citing *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006))).

A motion to compel should be denied if the Court finds that a discovery request is outside the scope of discovery as defined in Rule 26(b), including when the burden and expense of the proposed discovery outweighs its likely benefit. *See United States v. All Assets Held at Bank Julius*, 170 F. Supp.3d 161, 162–63 (D.C. Cir. 2016) (upholding district court denial of motion to compel that would have required U.S. to search for and produce all of its communications with foreign representatives that discussed the subject of the complaint for posing an extreme burden that was unlikely to lead to discovery of probative evidence). A district court "must limit otherwise permissible discovery if it determines that 'the burden or expense of the proposed

discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.'" *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011); *Areuzaga v. ADW Corporation*, 314 F.R.D. 428, 435 (N.D. Tex. 2016) (stating factors that would require court to limit proposed discovery remain unchanged after 2015 amendments).

I.   **Defendant-Intervenors' interrogatories and requests for production are outside the scope of discovery.**

   A.   **Defendant-Intervenors' discovery requests pose an undue burden on Federal Defendants.**

   Answering Defendant-Intervenors' discovery requests would require a significant and disproportionate logistical burden on Federal Defendants. District courts may use their discretion to protect parties from discovery requests that are unduly burdensome and outside the scope of discovery. *Montoya v. State Farm Lloyds*, No. 7:14-CV-182, 2015 WL 12940020, at *2 (S.D. Tex. Jan. 27, 2015) ("[D]istrict courts are tasked with guarding against abusive discovery, including "unwieldy, burdensome, and speculative fishing expedition[s]."). When evaluating a protective order or motion to compel, courts weigh, among other factors, the burden discovery would impose on a party against the need for the records in the case. *See United States v. All Assets Held at Bank Julius*, 170 F. Supp. 3d 161, 162–63 (D.C. Cir. 2016); *Munoz-Santana v. U.S. I.N.S.*, 742 F.2d 561, 563 (9th Cir. 1984) (reversing district court's default judgment against U.S.I.N.S. for noncompliance with discovery order when partial compliance with discovery order required 266 man-hours and a costs of $15,996 for manual searches of files); *Small v. Amgen, Inc.*, No. 212CV476FTM29MRM, 2016 WL 7228863, at *14–15 (M.D. Fla. Sept. 28, 2016) (partly denying motion to compel that would have required manual collection and review

5

of millions of pages of medical records and the redaction of confidential health information on each page). Courts have also taken into account the impact of discovery on important and necessary functions of an organization when determining undue burden. *See BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 359 (D.D.C. 2018) ("[D]iscovery under Rules 26 and 45 must properly accommodate 'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations.'" (quoting *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007))); *McPeek v. Ashcroft*, 202 F.R.D. 31, 33–35 (D.D.C. 2001) (balancing DOJ's need to perform public tasks against litigation needs when restricting timeframe for backup restoration of e-mails); *see also Northcross v. Bd. of Ed. of City of Memphis*, 333 F.2d 661, 667 (6th Cir. 1964) (upholding district court's denial of motion for production of documents when discovery would have imposed a great burden on administrative staff which was processing some 2,000 teacher applications looking to employ 500 or 600 new teachers).

Federal Defendants have demonstrated the undue burden of these discovery requests using sworn declarations from key personnel at U.S. Citizenship and Immigration Services (USCIS). Federal Defendants provided the Declaration of Tracy L Renaud, the Acting Deputy Director of USCIS, Ex. A, with their response and objections to Defendant-Intervenors' third set of discovery requests, and are providing additional declarations from Donald J. Monica, Adjudications Branch Division Chief for the Service Center Operations Directorate (SCOPS) within USCIS, Ex. B; Michael Hoefer, Chief of Office of Performance and Quality (OPQ) within USCIS, Ex. C; and Tracy A. Bellisime, Associate Center Director for the Records Management Operations Branch (BMOB), National Records Center (NRC) for USCIS, Ex. D, as additional proof of the substantial undue burden posed by Defendant-Intervenors' discovery requests. These

6

new declarations take into account the addition of Plaintiff State of Mississippi and provide

updated burden estimates and explanations. *See* Ex. B (Monica Decl. ¶ 8).

Defendant-Intervenors' interrogatories ask for information that would require an overly

burdensome and costly search on the part of Federal Defendants and would detract from mission-

critical work. Interrogatories 9 and 10 ask Federal Defendants to identify the number of initial

and renewal DACA requests that USCIS has denied and then identify the number of applications

denied "at least in part" because the requestor was a suspected gang member, or posed a threat to

national security or public safety, or when the criteria of the 2012 DACA memorandum had been

met. *See* Defendant-Intervenors' Mot. Compel Ex. 1, at 9, 11. Federal Defendants responded to

Interrogatories 9 and 10, in part, in their initial discovery response by providing the number of

initial and renewal DACA denials for Plaintiff States for the relevant time period. However, as

Federal Defendants' explained in their objections, and declaration in support thereof, USCIS

databases do not electronically capture the remainder of the information sought in Interrogatories

9 and 10 a readily retrievable manner, and a complete response would require a manual, case-by-

case review of the electronic and paper files of approximately 19,730[1] denied DACA requests.

*See* Ex. A (Renaud Decl. ¶¶ 7–8); Ex. B (Monica Decl. ¶¶ 8–9); Defendant-Intervenors' Mot.

Compel Ex. 1, at 10, 12. This manual review of records to determine the underlying basis for a

denial is estimated to take approximately 6,577 to 9,866 hours to complete, in addition to the

time and burden required to gather all relevant physical and/or electronic records necessary for

the review. Ex. B (Monica Decl. ¶¶ 9-12).

A similar burdensome effort would be required for Interrogatories 11 and 12 which ask

for the number of Requests for Evidence (RFEs) issued for initial and renewal DACA requests

---

[1] This number, and the following data, have been updated from the initial figures provided in the Renaud Declaration
to reflect the addition of Plaintiff State of Mississippi.

on various bases. *See* Defendant-Intervenors' Mot. Compel Ex.. 1, at 13, 15. This information is also not recorded in USCIS databases in a readily retrievable manner and would require a manual, case-by-case review of the electronic and/or paper copies of approximately 60, 853 RFEs. *See* Ex. A (Renaud Decl. ¶ 9); Ex. B (Monica Decl. ¶ 13); Defendant-Intervenors' Mot. Compel Ex. 1, at 14, 16. A manual review of these requests to determine the basis for sending the RFE would take approximately 5,071 hours to complete, in addition to the time and burden required to gather all relevant physical and/or electronic records necessary for the review. Ex. B (Monica Decl. ¶ 13).

Interrogatory 13, which asks the number of approved DACA requests submitted by individuals who indicated on their Form I-821D, Consideration of Deferred Action for Childhood Arrivals, that their immigration status was "expired" or "parole," would also require a manual, case-by-case review of over 157,763 Form I-821Ds kept in various electronic and paper formats. *See* Ex. A (Renaud Decl. ¶ 11); Ex. B (Monica Decl. ¶ 15); Defendant-Intervenors' Mot. Compel Ex. 1, at 17–18. Answering Interrogatory 13 would take Federal Defendants approximately 26,294 hours to complete, in addition to the time and burden required to gather all relevant physical and/or electronic records necessary for the review. Ex. B (Monica Decl. ¶ 15).

There are additional logistical difficulties in gathering the necessary documents to respond to Defendant-Intervenors' discovery requests. As not all Alien Files (A-files), RFEs, and Form I-821Ds are stored in an electronic format and/or electronic do not contain the information necessary to answer Defendant-Intervenors' questions, requiring review of the individual paper A-file, many of these records would have to be requested and gathered from across the country. Ex. B (Monica Decl. ¶¶ 9, 11, 13, 15, 16); Ex. D (Bellisime Decl. ¶ 7). If an A-file is stored at the NRC, it would take approximately 15 business days from the date of request for a USCIS

officer to receive the file and begin her review. Ex. B (Monica Decl. ¶¶ 11, 15). However, if a particular "A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months." Ex. B (Monica Decl. ¶¶ 11, 16, 26).

The substantial time and manpower required to conduct the individual case-by-case review of electronic and/or paper records need to answer Defendant-Intervenors' interrogatories would be unduly costly to Federal Defendants, both in terms of money and manpower. The review would also divert valuable agency resources from conducting mission critical work, such as reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including review and resolution of background check hits and other security vetting procedures. *See* Ex. A (Renaud Decl. ¶¶ 14–15); Ex. B (Monica Decl. ¶¶ 16–17, 29); Ex. D (Bellisime Decl. ¶ 8). This diversion has the potential to significantly and negatively impact and delay USCIS adjudicatory efforts that could lead to other burdensome litigation against USCIS. *See* Ex. B (Monica Decl. ¶¶ 17, 29).

Defendant-Intervenors' Request for Production 7(3) is similarly burdensome. The request – for documents showing the number of DACA requests accepted but denied, during the period of June 2012 to June 2018, after the adjudicator determined the requestor met the five criteria in the June 15, 2012 memorandum, but "was otherwise not a qualifying" requestor, including because the requestor posed a threat to national security or public safety, by each Plaintiff state, for each month – is vague, overly broad, and extremely burdensome. *See* Defendant-Intervenors' Mot. Compel Ex. 1, at 26–28. It is also duplicative in that it seeks statistics that Federal Defendants have already provided in response to interrogatories, and seeks the same information

that Federal Defendants identify above as burdensome and disproportionate to the needs of the case. *See id.*

Request 7(3) is also burdensome to the extent that it calls for the production of documents other than A-files. There are potentially 65 non-attorney and 59 attorney custodians scattered throughout DHS who may have relevant documents. Ex. A (Renaud Decl. ¶ 16). As of July 2018, there were also 12 potential custodians who were no longer employed by USCIS. *Id.* To identify and collect data from these custodians alone would require an estimated time of approximately 493 to 561 hours, and that assumes a total of only 1.5 GB of data and near perfect technological processing at every step. *See* Ex. A (Renaud Decl. ¶¶ 17–22). This true time requirement is likely to be three to four times higher than the estimate given Defendant-Intervenors' broad date range likelihood that the total data will exceed 1.5 GB. *See* Ex. A (Renaud Decl. ¶ 22). Excluded from the time estimate are additional likely scenarios, such as a search of individual-user archives to identify emails deleted before August 16, 2014—which would require an additional 250 to 575 hours of work—as well as the identification of non-email documents located on custodian's personal and share drives and local drives—which would require an additional 204 hours. *See* Ex. A (Renaud Decl. ¶¶ 23–24). The substantial time and effort identified above is only for document collection and processing—it does *not* take into account the time necessary for review of responsiveness, privileged material, personally identifying information, and referral of third party information to other agencies for review. Ex. A (Renaud Decl. ¶ 24).

Given that this discovery is not necessary for the resolution of the case, the significant effort required to fully respond to discovery is not proportional to the needs of the case. This Court should accordingly deny Defendant-Intervenors' Motion to Compel.

**B. Defendant-Intervenors' proposed alternatives do not alleviate the undue burden their discovery poses for Federal Defendants.**

Defendant-Intervenors' mention in their Motion to Compel that they have made a good faith effort to alleviate Federal Defendants' concerns as to burden. *See* Defendant-Intervenors' Mot. Compel 7, ECF No. 386. Their offer consists of reviewing a sampling of government files, conducting the manual review of files at their own expense, and entering into a confidentiality agreement to address any data privacy concerns. *Id.* Unfortunately, this offer does not address many of the threshold factors that make responding to their discovery unduly burdensome and ignores the abundant instances of privilege (including attorney-client, work product, deliberative process, and law enforcement) and third-party confidential information that likely exist in the records that prohibit review by anyone other than agency counsel.

Producing or using a sample of documents to answer Defendant-Intervenors' interrogatories does little to alleviate the burdens and challenges of this discovery, and is difficult to accomplish in a statistically sound manner. While Defendant-Intervenors proposed accepting a sample size of 3% of relevant documents for each category of discovery requests, this in of itself would not be a statistically sound methodology. *See* Ex. C (Hoefer Decl. ¶¶ 7–8). However, even using sample sizes for a 95% confidence level and a precision of +/- 5% would still require hundreds of hours that could take weeks or even months to complete. *See* Ex. C (Hoefer Decl. ¶ 10); Ex. B (Monica Decl. ¶¶ 18–29). Additionally, the value of any conclusion about the broader population derived from a review of these samples may be limited due to the imprecision of the estimate, given that some of the characteristics of the DACA population that Defendant-Intervenors are attempting to measure could be rare and would not follow the normal approximation for variance estimation. *See* Ex. C (Hoefer Decl. ¶ 8).

11

In order to implement Defendant-Intervenors' proposal, USCIS would first have to design a statistically-sound methodology that would randomly select receipt numbers of individual files for each category of discovery requests. Ex. C (Hoefer Decl. ¶¶ 7–8). Once an initial sample is determined, USCIS would then have to review each to determine whether any of the individuals selected are covered 8 U.S.C. § 1367. Ex. C (Hoefer Decl. ¶ 9). This confidentiality provision prevents USCIS from sharing the A-file, any other system record, or any other information about the protected individual with Defendant-Intervenors, and therefore would require USCIS to replace "the receipt number in the sample with another randomly selected receipt number."[2] *Id.*

Identifying a sample size for each of the categories requested in Defendant-Intervenors' Interrogatories 9 through 13 would take at least 16 hours. Ex. C (Hoefer Decl. ¶ 10). Any A-files or Form I-821Ds selected for the random sample that only exist in physical form would then have to be gathered from around the country and requested from any DHS or USCIS component that may be using it. *See* Ex. B (Monica Decl. ¶¶ 19–20); Ex. D (Bellisime Decl. ¶ 7).[3] The physical files would then need to be transferred to a central location for consolidation and scanning. *See* Ex. B (Monica Decl. ¶22); Ex. D (Bellisime Decl. ¶ 8). These files would then be individually reviewed and redacted for attorney-client, deliberative process, and law enforcement privilege, and any additional regulatory or statutory confidentiality provisions that may apply, including for personally identifiably information, a task which would be "a resource-intensive

---

[2] Replacing the receipt number has the potential to impact the overall randomness of the sample. *See* Ex. C (Hoefer Decl. ¶ 9).

[3] If a file is being used by another DHS component for another reason "USCIS would either need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number. As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample." Ex. B (Monica Decl. ¶¶ 19, 26, 28).

and time-consuming process for USCIS and other agencies whose documents and information

may be included in the A-file and therefore would require review by counsel for other agencies."

*See* Ex. D (Bellisime Decl. ¶ 12).[4]

Using a sample of documents to answer Defendant-Intervenors' Interrogatories 9 through

13 without producing the documents directly would similarly pose a substantial burden to

Federal Defendants. While USCIS would not have to undertake a resource-intensive privilege

review of any documents, they would still have to conduct a manual review of the sampled

documents in order to make the individual determinations asked for in each interrogatory. USCIS

estimates that it would take approximately 250 to 1,125 hours reviewing sample files to

determine answers to Interrogatories 9–10, approximately 66 hours for Interrogatories 11–12,

and approximately 68 hours for Interrogatory 13. *See* Ex. B (Monica Decl. ¶¶ 26–28).These

estimates are in addition to the time described above for creating the statistical samples, with the

exception of removing any documents protected by confidentiality provisions, and in addition to

the time and burden required to gather all relevant physical and/or electronic records necessary

for the review. *See* Ex. B (Monica Decl. ¶¶ 24-25).

Issuing a protective order and producing any responsive documents, sample sized or not,

for Defendant-Intervenors to review themselves is equally unfeasible because of the substantial

amount of information that is privileged and because information regarding certain DACA

requestors that may protected by confidentiality provisions, or cannot be produced even subject

to a protective order because Defendant-Intervenors do not represent these DACA requestors.

*See* Ex. C (Hoefer Decl. ¶ 9). These provisions prohibit public disclosure, regardless of whether

---

[4] Law enforcement privilege redactions will have a particular impact on the usability of the documents by Defendant-Intervenors as the redactions will make it difficult to "determine whether an initial or renewal DACA request was denied at least in part because the requestor was a suspected gang member or at least in part because the requestor posed a threat to national security or public safety." Ex. B (Monica Decl. ¶ 23).

13

there is a protective order in effect. *See, e.g.*, 8 U.S.C. § 1367 (2018). The substantial amount of information which is protected by attorney-client, deliberative process, and law enforcement privilege would also still require a resource intensive privilege review by USCIS, DOJ, and other agencies, even with the entry of a protective order. *See* Ex. B (Monica Decl. ¶ 23); Ex. D (Bellisime Decl. ¶¶ 10, 12).

Defendant-Intervenors' proposed alternatives do little to alleviate the burden of responding to their discovery requests and the validity of any statistical information they receive using their proposed methodology is questionable. Even with their alternative proposals, Defendant-Intervenors' discovery requests remain outside the scope of discovery.

**C.  This burden is not proportional to the needs of the case.**

Defendant-Intervenors' discovery requests ask for information that is disproportional to the needs of the case as it presently stands and is therefore outside the scope of discovery. While Defendant-Intervenors argue that their discovery requests are necessary to answer the question of agency discretion in DACA adjudications and are therefore relevant, this argument does not take into consideration the motions for summary judgment currently before the court that could resolve the case without requiring additional discovery. *See Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 435 (5th Cir. 1990), *opinion modified on denial of reh'g* (Apr. 27, 1990) (upholding district court's protective order staying depositions until after determinations of summary judgment motions that did not require discovery because of undue burden and expense); *Baker v. Holder,* No. 06-CV-91-HRW, 2010 WL 1334924, at *7 (E.D. Ky. Mar. 30, 2010) ("A court should deny a motion to compel where the information sought will not undermine a summary judgment granted on other grounds."); *cf. Guajardo v. Martinez*, No.

14

2:14-CV-450, 2015 WL 12831683, at *2 (S.D. Tex. Dec. 22, 2015) (staying discovery before Court ruled on motion to dismiss as it would be otherwise unduly burdensome and expensive).

Presently, the three issues before the Court are Plaintiffs' substantive and procedural Administrative Procedure Act claims and their Take Care Clause claim. All three claims are currently before the Court on motion for summary judgment. And it is clear that the substantive APA claim, at minimum, can be resolved on the merits without additional discovery. Moreover, the resolution of the substantive APA claim would be dispositive—rendering the requested discovery unnecessary—given the fact that the Court has already held that "DACA is 'manifestly contrary' to the statutory scheme promulgated by Congress" in the INA. *Texas v. United States (Texas II)*, 328 F. Supp. 3d 662, 722 (S.D. Tex. 2018) (quoting *Texas v. United States (Texas I)*, 809 F.3d 134, 186 (5th Cir. 2015)). Thus, Defendant-Intervenors' selective citation to the Court's decision denying Plaintiffs' Motion for Preliminary Injunction is nothing but a red herring—it applies only to issues involving Plaintiffs procedural APA claim, which should be decided on Federal Defendants' May 13, 2019, administrative record. Because the entirety of the case may be decided upon summary judgment—without the need for additional discovery—there is no question that Defendant-Intervenors' logistically and substantively burdensome discovery requests unrelated to the substantive APA claim are disproportionate to the needs to the case. Further pursuit of this avenue of discovery would be contrary to both Rule 1 and Rule 26 of the Federal Rules of Civil Procedure, given the fact that the case can be easily resolved through an avenue that does not require costly and burdensome discovery.

Requiring Federal Defendants to respond further to Defendant-Intervenors' discovery, even though it is not necessary for the resolution of the matter, would be diametrically opposed to the principles of the Federal Rules of Civil Procedure requiring the rules to be "construed,

administered, and employed by the court and the parties *to secure the just, speedy, and inexpensive determination of every action and proceeding*." Fed. R. Civ. P. 1 (emphasis added).

## II.     Federal Defendants have exceeded the requirements for Initial Disclosures under Federal Rules of Civil Procedure 26(a)(1).

Initial Disclosures are not required in an action for review on an administrative record under Rule 26(a)(1)(B)(i). It is well accepted among the courts that "judicial review of agency action under the APA is generally limited to review of the administrative record," *Bark v. Northrop*, 2 F. Supp. 3d 1147, 1150 (D. Or. 2014); *see also Camp v. Pitts,* 411 U.S. 138, 142 (1973) (holding "the focal point for judicial review [of an agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court."); *USA Group Loan Services, Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996) (Posner, C.J.) ("Discovery is rarely proper in the judicial review of administrative action. The court is supposed to make its decision on the basis of the administrative record, not create its own record."); *cf. also* 42 C.F.R. § 137.309 ("Jury trials and civil discovery are not permitted in APA proceedings[.]").

Notwithstanding this objection, Federal Defendants have disclosed all information they may use to support their claims or defenses as required by the rules, in light of the procedural posture of the action before the court.[5] *Cf. In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009*, 279 F.R.D. 18, 22 (D.D.C. 2011) (denying sanctions against defendant for failure to include information that was basis for plaintiff's motion for summary judgment

---

[5] As Federal Defendants have previously stated and argued in their Response to Plaintiffs' Motion for Summary Judgment, "This Court has already ruled, as a matter of law, that DACA is substantively unlawful under the APA. Federal Defendants agree.  DACA is materially indistinguishable from the DAPA and expanded DACA policies that were held substantively unlawful in *Texas*.  Plaintiffs are therefore entitled to summary judgment on their substantive APA claim…Plaintiffs are entitled to summary judgment on their substantive APA claim because the Court, guided by Fifth Circuit precedent, has already held that "DACA is 'manifestly contrary' to the statutory scheme promulgated by Congress" in the INA." Response to Tex. MSJ 7–8, ECF No. 366.

16

when it was not related to any claim or defense pled by defendant); *Adame v. Refugio County,* No. 2:16-CV-139, 2018 WL 1918656, at *3 (S.D. Tex. Apr. 24, 2018) (overruling an objection to exclusion of individual from defendant's initial disclosures because defendant never anticipated using the individual in support of their case); *see also* Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment (noting "the scope of the disclosure obligation is narrowed to cover only information that the disclosing party may use to support its position" and "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use").

If Defendant-Intervenors are unsatisfied with the individuals and documents Federal Defendants intend to rely upon in this matter, they may seek additional information through the discovery process. *See Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 590 (N.D. Tex. 2018) ("[Defendant] had the choice to obtain the documents desired by proceeding under Rule 34 or through informal requests. But there is no basis to compel compliance with Rule 26(a)(1)(A)(ii) under Rules 37(a)(3)(A) and 37(a)(4) where compliance has not been shown to be lacking.").

## III.   Sanctions and award for costs are inappropriate at this time.

Defendant-Intervenors' request for sanctions should be denied as they have not met the requirements under Federal Rules of Civil Procedure 37(d)(3) and 37(c)(1)(A). Sanctions under Rule 37(d)(3) are only permitted in the event of complete unresponsiveness to discovery requests. Fed. R. Civ. P. 37(d)(1)(A)(ii) advisory committee's note to 1970 amendment (Rule 37(d) concerns "total noncompliance").  A party may not immediately seek sanctions as a remedy for incomplete discovery responses. *See. GFI Computer Industries, Inc. v. Fry*, 476 F.2d 1, 3 (5th Cir. 1973) ("Plaintiff's remedy for incomplete . . . answers to interrogatories, and for failure to produce pursuant to a Rule 34 request, was to file a motion under Rule 37(a) . . . ");

17

*Enron Corp. Savings Plan v. Hewitt Associates, LLC,* 258 F.R.D. 149, 155 n.5 (S.D. Tex. 2009) (If a party ignores document requests under Rule 34, "he is subject to sanctions under Rule 37(d). However, if the party responds to the document requests, even if he responds by objecting, Rule 37(d) sanctions are not available."). Federal Defendants in this case have, in addition to properly objecting to Defendant-Intervenors' discovery requests, responded and supplemented those responses. Sanctions under Rule 37(c)(1)(A) are similarly inappropriate because Federal Defendants at this time have not failed to disclose any additional documents or witnesses upon which it may use to support its claims or defenses beyond what it already has. *See* Fed. R. Civ. P. 26(a); Ex. D (US Initial Disclosures).

Even if this Court were to grant Defendant-Intervenors' Motion, costs or attorney fees should not be awarded under Rule 37(a)(4) "if the objections were substantially justified." *Smith v. Conway Organization*, *Inc.*, 154 F.R.D. 73, 78 (S.D.N.Y 1994) (citing Fed. R. Civ. P. 37(a)(4)(A)). Here, Federal Defendants answered and objected to Defendant-Intervenors' discovery requests in accordance with the Court's Order, ECF No. 97, and provided an affidavit supporting its individualized and specific objections of undue burden. *See* Ex. A; Defendant-Intervenors' Mot. Compel Ex. 1.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant-Intervenors' Motion to

Compel and issue a protective order staying any additional discovery from Federal Defendants

until after the Court has ruled on Plaintiffs' Motion for Summary Judgment.

|  | Respectfully submitted, |
|---|---|
| Dated: June 7, 2019 | */s/ Jeffrey S. Robins* |
|  |  |
| JOSEPH H. HUNT | JEFFREY S. ROBINS |
| Assistant Attorney General | Attorney-in-Charge |
| Civil Division | Deputy Director |
|  | U.S. Department of Justice, Civil Division |
| WILLIAM C. PEACHEY | Office of Immigration Litigation |
| Director, Office of Immigration Litigation | District Court Section |
| District Court Section | P.O. Box 868, Washington, DC 20044 |
|  | Telephone: (202) 616-1246 |
|  | Facsimile: (202) 305-7000 |
|  | jeffrey.robins@usdoj.gov |
|  |  |
| Attorneys for Federal Defendants |  |

**CERTIFICATE OF SERVICE**

I certify that on June 7, 2019, this document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notifications of such filings to all counsel of record.

/s/ Jeffrey S. Robins
JEFFREY S. ROBINS

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

## DECLARATION OF TRACY L. RENAUD

I, Tracy L. Renaud, hereby make the following declaration with respect to the above captioned matter.

1.  I am the Acting Deputy Director of U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security. I began serving as the Acting Deputy Director on March 5, 2018. I also formerly served as the Acting Deputy Director of USCIS between January and October 2017.

2.  As the Acting Deputy Director of USCIS, I am responsible, along with the Director, for overseeing approximately 19,000 federal employees and contractors, handling approximately 26,000 immigration benefit applications, petitions, and other requests on an average day.

1

3. Prior to March 2018, I served as the Associate Director of the Management Directorate within USCIS.

4. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

**Limitations on Information Captured in USCIS Databases**

5. USCIS began accepting initial DACA requests on August 15, 2012, and began accepting DACA renewal requests on June 4, 2014.

6. The Computer Linked Application Information Management System (CLAIMS 3) and the Electronic Immigration System (ELIS) are electronic case management systems that USCIS uses to process certain immigration requests. From the inception of the DACA policy in 2012 until November 2015, all DACA requests were manually data entered into and processed in CLAIMS 3. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixupdate-may2018.pdf.   On November 1, 2015, USCIS began ingesting some DACA requests in ELIS.  In February 2016, USCIS transitioned to ELIS for the ingesting and processing of all newly filed DACA requests.  *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixupdate-may2018.pdf.

7. Based on its ordinary business practices, USCIS maintains electronic and/or paper copies of its initial and renewal DACA decisions and its Requests for Evidence (RFEs) in DACA cases.  However, USCIS' case management systems do not electronically capture the underlying basis (bases) for denial of an initial or renewal DACA request or the basis (bases)

on which a Request for Evidence (RFE) was sent, in a manner that can be systematically and reliably obtained.

8.  Individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests (approximately 17,000 denied initial requests and approximately 2,000 denied renewal requests from Plaintiff States) to determine the underlying basis (bases) for the denials would be a highly burdensome undertaking.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision. For each case requiring paper A-file review, many variables would impact the time it would take for the A-file to be transferred to an officer for review, including the current location of the A-file and whether it is in use by another DHS component or another USCIS office. Assuming most paper A-files that would be needed for this review are located at USCIS' National Records Center (NRC) and not otherwise currently needed by another DHS component or USCIS office, USCIS estimates that it would take approximately 15 business days from the date the A-file is requested, to the date it is received by an officer for review. USCIS further estimates that manual review of a paper A-file or electronic record to determine the underlying basis for denial, including an assessment of the evidence upon which the officer made the denial determination, would take approximately 20 minutes per case.   Therefore, USCIS estimates that individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests would take more than approximately 6,300 hours to complete.

9.  Individual case-by-case review of the electronic and/or paper copies of the Requests for Evidence (RFEs) sent for over approximately 60,100 initial and renewal DACA requests (approximately 50,600 initial requests received RFEs and approximately 9,500 renewal

requests received RFEs) to determine the basis (bases) for sending the RFE would also be an unduly burdensome undertaking. USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE, in order to determine the basis (bases) on which the RFE was sent. To conduct this case-by-case electronic review for approximately 60,100 requests would take more than approximately 5,008 hours to complete. Not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.

10. A response to Part 3, Question 4 on the Form I-821D is not required in order for USCIS to accept and process the Form I-821D. USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012. A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D. The three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status". Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations. Additionally, CLAIMS 3 does not electronically capture the standard, dropdown, responses to Part 3, Question 4, on the Form I-821D, and ELIS does not capture this information in a complete manner. Accordingly, individual, case-by-case review would be necessary to obtain this information.

11. Individual case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for over approximately 156,000 requests to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of approximately 26,000 hours.  For any cases that require paper review of the original Form I-821D, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

12. USCIS databases do not electronically capture the underlying statutory basis for which an individual is eligible for adjustment of status to lawful permanent residence in a manner that can be systematically obtained.

13. USCIS estimates that individual case-by-case review of the electronic and/or paper records of more than approximately 7,000 individuals to determine the underlying statutory eligibility basis for adjustment of status to lawful permanent residence would take approximately five minutes per case, for a total of approximately 583 hours to complete.  While it is possible some of the records for these cases have been digitized and therefore the records could be requested and obtained electronically for review quickly, additional time would be required to obtain the paper A-file for cases that have not been digitized. For paper A-files that need to be transferred to an officer for review, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

14. Individual case-by-case review of electronic or paper records would require the diversion of officers and employees from other mission critical work. To the extent officers would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer, which may take considerable time as such files are frequently in use by other DHS officers, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.

15. Many of the officers who would have to manually review the electronic and paper records on each case to determine the reasons for denial, RFE, or the responses selected on the Form I-821D to Part 3, Question 4 and 5a, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures. Those ongoing operations would be significantly and detrimentally affected if adjudicators were diverted to work on this burdensome discovery.

**Burden of Document Collection**

16. USCIS has identified more than approximately 65 potential non-attorney custodians throughout the agency in numerous components and directorates, including Service Center Operations (SCOPS), the Office of Intake and Document Production (OIDP), the Fraud Detection and National Security Directorate (FDNS), the Field Office Directorate (FOD), the Office of Policy & Strategy (OP&S), the Office of Public Affairs (OPA),  the Office of Management Executive Secretariat (Exec Sec), the External Affairs Directorate (EXA), and the Office of Legislative and Intergovernmental Affairs (OLIA).  USCIS has identified an additional approximately 59 potential custodians who are current agency counsel in the USCIS Office of the Chief Counsel.  USCIS has also identified at least 12 potential

custodians who are no longer employees of USCIS, approximately 8 of whom were former agency counsel.

17. Due to multiple unknown variables involved, the USCIS Office of Information Technology (OIT) is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of current and former USCIS employees.  This type of comprehensive collection requires, at a minimum, the following steps:

Step 1:    Searching of user archives using search terms and six-year data range.  In order to search from 2012 to 2018 requires OIT to query every user archive for base searches to ensure the most complete results;

Step 2:    Accepting the results;

Step 3:    Deduplication and exporting the results to a server;

Step 4:    Transferring the files from the initial server to a forensic server;

Step 5:    Replicating the files to a second forensic server;

Step 6:    Replicating the files onto an encrypted DOJ hard drive.

18. OIT estimates that Step 1 could take approximately 6 to 8 hours per custodian to complete, due to the number of archives that would need to be searched to cover the six year time frame.  In order not to inadvertently exclude potentially responsive documents, the keywords selected for searching emails would be so broad, *e.g.,* "DACA" or "deferred action," that they would likely result in an enormous volume in the hundreds of thousands of documents. Due to server limitations, OIT can run no more than 4 custodian searches simultaneously. Accordingly, OIT estimates that it would take approximately 204 to 272 hours to complete Step 1 for 136 custodians.

19. The time estimate for completing Step 2 is impossible to reliably determine due to the unknown volume of results.  At a minimum, OIT estimates that accepting the results could take approximately an hour per search, or approximately 136 hours for 136 custodians.

20. Likewise, the time estimate for completing Step 3 is impossible to reliably determine.   Due to software limitations, OIT can export no more than four sets of files at a time across the entire application.  Files are queued for export on a first in, first out basis, so if exports are already being run for other cases, the files for this case would be placed at the end of the queue, and therefore the exporting process for this case would be slowed significantly depending on the volume of files queued for export in other cases. A high volume of exports for this case would likewise significantly negatively impact OIT's ability to effectively comply with discovery requests in other USCIS litigation. Due to the large potential archive list, broad date range, and possible number of duplicates, OIT estimates that Step 3 would take approximately 1.5 hours per custodian to complete, or approximately 204 hours for 136 custodians.

21. It is also impossible to reliably estimate the time burden for completing Steps 4 through 6 as the burden entirely depends on the number of file results that remain after deduplication. Each transfer and replication step takes approximately 15 minutes per 1.5 GB to complete. If only 1.5 GB of email data per custodian remained after deduplication, it would take approximately 45 minutes per custodian to complete Steps 4 through 6, or approximately 102 hours for 136 custodians.  However, in light of the six year date range of the discovery requests and the broad search terms that would need to be used to conduct the search, 1.5GB is a very low benchmark for this calculation. It is likely that many custodians would have three to four times as much data to be transferred.

22. This overall estimate of approximately 493 to 561 hours to complete email searches and data transfers for 136 custodians is an exceedingly low estimate that assumes near perfect technological processing at every step.  Due to the high likelihood that custodians would have significantly more data to be transferred than the 1.5GB benchmark used above, as well as the high likelihood that data transfer speed would not be perfect, it is likely that the total time required to complete a search, collection, and transfer of this magnitude and complexity would be at least three to four times the number of hours indicated above.

23. Additionally, USCIS is not able to recover with 100% accuracy all emails that were sent or received prior to August 16, 2014.  Prior to this date, emails were maintained in individual user records, rather than through journaling on a server.  Therefore, emails sent or received prior to August 16, 2014, which were deleted by an individual user, may be unrecoverable. In limited circumstances, deleted emails sent or received prior to August 16, 2016, may be recoverable if captured in the individual's archive or in another user's archive, but it can be very burdensome and time consuming to retrieve emails from individual user archives depending on where the archives are located. Deleted emails sent or received prior to August 16, 2016, may also be recoverable if captured on USCIS email backup tapes before the email was deleted, however the process to restore back-up tapes is unduly burdensome, expensive, and would take information technology staff resources away from their core mission. Accessing these emails would require approximately 250 to 575 hours of active work per email account, plus additional time in transit from the storage site to the work site.

24. Documents only maintained locally on a former employee's hard drive cannot be recovered if the computer has been reimaged and reissued to another user.  Documents maintained on a former employee's share drive may be recovered if the share drive data was maintained on

the local office's server.  The burden of retrieving data from both current and former

employees' personal share drive and/or local drive, and transferring this data to the

Department of Justice (DOJ), and the burden of reviewing these records for responsiveness

and privileges, depends entirely on the amount of data obtained.  Due to limitations in OIT's

ability to search within all types of data files for keywords, entire contents of folders

containing any files with relevant keywords would generally need to be extracted.  This

method typically results in significantly large amounts of data to be obtained, transferred to

DOJ, and reviewed for responsiveness and privileges.  OIT estimates that it would take a

minimum of 2 hours to complete each data transfer per custodian to USCIS' forensic server,

another 2 hours per custodian to transfer the data to the second forensic server, and an

additional 2 hours per custodian to transfer the data to an encrypted DOJ hard drive.  Four

searches and collections of this non-email data can be run simultaneously, therefore, OIT

estimates that it would take a minimum of approximately 204 hours to complete this

collection and transfer for 136 custodians.  This estimate would increase if custodians stored

potentially responsive records in multiple locations, such that OIT would need to extract

folders from both a personal share drive and a local drive.

25. If each of the approximately 65 non-agency counsel custodians were to individually attempt

to conduct comprehensive searches of his or her own emails and non-email records to locate

all responsive records, USCIS estimates that it would take more than approximately 6,000

hours combined just to locate and segregate the responsive records, not including the time for

transferring large amounts of data to the Department of Justice (DOJ), and the time for

review of the documents for responsiveness and privileges by agency counsel.  This time

burden would increase significantly if an additional approximately 59 agency counsel

custodians were to individually attempt to conduct comprehensive email searches of his or her own emails and non-email records to locate all responsive records.  Individual searches by each custodian would require the diversion of officers and employees from other mission critical work.

26. All the time burden estimates regarding email and non-email record collection would increase if additional custodians are identified.

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 6th day of July of 2018.

_Tracy L. Renaud_
Tracy L. Renaud

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KIRSTJEN M. NIELSEN, *et al.*, <br><br> Defendants, <br><br> *and* <br><br> KARLA PEREZ, *et al.*, <br><br> Defendant-Intervenors. | Case No. 18-cv-00068 |

## DECLARATION OF DONALD J. MONICA

I, Donald J. Monica, hereby make the following declaration with respect to the above captioned matter.

1. I am employed by the Department of Homeland Security ("DHS") as the Adjudications Branch Division Chief for the Service Center Operations Directorate (SCOPS) within U.S. Citizenship and Immigration Services (USCIS). I have been in the Division Chief position since March 31, 2019. I have been employed by USCIS and its predecessor agency, the Immigration and Naturalization Service, since May 1980. As the Adjudications Branch Division Chief, I oversee all planning, management, and operational functions of the Division, including providing guidance for the review and decision making process for Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

1

2.  I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

3.  I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4.  I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5.  I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6.  I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

7.  All estimates provided below are based on best-case scenarios, assuming no unusual situations or circumstances arise.

**Burdens of Collecting and Manually Reviewing Records to Obtain Data Sought in Interrogatories Nos. 9-13 and Documents Sought in Request for Production 7(3)**

8.  Paragraphs 5-7 of the Declaration of Tracy Renaud, dated July 6, 2018, ("Renaud Decl.") explain the manual file review that would be required for USCIS to respond to the subparts of Interrogatories Nos. 9-12 and to Interrogatory No. 13 (except for responses to Part 3, Question 5a for cases processed in the USCIS Electronic Immigration System (ELIS)),

2

because USCIS' case management systems do not electronically capture the data Defendant-Intervenors seek in the normal course of business in a manner that can be reliably provided. Paragraphs 8-11 of the Renaud Decl. further detail the extraordinary time burden that would be necessary to conduct a manual file review of hundreds of thousands of records, and Paragraphs 16-26 detail the significant burden involved to conduct a comprehensive search for documents responsive to Request for Production No. 7(3), as the request is not conducive to a narrowly tailored keyword search. The approximate total number of requests to be reviewed and total estimated time burdens have been updated below to include the addition of Plaintiff State Mississippi.

9. For purposes of determining the basis (bases) for initial or renewal DACA denial (Interrogatories Nos. 9-10) from each Plaintiff State between June 2012 and June 2018, USCIS would need to gather records from the Alien File (A-file), the ELIS database, and/or any relevant systems information, including but not limited to emails on adjudicative guidance in Outlook, notices and correspondence in the Enterprise Correspondence Handling Online (ECHO) system, and records from TECS, EARM, and/or EAGLE. USCIS would then need to identify whether any of the A-files for the selected individuals are in electronic format and accessible in agency systems, such as the Enterprise Document Management System A-file repository (EDMS), and determine the location of the paper A-file for all others, because they will reside at different locations throughout the country. Not all A-files will be immediately available to USCIS for purposes of this review as they may be in use by other DHS components or other USCIS offices. Individual, manual case-by-case review of the electronic and/or paper records for approximately 19,730 denied DACA requests (approximately 17,582 denied initial requests and approximately 2,148 denied renewal

requests for Plaintiff States from June 2012 to June 2018) to determine the underlying basis (bases) for the denials and whether the request was denied "at least in part because the applicant was a suspected gang member[,] . . . posed a threat to national security or public safety[,]" or was denied "after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum[,]" would be a highly burdensome undertaking.

10. Furthermore, the bases for denial identified in Interrogatories Nos. 9-10 are not necessarily mutually exclusive and/or conducive to clear categorization.  For example, generally an individual who is a suspected gang member may also be considered to pose a threat to public safety.  Additionally, a suspected gang member with disqualifying convictions may have been issued a denial notice referencing the disqualifying convictions. Accordingly, it will likely be difficult to reconstruct and consistently determine all the applicable reasons an officer denied a request a year or more after the adjudication. Case-by-case review to answer these questions may also require further consultation with the adjudicator who rendered the decision, who may not be available for consultation and/or may not recall the specific adjudication.

11. For each case requiring paper A-file review, USCIS would need to first determine the location of the paper A-file, because A-files will reside at different locations throughout the country and each A-file would need to be manually requested for transfer. Many variables would impact the time it would take for the A-file to be transferred to an officer for review, including the current location of the A-file and whether it is in use by another DHS component or another USCIS office. If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months.

Assuming most paper A-files that would be needed for this review are located at USCIS'
National Records Center (NRC) and not otherwise currently needed by another DHS
component or USCIS office, USCIS estimates that it would take approximately 15 business
days from the date the A-file is requested, to the date it is received by a USCIS officer for
review.

12. USCIS further estimates that once all relevant information is gathered, electronically and/or
physically, including from relevant systems, and the record is before the officer conducting
the review, manual review of the paper A-file and/or electronic record to determine the
underlying basis (bases) for denial, including an assessment of the evidence upon which the
officer made the denial determination, would take anywhere from approximately 20 to 90
minutes per case, depending on the complexity of the case and the volume of the record.
Therefore, USCIS estimates that individual case-by-case review of the electronic and/or
paper files for over approximately 19,730 DACA requests could take anywhere between
approximately 6,577 hours and 9,866 hours to complete.

13. For purposes of determining the basis (bases) for an initial or renewal Request for Evidence
(RFE) (Interrogatories Nos. 11-12), USCIS would need to access a copy of the RFE. If the
RFE was created in ECHO, an officer would access an electronic copy and confirm in ELIS
or CLAIMS 3 that the notice was issued and mailed. Individual case-by-case review of the
electronic and/or paper copies of the RFEs sent for approximately 60,853 initial and renewal
DACA requests (approximately 51,283 initial requests received RFEs and approximately
9,570 renewal requests received RFEs for Plaintiff States from June 2012 to June 2018) to
determine the basis (bases) for sending the RFE would also be an unduly burdensome
undertaking.  USCIS estimates that it would take approximately five minutes per case to

retrieve and review an electronic-copy of the RFE, in order to determine the basis (bases) on which the RFE was sent.  To conduct this case-by-case electronic review for approximately 60,853 requests would take more than approximately 5,071 hours to complete.  However, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.  USCIS is not able to estimate the number of RFEs that are not electronically available and therefore is not able to estimate the number of physical A-files that would need to be retrieved and reviewed, however the steps and time burden described in Paragraph 11 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply.

14. As explained in Paragraph 10 of the Renaud Decl., a response to Part 3, Question 4 on the Form I-821D (Interrogatory 13) is not required in order for USCIS to accept and process the Form I-821D.  USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012.  A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D.  The three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status".  Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations.  CLAIMS 3 does not electronically capture the standard, dropdown responses to Part 3, Question 4, on the

6

Form I-821D, and ELIS does not systematically capture this data in a manner that can be reliably provided.  Additionally, as explained in Note 2 of the Chart previously provided in response to Interrogatory No. 13, CLAIMS 3 does not electronically record the response to Part 3, Question 5a; only cases processed in ELIS contain this information electronically. Accordingly, manual, individual, case-by-case review would be necessary to obtain this information.

15. For purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for approvals processed in ELIS and CLAIMS 3, and Part 3, Question 5a for approvals processed in CLAIMS 3, USCIS would need to review the individual case in ELIS, access a copy of the Form I-821D retained in the EDMS database, or locate and review the paper Form I-821D in the A-file if not available elsewhere.  Individual case-by-case review of ELIS records, a digitized version of the Form I-821D, or the original paper version of the Form I-821D, for approximately 157,763 approved requests to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of approximately 26,294 hours. For any cases that require paper review of the original Form I-821D, USCIS would need to first determine the location of the paper A-file, because A-files will reside at different locations throughout the country and each A-file would need to be manually requested for transfer. USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office. USCIS is not able

to estimate the number of cases for which an electronic copy of the Form I-821D would not be available.

16. Individual case-by-case review of electronic and/or paper records to extract the data sought in Interrogatories Nos. 9-13 would require the diversion of officers and employees from other mission critical work. To the extent officers/employees would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer/employee, which may take considerable time as such files are frequently in use by other DHS offices, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.  USCIS may not be able to obtain certain A-files if they are actively in use by another office, which may make the review necessary to determine the basis (bases) for denial or RFE nearly impossible.

17. Many of the officers/employees who would have to manually review the electronic and/or paper records on each case to determine the reasons for denial, RFE, or the responses selected on the Form I-821D to Part 3, Questions 4 and 5a, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures, as these individuals are most familiar with the Form I-821D and the DACA adjudications process. Those ongoing operations would be significantly and detrimentally affected if adjudicators were diverted to work on this burdensome discovery, with the potential to significantly negatively impact and delay the adjudication of DACA requests, which could lead to other burdensome litigation against USCIS.

**Burdens of Identifying, Collecting, Converting, Reviewing, and Redacting a Sample of Denials, RFEs, and Approvals for Production to Defendant-Intervenors**

18. As explained in the Declaration of Michael Hoefer (Hoefer Decl.), dated June 7, 2019, in order to obtain a sample of DACA denials, RFEs, and approvals for purposes of responding to Interrogatories Nos. 9-13, USCIS' Office of Performance and Quality ("OPQ") would first identify a sample of 1,960 receipt numbers across the five Interrogatory categories.

19. As explained in Paragraphs 9-12 above, for purposes of determining the basis (bases) for denial of a sampling of initial and renewal DACA denials and whether the request was denied "at least in part because the applicant was a suspected gang member[,] . . . posed a threat to national security or public safety[,]" or was denied "after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum[,]" (Interrogatories Nos. 9-10), USCIS would need to gather records from the A-file, the ELIS database, and/or any relevant systems information, including but not limited to emails on adjudicative guidance in Outlook, notices and correspondence in ECHO, and records from TECS, EARM, and/or EAGLE. USCIS would then need to identify whether any of the A-files for the selected individuals are in electronic format and accessible in agency systems, such as the EDMS A-file repository, and determine the location of the paper A-file for all others, because they will reside at different locations throughout the country. Not all A-files will be immediately available to USCIS for purposes of this review as they may be in use by other DHS components or other USCIS offices. USCIS would either need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number. As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample. As explained in the Declaration

9

of Tracy A. Bellisime (Bellisime Decl.), dated June 7, 2019, available physical A-Files and Temporary A-Files (T-files) that are not digitized will need to be shipped to a central location where they can be scanned and saved electronically. ELIS records and relevant systems information would also need to be accessed, exported, and saved electronically.

20. As explained in Paragraph 13 above, for purposes of determining the basis (bases) for an initial or renewal RFE (Interrogatories Nos. 11-12), for each receipt number selected for the sampling, USCIS would need to access a copy of the RFE. If the RFE was created in ECHO, an officer would need to access an electronic copy and confirm in ELIS or CLAIMS 3 that the notice was issued and mailed. If USCIS systems confirm the notice was mailed, USCIS would need to save an electronic copy of the RFE from ECHO into a central location. However, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed. As explained in the Bellisime Decl., available physical A-Files and Temporary A-Files (T-Files) that are not digitized will need to be shipped to a central location where they can be scanned and saved electronically.

21. As explained in Paragraph 14 above, for purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for cases processed in ELIS and CLAIMS 3, and Part 3, Question 5a for cases processed in CLAIMS 3, for each receipt number selected for the sampling (Interrogatory 13), USCIS would need to export information on the individual case from ELIS or access a copy of the Form I-821D in EDMS and save an electronic copy of the records into a central location, or locate the A-file and transfer the A-file to the NRC to scan the paper copy of the Form I-821D (if available).

22. As explained in the Bellisime Decl., the scanned version of the A-files and/or Form I-821D, will need to be electronically saved to a central location in order to be transferred to the Department of Justice (DOJ) on an encrypted drive for loading into DOJ's document review platform.  Additionally, a copy of all other relevant electronic records from ELIS, EDMS, ECHO, TECS, EARM, EAGLE and/or other relevant systems will need to be electronically saved to a central location and transferred to DOJ.

23. Because USCIS will need to redact law enforcement sensitive, law enforcement privileged, and other privileged or protected information before providing any records to Defendant-Intervenors, *see* Bellisime Decl., in many cases Defendant-Intervenors will likely be unable to determine whether an initial or renewal DACA request was denied at least in part because the requestor was a suspected gang member or at least in part because the requestor posed a threat to national security or public safety.   The denial notice generally will not explicitly state that the individual is a suspected gang member or poses a threat to national security or public safety due to the relevant information being law enforcement sensitive and/or law enforcement privileged.  Accordingly, providing a sampling of cases to Defendant-Intervenors to review would not necessarily enable them to extract the information they seek regarding denials.

**Burdens of Identifying and Reviewing a Sample of Denials, RFEs, and Approvals for USCIS to Obtain Data Sought in Interrogatories Nos. 9-13**

24. The burden and process for identifying the sample would be the same as described in the Hoefer Decl., without the added step of replacing any cases covered by 8 U.S.C. 1367.

25. The process and per case time burden for collection and review of the relevant A-files and other records for the sample would be the same as described in Paragraphs 9-16 above for

purposes of identifying and reviewing a sample of cases to obtain the data sought in Interrogatories Nos. 9-13.

26. For purposes of determining the basis (bases) for denial for a sampling of initial and renewal DACA denials (Interrogatories Nos. 9-10), USCIS estimates that once all relevant information is gathered, electronically and/or physically, including from relevant systems, and the record is before the officer conducting the review, manual review of the paper A-file or electronic record to determine the underlying basis (bases) for denial, including an assessment of the evidence upon which the officer made the denial determination, would take anywhere from approximately 20 to 90 minutes per case, depending on the complexity of the case and the volume of the record.  Therefore, USCIS estimates that individual case-by-case review of the electronic and/or paper files for a sample size of 750 cases (400 initial denials (2.3%) and 350 renewal denials (16.3%)), *see* Hoefer Decl., could take anywhere between approximately 250 hours and 1,125 hours to complete. These approximately 250 to 1,125 hours would be in addition to the estimated approximately 15 business days it would take from the date an A-file is requested to the date it is received by an officer for review, assuming the file is located at the NRC and not in use by another DHS component or USCIS office.  If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number.  As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample.

27. For purposes of determining the basis (bases) on which the RFE was sent for a sampling of initial and renewal RFEs (Interrogatories Nos. 11-12), USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE. To conduct this case-by-case electronic review for a sample size of 800 cases (410 initial RFEs (0.8%) and 390 renewal RFEs (4.1%), *see* Hoefer Decl., would take more than approximately 66 hours to complete. As noted in Paragraph 13 above, however, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed. USCIS is not able to estimate the number of RFEs that are not electronically available and therefore is not able to estimate the number of physical A-files that would need to be retrieved and reviewed, however the steps and time burden described in Paragraph 11 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply.

28. For purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for approvals processed in ELIS and CLAIMS 3, and Part 3, Question 5a for approvals processed in CLAIMS 3 for a sampling of approvals (Interrogatory 13), USCIS estimates that individual case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D would take approximately 10 minutes per case. To conduct this case-by-case electronic review for a sample size of 410 cases (0.03%), *see* Hoefer Decl., would take more than approximately 68 hours to complete. As described in Paragraph 15 above, for any cases that require paper review of the original Form I-821D, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC

13

and not otherwise currently needed by another DHS component or USCIS office. If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number.  As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample. USCIS is not able to estimate the number of cases for which an electronic copy of the Form I-821D would not be available.

29. As described in Paragraphs 11-12 above, this type of manual file review, even for a sample of cases, would likely require the diversion of significant resources from other mission critical work, with the potential to significantly negatively impact and delay the adjudication of DACA requests, which could lead to other burdensome litigation against USCIS.

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this ⁷th day of J∪N∈ of 2019.

Donald J. Monica

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

## DECLARATION OF MICHAEL HOEFER

I, Michael Hoefer, hereby make the following declaration with respect to the above captioned matter.

1. I am employed by U.S. Citizenship and Immigration Services ("USCIS") as Chief of the Office of Performance and Quality ("OPQ"). As Chief of OPQ, I am responsible for oversight and management in producing data and operational analyses to senior USCIS decision-makers in order to promote effective and efficient decision-making, and in responding to immigration data requests from key stakeholders including Congress, DHS, other government agencies, researchers, and the general public. I have held this position since September 2015.

1

2. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

3. I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4. I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5. I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6. I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

**<u>Identifying a Sample of DACA Denials, Requests for Evidence, and Approvals to Respond to Interrogatories Nos. 9-13</u>**

7. In order to obtain a sample of DACA denials, Requests for Evidence (RFEs), and approvals for purposes of responding to Interrogatories Nos. 9-13, OPQ would first have to identify a sample of receipt numbers, using a statistically sound methodology designed to randomly select receipt numbers, for each of the following categories of cases for the period of June 2012 to June 2018 for Plaintiff States: initial DACA denials (Interrogatory 9), DACA renewal denials (Interrogatory 10), initial DACA RFEs (Interrogatory 11), DACA renewal

RFEs (Interrogatory 12), and initial DACA approvals (Interrogatory 13). The preliminary

estimates of the five sample sizes for each Interrogatory are: initial DACA denials

(Interrogatory 9) 400 or 2.3% of the total initial denials during the specified period for

Plaintiff States; DACA renewal denials (Interrogatory 10) 350 or 16.3%; initial DACA RFEs

(Interrogatory 11) 410 or 0.8%; DACA renewal RFEs (Interrogatory 12) 390 or 4.1%; and

initial DACA approvals (Interrogatory 13) 410 or 0.3%.  The total number of sample records

for the five populations is estimated to be 1,960.

8.  The sample size estimates were calculated for proportions assuming the 95% confidence

level and a precision of +/- 5% using the normal approximation and finite population

correction factors.  However, some of the characteristics of the DACA population that

Defendant-Intervenors are attempting to measure could be rare (less than 30 receipts for any

measured characteristic) and would not follow the normal approximation for variance

estimation.  As a result, the value of any conclusions about the broader population derived

from a review of these samples may be limited due to the imprecision of the estimate.

9.  Once the initial sample of randomly selected receipt numbers are identified, USCIS would

need to identify whether any of the individuals selected are covered by 8 U.S.C. 1367.  If any

randomly selected individuals are covered by this confidentiality provision, USCIS would

not be able to provide the A-file or any other information about those individuals to

Defendant-Intervenors, and would instead replace the receipt number in the sample with

another randomly selected receipt number. Replacing the receipt number in the sample

because the individual is covered by 8 U.S.C. 1367 or because the A-file selected for the

sample cannot be immediately released for review has the potential to impact the overall

randomness of the sample.

10. Based on past experience, USCIS estimates that it would take approximately 16 hours to identify the sample of cases for each category, identify whether any of the individuals are covered by 8 U.S.C. 1367, and replace the receipt numbers for affected individuals with another randomly selected receipt number.  This estimate is based on a best-case scenario, assuming no unusual situations or circumstances arise.

11. It would not be possible to reduce the number of individual records to be reviewed by selecting a sample that would allow a single file to be reviewed for multiple interrogatories, as this type of selection would violate the random selection process and all the estimates would be invalid.

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this $7$ th day of June of 2019.


Michael Hoefer

# Exhibit D

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

## <u>DECLARATION OF TRACY A. BELLISIME</u>

I, Tracy A. Bellisime, hereby make the following declaration with respect to the above captioned matter.

1. I am the Associate Center Director for the Records Management Operations Branch (RMOB), National Records Center (NRC) for U.S. Citizenship and Immigrations Services (USCIS).  I have held this position since November of 2017.  In this position, I oversee the contract performance for the records contract for the NRC.   This includes file movement, maintenance and scanning.

2. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

1

3. I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4. I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5. I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6. I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

### Burdens of Collecting, Consolidating, and Scanning Alien Files

7. In order to produce copies of Alien Files (A-files) and paper Form I-821Ds to Defendant-Intervenors, available physical A-files and Temporary A-files (T-files) that have not been digitized will need to be shipped to a central location where they can be consolidated, scanned, and saved electronically.

8. The most efficient process for collecting, consolidating, and scanning physical A-files, T-files, and paper Form I-821Ds would be to utilize the facilities, equipment, and personnel available at the NRC in Lee's Summit, MO. Among other duties, the NRC stores over 16 million inactive A-files, and processes and responds to Freedom of Information Act requests.

2

Because of its record-keeping function, the NRC is best positioned to collect, consolidate, and scan a sampling of records.  Based on experience, USCIS estimates that it takes approximately sixty minutes to pull, consolidate, prep, scan, and re-shelve an average-sized A-file.  If the file is located at the NRC, the cost to do so would be approximately $42.41 per file. For files that are not located at the NRC, the cost increases by an additional $25.00 to cover shipping costs. These estimates are based on a best-case scenario, assuming no unusual situations or circumstances arise. Additional resources may be needed or diverted from existing priorities in order to accomplish this scanning effort, depending on the file request volume.

9.  An A-file serves as the official record of an individual's immigration history. *See also* DHS/USCIS-ICE-CBP-001 Alien File, Index, and National File Tracking System of Records, 82 Fed. Reg. 43556, 43557 (Sept. 18, 2017) (A-Files contain documents derived from the three immigration components of DHS: USCIS, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP")). *Id.* A-files also contain information that originates elsewhere within DHS and outside of DHS.

10. A-Files generally contain information that is subject to law enforcement and other privileges. For instance, the results of background checks contained in the A-file are often law enforcement privileged. Required security checks that may be reflected in the A-file include checks of information originating with, or databases operated by the Federal Bureau of Investigation (FBI fingerprint check) and CBP (TECS). Information contained within CBP's TECS database may contain derogatory information that originates with yet other agencies, such as, but not limited to, ICE, the Transportation Security Administration, FBI, or the Department of State. Pages from additional databases, such as the Consolidated Consular

Database (operated by the Department of State), or Student and Exchange Visitor Information System (operated by ICE) are often contained in A-Files. A-Files may also contain pages that originate with other agencies depending on how that individual entered the United States. A-Files may also include discussions, communications, and deliberations that are privileged, including those with agency counsel.

11. Once the consolidated A-files and/or paper Form I-821Ds are consolidated and scanned at the NRC, the scanned versions will need to be electronically saved to a central location in order to be transferred to the Department of Justice (DOJ) on an encrypted drive for loading into DOJ's document review platform.

12. Before production to Defendant-Intervenors, the sampling of A-files and other records would need to be reviewed by government counsel in DOJ's document review platform and redacted for privileges, personally identifiable information (PII), and other protected information, including information affecting equities and privileges of other agencies as well as information protected by various confidentiality statutes and regulations. Such privilege review will be a resource-intensive and time-consuming process for USCIS and other agencies whose documents and information may be included in the A-file and therefore would require review by counsel for other agencies.

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 7 th day of June of 2019.


Tracy A. Bellisime